## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS CORP.
and MES INC.,

        **Plaintiffs,**

  v.

VISTA ENERGY CORP., et al.,

        **Defendants.**

C.A. No. 1:19-cv-01334-RGA

**JURY TRIAL DEMANDED**

**PLAINTIFFS MIDWEST ENERGY EMISSIONS CORP. AND MES INC.'S
CONSOLIDATED RESPONSE IN OPPOSITION TO THE MOTIONS TO DISMISS
FILED BY THE CHEM-MOD, AJG, DTE, CERT AND OTHER RC DEFENDANTS**

Dated: October 15, 2019

DEVLIN LAW FIRM LLC
James M. Lennon (No. 4570)
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
jlennon@devlinlawfirm.com

**CALDWELL CASSADY CURRY PC**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Phone: (214) 888-4848
(214) 888-4849 (*fax*)
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
jnemunaitis@caldwellcc.com

Bradley W. Caldwell
Texas Bar No. 24040630
Jason D. Cassady
Texas Bar No. 24045625
John Austin Curry
Texas Bar No. 24059636
Justin T. Nemunaitis
Texas Bar No. 24065815

*Attorneys for Plaintiffs
Midwest Energy Emissions Corp.
and MES Inc.*

## TABLE OF CONTENTS

I.   NATURE AND STAGE OF THE PROCEEDINGS .......................................................1

II.  SUMMARY OF THE ARGUMENT ..........................................................................1

    A.   ME2C Adequately Pled Induced Infringement ...................................................1

    B.   ME2C Adequately Pled Contributory Infringement.............................................2

    C.   ME2C Has Adequately Pled the Knowledge Requirement for Indirect
        Infringement. .........................................................................................2

    D.   ME2C Has Adequately Pled Willful Infringement.............................................2

    E.   ME2C Has Adequately Pled Joint Infringement. ...............................................3

III. STATEMENT OF FACTS ........................................................................................3

    A.   The EPA's Call for New Mercury Capture Technologies Leads to the
        Development of the Patented Technology. ..........................................................3

    B.   Overview of the Patented Technology................................................................4

    C.   The RC Defendants Use the Patented Technology to Obtain Hundreds
        of Millions of Dollars in Federal Tax Credits. ..................................................5

IV.  LEGAL STANDARD ..............................................................................................7

V.   ARGUMENT ...........................................................................................................7

    A.   ME2C Has Adequately Pled Induced Infringement. ............................................7

    B.   ME2C Has Adequately Pled Contributory Infringement....................................10

    C.   ME2C Has Adequately Pled the Knowledge Requirement for Indirect
        Infringement. .......................................................................................13

    D.   ME2C Has Adequately Pled Willful Infringement............................................16

    E.   ME2C Has Adequately Pled Joint Infringement. ..............................................16

VI.  CONCLUSION ......................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..........................................................................................7, 17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .............................................................................................7

*BioMerieux, S.A. v. Hologic, Inc.,*
    No. CV 18-21 (LPS), 2018 WL 4603267 (D. Del. Sept. 25, 2018)...................14, 15

*Collabo Innovations, Inc. v. Omnivision Techs., Inc.,*
    No. CV 16-197-SLR-SRF, 2017 WL 374484 (D. Del. Jan. 25, 2017) ...................13

*Disc Disease Solutions Inc. v. VGH Solutions, Inc.,*
    888 F.3d 1256 (Fed. Cir. 2018)...............................................................................17

*Enthone Inc. v. BASF Corp.,*
    126 F. Supp. 3d 281 (N.D.N.Y. 2015) ...................................................................11

*EON Corp. IP Holdings LLC v. FLO TV Inc.,*
    802 F. Supp. 2d 527 (D. Del. 2011) .......................................................................17

*Erickson v. Pardus,*
    551 U.S. 89 (2007)..................................................................................................17

*Ericsson, Inc. v. D-Link Systems, Inc.,*
    773 F.3d 1201 (Fed. Cir. 2014)................................................................................9

*Fromberg, Inc. v. Thornhill,*
    315 F.2d 407, 137 USPQ 84 (5th Cir.1963) ...........................................................8

*Groove Digital, Inc. v. Jam City, Inc.,*
    No. 1:18-CV-01331-RGA, 2019 WL 351254 (D. Del. Jan. 29, 2019) .............13, 17

*In re Bill of Lading,*
    681 F.3d 1323 (Fed. Cir. 2012)............................................................................7, 11

*IOENGINE, LLC v. PayPal Holdings, Inc.,*
    No. CV 18-452-WCB, 2019 WL 330515 (D. Del. Jan. 25, 2019)...........................16

