**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**MIDWEST ENERGY EMISSIONS CORP.
and MES INC.,**

        **Plaintiffs,**

    **v.**

**VISTA ENERGY CORP., et al.,**

        **Defendants.**

C.A. No. 1:19-cv-01334-RGA

**PLAINTIFFS' ANSWER TO DEFENDANTS' COUNTERCLAIMS**

**Parties, Jurisdiction, and Venue**

1.     ME2C filed a Complaint against AEP seeking, among other things, a judgment that AEP infringes U.S. Patent Nos. 10,343,114 ("the '114 patent") and 8,168,147 ("the '147 patent"). An immediate judgment and justiciable controversy exists between ME2C and AEP regarding the infringement and validity of the '114 and '147 patents.

**RESPONSE**: Admitted.

2.     Subject matter jurisdiction in this Court is proper under, among other things, 28 U.S.C. §§ 1331, 1338 and 1367.

**RESPONSE**: Admitted, on information and belief.

3.     AEP Generation Resources Inc. is a Delaware corporation with its principal place of business at 1 Riverside Plaza, Columbus, OH 43215.

**RESPONSE**: Admitted, on information and belief.

4.     Southwestern Electric Power Company is a Delaware corporation with its principal place of business at 1 Riverside Plaza, Columbus, OH 43215.

**RESPONSE**: Admitted, on information and belief.

1

5.      AEP Texas Inc. is a Delaware corporation with its principal place of business at

1 Riverside Plaza, Columbus, OH 43215.

**RESPONSE**:  Admitted, on information and belief.

6.      On information and belief, Midwest Energy Emissions Corp. is a Delaware corporation

with its principal place of business at 670 D Enterprise Drive, Lewis Center, Ohio 43035.

**RESPONSE**:  Admitted.

7.      On information and belief, MES Inc. is a North Dakota corporation with its principal

place of business at 311 S. 4th street, STE 118, Grand Forks, ND 58201.

**RESPONSE**: Admitted.

8.      This Court has personal jurisdiction over ME2C because, among other things, Midwest

Energy Emissions Corp. is incorporated in this District and ME2C submitted to the jurisdiction

of this Court by filing its Complaint in this Court.

**RESPONSE**: Admitted.

9.      Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400 because, among other

things, Midwest Energy Emissions Corp. is incorporated in this District and ME2C selected this

venue by filing its Complaint in this Court.

**RESPONSE**: Admitted.

**The '114 Patent**

10.      On its face, the '114 patent, entitled "Sorbents for the oxidation and removal of

mercury," indicates it was issued by the USPTO on July 9, 2019.

**RESPONSE**: Admitted.

11.      On information and belief, Midwest Energy Emissions Corp. is the assignee of the '114

patent.

**RESPONSE**:  Admitted.

12.   The '114 patent contains thirty claims.

**RESPONSE**:  Admitted.

13.   The '114 patent contains four independent claims.

**RESPONSE**:  Admitted.

14.   Each independent claim of the '114 patent recites "[a] method of separating mercury from a mercury-containing gas."

**RESPONSE**:  Admitted.

### The '147 Patent

15.   On its face, the '147 patent, entitled "Sorbents for the oxidation and removal of mercury," indicates it was issued by the USPTO on May 1, 2012.

**RESPONSE**: Admitted.

16.   ME2C asserts it is the owner of the '147 patent.

**RESPONSE**:  Admitted.

17.   The '147 patent contains twenty-five claims.

**RESPONSE**: Admitted.

18.   The '147 patent contains one independent claim.

**RESPONSE**:  Admitted.

19.   Independent claim 1 recites "[a] method for separating mercury from a mercury-containing gas."

**RESPONSE**:  Admitted.

**Misrepresenting the Disclosure of the Nelson Reference and Intentionally Withholding the Inventors' March 2003 Publication**

20.     During prosecution of the '147 patent, the inventors misrepresented to the Patent Office that the activated carbons disclosed in the prior art United States Patent Application Publication US 2004/0003716 to Sidney G. Nelson, Jr. ("the Nelson reference" or "Nelson, Jr.") did not include any activated carbon having "graphene sheets having carbene species edge sites." During the same prosecution, the inventors also intentionally withheld from the Patent Office a March 2003 article that the inventors themselves had published that stated that activated carbon disclosed in the Nelson reference included graphene sheets having carbene species edge sites.

**RESPONSE**: Denied.

**To overcome an anticipation rejection under § 102, the inventors falsely asserted that the Nelson reference does not disclose activated carbon with graphene having carbene species edge sites**

21.     The issued claims of the '147 patent require a sorbent material comprising activated carbon.

**RESPONSE**: Admitted.

22.     The issued claims of the '147 patent require that the activated carbon contain "graphene sheets having carbene species edge sites."

**RESPONSE**: Admitted.

23.     The claim language requiring "graphene sheets having carbene species edge sites" was added during prosecution of the '147 patent in order to overcome an anticipation rejection under 35 U.S.C. § 102.

**RESPONSE**: ME2C admits that, after a patent office rejection, claim 34 was amended to add the language: "and wherein the activated carbon contains graphene sheets having carbene species edge sites which react with the bromine containing promoter to form a carbocation paired with a

bromide anion in the promoted brominated sorbent for oxidation of the mercury."  To the extent AEP intends for this paragraph to have a different meaning, denied.

