# *Exhibit 5*

FILED
September 28, 2011
INDIANA UTILITY
REGULATORY COMMISSION

PETITIONER'S EXHIBIT B

**PREFILED TESTIMONY OF
STEVEN W. MEEHAN, SENIOR ENGINEER,
PROGRAM ENGINEERING – MIDWEST REGION
DUKE ENERGY BUSINESS SERVICES, LLC
ON BEHALF OF DUKE ENERGY INDIANA, INC.
CAUSE NO. 44061 BEFORE THE
INDIANA UTILITY REGULATORY COMMISSION**

1  **Q.    PLEASE STATE YOUR NAME AND BUSINESS ADDRESS.**

2  A.    My name is Steven W. Meehan and my business address is 1000 East Main Street,

3        Plainfield, Indiana.

4  **Q.    BY WHOM ARE YOU EMPLOYED AND IN WHAT CAPACITY?**

5  A.    I am employed by Duke Energy Business Services, LLC, as Senior Engineer, Program

6        Engineering – Midwest Region.  Duke Energy Business Services is a non-utility

7        affiliate of Duke Energy Indiana, Inc. ("Petitioner," "Duke Energy Indiana," or

8        "Company").

9  **Q.    PLEASE STATE YOUR EDUCATIONAL AND PROFESSIONAL**

10        **BACKGROUND.**

11  A.    I graduated from Purdue University in 1971 with a Bachelor of Science degree in

12        Electric Engineering.  I also earned a Master of Science degree in Engineering from

13        Purdue in 1985.  I am a Registered Professional Engineer in the State of Indiana.

14        Following an eighteen-year tenure in power operations, engineering and fuel supply at

15        Indianapolis Power and Light, I joined the Fuels Department of Public Service

16        Company of Indiana, Inc. ("PSI"), a predecessor of Duke Energy Indiana, as Manager

17        of Fuels Planning in 1989.  I have held various positions in Fuels, Engineering and

18        Business Development at PSI and its successors, including Manager of Fuel

425802

| | | |
|---|---|---|
| 1 | | Transportation, Manager of Fuel Utilization, Principal Engineer and Director of |
| 2 | | Business Development prior to my current role. |
| 3 | Q. | **WHAT IS THE PURPOSE OF YOUR TESTIMONY?** |
| 4 | A. | I will describe the proposed Refined Coal transactions ("Transactions") with Cottbus |
| 5 | | Associates Company, LLC ("Cottbus") and Marquis Industrial Company, LLC |
| 6 | | ("Marquis") for Duke Energy Indiana's Cayuga and Gibson Generating Stations. |
| 7 | | Cottbus and Marquis are both wholly owned subsidiaries of Coal Emissions Reduction |
| 8 | | Technologies LLC ("CERT").  Since the Transactions are essentially identical, I will |
| 9 | | refer to the counter party as CERT. |
| 10 | Q. | **PLEASE DESCRIBE COAL EMISSIONS REDUCTION TECHNOLOGIES,** |
| 11 | | **LLC.** |
| 12 | A. | CERT is, as its name implies, an entity that has for a number of years produced |
| 13 | | Refined Coal in order to reduce emissions and take advantage of certain income tax |
| 14 | | credits.  CERT has produced Refined Coal at fifteen installations at coal mines in |
| 15 | | Alabama.  They are now transferring these operations from relatively small coal mines |
| 16 | | to large electric generating stations operated by utilities. |
| 17 | Q. | **IS CERT CURRENTLY OPERATING ANY FACILITIES SIMILAR TO THE** |
| 18 | | **PROPOSED FACILITIES FOR CAYUGA AND GIBSON?** |
| 19 | A. | CERT holds a number of franchise licenses for the proprietary Chem-Mod chemical |
| 20 | | technology which has been used to reduce $NO_x$ and mercury emissions from coal-fired |
| 21 | | utility boilers.  At least three other entities hold similar rights to the chemical |
| 22 | | technology.  However those other entities use more intrusive and capital-intensive |
| 23 | | application methods to produce the same Refined Coal result.  CERT has produced |

1      Refined Coal using Chem-Mod installations at coal mines since 2009 and is now

2      operating a similar installation at a Dominion Resources, Inc. station in West Virginia

3      and at a second Dominion Resources, Inc. station in Virginia.  CERT has additional

4      Refined Coal projects under development with Dominion Resources, Inc., Ameren

5      Corporation, Cleco Corp., NRG Energy, Inc., and Intermountain Power Agency.  The

6      Company's Cayuga and Gibson Generating Stations, however, will be the first to

7      utilize Refined Coal produced entirely from Illinois Basin coal feedstock.

8      As part of its due diligence the Company has conducted research into the

9      experiences of other utilities using the technology.  A team representing

10      environmental, engineering and operational departments of the Company has

11      communicated with other users of the technology.  The due diligence also included

12      review of emissions and operating data and a site visit to a station, the Santee Cooper

13      Cross Station in North Carolina, which has been operating with the same Chem-Mod

14      chemical technology for more than a year.  No detrimental affects to operations,

15      environmental compliance or marketability of coal combustion byproducts have been

16      identified.

17  **Q.**    **PLEASE GENERALLY DESCRIBE THE REFINED COAL TAX CREDITS.**

18  A.    Section 45 of the U.S. Internal Revenue Code provides a tax credit to entities that sell

19      Refined Coal to an unrelated third party which is used to produce steam.  In order to

20      qualify, the Refined Coal must demonstrate a minimum reduction of $NO_x$ emissions

21      by 20% and either $SO_2$ or mercury emissions by 40% compared to the emissions from

22      the feedstock coal.  In order to qualify for this tax credit, the facility used to produce

23      the Refined Coal must be in service prior to the end of 2011.  The ability of the CERT

1      process to achieve these reductions has been demonstrated in a pilot scale combustion

2      furnace at the University of North Dakota's Energy and Environmental Research

3      Center ("EERC"), using the same Illinois Basin feedstock coal Duke Energy Indiana

4      currently uses at Cayuga, and produced reductions of 24% $NO_x$ and 44% mercury.

5      Tests at the EERC on Gibson coal feedstock have produced similar qualifying

6      reductions to $NO_x$ and mercury.  Demonstration of the required emission reductions in

7      the pilot combustion test furnace is sufficient for meeting the performance standard

8      since CERT is not responsible for the operation of the host generating station.  CERT

9      will use the tax credit to cover all CERT expenses including: cost of capital,

10     consumables, staffing, franchise fee, lease payment and other O&M expenses.  The

11     tax credit can be generated for a period of ten years from the date that the Refined

12     Coal facility is placed in-service.

13  Q.    **DID YOU PARTICIPATE IN THE DISCUSSIONS AND NEGOTIATIONS**

14      **WITH CERT THAT LED TO THE TRANSACTIONS?**

15  A.    Yes, I did.

16  Q.    **HOW ARE THE TRANSACTIONS STRUCTURED?**

17  A.    As described in the Petition, the Transactions will each consist of six agreements, a

18      Feedstock Supply Agreement, a Lease Agreement, a Refined Coal Sales Agreement, a

19      Site Services Agreement, a Promissory Note and a Security Agreement.  The CERT

20      entities, Cottbus and Marquis, will erect their facilities on small leased areas at Cayuga

21      and Gibson.  These facilities will be non-intrusive to the normal operations at those

22      stations.  In order to qualify for the tax credit, CERT believes that they need to own a

23      two-day inventory of feedstock coal.  Therefore, Duke Energy Indiana has agreed to

1     sell CERT such two-day inventory at both stations, at the weighted average cost of

2     inventory.  In order to purchase this coal, CERT will enter into Promissory Notes to

3     Duke Energy Indiana and will pay interest on those Promissory Notes throughout the

4     life of the Transactions.  CERT has also executed Security Agreements to secure the

5     Promissory Notes.  Duke Energy Indiana will still be able to use the coal if it ever

6     becomes necessary.  The CERT inventory will remain physically co-mingled with the

7     Company's inventory.  Duke Energy Indiana will continue to sell required feedstock

8     coal from the station's coal supply to CERT at the weighted average cost of inventory

9     for the coal.  As CERT's coal feedstock, purchased from Duke Energy Indiana, travels

10    through CERT facilities on the existing Duke Energy Indiana station coal conveyors,

11    CERT will apply chemicals to the coal to produce Refined Coal.[1]  CERT will then sell

12    the Refined Coal to Duke Energy Indiana at the weighted average cost of coal

13    feedstock inventory plus a fee for the treatment at an incremental cost per ton.  CERT

14    will also pay Duke Energy Indiana a fee for site services such as coal handling under

15    the Site Services Agreements which will exactly offset the incremental fee Duke

16    Energy Indiana will pay CERT for the chemical treatment of the coal.  CERT will also

17    pay Duke Energy Indiana a rental fee for the lease spaces that is based on the revenue

18    CERT expects to generate at each facility.

19  **Q.**    **PLEASE IDENTIFY PETITIONER'S EXHIBITS B-1 THROUGH B-4.**

20  A.    Petitioner's Exhibits B-1 through B-4, collectively, are the Transaction agreements

21      with Cottbus for the Cayuga station.  As I stated above, the Transaction agreements

22      with Marquis are essentially identical.

---

[1] CERT is responsible for the cost of the chemicals.

1    **Q.**    **WHAT CHEMICALS WILL BE APPLIED TO THE FEEDSTOCK COAL IN**

2           **ORDER TO CONVERT THIS COAL INTO REFINED COAL?**

3    A.    There are two reagents to be applied in the proprietary process.  The commercial

4          names of the reagents are S-Sorb (a high grade cement kiln dust) and Mer-Sorb (a

5          50% aqueous solution of calcium bromide).  The application rates are prescribed based

6          on the qualification tests conducted at the EERC.

7    **Q.**    **DOES THE COMPANY HAVE ANY RESPONSIBILITIES WITH RESPECT**

8           **TO ACHIEVING THE TAX CREDITS?**

9    A.    No it does not.  The risk of qualifying for the tax credit is strictly borne by CERT.

10         Furthermore, the Company has very liberal termination rights under the Transaction

11         Agreements including the rights to terminate for cause, or in the event of lack of

12         necessary regulatory approvals, or for convenience.  The Company can also

13         immediately suspend CERT's operations in the event that, in the Company's sole

14         judgment, the Refined Coal causes operational difficulties or risk to persons or

15         property or violation of any law.  Any remedial action shall not require the Company

16         to incur any additional costs, to make any improvements or alterations to the

17         generating facility, to change the operations of the generating facility, or to modify or

18         obtain any permit, consent or other approval of any governmental authority.

19    **Q.**    **DOES THIS CONCLUDE YOUR TESTIMONY?**

20    A.    Yes, it does.

**EXECUTION VERSION**

**REFINED COAL SALES AGREEMENT**
**(Cayuga Generating Station)**

**between**

**COTTBUS ASSOCIATES, LLC,**

**as Seller**

**and**

**DUKE ENERGY INDIANA, INC.**

**as Purchaser**

## REFINED COAL SALES AGREEMENT
### (Cayuga Generating Station)

## TABLE OF CONTENTS

Page

ARTICLE I Definitions .......................................................................................................................1

ARTICLE II Purchase and Sale of Product; Quantity .......................................................................6

    2.1    Purchaser's Rights and Obligations With Respect to Purchases of Product. ..........6

    2.2    Seller's Rights and Obligations With Respect to Sales of Product. ........................7

ARTICLE III Term; Termination; Suspension...................................................................................8

    3.1    Term.........................................................................................................................8

    3.2    Early Termination by Seller.....................................................................................8

    3.3    Suspension Notices and Early Termination by Purchaser. ......................................8

    3.4    Other Termination Rights ......................................................................................10

    3.5    Liability Upon Termination ...................................................................................11

ARTICLE IV Price; Payment...........................................................................................................11

    4.1    Refined Coal Price .................................................................................................11

    4.2    Billing and Payment...............................................................................................12

    4.3    Sales Taxes on Product and Coal Feedstock..........................................................12

    4.4    Setoff.....................................................................................................................13

ARTICLE V Delivery of Product; Coal Feedstock Specifications .................................................13

    5.1    Delivery Point........................................................................................................13

    5.2    Facility Measuring Devices and Facility Input Scale ............................................13

    5.3    Quality Standards...................................................................................................14

    5.4    Seller's Warranties.................................................................................................15

ARTICLE VI Force Majeure; Representations and Warranties .....................................................15

| | | |
|---|---|---|
| 6.1 | Force Majeure. | 15 |
| 6.2 | Representations and Warranties of Purchaser | 16 |
| 6.3 | Representations and Warranties of Seller | 17 |

ARTICLE VII Indemnification; Limitation of Liability; Insurance; Adequate Assurances .........18

| | | |
|---|---|---|
| 7.1 | Purchaser | 18 |
| 7.2 | Seller | 18 |
| 7.3 | Infringement | 18 |
| 7.4 | Procedure | 18 |
| 7.5 | Reduction and Recovery | 19 |
| 7.6 | Limitation on Damages | 19 |

ARTICLE VIII Miscellaneous ..................................................................................................20

| | | |
|---|---|---|
| 8.1 | Independent Contractor | 20 |
| 8.2 | Binding Effect | 20 |
| 8.3 | Assignments | 20 |
| 8.4 | Accounting and Audit | 21 |
| 8.5 | Right of Observation and Examination | 21 |
| 8.6 | Drafting Conventions; Headings | 21 |
| 8.7 | Entire Agreement. | 22 |
| 8.8 | Representatives. | 22 |
| 8.9 | Governing Law; Jurisdiction | 22 |
| 8.10 | Partial Invalidity | 22 |
| 8.11 | Non-Waiver of Covenants. | 22 |
| 8.12 | Notices. | 22 |
| 8.13 | Confidentiality and Use of Proprietary Information. | 23 |
| 8.14 | Qualifications; Screening Measures | 24 |

8.15    Safety ...................................................................................................................... 25

8.16    Insurance ............................................................................................................... 25

8.17    Compliance with Regulatory Code of Conduct ...................................................... 25

8.18    Fraud and Ethics .................................................................................................... 26

8.19    Diverse Suppliers ................................................................................................... 26

8.20    No Third-Party Beneficiary ................................................................................... 26

8.21    Survival Clause ...................................................................................................... 26

8.22    Arbitration .............................................................................................................. 26

8.23    Counterparts ........................................................................................................... 28

8.24    Expenses ................................................................................................................ 28

8.25    Interpretation ......................................................................................................... 28

8.26    Attorneys' Fees ...................................................................................................... 28

8.27    Remedies ................................................................................................................ 28

Schedule 2.2(c)        Approved Chemicals
Schedule 5.1           Line Drawing
Schedule 5.3           Quality Standards

## REFINED COAL SALES AGREEMENT
(Cayuga Generating Station)

This **REFINED COAL SALES AGREEMENT** (this "Agreement") dated effective as of August 22, 2011 (the "Effective Date"), is between Duke Energy Indiana, Inc., an Indiana corporation having a business address at 526 S. Church St., Charlotte, NC 28202 ("Purchaser") and Cottbus Associates, LLC, a Delaware limited liability company ("Seller").

### RECITALS

A.     Purchaser owns and operates an electric power generation station and related facilities known as the Cayuga Generating Station located in Vermillion County, Indiana (the "Generation Facility"); and

B.     Seller owns a coal treatment plant ("Seller's Plant") to be relocated to the Lease Area, as defined below, near the Generation Facility, from which Seller desires to produce Product, as defined below, and sell such Product to Purchaser.

**NOW, THEREFORE**, in consideration of the promises and covenants herein, Purchaser and Seller agree as follows:

### AGREEMENT

### ARTICLE I
### Definitions

The following terms shall have the indicated meanings:

"AAA" is defined in Section 8.22(a).

"Adverse Consequences" means all actions, suits, arbitrations, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages (including natural resource damages), dues, penalties, fines, costs, liabilities, obligations, liens, losses, expenses, fees, including court costs and reasonable attorneys', consultants' and experts' fees and expenses.

"Affiliate" means, with respect to a Person, any Person that directly or indirectly controls, is controlled by or is under common control with, such Person. As used in this definition, the word "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, by contract or otherwise; *provided*, that any Person who owns 50 percent or more of the voting securities in another Person shall be conclusively deemed to control such Person.

"Agreement" is defined in the introductory paragraph.

"Alternate" is defined in Section 8.22(b).

1

"Annual Forecast" is defined in Section 2.1(b).

"Annual Forecast Quantity" means, with respect to any calendar year during the Term, the aggregate Tons of Product estimated to be produced by Seller and sold to Purchaser during such year as reflected in the Annual Forecast for such year.

"Approved Coal Feedstock Agreement" means an agreement to which Seller is a party for the purchase of coal feedstock to be used to produce Product which agreement was recommended or approved by Purchaser, assigned to Seller by Purchaser or one of its Affiliates, or entered into by Purchaser or one of its Affiliates.

"Arbitrator" is defined in Section 8.22(b).

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which national banking institutions in Indianapolis, Indiana are authorized by Law or other governmental action to close.

"Chemicals" means any of the chemicals set forth on Schedule 2.2(c), as such Schedule may be amended from time to time by the mutual agreement of the parties as provided in Section 2.2(c).

"Coal Sales Tax" is defined in Section 4.3.

"Coal Feedstock Inventory Price" means the monthly weighted average cost of inventory ("WACI") of Seller's coal inventory at the Generating Facility for the month prior to delivery of Product to Purchaser under this Agreement.

"Code" means the Internal Revenue Code of 1986, as it may be amended, restated, or supplemented from time to time, and any successor to such statute.

"Commercial Operations Date" shall be the date on which Seller completes installation of Seller's Plant and related facilities at the Generation Facility and undertakes full commercial operations of Seller's Plant pursuant to written instructions to the Operator.

"Conforming Coal Feedstock" means coal feedstock that meets the Quality Standards in effect from time to time.

"Delivery Point" is defined in Section 5.1.

"Dispute" is defined in Section 8.22(a).

"Effective Date" is defined in the introductory paragraph.

"Emissions Premium Amount" means

"Environmental Laws" means any and all Laws relating to public or employee health and safety, pollution or protection of the environment, including the Laws identified under the definition of "Hazardous Substances".

2

"Facility Measuring Devices" is defined in Section 5.2.

"Feedstock Supply Agreement" means the Feedstock Supply Agreement, dated as of the Effective Date, between Seller and Purchaser.

"Force Majeure" means with respect to either party, any circumstance whatsoever, whether or not foreseeable, that is not within the reasonable control of such party and was not caused by such party's negligence and that prevents or restricts the performance of its obligations under this Agreement, including, without limitation, (i) with respect to Seller, any circumstance that directly or indirectly prevents or restricts the production (including the delivery of coal feedstock), handling, loading or delivery of Product to Purchaser under this Agreement or the handling, storage or use of the Chemicals and (ii) with respect to Purchaser, any circumstance that prevents or restricts purchase of coal feedstock or the delivery of same to Seller or the handling, unloading, storing, or consumption of Product by Purchaser at the Generation Facility. Force Majeure shall include, without limitation: acts of God, war, insurrections, terrorist acts, riots, strikes, labor disputes, work stoppages, shortage of materials, supplies, equipment or services, shortage of rail cars, trucks, or other freight transport vehicles customarily used, failure of transport carrier to make deliveries or timely deliveries, blockade, lightning, electric power failures, fires, explosions, violent storm, hurricane, flood, drought, orders or acts of civil or military authority or any prohibition on the operation of Seller's Plant or the Generation Facility or transportation of Product or coal feedstock.

"Generation Facility" is defined in Recital A.

"Governmental Authority" means any United States federal, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, or government or any regulatory, administrative, judicial, legislative, executive or other agency, or any political or other subdivision, department or branch of any of the foregoing as now or hereinafter in effect.

"Hazardous Substances" means any waste, material or substance (i) defined, regulated, controlled, limited or prohibited by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 *et seq.*); the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§ 1801 *et seq.*); the Resource Conservation and Recovery Act ("RCRA"), as amended (42 U.S.C. §§ 6901 *et seq.*); the Clean Water Act, as amended (33 U.S.C. §§ 1251 *et seq.*); the Clean Air Act, as amended (42 U.S.C. §§ 7401 *et seq.*); the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601 *et seq.*); or any applicable laws of the State of Indiana, or any successor law, rule or regulation; (ii) containing regulated or reportable quantities of petroleum or any fraction thereof; (iii) containing naturally occurring radioactive materials, ash, or asbestos, or (iv) determined to be deleterious to human health or the environment by any federal, state, or local environmental, occupational health, or public health agency or authority having jurisdiction over the Lease Area or the land adjacent thereto.

"Hazardous Waste" means any waste, material or substance defined as hazardous waste in the Resource Conservation and Recovery Act ("RCRA"), as amended (42 U.S.C. §§ 6901 *et seq.*) or any similar law of the State of Indiana.

"IRS" means the Internal Revenue Service.

3

"IURC" is defined in Section 3.3(e).

"Late Payment Rate" means a rate of interest per annum equal to the lesser of (i) the prime rate as established from time to time by Citibank, N.A., and in effect on the date of calculation, *plus* 500 basis points and (ii) the maximum rate of interest permitted by applicable law.

"Law" means any law, statute, regulation, ordinance, rule, ruling, order, decree, judgment, consent decree, settlement agreement or requirement and any judicial or administrative interpretation of any of the foregoing, as enacted, promulgated, entered into, agreed or imposed by any Governmental Authority, including all amendments, modifications, extensions, replacements or re-enactments thereof.

"Lease Agreement" means the Lease Agreement, dated as of the Effective Date, between Purchaser, as lessor, and Seller, as lessee.

"Lease Area" is defined in the Lease Agreement.

"Lessee Permits" is defined in the Lease Agreement.

"M-Sorb" means that certain chemical compound licensed to Seller and constituting a "Reagent" under the Chem-Mod License Agreement between Seller and Chem-Mod, LLC.

"Note" is defined in the Feedstock Supply Agreement.

"Operator" is defined in Section 2.2(d).

"Operational Problems" with respect to the Generation Facility means problems attributable to the handling or burning of Product which would not have occurred had the Generation Facility burned coal feedstock purchased by Seller but which had not been treated with the Chemicals, instead of Product, including, without limitation, the interruption, suspension or removal from service (in whole or in part) of a generating unit or other facility at the Generation Facility, problems related to Product accumulation in handling facilities, problems experienced in feeding Product to the furnaces, controlling burn rates in the furnaces, lack of complete combustion of the Product, combustion stability in the furnaces, accumulation of Product residues in pollution control equipment, smokestacks and other equipment and facilities, increased slagging, fouling, corrosion or erosion of generating units or increased particulate matter emissions.

"Person" means a natural person, corporation, joint venture, partnership, limited partnership, limited liability company, limited liability limited partnership, trust, estate, business trust, association, Governmental Authority or any other entity.

"Product" means the treated coal produced by Seller's Plant per the Treatment Protocol.

"Project Agreements" means this Agreement, the Feedstock Supply Agreement, the Lease Agreement and the Site Services Agreement.

4

"Purchaser" is defined in the introductory paragraph.

"Purchaser Indemnified Parties" is defined in Section 7.2.

"Purchaser's Estimate" is defined in Section 2.1(b).

"Purchase Price" is defined in Section 4.1.

"Quality Standards" means the coal feedstock quality specifications and standards provided from time to time by Purchaser and Seller pursuant to this Agreement reflecting the minimum and maximum requirements for the coal feedstock that Seller is to use in the production of Product for sale to Purchaser under this Agreement. The initial Quality Standards are set forth on Schedule 5.3.

"Remedial Actions" is defined in Section 3.3(b).

"Required Approval" is defined in Section 3.3(e).

"Rules" has the meaning in Section 8.22(a).

"Seller" is defined in the introductory paragraph.

"Seller Indemnified Parties" is defined in Section 7.1.

"Seller Termination Notice" is defined in Section 3.2.

"Seller's Estimate" is defined in Section 2.1(b).

"Seller's Plant" is defined in Recital B.

"Site Services Agreement" means the Site Services Agreement, dated as of the Effective Date, between Seller and Purchaser.

"S-Sorb" means that certain chemical compound licensed to Seller and constituting a "Reagent" under the Chem-Mod License Agreement between Seller and Chem-Mod, LLC.

"Suspension Notice" is defined in Section 3.3(a).

"Tax Credits" means the credits against federal income tax under section 45(e) of the Code, or any successor statute.

"Term" is defined in Section 3.1.

"Termination Date" is defined in Section 3.1.

"Treasury Department" means the United States Department of Treasury.

"Treasury Regulations" means regulations issued by the Treasury Department under the Code, as they may be amended, restated or supplemented from time to time, and any successor regulations.

"Treatment Protocol" means the application rate of█████████████████████ (by weight) and █████████████████████ (by weight) per Ton of coal feedstock intake into Seller's Plant for the production of Product, or such higher application rate as necessary or advisable, in Seller's reasonable discretion, to satisfy the emission reduction standards required in order for the Product to qualify for Tax Credits.

"Ton" or "ton" means two thousand (2,000) pounds avoir dupois.

## ARTICLE II
## Purchase and Sale of Product; Quantity

2.1     Purchaser's Rights and Obligations With Respect to Purchases of Product.

(a)     Purchase Requirement. Purchaser agrees to purchase all of the output of all Product produced by Seller's Plant so long as the Lease is in effect. All operational aspects of Seller's Plant and the amount of Product produced shall be determined by Seller.

(b)     Production Estimates. On or before five business days prior to the anticipated Commercial Operations Date, with respect to the first calendar year, and thereafter not later than 60 days prior to the beginning of each subsequent calendar year, Purchaser shall deliver to Seller an estimate of the quantity of coal it intends to burn at the Generation Facility for such calendar year and to the extent known, a schedule of all planned outages or shutdowns of the boiler units at the Generation Facility during such calendar year ("Purchaser's Estimate"). On or before two business days after receipt of Purchaser's Estimate, with respect to the first calendar year, and thereafter not later than 45 days prior to the beginning of each subsequent calendar year, or, if later, five days after Seller's receipt of Purchaser's Estimate for such calendar year, Seller shall deliver to Purchaser an estimate of the quantity and timing of production of Product by Seller's Plant during such calendar year ("Seller's Estimate"). Seller's Estimate shall not be binding on Seller and Purchaser's Estimate shall not be binding on Purchaser. Seller and Purchaser shall work together in good faith to agree upon an annual forecast (the "Annual Forecast") of monthly scheduled deliveries of Product during the relevant calendar year within 10 Business Days after Seller's delivery of Seller's Estimate. The Annual Forecast shall be based upon the quantity of tons of Product reflected in Seller's Estimate or Purchaser's Estimate, whichever is lower. The Annual Forecast is to be used solely for scheduling purposes and the Annual Forecast shall not limit Purchaser's obligation to purchase or Seller's obligation to sell Product in accordance with the other terms of this Article II. During the course of each year, there shall be regular discussions between the parties in order to manage inventory such that there is a sufficient inventory of coal feedstock at all times to cover the next two (2) days expected production of Product.

(c)     Purchaser's Request for Additional Treatment. Purchaser may at any time require that Seller modify the Treatment Protocol by increasing the application rate of any or all

6

of the Chemicals to the coal feedstock; provided, however that any increase in incremental cost to Seller as a result of Purchaser's request shall be borne by Purchaser.

2.2 Seller's Rights and Obligations With Respect to Sales of Product.

(a) Seller's Right to Restrict Production for Tax Matters. If Seller determines, based on its commercially reasonable judgment, that (i) Product produced by Seller's Plant is unlikely for any reason to qualify as refined coal product with respect to which Seller (or its Affiliates or members) shall be entitled to claim Tax Credits during any tax year, (ii) Tax Credits attributable to the production and sale of Product may or will be disallowed for such tax year or (iii) Seller, or any Person that directly or indirectly owns any membership interest in Seller, will be unable to utilize any such Tax Credits for the tax year in which such Product is sold, Seller may reduce its production levels of Product for all or a part of such tax year as determined by Seller by giving Purchaser written notice thereof. If Seller believes that it will likely restrict production pursuant to this Section 2.2(a) during the succeeding 12 month period, Seller shall so notify Purchaser and shall indicate its estimate of the extent to which it expects to restrict production; *provided, however*, Seller's right to reduce production under this Section 2.2(a) shall not be conditioned upon giving such notice or limited in any way if Seller does not give such notice, and Seller shall have no liability to Purchaser and shall not be deemed to be in breach of this Agreement if Seller does not give such advance notice to Purchaser. In addition, notwithstanding that Seller has given such a notice to Purchaser, Seller may at any time after such notice, notify Purchaser that it is increasing production of Product.

(b) Licenses and Permits; Compliance with Laws. Seller agrees that it will acquire and use commercially reasonable efforts to maintain all licenses and permits required by any Governmental Authority for the production and sale of Product to Purchaser and all licenses required from third parties necessary for its performance of its obligations under this Agreement. If Seller fails to acquire and/or maintain any such licenses or permits (other than any license to be granted to Seller by Purchaser), this shall be considered a default pursuant to Section 3.4(b). Purchaser agrees that it will acquire and use commercially reasonable efforts to maintain all licenses and permits required by any Governmental Authority for the purchase and use of Product and all licenses required from third parties necessary for its performance of its obligations under this Agreement, provided however, that Purchaser shall only be responsible for the cost of acquiring and/or maintaining such licenses and permits if Purchaser would have been required to acquire and/or maintain such licenses and permits in the absence of the transactions contemplated by the Project Agreements; and if Purchaser would not have been required to acquire and/or maintain such licenses and permits in the absence of the transactions contemplated by the Project Agreements, Seller shall be responsible for reimbursing Purchaser for the cost of acquiring and/or maintaining any such licenses and permits. If Purchaser fails to acquire and/or maintain any such licenses or permits for which it would have been responsible in the absence of the transactions contemplated by the Project Agreements, this shall be considered a default pursuant to Section 3.4(b).

(c) Chemicals. Except as otherwise provided herein, Seller agrees that any chemical compound used in the production of Product shall be a Chemical set forth on Schedule 2.2(c). Any change in the Chemicals by Seller to another chemical not set forth on Schedule 2.2(c) shall require the consent of Purchaser, which consent shall not be unreasonably withheld

7

or delayed (it being understood that the use of any chemical compound not set forth on <u>Schedule 2.2(c)</u> may also require the approval of various Governmental Authorities).

(d)     <u>Operator</u>.  Seller may operate Seller's Plant through an Affiliate or another Person with the requisite experience necessary to operate Seller's Plant.  The Person that operates Seller's Plant is referred to herein as the "<u>Operator</u>."  Seller shall be responsible for any actions or inactions of Seller's subcontractors (including Operator) with respect to its responsibilities under this Agreement.

## ARTICLE III
### Term; Termination; Suspension

3.1     <u>Term</u>.  The term (the "<u>Term</u>") of this Agreement shall commence on the Rent Commencement Date (as such term is defined in the Lease Agreement) and, unless sooner terminated pursuant to Sections 3.2, 3.3 or 3.4, 4.3, 6.1 or 7.3, shall continue for a period of ten (10) years from and after the Rent Commencement Date (the "<u>Termination Date</u>").

3.2     <u>Early Termination by Seller</u>.  If (a) Seller determines, based on its commercially reasonable judgment, that (i) Product produced by Seller's Plant is unlikely for any reason to qualify as refined coal product with respect to which Seller (or its Affiliates or members) shall be entitled to claim Tax Credits at any time prior to the Termination Date, (ii) Tax Credits attributable to the production and sale of Product may or will be disallowed, or (iii) Seller, or any Person that, directly or indirectly owns any membership interest in Seller, will be unable to utilize any such Tax Credits in any tax year in which Product is sold, (b) Seller decides in its sole judgment that Seller's Plant for any other reason should not be operated, or (c) the sales or use tax laws applicable to sale of Product are changed or re-interpreted such that one of the parties is required to pay additional sales or use tax (as compared to what is payable by Purchaser as of the effective date of this Agreement unless Purchaser would otherwise be liable for such increased tax in the absence of the transactions contemplated hereby), Seller shall send a written notice (a "<u>Seller Termination Notice</u>") to Purchaser that it desires to terminate this Agreement, and this Agreement, including Seller's obligations under Section 2.2(a), shall terminate effective upon receipt of such notice by Purchaser.  Seller may also terminate this Agreement by sending a Seller Termination Notice to Purchaser if Purchaser has suspended Product deliveries by sending a Suspension Notice to Seller pursuant to Section 3.3(a) if Seller believes, in its reasonable commercial judgment, that the actions required by Seller to correct the deficiencies described in the applicable Suspension Notice would cause Seller to suffer Adverse Consequences, including incurring additional costs.  Seller may also terminate this Agreement by sending a Seller Termination Notice to Purchaser if Seller elects to terminate this Agreement in accordance with Section 3.3(c).

3.3     <u>Suspension Notices and Early Termination by Purchaser</u>.

(a)     <u>Suspension Notice</u>.  Purchaser shall have the right to require Seller to immediately suspend Product deliveries by giving verbal instructions to that effect to Seller from one of Purchaser's authorized representatives designated pursuant to Section 8.8 (a "<u>Suspension Notice</u>"), which instructions shall be followed by written notice confirming such instructions to Seller as soon as practicable but in any event within five (5) business days, under any one or

more of the following circumstances which Purchaser shall describe in reasonable detail in the Suspension Notice: (i) continued burning of Product at the Generation Facility will, in Purchaser's sole judgment, cause Purchaser to be in violation of any Law, (ii) Purchaser determines in its sole judgment that Product causes Operational Problems or (iii) for any reason the continued delivery of Product to Purchaser presents the risk of imminent danger to natural persons or property.

(b)     Seller's Response.  After receipt of a Suspension Notice, Seller shall immediately suspend further deliveries of Product to Purchaser.  The parties shall exercise commercially reasonable efforts to develop remedial actions to permit the resumption of deliveries of Product ("Remedial Actions").  However, Seller shall not be obligated to agree to any Remedial Action (or may terminate any Remedial Action agreed to) that Seller believes, in its sole discretion, would be adverse to Seller to correct the deficiencies that caused Purchaser to immediately suspend Product deliveries or could materially impair or jeopardize the ability of the Product to qualify for Tax Credits or for such Tax Credits to be properly allocable to Seller's members, and may instead elect to terminate this Agreement.  In addition, such Remedial Actions shall not require Purchaser to incur any additional cost, to make any improvements or alterations to the Generation Facility, to change the operations of the Generation Facility, or to modify or obtain any permit, consent or other approval of any Governmental Authority.  If Seller and Purchaser agree on the sharing of any additional costs arising out of the implementation and maintenance of a Remedial Action, then Purchaser agrees not to withhold its consent to such Remedial Action unreasonably; provided Purchaser shall be deemed to be reasonable in withholding such consent if the Remedial Action would cause an Operational Problem.

(c)     Review by Purchaser; Resumption of Deliveries or Termination.  If the parties have not agreed to Remedial Actions within 60 days following the delivery of a Suspension Notice to Seller pursuant to Section 3.3(a), either Purchaser or Seller may terminate this Agreement by delivering notice of such termination to the other party within 30 days after the expiration of such 60-day period.

(d)     Termination for Convenience by Purchaser.  Purchaser may terminate this Agreement for its convenience upon six (6) months' notice to Seller.

(e)     Termination for Regulatory Reasons.  Purchaser may terminate this Agreement for cause by written notice to Seller if (i) Purchaser receives notice of any determination, assertion and/or opinion rendered by the Indiana Department of Environmental Management, United States Environmental Protection Agency and/or any other Governmental Authority that the use of the Product at the Generation Facility has, or will be, considered to constitute the combustion and/or incineration of solid waste at the Generation Facility for purposes of the commercial and industrial solid waste incineration ("CISWI") solid waste rule codified at 40 C.F.R. 241; (ii) Purchaser makes a good faith determination in its sole and absolute discretion that approval from the Indiana Utility Regulatory Commission ("IURC") or any other agency or administrative body having authority over Purchaser or Purchaser's Generation Facility is required to purchase Product hereunder or to burn Product produced at Seller's Plant at the Generation Facility (a "Required Approval") and cannot be obtained; (iii) due to Purchaser's burning of the Product, an environmental permitting agency: (A) requires Purchaser to procure an additional permit or a modification to an existing permit, if procuring

9

such permit or modification subjects the Generation Facility to additional requirements, including but not limited to New Source Review, Prevention of Significant Deterioration, Best Available Control Technology, or Maximum Achievable Control Technology requirements; (B) requires installation of additional controls for treatment of air pollutants or water effluent; or (C) determines that any byproduct of burning the Product is rendered hazardous or is otherwise made subject to additional controls or restrictions on reuse; or (iv) any Required Approval previously obtained is subsequently revoked, rescinded, terminated, suspended or otherwise invalidated (collectively a "Revocation") for a period of more than ninety (90) days; provided, however, that: (A) Purchaser shall not be required to accept any Product or permit continued operation of Seller's Plant while any Revocation is in effect; (B) for a period of at least thirty (30) days prior to termination arising in connection with a Revocation, Purchaser and Seller will cooperate in good faith and use commercially reasonable efforts to re-obtain any Required Approval which has been the subject of a Revocation; and (C) Purchaser shall not be required to pay any material out-of-pocket expense to re-obtain any Required Approval absent Seller's agreement to immediately reimburse Purchaser for such expense even if the Required Approval is not ultimately re-obtained.

(f)     Temporary Suspension. The parties hereto acknowledge and agree that Purchaser is burning Product at the Generation Facility pursuant to a test burn permit (the data from which is required to prepare the application for, and obtain, the permanent air permit for burning Product) and Purchaser, upon written notice to Seller, may suspend or reduce deliveries of Product to the extent necessary for Purchaser to obtain any Required Approval to burn Product.

