IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS CORP.   )
and MES INC.,   )
  )
      Plaintiffs,   )
  )
      v.   )   C.A. No. 19-1334 (RGA) (CJB)
  )
VISTRA ENERGY CORP., *et al.*,   )
  )
      Defendants.   )

## OPENING BRIEF IN SUPPORT OF MOVING REFINED COAL DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

<div style="text-align:right">

MORRIS, NICHOLS, ARSHT &TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

*Attorneys for Moving Refined Coal
Defendants*[1]

</div>

OF COUNSEL:

Richard W. Mark
Joseph Evall
Paul J. Kremer
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

August 6, 2020

---

[1] The "Moving Refined Coal Defendants," or "Movants," are Arthur J. Gallagher & Co., Gallagher Clean Energy, LLC, AJG Coal, LLC, DTE REF Holdings, LLC, DTE REF Holdings II LLC, Chem-Mod LLC, AJG Iowa Refined Coal LLC, Joppa Refined Coal LLC, Thomas Hill Refined Coal, LLC (sued herein as "Thomas Hill Refined Coal LLC"), Wagner Coaltech LLC, Walter Scott Refined Coal LLC, Louisa Refined Coal, LLC, Belle River Fuels Company, LLC, Arbor Fuels Company LLC, and Portage Fuels Company, LLC.

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDING ........ 1

SUMMARY OF ARGUMENT ........ 1

STATEMENT OF FACTS ........ 2

I. The Patents-in-Suit ........ 2

II. The Allegations Against the Moving Refined Coal Defendants ........ 2

A. The Infringement Claims ........ 2

B. Internal Revenue Code Section 45 ........ 4

III. Procedural History ........ 4

LEGAL STANDARD ........ 5

ARGUMENT ........ 6

I. The FAC Fails to Put Any One of the Fifteen Movants on Notice of the Basis for the Claims Against It. ........ 6

II. The Claims for Induced Infringement Should Be Dismissed. ........ 7

III. The Claims for Contributory Infringement Should Be Dismissed. ........ 12

IV. The Claims for Direct Infringement Should Be Dismissed. ........ 15

A. The Joint Enterprise Claims Fail as a Matter of Law. ........ 15

**1.** The Allegations of Joint Enterprise Fail. ........ 16

**2.** The Alleged Purpose of the Putative Joint Enterprises Does Not Involve the Activated Carbon Step. ........ 18

B. Testing Refined Coal Does Not Require Use of Activated Carbon ........ 19

V. The Claims for Willful Infringement Should Be Dismissed. ........ 20

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
 797 F.3d 1020 (Fed. Cir. 2015) (*en banc*) ....................................................................16, 17

*CBA Envtl. Servs., Inc. v. Toll Bros. Inc.*,
 403 F. Supp. 3d 403 (D.N.J. 2019) ............................................................................18

*Ericsson, Inc. v. D-Link Sys., Inc.*,
 773 F.3d 1201 (Fed. Cir. 2014)......................................................................................9

*Halo Elecs., Inc. v. Pulse Elecs., Inc., et al.*,
 136 S. Ct. 1923 (2016) (Breyer, J., concurring) ...............................................................20

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*,
 940 F.3d 680 (Fed. Cir. 2019)......................................................................................10

*In re Bill of Lading Transmission and Processing Sys. Patent Litig.*,
 681 F.3d 1323 (Fed. Cir. 2012)...............................................................................13, 14

*IOENGINE, LLC v. PayPal Holdings, Inc.*,
 C.A. No. 18-452-WCB, 2019 WL 330515 (D. Del. Jan. 25, 2019) .........................................5

*Mayne Pharma Int'l PTY Ltd. v. Merck & Co., Inc.*,
 C.A. No. 15–438–LPS–CJB, 2015 WL 7833206 (D. Del. Dec. 3, 2015) ................................5

*Nalco Co. v. Chem-Mod, LLC*,
 C.A. No. 14-cv-2510, 2015 WL 6122811 (N.D. Ill. Oct. 15, 2015)....................................4, 15

*Neology, Inc. v. Kapsch Trafficcom IVHS, Inc.*,
 C.A. No. 13-2052-LPS, 2014 WL 4675316 (D. Del. Sept. 19, 2014).........................12, 13, 16

*RBATHTDSR, LLC v. Project 64 LLC*,
 C.A. No. 19-1280-RGA, 2020 WL 2748027 (D. Del. May 27, 2020) ...................................16

*St. Joseph Hosp. v. Wolff*,
 94 S.W.3d 513 (Tex. 2002)..........................................................................................17

*T-Jat Sys. 2006 Ltd. v. Expedia, Inc.*,
 C.A. No. 16-581-RGA-MPT, 2017 WL 896988 (D. Del. Mar. 7, 2017) .................................5

*Vita-Mix Corp. v. Basic Holding, Inc.*,
 581 F.3d 1317 (Fed. Cir. 2009).....................................................................................9

**Rules and Statutes**

26 U.S.C. § 45(c)(7)(B) ...........................................................................................................4

26 U.S.C. § 45(e)(8)(A)(ii) ......................................................................................................4

American Jobs Creation Act of 2004 .......................................................................................4

Fed. R. Civ. P. 12(b)(6) ........................................................................................................1, 5

Internal Revenue Code § 45 ............................................................................................. *passim*

## NATURE AND STAGE OF THE PROCEEDING

On June 18, 2020, Judge Burke issued a Report & Recommendation ("R&R") (D.I.110) recommending, *inter alia*, that all claims against the Moving Refined Coal Defendants and the CERT Defendants be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), but that plaintiffs Midwest Energy Emissions Corp. and MES Inc. be given leave to file an amended complaint.  Plaintiffs did not object to the R&R, which Judge Andrews adopted on July 15.  (D.I. 127.)

