## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:19-cv-01334-RGA |
| AEP GENERATION RESOURCES INC., *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## CERT DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS ALL CLAIMS IN THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)

OF COUNSEL:

Douglas R. Nemec
Leslie A. Demers
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
douglas.nemec@skadden.com
leslie.demers@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica R. Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
Tel: (302) 651-3000
Fax: (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendants CERT
Coal Holdings LLC, CERT
Holdings LLC, CERT Holdings
2018, LLC, CERT Operations
LLC, CERT Operations II LLC,
CERT Operations III LLC,
CERT Operations IV LLC,
CERT Operations V LLC and
CERT Operations RCB LLC*

# TABLE OF CONTENTS

Page

I. NATURE AND STAGE OF PROCEEDINGS ...................................................................1

II. SUMMARY OF ARGUMENT .........................................................................................1

III. STATEMENT OF FACTS .................................................................................................2

    A. The Asserted Patents.............................................................................................2

    B. The Alleged Infringement.....................................................................................3

IV. LEGAL STANDARD GOVERNING RULE 12(B)(6) MOTIONS ...................................4

V. THE COURT SHOULD DISMISS THE FAC AS TO THE CERT
DEFENDANTS FOR FAILURE TO STATE A CLAIM ...................................................5

    A. ME2C Fails to State a Claim for Indirect Infringement Against Any Single
CERT Defendant....................................................................................................5

        1. ME2C Does Not Remedy the Deficiencies from the Original
Complaint Concerning Knowledge.............................................................5

        2. ME2C Still Fails to Plausibly Allege Specific Intent for
Inducement.................................................................................................7

        3. Other Elements of Contributory Infringement Remain Inadequately
Pled ..........................................................................................................15

    B. ME2C's Direct Infringement Claims Against the CERT Defendants
Should Be Dismissed ..........................................................................................17

        1. ME2C Fails to Fill the Gaps in its Joint Infringement Claims .................17

        2. ME2C Does Not Clearly, Let Alone Plausibly, Assert that Any
CERT Defendant Directly Infringes as a Single Actor.............................19

    C. ME2C's Willful Infringement Allegations Similarly Fail......................................20

VI. CONCLUSION.................................................................................................................20

## **TABLE OF AUTHORITIES**

Page(s)

### CASES

*Akamai Technologies, Inc. v. Limelight Networks, Inc.*,
  797 F.3d 1020 (Fed. Cir. 2015) ..................................................................................18

*Artrip v. Ball Corp.*,
  735 F. App'x 708 (Fed. Cir. 2018) .............................................................................16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................................5

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................................4, 5

*In re Bill of Lading Transmission & Processing System Patent Litigation*,
  681 F.3d 1323 (Fed. Cir. 2012) ..............................................................................15, 16

*Bonutti Skeletal Innovations LLC v. Smith & Nephew, Inc.*,
  No. 12-1111-GMS, 2013 U.S. Dist. LEXIS 165359 (D. Del. Nov. 18, 2013) .................15

*CBA Environmental Services, Inc. v. Toll Bros. Inc.*,
  403 F. Supp. 3d 403 (D.N.J. 2019) .....................................................................17, 18, 19

*Chalumeau Power Systems LLC v. Alcatel-Lucent*,
  No. 11-1175-RGA, 2012 U.S. Dist. LEXIS 142809 (D. Del. July 18, 2012) ....................7

*Commil USA, LLC v. Cisco Systems, Inc.*,
  135 S. Ct. 1920 (2015) ...................................................................................................5

*DSU Medical Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006) ......................................................................................8

*Dynamic Data Technologies v. Google LLC*,
  No. 19-1529-CFC, 2020 U.S. Dist. LEXIS 46285 (D. Del. Mar. 18, 2020),
  *adopted by* 2020 U.S. Dist. LEXIS 102734 (D. Del. June 11, 2020) ................................7

*E.I. du Pont de Nemours & Co. v. Heraeus Holding GmbH*,
  No. 11-773-SLR-CJB, 2012 U.S. Dist. LEXIS 140037 (D. Del. Sept. 28, 2012).............16

*Eon Corp. IP Holdings LLC v. FLO TV Inc.*,
  802 F. Supp. 2d 527 (D. Del. 2011) .................................................................................6

*Ericsson v. D-Link Systems, Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014).......................................................................................8

*F2VS Technologies, LLC v. Aruba Networks, Inc.*,
  No. 17-cv-0754-RGA, 2018 U.S. Dist. LEXIS 60254 (D. Del. Apr. 10, 2018).................5

*Galderma Laboratories, L.P. v. Medinter US, LLC*,
  No. 18-1892-CFC-CJB, 2020 U.S. Dist. LEXIS 48741 (D. Del. Mar. 11, 2020) ..............9

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011) ..................................................................................................5

*Horatio Washington Depot Technologies LLC v. Tolmar, Inc.*,
  Civil Action No. 17-1086-LPS-CJB, 2018 U.S. Dist. LEXIS 187074 (D. Del.
  Nov. 1, 2018) ..........................................................................................................20

*HZNP Medicines LLC v. Actavis Laboratories UT, Inc.*,
  940 F.3d 680 (Fed. Cir. 2019) ..................................................................................15

*IOENGINE, LLC v. Paypal Holdings, Inc.*,
  No. 18-452-WCB, 2019 U.S. Dist. LEXIS 12195 (D. Del. Jan. 25, 2019) ..................9, 18

*Lyda v. CBS Corp.*,
  838 F.3d 1331 (Fed. Cir. 2016) ................................................................................17

*M2M Solutions, LLC v. Telit Communications PLC*,
  No. 14-1103-RGA, 2015 U.S. Dist. LEXIS 102349 (D. Del. Aug. 5, 2015) ....................9

*MONEC Holding AG v. Motorola Mobility, Inc.*,
  897 F. Supp. 2d 225 (D. Del. 2012)................................................................6, 7, 8, 20

*Nalco Co. v. Chem-Mod, LLC*,
  No. 14-cv-2510, 2015 U.S. Dist. LEXIS 141162 (N.D. Ill. Oct. 15, 2015) ...............11, 19

*Nalco Co. v. Chem-Mod, LLC*,
  883 F.3d 1337 (Fed. Cir. 2018)..................................................................................16

*Neology, Inc. v. Kapsch Trafficcom IVHS, Inc.*,
  No. 13-2052-LPS, 2014 U.S. Dist. LEXIS 131568 (D. Del. Sept. 19, 2014)..........8, 14, 18

*Network Managing Solutions, LLC v. AT&T Inc.*,
  No. 16-cv-295 (RGA), 2017 U.S. Dist. LEXIS 19274 (D. Del. Feb. 3, 2017)...................1

