## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**MIDWEST ENERGY EMISSIONS CORP.
and MES INC.,**

      **Plaintiffs,**

    **v.**

**VISTA ENERGY CORP., et al.**

    **Defendants.**

C.A. No. 19-1334-RGA-CJB

**JURY TRIAL DEMANDED**

## PLAINTIFFS MIDWEST ENERGY EMISSIONS CORP.
## AND MES INC.'S RESPONSE IN OPPOSITION TO THE
## <u>MOTION TO DISMISS FILED BY THE CERT DEFENDANTS</u>

Dated: August 27, 2020


OF COUNSEL:

Bradley W. Caldwell
Texas Bar No. 24040630
Jason D. Cassady
Texas Bar No. 24045625
John Austin Curry
Texas Bar No. 24059636
Justin T. Nemunaitis
Texas Bar No. 24065815
**CALDWELL CASSADY CURRY PC**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Phone: (214) 888-4848
Fax: (214) 888-4849
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
jnemunaitis@caldwellcc.com

DEVLIN LAW FIRM LLC
James M. Lennon (No. 4570)
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
jlennon@devlinlawfirm.com

*Attorneys for Plaintiffs Midwest Energy
Emissions Corp. and MES Inc.*

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.   SUMMARY OF THE ARGUMENT ................................................................................ 1

    A.   ME2C's Use of Group Names Is Proper ................................................................ 1

    B.   ME2C Has Adequately Alleged Knowledge for Purposes of Willful
         and Indirect Infringement. ...................................................................................... 2

    C.   ME2C Adequately Pled Induced Infringement ...................................................... 2

    D.   ME2C Adequately Pled Contributory Infringement ............................................... 2

    E.   ME2C Has Adequately Pled Joint Enterprise Infringement. .................................. 2

    F.   ME2C Has Adequately Pled Direct Infringement ................................................. 3

    G.   ME2C Has Adequately Pled Willful Infringement. ............................................... 3

III.  STATEMENT OF FACTS ............................................................................................... 3

IV.   LEGAL STANDARD ...................................................................................................... 3

V.    ARGUMENT ................................................................................................................... 4

    A.   The CERT Defendants Fail to Show That ME2C's Use of Group Names
         Creates a Lack of Notice of Its Asserted Claims. ................................................. 4

        1.   The CERT Defendants Waived Their Right to File a 12(b) Motion
            Objecting to ME2C's Use of Group Names to Plead Induced and
            Contributory Infringement. ....................................................................... 4

        2.   ME2C's use of Group Names Provides Adequate Notice. ................................ 5

    B.   ME2C Has Adequately Pled the Knowledge Requirement for Indirect
         Infringement. ........................................................................................................ 7

    C.   ME2C Has Adequately Pled Induced Infringement. .............................................. 9

    D.   The FAC Has Adequately Pled Contributory Infringement. ................................ 13

    E.   The FAC Has Adequately Pled Joint Enterprise Infringement ............................. 15

    F.   The FAC Has Adequately Pled Direct Infringement. ........................................... 17

    G.   The FAC Has Adequately Pled Willful Infringement. ......................................... 18

VI.   CONCLUSION .............................................................................................................. 19

i

# TABLE OF AUTHORITIES

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*
   797 F.3d 1020 (Fed. Cir. 2015) ................................................................. 15

*Align Tech., Inc. v. 3Shape A/S*
   339 F.Supp.3d 435 (D. Del. 2018) ............................................................. 5

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ............................................................................ 3, 17

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007) ......................................................................... 3, 4, 17

*BioMerieux, S.A. v. Hologic, Inc.*
   No. CV 18-21 (LPS), 2018 WL 4603267 (D. Del. Sept. 25, 2018) ............................ 8

*Callwave Commc'ns LLC v. AT & T Mobility LLC*
   No. CV 12-1701-RGA, 2014 WL 5363741 (D. Del. Jan. 28, 2014) ........................ 19

*Clouding IP, LLC v. Amazon.com, Inc.*
   No. CA 12-641-LPS, 2013 WL 2293452 (D. Del. May 24, 2013) ......................... 19

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*
   888 F.3d 1256 (Fed. Cir. 2018) ................................................................ 18

*Erickson v. Pardus*
   551 U.S. 89 (2007) ................................................................................. 4

*Groove Digital, Inc. v. Jam City, Inc.*
   No. 1:18-CV-01331-RGA, 2019 WL 351254 (D. Del. Jan. 29, 2019) .................... 8, 9

*Groove Digital, Inc. v. King.com, Ltd.*
   Civil Action No. 1:18-cv-836, 2018 WL 6168615 (D. Del. Nov. 26, 2018) .............. 5

*Hodosh v. Block Drug Co.*
   833 F.2d 1575 (Fed.Cir.1987) ................................................................. 14

*Huawei Technologies Company v. T-Mobile US, Inc.*
   2017 WL 1129951 (E.D. Tex. Feb. 21, 2017) .............................................. 19

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*
   681 F.3d 1323 (Fed. Cir. 2012) .............................................................. 4, 15

*Investpic, LLC v. FactSet Research Sys., Inc.*
   No. CIV. 10-1028-SLR, 2011 WL 4591078 (D. Del. Sept. 30, 2011) ...................................... 8

*Lfetime Indus., Inc. v. Trim-Lok, Inc.*
   869 F.3d 1372 (Fed. Cir. 2017) ............................................................................................ 8

