# EXHIBIT C

UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT TRIAL AND APPEAL BOARD

---

NRG Energy, Inc.,
Talen Energy Corporation, and
Vistra Energy Corp.

Petitioners

v.

Midwest Energy Emissions Corp.

Patent Owner

---

IPR2020-00832
Patent No. 10,343,114

**PETITION FOR *INTER PARTES* REVIEW**

Petition for IPR2020-00832
USP 10,343,114

## **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................1

II.     MANDATORY NOTICES UNDER 37 C.F.R. §42.8(a)(1) ........................1

    A.  Real Party-In-Interest under 37 C.F.R. §42.8(b)(1)..................1

    B.  Related Matters under 37 C.F.R. §42.8(b)(2) .........................6

    C.  Lead and Back-Up Counsel under 37 C.F.R. §42.8(b)(3) ........................8

    D.  Service Information under 37 C.F.R. §42.8(b)(4) ...................9

    E.  Fees..............................................................................9

III.    REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37
    C.F.R. §42.104 ......................................................................9

    A.  Standing......................................................................9

    B.  Asserted References and Prior-Art Status...............................9

    C.  Identification of Challenged Claims ..................................10

    D.  The Board Should Not Deny Institution ...............................11

IV.     OVERVIEW ........................................................................12

    A.  Level of Ordinary Skill ...............................................12

    B.  The Alleged Invention of the '114 Patent..............................12

    C.  Prosecution History of the '114 Patent ...............................13

    D.  State of the Art ........................................................15

V.      CLAIM CONSTRUCTION ........................................................20

VI.     The '114 Priority Date is No Earlier Than May 14, 2018 .........................20

    A.  PO Carries the Burden in Demonstrating Priority .....................21

    B.  Passages Cited During Prosecution for Written Description
    Support Were Either Added In 2018 or Do Not Provide Support..........23

    C.  PO Cannot Rely on the Provisional for Support......................26

    D.  There is No Support for the '114 Patent Claims in Intervening
    Applications Between the Provisional and the '114 Patent....................33

VII.    GROUND 1: CLAIMS 1-2, 4-9, 12-28, 30 ARE OBVIOUS OVER
    SJOSTROM IN VIEW OF ECKBERG .....................................36

    A.  Overview of Ex[1010] ("Sjostrom").....................................36

B.   Overview of Ex[1011] ("Eckberg") ........................................................37

C.   Prior Art Status of Sjostrom and Eckberg ...............................................39

D.   Reasons to Combine References ................................................................42

E.   Claim 1 .....................................................................................................44

F.   Claims Depending from Claim 1 ..............................................................54

G.   Claim 23 ...................................................................................................66

H.   Claim 24 ...................................................................................................66

I.   Claim 25 ....................................................................................................68

J.   Claims Depending from Claim 25 ............................................................68

VIII.   GROUND 2: CLAIMS 1-9 and 12-30 ARE OBVIOUS OVER
SJOSTROM IN VIEW OF OLSON-646 ....................................................69

A.   Overview of Ex[1014] ("Olson-646") .....................................................70

B.   Reasons to Combine References ................................................................74

C.   Claim 1 .....................................................................................................76

D.   Claims Depending from Claim 1 ..............................................................82

E.   Claim 24 ...................................................................................................91

F.   Claim 25 ....................................................................................................92

G.   Claims Depending from Claim 25 ............................................................93

IX.   CONCLUSION ................................................................................................98

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ..........................................................30

*Becton, Dickinson & Co. v. B. Braun Melsungen AG*,
IPR2017-01586, Paper 8 (Dec. 15, 2017).........................................11

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009) ..........................................................26

*GoPro, Inc. v. Contour IP Holding LLC*,
908 F.3d 690 (Fed. Cir. 2018) ............................................................39

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ...........................................56, 76, 83, 95

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020) ...................................................16, 56

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997) .......................... 21, 22, 26, 32, 33, 34

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008) .......................................10, 21, 22, 26

*Zenon Envtl., Inc. v. U.S. Filter Corp.*,
506 F.3d 1370 (Fed. Cir. 2007) .......................................................27

STATUTES

35 U.S.C. §111 .......................................................................................28

35 U.S.C. §122 .......................................................................................28

35 U.S.C. §311(c)(1)...............................................................................11

**OTHER AUTHORITIES**

37 C.F.R. §1.57(d) (2020) .......................................................................27

M.P.E.P. §201.08 .............................................................................12, 21

## LIST OF EXHIBITS

| Ex. | Description |
|---|---|
| 1001 | U.S. Patent No. 10,343,114 to Olson et al. (filed May 14, 2018) (**"'114 Patent" or "Challenged Patent"**) |
| 1002 | Declaration of Dr. Stephen Niksa in Support of Petition for *Inter Partes* Review of U.S. Patent No. 10,343,114 (**"'114 Niksa Decl."**) |
| 1003 | RESERVED |
| 1004 | Curriculum Vitae of Dr. Stephen Niksa |
| 1005 | *Midwest Energy Emissions Corp. v. Vistra Energy Corp. et al.*, Case No. 1:19-cv-01334, Dkt. No. 1 (D. Del. July 17, 2019) |
| 1006 | U.S. Patent Pub. No. 2008/0107579 to Downs et al. (published May 8, 2008) (**"Downs-Boiler"**) |
| 1007 | U.S. Patent Prov. App. No. 60/555,353 (filed Mar. 22, 2004) (**"Downs-Boiler-Provisional"**) |
| 1008 | U.S. Patent No. 6,878,358 to Vosteen et al. (filed May 6, 2003) (**"Vosteen"**) |
| 1009 | Proposed National Emission Standards for Hazardous Air Pollutants; and, in the Alternative, Proposed Standards of Performance for New and Existing Stationary Sources: Electric Utility Steam Generating Units, 69 Fed. Reg. 4652-4752 [Volume 69, No. 20] (Jan. 30, 2004) (**"EPA-Proposal"**) |
| 1010 | Sharon Sjostrom, "Full Scale Evaluations of Mercury Control Technologies with PRB Coals," Track A, Session A3 (Mercury – Control), Presentation A3b, EUEC: 8TH ELECTRIC UTILITIES ENVIRONMENTAL CONFERENCE (Tucson, Arizona: January 25, 2005) (**"Sjostrom"**) |

Petition for IPR2020-00832
USP 10,343,114

| | |
|---|---|
| 1011 | Craig Eckberg et al., "Mercury Control Evaluation of Halogen Injection into a Texas Lignite-Fired Boiler," Track A, Session A3 (Mercury – Control), Presentation A3c, EUEC: 8TH ELECTRIC UTILITIES ENVIRONMENTAL CONFERENCE (Tucson, Arizona: January 25, 2005) (**"Eckberg"**) |
| 1012 | U.S. Patent No. 6,953,494 to Nelson,  (filed May 6, 2003) (**"Nelson"**) |
| 1013 | U.S. Patent Pub. No. 2004/0003716 to Nelson (published Jan. 8, 2004) (**"Nelson Publication"**) |
| 1014 | U.S. Patent Pub. No. 2006/0048646 to Olson et al. (published Mar. 9, 2006) (**"Olson-646"**) |
| 1015 | U.S. Patent Pub. No. 2007/0180990 to Downs et al. (published August 9, 2007) (**"Downs-Halogenation"**) |
| 1016 | RESERVED |
| 1017 | Family Tree of '114 and '147 Patents, Showing Parent Patent Applications |
| 1018-1019 | RESERVED |
| 1020 | File History of U.S. Patent Prov. App. No. 60/605640 (**"Provisional"**) |
| 1021 | File History of U.S Patent Application No. 11/209,163 (**"'163 Application File History"**) |
| 1022 | File History of U.S Patent Application No. 12/201,595 (**"'595 Application File History"**) |
| 1023 | File History of U.S Patent Application No. 12/429,058 (**"'058 Application File History"**) |

Petition for IPR2020-00832
USP 10,343,114

| 1024 | File History of U.S Patent Application No. 14/102,896 (**"'896 Application File History"**) |
|---|---|
| 1025 | File History of U.S. Patent Application No. 15/295,594 (**"'594 Application File History"**) |
| 1026 | File History of U.S. Patent Application No. 15/978,760 (issued as U.S. Patent No. 10,343,114) (**"'114 Patent File History"**) |
| 1027 | Babcock & Wilcox, STEAM: ITS GENERATION AND USE, 40th ed. (The Babcock & Wilcox Company: 1992) (**"B&W: Steam"**) |
| 1028 | J. Bustard, S. Sjostrom, et al., "Full Scale Evaluation of Sorbent Injection for Mercury Control on Coal-Fired Power Plants," International Conference on Air Quality III, Paper No. A5-4 (Sept. 9-12, 2002: Arlington, VA) (**"Bustard"**) |
| 1029 | U.S. Patent No. 1,984,164 to Stock et al. (issued Dec. 11, 1934) (**"Stock"**) |
| 1030 | Electric Utilities Environment Conference 2005 Handout (**"EUEC Handout"**) |
| 1031 | Scan of CD mailed to conference attendees from EUEC: 8th Electric Utilities Environmental Conference (Tucson, Arizona: January 23-26, 2005) (**"EUEC CD Scan"**) |
| 1032 | Redline comparison between U.S. Patent Pub. No. 2008/0107579 (Downs-Boiler, Ex. 1006) and U.S. Patent Prov. Appl. No. 60/555,353 (Downs-Boiler-Provisional, Ex. 1007), using Downs-Boiler-Provisional as the original version (**"Downs-Boiler-Redline"**) |
| 1033 | 35 U.S.C. § 111 (2006) |
| 1034 | 35 U.S.C. § 122 (2006) |
| 1035 | 37 C.F.R. § 1.57 (July 1, 2005) |

| 1036 | U.S. Patent No. 7,514,052 to Lissianski et al. (filed Apr. 7, 2009) (**"Lissianski"**) |
| 1037 | Paul Chu, "Power Plant Evaluation of the Effect of SCR Technology on Mercury," Paper No. 106, COMBINED POWER PLANT AIR POLLUTANT CONTROL MEGA SYMPOSIUM (MEGA) (Washington, DC: May 19-22, 2003) ("**Power Plant Evaluation**") |
| 1038 | Evan J. Granite et al., "Sorbents for Mercury Removal from Flue Gas," DOE/FETC/TR–98-01, U.S. Department of Energy (Jan. 1998) (**"Granite"**) |
| 1039 | Thomas J. Feeley, et al., "A Review of DOE/NETL's Mercury Control Technology R&D Program for Coal-Fired Power Plants," *DOE/NETL &g R&D Program Review* (April 2003) (**"Feeley"**) |
| 1040 | Oxtoby et al., PRINCIPLES OF MODERN CHEMISTRY, 4th ed (Saunders College Publishing: 1999) (**"Oxtoby"**) |
| 1041 | N.N. Greenwood and A. Earnshaw, CHEMISTRY OF THE ELEMENTS, 2nd ed. (Butterworth-Heinemann: 1997) (**"Greenwood"**) |
| 1042 | B.R. Puri, *Surface Complexes on Carbons*, *in* CHEMISTRY AND PHYSICS OF CARBON 191 (Philip L. Walker, ed.) (Marcel Dekker: 1970) (**"Puri"**) |
| 1043 | Frank E. Huggins et al., "XAFS Examination of Mercury Sorption on Three Activated Carbons," *Energy & Fuels* 1999(13), p. 114-121 (1999) (**"XAFS"**) |
| 1044 | S. Niksa et al., *Predicting Complete Hg Speciation Along Coal-Fired Utility Exhaust Systems*, MEGA SYMPOSIUM, Paper # 45 (Washington, DC: 2004) (**"Hg Speciation"**) |
| 1045 | D.L. Laudal et al., *Evaluation of Mercury Speciation at Power Plants Using SCR and SNCR NOx Control Technologies*, Paper No. A5-01, INT'L CONF. ON AIR QUALITY III (Arlington, VA: Sept. 9-12, 2002) (**"Laudal"**) |

| 1046-1052 | RESERVED |
|---|---|
| 1053 | U.S. EPA, AP-42: External Combustion Sources, Chapter 1: Fifth Edition, Volume I (Sep. 1998), available at https://www3.epa.gov/ttn/chief/ap42/ch01/index.html (last visited Apr 10, 2020) (**"Chapter 1 of AP-42"**) |
| 1054 | U.S. DOE, Mercury Emissions Control - Regulatory Drivers (Jan. 24, 2003), available at https://web.archive.org/web/20030416142937/http:/www.netl.doe.gov/coalpower/environment/mercury/regs.html (**"Mercury Emissions Control"**) |
| 1055 | Clean Air Mercury Rule: Basic Information, available at https://web.archive.org/web/20050920005951/http:/www.epa.gov/mercuryrule/basic.htm (**"Clean Air Mercury Rule"**) |
| 1056 | EPA Newsroom, "EPA Announces First-Ever Rule to Reduce Mercury Emissions from Power Plants" (Mar. 15, 2005), available at: https://archive.epa.gov/epapages/newsroom_archive/newsreleases/91ab7266e65751b985256fc50067d9b0.html  (**"3/15/2005 EPA Press Release"**) |
| 1057 | EPA Newsroom, "Public Comment Period Begins for Proposed Power Plant Regulations" (Jan. 29, 2004), available at: https://archive.epa.gov/epapages/newsroom_archive/newsreleases/4daf1d46e8dd755c85257036005511f9.html (**"1/29/2004 EPA Press Release"**) |
| 1058 | EPA Newsroom, "EPA Supplements Proposal to Reduce Power Plant Mercury Emissions," (Feb. 24, 2004), available at: https://archive.epa.gov/epapages/newsroom_archive/newsreleases/5810096dabfc9eba85256e440078905f.html (**"2/24/2004 EPA Press Release"**) |
| 1059 | Sharon Sjostrom et al., "Field Studies of Mercury Control Using Injected Sorbents," AWMA ANNUAL MEETING, Session Ae-1b (2002) (**"Field Studies of Mercury Control"**) |

| 1060 | EPA, "Mercury Study Report to Congress Volume VIII: An Evaluation of Mercury Control Technologies and Costs," EPA Report No. EPA-452/R-97-010 (Dec. 1997), available at https://www3.epa.gov/airtoxics/112nmerc/volume8.pdf (**"EPA 1997 Mercury Study Report Vol. VIII"**) |
|------|-----|
| 1061 | EUEC 2005 home page, available at: https://web.archive.org/web/20050303090129/http:/www.euec.com/ |
| 1062 | Charlene R. Crocker et al., "Mercury Control with the Advanced Hybrid Particulate Collector Technical Progress Report," U.S. DOE-NETL (Nov. 2003) (**"Crocker"**) |
| 1063 | Redline Comparison, showing changes from '163 Application (as published at 2006/0048646) to '760 Application (as published at 2018/0257031) |
| 1064 | Redline Comparison, showing changes from '595 Application (as published at 2009/0062119) to '058 Application (as published at 2009/0297413) |
| 1065 | Redline Comparison, showing changes from '058 Application (as published at 2009/0297413) to '594 Application (as published at 2017/0128908) |
| 1066 | Redline Comparison, showing changes from '595 Application (as published at 2009/0062119) to '760 Application (as published at 2018/0257031) |
| 1067 | Redline Comparison, showing changes from '640 Provisional-Application (excerpted from Ex. 1020) to '760 Application (as published at 2018/0257031) |
| 1068 | Redline Comparison, showing changes from '594 Application (as published at 2017/0128908) to '760 Application (as published at 2018/0257031) |

Petition for IPR2020-00832
USP 10,343,114

| 1069 | Redline Comparison, showing changes from '058 Application (as published at 2009/0297413) to '760 Application (as published at 2018/0257031) |
| 1070 | Roop Chand Bansal, et al., ACTIVE CARBON (Marcel Dekker:1988) 1988. 482 pages (scan received from Library of Congress via Baker Botts) (**"Bansal"**) |

Other than prosecution histories, Ex[1020]-Ex[1026], all citations to exhibits reference original page numbers found in the underlying document, and all emphases are added.

