# EXHIBIT D

UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT TRIAL AND APPEAL BOARD

---

NRG Energy, Inc.,
Talen Energy Corporation, and
Vistra Energy Corp.

Petitioners

v.

Midwest Energy Emissions Corp.

Patent Owner

---

IPR2020-00834
Patent No. 10,343,114

**PETITION FOR *INTER PARTES* REVIEW**

Petition for IPR2020-00834
USP 10,343,114

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    MANDATORY NOTICES UNDER 37 C.F.R. §42.8(a)(1) .......................1

    A.  Real Party-In-Interest under 37 C.F.R. §42.8(b)(1).................................1

    B.  Related Matters under 37 C.F.R. §42.8(b)(2) .........................................6

    C.  Lead and Back-Up Counsel under 37 C.F.R. §42.8(b)(3) .......................8

    D.  Service Information under 37 C.F.R. §42.8(b)(4) ...................................9

    E.  Fees.......................................................................................................9

III.   REQUIREMENTS FOR IPR UNDER 37 C.F.R. §42.104 .......................9

    A.  Standing.................................................................................................9

    B.  Asserted References and Prior-Art Status................................................9

    C.  Identification of Challenged Claims .....................................................10

    D.  The Board Should Not Deny Institution ...............................................11

IV.    OVERVIEW.........................................................................................14

    A.  Level of Ordinary Skill ........................................................................14

    B.  The Alleged Invention of the '114 Patent.............................................14

    C.  Prosecution History of the '114 Patent .................................................15

    D.  State of the Art .....................................................................................17

V.     CLAIM CONSTRUCTION ...................................................................22

VI.    GROUND 1: CLAIMS 23-28, 30 ARE ANTICIPATED BY
      VOSTEEN .............................................................................................22

    A.  Overview of Ex[1008] ("Vosteen") ......................................................22

    B.  Claim 25 ..............................................................................................22

    C.  Claims Depending from Claim 25 ........................................................26

    D.  Claim 23 ..............................................................................................28

    E.  Claim 24 ..............................................................................................29

VII.   GROUND 2: CLAIMS 1-9, 12-30 ARE OBVIOUS OVER
       VOSTEEN .............................................................................................29

    A.  Claims Addressed in Ground 1 .............................................................30

i

B.  Claim 29: "The Method of Claim 25, Wherein the mercury-containing gas comprises about 1 g to about 30 g of the element bromine per 100 g of the sorbent" ...........................................32

C.  Claim 1 ...............................................................................33

D.  Claims Depending from Claim 1 ......................................35

VIII.  GROUND 3: CLAIMS 23, 25-27, 30 ARE ANTICIPATED BY DOWNS-BOILER..............................................................44

A.  Overview of Ex[1006] ("Downs-Boiler") ........................44

B.  Claim 25 .............................................................................45

C.  Claims Depending from Claim 25 .....................................49

D.  Claim 23 .............................................................................49

IX.  GROUND 4: CLAIMS 1-7, 12-28, 30 ARE OBVIOUS OVER DOWNS-BOILER.................................................................50

A.  Claims Addressed in Ground 3 ..........................................51

B.  Claim 1 ...............................................................................51

C.  Claims Depending from Claim 1 .......................................54

D.  Claim 24 .............................................................................64

E.  Claim 28 .............................................................................67

X.  GROUNDS 5-6: OBVIOUSNESS Of THE CLAIMS IN VIEW OF EPA-PROPOSAL..............................................................67

A.  Overview of EPA-Proposal.................................................67

B.  Reasons to Combine Each Reference with EPA-Proposal .....................68

C.  Disclosure of Vosteen in View of EPA-Proposal, and Downs-Boiler in View of EPA-Proposal...................................................69

XI.  GROUNDS 7-8: OBVIOUSNESS Of THE CLAIMS IN VIEW NELSON ...........................................................................74

A.  Overview of Ex[1012] ("Nelson")......................................75

B.  Reasons to Combine Each Reference With Nelson................................76

C.  Disclosure of Vosteen in View of Nelson, and Downs-Boiler in View of Nelson ...................................................................78

XII.  CONCLUSION ........................................................................87

Petition for IPR2020-00834
USP 10,343,114

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Bionics, LLC v. Med-El Elektromedizinische Gerate GMBH,*
 IPR2019-01469, Paper 6 (P.T.A.B. Feb. 13, 2020)................................11, 12, 13

*Amgen Inc. v. Sanofi,*
 872 F.3d 1367 (Fed. Cir. 2017) .............................................................44

*Becton, Dickinson & Co. v. B. Braun Melsungen AG,*
 IPR2017-01586, Paper 8 (Dec. 15, 2017)....................................................11, 12

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.,*
 800 F.3d 1375 (Fed. Cir. 2015) .............................................................44

*HTC Corp. et al. v. Motiva Patents,*
 LLC, IPR2019-01666, Paper 9 (P.T.A.B. April 3, 2020)....................................13

*In re Applied Materials, Inc.,*
 692 F.3d 1289 (Fed. Cir. 2012) ..................................................33, 37, 57, 83, 84

*Koninklijke Philips N.V. v. Google LLC,*
 948 F.3d 1330 (Fed. Cir. 2020) ...........................................17, 29, 35, 36, 40, 56

*Nat'l Steel Car, Ltd. v. Canad. Pac. Ry., Ltd.,*
 357 F.3d 1319 (Fed. Cir. 2004) .......................................................68, 69

*PowerOasis, Inc. v. T-Mobile USA, Inc.,*
 522 F.3d 1299 (Fed. Cir. 2008) ........................................................10

STATUTES

35 U.S.C. §311(c)(1).........................................................................11

44 U.S.C. §1507................................................................................67

OTHER AUTHORITIES

FRE 803(8)........................................................................................67

iii

Petition for IPR2020-00834
USP 10,343,114

FRE 902(1)..............................................................................................................67

Petition for IPR2020-00834
USP 10,343,114

## LIST OF EXHIBITS

| Ex. | Description |
|---|---|
| 1001 | U.S. Patent No. 10,343,114 to Olson et al. (filed May 14, 2018) (**"'114 Patent" or "Challenged Patent"**) |
| 1002 | Declaration of Dr. Stephen Niksa in Support of Petition for *Inter Partes* Review of U.S. Patent No. 10,343,114 (**"'114 Niksa Decl."**) |
| 1003 | RESERVED |
| 1004 | Curriculum Vitae of Dr. Stephen Niksa |
| 1005 | *Midwest Energy Emissions Corp. v. Vistra Energy Corp. et al.*, Case No. 1:19-cv-01334, Dkt. No. 1 (D. Del. July 17, 2019) |
| 1006 | U.S. Patent Pub. No. 2008/0107579 to Downs et al. (published May 8, 2008) (**"Downs-Boiler"**) |
| 1007 | U.S. Patent Prov. App. No. 60/555,353 (filed Mar. 22, 2004) (**"Downs-Boiler-Provisional"**) |
| 1008 | U.S. Patent No. 6,878,358 to Vosteen et al. (filed May 6, 2003) (**"Vosteen"**) |
| 1009 | Proposed National Emission Standards for Hazardous Air Pollutants; and, in the Alternative, Proposed Standards of Performance for New and Existing Stationary Sources: Electric Utility Steam Generating Units, 69 Fed. Reg. 4652-4752 [Volume 69, No. 20] (Jan. 30, 2004) (**"EPA-Proposal"**) |
| 1010 | Sharon Sjostrom, "Full Scale Evaluations of Mercury Control Technologies with PRB Coals," Track A, Session A3 (Mercury – Control), Presentation A3b, EUEC: 8TH ELECTRIC UTILITIES ENVIRONMENTAL CONFERENCE (Tucson, Arizona: January 25, 2005) (**"Sjostrom"**) |

| 1011 | Craig Eckberg et al., "Mercury Control Evaluation of Halogen Injection into a Texas Lignite-Fired Boiler," Track A, Session A3 (Mercury – Control), Presentation A3c, EUEC: 8TH ELECTRIC UTILITIES ENVIRONMENTAL CONFERENCE (Tucson, Arizona: January 25, 2005) (**"Eckberg"**) |
|---|---|
| 1012 | U.S. Patent No. 6,953,494 to Nelson,  (filed May 6, 2003) (**"Nelson"**) |
| 1013 | U.S. Patent Pub. No. 2004/0003716 to Nelson (published Jan. 8, 2004) (**"Nelson Publication"**) |
| 1014 | U.S. Patent Pub. No. 2006/0048646 to Olson et al. (published Mar. 9, 2006) (**"Olson-646"**) |
| 1015 | U.S. Patent Pub. No. 2007/0180990 to Downs et al. (published August 9, 2007) (**"Downs-Halogenation"**) |
| 1016 | RESERVED |
| 1017 | Family Tree of '114 and '147 Patents, Showing Parent Patent Applications |
| 1018-1019 | RESERVED |
| 1020 | File History of U.S. Patent Prov. App. No. 60/605640 (**"Provisional"**) |
| 1021 | File History of U.S Patent Application No. 11/209,163 (**"'163 Application File History"**) |
| 1022 | File History of U.S Patent Application No. 12/201,595 (**"'595 Application File History"**) |
| 1023 | File History of U.S Patent Application No. 12/429,058 (**"'058 Application File History"**) |

| 1024 | File History of U.S Patent Application No. 14/102,896 (**"'896 Application File History"**) |
|---|---|
| 1025 | File History of U.S. Patent Application No. 15/295,594 (**"'594 Application File History"**) |
| 1026 | File History of U.S. Patent Application No. 15/978,760 (issued as U.S. Patent No. 10,343,114) (**"'114 Patent File History"**) |
| 1027 | Babcock & Wilcox, STEAM: ITS GENERATION AND USE, 40th ed. (The Babcock & Wilcox Company: 1992) (**"B&W: Steam"**) |
| 1028 | J. Bustard, S. Sjostrom, et al., "Full Scale Evaluation of Sorbent Injection for Mercury Control on Coal-Fired Power Plants," International Conference on Air Quality III, Paper No. A5-4 (Sept. 9-12, 2002: Arlington, VA) (**"Bustard"**) |
| 1029 | U.S. Patent No. 1,984,164 to Stock et al. (issued Dec. 11, 1934) (**"Stock"**) |
| 1030 | Electric Utilities Environment Conference 2005 Handout (**"EUEC Handout"**) |
| 1031 | Scan of CD mailed to conference attendees from EUEC: 8th Electric Utilities Environmental Conference (Tucson, Arizona: January 23-26, 2005) (**"EUEC CD Scan"**) |
| 1032 | Redline comparison between U.S. Patent Pub. No. 2008/0107579 (Downs-Boiler, Ex. 1006) and U.S. Patent Prov. Appl. No. 60/555,353 (Downs-Boiler-Provisional, Ex. 1007), using Downs-Boiler-Provisional as the original version (**"Downs-Boiler-Redline"**) |
| 1033-1035 | RESERVED |
| 1036 | U.S. Patent No. 7,514,052 to Lissianski et al. (filed Apr. 7, 2009) (**"Lissianski"**) |

| 1037 | Paul Chu, "Power Plant Evaluation of the Effect of SCR Technology on Mercury," Paper No. 106, COMBINED POWER PLANT AIR POLLUTANT CONTROL MEGA SYMPOSIUM (MEGA) (Washington, DC: May 19-22, 2003) ("**Power Plant Evaluation**") |
|------|------|
| 1038 | Evan J. Granite et al., "Sorbents for Mercury Removal from Flue Gas," DOE/FETC/TR–98-01, U.S. Department of Energy (Jan. 1998) (**"Granite"**) |
| 1039 | Thomas J. Feeley, et al., "A Review of DOE/NETL's Mercury Control Technology R&D Program for Coal-Fired Power Plants," *DOE/NETL &g R&D Program Review* (April 2003) (**"Feeley"**) |
| 1040 | Oxtoby et al., PRINCIPLES OF MODERN CHEMISTRY, 4th ed (Saunders College Publishing: 1999) (**"Oxtoby"**) |
| 1041 | N.N. Greenwood and A. Earnshaw, CHEMISTRY OF THE ELEMENTS, 2nd ed. (Butterworth-Heinemann: 1997) (**"Greenwood"**) |
| 1042 | B.R. Puri, *Surface Complexes on Carbons*, *in* CHEMISTRY AND PHYSICS OF CARBON 191 (Philip L. Walker, ed.) (Marcel Dekker: 1970) (**"Puri"**) |
| 1043 | Frank E. Huggins et al., "XAFS Examination of Mercury Sorption on Three Activated Carbons," *Energy & Fuels* 1999(13), p. 114-121 (1999) (**"XAFS"**) |
| 1044 | S. Niksa et al., *Predicting Complete Hg Speciation Along Coal-Fired Utility Exhaust Systems*, MEGA SYMPOSIUM, Paper # 45 (Washington, DC: 2004) (**"Hg Speciation"**) |
| 1045 | D.L. Laudal et al., *Evaluation of Mercury Speciation at Power Plants Using SCR and SNCR NOx Control Technologies*, Paper No. A5-01, INT'L CONF. ON AIR QUALITY III (Arlington, VA: Sept. 9-12, 2002) (**"Laudal"**) |
| 1046-1052 | RESERVED |

| 1053 | U.S. EPA, AP-42: External Combustion Sources, Chapter 1: Fifth Edition, Volume I (Sep. 1998), available at https://www3.epa.gov/ttn/chief/ap42/ch01/index.html (last visited Apr 10, 2020) (**"Chapter 1 of AP-42"**) |
|------|---|
| 1054 | U.S. DOE, Mercury Emissions Control - Regulatory Drivers (Jan. 24, 2003), available at https://web.archive.org/web/20030416142937/http:/www.netl.doe.gov/coalpower/environment/mercury/regs.html (**"Mercury Emissions Control"**) |
| 1055 | Clean Air Mercury Rule: Basic Information, available at https://web.archive.org/web/20050920005951/http://www.epa.gov/mercuryrule/basic.htm (**"Clean Air Mercury Rule"**) |
| 1056 | EPA Newsroom, "EPA Announces First-Ever Rule to Reduce Mercury Emissions from Power Plants" (Mar. 15, 2005), available at: https://archive.epa.gov/epapages/newsroom_archive/newsreleases/91ab7266e65751b985256fc50067d9b0.html  (**"3/15/2005 EPA Press Release"**) |
| 1057 | EPA Newsroom, "Public Comment Period Begins for Proposed Power Plant Regulations" (Jan. 29, 2004), available at: https://archive.epa.gov/epapages/newsroom_archive/newsreleases/4daf1d46e8dd755c85257036005511f9.html (**"1/29/2004 EPA Press Release"**) |
| 1058 | EPA Newsroom, "EPA Supplements Proposal to Reduce Power Plant Mercury Emissions," (Feb. 24, 2004), available at: https://archive.epa.gov/epapages/newsroom_archive/newsreleases/5810096dabfc9eba85256e440078905f.html (**"2/24/2004 EPA Press Release"**) |
| 1059 | Sharon Sjostrom et al., "Field Studies of Mercury Control Using Injected Sorbents," AWMA ANNUAL MEETING, Session Ae-1b (2002) (**"Field Studies of Mercury Control"**) |
| 1060 | EPA, "Mercury Study Report to Congress Volume VIII: An Evaluation of Mercury Control Technologies and Costs," EPA Report No. EPA-452/R-97-010 (Dec. 1997), available at |

| | |
|---|---|
| | https://www3.epa.gov/airtoxics/112nmerc/volume8.pdf (**"EPA 1997 Mercury Study Report Vol. VIII"**) |
| 1061 | EUEC 2005 home page, available at: https://web.archive.org/web/20050303090129/http:/www.euec.com/ |
| 1062 | Charlene R. Crocker et al., "Mercury Control with the Advanced Hybrid Particulate Collector Technical Progress Report," U.S. DOE-NETL (Nov. 2003) (**"Crocker"**) |
| 1063 | Redline Comparison, showing changes from '163 Application (as published at 2006/0048646) to '760 Application (as published at 2018/0257031) |
| 1064 | Redline Comparison, showing changes from '595 Application (as published at 2009/0062119) to '058 Application (as published at 2009/0297413) |
| 1065 | Redline Comparison, showing changes from '058 Application (as published at 2009/0297413) to '594 Application (as published at 2017/0128908) |
| 1066 | Redline Comparison, showing changes from '595 Application (as published at 2009/0062119) to '760 Application (as published at 2018/0257031) |
| 1067 | Redline Comparison, showing changes from '640 Provisional-Application (excerpted from Ex. 1020) to '760 Application (as published at 2018/0257031) |
| 1068 | Redline Comparison, showing changes from '594 Application (as published at 2017/0128908) to '760 Application (as published at 2018/0257031) |
| 1069 | Redline Comparison, showing changes from '058 Application (as published at 2009/0297413) to '760 Application (as published at 2018/0257031) |

Petition for IPR2020-00834
USP 10,343,114

| 1070 | Roop Chand Bansal, et al., ACTIVE CARBON (Marcel Dekker:1988) 1988. 482 pages (scan received from Library of Congress via Baker Botts) (**"Bansal"**) |
|------|------|

Other than prosecution histories, Ex[1020]-Ex[1026], all citations to exhibits reference original page numbers found in the underlying document, and all emphases are added.

