# EXHIBIT H

UNITED STATES PATENT AND TRADEMARK
OFFICE

PATENT TRIAL AND APPEAL BOARD

---

NRG Energy, Inc.,
Talen Energy Corporation, and
Vistra Energy Corp.

Petitioners

v.

Midwest Energy Emissions Corp.

Patent Owner

---

IPR2020-00928
Patent No. 8,168,147

**PETITION FOR *INTER PARTES* REVIEW**

Petition for IPR2020-00928
USP 8,168,147

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................................. i

TABLE OF EXHIBITS ............................................................................... vii

I.      INTRODUCTION ...........................................................................1

II.     MANDATORY NOTICES UNDER 37 C.F.R. §42.8(a)(1)...........................1

        A.      Real Party-In-Interest under 37 C.F.R. §42.8(b)(1) ............................1

                1.      Additional Potential Real Parties in Interest Identified by
                        Talen...................................................................................2

                2.      Additional Potential Real Parties in Interest Identified by
                        Vistra..................................................................................4

                3.      Additional Potential Real Parties in Interest Identified by
                        NRG...................................................................................6

        B.      Related Matters under 37 C.F.R. §42.8(b)(2) ...................................6

        C.      Lead and Back-Up Counsel under 37 C.F.R. §42.8(b)(3) ...................8

        D.      Service Information under 37 C.F.R. §42.8(b)(4)...............................8

        E.      Fees.....................................................................................9

III.    REQUIREMENTS FOR IPR UNDER 37 C.F.R. §42.104...........................9

        A.      Standing.................................................................................9

        B.      Asserted References and Prior-Art Status.........................................9

        C.      Identification of Challenged Claims ..............................................10

        D.      The Board Should Not Deny Institution ..........................................10

IV.     OVERVIEW ...............................................................................11

        A.      Level of Ordinary Skill ..............................................................11

        B.      The Alleged Invention of the '147 Patent .........................................11

        C.      Prosecution History of the '147 Patent ...........................................12

        D.      State of the Art .......................................................................15

                1.      Coal-Fired Plants...................................................................15

                2.      EPA Regulations...................................................................16

3.       Mercury Removal Using Activated Carbon and Halogens ......16

V.     CLAIM CONSTRUCTION ........................................................................19

VI.    The Priority Date For Claims 18-19 Is No Earlier Than April 6, 2009 ........19

       A.      PO Carries the Burden in Demonstrating Priority .............................20

       B.      PO Cannot Rely on the Provisional For Support ...............................22

               1.       The Contents of the Provisional Were Not Present in Any
                        Intervening Application ...........................................................22

               2.       No Disclosure of Claims 18-19 in Provisional ........................25

       C.      There is No Disclosure Supporting Claims 18-19 In Intervening
               Applications Between the Provisional and the '147 Patent ...............28

VII.   GROUND 1: Claims 18-19 Are obvious over Lissianski-Presentation
       in view of Olson-646 .......................................................................................34

       A.      Overview of Ex[1011] ("Lissianski-Presentation") ..........................34

       B.      Prior Art Status of Lissianski-Presentation ......................................35

       C.      Overview of Ex[1014] ("Olson-646") ...............................................39

       D.      Prior Art Status of Olson-646............................................................42

       E.      Reasons to Combine References .........................................................42

       F.      Claim 1 ...............................................................................................47

               1.       Claim 1: Preamble—"A method for separating mercury
                        from a mercury containing gas comprising:" ...........................47

               2.       Element 1(a)(1)—"promoting at least a portion of a
                        particulate sorbent material comprising activated carbon
                        by chemically reacting the sorbent material with a
                        bromine containing promoter to form a promoted
                        brominated sorbent,"...............................................................51

               3.       Element 1(a)(2) —"wherein the bromine containing
                        promoter is in gaseous form, vapor form, or non-aqueous
                        liquid form,"............................................................................58

               4.       Element 1(a)(3) —"the activated carbon contains
                        graphene sheets having carbene species edge sites".................59

               5.       Element 1(a)(4) —"which react with the bromine
                        containing promoter to form a carbocation paired with a

bromide anion in the promoted brominated sorbent for
oxidation of the mercury;" ........................................................ 61

6.   Element 1(b) —"chemically reacting elemental mercury
     in the mercury containing gas with the promoted
     brominated sorbent to form a mercury/sorbent chemical
     composition;" ........................................................ 62

7.   Element 1(c) —"separating particulates from the mercury
     containing gas, the particulates including ash and the
     mercury/sorbent chemical composition." ................................. 65

G.   Dependent Claims .......................................................... 68

1.   Claim 17 ............................................................. 68

2.   Claim 18. "A method according to claim 17, wherein the
     gas stream is a mercury containing gas." .............................. 74

3.   Claim 19. "A method according to claim 18, wherein the
     gas stream is a transport gas." ...................................... 75

VIII. Ground 2: Claims 18-19 Are Obvious Over Sjostrom in view of
      Olson-646 ................................................................ 75

A.   Overview of Ex[1010] ("Sjostrom") ...................................... 75

B.   Prior Art Status of Sjostrom ........................................... 78

C.   Reasons to Combine References .......................................... 80

D.   Claim 1 ................................................................. 84

1.   Preamble —"A method for separating mercury from a
     mercury containing gas comprising:" .................................. 84

2.   Element 1(a)(1) —"promoting at least a portion of a
     particulate sorbent material comprising activated carbon
     by chemically reacting the sorbent material with a
     bromine containing promoter to form a promoted
     brominated sorbent," ................................................ 85

3.   Element 1(a)(2) —"wherein the bromine containing
     promoter is in gaseous form, vapor form, or non-aqueous
     liquid form," ........................................................ 90

4.   Element 1(a)(3)—"wherein the activated carbon contains
     graphene sheets having carbene species edge sites" ................... 91

5.  Element 1(a)(4) —"which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury;" ....................................................93

6.  Claim 1: Element 1(b) —"chemically reacting elemental mercury in the mercury containing gas with the promoted brominated sorbent to form a mercury/sorbent chemical composition; and" ...................................................93

7.  Element 1(c) —"separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent chemical composition." .................................95

E.  Dependent Claims .............................................................97

1.  Claim 17 .................................................................97

2.  Claim 18: "A method according to claim 17, wherein the gas stream is a mercury containing gas." ...............................102

3.  Claim 19: "A method according to claim 18, wherein the gas stream is a transport gas." ....................................104

IX.  CONCLUSION ........................................................104

CERTIFICATE OF COMPLIANCE ...................................................106

CERTIFICATE OF SERVICE ........................................................107

Petition for IPR2020-00928
USP 8,168,147

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Baxter Pharm. Prod., Inc.*,
   471 F.3d 1363 (Fed. Cir. 2006) ........................................................52

*Alcon Research, Ltd. v. Apotex Inc.*,
   687 F.3d 1362 (Fed. Cir. 2012) ........................................................55

*Apple Inc. v. Fintiv, Inc.*,
   IPR2020-00019, Paper 11 (P.T.A.B. Mar. 20, 2020) .........................10

*Becton, Dickinson & Co. v. B. Braun Melsungen AG*,
   IPR2017-01586, Paper 8 (Dec. 15, 2017)...........................................10

*Callaway Golf Co. v. Acushnet Co.*,
   576 F.3d 1331 (Fed. Cir. 2009) ........................................................23

*GoPro, Inc. v. Contour IP Holding LLC*,
   908 F.3d 690 (Fed. Cir. 2018) ..........................................................36

*In re Applied Materials, Inc.*,
   692 F.3d 1289 (Fed. Cir. 2012) .................................................73, 102

*In re Crish*,
   393 F.3d 1253 (Fed. Cir. 2004) ........................................................52

*Koninklijke Philips N.V. v. Google LLC*,
   948 F.3d 1330 (Fed. Cir. 2020) ........................................................15

*Lockwood v. Am. Airlines, Inc.*,
   107 F.3d 1565 (Fed. Cir. 1997) ...................... 20, 21, 22, 25, 27, 28, 31

*Midwest Energy Emissions Corp. and MES Inc. v. Vistra Energy Corp.*,
   No. 1:19-cv-01334-RGA (D. Del.)................................................2, 6

*Nat. Alternatives Int'l, Inc. v. Iancu*,
   904 F.3d 1375 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 2014 (2019) ..............20

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007) ...........................................................45, 62, 93

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) .............................................................9, 20, 21

*Purdue Pharma L.P. v. Faulding Inc.*,
    230 F.3d 1320 (Fed. Cir. 2000) ........................................................................27

*Zenon Envtl., Inc. v. U.S. Filter Corp.*,
    506 F.3d 1370 (Fed. Cir. 2007) ........................................................................23

## STATUTES

35 U.S.C. §111 ...................................................................................................24

35 U.S.C. §122(b)(2)(A)(iii) ..............................................................................24

## OTHER AUTHORITIES

37 C.F.R. §1.57(c) (2005) ..................................................................................24

37 C.F.R. §1.57(d) (2020) ..................................................................................24

37 C.F.R. §1.121(d) (2020) ................................................................................15

37 C.F.R. §1.121(d) (2009) ................................................................................15

M.P.E.P. §201.08 .........................................................................................11, 21

M.P.E.P. §714(D)...............................................................................................15

Petition for IPR2020-00928
USP 8,168,147

## TABLE OF EXHIBITS

| Ex. | Description |
|---|---|
| 1001 | U.S. Patent No. 8,168,147 to Olson et al. (filed April 6, 2009) (**"'147 Patent" or "Challenged Patent"**) |
| 1002 | Reserved |
| 1003 | Declaration of Dr. Stephen Niksa in Support of Petition for *Inter Partes* Review of U.S. Patent No. 8,168,147 (**"'147 Niksa Decl."**) |
| 1004 | Curriculum Vitae of Dr. Stephen Niksa (**"Curriculum-Vitae"**) |
| 1005 | *Midwest Energy Emissions Corp. v. Vistra Energy Corp. et al.*, Case No. 1:19-cv-01334, Dkt. No. 1 (D. Del. July 17, 2019) (**"Complaint"**) |
| 1006 | U.S. Patent Pub. No. 2008/0107579 to Downs et al. (published May 8, 2008) (**"Downs-Boiler"**) |
| 1007 | U.S. Patent No. 5,435,980 to Felsvang (filed Nov. 4, 1991) (**"Felsvang"**) |
| 1008 | U.S. Patent No. 6,878,358 to Vosteen et al. (filed May 6, 2003) (**"Vosteen"**) |
| 1009 | Proposed National Emission Standards for Hazardous Air Pollutants; and, in the Alternative, Proposed Standards of Performance for New and Existing Stationary Sources: Electric Utility Steam Generating Units, 69 Fed. Reg. 4652-4752 [Volume 69, No. 20] (Jan. 30, 2004) (**"EPA-Proposal"**) |
| 1010 | Sharon Sjostrom, "Full Scale Evaluations of Mercury Control Technologies with PRB Coals," Track A, Session A3 (Mercury – Control), Presentation A3b, EUEC: 8th Electric Utilities Environmental Conference (Tucson, Arizona: January 25, 2005) (**"Sjostrom"**) |

Petition for IPR2020-00928
USP 8,168,147

| Ex. | Description |
|---|---|
| 1011 | Vitali Lissianski, "Integrated Approach to Multi-Pollutant Control," Track B, Session B3 (Mercury – Control), Presentation B3.5, EUEC: 9TH ELECTRIC UTILITIES ENVIRONMENTAL CONFERENCE (Tucson, Arizona: January 24, 2006) (**"Lissianski-Presentation"**) |
| 1012 | U.S. Patent No. 6,953,494 to Nelson, (filed May 6, 2003) (**"Nelson"**) |
| 1013 | U.S. Patent Pub. No. 2004/0003716 to Nelson (published Jan. 8, 2004) (**"Nelson Publication"**) |
| 1014 | U.S. Patent Pub. No. 2006/0048646 to Olson et al. (published Mar. 9, 2006) (**"Olson-646"**) |
| 1015 | U.S. Patent Pub. No. 2007/0180990 to Downs et al. (published Aug. 9, 2007) (**"Downs-Halogenation"**) |
| 1016 | U.S. Patent Prov. App. No. 60/555,281 (filed Mar. 22, 2004) (**"Downs-Halogenation-Provisional"**) |
| 1017 | Family Tree of '114 and '147 Patents, Showing Parent Patent Applications (**"Family Tree"**) |
| 1018 | Redline comparison between U.S. Patent Pub. No. 2007/0180990 (Downs-Halogenation, Ex. 1015) and U.S. Patent Prov. Appl. No. 60/555,281 (Downs-Halogenation-Provisional, Ex. 1016), using Downs-Halogenation-Provisional as the original version (**"Downs-Halogenation-Redline"**) |
| 1019 | File History for U.S. Patent No. 8,168,147 (**"'147 Patent File History"**) |
| 1020 | File History of U.S. Patent Prov. App. No. 60/605640 (**"Provisional"**) |
| 1021 | File History of U.S Patent Application No. 11/209,163 (**"'163 Application File History"**) |

| Ex. | Description |
|-----|-------------|
| 1022 | File History of U.S Patent Application No. 12/201,595 (**"'595 Application File History"**) |
| 1023-1026 | RESERVED |
| 1027 | Babcock & Wilcox, STEAM: ITS GENERATION AND USE, 40th ed. (The Babcock & Wilcox Company: 1992) (**"B&W: Steam"**) |
| 1028 | J. Bustard, S. Sjostrom, et al., "Full Scale Evaluation of Sorbent Injection for Mercury Control on Coal-Fired Power Plants," International Conference on Air Quality III, Paper No. A5-4 (Sept. 9-12, 2002: Arlington, VA) (**"Bustard"**) |
| 1029 | U.S. Patent No. 1,984,164 to Stock et al. (issued Dec. 11, 1934) (**"Stock"**) |
| 1030 | Electric Utilities Environment Conference 2005 Handout (**"2005 EUEC Handout"**) |
| 1031 | Scan of CD mailed to conference attendees from EUEC: 8th Electric Utilities Environmental Conference (Tucson, Arizona: January 23-26, 2005) (**"2005 EUEC CD Scan"**) |
| 1032 | 37 C.F.R. § 1.121 (2009) |
| 1033 | 35 U.S.C. § 111 (2006) |
| 1034 | 35 U.S.C. § 122 (2006) |
| 1035 | 37 C.F.R. § 1.57 (July 1, 2005) |
| 1036 | U.S. Patent No. 7,514,052 to Lissianski et al. (filed Jan. 6, 2004) (**"Lissianski-Patent"**) |

| Ex. | Description |
|---|---|
| 1037 | Paul Chu, "Power Plant Evaluation of the Effect of SCR Technology on Mercury," Paper No. 106, COMBINED POWER PLANT AIR POLLUTANT CONTROL MEGA SYMPOSIUM (MEGA) (Washington, DC: May 19-22, 2003) (**"Power Plant Evaluation"**) |
| 1038 | Evan J. Granite et al., "Sorbents for Mercury Removal from Flue Gas," DOE/FETC/TR–98-01, U.S. Department of Energy (Jan. 1998) (**"Granite"**) |
| 1039 | Thomas J. Feeley, et al., "A Review of DOE/NETL's Mercury Control Technology R&D Program for Coal-Fired Power Plants," *DOE/NETL &g R&D Program Review* (April 2003) (**"Feeley"**) |
| 1040 | Oxtoby et al., PRINCIPLES OF MODERN CHEMISTRY, 4th ed (Saunders College Publishing: 1999) (**"Oxtoby"**) |
| 1041 | N.N. Greenwood and A. Earnshaw, CHEMISTRY OF THE ELEMENTS, 2nd ed. (Butterworth-Heinemann: 1997) (**"Greenwood"**) |
| 1042 | B.R. Puri, *Surface Complexes on Carbons*, *in* CHEMISTRY AND PHYSICS OF CARBON 191 (Philip L. Walker, ed.) (Marcel Dekker: 1970) (**"Puri"**) |
| 1043 | Frank E. Huggins et al., "XAFS Examination of Mercury Sorption on Three Activated Carbons," *Energy & Fuels* 1999(13), p. 114-121 (1999) (**"XAFS"**) |
| 1044 | S. Niksa et al., *Predicting Complete Hg Speciation Along Coal-Fired Utility Exhaust Systems*, MEGA SYMPOSIUM, Paper # 45 (Washington, DC: 2004) (**"Hg Speciation"**) |
| 1045 | D.L. Laudal et al., *Evaluation of Mercury Speciation at Power Plants Using SCR and SNCR NOx Control Technologies*, Paper No. A5-01, INT'L CONF. ON AIR QUALITY III (Arlington, VA: Sept. 9-12, 2002) (**"Laudal"**) |

