# EXHIBIT K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended: **December 31, 2019**

Commission file number: **000-33067**

## MIDWEST ENERGY EMISSIONS CORP.

(Exact name of registrant as specified in its charter)

| **Delaware** | **87-0398271** |
|---|---|
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**1810 Jester Drive, Corsicana, Texas 75109**
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: **(614) 505-6115**

Securities registered pursuant to Section 12(b) of the Act: None.

Securities registered pursuant to Section 12(g) of the Act: Common Stock, $.001 par value

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or emerging growth company. See the definition of "large accelerated filer", "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.:

| Large accelerated filer | ☐ | Non-accelerated filer | ☒ |
|---|---|---|---|
| Accelerated filer | ☐ | Smaller reporting issuer | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Exchange Act). Yes☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2019, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $13,086,000.

The number of shares outstanding of the Common Stock ($.001 par value) of the Registrant as of the close of business on May 14, 2020 was 77,747,750.

**DOCUMENTS INCORPORATED BY REFERENCE** None

**MIDWEST ENERGY EMISSIONS CORP.**
**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 16 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 16 |
| Item 4. | Mine Safety Disclosures | 16 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 17 |
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 27 |
| Item 8. | Financial Statements and Supplementary Data | 28 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 29 |
| Item 9A. | Controls and Procedures | 29 |
| Item 9B. | Other Information | 30 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 31 |
| Item 11. | Executive Compensation | 34 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 38 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 39 |
| Item 14. | Principal Accountant Fees and Services | 39 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 41 |
| Item 16. | Form 10-K Summary | 41 |
| | Signatures | 42 |

**TABLE OF DEFINED TERMS**

| TERM | DEFINITION |
| --- | --- |
| BAC | Brominated Powdered Activated Carbon |
| EERC | Energy and Environmental Research Center |
| EGU | Electric Generating Unit |
| EPA | The U.S. Environmental Protection Agency |
| ESP | Electrostatic Precipitator |
| Hg | Mercury |
| IGCC | Integrated Gasification Combined Cycle |
| MATS | Mercury and Air Toxics Standards |
| ME$_2$C | Midwest Energy Emissions Corp. |
| MW | Megawatt |
| OTCQB | OTCQB Venture Market |
| PAC | Powdered Activated Carbon |
| SCR | Selective Catalytic Reduction |
| SEC | U.S. Securities and Exchange Commission |

*Table of Contents*

**PART I**

**Forward-Looking Statements**

This Annual Report on Form 10-K contains "forward-looking statements," as defined in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, that are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 and reflect our current expectations regarding our future growth, results of operations, cash flows, performance and business prospects, and opportunities, as well as assumptions made by, and information currently available to, our management. Forward-looking statements are generally identified by using words such as "anticipate," "believe," "plan," "expect," "intend," "will," and similar expressions, but these words are not the exclusive means of identifying forward-looking statements. Forward-looking statements in this report are subject to risks and uncertainties that could cause actual events or results to differ materially from those expressed in or implied by the statements. These statements are based on information currently available to us and are subject to various risks, uncertainties, and other factors, including, but not limited to, those discussed herein under the caption "Risk Factors". In addition, matters that may cause actual results to differ materially from those in the forward-looking statements include, among other factors, the gain or loss of a major customer, change in environmental regulations, disruption in supply of materials, capacity factor fluctuations of power plant operations and power demands, a significant change in general economic conditions in any of the regions where our customer utilities might experience significant changes in electric demand, a significant disruption in the supply of coal to our customer units, the loss of key management personnel, availability of capital and any major litigation regarding the Company.

Except as expressly required by the federal securities laws, we undertake no obligation to update such factors or to publicly announce the results of any of the forward-looking statements contained herein to reflect future events, developments, or changed circumstances or for any other reason. Investors are cautioned that all forward-looking statements involve risks and uncertainties, including those detailed in $ME_2C$'s filings and with the Securities and Exchange Commission. See "Risk Factors" in Item 1A.

**Item 1. Business.**

As used in this Annual Report on Form 10-K, the terms "we", "us", "our", "the Company", "$ME_2C$", and "Midwest Energy Emissions Corp." refer to Midwest Energy Emissions Corp. and our wholly owned subsidiaries.

**Background**

Midwest Energy Emissions Corp., a Delaware corporation, is an environmental services and technology company specializing in mercury emission control technologies, primarily to utility and industrial coal-fired units. We deliver patented and proprietary solutions to the global coal-power industry to remove mercury from power plant emissions, providing performance guarantees, and leading-edge emissions services. We have developed patented technology and proprietary products that have been shown to achieve mercury removal at a significantly lower cost and with less operational impact than currently used methods, while maintaining and/or increasing unit output and preserving the marketability of fly-ash for beneficial use.

Our principal place of business is located at 1810 Jester Drive, Corsicana, Texas 75109, which location we have maintained for manufacturing and distribution of our products since 2015. As of December 2019, we relocated our corporate headquarters to such address which corporate headquarters prior thereto were maintained at 670 D Enterprise Drive, Lewis Center, Ohio 43035. Our telephone number is (614) 505-6115. Our corporate website address is http://www.midwestemissions.com. Our common stock is quoted on the OTCQB under the symbol "MEEC".

We originally incorporated under the name Digicorp on July 19, 1983 in the State of Utah. We subsequently domesticated as a Delaware corporation in February 2007; changed our name to China Youth Media, Inc. in October 2008; and changed our name to Midwest Energy Emissions Corp. in October 2011.

Our wholly owned subsidiary, MES, Inc., was originally incorporated under the name RLP Energy, Inc. in December 2008 in the State of North Dakota; changed its name to Grunergy Technologies USA Inc. in December 2010; and changed its name to Midwest Energy Emissions Corp. ("Midwest") in January 2011. Midwest was engaged in the business of developing and commercializing state-of-the-art control technologies relating to the capture and control of mercury emissions from coal-fired boilers in the United States and Canada.

4

*Table of Contents*

On June 21, 2011, we completed a merger transaction (the "Merger") whereby Midwest became our wholly owned subsidiary and changed its name to MES, Inc. For accounting purposes, the Merger was treated as a reverse merger and a recapitalization of the Company.

As a result of the Merger, our business is now focused on the delivery of mercury capture technologies to power plants in North America, Europe and Asia. Our prior business, which focused on youth marketing and media in China, terminated.

