# EXHIBIT L

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

NRG ENERGY, INC.
TALEN ENERGY CORPORATION, and
VISTRA ENERGY Corp.
Petitioners

v.

MIDWEST ENERGY EMISSIONS CORP.
Patent Owner

————————

Case IPR2020-00832
Patent 10,343,114

————————

**PATENT OWNER MIDWEST ENERGY EMISSIONS CORP.'S
PRELIMINARY RESPONSE**

**Mail Stop "PATENT BOARD"**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Case IPR2020-00832
Patent 10,343,114

# **TABLE OF CONTENTS**

I.  Introduction.............................................................................................1

II.  The Board Should Exercise its Discretion to Deny Institution. .....................1

    A.  The Board Should Deny Institution under 35 U.S.C. § 325(d).............1

        1.  Applicable Law ........................................................................2

        2.  Analysis....................................................................................4

    B.  The Board Should Deny Institution under 35 U.S.C. § 312(a)(2). .......8

III.  Applicable Law Related to Patent Priority .....................................................9

    A.  Legal Standard for Patent Priority.........................................................9

    B.  Petitioners Bear the Burden of Persuasion with Respect to a Disputed Priority Date ......................................................................................13

IV.  Petitioners Have Failed to Show that the '114 Patent Is Not Entitled to its Earliest Claimed Priority Date. ...........................................................................14

    A.  The Provisional Application Supports the '114 Claims......................16

    B.  The '594 '896, and '058 Applications Support the '114 Claims.........19

    C.  '595 and '163 Applications Support the '114 Claims..........................22

    D.  Response to Petitioners' Arguments. ..................................................24

        1.  The Provisional Application Discloses the Claimed Bromine Species. ..................................................................................24

        2.  The Provisional Application Discloses Coal Comprising Added Bromine...................................................................................27

        3.  The Intervening Applications Support the Challenged Claims. ..................................................................................31

V.  Conclusion .......................................................................................................31

Case IPR2020-00832
Patent 10,343,114

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbvie Deutschland GMBH & Co. v. Janssen Biotech, Inc.*,
  759 F.3d 1300 (Fed. Cir. 2014) ...................................................................12, 26

*Advanced Bionics LLC v. MED-EL Elektromedizinische Gerate GmbH*,
  IPR2019-01469, Paper 6 (Feb. 13, 2020) ........................................................3, 4

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (en banc) ...................................................10, 11

*Becton, Dickinson & Co. v. B. Braun Melsungen AG*,
  IPR2017-01586, Paper 8 (Dec. 15, 2017) ...............................................3, 4, 6, 8

*Bilstad v. Wakalopulos*,
  386 F.3d 1116 (Fed. Cir. 2004) ...................................................................11, 26

*Blue Calypso, LLC v. Groupon, Inc.*,
  815 F.3d 1331 (Fed. Cir. 2016) .........................................................................12

*Boart Longyear Ltd. v. Australian Mud Co. Pty Ltd.*,
  No. IPR2019-01129, 2019 WL 6442439 (P.T.A.B. Nov. 25, 2019).................13

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
  800 F.3d 1375 (Fed. Cir. 2015) .........................................................................13

*Fox Factory, Inc., v. Sram, LLC*,
  No. PGR2016-00043, 2017 WL 1242973 (P.T.A.B. Apr. 3, 2017)...................10

*In re Glob. IP Holdings LLC*,
  927 F.3d 1373 (Fed. Cir. 2019) ...................................................................12, 27

*Harmonic Inc. v. Avid Tech., Inc.*,
  815 F.3d 1356 (Fed. Cir. 2016) ...........................................................................1

*Hospira, Inc. v. Genentech, Inc.*,
  Case IPR2017-00739, Paper 16 (PTAB July 27, 2017) .......................................2

*LizardTech. Inc. v. Earth Res. Mapping, Inc.*,
  424 F.3d 1336 (Fed.Cir. 2005) ..................................................................... 10, 11

*In re Magnum Oil Tools Int'l, Ltd.*,
  829 F.3d 1364 (Fed. Cir. 2016) ........................................................................ 15

*Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*,
  934 F.3d 1344 (Fed. Cir. 2019) ........................................................................ 10

*Neil Ziegman, N.P.Z., Inc. v. Stephens*,
  Case IPR2015-01860, slip op. (PTAB Feb. 24, 2016) ...................................... 1

*In re Rasmussen*,
  650 F.2d 1212 (CCPA 1981) ............................................................................ 11

*ScriptPro LLC v. Innovation Associates, Inc.*,
  833 F.3d 1336 (Fed. Cir. 2016) ........................................................................ 11

*In re Smythe*,
  480 F.2d 1376, 178 USPQ 279 (CCPA 1973) ................................................... 12

*Tech. Licensing Corp. v. Videotek, Inc.*,
  545 F.3d 1316 (Fed.Cir.2008) .......................................................................... 14

*Vas–Cath Inc. v. Mahurkar*,
  935 F.2d 1555 (Fed. Cir. 1991) ........................................................................ 10

**Statutes**

35 U.S.C. 112(a) ...................................................................................................... 10

35 U.S.C. 120 ........................................................................................................... 7

