# EXHIBIT M

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

NRG ENERGY, INC.
TALEN ENERGY CORPORATION, and
VISTRA ENERGY Corp.
Petitioners

v.

MIDWEST ENERGY EMISSIONS CORP.
Patent Owner

———————

Case IPR2020-00928
Patent 8,168,147

———————

**PATENT OWNER MIDWEST ENERGY EMISSION CORP.'S
PRELIMINARY RESPONSE**

**Mail Stop "PATENT BOARD"**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## **TABLE OF CONTENTS**

I.      Introduction ....................................................................................1

II.     The Board Should Exercise its Discretion to Deny Institution. .....................1

        A.      The Board Should Deny Institution under 35 U.S.C. § 325(d) ............1

III.    The Board Should Exercise its Discretion to Deny Institution
        under 35 U.S.C. § 312(a)(2). ..........................................................1

IV.     Claim Construction ...........................................................................3

V.      Applicable Law Related to Patent Priority ...........................................5

        A.      Legal Standard for Patent Priority ..........................................5

        B.      Petitioners Bear the Burden of Persuasion with Respect to
                a Disputed Priority Date ......................................................7

VI.     Petitioners Have Failed to Show that '147 Patent Claims 18 and 19
        Are Not Entitled to the Earliest Claimed Priority Date. ..................9

        A.      The Provisional Application Supports '147 Claims 18 and 19 ..........10

        B.      Petitioners Misinterpret the Provisional Application. ........................14

        C.      The '163 and '595 Applications Support the '147 Claims. ...............15

VII.    Conclusion .......................................................................................19

## TABLE OF AUTHORITIES

**Cases**

*Ariad Pharm., Inc. v. Eli Lilly & Co.*
    598 F.3d 1336 (Fed. Cir. 2010) ...................................................................5

*Ariad Pharms., Inc. v. Eli Lilly & Co.*
    598 F.3d 1336 (Fed. Cir.2010) ....................................................................6

*Blue Calypso, LLC v. Groupon, Inc.*
    815 F.3d 1331 (Fed. Cir. 2016) ...................................................................7

*Boart Longyear Ltd. v. Australian Mud Co. Pty Ltd.*
    No. IPR2019-01129, 2019 WL 6442439 (P.T.A.B. Nov. 25, 2019) .................8

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*
    800 F.3d 1375 (Fed. Cir. 2015) .................................................................7, 8

*Fox Factory, Inc., v. Sram, LLC*
    No. PGR2016-00043, 2017 WL 1242973 (P.T.A.B. Apr. 3, 2017) .................6

*Gillette Co. v. Energizer Holdings, Inc.*
    405 F.3d 1367 (Fed. Cir. 2005) ...................................................................5

*In re Magnum Oil Tools Int'l, Ltd.*
    829 F.3d 1364 (Fed. Cir. 2016) ...................................................................9

*In re Rasmussen*
    650 F.2d 1212 (CCPA 1981) ........................................................................6

*LizardTech. Inc. v. Earth Res. Mapping, Inc.*
    424 F.3d 1336 (Fed. Cir. 2005) .................................................................6, 7

*Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*
    934 F.3d 1344 (Fed. Cir. 2019) ...................................................................6

*ScriptPro LLC v. Innovation Associates, Inc.*
    833 F.3d 1336 (Fed. Cir. 2016) ...................................................................6

*Tech. Licensing Corp. v. Videotek, Inc.*
    545 F.3d 1316 (Fed.Cir.2008) ....................................................................8

Case IPR2020-00928
Patent 8,168,147

*Vas–Cath Inc. v. Mahurkar*
     935 F.2d 1555 (Fed. Cir. 1991) ............................................................................5

**Statutes**

35 U.S.C. § 312(a)(2) .......................................................................................1, 3

35 U.S.C. § 315 ......................................................................................................2

35 U.S.C. § 316(e) .................................................................................................7

35 U.S.C. § 325(d) .................................................................................................1

35 U.S.C. 112(a) .....................................................................................................5

**Other Authorities**

MPEP 211.05 ..........................................................................................................5

## I.      Introduction

Petitioners challenge the priority date for two dependent claims of U.S.

