# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS )
CORP. and MES INC., )
                                    )
              Plaintiffs, )
                                    )
       v.                           )        Civil Action No. 19-1334-RGA-CJB
                                    )
ARTHUR J. GALLAGHER & CO., et al., )
                                    )
              Defendants. )

## REPORT AND RECOMMENDATION

Pending in this patent infringement case brought by Plaintiffs Midwest Energy Emissions

Corp. ("Midwest Energy") and MES Inc. ("MES" and collectively with Midwest Energy,

"Plaintiffs" or "ME2C") are the following motions ("the Motions"), filed pursuant to Federal

Rule of Civil Procedure 12(b)(6): (1) CERT Coal Holdings LLC, CERT Holdings LLC, CERT

Holdings 2018, LLC, CERT Operations LLC, CERT Operations II LLC, CERT Operations III

LLC, CERT Operations IV LLC, CERT Operations V LLC and CERT Operations RCB LLC's

(collectively, the "CERT Defendants") "Motion to Dismiss the First and Second Amended

Complaints[,]" (D.I. 272); and (2) Arthur J. Gallagher & Co., Gallagher Clean Energy, LLC and

AJG Coal, LLC (collectively, "AJG"), and DTE REF Holdings, LLC and DTE REF Holdings II

LLC (collectively "DTE"), and Chem-Mod LLC ("Chem-Mod"), and AJG Iowa Refined Coal

LLC, Joppa Refined Coal LLC, Thomas Hill Refined Coal, LLC, Wagner Coaltech LLC, Walter

Scott Refined Coal LLC, Louisa Refined Coal, LLC, Belle River Fuels Company, LLC, Arbor

Fuels Company LLC and Portage Fuels Company, LLC's (the "RC Defendants" and together

with AJG, DTE and Chem-Mod, the "Moving Refined Coal Defendants") "Renewed Motion to

Dismiss Operative Complaint[,]" (D.I. 273). For the reasons that follow, the Court recommends

that the CERT Defendants' and Moving Refined Coal Defendants' (together, the "Moving Defendants") Motions be GRANTED-IN-PART and DENIED-IN-PART in the manner further described below.

## I.    BACKGROUND

The Court[1] assumes familiarity with and incorporates by reference the summary of the background of this case set out in its June 18, 2020 Report and Recommendation ("June 18 R&R"). (D.I. 110 at 2-5)  In the June 18 R&R, the Court recommended that four motions to dismiss the original Complaint filed by various Defendants should essentially be granted in their entirety. (D.I. 110)  The District Court subsequently adopted that recommendation. (D.I. 127)

On July 15, 2020, Plaintiffs filed the First Amended Complaint ("FAC"). (D.I. 130)  The original Complaint had alleged infringement of two patents:  United States Patent Nos. 10,343,114 (the "'114 patent") and 8,168,147 (the "'147 patent" and together with the '114 patent, the "original asserted patents"). (D.I. 1)  In the FAC, Plaintiffs now alleged infringement of those original asserted patents as well as three additional patents:  United States Patent Nos. 10,589,225 (the "'225 patent"), 10,596,517 (the "'517 patent") and 10,668,430 (the "'430 patent" and collectively with the '225 patent and the '517 patent, the "newly asserted patents[,]" and collectively with the original asserted patents, "the asserted patents" or the "patents-in-suit"). (D.I. 130 at ¶¶ 49-53)  All five asserted patents are titled "Sorbents for the Oxidation and Removal of Mercury." (*Id.*; *see also id.*, exs. A-E)  As explained in the June 18 R&R, the original asserted patents "relate to methods for reducing mercury emissions from coal-fired power plants by combining halogen treatments such as bromine and bromide compounds in-

---

[1]    United States District Judge Richard G. Andrews has referred this case to the Court for all purposes, up through the case dispositive motions deadline. (D.I. 98)

2

flight with backend sorbents such as activated carbon." (D.I. 110 at 3) The relevant claims of the original asserted patents recited methods of separating mercury from a mercury-containing gas that comprise a "Bromine Step" (i.e., "combusting coal in a combustion chamber . . . wherein the coal comprises added [bromine], added to the coal upstream of the combustion chamber, or the combustion chamber comprises added [bromine]") and an "Activated Carbon Step" (i.e., "injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber"). (*Id.* (internal quotation marks and citations omitted)) The asserted claims of the newly asserted patents also relate to methods of separating mercury from a mercury-containing gas, and also require a similar Bromine Step and an Activated Carbon Step. (*See, e.g.*, D.I. 218-1 at ¶¶ 324, 327, 330, 336, 356, 359, 362, 368, 388, 391, 394, 405; *see also* D.I. 177 at 2; D.I. 179 at 3)

On July 31, 2020, the Court stayed all deadlines in the case concerning the CERT Defendants and the Moving Refined Coal Defendants, pending a determination that Plaintiffs have stated viable claims for relief against those Defendants. (D.I. 166) On August 6, 2020, the CERT Defendants and the Moving Refined Coal Defendants filed motions to dismiss the FAC. (D.I. 175; D.I. 176) Those motions were fully briefed as of September 10, 2020. (D.I. 203; D.I. 205) But then, while those motions were still pending, Plaintiffs moved for leave to file a second amended complaint (the "SAC") on September 28, 2020 (the "motion for leave to file the SAC"). (D.I. 218) Plaintiffs' proposed SAC included a few additional liability-related allegations and, *inter alia*, also replaced certain "John Doe" Defendants with entities identified by Defendants in their interrogatory responses, including Senescence Energy Products, LLC,

Rutledge Products, LLC and Alistar Enterprises, LLC (the "New Defendants"). (D.I. 214 at 2; *see also* D.I. 272 at 2)[2]

Then on November 6, 2020, certain Defendants that have since been dismissed from the case (the AEP Defendants, the Talen Defendants and the NRG Defendants), (*see supra* n.2), moved to stay the case pending issuance of final written decisions on *inter partes* review ("IPR") petitions filed by those Defendants, (D.I. 234). The Court granted that motion on December 10, 2020. (D.I. 253) On January 7, 2021, the Court ordered that the stay in favor of the IPR proceedings also applied to the CERT Defendants and the Moving Refined Coal Defendants. (D.I. 255; D.I. 263) Accordingly, with respect to the then-pending CERT Defendants' and the Moving Refined Coal Defendants' motions to dismiss the FAC and Plaintiffs' motion for leave to file the SAC, the Court denied those motions without prejudice to renew, if necessary, if/when the stay was lifted. (D.I. 263) The Court noted that to the extent any of the motions were later re-filed, the parties could advise the Court that it should rely on some or all of the previously-filed briefing relating to those motions. (*Id.*)

---

[2]     These New Defendants were not served at the time of oral argument on Moving Defendants' Motions, but they noted through counsel that they join in the Motions. (D.I. 278 at 55-57)

In addition to the New Defendants, the CERT Defendants and the Moving Refined Coal Defendants, the SAC also asserted claims against: AEP Generation Resources Inc., Southwestern Electric Power Co. and AEP Texas Inc. (the "AEP Defendants"), NRG Energy, Inc., NRG Texas Power LLC, Midwest Generation EME, LLC and Midwest Generation, LLC (the "NRG Defendants"), and Talen Energy Corporation, Brandon Shores LLC, Talen Generation LLC, Talen Montana LLC and H.A. Wagner LLC (the "Talen Defendants"). (D.I. 214, ex. 1 at 2) The SAC also newly sues Brandon Shores Coaltech, LLC. (*Id.*) However, the AEP Defendants were dismissed from the case on December 1, 2020, (D.I. 249), and the NRG Defendants and the Talen Defendants were dismissed from the case on January 14, 2021, (D.I. 266; D.I. 267).

Soon after, the IPR proceedings were terminated.  (D.I. 269)  And on January 25, 2021, the Court lifted the stay of the case in favor of the IPR proceedings; in doing so, the Court noted that the case remained stayed with respect to the CERT Defendants and the Moving Refined Coal Defendants until the Court determines that Plaintiffs have stated a viable claim for relief against those Defendants.  (D.I. 271)  The Court directed the CERT Defendants and the Moving Refined Coal Defendants to file renewed motions to dismiss.  (*Id.*)

The renewed Motions, which the Court is considering here, were filed on January 27, 2021; as to them, the parties are relying on their prior briefing regarding the motions to dismiss the FAC, as well as additional supplemental briefing that addressed any new content found in the SAC.  (D.I. 272; D.I. 273)[3]  The Court held a hearing on the Motions via videoconference on March 17, 2021.  (D.I. 278 (hereinafter, "Tr."))

Further relevant facts related to resolution of the Motions will be set out as needed in Section III.

## II.    LEGAL STANDARD

The Court hereby incorporates by reference the standard of review regarding Rule 12(b)(6) motions to dismiss for failure to state a claim, which was set out in its June 18 R&R. (D.I. 110 at 5)

---

[3]        Plaintiffs have not filed a motion renewing their request for leave to file the SAC. Accordingly, the SAC has not yet been formally docketed.  However, as noted above, Moving Defendants submitted letter briefing addressing Plaintiffs' proposed SAC, (D.I. 256; D.I. 257; D.I. 261; D.I. 262), and have noted that the renewed Motions apply to both the FAC and the SAC, (D.I. 272 at 1; D.I. 273 at 1 n.1).  And Moving Defendants have indicated they do not oppose Plaintiffs' motion for leave to file the SAC as against them.  (D.I. 215)  The Court thus deems the SAC to be filed and to be the operative complaint in this case.  Below, the Court will address the Motions solely as they relate to that pleading.  For administrative purposes, the Court will also enter a separate order requiring Plaintiffs to formally file the SAC (with accompanying exhibits) on the docket.

## III. DISCUSSION

Moving Defendants' Motions present numerous arguments for dismissal of Plaintiffs' claims. In terms of arguments that apply broadly to all claims, Moving Defendants contend that: (1) Plaintiffs' use of group pleading and/or their practice of "lumping" Moving Defendants together in the SAC fails to put Moving Defendants on notice of the claims against them; and (2) Plaintiff MES has no standing. Further, Moving Defendants make more specific challenges to each type of infringement claim brought against them (i.e., Plaintiffs' claims for indirect infringement, direct infringement and willful infringement). The Court will take up all of these arguments in turn.

