IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS CORP.
and MES INC.,

        Plaintiffs,

    v.

VISTA ENERGY CORP., et al.,

        Defendants.

C.A. No. 1:19-cv-01334-RGA-CJB

**JURY TRIAL DEMANDED**

## PLAINTIFFS MIDWEST ENERGY EMISSIONS CORP. AND MES INC.'S ANSWER TO CERT DEFENDANTS AND CERTAIN REFINED COAL LLC DEFENDANTS' COUNTERCLAIMS

Plaintiffs Midwest Energy Emission Corp and MES Inc. ("ME2C"), by and through its attorneys, herby answer and respond to the Counterclaims filed by Defendants CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC (the "CERT Defendants"); Senescence Energy Products, LLC; Rutledge Products, LLC; and Alistar Enterprises, LLC (the "Certain Refined Coal LLC Defendants"; the Certain Refined Coal LLC Defendants together with the CERT Defendants, the "Defendants") (D.I. 295) and in support thereof would respectfully show the Court the following:

## COUNTERCLAIMS

### Parties, Jurisdiction, and Venue

1.     ME2C filed a Complaint against the Defendants seeking, among other things, a judgment that the Defendants infringe U.S. Patent Nos. 10,343,114 ("the '114 patent"), 8,168,147 ("the '147 patent"), 10,589,225 ("the '225 patent"), 10,596,517 ("the '517 patent") and 10,668,430 ("the '430 patent"). An immediate and justiciable controversy exists between ME2C and the Defendants regarding the infringement and validity of the patents-in-suit.

**RESPONSE**:  Admitted.

2.      Subject matter jurisdiction in this Court is proper under, among other things, 28 U.S.C.

§§ 1331, 1338 and 1367.

**RESPONSE**: Admitted, on information and belief.

3.      CERT Operations IV, LLC is a Delaware limited liability company with its principal

place of business at 2100 Southbridge Parkway, Suite 585, Birmingham, AL 35209.

**RESPONSE**: Admitted, on information and belief.

4.      CERT Operations V, LLC is a Delaware limited liability company with its principal place

of business at 2100 Southbridge Parkway, Suite 585, Birmingham, AL.

**RESPONSE**: Admitted, on information and belief.

5.      CERT Operations RCB, LLC is a Delaware limited liability company with its principal

place of business at 2100 Southbridge Parkway, Suite 585, Birmingham, AL 35209.

**RESPONSE**: Admitted, on information and belief.

6.      Senescence Energy Products, LLC is a Delaware limited liability company with its

principal place of business at 2100 Southbridge Parkway, Suite 585, Birmingham, AL 35209.

**RESPONSE**: Admitted, on information and belief.

7.      Rutledge Products, LLC is a Delaware limited liability company with its principal place

of business at 2100 Southbridge Parkway, Suite 585, Birmingham, AL 35209.

**RESPONSE**: Admitted, on information and belief.

8.      Alistar Enterprises, LLC is a Delaware limited liability company with its principal place

of business at 2100 Southbridge Parkway, Suite 585, Birmingham, AL 35209.

**RESPONSE**: Admitted, on information and belief.

9.      On information and belief, Midwest Energy Emissions Corp. is a Delaware corporation with its principal place of business in Corsicana, Texas.

**RESPONSE**: Admitted.

10.     On information and belief, MES Inc. is a North Dakota corporation with its principal place of business at 311 S. 4th street, STE 118, Grand Forks, ND 58201.

**RESPONSE**: Admitted.

11.     This Court has personal jurisdiction over ME2C because, among other things, Midwest Energy Emissions Corp. is incorporated in this District and ME2C submitted to the jurisdiction of this Court by filing its Complaint in this Court.

**RESPONSE**: Admitted.

12.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400 because, among other things, Midwest Energy Emissions Corp. is incorporated in this District and ME2C selected this venue by filing its Complaint in this Court.

**RESPONSE**: Admitted.

<u>The '114 Patent</u>

13.     On its face, the '114 patent, entitled "Sorbents for the oxidation and removal of mercury," indicates it was issued by the USPTO on July 9, 2019.

**RESPONSE**: Admitted.

14.     On information and belief, Midwest Energy Emissions Corp. is the assignee of the '114 patent.

**RESPONSE**: Admitted.

15.     The '114 patent contains thirty claims.

**RESPONSE**: Admitted.

16.     The '114 patent contains four independent claims.

**RESPONSE**: Admitted.

17.     Each independent claim of the '114 patent recites "[a] method of separating mercury from a mercury-containing gas."

**RESPONSE**: Admitted.

The '147 Patent

18.     On its face, the '147 patent, entitled "Sorbents for the oxidation and removal of mercury," indicates it was issued by the USPTO on May 1, 2012.

**RESPONSE**: Admitted.

19.     ME2C asserts it is the owner of the '147 patent.

**RESPONSE**: Admitted.

20.     The '147 patent contains twenty-five claims.

**RESPONSE**: Admitted that the printed '147 patent lists 25 claims.

21.     The '147 patent contains one independent claim.

**RESPONSE**: Admitted.

22.     Independent claim 1 recites "[a] method for separating mercury from a mercury-containing gas."

**RESPONSE**: Admitted.

The '225 Patent

23.     On its face, the '517 patent, entitled "Sorbents for the oxidation and removal of mercury," indicates it was issued by the USPTO on March 17, 2020.

**RESPONSE**: Denied.

24.     ME2C asserts it is the owner of the '225 patent.

**RESPONSE**: Admitted.

25.    The '225 patent contains twenty-nine claims.

**RESPONSE:** Admitted.

26.    The '225 patent contains four independent claims.

**RESPONSE**: Admitted.

27.    Independent claim 1 recites "[a] method for treating a mercury-containing gas."

**RESPONSE**: Admitted.

The '517 Patent

28.    On its face, the '517 patent, entitled "Sorbents for the oxidation and removal of mercury," indicates it was issued by the USPTO on March 24, 2020.

**RESPONSE**: Admitted.

29.    ME2C asserts it is the owner of the '517 patent.

**RESPONSE**: Admitted.

30.    The '517 patent contains thirty claims.

**RESPONSE**: Admitted.

31.    The '517 patent contains three independent claims.

**RESPONSE**: Admitted.

32.    Independent claim 1 recites "[a] method for reducing mercury in a mercury- containing gas."

**RESPONSE**: Admitted.

The '430 Patent

33.    On its face, the '430 patent, entitled "Sorbents for the oxidation and removal of mercury," indicates it was issued by the USPTO on June 2, 2020.

**RESPONSE**: Admitted.

34.     ME2C asserts it is the owner of the '430 patent.

**RESPONSE**: Admitted.

35.     The '430 patent contains twenty-nine claims.

**RESPONSE**: Admitted.

36.     The '430 patent contains three independent claims.

**RESPONSE**: Admitted.

37.     Independent claim 1 recites "[a] method of separating mercury from a mercury-containing gas."

**RESPONSE**: Admitted.

38.     Defendants do not utilize activated carbon or engage a third party agent to utilize activated carbon for any certification testing for Section 45 tax credits or otherwise in connection with the production of refined coal.

**RESPONSE**: Denied.

39.     Prior to and other than in connection with defending this lawsuit, the Defendants have and had no knowledge of the particulars of the processes employed by any coal-fired power plants identified in the Second Amended Complaint, including whether any of these power plants utilized activated carbon in processes to capture mercury.

**RESPONSE**: Denied.

40.     The Defendants do not and did not intend for any coal-fired power plants to utilize activated carbon in processes that the power plants practice.

**RESPONSE**: Denied.

41.     In addition, refined coal can be utilized in processes that do not infringe the patents- in-suit, such as burning the refined coal without activated carbon, or other technologies using and not using activated carbon that would not implicate the patents-in-suit.

