IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 19-1334 (RGA) (CJB) |
| ARTHUR J. GALLAGHER & CO., *et al.*, | ) ) | |
| Defendants. | ) | |

**JOINT CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................1

       A.    ME2C's Opening Brief ...............................................................................1

       B.    Defendants' Answering Brief ....................................................................1

       C.    ME2C's Reply Brief ..................................................................................1

       D.    Defendants' Sur-Reply Brief .....................................................................2

II.   NATURE AND STAGE OF THE PROCEEDINGS .........................................2

III.  SUMMARY OF THE ARGUMENT ..................................................................2

       A.    ME2C's Opening Brief ...............................................................................2

       B.    Defendants' Answering Brief ....................................................................3

IV.   STATEMENT OF FACTS ....................................................................................4

       A.    ME2C's Opening Brief ...............................................................................4

              1.    Background of the Patented Technology ........................................4

              2.    Development of the Patented Technology .....................................4

              3.    Explanation of Terminology .........................................................6

       B.    Defendants' Answering Brief ....................................................................8

              1.    Background of the Asserted Patents ...............................................8

              2.    The Benefits of Halogen and Activated Carbon
                    Treatments Were Well Known .......................................................9

              3.    Relevant Terminology ..................................................................10

V.    ARGUMENT.........................................................................................................11

       A.    '114 and '430 patents: "injecting a sorbent material
              comprising activated carbon into the mercury-containing gas
              downstream of the combustion chamber".................................................11

              1.    ME2C's Opening Brief ................................................................11

              2.    Defendants' Answering Brief .....................................................15

                     a.    This Dispute Necessitates A Resolution By
                           The Court ...........................................................................15

                     b.    The Claim Requirement of Injecting Sorbent
                           Downstream Of The Combustion Chamber
                           Cannot Be Defined to Include Burning Coal
                           in the Combustion Chamber ..............................................16

                     c.    Claims Must Be Read In Light Of The
                           Specification .......................................................................17

                     d.    The Defendants' Proposed Construction Is
                           Consistent With The Intrinsic Record...........................19

|  |  | e. | The Defendants' Proposed Construction Will Not Cause Jury Confusion ............................................. 21 |

      3.      ME2C's Reply Brief .............................................................. 22

      4.      Defendants' Sur-Reply Brief ................................................ 24

B.     '147 Patent: "injecting the particulate sorbent material at a sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent" .............................. 26

      1.      ME2C's Opening Brief ........................................................ 26

      2.      Defendants' Answering Brief ............................................... 28

            a.     Injecting the Bromine-Containing Promoter Into a Gas Stream .................................................. 30

            b.     Injecting the Particulate Sorbent Into a Gas Stream .................................................................. 33

      3.      ME2C's Reply Brief .............................................................. 34

      4.      Defendants' Sur-Reply Brief ................................................ 37

C.     '225 Patent: "combusting a mixture comprising coal, pyrolysis char, and an additive comprising HBr, a bromide compound, or a combination thereof" ........................................ 41

      1.      ME2C's Opening Brief ........................................................ 41

      2.      Defendants' Answering Brief ............................................... 43

      3.      ME2C's Reply Brief .............................................................. 46

      4.      Defendants' Sur-Reply Brief ................................................ 47

D.     Alleged Indefinite Terms: "Halide Sorbent Enhancement Additive"/ "Sorbent Enhancement Additive" ('114 Patent Claims 19, 21, and 22; '517 Patent Claims 27 and 28; '430 Patent Claims 26 and 27) ............................................................ 48

      1.      ME2C's Opening Brief ........................................................ 48

      2.      Defendants' Answering Brief ............................................... 50

            a.     The Scope Of "Halide Sorbent Enhancement Additive" And "Sorbent Enhancement Additive" Is Undefined ........................................... 51

            b.     It Is Unclear How The "Halide Sorbent Enhancement Additive" Differs From The Claimed Bromine Or Bromide Compound ................... 53

            c.     "Sorbent Enhancement Additive" Is Indefinite At Least Because It Is ME2C's Registered Trademark ................................................. 54

3.      ME2C's Reply Brief ........................................................................54

4.      Defendants' Sur-Reply Brief ..........................................................56

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*
   725 F.3d 1315 (Fed. Cir. 2013)..................................................................................... 12

*Abbott Labs. v. Sandoz, Inc.*
   529 F. Supp. 2d 893 (N.D. Ill. 2007) ............................................................................ 56

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*
   694 F.3d 1312 (Fed. Cir. 2012)..................................................................................... 14

*AFG Indus., Inc. v. Cardinal IG Co.*
   239 F.3d 1239 (Fed. Cir. 2001)..................................................................................... 18

*Berkheimer v. HP Inc.*
   881 F.3d 1360 (Fed. Cir. 2018)..................................................................................... 53

*Bicon, Inc. v. Straumann Co.*
   441 F.3d 945 (Fed. Cir. 2006)....................................................................................... 56

*Callaway Golf Co. v. Acushnet Co.*
   576 F.3d 1331 (Fed. Cir. 2009)..................................................................................... 33

*CCS Fitness, Inc. v. Brunswick Corp.*
   288 F.3d 1359 (Fed. Cir. 2002)..................................................................................... 12

*Comark Commc'ns, Inc. v. Harris Corp.*
   156 F.3d 1182 (Fed. Cir. 1998)............................................................................... 52, 54

*Conformis, Inc. v. Medacta USA, Inc.*
   No. CV 19-1528-RGA, 2021 WL 827672 (D. Del. Mar. 4, 2021) .................................... 55, 56

*Cordis Corp. v. Boston Sci. Corp.*
   561 F.3d 1319 (Fed. Cir. 2009)..................................................................................... 12

*Datamize, LLC v. Plumtree Software, Inc.*
   417 F.3d 1342 (Fed. Cir. 2005)..................................................................................... 47

*Eli Lilly & Co. v. Teva Parenteral Meds.*
   845 F.3d 1357 (Fed. Cir. 2017)............................................................................... 55, 56

*Ex parte Simpson*
   218 U.S.P.Q. 1020 (B.P.A.I. 1982).............................................................................. 54

*Fla. Atl. Univ. Rsch. Corp. v. Acer, Inc.*
   No. 12-80694-CIV, 2014 WL 2960968 (S.D. Fla. Jun. 30, 2014) ........................................... 57

*GE Lighting Solutions, LLC v. AgiLight, Inc.*
   750 F.3d 1304 (Fed. Cir. 2014) ........................................................................................... 12

*Gen. Am. Transp. Corp. v. Cryo–Trans, Inc.*
   93 F.3d 766 (Fed. Cir. 1996) ............................................................................................... 44

*Gillette Co. v. Energizer Holdings, Inc.*
   405 F.3d 1367 (Fed. Cir. 2005) ........................................................................................... 14

*Haemonetics Corp. v. Baxter Healthcare Corp.*
   607 F.3d 776 (Fed. Cir. 2010) ............................................................................................. 19

*Ill. Comput. Rsch. LLC v. HarperCollins Publishers, Inc.*
   No. 10 Civ. 9124 (KBF), 2012 WL 163801 (S.D.N.Y. Jan. 19, 2012) ................................... 18

*In re Koninklijke Philips Pat. Litig.*
   No. 18-CV-01885-HSG, 2020 WL 7392868 (N.D. Cal. Apr. 13, 2020) ........................... 55, 56

*In re Walter*
   698 F. App'x 1022 (Fed. Cir. 2017) ..................................................................................... 52

*IQASR LLC v. Wendt Corp.*
   825 F. App'x 900 (Fed. Cir. 2020) ....................................................................................... 51

*Liebel-Flarsheim Co. v. Medrad, Inc.*
   358 F.3d 898 (Fed. Cir. 2004) ........................................................................................ 13, 36

*Markman v. Westview Instruments, Inc.*
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) .................................................... 46

*Mars Inc. v. H.J. Heinz Co.*
   377 F.3d 1369, 71 USPQ2d 1837 (Fed. Cir. 2004) ............................................................. 14

*Nautilus, Inc. v. Biosig Instruments*
   572 U.S. 898 (2014) .................................................................................................. 45, 51, 56

*NRG Energy, Inc. et al v. Midwest Energy Emissions Corp.*
   PTAB-IPR2020-00928, Paper 17 (P.T.A.B. Dec. 2, 2020) .............................................. 32, 33

*NRG Energy, Inc. v. Midwest Energy Emissions Corp.*
   No. IPR2020-00832, Paper 17 (P.T.A.B. Oct. 26, 2020) ........................................................ 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*
  521 F.3d 1351 (Fed. Cir. 2008)...................................................................... 15, 16, 24

*Pfizer, Inc. v. Apotex, Inc.*
  480 F.3d 1348 (Fed. Cir. 2007).......................................................................... 57

*Phillips v. AWH Corp.*
  415 F.3d 1303 (Fed. Cir. 2005)................................................................... passim

*PolyVision Corp. v. Smart Techs. Inc.*
  501 F. Supp. 2d 1042 (W.D. Mich. 2007) ..................................................... 54, 57

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*
  875 F.3d 1369 (Fed. Cir. 2017)..................................................................... 49, 53

*Renishaw PLC v. Marposs Societa' per Azioni*
  158 F.3d 1243 (Fed. Cir. 1998)........................................................................ 41

*Scriptpro, LLC v. Innovation Assocs., Inc.*
  762 F.3d 1355 (Fed. Cir. 2014)........................................................................ 47

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*
  537 F.3d 1357 (Fed. Cir. 2008)........................................................................ 47

*Sumitomo Dainippon Pharma v. Emcure Pahraceut.*
  887 F.3d 1153 (Fed. Cir. 2018)..................................................................... 12, 35

*Thorner v. Sony Computer Ent. Am. LLC*
  669 F.3d 1362 (Fed. Cir. 2012)................................................................... passim

*Versa Corp. v. Ag-Bag Int'l Ltd.*
  392 F.3d 1325 (Fed. Cir. 2004)........................................................................ 42

*Vitronics Corp. v. Conceptronic, Inc.*
  90 F.3d 1576 (Fed. Cir. 1996)................................................................. 18, 28, 33

*Volterra Semiconductor LLC v. Monolithic Power Systems, Inc.*
  No. 19-cv-02240-CFC-SRF (D. Del. Nov. 12, 2021)................................ 16, 23, 25

## Statutes

35 U.S.C. § 112.................................................................................................. 52

37 C.F.R. § 1.57(c) (2005)................................................................................. 32

37 C.F.R. § 1.57(d) (2015)................................................................................. 32

37 C.F.R. § 1.57(e).............................................................................................. 36

37 C.F.R. 1.57(d) ........................................................................................................... 39

U.S.C. § 112 ................................................................................................................... 3

**Other Authorities**

MPEP § 2173.05(u) (9th ed. June 2020) ........................................................................ 54

# I.  INTRODUCTION

## A.     ME2C's Opening Brief

A consistent theme emerges from the parties' competing constructions. Plaintiffs' proposals give full scope to the claim language, as firmly supported by the intrinsic evidence. Defendants' proposed constructions seek to limit the claims to certain preferred embodiments while excluding others. Plaintiffs respectfully requests that the Court adopt its proposals as supported by the intrinsic and extrinsic evidence and the canons of claim construction.

## B.     Defendants' Answering Brief

The Defendants' positions on the disputed claim terms that are susceptible to construction are entirely consistent with the canons of construction.  That is to say, defendants urge constructions that account for how the disputed claim language is used in the patents themselves and how it would be understood by persons of ordinary skill in the art.  Or, conversely, how the intrinsic record provides no direction for how persons skilled in the art would interpret some claim terms, thus rendering them indefinite.  For their part, ME2C offers no proposed construction for the terms at issue through its opening brief, instead urging "plain and ordinary" meaning and thus seeking—improperly—to let the case go to the jury despite unresolved questions of claim scope.  As set forth below, the Defendants' proposed constructions ensure the claim scope will be commensurate with the patent disclosures, where construction is possible, and thus urge the Court to adopt their proposed constructions.

## C.     ME2C's Reply Brief

Defendant's claim construction proposals all suffer from the same defect: absent clear and unmistakable intrinsic evidence of definition or disclaimer, a Court may not re-write a patentee's claims.  ME2C respectfully request that the Court reject Defendants' proposed revisions to the claims and adopt ME2C's claim construction positions.

### D.       Defendants' Sur-Reply Brief

Defendants' opposition brief pointed out that ME2C's repeated incantation of "plain and ordinary meaning" does nothing to delineate the actual scope of the asserted claims, particularly given ME2C's refusal to say what it believes the "plain and ordinary meaning" is.  In its reply brief, ME2C does not cure or even address those concerns about the lack of clarity regarding claim scope; ignores much of Defendants' argument concerning the intrinsic record; and once again fails to identify what it believes is the "plain and ordinary meaning" of those claim terms.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

**ME2C:** This case was filed on July 17, 2019.  Discovery is under way and the claim construction hearing for this case is set for April 28, 2022.

