# EXHIBIT F

# REFINED COAL SUPPLY AGREEMENT

by and between

## BELLE RIVER FUELS COMPANY, LLC

and

## THE DETROIT EDISON COMPANY

December 4, 2009

MPSC Case U-16434-R
Exhibit A-30, Source: U-16434-R
Page 2 of 873

## TABLE OF CONTENTS

                                                                                          **Page**

ARTICLE I DEFINITIONS .........................................................................................1
    Section 1.1.    Definitions. .........................................................................1
    Section 1.2.    Construction of Certain Terms and Phrases.........................8

ARTICLE II REPRESENTATIONS AND WARRANTIES ..........................................9
    Section 2.1.    Representations and Warranties of Buyer.........................9
    Section 2.2.    Representations and Warranties of Seller. ......................10

ARTICLE III TERM.................................................................................................10
    Section 3.1.    Term. ...............................................................................10

ARTICLE IV AUTHORIZED REPRESENTATIVES ...............................................11
    Section 4.1.    Authorized Representatives. ..........................................11

ARTICLE V PRODUCTION AND SALE OF REFINED COAL ...............................11
    Section 5.1.    Production and Sale. .......................................................11
    Section 5.2.    Sales to Third Parties. ....................................................12
    Section 5.3.    Annual Forecasts; Adjustments.....................................13
    Section 5.4.    Purchase by Buyer at Termination..................................13
    Section 5.5.    Consistent Reporting. .....................................................13

ARTICLE VI PURCHASE AND SALES OF SELLER COAL ...................................13
    Section 6.1.    Coal Purchase Contracts. ...............................................13
    Section 6.2.    Available Seller Coal. ....................................................14
    Section 6.3.    Purchase by Buyer at Termination. ................................14

ARTICLE VII DELIVERIES; WEIGHTS; TITLE AND RISK OF LOSS .................15
    Section 7.1.    Deliveries. ......................................................................15
    Section 7.2.    Weights. .........................................................................15
    Section 7.3.    Feedstock Inventory Store Reconciliation. ....................16
    Section 7.4.    Measurement Methodology. ...........................................17
    Section 7.5.    Title and Risk of Loss.....................................................17

ARTICLE VIII REFINED COAL AND RESOLD COAL SPECIFICATIONS ...........17
    Section 8.1.    Coal Specifications. ........................................................17
    Section 8.2.    Refined Coal Production Specifications and Use. ...................18
    Section 8.3.    Chemical Additives. .......................................................18
    Section 8.4.    Presumption Regarding Conforming Coal and Refined Coal..................19
    Section 8.5.    Warranty Disclaimer. .....................................................19

ARTICLE IX PRICE; BILLING AND PAYMENT ..................................................20
    Section 9.1.    Refined Coal Price. ........................................................20
    Section 9.2.    Resold Coal Price............................................................20
    Section 9.3.    Coal Consultant Fee Reimbursement..............................20

i

Case 1:19-cv-01334-CJB   Document 400-6  17 Filed 05/03/22   Page 4 of 63 PageID #: 7756
MPSC Case No. U-16434-R
MPSC Case No. U-17070 Source data 16434-R
Exhibit MES9-2-R, Source: Exhibit A-30, U-16434-R
Page 3 of 873 of 291 of 873

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  3 of 806

Section 9.4.   O&M and Capital Cost Reimbursement. .................................................20
Section 9.5.   Invoicing and Payment. .................................................................21
Section 9.6.   Business Days. ...........................................................................23
Section 9.7.   Audit. ...................................................................................23
Section 9.8.   Taxes and Other Liabilities. ...........................................................23

ARTICLE X FORCE MAJEURE .............................................................................23
Section 10.1.   Force Majeure. ..........................................................................23

ARTICLE XI EARLY TERMINATION ........................................................................24
Section 11.1.   Early Termination. ......................................................................24
Section 11.2.   Post-Termination Obligations; Survival. ................................................25

ARTICLE XII EVENTS OF DEFAULT AND REMEDIES .........................................................25
Section 12.1.   Event of Default. .......................................................................25
Section 12.2.   Remedies. ...............................................................................26
Section 12.3.   Limitations of Seller Liability. .......................................................27

ARTICLE XIII DISPUTE RESOLUTION .....................................................................27
Section 13.1.   Dispute Resolution. .....................................................................27

ARTICLE XIV MISCELLANEOUS ...........................................................................28
Section 14.1.   Terms and Conditions of Sale. ..........................................................28
Section 14.2.   Confidentiality. ........................................................................28
Section 14.3.   Required Disclosure. ....................................................................29
Section 14.4.   Compliance with Laws and Governmental Approvals. .......................................29
Section 14.5.   Entire Agreement; Successors and Assigns. ...............................................30
Section 14.6.   Notices. ................................................................................30
Section 14.7.   Assignment. .............................................................................31
Section 14.8.   Waiver; Invalidity. .....................................................................31
Section 14.9.   Limitations of Liability and Exclusive Remedies. .......................................31
Section 14.10.   Headings. ..............................................................................32
Section 14.11.   Counterparts. ..........................................................................32
Section 14.12.   Applicable Law. ........................................................................32
Section 14.13.   Amendment. .............................................................................32
Section 14.14.   No Third Party Beneficiary. ............................................................33

MPSC Case No. U-17087 Sur-rebuttal
MPSC Case No. U-17087 Sur-rebuttal
Exhibit U-16434-R, Source: Exhibit A-30, U-16434-R
Page 892 of 873

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  4 of 806

## EXHIBITS

EXHIBIT A       Belle River Site
EXHIBIT B       Delivery Points
EXHIBIT C       Calculation of Detroit Edison Benefits
EXHIBIT D       Calculation of MPPA Benefits
EXHIBIT E       Operating Protocols

## SCHEDULES

SCHEDULE 1.1(a)   Buyer Knowledge
SCHEDULE 1.1(b)   Seller Knowledge
SCHEDULE 2.1      Required Consents and Approvals

Case 1:19-cv-01334-CJB    Document 406-6  Filed 05/03/22    Page 6 of 63 PageID #: 7758

MPSC Case No. U-17097 Sur-rebuttal
MPSC Case No. U-17097 Sur-rebuttal
Exhibit MESB-28, Schedule 1 Exhibit A-30, U-16434-R
Page 8 of 873
Page 293 of 873

## REFINED COAL SUPPLY AGREEMENT

THIS REFINED COAL SUPPLY AGREEMENT (this "Agreement"), is made and entered into as of December 4, 2009, (the "Effective Date"), by and between BELLE RIVER FUELS COMPANY, LLC, a Delaware limited liability company ("Seller"), and THE DETROIT EDISON COMPANY, a Michigan corporation ("Buyer") (Seller and Buyer each a "Party," and collectively, the "Parties").

### RECITALS:

WHEREAS, Seller desires to provide refined coal produced at the Facility for use in Buyer's Belle River Power Plant; and

WHEREAS, Buyer desires to purchase all of the feedstock requirements for the Belle River Power Plant in the form of Refined Coal output of the Facility, and otherwise in the form of Resold Coal, as provided herein.

NOW, THEREFORE, in consideration of the mutual covenants, set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1.    Definitions.

The following terms, when used in this Agreement, have the following meanings:

"Acceptance Period Coal Inventory Purchase Agreement" means the Acceptance Period Coal Inventory Purchase Agreement, to be entered into on or about the Commercial Operations Date, by and between Detroit Edison and BR Fuels.

"Affiliate" of a specified Person means any Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, such specified Person.  As used in this definition of Affiliate, the term "control" of a specified Person including, with correlative meanings, the terms, "controlled by" and "under common control with," means (a) the ownership, directly or indirectly, of 50 percent or more of the equity interest in a Person or (b) the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise; provided, however, that notwithstanding the foregoing, for purposes of this Agreement, members of BR Fuels will be deemed to be an Affiliate of Seller, but, in no event will either Party be deemed to be an Affiliate of the other Party.

"Agreement" has the meaning given to such term in the introductory paragraph hereof.

"Authorized Representative" means the individual or individuals designated as such by each Party pursuant to Section 4.1.

MPSC Case No. U-17087 Surrebuttal
MPSC Case No. U-17087 Surrebuttal
Exhibit MEC-23-R, Schedule E-207
Exhibit A-30, U-16434-R
Page 7 of 873
Page 694 of 873

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 6 of 806

"Available Seller Coal" shall mean an amount of Conforming Coal that is in the Feedstock Inventory Store or in transit (or has been identified for delivery under a Coal Purchase Contract but is not yet in transit), in either case, as to which Seller has determined that is not needed as Feedstock.

"Back-Up Coal Purchase Contract" has the meaning given to such term in Section 6.1(b).

"Belle River Power Plant" means the two fossil fuel-fired steam electric generating units known as Belle River Unit No. 1 and Belle River Unit No. 2, each with a nominal rating of 650 megawatts, together with related facilities, located at the Belle River Site.

"Belle River Site" means that certain property located in St. Clair County, Michigan, on which the Belle River Power Plant is located, more particularly described on Exhibit A.

"BR Fuels" means Belle River Fuels Company, LLC, a Delaware limited liability company.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Michigan are authorized by law or governmental action to close.

"Buyer" has the meaning given such term in the introductory paragraph hereof.

"Buyer Annual Forecast" has the meaning given to such term in Section 5.3.

"Coal Consultant" has the meaning given to such term in the Coal Handling and Consulting Agreement.

"Coal Handling and Consulting Agreement" means the Coal Handling and Consulting Agreement, to be entered into on or about the Commercial Operations Date, by and between Detroit Edison and BR Fuels.

"Coal Consultant Fee" means the Coal Fee and the Coal Consultant Reimbursable Costs as defined in the Coal Handling and Consulting Agreement.

"Coal Inventory Price" means, for any given period, the per Ton amount derived by dividing (i) the sum of (A) the book value of the Seller Coal inventory at the beginning of the period (less the "Inventory Coal Purchase Price," as defined in the MPPA Coal Inventory Purchase Agreement), plus (B) the total quality adjusted cost of all Seller Coal purchased during such period (reflecting all quality and other allowances, adjustments and assessments under the applicable Coal Purchase Contract, all related Third Party Impositions that are imposed on Seller in this Agreement and transportation costs, and all other charges and costs relating to such period and charged to Seller Coal inventory in accordance with Seller's customary inventory accounting procedures consistently applied), by (ii) the sum of (A) the volume in Tons of Seller Coal inventory on hand at the beginning of the period, plus (B) the volume in Tons of Seller Coal inventory purchased during such period.

2

"Coal Inventory Purchase Agreement" means the Coal Inventory Purchase Agreement, to be entered into on or about the Commercial Operations Date, by and between Detroit Edison and BR Fuels.

"Coal Purchase Contract" has the meaning given to such term in Section 6.1(a).

"Coal Specifications" means coal type, other specifications and price parameters for the coal that Seller is to use as Feedstock in the production of Refined Coal for sale to Buyer hereunder and that Seller is to sell to Buyer and to other parties to the extent so directed by Buyer as Resold Coal hereunder, as provided in Section 8.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Coal Inventory Purchase Agreements" means, collectively, the Detroit Edison Coal Inventory Purchase Agreements and the MPPA Coal Inventory Purchase Agreement.

"Commercial Operations Date" has the meaning given to such term in the License Agreement.

"Conforming Coal" means Seller Coal that meets the Coal Specifications in effect at the time that the Coal Purchase Contract relating to such Seller Coal was entered into, and shall include, without limitation, Seller Coal presumed to be Conforming Coal pursuant to Section 8.4 hereof and/or pursuant to the Collective Coal Inventory Purchase Agreements.

"Contract" means any agreement, lease, license, evidence of indebtedness, indenture, or other contract (including any design, construction, equipment or other warranty or guarantee under any of the foregoing).

"Contract Year" means each calendar year during the Term of this Agreement, provided that:  (a) the initial Contract Year shall commence on the Commercial Operations Date and shall end on December 31 of that year; and (b) the final Contract Year shall end on the date of termination or expiration of this Agreement and shall commence on the immediately preceding January 1.

"Delivery Point for Feedstock" means the point at transfer gate no. 03zm053 on feed conveyor CV 23 and at transfer gate no. 03zm054 on feed conveyor CV 24, designated as "Delivery Point for Feedstock" on Exhibit B hereto.

"Delivery Point for Resold Coal" means:  (a) for Resold Coal that is in transit or that has been identified for delivery under a Coal Purchase Contract but is not yet in transit, the Point of Origin; and (b) for all other Resold Coal, the point at transfer gate no. 03zm053 on feed conveyor CV 23 and at transfer gate no. 03zm054 on feed conveyor CV 24, designated as "Delivery Point for Resold Coal" on Exhibit B hereto.

"Delivery Point for Refined Coal" means the point at which Refined Coal is discharged from the product conveyor extending from the discharge point of the Facility onto product

3

conveyors CV 19 and CV 20, designated as "Delivery Point for Refined Coal" on Exhibit B hereto.

"Detroit Edison" means The Detroit Edison Company, a Michigan corporation.

"Detroit Edison Benefits" means the amount equal to the sum of (i) the Detroit Edison FlyAsh Benefit, plus (ii) the Detroit Edison Mercury Benefit, plus (iii) the Detroit Edison $SO_2$ Benefit.

"Detroit Edison Coal Inventory Purchase Agreements" means (i) the Acceptance Period Coal Inventory Purchase Agreement, and (ii) the Coal Inventory Purchase Agreement.

"Detroit Edison Fly Ash Benefit" means the change in sales revenues and/or disposal expenses for the fly ash produced at the Belle River Power Plant while using Refined Coal as a fuel calculated in accordance with the formulas set forth in Exhibit C.

"Detroit Edison Mercury Benefit" means the benefits achieved as a result of reduced mercury emissions from the Belle River Power Plant while using Refined Coal as a fuel calculated in accordance with the formulas set forth in Exhibit C.

"Detroit Edison PA2 Expense Increase" means the increase in Detroit Edison's cost of purchasing power under PA2 power purchase agreements or any power purchase agreement entered into under the Public Utility Regulatory Policies Act of 1978, if any, that is due to Detroit Edison paying the Detroit Edison Refined Coal Adder calculated in accordance with the formulas set forth in Exhibit C.

"Detroit Edison Refined Coal Adder" means the amount calculated as set forth in Exhibit C.

"Detroit Edison Revenue Requirement" means Detroit Edison's share of BR Fuels' annual revenue requirements calculated in accordance with the formula set forth in Exhibit C.

"Detroit Edison $SO_2$ Benefit" means the benefits achieved as a result of reduced $SO_2$ emissions from the Belle River Power Plant while using Refined Coal as a fuel calculated in accordance with the formulas set forth in Exhibit C.

"Effective Date" has the meaning given to such term in the introductory paragraph hereof.

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement, dated as of August 24, 2009, by and between Detroit Edison and BR Fuels.

"Event of Default" has the meaning given to such term in Section 12.1.

"Event of Force Majeure" means any event beyond the reasonable control of the Party affected, including, without limitation, any act of God, strike, work stoppage or other labor disturbance, shortage of supplies, parts, materials, rail cars, barges or other freight transport vehicles customarily used, breakdowns or damage to or destruction of the Facility, the Belle

4

River Power Plant, the St. Clair Power Plant or any part thereof or to plants or other facilities (including a forced outage or an extension of a scheduled outage of the Facility, the Belle River Power Plant, the St. Clair Power Plant or such plants, equipment or facilities to make repairs to avoid breakdowns thereof or damage thereto), act of public enemy, act of terrorism, war, blockade, riot, public unrest, lightning, fire, violent storm, flood, frozen river, canal, channel or lake, unforeseeable geological condition, drought, unusually severe weather conditions, explosion, government order or restraint, or other cause or event, whether of a similar or dissimilar nature, which, in the case of any of the foregoing:  (a) could not have been reasonably anticipated by the affected Party, and (b) cannot be reasonably avoided or circumvented by the affected Party.

"Excess Amount" has the meaning given to such term in Section 7.3.

"Facility" means the refined coal production facility, comprised of one or more production lines, to be constructed and owned by BR Fuels to be located at the Belle River Site.

"Feedstock" means coal utilized as feedstock by the Facility for the production of Refined Coal.

"Feedstock Inventory Store" means the Seller Coal deposited and present in the areas identified as "Coal Yard" and on all interconnecting conveyors shown in Exhibit B hereto (prior to crossing either the Delivery Point for Resold Coal or the Delivery Point for Feedstock, each as identified on Exhibit B hereto).

