IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS CORP.
and MES INC.,

             Plaintiffs,

             v.

ARTHUR J. GALLAGHER & CO., et al.,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)

**PUBLIC VERSION**

C.A. No. 19-1334 (CJB)

**Confidential Version Filed: March 23, 2023**

**Public Version Filed: March 31, 2023**

**OPENING BRIEF IN SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND TO
<u>EXCLUDE EXPERT WITNESSES AND TESTIMONY</u>**

**TABLE OF CONTENTS**

**Pages**

TABLE OF AUTHORITIES ....................................................................................................v

TABLE I:  TABLES OF DEFENDANTS....................................................................... ix

TABLE II:  FAMILY TREE OF ME2C PATENTS

.......................................................................................................................................... ix

TABLE III:  GLOSSARY AND TABLE OF ABBREVIATIONS............................................ xii

TABLE IV:  TABLE OF EXHIBITS ........................................................................... ix

NATURE AND STAGE OF THE PROCEEDING......................................................... 1

SUMMARY OF ARGUMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 4

      1.      The Defendants ......................................................................... 4

      2.      Coal-Fired Power Plants ........................................................... 4

      3.      Use of Chemicals to Reduce Emissions.................................... 6

      4.      The U.S. Government Encourages the Development of Methods for Reducing Mercury Emissions from Coal-Fired Power Plants ............................... 6

      5.      Chem-Mod Develops and Markets a Method for Making Refined Coal that Results in Lowered Mercury and $NO_x$ Emissions .................................. 7

      6.      The Patents-in-Suit.................................................................. 9

      7.      This Litigation.......................................................................... 11

      8.      Plaintiffs License, and Dismiss, Power Plant Defendants ...................... 11

LEGAL STANDARDS GOVERNING THIS MOTION.............................................. 13

ARGUMENT........................................................................................................... 14

      I.      Because Licensed Use of Patents Is Not "Without Authority," There Can Be No Direct or Indirect Infringement at the ME2C-Licensed Power Plants.................................................................................. 14

II.   Because No Power Plants Directly Infringe the 147 Patent, There Can Be No Indirect Infringement of that Patent. ............................................................. 14

III.   There Is No Evidence That Any Power Plant Met the Claim Elements of Many Other Asserted Claims. .......................................................................... 18

IV.   Defendants Who Did Not Sell Refined Coal Are Entitled to Summary Judgment of Non-Infringement. ...................................................................... 19

V.   The Court Should Dismiss All Infringement Claims Based on Lack of Knowledge of Infringement. ............................................................................. 19

VI.   Summary Judgment Should Be Granted Dismissing the Contributory Infringement Claims as Against All Defendants. ................................................. 21

A.   Refined Coal Has Always Had Substantial Non-Infringing Uses. ........... 21

B.   Refined Coal Is Not Especially Made or Adapted for Use With Activated Carbon, and No Defendant Has Ever Thought Otherwise. ..................................................................................... 24

VII.   The Claims for Induced Infringement Should Be Dismissed. ............................. 24

A.   No Defendant Acted to Cause Power Plants to Perform the Activated Carbon Step. ................................................................. 25

B.   Selling Refined Coal Was Not an Act of Inducement. ............................ 26

C.   Defendants Lacked the Necessary Intent to Induce Infringement. ........... 27

VIII.   The Patents-in-Suit Are Invalid Under 35 U.S.C. §§ 102, 103, and 112. ............. 27

A.   As Essential Material, Fig. 2 Cannot Be Incorporated by Reference. ................................................................................. 28

B.   Regardless of Whether It Contains Essential Material, the Provisional Was Not Properly Incorporated by Reference in Various Priority Chains. ............................................................. 29

C.   The Breaks in the Priority Chain Doom the Later-Issued Patents. ........... 30

D.   The 147 and 225 Patent Claims Lack Written Description Support for the Application of a Bromine Containing Promoter to the Coal. ........ 33

E.   The 114, 225, 430, and 517 Patents Are Invalid Under 35 U.S.C. §§ 102 or 103. ............................................................................. 33

IX.    Plaintiffs' Technical Expert, Mr. Philip O'Keefe, Lacks the Knowledge, Skill, Experience, Training, or Education Necessary to Offer Opinions that Would Assist the Trier of Fact, and His Opinions Should Be Stricken............... 34

    A.    Mr. O'Keefe's Lacks the Qualifications Necessary for His Opinions. ................................................................................. 34

    B.    Mr. O'Keefe Should Be Excluded from Offering Opinions on Infringement and Invalidity Because He Lacks the Requisite Knowledge and Skill. ............................................................... 36

    C.    Mr. O'Keefe Lacks the Qualification to Testify on Many Discrete Subject Areas Where He Has Offered Opinions...................................... 40

    D.    Mr. O'Keefe's Opinions on Matters that Are Improper for Expert Testimony Should Be Excluded................................................. 42

    E.    Mr. O'Keefe's Opinions on Contributory Infringement Should Be Excluded Because He Did Not Consider Non-Infringing Uses by Power Plants Outside of the Case. ........................................... 44

    F.    Mr. O'Keefe's Opinions on Secondary Considerations Are Beyond His Field of Expertise and Based on Fundamental Methodological Errors........................................................................... 44

X.    The Court Should Exclude the Royalty Rate Opinions of Plaintiffs' Damages Expert, Philip Green, Because They Are Not Based on Reliable Methodology. ....................................................................... 45

    A.    Mr. Green Has No Basis to Compare ME2C's Patents to Anyone Else's........................................................................... 45

    B.    Mr. Green Did Not Apportion the Non-ME2C Royalty Rates. ................ 48

CONCLUSION............................................................................ 50

# TABLE OF AUTHORITIES

**Page(s**

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    572 U.S. 915 (2014)................................................................................................14

*Aloe Coal Co. v. Clark Equip. Co.*,
    816 F.2d 110 (3d Cir. 1987)...................................................................................40

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*,
    No. 13-CV-324 (RGA), 2017 WL 3528606 (D. Del. Aug. 16, 2017)........................42, 43, 44

*Amarin Pharma, Inc. v. W.-Ward Pharm. Intl. Ltd.*,
    407 F. Supp. 3d 1103 (D. Nev. 2019)....................................................................21

*Bial-Portela & CA. S.A. v. Alkem Lab. Ltd.*,
    2022 WL 4244989 (D. Del. 2022).........................................................................39

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc*,
    501 F.3d 1254 (Fed. Cir. 2007).............................................................................37

*Daubert v. Merrell Dow Pharm. Inc.*,
    509 U.S. 579 (1993).................................................................................13, 42, 44

*In re Depomed Pat. Litig.*,
    2016 WL 7163647 (D.N.J. Sept. 30, 2016) ............................................................21

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)............................................................................34, 40

*ePlus, Inc. v. Lawson Software, Inc.*,
    764 F. Supp. 2d 807 (E.D.Va. 2011) .....................................................................48

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014).......................................................................25, 49

*Exela Pharma Sciences, LLC v. Eton Pharmaceuticals, Inc.*,
    2022 WL 806524, Case No. 20-cv-365 (D. Del. 2022)...........................................13

*Fox Factory, Inc. v. SRAM, LLC*,
    944 F.3d 1366 (Fed. Cir. 2019).............................................................................45

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)..........................................................................19, 20, 21, 25

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
  438 F.3d 1354 (Fed. Cir. 2006).................................................................21

*Guardant Health, Inc. v. Foundation Med., Inc.*
  No. 17-1616-LPS-CJB, Slip. Op. (D. Del. Apr. 22, 2020)................................48, 50

*Halsey v. Pfeiffer*,
  750 F.3d 273 (3d Cir. 2014).................................................................13

*Hollmer v. Harari*,
  681 F.3d 1351 (Fed. Cir. 2012).............................................................29

*Hypertherm, Inc. v. Am. Torch Tip Co.*,
  No. 05-cv-373, 2009 WL 530064 (D.N.H. Feb. 27, 2009).................................39

*HZNP Medicines LLC v. Actavis Laboratories UT, Inc.*,
  940 F.3d 680 (Fed. Cir. 2019)...............................................................26

*IOENGINE, LLC v. PayPal Holdings, Inc.*,
  607 F. Supp. 3d 464 (D. Del. 2022).........................................................45

*JVC Kenwood Corp. v. Nero, Inc.*,
  797 F.3d 1039 (Fed. Cir. 2015).............................................................14

*Kitsch LLC v. Deejayzoo*,
  LLC, 2022 WL 17184603 (C.D. Ca. 2022) ................................................40

*Kyocera Senco Indus. Tools Inc. v. ITC*,
  22 F.4th 1369 (Fed. Cir. 2022) .............................................................34

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)............................................................46, 47

*Lockwood v. Am. Airlines, Inc.*,
  107 F.3d 1565 (Fed. Cir. 1997).............................................................30

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)..........................................................20, 24

*McKesson Info. Sols., Inc. v. Bridge Med., Inc.*,
  CIV S-02-2669 FCDKJM, 2005 WL 2346919, at *9 (E.D. Cal. Sept. 23,
  2005) .........................................................................................23

*Medtronic CoreValve, LLC v. Edwards Lifesciences Corp.*,
  741 F.3d 1359 (Fed. Cir. 2014).............................................................30

*Minks v. Polaris Indus., Inc.*,
  546 F.3d 1364 (Fed. Cir. 2008).............................................................48

*Mondis Tech. Ltd v. LG Electronics, Inc.*,
  407 F. Supp. 3d 482 (D.N.J. 2019) ...............................................................48, 49

*Omar v. Babcock*,
  177 F. App'x 59 (11th Cir. 2006) ...........................................................................42

*Patrick v. Moorman*,
  536 Fed. Appx. 255 (3d Cir. 2013)........................................................................42

*PayRange, Inc. v. Kiosoft Tech.*,
  LLC, No. 20-20970-cv, 2021 WL 7083639 (S.D. Fla. Dec. 22, 2021) ..................39

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
  491 F.3d 1342 (Fed. Cir. 2007).............................................................................19

*Pickholtz v. Rainbow Techs., Inc.*,
  260 F. Supp. 2d 980 (N.D. Cal. 2003) ...................................................................21

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  904 F.3d 965 (Fed. Cir. 2018)...............................................................................48

*Power Integrations, Inc. v. Fairchild Semiconductor Intl., Inc.*,
  843 F.3d 1315 (Fed. Cir. 2016).............................................................................25

*PPG Industries Ohio, Inc. v. Axalta Coating Systems, LLC*,
  2022 WL 610740 (D. Del. Jan. 26, 2022)..............................................................20

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
  536 F.3d 1256 (Fed. Cir. 2008).............................................................................39

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010)..........................................................................45, 50

*SA Music LLC v. Apple, Inc.*,
  592 F. Supp. 3d 869 (N.D. Cal. 2022) ...................................................................42

*Sanofi v. Glenmark Pharms. Inc., USA*,
  204 F. Supp. 3d 665 (D. Del. 2016).......................................................................22

*Shire Viropharma Inc. v. CSL Behring LLC*,
  No.17-414, 2021 WL 1227097 (D. Del. Mar. 31, 2021) ........................................43

*Sony Corp. of Am. v. Universal Studios*,
  464 U.S. 417 (1984)..............................................................................................21

*SUNOCO Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
  CV 17-1390-LPS-CJB, 2020 WL 7330715 (D. Del. Jan. 13, 2020) ......................50

*TC Tech. LLC v. Sprint Corp.*,
   1:16-CV-00153-RGA, 2019 WL 5295232 (D. Del. Oct. 18, 2019) ................................45, 46

*Toshiba Corp. v. Imation Corp.*,
   681 F.3d 1358 (Fed. Cir. 2012)................................................................................21

*Tyco Healthcare Group LP v. Biolitec, Inc.*,
   2010 WL 3324893 (N.D. Cal. 2010) ........................................................................22

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Products Liab. Litig.*,
   181 F. Supp. 3d 278 (E.D. Pa. 2016) ......................................................................42

*In re Varma*,
   816 F.3d 1352 (Fed. Cir. 2016)................................................................................15

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009)................................................................21, 23, 27

*W.L. Gore & Associates, Inc. v. C.R. Bard, Inc.*,
   No. 11-515-LPS-CJB, 2015 WL 12815314 (D. Del. Nov. 11, 2015) ....................42

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010)................................................................................19

*Wright Asphalt Products Co., LLC v. Pelican Ref. Co., LLC*,
   2012 WL 1936416 (S.D. Tex. 2012) ......................................................................40

*ZapFraud, Inc. v. Barracuda Networks, Inc.*,
   528 F. Supp. 3d 247 (D. Del. 2023)........................................................................20

*Zenon Env't, Inc. v. U.S. Filter Corp.*,
   506 F.3d 1370 (Fed. Cir. 2007)................................................................................29

*Zimmer Surgical, Inc. v. Stryker Corp.*,
   365 F. Supp. 3d 466, 2019 WL 1082336 (D. Del. 2019)........................................46

**Rules and Statutes**

37 C.F.R. § 1.57 ..............................................................................................................28

37 C.F.R. § 1.57(d) ....................................................................................................28, 31

37 C.F.R. § 1.57(d)(1)......................................................................................................28

35 U.S.C. § 271(a) ...........................................................................................................14

35 U.S.C. § 271(c) ...........................................................................................................26

Fed. R. Civ. P. 56(a) .......................................................................................................13

Fed. R. Evid. 702 ...................................................................................................................13, 45

████████████████████

## TABLE I
## TABLES OF DEFENDANTS

***Note***:  RC Defendants comprise four groups, which are in the first four tables:  the AJG RC Defendants, the DTE RC Defendants, the Alistar Defendant, and the CERT RC Defendants.

### AJG RC Defendants

| Named Defendant | Accused Power Plant Supplied, with Years[1] | First Named as a Defendant[2] |
|---|---|---|
| Canadys Refined Coal, LLC* | Cope Generating Station (2014–19) | May 3, 2022 |
| Coronado Refined Coal, LLC | Coronado Generating Station (2013–21) | May 3, 2022 |
| George Neal Refined Coal, LLC | George Neal Station South (2012–21) | October 7, 2021 |
| George Neal North Refined Coal, LLC | George Neal Station North (2013–21) | October 7, 2021 |
| Hastings Refined Coal, LLC | Whelan Energy Center (2020–21) | May 3, 2022 |
| Jefferies Refined Coal, LLC | Muscatine Generating Station (2013–20) | May 3, 2022 |
| Joppa Refined Coal, LLC | Joppa Power Plant (2013–21) | July 17, 2019 |
| Louisa Refined Coal, LLC | Louisa Generating Station (2011–21) | July 17, 2019 |
| Walter Scott Refined Coal, LLC | Walter Scott Energy Center (2011–21) | July 17, 2019 |
| Williams Refined Coal, LLC* | Williams Generating Station (2019–21) | May 3, 2022 |

### DTE RC Defendants

| Named Defendant | Accused Power Plant Supplied, with Years | First Named as a Defendant |
|---|---|---|
| Arbor Fuels Company LLC | Weston Generating Station (2016–21) | July 17, 2019 |
| Superior Fuels Company LLC* | Weston Generating Station (2018–19) | October 7, 2021 |
| Belle River Fuels Company, LLC | Belle River Power Plant (2011–21) | July 17, 2019 |
| Huron Fuels Company, LLC* | Belle River Power Plant (2015–21) | October 7, 2021 |
| Chouteau Fuels Company, LLC | Oak Grove Power Plant (2017–21) | May 3, 2022 |
| Portage Fuels Company LLC | Columbia Energy Center (2016–21) | July 17, 2019 |
| Erie Fuels Company, LLC* | Columbia Energy Center (2018–21) | October 7, 2021 |
| Jasper Fuels Company LLC | Newton Power Station (2012–21) | May 3, 2022 |
| Newton RC LLC* | Newton Power Station (2015–18) | May 3, 2022 |

\* indicates that ME2C is not pursuing damages against this Defendant

---

[1]   *See* Senior Decl. Ex. 1 at Ex. C; Lawton Decl. Ex. 2 at Schedule 6.3.

[2]   *See* D.I. 1 (filed July 7, 2019); SAC: D.I. 281 (filed May 21, 2021); D.I. 326 (filed Oct. 7, 2021); D.I. 406 (4AC) (filed May 3, 2022).

