# EXHIBIT 28

# FULLY REDACTED

# EXHIBIT 29

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

MIDWEST ENERGY EMISSIONS CORP.
and MES INC.,

              Plaintiffs,

    v.

ARTHUR J. GALLAGHER & CO., ET AL.,

              Defendants.

CIV. NO. 1:19-01334-CJB

**PLAINTIFFS ME2C'S RESPONSE TO REFINED COAL LLC DEFENDANTS' FIRST
SET OF REQUESTS FOR ADMISSION TO PLAINTIFFS (NO. 1)**

      Plaintiffs Midwest Energy Emissions Corp. and MES Inc. ("ME2C") hereby serve their

objections and responses to Refined Coal LLC Defendants' First Set of Requests for Admission

to Plaintiffs (No. 1).

**<u>GENERAL RESPONSE AND OBJECTION</u>**

      1.      Plaintiffs' responses are made to the best of their present knowledge,

information, and belief, after a reasonable inquiry. Plaintiffs reserve the right to supplement or

amend the responses pursuant to the Federal Rules of Civil Procedure and any scheduling order

entered in this case.

      2.      Plaintiffs object to each and every Request to the extent it requests information

protected from discovery by the attorney-client privilege, the attorney work-product doctrine, or

any other applicable privilege or immunity from disclosure, or information otherwise protected

from disclosure under the Federal Rules of Civil Procedure, the Federal Rules of Evidence, or

relevant statutory or case law.

      3.      Plaintiffs object to each and every Request to the extent it requests information

that is not within Plaintiffs' possession, custody, or control. Plaintiffs will provide responses to

1

these Requests based on information in its possession, custody, or control that can be located through a reasonable search proportional to the needs of the case.

4.      Any responses or failures to object to any of Defendants' Definitions or Instructions are not intended to be, and shall not be, construed as admissions as to the meaning of words or phrases at issue in this litigation, and shall have no binding effect on Plaintiffs in this or in any other proceeding.

5.      The responses to these requests for admissions shall not be deemed as an admission regarding the relevance of the information sought nor is it intended to waive any right to object the admissibility of such at trial.

6.      Plaintiffs respond to these requests as they interpret and understand each request as set forth. If Defendants subsequently assert an interpretation of any request that differs from Plaintiffs' understanding of that request, Plaintiffs reserve their right to supplement their objections and/or responses.

## SPECIFIC RESPONSES AND OBJECTIONS

### REQUEST FOR ADMISSION NO. 1:

Admit that attainment of a Qualified Emission Reduction, as defined in 26 U.S.C. § 45(c)(7)(B), is not part of any method stated in an Asserted Claim.

### RESPONSE:

ME2C admits that no Asserted Claim recites "attainment of a Qualified Emission Reduction, as defined in 26 U.S.C. § 45(c)(7)(B)," otherwise denied.

Dated: September 29, 2022

Respectfully submitted,

**CALDWELL CASSADY CURRY PC**

/s/ *Justin T. Nemunaitis*
Texas Bar No. 24065815
Bradley W. Caldwell
Texas Bar No. 24040630
Jason D. Cassady
Texas Bar No. 24045625
John Austin Curry
Texas Bar No. 24059636

**DEVLIN LAW FIRM LLC**
James M. Lennon (Bar No. 4570)
1526 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
jlennon@devlinlawfirm.com

2121 N. Pearl St., Suite 1200
Dallas, Texas 75201
Phone: (214) 888-4848
Fax: (214) 888-4849
jnemunaitis@caldwellcc.com
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com

*Attorneys for Plaintiffs*
*Midwest Energy Emissions Corp. and*
*MES Inc.*

## CERTIFICATE OF SERVICE

I certify that counsel of record is being served with a copy of the foregoing document via

electronic mail on September 29, 2022.

/s/ *Justin T. Nemunaitis*
Justin T. Nemunaitis

# EXHIBIT 30

1        IN THE UNITED STATES DISTRICT COURT

2        IN AND FOR THE DISTRICT OF DELAWARE

3

4   MIDWEST ENERGY EMISSIONS CORP.,)
    et al.,                        )
5                                  )
    --------------------Plaintiffs,)
6                                  )Case No.
            vs.                    )19-CV-1334-CJB
7                                  )
    ARTHUR J. GALLAGHER & CO., et  )
8   al.,                           )
                                   )
    --------------------Defendants.)
9

10          TRANSCRIPT OF MARKMAN HEARING

11

12        MARKMAN HEARING had before the Honorable

13   Christopher J. Burke, U.S.M.J., in Courtroom 2A

14   on the 28th of April, 2022.

15

16                    APPEARANCES

17   DEVLIN LAW FIRM
          BY: JAMES LENNON, ESQ.
18
                      -and-
19
     CALDWELL CASSADY & CURRY
20        BY: BRAD CALDWELL, ESQ.
          JUSTIN NEMUNAITIS, ESQ.
21        ADRIENNE DELLINGER, ESQ.

22                         Counsel for Plaintiff

23

     MORRIS, NICHOLS, ARSHT & TUNNELL LLP
24        BY: BRIAN EGAN, ESQ.

25                    -and-

```
 1              GIBSON DUNN & CRUTCHER
                    BY: DAVID GLANDOLE, ESQ.
 2                  RICHARD MARK, ESQ.
                    JOSEPH EVALL, ESQ.
 3                  PAUL KREMER, ESQ.

 4                              Counsel for Refined
                                Coal LLC Defendants
 5
            SKADDEN ARPS SLATE MEAGER & FLOM LLP
 6                  BY: JESSICA KUNZ, ESQ.
                    LESLIE DEMERS, ESQ.
 7                  DOUGLAS NEMEC, ESQ.

 8                              Counsel for CERT

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  All right.  We'll go on

2     the record.  Thanks to our court reporter for

3     her service today.

4          As we do, let me say a few things for the

5     record as we get started today.  The first is

6     that we're here this afternoon in the matter of

7     Midwest Corp., et al., versus Arthur J.

8     Gallagher Co., et al.  It's Civil Action Number

9     19-1334-RGA- -- now just CJB here in our court,

10    and we're here today for our Markman hearing in

11    the case.

12         Before we go further, let's have counsel

13    for each side identify themselves for the

14    record.  We'll start first with counsel for

15    Plaintiffs' side, and we'll begin there with

16    Delaware counsel.

17         Mr. Lennon, good afternoon to you.

18          MR. LENNON:  Good afternoon, Your

19    Honor.  Thank you.  It's Jim Lennon from the

20    Devlin Law Firm.  With me today from Caldwell,

21    Cassady, Curry, I believe presenting on the

22    first issue, is Justin Nemunaitis and Adrienne

23    Dellinger, and also with us is Bradley

24    Caldwell.

25          THE COURT:  Welcome to you.

1          We'll do the same for the two sets of

2     defendants here on Defendants' side.  First,

3     we'll ask counsel for the Refined Coal LLC

4     defendants, again beginning with Delaware

5     counsel.

6               MR. EGAN:  Good afternoon, Your

7     Honor.  Brian Egan from Morris Nichols on

8     behalf of the Refined Coal LLC defendants.

9     Joining me at counsel table are David Glandole

10    and Joseph Evall from Gibson Dunn.  We also

11    have Richard Mark and Paul Kremer from Gibson

12    Dunn as well.  We have a pending pro hac motion

13    for Mr. Glandole, who'll be presenting today,

14    and orally move for admission to the Court.

15              THE COURT:  I'll grant that motion.

16              MR. EGAN:  Thank you, Your Honor.

17    The parties discussed before the hearing that

18    we would argue in the order of the briefing the

19    terms.

20              THE COURT:  Okay.  Thank you.

21    Welcome to all of you.

22          We'll do the same for the counsel for the

23    CERT defendants.  Again, we'll begin there with

24    Delaware counsel.

25              MS. KUNZ:  Good afternoon, Your

1    Honor.  Jessica Kunz on behalf of the CERT

2    defendants.  With me here today are my

3    colleagues Leslie Demers and Douglas Nemec, and

4    also Mr. Glandole will be handling largely the

5    presentation today on behalf of all defendants.

6    Should the Court have any questions for the

7    CERT defendants, with Your Honor's permission,

8    Mr. Nemec will be handling them.

9              THE COURT:  All right.  Counsel, it's

10   good to be here in person.  We haven't had too

11   many of those in this case since COVID-19, so

12   good to see you all in person.

13        As we noted, the parties agreed, and I

14   agree, that with regard to now just the two

15   terms that are left -- four terms were briefed

16   in the parties' joint claim construction brief.

17   One of those terms, the first term that was

18   briefed, the parties in a later meet-and-confer

19   determined that term was no longer in dispute,

20   and the final term approved was one where the

21   parties entered a stipulation and it's become

22   moot as to that dispute.

23        There are two terms left.  I know that

24   per the parties' prior agreement, the

25   plaintiffs' side is going to go first on these

```
1    two terms.  To the extent the parties have

2    slides they want to use today and have slide

3    books, when you get up to present with regard

4    to the first term, feel free to bring up copies

5    to my clerk with regard to those slide decks.

6         Lastly, I think at one point I allocated

7    two hours for argument, but because the number

8    of terms have gone down, we'll just hear

9    argument from the parties on the two terms, so

10   you'll have as much time as you need to be able

11   to make that argument fairly, and I'll give

12   each side a chance both to have opening

13   remarks, and if they want, some brief rebuttal,

14   I'll let you.

15        Okay.  Any questions procedurally before

16   we get started?

17        All right.  Then let me turn to the

18   plaintiffs' counsel, Mr. Nemunaitis.  I'll

19   begin with regard to our first term, which is

20   the injected term.  Feel free, if you want to

21   make introductory comments about the case,

22   claim construction, feel free to do that as we

23   get started as well.

24             MR. NEMUNAITIS:  Thank you, Your

25   Honor.  May I approach to provide slide copies?
```

1          THE COURT:  You may.

2          I should also say if counsel is going to

3     be showing slides on the screen, I'll likely be

4     looking at the screen as opposed to my book.

5     If I'm not looking at you directly, no offense

6     intended.  I'm trying to follow along.

7          MR. NEMUNAITIS:  I believe today both

8     sides will refer to the slide books or put

9     things on the ELMO to keep it simple.

10          THE COURT:  I'll follow along that

11     way.  Thank you.

12          MR. NEMUNAITIS:  The first term in

13     dispute is from the '147 patent, and I would

14     like to begin by just sort of explaining what I

15     believe the parameters of the dispute are, then

16     back up a little bit, talk a little bit about

17     what the -- the technology is and some of the

18     terminology to make sure everyone is on the

19     same page on that, and then go through the

20     arguments.

21          And so the term in dispute is on the

22     third page of the slide I just handed up.  The

23     term is "injecting the particulate sorbent

24     material at a sorbent material injection rate

25     and injecting separately the bromine containing

1       promoter into a gas stream."

2            We propose no construction necessary, and

3       Defendants propose, essentially, a rewrite of

4       this term, and I'd like to focus in on the

5       specific changes the defendants proposed to the

6       claim language.  And these can be grouped into

7       two different types of changes.  The first is

8       the claim itself mentions the phrase "gas

9       stream" once, and Defendants propose changing

10      that to mentioning the term "gas stream" twice.

11      I don't believe that Defendants have

12      articulated a difference in claim scope for

13      this change.  For that reason, we don't have a

14      substantive problem with that change.  If it

15      really is the case there's no difference in

16      claim scope, we propose there's, at that point,

17      no reason, no basis to rewrite the claim

18      language, particularly if defendants have some

19      noninfringement hook or something behind this.

20      I don't think that's been articulated well

21      enough in the briefing to justify the change.

22            The real dispute, though, is on the

23      second portion here where Defendants propose

24      inserting this new language, "whereby neither

25      injection occurs upstream of a furnace exit."

1          What Defendants are proposing here really is

2     inserting a new limitation into the claim.

3     Many claim construction disputes, the dispute

4     is about what does a particular term mean.  You

5     may have the word "adjacent" appear in the

6     claim, and if you look it up in the dictionary,

7     you may have one definition that says

8     "adjacent" means two things that are next to

9     each other, nothing in between them, and

10     another definition says two things that are

11     pretty close together, maybe there's something

12     in between, and it's really close together, and

13     the fight is about which of those two

14     definitions apply.

15          Here, we can say based on their proposed

16     construction, they're not really proposing a

17     definition for a term.  They're proposing we

18     insert a new limitation into the claim, and to

19     justify that kind of ruling, Defendants need to

20     show disclaimer or disavowal, very exacting

21     standards there.  They can't just rely on terms

22     being used in a particular way in a limited

23     number of embodiments in the specification.

24     They've got to show a clear intent from the

25     inventor to actually limit the scope of their

1    claim, given they didn't actually put that

2    limitation in the claim language.

3         Before I get into some of the intrinsic

4    evidence, I do want to walk through the

5    technology briefly to make sure we're clear on

6    the way this works.  What I have here is a

7    figure from Plaintiffs' technology tutorial,

8    and it shows, essentially, the portion of a

9    coal-fired power plan that takes pulverized

10   coal, combusts it, and prepares it to go

11   through the bulk of the inclusion equipment.

12        As we see here, the coal is first led

13   into the coal pulverizer, and I'll show a quick

14   close-up of what the coal pulverizer looks like

15   here.  You have hot gas coming in from the

16   bottom, coal coming in from the top, and the

17   pulverized coal, once it is changed into a hard

18   lump of coal into dust that can be picked up by

19   the hot air, it goes out to the exhaust pipe.

20   What we see here is coal leaving the

21   pulverizer, going through this piping, and

22   entering the furnace, where it's injected into

23   the furnace.  And in the furnace itself,

24   there's already going to be combustion taking

25   place.  The moment that dust and whatever

1    additives are applied to the coal enters the

2    furnace, it combusts, and that heat causes it

3    to flow through the rest of the furnace, out

4    through the flue, until it's ready to go

5    through the rest of the pollution control

6    equipment.

7           THE COURT:  When we talk about the

8    furnace, are we going to be using

9    interchangeably "furnace" and "combustion

10    chamber" and "combustor"?

11           MR. NEMUNAITIS:  I believe for

12    today's purposes, "furnace," "combustion

13    chamber," and "boiler" are the same.

14           THE COURT:  Boiler as well.

15           MR. NEMUNAITIS:  Technically, they

16    have slight variations, but I don't believe

17    there's any dispute.

18           THE COURT:  Okay.

19           MR. NEMUNAITIS:  I would also like to

20    mention now the invention itself is really an

21    improvement on the type of equipment that you

22    saw previously.  The inventors proposed adding

23    two things: a bromine additive that's added in

24    somewhere and activated carbon injection.  You

25    combine those two things and capture mercury.

1       What I showed here are figures, again, from

2    Plaintiffs' technology tutorial.  On the left

3    is a figure of the actual additive feeder that

4    the inventors used when they first came up with

5    this technology in the early 2000s, and you can

6    see it's actually dropping bromine onto

7    pre-pulverized coal that then gets injected

8    into the combustion chamber they're using.

9           Similarly, with the activated carbon

10   injector, there's activated carbon that gets

11   injected into the big steel drum that gets

12   injected into the gas line below the picture

13   here.

14          Finally, I want to combine these

15   components together with the diagram from the

16   plaintiffs' tutorial to point out that the way

17   this power plant works is really by using a

18   loop of air that travels through the entire

19   system, and this matters because we need to

20   talk about what a gas stream is.  So as we see

21   here, coal comes from the coal pile, goes up

22   the conveyor belt, and around E is where you

23   can have additive sprayed onto the coal.  It

24   drops down into the pulverizer, where you can

25   see the primary air fan blowing into the

1    pulverizer and also blowing air out of the

2    pulverizer so it can be injected in the boiler.

3    And this same path of air is carrying that

4    coal, whatever additives are added, throughout

5    the rest of the system to the stack.  Some of

6    that air also goes back to the primary air fan

7    to continue this loop, so the gas stream

8    continues throughout entire system.

9         Right around F4G is where you would most

10   likely see activated carbon injection so it can

11   react with the bromine and the mercury and be

12   collected here so it doesn't get admitted

13   through the atmosphere.

14        With that, I'd like to return to the

15   disputed issue, which is this requirement

16   "whereby neither injection occurs upstream of

17   the furnace exit."  The -- to resolve this

18   dispute -- in the slides here I have some

19   statements of case law, but I'm sure Your Honor

20   is aware of the general case law standards

21   here.

22        Look at the intrinsic evidence starting

23   with the claims.  If you look at Claim 1, it

24   requires three things: promoting sorbent with

25   bromine, so reacting sorbent to bromine; B,

1    reacting elemental mercury gas with the

2    promoted sorbent; and, C, separating out the

3    particles.  One thing to note about Claim 1 is

4    it's fairly broad compared to the other claims

5    outside the briefing, but there's no

6    requirement that it be a power plant.  There's

7    no mention of where this -- these chemicals are

8    added, whether there's a flue or not, whether

9    there's a furnace or not.  It really talks more

10   about the idea of combining sorbent bromine and

11   mercury and capturing that.

12            THE COURT:  For the purposes of our

13   hearing today, can we use "sorbent" and

14   "activated carbon" as synonyms and "promotor"

15   and "bromine"?  I notice those terms are

16   together, but that's largely what we're going

17   to be talking about.

18            MR. NEMUNAITIS:  I'm sorry.  I'm sure

19   I've been not as clear as I could have been on

20   that point.

21            With that in mind, that that is what

22   Claim 1 covers, let's look at Claim 17 and see

23   what it adds.  What it adds is -- again, this

24   is Defendants' rewrite of it.  It says

25   injecting the particulate sorbent material at a

1      sorbent material injection rate.  Okay.  It

2      doesn't say where or how it happens, just

3      injecting the sorbent.  And injecting

4      separately the bromine-containing promoter into

5      the gas stream.  Again, it doesn't say where

6      this gas stream comes from, where these

7      injections are in relation to each other.  It

8      just requires that there be two separate

9      injections.

10         They go on to provide "whereby in-flight

11     reaction produces the promoted brominated

12     source."  Again, it doesn't say one way or the

13     other whether it's before or after the flue.

14     It just says they need to combine together in

15     flight, in the air, to create this reaction.

16     Again, this brings us back to the key point

17     here, which is there's got to be some statement

18     in the specification, the prosecution history,

19     of disclaimer or disavowal.

20              THE COURT:  On the disavowal or

21     disclaimer piece and the idea that what

22     Defendants are doing basically is inserting

23     into the claims a new limitation that's not in

24     any way connected to the claim language, how

25     come it couldn't be said by Defendants that

1      what the limitation, the added issue in their

2      construction, really is just a further gloss on

3      what "into the gas stream" means?  Those words

4      "into the gas stream" are in the claim.  Could

5      it be said what Defense is doing is making it

6      clear.  Let's all be clear what that term

7      means.  How come that's not what they're doing

8      as opposed to injecting new wording into the

9      claim that's totally disconnected to the claim

10     language?

11              MR. NEMUNAITIS:  I agree that's the

12     argument they set out here and essentially what

13     that argument would amount to is saying that

14     the ordinary English words "into the gas

15     stream" inherently mean "into the gas stream

16     downstream of the furnace," and that is not

17     what the normal English words mean.  Unless

18     there's some clear intent from the inventors

19     saying we're not using ordinary English, we're

20     using a specialized meaning of the words, they

21     can't just read a limitation in.

22              THE COURT:  In terms of better

23     understanding what the dispute really is about

24     here, I think the other side says that your

25     brief was kind of a little coy about exactly

 1    what the dispute is.  Here's the way the

 2    defendants frame what they think is going on,

 3    and your brief never really comes out and says

 4    that really isn't going on or something

 5    different.

 6         What they're saying is what the fight is

 7    all about, Judge, is that the plaintiffs want

 8    to be covered by the claims, a scenario where

 9    the bromide-containing promoters are introduced

10    into the furnace with the coal.  In other

11    words, coal that's treated with bromine.  They

12    say that's what the plaintiffs want to be

13    covered here, that if the bromine is with the

14    coal and that gets put into the furnace and

15    then there's combustion, that that counts as as

16    injecting the. . .bromine-containing promoter

17    into a gas stream.  Is that really what you're

18    suggesting?  Because you could be suggesting

19    that, or you could be saying no, no, it has to

20    be injected in the gas stream, meaning into

21    gas, but we dispute whether it has to happen

22    after the exit to the furnace or maybe it could

23    happen before.

24         What's really the issue here?  Why are

25    you fighting this?  What's the deal?

1           MR. NEMUNAITIS:  From my perspective,

2     what we are fighting about is the two different

3     claim construction proposals before the Court,

4     and at the end of the day, the difference in

5     the words presented to the Court are is there a

6     requirement that the injection occurs after the

7     flue or not.  I think it's clear from the

8     intrinsic evidence that we win that fight.

9           THE COURT:  The flue is like a

10    synonym for furnace exit, the words they use?

11          MR. NEMUNAITIS:  Yes, I'm sorry.

12          THE COURT:  I'm thinking of the

13    combustion chamber and I'm thinking of some

14    exit, basically, the place where the gas comes

15    out.  They're saying that somewhere after

16    there, always, these materials must be injected

17    into the gas stream.  You're saying no.  That

18    may happen, but it's possible that the promoter

19    and the activated carbon could be injected into

20    a gas stream earlier.  Which I think, what

21    would earlier cover?  It would cover in the

22    combustion chamber or maybe even prior to the

23    combustion chamber.

24          By the way, is that what you're

25    suggesting, that the injection could come both

1    in the combustion chamber and prior to -- even

2    prior to the combustion chamber?

3              MR. NEMUNAITIS:  Yes, Your Honor.

4    The claim language itself is agnostic as to the

5    location.  As long as we can prove a factual

6    matter for infringement that injection of the

7    gas stream occurs, the particular location in

8    relation to the furnace does not matter to the

9    claim.

10              THE COURT:  And with the bromine in

11   particular, the promoter in particular, is a

12   possible way that you would say, talking about

13   the claim, bromine could be injected. . .into

14   the gas stream is that the bromine is part of

15   the coal.  It's part of the same substance that

16   makes up the coal.  That stuff goes into the

17   combustion chamber and gets combusted.  That

18   gets turned into gas.  Is that an example of a

19   bromine promoter being injected. . .into the

20   gas stream?

21              MR. NEMUNAITIS:  Yes, Your Honor.  As

22   a practical matter, because this is hot air

23   coming in, bromine goes from liquid to gas

24   really easily.  It may turn into gas before you

25   get to the combustion chamber.  Again, I don't

1    think that matters.

2              THE COURT:  So the thing that they

3    say they're worried about in the briefs, the

4    thing they say is the real issue is the key

5    issue or at least disputed, they don't believe

6    that it's possible, according to this phrase in

7    dispute, injecting. . .into the gas stream,

8    they don't believe it's possible for the

9    bromine piece to be injected into the gas

10   stream if the bromine is, like, the same

11   substance as the coal.  The bromine substance

12   gets put into the chamber and gets combusted.

13   You believe that can qualify.  That's, at a

14   minimum, a key dispute that's at issue here

15   with regard to this term.  Is that fair?

16             MR. NEMUNAITIS:  I agree that's a key

17   dispute in the case.  That was raised in the

18   sur-reply, and we haven't had much disclosure

19   on this.  I believe that's really their

20   noninfringement position.  It wasn't, in fact,

21   disclosed to us until the claim construction

22   sur-reply.  I don't believe that presents a

23   claim construction dispute for Your Honor to

24   rule on.  It's a factual matter of the way the

25   bromine makes it from the coal to the

```
1          combustion chamber or, essentially, to the
2          point where it reacts with the activated
3          carbon.  Does an injection occur?  I believe
4          that's a factual question.
5                    THE COURT:  The other question about
6          possibilities, sounds like that's one
7          possibility that could be covered by what this
8          claim term allows for, but are you also
9          suggesting -- it may not turn out to actually
10         be relevant on infringement issues here, but
11         are you also suggesting it's possible that no,
12         look, the bromine could actually be injected
13         into a gas stream, and by "injected into a gas
14         stream," here I'm talking about the way
15         Defendants understand that term, meaning
16         literally injected into the gaseous substance.
17              It's very possible physically where that
18         could happen and does happen where the
19         injection happens in the combustion chamber.
20         There are some -- it's possible, Judge, that
21         there are some plants that the way they work is
22         actually inside the combustion chamber, gas is
23         emitted and bromine actually gets injected into
24         that gas in the combustion chamber.  Are you
25         saying that's possible?
```

```
 1                    MR. NEMUNAITIS:  Yes, absolutely.
 2                    THE COURT:  Can bromine get injected
 3         into gas in some way in these plant apparatuses
 4         even before the combustion chamber comes into
 5         play?  I can't picture that, but is that a
 6         possibility?
 7                    MR. NEMUNAITIS:  Certainly.  You
 8         could do it by putting it on the coal and going
 9         through that process or just by having a
10         separate bromine injector injecting gas or
11         liquid bromine into the gas chamber.
12                    THE COURT:  How could you have gas
13         before the combustion chamber that combusts
14         stuff that creates this?
15                    MR. NEMUNAITIS:  You could use
16         bromine in a gaseous form.
17                    THE COURT:  The bromine would have to
18         get injected into the gas stream.  Bromine
19         itself in a gaseous form, how would that be
20         injecting bromine into a gas stream?
21                    MR. NEMUNAITIS:  Any time you're
22         moving material through the pipes of one of
23         these power plants, there has to be a flow of
24         air or gas, a preexisting flow of air or gas.
25         So you have a pipe here, pump gas down into
```

1      this, it gets carried by the gas that's already

2      there into the combustion chamber, which is

3      also the same way with the pulverized coal in

4      that there already has to be a flow of gas into

5      the combustion chamber and the combustion

6      chamber itself is going to be sucking gas in so

7      the pulverized coal would be injected into that

8      coal and continue into the combustion chamber.

9                  THE COURT:  Okay.  So in some world

10     where there is a gaseous substance that is

11     going to be inserted into the combustion

12     chamber, and you're saying I think the claim

13     could allow, for example, that bromine could

14     actually be injected into that gaseous

15     substance which is then put into the combustion

16     chamber prior to the combustion chamber.

17     That's a possibility that could happen, and the

18     claims would allow for that.

19                  MR. NEMUNAITIS:  Yes, absolutely.

20                  THE COURT:  Okay.  So let's say your

21     position is that all those various things are

22     possible in all those various ways.  We think,

23     Judge, that bromine, for example, can be

24     injected into a gas stream at some point prior

25     to the furnace exit.  If it turns out that

```
 1          although that's fine and good but what's really
 2          in dispute for the infringement piece of this
 3          case is the more particular assertion you're
 4          making, one of the ways you think that it would
 5          qualify here, which is that you could inject
 6          bromine into the gas stream by having bromine
 7          be combined with coal or part of a coal-like
 8          substance and then putting that thing into the
 9          combustion chamber and combusting it.  That
10          seems like that's the key issue here, the key
11          infringement issue.  And I guess what I'm
12          wondering is if I understand that to be the key
13          infringement issue, I mean, obviously, you have
14          to construe the claim terms -- you don't
15          construe the claim terms by focusing on the
16          infringement question.  On the other hand, you
17          want to provide the parties at claim
18          construction with guidance about the meaning of
19          the term so that it is actually helpful when
20          you get to the infringement stage.
21              I guess that's a long way of asking
22          should I make sure that what I do, when I
23          construe this term, however I construe it, but
24          when I write out my Markman opinion, should I
25          make sure that one way or the other I tell the
```

1       parties, hey, look, I understand the dispute is

2       does coal plus bromine being put into a

3       combustion chamber and combusted count and

4       here's my answer, do I need to answer that

5       question one way or the other as part of my

6       Markman decision here or not?

7                   MR. NEMUNAITIS:  I don't believe --

8                   THE COURT:  Do you know what I mean?

9                   MR. NEMUNAITIS:  I do understand the

10      question, yes, and what I would say to that is

11      both sides had a chance to propose terms and

12      propose proposed constructions, and what we got

13      was Defendants' proposal about the key issue

14      being location in relation to the furnace.

15      That's what we briefed.  To the extent this

16      additional issue became more clear in the

17      sur-reply, I don't believe there's been

18      sufficient briefing on the particular issue

19      Your Honor is briefing even if it is an

20      infringement issue, but at the end of the day,

21      the way it's being discussed here it sounds

22      like resolving whether or not a particular

23      plant's use of coal and bromine and the type of

24      pulverizer they use and the type of piping they

25      use, whether or not that qualifies as injecting

1          into the gas stream strikes me as a very

2          factual question and not one that is driven by

3          the intrinsic evidence to resolve it.

4                    THE COURT:  You keep saying in the

5          sur-reply, but in their answering brief, they

6          made clear that they thought this was the

7          dispute.  On page 30, they say, "Although

8          Plaintiffs' stated position is no construction

9          necessary, it argues in its infringement

10         contentions that injecting a bromine-containing

11         promoter into a gas stream should be understood

12         to include pretreating coal with bromine."

13         That's the dispute.  It's in there in the

14         answer.  I don't see how this dispute was only

15         raised in the sur-reply or wasn't teed up right

16         away.  To me, it seems like it was teed up from

17         the get-go.  Is that wrong?

18                    MR. NEMUNAITIS:  It's difficult for

19         me to reconcile those statements with the

20         actual different proposed instructions.  To the

21         extent that argument was directed to resolve a

22         claim construction dispute, it's not clear to

23         me how that relates to their proposed

24         construction.  I certainly understand they are

25         taking the position, as a noninfringement

1     matter, that we will not be able to prove

2     infringement for that reason, but it is unclear

3     to me how that turns into a claim construction

4     issue that was properly briefed and is before

5     the Court.

6           THE COURT:  So I think what you're

7     saying, tell me if this is right, is, Judge, we

8     think the claim construction dispute that's

9     really best teed up by the proposed

10    constructions, or in your case lack thereof, is

11    just whether or not, when it comes to this

12    term, does the injection only occur upstream of

13    the furnace exit or not.  Basically, tell us

14    yes or no as to that and just that.  No need to

15    go on and say by the way, somehow this

16    addresses the more specific issue of can coal

17    treated with bromine going into the combustion

18    chamber, can that count.  Is that what you're

19    saying?

20           MR. NEMUNAITIS:  Yes, certainly, and

21    I would say I believe to the extent Defendants

22    want to make that position, what they should

23    have done is articulate a proposed

24    construction.  Right now, I'm having difficulty

25    understanding how the claims can be construed

1      to resolve that dispute, which is why I keep

2      addressing it as an infringement issue, because

3      it's not clear to me how claim construction can

4      resolve that matter.

5              THE COURT:  In a sense, since we're

6      talking about the proposed construction, in

7      your case there's no construction necessary, if

8      I were going to ask you, understanding what you

9      think the dispute is here, were you going to

10     have to put into words what is the plain and

11     ordinary meaning of the term in the way that

12     gets the dispute out of the way, what words

13     would you use?  How would you construe this

14     term in a way that resolves this dispute but

15     actually uses words if you had to?  Maybe I can

16     ask you that, and maybe on rebuttal you can

17     come back.  I'll give you a chance to think

18     about it and on rebuttal, come back and let me

19     know, unless there's something you want to say.

20             MR. NEMUNAITIS:  I think I can

21     address one aspect of it, and maybe you can

22     tell me if that better answers your question.

23     I suppose I can take Defendants' proposed

24     construction where they're saying "whereby

25     neither injection occurs upstream of a furnace

1    exit," we would propose that it reads "whereby

2    either upstream or downstream of the furnace

3    exit."  I think that's the substantive dispute,

4    although I don't think it would be necessary to

5    put that in the claim, given what the actual

6    words of the claim mean.

7              THE COURT:  I have other questions,

8    but I don't want to hijack your presentation.

9    I'll turn it back to you and get my questions

10   in.

11             MR. NEMUNAITIS:  There were a few

12   other points that I wanted to make, although,

13   given the nature of the questions, I'm not sure

14   they're particularly pertinent.

15             But I guess just very briefly, there was

16   a significant amount of briefing on what the

17   phrase "gas stream" means, and I would just

18   point out that I've provided multiple examples,

19   different ways to read the technology that's

20   disclosed, and they use the word "gas stream"

21   just in the ordinary English sense.  This is an

22   example where it says thus, the bromine gas

23   stream continuously passes into the rotating

24   barrel.  This is an example of an apparatus

25   where there's a bromine and carbon reaction

1    occurring, but -- it's not a power plant.  It's

2    a completely different type of apparatus.  It

3    just shows the inventors using "gas stream" in

4    the normal English sense.

5         Similarly, with Example 12 it talks

6    about, in this case, a sorbent in a gas stream.

7    Again, this is an experimental apparatus using

8    a glass dish, but in this example, again, not

9    using "gas stream" to particularly mean

10   downstream.

11        And then finally --

12        THE COURT:  How would I know that

13   from the example?  How would I know where, in

14   particular, the gas stream at issue there is

15   coming into play?

16        MR. NEMUNAITIS:  I can pull up the

17   patent.  This particular example is fairly

18   long, but what it's talking about is a test to

19   measure the effectiveness of this promotion

20   reaction, so it talks about a glass tube fitted

21   with a medium frit sintered glass filter disc

22   to hold the sorbent in the gas stream, the tube

23   containing some type of a gas inlet tube.  When

24   you read through it, it's clear it was talking

25   about an experimental apparatus.  These type of

1       things they're describing are not at a power

2       plant.

3               Finally, I would mention Example 10.  In

4       this example, it is talking about injecting

5       sorbent that has already been mixed with

6       bromine into a gas stream downstream of the

7       furnace exit, but it doesn't just say injecting

8       into a gas stream.  It says it's provided to

9       the flue gas stream, which, again, would

10      indicate that if the inventors really just

11      meant -- really believed that "gas stream"

12      meant the gas downstream of the flue, there

13      would be no reason to have the word there.

14      It's clear they mean "gas stream" in the

15      ordinary English sense, so they need to clarify

16      this is the part of the gas stream that's

17      downstream of the flue.

18              THE COURT:  Just coming back to what

19      I'm going to do here, I can see -- I can see a

20      world where I could, if I did what you wanted,

21      which is to just answer the question by way of

22      a construction as to whether or not the claim

23      requires that the respective injections must

24      occur upstream of the furnace exit, I could

25      answer that question one way or another, but it

```
 1        would be possible that, like, let's say I

 2        answered it in your favor, and I agreed with

 3        you, that, no, I don't think that the claims

 4        absolutely require in every instance that

 5        respective injections both must occur into a

 6        gas stream upstream of the furnace.  I could

 7        answer that question, but in doing so, I

 8        wouldn't necessarily be providing guidance

 9        about what the defendants say.  I think you

10        would acknowledge it's probably going to be the

11        key dispute here, which is what about if you've

12        got the coal plus the bromine promoter which is

13        inserted into the combustion chamber and

14        combusted?  Does that count as

15        injecting. . .bromine into a gas stream?

16        Because the defendants would say that's not

17        injecting it into a gas stream at all, whether

18        you're talking about at the furnace exit in the

19        combustion chamber or before.  So my worry

20        there would be if that happens, we're still at

21        square one with regard to what probably is in

22        dispute.  You don't think that's a problem?

23              MR. NEMUNAITIS:  I can certainly see

24        that being a vigorous dispute, one that would

25        normally be resolved with expert testimony and
```

1      evidence.  I believe that would be the most

2      efficient way to resolve that dispute.

3             THE COURT:  By saying that, though, I

4      think what you're saying is, Judge, I think

5      that's an infringement dispute.  The case law

6      on what counts as an infringement dispute

7      versus what's a claim construction dispute is a

8      fine line and sometimes hard to discern.  I

9      think that's what you're saying in terms of

10     what you just said.

11            MR. NEMUNAITIS:  I agree.  Part of

12     the reason I have difficulty with this question

13     is I understand the goal the defendants want to

14     get to, a claim construction issue that will

15     just grant them noninfringement as a matter of

16     law.  What I don't understand and what I have

17     difficulty commenting on is how they propose

18     getting from the intrinsic evidence to that

19     goal.  For example, you could have a system

20     where you have bromine liquid or gaseous form

21     using an off-the-shelf injection device

22     injecting somewhere into the gas stream at a

23     power plant.  We generally agree that counts as

24     injection into the a gas stream.  What if we

25     add some coal dust into that?  Does that now

```
1    defeat it?  I don't know.  Maybe their position

2    is that it would, but I don't understand what

3    the basis would be for arguing that.

4              THE COURT:  I think the way that they

5    would explain why it is that this is a claim

6    construction dispute is that it goes to what

7    the meaning of the phrase "injecting. . .into a

8    gas stream" is.  I think at base they would say

9    it's a linguistic matter.  The sorbent -- or

10   I'm sorry.  The promoter, it can't be -- it

11   can't be injected into a gas stream if the way

12   that it ends up materializing in a gas stream

13   is it being a part of coal that is then

14   combusted.  That can't be linguistically what

15   "injected into a gas stream" means.

16        I think they would say to be injected

17   into a gas stream, you have to actually inject

18   the bromine, the promoter, into a gaseous

19   material, and that that's not what happens when

20   you have bromine in coal that's combusted and

21   turns into gas.  I think that's the way they

22   would tie it -- they'll tell me if I'm wrong

23   when they get up here in a minute.  That's the

24   way they would tie to claim language and the

25   articulation that it's claim construction.
```

```
1            If that's right -- I'm not saying it
2       is -- how can that, from a linguistic
3       perspective, how would you argue that, sure,
4       you can inject a promoter into the gas stream
5       in the sense that the promoter, when it's
6       combusted along with coal, turns into gas?  How
7       can that be the same thing?  Do you know what
8       I'm saying?
9            MR. NEMUNAITIS:  As I'm thinking
10      about how a power plant works, coal, once it's
11      in its pulverized form, it does not move from
12      point A to point B except by the use of a gas
13      stream that is moving it.  So if bromine is
14      placed into that gas stream, you're also now
15      injecting bromine into that gas stream, and it
16      moves along and it enters the combustion
17      chamber, and the combustion chamber itself
18      already has gas in it, and it's funneling gas
19      and the coal after it combusts out through the
20      exit of the furnace.
21           THE COURT:  Maybe I'm using the wrong
22      terminology.  Let me go back to the way the
23      defendants said it in their answering brief,
24      the thing I was referring to when I said I
25      think they raised this dispute in their
```

1    answering brief.

2         Pretreating coal with a bromine promoter.

3    I'm picturing you've got the coal, and I don't

4    know how it happens, but someone is spraying

5    bromine on the coal and now the coal has got

6    bromine on it.  And that substance, what I'm

7    picturing to be like a hard substance, like a

8    physical material, not gas, then goes into the

9    combustion chamber.  I understand.  I think the

10   methods here, that's what's going on.  And they

11   seem to be saying spraying the bromine on coal,

12   putting it into the chamber and combusting that

13   to create gas can't be injecting the bromine

14   into a gas stream.  That's just not what that

15   means.  That's spraying bromine on coal which

16   later gets combusted.  Isn't that the issue?

17        MR. NEMUNAITIS:  I believe that I

18   understand.  I believe we're missing a step

19   there.  Bromine sprayed onto coal.  It's in

20   lumps, fist-sized lumps.  It moves along.  The

21   brominated coal is placed in the pulverizer

22   where it is injected from the pulverizer into a

23   gas stream.  Now there's injection of bromine

24   into a gas stream along with pulverized coal

25   where it travels along piping.  The gas stream

1    is then injected into a combustion chamber,

2    again, bromine injected into gas stream, where

3    it's moved on to the next section at the power

4    plant.

5              THE COURT:  So you're arguing that

6    somehow -- that in a world where you have,

7    again, to use the defendants' phrase,

8    pretreated coal with bromine promoter, that

9    that's not -- the fact of pretreating the coal

10   with bromine and the fact it later gets put in

11   the combustion chamber and combusted and

12   creates a gas, that's not what you're saying

13   amounts to injecting bromine into a combustion

14   chamber.  It's the fact that at some point that

15   pretreated coal with bromine promoter gets

16   pulverized and itself is injected into a gas

17   stream that might go into the combustion

18   chamber itself, and that kind of injection of

19   bromine into a gas stream can occur before the

20   furnace exit.

21             MR. NEMUNAITIS:  Yes.  Depending on

22   how a particular plant is set up, there could

23   be multiple points where the bromine is

24   injected into the gas stream before it gets to

25   the furnace or -- focus on the injection into

1    the furnace over the injection to the gas

2    stream.  Depending on the claims, I believe

3    there could be multiple different options.

4              THE COURT:  In your view there, the

5    relevant gas stream is combusted and creates

6    gas.  The relevant gas stream is some kind of

7    gas stream that, maybe, say entering into the

8    combustion chamber or even precombustion

9    chamber to which in some way bromine, maybe

10   even that had been mixed with coal, gets

11   injected into; is that right?

12             MR. NEMUNAITIS:  I believe that's

13   right, yes.

14             THE COURT:  I don't know.  I can't

15   tell if you're looking at me saying, Judge, I

16   don't know what you're talking about.  You

17   know, if you're saying no, I totally understand

18   you, but I think this is what I think the thing

19   I'm saying is what the briefs were all about

20   and the questions I'm asking is what they were

21   all about.  Do you think I'm wrong?  I'm

22   legitimately asking because it could be that I

23   didn't quite fully understand the real dispute

24   or at least what Plaintiffs think the real

25   dispute is.

1        MR. NEMUNAITIS:  I was also confused

2   by the briefing.

3        THE COURT:  You all live with the

4   case in a different way.

5        MR. NEMUNAITIS:  This is what I think

6   happened, is we got their proposed

7   construction.  We thought the battle line was

8   location of the injection, before or after.

9   That's the discovery.  Then we get to these

10   statements about how, well, our goal is to get

11   this noninfringement finding through claim

12   construction, but I saw no way that was tied to

13   the actual dispute before the Court, so we

14   always focused on battle line in the two

15   different competing composed constructions, but

16   I think that is at least the source of the

17   confusion.

18        And then an additional source of

19   confusion is I suppose the defendants want to

20   exclude just spraying bromine into open air

21   when coal is blown across it.  That won't meet

22   the claim.  I don't think there's a dispute

23   about that.  And the real infringement dispute

24   is about the plant setup and how the injection

25   happens.

1          THE COURT:  Let me ask a couple final

2     questions here and let you add whatever you

3     think is appropriate before we go to the other

4     side.

5          What you've been talking about is some

6     hypothetical scenarios in which you think

7     bromine could be injected into a gas stream

8     before a furnace exit.  I've been asking is

9     that possible, does that happen.  I think the

10    other side would say, Judge, in terms of what

11    the intrinsic evidence demonstrates when it

12    talks about the concept of injecting, for

13    example, bromine, they would say the only

14    examples shown are ones that happen after the

15    furnace exit.  Isn't that correct, albeit you

16    would say if it's correct, it doesn't mean the

17    claims are limited to it, or would you say no,

18    that's incorrect, I actually think the patent

19    shows or talks about bromine being injected in

20    the gas stream prior to the furnace exit?

21          MR. NEMUNAITIS:  As you said, the

22    sticky point is a legal one, and that's

23    insufficient.  I would point to a few examples

24    to rebut that.  One is -- well, certainly

25    there's examples I went through before, which

1      are experimental apparatuses where there is no

2      furnace.  I think the fairest reading of the

3      specification is that it is agnostic as to

4      location of the injection unless it says

5      otherwise.

6           I would also refer to Example 10 here as

7      one example.  This is one where the brominated

8      sorbent is injected downstream of the furnace,

9      but then it also says, "In general, however,

10     the inventive sorbent can be injected where

11     desired before, after, or within the boiler."

12     So, again, this would be injecting the carbon

13     and the bromine before or after or within the

14     boiler.

15           THE COURT:  I think they would say

16     there, gas stream, though, which is their key

17     term in the claim, that you'd say it could be

18     this other thing, but it's not the same thing

19     as injecting bromine into the gas stream.

20           MR. NEMUNAITIS:  Yes, and also the

21     fact that it uses the word "injected" would

22     be -- it would be confusing to me if the word

23     "injected" could not at least include the

24     possibility of injection into a gas stream.  It

25     would be unusual if it was not injecting into

1      the gas stream.

2                  THE COURT:  A couple other questions.

3      This one, maybe just to be clear, the

4      plaintiffs are not asserting that a way in

5      which the claim limitation can be met is if

6      bromine-treated coal is simply inserted into a

7      combustion chamber, combusted, and that that

8      creates gas.  The product of that combustion

9      creates a gas.  You are not saying that would

10     meet the limitations of the claim.

11           Instead, you are arguing no, in some way

12     bromine, whether it's left in and of itself or

13     whether it's connected to coal or whatever has

14     to be, at some point, injected into something

15     that is a gas.  Am I right?

16                  MR. NEMUNAITIS:  Yes, I believe I

17     agree with that.  The one caveat I would have

18     is you used the word "inserted."  If what we're

19     envisioning is shovelling coal into a boiler,

20     that's different than what the claims are

21     talking about.  I agree with that.  I wanted to

22     make that clear as a practical matter.  The way

23     the power plants work is by injecting it into a

24     pipe that has a gas stream in it.

25                  THE COURT:  And then just a couple of

```
 1            questions about Figure 2 and the provisional
 2            application, just to make sure I have the
 3            arguments right.  With respect to that figure,
 4            you've said that you think section 1.57(e) of
 5            37 CFR applies as opposed to B being
 6            nonessential materials versus B's essential
 7            materials.  I think the other side is saying if
 8            that reference is being utilized to help us
 9            understand the claim scope, which I think is
10            how it's utilized here, they're saying it's
11            really helpful with the arrows.  They're a key
12            piece of evidence here that helps you, Judge.
13            With that item by definition being essential
14            material, the second material that is part of
15            D, Judge, I would say, all of the possible
16            options there require publication, which it
17            seems undisputed that the application was not
18            published at the time, why is that line of
19            argument wrong?
20                 MR. NEMUNAITIS:  The point we made
21            there is background material can be
22            incorporated.  There's no problem with that to
23            the extent background material explains what a
24            word means.  I think really the key point is
25            intrinsic evidence from the prosecution record
```

1    is always used to understand the meaning of the

2    words as the inventors used.  So whether this

3    figure was in a provisional or whether it was

4    cited to the examiners as an example to help

5    explain arguments, it would be inappropriate to

6    disregard that figure when trying to understand

7    what words like "additive" or "injection" mean

8    because it shows the inventors' understanding.

9                THE COURT:  I don't know the answer

10   to this.  Is this part of the prosecution

11   history for the '147 patent or no?

12               MR. NEMUNAITIS:  For the particular

13   '147 patent, I don't believe it is included on

14   there, but I would find it difficult to

15   believe -- and I suppose we could submit

16   something on this -- that the Federal Circuit

17   would rule that the provisional application

18   cited on the face of the patent would not be

19   part of the intrinsic record.

20               THE COURT:  If for some reason they

21   were correct that the way it was cited, the way

22   it was attempted to be incorporated by

23   reference, isn't sufficient to make it a part

24   of the intrinsic record because it wasn't cited

25   in a more specific way that they would say the

1    law requires.  There, you would say even if

2    that's right, at minimum it's a piece of

3    evidence, extrinsic evidence, that is certainly

4    related in some way to this patent.  It's

5    helpful, relevant, you should consider it,

6    Judge.  Is that what you're saying?

7                 MR. NEMUNAITIS:  Yes.

8                 THE COURT:  I think that's all the

9    questions I have.  Anything further,

10   Mr. Nemunaitis?

11                MR. NEMUNAITIS:  No, Your Honor.

12                THE COURT:  Thank you.  We'll hear

13   from your colleague on the other side.

14                MR. GLANDOLE:  May I approach?

15                THE COURT:  You may.

16                MR. GLANDOLE:  Good afternoon, Your

17   Honor, and may it please the Court.  My name is

18   David Glandole I'm here on behalf of all

19   defendants in this case with regard to the

20   disputed terms that are specific to the '147

21   and '225 patents.

22       Let me start by mentioning the parties

23   really have two disputes about the '147 patent,

24   both centered around similar language.

25                THE COURT:  Mr. Glandole, just as

1    you're doing that, my first question was that

2    your initial response asserted that there were

3    two disputes, one being whether the particular

4    sorbent has to be injected into the gas stream

5    after the furnace exit and one being whether

6    the bromine promoter has to be injected after

7    the furnace exit.  The sur-reply portion of the

8    brief really focused on the bromine, which made

9    me think is there still a dispute about the

10   sorbent?

11           MR. GLANDOLE:  That's what I'm

12   referring to, Your Honor, you're right.  And

13   maybe some of the confusion arises from

14   procedurally how the parties went back and

15   forth on different terms.  And I don't know if

16   Your Honor is familiar with the '114 and the

17   '430 briefing that was mooted by the parties'

18   agreement.  The briefing there really did focus

19   on the sorbent, and we have it, though, and I

20   think in your briefing in 1.7, we do have a

21   section of the sorbent as well, which refers

22   largely back to the '114 and '430 briefing.

23           Maybe I should start there.  The parties

24   agreed, with regard to that term and with

25   regard to the injection of the sorbent

1     material, that that must be from outside,

2     outside the combustion chamber.  Those were the

3     words that were added by the parties'

4     agreement, "from outside."

5          We then negotiated with the plaintiffs

6     further as to whether or not that language

7     could be applied to the '147 patent as well.

8     The '147 patent has the same terms, "injecting"

9     or "injecting sorbent and bromine" in those

10    patents.  In those patents, you're just

11    injecting the sorbent, so we should also

12    include the words "from outside" here as well.

13    We never reached agreement with the plaintiffs,

14    but I think that is something we could consider

15    here today as well, whether there is any

16    clarification to be brought by using the words

17    "from outside" for both the sorbent and bromine

18    term here.

19              THE COURT:  As it stands, you think

20    there's a substantive dispute about whether to

21    insert "bromine must be injected into the gas

22    stream downstream of the furnace exit," but

23    also, as you assert, whether in all

24    circumstances the sorbent has to be injected

25    into a gas stream downstream of the furnace

1    exit.  You think the plaintiffs are asserting,

2    no, it's possible to inject the sorbent in the

3    gas stream upstream of the furnace exit.

4                    MR. GLANDOLE:  That is correct.

5                    THE COURT:  I'll certainly ask them

6    about that on rebuttal.

7                    MR. GLANDOLE:  As you know, Your

8    Honor, each of the claims in this case refer to

9    both a bromine compound and a sorbent.  I

10   believe as you said, the sorbent, we also refer

11   to that as activated carbon.  Each of the

12   claims requires sorbent to comprise activated

13   carbon.  We do use those terms.

14        With regard to the bromine compound, the

15   '147 patent has a specific term that it uses,

16   which is the bromine-containing promoter, so

17   the identification of what that species is is

18   important.  Again, as Your Honor mentioned, we

19   would often refer to bromine or bromine

20   compound.  The exact term is bromine-containing

21   promoter.

22        One thing that came out as Plaintiffs

23   were speaking and they referred to the

24   technology tutorial, and they really started at

25   the -- if you're going left to right, they

1     started at the left here.  They started at the

2     addition of the coal.  Here's where the coal is

3     added, here is where it's pulverized, here's

4     where it's combusted.

5          Missing from that discussion is any

6     discussion of the actual '147 patent itself.

7     If one reads through the '147 patent, there is

8     no focus on the combustion.  There's no focus

9     on what's being done to the coal, the treatment

10    of the coal, how the coal enters into the

11    system.  That discussion and the background

12    technology there does really apply to the '114

13    and '430 patents.  It is missing from the '147

14    patent.

15         The '147 has a specific context, and that

16    context is the right side, the back end, the

17    treating of the mercury gases, the flue gases

18    that are created during combustion.  All of

19    this discussion about the coal and how it can

20    be treated in the coal, it's missing -- there's

21    no guidance for a person of the skill in the

22    art in the '147 patent.  That is not what the

23    discussion is.

24         Stepping back --

25              THE COURT:  I think, in part, I'm

```
 1          getting what you're leading up to there, is,
 2          Judge, if you were to ultimately agree with the
 3          plaintiffs and disagree with us that the
 4          injections at issue here don't necessarily all
 5          have to happen after the furnace exit, that's
 6          not even talking about that at all; ergo,
 7          indefiniteness or lack of written description
 8          or enablement or something like that, some kind
 9          of 112 argument.  Is that what you're alluding
10          to?
11                    MR. GLANDOLE:  As well as just
12          confusion to the jury, difficulty of providing
13          proper instructions to the jury.  But I think
14          it also counsels for understanding this term in
15          the way that Defendants have proposed their
16          construction, and the reason that we are
17          providing this construction -- and I disagree
18          with Plaintiffs' counsel, that we're trying to
19          limit the scope or redefine the scope.  We're
20          trying to clarify the scope that the
21          application is seeking, and the scope should be
22          understood in the context of the patent.  This
23          patent, unlike the other four patents, is
24          downstream of the furnace.  It is treatment of
25          those gases.
```

```
 1              THE COURT:  Let me let you continue.
 2              MR. GLANDOLE:  Turning to the
 3     background technology here, just to say a
 4     little bit about that, again, the plaintiffs, I
 5     don't believe, are claiming -- they certainly
 6     should not be claiming that they were the first
 7     to identify the ability of bromine to promote
 8     or enhance activated carbon as an absorbent of
 9     mercury.  That was known and discussed in the
10     file history as of late -- in the file history
11     for the '147 patent, for example, I would point
12     you to the discussion of the Nelson reference,
13     which Nelson created a brominated activated
14     sorbent, an activated carbon sorbent, and he
15     took activated carbon outside of the system,
16     activated it with bromine, introduced that into
17     the system to help absorb mercury gases.
18              It's under that context that we should
19     understand what's happening in the '147 patent.
20     I would ask the Court to consider that, given
21     that background, the how and the where, the
22     manner of promoting the sorbent, is key to the
23     patent.  It's key to distinguishing this from
24     the art.  It's key to a person of skill in the
25     art reading this and understanding how it might
```

1    be an advancement over the background.  We do

2    need to determine the manner, the how and the

3    where, of the addition of the bromine and the

4    sorbent.

5         If we look going to the sixth page now in

6    our slides, Your Honor spoke with Plaintiffs'

7    counsel quite a bit about, you know, addition

8    of the bromine to the coal.  Well, here are the

9    other four patents in the case, and we've been

10   talking about the '147 and its language of

11   injecting a bromine-containing precursor into a

12   gas stream, and I think it's worthwhile to look

13   at how different that is from the other four

14   patents.  These are Claim 1 of the other four

15   patents where the coal comprises the added

16   bromine compounds, combusting a mixture

17   comprising coal and bromine compounds.  Clear

18   language, clear direction to a person of skill

19   in the art that this patent covers treatment of

20   coal with bromine.

21        And practically speaking, there was some

22   discussion of the technology here and how it

23   works in practice.  The addition of bromine

24   that's being accused here is really -- it's a

25   dripping, frankly.  You drip the solution of

1      bromine salt onto the cold coal before it's fed

2      into the system.  This is very much upstream of

3      anything that's happening in the '147 patent.

4              THE COURT:  I had a back and forth

5      about this.  When I read the briefs, this is

6      the way it read to me, that at least

7      Defendants' side thinks that this is what's

8      going on here and why it's important that we

9      construe this term and you construe it in the

10     way we suggest, and that is -- I'm going to

11     generalize, but what is happening in terms of

12     the infringement dispute is that we're talking

13     about coal that is pretreated with bromine.  I

14     don't know whether that happens, as you say, it

15     drips, bromine is dripped onto the coal.  And

16     that substance, coal that has bromine on it, is

17     put into a combustion chamber and it's

18     combusted.  And from that combustion process,

19     gas is produced.  I don't think there's dispute

20     about that.  And the gas makes its way out of

21     the furnace and down a -- we think what the

22     plaintiffs want to do is they want to consider

23     bromine added to coal that's then put into a

24     combustion chamber and combusted creating gas

25     as an example of bromine being injected into a

1          gas stream, and we Defendants just don't think

2          that's possible.  We don't think it's possible

3          linguistically that that can be what it means

4          to inject bromine into the gas stream.  And

5          that's the key dispute.  When I read it, part

6          of our proposal here is to wall off that

7          possibility, but we think it's also tied to the

8          claim language.

9               When I said all that to counsel on the

10         other side, they suggested maybe that's not the

11         dispute.  That's not what they're suggesting

12         could count as meeting the claim limitations,

13         and instead maybe in some way the bromine, for

14         example, has to be added before they think --

15         before the furnace exit to a gaseous stream.

16         You wouldn't count just dripping it on coal and

17         combust it, but they think maybe that can be

18         the case.

19              With all that said, is the key dispute

20         that you thought you were having in the briefs

21         still the one we think we're having after

22         hearing the other side speak?

23              MR. GLANDOLE:  I do think that's

24         right, and I think Your Honor has a good handle

25         on what the dispute is.  And you're right that

1    our construction makes it clear.  Our

2    construction would, for lack of a better term,

3    move that debate.  Without our construction, I

4    think it's very unclear.

5        We've been frustrated in this case

6    looking at the infringement contentions, trying

7    to understand from the plaintiffs claiming

8    plain and ordinary meaning, it's not clear at

9    all to us how the plain and ordinary meaning of

10   "inject into a gas stream," let alone how it's

11   understood in the patent, how that can apply to

12   dripping the bromine compound onto the coal.

13       We try to speculate as to multiple areas.

14   Is that addition of the bromine onto the coal

15   the injection?  Is it the moving the coal,

16   then, into the furnace?  Is it some kind of --

17   is there a portion of the combustion?  Is there

18   a combustion action that goes on that somehow

19   injects a bromine compound into a gas stream?

20       We have been confused.  We have asked for

21   clarification on this.  We hoped there would be

22   clarification that would come through the

23   briefing, and I don't feel like we got it.  I

24   do think the back and forth with Your Honor

25   this morning was somewhat helpful to help us

```
 1        kind of finally understand what their theory of

 2        infringement is, although I would say it's

 3        still a little unclear to us, still some

 4        caveats there.

 5             Again, I would say that all these

 6        theories are certainly outside the context of

 7        the teachings in the '147 patent, but we do

 8        have those concerns, and part of those concerns

 9        as well is what is it that they are identifying

10        as the bromine-containing promoter?  There is

11        one thing that has to be -- there is a specific

12        item that needs to be identified, that is

13        anything that's being injected into the gas

14        stream.  What is the bromine-containing

15        promoter?  What is the injection?  Which of

16        these is the gas stream?  These are all

17        questions that we are hoping -- frankly, I

18        think we deserve an answer to, and we're trying

19        to find the right way to --

20             THE COURT:  I'm not sure that some of

21        those questions are going to be answered by

22        this claim construction dispute.  What

23        qualifies as a bromine-containing promoter?  I

24        don't see any way that issue is fairly teed up

25        on the briefings.
```

```
 1              But I think on what I thought was maybe a
 2       key dispute, which is can the claim limitation
 3       be met -- phrasing it this way sounds more like
 4       an infringement dispute, but whatever.  Let's
 5       talk about it.  Can the claim limitation be met
 6       by dripping bromine onto coal and putting that
 7       bromine-coated coal into a combustion chamber
 8       and combusting it to get a gas, you were
 9       worried they were saying yes.  I think they're
10       saying today no, that's not what we're saying.
11       Instead, some other way bromine must be
12       injected into a gaseous substance, but they're
13       saying that can happen before a furnace exit.
14       It's possible that it can happen.  It's
15       possible it could happen in the combustion
16       chamber.  It's possible it could happen leading
17       into the combustion chamber.
18              I guess my question would be, just as a
19       technical matter, is there anything in the
20       record that suggests that's wrong, that it
21       can't happen that way, that a
22       bromine-containing promoter can't be injected
23       into a gas stream at some point prior to the
24       furnace exit?
25              MR. GLANDOLE:  Our position is that
```

```
 1        reading the claim language in the context of
 2        the patent, in the context of the teachings of
 3        the specification, that what is being discussed
 4        here, what is being taught here, so that what
 5        is being claimed here, is injection into a gas
 6        stream not upstream of the furnace exit.
 7                THE COURT:  And I know you cited that
 8        Figure 3 is an example of this process
 9        happening downstream.  I don't think there's
10        any dispute from the other side that that's
11        happening.  They say it's illustrated, but it's
12        not binding.  Is that about the only
13        circumstance where I can get a good handle that
14        the fact that -- absolutely, Judge, only after
15        the furnace exit can these substances be
16        injected?
17                MR. GLANDOLE:  There are a number of,
18        I guess, teachings or embodiments throughout
19        the patent, and, again, stepping back, because
20        many of the examples that counsel referred to I
21        think don't apply at all to the way these
22        claims ended up being written.  There are a lot
23        of unclaimed embodiments discussed here.
24            Again, reading through the patent, it is
25        about the preparation, the creation, of a
```

1      brominated activated carbon source, and there

2      are a number of different ways to prepare that.

3      Some of the examples even show, I think, you

4      can have a barrel full of activated carbon and

5      you can run it through some bromine gas or you

6      can put bromine into that.  You can create it

7      in a solution.  You can create it in a vapor.

8      You can have a fluidized bed of activated

9      carbon and run bromine through there.  All

10     these different ways to make it before you

11     introduce it into the system where it can

12     remove mercury.

13         One of the ways they taught to make it is

14     in-flight reaction.  Just to go back to the

15     claim language in Claim 17, Claim 17 is

16     specifically about that teaching about

17     in-flight preparation.

18            THE COURT:  There my question was

19     going to be -- I know you referenced that in

20     the briefs sometimes.  I think you want me to

21     understand that "in-flight" is kind of a

22     synonym for downstream from the furnace exit.

23            MR. GLANDOLE:  That's right.  That's

24     where the teaching is, I think, clear that this

25     in-flight preparation is downstream.

1          THE COURT:  What's the best part of

2     the patent that makes it super clear that when

3     the patent refers to the phrase "in flight"

4     that it must be only meaning downstream of the

5     furnace exit as opposed to some more broader

6     range?

7          MR. GLANDOLE:  Sure, I can point a

8     few reasons for that.

9          One is I think you see it here in the

10    claim language that these are both injected

11    into a gas stream, and I think the most

12    reasonable reading of this claim is there is

13    one gas stream.  They are injected into a gas

14    stream, and that's where the reaction happens.

15    The reaction happens in a gas stream.  That's

16    the in-flight part.  They're not making it in a

17    barrel outside the system.

18          So it's into a single gas stream.  That

19    has to be the gas stream, then, where you're

20    going to treat the mercury.  You're going to do

21    that directly where the mercury gas is or

22    you're going to do it in a transport line

23    that's subsequently being introduced into the

24    gas stream.  I think from the claim language

25    itself, it makes sense.

```
1            If we go, again, to the teachings of the
2      patent, you're right.  The only figure here
3      that relates to the in-flight promotion is
4      Figure 3, and I've highlighted here -- we're
5      not pointing to any particular injection points
6      here and saying this has to be the injection
7      point.  Our point is understanding this in the
8      context of the teaching, the context of the
9      patent.  This entire figure is the only one
10     that's really related to this in-flight
11     reaction.  It's all downstream of the furnace
12     exit.
13            THE COURT:  You would say the
14     promoter and the sorbent, they don't have to be
15     injected at the same time or the same place or
16     a particular place.  They just have to be
17     injected downstream of the furnace exit.
18            MR. GLANDOLE:  Into a gas stream.
19            Perhaps Your Honor understands this.  To
20     be clear, the furnace here is below the figure.
21     It's down here in the corner and the gas flows
22     up.  The yellow is the flue up to the exhaust,
23     and here are all these different transport
24     lines.  They're taking, in this case the
25     promoter sorbent, and those get pushed into,
```

1    injected into, the mercury-containing gas.

2              THE COURT:  I guess this is a

3    question I asked the other side and may not be

4    in the record, but just as a practical matter,

5    would it be possible in some way, again, just

6    focusing on the bromine piece of this, could it

7    be possible to inject bromine into a gas stream

8    either in a combustion chamber or even slightly

9    before the entrance to the combustion chamber

10   in a manner that still utilizes that bromine in

11   a way that ends up having the desired effect

12   with regard to the production of mercury

13   emission?  Can that be possible?  Even if maybe

14   that's not in the main what the patent was

15   talking about, or how you do it, et cetera.

16             MR. GLANDOLE:  Just to clarify, when

17   you say is that possible, I don't know if

18   you're asking if that works scientifically to

19   remove mercury or whether you're saying that is

20   possible within the scope of the claim.

21             THE COURT:  I mean, just to simplify,

22   I'm figuring in my head.  I'm picturing a

23   combustion chamber, and I'm understanding in

24   some way the claim requires that the promoter

25   has to be injected into a gas stream.  And I'm

1    just thinking like, okay, thinking of the

2    promoter, and if -- is it possible that

3    somewhere in the chamber itself or even just

4    thinking maybe there's a pipe leading into the

5    chamber in which gas --

6             MR. GLANDOLE:  Into the combustion

7    chamber.

8             THE COURT:  Into the internal

9    combustion chamber.  Maybe there's a pipe

10   leading into that chamber which gas is flowing

11   through.  Could bromine be added to that gas,

12   it then flows into the combustion chamber and

13   ultimately flows out of the combustion chamber,

14   after coal is combusted, such that the bromine

15   can be useful in this process?  Is it

16   physically possible to do what the plaintiff

17   says could be captured by this claim

18   limitation, i.e., inject the bromine either

19   into a gas stream in the combustion chamber or

20   before the entry?

21            MR. GLANDOLE:  I think I want to make

22   sure.  There are maybe two different questions

23   there, and I'm going to answer them both to

24   make sure it's clear.

25            Certainly, from a scientific point of

1    view, that can work, and I think that is what

2    is being discussed.  I guess that's more

3    similar to some of the other claims here.  You

4    could add the bromine.  Now, what you add to

5    the combustion chamber is going to be subject

6    to the combustion chamber, so it might not be

7    bromine in the same form it is later

8    downstream.  You can add bromine before.  You

9    can add bromine into the combustion chamber.

10            THE COURT:  And you don't have to add

11   it just by putting it into the coal or dripping

12   it onto the coal?

13            MR. GLANDOLE:  You can inject it

14   directly into the system.  Again, I don't know

15   the efficiency of that.  That bromine can

16   survive.  It may change form or another, but it

17   can survive and react downstream.  I want to be

18   clear that my answer there is about the

19   scientific, whether that works scientifically.

20   Let's go back to the claim.

21            THE COURT:  You'd say that's not

22   what --

23            MR. GLANDOLE:  That is not what the

24   patent talks about.  When you said will that

25   work, that does not work with the claims.  I

1        think -- again, I'm not the expert here, but I

2        believe that would work in the system.

3              With regard to the claims, they're

4        injecting the sorbent and the bromine into a

5        gas stream.  That gas stream -- practically

6        speaking, the sorbent we're talking about here

7        is activated carbon.  It's carbon.  Carbon is

8        combustible.  Plaintiffs can't deny that.

9        Activated carbon is able to combust.  It will

10       combust in the combustion chamber.

11             So in order to meet this claim in that

12       system, would you be injecting both the sorbent

13       and bromine into the combustion zone?

14             THE COURT:  You're saying why would

15       you be introducing activated carbon pre

16       combustion chamber or into the combustion

17       chamber before it could be combusted?

18             MR. GLANDOLE:  Doesn't make sense.

19       You wouldn't do that.  That's correct.

20             THE COURT:  That's why I thought

21       maybe, ultimately, the dispute was more about

22       the promoter and less about the sorbent itself,

23       but I could be wrong.  I'll ask Plaintiffs'

24       counsel.

25             MR. GLANDOLE:  I think that

1    understanding, that you wouldn't inject

2    activated carbon into the combustion zone, it

3    does inform, I think, the bromine flow because

4    these are both injected -- our position is the

5    reasonable reading of this is that they're both

6    injected into the same gas stream.  Those would

7    be different gas streams if you do it that way.

8    It's a different approach to the problem of

9    capturing mercury.  It's not the one that's

10   taught and claimed here in Claim 17.

11        Again, one thing I would point out, I

12   would dispute of Plaintiffs' characterization

13   of our construction as adding words or adding

14   limitations, I think we are clarifying the

15   scope of the claim term.

16        THE COURT:  To the extent they say,

17   Judge, the additional phraseology that the

18   defendants use is untethered to the words of

19   the claim, you would disagree and say no, it's

20   tethered to the words of the claim.  And the

21   words of the claim it's tethered to are?

22        MR. GLANDOLE:  Are injected in.  It

23   is, in fact, injecting into a gas stream.  And,

24   again, that last phrase, a gas stream whereby

25   in-flight reaction produces the promoted

1    brominated sorbent.  That also informs what

2    that gas stream is directed to.

3         We heard a lot of talking back and forth

4    with Plaintiffs, and certainly looking at their

5    infringement contentions, that I think their

6    plain reading of the injecting into a gas

7    stream does kind of take the meaning out of

8    those terms.  There's no longer injection.

9    It's simply getting it into the system,

10   providing it in the system.  It ends up

11   somewhere where there's not a vacuum in a gas.

12   That seems to be their reading of the term, and

13   I think that's what's led us to this proposed

14   construction here today.

15             THE COURT:  It does seem like it may

16   not be an issue anymore, but when we thought

17   that the key issue was does combusting

18   bromine-treated coal to create a gaseous

19   substance amount to reading off this claim

20   language, the other side would say, Judge,

21   that's an infringement dispute.  That's not

22   defining what this term means.  That's a

23   question about whether a particular

24   circumstance, i.e. pretreated bromine-treated

25   coal being combusted, meets the claim

1      limitation.  That's an infringement dispute.

2              MR. GLANDOLE:  I do think that's a

3      question for claim construction.  I think

4      that's one we would like resolved now.  If I'm

5      understanding your question, you're referring

6      to this potential theory where something in the

7      combustion process where you have pretreated

8      coal that's being combusted, something in that

9      process is what Plaintiffs define as injection

10     into a gas stream.  Again, that is really the

11     end of this for the "from the outside" term.

12             If you recall from the briefing -- and,

13     again, I apologize.  We settled this term

14     before you got a chance to dig into the

15     briefing on '413 and '440.  There was a

16     question there that burning coal would create

17     activate carbon, that that would somehow be

18     creating activated carbon, just the plain

19     combustion of coal.  And the parties agreed no,

20     that's not what this patent is talking about.

21     It's saying when you're adding the sorbent,

22     you're injecting the sorbent, that means from

23     outside the system.

24             And so I think that may help.  Those

25     words may help clarify here as well, that

1        there's not some theory here hiding in the

2        weeds where they're going to be talking about

3        something in the combustion of the treated coal

4        is going to be the injection of bromine.

5               THE COURT:  The other question I have

6        relates to this, which is in the briefing, you

7        sometimes use the phrase "inside the gas

8        stream."  I thought you were using that phrase

9        to be a synonym for already in the coal or

10       already part of the substance or something.  Is

11       that what you were getting to?

12              MR. GLANDOLE:  That's right.

13              THE COURT:  Whereas outside the gas

14       stream is, you would say, a substance being put

15       into, injected into, in some way introduced

16       into, something that could be considered a gas

17       stream.

18              MR. GLANDOLE:  Yes, a preexisting gas

19       stream.  We're not creating the gas stream and

20       then somehow in the creation of the gas stream

21       you're injecting one of the -- one of the

22       original --

23              THE COURT:  Mr. Glandole, anything

24       further you wanted to add?

25              MR. GLANDOLE:  Let me just refer

1          here.  I do think I'll pause at this point.
2                    THE COURT:  Okay.  Let me give your
3          colleague from the other side some rebuttal
4          time.
5               Mr. Nemunaitis, if you come up, the one
6          lingering question that I have for you from
7          Mr. Glandole's presentation was, it did seem
8          like in the reply and sur-reply portion of the
9          brief, that although the plaintiff talks about
10         injecting a sorbent into the gas stream, a lot
11         of the sur-reply brief was particularly focused
12         on the bromine piece of that, and maybe you
13         didn't have a dispute -- well, the defendants
14         thought we didn't have a dispute about where
15         the sorbent must be injected.
16              Is your position that the sorbent can
17         only be injected after the -- downstream of the
18         furnace exit, but the bromine can be injected
19         anywhere?  Or is your position that no, just
20         like with the bromine, the sorbent can be
21         injected prior to the furnace exit too?
22                    MR. NEMUNAITIS:  Just like with the
23         bromine.  The patent specification discusses
24         injecting bromine before the furnace, and
25         there's just nothing in the claim language that

1    is one way or the other.

2                 THE COURT:  So both the sorbent and

3    the bromine could be injected prior to the

4    furnace exit, in your view?

5                 MR. NEMUNAITIS:  Correct.  As a

6    practical matter of the infringement theories,

7    I don't think that matters, but that is the way

8    to interpret the claims.

9                 THE COURT:  Let me let you make a

10   brief rebuttal.

11                MR. NEMUNAITIS:  I just want to make

12   sure I make this point clear, which is that

13   this gas stream which is taking the pulverized

14   coal into the boiler, this is piping that has

15   gas flowing in it.  It has to have gas flowing

16   in it.  All these black arrows, green arrows,

17   it has to have a constant flow of gas.

18   Otherwise, everything shuts down.

19        So when this pulverized coal enters this

20   pre-existing gas stream and pipes, this is an

21   injection.  When it enters the boiler over

22   here, again, this is an injection.

23        I would come back to this point here.  I

24   believe this is an engineering point.  As a

25   practical matter, the way these injectors work

 1          is they are blowing fine coal dust into the

 2          furnace.  Once this coal dust enters the

 3          furnace, it immediately combusts, and it is

 4          flowing, and the reason it's staggered this way

 5          is to create a fire tornado so you would have a

 6          fire tornado flowing through to get this stream

 7          of gas flowing.

 8                    THE COURT:  Just to understand, in

 9          your view, when you're talking about the

10          promoter and sorbent being injected into the

11          gas stream, what qualifies there is that you

12          take the -- I say the promoter.  And it must

13          be, in some way, injected.  It must be, in some

14          way, pushed into a space in which a gas stream,

15          gaseous material, is also, and they must touch.

16          They must what?  What qualifies?  Is it

17          injecting the promoter or the sorbent into a

18          gas stream?  Do you know what I'm saying?

19                    MR. NEMUNAITIS:  Yes, we would say

20          that injecting is pushing something, could be

21          gas, could be a solid, could be particles, into

22          some type of pipe or apparatus or duct,

23          whatever, where there is gas that has some type

24          of movement that can transport whatever is

25          being put into it.

1          THE COURT:  They've got to make

2     contact; right?  The gas stream has to make

3     contact in some way with the sorbent or

4     promoter.

5          MR. NEMUNAITIS:  Right.

6          THE COURT:  They may not combine.

7          MR. NEMUNAITIS:  I believe that's

8     right.  If you think of injecting blood in

9     someone's vein, there's blood, and the blood

10    itself has liquid plasma as well as blood cells

11    that are solids and that gets injected in and

12    moves through the bloodstream.  I think it

13    works the same way except with a gas stream,

14    which is why the phrase is used throughout the

15    literature in this patent.

16          THE COURT:  Please continue.

17          MR. NEMUNAITIS:  I guess the final

18    point I would make is the purpose of these

19    changes, "into the gas stream," was to exclude

20    just spraying bromine into the open air and

21    letting it fall on bromine.  I don't think

22    there's any dispute about that, so the way to

23    resolve the dispute would be to reject that

24    change because it's not necessary.  And then we

25    get to the separate issue of before or after

1      the furnace exit.

2           Unless Your Honor has any further

3      questions.

4           THE COURT:  Thank you,

5      Mr. Nemunaitis.

6           Any brief rebuttal from defendants?

7           MR. GLANDOLE:  Very briefly, Your

8      Honor.  Just, again, just to clarify a few

9      things about this drawing here, and there is --

10     just to get an idea of the scale here, there is

11     this little fellow down here.  These are very

12     large systems.  The flue, which is an area down

13     here, is ten feet across.  These are very large

14     systems.

15          I appreciated counsel's example of the

16     bloodstream.  I think that's right.  What we're

17     seeking here is to understand injection in the

18     context that it's used in the patent, and when

19     you have injection into a gas stream the way

20     that's discussed in the patent is into these

21     gas streams that are downstream of the furnace.

22     Just like injection into the bloodstream has a

23     particular meaning.  It's not just something

24     that is in the blood.  When we talk about

25     injection, it has a specific meaning in that

1    context.  I think we want to appreciate that

2    same context.

3              THE COURT:  Just to make sure I

4    understand, the meaning, in your view, bromine

5    or the sorbent that's injected into a gas

6    stream in the sense that those substances are

7    in some way blank and then they blank with

8    regard to the gas stream.  What's required?

9              MR. GLANDOLE:  I think they are

10   exterior to the gas stream and they are pushed,

11   under pressure, under some kind of force, into

12   the gas stream; right?

13             THE COURT:  Meaning in some way, they

14   come into contact with the gas stream.

15             MR. GLANDOLE:  That's right.  They

16   enter into the gas stream.  In practicality,

17   this is done with very large lances.

18             THE COURT:  And it all together flows

19   in that stage?

20             MR. GLANDOLE:  It pushes in.  That's

21   right.

22             THE COURT:  Okay.

23             MR. GLANDOLE:  Again, I think what

24   counsel is talking about here whether or not

25   there's some injections, whether or not there

1          are gas streams present.  Our view on this,

2          again, is to look back at the patent and each

3          of the patents.  What is the gas stream being

4          mentioned there?  What does it teach a person

5          of skill in the art how to practice the

6          invention?

7                    THE COURT:  All right.  There's one

8          other term that the parties still have in

9          dispute, the third term in the briefing and

10         second term today, "combusting a mixture" term.

11         I'll turn to Plaintiffs' counsel.

12                    MS. DELLINGER:  Good afternoon, Your

13         Honor.  Adrienne Dellinger on behalf of the

14         plaintiffs.  I'll be arguing the '225 patent

15         term, which is "combusting a mixture comprising

16         coal, pyrolysis charge, and additive comprising

17         HBr, a bromide compound, or a combination

18         thereof."

19              Your Honor, the defendants' proposed

20         construction seeks to add in limitations,

21         limitations that the patentee explicitly

22         rejected during prosecution and that the

23         doctrine of claim differentiation refused.  In

24         doing, so the defendants hope to add in these

25         limitations to affect infringement, and in

1          doing so, importing those limitations is

2          improper is this case.

3               We talked about previously in order to

4          add in limitations, the defendants must point

5          to a clear and unmistakable statement of

6          disclaimer, disavowal, or lexicography.  The

7          defendants have been unable to point to any

8          such clear statement.  As we see if we look at

9          the proposed constructions, the defendants seek

10         to add in the language of "whereby each

11         substance in the mixture is added to the

12         combustor" and "to which has been added" for

13         claim 14.

14              First, I believe it's an undisputed point

15         that pyrolysis char is created by combustion of

16         coal.  That's cited in the brief, and I think

17         understood.

18              THE COURT:  Maybe there, to make

19         sure, again, I understand what the dispute is

20         from the plaintiffs' point of view, do you

21         agree the dispute as to this term is whether

22         the asserted claims require combusting a

23         mixture of coal and char and the bromine

24         compound, or whether the limitation can be met

25         by combusting a mixture of coal and the

1        compound that during the combustion process

2        produces chalk that is then combusted?  It

3        seemed like that's the dispute.  Is that right?

4                  MS. DELLINGER:  Your Honor, I think

5        the dispute circles around whether these

6        substances should be added to the combustor.  I

7        think that the combustion of coal -- through

8        the combustion of coal, pyrolysis char is

9        created, and when coal is combusted, the

10       pyrolysis char is created, the mixture includes

11       them both.  I don't believe the dispute centers

12       around whether the mixture itself is combusted

13       but how that mixture must come to be.

14                  THE COURT:  So I think what you're

15       saying if I'm right is no dispute that in

16       practice, the way that the char comes about

17       here is that no one is putting this pyrolysis

18       char into a combustion chamber.  The only way

19       the char is generated is it's generated as a

20       product of the combustion, for example, of the

21       coal and the bromine or perhaps other

22       substances in addition, but it's created in the

23       chamber; is that right?

24                  MS. DELLINGER:  Certainly, it is,

25       Your Honor, but the claim scope is not limited

1          to that.  It would also include adding it in.

2          We see that claim specifically in dependent

3          claims and other claims throughout the '225

4          patent.

5                    THE COURT:  You could add it in, but

6          the fight is about what happens in a world

7          where it's not added into the chamber, it's

8          created by the combustion of the materials

9          within the chamber?

10                   MS. DELLINGER:  Yes, Your Honor.

11                   THE COURT:  So would you have, in

12         that scenario, a circumstance where you're

13         combusting a mixture of the coal, the char, and

14         the bromine?  And that led to my question,

15         well, is what Plaintiffs are suggesting -- I

16         can picture one world in my mind where I've got

17         the coal and the bromine together.  I add it to

18         the coal, and the coal gets put into the

19         chamber.  That gets combusted.  Mentally, I

20         have this picture.  It creates this char, and

21         that's it.  There's nothing else left.  It's

22         just the char, and the char gets combusted.

23             The plaintiffs might be saying that

24         counts.  That counts as combusting a mixture,

25         or would Plaintiffs say no, we acknowledge that

1    doesn't count, but what we're suggesting is

2    what would count is you've got the coal and the

3    bromine, gets put into the chamber, gets

4    combusted.  Char is created, but there's still

5    some coal and some bromine hanging around in

6    there, and they're all together, and that gets

7    combusted, and that's the mixture.  It's when

8    the char created by the coal and bromine

9    combustion gets further combusted in a matter

10   such that there is still also coal and bromine

11   in the chamber such that they're all, quote,

12   mixed.  That's what we're saying counts, and

13   that's what Defendants say doesn't count, and

14   they're wrong.

15        Is that the issue, the last piece?  Am I

16   right about that?

17        MS. DELLINGER:  I would agree with

18   you there, but I think going back to just

19   factually how this occurs, we looked at the

20   diagram that showed the multiple entrances to

21   the furnace, the multiple gas inlets, it had

22   the pulverized coal and bromine, the fire

23   tornado that was referenced.  That whole

24   process is occurring simultaneously, so the

25   coal being combusted causes the char being

```
1     created and all being combusted together as a
2     factual matter occurs.
3          Defendants make a point that that may be
4     factually difficult to parse out and determine
5     based on whichever firm you're looking at, but
6     that isn't a matter of whether a claim is
7     indefinite or where the claim scope lands.
8     That is a matter of infringement, whether you
9     can actually factually determine that.
10          THE COURT:  I don't think you're
11     getting at what I'm getting, which is trying to
12     understand the dispute and what is at issue.
13     Let me try to reframe that.
14          I think maybe now, based on what your
15     comments are, that you are acknowledging that
16     for something to meet the claim limitation,
17     when the combustion at issue called for by the
18     specification happens, that combustion must in
19     some way occur as to a substance or it must
20     occur in a place that includes all three of the
21     substances.  It's not enough for two of the
22     substances to be put in, they get combusted,
23     create the third, but they go away, and then
24     the third gets combusted only on its own.
25     Combusting has to happen with all of those
```

1      still in the mix.  I think that's what you're

2      acknowledging, but you're saying as a practical

3      matter, this happens really fast.  May be hard

4      to figure out if that's happening or deal with

5      it, but that's an infringement dispute.

6           But we agree that the combustion in

7      question must occur as to all three somehow

8      mixed, somehow in the -- I don't know if

9      "mixed" means they're physically all touching

10     each other or "mixed" just in the sense that

11     they're all in the internal space, the chamber,

12     but that's what you're getting at.  Am I right?

13     What are you saying?

14           MS. DELLINGER:  I believe, Your

15     Honor, the claim language states combusting a

16     mixture comprising coal, pyrolysis char, and an

17     additive comprising HBr, and we believe that's

18     what it means.  The mixture comprising those

19     three substances must be combusted.  Whether

20     that mixture is partially created in the

21     combustion chamber by adding in coal and an

22     additive and that is created, there must be at

23     some point all three of those being combusted.

24           THE COURT:  And so all three of them

25     have to be combusted at the same time.  Do they

1    all have to be touching each other?

2          MS. DELLINGER:  I don't believe those

3    are limitations that are required by the

4    claims.

5          THE COURT:  We're trying to get at

6    what mixture means.  What does mixture mean in

7    your view?  How could the three substances be

8    mixed if they're not in contact with each

9    other?  They're mixed because?

10         MS. DELLINGER:  They could be making

11   contact with each other in a gaseous form,

12   which is likely what's occurring.  The

13   definition of what constitutes a mixture I

14   don't believe was disputed in the briefing, but

15   as far as what comprises a mixture and how

16   close in proximity those substances need to be,

17   I'm not quite sure there's a definite space

18   requirement, but the mixture could definitely

19   be inside the combustor, all three of the

20   substances.

21         THE COURT:  I thought the entire

22   dispute was about what mixture means.  What

23   does it mean to have a mixture that's three

24   substances?

25         It sounds like what you're saying is we

```
1      acknowledge that the three substances must all
2      be in the combustion chamber when the
3      combustion happens, and as long as that's the
4      case, that counts, even if a human being or a
5      machine didn't necessarily put in all three
6      substances into the combustion chamber from
7      outside of it.
8              MS. DELLINGER:  Certainly, Your
9      Honor.
10             THE COURT:  Is that right?
11             MS. DELLINGER:  Certainly.
12             THE COURT:  That's really the key;
13     right?  Because the char, no one is putting
14     that into the combustion chamber.  It gets
15     created by stuff already in there, and that's
16     what you believe can be captured by this claim
17     language; is that right?
18             MS. DELLINGER:  Yes, Your Honor.
19             THE COURT:  Let me let you continue.
20             MS. DELLINGER:  Thank you, Your
21     Honor.
22         Returning to the intrinsic evidence and
23     the prosecution history in the briefing, the
24     defendants cite to the prosecution history and
25     claim that that shows that this pyrolysis char
```

1          must be added from the outside, but the portion

2          of the prosecution history they cite goes to a

3          claim that is not in the '225 patent that we

4          see today.  Claim 45 was cancelled and never

5          underwent any substantive analysis at the PTO.

6               If we look at the prosecution history as

7          it pertains to the claims that did eventually

8          end up in the '225, we see that the examiner

9          and the patentee both understood the embodiment

10         to exclude the construction.

11              THE COURT:  Did you make the argument

12         in your briefing that the reason why the

13         intrinsic evidence that the other side cited to

14         Claim 45 shouldn't be considered is because

15         that wasn't part of the actual claims that were

16         discussed.

17              MS. DELLINGER:  I don't believe that

18         was in there.  We cited to the intrinsic

19         evidence supports that no construction is

20         necessary, and I'm happy to go further into

21         that, or if you would prefer not.

22              THE COURT:  I'll let you continue to

23         make whatever arguments you'd like to make, and

24         there's a question whether you fairly made

25         those arguments in the briefing.  I can always

1     assess.  I'll let you make all the arguments

2     you want in the time.  Please continue.

3          MS. DELLINGER:  Understood, Your

4     Honor.  Thank you.

5          If we look at the nonfinal office action

6     that was issued in this case on July 2nd of

7     2018, the examiner issued a 112 rejection, and

8     in doing so stated that addressing claim 66

9     correlates to Claim 1 of the '225 patent and

10    stated Claim 66 claims combusting pyrolysis

11    char and a promoter comprising BR2, HBr, and

12    Br.  As pyrolysis char is a byproduct of the

13    combination or the combustion of coal and the

14    promoter cannot be combusted as it is a halide,

15    it is believed that the applicant meant to

16    claim combusting coal in the presence of

17    pyrolysis char and a promoter and is

18    interpreted as such in the rejection below.

19         From this, we see that the examiner

20    understood that the applicant was claiming the

21    exact embodiment that the defendants seek to

22    exclude, which is combusting coal wherein the

23    pyrolysis char is created and combusted in the

24    mixture as well.  In response, the applicant

25    traversed the 112 rejection, but also stated --

1          THE COURT:  And I'm sorry to go back

2     to this, but what you're saying right now,

3     that's not in the briefing.  This is all new

4     argument that I'm hearing for the first time

5     and the other side is too.

6          MS. DELLINGER:  This specific screen

7     shot is not in the briefing.  The arguments

8     that made intrinsic evidence supports that this

9     is clearly contemplated by the patentee.

10          THE COURT:  Intrinsic evidence as it

11     brought through the patent specification and

12     claims, the particular intrinsic evidence

13     you're talking about now is part of the

14     prosecution history.  Part of it made it to the

15     examiner.  Okay.  I'm not going to be in a

16     great position to comment or ask questions

17     about it because I never heard it before.

18          MS. DELLINGER:  The point of that was

19     that the applicant agreed that that was not

20     going to be encompassed in the claim scoping.

21     Respondents are saying that a mixture can be

22     combusted without each individual component of

23     the mixture being combusted.  While that may be

24     part of the claim scope, the applicant's

25     understanding was that combusting coal within

1      the presence of the pyrolysis char and the

2      promoter falls within the claim scope.

3              THE COURT:  When I read this again,

4      something in the prosecution history is going

5      to show me that when it's talking about

6      combusting coal and promoter in the presence of

7      pyrolysis char has the requisite combustion?

8              MS. DELLINGER:  Yes, Your Honor.

9              THE COURT:  The thing you think the

10     other side is trying to exclude?

11             MS. DELLINGER:  Yes, Your Honor.

12             THE COURT:  Does pyrolysis char

13     always result from the combustion of coal plus

14     a bromine promoter?

15             MS. DELLINGER:  I believe -- I'm

16     hesitant to say always, but pyrolysis char is a

17     form -- pyrolysis char is also a partially

18     combusted carbon substance, and so yes, it is.

19     I wouldn't say always created, but I don't want

20     to say 100 percent of the time.

21             THE COURT:  Somebody could argue that

22     if it's a practical matter that char is always

23     created via combustion of the first two, why

24     would it need to be asserted in the claims?  If

25     it automatically comes about and automatically

```
1      would in turn be combusted always along with

2      the promoter and the coal, if it's inherently

3      going to happen, why do you want it listed out

4      as a required add in the claims?  People would

5      say because you have to literally add it in

6      separately.  To that, you would say what?

7                 MS. DELLINGER:  The claim does not

8      require that it be added in, and the claim, as

9      it is written, is the most accurate description

10     of what is going on during this process because

11     when coal is combusted and pyrolysis char is

12     created, the mixture inside the chamber

13     includes them both.

14                 THE COURT:  When you say mixture

15     inside the chamber, that's a mixture inside the

16     chamber.  As long as three things are in the

17     chamber together and being combusted, that's

18     good.  It's good.

19                 MS. DELLINGER:  I think practically

20     speaking, yes.  I don't believe that's required

21     by the claim language, but I agree.

22                 THE COURT:  Please continue.

23                 MS. DELLINGER:  Lastly, Your Honor,

24     the issue of the doctrine of claim

25     differentiation really shows that the
```

1    defendants' proposed construction is untenable.

2    So if we -- if the inventors wanted to claim

3    adding the pyrolysis char to the combustor,

4    they could have and did so in Claim 16.  If we

5    take a look, Claim 16 claims combusting coal in

6    a combustor and adding within the combustor a

7    pyrolysis char.  That limitation is not present

8    in Claims 1, 14, or 17.

9              THE COURT:  And just to make sure I

10   understand what you -- on the defendants' side,

11   what you think the claims mean by within the

12   combustor, or, for example, I know Claim 3 uses

13   the phraseology "prior to a combustor."  I'm

14   trying to understand what those words mean and

15   how they're different.

16       It sounds like what you think "adding

17   within the combustor" means is there's a

18   combustor, other stuff is in it, like, for

19   example, the coal plus the bromine, and then

20   we're going to put in char.  Is that what

21   adding within the combustor, a certain thing

22   within the combustor, means?  And how is adding

23   within the combustor distinguished from adding

24   prior to combustor?

25             MS. DELLINGER:  I think that's

```
 1          exactly right.  Adding within the combustor

 2          means adding something to the inside of the

 3          chamber and prior to the combustor, I assume,

 4          would be outside of the combustion chamber.

 5                    THE COURT:  Adding prior to the

 6          combustion chamber ultimately goes into the

 7          combustion chamber.  How would you know

 8          something is added within the combustor but not

 9          added prior to the combustor?  Why are those

10          two things different?

11                    MS. DELLINGER:  I believe the

12          injection point may be different.  Adding

13          directly to the combustor versus adding

14          something at some point beforehand.

15                    THE COURT:  So adding within the

16          combustor is like the injection goes directly

17          into the combustor, whereas prior to the

18          combustor means the injection or the

19          combination would be -- putting the element in

20          happens prior to the combustor, i.e., not

21          directly into it and then the stuff then later

22          goes into it.  Is that right?

23                    MS. DELLINGER:  I think that would

24          fit those descriptions.

25                    THE COURT:  Okay.  Anything further,
```

1        Ms. Dellinger?

2              MS. DELLINGER:  Briefly just

3        continuing onto Claims 3 and 4 as you

4        referenced, those also claimed this adding in

5        limitation which required that the pyrolysis

6        char be added in either prior to or within the

7        combustor.  Again, those limitations that are

8        present in dependent Claims 3 and 4 that depend

9        from Claim 1 here are not present in Claim 1.

10       Accordingly, Your Honor, we believe that those

11       limitations should not be imported into these

12       claims, and we ask that you find that no

13       construction is necessary.

14             THE COURT:  I think, Ms. Dellinger,

15       if I have it right for Claims 3 and 16 what I

16       think they mean here in terms of claim

17       differentiation, we know the other side wants

18       to include the phraseology "whereby each

19       substance in the mixture is added to the

20       combustor."

21            We know the key dispute here is what

22       happens when one of these substances actually

23       gets created within the combustor, and you say

24       limit this to just stuff having to be put into

25       the combustor, and you'd say well the claims,

1           one way or the other, talk about those

2           scenarios, talk about adding within, directly

3           in, they talk about it prior, with going in.

4           So if the claims wanted to limit things in the

5           way the defendants suggest these claims are

6           limited, they would have used the same

7           phraseology.  They would have said either added

8           within the combustor and prior to and/or prior

9           to the combustor, maybe just within.  They

10          would have used some or all of those phrases.

11          Since they didn't, there must be a broader

12          option, like one of the substances could get

13          created within the combustor and still be

14          combusted with the other stuff.  Is that what

15          you're saying?

16                    MS. DELLINGER:  Yes, Your Honor.

17                    THE COURT:  Thank you, Ms. Dellinger.

18          I'll give you a chance for brief rebuttal when

19          we hear from the other side.

20                    MS. DELLINGER:  Thank you.

21                    THE COURT:  We'll hear from

22          Defendants' counsel.

23             Mr. Glandole.

24                    MR. GLANDOLE:  Thank you, Your Honor.

25          Scrambling a little bit because none of the

1          citations to the intrinsic record are present

2          in either of the plaintiffs' briefing of this

3          case, but I'm familiar with them, and I think I

4          can address them here.

5                The '225 patent differs from other

6          patents in this case in one way.  It includes

7          this term "pyrolysis char."  It includes that

8          term in every claim.  It's in every claim of

9          the '225 patent, and each claim requires it to

10         be part of the combustion mixture.  We're going

11         to talk about that term.

12               If you were to read through the '225

13         patent, it would be understandable if you

14         thought there might be some pages missing.

15         There's nothing in the '225 patent in the

16         specification talking about pyrolysis char, and

17         we heard that from Plaintiffs' counsel here.

18         There was no tieing to the specification, no

19         description whatsoever.  I understand some of

20         those are going to be 112 issues later down the

21         line, but we should acknowledge here in the

22         context of claim construction that we don't

23         have any teaching in the patent whatsoever on

24         this use of pyrolysis char.  It's difficult to

25         understand the plaintiffs' brief.

1          THE COURT:  Is it literally that the

2     term is used in the claims, but it's never used

3     in the specification?  The only time it shows

4     up is in the claims and/or perhaps in the

5     introduction of that?

6          MR. GLANDOLE:  I can tell you exactly

7     how it's used because it does appear in one

8     other context.  Looking here at the language of

9     the claim, this is Claim 17.  I'm using it as a

10    representative here, and there are some colors

11    that are not really showing up.

12         The '225, this claim has two terms we've

13    been talking about in this case.  There's a

14    bromine term, and that's supposed to be green

15    here.  There's a sorbent material comprising

16    activated carbon.  We talked about that quite a

17    bit, activated carbon and bromine.  Those two

18    elements are in every claim that's being

19    asserted in this case.

20         There is this additional term, pyrolysis

21    char here, which, again, as you were discussing

22    with plaintiffs' counsel, has to be part of the

23    mixture that's combusted.  Now, this use of

24    pyrolysis char as an ingredient in the

25    combustion mixture, there's no discussion of

1       that.  The term "pyrolysis char" does appear a

2       handful of times in the specification, but it

3       does so always in the same context, which is as

4       an example of activated carbon, as an example

5       of the activated carbon sorbent.  So there are

6       these lists in the patent of what activated

7       carbon sorbent, what those could be, all the

8       different things, different charcoals and

9       things that are considered activated carbon.

10      One of the things that's in there is pyrolysis

11      char, but it's in this long list always as an

12      example of activated carbon sorbent.  That's

13      not how it's being used in this claim.

14              THE COURT:  If you weren't using

15      pyrolysis char as your relevant sorbent

16      material to soak up the mercury, how would you

17      be using it?

18              MR. GLANDOLE:  I don't know.  I

19      honestly do not know the answer to that

20      question, Your Honor.  There was no suggestion

21      by the plaintiffs in their briefing discussion,

22      infringement contentions.  There's no

23      discussion or teaching in the patent, and this

24      maybe gets to the 112 issues I was referring

25      to.  I don't know.  There's no discussion of it

1      in the prosecution history of what it's doing

2      here in the combustion chamber.

3          To go back to your question, the term

4      does show up in the patent in place, always in

5      this long list of sorbents, which, again, is

6      not where it appears here in the claim.

7          So the term we are to construe is mixture

8      comprising coal, pyrolysis char, and an

9      additive.  Again, I think we have a similar

10     situation where Plaintiffs are saying they want

11     the plain and ordinary meaning, but when you

12     look behind the scenes and dig into their

13     infringement contentions, you take it with the

14     arguments in the briefs, it's clear that they

15     have, I would say, not a plain understanding of

16     this, a more exotic understanding of the term,

17     which is, as the judge mentioned, they are

18     really reading combusting a mixture comprising,

19     coal, pyrolysis char, and additive to be

20     combusting a mixture of coal and an additive.

21     We believe they're reading this term out of the

22     claim because they're arguing that this

23     pyrolysis char is -- maybe just short of saying

24     always, but it does seem to be they're saying

25     that it's always created here from the

1          combustion of coal.  There's really no

2          difference in scope whether you remove that

3          term or not.  We think that's improper.

4               Turning now to the intrinsic record, I

5          think there was something the plaintiff brought

6          up that I don't think really informed one way

7          or the other.  This idea that you have to

8          combust the coal in the presence of pyrolysis

9          char, I don't think that gets to our dispute

10         here today.  Our dispute here today is whether

11         you have to read this to mean that you have to

12         add in the char if you have the char and the

13         bromine.  You add in each of those things, you

14         make this mixture, and that's what's being

15         combusted.  I think the idea that it has to be

16         done, that there's char there, it's present, I

17         don't think answers that question.

18              THE COURT:  Why, pursuant to the

19         claim language, would you have to add the char

20         into the combustion chamber if it is possible

21         that the coal and the bromine compound are

22         added, they're combusted, but yet coal and the

23         bromine compound remain in the chamber, but the

24         coal and the bromine compound, when combusted,

25         create the pyrolysis char which is then

1     subsequently further combusted along with the

2     remaining coal and bromine?  All three of them

3     end up in the chamber.  All three of them are

4     combusted simultaneously.  How come that can't

5     qualify as combusting?

6              MR. GLANDOLE:  Again, that seems to

7     be to be a reversal of the plain language here.

8     You're talking about a product of combustion,

9     now char, and now you're -- whereas the claim

10    requires it to be an ingredient, one of the

11    components of the combustion.

12             THE COURT:  Let's stop there.  I

13    think it's really key.  I think you're

14    suggesting it must be what you think the

15    mixture is, that the definition of the term is

16    such that the requisite mixture has to be,

17    like, a closer kind of composition than what

18    the plaintiffs are allowing for.  I think what

19    they're thinking a mixture is, these three

20    things are all together within a combined space

21    and they're combusted all at the same time.  I

22    think what you're suggesting is a more narrow

23    definition of mixture with the claims you're

24    talking about.  Just like how the bromine is

25    part of the coal, maybe the char is too?  Or

1    no.  I'm trying to get to what's really the

2    dispute here.  Where does it come out in the

3    claim language?

4              MR. GLANDOLE:  I do think you're

5    right.  The term "mixture" is key.  I don't

6    think of it in terms of closeness or proximity

7    to the components, but I think of it in terms

8    of something that the accused infringer has to

9    create, has to provide.  Providing a mixture to

10   be combusted.

11             THE COURT:  It doesn't say provide.

12   It just says combusted.  I'm picturing, again,

13   simplified, I've got a combustion chamber and

14   I've got the entrance, a hole, that's going

15   into it.  And one possibility is, boom, I put

16   the coal, then I put in some bromine compound,

17   then I put in the pyrolysis char, one, two,

18   three.  I put all three in.  They go in and

19   they're all combusted.  Whether they all mix

20   together or I put all three of them in there

21   separately, they're all combusted.  I think you

22   would say yes, that would count.

23             But the plaintiff is saying, well, look.

24   You could put in the coal and the bromine in

25   practice.  They're together.  They get

1       combusted.  They create pyrolysis char, but in

2       that process, the coal and portions of the coal

3       and bromine still exist.  They're still in the

4       chamber, and those three things together are

5       then further combusted before gas is emitted,

6       and that counts too.

7            Why does combusting a mixture have to be

8       providing each of the three from outside?  Why

9       can't it be all three are in there and they're

10      combusting, and we're good?

11               MR. GLANDOLE:  I think there are two

12      problems with that.  One is, again, completely

13      divorced from any teaching or any language in

14      the specification.

15               THE COURT:  Because you would say,

16      frankly, there's no discussion of pyrolysis

17      char in this context at all.

18               MR. GLANDOLE:  That's correct.  I

19      think of that as a long scheme that's not

20      described here.  That's certainly larding a lot

21      onto the simple phrase.

22           The second reason is scientifically,

23      practically, it's nonsensical.  This idea that

24      you have this term comprising -- you're

25      combusting a mixture of coal and bromine.  The

1        fact that there might be some char created

2        during the middle of the process so the

3        insulator is combusted, we're talking about,

4        under their theory, an intermediate that

5        appears and disappears.

6             Again, it's meaningless in the context of

7        method of treating mercury gas.  Reading that

8        claim that way here, there's nothing here the

9        char is doing if we're talking about it being

10       created, further combusted.

11            THE COURT:  I think what you're

12       saying now is from a scientific perspective, it

13       makes tremendous sense to combust a mixture of

14       these three things or all three of these things

15       separately added into a combustion chamber.

16       But it wouldn't make any sense from a

17       scientific perspective for the way that the

18       three things were said to be combusted together

19       is two of them come in, get combusted, third is

20       created and all three of them are further

21       combusted.

22            I think you're saying from a scientific

23       perspective the first makes eminent sense in

24       terms of stopping mercury emissions.  The

25       second doesn't.  I guess my question would be,

1      how do I know that?  Is that a person of skill

2      in the art telling me that, the patent telling

3      me that?

4                  MR. GLANDOLE:  You're right again.

5      The struggle here is the patent isn't telling

6      us anything about this process.

7                  THE COURT:  There, I think your real

8      fight -- I wonder if -- the question about what

9      the claims would allow for is a different

10     question about -- what the words of the claims

11     could allow for is arguably a different

12     question than what does the body of the patent

13     teach.  The questions can be conflated, but

14     they can also be different.  And the claim

15     language as written could allow for X then at a

16     later stage, one could argue if that is true,

17     there wasn't sufficient description because the

18     patent never teaches how one would get that

19     out.  I wonder maybe would it be a fair

20     criticism that really your arguments are you're

21     more focused on the 112 side than the claim

22     language.

23                 MR. GLANDOLE:  I do think there are

24     substantial 112 problems.

25                 THE COURT:  You're going to make 112

1    arguments.

2         MR. GLANDOLE:  That is correct, and

3    policy and reasons behind 112 are coming out

4    here because we're having difficulty describing

5    what this claim scope means.  Certainly from an

6    inventor -- this idea that there may be char

7    there or not, there's nothing in the patent

8    that teaches whether or how to determine that

9    if it's being met by this intermediate

10   application as Plaintiffs are suggesting.

11        I would like to turn to the --

12        THE COURT:  One other question.

13   Briefly in your brief, you suggested that were

14   the plaintiffs' construction to prevail here,

15   this claim term is indefinite.  I guess if I

16   were to ask you whether or not that's true or

17   not, do I really have the record here to make a

18   definiteness determination at claim

19   construction?  I don't have anything from

20   experts or what persons of skill in the art

21   would know.  Could I make a definiteness

22   determination if I were to determine that the

23   plaintiffs' construction more closely aligns

24   with the claim language?

25        MR. GLANDOLE:  Yes, as Your Honor is

1    suggesting, indefiniteness is an issue that

2    occasionally may be resolved at the claim

3    construction stage but often does benefit from

4    additional expert testimony.

5         THE COURT:  You might argue that

6    further down the line were the plaintiffs to

7    prevail.

8         MR. GLANDOLE:  That's correct.  I

9    think the indefiniteness arguments here would

10   relate to the transient nature of the char and

11   the lack of any kind of direction in the

12   specification as to the extent or the --

13   whether it has to be present, whether it has to

14   be combusted, how one would go about measuring

15   it.  I appreciate the Court as to determine

16   whether that's something that exists from

17   expert testimony.

18        THE COURT:  The other thing is you

19   can speak to the plaintiffs' claim

20   differentiation arguments.  What they're

21   suggesting is, look, if the fight is all about

22   or mainly about here whether or not the

23   combustion at issue can occur when the char is

24   created by the combustion materials in the

25   chamber, and maybe there's further combustion

1      in there, they would say what the defendants

2      want is it has to come in from the outside.

3      The patent talks about the scenarios in which

4      it can come from the outside and it's using

5      words when it talks about those scenarios.

6      Since it didn't use those words, they must be

7      talking about a broader world where you can add

8      it in the combustor, prior to the combustor, or

9      you could have a third way like our way, the

10      way we're talking about.  How come that

11      argument isn't somewhat persuasive?

12             MR. GLANDOLE:  Let's look at that,

13      Your Honor, if we could.  If I may, Your Honor,

14      I'm going to use Plaintiffs' version here.

15             THE COURT:  We're getting a lot of

16      use of the ELMO today.  It's old school.  Good.

17             MR. GLANDOLE:  Claims 3 and 4 do add

18      additional language to Claim 1, and I think

19      what's being done here is identifying two ways

20      it can be done, but both, to underline the main

21      point, both use the word "added."  Both are

22      additions.  It can be added prior to combustor

23      or within the combustor.  It's awkward

24      language, frankly, this idea of you're

25      combusting a mixture of coal, char, and the

| | |
|---|---|
| 1 | additive wherein the char and additive are |
| 2 | added prior to the combustor.  Added to what? |
| 3 | I think there's a little bit of ambiguity |
| 4 | there.  I think it's unusual language and we |
| 5 | struggle with it on our side. |
| 6 | THE COURT:  Do you think the |
| 7 | difference is that the other side I think |
| 8 | suggested that added within, it's kind of added |
| 9 | directly into the combustor whereas added prior |
| 10 | is added to stuff that later gets entered into |
| 11 | the combustor like add at an earlier stage. |
| 12 | MR. GLANDOLE:  Either way we're |
| 13 | talking about stuff going in.  It uses the word |
| 14 | added for both.  What they're distinguishing |
| 15 | here, what they're doing, what they're |
| 16 | distinguishing is either preparing the mixture |
| 17 | ahead of time or preparing the mixture there in |
| 18 | the combustor.  That's how I struggle with this |
| 19 | language.  I think it's unclear, but I read it |
| 20 | to mean "added within the combustor" is you're |
| 21 | adding these three things in and the mixture |
| 22 | doesn't really happen until they get there. |
| 23 | Added prior to a combustor that combusts the |
| 24 | mixture, again, this suggests that you made a |
| 25 | mixture prior to that mixture being added in, |

1    so I think it's premixing as opposed to mixing

2    at the time.  I think that's the most

3    reasonable read.  We have no guidance in the

4    specification.

5             THE COURT:  But if those are the

6    reads and the plaintiff suggested a third

7    option, which is most of the three are added

8    within or added prior two of the three, but the

9    third created within the combustor and then

10   mixes around the other two.  How come that

11   broader third option couldn't be covered by --

12            MR. GLANDOLE:  I think our

13   construction -- first of all, I think our

14   construction covers both of these narrower

15   embodiments.  We're saying all three need to be

16   added to or that they are mixed before or mixed

17   after are both covered by our construction.

18            THE COURT:  So 3 and 4 in your view

19   are more limited.  One covers both options.

20            MR. GLANDOLE:  That's right and they

21   point to Claim 16.  Claim 16 is a claim that

22   just says within.  That's a narrower option.

23   There are other ways that Claim 16 is more

24   narrow than Claim 1 as well.  It's not a strict

25   claim differentiation argument.

```
1            THE COURT:  Anything further?
2            MR. GLANDOLE:  We still have not
3    gotten to our intrinsic evidence.
4            Again, going back to my discussion of the
5    '225 patent, the specification, you're reading
6    it, there's nothing in here about the use of
7    the term pyrolysis char and how it's used here.
8    The examiner recognized this.  The examiner
9    said what's your written description for this
10   term?  And so we have this written description
11   here now.
12           Just to pause briefly here, I think that
13   plaintiff's counsel suggested that this is a
14   claim that was amended and not here in this
15   form.  That's not an argument we heard from
16   them previously, but if you look at the claim
17   language here which is from the Claim 45, which
18   may have been amended further.  If you're
19   looking at the feature that's being discussed
20   here, it's the feature we're discussing today.
21   Combusting a mixture comprising coal, pyrolysis
22   char, and a promoter to form the
23   mercury-containing gas.
24           If you look at the actual claims we're
25   discussing today, that term "promoter" gets
```

1      defined as a bromine or bromide compound.  That

2      is -- that's the only difference between this

3      claimed feature and we'll talk about later they

4      spell out what the promoter is.

5           To be clear, the idea that this written

6      support here is not relevant because this claim

7      was later amended, I would suggest that that is

8      not at all accurate.  This is the written

9      support for the claim term that we are

10     discussing here today, and this is the entirety

11     of the support.

12          And one thing I would point out right

13     away, if you look at their example of support,

14     there's four or five paragraphs here, not all

15     the same paragraph, not adjacent to one

16     another.  It's very much a Frankenstein picking

17     from different parts.  What they did here was

18     as we talked about here, paragraph 49, that's

19     where they get the term "pyrolysis char."  As I

20     mentioned before, the activated carbon, they

21     have a list of things it can be.  One of the

22     examples is pyrolysis char.  They take from

23     that sorbent paragraph, even though, as we

24     said, the pyrolysis char in the claim is not

25     being used as a sorbent, they point to that.

1      So they first tie the pyrolysis char to a

2      sorbent and then they go to a different

3      paragraph, very far away in the application,

4      that says the sorbent can be added whenever,

5      before, after, or within the boiler.

6           I would argue this kind of a Frankenstein

7      construction is not really proper written

8      support, but it is the only thing we have, and

9      the only thing we have here says it can be

10     added.  It's to be added.  This is the only

11     written support we have.

12          THE COURT:  If it's talking about the

13     sorbent, the activated carbon can be pyrolysis

14     char, and we know that this part of the claim

15     language isn't about the activated carbon

16     piece, it's about a precursor step, how is any

17     of this relevant?

18          MR. GLANDOLE:  This is the only thing

19     they provided.  This is the only thing the

20     applicant pointed to as the support for, as the

21     written description for, the claim we are

22     discussing.

23          I share the confusion.  Does this apply

24     or not?  If it doesn't apply, there's nothing

25     here.  There's no written description.  And,

1      again, maybe that's a determination for later

2      in the case.

3            To the extent that there is, to the

4      extent there's any support whatsoever for this

5      term in the specification that they pointed to

6      so that this is not entirely new material

7      that's being claimed, they tie it to the

8      sorbent and they say it can be added.

9            THE COURT:  We don't have any further

10     description from the examiner in the

11     prosecution history like I heard their

12     argument, let me tell you why it is -- there's

13     nothing?

14           MR. GLANDOLE:  Nothing.  That's

15     right.

16         And, again, whether or not this was

17     properly -- this sentence was a properly

18     written description as it was, they are at

19     least asserting here in their written

20     description -- they are asserting in their

21     argument that it is to be added.  That's where

22     you get that word added.  It's not a word we

23     came up with out of nowhere.  That word "added"

24     comes from the only written description support

25     relied on.

1          I think with that, I'll stop.

2                THE COURT:  Okay.  Thank you.  I'll

3     ask if Ms. Dellinger has any brief rebuttal.

4                MS. DELLINGER:  Yes, Your Honor, a

5     few points.

6          First, we heard throughout this

7     discussion -- I'll start with where we ended as

8     to this written description portion.  The

9     defendants brought up the paragraph that went

10    to Claim 45, and my opposing counsel stated

11    that this claim was later amended.  This claim

12    was never amended and never underwent

13    prosecution.

14         Secondly --

15               THE COURT:  On that point, though, in

16    essence, though, wasn't the patentee trying to

17    tell us something about what phraseology, just

18    like the phraseology that's in dispute here,

19    means and where in the specification we can

20    look for information to inform the meaning?  Is

21    that fair?

22               MS. DELLINGER:  It is fair.  It's to

23    relevant parts of the specification, but,

24    again, the statement that there was nothing

25    further from the examiner or during the

1          prosecution about further support for that is

2          just factually incorrect because even though

3          those claims were cancelled, the claims that do

4          appear now including the pyrolysis char, the

5          mixture comprising pyrolysis char and additives

6          appear in Claim 66.  As we saw, there was that

7          exchange with the examiner where they

8          understood the embodiment to be included, which

9          was understood that it meant the claim was

10         important.

11              And a promoter, that was not in response

12         to a written description challenge.  The

13         sections of the specification that were cited

14         were not in regard to or in response to a

15         written description challenge, so just

16         clarifying a few points.

17              THE COURT:  With regard to that kind

18         of chart of Claim 45 that the other side relies

19         on here, I think what you were saying about it,

20         regardless of the reason why, is you don't

21         think that's helpful.  You don't think the

22         Court should necessarily consider it.  Am I

23         right?

24              MS. DELLINGER:  I think since it goes

25         to none of the claims that are currently in the

1     patent, it's not necessarily the most helpful

2     evidence.

3                 THE COURT:  Not helpful in your view.

4     Is there another reason it's not helpful is

5     because in the patent it was pointing to

6     information about the char in the

7     specification, it was pointing to a part of the

8     specification that was referring to the char in

9     terms of its use as an activated carbon, i.e.,

10    something that is not a part of the limitation

11    we're dealing with now, something that's

12    talking about a step that comes later in the

13    claim?

14                MS. DELLINGER:  In that reference, it

15    does pertain to the activated carbon or

16    pyrolysis char being a form of activated

17    carbon, not necessarily it being created in the

18    combustion of coal in that section.

19                THE COURT:  Let me let you continue.

20                MS. DELLINGER:  Thank you.

21          Secondly, Defendants' proposed

22    construction, again, we talked about whether

23    this -- the dispute here focuses on what the

24    mixture is and where it's added or if it's

25    added.  Defendants' proposed construction seeks

1    to limit the claims to a premade mixture.  The

2    claims do not require a premade mixture.  The

3    claims are wholly silent as to where or when or

4    how this mixture is created or how it comes

5    about, so those limitations that the defendants

6    seek to import from these dependent claims or

7    from outside the specification where they're

8    seeking to import these limitations is

9    improper.

10        Additionally, Your Honor, when you look

11    at Claim 1, Claim 1 is a method claim.

12    Claim 1, Claim 14, and Claim 17.  We see

13    combusting a mixture comprising.  There is no

14    additional adding step in this combusting part.

15    We see adding a particular sorbent material but

16    no adding of a pyrolysis char in this method

17    step.  Accordingly, Your Honor, we believe it

18    is improper to read those limitations into

19    these claims.

20        Taking -- we believe when you look at all

21    the intrinsic evidence, particularly looking at

22    the differences between the claims and the fact

23    that they are silent as to whether and when and

24    how this mixture must appear, we believe that

25    it would be -- we ask that Your Honor not adopt

1       any claim limitation construction and find that

2       claim construction is not necessary.

3               THE COURT:  Thank you.

4          Any brief rebuttal?

5          MR. GLANDOLE:  Well, again, with

6       regard to the written description part, as I

7       mentioned, this is a new argument and one that

8       I wish we would have been able to address

9       previously, but just to restate what I said

10      earlier, this is the exact claim language that

11      is being disputed here.  It appears the claim

12      language appears in this form in the claim even

13      if this claim eventually was later cancelled,

14      so the suggestion that it is not relevant is

15      incorrect.

16          As far as the other statements, again,

17      there was discussion of this term.  There is no

18      further discussion of the term as we are

19      discussing it today.  There's no further

20      discussion of this question, this question of

21      whether the char is something to be added or

22      whether it arises naturally.  There's no

23      further discussion of that.

24          Also, I would point out when it comes to

25      written description, nothing we have seen from

1        Plaintiffs today is the discussion by the

2        examiner and applicant of the specification.

3        Nothing they've shown today is a discussion of

4        the written description support.  The only

5        discussion by the applicant and examiner with

6        written description support relates to the

7        paragraphs I've shown here, and I believe

8        that's true also for the claims that did issue.

9        I haven't had a chance sitting here today to go

10       through and make sure that's true.

11              THE COURT:  I know there's going to

12       be in the briefing, again, because you have it

13       up and you're addressing -- I'll ask you.  It

14       is asserted, though, that the patentee here is

15       saying in essence does it count to be

16       combusting the char and the coal and the

17       promoter in a circumstance where the char is

18       the byproduct of the coal and the promoter

19       being previously combusted?  Yeah, it counts.

20       It's asserted that that's what the patent is

21       saying.  Is that what the patent is saying?

22              MR. GLANDOLE:  I don't think that's

23       what the patent is saying here, and that's why

24       I put this language up.  Pyrolysis char is

25       something you can certainly purchase from a

```
 1          supplier.  It's something you can buy and use,
 2          and it has a variety of different applications.
 3          The way it is created is from -- it can be
 4          created from a variety of carbon sources but
 5          often from coal.  I think that's all this is
 6          saying here, is that char that is something
 7          that's created, that can be created, from coal.
 8          I don't think this is referring to the
 9          combustion that's going on in the claim term.
10          There's no tying here to the combustion going
11          on in the claim term.
12                    THE COURT:  It does say it is
13          believed the applicant meant to claim
14          combusting coal in the presence of pyrolysis
15          char and a promoter after just saying that the
16          way the pyrolysis char gets created is that
17          it's a byproduct of the combustion of coal and
18          the promoter, so what could the patentee be
19          meaning by it's believed the applicant meant to
20          claim combusting coal in the presence of
21          pyrolysis char?  What do you think the patentee
22          meant by that statement?
23                    MR. GLANDOLE:  I think that is the
24          examiner here.
25                    THE COURT:  I'm sorry.  The examiner.
```

1           MR. GLANDOLE:  I think the examiner

2      here, again, is saying pyrolysis char --

3      they're talking about its source.  It is often

4      sourced from coal.  That's the way it is

5      normally created.  It is not something that can

6      be -- it is something that can be combusted,

7      and I think they're contrasting it here with a

8      halide.  They're saying the claims require

9      burning all three at once, combusting all three

10     at once, even though it goes on to say the char

11     and the coal are combusted and the promoter is

12     not something that actually combusts.

13          THE COURT:  I may have asked you a

14     version of this.  One more time.  If you were

15     to have to separately define the term "mixture"

16     in this claim term, would the definition be

17     something like -- and we're talking about the

18     mixture of three elements, so would the

19     definition being something like the three

20     elements are all present together within the

21     combustor, or would the definition be more

22     narrow?

23          MR. GLANDOLE:  So I think all three

24     elements do need to be present in the combustor

25     and need to be subject to combustion.  Now, how

```
1        that -- chemically how that works with bromine

2        is a little different than the other two, but

3        they need to be in the combustion zone when

4        they're combusting together.

5                THE COURT:  They need to be in the

6        combustion zone in the combustor and combusted,

7        but that's combined with each other.

8                MR. GLANDOLE:  I think a mixture is a

9        direction to the person of skill in the art.

10       They are the one creating the mixture.  The

11       person of skill in the art is the one

12       performing this method, so they need to be the

13       ones to introduce that mixture.  We talk about

14       the two different ways the dependent claims

15       disclose that happening, whether it's in the

16       boiler or prior to the boiler, but no.  I think

17       mixture does imply that the person of skill in

18       the art, the accused infringer, has to be

19       creating that mixture.  They're the one

20       providing that mixture.  That's what it means

21       to be combusting that mixture.

22               THE COURT:  And the mixture must be

23       something more than putting the three elements

24       into an enclosed space and combusting that

25       mixture.  It must mean putting the three
```

1      elements into an enclosed space such that those

2      elements are blank before they're combusted.

3      What is the blank?

4              MR. GLANDOLE:  I don't think there is

5      a blank.  I don't think there is an additional

6      step.  Our position here is that they need to

7      put the three items in.  The difference between

8      our parties is they feel they only need to put

9      two.  It's all three.

10             THE COURT:  Anything further,

11     Mr. Glandole?

12             MR. GLANDOLE:  Nothing, Your Honor.

13             THE COURT:  Thank you.

14         All right, counsel.  I should say I

15     appreciate the parties' good faith efforts

16     before the hearing to meet and confer prior to

17     the claim construction hearing and see if they

18     could reach agreement on disputes.  The parties

19     did so with regard to one term, and the way it

20     worked out, with a stipulation of the other.  A

21     lot of it was airing out the issues with

22     respect to those remaining disputed terms, so I

23     appreciate the parties' efforts in that regard.

24         I will take the matter under advisement.

25     I expect to issue a claim construction

1    decision -- the scheduling order says that the

2    default would be within 60 days, and I'll

3    expect to do that.  If for some reason I'm not

4    going to meet that aspiration, I'll let the

5    parties know.

6         With all that said, before we go off the

7    record, is there anything further that I need

8    to address from a procedural perspective with

9    respect to our Markman here today?

10              MR. NEMUNAITIS:  No, Your Honor.

11              THE COURT:  On Defendants' side?

12              MR. GLANDOLE:  Nothing Your Honor.

13              THE COURT:  Let's go off the record.

14         (The proceeding was adjourned.)

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

STATE OF DELAWARE          )
                          ) ss:
COUNTY OF NEW CASTLE       )

I, Deanna L. Warner, a Certified
Shorthand Reporter, do hereby certify that as
such Certified Shorthand Reporter, I was
present at and reported in Stenotype shorthand
the above and foregoing proceedings in Case
Number 19-CV-1334-CJB, *MIDWEST ENERGY EMISSIONS
CORP., et al. Vs. ARTHUR J. GALLAGHER & CO., et
al.*, heard on April 28, 2022.

I further certify that a transcript of
my shorthand notes was typed and that the
foregoing transcript, consisting of 124
typewritten pages, is a true copy of said
**MARKMAN HEARING**.

**SIGNED**, **OFFICIALLY SEALED**, and **FILED**
with the Clerk of the District Court, NEW
CASTLE County, Delaware, this 2nd day of May,
2022.

_____
Deanna L. Warner, CSR, #1687
Speedbudget Enterprises, LLC

## #

**#1687** [1] - 124:22

## '

**'114** [3] - 46:16, 46:22, 49:12
**'147** [18] - 7:13, 44:11, 44:13, 45:20, 45:23, 47:7, 47:8, 48:15, 49:6, 49:7, 49:13, 49:15, 49:22, 51:11, 51:19, 52:10, 53:3, 56:7
**'225** [12] - 45:21, 76:14, 79:3, 85:3, 85:8, 86:9, 94:5, 94:9, 94:12, 94:15, 95:12, 109:5
**'413** [1] - 68:15
**'430** [3] - 46:17, 46:22, 49:13
**'440** [1] - 68:15

## 1

**1** [13] - 13:23, 14:3, 14:22, 52:14, 86:9, 90:8, 92:9, 106:18, 108:24, 116:11, 116:12
**1.57(e** [1] - 43:4
**1.7** [1] - 46:20
**10** [2] - 31:3, 41:6
**100** [1] - 88:20
**112** [9] - 50:9, 86:7, 86:25, 94:20, 96:24, 103:21, 103:24, 103:25, 104:3
**12** [1] - 30:5
**124** [1] - 124:14
**14** [3] - 77:13, 90:8, 116:12
**16** [6] - 90:4, 90:5, 92:15, 108:21, 108:23
**17** [7] - 14:22, 59:15, 66:10, 90:8, 95:9, 116:12
**19-1334-RGA** [1] - 3:9
**19-CV-1334-CJB** [2] - 1:6, 124:9

## 2

**2** [1] - 43:1

**2000s** [1] - 12:5
**2018** [1] - 86:7
**2022** [3] - 1:14, 124:11, 124:20
**28** [1] - 124:11
**28th** [1] - 1:14
**2A** [1] - 1:13
**2nd** [2] - 86:6, 124:19

## 3

**3** [8] - 58:8, 61:4, 90:12, 92:3, 92:8, 92:15, 106:17, 108:18
**30** [1] - 26:7
**37** [1] - 43:5

## 4

**4** [4] - 92:3, 92:8, 106:17, 108:18
**45** [5] - 85:4, 85:14, 109:17, 113:10, 114:18
**49** [1] - 110:18

## 6

**60** [1] - 123:2
**66** [3] - 86:8, 86:10, 114:6

## A

**ability** [1] - 51:7
**able** [4] - 6:10, 27:1, 65:9, 117:8
**absolutely** [4] - 22:1, 23:19, 32:4, 58:14
**absorb** [1] - 51:17
**absorbent** [1] - 51:8
**according** [1] - 20:6
**accordingly** [2] - 92:10, 116:17
**accurate** [2] - 89:9, 110:8
**accused** [3] - 52:24, 100:8, 121:18
**acknowledge** [4] - 32:10, 79:25, 84:1, 94:21
**acknowledging** [2] - 81:15, 82:2
**action** [3] - 3:8, 55:18, 86:5
**activate** [1] - 68:17

**activated** [35] - 11:24, 12:9, 12:10, 13:10, 14:14, 18:19, 21:2, 48:11, 48:12, 51:8, 51:13, 51:14, 51:15, 51:16, 59:1, 59:4, 59:8, 65:7, 65:9, 65:15, 66:2, 68:18, 95:16, 95:17, 96:4, 96:5, 96:6, 96:9, 96:12, 110:20, 111:13, 111:15, 115:9, 115:15, 115:16
**actual** [7] - 12:3, 26:20, 29:5, 39:13, 49:6, 85:15, 109:24
**add** [22] - 33:25, 40:2, 64:4, 64:8, 64:9, 64:10, 69:24, 76:20, 76:24, 77:4, 77:10, 79:5, 79:17, 89:4, 89:5, 98:12, 98:13, 98:19, 106:7, 106:17, 107:11
**added** [48] - 11:23, 13:4, 14:8, 16:1, 47:3, 49:3, 52:15, 53:23, 54:14, 63:11, 77:11, 77:12, 78:6, 79:7, 85:1, 89:8, 91:8, 91:9, 92:6, 92:19, 93:7, 98:22, 102:15, 106:21, 106:22, 107:2, 107:8, 107:9, 107:10, 107:14, 107:20, 107:23, 107:25, 108:7, 108:8, 108:16, 111:4, 111:10, 112:8, 112:21, 112:22, 112:23, 115:24, 115:25, 117:21
**adding** [24] - 11:22, 66:13, 68:21, 79:1, 82:21, 90:3, 90:6, 90:16, 90:21, 90:22, 90:23, 91:1, 91:2, 91:5, 91:12, 91:13, 91:15, 92:4, 93:2, 107:21, 116:14, 116:15, 116:16
**addition** [6] - 49:2, 52:3, 52:7, 52:23, 55:14, 78:22
**additional** [8] - 25:16, 39:18, 66:17, 95:20, 105:4, 106:18,

116:14, 122:5
**additionally** [1] - 116:10
**additions** [1] - 106:22
**additive** [12] - 11:23, 12:3, 12:23, 44:7, 76:16, 82:17, 82:22, 97:9, 97:19, 97:20, 107:1
**additives** [3] - 11:1, 13:4, 114:5
**address** [4] - 28:21, 94:4, 117:8, 123:8
**addresses** [1] - 27:16
**addressing** [3] - 28:2, 86:8, 118:13
**adds** [2] - 14:23
**adjacent** [3] - 9:5, 9:8, 110:15
**adjourned** [1] - 123:14
**admission** [1] - 116:25
**admitted** [1] - 13:12
**adopt** [1] - 116:25
**ADRIENNE** [1] - 1:16
**Adrienne** [2] - 3:22, 76:13
**advancement** [1] - 52:1
**advisement** [1] - 122:24
**affect** [1] - 76:25
**afternoon** [7] - 3:6, 3:17, 3:18, 4:6, 4:25, 45:16, 76:12
**agnostic** [2] - 19:4, 41:3
**agree** [12] - 5:14, 16:11, 20:16, 33:11, 33:23, 42:17, 42:21, 50:2, 77:21, 80:17, 82:6, 89:21
**agreed** [5] - 5:13, 32:2, 46:24, 68:19, 87:19
**agreement** [5] - 5:24, 46:18, 47:4, 47:13, 122:18
**ahead** [1] - 107:17
**air** [13] - 10:19, 12:18, 12:25, 13:1, 13:3, 13:6, 15:15, 19:22, 22:24, 39:20, 73:20
**airing** [1] - 122:21
**al** [6] - 1:4, 1:7, 3:7, 3:8, 124:10, 124:11
**albeit** [1] - 40:15
**aligns** [1] - 104:23
**allocated** [1] - 6:6
**allow** [5] - 23:13, 23:18, 103:9,

116:14, 122:5
**103:11, 103:15**
**allowing** [1] - 99:18
**allows** [1] - 21:8
**alluding** [1] - 50:9
**alone** [1] - 55:10
**ambiguity** [1] - 107:3
**amended** [5] - 109:14, 109:18, 110:7, 113:11, 113:12
**amount** [3] - 16:13, 29:16, 67:19
**amounts** [1] - 37:13
**analysis** [1] - 85:5
**AND** [1] - 1:2
**answer** [11] - 25:4, 26:14, 31:21, 31:25, 32:7, 44:9, 56:18, 63:23, 64:18, 96:19
**answered** [2] - 32:2, 56:21
**answering** [3] - 26:5, 35:23, 36:1
**answers** [2] - 28:22, 98:17
**apologize** [1] - 68:13
**apparatus** [5] - 29:24, 30:2, 30:7, 30:25, 72:22
**apparatuses** [2] - 22:3, 41:1
**appear** [6] - 9:5, 95:7, 96:1, 114:4, 114:6, 116:24
**APPEARANCES** [1] - 1:16
**applicant** [9] - 86:15, 86:20, 86:24, 87:19, 111:20, 118:2, 118:5, 119:13, 119:19
**applicant's** [1] - 87:24
**application** [6] - 43:2, 43:17, 44:17, 50:21, 104:10, 111:3
**applications** [1] - 119:2
**applied** [2] - 11:1, 47:7
**applies** [1] - 43:5
**apply** [6] - 9:14, 49:12, 55:11, 58:21, 111:23, 111:24
**appreciate** [4] - 75:1, 105:15, 122:15, 122:23
**appreciated** [1] - 74:15
**approach** [3] - 6:25, 45:14, 66:8
**appropriate** [1] - 40:3

**approved** [1] - 5:20
**April** [2] - 1:14, 124:11
**area** [1] - 74:12
**areas** [1] - 55:13
**arguably** [1] - 103:11
**argue** [6] - 4:18, 35:3, 88:21, 103:16, 105:5, 111:6
**argues** [1] - 26:9
**arguing** [5] - 34:3, 37:5, 42:11, 76:14, 97:22
**argument** [16] - 6:7, 6:9, 6:11, 16:12, 16:13, 26:21, 43:19, 50:9, 85:11, 87:4, 106:11, 108:25, 109:15, 112:12, 112:21, 117:7
**arguments** [12] - 7:20, 43:3, 44:5, 85:23, 85:25, 86:1, 87:7, 97:14, 103:20, 104:1, 105:9, 105:20
**arises** [2] - 46:13, 117:22
**ARPS** [1] - 2:5
**arrows** [3] - 43:11, 71:16
**ARSHT** [1] - 1:23
**art** [10] - 49:22, 51:24, 51:25, 52:19, 76:5, 103:2, 104:20, 121:9, 121:11, 121:18
**ARTHUR** [2] - 1:7, 124:10
**Arthur** [1] - 3:7
**articulate** [1] - 27:23
**articulated** [2] - 8:12, 8:20
**articulation** [1] - 34:25
**aspect** [1] - 28:21
**aspiration** [1] - 123:4
**assert** [1] - 47:23
**asserted** [6] - 46:2, 77:22, 88:24, 95:19, 118:14, 118:20
**asserting** [4] - 42:4, 48:1, 112:19, 112:20
**assertion** [1] - 24:3
**assess** [1] - 86:1
**assume** [1] - 91:3
**atmosphere** [1] - 13:13
**attempted** [1] - 44:22
**automatically** [2] - 88:25
**aware** [1] - 13:20
**awkward** [1] - 106:23

**B**

**B's** [1] - 43:6
**background** [6] - 43:21, 43:23, 49:11, 51:3, 51:21, 52:1
**barrel** [3] - 29:24, 59:4, 60:17
**base** [1] - 34:8
**based** [3] - 9:15, 81:5, 81:14
**basis** [2] - 8:17, 34:3
**battle** [2] - 39:7, 39:14
**became** [1] - 25:16
**become** [1] - 5:21
**bed** [1] - 59:8
**beforehand** [1] - 91:14
**begin** [4] - 3:15, 4:23, 6:19, 7:14
**beginning** [1] - 4:4
**behalf** [5] - 4:8, 5:1, 5:5, 45:18, 76:13
**behind** [3] - 8:19, 97:12, 104:3
**below** [3] - 12:12, 61:20, 86:18
**belt** [1] - 12:22
**benefit** [1] - 105:3
**best** [2] - 27:9, 60:1
**better** [3] - 16:22, 28:22, 55:2
**between** [5] - 9:9, 9:12, 110:2, 116:22, 122:7
**big** [1] - 12:11
**binding** [1] - 58:12
**bit** [7] - 7:16, 51:4, 52:7, 93:25, 95:17, 107:3
**black** [1] - 71:16
**blank** [5] - 75:7, 122:2, 122:3, 122:5
**blood** [5] - 73:8, 73:9, 73:10, 74:24
**bloodstream** [3] - 73:12, 74:16, 74:22
**blowing** [3] - 12:25, 13:1, 72:1
**blown** [1] - 39:21
**body** [1] - 103:12
**boiler** [11] - 11:13, 11:14, 13:2, 41:11, 41:14, 42:19, 71:14, 71:21, 111:5, 121:16
**book** [1] - 7:4
**books** [2] - 6:3, 7:8
**boom** [1] - 100:15
**bottom** [1] - 10:16

**Br** [1] - 86:12
**BR2** [1] - 86:11
**BRAD** [1] - 1:20
**Bradley** [1] - 3:23
**BRIAN** [1] - 1:24
**Brian** [1] - 4:7
**brief** [18] - 5:16, 6:13, 16:25, 17:3, 26:5, 35:23, 36:1, 46:8, 70:9, 70:11, 71:10, 74:6, 77:16, 93:18, 94:25, 104:13, 113:3, 117:4
**briefed** [4] - 5:15, 5:18, 25:15, 27:4
**briefing** [25] - 4:18, 8:21, 14:5, 25:18, 25:19, 29:16, 39:2, 46:17, 46:18, 46:20, 46:22, 55:23, 68:12, 68:15, 69:6, 76:9, 83:14, 84:23, 85:12, 85:25, 87:3, 87:7, 94:2, 96:21, 118:12
**briefings** [1] - 56:25
**briefly** [6] - 10:5, 29:15, 74:7, 92:2, 104:13, 109:12
**briefs** [6] - 20:3, 38:19, 53:5, 54:20, 59:20, 97:14
**bring** [1] - 6:4
**brings** [1] - 15:16
**broad** [1] - 14:4
**broader** [4] - 60:5, 93:11, 106:7, 108:11
**bromide** [3] - 17:9, 76:17, 110:1
**bromide-containing** [1] - 17:9
**brominated** [6] - 15:11, 36:21, 41:7, 51:13, 59:1, 67:1
**bromine** [165] - 7:25, 11:23, 12:6, 13:11, 13:25, 14:10, 14:15, 15:4, 17:11, 17:13, 17:16, 19:10, 19:13, 19:14, 19:19, 19:23, 20:9, 20:10, 20:11, 20:25, 21:12, 21:23, 22:2, 22:10, 22:11, 22:16, 22:17, 22:18, 22:20, 23:13, 23:23, 24:6, 25:2, 25:23, 26:10, 26:12, 27:17, 29:22, 29:25, 31:6, 32:12, 32:15, 33:20, 34:18, 34:20, 35:13, 35:15, 36:2, 36:5, 36:6, 36:11, 36:13, 36:15, 36:19, 36:23, 37:2, 37:8, 37:10, 37:13, 37:15, 37:19, 37:23, 38:9, 39:20, 40:7, 40:13, 40:19, 41:13, 41:19, 42:6, 42:12, 46:6, 46:8, 47:9, 47:17, 47:21, 48:9, 48:14, 48:16, 48:19, 48:20, 51:7, 51:16, 52:3, 52:8, 52:11, 52:16, 52:17, 52:20, 52:23, 53:1, 53:13, 53:15, 53:16, 53:23, 53:25, 54:4, 54:13, 55:12, 55:14, 55:19, 56:10, 56:14, 56:23, 57:6, 57:7, 57:11, 57:22, 59:5, 59:6, 59:9, 62:6, 62:7, 62:10, 63:11, 63:14, 63:18, 64:4, 64:7, 64:8, 64:9, 64:15, 65:4, 65:13, 66:3, 67:18, 67:24, 69:4, 70:12, 70:18, 70:20, 70:23, 70:24, 71:3, 73:20, 73:21, 75:4, 77:23, 78:21, 79:14, 79:17, 80:3, 80:5, 80:8, 80:10, 80:22, 88:14, 90:19, 95:14, 95:17, 98:13, 98:21, 98:23, 98:24, 99:2, 99:24, 100:16, 100:24, 101:3, 101:25, 110:1, 121:1
**bromine-coated** [1] - 57:7
**bromine-containing** [10] - 15:4, 17:16, 26:10, 48:16, 48:20, 52:11, 56:10, 56:14, 56:23, 57:22
**bromine-treated** [3] - 42:6, 67:18, 67:24
**brought** [4] - 47:16, 87:11, 98:5, 113:9
**bulk** [1] - 10:11
**Burke** [1] - 1:13
**burning** [2] - 68:16, 120:9
**buy** [1] - 119:1
**BY** [2] - 1:17, 2:6
**byproduct** [3] - 86:12, 118:18, 119:17

**C**

**Caldwell** [2] - 3:20, 3:24
**CALDWELL** [2] - 1:19, 1:20
**cancelled** [3] - 85:4, 114:3, 117:13
**cannot** [1] - 86:14
**capture** [1] - 11:25
**captured** [2] - 63:17, 84:16
**capturing** [2] - 14:11, 66:9
**carbon** [40] - 11:24, 12:9, 12:10, 13:10, 14:14, 18:19, 21:3, 29:25, 41:12, 48:11, 48:13, 51:8, 51:14, 51:15, 59:1, 59:4, 59:9, 65:7, 65:9, 65:15, 66:2, 68:17, 68:18, 88:18, 95:16, 95:17, 96:4, 96:5, 96:7, 96:9, 96:12, 110:20, 111:13, 111:15, 115:9, 115:15, 115:17, 119:4
**carried** [1] - 23:1
**carrying** [1] - 13:3
**case** [27] - 3:11, 5:11, 6:21, 8:15, 13:19, 13:20, 20:17, 24:3, 27:10, 28:7, 30:6, 33:5, 39:4, 45:19, 48:8, 52:9, 54:18, 55:5, 61:24, 77:2, 84:4, 86:6, 94:3, 94:6, 95:13, 95:19, 112:2
**Case** [2] - 1:5, 124:8
**Cassady** [1] - 3:21
**CASSADY** [1] - 1:19
**CASTLE** [2] - 124:3, 124:19
**causes** [2] - 11:2, 80:25
**caveat** [1] - 42:17
**caveats** [1] - 56:4
**cells** [1] - 73:10
**centered** [1] - 45:24
**centers** [1] - 78:11
**CERT** [4] - 2:8, 4:23, 5:1, 5:7
**certain** [1] - 90:21
**Certainly** [1] - 115:2
**certainly** [16] - 22:7, 26:24, 27:20, 32:23,

40:24, 45:3, 48:5, 51:5, 56:6, 67:4, 78:24, 84:8, 84:11, 101:20, 104:5, 118:25
**Certified** [2] - 124:4, 124:6
**certify** [2] - 124:5, 124:12
**cetera** [1] - 62:15
**CFR** [1] - 43:5
**chalk** [1] - 78:2
**challenge** [2] - 114:12, 114:15
**chamber** [92] - 11:10, 11:13, 12:8, 18:13, 18:22, 18:23, 19:1, 19:2, 19:17, 19:25, 20:12, 21:1, 21:19, 21:22, 21:24, 22:4, 22:11, 22:13, 23:2, 23:5, 23:6, 23:8, 23:12, 23:16, 24:9, 25:3, 27:18, 32:13, 32:19, 35:17, 36:9, 36:12, 37:1, 37:11, 37:14, 37:18, 38:8, 38:9, 42:7, 47:2, 53:17, 53:24, 57:7, 57:16, 57:17, 62:8, 62:9, 62:23, 63:3, 63:5, 63:7, 63:9, 63:10, 63:12, 63:13, 63:19, 64:5, 64:6, 64:9, 65:10, 65:16, 65:17, 78:18, 78:23, 79:7, 79:9, 79:19, 80:3, 80:11, 82:11, 82:21, 84:2, 84:6, 84:14, 89:12, 89:15, 89:16, 89:17, 91:3, 91:4, 91:6, 91:7, 97:2, 98:20, 98:23, 99:3, 100:13, 101:4, 102:15, 105:25
**chance** [6] - 6:12, 25:11, 28:17, 68:14, 93:18, 118:9
**change** [5] - 8:13, 8:14, 8:21, 64:16, 73:24
**changed** [1] - 10:17
**changes** [3] - 8:5, 8:7, 73:19
**changing** [1] - 8:9
**char** [84] - 77:15, 77:23, 78:8, 78:10, 78:16, 78:18, 78:19, 79:13, 79:20, 79:22, 80:4, 80:8, 80:25,

82:16, 84:13, 84:25, 86:11, 86:12, 86:17, 86:23, 88:1, 88:7, 88:12, 88:16, 88:17, 88:22, 89:11, 90:3, 90:7, 90:20, 92:6, 94:7, 94:16, 94:24, 95:21, 95:24, 96:1, 96:11, 96:15, 97:8, 97:19, 97:23, 98:9, 98:12, 98:16, 98:19, 98:25, 99:9, 99:25, 100:17, 101:1, 101:17, 102:1, 102:9, 104:6, 105:10, 105:23, 106:25, 107:1, 109:7, 109:22, 110:19, 110:22, 110:24, 111:1, 111:14, 114:4, 114:5, 115:6, 115:8, 115:16, 116:16, 117:21, 118:16, 118:17, 118:24, 119:6, 119:15, 119:16, 119:21, 120:2, 120:10
**characterization** [1] - 66:12
**charcoals** [1] - 96:8
**charge** [1] - 76:16
**chart** [1] - 114:18
**chemically** [1] - 121:1
**chemicals** [1] - 14:7
**Christopher** [1] - 1:13
**circles** [1] - 78:5
**circuit** [1] - 44:16
**circumstance** [4] - 58:13, 67:24, 79:12, 118:17
**circumstances** [1] - 47:24
**citations** [1] - 94:1
**cite** [2] - 84:24, 85:2
**cited** [9] - 44:4, 44:18, 44:21, 44:24, 58:7, 77:16, 85:13, 85:18, 114:13
**civil** [1] - 3:8
**CJB** [1] - 3:9
**Claim** [2] - 59:15, 86:9
**claim** [170] - 5:16, 6:22, 8:6, 8:8, 8:12, 8:16, 8:17, 9:2, 9:3, 9:6, 9:18, 10:1, 10:2, 13:23, 14:3, 14:22, 15:24, 16:4, 16:9, 18:3, 19:4, 19:9, 19:13, 20:21, 20:23,

21:8, 23:12, 24:14, 24:15, 24:17, 26:22, 27:3, 27:8, 28:3, 29:5, 29:6, 31:22, 33:7, 33:14, 34:5, 34:24, 34:25, 39:11, 39:22, 41:17, 42:5, 42:10, 43:9, 52:14, 54:8, 54:12, 56:22, 57:2, 57:5, 58:1, 59:15, 60:10, 60:12, 60:24, 62:20, 62:24, 63:17, 64:20, 65:11, 66:10, 66:15, 66:19, 66:20, 66:21, 67:19, 67:25, 68:3, 70:25, 76:23, 77:13, 78:25, 79:2, 81:6, 81:7, 81:16, 82:15, 84:16, 84:25, 85:3, 85:4, 85:14, 86:8, 86:10, 86:16, 87:20, 87:24, 88:2, 89:7, 89:8, 89:21, 89:24, 90:2, 90:4, 90:5, 90:12, 92:9, 92:16, 94:8, 94:9, 94:22, 95:9, 95:12, 95:18, 96:13, 97:6, 97:22, 98:19, 99:9, 100:3, 102:8, 103:14, 103:21, 104:5, 104:15, 104:18, 104:24, 105:2, 105:19, 106:18, 108:21, 108:23, 108:24, 108:25, 109:14, 109:16, 109:17, 110:6, 110:9, 110:24, 111:14, 111:21, 113:10, 113:11, 114:6, 114:9, 114:18, 115:13, 116:11, 116:12, 117:1, 117:2, 117:10, 117:11, 117:12, 117:13, 119:9, 119:11, 119:13, 119:20, 120:16, 122:17, 122:25
**claimed** [5] - 58:5, 66:10, 92:4, 110:3, 112:7
**claiming** [4] - 51:5, 51:6, 55:7, 86:20
**claims** [56] - 13:23, 14:4, 15:23, 17:8, 23:18, 27:25, 32:3, 38:2, 40:17, 42:20, 48:8, 48:12, 58:22,

64:3, 64:25, 65:3, 71:8, 77:22, 79:3, 83:4, 85:7, 85:15, 86:10, 87:12, 88:24, 89:4, 90:5, 90:8, 90:11, 92:3, 92:8, 92:12, 92:15, 92:25, 93:4, 93:5, 95:2, 95:4, 99:23, 103:9, 103:10, 106:17, 109:24, 114:3, 114:25, 116:1, 116:2, 116:3, 116:6, 116:19, 116:22, 118:8, 120:8, 121:14
**clarification** [3] - 47:16, 55:21, 55:22
**clarify** [5] - 31:15, 50:20, 62:16, 68:25, 74:8
**clarifying** [2] - 66:14, 114:16
**clear** [29] - 9:24, 10:5, 14:19, 16:6, 16:18, 18:7, 25:16, 26:6, 26:22, 28:3, 30:24, 31:14, 42:3, 42:22, 52:17, 52:18, 55:1, 55:8, 59:24, 60:2, 61:20, 63:24, 64:18, 71:12, 77:5, 77:8, 97:14, 110:5
**clearly** [1] - 87:9
**clerk** [1] - 6:5
**Clerk** [1] - 124:18
**close** [4] - 9:11, 9:12, 10:14, 83:16
**close-up** [1] - 10:14
**closely** [1] - 104:23
**closeness** [1] - 100:6
**closer** [1] - 99:17
**Co** [1] - 3:8
**CO** [2] - 1:7, 124:10
**coal** [150] - 4:3, 10:9, 10:10, 10:12, 10:13, 10:14, 10:16, 10:17, 10:18, 10:20, 11:1, 12:7, 12:21, 12:23, 13:4, 17:10, 17:11, 17:14, 19:15, 19:16, 20:11, 20:25, 22:8, 23:3, 23:7, 23:8, 24:7, 25:2, 25:23, 26:12, 27:16, 32:12, 33:25, 34:13, 34:20, 35:6, 35:10, 35:19, 36:2, 36:3, 36:5, 36:11, 36:15, 36:19, 36:21, 36:24, 37:8, 37:9, 37:15, 38:10,

39:21, 42:6, 42:13, 42:19, 49:2, 49:9, 49:10, 49:19, 49:20, 52:8, 52:15, 52:17, 52:20, 53:1, 53:13, 53:15, 53:16, 53:23, 54:16, 55:12, 55:14, 55:15, 57:6, 57:7, 63:14, 64:11, 64:12, 67:18, 67:25, 68:8, 68:16, 68:19, 69:3, 69:9, 71:14, 71:19, 72:1, 72:2, 76:16, 77:16, 77:23, 77:25, 78:7, 78:8, 78:9, 78:21, 79:13, 79:17, 79:18, 80:2, 80:5, 80:8, 80:10, 80:22, 80:25, 82:16, 82:21, 86:13, 86:16, 86:22, 87:25, 88:6, 88:13, 89:2, 89:11, 90:5, 90:19, 97:8, 97:19, 97:20, 98:1, 98:8, 98:21, 98:22, 98:24, 99:2, 99:25, 100:16, 100:24, 101:2, 101:25, 106:25, 109:21, 115:18, 118:16, 118:18, 119:5, 119:7, 119:14, 119:17, 119:20, 120:4, 120:11
**Coal** [2] - 2:4, 4:8
**coal-fired** [1] - 10:9
**coal-like** [1] - 24:7
**coated** [1] - 57:7
**cold** [1] - 53:1
**colleague** [2] - 45:13, 70:3
**colleagues** [1] - 5:3
**collected** [1] - 13:12
**colors** [1] - 95:10
**combination** [3] - 76:17, 86:13, 91:19
**combine** [4] - 11:25, 12:14, 15:14, 73:6
**combined** [3] - 24:7, 99:20, 121:7
**combining** [1] - 14:10
**combust** [5] - 54:17, 65:9, 65:10, 98:8, 102:13
**combusted** [66] - 19:17, 20:12, 25:3, 32:14, 34:14, 34:20, 35:6, 36:16, 37:11, 38:5, 42:7, 49:4, 53:18, 53:24, 63:14,

65:17, 67:25, 68:8,
78:2, 78:9, 78:12,
79:19, 79:22, 80:4,
80:7, 80:9, 80:25,
81:1, 81:22, 81:24,
82:19, 82:23, 82:25,
86:14, 86:23, 87:22,
87:23, 88:18, 89:1,
89:11, 89:17, 93:14,
95:23, 98:15, 98:22,
98:24, 99:1, 99:4,
99:21, 100:10,
100:12, 100:19,
100:21, 101:1,
101:5, 102:3,
102:10, 102:18,
102:19, 102:21,
105:14, 118:19,
120:6, 120:11,
121:6, 122:2
**combustible** [1] - 65:8
**combusting** [36] -
24:9, 36:12, 52:16,
57:8, 67:17, 76:10,
76:15, 77:22, 77:25,
79:13, 79:24, 81:25,
82:15, 86:10, 86:16,
86:22, 87:25, 88:6,
90:5, 97:18, 97:20,
99:5, 101:7, 101:10,
101:25, 106:25,
109:21, 116:13,
116:14, 118:16,
119:14, 119:20,
120:9, 121:4,
121:21, 121:24
**combustion** [112] -
10:24, 11:9, 11:12,
12:8, 17:15, 18:13,
18:22, 18:23, 19:1,
19:2, 19:17, 19:25,
21:1, 21:19, 21:22,
21:24, 22:4, 22:13,
23:2, 23:5, 23:8,
23:11, 23:15, 23:16,
24:9, 25:3, 27:17,
32:13, 32:19, 35:16,
35:17, 36:9, 37:1,
37:11, 37:13, 37:17,
38:8, 42:7, 42:8,
47:2, 49:8, 49:18,
53:17, 53:18, 53:24,
55:17, 55:18, 57:7,
57:15, 57:17, 62:8,
62:9, 62:23, 63:6,
63:9, 63:12, 63:13,
63:19, 64:5, 64:6,
64:9, 65:10, 65:13,
65:16, 66:2, 68:7,
68:19, 69:3, 77:15,
78:1, 78:7, 78:8,

78:18, 78:20, 79:8,
80:9, 81:17, 81:18,
82:6, 82:21, 84:2,
84:3, 84:6, 84:14,
86:13, 88:7, 88:13,
88:23, 91:4, 91:6,
91:7, 94:10, 95:25,
97:2, 98:1, 98:20,
99:8, 99:11, 100:13,
102:15, 105:23,
105:24, 105:25,
115:18, 119:9,
119:10, 119:17,
120:25, 121:3, 121:6
**combustor** [45] -
11:10, 77:12, 78:6,
83:19, 90:3, 90:6,
90:12, 90:13, 90:17,
90:18, 90:21, 90:22,
90:23, 90:24, 91:1,
91:3, 91:8, 91:9,
91:13, 91:16, 91:17,
91:18, 91:20, 92:7,
92:20, 92:23, 92:25,
93:8, 93:9, 93:13,
106:8, 106:22,
106:23, 107:2,
107:9, 107:11,
107:18, 107:20,
107:23, 108:9,
120:21, 120:24,
121:6
**combusts** [7] - 10:10,
11:2, 22:13, 35:19,
72:3, 107:23, 120:12
**coming** [6] - 10:15,
10:16, 19:23, 30:15,
31:18, 104:3
**comment** [1] - 87:16
**commenting** [1] -
33:17
**comments** [2] - 6:21,
81:15
**compared** [1] - 14:4
**competing** [1] - 39:15
**completely** [2] - 30:2,
101:12
**component** [1] - 87:22
**components** [3] -
12:15, 99:11, 100:7
**composed** [1] - 39:15
**composition** [1] -
99:17
**compound** [13] - 48:9,
48:14, 48:20, 55:12,
55:19, 76:17, 77:24,
78:1, 98:21, 98:23,
98:24, 100:16, 110:1
**compounds** [2] -
52:16, 52:17

**comprise** [1] - 48:12
**comprises** [2] - 52:15,
83:15
**comprising** [14] -
52:17, 76:15, 76:16,
82:16, 82:17, 82:18,
86:11, 95:15, 97:8,
97:18, 101:24,
109:21, 114:5,
116:13
**concept** [1] - 40:12
**concerns** [2] - 56:8
**confer** [2] - 5:18,
122:16
**conflated** [1] - 103:13
**confused** [2] - 39:1,
55:20
**confusing** [1] - 41:22
**confusion** [5] - 39:17,
39:19, 46:13, 50:12,
111:23
**connected** [2] - 15:24,
42:13
**consider** [5] - 45:5,
47:14, 51:20, 53:22,
114:22
**considered** [3] -
69:16, 85:14, 96:9
**consisting** [1] -
124:14
**constant** [1] - 71:17
**constitutes** [1] - 83:13
**construction** [56] -
5:16, 6:22, 8:2, 9:3,
9:16, 16:2, 18:3,
20:21, 20:23, 24:18,
26:8, 26:22, 26:24,
27:3, 27:8, 27:24,
28:3, 28:6, 28:7,
28:24, 31:22, 33:7,
33:14, 34:6, 34:25,
39:7, 39:12, 50:16,
50:17, 55:1, 55:2,
55:3, 56:22, 66:13,
67:14, 68:3, 76:20,
85:10, 85:19, 90:1,
92:13, 94:22,
104:14, 104:19,
104:23, 105:3,
108:13, 108:14,
108:17, 111:7,
115:22, 115:25,
117:1, 117:2,
122:17, 122:25
**constructions** [4] -
25:12, 27:10, 39:15,
77:9
**construe** [8] - 24:14,
24:15, 24:23, 28:13,
53:9, 97:7

**construed** [1] - 27:25
**contact** [5] - 73:2,
73:3, 75:14, 83:8,
83:11
**containing** [15] - 7:25,
15:4, 17:9, 17:16,
26:10, 30:23, 48:16,
48:20, 52:11, 56:10,
56:14, 56:23, 57:22,
62:1, 109:23
**contemplated** [1] -
87:9
**contentions** [5] -
26:10, 55:6, 67:5,
96:22, 97:13
**context** [17] - 49:15,
49:16, 50:22, 51:18,
56:6, 58:1, 58:2,
61:8, 74:18, 75:1,
75:2, 94:22, 95:8,
96:3, 101:17, 102:6
**continue** [9] - 13:7,
23:8, 51:1, 73:16,
84:19, 85:22, 86:2,
89:22, 115:19
**continues** [1] - 13:8
**continuing** [1] - 92:3
**continuously** [1] -
29:23
**contrasting** [1] -
120:7
**control** [1] - 11:5
**conveyor** [1] - 12:22
**copies** [2] - 6:4, 6:25
**copy** [1] - 124:15
**corner** [1] - 61:21
**CORP** [2] - 1:3, 124:10
**Corp** [1] - 2:13
**correct** [9] - 40:15,
40:16, 44:21, 48:4,
65:19, 71:5, 101:18,
104:2, 105:8
**correlates** [1] - 86:9
**counsel** [25] - 1:22,
3:12, 3:14, 3:16, 4:3,
4:5, 4:9, 4:22, 4:24,
5:9, 6:18, 7:2, 50:18,
52:7, 54:9, 58:20,
65:24, 75:24, 76:11,
93:22, 94:17, 95:22,
109:13, 113:10,
122:14
**Counsel** [2] - 2:4, 2:8
**counsel's** [1] - 74:15
**counsels** [1] - 50:14
**count** [10] - 25:3,
27:18, 32:14, 54:12,
54:16, 80:1, 80:2,
80:13, 100:22,
118:15

**counts** [9] - 17:15,
33:6, 33:23, 79:24,
80:12, 84:4, 101:6,
118:19
**COUNTY** [1] - 124:3
**County** [1] - 124:19
**couple** [3] - 40:1,
42:2, 42:25
**Court** [11] - 4:14, 5:6,
18:3, 18:5, 27:5,
39:13, 45:17, 51:20,
105:15, 114:22,
124:18
**court** [2] - 3:2, 3:10
**COURT** [146] - 1:1,
3:1, 3:25, 4:15, 4:20,
5:9, 7:1, 7:10, 11:7,
11:14, 11:18, 14:12,
15:20, 16:22, 18:9,
18:12, 19:10, 20:2,
21:5, 22:2, 22:12,
22:17, 23:9, 23:20,
25:8, 26:4, 27:6,
28:5, 29:7, 30:12,
31:18, 33:3, 34:4,
35:21, 37:5, 38:4,
38:14, 39:3, 40:1,
41:15, 42:2, 42:25,
44:9, 44:20, 45:8,
45:12, 45:15, 45:25,
47:19, 48:5, 49:25,
51:1, 53:4, 56:20,
58:7, 59:18, 60:1,
61:13, 62:2, 62:21,
63:8, 64:10, 64:21,
65:14, 65:20, 66:16,
67:15, 69:5, 69:13,
69:23, 70:2, 71:2,
71:9, 72:8, 73:1,
73:6, 73:16, 74:4,
75:3, 75:13, 75:18,
75:22, 76:7, 77:18,
78:14, 79:5, 79:11,
81:10, 82:24, 83:5,
83:21, 84:10, 84:12,
84:19, 85:11, 85:22,
87:1, 87:10, 88:3,
88:9, 88:12, 88:21,
89:14, 89:22, 90:9,
91:5, 91:15, 91:25,
92:14, 93:17, 93:21,
95:1, 96:14, 98:18,
99:12, 100:11,
101:15, 102:11,
103:7, 103:25,
104:12, 105:5,
105:18, 106:15,
107:6, 108:5,
108:18, 109:1,
111:12, 112:9,

113:2, 113:15,
114:17, 115:3,
115:19, 117:3,
118:11, 119:12,
119:25, 120:13,
121:5, 121:22,
122:10, 122:13,
123:11, 123:13
**Courtroom** [1] - 1:13
**cover** [2] - 18:21
**covered** [5] - 17:8,
17:13, 21:7, 108:11,
108:17
**covers** [4] - 14:22,
52:19, 108:14,
108:19
**COVID-19** [1] - 5:11
**coy** [1] - 16:25
**create** [11] - 15:15,
36:13, 59:6, 59:7,
67:18, 68:16, 72:5,
81:23, 98:25, 100:9,
101:1
**created** [33] - 49:18,
51:13, 77:15, 78:9,
78:10, 78:22, 79:8,
80:4, 80:8, 81:1,
82:20, 82:22, 84:15,
86:23, 88:19, 88:23,
89:12, 92:23, 93:13,
97:25, 102:1,
102:10, 102:20,
105:24, 108:9,
115:17, 116:4,
119:3, 119:4, 119:7,
119:16, 120:5
**creates** [6] - 22:14,
37:12, 38:5, 42:8,
42:9, 79:20
**creating** [5] - 53:24,
68:18, 69:19,
121:10, 121:19
**creation** [2] - 58:25,
69:20
**criticism** [1] - 103:20
**CRUTCHER** [1] - 2:1
**CSR** [1] - 124:22
**Curry** [1] - 3:21
**CURRY** [1] - 1:19

---

**D**

**David** [2] - 4:9, 45:18
**DAVID** [1] - 2:1
**days** [1] - 123:2
**deal** [2] - 17:25, 82:4
**dealing** [1] - 115:11
**Deanna** [2] - 124:4,
124:22

**debate** [1] - 55:3
**decision** [2] - 25:6,
123:1
**decks** [1] - 6:5
**default** [1] - 123:2
**defeat** [1] - 34:1
**Defendants** [2] - 1:8,
2:4
**defendants** [43] - 4:2,
4:4, 4:8, 4:23, 5:2,
5:5, 5:7, 8:3, 8:5,
8:9, 8:11, 8:18, 8:23,
9:1, 9:19, 15:22,
15:25, 17:2, 21:15,
27:21, 32:9, 32:16,
33:13, 35:23, 39:19,
45:19, 50:15, 54:1,
66:18, 70:13, 74:6,
76:24, 77:4, 77:7,
77:9, 80:13, 81:3,
84:24, 86:21, 93:5,
106:1, 113:9, 116:5
**Defendants'** [1] -
28:23
**defendants'** [12] - 4:2,
14:24, 25:13, 37:7,
53:7, 76:19, 90:1,
90:10, 93:22,
115:21, 115:25,
123:11
**defense** [1] - 16:5
**define** [2] - 68:9,
120:15
**defined** [1] - 110:1
**defining** [1] - 67:22
**definite** [1] - 83:17
**definitely** [1] - 83:18
**definiteness** [2] -
104:18, 104:21
**definition** [10] - 9:7,
9:10, 9:17, 43:13,
83:13, 99:15, 99:23,
120:16, 120:19,
120:21
**definitions** [1] - 9:14
**Delaware** [4] - 3:16,
4:4, 4:24, 124:19
**DELAWARE** [2] - 1:2,
124:2
**Dellinger** [6] - 3:23,
76:13, 92:1, 92:14,
93:17, 113:3
**DELLINGER** [34] -
1:21, 76:12, 78:4,
78:24, 79:10, 80:17,
82:14, 83:2, 83:10,
84:8, 84:11, 84:18,
84:20, 85:17, 86:3,
87:6, 87:18, 88:8,
88:11, 88:15, 89:7,

89:19, 89:23, 90:25,
91:11, 91:23, 92:2,
93:16, 93:20, 113:4,
113:22, 114:24,
115:14, 115:20
**DEMERS** [1] - 2:6
**Demers** [1] - 5:3
**demonstrates** [1] -
40:11
**deny** [1] - 65:8
**dependent** [4] - 79:2,
92:8, 116:6, 121:14
**described** [1] - 101:20
**describing** [2] - 31:1,
104:4
**description** [19] -
50:7, 89:9, 94:19,
103:17, 109:9,
109:10, 111:21,
111:25, 112:10,
112:18, 112:20,
112:24, 113:8,
114:12, 114:15,
117:6, 117:25,
118:4, 118:6
**descriptions** [1] -
91:24
**deserve** [1] - 56:18
**desired** [2] - 41:11,
62:11
**determination** [3] -
104:18, 104:22,
112:1
**determine** [6] - 52:2,
81:4, 81:9, 104:8,
104:22, 105:15
**determined** [1] - 5:19
**device** [1] - 33:21
**DEVLIN** [1] - 1:17
**Devlin** [1] - 3:20
**diagram** [2] - 12:15,
80:20
**dictionary** [1] - 9:6
**difference** [7] - 8:12,
8:15, 18:4, 98:2,
107:7, 110:2, 122:7
**differences** [1] -
116:22
**different** [31] - 8:7,
17:5, 18:2, 26:20,
29:19, 30:2, 38:3,
39:4, 39:15, 42:20,
46:15, 52:13, 59:2,
59:10, 61:23, 63:22,
66:7, 66:8, 90:15,
91:10, 91:12, 96:8,
103:9, 103:11,
103:14, 110:17,
111:2, 119:2, 121:2,
121:14

**differentiation** [5] -
76:23, 89:25, 92:17,
105:20, 108:25
**differs** [1] - 94:5
**difficult** [4] - 26:18,
44:14, 81:4, 94:24
**difficulty** [5] - 27:24,
33:12, 33:17, 50:12,
104:4
**dig** [2] - 68:14, 97:12
**directed** [2] - 26:21,
67:2
**direction** [3] - 52:18,
105:11, 121:9
**directly** [8] - 7:5,
60:21, 64:14, 91:13,
91:16, 91:21, 93:2,
107:9
**disagree** [3] - 50:3,
50:17, 66:19
**disappears** [1] - 102:5
**disavowal** [4] - 9:20,
15:19, 15:20, 77:6
**disc** [1] - 30:21
**discern** [1] - 33:8
**disclaimer** [4] - 9:20,
15:19, 15:21, 77:6
**disclose** [1] - 121:15
**disclosed** [2] - 20:21,
29:20
**disclosure** [1] - 20:18
**disconnected** [1] -
16:9
**discovery** [1] - 39:9
**discussed** [9] - 4:17,
25:21, 51:9, 58:3,
58:23, 64:2, 74:20,
85:16, 109:19
**discusses** [1] - 70:23
**discussing** [6] -
95:21, 109:20,
109:25, 110:10,
111:22, 117:19
**discussion** [21] - 49:5,
49:6, 49:11, 49:19,
49:23, 51:12, 52:22,
95:25, 96:21, 96:23,
96:25, 101:16,
109:4, 113:7,
117:17, 117:18,
117:20, 117:23,
118:1, 118:3, 118:5
**dish** [1] - 30:8
**dispute** [78] - 5:19,
5:22, 7:13, 7:15,
7:21, 8:22, 9:3,
11:17, 13:18, 16:23,
17:1, 17:21, 20:7,
20:14, 20:17, 20:23,
24:2, 25:1, 26:7,

26:13, 26:14, 26:22,
27:8, 28:1, 28:9,
28:12, 28:14, 29:3,
32:11, 32:22, 32:24,
33:2, 33:5, 33:6,
33:7, 34:6, 35:25,
38:23, 38:25, 39:13,
39:22, 39:23, 46:9,
47:20, 53:12, 53:19,
54:5, 54:11, 54:19,
54:25, 56:22, 57:2,
57:4, 58:10, 65:21,
66:12, 67:21, 68:1,
70:13, 70:14, 73:22,
73:23, 76:9, 77:19,
77:21, 78:3, 78:5,
78:11, 78:15, 81:12,
82:5, 83:22, 92:21,
98:9, 98:10, 100:2,
113:18, 115:23
**disputed** [6] - 13:15,
20:5, 45:20, 83:14,
117:11, 122:22
**disputes** [4] - 9:3,
45:23, 46:3, 122:18
**disregard** [1] - 44:6
**distinguished** [1] -
90:23
**distinguishing** [3] -
51:23, 107:14,
107:16
**District** [1] - 124:18
**DISTRICT** [2] - 1:1, 1:2
**divorced** [1] - 101:13
**doctrine** [2] - 76:23,
89:24
**done** [6] - 27:23, 49:9,
75:17, 98:16,
106:19, 106:20
**Douglas** [1] - 5:3
**DOUGLAS** [1] - 2:7
**down** [10] - 6:8, 12:24,
22:25, 53:21, 61:21,
71:18, 74:11, 74:12,
94:20, 105:6
**downstream** [20] -
16:16, 29:2, 30:10,
31:6, 31:12, 31:17,
41:8, 47:22, 47:25,
50:24, 58:9, 59:22,
59:25, 60:4, 61:11,
61:17, 64:8, 64:17,
70:17, 74:21
**drawing** [1] - 74:9
**drip** [1] - 52:25
**dripped** [1] - 53:15
**dripping** [5] - 52:25,
54:16, 55:12, 57:6,
64:11
**drips** [1] - 53:15

**driven** [1] - 26:2
**dropping** [1] - 12:6
**drops** [1] - 12:24
**drum** [1] - 12:11
**duct** [1] - 72:22
**DUNN** [1] - 2:1
**Dunn** [2] - 4:10, 4:12
**during** [6] - 49:18, 76:22, 78:1, 89:10, 102:2, 113:25
**dust** [5] - 10:18, 10:25, 33:25, 72:1, 72:2

### E

**early** [1] - 12:5
**easily** [1] - 19:24
**effect** [1] - 62:11
**effectiveness** [1] - 30:19
**efficiency** [1] - 64:15
**efficient** [1] - 33:2
**efforts** [2] - 122:15, 122:23
**EGAN** [3] - 1:24, 4:6, 4:16
**Egan** [1] - 4:7
**either** [8] - 29:2, 62:8, 63:18, 92:6, 93:7, 94:2, 107:12, 107:16
**element** [1] - 91:19
**elemental** [1] - 14:1
**elements** [7] - 95:18, 120:18, 120:20, 120:24, 121:23, 122:1, 122:2
**ELMO** [2] - 7:9, 106:16
**embodiment** [3] - 85:9, 86:21, 114:8
**embodiments** [4] - 9:23, 58:18, 58:23, 108:15
**eminent** [1] - 102:23
**emission** [1] - 62:13
**emissions** [1] - 102:24
**EMISSIONS** [2] - 1:3, 124:9
**emitted** [2] - 21:23, 101:5
**enablement** [1] - 50:8
**enclosed** [2] - 121:24, 122:1
**encompassed** [1] - 87:20
**end** [6] - 18:4, 25:20, 49:16, 68:11, 85:8, 99:3

**ended** [2] - 58:22, 113:7
**ends** [3] - 34:12, 62:11, 67:10
**ENERGY** [2] - 1:3, 124:9
**engineering** [1] - 71:24
**English** [6] - 16:14, 16:17, 16:19, 29:21, 30:4, 31:15
**enhance** [1] - 51:8
**enter** [1] - 75:16
**entered** [2] - 5:21, 107:10
**entering** [2] - 10:22, 38:7
**Enterprises** [1] - 124:23
**enters** [6] - 11:1, 35:16, 49:10, 71:19, 71:21, 72:2
**entire** [4] - 12:18, 13:8, 61:9, 83:21
**entirely** [1] - 112:6
**entirety** [1] - 110:10
**entrance** [2] - 62:9, 100:14
**entrances** [1] - 80:20
**entry** [1] - 63:20
**envisioning** [1] - 42:19
**equipment** [3] - 10:11, 11:6, 11:21
**ergo** [1] - 50:6
**ESQ** [12] - 1:17, 1:20, 1:20, 1:21, 1:24, 2:1, 2:2, 2:2, 2:3, 2:6, 2:6, 2:7
**essence** [2] - 113:16, 118:15
**essential** [2] - 43:6, 43:13
**essentially** [4] - 8:3, 10:8, 16:12, 21:1
**et** [7] - 1:4, 1:7, 3:7, 3:8, 62:15, 124:10
**EVALL** [1] - 2:2
**Evall** [1] - 4:10
**eventually** [2] - 85:7, 117:13
**evidence** [20] - 10:4, 13:22, 18:8, 26:3, 33:1, 33:18, 40:11, 43:12, 43:25, 45:3, 84:22, 85:13, 85:19, 87:8, 87:10, 87:12, 109:3, 115:2, 116:21
**exact** [3] - 48:20, 86:21, 117:10

**exacting** [1] - 9:20
**exactly** [3] - 16:25, 91:1, 95:6
**examiner** [14] - 85:8, 86:7, 86:19, 87:15, 109:8, 112:10, 113:25, 114:7, 118:2, 118:5, 119:24, 119:25, 120:1
**examiners** [1] - 44:4
**example** [28] - 19:18, 23:13, 23:23, 29:22, 29:24, 30:5, 30:8, 30:13, 30:17, 31:3, 31:4, 33:19, 40:13, 41:6, 41:7, 44:4, 51:11, 53:25, 54:14, 58:8, 74:15, 78:20, 90:12, 90:19, 96:4, 96:12, 110:13
**examples** [7] - 29:18, 40:14, 40:23, 40:25, 58:20, 59:3, 110:22
**except** [2] - 35:12, 73:13
**exchange** [1] - 114:7
**exclude** [5] - 39:20, 73:19, 85:10, 86:22, 88:10
**exhaust** [2] - 10:19, 61:22
**exist** [1] - 101:3
**existing** [1] - 71:20
**exists** [1] - 105:16
**exit** [36] - 8:25, 13:17, 17:22, 18:10, 18:14, 23:25, 27:13, 29:1, 29:3, 31:7, 31:24, 32:18, 35:20, 37:20, 40:8, 40:15, 40:20, 46:5, 46:7, 47:22, 48:1, 48:3, 50:5, 54:15, 57:13, 57:24, 58:6, 58:15, 59:22, 60:5, 61:12, 61:17, 70:18, 70:21, 71:4, 74:1
**exotic** [1] - 97:16
**expect** [2] - 122:25, 123:3
**experimental** [3] - 30:7, 30:25, 41:1
**expert** [4] - 32:25, 65:1, 105:4, 105:17
**experts** [1] - 104:20
**explain** [2] - 34:5, 44:5
**explaining** [1] - 7:14
**explains** [1] - 43:23
**explicitly** [1] - 76:21

**extent** [9] - 6:1, 25:15, 26:21, 27:21, 43:23, 66:16, 105:12, 112:3, 112:4
**exterior** [1] - 75:10
**extrinsic** [1] - 45:3

### F

**F4G** [1] - 13:9
**face** [1] - 44:18
**fact** [9] - 20:20, 37:9, 37:10, 37:14, 41:21, 58:14, 66:23, 102:1, 116:22
**factual** [5] - 19:5, 20:24, 21:4, 26:2, 81:2
**factually** [4] - 80:19, 81:4, 81:9, 114:2
**fair** [4] - 20:15, 103:19, 113:21, 113:22
**fairest** [1] - 41:2
**fairly** [5] - 6:11, 14:4, 30:17, 56:24, 85:24
**faith** [1] - 122:15
**fall** [1] - 73:21
**falls** [1] - 88:2
**familiar** [2] - 46:16, 94:3
**fan** [2] - 12:25, 13:6
**far** [3] - 83:15, 111:3, 117:16
**fast** [1] - 82:3
**favor** [1] - 32:2
**feature** [3] - 109:19, 109:20, 110:3
**fed** [1] - 53:1
**Federal** [1] - 44:16
**feeder** [1] - 12:3
**feet** [1] - 74:13
**fellow** [1] - 74:11
**few** [7] - 3:4, 29:11, 40:23, 60:8, 74:8, 113:5, 114:16
**fight** [6] - 9:13, 17:6, 18:8, 79:6, 103:8, 105:21
**fighting** [2] - 17:25, 18:2
**figure** [12] - 10:7, 12:3, 43:1, 43:3, 44:3, 44:6, 58:8, 61:2, 61:4, 61:9, 61:20, 82:4
**figures** [1] - 12:1
**figuring** [1] - 62:22
**file** [2] - 51:10

**FILED** [1] - 124:17
**filter** [1] - 30:21
**final** [3] - 5:20, 40:1, 73:17
**finally** [4] - 12:14, 30:11, 31:3, 56:1
**fine** [3] - 24:1, 33:8, 72:1
**fire** [3] - 72:5, 72:6, 80:22
**fired** [1] - 10:9
**firm** [1] - 81:5
**FIRM** [1] - 1:17
**Firm** [1] - 3:20
**first** [21] - 3:5, 3:14, 3:22, 4:2, 5:17, 5:25, 6:4, 6:19, 7:12, 8:7, 10:12, 12:4, 46:1, 51:6, 77:14, 87:4, 88:23, 102:23, 108:13, 111:1, 113:6
**fist** [1] - 36:20
**fist-sized** [1] - 36:20
**fit** [1] - 91:24
**fitted** [1] - 30:20
**five** [1] - 110:14
**flight** [11] - 15:10, 15:15, 59:14, 59:17, 59:21, 59:25, 60:3, 60:16, 61:3, 61:10, 66:25
**FLOM** [1] - 2:5
**flow** [6] - 11:3, 22:23, 22:24, 23:4, 66:3, 71:17
**flowing** [6] - 63:10, 71:15, 72:4, 72:6, 72:7
**flows** [4] - 61:21, 63:12, 63:13, 75:18
**flue** [11] - 11:4, 14:8, 15:13, 18:7, 18:9, 31:9, 31:12, 31:17, 49:17, 61:22, 74:12
**fluidized** [1] - 59:8
**focus** [5] - 8:4, 37:25, 46:18, 49:8
**focused** [4] - 39:14, 46:8, 70:11, 103:21
**focuses** [1] - 115:23
**focusing** [2] - 24:15, 62:6
**follow** [2] - 7:6, 7:10
**FOR** [1] - 1:2
**force** [1] - 75:11
**foregoing** [2] - 124:8, 124:14
**form** [12] - 22:16, 22:19, 33:20, 35:11, 64:7, 64:16, 83:11,

88:17, 109:15, 109:22, 115:16, 117:12

**forth** [4] - 46:15, 53:4, 55:24, 67:3

**four** [6] - 5:15, 50:23, 52:9, 52:13, 52:14, 110:14

**frame** [1] - 17:2

**Frankenstein** [2] - 110:16, 111:6

**frankly** [4] - 52:25, 56:17, 101:16, 106:24

**free** [3] - 6:4, 6:20, 6:22

**frit** [1] - 30:21

**frustrated** [1] - 55:5

**full** [1] - 59:4

**fully** [1] - 38:23

**funneling** [1] - 35:18

**furnace** [63] - 8:25, 10:22, 10:23, 11:2, 11:3, 11:8, 11:9, 11:12, 13:17, 14:9, 16:16, 17:10, 17:14, 17:22, 18:10, 19:8, 23:25, 25:14, 27:13, 28:25, 29:2, 31:7, 31:24, 32:6, 32:18, 35:20, 37:20, 37:25, 38:1, 40:8, 40:15, 40:20, 41:2, 41:8, 46:5, 46:7, 47:22, 47:25, 48:3, 50:5, 50:24, 53:21, 54:15, 55:16, 57:13, 57:24, 58:6, 58:15, 59:22, 60:5, 61:11, 61:17, 61:20, 70:18, 70:21, 70:24, 71:4, 72:2, 72:3, 74:1, 74:21, 80:21

**G**

**GALLAGHER** [2] - 1:7, 124:10

**Gallagher** [1] - 3:8

**gas** [188] - 8:1, 8:8, 8:10, 10:15, 12:12, 12:20, 13:7, 14:1, 15:5, 15:6, 16:3, 16:4, 16:14, 16:15, 17:17, 17:20, 17:21, 18:14, 18:17, 18:20, 19:7, 19:14, 19:18, 19:20, 19:23, 19:24, 20:7, 20:9, 21:13, 21:22, 21:24, 22:3,

22:10, 22:11, 22:12, 22:18, 22:20, 22:24, 22:25, 23:1, 23:4, 23:6, 23:24, 24:6, 26:1, 26:11, 29:17, 29:20, 29:22, 30:3, 30:6, 30:9, 30:14, 30:22, 30:23, 31:6, 31:8, 31:9, 31:11, 31:12, 31:14, 31:16, 32:6, 32:15, 32:17, 33:22, 33:24, 34:8, 34:11, 34:12, 34:15, 34:17, 34:21, 35:4, 35:6, 35:12, 35:14, 35:15, 35:18, 36:8, 36:13, 36:14, 36:23, 36:24, 36:25, 37:2, 37:12, 37:16, 37:19, 37:24, 38:1, 38:5, 38:6, 38:7, 40:7, 40:20, 41:16, 41:19, 41:24, 42:1, 42:8, 42:9, 42:15, 42:24, 46:4, 47:21, 47:25, 48:3, 52:12, 53:19, 53:20, 53:24, 54:1, 54:4, 55:10, 55:19, 56:13, 56:16, 57:8, 57:23, 58:5, 59:5, 60:11, 60:13, 60:15, 60:18, 60:19, 60:21, 60:24, 61:18, 61:21, 62:1, 62:7, 62:25, 63:5, 63:10, 63:11, 63:19, 65:5, 66:6, 66:7, 66:23, 66:24, 67:2, 67:6, 67:11, 68:10, 69:7, 69:13, 69:16, 69:18, 69:19, 69:20, 70:10, 71:13, 71:15, 71:17, 71:20, 72:7, 72:11, 72:14, 72:18, 72:21, 72:23, 73:2, 73:13, 73:19, 74:19, 74:21, 75:5, 75:8, 75:10, 75:12, 75:14, 75:16, 76:1, 76:3, 80:21, 101:5, 102:7, 109:23

**gaseous** [12] - 21:16, 22:16, 22:19, 23:10, 23:14, 33:20, 34:18, 54:15, 57:12, 67:18, 72:15, 83:11

**gases** [4] - 49:17, 50:25, 51:17

**general** [2] - 13:20, 41:9

**generalize** [1] - 53:11

**generally** [1] - 33:23

**generated** [2] - 78:19

**get-go** [1] - 26:17

**GIBSON** [1] - 2:1

**Gibson** [2] - 4:10, 4:11

**given** [4] - 10:1, 29:5, 29:13, 51:20

**Glandole** [8] - 4:9, 4:13, 5:4, 45:18, 45:25, 69:23, 93:23, 122:11

**GLANDOLE** [60] - 2:1, 45:14, 45:16, 46:11, 48:4, 48:7, 50:11, 51:2, 54:23, 57:25, 58:17, 59:23, 60:7, 61:18, 62:16, 63:6, 63:21, 64:13, 64:23, 65:18, 65:25, 66:22, 68:2, 69:12, 69:18, 69:25, 74:7, 75:9, 75:15, 75:20, 75:23, 93:24, 95:6, 96:18, 99:6, 100:4, 101:11, 101:18, 103:4, 103:23, 104:2, 104:25, 105:8, 106:12, 106:17, 107:12, 108:12, 108:20, 109:2, 111:18, 112:14, 117:5, 118:22, 119:23, 120:1, 120:23, 121:8, 122:4, 122:12, 123:12

**Glandole's** [1] - 70:7

**glass** [3] - 30:8, 30:20, 30:21

**gloss** [1] - 16:2

**goal** [3] - 33:13, 33:19, 39:10

**grant** [2] - 4:15, 33:15

**great** [1] - 87:16

**green** [2] - 71:16, 95:14

**grouped** [1] - 8:6

**guess** [10] - 24:11, 24:21, 29:15, 57:18, 58:18, 62:2, 64:2, 73:17, 102:25, 104:15

**guidance** [4] - 24:18, 32:8, 49:21, 108:3

**H**

**hac** [1] - 4:12

**halide** [2] - 86:14,

120:8

**hand** [1] - 24:16

**handed** [1] - 7:22

**handful** [1] - 96:2

**handle** [2] - 54:24, 58:13

**handling** [1] - 5:4, 5:8

**hanging** [1] - 80:5

**happy** [1] - 85:20

**hard** [4] - 10:17, 33:8, 36:7, 82:3

**HBr** [3] - 76:17, 82:17, 86:11

**head** [1] - 62:22

**hear** [4] - 6:8, 45:12, 93:19, 93:21

**heard** [7] - 67:3, 87:17, 94:17, 109:15, 112:11, 113:6, 124:11

**hearing** [7] - 3:11, 4:17, 14:13, 54:22, 87:4, 122:16, 122:17

**HEARING** [3] - 1:10, 1:12, 124:16

**heat** [1] - 11:2

**help** [6] - 43:8, 44:4, 51:17, 55:25, 68:24, 68:25

**helpful** [8] - 24:19, 43:11, 45:5, 55:25, 114:21, 115:1, 115:3, 115:4

**helps** [1] - 43:12

**hereby** [1] - 124:5

**hesitant** [1] - 88:16

**hiding** [1] - 69:1

**highlighted** [1] - 61:4

**hijack** [1] - 29:8

**history** [12] - 15:18, 44:11, 51:10, 84:23, 84:24, 85:2, 85:6, 87:14, 88:4, 97:1, 112:11

**hold** [1] - 30:22

**hole** [1] - 100:14

**honestly** [1] - 96:19

**Honor** [49] - 3:19, 4:7, 4:16, 5:1, 6:25, 13:19, 19:3, 19:21, 20:23, 25:19, 45:11, 45:17, 46:12, 46:16, 48:8, 48:18, 52:6, 54:24, 55:24, 61:19, 74:2, 74:8, 76:13, 76:19, 78:4, 78:25, 79:10, 82:15, 84:9, 84:18, 84:21, 86:4, 88:8, 88:11, 89:23, 92:10, 93:16, 93:24,

96:20, 104:25, 106:13, 113:4, 116:10, 116:17, 116:25, 122:12, 123:10, 123:12

**Honor's** [1] - 5:7

**Honorable** [1] - 1:12

**hook** [1] - 8:19

**hope** [1] - 76:24

**hoped** [1] - 55:21

**hoping** [1] - 56:17

**hot** [3] - 10:15, 10:19, 19:22

**hours** [1] - 6:7

**human** [1] - 84:4

**hypothetical** [1] - 40:6

**I**

**i.e** [4] - 63:18, 67:24, 91:20, 115:9

**idea** [9] - 14:10, 15:21, 74:10, 98:7, 98:15, 101:23, 104:6, 106:24, 110:5

**identification** [1] - 48:17

**identified** [1] - 56:12

**identify** [2] - 3:13, 51:7

**identifying** [2] - 56:9, 106:19

**illustrated** [1] - 58:11

**immediately** [1] - 72:3

**imply** [1] - 121:17

**import** [2] - 116:6, 116:8

**important** [3] - 48:18, 53:8, 114:10

**imported** [1] - 92:11

**importing** [1] - 77:1

**improper** [4] - 77:2, 98:3, 116:9, 116:18

**improvement** [1] - 11:21

**IN** [2] - 1:1, 1:2

**in-flight** [9] - 15:10, 59:14, 59:17, 59:21, 59:25, 60:16, 61:3, 61:10, 66:25

**inappropriate** [1] - 44:5

**include** [5] - 26:12, 41:23, 47:12, 79:1, 92:18

**included** [2] - 44:13, 114:8

**includes** [5] - 78:10, 81:20, 89:13, 94:6,

94:7
**including** [1] - 114:4
**inclusion** [1] - 10:11
**incorporated** [2] -
43:22, 44:22
**incorrect** [2] - 40:18,
114:2, 117:15
**indefinite** [2] - 81:7,
104:15
**indefiniteness** [3] -
50:7, 105:1, 105:9
**indicate** [1] - 31:10
**individual** [1] - 87:22
**inform** [2] - 66:3,
113:20
**information** [2] -
113:20, 115:6
**informed** [1] - 98:6
**informs** [1] - 67:1
**infringement** [27] -
19:6, 21:10, 24:2,
24:11, 24:13, 24:16,
24:20, 25:20, 26:9,
27:2, 28:2, 33:5,
33:6, 39:23, 53:12,
55:6, 56:2, 57:4,
67:5, 67:21, 68:1,
71:6, 76:25, 81:8,
82:5, 96:22, 97:13
**infringer** [2] - 100:8,
121:18
**ingredient** [2] - 95:24,
99:10
**inherently** [2] - 16:15,
89:2
**initial** [1] - 46:2
**inject** [10] - 24:5,
34:17, 35:4, 48:2,
54:4, 55:10, 62:7,
63:18, 64:13, 66:1
**injected** [65] - 6:20,
10:22, 12:7, 12:11,
12:12, 13:2, 17:20,
18:16, 18:19, 19:13,
19:19, 20:9, 21:12,
21:13, 21:16, 21:23,
22:2, 22:18, 23:7,
23:14, 23:24, 34:11,
34:15, 34:16, 36:22,
37:1, 37:2, 37:16,
37:24, 38:11, 40:7,
40:19, 41:8, 41:10,
41:21, 41:23, 42:14,
46:4, 46:6, 47:21,
47:24, 53:25, 56:13,
57:12, 57:22, 58:16,
60:10, 60:13, 61:15,
61:17, 62:1, 62:25,
66:4, 66:6, 66:22,
69:15, 70:15, 70:17,

70:18, 70:21, 71:3,
72:10, 72:13, 73:11,
75:5
**injecting** [41] - 7:23,
7:25, 14:25, 15:3,
16:8, 17:16, 20:7,
22:10, 22:20, 25:25,
26:10, 31:4, 31:7,
32:15, 32:17, 33:22,
34:7, 35:15, 36:13,
37:13, 40:12, 41:12,
41:19, 41:25, 42:23,
47:8, 47:9, 47:11,
52:11, 65:4, 65:12,
66:23, 67:6, 68:22,
69:21, 70:10, 70:24,
72:17, 72:20, 73:8
**injection** [42] - 7:24,
8:25, 11:24, 13:10,
13:16, 15:1, 18:6,
18:25, 19:6, 21:3,
21:19, 27:12, 28:25,
33:21, 33:24, 36:23,
37:18, 37:25, 38:1,
39:8, 39:24, 41:4,
41:24, 44:7, 46:25,
55:15, 56:15, 58:5,
61:5, 61:6, 67:8,
68:9, 69:4, 71:21,
71:22, 74:17, 74:19,
74:22, 74:25, 91:12,
91:16, 91:18
**injections** [6] - 15:7,
15:9, 31:23, 32:5,
50:4, 75:25
**injector** [2] - 12:10,
22:10
**injectors** [1] - 71:25
**injects** [1] - 55:19
**inlet** [1] - 30:23
**inlets** [1] - 80:21
**insert** [2] - 9:18, 47:21
**inserted** [4] - 23:11,
32:13, 42:6, 42:18
**inserting** [3] - 8:24,
9:2, 15:22
**inside** [7] - 21:22,
69:7, 83:19, 89:12,
89:15, 91:2
**instance** [1] - 32:4
**instead** [3] - 42:11,
54:13, 57:11
**instructions** [2] -
26:20, 50:13
**insufficient** [1] - 40:23
**insulator** [1] - 102:3
**intended** [1] - 7:6
**intent** [2] - 9:24, 16:18
**interchangeably** [1] -
11:9

**intermediate** [2] -
102:4, 104:9
**internal** [2] - 63:8,
82:11
**interpret** [1] - 71:8
**interpreted** [1] - 86:18
**intrinsic** [19] - 10:3,
13:22, 18:8, 26:3,
33:18, 40:11, 43:25,
44:19, 44:24, 84:22,
85:13, 85:18, 87:8,
87:10, 87:12, 94:1,
98:4, 109:3, 116:21
**introduce** [1] - 59:11,
121:13
**introduced** [4] - 17:9,
51:16, 60:23, 69:15
**introducing** [1] -
65:15
**introduction** [1] - 95:5
**introductory** [1] - 6:21
**invention** [2] - 11:20,
76:6
**inventive** [1] - 41:10
**inventor** [2] - 9:25,
104:6
**inventors** [7] - 11:22,
12:4, 16:18, 30:3,
31:10, 44:2, 90:2
**inventors'** [1] - 44:8
**issue** [33] - 3:22,
13:15, 16:1, 17:24,
20:4, 20:5, 20:14,
24:10, 24:11, 24:13,
25:13, 25:16, 25:18,
25:20, 27:4, 27:16,
28:2, 30:14, 33:14,
36:16, 50:4, 56:24,
67:16, 67:17, 73:25,
80:15, 81:12, 81:17,
89:24, 105:1,
105:23, 118:8,
122:25
**issued** [2] - 86:6, 86:7
**issues** [4] - 21:10,
94:20, 96:24, 122:21
**item** [2] - 43:13, 56:12
**items** [1] - 122:7
**itself** [16] - 8:8, 10:23,
11:20, 19:4, 22:19,
23:6, 35:17, 37:16,
37:18, 42:12, 49:6,
60:25, 63:3, 65:22,
73:10, 78:12

## J

**JAMES** [1] - 1:17
**Jessica** [1] - 5:1

**JESSICA** [1] - 2:6
**Jim** [1] - 3:19
**joining** [1] - 4:9
**joint** [1] - 5:16
**JOSEPH** [1] - 2:2
**Joseph** [1] - 4:10
**Judge** [13] - 17:7,
21:20, 23:23, 27:7,
33:4, 38:15, 40:10,
43:12, 45:6, 50:2,
58:14, 66:17, 67:20
**judge** [2] - 43:15,
97:17
**July** [1] - 86:6
**jury** [2] - 50:12, 50:13
**justify** [2] - 8:21, 9:19
**JUSTIN** [1] - 1:20
**Justin** [1] - 3:22

## K

**keep** [3] - 7:9, 26:4,
28:1
**key** [23] - 15:16, 20:4,
20:14, 20:16, 24:10,
24:12, 25:13, 32:11,
41:16, 43:11, 43:24,
51:22, 51:23, 51:24,
54:5, 54:19, 57:2,
67:17, 84:12, 92:21,
99:13, 100:5
**kind** [15] - 9:19, 16:25,
37:18, 38:6, 50:8,
55:16, 56:1, 59:21,
67:7, 75:11, 99:17,
105:11, 107:8,
111:6, 114:17
**known** [1] - 51:9
**KREMER** [1] - 2:3
**Kremer** [1] - 4:11
**KUNZ** [2] - 2:6, 4:25
**Kunz** [1] - 5:1

## L

**lack** [4] - 27:10, 50:7,
55:2, 105:11
**lances** [1] - 75:17
**lands** [1] - 81:7
**language** [40] - 8:6,
8:18, 8:24, 10:2,
15:24, 16:10, 19:4,
34:24, 45:24, 47:6,
52:10, 52:18, 54:8,
58:1, 59:15, 60:10,
60:24, 67:20, 70:25,
77:10, 82:15, 84:17,
89:21, 95:8, 98:19,
99:7, 100:3, 101:13,

103:15, 103:22,
104:24, 106:18,
106:24, 107:4,
107:19, 109:17,
111:15, 117:10,
117:12, 118:24
**larding** [1] - 101:20
**large** [3] - 74:12,
74:13, 75:17
**largely** [3] - 5:4, 14:16,
46:22
**last** [2] - 66:24, 80:15
**lastly** [2] - 6:6, 89:23
**late** [1] - 51:10
**LAW** [1] - 1:17
**Law** [1] - 3:20
**law** [5] - 13:19, 13:20,
33:5, 33:16, 45:1
**leading** [4] - 50:1,
57:16, 63:4, 63:10
**least** [6] - 20:5, 38:24,
39:16, 41:23, 53:6,
112:19
**leaving** [1] - 10:20
**led** [3] - 10:12, 67:13,
79:14
**left** [7] - 5:15, 5:23,
12:2, 42:12, 48:25,
49:1, 79:21
**legal** [1] - 40:22
**legitimately** [1] -
38:22
**LENNON** [2] - 1:17,
3:18
**Lennon** [2] - 3:17,
3:19
**Leslie** [1] - 5:3
**LESLIE** [1] - 2:6
**less** [1] - 65:22
**letting** [1] - 73:21
**lexicography** [1] -
77:6
**likely** [3] - 7:3, 13:10,
83:12
**limit** [5] - 9:25, 50:19,
92:24, 93:4, 116:1
**limitation** [17] - 9:2,
9:18, 10:2, 15:23,
16:1, 16:21, 42:5,
57:2, 57:5, 63:18,
68:1, 77:24, 81:16,
90:7, 92:5, 115:10,
117:1
**limitations** [14] -
42:10, 54:12, 66:14,
76:20, 76:21, 76:25,
77:1, 77:4, 83:3,
92:7, 92:11, 116:5,
116:8, 116:18
**limited** [5] - 9:22,

40:17, 78:25, 93:6, 108:19
**line** [8] - 12:12, 33:8, 39:7, 39:14, 43:18, 60:22, 94:21, 105:6
**lines** [1] - 61:24
**lingering** [1] - 70:6
**linguistic** [2] - 34:9, 35:2
**linguistically** [2] - 34:14, 54:3
**liquid** [4] - 19:23, 22:11, 33:20, 73:10
**list** [3] - 96:11, 97:5, 110:21
**listed** [1] - 89:3
**lists** [1] - 96:6
**literally** [3] - 21:16, 89:5, 95:1
**literature** [1] - 73:15
**live** [1] - 39:3
**LLC** [4] - 2:4, 4:3, 4:8, 124:23
**LLP** [2] - 1:23, 2:5
**location** [5] - 19:5, 19:7, 25:14, 39:8, 41:4
**look** [23] - 9:6, 13:22, 13:23, 14:22, 21:12, 25:1, 52:5, 52:12, 76:2, 77:8, 85:6, 86:5, 90:5, 97:12, 100:23, 105:21, 106:12, 109:16, 109:24, 110:13, 113:20, 116:10, 116:20
**looked** [1] - 80:19
**looking** [9] - 7:4, 7:5, 38:15, 55:6, 67:4, 81:5, 95:8, 109:19, 116:21
**looks** [1] - 10:14
**loop** [2] - 12:18, 13:7
**lump** [1] - 10:18
**lumps** [2] - 36:20

## M

**machine** [1] - 84:5
**main** [2] - 62:14, 106:20
**manner** [3] - 51:22, 52:2, 62:10
**Mark** [1] - 4:11
**MARK** [1] - 2:2
**MARKMAN** [3] - 1:10, 1:12, 124:16
**Markman** [4] - 3:10,

24:24, 25:6, 123:9
**material** [17] - 7:24, 14:25, 15:1, 22:22, 34:19, 36:8, 43:14, 43:21, 43:23, 47:1, 72:15, 95:15, 96:16, 112:6, 116:15
**materializing** [1] - 34:12
**materials** [5] - 18:16, 43:6, 43:7, 79:8, 105:24
**matter** [21] - 3:6, 19:6, 19:8, 19:22, 20:24, 27:1, 28:4, 33:15, 34:9, 42:22, 57:19, 62:4, 71:6, 71:25, 80:9, 81:2, 81:6, 81:8, 82:3, 88:22, 122:24
**matters** [3] - 12:19, 20:1, 71:7
**MEAGER** [1] - 2:5
**mean** [19] - 9:4, 16:15, 16:17, 24:13, 25:8, 29:6, 30:9, 31:14, 40:16, 44:7, 62:21, 83:6, 83:23, 90:11, 90:14, 92:16, 98:11, 107:20, 121:25
**meaning** [18] - 16:20, 17:20, 21:15, 24:18, 28:11, 34:7, 44:1, 55:8, 55:9, 60:4, 67:7, 74:23, 74:25, 75:4, 75:13, 97:11, 113:20, 119:19
**meaningless** [1] - 102:6
**means** [21] - 9:8, 16:3, 16:7, 29:17, 34:15, 36:15, 43:24, 54:3, 62:22, 68:22, 82:9, 82:18, 83:6, 83:22, 90:17, 90:22, 91:2, 91:18, 104:5, 113:19, 121:20
**meant** [7] - 31:11, 31:12, 86:15, 114:9, 119:13, 119:19, 119:22
**measure** [1] - 30:19
**measuring** [1] - 105:14
**medium** [1] - 30:21
**meet** [7] - 5:18, 39:21, 42:10, 65:11, 81:16, 122:16, 123:4
**meet-and-confer** [1] - 5:18

**meeting** [1] - 54:12
**meets** [1] - 67:25
**mentally** [1] - 79:19
**mention** [3] - 11:20, 14:7, 31:3
**mentioned** [5] - 48:18, 76:4, 97:17, 110:20, 117:7
**mentioning** [2] - 8:10, 45:22
**mentions** [1] - 8:8
**mercury** [18] - 11:25, 13:11, 14:1, 14:11, 49:17, 51:9, 51:17, 59:12, 60:20, 60:21, 62:1, 62:12, 62:19, 66:9, 96:16, 102:7, 102:24, 109:23
**mercury-containing** [2] - 62:1, 109:23
**met** [5] - 42:5, 57:3, 57:5, 77:24, 104:9
**method** [4] - 102:7, 116:11, 116:16, 121:12
**methods** [1] - 36:10
**middle** [1] - 102:2
**Midwest** [1] - 3:7
**MIDWEST** [2] - 1:3, 124:9
**might** [7] - 37:17, 51:25, 64:6, 79:23, 94:14, 102:1, 105:5
**mind** [2] - 14:21, 79:16
**minimum** [2] - 20:14, 45:2
**minute** [1] - 34:23
**missing** [5] - 36:18, 49:5, 49:13, 49:20, 94:14
**mix** [2] - 82:1, 100:19
**mixed** [10] - 31:5, 38:10, 80:12, 82:8, 82:9, 82:10, 83:8, 83:9, 108:16
**mixes** [1] - 108:10
**mixing** [1] - 108:1
**mixture** [71] - 52:16, 76:10, 76:15, 77:11, 77:23, 77:25, 78:10, 78:12, 78:13, 79:13, 79:24, 80:7, 82:16, 82:18, 82:20, 83:6, 83:13, 83:15, 83:18, 83:22, 83:23, 86:24, 87:21, 87:23, 89:12, 89:14, 89:15, 92:19, 94:10, 95:23, 95:25, 97:7, 97:18, 97:20,

98:14, 99:15, 99:16, 99:19, 99:23, 100:5, 100:9, 101:7, 101:25, 102:13, 106:25, 107:16, 107:17, 107:21, 107:24, 107:25, 109:21, 114:5, 115:24, 116:1, 116:2, 116:4, 116:13, 116:24, 120:15, 120:18, 121:8, 121:10, 121:13, 121:17, 121:19, 121:20, 121:21, 121:22, 121:25
**moment** [1] - 10:25
**moot** [1] - 5:22
**mooted** [1] - 46:17
**morning** [1] - 55:25
**MORRIS** [1] - 1:23
**Morris** [1] - 4:7
**most** [7] - 13:9, 33:1, 60:11, 89:9, 108:2, 108:7, 115:1
**motion** [2] - 4:12, 4:15
**move** [3] - 4:14, 35:11, 55:3
**moved** [1] - 37:3
**movement** [1] - 72:24
**moves** [3] - 35:16, 36:20, 73:12
**moving** [3] - 22:22, 35:13, 55:15
**MR** [110] - 3:18, 4:6, 4:16, 6:24, 7:7, 7:12, 11:11, 11:15, 11:19, 14:18, 16:11, 18:1, 18:11, 19:3, 19:21, 20:16, 22:1, 22:7, 22:15, 22:21, 23:19, 25:7, 25:9, 26:18, 27:20, 28:20, 29:11, 30:16, 32:23, 33:11, 35:9, 36:17, 37:21, 38:12, 39:1, 39:5, 40:21, 41:20, 42:16, 43:20, 44:12, 45:7, 45:11, 45:14, 45:16, 46:11, 48:4, 48:7, 50:11, 51:2, 54:23, 57:25, 58:17, 59:23, 60:7, 61:18, 62:16, 63:6, 63:21, 64:13, 64:23, 65:18, 65:25, 66:22, 68:2, 69:12, 69:18, 69:25, 70:22, 71:5, 71:11, 72:19, 73:5, 73:7, 73:17,

74:7, 75:9, 75:15, 75:20, 75:23, 93:24, 95:6, 96:18, 99:6, 100:4, 101:11, 101:18, 103:4, 103:23, 104:2, 104:25, 105:8, 106:12, 106:17, 107:12, 108:12, 108:20, 109:2, 111:18, 112:14, 117:5, 118:22, 119:23, 120:1, 120:23, 121:8, 122:4, 122:12, 123:10, 123:12
**MS** [34] - 4:25, 76:12, 78:4, 78:24, 79:10, 80:17, 82:14, 83:2, 83:10, 84:8, 84:11, 84:18, 84:20, 85:17, 86:3, 87:6, 87:18, 88:8, 88:11, 88:15, 89:7, 89:19, 89:23, 90:25, 91:11, 91:23, 92:2, 93:16, 93:20, 113:4, 113:22, 114:24, 115:14, 115:20
**multiple** [6] - 29:18, 37:23, 38:3, 55:13, 80:20, 80:21
**must** [27] - 18:16, 31:23, 32:5, 47:1, 47:21, 57:11, 60:4, 70:15, 72:12, 72:13, 72:15, 72:16, 77:4, 78:13, 81:18, 81:19, 82:7, 82:19, 82:22, 84:1, 85:1, 93:11, 99:14, 106:6, 116:24, 121:22, 121:25

## N

**name** [1] - 45:17
**narrow** [2] - 99:22, 108:24, 120:22
**narrower** [2] - 108:14, 108:22
**naturally** [1] - 117:22
**nature** [2] - 29:13, 105:10
**necessarily** [6] - 32:8, 50:4, 84:5, 114:22, 115:1, 115:17
**necessary** [8] - 8:2, 26:9, 28:7, 29:4, 73:24, 85:20, 92:13,

117:2
**need** [19] - 6:10, 9:19, 12:19, 15:14, 25:4, 27:14, 31:15, 52:2, 83:16, 88:24, 108:15, 120:24, 120:25, 121:3, 121:5, 121:12, 122:6, 122:8, 123:7
**needs** [1] - 56:12
**negotiated** [1] - 47:5
**Nelson** [2] - 51:12, 51:13
**Nemec** [2] - 5:3, 5:8
**NEMEC** [1] - 2:7
**NEMUNAITIS** [49] - 1:20, 6:24, 7:7, 7:12, 11:11, 11:15, 11:19, 14:18, 16:11, 18:1, 18:11, 19:3, 19:21, 20:16, 22:1, 22:7, 22:15, 22:21, 23:19, 25:7, 25:9, 26:18, 27:20, 28:20, 29:11, 30:16, 32:23, 33:11, 35:9, 36:17, 37:21, 38:12, 39:1, 39:5, 40:21, 41:20, 42:16, 43:20, 44:12, 45:7, 45:11, 70:22, 71:5, 71:11, 72:19, 73:5, 73:7, 73:17, 123:10
**Nemunaitis** [5] - 3:22, 6:18, 45:10, 70:5, 74:5
**never** [8] - 17:3, 47:13, 85:4, 87:17, 95:2, 103:18, 113:12
**new** [8] - 8:24, 9:2, 9:18, 15:23, 16:8, 87:3, 112:6, 117:7
**NEW** [2] - 124:3, 124:18
**next** [2] - 9:8, 37:3
**Nichols** [1] - 4:7
**NICHOLS** [1] - 1:23
**none** [2] - 93:25, 114:25
**nonessential** [1] - 43:6
**nonfinal** [1] - 86:5
**noninfringement** [5] - 8:19, 20:20, 26:25, 33:15, 39:11
**nonsensical** [1] - 101:23
**normal** [2] - 16:17, 30:4
**normally** [2] - 32:25, 120:5

**note** [1] - 14:3
**noted** [1] - 5:13
**notes** [1] - 124:13
**nothing** [15] - 9:9, 70:25, 79:21, 94:15, 102:8, 104:7, 109:6, 111:24, 112:13, 112:14, 113:24, 117:25, 118:3, 122:12, 123:12
**notice** [1] - 14:15
**nowhere** [1] - 112:23
**Number** [2] - 3:8, 124:9
**number** [4] - 6:7, 9:23, 58:17, 59:2

## O

**obviously** [1] - 24:13
**occasionally** [1] - 105:2
**occur** [9] - 21:3, 27:12, 31:24, 32:5, 37:19, 81:19, 81:20, 82:7, 105:23
**occurring** [3] - 30:1, 80:24, 83:12
**occurs** [7] - 8:25, 13:16, 18:6, 19:7, 28:25, 80:19, 81:2
**OF** [4] - 1:2, 1:10, 124:2, 124:3
**off-the-shelf** [1] - 33:21
**offense** [1] - 7:5
**office** [1] - 86:5
**OFFICIALLY** [1] - 124:17
**often** [4] - 48:19, 105:3, 119:5, 120:3
**old** [1] - 106:16
**once** [6] - 8:9, 10:17, 35:10, 72:2, 120:9, 120:10
**one** [68] - 5:17, 5:20, 6:6, 9:7, 14:3, 15:12, 21:6, 22:22, 24:4, 24:25, 25:5, 26:2, 28:21, 31:25, 32:21, 32:24, 40:22, 40:24, 41:7, 42:3, 42:17, 46:3, 46:5, 48:22, 49:7, 54:21, 56:11, 59:13, 60:9, 60:13, 61:9, 66:9, 66:11, 68:4, 69:21, 70:5, 71:1, 76:7, 78:17, 79:16, 84:13, 92:22,

93:1, 93:12, 94:6, 95:7, 96:10, 98:6, 99:10, 100:15, 100:17, 101:12, 103:16, 103:18, 104:12, 105:14, 108:19, 110:12, 110:15, 110:21, 117:7, 120:14, 121:10, 121:11, 121:19, 122:19
**ones** [2] - 40:14, 121:13
**open** [2] - 39:20, 73:20
**opening** [1] - 6:12
**opinion** [1] - 24:24
**opposed** [5] - 7:4, 16:8, 43:5, 60:5, 108:1
**opposing** [1] - 113:10
**option** [4] - 93:12, 108:7, 108:11, 108:22
**options** [3] - 38:3, 43:16, 108:19
**orally** [1] - 4:14
**order** [4] - 4:18, 65:11, 77:3, 123:1
**ordinary** [8] - 16:14, 16:19, 28:11, 29:21, 31:15, 55:8, 55:9, 97:11
**original** [1] - 69:22
**otherwise** [2] - 41:5, 71:18
**outside** [19] - 14:5, 47:1, 47:2, 47:4, 47:12, 47:17, 51:15, 56:6, 60:17, 68:11, 68:23, 69:13, 84:7, 85:1, 91:4, 101:8, 102:6, 104:6, 116:7
**own** [1] - 81:24

## P

**page** [4] - 7:19, 7:22, 26:7, 52:5
**pages** [2] - 94:14, 124:15
**paragraph** [5] - 110:15, 110:18, 110:23, 111:3, 113:9
**paragraphs** [2] - 110:14, 118:7
**parameters** [1] - 7:15
**parse** [1] - 81:4
**part** [29] - 19:14,

19:15, 24:7, 25:5, 31:16, 33:11, 34:13, 43:14, 44:10, 44:19, 44:23, 49:25, 54:5, 56:8, 60:1, 60:16, 69:10, 85:15, 87:13, 87:14, 87:24, 94:10, 95:22, 99:25, 111:14, 115:7, 115:10, 116:14, 117:6
**partially** [2] - 82:20, 88:17
**particles** [2] - 14:3, 72:21
**particular** [19] - 9:4, 9:22, 19:7, 19:11, 24:3, 25:18, 25:22, 30:14, 30:17, 37:22, 44:12, 46:3, 61:5, 61:16, 67:23, 74:23, 87:12, 116:15
**particularly** [5] - 8:18, 29:14, 30:9, 70:11, 116:21
**particulate** [2] - 7:23, 14:25
**parties** [16] - 4:17, 5:13, 5:18, 5:21, 6:1, 6:9, 24:17, 25:1, 45:22, 46:14, 46:23, 68:19, 76:8, 122:8, 122:18, 123:5
**parties'** [6] - 5:16, 5:24, 46:17, 47:3, 122:15, 122:23
**parts** [2] - 110:17, 113:23
**passes** [1] - 29:23
**patent** [64] - 7:13, 30:17, 40:18, 44:11, 44:13, 44:18, 45:4, 45:23, 47:7, 47:8, 48:15, 49:6, 49:7, 49:14, 49:22, 50:22, 50:23, 51:11, 51:19, 51:23, 52:19, 53:3, 55:11, 56:7, 58:2, 58:19, 58:24, 60:2, 60:3, 61:2, 61:9, 62:14, 64:24, 68:20, 70:23, 73:15, 74:18, 74:20, 76:2, 76:14, 79:4, 85:3, 86:9, 87:11, 94:5, 94:9, 94:13, 94:15, 94:23, 96:6, 96:23, 97:4, 103:2, 103:5, 103:12, 103:18, 104:7, 106:3, 109:5,

115:1, 115:5, 118:20, 118:21, 118:23
**patentee** [7] - 76:21, 85:9, 87:9, 113:16, 118:14, 119:18, 119:21
**patents** [10] - 45:21, 47:10, 49:13, 50:23, 52:9, 52:14, 52:15, 76:3, 94:6
**path** [1] - 13:3
**PAUL** [1] - 2:3
**Paul** [1] - 4:11
**pause** [2] - 70:1, 109:12
**pending** [1] - 4:12
**people** [1] - 89:4
**per** [1] - 5:24
**percent** [1] - 88:20
**performing** [1] - 121:12
**perhaps** [3] - 61:19, 78:21, 95:4
**permission** [1] - 5:7
**person** [10] - 5:10, 5:12, 49:21, 51:24, 52:18, 76:4, 103:1, 121:9, 121:11, 121:17
**persons** [1] - 104:20
**perspective** [6] - 18:1, 35:3, 102:12, 102:17, 102:23, 123:8
**persuasive** [1] - 106:11
**pertain** [1] - 115:15
**pertains** [1] - 85:7
**pertinent** [1] - 29:14
**phrase** [11] - 8:8, 20:6, 29:17, 34:7, 37:7, 60:3, 66:24, 69:7, 69:8, 73:14, 101:21
**phraseology** [6] - 66:17, 90:13, 92:18, 93:7, 113:17, 113:18
**phrases** [1] - 93:10
**phrasing** [1] - 57:3
**physical** [1] - 36:8
**physically** [3] - 21:17, 63:16, 82:9
**picked** [1] - 10:18
**picking** [1] - 110:16
**picture** [4] - 12:12, 22:5, 79:16, 79:20
**picturing** [4] - 36:3, 36:7, 62:22, 100:12
**piece** [9] - 15:21, 20:9, 24:2, 43:12, 45:2,

62:6, 70:12, 80:15,
111:16
**pile** [1] - 12:21
**pipe** [6] - 10:19, 22:25,
42:24, 63:4, 63:9,
72:22
**pipes** [2] - 22:22,
71:20
**piping** [4] - 10:21,
25:24, 36:25, 71:14
**place** [6] - 10:25,
18:14, 61:15, 61:16,
81:20, 97:4
**placed** [2] - 35:14,
36:21
**plain** [8] - 28:10, 55:8,
55:9, 67:6, 68:18,
97:11, 97:15, 99:7
**Plaintiff** [1] - 1:22
**plaintiff** [5] - 63:16,
70:9, 98:5, 100:23,
108:6
**plaintiff's** [1] - 109:13
**Plaintiffs** [2] - 1:5,
67:4
**plaintiffs** [24] - 17:7,
17:12, 38:24, 42:4,
47:5, 47:13, 48:1,
48:22, 50:3, 51:4,
53:22, 55:7, 65:8,
68:9, 76:14, 79:15,
79:23, 79:25, 96:21,
97:10, 99:18,
104:10, 105:6, 118:1
**plaintiffs'** [18] - 5:25,
6:18, 10:7, 12:16,
26:8, 50:18, 52:6,
65:23, 66:12, 76:11,
77:20, 94:2, 94:25,
95:22, 104:14,
104:23, 105:19,
106:14
**Plaintiffs'** [3] - 3:15,
12:2, 94:17
**plan** [1] - 10:9
**plant** [10] - 12:17,
14:6, 22:3, 30:1,
31:2, 33:23, 35:10,
37:4, 37:22, 39:24
**plant's** [1] - 25:23
**plants** [3] - 21:21,
22:23, 42:23
**plasma** [1] - 73:10
**play** [2] - 22:5, 30:15
**plus** [4] - 25:2, 32:12,
88:13, 90:19
**point** [43] - 6:6, 8:16,
12:16, 14:20, 15:16,
21:2, 23:24, 29:18,
35:12, 37:14, 40:22,

40:23, 42:14, 43:20,
43:24, 51:11, 57:23,
60:7, 61:7, 63:25,
66:11, 70:1, 71:12,
71:23, 71:24, 73:18,
77:4, 77:7, 77:14,
77:20, 81:3, 82:23,
87:18, 91:12, 91:14,
106:21, 108:21,
110:12, 110:25,
113:15, 117:24
**pointed** [2] - 111:20,
112:5
**pointing** [3] - 61:5,
115:5, 115:7
**points** [5] - 29:12,
37:23, 61:5, 113:5,
114:16
**policy** [1] - 104:3
**pollution** [1] - 11:5
**portion** [7] - 8:23,
10:8, 46:7, 55:17,
70:8, 85:1, 113:8
**portions** [1] - 101:2
**position** [12] - 20:20,
23:21, 26:8, 26:25,
27:22, 34:1, 57:25,
66:4, 70:16, 70:19,
87:16, 122:6
**possibilities** [1] - 21:6
**possibility** [6] - 21:7,
22:6, 23:17, 41:24,
54:7, 100:15
**possible** [26] - 18:18,
19:12, 20:6, 20:8,
21:11, 21:17, 21:20,
21:25, 23:22, 32:1,
40:9, 43:15, 48:2,
54:2, 57:14, 57:15,
57:16, 62:5, 62:7,
62:13, 62:17, 62:20,
63:2, 63:16, 98:20
**potential** [1] - 68:6
**power** [10] - 10:9,
12:17, 14:6, 22:23,
30:1, 31:1, 33:23,
35:10, 37:3, 42:23
**practical** [7] - 19:22,
42:22, 62:4, 71:6,
71:25, 82:2, 88:22
**practicality** [1] - 75:16
**practically** [4] - 52:21,
65:5, 89:19, 101:23
**practice** [4] - 52:23,
71:20, 78:16, 100:25
**pre** [3] - 12:7, 65:15,
71:20
**pre-existing** [1] -
71:20
**pre-pulverized** [1] -

12:7
**precombustion** [1] -
38:8
**precursor** [2] - 52:11,
111:16
**preexisting** [2] -
22:24, 69:18
**prefer** [1] - 85:21
**premade** [2] - 116:1,
116:2
**premixing** [1] - 108:1
**preparation** [3] -
58:25, 59:17, 59:25
**prepare** [1] - 59:2
**prepares** [1] - 10:10
**preparing** [2] -
107:16, 107:17
**presence** [6] - 86:16,
88:1, 88:6, 98:8,
119:14, 119:20
**present** [11] - 6:3,
76:1, 90:7, 92:8,
92:9, 94:1, 98:16,
105:13, 120:20,
120:24, 124:7
**presentation** [3] - 5:5,
29:8, 70:7
**presented** [1] - 18:5
**presenting** [2] - 3:21,
4:13
**presents** [1] - 20:22
**pressure** [1] - 75:11
**pretreated** [5] - 37:8,
37:15, 53:13, 67:24,
68:7
**pretreating** [3] -
26:12, 36:2, 37:9
**pretty** [1] - 9:11
**prevail** [2] - 104:14,
105:7
**previously** [5] - 11:22,
77:3, 109:16, 117:9,
118:19
**primary** [2] - 12:25,
13:6
**pro** [1] - 4:12
**problem** [4] - 8:14,
32:22, 43:22, 66:8
**problems** [2] - 101:12,
103:24
**procedural** [1] - 123:8
**procedurally** [2] -
6:15, 46:14
**proceeding** [1] -
123:14
**proceedings** [1] -
124:8
**process** [12] - 22:9,
53:18, 58:8, 63:15,
68:7, 68:9, 78:1,

80:24, 89:10, 101:2,
102:2, 103:6
**produced** [1] - 53:19
**produces** [3] - 15:11,
66:25, 78:2
**product** [3] - 42:8,
78:20, 99:8
**production** [1] - 62:12
**promote** [1] - 51:7
**promoted** [3] - 14:2,
15:11, 66:25
**promoter** [47] - 8:1,
15:4, 17:16, 18:18,
19:11, 19:19, 26:11,
32:12, 34:10, 34:18,
35:4, 35:5, 36:2,
37:8, 37:15, 46:6,
48:16, 48:21, 56:10,
56:15, 56:23, 57:22,
61:14, 61:25, 62:24,
63:2, 65:22, 72:10,
72:12, 72:17, 73:4,
86:11, 86:14, 86:17,
88:2, 88:6, 88:14,
89:2, 109:22,
109:25, 110:4,
114:11, 118:17,
118:18, 119:15,
119:18, 120:11
**promoters** [1] - 17:9
**promoting** [2] - 13:24,
51:22
**promotion** [2] - 30:19,
61:3
**promotor** [1] - 14:14
**proper** [2] - 50:13,
111:7
**properly** [3] - 27:4,
112:17
**proposal** [2] - 25:13,
54:6
**proposals** [1] - 18:3
**propose** [9] - 8:2, 8:3,
8:9, 8:16, 8:23,
25:11, 25:12, 29:1,
33:17
**proposed** [18] - 8:5,
9:15, 11:22, 25:12,
26:20, 26:23, 27:9,
27:23, 28:6, 28:23,
39:6, 50:15, 67:13,
76:19, 77:9, 90:1,
115:21, 115:25
**proposing** [3] - 9:1,
9:16, 9:17
**prosecution** [14] -
15:18, 43:25, 44:10,
76:22, 84:23, 84:24,
85:2, 85:6, 87:14,
88:4, 97:1, 112:11,

113:13, 114:1
**prove** [2] - 19:5, 27:1
**provide** [5] - 6:25,
15:10, 24:17, 100:9,
100:11
**provided** [3] - 29:18,
31:8, 111:19
**providing** [7] - 32:8,
50:12, 50:17, 67:10,
100:9, 101:8, 121:20
**provisional** [3] - 43:1,
44:3, 44:17
**proximity** [2] - 83:16,
100:6
**PTO** [1] - 85:5
**publication** [1] - 43:16
**published** [1] - 43:18
**pull** [1] - 30:16
**pulverized** [12] - 10:9,
10:17, 12:7, 23:3,
23:7, 35:11, 36:24,
37:16, 49:3, 71:13,
71:19, 80:22
**pulverizer** [9] - 10:13,
10:14, 10:21, 12:24,
13:1, 13:2, 25:24,
36:21, 36:22
**pump** [1] - 22:25
**purchase** [1] - 118:25
**purpose** [1] - 73:18
**purposes** [2] - 11:12,
14:12
**pursuant** [1] - 98:18
**pushed** [3] - 61:25,
72:14, 75:10
**pushes** [1] - 75:20
**pushing** [1] - 72:20
**put** [29] - 7:8, 10:1,
17:14, 20:12, 23:15,
25:2, 28:10, 29:5,
37:10, 53:17, 53:23,
59:6, 69:14, 72:25,
79:18, 80:3, 81:22,
84:5, 90:20, 92:24,
100:15, 100:16,
100:17, 100:18,
100:20, 100:24,
118:24, 122:7, 122:8
**putting** [10] - 22:8,
24:8, 36:12, 57:6,
64:11, 78:17, 84:13,
91:19, 121:23,
121:25
**pyrolysis** [52] - 76:16,
77:15, 78:8, 78:10,
78:17, 82:16, 84:25,
86:10, 86:12, 86:17,
86:23, 88:1, 88:7,
88:12, 88:16, 88:17,
89:11, 90:3, 90:7,

92:5, 94:7, 94:16, 94:24, 95:20, 95:24, 96:1, 96:10, 96:15, 97:8, 97:19, 97:23, 98:8, 98:25, 100:17, 101:1, 101:16, 109:7, 109:21, 110:19, 110:22, 110:24, 111:1, 111:13, 114:4, 114:5, 115:16, 116:16, 118:24, 119:14, 119:16, 119:21, 120:2

## Q

**qualifies** [4] - 25:25, 56:23, 72:11, 72:16
**qualify** [3] - 20:13, 24:5, 99:5
**questions** [16] - 5:6, 6:15, 29:7, 29:9, 29:13, 38:20, 40:2, 42:2, 43:1, 45:9, 56:17, 56:21, 63:22, 74:3, 87:16, 103:13
**quick** [1] - 10:13
**quite** [4] - 38:23, 52:7, 83:17, 95:16
**quote** [1] - 80:11

## R

**raised** [3] - 20:17, 26:15, 35:25
**range** [1] - 60:6
**rate** [2] - 7:24, 15:1
**reach** [1] - 122:18
**reached** [1] - 47:13
**react** [2] - 13:11, 64:17
**reacting** [1] - 13:25, 14:1
**reaction** [9] - 15:11, 15:15, 29:25, 30:20, 59:14, 60:14, 60:15, 61:11, 66:25
**reacts** [1] - 21:2
**read** [12] - 16:21, 29:19, 30:24, 53:5, 53:6, 54:5, 88:3, 94:12, 98:11, 107:19, 108:3, 116:18
**reading** [13] - 41:2, 51:25, 58:1, 58:24, 60:12, 66:5, 67:6, 67:12, 67:19, 97:18, 97:21, 102:7, 109:5

**reads** [3] - 29:1, 49:7, 108:6
**ready** [1] - 11:4
**real** [6] - 8:22, 20:4, 38:23, 38:24, 39:23, 103:7
**really** [42] - 8:15, 9:1, 9:12, 9:16, 11:20, 12:17, 14:9, 16:2, 16:23, 17:3, 17:4, 17:17, 17:24, 19:24, 20:19, 24:1, 27:9, 31:10, 31:11, 43:11, 43:24, 45:23, 46:8, 46:18, 48:24, 49:12, 52:24, 61:10, 68:10, 82:3, 84:12, 89:25, 95:11, 97:18, 98:1, 98:6, 99:13, 100:1, 103:20, 104:17, 107:22, 111:7
**reason** [13] - 8:13, 8:17, 27:2, 31:13, 33:12, 44:20, 50:16, 72:4, 85:12, 101:22, 114:20, 115:4, 123:3
**reasonable** [3] - 60:12, 66:5, 108:3
**reasons** [2] - 60:8, 104:3
**rebut** [1] - 40:24
**rebuttal** [10] - 6:13, 28:16, 28:18, 48:6, 70:3, 71:10, 74:6, 93:18, 113:3, 117:4
**recognized** [1] - 109:8
**reconcile** [1] - 26:19
**record** [13] - 3:2, 3:5, 3:14, 43:25, 44:19, 44:24, 57:20, 62:4, 94:1, 98:4, 104:17, 123:7, 123:13
**redefine** [1] - 50:19
**refer** [6] - 7:8, 41:6, 48:8, 48:10, 48:19, 69:25
**reference** [4] - 43:8, 44:23, 51:12, 115:14
**referenced** [3] - 59:19, 80:23, 92:4
**referred** [2] - 48:23, 58:20
**referring** [6] - 35:24, 46:12, 68:5, 96:24, 115:8, 119:8
**refers** [2] - 46:21, 60:3
**refined** [1] - 4:3
**Refined** [2] - 2:4, 4:8
**reframe** [1] - 81:13
**refused** [1] - 76:23

**regard** [18] - 5:14, 6:3, 6:5, 6:19, 20:15, 32:21, 45:19, 46:24, 46:25, 48:14, 62:12, 65:3, 75:8, 114:14, 114:17, 117:6, 122:19, 122:23
**regardless** [1] - 114:20
**reject** [1] - 73:23
**rejected** [1] - 76:22
**rejection** [3] - 86:7, 86:18, 86:25
**relate** [1] - 105:10
**related** [2] - 45:4, 61:10
**relates** [4] - 26:23, 61:3, 69:6, 118:6
**relation** [3] - 15:7, 19:8, 25:14
**relevant** [9] - 21:10, 38:5, 38:6, 45:5, 96:15, 110:6, 111:17, 113:23, 117:14
**relied** [1] - 112:25
**relies** [1] - 114:18
**rely** [1] - 9:21
**remain** [1] - 98:23
**remaining** [2] - 99:2, 122:22
**remarks** [1] - 6:13
**remove** [3] - 59:12, 62:19, 98:2
**reply** [9] - 20:18, 20:22, 25:17, 26:5, 26:15, 46:7, 70:8, 70:11
**reported** [1] - 124:7
**reporter** [1] - 3:2
**Reporter** [2] - 124:5, 124:6
**representative** [1] - 95:10
**require** [6] - 32:4, 43:16, 77:22, 89:8, 116:2, 120:8
**required** [5] - 75:8, 83:3, 89:4, 89:20, 92:5
**requirement** [4] - 13:15, 14:6, 18:6, 83:18
**requires** [8] - 13:24, 15:8, 31:23, 45:1, 48:12, 62:24, 94:9, 99:10
**requisite** [2] - 88:7, 99:16
**resolve** [7] - 13:17,

26:3, 26:21, 28:1, 28:4, 33:2, 73:23
**resolved** [2] - 32:25, 68:4, 105:2
**resolves** [1] - 28:14
**resolving** [1] - 25:22
**respect** [3] - 43:3, 122:22, 123:9
**respective** [2] - 31:23, 32:5
**respondents** [1] - 87:21
**response** [4] - 46:2, 86:24, 114:11, 114:14
**rest** [3] - 11:3, 11:5, 13:5
**restate** [1] - 117:9
**result** [1] - 88:13
**return** [1] - 13:14
**returning** [1] - 84:22
**reversal** [1] - 99:7
**rewrite** [2] - 8:3, 8:17, 14:24
**RICHARD** [1] - 2:2
**Richard** [1] - 4:11
**rotating** [1] - 29:23
**rule** [2] - 20:24, 44:17
**ruling** [1] - 9:19
**run** [2] - 59:5, 59:9

## S

**salt** [1] - 53:1
**saw** [3] - 11:22, 39:12, 114:6
**scale** [1] - 74:10
**scenario** [2] - 17:8, 79:12
**scenarios** [4] - 40:6, 93:2, 106:3, 106:5
**scenes** [1] - 97:12
**scheduling** [1] - 123:1
**scheme** [1] - 101:19
**school** [1] - 106:16
**scientific** [5] - 63:25, 64:19, 102:12, 102:17, 102:22
**scientifically** [3] - 62:18, 64:19, 101:22
**scope** [16] - 8:12, 8:16, 9:25, 43:9, 50:19, 50:20, 50:21, 62:20, 66:15, 78:25, 81:7, 87:24, 88:2, 98:2, 104:5
**scoping** [1] - 87:20
**scrambling** [1] - 93:25
**screen** [3] - 7:3, 7:4,

87:6
**SEALED** [1] - 124:17
**second** [5] - 8:23, 43:14, 76:10, 101:22, 102:25
**secondly** [2] - 113:14, 115:21
**section** [3] - 37:3, 43:4, 46:21, 115:18
**sections** [1] - 114:13
**see** [22] - 5:12, 10:12, 10:20, 12:6, 12:20, 12:25, 13:10, 14:22, 26:14, 31:19, 32:23, 56:24, 60:9, 77:8, 79:2, 85:4, 85:8, 86:19, 116:12, 116:15, 122:17
**seek** [3] - 77:9, 86:21, 116:6
**seeking** [3] - 50:21, 74:17, 116:8
**seeks** [2] - 76:20, 115:25
**seem** [4] - 36:11, 67:15, 70:7, 97:24
**sense** [12] - 28:5, 29:21, 30:4, 31:15, 35:5, 60:25, 65:18, 75:6, 82:10, 102:13, 102:16, 102:23
**sentence** [1] - 112:17
**separate** [3] - 15:8, 22:10, 73:25
**separately** [6] - 7:25, 15:4, 89:6, 100:21, 102:15, 120:15
**separating** [1] - 14:2
**service** [1] - 3:3
**set** [2] - 16:12, 37:22
**sets** [1] - 4:1
**settled** [1] - 68:13
**setup** [1] - 39:24
**share** [1] - 111:23
**shelf** [1] - 33:21
**short** [1] - 97:23
**Shorthand** [2] - 124:5, 124:6
**shorthand** [2] - 124:7, 124:13
**shot** [1] - 87:7
**shovelling** [1] - 42:19
**show** [6] - 9:20, 9:24, 10:13, 59:3, 88:5, 97:4
**showed** [2] - 12:1, 80:20
**showing** [2] - 7:3, 95:11
**shown** [3] - 40:14,

118:3, 118:7

**shows** [7] - 10:8, 30:3, 40:19, 44:8, 84:25, 89:25, 95:3

**shuts** [1] - 71:18

**side** [29] - 3:13, 3:15, 4:2, 5:25, 6:12, 16:24, 40:4, 40:10, 43:7, 45:13, 49:16, 53:7, 54:10, 54:22, 58:10, 62:3, 67:20, 70:3, 85:13, 87:5, 88:10, 90:10, 92:17, 93:19, 103:21, 107:5, 107:7, 114:18, 123:11

**sides** [2] - 7:8, 25:11

**SIGNED** [1] - 124:17

**significant** [1] - 29:16

**silent** [2] - 116:3, 116:23

**similar** [3] - 45:24, 64:3, 97:9

**similarly** [2] - 12:9, 30:5

**simple** [2] - 7:9, 101:21

**simplified** [1] - 100:13

**simplify** [1] - 62:21

**simply** [2] - 42:6, 67:9

**simultaneously** [2] - 80:24, 99:4

**single** [1] - 60:18

**sintered** [1] - 30:21

**sitting** [1] - 118:9

**situation** [1] - 97:10

**sixth** [1] - 52:5

**sized** [1] - 36:20

**SKADDEN** [1] - 2:5

**skill** [9] - 49:21, 51:24, 52:18, 76:5, 103:1, 104:20, 121:9, 121:11, 121:17

**SLATE** [1] - 2:5

**slide** [5] - 6:2, 6:5, 6:25, 7:8, 7:22

**slides** [4] - 6:2, 7:3, 13:18, 52:6

**slight** [1] - 11:16

**slightly** [1] - 62:8

**soak** [1] - 96:16

**solid** [1] - 72:21

**solids** [1] - 73:11

**solution** [2] - 52:25, 59:7

**someone** [1] - 36:4

**sometimes** [3] - 33:8, 59:20, 69:7

**somewhat** [2] - 55:25, 106:11

**somewhere** [5] - 11:24, 18:15, 33:22, 63:3, 67:11

**sorbent** [63] - 7:23, 7:24, 13:24, 13:25, 14:2, 14:10, 14:13, 14:25, 15:1, 15:3, 30:6, 30:22, 31:5, 34:9, 41:8, 41:10, 46:4, 46:10, 46:19, 46:21, 46:25, 47:9, 47:11, 47:17, 47:24, 48:2, 48:9, 48:10, 48:12, 51:14, 51:22, 52:4, 61:14, 61:25, 65:4, 65:6, 65:12, 65:22, 67:1, 68:21, 68:22, 70:10, 70:15, 70:16, 70:20, 71:2, 72:10, 72:17, 73:3, 75:5, 95:15, 96:5, 96:7, 96:12, 96:15, 110:23, 110:25, 111:2, 111:4, 111:13, 112:8, 116:15

**sorbents** [1] - 97:5

**sorry** [5] - 14:18, 18:11, 34:10, 87:1, 119:25

**sort** [1] - 7:14

**sounds** [5] - 21:6, 25:21, 57:3, 83:25, 90:16

**source** [5] - 15:12, 39:16, 39:18, 59:1, 120:3

**sourced** [1] - 120:4

**sources** [1] - 119:4

**space** [6] - 72:14, 82:11, 83:17, 99:20, 121:24, 122:1

**speaking** [4] - 48:23, 52:21, 65:6, 89:20

**specialized** [1] - 16:20

**species** [1] - 48:17

**specific** [9] - 8:5, 27:16, 44:25, 45:20, 48:15, 49:15, 56:11, 74:25, 87:6

**specifically** [2] - 59:16, 79:2

**specification** [23] - 9:23, 15:18, 41:3, 58:3, 70:23, 81:18, 87:11, 94:16, 94:18, 95:3, 96:2, 101:14, 105:12, 108:4, 109:5, 112:5, 113:19, 113:23,

114:13, 115:7, 115:8, 116:7, 118:2

**speculate** [1] - 55:13

**Speedbudget** [1] - 124:23

**spell** [1] - 110:4

**sprayed** [2] - 12:23, 36:19

**spraying** [5] - 36:4, 36:11, 36:15, 39:20, 73:20

**square** [1] - 32:21

**ss** [1] - 124:2

**stack** [1] - 13:5

**stage** [5] - 24:20, 75:19, 103:16, 105:3, 107:11

**staggered** [1] - 72:4

**standards** [2] - 9:21, 13:20

**stands** [1] - 47:19

**start** [4] - 3:14, 45:22, 46:23, 113:7

**started** [6] - 3:5, 6:16, 6:23, 48:24, 49:1

**starting** [1] - 13:22

**STATE** [1] - 124:2

**statement** [5] - 15:17, 77:5, 77:8, 113:24, 119:22

**statements** [4] - 13:19, 26:19, 39:10, 117:16

**STATES** [1] - 1:1

**states** [1] - 82:15

**steel** [1] - 12:11

**Stenotype** [1] - 124:7

**step** [6] - 36:18, 111:16, 115:12, 116:14, 116:17, 122:6

**stepping** [2] - 49:24, 58:19

**sticky** [1] - 40:22

**still** [14] - 32:20, 46:9, 54:21, 56:3, 62:10, 76:8, 80:4, 80:10, 82:1, 93:13, 101:3, 109:2

**stipulation** [2] - 5:21, 122:20

**stop** [2] - 99:12, 113:1

**stopping** [1] - 102:24

**stream** [132] - 8:1, 8:9, 8:10, 12:20, 13:7, 15:5, 15:6, 16:3, 16:4, 16:15, 17:17, 17:20, 18:17, 18:20, 19:7, 19:14, 19:20, 20:7, 20:10, 21:13,

21:14, 22:18, 22:20, 23:24, 24:6, 26:1, 26:11, 29:17, 29:20, 29:23, 30:3, 30:6, 30:9, 30:14, 30:22, 31:6, 31:8, 31:9, 31:11, 31:14, 31:16, 32:6, 32:15, 32:17, 33:22, 33:24, 34:8, 34:11, 34:12, 34:15, 34:17, 35:4, 35:13, 35:14, 35:15, 36:14, 36:23, 36:24, 36:25, 37:2, 37:17, 37:19, 37:24, 38:2, 38:5, 38:6, 38:7, 40:7, 40:20, 41:16, 41:19, 41:24, 42:1, 42:24, 46:4, 47:22, 47:25, 48:3, 52:12, 54:1, 54:4, 54:15, 55:10, 55:19, 56:14, 56:16, 57:23, 58:6, 60:11, 60:13, 60:14, 60:15, 60:18, 60:19, 60:24, 61:18, 62:7, 62:25, 63:19, 65:5, 66:6, 66:23, 66:24, 67:2, 67:7, 68:10, 69:8, 69:14, 69:17, 69:19, 69:20, 70:10, 71:13, 71:20, 72:6, 72:11, 72:14, 72:18, 73:2, 73:13, 73:19, 74:19, 75:6, 75:8, 75:10, 75:12, 75:14, 75:16, 76:3

**streams** [3] - 66:7, 74:21, 76:1

**strict** [1] - 108:24

**strikes** [1] - 26:1

**struggle** [3] - 103:5, 107:5, 107:18

**stuff** [9] - 19:16, 22:14, 84:15, 90:18, 91:21, 92:24, 93:14, 107:10, 107:13

**subject** [2] - 64:5, 120:25

**submit** [1] - 44:15

**subsequently** [2] - 60:23, 99:1

**substance** [18] - 19:15, 20:11, 21:16, 23:10, 23:15, 24:8, 36:6, 36:7, 53:16, 57:12, 67:19, 69:10, 69:14, 77:11, 81:19, 88:18, 92:19

**substances** [15] -

58:15, 75:6, 78:6, 78:22, 81:21, 81:22, 82:19, 83:7, 83:16, 83:20, 83:24, 84:1, 84:6, 92:22, 93:12

**substantial** [1] - 103:24

**substantive** [4] - 8:14, 29:3, 47:20, 85:5

**sucking** [1] - 23:6

**sufficient** [3] - 25:18, 44:23, 103:17

**suggest** [3] - 53:10, 93:5, 110:7

**suggested** [5] - 54:10, 104:13, 107:8, 108:6, 109:13

**suggesting** [13] - 17:18, 18:25, 21:9, 21:11, 54:11, 79:15, 80:1, 99:14, 99:22, 104:10, 105:1, 105:21

**suggestion** [2] - 96:20, 117:14

**suggests** [2] - 57:20, 107:24

**super** [1] - 60:2

**supplier** [1] - 119:1

**support** [12] - 110:6, 110:9, 110:11, 110:13, 111:8, 111:11, 111:20, 112:4, 112:24, 114:1, 118:4, 118:6

**supports** [2] - 85:19, 87:8

**suppose** [3] - 28:23, 39:19, 44:15

**supposed** [1] - 95:14

**sur** [8] - 20:18, 20:22, 25:17, 26:5, 26:15, 46:7, 70:8, 70:11

**sur-reply** [8] - 20:18, 20:22, 25:17, 26:5, 26:15, 46:7, 70:8, 70:11

**survive** [2] - 64:16, 64:17

**synonym** [3] - 18:10, 59:22, 69:9

**synonyms** [1] - 14:14

**system** [16] - 12:19, 13:5, 13:8, 33:19, 49:11, 51:15, 51:17, 53:2, 59:11, 60:17, 64:14, 65:2, 65:12, 67:9, 67:10, 68:23

**systems** [2] - 74:12, 74:14

## T

**table** [1] - 4:9
**talks** [9] - 14:9, 30:5, 30:20, 40:12, 40:19, 64:24, 70:9, 106:3, 106:5
**taught** [3] - 58:4, 59:13, 66:10
**teach** [2] - 76:4, 103:13
**teaches** [2] - 103:18, 104:8
**teaching** [6] - 59:16, 59:24, 61:8, 94:23, 96:23, 101:13
**teachings** [4] - 56:7, 58:2, 58:18, 61:1
**technical** [1] - 57:19
**technically** [1] - 11:15
**technology** [10] - 7:17, 10:5, 10:7, 12:2, 12:5, 29:19, 48:24, 49:12, 51:3, 52:22
**teed** [4] - 26:15, 26:16, 27:9, 56:24
**ten** [1] - 74:13
**term** [70] - 5:17, 5:19, 5:20, 6:4, 6:19, 6:20, 7:12, 7:21, 7:23, 8:4, 8:10, 9:4, 9:17, 16:6, 20:15, 21:8, 21:15, 24:19, 24:23, 27:12, 28:11, 28:14, 41:17, 46:24, 47:18, 48:15, 48:20, 50:14, 53:9, 55:2, 66:15, 67:12, 67:22, 68:11, 68:13, 76:8, 76:9, 76:10, 76:15, 77:21, 94:7, 94:8, 94:11, 95:2, 95:14, 95:20, 96:1, 97:3, 97:7, 97:16, 97:21, 98:3, 99:15, 100:5, 101:24, 104:15, 109:7, 109:10, 109:25, 110:9, 110:19, 112:5, 117:17, 117:18, 119:9, 119:11, 120:15, 120:16, 122:19
**terminology** [2] - 7:18, 35:22
**terms** [29] - 4:19, 5:15, 5:17, 5:23, 6:1, 6:8, 6:9, 9:21, 14:15, 16:22, 24:14, 24:15,

25:11, 33:9, 40:10, 45:20, 46:15, 47:8, 48:13, 53:11, 67:8, 92:16, 95:12, 100:6, 100:7, 102:24, 115:9, 122:22
**test** [1] - 30:18
**testimony** [3] - 32:25, 105:4, 105:17
**tethered** [2] - 66:20, 66:21
**THE** [147] - 1:1, 1:2, 3:1, 3:25, 4:15, 4:20, 5:9, 7:1, 7:10, 11:7, 11:14, 11:18, 14:12, 15:20, 16:22, 18:9, 18:12, 19:10, 20:2, 21:5, 22:2, 22:12, 22:17, 23:9, 23:20, 25:8, 26:4, 27:6, 28:5, 29:7, 30:12, 31:18, 33:3, 34:4, 35:21, 37:5, 38:4, 38:14, 39:3, 40:1, 41:15, 42:2, 42:25, 44:9, 44:20, 45:8, 45:12, 45:15, 45:25, 47:19, 48:5, 49:25, 51:1, 53:4, 56:20, 58:7, 59:18, 60:1, 61:13, 62:2, 62:21, 63:8, 64:10, 64:21, 65:14, 65:20, 66:16, 67:15, 69:5, 69:13, 69:23, 70:2, 71:2, 71:9, 72:8, 73:1, 73:6, 73:16, 74:4, 75:3, 75:13, 75:18, 75:22, 76:7, 77:18, 78:14, 79:5, 79:11, 81:10, 82:24, 83:5, 83:21, 84:10, 84:12, 84:19, 85:11, 85:22, 87:1, 87:10, 88:3, 88:9, 88:12, 88:21, 89:14, 89:22, 90:9, 91:5, 91:15, 91:25, 92:14, 93:17, 93:21, 95:1, 96:14, 98:18, 99:12, 100:11, 101:15, 102:11, 103:7, 103:25, 104:12, 105:5, 105:18, 106:15, 107:6, 108:5, 108:18, 109:1, 111:12, 112:9, 113:2, 113:15, 114:17, 115:3, 115:19, 117:3, 118:11, 119:12,

119:25, 120:13, 121:5, 121:22, 122:10, 122:13, 123:11, 123:13
**themselves** [1] - 3:13
**theories** [2] - 56:6, 71:6
**theory** [4] - 56:1, 68:6, 69:1, 102:4
**thereof** [2] - 27:10, 76:18
**they've** [2] - 73:1, 118:3
**They've** [1] - 9:24
**thinking** [7] - 18:12, 18:13, 35:9, 63:1, 63:4, 99:19
**thinks** [1] - 53:7
**third** [9] - 7:22, 76:9, 81:23, 81:24, 102:19, 106:9, 108:6, 108:9, 108:11
**three** [38] - 13:24, 81:20, 82:7, 82:19, 82:23, 82:24, 83:7, 83:19, 83:23, 84:1, 84:5, 89:16, 99:2, 99:3, 99:19, 100:18, 100:20, 101:4, 101:8, 101:9, 102:14, 102:18, 102:20, 107:21, 108:7, 108:8, 108:15, 120:9, 120:18, 120:19, 120:23, 121:23, 121:25, 122:7, 122:9
**throughout** [6] - 13:4, 13:8, 58:18, 73:14, 79:3, 113:6
**tie** [4] - 34:22, 34:24, 111:1, 112:7
**tied** [2] - 39:12, 54:7
**tieing** [1] - 94:18
**today** [26] - 3:3, 3:5, 3:10, 3:20, 4:13, 5:2, 5:5, 6:2, 7:7, 14:13, 47:15, 57:10, 67:14, 76:10, 85:4, 98:10, 106:16, 109:20, 109:25, 110:10, 117:19, 118:1, 118:3, 118:9, 123:9
**today's** [1] - 11:12
**together** [17] - 9:11, 9:12, 12:15, 14:16, 15:14, 75:18, 79:17, 80:6, 81:1, 89:17, 99:20, 100:20, 100:25, 101:4,

102:18, 120:20, 121:4
**took** [1] - 51:15
**top** [1] - 10:16
**tornado** [3] - 72:5, 72:6, 80:23
**totally** [2] - 16:9, 38:17
**touch** [1] - 72:15
**touching** [2] - 82:9, 83:1
**transcript** [2] - 124:12, 124:14
**TRANSCRIPT** [1] - 1:10
**transient** [1] - 105:10
**transport** [3] - 60:22, 61:23, 72:24
**travels** [2] - 12:18, 36:25
**traversed** [1] - 86:25
**treat** [1] - 60:20
**treated** [7] - 17:11, 27:17, 42:6, 49:20, 67:18, 67:24, 69:3
**treating** [2] - 49:17, 102:7
**treatment** [3] - 49:9, 50:24, 52:19
**tremendous** [1] - 102:13
**true** [5] - 103:16, 104:16, 118:8, 118:10, 124:15
**try** [2] - 55:13, 81:13
**trying** [12] - 7:6, 44:6, 50:18, 50:20, 55:6, 56:18, 81:11, 83:5, 88:10, 90:14, 100:1, 113:16
**tube** [3] - 30:20, 30:22, 30:23
**TUNNELL** [1] - 1:23
**turn** [7] - 6:17, 19:24, 21:9, 29:9, 76:11, 89:1, 104:11
**turned** [1] - 19:18
**turning** [2] - 51:2, 98:4
**turns** [4] - 23:25, 27:3, 34:21, 35:6
**tutorial** [4] - 10:7, 12:2, 12:16, 48:24
**twice** [1] - 8:10
**two** [32] - 4:1, 5:14, 5:23, 6:1, 6:7, 6:9, 8:7, 9:8, 9:10, 9:13, 11:23, 11:25, 15:8, 18:2, 39:14, 45:23, 46:3, 63:22, 81:21, 88:23, 91:10, 95:12, 95:17, 100:17,

102:18, 120:20, 121:4
**took** [1] - 51:15
**top** [1] - 10:16
**tornado** [3] - 72:5, 72:6, 80:23

101:11, 102:19, 106:19, 108:8, 108:10, 121:2, 121:14, 122:9
**tying** [1] - 119:10
**type** [8] - 11:21, 25:23, 25:24, 30:2, 30:23, 30:25, 72:22, 72:23
**typed** [1] - 124:13
**types** [1] - 8:7
**typewritten** [1] - 124:15

## U

**U.S.M.J** [1] - 1:13
**ultimately** [4] - 50:2, 63:13, 65:21, 91:6
**unable** [1] - 77:7
**unclaimed** [1] - 58:23
**unclear** [4] - 27:2, 55:4, 56:3, 107:19
**under** [5] - 51:18, 75:11, 102:4, 122:24
**underline** [1] - 106:20
**understandable** [1] - 94:13
**understood** [9] - 26:11, 50:22, 55:11, 77:17, 85:9, 86:3, 86:20, 114:8, 114:9
**underwent** [2] - 85:5, 113:12
**undisputed** [2] - 43:17, 77:14
**UNITED** [1] - 1:1
**unless** [4] - 16:17, 28:19, 41:4, 74:2
**unlike** [1] - 50:23
**unmistakable** [1] - 77:5
**untenable** [1] - 90:1
**untethered** [1] - 66:18
**unusual** [2] - 41:25, 107:4
**up** [36] - 6:3, 6:4, 7:16, 7:22, 9:6, 10:14, 10:18, 12:4, 12:21, 19:16, 26:15, 26:16, 27:9, 30:16, 34:12, 34:23, 37:22, 50:1, 56:24, 58:22, 61:22, 62:11, 67:10, 70:5, 85:8, 95:4, 95:11, 96:16, 97:4, 98:6, 99:3, 112:23, 113:9, 118:13, 118:24
**upstream** [10] - 8:25, 13:16, 27:12, 28:25,

29:2, 31:24, 32:6,
48:3, 53:2, 58:6
**useful** [1] - 63:15
**uses** [5] - 28:15,
41:21, 48:15, 90:12,
107:13
**utilized** [2] - 43:8,
43:10
**utilizes** [1] - 62:10

## V

**vacuum** [1] - 67:11
**vapor** [1] - 59:7
**variations** [1] - 11:16
**variety** [2] - 119:2,
119:4
**various** [2] - 23:21,
23:22
**vein** [1] - 73:9
**version** [2] - 106:14,
120:14
**versus** [4] - 3:7, 33:7,
43:6, 91:13
**via** [1] - 88:23
**view** [10] - 38:4, 64:1,
71:4, 72:9, 75:4,
76:1, 77:20, 83:7,
108:18, 115:3
**vigorous** [1] - 32:24
**vs** [2] - 1:6, 124:10

## W

**walk** [1] - 10:4
**wall** [1] - 54:6
**wants** [1] - 92:17
**warner** [1] - 124:4
**Warner** [1] - 124:22
**ways** [9] - 23:22, 24:4,
29:19, 59:2, 59:10,
59:13, 106:19,
108:23, 121:14
**weeds** [1] - 69:2
**welcome** [2] - 3:25,
4:21
**whatsoever** [3] -
94:19, 94:23, 112:4
**whereas** [4] - 69:13,
91:17, 99:9, 107:9
**whereby** [8] - 8:24,
13:16, 15:10, 28:24,
29:1, 66:24, 77:10,
92:18
**wherein** [2] - 86:22,
107:1
**whichever** [1] - 81:5
**who'll** [1] - 4:13

**whole** [1] - 80:23
**wholly** [1] - 116:3
**win** [1] - 18:8
**wish** [1] - 117:8
**wonder** [2] - 103:8,
103:19
**wondering** [1] - 24:12
**word** [12] - 9:5, 29:20,
31:13, 41:21, 41:22,
42:18, 43:24,
106:21, 107:13,
112:22, 112:23
**wording** [1] - 16:8
**words** [25] - 16:3,
16:14, 16:17, 16:20,
17:11, 18:5, 18:10,
28:10, 28:12, 28:15,
29:6, 44:2, 44:7,
47:3, 47:12, 47:16,
66:13, 66:18, 66:20,
66:21, 68:25, 90:14,
103:10, 106:5, 106:6
**works** [8] - 10:6,
12:17, 35:10, 52:23,
62:18, 64:19, 73:13,
121:1
**world** [6] - 23:9,
31:20, 37:6, 79:6,
79:16, 106:7
**worried** [2] - 20:3,
57:9
**worry** [1] - 32:19
**worthwhile** [1] - 52:12
**write** [1] - 24:24
**written** [22] - 50:7,
58:22, 89:9, 103:15,
109:9, 109:10,
110:5, 110:8, 111:7,
111:11, 111:21,
111:25, 112:18,
112:19, 112:24,
113:8, 114:12,
114:15, 117:6,
117:25, 118:4, 118:6

## Y

**yellow** [1] - 61:22

## Z

**zone** [4] - 65:13, 66:2,
121:3, 121:6

# EXHIBIT 31

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GUARDANT HEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1616-LPS-CJB |
| | ) | |
| FOUNDATION MEDICINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| GUARDANT HEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1623-LPS-CJB |
| | ) | |
| PERSONAL GENOME DIAGNOSTICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

In these two related actions filed by Plaintiff Guardant Health, Inc. ("Guardant") against Defendants Foundation Medicine, Inc. ("FMI") and Personal Genome Diagnostics, Inc. ("PGDx" and collectively with FMI, "Defendants"), Guardant alleges infringement of United States Patent Nos. 9,598,731 (the "'731 patent"), 9,834,822 (the "'822 patent"), 9,840,743 (the "'743 patent") and 9,902,992 (the "'992 patent" and collectively with the other patents, "the asserted patents"). This Report and Recommendation addresses:  (1) those portions of Guardant's Motion for Summary Judgment ("MSJ"), filed pursuant to Federal Rule of Civil Procedure 56, that relate to Defendants' inventorship defenses and inequitable conduct counterclaims (the "inventorship MSJ"), (Civil Action No. 17-1616-LPS-CJB, D.I. 291; Civil Action No. 17-1623-LPS-CJB, D.I. 434); (2) those portions of Guardant's MSJ that relate to PGDx's antitrust counterclaims (the "antitrust MSJ"), (*id.*); (3) Guardant's *Daubert* motion seeking to exclude the testimony of

PGDx's damages expert Dr. Bradley Reiff ("Guardant's *Daubert* Motion"), filed pursuant to Federal Rule of Evidence 702, (Civil Action No. 17-1623-LPS-CJB, D.I. 435); and (4) FMI's *Daubert* motion, also filed pursuant to Rule 702, which seeks to exclude the damages opinions of Guardant's expert, Dr. Stephen L. Becker, and the related opinions of its infringement expert, Dr. Gregory Cooper ("FMI's *Daubert* Motion"), (Civil Action No. 17-1616-LPS-CJB, D.I. 300). For the reasons that follow, the Court recommends that Guardant's inventorship MSJ be DENIED and that Guardant's antitrust MSJ be GRANTED-IN-PART and DENIED-IN-PART, and it orders that Guardant's *Daubert* Motion be DENIED and that FMI's *Daubert* Motion be GRANTED.[1]

## I.      PROCEDURAL BACKGROUND AND STANDARD OF REVIEW

### A.      Procedural Background

Guardant commenced these actions on November 9, 2017.  (D.I. 1)  The cases were thereafter referred to the Court to hear and resolve all pretrial matters, up to and including case-dispositive motions.  (Civil Action No. 17-1616-LPS-CJB, D.I. 5; Civil Action No. 17-1623-LPS-CJB, D.I. 4)  Briefing on all summary judgment and *Daubert* motions in the cases was completed on January 16, 2020, and the Court heard oral argument on those motions on January 23, 2020.  (D.I. 530 ("Tr."))

### B.      Standard of Review

#### 1.      Summary Judgment

---

[1]      For simplicity's sake, the Court will hereafter refer solely to the "D.I." number in Civil Action No. 17-1623-LPS-CJB, unless otherwise indicated.

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 n.10 (1986).  If the moving party meets this burden, the nonmovant must then demonstrate that there is a genuine issue of material fact that prevents grant of the motion.  *Id.* at 587; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## 2. *Daubert* Motions

Rule 702 governs the admissibility of qualified expert testimony, providing that an expert witness may testify if:  "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  Rule 702's requirements were examined in detail in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and have been said to embody "three distinct substantive restrictions on the admission of expert testimony:  qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *see also B. Braun Melsungen AG v. Terumo Med. Corp.*, 749 F. Supp. 2d 210, 222 (D. Del. 2010).

3

As to the above-referenced *Daubert* motions, at issue is the reliability and/or "fit" of the proposed expert testimony.  With regard to the reliability requirement, Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known."  *Daubert*, 509 U.S. at 590; *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  Such testimony should amount to "more than subjective belief or unsupported speculation[,]" and a court's focus in examining this factor must be on "principles and methodology" rather than on the expert's conclusions. *Daubert*, 509 U.S. at 590, 595; *see also Daddio v. Nemours Found.*, 399 F. App'x 711, 713 (3d Cir. 2010).  As to the "fit" requirement, it "goes primarily to relevance" as the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and have "a valid . . . connection to the pertinent inquiry as a precondition to admissibility."  *Daubert*, 509 U.S. at 591-92 (internal quotation marks and citations omitted); *see also Schneider*, 320 F.3d at 404.  The standard for fit, however, is "not high; it is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case."  *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (citations omitted).[2]

## II.   DISCUSSION

### A.    Guardant's Inventorship MSJ

---

[2]    The Court has fairly wide discretion in determining whether to admit or exclude expert testimony.  *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).  Overall, "Rule 702 embodies a 'liberal policy of admissibility.'"  *B. Braun*, 749 F. Supp. 2d at 222 (quoting *Pineda*, 520 F.3d at 243).  The burden is placed on the party offering expert testimony to show that it meets each of the standards for admissibility.  *Id.* (citing *Daubert*, 509 U.S. at 592 n.10).

The Court first addresses Guardant's inventorship MSJ, which relates to: (1) Defendants' inventorship allegations; (2) Defendants' inequitable conduct allegations relating to all of the asserted patents other than the '992 patent ("the Talasaz patents"); and (3) Defendants' inequitable conduct allegations relating to the '992 patent. Below, the Court sets out some facts relevant to each of these issues.

In the currently-operative Third Amended Complaints, Guardant alleges that Defendants' liquid biopsy tests infringe claims of the asserted patents. (Civil Action No. 17-1616-LPS-CJB, D.I. 149 at ¶¶ 4, 14-24; Civil Action No. 17-1623-LPS-CJB, D.I. 280 at ¶¶ 6, 17-28) The asserted patents relate to methods for identifying genetic material harboring cancer-causing mutations from a patient's blood. (*See* D.I. 59 at 1) Each of the patents is titled "Systems and Methods to Detect Rare Mutations and Copy Number Variation." (D.I. 53, exs. C-F)[3] The Talasaz patents share a common specification ("the specification"), and the '992 patent has a similar specification. (*See* D.I. 75, ex. 1 at Slide 4)

Dr. Helmy Eltoukhy and Dr. AmirAli Talasaz, the founders of Guardant, met in the early 2000s when they were Ph.D. students at Stanford University. (D.I. 461, ex. 20 at 76) By March 2009, both were employed by Illumina. (D.I. 462, exs. 40-41) Both men signed agreements with Illumina stating that, *inter alia*, all inventions that they made, conceived, reduced to practice or developed (in whole or in part, either alone or jointly with others) during their employment shall be the sole property of Illumina. (*Id.*, ex. 40 at ILL_GUARD0000004; *id.*, ex. 41 at

---

[3]     The asserted patents appear on the docket in this action more than once. Citations to the patents will simply be to the '731 patent, '822 patent, '743 patent and '992 patent.

ILL_GUARD0000017)  In 2011, while still employed by Illumina, Dr. Eltoukhy and Dr. Talasaz founded Guardant.  (D.I. 461, ex. 24 at 10; D.I. 462, ex. 48; *id.*, ex. 55)

On June 25, 2012, Dr. Talasaz resigned from Illumina.  (D.I. 462, exs. 66-67)  The same day, Dr. Eltoukhy indicated that he would be on "non extended [paid time off from Illumina] for" most of July.  (*Id.*, ex. 68 at GUARDFM00968319)

Two days later, on June 27, 2012, Dr. Eltoukhy emailed an Illumina employee, Frank Steemers, asking if he had "the presentation where you show the random coding improvement in error rate" because Dr. Eltoukhy was "thinking about creating some Matlab models for some communication theory ideas" that he had on how to decode barcodes more effectively.  (*Id.*, ex. 72 at GUARDFM00276787)  Dr. Steemers replied by sending a few Illumina slides (the "Steemers Presentation").  (*Id.* at GUARDFM00276786-87)  Two minutes later, Dr. Eltoukhy forwarded the slides to his personal Gmail account, (*id.*, ex. 70), and immediately thereafter to Dr. Talasaz's personal Gmail account, (*id.*, ex. 71).  Dr. Eltoukhy then requested additional slides from Dr. Steemers, which he then also forwarded to his and Dr. Talasaz's personal Gmail accounts.  (*Id.*, exs. 69, 73-75)  The day after that, June 28, 2012, Dr. Eltoukhy and Dr. Talasaz met with a potential Guardant consultant, and they discussed the use of "tags" to perform molecular counting and "next generation sequencing technology" to analyze cancer by "sampling blood rather than through analyzing biopsied material."  (*Id.*, ex. 76)

Guardant contends that Dr. Talasaz conceived of the inventions recited in the Talasaz patents in "July 2012."  (D.I. 461, ex. 25 at 5)  On January 2 or 3, 2013, Dr. Eltoukhy left Illumina and joined Guardant.  (D.I. 441, ex. 7 at 23)

Meanwhile, on September 12, 2012, Guardant filed U.S. Provisional Application No. 61/696,734 (the "'734 Provisional"), identifying Dr. Talasaz as the sole inventor.  (D.I. 460, ex.

2)  The Talasaz patents claim priority to the '734 Provisional.  (D.I. 437 at 5; D.I. 456 at 5)  The fourth patent asserted in this case, the '992 patent, lists both Dr. Talasaz and Dr. Eltoukhy as inventors.  (D.I. 460, ex. 15 at 1)[4]  Guardant asserts that the '992 patent derives priority from U.S. Provisional Application 61/948,530, which was filed on March 5, 2014.  (D.I. 437 at 19; D.I. 499 at 8)[5]

### 1.    Inventorship

The Talasaz patents list Dr. Talasaz as the sole inventor.  ('731 patent at 1; '822 patent at 1; '743 patent at 1; D.I. 284 at 25 at ¶ 38)  Defendants assert that the Talasaz patents are invalid because Dr. Eltoukhy jointly conceived of the inventions claimed therein with Dr. Talasaz, but was not identified as a co-inventor on these patents.  (*See, e.g.*, D.I. 284 at 16-17, 20-21, 25 at ¶¶ 19, 28-30, 38)  Dr. Eltoukhy was intentionally not named as an inventor, Defendants allege, because:  (1) he was still employed by Illumina when the two men conceived of the invention; and (2) he and Dr. Talasaz wanted to ensure that Guardant (and not Illumina) would have full ownership and exclusive rights to the Talasaz patents.  (*Id.* at 25 at ¶ 39)

With its Motion, Guardant asserts that Defendants cannot demonstrate by clear and convincing evidence that Dr. Eltoukhy is a co-inventor of the Talasaz patents, and that Defendants' inventorship defense must therefore fail as a matter of law.  (D.I. 437 at 8-16; D.I. 499 at 2-7)

---

[4]    Guardant asserts that the '992 patent also names Dr. Stefanie Mortimer as an inventor.  (D.I. 437 at 16 (citing D.I. 20, ex. 4))  The "[i]nventors" section of the '992 patent lists only Dr. Talasaz and Dr. Eltoukhy as inventors.

[5]    Defendants dispute this and assert that the '992 patent derives priority from the '734 Provisional.  (*See* D.I. 456 at 19 & n.27, 21 & n.30)

The Court will first set out the legal standard with regard to inventorship, and will then turn to the merits.

### a.    Legal Standard

"A patent is invalid if more or less than the true inventors are named." *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1301 (Fed. Cir. 2002).  Inventorship is a question of law with underlying factual issues.  *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1338 (Fed. Cir. 2005); *see also Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) ("The determination of whether a person is a joint inventor is fact specific[.]").  Because there is a presumption that the inventors named on an issued patent are correct, nonjoinder of inventors must be proven by clear and convincing evidence.  *Falana v. Kent State Univ.*, 669 F.3d 1349, 1356 (Fed. Cir. 2012).  At the summary judgment stage, if there is a genuine issue of material fact regarding the issue of joint inventorship in light of the evidence submitted by the parties, then summary judgment should not be granted.  *Checkpoint Sys.*, 412 F.3d at 1334; *Fina Oil*, 123 F.3d at 1474.

Conception is the touchstone of inventorship, which requires a definite and permanent idea of the complete and operative invention.  *Tavory v. NTP, Inc.*, 297 F. App'x 976, 979 (Fed. Cir. 2008) (citations omitted).  A joint inventor must contribute to the invention's conception. *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1358 (Fed. Cir. 2019); *Fina Oil*, 123 F.3d at 1473 ("[T]o be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention.").  However, a joint inventor need not "make the same type or amount of contribution" to the invention nor contribute to every claim; a contribution to one claim is enough.  *CODA Dev. S.R.O.*, 916 F.3d at 1358 (internal quotation

8

marks and citations omitted); *see also Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1303 (Fed. Cir. 2010) ("[E]ach contributor need not have their own contemporaneous picture of the final claimed invention in order to qualify as joint inventors."). There is no "explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." *Fina Oil*, 123 F.3d at 1473. Rather, a joint invention is the product "of a collaboration between two or more persons working together to solve the problem addressed." *Id.*; *see also CODA Dev. S.R.O.*, 916 F.3d at 1359; *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) ("Joint inventorship . . . can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts[.]") (citation omitted). Evaluating joint inventorship has been described as "one of the muddiest concepts in the muddy metaphysics of patent law." *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018) (internal quotation marks and citation omitted).

### b.    Analysis

The Court agrees with Defendants that there are genuine disputes of material fact regarding whether and the extent to which Dr. Eltoukhy made an inventive contribution to the Talasaz patents.

For example, Defendants assert that Dr. Eltoukhy conceived of an alleged "communication theory" solution that is a key feature of the Talasaz patents. And there is evidence to support this assertion.

The specification of the '731 patent refers to "communication theory[,]" explaining that:

> *Polynucleotide sequencing can be compared with a problem in communication theory.* A[] . . . polynucleotide . . . is thought of as an original message. Tagging and/or amplifying can be thought of

9

as encoding the original message into a signal.  Sequencing can be thought of as communication channel.  The output of a sequencer, e.g., sequence reads, can be thought of as a received signal.  Bioinformatic processing can be thought of as a receiver that decodes the received signal to produce a transmitted message, e.g., a nucleotide sequence or sequences.  The received signal can include artifacts, such as noise and distortion.  Noise can be thought of as an unwanted random addition to a signal.  Distortion can be thought of as an alteration in the amplitude of a signal or portion of a signal. . . .

*Collapsing sequence reads into a consensus sequence is one way to reduce noise in the received message from one molecule. . . . With respect to an ensemble of molecules, grouping reads into families and determining a quantitative measure of the families reduces distortion, for example, in the quantity of molecules at each of a plurality of different loci.  Again, collapsing sequence reads of different families into consensus sequences eliminate errors introduced by amplification and/or sequencing error.*

('731 patent, cols. 31:15-28, 32:6-16 (emphasis added))  Pursuant to this description, the communication theory idea (as utilized in the context of the inventions) speaks to the steps of, *inter alia*, "grouping reads" into "families" and "[c]ollapsing sequence reads into a consensus sequence[.]"  (*See* D.I. 456 at 6)  Guardant's July 30, 2012 invention summary states that if "molecular tracking is used[,] [c]ollapse all the same-molecule derived reads into a consensus read" to "reduce biases introduced in amplification[.]"  (D.I. 462, ex. 82 at GUARDFM00482826; Defendants' Summary Judgment Presentation, Slide DSJ 68; *see also* D.I. 461, ex. 33 at ¶¶ 397-98)  And these communication theory steps are reflected in the claims of the Talasaz patents.  (*See* D.I. 456 at 6)  For example, claim 1 of the '731 patent recites, *inter alia*, "comparing the sequence reads grouped within each family to each other to determine consensus sequences for each family[.]"  ('731 patent, col. 62:37-39)  Claim 1 of the '822 patent

10

recites, among other steps, "collapsing sequence reads in each family to yield a base call for each family at the genetic locus[.]"  ('822 patent, col. 62:44-46)[6]

Defendants also point to evidence linking *Dr. Eltoukhy* to the utilization of this communication theory as it relates to the asserted patents.  (D.I. 456 at 6)  As described above, Dr. Eltoukhy requested the Steemers Presentation "show[ing] random coding improvement in error rate" in relation to "some *communication theory* ideas" that he had.  (D.I. 462, ex. 72 at GUARDFM00276787 (emphasis added))  The Steemers Presentation slides, in turn, refer to the concepts of:  (1) "[g]roup[ing] reads with same barcode[;]"; (2) [c]ollaps[ing] reads into a single, accurate consensus sequence"; and (3) the "[b]arcode[s] . . . mak[ing] each molecule unique[.]"  (*Id.* at GUARDFM00276786-87; *see also* D.I. 456 at 3-4)  In August 2012, Dr. Eltoukhy forwarded an e-mail to Dr. Talasaz for his review that summarized a discussion Dr. Eltoukhy had with someone regarding Guardant's "[k]ey [a]ttributes" which includes "[u]se of communication theory informatics via 'error-correcting codes' to achieve great sensitivity[.]"  (D.I. 462, ex. 83)  And in February 2013 (one month after he had left employment at Illumina), Dr. Eltoukhy explained in an email that *he and Dr. Talasaz* built a "communication-theoretic signal processing workflow" that allows them to "error-correct to arbitrary levels of accuracy[.]"  (*Id.*, ex. 85)

This evidence (along with other evidence cited by Defendants) is easily sufficient to establish a genuine issue of material fact as to the significance of the Steemers Presentation (and Dr. Eltoukhy's related contribution) to inventorship of the Talasaz patents.[7]

---

[6]     Claim 1 of the '992 patent, on which Dr. Eltoukhy is listed as an inventor, recites this same step.  ('992 patent, col. 64:32-34)

[7]     Guardant argues that the above-cited evidence is wanting, asserting that Defendants only cited to a single e-mail from Dr. Eltoukhy (the one in which he requested the Steemers Presentation) in support of their assertion that Dr. Eltoukhy contributed a

11

In arguing to the contrary, Guardant asserts that Dr. Eltoukhy's forwarding of the Steemers Presentation to Dr. Talasaz cannot amount to evidence of Dr. Eltoukhy's joint inventorship because:  (1) he did not create or write the documents; and (2) the Steemers Presentation simply reflects an approach that was already disclosed in the prior art.  (D.I. 437 at 11-12; D.I. 499 at 4-5)  But as to Guardant's first point, the law does not require that Dr. Eltoukhy need have written or created the Steemers Presentation for it to constitute evidence of inventorship.[8]  And as to Guardant's second point, it is undisputed that the Steemers Presentation did not disclose applying its described method to cell-free DNA (or "cfDNA").  (*See, e.g.*, D.I. 461, ex. 31 at ¶ 430; *id.*, ex. 33 at ¶ 411)  And *that* is really the crux of Defendants' position—that Dr. Eltoukhy, working with Dr. Talasaz, "applied this 'communication theory' to the analysis of cell-free DNA[.]"  (D.I. 456 at 17)[9]  Indeed, Guardant has pointed to this application

---

communication theory to the inventions, and that the e-mail's "vague reference" to a "communication theory" is insufficient to tie that theory to the claims of the Talasaz patents. (D.I. 499 at 2-3; Tr. at 188-89)  But in the Court's view, Defendants' evidence is robust enough and it *does* neatly set out this tie:  (1) Dr. Eltoukhy's e-mail tells us the Steemers Presentation slides relate to a "communication theory"; (2) we know that that the slides (which Dr. Eltoukhy quickly forwarded to Dr. Talasaz) refer to specific concepts such as grouping reads and collapsing reads to get a consensus sequence; (3) we know that the specifications of the Talasaz patents then describe these concepts as solving a problem in "communication theory"; (4) we know that these concepts are reflected in the patent claims; and (5) we know that in additional e-mails, Dr. Eltoukhy referred to how he and Dr. Talasaz created "communication theory-related workflow" that allows them to reduce errors (i.e., noise) that results from the typical sequencing process.  (Tr. at 204)

[8]      *See, e.g.*, *CODA Dev. S.R.O.*, 916 F.3d at 1359 (joint inventorship may involve "one inventor seeing a relevant report and building upon it") (citing *Kimberly-Clark Corp. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992)); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.").

[9]      (*See also* Tr. at 212 (Defendants' counsel explaining that "[i]t is not just that [Eltoukhy] took Steemers.  It is that he then recognized Steemers' application to cell-free DNA

12

as novel and non-obvious.[10]  *Cf. Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, C.A. No. 07-127-LPS-MPT, 2014 WL 547712, at *8-9 (D. Del. Feb. 7, 2014) (concluding that there was an unnamed inventor of the asserted patent, in that the inventor at issue did more than merely explain a well-known concept to the other inventors, but instead suggested a particular kind of motor and stood behind it as the solution to the problem that the company was facing).[11]

The Court has focused its discussion above on the significance of the Steemers Presentation to the inventorship issue, as it received the bulk of the attention by the parties.  (*See, e.g*, Tr. at 216-17)  But beyond that issue, the Court also agrees with Defendants that there is a genuine fact dispute as to whether Dr. Eltoukhy contributed the concept of filtering sequence reads based on a quality or mapping score to the claims of the Talasaz patents.  (D.I. 456 at 6-7;

---

and implemented it, which hadn't been done before"); Tr. at 187, 213-14; D.I. 461, ex. 28 at ¶ 193 (FMI's expert explaining that the Steemers Presentation is "describing a method that could be applied to analysis of cfDNA"); *id*., ex. 33 at ¶ 411; *id*., ex. 34 at ¶¶ 105-06; Guardant Summary Judgment Presentation, Slide 178)

[10]  (*See, e.g.*, D.I. 461, ex. 16 at 8; *see also* D.I. 58 ("Guardant's Technology Tutorial"), Slides 10-12 and accompanying notes); D.I. 461, ex. 27 at ¶¶ 1218-24; *id*., ex. 33 at ¶ 402)

[11]  The Court is not persuaded otherwise by Guardant's citations to certain deposition testimony of Defendants' experts.  In that testimony, one expert, on cross-examination, responded that he did not know whether Dr. Eltoukhy "ever arrived at a definite and permanent idea of the complete and operative invention at any point in time" and another expert stated that other than what was in his report, he did not analyze whether Dr. Eltoukhy participated in the conception or the development of the inventions recited in the Talasaz patents.  (D.I. 499 at 5 (citing D.I. 441, ex. 5 at 414; *id*., ex. 32 at 432); *see also* D.I. 437 at 10-11)  With respect to the first citation, as Defendants note, the law only requires that a joint inventor make a *contribution* to the conception of the subject matter of a claim, not that each contributor have their own independent contemporaneous picture of the final claimed invention.  (D.I. 456 at 14-15 (citing *Vanderbilt*, 601 F.3d at 1303 and *Eli Lilly & Co.*, 376 F.3d at 1361-62))  As for the second citation, it ignores other testimony by the expert in which he opined that Dr. Eltoukhy should have been named as an inventor.  (*See* D.I. 456 at 15-16 & n.19 (citing D.I. 461, ex. 36 at 88; *id.*, ex. 37 at 305, 308, 328))

Tr. at 209)  In January 2012, Guardant was using "mapping quality score[s]" on cell-free samples.  (D.I. 462, ex. 56)  And the first Steemers Presentation Slide, obtained by Dr. Eltoukhy in July 2012, refers to reads being "[w]eighted by q scores[.]"  (*Id.*, ex. 72 at GUARDFM00276786; *see also* Tr. at 209; D.I. 461, ex. 28 at ¶ 199)  From there, the record can be read to show Dr. Eltoukhy providing input regarding the idea of filtering out certain sequence reads based on their quality score.  For example, on July 23, 2012, Dr. Hong Gao emailed Dr. Eltoukhy to inform him that she "filtered" "the bases with base quality ▮▮▮▮ before alignment" and Dr. Eltoukhy replied to confirm that "those very bad reads with varying start points" were "removed" by this filtering.  (D.I. 462, ex. 80; D.I. 461, ex. 35 at ¶ 10)[12]  And this "filtering" concept did end up in Guardant's invention summary, (D.I. 462, ex. 82 at GUARDFM00482826 (indicating that "[s]ome reads are filtered based on mapping quality scores"), in the specifications of the Talasaz patents, (*see, e.g.*, '743 patent, col. 3:54-58 ("filtering out reads with an accuracy or quality score of less than a threshold"), and in claims 1 and 10 of the '743 patent, (*id.*, cols. 62:49-50, 63:33-34 (reciting "filtering out reads that fail to meet a set accuracy, quality score, or mapping score threshold")).[13]

---

[12]    To the extent that Guardant suggests that this e-mail is not persuasive of Dr. Eltoukhy's contribution to the inventions, because it "specifically references filtering implemented by Dr. Gao" and does "not even suggest that this concept originated with Dr. Eltoukhy[,]" (D.I. 499 at 3), that is unclear from the e-mail.  The extent to which the document demonstrates that Dr. Eltoukhy made a contribution to the invention is a disputed fact to be resolved at trial.

[13]    In light of the Court's conclusions that Defendants' evidence demonstrates genuine issues of material fact with respect to whether Dr. Eltoukhy contributed to the Talasaz patents the above-referenced concepts (i.e., the communication theory solution and the concept of filtering reads based on quality or mapping score), the Court need not address Defendants' further argument that Dr. Eltoukhy also contributed a windows/binning approach to the claims of the Talasaz patents.  (*See* D.I. 456 at 7-8)

Lastly, there is other testimony and evidence of record that supports the idea that Dr. Eltoukhy was a co-inventor as to the Talasaz patents.  (D.I. 456 at 9, 12-14)  For example, Dr. Stefanie Mortimer, a Rule 30(b)(6) witness for Guardant, testified that it was her understanding that, while they were at Dr. Eltoukhy's pool house around September 2012, Dr. Eltoukhy and Dr. Talasaz jointly came up with the idea that "you can filter out random . . . noise in . . . sequencing [cell free DNA] to be able to have better confidence that a [true] mutation really exists" by "bar coding molecules."  (D.I. 460, ex. 10 at 105-08; *see also* D.I. 461, ex. 17 at 15-30)  Other Guardant employees testified similarly.  (*See, e.g.*, D.I. 461, ex. 18 at 227-28; *id.*, ex. 19 at 57-58, 175)  Furthermore, Guardant initially listed Dr. Eltoukhy as a co-inventor on several patent applications, including the application filed in March 2015 that eventually issued as the '743 patent, before removing him as an inventor in July 2017.  (D.I. 461, ex. 12 at GD00006836, GD00007176-77)[14]

In sum, evaluating the issue of inventorship is a fact-intensive exercise, and numerous genuine issues of material fact clearly exist here.  *See, e.g.*, *Skyline USA, Inc. v. M.A.S. GA LLC*, Case No: 6:14-cv-210-Orl-22GJK, 2015 WL 12559958, at *4 (M.D. Fl. July 31, 2015).  Thus, the Court recommends that Guardant's inventorship MSJ be denied with respect to the inventorship issue.

---

[14]     Guardant suggests that summary judgment should not be granted because "[t]he two people best positioned to know" whether Dr. Eltoukhy jointly invented the Talasaz patents—Dr. Eltoukhy and Dr. Talasaz—have consistently testified that Dr. Talasaz was the sole inventor. (D.I. 437 at 9-10; D.I. 499 at 5)  But in the face of the contrary evidence described above, the Defendants are not required to take Guardant's principals at their word.  *See, e.g.*, *F'Real Foods, LLC v. Hamilton Beach Brands, Inc.*, Civil Action No. 16-41-CFC, 2019 WL 1747550, at *1 (D. Del. Apr. 18, 2019) (denying plaintiff's motion seeking summary judgment on defendants' defenses and counterclaims regarding incorrect inventorship, even though an asserted unnamed inventor "denied under oath at his deposition that he invented or co-invented the subject matter of the patents at issue").

### 2.    Inequitable Conduct for the Talasaz Patents

In its briefing, Guardant asserts that because Defendants' evidence is insufficient to support their claim of improper inventorship for the Talasaz patents, their inequitable conduct claims relating to these patents fail as well.  (D.I. 437 at 16; D.I. 499 at 7-8)  Because the Court has recommended denial of Guardant's inventorship MSJ with respect to the inventorship issue, it therefore also recommends denial of that motion with respect to inequitable conduct as to the Talasaz patents.  (D.I. 456 at 18)

### 3.    Inequitable Conduct for the '922 Patent

Guardant also argues that Defendants' claim that the '992 patent is unenforceable by virtue of infectious inequitable conduct fails as a matter of law, and that summary judgment on that claim must therefore be granted as well.  (D.I. 437 at 16-21; D.I. 499 at 8-11)  Guardant had previously moved to dismiss Defendants' counterclaims for unenforceability based on inequitable conduct with respect to the '992 patent, (Civil Action No. 17-1616-LPS-CJB, D.I. 169; Civil Action No. 17-1623-LPS-CJB, D.I. 285), and on January 7, 2020, the Court issued a Report and Recommendation (the "R&R") recommending denial of the motions, (Civil Action No. 17-1616-LPS-CJB, D.I. 343; Civil Action No. 17-1623-LPS-CJB, D.I. 470).  The Court hereby incorporates by reference that R&R.  On March 23, 2020, Chief Judge Leonard P. Stark overruled Guardant's objections to the R&R and adopted it.  (Civil Action No. 17-1616-LPS-CJB, D.I. 404 at 10; Civil Action No. 17-1623-LPS-CJB, D.I. 541 at 10)

Here, Guardant first argues that its Motion should be granted because "Defendants have not explained how the alleged failure to disclose an inventor for the Talasaz patents permeated the prosecution of the '992 patent—which lists its inventors properly."  (D.I. 437 at 17 (internal quotation marks omitted))  The Court, however, has already considered and rejected this

16

argument in the R&R, (D.I. 470 at 11-15), concluding that "the law on infectious unenforceability requires no direct linkage between the inequitable conduct at issue and the *prosecution* of the patent-in-question[,]" (*id*. at 11 (emphasis added)).

In the R&R, the Court further concluded that Defendants had pleaded sufficient facts to demonstrate the required "immediate and necessary relation" between the inequitable conduct at issue and the *enforcement* of the '992 patent in light of: (1) the close relationship between the content of the respective patents and the inequitable conduct allegations at issue; and (2) Defendants' plausible allegations regarding the family history and the priority relationship of the respective patents. (*Id.* at 15-23) The doctrine of infectious unenforceability exists to prevent "manipulation of the patent process[,]" as otherwise "a party committing inequitable conduct could avoid the consequences of that conduct through a scheme of . . . continuation applications." *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F. Supp. 2d 580, 595 (D. Del. 2006) (internal quotation marks and citation omitted).

Now at the summary judgment stage, the Court finds that the evidence, viewed in the light most favorable to Defendants, is sufficient to demonstrate at least a genuine dispute of fact as to whether an immediate and necessary relation exists between the inequitable conduct alleged with respect to the Talasaz patents and the enforcement of the '992 patent. For example, as Defendants point out in their brief and as the Court explained in the R&R, elements of the "communication theory" solution (as applied to cell-free DNA) that Dr. Eltoukhy purportedly contributed to the Talasaz patents *are also recited in claim 1 of the '992 patent* (such as grouping reads into families and collapsing sequence reads in each family to yield a base call). (*See, e.g.*, D.I. 456 at 20; Defendants' Summary Judgment Presentation, Slide DSJ 91; *see also* Guardant's Technology Tutorial, Slides 33-34 and accompanying notes) In light of this, and in light of other

17

evidence set out by Defendants that demonstrates the close relation between the Talasaz patents and the '992 patent, summary judgment is not warranted here.  *See, e.g.*, *Robocast, Inc. v. Apple Inc.*, 39 F. Supp. 3d 552, 571 (D. Del. 2014) ("The extent to which the inequitable conduct in the '063 application actually infects the '451 patent is best left for trial, where the facts can be more clearly developed.").[15]

**B.    Antitrust MSJ and Guardant's *Daubert* Motion**

The Court next addresses Guardant's antitrust MSJ and Guardant's *Daubert* Motion.

Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it unlawful to "monopolize" or "attempt to monopolize[.]"  The Supreme Court of the United States established in *Walker Process Equipment, Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172 (1965) that "the enforcement of a patent procured by fraud on the [United States] Patent Office may be violative of [Section] 2 of the Sherman Act[.]"  *Walker Process*, 382 U.S. at 174.

To succeed on a *Walker Process* claim, a party must prove two elements:  (1) "the anti-trust defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement" and (2) "all the other elements necessary to establish a Sherman Act monopolization claim."  *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016).  A monopolization claim under Section 2 of the Sherman Act, in turn, requires:  (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power (as

---

[15]    This is true even if (as Guardant asserts) the '992 patent is a continuation-in-part to the parent application of the Talasaz patents and derives priority from U.S. Provisional Application 61/948,530, which issued in 2014.  (D.I. 437 at 16, 19; D.I. 499 at 8-9; *but see* D.I. 465 at 8 (Guardant noting that the "earliest provisional application" for the '822 and '992 patent is the '734 Provisional))  As the Court explained in the R&R, that two patents may not share the same priority date is not dispositive of the infectious unenforceability issue.  (D.I. 470 at 22 n.15)

distinguished from growth as a consequence of a superior product, business acumen, or historic

accident).  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d Cir. 2007).[16]  And the

elements of attempted monopolization are (1) a dangerous probability of achieving monopoly

power, (2) predatory or anticompetitive conduct with (3) a specific intent to monopolize the

relevant market.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Barr Labs., Inc.*

*v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992).

Guardant asserts three main arguments as to why summary judgment[17] should be granted

on PGDx's antitrust counterclaims:  (1) PGDx has not put forward sufficient evidence of harm to

competition; (2) PGDx has failed to sufficiently demonstrate monopoly power; and (3) PGDx

---

[16]     District Courts apply the law of the United Sates Federal Circuit to the
"fraudulently obtained" element of a *Walker Process* claim and their own regional Circuit law to
the monopolization element.  *See, e.g.*, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d
1059, 1067-68 (Fed. Cir. 1998); *Chamberlain Grp., Inc. v. Techtronic Indus. Co., Ltd.*, Case No.
16 CV 6097, 2017 WL 3493799, at *9 (N.D. Ill. Aug. 14, 2017).

[17]     As a threshold matter, during oral argument, Guardant suggested PGDx faces a
more stringent standard than that applying to a typical summary judgment motion, because the
claims at issue here are antitrust counterclaims.  Guardant's counsel asserted that as to summary
judgment motions regarding antitrust claims, "if it is a close call . . . [the court should] err on the
side of innovation and free enterprise under the antitrust laws[.]"  (Tr. at 13; *see also id.* at 22,
65-66)  In support, Guardant cites to *Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko,
LLP*, 540 U.S. 398 (2004).  (Tr. at 65; Guardant's Summary Judgment Hearing Presentation,
Slide 5)  It is true that the Supreme Court of the United States explained in *Verizon* that,
generally, "[m]istaken inferences and the resulting false condemnations are especially costly,
because they chill the very conduct the antitrust laws are designed to protect [and] [t]he cost of
false positives counsels against an undue expansion of [Section] 2 liability."  *Verizon*, 540 U.S.
at 414.  But *Verizon* does not clearly state (or even implicitly suggest) that there are two sets of
legal standards:  one that applies to summary judgment motions regarding antitrust claims and
one that applies to all other summary judgment motions.  Indeed, Guardant did not "cite any case
saying that the normal summary judgment standard should not apply[.]"  (Tr. at 43)  And so the
Court will treat this like any other summary judgment motion, and will ask whether there is a
genuine dispute of material fact as to each of the relevant issues, giving PGDx the benefit of all
reasonable inferences.

has no admissible economic testimony with regard to injury and damages (which implicates Guardant's *Daubert* Motion).  (Tr. at 12)  The Court will address each argument in the order that Guardant briefed them.

### 1.    Harm to Competition.

Guardant first asserts that PGDx's antitrust counterclaim fails as a matter of law because PGDx has no evidence of harm to competition.  (D.I. 437 at 26-28; D.I. 500 at 2-5; Tr. at 15-30); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) (explaining that in order to demonstrate that a party has unlawfully maintained monopoly power, there "must be proof that competition, not merely competitors, ha[ve] been harmed").  Here, Guardant argues that PGDx cannot point to any evidence of harm that has flowed from Guardant's allegedly anti-competitive conduct (such as an indication of higher prices or decreased output or quality); it also argues that PGDx's attorney's fees may not, on their own, constitute such harm.  (D.I. 437 at 27, 39; D.I. 500 at 1, 3-14)[18]

---

[18]    Another argument Guardant makes with respect to this element is that there is no harm to competition where a *Walker Process* claim is based on improper inventorship, because PGDx must show that "but for the alleged fraud, the patents *would not have been issued to anyone*" and here, if Dr. Eltoukhy had been acknowledged as an inventor on the Talasaz patents, those patents "still would have issued with Illumina and Guardant as co-owners."  (D.I. 437 at 25-26 (certain emphasis omitted, certain emphasis added).  In support of this proposition of law, Guardant relies on the decision in *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir. 1984).  But *Brunswick* is not controlling law.  And the Court reads Federal Circuit law to suggest that *Walker Process* claims premised on improper inventorship carried out with deceptive intent would be permitted.  *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1365 (Fed. Cir. 1998)  Our Court too has followed that path.  *See In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, Civil Action Nos. 06-52 (GMS), 06-71 (GMS), 2010 WL 1485328, at *9 (D. Del. Apr. 13, 2010); *Medtronic Ave, Inc. v. Boston Sci. Corp.*, No. CIV.A. 98-478-SLR, 2001 WL 652016, at *1 (D. Del. Mar. 30, 2001).

Guardant further argues that PGDx's *Walker Process* claim with respect to the '992 patent fails even if that patent were found to be unenforceable under the doctrine of infectious unenforceability.  Guardant states that this is because such a finding would not demonstrate

The Court is not persuaded.  In a *Walker Process* claim like PGDx's here, the focus is on harm to competition that *will result* if Guardant's lawsuit is successful.  *See, e.g.*, *TransWeb*, 812 F.3d at 1309 (noting that "TransWeb . . . [demonstrated harm to competition where it showed] what would have resulted had 3M succeeded in its [patent infringement] suit"); (D.I. 455, ex. 4 at 37-38 (Guardant's damages expert Dr. Stephen Becker agreeing that the analysis is "forward-looking in terms of the likelihood that, given the structure of the market and its characteristics, that Guardant would . . . be able to control price and exclude competition")).  Dr. Eltoukhy testified that Guardant is seeking an injunction through its lawsuits against PGDx and FMI (not a royalty).  (D.I. 455, ex. 7 at 347-48)  And PGDx's economic expert Dr. Reiff analyzed the evidence and opined that if Guardant prevails in this lawsuit, its market concentration will dramatically increase, its prices will increase (as Guardant will leverage its position as the only truly viable provider in the market), and product quality and innovation will decline.  (D.I. 454, ex. 1 at ¶¶ 67-75; *id.*, ex. 2 at ¶¶ 32-48; *see also* Guardant's Summary Judgment Presentation, Slides 7-9)[19]  Indeed, Guardant's expert Dr. Becker testified that PGDx and FMI are the only strong Guardant "competitors" and the only entities that act as a "competitive restraint" on

---

materiality of the alleged misconduct with respect to prosecution of the '992 patent, and thus would not rise to the level of fraud on the PTO required for a *Walker Process* claim.  (D.I. 437 at 24-25)  In its answering brief, PGDx does not really respond in a persuasive manner to this charge.  (D.I. 453 at 14 ("[E]ven if PGDx could not assert *Walker Process* claims based on the '992 Patent, PGDx's claims are still properly based on Guardant's other patents."))  Therefore, the Court recommends that Guardant's antitrust MSJ be granted-in-part to the extent that PGDx's *Walker Process* counterclaims are premised on the '992 patent.

[19]     Guardant challenges the admissibility of these opinions in its *Daubert* motion, but as the Court will explain below, it does not agree with Guardant's *Daubert* challenge.

Guardant; if PGDx and FMI are eliminated from the market, Dr. Becker acknowledged that

Guardant would capture all of their sales.  (D.I. 455, ex. 4 at 168, 170-71, 206, 237-38, 275-76)

PGDx has also put forward some evidence of already-occurring harm to competition,

purportedly caused by Guardant's lawsuit.  To that end, PGDx identified a lost investor,

Endeavor Vision ("Endeavor"), who failed to invest $10 million in PGDx's Series B funding

after Guardant filed this suit.  (D.I. 455, ex. 12 at ¶ 7; *see also* D.I. 454, ex. 2 at ¶ 51; PGDx's

Presentation on Guardant's Motion for Summary Judgment and Daubert Motion, Slide 11)

PGDx's Chief Executive Officer, Douglas Ward, submitted a Declaration in which he explains

that Endeavor began "inquiring about the lawsuit's impact on PGDx" and his interactions with

Endeavor caused him to believe that PGDx lost the investment "because of Guardant's lawsuit."

(D.I. 455, ex. 12 at ¶ 7)[20]

Additionally, PGDx cites the fact that it has been required to expend attorneys' fees and

costs in order to defend itself in this lawsuit.  (D.I. 453 at 12-13; Tr. at 47-49)  And there is good

authority suggesting that such fees and costs amount to actionable injury in this context.  *See,*

*e.g.*, *TransWeb*, 812 F.3d at 1309-12 (holding that where 3M's unlawful act was "the bringing of

---

[20]     Guardant's position with respect to lost investors has shifted; initially, Guardant
asserted that PGDx failed to identify *any* lost investor.  (D.I. 437 at 38)  After PGDx pointed out
that it had provided evidence regarding Endeavor, (D.I. 453 at 13), Guardant then argued that
this evidence is insufficient because:  (1) PGDx's expert Dr. Reiff could only speculate as to why
Endeavor failed to invest; and (2) this lost capital is not a harm to competition, since PGDx went
on to complete that funding round, (D.I. 500 at 5).  But, as the Court noted above, PGDx's
expert's view that Endeavor passed on funding PGDx partly because of this lawsuit is not based
on the expert's speculation—it is based on evidence to that effect provided by PGDx's CEO.
And Dr. Reiff also testified that Mr. Ward told him that, as a result, PGDx obtained less funding
in the funding round than PGDx had hoped for.  (D.I. 455, ex. 10 at 75)  There are thus factual
disputes about whether harm to PGDx flowed from the loss of this investor due to Guardant's
actions.

suit based on a patent known to be fraudulently obtained[,]" TransWeb's attorney's fees flowed "directly" from that "which makes [3M's] acts unlawful" and thus constituted "both injury-in-fact and antitrust injury"); *Ni-Q, LLC v. Prolacta Biosci., Inc.*, Case No. 3:17-cv-934-SI, 2020 WL 485525, at \*4-5 (D. Or. Jan. 29, 2020) (finding that plaintiff sufficiently alleged harm to competition where it alleged, *inter alia*, harm to it through attorney's fees) (citing cases); *Avocent Huntsville, LLC v. ZPE Sys., Inc.*, Case No. 3:17-cv-04319-WHO, 2018 WL 4859527, at \*15 (N.D. Cal. July 23, 2018).[21]  Taking all of this together, then, there is a genuine dispute of fact on this element that precludes summary judgment.[22]

### 2.    Monopoly Power

Guardant additionally asserts that PGDx's antitrust counterclaim fails as a matter of law because PGDx has no evidence of monopoly power.  (D.I. 437 at 28-35; D.I. 500 at 6-9; Tr. at 31-35)  "Monopoly power is the ability to control prices and exclude competition in a given

---

[21]    Guardant further argues that PGDx's position that there are multiple commercially acceptable non-infringing alternatives for each of the patents-in-suit means that PGDx's attorney's fees would not constitute antitrust injury as a matter of law.  (D.I. 437 at 39; D.I. 500 at 4 n.2 ("Because [PGDx] argues that there are commercially acceptable non-infringing alternatives accessible to it, PGDx cannot viably argue that Guardant's suit will shut them out of the market."))  The Court declines to recommend that summary judgment be granted on this basis.  For one thing, *Guardant* argues that there are *no* non-infringing alternatives.  (D.I. 455, ex. 4 at 161-62; *see also* Tr. at 51)  The Court agrees with PGDx that such a factual dispute may not be resolved on summary judgment.  (D.I. 453 at 13)  And further, PGDx's *Walker Process* claims are focused on the harm that would occur if Guardant's lawsuit *were to succeed in excluding the competition*.  (Tr. at 52)

[22]    PGDx claims that Guardant's conduct, if not monopolization, amounts to attempted monopolization.  (D.I. 453 at 1, 12)  In its briefing, Guardant did not address why it is entitled to summary judgment on this claim.  (*See id.* at 12; Tr. at 57-58)  During oral argument, Guardant asserted that "if there is no harm to competition . . . that alone takes care of the attempted monopolization" claim.  (Tr. at 62)  However, in light of the Court's conclusion with respect to this element, the Court recommends that PGDx's attempted monopolization claim survive summary judgment.

market." *Broadcom*, 501 F.3d at 307.  The existence of monopoly power may be proven through "indirect evidence" that Guardant has a "dominant share in a relevant market, and that significant entry barriers protect that market." *Id.* (internal quotation marks and citation omitted).[23] PGDx's indirect evidence on this front is sufficient to establish a genuine dispute of fact.

Market share is a "primary determinant" of whether monopoly power exists.  *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984); *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010) ("[M]arket share, while crucial, may not always be determinative.").  And there can be no real dispute that Guardant has quite a lot of it.  Dr. Reiff estimated that Guardant has a ▮▮▮ market share in the relevant comprehensive liquid biopsy ("CLB") market.  (D.I. 454, ex. 2 at ¶ 4; *see also* D.I. 453 at 6; D.I. 500 at 6)[24]  Guardant's expert agrees that Guardant "enjoys a high market share[.]"  (D.I. 455, ex. 17 at ¶ 45; *see also id.* at ¶ 55; ex. 4 at 34, 203-04)  Indeed, Guardant's own documents recognize Guardant's "dominance" of the market, (D.I. 455, ex. 19 at GUARDPG00058083; *id.*, ex. 24 at GUARDPG00599936), as do Guardant's witnesses, (*id.*, ex. 5 at 202, 318 (witness Bill Getty explaining that Guardant has "[l]imited [r]eal [c]ompetition" and that its main competition is "apathy"); *id.*, ex. 6 at 299-300, 302-03 (witness Mark Jacobstein testifying that Guardant was the "800-pound gorilla" in the liquid biopsy space and the "clear leader on many, and in fact, all,

---

[23]     Monopoly power may also be proven through "direct evidence of supracompetitive prices and restricted output." *Broadcom*, 501 F.3d at 307.  PGDx asserts that it has put forward direct evidence (in addition to indirect evidence) regarding Guardant's pricing and ability to exclude competition.  (D.I. 453 at 9-10)  However, because the Court finds that PGDx has established sufficient indirect evidence to survive summary judgment, it need not further assess PGDx's asserted direct evidence.

[24]     Guardant itself claims to have a market share of ▮▮▮ of the clinical submarket. (D.I. 455, ex. 21 at GUARDPG00348773, GUARDPG00348789; *id.*, ex. 5 at 291)

24

axes that we thought were important")).[25]  Meanwhile, PGDx and FMI jointly have

approximately ▇ of the market, and all remaining competitors constitute ▇ of the market.

(D.I. 454, ex. 2 at ¶ 4)

With respect to barriers to entry, Guardant argues that none of PGDx's evidence shows

that there will be no new entrants into the CLB market, or no expansion of the current CLB

market participants going forward.  (D.I. 500 at 7; Tr. at 34-35)  However, PGDx's evidence

establishes a dispute of fact on this point.  (D.I. 453 at 6-8; Tr. at 54-55)  For example:

- One of Guardant's own documents identified several
  "[b]arriers to [e]ntry" ▇▇▇▇▇▇▇
  ▇▇▇▇▇▇▇ (D.I. 455, ex. 20 at
  GUARDPG00321963; *id.*, ex. 6 at 307-09)  These included
  ▇▇▇▇▇▇▇
  ▇▇▇▇▇▇▇ (D.I. 455,
  ex. 20 at GUARDPG00321963)

- Furthermore, while it is true that PGDx's damages expert
  identified five companies beyond PGDx and FMI that have
  entered the market in the last three years (Resolution
  Bioscience, Archer, Inivata, Biodesix and Biocept), (D.I. 501,
  ex. 98 at 32-33; *see also* Tr. at 34), Guardant's expert Dr.
  Becker acknowledged that these companies were not a
  competitive restraint on Guardant because:  (1) customers were
  not willing to switch to these entities' products and (2)
  Resolution Bioscience may have been the only other company
  that was even able to offer a comprehensive liquid biopsy test,
  (D.I. 455, ex. 4 at 170-71).

---

[25]     Guardant makes much of testimony from FMI executive Doron Lipson, Ph.D. that
Guardant was not "the most dominant player" in the market, in arguing that PGDx has failed to
demonstrate monopoly power.  (D.I. 437 at 30 (citing D.I. 441, ex. 20 at 133); D.I. 500 at 6; Tr.
at 18-19)  However, that was not the full extent of Dr. Lipson's testimony on this point; he
explained that this view stemmed from the fact that "it's not like there's like a 90 percent
dominance of anybody, which is what I would call dominant."  (D.I. 441, ex. 20 at 133)
Considering the full context of his testimony, it does not move the needle with respect to this
market share issue.

- It is undisputed that PGDx and FMI's combined share of the market increased by only 3% in 2018.  (D.I. 441, ex. 12 at ex. 4; *see also* D.I. 437 at 35; D.I. 453 at 7)

- Dr. Becker also testified that since 2015, 26 companies attempted to enter the CLB market but failed due to technological challenges.  (D.I. 455, ex. 4 at 47-49)[26]

In sum, PGDx's evidence with respect to entry barriers, combined with Guardant's undisputedly high market share, could lead a reasonable fact-finder to infer monopoly power.  Thus, summary judgment cannot be granted on this front.

### 3.      Economic Expert Testimony Regarding Injury and Damages

Guardant's third ground for dismissal of PGDx's antitrust counterclaim is raised via its *Daubert* Motion, in which it argues that PGDx has no admissible economic testimony on injury and damages.  (Tr. at 38-41; *see also* D.I. 437 at 40-50; D.I. 500 at 2, 9-13)

PGDx's economic expert, Dr. Reiff, applied three tests (the Herfindahl-Hirschman Index analysis ("HHI"), Upward Pricing Pressure analysis ("UPP") and the hypothetical monopolist test, or the small but significant and non-transitory increase in price test ("SSNIP")) to opine that

---

[26]      Guardant further argues PGDx must prove that Guardant has "durable monopoly power, not fleeting power[,]" (D.I. 437 at 30 (citing *Dentsply Int'l, Inc.*, 399 F.3d at 188-89 ("[I]n evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share.") (emphasis added))), and it faults PGDx for failing to put forward evidence on this front, (D.I. 500 at 6; Tr. at 31).  However, PGDx has emphasized that through this lawsuit, Guardant seeks to eliminate PGDx and FMI from the market.  (D.I. 453 at 4, 7 (citing D.I. 455, ex. 4 at 104-05; *id.*, ex. 7 at 347-48))  And if that were to happen, then Guardant would capture ██ of the market and have no real competitor.  (*See* D.I. 455, ex. 4 at 168, 170-71, 206, 237-38, 275-76; *id.*, ex. 32 at ¶ 6 & exs. SLB-9AR, SLB-9BR; *see also id.*, ex. 11 at 96, 134-35, 146-47 (FMI's Chief Commercial Officer identifying Guardant, PGDx and FMI as the only three companies that have a commercially available product in the space and the other companies as "small sort of esoteric ones that aren't commonly used"))  The evidence can indicate that, if successful, Guardant's lawsuit would increase barriers to entry which would "further cement Guardant's monopoly power" such that it would not be fleeting.  (Tr. at 56; PGDx's Hearing Presentation, Slide 24; D.I. 454, ex. 1 at ¶ 75)

26

the exclusion of PGDx and FMI from the market would result in harm to competition (by

generating a substantial increase in market concentration and increased prices).  (D.I. 454, ex. 1

at ¶¶ 23-47, 72-73 & n.133; *see also* D.I. 453 at 16-20; Tr. at 48; PGDx's Summary Judgment

Hearing Presentation, Slides 7-9)  The United States Department of Justice and the Federal Trade

Commission employ these three tests when examining horizontal mergers between competitors.

Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines ("Merger Guidelines"), 8-

9, 18-21 (Aug. 19, 2010).  They explain that the tests are:

> [T]he principal analytical techniques and the main types of evidence
> on which the Agencies usually rely to predict whether a horizontal
> merger *may substantially lessen competition*.  They are not intended
> to describe how the Agencies analyze cases other than horizontal
> mergers.

*Id.* at 1 (emphasis added).  The "may substantially lessen competition" burden used to evaluate

mergers is a "different, lower" burden than that required by a plaintiff asserting a monopolization

claim, (Guardant's Summary Judgment Presentation, Slide 37; D.I. 437 at 41-42; Tr. at 39-40),

which "provides damages only when a person has proven *actual* injury[,]" (D.I. 437 at 42 (citing

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 561-62 (1981)).

In Guardant's opening brief, it first asserts that Dr. Reiff's utilization of these three tests

to demonstrate anticompetitive effects for purposes of a *Walker Process* Sherman Act Section 2

monopolization claim amounts to use of an unreliable methodology and does not fit the facts of

the case.  Initially, it argued that the tests should not be employed at all outside of the merger

context.  (D.I. 437 at 40-44)  Guardant's argument narrowed a bit by the time of the reply brief,

however, where it argued that Dr. Reiff's "use of the merger guidelines *in a patent context* is

unreliable."  (D.I. 500 at 9-10 (emphasis added))

The Court, however, is not persuaded that these tests may never be used outside of the merger context. (D.I. 453 at 16-18) Dr. Reiff explained why he found these tests useful in evaluating the competitive effects of Guardant's conduct. (*See, e.g.*, D.I. 454, ex. 1 at ¶¶ 72, 74 at n.133; *id.*, ex. 2 at ¶¶ 6 & n.5, 32, 35, 43, 45, 48)[27] Indeed, Guardant's expert Dr. Becker acknowledged that Dr. Reiff "spends a fair amount of time pointing to theoretical tools that economists use to assess . . . indicia of whether particular firms have or do not have market power and/or monopoly power" and that Dr. Reiff did "a reasonable job of articulating what the theory is on that[.]" (D.I. 455, ex. 4 at 31) Further, Defendants cite to several "peer-reviewed academic articles and learned treatises" which in fact apply these tests outside the merger context. (D.I. 453 at 18 (citing D.I. 455, exs. 26-30); Tr. at 58) And *Guardant* even cited to the Merger Guidelines in its discussion of monopoly power. (D.I. 437 at 33-34 (citing to the Merger Guidelines in support of the proposition that when analyzing barriers to entry, "the actual history of entry is a significant factor which is given substantial weight")) The Court thus will not exclude Dr. Reiff's opinions on this basis.[28] And Guardant's other complaints with respect to Dr. Reiff's use of these tests may be explored on cross-examination. (*Id.* at 42-44)

---

[27]     Dr. Reiff was the plaintiff's expert in *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295 (Fed. Cir. 2016), where the Federal Circuit found anticompetitive effects and where Dr. Reiff utilized the UPP test to identify such effects. (D.I. 455, ex. 10 at 14, 188-89; Tr. at 59)

[28]     *Cf. Hartle v. FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 522 (W.D. Pa. 2014) ("The EPA's use of a different test for regulatory purposes does not necessarily mean that Method 17 is unreliable when used on saturated stacks."); *Henrob Ltd. v. Bollhoff Systemtechnick GmbH & Co.*, No. 05-CV-73214-DT, 2009 WL 3199850, at *1-2 (E.D. Mich. Sept. 29, 2009) (rejecting defendants' argument that plaintiff's expert utilized an unreliable test (the "LSMR Test") that had nothing to do with lateral material flow, where the expert "presents an objectively reasonable basis for his opinion that the LSMR Test is an effective method of visually discerning lateral material flow, or at least the effects of lateral material flow").

Other of Guardant's arguments for exclusion of Dr. Reiff's opinions are also unpersuasive.

For example, as to the issue of "fit," Guardant asserts that Dr. Reiff failed to disaggregate the effects of Guardant's lawful procompetitive conduct from its alleged anticompetitive conduct, rendering his opinion "of no use in determining whether any claimed harm was, is or will be the result of the alleged anticompetitive conduct." (*Id.* at 46; *see also* D.I. 500 at 11-12) However, Dr. Reiff opined with respect to what would occur in the market if Guardant's lawsuit were successful, as described above. And the caselaw does not require experts to perfectly disaggregate competitive activity from anticompetitive activity. *See ZF Meritor LLC v. Eaton Corp.*, Civ. No. 06-623-SLR, 2013 WL 6729509, at *2-3 (D. Del. Dec. 20, 2013) (rejecting the defendant's argument that an expert's opinion was fatally flawed for failing to separate the losses attributable to its lawful, pro-competitive conduct from its allegedly unlawful, anti-competitive conduct, as such disaggregation would be "unnecessary, if not impossible") (citing *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2002)); *see also, e.g.*, *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016) (same).

Guardant also complains that Dr. Reiff's opinions do not fit the facts of the case because he did not consider information from any customers about the market, and that he did not consider Dr. Lipson's testimony, *supra* n. 25, that Guardant was not a dominant player on the market. (D.I. 437 at 45) But Guardant's expert, Dr. Becker, also did not speak to any customers, because he did not think it necessary. (D.I. 455, ex. 4 at 60, 283) And Dr. Reiff *did* address Dr. Lipson's testimony, explaining why he discounted its import. (D.I. 454, ex. 2 at ¶ 29 & n.41) In any event, these concerns go to the weight of Dr. Reiff's testimony, and may also be addressed during cross-examination.

29

Lastly, Guardant asserted that Dr. Reiff's "[m]echanical [d]amages [c]alculations [u]sing [s]ummary [i]nvoices [w]ith [n]o [b]ack-[u]p [a]re [i]nadmissable" for a few different reasons. (D.I. 500 at 12-13; *see also* D.I. 437 at 47-50)  Yet the Court does not find persuasive the three arguments that Guardant consistently raised to this effect in its opening and reply briefs,[29] for the following reasons:

- First, the Court does not see a problem with the fact that Dr. Reiff tallied up the attorney's fees and costs asserted to be damages related to Guardant's anticompetitive conduct (i.e., the bringing of this lawsuit)—as opposed to having left that task for the jury.  (*See* D.I. 500 at 12)  Experts regularly present juries with their view of the total damages that are associated with purportedly wrongful conduct.  And part of the process of doing that can involve (as here) the expert calculating the amount of damages by reconciling data obtained from a large number of underlying records.  (D.I. 453 at 23-24; PGDx's Presentation on Guardant's Motion for Summary Judgment and Daubert Motion, Slide 36); *see also Cromeans v. Morgan Keegan & Co., Inc.*, No. 2:12-CV-04269-NKL, 2014 WL 5351193, at *1 (W.D. Mo. Oct. 20, 2014).

- Second, the Court is not convinced that in doing these calculations, Dr. Reiff was necessarily required (as Guardant argues he was) to parse through billing descriptions and make determinations about how much of those fees/costs were the product of good, efficient lawyering—as opposed to "simple waste" on the part of PGDx's attorneys.  (D.I. 500 at 12); *see ABS Glob., Inc. v. Inguran, LLC*, 14-cv-503-wmc, 2016 WL 4204160, at *4 (W.D. Wis. Aug. 9, 2016).  Moreover, such a process could raise some thorny privilege/work product issues, (D.I. 453 at 24), and Guardant assures the Court that its motions here are not meant to raise a "question about privilege[,]" (D.I. 500 at 12).

---

[29]  To the extent the Court herein does not address additional arguments that Guardant made in its opening brief for disallowing Dr. Reiff's testimony, it is because after PGDx responded to those arguments in its answering brief, Guardant did not press them again in its reply brief.  The Court thus deems Guardant to have abandoned these arguments.  *See Progressive Sterilization, LLC v. Turbett Surgical LLC*, Civil Action No. 19-627-CFC, 2020 WL 1849709, at *6 n.8 (D. Del. Apr. 13, 2020) (citing *Blakeman v. Freedom Rides, Inc.*, Civil Action No. 12-416-LPS-CJB, 2013 WL 3503165, at *13 (D. Del. July 10, 2013)).

- Third, while the Court agrees with Guardant that Dr. Reiff does have to provide the jury with some articulable basis to explain his conclusion that the fees and costs at issue are actually associated with this litigation (as opposed to fees and costs associated with other matters, or not fairly traceable to work on this suit), (D.I. 500 at 12-13), here he has (minimally) met this hurdle. The record indicates that Dr. Reiff was provided with invoices from PGDx's counsel that link certain fees and costs with counsels' work on this case. (D.I. 454, ex. 1 at ¶ 77 & ex. 5) To be sure, these invoices are very heavily redacted, and they do not provide much detail (beyond connecting certain amounts of money to counsels' work on this matter). (D.I. 441, exs. 53, 56; D.I. 455, ex. 25) But if Guardant thought it was entitled to more detail here in expert discovery, it could have pressed the Court for it. Having not done so, Guardant is free to cross-examine Dr. Reiff on what he did or did not do in order to conclude that all of the fees and costs at issue are properly attributable to damages. (Tr. at 60) But the testimony will not be stricken on this ground.

The Court thus finds Guardant's arguments as to this issue to be wanting as well.

### 4. Conclusion

For the reasons set out above, while this may be an unusual type of antitrust suit, and while PGDx's evidence in a few areas may be not the most robust, genuine disputes of material fact exist in all relevant areas. Thus, the Court recommends that Guardant's antitrust MSJ be GRANTED-IN-PART only to the extent that PGDx's *Walker Process* counterclaims are premised on the '992 patent, and that it be DENIED in all other respects. And it orders that Guardant's *Daubert* Motion be DENIED.

### C. FMI's *Daubert* Motion

The Court lastly turns to FMI's *Daubert* Motion. It will first summarize the dispute and thereafter will address the parties' arguments.

### 1. Background and Legal Standards

The dispute raised in this motion regards an opinion by Guardant's damages expert, Dr. Becker.  In that opinion, Dr. Becker applies an apportionment factor of 50%—that is, he posits that the asserted patents contribute at least 50% of the value of the FMI accused products at issue.  (D.I. 302, ex. 32 at ¶¶ 201, 226)[30]  As support for this opinion, Dr. Becker relies on a "[d]iscussion with Dr. [Gregory] Cooper[,]" who is Guardant's infringement expert.  (*Id.*, ex. 32 at ¶ 201 & nn.403-04)

With its *Daubert* Motion, FMI asserts that the portions of Dr. Becker's and Dr. Cooper's testimony regarding reasonable royalty damages should be excluded, because of their failure to properly apportion damages to only the patented features of the accused products.  The Court has recently set out the relevant legal standards regarding apportionment of damages in *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, Civil Action No. 17-1390-LPS-CJB, D.I. 445 at 7-9 (D. Del. Jan. 3, 2020).  The Court hereby incorporates its discussion of those standards in *Sunoco* and will follow them herein.  To the extent that consideration of FMI's *Daubert* Motion necessitates discussion of other, related legal principles, the Court will set out those principles below.

## 2.    Discussion

The central dispute here is whether the 50% apportionment value chosen by Dr. Becker (Guardant's damages expert) is sufficiently supported by the content of his discussion with Dr. Cooper (Guardant's infringement expert)—a discussion that provided the exclusive basis for Dr. Becker's apportionment figure.  FMI argues that it is not, as Dr. Cooper's opinions regarding the 50% apportionment value are without "explanation or methodology[.]"  (D.I. 301 at 2)

---

[30]    In this sub-section, references are to the docket in Civil Action No. 17-1616-LPS-CJB, the case in which FMI is the Defendant.

In his report, Dr. Becker explains Dr. Cooper's input as to this issue:

> I understand from Dr. Cooper that the Patents-in-Suit are foundational to the commercial acceptability and success of the FMI accused products, and that they are at least as important as all of the non-patented contributions made to the product by FMI. With respect to technical aspects of FMI's accused products, the Patents-in-Suit account for the overwhelming majority of the technical value.[403]  Based on my discussion with Dr. Cooper, it is reasonable and conservative to assume that the Patents-in-Suit contribute at least 50% of the value of the Accused Products. Other elements that contribute to the success of CGP liquid biopsies, such as machine learning aspects that help improve the accuracy of the assay over time may be important as well but would not be relevant without the benefits of the Patents-in-Suit.  It is my understanding from Dr. Cooper that the accused CGP liquid biopsies would not be able to achieve an acceptable level of sensitivity and specificity without using the inventions of the Patents-in-Suit.[404]

(D.I. 302, ex. 32 at ¶ 201 (footnotes 403 and 404 reciting "Discussion with Dr. Cooper"))  And in applying this understanding, Dr. Becker states:

> [] Dr. Cooper informs me that the Patents-in-Suit are foundational to the commercial success of the Accused Products, and account for at least as much value as the non-patented contributions made by FMI.  This suggests an apportionment factor of no less than 50% of the value of the Accused Products to the Patents-in-Suit. For the purposes of my determination of the reasonable royalty, I have assumed an apportionment factor of 50% to the Patents-in-Suit.

(*Id.* at ¶ 226)

Guardant advances two arguments as to why it believes Dr. Cooper has sufficiently articulated how he determined that this 50% value was warranted.  The Court concludes, however, that neither argument is persuasive.

First, Guardant states that in his expert report, Dr. Cooper "clearly set forth his opinions . . . that the Guardant Patents-in-Suit are foundational and essential to the significant commercial

33

success of . . . FMI's Accused Products" and that these opinions were what Dr. Becker in turn

relied upon in utilizing the 50% figure.  (D.I. 335 at 1 (citing D.I. 339, ex. 80 at ¶¶ 39-78))  Here,

Guardant is citing to a section of Dr. Cooper's opening report on infringement, titled

"SUMMARY OF THE PATENTED INVENTIONS[.]"  (D.I. 339, ex. 80 at ¶¶ 39-78)  This

section discusses prior art "Tissue Biopsies[,]" "Liquid Biopsies And The Approach Of The

Patents-In-Suit[,]" and certain claims of the asserted patents.  (*Id.*)

However, nowhere in this portion of Dr. Cooper's report does Dr. Cooper purport to tie

the relative value of the patented features to *FMI's accused products*, which is meant to be the

focus of the apportionment analysis.[31]  Instead, Dr. Cooper generally discusses the field of

"liquid biopsies" and the role of the asserted patents within that field.  (*See* D.I. 339, ex. 80 at ¶

41 ("In this section, I provide an overview of 'liquid biopsies' and the approach in the Patents-in-

Suit"); *see also id* at ¶¶ 39-78 (not mentioning the FMI accused products))

Moreover, even were this section of Dr. Cooper's report to have made reference to the

accused products, and even if Dr. Cooper is correct when he says that the patented technology is

"foundational" to the accused products, this report still would not pass muster under *Daubert*.

That is because nowhere in this section does Dr. Cooper provide any factual foundation to

support the *specific 50% figure* that he provided to Dr. Becker.  In its briefing, Guardant appears

to suggest that this is not problematic, because after hearing that the patents were "foundational"

---

[31]        *See, e.g., Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*,
809 F.3d 1295, 1301 (Fed. Cir. 2015) (noting that "damages awarded for patent infringement
must reflect the value attributable to the *infringing features of the product*, and no more")
(emphasis added) (internal quotation marks and citation omitted); *Ericsson, Inc. v. D-Link Sys.,
Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("What is taken from the owner of a utility patent (for
purposes of assessing damages under § 284) is only the patented technology, and so the value to
be measured is only the value of the *infringing features of an accused product*.") (emphasis
added).

to the accused products, Dr. Becker "applied the most conservative apportionment possible of 50%." (D.I. 335 at 3-4; *see also id.* at 1) But merely labelling a value "conservative" is no substitute for a showing that there is an evidentiary foundation for the particular percentage selected—i.e., for describing the methodology used to reach that number. *See Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*, Civil No. 12-1369, 2017 WL 3140798, at *4 (W.D. Pa. July 25, 2017) (excluding expert opinion that provided "no objective support for his 50% apportionment rate" and precluding testimony from that same expert that the patented features were a "significant driver" and "majority of" the value of the accused products) (internal quotation marks omitted); *Open Text S.A. v. Box, Inc.*, Case No. 13-cv-04910-JD, 2015 WL 349197, at *4, *6-7 (N.D. Cal. Jan. 23, 2015) (excluding expert's purportedly "conservative" apportionment that did not reflect "the usage and importance of the accused features[,]" where the expert provided no "formula, method, or calculation, however approximate" to justify the 15% figure used, and instead "simply announces it and proceeds to apply it to her royalty base data").

Second, Guardant points to the portion of Dr. Cooper's reply report in which he states that he told Dr. Becker that "the Asserted Patents are essential to the commercial acceptability and success of FMI's Accused Products as they cover in essence the whole process of the detection of rare mutations in [cell-free]DNA." (D.I. 302, ex. 34 at ¶¶ 84, 87 (cited in D.I. 335 at 1, 3)) But obviously, as Dr. Becker notes, there are other non-patented aspects of FMI's accused products that *also* contribute to the products' success, "such as machine learning aspects that help improve the accuracy of the assay over time[.]" (*Id.*, ex. 32 at ¶ 201) And the key is that in Dr. Cooper's reply report, he does not really explain *why* the patented features amount to approximately *50%* of what makes the products successful. (*See* D.I. 366 at 10) Indeed, when

asked at his deposition whether Dr. Cooper ever told him "what [Dr. Cooper's] methodology was for evaluating the extent to which the patented elements contributed to the realizable profit of the product[,]" Dr. Becker replied "No." (D.I. 302, ex. 36 at 798; *see also id.* at 800 (Dr. Becker recalling his conversation with Dr. Cooper as Dr. Becker asking "Okay, so if I've got to put a number on it, are you saying it's at least 50%?" and Dr. Cooper replying "Yeah, that would be reasonable[.]"))

Because no concrete tie to the specific 50% value is explained, Dr. Becker's and Dr. Cooper's opinions lack a sufficiently reliable methodology. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018) (concluding that the district court erred in failing to exclude an expert's damages opinion, where the expert "plucked the 5% royalty rate out of nowhere" because it "is not enough for an expert to simply assert that a particular royalty rate is reasonable in light of evidence without tying the proposed rate to that evidence"); *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (rejecting apportionment that was "plucked out of thin air based on vague qualitative notions of the relative importance of the [accused technology]"); *NetFuel, Inc. v. Cisco Sys. Inc.*, Case No. 5:18-cv-02352-EJB, 2020 WL 1274985, at *9 (N.D. Cal. Mar. 17, 2020) (excluding apportionment analysis where the expert "failed to provide the methodology underlying his apportionment amount or explain how he arrived at that figure based on the facts of this case") (internal quotation marks omitted). Therefore, the Court orders that FMI's *Daubert* Motion be granted.

The Court further orders that Guardant be provided a further opportunity to present supplemental expert reports to address the deficiencies in Dr. Becker's and Dr. Cooper's analysis, and that it may do so by no later than **May 6, 2020**. The parties may further meet and

confer as to what additional process is needed for a response to any such supplemental report, if filed.

## III.    CONCLUSION

For the foregoing reasons, the Court recommends that Guardant's inventorship MSJ be DENIED.  It recommends that Guardant's antitrust MSJ be GRANTED-IN-PART and DENIED-IN-PART, as set out above.  It orders that Guardant's *Daubert* Motion be DENIED and that FMI's *Daubert* Motion be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections by **May 1, 2020**.  Reponses to objections may be served by **May 11, 2020**.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation.  Any such redacted version shall be submitted no later than **April 27, 2020** for review by the Court, along with a motion for redaction that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure."  *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994)

(internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Report and Recommendation.

Dated:  April 22, 2020

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

38

EXHIBITS 32-40

REDACTED IN THEIR ENTIRETY