████████████████████████████

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **MIDWEST ENERGY EMISSIONS** | ) | |
| **CORP. and MES Inc.,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 19-1334 (CJB)** |
| | ) | |
| **ARTHUR J. GALLAGHER & CO.,** *et al.,* | ) | ██████████████████ |
| | ) | ██████████████████ |
| **Defendants.** | ) | **REDACTED - PUBLIC VERSION** |

**PLAINTIFFS MIDWEST ENERGY EMISSIONS CORP. AND MES INC.'S
RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT AND TO EXCLUDE EXPERT WITNESSES AND TESTIMONY**

RESTRICTED—ATTORNEYS EYES ONLY

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

NATURE AND STAGE OF THE PROCEEDINGS ......................................................... 1

SUMMARY OF THE ARGUMENT ................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

LEGAL STANDARD ........................................................................................................ 4

ARGUMENT ..................................................................................................................... 4

I. ME2C's Patent Licenses to a Subset of Power Plants Do Not Retroactively Absolve Defendants' Pre-License Conduct. ............................................................ 4

II. Defendants Have Infringed the '147 Patent. ........................................................... 6

III. Defendants Have Infringed the Other Disputed Claims. ......................................... 8

IV. Defendants Cannot Avoid Liability Merely Because They Did Not Sign Refined Coal Sale Contracts ................................................................................................... 9

V. Defendants Had the Requisite Knowledge to be Liable for Indirect Infringement. ............ 13

VI. Defendants Have Contributed to Infringement. ..................................................... 15

    A. The Accused Refined Coal Has No Substantial Non-Infringing Use ................ 15

    B. Refined Coal Is Especially Made or Adapted for Use as an Infringement. ........ 18

VII. Defendants Have Induced Infringement. ................................................................ 19

VIII. Defendants Have Failed to Present Clear and Convincing Evidence of Invalidity ............ 21

    A. Defendants have Failed to Prove that the '114, '225, '430, and '517 Patents must be assigned a later priority date. ...................................................... 22

        1. Defendants' Priority Date Challenge Fails Because They Cite the Wrong Rule Regarding Incorporation by Reference. .................................................... 23

        2. Defendants Failed to Identify Improper Incorporation by Reference Language .............................................................................................................. 25

        3. Defendants Failed to Prove a Break in Priority Based on Additional Disclosures in the Relevant Applications ...................................................... 27

    B. Defendants Failed to Prove That the '147 and '225 Patents Lack Written Description. ................................................................................................... 30

IX. Mr. O'Keefe Is Qualified to Testify on the Full Scope of His Reports. ............................. 31

    A. Defendants Rely on the Wrong Standard for Qualification Under Rule 702...... 31

    B. Mr. O'Keefe Has Substantial Experience in the Relevant Field ......................... 33

    C. Mr. O'Keefe's Education and Experience Qualify Him as an Expert. ............... 35

**RESTRICTED—ATTORNEYS EYES ONLY**

D.    Defendants' More Targeted Attacks on Mr. O'Keefe Are Also Misplaced. ...... 37

E.    Mr. O'Keefe Does Not Offer Improper Opinion Testimony. ........................... 39

F.    Mr. O'Keefe's Opinions on Contributory Infringement Are Methodologically Sound.................................................................................................................. 41

G.    Mr. O'Keefe Is Qualified to Opine on Secondary Considerations. ................... 41

X.    Mr. Green's Reasonable Royalty Analysis is Methodologically Sound ............................ 42

A.    Mr. Green Properly And Sufficiently Considered The Chem-Mod, Nalco, and ADA-ES Agreements. .................................................................................. 43

B.    Mr. Green's Royalty Rate Range Does Not Fail To Apportion Tax Credits. ..... 48

RESTRICTED—ATTORNEYS EYES ONLY

## **TABLE OF AUTHORITIES**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*
   694 F.3d 1312 (Fed. Cir. 2012)................................................................................ 43

*Alarm.com, Inc. v. SecureNet Techs. LLC*
   No. CV 15-807-RGA, 2019 WL 133228 (D. Del. Jan. 8, 2019) ............................ 42

*Aloe Coal Co. v. Clark Equip. Co.*
   816 F.2d 110 (3d Cir. 1987)................................................................................... 32

*Aro Mfg. Co. v. Convertible Top Replacement Co.*
   377 U.S. 476 (1964)................................................................................................. 5

*Bayer Healthcare LLC v. Baxalta Inc.*
   989 F.3d 964 (Fed. Cir. 2021)................................................................................ 44

*Berall v. Teleflex Med. Inc.*
   No. 10-CV-5777 (LAP), 2021 WL 9629067 (S.D.N.Y. Sept. 13, 2021) .................. 5

*Bial-Portela & CA. S.A. v. Alkem Lab. Ltd.*
   2022 WL 4244989 (D. Del. 2022) .......................................................................... 32

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*
   967 F.3d 1353 (Fed. Cir. 2020)......................................................................... 43, 48

*Brooktree Corp. v. Advanced Micro Devices, Inc.*
   977 F.2d 1555 (Fed. Cir. 1992).............................................................................. 22

*Burton v. Teleflex Inc.*
   707 F.3d 417 (3d Cir. 2013).................................................................................... 4

*Caterpillar Prodotti Stradali S.R.L. v. Int'l Trade Comm'n*
   847 F. App'x 893 (Fed. Cir. 2021) .................................................................... 39, 40

*Commonwealth Sci. & Indus. Rsch. Organisation v. Buffalo Tech. (USA), Inc.*
   542 F.3d 1363 (Fed. Cir. 2008).............................................................................. 23

*Commonwealth Sci. and Indus. Research Org. v. Cisco Sys., Inc.*
   809 F.3d 1295 (Fed. Cir. 2015).............................................................................. 48

*Conceptus, Inc. v. Hologic, Inc.*
   No. C 09-02280 WHA, 2011 WL 13152795 (N.D. Cal. Sept. 27, 2011)................ 40

RESTRICTED—ATTORNEYS EYES ONLY

*Cross Refined Coal, LLC v. Comm'r of Internal Revenue*
    45 F.4th 150 (D.C. Cir. 2022) ................................................................... 50

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*
    851 F.2d 1387 (Fed. Cir. 1988) ................................................................. 42

*Elcock v. Kmart Corp.*
    233 F.3d 734 (3d Cir. 2000) .................................................................. 4, 32

*Ericsson, Inc. v. D-Link Sys., Inc.*
    773 F.3d 1201 (Fed. Cir. 2014) ................................................................. 43

*Exela Pharma Sciences, LLC v. Eton Pharmaceuticals, Inc.*
    2022 WL 806524, Case No. 20-cv-365 (D. Del. 2022) ............................... 4

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*
    7 F.4th 1320 (Fed. Cir. 2021) ............................................................. 39, 40

*Global-Tech Appliances, Inc. v. SEB S.A.*
    563 U.S. 754 (2011) .................................................................................... 9

*GREE, Inc. v. Supercell Oy*
    No. 219CV00070JRGRSP, 2020 WL 4288350 (E.D. Tex. July 27, 2020) ............................ 39

*Harari v. Lee*
    656 F.3d 1331 (Fed. Cir. 2011) ........................................................... 26, 27

*Holbrook v. Lykes Bros. S.S. Co.*
    80 F.3d 777 (3d Cir. 1996) ........................................................................ 32

*Hollmer v. Harari,*
    681 F.3d 1351 (Fed. Cir. 2012) ................................................................. 27

*Honeywell Int'l, Inc. v. United States*
    609 F.3d 1292 (Fed. Cir. 2010) ................................................................... 5

*Icon Health & Fitness, Inc. v. Tonal Sys.*
    C.A. 21-652-LPS-CJB, D.I. 45 (D. Del. Feb. 7, 2022) ............................... 13

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*
    No. 4:14-CV-371, 2016 WL 3746523 (E.D. Tex. Jan. 28, 2016) ................ 40

*Izumi Prod. Co. v. Koninklijke Philips Elecs. N.V.*
    315 F. Supp. 2d 589 (D. Del. 2004) ......................................................... 33

iv

RESTRICTED—ATTORNEYS EYES ONLY

*Manville Sales Corp. v. Paramount Sys., Inc*.,
    917 F.2d 544 (Fed. Cir. 1990) ................................................................. 10

*Maquet Cardiovascular LLC v. Abiomed, Inc.*
    No. CV 17-12311-FDS, 2022 WL 4138711 (D. Mass. Sept. 12, 2022) ........................... 24, 25

*McKesson Info. Sols., Inc. v. Bridge Med., Inc.*
    CIV S-02-2669 FCDKJM, 2005 WL 2346919 (E.D. Cal. Sept. 23, 2005) ........................... 17

*Microsoft Corp. v. DataTern, Inc.*
    755 F.3d 899 (Fed. Cir. 2014) .................................................................. 9

*Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*
    C.A. 19-1334-RGA-CJB, 2021 WL 2036671 (D. Del. May 20, 2021) ................................ 13

*Monsanto Co. v. Ralph*
    382 F.3d 1374 (Fed. Cir.) ..................................................................... 50

*Nalco Co. v. Chem-Mod, LLC*
    883 F.3d 1337 (Fed. Cir. 2018) ............................................................... 18

*Oak Indus., Inc. v. Zenith Elecs. Corp.*
    726 F.Supp. 1525 (N.D.Ill.1989) .............................................................. 18

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*
    806 F.2d 1565 (Fed. Cir. 1986) ............................................................... 10

*OrthoPediatrics Corp. v. Wishbone Med., Inc.*
    No. 3:20-CV-929 JD, 2022 WL 4978169 (N.D. Ind. Oct. 4, 2022) ................................ 36

*Osseo Imaging, LLC v. Planmeca USA Inc.*
    No. 1:17-CV-01386-JFB, 2023 WL 1815975 (D. Del. Feb. 8, 2023) ............................... 33

*Pavo Solutions LLC v. Kingston Tech. Co., Inc.*
    35 F.4th 1367 (Fed. Cir. 2022) ............................................................... 48

*Pelican Int'l, Inc. v. Hobie Cat Co.*
    No. 320-CV-02390, 2023 WL 2130379 (S.D. Cal. Feb. 10, 2023) ................................. 40

*Petruzzi's IGA Supermarkets v. Darling–Delaware Co.*
    998 F.2d 1224 (3d Cir.1993) ................................................................... 4

*Pineda v. Ford Motor Co.*
    520 F.3d 237 (3d Cir. 2008) .................................................................. 32

RESTRICTED—ATTORNEYS EYES ONLY

*Polaris Indus., Inc. v. Arctic Cat, Inc.*
  882 F.3d 1056 (Fed. Cir. 2018)................................................................. 42

*Realtime Data LLC v. EchoStar Corp.*
  No. 6:17-CV-00084-JDL, 2018 WL 10466828 (E.D. Tex. Dec. 6, 2018) ............................... 5

*Realtime Data, LLC v. Actian Corp.*
  No. 6:15-CV-463 RWS-JDL, 2017 WL 11662038 (E.D. Tex. Mar. 29, 2017) ...................... 40

*Schneider ex rel. Estate of Schneider v. Fried*
  320 F.3d 396 (3d Cir. 2003).................................................................. 4

*Smith & Nephew, Inc. v. Interlace Med., Inc.*
  No. CIV.A. 10-10951-RWZ, 2012 WL 3560811 (D. Mass. Aug. 17, 2012) ........................ 40

*Sonos, Inc. v. D & M Holdings Inc.*
  297 F. Supp. 3d 501 (D. Del. 2017)........................................................... 33

*State Indus., Inc. v. Mor-Flo Indus., Inc.*
  883 F.2d 153 (Fed. Cir. 1989)................................................................ 50

*Sundance, Inc. v. DeMonte Fabricating Ltd.*
  550 F.3d 1356 (Fed. Cir. 2008)............................................................... 33

*Tech. Licensing Corp. v. Videotek, Inc.*
  545 F.3d 1316 (Fed. Cir. 2008)............................................................... 22

*Thomas & Betts Corp. v. Richards Mfg. Co.*
  342 Fed. Appx. 754 (3d Cir. 2009)............................................................ 32

*TQ Delta, LLC v. 2Wire, Inc.*
  373 F. Supp. 3d 509 (D. Del. 2019)........................................................... 33

*TQ Delta, LLC v. ADTRAN, Inc.*
  No. CV 14-954-RGA, 2019 WL 5677539 (D. Del. Oct. 31, 2019)................................. 33

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*
  425 F.3d 1366 (Fed. Cir. 2005)............................................................... 50

*Vectura Ltd. v. GlaxoSmith-Kline LLC*
  397 F. Supp. 3d 579 (D. Del. 2019)........................................................... 48

*Vectura Ltd. v. GlaxoSmithKline LLC*
  981 F.3d 1030 (Fed. Cir. 2020)............................................................... 48

**RESTRICTED—ATTORNEYS EYES ONLY**

*Veritas Operating Corp. v. Microsoft Corp.*
  562 F. Supp. 2d 1141 (W.D. Wash. 2008) ............................................................ 18