*KOM Software Inc. v. NetApp, Inc.*,
   No. 1:18-cv-160, 2018 WL 6167978 (D. Del. Nov. 26, 2018)..............................................16

*Kyowa Hakka Bio, Co. v. Ajinomoto Co.*,
   2018 WL 834583 (D. Del. Feb. 12, 2018).............................................................................16

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
   869 F.3d 1372 (Fed. Cir. 2017)......................................................................................14, 15

*Merck Sharp & Dohme Corp. v. Teva Pharm. USA, Inc.*,
   No. CV 14-874-SLR-SRF, 2015 WL 4036951 (D. Del. July 1, 2015)...................................11

*Nalco v. Chem-Mod, LLC*,
   883 F.3d 1337 (Fed. Cir. 2018)....................................................................................1, 8, 12

*Nuance Commc'ns Inc. v. Tellme Networks Inc.*,
   707 F. Supp. 2d 472 (D. Del. 2010) .......................................................................................8

*Rearden LLC v. Walt Disney Co.*,
   293 F. Supp. 3d 963 (N.D. Cal. 2018)...................................................................................14

*Rhodes Pharms. L.P. v. Indivior, Inc.*,
   No. 16-1308, 2018 WL 326405 (D. Del. Jan. 8, 2018).........................................................10

*Spruill v. Gillis*,
   372 F.3d 218 (3d Cir. 2004) ..................................................................................................7

*Tegal Corp. v. Tokyo Electron Co.*,
   248 F.3d 1376 (Fed. Cir. 2001)..............................................................................................8

*Univ. of Mass. Med. Sch. v. L'Oreal S.A.*,
   No. 17-868, 2018 WL 5919745 (D. Del. Nov. 13, 2018) ...............................................10, 16

*Walker Digital, LLC v. Facebook, Inc.*,
   852 F. Supp. 2d 559 (D. Del. 2012) .........................................................................13, 14, 15

**Rules**

Fed. R. Civ. P. 12(b)(6)...........................................................................................................7

The RC Defendants that have moved to dismiss this case incentivize coal plants to burn refined coal so that they can collect and share refined coal tax credits.  These entities are a collection of inter-connected corporations and limited liability companies that are structured to maximize tax credit value and avoid liability.  Their liability avoidance strategy was dealt a major blow when the Federal Circuit found that refined coal companies can be found liable for indirect patent infringement in *Nalco v. Chem-Mod*.  The present motion is a last-ditch effort to salvage that strategy, but it simply cannot survive in light of the applicable legal standards.

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs filed this patent infringement action on July 17, 2019 against several defendant groups consisting of coal plant operators (Vistra, AEP, NRG, Talen (the "Coal Plant Defendants")) and entities associated with refined coal operations (AJG, DTE, CERT, Chem-Mod, Refined Coal LLCs (the "RC Defendants")).  All of those Defendants except AEP have filed various motions to dismiss.

To minimize filings before the Court, this consolidated response addresses the two motions to dismiss filed by the RC Defendants.  *See* Dkt. Nos. 48 and 55.

## II.     SUMMARY OF THE ARGUMENT

### A.  ME2C Adequately Pled Induced Infringement

According to the RC Defendants, ME2C failed to state a claim for induced infringement because it failed to allege a specific act of inducement for each step of the asserted method claims.  But the law only requires a plaintiff to allege an affirmative act that encourages or causes a party to directly infringe.  Here, Defendants encourage and cause coal plants to convert what would otherwise be non-infringing behavior into infringing behavior, and they provide financial incentives to infringe the method claims as a whole.  D.I. 1 at ¶¶ 155-165.  These allegations state a claim for induced infringement.

### B.  ME2C Adequately Pled Contributory Infringement

ME2C alleges that the RC Defendants contributorily infringe by supplying refined coal that has no substantial non-infringing use.  D.I. 1 at ¶ 155.  The RC Defendants disagree; they contend that the refined coal does have a substantial non-infringing use.  But Courts in this district have explained that where the parties raise a factual dispute as to whether a product has a non-infringing use, the case should not be dismissed.  Moreover, the RC Defendants' mistakenly equate hypothetically fungible refined coal with the specific refined coal delivered by the defendants in this case.  The Federal Circuit has explained that a plaintiff need only allege that a product lacks a substantial non-infringing use "as delivered."  Not even Defendants contend that the refined coal actually delivered to infringing plants has a non-infringing use.