24.    As of October 14, 2010, application claim 34 (which after amendment became claim 1 of the '147 patent) recited a method for separating mercury from a mercury containing gas comprising chemically reacting activated carbon with a bromine containing promoter followed by other process steps to remove mercury from a gas.

**RESPONSE**: ME2C admits that as of October 14, 2010, application claim 34 (which after amendment became claim 1 of the '147 patent) recited: "(Currently Amended) A method for separating mercury from a mercury containing gas comprising:

> (a) promoting at least a portion of a sorbent material comprising activated carbon
> by chemically reacting the sorbent material with a bromine containing promoter to form a
> promoted brominated sorbent, wherein the bromine containing promoter is in gaseous
> form, vapor form, or non-aqueous liquid form;
> (b) chemically reacting elemental mercury in the mercury containing gas with the
> promoted brominated sorbent to form a mercury/sorbent chemical composition; and
> (c) separating particulates from the mercury containing gas, the particulates including
> ash and the mercury/sorbent chemical composition."

To the extent AEP intends for this paragraph to have a different meaning, denied.

25.    As of October 14, 2010, application claim 53 (which after an amendment became claim17 of the '147 patent) recited a "method of claim 34 further comprising injecting the sorbent material …and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent."

**RESPONSE**: Admitted.

26.     As of October 14, 2010, neither application claim 34 nor application claim 52 recited that the activated carbon contained graphene sheets having carbene species edge sites that react with the bromine containing promoter.

**RESPONSE**: ME2C admits that as of October 14, 2010, neither application claim 34 nor application claim 52 recited: "activated carbon contained graphene sheets having carbene species edge sites that react with the bromine containing promoter."  To the extent AEP intends for this paragraph to have a different meaning, denied.

27.     On October 14, 2010, the Patent Examiner, Amber Orlando, issued a Final Office Action rejecting all pending claims in the application leading to the '147 patent.

**RESPONSE**:  Admitted.

28.     In the October 14, 2010 Final Office Action, the Examiner rejected application claim 34 as anticipated over the Nelson reference.

**RESPONSE**:  Admitted.

29.     In discussing her rejection of application claim 34 as anticipated by the Nelson reference, Examiner Orlando stated that Nelson disclosed "a method for separating mercury containing gas comprising: (a) promoting at least a portion of a sorbent material by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent; (b) chemically reacting elemental mercury in the mercury containing gas with a promoted brominated sorbent to form a mercury/sorbent chemical composition; (c) separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent composition, the bromine containing promoter is in gaseous form, the activated carbon contains basic binding sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent by oxidation of the mercury, the

carbocation paired with a bromide anion chemically react with elemental mercury from the mercury/sorbent composition, at least a portion of the basic binding sites of the activated carbon reacts with the oxidized mercury in the mercury containing gas to form another mercury/sorbent chemical composition."

**RESPONSE**:  Admitted.

30.     During prosecution, the inventors never disputed the Examiner's statements, Quoted in the previous paragraph, regarding the disclosure of the Nelson reference.

**RESPONSE**: ME2C admits that the public prosecution history record for the '147 patent does not include a statement from an inventor expressly disputing the paragraph quoted above.  To the extent AEP intends for this paragraph to have a different meaning, denied.

31.     In her October 14, 2010 Final Office Action, Examiner Orlando identified a disclosure of each element of then-pending application claim 34 as being found in the Nelson reference.

**RESPONSE**: ME2C admits that Examiner Orlando issued an anticipation rejection.  To the extent AEP intends for this paragraph to have a different meaning, denied.

32.     In her October 14, 2010 Final Office Action, Examiner Orlando rejected application claim 53 as being obvious over the Nelson reference as applied to application claim 34.

**RESPONSE**: Denied.

33.     In her October 14, 2010 Final Office Action, Examiner Orlando also rejected application claim 53 as being obvious over the Nelson reference in view of U.S. Patent No. 6,848,374 to Srinavasachar et al. ("the Srinavasachar patent").

**RESPONSE**:  Admitted.

34.     In her October 14, 2010 Final Office Action, the Examiner stated that the Srinavasachar patent disclosed injecting sorbent material at a sorbent material injection rate and injecting

separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent.

**RESPONSE**:  ME2C admits that in her October 14, 2010 Final Office Action the Examiner stated: "The 374 reference discloses injecting the sorbent material at an sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent (columns 5-6, lines 59-18) and the gas stream being a transport gas (columns 5-6, lines 55-18)."  To the extent AEP intends for this paragraph to have a different meaning, denied.

35.     In her October 14, 2010 Final Office Action, the Examiner stated that it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the Nelson reference to inject separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent.

**RESPONSE**:  ME2C admits that in her October 14, 2010 Final Office Action the Examiner stated: "It would have been obvious to one having ordinary skill in the art at the time the invention was made to have modified the 716 reference to include the sorbent material at an sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent (374, columns 5-6, lines 59-18), the gas stream is a mercury containing gas (374 columns 5-61ines 55-18) and the gas stream being a transport gas (374, columns 5-6, lines 55-18)."  To the extent AEP intends for this paragraph to have a different meaning, denied.

36.     The inventors never disputed during prosecution of the application leading to the '147 patent that it would have been obvious to one of the ordinary skill in the art at the time the invention was made to have modified the Nelson reference to inject separately the bromine

containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent.

**RESPONSE**:  ME2C admits that the public prosecution history record for the '147 patent does not include a statement from an inventor expressly disputing the paragraph quoted above.  To the extent AEP intends for this paragraph to have a different meaning, denied.