3.4     Other Termination Rights. In addition to the termination rights set forth in Sections 3.2, 3.3, 4.3, 6.1 and 7.3:

(a)     Seller may terminate this Agreement upon written notice from Seller to Purchaser if Purchaser has failed to make any payment due hereunder within 30 days after delivery of written notice from Seller to Purchaser that such amount is past due unless such failure is cured within such 30 day period.

(b)     Either party may terminate this Agreement upon the default by the non-terminating party in the performance of any material term, covenant or obligation contained in this Agreement (so long as the default does not arise out of or result from any act or omission of the terminating party or any Affiliate of the terminating party hereunder, under any of the Lease, Site Lease or Feedstock Supply Agreement or otherwise); *provided* that the non-terminating party shall have failed to correct such default within a period of 30 days after receipt of written notice from the non-defaulting party of such default (which written notice shall specify the nature of such default) or, if such default is not capable of cure in 30 days, shall have failed to commence and pursue the correction, using its commercially reasonable best efforts, within 30 days of written notice of such default and to have cured such default within 90 days after receipt of the default notice from the non-defaulting party.

(c)     Either party may terminate this Agreement by written notice to the other party upon the occurrence of any of the following events with respect to the other party: (i) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or similar official

10

for a substantial part of such other party's assets and the appointment is neither made ineffective nor discharged within 90 days after the making thereof; (ii) the entry of a judgment, decree, or order for relief against such other party that materially affects its ability to perform its obligations hereunder in accordance with the terms of this Agreement by a court of competent jurisdiction in an involuntary case commenced under any applicable bankruptcy, insolvency, or other similar law or any jurisdiction now or hereafter in effect (other than an involuntary case commenced by the terminating party); (iii) the commencement by such other party of a voluntary case under any applicable bankruptcy, insolvency, or similar law now or hereafter in effect; the consent to, request by, or acquiescence by such other party in the entry of an order for relief in an involuntary case under any such law or to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar official of any substantial part of its assets; (iv) the making by such other party of a general assignment for the benefit of creditors; or (v) the taking by such other party of corporate or other action in furtherance of any of the foregoing.

(d)     Either party may terminate this Agreement upon 15 days prior written notice to the other party upon a change of law which prohibits the production of Product or use of the chemicals to make Product or which imposes a significant burden on restriction on Owner's production or sale, or Purchaser's use, of Product or Seller's use of Chemicals needed to make Product.

(e)     This Agreement shall terminate upon, and such termination shall be effective as of, the effective date of the termination, in accordance with the respective terms thereof, of any of the Project Agreements.

(f)     Seller may terminate this Agreement upon 15 days prior written notice to Purchaser if Seller determines to move or sell or has moved or arranged for the move or disposition of Seller's Plant or has otherwise elected in its discretion to permanently cease production of Product at Seller's Plant.

3.5     Liability Upon Termination. Upon the early termination of this Agreement for any reason, neither party shall have any further obligation to the other in the case of such termination, except that such termination shall not relieve either party from (i) any liability that has accrued or attached prior to the date of such termination, or (ii) any liability resulting from any breach or default by such party occurring prior to the date of such termination.

## ARTICLE IV
## Price; Payment

4.1     Refined Coal Price. The price (the "Purchase Price") per ton of Product delivered to Purchaser f.o.b. the delivery point specified in Section 5.1 shall be equal to a fraction (a) the numerator of which equals the product of (i) (A) the number of tons of Product delivered to Purchaser *minus* (B) the number of tons of Chemicals used to produced such tons of Product, and (ii) (A) the Coal Feedstock Inventory Price for the coal feedstock used in the production of such Product; *plus* (B) the Emissions Premium Amount, and (b) the denominator of which equals the number of tons of Product delivered to Purchaser. By way of example only, if Seller produced 100 tons of Product which was made using 99.4 tons of coal feedstock which had a Coal

11

Feedstock Inventory Price of $30.00 per ton and 0.6 tons of Chemicals with a emissions premium amount of $0.50, then the Purchase Price per ton for such 100 tons of Product sold to Purchaser would be $30.317 per ton ((100 tons of Product — 0.6 tons of Chemicals) x ($30.00+ $0.50) ÷ 100 tons of Product)). For the avoidance of doubt, the Coal Feedstock Inventory Price used to calculate the Purchase Price shall be the Coal Feedstock Inventory Price in the month in which the coal feedstock was sold to Seller, regardless of the month in which the Product was delivered to Purchaser.

4.2   Billing and Payment.

(a)   For each calendar month during the Term (or partial month) Seller shall deliver to Purchaser an invoice for Product delivered during the preceding calendar month, which invoices shall be delivered by Seller no later than the 10th day of each month in respect of the preceding month. Purchaser may, if it so elects, after receipt of Seller's invoice, deliver to Seller in accordance with its regular accounting practices, a statement based on its records indicating payment due for goods or services provided by each party under the Project Agreements and the total net amount due by one party to the other in accordance therewith. Seller's invoices for Product and, if applicable, Purchaser's summary statement with respect to Product purchased, will be based on the weight of the Product that was delivered to Purchaser measured as provided in Section 5.2 and will show the number of tons and value of coal feedstock purchased by Seller, the weight of Chemicals applied and the number of tons of Product sold.

(b)   Payments by Purchaser for amounts due under each invoice or summary statement, as the case may be, shall be made to Seller on the 20th day of each calendar month (unless such day is not a Business Day, in which case payment shall be due on the next Business Day) with respect to the monthly statement for the preceding month and shall be made by electronic funds transfer to an account designated by Seller.

(c)   All payments of the Purchase Price for Product not paid on the date on which such amount is due shall bear interest at the Late Payment Rate from the date on which payment was due until the paid date.

4.3   Sales Taxes on Product and Coal Feedstock.  Purchaser shall pay all transfer fees, severance, excise, sales and use, carbon, Btu, energy, or similar taxes and fees ("Coal Sales Tax") imposed (whether on Purchaser or Seller) upon or incurred in connection with (i) the purchase and sale of Product hereunder and (ii) the purchase and sale of coal feedstock under the Feedstock Supply Agreement, but only if such Coal Sales Taxes would have been incurred by Purchaser and/or its Affiliates in the absence of the transactions contemplated by the Project Agreements (i.e., Purchaser or its Affiliate(s) would have been responsible for such Coal Sales Tax had Purchaser or its Affiliate(s) purchased the coal feedstock used to produce Product directly from the mine where produced or any other third party) (the "Expected Sales Tax"). In the event that any Coal Sales Tax is imposed retroactively (by legislation, administrative rulemaking or any other administrative determinations) on either party in excess of the Expected Sales Tax ("Retroactive Sales Tax"), the parties will work in good faith to dispute such imposition of the Retroactive Sales Tax and, in the event of a final determination that such Retroactive Sales Tax is owed, Seller shall be responsible for paying such Retroactive Sales Tax.

12

In the event that any Coal Sales Tax is likely to be imposed prospectively on either party in excess of the Expected Sales Tax ("Prospective Excess Sales Tax"), either party may terminate this Agreement upon written notice to the other party as of the date of implementation of the Prospective Excess Sales Tax, unless the parties come to an agreement on how to allocate the payment of the Prospective Excess Sales Tax or one party agrees to pay all of the Prospective Excess Sales Tax. If a party is required to remit or pay taxes that are the other party's responsibility hereunder, the party responsible for such taxes shall reimburse the other party for such taxes promptly following receipt of notice and evidence of such tax and its payment from the other party. Any party entitled to an exemption from any such taxes or charges shall furnish the other party any necessary documentation thereof.

4.4     Setoff. Each party reserves to itself all rights, setoffs, counterclaims, combination of accounts, liens and other remedies and defenses to which such party has or to which such party may be entitled (whether by operation of law, under this agreement, or otherwise). The parties' respective obligations to make payments under this Agreement, any Project Document and/or the Note may be offset against each other, set off or recouped therefrom. Each Party shall have the right to deduct and set-off any amount owed by it to the other party under this Agreement or any other Project Document, whether billed or unbilled, past due or current, from any undisputed amount such other party owes it under this Agreement or any other Project Document. The exercise of this remedy shall not require or preclude the Party exercising this right to or from the exercise of any other right or remedy under this Agreement, any other Project Document or as provided at law or in equity.

## ARTICLE V
## Delivery of Product; Coal Feedstock Specifications

5.1     Delivery Point. Product shall be delivered to Purchaser, and title and risk of loss to Product shall pass from Seller to Purchaser, at the point on Purchaser's conveyors that feed coal to Generation Facility, as designated on the line drawing attached hereto as Schedule 5.1 (the "Delivery Point"). Product deliveries to the Delivery Point shall be continuous from Seller's Plant during periods Seller's Plant is operating as scheduled by Seller. As between the parties, Seller shall be deemed to be in exclusive custody and control (and responsible for any damages or injury caused thereby) of the Product purchased and sold hereunder prior to delivery thereof to Purchaser at the Delivery Point, and Purchaser shall be deemed to be in exclusive custody and control (and responsible for any damages or injury caused thereby) of the Product purchased and sold hereunder immediately after the time the Product is delivered to the Delivery Point. Seller warrants that at the time of delivery of Product hereunder Seller will convey good and marketable title to such Product, free and clear of liens and encumbrances.

5.2     Facility Measuring Devices and Facility Input Scale. Purchaser's cost will be calculated using the daily weight of the coal feedstock as measured by the Facility Input Scale (as defined in the Feedstock Supply Agreement) plus the weight of the Chemicals following the procedures set forth below. On a daily basis, Seller will perform, and keep for Purchaser's review, a "mass balance" reconciliation whereby (x) the daily weights of the Chemicals applied to Coal Feedstock as determined by the Facility Measuring Devices are compared to (y) the amounts of Chemicals consumed as shown on Seller's Chemical inventory log using beginning/ending Chemical storage tank volumes (i.e., for each of M-Sorb and S-Sorb) and truck

13

tickets for the delivery of such Chemicals. In the event of a discrepancy between (x) and (y) of the immediately preceding sentence, the weight of Chemicals as measured by (y) shall prevail. If material discrepancies continue, then Seller will have the Facility Measuring Devices serviced and recalibrated. Seller understands that Purchaser currently maintains certification of the Facility Input Scale (as defined in the Feedstock Supply Agreement). The Facility Measuring Devices shall be calibrated in the ordinary course of business on a schedule as may be designated by the manufacturer of the Facility Measuring Devices, or on a schedule otherwise agreed by the parties. Should Purchaser decide in its sole discretion to cease certification of the Facility Input Scale, Seller shall have the right to inspect and test the Facility Input Scale for accuracy at its expense. Purchaser shall have the right to inspect and test the Facility Measuring Devices for accuracy at its expense. The weight of Coal Feedstock as measured by the Facility Input Scale and the weight of Chemicals as measured by the Facility Measuring Devices (as may be reconciled through the "mass balance reconciliation" set forth in the first sentence of this Section 5.2) shall be final and any recalibration shall not affect weights determined prior to such recalibration. Each measuring device owner shall notify the other party of the Facility Input Scale and Facility Measuring Devices calibration schedule. Each party shall have the right to witness (or have a representative witness) the calibration process. Each party will send a copy of all calibration test results to the other party within ten (10) days of receipt thereof, if requested by the other party. "Facility Measuring Devices" means Seller's Plant's measuring devices used for applying, respectively, the liquid and solid Chemicals pursuant to the Treatment Protocol.

     5.3    Quality Standards.

        (a)    Seller warrants that the Product produced from coal feedstock, other than coal feedstock solely supplied under any Approved Coal Feedstock Agreement, will meet or exceed the Quality Specifications in all material respects when delivered to the Delivery Point. All coal feedstock purchased by Seller under any Approved Coal Feedstock Agreement or otherwise from any Affiliate of Purchaser shall be deemed to be Conforming Coal Feedstock unless Purchaser recommends in writing to Seller that a delivery of coal feedstock be rejected pursuant to the terms of the applicable coal supply contract in time to permit such rejection prior to the unloading of such coal at the coal unloading facilities at the Generation Facility or otherwise in accordance with the terms of such contract for rejecting coal. Absent any such written recommendation from Purchaser to Seller, Purchaser shall be deemed to have waived the requirements of Section 5.3 with respect to such delivery and the coal in such delivery shall be deemed to be Conforming Coal Feedstock under this Agreement.

        (b)    Purchaser shall have the right during the Term to notify Seller of changes in the Quality Standards that are required in connection with changes in the operating requirements of the Generation Facility or the requirements of any permit, license or other approval of any Governmental Authority; *provided, however*, that (i) no change in Quality Standards shall be applied to coal purchased under supply contracts that are in existence at the time of any change in the Quality Standards, for the purchase of coal that satisfies the Quality Standards that were in effect at the time the contract was entered into, and coal purchased from time to time under such contracts pursuant to nominations made after the change in Quality Standards shall be deemed to meet the revised Quality Standards, and (ii) coal purchased under any Approved Coal Feedstock Agreement shall be deemed to meet the Quality Standards. Subject to the other provisions of this Section 5.3, in the event of a change in Quality Standards,

Seller shall use commercially reasonable efforts to cooperate with Purchaser to revise the quality specifications in any existing supply contracts that do not provide for the delivery of coal that meets the revised Quality Standards to take into account the changes to the Quality Standards made by Purchaser; *provided,* any such amendments on terms reasonably acceptable to it, coal purchased under such supply contracts shall continue to be covered by clause (i) or clause (ii) above, as applicable.

     5.4    Seller's Warranties. The only warranties made by Seller with respect to Product, Seller coal feedstock, and Chemicals are those expressly stated in Section 5.3 and SELLER EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE VI
## Force Majeure; Representations and Warranties

    6.1    Force Majeure.

     (a)    If, because of a Force Majeure event, Purchaser or Seller is unable to carry out its obligations under this Agreement, and if the party subject to such Force Majeure gives the other party prompt written notice of such Force Majeure event, including reasonable details as to the cause and expected duration of such Force Majeure event or condition, the obligations and liabilities of Purchaser and Seller, other than the obligation of either party to make payments of amounts due hereunder to the other party for Product actually delivered and reimbursement of Coal Sales Tax, shall be suspended (and the party whose performance is suspended shall not be considered to be in default) to the extent made necessary by and during the continuance of such Force Majeure event; *provided, however*, that the disabling effects of such Force Majeure event shall be eliminated as soon as and to the extent commercially reasonable (except that either party may settle any of its own labor disputes, strikes, or terminate any of its own lockouts in its sole discretion). The suspension of performance by a party due to a Force Majeure event or condition shall be of no greater scope and no longer duration than that which is necessary.

     (b)    It is agreed that in the event any valid Law is adopted or passed after the Effective Date, which either (i) prohibits the production of Product or the use of the Chemicals contemplated hereunder (unless the Parties mutually agree on any alternate chemicals) or (ii) directly or indirectly imposes significant burdens or restrictions or other Adverse Consequences upon the production or sale of Product by Seller, or the purchase, storing or consumption of Chemicals by Seller, or the storing, or purchase or consumption of such Product by Purchaser to the extent that Purchaser is unable or would not be allowed to utilize such Product without incurring material expenditures, then the implementation of such Law shall constitute an event of permanent Force Majeure whereupon this Agreement may be terminated by the party claiming the Force Majeure Event upon 10 days' prior written notice to the other party and without further liability on the part of either party hereunder, except with respect to the parties' obligations incurred prior to such permanent Force Majeure event.

     (c)    Notwithstanding the provisions of this Section 6.1, a party not claiming a Force Majeure event may terminate this Agreement upon written notice to the other party and

15

without liability to the other party whenever all of the following circumstances exist: (i) a condition of a Force Majeure event (alone or extended by other events of Force Majeure) occurs which causes the mutual obligations of the parties to be suspended as provided above for a period of 90 consecutive days and (ii) at the end of such 90 day period, the party not claiming a Force Majeure event, in the exercise of reasonable judgment, concludes that there is little likelihood of ending the Force Majeure event in the next 30 days. The party not claiming a Force Majeure event may exercise such right of termination, at any time after the conditions in the previous sentence are satisfied during the continuation of the event of Force Majeure, by giving the other party 10 days' prior written notice of its intention to terminate.

6.2 <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants as of the date hereof as follows:

(a) Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana, and is qualified to do business and is in good standing in the State of Indiana and each other jurisdiction in which the conduct of its business and ownership of its properties so require. Purchaser is not in violation of any of the provisions of its certificate/article of incorporation or its bylaws.

(b) Purchaser has all requisite right, power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance by Purchaser of this Agreement has been duly authorized by all necessary action on its part and no other company actions on the part of Purchaser and on the part of its shareholders or directors are necessary to authorize the execution, delivery and performance of this Agreement. This Agreement has been duly and validly executed by Purchaser. This Agreement is the legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, subject to the qualification, however, that enforcement of the rights and remedies created hereby is subject to bankruptcy and other similar laws of general application relating to or affecting the rights and remedies of creditors and that the remedy of specific enforcement or of injunctive relief is subject to the discretion of the court before which any proceeding therefore may be brought.

(c) The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser thereof of the transactions contemplated hereby do not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of the certificate/articles of incorporation or bylaws of Purchaser, (ii) with or without the giving of notice or the lapse of time, or both, violate, conflict with, result in the breach of or accelerate the performance required by, or give rise to a right of termination under, any bond, debenture, note, mortgage, indenture, lease, covenant, agreement or understanding to which Purchaser is a party or by which any of its properties are bound, or (iii) violate any order, ruling, decree, judgment or arbitration award, or any law, rule, regulation or stipulation, permit, license or authorization applicable to Purchaser.

(d) Except for such permits and governmental filing obligations which will not have a material adverse effect on the Generation Facility or Seller's Plant, Purchaser is not required to file, make or obtain any governmental notice, filing, authorization, approval, order or consent, in connection with the execution, delivery and performance by it of this Agreement. No

16

consent from any non-governmental third party is required in connection with the execution, delivery and performance by Purchaser of this Agreement.

(e)     There is no outstanding order, ruling, decree, judgment or stipulation by or with any Governmental Authority or arbitration panel or any litigation pending or, to the knowledge of Purchaser, threatened against Purchaser which is reasonably likely to affect Purchaser's ability to perform its obligations under this Agreement.

(f)     Purchaser intends to use all Product purchased under this Agreement for purposes of producing steam in the Generation Facility.

6.3     Representations and Warranties of Seller. Seller hereby represents and warrants as of the date hereof as follows:

(a)     Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and is qualified to do business and is in good standing in the State of Indiana and each other jurisdiction in which the conduct of its business and ownership of its properties so require. Seller is not in violation of any of the provisions of its certificate of formation or its limited liability company agreement.

(b)     Seller has all requisite right, power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance by Seller of this Agreement has been duly authorized by all necessary action on its part and no other company actions on the part of Seller and on the part of its managers or members are necessary to authorize the execution, delivery and performance of this Agreement.  This Agreement has been duly and validly executed by Seller.  This Agreement is the legal, valid and binding obligation of Seller, enforceable in accordance with its terms, subject to the qualification, however, that enforcement of the rights and remedies created hereby is subject to bankruptcy and other similar laws of general application relating to or affecting the rights and remedies of creditors and that the remedy of specific enforcement or of injunctive relief is subject to the discretion of the court before which any proceeding therefore may be brought.

(c)     The execution, delivery and performance by Seller of this Agreement, and the consummation by Seller thereof of the transactions contemplated hereby and thereby do not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of the certificate of formation or limited liability company agreement of Seller, (ii) with or without the giving of notice or the lapse of time, or both, violate, conflict with, result in the breach of or accelerate the performance required by, or give rise to a right of termination under, any bond, debenture, note, mortgage, indenture, lease, covenant, agreement or understanding to which Seller is a party or by which any of its properties are bound, or (iii) violate any order, ruling, decree, judgment or arbitration award, or any law, rule, regulation or stipulation, permit, license or authorization applicable to Seller.

(d)     Except for the Lessee Permits and such other permits and governmental filing obligations which will not have a material adverse effect on the Generation Facility or Seller's Plant, Seller is not required to file, make or obtain any governmental notice, filing, authorization, approval, order or consent, in connection with the execution, delivery and

17

performance by it of this Agreement. No consent from any third party is required in connection with the execution, delivery and performance by Seller of this Agreement.

(e)     There is no outstanding order, ruling, decree, judgment or stipulation by or with any Governmental Authority of arbitration panel, or any litigation pending or, to the knowledge of Seller, threatened against Seller which is reasonably likely to affect Seller's ability to perform its obligations under this Agreement.

## ARTICLE VII
### Indemnification; Limitation of Liability; Insurance; Adequate Assurances

7.1     Purchaser. Purchaser agrees to indemnify, defend, save and hold harmless Seller, its Affiliates, the Operator and their respective directors, managers, members, officers, employees and agents (the "Seller Indemnified Parties") from and against any and all Adverse Consequences arising out of any or all of (x) (i) death, sickness or bodily injury of or to any Person, or (ii) destruction or damage to any property of any Person, in each case arising from or related to negligent or willful acts or omissions of Purchaser, its Affiliates or any of their respective directors, managers, officers, employees or agents in respect of the operations of Purchaser, except to the extent the same under this clause (x)(i) or (x)(ii) was caused by the negligent or willful act or omission of the Seller Indemnified Parties, or (y) any breach of this Agreement by Seller.

7.2     Seller. Seller agrees to indemnify, defend, save and hold harmless Purchaser and its Affiliates and their respective directors, managers, officers, employees and agents (the "Purchaser Indemnified Parties" from and against any and all Adverse Consequences arising out of any or all of (x) (i) death, sickness or bodily injury of or to any Person, or (ii) destruction or damage to any property of any Person in each case arising from or related to negligent or willful acts or omissions of their respective directors, managers, officers, employees or agents in respect of the operations of Seller, except to the extent the same under this clause (x)(i) or (x)(ii) was caused by the negligent or willful act or omission of the Purchaser Indemnified Parties, or (y) any breach of this Agreement by Purchaser.

7.3     Infringement. If the production of Product is held in any action to constitute infringement, or the use of the Product is enjoined, Seller, at its election, shall either (a) at its expense, procure for Purchaser the right to continue use of the Product, or replace the Product with non-infringing materials or methods satisfactory to Purchaser, or modify the production of Product in a manner satisfactory to Purchaser so that the production of Product becomes non-infringing or (b) terminate the Agreement. Seller agrees to indemnify, defend and save Purchaser harmless from and against any liability or damages, including attorneys' fees, arising out of any alleged infringement or violation.

7.4     Procedure. The following procedures shall apply with respect to any third-party claims. In the event that any claim or demand for which Seller or Purchaser would be liable (as the case may be, an "Indemnifying Party") to any Person entitled to indemnification under this Agreement (an "Indemnitee") is asserted or sought to be collected from such Indemnitee by a third party, such Indemnitee shall give written notice to the Indemnifying Party thereof promptly after the discovery by such Indemnitee of the matters giving rise to a claim for indemnification

18

pursuant hereto; provided, however, that the failure of any Indemnitee to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 7.4 except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice. The Indemnifying Party shall be entitled to participate in or to assume the defense thereof, with counsel selected by the Indemnifying Party but reasonably satisfactory to the Indemnitee and, after notice from the Indemnifying Party to the Indemnitee of its election to assume the defense thereof, the Indemnifying Party shall not be liable to such Indemnitee for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof. The Indemnitee shall cooperate fully with the Indemnifying Party in connection with any negotiation or defense of any such action, proceeding or claim by the Indemnifying Party. In the event that (i) the Indemnifying Party advises an Indemnitee that it will contest a claim for indemnification hereunder or (ii) the Indemnifying Party fails, within 15 days of receipt of any indemnification notice to notify, in writing, such Indemnitee of its election to defend, settle or compromise, at its sole cost and expense, any action, proceeding or claim (or discontinues its defense at any time after it commences such defense), then the Indemnitee may, at its option, defend, settle or otherwise compromise or pay such action, proceeding or claim. In any event, unless and until the Indemnifying Party elects in writing to assume and does so assume the defense of any such claim, proceeding or action, the Indemnifying Party shall be liable for the Indemnitee's reasonable costs and expenses arising out of the defense, settlement or compromise of any such action, claim or proceeding. The Indemnifying Party shall not be liable for any settlement of any action, claim or proceeding effected without its written consent; provided, however, that the Indemnifying Party shall not unreasonably withhold its consent. Notwithstanding anything in this Section 7.4 to the contrary, the Indemnifying Party shall not, without the Indemnitee's prior written consent (whether or not the Indemnitee is a party), settle or compromise any claim or demand or offer to settle any claim or demand, or consent to entry of judgment in respect thereof.

7.5     Reduction and Recovery. At any time after the making of an indemnity payment to an Indemnitee, such Indemnitee's loss is reduced by recovery under any insurance coverage (excluding any proceeds from self-insurance or flow-through insurance policies), or under any recovery or payment by or against any other entity, the amount of such reduction, less any costs, expenses, deductibles or premiums incurred in connection therewith, must promptly be repaid by the Indemnitee to the Indemnifying Party.

7.6     Limitation on Damages.     NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, (I) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR ANY SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE LOSSES OR DAMAGES ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE OR NON-PERFORMANCE OF OBLIGATIONS HEREUNDER OR IN ANY MANNER FROM THE TRANSACTIONS CONTEMPLATED HEREBY, EXCEPT TO THE EXTENT ANY SUCH LOSS OR DAMAGE IS INCLUDED IN A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION IS OWED PURSUANT TO SECTION 7.1, 7.2 OR 7.3 OF THIS AGREEMENT; AND (II), NOTWITHSTANDING THE PRECEDING CLAUSE (I), IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR LOSS OF PROFIT OR REVENUE, DAMAGES SUFFERED BY THE OTHER PARTY AS THE RESULT OF THE LOSS OF USE OF SELLER'S PLANT OR PURCHASER'S GENERATION FACILITY OR OTHER PRODUCTION FACILITIES, COST

19

OF PURCHASED OR REPLACEMENT POWER, DAMAGES SUFFERED BY CUSTOMERS OF THE OTHER PARTY FOR SERVICE INTERRUPTIONS, COST OF CAPITAL, LOSS OF TAX CREDITS OR OTHER TAX BENEFITS, OR LOSS OF GOODWILL, RESULTING FROM ANY VIOLATION OF OR DEFAULT UNDER THIS AGREEMENT OR IN ANY MANNER FROM THE TRANSACTIONS CONTEMPLATED HEREBY, REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE IS INCLUDED IN A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION WOULD OTHERWISE BE OWED PURSUANT TO SECTION 7.1, 7.2 OR 7.3. IT BEING AGREED FOR THE AVOIDANCE OF DOUBT THAT PURCHASER SHALL BE LIABLE TO SELLER FOR THE PURCHASE PRICE OF PRODUCT THAT PURCHASER HAS PURCHASED PURSUANT TO THE TERMS OF THIS AGREEMENT, BUT HAS FAILED TO PAY FOR. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT, SHALL APPLY TO ALL CLAIMS, WHETHER IN CONTRACT, EQUITY, TORT OR OTHERWISE, REGARDLESS OF FAULT, NEGLIGENCE (IN WHOLE OR IN PART), STRICT LIABILITY, BREACH OF CONTRACT OR BREACH OF WARRANTY AND SHALL EXTEND TO THE MANAGERS, TRUSTEES, DIRECTORS, OFFICERS, MEMBERS, PARTNERS AND EMPLOYEES, AGENTS AND AFFILIATES OF EACH PARTY, AND THE MANAGERS, MEMBERS, DIRECTORS, TRUSTEES, OFFICERS, EMPLOYEES AND AGENTS OF SUCH AFFILIATES.

## ARTICLE VIII
### Miscellaneous

8.1    Independent Contractor.  This Agreement is a contract for the sale and purchase of Product.  The parties recognize and agree that Seller is not an agent or employee of Purchaser and that Seller is independent of any managerial or other control or direction by Purchaser and is free to perform, by such means and in such manner as Seller may choose, all work in pursuance of commitments hereunder.  The relationship of the parties is that of independent contractors and in no way establishes an agency or partnership relationship.

8.2    Binding Effect.  This Agreement shall bind and inure to the benefit of the parties and their successors and assigns, as permitted under Section 8.3.

8.3    Assignments.

(a)    This Agreement shall not be assigned by either party without the prior written consent in each instance of the other party, except that (i) either party may assign this Agreement to an Affiliate thereof without the consent of the other party; and (ii) Seller may assign this Agreement in connection with the contemporaneous sale of Seller's Plant to the Person acquiring Seller's Plant or the lease thereof, subject to Purchaser's consent (not to be unreasonably withheld, conditioned or delayed); provided, however, that Purchaser shall be permitted to refuse such consent (and such refusal shall not be deemed unreasonably withheld, conditioned, or delayed) if Purchaser, in the exercise of its reasonable business judgment, determines that the proposed assignee (or its designated operator) is not qualified, or does not have the financial resources necessary, to operate Seller's Plant in a manner consistent with Seller's prior operations or Purchaser's reasonable commercial expectations as to safe, efficient and prudent operations.  Notwithstanding anything to the contrary set forth herein, in connection

20

with the Purchaser's sale, transfer or other disposition of the Generation Facility, Purchaser shall be obligated to assign this Agreement to the Person acquiring the Generation Facility.

(b)       After any permitted assignment of this Agreement, the assignor shall provide to the other party a copy of the executed instrument of assignment and, the assignor shall be released and discharged from all further duties, obligations and liabilities thereafter accruing under this Agreement, except for (x) such duties and obligations accrued but undischarged at the time of such assignment, and (y) obligations for defense, reimbursement and indemnification to the extent such obligations relate to acts, omissions or other circumstances occurring prior to the date of any such assignment, including but not limited to the respective indemnification obligations of the parties set forth herein. In no event shall any assignor of this Agreement be released from any of its duties, obligations or liabilities under this Agreement to the extent relating to any period prior to such assignment without the prior written consent in each instance of the other party.

8.4       Accounting and Audit.   Each party shall provide the other party with all information in such party's possession reasonably necessary for the other party to perform its obligations under this Agreement and to account for the sale of Product. Each party shall keep full and complete books and records relating to the pricing, sale and delivery of Product under this Agreement in accordance with sound and accepted accounting principles and shall retain such books and records for at least 5 years after this Agreement is terminated or expires. Each party shall give the other party reasonable advance notice of its intent and schedule to examine such items. Any such examination will be performed at the requesting party's sole cost and expense during normal business hours, without unduly interfering with the other party's operations and will not extend to general operating expenses and other proprietary aspects of the other party's business.  It is expressly understood and agreed that the provisions of this Section 8.4 shall survive the termination or expiration of this Agreement for a period of 5 years.

8.5       Right of Observation and Examination.  Purchaser or its designated agent shall have the right at all times during regular business hours and upon reasonable advance notice, at its sole risk and expense, to enter upon Seller's Plant site to observe the equipment and manner of producing Product.

8.6       Drafting Conventions; Headings.  Unless otherwise required by the context in which any term appears: (a) the singular shall include the plural and vice versa; (b) the words "include" and "including" shall be deemed to be followed by the words "without limitation"; (c) references to "Sections", "Schedules" and "Exhibits" shall be to sections, schedules and exhibits hereof; (d) the words "herein", "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection hereof; (e) references to this Agreement shall include a reference to all schedules and exhibits hereto, as the same may be amended, modified, supplemented or replaced from time to time; and (f) references in this Agreement to contracts, agreements, or other documents shall be deemed to mean those contracts, agreements or documents as the same may be modified, supplemented, or amended from time to time. Section and paragraph headings used in this Agreement hereto are for reading convenience only and shall not have any other meaning, implication or purpose, legal or otherwise.

21

8.7     Entire Agreement.   This Agreement and the exhibits, schedules and other documents attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Purchaser and Seller concerning the sale of Product. This Agreement supersedes, cancels and annuls all other and former agreements made between such parties with respect to the sale of Product other than that certain Confidentiality Agreement dated June 17, 2011, between Chem-Mod, LLC and Duke Energy Business Services LLC, which is not hereby superseded and remains in full force and effect. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Agreement shall be binding upon Purchaser or Seller unless reduced to writing and signed by Purchaser and Seller.

8.8     Representatives.   Wherever any consent, authorization or approval of Purchaser is required or permitted under this Agreement, such consent, authorization or approval may be obtained only from those representatives designated by Purchaser in writing to Seller from time to time. The initial representatives designated by Purchaser are Vincent E. Stroud and Steven W. Meehan and Purchaser shall at all times have a designated representative. Wherever any consent, authorization or approval of Seller is required or permitted under this Agreement, such consent, authorization or approval may be obtained only from those representatives designated by Seller in writing to Purchaser from time to time. The initial representatives designated by Seller are Jeffrey K. Green and T. Barr Linton and Seller shall at all times have a designated representative.

8.9     Governing Law; Jurisdiction.   This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of Indiana, without reference to its conflicts of laws rules.   Subject to Section 8.22, the parties hereby submit to nonexclusive personal jurisdiction in the Indiana State Courts sitting in the County of Marion and the Federal District Court for the Southern District of Indiana.

8.10     Partial Invalidity.   The parties hereby agree to use good faith efforts to negotiate an equitable adjustment to any provisions of this Agreement determined to be invalid or unenforceable with a view toward effecting the purposes of this Agreement, and the validity or enforceability of the remaining provisions of this Agreement shall not be affected thereby.

8.11     Non-Waiver of Covenants.   The failure of either party to enforce any of the provisions of this Agreement at any time shall in no way be construed to be a waiver of any such provisions or affect the validity or enforceability of this Agreement, or any part hereof, or the right of any party thereafter to enforce each and every such provision.

8.12     Notices.   Any notice, request, protest, consent, demand, report or statement given by one party to the other shall be in writing, and deemed duly received (a) 48 hours after it is deposited in the United States mail, by certified mail, postage prepaid, and properly addressed as shown below, (b) upon personal delivery to the addressee, (c) upon delivery by a commercial courier service requiring confirmation of receipt by the addressee, or (d) upon transmission by telefacsimile if confirmed by posting of the written original by certified mail within two business days.

If to Purchaser:

Duke Energy Indiana, Inc.
526 S. Church Street
Charlotte, NC 28202
Attention: Larry Carter
Email: larry.carter@duke-energy.com

If to Seller:

Barr Linton
Cottbus Associates, LLC
2100 Third Avenue North, Suite 920
Birmingham, AL 35203
Fax: (205) 731-0961

With copies to:

Leah Schaatt
Cottbus Associates, LLC
4599 East Lake Boulevard
Birmingham, AL 35217
Fax: (205) 798-7790

Marcia R. Nirenstein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Fax: (202) 393-5760

A party may change its address by notice to the other party at the address set forth above.

8.13    Confidentiality and Use of Proprietary Information. From and after the date
hereof through a period of three years from the termination of this Agreement, unless otherwise
agreed to by the parties hereto, each party and its Affiliates shall keep, and shall ensure that its
officers, directors and employees keep, confidential: (a) the commercial and monetary terms of
this Agreement; and (b) information constituting a "trade secret", as such term is defined under
the Indiana Uniform Trade Secrets Act (IC 24-2-3-2). The recipient of the disclosing party's
confidential information shall treat such information with the same care that it uses to prevent
disclosure of its own confidential information and shall use such information solely for purposes
of carrying out its obligations under this Agreement, the Feedstock Supply Agreement, the Lease,
and the Site Services Agreement and enforcing its rights hereunder and thereunder. Such
information may be disclosed to a party's operators, contractors, consultants and advisors only if
such information is protected by confidentiality agreements with such persons. The foregoing
restriction shall not apply to any information that (i) is or hereafter becomes generally available
to the public other than by reason of any default with respect to a confidentiality obligation under
this Agreement or other agreements among the parties or their Affiliates; (ii) was already known

23

to the recipient as evidenced by prior written documents in its possession; (iii) is disclosed to the recipient by a third party who is not known by the recipient to be in default of any confidentiality obligation to the other party hereunder; (iv) is developed by or on behalf of the receiving party, without reliance on confidential information received hereunder; (v) is disclosed in any arbitration pursuant to Section 8.22 or litigation to the extent relevant to the issues being arbitrated or litigated; or (vi) is otherwise required to be disclosed in compliance with law or in the course of any judicial or administrative proceeding or regulatory examinations or process; provided, that if such disclosure is required, the disclosing party shall provide the other party with timely advance written notice of such disclosure. Except as provided in the preceding sentence, Purchaser shall not disclose the name of any member of Seller or any direct or indirect institutional investor in Seller without such Person's prior written consent. Notwithstanding the foregoing, nothing in this provision shall prevent (x) Purchaser from supplying information regarding Seller to a potential transferee of Purchaser as long as such information is protected by a confidentiality agreement with such transferee, (y) Seller from disclosing such information to its members and to potential members, investors or financing sources and/or to potential transferees of Seller or its members so long as such information is protected by a confidentiality agreement by which any such Person is bound or (z) Seller from disclosing such information to the IRS or any state taxing authority in connection with Seller's private letter ruling request, tax returns or audits of such tax returns.