Plaintiffs' First Amended Complaint (D.I. 130) ("FAC"), filed on July 15, 2020, accuses 43 named defendants, and an unspecified number of unnamed defendants, of directly and indirectly infringing claims of five "Patents-in-Suit."[2]  Movants submit this brief in support of their motion, pursuant to Rule 12(b)(6), to dismiss all claims against them.[3]

## SUMMARY OF ARGUMENT

The FAC fails to state a claim against any Movant.  Most factual allegations are impermissibly directed to all Movants as a group, without specifying acts that any Movant undertook to actively encourage infringement of any patent, and without pleading that any Movant had the specific knowledge of the patents, or of direct infringement, necessary for inducement or contributory infringement.  The inducement claims fail for the additional reasons that there are no factual allegations that any acts by Movants were directed to the Activated Carbon Step required by the Patents-in-Suit, and no allegations that lead to a plausible inference that the Movants' purported acts directed to the Bromine Step knowingly or intentionally induced performance of the Activated Carbon Step, even if Movants' goal was to secure Section 45 Tax Credits.

---

[2]  The five Patents-in-Suit are:  (i) the two patents that were the subject of the original Complaint (D.I. 1), U.S. Patent Nos. 10,343,114 (the "'114 Patent") and 8,168,147 (the "'147 Patent") (together, the "Original Patents-in-Suit"), and (ii) three additional patents (U.S. Patent Nos. 10,589,225 (the "'225 patent"), 10,596,517 (the "'517 patent"), and 10,668,430 (the "'430 patent") (together, the "New Patents-in-Suit").

[3]  Movants also join co-defendants in their argument that Plaintiff MES Inc. has no standing.

The contributory infringement claims fail for the additional reasons that the FAC does not plausibly plead that Refined Coal, even "as sold and delivered," has no substantial non-infringing use.  Indeed, the FAC pleads such uses.  For both induced and contributory infringement, there is no plausible pleading of any individual Movant's knowledge or specific intent—which also dooms the willfulness claims.

The FAC does not plead any element of a joint enterprise, or that any putative joint enterprise performs the Activated Carbon Step.  The "non-joint" direct infringement claims assert that Movants infringed through testing, but pleads no facts plausibly alleging that in connection with such testing, any individual Movant performed the Activated Carbon Step.

<div align="center">

**STATEMENT OF FACTS**

</div>

Relevant facts are set forth in Movants' brief in support of their motion to dismiss the original Complaint ("Complaint") (D.I. 56), which are incorporated herein by reference, the R&R, and additional allegations in the FAC.

## I.      The Patents-in-Suit

The two Original Patents-in-Suit "relate to methods for reducing mercury emissions from coal-fired power plants by combining" two distinct steps:  a "Bromine Step," which requires the use of bromine-enhanced coal, and an "Activated Carbon Step," which requires adding a sorbent such as Activated Carbon to the flue gas formed from combustion of the coal.  (*See* D.I. 110 at 3.)  Each asserted claim of the New Patents-in-Suit is alleged to require the same two distinct steps.  (*See, e.g.,* D.I. 130 ¶¶ 255, 289, 318, 347, 380.)

## II.     The Allegations Against the Moving Refined Coal Defendants

### A.      The Infringement Claims

The original induced and contributory infringement claims against the Movants were dismissed because, *inter alia*, there were no allegations that tied the Movants' acts, knowledge, or

<div align="center">

2

</div>

intent to the use of activated carbon at the coal-fired power plants.  (D.I. 110 at 15-20.)  The FAC asserts the same legal theories of induced and contributory infringement against the "AJG, DTE, CERT, Chem-Mod, and the RC Defendants"—a block of 24 defendants comprising the 15 Movants and the 9 CERT defendants—as the Complaint.  As explained below, the FAC still lacks *factual* allegations necessary to animate those legal theories.

The FAC also renews the theory of joint infringement that the R&R rejected (D.I. 110 at 20-22)—*i.e.,* that such Defendants directly infringe through an alleged web of joint enterprises.  In the FAC, these alleged joint enterprises include at least the following groups[4]:

- some number of joint enterprises comprising "AJG, Chem-Mod, their associated RC Defendants, and the operators of coal-fired power plants" (D.I. 130 ¶ 213);
- some number of joint enterprises comprising "AJG, Chem-Mod, and their associated RC Defendants . . .and each coal-fired power plant . . to which they provide refined coal" (*Id.* ¶ 262);
- some number of joint enterprises comprising "DTE, Chem-Mod, their associated RC Defendants, and the operators of coal-fired power plants" (*Id.* ¶ 216);
- some number of joint enterprises comprising "DTE, Chem-Mod, and their associated RC Defendants . . .and each coal-fired power plant . . to which they provide refined coal" (*Id.* ¶ 263);
- some number of joint enterprises comprising "CERT, Chem-Mod, their associated RC Defendants, and the operators of coal-fired power plants" (*Id.* ¶ 219); and
- some number of joint enterprises comprising "CERT, Chem-Mod, and their associated RC Defendants . . .and each coal-fired power plant . . to which they provide refined coal" (*Id.* ¶ 264).

The FAC also pleads, on information and belief, that the Movants and CERT Defendants (together, "Refined Coal Defendants") might directly infringe if they participate in certain certification testing for compliance with Section 45 tax credit requirements "by performing pilot scale testing . . . or by performing testing at a particular coal-fired power plant." (D.I. 130 ¶¶ 86, 88.) Plaintiffs plead that in preparing refined coal for testing at a specific power plant, the Movants "will

---

[4]  The FAC pleads that AJG is three separate Named Defendants; DTE is two; CERT is nine; and the FAC names nine "RC Defendants"–a category that may or may not include additional "John Doe LLCs."  (D.I. 130 at 2.)

be aware of a plant's use of activated carbon injection," and "can" use such knowledge for purposes of compliance testing.  *Id.*

Finally, as in the Complaint, the FAC pleads that infringement is willful.

### B.    Internal Revenue Code Section 45

More so than the Complaint, the FAC implicates the legal requirements for "Section 45" tax credits.  The American Jobs Creation Act of 2004, partially codified at 26 U.S.C. § 45, created tax incentives for the production of "refined coal."  The Act has since been amended and continued.  For purposes of this motion, the following legal principles regarding Section 45 tax credits—all of which have applied for at least the past decade, and at all times relevant to the FAC—are relevant:

- Section 45 Tax Credits are available to operators of certain facilities that make "Refined Coal" and sell such Refined Coal to an unrelated person, with the expectation that the Refined Coal would then be burned to produce steam.  26 U.S.C. § 45(e)(8)(A)(ii). Section 45 Tax Credits are not available for the purchase of Refined Coal, or for the burning of Refined Coal.