*North Star Innovations, Inc. v. Toshiba Corp.*,
  No. 16-115-LPS-CJB, 2016 U.S. Dist. LEXIS 168670 (D. Del. Dec. 6, 2016)........8, 9, 20

*SIPCO, LLC v. Streetline, Inc.*,
  No. 16-830-RGA, 2018 U.S. Dist. LEXIS 19911 (D. Del. Feb. 7, 2018) ........................15

*Sonrai Systems, LLC v. AMCS Group Inc.*,
  No. 16 C 9404, 2017 U.S. Dist. LEXIS 159450 (N.D. Ill. Sep. 27, 2017).......................18

*Stephenson v. Game Show Network, LLC*,
  933 F. Supp. 2d 674 (D. Del. 2013)............................................................................16

*Superior Industries, LLC v. Thor Global Enterprises Ltd.*,
  700 F.3d 1287 (Fed. Cir. 2012)..............................................................................8, 16

*TriDiNetworks Ltd. v. NXP-USA, Inc.*,
  No. 19-1062-CFC-CJB, 2020 U.S. Dist. LEXIS 85799 (D. Del. May 15, 2020) ..............9

*Valinge Innovation AB v. Halstead New England Corp.*,
No. 16-1082-LPS-CJB, 2018 U.S. Dist. LEXIS 88696 (D. Del. May 29, 2018) ..............20

*Varian Medical Systems, Inc. v. Elekta AB*,
No. 15-871-LPS, 2016 U.S. Dist. LEXIS 91226 (D. Del. July 12, 2016),
*adopted by* 2016 U.S. Dist. LEXIS 199290 (D. Del. Dec. 22, 2016) .................................7

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009).....................................................................................8, 10

**STATUTES**

26 U.S.C. § 45....................................................................................................................11, 19

26 U.S.C. § 52.........................................................................................................................19

**OTHER AUTHORITIES**

I.R.S. Notice 2010-54, 2010 I.R.B. 40, § 6.03(1)(a)(vi)............................................. 12

## I.      NATURE AND STAGE OF PROCEEDINGS

On July 17, 2019, plaintiffs Midwest Energy Emissions Corp. and MES Inc. (collectively, "Plaintiffs" or "ME2C") filed a complaint ("Original Complaint") accusing certain unnamed defendants and 43 named defendants, including nine CERT Defendants,[1] of infringing two patents relating to methods for separating mercury from a mercury-containing gas:  U.S. Patent Nos. 10,343,114 and 8,168,147  (respectively, the "'114" and "'147" Patents; collectively, the "Original Asserted Patents").  (D.I. 1 ¶¶ 182, 205.)  On June 18, 2020, the Court issued a Report and Recommendation ("R&R") (D.I. 110), recommending dismissal of all claims against the CERT Defendants for failing to state a claim, which was adopted on July 15, 2020.  (D.I. 127.)  On July 15, 2020, ME2C filed a First Amended Complaint ("FAC"), adding three patents with 88 claims: U.S. Patent Nos. 10,589,225; 10,596,517; and 10,668,430 (respectively, the "'225," "'517," and "'430" Patents; collectively, the "Newly-Added Patents"; together with the Original Asserted Patents, the "Asserted Patents").  (D.I. 130.)  The Newly-Added Patents are related to the Original Asserted Patents, and also address methods for separating mercury from a mercury-containing gas.

## II.     SUMMARY OF ARGUMENT

The FAC again falls short of adequately pleading infringement claims based on the CERT Defendants' alleged provision of coal with added bromine to other entities who burn the coal in a process, which process only infringes the patents if it uses activated carbon.  Instead of pleading facts to support inferences for infringement, ME2C states the inference itself, repeating "it is reasonable to infer" throughout and speculating about how the industry hypothetically "could"

---

[1]  "CERT Defendants" refers to CERT Coal Holdings LLC; CERT Holdings LLC; CERT Holdings 2018, LLC; CERT Operations LLC; CERT Operations II LLC; CERT Operations III LLC; CERT Operations IV LLC; CERT Operations V LLC; and CERT Operations RCB LLC. Certain of these entities are holding companies, which "ultimately . . . may be grounds for judgment against Plaintiff and grounds for a § 285 motion," but the CERT Defendants will address this issue at a later time.  *See Network Managing Sols., LLC v. AT&T Inc.*, No. 16-cv-295 (RGA), 2017 U.S. Dist. LEXIS 19274, at *4 (D. Del. Feb. 3, 2017).

work.  Further, ME2C's allegations relating to this motion exclusively address an amorphous group of "CERT" and 15 other named defendants.  That does not state a claim against the nine CERT Defendants collectively, let alone individually.  Dismissal is proper for the following reasons.

*First*, ME2C fails to cure the defects in its allegations that the CERT Defendants had the requisite knowledge, continuing instead to rely on flawed extrapolations from other entities' supposed knowledge and generalized claims about the industry.  The post-suit portions of its indirect infringement claims suffer additional deficiencies, stemming from ME2C's consistent failure to identify any act taken by a single CERT Defendant, and refusal to provide factual allegations that render plausible an intent to encourage the downstream use of activated carbon, or that the refined coal has no substantial non-infringing uses.

*Second*, ME2C's joint infringement theories fare no better than the already dismissed claims, and the FAC does not provide adequate notice for a single-actor direct infringement claim.

*Third*, ME2C's willfulness allegations fail for the same reasons as its indirect infringement claims.  As discussed below, ME2C's claims against the CERT Defendants should be dismissed.[2]

## III.    STATEMENT OF FACTS

### A.    The Asserted Patents

As set forth in the R&R, the two Original Asserted Patents "relate to methods for reducing mercury emissions from coal-fired power plants by combining halogen treatments such as bromine and bromide compounds in-flight with backend sorbents such as activated carbon." (D.I. 110 at 3.) The exemplary claims of the Original Asserted Patents require a Bromine Step and an Activated Carbon Step.  (*Id.*)  The Bromine Step entails "combusting coal in a combustion chamber . . .

---

[2]    The CERT Defendants also join co-defendants' argument that MES Inc. has no standing.  (D.I. 174.)  As the Court observed at oral argument on the motions to dismiss the Original Complaint, there is considerable overlap in the arguments advanced by the CERT Defendants and those advanced by the Moving Refined Coal Defendants.  To the extent applicable, the Moving Refined Coal Defendants' arguments for dismissal of the FAC are adopted herein.

wherein the coal comprises added [bromine], added to the coal upstream of the combustion chamber, or the combustion chamber comprises added [bromine]," and the Activated Carbon Step entails "injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber." (*Id.* (quoting '114 Pat., col. 36:7-23 (D.I. 130-1)).)