*Mayne Pharma International Pty Ltd. v. Merck & Co., Inc.*
   Civil Action No. 15–438–LPS–CJB, 2015 WL 7833206 (D. Del. Dec. 3, 2015) ..................... 7

*McDermott v. Clondalkin Grp., Inc.*
   2016 WL 2893844 (3d Cir. May 18, 2016) ......................................................................... 9, 10

*N. Star Innovations, Inc. v. Toshiba Corp.*
   No. CV 16-115-LPS-CJB, 2016 WL 7107230 (D. Del. Dec. 6, 2016) ...................................... 7

*Nalco Co. v. Chem-Mod, LLC*
   883 F.3d 1337 (Fed. Cir. 2018) .......................................................................................... 14

*Neology, Inc. v. Kapsch Trafficcom IVHS, Inc.*
   No. CV 13-2052-LPS, 2014 WL 4675316 (D. Del. Sept. 19, 2014) ........................................ 6

*Promos Techs., Inc. v. Samsung Elecs. Co.*
   No. CV 18-307-RGA, 2018 WL 5630585 (D. Del. Oct. 31, 2018) ........................................... 6

*Reagent Chemical & Research, Inc. v. Eurotarget S.R.L.*
   2016 WL 8200435 (M.D. Penn. May 23, 2016) ............................................................... 15, 17

*Shire ViroPharma Inc. v. CSL Behring LLC*
   No. CV 17-414, 2018 WL 326406 (D. Del. Jan. 8, 2018) ..................................................... 19

*Spruill v. Gillis*
   372 F.3d 218 (3d Cir. 2004) ................................................................................................. 3

*Sunoco Partners Marketing & Terminals L.P. v. Powder Springs Logistics, LLC*
   2019 WL 8641303 (D. Del. Aug. 7, 2019) ............................................................................ 4

*Välinge Innovation AB v. Halstead New England Corp.*
   Civil Action No. 16-1082-LPS-CJB, 2018 WL 2411218 (D. Del. May 29, 2018) ................. 19

**Rules**

Fed. R. Civ. P. 8(d)(1) ............................................................................................ 6

Fed. R. Civ. P. 8(e) .............................................................................................. 7

Fed. R. Civ. P. 12(b) ...................................................................................... 4, 17

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 3

Fed. R. Civ. P. 12(g)(2) ........................................................................................ 4

This Court dismissed ME2C's original complaint against the CERT defendants based on insufficient allegations of intent and knowledge for ME2C's indirect infringement theories. ME2C's First Amended Complaint ("FAC") includes over thirty additional paragraphs of factual allegations demonstrating that the refined coal defendants have knowledge of their customers use of activated carbon through the testing process and as a result of operating a refined coal facility on-site at a power plant, and that they intend for their customers to use activated carbon so that they can qualify for and continue to obtain refined coal tax credits.

Moreover, ME2C also alleges that these Defendants have directly infringed by performing "post-emission control" testing. Defendants do not deny that they have done so, they merely hypothesize that some companies could perform a different type of testing. Because the Court must accept the allegations in the FAC as true, ME2C has also stated a claim for direct infringement. Accordingly, ME2C respectfully requests that the Court deny the motion and lift the stay as to these defendants.

## I.      NATURE AND STAGE OF THE PROCEEDINGS

On June 18, 2020, the Court issued a Report & Recommendation (the "R&R") granting various Defendants' motions to dismiss and allowing ME2C to amend its complaint. D.I. 127. On July 15, 2020, ME2C filed its First Amended Complaint ("FAC"), which provides additional factual allegations related to its infringement theories, and also includes three additional patents that issued after ME2C filed its original complaint.

## II.     SUMMARY OF THE ARGUMENT

### A.  ME2C's Use of Group Names Is Proper

The CERT Defendants allege that it is improper to group similarly situated Defendants under group names. This argument was waived, is contrary to law, and disregards the fact that

the FAC asserts the same infringement claims against each of the CERT Defendants such that there is no lack of notice as to ME2C's infringement theories.

**B.  ME2C Has Adequately Alleged Knowledge for Purposes of Willful and Indirect Infringement.**

ME2C alleges that it provided notice of the patents at least by filing the original complaint and by providing a draft of the FAC to Defendants before filing the FAC.  Nothing more is required to plead knowledge for willful and infringement.  In addition, The FAC contains additional allegations of even earlier knowledge.

**C.  ME2C Adequately Pled Induced Infringement**

According to CERT, the FAC fails to allege specific intent to infringe because it leaves open the possibility that some refined coal operations might not infringe.  This is beside the point.  The FAC alleges that, for the plants and refined coal at issue in this case, Defendants rely on infringing use of activated carbon to qualify for Section 45 tax credits and to continue receiving the benefits of those tax credits.  This supports a finding of specific intent.

**D.  ME2C Adequately Pled Contributory Infringement**

The CERT Defendants argue that the refined coal they supply could have some non-infringing use.  At most, this presents a fact dispute.  Because the FAC alleges that the refined coal as supplied and delivered must be used to infringe, it states a claim for contributory infringement.

**E.  ME2C Has Adequately Pled Joint Enterprise Infringement.**

ME2C alleges joint enterprise infringement based on the fact that each CERT Defendant and each coal plant control a key part of the process for receiving the benefits of refined coal tax credits.  Defendants argue that to state a claim for joint enterprise infringement, both parties must have equal control over the entire process.  Defendants' assertion cannot be correct as it would

2

collapse joint enterprise infringement into simple direct infringement or direction and control infringement. Defendants attack other aspects of ME2C's joint enterprise theory, but these attacks are also misguided.