## I.     INTRODUCTION

Petitioners request IPR of claims 1-9 and 12-30 of U.S. Patent No. 10,343,114 (the "**'114 Patent**" or "**Challenged Patent**").  Ex[1001].  The Petition is supported by the expert declaration of Dr. Stephen Niksa.  Ex[1002] (declaration); Ex[1004] (CV).

## II.     MANDATORY NOTICES UNDER 37 C.F.R. §42.8(A)(1)

### A.     REAL PARTY-IN-INTEREST UNDER 37 C.F.R. §42.8(B)(1)

The real parties-in-interest are the Petitioners NRG Energy, Inc. (**"NRG"**), Talen Energy Corporation (**"Talen"**), and Vistra Energy Corp. (**"Vistra"**) (collectively, **"Petitioners"**).

Petitioners also identify the following real-parties-in-interest: Brandon Shores LLC; Talen Generation LLC; H.A. Wagner LLC; IPH, LLC; Illinois Power Resources Generating, LLC; Dynegy Midwest Generation LLC; Dynegy Miami Fort, LLC;  NRG Texas Power LLC; Midwest Generation EME, LLC; and Midwest Generation, LLC.[1]  These entities are parties to a lawsuit where they have been

---

[1]  Although Dynegy Inc. and Talen Energy Holdings, Inc. are also listed in the complaint, those entities no longer exist, and thus Petitioners have not included them here.

accused of infringing the Challenged Patent. *Midwest Energy Emissions Corp. and MES Inc. v. Vistra Energy Corp.*, No. 1:19-cv-01334-RGA (D. Del.) (**"Delaware Litigation"**). Ex[1005] (Complaint).

### 1.    Additional Potential Real Parties in Interest Identified by Talen

Petitioner Talen Energy Corporation, out of an abundance of caution, also identifies Alstom Power, Inc., Brandon Shores Coaltech, LLC, Brunner Island Refined Coal LLC, Chem-Mod LLC, Clean Coal Solutions, LLC, C.P. Crane LLC, Con-C, LLC, Clyde Bergemann Delta Ducon, Inc., Montour Refined Coal LLC, and Wagner Coaltech, LLC as potential real parties-in-interest to the Petitioner Talen Energy Corporation. These entities are vendors and suppliers with regards to certain allegedly infringing components at issue in the Delaware Litigation. None of these companies have agreed to be listed as a real party-in-interest for this Petition. None of these companies or any unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding.

In addition, Petitioner Talen Energy Corporation also identifies the following entities as potential real parties-in-interest out of an abundance of caution: Avista Corporation, Barney M. Davis, LP; BDW Corp.; Bell Bend, LLC; Brunner Island Services LLC; Brunner Island, LLC; C/R Topaz Holdings, LLC; Camden Plant Holding, LLC; Colstrip Comm Serv, LLC; Conemaugh Fuels, LLC; Dartmouth

Plant Holding, LLC; Dartmouth Power Associates Limited Partnership; Dartmouth Power Generation, LLC; Dartmouth Power Holding Company, LLC; Elmwood Energy Holdings, LLC; Elmwood Park Power, LLC; Fort Armistead Road – Lot 15 Landfill, LLC; Holtwood LLC; Interstate Energy Company LLC; Jade Power Generation Holdings LLC; Keystone Fuels, LLC; Lady Jane Collieries, Inc.; Laredo WLE, LP; Liberty View Power, LLC; LMBE Project Company; LMBE-MC Holdco I LLC; LMBE-MC Holdco II LLC; Lower Mount Bethel Energy, LLC; Martins Creek, LLC; MC OpCo LLC; MC Project Company LLC; MEG Generating Company, LLC; Millennium Power Partners, LP; Montour Services LLC; Montour Solar HoldCo LLC; Montour, LLC; Morris Energy Management Company, LLC; Morris Energy Operations Company, LLC; NBCP Urban Renewal Corporation; New Athens Generating Company, LLC; Newark Bay Cogeneration Partnership, LP; Newark Bay Holding Company, LLC; NorthEast Gas Generation GP, LLC; NorthEast Gas Generation Holdings, LLC; NorthEast Gas Generation, LLC; NorthWestern Corp.; Nueces Bay WLE, LP; PacifiCorp; Pedricktown Cogeneration Company LP; Pedricktown Investment Company LLC; Pedricktown Management Company LLC; Pennsylvania Mines, LLC; Portland General Electric Company; Puget Sound Energy, Inc.; Raven FS Property Holdings LLC; Raven Lot 15 LLC; Raven Power Finance LLC; Raven Power Fort Smallwood LLC; Raven Power

Generation Holdings LLC; Raven Power Group LLC; Raven Power Marketing LLC; Raven Power Operating LLC; Raven Power Property LLC; Realty Company of Pennsylvania; RMGL Holdings LLC; Sapphire Power Finance LLC; Sapphire Power Generation Holdings LLC; Sapphire Power LLC; Sapphire Power Marketing, LLC; Susquehanna Nuclear, LLC; Talen Energy Marketing, LLC; Talen Energy Retail LLC; Talen Energy Services Group, LLC; Talen Energy Services Holdings, LLC; Talen Energy Services Northeast, Inc.; Talen Energy Supply, LLC; Talen Investment Corporation; Talen Land Holdings, LLC; Talen Montana Holdings, LLC; Talen Montana, LLC; Talen MS Holdings LLC; Talen NE LLC; Talen Nuclear Development, LLC; Talen Receivables Funding, LLC; Talen Solar Holdings LLC; Talen Treasure State, LLC; Topaz Power Group GP II, LLC; Topaz Power Group LP II, LLC; Topaz Power Group, LLC; Topaz Power Holdings, LLC; Topaz Power Management II GP, LLC; Topaz Power Management II LP, LLC; Topaz Power Property Management II, LP; York Generation Company, LLC; and York Pant Holding, LLC.

### 2.   Additional Potential Real Parties in Interest Identified by Vistra

Petitioner Vistra Energy Corp., out of an abundance of caution, also identifies Bascobert (A) Holdings, LLC; Calgon Carbon Corp.; CERT Operations RCB, LLC; Chem-Mod LLC; RC29, LLC; and RTRC Texas LLC as potential real parties-in-

interest to Petitioner Vistra.  These entities are vendors and suppliers with regards to certain allegedly infringing components at issue in the District Court litigation referenced in the Related Matters section below.  None of these companies have agreed to be listed as a real party-in-interest for this Petition.  None of these companies or any unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding.

In addition, Petitioner Vistra Energy Corp. also identifies the following entities as potential real parties-in-interest out of an abundance of caution: Big Brown Power Company LLC; Coffeen and Western Railroad Company; Coleto Creek Power, LLC; Dynegy Coal Generation, LLC; Dynegy Coal HoldCo, LLC; Dynegy Commercial Asset Management, LLC; Dynegy Conesville, LLC; Dynegy Power Marketing, LLC; Dynegy Resource II, LLC; Dynegy Resources Generating Holdco, LLC; Dynegy Zimmer, LLC; Electric Energy, Inc.; EquiPower Resources Corp.; Havana Dock Enterprises, LLC; Illinois Power Generating Company; Illinois Power Resources, LLC; Joppa and Eastern Railroad Company; Kincaid Generation, L.L.C.; Luminant Generation Company LLC; NEPCO Services Company; Northeastern Power Company; Oak Grove Management Company; Sandow Power Company LLC; Vistra Asset Company LLC; Vistra Intermediate Company LLC; and Vistra Operations Company LLC.

### 3.   Additional Potential Real Parties in Interest Identified by NRG

Petitioner NRG Energy, Inc., out of an abundance of caution, also identifies ADA-ES, Inc., Alistar Enterprises, LLC, Cabot Corporation, Calgon Carbon Corporation, CERT Operations, LLC, CERT Operations IV, LLC, Chem-Mod LLC, Rutledge Products, LLC, and Senescence Energy Products, LLC.  These entities are vendors and suppliers with regards to certain allegedly infringing components at issue in the District Court litigation referenced in the Related Matters section below. None of these companies have agreed to be listed as a real party-in-interest for this Petition.  No unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding.

In addition, Petitioner NRG Energy, Inc. also identifies the following entities as potential real parties-in-interest out of an abundance of caution: NRG Texas LLC, NRG Midwest Holdings LLC, Mission Midwest Coal, LLC, Midwest Generation Holdings I, LLC, Midwest Generation Holdings II, LLC, Midwest Generation Procurement Services, LLC, Midwest Finance Company, LLC, NRG Energy Holdings, Inc., and NRG Acquisition Holdings Inc.

### B.   RELATED MATTERS UNDER 37 C.F.R. §42.8(B)(2)

Patent Owner ("PO") has asserted the Challenged Patent in district court in the following matter: *Midwest Energy Emissions Corp. and MES Inc. v. Vistra*

*Energy Corp.*, No. 1:19-cv-01334-RGA (D. Del.).  Ex[1005].  The case has multiple

motions to dismiss filed under Rule 12(b)(6) pending resolution, and the Court has

not issued a scheduling order.  None of the Petitioners have filed an answer to the

complaint, and the Court has not set a trial schedule.

According to U.S. Patent & Trademark Office Patent Application Information

Retrieval (PAIR) system, the '114 Patent was filed as App. No. 15/978,760 (the

"'760 Application") on May 14, 2018 and purports to claim priority as follows:

- Continuation-in-part of U.S. Patent Application No. 15/295,594 filed on Oct. 17, 2016 (the "'594 Application") and abandoned on March 5, 2020, which is a:

- Continuation of U.S. Patent Application No. 14/102,896, filed on Dec. 11, 2013 (the "'896 Application") and issued on October 18, 2016 as U.S. Patent No. 9,468,886, which is a:

- Continuation of U.S. Patent Application No. 12/429,058, filed on Apr. 23, 2009 (the "'058 Application") and issued on February 18, 2014 as U.S. Patent No. 8,652,235, which is a:

- Continuation-in-part of U.S. Patent Application No. 12/201,595, filed on Aug. 29, 2008 (the "'595 Application") and abandoned on September 30, 2010, which is a:

- Division of U.S. Patent Application No. 11/209,163, filed on Aug. 22, 2005 (the "'163 Application") and issued on September 24, 2008 as U.S. Patent No. 7,435,286, which is a non-provisional of:

- U.S. Provisional Patent Application No. 60/605,640, filed on August 30, 2004 (the "Provisional").

Petitioners are also concurrently filing a second petition against the Challenged Patent.  The current petition asserts a priority date of no earlier than May 14, 2018, the filing date of the '114 Patent, because the applications to which the '114 Patent claims priority do not contain support for the Challenged Claims of the '114 Patent.  The second petition assumes *arguendo* that the Challenged Claims of the '114 Patent have priority to Aug. 30, 2004.

### C.   LEAD AND BACK-UP COUNSEL UNDER 37 C.F.R. §42.8(B)(3)

| LEAD COUNSEL | BACK-UP COUNSEL |
| --- | --- |
| Brian W. Oaks (Reg. 44,981)<br>Baker Botts L.L.P.<br>98 San Jacinto Boulevard, Suite 1500<br>Austin, TX 78701-4078<br>Tel:  512-322-5470<br>brian.oaks@bakerbotts.com | David J. Tobin (Reg. 60,776)<br>Baker Botts L.L.P.<br>2001 Ross Avenue, Suite 900<br>Dallas, TX 75201-2980<br>Tel: 214-953-6869<br>david.tobin@bakerbotts.com<br><br>Elizabeth D. Flannery (Reg. 59,509)<br>Baker Botts L.L.P.<br>910 Louisiana Street<br>Houston, Texas 77002-4995<br>Tel.: 713.229.2104<br>liz.flannery@bakerbotts.com<br><br>Thomas B. Carter, Jr. (Reg. 76,040)<br>Baker Botts L.L.P.<br>910 Louisiana Street<br>Houston, Texas 77002-4995<br>Tel.: 713.229.1505<br>thomas.carter@bakerbotts.com |

Petition for IPR2020-00832
USP 10,343,114

### D.    SERVICE INFORMATION UNDER 37 C.F.R. §42.8(B)(4)

Petitioners may be served at lead counsel's address provided above and consent to e-mail service, provided it is made to all of the following e-mail addresses:

brian.oaks@bakerbotts.com, david.tobin@bakerbotts.com, and DLBB-ME2C-IPR@bakerbotts.com.

### E.    FEES

Payment for fees is authorized from Deposit Account 02-0384.

## III.    REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §42.104

### A.    STANDING

Petitioners certify the '114 Patent is eligible for IPR, and Petitioners are not barred or estopped from requesting IPR challenging the identified claims on the grounds herein.

### B.    ASSERTED REFERENCES AND PRIOR-ART STATUS

| Reference | Prior-Art Status |
|---|---|
| **Sjostrom**, Ex[1010], "Full-Scale Evaluations of Mercury Control Technologies with PRB Coals" | §§102(a) and 102(b) (pre-AIA), §102(a)(1) (post-AIA):<br><br>presented January 25, 2005 at the 2005 Electric Utilities Environment Conference ("2005 EUEC") in Tucson, Arizona, and mailed to conference attendees in February 2005 |

| Reference | Prior-Art Status |
|---|---|
| **Eckberg**, Ex[1011], "Chemical mechanisms in mercury emission control technologies" | §§102(a) and 102(b) (pre-AIA), §102(a)(1) (post-AIA):<br><br>presented January 25, 2005 at the 2005 EUEC and mailed to conference attendees in February 2005 |
| **Olson-646**, Ex[1014], U.S. Patent Application Publication No. 2006/0048646 | §§102(a) and 102(b) (pre-AIA), §§102(a)(1) and 102(a)(2) (post-AIA):<br><br>filed 4/22/2005 and published 3/9/2006 |

Each prior art reference was described in a printed publication or otherwise available to the public, including more than one year before the effective filing date of the '114 Patent.  Patent Owner bears the burden "to prove entitlement to claim priority to an earlier filing date." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304-05 (Fed. Cir. 2008).