## I.      INTRODUCTION

Petitioners request IPR of claims 1-9 and 12-30 of Patent No. 10,343,114 (the

"**'114 Patent**" or "**Challenged Patent**").  (Ex[1001]).  The Petition is supported by

the expert declaration of Dr. Stephen Niksa.  Ex[1002] (declaration); Ex[1004] (CV).

## II.     MANDATORY NOTICES UNDER 37 C.F.R. §42.8(A)(1)

### A.      REAL PARTY-IN-INTEREST UNDER 37 C.F.R. §42.8(B)(1)

The real parties-in-interest are the Petitioners NRG Energy, Inc. (**"NRG"**),

Talen Energy Corporation (**"Talen"**), and Vistra Energy Corp. (**"Vistra"**)

(collectively, **"Petitioners"**).

Petitioners also identify the following real-parties-in-interest: Brandon Shores

LLC; Talen Generation LLC; H.A. Wagner LLC; IPH, LLC; Illinois Power

Resources Generating, LLC; Dynegy Midwest Generation LLC; Dynegy Miami

Fort, LLC;  NRG Texas Power LLC; Midwest Generation EME, LLC; and Midwest

Generation, LLC.[1]  These entities are parties to a lawsuit where they have been

accused of infringing the Challenged Patent.  *Midwest Energy Emissions Corp. and*

---

[1]   Although Dynegy Inc. and Talen Energy Holdings, Inc. are also listed in the

complaint, those entities no longer exist, and thus Petitioners have not included them

here.

Petition for IPR2020-00834
USP 10,343,114

*MES Inc. v. Vistra Energy Corp.*, No. 1:19-cv-01334-RGA (D. Del.) (**"Delaware**

**Litigation"**).  Ex[1005] (Complaint).

### 1.   Additional Potential Real Parties in Interest Identified by Talen

Petitioner Talen Energy Corporation, out of an abundance of caution, also

identifies Alstom Power, Inc., Brandon Shores Coaltech, LLC, Brunner Island

Refined Coal LLC, Chem-Mod LLC, Clean Coal Solutions, LLC, C.P. Crane LLC,

Con-C, LLC, Clyde Bergemann Delta Ducon, Inc., Montour Refined Coal LLC, and

Wagner Coaltech, LLC as potential real parties-in-interest to the Petitioner Talen

Energy Corporation.  These entities are vendors and suppliers with regards to certain

allegedly infringing components at issue in the Delaware Litigation.  None of these

companies have agreed to be listed as a real party-in-interest for this Petition.  None

of these companies or any unnamed entity is funding, controlling, or directing, or

otherwise has an opportunity to control or direct this Petition or proceeding.

In addition, Petitioner Talen Energy Corporation also identifies the following

entities as potential real parties-in-interest out of an abundance of caution: Avista

Corporation, Barney M. Davis, LP; BDW Corp.; Bell Bend, LLC; Brunner Island

Services LLC; Brunner Island, LLC; C/R Topaz Holdings, LLC; Camden Plant

Holding, LLC; Colstrip Comm Serv, LLC; Conemaugh Fuels, LLC; Dartmouth

Plant Holding, LLC; Dartmouth Power Associates Limited Partnership; Dartmouth

2

Power Generation, LLC; Dartmouth Power Holding Company, LLC; Elmwood Energy Holdings, LLC; Elmwood Park Power, LLC; Fort Armistead Road – Lot 15 Landfill, LLC; Holtwood LLC; Interstate Energy Company LLC; Jade Power Generation Holdings LLC; Keystone Fuels, LLC; Lady Jane Collieries, Inc.; Laredo WLE, LP; Liberty View Power, LLC; LMBE Project Company; LMBE-MC Holdco I LLC; LMBE-MC Holdco II LLC; Lower Mount Bethel Energy, LLC; Martins Creek, LLC; MC OpCo LLC; MC Project Company LLC; MEG Generating Company, LLC; Millennium Power Partners, LP; Montour Services LLC; Montour Solar HoldCo LLC; Montour, LLC; Morris Energy Management Company, LLC; Morris Energy Operations Company, LLC; NBCP Urban Renewal Corporation; New Athens Generating Company, LLC; Newark Bay Cogeneration Partnership, LP; Newark Bay Holding Company, LLC; NorthEast Gas Generation GP, LLC; NorthEast Gas Generation Holdings, LLC; NorthEast Gas Generation, LLC; NorthWestern Corp.; Nueces Bay WLE, LP; PacifiCorp; Pedricktown Cogeneration Company LP; Pedricktown Investment Company LLC; Pedricktown Management Company LLC; Pennsylvania Mines, LLC; Portland General Electric Company; Puget Sound Energy, Inc.; Raven FS Property Holdings LLC; Raven Lot 15 LLC; Raven Power Finance LLC; Raven Power Fort Smallwood LLC; Raven Power Generation Holdings LLC; Raven Power Group LLC; Raven Power Marketing LLC;

Raven Power Operating LLC; Raven Power Property LLC; Realty Company of Pennsylvania; RMGL Holdings LLC; Sapphire Power Finance LLC; Sapphire Power Generation Holdings LLC; Sapphire Power LLC; Sapphire Power Marketing, LLC; Susquehanna Nuclear, LLC; Talen Energy Marketing, LLC; Talen Energy Retail LLC; Talen Energy Services Group, LLC; Talen Energy Services Holdings, LLC; Talen Energy Services Northeast, Inc.; Talen Energy Supply, LLC; Talen Investment Corporation; Talen Land Holdings, LLC; Talen Montana Holdings, LLC; Talen Montana, LLC; Talen MS Holdings LLC; Talen NE LLC; Talen Nuclear Development, LLC; Talen Receivables Funding, LLC; Talen Solar Holdings LLC; Talen Treasure State, LLC; Topaz Power Group GP II, LLC; Topaz Power Group LP II, LLC; Topaz Power Group, LLC; Topaz Power Holdings, LLC; Topaz Power Management II GP, LLC; Topaz Power Management II LP, LLC; Topaz Power Property Management II, LP; York Generation Company, LLC; and York Pant Holding, LLC.

### 2.     **Additional Potential Real Parties in Interest Identified by Vistra**

Petitioner Vistra Energy Corp., out of an abundance of caution, also identifies Bascobert (A) Holdings, LLC; Calgon Carbon Corp.; CERT Operations RCB, LLC; Chem-Mod LLC; RC29, LLC; and RTRC Texas LLC as potential real parties-in-interest to Petitioner Vistra.  These entities are vendors and suppliers with regards to

certain allegedly infringing components at issue in the District Court litigation referenced in the Related Matters section below. None of these companies have agreed to be listed as a real party-in-interest for this Petition. None of these companies or any unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding.

In addition, Petitioner Vistra Energy Corp. also identifies the following entities as potential real parties-in-interest out of an abundance of caution: Big Brown Power Company LLC; Coffeen and Western Railroad Company; Coleto Creek Power, LLC; Dynegy Coal Generation, LLC; Dynegy Coal HoldCo, LLC; Dynegy Commercial Asset Management, LLC; Dynegy Conesville, LLC; Dynegy Power Marketing, LLC; Dynegy Resource II, LLC; Dynegy Resources Generating Holdco, LLC; Dynegy Zimmer, LLC; Electric Energy, Inc.; EquiPower Resources Corp.; Havana Dock Enterprises, LLC; Illinois Power Generating Company; Illinois Power Resources, LLC; Joppa and Eastern Railroad Company; Kincaid Generation, L.L.C.; Luminant Generation Company LLC; NEPCO Services Company; Northeastern Power Company; Oak Grove Management Company; Sandow Power Company LLC; Vistra Asset Company LLC; Vistra Intermediate Company LLC; and Vistra Operations Company LLC.

### 3.    Additional Potential Real Parties in Interest Identified by NRG

Petitioner NRG Energy, Inc., out of an abundance of caution, also identifies ADA-ES, Inc., Alistar Enterprises, LLC, Cabot Corporation, Calgon Carbon Corporation, CERT Operations, LLC, CERT Operations IV, LLC, Chem-Mod LLC, Rutledge Products, LLC, and Senescence Energy Products, LLC.  These entities are vendors and suppliers with regards to certain allegedly infringing components at issue in the District Court litigation referenced in the Related Matters section below. None of these companies have agreed to be listed as a real party-in-interest for this Petition.  No unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding.

In addition, Petitioner NRG Energy, Inc. also identifies the following entities as potential real parties-in-interest out of an abundance of caution: NRG Texas LLC, NRG Midwest Holdings LLC, Mission Midwest Coal, LLC, Midwest Generation Holdings I, LLC, Midwest Generation Holdings II, LLC, Midwest Generation Procurement Services, LLC, Midwest Finance Company, LLC, NRG Energy Holdings, Inc., and NRG Acquisition Holdings Inc.

### B.   RELATED MATTERS UNDER 37 C.F.R. §42.8(B)(2)

Patent Owner ("PO") has asserted the Challenged Patent in district court in the following matter:  *Midwest Energy Emissions Corp. and MES Inc. v. Vistra*

*Energy Corp.*, No. 1:19-cv-01334-RGA (D. Del.).  Ex[1005].  The case has multiple motions to dismiss filed under Rule 12(b)(6) pending resolution and the Court has not issued a scheduling order.  None of Petitioners have filed an answer to the complaint, and the Court has not set a trial schedule.

According to U.S. Patent & Trademark Office Patent Application Information Retrieval (PAIR) system, the '114 Patent was filed as App. No. 15/978,760 (the "'760 Application") on May 14, 2018 and purports to claim priority as follows:

- Continuation-in-part of U.S. Patent Application No. 15/295,594 filed on Oct. 17, 2016 (the "'594 Application") and abandoned on March 5, 2020, which is a:

- Continuation of U.S. Patent Application No. 14/102,896, filed on Dec. 11, 2013 (the "'896 Application") and issued on October 18, 2016 as U.S. Patent No. 9,468,886, which is a:

- Continuation of U.S. Patent Application No. 12/429,058, filed on Apr. 23, 2009 (the "'058 Application") and issued on February 18, 2014 as U.S. Patent No. 8,652,235, which is a:

- Continuation-in-part of U.S. Patent Application No. 12/201,595, filed on Aug. 29, 2008 (the "'595 Application") and abandoned on September 30, 2010, which is a:

- Division of U.S. Patent Application No. 11/209,163, filed on Aug. 22, 2005 (the "'163 Application") and issued on September 24, 2008 as U.S. Patent No. 7,435,286, which is a non-provisional of:

- U.S. Provisional Patent Application No. 60/605,640, filed on August 30, 2004 (the "Provisional").

Petition for IPR2020-00834
USP 10,343,114

Petitioners are concurrently filing a second petition against the Challenged

Patent.  The current petition assumes *arguendo* that the Challenged Claims of the

'114 Patent have priority to Aug. 30, 2004 and that the pre-AIA statute applies.  The

second petition asserts a priority date of no earlier than May 14, 2018, the filing date

of the '114 Patent, because the applications to which the '114 Patent claims priority

do not contain support for the Challenged Claims of the '114 Patent.

### C.    LEAD AND BACK-UP COUNSEL UNDER 37 C.F.R. §42.8(B)(3)

| LEAD COUNSEL | BACK-UP COUNSEL |
| --- | --- |
| Brian W. Oaks (Reg. 44,981)<br>Baker Botts L.L.P.<br>98 San Jacinto Boulevard, Suite 1500<br>Austin, TX 78701-4078<br>Tel:  512-322-5470<br>brian.oaks@bakerbotts.com | David J. Tobin (Reg. 60,776)<br>Baker Botts L.L.P.<br>2001 Ross Avenue, Suite 900<br>Dallas, TX 75201-2980<br>Tel: 214-953-6869<br>david.tobin@bakerbotts.com<br><br>Elizabeth D. Flannery (Reg. 59,509)<br>Baker Botts L.L.P.<br>910 Louisiana Street<br>Houston, Texas 77002-4995<br>Tel.: 713.229.2104<br>liz.flannery@bakerbotts.com<br><br>Thomas B. Carter, Jr. (Reg. 76,040)<br>Baker Botts L.L.P.<br>910 Louisiana Street<br>Houston, Texas 77002-4995<br>Tel.: 713.229.1505<br>thomas.carter@bakerbotts.com |

### D.   SERVICE INFORMATION UNDER 37 C.F.R. §42.8(B)(4)

Petitioners may be served at lead counsel's address provided above and consent to e-mail service, provided it is made to all of the following e-mail addresses:

brian.oaks@bakerbotts.com,   david.tobin@bakerbotts.com,   and   DLBB-ME2C-IPR@bakerbotts.com.

### E.   FEES

Payment for fees is authorized from Deposit Account 02-0384.

## III.   REQUIREMENTS FOR IPR UNDER 37 C.F.R. §42.104

### A.   STANDING

Petitioners certify the '114 Patent is eligible for IPR, and Petitioners are not barred or estopped from requesting IPR on the grounds herein.

### B.   ASSERTED REFERENCES AND PRIOR-ART STATUS

| Reference | Prior-Art Status |
|---|---|
| **Vosteen**, Ex[1008], USP 6,878,358C1 | §102(e) (pre-AIA), §102(a)(2) (post-AIA): <br><br> filed 5/6/2003, and issued 4/12/2005 |
| **EPA-Proposal**, Ex[1009], 69 Fed. Reg. 4652-4752 (vol. 69, no. 20) | §102(a) (pre-AIA), §102(a)(2) (post-AIA): <br><br> published 1/30/2004 |
| **Nelson**, Ex[1012], USP 6,953,494B2 | §102(e) (pre-AIA), §102(a)(2) (post-AIA): <br><br> filed 5/6/2003, and issued 10/11/2005 |

| Reference | Prior-Art Status |
|---|---|
| **Downs-Boiler**, Ex[1006], USP Pub. 2008/0110579A1 | §102(e) (pre-AIA), §102(a)(2) (post-AIA):<br><br>published 5/8/2008, claiming priority to 3/22/2004 |

Each reference is also prior art under §102(b) (pre-AIA) and §102(a)(1) (post-AIA). Each was patented and/or described in a printed publication or otherwise available to the public, including more than one year before the effective filing date of the '114 Patent (May 2018). Patent Owner bears the burden to prove entitlement to an earlier filing date. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304-05 (Fed. Cir. 2008).

## C.   IDENTIFICATION OF CHALLENGED CLAIMS

There is a reasonable likelihood that the petitioned claims are unpatentable as being anticipated under §102 or obvious under §103, as follows:

| Ground | '114 Claims | Basis for Challenge |
|---|---|---|
| 1. | 23-28, 30 | Anticipated by Vosteen [Ex1008] |
| 2. | 1-9, 12-30 | Obvious over Vosteen |
| 3. | 23, 25-27, 30 | Anticipated by Downs-Boiler [Ex1006] |
| 4. | 1-7, 12-28, 30 | Obvious over Downs-Boiler |
| 5. | 1-7, 12-22, 24, 28 | Obvious over Vosteen in view of EPA-Proposal [Ex1009] |
| 6. | 1-9, 12-22, 24, 28 | Obvious over Downs-Boiler in view of EPA-Proposal |
| 7. | 2-4, 17-18, 24, 29-30 | Obvious over Vosteen in view of Nelson [Ex1012] |
| 8. | 2-4, 18, 24, 29-30 | Obvious over Downs-Boiler in view of Nelson |

### D.   THE BOARD SHOULD NOT DENY INSTITUTION

The Board should not deny institution under 35 U.S.C. §314(a), because the district-court proceeding is in its early stages.  With multiple motions to dismiss pending, the Court has not set a Rule 16 conference or provided a case schedule. The Petitioners have not filed an answer to the Complaint, and discovery has not opened.  Any Final Written Decision very likely would conclude before trial.