| Ex. | Description |
|---|---|
| 1046 | Radovic, Ljubisa R., et al., *What (Exactly) is on the Edges of Graphene Layers in Carbon: the Unfolding Story*, Fuel Chemistry Div. Preprints, 428 (2002) **("Radovic")** |
| 1047 | Electric Utilities Environment Conference 2006 Handout **("2006 EUEC Handout")** |
| 1048 | Scan of CD mailed to conference attendees from EUEC: 9th Electric Utilities Environmental Conference (Tucson, Arizona: January 22-25, 2006) **("2006 EUEC CD Scan")** |
| 1049 | PDF copy of the attendee list from the 2006 EUEC ("**2006 EUEC Attendee List**") |
| 1050 | EUEC 2006 home page, available at https://web.archive.org/web/20060204211859/http:/euec.com/ ("**EUEC 2006 Home Page**") |
| 1051 | *Ex Parte Jacobson*, No. 2009-003022, Decision on Appeal, Slip op. (B.P.A.I. Feb. 1, 2010) |
| 1052 | RESERVED |
| 1053 | U.S. EPA, AP-42: External Combustion Sources, Chapter 1: Fifth Edition, Volume I (Sep. 1998), available at https://www3.epa.gov/ttn/chief/ap42/ch01/index.html (last visited Apr 10, 2020) **("Chapter 1 of AP-42")** |
| 1054 | U.S. DOE, Mercury Emissions Control - Regulatory Drivers (Jan. 24, 2003), available at https://web.archive.org/web/20030416142937/http:/www.netl.doe.gov/coalpower/environment/mercury/regs.html **("Mercury Emissions Control")** |

| Ex. | Description |
|---|---|
| 1055 | Clean Air Mercury Rule: Basic Information, available at https://web.archive.org/web/20050920005951/http:/www.epa.gov/mercuryrule/basic.htm (**"Clean Air Mercury Rule"**) |
| 1056 | EPA Newsroom, "EPA Announces First-Ever Rule to Reduce Mercury Emissions from Power Plants" (Mar. 15, 2005), available at: https://archive.epa.gov/epapages/newsroom_archive/newsreleases/91ab7266e65751b985256fc50067d9b0.html  (**"3/15/2005 EPA Press Release"**) |
| 1057 | EPA Newsroom, "Public Comment Period Begins for Proposed Power Plant Regulations" (Jan. 29, 2004), available at: https://archive.epa.gov/epapages/newsroom_archive/newsreleases/4daf1d46e8dd755c85257036005511f9.html (**"1/29/2004 EPA Press Release"**) |
| 1058 | EPA Newsroom, "EPA Supplements Proposal to Reduce Power Plant Mercury Emissions," (Feb. 24, 2004), available at: https://archive.epa.gov/epapages/newsroom_archive/newsreleases/5810096dabfc9eba85256e440078905f.html (**"2/24/2004 EPA Press Release"**) |
| 1059 | Sharon Sjostrom et al., "Field Studies of Mercury Control Using Injected Sorbents," AWMA ANNUAL MEETING, Session Ae-1b (2002) (**"Field Studies of Mercury Control"**) |
| 1060 | EPA, "Mercury Study Report to Congress Volume VIII: An Evaluation of Mercury Control Technologies and Costs," EPA Report No. EPA-452/R-97-010 (Dec. 1997), available at https://www3.epa.gov/airtoxics/112nmerc/volume8.pdf (**"EPA 1997 Mercury Study Report Vol. VIII"**) |
| 1061 | EUEC 2005 home page, available at https://web.archive.org/web/20050303090129/http:/www.euec.com/ (**"EUEC 2005 Home Page"**) |

| Ex. | Description |
|---|---|
| 1062 | Charlene R. Crocker et al., "Mercury Control with the Advanced Hybrid Particulate Collector Technical Progress Report," U.S. DOE-NETL (Nov. 2003) (**"Crocker"**) |
| 1063-1069 | RESERVED |
| 1070 | Roop Chand Bansal, et al., ACTIVE CARBON (Marcel Dekker:1988) 1988. 482 pages (scan received from Library of Congress via Baker Botts) (**"Bansal"**) |
| 1071-1078 | RESERVED |
| 1079 | E. S. Olson, et al.  "Chemical Mechanism in Mercury Emission Control Technologies."  Published in *Journal de Physique IV, XIIth International Conference on Heavy Metals in the Environment: Proceedings*.  Grenoble, France, May 26-30, 2003.  Volume 107. May 2003. Volume 2. Pages. 979-982.  EDP Sciences, edited by C. Boutron and C. Ferrari (copy received from MIT Libraries) (**"Olson-Paper"**) |

Other than prosecution histories, Ex[1019]-Ex[1022], and as otherwise noted herein, all citations to exhibits reference original page numbers found in the underlying document, and all emphases are added.

## I.    INTRODUCTION

Petitioners request IPR of only Claims 18 and 19 of U.S. Patent No. 8,168,147 (the "**'147 Patent**" or "**Challenged Patent**").  Ex[1001].  The Petition is supported by the expert declaration of Dr. Stephen Niksa.  Ex[1003] (declaration); Ex[1004] (CV).

## II.    MANDATORY NOTICES UNDER 37 C.F.R. §42.8(A)(1)

### A.    REAL PARTY-IN-INTEREST UNDER 37 C.F.R. §42.8(B)(1)

The real parties-in-interest are the Petitioners NRG Energy, Inc. (**"NRG"**), Talen Energy Corporation (**"Talen"**), and Vistra Energy Corp. (**"Vistra"**) (collectively, **"Petitioners"**).

Petitioners also identify the following real-parties-in-interest: Brandon Shores LLC; Talen Generation LLC; H.A. Wagner LLC; IPH, LLC; Illinois Power Resources Generating, LLC; Dynegy Midwest Generation LLC; Dynegy Miami Fort, LLC;  NRG Texas Power LLC; Midwest Generation EME, LLC; and Midwest Generation, LLC.[1]  These entities are parties to a lawsuit where they have been

---

[1]   Although Dynegy Inc. and Talen Energy Holdings, Inc. are also listed in the complaint, those entities no longer exist, and thus Petitioners have not included them here.

1

accused of infringing the Challenged Patent. *Midwest Energy Emissions Corp. and MES Inc. v. Vistra Energy Corp.*, No. 1:19-cv-01334-RGA (D. Del.) (**"Delaware Litigation"**). Ex[1005] (Complaint).

### 1.    Additional Potential Real Parties in Interest Identified by Talen

Petitioner Talen Energy Corporation, out of an abundance of caution, also identifies Alstom Power, Inc., Brandon Shores Coaltech, LLC, Brunner Island Refined Coal LLC, Chem-Mod LLC, Clean Coal Solutions, LLC, C.P. Crane LLC, Con-C, LLC, Clyde Bergemann Delta Ducon, Inc., Montour Refined Coal LLC, and Wagner Coaltech, LLC as potential real parties-in-interest to the Petitioner Talen Energy Corporation.  These entities are vendors and suppliers with regards to certain allegedly infringing components at issue in the Delaware Litigation.  None of these companies have agreed to be listed as a real party-in-interest for this Petition.  None of these companies or any unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding.

In addition, Petitioner Talen Energy Corporation also identifies the following entities as potential real parties-in-interest out of an abundance of caution: Avista Corporation, Barney M. Davis, LP; BDW Corp.; Bell Bend, LLC; Brunner Island Services LLC; Brunner Island, LLC; C/R Topaz Holdings, LLC; Camden Plant Holding, LLC; Colstrip Comm Serv, LLC; Conemaugh Fuels, LLC; Dartmouth

Plant Holding, LLC; Dartmouth Power Associates Limited Partnership; Dartmouth Power Generation, LLC; Dartmouth Power Holding Company, LLC; Elmwood Energy Holdings, LLC; Elmwood Park Power, LLC; Fort Armistead Road – Lot 15 Landfill, LLC; Holtwood LLC; Interstate Energy Company LLC; Jade Power Generation Holdings LLC; Keystone Fuels, LLC; Lady Jane Collieries, Inc.; Laredo WLE, LP; Liberty View Power, LLC; LMBE Project Company; LMBE-MC Holdco I LLC; LMBE-MC Holdco II LLC; Lower Mount Bethel Energy, LLC; Martins Creek, LLC; MC OpCo LLC; MC Project Company LLC; MEG Generating Company, LLC; Millennium Power Partners, LP; Montour Services LLC; Montour Solar HoldCo LLC; Montour, LLC; Morris Energy Management Company, LLC; Morris Energy Operations Company, LLC; NBCP Urban Renewal Corporation; New Athens Generating Company, LLC; Newark Bay Cogeneration Partnership, LP; Newark Bay Holding Company, LLC; NorthEast Gas Generation GP, LLC; NorthEast Gas Generation Holdings, LLC; NorthEast Gas Generation, LLC; NorthWestern Corp.; Nueces Bay WLE, LP; PacifiCorp; Pedricktown Cogeneration Company LP; Pedricktown Investment Company LLC; Pedricktown Management Company LLC; Pennsylvania Mines, LLC; Portland General Electric Company; Puget Sound Energy, Inc.; Raven FS Property Holdings LLC; Raven Lot 15 LLC; Raven Power Finance LLC; Raven Power Fort Smallwood LLC; Raven Power

Generation Holdings LLC; Raven Power Group LLC; Raven Power Marketing LLC; Raven Power Operating LLC; Raven Power Property LLC; Realty Company of Pennsylvania; RMGL Holdings LLC; Sapphire Power Finance LLC; Sapphire Power Generation Holdings LLC; Sapphire Power LLC; Sapphire Power Marketing, LLC; Susquehanna Nuclear, LLC; Talen Energy Marketing, LLC; Talen Energy Retail LLC; Talen Energy Services Group, LLC; Talen Energy Services Holdings, LLC; Talen Energy Services Northeast, Inc.; Talen Energy Supply, LLC; Talen Investment Corporation; Talen Land Holdings, LLC; Talen Montana Holdings, LLC; Talen Montana, LLC; Talen MS Holdings LLC; Talen NE LLC; Talen Nuclear Development, LLC; Talen Receivables Funding, LLC; Talen Solar Holdings LLC; Talen Treasure State, LLC; Topaz Power Group GP II, LLC; Topaz Power Group LP II, LLC; Topaz Power Group, LLC; Topaz Power Holdings, LLC; Topaz Power Management II GP, LLC; Topaz Power Management II LP, LLC; Topaz Power Property Management II, LP; York Generation Company, LLC; and York Pant Holding, LLC.

## 2. Additional Potential Real Parties in Interest Identified by Vistra

Petitioner Vistra Energy Corp., out of an abundance of caution, also identifies Bascobert (A) Holdings, LLC; Calgon Carbon Corp.; CERT Operations RCB, LLC; Chem-Mod LLC; RC29, LLC; and RTRC Texas LLC as potential real parties-in-

interest to Petitioner Vistra.  These entities are vendors and suppliers with regards to certain allegedly infringing components at issue in the District Court litigation referenced in the Related Matters section below.  None of these companies have agreed to be listed as a real party-in-interest for this Petition.  None of these companies or any unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding.

In addition, Petitioner Vistra Energy Corp. also identifies the following entities as potential real parties-in-interest out of an abundance of caution:  Big Brown Power Company LLC; Coffeen and Western Railroad Company; Coleto Creek Power, LLC; Dynegy Coal Generation, LLC; Dynegy Coal HoldCo, LLC; Dynegy Commercial Asset Management, LLC; Dynegy Conesville, LLC; Dynegy Power Marketing, LLC; Dynegy Resource II, LLC; Dynegy Resources Generating Holdco, LLC; Dynegy Zimmer, LLC; Electric Energy, Inc.; EquiPower Resources Corp.; Havana Dock Enterprises, LLC; Illinois Power Generating Company; Illinois Power Resources, LLC; Joppa and Eastern Railroad Company; Kincaid Generation, L.L.C.; Luminant Generation Company LLC; NEPCO Services Company; Northeastern Power Company; Oak Grove Management Company; Sandow Power Company LLC; Vistra Asset Company LLC; Vistra Intermediate Company LLC; and Vistra Operations Company LLC.

### 3.   Additional Potential Real Parties in Interest Identified by NRG

Petitioner NRG Energy, Inc., out of an abundance of caution, also identifies ADA-ES, Inc., Alistar Enterprises, LLC, Cabot Corporation, Calgon Carbon Corporation, CERT Operations, LLC, CERT Operations IV, LLC, Chem-Mod LLC, Rutledge Products, LLC, and Senescence Energy Products, LLC.  These entities are vendors and suppliers with regards to certain allegedly infringing components at issue in the District Court litigation referenced in the Related Matters section below. None of these companies have agreed to be listed as a real party-in-interest for this Petition.  No unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding.

In addition, Petitioner NRG Energy, Inc. also identifies the following entities as potential real parties-in-interest out of an abundance of caution: NRG Texas LLC, NRG Midwest Holdings LLC, Mission Midwest Coal, LLC, Midwest Generation Holdings I, LLC, Midwest Generation Holdings II, LLC, Midwest Generation Procurement Services, LLC, Midwest Finance Company, LLC, NRG Energy Holdings, Inc., and NRG Acquisition Holdings Inc.

### B.   RELATED MATTERS UNDER 37 C.F.R. §42.8(B)(2)

Patent Owner ("PO") has asserted the Challenged Patent in district court in the following matter: *Midwest Energy Emissions Corp. and MES Inc. v. Vistra*

*Energy Corp.*, No. 1:19-cv-01334-RGA (D. Del.).  Ex[1005].  The case has multiple motions to dismiss filed under Rule 12(b)(6) pending resolution, and the Court only recently set a Rule 16 conference for June 15, 2020. None of the Petitioners have filed an answer to the Complaint, and the Court has not set a trial schedule.  PO has also asserted U.S. Patent No. 10,343,114 (the "'114 Patent") in the district court proceeding.  On April 21, 2020 Petitioners simultaneously filed two IPRs challenging the validity of the '114 Patent, IPR2020-00832 and IPR2020-00834.

According to U.S. Patent & Trademark Office Patent Application Information Retrieval (PAIR) system, the '147 Patent was filed as App. No. 12/419,219 (the "'219 Application") on April 6, 2009 and purports to claim priority as follows:

- Continuation of a U.S. Patent Application No. 12/201,595 filed on August 29, 2008 (the "'595 Application") and abandoned on September 30, 2010, which is a:

- Division of U.S. Patent Application No. 11/209,163, filed on Aug. 22, 2005 (the "'163 Application") and issued on September 24, 2008 as U.S. Patent No. 7,435,286, which is a non-provisional of:

- U.S. Provisional Patent Application No. 60/605,640, filed on August 30, 2004 (the "Provisional").