Prior to relocating our corporate headquarters to Corsicana, Texas, we maintained our corporate headquarters in Lewis Center, Ohio from March 2015 to December 2019, and in Worthington, Ohio from November 2011 to March 2015.

We currently have 11 full-time employees. Our employees are not represented by labor unions. We believe that relations with our employees are good.

**Regulations and Markets**

The markets for mercury removal from plant emissions are largely driven by regulations. Changes in regulations have profound effects on these markets and the companies that compete in these markets. This is especially true for smaller companies such as $ME_2C$.

On December 21, 2011 the EPA issued its Mercury and Air Toxics Standards ("MATS") for power plants in the U.S. The MATS rule is intended to reduce air emissions of heavy metals, including mercury (Hg), from all major U.S. power plants burning coal or oil, which are the leading source of non-natural mercury emissions in the U.S. Existing power plants were granted three years (plus a potential one-year extension in cases of hardship, ruled on by State EPA's where the plant is domiciled) from April 16, 2012, to comply with the new emission limits. The MATS rule applies to Electric Generating Units ("EGUs") that are larger than 25 megawatts ("MW") that burn coal or oil for the purpose of generating electricity for sale and distribution through the national electric grid to the public. They include investor-owned units, as well as units owned by the Federal government, municipalities, and cooperatives that provide electricity for commercial, industrial, and residential uses. At the time of MATS being promulgated, there were approximately 1,250 coal-fired EGU's affected by this new rule. Since this time, many of such EGU's have been shut down as a result of this regulation and due to competitive disadvantage to newer or gas-fired EGUs and renewable energy sources (e.g. wind, solar). We believe that at the end of 2019, there are approximately 350 coal-fired EGU's remaining in the power market which make up the large mercury-emissions control market into which we sell.

The final MATS rule identifies two subcategories of coal-fired EGUs, four subcategories of oil-fired EGUs and a subcategory for units that combust gasified coal or solid oil (integrated gasification combine cycle [IGCC] units) based on the design, utilization, and/or location of the various types of boilers at different power stations. The rule includes emission standards and/or other requirements for each subcategory. The rule set nationwide emission limits estimated to reduce mercury emissions in coal-fired plants by about 90%.

In addition to the U.S. federal MATS rule, more than 20 states currently have regulations which limit mercury emissions which regulations are similar to or more restrictive than the MATS rule.

There are several choices of pollution control technologies available to reduce mercury emissions, but they do not all work consistently or cost-effectively for every plant design or for all of the various types of coal. The most common technology employed to reduce mercury emissions is a sorbent injection system which provides for the injection of powdered activated carbon ("PAC") or brominated PAC ("BAC") into the flue-gas of an EGU after the boiler itself but in front of the Electro-Static Precipitators ("ESP"). Such injections have proven effective with many coals, especially at reduction levels of 70% or less. At required mercury reduction levels above 80%, these injection systems require substantial injection rates which often have severe operational issues including over-loading the ESP and rendering the fly ash unfit for sale to concrete companies, and at times even causing combustion concerns with the fly ash itself.

Mercury is also removed as a co-benefit by special pollution control equipment installed to remove oxides of sulfur ("$SO_X$") and nitrogen ("$NO_X$"). To achieve very high levels of $SO_X$ reduction, large, complex and expensive (capital costs in the hundreds of millions of dollars for a medium-sized EGU) systems called Scrubbers can be installed in the plant exhaust system, typically just before the flue-gas goes up the stack for release. As a co-benefit to their primary mission, Scrubbers have been shown to remove significant quantities of oxidized mercury. Mercury is typically found in two basic forms in coal: elemental and oxidized. The amount of each form varies in any given seam of coal and is affected by the other natural elements (such as chlorine) which might also be present in the coal. We believe about 30-40% of the mercury in the post-combustion flue-gas exists in the oxidized state for power plants burning low-rank coal and about 60-70% for power plants burning high-rank coals. Mercury is found in only trace amounts in coal making it difficult to remove from coal, or from the flue gas when combusted with the coal. It is in the burning of millions of tons of coal that these trace amounts become problematic, and why MATS was promulgated.

The other major pollution control system which contributes significantly to the co-benefits of mercury removal is a Selective Catalytic Reduction ("SCR") system which can be installed to achieve high levels of removal of $NO_X$. SCRs are also very large and expensive systems (costing hundreds of millions of dollars in capital costs to install on a medium-size EGU) that are typically installed just after the flue-gas exits from the unit boiler. As a co-benefit, SCRs have been shown to oxidize a considerable percentage of the elemental mercury in many types of coal. If the EGU then has a combination of an SCR and a Scrubber, we estimate that the EGU might achieve an overall reduction of 80-85% of the mercury in power plants that burn high-rank coals. The exact level of mercury emission reductions depends on the designs of these systems, the types of coal being burned and the operations of the power plant.

We believe that the large majority of the coal-fired EGUs in the U.S. employ some sort of sorbent injection system to achieve the very low mercury emission levels required by the MATS rule. Either the sorbent injection system is the primary removal method or such a system is employed as a supplemental system to SCR/Scrubber combinations to achieve the emission limits.

See "North American Markets for Our Technology" below for information on mercury control standards in Canada and "Other Markets for Our Technology" below for information on mercury control in Europe and Asia.

**ME$_2$C's Technology**

***Background and Acquisition of Patent Rights***

We provide customer-focused mercury capture solutions driven by our patented two-part Sorbent Enhancement Additive (SEA®) process using a powerful combination of science and engineering. We design systems and materials tailored and formulated specifically to each customer's coal-fired units. Our mercury removal technology and systems will achieve mercury removal levels which meet or exceed the MATS requirements and to do so with lower cost and plant systems impacts than typical PAC or BAC sorbent injection systems. Our products have been shown to be successful across a myriad of fuel and system types, tunable to any configuration, and environmentally friendly, allowing for the recycling of fly ash for beneficial use. Our SEA technology was originally developed by the University of North Dakota's Energy and Environmental Research Center ("EERC"). It was tested and refined on numerous operating coal-fired EGUs, with the founder of MES, Inc. participating with the EERC on these tests since 2008. The Energy and Environmental Research Center Foundation, a non-profit entity ("EERCF"), obtained patents on this technology.