35 U.S.C. § 112(a) .................................................................................................... 10

35 U.S.C. § 312(a)(2) ............................................................................................. 8, 9

35 U.S.C. § 314(a) ...................................................................................................... 1

35 U.S.C. § 315 ......................................................................................................... 8

35 U.S.C. § 316(e) .................................................................................................... 13

35 U.S.C. § 325(d) ......................................................................................1, 2, 3

**Other Authorities**

MPEP §201.08 ...................................................................................................7

MPEP §211.05 .................................................................................................10

MPEP §2163.II.A.3.a.ii....................................................................................12, 26

## I.      Introduction

The institution decision for this Petition boils down to a priority date dispute—one that the examiner implicitly addressed during prosecution.[1] Petitioners have failed to identify material error in the examiner's analysis, let alone meet their burden of demonstrating that the claims are not entitled to the provisional filing date.  Accordingly, Patent Owner respectfully requests that the Petition be denied.

## II.     The Board Should Exercise its Discretion to Deny Institution.

### A.      The Board Should Deny Institution under 35 U.S.C. § 325(d).

Institution of an *inter partes* review is discretionary. *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) (explaining that under § 314(a), "the PTO is permitted, but never compelled, to institute an IPR proceeding"). "While petitioners may have sound reasons for raising art or arguments similar to those previously considered by the Office, the Board weighs petitioners' desires to be heard against the interests of patent owners, who seek to avoid harassment and enjoy quiet title to their rights."  *See Neil Ziegman, N.P.Z., Inc. v. Stephens*, Case IPR2015-01860, slip op. at 12–13 (PTAB Feb. 24, 2016) (Paper 11).  For example, the Board has exercised its discretion to deny institution

---

[1] For purposes of this preliminary response only, Patent Owner does not dispute that the asserted art renders the claims at issue unpatentable, and will just focus on the priority dispute.

where the petition is based on a priority date dispute and the examiner had previously considered the priority date of the patent at issue. *Hospira, Inc. v. Genentech, Inc.*, Case IPR2017-00739, Paper 16 (PTAB July 27, 2017).

Petitioners contend that the challenged claims cannot claim priority to earlier applications because those applications fail to provide written description support for two limitations: (1) using HBr, $Br_2$, or $Br^-$/bromide as an additive (Pet. at VI.C.2); and (2) adding the additive to coal (Pet. at VI.C.3). They contend that this dispute is appropriate for *Inter Partes* Review because: "Examiners do not make findings of priority as a matter of course during prosecution." Pet. at 11-12. This assertion is misguided. Petitioners fail to mention that the examiner found written description support for the challenged claims based on material contained in, or equivalent to, the parent applications. Because Petitioners identify no material error in the examiner's conduct, the Board should deny institution under § 325(d).

### 1. Applicable Law

Section 325(d) provides that the Director may elect not to institute a proceeding if the challenge to the patent is based on arguments previously presented to the office. 35 U.S.C. § 325(d). In particular, the Board uses the following two-part framework before instituting a petition: (1) it determines whether the same or substantially the same art or arguments were previously presented to the Office; and (2) if so, then it determines whether the petitioner has

demonstrated that the Office "erred in a manner material to the patentability of

challenged claims." *Advanced Bionics LLC v. MED-EL Elektromedizinische*

*Gerate GmbH*, IPR2019-01469, Paper 6 (Feb. 13, 2020) (precedential). "If

reasonable minds can disagree regarding the purported treatment of the art or

arguments, it cannot be said that the Office erred in a manner material to

patentability. At bottom, this framework reflects a commitment to defer to previous

Office evaluations of the evidence of record unless material error is shown." *Id.*

The Board has identified the following non-exclusive factors in evaluating

whether to exercise discretion pursuant to § 325(d):

> (a) the similarities and material differences between the asserted art and
> the prior art involved during examination; (b) the cumulative nature of
> the asserted art and the prior art evaluated during examination; (c) the
> extent to which the asserted art was evaluated during examination,
> including whether the prior art was the basis for rejection; (d) the extent
> of the overlap between the arguments made during examination and the
> manner in which Petitioner relies on the prior art or Patent Owner
> distinguishes the prior art; (e) whether Petitioner has pointed out
> sufficiently how the Examiner erred in its evaluation of the asserted
> prior art; and (f) the extent to which additional evidence and facts
> presented in the Petition warrant reconsideration of the prior art or
> arguments.

*Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8

(Dec. 15, 2017) (precedential as to § III.C.5, first paragraph) ("*Becton,*

*Dickinson*").  The Board has further explained that, although these factors refer to

prior examination and previously presented art, they are meant to "more broadly

Case IPR2020-00832
Patent 10,343,114

provide guidance" as to whether art or arguments were previously presented in any

proceeding. *Advanced Bionics*, IPR2019-01469, Paper 6 at 10. It has also clarified

that factors (a), (b), and (d) relate to the first portion of the framework, and the

remaining factors relate to the second portion of the framework. *Id.*

### 2. Analysis

#### a) *Becton* factors (a), (b), (d): The Same or Substantially the Same Arguments Were Previously Presented to the Patent Office.