Patent No. 8,168,147.[1]  They have failed to demonstrate that those claims lack

written description support in the claimed priority applications.  Accordingly,

Patent Owner respectfully requests that the Petition be denied.

## II.     The Board Should Exercise its Discretion to Deny Institution.

### A.      The Board Should Deny Institution under 35 U.S.C. § 325(d).

Petitioners fail to demonstrate any pressing need for a separate review of

two claims of this patent.  While they attempt to argue that this second petition is

necessary to focus on the parties' priority date dispute, Petitioners have already

demonstrated that they may raise a priority date dispute in their primary petition.

*See* IPR2020-00834, Paper 16 (arguing that the Board should address the parties'

priority date dispute after attempting to justify a second petition to focus on that

dispute).  Accordingly, the Board should deny this petition as duplicative and an

unnecessary burden on the Board and the parties.

## III.    The Board Should Exercise its Discretion to Deny Institution under 35 U.S.C. § 312(a)(2).

35 U.S.C. § 312(a)(2) provides that a petition may only be considered if "the

---

[1] For purposes of this preliminary response only, Patent Owner does not dispute that the asserted art renders the claims at issue unpatentable, and will just focus on the priority dispute.

petition identifies all real parties in interest." This Petition lists dozens of

"potential real parties in interest," without explanation as to their relationship to

petitioners. This is not an identification of *all real parties in interest*. The Board

should not engage in *Inter Partes* Review under such a cloud of uncertainty.

This ambiguous response will likely lead to confusion and disputes as to

which parties are real parties in interest and which are bound by the estoppel

provisions of 35 U.S.C. § 315. For example, Petitioners identify various "vendors

and suppliers with regards to certain allegedly infringing components at issue in

the Delaware Litigation" as "potential real parties in interest." With respect to

these entities, Petitioners state: "None of these companies or any unnamed entity is

funding, controlling, or directing, or otherwise has an opportunity to control or

direct this Petition or proceeding." Thus, Petitioners imply that the believe these

entities are not actually real parties in interest. However, Petitioners also identify

dozens more potential real parties in interest without explanation. Do they also

contend that these named entities are not real parties in interest? Given that

petitioners contend that no un-named entities are funding controlling, or directing

the proceeding, are any of these later named entities doing so?

This problem is compounded by the fact that some entities are identified

both as "potential real parties in interest" and actual "real parties in interest." For

example, the Petition indicates that Chem-Mod LLC is not "funding, controlling,

or directing" the proceeding.  Pet. at 2.  However, Petitioner NRG identifies Chem-

Mod LLC as a real party in interest, and merely states that no "un-named entity is

funding, controlling, or directing" the proceeding.  Pet. at 6.  § 312(a)(2) requires

more than an ambiguous and conflicting listing of entities, which may or may not

be hiding additional real parties in interest.

Whether for tactical reasons, or simply because they did not do the work to

clarify the relationships between these various entities, Petitioners have not met

their burden of identifying all real parties in interest.  Because *Inter Partes* Review

is a discretionary procedure and the Board expects a high degree of preparedness

from Petitioners, the Board should deny institution for failure to comply with §

312(a)(2).

## IV.   Claim Construction

Although Petitioners do not propose any terms for construction, Petitioners

have interpreted claim 17 in a manner that is contrary to the plain claim language.

In particular, Petitioners insert the following limitation into the claim language:

"injecting separately the bromine containing promoter[, **and no other material**,]

into a gas stream."  The Board should reject this interpretation by ruling that the

plain and ordinary meaning of the claim language does not include this limitation.

The '147 patent describes a number of different promoters, sorbents, and

additional materials that can be used to practice the invention.  The claims at issue

3

do not exclude the use of additional materials beyond those specifically recited in the claims. For example, claim 1 requires the use of "particulate sorbent material comprising activated carbon." While this claim no doubt requires the use of activated carbon, it does not exclude the use of other sorbents such as pyrolysis char. *See* '147 patent at 2:55-60. Similarly, claim 1 requires the use of "a bromine containing promoter." Again, this requires use of a promoter with bromine, but it does not exclude the use of a promoter that also contains some other material such as an organic solvent or chloride. *See* '147 patent at 7:45-50.