### A. Plaintiffs' Use of Group Pleading/"Lumping"

Moving Defendants argue that the SAC's allegations are "impermissibly directed to all [Moving Defendants] as a group" and thus fail to put any one of the Moving Defendants on notice of how it supposedly infringes the asserted patents. (D.I. 177 at 1, 6-7; *see also* D.I. 179 at 2, 8-9; D.I. 203 at 1-2; D.I. 205 at 1-2) Plaintiffs retort that the SAC provides notice to the groups of similarly situated Defendants as to Plaintiffs' infringement theories against each member of each respective group (and that this is therefore not a basis for dismissal of Plaintiffs' claims). (D.I. 190 at 1-2, 5-7; D.I. 191 at 5-8)[4]

---

[4] Plaintiffs also argue that Moving Defendants have waived any argument as to this "group pleading" or "lumping" issue, pursuant to Federal Rule of Civil Procedure 12(g)(2). Plaintiffs say that this is so because Moving Defendants did not raise any objection to the use of group names in the motions to dismiss that they filed as to the original Complaint. (D.I. 190 at 4; D.I. 191 at 4-5) But the Court agrees with Moving Defendants that they did raise this issue (and in doing so, cited to relevant case law) when seeking to dismiss the original Complaint. (D.I. 203 at 1 (citing D.I. 50 at 13, D.I. 84 at 2, 6); D.I. 205 at 1-2 (citing D.I. 56 at 16, 18)) So it finds Plaintiffs' waiver argument not to be well taken.

Federal Rule of Civil Procedure 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). It is not impermissible *per se* for a plaintiff to refer to multiple defendants collectively in a complaint. *Bench Walk Lighting LLC v. LG Innotek Co.*, Civil Action No. 20-51-RGA, 2021 WL 1226427, at *13 (D. Del. Mar. 31, 2021). But a complaint that lumps together allegations against multiple defendants will not survive a motion to dismiss if in doing so, it fails to "plead enough facts to render it plausible that each defendant has performed at least one type of U.S.-related infringing act" or if it otherwise fails to provide each defendant with sufficient notice of the basis for the claims against it. *Id.* On the other hand, "a complaint that collectively refers to defendants meets Rule 8's pleading standard if it can be reasonably inferred that each and every allegation is made against each individual defendant" and if there is some factual basis provided to support that inference. *See Groove Digit., Inc. v. King.com, Ltd.*, Civil Action No. 1:18-cv-00836-RGA, 2018 WL 6168615, at *1 (D. Del. Nov. 26, 2018) (internal quotation marks and citation omitted); *see also, e.g.*, *Ausco Prods., Inc. v. Axle, Inc.*, 6:19-CV-06798 EAW, 2020 WL 7028521, at *2 (W.D.N.Y. Nov. 30, 2020) ("[N]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant.") (internal quotation marks and citation omitted).

In the Court's view, two paragraphs of the SAC are particularly important here. (*See* Tr. at 22-23, 25) They are paragraphs 212 and 213, which read as follows:

> 212. Each of Arthur J. Gallagher & Co., Gallagher Clean Energy, LLC and AJG Coal, LLC; DTE REF Holdings, LLC, DTE REF Holdings II LLC; CERT Coal Holdings LLC, CERT Holdings, LLC, CERT Holdings 2018, LLC, CERT Operations, LLC, CERT Operations II, LLC, CERT Operations III LLC, CERT Operations IV, LLC, CERT Operations V LLC, CERT Operations RCB LLC; AJG Iowa Refined Coal LLC, Joppa Refined Coal LLC, Thomas Hill Refined Coal LLC, Wagner Coaltech LLC, Walter Scott

Refined Coal LLC, Louisa Refined Coal, LLC, Belle River Fuels Company, LLC, Arbor Fuels Company, LLC, Portage Fuels Company, LLC, Brandon Shores Coaltech, LLC, Senescence Energy Products, LLC, Rutledge Products, LLC, Alistar Enterprises, LLC and John Does LLCs *operate at least one Accused RC Facility either by directly owning the facility, directly controlling the facility, or indirectly exercising control of the facility through a subsidiary that is either named above or referred to as a John Doe LLC.* For example, Arthur J. Gallagher & Co. owns and controls Walter Scott Refined Coal LLC which directly operates a refined coal facility at a power plant that directly infringes by supplying bromine-containing refined coal to a combustion chamber and injecting activated carbon downstream of the combustion chamber.

213. At least CERT Operations IV, LLC, CERT Operations V LLC, CERT Operations RCB LLC; AJG Iowa Refined Coal LLC, Joppa Refined Coal LLC, Thomas Hill Refined Coal LLC, Wagner Coaltech LLC, Walter Scott Refined Coal LLC, Louisa Refined Coal, LLC, Belle River Fuels Company, LLC, Arbor Fuels Company, LLC, Portage Fuels Company, LLC, Brandon Shores Coaltech, LLC, Senescence Energy Products, LLC, Rutledge Products, LLC, and Alistar Enterprises, LLC *each directly operated and operate an Accused RC Facility* that provides bromine-containing refined coal to a coal plant that directly infringes by combining the refined coal provided by those companies with use of activated carbon sorbents downstream of the combustion chamber. Those entities also perform the associated post-emission control section 45 testing.

(D.I. 218-1 at ¶¶ 212-13 (emphasis added))

In the Court's view, the allegations regarding the allegedly infringing role played by the 16 Moving Defendants listed in paragraph 213 are sufficiently clear and plausible. That paragraph asserts that each of these 16 entities themselves directly operate an Accused RC Facility. And the remainder of the SAC's allegations explain how it is that these Defendants' acts are said to amount to varying forms of patent infringement. To be sure, in describing those infringing acts, the SAC sometimes lumps together these 16 Defendants with other Defendants. (*See, e.g., id.* at ¶¶ 218, 219, 235) But paragraph 213 provides sufficient notice to these

Defendants of what they are alleged to have done that is asserted to infringe the patents-in-suit: i.e., that their employees, who work at their RC Facility, actually handle refined coal in a purportedly infringing manner.

However, the remaining 11 Moving Defendants listed in paragraph 212 (i.e., Arthur J. Gallagher & Co., Gallagher Clean Energy, LLC, AJG Coal, LLC, DTE REF Holdings, LLC, DTE REF Holdings II LLC, CERT Coal Holdings LLC, CERT Holdings, LLC, CERT Holdings 2018, LLC, CERT Operations, LLC, CERT Operations II, LLC and CERT Operations III LLC) are in a different boat.[5]  The allegations in paragraph 212 leaves the Court and these Defendants at a loss as to what these Defendants are alleged to have done that amounts to infringement.  Do they infringe because they "directly own[]" an Accused RC Facility (but some other entity's employees operate the facility)?  Do they infringe because they "directly control[]" the facility (whatever that means)?  Or do they infringe because they do not own or control the facility, but because they are said to "indirectly exercise[] control" of that facility "through a subsidiary" (a subsidiary that, with one exception, is not specifically identified by Plaintiffs)?  The SAC does not say for sure.  It leaves the Court and Defendants to guess at what is the theory of liability that is being asserted here.

That lack of clarity in paragraph 212 matters because, as a general matter, corporate entities are understood to be separate and distinct.  Just because a company is the parent of a subsidiary, that does not (without more) mean that the parent is automatically liable for patent infringement committed by the subsidiary.  *See British Telecommc'ns PLC v. IAC/Interactive*

_____

[5]        Plaintiffs seem to understand that their allegations as to these 11 Moving Defendants were potentially problematic.  When Plaintiffs discussed this issue in their briefing, they tended to focus on the allegations against those Defendants listed in paragraph 213 (and not on the allegations in paragraph 212).  (D.I. 259 at 2; D.I. 260 at 2; *see also* Tr. at 38-39)

*Corp.*, 356 F. Supp. 3d 405, 409 (D. Del. 2019); *M2M Sols. LLC v. Telit Commc'ns PLC*, Civil Action No. 14-1103-RGA, 2015 WL 4640400, at *3 (D. Del. Aug. 5, 2015). So if one or more of these 11 Defendants are alleged to be liable for patent infringement because of the acts of their subsidiary, the SAC would need to identify a legal basis for such liability, such as alter ego liability, or agency status. *See British Telecommc'ns*, 356 F. Supp. 3d at 409; *M2M Sols. LLC,* 2015 WL 4640400, at *3. And because the sufficiency of those legal bases depend on the presence or absence of various factors, then in order for such an allegation to survive, Plaintiffs would actually need to plead facts about those relevant factors—facts that, when taken together, would render it plausible that alter ego or agency status is applicable here. *See, e.g.*, *Masimo Corp. v. Sotera Wireless*, Case No. 19-cv-01100-BAS-NLS, 2020 WL 7260660, at *11-18 (S.D. Cal. Dec. 10, 2020) (dismissing claims against a defendant because the plaintiff had not sufficiently alleged facts plausibly demonstrating that an alter ego or agency relationship existed between that defendant and another defendant accused of infringement); *British Telecommc'ns*, 356 F. Supp. 3d at 409-12 (concluding that a complaint included facts sufficient to show that the plaintiff had a plausible claim for relief against two defendants under an agency theory, but only where the plaintiff had pleaded at least "minimal" facts suggesting an agency relationship existed between those defendants and their allegedly infringing subsidiaries); *M2M Sols. LLC,* 2015 WL 4640400, at *3 (explaining that in order to plead that a foreign parent is responsible for the alleged infringement of its domestic subsidiary pursuant to an agency theory, plaintiff must "present facts that demonstrate the parent's effective control over the subsidiary[,]" and

dismissing a direct infringement claim against the parent for failure to do so).  But the SAC does not do so.[6]

That leaves one last named Moving Defendant, Chem-Mod.  As to it, the SAC's confusing allegations leave the Court without a good understanding of how it is plausible that this entity infringes the patents-in-suit.  In the SAC's "Defendants' Acts of Infringement" section, Chem-Mod is said to "provide[] chemicals and/or refined coal to at least some of the Accused Coal Plants and Accused RC Facilities" and to "assist[] in operating the Accused Coal Plants and Accused RC Facilities in connection with administering the chemicals supplied by Chem-Mod."  (D.I. 218-1 at ¶¶ 214-15)  These paragraphs are vague, and in the rest of this section, (*id.* at ¶¶ 205-33), Chem-Mod is simply "lumped" in with the rest of the Moving Defendants in a manner that does not shed much more light on its particular role.  In light of this, the SAC never clearly explains:  (1) what *exactly* Chem-Mod does that is said to amount to a particular form of infringement; and (2) *why* that is so.  For example, saying that Chem-Mod "provides chemicals and/or refined coal to at least some of the Accused Coal Plants and Accused

---

[6]         Even as to the one Defendant (Arthur J. Gallagher & Co.) that paragraph 212 specifically calls out for "indirectly" exercising control over another (Walter Scott Refined Coal LLC), the allegations are insufficient.  There it is simply alleged that Arthur J. Gallagher & Co. "owns and controls" Walter Scott Refined Coal LLC.  (D.I. 218-1 at ¶ 212)  But that Arthur J. Gallagher & Co. "owns" another company is just another way of saying that the other company is its subsidiary.  And if the allegation is that it "controls" the other company, Plaintiffs need to plead *at least some facts* explaining why it is plausible that is so.  *M2M Sols. LLC,* 2015 WL 4640400, at *3.  If that was not the requirement, then any parent would be automatically liable for the infringement of its subsidiary, which is not the law.  The Court does note that the SAC earlier alleges that "AJG" (a group of three entities that includes Arthur J. Gallagher & Co., Gallagher Clean Energy, LLC and AJG Coal, LLC) "maintains control" of the Refined Coal LLCs by, "[f]or example . . . maintain[ing] majority control, or, if it lacks majority control, AJG requires that all major decisions obtain approval from AJG."  (D.I. 218-1 at ¶ 72)  In the Court's view, this vague, general allegation does not rectify the problem, because:  (1) it lumps together three defendants; (2) pleads facts in an "either/or" manner that does not clearly state what the facts alleged as to a particular entity actually are; and (3) generally fails to demonstrate that any particular Defendant is an alter ego or agent of any other particular Defendant.