**RESPONSE**: ME2C admits that coal treated with certain additives may be utilized in some ways without activated carbon. However, in this case, Defendants have prepare specific refined coals for specific plants and have obtained contractual limitations on the use of that refined coal. Accordingly, ME2C denies that the refined coal at issue in this case has a substantial non-infringing use.

42.     The '147 patent is unenforceable pursuant to the doctrine of inequitable conduct. During prosecution of the '147 patent, the inventors misrepresented to the Patent Office that the activated carbons disclosed in the prior art United States Patent Application Publication US 2004/0003716 to Sidney G. Nelson, Jr. ("the Nelson reference" or "Nelson, Jr.") did not include any activated carbon having "graphene sheets having carbene species edge sites."

**RESPONSE**: Denied.

43.     During the same prosecution, the inventors also intentionally withheld from the Patent Office a March 2003 article that the inventors themselves had published that stated that activated carbon disclosed in the Nelson reference included graphene sheets having carbene species edge sites. The "who, what, when, where, and how" of these acts of inequitable conduct are described below.

**RESPONSE**: Denied.

## Who: The Inventors

44.     Edwin S. Olson, Michael J. Holmes, and John H. Pavlish are the named inventors of the '147 patent.

**RESPONSE**: Admitted.

45.    The issued claims of the '147 patent require a sorbent material compromising activated carbon.

**RESPONSE**: Admitted.

46.    The issued claims of the '147 patent require that the activated carbon contain "graphene sheets having carbene species edge sites."

**RESPONSE**: Admitted.

47.    The claim language requiring "graphene sheets having carbene species edge sites" was added during prosecution of the '147 patent in order to overcome an anticipation rejection under 35 U.S.C. § 102.

**RESPONSE**: ME2C admits that, after a patent office rejection, claim 34 was amended to add the language: "and wherein the activated carbon contains graphene sheets having carbene species edge sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury." To the extent Defendants intend for this paragraph to have a different meaning, denied.

48.    As of October 14, 2010, application claim 34 (which after amendment became claim 1 of the '147 patent) recited a method for separating mercury from a mercury containing gas comprising chemically reacting activated carbon with a bromine containing promoter followed by other process steps to remove mercury from a gas.

**RESPONSE**: ME2C admits that as of October 14, 2010, application claim 34 (which after amendment became claim 1 of the '147 patent) recited:

"(Currently Amended) A method for separating mercury from a mercury containing gas comprising:

(a) promoting at least a portion of a sorbent material comprising activated carbon by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent, wherein the bromine containing promoter is in gaseous form, vapor form, or non-aqueous liquid form;

(b) chemically reacting elemental mercury in the mercury containing gas with the promoted brominated sorbent to form a mercury/sorbent chemical composition; and (c) separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent chemical composition."

To the extent Defendants intend for this paragraph to have a different meaning, denied.

49.     As of October 14, 2010, application claim 53 (which after an amendment became claim 17 of the '147 patent) recited a "method of claim 34 further comprising injecting the sorbent material and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent."

**RESPONSE**: Admitted.

50.     As of October 14, 2010, neither application claim 34 nor application claim 53 recited "activated carbon contained graphene sheets having carbene species edge sites that react with the bromine containing promoter."

**RESPONSE**: ME2C admits that as of October 14, 2010, neither application claim 34 nor application claim 52 recited: "activated carbon contained graphene sheets having carbene species edge sites that react with the bromine containing promoter." To the extent Defendants intends for this paragraph to have a different meaning, denied.

51.     On October 14, 2010, the Patent Examiner, Amber Orlando, issued a Final Office Action rejecting all pending claims in the application leading to the '147 patent.

**RESPONSE**: Admitted.

52.     In the October 14, 2010 Final Office Action, the Examiner rejected application claim 34 as anticipated over the Nelson reference.

**RESPONSE**: Admitted.

53.     In discussing her rejection of application claim 34 as anticipated by the Nelson reference, Examiner Orlando stated that Nelson disclosed "a method for separating mercury from a mercury containing gas comprising: (a) promoting at least a portion of a sorbent material by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent; (b) chemically reacting elemental mercury in the mercury containing gas with a promoted brominated sorbent to form a mercury/sorbent chemical composition; (c) separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent composition, the bromine containing promoter is in gaseous form, the activated carbon contains basic binding sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent by oxidation of the mercury, the carbocation paired with a bromide anion chemically react with elemental mercury form the mercury/sorbent composition, at least a portion of the basic binding sites of the activated carbon reacts with the oxidized mercury in the mercury containing gas to form another mercury/sorbent chemical composition."

**RESPONSE**: Admitted.

54.     During prosecution, the inventors never disputed the Examiner's statements, quoted in the previous paragraph, regarding the disclosure of the Nelson reference.

**RESPONSE**: ME2C admits that the public prosecution history record for the '147 patent does not include a statement from an inventor expressly disputing the paragraph quoted above. To the extent Defendants intend for this paragraph to have a different meaning, denied.

55.    In her October 14, 2010 Final Office Action, Examiner Orlando stated that then- pending application claim 34 was anticipated by the Nelson reference.

**RESPONSE**: Admitted.

56.    In her October 14, 2010 Final Office Action, Examiner Orlando rejected application claim 53 as being obvious over the Nelson reference "as applied in application claim 34 above."

**RESPONSE:** ME2C admits that in her October 14, 2010 Final Office Action Examiner Orlando stated: "Claims 47, 48, 53-55 and 61 are rejected under 35 U.S.C. 103(a) as being unpatentable over Nelson Jr. US 2004/003716 (further referred to as 716) as applied in claim 34 above, and further in view of Srinavasachar et al. US 6,848,374 (further referred to as 374)."

57.    In her October 14, 2010 Final Office Action, Examiner Orlando stated application claim 53 was rejected further rejected in view of U.S. Patent No. 6,848,374 to Srinavasachar et al. ("the Srinavasachar patent").

**RESPONSE**: ME2C admits that in her October 14, 2010 Final Office Action Examiner Orlando stated: "Claims 47, 48, 53-55 and 61 are rejected under 35 U.S.C. 103(a) as being unpatentable over Nelson Jr. US 2004/003716 (further referred to as 716) as applied in claim 34 above, and further in view of Srinivasachar et al. US 6,848,374 (further referred to as 374)."

58.    In her October 14, 2010 Final Office Action, the Examiner stated that the Srinavasachar patent disclosed injecting sorbent material at a sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent.

**RESPONSE**: ME2C admits that in her October 14, 2010 Final Office Action the Examiner stated: "The 374 reference discloses injecting the sorbent material at an sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent (columns 5-6, lines 59-18) and the gas stream being a transport gas (columns 5-6, lines 55-18)." To the extent Defendants intend for this paragraph to have a different meaning, denied.

59.     In her October 14, 2010 Final Office Action, the Examiner stated that it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the Nelson reference to inject separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent.

**RESPONSE:** ME2C admits that in her October 14, 2010 Final Office Action the Examiner stated: "It would have been obvious to one having ordinary skill in the art at the time the invention was made to have modified the 716 reference to include the sorbent material at an sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent (374, columns 5-6, lines 59-18), the gas stream is a mercury containing gas (374 columns 5-61ines 55-18) and the gas stream being a transport gas (374, columns 5-6, lines 55-18)." To the extent Defendants intend for this paragraph to have a different meaning, denied.

60.     The inventors never disputed during prosecution of the application leading to the '147 patent that it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the Nelson reference to inject separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent.

**RESPONSE:** ME2C admits that the public prosecution history record for the '147 patent does not include a statement from an inventor expressly disputing the paragraph quoted above. To the extent Defendants intend for this paragraph to have a different meaning, denied.

61.     On February 14, 2011, the inventors filed a response to the October 14, 2010 Office Action.

**RESPONSE:** ME2C admits that on February 14, 2011, prosecuting attorney Dennis R. Daley filed a response to the October 14, 2010 Office Action on behalf of applicant. To the extent Defendants intend for this paragraph to have a different meaning, denied.