**Defendants:** The Defendants do not dispute ME2C's statements regarding the nature and state of the proceedings.

## III.   SUMMARY OF THE ARGUMENT

### A.       ME2C's Opening Brief

1. Plaintiffs have asserted five patents that are all continuations of a common non-provisional application, and they trace their priority to a common provisional application.  With respect to each of the claim terms disputes, Defendants do not seek to define or clarify any claim language; rather, they merely re-arrange the actual words of the claims and then insert a wholly new limitation into each term at issue.  In short, they seek to commit the "cardinal sin" of claim construction by importing a new limitation into the claim language.  Because Defendants cannot demonstrate the requisite lexicography or disavowal necessary to import these limitations, the Court should find that the ordinary and customary meaning of the claims control, and rule that no construction is necessary.

2. Defendants assert that the terms "halide sorbent enhancement additive" and "sorbent

enhancement additive" are indefinite because they are not explained in the specifications. Defendant's assertions are beside the point as the claim language provides reasonable certainty as to the meaning of these terms.  Moreover, the specifications do explain these terms.  Indeed, they provide molecular analysis, and they include examples describing the functional purpose for these terms.  Accordingly, Defendants cannot meet their burden of demonstrating indefiniteness.

**B.    Defendants' Answering Brief**

1. By its proposed constructions, the Defendants seek only to clarify the meaning of certain terms in order to assist the jury in understanding the scope of the claims.  As explained below, the Defendants' constructions are consistent with the intrinsic record, and follow the well-known canon of construction that claims are to be read in light of the specification.  ME2C, on the other hand, offers no construction at all, contending instead that the disputed claim terms should be given their plain and ordinary meaning, without saying what that means.  In ME2C's view, the Defendants, by proposing constructions, are invoking the doctrines of lexicography or disavowal, but neither are at issue here.  The Defendants are merely seeking to offer clarity to otherwise ambiguous claim terms for the parties' and jury's benefit.

2. Four of the five Asserted Patents contain claims that are indefinite under pre-AIA 35 U.S.C. § 112, second paragraph, and therefore cannot be construed.  Those claims either relate to combusting a mixture that includes "pyrolysis char," or recite a "halide sorbent enhancement additive" and/or a "sorbent enhancement additive."  The claims containing those terms are indefinite for failing to inform a person of skill in the art of its scope with reasonable certainty.

IV.     **STATEMENT OF FACTS**

    A.     **ME2C's Opening Brief**

        1.     **Background of the Patented Technology**

The background story for the patented technology begins with the Clean Air Act Amendments of 1990.  That law required the U.S. Environmental Protection Agency (EPA) to study the environmental and health effects of toxic metals, and to devise regulations for reducing those metals, including mercury.   To assist in the research, in 1992, the EPA established a National Center for Excellence at the Energy & Environmental Research Center (EERC) referred to as the Center for Air Toxic Metals (CATM).  The EERC's research focused heavily on developing new methods for detecting, measuring, and ultimately, removing mercury from coal-fired power plant exhaust gas. *See* Ex. 1, Pavlish Decl. at ¶ 3.

By 1990, the EPA already had significant experience regulating power plant emissions. Since the 1970s, coal-burning power plants had been required to install equipment for controlling acid gas and particulate matter emissions. The industry had developed a number of technologies to address those requirements such as electrostatic precipitators, fabric filters, and scrubbers. However, those systems were not designed to capture mercury.  Ex. 2, EPA Report at 13-27. Mercury capture presented a particularly daunting problem because mercury makes up only a tiny fraction of the material emitted by coal combustion (typically less than 5 parts per billion. '430 Patent at 1:55-60.  In short, the removal of extremely small amounts of mercury from large volumes of coal plant emissions presented a daunting scientific and engineering challenge.

        2.     **Development of the Patented Technology**

The EERC—including the inventors John Pavlish, Edward Olson, and Michael Holmes—was at the forefront of the mercury capture research effort.  That work would eventually lead to the development of the patented technology at issue in this case.

The inventors noted that porous powdered materials—such as activated carbon— could be used as "sorbents" to capture mercury. '430 patent at 2:5-35.  Once mercury is adhered to the sorbent material, it can be captured by using a particulate control device (e.g., fabric filter, baghouse, ESP).  However, known sorbents were ineffective for capturing large amounts of mercury.  *See* '430 patent at 2:23-29 ("A major problem with existing carbon injection systems is that the sorbent is initially unreactive, and only after extended exposure to the flue gas does the sorbent become effectively seasoned and provide increased reactivity with the mercury in the gas.").

The inventors solved this problem when they discovered that sorbents could more effectively capture mercury when they were "enhanced" or "promoted" by reacting them with certain additives.  '430 patent at 2:62-67 ("a promoted carbon sorbent is provided comprising a base activated carbon that has reacted with a promoter selected from the group consisting of halides, halogens, and combinations thereof, such that the reaction product is effective for the removal of mercury from a gas stream.")  The patents describe a number of embodiments that can be used to take advantage of this discovery.  For example, the patents describe systems for specific sorbents ("powdered activated carbon, granular activated carbon, carbon black, carbon fiber, aerogel carbon, pyrolysis char,") and specific additives ("molecular halogens, Group V (CAS nomenclature is used throughout) halides, Group VI halides, hydrohalides, and combinations thereof").  '430 patent at 3:1-12.

The patents also describe various mechanisms for preparing, promoting, and employing sorbents and additives.  For example, they describe pre-treatment of sorbents with additives and then injection of the promoted sorbent into a power plant transport system.  '430 patent at 19:50-

25.  They also describe separately introducing sorbents and additives so that they react "in-flight" to promote the sorbent and capture mercury.  '430 patent at 20:40-53.

### 3. Explanation of Terminology

While the patents-in-suit use ordinary English words, it is helpful to understand how a POSITA would understand some of the common industry terms.  Figure 11 of the '430 patent displays an exemplary coal-fired power plant employing the patented technology:



Relevant terms include:

**Pulverizer** – This device pulverizes coal arriving in rail cars from a mine.  This pulverized coal is a fine powder that can be easily swept up in a gas transport system and injected into a combustion chamber.  '430 patent at 32:33-35.

**Boiler** – Also referred to as the furnace or combustion chamber,[1] this is where the pulverized coal is injected.  '430 patent at 32:33-35.  It contains the coal as it is being combusted as well as

---

[1] Technically, these terms have slightly different meanings.  For example, a furnace may not include steam piping for generating electricity and thus it may not be considered a boiler.  Nonetheless, based on Defendants' disclosures to date, these distinctions should not matter to the parties' claim construction disputes.

various water and steam heat exchangers and pipes. The heat from the coal combustion converts water within the boiler into high pressure steam used to power a turbine and generate electricity. The gas leaving the boiler will contain inorganic material referred to as ash from the combusted coal, small amounts of organic material from non- or partially-combusted coal referred to as "pyrolysis char," and various waste gases and particulates, including mercury. *See, e.g.,* Ex. 2, EPA Report at 13-31; Ex. 3, Shen at 3.

**Additive Injection** – As shown above, the disclosed additives (e.g., bromine or bromine compounds) may be added to coal, directly into the boiler, or at the boiler exit (where the gas leaves the boiler). '430 patent at 32:40-44.  A POSITA may refer to these different injection points as "upstream" (before) or "downstream" (after) the boiler.  *See, e.g.,* '430 Patent at 9:27-33.

**Sorbent Injection** – As shown above, sorbents may be injected upstream of the particulate and emissions control devices. Note, this injection can occur at any point in the gas stream.

**Baghouse or ESP** – A "baghouse" is a large receptacle containing numerous fabric filters.  As gas leaving the boiler passes through the baghouse, ash, particulates, and the sorbent with adhered mercury become trapped in the material collected by/on the fabric filters.  An "ESP" or "electrostatic precipitator" provides a similar function although it relies on electrically charged metal plates to attract particulates and sorbent.  '430 patent at 32:36-38.

**Scrubber** – A scrubber is another pollution control device designed primarily for capturing pollutants such as SO2 and not mercury.  '430 patent at 32:38-40.

**Sorbent bed** – A sorbent bed provides an additional filtering device for capturing gas-phase pollutants (that react with the sorbent bed material) and particulates, and it may also be used to capture the promoted sorbents in the gas so that the sorbents can be recycled and re-used.  *Id.*

**Stack** – Once the gas leaving the boiler has passed through all of the power plant's pollution controls, it will be released into the air through the stack.

Note that Figure 11 is just an exemplary embodiment, among several others. For example, some embodiments may employ sorbents before or within the boiler ('430 patent at 20:50-53), and some embodiments employ a temporary receptacle for reacting sorbents and additives and then injecting the combined additive/sorbent at various points in the process ('430 patent at 8:49-9:22).

      **B.**      **Defendants' Answering Brief**

          **1.**      **Background of the Asserted Patents**

The claims of the Asserted Patents are directed to methods for reducing mercury emissions from coal-fired power plants by combining two established techniques: (i) the use of halogens, such as bromine and bromide compounds, which react with or bind to mercury; and (ii) treating the combustion gas with sorbents such as activated carbon, which adsorb mercury compounds. The claims recite a two-step process involving a "Bromine Step" (combusting coal that comprises added bromine, or adding bromine to the combustion chamber or the gas stream), and an "Activated Carbon Step" (injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber").

Four of the Asserted Patents (the '114, '430, '225, and '517 patents) expressly claim, as relating to the Bromine Step, pre-treating coal with bromine or adding bromine to the combustion chamber. Claim 25 of the '114 patent recites, for example, a method of separating mercury from a mercury-containing gas that comprises, inter alia, "combusting coal in a combustion chamber . . . wherein the coal comprises added [bromine], added to the coal upstream of the combustion chamber, or the combustion chamber comprises added [bromine]" and then "injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the

8

combustion chamber."  '114 Patent at Cl. 25.

In contrast, the '147 patent is not directed to the use of coal pre-treated with bromine, and instead requires injecting bromine and activated carbon into a gas stream.  For example, Claim 17 of the '147 patent recites "injecting the particulate sorbent material [comprising activated carbon] at a sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent."[2]

### 2.    The Benefits of Halogen and Activated Carbon Treatments Were Well Known

ME2C's putative summary of the state of the art as of 2004 understates the level of understanding in the field,[3] and overstates any contributions by the named inventors.  For example, ME2C suggests that the named inventors "solved this problem [of enhancing mercury capture by activated carbon] when they discovered that sorbents could more effectively capture mercury when they were 'enhanced' or 'promoted' by reacting them with certain additives." ME2C, at 3 (citing '430 patent at 2:62-67).  The use of additives to enhance mercury capture by activated carbon (or by other sorbents), however, was well known many years before the filing of the provisional to which the patents allegedly claim priority—as is clear from a January 1998 review article.  See Ex. 1 [Evan Granite, Henry Pennline, and Richard Hargis, "Sorbents for Mercury Removal from Flue Gas"] (hereinafter, "Granite 1998").  Granite 1998 reviewed dozens of studies on sorbents and sorbent promoters for mercury removal, noting that "[a]ctivated carbons have been the most

---

[2] Although the Asserted Patents all claim priority to the same provisional application, the '147 patent makes no mention of adding bromine to coal, and that limitation lacks written support in the priority chain for the remaining Asserted Patents, which do include that limitation.  *See, e.g.*, *NRG Energy, Inc. v. Midwest Energy Emissions Corp.,* No. IPR2020-00832, Paper 17 at 31 (P.T.A.B. Oct. 26, 2020) (finding lack of written description support and affording May 2018 priority date for the '114 patent).

[3] Defendants dispute ME2C's Aug. 30, 2004 priority date.

thoroughly studied sorbent for the capture of mercury."  Id. at 22. Granite 1998 further explains, under the heading "Promoters," that "[m]any chemicals have been examined for their ability to increase the capacity of activated carbon" and that "[t]hese materials include halides, halogens, sulfur, sulfides, and lime."  Id. at 19.

The specification of the '430 patent itself belies ME2C's assertion, discussing prior art such as U.S. Patent Application 2004/0003716 ("Nelson"), which described improving the ability of activated carbon to capture mercury by reacting the activated carbon with bromine.  '430 patent at 30:22-45.[4]  ME2C's attempt to link the Asserted Patents to the named inventors "discovering" that sorbents can more effectively capture mercury when promoted with halides or halogens falls flat.

Although other statements in ME2C's brief are addressed in context below, one additional point bears note:  the furnace and process diagram that ME2C reproduces in their brief, and which they rely on repeatedly in support of their proposed claim constructions, is not part of the intrinsic record for all of the Asserted Patents.  See Section V.B.1 below.