"Follow-up Period" means the period commencing at the expiration of the Initial Acceptance Period and ending at the later of (i) the expiration of 60 days or such other period as agreed upon by the Parties, or (ii) such time as the reasonable determination is made by Buyer, after prompt review and analysis of the operating data and information relating to the use of Refined Coal during the Initial Acceptance Period, that use of Refined Coal at the Belle River Power Plant will not likely result in a Reduction Event.

"Governmental Approvals" means any authorization, consent, concession, license, certificate, permit, waiver, privilege or approval from, or filing with, or notice to, any Governmental Body.

"Governmental Body" means the federal government of the United States, any state of the United States or political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any other governmental entity, instrumentality, agency, authority or commission.

"Increased Expenses" has the meaning given to such term in Section 9.4.

"Initial Acceptance Period" means the period commencing on the Commercial Operations Date and ending at the later of (i) the expiration of 75 days following the Commercial Operations Date, or (ii) the last of 60 consecutive days during which the Facility is in operation with at least 90 percent availability (or such lesser percentage determined by reducing 90 percent as necessary to reflect any reduction in the production and supply of Refined Coal as directed by

5

MPSC Case No. U-17087, Source U-16434-R
Exhibit MEC-28, Schedule 1 E-28
Page 6 of 873

Buyer (except by reason of a Reduction Event)), as such availability is measured on a calendar week basis.

"Initial Term" has the meaning given to such term in Section 3.1.

"Knowledge" means, as to Buyer, the actual knowledge, after due inquiry, of those persons identified on Schedule 1.1(a) and, as to Seller, the actual knowledge, after due inquiry, of those persons identified on Schedule 1.1(b).

"Late Payment Rate" means a rate of interest per annum equal to the lesser of:  (a) as to each applicable day, the most recent published prime rate, as reported in *The Wall Street Journal* (Eastern Edition) under "Money Rates" or, if such rate does not so appear, in such other nationally recognized publication as Seller may, from time to time, specify to Buyer; or (b) the maximum rate of interest permitted by applicable Law.

"Law" means any law (including common law), statute, act, decree, ordinance, rule, directive (to the extent having the force of law), order, treaty, code or regulation (including any of the foregoing relating to health and safety matters) or any interpretation of any of the foregoing, as enacted, issued or promulgated by any Governmental Body, including all amendments, modifications, extensions, replacements or re-enactments thereof.

"License Agreement" means that certain License and Services Agreement, dated as of August 24, 2009, by and among BR Fuels, Detroit Edison and MPPA.

"Mer-Sorb" is a chemical additive identified in the patents listed in the Amended and Restated License Agreement, dated January 23, 2009, between Chem-Mod LLC and DTE Energy Resources, Inc.

"MPPA" means Michigan Public Power Agency, a public body politic and corporate organized pursuant to Act 448, Public Acts of Michigan 1976.

"MPPA Benefits" means the amount equal to the sum of (i) the MPPA FlyAsh Benefit, plus (ii) the MPPA Mercury Benefit, plus (iii) the MPPA $SO_2$ Benefit.

"MPPA Coal Inventory Purchase Agreement" means the Coal Inventory Purchase Agreement, to be entered into on or about the Commercial Operations Date, by and between BR Fuels and MPPA.

"MPPA Fly Ash Benefit" means the change in sales revenues and/or disposal expenses for the fly ash produced at the Belle River Power Plant while using Refined Coal as a fuel calculated in accordance with the formulas set forth in Exhibit D.

"MPPA Mercury Benefit" means the benefits achieved as a result of reduced mercury emissions from the Belle River Power Plant while using Refined Coal as a fuel calculated in accordance with the formulas set forth in Exhibit D.

"MPPA Refined Coal Adder" means the lesser of the MPPA Benefits or the MPPA Revenue Requirement.

6

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  11 of 806

"<u>MPPA Revenue Requirement</u>" means MPPA's share of BR Fuels' annual revenue requirements calculated in accordance with the formula set forth in <u>Exhibit D</u>.

"<u>MPPA SO$_2$ Benefit</u>" means the benefits achieved as a result of reduced SO$_2$ emissions from the Belle River Power Plant while using Refined Coal as a fuel calculated in accordance with the formulas set forth in <u>Exhibit D</u>.

"<u>NIST</u>" means the National Institute of Standards and Technology.

"<u>Operating Protocols</u>" means those certain operating protocols and procedures set forth as <u>Exhibit E</u>.

"<u>Party</u>" and "<u>Parties</u>" have the meanings given to such terms in the introductory paragraph hereof.

"<u>Person</u>" means any corporation, limited liability company, any form of partnership, any *joint venture, trust, estate, Governmental Body, or other legal or commercial entity or any natural person.*

"<u>Point of Origin</u>" means the location where the Seller Coal is loaded into a railcar (or other form of transport), FOB, for transport to Seller at the Belle River Site or to any other site designated by Buyer.

"<u>Project Documents</u>" means:  (a) this Agreement, (b) the Coal Handling and Consulting Agreement, (c) the License Agreement, (d) the Detroit Edison Coal Inventory Purchase Agreements, (e) the MPPA Coal Inventory Purchase Agreement, (f) the Environmental Indemnity Agreement, (g) the Memorandum of Understanding with respect to the Participation Agreement, to be entered into on or about the Commercial Operations Date, by and between MPPA and Detroit Edison, (h) the St. Clair Supply Agreement and (i) the other documents, agreements, certificates and instruments executed or entered into by and between (i) BR Fuels and MPPA and Detroit Edison, (ii) BR Fuels and Detroit Edison, and (iii) BR Fuels and MPPA in connection with the transactions contemplated thereby; provided that, in the case of clause (iii), Detroit Edison has received notice of and approved any such documents, agreements, certificates and instruments, such approval not to be unreasonably withheld.

"<u>Reduction Event</u>" has the meaning given to such term in <u>Section 5.1(b)</u>.

"<u>Refined Coal</u>" means the refined coal product produced by Seller for sale to Buyer pursuant to this Agreement.

"<u>Refined Coal Price</u>" means the per Ton amount equal to the sum of (i) the Coal Inventory Price, plus (ii) the Detroit Edison Refined Coal Adder, plus (iii) the MPPA Refined Coal Adder.

"<u>Renewal Term</u>" has the meaning given to such term in <u>Section 3.1</u>.

"<u>Resold Coal</u>" means Available Seller Coal sold hereunder to Buyer or to third parties as directed by Buyer.

7

"Resold Coal Price" has the meaning given to such term in Section 9.2.

"S-Sorb III" is a chemical additive identified in the patents listed in the Amended and Restated License Agreement, dated January 23, 2009, between Chem-Mod LLC and DTE Energy Resources, Inc.

"Section 45 Tax Credits" means the credits against federal income tax available under Section 45 of the Code or any successor provision.

"Seller" has the meaning given to such term in the introductory paragraph hereof.

"Seller Coal" means coal purchased by Seller pursuant to a Coal Purchase Contract.

"Shortfall Amount" has the meaning given to such term in Section 7.3.

"St. Clair Fuels" means St. Clair Fuels Company, LLC, a Delaware limited liability company.

"St. Clair Power Plant" means the fossil fuel-fired steam electric generating facility located at the St. Clair Site.

"St. Clair Site" means that certain property located in St. Clair County, Michigan adjacent to the Belle River Site, on which the fossil fuel-fired steam electric generating facility known as the St. Clair Power Plant is owned and operated by Detroit Edison.

"St. Clair Supply Agreement" means the St. Clair Supply Agreement, to be entered into on or about the Commercial Operations Date, by and between St. Clair Fuels and BR Fuels.

"Term" means, collectively, the Initial Term and any Renewal Term.

"Third Party Impositions" has the meaning given to such term in Section 9.7.

"Ton" means two thousand (2,000) pounds avoirdupois weight.

"Unloaded Weight" means the weight of the Seller Coal as documented by the supplier under the applicable Coal Purchase Contract.

Section 1.2.    Construction of Certain Terms and Phrases.

Unless the context of this Agreement otherwise requires: (a) words of either gender include the other gender; (b) words using the singular or plural also include the plural or singular, respectively; (c) the terms "hereof," "herein," "hereby," "hereto" and similar words refer to this entire Agreement and not any particular Article, Section, Clause, Exhibit, Appendix or Schedule or any other subdivision of this Agreement; (d) references to "Article," "Section," "Clause," "Exhibit," "Appendix" or "Schedule" are to the Articles, Sections, Clauses, Exhibits, Appendices and Schedules, respectively, of this Agreement; (e) the words "include" or "including" shall be deemed to be followed by "without limitation" or "but not limited to" whether or not they are followed by such phrases or words of like import; and (f) references to

8

"this Agreement" or any other agreement or document shall be construed as a reference to such agreement or document, including any Exhibits, Appendices, Attachments and Schedules thereto, as amended, modified or supplemented and in effect from time to time and shall include a reference to any document that amends, modifies or supplements it, or is entered into, made or given pursuant to or in accordance with its terms.  Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  All accounting terms used herein and not expressly defined herein shall have the meanings given to them under generally accepted accounting principles as promulgated by the Financial Accounting Standards Board and as in effect on the Effective Date.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Section 2.1.   <u>Representations and Warranties of Buyer</u>.

Buyer hereby represents and warrants as of the date hereof as follows:

(a)     except as set forth in Schedule 2.1, Buyer's execution and delivery of, and performance under, this Agreement have been duly authorized and do not violate or conflict with any charter, bylaw, Law, Contract, permit or obligation applying to Buyer, the Belle River Power Plant or the Belle River Site, other than such violations or conflicts that would not reasonably be expected to have a material adverse effect on Buyer's ability to perform its obligations under this Agreement;

(b)     except as set forth in Schedule 2.1, this Agreement constitutes a legal, valid and binding contractual obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws affecting the enforcement of creditors' rights generally;

(c)     except as set forth in Schedule 2.1, no permit from, notice to, or consent, approval, authorization or order of any court or other Governmental Body or third party not already given or obtained is required with respect to Buyer in connection with its execution and delivery of, and performance under, this Agreement, including, without limitation, Buyer's purchase, transportation, handling and use of Refined Coal and coal as fuel at the Belle River Power Plant;

(d)     Buyer is validly existing and in good standing under the laws of the State of Michigan and is authorized to do business in each jurisdiction necessary for it to perform its obligations under this Agreement, and Buyer has the right, power and authority, to enter into this Agreement and to perform its obligations hereunder; and

(e)     there is no pending or, to Buyer's Knowledge, threatened action, suit, investigation, arbitration or other proceeding against Buyer that, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

Case 1:19-cv-01334-CJB Document 406-10 Filed 05/03/22 Page 15 of 63 PageID #: 7767
MPSC Case No. U-17087, record at 164.24-R
Exhibit MEC-23R, Source: Exhibit A-30, U-16434-R
Page 702 of 873

Section 2.2.    <u>Representations and Warranties of Seller</u>.

Seller hereby represents and warrants as of the date hereof as follows:

(a)    Seller's execution and delivery of, and performance under, this Agreement have been duly authorized and do not violate or conflict with any charter, bylaw, Law, Contract, permit or obligation applying to Seller, other than such violations and conflicts that would not reasonably be expected to have a material adverse effect on Seller's ability to perform its obligations under this Agreement;

(b)    this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization and similar laws affecting the enforcement of creditors' rights generally;

(c)    no permit from, notice to, or consent, approval, authorization or order of any court or other Governmental Body or third party not already given or obtained is required with respect to Seller in connection with its execution and delivery of, and performance under, this Agreement, other than any such permit, notice, consent, approval authorization or order required for the construction and operation of the Facility;

(d)    Seller is validly existing and in good standing under the laws of the State of Delaware and is authorized to do business in each jurisdiction necessary for it to perform its obligations under this Agreement, and Seller has the right, power and authority to enter into this Agreement and perform its obligations hereunder; and

(e)    there is no pending or, to Seller's Knowledge, threatened action, suit, investigation, arbitration or other proceeding against Seller, that, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement.

## ARTICLE III
## TERM

Section 3.1.    <u>Term</u>.

Subject to <u>Section 11.1</u>, the term of this Agreement will commence on the Effective Date and will end on the tenth anniversary of the Commercial Operations Date (the "<u>Initial Term</u>"). This Agreement shall automatically renew for one additional five-year period thereafter (the "<u>Renewal Term</u>"), unless one Party provides to the other Party, at least 90 days prior to the expiration of the Initial Term, written notice of its election that this Agreement not be renewed beyond the Initial Term.

MPSC Case No. U-17087 Surrebuttal
Exhibit MEC9-2-R, Source: Exhibit A-30, U-16434-R
Page 16 of 873

## ARTICLE IV
## AUTHORIZED REPRESENTATIVES

Section 4.1.   <u>Authorized Representatives</u>.

The initial Authorized Representative of Seller is Katherine A. Panczak.  The initial Authorized Representative of Buyer is Patrick J. Temple.  Each Party shall be entitled to rely upon any instructions or information given or provided by the Authorized Representative of the other Party (or any one designated individual if more than one individual is designated as such other Party's Authorized Representative), but no Authorized Representative shall have authority under this <u>Section 4.1</u> to modify or amend this Agreement.  Each Party shall have the right to revoke any appointment of any individual or individuals who had been appointed to act as its Authorized Representative with such revocation being effective upon receipt by the other Party of the notice provided for in the following sentence.  Each Party shall give to the other Party written notice of any such revocation of appointment and of the appointment of a new individual or individuals to act as its Authorized Representative.

## ARTICLE V
## PRODUCTION AND SALE OF REFINED COAL

Section 5.1.   <u>Production and Sale</u>.

(a)      During each Contract Year, in accordance with the terms of, and except as otherwise provided in, this Agreement, (i) Buyer shall procure and purchase from Seller all of its requirements for coal and coal-based fuel at the Belle River Power Plant (other than any coal purchased by Buyer under a Back-Up Coal Purchase Contract in accordance with <u>Section 6.1(c)</u>), and (ii) Seller shall use commercially reasonable efforts, in accordance with the Operating Protocols, to produce and sell to Buyer Refined Coal in amounts necessary to satisfy Buyer's requirements for coal and coal-based fuel at the Belle River Power Plant, and (iii) to the extent that such requirements are not fully satisfied by such Refined Coal as described in clause (ii), including without limitation, during a suspension event under the provisions of <u>Sections 5.1(e)</u>, <u>8.2(c)</u> and <u>9.4</u>, Seller shall sell to Buyer (and Buyer shall purchase) Available Seller Coal, in amounts necessary to satisfy such requirements, as Resold Coal.

(b)      Buyer's purchase of Refined Coal pursuant to this <u>Section 5.1</u> shall be reduced to the extent necessary (i) to prevent damage (other than normal wear and tear that would be caused by the exclusive use of coal (other than Refined Coal) as fuel at the Belle River Power Plant) to the boilers, pollution control equipment or other operating components that comprise the Belle River Power Plant that would be caused by the use of Refined Coal as a fuel at the Belle River Power Plant, or (ii) to prevent material impairment to or a material  adverse effect on the operation and maintenance of the boilers, pollution control equipment or other operating components that comprise the Belle River Power Plant or (iii) to prevent the violation of any permit or Governmental Approval (any of the foregoing circumstances described in clauses (i), (ii) and (iii) being referred to as a "<u>Reduction Event</u>") and, to the extent that Buyer's requirements are not fully satisfied by Refined Coal, Seller shall sell to Buyer (and Buyer shall purchase) Available Seller Coal, in amounts necessary to satisfy such requirements, as Resold Coal.  The determination of a Reduction Event shall be made by Buyer in its good faith

11

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 16 of 806

discretion.  Buyer shall notify Seller promptly when Buyer determines that a Reduction Event has occurred.  The Reduction Event will terminate when the circumstances bringing rise to the Reduction Event are resolved or mitigated as agreed by Buyer and Seller in accordance with Section 5.1(d).  The reduction of Buyer's purchase of Refined Coal due to a Reduction Event shall be of no greater scope and no longer duration than that which is necessary by reason of the Reduction Event.

(c)      During the Follow-up Period, unless and until otherwise agreed by the Parties, each Party's obligations under Section 5.1(a) will be suspended to provide the Parties time to review and analyze operating data and other information relating to the use by Buyer of Refined Coal as fuel at the Belle River Power Plant during the Initial Acceptance Period.  During the Follow-up Period, Buyer shall have the right, but not the obligation, to purchase Available Seller Coal as Resold Coal from Seller as set forth in Section 5.1(a).