**The Alistar Defendant**

| Named Defendant | Accused Power Plant Supplied, with Years | First Named as a Defendant |
|---|---|---|
| Alistar Enterprises, LLC | • Allen Steam Station (2011–2015)<br>• Powerton Generation Station (2017–2021) | May 21, 2021 |

**CERT RC Defendants**

| Named Defendant | Accused Power Plant Supplied, with Years | First Named as a Defendant |
|---|---|---|
| Bascobert (A) Holdings, LLC | • Marshall Steam Station (2011–2015)<br>• Coleto Creek Power Station (2019–2021) | October 7, 2021 |
| Buffington Partners, LLC | Rush Island Project Generation Facility (2011–2021) | October 7, 2021 |
| Cottbus Associates, LLC | Laramie River Station (2013–2021) | October 7, 2021 |
| Larkwood Energy, LLC | Labadie Energy Center (2013–2021) | October 7, 2021 |
| Marquis Industrial Company, LLC | Antelope Valley Station (2013–2021) | May 3, 2022 |
| Rutledge Products, LLC | Limestone Generation Facility (2011–2021) | May 21, 2021 |
| Senescence Energy Products, LLC | W.A. Parish Generation Facility (2011–2021) | May 21, 2021 |
| Spring Hill Resources, LLC | Big Cajun II Generating Station (2011–2021) | October 7, 2021 |

**The Four "CERT Operations Companies" Defendants**

| Named Defendant | Supplied Operations at RC Facility(ies), with Years | First Named as a Defendant |
|---|---|---|
| CERT Operations II LLC | • Marquis Industrial (Antelope Valley Station: 2013–2021)<br>• Alistar (Allen Steam Station: 2011–2015; Powerton: 2017–2021)<br>• Bascobert (A) (Marshall Steam: 2011–2015) | July 17, 2019 |
| CERT Operations IV LLC | • Spring Hill Resources (Big Cajun II Generating Station: 2012–2021) | July 17, 2019 |
| CERT Operations V LLC | • Buffington Partners (Rush Island Project Generation Facility: 2011–2021) | July 17, 2019 |
| CERT Operations RCB LLC | • Senescence Energy Products (W.A. Parish Generation Facility: 2013–2021) | July 17, 2019 |

█████████████████████████

|  | • Bascobert (A) (Coleto Creek Power Station:  2019–2021)<br>• Rutledge Products, LLC (Limestone Generation Facility:  2013–2021)<br>• Larkwood Energy (Labadie Energy Center 2014–2021)<br>• Cottbus Associates (Laramie River Station:  2013–2021) |  |

**Additional Non-Party CERT Companies**

| Operations Company | Supplied Operations at RC Facility, with Years | Power Plant Supplied, with Years |
|---|---|---|
| CERT Operations, LLC | Shermont Industrial, LLC (2014–2021) | Chesterfield Power Station (2011–2021) |
|  | Powder Street, LLC (2013–2021) | Mount Storm Generating Station (2011–2021) |
| CERT Operations III, LLC | Deogun Manufacturing, LLC (2013–2021) | Intermountain Power Project (2011–2021) |

**TABLE II**
**FAMILY TREE OF ME2C PATENTS[3]**



---

[3]   Reproduced from Ex. 12 at ¶ 49; Niksa Decl. Ex. A at ¶ 170.

**TABLE III**
**GLOSSARY AND TABLE OF ABBREVIATIONS**

| Parties | |
|---|---|
| AJG RC Defendants | *See* Table I |
| Alistar | Defendant Alistar Enterprises, LLC |
| CERT Defendants | the CERT RC Defendants and the CERT Operations Companies |
| CERT Operations Companies | *See* Table I |
| CERT RC Defendants | *See* Table I |
| DTE Energy | Defendant DTE Energy Resources, LLC |
| DTE RC Defendants | *See* Table I |
| Non-Selling Entities | AJG Iowa Refined Coal LLC; DTE Energy Resources, LLC; and the four CERT Operations Companies |
| Plaintiffs or ME2C | Midwest Energy Emissions Corporation (together with Plaintiff MES, Inc., for purposes of this motion: "ME2C") |
| RC Defendants | Defendants alleged to have sold Refined Coal |
| **Non-Parties** | |
| accused power plant | one of the 24 power plants that purchased Refined Coal from an RC Defendant during the putative damages period.  *See* Senior Decl. at C-2. |
| ADA-ES | ADA-ES |
| AECI | power plant operator and current licensee of ME2C's patents |
| Chem-Mod | Chem-Mod LLC |
| Clean Coal Solutions | a licensee of ADA-ES, partially owned by ADA-ES |
| EERC | the Environmental Energy Research Center at the University of North Dakota |
| Nalco | Nalco Company |
| NRG | power plant operator and former Defendant, current licensee of ME2C's patents |
| Talen | power plant operator and former Defendant, current licensee of ME2C's patents |
| Vistra | power plant operator and former Defendant, current licensee of ME2C's patents |
| **Chemistry** | |
| $Br^-$ | bromide ion |
| $CaBr_2$ | calcium bromide |
| $Hg$ | mercury |
| $NO_x$ | nitrogen oxides |
| $SO_x$ | sulfur oxides |
| **Power Plant Emissions Control Technology** | |
| ACI | activated carbon injection |

██████████████████████████

| ESP | electrostatic precipitator |
| --- | --- |
| Scrubber (FGD) | flue gas desulfurization system |
| **Refined Coal Technology** | |
| Chem-Mod Solution | Chem-Mod's process for making Refined Coal by treating feedstock coal with MerSorb and S-Sorb |
| MerSorb | an aqueous solution of 52% calcium bromide by weight in water; one of the chemicals used in the Chem-Mod Solution to make Refined Coal |
| RC Facilities | specialized facilities built to manufacture Refined Coal |
| Refined Coal | coal that qualifies for tax credits under 26 U.S.C. § 45 |
| S-Sorb | a dry powder containing byproduct materials from the cement industry; one of the chemicals used in the Chem-Mod Solution to make Refined Coal |
| **ME2C Patents and Related Materials and Terms** | |
| 147 Patent | U.S. Patent No. 8,168,147 |
| 114 Patent | U.S. Patent No. 10,343,114 |
| 225 Patent | U.S. Patent No. 10,589,225 |
| 517 Patent | U.S. Patent No. 10,596,517 |
| 430 Patent | U.S. Patent No. 10,668,430 |
| Activated Carbon Step | the step or steps in each asserted claim that require(s) the use of activated carbon |
| BCP | "bromine containing promoter," a term in the 147 Patent |
| Bromine Step | the step or steps in each asserted claim that require(s) the use of bromine |
| Fig. 2 | Figure 2 and the accompanying text from the Provisional |
| POSITA | person of ordinary skill in the art |
| Provisional | Provisional Application 60/605,640, dated August 30, 2004 |
| **Litigation Materials** | |
| 4AC | ME2C's Fourth Amended Complaint (D.I. 406) |
| Egan Decl. | Omnibus Declaration of Brian P. Egan in Support of Defendants' Summary Judgment and *Daubert* Motions |
| Green Decl. | Declaration of Jeff Green |
| Niksa Decl. | Declaration of Dr. Stephen Niksa in Support of Defendants' Summary Judgment and *Daubert* Motions |
| Senior Decl. | Declaration of Dr. Constance Senior in Support of Defendants' Summary Judgment and *Daubert* Motions |
| Lawton Decl. | Declaration of Catharine M. Lawton in Support of Defendants' Summary Judgment and *Daubert* Motions |
| **Laws and Regulations** | |
| MATS | Mercury and Air Toxics Standards |
| Section 45 | 26 U.S.C. § 45 |

████████████████████

**TABLE IV**
**TABLE OF EXHIBITS**

**_Note_**:  Unless otherwise stated in the brief, citations to "Ex. __" refer to the Egan Declaration.  In all instances, page numbers refer to the hard-copy page number on the underlying document, not the electronic page of the PDF.

| | |
|---|---|
| Lawton Decl. | Declaration of Catharine M. Lawton, dated March 23, 2023 |
| Lawton Decl. Ex. 1 | Exhibit 1 to Lawton Decl. (Excerpts from First Expert Report of Catharine M. Lawton, dated December 22, 2022) |
| Lawton Decl. Ex. 2 | Exhibit 2 to Lawton Decl. (Schedules to the First Expert Report of Catharine M. Lawton, dated December 22, 2022) |
| Lawton Decl. Ex. 3 | Exhibit 3 to Lawton Decl. (Excerpts from Second Expert Report of Catharine M. Lawton, dated February 7, 2022) |
| Niksa Decl. | Declaration of Dr. Stephen Niksa, dated March 23, 2023 |
| Niksa Decl. Ex. A | Exhibit A to Niksa Decl. (Excerpts from Opening Expert Report of Dr. Stephen Niksa, dated October 25, 2022) |
| Niksa Decl. Ex. B | Exhibit B to Niksa Decl. (Excerpts from Second Expert Report of Dr. Stephen Niksa, dated December 22, 2022) |
| Niksa Decl. Ex. C | Exhibit C to Niksa Decl. (Excerpts from Third Expert Report of Dr. Stephen Niksa, dated February 07, 2023) |
| Senior Decl. | Declaration of Dr. Constance Senior, dated March 23, 2023 |
| Senior Decl. Ex. 1 | Exhibit A to Senior Decl. (Excerpts from First Expert Report of Dr. Constance Senior, dated December 22, 2022) |
| Green Decl. | Declaration of Jeff Green, dated March 22, 2023 |
| Egan Decl. | Declaration of Brian Egan, Esq., dated March 23, 2023 |
| Ex. 1 | Exhibit 1 to Egan Decl. (United States Patent No. 10,343,114 (the "114 Patent")) |
| Ex. 2 | Exhibit 2 to Egan Decl. (United States Patent No. 8,168,147 (the "147 Patent")) |
| Ex. 3 | Exhibit 3 to Egan Decl. (United States Patent No. 10,589,225 (the "225 Patent")) |
| Ex. 4 | Exhibit 4 to Egan Decl. (United States Patent No. 10,596,517 (the "517 Patent")) |
| Ex. 5 | Exhibit 5 to Egan Decl. (United States Patent No. 10,668,430 (the "430 Patent")) |
| Ex. 6 | Exhibit 6 to Egan Decl. (United States Provisional Application 60/605,640, dated August 30, 2004 (the "Prov. App" or "640 application")) |
| Ex. 7 | Exhibit 7 to Egan Decl. (Copy of a Fleetwide License and Supply Agreement, effective July 30, 2020, between Vistra Corp. and Midwest Energy Emissions Corp) |
| Ex. 8 | Exhibit 8 to Egan Decl. (Copy of a Fleetwide License and Supply Agreement, effective January 5, 2021, between NRG Energy, Inc., NRG Texas Power LLC, Midwest Generation EME, LLC, and Midwest Generation, LLC (collectively, "NRG"), and Midwest Energy Emissions Corp. and MES, Inc.) |
| Ex. 9 | Exhibit 9 to Egan Decl. (Copy of a Fleetwide License and Supply Agreement, effective January 15, 2021, between Brandon Shores LLC, Talen Generation LLC, Talen Montana, LLC, and H.A. |

███████████████████████████████

| | |
|---|---|
| | Wagner LLC and Midwest Energy Emissions Corp. and MES, Inc.) |
| Ex. 10 | Exhibit 10 to Egan Decl. (Copy of a License and Supply Bidding Agreement, effective November 17, 2021, between Associated Electric Cooperative, Inc. ("AECI"), and Midwest Energy Emissions Corp. and MES, Inc.) |
| Ex. 11 | Exhibit 11 to Egan Decl. (Excerpts from Opening Expert Report of Philip O'Keefe, served by Plaintiffs in this case, dated October 25, 2022) |
| Ex. 12 | Exhibit 12 to Egan Decl. (Excerpts from Rebuttal Expert Report of Philip O'Keefe, served by Plaintiffs in this case, dated December 22, 2022) |
| Ex. 13 | Exhibit 13 to Egan Decl. (Excerpts from Reply Expert Report of Philip O'Keefe, served by Plaintiffs in this case, dated February 6, 2023) |
| Ex. 14 | Exhibit 14 to Egan Decl. (Excerpts from First Expert Report of Philip Green, served by Plaintiffs in this case, dated October 25, 2022) |
| Ex. 15 | Exhibit 15 to Egan Decl. (Excerpts from Reply Expert Report of Philip Green, served by Plaintiffs in this case, dated December 22, 2022) |
| Ex. 16 | Exhibit 16 to Egan Decl. (Excerpts from the deposition transcript of William Whitney in this case, dated June 28, 2022) |
| Ex. 17 | Exhibit 17 to Egan Decl. (Excerpts from the deposition transcript of James Landreth in this case, dated August 11, 2022) |
| Ex. 18 | Exhibit 18 to Egan Decl. (Excerpts from the deposition transcript of Edwin Olson in this case, dated August 26, 2022) |
| Ex. 19 | Exhibit 19 to Egan Decl. (Excerpts from the deposition transcript of Michael Holmes in this case, dated August 24, 2022) |
| Ex. 20 | Exhibit 20 to Egan Decl. (Excerpts from the deposition transcript of John Pavlish in this case, dated August 25, 2022) |
| Ex. 21 | Exhibit 21 intentionally omitted |
| Ex. 22 | Exhibit 22 to Egan Decl. (Excerpts from the deposition transcript of Vincent Inendino in this case, dated July 15, 2022) |
| Ex. 23 | Exhibit 23 to Egan Decl. (Excerpts from the deposition of Thomas Erickson in this case, dated September 21, 2022) |
| Ex. 24 | Exhibit 24 to Egan Decl. (Excerpts from the deposition transcript of Philip O'Keefe in this case, dated March 2, 2023) |
| Ex. 25 | Exhibit 25 to Egan Decl. (Excerpts from the deposition transcript of Philip O'Keefe in this case, dated March 3, 2023) |
| Ex. 26 | Exhibit 26 to Egan Decl. (Excerpts from the deposition transcript of Philip Green in this case, dated March 7, 2023) |
| Ex. 27 | Exhibit 27 to Egan Decl. (Declaration of Jamie Recker, Chief Plant Engineer for Muscatine Power and Water, executed on October 20, 2022) |
| Ex. 28 | Exhibit 28 to Egan Decl. (Declaration of Robert Poehling, the Chairman of the Board of Public Power Generation Agency, executed on October 14, 2022) |

███████████████████████████████

| Ex. 29 | Exhibit 29 to Egan Decl. (ME2C's Responses and Objections to Refined Coal Defendants' First Set of Requests for Authentication (No.1), dated September 29, 2022) |
|--------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Ex. 30 | Exhibit 30 to Egan Decl. (Transcript from the Markman Hearing in this case, dated April 28, 2022) |
| Ex. 31 | Exhibit 31 to Egan Decl. (Report and Recommendation in *Guardant Health, Inc. v. Foundation Med., Inc.* No. 17-1616-LPS-CJB (D. Del.), dated April 22, 2020) |
| Ex. 32 | Exhibit 32 to Egan Decl. (February 4, 2021 Final Report prepared by the EERC entitled "Evaluation of Powerton Station Coal for $NO_x$ and $Hg$ Reductions – November 25, 2020"  (Bates number CERT_0003545)) |
| Ex. 33 | Exhibit 33 to Egan Decl. (August 14, 2020 Final Report prepared by the EERC entitled "Evaluation of Powerton Station Coal for $NO_x$ and $Hg$ Reductions – June 1, 2020"  (Bates number CERT_0003601)) |
| Ex. 34 | Exhibit 34 to Egan Decl. (Facility Purchase Agreement, made on December 16, 2021, entered into between Alistar Enterprises, LLC and Midwest Generation, LLC (Bates number CERT_0003545)) |
| Ex. 35 | Exhibit 35 to Egan Decl. (October 16, 2019 Final Report prepared by the EERC entitled "Evaluation of Jasper Fuels Company, LLC, Operating Samples for $NO_x$ and $Hg$ Reductions – July 30, 2019" (Bates number REF-COAL_00016327)) |
| Ex. 36 | Exhibit 36 to Egan Decl. (October 2, 2014 Final Report prepared by the EERC entitled "Evaluation of Salt River Project Coal for $NO_x$ and $Hg$ Reductions – July 21, 2014" (Bates number REF-COAL_00014065)) |
| Ex. 37 | Exhibit 37 to Egan Decl. (August 11, 2015 Final Report prepared by the EERC entitled "Evaluation of Labadie Coal for $NO_x$ and $Hg$ Reductions – May 26, 2015" (Bates number CERT_0005738)) |
| Ex. 38 | Exhibit 38 to Egan Decl. (February 9, 2021 Final Report prepared by the EERC entitled "Evaluation of Antelope Valley Station Coal for $NO_x$ and $Hg$ Reductions – December 3, 2020" (Bates number CERT_0010003)) |
| Ex. 39 | Exhibit 39 to Egan Decl. (October 27, 2014 Final Report prepared by the EERC entitled "Evaluation of Antelope Valley Station for $NO_x$ and $Hg$ Reductions – August 12, 2014" (Bates number CERT_0040881)) |
| Ex. 40 | Exhibit 40 to Egan Decl. (Final Report prepared by the EERC entitled "Evaluation of Labadie Coal for $NO_x$ and $Hg$ Reductions – May 26, 2015" (Bates number CERT_0003937)) |

Defendants move pursuant to Fed. R. Civ. P. 56(a) for summary judgment on certain claims and issues, and pursuant to Fed. R. Evid. 702 to exclude expert witness testimony proffered by Plaintiffs. Defendants are identified and described *infra* at Statement of Facts § 1 and *supra* at Table I. The Declarations of Stephen Niksa, Ph.D.; Constance Senior, Ph.D.; Catharine Lawton; Jeff Green; and Brian Egan, Esq. accompany and support Defendants' motions.