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*
  No. 11-515-LPS-CJB, 2015 WL 12731924 (D. Del. Nov. 4, 2015) ....................... 50

*Waldorf v. Shuta*
  142 F.3d 601 (3d. Cir.1998) .................................................................................. 32

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*
  609 F.3d 1308 (Fed. Cir. 2010) ............................................................................. 10

*Zenon Env't, Inc. v. U.S. Filter Corp.*
  506 F.3d 1370 (Fed. Cir. 2007) ............................................................................. 27


**Statutes**

35 USC § 102 ............................................................................................................ 2, 30

35 USC § 103 ............................................................................................................ 2, 30

35 USC § 112 ................................................................................................. 3, 22, 24, 31

35 USC § 112(a) ............................................................................................................. 25

35 USC § 119 ................................................................................................................. 25

35 USC § 119(a) ............................................................................................................. 25

35 USC § 120 ............................................................................................... 22, 24, 25, 31

35 USC § 271(b) .............................................................................................................. 9

35 USC § 271(c) .............................................................................................................. 9

37 CFR § 1.57(d) ........................................................................................... 2, 21, 25, 30


**Other Authorities**

MPEP 201.06(c) ...................................................................................... 22, 24, 25, 26, 27

MPEP 608.01(p) ......................................................................................... 2, 21, 22, 25


**Rules**

Fed. R. Ev. 702 ......................................................................................................... 3, 31

Fed. R. Ev. 704 ............................................................................................................. 40

**RESTRICTED—ATTORNEYS EYES ONLY**

| Ex. | Declaration of Philip O'Keefe |
|---|---|
| O'Keefe Ex. A | Opening report |
| O'Keefe Ex. B | Rebuttal report |
| O'Keefe Ex. C | Reply report |
| **Ex.** | **Declaration of Philip Green** |
| Green Ex. A | Opening report |
| Green Ex. B | Reply report |
| **Ex.** | **Declaration of Justin Nemunaitis** |
| 1 | Excerpts from Deposition of William Whitney |
| 2 | Excerpts from Deposition of Sally Batanian |
| 3 | Excerpts from Deposition of Tom Erickson |
| 4 | Excerpts from Deposition of Vince Inendino |
| 5 | Excerpts from Deposition of Chris Berkimer |
| 6 | Excerpts from Deposition of Philip O'Keefe |
| 7 | Excerpts from Deposition of Philip Green |
| 8 | Excerpts from Deposition of Dr. Stephen Niksa |
| 9 | U.S. Pat. App. No. 12/201,595 |
| 10 | U.S. Pat. App. No. 15/295,594 |
| 11 | CERT Defs.' Objs. & Resps. to Pls.' 3d Set of Common Interrogatories |
| 12 | Defs.' Resps. & Objs. to Pls.' 3d Set of Common Interrogatories |
| 13 | MPEP 608.01(p) (highlighted) |
| 14 | Google Patents Search Results |
| 15 | SB00002510 |
| 16 | SB_00002503 |
| 17 | SB_00003711 |
| 18 | CERT-0011704 |
| 19 | SB_00041379 |
| 20 | CERT-0034624 |
| 21 | CERT-0012026 |
| 22 | WHELAN-0000805 |
| 23 | ArborFuels_00159329 |
| 24 | Excerpts from Deposition of George Kotch |
| 25 | Excerpts from Deposition of Jeff Green |
| 26 | CERT-0012609 |
| 27 | Belle_00018066 |
| 28 | SB_00026045 |
| 29 | ME2C's Responses to Defendants' Second Set of Common Interrogatories (May 16, 2022) |
| 30 | ME2C's Responses to Refined Coal LLC Defendants' Fourth Set of Common Interrogatories |

**RESTRICTED—ATTORNEYS EYES ONLY**

| 31 | REF-COAL_00020453 |
|----|-------------------|
| 32 | ArborFuels_0081059 |
| 33 | REF-COAL_00001898 |
| 34 | Defendants' Responses and Objections to ME2C's First Requests for Admission |
| 35 | CERT Defendants' Responses and Objections to ME2C's First Requests for Admission |
| 36 | Alistar's Responses and Objections to ME2C's First Requests for Admission |
| 37 | Excerpts from Deposition of Sally Batanian (Feb. 20, 2019) |

RESTRICTED—ATTORNEYS EYES ONLY

## INTRODUCTION

Defendants' motion is a classic example of throwing everything at the wall to see what sticks.  In their hope for a win on any issue in the case, they fail to recognize controlling law, ignore important evidence, and even seek rulings on issues already decided by this Court.  While Defendants are of course allowed to try to avoid trial on the merits, this motion should not entitle them to the relief they seek.  ME2C respectfully requests that the motion be denied.

## NATURE AND STAGE OF THE PROCEEDINGS

This is a patent infringement case. The operative Fourth Amended Complaint ("4AC") was filed on May 3, 2022. D.I. 406 (4AC). The parties have completed fact and expert discovery, and the Court has issued a claim construction ruling.  Trial is set for November 13, 2023.

## SUMMARY OF THE ARGUMENT

Defendants have failed to demonstrate an absence of material fact disputes justifying summary judgment on any of their eight motions.  Defendants similarly fail to show that testimony from Messrs. O'Keefe and Green should be excluded.

I.        **MSJ of no Infringement for Pre-Licensed Conduct.**  As explained by the Supreme Court in *Aro Mfg. Co. v. Convertible Top Replacement Co*., ME2C's licenses with power plants do not retroactively absolve Defendants' liability for indirect infringement.

II.       **MSJ of Non-Infringement of the '147 Patent.**  At most, Defendants identify a fact dispute as to the presence of a bromine-containing promoter.

III.      **MSJ of Non-Infringement of Bromine/Carbon Ratio Claims.**  Defendants cannot demonstrate non-infringement of a subset of '147, '114, '517, and '430 claims where ME2C has presented unrebutted testimony and evidence that the claims are infringed.

IV.       **MSJ of Non-Infringement for Non-Signatories to Sales Contracts.**  The mere fact that certain Defendants are not named in sales contracts for refined coal is insufficient to

1

absolve them of liability where they have otherwise directed, controlled, and participated in the accused conduct.

V.　　　**MSJ of Non-Infringement Based on Lack of Knowledge of ME2C's Patents.**

Defendants argue that the filing of a complaint cannot provide notice for indirect infringement purposes, but the Court already rejected this argument and Defendants provide no basis for reconsideration.   Regardless, ME2C has presented evidence that Defendants had pre-suit knowledge of ME2C's patents as evidenced at least by Defendants' internal emails, Defendants' communications with power plants that were aware of ME2C's patents, and Defendants' presence at a technical conference where ME2C discussed its patents, among other evidence.  At a minimum, this evidence demonstrates a genuine fact dispute regarding pre-filing notice.

VI.　　　**MSJ of No Contributory Infringement.**  Defendants have failed to show an absence of fact disputes regarding contributory infringement.  Defendants mistakenly conflate non-accused conduct with a substantial non-infringing use, without showing that the alleged use would have been available for the accused power plants during the damages period.  They similarly fail to acknowledge the extent to which the refined coal accused in this case has been especially adapted for the power plants at issue.

VII.　　　**MSJ of No Induced Infringement.**  Defendants' contentions regarding inducement re-hash arguments from their failed attempts to dismiss ME2C's inducement claims. Because discovery has confirmed ME2C's allegations, Defendants' motion for summary judgment should be denied as well.

VIII.　　　**MSJ of Invalidity.**  Defendants' §§ 102/103 theories depend on negating the priority date of the patents-in-suit.  They rely on 37 CFR 1.57(d) to accomplish that goal, but they are mistaken; that rule does not apply in a priority date challenge.  *See* MPEP 608.01(p).

2

RESTRICTED—ATTORNEYS EYES ONLY

What is more, Defendants also misstate the law regarding incorporation by reference statements and misinterpret various teachings in the patents that independently support the earliest priority date.  For at least these reasons, Defendants also cannot prevail on their § 112 challenges either.

IX.        **Motion to Exclude ME2C's Technical Expert.**  Defendants' *Daubert* challenge of Mr. O'Keefe must fail because they severely misstate his qualifications, and in any event, they rely on the wrong standard for assessing qualifications under Rule 702.

X.        **Motion to Exclude ME2C's Damages Expert.** Defendants' *Daubert* challenge of Mr. Green must fail because they merely dispute his conclusions without identifying any methodological error in his analysis.

## STATEMENT OF FACTS[1]

This case involves five patents for capturing mercury emissions from coal-fired power plants.  Def. Exs. 1–5.  The claims of these patents generally cover the use of calcium bromide added to coal or a combustion chamber, downstream injection of activated carbon ("ACI"), and the use of a particulate capture device to remove mercury.  O'Keefe Ex. A at 10–46.

ME2C alleges that Defendants induce and contribute to infringement of the five patents-in-suit by marketing, manufacturing, offering for sale, selling, and delivering specific refined coals with added calcium bromide to specifically identified power plants.  O'Keefe Ex. A at 123–134.  Defendants provided the accused refined coal on conveyor belts leading to the combustion chambers of each power plant knowing that it would be combusted at a power plant that would rely on activated carbon injection to comply with the EPA's mercury regulations

---

[1] Defendants have filed motions on a wide range of disparate issues.  To avoid confusion and redundancy, additional factual evidence is identified on an issue-by-issue basis below.

RESTRICTED—ATTORNEYS EYES ONLY

("MATS").  *Id.* at 123–126.  This conduct was highly damaging to ME2C's business, and as a result, ME2C seeks damages in the form of a reasonable royalty.  *See generally* Green Ex. A.

## LEGAL STANDARD

When defendants move for summary judgment, they bear the burden to show that the plaintiff has failed to establish an essential element of a claim.  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). At the summary judgment stage, courts do not "weigh the evidence or make credibility determinations," but, instead, leave that task to the fact-finder.  *Petruzzi's IGA Supermarkets v. Darling–Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir.1993).

When evaluating a motion to exclude expert testimony, the proponent of the testimony bears the burden of proving admissibility by a preponderance of evidence.  *Exela Pharma Sciences, LLC v. Eton Pharmaceuticals, Inc.*, 2022 WL 806524 at *1, Case No. 20-cv-365 (D. Del. 2022).  Expert testimony is admissible if meets the requirements of "qualification, reliability and fit."  *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  The third circuit applies a "liberal standard" when evaluating the admissibility of expert testimony.  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

## ARGUMENT

I.    **ME2C's Patent Licenses to a Subset of Power Plants Do Not Retroactively Absolve Defendants' Pre-License Conduct.**

Some of the Defendants in this case sold refined coal to power plants that later obtained a license to ME2C's patents.  For these Defendants, ME2C is alleging indirect infringement for sales of refined coal that occurred before the date of those licenses.  According to Defendants, these claims are defective because, the licenses "retroactively authorized the power plants' activity, negating any claim of direct infringement based on prior acts, and thus precluding any

claim of indirect infringement predicated on activity at those plants." Defs.' Br. at 14.[2]

Defendants are simply wrong on the law. As the Supreme Court has held, "[a] release given a direct infringer in respect of past infringement, which clearly intends to save the releasor's rights against a past contributory infringer, does not automatically surrender those rights." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 501 (1964); *see, e.g.*, *Berall v. Teleflex Med. Inc.*, No. 10-CV-5777 (LAP), 2021 WL 9629067, at *3 (S.D.N.Y. Sept. 13, 2021) (citing *Aro* and holding that the relevant agreement "simply represent[ed] the parties' bargain that Aircraft would not face liability for its past infringing acts," and did not establish that the past acts "were authorized, let alone that they were sanctioned *at the time they were made*") (emphasis in original); *Realtime Data LLC v. EchoStar Corp.*, No. 6:17-CV-00084-JDL, 2018 WL 10466828, at *3 (E.D. Tex. Dec. 6, 2018) ("As these sales occurred prior to the execution of the RPX Agreement, they are unauthorized and cannot be retroactively authorized by the later execution of the RPX Agreement."); *cf. Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1304 (Fed. Cir. 2010) (subsequent ownership of a patent did "not retroactively authorize the earlier sale" of the patented invention). Defendants have no excuse for failing to address *Aro* in their motion, as ME2C specifically identified this decision to Defendants during discovery. Ex. 29 at 9-10. If Defendants have some basis for distinguishing this case, the Court should not permit them to raise it for the first time in reply.

The sole case Defendants cite for support—*JVC Kenwood Corp. v. Nero, Inc.*—does *not*

---

[2] The issue to be decided here is whether RC suppliers for NRG and Vistra facilities can be liable for indirect infringement based on conduct that occurred before the effective dates of the relevant agreements. As Defendants note, ME2C does not contend that any Defendant is liable for indirect infringement relating to coal combusted at a power plant *after* that plant licensed ME2C's patents. Additionally, ME2C is not pursuing claims against any current Defendant for supplying refined coal to Talen or AECI.