### C.  ME2C Has Adequately Pled the Knowledge Requirement for Indirect Infringement

According to CERT, but not the other RC Defendants, ME2C failed to allege pre-suit notice of the patents.  Courts in this district have explained that this is not a reason to dismiss a plaintiff's indirect infringement case because, at a minimum, the complaint provides such notice.  Moreover, ME2C specifically alleged that CERT was on notice of the patents through the EERC, and its interactions with the other RC Defendants.  D.I. 1 at ¶¶ 145-147.  Nothing more is required at the pleading stage.

### D.  ME2C Has Adequately Pled Willful Infringement

Courts in this district do not require specific allegations of egregious conduct to support a claim for willful infringement.  Thus, there is no basis for dismissing ME2C's willful infringement claims.  Moreover, ME2C has alleged egregious misconduct based on the fact that the RC Defendants, with full knowledge that ME2C's technology was patented, severely undercut ME2C in the market.

2

### E.  ME2C Has Adequately Pled Joint Infringement

The RC Defendants contend that ME2C has failed to state a claim for joint infringement because ME2C has only alleged that they are only involved in some of the steps of the asserted method claims.  Under the correct legal standard, that is all ME2C is required to allege at the pleading stage.

## III.    STATEMENT OF FACTS

### A.  The EPA's Call for New Mercury Capture Technologies Leads to the Development of the Patented Technology

The story of the patented technology begins in 1990 when Congress resolved to significantly reduce air pollution through the Clean Air Act Amendments if 1990.  D.I. 1 at ¶ 52. That law required the U.S. Environmental Protection Agency (EPA) to study the impact of various air pollutants, including mercury.  D.I. 1 at ¶ 53.  After a multi-year study, the EPA reported to congress on the pressing need to reduce mercury emissions from coal-fired power plants.  Unfortunately, it also reported that existing technologies could not achieve the EPA's goals for mercury capture.  D.I. 1 at ¶ 55.  The gaseous mercury present in coal exhaust gas was simply too difficult to capture using the conventional pollution control equipment available at the time.

In the wake of the EPA's report, various governmental and industry organizations injected millions of dollars into scientific research and experimental studies in search for new mercury capture technologies.  D.I. 1 at ¶ 56.  The EPA also established a National Center for Excellence at the Energy & Environmental Research Center (EERC), and tasked EERC scientists with studying this problem.  D.I. 1 at ¶ 54.  A group of those scientists made the discoveries that led to the patents-in-suit.  D.I. 1 at ¶ 61.  In particular, they discovered the benefits of combining

halogen treatments (e.g., bromine containing materials) in-flight with backend sorbents (e.g., activated carbon).  D.I. 1 at ¶ 61.

Plaintiff ME2C is the commercial extension of the patented technology.  As the exclusive licensee, and later assignee, of the patents-in-suit, ME2C developed, markets, and sells products and services that practice the patented technology.  D.I. 1 at ¶ 82.  ME2C's product development efforts have been led by named inventor and former EERC scientist John Pavlish.  D.I. 1 at ¶ 83.

### B.  Overview of the Patented Technology

A coal-fired power plant operates by burning coal to generate steam, and then using the steam to turn an electricity producing turbine.  In addition, a modern coal plant also includes a number of pollution control systems.  The patented technology supplements those systems with a two-step process.  As shown in the illustration below, bromine is added to the coal as it is conveyed to the boiler (the "Bromine Step").  After the coal is burnt, activated carbon (also referred to as "sorbent")  is added to the exhaust gas leaving the boiler (the "Carbon Step").  *See, e.g.,* U.S. Patent No. 10,343,114 at 9:50-60, fig. 6.



Performance of the Bromine Step causes a chemical reaction that boosts the performance of the Carbon Step making it much easier to capture mercury using conventional pollution control equipment.  D.I. 1 at ¶ 60.  ME2C has worked to commercialize this technology and has various customers throughout the United States.  D.I. 1 at ¶ 89.

### C.  The RC Defendants Use the Patented Technology to Obtain Hundreds of Millions of Dollars in Federal Tax Credits

While the EPA was working on addressing the issue of mercury emissions, Congress also took action.  In 2004, Congress passed the American Jobs Act, which created a new tax credit related to the production of refined coal (referred to as "Section 45 tax credits").  D.I. 1 at ¶ 63.

Under this law, a refined coal producer can receive an inflation-adjusted tax credit for each ton of refined coal sold to a power plant that results in a 40% reduction in mercury emissions[1] and a 20% reduction in NOx emissions.  D.I. 1 at ¶ 64.  This law has resulted in companies receiving hundreds of millions of dollars in tax credits each year.  Because of this highly lucrative law, financial services companies such as AJG jumped at the chance to collect the tax credits. D.I. 1 at ¶ 65.