37.    On February 14, 2011, the inventors filed a response to the October 14, 2010 Office Action.

**RESPONSE**:  ME2C admits that on February 14, 2011, prosecuting attorney Dennis R. Daley filed a response to the October 14, 2010 Office Action on behalf of applicant.  To the extent AEP intends for this paragraph to have a different meaning, denied.

38.    In the February 14, 2011 response, the inventors amended claim 34 to add the requirement that the activated carbon contain "graphene sheets having carbene species edge which react with the bromine containing promoter."

**RESPONSE**:  ME2C admits that, in the February 14, 2011 response applicant amended claim 34 to add the language: "and wherein the activated carbon contains graphene sheets having carbene species edge sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury."  To the extent AEP intends for this paragraph to have a different meaning, denied.

39.    In the February 14, 2011 response, the inventors made no changes to the text of application claim 53.

**RESPONSE**:  Admitted.

40.    In the February 14, 2011 response, the inventors argued that application claim 34, as amended to require "graphene sheets having carbene species edge sites," was not anticipated by the Nelson reference.

**RESPONSE**: ME2C admits that in the February 14, 2011 response Mr. Daley stated: "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein." To the extent AEP intends for this paragraph to have a different meaning, denied.

41.    In the February 14, 2011 response, the inventors addressed the Examiner's anticipation rejection of claim 34 over the Nelson reference by asserting, among other things, that "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein."

**RESPONSE**: ME2C admits that in the February 14, 2011 response Mr. Daley stated, among other things: "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein." To the extent AEP intends for this paragraph to have a different meaning, denied.

42.    In the February 14, 2011 response, the inventors also argued that "Nelson, Jr. describes exemplary activated carbons in paragraph 69."

**RESPONSE**: ME2C admits that in the February 14, 2011 response Mr. Daley stated, among other things: "Nelson, Jr. describes exemplary activated carbons in paragraph 69." To the extent AEP intends for this paragraph to have a different meaning, denied.

43.    Paragraph 69 of the Nelson reference states in part that "The gas-phase bromine treatment of this invention has been tested on many different commercially-available powdered activated carbons (PACs). Each has been found to be easily brominated to at least 15 wt % Br,

including PACs from …Norit.  Norit's Darco FGD® is a common PAC yardstick frequently used by other researches as a competitive yardstick."

**RESPONSE**: Admitted.

44.    By February 14, 2011, inventors Edwin S. Olson, Michael J. Holmes and John H. Pavlish had published extensively on research conducted using the Norit FGD PAC referred to in paragraph 69 of the Nelson reference.

**RESPONSE**:  ME2C admits that Edwin S. Olson, Michael J. Holmes and John H. Pavlish have conducted various research that has incorporated products from Norit.  As to the remainder of this paragraph, ME2C lacks sufficient information to admit or deny.

45.    By February 14, 2011, inventors Edwin S. Olson, Michael J. Holmes and John H. Pavlish had published multiple articles stating and/or disclosing that the Norit FGD PAC contained graphene sheets having carbene species edge sites.

**RESPONSE**:  Denied.

46.    By February 14, 2011, inventors Edwin S. Olson, Michael J. Holmes and John H. Pavlish knew that the Norit PAC referred in Norit PAC referred to in paragraph 69 of the Nelson reference contained graphene sheets having carbene species edge sites.

**RESPONSE**:  Denied.

47.    In the February 14, 2011 response, the inventors also stated that "The Examiner's Attention is directed to the examples reported by Nelson, Jr. The test results tend to demonstrate that the selection of activated carbon according to Nelson, Jr. is not particularly significant."

**RESPONSE**: ME2C admits that in the February 14, 2011 response, Mr. Daley stated: "The Examiner's Attention is directed to the examples reported by Nelson, Jr. The test results tend to

demonstrate that the selection of activated carbon according to Nelson, Jr. is not particularly significant."

48.     The argument in the previous paragraph implies that not all activated carbons include graphene sheets having carbene species edge sites.

**RESPONSE**:  ME2C denies that the argument in the previous paragraph implies that all activated carbons do or do not include graphene sheets having carbene species edge sites.

49.     In the February 14, 2011 response, the inventors also responded to the rejection of application claim 53 as obvious over the Nelson reference and the Srinavasachar patent.

**RESPONSE**: Admitted.

50.     In the February 14, 2011 response in the section addressing the obviousness rejection of claim 53 over the Nelson reference and the Srinavasachar patent, the inventors asserted that "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein."

**RESPONSE**: ME2C admits that in the February 14, 2011 response in the section addressing the obviousness rejection of claim 53 over the Nelson reference and the Srinavasachar patent, Mr. Daley stated: "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein."  To the extent AEP intends for this paragraph to have a different meaning, denied.

51.     In the February 14, 2011 response in the section addressing the obviousness of the rejection of claim 53 over the Nelson reference and the Srinavasachar patent, the inventors stated that "Nelson, Jr. describes exemplary activated carbons at paragraph 69," and that the "test results tend to demonstrate that the selection of activated carbon according to Nelson, Jr. is not particularly significant."

**RESPONSE**:  Admitted.

52.    In the '147 patent, Figure 2 shows carbene structures present in graphene sheets.

**RESPONSE**:  Admitted.

53.    Figure 2 of the '147 patent illustrates the chemistry whereby the graphene sheets that in bulk make up the activated carbon used in the '147 patent react at an edge carbene site—a carbon Zigzag site—with the bromine.