8.14    Qualifications; Screening Measures.  Seller shall comply, and shall require its authorized subcontractors to comply, with all applicable labor and immigration laws that may impact Seller's obligations under this Agreement, including but not limited to federal, state and local laws, rules and regulations, executive orders, that are now or that become applicable to the Seller during the period the Seller is performing its obligations hereunder. Without limiting the foregoing, Seller shall comply strictly with all laws relating to the verification of its employees' eligibility to work in the United States, including the Immigration Reform and Control Act of 1986 and Form I-9 requirements. Seller and its authorized subcontractors shall participate in E-Verify, perform all required employment eligibility and verification checks, and cooperate with the scope, timing, documentation, etc., of audits reasonably requested by Purchaser related to the foregoing, which shall be performed by a third party immigration attorney selected by Purchaser. Seller shall maintain all required employment records for at least three years following an employee's date of hire or one year following an employee's termination. Seller acknowledges and agrees that it is responsible for conducting adequate screening of its employees and agents prior to starting the services, and Seller further agrees to use additional screening measures that may be reasonably requested by Purchaser based upon audit results to ensure Seller's compliance with this Article. Purchaser has an Alcohol/Drug Abuse Procedure (MICCS). Seller and its authorized subcontractors shall implement and administer an alcohol/drug abuse policy acceptable to Purchaser and at least as stringent as that of Purchaser. By providing an employee under this Agreement, Seller warrants and represents that it has completed the Screening Measures (as defined below) with respect to such employee and that such Screening Measures did not reveal any information that could adversely affect such employee's suitability for employment by Seller or competence or ability to perform duties under this Agreement. If in doubt whether a suitability, competence or ability concern exists, Seller shall discuss with Purchaser the relevant facts and Purchaser will determine, in its sole discretion, whether such person should be allowed to perform the services. As used in this Section, the term "Screening Measures" means reference checks, social security trace, terrorist database search, criminal

24

background checks (including but not limited to checks for any felony convictions within the last seven years) and such other screening measures as a reasonably prudent employer would deem appropriate; provided, however, that nothing in this Section shall be interpreted as authorizing or requiring Seller to perform any screening activities that violate the federal Fair Credit Reporting Act, Title VII of the Civil Rights Act of 1964 or any other applicable law. Purchaser, in its sole discretion, shall have the option of barring from the Site any person whom Purchaser determines does not meet the qualification requirements set forth above. In all circumstances, Seller shall ensure, and shall require that its subcontractors ensure, that the substance and manner of any and all background checks performed by Seller pursuant to this Article conform fully to applicable federal, state, and local laws. Seller shall supervise, coordinate and direct the services using Seller's best skill, judgment, and attention.

8.15    Safety. Seller and its personnel involved in performance of Seller's obligations hereunder, including, but not limited to, employees, subcontractors and agents, shall comply with all Purchaser safety and security procedures (including Purchaser's Safe Work Practices Manual, a current copy of which has been previously provided to Seller) while on Purchaser's premises to achieve an injury-free work place, provided that such rules and procedures do not conflict with OSHA or other safety laws, rules and regulations and that Purchaser provides to Seller all updates or revisions to such safety and security procedures, including Purchaser's Safe Work Practices Manual. Written alternative work practices that provide equivalent safety may be submitted to Purchaser and used by Seller in the performance of services upon Purchaser's written approval. In addition, Seller must follow detailed technical safety specifications when they are provided. Seller shall comply with and enforce all applicable laws, rules and regulations applicable to safety and health standards, including but not limited to the Occupational Safety and Health Act of 1970 (OSHA), and any revisions to OSHA or successor legislation when on site at the Generation Facility. Seller shall provide Purchaser with Material Safety Data Sheets for all hazardous materials prior to delivery to the site. If Seller employs non-English speaking persons, Seller shall ensure that a bilingual person is available at the jobsite where the non-English speaking person(s) are working for purposes of safety and hazard related communications, emergency responses, and similar issues. Seller shall further ensure that all written and verbal safety training, hazard communications, and work rules are provided in the appropriate language for such non-English speaking employees or persons.

8.16    Insurance. Commencing with the performance of the services hereunder, and continuing until the termination of the services, Seller shall maintain or cause to be maintained the insurance policies and limits as set forth in the Lease Agreement.

8.17    Compliance with Regulatory Code of Conduct. Seller acknowledges that Seller may be given access to or otherwise become aware of certain operational information of Purchaser, the disclosure of which to other departments or affiliates of Purchaser is prohibited by federal law. Such confidential information includes, but is not limited to (a) planned outage schedules, (b) events of forced outages and generator derating, (c) construction schedules, (d) operational practices at the Purchaser's generating stations, and (e) transmission system operation and planning data. Seller shall, and shall require its subcontractors to (i) maintain the strict confidentiality of such operational information, and (ii) not share such operational and planning information with any third parties, including any other departments or affiliated entities of Purchaser without prior written consent.

25

8.18    Fraud and Ethics. Seller shall be familiar with and, to the extent applicable, shall adhere to the principles of Purchaser's Supplier Code of Conduct located at http://www.duke-energy.com/suppliers/code-of-conduct.asp.    Seller shall promptly report any fraud, illegal activity, fiscal waste or abuse, or other violations of Purchaser's Code of Conduct by any party, including Seller's suppliers and service providers. Such activity may be reported by contacting: (a) Larry Carter at larry.carter@duke-energy.com, (b) Purchaser's Ethics-Line managed by an independent third party at 800-525-3783, which may be called anonymously, or by web submittal at www.dukeenergy-ethicsline.com, (c) or by sending an e-mail to Purchaser's Ethics and Compliance Office at ethicsofficer@duke-energy.com.

8.19    Diverse Suppliers. For any agreement to which Seller is a party related to the obligations to be performed by Seller under this Agreement in which the total compensation to Seller will equal or exceed $650,000, Seller shall adopt and utilize a subcontracting plan that complies with 48 C.F.R. 52-219-9 for Small Diverse Suppliers ("SDS"). Seller shall: (i) use commercially reasonable efforts to utilize SDS (and Large Diverse Suppliers) as required by applicable law; and (ii) provide Purchaser a quarterly status report in a format reasonably acceptable to Purchaser.    Such report shall be entered on Purchaser's website at http://www.duke-energy.com/suppliers/supplier-diversity.asp. Purchaser, its designated auditors and any applicable Government Authority shall have the right of access during normal business hours to inspect Seller's records related to SDS and compliance with this Section.

8.20    No Third-Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of each party and their respective successors and assigns permitted pursuant to Section 8.3, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person other than (with respect to the indemnities set forth in Article VII), the Persons covered by the indemnities set forth in Article VII.

8.21    Survival Clause. Section 3.5, Article VII, Sections 8.4, 8.9, 8.10, 8.11, 8.12, 8.13, 8.20, 8.21, 8.22, 8.25, 8.26, and 8.27 shall survive the termination of this Agreement.

8.22    Arbitration.

(a)    AAA Commercial Arbitration Rules. Any dispute, disagreement, claim, or controversy arising out of or relating to this Agreement, or the breach, termination or validity thereof ("Dispute"), shall be finally settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"), except as the Rules may be modified herein. The arbitration award shall, as between the parties and those in privity with them, be final and entitled to all of the protections and benefits of a final judgment, e.g., res judicata (claim preclusion) and collateral estoppel (issue preclusion), as to all claims, including compulsory counterclaims, that were or could have been presented to the arbitrator. The arbitration award shall not be reviewable by or appealable to any court, except on the grounds to be found in the Federal Arbitration Action, 9 U.S.C. § 1 *et seq.*

(b)    Appointment of Arbitrator. Within 30 days after receipt by the respondent of a copy of the arbitration demand, the parties shall decide upon an independent third party mutually acceptable to both parties (the "Arbitrator") and an alternate third party (the "Alternate")

26

to decide disputes referable by the parties for arbitration in accordance with this Agreement. If the parties do not agree on an Arbitrator or Alternate within the period of time set forth above, then the American Arbitration Association shall be requested to select the Arbitrator and/or the Alternate on an expedited basis using a listing ranking and striking procedure with each party having a limited number of strikes. In the event that the Arbitrator becomes unavailable to resolve the Dispute within the time period stated in this Section 8.22, the dispute shall be referred to the Alternate, who shall then be referred to as the Arbitrator. Any Arbitrator or Alternate appointed by the AAA shall be an experienced arbitrator with at least 10 years' relevant legal experience.

(c)     Document Discovery. Each party will, upon the written request of the other party, promptly provide the other with copies of documents relevant to the issues raised by any claim or counterclaim. Any Dispute regarding discovery, or the relevance or scope thereof, shall be determined by the Arbitrator, which determination shall be conclusive. All discovery shall be completed within 45 days after the dispute is referred to the Arbitrator or the Alternate.

(d)     Reasoned Opinion Accompanying the Award. The award shall be rendered within 30 days of the completion of the hearing on the merits, and the Arbitrator shall agree to comply with this schedule before accepting appointment. The award shall be in writing, and shall include a statement regarding the reasons for the disposition of any claim.

(e)     Jurisdiction and Venue. The arbitration shall be held in Indianapolis, Indiana. All procedural aspects of this agreement to arbitrate, including, but not limited to, the construction and interpretation of this agreement to arbitrate, the scope of the arbitrable issues, allegations of waiver, delay or defenses as to arbitrability, and the rules governing the conduct of the arbitration, shall be governed by and construed pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and shall be decided by the Arbitrator. Any award resulting from any dispute resolution pursuant to this Section 8.22 shall be enforceable and judgment on such award may be entered and enforced in any court having jurisdiction. Each party hereto consents to the exclusive jurisdiction of, and to the laying of venue in any federal or state court located in Marion County, Indiana for an action to compel arbitration, provisional relief in aid or arbitration or to maintain the status quo or prevent irreparable harm prior to the appointment of the Arbitrator or for the resolution of a dispute relating to any issues under this Section 8.22 and to the non-exclusive jurisdiction of, and to the laying of venue in any federal or state court located in Marion County, Indiana for an action for the enforcement of any arbitral award rendered hereunder.

(f)     Punitive and/or Consequential Damages. The Arbitrator shall have no authority to award punitive damages, consequential damages or any other damages of the type prohibited under Section 7.6 under any circumstances (whether they be exemplary, multiple, remote, or other penalty or punitive type of damages) regardless of whether such damages may be available under Indiana law, the parties hereby waiving their right, if any, to recover such damages in connection with any Dispute.

(g)     Arbitration Costs and Fees. Each party shall bear its own costs and expenses and an equal share of the Arbitrator's fees and the administrative fees of the arbitration. Notwithstanding the foregoing, upon application by the prevailing party in the arbitration, the

27

Arbitrator shall have the power to award to the prevailing party reasonable attorney's and expert's fees and expenses incurred by the prevailing party in connection with the arbitration, but only upon a determination by the Arbitrator that the non-prevailing party's claims and defenses were not made in good faith.

(h)     Arbitration Provision Enforceable.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the parties' obligation to submit their claims to binding arbitration.  Moreover, the parties' obligations under this Section 8.22 are enforceable even after this Agreement has terminated.

(i)     Continuation of Services.  Pending final resolution of any dispute, whether or not submitted to arbitration hereunder, and regardless of the basis thereof or grounds therefor, for so long as this Agreement has not been terminated, the parties shall continue to fulfill their respective obligations hereunder.

(j)     Expedited Process.  It is the intent of the parties to have any arbitration of this Agreement proceed in an expeditious manner, however, any deadline, time period, procedure or standard contained herein or in the Rules may be extended or modified by agreement of the parties and the parties agree that the failure of the Arbitrator or the AAA to strictly conform to any deadline, time period, procedure or standard contained herein shall not be a basis for seeking to overturn any decision rendered by the Arbitrator.

8.23    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

8.24    Expenses.  Each party shall bear its respective costs and expenses, including fees of advisors and brokers, that such party has incurred in connection with the negotiation of this Agreement, the Lease, and the Site Services Agreement and all due diligence investigations pursued in connection herewith and therewith.

8.25    Interpretation.    Both parties and their attorneys have participated in the negotiation and drafting of this Agreement.  Consequently, any common law or statutory rule requiring interpretation against the interest of the drafter shall not apply.

8.26    Attorneys' Fees.  If either party is required to institute any action or suit in court of law to enforce any of the obligations of the other party under this Agreement or an arbitral award hereunder and the party so instituting such action or suit prevails thereon, then the prevailing party shall be entitled to recover (without duplication) reasonable attorneys', consultant's and expert's fees and expenses incurred by such prevailing party in connection with such action or suit.

8.27    Remedies.  No remedy herein conferred upon or reserved to Seller or Purchaser shall exclude any other remedy herein or by law provided, but each shall be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

**[Signatures on Next Page]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers duly authorized thereunto.

**PURCHASER:**

**DUKE ENERGY INDIANA, INC.,**
an Indiana corporation

By: _____

Name: _____

Title: _____

**SELLER:**

**COTTBUS ASSOCIATES, LLC,**
a Delaware limited liability company

By: _____

Name: __T. BARR LINTON__

Title: __MANAGER__

(1126989)

[Signature Page to Cayuga Refined Coal Sales Agreement]

**Schedule 2.2(c)**
<u>Approved Chemicals</u>

[Attached]



# MATERIAL SAFETY DATA SHEET

**Product Name**        **Merquel™ 52**
**Product id**           1390SM
**Revision date**       13/01/2009            **Revision: 1**

## 1. Identification of the substance & the company

| | |
|---|---|
| **Trade name** | Merquel™ 52 |
| **Chemical formula** | CaBr2 |
| **Chemical family** | Inorganic bromide |
| **Molecular weight** | 199.88 |
| **Type of product and use** | Product is used for oxidation of mercury |
| **Supplier** | ICL-IP America Inc. |
| | 95 MacCorkle Ave. SW, South Charleston, WV 25303-1411, USA |
| | Tel: (304) 720-3950 |
| | Fax: (304) 746-3101 |
| **Emergency Telephone** | Chemtrec (800)424-9300 |

## 2. Hazards identification

| | |
|---|---|
| **Emergency overview** | *Colourless liquid, odourless* |
| | *Risk of serious damage to eyes* |
| **Potential Health Effects:** | |
| **- Eye Contact** | Severe irritant |
| **- Skin contact** | Irritant |
| **- Inhalation** | Irritant to upper respiratory tract. |
| **- Ingestion** | May cause falling asleep, muscular incoordination and respiratory depression. Abdominal pain, nausea and vomiting. |

## 3. Composition / information on ingredients

| Components | CAS No. | Weight % |
|---|---|---|
| Calcium Bromide | 7789-41-5 | 52 |



**ICL Industrial**
P R O D U C T S

# MATERIAL SAFETY DATA SHEET

| | | |
|---|---|---|
| **Product Name** | Merquel™ 52 | |
| **Product id** | 1390SM | |
| **Revision date** | 13/01/2009 | **Revision:** 1 |

## 4. First-aid measures

| | |
|---|---|
| **Eye contact** | Holding the eyelids apart, flush eyes promptly with copious flowing water for at least 20 minutes.<br>Get medical attention immediately. |
| **Skin contact** | Remove contaminated clothing. Wash skin thoroughly with mild soap and plenty of water for at least 15 minutes. Wash clothing before re-use.<br>Get medical attention immediately. |
| **Inhalation** | In case of mist inhalation or breathing fumes released from heated material, remove person to fresh air.<br>Keep him quiet and warm. Apply artificial respiration if necessary and get medical attention immediately. |
| **Ingestion** | If swallowed, wash mouth thoroughly with plenty of water and give water to drink.<br>Get medical attention immediately.<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br>NOTE:  Never give an unconscious person anything to drink.<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* |
| **Notes to the physician** | Severe irritant<br>No specific antidote. In case of ingestion DO NOT induce vomiting. Treat symptomatically and supportively. |

## 5. Fire - fighting measures

| | |
|---|---|
| **Suitable extinguishing media** | Material is not combustible. Use extinguishing media appropriate to surrounding fire conditions. |
| **Fire fighting procedure** | Cool containers with water spray. In closed stores, provide fire-fighters with self-contained breathing apparatus in positive pressure mode |
| **Unusual fire and explosion hazards** | CaBr2 will decompose slowly from ca. 700°C, releasing poisonous and corrosive fumes of hydrogen bromide and bromine. |

## 6. Accidental release measures

| | |
|---|---|
| **Personal precautions** | Wear respirator, chemical safety goggles, rubber gloves and boots |



**ICL Industrial**
P R O D U C T S

# MATERIAL SAFETY DATA SHEET

| | | |
|---|---|---|
| **Product Name** | Merquel™ 52 | |
| **Product id** | 1390SM | |
| **Revision date** | 13/01/2009 | **Revision:** 1 |

**Methods for cleaning up**    Absorb on sand or vermiculite and place in closed container for disposal.  Ventilate area and wash spill site after material pickup is complete.

## 7. Handling and storage

**Handling**    Avoid bodily contact. Keep containers tightly closed.

**Storage**    Keep in a well-ventilated place  away from incompatible materials  (see "materials to avoid").

## 8. Exposure controls / personal protection

### Exposure Limits :

| Components | ACGIH-TLV Data | OSHA (PEL) Data |
|---|---|---|
| Calcium  Bromide<br>7789-41-5 | Not determined | Not determined |

**Ventilation requirements**    Use local exhaust as necessary, especially under mist conditions. Provide adequate ventilation.

**Personal protective equipment:**
- **Respiratory protection**    Approved respirator
- **Hand protection**    Protective gloves
- **Eye protection**    Chemical safety goggles
- **Skin and body protection**    Body covering clothes and boots

**Hygiene measures**    Do not eat, smoke or drink where material is handled, processed or stored. Wash hands carefully before eating or smoking.



**ICL Industrial**
P R O D U C T S

# MATERIAL SAFETY DATA SHEET

| | | |
|---|---|---|
| **Product Name** | Merquel™ 52 | |
| **Product id** | 1390SM | |
| **Revision date** | 13/01/2009 | **Revision:** 1 |

## 9. Physical and chemical properties

| | |
|---|---|
| **Appearance** | Colourless liquid, odourless |
| **Melting point/range** | < -7°C |
| **Boiling point/range** | 130°C |
| **Flash point** | None |
| **Flammable/Explosion limits** | Not flammable |
| **Auto-ignition temperature** | Not applicable |
| **Vapour pressure** | Not available |
| **Vapor density** | Not available |
| **Evaporation rate (ether=1)** | As of water |
| **Solubility:** | |
| **- Solubility in water** | For CaBr2 100%: |
| | 142 g/100ml at 30°C |
| | 312 gr/100ml at 100°C |
| **- Solubility in other solvents** | Alcohol Pyridine Acetone |
| **Specific gravity** | 1.7 |
| **Decomposition temperature** | >700 °C (CaBr2 100%) |

## 10. Stability and reactivity

| | |
|---|---|
| **Stability** | Stable under normal conditions |
| **Materials to avoid** | Avoid strong acids and oxidizers |
| **Conditions to avoid** | Heating above decomposition temperature |
| **Hazardous decomposition products** | Hydrogen bromide and bromine |
| **Hazardous polymerization** | Will not occur |


**ICL Industrial**
P R O D U C T S

# MATERIAL SAFETY DATA SHEET

**Product Name**      **Merquel™ 52**
**Product Id**      1390SM
**Revision date**      13/01/2009          **Revision: 1**

## 11. Toxicological information

**Note:**  The toxicological data presented below are the results of studies conducted on an active ingredient CaBr2.

**Acute toxicity:**
**- Rat oral LD50**  2210 mg/kg
**- Eye irritation (rabbit)**  Severe irritant
**- Dermal irritation (rabbit)**  Moderate irritant

**Chronic toxicity**  Repeated oral intake of bromides (>9 mg/kg body weight/day) may affect the central nervous system. Warning symptoms include mental dullness, slurred speech, weakened memory, apathy, anorexia, constipation, drowsiness and loss of sensitivity to touch and pain.
Repeated skin contact may cause dermatitis.

**Mutagenicity**  Not mutagenic by the Ames Test

**Carcinogenicity**  Not classified by IARC
Not included in NTP 11th Report on Carcinogens

## 12. Ecological information

**Aquatic toxicity :**
**- 48 Hour-EC50, Daphnia magna**  >105 mg/l (For CaBr2 95%)

## 13. Disposal considerations

**Waste disposal**  Observe all federal, state and local environmental regulations when disposing of this material.  Drain into sewer with ample water.

## 14. Transportation information

**DOT**  Not regulated

**IMO**  Not regulated

**ICAO/IATA**  Not regulated


**ICL Industrial**
**P R O D U C T S**

# MATERIAL SAFETY DATA SHEET

| | |
|---|---|
| **Product Name** | **Merquel™ 52** |
| **Product id** | 1390SM |
| **Revision date** | 13/01/2009 |

**Revision: 1**

## 15.  Regulatory information

| | |
|---|---|
| **USA** | Reported in the EPA TSCA Inventory. |
| **Canada** | Listed in DSL |
| **EU**<br>**-EEC  No.** | EU<br>232-164-6 |
| **Japanese METI** | ENCS No.: 1-1038 |
| **Australia** | Listed in AICS |
| **China inventory** | Listed |
| **Korea** | Listed in ECL (KE-04485) |
| **Philippines** | Listed in PICCS |

## 16.  Other information

**Health, Safety & Environment Policy**
We will strive to ensure that our operations and products meet the needs of the present global community without compromising the ability of future generations to meet their needs
We accept that the success of our business is dependent on the supply of products and services that will benefit society whilst ensuring human safety and protection of the environment and natural resources
Within the framework of our commitment to the Responsible Care program, we will provide a healthy and safe work environment for employees and will responsibly manage our products at all stages of their life cycle in order to protect human health and the environment whilst maintaining high production standards of operation


TO MEET THIS COMMITMENT WE WILL:
Comply with or exceed applicable national and international regulatory requirements and other requirements to which we subscribe
Communicate openly and actively encourage dialogue with employees, customers and community concerning our products and operations
Implement documented management systems consistent with and for promotion of the Responsible Care ethics
Develop and supply products that can be manufactured, transported, used and disposed of safely whilst best meeting the needs of our customers
Regularly assess, continually improve and responsibly manage health, safety and environmental risks associated with products and processes throughout their life-cycles
Share knowledge and expertise with others and seek to learn from and incorporate improved practices into our own operations


**ICL Industrial**
P R O D U C T S

# MATERIAL SAFETY DATA SHEET

**Product Name**          Merquel™ 52
**Product id**            1390SM
**Revision date**         13/01/2009                    **Revision: 1**

Communicate up-to-date information to enable our workers, customers and other interested parties to handle our products in a safe and environmentally responsible manner
Endeavor to work with customers, suppliers, distributors and contractors to foster the safe use, transport and disposal of our chemicals
Support Product Stewardship programs in cooperation with customers, distributors and transporters
Educate and train employees, contractors and customers to improve their HSE performance

Information is supplied upon the condition that the persons receiving same will make their own determination as to its safety and suitability for their purposes prior to use.
In no event will Bromine Compounds Ltd. be responsible for damages of any nature whatsoever resulting from the use of or reliance upon information.
NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESSED OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OF ANY OTHER NATURE, ARE MADE HEREUNDER WITH RESPECT TO INFORMATION OR THE PRODUCT TO WHICH THE INFORMATION REFERS.
Although the information and recommendations set forth herein (hereinafter "information") are presented in good faith and believed to be correct as of the date hereof, Bromine Compounds Ltd. makes no representations as to the completeness or accuracy thereof.

*In an event of discrepancy between the contents of this MSDS and the English version of it, the English version shall prevail.*

**Prepared By**          HSE Division in ISRAEL
                         telephone: +/972-8-6297830
                         telefax: +/972-8-6297832
                         www.icl-ip.com
                         e-mail:msdsinfo@icl-ip.com

**End of safety data sheet**



MSDS: S-Sorb™/Cement Kiln Dust

# Material Safety Data Sheet

### Section I:   PRODUCT AND COMPANY INFORMATION

**Product Name:**     S-Sorb™

**Product Identifiers:**     S-Sorb™, Cement Kiln Dust (CKD), Cement Lime

**Manufacturer:**                                **Information Telephone Number:**
    Lafarge North America Inc.                703-480-3600 (9am to 5pm EST)
    129500 Worldgate Drive, Suite 500      **Emergency Telephone Number:**
    Herndon, VA 20170                       1-800-451-8346

**Product Use:**     S-Sorb™ used in the manufacture of bricks, mortar, cement, concrete, plasters, paving
                    materials, and other construction applications. S-Sorb™ is also used as a coal treatment
                    additive.

**Note:**     This MSDS covers many types of S-Sorb™.  Individual composition of hazardous
            constituents will vary between types of S-Sorb™.

### Section II:   COMPOSITION / INFORMATION ON INGREDIENTS

| Component | Percent (By Weight) | CAS Number | OSHA PEL-TWA $(mg/m^3)$ | ACGIH TLV-TWA $(mg/m^3)$ | $LD_{50}$ (mouse, intraperitoneal) | $LC_{50}$ |
|---|---|---|---|---|---|---|
| Portland Cement/ S-Sorb™/Cement Kiln Dust | 100 | 68475-76-3 | NA | NA | NA | NA |
| Calcium Carbonate* | 10-80 | 1317-65-3 | 15 (T); 5 (R) | 10 (T) | NA | NA |
| Calcium Oxide | 5-50 | 1305-78-8 | 5 (T) | 2 (T) | 3059 mg/kg | NA |
| Crystalline Silica | 0-10 | 14808-60-7 | $[(10) / (\%SiO_2+2)]$ (R); $[(30) / (\%SiO_2+2)]$ (T) | 0.025 (R) | NA | NA |
| Magnesium Oxide | 0-2 | 1309-48-4 | 15 (T) | 10 (T) | NA | NA |

Note:    Exposure limits for components noted with an * contain no asbestos and <1% crystalline silica

        Cement is made from materials mined from the earth and is processed using energy provided by fuels.
        Trace amounts of chemicals may be detected during chemical analysis of cement and S-Sorb™.
        For example, S-Sorb™ may contain trace amounts of potassium and sodium sulfate compounds,
        chromium compounds, nickel compounds and other trace compounds.

### Section III:   HAZARD IDENTIFICATION





**WARNING**

Corrosive – Causes severe burns.
Toxic – Harmful by inhalation.
(Contains crystalline silica)

Use proper engineering controls, work
practices, and personal protective equipment to
prevent exposure to wet or dry product.

Read MSDS for details


Respiratory
Protection


Eye
Protection


Waterproof
Gloves


Waterproof
Boots



## Section III: HAZARD IDENTIFICATION (continued)

**Emergency Overview:** S-Sorb™ is a solid, grey or tan, odorless powder. It is not combustible or explosive. A single, short-term exposure to the dry powder presents little or no hazard. Exposure of sufficient duration to wet S-Sorb™, or to dry S-Sorb™ on moist areas of the body, can cause serious, potentially irreversible tissue (skin, eye, respiratory tract) damage due to chemical (caustic) burns, including third degree burns.

**Potential Health Effects:**

**Eye Contact:** Airborne dust may cause immediate or delayed irritation or inflammation. Eye contact with large amounts of dry powder or with wet S-Sorb™ can cause moderate eye irritation, chemical burns and blindness. Eye exposures require immediate first aid and medical attention to prevent significant damage to the eye.

**Skin Contact:** S-Sorb™ may cause dry skin, discomfort, irritation, severe burns and dermatitis.

**Burns:** Exposure of sufficient duration to wet S-Sorb™, or to dry S-Sorb™ on moist areas of the body, can cause serious, potentially irreversible damage to the skin, eye, respiratory and digestive tracts due to chemical (caustic) burns, including third degree burns. A skin exposure may be hazardous even if there is no pain or discomfort.

**Dermatitis:** S-Sorb™ is capable of causing dermatitis by irritation and allergy. Skin affected by dermatitis may include symptoms such as redness, itching, rash, scaling and cracking.

Irritant dermatitis is caused by the physical properties of S-Sorb™ including alkalinity and abrasion.

Allergic contact dermatitis is caused by sensitization to hexavalent chromium (chromate) present in S-Sorb™. The reaction can range from a mild rash to severe skin ulcers. Persons already sensitized may react to the first contact with S-Sorb™. Others may develop allergic dermatitis after years of repeated contact with S-Sorb™.

**Inhalation (acute):** Breathing dust may cause nose, throat or lung irritation, including choking, depending on the degree of exposure. Inhalation of high levels of dust can cause chemical burns to the nose, throat and lungs.

**Inhalation (chronic):** Risk of injury depends on duration and level of exposure.

**Silicosis:** This product contains crystalline silica. Prolonged or repeated inhalation of respirable crystalline silica from this product can cause silicosis, a seriously disabling and fatal lung disease. See Note to Physicians in Section 4 for further information.

**Carcinogenicity:** S-Sorb™ is not listed as a carcinogen by IARC or NTP; however, S-Sorb™ contains trace amounts of crystalline silica and hexavalent chromium which are classified by IARC and NTP as know human carcinogens.



MSDS: S-Sorb™/Cement Kiln Dust

## Section III: HAZARD IDENTIFICATION (continued)

| | |
|---|---|
| **Autoimmune Disease:** | Some studies show that exposure to respirable crystalline silica (without silicosis) or that the disease silicosis may be associated with the increased incidence of several autoimmune disorders such as scleroderma (thickening of the skin), systemic lupus erythematosus, rheumatoid arthritis and diseases affecting the kidneys. |
| **Tuberculosis:** | Silicosis increases the risk of tuberculosis. |
| **Renal Disease:** | Some studies show an increased incidence of chronic kidney disease and end-stage renal disease in workers exposed to respirable crystalline silica. |
| **Ingestion:** | Do not ingest S-Sorb™. Although ingestion of small quantities of S-Sorb™ is not known to be harmful, large quantities can cause chemical burns in the mouth, throat, stomach and digestive tract. |
| **Medical Conditions Aggravated by Exposure:** | Individuals with lung disease (e.g. bronchitis, emphysema, COPD, pulmonary disease) or sensitivity to hexavalent chromium can be aggravated by exposure. |

## Section 4: FIRST AID MEASURES

| | |
|---|---|
| **Eye Contact:** | Rinse eyes thoroughly with water for at least 15 minutes, including under lids, to remove all particles. Seek medical attention for abrasions and burns. |
| **Skin Contact:** | Wash with cool water and a pH neutral soap or a mild skin detergent. Seek medical attention for rash, burns, irritation, dermatitis and prolonged unprotected exposures to wet cement or S-Sorb™, cement mixtures or liquids from wet cement. |
| **Inhalation:** | Do not induce vomiting. If conscious, have person drink plenty of water. Seek medical attention or contact poison control center immediately. |
| **Ingestion:** | Do not induce vomiting. If conscious, have person drink plenty of water. Seek medical attention or contact poison control center immediately. |
| **Note to Physician:** | The three types of silicosis include: |

- Simple chronic silicosis – which results from long-term exposure (more than 20 years) to low amounts of respirable crystalline silica. Nodules of chronic inflammation and scarring provoked by the respirable crystalline silica form in the lungs and chest lymph nodes. This disease may feature breathlessness and may resemble chronic obstructive pulmonary disease (COPD).
- Accelerated silicosis – occurs after exposure to larger amounts of respirable crystalline silica over a shorter period of time (5-15 years). Inflammation, scarring, and symptoms progress faster in accelerated silicosis than in simple silicosis.
- Acute silicosis – results from short-term exposure to very large amounts of respirable crystalline silica. The lungs become very inflamed and may fill with fluid, causing severe shortness of breath and low blood oxygen levels.



## Section 4: FIRST AID MEASURES (continued)

Progressive massive fibrosis may occur in simple or accelerated silicosis, but is more common in the accelerated form. Progressive massive fibrosis results from severe scarring and leads to the destruction of normal lung structures.

## Section 5: FIREFIGHTING MEASURES

| **Flashpoint & Method:** | Non-combustible | **Firefighting Equipment:** | S-Sorb™ poses no fire-related hazard. A SCBA is |
|---|---|---|---|
| **General Hazard:** | Avoid breathing dust. Wet S-Sorb™ and cement is caustic. | | recommended to limit exposures to combustion products when fighting any fire. |
| **Extinguishing Media:** | Use extinguishing media appropriate for surrounding fire | **Combustion Products:** | None |

## Section 6: ACCIDENTAL RELEASE MEASURES

**General:** Place spilled material into a container. Avoid actions that cause the S-Sorb™ to become airborne. Avoid inhalation of S-Sorb™ and contact with skin. Wear appropriate protective equipment as described in Section 8. Scrape wet S-Sorb™ or cement and place in container. Allow material to dry or solidify before disposal. Do not wash S-Sorb™ down sewage and drainage systems or into bodies of water (e.g. streams).

**Waste Disposal Method:** Dispose of S-Sorb™ according to Federal, State, Provincial and Local regulations.

## Section 7: HANDLING AND STORAGE

**General:** Keep bulk and bagged S-Sorb™ dry until used. Stack bagged material in a secure manner to prevent falling. Bagged S-Sorb™ and cement is heavy and poses risks such as sprains and strains to the back, arms, shoulders and legs during lifting and mixing. Handle with care and use appropriate control measures.

Engulfment hazard. To prevent burial or suffocation, do not enter a confined space, such as a silo, bin, bulk truck, or other storage container or vessel that stores or contains S-Sorb™. S-Sorb™ and cement can buildup or adhere to the walls of a confined space. The S-Sorb™ and cement can release, collapse or fall unexpectedly.



MSDS: S-Sorb™/Cement Kiln Dust

## Section 7:  HANDLING AND STORAGE (continued)

|  |  |
|---|---|
|  | Properly ground all pneumatic conveyance systems. The potential exists for static build-up and static discharge when moving cement powders through a plastic, non-conductive, or non-grounded pneumatic conveyance system. The static discharge may result in damage to equipment and injury to workers. |
| Usage: | Cutting, crushing or grinding hardened cement, concrete or other crystalline silica-bearing materials will release respirable crystalline silica. Use all appropriate measures of dust control or suppression, and Personal Protective Equipment (PPE) described in Section 8 below. |
| Housekeeping: | Avoid actions that cause the S-Sorb™ to become airborne during clean-up such as dry sweeping or using compressed air. Use HEPA vacuum or thoroughly wet with water to clean-up dust. Use PPE described in Section 8 below. |
| Storage Temperature: | Unlimited          Storage Pressure:     Unlimited |
| Clothing: | Promptly remove and launder clothing that is dusty or wet with S-Sorb™. Thoroughly wash skin after exposure to dust or wet S-Sorb™. |

## Section 8:  EXPOSURE CONTROLS AND PERSONAL PROTECTION

**Engineering Controls:**      Use local exhaust or general dilution ventilation or other suppression methods to maintain dust levels below exposure limits.

**Personal Protective Equipment (PPE):**

**Respiratory Protection:**      Under ordinary conditions no respiratory protection is required. Wear a NIOSH approved respirator that is properly fitted and is in good condition when exposed to dust above exposure limits.

**Eye Protection:**      Wear ANSI approved glasses or safety goggles when handling dust or wet S-Sorb™ to prevent contact with eyes. Wearing contact lenses when using S-Sorb™, under dusty conditions, is not recommended.

**Skin Protection:**      Wear gloves, boot covers and protective clothing impervious to water to prevent skin contact. Do not rely on barrier creams, in place of impervious gloves. Remove clothing and protective equipment that becomes saturated with wet S-Sorb™ or cement and immediately wash exposed areas.

## Section 9:  PHYSICAL AND CHEMICAL PROPERTIES

| | | | |
|---|---|---|---|
| **Physical State:** | Solid (powder) | **Evaporation Rate:** | NA |
| **Appearance:** | Gray, tan, or white powder | **pH (in water):** | $10 - 13$ |
| **Odor:** | None | **Boiling Point:** | $>1000°$ C |
| **Vapor Pressure:** | NA | **Freezing Point:** | None, solid |
| **Vapor Density:** | NA | **Viscosity:** | None, solid |
| **Specific Gravity:** | $2.6 - 2.8$ | **Solubility in Water:** | $2 - 20\%$ |



MSDS: S-Sorb™/Cement Kiln Dust

## Section 10: STABILITY AND REACTIVITY

**Stability:**  Stable. Keep dry until use. Avoid contact with incompatible materials. S-Sorb™ reacts with water, resulting in a slight release of heat, depending on the amount of lime (Calcium oxide) present.

## Section 10: STABILITY AND REACTIVITY

**Incompatibility:**  S-Sorb™ and wet cement is alkaline and is incompatible with acids, ammonium salts and aluminum metal. S-Sorb™ and cement dissolves in hydrofluoric acid, producing corrosive silicon tetrafluoride gas. S-Sorb™ and cement reacts with water to form silicates and calcium hydroxide. Silicates react with powerful oxidizers such as fluoride, boron trifluoride, chlorine trifluoride, manganese trifluoride and oxygen difluoride.

**Hazardous Polymerization:** None        **Hazardous Decomposition:** None

## Section 11 and 12: TOXICOLOGICAL AND ECOLOGICAL INFORMATION

For questions regarding toxicological and ecological information refer to contact information in Section 1.

## Section 13: DISPOSAL CONSIDERATIONS

Dispose of waste and containers in compliance with applicable Federal, State, Provincial and Local regulations.

## Section 14: TRANSPORT INFORMATION

This product is not classified as a Hazardous Material under U.S. DOT or Canadian TDG regulations.