- "Refined Coal" is coal that has been modified so as to produce a "qualified emission reduction," defined as 20 percent lower emissions of nitrogen oxides, ***and*** 40 percent lower emissions of ***either*** sulfur oxides ***or*** mercury when combusted "as compared to the emissions when burning the [unrefined] feedstock coal."  26 U.S.C. § 45(c)(7)(B).

- Neither the use of Refined Coal, nor eligibility for Section 45 Tax Credits, requires the use of activated carbon.  *See, e.g., Nalco Co. v. Chem-Mod, LLC*, No. 14-cv-2510, 2015 WL 6122811, at *2 (N.D. Ill. Oct. 15, 2015) ("[d]efendants are not required to . . . practice any . . . specific process in order to qualify for Section 45 tax credits.").

The FAC alleges that "[i]n order to obtain the benefits of Section 45 Tax Credits," the Movants must demonstrate a "qualified emission reduction as defined in IRC § 45.  (D.I. 130 ¶ 84.)

### III.    Procedural History

The R&R summarizes the procedural history of the case through June 18, 2020.  (D.I. 110 at 5.)  On July 15, 2020, Judge Andrews adopted the R&R (D.I. 127), whereupon Plaintiffs filed the FAC (D.I. 130).  The Court has since entered a Second Amended Case Schedule (D.I. 140), a stipulated briefing schedule for this motion (D.I. 147), a Revised Protective Order (D.I. 161), and an

ESI Order (Ordering D.I. 156, July 30, 2020).

The Movants and CERT moved for a stay of proceedings against them and related interim relief.  (D.I. 119.)  By Oral Order entered July 31, 2020, the Court granted the motion, staying the case against Movants and CERT "until the Court determines that Plaintiffs have stated a viable claim for relief against those Defendants."  (D.I. 166.)

## LEGAL STANDARD

The legal standards governing Rule 12(b)(6) motions, claims for induced and contributory infringement, claims for willful infringement, and claims for joint direct infringement are set forth in Movants' opening brief in support of their motion to dismiss the Complaint (D.I. 56 at 9-10), and in the R&R (D.I. 110 at 5), and are adopted herein.

This Court has articulated how multiple-defendant cases must be pleaded.  In alleging patent infringement, plaintiffs may not simply direct allegations against a mass of multiple defendants without identifying how each defendant has infringed.  *See T-Jat Sys. 2006 Ltd. v. Expedia, Inc*., No. 16-581-RGA-MPT, 2017 WL 896988, at *7 (D. Del. Mar. 7, 2017) ("plaintiffs cannot combine allegations against multiple defendants." (*citing*, *e.g.*, *M2M Sols. LLC v. Telit Commc'ns PLC*, No. 14–1103–RGA, 2015 WL 4640400, at *3 (D. Del. Aug. 5, 2015) (direct infringement claim improperly "lump[ed] two defendants together"))).

The counts of a complaint may collect infringement allegations against multiple defendants, but only by incorporating factual assertions that identify each individual defendant's purportedly infringing acts.  *See IOENGINE, LLC v. PayPal Holdings, Inc.*, No. 18-452-WCB, 2019 WL 330515, at *11 (D. Del. Jan. 25, 2019); *Mayne Pharma Int'l PTY Ltd. v. Merck & Co., Inc.*, No. 15–438–LPS–CJB, 2015 WL 7833206, at *2-3 (D. Del. Dec. 3, 2015) (allowing section of the complaint that "lump[ed] together its allegations against three Defendants" because it "incorporate[d]" allegations particularized by defendant).

5

**ARGUMENT**

The R&R identified multiple specific deficiencies in the initial Complaint that warranted the dismissal of all claims against Movants.  Despite that guidance, the FAC has the same gaps in factual allegations that doomed its predecessor.  This deficient repleading makes clear that Plaintiffs have no claim against Movants, and the Court should dismiss the FAC with prejudice.

**I.     The FAC Fails to Put Any One of the Fifteen Movants on Notice of the Basis for the Claims Against It.**

Although twice as long as the Complaint, the FAC fails to put any one of the 15 Movants on notice of how it purportedly infringes.  Instead, in an effort to fill the voids that riddled its initial Complaint, the FAC indiscriminately lumps together more than 24 refined coal defendants (*i.e.*, the 15 Movants, the 9 CERT defendants, and the unspecified number of "John Doe LLCs" swept into the definition of "RC Defendants" (D.I. 130 at 2)), defines these 24 defendants as "AJG, DTE, CERT, Chem-Mod and the RC Defendants," and lodges undifferentiated and nonspecific allegations citing that same group no fewer than 75 times, and referring to that group (or to undifferentiated subsets of it) as "these Defendants" another 21 times.  The FAC uses these unstructured lists to suggest that defendants participate in dozens or even hundreds of unspecified joint enterprises, and fabricate direct infringement counts without specifying what each defendant purportedly does.  (*See id.* ¶¶ 262-266, 296-300, 325-329, 354-358, 387-391.)

Likewise, the indirect infringement counts of the FAC assert generically that Movants provide "coal with added BR2, HBr, a bromide compound, or a combination thereof to a coal-fired power plant with an activated carbon injection system," with knowledge or willful blindness "that the coal-fired power plant will perform the step of injecting sorbent comprising activated carbon," and again without specifying what each defendant is purported to have done. (D.I. 130 ¶¶ 255-256,

289-290, 318-319, 347-348, 380-381.)[5]  There are simply no allegations that lead to the plausible inference that any specific Movant had the knowledge and intent required for claims of indirect infringement.  This Court requires far more, and the Court should dismiss Counts One through Five of the FAC as to the Fifteen Movants.

## II.    The Claims for Induced Infringement Should Be Dismissed.

The Court dismissed Plaintiffs' original claim for induced infringement because there was no allegation that the Movants induce performance of the Activated Carbon Step at any power plant, and the Complaint required an unsupportable "inferential leap" to connect alleged activities directed to the Bromine Step with performance of the Activated Carbon Step.  (D.I. 110 at 14.)  Plaintiffs "point[ed] to the Complaint's allegation that [they] 'tailor' the amount of bromide added to the coal 'for the specific needs of the power plant,'" arguing that such "tailoring" tied bromine-directed activities to the "Activated Carbon Step."  (*Id.*)  But that argument was "not sufficient," as the Complaint even lacked allegations "for example, what such 'tailor[ing]' means or what it involves." (*Id.*)  The Court concluded that allegations that Defendants "tailor" the amount of bromide does not support the necessary conclusion that such Defendants "must necessarily know *and intend* that the coal plants will go on to perform the Activated Carbon Step," with both knowledge and intent required for inducement.  (*Id.* (emphasis added).)