The three Newly-Added Patents are related to the Original Asserted Patents, and are directed to methods for reducing mercury emissions at coal-fired power plants. (*See* D.I. 130-3 ('225 Pat.); D.I. 130-4 ('517 Pat.); D.I. 130-5 ('430 Pat.).) Each claim of the Newly-Added Patents described in the FAC as exemplary requires a Bromine Step and an Activated Carbon Step.[3]

### B.     The Alleged Infringement

Like the Original Complaint, ME2C largely bases its claims in the FAC on the activities of two groups of defendants: (1) the Coal Plant Defendants and unnamed power plants connected to the Accused RC Facilities; and (2) the nine CERT Defendants, and 15 other named defendants (AJG, DTE, Chem-Mod, and RC Defendants).[4] The first group is alleged to have performed each step of the claimed methods. (*See* D.I. 130 ¶¶ 242-252, 275-286, 309-315, 338-344, 367-377.)

As to the second group of entities, including the CERT Defendants, ME2C now asserts indirect and direct infringement theories. ME2C does not articulate any factual allegation against any single CERT Defendant for either theory. Instead, the FAC refers to the nine individual CERT Defendants only once, when listing their addresses (*id.* ¶¶ 26-34), otherwise calling this group "CERT" as if it were a single entity, and often referring to "CERT" alongside a block of 15 other named defendants (AJG, DTE, Chem-Mod, and the RC Defendants).

---

[3]   *See* D.I. 130 ¶¶ 308-09; D.I. 130-3 ('225 Pat.) col. 23:64-24:2; D.I. 130 ¶¶ 337-338; D.I. 130-4 ('517 Pat.) col. 35:61-67; D.I. 130 ¶¶ 366-367; D.I. 130-5 ('430 Pat.) col. 35:49-61.

[4]   "Accused RC Facilities" includes refined coal facilities allegedly operated by "CERT" or others (D.I. 130 ¶ 206); and "RC Defendants" includes additional named and unnamed entities (*see id.* at 2), that ME2C claims are owned or operated by "CERT" or others (*id.* ¶ 234).

For induced and contributory infringement, ME2C continues to allege that "CERT," among others, provides coal with added bromine to power plants. (*E.g.*, *id.* ¶ 206.) Through this arrangement, ME2C contends that "CERT" receives Section 45 tax credits. (*Id.* ¶¶ 68-108.) ME2C asserts that the Activated Carbon Step is typically performed by the Coal Plant Defendants, but adds allegations of activities presumably in an attempt to show that "CERT" knew and intended for the Coal Plant Defendants to perform the Activated Carbon Step. These allegations pertain to (1) mercury emissions regulations and Section 45 tax credits (*e.g.*, *id.* ¶¶ 84-89, 98-106); (2) hypothetical operations at unspecified power plants (*e.g.*, *id.* ¶¶ 90-92); and (3) advertising and sales by other entities (*e.g.*, *id.* ¶¶ 93-97). However, ME2C does not provide factual allegations that the Activated Carbon Step must be performed or that the CERT Defendants encourage others to perform this step, instead claiming only that these scenarios "can" or "will" include this step.[5]

As to direct infringement, ME2C appears to primarily assert theories of joint infringement against "CERT." ME2C still does not differentiate among the specific entities, instead lumping together the nine CERT Defendants with 15 other named defendants (AJG, DTE, Chem-Mod, and RC Defendants) and unspecified power plants or third parties for its joint infringement theories. (*E.g.*, *id.* ¶¶ 266, 300, 329, 358, 391.) The brief reference to single-actor direct infringement is limited to acts supposedly performed for certification testing for Section 45 tax credits, and similarly lumps together all defendants when raising the claim. (*Id.* ¶¶ 265, 299, 328, 357, 390.)

## IV.  LEGAL STANDARD GOVERNING RULE 12(B)(6) MOTIONS

Dismissal under Rule 12(b)(6) is appropriate if a plaintiff "fail[s] to state a claim upon which relief can be granted." Sufficient factual allegations are required so that each claim "is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy this

---

[5]  *E.g.*, D.I. 130 ¶ 91 (changes to bromine or activated carbon "***could*** hinder the plant's ability to comply with . . . mercury regulations and/or . . . [S]ection 45 tax credits." (emphasis added)).

requirement, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" (quoting *id.*)); *F2VS Techs., LLC v. Aruba Networks, Inc.*, No. 17-cv-0754-RGA, 2018 U.S. Dist. LEXIS 60254, at *4 (D. Del. Apr. 10, 2018) ("A plaintiff must plead facts sufficient to show that a claim has 'substantive plausibility.'" (citation omitted)).

## V.   THE COURT SHOULD DISMISS THE FAC AS TO THE CERT DEFENDANTS FOR FAILURE TO STATE A CLAIM

### A.   ME2C Fails to State a Claim for Indirect Infringement Against Any Single CERT Defendant

#### 1.   ME2C Does Not Remedy the Deficiencies from the Original Complaint Concerning Knowledge

ME2C's induced and contributory infringement claims require a plausible allegation that each CERT Defendant had knowledge of the patents and of the alleged infringement. *See, e.g.*, *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015).  The FAC adds only speculation and conjecture to allegations that this Court already deemed inadequate.  (*See* D.I. 110 at 15-17.)

As to knowledge of the patents, ME2C acknowledges that it did not provide notice of the Original Asserted Patents until July 17, 2019, or of the Newly-Added Patents until June 29, 2020. (D.I. 130 ¶¶ 194, 196.)  Prior to this, ME2C speculates that "CERT" gained knowledge in three ways, two of which invoke theories squarely rejected by the R&R, and all of which are inadequate.

***First***, ME2C alleges that it is "reasonable to infer" that the CERT Defendants conducted "some due diligence on potential competitors" because "ME2C is one of a small number of companies that competes with Chem-Mod, AJG, DTE, CERT, and the RC Defendants to provide

bromine-containing additives for mercury control," and the CERT Defendants likely discovered

the patents through that diligence.  (*Id.* ¶ 190.)  But ME2C has not alleged that any single CERT

Defendant provides these additives; that any single CERT Defendant has provided these additives

after the Asserted Patents issued; or any other fact supporting that any single CERT Defendant

would have had a reason to conduct this diligence.  In any event, as the R&R held, "participation

in the same technologically-based industry [as ME2C], standing alone, [is] insufficient to establish

[any CERT Defendant's] actual knowledge of the patent[s]."  (D.I. 110 at 17 (citing *MONEC*

*Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 232-33 (D. Del. 2012))); *see also*

*Eon Corp. IP Holdings LLC v. FLO TV Inc.*, 802 F. Supp. 2d 527, 533 (D. Del. 2011).