### F.  ME2C Has Adequately Pled Direct Infringement

ME2C alleges that the Moving Refined Coal Defendants directly infringe by performing each step of the asserted claims during Section 45 certification testing. Nothing more is required to state a claim for direct infringement.

### G.  ME2C Has Adequately Pled Willful Infringement.

ME2C alleges that it provided notice of the patents at least by filing the original complaint and by providing a draft of the FAC to Defendants before filing the FAC. Nothing more is required to plead willful infringement.

## III.  STATEMENT OF FACTS

ME2C alleges that each of the Moving Refined Coal Defendants directly infringes the patents-in-suit by performing the patented methods during Section 45 certification testing. D.I. 130 at ¶ 84-88. It further alleges that the indirectly infringe by inducing and contributing to the infringement of coal plant operators. D.I. 130 at ¶ 87-108. More detailed descriptions of the patented technology were provided in the parties' prior briefing and are not repeated here.

## IV.  LEGAL STANDARD

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court is required to accept as true all material allegations in the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Specific facts are not necessary; the statement need only 'give the defendant fair

notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 570).  "[T]he plausibility requirement is not akin to a 'probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1341 (Fed. Cir. 2012) (quoting *Twombly*, 550 U.S. at 556).

## V.    ARGUMENT

### A.  The CERT Defendants Fail to Show That ME2C's Use of Group Names Creates a Lack of Notice of Its Asserted Claims.

Throughout their motion, the CERT Defendants allege that the complaint is deficient because ME2C used the name "CERT" to refer to the CERT Defendants instead of restating the name of each Defendant in the group.  The CERT Defendants waived this argument by failing to raise it in their original motion to dismiss.  They are also wrong that this drafting decision renders the complaint deficient.

#### 1.    The CERT Defendants Waived Their Right to File a 12(b) Motion Objecting to ME2C's Use of Group Names to Plead Induced and Contributory Infringement.

Rule 12(g)(2) prohibits a party from raising a defense or objection in a Rule 12(b) motion that was available to the party but omitted from an earlier filed motion.  Fed. Civ. P. 12(g)(2).  It is reversible error for a Court to consider such a defense or objection.  *Sunoco Partners Marketing & Terminals L.P. v. Powder Springs Logistics, LLC*, 2019 WL 8641303 at *3 (D. Del. Aug. 7, 2019).  In their original motion to dismiss, the CERT Defendants raised no objection to ME2C's form of pleading using a group name.  Accordingly, this argument is waived.

### 2.      ME2C's use of Group Names Provides Adequate Notice.

Courts in this district have held that a complaint may plead infringement using group names.  For example, in *Align Tech., Inc. v. 3Shape A/S*, the complaint used the term "3Shape" to refer to the 3Shape entities named as Defendants.  The Defendants argued that this was improper.  Chief Judge Stark disagreed, explaining: "[the plaintiff] is alleging that both of the Defendants did everything. . . . The allegations must at this stage, be taken as true. Time will tell if the plaintiff can prove them."  *Align Tech., Inc. v. 3Shape A/S*, 339 F.Supp.3d 435, 447 (D. Del. 2018); *see also Groove Digital, Inc. v. King.com, Ltd.*, Civil Action No. 1:18-cv-836, 2018 WL 6168615, at *1 (D. Del. Nov. 26, 2018) ("[A] complaint that collectively refers to defendants meets Rule 8's pleading standard if 'it can be reasonably inferred that each and every allegation is made against each individual defendant.'").

In this case, ME2C used a group name to refer to the CERT Defendants.  For example, when listing the Defendants, the complaint states: "CERT Coal Holdings LLC, CERT Holdings LLC, CERT Holdings 2018, LLC, CERT Operations LLC, CERT Operations II LLC, CERT Operations III LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC ("CERT")."  D.I. 130 at page 2.  Below, the complaint uses the defined term "CERT" to refer to these same entities to avoid needing to restate all of their names.  By stating, e.g., "AJG, DTE, CERT, Chem-Mod, and the RC Defendants operate RC facilities that receive coal, add bromine and/or bromide such as CaBr2 to the coal, and then provide that 'refined' coal to a coal-fired power plant that injects a sorbent material comprising activated carbon downstream of the combustion chamber," (D.I. 130 at ¶ 206), ME2C has provided notice that each of the Defendants included in those group names are accused of the acts constituting infringement. This is precisely the type of drafting approach approved in *Align Tech.*  Accordingly, Defendants have failed to show that the complaint is deficient.

Some Courts have dismissed complaints where the use of a group name and boilerplate statements of infringement create ambiguity as to what conduct is accused.  For example, in *Promos Techs., Inc. v. Samsung Elecs. Co.*, No. CV 18-307-RGA, 2018 WL 5630585, at *3 (D. Del. Oct. 31, 2018), the complaint defined various US and foreign entities under a group name and accused them all of making, using, offering to sell, or selling the infringing products within the United States, or importing them into the United States.  The Court granted a motion to dismiss on as to those allegations because the use of such disjunctive pleading made it unclear which Defendants were accused of which acts of infringement.  *Id.*  Similarly, in *Neology, Inc. v. Kapsch Trafficcom IVHS, Inc.*, No. CV 13-2052-LPS, 2014 WL 4675316, at *6 (D. Del. Sept. 19, 2014), the patent owner lumped together unrelated defendants that sold different products and engaged in different activities related to indirect infringement.  Here, there is no such ambiguity.  ME2C has accused all of the CERT Defendants of directly and indirectly infringing by performing certification testing and by operating refined coal facilities.