## C.   IDENTIFICATION OF CHALLENGED CLAIMS

There is a reasonable likelihood that the petitioned claims are unpatentable as being obvious under §103, as follows:

| Ground | '114 Claims | Basis for Challenge |
|---|---|---|
| 1. | 1-2, 4-9, 12-28, 30 | Sjostrom (Ex[1010]) in view of Eckberg (Ex[1011]) |
| 2. | 1-9, 12-30 | Sjostrom in view of Olson-646 (Ex[1014]) |

### D.   THE BOARD SHOULD NOT DENY INSTITUTION

The Board should not deny institution under 35 U.S.C. §314(a), because the district-court proceeding has barely begun.  With multiple motions to dismiss pending, the Court has not set a Rule 16 conference or provided a case schedule. The Petitioners have not filed an answer to the Complaint, and discovery has not opened.  Any Final Written Decision would likely conclude before trial.

Further, as PO cannot satisfy its burden to demonstrate a priority date before May 2018, Petitioners filed this IPR shortly after the 9-month post-AIA waiting period from the 7/9/2019 issue date of the '114 Patent.  35 U.S.C. §311(c)(1).

The Board should not deny institution under 35 U.S.C. §325(d), because the Examiner did not consider Sjostrom or Eckberg during prosecution.  *See Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17-18 (Dec. 15, 2017) (factors (a)-(b) and (d) indicate the same art was not presented previously to the Office).  While the '114 Patent cites Olson-646—in a list spanning ***16 columns*** (9 pages) of cited references—the Examiner did not use Olson-646 in a substantive rejection.  *Id.* at 17-18 (factors (a)-(d)).  Indeed, each of the references are dated after the earliest provisional application from which the '114 Patent purports to claim priority, and as discussed below, Examiners do not make findings of priority as a

matter of course during prosecution, instead accepting applicant's asserted priority date.  M.P.E.P. §201.08.

## IV.   OVERVIEW

### A.   LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") would have at least a bachelor's degree in chemical engineering, mechanical engineering, or a related field of study with at least two years of experience with implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration. Ex[1002], ¶64.

### B.   THE ALLEGED INVENTION OF THE '114 PATENT

The '114 Patent relates to removal of mercury from a flue gas.  Ex[1001], 1:27-29.  The '114 Patent admits that known "mercury control methods" included "injection of fine sorbent particles into a flue gas duct" such as "activated carbon." Ex[1001], 1:56-60.  The '114 Patent admits it was "known to inject halogen forms at some stage of the combustion process" and provides a string-cite of nine prior-art patents disclosing these known features.  Ex[1001], 2:60-3:21.  The '114 Patent purports to combine these two known solutions.  Each independent claim of the '114 Patent includes limitations adding particular bromine-containing species (e.g., HBr or $Br_2$) to the combustion chamber and/or to the coal upstream of the combustion chamber and providing activated carbon downstream of the combustion chamber.

Ex[1001], Claims 1, 23, 24, 25.  Support for these limitations in the '114 Patent was first added in May 2018 when the '114 Patent was filed as a continuation-in-part application.  Ex[1002], ¶¶161-165.

### C.  PROSECUTION HISTORY OF THE '114 PATENT

The '114 Patent was filed May 14, 2018 as Application No. 15/978,760 (the "'760 Application") a continuation-in-part of Application No. 15/295,594 (the "'594 Application").  The '760 Application traces its alleged priority through a chain of applications, including an earlier CIP application, back to App. No. 60/605,640 (the "Provisional") filed August 30, 2004, as shown in the family tree below. Ex[1002], ¶¶166-167.

Petition for IPR2020-00832
USP 10,343,114





Ex[1017] (family tree).  The file histories for the '114 Patent, and each of the parent applications to which it claims priority, are submitted with this Petition.  Ex[1020]-Ex[1026].  Also submitted is a series of redline comparisons, showing changes made to the specification along the family tree.  Ex[1063]-Ex[1069].  Exhibit [1063] is a redline comparison showing the extensive changes made between the first non-provisional application (filed Aug. 22, 2005) and the '114 Patent.  Ex[1002], ¶¶168-186.

When the applicants filed the '760 Application in May 2018, they repeated a substantial portion of the '594 Application, but then added significant additional material not disclosed in the '594 Application.  Ex[1068] (redline comparison).  One significant addition included the text and Figure 2 from the Provisional, which was renumbered as Figure 6 in the '760 Application.  Ex[1001], 21:33-33:3, Figure 6; Ex[1067].  Other additions to the specification occurred earlier in prosecution, such as when the first continuation-in-part application was filed in April 2009.  Ex[1002], ¶¶168-186.

### D.   STATE OF THE ART

The inquiry into whether the "differences between the invention and the prior art would have rendered the invention obvious to a [POSITA] necessarily depends on such artisan's knowledge," including an "assessment of the background

Petition for IPR2020-00832
USP 10,343,114

knowledge possessed" by a POSITA.  *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337 (Fed. Cir. 2020) (internal citations omitted).  The subjects below would have been "within the general knowledge of a skilled artisan" by 2004.  *See id.* at 1338.

It was known that halogens are Group VII elements—in the family including fluorine (F), chlorine (Cl), bromine (Br), and iodine (I)—that are highly reactive oxidizing agents, meaning that they cause other species to give up electrons (become more positively charged).  Ex[1040], 788, 791, A.44; *see generally* Ex[1041], 789-824.



Ex[1027], exhibit p.239.  It was known that halogens exist in nature as diatomic molecules (e.g., $Cl_2$, $Br_2$,), halides/halide compounds (e.g., sodium chloride, calcium bromide), and hydrohalides (e.g., hydrogen bromide).  It was known that mercury is a metal that generally exists in two forms: elemental ($Hg^0$); and oxidized (either $Hg_2^{2+}$ (mercurous) or $Hg^{2+}$ (mercuric)).  Ex[1002], ¶¶69-88; Ex[1060], 2-1 (exhibit p.37).

## 1. **Coal Power Plants**

It was known that pulverized-coal firing was performed by feeding particle-sized coal to a combustion chamber.  Ex[1027], 13-1.  In addition to the coal-handling systems, other systems upstream of the boiler included air supplies for the primary air, secondary air, and overfire air.  Ex[1027], 11-13, 13-3.  The term "boiler" often was used to refer to the overall combustion chamber.  Ex[1027] at 18-1.  Combustion gases with entrained particles and pollutants, exiting the boiler, have been referred to as flue gases.  It was known that flue gases pass through an economizer and an air preheater.  Ex[1027], 19-1; Ex[1002], ¶¶89-95.

It was known that emissions from coal combustion included particulate matter (fly ash and unburned carbon), mercury (Hg), sulfur oxides ($SO_X$), nitrogen oxides ($NO_X$), and other pollutants.  Ex[1053], 1.1-3 to 1.1-6.  Various downstream components were used to control undesirable flue gas constituents, including

electrostatic precipitators (ESP) and fabric filters (FF) for particulates, wet or dry flue gas desulfurization (FGD) systems, and selective catalytic reduction (SCR) or selective noncatalytic reduction (SNCR) systems.   Ex[1053], 1.1-6 to 1.1-9; Ex[1037]; Ex[1045]; Ex[1002], ¶96-115.

## 2.   EPA Regulations

It was known that excess mercury in the environment posed significant health and safety threats.  Ex[1060], 4-12 to 4-19.  The 1990 Clean Air Act Amendments imposed requirements to reduce hazardous air pollutants.  Ex[1054]; *see* Ex[1055]. In 2000, the EPA announced the need for further regulations on mercury-emissions from coal-fired power plants.  Ex[1039], 2, 7-8.  The timetable for the EPA to propose updated mercury-emissions standards initially was set for December 2003, to be finalized by December 2004.  Ex[1039], 8; Ex[1009].  The EPA officially passed the Clean Air Mercury Rule in 2005, which required 70% mercury removal, but put the industry on notice of the upcoming requirements well before then. Ex[1056]; Ex[1009]; Ex[1057]; Ex[1058]; Ex[1002], ¶¶132-137.

As a result of the actions of the EPA, and funding provided by the National Energy Technology Laboratories (NETL), the American electric power utility industry mobilized a massive response to develop and evaluate mercury-emissions control technologies in 2000.  Ex[1039]; Ex[1002], ¶¶138-143.

### 3.      Mercury Removal Using Activated Carbon and Halogens

Even prior to the EPA regulations, sorbent technologies, including activated-carbon sorbents, were used to remove mercury, and researchers were investigating methods to reduce costs and improve effectiveness of sorbents. Ex[1060], 2-54; Ex[1038], 2. Research on activated-carbon built upon knowledge going back decades earlier. Ex[1002], ¶¶116-131, 144-146.

By 1934, it had been shown that halogens improved the ability of activated carbon to remove mercury. *See* Ex[1029], 1:33-41. By 1970, it was shown that bromine was adsorbed up to a saturation limit (adsorption equilibrium) of around 31-38% in carbon materials. Ex[1042], 260. By 1988, it was shown that bromine (Br) reacted with activated carbon to provide "carbon-bromine surface structures (surface compounds)." Ex[1070], 259. By 1998, "[a]ctivated carbons ha[d] been the most thoroughly studied sorbent for the capture of mercury." Ex[1038], 22. In 1999, researchers demonstrated that mercury from flue gas formed chemical bonds with the species on activated carbons, including halogens. Ex[1043], 119. By 2004, these findings had been generalized to interpret both oxidation and capture of elemental and oxidized mercury on injected activated-carbon sorbents. Ex[1044]; Ex[1062], exhibit p.14-15 (halides "improve[d] Hg capture both by conversion of the $Hg^0$ to the more easily removed $Hg^{2+}$ forms and by enhancing the reactivity of

$Hg^0$ with activated carbons"). It was known that halogens, particularly bromine-containing species, were effective at improving the effectiveness of activated carbon in removing mercury. *See, e.g.*, Ex[1006]; Ex[1008]; Ex[1012]; Ex[1013] Ex[1015]; Ex[1028]; Ex[1036]. In addition to using halides, it was also known that adjusting the sorbent injection rate would control mercury emissions. Ex[1059]; Ex[1009], 4676; Ex[1002], ¶¶147-160.

## V.   CLAIM CONSTRUCTION

For purposes of the asserted prior art, Petitioners do not, at this time, contend that any term requires construction. All terms have been accorded their plain and ordinary meaning. Ex[1002], ¶206.

## VI.   THE '114 PRIORITY DATE IS NO EARLIER THAN MAY 14, 2018

The '114 Patent priority date is no earlier than its filing date of May 14, 2018. Prior to this filing date a POSITA would not have concluded that applicants were in possession of the subject matter of the issued claims of the '114 Patent. The earlier-filed applications in the priority chain fail to include sufficient written description of claim limitations that appear in each of the independent claims (Claims 1, 23-25), at least because there is no disclosure of adding any type of bromine-containing species ($Br_2$, HBr, $Br^-$, bromine compound) to the coal upstream of the combustion chamber, let alone the particular species recited in the claims. Ex[1002], ¶¶179-181.

Petition for IPR2020-00832
USP 10,343,114

Without support in earlier-filed applications for these limitations appearing in the independent claims of the '114 Patent (hereinafter, the "Newly-Introduced Limitations"), PO cannot receive a priority date earlier than when the '114 Patent was filed—May 14, 2018. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997) (indicating that each application in the priority-chain must comply with the written description requirement to gain benefit of an earlier filing date).

## A.   PO CARRIES THE BURDEN IN DEMONSTRATING PRIORITY

Petitioners demonstrate the invalidity of the '114 Patent claims in the grounds below, and accordingly, the burden is correctly placed on PO to come forward with evidence "to prove entitlement to claim priority to an earlier filing date." *PowerOasis*, 522 F.3d at 1304-05.  The Patent Office does not make findings of priority as a matter of course during prosecution, and instead accepts applicant's asserted priority date. *Id.* at 1305; M.P.E.P. §201.08.  As in *PowerOasis*, the Patent Office made no finding regarding priority of the '114 Patent to earlier filed applications.

Here, the '114 Patent is the second continuation-in-part in the priority-chain, with the '058 Application being the first continuation-in-part filed on April 23, 2009. Ex[1017] (family tree).  Exhibit 1064 illustrates the additional material added to '058 Application, as compared to its parent non-provisional application, the '595

21

Application, filed in August 2005.  Exhibit 1063 shows the changes made to the specification, comparing the '163 Application with the '114 Patent.  The changes were extensive.  PO carries the burden to demonstrate priority earlier than both the '114 Patent and the '058 Application, each of which contained significant changes and additional material.  *Id.*; Ex[1069]; *PowerOasis*, 522 F.3d at 1305-06.

To demonstrate priority, PO must prove that the written description of each of the prior applications "convey[s] with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession of the invention.… Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed."  *PowerOasis*, 522 F.3d at 1306.  "***The question is not whether a claimed invention is an obvious variant*** of that which is disclosed in the specification.  Rather, a prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought."  *Lockwood*, 107 F.3d at 1571-72 (emphasis added).  Thus, in order to claim priority back to the provisional application, PO must demonstrate that the provisional application, and all intervening applications, expressly or inherently disclosed adding each of the claimed specific bromine-containing species ($Br_2$, HBr, $Br^-$, bromine compound) to the coal upstream of the combustion chamber.

Petition for IPR2020-00832
USP 10,343,114

Petitioners illustrate below that the Newly-Introduced Limitations do not have written-description support in any of the earlier patents, prior to when the '114 Patent was filed in May 2018.  Thus, PO cannot meet its burden to prove an earlier priority date.

B.   **PASSAGES CITED DURING PROSECUTION FOR WRITTEN DESCRIPTION SUPPORT WERE EITHER ADDED IN 2018 OR DO NOT PROVIDE SUPPORT**

Although the Patent Office did not make a determination regarding priority to earlier applications, applicants cited to the as-filed '760 Application for written-description support when adding the Newly-Introduced Limitations to the claims. Specifically, applicants amended the pending claims (which included features similar to those found in ultimately issued independent claims 1 and 23-25 of the '114 Patent) on May 15, 2018 to recite these limitations.  Ex[1026], 1905-11; Ex[1002], ¶182.  Shown below is '760 Application claim 2 (which issued as '114 Patent claim 1):

23

2.      (Currently Amended) A method of separating mercury from a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein the mercury-containing gas comprises a halogen or halide promoter comprising HBr, Br⁻, or a combination thereof, wherein

the coal comprises added Br₂, HBr, Br⁻, or a combination thereof, added to the coal upstream of the combustion chamber, or

the combustion chamber comprises added Br₂, HBr, Br⁻, or a combination thereof, or a combination thereof;

injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber such that the activated carbon reacts with the halogen or halide promoter in the mercury-containing gas to form a promoted sorbent;

reacting contacting mercury in the mercury-containing gas with the promoted sorbent, to form a mercury/sorbent composition;

separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas;

monitoring the mercury content of the cleaned gas; and

controlling, in response to the monitored mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, the sorbent composition, or a combination thereof, so that the mercury content of the cleaned gas is maintained at or below a desired level.