Further, as PO cannot satisfy its burden to demonstrate a priority date before May 2018, Petitioners filed this IPR and their concurrently-filed IPR (asserting a later priority date for the '114 Patent) shortly after the 9-month post-AIA waiting period from the 7/9/2019 issue date of the '114 Patent.  35 U.S.C. §311(c)(1).

The Board should not deny institution under 35 U.S.C. §325(d), because the Examiner did not consider some of the asserted references, and for the remainder, the Office erred in a manner material to the patentability of the challenged claims. *Advanced Bionics, LLC v. Med-El Elektromedizinische Gerate GMBH*, IPR2019-01469, Paper 6, at 8-9 (P.T.A.B. Feb. 13, 2020) (precedential).

EPA-Proposal Ex[1009] is relied upon in Grounds 5-6 for 22 out of 28 of the Challenged Claims, and was not considered by the Examiner during prosecution. *See Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8

at 17-18 (Dec. 15, 2017) (factors (a)-(b) and (d) indicate the same art was not presented previously to the Office).

While the '114 Patent cites Downs-Boiler (Ex[1006]) on the cover—among **16 columns** (9 pages) of cited references—the Examiner did not use Downs-Boiler in a substantive rejection. *Id.*, 17-18 (factors (a)-(d)). Downs-Boiler anticipates five of the Challenged Claims of the '114 Patent, and by itself renders obvious 25 out of 28 Challenged Claims (Grounds 3-4). The Examiner erred by not citing Downs-Boiler during prosecution. *Id.*, 17-18 (factor (e)). "[O]verlooking specific teachings of the relevant prior art" is an example of a "material error." *Advanced Bionics*, IPR2019-01469, Paper 6, at 8-9, n.9.

The Examiner cited Vosteen early in prosecution to reject then-pending claims 20-21, but only as a secondary reference for features recited in a dependent claim related to "monitoring the mercury content." Ex[1026], 75-79 (pending claims), 1530-31 (rejection). In response to the Examiner's rejection, the Patent Owner canceled those claims. *Id.*, 1569. At the time of that rejection, neither rejected claims 20 or 21, nor any other independent claim, recited (as the issued claims do now) the "coal comprises" particular bromine-containing species added to the coal. *Id.*, 1567-69; Ex[1002], ¶¶172-173.

After this rejection, the claims underwent significant amendments including to add that the coal must comprise particular bromine-containing species. Ex[1026], 1646 (cl. 7), 1905-11. Although Vosteen explicitly discloses this, and in fact anticipates three of the four independent claims and by itself renders obvious the remaining Challenged Claims (Grounds 1-2), all of these claims were prosecuted without citation by the Examiner to Vosteen.

Thus, the "Office erred in overlooking the teachings of" Vosteen. *See HTC Corp. et al. v. Motiva Patents*, LLC, IPR2019-01666, Paper 9, at 9-10 (P.T.A.B. April 3, 2020); *Advanced Bionics*, IPR2019-01469, Paper 6, at 8-9. For example, Vosteen describes "a process for removing mercury from flue gases," using: (a) "bromine and/or a bromine compound…fed to the [] appropriate multistage furnace" and/or to "coal or the like to be burnt, upstream of the furnace"; and (b) with downstream injection of a "sorbent" (e.g., "activated carbon") to remove mercury. Ex[1008], 1:65-2:4, 4:4-8, 5:27-30, cls. 1, 18. Vosteen clearly discloses bromine addition to the coal and/or combustion chamber, along with separation via activated carbon, and highlights the Examiner's error in overlooking Vosteen's teachings.

Finally, Petitioners cite Nelson, only as a secondary reference, for a small subset of limitations, in combination with Downs-Boiler or Vosteen, which were either not considered by the Examiner and/or whose teachings were overlooked.

Even though the Examiner used Nelson to reject claims during prosecution, Patent Owner never disputed that Nelson disclosed the limitations for which it is being used as a secondary reference in this Petition.  *See* Ex[1002], ¶¶172-178, 216-217.

## IV.  OVERVIEW

### A.    LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") would have at least a bachelor's degree in chemical engineering, mechanical engineering, or a related field of study with at least two years of experience with implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration. Ex[1002], ¶64.

### B.    THE ALLEGED INVENTION OF THE '114 PATENT

The '114 Patent relates to removal of mercury from a flue gas.  Ex[1001], 1:27-30.  The '114 Patent admits that known "mercury control methods" included "injection of fine sorbent particles into a flue gas duct" such as "activated carbon." Ex[1001], 1:56-60.  The '114 Patent admits it was "known to inject halogen forms at some stage of the combustion process," and provides a string-cite of nine prior-art patents disclosing these known features.  Ex[1001], 2:60-3:21.  The '114 Patent purports to combine these two known solutions.  Ex[1002], ¶¶161-165.  Each independent claim of the '114 Patent includes limitations adding particular bromine-containing species (e.g., HBr or $Br_2$) to the combustion chamber and/or to the coal

upstream of the combustion chamber, and providing activated carbon downstream of the combustion chamber.  Ex[1001], Claims 1, 23, 24, 25.

### C.   PROSECUTION HISTORY OF THE '114 PATENT

The '114 Patent was filed May 14, 2018 as Application No. 15/978,760 (the "'760 Application") a continuation-in-part of Application No. 15/295,594 (the "'594 Application").  The '760 Application traces its alleged priority through a chain of applications, including an earlier CIP application, back to App. No. 60/605,640 (the "Provisional") filed August 30, 2004, as shown in the family tree below.  Ex[1002], ¶¶166-167.

Petition for IPR2020-00834
USP 10,343,114





Ex[1017].  The file histories for the '114 Patent, and each of the parent applications to which it claims priority, are submitted with this Petition. Ex[1020]-Ex[1026].  Also submitted is a series of redline comparisons, showing changes made to the specification along the family tree.  Ex[1063]-Ex[1069].  Exhibit [1063] illustrates the extensive changes made between the first non-provisional application (filed Aug. 22, 2005) and the '114 Patent.  Ex[1002], ¶¶168-186.

### D.   STATE OF THE ART

The inquiry into whether the "differences between the invention and the prior art would have rendered the invention obvious to a [POSITA] necessarily depends on such artisan's knowledge," including an "assessment of the background knowledge possessed" by a POSITA.  *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337 (Fed. Cir. 2020) (internal citations omitted).  The subjects below would have been "within the general knowledge of a skilled artisan" by 2004. *See id.* at 1338.

It was known that halogens are Group VII elements—in the family including fluorine (F), chlorine (Cl), bromine (Br), and iodine (I)—that are highly reactive oxidizing agents, meaning that they cause other species to give up electrons (become more positively charged).  Ex[1040], 788, 791, A.44; *see generally* Ex[1041], 789-824.



Ex[1027], exhibit p.239.  It was known that halogens exist in nature as diatomic molecules (e.g., $Cl_2$, $Br_2$,), halides/halide compounds (e.g., sodium chloride, calcium bromide), and hydrohalides (e.g., hydrogen bromide).  It was known that mercury is a metal that generally exists in two forms: elemental ($Hg^0$); and oxidized (either $Hg_2^{2+}$ (mercurous) or $Hg^{2+}$ (mercuric)).  Ex[1002], ¶¶69-88; Ex[1060], 2-1 (exhibit p.37).

### 1.     Coal Power Plants

It was known that pulverized-coal firing was performed by feeding particle-sized coal to a combustion chamber.  Ex[1027], 13-1.  In addition to the coal-handling systems, other systems upstream of the boiler included air supplies for the primary air, secondary air, and overfire air.  Ex[1027], 11-13, 13-3.  The term "boiler" often was used to refer to the overall combustion chamber.  Ex[1027] at 18-1.  Combustion gases with entrained particles and pollutants, exiting the boiler, have been referred to as flue gases.  It was known that flue gases pass through an economizer and an air preheater.  Ex[1027], 19-1; Ex[1002], ¶¶89-95.

It was known that emissions from coal combustion included particulate matter (fly ash and unburned carbon), mercury (Hg), sulfur oxides ($SO_X$), nitrogen oxides ($NO_X$), and other pollutants.   Ex[1053], 1.1-3 to 1.1-6.  Various downstream components were used to control undesirable flue gas constituents, including electrostatic precipitators (ESP) and fabric filters (FF) for particulates, wet or dry flue gas desulfurization (FGD) systems, and selective catalytic reduction (SCR) or selective noncatalytic reduction (SNCR) systems.   Ex[1053], 1.1-6 to 1.1-9; Ex[1037]; Ex[1045]; Ex[1002], ¶96-115.

### 2.     EPA Regulations

It was known that excess mercury in the environment posed significant health and safety threats.  Ex[1060], 4-12 to 4-19.  The 1990 Clean Air Act Amendments

imposed requirements to reduce hazardous air pollutants.  Ex[1054]; *see* Ex[1055].

In 2000, the EPA announced the need for further regulations on mercury-emissions

from coal-fired power plants.  Ex[1039], 2, 7-8.  The timetable for the EPA to

propose updated mercury-emissions standards initially was set for December 2003,

to be finalized by December 2004.  Ex[1039], 8; Ex[1009].  The EPA officially

passed the Clean Air Mercury Rule in 2005, which required 70% mercury removal,

but put the industry on notice of the upcoming requirements well before then.

Ex[1056]; Ex[1009]; Ex[1057]; Ex[1058]; Ex[1002], ¶¶132-137.

As a result of the actions of the EPA, and funding provided by the National

Energy Technology Laboratories (NETL), the American electric power utility

industry mobilized a massive response to develop and evaluate mercury-emissions

control technologies in 2000.  Ex[1039]; Ex[1002], ¶¶138-143.

### 3.    <u>Mercury Removal Using Activated Carbon and Halogens</u>

Even prior to the EPA regulations, sorbent technologies, including activated-

carbon sorbents, were used to remove mercury, and researchers were investigating

methods to reduce costs and improve effectiveness of sorbents.  Ex[1060], 2-54;

Ex[1038], 2.  Research on activated-carbon built upon knowledge going back

decades earlier.  Ex[1002], ¶¶116-131, 144-146.

By 1934, it had been shown that halogens improved the ability of activated carbon to remove mercury. *See* Ex[1029], 1:33-41. By 1970, it was shown that bromine was adsorbed up to a saturation limit (adsorption equilibrium) of around 31-38% in carbon materials. Ex[1042], 260. By 1988, it was shown that bromine (Br) reacted with activated carbon to provide "carbon-bromine surface structures (surface compounds)." Ex[1070], 259. By 1998, "[a]ctivated carbons ha[d] been the most thoroughly studied sorbent for the capture of mercury." Ex[1038], 22. In 1999, researchers demonstrated that mercury from flue gas formed chemical bonds with the species on activated carbons, including halogens. Ex[1043], 119. By 2004, these findings had been generalized to interpret both oxidation and capture of elemental and oxidized mercury on injected activated-carbon sorbents. Ex[1044]; Ex[1062], exhibit p.14-15 (halides "improve[d] Hg capture both by conversion of the $Hg^0$ to the more easily removed $Hg^{2+}$ forms and by enhancing the reactivity of $Hg^0$ with activated carbons"). It was known that halogens, particularly bromine-containing species, were effective at improving the effectiveness of activated carbon in removing mercury. *See, e.g.*, Ex[1006]; Ex[1008]; Ex[1012]; Ex[1013] Ex[1015]; Ex[1028]; Ex[1036]. In addition to using halides, it was also known that adjusting the sorbent injection rate would control mercury emissions. Ex[1059]; Ex[1009], 4676; Ex[1002] ¶¶147-160.

## V.    CLAIM CONSTRUCTION

For purposes of the asserted prior art, Petitioners do not, at this time, contend that any term requires construction. All terms have been accorded their plain and ordinary meaning.  Ex[1002], ¶206.

## VI.   GROUND 1: CLAIMS 23-28, 30 ARE ANTICIPATED BY VOSTEEN

### A.    OVERVIEW OF EX[1008] ("VOSTEEN")

Vosteen describes removing "mercury from the flue gases" in "bituminous coal-fired or lignite-fired power stations."  Ex[1008], 2:16-37.  Vosteen removes mercury by feeding "bromine and/or a bromine compound" to the coal to be burnt and/or to the furnace.  Ex[1008], 2:1-4, 2:54-60, 4:4-19, cls. 1, 18.  Vosteen also injects "activated carbon" (a "dry sorbent") as part of the mercury removal process, and found: "Mercury bromide $HgBr_2$ adsorbs more strongly to dry sorbents than mercury chloride $HgCl_2$."  Ex[1008], 5:19-39.  As a result, Vosteen discloses the ability to remove more than 90% of mercury.  Ex[1008], Fig. 5.  Ex[1002], ¶¶218-221.

### B.    CLAIM 25

Claim 25 is discussed first, because the other independent claims copy its limitations.  Ex[1002], ¶¶290, 298, 323.

### 1.   25(Preamble)—"A method of separating mercury from a mercury-containing gas:"

Vosteen discloses a "process for removing mercury from flue gases." Ex[1008], Title; *see* 2:16-37, cls. 1, 18.   Removing refers to "separating," as described for Element 25(d).   Ex[1002], ¶270.

### 2.   25(a)—"combusting coal in a combustion chamber, to provide the mercury-containing gas"

Vosteen discloses "feeding the coal to the furnace" and "carrying out a combustion or incineration process, within the furnace" to provide the mercury-containing gas.   Ex[1008], cl. 18; *see* cl. 1, 7:25-28, 10:63-11:6, 11:23-24, Figs. 7-9.   Ex[1002], ¶271.

### 3.   25(b)—"the coal comprises added $Br_2$, HBr, a bromide compound, or a combination thereof, added to the coal upstream of the combustion chamber, or the combustion chamber comprises added $Br_2$, HBr, a bromide compound, or a combination thereof, or a combination thereof,"

Vosteen discloses adding bromine-containing ingredients—including "free…bromine" ($Br_2$), "hydrogen bromide" (HBr) and/or "sodium bromide" (a bromide compound)—"into one of the combustion chambers" and/or to "coal or the like to be burnt, upstream of the furnace" (i.e., combustion chamber).   Ex[1008], 2:54-61, 4:4-33; *see* cls. 1, 2, 18.   Ex[1002], ¶¶272-273.

### 4.      25(c)—"injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber; contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition"

Vosteen discloses a dry-emission control system that injects activated-carbon sorbent into the mercury-containing gas downstream of the combustion chamber. For example, "cloth filters … are impinged with…blown-in finely pulverant slaked lime/activated carbon." Ex[1008], 5:27-30.  "Blow[ing] in" activated carbon is a form of injecting the sorbent into a mercury-containing gas.  Vosteen confirms that mercury removal in the dry-emission system is "from the flue gases…downstream of the combustion."  Ex[1008], 2:16-19; *see* cls. 1, 12 (combustion and then cleanup). Ex[1002], ¶¶274-278.