Petitioners are also concurrently filing another petition against the Challenged Patent.  The current petition asserts a priority date for the Challenged Claims (Claims 18-19) as no earlier than April 6, 2009, when the '147 Patent was filed, because the applications to which it claims priority do not contain support for Claims 18-19.  The

other, concurrently filed petition assumes *arguendo* that the Challenged Claims have priority to Aug. 30, 2004.

### C. LEAD AND BACK-UP COUNSEL UNDER 37 C.F.R. §42.8(B)(3)

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| Brian W. Oaks (Reg. 44,981)<br>Baker Botts L.L.P.<br>98 San Jacinto Boulevard, Suite 1500<br>Austin, TX 78701-4078<br>Tel:  512-322-5470<br>brian.oaks@bakerbotts.com | David J. Tobin (Reg. 60,776)<br>Baker Botts L.L.P.<br>2001 Ross Avenue, Suite 900<br>Dallas, TX 75201-2980<br>Tel: 214-953-6869<br>david.tobin@bakerbotts.com<br><br>Elizabeth D. Flannery (Reg. 59,509)<br>Baker Botts L.L.P.<br>910 Louisiana Street<br>Houston, Texas 77002-4995<br>Tel.: 713.229.2104<br>liz.flannery@bakerbotts.com<br><br>Thomas B. Carter, Jr. (Reg. 76,040)<br>Baker Botts L.L.P.<br>910 Louisiana Street<br>Houston, Texas 77002-4995<br>Tel.: 713.229.1505<br>thomas.carter@bakerbotts.com |

### D. SERVICE INFORMATION UNDER 37 C.F.R. §42.8(B)(4)

Petitioners may be served at lead counsel's address provided above and consent to e-mail service, provided it is made to all of the following e-mail addresses:

brian.oaks@bakerbotts.com, david.tobin@bakerbotts.com, and DLBB-ME2C-IPR@bakerbotts.com.

Petition for IPR2020-00928
USP 8,168,147

### E.   FEES

Payment for fees is authorized from Deposit Account 02-0384.

## III.   REQUIREMENTS FOR IPR UNDER 37 C.F.R. §42.104

### A.   STANDING

Petitioners certify the '147 Patent is eligible for IPR.  Petitioners are not barred

or estopped from requesting IPR on the grounds herein.

### B.   ASSERTED REFERENCES AND PRIOR-ART STATUS

| Reference | Prior-Art Status (Pre-AIA) |
|---|---|
| **Sjostrom**, Ex[1010], "Full-Scale Evaluations of Mercury Control Technologies with PRB Coals" | **§§102(a) and 102(b)**: presented January 25, 2005 at the 2005 Electric Utilities Environment Conference ("EUEC") and mailed to conference attendees February 2005 |
| **Lissianski-Presentation**, Ex[1011], "Integrated Approach to Multi-Pollutant Control" | **§§102(a) and 102(b):** presented January 24, 2006 at the 2006 EUEC and mailed to conference attendees February 2006 |
| **Olson-646**, Ex[1014], U.S. Patent Application Publication No. 2006/0048646 | **§102(b):** filed 8/22/2005 and published 3/9/2006 |

Each prior art reference was described in a printed publication or otherwise

available to the public more than one year before the effective filing date of Claims

18-19.  Patent Owner bears the burden "to prove entitlement to claim priority to an

earlier filing date."  *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304-

1305 (Fed. Cir. 2008).

## C.   IDENTIFICATION OF CHALLENGED CLAIMS

There is a reasonable likelihood that the petitioned claims are unpatentable as

being obvious under §103:

| Ground | '147 Claims | Basis for Challenge |
|--------|-------------|---------------------|
| 1. | 18-19 | Lissianski-Presentation in view of Olson-646 |
| 2. | 18-19 | Sjostrom in view of Olson-646 |

## D.   THE BOARD SHOULD NOT DENY INSTITUTION

The Board should not deny institution under Section 314(a), because the

district-court proceeding is in its early stages.  With multiple motions to dismiss

pending, the Court recently set a Rule 16 conference for June 15, 2020, but has not

provided a case schedule.   Petitioners have not answered the Complaint, and

discovery has not opened.  Any Final Written Decision would likely conclude before

trial.  *See Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11, at 6 (P.T.A.B. Mar.

20, 2020) (precedential).

The Board should not deny institution under Section 325(d) because the

Examiner did not consider Sjostrom or Lissianski-Presentation during prosecution.

*See Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8

at 17-18 (Dec. 15, 2017).   Accordingly, both Grounds present art that was not

previously before the office during prosecution.  While the '147 Patent cites Olson-

646, the Examiner did not use Olson-646 in a substantive rejection.  *Id.*, 17-18

(factors (a)-(d)).   Indeed, each of the references are dated after the earliest provisional application from which the '147 Patent purports to claim priority.   As discussed below, Examiners do not make findings of priority as a matter of course during prosecution, instead accepting applicant's asserted priority date.   M.P.E.P. §201.08.

## IV.   OVERVIEW

### A.   LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") would have at least a bachelor's degree in chemical engineering, mechanical engineering, or a related field of study with at least two years of experience with implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration. Ex[1003], ¶¶63-66.

### B.   THE ALLEGED INVENTION OF THE '147 PATENT

The '147 Patent relates to removing mercury from a flue gas.  Ex[1001], 1:29-31.  The Patent admits that known "mercury control methods" included "injection of fine sorbent particles into a flue gas duct" such as "activated carbon."  Ex[1001], 1:57-61.  Ex[1003], ¶¶207-210.  The Patent purports to improve mercury capture with "exceptionally reactive halogen/halide promoted carbon sorbents using a bromide (or other halogen/halide) treatment of the carbon."  Ex[1001], 6:19-23. Independent Claim 1 recites limitations directed towards the surface structure of

activated-carbon sorbent, and its chemical reactions with promoter and mercury. Ex[1003], ¶¶164-168.

### C.    PROSECUTION HISTORY OF THE '147 PATENT

The '147 Patent was filed April 6, 2009, purportedly claiming priority through a series of applications to U.S. Provisional Application No. 60/605,640, filed on August 30, 2004 ("Provisional").  Ex[1003], ¶169.



Ex[1017].   The file histories for the '147 Patent and its parent applications are

submitted with this Petition. Ex[1019]-Ex[1022].

After the initial filing of the '219 Application, the USPTO issued a Notice to File Corrected Application Papers on September 4, 2009.  The USPTO requested corrections only to Figures 2 and 4-10.  Ex[1019], 69.  On December 4, 2009, the applicant filed a complete replacement set of Figures 1-10, even though replacement drawings were not requested for Figures 1 and 3.  *Id.*, 72-81.  Notably, Figure 1 included an improper substantive change.  The originally-filed Figure 1 is on the left, and revised Figure 1 is on the right, with highlighting added by Petitioners to show the change:



*Compare* Ex[1019], 9 *with id.*, 72.  Rather than appropriately alert the Examiner to Figure 1's change, applicants remained silent and omitted any indication or

explanation. *See id.*, 71-81. It is ***applicant's responsibility*** to explain "[a]ll changes to the drawings," yet applicants failed to even direct the Examiner's attention to this substantive change.  37 C.F.R. §1.121(d) (2020); MPEP 714(D).  The version of Rule 1.121(d) in place in 2009, when applicants made this unexplained alteration of the drawings, is identical to the current version.  Ex[1032] (37 C.F.R. §1.121(d) (2009)).  Yet applicants never informed the Examiner of the changes to the figures. After a series of substantive rejections, the Examiner ultimately allowed the claims on January 10, 2012. Ex[1019], exhibit p.466-72.  Ex[1003], ¶170.

### D.   STATE OF THE ART

Whether the "differences between the invention and the prior art would have rendered the invention obvious to a [POSITA] necessarily depends on such artisan's knowledge," including an "assessment of the background knowledge possessed" by a POSITA.  *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337 (Fed. Cir. 2020) (internal citations omitted).  The subjects below were "within the general knowledge of a skilled artisan" by 2004.  *Id.*, 1338.  Ex[1003], ¶67.

### 1.   Coal-Fired Plants

It was known that pulverized-coal firing was performed by feeding particle-sized coal to a combustion chamber, also referred to as a "boiler."  Ex[1027], 13-1, 18-1.  Combustion gases exiting the boiler have been referred to as flue gases. Ex[1027], 19-1; Ex[1003], ¶¶91-97.

It was known that flue gases included particles (fly ash and unburned carbon), mercury (Hg), sulfur oxides ($SO_X$), nitrogen oxides ($NO_X$), and other pollutants. Ex[1053], 1.1-3 to 1.1-6.  Downstream components were used to control flue-gas constituents, including electrostatic precipitators (ESP) and fabric filters (FF) for particulates, dry FGD systems (sorbents), and selective catalytic reduction (SCR) systems.  Ex[1053], 1.1-6 to 1.1-9; Ex[1037]; Ex[1045]; Ex[1003], ¶¶87, 98-117.

### 2.   EPA Regulations

It was known that mercury generally exists in elemental form ($Hg^0$) and oxidized form (either $Hg_2^{2+}$ or $Hg^{2+}$).  Ex[1060], 2-1 (exhibit p.37); Ex[1060], 4-12 to 4-19; Ex[1054]; Ex[1055].  In 2000, EPA announced the need to tighten restrictions on mercury-emissions from coal-fired power plants.  Ex[1039], 2, 7-8. EPA officially passed the Clean Air Mercury Rule in 2005, requiring 70% mercury removal, but put the industry on notice of the upcoming requirements well before then.  Ex[1056]; Ex[1009]; Ex[1057]; Ex[1058].  As a result, the American electric-power industry mobilized to develop and evaluate mercury-emissions control technologies.  Ex[1039]; Ex[1003] ¶¶135-146.

### 3.   Mercury Removal Using Activated Carbon and Halogens

Even prior to EPA regulations, activated-carbon sorbents were used to remove mercury, and researchers were investigating methods to reduce costs and improve effectiveness of sorbents.  Ex[1060], 2-54; Ex[1038], 2.  Ex[1003], ¶¶147-163.  By

1934, it was known that halogens improved the ability of activated carbon to remove mercury.  *See* Ex[1029], 1:33-41.  Ex[1003], ¶¶118-121, 150-163.  It was known that halogens—including chlorine (Cl), bromine (Br), and iodine (I)—are highly-reactive oxidizing agents.  Ex[1040], 788, 791, A.44; Ex[1041], 789-824; Ex[1003], ¶¶68-73, 83-86.



Ex[1027], exhibit p.239.

By 1970, it was known that bromine (Br) was adsorbed up to a saturation limit (adsorption equilibrium) of 31-38% in carbon materials.  Ex[1042], 260.  By 1988, it was shown that bromine (Br) reacted with activated carbon to provide "carbon-

bromine surface structures (surface compounds)." Ex[1070], 259. Ex[1003], ¶¶128-129. By 1991, it was known that halogen content of flue gas combustion depended on the variable halogen content of "coal mined at different locations," and that supplying additional halogen content (e.g., "to the coal before or during the combustion thereof and/or by injecting gaseous HCl into the flue gas") increased the effectiveness of activated carbon. Ex[1007], 3:50-4:50. By 1998, "[a]ctivated carbons ha[d] been the most thoroughly studied sorbent for the capture of mercury." Ex[1038], 22. Ex[1003], ¶¶118-127. In 1999, researchers demonstrated that flue-gas mercury chemically reacted with halogenated activated carbons. Ex[1043], 119. By 2004, researchers generalized these findings to interpret the capture of elemental and oxidized mercury on promoted activated-carbon sorbents. Ex[1044]; Ex[1062], exhibit p.14-15 (halides "improve[d] Hg capture both by conversion of the $Hg^0$ to the more easily removed $Hg^{2+}$ forms and by enhancing the reactivity of $Hg^0$ with activated carbons"). Prior to the earliest filing date, it was well-known that halogens, particularly bromine-containing, improved the effectiveness of activated carbon in removing mercury. *See, e.g.*, Ex[1006] ¶[0018]-[0020], [0025]; Ex[1007]; Ex[1008], 1:65-2:15, 5:18-39; Ex[1012]; Ex[1015]; Ex[1036]. Ex[1003], ¶¶128-132. It was also known to measure mercury content, and in response, to adjust halide

injection, sorbent injection, and/or sorbent composition.  Ex[1028], 10; Ex[1059];

Ex[1009], 4676; Ex[1003] ¶¶133-134.

## V.    **CLAIM CONSTRUCTION**

For purposes of the asserted prior art, Petitioners do not, at this time, contend

that any term requires construction.  All terms have been accorded their plain and

ordinary meaning.  Ex[1003], ¶211.

## VI.    **THE PRIORITY DATE FOR CLAIMS 18-19 IS NO EARLIER THAN APRIL 6, 2009**

Prior to the April 6, 2009 filing date of the '147 Patent, a POSITA would not

have concluded that applicants were in possession of the subject matter of issued

Claims 18-19.  Through its dependency on Claims 1 and 17, the subject matter of

Claim 18 requires: "injecting the particulate sorbent material at a sorbent material

injection rate and injecting separately the bromine containing promoter into [*a*

*mercury containing gas*] whereby in-flight reaction produces the promoted

brominated sorbent."  Claim 19 depends from Claim 18 and further specifies that

"*the [mercury containing gas] is a transport gas*."  Ex[1003], ¶¶177-179.

PO carries the burden in proving its priority date.  First, PO cannot rely on the

Provisional disclosure.  The subject matter was not expressly included into the

specifications of the intervening non-provisional applications; nor could it have been

incorporated by reference.  However, even if the Provisional disclosure were

properly incorporated into any intervening non-provisional application, its disclosure fails to show that applicants were in possession of claims 18-19. Second, none of the parent applications between the Provisional and the filing of the '219 Application (which matured into the '147 Patent) include any disclosure supporting Claim 18 (and thus also Claim 19 due to its dependency thereon). The only disclosure of Claims 18-19 in the '147 Patent is found in the language of Claims 18 and 19 themselves, which were first introduced in the April 6, 2009 preliminary amendment. Ex[1003], ¶¶176-206.

Without support in earlier-filed applications for these claims, PO cannot receive a priority date earlier than April 6, 2009. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997) (each application in the priority-chain must comply with the written description requirement to claim earlier filing date).

## A.   PO CARRIES THE BURDEN IN DEMONSTRATING PRIORITY

Petitioners demonstrate the invalidity of Claims 18-19 in the grounds below, and accordingly, the burden is correctly placed on PO to come forward with evidence "to prove entitlement to claim priority to an earlier filing date." *PowerOasis*, 522 F.3d at 1304-1305; *Nat. Alternatives Int'l, Inc. v. Iancu*, 904 F.3d 1375, 1380 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 2014 (2019) ("[C]laims in a patent or patent application are not entitled to priority under §120 at least until the patent owner

proves entitlement."). The Patent Office does not make findings of priority as a matter of course during prosecution, and instead accepts applicant's asserted priority date. *PowerOasis*, 522 F.3d at 1305; M.P.E.P. §201.08. As in *PowerOasis*, the Patent Office made no finding regarding priority of the '147 Patent claims to earlier filed applications.

To demonstrate priority, PO must prove that the written description of each of the prior applications "convey[s] with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession of the invention.… Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed." *PowerOasis*, 522 F.3d at 1306. "***The question is not whether a claimed invention is an obvious variant*** of that which is disclosed in the specification. Rather, a prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought." *Lockwood*, 107 F.3d at 1571-72. Thus, in order to claim priority back to the provisional application, PO must demonstrate that the provisional application, and all intervening applications, expressly disclosed separately injecting a sorbent and bromine containing promoter *into* "a mercury containing gas" (Cl. 18) and into a mercury containing gas that is a transport gas (Cl. 19). Petitioners illustrate below

that the Claims 18-19 do not have support prior to the '147 Patent filing date of April

6, 2009.  Ex[1003], ¶¶177-182.  Thus, PO cannot meet its burden.