On January 15, 2009, we entered into an "Exclusive Patent and Know-How License Agreement Including Transfer of Ownership" (the "License Agreement") with the EERCF. Under the terms of the License Agreement, we were granted an exclusive license by EERCF with respect to this patented technology to develop, make, have made, use, sell, offer to sell, lease, and import the technology in any coal-fired combustion systems (power plant) worldwide and to develop and perform the technology in any coal-fired power plant in the world. Amendments No. 4 and No. 5 to the License Agreement were made effective as of December 16, 2013 and August 14, 2014, respectively, expanding the number of patents covered, eliminated certain contract provisions and compliance issues and restructured the fee payments and buyout provisions while granting EERCF equity in the Company. The License Agreement applied to various domestic and foreign patents and patent applications which formed the basis of our mercury control technology.

Under the terms of the License Agreement, we were required to pay EERCF monthly license maintenance fees and annual running royalties on operational systems of the Company, and we had the right to purchase the patent rights for a payment specified therein.

On April 24, 2017, we closed on the acquisition from EERCF of all such patent rights, including all patents and patents pending, domestic and foreign, relating to the foregoing technology. A total of 42 domestic and foreign patents and patent applications were included in the acquisition. In accordance with the terms of the License Agreement, the patent rights were acquired for the purchase price of (i) $2,500,000 in cash, and (ii) 925,000 shares of common stock of which 628,998 shares were issued to EERCF and 296,002 were issued to the inventors who had been designated by EERCF. As a result of the acquisition of the patent rights, no additional monthly license maintenance fees and annual running royalties shall be due and owing to the EERCF following closing which fees and royalties have now been eliminated.

*Table of Contents*

*SEA® Technology*

Our SEA® technology provides total mercury control, providing solutions that are based on a thorough scientific understanding of actual and probable interactions involved in mercury capture in coal-fired flue gas. A complete understanding of the complexity of mercury–sorbent–flue gas interactions and chemisorption mechanisms allows for optimal control strategy and product formulation, resulting in effective mercury capture. Combined with a thorough proprietary audit of the plant and its configuration and instrumentation, we believe our complete science and engineering approach for mercury–sorbent–flue gas interactions is well-understood, highly predictive, and critical to delivering total mercury control.

The SEA® approach to mercury capture is specifically tailored for each application to match a customer's fuel type and boiler configuration for optimal results. Our two-pronged solution consists of a front end sorbent injected directly into the boiler in minimal amounts combined with a back end sorbent injection solution to insure maximum mercury capture. We believe our two-part process uses fewer raw materials than other mercury capture systems and causes less disruption to plant operations. We believe our sorbent line, which are designed to meet or exceed the mercury mitigation requirements of our customers, offers superior performance and the lowest possible feed rates when compared to other solutions on the market. Our processes also preserve fly ash which can be sold and recycled for beneficial use.

*Scrubber Reemissions Additive Technology*

We have also added a scrubber reemission additive to our product offering for use in wet flue gas desulfurization systems which reduces mercury reemissions from wet flue gas desulfurization systems by preventing scrubber reemission events. Our scrubber reemissions additive technology provides another mercury control solution in addition to our SEA technology for plants that are equipped with wet scrubbers. Depending on the level of mercury oxidation (discussed above), we can use one of our mercury oxidation additives to increase the amount of mercury oxidation in the flue gas and thereby increase the amount of mercury that is removed in the wet scrubber, often resulting in the plant achieving MATS compliance. Should the power plant encounter mercury reemission or desire a lower mercury emissions, we can provide a scrubber reemissions additive that is introduced into the scrubber to prevent mercury remissions resulting in lower mercury emissions from the plant.

*Customized Emissions Services*

In order to evaluate each customer's needs, we finely tune the combustion chemistry using our technologies and specially formulated MEC products. In order to achieve optimal results, we bring mercury emission analytics to the field for our demonstrations as opposed to collecting samples for laboratory analysis, while our team analyzes the entire plant's performance once compliance testing has begun. As a result, we are able to offer customers:

Assessment of existing systems and suggested improvements;

Assessment and guidance of mercury capture and emissions;

Optimal design of the injection strategy and appropriate equipment layout and installation;

Sorbent optimization using flow modeling for a customized, low-cost plan for each unit;

Emission testing for mercury and other trace metals with our mobile laboratory; and

Ongoing research toward improved technology for mercury capture and rapid-response scientific support for emission or combustion issues as operations and regulations change.

**Intellectual Property**

We have a patent portfolio consisting of 50 patents throughout the U.S., Canada, Europe and China and 18 patents pending. We believe that our patent position is strong in the U.S., Canada, and Europe.

*Table of Contents*

**North American Markets for Our Technologies**

North America is currently the largest market for our technologies.

In the U.S. market, our success depends, in part, on the success of demonstrations performed with utility customers and the resulting contract awards to meet the MATS requirements in the long-term period and our operational performance with EGUs under contract.

In Canada, there is a Canada-Wide Standard among all the provinces which was initially implemented in 2010, and which provides for increasingly stricter emissions control through 2020, although individual provinces may move faster to more stringent levels. We believe we have the most effective technology for the EGUs in Canada and a strong patent position there.

In 2010, we were awarded our first commercial contract to design, build and install our solution on two large (670MW each) coal units in the western part of the U.S. This was a multi-million dollar, three year renewable contract, which was awarded as a result of a competitive demonstration process. We invested more than $1.4 million in the capital equipment for this project. Our systems out-performed the contract guarantees in all operational areas during startup and testing and went into commercial operation at the start of 2012. The system has successfully kept the plant in compliance since 2012.

At the present time, there are 15 EGUs in the U.S. which currently use our technologies. In Canada, we have 3 EGUs which currently use our technologies, with 2 more expected in the near term. We expect to continue to conduct numerous demonstrations on prospective customer units throughout 2020 and thereafter.

**Other Markets for Our Technology**

In March 2018, we entered into an agreement for a term of ten years with one of the Company's primary suppliers to commercialize our technology throughout Europe. Under the terms of the agreement, we have granted such supplier an exclusive, non-transferable license to make, use, sell and market the Company's technology during the term throughout Europe (which includes Germany and Poland which currently have the largest coal fleets in Europe). We believe such arrangement will make our technology more saleable throughout Europe and which will benefit the Company from such supplier's knowledge and operations in this region. We have agreed to provide certain technical support throughout the term and shall continue to have the right to market and seek customers for our technology throughout Europe provided any opportunities are turned over to the supplier. Although we do not expect to generate significant revenues from such agreement for several years, we believe it positions us to make inroads in the European market sooner than we could achieve otherwise as Europe appears to be moving ahead with mercury emissions controls. The European market is significant although not as large as the market in the U.S. We believe more coal-fired EGUs operate throughout Europe than in the U.S. but are generally smaller EGUs.