Shortly after the filing of the original application for the '114 patent, the

applicant added the following independent claim:

2. (New)    A method of separating mercury from a mercury-containing gas, the method comprising:

combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein the mercury-containing gas comprises a halogen or halide promoter comprising $Br_2$, HBr, $Br^-$, or a combination thereof;

injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber such that the activated carbon reacts with the halogen or halide promoter in the mercury-containing gas to form a promoted sorbent;

reacting mercury in the mercury-containing gas with the promoted sorbent, to form a mercury/sorbent composition;

separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas;

monitoring the mercury content of the cleaned gas; and

controlling, in response to the monitored mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, the sorbent composition, or a combination thereof, so that the mercury content of the cleaned gas is maintained at or below a desired level.

4

Ex. 1026 at 75-76.  Notably, this claim encompasses all of the features that

Petitioners allege are absent from the various parent applications, i.e., the use of

HBr, Br2, or Br-, and the addition of a bromine material to the coal.  While claim 2

does not expressly recite providing bromine to the coal, its scope covers that

embodiment because it covers combusting coal to obtain a mercury-containing gas

that also contains those bromine species.

Prior to issuing the first office action, the examiner requested an interview to

discuss this claim and others.  That interview was summarized as follows:

---

**Issues Discussed:**

**Item(s) under 35 U.S.C. 112:**
The examiner asked for clarification where exactly the new claims 2-21 have support within the originally filed application. The applicant pointed to figure 6. The examiner agreed.

---

Ex. 1026 at 1535.  Thus, the examiner found that the claim scope now challenged

by Petitioners were supported, at least in part, by '114 patent figure 6:



FIG. 6

Ex. 1001.  Figure 6 above is taken directly from the provisional application.  Ex. 1020, Provisional application Fig. 2.  Substantially the same description of providing a bromine additive before or into the boiler appears in all of the parent applications.  *See infra* IV.B – IV.C.  Thus, the same written description issues that form the basis of the Petition were already considered by the examiner during prosecution.

### b)     *Becton* Factors (c), (e), (f): Petitioner Has Failed to Demonstrate that the Examiner Committed Material Error.

Petitioners contend that the examiner committed material error by failing to consider Sjostrom and Eckberg.  This is beside the point.  Because the examiner considered and ultimately rejected the written description challenge described above, she would have had no basis to issue a rejection based on Petitioners' proposed priority date. Petitioners could have attempted to argue that the examiner's § 112/priority date analysis contained some material error, but they failed to do so.  Thus, *Becton* factors (c), (e), and (f) weigh against institution.

Petitioners are also incorrect in their assertion that "Examiners do not make findings of priority as a matter of course during prosecution, instead accepting applicant's asserted priority date."  Pet. at 11-12.  While it is true that examiners are not required to provide a priority date analysis for every application, such an analysis is required when considering references that post-date the earliest claimed

filing date.  *See* M.P.E.P. §201.08 ("*Unless the filing date of the earlier nonprovisional application is actually needed*, for example, in the case of an interference or to overcome a reference, there is no need for the Office to make a determination as to whether the requirement of 35 U.S.C. 120, that the earlier nonprovisional application discloses the invention of the second application in the manner provided by the first paragraph of 35 U.S.C. 112, is met") (emphasis added).

During prosecution, the examiner considered several references with prior art dates in between the provisional filing date and the '114 filing date.  *See* '114 patent References Cited.  Indeed, Inventor John Pavlish testified that a 2010 presentation disclosed this invention.  *See* Ex. 2016 at 1818 (citing Nelson, Sid Jr., et al., "How China Can Leapfrog the World in Mercury Emission Reductions," Proc. of the AWMA Intl. Specialty Conference on Leapfrogging Opportunities for Air Quality Improvement (2010)).  This document was cited as objective evidence of non-obviousness because it demonstrated that one of the industry participants previously opposed to the invention later touted the test results reported by the EERC using this invention.  Nonetheless, the fact that the examiner did not reject the claims based on this reference indicates that she did not accept Petitioners' assertion of a lapse in priority.

Because all of the *Becton* factors weigh against institution, the Board should deny the petition.  This is particularly true here given that Petitioners have filed multiple petitions and designated this one as less appropriate for institution.

## B.     The Board Should Deny Institution under 35 U.S.C. § 312(a)(2).

35 U.S.C. § 312(a)(2) provides that a petition may only be considered if "the petition identifies all real parties in interest."  This Petition lists dozens of "potential real parties in interest," without explanation as to their relationship to petitioners.  This is not an identification of *all real parties in interest*.  The Board should not engage in *Inter Partes* Review under such a cloud of uncertainty.

This ambiguous response will likely lead to confusion and disputes as to which parties are real parties in interest and which are bound by the estoppel provisions of 35 U.S.C. § 315.  For example, Petitioners identify various "vendors and suppliers with regards to certain allegedly infringing components at issue in the Delaware Litigation" as "potential real parties in interest."  With respect to these entities, Petitioners state: "None of these companies or any unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding."  Thus, Petitioners imply that the believe these entities are not actually real parties in interest.  However, Petitioners also identify dozens more potential real parties in interest without explanation.  Do they also contend that these named entities are not real parties in interest?  Given that

8

petitioners contend that no un-named entities are funding controlling, or directing the proceeding, are any of these later named entities doing so?