Claim 17 refers back to claim 1 by reciting "injecting separately ***the*** bromine containing promoter." Thus claim 17 also incorporates claim 1's broad recitation of a promoter that must contain bromine, but may also be mixed with other material. The requirement that this promoter must be injected into a gas stream "separately" from the particulate sorbent material does not change that fact. For example, consider an embodiment where bromine and pyrolysis char are injected together at one location and activated carbon is injected at a separate location. In this embodiment, the bromine is injected separately from the activated carbon, and thus, it practices claim 17. Petitioners implicit interpretation of this term would exclude this embodiment.

Petitioners' interpretation also conflicts with the general principle of patent law that "the addition of elements not recited in the claim cannot defeat

infringement." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005) (explaining that a patent claim requiring a razor with three blades covered a product that included four blades).  The Board should not endorse a claim construction position that would lead to this sort of improper non-infringement argument.

## V.     Applicable Law Related to Patent Priority

### A.     Legal Standard for Patent Priority

"To be entitled to the benefit of the filing date of an earlier-filed application . . . the disclosure of the invention in the prior application and in the later-filed application must be sufficient to comply with the requirements of 35 U.S.C. 112(a) except for the best mode requirement." MPEP 211.05. To satisfy the written description requirement under 35 U.S.C. § 112(a), the specification "must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (internal quotation marks and alterations omitted). In other words, a patent applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention. The invention is, for purposes of the 'written description' inquiry, whatever is now claimed." *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991); *see also Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934

F.3d 1344, 1350 (Fed. Cir. 2019) (explaining that it "is not necessary that the exact terms of a claim be used *in haec verba* in the specification").

A claim "will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language." *LizardTech. Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005); *see also Fox Factory, Inc., v. Sram, LLC*, No. PGR2016-00043, 2017 WL 1242973, at *5 (P.T.A.B. Apr. 3, 2017) (finding that petitioner failed to show lack of written description support for claims that covered a broader range of embodiments than those disclosed in the specification). Relatedly, "[n]ot every claim must contain every limitation or achieve every disclosed purpose." *See ScriptPro LLC v. Innovation Associates, Inc.*, 833 F.3d 1336, 1342 (Fed. Cir. 2016); *see also In re Rasmussen*, 650 F.2d 1212, 1215 (CCPA 1981) (explaining "that a claim may be broader than the specific embodiment disclosed in a specification is in itself of no moment").

The Board must consider the following factors in evaluating the level of disclosure required: "the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, [and] the predictability of the aspect at issue." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir.2010).  This is because "the patent specification is written for a person of skill in the art, and such a person comes to the patent with

the knowledge of what has come before. . . . Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue experimentation." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed.Cir.2005).

Conclusory expert testimony that a specification fails to provide support for a claim is insufficient to demonstrate lack of written description.  *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1346 (Fed. Cir. 2016) (reversing Board decision and criticizing petitioner's expert testimony as "abstract and untethered from the context provided by the [challenged patent]").

### B.   Petitioners Bear the Burden of Persuasion with Respect to a Disputed Priority Date

"In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee."  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).  In particular, the burden of proving that an asserted reference pre-dates an alleged priority date rests on the petitioner, not the patentee.  *Id.*

Initially, a petitioner has the burden of persuasion, and the burden of production (i.e., coming forward with evidence) on all issues.  *See Dynamic Drinkware*, 800 F.3d 1379.  If the petitioner provides *prima facie* evidence that its burden has been met, the burden of production—but not the burden of persuasion—shifts to the patentee on some issues such as the determination of a patent's priority date.  *Id.* at 1380.  If the patentee meets this burden by providing evidence of an earlier priority date, the Board must evaluate the petitioner's arguments in light of all the evidence to determine if the petitioner has met its burden of persuasion.  *Id.*; *see, e.g., Boart Longyear Ltd. v. Australian Mud Co. Pty Ltd.*, No. IPR2019-01129, 2019 WL 6442439, at *14 (P.T.A.B. Nov. 25, 2019) (describing this procedure).