RC Facilities" is like saying nothing. Does Chem-Mod provide chemicals to these unnamed entities? Or does it provide refined coal? Or both? And if Chem-Mod simply provides certain chemicals to a coal plant or an Accused RC Facility, how is that said to be an infringing act? Or, for example, which coal plants does Chem-Mod "assist[] in operating"? And where are the pleaded facts that make that allegation plausible? The Court should not be responsible for having to ask all these questions and try to guess at what the answers are, in order to figure out what theories of liability are being pleaded in the SAC. Moving Defendants should not have to do so either.

For the above reasons, the Court recommends that all of the claims against Arthur J. Gallagher & Co., Gallagher Clean Energy, LLC, AJG Coal, LLC, DTE REF Holdings, LLC, DTE REF Holdings II LLC, CERT Coal Holdings LLC, CERT Holdings, LLC, CERT Holdings 2018, LLC, CERT Operations, LLC, CERT Operations II, LLC, CERT Operations III LLC and Chem-Mod be dismissed for failure to state a claim on "group pleading/"lumping" grounds.[7] It recommends that the claims against the other 16 Moving Defendants listed in paragraph 213 (CERT Operations IV, LLC, CERT Operations V LLC, CERT Operations RCB LLC, AJG Iowa Refined Coal LLC, Joppa Refined Coal LLC, Thomas Hill Refined Coal LLC, Wagner Coaltech LLC, Walter Scott Refined Coal LLC, Louisa Refined Coal, LLC, Belle River Fuels Company, LLC, Arbor Fuels Company, LLC, Portage Fuels Company, LLC, Brandon Shores Coaltech, LLC, Senescence Energy Products, LLC, Rutledge Products, LLC, and Alistar Enterprises, LLC) not be dismissed on "group pleading/"lumping" grounds.

---

[7]     Thus, below when the Court addresses "Moving Defendants'" additional arguments for dismissal, it is doing so only as to the claims brought against the remaining 16 Moving Defendants (since it has already recommended that all claims against these 12 Moving Defendants be dismissed). That said, the rationale for dismissal as to any of those remaining claims would also apply to these 12 Moving Defendants too.

### B.    Whether MES Has Standing to Sue

In the June 18 R&R, the Court recommended that claims brought by Plaintiff MES should be dismissed because MES has failed to plausibly allege that it is a "patentee" under 35 U.S.C. § 281 ("Section 281").  (D.I. 110 at 8-10, 23)[8]  For the '147 patent, the Court reached this conclusion because the original Complaint alleged that Midwest Energy was the sole rights holder for that patent.  (*Id.* at 9)  As for the '114 patent, the Court found that the record failed to plausibly demonstrate that MES was a patentee because:  (1) the original Complaint had lumped the two Plaintiffs together in alleging the rights of the Plaintiffs with respect to that patent; and (2) the United States Patent and Trademark Office's assignment records regarding the '114 patent showed only Midwest Energy as the owner or assignee for that patent.  (*Id.* at 9-10)

Here, Moving Defendants again argue that the SAC does not plausibly allege that MES is a "patentee" under Section 281 with respect to any of the asserted patents.  (D.I. 177 at 1 n.3; D.I. 179 at 2 n.2; D.I. 274 at 2-3)[9]  The relevant allegation of the SAC states that:

> MES, Inc. obtained an exclusive license to the '147 patent and pending related applications from the [Energy & Environmental Research Center ("EERC")].  Midwest Energy Emissions Corp. later obtained an assignment of the patents-in-suit from the EERC including any rights retained by the EERC to receive past damages, and MES, Inc. agreed to terminate its exclusive license at that time.  Thus, during the time period of alleged infringement, MES, Inc. and/or Midwest Energy Emissions Corp. held all substantial rights in the patents-in-suit.

---

[8]    The June 18 R&R set out the legal standard regarding this issue, which the Court hereby incorporates by reference.  (D.I. 110 at 8-9)

[9]    With respect to this argument, the CERT Defendants and Moving Refined Coal Defendants rely on the arguments made by another set of Defendants (the Talen Defendants) in their motion to dismiss the FAC.  (*See* D.I. 274 at 2-3 & n.1)  As noted above, the Talen Defendants have since been dismissed from the case.  (D.I. 266)

(D.I. 218-1 at ¶ 109)  Public records show that a change in ownership from EERC to Midwest Energy for the rights to all asserted patents was effectuated on April 24, 2017.  (D.I. 174 at 18 (citing D.I. 52, exs. A-B; D.I. 173, exs. C-E))  According to Moving Defendants, then, the assignment records and the FAC's allegations demonstrate that on April 24, 2017:  (1) EERC assigned the rights to the asserted patents to Midwest Energy; (2) MES's exclusive license was terminated; and (3) MES had not retained any right to sue for past damages—such that as of the date that Plaintiffs filed this lawsuit (July 17, 2019), MES had no relevant right to any asserted patent.  (*Id.* at 19)

Plaintiffs' retort is that MES is a proper plaintiff because prior to April 24, 2017, MES was an exclusive licensee with the right to recover damages for past infringement (i.e., for infringing conduct occurring before April 24, 2017).[10]  (D.I. 189 at 2, 10)  According to Plaintiffs, MES has "not alleged that [its] right to recover past damages terminated on April 24, 2017.  Thus, the Court may not assume that to be the case."  (*Id.* at 10)

The issue of whether MES has standing to sue under Section 281 is one of "statutory standing[,]" which is properly brought pursuant to Rule 12(b)(6).  *See Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019); *see also Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015); (D.I. 110 at 8-9).  Accordingly, pursuant to the Rule 12(b)(6) standard, the plaintiff must plead factual content that allows the Court to draw the reasonable inference that the plaintiff complies with Section 281.  *Uniloc 2017 LLC v. Google LLC*, Case Nos. 4:20-cv-04355-YGR, 2020 WL 7626430, at *5 (N.D. Cal. Dec. 22, 2020); *cf. Cook Techs., Inc. Emp. Stock Ownership Plan v. Panzarella*, CIVIL ACTION NO.

---

[10]     From what the Court can tell, it looks like the right to recover for such past damages would only apply to infringement of the '147 patent (i.e., the only one of the asserted patents to issue prior to April 24, 2017).  (D.I. 218-1 at ¶ 48)

15-CV-1028, 2016 WL 11697202, at *1 n.1 (E.D. Pa. Mar. 24, 2016) (explaining that on a motion to dismiss for lack of statutory standing, "a court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief; a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits"). The Court's review is limited to the pleadings, and any documents subject to judicial notice (like the above-referenced assignment records) or to incorporation by reference. *Uniloc 2017 LLC*, 2020 WL 7626430, at *5.

While Plaintiffs' original Complaint did not plausibly plead that MES had any right to either of the original asserted patents, (*see* D.I. 110 at 8-10), here, a different outcome is warranted. To be sure, the SAC is a bit ambiguous as to whether MES has retained a right to recover past damages occurring prior to April 24, 2017. As noted above, the relevant paragraph at issue states that "Midwest Energy Emissions Corp. later obtained an assignment of the patents-in-suit from the EERC *including any rights retained by the EERC to receive past damages*, and MES, Inc. agreed to terminate its exclusive license at that time." This could mean that at the time that Midwest Energy was assigned the relevant patents/applications, while it obtained any rights that EERC held to receive past damages, in fact there were no such rights, because *MES* actually held and holds such rights. Or, it could mean that at that time, EERC did retain the right to obtain past damages (and MES did not), such that after the assignment all such rights transferred to Midwest Energy as of April 24, 2017. Both readings of the pleadings are viable. In the end, the correct answer will probably turn on what the applicable contract(s) actually say with respect to these rights, yet those documents are not presently before the Court. *Cf. NextEngine Inc. v. NextEngine, Inc.*, Case No. CV 19-00249-AB (MAAx), 2021 WL 926104,

at *4 (C.D. Cal. Jan. 15, 2021) ("To determine whether the right to sue for prior infringement has been transferred turns on the proper construction of the assignment agreements, which is a matter of state contract law.") (internal quotation marks and citation omitted).

For now though, the Court is supposed to construe the SAC in the light most favorable to MES with regard to this issue. And construed in that light, MES *could* hold exclusive rights to obtain patent infringement damages as to at least one patent-in-suit for a portion of the relevant time period. So the Court recommends that Moving Defendants' challenge in this regard be denied.

## C.     Indirect Infringement

With respect to indirect infringement, the Court will first assess the CERT Defendants' arguments with respect to the lack of "pre-suit" knowledge of the patents-in-suit. (*See* D.I. 110 at 15) The Court will then turn to the parties' remaining arguments with respect to induced infringement and contributory infringement.[11]

### 1.     Pre-Suit Knowledge of the Patents

In the June 18 R&R, the Court agreed with the CERT Defendants that Plaintiffs' original Complaint failed to sufficiently plead pre-suit knowledge of the original asserted patents. (*Id.* at 15-17) The CERT Defendants now argue that the allegations of the SAC are similarly insufficient to demonstrate pre-suit knowledge[12] of any of the asserted patents. (D.I. 179 at 5-7; D.I. 203 at 2-3)

---

[11]     The June 18 R&R set out the elements of induced infringement and contributory infringement claims; the Court hereby incorporates that information by reference. (D.I. 110 at 6-7, 13, 17-18)

[12]     By "pre-suit knowledge," the Court is referring to knowledge existing prior to the first date on which Plaintiffs filed a pleading that asserted the particular patent-in-suit against the CERT Defendants. With regard to the original asserted patents, that date is the date of the filing

16

The SAC adds the following allegations with respect to the issue of pre-suit knowledge of the original asserted patents:

> 195. In addition, ME2C is one of a small number of companies that competes with Chem-Mod, AJG, DTE, CERT, and the RC Defendants to provide bromine-containing additives for mercury control. It is reasonable to infer that these companies have done at least some due diligence on potential competitors. During that process, it is likely that they would have discovered the patents-in-suit from the U.S. Patent Office, Google Patents, ME2C publications and product literature, and/or ME2C's website.