62.     In the February 14, 2011 response, the inventors amended claim 34 to add "and wherein the activated carbon contains graphene sheets having carbene species edge sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury."

**RESPONSE:** Admitted.

63.     In the February 14, 2011 response, the inventors made no changes to the text of application claim 53.

**RESPONSE:** Admitted.

64.     In the February 14, 2011 response, the inventors argued that application claim 34, as amended to require "graphene sheets having carbene species edge sites," was not anticipated by the Nelson reference.

**RESPONSE:** ME2C admits that in the February 14, 2011 response Mr. Daley stated: "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein." To the extent Defendants intend for this paragraph to have a different meaning, denied.

65.     In the February 14, 2011 response, the inventors addressed the Examiner's anticipation rejection of claim 34 over the Nelson reference by asserting, among other things, that "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein."

**RESPONSE:** ME2C admits that in the February 14, 2011 response Mr. Daley stated, among other things: "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein." To the extent Defendants intend for this paragraph to have a different meaning, denied.

66.     In the February 14, 2011 response, the inventors also argued that "Nelson, Jr. describes exemplary activated carbons in paragraph 69."

**RESPONSE:** ME2C admits that in the February 14, 2011 response Mr. Daley stated, among other things: "Nelson, Jr. describes exemplary activated carbons in paragraph 69." To the extent Defendants intend for this paragraph to have a different meaning, denied.

67.     Paragraph 69 of the Nelson reference states in part that "The gas-phase bromine treatment of this invention has been tested on many different commercially-available powdered activated carbons (PACs). Each has been found to be easily brominated to at least 15 wt % Br, including PACs from … Norit. Norit's Darco FGD® is a common PAC yardstick frequently used by other researchers as a competitive yardstick."

**RESPONSE:** Admitted.

68.     By February 14, 2011, inventors Edwin S. Olson, Michael J. Holmes and John H. Pavlish had published extensively on research conducted using the Norit FGD PAC referred to in paragraph 69 of the Nelson reference.

**RESPONSE:** ME2C admits that Edwin S. Olson, Michael J. Holmes and John H. Pavlish have conducted various research that has incorporated products from Norit. As to the remainder of this paragraph, ME2C lacks sufficient information to admit or deny.

69.     In February 2005, inventors John H. Pavlish and Michael J. Holmes were co- authors of a Final Report submitted to the U.S. Department of Energy regarding Cooperative Agreement No. DE-FC26-034NT41897 wherein they described "NORIT Americas Inc. DARCO® FGD."

**RESPONSE:** ME2C admits that In February 2005, inventors John H. Pavlish and Michael J. Holmes were co- authors of a Final Report submitted to the U.S. Department of Energy regarding Cooperative Agreement No. DE-FC26-03NT41897, and that the report references "NORIT Americas Inc. DARCO® FGD." To the extent Defendants intend for this paragraph to have a different meaning, denied.

70.     The February 2005 Final Report stated that Norit Darco FGD "has been proven in numerous incinerator facilities to be highly effective for removing gaseous Hg…."

**RESPONSE:** ME2C admits that the February 2005 Final Report stated that Norit Darco FGD "has been proven in numerous incinerator facilities to be highly effective for removing gaseous Hg, dioxins, and furans." To the extent Defendants intend for this paragraph to have a different meaning, denied.

71.     The February 2005 Final Report indicates that the inventors used Norit Darco FGD in pilot-scale tests involving sorbent injections and mercury oxidation additives.

**RESPONSE:** ME2C admits that the February 2005 report states "Nine tests were completed to evaluate the effectiveness of potential Hg sorbents (DARCO® FGD, EERC-treated FGD, and Amended Silicate™) and Hg0 oxidation and sorbent enhancement additives (NaCl, SEA2, and

CaCl2) to remove Hg using a SDA and FF. The test matrix is presented in Table 10." To the extent Defendants intend for this paragraph to have a different meaning, denied.

72.     On information and belief, by February 14, 2011, the inventors were familiar with Norit Darco FGD.

**RESPONSE:** ME2C admits that Edwin S. Olson, Michael J. Holmes and John H. Pavlish have conducted various research that has incorporated products from Norit. As to the remainder of this paragraph, ME2C lacks sufficient information to admit or deny.

73.     By February 14, 2011, inventors Edwin S. Olson, Michael J. Holmes and John H. Pavlish had published multiple articles stating and/or disclosing that the Norit FGD PAC contained graphene sheets having carbene species edge sites.

**RESPONSE:** Denied.

74.     By February 14, 2011, inventors Edwin S. Olson, Michael J. Holmes and John H. Pavlish knew that the Norit PAC referred to in paragraph 69 of the Nelson reference contained graphene sheets having carbene species edge sites.

**RESPONSE:** Denied.

75.     In the February 14, 2011 response, the inventors also stated that "The Examiner's attention is directed to the examples reported by Nelson, Jr. The test results tend to demonstrate that the selection of activated carbon according to Nelson, Jr. is not particularly significant."

**RESPONSE:** ME2C admits that in the February 14, 2011 response, Mr. Daley stated: "The Examiner's Attention is directed to the examples reported by Nelson, Jr. The test results tend to demonstrate that the selection of activated carbon according to Nelson, Jr. is not particularly significant."

76.      The argument in the previous paragraph implies that not all activated carbons include graphene sheets having carbene species edge sites.

**RESPONSE:** ME2C denies that the argument in the previous paragraph implies that all activated carbons do or do not include graphene sheets having carbene species edge sites.

77.      In the February 14, 2011 response, the inventors also responded to the rejection of application claim 53 as obvious over the Nelson reference and the Srinavasachar patent.

**RESPONSE:** Admitted.

78.      In the February 14, 2011 response in the section addressing the obviousness rejection of claim 53 over the Nelson reference and the Srinavasachar patent, the inventors asserted that "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein."

**RESPONSE:** ME2C admits that in the February 14, 2011 response in the section addressing the obviousness rejection of claim 53 over the Nelson reference and the Srinavasachar patent, Mr. Daley stated: "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein." To the extent Defendants intend for this paragraph to have a different meaning, denied.

79.      The inventors knew, when the statement in the previous paragraph was submitted to the Patent Examiner, that Norit Darco FGD was an activated carbon containing graphene sheets having carbene species edge sites therein.

**RESPONSE:** Denied.

80.      In the February 14, 2011 response in the section addressing the obviousness rejection of claim 53 over the Nelson reference and the Srinavasachar patent, the inventors also referred the Examiner to the exemplary activated carbons described in paragraph 69 of the Nelson reference

and argued that Nelson's test results demonstrate that the selection of activated carbon according to Nelson is not particularly significant.

**RESPONSE:** ME2C admits that the February 14, 2011 response states that "Nelson, Jr. describes exemplary activated carbons at paragraph 69," and that the "test results tend to demonstrate that the selection of activated carbon according to Nelson, Jr. is not particularly significant." To the extent Defendants intend for this paragraph to have a different meaning, denied.

81.    In the '147 patent, Figure 2 shows carbene structures present in graphene sheets.

**RESPONSE:** Admitted.

82.    Figure 2 of the '147 patent illustrates the chemistry whereby the graphene sheets that in bulk make up the activated carbon used in the '147 patent react at an edge carbene site—a carbon Zigzag site—with the bromine.

**RESPONSE:** ME2C admits that figure 2 provides a model illustrating graphene and an edge carbene site—a carbon Zigzag site—that can react with bromine, otherwise denied.

83.    Figure 2 of the patent discloses the zig-zag carbene structures referred to in the March 2003 presentation (discussed below):



FIG. 2

**RESPONSE:** ME2C admits that figure 2 of the '147 patent depicts a zig-zag site and that the Preprint Article depicts a zigzag site, otherwise denied.