### 3.    Relevant Terminology

ME2C's proffered definition of sorbent injection is misleading insomuch as it provides— with no reference to the asserted claims—that the injection "can occur at any point in the gas stream."  See Opening Br. 5.  The asserted claims, for example, are objectively narrower than ME2C's definition, and provide that the sorbent is injected into mercury-containing gas, downstream of the combustion chamber.  See, e.g., '114 Pat. at Cl. 1.  Thus, sorbent injection, as

---

[4] Nelson is entitled "Sorbents and Methods for the Removal of Mercury from Combustion Gases," is directed to "the removal of mercury from combustion gas streams . . . [using] halogenated carbon materials to reduce the emissions of mercury from coal-fired power plants," Ex. 6 [Nelson] ¶ 4, and discloses that a "critical element in the process is that a bromine-containing gas 3[, e.g., elemental bromine or hydrogen bromide,] is used to treat the carbonaceous substrate[, e.g., activated carbon]."  Id. ¶ 49.  Nelson further explains that the use of halogens enhances mercury capture by the sorbent.  Id. ¶ 17.

claimed, does not occur at just "any point in the gas stream"; rather, the asserted claims point out where the injection occurs.

## V. ARGUMENT

### A.    '114 and '430 patents: "injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber"

#### 1.    ME2C's Opening Brief

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction[5] |
|---|---|
| No construction necessary | injecting, into the mercury-containing gas, **from outside the mercury-containing gas,** downstream of the combustion chamber, a sorbent material comprising activated carbon, **whereby the sorbent material is not introduced with the coal** |

| Representative Claim: '430 claim 1 |
|---|
| 1. A method of separating mercury from a mercury-containing gas, the method comprising: combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein<br>    the coal comprises an additive comprising Br2, HBr, a bromide compound, or a combination thereof, wherein the additive is added to the coal before the coal enters the combustion chamber, or<br>    the combustion chamber comprises an additive comprising Br2, HBr, a bromide compound, or a combination thereof or<br>    a combination thereof;<br>*injecting a sorbent comprising activated carbon into the mercury-containing gas downstream of the combustion chamber;*<br>contacting mercury in the mercury-containing gas with the sorbent; and<br>separating the sorbent contacted with the mercury from the mercury-containing gas. |

For this term, Defendants do not seek to define or clarify the meaning of any words in this claim phrase; they only seek to insert new words into the claim (new words highlighted in bold in Defendants' Proposal: "injecting, into the mercury-containing gas, **from outside the mercury-**

---

[5] Because Defendants' proposed constructions merely restate or re-arrange the words already present in the claim, the highlighted portions of Defendants' proposed constructions below indicate where Defendants propose inserting new limitations into the claim language.

**containing gas,** downstream of the combustion chamber, a sorbent material comprising activated carbon, **whereby the sorbent material is not introduced with the coal**").  But to justify the insertion of a new limitation into the claim language, Defendants must prove that the inventors expressly defined some term in the claim to include each proposed limitation or prove that the inventors expressly disavowed the claim scope outside of these additional limitations.  *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history. There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."). The standards for finding lexicography or disavowal are "exacting."  *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).

"To act as a lexicographer, the patentee must 'clearly set forth a definition of the disputed claim term.'" *Sumitomo Dainippon Pharma v. Emcure Pahraceut*., 887 F.3d 1153, 1159 (Fed. Cir. 2018) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

In particular, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co.*

12

*v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004); *see also Thorner*, 669 F.3d at 1366–67 ("Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal. . . . It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and unmistakable disclaimer.").

The claims at issue require, among other things, combusting coal with added bromine/bromide (e.g. including an additive upstream or within the boiler), and use of sorbent downstream of a boiler. *See, e.g.,* '430 Patent claim 1. The claims do not include any negative limitation that excludes upstream use of a sorbent (e.g., before or within the boiler). Indeed, the '430 patent states "**the inventive sorbent can be injected where desired** (e.g., **before**, after, **or within the boiler**)." '430 patent at 20:51-53 (emphasis added). Accordingly, if a power plant system includes upstream use of the claimed additive and downstream use of the claimed sorbent as recited in the claims, it falls within the scope of the claims even if it also employs upstream use of sorbent. Because the claims and the specification do not exclude this scenario, Defendants cannot meet their burden of showing definition or disclaimer.

The primary problem with Defendants' proposal is that it injects new ambiguity into the claims by altering the claim language actually agreed upon by the inventors and the Patent Office. For example, it is not clear if, under Defendants' proposal, the claim scope encompasses a scenario involving upstream use of bromine, downstream use of sorbent, and an additional step of upstream use of sorbent. The confusion comes into play because, while that scenario is plainly covered by the actual claim language, there may be some confusion as to whether it meets Defendants' proposed construction because one could argue that the sorbent was "introduced" at the same time

13

with the coal.  To their credit, Defendants are not currently advancing such a non-infringement argument.[6]  But trial is over a year away and there is no reason to create the potential for juror confusion by importing new phrases into the claim language.

Moreover, if the claims were interpreted to exclude upstream use of sorbent, that would amount to the inclusion of an improper negative limitation.  This would be contrary to the basic principle that "[t]he addition of elements not recited in the claim cannot defeat infringement." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005) (explaining that a patent claim requiring a razor with three blades covered a product that included four blades); *see also Mars Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376, 71 USPQ2d 1837, 1843 (Fed. Cir. 2004) (explaining that the transitional term "comprising", which is synonymous with "including but not limited to," is open-ended and does not exclude additional, unrecited elements or method steps). To be clear, for claims that require (i) upstream use of bromine, and (ii) downstream use of activated carbon, Defendants should not be able to avoid infringement by inserting a new requirement that there be (iii) no upstream use of activated carbon.

Because Defendants cannot meet their burden for inserting a new limitation into the claims, the Court should find that the ordinary and customary meaning of the claims control, and rule that no construction is necessary. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) (explaining that when a party fails to show that a limitation should be imported into a claim and there are no further disputes as to the meaning of the claim language,

---

[6] During pre-briefing negotiations, ME2C offered to accept Defendants first proposed change to the claim language ("from outside the mercury-containing gas") if Defendants abandoned their second proposed change (inserting "whereby the sorbent material is not introduced with the coal"), because of the potential for confusion.  Plaintiffs made this offer to avoid disputes and based on its understanding that the resulting construction would not actually alter the scope of the claim. Defendants refused that offer but failed to provide a meaningful explanation as to why their proposal was necessary.

the court may rule that no construction is necessary).

## 2.    Defendants' Answering Brief

Claims 1 and 23-25 of the '114 patent, and claims 1, 28, and 29 of the '430 patent, recite

this limitation.  Claim 1 of the '430 patent, which ME2C asserts is representative, describes the

two-step process—*i.e.*, the Bromine Step and the Activated Carbon Step—and this claim

construction dispute involves the latter step.  Claim 1 recites, with emphasis on the operative

text:

> 1. A method of separating mercury from a mercury-containing gas, the method
> comprising:
>> combusting coal in a combustion chamber, to provide the mercury-containing
>> gas, wherein
>>> the coal comprises an additive comprising $Br_2$, HBr, a bromide compound,
>>> or a combination thereof, wherein the additive is added to the coal before
>>> the coal enters the combustion chamber, or
>>> the combustion chamber comprises an additive comprising $Br_2$, HBr, a
>>> bromide compound, or a combination thereof or
>>> a combination thereof;
>> ***injecting a sorbent comprising activated carbon into the mercury-containing***
>> ***gas downstream of the combustion chamber;***
>> contacting mercury in the mercury-containing gas with the sorbent; and
>> separating the sorbent contacted with the mercury from the mercury-containing
>> gas.

The Defendants propose construing this term to mean "injecting, into mercury-containing

gas, downstream of the combustion chamber, a sorbent material comprising activated carbon,

whereby the sorbent material is not introduced with the coal," while ME2C contends that no

construction is necessary.

### a.    This Dispute Necessitates A Resolution By The Court

Courts have a duty to resolve disputes over claim scope.  *See O2 Micro Int'l Ltd. v. Beyond*

*Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a

fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").  Here,

the parties' meet and confer discussions led to a concrete dispute over the meaning of this term.

15

Further, ME2C has compounded the dispute by urging a "plain and ordinary meaning" construction without stating what it believes that meaning is. *See O2 Micro*, 521 F.3d at 1361 (holding that when "the 'ordinary' meaning of a term does not resolve the parties' dispute, . . . claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit"); Ex. 2 [*Markman* Hearing Transcript at 22:22-23:7, *Volterra Semiconductor LLC v. Monolithic Power Systems, Inc.*, Case No. 19-cv-02240-CFC-SRF (D. Del. Nov. 12, 2021) (Connolly, J.)] (Judge Connolly cautioning that the "next time I get this situation [where] one side, the plaintiff says, oh, plain and ordinary meaning and offers no alternative definition and all it does is criticize the defendant['s construction], which there's some actual support for, I don't hold a hearing[,] . . . I'm just going with the defendant[,] . . . [s]o get the word out"). There is a dispute over what the term means; ME2C cannot preclude resolution by saying "plain and ordinary meaning" without saying what the meaning is.

>   **b.    The Claim Requirement of Injecting Sorbent Downstream Of The Combustion Chamber Cannot Be Defined to Include Burning Coal in the Combustion Chamber**

This dispute centers on whether the limitation requiring injecting sorbent downstream of the combustion chamber includes the mere burning of coal in the combustion chamber—*i.e.*, introducing the sorbent material by burning the coal, which can potentially create activated carbon. The Defendants seek only to ensure that "injecting . . . activated carbon into the mercury-containing gas downstream of the combustion chamber" does not encompass the introduction of activated carbon created naturally from combusting coal within the combustion chamber. That is, in the Defendants' view, a POSITA would understand claim 1 of the '430 patent to require activated carbon to be injected from *outside* the mercury-containing gas, and not from within the gas through the combustion of the coal itself. On the other hand, ME2C's position does not distinguish between

16

the creation of a byproduct of burning coal from the process of treating flue gas by "injecting a sorbent . . . downstream of a combustion chamber."

This dispute first became apparent due to vagueness in ME2C's initial infringement contentions. ME2C's contentions merely reiterate the language of the claims, and do not make clear if ME2C contends that the mere burning of coal would suffice to satisfy the "injecting" claim language. *See, e.g.*, Ex. 3 [Initial Infringement Cont.] at 2 ("The Accused Coal Plants inject a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber. *See* Attachment A."[7]). While claim construction is analyzed irrespective of infringement and validity, the parties' contentions in this regard bring into focus what claim terms require construction. Here, the unresolved vagueness in ME2C's infringement contentions requires the Court to confront whether "injecting . . . downstream of a combustion chamber" encompasses merely burning coal, and the implications of such a construction, *i.e.*, potential arguments that the claim term is met whenever coal is burned. The Defendants' proposed construction, in contrast, properly defines the sorbent-injection limitation as occurring downstream of the combustion chamber, from a source other than coal, and is consistent with the intrinsic record, as explained below.[8]

> ### c.    Claims Must Be Read In Light Of The Specification

ME2C's argument that the Defendants are attempting to add new limitations, or read limitations from the specification, into the claims (Opening Br. 7-8), misstates the Defendants'

---

[7] Attachment A cites CERT and Certain Refined Coal LLC Defendants' ("CERT") response to ME2C's Common Interrogatory No. 2, which provides that some of the associated power plants use activated carbon. No theory of infringement can reasonably be gleaned from a bare citation to that response.

[8] Based on correspondence before claim construction briefing, the Defendants believe ME2C might agree that activated carbon generated from coal burning is not within the scope of the claims, but ME2C has refused to agree on or propose a construction clarifying that point. *See* Ex. 7.

position.  The Defendants are following the well-known canon of construction that claims must be read in light of the specification.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("It is therefore entirely appropriate for a court, when conducting claim construction, to *rely heavily* on the written description for guidance as to the meaning of the claims." (emphasis added)); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.").

ME2C argues that the Defendants "seek to insert new words into the claim," and that in order to "justify the insertion of a new limitation into the claim language, Defendants must prove that the inventors expressly defined some term in the claim . . . or prove that the inventors expressly disavowed the claim scope."  Opening Br. 7.  ME2C is wrong for at least two reasons.  First, using words no in the claim to define and clarify claim scope benefits the jury.  *Ill. Comput. Rsch. LLC v. HarperCollins Publishers, Inc.*, No. 10 Civ. 9124 (KBF), 2012 WL 163801, at *9 (S.D.N.Y. Jan. 19, 2012) (holding that using "additional words to describe the scope and meaning of a claim" is "a routine exercise in claim construction," and that this "is what claim construction is all about[,] and [it] is neither earth shattering nor novel"); *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) (holding that it is "critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions").  Indeed, absent a scenario in which the claims are literally accorded their plain and ordinary meaning, the construction process necessarily uses different, and often more, words than in the claim itself.  Second, the Defendants have not argued for the disavowal or disclaimer of any claim scope.  The Defendants, by their proposed construction, merely seek to

define the proper claim scope—*i.e.*, explain and clarify how a POSITA would understand the claim term, having read the patent and the intrinsic record.