(d)      During any Reduction Event, as soon as it is reasonably available, Buyer will provide Seller with all information regarding the cause of the Reduction Event and other operating data and other information relating to the use of Refined Coal, and Buyer and Seller will cooperate, discuss and negotiate in good faith to develop and agree upon any price adjustments or other remedial actions to avoid or limit the circumstances leading to the Reduction Event and otherwise to improve, optimize and maximize the use of Refined Coal as a fuel at the Belle River Power Plant on a going-forward basis.  Examples of possible remedial actions include, without limitation, capital improvements to the Facility or the Belle River Power Plant, resetting chemical additive levels as provided in Section 8.3(a), and resetting Buyer's requirements for Refined Coal at a quantity less than 100 percent of its coal-based fuel requirements for the Belle River Power Plant.  Notwithstanding the foregoing, neither Party shall be required hereunder to agree to any remedial action that would require it to incur additional costs or expenditures.  In addition, Seller need not agree to any remedial action (and may terminate any remedial action agreed to) that Seller believes in its sole discretion, could impair or jeopardize the ability of the Refined Coal to qualify for Section 45 Tax Credits.

(e)      At any time that Seller fails to satisfy Buyer's requirements for coal or coal-based fuel at the Belle River Plant as required by Section 5.1(a), and Seller fails to deliver Resold Coal in accordance with Section 5.1(a), then, upon notice by telephone to Seller, Buyer shall have the right to cause transfer gates on the product conveyors extending from the Coal Yard to be switched such that Available Seller Coal bypasses the Facility and is delivered directly to the Delivery Point for Resold Coal for sale to and purchase by Buyer as Resold Coal and to maintain such transfer gate positions until such time as Seller provides to Buyer reasonably adequate assurances of Seller's ability to perform in accordance with Section 5.1(a).

(f)      Notwithstanding the foregoing, nothing contained in this Article V will prevent Buyer from discontinuing or reducing operation of one or both of the generating units at the Belle River Power Plant prior to the end of the Term.

Section 5.2.      Sales to Third Parties.

Any Refined Coal produced at the Facility and not purchased by Buyer, for any reason, may be sold by Seller to third parties or otherwise disposed of subject to compliance with

12

applicable existing permits, Coal Purchase Contracts and coal transportation agreements. This Section 5.2 is not intended and shall not be construed to limit any remedies available to Seller hereunder or under applicable Law.

Section 5.3.    Annual Forecasts; Adjustments.

For each Contract Year during the Term, Buyer shall provide Seller with a good faith projection (the "Buyer Annual Forecast") of the aggregate quantity of Refined Coal and Resold Coal it expects to require during each month of such Contract Year pursuant to the terms of this Agreement. The Buyer Annual Forecast for the initial Contract Year shall be provided no later than the 30th day following the Commercial Operations Date. Each succeeding Buyer Annual Forecast shall be delivered no later than October 1 preceding the start of such Contract Year. Buyer shall update such forecast on a monthly basis to reflect any change in Buyer's projections. Buyer shall provide any such amendment to Seller no less than 15 Business Days before the first Business Day of each such month. The Buyer Annual Forecast is to be used solely for informational purposes.

Section 5.4.    Purchase by Buyer at Termination.

On the last day of the Term, to the extent it has not already done so, Buyer shall purchase, and Seller shall sell to Buyer, all Refined Coal on hand.

Section 5.5.    Consistent Reporting.

Notwithstanding the means of sourcing fuel for the Belle River Power Plant prior to the Commercial Operations Date, Buyer covenants and agrees that it will not, and it will cause its Affiliates not to, make or give any filing, return, ruling request, representation, allegation, notice or report with or to any Governmental Body or court that contains, or otherwise presents in accounting or financial records, reports or statements, or tax or information returns, characterizations of the transactions (or elements thereof) contemplated by the various Project Documents that are inconsistent with the terms of such Project Documents, such as (by way of example and not limitation) any characterization that Feedstock purchased by Seller under applicable Coal Purchase Contracts was purchased by Buyer or any other Person, or that Refined Coal sold to Buyer hereunder was something other than Refined Coal.

**ARTICLE VI**
**PURCHASE AND SALES OF SELLER COAL**

Section 6.1.    Coal Purchase Contracts.

(a)    It is contemplated that Seller, directly or through an Affiliate, will enter into one or more contracts with third-party coal suppliers to purchase coal conforming to the Coal Specifications for use as Feedstock and for sale to Buyer, or others designated by Buyer, as provided herein (each, a "Coal Purchase Contract").

(b)    It is further contemplated that included among the Coal Purchase Contracts will be purchase contracts that Buyer has in place with coal suppliers on the

13

Case No.:   U-16434-R
Exhibit:   A-30
Witness:   G. E. Lapplander
Page:   18 of 806

Commercial Operations Date and that are to be assigned in whole or in part to Seller pursuant to the Coal Inventory Purchase Agreement.

(c)   For each Coal Purchase Contract entered into by Seller, Buyer may, but shall not be obligated to, enter into and maintain a back-up Contract to purchase coal from the same third-party coal supplier on terms substantially similar to the terms contained in the corresponding Coal Purchase Contract, including, without limitation, the quantity of coal to be purchased thereunder, except that Buyer's obligation to purchase a quantity of coal thereunder shall be reduced by the quantity of coal purchased by Seller under the corresponding Coal Purchase Contract (each, a "Back-Up Coal Purchase Contract").

(d)   Notwithstanding anything to the contrary herein but subject to the provisions of Sections 5.1(e), 8.2(c) and 9.4, Buyer's sole remedies for Seller's failure to produce and sell Refined Coal hereunder shall be to:  (i) purchase Resold Coal pursuant to Section 5.1 and to purchase coal under the Back-Up Coal Purchase Contracts; and (ii) terminate this Agreement in accordance with Section 11.1(f).

Section 6.2.   Available Seller Coal.

(a)   At any point in time, to the extent that Seller has Available Seller Coal, Buyer may request to purchase, and upon such request Seller will sell to Buyer, or to others to the extent so directed by Buyer, all (or such portion requested by Buyer) of such Available Seller Coal as Resold Coal at the applicable Resold Coal Price and otherwise as provided herein; provided, however, that, as to any Available Seller Coal that is to be sold to others or shipped for use at a location or facility other than the Belle River Power Plant or St. Clair Power Plant, Seller's obligation to sell such Available Seller Coal shall be subject to receiving Buyer's undertaking to replace or cause to be replaced by arranging for one or more Coal Purchase Contracts for Conforming Coal, and providing for delivery in such a manner that Seller's Feedstock requirements for production of Refined Coal, and its Refined Coal production schedule, will not be impaired.

(b)   At any point in time, to the extent that Seller has Available Seller Coal, Seller may request that Buyer purchase all or a portion of such Available Seller Coal, and upon such request, Buyer will purchase and Seller will sell to Buyer, or to others to the extent so directed by Buyer, such Available Seller Coal (or the applicable portion thereof) as Resold Coal at the applicable Resold Coal Price and otherwise as provided herein, it being agreed, for the avoidance of doubt, that Seller's exercise of such right shall not cause to arise an obligation by Buyer to replace Conforming Coal under Section 6.2(a).

Section 6.3.   Purchase by Buyer at Termination.

At the end of the Term, Buyer shall purchase, and Seller shall sell to Buyer, all Conforming Coal on hand or under contract as Resold Coal.  To the extent that there is any Coal Purchase Contract in place at the end of the Term which, by its terms, obligates Seller to purchase Conforming Coal for a period extending beyond the end of the Term, each Party agrees that Seller will assign such Coal Purchase Contract to Buyer and Buyer will assume Seller's rights and obligations thereunder.  To the extent any such Coal Purchase Contract is not able to

14

Case 1:19-cv-01334-CJB Document 406-16 Filed 05/03/22 Page 20 of 63 PageID #: 7772

MPSC Case No. U-17097, record at 164-24-R
Exhibit MEC3-28, Schedule 1.2067 A-30, U-16434-R
Page 8 of 707 of 873

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 19 of 806

be so assigned, following the end of the Term, Seller shall sell and Buyer shall purchase Conforming Coal as Resold Coal in accordance with the terms and conditions hereof until the applicable Coal Purchase Contract expires or otherwise terminates.

## ARTICLE VII
## DELIVERIES; WEIGHTS; TITLE AND RISK OF LOSS

Section 7.1.    Deliveries.

(a)    Refined Coal deliveries will be made at the Delivery Point for Refined Coal based on Buyer's requirements for use of Refined Coal as fuel in the Belle River Power Plant.

(b)    Deliveries of Available Seller Coal will be made at the applicable Delivery Point for Resold Coal as specified herein, and, assuming timely performance by third parties under the Coal Purchase Contracts and by the Coal Consultant under the Coal Handling and Consulting Agreement and except as may be otherwise agreed by the Parties, such deliveries will be made based on Buyer's, or others' to the extent so directed by Buyer, requirements for use of Available Seller Coal as fuel.

Section 7.2.    Weights.

(a)    The weight of Refined Coal sold to Buyer hereunder during any applicable period will be established by weights of Feedstock measured by Buyer's belt scales located on product conveyors CV 23 and CV 24, plus an agreed upon allowance for the chemical additive used in the Refined Coal production process.

(b)    The weight of Resold Coal sold to Buyer hereunder during any applicable period will be established by weights of Resold Coal measured by Buyer's belt scales located on product conveyors CV 23 and CV 24.

(c)    Buyer shall maintain and preserve, during the Term and for at least six months after any termination of this Agreement, records of all weights taken under this Section 7.2 and shall maintain the scales as provided below:

(i)    At least once each calendar year, the accuracy of the scales shall be maintained, tested and, if necessary, adjusted, in accordance with the guidelines outlined by the NIST Handbook #44, or other procedures which shall be mutually acceptable to Seller and Buyer and in accordance with applicable Law.  If any such test shows the scales to be in error, Buyer shall cause them to be adjusted to within the tolerance specifications as designated by the scale manufacturer;

(ii)    Buyer shall give prompt notice by telephone (and confirm such notice in writing or by email or facsimile) to Seller the results of any testing and adjustment of the scales, and otherwise if and when the scales are discovered to be in error beyond the tolerance specifications as designated by the scale manufacturer;

15

MPSC Case No. U-17087, Source Code U-16434-R
Exhibit MEC-238, Schedule E2.05
Page 28 of 708

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 20 of 806

(iii)     Seller shall have the right, but not the duty, to have a representative present at any and all times to observe the determination of weights hereunder.  In addition to the testing described in Section 7.2(c)(i), if Seller should at any time question the accuracy of the scales, Seller shall so advise Buyer and confirm the same in writing, and Buyer shall promptly arrange testing of the scales.  If such test shows the scales to be in error, Buyer shall cause them to be adjusted to within the tolerance specifications as designated by the scale manufacturer.  If such test prompted by Seller pursuant to this Section 7.2(c)(iii) shows the scale to be within the applicable tolerance specifications, then Seller shall pay all costs of such test.  Otherwise, Buyer shall pay all costs of maintaining, testing and adjusting the scales hereunder.

(d)     During any period when the scales are inoperable, determination of the quantities of Refined Coal and Resold Coal delivered hereunder shall be determined by a procedure to be established at such time by agreement of Seller and Buyer and in accordance with applicable Law.

Section 7.3.     Feedstock Inventory Store Reconciliation.

(a)     On a quarterly basis, the Coal Consultant shall cause to be performed a physical inventory survey of the Feedstock Inventory Store.  Promptly thereafter, a reconciliation of the Feedstock Inventory Store will be made, and the actual weight of Resold Coal sold from the Feedstock Inventory Store, and of Feedstock from the Feedstock Inventory Store used to produce Refined Coal, during such quarter will be determined, based on: (i) the Feedstock Inventory Store as measured on such date; (ii) the Feedstock Inventory Store as measured at the end of the prior quarter; (iii) the record of the Unloaded Weight of Seller Coal unloaded at the Belle River Site during the quarter; (iv) the record of the weight of Resold Coal moved from the Feedstock Inventory Store, as determined pursuant to Section 7.2(b), during the quarter; and (v) the record of the weight of Feedstock used to produce Refined Coal sold to Buyer, as determined pursuant to Section 7.2(a), during the quarter.  To the extent that the sum of:  (i) the Feedstock Inventory Store as measured at the end of the prior quarter; and (ii) the Unloaded Weight of Seller Coal unloaded at the Belle River Site during the quarter, exceeds the sum of: (x) the Feedstock Inventory Store on the measurement date; (y) the weight of Resold Coal moved from the Feedstock Inventory Store, as determined pursuant to Section 7.2(b), during the quarter; and (z) the weight of Feedstock used to produce Refined Coal sold to Buyer, as determined pursuant to Section 7.2(a), during the quarter, the difference (the "Excess Amount") shall be attributable to Resold Coal sold to Buyer and Feedstock used to produce Refined Coal sold to Buyer, in the same proportions as reflected in clauses (y) and (z) above, and the sum of such Excess Amount and the weights described in clauses (y) and (z) above will constitute the actual weight of Resold Coal sold, and Feedstock used, from the Feedstock Inventory Store during such quarter.  Seller will invoice Buyer for such Excess Amount using the Coal Inventory Price and the Resold Coal Price, as applicable, on the date the Excess Amount is recorded by Seller as a reduction of Feedstock Inventory Store, and Buyer will make payment, for such Excess Amount in accordance with Article IX.  To the extent that the sum of: (i) the Feedstock Inventory Store as measured at the end of the prior quarter; and (ii) the Unloaded Weight of Seller Coal unloaded at the Belle River Site during the quarter, is less than the sum of:  (x) the Feedstock Inventory Store on the measurement date; (y) the weight of Resold Coal moved from the Feedstock Inventory Store, as determined pursuant to Section 7.2(b), during the quarter; and (z) the weight of Feedstock used to produce Refined Coal sold to Buyer, as determined pursuant

16

to Section 7.2(a), during the quarter, the deficiency (the "Shortfall Amount") shall be attributable to Resold Coal purchased by Buyer and Feedstock used to produce Refined Coal sold to Buyer, in the same proportions as reflected in clauses (y) and (z) above, and, in such case, Seller will credit Buyer for such Shortfall Amount in accordance with Article IX using the Coal Inventory Price and the Resold Price, as applicable, on the date the Shortfall Amount is recorded by Seller as an increase in Feedstock Inventory Store.  For purposes of this Section 7.3, in the case of the first quarter (or partial quarter, as the case may be) following the closing date under the Coal Inventory Purchase Agreement, all references herein to "the Feedstock Inventory Store as measured at the end of the prior quarter" shall mean the aggregate tonnage purchased under the Collective Coal Inventory Purchase Agreements.  The costs of taking such physical inventories shall be borne by Buyer.

(b)  In addition to the reconciliation of the Feedstock Inventory Store, the Coal Consultant shall cause to be performed a physical survey of Seller's inventory located at the Superior Midwest Energy Terminal annually.  The survey shall be performed during either October or November of each Contract Year.  Buyer shall provide Seller with the results of the physical survey on or about December 15 of each year during Term.  Seller will adjust its inventory using the results of the survey before December 31 of the Contract Year.

Section 7.4.    Measurement Methodology.

Notwithstanding Sections 7.2 and 7.3, Buyer shall have the right to increase the frequency of scale testing to a quarterly basis.  If Buyer elects to increase scale testing to a quarterly basis, Seller shall direct the Coal Consultant to adjust the frequency of the Feedstock Inventory Store reconciliation to an annual basis.

Section 7.5.    Title and Risk of Loss.

(a)  Title and risk of loss, damage or destruction with respect to the Refined Coal sold hereunder will pass to Buyer at the Delivery Point for Refined Coal.

(b)  Title and risk of loss, damage or destruction with respect to the Resold Coal sold hereunder will pass to Buyer at the applicable Delivery Point for Resold Coal.

## ARTICLE VIII
## REFINED COAL AND RESOLD COAL SPECIFICATIONS

Section 8.1.    Coal Specifications.

Buyer will specify to Seller the initial Coal Specifications upon request by Seller, and will subsequently, from time to time during the Term as requested by Seller, confirm the Coal Specifications then in effect.  During the Term, Buyer may change the Coal Specifications from time to time.  Notification of any such change shall be made in writing to Seller and to the Coal Consultant.