For the convenience of the Court, because there are 34 moving Defendants, and multiple grounds for relief are set forth in this motion, the relief requested is summarized in a detailed Proposed Order filed herewith.

## NATURE AND STAGE OF THE PROCEEDING

This is a patent infringement lawsuit involving allegations that all 34 remaining Defendants indirectly infringe certain method claims of the five patents-in-suit. The operative Fourth Amended Complaint ("4AC") was filed on May 3, 2022. D.I. 406 (4AC). Issue has been joined, and the parties have completed fact and expert discovery. The Court has issued a claim construction ruling and multiple decisions directed to the pleadings.

## SUMMARY OF ARGUMENT

After five rounds of pleading, and the Court's or Plaintiffs' dismissal of numerous claims, theories, and defendants, this case has been reduced to allegations that Defendants induced and contributed to infringement of the method claims of five patents-in-suit.

Plaintiffs' indirect infringement theories are predicated on alleged direct infringement by non-party coal-fired power plants (the "accused power plants"), each of which purportedly did two things that are necessary (but not sufficient) for direct infringement:

(i) they burned bromine-treated Refined Coal provided by a Defendant, and

(ii) they used activated carbon injection ("ACI") to treat the flue gas produced by combusting that Refined Coal.

1

Plaintiffs' indirect infringement claims are all based on Defendants' putative involvement in making Refined Coal and selling it to accused power plants. Each of these claims fails.

***No Direct Infringement:*** In many instances, summary judgment dismissing the indirect infringement claims is warranted because there is no direct infringement:

- Some of the accused power plants were authorized to practice the patents-in-suit by ME2C, such that they cannot be direct infringers. *See* Arg. § I.

- ME2C cannot show that any accused power plant directly infringes the 147 Patent. *See* Arg. § II.

- ME2C has no evidence that any accused power plant directly infringes other asserted claims requiring more than the Bromine Step and the Activated Carbon Step. *See* Arg. § III.

***No Knowledge of Alleged Infringement:*** There is no evidence that any Defendant knew of any patent-in-suit before it received a complaint accusing it of infringing that patent; accordingly, there could be no indirect infringement prior to the date of suit for any Defendant. Moreover, because such pleadings are inadequate to establish knowledge of infringement, and there is no evidence that any Defendant ever had the requisite knowledge of infringement, all of Plaintiffs' claims should be dismissed on summary judgment. *See* Arg. § V.

***No Contributory Infringement:*** As a matter of law, the Defendants that do not sell or offer to sell Refined Coal cannot be liable for contributory infringement. *See* Arg. § IV. The Court should also enter summary judgment dismissing the contributory infringement claims against all Defendants for two independent reasons:

- First, Refined Coal has substantial non-infringing uses. *See* Arg. § VI(A).

- Second, Refined Coal is not especially made or adapted for use with ACI. *See* Arg. § VI(B).

***No Active Inducement:*** ME2C's inducement claim is based entirely on Defendants' sales of Refined Coal to the accused power plants, which allegedly incentivized those accused power

plants to use ACI when they burned the Refined Coal, thereby infringing the patents-in-suit.  But with fact and expert discovery now complete, there is no evidence that in selling Refined Coal, Defendants encouraged any accused power plant to use ACI; it is undisputed that power plants that used ACI chose to do so as their solution for meeting regulatory requirements, not because Refined Coal sellers incentivized its use.  There can be no inducement where, as here, Defendants did not encourage and cause the performance of each step of the claimed method.  *See* Arg. §§ IV, VII.

**_Patent Invalidity:_**  Summary judgment is also warranted on an issue first addressed during the claim construction hearing in this case.  D.I. 392 at 32–33, Ex. 30 at 42:25–45:1–9.  The named inventors omitted from later patent applications a figure and text in their Provisional Application.  Lacking that "essential material," the applications do not support claims that cover treating coal with bromine, leading to a later priority date and invalidity.  *See* Arg. § VIII.

**_Plaintiffs' Technical Expert Witness:_**  Defendants seek to exclude Mr. O'Keefe, Plaintiffs' technical expert witness.  His relevant education is limited to two introductory college chemistry classes and he has no experience or training in the chemistry or use of halogens to treat coal, the chemistry or use of ACI to control mercury emissions, or in mercury emissions controls generally.  He acquired his rudimentary knowledge of this technology solely for this litigation.  He therefore lacks relevant expertise and cannot assist the trier of fact.  The motion also challenges opinions proffered by Mr. O'Keefe that are not based on reliable methodology, lack sufficient factual support, or are not properly the subject of expert opinion testimony.  *See* Arg. § IX.

**_Plaintiffs' Damages Expert Witness:_**  Defendants also seek to exclude certain royalty rate opinions of Mr. Green, Plaintiffs' damages expert witness, for unreliable methodology—including his failure to have "technical comparability" evidence necessary to rely on certain licenses for his

royalty calculation, and a failure to apportion out the value of various licenses that is not

attributable to licenses on comparable mercury control patents. *See* Arg. § X.

## STATEMENT OF FACTS

**1.    The Defendants**

Each of the 34 Defendants is a Delaware LLC, *see* D.I. 406 (4AC) ¶¶ 3–36, and may be

grouped as follows:

- 28 "RC Defendants," each of which owned or leased a Refined Coal facility ("RC Facility") that made Refined Coal and sold it to an accused power plant at relevant times.  The RC Defendants consist of 10 "AJG RC Defendants," 9 "DTE RC Defendants," "Alistar," and 8 "CERT RC Defendants."  Table I identifies each RC Defendant, the power plant to which (and when) its RC Facility supplied Refined Coal, and the first pleading naming that RC Defendant as a Defendant.

- DTE Energy Resources, LLC ("DTE Energy"), alleged to be an alter ago of the DTE RC Defendants or a principal under which the DTE RC Defendants acted as agents when they made and sold Refined Coal.

- AJG Iowa Refined Coal LLC ("AJG Iowa"), which never sold Refined Coal to any accused power plant.  ME2C has refused to dismiss this entity from the case, even for claims requiring sales of contributory material.

- Four "CERT Operations Companies," alleged to operate the CERT RC Facilities.  *See supra* at Table I.  There is no evidence that any of the four CERT Operations Companies ever sold or offered to sell Refined Coal to any accused power plant.

**2.    Coal-Fired Power Plants**[4]

<u>Coal</u>:  Coal is a fossil fuel that is burned for various purposes, including to produce heat to

make steam to power turbines and generate electricity in coal-fired power plants.  Coal is a

combustible rock composed mostly of carbon (C), with variable quantities of other elements such

as hydrogen (H), sulfur (S), oxygen (O), and nitrogen (N).  All coal contains varying amounts of

certain other elements, including mercury (Hg).

<u>Combustion of Coal</u>:  When coal is combusted (burned) it reacts with oxygen from air at

---

[4]    *See generally* Senior Decl. Ex. 1 at ¶¶ 22–49.

high temperatures, generating substantial heat.  Coal is typically pulverized into flour-sized particles before it is burned in the boiler (furnace) of a coal-fired power plant.

The two major products created and released by coal combustion are carbon dioxide ($CO_2$) and water ($H_2O$).  Because of the various elements in coal, other gases also form when it is combusted, such as $SO_x$ (sulfur oxides), and $NO_x$ (nitrogen oxides).  When combusted, coal releases elemental mercury ($Hg^0$) as a gas.  Heavy particles released during combustion settle in the bottom of the furnace as "bottom ash;" fine "fly ash" particles rise up in, and out of, the boiler.

**Coal-Fired Power Plants**:  A coal-fired power plant may generally be divided into the following four functional areas, each having a characteristic associated function and temperature:

- ***Coal handling and preparation***:  Facilities for storing coal, crushing it into small pieces, pulverizing the pieces into flour-sized particles, and introducing the coal and air into the boiler.  Certain additives may be introduced onto the coal.

- ***The furnace (boiler)***:  Here, the coal is combusted (burned), and the heat created in the combustion "fireball" is captured to heat and pressurize steam for use in generating electricity.  The combustion zone of the lower furnace is the hottest part of the plant; its temperatures range from 2500 °F (1370 °C) to 3000 °F (1650 °C).

- ***Air pollution control devices***:  These devices connect to the flue, through which gases flow from the furnace to the smokestack.  They minimize the emission of harmful substances into the atmosphere, and include:

  o ***scrubbers (or "flue gas desulfurization" units)***, which remove $SO_x$ from the flue gas, and which have been in use since the 1980s;

  o ***selective catalytic and non-catalytic reducers***, which reduce $NO_x$ emissions, and which have been in use since the 1990s;

  o ***activated carbon injection ("ACI") systems***, in use since the 1990s to decrease mercury emissions from coal-fired power plants.  In ACI, activated carbon is injected into the flue gas at low temperatures.  Brominated activated carbon may also be injected into flue gas to capture mercury; and

  o ***electrostatic precipitators ("ESPs") and baghouses***, which are used to capture particulate matter as well as activated carbon that has binded to pollutants.

- ***Heat recovery systems and the smokestack***:  These recover heat from the combustion gases as they rise up through the stack, and exit into the atmosphere.

5

3.     **Use of Chemicals to Reduce Emissions**[5]

Technologies directed to reducing emissions from coal-fired power plants have been the focus of considerable investigation.  Many such technologies and investigations involve the introduction of chemicals and other substances into coal-fired power plants for purposes such as reducing emissions.  Depending on the purpose of the chemicals and their stability at different temperatures, some chemicals are added to or mixed with coal; others are injected into the boiler; others are injected into flue gas.  A 2004 patent assigned to Nalco Company claimed a method for reducing mercury emissions by injecting bromine compounds into the flue gas.

4.     **The U.S. Government Encourages the Development of Methods for Reducing Mercury Emissions from Coal-Fired Power Plants**[6]

Recognizing the negative health effects of mercury emissions from coal-fired power plants, Congress and various federal agencies took steps to foster the development of methods for reducing mercury emissions.

The government provided grants to public and academic laboratories to study mercury emissions and develop methods to decrease mercury emissions.  Government reports published in 1997–98 concluded that the use of halogens such as bromine could aid in mercury capture and that well-known sorbents, such as activated carbon, could bind mercury so it could be separated from the flue gas stream using an ESP or baghouse.  Lawton Decl. Ex. 1 at ¶ 66.  One government-funded lab, the EERC, received considerable funding for these purposes.  EERC employed and funded the named inventors on the patents-in-suit at the time of their putative invention.

Congress enacted a financial incentive program (a tax credit) to encourage private industry to develop an improved form of coal—Refined Coal—that, when combusted by a power plant,

---

[5]     *See generally* Senior Decl. Ex. 1 at ¶ 73.

[6]     *See generally* Senior Decl. Ex. 1 at ¶¶ 50–55.

emitted less mercury and NO$_x$ than the feedstock coal from which it was prepared.  The tax credit would be earned through the sale of qualified Refined Coal that met the technical requirements of 26 U.S.C. § 45 ("Section 45").  Section 45 does not require the use of ACI, either as part of the qualification process for Refined Coal or as part of Refined Coal's use in power plants.  *See id.*

All evidence regarding how a power plant chooses how to reduce mercury emissions shows that the power plant operators made such decisions without input or involvement by the Defendants, and that Defendants had no impact on any power plant's decision to use ACI.

**5.**   **Chem-Mod Develops and Markets a Method for Making Refined Coal that Results in Lowered Mercury and NO$_x$ Emissions[7]**

Long before the issuance of the patents-in-suit, non-party Chem-Mod LLC ("Chem-Mod") developed and patented a method that may be used to create Refined Coal that, when burned, emits less Hg and NO$_x$ than untreated coal, at a level of reduction that meets or exceeds the Section 45 requirements.  Chem-Mod's patented process creates Refined Coal by mixing feedstock coal with two chemical additives—MerSorb (an aqueous solution of 52% calcium bromide in water), and S-Sorb (a dry powder containing byproduct materials from the cement industry).

**a.   RC Facilities**

Chem-Mod licensed its patents and associated know-how, and provided chemistry, accounting, and engineering consulting services to RC Defendants.  Relying on Chem-Mod's patented technology and expertise, RC Defendants constructed and operated facilities to manufacture and sell Refined Coal to power plants.  The following activities took place in connection with each RC Defendant's business:

- Obtaining Refined Coal production equipment that was in service as of the date required by Section 45;

---

[7]   *See generally* Senior Decl. Ex. 1 at ¶¶ 81–93; Ex. 14 at ¶¶ 32–44.

- Entering into Refined Coal supply agreements, real estate use agreements, and other agreements with a coal-fired power plant;

- Biannually submitting samples of feedstock coal and a proposed methodology for preparing Refined Coal from that feedstock coal to the EERC for qualification testing. At its test facility, the EERC compared the $NO_x$ and Hg emissions from combustion of feedstock coal with those from combusting the Refined Coal, and issued a report qualifying—as meeting the Section 45 technical standards—the Refined Coal prepared using no less than the MerSorb and S-Sorb application rates specified in the report. The EERC earned more than ███████ conducting Section 45 qualification testing and issuing qualification reports for Refined Coal prepared by the Chem-Mod method, including fees paid by Defendants.  The qualification testing never used ACI (*see, e.g.*, Exs. 32–33, 35–40);

- Installing Refined Coal manufacturing equipment, and building an RC Facility that could retrieve tens or hundreds of millions of tons of feedstock coal from the coal yard each year, and manufacture Refined Coal from the feedstock coal;

- Operating the RC Facility, including purchasing and taking possession of the feedstock coal, obtaining MerSorb and S-Sorb, manufacturing Refined Coal by moving and crushing the feedstock coal, applying the MerSorb and S-Sorb at rates specified in the corresponding EERC qualification report, mixing the coal with the chemicals and selling and transferring possession of the Refined Coal back to the power plant; and

- Obtaining the capital needed for the foregoing operations, and researching, identifying, and marketing to power plants that were potential Refined Coal customers.

Each RC Defendant's sale of its Refined Coal to its adjacent power plant qualified for Section 45 tax credits because:  (i) the EERC tests established that the combustion of Refined Coal prepared from the power plant's feedstock coal using the MerSorb and S-Sorb application rates specified for that coal emitted at least 40% less mercury ***and*** at least 20% less $NO_x$ than would be emitted from untreated coal from the same source; and (ii) the Refined Coal was sold to an unrelated entity with the expectation that it would be used to produce steam.

The Hg emissions from combusting Refined Coal could be captured by the power plant's baghouse or ESP without additional chemical treatments.

### b. The Power Plants Used Refined Coal Sold by the RC Defendants

Many power plants, including the 24 accused power plants, combusted Refined Coal made by Chem-Mod's process without using ACI at all.

- From 2009 through 2021, Defendants sold more than ███████████ of Refined Coal made by the Chem-Mod Solution to the 24 power plants that ME2C has accused of direct infringement.  *See* Senior Decl. Ex. 1 at Ex. C-2.  Of that amount sold to accused power plants, at least 28% ████████████s) was burned when the power plant either did not have an ACI system installed or did not have that system engaged.  *Id.* at Ex. C-2, C-5 (estimating refined coal use prior to ACI installation); Ex. 13 at ¶ 18 (estimating refined coal use without ACI post-installation).

- In that same period from 2009 through 2021, more than ██████████ of Refined Coal made by the Chem-Mod Solution were sold to plants that are not accused in this case and that never installed ACI systems.  *See* Senior Decl. Ex. 1 at Ex. C-4, C-5.