RESTRICTED—ATTORNEYS EYES ONLY

address retroactive authorization.  *See* 797 F.3d 1039.  Rather, the panel affirmed a finding of no indirect infringement where the alleged direct infringement was subject to a license *at the time of the accused sale*.  *See id.* at 1045–46.  Accordingly, *JVC Kenwood* merely supports a finding of no *post*-license infringing conduct, which is precisely ME2C's position in this case.

 Moreover, the agreements at issue— ███████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████████

███████████████

 In short, because Defendants' infringing conduct "had already taken place at the time of the agreement. . . . it cannot be held, in the teeth of [the agreement's] contrary language and intention, to have erased the extant infringement."  *See Aro*, 377 U.S. at 501.  Even if there were some merit to Defendants' position—which there is not—at most, they have raised a fact dispute over the scope of the license grants.  Thus, the Court should deny Defendants' motion for summary judgment on this ground.

## II. Defendants Have Infringed the '147 Patent.

 According to Defendants, power plants' combustion of coal with added calcium bromide cannot meet the "bromine containing promoter" limitations of the '147 patent.  However, Defendants fail to address the fact that both sides' experts have concluded that combustion of coal with added bromide *does* meet these limitations.  Indeed, ME2C's expert Mr. O'Keefe

RESTRICTED—ATTORNEYS EYES ONLY

opines that combustion of coal with added bromide causes infringement, and Defendants' expert

Dr. Niksa offers a very similar explanation in the validity context, as shown below.[3]

| Mr. O'Keefe's Opening Report | Dr. Niksa's Opening Report |
|---|---|
| **Bromide compounds added to coal contain bromine ions** | **Bromide compounds added to coal contain bromine ions** |
| "This refined coal included feedstock coal with added MerSorb. MerSorb contains calcium bromide ($CaBr_2$) dissolved in water. When calcium bromide is dissolved in water, the solution contains calcium ions ($Ca^{++}$) and bromine ions ($Br-$).  These atoms of bromine are the promoter." (Pg. 159) | "Vosteen also discloses adding a bromide ion ($Br-$) to the coal and to the combustion chamber in the form of aqueous solutions of hydrogen bromide and sodium bromide, each of which dissociates in water to form bromide ions." (¶ 770) |
| **The bromide is converted to gaseous form in the boiler** | **The bromide is converted to gaseous form in the boiler** |
| Moreover, because water boils at 100 degrees Celsius and the combustion chambers maintain heat far above that temperature, the $Br-$ exits the combustion chamber in a gaseous state. (Pg. 159) | "For example, Vosteen describes applying aqueous hydrogen bromide (HBr) to the coal and into the combustion chamber, and at combustion temperatures (much greater than the boiling point of water), the HBr evaporates into the gas phase" (¶ 771) |
| **This bromine acts as a promoter** | **This bromine acts as a promoter** |
| "It is well accepted that both homogeneous and heterogeneous reactions must take place. Thus, for example, mercury leaving the combustion chamber would not be fully oxidized by the time it reaches the activated Carbon." (Pg. 160) | "The POSITA would understand that not all bromine added to the coal or combustion chamber in Vosteen is used to oxidize mercury [. . .] a POSITA would have understood that excess bromine would be available to contact the activated carbon in the mercury-containing gas to form a promoted sorbent." (¶ 618) |
| "Thus, this activated carbon and the bromine come into contact and form a promoted brominated sorbent, i.e., a sorbent particle that is bound with the bromine."  (Pg. 159) | |

Despite this testimony, Defendants now contend that the bromine they add to coal cannot

be a bromine containing promoter because it undergoes various intermediate chemical reactions

as it travels from the coal pulverizers, through the furnace, to the activated carbon injection

point.  However, they identify no claim limitation that excludes such reactions.  As Dr. Niksa

--------

[3] The asserted Vosteen reference is distinguishable at least based on its failure to teach injection of activated carbon.  *See, e.g.,* IPR2020-00834, Paper 18 at 18 (declining to institute *Inter Partes* review based on Vosteen due to the lack of disclosure of activated carbon injection).

RESTRICTED—ATTORNEYS EYES ONLY

admitted, the bromine that Defendants add to coal and that enters the combustion chamber, is the same bromine that exits the combustion chamber, it may just be attached to other elements:

> Q. Now, in the combustion chamber, the bromine is not completely burned up? It's not a fuel; is that fair?
> A. There's no nuclear chemistry inside the furnace. So bromine does not become another element.
> Q. Thank you. Exactly my question. So there's bromine going in, there's going to be bromine coming out; is that fair?
> A. The issue is not the bromine. The issue is what the bromine is bound up with. There's no –there's no unique process associated only with the atoms of bromine. Since it's not nuclear chemistry, what we are really concerned with is what the bromine is attached to.

Ex. 8, Niksa Depo. at 39:2-21.  At a minimum, the fact that Defendants' own expert has offered testimony in support of ME2C's infringement theory and in conflict with Defendants' non-infringement theory demonstrates that there is at least a dispute of material fact precluding summary judgment.

## III.    Defendants Have Infringed the Other Disputed Claims.

Defendants contend that there is "no evidence," of infringement for claims requiring that the sorbent or mercury-containing gas comprises 1–30 g of bromine for every 100 g of activated carbon sorbent.  However, Mr. O'Keefe identified specific evidence corresponding with these limitations.  O'Keefe Ex. B at 153.  For example, he explains that this range corresponds to the saturation limit of bromine on carbon such that "power plants employing bromine additives and activated carbon would necessarily produce a sorbent that is 1 g to 30 g bromine per 100 g of activated carbon."  *Id.*  Dr. Niksa agrees.  Niksa Ex. A at ¶ 522 (explaining bromine/carbon saturation limit and stating: "Given the residence times in flue gas, and other inefficiencies, a person of ordinary skill in the art would have understood that the actual bromine loaded onto activated carbon would have been less than the saturation limit.").  Indeed, he did not dispute infringement as to most of the claims containing this limitation, and even where he did dispute

RESTRICTED—ATTORNEYS EYES ONLY

infringement ('147 claim 17), he did not dispute that the accused power plants meet this limitation. *See generally* Niksa Ex. B (not disputing infringement of '114 claim 4 for example). Given that ME2C has presented un-rebutted testimony that these claim limitations are met, and the substantive basis for that opinion is supported by Defendants' own expert, summary judgment of non-infringement is inappropriate.

## IV.  Defendants Cannot Avoid Liability Merely Because They Did Not Sign Refined Coal Sale Contracts

Defendants contend that a subset of Defendants who did not directly sign refined coal sales contracts "cannot be liable either for contributory infringement or active inducement" because they did not sell or offer to sell refined coal. Defs.' Br. at 19. Defendants are mistaken on both counts.

First, any requirement of a sale or offer to sell is relevant only to contributory infringement, and not to induced infringement. *Compare* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."), *with id.* § 271(c) (a "contributory infringer" includes one who "offers to sell or sells . . ."). Rather, to prove induced infringement, the patentee must "show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011)). As explained below, ME2C has amassed substantial evidence of such inducing acts that are not limited to merely signing contracts for the sale of refined coal. *See infra* sec. VII. Thus, failure to prove a sale or offer for sale (even if true) cannot support a grant of summary judgment on induced infringement.

RESTRICTED—ATTORNEYS EYES ONLY

Second, ME2C's claim for contributory infringement against these Defendants is based on their participation in and/or control over the sales of Refined Coal.  "[C]orporate officers who actively assist with their corporation's infringement may be personally liable for inducing infringement regardless of whether the circumstances are such that a court should disregard the corporate entity and pierce the corporate veil."  *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1316 (Fed. Cir. 2010) (internal citation omitted) (quoting *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990)).   And, "[a]s with inducement, a corporation does not shield officers from liability for personally participating in contributory infringement."  *Id.* at 1317; *see also Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed. Cir. 1986) (upholding jury verdict finding of personal liability for contributory infringement on the non-selling corporate officers where the officers "were directly responsible for the design and production of the infringing [products] and . . . were the only ones who stood to benefit from sales of those [products]").  In those cases, the contracts for the sale of refined coal would be in the name of a corporate entity, but this would not shield others from liability for participating in the infringing conduct even if they remain unnamed in the contract.

Here, the CERT Operations Defendants are liable for contributory infringement because they are responsible for the provision of Refined Coal to power plants.  It is undisputed that the CERT RC Defendants entered into contracts for the manufacture and sale of refined coal.  Defs.' Br. at 7.  While the CERT Operations Defendants are not named in the contract, none of the CERT RC Defendants have employees to actually carry out their obligation to manufacture and deliver refined coal.  Ex. 11 at 8–9.  Rather, they rely on the CERT Operations Defendants to do that.  Ex. 25 at 254:2–5.  Thus, even though the CERT RC Defendants may be named on the

RESTRICTED—ATTORNEYS EYES ONLY

contracts for the sale of the refined coal, the CERT Operations Defendants effectuated such sale (and, thus, the contributory infringement) by participating in the operation, production, and delivery of refined coal to the infringing power plants.  The same can be said of AJG Iowa Refined Coal LLC and DTE Energy Resources, LLC, who own and control entities that contracted for the sale of Refined Coal.  *See* O'Keefe Ex. A at ¶¶ 85–91 (collecting evidence regarding corporate structure and control by corporate parents for AJG and DTE Defendants).

Moreover, additional evidence supports ME2C's claims against DTE Energy Resources, LLC ("DTE") as it owns and controls the other DTE Defendants.  This Court previously held that ME2C alleged facts that "plausibly demonstrate a lack of corporate separateness between these entities" sufficient to support alter ego and/or agency liability.  Oral Order, D.I. 404.  All of ME2C's allegations have been borne out through discovery:

(a) DTE pays the DTE REFCOs' costs[4]; (b) the DTE REFCOs were designed to operate at a loss, with no intention of ever turning a profit, and they simply pass their income back to DTE, which in turn uses it to help fund the DTE REFCOs' operation[5]; (c) DTEs employees provide tax and accounting services to the DTE REFCOs[6]; (d) DTE directs the DTE REFCOs' contracting ability and directs the

---

[4] *E.g.*, Ex. 5 at 59:11–60:10 ████████████████████████████████
████████████████████████████████████████████

[5] Mr. Berkimer testified that ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████ *Id.* at 84:21–88:15.
[6] *E.g.*, *id.* at 45:4–14 ████████████████████████████████
████████████████████████████████████

RESTRICTED—ATTORNEYS EYES ONLY

DTE REFCOs' infringing conduct[7]; and (e) none of the DTE REFCOs have independent business interests.[8]

The Court further noted in its Oral Order that the potential lack of a judgment-proof defendant qualified as "an element of injustice or unfairness." *See* Oral Order, D.I. 404. And indeed, not only were the DTE RC LLC Defendants designed to operate at a loss, they also ceased operation upon expiration of the Section 45 tax credits at the end of 2021. Ex. 5 at 35:8–11. Defendants do not even attempt to rebut this evidence and instead merely attempt to lump DTE in with other Defendants without explaining the important role DTE played in the infringing conduct.

Similarly, AJG Iowa Refined Coal LLC owns and controls entities that contracted for the sale of Refined Coal. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ Because the operation of these subsidiary refined coal Defendants is performed for the benefit of their corporate parents, including AJG Iowa Refined Coal LLC, this Defendant may be liable for contributory infringement.

---

[7] Mr. Berkimer testified that ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

[8] *E.g.*, *id.* at 44:20–45:2 ██████████████████████████████████
████████████████████████████████████

12

RESTRICTED—ATTORNEYS EYES ONLY

**V.      Defendants Had the Requisite Knowledge to be Liable for Indirect Infringement.**

Defendants claim that they deserve a get out of jail free card because they learned of ME2C's patents via the filing of a complaint.  While there is a split of authority on this issue in federal courts, *in this case*, that issue has been decided and Defendants are wrong.  *See Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, C.A. 19-1334-RGA-CJB, 2021 WL 2036671, at *10 (D. Del. May 20, 2021), *report and recommendation adopted in relevant part*, 2021 WL 4350591 (D. Del. Sept. 24, 2021); *see also Icon Health & Fitness, Inc. v. Tonal Sys.*, C.A. 21-652-LPS-CJB, D.I. 45, slip op. at 5-6 (D. Del. Feb. 7, 2022) (explaining case law).

Moreover, there is ample evidence from which a fact-finder could conclude that Defendants knew about asserted patents (then-existing) before ME2C filed the Original Complaint.[9]  The architect of AJG's refined coal program, and the person who licensed the technology to DTE and CERT, Sally Batanian, and the head of operations George Kotch testified that ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████  As explained by Mr. O'Keefe, the family of the patents-in-suit are discoverable via very basic searching. O'Keefe Ex. A at ¶ 116 (explaining that a search for pre-2007 patents using the phrase "adding bromide to coal to capture mercury" returns the patents at the top of the first results).  Moreover, Defendants were aware that the EERC (the original assignee of the patents) was the preeminent research organization for mercury capture, and thus it is reasonable to infer that they discovered the patents at that time.  As the head of AJG's refined coal operations explained:

---

[9] Moreover, Defendants cannot claim ignorance of other patents in the same family.  *See Midwest Energy Emissions Corp.*, 2021 WL 2036671 at *10 (explaining that it is reasonable to infer that a party would search for and find related patents).