Defendant AJG is an insurance brokerage and risk management services firm.  D.I. 1 at ¶ 66.  AJG Chief Financial Officer Douglas Howell has claimed credit for designing a business model to maximize profits based on Section 45 tax credits.  D.I. 1 at ¶ 67.  According to that model, AJG does not build standalone facilities to refine coal that is then shipped around the country for use at coal plants.  D.I. 1 at ¶ 70.  Instead, AJG forms a limited liability company to be associated with a particular coal-fired power plant.  D.I. 1 at ¶ 72.  That LLC leases space on the conveyor belt feeding coal to the coal plant's boiler.  The entity briefly takes possession of the plant's coal, sprays it with bromine and other chemicals, and then returns the now "refined"

---

[1] This reduction is insufficient to meet the EPA's requirements for mercury reduction, which typically requires a 90% reduction in mercury emissions.

coal to the conveyor belt.  D.I. 1 at ¶¶ 74-75.  For each ton of coal returned to the power plant, the LLC obtains a Section 45 tax credit.  As a result of this scheme, AJG has claimed that it will not need to pay U.S. federal income tax for many years to come.  D.I. 1 at ¶ 69.

AJG sells portions of the refined coal LLC to other entities looking to reduce their tax bill.  Because the entity refining the coal is an LLC, the claimed tax credits pass through to the owners of the LLC.  Defendants DTE and CERT have copied this business model, and all of these Defendants use Chem-Mod to provide the chemicals and technical support for the operations.  AJG, DTE, CERT, Chem-Mod, and various LLCs known by ME2C to participate in this process are referred to collectively in the complaint as "RC Defendants."

The RC Defendants have severely distorted the market for mercury capture services.  D.I. 1 at ¶ 78.  Because Section 45 tax credits are so lucrative, the RC Defendants provide bromine to coal plants for free or at negative cost.  D.I. 1 at ¶ 86.  They also tailor the bromine treatments they provide to account for each plant's overall mercury control systems.  D.I. 1 at ¶ 158.  This provides a powerful incentive for coal plants to work with the RC Defendants to infringe instead of contracting with ME2C for mercury capture services.  D.I. 1 at ¶ 87.  The net result is that the American tax-payer has paid hundreds of millions of dollars for mercury capture services at coal plants, and that money has gone primarily to financial investment vehicles, not the actual developer and owner of the patented technology.

ME2C filed the present lawsuit alleging direct infringement by various companies that own or operate coal plants in the United States.  ME2C has also alleged that the RC Defendants induce and contribute to the infringement of various coal plants by providing refined coal to those coal plants.

## IV.     LEGAL STANDARD

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court is required to accept as true all material allegations in the complaint.  *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]he plausibility requirement is not akin to a 'probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Bill of Lading*, 681 F.3d at 1341 (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

## V.     ARGUMENT

This brief responds to two different motions to dismiss that have substantial overlap.  The movants raise the same issues except that the CERT Defendants also contend that ME2C failed to allege pre-suit notice of the patents.  These assertions are incorrect and the motions should be denied.

### A.  ME2C Has Adequately Pled Induced Infringement

The asserted method claims require performance of two steps: the Bromine Step and the Carbon Step.  According to the RC Defendants, ME2C failed to state a claim for inducement because the RC Defendants only encourage and/or control performance of the Bromine Step. Defendants are wrong on the law and the facts.  Under the correct legal standard, encouraging a direct infringer to perform a method step that causes infringement is grounds for a finding of induced infringement.  Moreover, ME2C has alleged that Defendants encourage and cause coal plants to do more than just the Bromine Step.

Active inducement requires only an "affirmative act." *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376 (Fed. Cir. 2001). The Federal Circuit has acknowledged that an extensive scope of affirmative acts may suffice to create liability for inducement, in that "the term is as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent." *Id.* (quoting *Fromberg, Inc. v. Thornhill*, 315 F.2d 407, 411, 137 USPQ 84, 87 (5th Cir.1963)). Thus, a party may be liable for induced infringement even if it only controls or influences a portion of the alleged infringement. *See, e.g., Nuance Commc'ns Inc. v. Tellme Networks Inc.*, 707 F. Supp. 2d 472, 486 (D. Del. 2010) (denying summary judgment as to alleged inducer because it provided an "integral portion of the accused services").