**RESPONSE**:  ME2C admits that figure 2 provides a model illustrating graphene and an edge carbene site—a carbon Zigzag site—that can react with bromine, otherwise denied.

54.    Figure 2 of the patent discloses the zig-zag carbene structures referred to in the March 2003 presentation.

**RESPONSE**:  ME2C admits that figure 2 of the '147 patent depicts a zig-zag site and that the Preprint Article depicts a zigzag site, otherwise denied.

**The inventors' March 2003 article disclosed that Norit FGD contained graphene sheets with carbene species edge sites**

55.    In 2003, inventors Olson, Pavlish and other authors published an article, "The Multiple Site Model for Flue Gas-Mercury Interactions on Activated Carbons: the Basic Site," Fuel Chemistry Division Preprints 2003, 48(a), 30.  The article was also presented at a conference in March 2003: the 225th American Chemical Society National Meeting, New Orleans, LA, March 23-27, 2003.

**RESPONSE**:  Admitted.

56.    The March 2003 presentation reported that "The commercial powdered carbon Norit FGD sorbent has been thoroughly investigated at the Energy & Environmental Research Center (EERC) as a sorbent for elemental mercury. . . ."

**RESPONSE**:  ME2C admits that "The Multiple Site Model for Flue Gas-Mercury Interactions on Activated Carbons: the Basic Site," Fuel Chemistry Division Preprints 2003, 48(a), 30 ("Preprint article"), states: "The commercial powdered carbon Norit FGD sorbent has been thoroughly investigated at the Energy & Environmental Research Center (EERC) as a sorbent for elemental mercury. . . ."  To the extent AEP intends for this paragraph to have a different meaning, denied.

57.     In the March 2003 presentation, the inventors reported an explanation for the nature of carbon sites and their interaction with flue gases and mercury.  This explanation used "the concept of zig-zag carbene structures recently proposed for electronic states at the edge of the carbon graphene layers."

**RESPONSE**:  ME2C admits that the Preprint Article states: "the concept of zig-zag carbene structures recently proposed for electronic states at the edge of the carbon graphene layers.".  To the extent AEP intends for this paragraph to have a different meaning, denied.

58.     The 2003 article states that the chemistry of the Norit FGD sorbent is summarized in a figure showing the same structures.

**RESPONSE**:  ME2C admits that the Preprint Article states: "The interactions that appear to be adequate for explaining the behavior of the FGD sorbent are summarized in more detail in the scheme shown in Figure 2."  To the extent AEP intends for this paragraph to have a different meaning, denied.

59.     The March 2003 presentation is prior art under 35 U.S.C. § 103(b) prior art to the application that led to the '147 patent.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

60.     The inventors never disclosed the March 2003 presentation to the Patent Office during the pendency of the application leading to the '147 patent.

**RESPONSE**:  ME2C admits that the information disclosure statements contained in the prosecution history for the '147 patent do not list the March 2003 presentation.  Otherwise, ME2C is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies those allegations.

61.     The March 2003 presentation shows that the Norit FGD activated carbon disclosed in the Nelson reference includes graphene sheets with carbene species edge sites therein.

**RESPONSE**:  Denied.

62.     The March 2003 presentation directly contradicts the inventors' statements to the Patent Office that the Nelson reference failed to disclose activated carbon containing graphene sheets having carbene species therein.

**RESPONSE**:  Denied.

63.     The March 2003 presentation would have been material to the prosecution of the '147 patent.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

64.     The inventors continue to misrepresent Nelson in subsequent prosecution.

**RESPONSE**:  Denied.

65.     In response to the inventors' February 14, 2011 filing, the Patent Examiner believed the inventors' false statement that the Nelson reference did not disclose graphene having carbene edge sites.  She stated so in her February 23, 2011 Office Action.

**RESPONSE**:  Denied.

66.     Having successfully misled the Examiner, the inventors in subsequent papers argued that "The Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes."

**RESPONSE**:  ME2C denies that it misled the Examiner.  ME2C admits that Geoffrey Cooper stated: "The Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes."

67.     The inventors also asserted that the Nelson reference, even when combined with other prior art, "fails to disclose or suggest the use of graphene sheets, their carbene-containing edge sites and reaction with reaction with [*sic*] bromine promoting agents, and production of carbocations."

**RESPONSE**:  ME2C admits that Geoffrey Cooper stated: "The combination of the five cited documents fails to disclose or suggest the use of graphene sheets, their carbene containing edge sites and reaction with bromine promoting agents, and production of carbocations. Accordingly, a prima facie case of the obviousness of claims 46 over the four cited documents has not been

16

properly made." To the extent AEP intends for this paragraph to have a different meaning, denied.

**The inventors' misrepresentations regarding Norit PAC and the withholding of the March 2003 article were material and done with the intent to deceive the Patent Examiner into issuing the '147 patent**

68.     The statement that "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein" is false.

**RESPONSE**: Denied.

69.     The inventors made the statement in the previous paragraph multiple times during the prosecution of the '147 patent.

**RESPONSE**: Admitted.

70.     Each of the inventors' statements that "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein" was material to the prosecution of the '147 patent.

**RESPONSE**: This paragraph contains conclusions of law to which no response is required. As such, it is denied.

71.     The statement that "The Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes" implies that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes.