## Section 15: REGULATORY INFORMATION

| | |
|---|---|
| **OSHA/MSHA Hazard Communication:** | This product is considered by OSHA/MSHA to be a hazardous chemical and should be included in the employer's hazard communication program. |
| **CERCLA/SUPERFUND:** | This product is not listed as a CERCLA hazardous substance. |
| **EPCRA SARA Title III:** | This product has been reviewed according to the EPA Hazard Categories promulgated under Sections 311 and 312 of the Superfund amendment and Reauthorization Act of 1986 and is considered a hazardous chemical and a delayed health hazard. |
| **EPCRA SARA Section 313:** | This product contains none of the substances subject to the reporting requirements of Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 and 40 CFR Part 372. |



## Section 15:  REGULATORY INFORMATION (continued)

| | |
|---|---|
| **RCRA:** | If discarded in its purchased form, this product would not be a hazardous waste either by listing or characteristic. However, under RCRA, it is the responsibility of the product user to determine at the time of disposal, whether a material containing the product or derived from the product should be classified as a hazardous waste. |
| **TSCA:** | S-Sorb™ and crystalline silica are exempt from reporting under the inventory update rule. |
| **California Proposition 65:** | Crystalline silica (airborne particulates of respirable size) and Chromium (hexavalent compounds) are substances known by the State of California to cause cancer. |
| **WHMIS/DSL:** | Products containing crystalline silica and calcium carbonate are classified as D2A, E and are subject to WHMIS requirements. |

## Section 16:  OTHER INFORMATION

**Abbreviations:**

| | | | |
|---|---|---|---|
| > | Greater than | NA | Not Applicable |
| ACGIH | American Conference of Governmental Industrial Hygienists | NFPA | National Fire Protection Association |
| CAS No | Chemical Abstract Service number | NIOSH | National Institute of Occupational Safety and Health |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act | NTP | National Toxicology Program |
| | | OSHA | Occupational Safety and Health Administration |
| CFR | Code for Federal Regulations | PEL | Permissible Exposure Limit |
| CL | Ceiling Limit | pH | Negative log of hydrogen ion |
| DOT | U.S. Department of Transportation | PPE | Personal Protective Equipment |
| EST | Eastern Standard Time | R | Respirable Particulate |
| HEPA | High-Efficiency Particulate Air | RCRA | Resource Conservation and Recovery Act |
| HMIS | Hazardous Materials Identification System | SARA | Superfund Amendments and Reauthorization Act |
| IARC | International Agency for Research on Cancer | T | Total Particular |
| | | TDG | Transportation of Dangerous Goods |
| $LC_{50}$ | Lethal Concentration | TLV | Threshold Limit Value |
| $LD_{50}$ | Lethal Dose | TWA | Time Weighted Average (8 hour) |
| $mg/m^3$ | Milligrams per cubic meter | WHMIS | Workplace Hazardous Materials Information System |
| MSHA | Mine Safety and Health Administration | | |

**Schedule 5.1**
<u>Line Drawing</u>

[Attached]

Schedule 5.1

As shown on attached drawing labeled "DUKE CAYUGA IN" by Standley Batch Systems, Inc.



Schedule 5.1

**Schedule 5.3**
Quality Standards

| CHARACTERISTIC | TYPICAL SPECIFICATION |
|---|---|
| Calorific Value: | 11,000 Btu per Lb |
| Ash Content: | 10.5% |
| $SO_2$ Content: | 6.0 Lbs. per MMBtu |
| Moisture Content (Total): | 17.0% |
| Size: | 2" x 0" |

PETITIONER'S EXHIBIT B-2

**EXECUTION VERSION**

**FEEDSTOCK SUPPLY AGREEMENT**
**(Cayuga Generating Station)**

**between**

**COTTBUS ASSOCIATES, LLC,**

**as Owner**

**and**

**DUKE ENERGY INDIANA, INC.**

**as Seller**

# FEEDSTOCK SUPPLY AGREEMENT

## (Cayuga Generating Station)

## TABLE OF CONTENTS

Page

ARTICLE I Purchase And Sale Of Coal Feedstock; Quality ...........................................................1

    1.1     Supply of Coal Feedstock .....................................................................................1

    1.2     Coal Feedstock.....................................................................................................2

    1.3     Scheduling and Designation .................................................................................2

    1.4     Owner's Rights to Reduce Purchases for Tax Matters .........................................2

    1.5     Licenses and Permits............................................................................................3

    1.6     Initial Coal Feedstock Inventory..........................................................................3

ARTICLE II Term; Termination; Suspension .................................................................................3

    2.1     Term .....................................................................................................................3

    2.2     Early Termination by Owner ................................................................................3

    2.3     Suspension Notices and Early Termination by Seller...........................................4

    2.4     Other Termination Rights .....................................................................................4

    2.5     Liability Upon Termination ..................................................................................6

ARTICLE III Price; Title and Risk of Loss.....................................................................................6

    3.1     Coal Feedstock Price.............................................................................................6

    3.2     Billing and Payment..............................................................................................6

    3.3     Sales Taxes on Product .........................................................................................7

    3.4     Setoff....................................................................................................................7

ARTICLE IV Delivery of Coal Feedstock, Feedstock Specifications ............................................8

    4.1     Title and Risk of Loss ..........................................................................................8

    4.2     Coal Feedstock Quality Standards and Specifications..........................................8

4.3     Sampling and Analysis ...........................................................................................8

4.4     Seller's Warranties.................................................................................................8

ARTICLE V Force Majeure; Representations and Warranties .......................................................9

5.1     Force Majeure. .......................................................................................................9

5.2     Representations and Warranties of Seller ..............................................................9

5.3     Representations and Warranties of Owner ...........................................................10

ARTICLE VI Indemnification; Limitation of Liability..................................................................11

6.1     Owner....................................................................................................................11

6.2     Seller ....................................................................................................................11

6.3     Procedure ..............................................................................................................12

6.4     Reduction and Recovery.......................................................................................12

6.5     Limitation on Damages.........................................................................................12

6.6     Adverse Consequences .........................................................................................13

ARTICLE VII Miscellaneous.........................................................................................................13

7.1     Independent Contractor.........................................................................................13

7.2     Binding Effect.......................................................................................................14

7.3     Assignments..........................................................................................................14

7.4     Accounting and Audit...........................................................................................14

7.5     Drafting Conventions; Headings...........................................................................15

7.6     Entire Agreement..................................................................................................15

7.7     Representatives .....................................................................................................15

7.8     Governing Law; Jurisdiction.................................................................................15

7.9     Partial Invalidity....................................................................................................15

7.10    Non-Waiver of Covenants ....................................................................................15

7.11    Notices ..................................................................................................................16

7.12    Confidentiality and Use of Proprietary Information ...............................................16

7.13    Compliance with Regulatory Code of Conduct .....................................................17

7.14    No Third-Party Beneficiary ...................................................................................17

7.15    Survival Clause .....................................................................................................18

7.16    Arbitration.............................................................................................................18

7.17    Counterparts .........................................................................................................19

7.18    Expenses ...............................................................................................................20

7.19    Interpretation ........................................................................................................20

7.20    Attorneys' Fees .....................................................................................................20

7.21    Remedies...............................................................................................................20

7.22    Business Days .......................................................................................................20

Exhibit A          Form of Note
Exhibit B          Form of Security Agreement

Schedule 4.2       Quality Standards

## FEEDSTOCK SUPPLY AGREEMENT

This Feedstock Supply Agreement (this "Agreement") dated effective as of August 22, 2011 (the "Effective Date"), is between Duke Energy Indiana, Inc., an Indiana corporation having a business address at 526 S. Church St., Charlotte, NC 28202 ("Seller") and Cottbus Associates, LLC, a Delaware limited liability company ("Owner").

### RECITALS

A.     Seller owns an electric power generation station and related facilities known as the Cayuga Generating Station (the "Generation Facility") located on certain real property (the "Property") owned by Utility in Vermillion County, Indiana and a conveyor that is used to unload coal delivered by rail or truck to Seller and a conveyor that feeds the Generation Facility.

B.     Owner is the owner of a facility designed for the treatment of coal to produce refined coal (as such term is defined in Section 45 of the Internal Revenue Code) ("Owner's Plant") that will be relocated to a portion of the Property designated as the "Lease Area," as that term is defined in the Lease Agreement (the "Lease Agreement"), between Seller and Owner dated as of the Effective Date (the "Lease Area").

C.     Owner and Seller have entered into a Refined Coal Sales Agreement, dated as of the Effective Date (the "Refined Coal Sales Agreement"), pursuant to which Owner has agreed to sell to Seller refined coal produced by Owner at Owner's Plant using the Treatment Protocol described therein (the "Product").

D.     Capitalized terms not defined herein shall have the meaning set forth in the Refined Coal Sales Agreement or the Lease Agreement, as applicable.

NOW, THEREFORE, Seller and Owner, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF COAL FEEDSTOCK; QUALITY

1.1     Supply of Coal Feedstock. Seller shall supply and sell to Owner that quantity of Coal Feedstock as reasonably requested by Owner from time to time in connection with producing Product as provided under the Refined Coal Sales Agreement. The parties acknowledge there is no minimum purchase requirement by Owner hereunder. The quantity of Coal Feedstock to be sold to Owner will not exceed Seller's demand for use of Product at the Generation Facility, provided in the Refined Coal Sales Agreement. The time and duration of operation of Owner's Plant and the related amount of Coal Feedstock necessary for refined coal production shall be determined by Owner in its sole and absolute discretion. No Coal Feedstock shall be required to be provided by Seller to Owner during any period when the Generation Facility or Owner's Plant operations are significantly curtailed for any reason, including, without limitation, mechanical breakdown, lack of workforce, vacations or holidays, reduced demand for coal, or Force Majeure events, as hereinafter defined. Owner shall not be required to accept Coal

1

Feedstock while Owner's Plant is inoperable or not in operation for any reason, including, without limitation, mechanical breakdown or lack of workforce, or its operations significantly curtailed due to vacations or holidays, or Force Majeure events, shutdowns or other curtailments of operations at the Generation Facility or failure of Seller to buy Product under the Refined Coal Sales Agreement; provided, however, it is expressly understood that the design and installation of Owner's Plant shall not interfere with the operation of Seller's conveyor that is used to unload coal delivered by barge, rail or truck to Seller or conveyor that feeds the Generation Facility, in the event that Owner's Plant is inoperable or not in operation. Owner may obtain coal from other sources and enter into a coal feedstock agreement for the purchase of coal feedstock from other sources to be used to produce Product, if such agreement was recommended or approved by Seller, assigned to Owner by Seller or one of its Affiliates, or entered into by Seller or one of its Affiliates.

1.2     Coal Feedstock. Seller shall cooperate fully with Owner in providing information on a timely basis to Owner as to the specifications, rank, source and other information regarding Coal Feedstock purchased hereunder as may be needed by Owner to adjust its Treatment Protocol or otherwise needed by Owner to comply with the testing requirements set forth in the Code such that Tax Credits may be claimed with respect to Product sold to Seller.

1.3     Scheduling and Designation. On or before five business days prior to the anticipated Rent Commencement Date, with respect to the first calendar year, and thereafter not later than 60 days prior to the beginning of each subsequent calendar year, Seller shall deliver to Owner an estimate of the quantity of coal it intends to burn at the Generation Facility for such calendar year and to the extent known, a schedule of all planned outages or shutdowns of the boiler units at the Generation Facility during such calendar year ("Seller's Estimate"). On or before two business days after receipt of Seller's Estimate, with respect to the first calendar year, and thereafter not later than 45 days prior to the beginning of each subsequent calendar year, or, if later, five days after Owner's receipt of Seller's Estimate for such calendar year, Owner shall deliver to Seller an estimate of the quantity and timing of Coal Feedstock it desires to purchase during such calendar year ("Owner's Estimate"). Owner's Estimate shall not be binding on Seller and Seller's Estimate shall not be binding on Owner. Seller and Owner shall work together in good faith to agree upon an annual forecast (the "Annual Forecast") of monthly scheduled deliveries of Coal Feedstock during the relevant calendar year within 10 Business Days after Owner's delivery of Owner's Estimate. The Annual Forecast shall be based upon the quantity of tons of Product reflected in the estimates provided by Owner and Seller under the Refined Coal Sales Agreement as to Product to be purchase by Seller or produced by Owner, whichever is lower. The Annual Forecast is to be used solely for scheduling purposes and the Annual Forecast shall not impose an obligation on Owner to purchase Coal Feedstock or Seller to sell Coal Feedstock. During the course of each year, there shall be regular discussions between the parties in order to manage inventory such that there is a sufficient inventory of Coal Feedstock at all times to cover the next two (2) days expected production of Product.

1.4     Owner's Rights to Reduce Purchases for Tax Matters. If Owner determines, based on its commercially reasonable judgment, that (i) Product produced by Owner's Plant is unlikely for any reason to qualify as refined coal product with respect to which Owner (or its Affiliates or members) shall be entitled to claim Tax Credits during any tax year, (ii) Tax Credits attributable to the production and sale of Product may or will be disallowed for such tax year or

2

(iii) Owner, or any Person that directly or indirectly owns any membership interest in Owner, will be unable to utilize any such Tax Credits for the tax year in which such Product is sold, Owner may reduce its purchases of Coal Feedstock as determined by Owner. In addition, notwithstanding that Owner has notified Seller it is reducing Coal Feedstock purchases, unless this Agreement is terminated, Owner may at any time after such notice, notify Seller that it is increasing production of Product and reinstating purchases of Coal Feedstock.

      1.5    Licenses and Permits. Seller agrees that it will acquire and use commercially reasonable efforts to maintain all licenses and permits required by any Governmental Authority for the sale of Coal Feedstock to Owner, provided however, that Seller shall only be responsible for the cost of acquiring and/or maintaining such licenses and permits if Seller would have been required to acquire and/or maintain such licenses and permits in the absence of the transactions contemplated by the Project Agreements; and if Seller would not have been required to acquire and/or maintain such licenses and permits in the absence of the transactions contemplated by the Project Agreements, Owner shall be responsible for reimbursing Seller for the cost of acquiring and/or maintaining any such licenses and permits.

      1.6    Initial Coal Feedstock Inventory. Notwithstanding anything in this Agreement to the contrary, the parties acknowledge and agree that payment for the first 16,400 tons of Coal Feedstock hereunder shall not be payable until the later to occur of (i) the expiration or earlier termination of the Project Agreements or (ii) if applicable, two (2) Business Days after Owner's receipt of payment from Seller for any unused Owner's Coal Feedstock inventory pursuant to Section 2.4(f). In connection therewith, upon the delivery to Owner by Seller of such 16,400 tons of Coal Feedstock, Owner will deliver to Seller a Note (the "Note") and a Security Agreement, substantially in the form attached hereto as Exhibits A and B, respectively.

## ARTICLE II
## TERM; TERMINATION; SUSPENSION

      2.1    Term. The term (the "Term") of this Agreement shall commence on the Rent Commencement Date (as such term is defined in the Lease Agreement) and, unless sooner terminated pursuant to Sections 2.2, 2.3, 2.4, 4.2, or 5.1 shall continue for a period of ten (10) years from and after the Rent Commencement Date (the "Termination Date").

      2.2    Early Termination by Owner. If (a) Owner determines, based on its commercially reasonable judgment, that (i) Product produced by Owner's Plant is unlikely for any reason to qualify as refined coal product with respect to which Owner (or its Affiliates or members) shall be entitled to claim Tax Credits at any time prior to the Termination Date, (ii) Tax Credits attributable to the production and sale of Product may or will be disallowed, or (iii) Owner, or any Person that, directly or indirectly owns any membership interest in Owner, will be unable to utilize any such Tax Credits in any tax year in which Product is sold, (b) Owner decides in its sole judgment that Owner's Plant for any other reason should not be operated, or (c) the sales or use tax laws applicable to sale of Product are changed or re-interpreted such that one of the parties is required to pay additional sales or use tax (as compared to what is payable by Seller as of the effective date of this Agreement unless Seller would otherwise be liable for such increased tax in the absence of the transactions contemplated hereby), Owner shall send a written notice (a

3

"Owner Termination Notice") to Seller that it desires to terminate this Agreement, and this Agreement shall terminate effective upon receipt of such notice by Seller.

2.3     Suspension Notices and Early Termination by Seller. Owner shall immediately be deemed to have suspended purchases of Coal Feedstock and acceptance of Coal Feedstock for processing in Owner's Plant, without action on its part, upon Owner's receipt from Seller of a validly given Suspension Notice (as that term is defined in the Refined Coal Sales Agreement) under the Refined Coal Sales Agreement that Seller is suspending purchases of Product thereunder. Owner's suspension hereunder shall last until either (i) this Agreement is otherwise terminated in accordance with its terms or (ii) Seller resumes purchases of Product under the Refined Coal Sales Agreement and Owner notifies Seller that it is resuming purchases of Coal Feedstock hereunder.

2.4     Other Termination Rights. In addition to the termination rights set forth in Sections 2.2, 2.3, and 5.1:

(a)     Provided that Seller is not in default of any payment obligations under the Refined Coal Sales Agreement, Seller may terminate this Agreement upon written notice from Seller to Owner if Owner has failed to make any payment due hereunder within 30 days after delivery of written notice from Seller to Owner that such amount is past due unless such failure is cured within such 30 day period.

(b)     Either party may terminate this Agreement upon the default by the non-terminating party in the performance of any material term, covenant or obligation contained in this Agreement (so long as the default does not arise out of or result from any act or omission of the terminating party or any Affiliate of the terminating party hereunder, under any of the Lease Agreement, Site Services Agreement, between Seller and Owner dated as of the Effective Date (the "Site Services Agreement") or Refined Coal Sales Agreement or otherwise); *provided* that the non-terminating party shall have failed to correct such default within a period of 30 days after receipt of written notice from the non-defaulting party of such default (which written notice shall specify the nature of such default) or, if such default is not capable of cure in 30 days, shall have failed to commence and pursue the correction, using its commercially reasonable best efforts, within 30 days of written notice of such default and to have cured such default within 90 days after receipt of the default notice from the non-defaulting party.

(c)     Either party may terminate this Agreement by written notice to the other party upon the occurrence of any of the following events with respect to the other party: (i) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or similar official for a substantial part of such other party's assets and the appointment is neither made ineffective nor discharged within 90 days after the making thereof; (ii) the entry of a judgment, decree, or order for relief against such other party that materially affects its ability to perform its obligations hereunder in accordance with the terms of this Agreement by a court of competent jurisdiction in an involuntary case commenced under any applicable bankruptcy, insolvency, or other similar law or any jurisdiction now or hereafter in effect (other than an involuntary case commenced by the terminating party); (iii) the commencement by such other party of a voluntary case under any applicable bankruptcy, insolvency, or similar law now or hereafter in effect; the consent to, request by, or acquiescence by such other party in the entry of an order for relief in an

4

involuntary case under any such law or to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar official of any substantial part of its assets; (iv) the making by such other party of a general assignment for the benefit of creditors; or (v) the taking by such other party of corporate or other action in furtherance of any of the foregoing.

(d) <u>Termination for Convenience by Seller.</u>   Seller may terminate this Agreement for its convenience upon six (6) months' notice to Owner.

(e) <u>Termination for Regulatory Reasons.</u>   Seller may terminate this Agreement for cause by written notice to Owner if (i) Seller receives notice of any determination, assertion and/or opinion rendered by the Indiana Department of Environmental Management, United States Environmental Protection Agency and/or any other Governmental Authority that the use of the Product at the Generation Facility has, or will be, considered to constitute the combustion and/or incineration of solid waste at the Generation Facility for purposes of the commercial and industrial solid waste incineration ("CISWI") solid waste rule codified at 40 C.F.R. 241; (ii) Seller makes a good faith determination in its sole and absolute discretion that approval from the Indiana Utility Regulatory Commission ("IURC") or any other agency or administrative body having authority over Seller or Seller's Generation Facility is required to purchase the Product under the Refined Coal Sale Agreement or to burn the Product produced at Owner's Plant at the Generation Facility (a "Required Approval") and cannot be obtained; (iii) due to Seller's burning of the Product, an environmental permitting agency: (A) requires Seller to procure an additional permit or a modification to an existing permit, if procuring such permit or modification subjects the Generation Facility to additional requirements, including but not limited to New Source Review, Prevention of Significant Deterioration, Best Available Control Technology, or Maximum Achievable Control Technology requirements; (B) requires installation of additional controls for treatment of air pollutants or water effluent; or (C) determines that any byproduct of burning the Product is rendered hazardous or is otherwise made subject to additional controls or restrictions on reuse; or (iv) any Required Approval previously obtained is subsequently revoked, rescinded, terminated, suspended or otherwise invalidated (collectively a "Revocation") for a period of more than ninety (90) days; provided, however, that: (A) Seller shall not be required to accept any Product or permit continued operation of Lessee's Plant while any Revocation is in effect; (B) for a period of at least thirty (30) days prior to termination arising in connection with a Revocation, Seller and Owner will cooperate in good faith and use commercially reasonable efforts to re-obtain any Required Approval which has been the subject of a Revocation; and (C) Seller shall not be required to pay any material out-of-pocket expense to re-obtain any Required Approval absent Owner's agreement to immediately reimburse Seller for such expense even if the Required Approval is not ultimately re-obtained.

(f) This Agreement shall terminate upon, and be effective as of, the effective date of the termination, in accordance with the respective terms thereof, of any of (i) this Agreement, (ii) the Lease Agreement, (iii) the Site Services Agreement or (iv) the Refined Coal Sales Agreement (collectively, the "Project Agreements") and upon such termination, or at the expiration or termination of this Agreement for any other reason, Owner shall have the limited right to sell its inventory of Coal Feedstock back to Seller at the then prevailing book value of Seller's Coal Feedstock inventory at the Generating Facility.

(g)     Owner may terminate this Agreement upon 15 days prior written notice to Seller if Owner determines to move or has moved or arranged for the move of Owner's Plant or has otherwise elected in its discretion to permanently cease production of Product at Owner's Plant.

2.5     Liability Upon Termination. Upon the early termination of this Agreement for any reason, neither party shall have any further obligation to the other in the case of such termination, except that such termination shall not relieve either party from (i) any liability that has accrued or attached prior to the date of such termination, or (ii) any liability resulting from any breach or default by such party occurring prior to the date of such termination.

## ARTICLE III
## PRICE; TITLE AND RISK OF LOSS.

3.1     Coal Feedstock Price. The price for Coal Feedstock sold to Owner by Seller hereunder in any month shall be the monthly weighted average cost of inventory ("WACI") of Seller's coal inventory at the Generating Facility for the month prior to delivery of the Coal Feedstock to Owner hereunder (the "Purchase Price"). Coal Feedstock shall be sold to Owner F.O.B. Seller's existing coal Stockpile (the "Feedstock Delivery Point"). Owner will not be required to segregate the Owner's Coal Feedstock from Seller's Coal Feedstock. The amount to be paid by Owner each month will be calculated by multiplying the Monthly Feedstock Weight (as defined below) times the per-Ton Purchase Price. At any given time during the Term, the amount of Owner's Coal Feedstock held in inventory ("Owner's Coal Inventory") shall equal the cumulative amount of Coal Feedstock purchased by Owner hereunder less the cumulative amount of Coal Feedstock used to produce Product as measured by the Facility Input Scale (as defined below). For each calendar month, the "Monthly Feedstock Weight" shall equal the Tons of Owner's Coal Feedstock used to make Product as measured by the Facility Input Scale (i) plus the amount, if applicable, of the net monthly increase to Owner's Coal Inventory or (ii) less the amount, if applicable, of the net monthly decrease to Owner's Coal Inventory, in either case as measured from the beginning of the calendar month to the end of such month. For clarity, Coal Feedstock that crosses the Facility Input Scale that is stacked out to Seller's existing coal stockpile shall remain the property of Seller and such Coal Feedstock owned by Seller shall not be considered for purposes of calculating the Monthly Feedstock weight. The Coal Feedstock cost and the Monthly Feedstock Weight will be calculated not later than the fifth (5th) Business Day of the calendar month following delivery of the Coal Feedstock to the Feedstock Delivery Point. The "Facility Input Scale" shall be (i) the two scales that are currently in place on belts B1 and B2 to which the Facility Measuring Devices are electronically connected such that the Facility's programmable logic controller can apply the correct amount of Chemicals at the Delivery Point.

3.2     Billing and Payment.

(a)     For each calendar month during the Term (or partial month), Owner shall deliver to Seller a statement of the amount and value of Coal Feedstock delivered to Owner during the preceding calendar month, which statement shall be delivered by Owner no later than the 10th day of each month in respect of the preceding month, together with the invoice for Product delivered to Seller during the preceding month as required pursuant to the Refined Coal

6

Sales Agreement. Seller may, if it so elects, after receipt of Owner's invoice, deliver to Owner in accordance with its regular accounting practices and in accordance with the terms of the Refined Coal Sales Agreement, a statement based on its records indicating payment due for goods or services provided by each party under the Project Agreements and the total net amount due by one party to the other in accordance therewith. Each party's statement of the amount of Coal Feedstock will be based on the Monthly Feedstock Weight as determined in accordance with Section 3.1.

(b) Payments by Owner for the amount of Coal Feedstock purchased each month shall be made to Seller on the twentieth (20th) day of the month with respect to Owner's or Seller's monthly statement described in clause (a) for the preceding month (unless such day is not a Business Day, in which case payment shall be due on the next Business Day), and shall be made by electronic funds transfer to an account designated by Seller.

(c) All payments of the Purchase Price for Product not paid on the date on which such amount is due shall bear interest at the Late Payment Rate from the date on which payment was due until the date paid.

3.3 Sales Taxes on Product. Seller shall pay all transfer fees, severance, excise, sales and use, carbon, Btu, energy, or similar taxes and fees ("Coal Sales Tax") imposed (whether on Seller or Owner) upon or incurred in connection with (i) the purchase and sale of Product under the Refined Coal Sales Agreement and (ii) the purchase and sale of Coal Feedstock hereunder, but only if such Coal Sales Taxes would have been incurred by Seller and/or its Affiliates in the absence of the transactions contemplated by the Project Agreements (i.e., Seller or its Affiliate(s) would have been responsible for such Coal Sales Tax had Seller or its Affiliate(s) purchased the Coal Feedstock used to produce Product directly from the mine where produced or any other third party) (the "Expected Sales Tax"). In the event that any Coal Sales Tax is imposed retroactively (by legislation, administrative rulemaking or any other administrative determinations) on either party in excess of the Expected Sales Tax ("Retroactive Sales Tax"), the parties will work in good faith to dispute such imposition of the Retroactive Sales Tax and, in the event of a final determination that such Retroactive Sales Tax is owed, Owner shall be responsible for paying such Retroactive Sales Tax. In the event that any Coal Sales Tax is likely to be imposed prospectively on either party in excess of the Expected Sales Tax ("Prospective Excess Sales Tax"), either party may terminate this Agreement upon written notice to the other party as of the date of implementation of the Prospective Excess Sales Tax, unless the parties come to an agreement on how to allocate the payment of the Prospective Excess Sales Tax or one party agrees to pay all of the Prospective Excess Sales Tax. If a party is required to remit or pay taxes that are the other party's responsibility hereunder, the party responsible for such taxes shall reimburse the other party for such taxes promptly following receipt of notice and evidence of such tax and its payment from the other party. Any party entitled to an exemption from any such taxes or charges shall furnish the other party any necessary documentation thereof.

3.4 Setoff. Each party reserves to itself all rights, setoffs, counterclaims, combination of accounts, liens and other remedies and defenses to which such party has or to which such party may be entitled (whether by operation of law, under this agreement, or otherwise). The parties' respective obligations to make payments under this Agreement, any Project Document and/or the Note may be offset against each other, set off or recouped therefrom. Each Party shall

7

have the right to deduct and set-off any amount owed by it to the other party under this Agreement or any other Project Document, whether billed or unbilled, past due or current, from any undisputed amount such other party owes it under this Agreement or any other Project Document. The exercise of this remedy shall not require or preclude the Party exercising this right to or from the exercise of any other right or remedy under this Agreement, any other Project Document or as provided at law or in equity.

## ARTICLE IV
## DELIVERY OF COAL FEEDSTOCK, FEEDSTOCK SPECIFICATIONS

4.1     Title and Risk of Loss. Title to and risk of loss with respect to the Coal Feedstock shall transfer from Seller to Owner at the Feedstock Delivery Point; and as between the parties, Seller shall be deemed to be in exclusive custody and control (and responsible for any damages or injury caused thereby) of the Coal Feedstock up to and including delivery thereof to Owner at the Feedstock Delivery Point, and Owner shall be deemed to be in exclusive custody and control (and responsible for any damages or injury caused thereby) of the Coal Feedstock immediately upon delivery of the Coal Feedstock to the Feedstock Delivery Point. Seller warrants that at the time of delivery of Coal Feedstock Seller will convey good and marketable title to the Coal Feedstock.

4.2     Coal Feedstock Quality Standards and Specifications. The initial Coal Feedstock Quality Standards are set forth on Schedule 4.2. Seller shall have the right during the Term to notify Owner of changes in the Coal Feedstock Quality Standards consistent with the operating requirements of the Generation Facility; *provided, however*, that if Owner determines, in its sole, good faith, discretion that the proposed Coal Feedstock Quality Standards could prevent the Product from constituting refined coal with respect to which Owner (or its Affiliates or members) are entitled to claim Tax Credits when the Coal Feedstock is used to produce Product using the Treatment Process employed in Owner's Plant, Owner shall so notify Seller and if Seller and Owner are not able to agree on revised Coal Feedstock Quality Standards that are satisfactory to both parties, either party shall have the right to terminate this Agreement by delivery of written notice to the other party, effective upon the delivery of such notice to the other party.

4.3     Sampling and Analysis. Seller shall provide Owner in a timely manner with copies of any sampling and testing of Coal Feedstock performed in Seller's ordinary course of business at no cost to Owner, whether such sampling and analysis is provided to Seller from the mines from whom it purchased the Coal Feedstock or otherwise. Owner shall have the right to sample and conduct its own analysis of Coal Feedstock, at Owner's cost, and shall provide Seller with a copy of such test results if requested by Seller. Such sampling and testing results shall be Seller's confidential information pursuant to Section 7.12.

4.4     Seller's Warranties. The only warranties made by Seller with respect to Coal Feedstock are those expressly stated in Section 4.1 and SELLER EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

8

## ARTICLE V
## FORCE MAJEURE; REPRESENTATIONS AND WARRANTIES

5.1     Force Majeure.

(a)     If, because of a Force Majeure event, Owner or Seller is unable to carry out its obligations under this Agreement, and if the party subject to such Force Majeure gives the other party prompt written notice of such Force Majeure event, including reasonable details as to the cause and expected duration of such Force Majeure event or condition, the obligations and liabilities of Owner and Seller, other than the obligation of either party to make payments of amounts due hereunder to the other party for Coal Feedstock actually delivered and reimbursement of Coal Sales Tax, shall be suspended (and the party whose performance is suspended shall not be considered to be in default) to the extent made necessary by and during the continuance of such Force Majeure event; *provided, however*, that the disabling effects of such Force Majeure event shall be eliminated as soon as and to the extent commercially reasonable (except that either party may settle any of its own labor disputes, strikes, or terminate any of its own lockouts in its sole discretion). The suspension of performance by a party due to a Force Majeure event or condition shall be of no greater scope and no longer duration than that which is necessary.

(b)     Notwithstanding the provisions of this Section 5.1, a party not claiming a Force Majeure event may terminate this Agreement upon written notice to the other party and without liability to the other party whenever all of the following circumstances exist:  (i) a condition of a Force Majeure event (alone or extended by other events of Force Majeure) occurs which causes the mutual obligations of the parties to be suspended as provided above for a period of 90 consecutive days  and (ii) at the end of such 90 day period, the party not claiming a Force Majeure event, in the exercise of reasonable judgment, concludes that there is little likelihood of ending the Force Majeure event in the next 30 days. The party not claiming a Force Majeure event may exercise such right of termination, at any time after the conditions in the previous sentence are satisfied during the continuation of the event of Force Majeure, by giving the other party 10 days' prior written notice of its intention to terminate.

5.2     Representations and Warranties of Seller. Seller hereby represents and warrants as of the date hereof as follows:

(a)     Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana and is qualified to do business and is in good standing in the State of Indiana and each other jurisdiction in which the conduct of its business and ownership of its properties so require. Seller is not in violation of any of the provisions of its certificate/article of incorporation or its bylaws.

(b)     Seller has all requisite right, power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance by Seller of this Agreement has been duly authorized by all necessary action on its part and no other company actions on the part of Seller and on the part of its shareholders or directors are necessary to authorize the execution, delivery and performance of this Agreement. This Agreement has been duly and validly executed by Seller. This Agreement is the legal, valid and binding obligation of Seller,

9

enforceable in accordance with its terms, subject to the qualification, however, that enforcement of the rights and remedies created hereby is subject to bankruptcy and other similar laws of general application relating to or affecting the rights and remedies of creditors and that the remedy of specific enforcement or of injunctive relief is subject to the discretion of the court before which any proceeding therefore may be brought.

(c) The execution, delivery and performance by Seller of this Agreement, and the consummation by Seller thereof of the transactions contemplated hereby do not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of the certificate/articles of incorporation or bylaws of Seller, (ii) with or without the giving of notice or the lapse of time, or both, violate, conflict with, result in the breach of or accelerate the performance required by, or give rise to a right of termination under, any bond, debenture, note, mortgage, indenture, lease, covenant, agreement or understanding to which Seller is a party or by which any of its properties are bound, or (iii) violate any order, ruling, decree, judgment or arbitration award, or any law, rule, regulation or stipulation, permit, license or authorization applicable to Seller.

(d) Except for such permits and governmental filing obligations which will not have a material adverse effect on the Generation Facility or Owner's Plant, Seller is not required to file, make or obtain any governmental notice, filing, authorization, approval, order or consent, in connection with the execution, delivery and performance by it of this Agreement. No consent from any non-governmental third party is required in connection with the execution, delivery and performance by Seller of this Agreement.

(e) There is no outstanding order, ruling, decree, judgment or stipulation by or with any Governmental Authority or arbitration panel or any litigation pending or, to the knowledge of Seller, threatened against Seller which is reasonably likely to affect Seller's ability to perform its obligations under this Agreement.

5.3     Representations and Warranties of Owner. Owner hereby represents and warrants as of the date hereof as follows:

(a) Owner is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and is qualified to do business and is in good standing in the State of Delaware and each other jurisdiction in which the conduct of its business and ownership of its properties so require. Owner is not in violation of any of the provisions of its certificate of formation or its limited liability company agreement.

(b) Owner has all requisite right, power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance by Owner of this Agreement has been duly authorized by all necessary action on its part and no other company actions on the part of Owner and on the part of its managers or members are necessary to authorize the execution, delivery and performance of this Agreement. This Agreement has been duly and validly executed by Owner. This Agreement is the legal, valid and binding obligation of Owner, enforceable in accordance with its terms, subject to the qualification, however, that enforcement of the rights and remedies created hereby is subject to bankruptcy and other similar laws of general application relating to or affecting the rights and remedies of creditors and that the

10

remedy of specific enforcement or of injunctive relief is subject to the discretion of the court before which any proceeding therefore may be brought.

(c) The execution, delivery and performance by Owner of this Agreement, and the consummation by Owner thereof of the transactions contemplated hereby and thereby do not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of the certificate of formation or limited liability company agreement of Owner, (ii) with or without the giving of notice or the lapse of time, or both, violate, conflict with, result in the breach of or accelerate the performance required by, or give rise to a right of termination under, any bond, debenture, note, mortgage, indenture, lease, covenant, agreement or understanding to which Owner is a party or by which any of its properties are bound, or (iii) violate any order, ruling, decree, judgment or arbitration award, or any law, rule, regulation or stipulation, permit, license or authorization applicable to Owner.

(d) Except for the Lessee Permits and such other permits and governmental filing obligations which will not have a material adverse effect on the Generation Facility or Owner's Plant, Owner is not required to file, make or obtain any governmental notice, filing, authorization, approval, order or consent, in connection with the execution, delivery and performance by it of this Agreement. No consent from any third party is required in connection with the execution, delivery and performance by Owner of this Agreement.

(e) There is no outstanding order, ruling, decree, judgment or stipulation by or with any Governmental Authority of arbitration panel, or any litigation pending or, to the knowledge of Owner, threatened against Owner which is reasonably likely to affect Owner's ability to perform its obligations under this Agreement.

## ARTICLE VI
## INDEMNIFICATION; LIMITATION OF LIABILITY

6.1 Owner. Owner agrees to indemnify, defend, save and hold harmless Seller and its Affiliates and their respective directors, managers, members, officers, employees and agents (the "Seller Indemnified Parties") from and against any and all Adverse Consequences (as defined below) arising out of any or all of (x) (i) death, sickness or bodily injury of or to any Person, or (ii) destruction or damage to any property of any Person, in each case arising from or related to negligent or willful acts or omissions of Owner, its Affiliates or any of their respective directors, managers, officers, employees or agents in respect of the operations of Owner, except to the extent the same under this clause (x)(i) or (x)(ii) was caused by the negligent or willful act or omission of the Seller Indemnified Parties, or (y) any breach of this Agreement by Seller.

6.2 Seller. Seller agrees to indemnify, defend, save and hold harmless Owner, the Operator and its and their Affiliates and their respective directors, managers, officers, employees and agents (the "Owner Indemnified Parties") from and against any and all Adverse Consequences (as defined below) arising out of any or all of (x) (i) death, sickness or bodily injury of or to any Person, or (ii) destruction or damage to any property of any Person in each case arising from or related to negligent or willful acts or omissions of Seller, its Affiliates or their respective directors, managers, officers, employees or agents in respect of the operations of Seller, except to the extent the same under this clause (x)(i) or (x)(ii) was caused by the negligent

11

or willful act or omission of the Owner Indemnified Parties, or (y) any breach of this Agreement by Owner.