---

[5]  The allegations incorporated by reference into the Counts also lump together the 24 defendants comprising Movants and CERT.  (*See, e.g.*, D.I. 130 ¶ 212 ("directly and in concert with their subsidiaries . . .[defendants] have engaged in a pattern of conduct intended to induce and/or contribute to the infringement of others, including the Coal Plant Defendants and the operators of coal-fired power plants connected to an Accused RC Facility.").)  The activities that purportedly constitute this "pattern of conduct" are not attributed to any particular Defendant.  (*See id.* ¶ 212 ("forming" companies; "providing . . . chemicals"; etc.).)  Plaintiffs subsequently allege, again without specificity as to any particular Defendant, that the Fifteen Movants "induced and/or contributed to infringement at Vistra and Talen Accused Coal Plants and coal plants associated with Accused RC Facilities, and thus those parties are jointly, severally, and/or in the alternative liable with respect to those plants."  (*Id.*)

Still unable to plead acts directed to the Activated Carbon Step itself, Plaintiffs instead try to repair the three inducement theories from their original Complaint—tailoring, testing, and enhancing.  But the FAC's allegations fail to connect activities directed to the Bromine Step to inducing performance of the Activated Carbon Step for the same reason as those rejected in the R&R:  the allegations do not support the conclusion that Defendants "must necessarily know and intend that the coal plants will go on to perform the Activated Carbon Step." (D.I. 110 at 14.)

*First*, Plaintiffs double down on their "tailoring" theory.  The FAC now alleges that Movants "tailor" refined coal so that it will not "interfere with [the refined coal provider's] ability to provide Section 45 certification," (D.I. 130 ¶ 103) and must therefore "intend for the plant to ***continue to operate that system*** by injecting sorbent compromising activated carbon so that these Defendants ***may continue to receive the benefits of Section 45 tax credits***," (D.I. 130 ¶ 106 (emphasis added); *id.* ¶¶ 91–92, 102–104 (discussing tailoring or modification of refined coal).)  The allegation is not only impermissibly vague, it is a *non sequitur*—and therefore implausible.  A coal-fired power plant only needs to continue to operate an activated carbon system if the certification for refined coal tax credits is obtained using the "post-emissions control" method, which is one of several different certification methods permitted under Section 45.  The FAC does not plead that any Refined Coal Defendant certified eligibility using the "post-emissions control" method, or plead any acts that any such Defendant took to actively induce a power plant using Refined Coal to continue to operate an activated carbon system.

The FAC alleges that (i) Movants and their customers "keep each other apprised of the bromine, bromide, and activated carbon in use to ensure that they are able to comply with regulatory requirements," and (ii) "plant personnel have requested [] that the bromine concentration in the refined coal be altered during testing and evaluation of alternative carbon suppliers,"  (D.I. 130

¶ 103) so (iii) "the [Refined Coal] Defendants must know and intend that the coal plants will go on to perform the step of providing sorbent comprising activated carbon." (D.I. 130 ¶ 104). Even if predicates (i) and (ii) were true and relevant to the theory (they are neither), the FAC's conclusion (iii) as to what Movants "must know and intend" does not follow. The strongest inference that allegations (i) and (ii) could support would be that a Movant may be on notice that a plant *could* use activated carbon as part of a mercury control system. But "mere knowledge of possible infringement" cannot support an indirect infringement claim as a matter of law. *Vita-Mix Corp. v. Basic Holding, Inc.,* 581 F.3d 1317, 1328 (Fed. Cir. 2009) (cited in D.I. 110 at 6). Like the Complaint, the FAC does not allege that Movants do anything that actively encourages or promotes, or even inevitably leads to, the use of activated carbon in combination with refined coal. (*See* D.I. 56 (RC Defs. MTD) at 11–12); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014) (inducement claim requires active inducement of each step in a multi-step patent claim).

*Second*, just like the Complaint, the FAC advances theories of inducement based on "[t]esting the performance of the RC Facilities for regulatory reasons and to obtain Section 45 Tax Credits" or "[c]onditioning participation in the Section 45 Tax Credits Program on use of Chem-Mod chemicals at the Accused Refined Coal Facilities." (D.I. 1 ¶¶ 158 (g), (k), (l); D.I. 130 ¶¶ 84–89, 265–267, 299–301 (discussing certification testing under Section 45).) The Court rejected the theory that such allegations support an inference that any of the Movants knew and intended that activated carbon be used. The new allegations do not overcome the Complaint's failure to plead the link that when the alleged inducer "did the act that caused direct infringement to occur, the induce[r] actually knew that that direct infringement was happening—and specifically intended that it happen." (D.I. 110 at 14.)

For example, the FAC alleges that by performing Section 45 certification tests on-site at a

power plant, "the RC Defendants . . . **must be aware** of the other mercury control equipment at the plant," including activated carbon injection. (D.I. 130 ¶ 87 (emphasis added), *see id.* ¶¶ 88–92.)  As with the Complaint, the FAC requires an impermissible "inferential leap" from mere awareness to specific intent to infringe.   (D.I. 110 at 14.)   Here, the leap would be from a Refined Coal Defendant's mere awareness that a power plant had certain mercury control equipment to the inference that the Refined Coal Defendant intended to use the "post-emission control" method of certification for Refined Coal at that power plant.  *See HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 702 (Fed. Cir. 2019) (inducement requires more than "knowing of the possibility of infringement"; there must be "specific intent and action to induce infringement").