    ***Second***, ME2C hypothesizes that the CERT Defendants gained knowledge because (i) a

different entity, AJG, purportedly "acknowledged that it could face claims of patent infringement

for its refined coal activities," which "indicates that it has performed some due diligence"; and (ii)

a different entity, AJG, allegedly advertised that another different entity, "Chem-Mod[,] has patent

infringement insurance," which "indicates that Chem-Mod has also performed some due

diligence," and which "it is reasonable to infer" was motivated at least in part by ME2C's patents.

(D.I. 130 ¶ 191.)  From there, ME2C ventures to the CERT Defendants, claiming that (iii) they

"emulated AJG's business model and also use Chem-Mod as a supplier," which purportedly leads

to a "reasonable . . . infer[ence]" that the CERT Defendants gained knowledge through their "own

due diligence" or "interactions with Chem-Mod and/or AJG."  (*Id.* ¶ 192.)  None of these inferences

are plausible.  To pull on just one thread, that an entity purchased infringement insurance does not

render plausible knowledge of every patent in that market, which does not impute knowledge to

every company with which it interacts.  Further still, the R&R cautioned against imputing

knowledge from any "close relationship" between defendants.  (D.I. 110 at 16-17.)[6]

 ***Third***, with respect to the Newly-Added Patents, ME2C claims that "[i]t is reasonable to infer that AJG, DTE, CERT, Chem-Mod, and RC Defendants would have reviewed the prosecution history for the '114 and '147 [P]atents and would be generally aware of other patents in the same family." (D.I. 130 ¶ 195.)  But knowledge of one patent does not equate to knowledge of all related patents.  *See, e.g.*, *MONEC*, 897 F. Supp. 2d at 233.

 As ME2C fails to allege that any CERT Defendant had knowledge of the Original Asserted Patents before July 17, 2019, or knowledge of the Newly-Added Patents before June 29, 2020, indirect infringement claims prior to those dates should be dismissed.  *See, e.g.*, *Chalumeau Power Sys. LLC v. Alcatel-Lucent*, No. 11-1175-RGA, 2012 U.S. Dist. LEXIS 142809, at *3 (D. Del. July 18, 2012) (dismissing "allegations of indirect infringement prior to the filing of the complaint").

 As to knowledge of the alleged infringement, the Original Complaint failed to explain why the CERT Defendants "must necessarily know and intend that the coal plants will go on to perform the Activated Carbon Step."  (D.I. 110 at 14.)  As shown in more detail in Section V.A.2, *infra*, the FAC fails to cure these deficiencies, as it does not provide any facts to support that any single CERT Defendant had knowledge of performance of the Activated Carbon Step.  As such, the indirect infringement claims should be dismissed.  *See MONEC*, 867 F. Supp. 2d at 234-35.

  2. <u>ME2C Still Fails to Plausibly Allege Specific Intent for Inducement</u>

 The pre-suit and post-suit portions of the inducement claims should be dismissed because

---

[6] *See also Dynamic Data Techs. v. Google LLC*, No. 19-1529-CFC, 2020 U.S. Dist. LEXIS 46285, at *6 (D. Del. Mar. 18, 2020) (knowledge not imputed without "factual basis . . . for the conclusion that . . . knowledge should be imputed to [another]" beyond a parent/subsidiary relationship), *adopted by* 2020 U.S. Dist. LEXIS 102734 (D. Del. June 11, 2020); *Varian Med. Sys., Inc. v. Elekta AB*, No. 15-871-LPS, 2016 U.S. Dist. LEXIS 91226, at *20-21 (D. Del. July 12, 2016) (knowledge not imputed even where "[d]efendants operate under the same trade name"), *adopted by* 2016 U.S. Dist. LEXIS 199290 (D. Del. Dec. 22, 2016).

*(cont'd)*

ME2C fails to plausibly allege a specific intent to induce infringement.  Knowledge of the patents and of infringement is not enough to survive dismissal.  "Inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *MONEC*, 897 F. Supp. 2d at 231 (quoting *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part)).[7]

Beyond the allegations in the Original Complaint – which the R&R found inadequate (D.I. 110 at 10-13) – ME2C adds new allegations that fall into three categories: (1) mercury emissions regulations and Section 45 tax credits; (2) operations at power plants; and (3) advertising and sales. These allegations do not plausibly support that the CERT Defendants specifically intended others to perform the Activated Carbon Step, which is required for infringement of the Asserted Patents.

Two flaws pervade all three categories.  ***First***, ME2C fails to identify the role that any single CERT Defendant plays in any of these alleged activities, instead lumping together all nine CERT Defendants under the label "CERT," and then lumping together all nine CERT Defendants with 15 other defendants (AJG, DTE, Chem-Mod, and RC Defendants).  Yet, "[t]reating these [d]efendants as one big group for purposes of articulating how each has encouraged the induced infringement at issue says nothing plausible as to what any particular one of them might have done." *Neology, Inc. v. Kapsch Trafficcom IVHS, Inc.*, No. 13-2052-LPS, 2014 U.S. Dist. LEXIS 131568, at *21 (D. Del. Sept. 19, 2014); *see also N. Star Innovations, Inc. v. Toshiba Corp.*, No.

---

[7]   (*See also* D.I. 110 at 13 ("To make out a claim of induced infringement, the patentee must demonstrate that the alleged infringer performs, or induces another party to perform, every single step in the method." (citing *Ericsson v. D-Link Sys., Inc.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014)))); *Superior Indus., LLC v. Thor Glob. Enters. Ltd.*, 700 F.3d 1287, 1296 (Fed. Cir. 2012) (affirming dismissal of inducement claims); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 n.2 (Fed. Cir. 2009) ("[t]he question [for inducement] is not . . . whether a user following [defendant's] instruction may end up using the device in an infringing way[; r]ather, it is whether . . . instructions teach an infringing use of the device such that we are willing to infer from those instructions an affirmative intent to infringe the patent").