Moreover, even if a Plaintiff were required to copy and paste defendant names instead of using group names or use particular phrases to indicate that group names apply to all members of the group, such rules could not impact the plausibility of the allegations.  At most, Defendants assert that they lack notice as to what is accused.  However, CERT is plainly on notice as to what is accused.  Indeed, in their original motion to dismiss the CERT defendants stated: "ME2C alleges that the CERT Defendants provided coal with added promoter to the alleged direct infringers."   D.I. 50 at 15.  The CERT Defendants fail to show that the Court should dismiss a complaint that has complied with Rule 8's requirement for "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See also* Fed. R. Civ. P. 8(d)(1) ("Each

allegation must be simple, concise, and direct. No technical form is required."); 8(e) ("Pleadings

must be construed so as to do justice.").

Accordingly, ME2C has provided adequate notice of its allegations.  If the Court

nonetheless concludes that this drafting technique is inappropriate, ME2C requests leave to

amend the complaint, as dismissal with prejudice on this basis would be unduly harsh given that

this argument was not previously raised, and that it could be resolved with a straightforward

amendment to the complaint.  *See, e.g., N. Star Innovations, Inc. v. Toshiba Corp.*, No. CV 16-

115-LPS-CJB, 2016 WL 7107230, at *2 (D. Del. Dec. 6, 2016) (citing *Mayne Pharma*

*International Pty Ltd. v. Merck & Co., Inc.*, Civil Action No. 15–438–LPS–CJB, 2015 WL

7833206 (D. Del. Dec. 3, 2015)).

### B.  ME2C Has Adequately Pled the Knowledge Requirement for Indirect Infringement.

The CERT Defendants acknowledge that they had knowledge of the patents for indirect

infringement purposes prior to the filing of the FAC.  Mot. at 5 (citing ME2C's allegations that

the CERT Defendants received notice of infringement of the original patents at least as of the

filing of the original complaint on July 17, 2019, and notice of the additional patents at least

when they received a draft of the FAC on June 29, 2020 (D.I. 130 at ¶¶ 194, 196)).  They now

ask the Court to adjudicate the start date for indirect infringement damages.

Defendants cite no authority for their requested relief.  While some Courts have

dismissed indirect infringement claims arising prior to the filing of a complaint, there is no

dispute that the CERT Defendants received notice of each of the asserted patents, and the FAC

itself, prior to the filing of the FAC.  Accordingly, they cannot claim that they are entitled to

dismiss all pre-complaint claims for indirect infringement.  The Court need not decide, at the

pleading stage, the precise date when indirect infringement damages began to accrue.  Indeed, in

cases where Courts allow pre-suit indirect infringement claims to move forward, they do not typically require the plaintiff to identify the specific start date for pre-suit damages.

Regardless, ME2C alleges that the CERT Defendants received notice of infringement even earlier.  A Plaintiff may allege notice based on circumstantial evidence.  *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1380 (Fed. Cir. 2017) (overturning dismissal based on allegations that Defendant hired employees with knowledge of the patent).  For example, in *BioMerieux, S.A. v. Hologic, Inc.*, the Court found that a complaint adequately alleged pre-suit knowledge based on the fact that a party had a "business relationship" related to accused conduct with an entity aware of the patent.  No. CV 18-21 (LPS), 2018 WL 4603267, at *5 (D. Del. Sept. 25, 2018).  Similarly, *Groove Digital, Inc. v. Jam City, Inc.*, the plaintiff adequately alleged pre-suit notice by stating that the Defendant "monitors patent litigation against its competitors" and had been aware of a prior lawsuit involving a competitor.  No. 1:18-CV-01331-RGA, 2019 WL 351254, at *4 (D. Del. Jan. 29, 2019).  As another example, in *Investpic, LLC v. FactSet Research Sys.*, *Inc.* a plaintiff adequately alleged pre-suit notice by stating that the patent was "publicly known."  No. CIV. 10-1028-SLR, 2011 WL 4591078, at *2 (D. Del. Sept. 30, 2011) ("Defendants might disagree with this fact and may be able to prove otherwise through discovery; however, taking the factual assertion as true, if a patent is "publicly" known, one can infer (i.e., it is more probably true than not) that an individual defendant had knowledge of it.").

ME2C has alleged that the CERT Defendants had pre-suit notice of the patents:

- AJG, DTE, CERT, Chem-Mod, and RC Defendants have worked with the EERC to conduct testing related to their coal treatment processes. For example, they have relied on the EERC to demonstrate that the processes employed by refined coal facilities qualify for Section 45 Tax Credits. Through those interactions, it is likely that they became aware of the patents-in-suit and/or related applications as they were initially developed by the inventors while they were at the EERC.
- ME2C is one of a small number of companies that competes with Chem-Mod, AJG, DTE, CERT, and the RC Defendants to provide bromine-containing

additives for mercury control. It is reasonable to infer that these companies have done at least some due diligence on potential competitors. During that process, it is likely that they would have discovered the patents-in-suit from the U.S. Patent Office, Google Patents, ME2C publications and product literature, and/or ME2C's website.