Applicants cited to paragraphs [0088], [0123]-[0125], [0138], [0144], [0155], and [0164] and Figure 6 of the '760 Application for support for the amendments. Ex[1026], 38-49, 62, 1824; Ex[1002], ¶182.  While paragraph [0088] was present in the earlier '594 Application (the immediate parent to the '760 Application), it merely discusses the surface structure of activated carbon, and does not describe bromine being added to the combustion chamber, the coal, or anywhere else.  Ex[1026], 30. Neither Figure 6 nor the remainder of the cited paragraphs were present in the '594 Application.  Ex[1068] (redline comparison between '594 and '760 Applications); Ex[1002], ¶183.  Accordingly, there is at least one break in the priority chain (e.g.,

24

the '594 Application), and earlier applications do not provide written-description support for the independent claims of the '114 Patent.

In the same response, applicants amended dependent claim 7:

> 7.    (Currently Amended) The method of claim 2, wherein the coal comprises added Br$_2$, HBr, Br⁻, or a combination thereof, <u>added to the coal upstream of the combustion chamber</u>.

Applicants cited paragraphs [0035], [0050], [0064], [0088], [0098]-[0107], and Figure 6, although these similarly fail to provide any support. Ex[1026], 1648. Paragraphs [0050], [0064], and [0088] describe a promoted sorbent and a mechanism for how it reacts with mercury, but do not describe any bromine-containing species being added to either the combustion chamber, the coal, or anywhere else. Paragraphs [0098]-[0107] merely refer to the halogen promoter being contacted with the base sorbent in a flue gas, with no reference to bromine being added to the combustion chamber or coal. Ex[1026], 33. Finally, while paragraph [0035] of the '760 Application states that "the promoter is introduced into the mercury-containing gas upstream of the introduction of base sorbent," it fails to specify where the promoter is added (i.e., to the combustion chamber or coal, or elsewhere) or which species of promoter is used. Ex[1026], 18. Thus, the passages

relied on by applicants during prosecution do not entitle PO to a priority date earlier than May 2018.  Ex[1002], ¶¶184-186; *PowerOasis*, 522 F.3d at 1305-06.[2]

## C.   PO CANNOT RELY ON THE PROVISIONAL FOR SUPPORT

### 1.   The Contents of the Provisional Were Not Present in Any Application Before the '760 Application

To the extent PO alleges that the Provisional provides sufficient disclosure for the Newly-Introduced Limitations, this fails because the prior (intervening) applications to which the '760 Application claims priority do not include the relied-upon disclosure of the Provisional.   *Lockwood*, 107 F.3d at 1571 ("[E]ach application in the chain must describe the claimed features.").   Rather, they only included a generic statement of incorporation by reference without identifying with particularity what specific material is being incorporated.   *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) ("[T]he host document must

---

[2]  And even if paragraph [0035] somehow provided support, this entire paragraph was first added on April 23, 2009 by the filing of the continuation-in-part '058 Application.  Ex[1064], ¶[0037]; Ex[1026], 18 (¶[0035] of original '760 Application).  Ex. 1002, ¶186.  Accordingly, even if PO could prove written description support as of April 23, 2009 (it cannot), both Sjostrom and Eckberg still qualify as prior art because they were published in 2005.

identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents.").  Moreover, in the '760 Application and earlier applications, the Provisional is only "incorporated by reference *to the extent appropriate*," indicating that applicants did not intend to incorporate the entire document, but only parts of it, again without identifying the specific material to incorporate.  Ex[1001], 1:20-22; *Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1379 (Fed. Cir. 2007) ("The plain language expressly limits the incorporation to only relevant disclosures of the patents, indicating that the disclosures are not being incorporated in their entirety.").  Because applicants' incorporation by reference language fails as a matter of law, none of the disclosure in the Provisional is properly incorporated to the applications in the priority-chain and thus cannot provide written description support for the '114 Patent claims.

Even more fundamentally defective than applicants' incorporation by reference language, material from a provisional application incorporated by reference cannot be considered as providing written support in a priority analysis, because such material would be deemed "essential material." *See* 37 C.F.R. §1.57(d) (2020).  The current Rule 1.57(d) provides that "essential material"—which includes "material that is necessary to: provide a written description of the claimed invention"—"may be incorporated by reference, but *only* by way of incorporation

by reference to a ***U.S. patent or U.S. patent application publication***.”  The version of Rule 1.57 in place in 2005—when the first non-provisional (the ’163 Application) was filed (*see* Ex[1017] (family tree))—provides a similar limitation as to incorporating “essential material” by reference.  Ex[1035] (Rule 1.57(c) (2005)).  A provisional application is neither a “U.S. patent” nor a “U.S. patent application publication.”  For example, the current version of 35 U.S.C. §122(b)(2)(A)(iii) provides, “[a]n application ***shall not be published*** if that application is—a provisional application filed under section 111(b).”  35 U.S.C. §122; *see* 35 U.S.C. §111.  The versions of the statutes in place in 2005 provided similar restrictions on publication of provisional applications.  *See* Ex[1033]; Ex[1034] (2005 versions of 35 U.S.C. §§111, 122).  Thus, applicants cannot incorporate by reference the provisional application into the ’760 Application and earlier applications.

Nevertheless, even if the disclosure of the Provisional could somehow be considered, in contravention to Rule 1.57, the Provisional fails to disclose each of the Newly-Introduced Limitations.

### 2. No Disclosure of a Promoter Comprising $Br_2$, $Br^-$, or Combinations of $Br_2$ and HBr with Bromide Compounds in the Provisional

The Provisional fails to disclose adding to the coal or to the combustion chamber each of the particular bromine-containing species recited in the Newly-

Introduced Limitations, such as $Br_2$, $Br^-$ and "bromide compounds." Ex[1002], ¶¶187, 192-196. To the extent PO points to the Provisional's Example 1E, which recites that the "additional substance is hydrohalide (HI, HBr, HCl), etc., 1%B-10% of bromine," this fails. Ex[1020], 3 (Example 1E); Ex[1026], 29-30 (¶¶[0124]-[0125]); Ex[1002], ¶192.

First, there is no indication that this "additional substance" is the "additive" that is added "before the boiler," discussed below. Ex[1020], 6. And even if the "additional substance" is added before the boiler, the Provisional discloses at most that this additional substance is hydrogen bromide (HBr). During prosecution of the '114 Patent, Patent Owner distinguished "hydrogen bromide" from other forms of bromine-containing components, such as $Br_2$, $Br^-$, and bromide compound in the Newly-Introduced Limitations. Ex[1026], 1785-87, ¶¶9, 11-13, 17 (3/20/2019 Decl. C from Pavlish and Lentz). Thus, the Newly-Introduced Limitations do not find support in the Provisional.

As confirmed by the declaration of named inventor, Dr. Pavlish: "$Br_2$ is not HBr and does not include HBr." Ex[1026], 1787 ¶17. Thus, the Provisional's discussion of HBr does not disclose $Br_2$ as recited in "the coal comprises added $Br_2$" or "the combustion chamber comprises added $Br_2$" of Claims 1 and 23-25. Ex[1002], ¶194.

Neither does disclosure of HBr in the Provisional disclose that "the coal comprises added $Br^-$" or that "the combustion chamber comprises added $Br^-$," of Claims 1, 23, and 24.  As Dr. Pavlish declared, $Br^-$ refers to "a bromine atom with an ionic charge of -1 ($Br^-$)," as opposed to "bromide" which is "a binary compound of bromine with another element or a radical."  Ex[1026], 1784 ¶9.  Ex[1002], ¶195.

Finally, a disclosure of HBr (a species) in the Provisional does not support the full breadth claimed by the coal and/or combustion chamber including the entire class of added "bromide compound[s]," of Claim 25.  *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1350 (Fed. Cir. 2010) (finding that disclosure of a type does not provide sufficient written description support for a claimed class).  Indeed, there are nearly infinite forms of bromide compounds because, as confirmed by Dr. Pavlish, a "bromide compound" may be any "chemical compound containing a bromide ion or ligand."  Ex[1026], 1784 ¶9.  Thus, a POSITA would not have understood the Provisional's disclosure of HBr (one type) to demonstrate that the inventors were in possession of the broad class of any "bromide compound," that "the coal comprises added $Br^-$" or adding $Br_2$ to the combustion chamber or to the coal. Ex[1002], ¶¶195-196

### 3.   No Disclosure for "the Coal Comprises Added" Bromine Species

Even if the "additive" includes the bromine-containing species of the Newly-Added Limitations, the Provisional provides no disclosure that "the coal comprises" the bromine-containing species in the Newly-Added Limitations, or that those species are "added to the coal," as required by the independent claims of the '114 Patent.   Petitioners expect that PO may cite to Figure 2 and corresponding description from the Provisional of an "additive" as allegedly providing disclosure. Ex[1002], ¶¶187-191 (noting similar language to paragraph [00164] of '760 Application which was cited for support during prosecution); *see also* Ex[1026], 1824, 40.   Figure 2 of the Provisional, reproduced below, includes a label with "Additive Injection" having three arrows vaguely pointing in the direction of the boiler of a coal-fired plant.

**DESCRIPTION OF EXEMPLARY EMBODIMENTS**

FIG. 2 is a block diagram illustrating the use of the invention in a coal fueled facility. Of course, the invention can also be used in any other desired type of facility. FIG. 2 shows a boiler for burning pulverized coal. The facility utilizes various devices to clean the exhaust of the boiler. In this example, a baghouse or ESP is used to collect particulates in the exhaust. A scrubber and sorbent bed are also used to remove undesired constituents from the flue gas stream, before being fed to the stack. In the example shown, the sorbent is injected into the flue gas after the boiler. The additive can be injected where desired (e.g., before, after, or within the boiler).



FIG. 2

Ex[1020], 15, 16 (Fig. 2).  However, this figure and the "before…the boiler" language neither expressly nor inherently discloses supplying bromine-containing species to the coal, such that "the coal comprises added" bromine-containing species.  To the extent PO argues obviousness, a "description which renders obvious the invention for which an earlier filing date is sought is not sufficient." *Lockwood*, 107 F.3d at 1572.

Even if "the additive can be injected…before the boiler" were interpreted to refer to injecting a bromine-containing species (which is not express or inherent in the Provisional), nothing in the Provisional expressly states that an additive containing bromine is supplied "to the coal," as opposed to somewhere else upstream of the boiler.  Further, nothing in the Provisional inherently, or "necessarily

discloses," adding bromine to the coal.  *See Lockwood*, 107 F.3d at 1572.  Figure 2, and its accompanying text about injecting an additive "before…the boiler," does not necessarily disclose adding bromine to the coal, because a POSITA would understand that there are numerous systems in a coal plant that are "before…the boiler" that do not interface with the coal.  Examples of such systems include secondary air systems, low-$NO_x$ overfire air systems, or even a specialized additive injection system separate from the coal.  Ex[1027], 13-3; Ex[1002], ¶95.  To the extent PO argues that it "would be obvious over what is expressly disclosed" that the coal comprises added bromine, that is not the standard for a priority-date analysis.  *Lockwood*, 107 F.3d at 1571-72.  Accordingly, Figure 2 of the Provisional fails to clearly disclose that "***the coal*** comprises added" bromine-containing species, as required by each of the independent claims of the '114 Patent.  Ex[1002], ¶¶188-191.

**D.    THERE IS NO SUPPORT FOR THE '114 PATENT CLAIMS IN INTERVENING APPLICATIONS BETWEEN THE PROVISIONAL AND THE '114 PATENT**

The Newly-Introduced Limitations also are not supported by the earlier-filed "application[s] in the chain."  *See Lockwood*, 107 F.3d at 1572.  For this additional reason, priority is broken.  Ex[1002], ¶¶197-201.

Nothing in the '595 Application filed 8/29/2008 describes adding the bromine promoter independently from the mercury sorbent, let alone to the coal or combustion chamber. Ex[1022], 1-34. Similarly, the '058 Application (the first CIP Application, filed 4/23/2009), does not include the full portions cited by applicants for support for the Newly-Introduced Limitations or provides any independent support. Ex[1023], 7-44; Ex[1002], ¶197.

Likewise, the '594 and '896 Applications, whose figures and description are substantively identical to the '058, lack support. Ex[1025]; Ex[1024]; Ex[1002], ¶¶198-201. To the extent PO points to the claims of these three applications for support, this fails. For example, Claims 5, 11, and 18 of the '594 Application (as filed Oct. 17, 2016) and the '896 Application (as filed Dec. 11, 2013) recite that "halogen or halide promoter is introduced ***into at least one of before a combustion chamber*** that produces a mercury-containing gas, ***into a combustion chamber*** that produces a mercury-containing gas." Ex[1025], 29-41; Ex[1024], 36-39. These claims are not present in the '058 Application that was filed on Apr. 23, 2009, and thus cannot support a claim for priority back to the Provisional. *Lockwood*, 107 F.3d at 1571; Ex[1023], 35-38. And in any event, Sjostrom and Eckberg were still published years before the '058, '896, and '594 Applications were filed. Ex[1002], ¶¶197-201, 245-50.

To the extent PO points to Figures 5A and 5B (shown below), which were first added by the '058 Application in 2009 (years after Sjostrom and Eckberg), these were not present in the '595 Application filed Aug. 29, 2008, thus breaking priority.



Ex[1001], Figs. 5a, 5b.  Although the corresponding description explains introducing the bromide promoter (independently from the sorbent, e.g., via 401/401' or 501/501') into the combustion chamber (301/301') or the flue gases, this does not expressly or inherently describe to a POSITA that "the coal comprises added" bromine-containing species.  As discussed above regarding the Provisional, the promoter could be added to the combustion chamber by first introducing the

promoter into any one of the multitude of auxiliary systems located before the combustion chamber.  Ex[1002], ¶200.

Because none of the earlier-filed applications in the priority chain for the '114 Patent, including the Provisional, provide written description support for all the Newly-Introduced Limitations in the '114 Patent claims, the priority date is not earlier than the filing date of the '114 Patent—May 14, 2018.

## VII.   GROUND 1: CLAIMS 1-2, 4-9, 12-28, 30 ARE OBVIOUS OVER SJOSTROM IN VIEW OF ECKBERG

Claims 1-2, 4-9, 12-28, and 30 would have been obvious over Sjostrom in view of Eckberg.  Ex[1002], ¶502.

### A.   OVERVIEW OF EX[1010] ("SJOSTROM")

Sjostrom's title is "Full Scale Evaluations of Mercury Control Technologies with PRB [Powder River Basin] Coals."   Ex[1010], 1.   Sjostrom explains that activated-carbon sorbent injection was well-known to control mercury emissions from flue gas.  Ex[1010], 10-11.  In addition to the "Sorbent Injection" (shown below), Sjostrom also teaches the addition of halogens (e.g., "Cl, Br, F, I") in at least three locations:

Petition for IPR2020-00832
USP 10,343,114



Ex[1010], 4 (annotations added in red).  Sjostrom renders obvious injecting bromine to the pulverized coal entering the boiler, at Addition Location 1.  The stream indicated by the arrow at Addition Location 1 splits into four primary air lines used to add pulverized coal into the combustion chamber.  Sjostrom also teaches adding bromine directly into the combustion chamber at Addition Location 2.  Finally, Sjostrom teaches adding bromine to the mercury sorbent that is added to the flue gas at Addition Location 3.  Ex[1010], 4; Ex[1002], ¶¶251-256.