The flue-gas mercury is adsorbed, and thus contacted, with the activated-carbon sorbent to form a mercury/sorbent composition.  Vosteen states, the "dry emission control system" works "based on the adsorption of ionic mercury compounds." Ex[1008], 5:19-36.  The bromine-containing species added to the coal and/or combustion chamber (e.g., HBr) oxidizes mercury, and the oxidized mercury ($HgBr_2$) "is readily adsorbable to a range of adsorbents."  Ex[1008], 2:20-31.  "Adsorption" refers to a process by which an adsorbate in a fluid (typically gas) adhere to the surface of a sorbent.  In Vosteen, the adsorbate (mercury and bromine)

in the fluid (mercury-containing gas) adheres to the sorbent (activated carbon) to form a mercury/sorbent composition, and thus the mercury in the mercury-containing gas has "contact[ed]…the sorbent."   Upon adsorption, the mercury/sorbent composition comprises mercury, bromine, and activated carbon: "[m]ercury bromide $HgBr_2$ adsorbs more strongly to dry sorbents than mercury chloride $HgCl_2$." Ex[1008], 5:35-39.  The "mercury/sorbent composition" of claim 25 of the '114 Patent encompasses a "mercury/sorbent/bromine" composition, as evidenced by comparing claim 25 ("mercury/sorbent composition") and dependent claim 30 ("the mercury/sorbent composition comprises the element bromine, the sorbent material, and mercury").  Ex[1002], ¶¶279-280.

### 5.   25(d)—"separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas."

Vosteen separates the mercury/sorbent composition from the mercury-containing (flue) gas using a cloth-fabric filter with activated carbon to provide "for the substantially complete removal of mercury (Hg)."  Ex[1008], 5:50-53; 5:15-30; *see* cl. 10; *infra.* §VII.D.1 (Ground 2, Claims 2-3).  The separation forms a "clean gas downstream of the wet and/or dry flue gas emission system."  Ex[1008], 6:2-4; *see* cls. 1, 18.  Ex[1002], ¶¶281-282.

### C.   CLAIMS DEPENDING FROM CLAIM 25

#### 1.   Claims 26-27: "wherein the [coal—cl. 26; combustion chamber—cl. 27] comprises the added Br$_2$, HBr, the bromide compound, or a combination thereof [cl. 26—added to the coal upstream of the combustion chamber]."

As discussed for Element 25(b), Vosteen discloses these claims. The bromine (Br$_2$), HBr, sodium bromide, and other bromide compounds are added to "coal or the like to be burnt, upstream of the furnace" and/or added "into one or both combustion chambers." Ex[1008], 4:4-19; *see* 1:65-2:4, cls. 1, 18 ("bromine…is fed to the furnace"; "applying…bromine compounds to a coal"). Ex[1002], ¶¶283-284.

#### 2.   Claim 28

##### a.   *28(a): "monitoring the mercury content of the cleaned gas"*

Vosteen discloses that "the mercury content of the flue gas…is measured continuously downstream of the flue gas emission control system." Ex[1008], 5:48-50; *see* cl. 9, Figs. 2-8. Measuring the mercury is a form of monitoring the mercury. Ex[1002], ¶¶285-286.

### b. 28(b): "controlling, in response to the mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, a rate of addition to the coal or the combustion chamber of the added $Br_2$, HBr, the bromide compound, or a combination thereof, or a combination thereof;"

Vosteen discloses that "on the basis of the measured mercury content the amount of bromine fed and/or bromine compounds…is controlled." Ex[1008], 5:48-55, cl. 9. As explained for Element 25(b), the bromine compounds include $Br_2$, HBr, and sodium bromide. Controlling the "amount of bromine fed" refers to controlling its rate of addition to the coal and/or combustion chamber. Ex[1008], 4:4-19; *see* 1:65-2:4, cls. 1, 18 ("bromine…is fed to the furnace"; "applying…bromine compounds to a coal"); Figs. 2-8. Ex[1002], ¶287.

### c. 28(c): "so that the mercury content of the cleaned gas is maintained at or below a desired level."

Vosteen discusses "strict limiting values exist for the legally permissible emission of mercury, for example from…power stations," and provides for "further reduction of the currently permitted limiting values." Ex[1008], 1:10-22. Such "limiting values" on mercury emissions are each examples of a "desired level." Ex[1002], ¶288.

### 3. Claim 30: "the mercury/sorbent composition comprises the element bromine, the sorbent material, and mercury."

As described for Element 25(c), mercury in the flue gas is oxidized by the bromine-containing species to form $HgBr_2$. "Mercury bromide $HgBr_2$ adsorbs more strongly to dry sorbents[.]" Ex[1008], 5:35-39; *see* 2:20-31. Once adsorbed, the composition includes mercury, bromine, and the sorbent material. Ex[1002], ¶289.

### D. CLAIM 23

Claim 23 is nearly identical to Claim 25, with minor changes. As compared to Element 25(b), Claim 23 adds "wherein the mercury-containing gas comprises a halogen or halide promoter comprising HBr, Br⁻ or a combination thereof," in what is abbreviated herein as Element 23(b). For the same reasons Vosteen discloses Claim 25, it also discloses Claim 23. Ex[1002], ¶¶290-297.

As discussed for Element 25(b), Vosteen discloses adding "bromine" ($Br_2$), "hydrogen bromide" (HBr) and aqueous "sodium bromide" to the combustion chamber, to coal, and to "recycled flue gas." Ex[1008], 2:54-61, 4:4-33; cls. 1, 2, 5, 18. HBr and Br⁻ are expressly disclosed by Element 23(b) as examples of "halogen or halide promoter." Vosteen expressly discloses HBr, and aqueous sodium bromide dissociates in water to form bromide ions (Br⁻). Ex[1008], 2:55-61, 4:4-19, 4:27-33. Vosteen also confirms that the bromine-containing species are present in the mercury-containing flue gas, as he describes "the mass ratio of bromine to mercury

28

in the flue gas."   Ex[1008], 4:34-38, cl. 6; *see* Figs. 2, 5-6, 8 (gas-phase concentrations of both mercury and Br).  Ex[1002], ¶¶293-295.

## E.   CLAIM 24

Claim 24 combines limitations of Claims 23, 25, and 28.  As compared to the aforementioned claims, Claim 24 adds, "the activated carbon reacts with the halogen or halide promoter in the mercury-containing gas to form a promoted sorbent" and that the mercury is contacted "with the promoted sorbent," in what is abbreviated herein as Element 24(c).  For the same reasons Vosteen discloses Claims 23, 25, and 28, it also discloses Claim 24.  Ex[1002], ¶¶298-306.

Vosteen explains that mercury bromide ($HgBr_2$) adsorbs to the activated carbon.  Ex[1008], 5:35-39.  A POSITA would have understood that when bromine and carbon come into contact with another (e.g., upon adsorption as in Vosteen), the bromine and activated carbon react with one another to form a promoted sorbent. *See* §IV.D.3; Ex[1002], ¶302; *Philips*, 948 F.3d at 1337.

## VII.  GROUND 2: CLAIMS 1-9, 12-30 ARE OBVIOUS OVER VOSTEEN

Claims 23-28 and 30 are obvious for the same reasons as in Ground 1, as anticipation is the epitome of obviousness.  These claims, and Claims 1-9, 12-22, and 29 are also obvious for the reasons below.  Elements and claims not mentioned below are disclosed or rendered obvious for the reasons stated above in Ground 1.

### A.   CLAIMS ADDRESSED IN GROUND 1

#### 1.   Elements 23(c), 24(c), 25(c), and Claim 30

##### a.   Elements 23(c), 24(c), 25(c)—"contacting mercury in the mercury-containing gas with [the sorbent], to form a mercury/sorbent composition"

##### b.   Claim 30—"the mercury sorbent composition comprises the element bromine, the sorbent material, and mercury"

As described in Ground 1, Vosteen discloses that "[m]ercury bromide $HgBr_2$ adsorbs more strongly to dry sorbents[.]" Ex[1008], 5:35-39. A POSITA would have understood that "adsorbs" refers to an adsorbate (e.g., mercury) in a fluid (e.g., mercury-containing gas), and that the adsorbate adheres to the surface of the "sorbents" (e.g., activated carbon). A POSITA would have known that in order to "adsorb," the mercury must have contacted the activated carbon. A POSITA would have understood that adsorption of $HgBr_2$ onto activated carbon would have resulted in a mercury/sorbent composition contains mercury and sorbent (cls. 23-25), which also contains bromine (cl. 30). Ex[1002], ¶¶307-314.

##### c.   Element 24(c): "the activated carbon reacts with the halogen or halide promoter in the mercury-containing gas to form a promoted sorbent"

As described immediately above and in Ground 1, in addition to the contacting (adsorbing) disclosed in Vosteen, a POSITA would have understood that the activated-carbon sorbent and halogen (bromine-containing species) would have

reacted with one another to form at least a quantity of promoted sorbent. For example, it was well known that halides form chemical bonds directly with activated carbon, and improve mercury capture not only by oxidizing elemental mercury ($Hg^0$) to the more easily removed $Hg^{2+}$ form, but also by enhancing the reactivity of $Hg^0$ with activated carbons. *See* §IV.D.3. A POSITA would have also known that with a "mass ratio of bromine to mercury in the flue gas…in the range from $10^2$ to $10^4$," there would have been excess Br in the flue gas to further react and promote the activated-carbon sorbent. Ex[1008], 4:33-38. On account of the well-known enhanced reactivity of activated carbon towards mercury, provided by the halogens, the sorbent/halogen composition would have been considered a "promoted" sorbent. Ex[1002], ¶313.

## 2.   Elements 28(c), 24(f)(2)— *"mercury content of the cleaned gas is maintained at or below a desired level."*

As described in Ground 1, Vosteen discloses maintaining mercury content in the cleaned-gas below a desired level, to comply with legal and regulatory requirements. Ex[1008], 1:10-22. A POSITA would have known that EPA and other regulatory bodies proposed rules that required mercury emissions reductions by 70%. *See* §IV.D.2. A POSITA seeking to ensure compliance would have been motivated to maintain mercury emissions below the desired levels imposed by regulatory bodies to avoid fines and other penalties. Ex[1002], ¶314.

**B.     CLAIM 29: "THE METHOD OF CLAIM 25, WHEREIN THE MERCURY-CONTAINING GAS COMPRISES ABOUT 1 G TO ABOUT 30 G OF THE ELEMENT BROMINE PER 100 G OF THE SORBENT"**

Vosteen renders this claim obvious.  Vosteen plots the weight percentage of metallic/elemental mercury compared to total mercury ($Hg_{met}/Hg_{tot}$), as a function of total bromine concentration ($Br_{tot}$) (the sharper curve).



Fig. 6

Ex[1008], Fig. 6, 10:58-61.  Bromine concentration is reported in units of milligrams Br per $m^3$ of mercury-containing flue gas, on a dry basis at standard temperature and pressure (25 ºC, 1 atm).  Ex[1008], Fig. 6, 1:18, 6:40-45.  The first datapoint provided is 50 mg/$m^3$ S.T.P. db.  *Id.*  Ex[1002], ¶¶315-316.

Vosteen describes using activated carbon but does not specify its injection rate or concentration in the flue gas.  Ex[1008], 5:23-37.  A POSITA would have known that it was routine in the industry to use activated-carbon injection rates to provide a

gas-phase concentration of around 10 lbs/MMacf (pounds/million actual cubic feet of flue gas) to capture mercury.  Based on the disclosed bromine concentration in the flue gas of 50 mg/m$^3$ S.T.P. db, and a conventional flue-gas concentration of activated carbon of around 10 lbs/MMacf, this equates to a mercury-containing flue gas that comprises approximately 20 grams of the element bromine per 100 grams of sorbent.  Ex[1002], ¶¶317-321

Claim 29 is also obvious because it is merely an attempt to claim a workable range for a conventional halogen (bromine) being used in a conventional way (to oxidize mercury and promote activated carbon) with a conventional sorbent (activated carbon).  Nothing in the '114 Patent specification attributes significance to the claimed range, or establishes that it "achieves unexpected results."  The range presents nothing more than optimization of "result-effective" variables that would have been obvious to a POSITA.  *In re Applied Materials, Inc.*, 692 F.3d 1289, 1297-98 (Fed. Cir. 2012).  Ex[1002], ¶322.

## C.    CLAIM 1

Claim 1 combines the limitations of Claims 23, 25 and 28.  Accordingly, the analysis above in Grounds 1 and 2 also applies to Claim 1.  Ex[1002], ¶¶323-333.

As compared to the aforementioned claims, Claim 1 adds "controlling, in response to the monitored mercury content of the cleaned gas, an injection rate of

*injecting the sorbent into the mercury-containing gas*, the sorbent composition, or a combination thereof," which is herein referred to as Element 1(f)(1).  Claim 1 would have been obvious.  Ex[1002], ¶323.

Vosteen discloses that "the mercury content of the flue gas…is measured continuously downstream of the flue gas emission control system," and on that basis, "the amount of bromine fed and/or bromine compounds…is controlled."  Ex[1008], 5:48-55; *see* cl. 9, Figs. 2-8.  A POSITA would have known that by controlling the feed rate of bromine, the "sorbent composition" would also be controlled, because the sorbent in the flue gas is comprised of bromine and activated carbon.  Ex[1002], ¶¶330-331.

It would have also been obvious to control the "rate of injecting the sorbent" in view of Vosteen.  A POSITA would have also known that activated carbon was expensive, compared to bromine-containing ingredients.  Thus, a POSITA viewing Figs. 5-8 of Vosteen—comparing bromine addition rate and mercury removal— would have been motivated to at least try, and would have had a reasonable expectation of success, adjusting the sorbent injection rate at a level that minimized costs while reaching mercury removal targets.  *See* §IV.D.2.  A POSITA would have further understood that coal composition varies in native mercury and halogen content, and would have adjusted the sorbent injection rate anyways as part of

routine optimization and process control, with a reasonable expectation of success. Ex[1002], ¶332; *Philips*, 948 F.3d at 1337.

### D.    CLAIMS DEPENDING FROM CLAIM 1

#### 1.    Claims 2-3: "removing greater than 70 wt% of the mercury in the mercury-containing gas [cl. 3—on the sorbent]"

Vosteen discloses Claim 2, providing "substantially complete removal of mercury (Hg), from flue gases." Ex[1008], 1:50-52. Vosteen discloses removing greater than 98% of the mercury in the mercury-containing gas. Ex[1008], Fig. 5. In other examples for wastewater incineration, which a POSITA would have known generates even more mercury than coal combustion, Vosteen discloses removal of 99.9% of the total mercury. Ex[1008], 8:22-38. Ex[1002], ¶¶334-335.

Regarding Claim 3, a POSITA would have understood that that the mercury removal on the sorbent alone would meet or exceed 70%. Vosteen discloses plants that "do not have a wet flue gas emission control system" (scrubber), and that "solely have a dry emission control system having a mercury sorption stage." Ex[1008], 5:32-36. Further, Vosteen discloses combustion of lignite coal. Ex[1008], 2:36. A POSITA would have understood that lignite coal has minimal native chlorine and produces minimal unburned carbon. A POSITA would thus understand that plants burning lignite, having "solely a dry emission control system," would depend on the sorbent for mercury removal. A POSITA would have understood that, in such

configurations, the activated carbon would be the component that accounts for almost all of the mercury removal.  Ex[1002], ¶336.

Vosteen further renders Claims 2 and 3 obvious, because Vosteen discloses removing sufficient mercury to comply with regulatory requirements.  Ex[1008], 1:10-22.  A POSITA would have been motivated, and would have had a reasonable expectation of success through routine process optimization, to adjust the bromine injection rate and/or activated-carbon injection rate in a plant to meet and surpass (e.g., for safety margin) well-known regulatory proposals calling for at least 70% mercury removal, such as those discussed *supra* §IV.D.2.  Ex[1002], ¶¶335, 337; *Philips*, 948 F.3d at 1337.

### 2.   Claim 4: "the sorbent in the mercury-containing gas comprises about 1 g to about 30 g of the halogen or halide promoter per 100 g of the sorbent material"

Claim 4 is obvious because it is merely an attempt to claim a workable range for a conventional halogen (bromine) being used in a conventional way (halogens are inherent to coal, and both oxidize mercury and promote activated carbon) with a conventional sorbent (activated carbon).  Nothing in the '114 Patent specification attributes any particular significance to the claimed range, or establishes that it "achieves unexpected results" in mercury removal.  Rather, the range presents

nothing more than optimization of "result-effective" variables that would have been obvious to a POSITA. *Applied Materials*, 692 F.3d at 1297-98.  Ex[1002], ¶338.