### B.   PO CANNOT RELY ON THE PROVISIONAL FOR SUPPORT

PO cannot show that Claims 18-19 are entitled to the Provisional date priority,

because the contents of the Provisional were not explicitly included into any

intervening application—thus breaking priority.  Furthermore, the material from the

Provisional cannot be incorporated by reference.  For these reasons alone, PO cannot

trace the '147 Patent's priority date back to the Provisional.  Second, even if the

priority were preserved, the Provisional fails to disclose adequate support for Claims

18-19.  Ex[1003], ¶¶202-206.

### 1.   The Contents of the Provisional Were Not Present in Any Intervening Application

To the extent PO alleges that the Provisional provides sufficient disclosure for

Claims 18-19, this fails because the prior applications to which the '147 Patent

claims priority do not include the relied-upon disclosure of the Provisional, thus

breaking priority.  Ex[1003], ¶¶185-186 (intervening applications omitted entire

sections  of the Provisional and substantively changed others); *Lockwood*, 107 F.3d

at 1571 ("[E]ach application in the chain must describe the claimed features.").

Rather, the intervening applications only included a generic statement of

incorporation by reference, without identifying with particularity what specific

material is being incorporated.  *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) ("[H]ost document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents."); Ex[1021], 5 (indicating generally that the Provisional Application is "hereby incorporated by reference in its entirety"); Ex[1022], 1 (indicating '163 Application and Provisional Application are "hereby incorporated by reference in their entirety for all purposes").  The '219 Application indicates that the '595 Application, '163 Application, and Provisional Application are "incorporated by reference."  However, the '163 Application "claims priority ***to the extent appropriate*** from" the Provisional. This indicates that applicants did not intend to claim priority to and incorporate the entire Provisional Application, but only parts of it, again without identifying the specific material to incorporate. Ex[1001], 1:20-22; *Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1379 (Fed. Cir. 2007) ("The plain language expressly limits the incorporation to only relevant disclosures of the patents, indicating that the disclosures are not being incorporated in their entirety.").  Because applicants' incorporation by reference language fails as a matter of law, none of the disclosure in the Provisional is properly incorporated to the applications in the priority-chain and thus cannot provide written description support for the '147 Patent claims.

In any event, material incorporated by reference from the Provisional, but not disclosed in the specification, cannot be considered as providing written-description support in a priority analysis because such material would be deemed "essential material." 37 C.F.R. §1.57(d) (2020). Rule 1.57(d) provides that "essential material"—which includes "material that is necessary to: provide a written description of the claimed invention"—"may be incorporated by reference, but *only* by way of incorporation by reference to a *U.S. patent or U.S. patent application publication*." The version of Rule 1.57 in place in 2005—when the first non-provisional (the '163 Application) was filed—provides a similar limitation as to incorporating "essential material" by reference. Ex[1035] (Rule 1.57(c) (2005)). A provisional application is neither a "U.S. patent" nor a "U.S. patent application publication." For example, in the current patent statutes, "[a]n application *shall not be published* if that application is—a provisional application filed under section 111(b)." 35 U.S.C. §122(b)(2)(A)(iii); 35 U.S.C. §111. The versions of the statutes in place in 2005 provided similar restrictions on publication of provisional applications. Ex[1033]; Ex[1034] (2005 versions of 35 U.S.C. §§111, 122). Thus, applicants cannot incorporate by reference the provisional application into the '219 Application and earlier applications.

### 2.   No Disclosure of Claims 18-19 in Provisional

Even if the disclosure of the Provisional were considered, in contravention to the requirements discussed in Section VI.B.1, *supra*, the Provisional fails to disclose Claims 18-19.  Ex[1003], ¶¶202-206.  At best, PO may argue that certain disclosure in the Provisional renders Claims 18-19 obvious, but a "description which renders obvious the invention for which an earlier filing date is sought is not sufficient." *Lockwood*, 107 F.3d at 1571-72.

The Provisional fails to disclose Claims 18-19 because it only discloses injecting a halogen and activated carbon sorbent ***together*** into a mercury-containing gas, ***not separately*** as recited in claims 18-19.  Ex[1020], 11 ("With this technique, ***the halogen is introduced*** to the carbon-air mixture ***in the transport line (or other part of the sorbent storage and injection system).***").  The halogen and activated carbon sorbent are being combined in a transport line with a *non*-mercury-containing gas, and then injected together (not separately), into a mercury-containing gas. Ex[1003], ¶203.

To the extent PO points to "additive injection" in Figure 2 as support for injecting the halogen separately from the sorbent, this too fails.



FIG. 2

First, Figure 2 and surrounding description was not included in the '147 Patent.

Second, the Provisional describes this "additive" as "additives of base chemistry"

"comprised of Group I or Group II elements, such as Ca, Na, and others."

9. The process of using additives (1-8) in conjunction with sorbents to capture acid gases and other flue gas constituents that block oxidation reactions or consume sorbent sites that would otherwise capture mercury. The additive is a compound comprised of Group I or II elements, such as Ca, Na, and others. These additives of base chemistry may be added to flue gas as a sorbent mixture or co-injected to selectively sorb acid gases or other gas constituents that compete for mercury reactive/sorption sites, thereby improving the effectiveness of activated carbon to capture mercury. In addition, the base additives can augment the treated activated carbon by helping to capture oxidized mercury forms in the flue gas, such as mercuric chloride, or that are produced on the carbon sorbent, such as mercuric bromide, but are released to the gas phase as the sorbent becomes saturated or capacity limited.

Ex[1020], 4. Halogens (including bromine) are Group VII, not Groups I or II. *See*

§IV.D.3. Ex[1003], ¶¶83-86. Third, this paragraph of the Provisional does not

describe the "additive" chemically reacting with the active-carbon sorbent (as would

be required by Claim 1 for a bromine-containing promoter). Indeed, this additive is used to "augment the *treated* activated carbon"—the "treated activated carbon" meaning that it had already been treated (promoted) by the time the additive is applied. In other words, this additive does not provide an in-flight reaction promoting the sorbent with a bromine-containing promoter within the mercury-containing (flue) gas stream. Ex[1003], ¶¶204-205.

Even if the "additive" and/or "additional substance" disclosure were sufficient to support Claims 18-19—which it is not—this piecemeal and disparate disclosure fails to convey with reasonable clarity to those skilled in the art that the inventor was in possession of the invention. *Lockwood*, 107 F.3d at 1571-72. "[O]ne cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention. In order to satisfy the written description requirement, the blaze marks directing the skilled artisan to that tree must be in the originally filed disclosure." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326-27 (Fed. Cir. 2000). The Provisional does not provide any clear disclosure such that a POSITA could identify the invention of activated-carbon sorbent and bromine-containing promoter being injected *separately* into a mercury containing gas as in Claim 18, much less that this is a transport gas as in Claim 19. Ex[1003], ¶206.

**C.** **THERE IS NO DISCLOSURE SUPPORTING CLAIMS 18-19 IN INTERVENING APPLICATIONS BETWEEN THE PROVISIONAL AND THE '147 PATENT**

Because Claims 18-19 are not supported by the earlier-filed applications in the chain, priority is broken and PO cannot claim an earlier priority date. *Lockwood*, 107 F.3d at 1571-72. Claims 18-19 require that bromine-containing promoter be injected "separately" from sorbent into a mercury-containing gas, and that in-flight reaction occur in that mercury-containing gas. Claim 19 further requires that the mercury containing gas of Claim 18 is a transport gas. Ex[1003], ¶¶177-179. However, the '163 and '595 Applications—parent applications to the '147 Patent— repeatedly describe introducing a base activated-carbon sorbent and a bromine promoter into a common transport line that has ***no mercury containing gas***, and then injecting the sorbent and the promoter ***together*** (not separately) into the mercury-containing flue gas. As a result, there is no disclosure of injecting the sorbent and separately injecting the promoter into a mercury containing gas. Ex[1003], ¶¶181-182.

First, the '163 and '595 Applications describe "in-flight" promotion only as treating the activated carbon with a bromine promoter ***before*** introduction into the mercury-containing flue gas:

> *"In-Flight" Sorbent Preparation*
>
> **[0075]** Furthermore, we have demonstrated that the halogen promoted carbon sorbent can be readily produced "in-flight". This is accomplished by, for example, contacting the vapors of any combination of halogens and optionally a second component, in-flight, with very fine carbon particles. The particles may be dispersed in a stream of transport air (or other gas), which also conveys the halogen/halide promoted carbon sorbent particles to the flue gas duct, or other contaminated gas stream, from which mercury is to then be removed. There is no particular temperature requirement for this contact. This technology is obviously very simple to implement, and results in a great cost savings to facilities using this technology for mercury capture.

Ex[1021], 20 ¶[0075]; Ex[1022], 16 ¶[0075].  The introduction of the sorbet and the promoter as well as the "in-flight" promotion occurs on the way "***to*** the flue gas duct"—before the sorbent contacts the mercury-containing gas.  Ex[1003], ¶¶183-184.

Figure 3 of the '163 and '595 Applications reiterate that introduction of the sorbent and the promoter and the in-flight promotion occurs before any injection into the mercury-containing gas.  Specifically, activated-carbon sorbent (red) and bromine-containing promoter (blue) are introduced into a transport line (purple), and thus react ***before*** being injected together into the mercury-containing gas (green):



FIG. 3

Ex[1021], 43; Ex[1022], 42.   Thus, the activated-carbon sorbent is not injected "separately" into the mercury-containing gas, as in Claim 18.   Further, there is no disclosure that the transport line contains any mercury-containing gas, as in Claim 19.   Although the '163 and '595 Applications include injecting an alkali component (turquoise) separately into the mercury-containing gas, the '163 and '595 Applications are devoid of any suggestion that the ***bromine-containing promoter***

may be introduced to the flue gas separately from the activated-carbon sorbent.  For example, the specification discloses embodiments in which the alkali component acts as a second sorbent, not a promoter.  Ex[1001], 10:7-12; Fig. 10.  Figure 10 compares "Standard AC" and "Standard AC with Alkali," where the alkali acts as a second sorbent to remove HCl, NOx, and other particulates in the flue gas so as to not foul any activated carbon.  Ex[1001], Fig. 10, 20:60-21:16.  There is no explicit disclosure, much less any suggestion, that a POSITA would use the separate alkali component line for the promoter.  *Lockwood*, 107 F.3d at 1571-72 (claimed invention cannot be just an "obvious variant").  Ex[1003], ¶¶187-190.

Figure 1 of the '163 and '595 Applications reinforces that in-flight promotion occurs before any injection into the mercury-containing gas.  Both "paths" for the base activated-carbon sorbent (red) illustrate the activated carbon reacting with the promoter (blue) to form a promoted brominated sorbent (purple) ***before*** being injected together into the mercury-containing gas (green), such that they are not injected separately.  This fails to support Claims 18-19.  Ex[1003], ¶¶191-193.



**FIG. 1**

Ex[1021], 41; Ex[1022], 40.   Critically, all embodiments in the '163 and '595 Applications have the bromine-containing promoter injected into the mercury-containing gas together with—and not separately from—the activated-carbon sorbent.  Ex[1003], ¶193.

To the extent PO attempts to rely on Replacement-Figure 1, found in the'147 Patent as issued, it is not part of the priority analysis and was not present in the '163

or '595 Applications.   The descriptions in these earlier applications are silent

regarding any disclosure of a path directly from block 10 (activated carbon) to block

50 (flue gas).  As discussed in the prosecution-history overview, during prosecution

applicants provided Replacement-Figure 1 (right) as found in the issued '147 Patent,

which included a newly-added line from box 10 to box 50 (added line shown in

yellow).



Because Replacement-Figure 1 does not appear in the earlier applications or even in

the as-filed '147 Patent, there is no priority chain for this disclosure, and PO cannot

rely on it as supporting any claim language in its priority analysis.  Ex[1003], ¶¶194-

197.

Because none of the earlier-filed applications in the priority chain for the '147 Patent, including the Provisional, provide written description support for Claims 18-19, the priority date for these claims is not earlier than when these claims were introduced through preliminary amendment—April 6, 2009.  Ex[1003], ¶¶198-201.

## VII.   GROUND 1: CLAIMS 18-19 ARE OBVIOUS OVER LISSIANSKI-PRESENTATION IN VIEW OF OLSON-646

Because Claims 18-19 have a priority date no earlier than April 6, 2009, Lissianski-Presentation and Olson-646 are prior art and render Claims 18-19 obvious.

### A.   OVERVIEW OF EX[1011] ("LISSIANSKI-PRESENTATION")

Lissianski-Presentation discloses removal of mercury from coal-fired plants. Specifically, the figure below (annotated) describes removing mercury from flue gas of coal-fired power plants using activated-carbon sorbent and halogen-promoter injection.  Ex[1011], 9.



This figure describes injecting "Cl-containing and Br-containing" promoters into the flue gas and injecting "activated carbon" as a sorbent "to trim Hg emissions." *Id.* Lissianski-Presentation also discloses the use of "Darco FGD," a commercial and industry-standard activated-carbon sorbent for injection. Ex[1011], 8, 18 ("Darco Hg"). Ex[1003], ¶¶279-280.

### B.   Prior Art Status of Lissianski-Presentation

Lissianski-Presentation is a printed publication, available as prior art under 35 U.S.C. §§102(a)-(b). A conference paper qualifies as prior art "so long as the

relevant public has a means of accessing" it. *GoPro, Inc. v. Contour IP Holding LLC*, 908 F.3d 690, 693 (Fed. Cir. 2018). Public accessibility requires that a reference was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter, or are exercising reasonable diligence, can locate it. *Id.* Lissianski-Presentation, delivered at the Electric Utilities Environment Conference ("EUEC") in January 2006 and mailed on CD to conference participants within a few weeks, meets the *GoPro* standard. Ex[1003], ¶269.

The EUEC has been held annually since 1998 to facilitate information exchange and foster cooperation between industry, government, and regulatory stakeholders regarding environmental controls for electric utilities. Dr. Niksa personally attended the EUEC in 2005, 2006, 2007, 2009, 2010 and 2013 and delivered presentations in 2005, 2006, 2007 and 2013. "During these years, the EUEC included a focus on bringing together vendors and developers of mercury control technology with people who implemented that technology in utility companies." Ex[1003], ¶¶259-264 (indicating EUEC was a helpful "direct link" between vendors and utilities).

Lissianski-Presentation was presented at the 2006 EUEC that took place in Tucson, Arizona on January 22-25, 2006. Ex[1047], exhibit p.27. Based on his

personal participation, Dr. Niksa declares that over 1000 people attended the 2006

EUEC.  This figure is confirmed by an attendee list that was included on a CD sent

to all attendees, including Dr. Niksa, within a few weeks of the conference.[2]

Ex[1049], exhibit p.1-30; Ex[1003], ¶¶269-272. *See* Ex[1048]:

---

[2] The public accessibility of Lissianski-Presentation is further supported by the

EUEC website, as archived on Feb. 4, 2006 ("20060204") at The Internet Archive

(https://web.archive.org/web/20060204211859/http:/euec.com/).   Ex[1050].   The

website also states that the 2006 EUEC had over 1000 attendees and Ex[1050].

Petitioners requested an affidavit verifying the authenticity and availability of this

page and related EUEC 2006 pages from The Internet Archive on April 23, 2020.

Due to COVID-19 policies, Petitioners have not yet received the affidavit, but will

submit it as soon as it is received.