In May 2017, the European Union and seven of its member states ratified the Minamata Convention on Mercury, which triggered its entry into force with implementation starting in 2021. The Minamata Convention on Mercury is a global treaty to protect human health and the environment from the adverse effects of mercury. This Convention was a result of three years of meeting and negotiating, after which the text of the Convention was approved by delegates representing approximately 140 countries in January 2013 in Geneva and adopted and signed later that year in October 2013 by approximately 125 countries at a diplomatic conference held in Japan. It is expected that over the next few decades, this international agreement will enhance the reduction of mercury pollution from the targeted activities responsible for the major release of mercury to the environment.

In addition, in July 2017, the European Union, through the European Commission, adopted certain BREF standards for large coal-fired electric generating units. The BREFs are a series of reference documents covering certain industrial activities and provide descriptions of a range of industrial processes and their respective operating conditions and emission rates. Member states are required to take these documents into account when determining best available techniques. As a result of the EU's adoption of these BREF conclusions, specific emissions limits are currently being developed.

With regard to business opportunities in China and other Asian countries, there currently exists no specific mandate for mercury capture that requires specific control technology, such as we offer. Nevertheless, we are optimistic of the prospects for mercury emissions regulations in China in the coming years, and because we have very broad patent rights in China, this has the potential to become a large business opportunity for us in future years. It is estimated that China represents 47% of the world's coal power usage compared to the United States which represents 14%*. We are hopeful that as a result of the Minamata Convention, China as well as other countries will follow the U.S. in regulating mercury emissions.

*Source: Carbon Brief, "Mapped: The World's Coal Power Plants", Simon Evans and Rosamund Pearce. May 6, 2018.

*Table of Contents*

**Additional Business Opportunities**

Our acquisition of all the patent rights, including all patents and patents pending, domestic and foreign, which forms the basis of our mercury control technology, which acquisition was completed on April 24, 2017 (see "ME$_2$C's Technology" above) positions us to license systems using a two-part mercury control process. In this regard, we anticipate being able, and have begun efforts, to license our technologies to utilities and others across North America and elsewhere.

In October 2019, we entered into a license and development agreement with an unaffiliated entity located in Alabama pursuant to which the parties will work together to develop a plan to commercialize and market certain technology owned by such unaffiliated entity related to the removal of mercury from air and water emissions generated by coal burning power plants. Although no assurance can be given, we are optimistic that this arrangement will lead to a new revenue stream for us in the future.

**Raw Materials**

We buy all the raw materials needed to implement our technologies and provide uniquely formulated products for effective mercury removal. Material components of our proprietary SEA® technology are readily available from numerous sources in the market. Suppliers of our raw materials include large companies that have provided materials for decades and have an international presence. When we use PAC as one component of our sorbent material, we buy it in the market from large activated carbon manufacturers. We believe that we have excellent relationships with our current suppliers. If any of our suppliers should become unavailable to us for any reason, there are a number of other suppliers that we believe can be contracted with expeditiously to supply the raw materials that we need, ensuring a continued supply of our products to our customers.

**Competition**

Our major competitors in the U.S. and Canada include companies such as Advanced Emissions Solutions, Inc., Albemarle Corporation, Cabot Corporation, Calgon Carbon Corporation, Carbonxt, Inc., Environmental Energy Services Inc. and Nalco Company. These companies employ large sales staff and are well positioned in the market. However, in head–to–head tests with competitor products our SEA® technology has consistently performed better in mercury removal, at lower projected costs. We believe that our SEA® technology is superior to offerings of our competitors and, with our highly experienced staff, we have shown that we can compete effectively in these markets.

**Seasonality**

The power market has changed over recent years with the introduction of more renewable energy, the low price of natural gas and the declining industrial demand for continuous power resulting in a greater proportional residential load demand. With this shift in demand and load, we have experienced some seasonal declines in the winter months due to our current customer concentration in the Southwestern United States, where many of our customers decrease capacity in such winter months.

**Backlog**

We do not consider backlog to be a significant indicator of the level of future sales activity. In general, we do not manufacture our products against a backlog of orders. Production and inventory levels are based on the level of incoming orders as well as projections of future demand. Therefore, we believe that backlog information is not material to understanding our overall business and is not a reliable indicator of our ability to achieve any particular level of revenue or financial performance.

**Available Information**

We file with or submit to the SEC annual, quarterly and current periodic reports, proxy statements and other information meeting the informational requirements of the Exchange Act. The SEC maintains an Internet website that contains reports, proxy and information statements and other information regarding issuers that file electronically with the SEC at www.sec.gov. Our SEC filings are also available on our website at www.midwestemissions.com. Information on or connected to our website is neither part of, nor incorporated by reference into, this Form 10-K or any other report filed with or furnished to the SEC.

**Item 1A. Risk Factors.**

*In your evaluation of the Company and our business, you should carefully consider the risks and uncertainties described below, together with the information included elsewhere in this report and the other documents we file with the SEC. The following factors describe the risks and uncertainties that we consider significant to the operation of our business, but should not be considered a complete listing of all potential risks and uncertainties that could adversely affect our operating results, financial position or liquidity. Additionally, our business is subject to the same general risks and uncertainties that affect many other companies, such as but not limited to the overall economic conditions, changes in laws or accounting rules, fluctuations in interest and exchange rates or other disruptions of expected economic and business conditions.*

*Risks Related to our Business*

**Our business focus is mercury removal from power plant emissions, which is driven primarily by regulation. Any significant changes in mercury emission regulation could have a major impact on the Company.**

Our business focus is mercury reduction in flue gas emissions from large coal-fired utility and industrial boilers. This market is primarily based on air pollution control regulations and enforcement of those regulations. Any significant change in these regulations would have a dramatic effect on the Company, especially in North America (and primarily the United States) which is currently the largest market for our technology. Specifically, on December 16, 2011, the EPA published the Mercury and Air Toxics Standards (MATS), which sets forth federal mercury emission levels. Power plants were required to begin complying with MATS on April 16, 2015, unless they were granted a one-year extension to begin to comply.