This problem is compounded by the fact that some entities are identified both as "potential real parties in interest" and actual "real parties in interest." For example, the Petition indicates that Chem-Mod LLC is not "funding, controlling, or directing" the proceeding. Pet. at 2. However, Petitioner NRG identifies Chem-Mod LLC as a real party in interest, and merely states that no "un-named entity is funding, controlling, or directing" the proceeding. Pet. at 6. § 312(a)(2) requires more than an ambiguous and conflicting listing of entities, which may or may not be hiding additional real parties in interest.

Whether for tactical reasons, or simply because they did not do the work to clarify the relationships between these various entities, Petitioners have not met their burden of identifying all real parties in interest. Because *Inter Partes* Review is a discretionary procedure and the Board expects a high degree of preparedness from Petitioners, the Board should deny institution for failure to comply with § 312(a)(2).

## III.   Applicable Law Related to Patent Priority

### A.   Legal Standard for Patent Priority

"To be entitled to the benefit of the filing date of an earlier-filed application . . . the disclosure of the invention in the prior application and in the later-filed

application must be sufficient to comply with the requirements of 35 U.S.C. 112(a) except for the best mode requirement." MPEP 211.05. To satisfy the written description requirement under 35 U.S.C. § 112(a), the specification "must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (internal quotation marks and alterations omitted). In other words, a patent applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention. The invention is, for purposes of the 'written description' inquiry, whatever is now claimed." *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991); *see also Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344, 1350 (Fed. Cir. 2019) (explaining that it "is not necessary that the exact terms of a claim be used *in haec verba* in the specification").

A claim "will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language." *LizardTech. Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed.Cir. 2005); *see also Fox Factory, Inc., v. Sram, LLC*, No. PGR2016-00043, 2017 WL 1242973, at *5 (P.T.A.B. Apr. 3, 2017) (finding that petitioner failed to show lack of written description support for claims that covered a broader range of embodiments than those disclosed in the specification).

Relatedly, "[n]ot every claim must contain every limitation or achieve every disclosed purpose." *See ScriptPro LLC v. Innovation Associates, Inc.*, 833 F.3d 1336, 1342 (Fed. Cir. 2016); *see also In re Rasmussen*, 650 F.2d 1212, 1215 (CCPA 1981) (explaining "that a claim may be broader than the specific embodiment disclosed in a specification is in itself of no moment").

The Board must consider the following factors in evaluating the level of disclosure required: "the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, [and] the predictability of the aspect at issue." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed.Cir.2010). This is because "the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before. . . . Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue experimentation." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed.Cir.2005).

"[T]he general rule [is] that disclosure of a species provides sufficient written description support for a later filed claim directed to the genus." *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004). A specification supports a

11

genus claim if "one of skill in the art would recognize that the applicant was in possession of the necessary common attributes or features possessed by the members of the genus in view of the species disclosed." MPEP 2163.II.A.3.a.ii. For example, disclosure of a species in a specification may provide support for a genus claim covering species that are predictable alternatives to the disclosed species. *In re Glob. IP Holdings LLC*, 927 F.3d 1373, 1377 (Fed. Cir. 2019) (reversing Board decision for failure to consider predictability of alternatives).

Similarly, a specification may support a claim where there is "a reasonable structure-function correlation." Such a correlation may be established "by the inventor as described in the specification," or it may be "known in the art at the time of the filing date." *AbbVie*, 759 F.3d at 1300-01 (Fed. Cir. 2014); *see, e.g., In re Smythe*, 480 F.2d 1376, 1383, 178 USPQ 279, 285 (CCPA 1973) (the phrase "air or other gas which is inert to the liquid" was sufficient to support a claim to "inert fluid media" because the description of the properties and functions of the air or other gas segmentizing medium would suggest to a person skilled in the art that appellant's invention includes the use of "inert fluid" broadly).

Conclusory expert testimony that a specification fails to provide support for a claim is insufficient to demonstrate lack of written description.  *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1346 (Fed. Cir. 2016) (reversing Board

decision and criticizing petitioner's expert testimony as "abstract and untethered from the context provided by the [challenged patent]").

### B. Petitioners Bear the Burden of Persuasion with Respect to a Disputed Priority Date

"In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). In particular, the burden of proving that an asserted reference pre-dates an alleged priority date rests on the petitioner, not the patentee. *Id.*

Initially, a petitioner has the burden of persuasion, and the burden of production (i.e., coming forward with evidence) on all issues. *See Dynamic Drinkware*, 800 F.3d 1379. If the petitioner provides *prima facie* evidence that its burden has been met, the burden of production—but not the burden of persuasion—shifts to the patentee on some issues such as the determination of a patent's priority date. *Id.* at 1380. If the patentee meets this burden by providing evidence of an earlier priority date, the Board must evaluate the petitioner's arguments in light of all the evidence to determine if the petitioner has met its burden of persuasion. *Id.*; *see, e.g., Boart Longyear Ltd. v. Australian Mud Co. Pty*

*Ltd.*, No. IPR2019-01129, 2019 WL 6442439, at *14 (P.T.A.B. Nov. 25, 2019)

(describing this procedure).