Citing *PowerOasis*, Petitioners mistakenly assert that a patent owner bears the burden of persuasion with respect to establishing a priority date.  In doing so, Petitioners confuse the burden of *production* with the burden of *persuasion*. The Federal Circuit has already rejected this misinterpretation of *PowerOasis*.  *See Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed.Cir.2008) (explaining that *PowerOasis* held that the burden of *production* can shift to the patentee, not the burden of *persuasion*).

**VI.    Petitioners Have Failed to Show that '147 Patent Claims 18 and 19 Are Not Entitled to the Earliest Claimed Priority Date.**

Petitioners contend that neither the cited provisional application (Ex. 1020) nor the first non-provisional application (Ex. 1021) provide written description support from the requirements in claims 18 and 19 that the promoter be separately injected into a mercury-containing gas or transport gas.  Petitioners are wrong.

Because Petitioners bear the burden of proof on the issue of priority, and as a matter of due process, the Board's analysis is limited to this issue.  *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) ("Given that framework, we find no support for the PTO's position that the Board is free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR. Instead, the Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond.").

For the reasons provided below, Petitioners have not met their burden of establishing a *prima facie* case for unpatentability.  Even if they had met that burden, the portions of the applications cited below demonstrate that Petitioners are unable to meet their ultimate burden of persuasion on this issue.

### A.    The Provisional Application Supports '147 Claims 18 and 19.

The provisional application provides a chemical model to help explain how

this invention works:

> We now teach that the formation of the new bromide compound with
> carbon increases the reactivity of the carbon forms toward mercury and
> other pollutants. The resulting bromide compound is uniquely suited to
> facilitate oxidation of the mercury. The effectiveness of the oxidation
> results from the promotion effect of the halide exerted on the
> developing positive charge on the mercury during the oxidation, known
> in the chemical art as a specific catalytic effect. Thus, as the mercury
> electrons are drawn toward the positive carbon, the halide anion
> electrons are pushing in from the other side, which stabilizes the
> positive charge developing on the mercury and lowers the energy
> requirement for the oxidation process. Bromide is especially reactive,
> owing to the highly polarizable electrons in the outer 4p orbitals of the
> ion. Thus, adding HBr or Br2 to the carbon forms a similar carbon
> bromide, in which the positive carbon oxidizes the mercury with the
> assistance of the bromide ion.

Ex. 1020 at 9. Thus, the inventors explained that the benefits of the claimed

promoted sorbent are obtained by forming a carbon-bromine bond out of activated

carbon and a bromine ion, i.e., Br-.  They further explain that this Br- ion may be

supplied by adding HBr or $Br_2$ to the carbon.  This is further illustrated in the

diagram below:

As shown above, activated carbon interacts with HBr. This results in carbon bonded with the hydrogen atom, and a bromine ion Br-. When these components are mixed into mercury-containing gas, the mercury (Hg) is drawn toward the carbon and the bromine ion, creating a stable bond. Thus, the inventors explained that mercury is captured by intermixing activated carbon and bromine ions with the mercury.

Having described this chemical model, the inventors also described various implementations of their theory, including the example provided below:

> FIG. 2 is a block diagram illustrating the use of the invention in a coal fueled facility. Of course, the invention can also be used in any other desired type of facility. FIG. 2 shows a boiler for burning pulverized coal. The facility utilizes various devices to clean the exhaust of the boiler. In this example, a baghouse or ESP is used to collect particulates

in the exhaust. A scrubber and sorbent bed are also used to remove undesired constituents from the flue gas stream, before being fed to the stack. ***In the example shown, the sorbent is injected into the flue gas after the boiler. The additive can be injected where desired (e.g., before, after, or within the boiler).***

*Id.* And as illustrated below:



FIG. 2

*Id.* In this example, the bromine-containing additive is mixed with powdered (pulverized) coal (which inherently contains mercury) and air and injected into the combustion chamber (which also contains mercury from the combusted coal). Later, activated carbon sorbent is injected into the mercury-containing flue gas to cause the promotion reaction described above. This reaction occurs "in-flight" in the gas as it is transported to the baghouse or ESP. Thus, the provisional application provides support for claims 18 and 19.