> 196. For example, prior to filing this lawsuit, AJG acknowledged that it could face claims of patent infringement for its refined coal activities. This indicates that it has performed some due diligence to identify patents potentially relevant to its business. It has advertised to investors and/or potential investors that the risk of a patent infringement finding is mitigated by the fact that Chem-Mod has patent infringement insurance. This indicates that Chem-Mod has also performed some due diligence to identify patents potentially relevant to its business. Given the limited number of participants in the relevant market, it is reasonable to infer that Chem-Mod's decision to purchase patent infringement insurance, and AJG's reliance on that insurance, were motivated at least in part by their awareness of ME2C's patents and the risk of infringing those patents.

> 197. Because CERT, DTE, and the RC Defendants have emulated AJG's business model and also use Chem-Mod as a supplier, it is reasonable to infer that these parties would have also been aware of ME2C's patents either as a result of their own due diligence, or as part of their interactions with Chem-Mod and/or AJG.

(D.I. 218-1 at ¶¶ 195-97)

As an initial matter, Plaintiffs argue—and the Court disagrees—that the Court need not address this issue now. In that regard, Plaintiffs assert that: (1) the CERT Defendants received notice of all of the asserted patents around the time of the filing of the FAC, such that the indirect

---

of the original Complaint (i.e., July 17, 2019). With regard to the newly-asserted patents, that date is the date of the filing of the FAC (i.e., July 15, 2020).

infringement claims as to each patent will not be entirely dismissed on "knowledge of the patent" grounds and so (2) the Court thus need not determine now if *some portion* of those claims (e.g., any claim for indirect infringement dating from prior to the filing of the original Complaint) should be dismissed.  (D.I. 190 at 7-8 ("The Court need not decide, at the pleading stage, the precise date when indirect infringement damages began to accrue."))  But Plaintiffs cite to no support for this position.  (*Id.*)  And Plaintiffs' position ignores that our Court has "par[ed] inducement claims down by time period when Plaintiff fails to adequately plead pre-suit inducement."  *DoDots Licensing Sols. LLC v. Lenovo Holding Co.*, C.A. No. 18-098 (MN), 2019 WL 3069773, at *4 (D. Del. July 12, 2019).  So the Court now turns to the substance of the CERT Defendants' arguments.

With regard to the original asserted patents, the Court concludes that the SAC's speculative allegations do not render it plausible that the CERT Defendants had pre-suit knowledge of those patents.  In that regard:

- It does seem plausible that, as Plaintiffs allege, because the CERT Defendants are "one of a small number of companies [along with Plaintiffs]" that compete in a particular industry, then the CERT Defendants likely conducted some "due diligence" on potential competitors like Plaintiffs.

- But the leap from there that any such "due diligence" necessarily included "discover[ing] the [original asserted patents]" is one too far.  Without more, such a conclusion would mean that it is plausible that in any "small" industry, every competitor knows of every patent owned by every other competitor at all times.  That just does not track logically.  *Cf. MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 232-33 (D. Del. 2012) (finding that the plaintiff's reliance on the defendants' participation in the same technologically-based industry as plaintiff, standing alone, was insufficient to establish defendants' actual knowledge of the patent).

- As noted above, the SAC also asserts that Moving Defendants would have obtained pre-suit knowledge of the original asserted patents because: (1) a different entity, AJG, "acknowledged that it could face claims of patent infringement for its refined coal activities"; (2) another different entity, Chem-Mod, "has patent infringement insurance"; (3) the CERT Defendants "have emulated AJG's business model and also use Chem-Mod as a supplier," so (4) the CERT Defendants (like AJG and Chem-Mod) would have been worried about possible infringement liability at the hands of Plaintiffs and, as a result, would have somehow learned of these patents.

- But such allegations simply require too much speculation and hypothesizing to be plausible. For example, as the CERT Defendants note, "[t]o pull on just one thread, that an entity purchased infringement insurance does not render plausible knowledge of every patent in that market, which does not impute knowledge to every company with which it interacts." (D.I. 179 at 6)

Accordingly, the Court recommends that the pre-suit portions of Plaintiffs' claims for indirect infringement regarding the original asserted patents be dismissed as to the CERT Defendants.[13]

With regard to the newly asserted patents, those patents issued on March 17, 2020 (the '225 patent), March 24, 2020 (the '517 patent) and June 2, 2020 (the '430 patent), respectively— not very long before the FAC was filed on July 15, 2020. ('225 patent at 1; '517 patent at 1; '430 patent at 1) Since one cannot know of a patent before it exists, the CERT Defendants could not have had knowledge of these three patents before their respective issuance dates. But otherwise, the SAC alleges that after the July 17, 2019 filing of the original Complaint, "[i]t is reasonable to infer that . . . CERT . . . would have reviewed the prosecution history for the '114 and '147 patents and would be generally aware of other patents in the same family." (D.I. 218-1 at ¶ 200)

---

[13]      Obviously, the CERT Defendants plausibly had knowledge of the original asserted patents after they received the original Complaint. Thus, as to these patents, Plaintiffs could make out the "knowledge of the patent" element of their induced infringement claims in the SAC as of the date of the filing of the original Complaint.

On this front, the Court agrees that it does seem plausible that, after Plaintiffs sued the CERT Defendants in July 2019 on the two original asserted patents, the CERT Defendants and their counsel would have thereafter reviewed those patents' prosecution history—and would have been on the lookout for any other related patents of Plaintiffs that might issue thereafter. One reason the CERT Defendants might plausibly have done this, for example, is because if/when such patents issued, then Plaintiffs might later sue them for infringement of those patents too (as happened here). So the Court agrees that it is plausible that, as of the respective dates of issuance of the newly asserted patents, the CERT Defendants had knowledge of those three patents (and thus had that form of "pre-suit" knowledge for purposes of the induced infringement claims).

### 2. Moving Defendants' Other Arguments Regarding Induced Infringement

In the June 18 R&R, the Court recommended that Plaintiffs' induced infringement claims against the Moving Defendants be dismissed. (D.I. 110 at 14-15) The original Complaint tied the Moving Defendants to the performance of the Bromine Step of the claimed methods. (*Id.* at 14) And it further alleged that the Moving Defendants "'tailor[ed]'" the amount of bromide added to the coal that they delivered to a power plant for the specific needs of that plant. (*Id.*) But the Complaint did not sufficiently explain why the Moving Defendants necessarily knew and specifically intended that, after they provided this coal, the coal plants would then go on to perform the *Activated Carbon Step* of the claimed methods (i.e., that Plaintiffs had not sufficiently pleaded the "knowledge of infringement" and "specific intent to infringe" elements of induced infringement). (*Id.*)

With the SAC, Plaintiffs assert that they have now fixed this problem. In doing so, they point to allegations that largely relate to Moving Defendants' participation in a type of

certification testing that must be performed before they can receive "Section 45 tax credits" (or "refined coal tax credits"). (D.I. 191 at 8; *see also* D.I. 190 at 10-12; Tr. at 48) According to the SAC, Section 45 tax credits are tax credits related to the production of refined coal, which were established by Congress in the 2004 American Jobs Act. (D.I. 218-1 at ¶ 63) Pursuant to this law, a refined coal producer can receive an inflation-adjusted tax credit for each ton of refined coal it sells to a power plant that results in a significant reduction in harmful emissions when the coal is burned. (*Id*. at ¶ 64)

Moving Defendants disagree that Plaintiffs have met their burden. For their part, the Moving Refined Coal Defendants argue that the allegations in the SAC fare "no better than those of the original complaint[,]" as Plaintiffs have failed to plead that Moving Defendants took active steps, with the requisite knowledge and intent, to cause a power plant to perform the Activated Carbon Step. (D.I. 262 at 1; *see also* D.I. 205 at 3-4) More specifically, Moving Refined Coal Defendants assert that the allegations are insufficient to demonstrate that they knew and intended that the coal plants would go on to perform the Activated Carbon Step because a power plant "only needs to continue to operate an activated carbon system if the certification for refined coal tax credits is obtained *using the 'post-emissions control' method*, which is one of several different certification methods permitted under Section 45" and because Plaintiffs' pleading does not allege that any Moving Refined Coal Defendant in fact "certified eligibility using the 'post-emissions control' method[.]" (D.I. 177 at 8 (emphasis added))[14]

---

[14]     (*See also* D.I. 177 at 10 (Moving Refined Coal Defendants asserting that the FAC's allegations "fail to plead active inducement of the Activated Carbon Step because the FAC does not plead that compliance testing was conducted using the 'post-emission control method' instead of other [possible] methods"); D.I. 205 at 4 ("Plaintiffs allege that one *possible* way to show compliance with Section 45 is through on-site post-emissions control testing, but deliberately stop short of alleging that such testing occurred at any accused sites.") (emphasis in original); Tr. at 31 (Moving Refined Coal Defendants' counsel asserting that Plaintiffs'

Similarly, the CERT Defendants assert that the SAC fails to sufficiently allege specific intent, in that it fails to allege that the Activated Carbon Step must be performed for the CERT Defendants to obtain the benefit of Section 45 tax credits.  (D.I. 179 at 10-11; D.I. 203 at 5; D.I. 256 at 3-4; D.I. 261 at 2-3)[15]

Taking all facts as true and drawing all inferences in favor of the non-moving party, however, the Court sides with Plaintiffs.  This is because the SAC alleges that:

> (1) To obtain the benefits of Section 45 tax credits, Moving Defendants must comply with 26 U.S.C. § 45 by showing that the refined coal, *inter alia*, results in a "qualified emission reduction" when used in the production of steam ("Section 45 certification testing").  (D.I. 218-1 at ¶ 82);

> (2) A "qualified emission reduction" can be demonstrated by a reduction of at least 20 percent of the emissions of nitrogen oxide and at least 40 percent of the emissions *of either sulfur dioxide or mercury* released when burning the refined coal, as compared to the emissions released when burning the coal available in the marketplace as of January 1, 2003.  (*Id.*) (emphasis added);

---

allegations of inducement throughout the SAC are insufficient because "[S]ection 45 compliance absolutely does not require performance of an activated carbon step treating flue gas"))

In contrast to the post-emissions control method, "pre-emission control" testing tests the amount of mercury emitted from refined coal combustion without regard for the emission control equipment used at a particular plant.  (D.I. 191 at 9)

[15]    The CERT Defendants also argued that Section 45 certification testing is irrelevant as to whether they possessed the requisite specific intent for the newly asserted patents, because (1) that testing occurs "at least every six months" but (2) those patents issued less than six months before the FAC was filed.  (D.I. 179 at 11 (citing D.I. 130 at ¶¶ 51-53, 89); D.I. 203 at 4; *see also* D.I. 177 at 20 (Moving Refined Coal Defendants making a similar suggestion with respect to why Plaintiffs' willful infringement claims were deficient as to the newly asserted patents))  Plaintiffs did not respond to this particular argument.  (D.I. 190 at 9-13; D.I. 203 at 4)  However, drawing all reasonable inferences in favor of Plaintiffs, it is plausible that the testing occurred sometime after the patents issued and sometime before the FAC's filing (and certainly before the SAC's filing).