84.     In 2003, inventors Olson, Pavlish and other authors published an article, "The Multiple Site Model for Flue Gas-Mercury Interactions on Activated Carbons: the Basic Site," Fuel Chemistry Division Preprints 2003, 48(1), 30. The article was also presented at a conference in March 2003: the 225th American Chemical Society National Meeting, New Orleans, LA, March 23-27, 2003.

**RESPONSE:** Admitted.

85.     The March 2003 presentation reported that "The commercial powdered carbon Norit FGD sorbent has been thoroughly investigated at the Energy & Environmental Research Center (EERC) as a sorbent for elemental mercury…."

**RESPONSE:** ME2C admits that "The Multiple Site Model for Flue Gas-Mercury Interactions on Activated Carbons: the Basic Site," Fuel Chemistry Division Preprints 2003, 48(a), 30 ("Preprint article"), states: "The commercial powdered carbon Norit FGD sorbent has been thoroughly investigated at the Energy & Environmental Research Center (EERC) as a sorbent for elemental mercury. . . ." To the extent Defendants intend for this paragraph to have a different meaning, denied.

86.     In the March 2003 presentation, the inventors reported an explanation for the nature of carbon sites and their interaction with flue gases and mercury. This explanation used "the concept of zig-zag carbene structures recently proposed for electronic states at the edges of the carbon graphene layers."

**RESPONSE:**

87.     The 2003 article states that the chemistry of the Norit FGD sorbent is summarized in a figure showing the same structures:

**RESPONSE:** ME2C admits that the Preprint Article states: "The interactions that appear to be adequate for explaining the behavior of the FGD sorbent are summarized in more detail in the scheme shown in Figure 2." To the extent Defendants intend for this paragraph to have a different meaning, denied.

88.     The March 2003 presentation is prior art under 35 U.S.C. § 102(b) to the '147 patent and was 35 U.S.C. § 102(b) prior art to the application that led to the '147 patent.

**RESPONSE**: This paragraph contains conclusions of law to which no response is required. As such, it is denied.

89.     The inventors never disclosed the March 2003 presentation to the Patent Office during the pendency of the application leading to the '147 patent.

**RESPONSE:** ME2C admits that the information disclosure statements contained in the prosecution history for the '147 patent do not list the March 2003 presentation. Otherwise, ME2C is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies those allegations.

90.     By March 2003 the inventors knew that the Norit FGD activated carbon disclosed in the Nelson reference includes graphene sheets with carbene species edge sites therein.

**RESPONSE:** Denied.

91.    By March 2003 the inventors know that Norit Darco FGD activated carbon includes graphene sheets with carbene species edge sites therein.

**RESPONSE:** Denied.

92.    The March 2003 presentation shows that the Norit FGD activated carbon disclosed in the Nelson reference includes graphene sheets with carbene species edge sites therein.

**RESPONSE:** Denied.

93.    The March 2003 presentation shows that Norit Darco FGD activated carbon includes graphene sheets with carbene species edge sites therein.

**RESPONSE:** Denied.

94.    The March 2003 presentation directly contradicts the inventors' statements to the Patent Office that the Nelson reference failed to disclose activated carbon containing graphene sheets having carbene species therein.

**RESPONSE:** Denied.

95.    The March 2003 presentation would have been material to the prosecution of the '147 patent.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

96.    The inventors continue to misrepresent Nelson in subsequent prosecution

On information and belief, in response to the inventors' February 14, 2011 filing, the Patent Examiner believed the inventors' false statement that the Nelson reference did not disclose graphene having carbene edge sites. She stated so in her February 23, 2011 Office Action.

**RESPONSE:** Denied.

97.     Having successfully misled the Examiner, the inventors in subsequent papers argued that "The Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes."

**RESPONSE:**  ME2C denies that it misled the Examiner. ME2C admits that Geoffrey Cooper stated: "The Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes."

98.     The inventors also asserted that the Nelson reference, even when combined with other prior art, "fails to disclose or suggest the use of graphene sheets, their carbene- containing edge sites and reaction with bromine promoting agents, and production of carbocations."

**RESPONSE:** ME2C admits that Geoffrey Cooper stated: "The combination of the five cited documents fails to disclose or suggest the use of graphene sheets, their carbene containing edge sites and reaction with bromine promoting agents, and production of carbocations. Accordingly, a prima facie case of the obviousness of claims 46 over the four cited documents has not been properly made." To the extent Defendants intend for this paragraph to have a different meaning, denied.

99.     For instance, on May 20, 2011, the inventors filed an Amendment and Response under 37 C.F.R. § 1.111 (May 2011 Response). No claims were amended or canceled in the May 2011 Response.

**RESPONSE:** Admitted.

100.    In the May 2011 Response, the inventors stated that "[t]he Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes. It also does not disclose or suggest the reaction of the carbene sites with a bromine containing promoter to yield bromide anion paired carbocation sites on the carbon as being the sites reactive with

mercury, which serve to react with and immobilize mercury vapor from the waste gas stream." In the May 2011 Response, the applicants requested withdrawal of the rejections with respect to claim 34 and all rejected dependent claims.

**RESPONSE:** ME2C admits that in the May 2011 Response, Geoffrey Cooper stated that "[t]he Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes. It also does not disclose or suggest the reaction of the carbene sites with a bromine containing promoter to yield bromide anion paired carbocation sites on the carbon as being the sites reactive with mercury, which serve to react with and immobilize mercury vapor from the waste gas stream." In the May 2011 Response, the applicants requested withdrawal of the rejections with respect to claim 34 and all rejected dependent claims. To the extent Defendants intend for this paragraph to have a different meaning, denied.

101.    In an August 4, 2011 Non-Final Rejection ("August 2011 Rejection"), the Patent Office rejected all pending claims under 35 U.S.C. 103(a) as being unpatentable over Nelson, Jr. in light of other references.

**RESPONSE:** Admitted.

102.    In the August 2011 Rejection, the Examiner stated that Nelson Jr. reference "does not disclose the activated carbon being graphene sheets and the binding sites being carbene species edge sites."

**RESPONSE:** Denied.

103.    In the August 2011 Rejection, the Examiner stated that "Chlorine and bromine are very similar in there [sic] chemical characteristics, and there would be a reasonable expectation of success when using the same methods to regenerate a brominated sorbent as is used for a chlorinated sorbent."

**RESPONSE:** Admitted.

104.    On August 31, 2011, the Examiner held a telephone interview with the applicants'

representatives Nicholas P. Lanzatella and Ramani V. Marakani.

**RESPONSE:** Admitted.

105.    On October 27, 2011, the Applicants filed an Amendment and Response under 37 C.F.R.

§ 1.111 ("the October 2011 Response"). In the October 2011 Response, independent claim 34

was amended to add the word "particulate" before the phrase "sorbent material." According to

the October 2011 Response, this amendment was proposed during the August 31, 2011

interview.

**RESPONSE:** ME2C admits that the October 27, 2011 response states: "Applicants thank

Examiner Amber Orlando for the courtesy of a telephone interview on August 31, 2011 with

Applicants' representatives Nicholas P. Lanzatella and Ramani V. Marakani. During the

interview, it was proposed to amend claim 34 to include "a particulate sorbent material" in place

of "a sorbent material". It was agreed upon that with the amendment, Applicants would

overcome the rejections under 35 U.S.C . .§. 112 and .§.103." To the extent Defendants intend

for this paragraph to have a different meaning, denied.

106.    In the October 2011 Response, the Applicants stated that "[t]he Examiner admits that

Nelson does not disclose or suggest the activated carbon being graphene sheets, or edge sites of

graphene sheets being carbenes." In the October 2011 Response, the Applicants requested

withdrawal of the rejections with respect to claim 34 and all rejected dependent claims.