### d.   The Defendants' Proposed Construction Is Consistent With The Intrinsic Record

The Defendants' construction is consistent with the asserted claims.  Claim 1 of the '430 patent recites a method of separating mercury from gas comprising the steps of, *inter alia*, combusting coal with a bromine additive added to the coal, combustion chamber, or a combination thereof, and then "injecting a sorbent comprising activated carbon into the mercury-containing gas downstream of the combustion chamber."  '430 Patent at Cl. 1.  In other words, the bromine additive may be introduced with the coal by the plain language of the claim.  In contrast, the claimed activated carbon is injected into the mercury-containing gas downstream of the combustion chamber.  Adding activated carbon to the coal therefore falls outside the claim scope.

Further, if the injection limitation could be satisfied merely by burning coal, then it is not a meaningful limitation.  The claim already includes "combusting coal" as a step—"combusting coal in a combustion chamber, to provide the mercury-containing gas."  '430 Patent at Cl. 1.  That step would itself "inject[] . . . carbon" if it were to be read in ME2C's way, rendering the injecting-carbon-downstream limitation superfluous.  *See Haemonetics Corp. v. Baxter Healthcare Corp*., 607 F.3d 776, 781 (Fed. Cir. 2010) (holding that the "notice function [that claims provide] would be undermined . . . if courts construed claims so as to render physical structures and characteristics specifically described in those claims superfluous").

The Defendants' construction is also supported by the specification's reference to "injecting" and "injection" as occurring via an injection point, downstream of the combustion chamber.  For example, Figure 3 is a schematic of a mercury removal process wherein materials are injected in a contaminated gas stream 15 via injection points 116 and 119.  '114 Patent at Figs.

3 (reproduced, annotated below), 13:55-14:6 (disclosing "injection point **116**" and "injection point **119**"), and 14:10-25 ("For clarity, single injection points **116** or **119** are shown in FIG. 3, although one skilled in the art will understand that multiple injection points and/or locations are within the scope of the present invention.").



FIG. 3

These injection sites are disposed after the combustion chamber and show injection into contaminated gas line/stream 15, which is contaminated with mercury generated during combustion.

Figure 6 of the '114 patent also depicts sorbent being injected downstream of the combustion chamber and not generated from within the boiler:



FIG. 6

Thus, the specification is consistent with the sorbent being injected into the mercury-containing gas from outside of the gas, and not being introduced with the coal or created during the combustion of the coal.

> ### e. The Defendants' Proposed Construction Will Not Cause Jury Confusion

ME2C is wrong that the Defendants' proposed construction will confuse a jury. Quite the opposite, the Defendants' construction is intended to explain the scope of the claims in plain English. ME2C argues, for instance, that the last clause—"whereby the sorbent material is not introduced with the coal"—introduces the question of whether infringement occurs when a power plant (1) injects activated carbon downstream of the combustion chamber, and also (2) adds activated carbon to the coal upstream of the combustion chamber or inside of the chamber. Opening Br. 8-9. The Defendants' construction does not exclude the use of sorbent upstream of the chamber; it ensures, consistent with the claim language, that "the sorbent" as claimed is injected downstream of the combustion chamber. Indeed, the Defendants' construction excludes a scenario where "*the* sorbent material" is introduced with the coal, not "*a* sorbent material."

Under the Defendants' construction, the sorbent material must be injected downstream of the combustion chamber into the mercury containing gas, from outside the mercury containing gas, and not be introduced with the coal. Given that these are open ended "comprising" claims, nothing in that construction prevents ME2C from advancing an infringement theory against a party

21

who adds sorbent to coal upstream of the boiler and *also* injects sorbent into the flue gas downstream; only the latter would be relevant to infringement.  What matters in determining what falls within the scope of the claim is the injection of "the sorbent" downstream of the combustion chamber and that "the sorbent" is not introduced with the coal.

And despite ME2C's remarks to the contrary, the Defendants made this perfectly clear in their pre-briefing communications.  There, the Defendants explained their understanding that adding carbon before the boiler is not the relevant inquiry when it is also injected downstream, and expressed their concerns that omitting the last clause would lead to jury confusion:

> The infringement question is thus whether the sorbent material required by the claim 'is not introduced with the coal.' . . . Defendants will not argue that a speck of activated carbon on the refined coal would render the use of an activated carbon injection system in the flue non-infringing. . . . [O]ur reason for wanting a full construction is to ensure that the jury is properly instructed about what the claim means, so that it does not draw its own inferences about the effect of that 'speck' of activated carbon on the refined coal.

Ex. 4 [01.06.2022 Evall [Defendants'] email to Nemunaitis [ME2C]] at 1.  The Defendants went on to offer three additional alternatives in an attempt to reach an agreement, each clarifying in a different way the crucial issue that the claim itself is directed to sorbent that is introduced separate from the coal (*id.*), but ME2C declined.  The Defendants' efforts to reach an agreement are a far cry from ME2C's complaint that the Defendants failed to meaningfully justify their insistence on the construction in dispute here.  *See* Opening Br. 9, n.3.

### 3.  ME2C's Reply Brief

The parties agree on the scope of this claim term.  It requires injecting sorbent downstream of the combustion chamber and does not exclude embodiments where sorbent may also be used at other locations.  The only dispute is whether the Court should re-write the claim language as

proposed by Defendants.[9]  Defendants do not cite any authority supporting their position that the Court should insert new language into the claim when there is no claim scope dispute to be resolved or intrinsic evidence of definition or disclaimer.  *Cf. Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that.")  Accordingly, Defendants have failed to show that the Court should re-write the claim language negotiated between the inventors and the Patent Office.

At best, Defendants argue that their proposed construction would provide instruction to the jury.  But as noted above, as a matter of law, that is insufficient to justify re-writing ME2C's patent claims.  Moreover, Defendants are simply wrong.  According to Defendants, their proposal is necessary to clarify that the claims require injection of sorbent downstream of the combustion chamber.  But this requirement is already expressly stated in the claim and ME2C has never disputed that requirement.  Indeed, the parties' multiple rounds of motion to dismiss briefing in this case were premised on this very requirement.  Thus, Defendants fail to show any need for such a jury instruction.

Conversely, Defendants proposed construction is ripe for abuse.  For example, at trial, a Defendant witness may testify that Defendants "always introduce sorbent material to the coal."  Based on Defendants' representations in their responsive claim construction, this testimony could not support a finding of non-infringement if activated carbon is also injected downstream of the

---

[9] Defendants cite Judge Connolly's comments in *Volterra* criticizing plaintiffs for not offering alternative definitions when a defendant offers a definition that is supported by evidence.  *Supra* at 16.  However, in that case, the lack of an alternative definition obscured the nature of the claim scope dispute.  *See, e.g.,* Ex. 2 [Markman Hearing Transcript at 82:20-83:14].  Here, Defendants did not propose a definition for any claim term.  Rather, their proposed constructions merely insert additional words into the claim language.  Thus, the best way for ME2C to crystalize the parties' disputes is to oppose this proposed insertion of additional words.

combustion chamber.  Nonetheless, lay jurors may be misled into believing that the testimony does support non-infringement if they are instructed by the Court that the claim requires that "sorbent material is not introduced with the coal," as Defendants propose.

In short, Defendants identify no claim scope dispute that must be resolved by the Court through claim construction, nor do they identify any legal basis for re-writing ME2C's claim language.  At best, they seek a prophylactic jury instruction that is unnecessary at this stage of the case, and likely to cause unnecessary disputes and juror confusion in the future.

### 4.    Defendants' Sur-Reply Brief

ME2C asserts that the parties "agree" on the scope of this term (Reply Br. at 1), yet ME2C vigorously resists ensuring that the claim construction matches the supposed agreed-upon scope of the claims.  ME2C's briefing reveals that there is indeed a dispute, thus requiring resolution by the Court.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008).

What is more, ME2C refuses to commit to a central point regarding the scope of the claims, and one that should be clarified for the jury:  in order for it to be "inject[ed] . . . downstream of the combustion chamber" as required by the claims, the "sorbent material" that is itself "injected" cannot have been introduced with or formed from the coal.  For instance, ME2C says it is "expressly stated in the claim" and "has never [been] disputed" that "injection of sorbent" occurs "downstream" (Reply Br. at 2), but ME2C is silent on whether it intends to argue—contrary to the claim language—that the "sorbent material" that is injected downstream can have been applied to the coal or created during its combustion.

The lack of clarity in ME2C's briefing on this crucial question of claim scope is compounded by ambiguous statements ME2C has made throughout the record.  *See* Declaration of Jessica R. Kunz in Support of Defendants' Answering Claim Construction Brief ("Kunz Decl.")

Ex. 3 [Initial Infringement Cont.] at 2 ("The Accused Coal Plants inject a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber.").  The potential mischief created from this ambiguity and lack of clarity, coupled with ME2C's refusal to offer its own construction,[10] warrant adopting the clarity provided by Defendants' proposed construction.

Far from being "ripe for abuse," as ME2C suggests (Reply Br. at 2), Defendants' proposed construction is calculated to avoid juror confusion by foreclosing an unintended reading of the claims.  Indeed, ME2C suggests that Defendants' proposed construction would lead jurors to conclude that even if a Defendant actually "injected sorbent" into the flue ducts downstream of the combustion chamber, they would be exonerated if they *also* put some sorbent on the coal.  But ME2C ignores a critical portion of the construction:  Defendants propose that "***the*** sorbent material is not introduced with the coal" (Answering Br. at 5 (emphasis added)) and not, as ME2C claims, "sorbent material is not introduced with the coal."  Reply Br. at 2.  Defendants' construction prevents jurors from wrongly believing that burning coal alone is within the scope of the claim.

---

[10] Judge Conolly's warning in *Volterra* applies here, where Plaintiffs likewise are saying "oh, plain and ordinary meaning and offer[ing] no alternative definition and . . . criticiz[ing] the defendant." Answering Br., Kunz Decl. Ex. 2 [*Markman* Hearing Transcript] at 22:22-23:7.  This failure does in fact "obscure[] the nature of the claim scope dispute" (Reply Br. at 1 n.1) because it risks leaving the jury wondering what exactly are the bounds of the "meaning" ME2C seeks to advance.

    **B.**    **'147 Patent: "injecting the particulate sorbent material at a sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent"**

        **1.**    **ME2C's Opening Brief**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | injecting into a gas stream the particulate sorbent material at a sorbent material injection rate and injecting separately into **the gas stream** the bromine containing promoter, **whereby neither injection occurs upstream of a furnace exit, and** whereby in-flight reaction produces the promoted brominated sorbent |

| Representative Claim: '147 claim 17 |
|---|
| 1. A method for separating mercury from a mercury containing gas comprising:<br>(a) promoting at least a portion of a particulate sorbent material comprising activated carbon by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent, wherein the bromine containing promoter is in gaseous form, vapor form, or non-aqueous liquid form, and wherein the activated carbon contains graphene sheets having carbene species edge sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury;<br>(b) chemically reacting elemental mercury in the mercury containing gas with the promoted brominated sorbent to form a mercury/sorbent chemical composition; and<br>(c) separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent chemical composition.<br>17. A method according to claim 1, further comprising *injecting the particulate sorbent material at a sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent*, wherein the promoter is reacted in the gas phase or as a vapor, wherein the promoter is added at from about 1 to about 30 grams per 100 grams of the sorbent material. |

        Defendants' proposed construction for this term raises a similar concern to that described above.  Again, Defendants do not seek to define any terms, they merely seek to insert new words into the claim in an even more transparent attempt to generate a non-infringement argument (new words highlighted in bold in Defendants' proposal: "injecting into a gas stream the particulate sorbent material at a sorbent material injection rate and injecting separately into **the gas stream**

26

the bromine containing promoter, **whereby neither injection occurs upstream of a furnace exit, and** whereby in-flight reaction produces the promoted brominated sorbent"). Here, Defendants propose that a new limitation be added to exclude embodiments where either sorbent *or bromine* is injected upstream of the combustion chamber. Because the '114 and '430 patents are continuations of the '147 patent, and for the same reasons described above, Defendants cannot demonstrate the requisite definition or disavowal necessary to justify this alteration of the claim language. *See, e.g., Thorner*, 669 F.3d at 1366–67.

Nothing in the claim language requires that the bromine promoter and sorbent material both be injected downstream of a furnace exit. Claim 1—the claim on which claim 17 depends— merely requires: reacting a sorbent with a bromine containing promoter, (b) reacting elemental mercury with the promoted brominated sorbent, and (c) separating particulates, including the mercury sorbent composition. None of these steps require injection of bromine or sorbent downstream of a furnace exit. Claim 17 requires injecting the particulate sorbent material and injecting separately the bromine containing promoter into "a gas stream." In no way does it require that all injection occur downstream of a furnace exit, it does not even mention a furnace exit.