17

Case 1:19-cv-01334-CJB  Document 406-16-17 Filed 05/03/22  Page 23 of 63 PageID #: 7775
MPSC Case No. U-17087 Surrebuttal 164 24-R
Exhibit U-16R3-2-R, Sourdde: 1 Exhibit A-30, U-16434-R
Page 23 of 720 of 873

Section 8.2.   Refined Coal Production Specifications and Use.

(a)   Refined Coal produced and sold to Buyer hereunder shall be produced from Feedstock that was purchased pursuant to a Coal Purchase Contract and was Conforming Coal at the time delivered to the Belle River Site.

(b)   Seller hereby covenants and warrants that Refined Coal produced and sold to Buyer hereunder shall be produced in accordance with the Operating Protocols.

(c)   During any time that Seller is delivering Refined Coal without complying with the Operating Protocols:

(i)   Buyer shall have the right to suspend immediately all deliveries of Refined Coal by giving notice of the suspension to Seller.  Such suspension shall remain in effect until such time as Seller provides to Buyer reasonably adequate assurances of Seller's ability and intention to comply with the Operating Protocols in accordance with this Section 8.2.  After receipt of such notice, Seller shall commence appropriate action and use its best efforts to correct the deficiency; and

(ii)   Buyer shall have the right upon notice by telephone to Seller, to cause transfer gates on the product conveyors extending from the Coal Yard to be switched such that Available Seller Coal bypasses the Facility and is delivered directly to the Delivery Point for Resold Coal for sale to and purchase by Buyer as Resold Coal and to maintain such transfer gate positions until such time as Seller provides to Buyer reasonably adequate assurances of Seller's ability to perform in accordance with the Operating Protocols.

(d)   Buyer hereby covenants that it will use all Refined Coal purchased hereunder solely for use as fuel in the Belle River Power Plant.

(e)   Each Monday, Buyer shall provide to Seller the inputs or estimates of the inputs required for calculating the Detroit Edison Benefits and the MPPA Benefits for the previous week (beginning on the previous Monday and ending on Sunday), as set forth on Exhibit C or Exhibit D.

Section 8.3.   Chemical Additives.

(a)   Upon Buyer's request and Seller's approval, Seller will increase the level of chemical additives used in the production of Refined Coal beyond that called for in the Operating Protocols (subject to the physical constraints of the Facility), and, in such event, Buyer shall reimburse Seller for any additional costs and expenses incurred by Seller for and attributable to the use of the additional chemical additive.  Notwithstanding the foregoing, if, after such an increase, there occurs a Reduction Event, Seller shall have the right to reduce levels of chemical additives back to levels called for in the Operating Protocols.

(b)   Upon Buyer's request, Seller shall for a period of up to seven days of testing, supply additional Mer-Sorb, at its own expense, and increase the application rate for Mer-Sorb to the level that the Parties mutually agree is likely reduce the mercury emissions from the Belle River Power Plant to the maximum level of mercury emissions reductions that can be

18

Case 1:19-cv-01334-CJB    Document 406-16-17 Filed 05/03/22    Page 24 of 63 PageID #: 7776
MPSC Case No. U-16434-R
Exhibit MEC3-28, Source: Exhibit A-30, U-16434-R
Page 23 of 721 of 873

reasonably achieved by the application of additional Mer-Sorb to the Conforming Coal (all subject to the physical constraints of the Facility); provided, however, that all costs and expenses (other than the cost of such additional Mer-Sorb) related to such testing shall be borne by Buyer.

(c)    During any time during the Term that the Facility is not operating, Buyer shall have the right to purchase from Seller, as Seller's delivered cost, such chemical additives for use at the Belle River Power Plant; provided that Buyer shall be responsible for any capital relating to the handling, storage and use of such chemical additives so purchased, including with limitation, any capital costs associated with or required for Buyer's use of such chemical additives.

Section 8.4.    <u>Presumption Regarding Conforming Coal and Refined Coal</u>.

**BUYER AGREES THAT ANY RESOLD COAL OR FEEDSTOCK WILL BE CONCLUSIVELY PRESUMED TO HAVE BEEN CONFORMING COAL IF SUCH COAL WAS PURCHASED BY SELLER PURSUANT TO THE COLLECTIVE COAL INVENTORY PURCHASE AGREEMENTS OR:  (A) WAS PURCHASED BY SELLER PURSUANT TO A COAL PURCHASE CONTRACT THAT WAS ASSIGNED TO SELLER BY BUYER OR THAT WAS CERTIFIED BY THE COAL CONSULTANT AS PROVIDED IN THE COAL HANDLING AND CONSULTING AGREEMENT, AND (B) WAS NOT RECOMMENDED FOR REJECTION IN ACCORDANCE WITH THE APPLICABLE COAL PURCHASE CONTRACT BY THE COAL CONSULTANT PURSUANT TO THE COAL HANDLING AND CONSULTING AGREEMENT, AND WAS PREPARED, BLENDED AND DELIVERED TO THE APPLICABLE DELIVERY POINT BY THE COAL CONSULTANT PURSUANT TO THE COAL HANDLING AND CONSULTING AGREEMENT.  ACCORDINGLY, BUYER WAIVES ANY RIGHT IT MIGHT HAVE TO REJECT OR TO REVOKE ACCEPTANCE OF, OR TO CLAIM DAMAGES OR ANY OTHER RELIEF WITH RESPECT TO ANY SUCH RESOLD COAL OR ANY REFINED COAL PRODUCED FROM SUCH FEEDSTOCK BY REASON THAT SUCH RESOLD COAL OR FEEDSTOCK WAS NOT CONFORMING COAL.**

Section 8.5.    <u>Warranty Disclaimer</u>.

(a)    **EXCEPT AS EXPRESSLY PROVIDED IN THIS <u>ARTICLE VIII</u>, ALL RESOLD COAL AND REFINED COAL SOLD PURSUANT TO THIS AGREEMENT IS SOLD "AS IS" AT THE APPLICABLE DELIVERY POINT PROVIDED HEREIN.**

(b)    **EXCEPT AS EXPRESSLY PROVIDED IN THIS <u>ARTICLE VIII</u>, SELLER HEREBY DISCLAIMS ALL WARRANTIES (OTHER THAN THE WARRANTY OF TITLE) WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL WARRANTIES REGARDING THE COMPATIBILITY OF ANY REFINED COAL WITH ANY BUYER EQUIPMENT.**

19

## ARTICLE IX
## PRICE; BILLING AND PAYMENT

Section 9.1.    Refined Coal Price.

For each Ton of Refined Coal produced and sold by Seller and purchased by Buyer hereunder during a Contract Year, Buyer shall pay to Seller the Refined Coal Price applicable to such Ton of Refined Coal.

Section 9.2.    Resold Coal Price.

Buyer shall pay (or cause to be paid) to Seller for each Ton of Resold Coal purchased and sold hereunder the Resold Coal Price.  The "Resold Coal Price" for Resold Coal purchased at a site other than the Belle River Site shall be the same quality adjusted price per Ton incurred or to be incurred directly by Seller under any applicable Coal Purchase Contract, plus any applicable transportation charges or other rail and transloading costs incurred by Seller.  The "Resold Coal Price" for Resold Coal sold from the Feedstock Inventory Store shall be the Coal Inventory Price applicable to such Ton of Resold Coal.

Section 9.3.    Coal Consultant Fee Reimbursement.

Buyer shall reimburse Seller for the Coal Fee as and when paid under the Coal Handling and Consulting Agreement.

Section 9.4.    O&M and Capital Cost Reimbursement.

(a)    Seller shall reimburse Buyer for increased operation and maintenance expenses incurred and that Buyer demonstrates are related to Buyer's use of Refined Coal (and not increased levels of chemical additives pursuant to Section 8.3) as a fuel in the Belle River Power Plant that would not have been incurred from use of coal (other than Refined Coal), but only to the extent such costs are not included in the calculation of Detroit Edison Benefits ("Increased Expenses").  Buyer shall give Seller prompt notice upon the occurrence of any Increased Expenses.  If the Increased Expense is ongoing, either Party shall have the right to suspend delivery of Refined Coal hereunder unless and until the Parties agree upon a resolution of such Increased Expense; provided, however, that Buyer shall have the right to suspend delivery of Refined Coal hereunder only to the extent that Buyer is not reimbursed for such Increased Expense.  If Seller disputes an Increased Expense, Seller shall have the right to withhold reimbursement for such Increased Expense until such dispute has been resolved.

(b)    Seller shall reimburse Buyer for any capital investments that Buyer demonstrates are required of Buyer as a result of Buyer's use of Refined Coal (and not increased levels of chemical additives pursuant to Section 8.3) as fuel in the Belle River Power Plant, to the extent agreed to and approved by Seller.  Either Party shall have the right to suspend delivery of Refined Coal hereunder unless and until the Parties agree upon such capital investment and reimbursement or upon other resolution of such matter.

20

MPSC Case No. U-17087 surrebuttal
Exhibit MEC9-28, Schedule E-2.97
Page 25 of 723

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  25 of 806

     (c)     Notwithstanding the foregoing, Seller shall not be required to reimburse Buyer for any costs, expenses or capital investment that Buyer cannot demonstrate are amounts that Buyer would not have incurred but for Buyer's use of Refined Coal.

     Section 9.5.   <u>Invoicing and Payment.</u>

     (a)     Buyer shall pay Seller by electronic transfer (recipient's account per Seller's advice) in United States funds for all Refined Coal produced and sold by Seller and purchased by Buyer hereunder. Seller shall submit to Buyer an invoice for the Refined Coal delivered to Buyer hereunder during each week. Such invoice will be submitted within two Business Days after the end of the applicable week and will include the weight of Refined Coal delivered, an estimate of the Refined Coal Price applicable to such Refined Coal, the amount of any applicable true-up adjustment and pertinent wire transfer instructions. Buyer shall make payment within four days after receipt of each Seller invoice. From time to time, Seller, with assistance of the Coal Consultant, shall determine (i) the actual Refined Coal Price, (ii) the actual price of the Detroit Edison Refined Coal Adder, and (iii) the actual price of the MPPA Refined Coal Adder, in each case, applicable to the Refined Coal produced and sold during the most recent period following any prior true-up adjustment and any resulting true-up adjustment will be reflected (as an addition or reduction, as the case may be) on the weekly invoice next submitted by Seller hereunder.

     (b)     Buyer shall pay Seller by electronic transfer (recipient's account per Seller's advice) in United States funds for all Resold Coal from the Feedstock Inventory Store purchased and sold hereunder. Seller shall submit to Buyer an invoice for the Resold Coal from the Feedstock Inventory Store delivered to Buyer hereunder during each week. Such invoice will be submitted within two Business Days after the end of the applicable week and will include the weight of such Resold Coal delivered, an estimate of the Resold Coal Price applicable to such Resold Coal, the amount of any applicable true-up adjustment and pertinent wire transfer instructions. Buyer shall make payment within four days after receipt of each Seller invoice. From time to time, Seller, with assistance of the Coal Consultant, shall determine the actual Resold Coal Price applicable to the Resold Coal from the Feedstock Inventory Store delivered to Buyer hereunder during the most recent period following any prior true-up adjustment and any resulting true-up adjustment will be reflected (as an addition or reduction, as the case may be) on the weekly invoice next submitted by Seller hereunder. Following each inventory reconciliation (and determination of the actual Unloaded Weight of Resold Coal sold from the Feedstock Inventory Store during such period) as to which it is determined that there is an Excess Amount or a Shortfall Amount as provided in <u>Section 7.3</u>, the amount of such Excess Amount or Shortfall Amount will be reflected (as an addition or reduction, as the case may be) on the weekly invoice next submitted by Seller hereunder.

     (c)     Buyer shall pay Seller by electronic transfer (recipient's account per Seller's advice) in United States funds for all Resold Coal purchased and sold hereunder other than from the Feedstock Inventory Store. Seller shall submit to Buyer an invoice for the Resold Coal other than from the Feedstock Inventory Store delivered to Buyer hereunder during each week. Such invoice will be submitted within two Business Days after the end of the applicable week and will include the weight of such Resold Coal delivered, the Resold Coal Price

applicable to such Resold Coal and pertinent wire transfer instructions.  Buyer shall make payment within four days after receipt of each Seller invoice.

   (d) Buyer shall pay Seller by electronic transfer (recipient's account per Seller's advice) in United States funds for the reimbursement required under <u>Section 9.3</u>.  Seller shall submit to Buyer an invoice for the Coal Fee during each week.  Such invoice will be submitted within two Business Days after the end of the applicable week and will include pertinent wire transfer instructions.  Buyer shall make payment within four days after receipt of each Seller invoice.

   (e) The Parties agree that each Party may, in computing the amount required to be paid by such Party upon termination of this Agreement, reduce the required amount of such payment by offsetting against such amount the aggregate amount due and owing (and not subject to a good faith dispute) to such Party and all Affiliates of such Party by such other Party hereunder and under the other Project Documents.

   (f) In case any portion of an invoice submitted pursuant to this <u>Section 9.5</u> is in bona fide dispute, the undisputed amount shall be payable when due.  Any Party disputing any portion of an invoice shall provide the other Party with notice describing the nature of the dispute as soon as reasonably possible.

   (g) Invoices shall be mailed, emailed or sent by facsimile to the Persons listed below, or such other Person or address as may be specified by Buyer:

    The Detroit Edison Company
    One Energy Plaza
    634 General Offices
    Detroit, Michigan 48226
    Attention:  John R. Klos
    Email:  klosj@dteenergy.com

    With a copy to:

    The Detroit Edison Company
    One Energy Plaza
    634 General Offices
    Detroit, Michigan 48226
    Attention:  John A. Wagner
    Email:  wagnerj@dteenergy.com

   (h) All amounts owed by a Party to the other Party under this Agreement more than five Business Days beyond the date on which such amount is due and payable shall bear interest at the Late Payment Rate.

Case 1:19-cv-01334-CJB   Document 406-6   Filed 05/03/22   Page 28 of 63 PageID #: 7780
MPSC Case No. U-17097, Exhibit A-30, U-16434-R
Exhibit MEG-28, Source: Exhibit A-30, U-16434-R
Page 23 of 725 of 873

Section 9.6.   <u>Business Days</u>.

All payments to be made under this Agreement shall be made on a Business Day.  If the day specified for payment is not a Business Day, such payment shall be made on the next succeeding day which is a Business Day.

Section 9.7.   <u>Audit</u>.

Notwithstanding the payment of any amount pursuant to this <u>Article IX</u>, each Party shall remain entitled to conduct an audit and review of all costs and expenses subject to reimbursement by such Party hereunder, including, but not limited to, costs incurred and taken into account in the calculation of the Detroit Edison Benefits, together with any supporting documentation, for a period of three years from and after the close of the calendar year in which such costs were incurred, excluding those books and records related to costs based upon the standard allowances and rates.  If, pursuant to such audit and review, it is determined that any amount previously paid by such Party did not constitute a due and payable item of costs, such Party may submit a claim to the other Party indicating the amount and reason the cost is believed not to be reimbursable.  If the Parties agree on such matter, the Party obligated to pay will remit the amount within 30 calendar days.  If there is not agreement on any item of cost, the Parties will then meet and attempt to agree on the disposition of the item of cost.  If the Parties are not able to resolve issues raised by such an audit and review, any disputed items will be resolved in accordance with the provisions of <u>Article XIII</u>.

Section 9.8.   <u>Taxes and Other Liabilities</u>.

(a)      Seller shall be solely responsible for all assessments, fees, costs, expenses and taxes imposed by any Governmental Body or other third parties ("<u>Third Party Impositions</u>") relating to Seller Coal that arise prior to any transfer of title to the Seller Coal hereunder, either as Resold Coal or after its conversion into Refined Coal, as provided herein; <u>provided</u>, <u>however</u>, that such Third Party Impositions shall, for purposes of this Agreement, be included in the definition and calculation of the Coal Inventory Price.  Buyer shall be solely responsible for all Third Party Impositions relating to the Resold Coal or Refined Coal imposed at or after the transfer of title to Buyer (other than franchise or income taxes which are related to the sale of the Seller Coal and are the responsibility of Seller), including, but not limited to, sales or use tax if applicable.

(b)      Upon Buyer's purchase of Refined Coal from Seller, Buyer shall provide Seller with a sales tax exemption certificate with the "industrial processing" exemption box selected.

## ARTICLE X
## FORCE MAJEURE

Section 10.1.   <u>Force Majeure</u>.