There is no dispute that the sellers of qualifying Refined Coal earned tax credits regardless of whether their power plant customers also used ACI at the time.  *See* Ex. 22 at 52:16–22; Ex. 26 at 173:11–12, 200:20–25.

Some power plants that purchased Refined Coal from an RC Defendant had an ACI system available to use as an additional mercury reduction tool, including to meet the EPA's Mercury and Air Toxics Standard ("MATS") requirements that went into effect starting in 2015.  In many instances power plants purchased and combusted Refined Coal for many years before installing their ACI system.  Senior Decl. Ex. 1 at Ex. C-2; *id.* at ¶¶ 195–219.  And once their ACI system was installed, such power plants used ACI only "intermittently" when combusting Refined Coal.  *See, e.g.*, Ex. 28 at 1; Ex. 27 at 1.  There is no evidence that any RC Defendant encouraged ACI use at its customers' power plants.

### 6.    The Patents-in-Suit

Each of the five patents-in-suit names as inventors Edwin S. Olson, Michael J. Holmes, and John H. Pavlish, each of whom was employed by EERC at the time of the claimed invention.  Patent information—including the earliest-dated pleading asserting that patent—follows:

| Patent No. | Filing Date | Issue Date | First Pleading, and Date |
|---|---|---|---|
| 8,168,147 (the 147 Patent) | April 6, 2009 | May 1, 2012 | D.I. 1 (July 17, 2019) |
| 10,343,114 (the 114 Patent) | May 14, 2018 | July 9, 2019 | D.I. 1 (July 17, 2019) |
| 10,589,225 (the 225 Patent) | May 14, 2015 | March 17, 2020 | D.I. 326 (October 7, 2021) |
| 10,596,517 (the 517 Patent) | June 4, 2018 | March 24, 2020 | D.I. 326 (October 7, 2021) |
| 10,668,430 (the 430 Patent) | May 8, 2018 | June 20, 2020 | D.I. 326 (October 7, 2021) |

*See* Exs. 1–5.  The claims of all five patents are method claims directed to a process for reducing mercury emissions from coal-fired power plants.  The claimed processes, *inter alia*, combine two known methods for reducing mercury:  the use of bromine and ACI into the flue gas.

The 147 Patent further requires the use of a molecule serving as what the patent terms a "Bromine Containing Promoter," which must react with an injected activated carbon sorbent to create a promoted sorbent, which must then react with mercury in the flue gas.

The four other patents require, *inter alia*, (i) coal comprising added (or an additive comprising) "$Br_2$, HBr, $Br^-$, or a combination thereof," and (ii) ACI into the flue gas.

All five patents purport to claim priority to a Provisional Application 60/605,640, dated August 30, 2004 (the "Provisional").  Ex. 6.  The Provisional contains "essential material"— namely, a figure that Plaintiffs included in their Technology Tutorial, and which, with accompanying text, purports to show the addition of bromine to the coal, to the boiler, or after the boiler ("Fig. 2").  The early utility applications did not include Fig. 2, stating only that the Provisional was "incorporated herein by reference."  The patents' 12 examples do not involve applying bromine material to the coal, and the 147 Patent does not include any statement that the bromine material may be applied to or introduced with the coal.

No patent-in-suit mentions Section 45 tax credits or Refined Coal, or teaches a method to reduce $NO_x$ emissions or make a Refined Coal complying with Section 45 requirements.  By contrast, the Chem-Mod patents and technology:  (i) teach the manufacture of a product that, when combusted, leads to a reduction of mercury and $NO_x$ emissions as required for Section 45; (ii) teach

10

and claim a coal product, which can be prepared and sold by an entity other than a power plant; and (iii) do not require ACI.

ME2C never sought:  (i) to use its technology to develop a Refined Coal that would qualify for Section 45 tax credits; or (ii) to enter into a business that would or could use its technology to create Refined Coal.  Instead, ME2C marketed chemicals to power plants, including chemicals for adding bromine to coal (the composition of which it kept secret), and its own ACI chemicals.

Prior to suit, ME2C did not send a demand letter or otherwise provide notice of any of the patents-in-suit to any current Defendant.  None of the current Defendants was aware of any of the patents-in-suit before being named as a Defendant in a pleading that identified such patent.

**7.     This Litigation**

In the nearly four years since this litigation was commenced, Plaintiffs:  (i) filed (and attempted to file) multiple complaints; (ii) added additional patents-in-suit as they issued; (iii) added multiple RC Defendants and other Defendants; and (iv) changed their pleaded theory of liability multiple times.   In granting successive motions to dismiss, the Court dismissed: (i) many parent entities; (ii) joint infringement claims against all Defendants, with prejudice; and (iii) all claims for pre-suit damages as against Alistar and all CERT Defendants.

All of the remaining claims are for indirect infringement—and all are premised on allegations that the RC Defendants' sale of Refined Coal to a power plant (i) induced the power plant to use ACI to treat the flue gas produced by combusting the Refined Coal, or (ii) contributed to the power plant's infringement of a patent-in-suit.   The Court has issued opinions defining Plaintiffs' evidentiary burdens to prove that any Defendant induced or contributed to infringement.

**8.     Plaintiffs License, and Dismiss, Power Plant Defendants**

The original complaint named as defendants many of the power plant operators who purchased and used Refined Coal sold by RC Defendants.   The power plant operators filed IPR

petitions against the 147 and 114 Patents, the two patents asserted in the original complaint. The PTAB, concluding that there was a reasonable likelihood of unpatentability, instituted review. ME2C thereafter granted patent licenses to each power plant operator, including the power plants that they operated, and dismissed the power plant defendants. *See* D.I. 167, 249, 266, 267. The power plant operators discontinued the IPR proceedings, which were thereafter dismissed.

Since the 2019 issuance of the earliest patent-in-suit mentioning coal treatment, ME2C has granted licenses to four power plant operators using Refined Coal made by the Chem-Mod Solution. *See* Exs. 7–10. The following chart summarizes the relevant terms:



| Operator | Vistra | NRG | Talen | AECI |
|---|---|---|---|---|
| Effective Date | | | | |
| License Grant | | | | |
| Retroactive Authorization | | | | |

Although each of these four license agreements includes a section in which ME2C purports to reserve its right to "pursue" third parties for infringement, the clause apparently does not apply to

Refined Coal suppliers.  *See* Ex. 7 at § 2.5; Ex. 8 § 2.5; Ex. 9 § 2.5; Ex. 10 § 2.4.  After executing

its agreements with Talen and AECI, ME2C dismissed their Refined Coal suppliers from this case

entirely, and ME2C is no longer seeking damages from Vistra's or NRG's Refined Coal suppliers

for the period after the effective dates of those operators' license agreements.  *See* Ex. 14 at C-1.

## LEGAL STANDARDS GOVERNING THIS MOTION

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  "[A] court must view the evidence in the light most favorable to the non-moving

party and give that party the benefit of all reasonable inferences that can be drawn from the

evidence."  *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (citation omitted).  "[A]n inference

based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat

summary judgment."  *Id.* (citation omitted).

Expert opinion testimony must be "based on sufficient facts or data" and "the product of

reliable principles and methods . . . reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.

"The proponent of the expert testimony bears the burden of proving its admissibility by a

preponderance of evidence."  *Exela Pharma Sciences, LLC v. Eton Pharmaceuticals, Inc.*, 2022

WL 806524 at *1, Case No. 20-cv-365 (D. Del. 2022).  The opinion offered by the expert must be

"more than . . . unsupported speculation," "assist the trier of fact to understand the evidence or to

determine a fact in issue," and have "a valid scientific connection to the pertinent inquiry as a

precondition to admissibility."  *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 590–92 (1993).

███████████████████████████████████

## ARGUMENT

**I.    Because Licensed Use of Patents Is Not "Without Authority," There Can Be No Direct or Indirect Infringement at the ME2C-Licensed Power Plants.**

Direct infringement is an element of any indirect infringement claim, *see Akamai  Techs., Inc. v. Limelight Networks, Inc.*, 572 U.S. 915, 921 (2014), and direct infringement of a method claim requires use of the patented method "without authority."   35 U.S.C. § 271(a).   Because ME2C has authorized Vistra and NRG to use its patents, those plants cannot be direct infringers, summary judgment should be entered dismissing the indirect infringement claims against Vistra's and NRG's Refined Coal suppliers.

In addition to the licenses effective on the "Effective Date" of each agreement, ███████████

████████████████████████████████████████████████████

███████████████████████████████████████████████. These releases and covenants retroactively authorized the power plants' activity, negating any claim of direct infringement based on prior acts, and thus precluding any claim of indirect infringement predicated on activity at those plants.  *See JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1045 (Fed. Cir. 2015) (affirming summary judgment of no indirect infringement because defendant's customers were "licensees" of the patents-in-suit and "expressly released from claims of infringement").   Accordingly, the claims against Defendants Chouteau, Jasper, Joppa, Newton, and Bascobert (A) Holdings, which sold Refined Coal to Vistra plants, and against Alistar, Rutledge, Senescence, and Spring Hill, which sold Refined Coal to NRG plants, fail before and after the date of those licenses.

**II.    Because No Power Plants Directly Infringe the 147 Patent, There Can Be No Indirect Infringement of that Patent.**

Practicing any asserted claim (17–20) of the 147 Patent requires:

- "chemically reacting the sorbent material with *a bromine containing promoter* to form

14

a promoted brominated sorbent," where

- "***the bromine containing promoter*** is in gaseous form, vapor form, or non-aqueous liquid form"

- "carbene species edge sites [on the activated carbon] react with ***the bromine containing promoter*** to form a carbocation paired with a bromide anion"

- "injecting separately ***the bromine containing promoter*** into a gas stream"

- "***the promoter*** is reacted in the gas phase or as a vapor"

Ex. 2 at 23:36–45, Cl. 17 (emphases added throughout).

The highlighted term "***bromine containing promoter***" ("BCP") must refer to the same entity each time it appears in a claim. *See, e.g., In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016). Accordingly, the BCP that is "inject[ed] . . . into a gas stream" must also "chemically react[]" with the "separately" injected sorbent—and the reaction must occur by the BCP reacting with "carbene species edge sites" on the activated carbon. The claims do not cover anything close to all methods for adding bromine to the system, but only those in which a bromine species is in the BCP; the BCP is in a particular form; and the BCP undergoes the reaction specified in the claim.

Plaintiffs have not identified a single substance in the accused power plants that can meet each of these BCP limitations. Indeed, at various times ME2C switched among accusing MerSorb, bromide ions, calcium bromide, and bromine atoms. *See* Ex. 11 at ¶ 124 (p. 132), p. 159 (147 claim 1b), p. 161 (147 claim 17a); p. 150; Ex. 13 at ¶¶ 28, 30.[8] Each of these is a distinct species, and none meets the claim requirements for a BCP.

***MerSorb:*** MerSorb, a product that RC facilities added to coal to make Refined Coal, is an aqueous (48% water) solution of calcium bromide, $CaBr_2$. Ex. 11 at ¶ 83 (p. 45), p. 159 (147 claim 1b), p. 156 (114 claim 24e); Niksa Decl. Ex. B at ¶¶ 53, 56, 56 n.28, 60. Because the BCP must

---

[8]   Because Mr. O'Keefe's initial infringement report repeats paragraph numbers, it is necessary to provide both a page number and a paragraph number to locate the correct cite.

be "in gaseous form, vapor form, or non-aqueous liquid form," and MerSorb is an aqueous solution, MerSorb cannot meet the BCP requirements for at least that reason. *Id.* Ex. B at ¶¶ 52–53, 53 n.25, 56 n.28, 60. Also, because the aqueous solution is destroyed after being added to the coal and combusted in the furnace (which is thousands of degrees above the boiling point of water), no MerSorb solution remains to undergo the required reactions. *Id.* at ¶ 56 n.28. Even if some did remain, it is unrefuted that it could not engage in the required reaction with the carbene edge sites of the sorbent. *Id.* at ¶¶ 42–43, 60.

***Bromide Ions****:*  Nor can "bromide ions," or Br⁻, be the BCP.  Even if injecting Refined Coal into the combustion chamber of the furnace satisfied the requirement of "injecting" bromide ions ***into a gas stream*** (it does not), the "gas" or "vapor phase" reaction cannot occur because bromide ions do not exist in the gas or vapor phase.  Niksa Decl. Ex. B at ¶¶ 23, 27, 46, 52.  The ***only*** evidence on whether bromide ions exist in the gas phase was provided by Dr. Niksa, who stated that they do not.  *Id.*; Ex 13 at ¶ 24.  Likewise, Dr. Niksa gave unrefuted testimony that the electronic structure of bromide ions prevents them from reacting with the carbene edge sites of the sorbent in the manner required by the claims.  Niksa Decl. Ex. B at ¶¶ 30–40, 42, 48, 50–51.

Named inventor Dr. Olson also testified that bromide ion could not be a BCP.  Ex. 18 at 82:22–83:2.  Plaintiffs have offered *no* evidence that bromide ions exist in the gas phase, or could undergo the required reaction.  It is thus undisputed that bromide ions are not the BCP.

***Calcium Bromide****:*  Calcium bromide also fails as the BCP.  There is no evidence that calcium bromide can be present in the required physical form to react with the activated carbon sorbent (it does not exist as a "gas, vapor, or non-aqueous solution" at the lower post-boiler temperatures where the reaction with activated carbon must occur), or that calcium bromide can undergo the required reaction at all.  Niksa Decl. Ex. B at ¶¶ 42–43, 53, 53 n.25, 60.  Named

inventor Dr. Olson agreed that calcium bromide cannot be a BCP.  It is undisputed that "calcium bromide" cannot act as the BCP.  Ex. 18 at 82:6–15.

**_Bromine Atoms:_**  Finally, unable to identify a single substance that can meet each claim requirement for the BCP, Plaintiffs would bypass the entire issue, ignore the plain language of the claims, and argue that the BCP is not a substance, but instead are simply "atoms of bromine."  Ex. 13 at ¶¶ 26, 28.  But there is no evidence that BCP should be given anything other than its plain meaning—a species or entity that "contain[s]" bromine.  Niksa Decl. Ex. B at ¶¶ 28–40, 57–60.  Because the bromine is the thing **_being contained_** by the "**_bromine containing_** promoter," and not the thing **_doing the containing_**, simple English mandates that bromine atoms cannot be the BCP.  *Id.*  The specification does not contravene the usual rules of English, but consistently describes the BCP as chemical compounds that *contain* bromine, and not the other way around.  *Id.*; Ex. 2 at 2:49–64; 21:47–54; Cls. 22–25.  That is also how each named inventor used and defined "BCP" at their depositions, and how all expert witnesses used the term.  *See* Niksa Decl. Ex. B at ¶ 57 (POSITA would understand "bromine containing promoter" to refer to a single bromine-containing species); Ex. 18 at 45:10–25 (BCP "is a **_compound that contains bromine_** . . . ."); Ex. 24 at 88:1–19 (a BCP would be "[s]ome sort of a **_bromine-containing compound_** like calcium bromide.").

Finally, bromine atoms cannot be the BCP because the required reaction specifies a role for the other atoms in the BCP, in addition to the role for the bromine atom.  *See, e.g.*, Ex. 2 at Fig. 2 (showing role for other atoms in the BCP).  Niksa Decl. Ex. B at ¶¶ 28–40, 57–60.  There is no evidence that this required reaction could occur without participation by those other atoms, and

Dr. Olson admitted that many bromine compounds are not BCPs because they cannot participate in that reaction—*i.e.*, the other atoms could not play their required role. *Id.*; Ex. 18 at 53:1–19.[9]

Proving infringement of the 147 Patent requires Plaintiffs to identify a BCP in the accused process, and to show that the BCP meets each requirement of the asserted claims. They have not identified any BCP meeting each requirement. Ex. 13 at ¶¶ 23–30. Summary judgment should be granted dismissing all claims based on alleged infringement of the 147 Patent.

## III.   There Is No Evidence That Any Power Plant Met the Claim Elements of Many Other Asserted Claims.

Claims from four of the five patents-in-suit require that the sorbent or mercury-containing gas comprises 1–30 g of bromine, or a Br–containing compound, for every 100 g of activated carbon sorbent.[10] Although Plaintiffs must prove that the power plants used bromine and activated carbon sorbent within that range, there is no evidence on the relative amounts of bromine-containing compounds and activated carbon sorbent used in the actual operation of any accused power plant. Ex. 11 at p. 153.[11] Accordingly, Defendants are entitled to summary judgment of no indirect infringement of these claims.