RESTRICTED—ATTORNEYS EYES ONLY

> Q. If you were doing diligence to determine whether or not there's patents on a mercury control method you want to offer to the market, do you think it would make sense to check and see if the EERC has patents?
> A. If I were doing patent research like that, potentially, I would look to the EERC. I'm not sure how a patent search is done, but I could see that could be reasonable.

Ex. 24 at 103:22-104:8.  Given this admission, a jury may also find that Defendants' refusal to check for EERC patents amounts to willful blindness.  Indeed, even after Defendants admit that they were aware of the patents, the relevant individuals had not actually read them.  Ex. 2, Batanian depo at 10:24–11:1; Ex. 4, Inendino (AJG 30(b)(6)) depo. at 41:25–42:2; Ex. 25, Green (CERT 30(b)(6)) depo. at 210:20–23; Ex. 5 Berkimer (DTE 30(b)(6)) depo. at 172:7–11.

As early as 2014 Defendants were specifically monitoring ME2C and became aware that it was advertising patented technology.  ███████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████  In addition, Murray Abbot, the president of Chem-Mod, attended a conference in which inventor John Pavlish discussed the patented technology and identified the '147 patent by number.  Mr. Abbott later ███████████████████

████████████████████████

Moreover, ME2C had a practice of informing power plant customers and potential customers of its patents.  Several of these power plant customers later communicated with Defendants about ME2C technology and specifically identified it as patented.  O'Keefe Ex. A at ¶¶ 121-22.  In short, a fact-finder could conclude that Defendants had pre-suit knowledge of the

RESTRICTED—ATTORNEYS EYES ONLY

patents, or at least that they had reason to expect that ME2C had relevant patents and that they nonetheless were willfully blind to the specifics of the patents.

## VI. Defendants Have Contributed to Infringement.

### A. The Accused Refined Coal Has No Substantial Non-Infringing Use

According to Defendants, the accused refined coal has a substantial non-infringing use because a power plant receiving the coal could shut off its ACI system.  Defendants are wrong.

ME2C has accused Defendants of contributing to infringement at power plants that burn PRB or lignite coals and that are subject to mercury emission limits.  As confirmed through expert testimony, state and federal records, internal documents and emails, and testimony, these power plants depend on ACI use to meet their mercury emission limits and remain operational.  O'Keefe Ex. A at pgs. 15-19, 26-29, 57-127 (citing evidence); O'Keefe Ex. C at 18-19.  Defendants assert that these power plants may *occasionally* shut down their ACI systems, e.g., to clean equipment, but such interruptions are minimal and do not detract from the importance of ACI to these plants.  As one power plant operator explained:



Defendants fail to confront this evidence, and instead focus on non-accused conduct.  For example, Defendants assert that various power plants turn off activated carbon 25%, 34%, or even 59% of the time.  Defs.' Br. at 22.  In truth, Defendants

15

RESTRICTED—ATTORNEYS EYES ONLY

arrive at those calculations by comparing the accused conduct to the way those plants operated *before they were subject to mercury regulations and began using activated carbon*. Once those power plants were subject to mercury regulations, even Defendants acknowledge that the power plants did not have substantial interruptions in ACI use.[10]  To be clear, the power plants at issue in this case could have burned refined coal without ACI before they were required to limit mercury emissions, i.e., before the damages period.  But once those regulations went into effect, that non-infringing option disappeared.  Accordingly, the accused refined coal has no substantial non-infringing use.

In fact, during discovery, Defendants tried to propose various non-infringing alternatives that would allow these power plants to burn refined coal without ACI, such as injecting different sorbents or installing alternative mercury control equipment.  Mr. O'Keefe explained why each of those alternatives would have been unavailable, ineffective, or prohibitively expensive for the power plants at issue, often relying on documentation and admissions from Defendants' own witnesses.  O'Keefe Ex. A at 134-146.  Those opinions went un-rebutted, and to-date, neither of Defendants' technical experts has asserted that the power plants at issue could have met their mercury capture obligations in any way other than using the patented technology.  *See generally* Niksa Ex. B; Senior Ex. 1 (not responding to Mr. O'Keefe's opinions regarding proposed non-infringing alternatives).  At the very least, this demonstrates that there are factual issues precluding summary judgment.

Defendants also argue that a substantial non-infringing use for the accused refined coal would be to burn it at the EERC.  Defs.' Br. at 23.  However, the EERC operates a small test

---

[10] Defendants also refer to the Cope and Williams power plants, but those power plants burn a different type of coal (bituminous) and are not accused of contributory infringement.

**RESTRICTED—ATTORNEYS EYES ONLY**

combustor that burns coal, pounds at a time.  O'Keefe Ex. B. at ¶ 116. ████████████

████████████████████████████████████████████████████████████

████ Defendants supplied millions of tons of refined coal to power plants throughout the country for producing hundreds of thousands of megawatts of electricity.  Defendants could not deliver the accused coal to the EERC in an economically viable way.  Even if they could, the EERC could not consume anywhere near the volume of infringing coal produced by Defendants, it could not replace the power generation of any of the accused power plants, nor would it entitle Defendants to Section 45 tax credits.  O'Keefe Ex. C at ¶ 6.  The fact that Defendants even propose this as a substantial non-infringing use demonstrates that they are grasping at straws.

The cases cited by Defendants are inapposite.  In each case, the accused infringer sold a drug or device that had at least one non-infringing use, e.g., prescribing a drug to treat a condition outside the scope of the asserted patent.  In contrast, in this case, each Defendant sells a specific refined coal to a specific power plant that necessarily results in infringement.  *See* Exs. 34-36; O'Keefe Ex. A at pgs. 67-69 (citing RFA responses for each Defendant admitting that each power plant "injected at least some activated carbon downstream of the combustion chamber" during the damages period).  While each power plant may experience brief ACI interruption, e.g., for maintenance, at most, that demonstrates the existence of a fact dispute as to whether such an interruption constitutes a substantial non-infringing use.  Viewing the evidence in the light most favorable to ME2C, a fact-finder may conclude that it does not.[11]

---

[11] Defendants also provide the following quote without explanation as to how it relates to this case: "[i]f the practice of the patented method [or combination] is incidental and necessary to the practice of the unpatented methods, the device is a staple [article of commerce] and there can be no contributory infringement." Defs.' Br. at 23 (quoting *McKesson Info. Sols., Inc. v. Bridge Med., Inc.*, CIV S-02-2669 FCDKJM, 2005 WL 2346919, at *9 (E.D. Cal. Sept. 23, 2005).

RESTRICTED—ATTORNEYS EYES ONLY

### B.  Refined Coal Is Especially Made or Adapted for Use as an Infringement.

Defendants also argue that they did not intend to create refined coal specifically for use with ACI, but that misses the point.  *See Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1356 (Fed. Cir. 2018) (explaining that intent is irrelevant to contributory infringement).  What matters is whether the accused material, as delivered, is adapted for use as an infringement.  *Id.*  The accused refined coal satisfies that requirement.

Coal is not an interchangeable staple commodity for a power plant.  It is classified based on a number of attributes, and each coal-fired power plant must be specifically designed and tuned to burn a particular type of coal or coal blend.  O'Keefe Ex. A at ¶¶ 38-39.  "Refined coal" is further specialized as the additives applied to prepare the refined coal must be tested, and additive dosages evaluated, every six months.  *Id.* at ¶¶ 97-98.  As a practical matter, each power plant at issue in this case has contracted with one or more mines and built railways from the mines to the power plant to deliver coal.  This coal is blended and placed on a conveyor belt to be delivered to each Defendant's refined coal sprayer.  The Defendant takes possession of this coal (referred to as "feedstock coal"), applies the specific coal additive formulation, and then delivers the coal back to the power plant.  *Id.* at ¶¶ 79-84.  Mr. O'Keefe has explained that this coal, as delivered, has no use other than to be combusted at that specific infringing power plant.

---

In that case, the Court noted the factual nature of determining a substantial non-infringing use and denied summary judgment of no contributory infringement.  The quote at issue ultimately came from *Oak Indus., Inc. v. Zenith Elecs. Corp.*, 726 F.Supp. 1525 (N.D.Ill.1989).  That case involved a device with an infringing use and a separate non-infringing use that could accidentally result in undesired infringement.  The Court denied summary judgment of no contributory infringement, but nonetheless theorized that such a scenario may not infringe.  That scenario has no applicability to the present case, and neither of these cases support a finding that conduct that necessarily results in infringement somehow absolves a party of liability for contributory infringement.  *See also Veritas Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d 1141, 1168 (W.D. Wash. 2008) (explaining case law).

**RESTRICTED—ATTORNEYS EYES ONLY**

*Id.* at pgs. 128-130.  Defendants' experts have not rebutted that opinion.  Indeed, the architect of Defendants' refined coal program, Sally Batanian, testified that ███████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ Because the accused refined coal is a material specifically formulated and certified on a per-power plant basis, and because it has only one use—combustion at an infringing power plant—it is especially made or adapted for use as an infringement.

Defendants also cite testimony from EERC witness Tom Erickson as asserting ████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████ In any event, dozens of emails and testimony from Defendants' own witnesses confirm that they were actually aware of ACI use at these power plants.  *See infra* sec. VII.

**VII.    Defendants Have Induced Infringement.**

Defendants' disputes regarding induced infringement re-hash arguments from their failed attempts to dismiss ME2C's inducement claims.  Because discovery has confirmed ME2C's allegations, Defendants' motion for summary judgment should be denied as well.

When Defendants began marketing refined coal, the EPA had not yet finalized its mercury regulations.  Nonetheless, it was well known that the EPA would eventually impose limits on mercury emissions that would require the use of new mercury capture systems. Defendants specifically knew that █████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████

**RESTRICTED—ATTORNEYS EYES ONLY**

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

Once those regulations went into effect, Defendants knew that ████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

Defendants and their customers were also aware of ME2C's patents and its claims that

combined use of calcium bromide and activated carbon injection would infringe.  *See supra* sec.

V.  A number of power plants specifically informed Defendants that ████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

Ultimately, Defendants agreed to sell refined coal to each of the power plants at issue at

below the cost of the coal itself such that they were paying power plants millions of dollars each

year just to accept refined coal.  According to the head of DTE's refined coal program, Chris

Berkimer, this was ███████████████████████████████████████████ Ex. 5, at

RESTRICTED—ATTORNEYS EYES ONLY

85:5-17.  As explained above, Defendants delivered refined coal such that the power plant had

no use for the coal other than to combust it at an infringing power plant.  *See supra* sec. VI.

      In some cases, Defendants █████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

      In short, the Defendants gambled that the price of patent infringement would be dwarfed

by the value of refined coal tax credits.  Under these circumstances, the fact-finder could

conclude that Defendants took action during the time the patents were in force that was intended

to cause and did in fact lead to infringing acts by the power plants.

## VIII.   Defendants Have Failed to Present Clear and Convincing Evidence of Invalidity

      Based on prior art that post-dates their priority date, Defendants contend that the '114,

'225, '430, and '517 patents are invalid as anticipated or obvious.  To prevail, they must first

prove that these patents cannot rely on their earliest priority date, and specifically, that at least

one of the parent applications lacks written description support for the challenged claims.

      According to Defendants, the only written description support in certain of the parent

applications is material from an earlier provisional application that is incorporated by reference.

Citing 37 CFR § 1.57(d), Defendants claim that this is improper because the material in the

provisional application is "essential material" that should have been physically copied and pasted

into each of the applications in the patent family.  Defendants are wrong.  As explained in MPEP

608.01(p), the limitations regarding incorporation by reference contained in 37 CFR § 1.57(d) do

RESTRICTED—ATTORNEYS EYES ONLY

not apply in the context of a priority date challenge. Defendants have no excuse for failing to

address MPEP 608.01(p) in their motion as ME2C specifically identified it to Defendants during

discovery. Ex. 30 at 8, 15. To the extent Defendants have some basis for distinguishing this

rule, the Court should not permit them to raise it for the first time in reply.

Separately, Defendants argue that the '147 and '225 patents are invalid for failure to

comply with the written description standard under § 112. These theories are similarly defective.

### A. Defendants have Failed to Prove that the '114, '225, '430, and '517 Patents must be assigned a later priority date.

As an initial matter, Defendants face a high burden in attempting to negate the patents'

priority date. Under 35 U.S.C. § 120, patent claims are entitled to the priority date of an earlier-

filed application if they have written description support in the entire chain of applications

tracing back to the desired priority date. This chain is presumed to remain intact, and a patent

challenger bears the burden of proving a break in the chain by clear and convincing evidence.

*Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008).