The Defendants in this case are well aware of this standard. In *Nalco v. Chem-Mod*—a case which included AJG, Chem-Mod, and other movants as Defendants—the patent owner alleged that various refined coal companies induced infringement of several multi-step method patent claims. 883 F.3d 1337, 1356 (Fed. Cir. 2018). The district court dismissed those claims for failure to adequately plead the intent requirement. The Federal Circuit reversed as to all claims, including claims where a portion of the method was performed by coal plants rather than refined coal companies.[2] Moreover, the Federal Circuit confirmed that the patent owner was not required to allege that the inducing parties engaged in the underlying direct infringement. *Id.*

---

[2] To the extent the RC Defendants respond that the Federal Circuit's decision focused on a claim directed to conduct of the refined coal companies, the patent at issue also included claims with various steps performed by coal plants with specific equipment installed. *See, e.g., See Nalco Co. v. Chem-Mod LLC*, Case No. 1:14-cv-02510, D.I. 110-4 at pg. 42 (Exhibit F to Third Amended Complaint) (N.D. Ill. Nov. 30, 2015) (excerpt attached as Ex. 1) (asserting that the step of claim 29 is performed "in coal-fired plants that include [the particular equipment required by the claim]").

According to Defendants, the legal standard for inducement requires that a patent owner allege a specific act of inducement with respect to each asserted method step of a patent claim. For support, they cite *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014).  However, *Ericsson* merely provides the unremarkable proposition that a showing of inducement requires evidence that a single entity committed an act of direct infringement.  *Id.* ("In order to prove induced infringement, the patentee must show that the alleged infringer performs, or induces another party to perform, every single step in the method.").  *Ericsson* did not overturn the general rule that inducement merely requires performance of an affirmative act.

Because Defendants acknowledge that ME2C has alleged inducement with respect to at least the Bromine Step, and because performance of the Bromine Step converts what would otherwise be non-infringing conduct (performing only the Carbon Step) into infringing conduct, ME2C has adequately pled inducement.  Moreover, ME2C has also alleged additional facts in support of its inducement claim.

As noted in the complaint, the benefits of the patented technology come from the fact that the Bromine Step boosts the effectiveness of the Carbon Step.  D.I. 1 at ¶¶ 59-61.  Thus, encouraging and incentivizing a coal plant perform the Bromine Step effectively encourages that coal plant to also perform the Carbon Step to obtain the full mercury capture benefits.  D.I. 1 at ¶ 86.  ME2C also alleges that the RC Defendants have distorted the marketplace for market capture services by: providing "operational support, regulatory, and technical support necessary to use Chem-Mod chemicals at the Accused RC Facilities and Accused Coal Plants;" "Testing the performance of the RC Facilities for regulatory reasons and to obtain Section 45 Tax Credits;" "Tailoring the treatments applied to coal for each individual power plant;" and "Modifying the amount of bromine and/or bromide added to coal sold to Coal Plant Defendants

and/or operators of coal-fired power plants connected to an RC Facility in connection with plants' MATS obligations." D.I. 1 at ¶ 158. By offering these services, support, and financial incentives, ME2C alleges that the RC Defendants "induce power plants to infringe the patents-in-suit by offering the technology at no or artificially low costs to the plant." D.I. 1 at ¶ 86. Indeed, ME2C has alleged that these actions have specifically deflated prices and caused coal plants to infringe instead of contracting with ME2C to provide the patented technology. *Id.* Taking these allegations as true, ME2C has adequately pled induced infringement.

To the extent Defendants raise a separate challenge as to the intent requirement, the above described allegations also support the intent requirement. That is, because the RC Defendants are aware of the patents-in-suit and their customers' performance of the Carbon Step, ME2C's allegations that the RC Defendants encourage performance of the Bromine Step also supports an inference that the RC Defendants intend to induce infringement.

## B. ME2C Has Adequately Pled Contributory Infringement

According to Defendants, ME2C failed to state a claim for inducement because the refined coal they provide to infringing coal plants has a substantial non-infringing use. This assertion fails as a matter of law.

Courts in this district have held that simply pleading the absence of substantial non-infringing uses is normally sufficient to satisfy the pleading requirement for that element of contributory infringement. *See Univ. of Mass. Med. Sch. v. L'Oreal S.A.*, Civil Action No. 17-868, 2018 WL 5919745, at *8 (D. Del. Nov. 13, 2018) ("affirmatively pleading the absence of substantial non-infringing uses renders the claim plausible if the pleadings do not undermine that allegation"); *Rhodes Pharms. L.P. v. Indivior, Inc.*, Civil Action No. 16-1308, 2018 WL 326405, at *9 (D. Del. Jan. 8, 2018) ("A simple allegation that the product at issue is not suitable for substantial non-infringing use is generally sufficient to satisfy the pleading requirements of

*Twombly* and *Iqbal*.").  Because ME2C has alleged that the refined coal provided by the RC Defendants is tailored for individual plants and has no substantial non-infringing use, ME2C has stated a claim for contributory infringement.  *See* D.I. 1 at ¶¶ 155, 196, 220.