**RESPONSE**: Denied.

72.     The inventors made the statement in the previous paragraph multiple times during the prosecution of the '147 patent.

**RESPONSE**: Denied.

73.     The implication that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes is false.

**RESPONSE**:  Denied.

74.     Each of the inventors' statements that "The Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes" and their implications, was material to the prosecution of the '147 patent.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

75.     The statement that the Nelson reference, when combined with other references, did not disclose or suggest graphene sheets containing carbene species edge cites is false.

**RESPONSE**:  Denied.

76.     The inventors made the statement in the previous paragraph multiple times during the prosecution of the '147 patent.

**RESPONSE**:  Denied.

77.     Each of the inventors' statement that the Nelson reference, when combined with other references, did not disclose or suggest graphene sheets containing carbene species edge cites was material to the prosecution.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

78.     By the time the inventors made the false statements to the Examiner regarding the activated carbons disclosed in the Nelson reference, the inventors had thoroughly investigated the Norit FGD sorbent and were familiar with its structure.

**RESPONSE**:  Denied.

79.    The inventors stated or implied that Nelson did not disclose activated carbene containing graphene sheets having carbene species edge sites at least fifteen times over the course of February 14, 2011 until October 27, 2011.

**RESPONSE**:  ME2C admits that one or more prosecuting attorneys stated "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein." Otherwise denied.  To the extent AEP intends for this paragraph to have a different meaning, denied.

80.    The Examiner stated in her reasons for allowance that she was allowing the claims of the '147 patent to issue because she believed the prior art did not disclose a method of removing mercury from a gas using bromine and activated carbon where the activated carbon contains graphene sheets having carbene edge special sites.

**RESPONSE**:  ME2C admits that the examiner stated: "The following is an examiner's statement of reasons for allowance: a method for separating mercury from a mercury containing gas comprising promoting at least a portion of a particulate sorbent material comprising activated carbon by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent, wherein the activated carbon contains grapheme sheets having carbine species edge sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury could not be found within the prior art."  To the extent AEP intends for this paragraph to have a different meaning, denied.

81.    The only reasonable inference that can be drawn from the inventors' repeated false statements regarding the activated carbons disclosed in the Nelson reference and the inventors' failure to disclose the March 2003 article that would have exposed the inventors' falsehood and

the other conduct cited above is that the inventors made these false statements and withheld this reference in an attempt to deceive the Examiner into issuing the '147 patent.

**RESPONSE**:  Denied.

### Withholding of the May 2003 presentation and article

82.     During prosecution of the '147 patent, the inventors intentionally withheld their May 2003 article and a separate May 2003 presentation, each of which were § 102(b) prior art to the '147 patent and the '114 patent and each of which disclosed an element that the inventors contended was missing from the prior art—that carbene sites that react with bromines to produce carbocationic sites that can react with and immobilize mercury atoms.

**RESPONSE**:  Denied.

83.     Bromine and chlorine are halogens.

**RESPONSE**:  Admitted.

84.     The examiner repeatedly stated that "chlorine and bromine are very similar in there [*sic*] chemical characteristics."

**RESPONSE**:  ME2C admits that on October 14, 2010, the Examiner stated: "Chlorine and bromine are very similar in there chemical characteristics."

85.     The '147 patent discloses in Figure 2 "a theory developed from scientific evidence to explain the nature of the promoting compounds."

**RESPONSE**:  Admitted.

86.     Figure 2 of the '147 patent illustrates the chemistry whereby the grapheme sheets react at an edge carbine site with bromine to form a mercury reactive species capable of capturing mercury.

**RESPONSE**:  ME2C admits that the '147 patent states: "Referring now to FIG. 2, there is illustrated a theory developed from scientific evidence to explain the nature of the promoting compounds. For example, as illustrated in FIG. 2, hydrogen bromide reacts with the unsaturated structure of the activated carbon. This may be, by way of illustration only, a carbene species on the edge of the graphene sheet structures of the carbon. Molecular bromine or a bromine compound.  reacts to form a similar structure, with a positive carbon that is active for oxidizing the mercury with Subsequent capture by the sorbent." To the extent AEP intends for this paragraph to have a different meaning, denied.

87.    In May 2003, the inventors issued two publications that disclose this chemistry for chlorine.

**RESPONSE**:  Denied.

88.    Investors Edwin S. Olson, Michael J. Holmes and John H. Pavlish are coauthors on Olson et al., "Chemical mechanisms in mercury emission control technologies," J. Phys. IV France 107 (2003), presented May 26-30, 2003 and the XIIth International Conference on Heavy Metals in the Environment in Grenoble, France.

**RESPONSE**:  Admitted.

89.    The same inventors are co-authors on another paper, Olson et al., "An Improved Model for Flue Gas-Mercury Interactions on Activated Carbons," Paper #142 at the Combined Power Plant Air Pollutant Control Mega Symposium, May 19-22, 2003 in Washington, DC.

**RESPONSE**:  Admitted.

90.    By virtue of being published more than one year before the earliest application date shown on the face of either the '147 patent or the '114 patent, each of these papers is prior art under 35 U.S.C. § 102(b) to the '147 patent and to the '114 patent.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

91.    Each of these May 2003 inventor publications discloses the same chemistry for chlorine that the inventors claimed they discovered for bromine.  Shown below is Figure 2 from the patents-in-suit on the left and the corresponding figure from the May 2003 inventor publications:



Figure 3. Oxidation mechanism model for activated carbons.