6.3     Procedure. The following procedures shall apply with respect to any third-party claims. In the event that any claim or demand for which Seller or Owner would be liable (as the case may be, an "Indemnifying Party") to any Person entitled to indemnification under this Agreement (an "Indemnitee") is asserted or sought to be collected from such Indemnitee by a third party, such Indemnitee shall give written notice to the Indemnifying Party thereof promptly after the discovery by such Indemnitee of the matters giving rise to a claim for indemnification pursuant hereto; provided, however, that the failure of any Indemnitee to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 6.3 except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice. The Indemnifying Party shall be entitled to participate in or to assume the defense thereof, with counsel selected by the Indemnifying Party but reasonably satisfactory to the Indemnitee and, after notice from the Indemnifying Party to the Indemnitee of its election to assume the defense thereof, the Indemnifying Party shall not be liable to such Indemnitee for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof.     The Indemnitee shall cooperate fully with the Indemnifying Party in connection with any negotiation or defense of any such action, proceeding or claim by the Indemnifying Party. In the event that (i) the Indemnifying Party advises an Indemnitee that it will contest a claim for indemnification hereunder or (ii) the Indemnifying Party fails, within 15 days of receipt of any indemnification notice to notify, in writing, such Indemnitee of its election to defend, settle or compromise, at its sole cost and expense, any action, proceeding or claim (or discontinues its defense at any time after it commences such defense), then the Indemnitee may, at its option, defend, settle or otherwise compromise or pay such action, proceeding or claim. In any event, unless and until the Indemnifying Party elects in writing to assume and does so assume the defense of any such claim, proceeding or action, the Indemnifying Party shall be liable for the Indemnitee's reasonable costs and expenses arising out of the defense, settlement or compromise of any such action, claim or proceeding. The Indemnifying Party shall not be liable for any settlement of any action, claim or proceeding effected without its written consent; provided, however, that the Indemnifying Party shall not unreasonably withhold its consent. Notwithstanding anything in this Section 6.3 to the contrary, the Indemnifying Party shall not, without the Indemnitee's prior written consent (whether or not the Indemnitee is a party), settle or compromise any claim or demand or offer to settle any claim or demand, or consent to entry of judgment in respect thereof.

6.4     Reduction and Recovery. At any time after the making of an indemnity payment to an Indemnitee, such Indemnitee's loss is reduced by recovery under any insurance coverage (excluding any proceeds from self-insurance or flow-through insurance policies), or under any recovery or payment by or against any other entity, the amount of such reduction, less any costs, expenses, deductibles or premiums incurred in connection therewith, must promptly be repaid by the Indemnitee to the Indemnifying Party.

6.5     Limitation on Damages.

(a)     NOTWITHSTANDING     ANYTHING     TO     THE     CONTRARY CONTAINED HEREIN, (I) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR ANY SPECIAL, INCIDENTAL,

INDIRECT, CONSEQUENTIAL OR PUNITIVE LOSSES OR DAMAGES ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE OR NON-PERFORMANCE OF OBLIGATIONS HEREUNDER OR IN ANY MANNER FROM THE TRANSACTIONS CONTEMPLATED HEREBY, EXCEPT TO THE EXTENT ANY SUCH LOSS OR DAMAGE IS INCLUDED IN A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION IS OWED PURSUANT TO SECTION 6.1 OR 6.2 OF THIS AGREEMENT; AND (II), NOTWITHSTANDING THE PRECEDING CLAUSE (I), IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR LOSS OF PROFIT OR REVENUE, DAMAGES SUFFERED BY THE OTHER PARTY AS THE RESULT OF THE LOSS OF USE OF OWNER'S PLANT OR SELLER'S GENERATION FACILITY OR OTHER PRODUCTION FACILITIES, COST OF PURCHASED OR REPLACEMENT POWER, DAMAGES SUFFERED BY CUSTOMERS OF THE OTHER PARTY FOR SERVICE INTERRUPTIONS, COST OF CAPITAL, LOSS OF TAX CREDITS OR OTHER TAX BENEFITS, OR LOSS OF GOODWILL, RESULTING FROM ANY VIOLATION OF OR DEFAULT UNDER THIS AGREEMENT OR IN ANY MANNER FROM THE TRANSACTIONS CONTEMPLATED HEREBY, REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE IS INCLUDED IN A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION WOULD OTHERWISE BE OWED PURSUANT TO SECTION 6.1 OR 6.2. IT BEING AGREED FOR THE AVOIDANCE OF DOUBT THAT OWNER SHALL BE LIABLE TO SELLER FOR THE PURCHASE PRICE OF COAL FEEDSTOCK THAT OWNER HAS PURCHASED PURSUANT TO THE TERMS OF THIS AGREEMENT, BUT HAS FAILED TO PAY FOR.   THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT, SHALL APPLY TO ALL CLAIMS, WHETHER IN CONTRACT, EQUITY, TORT OR OTHERWISE, REGARDLESS OF FAULT, NEGLIGENCE (IN WHOLE OR IN PART), STRICT LIABILITY, BREACH OF CONTRACT OR BREACH OF WARRANTY AND SHALL EXTEND TO THE MANAGERS, TRUSTEES, DIRECTORS, OFFICERS, MEMBERS, PARTNERS AND EMPLOYEES, AGENTS AND AFFILIATES OF EACH PARTY, AND THE MANAGERS, MEMBERS, DIRECTORS, TRUSTEES, OFFICERS, EMPLOYEES AND AGENTS OF SUCH AFFILIATES.

6.6     Adverse Consequences. For purposes of this Agreement, "Adverse Consequences" means all actions, suits, arbitrations, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages (including natural resource damages), dues, penalties, fines, costs, liabilities, obligations, liens, losses, expenses, fees, including court costs and reasonable attorneys', consultants' and experts' fees and expenses.

### ARTICLE VII
### MISCELLANEOUS

7.1     Independent Contractor. This Agreement is a contract for the sale and purchase of Coal Feedstock.  The parties recognize and agree that Seller is not an agent or employee of Owner and that Seller is independent of any managerial or other control or direction by Owner and is free to perform, by such means and in such manner as Seller may choose, all work in pursuance of commitments hereunder.  The relationship of the parties is that of independent contractors and in no way establishes an agency or partnership relationship.

7.2     Binding Effect. This Agreement shall bind and inure to the benefit of the parties and their successors and assigns, as permitted under Section 7.3.

7.3     Assignments.

(a)     This Agreement shall not be assigned by either party without the prior written consent in each instance of the other party, except that (i) either party may assign this Agreement to an Affiliate thereof without the consent of the other party; and (ii) Owner may assign this Agreement in connection with the contemporaneous sale or lease of Owner's Plant to the Person acquiring Owner's Plant or the lease thereof subject to Seller's consent (not to be unreasonably withheld, conditioned or delayed); provided, however, that Seller shall be permitted to refuse such consent (and such refusal shall not be deemed unreasonably withheld, conditioned, or delayed) if Seller, in the exercise of its reasonable business judgment, determines that the proposed assignee (or its designated operator) is not qualified, or does not have the financial resources necessary, to operate Owner's Plant in a manner consistent with Owner's prior operations or Seller's reasonable commercial expectations as to safe, efficient and prudent operations. Notwithstanding anything to the contrary set forth herein, in connection with the Seller's sale, transfer or other disposition of the Generation Facility, Seller shall be obligated to assign this Agreement to the Person acquiring the Generation Facility if Owner so requests in writing.

(b)     After any permitted assignment of this Agreement, the assignor shall provide to the other party a copy of the executed instrument of assignment and, the assignor shall be released and discharged from all further duties, obligations and liabilities thereafter accruing under this Agreement, except for (x) such duties and obligations accrued but undischarged at the time of such assignment, and (y) obligations for defense, reimbursement and indemnification to the extent such obligations relate to acts, omissions or other circumstances occurring prior to the date of any such assignment, including but not limited to the respective indemnification obligations of the parties set forth herein. In no event shall any assignor of this Agreement be released from any of its duties, obligations or liabilities under this Agreement to the extent relating to any period prior to such assignment without the prior written consent in each instance of the other party.

7.4     Accounting and Audit. Each party shall provide the other party with all information in such party's possession reasonably necessary for the other party to perform its obligations under this Agreement and to account for the sale of Coal Feedstock. Each party shall keep full and complete books and records relating to the pricing, sale and delivery of Coal Feedstock under this Agreement in accordance with sound and accepted accounting principles and shall retain such books and records for at least 5 years after this Agreement is terminated or expires. Each party shall give the other party reasonable advance notice of its intent and schedule to examine such items. Any such examination will be performed at the requesting party's sole cost and expense during normal business hours, without unduly interfering with the other party's operations and will not extend to general operating expenses and other proprietary aspects of the other party's business. It is expressly understood and agreed that the provisions of this Section 7.4 shall survive the termination or expiration of this Agreement for a period of 5 years.

14

7.5     Drafting Conventions; Headings. Unless otherwise required by the context in which any term appears: (a) the singular shall include the plural and vice versa; (b) the words "include" and "including" shall be deemed to be followed by the words "without limitation"; (c) references to "Sections", "Schedules" and "Exhibits" shall be to sections, schedules and exhibits hereof; (d) the words "herein", "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection hereof; (e) references to this Agreement shall include a reference to all schedules and exhibits hereto, as the same may be amended, modified, supplemented or replaced from time to time; and (f) references in this Agreement to contracts, agreements, or other documents shall be deemed to mean those contracts, agreements or documents as the same may be modified, supplemented, or amended from time to time. Section and paragraph headings used in this Agreement hereto are for reading convenience only and shall not have any other meaning, implication or purpose, legal or otherwise.

7.6     Entire Agreement. This Agreement and the exhibits, schedules and other documents attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Owner and Seller concerning the sale of Coal Feedstock.    This Agreement supersedes, cancels and annuls all other and former agreements made between such parties with respect to the sale of Product other than that certain Confidentiality Agreement dated June 17, 2011 between Chem-Mod, LLC and Duke Energy Business Services LLC, which is not hereby superseded and remains in full force and effect. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Agreement shall be binding upon Owner or Seller unless reduced to writing and signed by Owner and Seller.

7.7     Representatives. Wherever any consent, authorization or approval of Seller is required or permitted under this Agreement, such consent, authorization or approval may be obtained only from those representatives designated by Seller in writing to Owner from time to time.  The initial representatives designated by Seller are Vincent E. Stroud and Steven W. Meehan and Seller shall at all times have a designated representative.  Wherever any consent, authorization or approval of Owner is required or permitted under this Agreement, such consent, authorization or approval may be obtained only from those representatives designated by Owner in writing to Seller from time to time.  The initial representatives designated by Owner are Jeffrey K. Green and T. Barr Linton and Seller shall at all times have a designated representative.

7.8     Governing Law; Jurisdiction. This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of Indiana, without reference to its conflicts of laws rules.    Subject to Section 7.16, the parties hereby submit to nonexclusive personal jurisdiction in the Indiana State Courts sitting in the County of Marion and the Federal District Court for the Southern District of Indiana.

7.9     Partial Invalidity. The parties hereby agree to use good faith efforts to negotiate an equitable adjustment to any provisions of this Agreement determined to be invalid or unenforceable with a view toward effecting the purposes of this Agreement, and the validity or enforceability of the remaining provisions of this Agreement shall not be affected thereby.

7.10    Non-Waiver of Covenants. The failure of either party to enforce any of the provisions of this Agreement at any time shall in no way be construed to be a waiver of any such

15

provisions or affect the validity or enforceability of this Agreement, or any part hereof, or the right of any party thereafter to enforce each and every such provision.

7.11    Notices. Any notice, request, protest, consent, demand, report or statement given by one party to the other shall be in writing, and deemed duly received (a) 48 hours after it is deposited in the United States mail, by certified mail, postage prepaid, and properly addressed as shown below, (b) upon personal delivery to the addressee, (c) upon delivery by a commercial courier service requiring confirmation of receipt by the addressee, or (d) upon transmission by telefacsimile if confirmed by posting of the written original by certified mail within two business days.

If to Seller:

Duke Energy Indiana, Inc.
526 S. Church Street
Charlotte, NC 28202
Attention: Larry Carter
Email: larry.carter@duke-energy.com

If to Owner:

Barr Linton
Cottbus Associates, LLC
2100 Third Avenue North, Suite 920
Birmingham, AL 35203
Fax: (205) 731-0961

With copies to:

Leah Schaatt
Cottbus Associates, LLC
4599 East Lake Boulevard
Birmingham, AL 35217
Fax: (205) 798-7790

Marcia R. Nirenstein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Fax: (202) 393-5760

A party may change its address by notice to the other party at the address set forth above.

7.12    Confidentiality and Use of Proprietary Information. From and after the date hereof through a period of three years from the termination of this Agreement, unless otherwise agreed to by the parties hereto, each party and its Affiliates shall keep, and shall ensure that its officers, directors and employees keep, confidential: (a) the commercial and monetary terms of

16

this Agreement; and (b) information constituting a "trade secret", as such term is defined under the Indiana Uniform Trade Secrets Act (IC 24-2-3-2). The recipient of the disclosing party's confidential information shall treat such information with the same care that it uses to prevent disclosure of its own confidential information and shall use such information solely for purposes of carrying out its obligations under this Agreement, the Refined Coal Sales Agreement, the Lease Agreement, and the Site Services Agreement and enforcing its rights hereunder and thereunder. Such information may be disclosed to a party's operators, contractors, consultants and advisors only if such information is protected by confidentiality agreements with such persons. The foregoing restriction shall not apply to any information that (i) is or hereafter becomes generally available to the public other than by reason of any default with respect to a confidentiality obligation under this Agreement or other agreements among the parties or their Affiliates; (ii) was already known to the recipient as evidenced by prior written documents in its possession; (iii) is disclosed to the recipient by a third party who is not known by the recipient to be in default of any confidentiality obligation to the other party hereunder; (iv) is developed by or on behalf of the receiving party, without reliance on confidential information received hereunder; (v) is disclosed in any arbitration pursuant to Section 7.16 or litigation to the extent relevant to the issues being arbitrated or litigated; or (vi) is otherwise required to be disclosed in compliance with law or in the course of any judicial or administrative proceeding or regulatory examinations or process; provided, that if such disclosure is required, the disclosing party shall provide the other party with timely advance written notice of such disclosure. Except as provided in the preceding sentence, Seller shall not disclose the name of any member of Owner or direct or indirect institutional investor in Owner without such Person's prior written consent. Notwithstanding the foregoing, nothing in this provision shall prevent (x) Seller from supplying information regarding Owner to a potential transferee of Seller as long as such information is protected by a confidentiality agreement with such transferee, (y) Owner from disclosing such information to its members and to potential members, investors or financing sources and/or to potential transferees of Owner or its members so long as such information is protected by a confidentiality agreement by which any such Person is bound or (z) Owner from disclosing such information to the IRS or any state taxing authority in connection with Owner's private letter ruling request, tax returns or audits of such tax returns.

7.13  Compliance with Regulatory Code of Conduct. Owner acknowledges that Owner may be given access to or otherwise become aware of certain operational information of Seller, the disclosure of which to other departments or affiliates of Seller is prohibited by federal law. Such confidential information includes, but is not limited to (a) planned outage schedules, (b) events of forced outages and generator derating, (c) construction schedules, (d) operational practices at the Seller's generating stations, and (e) transmission system operation and planning data. Owner shall, and shall require its subcontractors to (i) maintain the strict confidentiality of such operational information, and (ii) not share such operational and planning information with any third parties, including any other departments or affiliated entities of Seller, without prior written consent.

7.14  No Third-Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of each party and their respective successors and assigns permitted pursuant to Section 7.3, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person other than (with respect to the indemnities set forth in Article VI) the Persons covered by the indemnities set forth in Article VI.

17

7.15     Survival Clause.  Section 2.5, Article VI, Sections 7.4, 7.8, 7.9, 7.10, 7.11, 7.12, 7.14, 7.15, 7.16, 7.19, 7.20 and 7.21 shall survive the termination of this Agreement.

7.16     Arbitration.

(a)     AAA Commercial Arbitration Rules.  Any dispute, disagreement, claim, or controversy arising out of or relating to this Agreement, or the breach, termination or validity thereof ("Dispute"), shall be finally settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"), except as the Rules may be modified herein.  The arbitration award shall, as between the parties and those in privity with them, be final and entitled to all of the protections and benefits of a final judgment, e.g., res judicata (claim preclusion) and collateral estoppel (issue preclusion), as to all claims, including compulsory counterclaims, that were or could have been presented to the arbitrator.  The arbitration award shall not be reviewable by or appealable to any court, except on the grounds to be found in the Federal Arbitration Action, 9 U.S.C. § 1 *et seq.*

(b)     Appointment of Arbitrator.  Within 30 days after receipt by the respondent of a copy of the arbitration demand, the parties shall decide upon an independent third party mutually acceptable to both parties (the "Arbitrator") and an alternate third party (the "Alternate") to decide disputes referable by the parties for arbitration in accordance with this Agreement.  If the parties do not agree on an Arbitrator or Alternate within the period of time set forth above, then the American Arbitration Association shall be requested to select the Arbitrator and/or the Alternate on an expedited basis using a listing ranking and striking procedure with each party having a limited number of strikes.  In the event that the Arbitrator becomes unavailable to resolve the Dispute within the time period stated in this Section 7.16, the dispute shall be referred to the Alternate, who shall then be referred to as the Arbitrator.  Any Arbitrator or Alternate appointed by the AAA shall be an experienced arbitrator with at least 10 years' relevant legal experience.

(c)     Document Discovery.  Each party will, upon the written request of the other party, promptly provide the other with copies of documents relevant to the issues raised by any claim or counterclaim.  Any Dispute regarding discovery, or the relevance or scope thereof, shall be determined by the Arbitrator, which determination shall be conclusive.  All discovery shall be completed within 45 days after the dispute is referred to the Arbitrator or the Alternate.

(d)     Reasoned Opinion Accompanying the Award.  The award shall be rendered within 30 days of the completion of the hearing on the merits, and the Arbitrator shall agree to comply with this schedule before accepting appointment.  The award shall be in writing, and shall include a statement regarding the reasons for the disposition of any claim.

(e)     Jurisdiction and Venue.  The arbitration shall be held in Indianapolis, Indiana.  All procedural aspects of this agreement to arbitrate, including, but not limited to, the construction and interpretation of this agreement to arbitrate, the scope of the arbitrable issues, allegations of waiver, delay or defenses as to arbitrability, and the rules governing the conduct of the arbitration, shall be governed by and construed pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and shall be decided by the Arbitrator.  Any award resulting from any

18

dispute resolution pursuant to this Section 7.16 shall be enforceable and judgment on such award may be entered and enforced in any court having jurisdiction. Each party hereto consents to the exclusive jurisdiction of, and to the laying of venue in any federal or state court located in Marion County, Indiana for an action to compel arbitration, provisional relief in aid or arbitration or to maintain the status quo or prevent irreparable harm prior to the appointment of the Arbitrator or for the resolution of a dispute relating to any issues under this Section 7.16 and to the non-exclusive jurisdiction of, and to the laying of venue in any federal or state court located in Marion County, Indiana for an action for the enforcement of any arbitral award rendered hereunder.

(f)     Punitive and/or Consequential Damages.  The Arbitrator shall have no authority to award punitive damages, consequential damages or any other damages of the type prohibited under Section 6.5 under any circumstances (whether they be exemplary, multiple, remote, or other penalty or punitive type of damages) regardless of whether such damages may be available under Indiana law, the parties hereby waiving their right, if any, to recover such damages in connection with any Dispute.

(g)     Arbitration Costs and Fees.  Each party shall bear its own costs and expenses and an equal share of the Arbitrator's fees and the administrative fees of the arbitration. Notwithstanding the foregoing, upon application by the prevailing party in the arbitration, the Arbitrator shall have the power to award to the prevailing party reasonable attorney's and expert's fees and expenses incurred by the prevailing party in connection with the arbitration, but only upon a determination by the Arbitrator that the non-prevailing party's claims and defenses were not made in good faith.

(h)     Arbitration Provision Enforceable.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the parties' obligation to submit their claims to binding arbitration. Moreover, the parties' obligations under this Section 7.16 are enforceable even after this Agreement has terminated.

(i)     Continuation of Services.  Pending final resolution of any dispute, whether or not submitted to arbitration hereunder, and regardless of the basis thereof or grounds therefor, for so long as this Agreement has not been terminated, the parties shall continue to fulfill their respective obligations hereunder.

(j)     Expedited Process.  It is the intent of the parties to have any arbitration of this Agreement proceed in an expeditious manner, however, any deadline, time period, procedure or standard contained herein or in the Rules may be extended or modified by agreement of the parties and the parties agree that the failure of the Arbitrator or the AAA to strictly conform to any deadline, time period, procedure or standard contained herein shall not be a basis for seeking to overturn any decision rendered by the Arbitrator.

7.17   Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

7.18    Expenses.  Each party shall bear its respective costs and expenses, including fees of advisors and brokers, that such party has incurred in connection with the negotiation of this Agreement, the Lease, and the Site Services Agreement and all due diligence investigations pursued in connection herewith and therewith.

7.19    Interpretation.  Both parties and their attorneys have participated in the negotiation and drafting of this Agreement.  Consequently, any common law or statutory rule requiring interpretation against the interest of the drafter shall not apply.

7.20    Attorneys' Fees.  If either party is required to institute any action or suit in court of law to enforce any of the obligations of the other party under this Agreement or an arbitral award hereunder and the party so instituting such action or suit prevails thereon, then the prevailing party shall be entitled to recover (without duplication) reasonable attorneys', consultant's and expert's fees and expenses incurred by such prevailing party in connection with such action or suit.

7.21    Remedies.  No remedy herein conferred upon or reserved to Seller or Owner shall exclude any other remedy herein or by law provided, but each shall be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

7.22    Business Days.  For purposes of this Agreement, "Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which national banking institutions in Indianapolis, Indiana are authorized by Law or other governmental action to close.

**[Signatures on next page]**

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed by their authorized officers on the day and year first above written.

**SELLER:**

**DUKE ENERGY INDIANA, INC.,**
an Indiana corporation

By: _____
Name: _____
Title: _____

**OWNER:**

**COTTBUS ASSOCIATES, LLC,**
a Delaware limited liability company

By: _____
Name: T. BARR LINTON
Title: MANAGER

(1126985)

[Signature Page to Cayuga Feedstock Supply Agreement]

**EXHIBIT A**
Form of Note

[Attached]

## SECURED PROMISSORY NOTE

U.S. $[____]

[____], 2011

**FOR VALUE RECEIVED**, the undersigned, Cottbus Associates, LLC, a Delaware limited liability company (together with its successors and permitted assigns, the "***Company***"), promises to pay to Duke Energy Indiana, Inc. an Indiana corporation (together with its successors and permitted assigns, "***Holder***"), in lawful money of the United States of America and in immediately available funds, the principal amount of [_____ ($_____)], and interest thereon calculated from (and including) the date hereof through (but excluding) the date paid in full, all in accordance with the provisions of this Note.

This Note is issued in connection with the Feedstock Supply Agreement, dated as of August 22, 2011, by and between Holder and the Company (the "***Feedstock Supply Agreement***"). Capitalized terms used in this Note but not defined herein have the meanings assigned to them in the Feedstock Supply Agreement.

### Section 1. Payment of Principal and Interest.

(a) <u>Scheduled Payment of Principal and Interest</u>. The principal amount of this Note shall be paid to Holder on the tenth $(10^{th})$ anniversary of the Rent Commencement Date or such earlier date on which the Feedstock Supply Agreement shall have automatically terminated in accordance with its terms or been terminated by the Company or Holder in accordance with its terms (the earliest of such dates, the "***Maturity Date***"). Payment shall be made in immediately available funds, without reduction by reason of set off, counterclaim or deduction of any kind, except as provided in the Feedstock Supply Agreement. Accrued interest on the principal amount shall be paid on a semi-annual basis, on January 20 and July 20 of each year, and shall be paid based on a principal amount calculated as the average of the weighted average cost of inventory of a ton of Coal Feedstock ("***WACI***") for the last six months prior to the date the interest payment is to be made, multiplied by 16,400 tons. For purposes of this calculation, the WACI as of the last day of each month shall be used, except that the last day of the prior month shall be used for the calculation of interest for any partial month which has not yet ended at the time such payment is due. This Note shall bear simple interest on the principal amount, from (and including) the date hereof through (but excluding) the date paid in full, at the rate equal to the Total Revenue Conversion Factor shown on Duke Energy's Exhibit B-2 Weighted Cost of Capital schedule in Duke Energy Indiana's semi-annual Environmental Cost Recovery ("***ECR***") rate filings in Cause No. 42061 ("***Total Revenue Conversion Factor Rate***"). As of the effective day of this Note, the interest rate is 10.0690% per annum, and shall adjust each January 1 and July 1 during the term to match the Total Revenue Conversion Factor Rate. Interest shall be calculated based upon a 360-day year and the actual number of days elapsed.

(b) <u>Optional Prepayment</u>. The Company may, at any time and from time to time, without premium or penalty, prepay in whole or in part the unpaid principal amount of this Note, together with accrued and unpaid interest thereon, in cash, to (but excluding) the date

of prepayment. Each partial prepayment made pursuant to this Section 1(b) shall first be credited to accrued and unpaid interest and the remainder shall be credited to the unpaid principal amount of this Note.

### Section 2. Events of Default.

(a) Definition. For purposes of this Note, an "*Event of Default*" shall be deemed to have occurred if any of the following shall have occurred:

(i)      the Company fails to pay when due and payable at the Maturity Date the full amount of any principal payment or interest due under this Note;

(ii)      an Event of Default (as defined in the Security Agreement (as defined below)) occurs under the Security Agreement or a default by the Company occurs under the Feedstock Supply Agreement that gives rise to a termination right under Section 2.4(b) thereunder (subject to the cure periods included in such Section 2.4(b)).

(iii)the Com      pany shall (A) become insolvent or generally unable to pay its debts as they become due; (B) apply for, consent to, or acquiesce in, the appointment of a trustee, receiver, sequestrator or other custodian for any of its property, or make a general assignment for the benefit of its creditors; (C) in the absence of any such application, consent or acquiescence, permit or suffer to exist the appointment of a trustee, receiver, sequestrator or other custodian for it or a substantial portion of its property, and such trustee, receiver, sequestrator or other custodian shall not be discharged within ninety (90) days; (D) permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect of it, and, if any such case or proceeding is not commenced by it, such case or proceeding shall be consented to or acquiesced in by it or shall result in the entry of an order for relief or shall remain for ninety (90) consecutive days undismissed; or (E) take any formal action authorizing, or in furtherance of, any of the foregoing.

(b) Consequences of Events of Default. If an Event of Default has occurred and is continuing pursuant to Section 2(a)(iii), then, without any notice to the Company or any other act by Holder, the principal amount of this Note, together with accrued but unpaid interest thereon, shall thereupon become immediately due and payable in cash, without presentment, demand, protest or other notice of any kind. If any other Event of Default has occurred and is continuing, then, at the option of Holder, the principal amount of this Note, together with accrued but unpaid interest thereon, shall thereupon become immediately due and payable in cash, upon written notice to the Company. Such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that Holder may have under the Security Agreement or under applicable law.

### Section 3. Security. 
In order to secure the payment and performance of the Company's obligations under this Note, the Company and Holder have entered into a Security Agreement, dated as of the date hereof (the "*Security Agreement*").

### Section 4. Amendment.  
This Note may not be modified, amended, waived, extended, discharged or terminated orally or by the act or failure to act of on the part of the Company or

Holder, but only by an agreement in writing signed by the party against whom any modification, amendment, waiver, extension, discharge or termination is sought.

**Section 5. Binding Nature.** The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Company may not assign or otherwise transfer this Note or any of its rights or obligations under this Note without the prior written consent of the Holder in its sole and absolute discretion.

**Section 6. Notices and Other Communications.** All notices and other communications to Holder hereunder are to be delivered to Holder in accordance with Section 7 of the Security Agreement.

**Section 7. Non-Recourse.** The obligations under this Note are non-recourse to the members, employees, parents, directors and officers of the Company.

**Section 8. Cancellation.** After all principal and accrued interest on this Note have been paid in full, it shall be surrendered to the Company for cancellation.

**Section 9. Governing Law; Consent to Jurisdiction.** This Note shall be governed by and construed in accordance with the Laws of the State of New York without regard to the conflict of laws rules thereof other than sections 5-1401 and 5-1402 of the New York General Obligations Law. Each of the Company and Holder hereby irrevocably and unconditionally consents exclusively to venue in the state or federal courts of competent jurisdiction located in Marion County, Indiana. In the case of any action filed in or removed to a federal court of competent jurisdiction located in Marion County, Indiana, each of the Company and Holder hereby irrevocably and unconditionally waives any right to change venue to another federal court. In the case of any complaint filed in federal or state court, each of the Company and Holder agrees to waive their right, if any, to a trial by jury for any claim or cause of action set forth in such complaint.

**Section 10.    Severability.** If any provision or any part or portion of any provision of this Note becomes or is declared to be unlawful, invalid, void, or otherwise unenforceable, the rights and obligations of the parties hereto will be reduced only as much as is required to remove the unenforceability. The balance of this Note will remain in effect.

**Section 11.    Entire Agreement; Amendment.** This Note and the Security Agreement, together with all attachments and incorporated references, constitute the entire agreement between the parties hereto and supersedes any prior or contemporaneous agreement or understanding between the parties hereto regarding the subject matter thereof. No revision or amendment to this Note will be effective unless it is signed by the parties hereto.

**Section 12.    No Waiver.** The failure of either party hereto to demand strict performance of the terms of or to exercise any right conferred by this Note is not intended by the parties hereto to be construed as a waiver or relinquishment of its right to assert or rely upon any term or right in the future, or as a consent to any continuing or subsequent failure or breach.

**Section 13.    Expenses.** Upon receipt of reasonable documentation, the Company shall pay, if an Event of Default occurs, all reasonable out-of-pocket expenses incurred by Holder,

including reasonable fees and expenses of counsel, in connection with such Event of Default and any collection or other enforcement proceedings resulting therefrom.

*[Signature Pages Follow]*

4

**IN WITNESS WHEREOF**, the Company has caused this Note to be duly executed in its name by a duly authorized officer of the Company as of the date set forth above.

**Cottbus Associates, LLC**

By:_____

Name:

Title:

Acknowledged and agreed:

**Duke Energy Indiana, Inc.**

By:_____

Name:

Title:

(1135365)

5

**EXHIBIT B**
Form of Security Agreement

[Attached]

**EXHIBIT B**

## SECURITY AGREEMENT

This SECURITY AGREEMENT (this "Agreement"), dated as of _____, 2011, by and between Cottbus Associates, LLC, a Delaware limited liability company (together with its successors and permitted assigns, the "Company"), and Duke Energy Indiana, Inc., an Indiana corporation (together with its successors and permitted assigns, the "Secured Party").

### WITNESSETH

WHEREAS, reference is made to that certain Secured Promissory Note, dated as of the date hereof, issued by the Company in favor of the Secured Party in the principal amount of $_____ (as it may be amended, restated, supplemented or otherwise modified from time-to-time, the "Note");

WHEREAS, pursuant to the terms of that certain Feedstock Supply Agreement, dated as of August 22, 2011, by and between the Secured Party and the Company, the Secured Party sold 16,400 tons of coal feedstock to the Company on the date hereof and for which the Company delivered the Note as payment therefor; and

WHEREAS, as inducement to the Secured Party to accept the Note, the Company has agreed to enter into this Agreement to provide security for the payment and performance of the Company's obligations owed under the Note, including the obligation to make principal and interest payments under the Note, including in each case any extensions, renewals, refinancing, or changes in form thereof, now existing or hereafter arising (collectively, the "Obligations").

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained and contained in the Note, the Company and Secured Party hereby agree as follows:

1.      Security Interest. As collateral security for the Obligations, the Company hereby grants to the Secured Party a security interest in the following collateral (the "Collateral"): (i) all of the Company's rights in and to 16,400 tons of coal inventory purchased by the Company from the Secured Party pursuant to the Feedstock Supply Agreement and located at Secured Party's coal yard and (ii) any and all proceeds of the foregoing.

2.      Endorsement; Execution of Financing and Other Statements.

(a)     At any time and from time to time, upon request of the Secured Party, the Company will give and execute any notice, continuation statement, instrument, document, or agreement that the Secured Party may reasonably request to preserve, continue, perfect, or validate the security interest granted hereunder or which the Secured Party may consider necessary or reasonably desirable to exercise or enforce its rights hereunder with respect to such security interest. Without limiting the generality of the foregoing, the Company hereby irrevocably authorizes the Secured Party to file financing statements with respect to the Collateral in the form attached hereto as Exhibit A, and any amendments thereto to continue the effectiveness of such financing statements for as long as the Obligations remain outstanding, with the Secretary of State of Delaware and any other Uniform Commercial Code jurisdiction in

which a filing of such financing statement is necessary in order to perfect the security interest of the Secured Party in the Collateral.

(b)     In addition to the foregoing, the Company hereby constitutes and appoints the Secured Party and each officer of the Secured Party, and each of the foregoing acting singly, with full power of substitution, its true and lawful attorney-in-fact in its name, place, and stead to carry out fully the provisions of this Security Agreement and take any action which such parties reasonably deem necessary or appropriate in that connection; provided that this power of attorney shall be effective only upon and during the continuation of an Event of Default (as defined in Section 3 herein). The power of attorney hereby granted shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive and shall not be affected by the subsequent bankruptcy, dissolution, or termination of the Company.

3.     Default.

(a)     Each of the following shall constitute an event of default ("Event of Default") hereunder: (i) the Company shall fail to make any payment of principal or interest as and when due under the Note; (ii) a default by the Company under the Feedstock Supply Agreement that gives rise to a termination right under Section 2.4(b) thereunder (subject to the cure periods included in such Section 2.4(b)); (iii) the Company breaches any obligation under this Agreement or any representation, warranty, or covenant made by the Company in Section 6 hereof shall prove to have been incorrect in any material respect when made or deemed made; provided that, with respect to the second sentence of Section 6(b) hereof, the Company shall have a period of 10 days after receipt of written notice of such breach to correct or cure the circumstance that caused such representation, warranty and covenant to be incorrect; or (iv) the Company shall (A) become insolvent or generally unable to pay its debts as they become due; (B) apply for, consent to, or acquiesce in, the appointment of a trustee, receiver, sequestrator or other custodian for any of its property, or make a general assignment for the benefit of its creditors; (C) in the absence of any such application, consent or acquiescence, permit or suffer to exist the appointment of a trustee, receiver, sequestrator or other custodian for it or a substantial portion of its property, and such trustee, receiver, sequestrator or other custodian shall not be discharged within ninety (90) days; (D) permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect of it, and, if any such case or proceeding is not commenced by it, such case or proceeding shall be consented to or acquiesced in by it or shall result in the entry of an order for relief or shall remain for ninety (90) consecutive days undismissed; or (E) take any formal action authorizing, or in furtherance of, any of the foregoing.

(b)     If an Event of Default shall occur and be continuing pursuant to Section 3(a)(iv) hereof, all the Obligations accrued through the date thereof shall become immediately due and payable. If any other Event of Default shall occur and be continuing, then, at the option of the Secured Party, all the Obligations accrued through the date thereof shall, upon written notice to the Company, become immediately due and payable. In either case, the Secured Party may avail itself of all rights and remedies granted hereunder or available to a secured party under the Uniform Commercial Code of the State of Delaware (the "UCC"), and in any event, including, without limiting the generality of the foregoing, the right to sell, assign or

2

otherwise dispose of the Collateral or any part thereof, at public or private sale wherever the Secured Party may determine in good faith and at such prices as the Secured Party may deem commercially reasonable under the circumstances.

(c)     The Company hereby acknowledges that the remedies provided herein in favor of the Secured Party shall not be deemed exclusive, but shall be cumulative and shall be in addition to all other remedies in favor of the Secured Party now or hereafter existing by statute, at law, or in equity.

(d)     The Company will provide notice to the Secured Party of any Event of Default within 5 days after the Company becomes aware, or reasonably should have become aware, of the occurrence of such Event of Default.

4.      Governing Law; Consent to Jurisdiction; Waiver of Jury Trial. This Security Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to the conflict of laws rules thereof other than sections 5-1401 and 5-1402 of the New York General Obligations Law. Each of the Company and the Secured Party hereby irrevocably and unconditionally consents exclusively to venue in the state or federal courts of competent jurisdiction located in Marion County, Indiana. In the case of any action filed in or removed to a federal court of competent jurisdiction located in Marion County, Indiana,e ach of the Company and the Secured Party hereby irrevocably and unconditionally waives any right to change venue to another federal court. In the case of any complaint filed in federal or state court, each of the Company and the Secured Party agrees to waive their right, if any, to a trial by jury for any claim or cause of action set forth in such complaint.

5.      Assignability. Neither this Security Agreement, nor any of the rights and obligations hereunder, may be assigned, transferred or, delegated or pledged or otherwise encumbered by either of the Company and the Secured Party without the express prior written consent of the other party hereto. This Security Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

6.      Representations, Warranties and Covenants. The Company makes each of the following representations, warranties and covenants:

(a)     Each of the Note and this Security Agreement has been duly and validly authorized, executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms (subject, however, to the effects of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect relating to the rights and remedies of creditors as well as to general principles of equity whether considered at law or in equity).

(b)     The Company is and at all times will be the direct beneficial owner of the Collateral hereby pledged by it. The Company agrees that it will not encumber or grant any security interest in or file a financing statement with respect to the Collateral hereby pledged by it, or permit any of the foregoing, without the prior written consent of the Secured Party, and hereby represents that (except as aforesaid) it has not heretofore done so.

3

(c)     This Security Agreement constitutes, creates and grants a valid first priority security interest in the Collateral, subject to no prior security interest, lien, charge or encumbrance or to any agreement purporting to grant to any third party a security interest in the property or assets of the Company that would include the Collateral hereby pledged by the Company.