The FAC also alleges that because activated carbon injection is but one type of "mercury control equipment" installed at some power plants, Section 45 compliance tests that "simulate[] the plant's equipment" must necessarily be affected by emissions reductions attributable to activated carbon and other mercury control devices.  (*See* D.I. 130 ¶¶ 87–88; *see also id.* ¶ 91 ("if the plant were to unilaterally reduce its activated carbon injection rate . . . this could hinder . . . the certification process for Section 45 tax credits); ¶ 92 ("On information and belief . . . the RC Defendants discuss with owners and operators of coal-fired power plants . . . the effect that the sorbent comprising activated carbon would have on the test results. . . .").)  These hypothetical, conditional allegations fail to plead active inducement of the Activated Carbon Step because the FAC does not plead that compliance testing was conducted using the "post-emission control method" instead of other methods.  Such other methods include measuring mercury emissions "upstream of"—that is, before the use of—"any . . . Hg [mercury] control device (such as activated carbon injection)."  *See supra* at 4; IRS Notice 2010-54, § 6.03(1)(a)(vi).

Again focusing on Section 45 tax credits, the FAC spotlights its misunderstanding of the law

10

by alleging that

> if these Defendants attempted to perform a certification test by merely combusting refined coal and measuring the amount of emitted mercury leaving the combustion chamber (i.e., disregarding the plant's activated carbon injection and other mercury control equipment), they would be unable to demonstrate the required reduction in mercury.   (D.I. 130 ¶ 87.)

But as explained above, there are many ways to certify Refined Coal for tax credit eligibility—including measuring before emissions control devices, and thereby disregarding the plant's activated carbon injection and other mercury control equipment.  *See supra* at 4.[6]

**Third**, the FAC rehashes the Complaint's theory that the Movants induce the Activated Carbon Step because the use of bromine purportedly augments the performance of activated carbon. (*Compare* D.I. 130 ¶ 93 ("bromine and/or bromide enhances the performance of [] activated carbon . . . result[ing] in a reduced need for emissions controls") *with* D.I. 82 (MTD Opp. Br.), at 5 ("Performance of the Bromine Step causes a chemical reaction that boosts the performance of the Carbon Step making it much easier to capture mercury using conventional pollution control equipment."); *see also* D.I. 130 ¶ 96 (use of bromine could "reduce the quantity of activated carbon required for mercury capture and preserve the plant's ability to sell fly ash.").)  Once again, there is no allegation that Movants know or intend that activated carbon be used.

The FAC also alleges that Movants induced the Activated Carbon Step in one instance by entering into a contract that has an exhibit referring to a possible financial benefit flowing from reduced use of activated carbon.  (D.I. 130 ¶ 95; *see* D.I. 130-6.)  In opposing Movants' stay motion, Plaintiffs told the Court that this 2009 contract (now expired) "specifically obligates the coal plant to use the [refined] coal only for combustion at the plant using activated carbon," and urged the Court to infer "that the other refined coal companies . . . would sign similar contracts."  (D.I. 125 at 3.)

---

[6]   Section 45 does not even require testing to show a reduction in mercury, but a reduction in mercury *or* sulfur oxides.

The contract contains no such provision.  As the FAC alleges, in more restrained terms, the contract at best suggests that two of the Movants "are aware of activated carbon use at coal-fired power plants to which they supply refined coal."  (D.I. 130 ¶ 95.)  This suggested "aware[ness]" of the Activated Carbon Step is no different from what the Complaint presented.  The FAC allegations do not come close to the actual standard for inducement, which requires that the Movants "actually knew that that direct infringement was happening—and specifically intended that it happen."  (D.I. 110 at 14.)

The FAC does not allege that Movants induce the Activated Carbon Step, including by acts directed to the Bromine Step.  And rather than plead facts that individual Movants possessed the requisite knowledge and intent, the FAC impermissibly lodges conclusory allegations against all of them together.[7] *See Neology, Inc. v. Kapsch Trafficcom IVHS, Inc*., No. 13-2052-LPS, 2014 WL 4675316, at *7 (D. Del. Sept. 19, 2014) ("[t]reating these [d]efendants as one big group for purposes of articulating how each has encouraged the induced infringement at issue says nothing plausible as to what any particular one of them might have done.").  The claims for inducement should be dismissed, with prejudice.

### III.    The Claims for Contributory Infringement Should Be Dismissed.

To state a claim that Movants are liable for contributory infringement, the FAC must plausibly plead that the Movants sell a product, and that such product has no substantial non-

---

[7]    Working in the same industry or going to the same conference as an inventor, or having a close relationship with an inventor, does not provide the basis for an inference of knowledge. (D.I. 110 at 15-17.)  Accordingly, Plaintiffs' allegations of industry participation by AJG or Chem-Mod (*e.g.*, D.I. 130 ¶¶ 188-195) are insufficient to support an inference that even those two defendants had the knowledge required for indirect and willful infringement.  Moreover, if such allegations do not support an inference regarding those two Movants, they are certainly inadequate to plead plausibly that the other Movants had such knowledge.  The CERT Defendants' brief discusses this issue in some detail.  Movants adopt the CERT Defendants' arguments relating to the FAC's failure to plead the knowledge and intent required for induced, contributory, and willful infringement.

infringing use.  The FAC falls short.

*First*, the FAC does not allege what exactly the Movants sell, or to whom, or which Movants purportedly refine coal.  The claim fails for these reasons alone.

*Second*, as in the original claim for contributory infringement, the FAC asserts that the allegedly "tailored" refined coal that certain Movants sell to power plants must be used in an infringing manner.  (D.I. 1 ¶ 196; *see* D.I. 56 at 13; D.I. 130 ¶ 107.)  The Court rejected this claim the first time around, because the Complaint "does not adequately plead that when these Defendants deposit that [tailored] coal onto the conveyance, they know that this coal has no substantial non-infringing use (i.e., that it cannot reasonably be used for purposes other than to be injected with activated carbon)."  (D.I. 110 at 19–20.)  As the Court recognized, "the [substantial non-infringing use] inquiry focuses on whether the accused products can be used for purposes *other than* infringement."  (*Id*. at 18 (citing *In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012) (emphasis in original)).)

To fill this void, Plaintiffs now suggest that refined coal must be tailored so that it will not "interfere with [the refined coal provider's] ability to provide Section 45 certification," (D.I. 130 ¶ 103) and that by dint of ***this*** tailoring, Movants must "intend for the plant to continue to operate that system by injecting sorbent comprising activated carbon so that these Defendants may continue to receive the benefits of Section 45 tax credits," (D.I. 130 ¶ 106).  But Section 45 compliance testing is not limited to the "post-emission control" method, and does not require the use of activated carbon. The suggestion that Movants must intend for the refined coal to be used with activated carbon (i.e., in a purportedly infringing manner) in order to reap Section 45 Credits is simply not plausibly pleaded.