16-115-LPS-CJB, 2016 U.S. Dist. LEXIS 168670, at *3-4, *6 (D. Del. Dec. 6, 2016) (recommending dismissal of complaint that "simply refer[red] to all three . . . entities as 'Defendants'" but did not "clearly allege[] that either [d]efendant [took] part in any *specific* infringing act").  That is particularly so in view of the FAC's failure to provide any allegation specific to any single CERT Defendant at all, beyond their addresses and the address of their agents for service of process, otherwise referring only to "CERT."  (D.I. 130 ¶¶ 26-34); *M2M Sols. LLC v. Telit Commc'ns PLC*, No. 14-1103-RGA, 2015 U.S. Dist. LEXIS 102349, at *2 n.1, *11-13 (D. Del. Aug. 5, 2015) (inducement allegations inadequate that simply "refer[red] to the two [d]efendants as 'Telit,' as if both [d]efendants were one entity").  By itself, the failure to include any individualized allegation is fatal to ME2C's inducement claims.  (*See* D.I. 110 at 8 n.7 (claims against certain Coal Plant Defendants "lack[ed] the requisite specificity to sufficiently allege induced infringement" by failing to "identify which entities within these [d]efendant groups have actually induced infringement, by which actions they are said to have done so, and how such actions encouraged another to infringe or necessarily resulted in infringement by another entity").)[8]

*Second*, ME2C asks for specific intent to be inferred from three categories of scenarios that it claims would be compatible with (but would not necessarily require) an Activated Carbon Step.  Yet, ME2C admits there are other uses for refined coal that are also compatible with these scenarios but that do not involve an Activated Carbon Step – e.g., burning the refined coal without

---

[8]  The CERT Defendants are not contending that group allegations are *per se* impermissible, but rather that the FAC lacks what courts (including this Court) require in order to support group allegations, i.e., notice of the grounds and plausible allegations that each defendant is liable for infringement.  *Cf. IOENGINE, LLC v. Paypal Holdings, Inc.*, No. 18-452-WCB, 2019 U.S. Dist. LEXIS 12195, at *32-34 (D. Del. Jan. 25, 2019) (counterclaims adequate that included "alleg[ations] that each of the defendants is responsible for each of the alleged infringing act"); *accord TriDiNetworks Ltd. v. NXP-USA, Inc.*, No. 19-1062-CFC-CJB, 2020 U.S. Dist. LEXIS 85799, at *4-5 (D. Del. May 15, 2020); *Galderma Labs., L.P. v. Medinter US, LLC*, No. 18-1892-CFC-CJB, 2020 U.S. Dist. LEXIS 48741, at *5-9 (D. Del. Mar. 11, 2020).

*(cont'd)*

activated carbon, or with a non-carbon sorbent instead of carbon.[9]  Without factual allegations that

the Activated Carbon Step must be performed or that it is performed and the CERT Defendants

intended to encourage that step, an inference is not plausible.  *See Vita-Mix*, 581 F.3d at 1329

(affirming summary judgment of noninfringement; "especially where a product has substantial

non-infringing uses, intent to induce infringement cannot be inferred even when the defendant has

actual knowledge that some users of its product may be infringing the patent").

Against this backdrop, it is evident that the new allegations fail to plausibly state that any

CERT Defendant specifically intended for others to practice at least the Activated Carbon Step:

*Category 1: Emissions Regulations and Section 45 Tax Credits*.  ME2C outlines activities

relating to state and federal mercury emissions regulations and Section 45 tax credits as bases for

a specific intent to induce infringement.  With regard to emissions regulations, ME2C supposes

that "[a]n activated carbon injection system . . . requires an upfront cost and ongoing costs for

operation"; that plants that have these systems "operate the systems in order to comply with state

and federal regulations regarding mercury emissions"; that a plant "could face fines" if it were to

stop operating these systems; and that "CERT" (and 15 other defendants) therefore "must

necessarily know and intend" that (unspecified) coal plants inject activated carbon.[10]  Missing from

that list, however, is a crucial link in the chain: ME2C carefully avoids pleading that plants need

activated carbon to meet emissions regulations.  This is not inadvertent, as ME2C's pleadings show

---

[9]   The FAC claims that the alleged invention is a combination of two treatments, "halogen treatments (e.g., bromine containing materials)" and "backend sorbents (e.g., activated carbon)."  (D.I. 130 ¶ 63; D.I. 130-1 ('114 Pat.) col. 2:60-3:8 (describing prior art methods using bromine without activated carbon).)  In addition, the '114 Patent states that "the use of non-carbon base sorbents and a combination of carbon and non-carbon base sorbents is also contemplated to at least the same degree as carbon base sorbents."  (*Id.* col. 10:4-8.)

[10]   D.I. 130 ¶¶ 98-101; *id.* ¶ 91 ("[I]f the plant were to unilaterally reduce its activated carbon injection rate, or [the 24 defendants] were to unilaterally reduce the amount of bromine added to the coal, this ***could*** hinder the plant's ability to comply with state and federal mercury regulations and/or the certification process for [S]ection 45 tax credits." (emphasis added)).

that an Activated Carbon Step is not required.  Combined with the failure to distinguish among any of the nine CERT Defendants and 15 others, allegations concerning these regulations do not render a specific intent to encourage the Activated Carbon Step plausible.

ME2C also invokes Section 45 tax credits as a basis for specific intent.  ME2C claims that "CERT" and 15 others intend for plants to inject activated carbon to receive Section 45 tax credits. (*E.g.*, *id.* ¶¶ 106-08.)  But, ME2C does not allege that an Activated Carbon Step must be performed for refined coal to qualify for Section 45 tax credits.  Nor could it, as "[d]efendants are not required to . . . practice any . . . specific process in order to qualify for Section 45 tax credits." *Nalco Co. v. Chem-Mod, LLC*, No. 14-cv-2510, 2015 U.S. Dist. LEXIS 141162, at *6 (N.D. Ill. Oct. 15, 2015) ("*Nalco I*"); *see also* 26 U.S.C. § 45(a), (c)(7) (specifying that tax credits are awarded for selling refined coal, and not requiring refined coal to be burned in any particular process).

As another activity relating to Section 45 tax credits, ME2C speculates about certification testing.  (D.I. 130 ¶¶ 84-89.)  Although ME2C provides conflicting factual allegations as to who carries out the tests,[11] ME2C at one point claims that a third party performs the tests, and that the amorphous group of nine CERT Defendants and 15 other defendants induced that performance. (*E.g.*, D.I. 130 ¶ 267.)  As an initial matter, the certification testing is irrelevant as to whether any CERT Defendant possessed the requisite specific intent for the Newly-Added Patents, because ME2C claims that such testing only occurs "at least every six months" (*id*. ¶ 89), but the CERT Defendants have had knowledge of these patents for less than six weeks.  (*See supra,* Sec. V.A.1; *see also* D.I. 130 ¶¶ 51-53 (Newly-Added Patents issued within the last five months).)

What is more, the factual allegations for certification testing – made upon information and belief – do not support that an Activated Carbon Step must be performed during testing.  While

---

[11]   The FAC asserts both that AJG, DTE, CERT, Chem-Mod, and RC Defendants perform the tests (*e.g.*, *id*. ¶¶ 86, 265), and that a third party performs the testing (*e.g.*, *id*. ¶¶ 265-67).