- [Since the original complaint was filed, it] is reasonable to infer that AJG, DTE, CERT, Chem-Mod, and RC Defendants would have reviewed the prosecution history for the '114 and '147 patents and would be generally aware of other patents in the same family.

D.I. 130 at ¶¶ 187, 190, 195.  In addition, ME2C has alleged that CERT has formed a business relationship with Chem-Mod related to the accused conduct, and that Chem-Mod has had even more connections to the patents-in-suit.  *Id.* at ¶¶ 188-192.  These allegations are similar to those approved in the cases cited above and they plausibly allege that CERT was aware of the patents-in-suit independently from the original complaint and FAC.  Moreover, the CERT Defendants' knowledge is peculiarly within their control, and ME2C has alleged the requisite knowledge with more than merely boilerplate or conclusory allegations.  Nothing more is required at the pleading stage.  *McDermott v. Clondalkin Grp.*, Inc., 2016 WL 2893844, at *4 (3d Cir. May 18, 2016).

It is unclear if the CERT Defendants contest the knowledge requirement for post-suit indirect infringement, but, regardless "Plaintiff's filing of the Complaint is sufficient to establish the requisite knowledge for post-filing indirect infringement liability."  *Groove Digital, Inc. v. Jam City, Inc.*, No. 1:18-CV-01331-RGA, 2019 WL 351254, at *4 (D. Del. Jan. 29, 2019).

### C.  ME2C Has Adequately Pled Induced Infringement.

The Court previously dismissed the complaint because it "does not sufficiently explain why if these Defendants 'tailor' the amount of bromide added to the coal, they must necessarily know and intend that the coal plants will go on to perform the Activated Carbon Step."  D.I. 110 at 14.  It also found that ME2C's allegations regarding tax credit testing and regulatory requirements failed to demonstrate that the Defendants had knowledge of the downstream use of carbon.  *Id.* at 14 n. 12.  The FAC alleges that the Refined Coal Defendants "must necessarily

9

know and intend that the coal plants will go on to perform the step of injecting activated carbon." D.I. 130 at ¶ 100.  Taking this statement as true, ME2C has adequately alleged induced infringement.  The FAC also provides additional allegations that explain how and why the CERT Defendants know and intend for coal plants to perform the step of injecting activated carbon.

The CERT Defendants' primary basis for contesting ME2C's inducement claim is their assertion that "ME2C does not allege that an Activated Carbon Step must be performed for refined coal to qualify for Section 45 tax credits." Mot. at 11.[1]  This is both beside the point and disregards the allegations in the FAC.  ME2C need not, and does not, make blanket allegations regarding "all refined coal."  Rather, ME2C alleges that, because of the type of refined coal and testing that the CERT Defendants have elected to use, they have chosen to perform the Activated Carbon Step, and thus they directly and indirectly infringe.

In particular, ME2C alleges that, in order for the CERT Defendants to obtain the benefits of Section 45 tax credits, they must perform Section 45 certification testing.  D.I. 130 at ¶ 84. That is, they must demonstrate that use of their refined coal at a particular plant will provide the mercury reduction required under the statute.  *Id.* at ¶ 85.

The FAC explains that there are multiple techniques for performing Section 45 certification testing.  *Id.* at ¶ 86-88.  "Pre-emission control" testing tests the amount of mercury emitted from refined coal combustion without regard to the emission control equipment used at a

---

[1] The CERT Defendants also criticize ME2C for pleading some facts "on information and belief."  However, this form of pleading is entirely appropriate "where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control—so long as there are no boilerplate and conclusory allegations and plaintiffs . . . accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *McDermott v. Clondalkin Grp., Inc.*, 2016 WL 2893844, at *4 (3d Cir. May 18, 2016) (internal quotation marks omitted).  As shown below, ME2C's allegations regarding CERT's confidential testing protocols are not boilerplate or conclusory.

10

particular plant.  *Id.* at ¶ 87.  This approach may be appropriate if the refined coal is prepared by removing atoms of mercury from the coal.  With this type of refined coal, the operator need only compare mercury emissions between refined and non-refined coals to demonstrate mercury reduction.  *Id.*  The FAC alleges, and the Court must accept as true, that the Defendants do not refine coal in this manner, nor do they rely on "pre-combustion control" testing.  *Id.*

In contrast, "post-emission control" testing depends on the use of a plant's emission control equipment, including its use of activated carbon injection.  *Id.* at ¶ 88.  This approach is appropriate when the refined coal is prepared by adding chemicals to the coal to boost performance of emission control equipment (i.e., activated carbon injection), as opposed to removing atoms of mercury from the coal.  With this type of refined coal, "pre-combustion control" testing would fail to demonstrate any reduction in mercury because all of the mercury atoms remain in the coal.  *Id.* at ¶ 87.  "Post-emission control" testing, is performed on-site or using a combustor that simulates a plant's emission control equipment.  The operator compares the amount of mercury exiting this emission control equipment after combusting refined and non-refined coal.