## B.   OVERVIEW OF EX[1011] ("ECKBERG")

Eckberg also discloses using halogens to remove mercury from coal-fired plants. Eckberg is entitled, "Mercury Control Evaluation of Halogen Injection into

a Texas Lignite-Fired Boiler." Ex[1011], 1. Eckberg describes "Chemical Injection" of a halogen directly into a coal-fired boiler as shown below:



Ex[1011], 5. Eckberg details the equipment used for the halogen addition:



Ex[1011], 8.  The "salt solution" added to the "boiler" was either "$CaCl_2$ (25 wt%)" or "$CaBr_2$ (52 wt%)."  Ex[1011], 9.  Eckberg teaches the ratio of bromine to coal, the feed rate of the aqueous salt solution, and the bromine concentration in flue gas. Ex[1011], 9; Ex[1002], ¶¶257-258.

### C.   PRIOR ART STATUS OF SJOSTROM AND ECKBERG

Sjostrom and Eckberg are printed publications, available as prior art under 35 U.S.C. §§102(a) and (b) (pre-AIA) and §102(a)(1) (post-AIA).  A conference paper qualifies as prior art "so long as the relevant public has a means of accessing" it. *GoPro, Inc. v. Contour IP Holding LLC*, 908 F.3d 690, 693 (Fed. Cir. 2018).  Public accessibility requires that a reference was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.  *Id.*  The Sjostrom and Eckberg presentations, delivered consecutively at the Electric Utilities Environment Conference ("EUEC") in January 2005 and mailed on CD to conference participants within a few weeks, meet the *GoPro* standard.

The EUEC has been held annually since 1998 to facilitate information exchange and foster cooperation between industry, government, and regulatory stakeholders regarding environmental controls for electric utilities.  Dr. Niksa personally attended the EUEC in 2005, 2006, 2007, 2009, 2010 and 2013 and

delivered presentations in 2005, 2006, 2007 and 2013.  "During these years, the EUEC included a focus on bringing together vendors and developers of mercury control technology with people who implemented that technology in utility companies."  "[T]he EUEC was particularly valuable as a direct link from vendors of technologies and services for mercury emissions control and the engineers and technical staff at utilities."  Ex[1002], ¶¶239, 241-244.

Sjostrom and Eckberg were presented consecutively at the 2005 EUEC that took place on January 24-25, 2005.  Ex[1030], 23.  Based on his personal participation, Dr. Niksa declares that over 800 people attended the 2005 EUEC.  This figure is confirmed by an attendee list that was included on a CD sent to all attendees, including Dr. Niksa, within a few weeks of the conference.[3]  Ex[1030], 106-18; Ex[1002], ¶¶240, 245-250.; *see also* Ex[1031].

---

[3] The public accessibility of Sjostrom and Eckberg are further supported by the EUEC website, as archived at The Internet Archive (https://web.archive.org/web/20050303090129/http://www.euec.com/), as early as March 3, 2005.  Ex[1061].  The website states that the 2005 EUEC had 956 participants and that "EUEC Conference Proceedings will be mailed out the week of February 21."  Ex[1061].  Petitioners requested an affidavit verifying the

The 2005 EUEC included four presentation tracks, with Sjostrom and Eckberg being presented in "Track A – Air Quality."  Ex[1030], 2.  Specifically, Sjostrom and Eckberg were delivered during the A3 session—a particular subset of Track A that was devoted to "Mercury – Control"  Ex[1030], 3.  Approximately 250 to 300 people attended the Track A presentations.  These attendees included POSITAs in the mercury-control industry, such as "engineers, regulatory compliance specialists, and project managers from utilities; engineers and technicians from labs and testing organizations; technical staff from R&D organizations; and sales managers and representatives from technology vendors."  Ex[1002], ¶¶245-250.

The CD mailed to each recipient also included the conference program containing a navigable index of all presentations, and PDF copies of all presentations, including Sjostrom and Eckberg, given at the conference.  *See* Ex[1030].  Exhibits 1010 (Sjostrom) and 1011 (Eckberg), attached to this Petition, are printed versions of electronic documents contained on the CD that was received in February 2005 by Dr. Niksa.  Ex[1002], ¶¶240, 245-250.

---

authenticity and availability of this page and related EUEC 2005 pages from The Internet Archive on March 2, 2020.  Due to COVID-19 policies, Petitioners have not yet received the affidavit, but will submit it as soon as it is received.

Sjostrom and Eckberg qualify as prior art under 35 U.S.C. §§102(a) and (b) (pre-AIA) and §102(a)(1) (post-AIA) because they were made available to the relevant public on January 25, 2005—the date they were presented.  They were also made available as printed publications in February 2005, when they were mailed on CD to the hundreds of conference attendees.

### D.    REASONS TO COMBINE REFERENCES

A POSITA would have been motivated to combine Sjostrom and Eckberg, and would have had a reasonable expectation of success, because both references are directed to using bromine (in conjunction with activated carbon) for improving mercury removal.  Sjostrom describes addition of halogens (including Br) and activated-carbon sorbents for mercury removal in coal-fired flue gas.  Ex[1010], 4. Sjostrom further discloses suitable injection rates for the sorbent.  Ex[1010], 15-16, 20-21.  Sjostrom also teaches addition of bromine at three locations: onto coal, into the combustion chamber, or concurrently with the sorbent.  Ex[1010], 4.  Sjostrom states that "Br" is used, but does not identify the specific chemical that contains that bromine or its injection rate.  Ex[1010], 4; Ex[1002], ¶503.

A POSITA would have looked to Eckberg to provide these implementation details and to further tune and supplement the teachings of Sjostrom.  Eckberg describes a similar system, including injection of halogens into a coal-fired boiler

for mercury removal.  Ex[1011], 5.  Supplementing the teachings of Sjostrom, Eckberg informs a POSITA of the type of bromine to be used (calcium bromide), the bromine:coal ratio, the bromine feed rate, and the bromine concentration in the flue gas.  Ex[1011], 5, 9, 14; Ex[1002], ¶504.

Further motivation to combine existed because both references were presented consecutively during the "A3" session at the 2005 EUEC.  Ex[1030], 23.  Specifically, Sjostrom was presented in the A3b slot and Eckberg was presented in the A3c slot.  Ex[1030], 23.  Both presentations also shared a common author (Dr. Ramsay Chang) and a common partner (EPRI).  Ex[1030], 23.  Thus, a POSITA attending the conference, or reading the materials after receiving the mailed CD, would have understood that the two presentations included related material and would have complemented one another.  Ex[1002], ¶505.

A POSITA would have been motivated to apply the teachings of Eckberg to Sjostrom because it would have provided well-known chemical substances to use as the "Cl" or "Br" identified in the figures of Sjostrom.  A POSITA would have found supplementing the system of Sjostrom with the teachings of Eckberg obvious to try, and would have had a reasonable expectation of success in combining these references, because they described nearly identical processes.  Both references add bromine to coal-plants to remove mercury from flue gas.  Ex[1010], 4; Ex[1011], 9.

Addition Location 2 of Sjostrom—the boiler—is the same as the chemical addition location of Eckberg.  Ex[1010], 4; Ex[1011], 5.  Both references include similar surrounding equipment—such as boilers, air pre-heaters, and ESPs or other particulate matter control devices.  Ex[1010], 4; Ex[1011], 5.  In combining Sjostrom with Eckberg, no modifications would need to be made to the overall process equipment, operating conditions, or activated carbon sorbent used in Sjostrom.  Ex[1002], ¶¶506-511

### E.   CLAIM 1

#### 1.   Element 1(Pre)—"A method of separating mercury from a mercury-containing gas"

Sjostrom's title is "Full Scale Evaluations of Mercury Control Technologies with PRB Coals."  Ex[1010], 1.  Sjostrom quantifies mercury separation from a mercury-containing gas in the form of charts showing the "Hg Removal (%)" and "Hg Removal Efficiency (%)".  Ex[1010], 8, 15-17, 20-21; Ex[1002], ¶512.

#### 2.   Element 1(a)—"combusting coal in a combustion chamber, to provide the mercury-containing gas,"

The figure of Sjostrom below discloses combustion of coal in a coal-fired boiler (e.g., combustion chamber):



Ex[1010], 4 (annotations added in red).  The red annotations point to a well-known representation of a coal-fired boiler (e.g., combustion chamber).   Similar to Sjostrom, Eckberg labels the combustion chamber "boiler," corresponding to the unlabeled unit of Sjostrom.  Ex[1011], 5; Ex[1002], ¶¶513-514.

Sjostrom discloses combustion of PRB (Powder River Basin) coal having a mercury content of "0.04 – 0.1 ppm-dry."  Ex[1010], 12, 18.  Combustion generated a concentration of mercury in the flue gas of 11.2 µg/dncm.  Ex[1010], 3; Ex[1002], ¶513.

**3.** **Element 1(b)—"the mercury-containing gas comprises a halogen or halide promoter comprising HBr, Br⁻, or a combination thereof, wherein the coal comprises added Br₂, HBr, Br⁻, or a combination thereof, added to the coal upstream of the combustion chamber, or the combustion chamber comprises added Br₂, HBr, Br⁻, or a combination thereof, or a combination thereof;"**

Sjostrom renders obvious that the halogen would be added to the coal and discloses that the halogen is added to the combustion chamber.



Ex[1010], 4 (annotations in red).  Sjostrom discloses that "Br" could be added to the combustion chamber at Addition Location 2.  It would have been obvious to a POSITA that the "Br" added at Addition Location 1 would be to pulverized coal.  It would have been further obvious in view of the teachings of Sjostrom that the "Br"

source would have been widely available bromine-containing materials, such as HBr or an aqueous solution of a bromide compound, such as $CaBr_2$. A POSITA would also have understood it was obvious that a calcium bromide in an aqueous solution would dissociate to form $Br^-$ (bromide ions). Indeed, Sjostrom refers adding "KNX (Alstom Power)"—a known aqueous solution of bromide salt for enhancing mercury control. Ex[1010], 23. At least a portion of the $Br^-$ ions resulting from the addition of a bromide compound at either Addition Location 1 or Addition Location 2 of Sjostrom would have evaporated at the temperatures inside the boiler and left the combustion chamber as HBr in the vapor phase of the flue gas. Ex[1010], 4; Ex[1002], ¶¶515-519.

Eckberg supplements the teachings of Sjostrom, confirming that the "Br" would have been added as a bromide compound, including dissociated $Br^-$ (bromide ions). For example, Eckberg discloses "chemical injection" to the boiler from a "salt solution tank" that is diluted with water (i.e., aqueous) to "$CaBr_2$ (52 wt%)." Ex[1011], 5, 8-9. A POSITA would have understood that $CaBr_2$ (calcium bromide) is a bromide compound, which when dissolved in water (as shown in Eckberg), dissociates to form $Br^-$ (bromide ions). Ex[1011], 9. A POSITA would have been motivated to supplement the system of Sjostrom ("Br") with the teachings of

Eckberg (aqueous solution of CaBr$_2$), at least because calcium bromide was a widely

obtainable, and relatively cheap, form of bromine.  Ex[1002], ¶520.

4.   **Element 1(c)**

a.  ***"injecting a sorbent material comprising activated
carbon into the mercury-containing gas downstream of
the combustion chamber"***

Sjostrom discloses sorbent injection downstream of the combustion chamber

(e.g., boiler) as shown in the annotated figure below, and specifically labels sorbent

"injection":



Ex[1010], 4 (annotations in red).  Exemplary activated-carbon sorbents  for mercury

capture include "DARCO FGD."  Ex[1010], 10-11, 16; Ex[1002], ¶¶521-522.

### b. *"contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition;"*

The mercury in the flue gas of Sjostrom is contacted with activated carbon to form a mercury/sorbent composition, because the mercury is adsorbed by the activated carbon. Adsorption is a form of contact. Norit DARCO FGD and other activated carbons were referred to as "sorbents" because when they contacted certain materials in the gas phase such as mercury, they adsorbed them. It was well-known to a POSITA that in an adsorption process, adsorbate (e.g., mercury) from a fluid (e.g., flue gas) are adhered to the surface of a sorbent upon contact. Ex[1002], ¶¶523-524.

### 5. Element 1(d)—"separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas;"

Sjostrom discloses removing the sorbent from the flue gas as shown below:



Ex[1010], 4 (annotations in red).   Specifically, Sjostrom shows that "ash and sorbent" are removed in an ESP or FF, which were well-known particulate control devices to separate particles (e.g., the mercury/sorbent material) from a mercury-containing gas.  Ex[1010], 4; Ex[1002], ¶525.

### 6.   Element 1(e)—"monitoring the mercury content of the cleaned gas"

Sjostrom discloses an "Hg CEM" (continuous emissions monitor) to monitor the mercury content of the flue gas as shown in the annotated figure below:



Ex[1010], 4 (annotations in red).  Sjostrom also discloses Hg measurements taken at

the inlet and outlet of the ESP:





Ex[1010], 19, 22 (red line in original); Ex[1002], ¶526.

**7.   Element 1(f)**

    *a.* **1(f)(1)—"controlling, in response to the monitored mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, the sorbent composition, or a combination thereof,"**

    *b.* **1(f)(2)—"so that the mercury content of the cleaned gas is maintained at or below a desired level."**

Sjostrom includes charts showing mercury-removal percentages plotted against activated-carbon injection rates:





Ex[1010], 16, 20.  These graphs taught a relationship between the sorbent-injection

rate (X-Axis) and Hg-removal percentage (Y-axis).  It would have been obvious to

a POSITA to adjust the sorbent-injection rate in response to the monitored mercury

content in order to target a specific Hg removal percentage.  Because of the expense

associated with activated carbon sorbents, especially relative to costs of cheaper components such as "Br," a POSITA would have been motivated to use the charts of Sjostrom as a guide to adjust the sorbent injection rate to minimize costs while reaching desired mercury removal levels.  Ex[1002], ¶¶527-529.

Sjostrom also includes a chart showing a "Proposed Limit" on the amount of Hg emissions:



Ex[1010], 22.  A POSITA would have been motivated to remove at least that amount of mercury to stay within this "Proposed Limit" while minimizing the amount of activated carbon injected.  Ex[1002], ¶530.

## F.   CLAIMS DEPENDING FROM CLAIM 1

### 1.   Claim 2: "removing greater than 70 wt % of the mercury in the mercury-containing gas."

Sjostrom includes charts showing greater than 70 wt% mercury removal (Y-axis):





Ex[1010], 16, 20; Ex[1002], ¶531.