Claim 4 is also obvious because a POSITA would have known since at least the 1970s that the saturation limit of activated carbon for bromine (i.e., how much bromine the activated carbon can hold at equilibrium), was around 31-38 grams per 100 grams of activated carbon.  Given the residence times in flue gas, a POSITA would have understood that the bromine loaded onto activated carbon would be less than the saturation limit.  Ex[1002], ¶339.

A POSITA would have recognized that there would be sufficient bromine in the flue gas, according to Vosteen's processes, to provide a ratio of 1-30 g of bromine per 100 g of activated carbon.  Ex[1008], 4:33-38.  A POSITA would have been motivated to load the activated carbon sufficiently to increase its reactivity and ability to adsorb mercury.  Ex[1002], ¶¶340-341

### 3.     Claim 5: "the combustion chamber comprises the halogen or halide promoter"

Vosteen discloses this claim.  As described in Ground 1 for Element 25(b) and Claim 27, Vosteen discloses adding "free…bromine" ($Br_2$), "hydrogen bromide" (HBr) and "sodium bromide" to the combustion chamber.  Ex[1008], 2:54-61, 4:4-33; *see* cls. 1, 2, 5, 18.  HBr (disclosed in Vosteen) and $Br^-$ (bromide ions, dissociated

from aqueous sodium bromide) are expressly disclosed by Claims 1 and 23 of the '114 Patent as examples of "halogen or halide promoter."  Ex[1002], ¶342.

### 4.   Claim 6: "the coal comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, added to the coal upstream of the combustion chamber"

Vosteen discloses this claim for the reasons described in Ground 1 for Element 25(b) and Claim 26.  Vosteen adds bromine ($Br_2$), HBr, sodium bromide, and other bromide compounds to "coal or the like to be burnt, upstream of the furnace." Ex[1008], 2:54-61, 4:4-33; *see* cl. 18 ("applying…bromine compounds to a coal"). Ex[1002], ¶343.

### 5.   Claim 7: "the promoter is contacted with the sorbent in vapor form, gaseous form, liquid form, or in an organic solvent."

Vosteen discloses this claim, describing adding "free…bromine" ($Br_2$), hydrogen bromide, and sodium bromide to the coal and/or combustion chamber. Ex[1008], 2:55-61, 4:4-33.  A POSITA would have known that $Br_2$ has "a boiling point of 58.8ºC," and HBr has "a boiling point of -67ºC."  Ex[1026], 1785-87, ¶¶ 4, 7, 11-12, 14.   Vosteen discloses a "temperature during contact of the bromine compound with the flue gas being at least 500 ºC, preferably 800 ºC."  Ex[1008], Abstract, 2:7-8, 4:1-4, 4:20-23, cls. 13,  18.  A POSITA would have understood that at such temperatures, the halide promoter be in gaseous form, and would have

remained in gaseous form as it is transported to the activated-carbon sorbent, such as in the fabric filter.  Ex[1002], ¶344.

### 6.     Claim 8: "injecting a secondary material into the mercury-containing gas downstream of the combustion chamber"

Vosteen discloses this claim.  Exemplary secondary materials include slaked lime, a sulphur compound, "chlorine and/or iodine," and "a mixture of [i.e., more than one] bromine compounds."  Ex[1008], 3:66-4:1, 4:58-65, 5:27-29, 5:47-55, cls. 1, 18.  The above are injected downstream of the combustion chamber, such as into the flue gas.  *Id.*  Ex[1002], ¶345.

### 7.     Claim 9: "The method of claim 8, wherein the secondary material comprises a halogen, a compound derived from a halogen, a hydrohalide, a compound comprising a Group V or Group VI element and a molecular halogen, or a combination thereof."

Vosteen discloses this claim.  As described for Claim 8, Vosteen discloses additional bromine, chlorine, and/or iodine compounds.  Each comprises a halogen or compound derived from a halogen.  Ex[1002], ¶346.

### 8.     Claim 12: "the activated carbon comprises powdered activated carbon, granular activated carbon, or a combination thereof."

Vosteen discloses this claim.  Vosteen discloses "granulated activated carbon" as the sorbent, which is the same as "granular" activated carbon.  Ex[1008], 5:23-29;  Ex[1002], ¶347.

9.    **Claims 13-14: "the sorbent material injected into the mercury-containing gas is [cl. 13—substantially free of halogen and halide promotion] [cl. 14— a promoted sorbent obtained by contacting a base sorbent with another halogen or halide promoter]"**

As discussed in Ground 1 for Element 25(c), Vosteen discloses injecting an activated carbon into the mercury-containing flue gas.

Regarding Claim 13, Vosteen does not characterize the sorbent as having been promoted prior to injection.  Thus, a POSITA would have understood the disclosure of Vosteen to refer to sorbent material that is substantially free of halogen and halide promotion prior to injection.  Ex[1002], ¶348.

Regarding Claim 14, a POSITA would have been motivated, and would have had a reasonable expectation of success, to try pre-halogenating (e.g., impregnating) the sorbent before injection into the mercury-containing flue gas.  For example, it was well-known in the art since the 1930s to remove mercury vapors by injecting halogen-impregnated activated-carbon sorbents into a mercury-containing flue gas.  *See* §IV.D.3 (discussing Ex[1029]).  A POSITA would have been motivated to at least try such halogen-impregnated sorbents in conjunction with Vosteen, particularly for coals with higher native mercury content (or lower native halogen content) to further reduce total mercury emissions.  Ex[1002], ¶¶349-350; *Philips*, 948 F.3d at 1337.

### 10.    Claim 15: "the combustion chamber comprises a boiler."

Vosteen identifies a boiler as part of the combustion chamber, and refers to "boiler flue gas."  Ex[1008], 11:3-12, 6:15-62, Fig. 9.  Ex[1002], ¶351.

### 11.    Claim 16: "the mercury-containing gas is a flue gas."

Vosteen discloses this claim.  Vosteen is entitled, "Process for Removing Mercury from Flue Gases," and the Abstract refers to "removing mercury from flue gases [from] power stations."  Ex[1008], Title, Abstract.  Ex[1002], ¶352.

### 12.    Claims 17-18: "the injection of the sorbent material into the mercury-containing gas occurs upstream of [cl. 17—an air pre-heater] [cl. 18—a particulate separator or a scrubber]."

Regarding Claim 18, Vosteen describes alternative embodiments of an electrostatic precipitator (ESP) and fabric filter ("cloth filter"), each of which is a particulate separator.  Ex[1008], 5:25-39, 11:5-10, Fig. 9 (item 96).  Vosteen also discloses the use of a "scrubber."  Ex[1008], Abstract.  Vosteen discloses injecting the activated-carbon sorbent upstream of the fabric filter, in that the fabric filter separates the mercury/activated-carbon composition from the gas stream, as described in Ground 1 for Element 25(d).  Ex[1008], 5:24-29.  Regarding the ESP and scrubber embodiment, a POSITA would have understood that an ESP and a scrubber are among the last units in an emissions control system, and that activated-carbon sorbent would have been injected before these units.  Ex[1008], 11:1-14, Fig. 9 (items 96, 97).  Ex[1002], ¶353.

41

The ESP embodiment of Vosteen also renders claim 17 obvious.  Ex[1008], 5:38-39 (use of ESP to separate mercury).  A POSITA would have understood that adsorption of mercury onto activated carbon, taught by Vosteen, occurs with direct contact between the two.  *See* Ex[1008] at 5:36-38.  A POSITA would have known that, once entrained in flue gas, the activated carbon would have been transported downstream to a particle collection device (PCD), such as a fabric filter or ESP.  A POSITA would have also known that air pre-heaters are located immediately upstream of PCDs in a conventional flue-gas system.  Much like the activated carbon would have been injected upstream of a fabric filter or ESP, the activated carbon would likewise have been injected upstream of the air preheater.  A POSITA would have been further motivated, with a reasonable expectation of success, to inject activated carbon upstream of the air preheater in order to extend the residence time during which the activated carbon can contact the mercury in the flue gas, thereby increasing the amount of mercury removal.  Ex[1002], ¶354.

13. <u>**Claims 19, 21, 22**</u>

   a. <u>*Claims 19, 21:*</u> *"the coal comprises added halide sorbent enhancement additive [cl. 21—that comprises Br⁻]."*

   b. <u>*Claim 22:*</u> *"The method of claim 21, wherein the sorbent enhancement additive comprises a bromide compound."*

Vosteen discloses these claims. As evidenced by Claims 21 and 22 of the '114 Patent, a "sorbent enhancement additive" includes a bromide compound and/or bromide ions ($Br^-$). Vosteen describes adding bromine ($Br_2$), HBr, sodium bromide, and other bromide compounds to "coal or the like to be burnt, upstream of the furnace." Ex[1008], 2:54-61, 4:4-33; *see* cl. 18 ("applying…bromine compounds to a coal"). HBr and sodium bromide are both bromide compounds. Further, aqueous solutions of sodium bromide dissociate in water to form $Br^-$ ions. Ex[1002], ¶¶355, 357.

14. <u>**Claim 20: "the combustion chamber comprises added $Br_2$, HBr, Br⁻, or a combination thereof."**</u>

Vosteen discloses this claim. As described for Element 25(b) and Claim 27 in Ground 1, Vosteen discloses adding bromine ($Br_2$), HBr, sodium bromide (NaBr), and other bromide compounds to the combustion chamber. Ex[1008], 2:54-61, 4:4-19; *see* cls. 1, 2, 5, 18. A POSITA would also understand that HBr and NaBr in water would dissociate in water to form $Br^-$ ions. Ex[1002], ¶356.

## VIII.  GROUND 3: CLAIMS 23, 25-27, 30 ARE ANTICIPATED BY DOWNS-BOILER

### A.  OVERVIEW OF EX[1006] ("DOWNS-BOILER")

**Downs-Boiler** (Ex[1006]) qualifies as prior art, with a priority date back to the March 22, 2004 filing date of 60/555,353 **"Downs-Boiler-Provisional"** (Ex[1007]).  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015); *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1380 (Fed. Cir. 2017) (*Dynamic* applies to published patent applications).  The disclosure of Downs-Boiler is supported by Downs-Boiler-Provisional, as illustrated in a redline between the two.  Ex[1032].  The materials from Downs-Boiler relied on below and by Dr. Niksa are found in Downs-Boiler-Provisional.  Ex[1002], ¶¶222-226.

At least claim 1 of Downs-Boiler has written-description support in Downs-Boiler-Provisional.  Ex[1002], ¶¶227-238.  Regarding Element 1(a) of Downs-Boiler, Downs-Boiler-Provisional discloses a "method of removing elemental mercury from coal combustion flue gases."  Ex[1007] Title, ¶[0021].  Regarding Elements 1(b)-1(d), Downs-Boiler-Provisional provides a "bromine-containing reagent" to mercury-containing (flue) gas in the combustion chamber, as shown in Figure 2 (annotated) of Downs-Boiler-Provisional, in order to "promote the oxidation of elemental mercury" and create an oxidized form.  Ex[1007], Title, Fig. 2, ¶[0027].



FIG. 2

Regarding Element 1(e), Downs-Boiler-Provisional "removes both oxidized and elemental mercury species" from the flue gas. Ex[1007], Title, cl. 1, ¶¶[005], [0019].

Much like Downs-Boiler-Provisional, Downs-Boiler seeks to enhance the effectiveness of mercury removal by powdered activated carbon (PAC), by adding a bromine-containing promoter to crushed coal (point A), pulverized coal (point B), or a combustion chamber (point C). Ex[1006], Figure 2, [0007].

## B. CLAIM 25

Claim 25 is discussed first, because the other independent claims copy its limitations. Ex[1002], ¶388. Parallel citations to written-description support in Downs-Boiler-Provisional Ex[1007] are also provided.

### 1. Claim 25(Preamble)—"A method of separating mercury from a mercury-containing gas, the method comprising:"

Downs-Boiler is entitled, "Bromine Addition for the Improved Removal of Mercury from Flue Gas."  Ex[1006], Title; Ex[1007], Title.  "Removal of mercury" refers to separating the mercury, as described for Element 25(d).  Ex[1002], ¶389.

### 2. 25(a)—"combusting coal in a combustion chamber, to provide the mercury-containing gas"

Downs-Boiler states, "Mercury appears in coal combustion flue gases in both solid and gas phases."  Ex[1006], ¶¶[0001]; *see* Fig. 4 (item 14), ¶[0020] (types of coal); Ex[1007], ¶¶[002]-[003], [009], [0018], [0023], Fig. 4.  Ex[1002], ¶¶390-391.

### 3. 25(b)—"the coal comprises added $Br_2$, HBr, a bromide compound, or a combination thereof, added to the coal upstream of the combustion chamber, or the combustion chamber comprises added $Br_2$, HBr, a bromide compound, or a combination thereof, or a combination thereof,"

Downs-Boiler discloses bromine-containing reagents—including "alkali metal and alkaline earth metal bromides, hydrogen bromide (HBr) or bromine ($Br_2$)," and "an aqueous solution of calcium bromide ($CaBr_2$)."  Ex[1006], ¶¶[0018]-[0019], [0021]; Ex[1007], ¶¶[0021]-[0022, 0024].   Downs-Boiler discloses adding the bromine-containing to the coal upstream of the combustion chamber (Points A and B) and/or to the combustion chamber (Point C).

46



FIG. 2

Ex[1006], Fig. 2, ¶[0007] ("bromine-containing compounds, added to the coal, or to the boiler combustion furnace"); Ex[1007] Fig. 2, ¶[009]. Downs-Boiler describes calcium bromide "sprayed onto the crushed coal 16 before the coal 16 is pulverized for combustion" so that the two "intimately mix," and also discloses adding the bromine-containing reagent to the pulverized coal before it enters the combustion chamber. Ex[1006], Fig. 2, ¶[0019]; Ex[1007] Fig. 2, ¶[0022]. Downs-Boiler also discloses adding bromine-containing reagent directly into the combustion chamber—"fed to the boiler combustion zone 14 in gaseous, liquid, or solid form." Ex[1006], ¶[0022]; Ex[1007], ¶[0025]. Ex[1002], ¶¶392-398.

     **4.**      **25(c)—"injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber; contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition"**

Downs-Boiler discloses "*injection* of a carbonaceous sorbent (e.g., powdered activated carbon, or PAC) into the flue gas upstream of the dust collector to adsorb vapor-phase mercury." Ex[1006], ¶[0004]; Ex[1007], ¶[0005]. Downs-Boiler describes "PAC injection systems" as a component of "*downstream* pollution control systems," as they are "downstream" of the combustion chamber. Ex[1006], ¶[0015]; Ex[1007], ¶[0018]. The mercury in the mercury-containing gas contacts the sorbent, as evidenced by Downs's disclosure of the "sorbent, and its burden of adsorbed mercury," and the creation of "particulate-bound mercury" due to the increased "reactivity of oxidized mercury with PAC." Ex[1006], ¶¶[0003]-[0004], [0015]-[0016]; Ex[1007], ¶[005], [0018]-[0019]. Ex[1002], ¶¶399-402.

     **5.**      **25(d)—"separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas."**

Downs-Boiler discloses that the activated-carbon "sorbent, and its burden of adsorbed mercury, are subsequently removed from the flue gases in a downstream particulate collector," which separates the mercury/sorbent composition by removing it from the mercury-containing (flue) gas resulting in a cleaned gas. Ex[1006], ¶[0004]; Ex[1007], ¶[005]. Ex[1002], ¶403.

### C.   CLAIMS DEPENDING FROM CLAIM 25

#### 1.   Claims 26-27: "the [coal--cl. 26; combustion chamber--cl. 27] comprises the added Br$_2$, HBr, the bromide compound, or a combination thereof [cl. 26--added to the coal upstream of the combustion chamber]."

As discussed for Element 25(b), Downs-Boiler discloses these claims. The HBr, Br$_2$, and bromide compounds are added to the coal and/or to the combustion chamber. Ex[1006], Fig. 2, ¶¶[0018]-[0019], [0021]-[0022]; Ex[1007] Fig. 2, ¶¶[0021-22], [0024-25]. Ex[1002], ¶¶404-405.