The 2006 EUEC included four presentation tracks, with Lissianski-Presentation being presented in "Track B – Mercury CAMR." Ex[1047], exhibit p.24. Approximately 300-350 people attended the Track B presentations. These attendees included POSITAs in the mercury-control industry, such as "engineers, regulatory compliance specialists, and project managers from utilities; engineers and technicians from labs and testing organizations; technical staff from R&D organizations; and sales managers and representatives from technology vendors." Ex[1003], ¶271.

The CD mailed to each recipient also included the conference program containing a navigable index of all presentations, and PDF copies of all presentations, including Lissianski-Presentation, given at the conference. Ex[1030]. Exhibit 1011 is a printed version of the electronic Lissianski-Presentation on the CD that Dr. Niksa received in February 2006. Ex[1003], ¶272.

Lissianski-Presentation qualifies as prior art under 35 U.S.C. §§102(a)-(b) because it was made available to the relevant public and POSITAs on January 24, 2006 when it was presented. Lissianski-Presentation was also made available as a printed publication in February 2006, when it was mailed on CD to the hundreds of conference attendees. Ex[1003], ¶¶269-272.

### C.   OVERVIEW OF EX[1014] ("OLSON-646")

Olson-646 describes the reactions between a bromine-containing promoter, activated carbon, and mercury, as illustrated in Figure 2 below:

FIG. 2

Ex[1014], ¶[0054], Fig. 2.  Olson-646 states that "hydrogen bromide reacts with the unsaturated structure of the activated carbon" and that the reaction takes place at "a carbene species on the edge of the graphene sheet structures of the carbon." Ex[1014], ¶[0054].  "Molecular bromine or a bromine compound reacts to form a similar structure, with a positive carbon that is active for oxidizing the mercury with subsequent capture by the sorbent."  Ex[1014], ¶[0054]; Ex[1003], ¶¶283-284.

Olson-646 also provides exemplary process conditions involved when reacting activated carbon with a bromine-containing reagent to form promoted activated-carbon sorbent, and then injecting that promoted activated carbon into the mercury-containing (flue) gas stream:



Ex[1014], Fig. 3 (annotated). Figure 3 shows a "mercury control system 100 comprising preparation of promoted carbon sorbents." Ex[1014], ¶[0056]. Specifically, Figure 3 depicts a "base activated carbon reservoir 110 [red], an optional halogen/halide promoter reservoir 120 [blue], an optional secondary component reservoir 130 [brown], and an optional alkali component reservoir 180 [turquoise], each of which with corresponding flow control device(s) 201, 202, 203, and 208/209, respectively." Ex[1014], ¶[0056]. A "promoted carbon sorbent and/or

an optional alkali component is injected into contaminated flue gas stream 15."
Ex[1014], ¶[0061]; Ex[1003], ¶¶285-286.

### D.   PRIOR ART STATUS OF OLSON-646

Olson-646, entitled "Sorbents for the Oxidation and Removal of Mercury,"
was published by the USPTO on March 9, 2006. Ex[1014], 1.  The earliest priority
date for the Challenged Claims is April 6, 2009.  *See* §VI.  Thus, Olson-646 is
available as prior art under 35 U.S.C. §102(b).  Ex[1003], ¶¶281-282.

### E.   REASONS TO COMBINE REFERENCES

A POSITA would have been motivated to combine Lissianski-Presentation
and Olson-646, with a reasonable expectation of success, because both references
are directed to the use of halogens and activated-carbon sorbents to improve mercury
removal from flue gas emission leaving coal-fired power plants.  Ex[1011], 1 (Title:
"Integrated Approach to Multi-Pollutant Control"); *id.*, 2 ("[i]ntegrated approach to
NOx and mercury control"); Ex[1014], Title ("Sorbents for the Oxidation and
Removal of Mercury").  In fact, both references teach the same supplier (Norit) and
specific brand name (Darco FGD®) of powdered-activated carbon.  Ex[1011], 8
("Darco FGD" sorbent); Ex[1014], ¶ [0095] "NORIT Darco FGD.").  Further, both
references discuss the same additional equipment for removing particles of
mercury/sorbent composition, such as an ESP and a fabric filter (or baghouse).



Ex[1011], 9 (annotated); Ex[1014], ¶[0111] ("baghouse" (e.g., fabric filter) and "electrostatic precipitator/ESP").  Moreover, both references discuss control of $NO_x$ emissions in addition to mercury control.  Ex[1011], 2, 19; Ex[1014], ¶¶[0075], [0113].  Ex[1003], ¶¶529-531.

Lissianski-Presentation teaches separating mercury from a mercury-containing gas by adsorbing the mercury onto activated carbon, and then separating the mercury/sorbent chemical composition.  Its approach removes mercury from flue gas of coal-fired power plants using halogen-containing promoters (bromine or chlorine) and activated-carbon sorbent injection.  Ex[1011], 1 (Title), 9.



As illustrated above, Lissianski-Presentation feeds "fuel" (coal) and "air" to a combustion chamber, generating a mercury-containing gas. *Id.*, 9. Then "Cl- and Br- containing" halide promoters and "Activated carbon" are separately injected into the mercury-containing gas to treat mercury emissions in the flue gas. *Id.* Ex[1003], ¶532.

Like Lissianski-Presentation, Olson-646 describes using a conventional halogen (bromine) in a conventional way to increase the effectiveness of a conventional sorbent (activated carbon) to capture mercury from coal flue gas. It describes "Sorbents for the Oxidation and Removal of Mercury" and teaches embodiments "wherein the halogen/halide promoter is in gaseous or vapor form" that comprises "gaseous HBr or $Br_2$." Ex[1014], Title, ¶[0066]. A POSITA would

also have knowledge of the underlying chemistry from Olson-646 that is theorized to take place by the processes disclosed in Lissianski-Presentation. *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1363-64 (Fed. Cir. 2007) ("[C]onfirmation of what was already believed to be true … does not give rise to a patentable invention."). Ex[1003], ¶¶533-534.

A POSITA would have been motivated to combine the references because both focus on solving the same technical problem, and their solutions both discuss using the same halogen promoters (e.g., "Br- containing" in Lissianski-Presentation and "gaseous HBr or $Br_2$" in Olson-646) and mercury sorbents (activated carbon). Olson-646 proposes that the surface structure activated carbon comprises graphene sheets with carbene edge sites. Ex[1014], ¶[0054]. Olson-646 also identifies surface compounds formed on activated carbon, and proposes a theory for the underlying chemical reaction mechanisms taking place in Lissianski-Presentation. Accordingly, in combining Lissianski-Presentation with Olson-646, no modifications would need to be made to the chemical reactors, activated carbon sorbent, or type of halogen promoter used in Lissianski-Presentation. A POSITA would have also been motivated to combine the teachings of Olson-646 with the Lissianski-Presentation because Olson-646 provides certain implementational details regarding the system disclosed in Lissianski-Presentation, such as which

specific "Br-containing" chemicals to use and the ratios of bromine promoter to

activated-carbon sorbent.  Ex[1003], ¶535.

Figure 2 of Olson-646 illustrates "a theory developed from scientific evidence

to explain the nature of the promoting compounds."



FIG. 2

Ex[1014], ¶[0054], Fig. 2.  Olson-646 proposes that "hydrogen bromide reacts with

the unsaturated structure of the activated carbon," and this reaction may take place

at "a carbene species on the edge of the graphene sheet structures of the carbon."

Ex[1014], ¶[0054]. Further, Olson-646 states that "[m]olecular bromine or a

bromine compound reacts to form a similar structure, with a positive carbon that is

active for oxidizing the mercury with subsequent capture by the sorbent." *Id.* Fig.

2 of Olson-646 discloses that the complex includes the activated-carbon sorbent, the

element bromine, and the element mercury. Thus, a POSITA would have been motivated to apply the teachings of Olson-646 to Lissianski-Presentation because it illustrates the well-known chemicals and proposed reactions mechanisms underlying the system of Lissianski-Presentation. Specifically, a POSITA would have been motivated to use the "HBr or Br$_2$" of Olson-646 as the bromine injection of Lissianski-Presentation. Ex[1003], ¶536.

Looking to the implementation details provided in the Olson-646 regarding the chemicals to use (e.g., use HBr or Br$_2$ as the "Br-containing" species of Lissianski-Presentation, or the quantities to inject) in Lissianski-Presentation would have been nothing more than using known results to improve one process in a known way to improve a similar process to achieve the same goal of reducing mercury emissions in coal-fired power plants. Ex[1003], ¶537.

## F.  CLAIM 1

### 1.  Claim 1: Preamble—"A method for separating mercury from a mercury containing gas comprising:"

Lissianski-Presentation discloses this preamble. Lissianski-Presentation discloses an "Integrated Approach to Multi-Pollutant Control, more specifically … mercury control." Ex[1011], 1-2; Ex[1011], 9 (illustrating "[m]ercury control for low-rank coals"). Mercury control refers to separating mercury from a mercury-containing (flue) gas, as further discussed below for Claim Element 1(c). The system

of Lissianski-Presentation would have formed a promoted brominated sorbent that would adsorb mercury to form a mercury/sorbent chemical composition. Lissianski-Presentation also discloses the use of particulate material separators to remove the mercury/sorbent chemical composition from the flue gas, such as an ESP and a fabric filter (or baghouse).



Ex[1011], 9 (annotated). A POSITA would have understood the first unit to be an ESP because the cutaway view shows the charged flyash collection plates and the ash hoppers below. As shown, the ESP is downstream of both bromine injection locations and at least one proposed activated-carbon sorbent injection location. *Id.*

A POSITA would have understood the second unit to be a fabric filter (or baghouse) because the illustration shows banks of suspended fabric-collection bags and a single ash-collection hopper.  The figure further shows the FF as being downstream of both bromine injection locations and both activated-carbon sorbent injection locations. Lissianski-Presentation confirms this understanding in the below figure that shows a pilot-scale boiler-simulation facility ("BSF"), in accordance with the system above, that includes an "ESP" and "Fabric Filter."  *Id.*, 10;  Ex[1003], ¶¶538-539.

Petition for IPR2020-00928
USP 8,168,147



A POSITA would have understood that it was well-known that the ESP or FF would have removed solid material, including the mercury/sorbent chemical composition. *Id.* Thus, Lissianski-Presentation teaches separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent chemical composition. Ex[1003], ¶540.

### 2. Element 1(a)(1)—"promoting at least a portion of a particulate sorbent material comprising activated carbon by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent,"

Element 1(a)(1) is obvious in view of Lissianski-Presentation. The particulate

sorbent in Lissianski-Presentation is "activated carbon," shown below.



Ex[1011], 9 (annotated). As discussed below, a POSITA would have understood

that the bromine and activated carbon would have contacted and reacted in the flue

gas to form promoted-brominated sorbent. Ex[1003], ¶541. "The general principle

that a newly-discovered property of the prior art cannot support a patent on that same

art is not avoided if the patentee explicitly claims that property." *Abbott Labs. v. Baxter Pharm. Prod., Inc.*, 471 F.3d 1363, 1368 (Fed. Cir. 2006); *In re Crish*, 393 F.3d 1253, 1258 (Fed. Cir. 2004) ("[O]ne cannot establish novelty by claiming a known material by its properties.").

This element is also obvious over Lissianski-Presentation in view of Olson-646. Like Lissianski-Presentation, Olson-646 describes using a conventional halogen (bromine) in a conventional way (as a promoter) to increase the effectiveness of a conventional sorbent (activated carbon) to capture mercury from coal flue gas. Olson-646 provides additional discussion of underlying chemistry already theorized to take place by the processes disclosed in Lissianski-Presentation. Ex[1003], ¶542.

### a.   "particulate sorbent material comprising activated carbon"

Lissianski-Presentation discloses the use of activated carbon as a particulate sorbent material to capture mercury. The figure above discloses injection of "[a]ctivated carbon to trim Hg emissions," and the specific brand name of activated carbon is "Darco FGD." Ex[1011], 9; *id.* 8, 18. A POSITA would have understood that Darco FGD was a type of powdered activated carbon ("PAC"), which as evidenced by the moniker, is in particulate form. *See* §IV.D.3. Lissianski-Presentation also discloses the use of well-known particulate material separators

(e.g., ESPs and fabric filters) to remove the spent activated carbon, further evidencing that the activated-carbon sorbent is in particulate form.  Ex[1011], 9; Ex[1003], ¶¶543-544.

This limitation is also obvious in view of Olson-646.  For example, Olson-646 confirms that the sorbent is "particulate activated carbon sorbent."  Ex[1014], ¶ [0028].  Like Lissianski-Patent, Olson-646 states that particulate control devices include a "baghouse" (e.g., fabric filter) and an "electrostatic precipitator/ESP," each to remove mercury/sorbent particles.  *Id.*, ¶[0111].  Also like Lissianski-Patent, Olson  teaches the same supplier (Norit) and specific brand name (Darco FGD®) of PAC.  Ex[1011], 8 ("Darco FGD" sorbent); Ex[1014], ¶[0095] ("NORIT Darco FGD").  Ex[1014], ¶[0054].  Ex[1003], ¶545.

> **b.**    **"promoting at least a portion of a particulate sorbent material by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent"**

Lissianski-Presentation describes removing mercury from flue gas of coal-fired power plants using activated-carbon sorbent injection and halogen injection. Ex[1011], 9.  It would have been obvious in view of the disclosure of Lissianski-Presentation that at least some of the bromine-containing promoter injected into the flue gas of Lissianski-Presentation would have contacted the sorbent in mercury-containing gas, at or downstream of the sorbent injection point, because not all of

the bromine would have been consumed in oxidizing mercury in the gas-phase. Ex[1003], ¶546.

First, Lissianski-Presentation discloses that only 60-90% of mercury is oxidized by the bromine in the gas phase. Ex[1011], 9. Second, to address the remaining 10-40% of mercury that was not oxidized, Lissianski-Presentation discloses using activated carbon (dry sorbent). Ex[1011], 10. It was well-known since the 1930s and in the intervening decades that halogens improve the ability of activated carbon to capture mercury. For example, it was explained in 2003 and 2004 that halogens react with the surface of activated carbon, promoting it. *See* §IV.D.3; Ex[1062], 2-3; Ex[1079], 979. Ex[1003], ¶547.

Given this known effect on activated carbon, a POSITA would have been motivated to size the Br-containing injection appropriately so that some of the Br-containing additive would be available to react with activated carbon. As described in State of the Art, it was known that acid halides (e.g., HCl and HBr) are highly reactive towards activated carbon, such that the acid halides that are not consumed in oxidizing mercury would have reacted with activated carbon. *See* §IV.D.3; Ex[1003], ¶¶83-86, 147-148, 150-163. Third, it was known in the art that gas-surface reactions occur between gas-phase elemental mercury and halide-adsorbed activated carbon, such that the oxidation occurs on the sorbent itself. Ex[1014], Fig.

2.  Thus, even though Lissianski-Presentation identifies oxidation of the mercury with bromine, it would have been obvious to use a sufficient amount of bromine such that the sorbent also is promoted.  *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368 (Fed. Cir. 2012) ("We have repeatedly held that the motivation to modify a prior art reference to arrive at the claimed invention need not be the same motivation that the patentee had."). Ex[1003], ¶547.

Accordingly, and in view of the teachings of Olson-646 explained below, a POSITA would have been motivated to inject sufficient Br-containing promoter such that at least some quantity would be available to react with activated-carbon sorbent.  *See* §IV.D.3.

Olson-646 teaches the advantages of promoting activated-carbon sorbent with bromine-containing promoter.  Olson discloses "reactive halogen/halide promoted carbon sorbents using a bromide (or other halogen/halide) treatment of the carbon, that capture mercury via mercury-sorbent surface reactions."  Ex[1014], ¶[0043]. Olson-646 teaches embodiments "wherein the halogen/halide promoter is in gaseous or vapor form" that comprises "gaseous HBr or $Br_2$." *Id.*, ¶[0066].  As described in the Reasons to Combine section, a POSITA would have been motivated, with a reasonable expectation of success, to apply Olson's teachings regarding the injection

of HBr or $Br_2$ as the bromine-containing promoter of Lissianski-Presentation. Ex[1003], ¶548.