The MATS regulation has been subject to legal challenge, and in June 2015, the U.S. Supreme Court held that the EPA unreasonably failed to consider costs in determining whether it is "appropriate and necessary" to regulate hazardous air pollutants, including mercury, from power plants. The Court remanded the case back to the U.S. Court of Appeals for the District of Columbia Circuit for further proceedings, but left the rule in place. In December 2015, the D.C. Circuit remanded the rule back to the EPA for further consideration while allowing MATS to remain in effect pending the EPA's finding; the Supreme Court later denied a petition challenging the lower court's decision to remand without vacating. On April 14, 2016, EPA issued a final supplemental finding reaffirming the MATS rule on the ground that it is supported by the cost analysis the Supreme Court required. That supplemental finding is under review by the D.C. Circuit, and the Company is unable to predict with certainty the outcome of these proceedings. On April 18, 2017, EPA asked the court to place that litigation in abeyance, stating that the Agency is reviewing the supplemental finding to determine whether it should be reconsidered in whole or in part. The court granted EPA's abeyance request on April 27, 2017, and ordered EPA to file 90-day status reports starting July 26, 2017. In February 2019, the EPA published a proposed revised supplemental cost-benefits finding for MATS in which EPA proposed to conclude that the 2016 supplemental finding was flawed in part due to its reliance on co-benefits to justify MATS. Nevertheless, the EPA proposed to leave the MATS rule in place. At the same time, EPA also requested public comment on whether MATS may or must be rescinded if EPA reversed its earlier conclusion that it is "appropriate and necessary" to regulate power plant emissions of mercury and other hazardous air pollutants under the statutory provision authorizing MATS. Following the close of the public comment period, on April 16, 2020, the EPA issued a final rule which finalized the proposed supplemental cost-benefits finding in substantially the form proposed in 2019. The final rule withdraws EPA's 2016 "appropriate-and-necessary" determination as erroneous, but leaves the 2011 MATS rule in place pursuant to D.C. Circuit case law holding that a source category may only be removed from the list of categories to be regulated through a rigorous delisting process that cannot currently be satisfied by EPA. EPA's final action will almost certainly be challenged in the courts, both by those who favor retention of MATS (such as the electric utility industry) and by those who oppose it (such as certain coal interests and deregulatory groups). This litigation could extend uncertainty over the status of MATS for a number of years. Investors should note that any changes to the MATS rule could have a negative impact on our business.

Table of Contents

**The risks associated with technological change may make the Company's products and services less marketable.**

The market into which we sell our products and services is characterized by periodic technological change as well as evolving industry standards and regulations. The nature of such market will require that we continually improve and/or modify the performance, features, and reliability of our products and services, particularly in response to possible competitive offerings. Unless we are able to enhance, improve and/or modify existing products in a timely manner or to develop and introduce new products that incorporate new technologies or conform with evolving industry standards and regulations, our products and services may be rendered less marketable.

**Our industry is highly competitive. If we are unable to compete effectively with competitors having greater resources than we do, our financial results could be adversely affected.**

Our major competitors in the U.S. and Canada include companies such as Advanced Emissions Solutions, Inc., Albemarle Corporation, Cabot Corporation, Calgon Carbon Corporation, Carbonxt, Inc., Environmental Energy Services Inc. and Nalco Company. These companies employ large sales staff and are well positioned in the market. Our ability to compete successfully depends in part upon our ability to offer superior technology, including a superior team of sales and technical staff. If we are unable to maintain our competitive position, we could lose market share to our competitors which is likely to adversely impact our financial results.

**We may not be able to successfully protect our intellectual property rights.**

We own a number of significant patents, and patents pending covering the U.S., Canada, Europe and China for our technology. Certain critical technology related to our systems and products is protected by trade secret laws and confidentiality and licensing agreements. There can be no assurance that outstanding patents will not be challenged or circumvented by competitors, or that such other protection provided by trade secret laws and confidentiality and licensing agreement will prove adequate. We cannot assure you that we will have adequate remedies against contractual counterparties for disclosure of our trade secrets or violation of ME$_2$C's intellectual property rights. As a result, we may not be able to successfully defend our patents or protect proprietary aspects of our technology.

**We may not be successful in our current or any future patent litigation.**

In July 2019, we announced that we had initiated patent litigation against defendants in the U.S. District Court for the District of Delaware for infringement of certain patents which relate to our two-part Sorbent Enhancement Additive (SEA[®]) process for mercury removal from coal-fired power plants. Such litigation is in its early stages. Investors should note that patent litigation, like most types of commercial litigation, can be expensive, time-consuming and unpredictable. There is no assurance that this litigation, or any future patent litigation which the Company may commence, will be successful. In addition, in an infringement proceeding, a court may decide that one or more of our patents are not valid or enforceable, or a court may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover the technology in question. An adverse result in any litigation could put one or more of our patents at risk of being invalidated, held unenforceable or interpreted narrowly and could put our patent applications at risk of not issuing. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business.

**We depend on third-party suppliers for materials needed to implement our technology.**

We buy all the raw materials needed to implement our technology and provide uniquely formulated products for effective mercury removal from third-party suppliers. Suppliers of our raw materials include large companies that have provided materials for decades and have an international presence. When we use PAC as one component of our sorbent material, we buy it in the market from large activated carbon manufacturers. We believe that we have excellent relationships with our current suppliers. If any of our suppliers should become unavailable to us for any reason, there are a number of other suppliers that we believe can be contracted with expeditiously to supply the raw materials that we need, ensuring a continued supply of our products to our customers. However, the possibility exists that we may not be able to secure such arrangements on terms acceptable to the Company which could negatively impact our business.

**We are dependent on key customers. A significant adverse change in such relationships could adversely impact our results of operations and financial condition.**

Our customers are concentrated, so the loss of one or more key customers or a material reduction in business performed for them could cause us to experience a decline in net sales, which could adversely affect our financial results. In addition, there can be no assurance that such customers will not experience financial difficulties or other problems which could delay such customers in paying for product and services on a timely basis or at all. Any problems with such customers can be expected to have an adverse impact on our results of operations and financial condition.

*Table of Contents*

**We rely on a small number of key employees. The loss of more than one of these employees could disrupt our operations and future growth.**

We have a limited number of employees and we depend on the continued services and performance of our key personnel. The loss of more than one member of this team could disrupt our operations and negatively impact our projected future growth. In addition, as we continue to grow, we cannot guarantee we will continue to attract and retain the personnel we need to maintain our competitive position.