Citing *PowerOasis*, Petitioners mistakenly assert that a patent owner bears

the burden of persuasion with respect to establishing a priority date.  In doing so,

Petitioners confuse the burden of *production* with the burden of *persuasion*. The

Federal Circuit has already rejected this misinterpretation of *PowerOasis*.  *See*

*Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed.Cir.2008)

(explaining that *PowerOasis* held that the burden of *production* can shift to the

patentee, not the burden of *persuasion*).

## IV.    Petitioners Have Failed to Show that the '114 Patent Is Not Entitled to its Earliest Claimed Priority Date.

The chain of applications connecting the original provisional application to

the '114 patent includes a number of applications with identical specifications.  For

ease of reading, ME2C will refer to the following applications:

- The provisional application (Ex. 1020)
- The '595 Application – representative of the '163 application (Exs. 1021-1022)
- The '594 Application – representative of the '058 and '896 applications (Exs. 1023-1025)

Petitioners must demonstrate that one or more of these applications lacks written

description support for the challenged claims of the '114 patent.  To meet this

burden, Petitioners identify two limitations that are allegedly missing from these

applications:

1. "No Disclosure of a Promoter Comprising Br2, Br-, or Combinations of Br2 and HBr with Bromide Compounds in the Provisional" (Pet. at VI.C.2)
2. "No Disclosure for 'the Coal Comprises Added' Bromine Species" (Pet. at VI.C.3)

Because Petitioners bear the burden of proof on the issue of priority, and as a

matter of due process, the Board's analysis is limited to these two issues. *In re*

*Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) ("Given that

framework, we find no support for the PTO's position that the Board is free to

adopt arguments on behalf of petitioners that could have been, but were not, raised

by the petitioner during an IPR. Instead, the Board must base its decision on

arguments that were advanced by a party, and to which the opposing party was

given a chance to respond.").

For the reasons provided below, Petitioners have not met their burden of

establishing a *prima facie* case for unpatentability. Even if they had met that

burden, the portions of the applications cited below demonstrate that Petitioners

are unable to meet their ultimate burden of persuasion on this issue.

**A.      The Provisional Application Supports the '114 Claims.**

The bulk of the petition's priority date analysis focuses on the provisional

application.  However, this application provides sufficient support for the

challenged claims.

The provisional application explains the scientific basis for the invention.  It

states:

> We now teach that the formation of the new bromide compound with carbon increases the reactivity of the carbon forms toward mercury and other pollutants. The resulting bromide compound is uniquely suited to facilitate oxidation of the mercury. The effectiveness of the oxidation results from the promotion effect of the halide exerted on the developing positive charge on the mercury during the oxidation, known in the chemical art as a specific catalytic effect. ***Thus, as the mercury electrons are drawn toward the positive carbon, the halide anion electrons are pushing in from the other side, which stabilizes the positive charge developing on the mercury and lowers the energy requirement for the oxidation process. Bromide is especially reactive, owing to the highly polarizable electrons in the outer 4p orbitals of the ion. Thus, adding HBr or Br2 to the carbon forms a similar carbon bromide, in which the positive carbon oxidizes the mercury with the assistance of the bromide ion.***

Ex. 1020 at 9. Thus, the inventors explained that the benefits of the claimed

promoted sorbent are obtained by forming a carbon bromide out of activated

carbon and a negative Bromine ion, i.e., Br-.  They further explain that this Br- ion

may be supplied by adding HBr or $Br_2$ (both of which contain Br-) to the carbon.

This is further illustrated in the diagram below:

As shown above, activated carbon is mixed with HBr.  This results in carbon bonded with the hydrogen atom, and a Bromine ion Br-.  When these components are mixed into mercury-containing gas, the mercury (Hg) is drawn toward the carbon, and the Bromine ion is drawn toward the mercury, creating a stable bond.

Thus, the inventors explained that mercury is captured by intermixing activated carbon and bromine ions with the mercury.  It also provides examples of chemicals that can supply the bromine ion, Hydrogen Bromide (HBr) and Bromine gas ($Br_2$).  Of course, the chemical model described above demonstrates that other sources of Bromine ions (i.e., bromides) may be used.  As Petitioners' expert testified, a POSITA would recognize that a "bromide" consists of a bromine ion (Br-) and some other element.  Ex, 1002, Niksa Decl. at ¶ 73.

17

The provisional application also describes the use of "an optional second component." This component is a halogen or a compound from a halogen such as HBr. Ex. 1020 at 10. Thus, the inventors describe the use of an activated carbon sorbent with a source of bromine ions, and, optionally, another source of halogen ions, which could also be bromine ions:

> It has been demonstrated that addition of an optional second component, in addition to the bromine, results in improved reactivity and capacity for the sorbent, exceeding that of both the untreated carbon and the brominated carbon. The second compound comprises either a second halogen or a compound from a second halogen, such as HBr.