As another example, the provisional application describes another "in-flight" technique where bromine is injected into a gas stream containing the carbon sorbent.  Ex. 1020 at 14 ("A unique, nonobvious technique for preparation of the treated carbon is through combining the treatment system with the carbon injection system at the end-use site. With this technique, the halogen is introduced to the carbon-air mixture in the transport line (or other part of the sorbent storage and injection system).").  This gas stream is a "transport gas" as required by claim 19, e.g., it is described as being passed through a "transport line."

This gas stream can also be a "mercury-containing gas" as required by claim 18.  For example, the provisional application describes recycling the injected sorbent back through the transport line.  *See, e.g.,* Ex. 1020 at 14 (explaining that this in-flight method may re-use the carbon sorbent); *id.* at 13 ("further disposal reduction is made possible by recycling and reusing the sorbent that is produced using this technology"); *id.* 5 ("Carbon is regenerated from previous usage cycle and recycled"); *see also id.* at 6-8 (describing examples 6 and 10 where carbon and bromine are reacted in flight and the carbon is recycled).  Because this recycled sorbent contains mercury from its use in the flue gas, this provides "injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent," as required by claim 17, and the gas stream is a "mercury containing gas" as required by claim 18.

13

### B.   Petitioners Misinterpret the Provisional Application.

According to Petitioners, the provisional application fails to support claims 18 and 19, because they contend example 9 (in a list of 15) refers to a non-bromine additive.  This assertion is a red herring as Patent Owner does not rely on example 9 to demonstrate written description support.  Moreover, Petitioners have misinterpreted example 9.

As noted above, the inventors' chemical model for the promotion reaction relies on a combination of two components—bromine ions and activated carbon sorbent.  It strains credulity to think that a POSITA would conclude that example 9 overrides that disclosure and teaches that the "additive" in figure 2 actually refers to a non-bromine additive.  This argument also fails to address examples where the mercury containing gas is provided as a result of sorbent recycling.

Moreover, example 9 is not referring to a non-bromine additive.  Example 9 appears in an "Outline of Examples of the Invention."  Ex. 1020 at 5.  Each of examples 1-8 contain references to bromine additives and/or techniques for using bromine additives.  Example 9 refers to "The process of using additives (1-8) in conjunction with sorbents. . . ." and it adds "[t]he additive is a compound comprised of Group I or II elements, such as Ca, Na, and others."  In other words, the additive is CaBr, NaBr, or another similar compound.  This is confirmed by the fact that example 9 refers to the formation of "mercuric bromide," which can occur

14

only when the additive contains at least some bromine atoms.  Thus, even if the inventors had intended example 9 to redefine the word "additive"—they did not— it would not exclude the use of bromine containing additives.

### C.   The '163 and '595 Applications Support the '147 Claims.

The intervening applications similarly disclose separately injecting promoter into a mercury containing gas.  For purposes of this dispute, the '595 and '163 applications contain substantively identical disclosures.  For ease of reading, patent owner refers to the '163 application below.  Ex. 1021.  The '163 application discloses the same chemical model as the provisional application (fig. 2; ¶¶ 52-53), as well as techniques for in-flight promotion of sorbents (¶¶ 20, 55-56, 107).  In particular, the '163 application describes various exemplary embodiments of claims 18 and 19.

For example, Figure 3 depicts activated carbon reservoir 110, halogen reservoirs 120 and 130, and injection point 116 where these materials are injected together into a mercury containing gas 15. *Id.* at ¶ 55-56.  The '163 application further explains that the invention is not limited to this single point depiction, but may also encompass multiple injection points, i.e. a bromine injection point and a sorbent injection point.  *Id.* at ¶ 56 ("For clarity, single injection points 116 or 119 are shown in Figure 3, although one skilled in the art will understand that multiple injection points are within the scope of the present invention.").  This multiple

injection point embodiment satisfies the requirement of "injecting separately the bromine containing promoter into a gas stream."