(3) On information and belief, the Moving Defendants have "elected to focus on a reduction in mercury rather than sulfur dioxide." (*Id.* at ¶ 83);

(4) In order to demonstrate that the refined coal they produce meets the reduced emissions requirements necessary to obtain Section 45 tax credits, Moving Defendants engage in Section 45 certification testing. They do this by either performing "pilot scale testing that simulates the conditions of a particular coal-fired power plant" or by performing testing at a particular coal-fired power plant. In either scenario, Moving Defendants "must prepare a specific refined coal designed to work for that plant, and they will be aware of a plant's use of activated carbon injection." (*Id.* at ¶ 84);[16]

(5) Moving Defendants make refined coal by adding chemicals to the coal, not by removing atoms of mercury, and thus the mercury present in the coal will be present in the gas omitted from the combustion chamber. So if these Defendants attempted to perform Section 45 certification testing by merely measuring the amount of emitted mercury leaving the combustion chamber (disregarding the plant's activated carbon injection and other mercury control equipment), they would "be unable to demonstrate the required reduction in mercury." Thus, when Moving Defendants perform certification testing for a particular plant, they must be aware of the other mercury control equipment at the plant, including activated carbon injection. (*Id.* at ¶ 85);

(6) "On information and belief, for coal-fired power plants that use activated carbon injection," Moving Defendants perform Section 45 certification testing at least every six months "for those plants by adding activated carbon sorbent downstream of the combustion chamber during the certification testing[,]" capturing some of the mercury in the coal at the combustion chamber utilizing an electrostatic precipitator, and then measuring the mercury content of the gas downstream. This test can be performed either on-site at the plant, or at a pilot scale facility that

---

[16] The inventors of the patents-in-suit discovered that applying a halogen additive such as bromine and bromide compounds to coal, when combined with activated carbon injection, could significantly reduce the mercury from coal-fired power plant emissions. (D.I. 218-1 at ¶¶ 60-61)

simulates the plant's equipment. "Thus, [the Moving Defendants] are aware of a plant's use of activated carbon either by obtaining that information so that they can simulate this step during pilot scale testing, or by observing the use of activated carbon on-site at the plant." (*Id.* at ¶¶ 86, 88)

(7)    The SAC specifies that Defendants refer to this type of testing as "'post-emission control testing'" and that Moving Defendants "perform post-emission control testing at least with respect to each power plant they provide refined coal to, if the power plant uses activated carbon injection." (*Id.* at ¶ 87; *see also* D.I. 191 at 11 n.5); and

(8)    When Moving Defendants provide refined coal to a coal plant that utilizes an activated carbon injection system, "they intend for the plant to continue to operate that system by injecting sorbent comprising activated carbon so that these Defendants may continue to receive the benefits of Section 45 tax credits." (D.I. 218-1 at ¶ 105; *see also id.* at ¶ 87)

These allegations *do* plausibly plead that Moving Defendants certify Section 45 tax credit eligibility by using the post-emissions control method, and *do* plausibly explain why, in performing that testing method, Moving Defendants necessarily both know and intend that the power plants at issue use an Activated Carbon Step.[17] (D.I. 191 at 10-11; D.I. 259 at 2) Now, to be sure, an entity certainly could provide refined coal to a plant that does not use an activated carbon injection. (Tr. at 39; D.I. 259 at 2; *see also* D.I. 218-1 at ¶¶ 82-83) And, relatedly, it is also possible to use other techniques for performing Section 45 testing that do not involve such an injection. (D.I. 218-1 at ¶¶ 82-83) But those possibilities are not the focus of the *SAC's*

---

[17]    At times, Moving Defendants call out Plaintiffs for not "say[ing] which coal plants purportedly use activated carbon injection[.]" (D.I. 257 at 3) However, for indirect infringement purposes, the law does not require a plaintiff to list the name of a direct infringer if it is plausible that one exists. (D.I. 260 at 3); *see, e.g.*, *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1336 (Fed. Cir. 2012) ("To state a claim for indirect infringement . . . a plaintiff need not identify a *specific* direct infringer if it pleads facts sufficient to allow an inference that at least one direct infringer exists.") (emphasis in original).

*allegations*. (D.I. 259 at 2-3)  Rather, the conduct accused of infringement in the SAC is Moving Defendant's provision of coal to plants that *do* use an activated carbon injection—plants as to which Moving Defendants engage in Section 45 certification testing via use of the post-emissions control method.  (D.I. 191 at 10-11; D.I. 260 at 1-2 ("[Plaintiffs] have alleged, that when the Moving [Refined Coal] Defendants supply refined coal to coal plants that use activated carbon injection, they perform the infringing post-emission control testing and further induce infringement of [Plaintiffs'] patents.  This is not a conditional statement; it is just an identification of which coal plants are the direct infringers being induced by the Moving [Refined Coal] Defendants."); Tr. at 39-40)  If the Moving Defendants are participating in the particular type of Section 45 certification process described above, then it is plausible that they *know* that the coal plant otherwise has and does use the refined coal they provide in a similarly infringing manner.  And it is also plausible that they *specifically intend* for such coal plants to do this on a continuing basis—since Moving Defendants freely and actively engage in this coal providing-process, and since they benefit financially from that process.  (*See* Tr. at 49 (Plaintiffs' counsel confirming that the SAC's allegations relating to post-emissions control testing are meant to demonstrate specific intent to induce infringement on the part of Moving Defendants, "since both sides of this need that plant to keep burning the coal in order for their operations to be economically feasible"))[18]

_____

[18]     The SAC also includes factual allegations explaining that if a coal plant uses an activated carbon injection, there are practical, economic and regulatory reasons why it would continue to do so in the future.  (D.I. 218-1 at ¶ 97 ("An activated carbon injection system for mercury control requires an upfront cost and ongoing costs for operation.  Plants with such systems installed operate the systems in order to comply with state and federal regulations regarding mercury emissions [such that w]ere a plant to stop operating its activated carbon injection system, it could face fines that would destroy the economic incentives for dealing with a refined coal provider, or be shut down."); *see also id.* at ¶ 90 (alleging that if a plant using activated carbon "were to unilaterally reduce its activated carbon injection rate . . . this could

### 3. Conclusion

For these reasons, the Court recommends that the Moving Defendants' Motions be denied as to the induced infringement claims against them, with the exception that the CERT Defendants' Motion should be granted as to any "pre-suit" claims against them regarding the original asserted patents (i.e., claims arising prior to the date of filing of the original Complaint).

### D. Contributory Infringement

In the June 18 R&R, the Court recommended dismissal of Plaintiffs' contributory infringement claims against Moving Defendants. (D.I. 110 at 19-20) It did so based on its finding that in the Complaint, Plaintiffs had not sufficiently explained why or how the "tailored" nature of the refined coal (i.e., the coal that Moving Defendants provide to power plants) indicated that the coal had no reasonable commercial use other than to be treated with activated carbon. (*Id.*) As a result, the Complaint failed to adequately plead that when the Moving Defendants deposited that coal onto a conveyance at the power plant, they knew that the coal had no substantial non-infringing use. (*Id.*)

Moving Defendants now argue that the SAC's contributory infringement allegations fare no better on this score. (D.I. 177 at 12-15; D.I. 179 at 15-16; D.I. 203 at 6-8; D.I. 205 at 5-6; Tr. at 10-18) They assert that: (1) burning refined coal only infringes the asserted patents if activated carbon is added to the coal; (2) the asserted patents, the tax code, and a contract attached to the SAC make it clear that refined coal can be burned without activated carbon; (3) therefore the refined coal has a substantial use that does not require injecting activated carbon into combustion flue gas; and so (4) Moving Defendants cannot be held liable for contributory

---

hinder the plant's ability to comply with state and federal mercury regulations and/or the certification process for section 45 tax credits"))

infringement.  (D.I. 177 at 14-15; D.I. 205 at 5; *see also* D.I. 179 at 15-16; D.I. 203 at 6-8)

Additionally, Moving Defendants argue that even if the refined coal "as sold and delivered" is meant to be used at the power plant with activated carbon, that is not enough to set out a contributory infringement claim—because the receiving plant "can just stop using activated carbon."  (D.I. 177 at 14-15; *see also* D.I. 203 at 7 (contending that the pleadings fail to "confront whether activated carbon needs to be injected" at plants using activated carbon)) Plaintiffs disagree.  They maintain that the SAC alleges that the refined coal supplied and delivered by Moving Defendants must be used to infringe (and that whether the refined coal they supply *could* have some non-infringing use presents, at most, a fact dispute).  (D.I. 190 at 2, 14-15; D.I. 191 at 12-15; Tr. at 40-41, 43)

As an initial matter, the Court agrees with Plaintiffs that the "proper inquiry is whether the accused refined coal 'as sold and delivered' lacks substantial non-infringing use."  (D.I. 190 at 14); *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1357 (Fed. Cir. 2018); *see also* (D.I. 110 at 18).  And pursuant to that inquiry, the SAC's allegations are sufficient to plead a contributory infringement claim.