**RESPONSE:** Admitted.

107.    In the October 2011 Response, the Applicants argued that the Examiners' rejections over

Nelson Jr. in light of other references had a fundamental deficiency "concerning activated carbon

containing graphene sheets, carbene-containing edge sites of the graphene sheets and reaction bromine promoting agents, and the resulting production of carbocations that can react with and immobilize vaporized mercury." The Applicants next stated that "[a]ccordingly, a prima facie case" of obviousness had not been properly made. The Applicants repeated the above two statements in regard to multiple combinations of references, each of which included the Nelson Jr. reference.

**RESPONSE:** ME2C admits that in the October 2011 response, Geoffrey Cooper stated: "The Examiner's arguments for rejection of claims 34 and claims 35, 39, 40, 42, 49-52 and 5 8-60 dependent thereon over Nelson and Yang do not properly create a prima facie case of obviousness, at least because the two cited documents fail to disclose or suggest all elements of the rejected claims.

The Examiner admits that Nelson does not disclose or suggest the activated carbon being graphene sheets, or edge sites of graphene sheets being carbenes. It also does not disclose or suggest the reaction of the carbene sites with a bromine containing promoter to yield bromide anion paired carbocation sites on the carbon as being the sites reactive with mercury, which serve to react with and immobilize mercury vapor from the waste gas stream.

Yang does not remedy this deficiency. Yang neither discloses nor teaches using activated carbon containing graphene sheets. Yang discloses using carbon nanotubes as a sorbent to remove dioxin from an exhaust gas. Yang asserts that carbon nanotubes are better sorbents than activated carbon as the nanotubes desorb dioxin at a higher temperature than the activated carbon. Yang further discloses a principal problem associated with the use of activated carbon. Clearly, Yang teaches away from using activated carbon for treating the exhaust gas. Support for this argument may at least be found from paragraphs [0015] to [0017] of Yang.

A person skilled in the art would not be motivated to combine the teachings of Nelson and Yang because Yang clearly teaches away from using activated carbon. Therefore, the combination of Nelson and Yang fails to create a prima facie case of obviousness. Further, the combination of the cited documents fails to disclose or suggest activated carbon containing graphene sheets with carbene species edge cites that react with a bromine containing promoter to produce carbocationic sites that can react with and immobilize mercury atoms." To the extent Defendants intend for this paragraph to have a different meaning, denied.

108.    The statement that "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein" is false.

**RESPONSE:** Denied.

109.    The inventors made the statement in the previous paragraph multiple times during the prosecution of the '147 patent.

**RESPONSE:** Admitted.

110.    Each of the inventors' statements that "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein" was material to the prosecution of the '147 patent.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

111.    The statement that "The Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes" implies that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes.

**RESPONSE:** Denied.

112. The inventors made the statement in the previous paragraph multiple times during the prosecution of the '147 patent.

**RESPONSE:** Denied.

113. The implication that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes is false.

**RESPONSE:** Denied.

114. Each of the inventors' statements that "The Examiner admits that Nelson does not disclose or suggest graphenes, or edge sites of graphene sheets being carbenes" and their implications, was material to prosecution of the '147 patent.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

115. The statement that the Nelson reference, when combined with other references, did not disclose or suggest graphene sheets containing carbene species edge cites is false.

**RESPONSE:** Denied.

116. The inventors made the statement in the previous paragraph multiple times during the prosecution of the '147 patent.

**RESPONSE:** Denied.

117. Each of the inventors' statement that the Nelson reference, when combined with other references, did not disclose or suggest graphene sheets containing carbene species edge cites was material to prosecution.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

118.    By the time the inventors made the false statements to the Examiner regarding the activated carbons disclosed in the Nelson reference, the inventors had thoroughly investigated the Norit FGD sorbent and were familiar with its structure.

**RESPONSE:** Denied.

119.    The inventors stated or implied that Nelson did not disclose activated carbene containing graphene sheets having carbene species edge sites at least fifteen times over the course of February 14, 2011 until October 27, 2011.

**RESPONSE:** ME2C admits that one or more prosecuting attorneys stated "Nelson, Jr. fails to disclose activated carbon containing graphene sheets having carbene species edge sites therein." Otherwise denied. To the extent Defendants intend for this paragraph to have a different meaning, denied.

120.    In a January 10, 2012 Notice of Allowance, Claims 34-36, 39, 40, and 42-61 were allowed. The examiner's entire statement of reasons for allowance was that "a method for separating mercury from a mercury containing gas comprising promoting at least a portion of a particulate sorbent material comprising activated carbon by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent, wherein the activated carbon contains graphene sheets having carbine species edge sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury could not be found within the prior art."

**RESPONSE:** Admitted.

121.    On information and belief, the Examiner stated in her reasons for allowance that she was allowing the claims of the '147 patent to issue because she believed the prior art did not disclose

a method of removing mercury from a gas using bromine and activated carbon where the activated carbon contains graphene sheets having carbene edge species sites.

**RESPONSE:** ME2C admits that the examiner stated: "The following is an examiner's statement of reasons for allowance: a method for separating mercury from a mercury containing gas comprising promoting at least a portion of a particulate sorbent material comprising activated carbon by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent, wherein the activated carbon contains grapheme sheets having carbine species edge sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury could not be found within the prior art." To the extent Defendants intend for this paragraph to have a different meaning, denied.

122.    The only reasonable inference that can be drawn from the inventors' repeated false statements regarding the activated carbons disclosed in the Nelson reference and the inventors' failure to disclose the March 2003 article that would have exposed the inventors' falsehood and the other conduct cited above is that the inventors made these false statements and withheld this reference in an attempt to deceive the Examiner into issuing the '147 patent.

**RESPONSE:** Denied.

123.    During prosecution of the '147 patent, the inventors intentionally withheld their May 2003 article and a separate May 2003 presentation, each of which were § 102(b) prior art to the '147 patent and the '114 patent and each of which disclosed an element that the inventors contended was missing from the prior art—that carbene sites that react with bromines to produce carbocationic sites that can react with and immobilize mercury atoms.

**RESPONSE:** Denied.

124.    Bromine and chlorine are halogens.

**RESPONSE:** Admitted.

125.    The examiner repeatedly stated that "chlorine and bromine are very similar in there chemical characteristics."

**RESPONSE:** ME2C admits that on October 14, 2010, the Examiner stated: "Chlorine and bromine are very similar in there chemical characteristics."

126.    The '147 patent discloses in Figure 2 "a theory developed from scientific evidence to explain the nature of the promoting compounds."

**RESPONSE:** Admitted.

127.    Figure 2 of the '147 patent illustrates the chemistry whereby the graphene sheets react at an edge carbene site with bromine to form a mercury-reactive species capable of capturing mercury.

**RESPONSE:** ME2C admits that the '147 patent states: "Referring now to FIG. 2, there is illustrated a theory developed from scientific evidence to explain the nature of the promoting compounds. For example, as illustrated in FIG. 2, hydrogen bromide reacts with the unsaturated structure of the activated carbon. This may be, by way of illustration only, a carbene species on the edge of the graphene sheet structures of the carbon. Molecular bromine or a bromine compound. reacts to form a similar structure, with a positive carbon that is active for oxidizing the mercury with Subsequent capture by the sorbent." To the extent Defendants intend for this paragraph to have a different meaning, denied.

128.    The specification of the '114 Patent describes the Figure 2 as follows: "Thus an entirely new model is presented for the reactivity of bromine-treated carbon with mercury shown in Fig. 2."

**RESPONSE:** Admitted.

129.    In May 2003, the inventors issued two publications that disclose this chemistry for chlorine.

**RESPONSE:** Denied.

130.    Inventors Edwin S. Olson, Michael J. Holmes and John H. Pavlish are co-authors on Olson et al., "Chemical mechanisms in mercury emission control technologies," J. Phys. IV France 107 (2003), presented May 26-30, 2003 and the XIIth International Conference on Heavy Metals in the Environment in Grenoble, France.