The specification also supports Patent Owner's proposed construction. As with the '430 patent noted above, the '147 patent expressly discloses that sorbent *could be* injected upstream of a furnace exit. '147 patent at 20:10-13 ("the inventive sorbent can be injected where desired (e.g., before, after, or within the boiler)."). Similarly, the '147 patent discloses that the bromine could be injected upstream of the furnace exit. For example, in figure 2 of provisional application no. 60/605,640 (incorporated by reference into the '147 patent at 1:5-15), it provides the following:



FIG. 2

In the embodiment shown above, sorbent is injected downstream of the furnace exit, but the bromine additive is injected before, after, and/or into the furnace. Defendants' proposal would exclude the disclosed embodiments where additive is injected before or into the boiler, a result that is "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Accordingly, as with the term in dispute above, because Defendants cannot meet their burden for inserting a new limitation into the claims, no construction is necessary.

### 2.   Defendants' Answering Brief

This limitation is recited in claim 17 of the '147 patent. It provides, with emphasis on the operative text:

1. A method for separating mercury from a mercury containing gas comprising:
(a) promoting at least a portion of a particulate sorbent material comprising activated carbon by chemically reacting the sorbent material with a bromine containing promoter to form a promoted brominated sorbent, wherein the bromine containing promoter is in gaseous form, vapor form, or non-aqueous liquid form, and wherein the activated carbon contains graphene sheets having carbene species edge sites which react with the bromine containing promoter to form a carbocation

28

paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury;

(b) chemically reacting elemental mercury in the mercury containing gas with the promoted brominated sorbent to form a mercury/sorbent chemical composition; and

(c) separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent chemical composition.

17. A method according to claim 1, further comprising ***injecting the particulate sorbent material at a sorbent material injection rate and injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent***, wherein the promoter is reacted in the gas phase or as a vapor, wherein the promoter is added at from about 1 to about 30 grams per 100 grams of the sorbent material.

The parties have two disputes regarding asserted Claim 17 of the '147 patent and un-asserted Claim 1, from which Claim 17 depends.  Both disputes center around the required locations for injection—one with respect to location for injection of the sorbent and the other for the location for injection of the bromine-containing promoter.  ME2C proposes that no construction is necessary, and that the plain and ordinary meaning of the claim permits both injections to occur anywhere.  The Defendants, relying on the intrinsic record, seek the Court's clarification on the location of the injections.

As with their arguments on the '114 patent, ME2C seeks to dissuade the Court from even construing the claim by arguing that the Defendants' proposed constructions would create a defense to infringement if a power plant injects *some* sorbent or bromine upstream of the combustion chamber.  But this is a red herring to divert the Court from the language of the claim:  the injection location terms refer to injection of "***the*** . . . sorbent" and of  "***the*** . . . promoter" with the definite articles referring to antecedent descriptions of such sorbent and promoter.  The Defendants' proposed construction clarifies where the *claimed* sorbent must be injected and where the *claimed* bromine-containing-promoter must be injected in order to practice the claimed method.  The Defendants' construction is silent on whether additional sorbents or additives may be injected or introduced in other locations.

29

### a.       Injecting the Bromine-Containing Promoter Into a Gas Stream

The '147 patent is unique among the five asserted patents in that no asserted claim of the '147 patent claims the addition of a bromine compound to the coal.  Each of the other four patents, all of which issued more than 7 years after the '147 patent, expressly claims the addition of a bromine compound to the coal or into the combustion chamber.  ME2C's attempt to craft their later claims to capture the by-then widespread use of bromine-treated coals is exemplified below:[11]

- **'114 patent, claim 1**: "…wherein the coal comprises added [bromine compounds]…or the combustion chamber comprises added [bromine compounds]"

- **'225 patent, claim 1**: "combusting a mixture comprising coal, pyrolysis char, and an additive comprising [bromine compounds]"

- **'430 patent, claim 1**: "the coal comprising an additive comprising [bromine compounds]…or the combustion chamber comprises added [bromine compounds]"

- **'517 patent, claim 1**: "the coal comprising an additive comprising [bromine compounds]"

The asserted claims of the '147 patent are different, requiring "injecting" a bromine containing promoter into a "gas stream."  Although ME2C's stated position is "no construction necessary," it argues in its infringement contentions that "injecting" a bromine-containing promoter into a "gas stream" should be understood to include pre-treating coal with a bromine promoter.  Ex. 3 at 1, 2, and 13.  The intrinsic evidence, however, supports a narrower reading that limits where injection may occur.  Claim construction is needed to resolve the parties' disagreement about the meaning of the claim.

---

[11] *See* D.I. 345 [CERT Defendants Answer to TAC] ¶¶ 153-62 (alleging ME2C used confidential, third-party information to draft later-issuing patent claims in breach of a non-disclosure agreement).

The claim language requires that the injection be "into a gas stream"—language that ME2C largely ignores. And the patent's use of the term "gas stream" cabins the scope of the claim. In the patent, "gas stream" refers to gas streams in two places. One is the flue gas that begins at the furnace exit and courses through to the smokestack. Figure 3 of the patent depicts the gas stream in the flue (15). The other is the gas stream that is in one or more separate transport gas lines that are injected into the flue gas; Figure 3 discloses gas streams in the transport lines (i.e., 115 and 118). The '147 patent discloses injection of the bromine-containing precursors into the flue gas stream (elements 116 and 119, in yellow), and into transport line gas (element 121, in yellow), but nowhere else. Each of the gas streams—and each of the depicted injection points—is *after* the furnace exit (which would be prior to element 119 in his figure).



FIG. 3

'147 Patent, Figure 3 (annotated).  While the injection of the bromine-containing promoter at element 121 is the option that may "preferably" be used, it is directly tied to the "in-flight" promotion that is claimed in Claim 17 of the '147 patent:

> The halogen/halide may preferably be combined via line 121 directly into transport line 115, within which it contacts and reacts with the base activated carbon prior to injection point 116. This option is one form of what is referred to herein as "in-flight" preparation of a promoted carbon sorbent in accordance with the invention.

'147 Patent at 9:51-56; *see also id.* at 4:19-23.  ME2C does not propose any gas stream locations other than the flue gas line and the transport as lines described above and in the patent. The intrinsic record thus supports the Defendants' proposed construction.

ME2C's only cited support for their proposal that the plain and ordinary meaning of the claim terms would encompass pre-treatment of coal is a single diagram that is not part of the '147 patent disclosure.  ME2C's figure, which is Figure 2 from Provisional Application No. 60/605,640, is not incorporated into the specification.  And the figure does not even support the meaning the ME2C advocates.

First, incorporation of material by reference to a prior-filed application is limited to patents or *published* applications, and thus excludes provisional applications, which are not published.  37 C.F.R. § 1.57(d) (2015); *see also* 37 C.F.R. § 1.57(c) (2005).[12]

Second, to be incorporated, even a prior-filed published application must be identified with specificity: "To incorporate matter by reference, a host document must contain language 'clearly identifying the subject matter which is incorporated and where it is to be found'; a 'mere *reference* to another application, or patent, or publication is not an incorporation of anything therein . . . .'"

---

[12] The PTAB rejected ME2C's attempt at arguing that Figure 2 of the '640 provisional application and its accompanying description was incorporated by reference in the '147 patent. *NRG Energy, Inc. et al v. Midwest Energy Emissions Corp.*, PTAB-IPR2020-00928, Paper 17 at 21-24 (P.T.A.B. Dec. 2, 2020).

*Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (citation omitted).  Yet that's all that the '147 patent did:  making "mere reference" to the provisional application that it asserts was incorporated.[13]  *See* '147 patent at 1:5-15 (stating simply that the 60/605,640 application as a whole, along with two other applications, should be "incorporated by reference herein.").

Third, even if it were part of the intrinsic record, Figure 2 would not support ME2C's broad construction.  The figure shows "additive injection" with three arrows, but does not even suggest that the "additive injection" is into a gas stream, as the claim requires.  Nor could it.  The only arrow that corresponds to a gas stream disclosed by the patent is the rightmost arrow—the other two arrows, where the additive is injected before or into the boiler, do not depict dependent Claim 17's requirement of injection into a gas stream.  ME2C's citation to *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) is thus entirely inapposite: Figure 2 is not an embodiment incorporated into the disclosure of the '147 patent, and, even if it were, claim 17 need not cover every embodiment depicted there.

### b.     Injecting the Particulate Sorbent Into a Gas Stream

ME2C likewise argues that no construction is necessary for "injecting the particulate sorbent, which comprises activated carbon, into a gas stream," and that the plain and ordinary meaning permits the sorbent to be introduced anywhere in the system.

Once again, the meaning of the term requires resolution from the Court.  As an initial matter, for the reasons explained above, the term cannot encompass carbon that is formed from the combusting coal.  *See* Section V.A.2 above.

---

[13] *NRG Energy, Inc. v. Midwest Energy Emissions Corp.*, No. IPR2020-00928, Paper 17 at 30-32 (P.T.A.B. Dec. 2, 2020) (finding ME2C's generic incorporation by reference statement in the application that lead to the '147 patent "fail[ed] to identify with detailed particularity the specific material incorporated and fails to clearly indicate where that material is found in the various documents").

ME2C draws their broad scope from a single statement in the record:  "In general, however, the inventive sorbent can be injected where desired (e.g., before, after or within the boiler)."  '147 Patent, at 20:11-14.  This ***general*** statement, however, entirely ignores the dependent claim's explicit requirement that the sorbent be injected ***into a gas stream***.  Indeed, the patent contrasts that general statement with a specific example where the sorbent is injected into the flue gas—*i.e.*, a specific gas stream, as permitted by the claim.

The intrinsic record supports Defendants' proposed construction.  The only disclosure of locations where sorbent may be injected into a gas stream is into the flue gas directly, or a transport line that leads into the flue gas.  *See, e.g.*, '147 Patent at 4:5-23 (disclosing an embodiment where sorbent is injected into flue gas stream and a separate embodiment where sorbent is prepared in a transport line); Figure 3 at injection points 119, 116, 118 or 115 (highlighted above).  All of the disclosed locations for injection into a gas stream are after the furnace exit.  Defendants' proposed construction reflects the intrinsic record.

ME2C's proposed reading of the claim is neither plain nor ordinary because it would permit the addition of an activated carbon sorbent to the furnace to meet the required claim element (*i.e.*, before or during combustion), where it would be destroyed—it would hardly be "plain" or "ordinary" to presume the patent encompassed this practice.  Accordingly, the "general" statement that ME2C would read to mean that sorbents can be added "before, during, or after" combustion should be understood to be a general statement referring to all types of sorbents, including the non-combustible sorbents such as those identified in the '147 patent.  '147 Patent at 1:60-62.  Combustible sorbents, such as activated carbon should be injected after the furnace exit, as the Defendants propose, and this "generalization" does not state otherwise.

### 3.    ME2C's Reply Brief

Unable to demonstrate the requisite definition or disclaimer necessary to justify inserting

new limitations into this claim term, Defendants have now pivoted to arguing that the inventors defined the phrase "gas stream" to mean "gas stream downstream of the furnace exit (a.k.a. the 'flue')." However, the phrase "gas stream" uses ordinary English words that do not inherently refer to, or limit the "gas stream" to a gas downstream of the furnace, or the flue gas. Thus, Defendants must still identify intrinsic evidence that the inventors clearly and unmistakably re-defined this term. *See Sumitomo Dainippon Pharma. v. Emcure Pharma.*, 887 F.3d 1153, 1159 (Fed. Cir. 2018).

At most Defendants argue that the Court should re-define the phrase "gas stream," because all of the gas streams depicted in figure 3 of the patent are downstream of the flue. As a matter of law, this argument cannot justify Defendants' proposed construction. "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning. It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1366 (internal citations omitted). Indeed, even Defendants admit that figure 3 merely depicts "one form" of in-flight preparation that may "preferably" be used. *Supra* at 32-33 (quoting '147 patent at 9:51-56). Thus, this exemplary embodiment cannot provide clear and unmistakable evidence that the inventors intended to use this figure to re-define words.

Moreover, as explained in ME2C's opening brief, Defendants' proposal would exclude embodiments where sorbent or additive is used upstream of the combustion chamber. Defendants claim that no such embodiment is expressly described in the '147 specification, but that argument cannot justify Defendants' proposed construction. As the Federal Circuit has explained, "it is improper to read limitations from a preferred embodiment described in the specification—even if

it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Regardless, the inventors did describe such an embodiment in figure 2 of the provisional application.  Defendants encourage the Court to disregard this embodiment by arguing that the provisional application was not properly incorporated into the '147 patent.  This is incorrect (*see* 37 C.F.R. § 1.57(e)), and also irrelevant as the Court must also consider the prosecution history when construing claims.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (noting that prosecution history may provide "substantial guidance as to the meaning of particular claim terms").  Defendants' only substantive response to the inventors' provisional application disclosure is that their description of "additive injection" upstream of the flue must refer to "injection" into something other than a "gas stream" because a "gas stream" must be downstream of the flue.  But this argument is circular.  Simply put, the inventors used the ordinary English definition of the phrase gas stream, to refer to a stream of gas regardless of whether it is upstream or downstream of the flue.