(a)      Except as otherwise provided in this <u>Section 10.1</u>, a Party shall be excused from performance under this Agreement, and shall not be considered to be in default hereunder for failure to perform obligations under this Agreement, to the extent that such Party is unable to,

23

Case 1:19-cv-01334-CJB   Document 406-16   Filed 05/03/22   Page 29 of 63 PageID #: 7781
MPSC Case No. U-17075, Exhibit A-30, U-16434-R
Exhibit U-16434-R, Schedule 1, Exhibit A-30, U-16434-R
Page 28 of 726 of 873

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  28 of 806

or otherwise fails to, perform due to an Event of Force Majeure or the failure of the other Party
or any of its Affiliates to perform it obligations under any of the Project Documents.  No Party
shall be relieved of any obligation for the payment of money as a result of an Event of Force
Majeure or relieved of any other obligations under this Agreement as a result of an Event of
Force Majeure solely because of increased costs or other adverse economic consequences that
may result from performance by such Party.

   (b) If a Party's ability to perform its obligations under this Agreement is
affected by an Event of Force Majeure, such Party shall:  (i) promptly notify the other Party in
writing of such event and its cause; and (ii) promptly supply such other available information
about the Event of Force Majeure and its cause as may be reasonably requested by the other
Party.

   (c) The suspension of performance by a Party due to an Event of Force
Majeure hereunder shall be of no greater scope and no longer duration than that which is
necessary by reason of the Event of Force Majeure.  The affected Party shall use commercially
reasonable efforts to promptly mitigate or remedy its inability to perform.  However, no Party
shall be required hereunder to accede to the demands of labor or settle any strike or labor dispute.
An Event of Force Majeure shall not excuse compliance with any Law or environmental permits
unless so provided under the applicable Law or permit.

## ARTICLE XI
## EARLY TERMINATION

  Section 11.1. Early Termination.

   This Agreement shall terminate on a date prior to the date referred to in Section 3.1 under
the following circumstances:

   (a) Upon mutual agreement of Buyer and Seller, which termination shall be
effective on the date agreed to by Buyer and Seller;

   (b) If the Term (as defined in the License Agreement) under the License
Agreement expires or is terminated, which termination of this Agreement shall be effective as of
the expiration or termination of the Term under the License Agreement;

   (c) Upon the date specified in a termination notice sent by a non-breaching
Party, so long as such date follows the expiration of any applicable notice and/or cure period, in
accordance with Article XII hereof;

   (d) Upon the date specified in a notice of termination from Seller to Buyer, so
long as such date follows the expiration of 30 days' notice, if a change in Law or circumstances
that results in a material increase in costs and expenses or a material reduction in revenue or
benefits in respect of Section 45 Tax Credits; provided that to the extent Seller terminates in
accordance with this Section 11.1(d), Seller shall not be required to produce and sell Refined
Coal pursuant to Section 5.1 from the date of the notice of termination until the effective date of
such termination;

24

Case 1:19-cv-01334-CJB    Document 406-16-17 Filed 05/03/22    Page 30 of 63 PageID #: 7782

MPSC Case No. U-17070 Surrebuttal
Exhibit MEC-32R, Schedule 1, Page 1
Page 29 of 727

MPSC Case No. U-16434-R
Exhibit A-30, U-16434-R
Page 28 of 873

(e)      Upon the date specified in a notice of termination by one Party to the other Party, so long as such date follows the expiration of 30 days' notice, if the other Party's obligation to perform hereunder is excused due to an Event of Force Majeure and, notwithstanding the provisions of Section 10.1, the suspension of such other Party's performance due to the Event of Force Majeure has continued for at least six consecutive months;

(f)      Upon the date specified in a notice of termination by Buyer to Seller, so long as such date follows the expiration of 30 days' notice, if after the Follow-up Period, Seller fails to produce Refined Coal for at least three consecutive months and such failure to produce is not attributable in whole or part to Buyer;

(g)      Upon the date specified in a notice of termination by one Party to the other Party, so long as such date follows the expiration of 30 days' notice, if after the Follow-up Period, deliveries of Refined Coal are suspended for at least three consecutive months;

(h)      Upon the date specified in a notice of termination from Buyer to Seller, so long as such date follows the expiration of 30 days' notice, if an order issued by the Michigan Public Service Commission, or a change in Law, related to Buyer's use of Refined Coal as a fuel in the Belle River Power Plant, this Agreement or any of the transactions contemplated by the Project Documents results in an increase in costs and expenses or a reduction in revenue to Buyer; or

(i)      Upon the date specified in a notice of termination from Buyer to Seller, so long as such date follows the expiration of 30 days' notice, if operation of one or both of the generating units at the Belle River Power Plant is discontinued.

Section 11.2.   Post-Termination Obligations; Survival.

(a)      Any termination of this Agreement, irrespective of the reason therefor, shall not release either Party of any obligations incurred prior to the effective date of such termination nor, subject to Article XII hereof, waive any rights or remedies with respect to a breach of this Agreement giving rise to such termination.

(b)      Any termination of this Agreement, irrespective of the reason therefor, shall not release either Party of any applicable rights and obligations pursuant to Section 5.4, Section 5.5, Section 6.3, Section 7.2(b), Section 11.2, Article XII, Article XIII or Article XIV.

## ARTICLE XII
## EVENTS OF DEFAULT AND REMEDIES

Section 12.1.   Event of Default.

An "Event of Default" shall mean the occurrence of any one or more of the following events:

(a)      A breach by Buyer of its payment obligations under Article IX hereof, which breach is not cured within ten days from the date written notice thereof is given to Buyer by Seller;

25

Case 1:19-cv-01334-CJB   Document 406-6   Filed 05/03/22   Page 31 of 63 PageID #: 7783
MPSC Case No. U-17087, Source 1240-R
Exhibit MEC-23-R, Schedule 12.97
Page 30 of 728
MPSC Case No. U-17087, Source 1240-R
Exhibit A-30, U-16434-R
Page 31 of 873

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  30 of 806

(b)     Any representation or warranty made by either Party in this Agreement shall at any time prove to be false or misleading in any material respect as of the date hereof, unless: (i) the fact, circumstance or condition that is the subject of such representation or warranty is made true within 30 days after such Party becomes aware that it was false or misleading (or within such longer period of time, not to exceed 90 days, as is necessary for such Party with the exercise of diligence to cure such failure, if such failure is susceptible to being made true but cannot be cured with the exercise of diligence within such 30-day period, and if such Party commences within such 30-day period and thereafter diligently and in good faith prosecutes the curing of such failure); and (ii) such cure removes any adverse effect on the other Party of such fact, circumstance or condition being otherwise than as first represented; or unless such fact, circumstance or condition being other than as first represented does not materially adversely affect the other Party, as the case may be;

(c)     The failure by Buyer to purchase its requirements for coal, refined coal and coal-based feedstock as required in Section 5.1, which breach is not cured within ten days from the date written notice thereof is given to Buyer by Seller;

(d)     A breach of a material provision hereof (other than a breach described in the other subsections of this Section 12.1) by either Party, which breach is not cured within: (i) 60 days from the date written notice thereof is given to the breaching Party by the other Party; or (ii) if such breach cannot reasonably be cured within such 60 days, and the breaching Party has commenced and is diligently pursuing cure, within 90 days of the date written notice is given; or

(e)     If either Party shall: (i) become insolvent or generally unable to pay its debts as they become due; (ii) apply for, consent to, or acquiesce in, the appointment of a trustee, receiver, sequestrator or other custodian for it or any of its property, or make a general assignment for the benefit of its creditors; (iii) in the absence of any such application, consent or acquiescence, permit or suffer to exist the appointment of a trustee, receiver, sequestrator or other custodian for it or a substantial portion of its property, and such trustee, receiver, sequestrator or other custodian shall not be discharged within 60 days; (iv) permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law, or any dissolution, winding up or liquidation proceeding, in respect of it, and, if any such case or proceeding shall be consented to or acquiesced in by it or shall result in the entry of an order for relief or shall remain for 60 days undismissed; or (v) take any formal action authorizing, or in furtherance of, any of the foregoing.

Section 12.2.   Remedies.

(a)     Upon the occurrence of an Event of Default described in Section 12.1(c), Seller shall have the right, exercisable within 90 days following the occurrence of the Event of Default, by giving written notice to Buyer to such effect, to terminate this Agreement within 30 days after the date of such notice.

(b)     Upon the occurrence of the Event of Default described in Section 12.1(a), Section 12.1(b) or Section 12.1(d), the non-breaching Party shall have the right to terminate this Agreement (so long as such Event of Default remains uncured) by giving written notice to the

breaching Party to such effect, which notice shall specify a date of termination that is not less than 90 days after written notice of the breach and not more than 120 days after written notice of the breach.

(c)     Upon the occurrence of an Event of Default described in <u>Section 12.1(e)</u>, the non-breaching Party shall have the right to terminate this Agreement immediately by giving written notice to the breaching Party to such effect.

(d)     Notwithstanding any other provision of this Agreement to the contrary, the remedies contained in this <u>Article XII</u> shall not be applicable to any matter governed by the Environmental Law or pertaining to Hazardous Materials, as those terms are defined in the Environmental Indemnity Agreement, and the Parties acknowledge and agree that any indemnification or other remedies as to such environmental matters are governed solely and exclusively by the Environmental Indemnity Agreement.

(e)     Except as otherwise provided herein, in addition to the remedies specified in this <u>Article XII</u>, each Party shall have all rights and remedies as are available to it at law or in equity.

Section 12.3.   <u>Limitations of Seller Liability</u>.

Notwithstanding anything to the contrary in this Agreement, the total aggregate liability of Seller for the payment of money to Buyer  in any Contract Year under this Agreement, including without limitation, Seller's breach or alleged breach of this Agreement but excluding Seller's reimbursement obligations under <u>Section 9.4</u>, shall in no event exceed the aggregate amount paid by Buyer pursuant to <u>Sections 9.1</u> and <u>9.2</u> after deducting the Coal Inventory Price associated therewith and Resold Coal Price for Resold Coal purchased at a site other than the Belle River Site.

## ARTICLE XIII
## DISPUTE RESOLUTION

Section 13.1.   <u>Dispute Resolution</u>.

(a)     The Parties hereto agree: (i) to attempt to resolve all disputes arising hereunder promptly, equitably and in a good faith manner; and (ii) to provide each other with reasonable access during normal business hours to any and all non-privileged records, information and data pertaining to any such dispute.

(b)     Other than a claim for equitable relief, which may be brought directly to any court of competent jurisdiction, any claim or dispute arising out of any of the provisions of this Agreement or the breach thereof which the Parties are unable to resolve pursuant to <u>Section 13.1(a)</u>, shall be settled by arbitration to be conducted in Lansing, Michigan in accordance with the American Arbitration Association Commercial Arbitration Rules. The arbitration shall be held before a panel of three arbitrators.  Each Party shall appoint an arbitrator within 30 days of the filing of the notice of intent to arbitrate.  The arbitrators appointed by the Parties shall attempt to agree on the selection of the third arbitrator who will serve as chairman of the arbitration panel within 30 days from their appointment.  If they cannot agree on an arbitrator

27

Case 1:19-cv-01334-CJB    Document 406-10-17 Filed 05/03/22    Page 33 of 63 PageID #: 7785
MPSC Case No. U-17097 Surrebuttal 16434-R
Exhibit: MEC9-28, Source: Exhibit A-30, U-16434-R
Page 32 of 720 of 873

then either Party may move to have the arbitrator appointed by the American Arbitration Association.  Time shall be of the essence in the nomination of the arbitrators.  If a Party fails to appoint an arbitrator within such 30 day period, that Party shall waive its right to appoint an arbitrator and the arbitration shall proceed with the appointed arbitrator.  The arbitration award by the arbitrator shall be final and binding and, unless the arbitrator expressly determines them to be appropriate, shall not include costs or attorney's fees.  A judgment to enforce the arbitration award may be entered in any court of appropriate jurisdiction.  Each Party shall bear the cost of its appointed arbitrator and the Parties shall share equally the cost of the third arbitrator and the American Arbitration Association. Upon the date of an arbitration award, if it is determined that an amount is due from one Party to the other, then such amount will be paid to the Party to whom it is due within 15 days from the final settlement, or written determination of the arbitrator, as the case may be.

(c)       During resolution of any dispute under this Article XIII, the Parties shall continue to perform all of their respective obligations under this Agreement without interruption or slow down, except to the extent a Party is prevented from performing due to the nature of the dispute, until such dispute is resolved.

(d)       The Parties agree that they may be joined as an additional party to an arbitration involving BR Fuels, MPPA or Detroit Edison under any of the other Project Documents; provided, that the Party joined as an additional party to the arbitration is a proper respondent in the arbitration.  If more than one arbitration is begun under the Agreement or the Project Documents and any Person contends that two or more arbitrations involve substantially the same issues and should be heard in one proceeding, then the arbitration(s) that have been commenced shall be dismissed and a new arbitration proceeding involving all of the parties shall be commenced and a new arbitration panel shall be selected.

### ARTICLE XIV
### MISCELLANEOUS

Section 14.1.  Terms and Conditions of Sale.

The terms and conditions of sale applicable to each sale of Refined Coal under this Agreement will be those stated in this Agreement, unless the Parties otherwise agree in writing. The terms and conditions of sale applicable to each sale of Resold Coal under this Agreement will be those stated in this Agreement, unless the Parties otherwise agree in writing; provided that any inconsistencies between the terms and conditions of this Agreement and any purchase order shall be resolved in favor of the terms and conditions set forth in this Agreement.

Section 14.2.  Confidentiality.

Each Party shall hold, and shall use its best efforts to cause its Affiliates, agents, advisors (including counsel and consultants), any lender, potential lender, investor or potential investor to hold, in strict confidence from any other Person (other than any such Affiliate, agent or advisor or any lender, potential lender, investor or potential investor as permitted hereby) all documents and information concerning the other Party or any of its Affiliates furnished to it, or its Affiliates,

28

MPSC Case No. U-17059, Exhibit A-30
Exhibit MEB32-R, Schedule 12.09T
Page 722 of 873

agents or advisors (including counsel and consultants) which are marked confidential or can reasonably be interpreted to contain confidential information, whether before or after the Effective Date, by or on behalf of the other Party in connection with this Agreement or the transactions contemplated hereby, and neither Party nor their Affiliates or any agent, advisor, lender, potential lender, investor or potential investor shall disclose any such information unless, subject to <u>Section 14.3</u>, required to disclose any such information by judicial or administrative process (including in connection with obtaining from Governmental Bodies the necessary approvals of this Agreement and the transactions contemplated hereby) or by other requirements of Law. Each Party may disclose such documents or information to its agents and advisors and any lender or potential lender or any investor or potential investor, <u>provided</u> that prior to receipt of any such information any such agent, advisor, lender, potential lenders, investor or potential investor shall have executed a confidentiality agreement with such Party that incorporates the restrictions and exceptions set forth in this <u>Section 14.2</u>, and may disclose such documents or information in an action or proceeding brought by either Party in pursuit of its rights or in the exercise of its remedies hereunder. Notwithstanding the foregoing, this <u>Section 14.2</u> shall not apply to such documents or information that were (i) previously known by the Party receiving such documents or information without breach of any confidentiality requirement or obligation, (ii) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through operation of Law, or by no fault of such receiving Party, or (iii) later acquired by such receiving Party from another source if such receiving Party is not aware that such source is under an obligation to the other Party to keep such documents and information confidential.

Section 14.3. <u>Required Disclosure</u>.

Any Party reasonably determining in good faith that it is required by Law or in the course of tax audits or administrative or judicial proceedings to disclose information that is otherwise required to be maintained in confidence pursuant to <u>Section 14.2</u> may make disclosure notwithstanding the provisions of <u>Section 14.2</u>; <u>provided</u>, <u>however</u>, that the Party making the disclosure shall, to the extent possible, give prior notice to the other Party of the requirement and the terms thereof and shall cooperate to the maximum extent practicable to minimize the disclosure of the information to allow such Party at its cost and expense to obtain proprietary or confidential treatment of such information by the third party to whom the information is disclosed and, to the extent such remedies are available, to seek protective orders limiting the dissemination and use of the information. This Agreement does not alter the rights of either Party to object to the Law or proceedings requiring the disclosure.

Section 14.4. <u>Compliance with Laws and Governmental Approvals</u>.