---

[9]   Although the 147 Patent claims require one specific reaction pathway, named inventor Dr. Olson admitted that several different reaction pathways involving mercury and bromine were possible. *See id.* at 58:19–59:3; 64:12–19. Plaintiffs' expert witness, Mr. O'Keefe, admitted that he never considered whether bromine could react through pathways other than the one required in the patent, rendering his opinion unreliable. Ex. 24 at 108:3-14.

[10]   The claims are claims 4 and 29 of the 114 Patent, claim 17 (and dependent claims 18–20) of the 147 Patent, claims 5, 19, and 21 of the 517 Patent, and claims 13 and 17 of the 430 Patent.

[11]   Mr. O'Keefe incorporates his opinion regarding claim 4 of the 114 Patent for all other similar claims. *Id.* at pp. 158, 162, 163, 168, 170, 175, 176.

**IV.**     **Defendants Who Did Not Sell Refined Coal Are Entitled to Summary Judgment of Non-Infringement.**

The Court should grant summary judgment of non-infringement for the Defendants who have not sold Refined Coal:  AJG Iowa Refined Coal LLC; DTE Energy Resources, LLC; and the four CERT Operations Companies (together, the "Non-Selling Entities").

Liability under 35 U.S.C. § 271(c) requires that a defendant "sell[]" or "offer[] to sell" material that contributes to infringement.  An "offer[] to sell or s[ale]" requires a specific transaction with a change in title or ownership of an article which is then used in the infringing method.  *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1356–1358 (Fed. Cir. 2007); *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1317 (Fed. Cir. 2010). Similarly, ME2C's inducement theory also relies on the allegation that each Defendant sold Refined Coal.  *See* Ex. 14 at ¶ 3; Ex. 11 at ¶ 99 (p. 123).  There is no evidence that any of the Non-Selling Entities ever "offer[ed] to sell or [sold]" Refined Coal.  *See* Green Decl. at ¶ 4. Thus, these Defendants cannot be liable either for contributory infringement or active inducement. Accordingly, the six Non-Selling Entities are entitled to summary judgment of non-infringement.

One Non-Selling Entity, DTE Energy Resources, LLC, is alleged to be either an alter ego of, or the principal for, certain Defendants who made and sold Refined Coal.  But there is no evidence to support those theories, and that Defendant is also entitled to summary judgment.

**V.**     **The Court Should Dismiss All Infringement Claims Based on Lack of Knowledge of Infringement.**

To be liable for inducement under 35 U.S.C. § 271(b), Defendants must have "knowledge of the existence of the patent that is infringed" and "knowledge that the acts [at issue] constitute patent infringement"—*i.e.*, Defendants must have known that the conduct they induced actually constituted infringement as a matter of law.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011).  Likewise, to be liable for contributory infringement under 35 U.S.C. § 271(c),

Defendants must have "kn[o]w[n] that the combination of its components was both patented and infringing with no substantial non-infringing uses." *Lucent Techs.*, *Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009).

There is no evidence that any Defendant had "knowledge of the existence of [any asserted] patent" prior to the date on which that Defendant was provided with a complaint attaching the patents-in-suit. ME2C cannot rely on their litigation complaint to prove the element of knowledge. *See ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 251 (D. Del. 2023).

ME2C may argue that service of a complaint upon each Defendant sufficed to put those Defendants on notice of the patents-in-suit. While a complaint may serve as notice of a ***patent*** and enable knowledge of the ***patent*** going forward, this Court has emphasized that a complaint is insufficient to constitute the "source of the knowledge required to sustain claims of induced infringement and willfulness-based enhanced damages," *Id*.; *see also id*. at 250 ("[t]he purpose of a complaint is to obtain relief from an existing claim and not to create a claim" (cleaned up)).

Plaintiffs' theory that Defendants were "willfully blind" to the patents-in-suit and to their customers' infringement must also fail. *See* D.I. 406 (4AC) at ¶ 78. In *Global-Tech*, the Supreme Court identified two requirements for willful blindness: "(1) the defendants must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances*, *Inc. v. SEB S.A.,* 563 U.S. 754, 765–66 (2011). A willfully blind defendant is "one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *PPG Industries Ohio, Inc. v. Axalta Coating Systems, LLC*, 2022 WL 610740, at *4 (D. Del. Jan. 26, 2022). A defendant who "merely knows of a substantial and unjustified risk of such wrongdoing" is not willfully blind to that risk. *See Global-Tech*, 563 U.S. at 770.

There is no evidence that any Defendant held *any* relevant subjective beliefs regarding ME2C patents, or took *any* deliberate actions to avoid learning of the patents or of potential infringement.

Accordingly, each of ME2C's claims for contributory infringement, induced infringement, and willful infringement should be dismissed on summary judgment. To the extent that the claims are not dismissed on summary judgment, damages for each Defendant with respect to each patent must be limited to the period following notice of the patent, as established by the date that the Defendant was first served with a complaint attaching the patent.

**VI.    Summary Judgment Should Be Granted Dismissing the Contributory Infringement Claims as Against All Defendants.**

**A.    Refined Coal Has Always Had Substantial Non-Infringing Uses.**

For their claim of contributory infringement, ME2C must prove that Refined Coal lacks substantial non-infringing use. *See Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1361–1363 (Fed. Cir. 2012); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006). Any non-infringing use is "substantial" if it is "not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009). "[S]ubstantial non-infringing use can be shown when 'a significant number of [uses] would be non-infringing.'" *Pickholtz v. Rainbow Techs., Inc.*, 260 F. Supp. 2d 980, 989 (N.D. Cal. 2003) (quoting *Sony Corp. of Am. v. Universal Studios*, 464 U.S. 417, 442–443 (1984)). There is no minimum amount of use that must be non-infringing, but courts regularly find substantial non-infringing use if 5% or more of uses may be non-infringing. *See, e.g.*, *Amarin Pharma, Inc. v. W.-Ward Pharm. Intl. Ltd.*, 407 F. Supp. 3d 1103, 1113 (D. Nev. 2019) (granting summary judgment and finding that substantial non-infringing use of a drug was established "[e]ven if [such use] only happens about 5% of the time"); *In re Depomed Pat. Litig.*, 2016 WL 7163647, at *69 (D.N.J. Sept. 30, 2016) (non-infringing use indicated for "less than 5%"

of patients was nonetheless substantial); *see also Sanofi v. Glenmark Pharms. Inc., USA*, 204 F. Supp. 3d 665, 684 (D. Del. 2016).

The accused product here is Refined Coal made by the Chem-Mod Solution—*i.e.*, treating feedstock coal with MerSorb and S-Sorb. Ex. 11 at ¶ 111 (pg. 127); ¶ 119 (pg. 131).  There is no dispute that that product was in widespread non-infringing use throughout the United States for the duration of the Section 45 program, which ran from 2009 to 2021, both before and after each patent-in-suit issued.  *See* Senior Decl. Ex. 1 at Ex. C; Ex. 25 at 369:6–380:25, 392:7–17.  Many plants that used Refined Coal during this time period never used ACI at all.  *See* Senior Decl. Ex. 1 at Ex. C-4.  ME2C has left such plants out of this lawsuit, but they nonetheless demonstrate substantial non-infringing use of Refined Coal.

Even plants with ACI systems like Defendants' customers did not actually use those systems continuously.  For example, ███████████████████████████ burned at least 59% of its Refined Coal without ACI; ███████████████████ burned at least 42% of its Refined Coal without ACI; ██████████████████████████ burned at least 34% of its Refined Coal without ACI; and ███████████████████ burned at least 25% of its Refined Coal without ACI.  *See* Senior Decl. Ex. 1 at Ex. C-2; *see also* Statement of Facts § 5(b), *supra*. Each of these plants, and many others, used Refined Coal without ACI both before and after issuance of the patents-in-suit.  The use of a product before the patent-in-suit issues is proof of substantial non-infringing use.  *See Tyco Healthcare Group LP v. Biolitec, Inc.*, 2010 WL 3324893, at *2–3 (N.D. Cal. 2010).  Here, as in *Tyco*, Plaintiffs do not dispute that such non-infringing uses occurred.

ME2C may argue that after MATS went into effect, the 24 accused power plants needed to use ACI "***continuously***" in order to comply with emissions requirements—avoiding any chance

███████████████████████████████

of non-infringing use.  But there is no precedent for looking only at a subset of the time that an accused product is on the market, and in any event, there is no dispute that even after MATS, none of the accused plants used ACI 100% of the time.  *See* Senior Decl. Ex. 1 at  ¶¶ 195–219; Ex. 13 O'Keefe Reply ¶ 18; *see also* ████ (█████ power plant operator stating that ██████ "***intermittently*** injected activated carbon . . . during each 30 day MATS monitoring period") (emphasis added); Ex. ██ (███████ power plant operator stating "employed activated carbon daily, but ***not continuously***, at ████████ from 2016 through 2021) (emphasis added); Ex. 11 at ¶ 100 (p. 64) (admitting that ███████████ plants used ACI "only on a temporary basis" through 2021).  Mr. O'Keefe admitted to multiple non-infringing uses for Refined Coal:  (i) power plants' use of Refined Coal without ACI before and after MATS went into effect; (ii) power plants' use of Refined Coal without ACI before they installed ACI systems; and (iii) EERC's decade-long use of Refined Coal without ACI for its qualification tests.  Ex. 25 at 277:11–16, 282:1–24, 288:20–289:9, 290:22–291:5, 304:4–10, 348:2–24, 358:9–359:8, 361:1–363:23, 365:3–392:17.

ME2C may argue that a given power plant's ability to use Refined Coal in a non-infringing manner depends on that power plant using Refined Coal and ACI together at least some of the time—possibly to meet MATS.  But "[i]f the practice of the patented method [or combination] is incidental and necessary to the practice of the unpatented methods, the device ***is*** a staple [article of commerce] and there can be no contributory infringement."  *See, e.g.*, *McKesson Info. Sols., Inc. v. Bridge Med., Inc.*, CIV S-02-2669 FCDKJM, 2005 WL 2346919, at *9 (E.D. Cal. Sept. 23, 2005) (citations omitted) (emphasis added); *see also Vita-Mix*, 581 F.3d at 1327–28 (non-infringing use is substantial if product feature that allegedly contributed to infringement has other beneficial uses).  Thus, even if a power plant chose to use ACI in some instances to remain in

████████████████████████

compliance with MATS, the same bromine-containing Refined Coal still had substantial non-infringing use at other times—precluding contributory infringement.

**B.      Refined Coal Is Not Especially Made or Adapted for Use With Activated Carbon, and No Defendant Has Ever Thought Otherwise.**

ME2C must also prove that the Refined Coal was "especially made or especially adapted for use in an infringement of [the] patent." *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009). The Refined Coal that is the basis of Plaintiffs' contributory infringement claims was made by mixing feedstock coal with MerSorb and S-Sorb in the amounts specified in the EERC qualification reports to meet the Section 45 technical requirements—based on a testing process that did not involve ACI. *See, e.g.*, Exs. 32–33, 35–40; Ex. 25 at 364:1–373:23; Ex. 11 at ¶ 81 (p. 42); Senior Decl. Ex. 1 at ¶¶ 55–56, 81–87. If Refined Coal was "especially made" for anything at all, it was to qualify for Section 45 tax credits. It was not made to facilitate, accommodate, or encourage ACI use by power plants. The record does not support any assertion that Refined Coal was "especially made or especially adapted for use in an infringement," or that any Defendant "knows" it to have been so made. To the contrary, the EERC—the original owner of the 147 Patent, employer of the inventors, and the entity that certified the Refined Coal at issue in this case—testified that Refined Coal was made and certified to be used ██████████████████████████████████████████

██████████████████████████████████ at 182:12–183:20.

**VII.   The Claims for Induced Infringement Should Be Dismissed.**

ME2C touts its patented process as a two-step process, because each asserted claim requires a power plant to perform at least two steps: a "Bromine Step" and an "Activated Carbon Step." *See* D.I. 513 ¶ 2. ME2C contends that Defendants are liable for inducing infringement based solely on their provision of bromine-treated Refined Coal to power plants, which when

combusted allegedly provides the bromine for the Bromine Step.  ME2C further contends that Defendants' sale of bromine-treated Refined Coal induced power plants to use ACI and thereby perform the Activated Carbon Step—either because Defendants hoped or expected the power plants to use ACI, or because the Defendants actively touted the benefits of using Refined Coal and ACI together.  *See* D.I. 513 ¶¶ 6, 9; *see also* D.I. 406 (4AC) ¶¶ 81–82, 86, 92, 257.  The law and the record do not support either theory.

### A.   No Defendant Acted to Cause Power Plants to Perform the Activated Carbon Step.

To induce infringement of a multi-step method claim, a defendant must act to cause a direct infringer to perform steps which, taken together, comprise the patented method.  Any performance not caused by the defendant is irrelevant:  the steps induced by the defendant must "constitute patent infringement."  *Glob.-Tech*, 563 U.S. at 766.  As this Court has noted, "'[i]n order to prove induced infringement, the patentee must show that the alleged infringer performs, or ***induces*** another party to perform, ***every single step in the method***.'"  D.I. 110 at 13 (emphases added) (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014)).  If the defendant's acts fail to cause one or more of the claimed steps, there can be no inducement liability.  *See Power Integrations, Inc. v. Fairchild Semiconductor Intl., Inc.*, 843 F.3d 1315, 1330–31 (Fed. Cir. 2016); *see also* D.I. 513 ¶ 5 (defendant's act(s) must "'***successfully communicate with*** and ***induce*** [the] third-party direct infringer'") (emphases added) (quoting *Power Integrations*, 843 F.3d at 1331).

There is no evidence that Defendants used words to "lead," "influence," "prevail on," or "persuade" their power plant customers to use ACI, an element of each asserted claim.  *See Glob.-Tech*, 563 U.S. at 760 (defining "induce"); D.I. 513 ¶ 7.  In fact, the record shows that the accused power plants made their own decisions about how to meet mercury emissions regulations.

███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████.  *See, e.g.*, Ex. 16 at 22:22–23:10; Ex. 17 at 11:6–12:16.  Plaintiffs'

own technical expert Philip O'Keefe opined that it was ***only*** the accused power plants' desire to

use ACI to comply with MATS, and not the sale of Refined Coal, that induced power plants to

install and use ACI systems.  Ex. 25 at 375:11–376:3.  There is not a shred of evidence that the

use of Refined Coal spurred a power plant to install or use ACI.  To the contrary, there is evidence

that several power plants unilaterally decided to reduce their ACI use upon adopting Refined Coal.

     **B.**     **Selling Refined Coal Was Not an Act of Inducement.**

As the Court noted in connection with Defendants' third motion to dismiss, ME2C's

primary theory of how Defendants induced infringement is predicated on the provision of Refined

Coal, only, and does not involve physically providing activated carbon to power plants, verbally

encouraging power plants to use it, or incentivizing its use.  *See* D.I. 513 ¶¶ 4, 7.  As a matter of

law, however, the mere sale of a product cannot be indirectly infringing unless the plaintiff proves

the other elements of contributory infringement.  *See* 35 U.S.C. § 271(c).  Plaintiffs imply that

there are two circumstances that made Defendants' sales of Refined Coal an inducing act.  Neither

argument has merit.

First, Plaintiffs suggest that the sale of Refined Coal was an inducing act because of the

price incentives to the power plant.  But there is no evidence that the use of ACI depended on the

price of Refined Coal, or vice versa.

Second, Plaintiffs suggest that the sale of Refined Coal was an inducing act because plants

needed to use ACI when they burned Refined Coal in order to comply with MATS.  As an initial

matter, there is no evidence that any Defendant "knew" that.  Even so, knowledge that a product

may be put to infringing uses is not enough:  "To prove inducement, a plaintiff must present

26

evidence of active steps taken to encourage direct infringement; mere knowledge about a product's characteristics or that it may be put to infringing uses is not enough." *HZNP Medicines LLC v. Actavis Laboratories UT, Inc.*, 940 F.3d 680, 701 (Fed. Cir. 2019). There is no evidence that Defendants encouraged power plants to use ACI to comply with MATS.