Moreover, when the Patent Office has already implicitly determined a patent's priority

date, that determination is entitled to "an especially weighty presumption of correctness." *See*

*Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1574 (Fed. Cir. 1992). This

presumption stems from the fact that the Patent Office is required to prevent applicants from

adding "new matter" to patent applications. *See* MPEP 201.06(c). For example, an applicant

can amend an application or file a continuation application that changes wording in the

specification or adds additional disclosures. However, these changes cannot include new matter

that broadens the disclosure in the original application or parent application. If an examiner

allows an amendment to a specification without objection, Courts must presume that the

amendment did not add new matter. *See Commonwealth Sci. & Indus. Rsch. Organisation v.*

RESTRICTED—ATTORNEYS EYES ONLY

*Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1380 (Fed. Cir. 2008) (explaining that challenger

failed to overcome presumption of correct priority date).

In this case, the inventors included the figure below in their first provisional application:



Def. Ex. 6.  This figure is not in some of ME2C's non-provisional applications, although they

contain similar disclosures and incorporate the provisional application by reference.

The core of Defendants' motion is that this figure was not properly incorporated into the

parent applications and that it amounts to a broader disclosure than what was contained in those

applications.  However, the PTO already rejected that argument.  When ME2C filed the '430 and

'517 patents, it included figure 2 in their specifications and filed them as continuations from a

non-provisional application that omitted this figure.  If Defendants were correct that this figure

were not already incorporated by reference, or otherwise broadened the disclosure of those

applications, the PTO should have rejected the proposed change to the specification as adding

new matter.  Instead, the PTO allowed the change without objection.  Accordingly, the Court

must presume that Defendants' priority date challenge is incorrect.  Defendants have failed to

rebut that presumption.

**1.      Defendants' Priority Date Challenge Fails Because They Cite the Wrong
Rule Regarding Incorporation by Reference.**

As explained above, for purposes of this motion, Defendants do not dispute that the inventors' provisional application fully supports the claims of the four challenged patents. In all subsequent applications, the inventors incorporated the provisional application by reference. Each patent specification begins with an MPEP 201.06(c) cross reference statement such as:

> This application is a continuation of U.S. patent application Ser. No. 12/201,595 filed on Aug. 29, 2008, which is a division of U.S. patent application Ser. No. 11/209,163, filed on Aug. 22, 2005 (now U.S. Pat. No. 7,435,286), which claims priority to the extent appropriate from provisional application 60/605,640, filed on Aug. 30, 2004. Application Ser. Nos. 12/201,595; 11/209,163; and 60/605,640 are incorporated herein by reference.

*See, e.g.,* Def. Ex. 2, '147 patent at 1:5-15. This is a common patent prosecution practice that allows an applicant to revise later applications without worrying about a loss of priority date. Defendants do not dispute that this is an entirely common and acceptable practice, nor do they contend that subsequent applications must be carbon copies of prior applications.

Nonetheless, Defendants contend that this practice was defective for ME2C because they believe that it is improper to incorporate "essential material"—i.e., material that provides written description support for claims—from a provisional application. *See* Defs.' Br. at 28 (citing 37 CFR § 1.57(d)). However, the PTO has already explained that its regulation limiting material that can be incorporated by reference only apply when challenging the written description of a claim (i.e., when comparing a claim in a patent to the specification of that same patent); it does not apply when challenging the priority support for claims based on earlier applications (comparing a claim to the specification in parent applications). *See Maquet Cardiovascular LLC v. Abiomed, Inc.*, No. CV 17-12311-FDS, 2022 WL 4138711, at *5 (D. Mass. Sept. 12, 2022) (explaining the difference between incorporation by reference under § 120 versus § 112). Specifically, the PTO has explained:

RESTRICTED—ATTORNEYS EYES ONLY

> *The limitations on the material which may be incorporated by reference in U.S. patent applications which are to issue as U.S. patents **do not apply** to applications relied on only to establish an earlier effective filing date under 35 U.S.C. 119 or 35 U.S.C. 120. Neither 35 U.S.C. 119(a) nor 35 U.S.C. 120 places any restrictions or limitations as to how the claimed invention must be disclosed in the earlier application to comply with 35 U.S.C. 112(a). Accordingly, **an application is entitled to rely upon the filing date of an earlier application, even if the earlier application itself incorporates essential material by reference to another document**.*

Ex. 13, MPEP 608.01(p) (emphasis added) (further explaining the policy reasons why § 1.57(d) limitations on the types of documents that can be incorporated into a patent do not apply in the context of a priority date challenge); *see also Maquet*, 2022 WL 4138711 at *5.  In short, if an inventor discloses an invention in a provisional application that is incorporated by reference into subsequent child applications, any child application can rely on the priority date of that provisional application even if various intervening applications focus on different embodiments. Indeed, the PTO specifically encourages incorporation by reference statements at the beginning of a specification to avoid unnecessary copy and paste exercise.  MPEP 201.06(c) (explaining that a party can maintain a priority date by merely identifying an application number along with an incorporation statement such as "hereby incorporated by reference").  Because the patentee followed this common practice, each of the patents-in-suit is entitled to the priority date of the provisional application.

> ## 2.     Defendants Failed to Identify Improper Incorporation by Reference Language.

In addition to their misapplication of 37 CFR § 1.57(d), Defendants argue that intervening applications leading to the challenged patents contain improper incorporation statements.  Defendants are wrong again.

To incorporate a prior application for purposes of preserving priority, a patentee need only identify the application and use an incorporation phrase.  The patentee need not identify

RESTRICTED—ATTORNEYS EYES ONLY

specific portions of the application or otherwise expressly state that the prior application is incorporated "in its entirety." *See* MPEP 201.06(c)(explaining that the phrase "hereby incorporated by reference" is sufficient to incorporate a prior application); *see also Harari v. Lee*, 656 F.3d 1331, 1335 (Fed. Cir. 2011) (rejecting argument that the phrase "in its entirety" is necessary to incorporate an entire prior application and holding that the phrase "The disclosures of the two applications are hereby incorporate[d] by reference" incorporated the entirety of the applications).  The applications in this case satisfy these requirements.

Intervening applications for the '225, '430, and '517 patents claim priority to the provisional application "to the extent appropriate," and state that the provisional application is "incorporated herein by reference."  Def. Exs. 3-5.  According to Defendants, this incorporation is overly vague and deficient because it did not include the phrase "incorporated by reference *in its entirety*."  But as noted above, that assertion has been specifically rejected by the PTO and the Federal Circuit.

Defendants similarly attack intervening applications for the '114 patent because they claim priority to the provisional application and state that it is "incorporated herein by reference to the extent appropriate."  However, as noted above, it is entirely appropriate to incorporate prior applications by reference.  Accordingly, Defendants fail to show that this statement failed to accomplish that goal. Moreover, although not binding on the Court, it is worth noting that literally thousands of patents claim priority and/or incorporate by reference "to the extent appropriate."  Ex. 14 (Google patents search result identifying over 9,000 applications). Defendants' unprecedented position would raise a cloud of invalidity over this broad swath of patents.

RESTRICTED—ATTORNEYS EYES ONLY

Defendants' reliance on *Hollmer* and *Zenon* cannot salvage their position.  In *Hollmer v. Harari*, the Federal Circuit found an incorporation statement defective because it identified the wrong application.  681 F.3d 1351, 1358 (Fed. Cir. 2012) (explaining, "on its face, the incorporation language does not directly lead one of ordinary skill to the '579 application but rather presents several potential documents for incorporation").  In *Zenon*, the incorporation statement was not a general incorporation statement under MPEP 201.06(c).  Rather, the patentee expressly limited the incorporation to material that could not support a priority claim.[12]  *See Zenon Env't, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1380-81 (Fed. Cir. 2007).  Neither of these cases are analogous to the broad incorporation statements in ME2C's patents.   In short, Defendants have failed to overcome the presumption that the patents-in-suit properly incorporated the provisional application to support the earliest priority date.

### 3.    Defendants Failed to Prove a Break in Priority Based on Additional Disclosures in the Relevant Applications

Because the intervening applications at issue incorporated the provisional application by reference, no further analysis is necessary to deny Defendants' motion.  Nonetheless, even if

---

[12] In *Zenon*, the patentee filed an original application disclosing a skein and a gas distribution system.  The patentee later filed a continuation-in-part application that disclosed the same skein but replaced the gas distribution disclosure with a different gas system.  *Id.*  This intervening application did not include an incorporation cross-reference statement pursuant to MPEP 201.06(c).  The patentee then filed a third application incorporating by reference the original and intervening applications, and attempted to obtain claims based on the disclosure in the original application.  It argued that the intervening application did not break the priority chain because it included a statement in the body of the specification that: "Further details relating to the construction and deployment of a most preferred skein are found in the [original application], the relevant disclosures of each of which are included by reference thereto as if fully set forth herein." *Id.* at 1380.  The Federal Circuit rejected this argument.  It found that the gas distribution system of the intervening application was separate from and inconsistent with the skein of the original application.  Accordingly, it found that neither the intervening application, nor its partial incorporation statement could support claims covering the gas distribution system of the original application.  *Id.* at 1381-82.

RESTRICTED—ATTORNEYS EYES ONLY

ME2C's patents contained defective incorporation statements—which they do not—Defendants have failed to demonstrate a lack of material fact disputes sufficient to break the priority chain of the challenged patents.

According to Defendants, the '114, '225, '430, and '517 patents contain claim limitations regarding combustion of bromine with coal that lack support in intervening applications.  For example, '114 claim 25 recites:

> combusting coal in a combustion chamber, to provide the mercury-containing gas, wherein the coal comprises added Br2, HBr, a bromide compound, or a combination thereof, added to the coal upstream of the combustion chamber, or the combustion chamber comprises added Br2, HBr, a bromide compound, or a combination thereof, or a combination thereof

Def. Ex. 1.

Defendants identify the alleged break in priority in U.S. Pat. App. 12/201,595 ("the '595 application").  Ex. 9.  Note that this this application "incorporate[s] herein by reference in their entirety for all purposes," the inventors' provisional and first non-provisional application.  Defendants do not dispute that those parent applications provide sufficient support for priority purposes at this summary judgment stage.  Thus, even under Defendants' mistaken understanding of the rules regarding incorporation by reference, they have failed to meet their burden for establishing a break in priority.

Moreover, there is at least a genuine dispute of material fact as to whether the '595 patent contains additional disclosures that support these claims even absent incorporation by reference.  For example, the '595 application describes the interaction between activated carbon and bromine additives and promoters (HBr, Br2, and other compounds).  *See Id.* at ¶¶ 53, 64, original claim 8.  It further describes multiple ways and locations to add these materials (e.g., ¶ 56), and further states that "In general however, the inventive sorbent can be injected where desired (e.g.,

RESTRICTED—ATTORNEYS EYES ONLY

before, after, or within the boiler)."[13]  *Id.* at ¶ 107.  Defendants admit that this statement encompasses bromine compounds, but argue that it is deficient because it refers to a brominated "sorbent" rather than brominated coal.  However, Defendants refer to their own bromine coal additives as "sorbents."  Ex. 23, ArborFuels_00159329 (referring to refined coal preparation process as "mixing feedstock with two sorbent additives, Mer-Sorb (calcium bromide) and S-Sorb").  Thus, it is reasonable to expect a POSITA to understand this description to encompass the claims at issue.

Defendants also rely on their expert Dr. Niksa, who asserts that because brominated sorbent contains activated carbon, a POSITA would ignore the teaching in the patent and only add brominated sorbent after the boiler.  Defs.' Br. at 32.  He notes that this approach better preserves the effectiveness of the carbon.  But even if that is recognized as a more preferred implementation of the technology today, it merely reflects a preferred implementation.  It does not detract from the fact that the inventors had possession of a broader range of implementations, including adding brominated sorbent before the boiler.  This approach falls within the scope of the claims at issue and demonstrates that the inventors had possession of those claims.

With respect to the '114 patent, Defendants identify an additional alleged break in priority in three applications that have substantively identical disclosures (U.S. Patent Nos. 8,652,235 and 9,468,886, and Application No. 15/295,594).  However, these applications contain similar disclosures to the '595 application.  *See, e.g.,* Ex. 10, '594 Application at ¶ 35 ("In some embodiments, the promoter is introduced upstream of a boiler or a combustion chamber."); *Id.*

---

[13] This statement appears under the sub-heading "Example 10."  Defendants are correct that in that example, sorbent was added downstream of the combustion chamber.  Nonetheless, this broader disclosure of adding sorbent before or within the boiler demonstrates that the inventors had possession of the claimed invention.

RESTRICTED—ATTORNEYS EYES ONLY

(explaining that figs. 5A, 5B depict bromine promoter and/or sorbent added through multiple locations including coal inlet 501 into the boiler).