Defendants argue that something more is required for a patent owner to state a claim for contributory infringement, but their assertion is based on a misstatement of the law.  In particular, Defendants cite *In re Bill of Lading* as requiring a patentee to more specifically prove that a product lacks non-infringing uses.  However, *Bill of Lading* does not contradict the rule that a general allegation of no substantial non-infringing uses suffices at the pleading stage.  In that case, the complaint was dismissed because the patentee had affirmatively pled that the product at issue had a non-infringing use.  *See, e.g., Enthone Inc. v. BASF Corp.*, 126 F. Supp. 3d 281, 288 (N.D.N.Y. 2015) (explaining and distinguishing *Bill of Lading*); *see also Merck Sharp & Dohme Corp. v. Teva Pharm. USA, Inc.*, No. CV 14-874-SLR-SRF, 2015 WL 4036951, at *7 (D. Del. July 1, 2015) (citing *Bill of Lading* for the proposition that "affirmatively pleading the absence of substantial non-infringing uses renders the claim plausible if the pleadings do not undermine that allegation").  In this case, Defendants identify no allegations in the complaint that undermine ME2C's infringement theories.  Thus, this portion of the motion must fail.

More generally, Defendants' non-infringement position is flawed.  ME2C alleges that the RC Defendants contributorily infringe by supplying refined coal to coal plants engineered to perform the Carbon Step such that the refined coal has no substantial non-infringing use.  According to the RC Defendants, they could prepare and provide refined coal to plants that are not engineered to perform the Carbon Step.  Thus, they contend that refined coal has a substantial non-infringing use.  This assertion fails to acknowledge how refined coal is actually prepared and delivered.

11

ME2C has alleged that the RC Defendants "tailor the amount of Br2, HBr, a bromide compound, or a combination thereof added to the coal for the specific needs of the power plant" (D.I. 1 at ¶¶ 196, 220), and they "provid[e] the refined coal directly onto conveyances leading to the combustor" (D.I. 1 at ¶ 157).  In other words, the RC Defendants do not merely produce easily transportable fungible product, they deliver a specifically tailored product as it is being conveyed into the combustor of an infringing plant.  *See also* D.I. 1 ¶ 155 ("Given the location and operation of the Accused RC Facilities and the contractual relationships between Accused RC Facilities and associated coal-fired power plants, the refined coal provided by each Accused RC Facility has no substantial non-infringing use.").  There is simply no commercially reasonable non-infringing use for that refined coal.  In order for a coal plant to take advantage of the supposed non-infringing use, it would first need to locate a coal plant that is engineered to avoid performing the Carbon Step, but that can nonetheless make use of refined coal that was tailored for a plant that does perform the Carbon Step.  Next, it would need to build a new conveyor system and railroad line to transport the coal to that plant.  It would then need to negotiate sale terms that would make burning the coal commercially viable.  Defendants fail to show that this scenario is actually possible, let alone that this scenario is supported by allegations in the complaint.  At best, Defendants have identified various factual disputes not suitable for resolution via motion to dismiss.

Indeed, the Federal Circuit has already rejected Defendants' non-infringement theory.  In *Nalco v. Chem-Mod*, the patent owner alleged that various refined coal companies contributorily infringed by supplying refined coal to coal plants.  It specifically alleged that, "as sold and delivered" to those plants, the refined coal had no substantial non-infringing use.  883 F.3d at

1357.  The Federal Circuit found that this allegation was adequate to plead a claim for contributory infringement.  Thus, this portion of Defendants' motion should also be denied.

### C.  ME2C Has Adequately Pled the Knowledge Requirement for Indirect Infringement

ME2C has alleged that all of the RC Defendants learned of the patents-in-suit through ME2C's commercialization efforts and presentations at industry conferences, and through the RC Defendants' interactions with the EERC and Chem-Mod.  In a footnote, most of the RC Defendants criticize ME2C's allegations as "thin," but they do not dispute that the allegations adequately plead knowledge of the patents.  AJG Mot. at 12.  CERT contends that these allegations are not plausible.  CERT Mot. at 9.  CERT is wrong.