**RESPONSE**:  Denied.

92.    The prior art included teachings that bromine compounds oxidize mercury more Effectively than chlorine compounds.  However, the inventors argued that the prior art did not disclose the same chemistry as allegedly discovered by the inventors by which bromine interacted with carbon and mercury.

**RESPONSE**:  Denied.

93.    The May 2003 inventor publications disclosed that chlorine acted in accordance with the same chemical reactions and taught that other halogens would work in the same way.

**RESPONSE**:  Denied.

94.    The May 2003 inventor publications would have been material to the prosecution of the '147 patent and the prosecution '114 patent because, among other reasons, it showed that

chlorine interacted with carbon and mercury using the same chemical reactions as the inventors claimed bromine interacted with carbon and mercury and that activated brominated carbon used in the prior art to control mercury possessed the requisite structures for these chemical reactions.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

95.     But for the inventors' deliberate withholding of their May 2003 publications, the Examiner would have persisted in rejecting the claims of the '114 patent and the '147 patent over the prior art and the claims of the '114 patent and the '147 patent would not have issued in their present form.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

96.     The inventors had knowledge of their May 2003 publications and had knowledge of their contents.

**RESPONSE**:  Admitted.

97.     The only reasonable inference that can be drawn regarding the inventors' decision to withhold the May 2003 inventor publications is that they did so in order to deceive the Patent Examiner into issuing the '114 and '147 patents.

**RESPONSE**:  Denied.

### ME2C's breach of the NDA

98.     In 2016, plaintiffs (hereinafter "ME2C") induced AEP to permit ME2C to enter the Pirkey plant and gain access to confidential information regarding the operation of that plant.

**RESPONSE**:  ME2C admits that AEP expressed interest in evaluating ME2C's patented technology and explained that it was willing to share confidential information with ME2C. ME2C also admits that it entered the Pirkey plant.  Otherwise denied.

99.     ME2C entered a Non-Disclosure Agreement ("NDA") in which ME2C promised to maintain as confidential and promised that it would not use any of AEP's confidential information for any purpose other than for evaluation of and negotiations relating to the testing at Pirkey.

**RESPONSE**: ME2C admits that it signed the NDA wherein the parties agreed, among other things, that with respect the Confidential Information as defined therein "Neither party shall use the Confidential Information (including Evaluation Material) for any purpose other than for evaluation of and negotiations relating to the Project."  To the extent AEP intends for this paragraph to have a different meaning, denied.

100.     ME2C was then permitted to enter the Pirkey plant, where ME2C conducted tests and had access to confidential information regarding the operation of the Pirkey plant.

**RESPONSE**: ME2C admits that ME2C was permitted to enter the Pirkey plant, where it conducted tests.  ME2C also admits that it had access to information AEP contends is confidential as well as information that is not confidential.  ME2C is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

101.     At the time of these tests, ME2C considered the process at Pirkey using halogen-based additives and halogen-based sorbents to be a process outside the scope of ME2C's patents that was, ME2C believed, inferior to ME2C's patented process.

**RESPONSE**:  Denied.

102.    ME2C repeatedly identified its patents, including the '147 patent, as covering a process that was different from, and allegedly superior to, the halogen-based additive and sorbent process that was already being used at Pirkey.

**RESPONSE**:  Denied.

103.    ME2C, at the time of the testing at Pirkey, did not believe the '147 patent covered the halogen-based additive and sorbent process that was already being used at Pirkey and that is still being used today.

**RESPONSE**:  Denied.

104.    In 2018, ME2C filed a patent application seeking to obtain claims that covered the halogen-based additive and sorbent process that ME2C learned was being used at Pirkey. ME2C gained that knowledge through confidential information it received under the work governed by the NDA.

**RESPONSE**:  Admitted that ME2C filed a patent application in 2018. Otherwise denied.

105.    In doing so, ME2C knowingly and willfully breached the NDA, which precluded ME2C from using AEP's confidential information for purposes other than for evaluation and negotiations relating to the Pirkey plant testing.

**RESPONSE**:  Denied.

106.    On information and belief, in 2018 or 2019, ME2C, by distorting the meanings of claim terms in the '147 patent, developed an argument that the '147 patent covered the halogen-based additive and sorbent process that was already being used at Pirkey, despite concluding in 2016 and 2017 that the '147 patent did not cover that process.

**RESPONSE**:  Denied.

107.    ME2C developed the argument referred to in the previous paragraph using confidential information about the Pirkey plant obtained as part of its work at Pirkey governed by the NDA.

**RESPONSE**:  Denied.

**COUNT I: NONINFRINGEMENT OF THE '147 PATENT**

108.    AEP re-alleges herein the foregoing paragraphs of its Counterclaims.

**RESPONSE**: ME2C incorporates by reference its answers to the preceding paragraphs.

109.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1, et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that no valid claims of the '147 patent will be infringed by AEP's processes for burning coal and that the AEP has not made, used, sold and/or offered to sell in this country any of the methods that are within the scope of the claims of the '147 patent and thus has not infringed and is not infringing any claim of the '147 patent.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

110.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of AEP's methods will infringe any valid and enforceable claim of the '147 patent.