(d)     Except for the filing of the financing statement, no consent, license, permit, approval, or authorization of, exemption by notice or report to, or registration, filing or declaration with any Governmental Body is required to be obtained in connection with the execution, delivery, performance by the Company, or the validity or enforceability, of the Note or this Security Agreement and no consent of any other person or entity is required for any of the foregoing.

(e)     The Company's exact legal name is that indicated on the signature page hereof and the Company is a limited liability company organized under the laws of Delaware. The Company will not change its type of organization or jurisdiction of organization without giving the Secured Party thirty (30) days' prior written notice.

7.     Notices. All notices, demands and other communications hereunder must be in writing and shall be delivered personally (by hand delivery or by overnight courier) or by facsimile transmission (with receipt of transmission confirmation) or mailed (certified mail postage prepaid) to the parties hereto at the following addresses or facsimile numbers and shall be effective upon receipt (when sent by personal delivery or certified mail) and upon receipt of transmission confirmation (when sent by facsimile):

If to the Secured Party, to:

Duke Energy Indiana, Inc.
526 South Church Street
Charlotte, NC 28202
Attention: Larry Carter
Email: larry.carter@duke-energy.com

If to the Company, to:

Barr Linton
Cottbus Associates, LLC
2100 3rd Avenue North, Suite 920
Birmingham, AL 35203
Fax: (205) 731-0961

With a copy to:

Leah Schaatt
Cottbus Associates, LLC
4599 East Lake Boulevard

4

Birmingham, AL 35217
Fax: (205) 798-7790

And with a copy to:

Marcia R. Nirenstein, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Fax: (202) 393-5760

provided, however, that either party hereto from time to time may change its address, facsimile
number or other information for the purposes of notices to such party by giving notice, as
provided by this Section 7, specifying such change to the other party.

8.    Severability. If any provision or any part or portion of any provision of this
Security Agreement becomes or is declared to be unlawful, invalid, void, or otherwise
unenforceable, the rights and obligations of the parties hereto will be reduced only as much as is
required to remove the unenforceability. The balance of this Security Agreement will remain in
effect.

9.    Entire Agreement; Amendment. This Security Agreement and the Note, together
with all attachments and incorporated references, constitute the entire agreement between the
parties hereto and supersedes any prior or contemporaneous agreement or understanding between
the parties hereto regarding the subject matter thereof. The parties hereto will not be bound by or
be liable for any statement, representation, promise, inducement, or understanding of any kind or
nature not set forth or provided for in this Security Agreement. No prior course of dealing, usage
of trade, or course of performance is intended by either party hereto to be used to supplement or
explain any term, condition, or instruction used in this Security Agreement or to effect any
amendment to it. No revision or amendment to this Security Agreement will be effective unless
it is signed by the parties hereto.

10.    Non-Waiver of Rights. The failure of either party hereto to demand strict
performance of the terms of or to exercise any right conferred by this Security Agreement is not
intended by the parties hereto to be construed as a waiver or relinquishment of its right to assert
or rely upon any term or right in the future, or as a consent to any continuing or subsequent
failure or breach.

11.    Termination. Upon satisfaction of all of the Obligations, this Security Agreement
and the lien created hereby shall terminate. The Secured Party shall promptly execute and
deliver to the Company any documents as the Company may reasonably request to evidence the
termination of the Secured Party's interest in the Collateral, including but not limited to the
execution and delivery of a termination statement relating to the Collateral.

[The remainder of this page intentionally left blank]

5

IN WITNESS WHEREOF, the parties have executed this Security Agreement as of this ___ day of [_____], 2011 and by its execution hereof accept, adopt, and agree to be bound by all of the terms hereof.

DUKE ENERGY INDIANA, INC.

By:_____
    Name:
    Title:

COTTBUS ASSOCIATES, LLC

By:_____
    Name:
    Title:

(1135366)

6

## EXHIBIT A

Financing Statement

See attached

7

**Schedule 4.2**
Quality Standards

| CHARACTERISTIC | TYPICAL SPECIFICATION |
|---|---|
| Calorific Value: | 11,000 Btu per Lb |
| Ash Content: | 10.5% |
| $SO_2$ Content: | 6.0 Lbs. per MMBtu |
| Moisture Content (Total): | 17.0% |
| Size: | 2" x 0" |

PETITIONER'S EXHIBIT B-3

**EXECUTION VERSION**

**SITE SERVICES AGREEMENT**
**(Cayuga Generating Station)**

**between**

**COTTBUS ASSOCIATES, LLC,**

**as Owner**

**and**

**DUKE ENERGY INDIANA, INC.**

**as Utility**

## SITE SERVICES AGREEMENT

### (Cayuga Generating Station)

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Term | 1 |
| 3. | Services to be Provided by Utility | 4 |
| 4. | Compensation for Services | 5 |
| 5. | Invoices; Late Payments | 5 |
| 6. | Access to Information | 6 |
| 7. | Confidential and Proprietary Information | 6 |
| 8. | No Warranty | 6 |
| 9. | Limitation of Liability | 7 |
| 10. | Force Majeure | 7 |
| 11. | Representations and Warranties of Utility | 8 |
| 12. | Representations and Warranties of Owner | 9 |
| 13. | Indemnification | 10 |
| 14. | Audit | 11 |
| 15. | Independent Contractor | 11 |
| 16. | No Waiver | 12 |
| 17. | Insurance of Utility | 12 |
| 18. | Insurance of Owner | 12 |
| 19. | Notices | 12 |
| 20. | Assignment | 13 |
| 21. | Right to Subcontract | 13 |

i

22.   Governing Law ...........................................................................................................13

23.   Entire Agreement .......................................................................................................13

24.   No Third Party Beneficiary.........................................................................................13

25.   Counterparts ...............................................................................................................14

26.   Dispute Resolution.....................................................................................................14

27.   Invalidity ...................................................................................................................14

28.   Expenses ....................................................................................................................14

29.   Interpretation..............................................................................................................14

30.   Headings; Other Drafting Conventions .....................................................................14

31.   Survival ......................................................................................................................14

32.   Attorneys' Fees ..........................................................................................................14

33.   Binding Effect............................................................................................................15

34.   Business Days .............................................................................................................15

## SITE SERVICES AGREEMENT
(Cayuga Generating Station)

This **SITE SERVICES AGREEMENT** (this "Agreement"), dated effective as of August 22, 2011 (the "Effective Date"), is between Duke Energy Indiana, Inc., an Indiana corporation having a business address at 526 S. Church St., Charlotte, NC 28202 (the "Utility") and Cottbus Associates, LLC, a Delaware limited liability company ("Owner").

### RECITALS

A.      Utility owns an electric power generation station and related facilities known as the Cayuga Generating Station (the "Generation Facility") located on certain real property (the "Property") owned by Utility in Vermillion County, Indiana and a conveyor that is used to unload coal delivered by rail or truck to Utility and a conveyor that feeds the Generation Facility ("Utility's Coal Handling Facilities").

B.      Owner is the owner of a facility designed for the treatment of coal to produce refined coal (as such term is defined in Section 45 of the Internal Revenue Code) ("Lessee's Plant") that will be relocated to a portion of the Property designated as the "Lease Area," as that term is defined in the Lease Agreement (the "Lease Agreement"), between Utility and Owner dated as of the Effective Date (the "Lease Area").

C.      Owner and Utility have entered into a Refined Coal Sales Agreement, dated as of the Effective Date (the "Refined Coal Sales Agreement"), pursuant to which Owner has agreed to sell to Utility refined coal produced by Owner at Lessee's Plant.

D.      Owner has requested that Utility provide certain services to Owner with respect to coal to be delivered at the Generation Facility, and Utility has agreed to provide such services on the terms and conditions set forth in this Agreement.

### AGREEMENT

In consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Definitions.  Capitalized terms used but not defined in this Agreement shall have the meaning specified in the Refined Coal Sales Agreement, or if not specified in the Refined Coal Sales Agreement, in the Lease Agreement.

2.      Term.

(a)      Term Generally.    The term (the "Term") of this Agreement shall commence on the Rent Commencement Date (as such term is defined in the Lease Agreement) and, unless sooner terminated pursuant to Section 2(b), (c) or (d), shall continue for a period of ten (10) years from and after the Rent Commencement Date (the "Termination Date"), unless extended by the mutual agreement of the parties.

(b)    Termination by Owner for Cause.

(i)    Owner may terminate this Agreement for cause upon the satisfaction of all of the following: (A) Utility fails to perform its obligations under this Agreement in any material respect, (B) Owner delivers a written notice to Utility stating that Owner has reasonably determined that Utility has failed to perform its obligations under this Agreement in any material respect and the basis for such determination, and (C) Utility does not remedy such failure within 30 days after its receipt of the written notice or, if such failure is not capable of remedy within such 30-day period, commence diligent efforts to remedy Utility's failure within 30 days after its receipt of the written notice and does not continue to pursue such diligent efforts until the failure is remedied. Any failure by Utility to make any payment due under this Agreement shall be covered by Section 2(b)(i) and not by this Section 2(b)(ii).

(ii)    In addition, Owner may terminate this Agreement for cause by written notice to Utility upon the occurrence of any of the following events: (A) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or similar official for a substantial part of Utility's assets and the appointment is neither made ineffective nor discharged within 90 days after the making thereof; (B) the entry of a judgment, decree, or order for relief against Utility that materially affects its ability to perform its obligations hereunder in accordance with the terms of this Agreement by a court of competent jurisdiction in an involuntary case commenced under any applicable bankruptcy, insolvency, or other similar law or any jurisdiction now or hereafter in effect (other than an involuntary case commenced by Owner); (C) the commencement by Utility of a voluntary case under any applicable bankruptcy, insolvency, or similar law now or hereafter in effect; the consent to, request by, or acquiescence by Utility in the entry of an order for relief in an involuntary case under any such law or to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar official of any substantial part of its assets; (D) the making by Utility of a general assignment for the benefit of creditors; or (E) the taking by Utility of corporate or other action in furtherance of any of the foregoing.

(c)    Termination by Utility for Cause.

(i)    Utility may terminate this Agreement for cause upon written notice from Utility to Owner if Owner has failed to make any payment due hereunder within 15 days after delivery of written notice from Utility to Owner that such amount is past due.

(ii)    Utility may terminate this Agreement for cause upon the satisfaction of all of the following: (A) Owner fails to perform any of its obligations under this Agreement in any material respect, (B) Utility delivers a written notice to Owner stating that Utility has reasonably determined that Owner has failed to perform its obligations under this Agreement in any material respect and the basis for such determination, and (C) Owner does not remedy such failure within 30 days after its receipt of the written notice or, if such failure is not capable of remedy within such 30-day period, commence diligent efforts to remedy Owner's failure within 30 days after its receipt of the written notice and does not continue to pursue such diligent efforts until the failure is remedied. Any failure by Owner to make any payment due under this Agreement shall be covered by Section 2(c)(i) and not by this Section 2(c)(ii).

(iii)T   ermination for Convenience by Utility. Utility may terminate this Agreement for its convenience upon six (6) months' notice to Owner.

(iv)     Termination for Regulatory Reasons. Utility may terminate this Agreement for cause by written notice to Owner if (i) Utility receives notice of any determination, assertion and/or opinion rendered by the Indiana Department of Environmental Management, United States Environmental Protection Agency and/or any other Governmental Authority that the use of the Product at the Generation Facility has, or will be, considered to constitute the combustion and/or incineration of solid waste at the Generation Facility for purposes of the commercial and industrial solid waste incineration ("CISWI") solid waste rule codified at 40 C.F.R. 241; (ii) Utility makes a good faith determination in its sole and absolute discretion that approval from the Indiana Utility Regulatory Commission ("IURC") or any other agency or administrative body having authority over Utility or Utility's Generation Facility is required to purchase Product under the Refined Coal Sales Agreement or to burn Product produced at Lessee's Plant at the Generation Facility (a "Required Approval") and cannot be obtained; (iii) due to Utility's burning of the Product, an environmental permitting agency: (A) requires Utility to procure an additional permit or a modification to an existing permit, if procuring such permit or modification subjects the Generation Facility to additional requirements, including but not limited to New Source Review, Prevention of Significant Deterioration, Best Available Control Technology, or Maximum Achievable Control Technology requirements; (B) requires installation of additional controls for treatment of air pollutants or water effluent; or (C) determines that any byproduct of burning the Product is rendered hazardous or is otherwise made subject to additional controls or restrictions on reuse; or (iv) any Required Approval previously obtained is subsequently revoked, rescinded, terminated, suspended or otherwise invalidated (collectively a "Revocation") for a period of more than ninety (90) days or otherwise invalidated; provided, however, that: (A) Utility shall not be required to accept any Product or permit continued operation of Lessee's Plant while any Revocation is in effect; (B) for a period of at least thirty (30) days prior to termination arising in connection with a Revocation, Utility and Owner will cooperate in good faith and use commercially reasonable efforts to re-obtain any Required Approval which has been the subject of a Revocation; and (C) Utility shall not be required to pay any material out-of-pocket expense to re-obtain any Required Approval absent Owner's agreement to immediately reimburse Utility for such expense even if the Required Approval is not ultimately re-obtained.

(v)     In addition, Utility may terminate this Agreement for cause by written notice to Owner upon the occurrence of any of the following events: (A) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or similar official for a substantial part of Owner's assets and the appointment is neither made ineffective nor discharged within 90 days after the making thereof; (B) the entry of a judgment, decree, or order for relief against Owner that materially affects its ability to perform its obligations hereunder in accordance with the terms of this Agreement by a court of competent jurisdiction in an involuntary case commenced under any applicable bankruptcy, insolvency, or other similar law or any jurisdiction now or hereafter in effect (other than an involuntary case commenced by Utility); (C) the commencement by Owner of a voluntary case under any applicable bankruptcy, insolvency, or similar law now or hereafter in effect; the consent to, request by, or acquiescence by Owner in the entry of an order for relief in an involuntary case under any such law or to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee,

Page 3

sequestrator, or other similar official of any substantial part of its assets; (D) the making by Owner of a general assignment for the benefit of creditors; or (E) the taking by Owner of corporate or other action in furtherance of any of the foregoing.

(d)     Automatic Termination.  Notwithstanding the foregoing, this Agreement shall terminate upon, and such termination shall be effective as of, the effective date of the termination, in accordance with the respective terms thereof, of (i) this Agreement, (ii) the Lease Agreement, (iii) the Refined Coal Sales Agreement or (iv) Feedstock Supply Agreement, dated as of the Effective Date, between Utility and Owner (the "Feedstock Supply Agreement," and together with this Agreement, the Lease Agreement, and the Refined Coal Sales Agreement, the "Project Agreements").

(e)     Remedies.

(i)     In the event this Agreement is terminated by either party for any reason, neither party shall be liable to the other under this Agreement for any damages, losses, liabilities or expenses except that (x) the parties remain liable for any obligation required to be performed prior to such termination, (y) the parties remain liable under Sections 7 and 13 hereof, and (z) Owner remains liable to Utility for any unpaid Reimbursable Costs for Emergency Services performed on or before the termination date.

(ii)     In addition to the remedies under Section 2(e)(i), in the event of breach of this Agreement by either party, it is agreed that the non-breaching party under this Agreement shall have the right to terminate the Agreement pursuant to Section 2(b) or Section 2(c), as applicable.

(iii)T     he foregoing Sections 2(e)(i) and (ii) shall be the sole and exclusive remedies under this Agreement in the event of a breach or termination of this Agreement; provided, however, that nothing in this Section 2(e) shall impair the rights of either party under Section 13 or limit the remedies of either party under any of the other Project Documents.

3.     Services to be Provided by Utility.  During the term of this Agreement, Utility agrees to provide Owner with the following services (the "Services") at the Property 24 hours per day, seven days a week, at manpower and equipment levels sufficient to perform the Services required to be performed hereunder at such levels as may be reasonably required by Owner to continually operate Lessee's Plant:

(a)     Feedstock Preparation and Handling Services.  Utility shall deliver coal feedstock to Lessee's Plant via Utility's Coal Handling Facilities, which coal feedstock shall be maintained in Utility's coal yard located at the Generation Facility and shall not be segregated from Utility's coal feedstock.

(b)     Equipment Operation, Maintenance, and Repair Services.  Utility shall, at its own cost and expense, operate, repair and maintain in reasonably good condition Utility's Coal Handling Facilities and the related equipment.  Utility will be responsible, at its own cost and expense, for replacing, in a reasonable timeframe to be agreed upon by the parties, any equipment constituting part of Utility's Coal Handling Facilities as necessary to deliver coal to

Owner, except to the extent such equipment is damaged by the negligence or willful misconduct of Owner.

(c)     Emergency Services.  Utility shall furnish additional reasonable assistance to Owner when such assistance is needed due to emergency events or conditions at the Property, such as fire, equipment breakdown, explosion and acts of God or when special conditions develop at the Lease Area ("Emergency Services"), as Utility would furnish in its normal course of business to its own generating facilities.  Utility will exercise reasonable efforts to respond quickly to requests for Emergency Services.

(d)     Other Services.  The parties may agree from time to time upon the provision of additional Services hereunder and shall either amend this Agreement to include such services or execute such other written agreements as may be appropriate.  The additional services referred to therein shall be deemed to be Services for purposes of this Agreement.

(e)     Safety.  Utility shall ascertain and comply with all applicable Laws, including all OSHA, state and local requirements relating to safety and health, accident or injury to its employees on, about, or adjacent to the premises where the Services are being performed.

(f)     Coordination.  Consistent with the requirements of the Feedstock Supply Agreement and Refined Coal Sales Agreement, Utility shall use commercially reasonable efforts to coordinate the Services with the other services required for the inspection, preparation and handling of coal purchased and utilized by Utility at  the Generation Facility, but in no event shall Utility's performance of the Services take precedence or priority over Utility's operation, maintenance and servicing of the Generation Facility.  In the case of a Force Majeure event that affects the operation of the Generation Facility, the parties acknowledge and agree that Utility shall have the right to first ensure that the Generation Facility is operational before performing any Services.

4.     Compensation for Services.  As compensation for the Services, Owner shall pay Utility an amount equal to ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ("Services Payment").  In addition, Owner shall reimburse Utility for its direct out-of-pocket costs and expenses in performing the Emergency Services at rates to be mutually agreed by Owner and Utility ("Reimbursable Costs").

5.     Invoices; Late Payments.

(a)     Within 10 days after the end of each calendar month, Utility shall deliver to Owner in accordance with its regular accounting practices and in accordance with the terms of the Refined Coal Sales Agreement, a statement based on its records indicating payment due for goods or services provided by each party under the Project Agreements and the total net amount due by one party to the other in accordance therewith, including the Services Payment showing the number of tons of coal delivered to Owner in the preceding month.  In addition, Utility shall deliver a monthly invoice for Reimbursable Costs, if any, incurred by Utility during the Term within 10 days after the end of each month in which Emergency Services are provided by Utility. Payment shall be made by Owner on the twentieth (20th) day of the month with respect to the

monthly statement or invoice for the preceding month (unless such day is not a Business Day, in which case payment shall be due on the next Business Day) by electronic funds transfer to the bank account specified by Utility within 2 Business Days after the Effective Date. In the event that Lessor determines to change the designated bank account, it shall give notice thereof to Lessee at least 5 Business Days prior to the end of a calendar month.

(b)     Any Services Payment or Reimbursable Costs that are not paid when due shall bear interest at the Late Payment Rate from the date on which payment was due until paid.

6.     Access to Information.     Each party shall provide the other party with all information in such party's possession reasonably necessary for the other party to perform its obligations under this Agreement and to account for Services performed hereunder.

7.     Confidential and Proprietary Information.

(a)     From and after the date hereof through a period of three years from the termination of this Agreement, unless otherwise agreed to by the parties hereto, each party and its Affiliates shall keep, and shall ensure that its officers, directors and employees keep, confidential: (a) the commercial and monetary terms of this Agreement; and (b) information constituting a "trade secret", as such term is defined under the Indiana Uniform Trade Secrets Act (IC 24-2-3-2). The recipient of the disclosing party's confidential information shall treat such information with the same care that it uses to prevent disclosure of its own confidential information. Neither party shall disclose such information to any officers or employees or Affiliates except on a need-to-know basis. The recipient of the disclosing party's confidential information shall use such information solely for purposes of carrying out its obligations under the Project Agreements. Such information may be disclosed to a party's contractors or consultants strictly on a need-to-know basis and only if such information is protected by confidentiality agreements with such contractors or consultants. The foregoing restriction shall not apply to any information that (i) is or hereafter becomes generally available to the public other than by reason of any default with respect to a confidentiality obligation under this Agreement or other agreements among the parties or their Affiliates; (ii) was already known to the recipient as evidenced by prior written documents in its possession; (iii) is disclosed to the recipient by a third party who is not known by the recipient to be in default of any confidentiality obligation to the other party hereunder; (iv) is developed by or on behalf of the receiving party, without reliance on confidential information received hereunder; (v) is disclosed in any arbitration pursuant to Section 26 or litigation to the extent relevant to the issues being arbitrated or litigated; or (vi) is otherwise required to be disclosed in compliance with law or in the course of any judicial or administrative proceeding or regulatory examinations or process; provided, that if such disclosure is required, the disclosing party shall provide the other party with timely advance written notice of such disclosure. Except as provided in the preceding sentence, Utility shall not disclose the name of any member of Owner or direct or indirect institutional investor in Owner without such Person's prior written consent. Nothing in this provision shall prevent Utility or Owner from supplying information regarding the other party to a potential transferee as long as such information is protected by a confidentiality agreement with such transferee.

8.     No Warranty. Each party shall be entitled to rely on the accuracy and currency and completeness of information supplied by or at the direction of the other party. UTILITY

DOES NOT WARRANT ITS SERVICES AND DISCLAIMS ALL WARRANTIES OF ANY KIND), EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

9.     Limitation of Liability.    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, (A) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR ANY SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE OR NON-PERFORMANCE OF SERVICES HEREUNDER, EXCEPT TO THE EXTENT ANY SUCH LOSS OR DAMAGE IS INCLUDED IN A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION IS OWED PURSUANT TO SECTION 13; AND (B) NOTWITHSTANDING THE PRECEDING CLAUSE (A), IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS AGREEMENT FOR ANY LOSS OR DAMAGE ARISING FROM LOSS OF USE OF LESSEE'S PLANT OR UTILITY'S GENERATION FACILITY OR OTHER    PRODUCTION FACILITIES, LOSS OF TAX CREDITS OR OTHER TAX BENEFITS, LOSS OF PROFIT OR REVENUE, LOSS OF GOODWILL, LOSS OF COAL FEEDSTOCK, COST OF REPLACEMENT FEEDSTOCK OR SERVICES, COST OF PURCHASED OR REPLACEMENT POWER, COST OF CAPITAL, OR CLAIMS OF CUSTOMERS, REGARDLESS OF WHETHER ANY SUCH LOSS OR DAMAGE IS INCLUDED IN A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION WOULD OTHERWISE BE OWED PURSUANT TO SECTION 10.   THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT, SHALL APPLY TO ALL CLAIMS, WHETHER IN CONTRACT, EQUITY, TORT OR OTHERWISE, REGARDLESS OF FAULT, NEGLIGENCE (IN WHOLE OR IN PART), STRICT LIABILITY, BREACH OF CONTRACT OR BREACH OF WARRANTY AND SHALL EXTEND TO THE MANAGERS, TRUSTEES, DIRECTORS, OFFICERS, MEMBERS, PARTNERS AND EMPLOYEES, AGENTS AND AFFILIATES OF EACH PARTY, AND THE MANAGERS, DIRECTORS, TRUSTEES, OFFICERS, EMPLOYEES AND AGENTS OF SUCH AFFILIATES.   THE PROVISIONS OF THIS SECTION 9 SHALL NOT IMPAIR OR AFFECT IN ANY MANNER THE REMEDIES EITHER PARTY MAY HAVE UNDER ARTICLE VII OF THE REFINED COAL SALES AGREEMENT OR ARTICLE VI OF THE FEEDSTOCK SUPPLY AGREEMENT AS A RESULT OF ANY VIOLATION OR BREACH OF THIS AGREEMENT.

10.    Force Majeure.

(a)    If, because of a Force Majeure event, Owner or Utility is unable to carry out its obligations under this Agreement, and if the party subject to such Force Majeure gives the other party prompt written notice of such Force Majeure event, including reasonable details as to the cause and expected duration of such Force Majeure event or condition, the obligations and liabilities of Owner and Utility, other than the obligation of either party to make payments of amounts due hereunder to the other party, shall be suspended (and the party whose performance is suspended shall not be considered to be in default) to the extent made necessary by and during the continuance of such Force Majeure event; provided, however, that the disabling effects of such Force Majeure event shall be eliminated as soon as and to the extent commercially reasonable (except that either party may settle any of its own labor disputes, strikes, or terminate

any of its own lockouts in its sole discretion). The suspension of performance by a party due to a Force Majeure event or condition shall be of no greater scope and no longer duration than that which is necessary.

(b) Notwithstanding the provisions of this Section 10, a party not claiming a Force Majeure event may terminate this Agreement upon written notice to the other party and without liability to the other party whenever all of the following circumstances exist: (i) a condition of a Force Majeure event (alone or extended by other events of Force Majeure) occurs which causes the mutual obligations of the parties to be suspended as provided above for a period of 90 consecutive days and (ii) at the end of such 90 day period, the party not claiming a Force Majeure event, in the exercise of reasonable judgment, concludes that there is little likelihood of ending the Force Majeure event in the next 30 days. The party not claiming a Force Majeure event may exercise such right of termination, at any time after the conditions in the previous sentence are satisfied during the continuation of the event of Force Majeure, by giving the other party 10 days' prior written notice of its intention to terminate.

11. <u>Representations and Warranties of Utility</u>. Utility hereby represents and warrants as of the date hereof as follows:

(a) Utility is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana and is qualified to do business and is in good standing in the State of Indiana and each other jurisdiction in which the conduct of its business and ownership of its properties so require. Utility is not in violation of any of the provisions of its certificate/article of incorporation or its bylaws.

(b) Utility has all requisite right, power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance by Utility of this Agreement has been duly authorized by all necessary action on its part and no other company actions on the part of Utility and on the part of its shareholders or directors are necessary to authorize the execution, delivery and performance of this Agreement. This Agreement has been duly and validly executed by Utility. This Agreement is the legal, valid and binding obligation of Utility, enforceable in accordance with its terms, subject to the qualification, however, that enforcement of the rights and remedies created hereby is subject to bankruptcy and other similar laws of general application relating to or affecting the rights and remedies of creditors and that the remedy of specific enforcement or of injunctive relief is subject to the discretion of the court before which any proceeding therefore may be brought.

(c) The execution, delivery and performance by Utility of this Agreement, and the consummation by Utility thereof of the transactions contemplated hereby do not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of the certificate/articles of incorporation or bylaws of Utility, (ii) with or without the giving of notice or the lapse of time, or both, violate, conflict with, result in the breach of or accelerate the performance required by, or give rise to a right of termination under, any bond, debenture, note, mortgage, indenture, lease, covenant, agreement or understanding to which Utility is a party or by which any of its properties are bound, or (iii) violate any order, ruling, decree, judgment or arbitration award, or any law, rule, regulation or stipulation, permit, license or authorization applicable to Utility.

(d)     Except for such permits and governmental filing obligations which will not have a material adverse effect on the Generation Facility or Lessee's Plant, Utility is not required to file, make or obtain any governmental notice, filing, authorization, approval, order or consent, in connection with the execution, delivery and performance by it of this Agreement.  No consent from any non-governmental third party is required in connection with the execution, delivery and performance by Utility of this Agreement.

(e)     There is no outstanding order, ruling, decree, judgment or stipulation by or with any Governmental Authority or arbitration panel or any litigation pending or, to the knowledge of Utility, threatened against Utility which is reasonably likely to affect Utility's ability to perform its obligations under this Agreement.

12.     Representations and Warranties of Owner.  Owner hereby represents and warrants as of the date hereof as follows:

(a)     Owner is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and is qualified to do business and is in good standing in the  State of Delaware and each other jurisdiction in which the conduct of its business and ownership of its properties so require. Owner is not in violation of any of the provisions of its certificate of formation or its limited liability company agreement.

(b)     Owner has all requisite right, power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance by Owner of this Agreement has been duly authorized by all necessary action on its part and no other company actions on the part of Owner and on the part of its managers or members are necessary to authorize the execution, delivery and performance of this Agreement.  This Agreement has been duly and validly executed by Owner.  This Agreement is the legal, valid and binding obligation of Owner, enforceable in accordance with its terms, subject to the qualification, however, that enforcement of the rights and remedies created hereby is subject to bankruptcy and other similar laws of general application relating to or affecting the rights and remedies of creditors and that the remedy of specific enforcement or of injunctive relief is subject to the discretion of the court before which any proceeding therefore may be brought.

(c)     The execution, delivery and performance by Owner of this Agreement, and the consummation by Owner thereof of the transactions contemplated hereby and thereby do not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of the certificate of formation or limited liability company agreement of Owner, (ii) with or without the giving of notice or the lapse of time, or both, violate, conflict with, result in the breach of or accelerate the performance required by, or give rise to a right of termination under, any bond, debenture, note, mortgage, indenture, lease, covenant, agreement or understanding to which Owner is a party or by which any of its properties are bound, or (iii) violate any order, ruling, decree, judgment or arbitration award, or any law, rule, regulation or stipulation, permit, license or authorization applicable to Owner.

(d)     Except for the Lessee Permits and such other permits and governmental filing obligations which will not have a material adverse effect on the Generation Facility or Lessee's Plant, Owner is not required to file, make or obtain any governmental notice, filing,

authorization, approval, order or consent, in connection with the execution, delivery and performance by it of this Agreement. No consent from any third party is required in connection with the execution, delivery and performance by Owner of this Agreement.

(e)    There is no outstanding order, ruling, decree, judgment or stipulation by or with any Governmental Authority of arbitration panel, or any litigation pending or, to the knowledge of Owner, threatened against Owner which is reasonably likely to affect Owner's ability to perform its obligations under this Agreement.

13.    Indemnification.

(a)    Utility shall indemnify, defend, save and hold harmless Owner, its Affiliates and the Operator (as defined in the Lease Agreement) and their respective directors, managers, officers, employees, members and agents from and against any and all Adverse Consequences arising from or out of (i) death, sickness or bodily injury of or to any Person, or (ii) destruction or damage to any property of any Person, in each case arising from or related to negligent or willful acts or omissions of Utility, its Affiliates or any of their directors, managers officers, employees or agents, except to the extent the same was caused by the negligent or willful act or omission of Owner, any Affiliate of Owner, the Operator or their respective directors, managers, officers, employees or agents.

(b)    Owner, shall indemnify, defend, save hold harmless Utility and its Affiliates and their respective directors, managers, officers, employees and agents from and against any and all Adverse Consequences arising from or out of (i) death, sickness or bodily injury to any Person, or (ii) destruction or damage to any property of any Person in each case arising from or related to negligent or willful acts or omissions of Owner, any Affiliate of Owner, the Operator or their respective directors, managers, officers, employees or agents, except to the extent the same was caused by the negligent or willful act or omission of Utility, any Affiliate of Utility, any contractor or subcontractor of Utility for the performance of Services hereunder, or their respective directors, managers, officers, employees or agents.

(c)    Owner shall indemnify, defend, save and hold harmless the Utility Indemnified Parties from and against any and all Adverse Consequences (as such term is defined in the Lease Agreement) as a result of any breach, violation or nonperformance of any covenant, condition or agreement in this Agreement set forth and contained on the part of Owner to be fulfilled, kept, observed or performed. Utility shall indemnify, defend, save and hold harmless the Owner Indemnified Parties from and against any and all Adverse Consequences as a result of any breach, violation or nonperformance of any covenant, condition or agreement in this Agreement set forth and contained on the part of Utility to be fulfilled, kept, observed or performed.

(d)    The following procedures shall apply with respect to any third-party claims, other than claims related to taxes or tax credits. In the event that any claim or demand for which Owner or Utility would be liable (as the case may be, an "Indemnifying Party") to any Person entitled to indemnification under this Lease (an "Indemnitee") is asserted or sought to be collected from such Indemnitee by a third party, such Indemnitee shall give written notice to the Indemnifying Party thereof promptly after the discovery by such Indemnitee of the matters

Page 10

giving rise to a claim for indemnification pursuant hereto; provided, however, that the failure of any Indemnitee to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 13 except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice. The Indemnifying Party shall be entitled to participate in or to assume the defense thereof, with counsel selected by the Indemnifying Party but reasonably satisfactory to the Indemnitee and, after notice from the Indemnifying Party to the Indemnitee of its election to assume the defense thereof, the Indemnifying Party shall not be liable to such Indemnitee for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof. The Indemnitee shall cooperate fully with the Indemnifying Party in connection with any negotiation or defense of any such action, proceeding or claim by the Indemnifying Party. In the event that (i) the Indemnifying Party advises an Indemnitee that it will contest a claim for indemnification hereunder or (ii) the Indemnifying Party fails, within 15 days of receipt of any indemnification notice to notify, in writing, such Indemnitee of its election to defend, settle or compromise, at its sole cost and expense, any action, proceeding or claim (or discontinues its defense at any time after it commences such defense), then the Indemnitee may, at its option, defend, settle or otherwise compromise or pay such action, proceeding or claim. In any event, unless and until the Indemnifying Party elects in writing to assume and does so assume the defense of any such claim, proceeding or action, the Indemnifying Party shall be liable for the Indemnitee's reasonable costs and expenses arising out of the defense, settlement or compromise of any such action, claim or proceeding. The Indemnifying Party shall not be liable for any settlement of any action, claim or proceeding effected without its written consent; provided, however, that the Indemnifying Party shall not unreasonably withhold its consent. Notwithstanding anything in this Section 13 to the contrary, the Indemnifying Party shall not, without the Indemnitee's prior written consent (whether or not the Indemnitee is a party), settle or compromise any claim or demand or offer to settle any claim or demand, or consent to entry of judgment in respect thereof.

(e) At any time after the making of an indemnity payment to an Indemnitee, such Indemnitee's loss is reduced by recovery under any insurance coverage (excluding any proceeds from self-insurance or flow-through insurance policies), or under any recovery or payment by or against any other entity, the amount of such reduction, less any costs, expenses, deductibles or premiums incurred in connection therewith, must promptly be repaid by the Indemnitee to the Indemnifying Party.

14.     Audit.  Utility shall keep complete and accurate books, records and reports concerning the Services performed hereunder and the basis of the costs and fees invoiced to Owner.  Owner and its representatives shall have the right at Owner's sole cost and expense to review and audit such books, records and reports, to the extent required to verify the basis of the costs and fees invoiced to Owner, during the term hereof and for a period of six months after termination, at reasonable times during regular business hours and upon reasonable notice; *provided, however,* that Owner shall use its good faith efforts to minimize the disruption to Utility's business in connection with any such audit.

15.     Independent Contractor.  This Agreement is a contract for the performance of services.  The parties recognize and agree that Utility is not an agent or employee of Owner but is independent of any managerial or other control or direction by Owner in its work hereunder, and is free to perform, by such means and in such manner as Utility may choose, all work in

pursuance of commitments hereunder. The relationship of the parties is that of independent contractors and in no way establishes an agency or partnership relationship.

16.     No Waiver. Except as otherwise provided in this Agreement, any failure of either of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition will not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

17.     Insurance of Utility. On or before the execution of this Agreement Utility shall secure or cause to be secured, and during the Term Utility shall maintain or cause to be maintained, the insurance required under the Lease Agreement.

18.     Insurance of Owner. On or before the execution of this Agreement Owner shall secure or cause to be secured, and during the Term Owner shall maintain or cause to be maintained by its Operator, the insurance required under the Lease Agreement.

19.     Notices. Any notice, request, protest, consent, demand, report or statement given by one party to the other shall be in writing, and deemed duly received (a) forty-eight (48) hours after it is deposited in the United States mail, by certified mail, postage prepaid, and properly addressed as shown below, (b) upon personal delivery to the addressee, (c) upon delivery by a commercial courier service requiring confirmation of receipt by the addressee, or (d) upon transmission by facsimile if confirmed by posting of the written original by certified mail within two business days.

If to Utility:

Duke Energy Indiana, Inc.
526 S. Church Street
Charlotte, NC 28202
Attention: Larry Carter
Email: larry.carter@duke-energy.com

If to Owner:

Barr Linton
Cottbus Associates, LLC
2100 Third Avenue North, Suite 920
Birmingham, AL 35203
Fax: (205) 731-0961

With copies to:

Leah Schaatt
Cottbus Associates, LLC
4599 East Lake Boulevard
Birmingham, AL  35217
Fax:  (205) 798-7790

Marcia R. Nirenstein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Fax:  (202) 393-5760

A party may change its address by notice to the other party at the address set forth above.

20.     Assignment.  This Agreement shall not be assigned by either party without the prior written consent in each instance of the other party, except that either party may assign this Agreement to an Affiliate thereof without the consent of the other party.  In addition, in the event that Owner assigns the Lease Agreement in accordance with the terms of the Lease Agreement, Owner shall assign this Agreement to the assignee of the Lease Agreement.  In the event that Utility sells, transfers or otherwise conveys the Generation Facility, Utility shall assign this Agreement to the Person to whom the Generation Facility is sold, transferred or conveyed.

21.     Right to Subcontract.  It is understood and agreed that Utility shall have the right to subcontract the Services.  Utility nevertheless shall remain liable to Owner for all of its obligations under this Agreement whether or not any such obligations are performed by any of its subcontractors.

22.     Governing Law.       All questions concerning the execution, construction, performance, breach or enforcement of this Agreement shall be construed under the substantive laws of the State of Indiana, without reference to the conflict of laws provisions thereof.