Plaintiffs offer a second theory, too.  The FAC alleges that because the Movants must sell

13

refined coal with "the reasonable purpose of producing steam" and for use at a particular plant, the refined coal they sell must have no use other than to be burned in an infringing manner (*viz.*, at a power plant that uses activated carbon post-combustion). (D.I. 130 ¶ 108.) That allegation ignores that activated carbon injection may be turned off, resulting in the combustion of refined coal without activated carbon injection—a non-infringing use. (D.I. 96 at 7.) Plaintiffs cannot dispute that their own patent's specification shows that the Bromine Step can be performed independently of the Activated Carbon Step (D.I. 130-1, Ex. A at 2:60–3:8 (the claimed invention of the '114 Patent may be practiced with "non-carbon" sorbents)*,* or that other patents teach the use of refined coal without activated carbon (*see* D.I. 86 at 8 (referring to a patent that teaches the Bromine Step without mention of activated carbon)). And while Plaintiffs continually state that power plants may "unilaterally reduce" their use of activated carbon (D.I. 130 ¶ 91), they avoid the logical inference: power plants have the ability to eliminate activated carbon use outright, or to use it intermittently. Plaintiffs do not, and cannot, allege that power plants can *only* perform the Bromine Step in conjunction with the Activated Carbon Step, as the law of contributory infringement requires. *See Bill of Lading*, 681 F.3d at 1338. And because any combustion without activated carbon is a non-infringing use, Plaintiffs' inability[8] to plead that refined coal is sold with the knowledge and intent that the plant burning it to make steam must always, without break, use activated carbon, and may never substitute another mercury-reduction system for activated carbon, dooms the claim.

In opposing the motion to dismiss their Complaint, Plaintiffs implied that the only use for refined coal "as sold and delivered" is for the receiving power plant to use it with activated carbon, belying any substantial non-infringing use. But even if "as sold and delivered" is the correct test, the receiving plant can just stop using activated carbon. The FAC does not—and cannot—plead

---

[8]  As explained *supra* at 4, a seller of refined coal is not required to use activated carbon, or practice any other specific process, in order to qualify for Section 45 tax credits.

otherwise, or that the Refined Coal Defendants believe otherwise, and the patent specification shows that refined coal *can* be used without activated carbon.[9]  (D.I. 130, Ex. A at 2:60–3:8.)

Finally, plaintiff's theory in *Nalco* was that simply burning the refined coal in the furnace infringed Nalco's patent; there was no "Activated Carbon Step."  *See, e.g., Nalco*, 2015 WL 6122811, at *2.  Here, by contrast, burning refined coal only infringes these Patents-in-Suit if activated carbon is added to the combustion gas.  The exhibits attached to the FAC (including the Patents-in-Suit and one expired contract) make clear that that does not need to happen.

## IV.   The Claims for Direct Infringement Should Be Dismissed.

The FAC accuses Movants of direct infringement by: (a) forming "joint enterprise[s]" with "each coal-fired power plant . . . to which they provide refined coal" (*e.g.*, D.I. 130, ¶¶ 264–65); and/or (b) "performing certification testing of refined coal," either (i) directly (*e.g.*, *id.*, ¶ 266) or (ii) by "engag[ing] a third party to perform each step" (*e.g.*, *id.* ¶ 267).  These theories fail.

### A.   The Joint Enterprise Claims Fail as a Matter of Law.

The Complaint alleged joint enterprise(s) between all Refined Coal Defendants and their power plant customers, with the putative "common purpose" of "obtaining Section 45 Tax Credits and compliance with mercury capture regulations by performing the patented methods." (*E.g.*, D.I. 1 ¶¶ 159–60.)  That claim failed.  The FAC jettisons Plaintiffs' theory that the "common purpose" involves mercury capture regulations, alleging only the ostensible common purpose of "obtaining the benefits of Section 45 tax credits."  (*See, e.g.*, D.I. 130 ¶¶ 216-17.)  And the FAC also jettisons Plaintiffs' initial theory that the Power Plant Defendants were under the direction and control of the Refined Coal Defendants.  What remains is a theory of joint enterprise based entirely on the Refined

---

[9]   So does the FAC itself, for the "agreement" that Plaintiffs attached as Exhibit 6, D.I. 130-6, contemplates alternate uses of refined coal.  (*See* D.I. 130-6 at Sec. 5.2 ("Any Refined Coal produced at the Facility and not purchased by Buyer, for any reason, may be sold by Seller to third parties or otherwise disposed . . . .").)

Coal Defendants as the recipients of tax credits, and the Power Plant Defendants as purchasers of Refined Coal.

### 1.    The Allegations of Joint Enterprise Fail.

The FAC pleads a contractual relationship that benefits each party—one earns tax credits, and others get refined coal at a discount, and rent.  But it does not plead the four elements that would make such a contractual relationship a "joint enterprise," as set out in *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (*en banc*) (adopting the Restatement (Second) of Torts) (cited in D.I. 110 at 20).  Nor can it.

*First*, Plaintiffs do not identify any agreements purporting to form or govern a joint enterprise, let alone plead the operative terms of an agreement—the bare minimum for any action based on one.  *See, e.g., RBATHTDSR, LLC v. Project 64 LLC*, No. 19-1280-RGA, 2020 WL 2748027 at *3 (D. Del. May 27, 2020) (requiring plaintiff to "allege facts that support . . . the existence of a contract" in order to state a claim for breach).  The FAC does not identify the members of any putative joint enterprise, or the circumstances of any agreement they might have entered.  Using vague terms such as "associated RC Defendants" and "operators of coal-fired power plants connected to an RC Facility" (*see, e.g.*, D.I. 130 ¶¶ 216, 219), the FAC does not state who the "associated" Defendants are; whom they are "associated" with; who the "coal-fired power plants" are; which "RC Facility" they are "connected to"; or which allegations relate to which operators of furnaces or plants.  This falls far short of giving "each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *See Neology,* 2014 WL 4675316 at *4 (internal quotation marks and citations omitted) (dismissing complaint).