ME2C concludes that payment is conditioned on the third party "performing each step of the [Asserted P]atent claims" (*e.g.*, *id.* ¶ 267), the factual allegations do not go so far.  For instance, ME2C speculates that testing is either by "pilot scale testing that simulates the conditions of a particular coal-fired power plant or by performing testing at a particular coal-fired power plant." (*Id.* ¶ 86.)  ME2C claims that this requires "a specific refined coal designed to work for that plant," and "aware[ness] of a plant's use of activated carbon injection," but does not plausibly assert that an Activated Carbon Step must be performed in both hypothetical scenarios.  (*Id.*)  ME2C also claims that "if these [24 d]efendants attempted to perform a certification test by merely combusting refined coal and measuring the amount of emitted mercury leaving the combustion chamber (i.e., disregarding the plant's activated carbon injection ***and other mercury control equipment***), they would be unable to demonstrate the required reduction in mercury."  (*Id.* ¶ 87 (emphasis added).)  Again, this carefully avoids alleging that activated carbon (apart from all "other mercury control equipment") is required to achieve mercury reductions.[12]

Finally with regard to this category, ME2C supplements its allegations concerning tailoring the bromide applied to coal, but still fails to "sufficiently explain why if these Defendants 'tailor' the amount of bromide added to the coal, they must necessarily know and intend that the coal plants will go on to perform the Activated Carbon Step."  (D.I. 110 at 14 ("the Court cannot make the inferential leap that Plaintiffs want it to make" without "facts like these").)  ME2C asserts:

1. After Section 45 certification, the "amount of [bromine] applied to the coal will need to be tailored (chemically adjusted) depending on the ongoing needs of the plant . . . .";

---

[12]  As a whole, these allegations also do not support that an Activated Carbon Step ***is*** performed, but rather relate to whether defendants would have knowledge of this step ***if*** it were performed. Similarly, ME2C also asserts on information and belief that "CERT" "add[s] activated carbon . . . during . . . testing." (D.I. 130 ¶ 88.)  But this assertion rests solely on speculation as to how testing ***could be*** conducted (*id.*), and fails to provide factual allegations that all steps ***are*** performed.  In fact, IRS guidance allows for testing at the point in the process before any activated carbon. *See, e.g.*, I.R.S. Notice 2010-54, 2010 I.R.B. 40, § 6.03(1)(a)(vi).

2.  "On information and belief, the parties must keep each other apprised of the [bromine] and activated carbon in use to ensure that they are able to comply with regulatory requirements."; and

3.  "[P]lant personnel have requested (communicated to at least some of the refined coal provider Defendants) that the bromine concentration in the refined coal be altered during testing and evaluation of alternative carbon suppliers."

(D.I. 130 ¶¶ 102-103.)  None of these allegations assert that a change to any activated carbon would necessitate a change to bromine, let alone explain why the tailored nature would support a specific intent for the Activated Carbon Step to be performed.  In fact, an agreement attached to the FAC contradicts that the tailored nature makes refined coal suitable only for a particular plant with a particular process, as the agreement expressly contemplates refined coal being sold to third parties.  (*See* D.I. 130-6, Section 5.2 ("Any Refined Coal produced at the Facility and not purchased by Buyer, for any reason, may be sold by Seller to third parties or otherwise disposed . . . ."); *cf.* D.I. 108 at 54:17-22 ("[T]here's not . . . generic refined coal that you can pick up and take to any plant in the country.  At each plant, it's a particular material that's prepared for that plant.").)

*Category 2: Operations at Power Plants*.  ME2C's allegations concerning the operations at power plants amount to nothing more than rank speculation.  ME2C asserts that "CERT" (and 15 others) "would learn" of the use of activated carbon by working with unspecified plants, including as they "would be able to witness activated carbon injection," "would be required to comply with safety protocols," and "would be aware of warnings and safety information regarding the hazards of activated carbon."[13]  Even crediting these "take my word for it" claims, they say nothing about how or why any single CERT Defendant intended for the performance of the

---

[13]  D.I. 130 ¶ 90; *see also id.* ¶ 91 (speculating, on information and belief, that "CERT" (and 15 others) "would learn of the plant's use of . . . activated carbon through routine conversation and communications"); *id.* ¶ 92 (hypothesizing that these discussions include "the mercury control system, such as the activated carbon injection equipment," and "how best to set the quantities for bromine and activated carbon so as to minimize overall cost and balance of plant effects").

Activated Carbon Step.  *See Neology*, 2014 U.S. Dist. LEXIS 131568, at *10-13 (pleading inadequate that "simply refer[red] to [the issue] in conclusory, 'take my word for it' terms").

_Category 3: Advertising and Sales_.  Finally, ME2C strings together suppositions about advertising and sales (D.I. 130 ¶¶ 93-97), but these too fail to support a specific intent.  ME2C claims that another entity, Chem-Mod, "advertises that its bromine-containing coal additives improve fly ash salability" (*id.* ¶ 97), which is supposedly relevant because "the use of high quantities of activated carbon . . . can discolor the fly ash" and that "may prevent the plant from selling the fly ash to cement producers," but the use of bromine "can reduce . . . the quantity of activated carbon" (*id.* ¶ 96).  ME2C also quotes a statement from the CFO of another entity, AJG, including that participants "get a better ash."  (*Id.* ¶ 94.)  This is too attenuated to plausibly show that these other entities – let alone each CERT Defendant – intended for an Activated Carbon Step.

Again attempting to impute one entity's activities to all nine CERT Defendants, ME2C attaches a contract between others that it claims "demonstrates that [other entities] are aware of activated carbon use at coal-fired power plants to which they supply refined coal." (D.I. 130 ¶ 95.) But that contract does not dictate the process utilized by the power plant or require an Activated Carbon Step.  (*See* D.I. 130-6.)  Similarly off the mark is ME2C's assertion that "[i]t is reasonable to infer" that "CERT" (and 15 others) are aware that coal with added bromine "enhances the performance of activated carbon" and "take [this] into consideration when marketing their offerings . . . and when negotiating contracts."  (D.I. 130 ¶ 93.)  Without factual allegations that any single CERT Defendant conducts marketing and sales activities, let alone that address the substance of any efforts, ME2C fails to allege the requisite specific intent.