The FAC alleges that Defendants prepare refined coal by adding chemicals to the coal, not by removing atoms of mercury.  Thus, when they perform Section 45 certification testing, they determine whether a given coal plant uses activated carbon injection, and the rely on that usage to perform "post-emission control" testing.  *Id.* at ¶ 87-88 ("On information and belief, for coal-fired power plants that use activated carbon injection, AJG, DTE, CERT, Chem-Mod, and the RC Defendants demonstrate qualified emission reduction for those plants by adding activated carbon sorbent downstream of the combustion chamber during the certification testing.").  This certification testing remains valid only for the coal plant under the conditions of the certification

11

test.  *Id.*  Thus, the Moving Refined Coal Defendants must know and intend for the coal plant to continue to inject activated carbon during normal operation so that they can continue to receive the benefits of refined coal tax credits.  *Id.* at ¶ 106.

In addition, the FAC alleges that, either through contractual obligations or financial incentives, once a refined coal system is installed at a plant, the coal plant operator cannot simply stop injecting activated carbon.  *Id.* at ¶ 98.  Because the particular refined coal used at an accused coal plant has been formulated to work with the activated carbon injection system at the plant, turning off that activated carbon injection system would result in mercury regulation violations.  *Id.* at ¶ 98 ("Were a plant to stop operating its activated carbon injection system, it could face fines that would destroy the economic incentives for dealing with a refined coal provider, or be shut down.").  The FAC alleges that the CERT Defendants are aware of this fact, and thus intend for coal plant operators to perform activated carbon injection after combusting the refined coal.  *Id.* at ¶¶ 98-100.

The FAC also alleges additional support for this claim.  *See, e.g., id.* at 90-104.  It alleges that the CERT Defendants have advertised the benefits of refined coal and specifically targeted marketing efforts towards plants that use activated carbon injection systems.  *Id.* at ¶ 97.  In particular, it alleges that the CERT Defendants advertise that refined coal can result in reduced carbon costs and the ability to sell fly ash instead of paying for disposal.  *Id.* at ¶ 96 ("In addition, the use of high quantities of activated carbon injection can discolor the fly ash produced by a coal-fired power plant. This may prevent the plant from selling the fly ash to cement producers, and instead require it to take on the cost of disposing of the fly ash. Providing bromine and/or bromide additives onto the coal combusted at a coal-fired power plant can reduce, the quantity of activated carbon required for mercury capture and thus preserve the

plant's ability to sell fly ash.").  Taken as true, these allegations indicate that the CERT Defendants know and intend for coal plants to use refined coal with activated carbon injection.

The FAC also alleges that, once a refined coal facility is installed at a plant, the plant operator and refined coal operator must coordinate regarding the amount of bromine and activated carbon being used.  This may be for economic and technical reasons.  For example, the refined coal contract between Defendant Belle River Fuels LLC and a coal plant operator requires the operator to report various operational parameters to Belle River Fuels, including the amount of activated carbon used.  D.I. 130-6 at sec. 8.2(e), exhibit C.  ME2C alleges that this contract is representative of the contracts entered into by the CERT Defendants.  *Id.* at ¶ 95.  ME2C also alleges that the CERT Defendants coordinate with coal plant operators to ensure that the amount of bromine used is appropriate for the amount of mercury in the current batch of coal and the current amount of activated carbon being added.  *Id.* at ¶ 91, 102-103.

Finally, CERT criticizes ME2C for leveling the same allegations against a large number of entities.  However, the mere fact that multiple entities engage in the same or similar acts of infringement is no reason to find ME2C's allegations implausible.  That is particularly true where ME2C alleges that these entities are essentially cookie-cutter versions of each other that exist as separate entities merely so that ownership in the entity can be sold to companies and individuals looking to reduce their tax burden through refined coal tax credits.  D.I. 130 at ¶¶ 73-80.  Thus, it makes sense that the same theories of infringement and supporting factual allegations would apply equally to each of the CERT Defendants.

**D.  The FAC Has Adequately Pled Contributory Infringement.**

The Court previously dismissed ME2C's claims for contributory infringement after finding that it failed to allege that the Defendants "know that this coal has no substantial non-

infringing use (i.e., that it cannot reasonably be used for purposes other than to be injected with activated carbon)."  The FAC alleges:

> [W]hen AJG, DTE, CERT, Chem-Mod, and/or one of the RC Defendants provides refined coal on the conveyance leading to the combustion chamber of a coal-fired power plant with an activated carbon injection system, AJG, DTE, CERT, Chem-Mod, and the RC Defendants know that this refined coal has been specifically tailored and certified for that plant, and that the provided refined coal has no substantial non-infringing use (i.e., it cannot reasonably be used for purposes other than to be combusted at the plant where sorbent comprising activated carbon will later be injected).

D.I. 130 at ¶ 107.  Taken as true, these allegations state a claim for contributory infringement.

According to Defendants, they cannot contribute to infringement because refined coal, in the abstract, can have some non-infringing use.  However, the proper inquiry is whether the accused refined coal "as sold and delivered" lacks substantial non-infringing use.  *See Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1357 (Fed. Cir. 2018) (finding that the plaintiff's allegations were sufficient to plead that the accused products had no substantial non-infringing uses, where the plaintiff pleaded that "[a]s sold and delivered" to the refined coal LLCs or operators of coal-fired power plants using Chem-Mod solution, certain additives at issue (MerSorb and S-Sorb) had no substantial non-infringing uses).  For example, in *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed.Cir.1987), the defendant sold potassium nitrate, which has a variety of different uses.  Nonetheless, the Federal Circuit found that the defendant could be liable for contributing to infringement of a patent claim covering a method of desensitizing teeth based on how the Defendant sold potassium nitrate—as a paste in a toothpaste tube.  *Id.* at 1580 (explaining that the proper inquiry is on the product "actually sold").  ME2C's claim for contributory infringement is even stronger.  The CERT Defendants do not merely place the accused refined coal in a receptacle convenient for infringement, they place it on a conveyer belt that drops it into an infringing plant.  Moreover, they do not just sell a staple chemical in a particular form factor,

14

they sell a particular refined coal that is formulated and certified for a single, infringing coal plant, and they require that coal plant to use the coal only for combustion, i.e., to infringe. D.I. 130 at ¶ 108, D.I. 130-6 at 8.2(d).