### 2.  Claim 4: "the sorbent in the mercury-containing gas comprises about 1 g to about 30 g of the halogen or halide promoter per 100 g of the sorbent material."

Claim 4 is merely an attempt to claim a workable range for combining a conventional halogen (bromine) being used in a conventional way (halogens are inherent to coal, and both oxidize mercury and promote activated carbon) with a conventional sorbent (activated carbon).  Nothing in the '114 Patent specification attributes any particular significance to the claimed range, or establishes that the claimed range "achieves unexpected results" in mercury removal.  Rather, the range presents nothing more than optimization of "result-effective" variables that would have been obvious to a POSITA.  *In re Applied Materials, Inc.*, 692 F.3d 1289, 1297-98 (Fed. Cir. 2012); Ex[1002], ¶532.

A POSITA would have been motivated to load the activated carbon with up to nearly its saturation limit to increase its reactivity and ability to adsorb mercury. A POSITA would have known that the saturation limit of activated carbon for bromine (i.e., how much bromine the activated carbon can actually hold at equilibrium), was up to 31 grams per 100 grams of activated carbon (based on numbers for carbon black, as discussed in the State of the Art).  Ex[1002], ¶¶533-535; Ex[1042], 260; *see Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337 (Fed. Cir. 2020).

Petition for IPR2020-00832
USP 10,343,114

### 3.  Claim 5: "the combustion chamber comprises the halogen or halide promoter."

As described for Element 1(b), Sjostrom discloses this claim.  Ex[1002], ¶536.

### 4.  Claim 6: "the coal comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, added to the coal upstream of the combustion chamber."

As described for Element 1(b), claim 6 is obvious over Sjostrom in view of Eckberg.  Ex[1002], ¶537.

### 5.  Claim 7: "the promoter is contacted with the sorbent in vapor form, gaseous form, liquid form, or in an organic solvent."

As described for Element 1(b), a POSITA would have found it obvious that the "Br" addition of Sjostrom would have included a bromide compound (e.g., calcium bromide) and $Br^-$ ions that dissociated from bromide compounds.  At combustion temperatures, at least a portion of the aqueous salt solution would have evaporated and left the boiler as HBr in vapor form.  A POSITA would have known that the HBr would make contact with the injected sorbent once it reached the sorbent injection location of Sjostrom.  To the extent Sjostrom fails to explicitly disclose that the "Br" is added as a bromide salt, a POSITA would have been motivated to look to Eckberg for this information.  Ex[1002], ¶¶538-542.

6. <u>Claims 8-9</u>

*a.* **Claim 8: "injecting a secondary material into the mercury-containing gas downstream of the combustion chamber."**

*b.* **Claim 9: "The method of claim 8, wherein the secondary material comprises a halogen, a compound derived from a halogen, a hydrohalide, a compound comprising a Group V or Group VI element and a molecular halogen, or a combination thereof."**

A POSITA would have understood that Sjostrom teaches that bromine may be added at either or both of Addition Location 1 or Addition Location 2 while another halogen (e.g., Cl) may be injected at Addition Location 3.



Ex[1010], 4 (annotations in red).  Claim 9 confirms that the secondary material may be another halogen.  Ex[1001], Claim 9; Ex[1002], ¶¶543-544, 546.

To the extent Sjostrom fails to explicitly disclose the particular chemical used as the other halogen (e.g., Cl) injected at Addition Location 3, a POSITA would have been motivated to look to Eckberg for this information.  Eckberg teaches the use of aqueous $CaBr_2$ or $CaCl_2$ solutions.  Ex[1011], 9; Ex[1002], ¶545.

### 7.  <u>Claim 12: "the activated carbon comprises powdered activated carbon, granular activated carbon, or a combination thereof."</u>

Sjostrom discloses the use of PAC ("powdered activated carbon") sorbents.  Ex[1010], 20.  Sjostrom also discloses the injection of "DARCO FGD"—a well-known PAC sorbent.  Ex[1010], 15, 16; Ex[1002], ¶547.

### 8.  <u>Claims 13-14: "the sorbent material injected into the mercury-containing gas is [cl. 13—substantially free of halogen and halide promotion] [cl. 14— a promoted sorbent obtained by contacting a base sorbent with another halogen or halide promoter"]</u>

Sjostrom teaches addition of bromine in at least three locations.



Ex[1010], 4 (annotations in red).  A POSITA would have understood that the "Br"

added at Addition Locations 1-3 refers to a bromide compound (e.g., HBr) including

Br⁻ ions dissociated from a bromide compound added in the form of an aqueous

solution of a bromide salt, such as $CaBr_2$.  Further, a POSITA would have been

motivated to select different combinations of Addition Location 1, 2, and/or 3 to

meet operational requirements.  Ex[1002], ¶548.

Regarding claim 13, Sjostrom teaches that the "Br" is added at Addition

Location 1 or 2 and does not require Br injection to also take place at Addition

Location 3.  For example, the annotated figure below shows the results of testing

with treated activated carbon.



Ex[1010], 16 (annotations in red).  A POSITA would have understood that for certain treated carbon tests (e.g., "KNX + FGD"), the halogen addition would be occurring at Locations 1 or 2 while an untreated carbon is injected into the flue gas.  As shown in the above graph, and in view of the flexibility of addition locations described by Sjostrom, a POSITA would have been motivated to add, or at least try adding, "Br" at Addition Location 1 or 2 while adding an untreated activated carbon sorbent substantially free of halogens or halide promoters to the flue gas downstream of the boiler.  A POSITA would be motivated to try such a configuration in situations where cost was the driving factor in designing a mercury removal system.  Specifically, a POSITA would have understood that the "Br" and untreated carbon would have been able to obtain the desired mercury removal at a lower cost than using a pre-brominated activated carbon sorbent.  Indeed, it was known that a pre-

treated activated carbon (such as the BPAC, or brominated PAC) disclosed in Sjostrom was more expensive than the activated carbon that is brominated in the flue gas from Addition Locations 1 and 2. Ex[1002], ¶¶549-550.

Regarding claim 14, Sjostrom also teaches pre-brominating (or pre-chlorinating) an activated carbon at Addition Location 3 (such as "BPAC," which stands for brominated-PAC). Ex[1010], 4, 16. A POSITA would have been motivated try such a configuration—adding bromine at Addition Locations 1 or 2, and also adding bromine to the sorbent before injecting at Addition Location 3—particularly for coals with higher native mercury content (or lower native halogen content) in order to further reduce total mercury emissions. In situations where additional mercury capture was required, a POSITA would have been motivated to add, or at least try adding, "Br" at Addition Location 1 or 2 while adding a treated activated carbon sorbent to the flue gas downstream of the boiler (e.g., at Addition Location 3). A POSITA would have known that this approach would have increased overall mercury capture, albeit at an increased cost compared to using bromine only at Addition Locations 1 and 2. Ex[1002], ¶¶551-552.

Sjostrom teaches that the bromine or other halogens may be added to the sorbent, thereby contacting it, at Addition Location 3 that is then injected into the flue gas. Ex[1010], 4. At least a quantity of promoted sorbent would have formed

as a reaction between the sorbent and halogen upon contact.  Halogens "promote" activated carbon sorbents because they improve mercury removal by increasing the ability of the activated carbon to bind with the mercury.  Ex[1002], ¶552.

### 9.    Claim 15: "the combustion chamber comprises a boiler."

As described for Element 1(a), the combustion chamber in Sjostrom has a boiler.  Ex[1002], ¶553

### 10.    Claim 16: "the mercury-containing gas is a flue gas."

Sjostrom expressly discloses sampling mercury content in the "Flue Gas Flow."  Ex[1010], 19; Ex[1002], ¶554.

### 11.    Claims 17-18: "the injection of the sorbent material into the mercury-containing gas occurs upstream of [cl. 17—an air pre-heater] [cl. 18—particulate separator or a scrubber]"

Regarding claim 17, Sjostrom discloses a coal-fired power plant that includes an air pre-heater:



Ex[1010], 4 (annotations in red).  The annotated unit in the figure above was an air

pre-heater.  Ex[1002], ¶555.

A POSITA would have been motivated to inject the sorbent upstream of an

air pre-heater.  A POSITA would have understood that mercury adsorption is a time-

consuming process.  Specifically, increasing the residence time of sorbent in the flue

gas would have resulted in increased mercury removal.  Because air pre-heaters are

typically located immediately upstream of the PCDs, a POSITA would have been

motivated to inject the sorbent before the air pre-heater to increase the residence time

of the sorbent in the flue gas.  Ex[1002], ¶556.

Regarding claim 18, Sjostrom shows that the sorbent is injected upstream of

an ESP or FF:



Ex[1010], 4 (annotations in red).  ESPs and FFs are particulate separators that would

have removed the mercury/sorbent material.  Ex[1002], ¶557.

### 12.   Claim 19, 21, and 22

> ***a.*** **Claims 19, 21:** **"the coal comprises added halide sorbent enhancement additive [cl. 21—that comprises Br⁻]."**
>
> ***b.*** **Claim 22:** **"The method of claim 21, wherein the sorbent enhancement additive comprises a bromide compound."**

As described for Element 1(b), Sjostrom renders obvious adding "Br," which

a POSITA would have found obvious to add a bromide compound, including

bromine ions that dissociate from the bromide compound added to the coal.  Eckberg

Case 1:19-cv-01334-CJB   Document 236-3   Filed 11/06/20   Page 79 of 114 PageID #: 3125

Petition for IPR2020-00832
USP 10,343,114

discloses that the "Br" is an aqueous solution of calcium bromide ($CaBr_2$), a bromide compound, as in claim 22. A POSITA would have understood it was obvious that the calcium bromide in the aqueous solution would dissociate to form $Br^-$ ions, as recited in claim 21. Ex[1002], ¶¶558, 561-562.

### 13.   Claim 20: "the combustion chamber comprises added $Br_2$, HBr, $Br^-$, or a combination thereof."

As discussed for Element 1(b), Sjostrom discloses that the combustion chamber comprises added "Br," and it would have been obvious in view of Eckberg that this would include bromide ions. Eckberg discloses injecting an aqueous calcium bromide solution. A POSITA would have understood it was obvious that the calcium bromide in the aqueous solution would dissociate to form $Br^-$ ions. Ex[1002], ¶¶559-560.

### G.   CLAIM 23

Claim 23 copies Elements 1(Pre)-1(d). Ex[1002], ¶563 (showing redlines between claims). Thus, claim 23 is obvious over Sjostrom in view of Eckberg for the same reasons. Ex[1002], ¶¶564-568.

### H.   CLAIM 24

Claim 24 is nearly identical to claim 1. Ex[1002], ¶569 (showing redlines between claims). Thus, claim 24 is obvious over Sjostrom in view of Eckberg for the same reasons. Ex[1002], ¶¶570-578.

Element 24(c) adds that "the activated carbon reacts with the halogen or halide promoter in the mercury-containing gas to form a promoted sorbent" and that the mercury is contacted with "the promoted sorbent." Ex[1001], Claim 24. The bromine added at Addition Location 1 or Addition Location 2 of Sjostrom would contact the sorbent in the flue gas at or downstream of the sorbent injection point. Ex[1010], 4. At least a quantity of promoted sorbent would have formed as a reaction between the sorbent and halogen upon contact. It was well-known in the art that halogens (including bromine) "promoted" activated carbon sorbents because they improved mercury removal by increasing the ability of the activated carbon to bind with the mercury. Ex[1002], ¶¶573-574.

Claim 24 also differs in that Element 24(f)(1) requires "controlling, in response to the mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, a rate of addition to the coal or the combustion chamber of the added $Br_2$, HBr, the bromide compound, or a combination thereof, or a combination thereof." Ex[1001], Claim 24. As discussed for Element 1(f), Sjostrom discloses continuously controlling the rate of injecting the sorbent based on the continuous mercury content measurements. Ex[1002], ¶577.

## I.   CLAIM 25

Claim 25 is nearly identical to Elements 1(Pre)-1(d).   Ex[1002], ¶579 (showing redlines between claims).  Thus, claim 25 is obvious over Sjostrom in view of Eckberg for the same reasons.  Ex[1002], ¶¶580-584.

Claim 25 differs from Claim 1 in that it replaces "$Br^-$" with "a bromide compound."  Ex[1001], Claim 25.  As discussed above with respect to Claim 1, it would have been obvious that Sjostrom's "Br" teaches a bromide compound, and Eckberg discloses using the specific bromide compound as an aqueous solution of calcium bromide.  Ex[1002], ¶582.

### J.   CLAIMS DEPENDING FROM CLAIM 25

#### 1.   Claims 26-27: "the [coal—cl. 26; combustion chamber—cl. 27] comprises the added $Br_2$, HBr, the bromide compound, or a combination thereof [cl. 26—added to the coal upstream of the combustion chamber]"

As discussed for Element 1(b), Sjostrom in view of Eckberg renders these claims obvious.  Ex[1002], ¶¶585-588.

#### 2.   Claim 28

Claim 28 combines claim elements 24(e), 24(f)(1), and 24(f)(2).  Ex[1002], ¶589 (redline between claims).  Thus, Claim 28 is obvious for the same reasons described for those claims.  As discussed for Element 1(f), Sjostrom discloses

continuously monitoring mercury content, and adjusting the sorbent injection rate. Ex[1002], ¶589.

### 3. Claim 30: "the mercury/sorbent composition comprises the element bromine, the sorbent material, and mercury."

As discussed for claim 7, Sjostrom teaches that the bromide promoter is contacted with the sorbent in vapor form. At least a quantity of promoted sorbent comprising bromine and sorbent would have formed as a reaction between the sorbent and halogen upon contact. A POSITA would have known that the promoted carbon sorbent injected into the flue gas would contact and adsorb at least a quantity of the mercury in the flue gas. Upon adsorption, the mercury and activated carbon in the flue gas would contact (adhere to) one another to form a mercury/sorbent composition. A POSITA would have understood that this mercury/sorbent composition contains mercury, sorbent, and bromine. Ex[1002], ¶590.

## VIII. GROUND 2: CLAIMS 1-9 AND 12-30 ARE OBVIOUS OVER SJOSTROM IN VIEW OF OLSON-646

Claims 1-9 and 12-30 would have been obvious over Sjostrom in view of Olson-646 for the additional reasons provided below. Ex[1002], ¶591. Elements and claims not mentioned below are disclosed or rendered obvious for the reasons stated above in Ground 1. Ex[1002], ¶¶591, 599-600, 606, 619, 631-632, 636-639, 646-651.

**A.**   **OVERVIEW OF EX[1014] ("OLSON-646")**

    **1.**   **Prior Art Status of Olson-646**

Olson-646, entitled "Sorbents for the Oxidation and Removal of Mercury," was published by the USPTO on March 9, 2006.  Ex[1014], 1.  As shown in the family tree below, Olson-646 was the first non-provisional application leading to the '114 Patent.