#### 2.   Claim 30: "the mercury/sorbent composition comprises the element bromine, the sorbent material, and mercury."

As described for Element 25(c), mercury in the flue gas is oxidized by the bromine-containing reagent, and subsequently adsorbed onto activated carbon to form "particulate-bound mercury." Adsorbed mercury includes "the oxidized form" of mercury (e.g., HgBr$_2$), so the mercury/sorbent composition also comprises the element bromine. Ex[1006], ¶¶[0004], [0015]-[0016]; Ex[1007], ¶¶[005], [0018]-[0019]. Ex[1002], ¶406.

### D.   CLAIM 23

Claim 23 is nearly identical to Claim 25, with minor changes. As compared to Element 25(b), Element 23(b) adds "wherein the mercury-containing gas comprises a halogen or halide promoter comprising HBr, Br$^-$ or a combination

thereof."  For the same reasons Downs-Boiler discloses Claim 25, it also discloses Claim 23.  Ex[1002], ¶¶407-415.

As discussed for Element 25(b), Downs-Boiler discloses adding $Br_2$, HBr, or an "aqueous solution of calcium bromide" ($CaBr_2$) to the coal and/or combustion chamber.  Ex[1006], Fig. 2, ¶¶[0018]-[0019], [0021]; Ex[1007] Fig. 2, ¶¶[0021]-[0022].  HBr and $Br^-$ are expressly disclosed by Element 23(b) as examples of "halogen or halide promoter."  Downs-Boiler expressly discloses HBr and aqueous solutions of calcium bromide dissociate in water to form bromide ions ($Br^-$).  Ex[1006],  ¶¶ [0018]-[0019];  Ex[1007],  ¶¶ [0021]-[0022].  Downs-Boiler  also confirms that the bromine-containing species are present in the mercury-containing flue gas, stating that they are responsible for "enhanc[ing] the removal of mercury across a PAC injection process."  Ex[1006], ¶¶[0015]-[0016]; Ex[1007], ¶¶[0018]-[0019].  Ex. 1002, ¶¶410-413

## IX.   GROUND 4: CLAIMS 1-7, 12-28, 30 ARE OBVIOUS OVER DOWNS-BOILER

Claims 23, 25-27, and 30 are obvious for the same reasons as in Ground 3, as anticipation is the epitome of obviousness.  These claims, and Claims 1-7, 12-22, 24, and 28, are also obvious for the reasons below.  Elements and claims not mentioned below are disclosed or rendered obvious for the reasons stated above in Ground 3.  Ex. 1002, ¶416.

### A.   CLAIMS ADDRESSED IN GROUND 3

#### 1.   Elements 23(c), 25(c), and Claim 30

##### a.   Elements 23(c), 25(c)—"contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition"

##### b.  Claim 30—"the mercury sorbent composition comprises the element bromine, the sorbent material, and mercury"

As described for Element 25(c) in Ground 3, Downs-Boiler uses "powdered activated carbon, or PAC…to adsorb vapor-phase mercury"—resulting "in an increased fraction of particulate-bound mercury," due to the increased "reactivity of oxidized mercury with PAC" and further refers to "sorbent, and its burden of adsorbed mercury."  Ex[1006], ¶[0004], [0015-0016]; Ex[1007], ¶[005], [0018]-[0019].  A POSITA would have understood that adsorption and the related chemical reaction between oxidized mercury (mercury bromide, $HgBr_2$) with the activated-carbon sorbent is a form of contacting, and that the "particulate-bound mercury" refers to "mercury/sorbent" composition.  This composition contains mercury and sorbent (cls. 23-25), and also contains bromine (cl. 30).  Ex[1002], ¶¶417-422.

### B.   CLAIM 1

Claim 1 combines the limitations of Claims 23 and 25.  Accordingly, the analysis above in Grounds 3 and 4 also applies to Claim 1.  Ex[1002], ¶¶423-432.  The limitations added in Claim 1 are discussed below.

Petition for IPR2020-00834
USP 10,343,114

### 1. (1)(e)—"monitoring the mercury content of the cleaned gas"

Downs-Boiler discloses monitoring the mercury content of the cleaned gas, as depicted by the Y-axis and diamond markers in Figure 3:



FIG. 3

Ex[1006], Ex[1007], Figure 3.   The mercury content is monitored at least semi-continuously at the outlet of the particulate collector.   Ex[1002], ¶429.

### 2. Element (1)(f)(1)—"controlling, in response to the monitored mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, the sorbent composition, or a combination thereof,"

In response to the mercury content of the cleaned gas (Y-axis), Downs-Boiler controls adding promoter ($CaBr_2$) between 375–1000 ppm:

52



Ex[1006], Ex[1007] Figure 3 (excerpted).  A POSITA would have known that by controlling the feed rate of bromine, the sorbent composition (which in the flue gas contains bromine and activated carbon) is also controlled.  Ex[1002], ¶430.

It would have also been obvious to control the "rate of injecting the sorbent." Downs-Boiler explains that, although activated-carbon sorbents were effective for removing mercury, the "economics of high injection rates can be prohibitive." Ex[1006], ¶¶[0004]; Ex[1007], ¶¶[005].  Accordingly, a POSITA would have been motivated to at least try adjusting, in response to the monitored mercury content, the sorbent injection rate at a level that minimized costs while reaching mercury content removal targets.  *See* §IV.D.2.  A POSITA would have further understood that coal composition varies in native mercury and halogen content, and would have adjusted the sorbent injection rate as part of routine optimization and process control to account for the fluctuating coal content, with a reasonable expectation of success. Ex[1002], ¶431.

### 3.    Element (1)(f)(2)—"so that the mercury content of the cleaned gas is maintained at or below a desired level."

Downs-Boiler discloses this element, discussing EPA standards regulating mercury emissions from coal-fired plants.  Ex[1006], ¶[0001]; Ex[1007], ¶[002].  Such standards act as a "desired level," for which a POSITA would have controlled mercury content of the cleaned gas to meet or surpass.  *See* IV.D.2.  A POSITA seeking to ensure compliance would have been motivated to keep mercury emissions below such desired levels to avoid fines and other penalties.  Ex[1002], ¶432.

### C.    CLAIMS DEPENDING FROM CLAIM 1

### 1.    Claims 2-3: "removing greater than 70 wt% of the mercury in the mercury-containing gas [cl. 3—on the sorbent]"

Downs-Boiler discloses Claim 2, removing 77 wt% of the mercury in the mercury-containing gas.  Downs-Boiler discloses removing 7 µg/dscm of mercury (green), which is the difference between measured mercury content at the inlet of the fabric filter (9 µg/dscm, red) and at the outlet (2 µg/dscm, blue):



FIG. 3

Ex[1006], Ex[1007], Fig. 3 (annotated).  This equates to removing 77% (=7μg/9μg) of the mercury in the mercury-containing gas.  Ex[1002], ¶¶433-434.

Regarding Claim 3, a POSITA would have understood that that the mercury removal on the sorbent alone would meet or exceed 70%.  Downs-Boiler discloses that only "25% of the coal-fired power plants in the U.S. are equipped with wet FGD systems" (scrubbers), and discloses "PAC injection systems" (activated carbon) as an alternative to "downstream pollution control systems such as wet 22 and SDA 24 FGD systems."  Ex[1006], ¶¶[0007], [0015]; Ex[1007], ¶¶[009], [0018].  Downs-Boiler also discloses burning "lignite coals," which produce a lower "percentage of oxidized mercury" on account of "low chloride content."  Ex[1006], ¶¶[0005];

55

Ex[1007], ¶¶[006]. A POSITA would have understood that plants burning lignite, having solely an activated-carbon system (as in Downs-Boiler), would depend on the activated-carbon for mercury removal.  In such configurations, the activated carbon would be the component that accounts for almost all of the mercury removal. Ex[1002], ¶¶435-436.

Downs-Boiler further renders Claims 2 and 3 obvious, because it teaches compliance with EPA standards regulating mercury emissions from coal-fired plants. Ex[1006], ¶[0001]; Ex[1007], ¶[002].   A POSITA would have been motivated, and would have had a reasonable expectation of success through routine process optimization, to adjust the rates of adding bromine and/or activated-carbon sorbent in a plant to meet and surpass (e.g., for safety margin) well-known EPA proposals calling for at least 70% mercury removal, such as those discussed *supra* in Section IV.D.2. *Philips*, 948 F.3d at 1337.  Ex[1002], ¶¶ 434, 437; .

### 2.  **Claim 4: "the sorbent in the mercury-containing gas comprises about 1 g to about 30 g of the halogen or halide promoter per 100 g of the sorbent material."**

Claim 4 is obvious because it is merely an attempt to claim a workable range for a conventional halogen (bromine) being used in a conventional way (halogens are inherent to coal, and both oxidize mercury and promote activated carbon) with a conventional sorbent (activated carbon).  Nothing in the '114 Patent specification

attributes any particular significance to the claimed range, or establishes that it "achieves unexpected results" in mercury removal.  Rather, the range presents nothing more than optimization of "result-effective" variables that would have been obvious to a POSITA.  *Applied Materials*, 692 F.3d at 1297-98.  Ex[1002], ¶438.

Claim 4 is also obvious because a POSITA would have known since at least the 1970s that the saturation limit of activated carbon for bromine (i.e., how much bromine the activated carbon can hold at equilibrium), was around 31-38 grams per 100 grams of activated carbon.  *See* §IV.D.3  Given the residence times in flue gas, a POSITA would have understood that the bromine loaded onto activated carbon would be less than the saturation limit.  Ex[1002], ¶¶439-440.

A POSITA would have recognized that there would be sufficient bromine in the flue gas, according to Downs-Boiler's processes, to provide a ratio of 1-30 g of bromine per 100 g of activated carbon.  A POSITA would have been motivated and had a reasonable expectation of success to load the activated carbon sufficiently to increase its reactivity and ability to adsorb mercury.  Ex[1002], ¶441.

### 3.    Claim 5: "the combustion chamber comprises the halogen or halide promoter."

Downs-Boiler discloses this claim.  As described in Ground 3 for Claim Element 25(b) and Claim 27, Downs-Boiler discloses adding "bromine" ($Br_2$), "hydrogen bromide" (HBr) and aqueous "calcium bromide" to the combustion

chamber.  Ex[1006], Fig. 2, ¶¶[0018]-[0019], [0021]; Ex[1007] Fig. 2, ¶¶[0021-

0022].  HBr (disclosed in Downs-Boiler) and Br– (e.g., dissociated from aqueous

calcium bromide) are expressly disclosed by Claims 1 and 23 as examples of "a

halogen or halide promoter."   Additionally, Downs-Boiler discloses that the

halogens in the combustion chamber acts as a promoter—"enhances mercury

removal." Ex[1006], ¶¶[0015]; Ex[1007], ¶¶[0018].  Ex[1002], ¶442.

### 4.   Claim 6: "the coal comprises added $Br_2$, HBr, $Br^-$, or a combination thereof, added to the coal upstream of the combustion chamber."

Downs-Boiler discloses this claim, for the reasons described in Ground 3 for

Element 25(b) and Claim 26.  Ex[1002], ¶¶443-444.

### 5.   Claim 7: "the promoter is contacted with the sorbent in vapor form, gaseous form, liquid form, or in an organic solvent."

Downs-Boiler discloses this claim, describing that the bromine-containing

reagent "may be fed to the boiler combustion zone 14 in gaseous, liquid, or solid

form." Ex[1006], ¶[0022]; Ex[1007], ¶[0025].  A POSITA would have known that

$Br_2$ has "a boiling point of 58.8°C," and HBr has "a boiling point of -67°C."

Ex[1026], 1785-87, ¶¶ 4, 7, 11-12, 14 (Pavlish Decl. C).   Upon exposing the

bromine-containing reagent to the relatively high combustion temperatures and

subsequent flue gas, the bromine-containing promoter would remain in gaseous

form. Ex[1002], ¶445.

6.      **Claim 12: "the activated carbon comprises powdered
          activated carbon, granular activated carbon, or a
          combination thereof."**

Downs-Boiler discloses this claim.  Downs-Boiler uses "powdered activated

carbon (PAC)."  Ex[1006], ¶[0025]; Ex[1007], ¶[0028].  Ex[1002], ¶446.

7.      **Claims 13-14: "the sorbent material injected into the
          mercury-containing gas is [cl. 13—substantially free of
          halogen and halide promotion] [cl. 14— a promoted sorbent
          obtained by contacting a base sorbent with another halogen
          or halide promoter]"**

Regarding Claim 13, Downs-Boiler acknowledges that that "removal of

elemental mercury from coal combustion gases…through the application of a

conventional PAC injection process" was well-known in the industry.  Ex[1006],

¶[0016]; Ex[1007], ¶[0019].  A POSITA would have understood that "conventional

PAC injection process" refers untreated activated carbon (*i.e.*, substantially free of

halogen or halide promotion prior to injection).  Ex[1002], ¶447.

Regarding Claim 14, a POSITA would have been motivated, and would have

had a reasonable expectation of success, to try pre-halogenating (e.g., impregnating)

the sorbent before injection into the mercury-containing flue gas.  For example, it

was well-known since the 1930s to remove mercury vapors by injecting halogen-

impregnated activated-carbon sorbents into a mercury-containing flue gas.  *See*

§IV.D.3 (discussing Ex[1029]).  A POSITA would have been motivated to at least

try such halogenated-impregnated sorbents in conjunction with Downs-Boiler,

59

particularly for coals with higher native mercury content (or lower native halogen content) to further reduce total mercury emissions.  Ex[1002], ¶¶448-449.

### 8.   Claim 15: "the combustion chamber comprises a boiler."

Downs-Boiler discloses a combustion chamber (i.e. a "combustion furnace") that comprises a "boiler."  Ex[1006], ¶[0015], Figs. 2, 4-6; Ex[1007], ¶[0018], Figs. 2, 4-6.  Ex[1002], ¶450.

### 9.   Claim 16: "the mercury-containing gas is a flue gas."

Downs-Boiler discloses this claim, noting that "[m]ercury appears in coal combustion flue gases."  Ex[1006], ¶[0002]; Ex[1007], ¶[003].  Ex[1002], ¶451.

### 10.   Claims 17-18: "the injection of the sorbent material into the mercury-containing gas occurs upstream of [cl. 17—an air pre-heater] [cl. 18—a particulate separator or a scrubber]."

Downs-Boiler discloses claims 17 and 18.  For example, Downs discloses a coal-fired utility boiler with an air preheater 20 (blue), a particulate separator device 26 (purple), and a scrubber (yellow), as annotated in representative Figures 5 and 6.

Petition for IPR2020-00834
USP 10,343,114



FIG. 5



FIG. 6

Ex[1006], Ex[1007], Figs. 5-6 (annotated).  Ex[1002], ¶¶452, 455.

Regarding claim 17, Downs-Boiler explains that "combustion air preheater temperature profiles" have "been shown to affect the conversion of elemental mercury to oxidized mercury species," and would therefore have been considered by a POSITA in deciding where to inject sorbent material.  Ex[1006], ¶[0005]; Ex[1007], ¶[006].  Ex[1002], ¶452.

A POSITA would have understood increasing residence time—from when the activated-carbon is injected to when the activated carbon reaches the particulate separator—would have increased mercury removal from the flue gas.  A POSITA would have known that air pre-heaters are located immediately upstream of other pollution control devices in a conventional flue-gas system, and POSITA would have been motivated, with a reasonable expectation of success, to inject the sorbent before the air pre-heater to maximize the residence time.  Additionally, a POSITA would have known that, for a coal-fired utility boiler configured with a hot-side ESP, the sorbent would necessarily be injected upstream of the hot-side ESP, and that therefore the sorbent injection into the mercury-containing gas (*i.e.*, the flue gas) would occur upstream of the air pre-heater as well.  Ex[1002], ¶¶453-454.

Downs-Boiler discloses Claim 18, stating that "sorbent, and its burden of adsorbed mercury, are subsequently removed from the flue gases *in a downstream particulate collector*," which means that the sorbent must have been injected

upstream of that particulate collector in order to be removed by it.   Ex[1006],

¶[0004]; Ex[1007], ¶[005].   Ex[1002], ¶¶455-456.