Olson-646 proposes that reactions between HBr(g) and/or $Br_2$(g) and activated-carbon sorbent are one of promotion, as described below for Claim Elements 1(a)(3) and 1(a)(4). Olson-646 states that "a promoted carbon sorbent is provided comprising a base activated carbon that has reacted with a promoter selected from the group consisting of halides, halogens, and combinations thereof, such that the reaction product is effective for the removal of mercury from a gas stream." Ex[1014], ¶[0012]. Further, Olson-646 states that "hydrogen bromide *reacts* with the unsaturated structure of the activated carbon," and that "[m]olecular bromine or a bromine compound reacts to form a similar structure." *Id.*, ¶[0054]. Fig. 2 of Olson-646 illustrates that once the bromine/activated carbon complex contacts mercury, it chemically reacts with the mercury. Ex[1003], ¶¶549-550.

FIG. 2

A POSITA would have been motivated to combine Lissianski-Presentation with Olson-646 to further understand the relationship between the bromine-containing promoter and activated carbon disclosed by Lissianski-Presentation. Specifically, a POSITA would have understood that the activated-carbon sorbent of Lissianski-Presentation would have chemically reacted with the "Br" promoter. A POSITA would have understood that by using the particular bromine-containing species disclosed in Olson-646 ("HBr or $Br_2$") as the source of "Br" disclosed in Lissianski-Presentation, then at least a portion of the bromine and activated sorbent would have reacted with each other. Ex[1003], ¶551.

### 3.    Element 1(a)(2) —"wherein the bromine containing promoter is in gaseous form, vapor form, or non-aqueous liquid form,"

Element 1(a)(2) is obvious over Lissianski-Presentation in view of Olson-646.

Lissianski-Presentation discloses removing mercury from flue gas of coal-fired

power plants by injecting a bromine-containing promoter into the flue gas, and then

injecting activated carbon into the flue gas.



Ex[1011], 9 (annotated).  A POSITA would have understood that the bromine of

Lissianski-Presentation would have been injected into the flue gas as a gas or vapor,

as informed by Olson-646.  A POSITA would have been motivated to use acid

halides to aid in Lissianski-Presentation's mercury removal because it was known since the 1930s that acid halides improve the effectiveness of activated carbon in mercury removal. Ex[1003], ¶¶128-129, 150-163. Among the various acid halides, such as HCl, HI, and HBr, a POSITA would be motivated to use HBr because Olson-646 discloses it as promoting activated carbon. Because the boiling point of HBr is -67 degrees Celsius, a POSITA would have recognized that using HBr in any practical application in a coal plant would have involved HBr in a gaseous phase. Ex[1041], exhibit p.66. Ex[1003], ¶553.

Olson-646 also describes that the bromine-containing promoter is in gaseous or vapor form, such as "gaseous HBr or $Br_2$." Ex[1014], ¶[0066]; Ex[1014], ¶[0052]. While Olson-646 does not disclose adding HBr or $Br_2$ to the combustion chamber, a POSITA would have been motivated to combine Lissianski-Presentation for the injection location with Olson-646 for the specific chemical to be injected (e.g., HBr(g) or $Br_2$(g)). Ex[1003], ¶¶552-553.

### 4. Element 1(a)(3) —"the activated carbon contains graphene sheets having carbene species edge sites"

This limitation is obvious over Lissianski-Presentation in view of Olson-646. As discussed for Element 1(a)(1), Lissianski-Presentation discloses injecting an exemplary activated-carbon sorbent—"Darco FGD"—for removing mercury. Ex[1011], 9. Olson-646 teaches the use of the same sorbent—"NORIT Darco

FGD." Ex[1014], ¶[0095].  Olson-646 proposes that "hydrogen bromide reacts with

the unsaturated structure of the activated carbon" and that the reaction with bromine-

containing promoter may take place at "a carbene species on the edge of the

graphene sheet structures of the carbon."  Ex[1014], ¶[0054].  The carbene sites

found in graphene sheets are shown in Figure 2 of Olson-646, labeled "Carbon Basic

Zig-Zag Site."



FIG. 2

In the above figure, each vertex represents a carbon atom; each hexagon represents

an aromatic ring, and graphene is a structure with sheets of such aromatic rings

stacked in layers upon one another.  The "carbene species edge site" is excerpted

below:

Petition for IPR2020-00928
USP 8,168,147



The carbene species is shown as a neutral carbon atom that is bonded to two other carbon atoms and that has two unshared valence electrons (indicated by the >:). Ex[1003], ¶¶554-555.

     5.    **Element 1(a)(4) —"which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury;"**

This limitation is obvious over Lissianski-Presentation in view of Olson-646. Olson-646 proposes that "adding the bromine from the bromine reagent or a proton from a hydrogen halide acid to a ***basic carbene site on the carbon edge structure forms a carbocation that accepts electrons from the neutral mercury atom forming the oxidized mercury species that is bound to the sorbent surface***." Ex[1014], ¶[0093]. The reaction "may also generate reactive bromine radicals or carbon radicals at the active sites on the carbon." *Id.*, ¶[0093]. Specifically, Olson-646 states that "the brominated carbon contains both covalent carbon-bound (organic) bromide as well as ***anionic bromide***." *Id.*, ¶[0096]. Olson-646 discloses that this reaction "provides a highly reactive bromine-containing reagent that can oxidize the

mercury and promote its capture on the activated carbon." *Id.*, ¶[0093]. As described in the Reasons to Combine section, a POSITA would have been motivated to combine Lissianski-Presentation with Olson-646 to further provide a theory for reaction mechanisms taking place when a bromine-containing promoter (as in Lissianski-Presentation) contacts activated carbon. *See PharmaStem*, 491 F.3d at 1363-64 ("[C]onfirmation of what was already believed to be true … does not give rise to a patentable invention.") Ex[1003], ¶556.

### 6. Element 1(b) —"chemically reacting elemental mercury in the mercury containing gas with the promoted brominated sorbent to form a mercury/sorbent chemical composition;"

This limitation is obvious in view of Lissianski-Presentation. The annotated figure of Lissianski-Presentation below describes mercury removal from flue gas of coal-fired power plants involving activated-carbon sorbent injection and bromine-containing promoter injection. Ex[1011], 9.

Petition for IPR2020-00928
USP 8,168,147



A POSITA would have understood that the promoted brominated sorbent formed by the bromine-containing promoter and activated-carbon sorbent of Lissianski-Presentation would have chemically reacted with elemental mercury in the mercury containing gas (e.g., flue gas) to form a mercury/sorbent chemical composition.  A POSITA would have understood that it was well-known that halogens reacted with activated-carbon sorbents by increasing their capacity and effectiveness for mercury removal.  *See* §IV.D.3.

This limitation is also obvious over Lissianski-Presentation in view of Olson-646.  Olson-646 describes that elemental mercury and activated carbon in the flue

gas react to form a mercury/sorbent composition. Indeed, Olson-646 discloses a promoted activated-carbon sorbent "that capture[s] mercury via mercury-sorbent surface reactions." Ex[1014], ¶[0043]. Olson-646 further identifies "AC mercury binding sites" (i.e., sites where mercury contacts the sorbent and forms a mercury/sorbent chemical composition). *Id.*, ¶[0128].



Specifically, Fig. 2, annotated above, shows elemental mercury ($Hg^0$) reacting with promoted-brominated sorbent to form a mercury/sorbent chemical composition. *Id.*, Fig. 2. Ex[1003], ¶¶557-558.

### 7.   Element 1(c) —"separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent chemical composition."

This limitation is disclosed by Lissianski-Presentation. Lissianski-Presentation discloses use of an ESP and a fabric filter (or baghouse), each of which separate mercury/sorbent particulates and fly ash.



Ex[1011], 9 (annotated).  A POSITA would have understood the first unit to be an ESP because the cutaway view shows the charged flyash collection plates and the ash hopper below.  The figure shows the ESP as being downstream of both bromine injection locations and at least one activated-carbon sorbent injection location.  A

POSITA would have understood the second unit to be a fabric filter (or baghouse) because the illustration shows the banks of suspended fabric-collection bags and a single ash-collection hopper below.  The figure also shows the fabric filter as being downstream of both bromine injection locations and both activated-carbon sorbent injection locations.  Lissianski-Presentation confirms this understanding in the below figure that shows a pilot-scale plant, in accordance with the system above, that includes an "ESP" and "Fabric Filter."  *Id.*, 10.



A POSITA would have understood that it was well-known that the ESP or FF would have removed solid material, including the mercury/sorbent chemical composition. *See* §IV.D.1; Ex[1001], 8:61-66 (admitting that "particulate separators," including ESPs, were "known in the art"). Thus, Lissianski-Presentation teaches separating particulates from the mercury containing gas, the

particulates including ash and the mercury/sorbent chemical composition. Ex[1003], ¶¶559-561.

### G.   DEPENDENT CLAIMS

#### 1.   Claim 17

##### *a.*   Element 17(a)—"A method according to claim 1, further comprising injecting the particulate sorbent material at a sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream"

This limitation is disclosed by Lissianski-Presentation. Lissianski-Presentation discloses injecting the bromine promoter into flue gas upstream of the air preheater ("APH"), and separately injecting the activated-carbon sorbent into the flue gas stream either after the APH and before the ESP, or between the ESP and fabric filter, as shown below.  Ex[1011], 9.

Petition for IPR2020-00928
USP 8,168,147



Lissianski-Presentation discloses that the bromine-containing promoter is injected into the mercury-containing flue gas, in that it references "injection" and that the materials being injected are "Cl- and Br- containing." *Id.* While Lissianski-Presentation does not expressly label the *sorbent* as being "injected," a POSITA would have found it obvious to introduce the sorbent by "injection"—similar to the bromine promoters. For example, Olson-646 discloses a "fluidized bed" reactor as a means of mixing activated-carbon sorbent and bromine-promoter. Ex[1014], ¶[0066]. A POSITA would have understood that in a fluidized-bed reactor, as in Olson-646, activated-carbon particles and other solids are suspended in gas and then

69

transported to a gas mixture.  Ex[1003], ¶562.  Olson-646 also discloses "gas source

170," such as a blower fan, to transport activated carbon into a gas mixture.

Ex[1014], ¶[0057].   Due to Lissianski-Presentation's disclosure of injecting the

bromine-containing promoter, a POSITA would have understood that it would

necessarily have been injected at some injection rate.  Similarly, as discussed above,

a POSITA would have found it obvious to introduce the sorbent by "injection" like

the promoter, and thus the sorbent would have been injected at some injection rate

as well.  Moreover, Figure 3 of Olson-646 discloses injecting activated carbon (item

110) via an "injection point 116."  Ex[1014], ¶[0057], Fig. 3.  Thus, Lissianski-

Presentation discloses, or at the very least renders obvious in view of Olson-646,

injecting the particulate sorbent material at a sorbent material injection rate.

Ex[1003], ¶562.

> ### *b.*   **Elements 17(b)-17(c): "whereby in-flight reaction produces the promoted brominated sorbent, wherein the promoter is reacted in the gas phase or as a vapor,"**

These limitations are obvious over Lissianski-Presentation in view of Olson-

646.  As described for Element 1(a)(1), a POSITA would have understood that the

bromine and activated carbon would have reacted in the flue gas to form a promoted

brominated sorbent.  To the extent that Lissianski-Presentation does not explicitly

identify the specific bromine-containing species used, Olson-646 teaches this

limitation in its disclosure of the halogen/halide promoter comprising "gaseous HBr or $Br_2$." Ex[1014], ¶[0043], ¶[0066].  As described above in the Reasons to Combine section, a POSITA would have been motivated, and would have reasonably expected success, to apply the teachings of Olson-646 (e.g., the injection of gaseous or vapor HBr or $Br_2$) to the system of Lissianski-Presentation.  *See* §VII.D.

A POSITA would have understood that, at combustion temperatures found within the boiler, the gaseous HBr or $Br_2$ added, especially in the amounts and locations disclosed in Olson-646 (about 1-30g of promoter per 100g of activated carbon) would have remained in the vapor phase and entered the flue gas leaving the boiler.  Ex[1014], ¶[0027].  At the temperature and pressure conditions present within standard flue gas systems, the HBr or $Br_2$ would have remained in the gaseous or vapor phase during subsequent contact with activated carbon.  Ex[1003], ¶564.  Accordingly, a POSITA would have understood that bromine gas or bromine vapors would have made contact with the activated-carbon sorbent of Lissianski-Presentation at the sorbent injection location within the flue gas stream.  Thus, Lissianski-Presentation in view of Olson-646 renders obvious an "in-flight" reaction.  Ex[1003], ¶¶563-564.

Further, Olson-646 repeatedly describes an "in-flight" reaction between bromine and activated-carbon sorbents.  Ex[1014], Abstract, ¶¶[0011], [0022],

[0024], [0027], [0062], [0077], [0078]. Olson-646 states that an "in-flight" reaction is accomplished by contacting the vapors of any combination of halogens with very fine carbon particles. *Id.*, ¶[0077]. A POSITA would have been motivated to combine Lissianski-Presentation's location at which bromine-containing promoter and activated-carbon sorbent contact with one another (i.e., in a mercury-containing gas), with Olson-646's description of such contact being an in-flight reaction. As discussed for Claim 1, Lissianski-Presentation in view of Olson-646 renders obvious that this reaction forms a promoted brominated sorbent. Ex[1003], ¶¶565-566.

   *c.* **Element 17(d)—"wherein the promoter is added at from about 1 to about 30 grams per 100 grams of the sorbent material."**

  This limitation is obvious over Lissianski-Presentation in view of Olson-646. Olson-646 discloses this ratio of the promoter to the sorbent, using identical language from Element 17(d). Specifically, Olson-646 states that "the promoter is added at from about 1 to about 30 grams per 100 grams of activated carbon." Ex[1014], ¶[0023], Claims 3, 17, 37, 47.

  A POSITA would have been motivated to combine with Olson-646 to provide implementation details for the system of Lissianski-Presentation because both references are directed at reducing mercury emissions from coal-fired power plants. Specifically, a POSITA would have been motivated to find the type of bromine-

containing chemical for injection (e.g., HBr or $Br_2$) and the relative rates of addition for both activated carbon and bromine for optimum mercury removal. Ex[1003], ¶¶567-568.

Furthermore, element 17(d) is merely an attempt to claim the optimum or workable range for a process of combining a particular conventional halogen (bromine) being used in a conventional way (halogens are inherent to coal, and both oxidize mercury and promote activated carbon) with a conventional sorbent (activated carbon). Nothing about the particular range of 1 g to about 30 g of the halide promoter per 100 g of the sorbent would lead to an unexpected result from what was already known to a POSITA. As described in the State of the Art, it was known that the saturation limit of activated carbon for bromine (i.e., how much bromine the activated carbon can actually adsorb at equilibrium), was up to 31 to 38 grams per 100 grams of activated carbon. *See* §IV.D.3. Through routine process optimization and routine experimentation, a POSITA would have adjusted the rate of addition of bromine-containing species and/or activated carbon injection rate to achieve about 1 g to about 30 g of halide promoter per 100g of sorbent. The range presents nothing more than routine optimization of "result-effective" variables that would have been obvious to a POSITA. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1297-98 (Fed. Cir. 2012). Ex[1003], ¶569.