**Our lack of diversification increases the risk of an investment in the Company.**

Our business lacks significant diversification and is dependent on the success of our mercury emission control technologies. As a result, we are impacted more acutely by factors affecting our industry or the regions in which we operate that we would if our business were more diversified, enhancing our risk profile.

**Low gas prices could negatively impact our results of operations; mild weather could also have corresponding effects on the demand for coal.**

Our mercury-emissions control technologies are used by coal-fired power plants primarily in the United States. At such times that gas prices remain low for an extended period of time or drop substantially, power suppliers will likely rely more upon gas-fired units rather than coal plants in meeting their power needs. Gas prices can be very volatile and are influenced by numerous factors beyond our control. For example, market prices for natural gas have recently been low which has caused, and will likely continue to cause, a weaker demand for our products until such time that such prices increase. In addition, mild winter months in the U.S. will also result in less of a power demand which will also be expected to negatively impact our operations.

**Our insurance coverage may not be adequate to protect us from all business risks.**

We may be subject, in the ordinary course of business, to claims resulting from products liability, employment-related actions, class action lawsuits, accidents, acts of God and other actions against us. Additionally, our insurance coverage may be insufficient to cover all existing and future claims against us. We may be compelled to expend significant time and resources defending any such claims, and a loss that is uninsured or which exceeds policy limits may require us to pay substantial amounts, which could adversely affect our financial condition and operating results.

**Litigation resulting from disputes with customers may result in substantial costs, liabilities and loss of revenues.**

From time to time, we may be faced with disputes with our customers over the provisions of supply contracts relating to, among other things, pricing, quality, quantity and the existence of specified conditions beyond our or our customers' control that impact performance obligations under the particular contract. In the event such disputes occur, we may not be able to resolve those disputes in a satisfactory manner which could have a material adverse effect on our business, financial condition and results of operations.

**Revenues are generated under contracts that must be renegotiated periodically.**

Substantially all of our revenues are generated under contracts which expire periodically or which must be frequently renegotiated, extended or replaced. Whether these contracts are renegotiated, extended or replaced is often subject to factors that may be beyond our control, including an extremely competitive marketplace for the services we offer. We cannot assure you that the costs and pricing of our services can remain competitive in the marketplace or that we will be successful in renegotiating our contracts.

**Business interruptions, including any interruptions resulting from COVID-19, could significantly disrupt our operations and could have a material adverse impact on us.**

The ongoing coronavirus outbreak which began in China at the beginning of 2020 has impacted various businesses throughout the world, including travel restrictions and the extended shutdown of certain businesses in impacted geographic regions. If the coronavirus outbreak situation should worsen, we may experience disruptions to our business including, but not limited to, the availability of raw materials, equipment, to our workforce, or to our business relationships with other third parties. Also, it may hamper our efforts to comply with our filing obligations with the Securities and Exchange Commission (the "SEC"). In this regard, on April 14, 2020, we filed a current report on Form 8-K with the SEC in part to avail ourselves of a 45-day grace period to file this Annual Report on Form 10-K provided by an SEC order issued on March 25, 2020 (which extended and superseded a prior order issued on March 4, 2020), which order allows a registrant up to an additional 45 days after the original due date of certain reports required to be filed with the SEC if a registrant's ability to file such report timely is affected due to COVID-19. In such Form 8-K, we acknowledged experiencing disruptions including, but not limited to, the limited availability of key Company personnel and professional advisors who are needed to prepare this Annual Report due in part to suggested and mandated social quarantining and work from home orders. This has, in turn, delayed our ability to complete our audit and prepare this Annual Report. Investors should be aware that such disruptions may impact our ability to file future SEC reports by their original due dates.

*Table of Contents*

The extent to which the coronavirus impacts our operations in other areas or those of our third-party partners will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the duration of the outbreak, new information that may emerge concerning the severity of the coronavirus and the actions to contain the coronavirus or treat its impact, among others. Any such disruptions or losses we incur could have a material adverse effect on our financial results and our ability to conduct business as expected**.**

**Delays in enactment of foreign regulations could restrict our ability to reach our strategic growth targets in Europe and Asia.**

Our strategic growth initiatives are reliant upon more restrictive environmental regulations being enacted for the purpose of mercury control from power plant emissions in Europe and in China and other Asian countries. In May 2017, the European Union and seven of its member states ratified the Minamata Convention on Mercury, which triggered its entry into force with implementation starting in 2021. The Minamata Convention on Mercury is a global treaty to protect human health and the environment from the adverse effects of mercury. With regard to business opportunities in China and other Asian countries, there currently exists no specific mandate for mercury capture that requires specific control technology, such as we offer. China is the largest producer and consumer of coal in the world. Nevertheless, we are hopeful that as a result of the Minamata Convention, China as well as other countries will follow the U.S. in regulating mercury emissions. If stricter regulations are delayed or are not enacted, our sales growth targets in Europe and Asia could be adversely affected.

**Maintaining and improving our financial controls may divert management's attention and increase costs.**

We are subject to the requirements of the Securities Exchange Act of 1934, including the requirements of the Sarbanes-Oxley Act of 2002. The requirements of these rules and regulations have increased in recent years, causing an increase in legal and financial compliance costs, and make some activities more difficult, time-consuming or costly and may also place undue strain on our personnel, systems and resources. Such rules and regulations require, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. This can be difficult to do. In this regard, our management concluded our internal control over financial reporting was not effective as of December 31, 2019. While certain remedial actions have been completed, we continue to actively plan for and implement additional control procedures to improve our overall control environment and expect these efforts to continue throughout 2020 and beyond. As a result of this and similar activities, management's attention may be diverted from other business concerns, which could have a material adverse effect on our business, financial condition and results of operations.

**Our board of directors recently concluded that we needed to restate previously issued financial statements as a result of a change in accounting for a certain debt restructuring.**

On April 13, 2020, our board of directors of the Company (which currently acts as our audit committee) concluded, after consultation with management and the Company's recently retained financial consulting firm, that our previously issued unaudited financial statements for the periods ended March 31, 2019, June 30, 2019 and September 30, 2019, included in the Company's Quarterly Reports of Form 10-Q for the periods ended March 31, 2019, June 30, 2019 and September 30, 2019, respectively, should no longer be relied upon as a result of the change in accounting for a certain debt restructuring. We concluded that a gain on debt restructuring recognized during the first quarter of 2019 should have been accounted for as a capital transaction. Specifically, on February 25, 2019, we entered into an Unsecured Note Financing Agreement with AC Midwest Energy LLC ("AC Midwest"), pursuant to which AC Midwest exchanged a previously issued subordinated unsecured note in the principal amount of $13,000,000, together with all accrued and unpaid interest thereon, for a new unsecured note in the principal amount of $13,154,931. We recorded a gain of $3,412,402 on this exchange which we recently concluded should have been recorded as an equity transaction capital contribution. The adjustments resulting therefrom, which are non-cash in nature, increase additional paid-in capital and increase our previously reported net loss, but has no impact on previously reported cash, working capital, total assets, total liabilities and revenues. Nevertheless, such restatement could cause investors in our securities to lose confidence in our financial statements and management which could result in a decrease in our stock price and negative sentiment in the investment community.