*Id.* Having described the scientific theory behind their invention, the inventors also described various implementations of their theory, including the example provided below:

> FIG. 2 is a block diagram illustrating the use of the invention in a coal fueled facility. Of course, the invention can also be used in any other desired type of facility. FIG. 2 shows a boiler for burning pulverized coal. The facility utilizes various devices to clean the exhaust of the boiler. In this example, a baghouse or ESP is used to collect particulates in the exhaust. A scrubber and sorbent bed are also used to remove undesired constituents from the flue gas stream, before being fed to the stack. ***In the example shown, the sorbent is injected into the flue gas after the boiler. The additive can be injected where desired (e.g., before, after, or within the boiler).***

*Id.* And as illustrated below:



FIG. 2

*Id.* Thus, the provisional application provides full written description support for each of the claims of the '114 patent.

### B.    The '594 '896, and '058 Applications Support the '114 Claims.

Petitioners admit that the 594, 896, and 058 applications contain substantively identical disclosures.  For ease of reading, patent owner refers to the '594 application below.  Ex. 1025.

The '594 application contains the same or similar disclosures as those contained in the provisional application.  It offers the same chemical model to describe the reaction between activated carbon, bromine ions, and mercury:

**FIG. 2**

*See also* Ex. 1025, at ¶ 64 (containing the same description as in the provisional

application quoted above); ¶ 88 (describing optional second halogen component).

The '594 application does differ from the provisional application in two

relevant respects: (1) the '594 application contains generic block diagram figures

(figs. 1 and 3) of a coal plant instead of the provisional application's graphical

depiction of a coal plant (fig. 2); (2) the '594 application states that a "promoter"

can be introduced upstream of the boiler, whereas the provisional application states

that the "additive" can be added before, after, or within the boiler.  Neither of these

differences destroy priority.

The figures and accompanying descriptions of the '594 application provide similar disclosure to that provided in the provisional application.  Figure 3 depicts activated carbon reservoir 110, halogen reservoirs 120 and 130, and an injection point 116 where these materials are added to a mercury containing gas 15. *Id.* at ¶ 72. The '594 application further explains that the invention is not limited to a single injection point.  *Id.* at ¶ 74 ("injection point 116 and 119 may be at multiple locations upstream and/or downstream of 140 when parallel, sequential, or combinations thereof exist.")  Thus, the inventors expressly stated that the carbon sorbent and halogen/halide may be added at multiple locations in the coal burning process.

The inventors further explained that the locations for adding the halogen/halide and sorbent may be, before, after, or within the boiler.  *Id.* at ¶ 35 ("In some embodiments, the promoter is introduced into the mercury-containing gas upstream of the introduction of the base sorbent. In some embodiments, the promoter is introduced upstream of a boiler or a combustion chamber."); *see also id.* at ¶ 93 (explaining that figs. 5A, 5B depict promoter 401 added to boiler 301 and sorbent 402 added downstream of the boiler).

While the '594 application refers to a "promoter" instead of an "additive," this does not defeat priority.  Just as the provisional describes the "additive" as supplying a bromine ion, the '594 application describes the "promoter" as

supplying the bromine ion.  *Id.* at ¶ 20 ("a promoter selected from the group

consisting of halogens, halides, and combinations thereof, such that the reaction

product comprises a promoted sorbent effective for removal of mercury from a gas

stream."); ¶ 22 ("promoter is selected from the group consisting of Br.sub.2, a

Group V bromide, a Group VI bromide, and combinations thereof"); ¶ 81 ("In

embodiments wherein the halogen/halide promoter is in gaseous or vapor form, it

may be diluted in air, nitrogen, or other gas as appropriate. The halide/halogen gas,

for example, gaseous HBr or Br.sub.2. . .").

### C.     '595 and '163 Applications Support the '114 Claims.

The '595 and '163 applications contain substantively identical disclosures.

For ease of reading, patent owner refers to the '595 application below.  Ex. 1022.

'595 application discloses the same chemical model as the '594 application

(fig. 2; ¶¶ 52-53), the use of a "promoter" that supplies Br- such as HBr or $Br_2$ (¶¶

53, 64, original claim 8), and the practice of adding the promoter and sorbent at

one or multiple locations (¶ 56).

The '595 application does differ from the 594 application in one relevant

respect: instead of the hypothetical example depicted in figure 5 of the '595 patent,

the '594 patent describes an experimental test setup at an actual coal plant.  In that

example, the promoter and sorbent were both injected downstream of the boiler.

However, the inventors explained that these components could be added before,

after, or within the boiler. *Id.* at ¶ 107 ("In this example, the halogen/halide promoted carbon sorbent was injected into the flue gas after the boiler. In general however, the inventive sorbent can be injected where desired (e.g., before, after, or within the boiler)").

This portion of the '595 application also differs from the '594 application and the provisional application in that the '595 application describes the "halogen/halide promoted carbon sorbent being added "before, after, or within the boiler," whereas the '595 and provisional applications describes an "additive" or "promoter" as being added "before, after, or within the boiler." This difference is immaterial to the priority dispute.

What matters is whether the '595 application discloses "coal compris[ing] added $Br_2$, HBr, Br-, or a combination thereof" and/or a combustion chamber compris[ing] added $Br_2$, HBr, Br-, or a combination thereof" as claimed in the '114 patent claims. Because a halogen/halide promoted sorbent necessarily includes a halogen/halide such as $Br_2$, HBr, or Br-, a POSITA would recognize that adding this material before the boiler necessarily results in the limitations at issue in the '114 patent. In any event, Petitioners do not rely on this difference between the applications to support their priority date assertions. Thus, the word choice distinctions between the provisional, '594, and '595 applications are immaterial to the dispute presently before the Board.