In addition, the '163 application also discloses in-flight promotion using recycled sorbent.  Petitioners focus on their annotated version of figure 3:



FIG. 3

However, they fail to mention the sorbent recycling system depicted in the figure:

16



*See also id.* at ¶ 59 (describing separators 140 and 150 and regenerator 160). The

'163 patent further explains:

> [P]articulate activated carbon sorbent with a mass mean size greater
> than 40 μm is injected into the gas stream, mercury is removed from
> the gas by the sorbent particles, the sorbent particles are separated from
> the ash particles on the basis of size, and the sorbent particles are re-
> injected to the gas stream.

*Id.* at ¶ 26. When such a recycling system is in use, a transport gas is used to "re-

inject" used sorbent back into the transport line for sorbent and promoter. As a

result, the transport gas is necessarily a mercury-containing gas because it contains the mercury recycled with the used sorbent.  As shown in figure 3, bromine promoter is then separately injected into this mercury-containing transport gas as required by claims 18 and 19.

Petitioners fail to prove lack of written description support both because they disregard the portions of the specification cited above, and also because they rely on their erroneous claim construction position.  For example, Petitioners assert that figure 1 depicts mixing two different batches of promoter and sorbent and injecting them into mercury-containing gas through different paths:



FIG. 1

According to Petitioners, this is an example of non-separate injection of bromine. However, under the correct construction of the claim language, this embodiment practices claim 17.  That is, the promoter 20 in the left path is injected into the mercury-containing gas 50 separately from the activated carbon sorbent in the right path.  While the transport line for promoter 20 will also contain some activated carbon, the addition of an unclaimed element does not exclude this embodiment from the scope of the claims.  Thus, Petitioners have failed to prove that '147 claims 18 and 19 lack written description support in the parent applications.

## VII.  Conclusion

For the reasons provided above, Patent Owner respectfully requests that the Board deny the Petition.

Case IPR2020-00928
Patent 8,168,147

Dated: September 4, 2020            Respectfully submitted,

                                    *Midwest Energy Emissions Corp.*

                                    By */Hamad M. Hamad/*
                                    Hamad M. Hamad, Reg. No. 64,641
                                    Justin T. Nemunaitis (*pro hac pending*)
                                    CALDWELL CASSADY CURRY, P.C.
                                    2121 N. Pearl St., Ste. 1200
                                    Dallas, Texas 75201
                                    Telephone: 214.888.4848
                                    Facsimile:  214.888.4849
                                    hhamad@caldwellcc.com
                                    jnemunaitis@caldwellcc.com
                                    midwest@caldwellcc.com

## CERTIFICATE OF SERVICE UNDER 37 C.F.R. § 42.6 (e)(4)

It is hereby certified that on this 4th day of September, 2020, a copy of the

foregoing document was served via electronic mail, as previously consented to by

Petitioner upon the following counsel of record:

Brian W. Oaks (Lead Counsel)
David J. Tobin (Back-up Counsel)
Elizabeth D. Flannery (Back-up Counsel)
Thomas B. Carter (Back-up Counsel)
Baker Botts L.L.P.

Brian.oaks@bakerbotts.com
David.tobin@bakerbotts.com
DLBB-ME2C-IPR@bakerbotts.com

Date: September 4, 2020            */Hamad M. Hamad/*
                                    Hamad M. Hamad, Reg. No. 64,641

Case IPR2020-00928
Patent 8,168,147

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This Preliminary Response complies with the type-volume limitation of 14,000 words, excluding the parts exempted by 37 C.F.R. § 42.24(b).

This Preliminary Response complies with the general format requirements of 37 C.F.R. § 42.6(a) and has been prepared using Microsoft® Word 2016 in 14 point Times New Roman.

Date: September 4, 2020                    */Hamad M. Hamad/*
                                           Hamad M. Hamad, Reg. No. 64,641