As noted above, Plaintiffs' pleading alleges that when engaging in Section 45 certification testing, Moving Defendants prepare a specific type of refined coal that is designed to work for a particular coal-fired power plant, and they will be aware of the plant's use of activated carbon injection (e.g., in part due to the post-emissions control testing process).  (D.I. 218-1 at ¶¶ 84-87)  The SAC also alleges that activated carbon systems require upfront costs and ongoing costs, and that plants utilizing such systems "operate the systems in order to comply with state and federal regulations regarding mercury emissions [such that w]ere a plant to stop operating its activated carbon injection system, it could face fines that would destroy the

economic incentives for dealing with a refined coal provider, or be shut down." (*Id.* at ¶ 97; *see also id.* at ¶ 90)  Thus, the SAC alleges that Moving Defendants:  (1) provide refined coal on a conveyance, which leads to the combustion chamber of a power plant that uses an activated carbon injection system; (2) know that such coal has been specifically tailored and certified for that plant; and (3) know that the provided coal cannot reasonably be used for purposes other than to be combusted at a plant where activated carbon will later be injected.  (*Id.* at ¶ 106)  Further, the SAC alleges that:

> 107.  In addition, even if the provided refined coal could have had some non-infringing use, because AJG, DTE, CERT, Chem-Mod, and one of the RC Defendants must sell the refined coal "with the reasonable expectation that it will be used for the purpose of producing steam," and as explained above, the refined coal is only certified for a particular plant (i.e., a plant that uses activated carbon), it is reasonable to infer that they require the coal plant to combust the provided refined coal or at least some significant portion of it in accordance with those expectations, i.e., not in some non-infringing way.

(*Id.* at ¶ 107 (emphasis added))  This all suggests that when the refined coal at issue is dropped off at the power plant, it has no substantial non-infringing use.

Moving Defendants' arguments to the contrary were not persuasive.

For example, Moving Defendants argue that despite all of the facts pleaded above, it is still *possible* that such power plants might nevertheless burn refined coal without using activated carbon.  And that is true.  Almost anything is possible.[19]  But the point is that the above allegations, taken as true, indicate that it is *plausible* that these plants *do not do so* with the

---

[19]      It could be possible, for example, that Plaintiffs are just wrong about how one or more of these power plants work and that one or more of them do not use activated carbon at all. Or it could be possible that Plaintiffs are right about how the power plants have operated, but one day, the operator of one such a power plant wakes up and decides that he or she does not want to use activated carbon that day at the plant, for some reason.  All of these things are *possible*, but the question here is as to the *plausibility* of Plaintiffs' allegations.

accused coal (and that, as sold and delivered to the plants, the coal has no substantial non-infringing use). (*See* D.I. 190 at 15; D.I. 191 at 2, 14-15; Tr. at 35, 41)

Additionally, during oral argument, Moving Defendants pointed to the language in paragraph 107 of the SAC (reproduced above) stating that Moving Defendants require the coal plant to "combust the provided refined coal *or at least some significant portion of it*" in an infringing way. They argued that this amounts to "an affirmative pleading of the existence of substantial non-infringing use." (Tr. at 16-20) That is a clever argument. And Plaintiffs here did use some awkward phraseology. But ultimately, the Court does not agree that Plaintiffs have pleaded themselves out of a contributory infringement claim. After all, the purported non-infringing use must be "substantial"—i.e., "not *unusual*, far-fetched, illusory, impractical, *occasional*, aberrant, or experimental." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009) (emphasis added). And one can read this language in paragraph 107 to mean that only a *less-than-significant* portion of the provided refined coal (if any) might somehow end up being utilized in a non-infringing manner. (Tr. at 43-44) This would mean that any non-infringing uses for the refined coal at issue would be unusual or occasional—i.e., not "substantial." *See, e.g.*, *Garrett v. TP-Link Rsch. Am. Corp.*, No. 20-cv-03491-SI, 2020 WL 5517202, at *6 (N.D. Cal. Sept. 14, 2020).[20]

For the above reasons, the Court recommends that: (1) in light of the above and the Court's decision in Section III.C.1, the CERT Defendants' Motion should be granted with respect to pre-suit contributory infringement as to the original asserted patents, and should be

---

[20]     Moreover, to the extent that Moving Defendants dispute that the refined coal that they provide does not have other substantial uses, that is a factual dispute that may be developed through discovery. *See, e.g.*, (D.I. 190 at 2); *Regents of Univ. of Ca. v. St. Jude Med., Inc.*, Case No. 16-cv-06210-YGR, 2017 WL 2335542, at *2 (N.D. Cal. May 30, 2017).

otherwise denied; and (2) the Moving Refined Coal Defendants' Motion should be denied with respect to contributory infringement.

### E. Direct Infringement

Direct infringement under 35 U.S.C. § 271(a) occurs "where all steps of a claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015). One typical way to assert that a defendant is liable for direct infringement is to allege "single-actor" direct infringement: i.e., that the defendant itself performs every step of the claimed method. *Sapphire Crossing, LLC v. Sansan Corp.*, Civil Action No. 20-1136-MN-CJB, 2021 WL 1299506, at *2 (D. Del. Apr. 7, 2021). Alternatively, when more than one actor is involved in practicing the steps of a method claim, "a court must determine whether the acts of one are attributable to the other such that a single entity is responsible for the infringement" (i.e., "divided infringement" or "joint infringement"). *Akamai Techs., Inc.*, 797 F.3d at 1022.

The SAC alleges two theories of direct infringement against Moving Defendants: (1) that Moving Defendants directly infringe by forming joint enterprises with each coal-fired power plant to which they provide refined coal (i.e., joint infringement); and (2) that Moving Defendants directly infringe by performing Section 45 certification testing of refined coal (i.e., single-actor direct infringement). (*See, e.g.*, D.I. 218-1 at ¶¶ 274-76, 311-15; *see also* D.I. 177 at 15; D.I. 262 at 2) Moving Defendants argue that Plaintiffs' allegations are insufficient with respect to both theories. The Court will consider each theory in turn.

#### 1. Joint Infringement

As the Court noted in the June 18 R&R, (D.I. 110 at 20), to successfully plead a claim for joint infringement, a plaintiff must allege facts "sufficient to allow a reasonable inference that all

steps of the claimed method are performed and either: (1) one party exercises the requisite 'direction or control' over the others' performance or (2) the actors form a joint enterprise such that performance of every step is attributable to the controlling party[,]" *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016) (quoting *Akamai Techs.*, 797 F.3d at 1022).[21]  To plead that a defendant was part of a joint enterprise with another actor or group of actors (as Plaintiffs attempt here) a plaintiff must allege: "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Akamai*, 797 F.3d at 1023; *see also, e.g.*, *IOENGINE, LLC v. PayPal Holdings, Inc.*, Civil Action No. 18-452-WCB, Civil Action No. 18-826-WCB, 2019 WL 330515, at *1 (D. Del. Jan. 25, 2019).  This is a "demanding standard" for a plaintiff to meet.  *IOENGINE*, 2019 WL 330515, at *3.

The SAC alleges that Moving Defendants and the operators of coal-fired power plants are involved in a "joint enterprise" to infringe the asserted patents.  In support, it asserts that: (1) the Moving Defendants contract with the respective power plants to provide refined coal at the power plant "for the common purpose" of obtaining the benefits of Section 45 tax credits; and (2) Moving Defendants have a community of pecuniary interest with the power plants, in that the Moving Defendants receive the tax credits and the power plants rely on the value of the tax credits in order to provide discounted refined coal to consumers and/or to pay their rent.  (D.I. 218-1 at ¶¶ 94, 220-21, 223-24, 226-27)  Further, the SAC alleges that the members of this joint

---

[21]      The June 18 R&R recommended dismissal of Plaintiffs' joint infringement claims, which were based on both a "direction or control" theory and a "joint enterprise" theory, because the Complaint failed to adequately plead all necessary elements of either theory of joint infringement.  (D.I. 110 at 20-22)  Now, Plaintiffs only press the joint enterprise theory via the SAC.

enterprise have an "equal right of control" in the joint enterprise, in that in order to allow Moving Defendants to obtain Section 45 tax credits, the members of the joint enterprise each divide up and perform a portion of the work required to achieve that purpose. (*Id.* at ¶¶ 222, 225, 228; *see also* D.I. 190 at 2, 16-17; D.I. 191 at 16-18) To that end, it is alleged that, *inter alia*: (1) certain Moving Defendants control the certification process for obtaining the benefits of Section 45 tax credits, as well as the application of chemicals onto the coal; and (2) the power plants control the process of combusting the coal and providing activated carbon. (D.I. 218-1 at ¶¶ 222, 225, 228)

The Court concludes that Plaintiffs' joint enterprise theory of direct infringement is insufficiently pleaded. This is so because, at a minimum, the allegations fail to plead facts as to the fourth element of such a claim: i.e., that a Moving Defendant and its associated power plant each have an "equal right to a voice in the direction of the enterprise, which gives an equal right of control." (D.I. 177 at 17-18; D.I. 179 at 18; D.I. 203 at 9; D.I. 205 at 8)

In pushing back against this conclusion, Plaintiffs point to a refined coal contract between Belle River Fuels Company LLC ("Belle River Fuels") (an allegedly affiliated Refined Coal LLC of AJG and Chem-Mod) and the Detroit Edison Company; the contract is referenced in the SAC. (D.I. 218-1 at ¶ 94 & ex. F)[22] The contract requires the Detroit Edison Company to "use all Refined Coal purchased hereunder solely for use as fuel in [its] Belle River Power Plant." (*Id.*, ex. F at 8.2(d)) It also requires the Detroit Edison Company to report the amount of activated carbon in use to Belle River Fuels. (*Id.*, ex. F at 8.2(e) & ex. C; *see also* D.I. 260 at 2; D.I. 262 at 1) Plaintiffs assert that their citation to this contract helps to satisfy the "equal right of control" element, because the contract "curtails each party's right to terminate the agreement,

---

[22]     The proposed SAC filed on the docket makes reference to attached exhibits, (*see, e.g.*, D.I. 218-1 at ¶ 94), but does not actually attach them. The exhibits are filed on the docket along with the FAC. (D.I. 130, exs. A-F)

[] and provides mechanisms requiring the parties to coordinate in the performance of the enterprise." (D.I. 190 at 16 (citing D.I. 130, ex. F at 24-25)) In other words, the agreement states that Belle River Fuels has a role to play in the joint operation (i.e., it supplies refined coal) and the coal plant operator (the Detroit Edison Company) also has a role to play (i.e., it combusts the coal and uses activated carbon). (*Id.* at 16-17; D.I. 191 at 16-17) And Plaintiffs thereafter allege that since Belle River Fuels has this type of a contract with a coal plant operator, then it is reasonable to infer that the other Moving Defendants have similarly-worded contracts with the coal plants to whom they produce refined coal. (D.I. 190 at 16; D.I. 191 at 17; *see also* D.I. 218-1 at ¶ 94)

However, for various reasons, the Court disagrees that Plaintiffs' allegations about this contract are helpful regarding the "equal right of control" element.