**RESPONSE:** Admitted.

131.    The same inventors are co-authors on another paper, Olson et al., "An Improved Model for Flue Gas-Mercury Interactions on Activated Carbons," Paper #142 at the Combined Power Plant Air Pollutant Control Mega Symposium, May 19-22, 2003, in Washington, DC.

**RESPONSE:** Admitted.

132.    By virtue of being published more than one year before the earliest application date shown on the face of either the '147 patent or the '114 patent, each of these papers is prior art under 35 U.S.C. § 102(b) to the '147 patent and to the '114 patent.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

133.    Each of these May 2003 inventor publications discloses the same chemistry for chlorine that the inventors claimed they discovered for bromine.

**RESPONSE:** Denied.

134.    Shown below is Figure 2 from the patents-in-suit on the left and the corresponding figure from the May 2003 inventor publications:

FIG. 2

Figure 3: Oxidation mechanism model for activated carbons.

**RESPONSE:** ME2C admits that the figure on the left is included in the '147 patent and the figure on the right is included in the May 2003 articles.

135.    The prior art included teachings that bromine compounds oxidize mercury more effectively than chlorine compounds.

**RESPONSE:** Denied.

136.    However, the inventors argued that the prior art did not disclose the same chemistry as allegedly discovered by the inventors by which bromine interacted with carbon and mercury.

**RESPONSE:** Denied.

137.    The statement by the inventors that Fig. 2 shows "an entirely new model" is false, as the model was disclosed in the 2003 prior art references described above.

**RESPONSE:** Denied.

138.    The May 2003 inventor publications disclosed that chlorine acted in accordance with the same chemical reactions and taught that other halogens would work in the same way.

**RESPONSE:** Denied.

139.    The May 2003 inventor publications would have been material to the prosecution of the '147 patent and the prosecution of the '114 patent because, among other reasons, it showed that chlorine interacted with carbon and mercury using the same chemical reactions as the inventors

claimed bromine interacted with carbon and mercury and that activated brominated carbon used in the prior art to control mercury possessed the requisite structures for these chemical reactions.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

140.    But for the inventors' deliberate withholding of their May 2003 publications, the Examiner would have persisted in rejecting the claims of the '114 patent and the '147 patent over the prior art and the claims of the '114 patent and the '147 patent would not have issued in their present form.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

141.    The inventors had knowledge of their May 2003 publications and had knowledge of their contents.

**RESPONSE:** Admitted.

142.    The only reasonable inference that can be drawn regarding the inventors' decision to withhold the May 2003 inventor publications is that they did so in order to deceive the Patent Examiner into issuing the '114 and '147 patents.

**RESPONSE:** Denied.

143.    Each of the '225, '517, and '430 patents is a related patent to both the '114 and '147 patents.

**RESPONSE:** Admitted.

144.    Each claim of the '225, '517, and '430 patents includes, inter alia, elements relating to the combusting of coal and a bromine or bromide additive, and the use of a sorbent containing

activated carbon. Each of the '225, '517, and '430 patents includes Figure 2, which is substantially identical to Figure 2 in the '114 and '147 patents discussed above.

**RESPONSE:** Admitted.

145.    The inequitable conduct of the named inventors discussed above relating to the '147 patent, which occurred earlier in the patent family chain, bears an immediate and necessary relationship to the enforcement of the '225, '517, and '430 patents, as the claims concern, inter alia, the interaction of additive halogens with an activated carbon sorbent.

**RESPONSE:** Denied.

146.    The inequitable conduct of the inventors discussed above relating to the '114 patent, which occurred earlier in the patent family chain, bears an immediate and necessary relationship to the enforcement of the '225, '517, and '430 patents, as the claims concern, inter alia, the interaction of additive halogens with an activated carbon sorbent.

**RESPONSE:** Denied.

147.    The inequitable conduct associated with the '147 and '114 patent occurred earlier in the patent family chain that led to the '225, '517, and '430 patents. Because the inequitable conduct associated with the '147 and '114 patents bears an immediate and necessary relation to the enforcement of the '225, '517, and '430 patents, the inequitable conduct associated with the '147 and '114 patents, individually and together, renders each of the '225, '517, and '430 patents unenforceable.

**RESPONSE:** Denied.

148.    On information and belief, in 2016, ME2C induced AEP to permit ME2C to enter AEP's H.W. Pirkey Power Plant and gain access to confidential information regarding the operation of that plant.

**RESPONSE:** ME2C admits that AEP expressed interest in evaluating ME2C's patented technology and explained that it was willing to share confidential information with ME2C. ME2C also admits that it entered the Pirkey plant. Otherwise denied.

149.     On information and belief, ME2C entered a Non-Disclosure Agreement ("NDA") in which ME2C promised to maintain as confidential and promised that it would not use any of AEP's confidential information for any purpose other than for evaluation of and negotiations relating to the testing at the Pirkey plant.

**RESPONSE:** ME2C admits that it signed the NDA wherein the parties agreed, among other things, that with respect the Confidential Information as defined therein "Neither party shall use the Confidential Information (including Evaluation Material) for any purpose other than for evaluation of and negotiations relating to the Project." To the extent Defendants intend for this paragraph to have a different meaning, denied.

150.     On information and belief, ME2C was then permitted to enter the Pirkey plant, where ME2C conducted tests and had access to confidential information regarding the operation of the Pirkey plant.

**RESPONSE:** ME2C admits that ME2C was permitted to enter the Pirkey plant, where it conducted tests. ME2C also admits that it had access to information AEP contends is confidential as well as information that is not confidential. ME2C is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

151.     On information and belief, at the time of these tests, ME2C considered the process at Pirkey using halogen-based additives and halogen-based sorbents to be a process outside the scope of ME2C's patents that was, ME2C believed, inferior to ME2C's patented process.

**RESPONSE:** Denied.

152.    On information and belief, ME2C repeatedly identified its patents, including the '147 patent, as covering a process that was different from, and allegedly superior to, the halogen-based additive and sorbent process that was already being used at Pirkey.

**RESPONSE:** Denied.

153.    On information and belief, ME2C, at the time of the testing at Pirkey, did not believe the '147 patent covered the halogen-based additive and sorbent process that was already being used at Pirkey and that is still being used today.

**RESPONSE:** Denied.

154.    On information and belief, in 2018, ME2C filed a patent application seeking to obtain claims that covered the halogen-based additive and sorbent process that ME2C learned was being used at Pirkey. ME2C gained that knowledge through confidential information it received under the work governed by the NDA.

**RESPONSE:** Admitted that ME2C filed a patent application in 2018. Otherwise denied.

155.    On information and belief, ME2C knowingly and willfully breached the NDA, which precluded ME2C from using AEP's confidential information for purposes other than for evaluation and negotiations relating to the Pirkey plant testing.

**RESPONSE:** Denied.

156.    On information and belief, in 2018 or 2019, ME2C, by distorting the meanings of claim terms in the '147 patent, developed an argument that the '147 patent covered the halogen- based additive and sorbent process that was already being used at Pirkey, despite concluding in 2016 and 2017 that the '147 patent did not cover that process.

**RESPONSE:** Denied.

157. On information and belief, ME2C developed the argument referred to in the previous paragraph using confidential information about the Pirkey plant obtained as part of its work at Pirkey governed by the NDA.

**RESPONSE:** Denied.

### Count I: Noninfringement of the '147 Patent

158. The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

159. This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that no valid claims of the '147 patent are infringed by the Defendants and that the Defendants have not made, used, sold and/or offered to sell in this country any of the methods that are within the scope of the claims of the '147 patent and thus have not infringed and are not infringing any claim of the '147 patent, to the extent ME2C's claims regarding this patent are not dismissed by the Court.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

160. There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid and enforceable claim of the '147 patent.

**RESPONSE:** Admitted.

161. The Defendants do not infringe any claim of the '147 patent.

**RESPONSE:** Denied.

162.    The Defendants are entitled to a judicial declaration that the manufacture, use, sale and/or offering for sale of the Defendants' methods will not infringe, directly or indirectly, any valid claim of the '147 patent.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

## Count II: Invalidity of the '147 Patent

163.    The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

164.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '147 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

165.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid and enforceable claim of the '147 patent.