Finally, Defendants argue that their proposal must be correct because it would exclude embodiments where activated carbon is added upstream of the combustion chamber.  According to Defendants, this approach would be inefficient because the activated carbon would combust and be less useful for capturing mercury.  This is a fact specific assertion about power plant best practices for which Defendants offer no evidence.  Moreover, Defendants cite no authority indicating that a Court may re-write an inventor's patent claim to cover only the most efficient embodiments of the invention.  Indeed, it is common and appropriate for inventors to seek

36

protection covering the full scope of their invention to prevent others from avoiding infringement merely by introducing inefficiencies into a product or process.

### 4.     Defendants' Sur-Reply Brief

The essential dispute between the parties concerning this claim term, which requires the Court's resolution, is the meaning of the requirement that the "bromine containing promoter" be "inject[ed] . . . into a gas stream."  ME2C contends that the term should be given its "plain and ordinary meaning," but refuses to specify what that meaning is, simply repeating the words of the claim, and doing nothing to resolve the issue that requires clarification.  In particular, ME2C refuses to articulate any position on the basic proposition that in requiring that the "injection" be "into a gas stream," the claim necessarily requires that the material to be injected must come from outside that gas stream.  It is not even clear whether ME2C agrees with this fundamental point and simply opposes having the Court give direction on it, or disagrees with the point, or wants to wait and see how the case develops and then decide what position it wants to take.  But that turns the claim construction process into gamesmanship, flouting the fundamental purpose of announcing the meaning of the claim so that the parties can focus their positions and arguments on infringement and invalidity.

Instead of agreeing to or even addressing this central point, ME2C insists that the Court "clarify" an entirely different point.  Specifically, ME2C asks the Court to "clarify that this limitation does not exclude injection of materials in addition to the bromine containing promoter."  But nothing in the claim language suggests that any such clarification is necessary, and none of the parties has ever suggested that the claim language forbids the additional injection of other materials.

ME2C advances this straw-person argument about bromine-containing promoters that are not covered by the claim, and ignores the requirements governing bromine-containing promoters

that are covered by the claim.  ME2C's objective is to create enough distraction about the claim's meaning to leave it room to take the position later in the case that a bromine compound mixed with coal and introduced into the furnace is "inject[ed] . . . into a gas stream."  Or, maybe ME2C will argue that the "plain and ordinary meaning" of "injection . . . into a gas stream" precludes such an interpretation.  It simply refuses to say.

Defendants' position has always been clear:  the claims of the '147 Patent are not directed to bromine-containing promoters that are introduced into the furnace with the coal.   Rather, bromine-treated coal is the subject of claims in the other patents-in-suit.  The claims of the '147 Patent only concern bromine-containing promoters that are "inject[ed] . . . into a gas stream," which requires that such promoters be injected from outside a gas stream.   ME2C's communications throughout the case make clear that there is a dispute on this point.  It requires clarification, and—based on the intrinsic record—should be clarified as Defendants request.

First, the putative invention taught and claimed in the '147 Patent is the preparation of certain bromine-promoted carbon sorbents from bromine-containing promoters and activated carbon sorbents.  Those bromine-promoted carbon sorbents, their preparation from bromine-containing promoters and activated carbon sorbents, and their use for the removal of mercury were all known in the industry prior to the "invention" at issue. *See, e.g.,* U.S. Patent No. 6,953,494 to Nelson Jr. (cited on the face of the '147 Patent).  The claimed invention is directed to a purportedly new method of preparing some of those known bromine-promoted sorbents—by separately injecting bromine-containing promoters and sorbents into a gas stream so that they react "in-flight." *See, e.g.,* '147 Patent. at 2:46-48 ("New methods for in-flight preparation, introduction and control of the active sorbent into the mercury contaminated gas stream are described.").  Accordingly, it is imperative that the jury understand what the patent teaches and claims regarding

the "new" preparation of the bromine-promoted sorbent from precursor and sorbent that are injected into a gas steam.

Second, other claims in the patent family make clear that the '147 Patent claims did not intend to capture bromine promoters that are introduced with the coal. *See* Answering Br. at 15. Had the applicants wanted to describe and claim the pretreatment of coal with bromine promoters, they would had done so as they did in the other asserted patents, instead of hiding that use in claim language requiring injection into a gas stream.

Third, ME2C repeatedly asserts that Defendants' discussion of the various diagrams that are actually in the '147 Patent is an attempt to limit the claim scope to those enumerated and illustrated embodiments. Not so. The discussion is to make clear how the patent uses the term "inject[] . . . into a gas stream," and that the patent's use of the term is inconsistent with any effort that ME2C may make in this litigation to apply the language to bromine-treated coal.

ME2C's reply does not rely on intrinsic evidence. Instead, it leans on a single figure that is not part of the intrinsic record. Not only is this reliance incorrect as a matter of law, but the figure that it spotlights would not even help if it were part of the record.

First, on the law, ME2C cites to 37 C.F.R. 1.57(e), but that section governs the use of "nonessential material." Here, ME2C asserts that the figure, which appears in a provisional application, provides a written description of the precursor and sorbent that sweeps in the use of bromine-treated coal. But if it is cited as written description, the figure is per se "essential material." As such its putative incorporation into the specification is governed by 37 C.F.R. 1.57(d). Section 1.57(d) only permits the incorporation of a U.S. patent or application publication; the Provisional Application is neither. Moreover, even if the Provisional Application were within the class of patents or publications that could be incorporated under this section, the incorporation

39

would still fail because the method of incorporation—an explicit reference to the material relied upon in the patent or application—is absent.

Second, ME2C suggests that even if it is not deemed an incorporated component of the specification, the figure is nevertheless part of the prosecution history.  Yet ME2C cites nothing in the prosecution history to support that assertion.

Finally, ME2C misconstrues Defendants' argument about the figure.  The figure shows precursor injection at various points, but ME2C fails to connect any of those embodiments to the actual disputed claim language requiring injection into a gas stream.

ME2C's reply conspicuously avoids any discussion of the location of "a gas stream" into which injection may occur.  This omission is unsurprising, because the '147 Patent only teaches about gas streams that are downstream of the combustion chamber, either in the flue or in transport lines connected to the flue.  Even if ME2C had tried to identify a hypothetical gas stream within or upstream from the combustion chamber, such a location would be inconsistent with the asserted claims—which require that both the bromine-containing precursor and the sorbent be added into the particular gas stream "whereby" their "in-flight reaction" takes place. *See* '147 Patent, Claim 17.

The Court should give the claim term "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," which is the construction proposed by Defendants.  *See Phillips*, 415 F.3d at 1312–13.  The Court should not allow ME2C, by simply reciting the "plain and ordinary meaning" mantra, to distort the requirement of "injection . . . into a gas stream" so that the promoter may be introduced anywhere in the system.  Defendants' proposed construction is the one that "stays true to the claim language and most naturally aligns

with the patent's description of the invention." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

   **C.   '225 Patent: "combusting a mixture comprising coal, pyrolysis char, and an additive comprising HBr, a bromide compound, or a combination thereof"**

   **1.   ME2C's Opening Brief**

| Claim Language | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Claims 1, 17: "combusting a mixture comprising coal, pyrolysis char, and an additive comprising HBr, a bromide compound, or a combination thereof" | No construction necessary | combusting a mixture comprising coal, pyrolysis char, and an additive comprising HBr, a bromide compound, or a combination thereof, **whereby each substance in the mixture is added to the combustor** |
| Claim 14: "combusting coal in a combustor comprising pyrolysis char and an additive comprising HBr, a bromide compound, or a combination thereof, to form the mercury-containing gas" | No construction necessary | combusting coal in a combustor **to which has been added** (i) pyrolysis char and (ii) an additive comprising HBr, a bromide compound, or a combination thereof, to form the mercury-containing gas |

| Representative Claim: '225 claim 17 |
|---|
| 1. A method for treating a mercury-containing gas, the method comprising: *combusting a mixture comprising coal, pyrolysis char, and an additive comprising HBr, a bromide compound, or a combination thereof*, to form the mercury-containing, gas; and adding a particulate sorbent material comprising activated carbon into the mercury-containing gas. |

   As with the terms described above, Defendants again seek to import new limitations regarding where sorbent and bromine must be added (new words highlighted in bold in Defendants' Proposal: "injecting into a gas stream the particulate sorbent material at a sorbent material injection rate and injecting separately into **the gas stream** the bromine containing promoter, **whereby neither injection occurs upstream of a furnace exit, and** whereby in-flight reaction produces the promoted brominated sorbent"). With respect to the patents discussed above,

Defendants sought to exclude embodiments where bromine or sorbent was added upstream of the combustor.  For this '225 patent, Defendants seek the opposite result, limiting the claims to requiring that bromine and pyrolysis char (a type of sorbent) must be added upstream of the combustion chamber.

Each of the '225 claims at issue recite combusting coal, a bromine additive, and pyrolysis char.  None of them include Defendants additional proposed limitation of "whereby each substance in the mixture is added to the combustor."  Thus, to prove infringement, ME2C need only show that the combustion step has been performed.  It need not present further evidence of material being added to the combustor, nor address potential joint infringement issues if the "adding" of material is performed by one entity but the combustion is performed by another.  Because the plain claim language does not include Defendants' proposed limitation no construction is necessary.

Moreover, the inventors were fully capable of including such language in a claim when desired.  For example, '225 claim 16, for which the parties have no claim construction disputes, requires "combusting coal in a combustor *and adding within the combustor a pyrolysis char*" (emphasis added).  Defendants have no basis for taking a limitation from claim 16 and inserting it into other claims as this would conflict with the doctrine of claim differentiation.  *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1329 (Fed. Cir. 2004).

Finally, as a POSITA would recognize, pyrolysis char is a form of carbon created by burning a carbon-based substance such as coal.  *See, e.g.,* Ex. 2, EPA Report at 13-31 ("Activated carbon (AC) is a specialized form of carbon produced by pyrolyzing coal"); Ex. 3, Shen at 3 ("When heated, the organic matter of coal is pyrolyzed, and then evolves as volatile. The remaining solid is a mixture of carbon and mineral matter, which is referred to as "char.")  In other words, a combustion chamber could "comprise" pyrolysis char as required by these claims, where the

pyrolysis char is produced from within the chamber as a result of the coal combustion process. Thus, Defendants' proposed narrowing of the claims would result in the exclusion of possible scenarios in a way inconsistent with a POSITA's understanding of how pyrolysis char can be created and be present in a combustor.

### 2.      Defendants' Answering Brief

Claims 1 and 17 of the '225 patent recite this limitation.  Claim 17, which ME2C asserts is representative, recites, with emphasis on operative text:

> 17. A method for treating a mercury-containing gas, the method comprising:
> ***combusting a mixture comprising coal, pyrolysis char, and an additive comprising HBr, a bromide compound, or a combination thereof***, to form the mercury-containing gas; and
> adding a sorbent material comprising activated carbon into the mercury-containing gas.

The parties' disputes concerning the meaning of this claim term centers around whether the asserted claims require combusting a mixture of coal, pyrolysis char, and a bromide compound,[14] as stated in the claim, or whether this claim element can be met by combusting a mixture of coal and a bromide compound that produces the pyrolysis char component.  ME2C again purports to argue for plain and ordinary meaning, but the "plain and ordinary meaning" that they advance ignores the plain fact that "a mixture comprising coal, pyrolysis[15] char, and an additive" must contain all three.

In their claim construction briefing and infringement contentions, ME2C asserts that pyrolysis char is created during the combustion of coal.  ME2C apparently intends for its

---

[14]      The term "bromine compound" here is shorthand for "an additive comprising HBr, a bromide compound, or a combination thereof."

[15] Defendants are not proposing to construe the word "pyrolysis," but offer the following definition as background: Pyrolysis is a process of chemically decomposing organic materials at elevated temperatures in the absence of oxygen. *See, e.g*., https://www.azocleantech.com/article.aspx?ArticleID=336.

construction of "combusting a mixture of coal, pyrolysis char, and a bromide compound" to encompass pyrolysis char that it asserts is created during the combustion of coal.  If the char ostensibly created from combusting coal meets that "char" limitation, then the limitation is meaningless as the claim would cover combusting a mixture of just coal and a bromide compound. An express claim limitation cannot be rendered superfluous in claim construction.  *See, e.g.*, *Gen. Am. Transp. Corp. v. Cryo–Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (rejecting district court's claim construction because it rendered superfluous claim requirement for openings adjacent to end walls).

Although hidden behind an assertion of "plain meaning," ME2C's position turns the claim language on its head by making the pyrolysis char the ***product*** of combustion rather than part of the mixture ***to be combusted***, as the claims state.  Unsurprisingly, there is no support in the specification for permitting the char that must be part of the mixture *to be combusted* to be created by combusting the coal with which it is to be mixed.