In connection with the performance of this Agreement, each Party agrees to comply in all material respects with all Laws, and each Party hereto agrees that it or its agent will use commercially reasonable efforts to acquire and maintain, in a timely manner, all Governmental Approvals required by Law or Governmental Bodies to perform its obligations under this Agreement.

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  34 of 806

Section 14.5.   Entire Agreement; Successors and Assigns.

This Agreement, together with the other Project Documents, constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and therein and the transactions contemplated hereby and thereby, and any and all previous understandings, proposals, negotiations, agreements, commitments and representations, whether oral or written, are merged herein and are superseded hereby.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 14.6.   Notices.

Except as otherwise set forth in this Agreement, all notices, requests and other communications hereunder must be in writing and shall be delivered personally (by hand delivery or by overnight courier) or by facsimile transmission (with receipt of transmission confirmation) or mailed (certified mail postage prepaid, return receipt requested) to the Parties at the following addresses or facsimile numbers and shall be effective upon receipt (when sent by personal delivery or certified mail) and upon receipt of transmission confirmation (when sent by facsimile):

If to Buyer, to:   The Detroit Edison Company
One Energy Plaza
634 General Offices
Detroit, Michigan 48226
Attention: Manager, Business Development and
Administration - Fuel Supply
Facsimile: (313) 235-6992

With a copy to:   The Detroit Edison Company
One Energy Plaza
641 General Offices
Detroit, Michigan 48226
Attention:  Director - Fuel Supply
Facsimile: (313) 235-6992

If to Seller, to:   Belle River Fuels Company, LLC
414 South Main Street
Suite 600
Ann Arbor, MI  48104
Attention:  General Counsel
Facsimile:  (734) 302-8245

30

Case 1:19-cv-01334-CJB   Document 406-16   Filed 05/03/22   Page 36 of 63 PageID #: 7788
MPSC Case No. U-17697 et al
Exhibit MEO-38, Source: Exhibit A-30, U-16434-R
Page 35 of 873

With a copy to:                Belle River Fuels Company, LLC
414 South Main Street
Suite 600
Ann Arbor, MI  48104
Attention:  Katherine A. Panczak
Facsimile:  (734) 302-5335

provided, however, that either Party from time to time may change its address, facsimile number or other information for the purposes of notices to such Party by giving notice specifying such change to the other Party.

Section 14.7.   Assignment.

Neither this Agreement, nor any of the rights and obligations hereunder, may be assigned, transferred or delegated by either Party without the express prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed, except that either Party may assign this Agreement to an Affiliate thereof without the prior written consent of the other Party; provided that any assignment to an Affiliate shall not release the assignor from any obligations under this Agreement unless otherwise expressly consented to by the other Party.  For purposes of this Section 14.7, any change in control or majority ownership of Seller which causes Seller no longer to be an Affiliate of DTE Energy Company (determined without regard to the proviso in the definition of "Affiliate" contained herein) shall be deemed an assignment.

Section 14.8.   Waiver; Invalidity.

Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by such waiving Party.  The failure or delay of either Party to require performance by the other Party of any provision of this Agreement shall not affect its right to require performance of such provision unless and until such performance has been waived by such Party in writing in accordance with the terms hereof.  No waiver by either Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.  All remedies, either under this Agreement or by Law or otherwise afforded, shall be cumulative and not alternative.  The invalidity or unenforceability of any provision of this Agreement shall be determined only by a court of competent jurisdiction.  The Parties hereby agree to use good faith efforts to negotiate an equitable adjustment to any provisions of this Agreement determined to be invalid or unenforceable with a view toward effecting the purposes of this Agreement, and the validity or enforceability of the remaining provisions of this Agreement shall not be affected thereby.

Section 14.9.   Limitations of Liability and Exclusive Remedies.

(a)     **NEITHER PARTY NOR ITS AFFILIATES SHALL BE LIABLE UNDER THIS AGREEMENT TO THE OTHER PARTY OR ITS AFFILIATES FOR CONSEQUENTIAL OR INDIRECT LOSS OR DAMAGE, INCLUDING, WITHOUT**

31

**LIMITATION, LOSS OF PROFIT, LOSS OF TAX BENEFIT OR CREDITS, LOSS OF GOODWILL OR ANY OTHER SPECIAL, PUNITIVE OR INCIDENTAL DAMAGES RESULTING FROM ANY VIOLATION OF OR DEFAULT UNDER THIS AGREEMENT.**

(b)    **THE PROVISIONS OF THIS <u>SECTION 14.9</u> SHALL APPLY TO ALL CLAIMS BASED ON OR ARISING UNDER THIS AGREEMENT, WHETHER IN CONTRACT, EQUITY, TORT OR OTHERWISE, REGARDLESS OF FAULT, GROSS OR OTHER NEGLIGENCE (IN WHOLE OR IN PART), STRICT LIABILITY, BREACH OF CONTRACT OR BREACH OF WARRANTY AND SHALL EXTEND TO THE MEMBERS, MANAGERS, TRUSTEES, DIRECTORS, OFFICERS AND EMPLOYEES, AGENTS AND RELATED PERSONS OR AFFILIATES OF EACH PARTY, AND THEIR RESPECTIVE MEMBERS, MANAGERS, DIRECTORS, TRUSTEES, OFFICERS, EMPLOYEES AND AGENTS.**

Section 14.10. <u>Headings</u>.

The headings contained in this Agreement are solely for the convenience of the Parties and shall not be used or relied upon in any manner in the construction or interpretation of this Agreement.

Section 14.11. <u>Counterparts</u>.

The Parties may execute this Agreement in counterparts, which shall, in the aggregate, when signed by both Parties constitute one and the same instrument, and, thereafter, each counterpart shall be deemed an original instrument as against any Party who has signed it.

Section 14.12. <u>Applicable Law</u>.

This Agreement, including the interpretation, construction, validity and enforceability hereof, and the transactions contemplated herein, and all disputes between the Parties under or related to this Agreement or the facts and circumstances leading to its execution or performance, whether in contract, tort or otherwise will be governed by the laws of the State of Michigan without regard to the conflict of laws rules thereof.  IN ADDITION, EACH PARTY, KNOWINGLY AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY, WAIVES TRIAL BY JURY IN AND AS TO ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY CLAIM, COUNTERCLAIM, CROSS CLAIM OR THIRD PARTY CLAIM THEREIN.

Section 14.13. <u>Amendment</u>.

No modification or amendment of any provisions of this Agreement shall be valid unless it is in writing and signed by both Parties.

MPSC Case No. U-17087 et al.
Exhibit MEC-238, Source: Exhibit A-30, U-16434-R
Page 37 of 725 of 873

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  37 of 806

Section 14.14. <u>No Third Party Beneficiary</u>.

The terms and provisions of this Agreement are intended solely for the benefit of each Party and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

[Remainder of page intentionally left blank]

33

MPSC Case No. U-17767 Surrebuttal U-16434-R
Exhibit MEC-23-R, Schedule 1 Exhibit A-30, U-16434-R
Page 38 of 726 of 873

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 38 of 806

IN WITNESS WHEREOF, the Parties have executed this Refined Coal Supply Agreement by their authorized representatives as of the date first above written.

**BELLE RIVER FUELS COMPANY, LLC**

By: _____

Name: Davio Rund

Title: President

REVIEWED BY:
LEGAL

**THE DETROIT EDISON COMPANY**

By: _____

Name: Anthony F Earley, Jr.

Title: Chair & CEO

34

MPSC Case No. U-17087 Rebuttal U-16434-R
Exhibit MEC-28, Source: Exhibit A-30, U-16434-R
Page 39 of 727 of 873

**EXHIBIT A**

**BELLE RIVER SITE**



MPSC Case No. U-17097 Rebuttal
MPSC Case No. U-17097 Source details 16434-R
Exhibit MEC-238, Source: Exhibit A-30, U-16434-R
Page 40 of 728 of 873

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 40 of 806

## EXHIBIT B

### DELIVERY POINTS

See attached on the next page.

B-1

MPSC Case No. U-17087 Surrebuttal
MPSC Case No. U-17087 Surrebuttal
Exhibit MEOG-28, Source: Exhibit A-30, U-16434-R
Page 42 of 873

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 41 of 806



B-2

MPSC Case No. U-17087, rebuttal 164-34-R
Exhibit MEC-28, Source: Exhibit A-30, U-16434-R
Page 42 of 873

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  42 of 806

## EXHIBIT C

### CALCULATION OF DETROIT EDISON BENEFITS

See attached.

MPSC Case No. U-16434-R
Exhibit A-30, Source: Exhibit A-30, U-16434-R
Page 43 of 721 of 873

Case No.:   U-16434-R
Exhibit:   A-30
Witness:   G. E. Lapplander
Page:   43 of 806



# Detroit Edison Benefits

## DECo Refined Coal Adder Calculation:

DECo Refined Coal Adder = Minimum(DECo Environmental Benefit, DECo's

Share of BRFC's Revenue Requirement) – PA2 Expense Increase + DECO

Avoided Hg Capital Amortization

DECo Environmental Benefit = DECo $SO_2$ Benefit + DECo Mercury Benefit

+ DECo Fly Ash Benefit

1

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 44 of 806



2

# Environmental Benefit Cal...
## 2 Benefit

### DECo SO2 Benefit

1. $\text{DECo SO}_2 \text{ Benefit}_{Year} = \sum\limits_{Jan}^{Dec} \text{DECo SO}_2 \text{ Benefit}_{Month}$

### Monthly SO₂ Benefit Calculation:

● If Actual SO₂ Emissions$_{Month}$ ≥ Status Quo SO₂ Emissions$_{Month}$, then DECo SO₂ Benefit$_{Month}$ = 0

● If Actual SO₂ Emissions$_{Month}$ < Status Quo SO₂ Emissions$_{Month}$, then DECo SO₂ Benefit$_{Month}$ = 0.8139 X Transacted SO₂ Allowance Benefit$_{Month}$

### Status Quo Calculation:

1. Status Quo SO₂ Emissions$_{Month}$ (tons SO₂) = Emission Factor$_{Unit}$ X % Sulfur in Coal$_{Monthly Avg}$ X Actual Tons Coal Combusted$_{Month}$ X 0.0005

Table defining terms on next page

MPSC Case No. U-17097 December 1, 2017
MPSC Case No. U-17097 December 1, 2017
Exhibit MEC-28, Source Exhibit A-30, U-16434-R
Page 43 of 873

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  45 of 806

## Environmental Benefit Calculation
## SO2 Benefit Continued

| Defined Terms | Unit | | Data Source |
|---|---|---|---|
| Actual SO$_2$ Emissions$_{Month}$ | (tons SO$_2$) | = | Tons of SO$_2$ emissions for the calendar month, as reported by the SO$_2$ Continuous Emissions Monitors installed at Belle River Unit 1 and 2 stack(s).  Data shall be provided by Buyer to Seller by the 5th day of the month for the prior month's emissions. |
| Emission Factor $_{Unit 1}$ | lbs SO$_2$ / tons coal | = | 33.0 Fixed number, developed by adjusting AP-42 Emission Factor of 35 to better correlate with annual SO$_2$ emissions reported for Belle River Unit 1 to the United States Environmental Protection Agency (USEPA) from 1998 through 2007.  If Buyer installs additional control technology on the unit to comply with future environmental regulations, the Emission Factor shall be adjusted to account for changes in Belle River Unit 1 emissions due to the installation of the control technology. |
| Emission Factor $_{Unit 2}$ | lbs SO$_2$ / tons coal | = | 33.4 Fixed number, developed by adjusting AP-42 Emission Factor of 35 to better correlate with annual SO$_2$ emissions reported for Belle River Unit 2 to the USEPA from 1998 through 2007.  If Buyer installs additional control technology on the unit to comply with future environmental regulations, the Emission Factor shall be adjusted to account for changes in Belle River Unit 2 emissions due to the installation of the control technology. |
| % Sulfur in Coal$_{Monthly Avg.}$ | lbs S / lbs coal | = | Average percent sulfur content of coal for month as determined by averaging, for the calendar month, the daily sample percent sulfur content (% Sulfur) results reported by the Buyer's Central Fuel Lab.  The Buyer shall provide daily coal samples for Belle River Unit 1 and Unit 2 to Seller within 5 calendar days.  % Sulfur in coal shall be analyzed for % Sulfur in accordance with ASTM standards and reported to Seller within 5 calendar days. |
| Allowances Not Consumed | (tons) | = | The number of SO$_2$ allowances that would have been surrendered to the USEPA if the difference between Status Quo SO$_2$ Emissions and Actual SO$_2$ Emissions were emitted by the Belle River Power Plant.  For example, in 2010 under the current Clean Air Interstate Rule (CAIR), two SO$_2$ allowances are required to be surrendered for every one ton of SO$_2$ emitted; therefore Allowances Not Consumed = (Status Quo SO$_2$ Emissions$_{Month}$ – Actual SO$_2$ Emissions$_{Month}$) x 2. |
| Actual Tons Coal Combusted$_{Month}$ | (tons coal) | = | Actual tonnage of coal consumed for the calendar month as reported in P3M as COAL_CONS |
| Transacted SO$_2$ Allowance Benefit$_{Month}$ | ($) | = | The actual sale price realized by Buyer for the sale of monthly Allowances Not Consumed.  Buyer shall use commercially reasonable efforts to sell the number of Allowances Not Consumed during a calendar month by the 12th day of the following month.  In the event Buyer does not sell the Allowances Not Consumed, the Argus Air Daily monthly index price (ADI) for one SO$_2$ allowance, as published by Argus Air daily on the last business day of the month, shall be multiplied by the number of Allowances Not Consumed during that same calendar month to estimate the monthly Transacted SO$_2$ Allowance Benefit.  The estimated Transacted SO$_2$ Allowance Benefit will be reconciled within 30 days to reflect actual sales price if Buyer makes a transaction for Allowances Not Consumed within 3 months after the estimated value was used.  It is the Parties' intent that the SO$_2$ price index used for purposes of the calculations specified above are representative of the current SO$_2$ market price.  In the event that the ADI becomes unavailable, or if the Parties agree that the above-specified does not accurately represent the current SO$_2$ market price, the Parties shall mutually agree to an alternative or replacement SO$_2$ price index for the calculations. |

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 46 of 806

# Environmental Benefit Calculation: Mercury Benefit

## Mercury Benefit Calculation:

- $DECo\ Mercury\ Benefit_{Year} = 0.6139 \times Avoided\ Mercury\ Compliance\ Cost_{Year}$

## Avoided Mercury Compliance Cost Calculations:

- If $Actual\ Mercury\ Compliance\ Cost_{Year} \geq Status\ Quo\ Mercury\ Compliance\ Cost_{Year}$, then $Avoided\ Mercury\ Compliance\ Cost_{Year} = 0$

- If $Actual\ Mercury\ Compliance\ Cost_{Year} < Status\ Quo\ Mercury\ Compliance\ Cost_{Year}$, then $Avoided\ Mercury\ Compliance\ Cost_{Year} = (Status\ Quo\ Mercury\ Compliance\ Cost_{Year} + Avoided\ Capital\ Effect_{Year}) - Actual\ Mercury\ Compliance\ Cost_{Year}$

### Status Quo Calculations:

- $Status\ Quo\ Mercury\ Compliance\ Cost_{Year} = SQ\ Sorbent\ Cost_{Year} + SQ\ Fixed\ O\&M_{Year}$
- If $Year < Hg\ Compliance\ Date - 1$, $SQ\ Capital\ Cost_{HCI\ (Year)} = DECo\ Hg\ Capital\ Cost_{Year}$
- If $Year \geq Hg\ Compliance\ Date - 1$, $SQ\ Capital\ Cost_{HC(Year)} = \$0$

### Status Quo Sorbent Cost Calculations:

- If $Year < Hg\ Compliance\ Date$, $SQ\ Sorbent\ Cost\ Calculations_{Year} = 0$
- If $Year \geq Hg\ Compliance\ Date$, $SQ\ Sorbent\ Cost\ Calculations_{Year} = Sorbent\ Usage\ Rate\ (\frac{lb}{mmacf}) \times Flue\ Gas\ Flow\ Rate\ (\frac{mmacf}{min}) \times 525,600\ (\frac{min}{year}) \times Plant\ Capacity\ Factor_{Year} \times Delivered\ Sorbent\ Unit\ Price\ (\frac{\$}{lb})$