### C. Defendants Lacked the Necessary Intent to Induce Infringement.

That fact also dooms Plaintiffs' intent argument. *See Vita-Mix*, 581 F.3d at 1329 ("intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent."). There is no evidence that Defendants ***intended*** that their power plant customers would use ACI in combination with Refined Coal in a manner that infringed—to meet MATS or otherwise. Rather, Plaintiffs' theory of intent appears to be that when Defendants sold Refined Coal, they: (i) knew that their customers would do whatever it took to comply with emissions regulations; (ii) intuited that such compliance would entail the simultaneous use of Refined Coal and ACI; and (iii) knew that such simultaneous use infringed the patents-in-suit. But there is no evidence that Defendants possessed that necessary knowledge, and no support for the proposition that that would be enough for inducement liability.

### VIII.  The Patents-in-Suit Are Invalid Under 35 U.S.C. §§ 102, 103, and 112.

Defendants are entitled to summary judgment that all asserted claims are invalid under 35 U.S.C. §§ 102, 103, and 112. Every asserted claim, either explicitly or as interpreted by Plaintiffs, covers adding bromine-containing additives to coal before the coal is combusted. The 640 provisional application (the "Provisional"), to which each patent-in-suit purports to claim priority, contains a Figure 2 that depicts where bromine might be added to the system. Niksa Decl. Ex. A at ¶ 264. Neither Figure 2 nor its associated text (together, "Fig. 2") was included in the first non-provisional application filed in the family, and it disappeared from all applications filed until 2018.

27

*Id.* ¶¶ 180, 202.[12]  The absence of that disclosure in intervening applications defeats any claim of priority to the Provisional or the intervening applications.  Without that priority claim, the 114, 225, 430, and 517 Patents are invalid under 35 U.S.C. §§ 102 and 103.  The absence of that disclosure also creates a deficiency under Section 112 for the 147 and 225 Patents.

To avoid those conclusions, Plaintiffs argue that:  (i) each application in the priority chains incorporates the Provisional by reference; and (ii) there is separate disclosure in the intervening applications that supports the addition of bromine to coal prior to combustion.  The first argument fails because regulations prohibit incorporation by reference of essential material like Fig. 2 from provisional applications and because the applicants did not identify the incorporated material with the required clarity and particularity.  The second argument fails because it is premised on admittedly untenable readings of the intervening applications.

**A.      As Essential Material, Fig. 2 Cannot Be Incorporated by Reference.**

Fig. 2 is essential material that cannot be incorporated by reference into any of the patents-in-suit or intervening applications.  Although material may be incorporated into an application, 37 C.F.R. § 1.57, "essential material" may only be incorporated "by reference to a U.S. patent or U.S. patent application publication." *Id.* § 1.57(d).  "Essential material" includes material necessary to "[p]rovide a written description of the claimed invention, and of the manner and process of making and using it" as required by section 112.  *Id.* § 1.57(d)(1).

Fig. 2 is "essential material" because it provides the ***only potential disclosure*** of adding bromine to coal prior to combustion.  Niksa Decl. Ex. C at ¶¶ 18–22, 25.[13]  Fig. 2 is the basis of

---

[12]   The undisputed Family Tree of ME2C Patents is reproduced here as Table II to the brief, *supra*. It is reproduced from both sides' expert reports.  The patents-in-suit are yellow; intervening related applications are blue.

[13]   Defendants do not concede that Fig. 2 supports a claim of priority to a given application. But, for purposes of the question of incorporation, it provides the only ***potential*** disclosure.

Mr. O'Keefe's argument that the patents-in-suit may claim priority to the Provisional.  Ex. 12 at ¶¶ 54, 55, 85, 94, 105.  During deposition, when asked point blank whether they are essential material, he agreed "I think so" and "Yes."  Ex. 25 at 240:13–15, 240:25–241:9.

As essential material necessary for any possible description of adding bromine to coal prior to combustion, Fig. 2 may only be incorporated by reference from a U.S. patent or U.S. patent application publication.  The putative incorporation fails because the Provisional is neither.

### B.     Regardless of Whether It Contains Essential Material, the Provisional Was Not Properly Incorporated by Reference in Various Priority Chains.

Regardless of whether the material from the Provisional is "essential," the incorporation of the Provisional is also improper because the applicants did not identify, with clarity and particularity, what was to be incorporated.  "Whether and to what extent a patent incorporates material by reference . . . is a legal question."  *Hollmer v. Harari*, 681 F.3d 1351, 1355 (Fed. Cir. 2012).  "To incorporate material by reference, the host document must identify with *detailed particularity* what specific material it incorporates and *clearly indicate where* that material is found in the various documents."  *Zenon Env't, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007) (internal quotation marks omitted).

The intervening applications in the priority chain do not meet this standard.  The 114 Patent purports to claim priority through U.S. Patent Nos. 8,652,235 and 9,468,886, and Application No. 15/295,594.  Niksa Decl. Ex. A at  ¶ 170; *id.* at p. 101.  These documents state only that they incorporate the disclosures of the Provisional "to the extent appropriate."  Ex. 12 at pp. 25–27.  There is no direction as to *what* is "appropriate" to incorporate from the Provisional or *where* that

material is found in the Provisional.[14]  As a result, Fig. 2 is not incorporated into those intervening applications, breaking the priority chain before the 114 Patent was filed in May 2018.

The incorporation of any contents of the Provisional in the priority chain leading to the 225, 430, and 517 Patents is similarly deficient.  Those patents purport to claim priority through U.S. Patent Nos. 8,512,655; 8,821,819; and 9,757,689.  Niksa Decl. Ex. A at ¶ 170; *id.* at p. 101. Each of those intervening patents includes a generic statement of incorporation that does not incorporate the Provisional in its entirety and then purports to claim priority to the Provisional "to the extent appropriate." Ex. 12 at pp. 19–21.  Again, the vague language does not clearly indicate **what** is incorporated from the Provisional or **where** it is found.  That reflects a complete failure to incorporate Fig. 2 into those intervening applications, and so breaks the priority chain at least prior to the filing of the 225 Patent in May 2015.[15]

### C.    The Breaks in the Priority Chain Doom the Later-Issued Patents.

Because Fig. 2 was not and could not have been incorporated by reference into the patents-in-suit or intervening applications, the priority dates can be set.  *See Medtronic CoreValve, LLC v. Edwards Lifesciences Corp.*, 741 F.3d 1359, 1363 (Fed. Cir. 2014) ("Determination of a patent's priority date is purely a question of law if the facts underlying that determination are undisputed."). Plaintiffs contend that every asserted claim covers adding bromine-containing additives to coal prior to the combustion of the coal.  But this requires that each application in the proposed priority chain provide written description of adding bromine to coal before combustion; the chain ends with any non-compliant application.  *See Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1571

---

[14]   Moreover, Dr. Niksa confirmed that such language would not inform a POSITA what material from the Provisional was intended to be incorporated. Niksa Decl. Ex. C at ¶¶ 27–28.

[15]   Because Figure 2 is not physically copied into the 225 Patent and cannot be incorporated into it by reference, the break in the priority chain continues through the 225 Patent as well.

(Fed. Cir. 1997) ("In order to gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112.").

For the 114 Patent, there is no support for adding bromine to coal prior to combustion in any intervening application in its priority chain prior to the May 14, 2018 filing of the application underlying the 114 Patent.  Niksa Decl. Ex. A at ¶¶ 268–279, 286–290.  For the priority chain leading to the 225, 430, and 517 Patents, there is no support for adding bromine to coal prior to combustion in any intervening application in that priority chain prior to the April 12, 2018 filing of the application underlying U.S. Patent No. 10,933,370.  *Id.* at ¶¶ 293–311.[16]

Mr. O'Keefe has not identified disclosure of adding bromine to coal prior to combustion in any intervening patents.  First, to the extent he relies on the incorporation of the Provisional into intervening patents, Fig. 2 is not and cannot be incorporated by reference.  Second, his agreement that Fig. 2 is essential material confirms that any other common disclosure in the intervening applications is not sufficient to provide support under Section 112.  If Fig. 2 is ***necessary*** to provide written description support, *see* 37 C.F.R. § 1.57(d), then the disclosure omitting it is ***insufficient***.  Third, the disclosure Mr. O'Keefe identified in the intervening applications in Figures 3, 10, and 5 could not reasonably be found to be sufficient disclosure.

***Figure 3***:   Mr. O'Keefe points to Figure 3 and related description from the 595 application,[17] which is a predecessor to all four patents, as teaching multiple injection points for

---

[16]   Again, Defendants do not concede that the inclusion of Figure 2 from the provisional provides sufficient disclosure, *see supra* n.13, but for purposes of priority, the point is the inclusion of Figure 2 is the earliest possible date for disclosure supporting priority.

[17]   Mr. O'Keefe's arguments regarding the 595 Application also apply to the 163 Application that is a predecessor to all four patents. Ex. 12 at ¶ 95.

bromine.  Ex. 12 at ¶¶ 86, 106.  But neither has anything to do with pre-treating coal with bromine before combustion, and Mr. O'Keefe provides no reasons that they would.

***Example 10***:  Mr. O'Keefe relies on Example 10 from the application, but in that example a pre-treated ***activated carbon sorbent***—not pre-treated ***coal***—was injected into the flue gas after the boiler.  The accompanying text states:  "In general however, the inventive sorbent can be injected where desired (*e.g.*, before, after, or within the boiler)."  *Id.* at ¶¶ 87–88.  But both the figure and the statement refer to the already brominated-***sorbent***, and not the bromine containing ***promoter***, or bromine-treated ***coal***.  A POSITA would never understand that to pertain to either an Activated Carbon sorbent or a Brominated Activated Carbon sorbent, Niksa Decl. Ex. C at ¶¶ 35–37, because putting either material into the boiler would defeat the point of the invention:  those substances would be incinerated in the fireball.  Every POSITA would know, and the claims and specifications reflect, that those materials are added to the cooler flue gas, ***after*** the boiler.  Mr. O'Keefe confirmed this at his deposition, Ex. 24 at 170:6–174:23, and also that Example 10 does not disclose adding bromine in any form to coal, or adding any bromine species anywhere into the flue gas before the bromine is reacted with the activated carbon sorbent.  *Id.* at 164:23–165:17.

***Figure 5***:  Finally, for the 114 Patent, Mr. O'Keefe points to Figure 5 from the 594, 896, and 058 applications.  Ex. 12 at ¶¶ 89, 91–92.  But Figure 5 does not describe adding bromine to the coal, as opposed to other systems upstream of the combustion chamber.  Niksa Decl. Ex. A at ¶¶ 289–290; *id.* Ex. C at ¶¶ 45–46.  Mr. O'Keefe has not refuted that point.[18]

In sum, the 114 Patent is entitled to a priority date no earlier than its May 14, 2018 filing date; the 430 and 517 Patents are entitled to a priority date no earlier than the predecessor 370

---

[18]   Even if Figure 5 provided sufficient support for adding bromine to coal prior to combustion, the earliest-filed 058 application was filed April 23, 2009.  As that still postdates the prior art references discussed below by three or four years, it would not change the ultimate conclusion.

Patent filing date of April 12, 2018; the 225 Patent is entitled to a priority date no earlier than its May 14, 2015 filing date.

### D.   The 147 and 225 Patent Claims Lack Written Description Support for the Application of a Bromine Containing Promoter to the Coal.

Although the applicants eventually copied Fig. 2 from the Provisional into later patent applications, they did not do so for the applications leading to the 147 and 225 Patents.  For reasons stated previously, the omission of the "essential" Fig. 2 from applications leading to the 147 and 225 Patents means those patents lack written description of adding bromine to coal prior to combustion and are invalid under Section 112(a) to the extent they purport to cover the use of pre-treated coal, as Plaintiffs contend.  *Id.* Ex. A at ¶¶ 486, 490.

Try as they may, Plaintiffs have not created a genuine disputed issue of material fact.  With respect to the 147 Patent, Mr. O'Keefe points to Figure 3 and the related statement that multiple injection points for bromine and sorbent are within the scope of the invention, as well as Figure 1 showing multiple paths to inject activated carbon into the flue gas.  Ex. 12 at ¶¶ 230–233.  None of these has anything to do with pre-treating coal with bromine before combustion, nor does Mr. O'Keefe explain that they would.  Instead, he contends they show injecting the bromine containing promoter into a gas stream *separate* from the sorbent.  *Id.* Dr. Niksa's opinion on the 147 Patent is unrebutted.

Scouring the 225 Patent for a disclosure, Mr. O'Keefe turns to Fig. 2 from the Provisional. *Id.* at ¶ 241.  But Fig. 2 was not copied into the 225 Patent and, as essential material, it could not be incorporated by reference.  Example 10 fails too, as explained above.

### E.   The 114, 225, 430, and 517 Patents Are Invalid Under 35 U.S.C. §§ 102 or 103.

Based on the priority dates for the 114, 225, 430, and 517 Patents set out above in Section VIII(C), the undisputed facts show that the asserted claims of each of those patents are invalid

under 35 U.S.C. §§ 102 or 103.  Defendants' expert Dr. Niksa established that the asserted claims of those four patents are either anticipated or rendered obvious by the Sjostrom, Eckberg, and Olson-646 references.  Niksa Decl. Ex. A at ¶¶ 19, 499–635 (114 Patent), ¶¶ 21, 812–845, 889–917 (225 Patent), ¶¶ 25, 1037–1164 (517 Patent), ¶¶ 27, 1317–1456 (430 Patent), ¶¶ 418–434 (motivation to combine).

Mr. O'Keefe did not rebut the substance of Dr. Niksa's opinion.  He offers no opinions directed to Eckberg or Olson-646.  His only response on any of the art is that Sjostrom is not prior art because its date of January 2005 came after Plaintiffs' claimed priority date, based on the Provisional.  Ex. 12 at ¶¶ 155–156.  Without the benefit of the Provisional, Sjostrom, too, is prior art, and Mr. O'Keefe's sole argument against the invalidity of those patents fails.  Defendants are entitled to summary judgment that the asserted claims of the 114, 225, 430, and 517 Patents are invalid under 35 U.S.C. §§ 102 & 103.

IX.    **Plaintiffs' Technical Expert, Mr. Philip O'Keefe, Lacks the Knowledge, Skill, Experience, Training, or Education Necessary to Offer Opinions that Would Assist the Trier of Fact, and His Opinions Should Be Stricken.**

"To offer expert testimony from the perspective of a skilled artisan in a patent case—*like for . . . validity[] or infringement*—a witness must at least have ordinary skill in the art."  *Kyocera Senco Indus. Tools Inc. v. ITC*, 22 F.4th 1369, 1376–77 (Fed. Cir. 2022) (emphasis added).  More generally, while the Third Circuit has "a generally liberal standard of qualifying experts[,]" it has "also set a floor with respect to an expert witness's qualifications."  *Elcock v. Kmart Corp.*, 233 F.3d 734, 742 (3d Cir. 2000).

A.    **Mr. O'Keefe's Lacks the Qualifications Necessary for His Opinions.**

<u>*Education*</u>:  Mr. O'Keefe has no graduate degree, nor any degree in chemistry.  He has a Bachelor's degree in Mechanical Engineering, which required only two introductory chemistry courses he took in the 1970s.  Ex. 24 at 17:7–18:1, 18:17–19.  His only on-the-job training

involving chemistry related to water purification, in the early 1980s. *Id.* at 11:21–12:17, 16:8–11. He has never attended any conference related to mercury control or gas emissions from power plants, *id.* at 79:15–20, nor has he taken any course on activated carbon, *id.* at 42:6–42:11.

**_Experience_:**   Mr. O'Keefe worked as a power plant engineer at Commonwealth Edison from 1981 to 1995, long before power plants employed mercury control technology of any kind, and twenty years before the EPA's MATS regulations went into effect starting in 2015. *Id*. at 11:1–3, 19:19–20:2; Ex. 25 at 343:22–345:19. None of the power plants Mr. O'Keefe worked at during his time at ComEd had any emission control technologies other than ESPs, and none had mercury emission control systems. Ex. 24 at 31:3–32:12. He confirmed that "no" part of his "time at ComEd ha[d] to do with the control of the amount of mercury emitted from the plant." *Id*. at 24:7–10.

The training courses he attended at ComEd were largely management training classes, save one pollution control class on how electrostatic precipitators (ESPs) control fly ash. *Id.* at 10:21–25, 11:6–14, 13:11–14:14. His role at ComEd with ESPs and fly ash control was writing "tech staff" procedures on how to inspect ESPs. *Id*. at 14:7–23. His responsibility for training plant engineers at ComEd did not include measuring pollutant levels, or control of mercury or any other emissions—except for an "[a]udit course on [ESPs]". *Id.* at 23:1–4, 23:15–24, 24:3–6.