Ultimately, if the Court determines that analysis of these disclosures is necessary—it is not given Defendants' misinterpretation of § 1.57(d)—this is a dispute for the fact-finder.  Mr. O'Keefe has explained that each of the intervening applications sufficiently describe the claims. O'Keefe Ex. B at pgs. 16-53.  Defendants' expert Dr. Niksa disagrees.  Of course, the jury may ultimately find Dr. Niksa's testimony less credible given his prior inconsistent positions.  For example, according to Dr. Niksa, the patent figure below on the left fails to disclose combustion of coal with added bromine even though it describes the addition of bromine and coal at 501 and a combustion chamber at 301.  However, he also contends that the nearly identical depiction in the conference presentation below on the right *would* teach that limitation.  Niksa Ex. B at ¶ 504.



| ME2C Application Figure | Asserted Prior Art |
|---|---|

Accordingly, Defendants have failed to present clear and convincing evidence sufficient to negate the presumptive priority date of the patents-in-suit, and thus their attempt to invalidate the claims under §§ 102 and 103 must also fail.

### B.  Defendants Failed to Prove That the '147 and '225 Patents Lack Written Description.

RESTRICTED—ATTORNEYS EYES ONLY

In the priority date challenge discussed above, the relevant comparison is between an asserted claim and its disclosure in the specification of one or more parent applications. *See* 35 U.S.C. § 120. Defendants' written description challenges for the '147 and '225 patents requires a comparison of each claim only to its own specification. *See* 35 U.S.C. § 112. With respect to the '225 patent, this patent contains similar disclosures to the '595 application. As explained above, the '595 application provides adequate support for the '225 claims, and thus the '225 specification also provides adequate support for those claims.

With respect to the '147 patent, the asserted claims do not explicitly require combusting coal with added bromine in the same way as the claims of the other patents-in-suit. Defendants criticize Mr. O'Keefe for opining that this patent discloses "injecting the bromine containing promoter into a gas stream separate from the sorbent," Defs.' Br. at 33, but his opinions track the actual claim language. Ex. Def. Ex. 2, '147 patent claim 2 ("injecting the particulate sorbent material at a sorbent material injection rate and injecting separately the bromine containing promoter"). Because Defendants have not identified any actual limitations of the '147 patent that lack written description support, they have not met their burden for summary judgment.

## IX.   Mr. O'Keefe Is Qualified to Testify on the Full Scope of His Reports.

### A.   Defendants Rely on the Wrong Standard for Qualification Under Rule 702.

Defendants' motion to exclude Mr. O'Keefe is deficient for failing to address the applicable standard for witness qualification under Rule 702.[14] The Third Circuit has articulated this standard as follows:

---

[14] In contrast to the cases cited below, Defendants rely primarily on out-of-circuit district court opinions or opinions related to inequitable conduct experts without explaining how they are relevant to this case. In the one technical expert Delaware case cited by Defendants, the Court actually *allowed the experts at issue to testify* and merely excluded portions of their opinions

RESTRICTED—ATTORNEYS EYES ONLY

> Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical as well as academic training and credentials." We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualifications of experts." However, "at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman ..."

*Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d. Cir.2000) (omissions in original) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d. Cir.1998)).  An expert should not be excluded "simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (allowing an engineer to testify about the inadequacy of a warning in a service manual for an automotive rear liftgate, even though the expert was not substantively qualified in the design of automobile rear liftgates or the drafting of service manual warnings); *see also Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) (accepting more general qualifications in holding that a treating physician did not have to practice a particular specialty in order to testify concerning certain matters). To the contrary, the inquiry is "flexible" and "[a]ny dispute between the parties about the strength of the evidence in this case should be resolved by the jury." *Thomas & Betts Corp. v. Richards Mfg. Co.*, 342 Fed. Appx. 754, 761 (3d Cir. 2009) (alteration in original) (quoting *Pineda*, 520 F.3d at 248–49).

---

regarding knowledge of a POSITA because neither one met the applicable standard for a POSITA. *See Bial-Portela & CA. S.A. v. Alkem Lab. Ltd.*, 2022 WL 4244989 at *6–*7 (D. Del. 2022). Defendants also cite *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987), but that case involved the exclusion of technical testimony from a salesperson the Court found to be an "average layman."  That case is plainly inapplicable here.

RESTRICTED—ATTORNEYS EYES ONLY

In a patent case, an expert on infringement or validity must be "qualified as an expert in the pertinent art." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008). However, "it is not necessary that the expert have expertise in the precise technology that is the subject of the patent or patents in suit." *See Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 510 (D. Del. 2017) (Bryson, J.) (admitting testimony of engineer who lacked experience in the audio field of the patented technology); *TQ Delta, LLC v. 2Wire, Inc.*, 373 F. Supp. 3d 509, 527 (D. Del. 2019) (admitting expert testimony regarding DSL technology despite the expert having only a general background in communications). "An expert who lacks the literal qualifications of one ordinarily skilled in the art, but who otherwise has sufficient relevant technical experience that will assist the trier of fact to understand the evidence, may still be qualified to testify in the pertinent art." *TQ Delta, LLC v. ADTRAN, Inc.*, No. CV 14-954-RGA, 2019 WL 5677539, at *2 (D. Del. Oct. 31, 2019). Indeed, an expert with an appropriate technical background may learn the details of the patented technology through their involvement in the case. *Izumi Prod. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 602 (D. Del. 2004), aff'd, 140 F. App'x 236 (Fed. Cir. 2005) (admitting expert testimony regarding infringement of razor patents despite the expert having no prior expertise with razors or patents); *Osseo Imaging, LLC v. Planmeca USA Inc.*, No. 1:17-CV-01386-JFB, 2023 WL 1815975, at *3 (D. Del. Feb. 8, 2023) (finding "no merit" in the argument that a patent infringement expert must have expertise in the patented field at the time of a patent's effective date). With these principles in mind, Mr. O'Keefe is plainly qualified to testify.

### B. Mr. O'Keefe Has Substantial Experience in the Relevant Field

ME2C intends to offer the opinion testimony of Philip O'Keefe in the field of coal-fired power plant operation as it relates to the patented technology and infringement and validity of the patents-in-suit. Mr. O'Keefe is a certified professional engineer with a bachelor's degree in

RESTRICTED—ATTORNEYS EYES ONLY

mechanical engineering who has testified as an expert witness in numerous cases over the years, including in patent cases.  He has decades of experience as an engineer, including over fourteen years of experience working directly at power plants, and additional experience as a consultant to power plant professionals.  O'Keefe Ex. A at ¶¶ 2-8 .  He has managed and operated boilers, steam turbines, combustion turbines, coal pulverizers, coal feeders, burners, gas ignition systems, piping, exhausters, condensers, heat exchangers, fans, ductwork, piping systems, coal handling equipment, as well as other systems.  *Id.* at Ex. C, CV at 4.  He also has substantial experience operating and testing pollution control equipment such as electrostatic precipitators and baghouses.  Ex. 6 at 14:3-23.  He has also written power plant procedures regarding equipment operations, maintenance, and safety.

At Commonwealth Edison ("ComEd")—one of the largest utility companies in the country—Mr. O'Keefe served as the technical training coordinator for all the coal-fired power plants throughout the ComEd system.  In that role, he oversaw the training for all of ComEd's fossil fuel power plant engineers, including by teaching courses on numerous coal-fired power plant systems.  Ex. 6 at 20:12 – 21:16.  Mr. O'Keefe was also trained in, and taught courses on, power plant chemistry.  O'Keefe Ex. C at 12.  Even after leaving ComEd, Mr. O'Keefe continued to teach courses in power plant operations for the EUCI—a continuing education institute for the energy and fossil fuel industries.  *Id.* at Ex. C, CV at 5.

Mr. O'Keefe has also been brought in as a power plant specialist to research problems and develop solutions.  *See, e.g.,* Ex. 6 at 25:15 – 29:9 (describing use of flame scanners to monitor fireball efficiency, development of distributed control combustion systems, opacity measurements, etc.).  He has also supervised tests to measure the efficiency of air pollution control equipment and the effectiveness of stack monitoring instruments, and designed

combustion control systems and burner management systems for both pulverized and cyclone furnaces. These systems increase efficiency and reduce unwanted particulate emissions. O'Keefe Ex. C at 12. In short, Mr. O'Keefe has specialized knowledge, certainly greater than that of a layman, such that he is qualified to testify under Rule 702.

### C.  Mr. O'Keefe's Education and Experience Qualify Him as an Expert.

Defendants move to exclude Mr. O'Keefe as having insufficient skill in the art. First, they criticize him for obtaining some relevant knowledge through his work on this case—as opposed to beforehand—but as noted above, this is entirely appropriate for an expert in a patent case. What matters is whether Mr. O'Keefe has relevant expertise in the pertinent art. As to that issue, Defendants' attack Mr. O'Keefe for being a mechanical engineer rather than having and advanced chemistry degree, but this criticism cannot disqualify his opinions.

Prior to the opening expert report deadline, the parties' experts had agreed that a POSITA would *not* require an advanced chemistry degree. In IPRs related to the patents-in-suit, Defendants' expert Dr. Niksa opined that a POSITA would have a bachelor's degree in mechanical engineering, chemical engineering, chemistry, or a related field of technology and at least two years of experience with implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration. O'Keefe Ex. A at ¶ 22. This formulation recognizes that power plant engineers typically come from a mechanical *or* chemical background, and they then rely on on-the-job training and practical experience to become familiar with power plant operation. Mr. O'Keefe agreed with this assessment—having personally provided such training to numerous power plant engineers—and Defendants do not dispute that Mr. O'Keefe qualifies under this standard.

Despite having litigated this case for years under that shared understanding, Defendants changed their proposed requirements for a POSITA at the opening report stage to require an

RESTRICTED—ATTORNEYS EYES ONLY

advanced degree in chemistry.  Niksa Ex. A at ¶ 67.  Dr. Niksa offered no explanation for this new opinion, and only attempted a *post hoc* rationalization after being confronted with the inconsistency.

Defendants' current rationale for this is unpersuasive.  Defendants note that inventor John Pavlish—who has a bachelor's degree in mechanical engineering—deferred some chemistry questions in his deposition to inventor Dr. Edwin Olson—who has a Ph.D in chemistry.  According to Defendants, this indicates that a POSITA must have just as much chemistry education as Dr. Olson.  Defs.' Br. at 37-38.  But Defendants do not dispute that Mr. Pavlish is a properly named inventor who understands his own inventions.  Far from proving Defendants' point, this fact demonstrates that an advanced degree in chemistry is ***not*** required to understand or practice the patented technology.  *See, e.g., OrthoPediatrics Corp. v. Wishbone Med., Inc.*, No. 3:20-CV-929 JD, 2022 WL 4978169, at *5 (N.D. Ind. Oct. 4, 2022) (rejecting proposed definition of POSITA that would exclude an inventor).

Moreover, Dr. Niksa's opinion simply did not stand up to cross examination.  When asked about his interactions with power plant engineers—i.e., the persons of ordinary skill in the art that would evaluate, implement, and practice the patented technology—Dr. Niksa testified that "you don't find Ph.Ds on the line at power plants."  Ex. 8 at 17:8-25.  Ultimately, he admitted that this change in his opinion should have no substantive impact on the case, and then he abandoned the requirement for an advanced degree altogether:

> Q. And just to be clear, your opinions would be the same regardless of whether the level of skill is the one that you put forth in the IPRs or the heightened level that you opine is appropriate here; is that correct?
> A. That's fair. And I would add that we expanded on that by saying **it's possible for somebody with a bachelor's degree in engineering through more work experience or deeper dives into the technical literature to be a POSA.**

RESTRICTED—ATTORNEYS EYES ONLY

Ex. 8 at 64:14-25 (emphasis added).  Defendants do not even attempt to argue that Mr. O'Keefe should be disqualified under that standard, nor do they attack his reports as lacking appropriate citations or support from the technical literature.  *See* O'Keefe Exs. A and B, List of References (citing hundreds of sources, including dozens of technical papers, books, and reports).  Accordingly, Mr. O'Keefe is qualified under Rule 702.

Tellingly, the only supposed chemistry error Defendants identify as justifying disqualification of Mr. O'Keefe is a statement in his deposition that $CaBr_2$ "comprises" $Br_2$.  But this is at most a claim construction dispute, and one that Defendants do not even identify as relevant to the case given that they do not dispute that the limitation at issue is met.  In fact, Defendants' non-infringement expert only disputes Mr. O'Keefe's infringement analysis as to the '147 claims, and those claims do not recite $CaBr_2$ or $Br_2$.  Ex. 8 at 134:9-13.  Moreover, as explained above, Mr. O'Keefe and Dr. Niksa largely agree on the underlying facts related to infringement of the '147 patent.  *See supra* sec. II.

### D.  Defendants' More Targeted Attacks on Mr. O'Keefe Are Also Misplaced.

Defendants identify six topics as allegedly outside the scope of Mr. O'Keefe's expertise.  However, they again fail to evaluate their criticisms under applicable law.

First, Defendants argue that Mr. O'Keefe is unqualified to discuss certain pieces of power plant equipment that he did not personally use before his work on this case, i.e., ACI, SCR, and refined coal sprayers.  They also criticize him for not visiting the power plants at issue with this equipment.  But Defendants identify no reason why Mr. O'Keefe would need to have had prior operational experience to support his opinions.  For example, Defendants seek to exclude his statements—based in part on Defendants' own Request for Admission responses—that certain equipment is installed at various plants.  Given Mr. O'Keefe's extensive experience with power plant operations, he is fully qualified to research these systems and apply his engineering and

power plant experience to explain their use to the jury.  Defendants do not identify any errors in his descriptions of this equipment.