As an initial matter, "[p]re-suit knowledge is not required to plead a claim of induced infringement."  *Groove Digital, Inc. v. Jam City, Inc.*, No. 1:18-CV-01331-RGA, 2019 WL 351254 at *4 (D. Del. Jan. 29, 2019).  Courts in this district have explained:

> [I]f a complaint sufficiently identifies, for purposes of Rule 8, the patent at issue and the allegedly infringing conduct, a defendant's receipt of the complaint and decision to continue its conduct despite the knowledge gleaned from the complaint satisfies the requirements of *Global–Tech*.

*Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 565–66 (D. Del. 2012).  Thus, even if ME2C failed to adequately allege pre-suit notice of the patent, that is no basis to dismiss its indirect infringement claims.  Lack of pre-suit knowledge relates only to the quantification of damages, not the plausibility of ME2C's claim for induced infringement.[3]  Accordingly, the

---

[3] At least one court in this district has ruled that it can dismiss the portion of an inducement claim related to pre-suit conduct without dismissing the claim related to post-suit conduct.  *Collabo Innovations, Inc. v. Omnivision Techs., Inc.*, No. CV 16-197-SLR-SRF, 2017 WL 374484, at *9 (D. Del. Jan. 25, 2017).  However, in that case, the plaintiff admitted that it was not alleging pre-suit inducement.  *Id.*  Thus, *Collabo* does not support the proposition that a court should use rule 12(b)(6) as way to limit a plaintiff's damages.

Court should deny this portion of CERT's motion.  Regardless, ME2C has adequately alleged pre-suit notice of the patent as evidenced by the fact that CERT stands alone in moving on this basis.

A plaintiff need not provide detailed factual support for an allegation of pre-suit knowledge of the patent.  *See Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 564 (D. Del. 2012) (finding the following statement to properly allege notice of a patent: "It is believed that Zappos was on notice of the ′056 patent and Walker Digital's claims prior to April 11, 2011 through Zappos' interactions with representatives of Walker Digital").  A plaintiff may allege notice of a patent based on circumstantial evidence.  *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1380 (Fed. Cir. 2017) (overturning dismissal based on allegations that Defendant hired employees with knowledge of the patent).  A plaintiff may also allege notice on information and belief.  *Rearden LLC v. Walt Disney Co.*, 293 F. Supp. 3d 963, 976 (N.D. Cal. 2018) (explaining that a "plaintiff may plead facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible") (internal citations omitted).

For example, in *BioMerieux, S.A. v. Hologic, Inc.*, multiple entities worked together to infringe a patent.  No. CV 18-21 (LPS), 2018 WL 4603267, at *5 (D. Del. Sept. 25, 2018).  One of those entities had attempted to invalidate the European counterpart to the patents-in-suit.  Based on that conduct, the patentee inferred that the entity had knowledge of the U.S. patents, and based on the close relationship between the entities, that they all had knowledge of the patents-in-suit.  This allegation was found to meet the pleading requirement.  *Id.*

14

In this case, ME2C alleges that that the patented technology was developed at the EERC. ME2C also alleges that CERT tests its coal treatment process at the EERC, interacts with individuals at the EERC, and learned of the patents-in-suit from the EERC.  D.I. 1 at ¶ 145 (stating that CERT "relied on the EERC to demonstrate that the processes employed by refined coal facilities qualify for Section 45 Tax Credits. Through those interactions, it is likely that [it] became aware of the patents-in-suit").  ME2C has also alleged that it has publicized its technology and its patent portfolio at various industry conferences.  D.I. 1 at ¶ 84.  To the extent officials from CERT did not personally attend any of those conferences, at least Chem-Mod did so.  D.I. 1 at ¶ 146.  CERT works directly with Chem-Mod to develop and provide the refined coal accused of infringement.  D.I. 1 at ¶¶ 153, 154.  Thus, ME2C has also alleged that CERT learned of the patents-in-suit from Chem-Mod.  D.I. 1 at ¶ 147 ("Given the close relationship between Chem-Mod, AJG, DTE, CERT, and the RC Defendants, those Defendants know of ME2C's patented technology and patent portfolio and/or are willfully blind to ME2C's patents.").  CERT criticizes these allegations as requiring "too many layers of inferences," but induced infringement often requires inferential and circumstantial evidence.  ME2C's allegations are precisely the types of allegations found to support claims for induced infringement in *Walker Digital*, *Lifetime*, and *BioMerieux*.