**RESPONSE**:  Admitted.

111.    AEP does not infringe any claim of the '147 patent.

**RESPONSE**:  Denied.

112.    AEP is entitled to a judicial declaration that the manufacture, use, sale and/or offering for sale of AEP's methods will not infringe, directly or indirectly, any valid claim of the '147 patent.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

## COUNT II: INVALIDITY OF THE '147 PATENT

113.    AEP re-alleges herein the foregoing paragraphs of its Counterclaims.

**RESPONSE**:  ME2C incorporates by reference its answers to the preceding paragraphs.

114.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '147 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

115.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of AEP's methods will infringe any valid and enforceable claim of the '147 patent.

**RESPONSE**:  Admitted.

116.    One or more claims of the '147 patent is invalid under one or more of §§ 101, 102, 103, and/or 112 of the Patent Act, Title 35 of the United States Code.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

117.    AEP is entitled to a judicial declaration that the claims of the '147 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including

without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

## COUNT III: UNENFORCEABILITY OF THE '147 PATENT

118.    AEP re-alleges herein the foregoing paragraphs of their Counterclaim.

**RESPONSE**: ME2C incorporates by reference its answers to the preceding paragraphs.

119.    This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '147 patent are unenforceable pursuant to the doctrine of inequitable conduct and unclean hands.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

120.    AEP seeks a declaration that the claims of the '147 patent are unenforceable.  A judicial declaration is necessary and appropriate at this time in order that AEP may ascertain its rights and duties with respect to the '147 patent and to any past, present, or future manufacture, use, distribution, sale and/or offer for sale of its methods.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

121.    As alleged in more detail above, during prosecution of the '147 patent, the inventors made material misrepresentations of fact to the Patent Office regarding the activated carbon disclosed in the Nelson prior art reference, and intentionally withheld a prior art reference that the inventors themselves had authored which would have exposed the falsehood of the inventors' misrepresentations.

**RESPONSE**:  Denied.

122.     As alleged in more detail above, the inventors acted with an intent to deceive the Patent Office into issuing the '147 patent.

**RESPONSE**:  Denied.

123.     The named inventors further violated their duty of candor by failing to submit to the patent examiner and the USPTO material prior art, namely the May 2003 inventor publications discussed above.

**RESPONSE**:  Denied.

124.     As alleged in more detail above, the May 2003 publications were material to the prosecution of the '147 patent, the inventors made material misrepresentations of fact to the Patent Office regarding the activated carbon disclosed in the Nelson prior art reference, and intentionally withheld a prior art reference that the inventors themselves had authored which would have exposed the falsehood of the inventors' misrepresentations.

**RESPONSE**:  Denied.

125.     As alleged in more detail above, the inventors acted with an intent to deceive the Patent Office into issuing the '147 patent.

**RESPONSE**:  Denied.

126.     AEP is entitled to a judicial declaration that the claims of the '147 patent are therefore unenforceable due to the inventors' inequitable conduct and unclean hands.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

## COUNT IV: NONINFRINGEMENT OF THE '114 PATENT

127.     AEP re-alleges herein the foregoing paragraphs of its Counterclaims.

**RESPONSE**:  ME2C incorporates by reference its answers to the preceding paragraphs.

128.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that no valid claims of the '114 patent will be infringed by the AEP has not made, used, sold and/or offered to sell in this country any of the methods that are within the claims of the '114 patent and thus has not infringed and is not infringing any claim of the '114 patent.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

129.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of AEP's methods will infringe any valid and enforceable claim of the '114 patent.

**RESPONSE**:  Admitted.

130.    AEP does not infringe any claim of the '114 patent.

**RESPONSE**:  Denied.

131.    AEP Is entitled to a judicial declaration that the manufacture, use, sale and/or offering for sale of AEP's methods will not infringe, directly or indirectly, any valid claim of the '114 patent.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

## COUNT V: INVALIDITY OF THE '114 PATENT

132.    AEP re-alleges herein the foregoing paragraphs of their Counterclaim.

**RESPONSE**: ME2C incorporates by reference its answers to the preceding paragraphs.

133.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration

that the claims of the '147 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of the §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

134.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of AEP's methods will infringe nay valid and enforceable claim of the '114 patent.

**RESPONSE**:  Admitted.

135.    One or more claims of the '114 patent is invalid under one or more of the §§ 101, 102, 103, and/or 112 of the Patent Act, Title 35 of the United States Code.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

136.    AEP is entitled to a judicial declaration that the claims of the '114 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

## COUNT VI: UNENFORCEABILITY OF THE '114 PATENT

137.    AEP re-alleges herein the foregoing paragraphs of its Counterclaims.

**RESPONSE**:  ME2C incorporates by reference its answers to the preceding paragraphs.

138.    This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and

2202, and seeks a declaration that the claims of the '114 patent are unenforceable pursuant to the

doctrines of inequitable conduct and unclean hands.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As

such, it is denied.

139.    AEP seeks a declaration that the claims of the '114 patent are unenforceable.  A judicial

declaration is necessary and appropriate at this time in order that AEP may ascertain its rights

and duties with respect to the '114 patent and to any past, present, or future manufacture, use,

distribution, sale and/or offer for sale of its methods.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As

such, it is denied.

140.    As alleged in more detail above, during prosecution of the '114 patent, the inventors

intentionally withheld a prior art reference that the inventors themselves had authored that would

have exposed the falsehood of the inventors' misrepresentations.

**RESPONSE**:  Denied.

141.    As alleged in more detail above, the inventors acted with an intent to deceive the Patent

Office into issuing the '114 patent.

**RESPONSE**:  Denied.

142.    The named inventors further violated their duty of candor by failing to submit to the

patent examiner and the USPTO material prior art, namely the March 2003 and May 2003

inventor publications discussed above.