23.     Entire Agreement.  This Agreement, and all exhibits and references herein set forth, and the Lease Agreement contains all the covenants, promises, agreements, conditions, representations and understandings among Utility and Owner concerning the transactions contemplated herein, and there are no promises, agreements, conditions, representations or understandings, either written or oral, other than those set forth herein.   No subsequent modification or addition to this Agreement shall be binding upon either party unless in writing making reference to this Agreement and signed by both parties.   All previous agreements between the parties respecting the transactions contemplated by this Agreement are hereby merged into this Agreement.

24.     No Third Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of each party and their respective successors and assigns permitted pursuant to Section 20, and it is not the intention of the parties to confer third-party beneficiary

Page 13

rights upon any other Person other than (with respect to the indemnities set forth in Section 13) the Persons covered by the indemnities set forth in Section 13.

25.     Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. A facsimile transmission of this Agreement bearing a signature on behalf of a party will be legal and binding on such party.

26.     Dispute Resolution. Any dispute, disagreement, claim or controversy arising out of or relating to this Agreement, or the breach hereof, shall be finally settled by binding arbitration in effect in accordance with Section 27 of the Lease Agreement.

27.     Invalidity. The parties hereby agree to use good faith efforts to negotiate an equitable adjustment to any provisions of this Agreement determined to be invalid or unenforceable with a view toward effecting the purposes of this Agreement, and the validity or enforceability of the remaining provisions of this Agreement shall not be affected thereby.

28.     Expenses. Each party shall bear its respective costs and expenses, including fees of advisors and brokers, that such party has incurred in connection with the negotiation of this Agreement.

29.     Interpretation. Both parties and their attorneys have participated in the negotiation and drafting of this Agreement and all other Project Documents. Consequently, any common law or statutory rule requiring interpretation against the interest of the drafter shall not apply.

30.     Headings; Other Drafting Conventions. Unless otherwise required by the context in which any term appears: (a) the singular shall include the plural and vice versa; (b) the words "include" and "including" shall be deemed to be followed by the words "without limitation"; (c) references to "Sections", "Schedules" and "Exhibits" shall be to sections, schedules and exhibits hereof; (d) the words "herein", "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection hereof; (e) references to this Agreement shall include a reference to all schedules and exhibits hereto, as the same may be amended, modified, supplemented or replaced from time to time; and (f) references in this Agreement to contracts, agreements, or other documents shall be deemed to mean those contracts, agreements or documents as the same maybe modified, supplemented, or amended from time to time. Section and paragraph headings used in this Agreement hereto are for reading convenience only and shall not have any other meaning, implication or purpose, legal or otherwise.

31.     Survival. Sections 7, 9, 13, 14 (as provided therein), 16, 19, 21, 22, 24, 26, 27, this Section 31, and Sections 32 and 33 shall survive the termination of this Agreement.

32.     Attorneys' Fees. If either party is required to institute any action or suit to enforce any of the obligations of the other party under this Agreement and the party so instituting such action or suit prevails thereon, then the prevailing party shall be entitled to recover (without duplication) reasonable attorneys', consultant's and expert's fees and expenses incurred by such prevailing party in connection with such action or suit, but only upon a determination by the court that the non-prevailing party's claims and defenses were not made in good faith.

33. <u>Binding Effect</u>.  This Agreement shall bind and inure to the benefit of the parties and their successors and assigns permitted under Section 20.

34. <u>Business Days</u>.  "<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which national banking institutions in Indianapolis, Indiana are authorized by Law or other governmental action to close.

**[Signatures on next page]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their authorized officers on the day and year first above written.

**DUKE ENERGY INDIANA, INC.,**
an Indiana corporation

By: _____
Name: _____
Title: _____

**COTTBUS ASSOCIATES, LLC,**
a Delaware limited liability company

By: _____
Name: T. BARR LINTON
Title: MANAGER

(1126991)

[Signature Page to Cayuga Site Services Agreement]

PETITIONER'S EXHIBIT B-4

EXECUTION VERSION

# LEASE AGREEMENT

between

## DUKE ENERGY INDIANA, INC.

as Lessor

and

## COTTBUS ASSOCIATES, LLC,

as Lessee

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Lease. | 1 |
| 2. | Term. | 2 |
| 3. | Rent; Late Payments. | 5 |
| 4. | Title; Use; Environmental Matters. | 6 |
| 5. | Access and Use Licenses; Utilities; Services. | 9 |
| 6. | Compliance with Law; Permits; Etc. | 11 |
| 7. | Quiet Enjoyment; Claim of Title. | 11 |
| 8. | Liens. | 12 |
| 9. | Insurance. | 13 |
| 10. | Indemnity and Liability. | 14 |
| 11. | Maintenance; Repairs and Improvements. | 17 |
| 12. | Condemnation. | 17 |
| 13. | Successors And Assigns. | 18 |
| 14. | Transfer; Assignment. | 18 |
| 15. | Drafting Conventions; Headings. | 19 |
| 16. | Entire Agreement. | 19 |
| 17. | Representatives. | 19 |
| 18. | Governing Law; Jurisdiction. | 19 |
| 19. | Partial Invalidity. | 20 |
| 20. | Non-Waiver of Covenants. | 20 |
| 21. | Notices. | 20 |
| 22. | Confidentiality and Use of Proprietary Information. | 21 |
| 23. | Authority. | 22 |
| 24. | Relationship of the Parties. | 22 |
| 25. | Survival Clause. | 22 |
| 26. | Estoppel Certificate. | 22 |
| 27. | Arbitration. | 23 |
| 28. | Counterparts. | 24 |
| 29. | Expenses. | 24 |
| 30. | Interpretation. | 25 |
| 31. | Attorneys' Fees. | 25 |
| 32. | No Third-Party Beneficiary. | 25 |
| 33. | Remedies. | 25 |
| 34. | Business Days. | 25 |

## EXHIBITS AND SCHEDULES

### **Exhibits**

| Exhibit | Description |
| --- | --- |
| Exhibit A-1 | Description of Property |
| Exhibit A-2 | Description of Lease Area |
| Exhibit A-3 | Description of Licensed Area |

### **Schedules**

| Schedule | Description |
| --- | --- |
| Schedule 4(e)(i) | Permitted Hazardous Materials |
| Schedule 9(a) | Required Insurance Coverages |

## INDEX TO DEFINED TERMS

| **TERM** | **SECTION** |
|---|---|
| AAA | Section 27(a) |
| Adverse Consequences | Section 10(h) |
| Affected Area | Section 14(a) |
| Affiliate | Section 10(h) |
| Alternate | Section 27(b) |
| Base Amount | Section 3(d) |
| Business Day | Section 34 |
| Coal Feedstock | Section 4(b) |
| Coal Feedstock Purchase Agreement | Recital B |
| Dispute | Section 27 |
| Effective Date | Preamble |
| Environmental Laws | Section 4(f) |
| Environmental Obligations | Section 4(f) |
| Existing Mortgage | Section 7(b) |
| Fast Track Arbitrator | Section 27(b) |
| Hazardous Material | Section 4(f) |
| Hazardous Waste | Section 4(f) |
| Indemnifying Party | Section 10(h) |
| Indemnitee | Section 10(h) |
| IURC | Section 2(b)(ii) |
| Lease | Preamble |
| Lease Area | Recital C |
| Lessee | Preamble |
| Lessee Facilities | Section 2(e) |
| Lessee Indemnified Parties | Section 10(b) |
| Lessee Permits | Section 4(c) |
| Lessee's Plant | Recital B |
| Lessor | Preamble |
| Lessor Indemnified Parties | Section 10(a) |
| Lessor's Permits | Section 4(c) |
| Lessor's Plant | Recital A |
| License Rights | Section 5(a) |
| Licensed Area | Section 5(a) |
| Multiplier | Section 3(d) |
| Operator | Section 4(d) |
| Operating License | Section 5(a)(ii) |
| Permits | Section 4(c) |
| Permitted Materials | Section 4(e)(i) |
| Product | Recital C |
| Project Agreements | Recital B |
| Property | Recital A |
| RCRA | Section 4(f) |
| Refined Coal Sales Agreement | Recital B |
| Rent | Section 3(a) |

iii

Rent Commencement Date                    Section 3(a)
Required Approval                          Section 2(b)(ii)
Revocation                                Section 2(b)(ii)
Rules                                     Section 27
Site Services Agreement                   Recital B
Term                                      Section 2(a)
Termination Date                          Section 2(a)
Trustee                                   Section 7(b)

iv

## LEASE AGREEMENT

(Cayuga Generating Station)

This **LEASE AGREEMENT** (this "Lease") dated effective as of the 22nd day of August, 2011 (the "Effective Date"), is between Duke Energy Indiana, Inc., an Indiana corporation having a business address at 1000 E. Main Street, Plainfield, Indiana 46168 ("Lessor") and Cottbus Associates, LLC, a Delaware limited liability company ("Lessee").

## RECITALS

A.     Lessor is the owner of the property described on Exhibit A-1 hereto (the "Property"), and owns and operates certain facilities at the site to receive, handle and store coal for use at the electric power generation and related facilities known as the Cayuga Generating Station located in Vermillion County, Indiana ("Lessor's Plant").

B.     Lessee owns a coal treatment facility and related equipment ("Lessee's Plant"). Lessee and Lessor are entering into various agreements, each dated as of the Effective Date, pursuant to which, among other things, (i) Lessor agrees to sell coal feedstock to Lessee, pursuant to a Feedstock Supply Agreement (the "Feedstock Supply Agreement"), between Lessor and Lessee, (ii) Lessee agrees to sell refined coal (as such term is defined in Section 45 of the Internal Revenue Code) to Lessor, pursuant to a Refined Coal Sales Agreement (the "Refined Coal Sales Agreement"), between Lessor and Lessee and (iii) Lessor agrees to provide certain coal handling and other services to Lessee pursuant to a Site Services Agreement (the "Site Services Agreement"), between Lessor and Lessee (this Lease, together with the Feedstock Supply Agreement, Refined Coal Sales Agreement and Site Services Agreement, the "Project Agreements").

C.     Lessee desires to operate Lessee's Plant on approximately One Thousand (1,000) square feet of the Property, as described and illustrated on Exhibit A-2 hereto and identified as the "Lease Area" (the "Lease Area") for the purpose of producing refined coal (the "Product"), and in connection therewith, Lessor has agreed to lease to Lessee the Lease Area on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AGREEMENT

1.     Lease. Subject to the terms and conditions hereinafter set forth, Lessor does hereby lease to Lessee for the Term the Lease Area solely for the purposes set forth in Section 4, and Lessee does hereby accept the lease of the Lease Area from Lessor, together with a non-exclusive right and license authorizing Lessee to enter upon and use the Licensed Area pursuant to Section 5 in order to provide the services contemplated in the Project Agreements. Notwithstanding the foregoing, Lessor shall have the right to relocate the Lease Area and Licensed Area in accordance with Section 5(e) of this Lease.

2.     Term.

(a)     Term Generally.  This Lease shall be binding upon the parties hereto on the Effective Date. The term of this Lease (the "Term"), and the duration of the licenses granted hereby, shall commence on the Effective Date and, unless sooner terminated pursuant to Section 2(b), (c), or (d) or as otherwise provided in this Lease, shall continue for a period of ten (10) years from and after the "in-service date" of Lessee's Plant (being the date upon which Lessee, or its designated operator, commences production of refined coal upon the Lease Area, which date shall have been specified in writing from Lessee to Lessor) (such date of termination, the "Termination Date"). Lessee shall be authorized to exercise the License Rights from and after the Effective Date as necessary to construct Lessee's Plant and Lessee Facilities on the Lease Area and to transport necessary chemicals, spare parts and other materials incidental to commencing operation of Lessee's Plant.

(b)     Termination by Lessor for Cause.     Without limiting Lessor's other termination rights under this Lease,

(i)     Lessor may terminate this Lease for cause upon (A) the satisfaction of all of the following as to any non-monetary default: (1) Lessee fails to perform any of its material obligations under this Lease, (2) Lessor delivers a written notice to Lessee stating that Lessor has reasonably determined that Lessee has failed to perform a material obligation under this Lease in any material respect and the basis for such determination, and (3) Lessee does not commence to cure any such non-monetary default within 30 days after receipt of such written notice and cure such non-monetary default no later than 90 days after its receipt of such written notice; or (B) written notice from Lessor to Lessee if Lessee has failed to make any payment due hereunder within 30 days after delivery of written notice from Lessor to Lessee that such amount is past due.

(ii)     Lessor may terminate this Lease for cause by written notice to Lessee if (A)L essor receives notice of any determination, assertion and/or opinion rendered by the Indiana Department of Environmental Management, United States Environmental Protection Agency and/or any other Governmental Authority that the use of the Product at the Generation Facility has, or will be, considered to constitute the combustion and/or incineration of solid waste at the Generation Facility for purposes of the commercial and industrial solid waste incineration ("CISWI") solid waste rule codified at 40 C.F.R. 241; (B) Lessor makes a good faith determination, in its sole and absolute discretion, that approval from the Indiana Utility Regulatory Commission ("IURC") or any other agency or administrative body having authority over Lessor or Lessor's Plant is required to purchase Product under the Refined Coal Sales Agreement or to burn Product produced at Lessee's Plant at Lessor's Plant (a "Required Approval") and cannot be obtained; (C) due to Lessor's burning of the Product, an environmental permitting agency: (1) requires Lessor to procure an additional permit or a modification to an existing permit, if procuring such permit or modification subjects Lessor's Plant to additional requirements, including but not limited to New Source Review, Prevention of Significant Deterioration, Best Available Control Technology, or Maximum Achievable Control Technology requirements; (2) requires installation of additional controls for treatment of air pollutants or water effluent; or (3) determines that any byproduct of burning the Product is rendered hazardous or is otherwise made subject to additional controls or restrictions on reuse; or

2

(D) any Required Approval previously obtained is subsequently revoked, rescinded, terminated, suspended or otherwise invalidated (collectively, a "Revocation") for a period of more than ninety (90) days; provided, however, that: (1) Lessor shall not be required to accept any Product or permit continued operation of Lessee's Plant while any Revocation is in effect; (2) for a period of at least thirty (30) days prior to termination arising in connection with a Revocation, Lessor and Lessee will cooperate in good faith and use commercially reasonable efforts to re-obtain any Required Approval which has been the subject of a Revocation; and (3) Lessor shall not be required to pay any material out-of-pocket expense to re-obtain any Required Approval absent Lessee's agreement to immediately reimburse Lessor for such expense even if the Required Approval is not ultimately re-obtained.

(iii)      In addition, Lessor may terminate this Lease for cause by written notice to Lessee upon the occurrence of any of the following events: (A) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or similar official for a substantial part of Lessee's assets and the appointment is neither made ineffective, dismissed, nor discharged within 90 days after the making thereof; (B) the entry of a judgment, decree, or order for relief against Lessee that materially affects its ability to perform its obligations hereunder in accordance with the terms of this Lease by a court of competent jurisdiction in an involuntary case commenced under any applicable bankruptcy, insolvency, or other similar law now or hereafter in effect (other than an involuntary case commenced by Lessor); or (C) the commencement by Lessee of a voluntary case under any applicable bankruptcy, insolvency, or similar law now or hereafter in effect; the consent to, request by, or acquiescence by Lessee in the entry of an order for relief in an involuntary case under any such law or to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar official of any substantial part of its assets; the making by Lessee of a general assignment for the benefit of creditors; or the taking by Lessee of corporate or other action in furtherance of any of the foregoing.

(c)      Termination by Lessee for Cause.      Without limiting Lessee's other termination rights under this Lease,

(i)      Lessee may terminate this Lease for cause upon (A) the satisfaction of all of the following as to any non-monetary default: (1) Lessor fails to perform any of its material obligations under this Lease, (2) Lessee delivers a written notice to Lessor stating that Lessee has reasonably determined that Lessor has failed to perform a material obligation under this Lease in any material respect and the basis for such determination, and (3) Lessor does not commence to cure any such non-monetary default within 30 days after receipt of such written notice and cure such non-monetary default no later than 90 days after its receipt of such written notice; or (B) written notice from Lessee to Lessor if Lessor has failed to make any payment due hereunder within 30 days after delivery of written notice from Lessee to Lessor that such amount is past due.

(ii)      In addition, Lessee may terminate this Lease for cause by written notice to Lessor upon the occurrence of any of the following events: (A) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or similar official for a substantial part of Lessor's assets and the appointment is neither made ineffective nor discharged within 90 days after the making thereof; (B) the entry of a judgment, decree, or order for relief against

3

Lessor that materially affects its ability to perform its obligations hereunder in accordance with the terms of this Lease by a court of competent jurisdiction in an involuntary case commenced under any applicable bankruptcy, insolvency, or other similar law now or hereafter in effect (other than an involuntary case commenced by Lessee); or (C) the commencement by Lessor of a voluntary case under any applicable bankruptcy, insolvency, or similar law now or hereafter in effect; the consent to, request by, or acquiescence by Lessor in the entry of an order for relief in an involuntary case under any such law or to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar official of any substantial part of its assets; the making by Lessor of a general assignment for the benefit of creditors; or the taking by Lessor of corporate or other action in furtherance of any of the foregoing.

(d)     Termination for Convenience by Lessor. Lessor may terminate this Lease for its convenience upon six (6) months' notice to Lessee.

(e)     Automatic Termination. This Lease shall terminate upon, and termination shall be effective as of, the effective date of termination of any of the Project Agreements in accordance with their respective terms.

(f)     Removal of Lessee Facilities after Termination of Lease. Within two months after the termination of this Lease, whether by expiration of the Term or any other reason, or such additional period as may be approved by Lessor, which approval shall not be unreasonably withheld or delayed, Lessee shall, at its sole cost and expense, remove Lessee's Plant and all ancillary equipment, including any other structures, improvements, equipment or other facilities installed upon the Lease Area or on the Licensed Area by or through Lessee (collectively Lessee's Plant and all such other ancillary equipment, structures and improvements, together with any replacements, modifications or additions thereto, are referred to herein as the "Lessee Facilities") and all of Lessee's supplies, inventories and other materials at or on the Lease Area or Licensed Area. In effecting the removal of the Lessee Facilities installed or erected on or about the Lease Area or the Licensed Area by or through Lessee, the Lease Area and the Licensed Area shall be restored by Lessee, at its sole cost and expense, to reasonably similar conditions to those received by Lessee. Lessee shall coordinate all such removal activities with Lessor so as not to disrupt Lessor's operation of Lessor's Plant. Lessor agrees to provide reasonable access to Lessee to complete the removal as mutually agreed by the parties. If Lessee shall fail to timely remove any such improvements, supplies or other property or pay any charges related to such removal, then Lessor may remove and dispose of the same in any lawful manner, which shall be conclusively presumed to be abandoned, all at the sole cost and expense of Lessee (net of any proceeds of such sale and the salvage value of any improvements not sold by Lessor), which cost and expense shall be reimbursed to Lessor upon demand. Lessee shall, during the performance of its removal obligations described in this Section 2(f), continue to carry insurance required to be carried during the Term as contemplated in Section 9 of this Lease (in the types and amounts referenced on Schedule 9(a) hereto).

(g)     Obligations after Termination. Upon the early termination of this Lease for any reason, both parties shall be released and discharged from all further duties, obligations and liabilities thereafter accruing under this Lease (including following a termination due to Lessee's breach of this Lease, any claim for future Rent and any consequential damages

4

attributable to the loss of such future Rent), *except for* (x) such duties and obligations existing but undischarged at the time of such termination, (y) obligations for defense, reimbursement and indemnification to the extent such obligations relate to acts, omissions or other circumstances occurring prior to the date of any such termination, including as provided under Sections 4(g) and 4(h) and Section 10, and (z) Lessee's obligation to remove the Lessee Facilities as provided in Section 2(e).

3.　　Rent; Late Payments.

(a)　　Lessee shall pay to Lessor as consideration for the lease granted herein, and as a fee for the licenses granted herein, an amount equal to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ("Rent"), commencing on the date Lessee begins testing of Lessee's Plant upon the Lease Area as directed in a written notice to the Operator ("Rent Commencement Date"). Except for the Rent and utility service charges arising under Section 5(d) below, there shall be no fees or other payments due from Lessee for access to the Lease Area or Licensed Area by Lessee, its contractors, subcontract, suppliers or other invitees. The Rent shall be due and payable in arrears for the preceding month.

(b)　　For each calendar month during the Term (or partial month) Lessor shall deliver to Lessee an invoice for Rent, which invoice shall be delivered by Lessor no later than the 10th day of each month in respect of the preceding month. Payments by Lessee for amounts due under such invoice shall be made to Lessor on the 20th day of each calendar month (unless such day is not a Business Day, in which case payment shall be due on the next Business Day). Payment of Rent shall be made by electronic funds transfer to a bank account specified by Lessor . In the event that Lessor determines to change the designated bank account, it shall give notice thereof to Lessee at least 5 Business Days prior to the end of a calendar month. Any Rent payment that is not received on or before the due date will bear interest accruing daily from the due date for payment thereof until paid at the Late Payment Rate.

(c)　　Lessor shall pay all real estate taxes, assessments (general and special), and other charges in the nature of real estate taxes which may be levied, assessed or charged against the Property, accruing or becoming due and payable during the Term and any extension thereof; provided Lessee shall pay all personal property taxes and other taxes and assessments payable as the result of the installation, operation and maintenance of the Lessee Facilities or as otherwise applicable to Lessee's Plant.

(d)



5



(e)

4.  Title; Use; Environmental Matters.

(a)  Notwithstanding anything to the contrary contained in this Lease or otherwise, it is expressly understood and agreed that the Lessee Facilities shall not be deemed to constitute a fixture or otherwise a part of the real property underlying the Lease Area, but shall at all times be and remain the sole and separate personal and movable property of Lessee regardless of the manner in which the same may be affixed or attached to the Lease Area or Licensed Area. Lessor shall from time to time do or cause to be done such other things as Lessee may reasonably request, including execute and deliver additional documentation, to evidence the sole and separate ownership of Lessee in and to the Lessee Facilities.

(b)  Lessee shall use and occupy the Lease Area solely for the purpose of installing, operating, using, maintaining, modifying, repairing, relocating and removing Lessee's Plant, which will be used for the production of refined coal, together with the performance of related functions and activities, including the operation and maintenance of ancillary facilities for the treatment of coal ("Coal Feedstock") to produce refined coal, storage of Chemicals (as that term is defined in the Refined Coal Sales Agreement) and sales of refined coal. Lessee shall be entitled to have its contractors, subcontractors, suppliers, agents and other invitees enter the Lease Area for all related purposes. Lessee shall not use or permit the use of the Lease Area or the Licensed Area by anyone acting by, through or under Lessee, for any purpose which is forbidden by applicable law, regulation or ruling of any local, state or federal governmental authority having jurisdiction over the Lease Area or the Licensed Area. Except as permitted or contemplated under this Lease with respect to the Lease Area and the Licensed Area, Lessee shall not use any property of Lessor without first obtaining the prior written consent of Lessor.

(c)  Lessee shall at Lessee's sole cost and expense promptly apply for and diligently pursue those governmental permits, licenses, consents and approvals (collectively, "Permits") necessary for the installation, operation, maintenance, and/or modification of the Lessee Facilities upon the Lease Area or the Licensed Area for the purposes of producing and selling refined coal as contemplated under this Lease ("Lessee's Permits"); provided, however, that all air and other environmental permits that are necessary to operate Lessor's Plant shall be the sole responsibility of Lessor ("Lessor's Permits"). Lessee shall provide Lessor with a copy of any Lessee Permit which is required to be held by Lessee in order to begin installation prior to commencing any installation work at the Lease Area. Lessor shall cooperate with Lessee in connection with obtaining Lessee's Permits, and shall provide or cause to be provided such information in its possession or otherwise available to if relating to the Property or Lessor's Plant that is reasonably necessary for Lessee's application and renewal of all necessary Permits.

6

Lessee agrees to give Lessor written notice of any material modifications to Lessee's Plant not less than 10 days prior thereto.

(d)     Lessee shall have sole responsibility for the care and maintenance of the Lease Area and for the operation, care and maintenance of the Lessee Facilities. Lessee has entered into an Operating Services Agreement with CERT Operations II, LLC, a Delaware limited liability company ("Operator"), whereby Operator has agreed to, among other things, operate and maintain the Lessee Facilities on behalf of Lessee in accordance with the relevant Project Agreements, including this Lease.  Lessee and Operator (and any successor or replacement operator) shall employ only experienced, licensed contractors and subcontractors in connection with operation and maintenance of the Lessee Facilities.  Lessee will have no employees working at Lessee's Plant (or otherwise at Lessor's Plant).  All such employees will be provided by Operator.

(e)     (i)  Except for the materials listed on Schedule 4(e)(i) hereof, which will be used in connection with the installation, operation and maintenance of the Lessee Facilities, together with such other materials as may hereafter be approved in writing from time to time by Lessor for such use (together with the materials listed on Schedule 4(e)(i), "Permitted Materials"), which approval shall not be unreasonably withheld or delayed, it is understood and agreed that Lessee shall not generate, use or store any Hazardous Materials upon the Lease Area or the adjacent premises during the Term.  In addition, Lessee shall not use or store any Permitted Materials upon the Lease Area or the adjacent premises prior to delivering a copy of the Material Safety Data Sheet for such Permitted Material to Lessor.  Lessee shall not generate Hazardous Waste through the use of materials not on the Permitted Materials list.  Lessee agrees to use best management practices in connection with the handling, use, storage, and disposal of Hazardous Materials in order to prevent any accidental release or discharge of any such material.

(ii)     Lessee maintains RCRA responsibility for Hazardous Waste generated by Lessee's operations.  Lessee shall segregate and label all Hazardous Materials at the Lease Area and shall accumulate, segregate, drum and label all Hazardous Waste of every type generated, used, stored or disposed of by Lessee, its officers, employees, operators, contractors or agents.  Such segregation and labeling shall be done in accordance with applicable Environmental Laws.  Arrangements for disposal of Hazardous Materials may be made at the sole discretion of Lessee.  Where Lessor has existing arrangements in place for managing such waste, and both parties agree to the arrangement, Lessee may coordinate disposal of those wastes with Lessor's disposal of its similar Hazardous Materials, including, if specifically agreed to and permitted by law, transfer of those wastes to Lessor for disposal.  In such cases the actual costs and expenses of disposal will be charged to Lessee.

(f)     For the purposes of this Lease, the term "Hazardous Material" means any waste, material or substance (i) defined, regulated, controlled, limited or prohibited by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 *et seq.*); the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§ 1801 *et seq.*); the Resource Conservation and Recovery Act ("RCRA"), as amended (42 U.S.C. §§ 6901 *et seq.*); the Clean Water Act, as amended (33 U.S.C. §§ 1251 *et seq.*); the Clean Air Act, as amended (42 U.S.C. §§ 7401 *et seq.*); the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601 *et seq.*); any applicable laws of the State of Indiana, or any successor law,

7

rule or regulation (collectively with all other applicable statutes, rules, regulations, orders and other laws pertaining to health, safety or the environment, "Environmental Laws"); (ii) containing regulated or reportable quantities of petroleum or any fraction thereof; (iii) containing naturally occurring radioactive materials, ash, or asbestos, or (iv) determined to be deleterious to human health or the environment by any federal, state, or local environmental, occupational health, or public health agency or authority having jurisdiction over the Lease Area, the Licensed Area or the land adjacent thereto.  The term "Hazardous Waste" means any waste, material or substance defined as hazardous waste in RCRA or any similar law of the State of Indiana.  The term "Environmental Obligations" shall mean all applicable requirements of all federal, state or local Environmental Laws including permits, licenses or other requirements issued or adopted pursuant thereto and payment of fees, charges, fines, penalties and other amounts pursuant thereto.

(g)     Lessor shall indemnify, defend, save and hold harmless the Lessee Indemnified Parties from and against any and all Adverse Consequences, including, all such claims, causes of action, damages, costs, expenses and liability involving any Hazardous Material or the violation of any Environmental Laws, or the failure to perform or comply with any Environmental Obligations, or otherwise resulting from any environmental investigation, evaluation, mitigation, remediation or cleanup, as a result of the following:

(i)     Any and all environmental conditions affecting any or all of the Lease Area or the Licensed Area or the surrounding property, whether involving the soil, groundwater, surface water or air, and regardless of who or what may have caused or contributed to such conditions, arising prior to the Effective Date;

(ii)     Any and all environmental conditions affecting any or all of the Lease Area or the Licensed Area or the surrounding property, whether involving the soil, groundwater, surface water or air, and regardless of who or what may have caused or contributed to such conditions, except to the extent that any such liability arises from any act or omission of any of the Lessee Indemnified Parties.  In the event of uncertainty as to which party may have caused the environmental condition, Lessor agrees to make available documents and other existing information that may be useful in establishing baseline environmental conditions (pre-refined coal plant) for the Lease Area and the Licensed Area.

(iii)     The presence of coal (together with its various constituents) and any coal treated at the Lessee Facilities with the Chemicals (as that term is defined in the Refined Coal Sales Agreement) on or about the Lease Area, the Licensed Area or the surrounding property.

Any claim for indemnification under this Section 4(g) shall be subject to the provisions and procedures set forth in Section 10.

(h)     Lessee shall indemnify, defend, save and hold harmless the Lessor Indemnified Parties from and against any and all Adverse Consequences, including all such liability involving any Hazardous Material, the violation of any Environmental Laws or the failure to perform any Environmental Obligations, or otherwise resulting from any environmental investigation, evaluation, mitigation, remediation or cleanup, resulting from any

acts or omissions of any of the Lessee Indemnified Parties. Any claim for indemnification under this Section 4(h) shall be subject to the provisions and procedures set forth in Section 10.

5.    Access and Use Licenses; Utilities; Services.

(a)    Lessor hereby grants to Lessee the following non-exclusive licenses (with any portion of the Property licensed pursuant to such licenses referred to as the "Licensed Area"), each of which shall be governed by all of the terms and conditions set forth in this Lease, unless otherwise expressly set forth below, provided that each of such licenses shall be available to Lessee on a 24-hour day, 7-days per week basis during the Term hereof, except as otherwise expressly set forth below (collectively, the "License Rights"):

(i)    A license to utilize those primary access roads and associated interior roads located upon the Property which are identified by Lessor, from time to time, for the purpose of ingress and egress from the Lease Area and other portions of the Licensed Area as necessary or appropriate such that, throughout the Term, Lessee, its officers, directors, employees, members, managers, operators, contractors, agents and invitees, shall at all times have reasonable access to at least one means of ingress to and egress from the Lease Area and the Licensed Area;

(ii)    A license for access to and from the Lessee Facilities and the Lease Area across the portion of the Property designated on Exhibit A-3 hereto as the "Operating License", which shall be used solely for the purposes of assembling, installing, testing, operating, maintaining, modifying, repairing, replacing and removing the Lessee Facilities and complying with the terms of this Lease, including Section 2(e);

(iii)    A license for parking passenger vehicles in the areas designated on the Property for parking, as specifically designated and directed by Lessor, together with the right of pedestrian access to and from the Lease Area and such parking area at locations designated by Lessor;

(iv)    A license for access and unloading the Chemicals (as such term is defined in the Refined Coal Sales Agreement) (or the constituent components of the Chemicals), together with the right of pedestrian access to and from such area and the Lease Area;

(v)    A license to use the areas designated on Exhibit A-3 to locate the application hoses that carry the liquid Chemical (as that term is defined in the Refined Coal Sales Agreement) and the conveyors that carry the solid Chemicals that constitute part of the Lessee Facilities from the Lease Area to the shrouded application point(s) over Lessor's existing coal feedstock conveyors that feed Lessor's Plant, as shown on Exhibit A-3, that constitutes a part of the Lessee Facilities and a license for access thereto;

(vi)    A license to use the areas designated on Exhibit A-3 to locate the Mixer and Lessee's auxiliary equipment for applying Chemicals (as that term is defined in the Refined Coal Sales Agreement) on Lessor's conveyor system that is used to unload coal delivered by barge or rail to Lessor and the conveyor system that eventually feeds the boilers of Lessor's Plant and license for access thereto; and

9

(vii)    A license to use Lessor's existing coal yard designated on Exhibit A-3 to store Lessee's coal feedstock inventory.

(b)    Lessor and Lessee agree to use commercially reasonable efforts to cooperate in obtaining any necessary consents or approvals from non-governmental third parties, if any, that are necessary for the installation and assembly of any of the Lessee Facilities.

(c)    Unless otherwise previously terminated as herein provided, any licenses or rights-of-way granted to Lessee pursuant to this Lease shall automatically and immediately terminate upon the expiration or earlier termination of this Lease, except as provided in Section 5(a)(ii) and Section 2(e) hereof with respect to the dismantling and removal of the Lessee Facilities, and the other ancillary equipment, supplies and property of Lessee.

(d)    During the Term, Lessor shall provide to Lessee (i) electricity (480V 200 AMP Main Breaker, full load 110 AMP) to operate the Lessee Facilities, (ii) use of restrooms at Lessor's Plant (or at Lessor's option, the right and license to Lessee to bring a portable toilet to be located, replaced and otherwise serviced on the Lease Area or on a part of the Property adjacent thereto and (iii) service water for general wash down in connection with Lessee's operation of the Lessee Facilities. The metered electrical utility service costs shall be paid by Lessee in accordance with applicable tariff. Water utility service costs shall be reimbursed to Lessor by Lessee, per separate Lessor invoice.

(e)    Lessee agrees and acknowledges that Lessor must maintain full and complete operational control over the Property and Lessor's Plant in order to comply with applicable laws, regulations and orders, and Lessee therefore agrees and acknowledges that the License Rights shall be subject to unilateral amendment, modification and/or partial termination by Lessor, upon reasonable prior notice to Lessee, as deemed necessary or desirable by Lessor (in its sole and absolute discretion) in order to operate, manage and maintain the security of the Property, Lessor's Plant and Lessor's business operations thereon, and to preserve the health, safety and welfare of employees, visitors and other third parties (including, without limitation, the right to relocate all or any portion of the Licensed Area upon the Property), and that no such amendment, modification, and/or partial termination shall constitute a breach or default by Lessor so long as: (i) Lessee's ability to operate Lessee's Plant and provide or produce Product as contemplated herein is not materially restricted, diminished or decreased; or (ii) the cost to Lessee of providing or producing the Product is not materially increased, as determined by Lessee in its reasonable discretion. Lessor's rights hereunder shall include the right to relocate the Lease Area to another location upon the Property upon ninety (90) days' prior written notice to Lessee, with Lessee to relocate Lessee's Plant to the new location selected by Lessor at Lessor's sole cost and expense, provided that the new location selected by Lessor shall include a substantially similar amount of space and shall provide substantially similar access to the Coal Feedstock and associated coal feedstock conveyors serving Lessor's Plant.

10

6.    Compliance with Law; Permits; Etc.

(a)    In connection with the performance of its obligations under this Lease, each party agrees to comply in all material respects with all applicable laws, rules, regulations and ordinances.

(b)    Lessee shall provide Lessor with prompt written notice of any material claim asserted or threatened in writing against Lessee in connection with the installation, operation and maintenance of the Lessee Facilities, including any claim alleging violation by Lessee or its Affiliates of any laws, rules, regulations and ordinances pertaining to the Lessee Facilities or the Property.

(c)    Upon reasonable advance notice to Lessee, Lessor, at its own cost and expenses, shall have the unrestricted right (but not the legal duty or obligation) to conduct or have others conduct not more than once per calendar year, at Lessor's sole cost and expense, environmental, health and safety audits or other inspections from time to time in connection with the operation and maintenance of the Lessee Facilities by Lessee, provided that such audits shall not unreasonably interfere with the normal business operations of Lessee, and in connection with any such audit Lessee shall make available to Lessor for inspection, copying or abstracting its books, records and other documentation relating to the generation, use, storage or disposal of Hazardous Material on or from the Lease Area or the Licensed Area by Lessee, its officers, employees, operators, contractors or agents; *provided, further* that if, in Lessor's reasonable judgment any audit (whether an initial audit or a follow-up audit) conducted pursuant to this Section 6(c) raises material concerns that warrant a follow-up audit in the same calendar year, Lessor shall have the right to conduct such follow-up audit (at its sole cost and expense) in accordance with the provisions of this Section 6(c). To the extent that any such audit or other inspections shall reveal the violation of any law, regulation, rule or ordinance by Lessee, its officers, employees, operators, contractors or agents, Lessor shall give Lessee prompt written notice of such violation and Lessee shall diligently remedy such violation at its sole cost and expense, subject to the provisions set forth in this Lease, including the provisions set forth in Sections 4(e) through 4(h) hereof.

(d)    Each party shall, at its sole cost and expense, obtain and maintain those Permits required to perform its obligations hereunder; provided however, that Lessor shall only be responsible for the cost of obtaining and/or maintaining such Permits if Lessor would have been required to obtain and/or maintain such Permits in the absence of the transactions contemplated by the Project Agreements; and if Lessor would not have been required to obtain and/or maintain such Permits in the absence of the transactions contemplated by the Project Agreements, Lessee shall be responsible for reimbursing Lessor for the cost of obtaining and/or maintaining any such Permits. Each party shall provide to the other party copies of any Permits for which it is responsible promptly following receipt thereof.