*Second*, a joint enterprise with the supposed purpose of earning Section 45 tax credits cannot have a power plant customer as a member, because to receive such credits, the joint enterprise must sell the refined coal to an unrelated purchaser—a fellow member of a joint enterprise necessarily

fails that test.  It is not plausible that a Movant would enter a joint enterprise that would render it ineligible for the very tax credits the FAC alleges to be its raison d'etre.

*Third*, as a matter of law there can be no community of pecuniary interest in the Refined Coal Defendants' Section 45 tax credits.  A "community of pecuniary interest" is a "monetary interest" "shared without special or distinguishing characteristics" "among the members of the group."  *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 531 (Tex. 2002) (applying same Restatement approach as *Akamai*).  Section 45 forecloses the possibility that the Refined Coal Defendants and their unrelated power plant customers could share Section 45 tax credits "without . . . distinguishing" between the entities.

Recognizing the obstacle posed by IRC Section 45 (requiring that the taxpayer sell Refined Coal to an "unrelated person"), Plaintiffs do not allege that their "Joint Enterprises" receive Tax Credits, and instead allege that the power plants "rely[] on the value of the tax credits to provide discounted refined coal and/or pay rent to the coal-fired power plant."  (D.I. 130 ¶¶ 214, 217.)  But that leaves a bargained-for exchange (at best with a discount), and not a joint enterprise.  The buyer and seller never share in one pile of money, the plants have no claim on the Refined Coal Defendants' tax credits, and the Refined Coal Defendants have no claim on either the "discount[s]" or the "rent" that the power plants purportedly realize from the exchange.  There is no "community" asset or shared income. *See St. Joseph Hosp.*, 94 S.W. 3d at 531.[10]

*Fourth*, rather than alleging that the Power Plant Defendants and Refined Coal Defendants

---

[10]   In *St. Joseph's*, the Texas Supreme Court found no community of pecuniary interest between a hospital and residency sponsor, notwithstanding "an agreement and a common purpose to establish a general surgery residency" there, because the residency sponsor had no legal right to the Medicare funds that the hospital  received "based on the number of residents in the program," and there was no evidence that the residence sponsor agreed to share "money it received from operating the residency program." *Id.* at 531–32.  As with the FAC, both parties stood to benefit financially from the alleged arrangement, but there was no joint enterprise because neither party had a legal claim on proceeds earned by the other's participation.

share an equal right of control in the putative joint enterprises, the FAC only makes the vague and legally inadequate allegation that each "controls a necessary aspect of the endeavor."  (D.I. 130 ¶¶ 215, 218.)  It does not describe two entities that share control over one enterprise geared towards "obtaining Section 45 tax credits."  Moreover, in alleging that Section 45 tax credits are obtained only if the unspecified joint enterprise members cooperate to perform "the certification process," "the provision of chemicals onto the coal," "providing refined coal," "providing the coal additives," "combusting the coal," and "providing sorbent comprising activated carbon" (*e.g.*, D.I. 130 ¶¶ 215, 218), Plaintiffs fail to name a single Defendant with the right to compel performance of all these alleged joint enterprise acts—let alone the *multiple* Defendants who would need such authority in order for the asserted joint enterprise to exist.  *Cf. CBA Envtl. Servs., Inc. v. Toll Bros. Inc.*, 403 F. Supp. 3d 403, 419 (D.N.J. 2019) (dismissing complaint where only one side of alleged joint venture was alleged to have "oversight authority").

Finally, even if Plaintiffs could allege that some specified named Defendants had the requisite shared control over their alleged "scheme," the claim would need to be limited to the Defendants alleged to have such authority.  The FAC—which does not even specify the actual members of any one of the joint enterprises it pleads—names no such Defendant.

## 2.    The Alleged Purpose of the Putative Joint Enterprises Does Not Involve the Activated Carbon Step.

The joint enterprise claim also fails because it has nothing do with the Activated Carbon Step, as would be necessary for the joint enterprise's activities to infringe.  Section 45 tax credits are created by selling refined coal to an unrelated party.  Even if the purpose of the alleged joint enterprise were to obtain tax credits (barred by the unrelated-buyer requirement), the theory would fail because that purpose does not require performance of the Activated Carbon Step.

18

### B.      Testing Refined Coal Does Not Require Use of Activated Carbon.

In addition to the "joint enterprise" theory of direct infringement, the FAC separately alleges that the Refined Coal Defendants directly infringe—not through commercial power plant operations, but by "performing," or "directing and controlling a third party to perform," "certification testing" for Section 45. (*See, e.g.*, D.I. 130 ¶¶ 265–66.)[11]

Plaintiffs hypothesize that the Refined Coal Defendants must simulate the operating conditions of their power plant customers by using a test system that employs both refined coal and activated carbon.  Plaintiffs allege, "[o]n information and belief," that the Refined Coal Defendants "provide the required certification for qualified emission reduction" (a term defined by Section 45) by performing either "pilot scale testing that simulates the conditions of a particular coal-fired power plant" or "testing at a particular coal-fired power plant." (D.I. 130 ¶ 86.)  Further, for plants that use activated carbon, "if these Defendants attempted to perform a certification test by merely combusting refined coal and measuring the amount of emitted mercury leaving the combustion chamber . . . , they would be unable to demonstrate the required reduction in mercury." (D.I. 130 ¶ 87.)  And therefore, according to Plaintiffs, the Refined Coal Defendants must "demonstrate emission reduction" for these plants by "adding activated carbon sorbent downstream of the combustion chamber during the certification testing." (D.I. 130 ¶ 88.)

Not so.  As explained above, Section 45 specifies various ways for a Refined Coal seller to establish eligibility for tax credits—it does not require the use of activated carbon, and the FAC does not, and cannot, plead that any Refined Coal Defendant would be required to certify tax credit eligibility by measuring downstream of an activated carbon injection system.  That such certification may be possible does not render its use by any Refined Coal Defendant plausible.

---

[11]   The FAC does not identify the putative "third parties" who are alleged to conduct this testing, or allege any specific facts about the circumstances of such "third-party testing."

**V.    The Claims for Willful Infringement Should Be Dismissed.**

The willfulness claims in the Complaint were dismissed against the Movants because Plaintiffs did not "adequately plead knowledge of infringement." (D.I. 110 at 15, n. 13.) The R&R also affirmed that such claims "require[] the plaintiff to plausibly plead that the defendant had knowledge of the patent." (*Id.* at 15, n.14.)