Taking all three categories together, at the very most, ME2C alleges that some unspecified power plants may use activated carbon, and some amorphous group of defendants was aware of

this use.  Given the nature of the group allegations, it is not plausible that any CERT Defendant
had knowledge of an Activated Carbon Step.  But even assuming that ME2C plausibly alleged that
all CERT Defendants had knowledge of the patents and of an Activated Carbon Step, ME2C still
has not plausibly alleged that each CERT Defendant intended for third parties to perform each
step.  As merely "knowing of the possibility of infringement" is not enough, but "specific intent
and action to induce infringement must be shown," dismissal of ME2C's claims is warranted.
*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 701-02 (Fed. Cir. 2019) (affirming
summary judgment of no inducement), *petition for cert. filed*, No. 20-88 (U.S. July 29, 2020).[14]

### 3.   Other Elements of Contributory Infringement Remain Inadequately Pled

ME2C's continued failure to plausibly allege that refined coal lacks substantial
noninfringing uses and is especially made to infringe provides another ground for dismissal.  A
plaintiff must "plead facts that allow an inference that the components sold or offered for sale have
no substantial non-infringing uses."  *In re Bill of Lading Transmission & Processing Sys. Patent
Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012).  "[T]he inquiry focuses on whether the accused
products can be used for purposes *other than* infringement."  *Id.* at 1338.  As the pleading describes
uses other than infringement, it forecloses the claims.  *See id.* at 1337.

Instead of adding allegations that refined coal cannot be used for purposes other than
infringement, the FAC focuses on refined coal that is purportedly supplied to a conveyance that
moves the coal to a power plant that it claims will use an Activated Carbon Step.  ME2C thus
asserts that the Activated Carbon Step will be performed at the power plant, instead of confronting

---

[14]   *See also SIPCO, LLC v. Streetline, Inc.*, No. 16-830-RGA, 2018 U.S. Dist. LEXIS 19911, at
*5 (D. Del. Feb. 7, 2018); *Bonutti Skeletal Innovations LLC v. Smith & Nephew, Inc.*, No. 12-
1111-GMS, 2013 U.S. Dist. LEXIS 165359, at *2 n.5, *6 (D. Del. Nov. 18, 2013) ("[T]hat
[defendant] knew of [plaintiff's] patents and of its customers' use of [defendant's] products
[did] not establish that [defendant] intended that its customers infringe [the] patents . . . .").

whether it needs to be performed.  (*See, e.g.*, D.I. 130 ¶ 107 ("it cannot reasonably be used for purposes other than to be ***combusted at the plant where . . . activated carbon will later be injected***" (emphasis added); *id.* ¶ 258 (when "CERT" and others provide coal, they "know that the provided coal has no substantial use other than to be ***combusted at the plant that will perform the step of injecting sorbent comprising activated carbon***").)  This is not supported by the Federal Circuit's opinion in *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018) ("*Nalco II*"), which did not overrule the framework set forth in *Bill of Lading*.  Instead, *Nalco II* reiterated the standard from *Bill of Lading* – a focus on "purposes other than infringement" – in finding allegations sufficient that additives "[a]s sold and delivered" have no substantial noninfringing uses.  *See id.* ME2C essentially asks for a standard of "as sold and delivered and in one manner of use"; this is not the law.  *Cf. Bill of Lading*, 681 F.3d at 1323 (rejecting allegation that "'if you use this device to perform the patented method, the device will infringe and has no noninfringing uses'").

As the R&R held, ME2C's allegations in the Original Complaint regarding the "tailor[ed]" nature of the refined coal did not adequately plead that the refined coal "cannot reasonably be used for purposes other than to be injected with activated carbon."  (D.I. 110 at 19-20.)  The FAC does not remedy these deficiencies, as it fails to assert that the refined coal can only be used with an Activated Carbon Step – and in fact, the FAC offers new information showing that refined coal is not specifically tailored to be used only in one process.  (*See supra*, Sec. V.A.2.)

Similarly, ME2C does not plausibly allege that the refined coal is "especially made" to be used in a process with an Activated Carbon Step.  Because multiple elements are missing, these claims should be dismissed.  *See Artrip v. Ball Corp.*, 735 F. App'x 708, 713 (Fed. Cir. 2018).[15]

---

[15]  *See also Superior Indus.*, 700 F.3d at 1296 (affirming dismissal of contributory infringement claim); *accord Stephenson v. Game Show Network, LLC*, 933 F. Supp. 2d 674, 681 (D. Del. 2013); *E.I. du Pont de Nemours & Co. v. Heraeus Holding GmbH*, No. 11-773-SLR-CJB, 2012 U.S. Dist. LEXIS 140037, at *33-34 (D. Del. Sept. 28, 2012).

B.   **ME2C's Direct Infringement Claims Against
     the CERT Defendants Should Be Dismissed**

1.   ME2C Fails to Fill the Gaps in its Joint Infringement Claims

For joint infringement theories, a plaintiff must "plead[] facts sufficient to allow a reasonable inference that all steps of the claimed method are performed and either (1) one party exercises the requisite 'direction or control' over the others' performance or (2) the actors form a joint enterprise such that performance of every step is attributable to the controlling party."  *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339-40 (Fed. Cir. 2016) (citation omitted) (affirming dismissal with prejudice where plaintiff inadequately alleged that "each claim step was performed by or should be attributed to [d]efendants").  Because ME2C does not provide factual allegations to cure the deficiencies of its joint infringement claims (D.I. 110 at 21), the claims should be dismissed again.

With respect to a theory of direction or control, ME2C fails to plausibly allege that any single CERT Defendant directs or controls the process such that all steps, including the Activated Carbon Step, may be attributed to it.  (*See* D.I. 110 at 20 (citing *CBA Envtl. Servs., Inc. v. Toll Bros.*, 403 F. Supp. 3d 403, 418 (D.N.J. 2019)).)  ME2C does not assert a theory based on direction or control over the Coal Plant Defendants' alleged performance of the Activated Carbon Step. Instead, ME2C turns to the certification testing, asserting that the nine CERT Defendants and 15 others direct and control a third party to perform the certification testing.  (*E.g.*, D.I. 130 ¶ 266.)

As an initial matter, the FAC does not plausibly allege that the third party is performing all claimed steps during this testing, including the Activated Carbon Step.  (*See supra*, Sec. V.A.2.) But even assuming that all steps are adequately alleged to have been performed, ME2C has pled itself out of a claim by asserting that some combination of multiple defendants all retain control over the certification testing, as opposed to one defendant having control over testing. (D.I. 130 ¶ 221 ("CERT, Chem-Mod, [and] their associated RC Defendants control . . . certification")); *CBA*,

17

403 F. Supp. 3d at 419 (dismissing claim where "according to the [pleading], Toll Bros., TWT and First Environment—and not Toll Bros. alone—all retained some level of joint authority").

ME2C also fails to meet the "demanding standard" to plausibly allege the existence of a joint enterprise.  (D.I. 110 at 20 (quoting *IOENGINE*, 2019 U.S. Dist. LEXIS 12195, at *11).) ME2C claims that there is a joint enterprise between "CERT, Chem-Mod, . . . their associated RC Defendants, . . . and each coal-fired power plant . . . ."  (*See, e.g.*, D.I. 130 ¶ 264.)  This vague reference to the CERT Defendants collectively, unspecified RC Defendants, and unspecified power plants does not provide "each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests."  *Neology*, 2014 U.S. Dist. LEXIS 131568, at *13 (citation omitted).