Defendants attempt to avoid this conclusion by comparing this case to *Bill of Lading*. However, in that case, the accused article was a scanning device that could be used in infringing and admittedly non-infringing ways. 681 F.3d at 1338 (comparing the devices to VCRs). According to Defendants it is possible to formulate a refined coal to be used at a plant that does not use activated carbon. Even if that is correct, ME2C alleges that the specific refined coal accused in this case can only be used at plants using activated carbon. Taken as true, this allegation distinguishes *Bill of Lading* and states a claim for contributory infringement.

### E.  The FAC Has Adequately Pled Joint Enterprise Infringement.

To plead joint enterprise infringement, a patent owner must allege: "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015).  Under these circumstances, the members of the joint enterprise may be considered a single entity for purposes of determining direct infringement. *Id.*

For example, in *Reagent Chemical & Research, Inc. v. Eurotarget S.R.L.*, 2016 WL 8200435 at *2 (M.D. Penn. May 23, 2016), the patent at issue covered a method of shooting targets.  The patentee alleged that various shooting galleries formed joint enterprises with their customers to perform the common purpose of facilitating a shooting activity.  This was sufficient to state a claim for joint enterprise infringement. *Id.* at *6 ("an agreement has been formed, with a common purpose of facilitating a shooting activity.  The parties have a pecuniary interest,

insomuch as the shooting facilities generate profits from their customers' dues and/or payments to use the facilities. . . . Finally, all involved have an equal right to a voice in the direction of the enterprise, insomuch as they may control whether and when the shooting activity takes place.")

ME2C has adequately alleged that the Moving Refined Coal Defendants are involved in a joint enterprise with respect to each coal plant operator that receives refined coal and uses activated carbon injection.  The Belle River Fuels contract is instructive.  It demonstrates that Belle River Fuels LLC has contracted with a coal plant operator to sell refined coal to the operator.  It further confirms that the parties to the agreement share the common purpose and pecuniary interest of benefiting from Section 45 tax credits, i.e., Belle River Fuels obtains those benefits directly from the IRS, and the coal plant operator obtains those benefits through reduced mercury regulation compliance costs and the other "Mercury Benefits," defined in the contract. Finally, it demonstrates that both parties to the agreement maintain an equal right of control in the enterprise.  For example, the agreement curtails each party's right to terminate the agreement (D.I. 130-6 at 24-25), and provides mechanisms requiring the parties to coordinate in the performance of the enterprise.  Because ME2C has alleged that this contract is representative of contracts signed by the other CERT Defendants, ME2C has stated a claim for joint enterprise. Defendants' arguments to the contrary are unavailing.

According to the CERT Defendants, they are merely in a supplier/customer relationship with the coal plants such that there is no equal right of control.  However, the FAC alleges otherwise.  In particular, both the CERT Defendants and the coal plants have equal control over the common purpose of benefiting from Section 45 tax credits, they just divide the responsibility for achieving that goal.   As noted above, the CERT Defendants must continue to supply refined coal (D.I. 130-6 at 8.2(a),(b), 8.3), and the coal plants must use that coal for the common

16

purpose, i.e., it must combust the coal only at the plant using activated carbon (D.I. 130-6 at 8.2(d)).  Failure of either party to support the common purpose could result in a breach of contract.  This sufficiently demonstrates an equal right to a voice in the direction of the enterprise.  *See, e.g., Reagent*, 2016 WL 8200435 at *6.

Second, Defendants argue that there can be no community of pecuniary interest because there is no single shared income.  Such a showing is not required at the pleading stage in a patent case.  *See, e.g., Reagent*, 2016 WL 8200435 at *6 (finding that patentee alleged a common pecuniary interest based on the fact that shooters must pay dues to shoot at a gallery).  Moreover, ME2C has alleged more than a mere exchange of money for refined coal.  Rather, ME2C alleges that the Moving Refined Coal Defendants share the value of Section 45 tax credits with coal plant operators by providing free or reduced price mercury control products and services, paying rent, and the other benefits enumerated in the Belle River contract.  D.I. 130 at ¶¶ 214, 217, 220.

Finally, the CERT Defendants note that the refined coal tax statute requires refined coal operators to be different entities from coal plant operators and not to be under common control with a coal plant operator.  They ask the Court to find, based on information outside the complaint, that they have met these statutory requirements.  This is improper in the context of a Rule 12(b) motion.  Moreover, even if the Court accepted the argument as true, none of the elements of joint enterprise liability require a plaintiff to allege that the parties are the same corporate entity or owned by the same corporate entity.  Accordingly, this argument fails as well.