71

Ex[1017] (family tree).  The earliest priority date for the Challenged Claims of the

'114 Patent is May 2018.  *See* §VI.  Thus, Olson-646 is available as prior art under 35

U.S.C. §§102(a) and 102(b) (pre-AIA) and §§102(a)(1) and 102(a)(2) (post-AIA).

Ex[1002], ¶264.

### 2.    <u>Summary of Olson-646</u>

Olson-646 describes the reactions between bromine, activated carbon, and

mercury, as illustrated in Figure 2 below:



**FIG. 2**

Ex[1014], ¶[0054], Fig. 2.  Olson-646 explains that "hydrogen bromide reacts with

the unsaturated structure of the activated carbon" and that the reaction takes place at

"a carbene species on the edge of the graphene sheet structures of the carbon."

Ex[1014], ¶[0054].  "Molecular bromine or a bromine compound reacts to form a

Petition for IPR2020-00832
USP 10,343,114

similar structure, with a positive carbon that is active for oxidizing the mercury with subsequent capture by the sorbent."  Ex[1014], ¶[0054]; Ex[1002], ¶¶265-266.

Olson-646 also provides typical process conditions involved when reacting activated carbon with a bromine-containing reagent to form promoted activated carbon, and then injecting the promoted activated carbon into the mercury-containing (flue) gas stream in Figure 3:



FIG. 3

Ex[1014], Fig. 3.   Figure 3 shows a "mercury control system 100 comprising preparation of promoted carbon sorbents." Ex[1014], ¶[0056].  Specifically, Figure 3 depicts a "base activated carbon reservoir 110, an optional halogen/halide promoter reservoir 120, an optional secondary component reservoir 130, and an optional alkali component reservoir 180, each of which with corresponding flow control device(s) 201, 202, 203, and 208/209, respectively."  Ex[1014], ¶[0056].  Olson-646 explains that a "promoted carbon sorbent and/or an optional alkali component is injected into contaminated flue gas stream 15." Ex[1014], ¶[0061]; Ex[1002], ¶¶267-268.

### B.   REASONS TO COMBINE REFERENCES

Sjostrom provides a system for the addition of halogens and activated carbon sorbents for mercury removal.  Ex[1010], 4.  Sjostrom explains that activated carbon was a well-known mercury sorbent and discloses suitable rates for sorbent injection. Ex[1010], 10, 11, 16.  Sjostrom also teaches that halogens (e.g., "Cl, Br, F, I") may be added in multiple locations to increase the effectiveness of activated carbon at removing mercury.  Ex[1010], 4, 16.  However, Sjostrom does not expressly state which specific "Br" compounds to use, or their specific injection rate.  Ex[1002], ¶¶592-594.

In addition to such process matters being a matter of routine implementation, a POSITA would have looked to Olson-646 to provide implementational details such as these.  A POSITA would have been motivated to combine Sjostrom and Olson-646, and have had a reasonable expectation of success in applying the teachings of Olson-646 to Sjostrom, because both references teach using a conventional halogen (bromine) in a conventional way (as a promoter) to increase the effectiveness of a conventional sorbent (activated carbon) to capture mercury.  Specifically, a POSITA would have been motivated to use the "HBr or $Br_2$" of Olson-646 as the bromine-containing species ("Br") of Sjostrom.  Ex[1014], ¶¶[0043], [0066].  A POSITA would have been additionally motivated to apply the chemistry teachings of Olson-646 to Sjostrom, because it describes the chemicals and associated reactions theorized to have been used in the system of Sjostrom.  Ex[1002], ¶¶594-596.

A POSITA would have been additionally motivated to apply the teachings of Olson-646 to Sjostrom, and have had a reasonable expectation of success, because both references teach using the same conventional halogen to achieve the same results.  Sjostrom shows removing 70 wt% or more of mercury from the mercury-containing coal flue gas using halogen treated activated carbons (KNX + FGD).  Ex[1010], 16.  Likewise, Olson-646 provides "for reducing mercury in flue gas comprising providing a sorbent, injecting the sorbent into a mercury-containing flue

gas stream, [and] collecting greater than 70 wt-% of the mercury in the flue gas on the sorbent to produce a cleaned flue gas." Ex[1014], ¶[0022].  Sjostrom and Olson also use the same brand name of commercial activated carbon—Norit Darco FGD sorbent.  Ex[1002], ¶597.

Implementing the processing conditions of Olson-646 would have been nothing more than using known results that were known to improve one process in a known way to improve a similar process.  The implementation details provided in Olson-646 are simply proposed workable ranges (such as bromine to sorbent ratios), which were conventional and known in the art, and would have been selected, or at least tried, as part of routine process optimization by a POSITA applying the teachings of Sjostrom.  *Applied Materials*, 692 F.3d at 1297-98; Ex[1002], ¶598.

## C.   CLAIM 1

### 1.   Element 1(b)—"the mercury-containing gas comprises a halogen or halide promoter comprising HBr, Br⁻, or a combination thereof, wherein the coal comprises added Br₂, HBr, Br⁻, or a combination thereof, added to the coal upstream of the combustion chamber, or the combustion chamber comprises added Br₂, HBr, Br⁻, or a combination thereof, or a combination thereof;"

As discussed for Element 1(b) in Ground 1, Sjostrom renders obvious that the halogen would be added to the coal and discloses that the halogen would be added to the combustion chamber.  Olson-646 supplements the teachings of Sjostrom, describing specific "Br" containing compounds that react with activated-carbon and

improve mercury removal.  Olson-646 "provides a cost-effective way to capture pollutants by utilizing exceptionally reactive halogen/halide promoted carbon sorbents using a bromide (or other halogen/halide) treatment of the carbon, that capture mercury via mercury-sorbent surface reactions." Ex[1014], ¶[0043].  Olson-646 teaches embodiments "wherein the halogen/halide promoter is in gaseous or vapor form" that comprises "gaseous HBr or $Br_2$." Ex[1014], ¶[0066].  A POSITA would have been motivated, and have had a reasonable expectation of success, to apply the teachings of Olson-646 (e.g., the injection of HBr or $Br_2$) to the system of Sjostrom because both references teach using a conventional halogen (bromine) in a conventional way (as a promoter) to increase the effectiveness of a conventional sorbent (activated carbon) to capture mercury from coal flue gas.  Ex[1002], ¶¶601-602; *see* §VIII.B.

### 2.      Element 1(c)—"injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber; contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition;"

As discussed in Ground 1, Sjostrom discloses Element 1(c).  Element 1(c) would have also been obvious over Olson-646.  Olson-646 teaches that "[a] promoted activated carbon sorbent is described that is highly effective for the removal of mercury from flue gas streams." Ex[1014], Abstract.  Olson-646

explains that a "promoted carbon sorbent…is injected into contaminated flue gas stream 15."  Ex[1014], ¶[0061].  The "contaminated flue gas stream" refers to a stream of mercury-containing gas.  Figure 3 of Olson-646 shows the sorbent, along with the halide promoter, injected into the mercury-containing (flue) gas (item 15) at injection point 116.



**FIG. 3**

Ex[1014], Fig. 3. "The halogen/halide…contacts and reacts with the base activated carbon prior to injection point 116." Ex[1014], ¶[0061]; Ex[1002], ¶¶603-604.

Olson-646 describes that mercury and activated carbon in the flue gas would react to form a mercury/sorbent composition.   Indeed, Olson-646 discloses a promoted activated-carbon sorbent "that capture[s] mercury via mercury-sorbent surface reactions."  Ex[1014], ¶[0043]. Olson-646 further describes "AC mercury binding sites," which are sites where mercury contacts the sorbent and forms a mercury/sorbent composition.  Ex[1014] at ¶[0128]; Ex[1002], ¶605.

### 3.   Element 1(f)

#### *a.* Element 1(f)(1)—"controlling, in response to the monitored mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, the sorbent composition, or a combination thereof,"

#### Element 1(f)(2)—"so that the mercury content of the cleaned gas is maintained at or below a desired level."

As discussed in Ground 1, these elements are obvious in view of Sjostrom. They would also have been obvious over Olson-646.  Olson-646 explains, "[t]he reduced mercury 'clean' flue gas stream 142 is then monitored for mercury content by an optional CEM 205, which provides corresponding signals to an optional computer/controller 206…to maintain the mercury concentration in exhaust stream 35 within desired limits, according to control algorithms well known in the art." Ex[1014], ¶[0061].   A "CEM" is a continuous emissions monitor.   Olson-646 acknowledges control algorithms that were "well known in the art" to keep the

mercury content of the cleaned gas "within desired limits" (another term for "desired level"). Ex[1014], ¶[0061]; Ex[1002], ¶¶607-608.

For example, "mercury CEM 205 and flow controllers 201, 202, 203, 208, and 209 are electrically connected via optional lines 207 (or wirelessly) to an optional digital computer (or controller) 206, which receives and processes signals and preferably controls the preparation and injection of promoted carbon sorbent into contaminated flue gas stream 15." Ex[1014], ¶[0060]. Flow controller 201 controls the rate of injection of activated carbon sorbent, flow controller 202 controls the rate of injection of halogen promoter, and flow controller 204 discloses the addition of both activated carbon and bromine-containing promoter into the mercury-containing flue gas 15. Ex[1014], ¶[0061]. These flow controllers were used to continuously control the mercury content of the cleaned gas, in response to feedback signals from the continuous mercury measurements. Ex[1002], ¶609.

A POSITA would have had a reasonable expectation of success in applying the teachings of Olson-646, such controlling a promoter and/or sorbent injection rate in response to mercury measurements, because Sjostrom and Olson-646 use conventional equipment and materials to implement well-known control methods to achieve the same goal (e.g., removal of mercury from flue gas). Moreover, the hardware in Olson-646 involves continuous emissions monitors (as in Sjostrom), as

well as mass-flow controllers and basic feedback logic, each of which were well-known to a person of ordinary skill in the art and routinely used in the power-generation industry.  A POSITA would not have needed to remove anything from the system of Sjostrom, they merely would have had to apply the teachings of Olson-646 to fill in the missing details, such as flow controllers and valves, to implement the desired control system.  Ex[1002], ¶610.

### D.   CLAIMS DEPENDING FROM CLAIM 1

#### 1.   Claims 2-3: "removing greater than 70 wt % of the mercury in the mercury-containing gas [cl. 3—on the sorbent]"

As discussed in Ground 1, Sjostrom discloses claim 2.  Claims 2 and 3 would have also been obvious over Sjostrom in view of Olson-646.  Olson-646 provides a method "for reducing mercury in flue gas comprising providing a sorbent, injecting the sorbent into a mercury-containing flue gas stream, collecting greater than 70 wt-% of the mercury in the flue gas on the sorbent to produce a cleaned flue gas, and substantially recovering the sorbent from the cleaned flue gas."  Ex[1014], ¶[0022].  A POSITA would have looked to the Olson-646 reference to further understand the mechanisms for the mercury-removal disclosed by Sjostrom.  By using the particular species disclosed in Olson ("HBr or $Br_2$") as the source of "Br" disclosed in Sjostrom, then "greater than 70 wt % of the mercury in the mercury-containing gas" would have been removed "on the sorbent."  Ex[1002], ¶¶611-613.

### 2.   Claim 4: "the sorbent in the mercury-containing gas comprises about 1 g to about 30 g of the halogen or halide promoter per 100 g of the sorbent material."

Claim 4 is merely an attempt to claim a workable range for combining a conventional halogen (bromine) being used in a conventional way (halogens are inherent to coal, and both oxidize mercury and promote activated carbon) with a conventional sorbent (activated carbon).  Nothing in the '114 Patent specification attributes any particular significance to the claimed range, or establishes that the claimed range "achieves unexpected results" in mercury removal.  Rather, the range presents nothing more than optimization of "result-effective" variables that would have been obvious to a POSITA.  *Applied Materials*, 692 F.3d at 1297-98; Ex[1002], ¶614.

Consistent with that, Olson-646 discloses that "the sorbent comprises from about 1 to about 30 grams promoter per 100 grams of base activated carbon." Ex[1014], ¶[0014], ¶[0018], Claims 3, 17.  Olson-646 also discloses an embodiment wherein "the injected sorbent is prepared in-flight by reacting an activated carbon and a promoter within a pneumatic transport line from which the reaction product is injected to the mercury-containing flue gas stream."  Ex[1014], ¶[0027].  In that embodiment, Olson-646 explains that "the promoter is added at from about 1 to about 30 grams per 100 grams of activated carbon." Ex[1014], ¶[0027].  A POSITA

would have looked to the Olson-646 reference to further understand the relationship between the halogen and activated carbon disclosed by Sjostrom.  Specifically, a POSITA would have understood that the activated carbon sorbent of Sjostrom would have "comprise[d] from about 1 to about 30 grams promoter per 100 grams of base activated carbon" after the activated carbon sorbent made contact with the "Br" promoter.  By using the particular species disclosed in Olson ("HBr or $Br_2$") as the source of "Br" disclosed in Sjostrom, then "the sorbent comprises from about 1 to about 30 grams promoter per 100 grams of base activated carbon."  Ex[1002], ¶¶615-618.

### 3.   Claim 6: "the coal comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, added to the coal upstream of the combustion chamber."

As discussed in Ground 1, Sjostrom renders obvious claim 6.  This claim is also obvious over Sjostrom in view of Olson-646 for the same reasons discussed above for Element 1(b).  Sjostrom renders obvious the addition of "Br" to the coal (Addition Location 1).  A POSITA desiring to determine the particular "Br" compounds for addition would have been motivated to try HBr or $Br_2$ (as disclosed in Olson) for the "Br" in Sjostrom.  *See* §VIII.B.  Indeed, HBr and $Br_2$ were relatively cheap and widely available sources of bromine.  While Olson-646 does not expressly

or inherently disclose adding HBr or $Br_2$ to the coal, it does identify the effectiveness of HBr and $Br_2$ in promoting activated carbon.  Ex[1002], ¶¶620-621.

### 4.     Claim 7: "the promoter is contacted with the sorbent in vapor form, gaseous form, liquid form, or in an organic solvent."

As described for Element 1(b) above and in Ground 1, a POSITA would have found it obvious that the "Br" addition of Sjostrom would have included a bromide compound (e.g., HBr or calcium bromide) and/or $Br^-$ ions.  Sjostrom teaches addition of bromine in at least three locations.



At combustion temperatures, at least a portion of the aqueous salt solution would have evaporated and left the boiler as HBr in vapor form.  A POSITA would have known that the HBr would make contact with the injected sorbent once it reached

the sorbent addition location of Sjostrom.  Olson-646 also teaches embodiments "wherein the halogen/halide promoter is in gaseous or vapor form" that comprises "gaseous HBr or $Br_2$."  Ex[1014], ¶[0066].  While Olson-646 does not disclose adding HBr or $Br_2$ to the combustion chamber or coal, a POSITA would have looked to Olson to identify the effectiveness of HBr and $Br_2$ in promoting activated carbon.  Ex[1002], ¶¶622-624.