>    **11.**   **Claims 19, 21, 22**

>    >    **a.   *Claims 19, 21:* "the coal comprises added halide sorbent enhancement additive [cl. 21—that comprises Br⁻]."**

>    >    **b.   *Claim 22:* "The method of claim 21, wherein the sorbent enhancement additive comprises a bromide compound."**

Downs-Boiler discloses these claims.   As evidenced by Claims 21 and 22 of

the '114 Patent, a "sorbent enhancement additive" includes a bromide compound

and/or bromide ions ($Br^-$).   Downs-Boiler describes adding to the coal bromine-

containing reagents including "alkali metal and alkaline earth metal bromides,

hydrogen bromide (HBr) or bromine ($Br_2$)," and "an aqueous solution of calcium

bromide" ($CaBr_2$).   Ex[1006], ¶¶[0018]-[0019], [0021], Fig. 2; Ex[1007], ¶¶[0021]-

[0022, 0024], Fig. 2.   HBr and $CaBr_2$ are both bromide compounds, and aqueous

solutions of $CaBr_2$ dissociate in water to form $Br^-$ ions.   Additionally, Downs-Boiler

discloses that the halogen "enhances mercury removal in…PAC injection systems."

Ex[1006], ¶[0015]; Ex[1007], ¶[0018].   Ex[1002], ¶¶457-458, 460-462.

12. **Claim 20: "the combustion chamber comprises added $Br_2$, HBr, $Br^-$, or a combination thereof."**

Downs-Boiler discloses this claim.  As described for Element 25(b) and Claim 27 in Ground 3, the "metal bromides, hydrogen bromide (HBr) or bromine ($Br_2$)," and "an aqueous solution of calcium bromide" ($CaBr_2$) are added directly into the combustion chamber—"fed to the boiler combustion zone."  Ex[1006], ¶¶[0018]-[0019], [0021]-[0022], Fig. 2;  Ex[1007], ¶¶[0021]-[0022], [0024]-[0025]. Ex[1002], ¶459.

## D.   CLAIM 24

Claim 24 combines limitations of Claims 1, 23 and 25.  For the same reasons, Downs-Boiler also renders obvious Claim 24.  Ex[1002], ¶¶290, 298, 323, 463-473.

### 1.   Element 24(c)

As compared to the aforementioned claims, Claim 24 adds, "the activated carbon reacts with the halogen or halide promoter in the mercury-containing gas to form a promoted sorbent" and that the mercury is contacted "with the promoted sorbent," in what is abbreviated herein as Element 24(c).

In addition to the activated carbon adsorbing (and thus contacting) the halide promoter (bromine), a POSITA would have understood that the two would have reacted to form at least a quantity of promoted sorbent.  For example, it was well-known that halides form chemical bonds directly with activated carbon, and improve

mercury capture not only by oxidizing elemental mercury ($Hg^0$) to the more easily removed $Hg^{2+}$ form, but also by enhancing the reactivity of $Hg^0$ with activated carbons. *See* §IV.D.3. Indeed, Downs-Boiler teaches that halogens may be "incorporated into the carbonaceous sorbent" to "yield sorbents that more strongly bond with adsorbed mercury species" (i.e., forming a promoted sorbent). Ex[1006], ¶[0004]; Ex[1007], ¶[005]. A POSITA would have also known that on account of the enhanced reactivity of activated carbon to mercury, the sorbent/halogen composition would have been considered a "promoted" sorbent. Ex[1002], ¶¶467-468.

## 2.   <u>Element 24(f)(1)</u>

As compared to the aforementioned claims, Claim 24 also adds "controlling, in response to the mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, *a rate of addition to the coal or the combustion chamber of the added $Br_2$, HBr, the bromide compound*, or a combination thereof, or a combination thereof," herein referred to as Element 24(f)(1). Downs-Boiler discloses this limitation. Downs-Boiler illustrates measuring mercury content of the cleaned gas (Y-Axis) and controls the addition rate of the bromide compound ($CaBr_2$) of up to 1000 ppm:



Ex[1006], ¶[0018], Fig. 3 (annotated); Ex[1007], ¶[0021], Fig. 3.

A POSITA, reviewing the monitored data of the parametric test as presented by Figure 3 of Downs-Boiler, would have been motivated to control the bromine addition rate in response to fluctuations in mercury content, such as by selecting a given addition rate (*e.g.*, one of the four rates provided: 0, 375, 750, and 1000 ppm) and/or by interpolating an intermediate value in response to the monitored mercury content of the cleaned gas.  Ex[1002], ¶¶471-472.

### E.    CLAIM 28

Claim 28 combines Elements 24(e), 24(f)(1), and 24(f)(2), and is obvious for the same reasons.  Ex[1002], ¶¶474-477.

## X.    GROUNDS 5-6: OBVIOUSNESS OF THE CLAIMS IN VIEW OF EPA-PROPOSAL

Ground 5 explains why Claims 1-9, 12-22, 24, and 28 would have been obvious over Vosteen in view of EPA-Proposal.  Ex[1009].  For similar reasons, Ground 6 explains why Claims 1-7, 12-22, 24, and 28 would have been obvious over Downs-Boiler in view of EPA-Proposal.  Elements and claims not mentioned below are disclosed or rendered obvious for the reasons stated above in Grounds 1-2 (Vosteen) and Grounds 3-4 (Downs-Boiler).  Ex[1002], ¶¶358-371, 478-491.

### A.    OVERVIEW OF EPA-PROPOSAL

EPA-Proposal was published on January 30, 2004 as 69 Fed. Reg. 4652-4752 [vol. 69, no. 20], and is thus authentic and qualifies as a printed publication at least by that date.  44 U.S.C. §1507; FRE 803(8), 902(1).

EPA-Proposal described upcoming tightening of mercury-control standards, with a "primary goal" of reducing emissions "by 70 percent from today's levels by 2018."  Ex[1009], 4698.  To reduce mercury, the EPA identified well-known methods of controlling the activated-carbon injection rate, including regular and halogen-impregnated.  Ex[1009] at 4676.  Ex[1002], ¶¶259-262.

**B.**    REASONS TO COMBINE EACH REFERENCE WITH EPA-PROPOSAL

Whether starting from Vosteen or from Downs-Boiler, a POSITA would have looked to EPA-Proposal to identify a target of at least 70% mercury removal. As of January 2004, if not earlier, the EPA had announced to the coal-fired industry that upcoming regulations would require an eventual 70% reduction in mercury emissions, and researchers were motivated to adopt processes that would achieve those limits. Ex[1009], Cover, 4652, 4698; Ex. 1057 (1/29/2004 EPA Press Release); Ex. 1058 (2/24/2004 EPA Press Release). *See Nat'l Steel Car, Ltd. v. Canad. Pac. Ry., Ltd.*, 357 F.3d 1319, 1337 (Fed. Cir. 2004) (motivation to combine can be external to prior-art printed publication). Ex[1002], ¶¶358-361, 470-480.

Vosteen discusses "strict limiting values exist for the legally permissible emission of mercury, for example from…power stations," and provides for "further reduction of the currently permitted limiting values." Ex[1008], 1:10-22. Similarly, Downs-Boiler discusses EPA standards regulating mercury emissions from coal-fired plants. Ex[1006], ¶[0001]; Ex[1007], ¶[002]. Thus, both primary references discuss the need to comply with regulatory requirements for mercury emissions. One such regulatory requirement was set forth in EPA-Proposal. Ex[1002], ¶¶358-361, 479-480.

EPA-Proposal discusses several ways to reduce mercury emissions to a desired level, including by injecting activated-carbon sorbent material (bare or halogen-impregnated), and controlling the activated-carbon injection rate. Ex[1009], 4676.  Whether starting with Vosteen or with Downs-Boiler, a POSITA would have been motivated to operate their coal-fired plants in a manner compliant with the EPA-Proposal to avoid eventual regulatory fines for emissions violations, and would have been motivated to try the remediation methods described by the EPA-Proposal.  Ex[1002], ¶¶359-360, 479-480.

A POSITA would have had a reasonable expectation of success in combining Vosteen with EPA-Proposal, and in combining Downs-Boiler with EPA-Proposal. Similar to Vosteen (described in Grounds 1-2) and Downs-Boiler (Grounds 3-4), EPA-Proposal describes "sorbent injection" into the flue gas.  Ex[1009], 4676. "[A]fter sorbent is introduced into the flue gas, it adsorbs Hg and other contaminants and is captured downstream in an existing or sorbent-specific PM [particulate matter] control device."  Id.  EPA-Proposal describes "activated carbon" as an exemplary sorbent for injection into flue gas.  Id.  Ex[1002], ¶¶361, 481.

## C.   DISCLOSURE OF VOSTEEN IN VIEW OF EPA-PROPOSAL, AND DOWNS-BOILER IN VIEW OF EPA-PROPOSAL

In addition to the reasons described in Grounds 1-2 (Vosteen) and Grounds 3-4 (Downs-Boiler), further analyses for why Vosteen in view of EPA-Proposal, and

why Downs-Boiler in view of EPA-Proposal, renders the Challenged Claims obvious are presented below.

### 1.   Claims 1-3, 24, and 28

#### a. Elements 1(f)(1), 24(f)(1), 28(b): "controlling, in response to the monitored mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas."

Whether starting from Vosteen or starting from Downs-Boiler, a POSITA would have found claims 1, 24, and 28 (and claims depending from them) obvious in view of EPA-Proposal in achieving mercury-emissions targets. Ex[1002], ¶¶362-364, 482-484.

As described in Grounds 1–4, each of Vosteen and Downs-Boiler monitor mercury content and control the addition rate of bromine and/or bromide compound. EPA-Proposal discusses an additional control variable that can be adjusted based on mercury content in the mercury-containing gas. EPA-Proposal explains that when using activated carbon, the "extent of potential Hg removal is dependent on: (1) Efficient distribution of the sorbent (*e.g.*, activated carbon) in the flue gas; (2) *the amount of sorbent needed* to achieve a specific level of Hg removal *which will vary depending on the fuel being burned*." Ex[1009], 4676. Accordingly, the EPA-Proposal disclosed the well-known concept that coal composition varies in its native mercury content. *See* Ex[1002], ¶¶89-90. As described by EPA-Proposal for

mercury-emissions control using activated carbon (as in each of Vosteen and Downs-Boiler), a POSITA would have been motivated to continuously adjust a sorbent injection rate into the mercury-containing gas as part of routine optimization and process control, in response to the monitoring of the mercury content of that gas, to achieve a specific level of mercury removal. Ex[1002], ¶¶362, 483.

### b. Elements 1(f)(2), 24(f)(2), 28(c), and Claims 2-3

Claims 1, 24, and 28 require "that the mercury content of the cleaned gas is maintained at or below a desired level." Claims 2 and 3 further include "removing greater than 70 wt% of the mercury in the mercury-containing gas." Whether starting from Vosteen or starting from Downs-Boiler, a POSITA would have found Claims 1, 2-3, 24, and 28 (and claims depending from them) obvious in view of EPA-Proposal in achieving mercury-emissions targets.

Vosteen discusses "strict limiting values exist for the legally permissible emission of mercury, for example from…power stations," and achieves greater than 98 wt% mercury removal from mercury-containing gas. Ex[1008], 1:10-22, 1:50-52, Fig. 5. Similarly, Downs-Boiler discusses EPA standards regulating mercury emissions from coal-fired plants and achieves mercury removal of at least 77 wt% of the mercury in the mercury-containing gas. Ex[1006], ¶[0001], Fig. 3; Ex[1007], ¶[002], Fig. 3.

It was known that EPA regulated the legally permissible emissions of mercury, and EPA-Proposal describes a "primary goal in this rulemaking is to reduce power plant emissions of Hg by 70 percent from today's levels by 2018." Ex[1006], 4698. The EPA's announcement of forthcoming regulations reducing mercury emissions by 70% exerted a strong outside impetus on the industry. *See* Ex[1057], Ex[1058]. For example, the EPA-Proposal discussed enforcement mechanisms, including "automatic…financial penalties" for mercury emissions exceeding the desired levels. Ex[1009], 4701. Accordingly, a POSITA would have been motivated to target at least this 70% emissions reduction as a "desired level" of mercury removal from the mercury-containing gas. Ex[1002], ¶¶362-367, 484-487.

2.    **Claims 13-14: "the sorbent material injected into the mercury-containing gas is [cl. 13—substantially free of halogen and halide promotion] [cl. 14— a promoted sorbent obtained by contacting a base sorbent with another halogen or halide promoter"]**

Whether starting from Vosteen or starting from Downs-Boiler, a POSITA would have found Claims 13-14 obvious in view of EPA-Proposal. A POSITA would have been motivated to try activated-carbon sorbent that is substantially free of halogen promotion (as in each of Vosteen and Downs-Boiler), and would have also tried sorbent that was already promoted with another halogen or halide promoter. Ex[1002], ¶¶368-371, 488-491.

For the direct injection of sorbent materials into a mercury-containing flue gas, the EPA recognized "two basic types of activated carbon (AC; regular and impregnated)" that were suitable candidates for achieving desired mercury reductions. Ex[1009], 4676. The "impregnated" activated carbons refer to those "supplemented with chemicals," such as "Cl, sulfur, and iodide." *Id*. Thus, activated-carbon sorbent of Claim 13 ("regular AC") and activated-carbon sorbent of Claim 14 ("impregnated AC") were each known in the art and taught for use in reducing mercury emissions. Ex[1002], ¶¶369, 489.

Regarding Claim 13, a POSITA would have been motivated to select, or at least try, injecting regular activated carbon into the mercury-containing gas because the EPA explains that they "have shown good to excellent Hg removal" in certain applications ("particularly on bituminous-fired units"). Ex[1009], 4676. A POSITA would have selected regular-activated carbon over a halogen-impregnated activated carbon due to the significantly lower "cost per mass unit," particularly for those applications which do not require the enhanced mercury removal properties of the halogen-impregnated activated carbons. Ex[1009], 4676; Ex[1002], ¶¶370, 490.

Regarding Claim 14, a POSITA would have been motivated to at least try injecting halogen-impregnated activated carbon into mercury-containing gas. The halogen-impregnated carbon described in EPA-Proposal was obtained by contacting

a base sorbent with another halogen or halide promoter, such as "Cl, sulfur, and iodide." Ex[1009], 4676. These halogen-impregnated activated carbons "have shown enhanced Hg removal over regular AC. Chemically-impregnated AC require smaller rates of carbon injection than does regular AC for equivalent Hg removals." Ex[1009], 4676. Therefore, a POSITA would have been motivated to select, or at least try, the impregnated-activated carbons for those applications that require the enhanced mercury removal. A POSITA would have been additionally motivated to try, and would have had a reasonable expectation of success, in injecting halogen-impregnated activated carbon, as described by EPA-Proposal, because halogen-impregnated activated carbon was well-known since the 1930s to remove mercury vapors from a mercury-containing flue gas. *See* §IV.D.3 (discussing Ex[1029]). Ex[1002], ¶¶371, 491.

## XI.   GROUNDS 7-8: OBVIOUSNESS OF THE CLAIMS IN VIEW NELSON

Ground 7 explains why Claims 2-4, 17-18, 24, and 29-30 would have been obvious over Vosteen in view of Nelson, Ex[1012]. For similar reasons, Ground 8 explains why Claims 2-4, 18, 24, and 29-30 would have been obvious over Downs-Boiler in view of Nelson. Elements and claims not mentioned below are disclosed or rendered obvious for the reasons stated above in Grounds 1-2 (Vosteen) and Grounds 3-4 (Nelson). Ex[1002], ¶¶372-387, 492-501.

### A.   OVERVIEW OF EX[1012] ("NELSON")

Nelson discloses preparation of promoted sorbent (purple) by chemically reacting powdered-activated carbon (PAC) sorbent (red) with HBr and/or $Br_2$ promoter (blue).