Petition for IPR2020-00928
USP 8,168,147

## 2.    Claim 18. "A method according to claim 17, wherein the gas stream is a mercury containing gas."

This limitation is disclosed by Lissianski-Presentation.   Lissianski-Presentation discloses injecting the bromine-containing promoter into mercury-containing flue gas upstream of the air preheater ("APH"), and separately injecting the activated-carbon sorbent either between the APH and ESP, or between the ESP and fabric filter.



A POSITA would have understood that coal combustion produced a mercury-containing flue gas, which would be created at or before the bromine injection points indicated in the figure above. Ex[1003], ¶570.

### 3.   Claim 19. "A method according to claim 18, wherein the gas stream is a transport gas."

This limitation is obvious over Lissianski-Presentation in view of Olson-646. As explained for Claims 17-18, Lissianski-Presentation discloses an in-flight reaction in the flue gas between bromine and activated carbon to form an improved sorbent.   A POSITA would have understood that coal combustion produced a mercury-containing flue gas, and that the mercury-containing gas transported the bromine-containing promoter of Lissianski-Presentation to the activated-carbon sorbent. Ex[1003], ¶571.

## VIII.  GROUND 2: CLAIMS 18-19 ARE OBVIOUS OVER SJOSTROM IN VIEW OF OLSON-646

Because Claims 18-19 have a priority date no earlier than April 6, 2009, as discussed above, Sjostrom and Olson-646 are prior art and render Claims 18-19 obvious.

### A.   OVERVIEW OF EX[1010] ("SJOSTROM")

Sjostrom discusses the results of full-scale testing that was focused on increasing the halogen, particularly bromine, concentration in coal-fired power plant flue gas for the purpose of mercury removal from the flue gas.  Sjostrom describes

Petition for IPR2020-00928
USP 8,168,147

testing mercury removal from flue gas of coal-fired power plants involving activated-carbon sorbent injection, halogen-promoter injection, and both, as detailed below. Ex[1010], 4. Sjostrom describes various mercury control tests conducted at coal-fired power plants, which involve combustion of coal in a coal-fired boiler (e.g., combustion chamber). *Id.*, 4, 12, 18.



This annotated figure from Sjostrom discloses the plants including an air pre-heater, a sorbent injection unit downstream of the boiler ("Sorbent Injection"), and electrostatic precipitator ("ESP") or fabric filter ("FF") for the flue gas to pass through. *Id.*, 4. This figure specifically shows that particulate matter, including the

mercury-sorbent composition, would have been separated from the flue gas by the ESP or FF.  Indeed, a POSITA would have understood that it was well-known to use an ESP or FF to separate such solid materials from the flue gas.  Ex[1003], ¶¶273-277.

Sjostrom also discloses that activated-carbon sorbent injection was a well-known way of treating mercury emissions in flue gas.  Ex[1010], 10-11.  Sjostrom further teaches that halogens (e.g., "Cl, Br, F, I") may be injected within the process in multiple locations, including into the combustion chamber (Location 2), and into the sorbent (Location 3).  *Id.*, 4.



Sjostrom teaches flexibility for where the halogens may be injected, and a POSITA would have known that the halogens may be injected in one location or multiple

locations.  For example, a POSITA may decide to inject the halogen in Location 2, and not other locations labeled.  Ex[1003], ¶278.

## B.   PRIOR ART STATUS OF SJOSTROM

Sjostrom is a printed publication, available as prior art under 35 U.S.C. §§102(a) and (b).  The Sjostrom presentation, delivered at the EUEC in January 2005 and mailed on CD to conference participants within a few weeks, meets the *GoPro* standard for similar reasons as Lissianski-Presentation, discussed above.

Sjostrom was presented at the same conference as Lissianski-Presentation, but one year earlier—the 2005 EUEC that took place in Tucson, Arizona on January 24-25, 2005.  Ex[1030], 23.  Dr. Niksa attended and declares that over 800 people attended the 2005 EUEC, confirmed by an attendee list included on a CD sent to all attendees, including Dr. Niksa, within a few weeks of the conference.[3]  Ex[1030], 106-18; Ex[1003], ¶¶265-268.  *See* Ex[1031]:

-----

[3] The public accessibility of Sjostrom is further supported by the EUEC website, as archived at The Internet Archive (https://web.archive.org/web/20050303090129/http://www.euec.com/), as early as March 3, 2005.  Ex[1061].  The website states that the 2005 EUEC had 956 participants and that "EUEC Conference Proceedings will be mailed out the week of February 21."  Ex[1061].  Petitioners requested an affidavit verifying the

Petition for IPR2020-00928
USP 8,168,147



The 2005 EUEC included four presentation tracks, with Sjostrom being presented in "Track A – Air Quality." Ex[1030], 2. Specifically, Sjostrom was delivered during the A3 session—a particular subset of Track A that was devoted to "Mercury – Control." Ex[1030], 3. Approximately 250 to 300 people attended the

---

authenticity and availability of this page and related EUEC 2005 pages from The Internet Archive on March 2, 2020. Due to COVID-19 policies, Petitioners have not yet received the affidavit, but will submit it as soon as it is received.

Track A presentations.  These attendees included POSITAs in the mercury-control industry.  Ex[1003], ¶267.  The CD mailed to each recipient also included the conference program containing a navigable index of all presentations, and PDF copies of all presentations, including Sjostrom, given at the conference.  Ex[1030].  Exhibit 1010 (Sjostrom), attached to this Petition, is a printed version of electronic documents contained on the CD that was received in February 2005 by Dr. Niksa.  Ex[1003], ¶268.

Sjostrom qualifies as prior art under 35 U.S.C. §§102(a) and (b) because it was made available to the relevant public and POSITAS on January 25, 2005—the date it was presented.  It was also made available as  a printed publication in February 2005, when it was mailed on CD to the hundreds of conference attendees.

### C.   REASONS TO COMBINE REFERENCES

A POSITA would have been motivated to combine Olson-646 and Sjostrom, with a reasonable expectation of success, because both references are directed to mercury control and removal using the same sorbent (activated carbon) and further they disclose the same halogen promoters (e.g., "Br" in Sjostrom and "gaseous HBr or $Br_2$" in Olson-646).  Ex[1010], 1 ("Full Scale Evaluations of Mercury Control Technologies with PRB Coals,"), 4; Ex[1014], Title ("Sorbents for the Oxidation and Removal of Mercury"); ¶[0066].  In fact, both references teach the same supplier

(Norit) and specific brand name (Darco FGD®) of powdered-activated carbon. Ex[1010], 15, 16; Ex[1014], ¶[0095].

Sjostrom describes improving the effectiveness of mercury capture from coal-fired power plants by separately injecting a bromine-containing promoter and an activated-carbon sorbent into a mercury-containing gas stream, in order to improve the effectiveness of the sorbent in removing mercury.



Sjostrom discloses using activated-carbon sorbent injection and halogen injection as a way to achieve mercury removal. *Id.*, 4, 10-11. As discussed below, Olson-646 confirms that the halogen-sorbent reactions are promotion.

Fig. 2 of Olson-646 states the nature of the promoting compounds, proposing that the complex includes the activated-carbon sorbent, the element bromine, and

the element mercury.  Olson-646 proposes that the surface structure of activated carbon comprises graphene sheets with carbene edge sites.  Ex[1014], ¶[0054]; *see* §IV.D.3.



**FIG. 2**

Ex[1014], ¶[0054]. Olson-646 states that the hydrogen bromide reacts with the unsaturated structure of the activated carbon, and that the reaction may take place at "a carbene species on the edge of the graphene sheet structures of the carbon." *Id.*, ¶[0054],  Further, Olson-646 states that "[m]olecular bromine or a bromine compound reacts to form a similar structure, with a positive carbon that is active for oxidizing the mercury with subsequent capture by the sorbent." *Id.*  Thus, a POSITA would have been motivated to apply the teachings of Olson-646 to Sjostrom because it would have provided well-known details regarding the chemicals and proposed

reaction mechanisms underlying the system of Sjostrom for mercury control from coal flue gas.  Specifically, a POSITA would have been motivated to use the "HBr or $Br_2$" of Olson-646 as the "Br" injection of Sjostrom.  Ex[1003], ¶¶572-576.

A POSITA would have been additionally motivated to apply the teachings of Olson-646, and have had a reasonable expectation of success in doing so, because, both references teach using the same chemicals to achieve the same results. Ex[1003], ¶¶577.  For example, the below figure of Sjostrom shows removing 70 wt% or more of mercury from the mercury-containing coal flue gas using a bromine promoter in combination with untreated activated carbons (KNX + FGD). Ex[1010], 16.



Likewise, Olson-646 states that "a method is provided for reducing mercury in flue gas comprising providing a sorbent, injecting the sorbent into a mercury-containing

flue gas stream, collecting greater than 70 wt-% of the mercury in the flue gas on the sorbent to produce a cleaned flue gas, and substantially recovering the sorbent from the cleaned flue gas." Ex[1014], ¶[0022].

Looking to the implementation details provided in the Olson-646 reference for the specific chemicals to use (e.g., use HBr or $Br_2$ as the "Br" of Sjostrom, or the quantities to inject), would have been nothing more than using known results to improve one process in a known way to improve a similar process. Ex[1003], ¶¶577-578.

### D.  CLAIM 1

#### 1.  Preamble —"A method for separating mercury from a mercury containing gas comprising:"

Sjostrom discloses the preamble.  Sjostrom teaches separating mercury from a mercury-containing gas and describes various mercury control tests conducted at coal-fired power plants.  Ex[1010], 1 ("Full Scale Evaluations of *Mercury Control Technologies* with PRB Coals"), 12, 18 (testing).  Sjostrom described testing mercury removal from flue gas of coal-fired power plants involving sorbent injection and halogen addition, as illustrated below.  *Id.*, 4.



This annotated figure illustrates separating particulate matter (including the mercury-sorbent composition) from a mercury-containing flue gas by an electrostatic precipitator (ESP) or fabric filter (FF), which were well-known devices to remove particulate matter.  *See* §IV.D.1.**Error! Reference source not found.** Ex[1003], ¶¶107-108, 579.

### 2. Element 1(a)(1) —"promoting at least a portion of a particulate sorbent material comprising activated carbon by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent,"

This limitation is obvious in view of Sjostrom, which describes testing mercury removal from flue gas of coal-fired power plants involving sorbent

injection, halogen injection, and both sorbent and halogen injection. Ex[1010], 4.
Specifically, the annotated figure below teaches addition of bromine-containing
promoter, including at Location 2 into the combustion chamber. *Id.*



As discussed below, in the embodiment where the bromine-containing promoter is
added into the combustion chamber (Location 2), a POSITA would have understood
that the promoter would have contacted and reacted with the activated-carbon
sorbent in the flue gas (i.e., downstream from the combustion chamber) to form
promoted-brominated sorbent. Ex[1003], ¶580.

This element is also obvious over Sjostrom in view of Olson-646.   As
described in the Reasons to Combine, a POSITA would have been motivated to
combine Sjostrom with Olson-646 for guidance on the selection of the particular

chemical to provide the "Br" in Sjostrom, and how the "Br" reacts with the activated

carbon of Sjostrom. Ex[1003], ¶¶581.

> ### a.   "particulate sorbent material comprising activated carbon"

As shown in the annotated figure below, Sjostrom describes certain tests

involving "Sorbent Injection" into a flue-gas stream. Ex[1010], 4.



Specifically, Sjostrom describes testing performed with activated carbon injection,

including the specific brand name "DARCO FGD." *Id.*, 10-11, 16. Sjostrom

specifically describes its sorbent as "PAC" and further a POSITA would have

understood that Darco FGD was a type of powdered activated carbon ("PAC"),

which as evidenced by the moniker, is in particulate form. Ex[1010], 20; *see*

§IV.D.3.   Sjostrom also discloses the use of well-known particulate material

separators (e.g., ESPs and fabric filters) to remove the spent activated carbon, further

evidencing that the activated-carbon sorbent in Sjostrom is in particulate form.  *Id.*,

4; Ex[1003], ¶582.

> ***b.*** **"promoting at least a portion of a particulate sorbent material by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent"**

Sjostrom teaches injection of bromine-containing promoter directly into the

combustion chamber at Location 2. Ex[1010], 4. Sjostrom also discloses "Sorbent

Injection" into the flue gas downstream of the combustion chamber. *Id.* A POSITA

would have understood that the bromine-containing promoter added at Location 2

of Sjostrom would have contacted the sorbent in the flue gas at or downstream of

the sorbent injection point. A POSITA would also have known that halides, such as

the "Br" in Sjostrom, improved mercury capture both by reacting with mercury in

the gas-phase to oxidize the mercury, and also by reacting with activated-carbon

sorbent. In view of the teachings of Olson-646, a POSITA would have been

motivated to inject sufficient bromine-containing promoter such that at least some

quantity would be available to react with activated-carbon sorbent. Ex[1003], ¶583.

As discussed above, Olson-646 teaches the advantages of promoting

activated-carbon sorbent with bromine-containing promoter. Olson-646 further

discloses a carbon sorbent promoted with a reactive halogen such as "gaseous HBr

or $Br_2$" to capture mercury via mercury-sorbent surface reactions.   Ex[1014],

¶[0043], ¶[0066].  As described in the Reasons to Combine section, a POSITA would

have been motivated, with a reasonable chance of success, to apply the teachings of

Olson-646 (e.g., the addition of HBr or $Br_2$) as the "Br" source of Sjostrom.

Ex[1003], ¶584.

Olson-646 proposes that reactions between $HBr(g)$ and/or $Br_2(g)$ and

activated-carbon sorbent are one of promotion, as described below for Claim

Elements 1(a)(3) and 1(a)(4).  Olson-646 states that "a promoted carbon sorbent is

provided comprising a base activated carbon that has reacted with a promoter

selected from the group consisting of halides, halogens, and combinations thereof,

such that the reaction product is effective for the removal of mercury from a gas

stream." Ex[1014], ¶[0012].   Further, Olson-646 states that "hydrogen bromide

*reacts* with the unsaturated structure of the activated carbon," and that "[m]olecular

bromine or a bromine compound reacts to form a similar structure." *Id.*, ¶[0054].

Fig. 2 of Olson-646 illustrates that once the promoted-brominated sorbent contacts

mercury, it chemically reacts with the mercury. Ex[1003], ¶¶585-586.

A POSITA would have been motivated to combine Sjostrom Olson-646 to

further understand the relationship between the bromine-containing promoter and

activated carbon disclosed by Sjostrom.   Specifically, a POSITA would have

understood that the activated-carbon sorbent of Sjostrom would have chemically reacted with the "Br" promoter.  Ex[1003], ¶587.

### 3.   Element 1(a)(2) —"wherein the bromine containing promoter is in gaseous form, vapor form, or non-aqueous liquid form,"

This limitation is obvious over Sjostrom in view of Olson-646.  Location 2 of Sjostrom discloses injecting bromine into the boiler.  Ex[1010], 4.  Although Sjostrom is silent about the form that the bromine should take, a POSITA would have understood that it would have been obvious to inject bromine in a gaseous phase as in Olson-646.  A POSITA would have been motivated to use acid halides to aid in Sjostrom's mercury removal because it was known since the 1930s that acid halides improve the effectiveness of activated carbon in mercury removal.  Ex[1003], ¶¶128-129, 150-163.  Among the various acid halides, such as HCl, HI, and HBr, a POSITA would be motivated to use HBr because Olson-646 discloses it as promoting activated carbon.  Because the boiling point of HBr is -67 degrees Celsius, a POSITA would have recognized that using HBr in any practical application in a coal plant would have involved HBr in a gaseous phase.  Ex[1041], exhibit p.66.  Ex[1003], ¶588.