---

13

**Liquidity risk could impair our ability to fund operations and jeopardize our financial condition.**

Liquidity, i.e., ready access to funds, is essential to our business. Our access to external sources of financing could be impaired by factors that are specific to us or others that may be outside of our control. As a result, such liquidity risk could impair our ability to funds operations and jeopardize our financial condition.

**Possible inability of the Company to continue as a going concern.**

The accompanying consolidated financial statements as of December 31, 2019 have been prepared assuming the Company will continue as a going concern. As reflected in the consolidated financial statements, we had an accumulated deficit of $57.7 million, $1.5 million in cash and negative working capital of $302,000 at December 31, 2019. Additionally, we had a net loss in the amount of $6.1 million and cash used by operating activities of $1.6 million for the year ended December 31, 2019. These factors raise substantial doubt about our ability to continue as a going concern for the next twelve months from the filing of this Annual Report on Form 10-K. Although we anticipate continued significant revenues for products to be used in MATS compliance activities, no assurances can be given that we can obtain sufficient working capital through these activities and additional financing may be needed to meet its obligations. In February 2020, we closed on a one-year secured loan with a bank in the principal amount of $200,000 and in April 2020, we received loan proceeds in the amount of $299,300 pursuant to the Paycheck Protection Program under the CARES Act which was enacted on March 27, 2020 as a result of the COVID-19 pandemic. Nevertheless, we may need to raise additional working equity or debt financing. While we believe in our ability to raise additional funds, no assurances can be given that we can maintain sufficient working capital through these efforts, or that the continued implementation of our business plan will generate sufficient revenues in the future to sustain ongoing operations.

The accompanying consolidated financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classifications of liabilities that may result from the possible inability of the Company to continue as a going concern.

*Risks Related to our Common Stock*

**Current stockholders may suffer dilution.**

In recent prior years, we have raised funds through the sale of convertible notes and restricted stock to qualified investors, and have under certain circumstances issued warrants to investors and options to employees and others. As of December 31, 2019, we have 76,747,750 shares of common stock outstanding of a total of 150,000,000 shares authorized by the Company. Approximately 104,313,000 shares of common stock are outstanding on a fully diluted basis as of December 31, 2019, taking into account shares issuable upon conversion of outstanding notes, and exercise of outstanding warrants and options. Any such conversion and/or exercise of such securities will have a dilutive effect on existing stockholders. In addition, if we were to raise additional funds through further issuances of equity or convertible debt securities in the future, our stockholders would suffer additional dilution.

**We do not currently intend to pay dividends on our common stock and, consequently, your ability to achieve a return on your investment will depend on appreciation in the price of our common stock.**

We have never declared or paid any cash dividends on our common stock and do not currently intend to do so for the foreseeable future. We currently intend to invest our future earnings, if any, to fund our growth. In addition, until such time that the AC Midwest Energy, LLC promissory notes are paid in full, we are not permitted to issue any dividends. Therefore, you are not likely to receive any dividends on your common stock for the foreseeable future and the success of an investment in shares of our common stock will depend upon any future appreciation in its value. There is no guarantee that shares of our common stock will appreciate in value or even maintain the price at which our stockholders have purchased their shares.

*Table of Contents*

**If our internal control over financial reporting is found not to be effective or if we make disclosure of existing or potential significant deficiencies or material weaknesses in those controls, investors could lose confidence in our financial reports, and our stock price may be adversely affected.**

Section 404 of the Sarbanes-Oxley Act of 2002 requires us to include an internal control report with our Annual Report on Form 10-K. That report must include management's assessment of the effectiveness of our internal control over financial reporting as of the end of the fiscal year. We evaluate our existing internal control over financial reporting based on the framework issued in 2013 by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission. During the course of our ongoing evaluation of the internal controls, we may identify areas requiring improvement, and may have to design enhanced processes and controls to address issues identified through this review. Remedying any deficiencies, significant deficiencies or material weaknesses that we identify may require us to incur significant costs and expend significant time and management resources. Based on such evaluation, our management concluded our internal control over financial reporting was not effective as of December 31, 2019. The ineffectiveness of our internal control over financial reporting was due to the following material weaknesses which are indicative of many small companies: (i) lack of a sufficient complement of personnel commensurate with the Company's reporting requirements; and (ii) insufficient written documentation or training of our internal control policies and procedures which provide staff with guidance or framework for accounting and disclosing financial transactions. While certain remedial actions have been completed, we continue to actively plan for and implement additional control procedures to improve our overall control environment and expect these efforts to continue throughout 2020 and beyond.

Nevertheless, we cannot assure you that any of the measures we implement to remedy any such deficiencies will effectively mitigate or remedy such deficiencies. Due to the nature of the remediation process, the need to have sufficient resources (cash or otherwise) to devote to such efforts, and the need to allow adequate time after implementation to evaluate and test the effectiveness of the controls, no assurance can be given as to the timing of achievement of remediation. Investors could lose confidence in our financial reports, and our stock price may be adversely affected, if our internal controls over financial reporting continue to be found not to be effective by management or if we make disclosure of existing or potential significant deficiencies or material weaknesses in those controls in the future, investors could lose confidence in our financial reports and our stock price may be adversely affected.

**The trading price of our common stock may be volatile.**

The trading price of our shares has, from time to time, fluctuated widely and in the future may be subject to similar fluctuations. The trading price may be affected by a number of factors including the risk factors set forth in this report as well as our operating results, financial condition, announcements of innovations or new products by us or our competitors, general conditions in the market place, and other events or factors. Although we believe a number of registered broker dealers currently make a market in our common stock, we cannot assure you that any of these firms will continue to serve as market makers or have the financial capability to stabilize or support our common stock. A reduction in the number of market makers or the financial capability of any of these market makers could also result in a decrease in the trading volume and price of our shares. In recent years, broad stock market indices in general have experienced substantial price fluctuations. Such broad market fluctuations may adversely affect the future trading price of our common stock.