**D.     Response to Petitioners' Arguments.**

For the reasons stated above, Patent Owner has met its burden to provide

evidence establishing an earlier priority date.  In light of that evidence, Petitioners

cannot sustain their burden of proving that the challenged claims are not entitled to

the priority date of the provisional application.

### 1.  The Provisional Application Discloses the Claimed Bromine Species.

According to Petitioners, the provisional application fails to teach this

limitation because it states that an "additive" may be added before the boiler

instead of stating that bromine/bromide may be added before the boiler.  *See* Ex.

1020 at fig. 2. This is elevating form over substance.  As noted above, the

inventors' chemical model relies on a combination of two components—bromine

ions and activated carbon sorbent.  It strains credulity to think that a POSITA

would be unable to determine what "additive" is referred to in figure 2.

The provisional application does describe an "optional second component"

that may be used in addition to the bromine and activated carbon.  Ex. 1020 at 13.

However, Petitioners fail to show that a POSITA would interpret figure 2 as

describing the combination of activated carbon and an "optional second

component," while *omitting* the critical bromine component.  Even if Petitioners

had identified some teaching that the bromine is optional, the provisional

application plainly teaches using bromine (specifically HBr, Br$_2$, and Br- ions) as an additive. *Id.* at 8.

This is further confirmed by the provisional application's description of "in-flight" mixing.  It states: "we demonstrated that the sorbent can be readily treated with any combination of bromine and the second component in-flight using vapors of the these components contacting the very fine carbon particles dispersed in air or other gas stream that conveys the particles to the flue gas duct." When listing the benefits of this method it states: "There are no costs for transporting carbon and additive to a treatment facility." If the inventors intended the word "additive" to refer only to the optional second component, this sentence should state: "There are no costs for transporting carbon [bromine] and additive to a treatment facility." This indicates that the inventors used the word "additive" with its ordinary meaning, i.e., a component that is added to the carbon.  Thus, the word "additive" encompasses bromine *and* the optional second component.  *See also Id.* ("This process allows rapid on-site tailoring of additive-sorbent ratios in order to match the requirements of flue gas changes, such as needed when changing fuels or reducing loads, thus further optimizing the economics.")

Petitioners also criticize the claims listed in the provisional, but an inventor is not required to include claims in a provisional application, let alone include

claims that, standing alone, provide § 112 support for later claims.[2]

Finally, petitioners argue that the species disclosed in the provisional application fail to support genus claims encompassing Br- or bromides.  However, "the general rule [is] that disclosure of a species provides sufficient written description support for a later filed claim directed to the genus." *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004). Petitioners fail to show that this general rule is inapplicable here.

In particular, an application supports a genus claim if "one of skill in the art would recognize that the applicant was in possession of the necessary common attributes or features possessed by the members of the genus in view of the species disclosed." MPEP 2163.II.A.3.a.ii. Similarly, a specification may support a claim where there is "a reasonable structure-function correlation." *AbbVie*, 759 F.3d at 1300-01. The provisional application satisfies this standard.  By describing a chemical model illustrating the interaction between activated carbon, mercury and Br- ions, a POSITA would understand that the common attribute of the relevant genus is a chemical that can supply a Br- ion, i.e., a bromide.

---

[2] Relatedly, Petitioners criticize Mr. Pavlish for distinguishing HBr from Br2, etc. Mr. Pavlish's testimony on these issues merely provided basic truths of chemistry. HBr refers to a molecule containing a hydrogen atom and a bromine atom.  Br2 contains to bromine atoms. Drawing that distinction in no way minimizes the significance of the chemical model taught in the provisional application.

Similarly, disclosure of a species may provide support for a genus claim covering species that are predictable alternatives to the disclosed species. *In re Glob. IP Holdings LLC*, 927 F.3d 1373, 1377 (Fed. Cir. 2019) (reversing Board decision for failure to consider predictability of alternatives). For the same reasons described above, that standard is also met. Here, Petitioners argue that Sjostrom's bare description of adding "Br" to coal is enough to inform a POSITA to use HBr, Br- ions, and other bromides. Pet. at 60 ("A POSITA would have understood that the "Br" added at Addition Locations 1-3 refers to a bromide compound (e.g., HBr) including Br– ions dissociated from a bromide compound added in the form of an aqueous solution of a bromide salt, such as CaBr2."). If Petitioners are correct, then the much more detailed description of chemical mechanisms contained in the '114 parent applications also inform a POSITA as to the scope of this genus.

### 2. The Provisional Application Discloses Coal Comprising Added Bromine.

Petitioners argue that, even if the provisional application describes adding bromine "before . . . the boiler," it fails to disclose "the coal comprises added Br2, HBr, Br-, or a combination thereof, added to the coal upstream of the combustion chamber."