For one thing, with regard to the Moving Defendants other than Belle River Fuels, the Court does not see how the contract is very persuasive. The Court does not believe that, without more pleaded, it is reasonable to infer that every single other Moving Defendant has a contract with a coal plant operator that contains similar language to that in the Belle River Fuels contract. Plaintiffs do not provide a sufficient factual basis to support such a broad inference. (D.I. 203 at 9)

Moreover, even if that is incorrect, and even if is true (as Plaintiffs assert) that pursuant to such contracts, each participant "controls a necessary aspect of the endeavor[,]" (D.I. 218-1 at ¶ 225), such an allegation does "not go beyond a typical supplier relationship[,]" (D.I. 179 at 18). In other words, allegations demonstrating that one entity supplies another entity with something pursuant to a contract, and then the second entity does something with what is supplied, cannot alone be enough to support a joint enterprise theory—even if the net result of the contract is that

both parties obtain some type of benefit from this contractual relationship. Were the law otherwise, then any two parties who entered into a supply agreement could be asserted to be a joint enterprise. (D.I. 205 at 7) A joint enterprise requires more than an agreement of parties to act in concert to achieve an objective. It requires an equal voice in and equal right of control over the entire enterprise. And absent from the SAC are any specific allegations about the nature of the joint enterprise that each Moving Defendant is said to have with a power plant that might go to establish the "equal right of control" element. There are no allegations, for example, as to how those joint enterprises are run, or as to how decisions about the direction of the enterprises are made—i.e., allegations that show how all parties have an equal voice in the decision-making associated with those enterprises. Nor are there any allegations, for example, that Moving Defendants (even if they do not perform the step itself) nevertheless have an equal voice regarding how the power plants perform or conduct, *inter alia*, the Activated Carbon step. (D.I. 177 at 18; D.I. 203 at 9; D.I. 205 at 8; *see also, e.g.*, D.I. 218-1 at ¶ 228 (Plaintiffs pleading that the power plants "control[] the process of combusting the coal and providing sorbent comprising activated carbon")) The absence of such allegations dooms Plaintiffs' joint infringement claims. *See Nalco Co. v. Chem-Mod, LLC*, Case No. 14-cv-2510, 2015 WL 6122811, at *4 (N.D. Ill. Oct. 15, 2015) ("The fact that the Refined Coal LLCs receive Section 45 tax credits is not evidence that they direct and control the alleged infringing actions of each coal-fired power plant, and the TAC does not sufficiently support the presence of a joint enterprise.").[23]

---

[23]     *See also, e.g.*, *CBA Env't Servs., Inc. v. Toll Bros. Inc.*, 403 F. Supp. 3d 403, 419 (D.N.J. 2019) (concluding that the joint enterprise theory was insufficiently pleaded where the "Complaint is clear that not all of the Defendants had equal control over the project, alleging that while Toll Bros., TWT and First Environment were responsible for 'overseeing and directing soil remediation activities at Apple Ridge and High Mountain,' ENRC had no such oversight authority") (citation omitted); *Shure, Inc. v. ClearOne, Inc.*, No. 17 C 3078, 2018 WL 1371170, at *9 (N.D. Ill. Mar. 16, 2018) (finding the equal right of control element to be sufficiently

## 2. Single-Actor Direct Infringement

For single-actor direct infringement, at the pleading stage, the plaintiff must allege facts that plausibly indicate that the defendant's acts satisfy each of the limitations found in the asserted claims. *See, e.g.*, *ID Image Sensing LLC v. OmniVision Techs., Inc.*, Civil Action No. 20-136-RGA, 2020 WL 6888270, at *6 (D. Del. Nov. 24, 2020) (citing cases), *report and recommendation adopted*, Civil Action No. 20-136-RGA, 2021 WL 602438 (D. Del. Feb. 16, 2021); *Horatio Wash. Depot Techs. LLC v. TOLMAR, Inc.*, Civil Action No. 17-1086-LPS, 2018 WL 5669168, at *11-12 (D. Del. Nov. 1, 2018) (citing cases), *order corrected*, Civil Action No. 17-1086-LPS, 2018 WL 6168617 (D. Del. Nov. 26, 2018), *report and recommendation adopted* C.A. No. 17-1086-LPS-CJB, 2019 WL 1276028 (D. Del. Mar. 20, 2019).[24]

---

proven on a motion for preliminary injunction, where the joint project was one of "increasing interoperability and marketing [certain] products' compatibility" and where "[i]t is clear from the communications between Shure, Biamp, and QSC that each had the ability to direct and control the joint efforts to promote product integration and marketing" because, *inter alia*, "each party was exercising control over [] joint press releases . . . . [e]ach party also had control over the decision whether to make their products compatible, and could have opted out of compatibility efforts at any time"); *Sonrai Sys., LLC v. AMCS Grp. Inc.*, No. 16 C 9404, 2017 WL 4281122, at *6 (N.D. Ill. Sept. 27, 2017) ("Under either the agency or joint enterprise theories of direct infringement, AMCS would have to exercise a degree of control over Lakeshore, the other entity allegedly involved in the infringement: . . . for a joint enterprise, an equal voice in the direction of the enterprise. . . . [but t]here are no allegations in the complaint that AMCS had any control over Lakeshore's use of its technology."); *see also, e.g.*, *Limelight Networks, Inc. v. Akamai Techs., Inc*., 572 U.S. 915, 923 (2014) (direct infringement requires that "performance of *all the claimed steps* . . . be attributed to a *single person*") (emphasis added).

[24]     While Plaintiffs suggest that that is not the correct legal standard for pleading direct infringement, (*see, e.g.*, D.I. 259 at 3; D.I. 260 at 3-4), for reasons it has set out in cases like those cited above, the Court does not agree.

Moreover, to the extent that Plaintiffs cite to *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), for the proposition that "the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met[,]" (D.I. 259 at 3 (internal quotation marks omitted) (quoting *Nalco Co*., 883 F.3d at 1350)), the Court disagrees that this quotation from *Nalco* is dispositive here. For one thing, the quotation in *Nalco* was clearly dicta. The *Nalco* Court used the quotation at the end of a discussion about

The SAC alleges that the Moving Defendants have committed single-actor direct infringement "when performing certification testing of refined coal designed for coal-fired power plants that use sorbent comprising activated carbon[,]" either by executing each step of the asserted patents' claims or by engaging a third party agent to do so on their behalf. (*See, e.g.*, D.I. 218-1 at ¶¶ 275-76; *see also id.* at ¶¶ 84, 86-87, 211-13, 256, 259) Moving Defendants assert that the SAC fails to explain how in the course of Section 45 certification testing, certain actions by the Moving Defendants meet each of the elements of the asserted claims. (D.I. 257 at 4; D.I. 261 at 3; D.I. 262 at 2; Tr. at 53)[25]

---

whether the plaintiff had plausibly pleaded facts supporting a direct infringement allegation—more particularly, as to whether the plaintiff had pleaded sufficient facts indicating that the defendants' conduct satisfied a particular limitation (the "injecting" limitation) in the asserted claims. But in *Nalco*, it is not as if the plaintiff had made no attempt to plead facts that established that defendant's acts actually satisfied the injecting limitation. Instead, the plaintiff had pleaded quite a number of facts in that regard, *Nalco Co.*, 883 F.3d at 1348-50, and the United States Court of Appeals for the Federal Circuit's core holding was that the defendants' arguments as to the implausibility of those allegations raised factual disputes that were inappropriate for the pleading stage, *see Uniloc 2017 LLC v. Zenpayroll, Inc.*, No. CV 19-1075-CFC-SRF, 2020 WL 4260616, at *2 (D. Del. July 23, 2020) (concluding the same regarding the *Nalco* decision). Moreover, the quotation at issue in *Nalco* comes from *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323 (Fed. Cir. 2012). And crucially, in *Bill of Lading*, the quotation was used in reference to the pleading standard that was *in effect at that time*—a time when all a patentee needed to do to plead direct infringement was to satisfy the bare bones requirements of Form 18 of the Federal Rules of Civil Procedure. *Bill of Lading*, 681 F.3d at 1335 ("As we held in *McZeal*, *Form 18* and the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met. . . . Indeed [pursuant to Form 18], a plaintiff need not even identify which claims it asserts are being infringed.") (emphasis added). Of course, Form 18 has since been abrogated, and it no longer controls the pleading requirements for a direct infringement claim. Instead, a patentee must now plead facts that satisfy the *Twombly* and *Iqbal* pleading standard as to such a claim. And in that regard, if the Court cannot understand from a patentee's allegations why the defendant's acts satisfy a limitation in the asserted patent claim, then pursuant to *Twombly* and *Iqbal*, it cannot conclude that it is plausible that the defendant actually infringes that claim.

[25]     Moving Defendants make some other arguments with respect to this theory of direct infringement that the Court does not find persuasive. The Court will deal with those here.

For their part, Plaintiffs argue that the SAC *does* allege that Moving Defendants perform all the steps of the claimed methods during post-emission control testing. In support, they point to the following three paragraphs of the SAC:

> 87. To be clear, Defendants refer to the above described type of testing as "post-emission control testing." Each of the entities identified with the names AJG, DTE, CERT, and the RC Defendants perform post-emission control testing at least with respect to each power plant they provide refined coal to, if the power plant uses activated carbon injection. Performance of this testing constitutes direct infringement of at least one claim of each of the patents-in-suit, and providing the refined coal to these power plants also induces and contributes to infringement at the power plant. . . .