**RESPONSE:** Admitted.

166.    One or more claims of the '147 patent is invalid under one or more of §§ 101, 102, 103, and/or 112 of the Patent Act, Title 35 of the United States Code. On information and belief, one or more claims of the '147 patent are invalid for at least the same reasons as set forth in the petitions filed in PTAB Case Nos. IPR2020-00926, IPR2020-00928, IPR2020-1296, and

IPR2020-1297. The Defendants' investigation is ongoing, and thus the Defendants expressly reserve the right to assert further and additional grounds for invalidity of the '147 patent according to the appropriate schedule determined by the Court.

**RESPONSE:** Denied.

167.    The Defendants are entitled to a judicial declaration that the claims of the '147 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

### Count III: Unenforceability of the '147 Patent

168.    The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

169.    This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '147 patent are unenforceable pursuant to the doctrine of inequitable conduct and unclean hands.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

170.    The Defendants seek a declaration that the claims of the '147 patent are unenforceable. A judicial declaration is necessary and appropriate at this time in order that the Defendants may ascertain their rights and duties with respect to the '147 patent and to any past, present, or future conduct by the Defendants.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

171.    As alleged in more detail above, during prosecution of the '147 patent, the inventors made material misrepresentations of fact to the Patent Office regarding the activated carbon disclosed in the Nelson prior art reference, and intentionally withheld a prior art reference that the inventors themselves had authored which would have exposed the falsehood of the inventors' misrepresentations.

**RESPONSE:** Denied.

172.    As alleged in more detail above, the inventors acted with an intent to deceive the Patent Office into issuing the '147 patent.

**RESPONSE:** Denied.

173.    The named inventors further violated their duty of candor by failing to submit to the patent examiner and the USPTO material prior art, namely the May 2003 inventor publications discussed above.

**RESPONSE:** Denied.

174.    As alleged in more detail above, the May 2003 publications were material to the prosecution of the '147 patent, the inventors made material misrepresentations of fact to the Patent Office regarding the activated carbon disclosed in the Nelson prior art reference, and intentionally withheld a prior art reference that the inventors themselves had authored which would have exposed the falsehood of the inventors' misrepresentations. As alleged in more detail above, the inventors acted with an intent to deceive the Patent Office into issuing the '147 patent.

**RESPONSE:** Denied.

175.     The Defendants are entitled to a judicial declaration that the claims of the '147 patent are therefore unenforceable due to the inventors' inequitable conduct and unclean hands.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

### Count IV: Noninfringement of the '114 Patent

176.     The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

177.     This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that no valid claims of the '114 patent are infringed by the Defendants and that the Defendants have not made, used, sold and/or offered to sell in this country any of the methods that are within the scope of the claims of the '114 patent and thus have not infringed and are not infringing any claim of the '114 patent, to the extent ME2C's claims regarding this patent are not dismissed by the Court.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

178.     There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid and enforceable claim of the '114 patent.

**RESPONSE:** Admitted.

179.     The Defendants do not infringe any claim of the '114 patent.

**RESPONSE:** Denied.

180.    The Defendants are entitled to a judicial declaration that the manufacture, use, sale and/or offering for sale of the Defendants' methods will not infringe, directly or indirectly, any valid claim of the '114 patent.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

### Count V: Invalidity of the '114 Patent

181.    The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

182.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '114 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

183.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid and enforceable claim of the '114 patent.

**RESPONSE:** Admitted.

184.    One or more claims of the '114 patent is invalid under one or more of §§ 101, 102, 103, and/or 112 of the Patent Act, Title 35 of the United States Code. On information and belief, one or more claims of the '114 patent are invalid for at least the same reasons as set forth in the petitions filed in PTAB Case Nos. IPR2020-00832, IPR2020-00834, IPR2020-1294, and

IPR2020-1295. The Defendants' investigation is ongoing, and thus the Defendants expressly

reserve the right to assert further and additional grounds for invalidity of the '114 patent

according to the appropriate schedule determined by the Court.

**RESPONSE:** Denied.

185.     The Defendants are entitled to a judicial declaration that the claims of the '114 patent are

invalid for failure to comply with the statutory prerequisites of Title 35 of the United States

Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other

judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As

such, it is denied.

### Count VI: Unenforceability of the '114 Patent

186.     The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

187.     This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and

2202, and seeks a declaration that the claims of the '114 patent are unenforceable pursuant to the

doctrine of inequitable conduct and unclean hands.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As

such, it is denied.

188.     The Defendants seek a declaration that the claims of the '114 patent are unenforceable.

A judicial declaration is necessary and appropriate at this time in order that the Defendants may

ascertain their rights and duties with respect to the '114 patent and to any past, present, or future

conduct by the Defendants.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

189.    As alleged in more detail above, during prosecution of the '114 patent, the inventors intentionally withheld a prior art reference that the inventors themselves had authored which would have exposed the falsehood of the inventors' misrepresentations.

**RESPONSE:** Denied.

190.    As alleged in more detail above, the inventors acted with an intent to deceive the Patent Office into issuing the '114 patent.

**RESPONSE:** Denied.

191.    The named inventors further violated their duty of candor by failing to submit to the patent examiner and the USPTO material prior art, namely the March 2003 and May 2003 inventor publications discussed above.

**RESPONSE:** Denied.

192.    As alleged in more detail above, the March and May 2003 publications were material to the prosecution of the '114 patent, the inventors intentionally withheld a prior art reference that the inventors themselves had authored which would have led the Examiner to refuse to issue the claims of the '114 patent in their current form.

**RESPONSE:** Denied.

193.    As alleged in more detail above, the inventors acted with an intent to deceive the Patent Office into issuing the '114 patent.

**RESPONSE:** Denied.

194.     As also alleged above, ME2C obtained the '114 patent and drafted the claims of the '114 patent using confidential information of AEP's that ME2C used in breach of the NDA that ME2C entered into with AEP.

**RESPONSE:** Denied.

195.     The Defendants are entitled to a judicial declaration that the claims of the '114 patent are therefore unenforceable due to the inventors' inequitable conduct and unclean hands.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

### Count VII: Noninfringement of the '225 Patent

196.     The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

197.     This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that no valid claims of the '225 patent are infringed by the Defendants and that the Defendants have not made, used, sold and/or offered to sell in this country any of the methods that are within the scope of the claims of the '225 patent and thus have not infringed and are not infringing any claim of the '225 patent, to the extent ME2C's claims regarding this patent are not dismissed by the Court.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

198.     There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid.

**RESPONSE:** Admitted.

199.    The Defendants do not infringe any claim of the '225 patent.

**RESPONSE:** Denied.

200.    The Defendants are entitled to a judicial declaration that the manufacture, use, sale and/or

offering for sale of the Defendants' methods will not infringe, directly or indirectly, any valid

claim of the '225 patent.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As

such, it is denied.

## Count VIII: Invalidity of the '225 Patent

201.    The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

202.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1

et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration

that the claims of the '225 patent are invalid for failure to comply with the statutory prerequisites

of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102,

103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As

such, it is denied.

203.    There is an actual and justiciable controversy between the parties concerning whether the

manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid

and enforceable claim of the '225 patent.

**RESPONSE:** Admitted.

204.    One or more claims of the '225 patent is invalid under one or more of §§ 101, 102, 103,

and/or 112 of the Patent Act, Title 35 of the United States Code. On information and belief, one

or more claims of the '225 patent are invalid including with respect to the prior art cited in the petitions filed in PTAB Case Nos. IPR2020-00926, IPR2020-00928, IPR2020-1296, IPR2020-1297, IPR2020-00832, IPR2020-00834, IPR2020-1294, and IPR2020-1295. The Defendants' investigation is ongoing, and thus the Defendants expressly reserve the right to assert further and additional grounds for invalidity of the '225 patent according to the appropriate schedule determined by the Court.

**RESPONSE:** Denied.

205.     The Defendants are entitled to a judicial declaration that the claims of the '225 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

### Count IX: Unenforceability of the '225 Patent

206.     The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

207.     This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '225 patent are unenforceable pursuant to the doctrines of inequitable conduct and unclean hands.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

208.     The Defendants seek a declaration that the claims of the '225 patent are unenforceable. A judicial declaration is necessary and appropriate at this time in order that the Defendants may

ascertain their rights and duties with respect to the '225 patent and to any past, present, or future conduct by the Defendants.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

209.    As alleged in more detail above, the inequitable conduct associated with the '147 and '114 patents, individually and together, renders the '225 patent unenforceable.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

210.    As also alleged above, ME2C obtained the '225 patent and drafted the claims of the '225 patent using confidential information of AEP's that ME2C used in breach of the NDA that ME2C entered into with AEP.

**RESPONSE:** Denied.

211.    The Defendants are entitled to a judicial declaration that the claims of the '225 patent are therefore unenforceable due to the inventors' inequitable conduct.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

### Count X: Noninfringement of the '517 Patent

212.    The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

213.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that no valid claims of the '517 patent are infringed by the Defendants and that the Defendants have not made, used, sold and/or offered to sell in this country any of the methods that are within

the scope of the claims of the '517 patent and thus have not infringed and are not infringing any claim of the '517 patent, to the extent ME2C's claims regarding this patent are not dismissed by the Court.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

214.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid and enforceable claim of the '517 patent.

**RESPONSE:** Admitted.

215.    The Defendants do not infringe any claim of the '517 patent.

**RESPONSE:** Denied.

216.    The Defendants are entitled to a judicial declaration that the manufacture, use, sale and/or offering for sale of the Defendants' methods will not infringe, directly or indirectly, any valid claim of the '517 patent.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

## Count XI: Invalidity of the '517 Patent

217.    The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

218.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '517 patent are invalid for failure to comply with the statutory prerequisites

of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

219.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid and enforceable claim of the '517 patent.

**RESPONSE:** Admitted.

220.    One or more claims of the '517 patent is invalid under one or more of §§ 101, 102, 103, and/or 112 of the Patent Act, Title 35 of the United States Code. On information and belief, one or more claims of the '517 patent are invalid including with respect to the prior art cited in the petitions filed in PTAB Case Nos. IPR2020-00926, IPR2020-00928, IPR2020-1296, IPR2020-1297, IPR2020-00832, IPR2020-00834, IPR2020-1294, and IPR2020-1295. The Defendants' investigation is ongoing, and thus the Defendants expressly reserve the right to assert further and additional grounds for invalidity of the '517 patent according to the appropriate schedule determined by the Court.

**RESPONSE:** Denied.

221.    The Defendants are entitled to a judicial declaration that the claims of the '517 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

## Count XII: Enforceability of the '517 Patent

222.   The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

223.   This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '517 patent are unenforceable pursuant to the doctrines of inequitable conduct and unclean hands.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

224.   The Defendants seek a declaration that the claims of the '517 patent are unenforceable. A judicial declaration is necessary and appropriate at this time in order that the Defendants may ascertain their rights and duties with respect to the '517 patent and to any past, present, or future conduct by the Defendants.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

225.   As alleged in more detail above, the inequitable conduct associated with the '147 and '114 patents, individually and together, renders the '517 patent unenforceable.

**RESPONSE:** Denied.

226.   As also alleged above, ME2C obtained the '517 patent and drafted the claims of the '517 patent using confidential information of AEP's that ME2C used in breach of the NDA that ME2C entered into with AEP.

**RESPONSE:** Denied.

227.   The Defendants are entitled to a judicial declaration that the claims of the '517 patent are therefore unenforceable due to the inventors' inequitable conduct.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

## Count XIII: Noninfringement of the '430 Patent

228.    The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

229.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that no valid claims of the '430 patent are infringed by the Defendants and that the Defendants have not made, used, sold and/or offered to sell in this country any of the methods that are within the scope of the claims of the '430 patent and thus have not infringed and are not infringing any claim of the '430 patent, to the extent ME2C's claims regarding this patent are not dismissed by the Court.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

230.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid and enforceable claim of the '430 patent.

**RESPONSE:** Admitted.

231.    The Defendants do not infringe any claim of the '430 patent.

**RESPONSE:** Denied.

232.    The Defendants are entitled to a judicial declaration that the manufacture, use, sale and/or offering for sale of the Defendants' methods will not infringe, directly or indirectly, any valid claim of the '430 patent.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

## Count XIV: Invalidity of the '430 Patent

233.    The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

234.    This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '430 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

235.    There is an actual and justiciable controversy between the parties concerning whether the manufacture, use, sale and/or offering for sale of the Defendants' methods will infringe any valid and enforceable claim of the '430 patent.

**RESPONSE:** Admitted.

236.    One or more claims of the '430 patent is invalid under one or more of §§ 101, 102, 103, and/or 112 of the Patent Act, Title 35 of the United States Code. On information and belief, one or more claims of the '430 patent are invalid including with respect to the prior art cited in the petitions filed in PTAB Case Nos. IPR2020-00926, IPR2020-00928, IPR2020-1296, IPR2020-1297, IPR2020-00832, IPR2020-00834, IPR2020-1294, and IPR2020-1295. The Defendants' investigation is ongoing, and thus the Defendants expressly reserve the right to assert further and

additional grounds for invalidity of the '430 patent according to the appropriate schedule determined by the Court.

**RESPONSE:** Denied.

237.    The Defendants are entitled to a judicial declaration that the claims of the '430 patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 101, 102, 103, and/or 112, or other judicially-created bases for invalidation and unenforceability.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

### Count XV: Unenforceability of the '430 Patent

238.    The Defendants re-allege herein the foregoing paragraphs of their Counterclaims.

**RESPONSE:** ME2C incorporates by reference its answers to the preceding paragraphs.

239.    This counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the '430 patent are unenforceable pursuant to the doctrines of inequitable conduct and unclean hands.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

240.    The Defendants seek a declaration that the claims of the '430 patent are unenforceable. A judicial declaration is necessary and appropriate at this time in order that the Defendants may ascertain their rights and duties with respect to the '430 patent and to any past, present, or future conduct by the Defendants.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

241.    As alleged in more detail above, the inequitable conduct associated with the '147 and '114 patents, individually and together, renders the '430 patent unenforceable.

**RESPONSE:** Denied.

242.    As also alleged above, ME2C obtained the '430 patent and drafted the claims of the '430 patent using confidential information of AEP's that ME2C used in breach of the NDA that ME2C entered into with AEP.

**RESPONSE:** Denied.

243.    The Defendants are entitled to a judicial declaration that the claims of the '430 patent are therefore unenforceable due to the inventors' inequitable conduct.

**RESPONSE:** This paragraph contains conclusions of law to which no response is required. As such, it is denied.

Dated: September 9, 2021

OF COUNSEL:

Bradley W. Caldwell
Texas Bar No. 24040630
Jason D. Cassady
Texas Bar No.  24045625
John Austin Curry
Texas Bar No. 24059636
Justin T. Nemunaitis
Texas Bar No. 24065815
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
jnemunaitis@caldwellcc.com
**CALDWELL CASSADY CURRY PC**
2121 N. Pearl St., Suite 1200
Dallas, Texas 75201
Phone: (214) 888-4848
(214) 888-4849 (*fax*)

**DEVLIN LAW FIRM LLC**

*/s/ James M. Lennon*
James M. Lennon (No. 4570)
526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
jlennon@devlinlawfirm.com

*Attorneys for Plaintiffs Midwest Energy*
*Emissions Corp. and MES Inc.*