The intrinsic evidence supports the Defendants' construction.  There is no express discussion of using pyrolysis char in the combustion mixture in the specification of the '225 patent. During prosecution, the applicant cobbled together several statements to suggest written description for the claim element:

| Claim #, feature | Example of support |
|---|---|
| 45, combusting a mixture comprising coal, pyrolysis char, and a promoter, to form the mercury-containing gas | [0006] combusting coal to form the mercury-containing gas<br>[0119] the halogen/halide promoted sorbent can be added where desired, "e.g., before, after, or within the boiler."<br>[0049] the activated carbon can be pyrolysis char<br>[0073] and [0093] a promoted sorbent can include the promoter |

June 13, 2018 Remarks at 8.  The applicant relied on the statement in paragraph [0049] that the activated carbon sorbent could be pyrolysis char and the statement in paragraph [0119], that sorbents "in general" could be "***added*** where desired, 'e.g., before, after, or within the boiler." *Id.* (emphasis added).  Regardless of whether these cited statements are an adequate written description of the claim element, it is the only written description, and it supports the Defendants' construction: the pyrolysis char is to be ***added***.

As interpreted by ME2C, the claim term "combusting a mixture comprising coal, pyrolysis char, and a bromine compound" would be indefinite.  To ME2C, the claim element is met by combusting coal to which no char is added, and producing char in the combustion zone, where such char would completely or partially be combusted.  The specification offers no direction or teaching to a POSITA as to when and where the putative mixture of coal and char-produced-from-coal-during-combustion constitutes the claimed "mixture comprising coal [and] pyrolysis char" to be combusted, such that no one would ever know if or when putative infringement begins—or when the combustion of coal in a furnace, which necessarily produces char (in ME2C's position), does not at least fleetingly produce the "mixture comprising coal [and]  pyrolysis char" required by the claim.  Accordingly, claims including this term are indefinite.  *See Nautilus, Inc. v. Biosig Instruments*, 572 U.S. 898, 901 (2014) ("[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.").

ME2C's claim differentiation argument offers no support for its position.  Claim 1 requires combusting a mixture of coal, pyrolysis char, and a bromine compound.  ME2C suggests that the Defendants' proposed construction is commensurate in scope with Claim 1 because the additional element of Claim 16—that the char must be added—is already encompassed by the Defendants'

proposed construction of Claim 1.  But Claim 16 requires not just that the char and bromide compound be added, but that they be added "within the combustor."  As specified in the dependent claims, adding the char and bromide compounds "within the combustor" is an alternative to adding the char and bromide compounds "prior to the combustor."  *See, e.g.*, claims 3 and 4.  Claim 16 only claims one of those two locations, which both explicitly require *additions*.

ME2C's argument that the Defendants' construction introduces joint infringement issues is of no moment.  Indeed, it is axiomatic that a line is drawn between issues of claim construction and issues of infringement.  *See, e.g.*, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  In any event, that joint infringement issues may exist for patents directed to technology that utilizes at least two distinct steps (a Bromine Step and an Activated Carbon Step) is unsurprising.  *See, e.g.*, D.I. 110 [Report & Recommendation] at 3 (describing Bromine Step and Activated Carbon Step, to which ME2C did not object); *see also, e.g.*, '147 Patent at Cl. 17 (requiring "injecting [activated carbon]" and "injecting *separately* the bromine containing promoter").  And the Defendants' construction does not alter that result.

### 3.    ME2C's Reply Brief

For these terms, Defendants propose inserting a new limitation that the pyrolysis char must be "added" to the combustion chamber.  Again, Defendants must identify some clear and unmistakable statement of disclaimer to justify this assertion.  They have failed to do so.  At most, Defendants argue that the various examples in the specification all refer to sorbent being "added" somewhere in the process.  But as explained above, as a matter of law, this assertion cannot justify re-writing the claims.  *See, e.g., Phillips*, 415 F.3d at 1320 (describing "reading a limitation from the written description into the claims" as "one of the cardinal sins of patent law") (internal quotation marks omitted); *Thorner*, 669 F.3d at 1366 ("We do not read limitations from the specification into claims...").  Indeed, "[i]t is common, and often permissible, for particular claims

46

to pick out a subset of the full range of described features, omitting others." *Scriptpro, LLC v. Innovation Assocs., Inc.*, 762 F.3d 1355, 1359 (Fed. Cir. 2014).

Defendants also argue that their proposal is necessary to prevent the claims from being rendered indefinite.  However, they fail to cite any authority that this assertion would allow the Court to read limitations into the claims in a manner contrary to *Phillips* and *Thorner*.  Defendants are also wrong.  They do not dispute that a POSITA would recognize that combusted coal forms pyrolysis char that may also be combusted.  They merely argue that it would be difficult to determine whether a particular furnace produces pyrolysis char.  However, this is a factual assertion regarding the difficulty of determining infringement.  Defendants offer no evidence that this factual assertion is correct, nor do they show that it results in ambiguity as to the *scope* of the claim.  As the Federal Circuit has explained, "indefiniteness does not depend on the difficulty experienced by a particular person in comparing the claims with the prior art or the claims with allegedly infringing products or acts." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1373 (Fed. Cir. 2008) (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1354 (Fed. Cir. 2005)).

### 4.    Defendants' Sur-Reply Brief

ME2C argues that Defendants' proposed clarification that the '225 patent claims require addition of pyrolysis char is unnecessary, but ME2C's own wild interpretation of the claim language reveals the need for such clarification.  Again, ME2C's theories would expand the claimed method from one that requires employing a mixture comprising coal, char, and a bromine compound to one that only requires use of a mixture of coal and a bromine compound.  Plaintiffs have eliminated one required component of the mixture—char—citing no teaching in the patent or intrinsic record that permits the elimination of that component, and the concomitant expansion of the claim scope.

47

Defendants are not attempting to limit the claim to the disclosed embodiments.  Rather, the patent teaches that pyrolysis char is an additive to the system.  As Defendants explained in their opposition brief, the PTO was skeptical that there was written description support for the use of pyrolysis char in the combustion mixture, and the only support relied on by the applicant concerned the locations where the sorbent could be "added."  *See* Answering Br. at 21.  Just as ME2C would, in the context of the '147 Patent, argue that "injection . . . into" does not need to come from outside, so, too, it argues here that an additive need not be something that is added.  ME2C's "plain and ordinary" use of English is anything but.

### D. Alleged Indefinite Terms: "Halide Sorbent Enhancement Additive"/ "Sorbent Enhancement Additive" ('114 Patent Claims 19, 21, and 22; '517 Patent Claims 27 and 28; '430 Patent Claims 26 and 27)

#### 1. ME2C's Opening Brief

| Representative Claim: '430 claim 26 |
| --- |
| 1. A method of separating mercury from a mercury-containing gas, the method comprising: combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein<br>    the coal comprises an additive comprising Br2, HBr, a bromide compound, or a combination thereof, wherein the additive is added to the coal before the coal enters the combustion chamber, or<br>    the combustion chamber comprises an additive comprising Br2, HBr, a bromide compound, or a combination thereof or<br>    a combination thereof;<br>injecting a sorbent comprising activated carbon into the mercury-containing gas downstream of the combustion chamber;<br>contacting mercury in the mercury-containing gas with the sorbent; and<br>separating the sorbent contacted with the mercury from the mercury-containing gas.<br>26. The method of claim 1, wherein a *halide sorbent enhancement additive* comprises the added Br2, HBr, bromide compound, or combination thereof. |

Defendants allege that these terms, which appear in various dependent claims of the '114, '517, and '430 patents, render those claims indefinite.  Because the patents provide substantial descriptions of how halides can be used to enhance sorbents, Plaintiffs sought clarification as to Defendants' indefiniteness assertions.  Defendants merely referred Plaintiffs to their invalidity

contentions without providing any further explanation.  However, Defendants' contentions merely state:

> Despite being a claim limitation, 'halide sorbent enhancement additive' does not appear once in the specifications. The only mention of 'sorbent enhancement additive' does not meet definiteness, written description, or enablement requirements of 35 U.S.C. § 112, and consists only of the following: 'This invention provides for cost-effective removal of pollutants including mercury, using sorbent enhancement additives and/or highly reactive sorbents, with contact times of seconds (or less), and that may be regenerated and reused.' E.g., '517 Patent, at 2:42-46.

This meager statement provides no legal basis for finding the claims indefinite.  The mere fact that a claim phrase does not appear *in haec verba* in the specification has no bearing on the question of definiteness.  *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2017).  Moreover, this assertion ignores the numerous explanations throughout the intrinsic record as to how halogen and halide additives can be reacted with sorbents to produce an enhanced sorbent.  For example, the '430 patent states:

> The present invention provides a cost-effective way to capture pollutants **by utilizing exceptionally reactive halogen/halide-promoted sorbents** using a bromide (or other halogen/halide) treatment of the promoted sorbent, that capture mercury via mercury-sorbent surface reactions, at very short contact times of seconds or less. . . . **The reactivity of the promoted sorbent toward the pollutants (i.e., mercury) is greatly enhanced**.

'430 patent at 6:41-53 (emphasis added).  The patents further provide a chemical model to describe this sorbent enhancing property as shown below:

| | |
|---|---|
| Thus, an entirely new model is presented for the reactivity of the bromine-treated carbon with mercury. The reactive carbon form can preferably be generated by the addition of bromine, hydrogen bromide, or combinations of bromine and other elements, as described herein. Halogen treatment resulted in higher-activity carbons because the halide anions (especially bromide and iodide) were effective in promoting oxidation by stabilizing the developing positive charge on the | |

mercury in the transition state for oxidation. Based on this model, several innovative, inexpensive, activity-enhancing features have been developed.  ('430 patent at 12:22-33)

FIG. 2

Moreover, the patents provide examples of sorbents ("powdered activated carbon, granular activated carbon, carbon black, carbon fiber, aerogel carbon, pyrolysis char,") and additives ("molecular halogens, Group V (CAS nomenclature is used throughout) halides, Group VI halides, hydrohalides, and combinations thereof") that can be used with the invention.  '430 patent at 3:1-12.

Accordingly, a POSITA would have no difficulty in understanding that a halide sorbent enhancement additive is one of the class of halides identified by the inventors as enhancing a sorbent's ability to capture mercury.   Even if there were some doubt as to the meaning of these terms—and there is not—the general explanation and examples provided in the specifications preclude a finding of indefiniteness.  Because the patents provide reasonable certainty as to the meaning of these terms, and because Defendants' stated basis for finding the terms indefinite is legally defective, Plaintiffs respectfully request that the Court rule that Defendants have failed to meet their burden and find that no construction is necessary for these terms.

## 2. Defendants' Answering Brief

Claims 19, 21, and 22 of the '114 patent, claims 27 and 28 of the '517 patent, and claims 26 and 27 of the '430 patent recite this limitation, and are indefinite.  Claim 26 of the '430 patent,

which ME2C asserts is representative, depends from claim 1 and recites, with emphasis on the

operative text:

> 1. A method of separating mercury from a mercury-containing gas, the method comprising:
> combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein
>> the coal comprises an additive comprising $Br_2$, HBr, a bromide compound, or a combination thereof, wherein the additive is added to the coal before the coal enters the combustion chamber, or
>> the combustion chamber comprises an additive comprising $Br_2$, HBr, a bromide compound, or a combination thereof or
>> a combination thereof;
> injecting a sorbent comprising activated carbon into the mercury-containing gas downstream of the combustion chamber;
> contacting mercury in the mercury-containing gas with the sorbent; and
> separating the sorbent contacted with the mercury from the mercury-containing gas.
> 26. The method of claim 1, wherein ***a halide sorbent enhancement additive*** comprises the added $Br_2$, HBr, bromide compound, or combination thereof.

Claim 26 is indefinite for failing to apprise a POSITA of the emphasized term with

reasonable certainty.  *See Nautilus, Inc.*, 572 U.S. at 901 (holding that a  "patent is invalid for

indefiniteness if its claims, read in light of the specification delineating the patent, and the

prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope

of the invention"); *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 904 (Fed. Cir. 2020) ("When a

term 'has no ordinary and customary meaning,' it is a 'coined term,' raising the question of 'whether

the intrinsic evidence provides objective boundaries to the scope of the term.'" (citation omitted))

### a.   The Scope Of "Halide Sorbent Enhancement Additive" And "Sorbent Enhancement Additive" Is Undefined

A POSITA, having read claim 26, in view of the written description and file history, would

not know the full scope of "halide sorbent enhancement additive."

Claim 26 recites "***a*** halide sorbent enhancement additive," which indicates—by the article

"a"—that it does not reference any element in claim 1.  Yet, claim 26 further recites that said

"halide sorbent enhancement additive" comprises "***the*** $Br_2$, HBr, a bromide compound, or a

51

combination thereof" of claim 1.  So, on the one hand, claim 26 introduces a new element—a halide sorbent enhancement additive—that is distinct from the elements of claim 1, and on the other, requires it to comprise the "Br$_2$, HBr, a bromide compound, or a combination thereof" of claim 1.  These two claim features cannot be reconciled.  A POSITA would not be able to ascertain the scope of the "halide sorbent enhancement additive."  If the "halide sorbent enhancement additive" merely included the bromine-limitations of claim 1, then claim 26 would be invalid for failing to further limit claim 1.  *See* pre-AIA 35 U.S.C. § 112, 4th paragraph ("[A] claim in dependent form shall . . . specify a further limitation of the subject matter claimed.").  But if its scope is different, which it presumably is under the principle of claim differentiation, then its boundaries are unknown.  *See In re Walter*, 698 F. App'x 1022, 1027 (Fed. Cir. 2017) ("[T]he term's ill-defined boundaries coupled with the patentee's erratic use of the term fails to inform skilled artisans about the scope of the invention with reasonable certainty . . . ."); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." (citation omitted)).

This is true at least because the intrinsic record offers no insight into what a "halide sorbent enhancement additive" means.  Indeed, "halide sorbent enhancement additive" is not a term of art and it is not defined or even used a single time in the specification.  And while "sorbent enhancement additive" does appear once in the specification, it fails to inform a POSITA of its scope when claimed.  Likewise, the only recitation of "sorbent enhancement additive"[16] in the specification states generally that the purported invention is directed to removing pollutants like

---

[16] Recited in claims 21, and 22 of the '114 patent, claim 28 of the '517 patent, and claim 27 of the '430 patent.

mercury "using sorbent enhancement additives and or highly reactive sorbents, with contact times of seconds (or less), and that may be regenerated and reused."   '430 Patent at 2:35-40.   In its opening brief, ME2C cites to excerpts from the specification explaining that additives may include Group V and Group VI halides (Opening Br. 16), but those Groups are broader than what is claimed.  This falls well short of explaining with reasonable certainty to a skilled artisan what a "sorbent enhancement additive" includes or omits.  *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) (finding claim that required an archive exhibit "minimal redundancy" indefinite because the "specification contains no point of comparison for skilled artisans to determine an objective boundary of 'minimal'").

ME2C cites to the specification of the '430 patent to provide an explanation of the limitations at issue (Opening Br. at 16), but that passage refers to halogen/halide promoted sorbents, which are not recited in the operative claims.  That halide and/or halogens enhance the reactivity of carbon sorbents with mercury does not explain the recitation in the claims at issue sufficiently to render them definite.  And, further, ME2C's reliance on *Presidio Components, Inc. v. American Technical Ceramics Corp.*, 875 F.3d 1369 (Fed. Cir. 2017), is misplaced.  Opening Br. at 15.  In that case, the Federal Circuit held that while definiteness does not require an explicit recitation of claim language in the specification, the claims-at-issue were not indefinite because the claimed method *was* referenced in the specification.  *See Presidio Components*, 875 F.3d at 1376-77.  On the other hand, here, "halide sorbent enhancement additive" is neither defined nor referenced in the specification.

### b.    It Is Unclear How The "Halide Sorbent Enhancement Additive" Differs From The Claimed Bromine Or Bromide Compound

Regarding the '114 patent, to the extent ME2C argues that claim 19 merely selects coal as the location to add the "$Br_2$, HBr, $Br^-$, or a combination thereof" of independent claim 1, this too

53

is unclear because "halide sorbent enhancement additive" is not recited in claim 1. And in that way, the "halide sorbent enhancement additive" does not further limit claim 1's "Br$_2$, HBr, Br$^-$, or a combination thereof." Indeed, a hallmark of construction is that different words in different claims are presumed to have different meanings. *See Comark*, 156 F.3d at 1187; *cf. Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("[T]he usage of [the] term in one claim can often illuminate the meaning of the same term in other claims."). Here, the "halide sorbent enhancement additive" differs from the "Br$_2$, HBr, Br$^-$, or a combination thereof" of claim 1, but is not a term of art or defined by the specification. Thus, its scope is unclear to a POSITA.

### c.   "Sorbent Enhancement Additive" Is Indefinite At Least Because It Is ME2C's Registered Trademark

While not *per se* indefinite, use of a trademark in a claim risks indefiniteness when used to identify or describe a particular material or product. *See* MPEP § 2173.05(u) (9th ed. June 2020); *Ex parte Simpson*, 218 U.S.P.Q. 1020, 1021-22 (B.P.A.I. 1982) (finding claim indefinite because it included trademarked brand of synthetic resin as a limitation—Hypalon). Courts reason that because "a trademark identifies the source of a product rather than a product itself , the use of a trademark in a patent may render a claim indefinite." *PolyVision Corp. v. Smart Techs. Inc.*, 501 F. Supp. 2d 1042, 1063 (W.D. Mich. 2007) (citation omitted).

Here, ME2C registered "SEA" (*i.e.*, sorbent enhancement additive) as a trademark. Ex. 5 [https://www.me2cenvironmental.com/emissions-technologies]. To the extent "sorbent enhancement additive" as claimed identifies a particular material or product—ME2C's registered mark—it is indefinite for failing to reasonably apprise those skilled in the art of its scope. *See Simpson*, 218 U.S.P.Q. at 1021-22.

### 3.   ME2C's Reply Brief

As explained in ME2C's opening brief, a halide sorbent enhancement additive is one of

the class of halides identified by the inventors as enhancing a sorbent's ability to capture mercury. For example, independent claim 1 requires, "an additive comprising Br2, HBr, a bromide compound, or a combination thereof."  Dependent claim 26 further clarifies that this additive must be a sorbent enhancement additive.  For example, Calcium Bromide is an example of a bromide compound that can act as a sorbent enhancement additive.  Because calcium bromide "comprises" a bromide compound, it meets this claim language.

According to Defendants, this interpretation of the claim language is improper because there would be no difference in claim scope between the independent and dependent claims.  In other words, Defendants argue that any bromide compound will inherently act as a sorbent enhancement additive such that there is no difference in claim scope with respect to those two terms.  However, this argument rests on the factual assertion that all possible bromide compounds as used in any possible configuration, must necessarily enhance sorbent.  Defendants fail to offer any evidentiary support for that assertion.  Even if Defendants had offered evidence to prove that assertion, at most, this would demonstrate that the phrase "sorbent enhancement additive" is superfluous.  But the general principle that claims should be construed to avoid redundancy or superfluous language is merely a guideline for claim construction; it is no reason to invalidate a claim. *See, e.g., Conformis, Inc. v. Medacta USA, Inc.*, No. CV 19-1528-RGA, 2021 WL 827672, at *5 (D. Del. Mar. 4, 2021)(citing *Eli Lilly & Co. v. Teva Parenteral Meds.*, 845 F.3d 1357, 1371-72 (Fed. Cir. 2017) (explaining that whether a claim term is "superfluous" is "ultimately a non-issue because redundancy does not necessarily make a claim indefinite"); *In re Koninklijke Philips Pat. Litig.*, No. 18-CV-01885-HSG, 2020 WL 7392868, at *17 (N.D. Cal. Apr. 13, 2020) (rejecting indefiniteness argument and noting "the Court has found no cases where superfluity was found to make claims indefinite").

### 4.   Defendants' Sur-Reply Brief

Defendants raised the issue of the lack of claim differentiation in order to highlight the indefiniteness of the claims.  In its Reply, ME2C appears to concede that certain independent and dependent claims are co-extensive.  *See* Reply Br. at 6.  But "[a]llowing a patentee to argue that . . . characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous[.]" *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006); *see Abbott Labs. v. Sandoz, Inc.*, 529 F. Supp. 2d 893, 907 (N.D. Ill. 2007) ("[A] dependent claim must contain a further limitation than the independent claim from which it depends[,] . . . disregarding the [claim differentiation doctrine] here would render the dependent claims invalid.").  In the face of such ambiguity it cannot be said that claims are sufficiently definite.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

The cases ME2C cites for the proposition that avoiding superfluity is a mere "guideline for claim construction" are distinguishable.  In those cases, courts found that superfluity was evident from the intrinsic record.  *See Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1372 (Fed. Cir. 2017) ("Here, the redundancy is supported by the prosecution history. . . ."); *Conformis, Inc. v. Medacta USA, Inc.*, No. CV 19-1528-RGA, 2021 WL 827672, at *5 (D. Del. Mar. 4, 2021) (accepting the construction "consistent with the intrinsic evidence"); *In re Koninklijke Philips Patent Litig.*, No. 18-CV-01885-HSG, 2020 WL 7392868, at *16-17 (N.D. Cal. Apr. 13, 2020) (citing prosecution history and disclosures in the specification to support construction).  ME2C has cited nothing in the intrinsic record here to support a similar conclusion—i.e, ME2C cites nothing in the intrinsic record to support a finding that the element was intended to be superfluous.

Furthermore, ME2C's claim that factual evidence forecloses Defendants' argument has it backwards.  Defendants carried their burden by demonstrating how, in reviewing the intrinsic evidence, a POSITA would not be reasonably certain of the claim scope.  *See* Answering Br. at

56

25-26.  Plaintiffs have not set forth any evidence to rebut these arguments.  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007) (stating that a "patentee would be well advised to introduce evidence sufficient to rebut" a challenge to invalidity (internal quotation marks and citation omitted); *see also Fla. Atl. Univ. Rsch. Corp. v. Acer, Inc.*, No. 12-80694-CIV, 2014 WL 2960968, at *1 (S.D. Fla. Jun. 30, 2014) (finding patent owner failed to rebut evidence on indefiniteness).

Likewise, Defendants do not argue, as ME2C suggests, that "all possible bromide compounds as used in any possible configuration, must necessarily enhance sorbent."  *See* Reply Br. at 6.  Rather, ME2C's argument in this regard simply underscores that its claims are indefinite, as it raises the prospect that "sorbent enhancement additive" may mean something other than "Br2, HBr, a bromide compound, or a combination thereof."  But a POSITA has no way of knowing what exactly does or does not make a particular bromide compound a sorbent enhancement additive, and ME2C does not point to anything showing how this line can be drawn.

Finally, Defendants note that ME2C did not respond to the argument that ME2C registering "SEA" as a trademark also renders it indefinite.  *See* Answering Br. at 27.  ME2C's failure to respond and correct the impression that the claim limitation identifies its trademarked product only strengthens Defendants' indefiniteness argument.  *See PolyVision Corp. v. Smart Techs. Inc.*, 501 F. Supp. 2d 1042, 1063 (W.D. Mich. 2007)

DATED: March 28, 2022

Respectfully submitted,

*/s/ James M. Lennon*
James M. Lennon (No. 4570)
**DEVLIN LAW FIRM LLC**
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
jlennon@devlinlawfirm.com

**CALDWELL CASSADY CURRY PC**
2121 N. Pearl St., Suite 1200
Dallas, Texas 75201
Phone: (214) 888-4848
(214) 888-4849 (fax)
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
jnemunaitis@caldwellcc.com

Bradley W. Caldwell
Texas Bar No. 24040630
Jason D. Cassady
Texas Bar No. 24045625
John Austin Curry
Texas Bar No. 24059636
Justin T. Nemunaitis
Texas Bar No. 24065815

*Attorneys for Plaintiffs*
*Midwest Energy Emissions Corp.*
*and MES Inc.*

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

*/s/ Brian P. Egan*
Jack B. Blumenfeld (ID No. 1014)
Brian P. Egan (ID No. 6227)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

OF COUNSEL:

**GIBSON, DUNN & CRUTCHER LLP**

Richard W. Mark
Joseph Evall
Paul J. Kremer

*/s/ Jessica R. Kunz*
Robert S. Saunders (ID No. 3027)
Nicole A. DiSalvo (ID No. 4662)
Jessica R. Kunz (ID No. 5698)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Tel.: (302) 651-3000
Fax: (302) 651-3001
rob.saunders@skadden.com
nicole.disalvo@skadden.com
jessica.kunz@skadden.com

OF COUNSEL:

Douglas R. Nemec
Leslie A. Demers
One Manhattan West
New York, New York 10001-8602

200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
rmark@gibsondunn.com
jevall@gibsondunn.com
pkremer@gibsondunn.com

*Attorneys for Defendants*
*AJG Iowa Refined Coal LLC,*
*Arbor Fuels Company, LLC,*
*Belle River Fuels Company, LLC,*
*Brandon Shores Coaltech LLC,*
*Erie Fuels Company, LLC*
*George Neal North Refined Coal, LLC*
*George Neal Refined Coal, LLC*
*Huron Fuels Company, LLC*
*Joppa Refined Coal LLC*
*Louisa Refined Coal, LLC*
*Portage Fuels Company, LLC*
*Superior Fuels Company 1, LLC*
*Thomas Hill Refined Coal LLC*
*Wagner Coaltech LLC*
*Walter Scott Refined Coal LLC*

Tel.: (212) 735-3000
Fax: (212) 735-2000
douglas.nemec@skadden.com
leslie.demers@skadden.com

*Attorneys for Defendants*
*Alistar Enterprises, LLC,*
*CERT Operations RCB LLC,*
*CERT Operations IV LLC,*
*CERT Operations V LLC,*
*Rutledge Products, LLC, and*
*Senescence Energy Products, LLC,*
*Spring Hill Resources LLC; Buffington*
*Partners LLC; Bascobert (A) Holdings LLC;*
*Larkwood Energy LLC; and Cottbus*
*Associates LLC*