### Status Quo Fixed O&M Calculations:

- If $Year < Hg\ Compliance\ Date$, $SQ\ Fixed\ O\&M_{Year} = 0$
- If $Year \geq Hg\ Compliance\ Date$, $SQ\ Fixed\ O\&M_{Year} = DECo\ Hg\ O\&M_{Year}$

### Avoided Capital Effect Calculations:

- If $Year < Hg\ Compliance\ Date$, $Avoided\ Capital\ Effect_{(Year)} = 0$
- If $Year \geq Hg\ Compliance\ Date$, $Avoided\ Capital\ Effect_{(Year)} = [(SQ\ Capital\ Cost_{(Year)} - Actual\ Capital\ Cost_{(Year-1)}) \times DECo\ Capital\ Fixed\ Charge\ Rate + (Actual\ Capital\ Effect_{(Year-1)}) \times DECo\ Capital\ Fixed\ Charge\ Rate)]$

4

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 47 of 806

# Environmental Benefit Calculation — Mercury Benefit

| Defined Terms | Unit | | Data Source |
|---|---|---|---|
| Actual Mercury Compliance Cost$_{Year}$ | ($) | = | Actual Belle River Mercury Compliance Cost as determined from discrete accounts dedicated to Belle River mercury control equipment, which will be the sum of all mercury control related expenditures, excluding capital |
| Actual Capital Cost$_{Year}$ | ($) | = | Actual annual capital cost for mercury control equipment for Belle River Power Plant as determined from discrete accounts dedicated to Belle River mercury control equipment |
| Hg Compliance Date | (year) | = | First year Hg emissions are required to be removed from Belle River stack emissions due to State and/or Federal requirements |
| DECo Hg O&M$_{Year}$ | ($) | = | Actual O&M expenses incurred for mercury control at Detroit Edison plants not consuming Refined Coal, adjusted for Belle River Power Plant requirements without Refined Coal consumption. If actual Detroit Edison cost data is unavailable, EPRI O&M$_{2006}$ will be used. |
| EPRI O&M$_{2006}$ | ($) | = | 1,000,000 x Inflation Adjustment Factor. 1,000,000 is a fixed value, determined using the EPRI-based Hg Cost Table that was developed using the September 2006 EPRI Mercury Control Technology Selection Guide |
| Sorbent Usage Rate | $\frac{lb}{mmacf}$ | = | Determined from EPRI-based Sorbent Injection Rate Table, based on Hg Removal % and Coal Type; such table to be updated as more current or relevant data is published by EPRI. In the event Detroit Edison conducts appropriate activated carbon injection testing at Belle River or another plant suitable to simulate Belle River conditions, the Sorbent Usage Rate value determined from that testing will be used. |
| Inflation Adjustment Factor$_{Year}$ | - | = | Gross Domestic Product Implicit Price Deflator (GDPIPD); GDPIPD$_{Year}$ is annually computed and published by US Department of Commerce $$\frac{GDPIPD_{Year}}{GDPIPD_{2006}}$$ |
| Flue Gas Flow Rate | $\frac{mmacf}{min}$ | = | 2.75. Fixed value, based on design data assuming full load operation |
| Plant Capacity Factor$_{Year}$ | - | = | Annual Capacity Factor for Belle River for specified year, as determined from P3M OUTPUT_FAC |
| Delivered Sorbent Unit Price | $\frac{\$}{lb}$ | = | Unit cost for the purchase of treated activated carbon, as determined using average annual price paid by Detroit Edison for treated activated carbon plus cost for delivery to Belle River |
| DECo Hg Capital Cost$_{Year}$ | ($) | = | Actual capital costs incurred for mercury control at Detroit Edison plants, adjusted for Belle River Power Plant conditions and installation year. If actual Detroit Edison cost data is unavailable, EPRI Capital Cost$_{2006}$ will be used and installation year. |
| EPRI Capital Cost$_{2006}$ | ($) | = | 5,000,000 x Inflation Adjustment Factor. 5,000,000 is a fixed value, determined using the EPRI-based Hg Cost Table that was developed using the September 2006 EPRI Mercury Control Technology Selection Guide |
| DECo Capital Fixed Charge Rate | - | = | .15 |

5

MPSC Case No. U-17087, dated 11/24/14
MPSC Case No. U-17087, rebuttal 01/27/15
Exhibit MEC-34, Source: Exhibit A-30, U-16434-R
Page 48 of 873

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 48 of 806



## Environmental Benefit Calculation:
### Fly Ash Benefit

**Fly Ash Benefit Calculation:**

- DECo Fly Ash Benefit$_{Year}$ = 0.8139 X (Fly Ash Revenue Benefit$_{Year}$ + Fly Ash Disposal Expense Benefit$_{Year}$)

**Fly Ash Revenue Benefit Calculation:**

- Fly Ash Revenue Benefit$_{Year}$ = Actual Fly Ash Revenue$_{Year}$ - Status Quo Fly Ash Revenue$_{Year}$
  - If Year < Hg Compliance Date, Status Quo Fly Ash Revenue$_{Year}$ = Total Guaranteed Payment$_{Year}$
  - If Year ≥ Hg Compliance Date, Status Quo Fly Ash Revenue$_{Year}$ = 0
- Actual Fly Ash Revenue$_{Year}$ = Project Contracted Fly Ash Volume$_{Year}$ X  Project Contracted Fly Ash Unit Price$_{Year}$

**Fly Ash Disposal Expense Benefit Calculation:**

- Fly Ash Disposal Expense Benefit$_{Year}$ = (Project Contracted Fly Ash Volume$_{Year}$ - Status Quo Contracted Fly Ash Volume$_{Year}$ - Incremental Fly Ash Increase$_{Year}$) x Variable Unit Disposal Cost
  - If Year < Hg Compliance Date, Status Quo Contracted Fly Ash Volume$_{Year}$ = Total Guaranteed Volume$_{Year}$
  - If Year ≥ Hg Compliance Date, Status Quo Contracted Fly Ash Volume$_{Year}$ = 0

6

MPSC Case No. U-16434-R
Exhibit: A-30, Source: Exhibit A-30, U-16434-R
Page: 49 of 873

Case No.:   U-16434-R
Exhibit:   A-30
Witness:   G. E. Lapplander
Page:   49 of 806



## Environmental Benefit Calc...
## Fly Ash Benefit Continued

| Defined Terms | Unit | | Data Source |
|---|---|---|---|
| Project Contracted Fly Ash Volume$_{year}$ | (tons) | = | Volume of Fly Ash committed for sale under contracts in place when Refined Coal is used as fuel at Belle River Power Plant |
| Project Contracted Fly Ash Unit Price$_{year}$ | ($/ton) | = | Unit price committed to be paid to Detroit Edison under fly ash contracts in place when Refined Coal is used as fuel at Belle River Power Plant |
| Variable Unit Disposal Cost$_{year}$ | ($/ton) | = | $\dfrac{\text{Actual Annual Variable Disposal Cost}_{year}}{\text{Actual Annual Fly Ash Tons Landfilled}_{year}}$ |
| Actual Annual Variable Disposal Cost$_{year}$ | ($) | = | Cost for landfilling fly ash produced at Belle River for specified year, as reported in [Plant Maximo Account]. This cost excludes fixed costs associated with landfill. |
| Actual Annual Fly Ash Tons Landfilled$_{year}$ | (tons) | = | Actual annual tons of fly ash produced at Belle River for specified year that were disposed by landfilling, as reported in [Plant Maximo Account] |
| Hg Compliance Date | (year) | = | First year that Hg emissions are required to be removed from Belle River stack emissions due to State and/or Federal requirements |
| Incremental Fly Ash Increase$_{year}$ | (tons) | = | Annual volume of additives mixed with coal by BRFC to produce Refined Coal, as determined from BRFC data acquisition system |
| Total Guaranteed Volume$_{year}$ | (tons) | = | Value determined from Belle River Fly Ash Contracts Table for specified year. Table will be amended to incorporate future contract adjustments not attributed to the use of Refined Coal. |
| Total Guaranteed Payment$_{year}$ | ($) | = | Value determined from Belle River Fly Ash Contracts Table for specified year. Table will be amended to incorporate future contract adjustments not attributed to the use of Refined Coal. |

7

MPSC Case No. U-17677
Exhibit A-36, Schedule 1
Page 72 of 873

MPSC Case No. U-16434-R
Exhibit U-16434-R, Source Exhibit A-30, U-16434-R
Page 50 of 726

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 50 of 806



**DECo's Share of BRFC's Revenue Requirement:**

● DECo's Share of BRFC's Revenue Requirement$_{Year}$ =
  81.39% X (Expenses$_{Year}$ + DECo Allowed Return X (1/1-Tax Rate) X (Net Plant$_{Year}$ + Non Coal Working Capital$_{Year}$ ))
  + DECo Allowed Return X (1/1-Tax Rate) X DECo Coal Inventory$_{Year}$)

| Defined Terms | Unit | | Data Source |
|---|---|---|---|
| Expenses$_{Year}$ | ($) | = | Total BRFC reasonable and prudent expenses incurred for the year less all coal and coal handling expenses for which BRFC is reimbursed by either Edison or MPPA - See Note 1. |
| DECo Allowed Return | % | = | 7.16%. |
| Tax Rate | ($) | = | Federal Statutory Tax Rate + ((1 – Federal Statutory Tax Rate) X (State Income Tax Rate including Surcharges)) e.g. for 2008: 35% + ((1 – 35%) X (4.95% + 0.6%)) = 38.74% |
| Net Plant$_{Year}$ | ($) | = | BRFC's Net Book Value of Capital Assets at December 31st of the applicable year  Note:  If the number of facilities exceeds the appropriate number of facilities, Net Plant$_{Year}$ will be reduced by the net book value of excess facilities. |
| Non Coal Working Capital$_{Year}$ | ($) | = | BRFC's Working Capital at December 31st of the applicable year  Less Coal Inventory (Coal Intransit + Coal Yard) at the Same Date (i.e. Current Assets – Current Liabilities – Coal Inventory) |
| DECo Coal Inventory$_{Year}$ | ($) | = | BRFC's Coal Inventory stored in Coal Intransit and Coal Yard (excluding the MPPA's portion of BRFC's inventory) at Year End. |

Note: When it is anticipated that DECo's Share of BRFC's Revenue Requirement will be less then the DECo Environmental Benefit, monthly invoices will be estimated using prior year Expenses, prior year Tax Rate, prior year Net Plant, prior year Non Coal Working Capital and prior year DECo Coal Inventory.

8

MPSC Case No. U-17767 Sur-rebuttal U-16434-R
Exhibit MEC0-248, Source: Exhibit A-30, U-16434-R
Page 739 of 873

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 51 of 806

## DECo Avoided Hg Capital Amortization

### DECo Avoided Hg Capital Amortization Calculations:

- DECo Avoided Hg Capital Amortization$_{(year)}$ = Minimum(Avoided Hg Capital Balance$_{(year-1)}$, Maximum(DECo Environmental Benefit - DECo's Share of BRFC's Revenue Requirement, 0), DECo Avoided Capital Amortization Cap$_{(year)}$)

- If Year = 2009, Avoided Hg Capital Balance$_{(year)}$ = 0

- If Year ≥ 2009, Avoided Hg Capital Balance$_{(year)}$ = Avoided Hg Capital Balance$_{(year-1)}$ + .8139 * (SQ Capital Cost$_{AC(year)}$ - Actual Capital Cost$_{(year)}$) – DECo Avoided Hg Capital Amortization$_{(year)}$

### DECo Avoided Capital Amortization Cap Calculations:

- If Year < Hg Compliance Date, DECo Avoided Capital Amortization Cap = 0

- If Year = Hg Compliance Date, DECo Avoided Capital Amortization Cap = 0.8139 * ((SQ Capital Cost$_{QC(year-1)}$ –Actual Capital Cost $_{(year-1)}$ )X(2020 - Hg Compliance Date))

- If Year > Hg Compliance Date, DECo Avoided Capital Amortization Cap = DECo Avoided Capital Amortization Cap$_{(year-1)}$ + (DECo Avoided Capital Amortization Cap$_{(year-1)}$) – DECo Avoided Hg Capital Amortization$_{(year-1)}$

### Status Quo Calculations:

- If Year = Hg Compliance Date - 1, SQ Capital Cost$_{AC (Year)}$ = DECo Hg Capital Cost$_{act}$

- If Year ≠ Hg Compliance Date - 1, SQ Capital Cost$_{QC(Year)}$ = $0

9

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  52 of 806



10

# Avoided Hg Capital Amount ... tion Continued

| Defined Terms | Unit | Data Source |
|---|---|---|
| Hg Compliance Date | (year) | = First year Hg emissions are required to be removed from Belle River stack emissions due to State and/or Federal requirements |
| Actual Capital Cost $_{Year}$ | ($) | = Actual annual capital cost for mercury control equipment for Belle River Power Plant as determined from discrete accounts dedicated to Belle River mercury control equipment |
| DECo Hg Capital Cost $_{Belt}$ | ($) | = Actual capital costs incurred for mercury control at Detroit Edison plants, adjusted for Belle River Power Plant conditions and installation year.  If actual Detroit Edison cost data is unavailable, EPRI Capital Cost $_{2008}$ will be used and installation year. |
| EPRI Capital Cost $_{2008}$ | ($) | = 5,000,000 x Inflation Adjustment Factor.  5,000,000 is a fixed value, determined using the EPRI-based Hg Cost Table that was developed using the September 2006 EPRI Mercury Control Technology Selection Guide |
| DECo Capital Fixed Charge Rate | - | = .15 |

MPSC Case No. U-17767 etc.
Exhibit A-30, Source: U-16434-R
Page 53 of 873

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  53 of 806



# PA2 Expense Increase Calculation

## PA2 Expense Increase Calculation:

$$\text{PA2 Expense Increase}_{year} = \text{PA2 MWH}_{year} / \text{BR MWH}_{year} * (\text{DECo SO2 Benefit}_{year} + \text{DECo Avoided Hg Capital Amortization}_{year}) / (1 + \text{PA2 MWH/BR MWH}_{year})$$

| Defined Terms | Unit | Data Source |
| --- | --- | --- |
| $\text{PA2 MWH}_{year}$ | MWH | The quantity of electricity purchased by Detroit Edison through contracts where the price paid by Detroit Edison is a function of Belle River Power Plant fuel expense. |
| $\text{DECo SO2 Benefit}_{year}$ | ($) | As defined earlier in this Exhibit |
| $\text{DECo SO Hg Capital Amortization}_{year}$ | ($) | As defined earlier in this Exhibit |
| $\text{BR MWH}_{year}$ | MWH | The quantity of electricity produced at Belle River Power Plant by Detroit as used in calculating the price Detroit Edison pays is a function of Belle River Power Plant fuel expense. |

11

MPSC Case No. U-16434-R
Exhibit A-30, Source: T 297
Page 54 of 873

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 54 of 806



## Acronym/Symbol Definitions

| Acronym/Symbol | Definition |
| --- | --- |
| $ | U.S. Dollar |
| lb | pound |
| mmacf | million actual cubic feet |
| min | minute |
| SQ | Status Quo |
| O&M | Operations & Maintenance |
| MWH | Mega Watt Hour |
| USEPA | United States Environmental Protection Agency |
| BACT | Best Available Control Technology |

12

13

## EPRI-based Hg Cost Table

| Hg Reduction | Belle River | |
|---|---|---|
| | EPRI Capital Cost ($) | EPRI Fixed O&M ($) |
| 50 | 5,000,000 | 1,000,000 |
| 60 | 5,000,000 | 1,000,000 |
| 70 | 5,000,000 | 1,000,000 |
| 75 | 5,000,000 | 1,000,000 |
| 80 | 5,000,000 | 1,000,000 |
| 85 | 5,000,000 | 1,000,000 |
| 90 | 5,000,000 | 1,000,000 |

## EPRI-based Sorbent Injection Rate Table

| Sorbent | Hg Removal (%) | Sorbent Usage (lb/Mmacf) by Coal Type[1] | |
|---|---|---|---|
| | | Powder River Basin | Low Sulfur Eastern Blend |
| Untreated Activated Carbon | 50 | 2.8 | 3.3 |
| | 60 | 9.4 | 5.7 |
| | 70 | 18.2 | 8.0 |
| | 75 | NA | 10.8 |
| | 80 | NA | 13.6 |
| | 85 | NA | 16.4 |
| | 90 | NA | 19.2 |
| Treated Activated Carbon | 50 | 0.7 | 2.8 |
| | 60 | 1.3 | 4.4 |
| | 70 | 1.9 | 6.8 |
| | 75 | 2.7 | 7.2 |
| | 80 | 3.6 | 8.6 |
| | 85 | 4.4 | 9.9 |
| | 90 | 6.2 | 11.3 |

[1] Data pulled from EPRI Report, "Mercury Control Technology Selection Guide (Technical Report 1012672) September 2006, Table 5-3

NA = Limited or no data available, not appropriate option, or not achievable or not consistently achievable based on available test data.

Bold numbers were provided in EPRI Report referenced in footnote [1]

Italicized numbers were not provided in EPRI report but developed through linear interpolation using closest EPRI-provided usage rates for Hg Removal % greater and lower than italicized value.

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 56 of 806



ition of MPPA Benefits

**MPPA Refined Coal Adder Calculation:**

**MPPA Refined Coal Adder = Minimum(MPPA Environmental Benefit, MPPA's**

**Share of BRFC's Revenue Requirement) + MPPA Avoided Hg Capital**

**Amortization**

**MPPA Environmental Benefit = MPPA SO2 Benefit + MPPA Mercury Benefit**

**+ MPPA Fly Ash Benefit**

1

Case 1:19-cv-01334-CJB    Document 406-10-17 Filed 05/03/22    Page 58 of 63 PageID #: 7810
MPSC Case No. U-16434-R
Exhibit MECO-28, Source Exhibit A-30, U-16434-R
Page 57 of 725 of 873

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 57 of 806

# Environmental Benefit Cal... SO2 Benefit

## MPPA SO2 Benefit

$$\text{MPPA SO}_2 \text{ Benefit}_{Year} = \sum_{Jan}^{Dec} \text{MPPA SO}_2 \text{ Benefit}_{Month}$$

## Monthly SO₂ Benefit Calculation:

- If Actual SO$_2$ Emissions$_{Month}$ ≥ Status Quo SO$_2$ Emissions$_{Month}$, then MPPA SO$_2$ Benefit$_{Month}$ = 0

- If Actual SO$_2$ Emissions$_{Month}$ < Status Quo SO$_2$ Emissions$_{Month}$, then MPPA SO$_2$ Benefit$_{Month}$ = 0.1861 X Transacted SO$_2$ Allowance Benefit$_{Month}$

## Status Quo Calculation:

- Status Quo SO$_2$ Emissions$_{Month}$ (tons SO$_2$) = Emission Factor$_{Coal}$ X % Sulfur in Coal$_{Monthly \, Avg}$ X Actual Tons Coal Combusted$_{Month}$ X 0.0005

Table defining terms on next page

2

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 58 of 806

# Environmental Benefit Continued

## SO₂ Benefit Continued

| Defined Terms | Unit | Data Source |
|---|---|---|
| Actual SO₂ Emissions$_{Month}$ | (tons SO₂) | = | Tons of SO₂ emissions for the calendar month, as reported by the SO₂ Continuous Emissions Monitors installed at Belle River Unit 1 and 2 stack(s). Data shall be provided by Detroit Edison to BRFC by the 5ᵗʰ day of the month for the prior month's emissions. |
| Emission Factor $_{Unit\ 1}$ | $\frac{lbs\ SO_2}{tons\ coal}$ | = | 33.0 Fixed number, developed by adjusting AP-42 Emission Factor of 35 to better correlate with annual SO₂ emissions reported for Belle River Unit 1 to the United States Environmental Protection Agency (USEPA) from 1998 through 2007. If additional control technology is installed on the unit to comply with future environmental regulations, the Emission Factor shall be adjusted to account for changes in Belle River Unit 1 emissions due to the installation of the control technology. |
| Emission Factor $_{Unit\ 2}$ | $\frac{lbs\ SO_2}{tons\ coal}$ | = | 33.4 Fixed number, developed by adjusting AP-42 Emission Factor of 35 to better correlate with annual SO₂ emissions reported for Belle River Unit 2 to the USEPA from 1998 through 2007. If additional control technology is installed on the unit to comply with future environmental regulations, the Emission Factor shall be adjusted to account for changes in Belle River Unit 2 emissions due to the installation of the control technology. |
| % Sulfur in Coal$_{Monthly\ Avg.}$ | $\frac{lbs\ S}{tons\ coal}$ | = | Average percent sulfur content of coal for month as determined by averaging, for the calendar month, the daily sample percent sulfur content (% Sulfur) results reported by the Detroit Edison's Central Fuel Lab. Detroit Edison shall provide daily coal samples for Belle River Unit 1 and Unit 2 to their Central Fuel Lab, which shall each be analyzed for % Sulfur in accordance with ASTM standards and reported to BRFC within 5 calendar days. |
| Allowance Not Consumed | (tons) | = | The number of SO₂ allowances that would have been surrendered to the USEPA if the difference between Status Quo SO₂ Emissions and Actual SO₂ Emissions were emitted by the Belle River Power Plant. For example, in 2010 under the current Clean Air Interstate Rule (CAIR), two SO₂ allowances are required to be surrendered for every ton of SO₂ emitted; therefore Allowances Not Consumed = (Status Quo SO₂ Emissions$_{Month}$ – Actual SO₂ Emissions$_{Month}$) x 2. |
| Actual Tons Coal Combusted$_{Month}$ | (tons coal) | = | Actual tonnage of coal consumed for the calendar month as reported in P3M as COAL_CONS |
| Transacted SO₂ Allowance Benefit$_{Month}$ | ($) | = | The actual sale price realized by Detroit Edison for the sale of monthly Allowances Not Consumed. Detroit Edison shall use commercially reasonable efforts to sell the number of Allowances Not Consumed during a calendar month by the 12ᵗʰ day of the following month. In the event Detroit Edison does not sell the Allowances Not Consumed, the Argus Air Daily monthly index price (ADI) for one SO₂ allowance, as published by Argus Air daily on the last business day of the month, shall be multiplied by the number of Allowances Not Consumed during that same calendar month to estimate the monthly Transacted SO₂ Allowance Benefit. The estimated Transacted SO₂ Allowance Benefit will be reconciled within 30 days to reflect actual sales price if Detroit Edison makes a transaction for Allowances Not Consumed within 3 months after the estimated value was used. It is the Parties' intent that the Transacted SO₂ Allowance Benefit value used for purposes of the calculations specified above are representative of the current SO₂ market price. In the event that the ADI becomes unavailable, or if the Parties agree that the above-specified does not accurately represent the current SO₂ market price, the Parties shall mutually agree to an alternative or replacement SO₂ price index for the calculations. |

Case 1:19-cv-01334-CJB   Document 406-16   Filed 05/03/22   Page 60 of 63 PageID #: 7812
MPSC Case No. U-17087 Source Doc. U-16434-R
Exhibit A-30, Source: Exhibit A-30, U-16434-R
Page 59 of 727 of 873

Case No.:  U-16434-R
Exhibit:  A-30
Witness:  G. E. Lapplander
Page:  59 of 806



# Environmental Benefit Calculation

## Mercury Benefit

4

### Mercury Benefit Calculation:

$\bullet$ MPPA Mercury Benefit$_{year}$ = 0.1861 X  Avoided Mercury Compliance Cost$_{year}$

### Avoided Mercury Compliance Cost Calculations:

$\bullet$ If Actual Mercury Compliance Cost$_{year}$ $\geq$ Status Quo Mercury Compliance Cost$_{year}$, then Avoided Mercury Compliance Cost$_{year}$ = 0

$\bullet$ If Actual Mercury Compliance Cost$_{year}$ < Status Quo Mercury Compliance Cost$_{year}$, then Avoided Mercury Compliance Cost$_{year}$ = (Status Quo Mercury Compliance Cost$_{year}$ - Actual Mercury Compliance Cost$_{year}$) + Avoided Capital Effect$_{year}$

### Status Quo Mercury Compliance Cost Calculations:

$\bullet$ Status Quo Mercury Compliance Cost$_{year}$ = SQ Sorbent Cost$_{year}$ + SQ Fixed O&M$_{year}$

### SQ Sorbent Cost Calculations:

$\bullet$ If Year < Hg Compliance Date, SQ Sorbent Cost Calculations$_{year}$ = 0

$\bullet$ If Year $\geq$ Hg Compliance Date, SQ Sorbent Cost Calculations$_{year}$ = Sorbent Usage Rate ($\frac{lb}{mmacf}$) X Flue Gas Flow Rate ($\frac{mmacf}{min}$) X 525,600 ($\frac{min}{year}$) X Plant Capacity Factor$_{year}$ X Delivered Sorbent Unit Price ($\frac{\$}{lb}$)

### SQ Fixed O&M Calculations:

$\bullet$ If Year < Hg Compliance Date,  SQ Fixed O&M$_{year}$ = 0

$\bullet$ If Year $\geq$ Hg Compliance Date,  SQ Fixed O&M$_{year}$ = DECo Hg O&M$_{year}$

### SQ Capital Cost Calculations:

$\bullet$ If Year = Hg Compliance Date - 1, SQ Capital Cost$_{LCI (Year)}$ = DECo Hg Capital Cost$_{year}$

$\bullet$ If Year $\neq$ Hg Compliance Date - 1, SQ Capital Cost$_{LCI(Year)}$ = $0

### Avoided Capital Effect Calculations:

$\bullet$ If Year < Hg Compliance Date, Avoided Capital Effect$_{(Year)}$ = 0

$\bullet$ If Year $\geq$ Hg Compliance Date, Avoided Capital Effect$_{(Year)}$ = (SQ Capital Cost$_{LCI(Year-1)}$ – Actual Capital Cost$_{LCI(Year-1)}$) * DECo Capital Fixed Charge Rate

$\bullet$ If Year $\geq$ Hg Compliance Date, Avoided Capital Effect$_{(Year)}$ = Avoided Capital Effect$_{(Year-1)}$ – (Actual Capital Cost$_{(Year)}$) * DECo Capital Fixed Charge Rate)

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 60 of 806

# Environmental Benefit Cap
## Mercury Benefit

| Defined Terms | Unit | Data Source |
|---|---|---|
| Actual Mercury Compliance Cost$_{Year}$ | ($) | = | Actual Belle River Mercury Compliance Cost as determined from discrete accounts dedicated to Belle River mercury control equipment, which will be the sum of all mercury control related expenditures, excluding capital |
| Actual Capital Cost$_{Year}$ | ($) | = | Actual annual capital cost for mercury control equipment for Belle River Power Plant as determined from discrete accounts dedicated to Belle River mercury control equipment |
| Hg Compliance Date | (year) | = | First year Hg emissions are required to be removed from Belle River stack emissions due to State and/or Federal requirements |
| DECo Hg O&M$_{Year}$ | ($) | = | Actual O&M expenses incurred for mercury control at Detroit Edison plants not consuming Refined Coal, adjusted for Belle River Power Plant requirements without Refined Coal consumption. If actual Detroit Edison cost data is unavailable, EPRI O&M$_{2006}$ will be used. |
| EPRI O&M$_{2006}$ | ($) | = | 1,000,000 x Inflation Adjustment Factor. 1,000,000 is a fixed value, determined using the EPRI-based Hg Cost Table that was developed using the September 2006 EPRI Mercury Control Technology Selection Guide |
| Sorbent Usage Rate | | = | Determined from EPRI-based Sorbent Injection Rate Table, based on Hg Removal % and Coal Type; such table to be updated as more current or relevant data is published by EPRI. In the event Detroit Edison conducts appropriate activated carbon injection testing at Belle River or another plant suitable to simulate Belle River conditions, the Sorbent Usage Rate value determined from that testing will be used. |
| Inflation Adjustment Factor$_{Year}$ | - | = | .GDPIPD$_{Year}$ is annually computed and published by US Department of Commerce |
| Flue Gas Flow Rate | | = | 2.75. Fixed value, based on design data assuming full load operation |
| Plant Capacity Factor$_{Year}$ | - | = | Annual Capacity Factor for Belle River for specified year, as determined from P3M OUTPUT_FAC |
| Delivered Sorbent Unit Price | | = | Unit cost for the purchase of treated activated carbon, as determined using average annual price paid by Detroit Edison for treated activated carbon plus cost for delivery to Belle River |
| DECo Hg Capital Cost$_{Year}$ | ($) | = | Actual capital costs incurred for mercury control at Detroit Edison plants, adjusted for Belle River Power Plant conditions and installation year. If actual Detroit Edison cost data is unavailable, EPRI Capital Cost$_{2006}$ will be used and installation year. |
| EPRI Capital Cost$_{2006}$ | ($) | = | 5,000,000 x Inflation Adjustment Factor. 5,000,000 is a fixed value, determined using the EPRI-based Hg Cost Table that was developed using the September 2006 EPRI Mercury Control Technology Selection Guide |
| DECo Capital Fixed Charge Rate | - | = | .15 |

5



# Environmental Benefit Calculation
## Fly Ash Benefit

## Fly Ash Benefit Calculation:

- MPPA Fly Ash Benefit$_{Year}$ = 0.1861 X (Fly Ash Revenue Benefit$_{Year}$ + Fly Ash Disposal Expense Benefit$_{Year}$)

## Fly Ash Revenue Benefit Calculation:

- Fly Ash Revenue Benefit$_{Year}$ = Actual Fly Ash Revenue$_{Year}$ - Status Quo Fly Ash Revenue$_{Year}$
  - If Year < Hg Compliance Date, Status Quo Fly Ash Revenue$_{Year}$ = Total Guaranteed Payment$_{Year}$
  - If Year ≥ Hg Compliance Date, Status Quo Fly Ash Revenue$_{Year}$ = 0

- Actual Fly Ash Revenue$_{Year}$ = Project Contracted Fly Ash Volume$_{Year}$ X Project Contracted Fly Ash Unit Price$_{Year}$

## Fly Ash Disposal Expense Benefit Calculation:

- Fly Ash Disposal Expense Benefit$_{Year}$ = (Project Contracted Fly Ash Volume$_{Year}$ - Status Quo Contracted Fly Ash Volume$_{Year}$ - Incremental Fly Ash Increase$_{Year}$) X Variable Unit Disposal Cost
  - If Year < Hg Compliance Date, Status Quo Contracted Fly Ash Volume$_{Year}$ = Total Guaranteed Volume$_{Year}$
  - If Year ≥ Hg Compliance Date, Status Quo Contracted Fly Ash Volume$_{Year}$ = 0

6

Case No.: U-16434-R
Exhibit: A-30
Witness: G. E. Lapplander
Page: 62 of 806

## Environmental Benefit Calc...
## Fly Ash Benefit Continued

| Defined Terms | Unit | | Data Source |
|---|---|---|---|
| Project Contracted Fly Ash Volume$_{Year}$ | (tons) | = | Volume of Fly Ash committed for sale under contracts in place when Refined Coal is used as fuel at Belle River Power Plant |
| Project Contracted Fly Ash Unit Price$_{Year}$ | ($/ton) | = | Unit price committed to be paid to Belle River under fly ash contracts in place when Refined Coal is used as fuel at Belle River Power Plant |
| Variable Unit Disposal Cost$_{Year}$ | ($/ton) | = | $\dfrac{\text{Actual Annual Variable Disposal Cost}_{Year}}{\text{Actual Annual Fly Ash Tons Landfilled}_{Year}}$ |
| Actual Annual Variable Disposal Cost$_{Year}$ | ($) | = | MPPA cost for landfilling fly ash produced at Belle River for specified year, as reported in [Plant Maximo Account]. This cost excludes fixed costs associated with landfill. |
| Actual Annual Fly Ash Tons Landfilled$_{Year}$ | (tons) | = | Actual annual tons of fly ash produced at Belle River for specified year that were disposed by landfilling, as reported in [Plant Maximo Account] |
| Hg Compliance Date | (year) | = | First year that Hg emissions are required to be removed from Belle River stack emissions due to State and/or Federal requirements |
| Incremental Fly Ash Increase$_{Year}$ | (tons) | = | Annual volume of additives mixed with coal by BRFC to produce Refined Coal, as determined from BRFC data acquisition system |
| Total Guaranteed Volume$_{Year}$ | (tons) | = | Value determined from Belle River Fly Ash Contracts Table for specified year. Table will be amended to incorporate future contract adjustments not attributed to the use of Refined Coal. |
| Total Guaranteed Payment$_{Year}$ | ($) | = | Value determined from Belle River Fly Ash Contracts Table for specified year. Table will be amended to incorporate future contract adjustments not attributed to the use of Refined Coal. |

7