None of the ComEd plants during Mr. O'Keefe's employment had ACI systems, and Mr. O'Keefe never worked at a power plant with an ACI system. *Id*. at 41:18–42:25. Mr. O'Keefe has never taught nor attended any course relating to ACI. *Id*. at 42:6–42:11. All of Mr. O'Keefe's understanding of ACI systems results "entirely" from his work on this case. *Id*. at 42:12–19. Yet he has never visited a power plant with an ACI system. *Id*. at 55:16–18. Outside of this case, he has never done any study of ACI systems. *Id*. at 55:19–24. But even for this case, he did not visit

35

any coal-fired power plants. *Id.* at 54:24–55:1. He did not visit any plants accused of infringement, *id.* at 58:9–11, or communicate with them. *Id.* at 59:1–4. Thus, he never visited or observed a power plant that uses Refined Coal, *id.* at 66:5–11, nor observed the production of Refined Coal. *Id.* at 66:23–25. He never visited a power plant that uses ME2C products, nor observed their production. *Id.* at 66:17–22. He never visited a plant that uses brominated activated carbon. *Id.* at 67:1–3.

Mr. O'Keefe has no professional experience working with power plants on MATS compliance or compliance with any other mercury emission control regulation. Ex. 25 at 345:20–346:7. Outside of his work in this case, Mr. O'Keefe has not conducted any research or published regarding MATS compliance. *Id.* at 346:8–21. Outside of this case, Mr. O'Keefe has no training, education or teaching experience on MATS compliance. *Id.* at 346:18–25. Mr. O'Keefe's entire understanding of MATS compliance has come as a result of his work as an expert witness in this case. *Id.* at 347:1–4.

Mr. O'Keefe's understanding of mercury control results "entirely" from this case. Ex. 24 at 42:203–25. By his own admission, Mr. O'Keefe has been self-employed as a professional expert witness for the last twenty years, and any expertise he has is in "general" "mechanical and electrical engineering," with "[n]o focus." *Id.* at 8:17–9:3, 9:15–22. Other than this case, none of his work as an expert has involved chemistry. *Id.* at 47:7–9.

**B.    Mr. O'Keefe Should Be Excluded from Offering Opinions on Infringement and Invalidity Because He Lacks the Requisite Knowledge and Skill.**

The level of ordinary skill is disputed and must be determined, which begins with identifying the relevant art. The patents-in-suit describe the field of invention as "the removal of pollutants from flue gas," particularly the removal of mercury by reactive regenerable sorbents. Ex. 2 at 1:28–33. Similarly, the claims are directed to methods of treating a mercury-containing

gas to separate or reduce mercury.  *Id.* at cl. 1; Ex. 1 at cl. 1; Ex. 3 at cl. 1; Ex. 4 at cl. 1; Ex. 5 at cl. 1.  The specification assumes familiarity with the properties of activated carbon, chemical concepts regarding mercury capture, and the formulation and testing of brominated activated carbon.  *E.g.*, Ex. 2 at 7:16–23, 7:51–8:20, 14:29–22:55, fig. 2.  Thus, the relevant art is the use of halogens and sorbents to reduce mercury emissions from coal-fired power plants.

The educational level of the inventors and others in the field, as well as the sophistication of the technology, are informative as to the level of ordinary skill.  *Daiichi Sankyo Co., Ltd. v. Apotex, Inc*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).  The three inventors have a high level of education or experience.  At the time of the alleged invention, Inventor Olson held a Ph.D. in Chemistry and Physics and had eight years' experience focused on mercury control, on top of nearly 15 years with EERC researching energy-related topics.  Ex. 18 at 9:13–10:1, 21:17–22:7, 27:16–23, 28:4–7.  Inventor Holmes held a master's degree in Chemical Engineering, spent the preceding three years at the EERC on research focused on mercury capture and particulate $SO_2$ and $NO_x$, and more generally spent 15 years as a research engineer including work on coal combustion, pollutant emissions, and fuel processing.  Ex. 19 at 12:4–20, 13:16–24, 16:20–18:12, 21:5–16.  Inventor Pavlish held a Bachelor's degree in Mechanical Engineering and for the preceding 10 years served as a senior research advisor at the EERC focusing on air toxic metals with an emphasis on the emissions and capture of mercury, on top of nine years' experience in industry designing components for power plants.  Ex. 20 at 18:14–19:7, 20:10–21:4, 22:22–24:8, 27:7–11.  Despite this experience, Pavlish readily admitted he did not fully understand the chemistry in the patents.  *Id.* at 92:6–11.

The problems encountered in separating mercury from flue gas are complex.  For example, gaseous phase reactions of bromine in flue gas resulting from coal combustion involves over a

dozen bromine species and nearly a hundred different chemical reactions, Niksa Decl. Ex. B at ¶ 25 n.10.  As a result, in the early 2000s, technology in this field was developed by researchers in laboratories, not field engineers in power plants, because POSITAs needed to understand a variety of chemistry and engineering principles specific to coal combustion and removal of pollutants from gas streams.  *Id.* Ex. A at ¶¶ 67, 70–168; *id.* Ex. C at ¶ 6.

Defendants contend that a POSITA would have at least a Master's degree in chemical engineering, chemistry, or a related field, knowledge of mercury chemistry, and at least two years' experience with research and development or implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration.  *Id.* Ex. A at ¶ 67.  This is consistent with, albeit less than, the inventors' education and experience and reflects the technical field identified by the patents-in-suit and the problem addressed by the claimed inventions.

Plaintiffs, on the other hand, contend that a POSITA would have a Bachelor's degree in mechanical engineering, chemical engineering, chemistry, or a related field of technology and at least two years of experience dealing with power plant operation, and/or pollution control equipment.  Ex. 11 ¶ 22 (p. 9).  Plaintiff's proposal is inconsistent with the testimony of the inventors.  Pavlish far exceeds those requirements, yet he testified that "some of the chemistry" in the patents "is beyond my educational training and expertise."  Ex. 20 at Pavlish Dep. 92:6–11. Both Pavlish and Holmes were unable to answer or deferred to Olson on questions regarding the chemical technology of the patents, including the basic meaning of claim terms and whether certain technologies or chemical species fall within the scope of the claims.  *See, e.g.*, Ex. 20 Pavlish Dep. at 116:22–117:19, 119:5–9; Ex. 19 Holmes Dep. Tr. at 63:1–19, 66:13–67:13, 70:22–71:4, 124:7– 125:5, 126:4–19, 193:9–18, 197:12–198:5.  Olson's specific chemical knowledge is integral to the POSITA.  Accordingly, the record supports Defendants' proposed level of skill for a POSITA.

███████████████

Mr. O'Keefe lacks the education and experience necessary to testify from the perspective

of a POSITA, even if the POSITA is defined at a much lower level than Defendants propose.

Courts exclude witnesses from offering opinions from the point of view of a POSITA where, like

Mr. O'Keefe, they lack experience in the technical field of the patents at issue.  More generally,

Mr. O'Keefe's lack of education, training, experience, and knowledge regarding mercury

emissions control techniques, renders him unqualified to offer any informed, reliable, and helpful

testimony.  Mr. O'Keefe cannot reasonably assist the trier of fact with understanding, for example,

whether a reference teaching the creation of brominated activated carbon for mercury capture in a

fluidized bed outside the flue would render obvious a claim covering the creation of brominated

activated carbon in a gas transport line outside the flue, when he has no understanding of the

chemistry involved and was working in the lawn equipment and medical device field while such

mercury capture techniques were being devised.  Indeed, one of the simpler questions for the

experts in this case is whether there is infringement of the broad claims of the later patents through

the use of $CaBr_2$, but even that confused Mr. O'Keefe.  He testified that the salt $CaBr_2$ "comprises"

the molecular compound $Br_2$, a position that any freshman chemistry student would reject as

absurd, until his counsel's leading questions on redirect spotlighted his misconception.  The Court

should exclude his opinions on the subjects of infringement and invalidity.[19]

---

[19]   *See Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1268 (Fed. Cir. 2008) (engineer
with experience in satellite design not qualified to testify about specific laboratory equipment);
*Hypertherm, Inc. v. Am. Torch Tip Co.*, No. 05-cv-373, 2009 WL 530064, at *4-*5 (D.N.H. Feb.
27, 2009) (excluding expert with Ph.D. in mechanical engineering and 25 years of experience from
testifying as POSITA regarding plasma arc torches because he had no experience designing or
manufacturing plasma arch torches and relied on general principles of engineering); *PayRange,
Inc. v. Kiosoft Tech.*, LLC, No. 20-20970-cv, 2021 WL 7083639, at *2–*3 (S.D. Fla. Dec. 22,
2021) (50 years of experience and knowledge were not adequate for POSITA testimony on mobile
device and electronic payment systems because his experience predated development of such
systems and he had no specific experience with them); *Bial-Portela & CA. S.A. v. Alkem Lab. Ltd.*,
2022 WL 4244989 at *6–*7 (D. Del. 2022) (excluding a medical doctor in the relevant field and a

### C.   Mr. O'Keefe Lacks the Qualification to Testify on Many Discrete Subject Areas Where He Has Offered Opinions.

In explaining when an expert's opinions should be excluded under Fed. R. Evid. 702, the Third Circuit cited with approval a pre-*Daubert* case, *Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110 (3d Cir. 1987), which held that a district court abused its discretion in allowing a tractor salesperson to testify as an expert about the cause of a tractor fire because he was unqualified to do so.  *See Elcock,* 233 F.3d at 742.  In making this determination, the *Aloe Coal* Court stated:

> Drewnoski [the expert witness] was not an engineer.  He had no experience in designing construction machinery.  He had no knowledge or experience in determining the cause of equipment fire.  He had no training as a mechanic.  He had never operated construction machinery in the course of business.  He was a salesman, who at times prepared damage estimates.

*Id.* (citations omitted).  Under this standard, even if Mr. O'Keefe is not entirely disqualified, many of his proffered opinions and testimony should nevertheless be excluded.

First, Mr. O'Keefe offers opinions that the accused power plants deploy ACI systems as a necessary means to comply with MATS regulations or the plants' emission control permits.  Ex. 11 at ¶¶ 66, 99, 111, 133–97, 114–15, 120–21, 131–34, 137–49 (pp. 29, 62–63, 87, 102–19, 128–29, 131, 135–36, 138–46); Ex. 13 at ¶¶ 17–18, 34.  But Mr. O'Keefe has *no* professional experience, education, or training regarding MATS, MATS compliance, power plant permitting, mercury emissions, mercury emission control technologies, or ACI systems.  Indeed, his power plant experience predates the adoption of mercury emissions control by some two decades.  He is wholly unqualified to opine on these matters.

---

Ph.D. pharmaceutical scientist because neither had the education *and* experience of a POSITA); *Kitsch LLC v. Deejayzoo*, LLC, 2022 WL 17184603 at *3 (C.D. Ca. 2022) (excluding expert with degrees in textiles with "over 40 years of textile development and engineering experience"); *Wright Asphalt Products Co., LLC v. Pelican Ref. Co., LLC*, 2012 WL 1936416 at *3, *5 (S.D. Tex. 2012) (excluding licensed professional engineer with Ph.D. and 40 years of experience in machinery and manufacturing because he had no experience with asphalt formulation).

Second, Mr. O'Keefe also offers opinions on the mechanisms and chemistry of mercury capture at coal fired power plants.  Ex. 11 at ¶¶ 54–68 (pp. 22–31); Ex. 13 at ¶¶ 23–30.  He indisputably lacks meaningful education and training in chemistry, and has no education, experience, or training at all on flue gas chemistry, mercury chemistry, or the chemistry of mercury capture.  The Court should exclude his testimony in these areas.

Third, Mr. O'Keefe offers opinions on Defendants' processes for preparing, testing and supplying Refined Coal to the accused power plants, and on the properties and combustion of Refined Coal.  Ex. 11 at ¶¶ 79–84, 97–100 (pp. 41–46, 60–64).  Here too, Mr. O'Keefe has no training or education on these subjects, and never even sought to compensate for that gap by visiting or observing a Refined Coal Facility, Refined Coal production or Refined Coal use.  His testimony in this area should also be excluded.

Fourth, Mr. O'Keefe offers opinions on the operation of SCR units and wet and dry scrubbers at coal fired power plants, and strategies for reducing mercury and other emissions.  *Id.* at ¶¶ 32–36 (pp. 12–14).  He has no qualifications to do so, Ex. 24 at 31:3–32:12, and his testimony on their use by a power plant should be excluded.

Fifth, Mr. O'Keefe offers opinions relating to air pollution emission control permits, including what power plants need to do to comply with those permits. Ex. 11 at ¶¶ 40–44 (pp. 15–17).  He has no experience with the power plant permitting process and no experience, training or education on power plant permit compliance.  Accordingly, Mr. O'Keefe is not qualified to offer opinion testimony on the permitting process and permit compliance at power plants, and his testimony in these areas should be excluded.

Sixth, Mr. O'Keefe offers technical opinions regarding the development of mercury capture technology, mercury emission control regulations at the state and federal level, and statutes

providing tax credits for clean coal technologies, including Refined Coal.  *Id.* at ¶¶ 45–47 & 50–53 (pp. 18–22).  Mr. O'Keefe has no qualifications to offer expert testimony in these areas.  Thus, this testimony should be excluded.

> ### D.    Mr. O'Keefe's Opinions on Matters that Are Improper for Expert Testimony Should Be Excluded.

Expert opinions "must be capable of 'help[ing the jury to] understand the evidence or to determine a fact in issue.'"  *Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, No. 13-CV-324 (RGA), 2017 WL 3528606, *3 (D. Del. Aug. 16, 2017) (*citing Daubert*, 509 U.S. at 591).  An expert cannot simply "recount[] the facts and then offer[] an opinion as to the conclusion which the jury should reach." *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006).  "Conclusory statements of basic facts will not help the jury and fail to offer a reliable methodology[,] and an expert report [that] is nothing more than a recitation of facts paired with bare assertions" is properly excluded.  *Am. Cruise Lines*, 2017 WL 3528606 at *4.

"While Rule 704 allows experts to provide an opinion about the 'ultimate issue' in a case, it prohibits experts from opining about the ultimate legal conclusion or about the law or legal standards." *Patrick v. Moorman*, 536 Fed. Appx. 255, 258 (3d Cir. 2013); *see also In re Tylenol (Acetaminophen) Mktg., Sales Practices & Products Liab. Litig.*, 181 F. Supp. 3d 278, 294–95 n.27 (E.D. Pa. 2016) (collecting cases on prohibition of legal opinion expert testimony and expert testimony regarding intent, motive, or state of mind, or evidence by which such state of mind may be inferred).  A trial court should properly exclude such testimony, especially when it is nothing more than bald legal conclusions based on facts the expert assumes to be correct.  *SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869, 902 (N.D. Cal. 2022).

Finally, speculation as to another's knowledge, intent, or state of mind is impermissible. *W.L. Gore & Associates, Inc. v. C.R. Bard, Inc.*, No. 11-515-LPS-CJB, 2015 WL 12815314, at *5

(D. Del. Nov. 11, 2015); *Shire Viropharma Inc. v. CSL Behring LLC*, No. 17-414, 2021 WL 1227097, at *5 (D. Del. Mar. 31, 2021); *see also Am. Cruise Lines*, 2017 WL 3528606 at *5 ("Intent is not a proper topic for expert testimony.").

Mr. O'Keefe's opinions are rife with irrelevant fact-recasting narratives that lie outside of any expertise he might possess:

- Section 5.2 (an "Overview of Defendant (sic) Corporate Structure").  Ex. 11 at ¶¶ 85–95 (pp. 46–57).

- Section 5.4 ("Defendant Interactions with Power Plants and Knowledge of Activated Carbon Injection").  *Id.* at ¶¶ 101–111 (pp. 64 – 87).

- Section 5.5 ("Defendant Information Regarding ME2C Patents").  *Id.* at ¶¶ 112–122 (pp. 87–94).

- Section 5.6 ("Evidence Related to Defendant Conduct Leading to Infringement").  *Id.* at ¶¶ 123–132 (pp. 94–101).

- Section 7.1 ("Induced Infringement").  *Id.* at ¶¶ 99–108 (pp. 123–127).

- Section 7.2 ("Contributory Infringement").  *Id.* at ¶¶ 110–118 (pp. 127–130).

In each instance, Mr. O'Keefe simply recounts facts, then impermissibly offers his opinions, as a proxy for ME2C's counsel, on the conclusion that the jury should reach on indirect infringement.

Mr. O'Keefe's opinions on induced and contributory infringement are further infected by inappropriate legal conclusions, referencing "the expectation" of "risk" resulting from "indemnity provisions"; actions that purportedly "led to infringement"; and so on.  Perhaps none is so blatant as his opinion that "[a] fact-finder could conclude that the Defendants intended for their power plant customers to infringe."  *Id.* at ¶ 104 (p. 126).  This and other such opinions, collected at Egan Decl. ¶ h far exceed the scope of admissible expert testimony.

Mr. O'Keefe strays outside expert terrain throughout his report, with forays into contract interpretation and party motivation ("These payments are made to incentivize . . . ."), and other conclusions about jurors ("There is evidence from which a fact-finder could conclude that

Defendants were aware of the patents-in-suit.").  This and other such opinions, collected at Egan Decl. ¶ i, are also far outside the scope of admissible expert testimony and should be excluded.

     **E.**    **Mr. O'Keefe's Opinions on Contributory Infringement Should Be Excluded Because He Did Not Consider Non-Infringing Uses by Power Plants Outside of the Case.**

      In rendering his opinion that the Refined Coal supplied by Defendants was not suitable for substantial non-infringing uses, *Id.* at ¶ 113 (p. 128), Mr. O'Keefe ignored:  (i) power plants outside of this lawsuit that burn Refined Coal without using ACI; and (ii) accused power plants' use of Refined Coal before those plants installed an ACI system—during which time they could not have infringed the patents-in-suit.  *Id.* at ¶¶ 113–114 (pg. 128); Ex. 13 at ¶ 3.  Those uses are indisputably non-infringing and substantial, as Mr. O'Keefe admitted.  Ex. 25 at 282:5– 283:2362:12–363:23.  Yet his opinion, at Ex. 11 at ¶¶ 110–149 (pp. 127–145) and Ex. 13 at ¶¶ 2– 19, offers no basis exclude them from consideration.

      Admissible opinions must be "more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590, and "based on sufficient facts," Fed. R. Ev. 702.  They must be "formulat[ed]" using "reliable" methodology.  *Am. Cruise Lines*, 2017 WL 3528606 at *3.  Mr. O'Keefe's opinions on significant non-infringing uses should be excluded because of his failure to consider these significant non-infringing uses, or provide a reliable methodology for excluding them from his analysis.

     **F.**    **Mr. O'Keefe's Opinions on Secondary Considerations Are Beyond His Field of Expertise and Based on Fundamental Methodological Errors.**

      Mr. O'Keefe's opinions on secondary considerations of non-obviousness are conclusory, beyond any expertise he may have, and not based on reliable methodology.

      First, Mr. O'Keefe renders opinions on the import of ME2C's revenue for its allegedly patented process, Ex. 12 at ¶¶ 204–208, and the government's economic interest in research

investments.  *Id.* at ¶¶ 214–215.  Because he lacks any training or expertise in economics or business finance, those opinions should be excluded.

Second, Mr. O'Keefe does not apply reliable methodology, or even state any methodology, for establishing a "nexus" between the evidence of secondary considerations and the claims.  *See Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (internal quotation marks omitted) ("there must be a legally and factually sufficient connection between the evidence and the patented invention.").  He does not explain how he evaluated the alleged commercial success of ME2C's offerings; does not account for exogenous forces that could create perceived, but unrelated, value in the claimed inventions; and does not distinguish between the value of the patents-in-suit and either (i) other ME2C patents or trade secrets, or (ii) the broader use of halogens in mercury removal.  Lawton Decl. Ex. 3 at ¶¶ 8–10, 22–115.  With these failings, his secondary consideration opinions should be excluded.

**X.    The Court Should Exclude the Royalty Rate Opinions of Plaintiffs' Damages Expert, Philip Green, Because They Are Not Based on Reliable Methodology.**

**A.    Mr. Green Has No Basis to Compare ME2C's Patents to Anyone Else's.**

"The Federal Circuit has instructed district courts 'to exercise vigilance when considering past licenses to technologies other than the patent in suit.'"  *IOENGINE, LLC v. PayPal Holdings, Inc.*, 607 F. Supp. 3d 464, 501 (D. Del. 2022) (emphasis removed) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)).  Before a damages expert can be permitted to derive a reasonable royalty opinion from real-world licenses that do not cover the patents-in-suit, that expert must have (i) a technological basis to compare the licensed patents with the patents-in-suit and (ii) an economic basis to compare the rate in the real-world license (which may have other terms and components) with the rate the defendant would pay for a bare license to the patents-in-suit (and nothing more).  *See TC Tech. LLC v. Sprint Corp.*, 1:16-CV-00153-RGA, 2019 WL

5295232, at *2 (D. Del. Oct. 18, 2019) (expert must "account for the technological and economic differences between [prior] licenses and [proposed license]") (citation omitted); *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 494–95, 2019 WL 1082336 (D. Del. 2019) (same).

Mr. Green's opinions lack the requisite technological and economic bases needed to compare real-world licenses to a hypothetical negotiation, rendering his opinions unreliable. The Court should exclude his testimony on those licenses.

First, Mr. Green has no technological basis to compare the ME2C patents (directed to mercury control in power plants) to any of the Nalco, ADA-ES, or Chem-Mod patents (which cover mercury control, $NO_x$ control, $SO_x$ control, Refined Coal manufacturing, non-brominated Refined Coal preparation, and various business methods, among other subjects). *See, e.g.*, Ex. 26 at 87:5–87:16–88:11;93:6–93:24. Mr. Green asserts only that these four companies' technologies are "similar" and thus "comparable," *see* Ex. 14 ¶¶ 190, 199, because they are from the same general field. *See generally* Ex. 26 at 157:17–161:3. But "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). Mr. Green cannot remedy this defect at trial, because ME2C's technical expert has not offered a sufficiently reliable predicate to compare ME2C's patents to anyone else's. *See* Ex. 11 at ¶ 157 (p. 149) (opining that certain patents are comparable only "in the sense that they are drawn toward the same field of technology").

The law compels exclusion of Mr. Green's deficient opinions. *See, e.g.*, *TC Tech. LLC v. Sprint Corp.*, 2019 WL 5295232, at *2 (D. Del. Oct. 18, 2019) (excluding damages opinion where expert "glaze[d] over the concept [of comparability]" by casting the patents as "'telecommunications patents'"); *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466,

495–96, 2019 WL 1082336 (D. Del. 2019) (excluding damages expert who used "broad and nebulous language to describe the technological comparability of the patents," including that the patents "provide benefits along the same general lines as" the patents-in-suit).

Mr. Green fares no better on the economic comparability requirement. He admits that the Chem-Mod licenses were entered into under circumstances far different from the arm's-length, patent-focused transaction contemplated by the hypothetical negotiation. *See* Ex. 26 at 64:3–65:2, 96:21–97:5 (opining that Chem-Mod agreements were entered as part of a closed, "common structure" of companies designed to earn and claim Section 45 tax credits, which involved multiple corporate relationships and included engineering, technical, financial, and business support provided through that structure). Mr. Green offers no basis to conclude that those circumstances should or could apply to the hypothetical negotiation.

Mr. Green's reliance on the Nalco agreement requires a heightened showing of economic comparability because it is a litigation settlement. *See ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 813 (E.D.Va. 2011) (settlement agreements "entered into in the context of litigation" have "minimal probative value" to the "calculation of reasonable royalties," especially where "the settlement occurred years after the hypothetical negotiation"); *LaserDyamics*, 694 F.3d at 78 (a settlement entered into "a full three years after the hypothetical negotiation date, is in many ways not relevant to the hypothetical negotiation analysis" and reflects "not the value of the claimed invention but the strong desire to avoid further litigation"). Mr. Green provides no reason why the circumstances of the Nalco settlement might be similar to those of the hypothetical negotiation, or even a bare opinion that they are; indeed, he "understands" that the settlement amount was not equivalent to the royalty damages that would have been awarded if the case had proceeded to trial. Ex. 14 at ¶¶ 79, 125–127.

Mr. Green's failures on the ADA-ES agreement are similar.  He recognizes that the ADA-ES agreement was an exclusive license to a company in which the licensor had an interest, which it had formed to commercialize the licensor's inventions, but Mr. Green offers no opinion that would let a jury bridge the gap between that type of arrangement and the hypothetical negotiation between ME2C and Defendants.  *See id.* ¶¶ 174–78; *cf. Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1373 (Fed. Cir. 2008) (because the "hypothetical negotiation is deemed to be an arm's length transaction," courts should not "accept as conclusive the royalty arrangement" between "[non-]competitors") (internal quotations omitted).

With no reliable bases for his technological comparability assumption, and no economic comparability opinions at all, Mr. Green's reasonable royalty opinions should be excluded insofar as they rely on rates paid under the Chem-Mod, Nalco, or ADA-ES agreements.

### B.    Mr. Green Did Not Apportion the Non-ME2C Royalty Rates.

"The patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.'"  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (citations omitted).  Here, "[h]aving built [his] damages case[] on licenses which assigned no value to particular patents, but only on access to . . . technology," it was incumbent on Mr. Green to "isolate the incremental value of [the patents covered by the licenses] to the final product."  *Mondis Tech. Ltd v. LG Electronics, Inc.*, 407 F. Supp. 3d 482, 492–93 (D.N.J. 2019).  Because the licenses were for other companies' patents, Mr. Green also needed to isolate the portion of each license fee attributable to the patents that he assumed were comparable to the patents-in-suit.  He did not.

Mr. Green's apportionment opinion is even weaker than that of the typical expert who assigns a specific percentage based on vague generalities.  *See, e.g., Guardant Health, Inc. v.*

*Foundation Med., Inc.* No. 17-1616-LPS-CJB, Slip. Op. at 34–35 (D. Del. Apr. 22, 2020) (excluding opinion that 50% of accused product's value was attributable to patented features, based only on technical expert's opinion that "patented technology is 'foundational' to the accused products"). Here, Mr. Green offers no apportionment theory at all for the Nalco or ADA-ES licenses, while his opinion on Chem-Mod is that no apportionment is necessary—he assumes that the full Chem-Mod payment was for "comparable" mercury emission reduction technology alone. He ignored the additional benefits provided under the Chem-Mod licenses, such as technology for $NO_x$ reduction and consulting and business services relating to Section 45, and made no effort to value those other significant benefits, suggesting that he could not do so. Ex. 26 at 89:13–92:7, 93:25–94:16, 213:18–216:14, *cf. Mondis Technology Ltd. v. LG Electronics, Inc.*, 407 F.3d 482, 493 (Plaintiff's damages case did not satisfy the apportionment requirement because "the scope of th[e] exemplary agreement differs substantially from the scope of" the patent-in-suit).

Mr. Green's opinion on royalty rates also must be excluded because he does not apportion out the value of the Section 45 tax credits earned by the licensees of Chem-Mod's, Nalco's, and ADA-ES's technology. In fact, he does the opposite: he admits that the basis for his opinion that Defendants should pay more than anyone else ever has to license ME2C's patents is that, unlike other ME2C licensees, Defendants made and sold Refined Coal, which earned them tax credits. Ex. 14 at, *e.g.*, ¶¶ 127–128, 149, 151; Ex. 15 at, *e.g.*, ¶¶ 16 ("[t]he Section 45 tax credits . . . serve as the economic basis for the alleged infringement by the RC Defendants"), 251, 256.

This opinion is fundamentally flawed for two reasons. First, it is undisputed that the patents-in-suit do not claim or enable qualifying for Section 45 tax credits or reducing $NO_x$, a requirement to earn those credits—thus, the value of the credits cannot be attributed to the alleged infringement. *See* Ex. 29 at 2; *Ericsson*, 773 F.3d at 1226 ("[T]he ultimate combination of royalty

base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."). Second, even if practicing the patents-in-suit were incidentally necessary to earn the tax credits, the value of the allegedly infringing Refined Coal would still be attributable to the legal requirements that taxpayers must meet to earn tax credits—rather than to the value of any particular technical contribution of the patents-in-suit to the field of mercury reduction. The value of tax code compliance—comparable to the value inherent in meeting a standard set by an organization—would still need to be apportioned out. *Cf. id.* at 1233 ("[T]he royalty for [standard essential patents] should reflect the approximate value of that technological contribution, not the value of its widespread adoption due to standardization."). Either way, Mr. Green has no basis to include the value of the tax credits in his calculation of a reasonable royalty for the patents-in-suit—it should have been apportioned out, but wasn't. *See* Ex. 26 at 213:18–216:14.

Because Mr. Green's refusal to apportion was born from a "lack of sufficiently reliable methodology," *see Guardant Health*, No. 17-1616-LPS-CJB at 36, his royalty rate opinion must be excluded. *See SUNOCO Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, CV 17-1390-LPS-CJB, 2020 WL 7330715, at *4–7 (D. Del. Jan. 13, 2020) (excluding opinion where prior agreements "not only license[d] . . . patents but also provide[d] . . . 'a basket of services'" that expert did not apportion out); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010).

## CONCLUSION

For the foregoing reasons, summary judgment should be granted dismissing all claims with prejudice, or, to the extent such relief is not granted in its entirety, dismissing the claims, theories, and damages periods against particular defendants as set forth in the Proposed Order, and excluding the testimony of Mr. O'Keefe and Mr. Green.

████████████████████

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Anthony D. Raucci (#5948)

OF COUNSEL:

Richard W. Mark
Joseph Evall
Paul J. Kremer
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

David Glandorf
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
(303) 298-5700

1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendants*
*AJG Iowa Refined Coal LLC*
*Arbor Fuels Company, LLC*
*Belle River Fuels Company, LLC*
*Canadys Refined Coal, LLC*
*Chouteau Fuels Company, LLC*
*Coronado Refined Coal, LLC*
*DTE Energy Resources, LLC*
*Erie Fuels Company, LLC*
*George Neal North Refined Coal, LLC*
*George Neal Refined Coal, LLC*
*Hastings Refined Coal, LLC*
*Huron Fuels Company, LLC*
*Jasper Fuels Company, LLC*
*Jefferies Refined Coal, LLC*
*Joppa Refined Coal LLC*
*Louisa Refined Coal, LLC*
*Newton RC, LLC*
*Portage Fuels Company, LLC*
*Superior Fuels Company 1, LLC*
*Walter Scott Refined Coal LLC*
*Williams Refined Coal, LLC*

███████████████████

MORRIS JAMES LLP

/s/ Kenneth L. Dorsney

OF COUNSEL:

Jeff Dyess
Paul Sykes
Benn Wilson
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL  35203
 (205) 521-8000

Jessica Zurlo
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW, Suite 1350
Washington, D.C.  20036
(202) 393-7150

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Bascobert (A) Holdings LLC*
*Buffington Partners LLC*
*CERT Operations II LLC*
*CERT Operations IV LLC*
*CERT Operations RCB LLC*
*CERT Operations V LLC*
*Cottbus Associates LLC*
*Larkwood Energy LLC*
*Marquis Industrial Company, LLC*
*Rutledge Products LLC*
*Senescense Energy Products LLC*
*Springhill Resources LLC*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Jessica R. Kunz

OF COUNSEL:

Douglas R. Nemec, Esquire
Leslie A. Demers, Esquire
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY  10001-8602
(212) 735-300

Robert S. Saunders, Esquire
Nicole A. DiSalvo, Esquire
Jessica R. Kunz, Esquire
Daniel S. Atlas, Esquire
One Rodney Square
P.O. Box 636
Wilmington, DE  19899-0636

*Attorneys for Defendant Alistar Enterprises,*
*LLC*

March 23, 2023

52

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 23, 2023, upon the following in the manner indicated:

| | |
|---|---|
| James M. Lennon, Esquire | *VIA ELECTRONIC MAIL* |
| DEVLIN LAW FIRM LLC | |
| 1526 Gilpin Avenue | |
| Wilmington, DE  19806 | |
| *Attorneys for Plaintiffs* | |

| | |
|---|---|
| Bradley W. Caldwell, Esquire | *VIA ELECTRONIC MAIL* |
| Jason D. Cassady, Esquire | |
| John Austin Curry, Esquire | |
| Justin T. Nemunaitis, Esquire | |
| Adrienne R. Dellinger, Esquire | |
| Daniel R. Pearson, Esquire | |
| CALDWELL CASSADY CURRY PC | |
| 2121 North Pearl Street, Suite 1200 | |
| Dallas, TX  75201 | |
| *Attorneys for Plaintiffs* | |

*/s/ Brian P. Egan*

_____

Brian P. Egan (#6227)