Overall, Defendants demand a level of experience that would limit the pool of potential experts to individuals that previously worked for them at the power plants at issue.  This would result in disqualification of their own experts, and it cannot be the correct standard.  Dr. Niksa's background and involvement in this field is in computational analysis; in his words, he has never "put wrenches to metal."  Ex. 8 at 19:7-11.  He has never worked at a power plant (Ex. 8 at 18:7-11: "Q. Dr Niksa, have you ever worked at a coal-fired power plant? A. I have not."), nor designed a mercury control system (Ex. 8 20:11-5: Q.· Now, have you ever designed a mercury capture system for a coal-fired power plant? A. I have not.").  Given his lack of practical experience, he is far less qualified than Mr. O'Keefe to discuss any power plant equipment.

Defendants also attack Mr. O'Keefe's background discussion of power plant chemistry.  O'Keefe Ex. A at ¶¶ 54–68; O'Keefe Ex. B at ¶¶ 23–30.  But Mr. O'Keefe has been trained in, and taught courses on, power plant chemistry, and his extensive power plant experience qualifies him to provide this background information.  O'Keefe Ex. C at pg. 12 n. 11.  Moreover, his reports cite EPA reports and other appropriate sources to support his opinions.  *Id.*  While Defendants dispute his conclusions, that is no reason to exclude his opinions.

Defendants also seek to strike five paragraphs (¶¶ 40-44) from Mr. O'Keefe's opening report explaining that the EPA regulates power plants, and describing generally how power plants comply with regulations.  Again this is squarely within his experience, having operated pollution control equipment and been tasked with EPA compliance during his time at ComEd.  They similarly seek to exclude paragraphs (¶¶ 45-47, 50-53) describing the development of mercury regulations and tax credits.  While Mr. O'Keefe was not working for the EPA or

Congress during that time, his report cites appropriate authorities, and his specialized knowledge of power plant operation allows him to explain the significance of those developments.

Moreover, Defendants again seek a testifying standard for Mr. O'Keefe while relying on a much lower standard for their own experts. For example, Defendants' experts—including Defendants' damages expert who has no technical expertise or power plant experience—provide similar background information regarding the development of mercury control technologies and regulations. Defendants even rely on their damages expert to prove up background information regarding government research into mercury sorbents and chemistry. Defs.' Br. at 6.

### E.  Mr. O'Keefe Does Not Offer Improper Opinion Testimony.

Defendants object to the entirety of Mr. O'Keefe's indirect infringement analysis as mere "fact re-casting narratives." Defs.' Br. at 43. However, they provide no explanation or authority to support exclusion of that analysis. If Defendants contend that experts may not address the issue of indirect infringement, they are simply wrong. *See, e.g., GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1338 (Fed. Cir. 2021) (affirming judgment of induced infringement based on expert testimony on inducement); *Caterpillar Prodotti Stradali S.R.L. v. Int'l Trade Comm'n,* 847 F. App'x 893, 899 (Fed. Cir. 2021) (reversing finding of no induced infringement based on expert testimony on inducement and knowledge).

Defendants also accuse Mr. O'Keefe of offering improper state of mind opinions, but he does no such thing. While an expert may not opine on another' person's state of mind, an expert can opine "on the underlying facts that may show a party's state of mind." *GREE, Inc. v. Supercell Oy*, No. 219CV00070JRGRSP, 2020 WL 4288350, at *3 (E.D. Tex. July 27, 2020). In particular, an expert may present evidence from which the jury may infer intent or knowledge for induced or contributory infringement. *Id.* (admitting expert testimony in support of intent element for inducement); *Realtime Data, LLC v. Actian Corp.*, No. 6:15-CV-463 RWS-JDL,

RESTRICTED—ATTORNEYS EYES ONLY

2017 WL 11662038, at *3 (E.D. Tex. Mar. 29, 2017) (same for induced and contributory infringement); *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2011 WL 13152795, at *1 (N.D. Cal. Sept. 27, 2011) (same); *Smith & Nephew, Inc. v. Interlace Med., Inc.*, No. CIV.A. 10-10951-RWZ, 2012 WL 3560811, at *3 (D. Mass. Aug. 17, 2012) (same); *see also Pelican Int'l, Inc. v. Hobie Cat Co.*, No. 320-CV-02390, 2023 WL 2130379, at *10 (S.D. Cal. Feb. 10, 2023) (collecting cases).  An expert may also opine on the ultimate issue of induced or contributory infringement.  Fed. R. Ev. 704; *See, e.g., GlaxoSmithKline*, 7 F.4th at 1338; *Caterpillar*, 847 F. App'x at 899; *see also Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, No. 4:14-CV-371, 2016 WL 3746523, at *2 (E.D. Tex. Jan. 28, 2016) (permitting testimony on ultimate issue of willful infringement).

In this case, Mr. O'Keefe identifies the three-element test for induced infringement and the five-element test for contributory infringement, and he performs an element-by-element infringement analysis.  This includes collecting and explaining evidence from which the jury may find culpable knowledge and intent with respect to each of the Defendants and power plants. Defendants fail to demonstrate anything improper about this approach.  For example, Defendants identify the following paragraph as the most "blatantly" inappropriate (Defs.' Br. at 43):

> A fact-finder could conclude that the Defendants intended for their power plant customers to infringe. See sections 5.3 – 5.6. To qualify for section 45 tax credits, Defendants were required to supply refined coal with the expectation that it be combusted by the power plant.  Defendants ensured that the power plants would do so by using the power plant's own feedstock coal to produce the refined coal, and then transferring that refined coal on a conveyor leading to the power plant combustion chamber. The combustion of this coal inevitably produces mercury emissions which must be captured by the power plant. See Sections 2, 3.

O'Keefe Ex. A at pg. 126 (internal footnotes omitted).  But this paragraph merely summarizes Mr. O'Keefe's ultimate conclusion regarding element (1) of induced infringement, and refers back to additional sections where he identifies and explains technical evidence in support of his

40

RESTRICTED—ATTORNEYS EYES ONLY

opinion.  While the paragraph begins by referring to a conclusion that the fact-finder may draw from the evidence, this is entirely consistent with applicable law regarding the scope of expert testimony for indirect infringement.

### F.  Mr. O'Keefe's Opinions on Contributory Infringement Are Methodologically Sound.

According to Defendants, Mr. O'Keefe's opinions are deficient because he failed to consider refined coal sold to non-infringing power plants or to power plants before they installed ACI systems.  This is a red herring.  Refined coal produced from different feedstock and delivered to different power plants, or delivered before mercury regulations were in effect, is not evidence of a non-infringing use for the refined coal accused in this case.  As Mr. O'Keefe explained: "while refined bituminous coal may be combusted without the use of activated carbon at some power plants, that does not mean that omitting activated carbon use would be a viable approach for the power plants at issue in this case burning refined subbituminous or lignite coals."  O'Keefe Ex. A at pg. 135-137.  He also provided a thorough discussion of the differences between various types of coal and explained why, with citation to reputable sources, the patented technology is important for the power plants at issue in this case.  *Id.* at 10-31.  Similarly, Mr. O'Keefe reviewed substantial evidence of power plant operation before and after ACI installation and explained that, the fact that a power plant was able to emit unlimited mercury before the EPA's MATS rule went into effect does not mean that they could continue to do so during the damages period in this case.  *See supra* Sec. VI.  These conclusions follow logically from the evidence, and Defendants identify no error in reasoning or reliance on rebutted evidence that call them into question.

### G.  Mr. O'Keefe Is Qualified to Opine on Secondary Considerations.

RESTRICTED—ATTORNEYS EYES ONLY

Defendants seek to exclude several paragraphs from Mr. O'Keefe's report regarding secondary considerations.  These paragraphs recite factual information regarding the inventors' acceptance of government grant money and ME2C's revenue, and conclude that this evidence supports a finding of commercial success as it relates to the issue of obviousness.  According to Defendants, Mr. O'Keefe provided insufficient evidence of nexus.  However, Mr. O'Keefe provided an element-by-element analysis mapping the claims to the inventors' early practice of the patents as reported per the terms of government grants.  O'Keefe Ex. B, Appendix A claim chart.  He further explained that ME2C has continued to practice the patented technology, identified their practicing products, and described how their customers use the patented approach of combining bromine additives and activated carbon injection.  O'Keefe Ex. A at pgs. 38-40. Given Mr. O'Keefe's extensive power plant experience, he is fully qualified to opine on secondary considerations of non-obviousness.

At most, Defendants speculate that ME2C's success could be due to some external influence, but this vague speculation is no basis to exclude Mr. O'Keefe's opinions.  Where ME2C's business model and products are co-extensive with the patented technology, any success is presumed to be tied to the patented technology.  *See Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018); *see also Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1394 (Fed. Cir. 1988) ("A patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is not due to factors other than the patented invention."); *Alarm.com, Inc. v. SecureNet Techs. LLC*, No. CV 15-807-RGA, 2019 WL 133228, at *3 (D. Del. Jan. 8, 2019) (rejecting challenge to commercial success opinion as going to weight not admissibility).

X.     **Mr. Green's Reasonable Royalty Analysis is Methodologically Sound**

RESTRICTED—ATTORNEYS EYES ONLY

### A. Mr. Green Properly And Sufficiently Considered The Chem-Mod, Nalco, and ADA-ES Agreements.

Defendants criticize Mr. Green for considering licenses to patents other than the patents-in-suit. But there is nothing methodologically inappropriate about relying on patent licenses to inform a reasonable royalty rate. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("This court has recognized that licenses may be presented to the jury to help the jury decide an appropriate royalty award."). "Prior licenses, however, are almost never perfectly analogous to the infringement action…[and] the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Id.* at 1227-1228; *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the…license agreements as well as any failure on the part of ActiveVideo's expert to control for certain variables are factual issues address by cross examination and not by exclusion."). To be admissible, a damages expert's discussion of comparable licenses need only establish a "baseline comparability." *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374 (Fed. Cir. 2020) (further explaining that the "degree of comparability is a factual issue best addressed through cross examination").

Mr. Green's opinions satisfy this requirement. With respect to the Chem-Mod and Nalco licenses, Mr. Green noted that they involve the same and/or related entities to the refined coal Defendants in the hypothetical negotitation, that they cover the same conduct that is accused in this case, and that they involve highly similar technology—mercury capture through the use of additives. Green Ex. A at 199. He further considered aspects of these licenses that would differ from the hypothetical negotiation, but ultimately found them to be comparable. *Id.* at ¶¶ 199, 131-134, 168-173. Mr. Green also considered, among other factors, ME2C's minimum expected foregone profits of ███████, Defendants' profits of ███████████ and the amount

43

**RESTRICTED—ATTORNEYS EYES ONLY**

Defendants were willing to pay to power plants to accept refined coal of ██████ per ton.
Id. at ¶¶ 200-204.

Ultimately, Mr. Green concluded that while the license rates of ██████
would be informative, the *Georgia-Pacific* factors would lead the parties to a negotiating range
of $0.65 per ton to $1.00 per ton.[15]  *Id.* at ¶¶ 196-205.  This range is above ME2C's minimum
foregone profits (without considering price erosion, intangible benefits, the value of long term
contracts, etc.), below Defendants' profit margins, and within the range Defendants had been
willing to pay to power plants to maintain their practice of producing refined coal.  In a case
involving a practicing patentee and a Defendant's competing product, this methodology has been
approved by the Federal Circuit.  *See Bayer Healthcare LLC v. Baxalta Inc.,* 989 F.3d 964, 985
(Fed. Cir. 2021) (approving damages expert testimony regarding a negotiation range based on "a
maximum royalty rate from the incremental profits [Defendant] would expect to earn from [the
accused product], and a minimum royalty rate from the profits [plaintiff] would expect to lose by
granting a license to [Defendant]").  Defendants do not even attempt to challenge this overall
methodology or the other calculated data points relied upon by Mr. Green; they merely seek to
exclude some of the licenses Mr. Green considered in arriving at his conclusion.  Because Mr.
Green performed a proper comparability analysis and relied on the these licenses to support a
sound damages methodology, Defendants' arguments cannot prevail.

First, Defendants incorrectly claim that "Mr. Green has no technological basis" to do a
comparability analysis.  Defs.' Br. at 46.  It is undisputed that Mr. Green is offering no technical
opinions in this case, and is properly relying on ME2C's technical expert for his technical

---

[15] Mr. Green also provides a separate alternative analysis based on an earlier negotiation
date, but the overall methodology remains the same.

RESTRICTED—ATTORNEYS EYES ONLY

comparability analysis.  Green Rep. at ¶ 5; *Apple*, 757 F.3d at 1322 ("A rule that would exclude Apple's damages evidence simply because it relies upon information from an Apple technical expert is unreasonable and contrary to Rules 702 and 703 and controlling precedent.").  Defendants' motion only cites to two paragraphs of Mr. Green's report, simply ignoring his opinions related to technical comparability of these licenses that he learned from Mr. O'Keefe.  *See* Green Rep. at ¶¶ 131-139, 167-179; *see* Green Depo. at 52:7-62:17, 82:15-88:2,157:17-162:15, 229:8-230:17.

With respect to licenses involving Chem-Mod technology, Mr. O'Keefe analyzed the licensed patents and found that, similar to ME2C's patents, they provide mercury control through the use of some of the same additives covered by the patents-in-suit, i.e., calcium bromide and silicates.  O'Keefe Ex. A at ¶ 153. Mr. O'Keefe also noted relevant differences.  He explained, among other things, that the Chem-Mod claims would be practiced less frequently because they were tied to additive rate adjustments and that they post-date the ME2C patents.  O'Keefe Ex. A at ¶¶ 153-155. Defendants do not seek to exclude this analysis, nor do they identify any substantive errors with it.  Defendants claim in a single sentence that it is not "a sufficiently reliable predicate," but this conclusory statement cannot justify exclusion.  Defs.' Br. at 46.

Mr. O'Keefe provides similar technical analysis for patents covered by the ADA and Nalco licenses.  O'Keefe Ex. A at ¶¶ 150-157.  Again, Defendants identify no error in his opinions.  Their own expert Dr. Niksa opined that the Nalco technology is comparable, and he did not dispute comparability of the ADA license.  Niksa Ex. B at ¶¶ 70-74.  In fact, his comparability analysis for the Nalco patents focuses on the same facts Mr. O'Keefe focused on with respect to Chem-Mod, i.e., similarities in the additives used and goals achieved.  *Id.* at ¶ 71.

RESTRICTED—ATTORNEYS EYES ONLY

Second, Defendants incorrectly claim that Mr. Green offers "no economic comparability opinions **at all**" related to the licenses at issue in Defendants' motion.  Defs.' Br. at 48 (emphasis added).  Defendants' economic comparability argument merely cites a selected twelve paragraphs of Mr. Green's report and one deposition passage—resulting in Defendants again ignoring Mr. Green's *actual* economic comparability analysis. *Compare* Defs.' Br. at 47-48 *with* Green Rep. at ¶¶ 67, 79, 85, 130-145, 166-179, 185, 189-190, 192, 194, 196-197, 199, 205, Ex. J.; Green Reply Rep. at 147-158, 276; Green Depo. at 52:20-61:19, 128:6-15, 131:1-132:10, 161:9-162:15, 166:5-169:7, 225:19-228:9.

With respect to the Chem-Mod and ADA licenses, Defendants' only substantive criticism is a recognition that Mr. Green specifically identified and considered potential differences between the licenses and the hypothetical negotiation. Defs.' Br. at 47.  While they may disagree with his ultimate conclusions, this methodology of addressing potential differences is sound.  Moreover, with respect to Chem-Mod, Defendants assert that Mr. Green failed to account for the fact that the licenses were not arms-length agreements, but Mr. Green did just that. He noted that Chem-Mod entered into agreements for similar amounts with its corporate relatives (AJG entities) and with unrelated entities (CERT and DTE entities).  Green Ex. A at 131-134, 168-173.  If Defendants contend that Mr. Green should have adjusted his rates downward because Defendants agreed to sham licenses, the evidence simply does not support that conclusion. *See also* Ex. 2, Batanian depo. at 142:4-9, 143:16-145:4 (explaining safeguards employed to ensure that Chem-Mod/AJG negotiations were at arms length).  Regardless, this criticism goes to the weight, not the admissibility, of Mr. Green's analysis.

Defendants' criticism regarding the Nalco agreement is even more curious, considering that Defendants' own experts contend that this license is comparable.  Niksa Ex. B at ¶¶ 70-74.

RESTRICTED—ATTORNEYS EYES ONLY

Indeed, Defendants' damages expert elaborates for nine full pages of her report about how ME2C was aware of Nalco's licensed patent, Nalco was ME2C's primary competitor, and ME2C closely tracked the Nalco litigation as a source of competitive information.  Lawton Rep. at ¶ 748-766.

Defendants attempt to compare this case to *TC Tech* and *Zimmer*, but in those cases the experts merely used "nebulous" language of comparability or noted that the technology related to "telecommunications."  But whereas the telecommunications industry encompasses hundreds of thousands patents covering a wide variety of technologies, Mr. Green's comparison was far more focused and specific as summarized in his deposition:

> Q. What is your basis for saying that the Chem-Mod technology that Chem-Mod licensed to defendants in this case provides effectively the same result as the patented ME2C technology?
> A. Well, they appear to indicate -- they -- according to the discussion that I had with Mr. O'Keefe, and you can see it in paragraph 132, he described that the ME2C -- that the '083 patent, which is a Chem-Mod patent generally describes the use of calcium bromide, aluminosilicate clay, and so forth as additives to coal for the reduction of mercury emissions. Mersorb and S-Sorb contain some of these components. Those are some products that Chem-Mod sells. And then the '170 patent describes combusting coal in the presence of or injecting into coal combustion gasses, nitrate salts.
> And the idea, as I understood it from using ME2C's -- excuse me -- Chem-Mod's technology was to reduce either mercury or sulfur emissions, which is what happens when you use the ME2C technology.

Ex. 7 at 53:7-54:1.

Finally, Defendants' are incorrect that Mr. Green did not properly take apportionment considerations into account in assessing his royalty rate.  Defs.' Br. at 48-49.  Defendants repeat their practice of ignoring Mr. Green's *actual* opinion, which is that the rates for the comparable licenses did not need to be mechanically adjusted before consideration because the agreements already reflected the apportioned value of the comparable technology based on their real-world circumstances.  *See, e.g.*, Green Rep. at ¶ 185; Green Depo. at 86:17-88:2, 89:9-92:7, 95:9-96:7,

47

RESTRICTED—ATTORNEYS EYES ONLY

214:4-218:25.  This is proper under longstanding Federal Circuit case law.  *See, e.g.*, *Pavo Solutions LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1380 (Fed. Cir. 2022); *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040-41 (Fed. Cir. 2020); *Bio-Rad Labs.*, 967 F.3d at 1376-77 ("[T]here is no blanket rule of quantitative apportionment in every comparable license case."); *Commonwealth Sci. and Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) ("this [license rate] starting point for the district court's analysis already built in apportionment").  Furthermore, degree of comparability and scope of apportionment are factual questions for the jury that should not be decided via motion following the submissiong of a proper and sufficient expert report.  *See, e.g.*, *Vectura Ltd. v. GlaxoSmith-Kline LLC*, 397 F. Supp. 3d 579, 593-94 (D. Del. 2019) (finding that challenges based on damages expert's alleged failure to apportion and reliance on allegedly non-comparable licenses "are factual issues best addressed by cross-examination."); *see also, e.g.*, *Bio-Rad Labs.*, 967 F.3d at 1377 ("the jury was free to accept Bio-Rad's evidence that this license was not comparable"). Defendants have cited no authority for their argument that license rates must be mechanically adjusted by a damages expert *prior* to being considered as some, among many, data points holistically considered to determine an ultimate royalty rate range.  Because Mr. Green's properly apportioned royalty rate only reflects the value of the patented invention, Defendants' motion fails on this point.

### B.  Mr. Green's Royalty Rate Range Does Not Fail To Apportion Tax Credits.

Finally, Defendants' *only* challenge to the royalty rate as a whole is the incorrect claim that Mr. Green fails to "apportion out the value of the Section 45 tax credits earned by the licensees of Chem-Mod's, Nalco's, and ADA-ES's technology."  Defs.' Br. at 49.  As described above, Mr. Green's royalty rate opinion is a flat per-unit amount, assessed on a per-ton basis, and determined from a variety of inputs.  Green Rep. at ¶¶ 189-205.  It does not *include* any tax credit component to apportion *out*, and Defendants identify no evidence to show the *inclusion* of

the value of the tax credits.  Instead, the very deposition testimony Defendants cite to in their

Motion disproves their own argument, as Mr. Green describes how his analysis carefully

identifies the economics of Defendants' infringement and separates the apportioned value for the

use of the patented technology:

> [W]hat we're doing is we're saying look, the tax benefit is a particular value, and we can see that and we're leaving it for the refined coal LLC, and we can see that from the licensing and the other financial information that I've been given that a royalty for the use of the patented technology would be, you know, within these ranges that I have described, based on the evidence that's available to us. And so we've already considered -- the parties to these original negotiations have already considered the value that the tax credit. What we're left with as a royalty is the -- the -- the what the cost is for being able to use the patented technology.

Green Depo. at 214:4-216:14; Defs.' Br. at 50 (citing same).

Defendants' argument is really an attempt to have the Court implement their own

(factually disputed) damages theory under the guise of an "apportionment" argument.

Defendants' damages expert has opined that "the Section 45 tax credits are of no economic

consequence to any named party" because the Defendant LLCs "are pass-through entities that do

not and cannot use the Section 45 production tax credits," and accordingly, the tax credits are not

relevant to the hypothetical negotiation.  Lawton Rep. at ¶ 822.  Some of the Defendants, of

course, are limited-purpose LLCs that each execute a single sales contract with a power plant

that is specifically written so that Defendants are *guaranteed* to *lose* money.  *See, e.g.*, Green

Rep. at ¶¶ 35, 38, 149, 161; Green Reply Rep. at ¶¶ 17-31; Green Depo. at 125:11-16, 168:24-

170:19.   The *only* value these Defendants generate for themselves or their owners is the

qualification for tax credits.  *Id*.  And, since Ms. Lawton deemed the tax credits irrelevant to this

case, *voilá*, she believes the reasonable royalty for each Defendant should be *de minimis*.

Lawton Rep. at 35; *see also* Green Depo. at 167:9-169:7.  Of course, an infringer cannot escape

liability by losing money in the course of the infringement or shifting profits to a related entity.

RESTRICTED—ATTORNEYS EYES ONLY

*See, e.g.*, *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1384 (Fed. Cir.) ("the law does not require than an infringer be permitted to make a profit"); *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 153, 1580 (Fed. Cir. 1989) ("There is no rule that a royalty be no higher than the infringer's net profit margin."); *Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1378 (Fed. Cir. 2005) ("Simply put, the holding company would not enter any negotiation without considering the competitive position of its corporate parent").  That maxim is especially true in this case where the Defendants are *designed* to lose money on a pre-tax basis and generate substantial profit on a post-tax basis.[16]

In any event, Mr. Green properly considered the business organization arrangements of the Defendants in formulating his opinions, taking care to assess no more in his royalty rate than is properly attributable to the patented inventions.  Accordingly, Plaintiffs respectfully request that the Court deny Defendants' motion with respect to Mr. Green.  Nonetheless, should the Court have any concerns with any aspect of Mr. Green's opinions challenged by Defendants, Plaintiffs request, in the alternative, an opportunity to offer a brief supplemental expert report from Mr. Green to address the Court's concerns.  *See, e.g.*, *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. 11-515-LPS-CJB, 2015 WL 12731924, at *7 (D. Del. Nov. 4, 2015).

**CONCLUSION**

For the reasons stated above, ME2C respectfully requests that the Court deny Defendants' motion.

---

[16] The IRS had initially denied tax credits for the refined coal LLCs because it found that they "did not pursue business activity to obtain a pre-tax profit." *Cross Refined Coal, LLC v. Comm'r of Internal Revenue*, 45 F.4th 150, 158 (D.C. Cir. 2022).  The DC Circuit reversed that decision finding that these entities did have a legitimate business purpose in pursuing post-tax profits based on Section 45 tax credits. *Id.* at 159.

**RESTRICTED—ATTORNEYS EYES ONLY**

Dated: April 10, 2023

OF COUNSEL:

Bradley W. Caldwell
Texas Bar No. 24040630
Jason D. Cassady
Texas Bar No. 24045625
John Austin Curry
Texas Bar No. 24059636
Justin T. Nemunaitis
Texas Bar No. 24065815
Daniel R. Pearson
Texas Bar No. 24070398
Adrienne R. Dellinger
Texas Bar No. 24116275
CALDWELL CASSADY CURRY PC
2121 N. Pearl Street, Suite 1200
Dallas, Texas 75201
Phone: (214) 888-4848
Fax: (214) 888-4849
bcaldwell@caldwellcc.com
jcassady@caldwellcc.com
acurry@caldwellcc.com
jnemunaitis@caldwellcc.com
adellinger@caldwellcc.com

**DEVLIN LAW FIRM LLC**

*/s/ James M. Lennon*
James M. Lennon (No. 4570)
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
jlennon@devlinlawfirm.com

*Attorneys for Plaintiffs Midwest Energy
Emissions Corp. and MES Inc.*

51

RESTRICTED—ATTORNEYS EYES ONLY

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that copies of the within filing were served on

counsel of record via electronic mail on April 10, 2023.

/s/ *James M. Lennon*
James M. Lennon