CERT also contends that ME2C failed to allege that they have knowledge of the infringement.  CERT is wrong.  *See* D.I. 1 at ¶ 198 ("AJG, DTE, CERT, Chem-Mod and the RC Defendants have actual knowledge of the '114 patent and know that actions described above, if taken, would constitute infringement of that patent.").  Moreover, ME2C alleges that CERT "tailor[s] the amount of Br2, HBr, a bromide compound, or a combination thereof added to the coal for the specific needs of the power plant."  D.I. 1 at ¶ 196.  CERT fails to explain how they

15

could perform that step without being aware of the plant's mercury capture process, which would include the Carbon Step.  ME2C also alleges that CERT "Connect[s] the RC facilities to coal-fired power plants," and "Test[s] the performance of the RC Facilities for regulatory reasons and to obtain Section 45 Tax Credits."  D.I. 1 at ¶ 158.  Again, CERT fails to explain how it could do so without being aware of its customer's performance of the Carbon Step.  At best, CERT raises a fact dispute as to the extent of its knowledge.

### D.  ME2C Has Adequately Pled Willful Infringement

Defendants have moved to dismiss ME2C's allegations of willful infringement, but Courts in this district routinely reject that request.  *See, e.g., Kyowa Hakka Bio, Co. v. Ajinomoto Co.*, 2018 WL 834583, at *13 (D. Del. Feb. 12, 2018) ("[A]llegations of willfulness without a specific showing of egregiousness are sufficient to withstand a motion to dismiss."); *KOM Software Inc. v. NetApp, Inc.*, No. 1:18-cv-160, 2018 WL 6167978 at *3 (D. Del. Nov. 26, 2018); *Univ. of Mass. Med. Sch. v. L'Oreal S.A.*, No. 17-868, 2018 WL 5919745 at *8 (D. Del. Nov. 13, 2018).  This is because, to plead willful infringement a plaintiff need only allege knowledge of the patent, and "[w]ith respect to the allegations of post-suit willfulness, knowledge is a given."  *IOENGINE, LLC v. PayPal Holdings, Inc.*, No. CV 18-452-WCB, 2019 WL 330515, at *7 (D. Del. Jan. 25, 2019).  With respect to pre-suit willfulness, ME2C has adequately alleged pre-suit knowledge of the patents as explained above.  Moreover, ME2C has alleged egregious misconduct based on the fact that the RC Defendants, with full knowledge that ME2C's technology was patented, severely undercut ME2C in the market.  Thus, this portion of Defendants' motion should be denied.

### E.  ME2C Has Adequately Pled Joint Infringement

With respect to joint infringement, the RC Defendants misstate the applicable legal standard.  The RC Defendants contend that they cannot be liable for joint infringement if they

16

are only involved in some of the steps of the asserted method claims.  But one of the purposes of joint infringement is to account for that scenario.  Under the correct legal standard, ME2C's pleadings are sufficient.

To satisfy the *Iqbal* pleading standard for direct infringement in a patent case, "[s]pecific facts are not necessary."  *Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  "In circumstances where one party performs some of the steps of a patent claim, and another entity performs other of the claimed steps, a theory of joint infringement may establish liability.*" EON Corp. IP Holdings LLC v. FLO TV Inc.*, 802 F. Supp. 2d 527, 534 (D. Del. 2011).  ME2C alleges that each RC Defendant operating a refined coal facility physically connected to an infringing coal plant jointly infringes with the owner/operator of that coal plant.  D.I. 1 at ¶¶ 157-165.  This is sufficient to permit a reasonable inference that ME2C has a "plausible claim for relief" with respect to its claim for joint infringement.  *Groove Digital, Inc. v. Jam City, Inc.*, No. 1:18-CV-01331-RGA, 2019 WL 351254, at *3 (D. Del. Jan. 29, 2019) (denying motion to dismiss based on similar allegations).  Thus, this portion of Defendants' motion may be denied.

## VI.    CONCLUSION

For all of the foregoing reasons, and given the lenient standard applied at this stage in the case, the court should deny the Motion to Dismiss.

Dated: October 15, 2019

Respectfully submitted,

**DEVLIN LAW FIRM LLC**

/s/ *James M. Lennon*
James M. Lennon (No. 4570)
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
jlennon@devlinlawfirm.com

**CALDWELL CASSADY CURRY PC**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Phone: (214) 888-4848
(214) 888-4849 (*fax*)
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
jnemunaitis@caldwellcc.com

Bradley W. Caldwell
Texas Bar No. 24040630
Jason D. Cassady
Texas Bar No. 24045625
John Austin Curry
Texas Bar No. 24059636
Justin T. Nemunaitis
Texas Bar No. 24065815

*Attorneys for Plaintiffs*
*Midwest Energy Emissions Corp.*
*and MES Inc.*