**RESPONSE**:  Denied.

143.     As alleged in more detail above, the March and May 2003 publications were material to the prosecution of the '114 patent, and the inventors intentionally withheld a prior art reference that the inventors themselves had authored which would have led the Examiner to refuse to issue the claims of the '114 patent in their current form.

**RESPONSE**:  Denied.

144.     As alleged in more detail above, the inventors acted with an intent to deceive the Patent Office into issuing the '114 patent.

**RESPONSE**:  Denied.

145.     AEP is entitled to a judicial declaration that the claims of the '114 patent are therefore unenforceable due to the inventors' inequitable conduct.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

146.     As also alleged above, ME2C obtained the '114 patent and drafted the claims of the '114 patent using confidential information of AEP's that ME2C used in breach of the Non-Disclosure Agreement (NDA) that ME2C entered into with AEP.

**RESPONSE**:  Denied.

147.     AEP is entitled to a judicial declaration that the claims of the '114 patent are therefore unenforceable due to ME2C's unclean hands.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

## COUNT V: BREACH OF CONTRACT

148.     AEP re-alleges herein the foregoing paragraphs of their Counterclaim.

**RESPONSE**:  ME2C incorporates by reference its answers to the preceding paragraphs.

149.    Pursuant to the 2017 NDA ME2C had a duty, among other things, not to disclose AEP's confidential information to third parties or use it for a purpose other than the parties' work together.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

150.    In violation of the terms of the 2017 NDA, ME2C has used AEP's confidential information for purposes of obtaining a patent and has publicly disclosed certain of AEP's confidential information.

**RESPONSE**:  Denied.

151.    As a result of ME2C's breach of the 2017 NDA, AEP is entitled to damages and an injunction against further use of AEP's information.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

## COUNT VI: TRADE SECRET MISAPPROPRIATION

152.    AEP re-alleges herein the foregoing paragraphs of their Counterclaim.

**RESPONSE**:  ME2C incorporates by reference its answers to the preceding paragraphs.

153.    Pursuant to the 2017 NDA, ME2C had a duty, among other things, not to disclose AEP's confidential information to third parties or use it for a purpose other than the parties' work together.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

154.    ME2C was aware of the terms of the 2017 NDA, including but not limited to the duty to not disclose AEP's confidential and proprietary information to third parties.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

155.    ME2C misused and/or disclosed information to at least one third party, which constitutes the trade secrets of AEP, and which conduct constitutes misappropriation of trade secrets.

**RESPONSE**:  Denied.

156.    As a result of ME2C's misconduct, AEP is entitled to damages and an injunction against further use of AEP's information.

**RESPONSE**:  This paragraph contains conclusions of law to which no response is required.  As such, it is denied.

### PRAYER FOR RELIEF

ME2C denies that counter-claimants are entitled to any of the relief they request.

### DEMAND FOR JURY TRIAL

ME2C respectfully demands a jury trial of all issues triable to a jury in this action.

### GENERAL DENIAL

ME2C further denies each allegation contained in AEP's counterclaims that was not specifically admitted, denied, or otherwise responded to herein.

### DEFENSES

First Affirmative Defense

1.    AEP has failed to state one or more essential elements in its stated causes of action.

Second Affirmative Defense

2.    ME2C asserts that even if AEP's allegations are true, AEP did not suffer any damages (economic loss), or failed to mitigate any economic loss, as a result of ME2C's actions.

<u>Third Affirmative Defense</u>

3.       AEP's claims for relief are barred, in whole or in part, under the equitable doctrines of estoppel, waiver, laches, and/or unclean hands.

<u>Fourth Affirmative Defense</u>

4.       AEP's claims for relief are barred, in whole or in part, because it has failed to allege the existence of confidential information or trade secrets or otherwise allege that it maintained the secrecy of this information and did not publicly disclose it.

ME2C's investigations into the allegations set forth in AEP's Counterclaims Complaint are ongoing and discovery has not yet commenced.  Accordingly, ME2C expressly reserves the right to assert and pursue additional defenses.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, ME2C respectfully requests that this Court enter a Judgment and Order as follows:

A.  Declaring that AEP has infringed, and is infringing, the '114 patent;

B.  Declaring that AEP has infringed, and is infringing, the '147 patent;

C.  Declaring that the '114 patent is valid and enforceable against AEP;

D.  Declaring that the '147 patent is valid and enforceable against AEP;

E.  Declaring that ME2C has not violated the NDA;

F.  Declaring that ME2C has not misappropriated AEP's trade secrets;

G.  For costs, including such reasonable attorneys' fees as the Court may find recoverable; and

H.  Such other relief as the Court deems proper.

Dated: October 30, 2019

**DEVLIN LAW FIRM LLC**

*/s/ James M. Lennon*
James M. Lennon (No. 4570)
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
jlennon@devlinlawfirm.com

**CALDWELL CASSADY CURRY PC**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Phone: (214) 888-4848
(214) 888-4849 (fax)
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
jnemunaitis@caldwellcc.com

Bradley W. Caldwell
Texas Bar No. 24040630
Jason D. Cassady
Texas Bar No. 24045625
John Austin Curry
Texas Bar No. 24059636
Justin T. Nemunaitis
Texas Bar No. 24065815

***Attorneys for Plaintiffs***
***Midwest Energy Emissions Corp.***
***and MES Inc.***