7.    Quiet Enjoyment; Claim of Title.

(a)    Subject to the terms and conditions of this Lease (including, without limitation, Lessor's termination rights and Lessor's other rights arising under Section 5(e)), Lessor covenants and agrees that Lessee, provided it remains in compliance with its obligations

11

under this Lease, shall lawfully and quietly have, hold, occupy and enjoy the Lease Area and exercise the License Rights in accordance with the terms hereof throughout the entire term of this Lease free from any claim of any entity or person of superior title thereto without hindrance to, interference with, interruption or molestation of Lessee's use and enjoyment thereof, whether by Lessor or any of its agents, employees or independent contractors or by any entity, Person or Persons having or claiming an interest in the Property. Lessor agrees that it shall not use or permit the use of the Lease Area or construct or permit the construction of any building, structure, easement or other improvement on the Lease Area or the Licensed Area in any manner that would unreasonably interfere with the Lessee's use, enjoyment or operation of the Lessee Facilities, the Lease Area or Licensed Area.

(b)     Lessor represents and warrants to Lessee that there is a single master mortgage applicable to all properties owned by Lessor (including the Property), and that no consent or other approval from the mortgage trustee is required in order to enter into this Lease, to authorize installation of Lessee's Plant on the Property, or to grant the License Rights.

(c)     It is understood and agreed that, except as provided in this Lease, Lessee shall not at any time own or claim any right, title or interest in or to the Lease Area or the Licensed Area, nor shall the exercise of any right by Lessee under this Lease or the existence of any circumstances for any length of time give rise to any right, title or interest by Lessee in or to the Lease Area or the Licensed Area, except for the leasehold interest described herein.

(d)     Lessor represents and warrants that, other than Lessor's Permits, Lessor is not required to obtain any Permits in connection with the execution, delivery and performance by it of this Agreement or the relocation, installation, operation and maintenance by Lessee of Lessee's Plant on the Lease Area. Lessor covenants that it shall use commercially reasonable efforts to obtain Lessor's Permits, and to avoid making or requesting amendments, modifications or supplements to any of its existing Permits that would reasonably be expected to have a material adverse effect on Lessee's ability to locate, install, operate or maintain Lessee's Plant and produce refined coal as contemplated in the Refined Coal Sales Agreement.

8.     Liens.

(a)     Lessee covenants to Lessor that it will not cause, create, incur, assume, permit or suffer to exist any liens or security interests in the Lessor Plant or on the Property; provided, however, that if any contractor, subcontractor, mechanic, laborer or materialman shall nevertheless file any such lien arising out of work requested or authorized by Lessee, Lessee shall have the right to contest any such lien and shall promptly bond over any such lien in accordance with applicable law in an amount sufficient to protect the affected property against the foreclosure of any such lien. Lessee shall be required to deliver a notice to sue letter (pursuant to IC 32-28-3-10) to the lien holder within thirty (30) days following notice to Lessee of the filing of any such lien to the extent such lien has not been removed prior thereto.

(b)     Lessor covenants to Lessee that it will not cause, create, incur, assume, permit or suffer to exist any liens to attach to the Lessee Facilities; provided, however, that if any contractor, subcontractor, mechanic, laborer or materialman shall nevertheless file any such lien arising out of work requested or authorized by Lessor which attaches (or is claimed by such lien

12

holder to attach) to the Lessee Facilities, Lessor shall have the right to contest any such lien and shall promptly bond over any such lien in accordance with applicable law in an amount sufficient to protect the Lessee Facilities against the foreclosure of any such lien or to remove the Lessee Facilities from the claim of any such lien. Lessor's obligation under this provision shall be deemed satisfied if Lessor, whether prior or subsequent to the filing of foreclosure complaint, obtains from the lien holder or the applicable court documentation reasonably acceptable to Lessee confirming that property claimed under such lien or in any foreclosure proceeding does not include the Lessee Facilities.

9.   Insurance.

(a)   Each party shall secure or cause to be secured, and during the Term each party shall maintain or cause to be maintained, the insurance coverages set forth on Schedule 9(a) hereto.

(b)   The foregoing insurance to be maintained by each party shall include a requirement that the insurer provide the other party to this Lease with at least 30 days' prior written notice of any cancellation (or 10 days if due to non-payment of premiums) of such insurance; and (except with respect to the Worker's Compensation Insurance) name the other party (and in the case of Lessee, its Operator and members) as an additional insured and (ii) be primary to and not in excess of or contributory with any other insurance available to Lessor, Lessee, the Operator or any Affiliate of Lessor, or the Operator.

(c)   Promptly following the date hereof, each party shall cause its insurers or agents to provide the other party with duly executed original certificates of insurance, which shall be underwritten by insurance carriers with a minimum A.M. Best Rating of A-7 or higher and authorized to do business in the State of Indiana, and shall evidence the insurance coverages and endorsements required hereunder. Each party shall deliver to the other renewal certificates of insurance promptly after each renewal.

(d)   The insurer shall waive all rights of subrogation (i) against Lessor and its officers, directors and employees, in the case of insurance maintained by Lessee and (ii) against Lessee and its officers, directors and employees, in the case of insurance maintained by Lessor.

(e)   Failure by a party to obtain the insurance required by this Section 9 shall not be deemed to release or diminish its liability under this Agreement, including liability under the indemnity provisions of this Lease. Damages recoverable by a party shall not be limited to the amount of the required insurance coverage.

(f)   It is understood that neither party shall be in breach of its obligations hereunder if and to the extent that at any particular insurance (or any required endorsement) is unavailable to it under commercially reasonable terms for reasons other than any negligence or default by such party.

(g)   Notwithstanding the foregoing, and to the fullest extent permitted by applicable law, Lessor may (but shall not be required to) self-insure all of such obligations in accordance with Lessor's then-current program of self-insurance, and shall provide Lessee with a standard ACORD insurance certificate confirming such coverage.

13

10. Indemnity and Liability.

(a) Except as otherwise provided with respect to environmental matters as set forth in this Lease, to the fullest extent permitted by applicable law, Lessee hereby agrees to indemnify, defend, save and hold harmless Lessor and its Affiliates and their respective directors, managers, officers, employees and agents ("Lessor Indemnified Parties") from and against any and all Adverse Consequences arising out of (i) death, sickness or bodily injury of or to any natural person, or (ii) destruction or loss of or damage to any property of any Person, in each case arising from or related to negligent or willful acts or omissions of Lessee, its Affiliates, or any of their respective directors, managers, officers, employees or agents, except to the extent the same was caused by the negligent or willful act or omission of any Lessor Indemnified Party, any contractor or subcontractor of Lessor, or any of their respective directors, managers, officers, employees or agents.

(b) Except as otherwise provided with respect to the environmental matters as set forth in this Lease, including but not limited to Sections 4(g) and (h) hereof, to the fullest extent permitted by applicable law, Lessor agrees to indemnify, defend, save and hold harmless Lessee, its Affiliates and the Operator and their respective directors, managers, members, officers, employees and agents ("Lessee Indemnified Parties"), from and against any and all Adverse Consequences arising out of (i) death, sickness or bodily injury of or to any natural person, and (ii) destruction or loss of or damage to any property of any Person, in each case arising from or related to negligent or willful acts or omissions of Lessor, its Affiliates, or any of their respective directors, managers, officers, employees or agents, except to the extent the same was caused by the negligent or willful act or omission of any Lessee Indemnified Party or any of their respective directors, managers, officers, employees or agents.

(c) Lessee shall indemnify, defend, save and hold harmless the Lessor Indemnified Parties from any failure by any Lessee Indemnified Parties to comply with any applicable laws, rules, regulations or ordinances related to the use and occupancy of the Lease Area or Licensed Area, including all applicable Environmental Laws or Environmental Obligations, subject to the provisions set forth in this Lease, including the indemnification obligations of Lessee set forth in Section 4 hereof.

(d) Lessor shall indemnify, defend, save and hold harmless the Lessee Indemnified Parties from any failure by any Lessor Indemnified Parties to comply with any applicable laws, rules, regulations or ordinances related to the use and occupancy of the Property, including all applicable Environmental Laws or Environmental Obligations, subject to the provisions set forth in this Lease, including but not limited to the indemnification obligations of Lessor set forth in Section 4 hereof.

(e) Lessee shall indemnify, defend, save and hold harmless the Lessor Indemnified Parties from and against any and all Adverse Consequences as a result of any mechanic's or other lien, the enforcement thereof, or any encumbrance caused by the same, arising by or through Lessee with respect to the Lease Area, the Licensed Area or any other property of Lessor. Lessor shall indemnify, defend, save and hold harmless the Lessee Indemnified Parties from and against any and all Adverse Consequences as a result of any

14

mechanic's or other lien, the enforcement thereof, or any encumbrance caused by the same, arising by or through Lessor with respect to the Lessee Facilities or any other property of Lessee.

(f)     Lessee shall indemnify, defend, save and hold harmless the Lessor Indemnified Parties from and against any and all Adverse Consequences as a result of any breach, violation or nonperformance of any covenant, condition or agreement in this Agreement set forth and contained on the part of Lessee to be fulfilled, kept, observed or performed. Lessor shall indemnify, defend, save and hold harmless the Lessee Indemnified Parties from and against any and all Adverse Consequences as a result of any breach, violation or nonperformance of any covenant, condition or agreement in this Agreement set forth and contained on the part of Lessor to be fulfilled, kept, observed or performed.

(g)     The parties acknowledge and agree that the foregoing indemnities run to the parties only in their respective capacities under this Lease (as opposed to any or all other separate or independent contracts between the parties).

(h)     The following procedures shall apply with respect to any third-party claims, other than claims related to taxes or tax credits. In the event that any claim or demand for which Lessee or Lessor would be liable (as the case may be, an "Indemnifying Party") to any Person entitled to indemnification under this Lease (an "Indemnitee") is asserted or sought to be collected from such Indemnitee by a third party, such Indemnitee shall give written notice to the Indemnifying Party thereof promptly after the discovery by such Indemnitee of the matters giving rise to a claim for indemnification pursuant hereto; provided, however, that the failure of any Indemnitee to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 10 except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice. The Indemnifying Party shall be entitled to participate in or to assume the defense thereof, with counsel selected by the Indemnifying Party but reasonably satisfactory to the Indemnitee and, after notice from the Indemnifying Party to the Indemnitee of its election to assume the defense thereof, the Indemnifying Party shall not be liable to such Indemnitee for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof. The Indemnitee shall cooperate fully with the Indemnifying Party in connection with any negotiation or defense of any such action, proceeding or claim by the Indemnifying Party. In the event that (i) the Indemnifying Party advises an Indemnitee that it will contest a claim for indemnification hereunder or (ii) the Indemnifying Party fails, within 15 days of receipt of any indemnification notice to notify, in writing, such Indemnitee of its election to defend, settle or compromise, at its sole cost and expense, any action, proceeding or claim (or discontinues its defense at any time after it commences such defense), then the Indemnitee may, at its option, defend, settle or otherwise compromise or pay such action, proceeding or claim. In any event, unless and until the Indemnifying Party elects in writing to assume and does so assume the defense of any such claim, proceeding or action, the Indemnifying Party shall be liable for the Indemnitee's reasonable costs and expenses arising out of the defense, settlement or compromise of any such action, claim or proceeding. The Indemnifying Party shall not be liable for any settlement of any action, claim or proceeding effected without its written consent; provided, however, that the Indemnifying Party shall not unreasonably withhold its consent. Notwithstanding anything in this Section 10 to the contrary, the Indemnifying Party shall not, without the Indemnitee's prior written consent (whether or not the Indemnitee is a party), settle

15

or compromise any claim or demand or offer to settle any claim or demand, or consent to entry of judgment in respect thereof.

(i)     At any time after the making of an indemnity payment to an Indemnitee, if such Indemnitee's loss is reduced by recovery under any insurance coverage (excluding any proceeds from self-insurance or flow-through insurance policies), or under any recovery or payment by or against any other entity, the amount of such reduction, less any costs, expenses, deductibles or premiums incurred in connection therewith, must promptly be repaid by the Indemnitee to the Indemnifying Party.

(j)     For purposes of this Lease:

(i)     "Adverse Consequences" means any actions, suits, arbitrations, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages (including natural resource damages), dues, penalties, fines, costs, liabilities, obligations, liens, losses, expenses, fees, including court costs and reasonable attorneys', consultants' and experts' fees and expenses, and, with respect to any Hazardous Materials, costs of assessment, containment, removal or other remediation;

(ii)     "Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with, such Person, and any Person that has a 50 percent or more interest in another Person shall be conclusively deemed to control such Person;

(iii)     "Person" means an individual, natural person, corporation, joint venture, partnership, limited partnership, limited liability partnership, limited liability company, trust, estate, business trust, association, governmental authority or any other entity; and

(iv)     "Ton" or "ton" means two thousand (2,000) pounds avoir dupois.

(k)     **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, (A) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS LEASE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE LOSSES OR DAMAGES ARISING OUT OF THIS LEASE OR THE PERFORMANCE OR NON-PERFORMANCE OF OBLIGATIONS HEREUNDER, EXCEPT TO THE EXTENT ANY SUCH LOSS OR DAMAGE IS INCLUDED IN A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION IS OWED PURSUANT TO SECTIONS 4(g), 4(h) OR 10 OF THIS LEASE; AND (B) NOTWITHSTANDING THE PRECEDING CLAUSE (A), IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY UNDER THIS LEASE FOR LOSS OF PROFIT OR REVENUE, DAMAGES SUFFERED BY THE OTHER PARTY AS THE RESULT OF THE LOSS OF USE OF LESSEE'S PLANT OR LESSOR'S PLANT OR OTHER PRODUCTION FACILITIES, COST OF PURCHASED OR REPLACEMENT POWER, DAMAGES SUFFERED BY CUSTOMERS OF THE OTHER PARTY FOR SERVICE INTERRUPTIONS, COST OF CAPITAL, LOSS OF TAX CREDITS OR OTHER TAX BENEFITS, OR LOSS OF GOODWILL, RESULTING FROM ANY VIOLATION OF OR DEFAULT UNDER THIS LEASE OR IN ANY**

16

**MANNER FROM THE TRANSACTIONS CONTEMPLATED HEREBY, REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE IS INCLUDED IN A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION WOULD OTHERWISE BE OWED PURSUANT TO SECTIONS 4(g), 4(h) OR 10. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE, SHALL APPLY TO ALL CLAIMS, WHETHER IN CONTRACT, EQUITY, TORT OR OTHERWISE, REGARDLESS OF FAULT, NEGLIGENCE (IN WHOLE OR IN PART), STRICT LIABILITY, BREACH OF CONTRACT OR BREACH OF WARRANTY AND SHALL EXTEND TO THE MANAGERS, TRUSTEES, DIRECTORS, OFFICERS, MEMBERS, PARTNERS AND EMPLOYEES, AGENTS AND AFFILIATES OF EACH PARTY, AND THE MANAGERS, DIRECTORS, TRUSTEES, OFFICERS, EMPLOYEES AND AGENTS OF SUCH AFFILIATES.**

11.     Maintenance; Repairs and Improvements. Lessee, at its own expense, shall at all times maintain the Lessee Facilities in good order, repair and condition in all material respects. Except as otherwise permitted or contemplated in this Lease, Lessee will not make, or permit to be made, any material improvements or alterations to the Lease Area or the Licensed Area, without the prior written consent of Lessor, which consent shall not be unreasonably withheld or delayed, provided that such improvements or alterations are necessary, appropriate or convenient for the operation and maintenance of the Lessee Facilities.

12.     Condemnation.

(a)     Lessor agrees to promptly provide Lessee with any notices of condemnation received by any government authority. Subject to Lessor's rights to relocate the Lease Area and Licensed Area to permit Lessee's continued operations (in accordance with Section 5(e) of this Lease), if all of the Lease Area or any part of the Lease Area material to Lessee's operations or any material part of the Licensed Area, including all reasonable means of access to and from the Lease Area or portions of the Licensed Area on which the Lessee Facilities are located, shall be acquired, appropriated, or condemned by any authority having the right of eminent domain for any public or quasi-public use or purpose, then this Lease shall terminate within 5 Business Days of the date when all or any substantial part of the Lease Area or the Licensed Area, shall be taken and all Rent due and owing by Lessee shall be prorated to reflect the date of such termination and paid to Lessor within 5 Business Days of the date of termination of this Lease.

(b)     No award for any partial or entire taking of all or any part of the Lease Area or Licensed Area shall be apportioned, and Lessee hereby assigns to Lessor any award which may be made in such taking or condemnation; provided, nothing contained herein shall be deemed to give Lessor any interest in or require Lessee to assign to Lessor any award made to Lessee for the taking of personal property and fixtures belonging to Lessee (including the Lessee Facilities), for the interruption of or damage to Lessee's business, or for Lessee's unamortized cost of any improvements or cost of removal and Lessee shall have the right to prosecute its claim for an award based thereon against the condemning authority.

(c)     Improvements or facilities of Lessee not so acquired, appropriated or condemned shall be removed in accordance with Section 2(e) hereof.

17

13.     Successors And Assigns.  Without limitation of the provisions set forth in Section 14 hereof, the terms, covenants and conditions of this Lease shall inure to the benefit of and be binding upon the parties hereto, including their respective representatives, trustees, successors, and assigns permitted under Section 14.

14.     Transfer; Assignment.

(a)     This Lease shall not be assigned by either party without the prior written consent in each instance of the other party, except that: (i) either party may assign this Lease to an Affiliate thereof without the consent of the other party (subject to Lessor's prior approval of any designated or successor operator, as described in (ii) below); and (ii) Lessee may assign this Lease in connection with the contemporaneous sale or lease of Lessee's Plant to the Person acquiring Lessee's Plant or the lease thereof, subject to Lessor's consent (not to be unreasonably withheld, conditioned or delayed); provided, however, that Lessor shall be permitted to refuse such consent (and such refusal shall not be deemed unreasonably withheld, conditioned or delayed) if Lessor, in the exercise of its reasonable business judgment, determines that the proposed assignee (or its designated operator) is not qualified, or does not have the financial resources necessary, to operate Lessee's Plant in a manner consistent with Lessee's prior operations or Lessor's reasonable commercial expectations as to safe, efficient and prudent operations.  Lessor acknowledges and agrees that the Lessee Facilities may not be sold, transferred, assigned, mortgaged, pledged or otherwise alienated or encumbered with the fee or ground leasehold interest of the Property and Lessor shall give Lessee at least 15 days prior written notice of any transfer of the Property and shall require that any transferee acknowledge and consent to the terms of this Lease as more particularly set forth herein.  Notwithstanding anything to the contrary set forth herein, in connection with the Lessor's sale to a Person of a portion of the Property, including Lessor's Plant, the Lease Area or any land affected by a license granted to Lessee herein (as applicable, the "Affected Area"), Lessor agrees that such Person shall execute and deliver a Recognition and Non-Disturbance Agreement in form and substance reasonably acceptable to Lessee pursuant to which such purchaser recognizes and acknowledges this Lease, Lessee's rights hereunder and Lessee's use and possession of the Affected Area and agrees that such use and possession will not be disturbed as a result of the change in ownership of the Affected Area.

(b)     After any permitted assignment of this Lease, the assignor shall provide to the other party a copy of the executed instrument of assignment and, the assignor shall be released and discharged from all further duties, obligations and liabilities thereafter accruing under this Lease, *except for* (x) such duties and obligations accrued but undischarged at the time of such assignment, and (y) obligations for defense, reimbursement and indemnification to the extent such obligations relate to acts, omissions or other circumstances occurring prior to the date of any such assignment, including but not limited to the respective indemnification obligations of the parties set forth in Sections 4(g), 4(h) and 10 hereof.  In no event shall any assignor of this Lease be released from any of its duties, obligations or liabilities under this Lease to the extent relating to any period prior to such assignment without the prior written consent in each instance of the other party.

(c)     Lessee agrees to notify each member of Lessee in writing, at the address designated by each such Person of any default, act or event of default of Lessee under this Lease

18

of which Lessor has knowledge that would entitle Lessor to terminate this Lease or otherwise proceed with enforcement remedies against Lessee in each case, if such default remained uncured, and each such member shall have the same amount of time as Lessee, but at least 10 days with respect to any monetary default and at least 30 days with respect to any non-monetary default, to cure any default by Lessee under this Lease; provided that in no event shall any member of Lessee be obligated to cure any such default.

15.     Drafting Conventions; Headings.   Unless otherwise required by the context in which any term appears: (a) the singular shall include the plural and vice versa; (b) the words "include" and "including" shall be deemed to be followed by the words "without limitation"; (c) references to "Sections", "Schedules" and "Exhibits" shall be to sections, schedules and exhibits hereof; (d) the words "herein", "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection hereof; (e) references to this Agreement shall include a reference to all schedules and exhibits hereto, as the same may be amended, modified, supplemented or replaced from time to time; and (f) references in this Agreement to contracts, agreements, or other documents shall be deemed to mean those contracts, agreements or documents as the same may be modified, supplemented, or amended from time to time. Section and paragraph headings used in this Lease hereto are for reading convenience only and shall not have any other meaning, implication or purpose, legal or otherwise.

16.     Entire Agreement.   This Lease and the exhibits, schedules and other documents referenced herein and/or attached hereto and forming a part hereof (including, without limitation, the Site Services Agreement) set forth all the covenants, promises, agreements, conditions and understandings between Lessor and Lessee concerning the Lease Area and Licensed Area. This Lease supersedes, cancels and annuls all other and former agreements made between such parties with respect to the Lease Area or the Licensed Area other than the Site Services Agreement and with respect to confidentiality, other than that certain Confidentiality Agreement dated June 17, 2011, between Chem-Mod, LLC, and Duke Energy Business Services LLC, which is not hereby superseded and remains in full force and effect. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Lessor or Lessee unless reduced to writing and signed by Lessor and Lessee.

17.     Representatives.   Wherever any consent, authorization or approval of Lessor is required or permitted under this Lease, such consent, authorization or approval may be obtained only from those representatives designated by Lessor in writing to Lessee from time to time. The initial representatives designated by Lessor are Vincent E. Stroud and Steven W. Meehan, and Lessor shall at all times have a designated representative.   Wherever any consent, authorization or approval of Lessee is required or permitted under this Lease, such consent, authorization or approval may be obtained only from those representatives designated by Lessee in writing to Lessor from time to time.   The initial representatives designated by Lessee are Jeffrey K. Green and T. Barr Linton and Lessee shall at all times have a designated representative.

18.     Governing Law; Jurisdiction.   This Lease shall be interpreted, construed and enforced in accordance with the laws of the State of Indiana, without reference to its conflicts of laws rules. Subject to Section 27, the parties hereby submit to nonexclusive personal jurisdiction

in the Indiana State Courts sitting in the County of Marion and the Federal District Court for the Southern District of Indiana.

19. Partial Invalidity. The parties hereby agree to use good faith efforts to negotiate an equitable adjustment to any provisions of this Lease determined to be invalid or unenforceable with a view toward effecting the purposes of this Lease, and the validity or enforceability of the remaining provisions of this Lease shall not be affected thereby.

20. Non-Waiver of Covenants. The failure of either party to enforce any of the provisions of this Lease at any time shall in no way be construed to be a waiver of any such provisions or affect the validity or enforceability of this Lease, or any part hereof, or the right of any party thereafter to enforce each and every such provision.

21. Notices. Any notice, request, protest, consent, demand, report or statement given by one party to the other shall be in writing, and deemed duly received (a) 48 hours after it is deposited in the United States mail, by certified mail, postage prepaid, and properly addressed as shown below, (b) upon personal delivery to the addressee, (c) upon delivery by a commercial courier service requiring confirmation of receipt by the addressee, or (d) upon transmission by telefacsimile if confirmed by posting of the written original by certified mail within two business days.

        If to Lessor:

        Duke Energy Indiana, Inc.
        526 South Church Street
        Charlotte, NC 28202
        Attention: Larry Carter
        Email: larry.carter@duke-energy.com

        With a copy to:

        D. Bryan Weese
        Bingham McHale LLP
        2700 Market Tower, 10 W. Market Street
        Indianapolis, Indiana 46204-4900
        Fax: (317) 236-9907

        If to Lessee:

        Barr Linton
        Cottbus Associates, LLC
        2100 Third Avenue North, Suite 920
        Birmingham, AL 35203
        Fax: 205-731-0961

With copies to:

Leah Schaatt
Cottbus Associates, LLC
4599 East Lake Boulevard
Birmingham, AL 35217
Fax: (205) 798-7790

Marcia R. Nirenstein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Fax: (202) 393-5760

A party may change its address by notice to the other party at the address set forth above.

22.    Confidentiality and Use of Proprietary Information.    From and after the date hereof through a period of three years from the termination of this Lease, unless otherwise agreed to by the parties hereto, each party and its Affiliates shall keep, and shall ensure that its officers, directors and employees keep, confidential: (a) the commercial and monetary terms of this Lease; and (b) information constituting a "trade secret", as such term is defined under the Indiana Uniform Trade Secrets Act (IC 24-2-3-2).    The recipient of the disclosing party's confidential information shall treat such information with the same care that it uses to prevent disclosure of its own confidential information and shall use such information solely for purposes of carrying out its obligations under the Project Agreements and enforcing its rights hereunder and thereunder.    Such information may be disclosed to a party's operators, contractors, consultants and advisors only if such information is protected by confidentiality agreements with such persons.  The foregoing restriction shall not apply to any information that (i) is or hereafter becomes generally available to the public other than by reason of any default with respect to a confidentiality obligation under this Lease or other agreements among the parties or their Affiliates; (ii) was already known to the recipient as evidenced by prior written documents in its possession; (iii) is disclosed to the recipient by a third party who is not known by the recipient to be in default of any confidentiality obligation to the other party hereunder; (iv) is developed by or on behalf of the receiving party, without reliance on confidential information received hereunder; (v) is disclosed in any arbitration pursuant to Section 27 or litigation to the extent relevant to the issues being arbitrated or litigated; or (vi) is otherwise required to be disclosed in compliance with law or in the course of any judicial or administrative proceeding or regulatory examinations or process; provided, that if such disclosure is required, the disclosing party shall provide the other party with timely advance written notice of such disclosure.    Except as provided in the preceding sentence, Lessor shall not disclose the name of any member of Lessee or direct or indirect institutional investor in Lessee without such Person's prior written consent. Notwithstanding the foregoing, nothing in this provision shall prevent (x) Lessor from supplying information regarding Lessee to a potential transferee of Lessor as long as such information is protected by a confidentiality agreement with such transferee, (y) Lessee from disclosing such information to its members and to potential members, investors or financing sources and/or to potential transferees of Lessee or its members so long as such information is protected by a confidentiality agreement by which any such Person is bound or (z) Lessee from disclosing such

21

information to the IRS or any state taxing authority in connection with Lessee's private letter ruling request, tax returns or audits of such tax returns.

23.     Authority.  Lessor and Lessee represent and warrant to each other that they have full power and authority to enter into this Lease and perform their respective duties and obligations hereunder, and that they have otherwise taken all necessary or appropriate action to authorize the execution, delivery and performance of this Lease.

24.     Relationship of the Parties.  The relationship of the parties is that of independent contractors and in no way establishes an agency relationship.

25.     Survival Clause.  Sections 2(e), 2(f), 4(g) and 4(h), such provisions of Section 5(a) as may be necessary to permit Lessee to comply with its obligations under Section 2(e), Sections 10, 15 through 24, this Section 25, Section 27 and Sections 30 through 33 shall survive the termination of this Lease.

26.     Estoppel Certificate.  The parties mutually agree that at any time and from time to time upon written request of the other party, Lessor or Lessee, as the case may be, shall execute, acknowledge and deliver to the other party not later than thirty (30) days after said written request, a certificate:

            (a)     stating whether or not the Lease is in full force and effect;

            (b)     stating whether or not this Lease has been modified or amended in any respect, and identifying such modifications or amendments, if any;

            (c)     stating whether or not there are any existing defaults by the requesting party under this Lease to the knowledge of the party executing the certificate, and specifying the nature of such defaults, if any;

            (d)     confirming the term of this Lease; and

            (e)     confirming the date to which Rent has been paid (e.g., through the end of the preceding month).

27.    Arbitration.

(a)    AAA Commercial Arbitration Rules.  Any dispute, disagreement, claim, or controversy arising out of or relating to this Lease, or the breach, termination or validity thereof ("Dispute"), shall be finally settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"), except as the Rules may be modified herein.  The arbitration award shall, as between the parties and those in privity with them, be final and entitled to all of the protections and benefits of a final judgment, e.g., res judicata (claim preclusion) and collateral estoppel (issue preclusion), as to all claims, including compulsory counterclaims, that were or could have been presented to the arbitrator.  The arbitration award shall not be reviewable by or appealable to any court, except on the grounds to be found in the Federal Arbitration Action, 9 USC § 1 *et seq*.

(b)    Appointment of Arbitrator.  Within 30 days after receipt by the respondent of a copy of the arbitration demand, the parties shall decide upon an independent third party mutually acceptable to both parties (the "Arbitrator") and an alternate third party (the "Alternate") to decide disputes referable by the parties for arbitration in accordance with this Lease.  If the parties do not agree on an Arbitrator or Alternate within the period of time set forth above, then the American Arbitration Association shall be requested to select the Arbitrator and/or the Alternate on an expedited basis using a listing ranking and striking procedure with each party having a limited number of strikes.  In the event that the Arbitrator becomes unavailable to resolve the Dispute within the time period stated in this Section 27, the dispute shall be referred to the Alternate, who shall then be referred to as the Arbitrator.  Any Arbitrator or Alternate appointed by the AAA shall be an experienced arbitrator with at least 10 years' relevant legal experience.

(c)    Document Discovery.  Each party will, upon the written request of the other party, promptly provide the other with copies of documents relevant to the issues raised by any claim or counterclaim.  Any Dispute regarding discovery, or the relevance or scope thereof, shall be determined by the arbitrator, which determination shall be conclusive.  All discovery shall be completed within 45 days after the dispute is referred to the Arbitrator or the Alternate.

(d)    Reasoned Opinion Accompanying the Award.    The award shall be rendered within 30 days of the completion of the hearing on the merits, and the arbitrator shall agree to comply with this schedule before accepting appointment.  The award shall be in writing, and shall include a statement regarding the reasons for the disposition of any claim.

(e)    Jurisdiction and Venue.  The arbitration shall be held in Indianapolis, Indiana.  All procedural aspects of this agreement to arbitrate, including, but not limited to, the construction and interpretation of this agreement to arbitrate, the scope of the arbitrable issues, allegations of waiver, delay or defenses as to arbitrability, and the rules governing the conduct of the arbitration, shall be governed by and construed pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and shall be decided by the arbitrator.  Any award resulting from any dispute resolution pursuant to this Section 27 shall be enforceable and judgment on such award may be entered and enforced in any court having jurisdiction.  Each party hereto consents to the exclusive jurisdiction of, and to the laying of venue in any federal or state court located in

23

Marion County, Indiana for an action to compel arbitration, provisional relief in aid or arbitration or to maintain the status quo or prevent irreparable harm prior to the appointment of the Arbitrator or for the resolution of a dispute relating to any issues under this Section 27 and to the non-exclusive jurisdiction of, and to the laying of venue in any federal or state court located in Marion County, Indiana for an action for the enforcement of any arbitral award rendered hereunder.

(f)   Punitive and/or Consequential Damages.   The arbitrator shall have no authority to award punitive damages, consequential damages or any other damages of the type prohibited under Section 10(k) under any circumstances (whether they be exemplary, multiple, remote, or other penalty or punitive type of damages) regardless of whether such damages may be available under Indiana law, the parties hereby waiving their right, if any, to recover such damages in connection with any Dispute.

(g)   Arbitration Costs and Fees.   Each party shall bear its own costs and expenses and an equal share of the arbitrator's fees and the administrative fees of the arbitration. Notwithstanding the foregoing, upon application by the prevailing party in the arbitration, the arbitrator shall have the power to award to the prevailing party reasonable attorney's and expert's fees and expenses incurred by the prevailing party in connection with the arbitration, but only upon a determination by the arbitrator that the non-prevailing party's claims and defenses were not made in good faith.

(h)   Arbitration Provision Enforceable.   The invalidity or unenforceability of any provision of this Lease shall not affect the validity or enforceability of the parties' obligation to submit their claims to binding arbitration. Moreover, the parties' obligations under this Section 27 are enforceable even after this Lease has terminated.

(i)   Continuation of Services.   Pending final resolution of any dispute, whether or not submitted to arbitration hereunder, and regardless of the basis thereof or grounds therefor, for so long as this Lease has not been terminated, the parties shall continue to fulfill their respective obligations hereunder.

(j)   Expedited Process.   It is the intent of the parties to have any arbitration of this Agreement proceed in an expeditious manner, however, any deadline, time period, procedure or standard contained herein or in the Rules may be extended or modified by agreement of the parties and the parties agree that the failure of the arbitrators or the AAA to strictly conform to any deadline, time period, procedure or standard contained herein shall not be a basis for seeking to overturn any decision rendered by the arbitrator.

28.   Counterparts.   This Lease may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

29.   Expenses.   Each party shall bear its respective costs and expenses, including fees of advisors and brokers, that such party has incurred in connection with the negotiation of the Project Agreements and all due diligence investigations pursued in connection herewith and therewith.

24

30.     Interpretation.     Both parties and their attorneys have participated in the negotiation and drafting of this Lease. Consequently, any common law or statutory rule requiring interpretation against the interest of the drafter shall not apply.

31.     Attorneys' Fees. If either party is required to institute any action or suit in court of law to enforce any of the obligations of the other party under this Lease or an arbitral award hereunder and the party so instituting such action or suit prevails thereon, then the prevailing party shall be entitled to recover (without duplication) reasonable attorneys', consultant's and expert's fees and expenses incurred by such prevailing party in connection with such action or suit.

32.     No Third-Party Beneficiary. The terms and provisions of this Lease are intended solely for the benefit of each party and their respective successors and assigns permitted pursuant to Section 14, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person other than (with respect to the indemnities set forth in Sections 4(g), 4(h) and 10) the Persons covered by the indemnities set forth in Sections 4(g), 4(h) and 10.

33.     Remedies. No remedy herein conferred upon or reserved to Lessee or Lessor shall exclude any other remedy herein or by law provided, but each shall be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

34.     Business Days. "Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which national banking institutions in Indianapolis, Indiana are authorized by law or other governmental action to close.

**[Signatures on next page.]**

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date and year first above written.

LESSOR:

**DUKE ENERGY INDIANA, INC.,**
an Indiana corporation

By: _____
Name: _____
Title: _____

LESSEE:

**COTTBUS ASSOCIATES, LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

(1126994)

[Signature Page to Cayuga Lease Agreement]

**EXHIBIT A-1**
<u>Description of Property</u>

[Attached]

Exhibit A-1

RELEVANT PORTIONS OF PROPERTY SHOWING COAL HANDLING STRUCTURES LEADING TO BOILER ROOM OF CAYUGA STATION

See attached drawing number B-370, entitled "COAL HANDLING STRUCTURES, LOCATION PLAN AND ELEVATIONS, UNIT 1, CAYUGA STATION".

EXHIBIT A-1



**EXHIBIT A-2**
Description of Lease Area

[Attached]

Exhibit A-2

LEASE AREA

As shown on drawing from Standley Batch Systems, Inc. entitled "CERT REFINED COAL PROJECT", the land immediately under the following:

28' x 8' Control Room Trailer, M-Sorb Tank, Active Silo for S-Sorb and Receiving Silo for S-Sorb.



" EXHIBIT A-2"

* GEOGRAPHIC COORDINATES OF 39°55'23.9" NORTH AND 87°25'29.46" WEST

**EXHIBIT A-3**
<u>Description of Licensed Area</u>

[Attached]

Exhibit A-3

OPERATING LICENSE

Those portions of the Property generally shown on attached drawing number B-370, entitled "COAL HANDLING STRUCTURES, LOCATION PLAN AND ELEVATIONS, UNIT 1, CAYUGA STATION"; provided, however, Lessor has the sole right to designate the exact locations of the Operating Licenses set forth in Section 5 of the Lease.

EXHIBIT A-3



General Operating License Area

**Schedule 4(e)(i)**
Permitted Hazardous Materials

None.

**Schedule 9(a)**

## REQUIRED INSURANCE COVERAGES

a.      Worker's Compensation and Employer's Liability Insurance:      Workers compensation insurance shall be as required by applicable state law.  Employer's liability insurance shall have limits of two million dollars ($2,000,000) for each accident, two million dollars ($2,000,000) for bodily injury by disease, and two million dollars ($2,000,000) for bodily injury by disease for each employee.

b.      Commercial General Liability:  Commercial general liability insurance covering personal injury and property damage to third parties.  The coverage shall be provided either in a single policy or through a combination of policies.  Such policy or combination of policies shall:

1.      Have reasonable deductibles and a combined limit of no less than ten million dollars ($10,000,000) per occurrence and in the aggregate where applicable; and

2.      Shall include blanket contractual liability coverage, products-completed operations liability, broad form property damage coverage, cross liability for additional insureds, independent contractor coverage and no exclusions for XCU hazards.

c.      Automobile Liability Insurance:     Automobile insurance against claims for personal injury and property damage covering all owned, leased, non-owned and hired motor vehicles, with a two million dollars ($2,000,000) minimum limit per occurrence for combined bodily injury and property damage.

d.      Endorsements:  All policies of insurance required by Section 9(a) shall provide for waivers of subrogation in favor of Lessor as to Lessee's insurance and in favor of Lessee as to Lessor's insurance.

e.      Sudden and Accidental Pollution Insurance.  Pollution insurance against costs incurred for clean-up of accidental spills with a limit of two million dollars ($2,000,000) each occurrence.  Lessor and Lessee will be named on the policy as Insureds.

# VERIFICATION

I hereby verify under the penalties of perjury that the foregoing representations are true to the best of my knowledge, information and belief.

Signed: _Steven W. Meehan_          Dated: ___9-28-11___
        Steven W. Meehan