The FAC's willfulness allegations against the Refined Coal Defendants vaguely imply that "it is likely" that unspecified Refined Coal Defendants knew about the patents-in-suit, based on the same inadequate platitudes about working in the same industry as a named inventor, or going to the same conferences, or having a "close relationship" with another defendant, that the Court found wanting in the Complaint's claims. (*Compare* D.I. 1 ¶¶ 145–147 (describing EERC testing and conference attendance), *with* D.I. 130 ¶¶ 187-192 (repeating those allegations and adding that "it is reasonable to infer that [Defendants] have done at least some due diligence on potential competitors").) Such allegations do not plead knowledge of the patents. Moreover, the New Patents-in-Suit issued within the last several months. The FAC does not allege that the sporadic testing pleaded in the FAC took place after such patents even issued.

Even if plausible, knowledge of the asserted patents is insufficient for enhanced damages. *See Halo Elecs., Inc. v. Pulse Elecs., Inc., et al.*, 136 S. Ct. 1923, 1936 (2016) (Breyer, J., concurring) ("[T]he Court's references to 'willful misconduct' do not mean that a court may award enhanced damages simply because the evidence shows that the infringer knew about the patent and nothing more."). Here, any assertion that the Movants were willful after the complaint was filed, putting them on notice, is belied by the dismissal of all infringement claims against them.

## CONCLUSION

For the foregoing reasons, the Court should grant the Moving Refined Coal Defendants' motion and dismiss the FAC with prejudice.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com

OF COUNSEL:

Richard W. Mark
Joseph Evall
Paul J. Kremer
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

*Attorneys for Defendants*
*AJG Coal, LLC*
*AJG Iowa Refined Coal LLC*
*Arbor Fuels Company, LLC*
*Arthur J. Gallagher & Co.*
*Belle River Fuels Company, LLC*
*Chem-Mod LLC*
*DTE REF Holdings, LLC*
*DTE REF Holdings II LLC*
*Gallagher Clean Energy, LLC*
*Joppa Refined Coal LLC*
*Louisa Refined Coal, LLC*
*Portage Fuels Company, LLC*
*Thomas Hill Refined Coal LLC*
*Wagner Coaltech LLC*
*Walter Scott Refined Coal LLC*

August 6, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 6, 2020, upon the following in the manner indicated:

James M. Lennon, Esquire                          *VIA ELECTRONIC MAIL*
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE  19806
*Attorneys for Plaintiffs*

Bradley W. Caldwell, Esquire                       *VIA ELECTRONIC MAIL*
Jason D. Cassady, Esquire
John Austin Curry, Esquire
Justin T. Nemunaitis,Esquire
CALDWELL CASSADY CURRY PC
2010 Cedar Springs Road, Suite 1000
Dallas, TX  75201
*Attorneys for Plaintiffs*

Frederick L. Cottrell, III, Esquire                *VIA ELECTRONIC MAIL*
Tyler E. Cragg, Esquire
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
*Attorneys for Defendants NRG Energy, Inc., NRG*
*Texas Power LLC, Midwest Generation EME,*
*LLC and Midwest Generation, LLC*

Timothy S. Durst, Esquire                                      *VIA ELECTRONIC MAIL*
Douglas M. Kubehl, Esquire
Christa Brown-Sanford, Esquire
Megan LaDriere, Esquire
Mark Johnson, Esquire
BAKER BOTTS, L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201
*Attorneys for Defendants NRG Energy, Inc., NRG*
*Texas Power LLC, Midwest Generation EME, LLC*
*and Midwest Generation, LLC*

Robert S. Saunders, Esquire                                    *VIA ELECTRONIC MAIL*
Jessica R. Kunz, Esquire
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636
*Attorneys for Defendants CERT Coal Holding,*
*LLC, CERT Holdings LLC, CERT Holdings 2018,*
*LLC, CERT Operations LLC, CERT Operations II*
*LLC, CERT Operations III LLC, CERT Operations*
*IV LLC, CERT Operations V LLC and CERT*
*Operations RCB LLC*

Douglas R. Nemec, Esquire                                      *VIA ELECTRONIC MAIL*
Leslie A. Demers, Esquire
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001-8602
*Attorneys for Defendants CERT Coal Holding,*
*LLC, CERT Holdings LLC, CERT Holdings 2018,*
*LLC, CERT Operations LLC, CERT Operations II*
*LLC, CERT Operations III LLC, CERT Operations*
*IV LLC, CERT Operations V LLC and CERT*
*Operations RCB LLC*

Francis DiGiovanni, Esquire                                    *VIA ELECTRONIC MAIL*
Thatcher A. Rahmeier, Esquire
FAEGRE DRINKER BIDDLE & REATH LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
*Attorneys for Defendants Talen Energy*
*Corporation, Brandon Shores LLC, Talen*
*Generation LLC and H.A. Wagner LLC*

John Conrad Williams, Esquire      *VIA ELECTRONIC MAIL*
BAKER BOTTS L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas  78701
*Attorneys for Defendants Talen Energy*
*Corporation, Brandon Shores LLC, Talen*
*Generation LLC and H.A. Wagner LLC*

Rodger D. Smith II, Esquire       *VIA ELECTRONIC MAIL*
Lucinda C. Cucuzzella, Esquire
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
*Attorney for Defendants AEP Generation*
*Resources Inc., Southwestern Electric Power Co.*
*and AEP Texas Inc.*

Randall E. Mehrberg, Esquire      *VIA ELECTRONIC MAIL*
Terri L. Mascherin, Esquire
Aaron A. Barlow, Esquire
JENNER & BLOCK LLP
353 North Clark Street,
Chicago, IL  60654-3456
*Attorney for Defendants AEP Generation*
*Resources Inc., Southwestern Electric Power Co.*
*and AEP Texas Inc.*

Adam G. Unikowsky, Esquire      *VIA ELECTRONIC MAIL*
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC  20001-4412
*Attorney for Defendants AEP Generation*
*Resources Inc., Southwestern Electric Power Co.*
*and AEP Texas Inc.*

*/s/ Brian P. Egan*

_____

Brian P. Egan (#6227)