The FAC also fails to allege required elements of the theory.  For instance, in an attempt to allege that all participants hold "an equal right to a voice in the direction of the enterprise, which gives an equal right of control," *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (citation omitted), ME2C alleges that "each controls a necessary aspect of the endeavor."  (D.I. 130 ¶ 221.)  But ME2C's allegations do not go beyond a typical supplier relationship.  That "CERT can exercise its controlling interest in the RC Defendants to cease providing refined coal" (*id.*) does not allege that the CERT Defendants have any voice or control over the unspecified power plants' use of the refined coal, or an Activated Carbon Step.  *See, e.g.*, *Sonrai Sys., LLC v. AMCS Grp. Inc.*, No. 16 C 9404, 2017 U.S. Dist. LEXIS 159450, at *18 (N.D. Ill. Sept. 27, 2017) (joint enterprise theory inadequate as plaintiff "alleged only that [defendant] AMCS provided technology to [defendant] Lakeshore and instructed Lakeshore how to use it," but not that "AMCS has the authority of a principal or has an equal voice in the conduct of Lakeshore's use of the technology").  Indeed, ME2C concedes that a "plant controls the process of combusting

the coal and providing . . . activated carbon."  (D.I. 130 ¶ 221); *cf. CBA*, 403 F. Supp. 3d at 419 (joint infringement pleading deficient as one defendant "had no . . . oversight authority").

ME2C also fails to plausibly allege a community of pecuniary interest, as it identifies different supposed benefits for each participant.  (D.I. 130 ¶ 220 (identifying "tax credits," "discount[s]," and/or "rent").)  ME2C's factual allegations for joint enterprise are thus deficient.

Beyond the deficiencies of ME2C's factual allegations, as a matter of law, its joint enterprise theories are not plausible under Section 45.  Specifically, "[d]efendants are not required to . . . practice any . . . specific process in order to qualify for Section 45 tax credits."  *Nalco I*, 2015 U.S. Dist. LEXIS 141162, at *6.  In addition, Section 45 provides tax credits for the sale of refined coal "to an unrelated person," 26 U.S.C. § 45(a)(2)(B), which excludes those under "common control," 26 U.S.C. § 52(b)(1).  ME2C's claim that the CERT Defendants form a joint enterprise related to tax credits, and that through this joint enterprise, all steps of a claimed method can be attributed to them, thus does not square with the statutory language.  Indeed, *Nalco I* rejected that "[d]efendants participate in a joint enterprise to receive Section 45 tax credits."  2015 U.S. Dist. LEXIS 141162, at *11, *14.

> 2.    ME2C Does Not Clearly, Let Alone Plausibly, Assert
>       that Any CERT Defendant Directly Infringes as a Single Actor

Sandwiched between paragraphs addressing joint infringement theories is a barebone statement that the CERT Defendants (and 15 other defendants) directly infringe each patent alone:

> AJG, DTE, CERT, Chem-Mod, and their associated RC Defendants also directly infringe when performing certification testing of refined coal designed for coal-fired power plants that use sorbent comprising activated carbon. They perform each step of the [asserted] claims, or they engage a third party agent on their behalf to perform each step of the [asserted] claims that acts under their control.

(D.I. 130 ¶¶ 265, 299, 328, 357, 390.)  It is unclear which, if any, CERT Defendant is alleged to perform which, if any, step alone, as is the basis for any theory of third party agency.  But it is

abundantly clear that these perfunctory assertions "fail[] to provide . . . adequate notice of the direct infringement allegations." *N. Star Innovation*, 2016 U.S. Dist. LEXIS 168670, at *6.  As ME2C fails to plausibly allege that any CERT Defendant practices each claim element (by itself or through a third party), any claim should be dismissed.  *See, e.g.*, *Horatio Wash. Depot Techs. LLC v. Tolmar, Inc.*, Civil Action No. 17-1086-LPS-CJB, 2018 U.S. Dist. LEXIS 187074, at *31 (D. Del. Nov. 1, 2018) (plaintiff failed to "plead[] facts relating to [each] claim limitation[] sufficient to explain why it is plausible that [d]efendants' product/acts satisfy those elements of the claims").

### C. ME2C's Willful Infringement Allegations Similarly Fail

ME2C fails to adequately plead that any single CERT Defendant "(1) knew of the patent-in-suit; (2) after acquiring that knowledge, . . . infringed the patent; and (3) in doing so, . . . knew, or should have known, that . . . conduct amounted to infringement of the patent." *Valinge Innovation AB v. Halstead New Eng. Corp.*, No. 16-1082-LPS-CJB, 2018 U.S. Dist. LEXIS 88696, at *35 (D. Del. May 29, 2018).  As set forth above, ME2C's pleading is bereft of factual allegations demonstrating that any single CERT Defendant possessed the requisite knowledge or took any act of infringement.  As such, ME2C's willfulness allegations should be dismissed. *See id.* at *35-37; *see also MONEC*, 897 F. Supp. 2d at 236-37 (dismissing willful infringement claim).

## VI. CONCLUSION

For the foregoing reasons, the Court should dismiss all claims in the FAC against the CERT Defendants under Rule 12(b)(6).  ME2C's second attempt to plead still falls short despite clear notice from the R&R as to the deficiencies in the Original Complaint, thus further attempts would be futile. Accordingly, the Court should dismiss all claims with prejudice.

DATED: August 6, 2020                    Respectfully submitted,

                                         /s/ Robert S. Saunders
OF COUNSEL:                              Robert S. Saunders (ID No. 3027)
Douglas R. Nemec                         Jessica R. Kunz (ID No. 5698)
Leslie A. Demers                         SKADDEN, ARPS, SLATE, MEAGHER &
SKADDEN, ARPS, SLATE, MEAGHER &             FLOM LLP
   FLOM LLP                              One Rodney Square
One Manhattan West                       P.O. Box 636
New York, NY 10001-8602                  Wilmington, Delaware  19899
Tel: (212) 735-3000                      Tel:  (302) 651-3000
douglas.nemec@skadden.com                Fax:  (302) 651-3001
leslie.demers@skadden.com                rob.saunders@skadden.com
                                         jessica.kunz@skadden.com

                                         *Attorneys for Defendants CERT
                                         Coal Holdings LLC, CERT
                                         Holdings LLC, CERT Holdings
                                         2018, LLC, CERT Operations
                                         LLC, CERT Operations II LLC,
                                         CERT Operations III LLC,
                                         CERT Operations IV LLC,
                                         CERT Operations V LLC, and
                                         CERT Operations RCB LLC*