### F.  The FAC Has Adequately Pled Direct Infringement.

The FAC alleges that each of the CERT Defendants directly infringes by performing the patented methods during Section 45 certification testing, or in the alternative, by directing a third party to perform section 45 certification testing.  As to the first option, to plead direct infringement under the *Iqbal/Twombly* standard, a plaintiff need only identify the patent and

17

products at issue and allege that Defendants meet every element of at least one claim.  *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018).  The Federal Circuit has approved such pleadings even where the allegations use a group name such as "Defendants" to allege that the Defendants infringe.  *Id.*  The FAC meets this standard (D.I. 130 at ¶¶ 265, 299, 328, 357, 390), and exceeds it.  *See* D.I. 130 at ¶¶ 88 (explaining that, for certification testing, each of the CERT Defendants prepare refined coal containing bromine, combust it, and inject activated carbon sorbent downstream of the combustion chamber).

As to the second option, the CERT Defendants contend that the FAC fails to allege that the third party performs each step of the asserted claims.  They are wrong:

> Alternatively, AJG, DTE, CERT, Chem-Mod, and their associated RC Defendants also directly infringe by directing and controlling a third party to perform certification testing of refined coal designed for coal-fired power plants that use sorbent comprising activated carbon. They either instruct the third party to perform the test using coal with added bromine or bromide and using sorbent comprising activated carbon downstream of the combustion chamber, or they instruct the third party to simulate the operation of a particular plant that uses sorbent comprising activated carbon. **In either case, they condition payment for the testing on the third party performing each step of the '114 patent claims.**

D.I. 130 at ¶ 266 (emphasis added).  Defendants next argue that this claim fails because the complaint alleges that the various refined coal Defendants work together to instruct the third party.  This is a re-hash of the group names issue.  ME2C alleges that each CERT Defendant instructs a third party to perform certification testing.  In doing so, it exercises control over the testing.

### G.  The FAC Has Adequately Pled Willful Infringement.

ME2C alleges that the CERT Defendants received notice of the original patents and the acts constituting infringement at least as of the filing of the original complaint on July 17, 2019, and notice of the additional patents and acts constituting infringement at least when they received a draft of the FAC on June 29, 2020.  D.I. 130 at ¶ 224.  Nothing more is required at the pleading

stage.  *See Välinge Innovation AB v. Halstead New England Corp.*, Civil Action No. 16-1082-LPS-CJB, 2018 WL 2411218, at \*13 (D. Del. May 29, 2018); *see also Shire ViroPharma Inc. v. CSL Behring LLC*, No. CV 17-414, 2018 WL 326406, at \*3 (D. Del. Jan. 8, 2018) (approving willfulness allegations in amended complaint based on notice provided in original complaint); *Clouding IP, LLC v. Amazon.com, Inc.*, No. CA 12-641-LPS, 2013 WL 2293452, at \*4 (D. Del. May 24, 2013) ("For purposes of pleading willful infringement, there appears to be little practical difference between a pre-complaint notice letter informing a defendant about a patentee's allegation of infringement and a subsequently-superseded original complaint formally alleging infringement.").[2]

## VI.    CONCLUSION

For all of the foregoing reasons, and given the lenient standard applied at this stage in the case, the court should deny the Motion to Dismiss.  If the Court is inclined to dismiss some aspect of the FAC, ME2C requests leave to amend.

---

[2] One Court has dismissed willfulness allegations based on the notice provided in an original complaint.  *See Callwave Commc'ns LLC v. AT & T Mobility LLC*, No. CV 12-1701-RGA, 2014 WL 5363741, at \*1 (D. Del. Jan. 28, 2014).  However, this is the sort of rigid rule that the Supreme Court would later criticize in *Halo*.  One of the purposes of an amended complaint is to account for new facts that have arisen or been discovered after the filing of the original complaint.  Because each act of infringement is a new tort that damages the plaintiff, the fact that a Defendant continues to infringe even after receiving a complaint for patent infringement is precisely the type of new fact appropriately added to an amended complaint.  It simply should not be the case that once a complaint is on file, the accused infringer is forever absolved of any subsequent egregious conduct.  *See also Huawei Technologies Company v. T-Mobile US, Inc.*, 2017 WL 1129951, at \*4 (E.D. Tex. Feb. 21, 2017) ("*Halo* recognizes that 'culpability is generally measured against the knowledge of the actor at the time of the challenged conduct.'  Culpability can arise pre- or post-suit—the scienter requirement is the same in either instance.  The contrary conclusion would permit the very type of culpable behavior admonished by the Supreme Court in *Halo* simply because of timing.").

Dated:  August 27, 2020

Respectfully submitted,

**DEVLIN LAW FIRM LLC**

*/s/ James M. Lennon*
James M. Lennon (No. 4570)
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
jlennon@devlinlawfirm.com

**CALDWELL CASSADY CURRY PC**
2121 N. Pearl St., Suite 1000
Dallas, Texas 75201
Phone: (214) 888-4848
(214) 888-4849 (*fax*)
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
jnemunaitis@caldwellcc.com

Bradley W. Caldwell
Texas Bar No. 24040630
Jason D. Cassady
Texas Bar No. 24045625
John Austin Curry
Texas Bar No. 24059636
Justin T. Nemunaitis
Texas Bar No. 24065815

*Attorneys for Plaintiffs*
*Midwest Energy Emissions Corp.*
*and MES Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that all counsel of record have been served with this document via the Court's CM/ECF system on August 27, 2020.

*/s/ James M. Lennon*
James M. Lennon