5.  **Claim 8: "further comprising injecting a secondary material into the mercury-containing gas downstream of the combustion chamber."**

As described in Ground 1, Sjostrom discloses claim 8.  This limitation would have also been obvious over Sjostrom in view of Olson.  Olson-646 repeatedly refers to a "secondary component," which is another term for "secondary material."  *See, e.g.*, Ex[1014], ¶[0011], [0014], [0015], [0017], Claims 4-8, 11, 24-27, 38-43.  Olson-646 shows a schematic of "mercury control system 100 comprising preparation of promoted carbon sorbents," which includes "an optional secondary component reservoir 130, and an optional alkali component reservoir 180."

Petition for IPR2020-00832
USP 10,343,114



**FIG. 3**

Ex[1014], ¶[0056], Fig. 3.   Olson-646 explains that "the optional secondary component may be contacted and react directly in transport line 115 via line 131, or optionally as described above with respect to the halogen/halide, via lines 131 b and 131 c." Ex[1014], ¶[0063]; Ex[1002], ¶¶625-626.

Olson-646 teaches that the "optional secondary component compris[es] a halogen or a hydrohalide." Ex[1014], ¶[0014]. These secondary components are added "such that the reactivity and mercury capacity of the sorbent are enhanced." Ex[1014], ¶[0014]. A POSITA would have desired to lower the cost of mercury removal by increasing the reactivity and capacity of the activated carbon sorbent of Sjostrom. Thus, a POSITA would have been motivated to use the optional secondary components of Olson-646 "to further increase reactivity and mercury capacity." Ex[1014], ¶[0011]; Ex[1002], ¶¶627-628.

### 6.   Claim 9: "The method of claim 8, wherein the secondary material comprises a halogen, a compound derived from a halogen, a hydrohalide, a compound comprising a Group V or Group VI element and a molecular halogen, or a combination thereof."

Claim 9 is obvious for the same reasons as discussed in claim 8. Olson-646 includes embodiments wherein "the optional secondary component is selected from the group consisting of Group V halides, Group VI halides, HI, HBr, HCl, and combinations thereof." Ex[1014], ¶[0017]; *see also* Ex[1014], ¶[0025]. Ex[1002], ¶¶629-630.

### 7.   Claim 14: "the sorbent material injected into the mercury-containing gas is a promoted sorbent obtained by contacting a base sorbent with another halogen or halide promoter"

As described in Ground 1, Sjostrom renders obvious claim 14. This claim would have also been obvious over Sjostrom in view of Olson. Sjostrom and Olson

Petition for IPR2020-00832
USP 10,343,114

use the same brand name of commercial product—Norit Darco FGD sorbent.  And

similar to Addition Location 3 of Sjostrom, Olson-646 teaches first promoting a base

activated carbon (item 10) with a bromine promoter (items 20, 40), and then injecting

the "promoted carbon sorbent" into the mercury-containing flue gas (item 50).



**FIG. 1**

Ex[1014], Fig. 1, ¶¶45-48.  A POSITA would have been motivated try adding

bromine at Addition Locations 1 or 2, as taught by Sjostrom, and also adding

bromine to the sorbent before injecting at Addition Location 3. as taught by both Sjostrom and Olson-646—particularly for coals with higher native mercury content (or lower native halogen content) in order to further reduce total mercury emissions. In situations where additional mercury capture was required, a POSITA would have been motivated to add, or at least try adding, "Br" at Addition Location 1 or 2 while adding a treated activated carbon sorbent to the flue gas downstream of the boiler (e.g., at Addition Location 3). A POSITA would have known that this approach would have increased overall mercury capture, albeit at an increased cost compared to using bromine only at Addition Locations 1 and 2. Ex[1002], ¶¶633-635.

### 8.    Claim 19, 21, and 22

  *a.*   **Claims 19, 21:** **"the coal comprises added halide sorbent enhancement additive [cl. 21—that comprises Br⁻."]**

  *b.*   **Claim 22:** **"The method of claim 21, wherein the sorbent enhancement additive comprises a bromide compound."**

As discussed in Ground 1, Sjostrom renders obvious claims 19, 21, and 22. A POSITA would also have been motivated, and expected a reasonable chance of success, to apply the teachings of Olson-646 (e.g., the injection of HBr or $Br_2$) to the system of Sjostrom. Moreover, Olson-646 explains that the "invention provides for cost-effective removal of pollutants including mercury, using sorbent enhancement additives." Ex[1014], ¶[0009]. A POSITA would have understood that Olson-646

referred to the HBr or $Br_2$ as sorbent enhancement additives, in that they enhance the ability of activated carbon to remove mercury.  Ex[1002], ¶¶640-645.

### 9.   Claim 20: "the combustion chamber comprises added $Br_2$, HBr, $Br^-$, or a combination thereof."

As discussed in Ground 1, Sjostrom discloses claim 20.  This claim is also obvious over Sjostrom in view of Olson-646 for the same reasons discussed above for Element 1(b).  Sjostrom discloses adding "Br" to the combustion chamber (Addition Location 2). Ex[1010], 4.  A POSITA desiring to determine the particular "Br" compounds at either location, would have been motivated to look to Olson-646 to select HBr or $Br_2$ as the "Br."  *See* §VIII.B; Ex[1002], ¶¶640-641.

### E.   CLAIM 24

Claim 24 is nearly identical to claim 1.  Ex[1002], ¶652 (showing redlines between claims).  Thus, claim 24 is obvious over Sjostrom in view of Olson-646 for the same reasons.  Ex[1002], ¶¶653-662.

The changes to Element 24(c), as compared to claim 1, are also obvious over Sjostrom in view of Olson-646.  When bromine and carbon come into contact with each other, as in Sjostrom and Olson-646, that they react to form a promoted sorbent.  Olson-646 explains that "hydrogen bromide ***reacts*** with the unsaturated structure of the activated carbon" at "a carbene species on the edge of the graphene sheet structures of the carbon."  Ex[1014], ¶[0054].  Further, Olson-646 explains that

"[m]olecular bromine or a bromine compound *reacts* to form a similar structure, with a positive carbon that is active for oxidizing the mercury with subsequent capture by the sorbent." Ex[1014], ¶[0054]. A POSITA would have understood that Figure 2 of Olson-646 shows that once the bromine/activated carbon complex contacts mercury, it chemically reacts with (e.g., adsorbs) the mercury. Ex[1002], ¶¶656-657.

A POSITA would have looked to the Olson-646 reference to further understand the relationship between the halogen and activated carbon disclosed by Sjostrom. By using the particular species disclosed in Olson ("HBr or $Br_2$") as the source of "Br" disclosed in Sjostrom, then the sorbent material injected into the mercury-containing gas is a promoted sorbent obtained by contacting a base sorbent with another halogen or halide promoter. Ex[1002], ¶658.

The changes to Element 24(f)(1) are also obvious over Sjostrom in view of Olson-646 because Olson also discloses adjusting the injection rate of injecting the sorbent into the mercury containing gas as shown in Element 1(f)(1). *See* §VIII.C.3; Ex[1002], ¶661.

### F.   CLAIM 25

Claim 25 is nearly identical to Elements 1(Pre)-1(d). Claim 25 differs from Claim 1 in that it replaces "$Br^-$" with "a bromide compound," while still retaining "$Br_2$, HBr" in the claim. Claim 25 is obvious over Sjostrom in view of Olson-646

for the same reasons, including in their teachings of $Br_2$ and HBr.  *See* §VIII.C;

Ex[1002], ¶¶663-668.

### G.   CLAIMS DEPENDING FROM CLAIM 25

#### 1.   Claims 26-27: "the [coal—cl. 26; combustion chamber—cl. 27] comprises the added $Br_2$, HBr, the bromide compound, or a combination thereof [cl. 26—added to the coal upstream of the combustion chamber]"

As discussed in Ground 1, Sjostrom renders obvious claims 26 and 27.  These

claims are also obvious over Sjostrom in view of Olson-646 for the same reasons

discussed above for Element 1(b).  Sjostrom renders obvious that "Br" could be

added to the coal (Addition Location 1) and/or to the combustion chamber (Addition

Location 2).  A POSITA desiring to determine the particular "Br" compounds at

either location, would have been motivated to look to Olson-646 to select HBr or

$Br_2$ as the "Br."  *See* §VIII.B.  While Olson-646 does not disclose adding HBr or $Br_2$

to the combustion chamber or coal, it does describe the effectiveness of HBr and $Br_2$

in promoting activated carbon.  Ex[1002], ¶¶669-674.

**2.** **Claim 28: "further comprising monitoring the mercury content of the cleaned gas; and controlling, in response to the mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, a rate of addition to the coal or the combustion chamber of the added Br$_2$, HBr, the bromide compound, or a combination thereof, or a combination thereof, so that the mercury content of the cleaned gas is maintained at or below a desired level."**

Claim 28 combines claim elements 24(e), 24(f)(1), and 24(f)(2). Ex[1002], ¶675 (redline between claims). Thus, Claim 28 is obvious for the same reasons described for those claims. As discussed for Element 1(f), Sjostrom discloses continuously monitoring mercury content, and adjusting the sorbent injection rate. Ex[1002], ¶675.

**3.** **Claim 29: "the mercury-containing gas comprises about 1 g to about 30 g of the element bromine per 100 g of the sorbent."**

Olson-646 includes repeated discussion of this ratio of the halogen or halide promoter to the sorbent material. Olson-646 discusses embodiments wherein "the promoter is added at from about 1 to about 30 grams per 100 grams of activated carbon." Ex[1014], ¶[0023]. This limitation also appears repeatedly in the claims of Olson-646. Ex[1014], Claims 3, 17, 37, 47. Olson-646 also discloses an embodiment wherein "the injected sorbent is prepared in-flight by reacting an activated carbon and a promoter within a pneumatic transport line from which the reaction product is injected to the mercury-containing flue gas stream." Ex[1014],

¶[0027].  In that embodiment, Olson-646 explains that "the promoter is added at from about 1 to about 30 grams per 100 grams of activated carbon."  Ex[1014], ¶[0027]. Ex[1002], ¶676.

A POSITA would have looked to the Olson-646 reference to provide the implementation details for the system of Sjostrom.  Specifically, a POSITA would have been motivated to find the type of "Br" for addition and the relative rates of addition for both activated carbon and "Br" for optimum mercury removal.  To the extent that Sjostrom does not explicitly state that the ratio of promoter:activated carbon addition, Olson-646 provides this explanation.  Ex[1002], ¶677.

Claim 29 is merely an attempt to claim a workable range for combining a conventional halogen (bromine) being used in a conventional way (to oxidize mercury and promote activated carbon) with a conventional sorbent (activated carbon).  Nothing in the '114 Patent specification attributes significance to the claimed range, or establishes that the claimed range "achieves unexpected results." The range presents nothing more than optimization of "result-effective" variables that would have been obvious to a POSITA.  *Applied Materials*, 692 F.3d at 1297-98; Ex[1002], ¶¶678-679.

### 4. Claim 30: "the mercury/sorbent composition comprises the element bromine, the sorbent material, and mercury."

Figure 2 of Olson-646, reproduced below, identifies formation of a bromine/sorbent/mercury composition.



FIG. 2

Ex[1014], ¶[0054], Fig. 2  Olson-646 explains that "hydrogen bromide reacts with the unsaturated structure of the activated carbon" at "a carbene species on the edge of the graphene sheet structures of the carbon." Ex[1014], ¶[0054]. Further, Olson-646 explains that "[m]olecular bromine or a bromine compound reacts to form a similar structure, with a positive carbon that is active for oxidizing the mercury with subsequent capture by the sorbent." Ex[1014], ¶[0054]. Figure 2 of Olson-646, annotated below, shows that the composition includes the activated carbon sorbent, the element bromine, and the element mercury.



**FIG. 2**

Ex[1014], Fig. 2 (annotations in red); Ex[1002], ¶¶680-681.

A POSITA would have looked to the Olson-646 reference to further understand the reaction and relationship already occurring between the halogen, activated carbon, and mercury disclosed by Sjostrom. Specifically, Sjostrom discloses a flue gas that would contain "Br", mercury, and activated carbon. Ex[1002], ¶682.

## IX.    <u>CONCLUSION</u>

Petitioners respectfully request that *inter partes* review of the '114 Patent be
instituted and that the Challenged Claims be cancelled as unpatentable under 35
U.S.C. §318(b).

Respectfully submitted,

BAKER BOTTS L.L.P.

April 21, 2020____          /Brian W. Oaks/_____
Date                       Brian W. Oaks (Reg. 44,981)
                           98 San Jacinto Blvd., Suite 1500
                           Austin, Texas 78701
                           Phone: (512) 322-5470

                           David J. Tobin (Reg. 60,776)
                           2001 Ross Avenue, Suite 900
                           Dallas, TX 75201-2980

                           Elizabeth D. Flannery (Reg. 59,509)
                           Thomas B. Carter Jr. (Reg. 76,040)
                           910 Louisiana Street
                           Houston, Texas 77002-4995

                           ATTORNEYS FOR PETITIONERS

Petition for IPR2020-00832
USP 10,343,114

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 37 C.F.R. §42.24(d), the undersigned certifies that the foregoing Petition, exclusive of the exempted portions as provided in 37 C.F.R. §42.24(a), contains 13,961 words which is no more than 14,000 words and therefore complies with the type-volume limitations of 37 C.F.R. §42.24(a). The word count was calculated by starting with Microsoft Word's total document word count and subtracting the words for the Table of Contents, the Exhibit List, the Mandatory Notices, the Certificate of Compliance, and the Certificate of Service.

Dated: April 21, 2020                /Brian W. Oaks/
                                     Brian W. Oaks (Reg. No. 44,981)
                                     98 San Jacinto Blvd., Suite 1500
                                     Austin, Texas 78701
                                     Phone: (512) 322-2500
                                     Facsimile: (512) 322-2501


                                     LEAD ATTORNEY FOR PETITIONERS

Petition for IPR2020-00832
USP 10,343,114

## CERTIFICATE OF SERVICE

In accordance with 37 C.F.R. §§42.6(e) and 42.105, the undersigned certifies that on the 21st day of April, 2020, a complete and entire copy of the PETITION FOR *INTER PARTES* REVIEW ("petition"), Power of Attorney and related Exhibits were served on Patent Owner at the correspondence address of record for the subject patent,

SCHWEGMAN LUNDBERG & WOESSNER, P.A.
P.O. BOX 2938
MINNEAPOLIS MN 55402

via Express Mail or by means at least as fast and reliable as Express Mail.

Additionally, a courtesy copy was served via electronic mail on the Patent Owner's counsel at the following email address:

**CALDWELL CASSADY CURRY PC**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201

Bradley W. Caldwell (Texas Bar No. 24040630)
bcaldwell@caldwellcc.com

and
Justin T. Nemunaitis (Texas Bar No. 24065815)
jnemunaitis@caldwellcc.com

100

Petition for IPR2020-00832
USP 10,343,114

Dated: April 21, 2020
/Brian W. Oaks/
Brian W. Oaks (Reg. No. 44,981)
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701

LEAD ATTORNEY FOR PETITIONERS