Ex[1012], Fig. 1 (annotated).  Nelson describes that promoting powdered-activated carbon (PAC) sorbents with halogens (e.g., iodine) has been known since the 1930s to improve mercury removal.   Ex[1012], 2:10-13 (citing Ex[1029]).   Nelson describes an advantage of using "chlorine and bromine" to promote activated-carbon

sorbents is that they "*chemically react with* strongly-held carbon surface compounds" and thus adsorb more strongly.  Ex[1012] at 2:33-39; *see* 3:44-49, 4:64-67.  By reacting activated-carbon sorbents with "$Br_2(g)$" and/or "$HBr(g)$," Nelson improved the sorbent's "ability to remove mercury species when injected into high-temperature coal-fired flue-gas compositions."  Ex[1012], 6:10-15.  Ex[1002], ¶¶207-217.

### B.   REASONS TO COMBINE EACH REFERENCE WITH NELSON

As described in Grounds 1-2 (Vosteen) and Grounds 3-4 (Downs-Boiler), each of Vosteen and Downs-Boiler discuss adding bromine to the coal and/or combustion chamber to increase the Br concentration in the mercury-containing flue gas, and then adsorbing mercury onto activated carbon in order to separate the mercury.  Vosteen and Downs-Boiler each describe the desired Br concentration in the mercury-containing gas.  Ex[1008], 4:33-38, cls. 6, 10; *id.*, Figs. 2, 5-6, 8; Ex[1006], Fig. 3; Ex[1007], Fig. 3.  However, neither Vosteen nor Downs-Boiler expressly states the injection rate of activated carbon, or the ratio of bromine to activated carbon, and neither expressly identifies the precise downstream location of where to inject activated carbon.  In addition to these process parameters being well-known to a POSITA as a matter of routine implementation, a POSITA would have

been motivated to look to Nelson to provide these implementation details.  Ex[1002], ¶¶373, 493.

Whether starting with Vosteen or with Downs-Boiler, a POSITA would have been motivated to combine with Nelson, and would have had a reasonable expectation of success in applying the teachings of Nelson, because each of the references teach the use of bromine (particularly, HBr and/or $Br_2$) to increase the effectiveness of activated-carbon sorbents in removing mercury from coal-fired plants.  *See, e.g.*, Ex[1008], 2:54-61; Ex[1006], ¶¶[0018]-[0019], [0021]; Ex[1007], ¶¶[0021]-[0022], [0024]; Ex[1012], Title.  Further, Vosteen and Downs-Boiler each discloses the need to remove both elemental mercury (referred to as "metallic mercury") and oxidized mercury from the mercury-containing gas.  Ex[1008], 6:40-45, 10:7-61, Fig. 6; Ex[1006], ¶[0004]; Ex[1007], ¶[005].  A POSITA would have looked to Nelson, which quantifies a ratio of bromine on activated carbon, such that "the sorbent adsorbs its elemental mercury and oxidized mercury species." Ex[1012], 9:35-37; *see* 6:26-41.  Also, Nelson provides additional detail of the process already taking place in each of Vosteen and Downs-Boiler, that when bromine adsorbs onto activated carbon, a chemical reaction takes place.  Ex[1002], ¶¶374-375, 494-495.

77

### C. DISCLOSURE OF VOSTEEN IN VIEW OF NELSON, AND DOWNS-BOILER IN VIEW OF NELSON

In addition to the reasons described in Grounds 1-2 (Vosteen) and Grounds 3-4 (Downs-Boiler), further analyses for why Vosteen in view of Nelson, and why Downs-Boiler in view of Nelson renders the Challenged Claims obvious are presented below.

#### 1. Claims 24 and 30

##### a. *Elements 24(c):* "the activated carbon reacts with the halogen or halide promoter in the mercury-containing gas to form a promoted sorbent".

##### b. *Claim 30:* "the mercury/sorbent composition comprises the element bromine, the sorbent material, and mercury" [claim 30]

As described in Grounds 1 and 2, Vosteen discloses that bromine oxidizes mercury to form $HgBr_2$, and "[m]ercury bromide $HgBr_2$ adsorbs more strongly to dry sorbents." Ex[1008], 5:35-39. Similarly, and as described in Grounds 3 and 4, Downs-Boiler states that the adsorption between the mercury bromide and the sorbent occurs "due to the higher reactivity of oxidized mercury with PAC." Ex[1006], ¶[0016]; Ex[1007], ¶[0019].

A POSITA would have understood that not all bromine added to the coal/chamber in Vosteen and in Downs-Boiler is used to oxidize mercury. For example, Vosteen discloses in the mercury-containing gas that "the mass ratio of

bromine to mercury in the flue gas is in the range from $10^2$ to $10^4$.” Ex[1008], 4:33-38; *see* Figs. 2, 5-6, 8 (Br concentration in flue gas).   Likewise, Downs-Boiler discloses bromine concentration in the flue gas in excess of that needed to oxidize mercury.   Ex[1006], Ex[1007], Fig. 3.   Accordingly, a POSITA would have understood that excess bromine would be available to contact the activated carbon to form a promoted sorbent.  Ex[1002], ¶¶376-378, 496-497.

Vosteen and Downs-Boiler each describe that the bromine promoter includes $Br_2$ and/or HBr.   Ex[1008], 2:54-61, 4:4-33; Ex[1006], ¶¶[0018-0019], [0021]; Ex[1007], ¶¶[0021-0022], [0024].

Nelson describes the underlying processes that occur when bromine-containing gases (particularly HBr and $Br_2$) contact activated carbon, as in each of Vosteen and Downs-Boiler.   Nelson explains that the bromine acts as a halogen/halide promoter in that the HBr and $Br_2$ “increase the ability of the carbonaceous substrate [activated carbon] to adsorb mercury and mercury-containing compounds.”  Ex[1012], Abstract; *see* 5:12-17, 8:35-36, 11:20-21, 16:5-6, Fig. 1.  Regarding Element 24(c), Nelson describes that the activated carbon “will both physically adsorb the bromine species at [step 4 in Figure 1] and chemically react with them.”  Ex[1012], 8:21-30, Fig. 1 (excerpted and annotated below); *see* 2:36-37, 6:26-34, 7:45-51, 8:8-30, 14:44-48.



Nelson is describing the same halide promoters in Vosteen and Downs-Boiler (Br$_2$ and HBr), and the same sorbent (activated carbon). Accordingly, Nelson discloses what was already known in the art and taking place in Vosteen and Downs-Boiler, namely that bromine-containing species (particularly HBr and Br$_2$) chemically react with activated carbon to form a promoted sorbent and increase its effectiveness to capture mercury. Ex[1002], ¶¶379, 497.

Regarding Element 24(c) and Claim 30, Nelson describes that when mercury contacts the activated carbon, a mercury/sorbent composition is formed that contains mercury, halide promoter (bromide), and sorbent (activated carbon). "When the PAC is then injected into the flue gas, the ***elemental mercury and oxidized mercury species there appear to react with at least one form of the bromine-carbon surface compounds that were created and are held fast***....[T]he mercury has been chemically adsorbed, rather than just physically adsorbed[.]" Ex[1012], 6:26-41; *see* 9:35-37. Ex[1002], ¶¶379, 497.

### 2.   Claims 2-3: "removing greater than 70 wt% of the mercury in the mercury-containing gas [cl. 3—on the sorbent]"

As described in Ground 2, Vosteen discloses removing greater than 98% of the mercury in the mercury-containing gas.  Ex[1008], Fig. 5, 1:50-52, 8:22-38.  And as described in Ground 4, Downs-Boiler illustrates removing at least 77% of the mercury from the mercury-containing gas. Ex[1006], Ex[1007], Fig. 3.

As also described for Claim 3 in Grounds 2 and 4, a POSITA would have been motivated, and would have had a reasonable expectation of success through routine process optimization, of achieving greater than 70% mercury removal on the sorbent itself.  Nelson provides additional motivation to achieve 70% mercury removal on the sorbent itself.  For example, Figure 15 of Nelson plots the "Hg vapor removal (%) *due to sorbent*," as opposed to other components such as unburnt carbon or a scrubber.

Petition for IPR2020-00834
USP 10,343,114



Ex[1012], Fig. 15.  At a sorbent injection rate of approximately 4 lbs/MMacf, Nelson achieves above 70% removal on the sorbent.  Ex[1012], 15:35-38.  At a sorbent injection rate of 5 lbs/MMacf, the sorbent itself would have removed even more mercury.  Accordingly, a POSITA would have been motivated to, and capable of, removing 70% or more mercury from the mercury-containing flue gas, including on the sorbent.  Ex[1002], ¶¶383-384, 499.

### 3.    Claims 4, 29

a.  **_Claim 4:_** **_"The method of claim 1, wherein the sorbent in the mercury-containing gas comprises about 1 g to about 30 g of the halogen or halide promoter per 100 g of the sorbent material."_**

b.  **_Claim 29:_**  **_"The method of claim 25, wherein the mercury-containing gas comprises about 1 g to about 30 g of the element bromine per 100 g of the sorbent."_**

Claims 4 and 29 are merely an attempt to claim an optimal or workable range for combining a conventional halogen (bromine) being used in a conventional way with a conventional sorbent (activated carbon).  The claimed range presents nothing more than optimization of "result-effective" variables that would have been obvious to a POSITA.  _Applied Materials_, 692 F.3d at 1297-98.

So too, during prosecution of the '114 Patent, the Examiner noted that "[t]he Nelson reference discloses optimizing the amount [of bromine] so as to obtain a desired mercury reactivity."  Ex[1026], 1611.  In particular, the Examiner explained "[i]t would have been obvious to one having ordinary skill in the art before the invention was made to have modified [prior art] to include the promoted sorbent comprises about 1 g to about 30 g of the halogen or halide promoter per 100 g of the sorbent material so as to…ensure optimum reaction between the halogen and the activated carbon….[W]here the general conditions of a claim are disclosed in the prior art, discovering the optimum or workable ranges involves only routine skill in

the art."  *Id.* (quoting *in re Aller*, 220 F.2d 454, 456 (CCPA 1955)).  Ex[1002], ¶¶380-381, 498.

A POSITA would have understood that Nelson describes a promoted activated-carbon sorbent formed from about 1 g to about 30 g of bromide per 100 g of sorbent.  "While over 30 wt % of $Br_2(g)$ can be adsorbed into some powdered activated carbons, for example, significant increases in mercury reactivity will be observed with only about 1 wt % $Br_2(g)$ in the PAC."  Ex[1012], 8:35-40.  Ex[1002], ¶¶382, 498.

### 4. **Claims 17-18: "the injection of the sorbent material into the mercury-containing gas occurs upstream of [cl. 17—an air pre-heater] [cl. 18—a particulate separator or a scrubber]" (Vosteen in view of Nelson)**

Claims 17-18 would have been obvious over Vosteen in view of Nelson. Regarding claim 17, and as described in Ground 2, Vosteen discloses that the activated-carbon sorbent is injected upstream of the fabric filter, in that the fabric filter separates the mercury-sorbent composition from the gas stream.  Ex[1008], 5:24-29.  Similarly, Nelson also discloses an embodiment in which "sorbent flows with flue gas to a fabric filter" that causes "intimate contact between the sorbents and the remaining mercury in the flue gas," such that the flue gas is "[c]leansed of its mercury content and particulates."  Ex[1012], 9:30-52.  Accordingly, Nelson clarifies the disclosure of Vosteen, that the activated-carbon sorbent would have

been injected upstream of a particulate separator (such as a fabric filter).  Ex[1002], ¶¶385-387.

Regarding claim 18, Vosteen also describes an embodiment with an electrostatic precipitator (ESP) as a particulate separator.   Ex[1008], 5:28-39.  However, Vosteen does not expressly state the injection location of activated-carbon sorbent for such an embodiment.  A POSITA would have used Nelson to clarify the disclosure of Vosteen, particularly, where to inject the activated-carbon sorbent for those plants configured with an ESP.  Nelson describes injecting "sorbents to a plant which has a 'hot-side' ESP" and, in which, "air preheater 22 follows the ESP 32." Ex[1012], 10:9-12.  Figure 4 of Nelson explains that the activated carbon is injected "from bin 71," which is upstream from the air-preheater (item 22) and upstream from a particulate separator (item 32).  Ex[1012], 10:9-26, Fig. 4.



Thus, Nelson clarifies the disclosure of Vosteen in that for a plant with an ESP followed by a pre-heater, the injection of activated carbon would have been upstream of both.  Ex[1002], ¶¶386-387.

### 5. Claim 17:  "the injection of the sorbent material into the mercury-containing gas occurs upstream of an air pre-heater." (Downs-Boiler in view of Nelson)

Claim 17 would have been obvious over Downs-Boiler in view of Nelson.  As described in Ground 4, Downs-Boiler describes "particulate collectors" including electro static precipitators (ESP) for "removal of particulate-bound mercury." Ex[1006], ¶[0003], Figs. 5-6; Ex[1007], ¶[004], Figs. 5-6.



FIG. 5

Petition for IPR2020-00834
USP 10,343,114

A POSITA would have used Nelson to clarify the disclosure of Downs-Boiler,

particularly, where to inject the activated-carbon sorbent for coal-fired utility plant

configured with an ESP.  Nelson describes injecting "sorbents to a plant which has

a 'hot-side' ESP" and, in which, "air preheater 22 follows the ESP 32."  Ex[1012],

10:9-12.  Figure 4 of Nelson shows the activated carbon injected "from bin 71,"

which is upstream from the air-preheater (item 22).  Ex[1012], 10:9-26, Fig. 4.



Thus, Nelson clarifies that for a plant with an ESP followed by a pre-heater, the

injection of activated carbon would have been upstream of both.  Ex[1002], ¶¶500-

501.

## XII.    <u>CONCLUSION</u>

Petitioners respectfully request that IPR of the '114 Patent be instituted and

that the Challenged Claims be cancelled as unpatentable.

Petition for IPR2020-00834
USP 10,343,114

Respectfully submitted,

BAKER BOTTS L.L.P.

April 21, 2020
Date

/Brian W. Oaks/
Brian W. Oaks (Reg. 44,981)
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
Phone: (512) 322-5470

David J. Tobin (Reg. 60,776)
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980

Elizabeth D. Flannery (Reg. 59,509)
Thomas B. Carter, Jr. (Reg. 76,040)
910 Louisiana Street
Houston, Texas 77002-4995

ATTORNEYS FOR PETITIONERS

Petition for IPR2020-00834
USP 10,343,114

# **CERTIFICATE OF COMPLIANCE**

Pursuant to 37 C.F.R. §42.24(d), the undersigned certifies that the foregoing Petition, exclusive of the exempted portions as provided in 37 C.F.R. §42.24(a), contains 13,996 words which is no more than 14,000 words and therefore complies with the type-volume limitations of 37 C.F.R. §42.24(a). The word count was calculated by starting with Microsoft Word's total document word count and subtracting the words for the Table of Contents, the Exhibit List, the Mandatory Notices, the Certificate of Compliance, and the Certificate of Service.


Dated: April 21, 2020          /Brian w. Oaks/_____
                               Brian W. Oaks (Reg. No. 44,981)
                               98 San Jacinto Blvd., Suite 1500
                               Austin, Texas 78701
                               Phone: (512) 322-2500

                               LEAD ATTORNEY FOR PETITIONERS

Petition for IPR2020-00834
USP 10,343,114

## CERTIFICATE OF SERVICE

In accordance with 37 C.F.R. §§42.6(e) and 42.105, the undersigned certifies

that on the 21st day of April, 2020, a complete and entire copy of the PETITION

FOR *INTER PARTES* REVIEW ("petition"), Power of Attorney and related Exhibits

were served on Patent Owner at the correspondence address of record for the subject

patent,

SCHWEGMAN LUNDBERG & WOESSNER, P.A.
P.O. BOX 2938
MINNEAPOLIS MN 55402

via Express Mail or by means at least as fast and reliable as Express Mail.

Additionally, a courtesy copy was served via electronic mail on the Patent

Owner's counsel at the following email address:

**CALDWELL CASSADY CURRY PC**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201

Bradley W. Caldwell (Texas Bar No. 24040630)
bcaldwell@caldwellcc.com

and
Justin T. Nemunaitis (Texas Bar No. 24065815)
jnemunaitis@caldwellcc.com

90

Petition for IPR2020-00834
USP 10,343,114

Dated: April 21, 2020 /Brian W. Oaks/
Brian W. Oaks (Reg. No. 44,981)
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701

LEAD ATTORNEY FOR PETITIONERS