Olson-646 also describes that the bromine-containing promoter (HBr or $Br_2$) is in gaseous or vapor form.  Ex[1014], ¶[0052], ¶[0066].  While Olson-646 does not

disclose adding HBr or $Br_2$ to the combustion chamber, a POSITA would have been motivated to combine Sjostrom's injection location with Olson-646's disclosure of the specific chemical to be injected (e.g., HBr(g) or $Br_2$(g)). A POSITA would have understood that at combustion temperatures found within the boiler, any gaseous HBr or $Br_2$ added at Location 2 of Sjostrom would have remained in the vapor phase during subsequent contact with activated-carbon sorbent. Ex[1003], ¶¶589-590.

### 4. Element 1(a)(3)—"wherein the activated carbon contains graphene sheets having carbene species edge sites"

This limitation is obvious over Sjostrom in view of Olson-646. As discussed for Element 1(a)(1), Sjostrom teaches injecting a particulate sorbent material— "DARCO FGD"—for removing mercury. Ex[1010],16. Olson-646 teaches the use of the same sorbent—"NORIT Darco FGD." Ex[1014], ¶[0095]. Olson-646 proposes that "hydrogen bromide reacts with the unsaturated structure of the activated carbon" and that the reaction with bromine-containing promoter may take place at "a carbene species on the edge of the graphene sheet structures of the carbon." Ex[1014], ¶[0054]. The carbene sites found in graphene sheets are shown in Figure 2 of Olson-646, labeled "Carbon Basic Zig-Zag Site."

FIG. 2

In the above figure, each vertex represents a carbon atom; each hexagon represents an aromatic ring, and graphene is a structure with sheets of such aromatic rings stacked in layers upon one another.  Ex[1003], ¶¶78-81, 122-127.  The "carbene species edge site" is excerpted below:



The carbene species is shown as a neutral carbon atom that is bonded to two other carbon atoms and that has two unshared valence electrons (indicated by the >:). Ex[1003], ¶¶591-593.

### 5.     Element 1(a)(4) —"which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury;"

This limitation is obvious over Sjostrom in view of Olson-646, which proposes that adding bromine "to a ***basic carbene site on the carbon edge structure forms a carbocation that accepts electrons from the neutral mercury atom forming the oxidized mercury species that is bound to the sorbent surface***." Ex[1014], ¶[0093]. Specifically, Olson-646 states that "the brominated carbon contains both covalent carbon-bound (organic) bromide as well as ***anionic bromide***." *Id.*, ¶[0096]. Olson-646 discloses that this reaction "provides a highly reactive bromine-containing reagent that can oxidize the mercury and promote its capture on the activated carbon." *Id.*, ¶[0093]. As described in the Reasons to Combine section, a POSITA would have been motivated to combine Sjostrom with Olson-646 to further provide a theory for reaction mechanisms taking place when a bromine-containing promoter (as in Sjostrom) contacts activated carbon. *See PharmaStem Therapeutics*, 491 F.3d at 1363-64. Ex[1003], ¶594.

### 6.     Claim 1: Element 1(b) —"chemically reacting elemental mercury in the mercury containing gas with the promoted brominated sorbent to form a mercury/sorbent chemical composition; and"

This limitation is obvious in view of Sjostrom, which teaches injection of bromine and injection of a sorbent. Ex[1010], 4. As discussed in Element 1(a)(1),

a POSITA would have understood that the bromine-containing promoter and activated carbon form a promoted brominated sorbent, which would chemically react with elemental mercury in the mercury containing gas (e.g., flue gas) to form a mercury/sorbent chemical composition. *See* §IV.D.3. For example, Sjostrom discloses removing more than 90% of mercury, which would have included a quantity of elemental mercury. Ex[1010], 16. A POSITA would have understood that it was well known that halogens promoted activated-carbon sorbents by increasing their capacity and effectiveness for mercury removal. *See* §IV.D.3. Ex[1003], ¶595.

This limitation is also obvious over Sjostrom in view of Olson-646. Olson-646 describes that elemental mercury and activated carbon in the flue gas react to form a mercury/sorbent composition. Indeed, Olson-646 discloses a promoted activated-carbon sorbent "that capture[s] mercury via mercury-sorbent surface reactions." Ex[1014], ¶[0043]. Olson-646 further describes "AC mercury binding sites" (i.e., sites where mercury contacts the sorbent and forms a mercury/sorbent chemical composition). *Id.*, ¶[0128]; Ex[1003], ¶596.



FIG. 2

Specifically, Fig. 2, annotated above, shows elemental mercury ($Hg^0$) reacting with the promoted brominated sorbent to form a mercury/sorbent chemical composition. *Id.*, Fig. 2; Ex[1003], ¶596.

### 7. Element 1(c) —"separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent chemical composition."

This limitation is disclosed by Sjostrom. As shown in the annotated figure below, Sjostrom describes passing the flue gas through an electrostatic precipitator (ESP) or fabric filter (FF) after the bromine and sorbent injection, each of which separate mercury/sorbent particulates and fly ash. Ex[1010], 4.

Petition for IPR2020-00928
USP 8,168,147



Further, a POSITA would have understood that it was well known that the ESP or FF would have removed solid material, including the mercury/sorbent composition and fly ash. *See* §IV.D.1; Ex[1001], 8:61-66 ("particulate separators," including ESPs, were "known in the art").   Thus, Sjostrom teaches separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent chemical composition. Ex[1003], ¶¶597-599.

E.     DEPENDENT CLAIMS

1.     **Claim 17**

  *a.*     **Element 17(a)—"A method according to claim 1, further comprising injecting the particulate sorbent material at a sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream"**

The annotated figure below shows that Sjostrom teaches introducing "Br" into the system. Ex[1010], 4.



Location 2 of Sjostrom teaches injecting bromine into the boiler, upstream of the sorbent injection point. *Id.* Also, as shown in the annotated figure below, Sjostrom labeled "Sorbent Injection" at a separate location that is downstream of the boiler. *Id.*; Ex[1003], ¶¶600-601.

Petition for IPR2020-00928
USP 8,168,147



Sjostrom discloses injecting the sorbent at a "sorbent injection rate," provided

in lb/MMacf (pounds per million actual cubic feet of flue gas):



Ex[1010], 16.  A POSITA would have understood that for certain tests, the halogen

injection would be occurring at Location 2, while an untreated carbon is injected into

the flue gas.  Ex[1003], ¶601.  Indeed, the above graph illustrates using an activated carbon such as "Darco FGD," which a POSITA would have known refers to an activated carbon that had not been pre-treated with bromine due to it being plotted in the purple range above labeled "untreated carbons."  *Id.* Further, a POSITA would have been motivated to try untreated (plain) activated carbon, because it was known that the "cost per mass unit of impregnated AC [activated carbon] may, however, be significantly greater than that of unmodified AC."  Ex[1009], EPA-Proposal at 4676.  In other words, where cost was a driving factor in designing a mercury-removal system, a POSITA would have been motivated to use a less expensive untreated activated carbon when injecting bromine at Location 2 to assist with mercury removal given that the bromination could be handled solely through the bromine injected at Location 2.  Accordingly, it is obvious in view of Sjostrom to inject bromine at Location 2 and separately inject untreated activated carbon at a point downstream.  *Id.*

Regardless, even if a POSITA were to include bromine at both Location 2 and Location 3 (i.e., creating a brominated sorbent at Location 3), this brominated sorbent is still a "sorbent material comprising activated carbon," which means that sorbent can include other components besides activated-carbon, such as halogens.

Ex[1001], 7:44-46, 10:34-57 (describing multiple halogenation steps).  Ex[1003],

¶602.

> ***b.*** **Elements 17(b)-17(c): "whereby in-flight reaction produces the promoted brominated sorbent," "wherein the promoter is reacted in the gas phase or as a vapor,"**

These limitations are obvious over Sjostrom in view of Olson-646.  As

described above for Element 1(a)(1), a POSITA would have understood that the

bromine and activated carbon would have reacted in the flue gas to form promoted

brominated sorbent.  Ex[1014], ¶[0043], ¶[0066].  As described above in the Reasons

to Combine section, a POSITA would have been motivated, and would have

reasonably expected success, to apply the teachings of Olson-646 (e.g., the injection

of gaseous or vapor HBr or $Br_2$) to the system of Sjostrom.  *See* §VIII.C. Ex[1003],

¶603.

A POSITA would have understood that, at combustion temperatures found

within the boiler, the gaseous HBr or $Br_2$ added at Location 2, especially in the

amounts and locations disclosed in Olson-646 (about 1-30g of promoter per 100g of

activated carbon), would have remained in the vapor phase within the flue gas

leaving the boiler.  Ex[1014], ¶[0027].  At the temperature and pressure conditions

present within standard flue gas systems, the HBr or $Br_2$ would have remained in the

gaseous or vapor phase.  Accordingly, a POSITA would have understood that

bromine gas or bromine vapors would have made contact with the activated-carbon sorbent of Sjostrom at the sorbent injection location within the flue gas stream. Thus, Sjostrom in view of Olson-646 renders obvious an "in-flight" reaction. Ex[1003], ¶604.

Further, Olson-646 repeatedly describes an "in-flight" reaction between bromine and activated-carbon sorbents.  Ex[1014], Abstract, ¶¶[0011], [0022], [0024], [0027], [0062], [0077], [0078]. Olson-646 states that an "in-flight" reaction is accomplished by contacting the vapors of any combination of halogens with very fine carbon particles.  *Id.*, ¶[0077].  A POSITA would have been motivated to combine Sjostrom's location at which bromine-containing promoter and active-carbon sorbent contact with one another (i.e., in a mercury-containing gas), and Olson-646's description of such contact being an in-flight reaction.  If a POSITA were to include bromine at both Location 2 and 3 (i.e., creating a brominated sorbent at Location 3), the additional bromine injected at Location 2 would further promote the pre-brominated sorbent of Location 3.  Ex[1003], ¶605.

> *c.*    **Claim 17: Element 17(d)—"wherein the promoter is added at from about 1 to about 30 grams per 100 grams of the sorbent material."**

This limitation is obvious over Sjostrom in view of Olson-646.  Olson-646 discloses this ratio of the promoter to the sorbent, using identical language from

Element 17(d).  Specifically, Olson-646 states that "the promoter is added at from about 1 to about 30 grams per 100 grams of activated carbon."  Ex[1014], ¶[0023], Claims 3, 17, 37, 47.  Sjostrom describes the sorbent injection rate and the location for injecting "Br", and a POSITA would have looked to Olson-646 to identify the specific chemical to inject (e.g., HBr and/or $Br_2$) and the amount of that chemical to inject.  Ex[1010], 4, 16.  Ex[1003], ¶¶606-607.

Furthermore, as discussed above, element 17(d) is merely an attempt to claim the optimum or workable range for a process of combining a particular conventional halogen (bromine) being used in a conventional way (halogens are inherent to coal, and both oxidize mercury and promote activated carbon) with a conventional sorbent (activated carbon).  The range presents nothing more than routine optimization of "result-effective" variables that would have been obvious to a POSITA.  *Applied Materials*, 692 F.3d at 1297-98; s*ee* §VII.G.1.c;  Ex[1003], ¶608.

## 2.     Claim 18: "A method according to claim 17, wherein the gas stream is a mercury containing gas."

This limitation is disclosed by Sjostrom.  As described for Claim 17, Sjostrom in view of Olson-646 discloses an in-flight reaction in the flue gas between bromine and activated carbon to form an improved sorbent.  Sjostrom describes injecting "Br" promoter into a coal-fired boiler (e.g., combustion chamber) at Location 2. Ex[1010], 4.



A POSITA would have understood that this unit was a boiler based on the image used to represent the unit in the drawing, whose distinctive inverted fish hook cross section was a common and routine way to represent a coal-combustion chamber (boiler).  Sjostrom explains that at the time of testing, both of the coal-fired power plants combusted PRB (Powder River Basin) coal having a mercury content of "0.04-0.1 ppm-dry."  Ex[1010], 12, 18.  Accordingly, combusting such coal produced a mercury-containing gas in the combustion chamber, into which the "Br" promoter is injected.  Relying only on existing equipment at these plants, Sjostrom shows that the outlet mercury content of the flue gas was 11.2 µg/dncm.  *Id.*, 3. Thus,

the bromine injected at Addition Location 2 is injected into a mercury-containing gas.  Ex[1003], ¶609.

In addition, the sorbent is also injected into a mercury-containing gas. Sjostrom shows injection of the sorbent into the flue-gas ductwork prior to the ESP or FF.  A POSITA would have known that the flue gas prior to reaching the ESP or FF still contained mercury created by the coal-combustion process.  Ex[1003], ¶610.

### 3. Claim 19: "A method according to claim 18, wherein the gas stream is a transport gas."

This limitation is obvious over Sjostrom in view of Olson-646.  As explained for Claims 17-18, Sjostrom discloses an in-flight reaction in the mercury-containing flue gas between bromine and activated carbon to form an improved sorbent.  A POSITA would have understood that coal combustion produced a mercury-containing flue gas, and that the mercury-containing gas transported the bromine-containing promoter of Sjostrom to the activated-carbon sorbent.  Ex[1003], ¶611.

## IX. CONCLUSION

Petitioners respectfully request that *inter partes* review of the '147 Patent be instituted and that the Challenged Claims be cancelled as unpatentable under 35 U.S.C. §318(b).

Petition for IPR2020-00928
USP 8,168,147

Respectfully submitted,

BAKER BOTTS L.L.P.

May 27, 2020 _____          /Brian W. Oaks/ _____
Date                            Brian W. Oaks (Reg. 44,981)
                                98 San Jacinto Blvd., Suite 1500
                                Austin, Texas 78701
                                Phone: (512) 322-5470

                                LEAD ATTORNEY FOR PETITIONERS

Petition for IPR2020-00928
USP 8,168,147

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 37 C.F.R. §42.24(d), the undersigned certifies that the foregoing

Petition, exclusive of the exempted portions as provided in 37 C.F.R. §42.24(a),

contains 13,993 words which is no more than 14,000 words and therefore complies

with the type-volume limitations of 37 C.F.R. §42.24(a). The word count was

calculated by starting with Microsoft Word's total document word count and

subtracting the words for the Table of Contents, the Exhibit List, the Mandatory

Notices, the Certificate of Compliance, and the Certificate of Service.

Dated: May 27, 2020            /Brian W. Oaks/
                               Brian W. Oaks (Reg. No. 44,981)
                               98 San Jacinto Blvd., Suite 1500
                               Austin, Texas 78701
                               Phone: (512) 322-2500
                               Facsimile: (512) 322-2501


                               LEAD ATTORNEY FOR PETITIONERS

Petition for IPR2020-00928
USP 8,168,147

## <u>CERTIFICATE OF SERVICE</u>

In accordance with 37 C.F.R. §§42.6(e) and 42.105, the undersigned certifies

that on the 27th day of May 2020, a complete and entire copy of the PETITION FOR

*INTER PARTES* REVIEW ("petition"), Power of Attorney and related Exhibits were

served on Patent Owner at the correspondence address of record for the subject

patent,

SCHWEGMAN LUNDBERG & WOESSNER, P.A.
P.O. BOX 2938
MINNEAPOLIS MN 55402

via Express Mail or by means at least as fast and reliable as Express Mail.

Additionally, a courtesy copy was served via electronic mail on the Patent

Owner's counsel at the following email address:

**CALDWELL CASSADY CURRY PC**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201

Bradley W. Caldwell (Texas Bar No. 24040630)
bcaldwell@caldwellcc.com

and
Justin T. Nemunaitis (Texas Bar No. 24065815)
jnemunaitis@caldwellcc.com

Petition for IPR2020-00928
USP 8,168,147

Dated: May  27, 2020      /Brian W. Oaks/
Brian W. Oaks (Reg. No. 44,981)
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701

LEAD ATTORNEY FOR PETITIONERS