**The trading market for securities quoted on the OTCQB is less liquid.**

Our common stock currently trades on the OTCQB. The trading market for securities of companies quoted on the OTCQB or other quotation systems is substantially less liquid than the average trading market for companies listed on a national securities exchange. The quotation of our shares on the OTCQB or other quotation system may result in a less liquid market available for existing and potential shareholders to trade shares of our common stock, could depress the trading price of our common stock and could have a long-term adverse impact on our ability to raise capital in the future.

**Potential future sales pursuant to Rule 144.**

Many of the shares of our common stock presently held by management and others are "restricted securities" as that term is defined in Rule 144, promulgated under the Securities Act of 1933, as amended. Under Rule 144, a person (or persons whose shares are aggregated) who has satisfied a certain holding period, may, under certain circumstances sell such shares or a portion of such shares. Such holding periods have already been satisfied in many instances. Therefore, actual sales or the prospect of sales of such shares under Rule 144 in the future may depress the prices of the Company's securities.

*Table of Contents*

**Our common stock may be characterized as a "penny stock" under applicable SEC regulations.**

Our common stock may be characterized as "penny stock" under SEC regulations. As such, broker-dealers dealing in our common stock may be subject to the disclosure rules for transactions involving penny stocks, which generally require that, prior to a purchase, the broker-dealer has approved the proposed purchaser's account for transactions in penny stocks and has received from the purchaser an agreement to the transaction setting forth the identity and quantity of the common stock to be purchased. In order to approve a person's account for transactions in penny stocks, the broker-dealer must obtain from the person information concerning the person's financial situation, investment experience and investment objectives, and reasonably determine that transactions in penny stocks are suitable for the person. These additional burdens imposed upon broker-dealers may discourage them from effecting transactions in our common stock, which could make it difficult for an investor to sell his, her or its shares at any given time.

Except as required by the Federal Securities Law, the Company does not undertake any obligation to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this report or for any other reason.

**Item 1B. Unresolved Staff Comments.**

We are a smaller reporting company as defined by Rule 12b-2 of the Securities Exchange Act of 1934 and are not required to provide the information under this item.

**Item 2. Properties.**

We lease a warehouse in Corsicana, Texas consisting of 20,000 square feet which we use for manufacturing and distribution of our products. As of December 2020, we relocated our corporate headquarters to such location which corporate headquarters prior thereto were maintained in Lewis Center, Ohio. Such lease in Corsicana, Texas expires March 31, 2024. We also lease approximately 500 square feet of office space in Grand Forks, North Dakota which is primarily used for research and development activities. Such lease currently expires August 31, 2020, which shall automatically extend an additional year and on a year to year basis thereafter unless either landlord or tenant otherwise terminates.

**Item 3. Legal Proceedings.**

On July 17, 2019, we initiated patent litigation against certain defendants in the U.S. District Court for the District of Delaware for infringement of United States Patent Nos. 10,343,114 (the "'114 Patent") and 8,168,147 (the "'147 Patent") owned by the Company. These patents relate to our two-part Sorbent Enhancement Additive (SEA$^{®}$) process for mercury removal from coal-fired power plants. Named as defendants in the lawsuit are (i) Vistra Energy Corp., AEP Generation Resources Inc., NRG Energy, Inc., Talen Energy Corporation, and certain of their respective affiliated entities, all of which are owners and/or operators of coal-fired power plants in the United States, and (ii) Arthur J. Gallagher & Co., DTE REF Holdings, LLC, CERT Coal Holdings LLC, Chem-Mod LLC, and certain of their respective affiliated entities, and additional named and unnamed defendants, all of which operate or are involved in operations of coal facilities in the United States. In the lawsuit, the Company alleges that each of the defendants has willfully infringed the Company's '114 Patent and '147 Patent and seeks a permanent injunction from further acts of infringement and monetary damages. Such litigation is currently pending and in its early stages.

On April 21, 2020, NRG Energy, Inc., Talen Energy Corporation and Vistra Energy Corp., three of the defendants in the above action, filed two petitions for Inter Partes Review (IPR) with the United States Patent and Trademark Office (USPTO), seeking to invalidate certain claims to the '114 Patent. The Company believes that such claims of invalidity are without merit.

Other than the foregoing, there are no material pending legal proceedings to which we are a party or to which any of our property is subject, nor are there any such proceedings known to be contemplated by governmental authorities. None of our directors, officers or affiliates is involved in a proceeding adverse to our business or has a material interest adverse to our business.

**Item 4. Mine Safety Disclosures.**

Not applicable.

EXHIBIT 31.1

I, Richard MacPherson, certify that:

1.  I have reviewed this annual report on Form 10-K of Midwest Energy Emissions Corp.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 14, 2020

By:  */s/ Richard MacPherson*
    Richard MacPherson
    President and Chief Executive Officer
    (Principal Executive Officer)

EXHIBIT 31.2

I, Richard MacPherson certify that:

1.   I have reviewed this annual report on Form 10-K of Midwest Energy Emissions Corp.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the consolidated financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


Dated: May 14, 2020                              By:  */s/ Richard MacPherson*
                                                      Richard MacPherson
                                                      Principal Financial and Accounting Officer

EXHIBIT 32.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**

In connection with the Annual Report of Midwest Energy Emissions Corp. (the "Corporation") on Form 10-K for period ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Richard MacPherson, President and Chief Executive Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 and the Sarbanes-Oxley Act of 2002:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

Dated: May 14, 2020                                        By:    */s/ Richard MacPherson*
                                                                          Richard MacPherson
                                                                          President and Chief Executive Officer
                                                                          (Principal Executive Officer)

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**

In connection with the Annual Report of Midwest Energy Emissions Corp. (the "Corporation") on Form 10-K for period ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Richard MacPherson, Principal Financial and Accounting Officer of the Corporation, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 and the Sarbanes-Oxley Act of 2002:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

Dated: May 14, 2020                                        By:   */s/ Richard MacPherson*
                                                                    Richard MacPherson
                                                                    Principal Financial and Accounting Officer

A signed original of this written statement required by Section 906 has been provided to the Corporation and will be retained by the Corporation and furnished to the Securities and Exchange Commission or its staff upon