To understand the flaw in this argument, it is helpful to describe how coal is provided to a combustion chamber.[3]  As Petitioners' expert explained:

> It was known that the main method in use by the electric utility steam generation industry for the combustion of coal as a fuel source was pulverized coal firing. Pulverized coal firing is performed by feeding small particle sized coal—around 50 micron mean diameter—to a combustion chamber or furnace for combustion of the pulverized coal [. . . .]
>
> [T]he components within these systems generally included a number of burners that fired the pulverized coal as it was carried from the pulverizers by a stream of primary air supplied by a large forced draft fan. It was known that the combustion chamber may also include a supply of secondary air and over-fire air ports for the control of NOx formation.

Ex. 1002 at ¶ 91-92. In other words, coal is provided to a combustion chamber by first crushing the coal into a fine powder and then using air flow to transport the coal into entry ports for the chamber.  Moreover, Dr. Niksa testified that a POSITA would understand a coal combustion chamber to have only two entry points: coal entry ports or secondary entry ports.  This description is consistent with the provisional application which depicts coal passing through a pulverizer and then entering the combustion chamber:

---

[3] Petitioners do not dispute that the term "boiler" as used in the provisional application encompasses a combustion chamber.



FIG. 2

Ex. 1020 at fig. 2. This description is also consistent with the overall structure of

the claims, which describe adding bromine either through coal entry ports,

alternative entry ports, or both:

> the mercury-containing gas comprises a halogen or halide promoter comprising HBr, Br–, or a combination thereof, wherein
> the coal comprises added Br2, HBr, Br–, or a combination thereof, added to the coal upstream of the combustion chamber,
> or the combustion chamber comprises added Br2, HBr, Br–, or a combination thereof,
> or a combination thereof;

Ex. 1001 at claim 1. Given the background described above, a POSITA would

understand that this claim refers to the two ways that bromine could be added to

the combustion chamber: either it is added to the coal and then passed through the

coal entry ports, or it is added through secondary air ports into the combustion

chamber. This is consistent with the provisional application which describes

adding the bromine "before" or "within" the boiler.  Ex. 1020 at 15.  Thus, the

provisional application provides support for this limitation.

Even Petitioners acknowledge that a POSITA would understand an image

similar to the provisional figure as disclosing this limitation.  Petitioners argue that

Sjostrom teaches this limitation based on the image below:



Pet. at 46. In particular, Petitioners state: "It would have been obvious to a

POSITA that the 'Br' added at Addition Location 1 would be to pulverized coal."

Petitioners cannot meaningfully contend that a POSITA would understand

Sjostrom's arrow to disclose adding bromine to pulverized coal, but reach a different conclusion with respect to the provisional application.[4]

### 3. The Intervening Applications Support the Challenged Claims.

Petitioners offer only brief, vague assertions as to why these applications fail to provide support for the challenged claims, or they criticize portions of the applications not relied upon above. For all of the reasons described above, these applications do provide written description support for the claims.

## V.    Conclusion

For the reasons provided above, the Board should conclude that Petitioners have failed to meet their burden of proving that the asserted references qualify as prior art, and thus deny the Petition.

---

[4] Petitioners may argue that there is no direct contradiction because they used the word "obvious." This is too clever by half. In this statement, Petitioners acknowledge that a POSITA would understand the arrow pointing before the boiler in Sjostrom to be describing bromine added to pulverized coal. Based on that same reasoning, a POSITA would also understand the provisional application to demonstrate the '114 inventors possessed the same idea.

Case IPR2020-00832
Patent 10,343,114

Dated: July 29, 2020

Respectfully submitted,

*Midwest Energy Emissions Corp.*

By */Hamad M. Hamad/*
Hamad M. Hamad, Reg. No. 64,641
Justin T. Nemunaitis (*pro hac pending*)
CALDWELL CASSADY CURRY, P.C.
2121 N. Pearl St., Ste. 1200
Dallas, Texas 75201
Telephone: 214.888.4848
Facsimile:  214.888.4849
hhamad@caldwellcc.com
jnemunaitis@caldwellcc.com
midwest@caldwellcc.com

**CERTIFICATE OF SERVICE UNDER 37 C.F.R. § 42.6 (e)(4)**

It is hereby certified that on this 29th day of July, 2020, a copy of the

foregoing document was served via electronic mail, as previously consented to by

Petitioner upon the following counsel of record:

Brian W. Oaks (Lead Counsel)
David J. Tobin (Back-up Counsel)
Elizabeth D. Flannery (Back-up Counsel)
Thomas B. Carter (Back-up Counsel)
Baker Botts L.L.P.

Brian.oaks@bakerbotts.com
David.tobin@bakerbotts.com
DLBB-ME2C-IPR@bakerbotts.com

Case IPR2020-00832
Patent 10,343,114

Date: July 29, 2020                    */Hamad M. Hamad/*
                                        Hamad M. Hamad, Reg. No. 64,641


**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS**

This Preliminary Response complies with the type-volume limitation of

14,000 words, excluding the parts exempted by 37 C.F.R. § 42.24(b).

This Preliminary Response complies with the general format requirements of

37 C.F.R. § 42.6(a) and has been prepared using Microsoft® Word 2016 in 14

point Times New Roman.

Date: July 29, 2020                    */Hamad M. Hamad/*
                                        Hamad M. Hamad, Reg. No. 64,641