> 253. AJG, DTE, CERT, Chem-Mod and the RC Defendants perform this step [combusting coal in a combustion chamber to provide the mercury-containing gas, wherein the coal comprises added Br2, HBr, a bromide compound, or a combination thereof,

---

For example, similar to their arguments with respect to induced infringement, Moving Refined Coal Defendants assert that Plaintiffs' allegations "plead[] that Movants are involved in certification testing, and that some types of certification testing infringe, but do[] not plead that Movants conduct infringing tests." (D.I. 205 at 9) In other words, Moving Refined Coal Defendants contend that the SAC's allegations relating to post-emissions control testing are "all hypothetical." (*Id.* at 9-10; *see also* D.I. 177 at 19 ("That [post-emission control testing] certification may be possible does not render its use by any Refined Coal Defendant plausible."); D.I. 261 at 3) But as discussed above with respect to induced infringement, the SAC *does* sufficiently allege that Moving Defendants conduct post-emissions control testing with respect to plants that use activated carbon sorbent. (*See, e.g.*, D.I. 218-1 at ¶¶ 83-88)

Second, Moving Defendants also counter that it is simply not plausible that [for purposes of certification testing] these entities "march into the power plant, take it over, and actually run all of the systems and perform the acts that constitute the method." (Tr. at 32-33; *see also id.* at 53) According to Moving Defendants' counsel, "[i]t's equally plausible as an inference that we take the plant as we find it, we prepare refined coal, and we stick a probe in the smokestack to measure what's coming out." (*Id.* at 53) This is not a persuasive argument. Whether it is "equally plausible" that the pleaded facts could suggest non-infringement is not the test here. Whether *Plaintiffs' allegations* are plausible is the issue. *See, e.g.*, *Bill of Lading*, 681 F.3d at 1340 (explaining that courts may not "choose among competing inferences as long as there are sufficient facts alleged to render the non-movant's asserted inferences plausible"); *Mobile Enhancement Sols. LLC v. HTC Corp.*, Nos. 3:12-CV-00794-M, 3:12-cv-00797-M, 2013 WL 12137006, at *2 (N.D. Tex. Mar. 6, 2013) (explaining that where a pleading presents multiple "reasonable" inferences, "the Court cannot, at the pleading stage, choose between them").

added to the coal upstream of the combustion chamber, or the combustion chamber comprises added Br2, HBr, a bromide compound, or a combination thereof] when conducting section 45 testing for at least one coal plant that uses activated carbon sorbent. . . .

256. AJG, DTE, CERT, Chem-Mod and the RC Defendants perform this step [injecting a sorbent material comprising activated carbon into the mercury containing gas downstream of the combustion chamber] when conducting section 45 testing for at least one coal plant that uses activated carbon sorbent.

(D.I. 260 at 3 (citing D.I. 218-1 at ¶¶ 87, 253, 256); *see also* D.I. 259 at 3)

These paragraphs (and the paragraphs surrounding them) sufficiently establish that the Moving Defendants perform these steps of the claimed methods in the course of Section 45 certification testing. Paragraph 87 simply says that performance of post-emissions testing infringes the claimed methods. But paragraphs 253 and 256 go a step further, in that they identify particular claim limitations and state that Moving Defendants perform such limitations during Section 45 testing. And there are enough additional allegations in the SAC about what Section 45 testing is, and how it is performed, *see supra* Section III.C.2, to make it plausible that, during the course of such testing, the above-referenced claim limitations are actually satisfied. No more is required with respect to these limitations at the pleading stage.

However, as Moving Defendants note, the SAC does not even make an attempt to allege that Moving Defendants' conduct satisfies a particular limitation in exemplary claim 25 of the '114 patent and exemplary claim 1 of the '430 patent. (D.I. 256 at 5; D.I. 257 at 4) These claims require, *inter alia*, "separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas"; yet the SAC does not anywhere allege that Moving Defendants actually perform this step during Section 45 certification testing or otherwise. (D.I. 218-1 at ¶¶ 260-61, 400-01)

Accordingly, the Court recommends that Plaintiffs' single-actor theory direct infringement claims against Moving Defendants be dismissed with respect to claim 25 of the '114 patent and claim 1 of the '430 patent, but that Moving Defendants' Motion be denied with respect to the remaining asserted claims.

###    F.    Willful Infringement

Moving Defendants argue that Plaintiffs' willful infringement allegations are deficient, due to Plaintiffs' failure to plead Moving Defendants' knowledge of the asserted patents and knowledge of their infringement of those patents.[26]  (D.I. 177 at 20; D.I. 203 at 10)

Plaintiffs do not appear to be alleging that the Moving Refined Coal Defendants engaged in willful infringement prior to the filing of the original Complaint in this case.  (*See* D.I. 191 at 19; D.I. 205 at 10)  They *do* appear to be alleging that the CERT Defendants engaged in willful infringement prior to that date.  And for the reasons discussed above in Section III.C.1, the Court agrees that the SAC does not plead a plausible claim of pre-Complaint willful infringement against the CERT Defendants.  It therefore recommends that any such claim be dismissed.

With respect to Plaintiffs' willful infringement claims that post-date the filing of the original Complaint, again, the original Complaint only included allegations as to the two original asserted patents.  So to the extent that Plaintiffs assert that *the original Complaint* could have provided Moving Defendants with the requisite knowledge of their infringement, that could only be with regard to those two patents.  Yet in that regard, the Court agrees with Moving Defendants, (D.I. 177 at 20; D.I. 203 at 10), that any such claim must fail.  That is because the original Complaint did not state a sufficient claim against Moving Defendants.  In the June 18

---

[26]    The June 18 R&R set out the elements of willful infringement, which the Court hereby incorporates by reference.  (D.I. 110 at 10)

R&R, the Court explained why Plaintiffs' claims against Moving Defendants, as alleged in the original Complaint (i.e., claims for indirect infringement and joint infringement), were wanting. (D.I. 110 at 13-22)  Accordingly, "any assertion that the Mov[ing Defendants] were willful after the complaint was filed, putting them on notice, is belied by the dismissal of all infringement claims against them."  (D.I. 177 at 20); *cf. Blitzsafe Tex., LLC v. Volkswagen Grp. of Am., Inc.*, Case nos. 2:15-cv-1274-JRG-RSP, 2016 WL 4778699, at *7 (E.D. Tex. Aug. 19, 2016) ("The Court also finds the Complaint states a claim to post-suit willful infringement.  The Complaint notifies the VW Defendants of the patents that they are accused of infringing.  It also recites facts which *state a plausible claim of direct and indirect infringement*.  The Complaint alleged that despite these facts, the VW Defendants have not ceased their infringing activities.") (emphasis added).

Plaintiffs also assert that regardless of the above, Moving Defendants at least had knowledge of the asserted patents and of their infringement of those patents as of June 29, 2020—i.e., the date on which Plaintiffs provided Moving Defendants' counsel with a draft of the FAC.  (D.I. 218-1 at ¶ 231; *see also* D.I. 191 at 19)  There is some dispute between the parties as to whether the sharing of this draft FAC could be a triggering date for knowledge-of-infringement purposes (in light of certain conditions that Plaintiffs imposed on that sharing process, i.e., that Moving Defendants "agree not to rely on the draft other than to evaluate whether they oppose the amendment [of the complaint]").  (D.I. 205, ex. A at 2)  That seems like a fact dispute, and so in the Court's view, Moving Defendants could have willfully infringed as of June 29, 2020.  Moreover, the allegations of willful infringement are at least plausible as of the date a few weeks later (i.e., July 15, 2020) when Moving Defendants received notice of the *filing* of the FAC.  (D.I. 218-1 at ¶ 202; D.I. 260 at 4)  As of June 29, 2020 or July 15, 2020,

when they saw the content of the FAC, it is plausible that Moving Defendants had knowledge of all of the asserted patents and knowledge of how they infringe those patents (as to any infringement claims that survive the Motions). *See, e.g.*, *Välinge Innovation AB v. Halstead New England Corp.*, Civil Action No. 16-1082-LPS-CJB, 2018 WL 2411218, at *11 n.15 (D. Del. May 29, 2018); *Clouding IP, LLC v. Amazon.com, Inc.*, C.A. Nos. 12-641-LPS, 12-642-LPS, 12-675-LPS, 2013 WL 2293452, at *4 (D. Del. May 24, 2013).

In sum, the Court recommends that Plaintiffs' claims of willful infringement be dismissed, with the exception of any claims dating from June 29, 2020 (i.e., the time when Moving Defendants received notice of the FAC's contents).

### G.    Nature of Dismissal

Plaintiffs have now submitted three complaints in this action and thus have had three tries to assert plausible claims against Moving Defendants.  That is a lot of tries.

With respect to certain of the claims found wanting herein (i.e., portions of Plaintiffs' claims for indirect infringement against the CERT Defendants; Plaintiffs' joint infringement claims against Moving Defendants; and portions of Plaintiffs' claims for willful infringement against Moving Defendants), because the Court has already previously considered these claims and found them deficient, and then Plaintiffs submitted two additional complaints unsuccessfully attempting to shore these claims up, it is clear that permitting further amendments of these claims would be futile.  The Court thus recommends that these claims be dismissed with prejudice.  *See, e.g.*, *Talley v. Christiana Care Health Sys.*, Civil Action No. 17-926-CJB, 2018 WL 4938566, at *9 (D. Del. Oct. 11, 2018) (noting that dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile).

The Court has also recommended dismissal of certain of Plaintiffs' single-actor direct infringement claims against Moving Defendants; however, Plaintiffs did not first raise those claims until they filed the SAC. Additionally, the Court has also for the first time recommended dismissal of all claims against Defendants Arthur J. Gallagher & Co., Gallagher Clean Energy, LLC, AJG Coal, LLC, DTE REF Holdings, LLC, DTE REF Holdings II LLC, CERT Coal Holdings LLC, CERT Holdings, LLC, CERT Holdings 2018, LLC, CERT Operations, LLC, CERT Operations II, LLC, CERT Operations III LLC and Chem-Mod on improper "group pleading"/"lumping" grounds. The Court's June 18 R&R did not address these deficiencies; this Report and Recommendation is the first time they have been addressed. So it is a little harder for the Court to say that it would clearly be futile for Plaintiffs to attempt to overcome such deficiencies in the future.[27] Moreover, the Court is always mindful that leave to amend should be given freely "when justice so requires[.]" Fed. R. Civ. P. 15(a)(2). So as to these claims, the Court recommends that dismissal be without prejudice. That said, in light of the many opportunities Plaintiffs have now had to attempt to amend their original Complaint, the Court also recommends that as to any further attempt to amend (e.g., to add single-actor direct infringement claims, or to add back in certain claims against the above-referenced 12 Moving Defendants), Plaintiffs should not be permitted to do so as of right. Instead, the Court recommends that in such a circumstance, Plaintiffs first be required to file a motion for leave to file a further amended complaint (one that attaches the proposed amended pleading). *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007).

_____

[27]     To be clear, though, even if Plaintiffs are able to later make out plausible infringement claims of some kind as to one or more of the 12 Moving Defendants, such claims could not include those claims that the Court above has recommended be dismissed with prejudice (assuming the District Court affirms those recommendations of dismissal).

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' Motions be GRANTED-IN-PART and DENIED-IN-PART in the manner set out above.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.


Dated: May 20, 2021

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE