Originally Filed:  April 18, 2023
Redacted Version Filed:  April 25, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS CORP. )
and MES INC., )
)
          Plaintiffs, )
)
          v. )
)
ARTHUR J. GALLAGHER & CO., et al., )
)
          Defendants. )

REDACTED - PUBLIC VERSION

C.A. No. 19-1334 (CJB)

**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT AND TO
<u>EXCLUDE EXPERT WITNESSES AND TESTIMONY</u>**

# TABLE OF CONTENTS

**Page**

TABLE I TABLES OF DEFENDANTS ................................................................ vi

TABLE II FAMILY TREE OF ME2C PATENTS ................................................ ix

TABLE III GLOSSARY AND TABLE OF ABBREVIATIONS ................................ x

TABLE IV TABLE OF EXHIBITS .................................................................. xiii

SUMMARY OF ARGUMENT ........................................................................ 1

ARGUMENT ............................................................................................... 1

I.     ME2C's License Agreements with Power Plants Preclude Claims for Inducing or Contributing to Infringement at Such Plants. ..................... 1

II.    Because No Power Plants Directly Infringe the 147 Patent, There Can Be No Indirect Infringement of That Patent. ............................................... 2

III.   There Is No Evidence That Any Power Plant Met the "Ratio" Claim Elements. ............................................................................................. 3

IV.   Summary Judgment Should Be Entered in Favor of the Non-Selling Entities. .............................................................................................. 3

V.    Summary Judgment Should Be Granted Based on Lack of Knowledge. .............. 5

VI.   Summary Judgment of No Contributory Infringement Should Be Entered. .......... 7

VII.  The Claims for Induced Infringement Should Be Dismissed. ............................. 13

VIII. Summary Judgment Should Be Granted Invalidating the Patents-in-Suit. ........... 15

      A.    As Essential Material, Fig. 2 Cannot Be Incorporated by Reference. ...................................................................................... 15

      B.    The Provisional Application Was Not Properly Incorporated by Reference. ...................................................................................... 17

      C.    The Breaks in the Priority Chain Doom the Later-Issued Patents. ........... 17

      D.    The 147 and 225 Patent Claims Lack Written Description Support for the Application of a Bromine Containing Promoter to the Coal. ........ 19

IX.   Mr. O'Keefe's Opinions Should Be Stricken. ........................................... 19

A.    Testimony on Infringement and Validity Requires POSA Qualifications. ........................................................................... 19

B.    ME2C Offers No Evidence on the Level of Skill in the Art. .................... 20

C.    Mr. O'Keefe's Power Plant Experience Is Outdated and Irrelevant. ........ 22

D.    Plaintiffs Do Not Meet Their Burden of Establishing That Mr. O'Keefe Should Be Permitted to Testify in Six Areas Where He Has No Experience. ................................................................................. 22

E.    Mr. O'Keefe's Other Opinions Should Be Excluded. ............................. 23

X.    Mr. Green's Opinions Should Be Excluded. ........................................................ 23

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
   377 U.S. 476 (1964) (Resp.) ................................................................1, 2

*Bial-Portela & CA. S.A. v. Alkem Lab. Ltd.*,
   2022 WL 4244989 (D. Del. Sept. 15, 2022) ...........................................21

*In re Bill of Lading Transmission and Processing System Patent Litigation*,
   681 F.3d 1323 (Fed. Cir. 2012).................................................................9

*Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.*,
   396 F. Supp. 3d 368 (D. Del. 2019).........................................................24

*Canon Inc. v. Tesseron Ltd.*,
   146 F. Supp. 3d 568 (S.D.N.Y. 2015).......................................................2

*Commonwealth Sci. & Indus. Rsch. Organisation v. Buffalo Tech. (USA), Inc.*,
   542 F.3d 1363 (Fed. Cir. 2008)...............................................................15

*Conceptus, Inc. v. Hologic, Inc.*,
   No. C 09-02280 WHA, 2011 WL 13152795 (N.D. Cal. Sept. 27, 2011)..............................23

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*,
   501 F.3d 1254 (Fed. Cir. 2007)...............................................................20

*Ericsson v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014)...............................................................25

*F'Real Foods, LLC v. Hamilton Beach Brands, Inc.*,
   2020 WL 4932223 (D. Del. June 24, 2020)................................................1

*Hecksher v. Fairwinds Baptist Church, Inc.*,
   115 A.3d 1187 (Del. 2015) ........................................................................7

*Helios Streaming, LLC v. Vudu, Inc.*,
   2020 WL 3167641 (D. Del. June 15, 2020)................................................5

*HVLPO2, LLC v. Oxygen Frog, LLC*,
   949 F.3d 685 (Fed. Cir. 2020).................................................................20

*JVC Kenwood Corp. v. Nero, Inc.*,
   797 F.3d 1039 (Fed. Cir. 2015)..................................................................1

*Kyocera Senco Ind. Tools Inc. v. ITC*,
    22 F.4th 1369 (Fed. Cir. 2022) ..................................................................20

*Lipocine Inc. v. Clarus Therapeutics, Inc.*,
    541 F. Supp. 3d 435 (D. Del. 2021)............................................................19

*Maquet Cardiovascular LLC v. Abiomed, Inc.*,
    No. CV 17-12311-FDS, 2022 WL 4138711 (D. Mass. Sept. 12, 2022)................16

*Nat. Alternatives Int'l, Inc. v. Iancu*,
    904 F.3d 1375 (Fed. Cir. 2018)..................................................................16

*Netfuel, Inc. v. Cisco Sys., Inc.*
    2018 WL 4510737 (N.D. Cal. Sept. 18, 2018) .........................................5

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
    806 F.2d 1565 (Fed. Cir. 1986)................................................................4

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007)................................................................4

*PSN Illinois, LLC v. Abbott Labs*,
    2011 WL 4442825 (N.D. Ill. Sept. 20, 2011) ...........................................2

*Realtime Data, LLC v. Actian Corp.*,
    No. 6:15-CV-463 RWS-JDL, 2017 WL 11662038 (E.D. Tex. Mar. 29, 2017) .....................23

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008)................................................................15

*Tyco Healthcare Group LP v. Biolitec, Inc.*,
    No. C–08–3129 MMC, 2010 WL 3324893 (N.D. Cal. 2010) .................................10

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010)................................................................4

*ZapFraud, Inc. v. Barracuda Networks, Inc.*,
    528 F. Supp. 3d 247 (D. Del. Mar. 23, 2021) .........................................5

*Zenon Env't, Inc. v. U.S. Filter Corp.*,
    506 F.3d 1370 (Fed. Cir. 2007)................................................................17

**Other Authorities**

37 C.F.R. § 1.57(d) ...............................................................................15, 16, 19

https://www.epa.gov/sites/default/files/documents/mats-erp.pdf.................................12

**Rules and Statutes**

26 U.S.C. § 45(c)(7)................................................................................24, 25

35 U.S.C. § 103......................................................................................21

35 U.S.C. § 120......................................................................................15

35 U.S.C. § 271(c)..............................................................................3, 4, 8

35 U.S.C. § 271(f)...................................................................................3

Fed. R. Civ. P. 56(c)(2)..........................................................................17

**TABLE I**
**TABLES OF DEFENDANTS**

***Note***:  RC Defendants comprise four groups, which are in the first four tables:  the AJG RC Defendants, the DTE RC Defendants, the Alistar Defendant, and the CERT RC Defendants.

**AJG RC Defendants**

| Named Defendant | Accused Power Plant Supplied, with Years[1] | First Named as a Defendant[2] |
|---|---|---|
| Canadys Refined Coal, LLC* | Cope Generating Station (2014–19) | May 3, 2022 |
| Coronado Refined Coal, LLC | Coronado Generating Station (2013–21) | May 3, 2022 |
| George Neal Refined Coal, LLC | George Neal Station South (2012–21) | October 7, 2021 |
| George Neal North Refined Coal, LLC | George Neal Station North (2013–21) | October 7, 2021 |
| Hastings Refined Coal, LLC | Whelan Energy Center (2020–21) | May 3, 2022 |
| Jefferies Refined Coal, LLC | Muscatine Generating Station (2013–20) | May 3, 2022 |
| Joppa Refined Coal, LLC | Joppa Power Plant (2013–21) | July 17, 2019 |
| Louisa Refined Coal, LLC | Louisa Generating Station (2011–21) | July 17, 2019 |
| Walter Scott Refined Coal, LLC | Walter Scott Energy Center (2011–21) | July 17, 2019 |
| Williams Refined Coal, LLC* | Williams Generating Station (2019–21) | May 3, 2022 |

**DTE RC Defendants**

| Named Defendant | Accused Power Plant Supplied, with Years | First Named as a Defendant |
|---|---|---|
| Arbor Fuels Company LLC | Weston Generating Station (2016–21) | July 17, 2019 |
| Superior Fuels Company LLC* | Weston Generating Station (2018–19) | October 7, 2021 |
| Belle River Fuels Company, LLC | Belle River Power Plant (2011–21) | July 17, 2019 |
| Huron Fuels Company, LLC* | Belle River Power Plant (2015–21) | October 7, 2021 |
| Chouteau Fuels Company, LLC | Oak Grove Power Plant (2017–21) | May 3, 2022 |
| Portage Fuels Company LLC | Columbia Energy Center (2016–21) | July 17, 2019 |
| Erie Fuels Company, LLC* | Columbia Energy Center (2018–21) | October 7, 2021 |
| Jasper Fuels Company LLC | Newton Power Station (2012–21) | May 3, 2022 |
| Newton RC LLC* | Newton Power Station (2015–18) | May 3, 2022 |

\* indicates that ME2C is not pursuing damages against this Defendant

---

[1] *See* Senior Decl. Ex. 1 at Ex. C; Lawton Decl. Ex. 2 at Schedule 6.3.
[2] *See* D.I. 1 (filed July 7, 2019); SAC: D.I. 281 (filed May 21, 2021); D.I. 326 (filed Oct. 7, 2021); D.I. 406 (4AC) (filed May 3, 2022).

**The Alistar Defendant**

| Named Defendant | Accused Power Plant Supplied, with Years | First Named as a Defendant |
|---|---|---|
| Alistar Enterprises, LLC | • Allen Steam Station (2011–2015)<br>• Powerton Generation Station (2017–2021) | May 21, 2021 |

**CERT RC Defendants**

| Named Defendant | Accused Power Plant Supplied, with Years | First Named as a Defendant |
|---|---|---|
| Bascobert (A) Holdings, LLC | • Marshall Steam Station (2011–2015)<br>• Coleto Creek Power Station (2019–2021) | October 7, 2021 |
| Buffington Partners, LLC | Rush Island Project Generation Facility (2011–2021) | October 7, 2021 |
| Cottbus Associates, LLC | Laramie River Station (2013–2021) | October 7, 2021 |
| Larkwood Energy, LLC | Labadie Energy Center (2013–2021) | October 7, 2021 |
| Marquis Industrial Company, LLC | Antelope Valley Station (2013–2021) | May 3, 2022 |
| Rutledge Products, LLC | Limestone Generation Facility (2011–2021) | May 21, 2021 |
| Senescence Energy Products, LLC | W.A. Parish Generation Facility (2011–2021) | May 21, 2021 |
| Spring Hill Resources, LLC | Big Cajun II Generating Station (2011–2021) | October 7, 2021 |

**The Four "CERT Operations Companies" Defendants**

| Named Defendant | Supplied Operations at RC Facility(ies), with Years | First Named as a Defendant |
|---|---|---|
| CERT Operations II LLC | • Marquis Industrial (Antelope Valley Station:  2013–2021)<br>• Alistar (Allen Steam Station:  2011–2015; Powerton:  2017–2021)<br>• Bascobert (A) (Marshall Steam:  2011–2015) | July 17, 2019 |
| CERT Operations IV LLC | • Spring Hill Resources (Big Cajun II Generating Station:  2012–2021) | July 17, 2019 |
| CERT Operations V LLC | • Buffington Partners (Rush Island Project Generation Facility:  2011–2021) | July 17, 2019 |
| CERT Operations RCB LLC | • Senescence Energy Products (W.A. Parish Generation Facility:  2013–2021) | July 17, 2019 |

|  | • Bascobert (A) (Coleto Creek Power Station: 2019–2021)<br>• Rutledge Products, LLC (Limestone Generation Facility: 2013–2021)<br>• Larkwood Energy (Labadie Energy Center 2014–2021)<br>• Cottbus Associates (Laramie River Station: 2013–2021) |  |

**Additional Non-Party CERT Companies**

| Operations Company | Supplied Operations at RC Facility, with Years | Power Plant Supplied, with Years |
|---|---|---|
| CERT Operations, LLC | Shermont Industrial, LLC (2014–2021) | Chesterfield Power Station (2011–2021) |
|  | Powder Street, LLC (2013–2021) | Mount Storm Generating Station (2011–2021) |
| CERT Operations III, LLC | Deogun Manufacturing, LLC (2013–2021) | Intermountain Power Project (2011–2021) |

## TABLE II
## FAMILY TREE OF ME2C PATENTS[3]



[3] Reproduced from Ex. 12 at ¶ 49; Niksa Decl. Ex. A at ¶ 170.

**TABLE III**
**GLOSSARY AND TABLE OF ABBREVIATIONS**

| Parties | |
|---|---|
| AJG RC Defendants | *See* Table I |
| Alistar | Defendant Alistar Enterprises, LLC |
| CERT Defendants | the CERT RC Defendants and the CERT Operations Companies |
| CERT Operations Companies | *See* Table I |
| CERT RC Defendants | *See* Table I |
| DTE Energy | Defendant DTE Energy Resources, LLC |
| DTE RC Defendants | *See* Table I |
| Non-Selling Entities | AJG Iowa Refined Coal LLC; DTE Energy Resources, LLC; and the four CERT Operations Companies |
| Plaintiffs or ME2C | Midwest Energy Emissions Corporation (together with Plaintiff MES, Inc., for purposes of this motion: "ME2C") |
| RC Defendants | Defendants alleged to have sold Refined Coal |
| **Non-Parties** | |
| accused power plant | one of the 24 power plants that purchased Refined Coal from an RC Defendant during the putative damages period. *See* Senior Decl. at C-2. |
| ADA-ES | ADA-ES |
| AECI | power plant operator and current licensee of ME2C's patents |
| Chem-Mod | Chem-Mod LLC |
| Clean Coal Solutions | a licensee of ADA-ES, partially owned by ADA-ES |
| EERC | the Environmental Energy Research Center at the University of North Dakota |
| Nalco | Nalco Company |
| NRG | power plant operator and former Defendant, current licensee of ME2C's patents |
| Talen | power plant operator and former Defendant, current licensee of ME2C's patents |
| Vistra | power plant operator and former Defendant, current licensee of ME2C's patents |
| **Chemistry** | |
| $Br^-$ | bromide ion |
| $CaBr_2$ | calcium bromide |
| Hg | mercury |
| $NO_x$ | nitrogen oxides |
| $SO_x$ | sulfur oxides |

| Power Plant Emissions Control Technology | |
|---|---|
| ACI | activated carbon injection |
| ESP | electrostatic precipitator |
| Scrubber (FGD) | flue gas desulfurization system |
| **Refined Coal Technology** | |
| Chem-Mod Solution | Chem-Mod's process for making Refined Coal by treating feedstock coal with MerSorb and S-Sorb |
| MerSorb | an aqueous solution of 52% calcium bromide by weight in water; one of the chemicals used in the Chem-Mod Solution to make Refined Coal |
| RC Facilities | specialized facilities built to manufacture Refined Coal |
| Refined Coal | coal that qualifies for tax credits under 26 U.S.C. § 45 |
| S-Sorb | a dry powder containing byproduct materials from the cement industry; one of the chemicals used in the Chem-Mod Solution to make Refined Coal |
| **ME2C Patents and Related Materials and Terms** | |
| 147 Patent | U.S. Patent No. 8,168,147 |
| 114 Patent | U.S. Patent No. 10,343,114 |
| 225 Patent | U.S. Patent No. 10,589,225 |
| 517 Patent | U.S. Patent No. 10,596,517 |
| 430 Patent | U.S. Patent No. 10,668,430 |
| Activated Carbon Step | the step or steps in each asserted claim that require(s) the use of activated carbon |
| BCP | "bromine containing promoter," a term in the 147 Patent |
| Bromine Step | the step or steps in each asserted claim that require(s) the use of bromine |
| Fig. 2 | Figure 2 and the accompanying text from the Provisional |
| POSITA | person of ordinary skill in the art |
| Provisional | Provisional Application 60/605,640, dated August 30, 2004 |
| **Litigation Materials** | |
| 4AC | ME2C's Fourth Amended Complaint (D.I. 406) |
| Egan Decl. | Omnibus Declaration of Brian P. Egan in Support of Defendants' Summary Judgment and *Daubert* Motions |
| Green Decl. | Declaration of Jeff Green |
| Niksa Decl. | Declaration of Dr. Stephen Niksa in Support of Defendants' Summary Judgment and *Daubert* Motions |
| Senior Decl. | Declaration of Dr. Constance Senior in Support of Defendants' Summary Judgment and *Daubert* Motions |
| Lawton Decl. | Declaration of Catharine M. Lawton in Support of Defendants' Summary Judgment and *Daubert* Motions |
| Supp. Egan Decl. | Omnibus Supplemental Declaration of Brian P. Egan in Further Support of Defendants' Summary Judgment and *Daubert* Motions |

| Op. Br. | Defendant's Opening Brief in Support of Defendants' Motions for Summary Judgment and *Daubert* Motions |
| --- | --- |
| Resp. | Plaintiffs' Response Brief in Opposition to Defendants' Motions for Summary Judgment and *Daubert* Motions |
| **Laws and Regulations** | |
| MATS | Mercury and Air Toxics Standards |
| Section 45 | 26 U.S.C. § 45 |

**TABLE IV**
**TABLE OF EXHIBITS**

*Note*:  Unless otherwise stated in the brief, citations to "Ex. __" refer to the Egan Declaration or to the Supplemental Egan Declaration.  In all instances, page numbers refer to the hard-copy page number on the underlying document, not the electronic page of the PDF.

| | |
|---|---|
| Lawton Decl. | Declaration of Catharine M. Lawton, dated March 23, 2023 |
| Lawton Decl. Ex. 1 | Exhibit 1 to Lawton Decl. (Excerpts from First Expert Report of Catharine M. Lawton, dated December 22, 2022) |
| Lawton Decl. Ex. 2 | Exhibit 2 to Lawton Decl. (Schedules to the First Expert Report of Catharine M. Lawton, dated December 22, 2022) |
| Lawton Decl. Ex. 3 | Exhibit 3 to Lawton Decl. (Excerpts from Second Expert Report of Catharine M. Lawton, dated February 7, 2022) |
| Niksa Decl. | Declaration of Dr. Stephen Niksa, dated March 23, 2023 |
| Niksa Decl. Ex. A | Exhibit A to Niksa Decl. (Excerpts from Opening Expert Report of Dr. Stephen Niksa, dated October 25, 2022) |
| Niksa Decl. Ex. B | Exhibit B to Niksa Decl. (Excerpts from Second Expert Report of Dr. Stephen Niksa, dated December 22, 2022) |
| Niksa Decl. Ex. C | Exhibit C to Niksa Decl. (Excerpts from Third Expert Report of Dr. Stephen Niksa, dated February 07, 2023) |
| Senior Decl. | Declaration of Dr. Constance Senior, dated March 23, 2023 |
| Senior Decl. Ex. 1 | Exhibit A to Senior Decl. (Excerpts from First Expert Report of Dr. Constance Senior, dated December 22, 2022) |
| Green Decl. | Declaration of Jeff Green, dated March 22, 2023 |
| Egan Decl. | Declaration of Brian Egan, Esq., dated March 23, 2023 |
| Ex. 1 | Exhibit 1 to Egan Decl. (United States Patent No. 10,343,114 (the "114 Patent")) |
| Ex. 2 | Exhibit 2 to Egan Decl. (United States Patent No. 8,168,147 (the "147 Patent")) |
| Ex. 3 | Exhibit 3 to Egan Decl. (United States Patent No. 10,589,225 (the "225 Patent")) |
| Ex. 4 | Exhibit 4 to Egan Decl. (United States Patent No. 10,596,517 (the "517 Patent")) |
| Ex. 5 | Exhibit 5 to Egan Decl. (United States Patent No. 10,668,430 (the "430 Patent")) |
| Ex. 6 | Exhibit 6 to Egan Decl. (United States Provisional Application 60/605,640, dated August 30, 2004 (the "Prov. App" or "640 application")) |
| Ex. 7 | Exhibit 7 to Egan Decl. (Copy of a Fleetwide License and Supply Agreement, effective July 30, 2020, between Vistra Corp. and Midwest Energy Emissions Corp) |
| Ex. 8 | Exhibit 8 to Egan Decl. (Copy of a Fleetwide License and Supply Agreement, effective January 5, 2021, between NRG Energy, Inc., NRG Texas Power LLC, Midwest Generation EME, LLC, and Midwest Generation, LLC (collectively, "NRG"), and Midwest Energy Emissions Corp. and MES, Inc.) |
| Ex. 9 | Exhibit 9 to Egan Decl. (Copy of a Fleetwide License and Supply Agreement, effective January 15, 2021, between Brandon Shores LLC, Talen Generation LLC, Talen Montana, LLC, and H.A. |

| | Wagner LLC and Midwest Energy Emissions Corp. and MES, Inc.) |
|---|---|
| Ex. 10 | Exhibit 10 to Egan Decl. (Copy of a License and Supply Bidding Agreement, effective November 17, 2021, between Associated Electric Cooperative, Inc. ("AECI"), and Midwest Energy Emissions Corp. and MES, Inc.) |
| Ex. 11 | Exhibit 11 to Egan Decl. (Excerpts from Opening Expert Report of Philip O'Keefe, served by Plaintiffs in this case, dated October 25, 2022) |
| Ex. 12 | Exhibit 12 to Egan Decl. (Excerpts from Rebuttal Expert Report of Philip O'Keefe, served by Plaintiffs in this case, dated December 22, 2022) |
| Ex. 13 | Exhibit 13 to Egan Decl. (Excerpts from Reply Expert Report of Philip O'Keefe, served by Plaintiffs in this case, dated February 6, 2023) |
| Ex. 14 | Exhibit 14 to Egan Decl. (Excerpts from First Expert Report of Philip Green, served by Plaintiffs in this case, dated October 25, 2022) |
| Ex. 15 | Exhibit 15 to Egan Decl. (Excerpts from Reply Expert Report of Philip Green, served by Plaintiffs in this case, dated December 22, 2022) |
| Ex. 16 | Exhibit 16 to Egan Decl. (Excerpts from the deposition transcript of William Whitney in this case, dated June 28, 2022) |
| Ex. 17 | Exhibit 17 to Egan Decl. (Excerpts from the deposition transcript of James Landreth in this case, dated August 11, 2022) |
| Ex. 18 | Exhibit 18 to Egan Decl. (Excerpts from the deposition transcript of Edwin Olson in this case, dated August 26, 2022) |
| Ex. 19 | Exhibit 19 to Egan Decl. (Excerpts from the deposition transcript of Michael Holmes in this case, dated August 24, 2022) |
| Ex. 20 | Exhibit 20 to Egan Decl. (Excerpts from the deposition transcript of John Pavlish in this case, dated August 25, 2022) |
| Ex. 21 | Exhibit 21 intentionally omitted |
| Ex. 22 | Exhibit 22 to Egan Decl. (Excerpts from the deposition transcript of Vincent Inendino in this case, dated July 15, 2022) |
| Ex. 23 | Exhibit 23 to Egan Decl. (Excerpts from the deposition of Thomas Erickson in this case, dated September 21, 2022) |
| Ex. 24 | Exhibit 24 to Egan Decl. (Excerpts from the deposition transcript of Philip O'Keefe in this case, dated March 2, 2023) |
| Ex. 25 | Exhibit 25 to Egan Decl. (Excerpts from the deposition transcript of Philip O'Keefe in this case, dated March 3, 2023) |
| Ex. 26 | Exhibit 26 to Egan Decl. (Excerpts from the deposition transcript of Philip Green in this case, dated March 7, 2023) |
| Ex. 27 | Exhibit 27 to Egan Decl. (Declaration of Jamie Recker, Chief Plant Engineer for Muscatine Power and Water, executed on October 20, 2022) |
| Ex. 28 | Exhibit 28 to Egan Decl. (Declaration of Robert Poehling, the Chairman of the Board of Public Power Generation Agency, executed on October 14, 2022) |

| Ex. 29 | Exhibit 29 to Egan Decl. (ME2C's Responses and Objections to Refined Coal Defendants' First Set of Requests for Authentication (No.1), dated September 29, 2022) |
| Ex. 30 | Exhibit 30 to Egan Decl. (Transcript from the Markman Hearing in this case, dated April 28, 2022) |
| Ex. 31 | Exhibit 31 to Egan Decl. (Report and Recommendation in *Guardant Health, Inc. v. Foundation Med., Inc.* No. 17-1616-LPS-CJB (D. Del.), dated April 22, 2020) |
| Ex. 32 | Exhibit 32 to Egan Decl. (February 4, 2021 Final Report prepared by the EERC entitled "Evaluation of Powerton Station Coal for $NO_x$ and Hg Reductions – November 25, 2020" (Bates number CERT_0003545)) |
| Ex. 33 | Exhibit 33 to Egan Decl. (August 14, 2020 Final Report prepared by the EERC entitled "Evaluation of Powerton Station Coal for $NO_x$ and Hg Reductions – June 1, 2020" (Bates number CERT_0003601)) |
| Ex. 34 | Exhibit 34 to Egan Decl. (Facility Purchase Agreement, made on December 16, 2021, entered into between Alistar Enterprises, LLC and Midwest Generation, LLC (Bates number CERT_0003545)) |
| Ex. 35 | Exhibit 35 to Egan Decl. (October 16, 2019 Final Report prepared by the EERC entitled "Evaluation of Jasper Fuels Company, LLC, Operating Samples for $NO_x$ and Hg Reductions – July 30, 2019" (Bates number REF-COAL_00016327)) |
| Ex. 36 | Exhibit 36 to Egan Decl. (October 2, 2014 Final Report prepared by the EERC entitled "Evaluation of Salt River Project Coal for $NO_x$ and Hg Reductions – July 21, 2014" (Bates number REF-COAL_00014065)) |
| Ex. 37 | Exhibit 37 to Egan Decl. (August 11, 2015 Final Report prepared by the EERC entitled "Evaluation of Labadie Coal for $NO_x$ and Hg Reductions – May 26, 2015" (Bates number CERT_0005738)) |
| Ex. 38 | Exhibit 38 to Egan Decl. (February 9, 2021 Final Report prepared by the EERC entitled "Evaluation of Antelope Valley Station Coal for $NO_x$ and Hg Reductions – December 3, 2020" (Bates number CERT_0010003)) |
| Ex. 39 | Exhibit 39 to Egan Decl. (October 27, 2014 Final Report prepared by the EERC entitled "Evaluation of Antelope Valley Station for $NO_x$ and Hg Reductions – August 12, 2014" (Bates number CERT_0040881)) |
| Ex. 40 | Exhibit 40 to Egan Decl. (Final Report prepared by the EERC entitled "Evaluation of Labadie Coal for $NO_x$ and Hg Reductions – May 26, 2015" (Bates number CERT_0003937)) |
| Supp. Egan Decl. | Supplemental Declaration of Brian P. Egan, Esq., dated April 18, 2023 |
| Ex. 41 | Exhibit 41 to Supp. Egan Decl. (*NRG Energy, Inc. and Talen Energy Corporation v. Midwest Energy Emissions Corp.*, IPR2020-00832, Paper 17 (P.T.A.B. Oct. 26, 2020)) |

| Ex. 42 | Exhibit 42 to Supp. Egan Decl. (*NRG Energy, Inc. and Talen Energy Corporation v. Midwest Energy Emissions Corp.*, IPR2020-00928, Paper 17 (P.T.A.B. Dec. 2, 2020)) |
|---|---|
| Ex. 43 | Exhibit 43 to Supp. Egan Decl. (Excerpts from the deposition transcript of Sally Batanian in this case, dated September 1, 2022) |
| Ex. 44 | Exhibit 44 to Supp. Egan Decl. (Excerpts from the deposition transcript of Thomas Erickson in this case, dated September 21, 2022) |
| Ex. 45 | Exhibit 45 to Supp. Egan Decl. (Excerpts from the deposition transcript of Philip Green in this case, dated March 7, 2023) |
| Ex. 46 | Exhibit 46 to Supp. Egan Decl. (Excerpts from the deposition transcript of Jay R. Gunderson this case, dated September 21, 2022) |
| Ex. 47 | Exhibit 47 to Supp. Egan Decl. (Excerpts from the deposition transcript of Vincent Inendino in this case, dated July 15, 2022) |
| Ex. 48 | Exhibit 48 to Supp. Egan Decl. (Excerpts from the deposition transcript of Dr. Stephen Niksa in this case, dated February 24, 2023) |
| Ex. 49 | Exhibit 49 to Supp. Egan Decl. (Excerpts from the deposition transcript of Philip J. O'Keefe in this case, dated March 2, 2023) |
| Ex. 50 | Exhibit 50 to Supp. Egan Decl. (Excerpts from the deposition transcript of Philip J. O'Keefe in this case, dated March 3, 2023) |
| Ex. 51 | Exhibit 51 to Supp. Egan Decl. (Excerpts from the deposition transcript of John Pavlish in this case, dated August 25, 2023) |
| Ex. 52 | Exhibit 52 to Supp. Egan Decl. (Excerpts from the deposition transcript of Vincent Verschueren in this case, dated July 19, 2022) |
| Ex. 53 | Exhibit 53 to Supp. Egan Decl. (Excerpts from the Declaration of Dr. Stephen Niksa, *NRG et al.*, dated September 1, 2022) |
| Ex. 54 | Exhibit 54 to Supp. Egan Decl. (Dr. Stephen Niksa CV) |

## SUMMARY OF ARGUMENT

Plaintiffs oppose Defendants' motion for summary judgment much as they opposed Defendants' motions to dismiss:  by describing things they wished were true.  But discovery is over, the facts are out, and Plaintiffs are empty handed.  They have no evidence that any Defendant had the knowledge necessary for an indirect infringement claim; do not even try to identify a BCP meeting each patent claim requirement; and do not address, much less dispute, Defendants' evidence that hundreds of millions of tons of Refined Coal were burned without ACI.  Despite the Court's repeated caution, they try to blur their evidence about different Defendants, but still come up short on any claim against any Defendant, let alone all of them.  Plaintiffs' unqualified professional "technical expert" cannot fill these gaps, and their damages expert ignored technical and economic realities of ME2C's business and its patents.  Defendants' motion should be granted.

## ARGUMENT

I.    **ME2C's License Agreements with Power Plants Preclude Claims for Inducing or Contributing to Infringement at Such Plants.**

ME2C concedes that it may not pursue post-license claims against the Vistra and NRG Refined Coal suppliers.  Resp. at 6.  Summary judgment should be entered for such post-license conduct.  *See JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1045-46 (Fed. Cir. 2015).

The Court should also enter summary judgment for pre-license conduct.  Plaintiffs' argument under *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964) (Resp. at 5.),[4] fails to address these contract terms governing pre-agreement claims.  Courts post-*Aro* recognize that parties may grant retrospective rights in contracts, and that doing so may prevent

---

[4] ME2C's attempt to silence Defendants on *Aro* because it was cited for a different point in discovery responses one year ago is misplaced.  (Resp. at 5; *see F'Real Foods, LLC v. Hamilton Beach Brands, Inc.*, 2020 WL 4932223, at *1 (D. Del. June 24, 2020) (movant permitted to respond to arguments raised in answering brief)).

pre-agreement claims against others—indicating that *Aro* allows such provisions.  *See, e.g.*, *Canon Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 579-80 (S.D.N.Y. 2015) (granting summary judgment; construing license to apply retroactively, extinguishing others' past liability); *PSN Illinois, LLC v. Abbott Labs*, 2011 WL 4442825, at *9-10, (N.D. Ill. Sept. 20, 2011) (similar).  That is the case here.  ME2C's agreements, not limited to simple releases in favor of direct infringers, also included "████████████████████████████████████████████████████████████████████████████████████████████████████."  Ex. 7 at § 2.2; Ex. 8 at § 2.2.  Neither *Aro*, nor any other case ME2C cites, addresses such a broad covenant, which necessarily encompasses the purpose of asserting claims against indirect infringers.  *See* Op. Br. at 14 (citing case and statute).

The contract language shows an intent to grant retrospective rights, with broad backward-looking releases for ███████████████████████," Ex. 7 at § 3.1; Ex. 8 at § 3.1 (same), and ████████████████████████.  Ex. 7 at § 2.2; *see also* Ex. 8 at § 2.2 (same).  The Court should conclude that ME2C's license agreements extinguish all of ME2C's claims based on pre-license Refined Coal sales to any Vistra or NRG power plant.  *See PSN Illinois*, 2011 WL 4442825, at *9-10 ("agreement authorized [past] sale of . . . materials from [licensed party] to [d]efendants").

## II.   Because No Power Plants Directly Infringe the 147 Patent, There Can Be No Indirect Infringement of That Patent.

Defendants' Op. Br. challenged Plaintiffs to (i) identify the BCP in the accused power plants, and (ii) show that the identified BCP satisfies all five claim elements of each 147 Patent Claim.  Op. Br. at 14-15.  Plaintiffs failed Defendants' challenge.

First, although Plaintiffs do not dispute that all five elements must be met by a BCP, they do not identify any such BCP, and instead assert infringement through irrelevant quotes such as "bromine going in . . . bromine coming out."  *Id.* at 8.  The 147 Patent claims set forth specific requirements for a "bromine containing ***promoter***," not, as Plaintiffs put it, for "the bromine."  *Id.*

Second, again dodging their burden, Plaintiffs cite the discussion in Dr. Niksa's opening report regarding the prior-art Vosteen patent. That section discusses hydrogen bromide (HBr), a bromine compound that Plaintiffs never before identified, do not now identify, and cannot identify, as the BCP added in any accused plant. *Id.* at 7.

Third, Plaintiffs do not rebut Defendants' showing that none of the substances Plaintiffs previously identified as the BCP could meet all five claim requirements. That silence is hardly surprising, because any assertion that one of those substances is the BCP is scientifically implausible—as Dr. Niksa explained, Op. Br. at 15-18, and Dr. Olson confirmed, *id.* at 16-18. The evidence is unrebutted, and the Court should grant summary judgment of non-infringement.

## III.   There Is No Evidence That Any Power Plant Met the "Ratio" Claim Elements.

Plaintiffs fail to identify sufficient evidence of the accused power plants' bromine to activated carbon ratio to bring those claims to a jury. Having no direct evidence of ***actual*** plant operation on this point, Plaintiffs argue that an operating plant is unlikely to exceed the saturation level of bromine in carbon. But that only addresses the ***upper bound*** of the bromine to activated carbon ratio in the claims—it ignores the ***lower bound*** that the claims also place on that ratio. Regardless, there is no evidence of any actual injection ratio in any accused power plant.

## IV.   Summary Judgment Should Be Entered in Favor of the Non-Selling Entities.

Rather than contend that the Non-Selling Entities actually "offer[ed] to sell or [sold]" Refined Coal to an accused power plant, 35 U.S.C. § 271(c), Plaintiffs improperly rely on their "participati[on] in the *operation*, *production*, and *delivery* of refined coal to the infringing power plants," Resp. at 11, as a proxy for a contributorily infringing "offer[] to sell or [sale]."

Congress included the sale requirement in § 271(c), but used different language where it intended to subject a broader range of activities to liability. *See* 35 U.S.C. § 271(f) (liability for one who "supplies or causes to be supplied" a component of patented invention). The requirement

that a sale include a change in the title or ownership of the article used in the infringing method further shows that merely providing a service does not count. *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1357-58 (Fed. Cir. 2007). Expanding the scope of section 271(c) by allowing related activities to substitute for an actual sale or offer would do violence to Congress's choice of language throughout the infringement statute.

Plaintiffs' reliance on *Wordtech Systems* is misplaced. There, a new trial was warranted because the plaintiff lacked evidence that the defendants "participated in any sales of [the infringing products]" and because "no evidence shows that [the defendants] sold or offered to sell nonstaple components" to the direct infringer. *Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1317 (Fed. Cir. 2010). Such evidence is also absent here. Even if, contrary to fact, the Non-Selling Entities could be considered officers of the RC Defendants, there would still be no liability under § 271(c) because the Non-Selling Entities only "participat[ed] in the operation, production, and delivery of refined coal to the infringing power plants," Resp. at 11, but never "offer[ed] to sell or [sold]" Refined Coal.[5]

As to induced infringement, Plaintiffs' theory is that Defendants' sole affirmative act encouraging the power plants' direct infringement was the sale of Refined Coal to the power plants. Resp. at 20-21. Accordingly, the lack of evidence that the Non-Selling Entities actually sold Refined Coal sinks Plaintiffs' inducement theory against these Defendants. The Non-Selling Entities are entitled to summary judgment as to the induced infringement claims theories.

---

[5] *Orthokinetics* is inapposite. The sole mention of "contributory infringement" appears to be an error. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1578-79 (Fed. Cir. 1986) (stating jury found individual defendants "liable for acts of direct infringement and for inducing infringement," but concluding that evidence supported personal liability for both direct infringement and contributory infringement). And here, unlike *Orthokinetics*, there are no individual liability claims against the incorporators or officers of any Non-Selling Entities.

## V.      Summary Judgment Should Be Granted Based on Lack of Knowledge.

ME2C's response treats knowledge of a patent as sufficient to prove knowledge of infringing conduct, and argues that, at a minimum, the service of the complaint proves that all Defendants knew of ME2C's patents.  Whether a litigation complaint alone provides knowledge of infringement is a question of law properly decided on this motion.  Sound policy supports Defendants. *See Helios Streaming, LLC v. Vudu, Inc.*, 2020 WL 3167641, at *2 n.1 (D. Del. June 15, 2020) ("purpose of a complaint is . . . not to create a claim");  *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 251 (D. Del. Mar. 23, 2021) (court dockets should not "serve as notice boards for future legal claims for indirect infringement and enhanced damages").

Regarding pre-suit knowledge, ME2C's complaints outlined theories of how Defendants could know about the ME2C patents before being sued on them.  With discovery complete, ME2C has no evidence that ***any*** Defendant—let alone ***all*** Defendants—had such knowledge.

***First***, ME2C argues that Defendants would have, or should have, identified the patents-in-suit through a patent search.  Resp. at 13.  Their only evidence of any ***actual*** patent search belies this theory: ███████████████████████████████████████████████████████
███████████████████████████████████████████████.  Ex. 43 at 55:13-18. Plaintiffs' only evidence of what they believe a "diligent" patent search would have uncovered is a recent "simulation" that Mr. O'Keefe claims to have performed.  Ex. 11 ¶ 116 (p. 88).  Neither that flawed simulation nor Chem-Mod's actual search would have returned any patent-in-suit, however, because ***the first patent-in-suit did not issue until 2012***.  Ex. 2.  Plaintiffs argue that the search would have uncovered a "related" patent application, but that would not provide knowledge of any patent:  "knowledge of a pending application related to" a technology "does not establish Defendant[s] knew of the Patents-in-Suit and knowingly induced infringing acts." *Netfuel, Inc. v. Cisco Sys. Inc.*, 2018 WL 4510737, at *3 (N.D. Cal. Sept. 18, 2018).

**Second**, ME2C argues that because Defendants were "aware [of] the EERC . . . it is reasonable to infer that they discovered [ME2C's] patents at that time." Resp. at 13. Plaintiffs have no evidence to support this inference against any **Defendant**, or even with respect to Chem-Mod. Discovery of the EERC, which was the original owner of the patents, and which employed the named inventors and sponsored their work, turned up no evidence that the EERC ever disclosed confidential information of one client to another client. Ex. 44 at 166:21-167:8. Likewise, the EERC employee who conducted the Section 45 qualification tests for Defendants testified that he

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████." Ex. 46 at 49:22–50:12; *see also*

Ex. 51 at 147:16-150:22; 153:7-18 (no evidence that "████████████████████████

███████████████████████████████████████████████████

███████████████). This is hardly surprising, since the EERC kept its use of bromine a trade secret. Chem Mod's Sally Batanian ███████████████████████, testifying she did not "know[] what their product was," and that through "years" of working with the EERC, "they never mentioned that [Chem-Mod] had any issue with [EERC's] patents." Ex. 43 at 85:19–86:21. In short, there was no reason for Chem-Mod, let alone any **Defendant**, to check specifically for an EERC patent, such that the failure to do so could not be willful blindness. *See* Resp. at 14.

**Third**, ME2C argues that Defendants must have known about ME2C's patents because Murray Abbott, Chem-Mod's president, "attended a conference in which inventor John Pavlish discussed the patented technology and identified the '147 patent." Resp. at 14. Plaintiffs have no evidence that Dr. Abbott learned of ME2C's patents at that conference or otherwise. *See* Ex. 47 at 44:17–45:21. Indeed, Mr. Pavlish testified that he did not tell Dr. Abbott "████████████████

██████████████████████████████████████████.  Ex. 51 at 57:12-19.  Neither

Mr. Pavlish's slides, nor his conference paper, disclosed that the patented work involved bromine

because the "████████████████████████████████."  *Id.* at 60:11-23; 63:19–64:21.[6]

**Fourth**, ME2C argues that all Defendants must have known about the contents of ME2C's

patents because certain Defendants "became aware that [ME2C] was advertising patented

technology," including through communications with power plant customers.  Resp. at 14.  ME2C

speculates that representatives of unspecified AJG and DTE entities met with those power plants

and were made "aware of" ME2C's "patents," "patent process," and "technology."  Ex. 11 at ¶¶

121–122 (p. 92–94).  Plaintiffs provide no evidence that any Defendant had such communications;

that any such communications identified any asserted patent; or that ME2C or anyone else broke

its policy of confidentiality regarding their use of bromine.

**Finally**, Plaintiffs cite no evidence that any Defendant was aware that ME2C ***technology***

involved bromine and ACI, or knew that the 147 Patent required that a specific reaction take place,

what that reaction was, or when and how it would take place.  As for evidence of what individuals

employed by Defendants actually knew, Plaintiffs' speculation falls flat:  the individuals who

worked most closely with the power plant operators had no knowledge of the chemistry inside the

power plant boilers.  *See* Ex. 52 at 174–175:1-10.

## VI.    Summary Judgment of No Contributory Infringement Should Be Entered.

**_Especially Made and Adapted to Infringe:_**  It is uncontroverted that Defendants' Refined

---

[6] Even if ME2C had evidence that Dr. Abbott or any other Chem-Mod representative knew about the patents, such evidence would be irrelevant.  Dr. Abbott's employer, Chem-Mod, was dismissed as a Defendant from this lawsuit, and as a matter of law, any knowledge that Chem-Mod might have had about the patents cannot be imputed to any ***Defendant*** because Chem-Mod never obtained any legal authority over Defendants that were, at most, licensees.  *See Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1200-01 & n.50 (Del. 2015).

Coal was especially made to generate tax credits, and that it qualified through tests done ***without*** ACI, showing that it results in the necessary emissions reductions when combusted ***without*** ACI. Plaintiffs proffer no evidence that it was especially made to be used ***with*** ACI, as is necessary for infringement.  Summary judgment is warranted.

> ***<u>Substantial Non-Infringing Uses:</u>***  These facts are not disputed:



This combustion of Refined Coal was without ACI, was substantial and non-infringing.

Plaintiffs contend that they are not SNIUs, however, because they were not "uses."

> ***<u>The Proper "Product" for SNIU Analysis:</u>***  To disregard so much Refined Coal, Plaintiffs

craft a narrow definition of the accused product—one that ignores the statute and the patent claims. But contributory infringement requires Plaintiffs to prove that each Defendant sold:

> a ***material*** or apparatus for use in practicing a patented process, ***constituting a material part of the invention***, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use[.]

§ 271(c) (emphases added).  The statute thus requires (i) defining the "invention"—which patent law mandates is defined by the claims, and (ii) identifying the "material" sold by Defendants that "constitute[s] a ***material part of the invention***."

> Of the 14 independent Asserted Patent Claims that mention coal at all (none of the 147

Patent claims mentions coal), the "material part of the invention" that Defendants allegedly sell is identified only as "coal" with a bromine additive.  *See* Ex. 1 at cl. 1 ("method comprising: **combusting coal** in a combustion chamber, . . . **wherein the coal comprises** added $Br_2$, HBr, $Br^-$, or a combination thereof, added to the coal upstream of the combustion chamber . . .") (emphases added).  The independent claims include no limitation or differentiation as to the rank, chemical characteristics, source, or location of the coal, and the same is true as to 62 of the 66 asserted dependent claims.  Defined by these 80 claims, the "material part of the invention" supplied by Defendants is just "coal" with added bromine.

**_Plaintiffs' Narrow Definition of the Relevant Product Is Improper:_**  The  "material part of the invention"—*i.e.*, coal with bromine additives—has widespread, substantial non-infringing uses.  Op. Br. at 22.  Plaintiffs, however, would limit the relevant product for purposes of SNIU analysis to (i) the Refined Coal sold by a particular Defendant; (ii) to a specific accused power plant; (iii) after the MATS regulation went into effect.  Applying these limitations, Plaintiffs ignore over half of the Refined Coal ever sold—including Refined Coal burned by plants that they chose not to sue in this case,[7] Refined Coal sold before plants installed ACI, and Refined Coal burned before MATS went into effect.  *See* D.I. 545 at 15, 16, and 17.  That approach conflicts with the statute and patent claims; it was rejected by the Federal Circuit in *In re Bill of Lading Transmission and Processing System Patent Litigation*, 681 F.3d 1323, 1338 (Fed. Cir. 2012):

> These allegations are tailored too narrowly; they say nothing more than "if you use this device to perform the patented method, the device will infringe and has no noninfringing uses." But that is not the relevant inquiry.  For purposes of contributory infringement, the

_____

[7] Plaintiffs' assertion that Defendants "focus on non-accused conduct" is incorrect.  Resp. at 15-16.  Seventeen of the 24 RC Defendants engaged in the accused conduct of supplying Refined Coal to the accused power plants (140 million tons) at a time when those power plants did not have an ACI system, and so could not have infringed.  Even after those plants installed ACI, they did not use it continuously—*i.e.*, they burned Refined Coal in an indisputably non-infringing manner.

inquiry focuses on whether the accused products can be used for purposes *other than* infringement.[8]

Likewise, it is improper to limit the SNIU inquiry to the uses employed by accused customers of a Defendant, even those customers who allegedly can only use the accused product in an infringing manner.  *See Tyco Healthcare Group LP v. Biolitec, Inc.,* No. C–08–3129 MMC, 2010 WL 3324893, at *3 (N.D. Cal. 2010).  The statute focuses on whether a product is "***suitable*** for substantial noninfringing use," not how the accused infringers use it.

Plaintiffs' approach would rewrite the SNIU requirement to allow plaintiffs suing for contributory infringement to ignore evidence of non-infringing uses by asserting that they are only suing on the infringing use.  And it would allow Plaintiffs in this case to create contributory infringement liability by eliminating SNIUs of Refined Coal based solely upon characteristics (rank of and chemical properties of coal, amount of MerSorb or S-Sorb used) or commercial conditions (compliance with mercury control regulations and rail lines connecting power plants to certain coal mines) found nowhere in the language of the asserted claims.

Plaintiff's putative reasons for disregarding the various non-infringing uses of Refined Coal do not withstand scrutiny.  Plaintiffs' technical expert did not actually limit his exclusion of the Refined Coal used at non-accused plants to a product made from different ranks of coal, or made using different amounts of chemicals, as Plaintiffs imply—he simply ignored ***all*** of the Refined Coal used at those non-accused plants.[9]  And Plaintiffs have not, and cannot, provide any

---

[8] Plaintiffs purport to distinguish the cases Defendants cite on the ground that in those cases, the product "had at least one non-infringing use," whereas here, "each Defendant sells a specific refined coal to a specific power plant that necessarily results in infringement."  Resp. at 17.  That is not only wrong factually, but also entirely converts the question from whether the product has a non-infringing use to how it is used in a particular instance.  It is circular.

[9] One reason that Mr. O'Keefe ignored instances where Refined Coal was combusted without ACI was his mistaken belief that Refined Coal could only be burned with ACI.  Reflecting his utter lack of familiarity with this technology, Mr. O'Keefe was shocked to learn during his deposition

reason for concluding that the Refined Coal made by the Defendants—which, like the Refined Coal used by the non-accused plants, is prepared from coal treated with MerSorb and S-Sorb according to an EERC Section 45 Qualification report, and burned for the purpose of generating electricity—cannot be used in the same non-infringing manner as the Refined Coal used by the non-accused plants. Indeed, there is no dispute that each and every accused power plant used some of the accused Refined Coal in a non-infringing manner, by turning off its ACI system at least intermittently the entire time it was combusting its Refined Coal. *See* Senior Decl. Ex. 1 at ¶¶ 138, 153, 155, 215; Ex. 11 at ¶ 114 (p. 128); Ex. 13 at ¶ 18; Ex. 50 at 304:4-307:8.

**_The "Pre-MATS" Exclusion:_** Plaintiffs do not argue that the Refined Coal at a particular plant was different after MATS went into effect. They offer no evidence that power plants that burned Refined Coal without ACI before MATS came into effect could not continue to do so after MATS went into effect. For example, Plaintiffs do not show that the MATS effective date prohibited waivers from compliance on that date, or extensions for compliance, or trade-offs with other point sources, or carve-outs, or other compromises. Nor did they show that failure to comply with MATS would result in fines or any other penalties to preclude the continued use of Refined Coal, let alone that the plants would be barred from remaining in operation. In short, Plaintiffs *posit* that all combustion of Refined Coal would halt after the effective date of MATS unless the plant is in MATS compliance, but provide no evidence for their position.[10] This failure is fatal because Plaintiffs bear the burden to show an absence of SNIU, not the other way around.

---

that multiple accused power plants had combusted Refined Coal for **years** before employing ACI—something he never investigated, and did not consider in forming his opinion that Refined Coal had no substantial non-infringing uses. Ex. 25 at 353:20-363:23; *see* Fed. R. Evid. 702(b).

[10] Plaintiffs do not address—or cite—EPA's MATS enforcement policy statement: "Where there is a conflict between timely compliance with a particular requirement and electric reliability, the EPA intends to carefully exercise its authorities to ensure compliance with environmental

Even if a plant's failure to comply with MATS the moment it became effective meant what Plaintiffs imply, albeit without any evidence—*i.e.*, that the plant must immediately cease operation—there is still undisputed evidence that plants could comply with MATS by continuing to burn Refined Coal without using ACI.  After all, MATS does not mandate any use of ACI, let alone the continuous use of ACI.  Plaintiffs have not controverted Defendants' evidence that there are numerous plant or operational modifications that ***could*** be made to permit the continued MATS-compliant combustion of Refined Coal without ACI, saying only that they are expensive—but once again providing no analysis that the expense would be prohibitive or dispositive.[11]  And there is no dispute that the plants that complied with MATS did not continuously use ACI—*i.e.*, that dozens of power plants, including each of the 24 accused power plants here, still used Refined Coal without ACI even after MATS went into effect.  *See* Senior Decl. Ex. 1 at ¶¶ 138, 153, 155, 215; Ex. 11 at ¶ 114; Ex. 13 at ¶ 18; Ex. 50 at 304:4-307:8.

**_Plaintiffs Shift the Burden:_**  Plaintiffs contend that summary judgment should be denied with respect to any accused power plant that did not shut off its ACI at least 5% of the time that it burned Refined Coal after MATS went into effect.  But that inverts the caselaw holding that it is ***sufficient*** to show that 5% of uses are non-infringing—converting it to a ***requirement*** that at least 5% of users be non-infringing.  Notably, Plaintiffs' expert witness declined to offer any standard for "substantial" that they could apply to their analysis.  It is not Defendants' burden to prove SNIUs, but Plaintiffs' burden to prove the ***absence*** of a "suitable [NIU]."  Op. Br. at 21–23.

---

standards while addressing genuine risks to reliability in a matter that protects public health and welfare."  https://www.epa.gov/sites/default/files/documents/mats-erp.pdf.  § I, ¶ 1.

[11] Here, too, Plaintiffs come up short on their evidence and analysis, ignoring issues of power plant finance.  Power plants are regulated public utilities, and yet there is no evidence or data about how the capital and operating accounts are set up, or what charges go into the rate base, or the long-term horizon for a plant's operation—all of which necessarily undergird whether an expenditure is appropriate or warranted, the linchpin of Plaintiffs' argument.

## VII.   The Claims for Induced Infringement Should Be Dismissed.

Plaintiffs' response on inducement ignores the law and cases cited in Defendants' opening brief.  Plaintiffs' response also distorts the procedural record, ignoring that the Court dismissed their attempts to claim inducement multiple times before concluding that they had stated a claim— and even then, cautioning that stating a claim at the pleading stage was very different from succeeding at the proof stage.  D.I. 513 at 7.  Finally, Plaintiffs' response garbles and misstates the factual record.  Examination of their cited evidence shows that they cannot meet their burden.

First, Plaintiffs assert that they can show that Defendants helped power plants ensure that Refined Coal use could be "smooth[ly] integrat[ed]" with the power plant's ACI.  Resp. at 19.  But "proof" of that proposition is inadequate, because it ignores that many power plants were already using ACI (a decision they made on their own), and Plaintiffs cite no evidence that Defendants helped plants use Refined Coal and ACI together to comply with MATS.  Inducement requires "actively induc[ing]" *all* the steps of a multi-step claim.  *See* Op. Br. at 25 (causing an entity that already performs the other steps of a claim to perform the remaining step is not inducement).

Second, Plaintiffs assert that they can show the intent element of their inducement claim through evidence that (i) Defendants knew that certain power plants using Refined Coal would also use ACI; (ii) Defendants knew of the patents-in-suit; and (iii) Defendants knew that when the power plants used Refined Coal together with ACI, they would infringe.  Plaintiffs cannot prove all three, as they must.  On the first point, their evidence is limited to certain Defendants and certain plants, though they ignore those distinctions.  On the second point, Plaintiffs cannot show that Defendants knew of the Patents, as explained *supra*.  And on the third point, Plaintiffs cannot show that Defendants knew that the combined use of Refined Coal and ACI would infringe.  As explained *supra*, even Plaintiffs and their experts are unable to come up with any evidence that the

accused plants use a "bromine containing promoter"—or that any Defendant thought they were using one, let alone that any added BCP was undergoing required reactions in the accused plants.

Plaintiffs' evidence does not support their claim.   One exhibit, ███████████ ██████████████████████████████████████████████████████████ Resp. at 20, has nothing to do with their patents:  it is a deck describing a presentation to an entity that is not a customer of any Defendant; it references *different* patents owned by *different* entities, not the ME2C patents; and describes ████████████████████████████████████ ███████████████████████  ████████████████████████████ ██████████████████████████████████  *See* Resp. at 20, citing evidence.

Third, Plaintiffs argue that the discounted price for Refined Coal is evidence that its sale is an inducing act.  Resp. at 20.  Plaintiffs admit that such discount was to encourage power plants to use Refined Coal, not to incentivize them to use it with ACI—as an act of inducement must. Plaintiffs further assert that "the power plant had no use for the coal other than to combust it an infringing power plant," Resp. at 21, but that ignores the factual record, including the hundreds of millions of tons of Refined Coal burned without ACI.  Indeed, Plaintiffs' language here—"an infringing power plant"—is telling, showing once again that they ignore evidence that even plants with ACI systems do not use them continuously when burning Refined Coal.

Finally, Plaintiffs cite a November 2021 email exchange concerning a single Refined Coal supply contract, and mischaracterize that, too.  In that exchange, a power plant explained that ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████  Plaintiffs assert that Refined Coal was supplied to that plant for the remaining month

14

of the Refined Coal program.

Plaintiffs were obligated to come forward and show that they could succeed at the "proof stage," but in each instance they have cited evidence applicable to just one element of a claim against one or two of the dozens of the Defendants, and in each instance, they have grotesquely distorted what the evidence says.  In no instance have they provided sufficient evidence to establish that any single Defendant met every element of an active inducement claim.

## VIII.    Summary Judgment Should Be Granted Invalidating the Patents-in-Suit.

Plaintiffs' suggestion that Defendants must overcome a presumption that the PTO correctly determined the priority issue is wrong.  *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008), says nothing more than that patents are presumed valid and can only be invalidated by clear and convincing evidence.  *Commonwealth Scientific* and *Brooktree* acknowledge a presumption that *an amendment* does not add new matter if an examiner allows it without objection.  *Commonwealth Sci. & Indus. Rsch. Organisation v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1380 (Fed. Cir. 2008).  But here, Figure 2 was included in the original filings of the 403 and 517 Patents, not added as an amendment.  Resp. at 23.  To the extent the PTO implicitly determined priority during prosecution, the PTAB correctly determined that the PTO erred.

### A.    As Essential Material, Fig. 2 Cannot Be Incorporated by Reference.

A priority claim may only be made to a prior application if that application discloses the invention "in the manner provided by section 112(a)"—*i.e.*, provides support for the claims.  35 U.S.C. § 120.  "Essential materials," which are necessary for disclosures to be compliant with § 112(a), may only be incorporated from a U.S. patent or U.S. patent application publication.  37 C.F.R. § 1.57(d).  That 35 U.S.C. § 120 does not mention § 1.57(d) is of no moment:  § 120 requires disclosure in compliance with § 112(a), and § 1.57(d) sets rules for compliance with § 112(a).

Applying § 1.57, the PTAB concluded that Figure 2 could not be incorporated by reference

15

into intervening applications preceding the 147 and 114 Patents and that a break existed in the priority chain of each patent. Ex. 41 at 29-32; Ex. 42 at 23-24, 29-30. The PTAB was correct.

In response, Plaintiffs would disregard the plain language of both the statute and the agency regulation in favor of a passage in the MPEP, Resp. at 24-25—a guidance that is not binding law. *Nat. Alternatives Int'l, Inc. v. Iancu*, 904 F.3d 1375, 1382 (Fed. Cir. 2018). Plaintiffs also cite selectively from *Maquet Cardiovascular*, Resp. at 24-25, but ignore crucial parts of that decision. In *Maquet Cardiovascular LLC v. Abiomed, Inc.*, No. CV 17-12311-FDS, 2022 WL 4138711, at *7 (D. Mass. Sept. 12, 2022), the court held that "[m]aterial that was nonessential and incorporated by reference in a preceding patent can later be called upon to serve as essential material for claims made in a later patent without compromising the continuity of disclosure." The court further explained that if the material was essential to those intervening applications, "then those patents' attempts to incorporate by reference the [incorporated application] would have failed because § 1.57(d) does not permit the incorporation by reference of unpublished patent applications." *Id.*

That is the very problem that arises here for any claim that purports to cover adding bromine to coal prior to combustion. It is undisputed that Figure 2 is essential material. Niksa Decl. Ex. C at ¶¶ 18-22, 25; Ex. 25 at 240:13-15, 240:25-241:9. Plaintiffs try to sideline this point, but have no response to the central point that if Figure 2 is "essential material," then it must be necessary support for any claim covering the treatment of coal with bromine prior to combustion.

Plaintiffs argue that the 147 and 225 Patent claims cover the application of bromine to coal. Figure 2 does not appear in either patent's specification, and as essential material to the patents' claims, it cannot be incorporated by reference. The 147 Patent thus breaks the chain of disclosure of Figure 2 for the 225, 517, and 430 Patents; the 225 Patent breaks it for the 517 and 430 Patents.

The 114 Patent is a different "branch" of the family tree. It is preceded by U.S. Patent No.

9,468,886, D.I. 528 at xii, Table II, which itself does not explicitly copy Figure 2 into its specification.  Because Claims 5, 11, and 18 of the 886 Patent recite the addition of a halogen or halide promoter prior to combustion, Figure 2 is essential material for that 886 Patent, and cannot be incorporated by reference into that patent.  The 886 Patent constitutes one break in disclosure of Figure 2, among others, leading to the 114 Patent.

## B.  The Provisional Application Was Not Properly Incorporated by Reference.

To incorporate by reference, "the host document must identify with ***detailed particularity*** what specific material it incorporates and ***clearly indicate where*** that material is found ***in*** the various documents."  *Zenon Env't, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007).  The putative incorporations of the Provisional "to the extent appropriate" fail this test.  Resp. at 26.  The language "to the extent appropriate" is limiting on its face—*i.e.*, it is not a complete incorporation.  *Cf. Zenon*, 506 F.3d at 1379 (incorporating only "relevant disclosures" does not incorporate "entirety" of a document).  Once the putative incorporation is less than total, the issue is what specifically is incorporated.  *Id.*  The vague language "to the extent appropriate" fails the *Zenon* test, so the incorporation fails.[12]  The PTAB correctly concluded that the incorporation statements in the 114 and 147 Patents lacked the required clarity. Ex. 41 at 30-31; Ex. 42 at 31-32.

## C.  The Breaks in the Priority Chain Doom the Later-Issued Patents.

Without continuous disclosure of Figure 2 throughout the priority chains, the later-issued patents lose their priority claims.  Plaintiffs' efforts to find alternate support fail.

---

[12] Plaintiffs' claim that rejecting the manner of incorporating the Provisional would place a cloud over 9,000 patents should be rejected.  The lawyer's Google search masquerading as "evidence" (Resp. Ex. 14) to support that assertion should be stricken; it cannot be presented in admissible form at trial.  *See* Fed. R. Civ. P. 56(c)(2).  Moreover, the opinion is untimely, does not provide the necessary foundation and context to support Plaintiffs' or any other conclusions, and is methodologically unsound.  It also doesn't address what the law requires.

***The 595 Application:***   The excerpt from the 595 application cited by Plaintiffs does not even mention coal, let alone provide disclosure on the key issue of adding a bromine compound to coal prior to combustion.  *See* Resp. at 28.  Likewise, they cite para. 56, stating there can be multiple injection points for bromine, but that has nothing to do with pre-treating coal with bromine or separately injecting bromine.  Resp. at 28-29; Niksa Decl. Ex. C at ¶¶ 31-38.

Plaintiffs lean heavily on Example 10 for the missing disclosure, but concede that the paragraph describes adding an ***inventive sorbent*** to the system—not adding bromine to coal, or anywhere else, as a way of making the inventive sorbent.  Resp. at 29.  Plaintiffs urge instead that "***sorbent***" may have been used to refer to bromine additives.  But the quoted material refers to Mer-Sorb (calcium bromide) as a ***sorbent additive***, not a ***sorbent***.  Moreover, the 595 Application used the term ***inventive sorbent*** to describe the ***promoted carbon sorbent*** itself, and not the bromine compound used to promote the sorbent.  *Id.* at ¶ 11.

Plaintiffs mischaracterize Dr. Niksa's opinion regarding Example 10.  *See* Resp. at 29.  Dr. Niksa explained that a POSA ***would not understand*** Example 10 to disclose adding brominated activated carbon prior to the furnace as a way to add bromine, because doing so would defeat the point of the invention by destroying the sorbent.  Niksa Decl. Ex. C at ¶¶ 37-40.  Mr. O'Keefe agreed that adding brominated activated carbon to the furnace would not be a reasonable way to add bromine to the system.  Ex. 24 at 170:6-174:23.  This is not an instance where one implementation was "preferred" over another.  Resp. at 29.  No POSA would give Example 10 this nonsensical litigation-driven interpretation.

With regard to the 114 Patent chain, Plaintiffs argue that the intervening applications contain similar disclosures to the 595 application.  Resp. at 29-30.  They are still deficient.  It is unrefuted that Figure 5, for example, does not depict adding bromine to the coal.  Niksa Decl. Ex.

A at ¶ 289; Niksa Decl. Ex. C at ¶¶ 45-46.  Yet Plaintiffs suggest the jury may question Dr. Niksa's credibility because his opinions regarding Figure 5 of the 594 application and a prior art reference are purportedly inconsistent.  Resp. at 30.  They are not.  Unlike Figure 5, the referenced prior art figure, by showing the addition of bromine into the manifold that delivers a *coal* and air mixture into individual burners, Ex. 48 at 157:17-160:6, depicts the addition of bromine to coal.

**D.    The 147 and 225 Patent Claims Lack Written Description Support for the Application of a Bromine Containing Promoter to the Coal.**

Dr. Niksa ██████████ agree that Figure 2, which was not physically copied into those patents, is essential material for the claims of the 147 and 225 Patents.  Niksa Decl. Ex. C at ¶¶ 18-22, 25; Ex. 25 at 240:13-15, 240:25-241:9.  Even under Plaintiffs' interpretation of 37 C.F.R. § 1.57(d), essential material cannot be incorporated from the Provisional into the patents to provide § 112 support for their claims.  Without Figure 2, they are invalid for lack of written description.

For the 225 Patent, Plaintiffs rely on the same arguments regarding the 595 Application that are refuted above.  Resp. at 31.  For the 147 Patent, Plaintiffs argue that the asserted claims do not encompass adding bromine to coal prior to combustion—but that putative coverage is Plaintiffs' asserted theory of infringement.  Ex. 11 at 159.  And because that limitation is not supported, the patents do not "provide enough description in the specification to demonstrate . . . invent[ion of] the full scope of what has been claimed."  *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435, 463 (D. Del. 2021).  Plaintiffs cannot have it both ways:  if the claim scope extends to cover pre-treatment of coal, then that full scope must be supported.

**IX.    Mr. O'Keefe's Opinions Should Be Stricken.**

**A.    Testimony on Infringement and Validity Requires POSA Qualifications.**

"[I]t is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art."

*HVLPO2, LLC v. Oxygen Frog, LLC*, 949 F.3d 685, 689-90 (Fed. Cir. 2020).  An expert on the perspective of a POSA "must at least have ordinary skill in the art."  *Kyocera Senco Ind. Tools Inc. v. ITC*, 22 F.4th 1369, 1377 (Fed. Cir. 2022).[13]

**B.    ME2C Offers No Evidence on the Level of Skill in the Art.**

Without defining the relevant art, or analyzing the factors used to define a POSA, *see Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007), ME2C asserts that the art is "coal-fired power plant operation," and that the POSA is a "power plant engineer."  Resp. at 33, 35.[14]  ME2C's claim that it is adopting the POSA definition offered by Dr. Niksa in an earlier IPR Petition, *id.* at 35, is false because ME2C ignores the specific experience Dr. Niksa required, and "the POSITA would have been familiar with each of the topics discussed below in the State of the Art section."  Ex. 53 at ¶ 64.[15]  Rather than "abandoning the requirement for an advanced degree," Resp. at 36, Dr. Niksa explained that a POSA could have less education as long as she mastered these specific topics "through more work experience or deeper dives in the technical literature," Resp. Ex. 8 at 64:14-25.  Mr. O'Keefe has less education, but also lacks any training or practical experience on these topics.  Op. Br. at 34-36.

---

[13] Plaintiffs rely on district court patent cases that predate the Federal Circuit's strict application of its bright-line rule in *Kyocera*.  Moreover, the Federal Circuit's requirement that a validity and infringement expert qualify as a POSA does not conflict with the Third Circuit's "specialized knowledge" standard.  *See* Resp. at 31-32.  Because "[i]ssues of infringement and validity 'are analyzed in great part from the perspective of a [POSA]," the "specialized knowledge" requirements amount to qualification "by knowledge, skill, experience, training, or education' in the pertinent art" else the witness cannot "assist the trier of fact to understand the evidence or to determine a fact in issue."  *See HVLPO2*, 949 F.3d at 688-89.

[14] ME2C's assertion that the parties had "agreed" on the POSA definition is also false.  Resp. at 35.  There was no agreement, and ME2C's sole "support" is petitions filed by power plants in an IPR for which Defendants were not parties.  *Id.*

[15] These topics, described by Dr. Niksa in detail with evidentiary support, include the composition and chemistry of flue gas constituents, *id.* at ¶¶ 96-103, the chemical structure, properties, and reactivity of activated carbon, *id.* at ¶¶ 116-24, 130-31, and mercury emissions controls including specific chemical reactions, *id.* at ¶¶ 114-15, 125-129, 144-160.

The level of skill is determined as of the time of the invention, *see, e.g.*, 35 U.S.C. § 103, which here is around the 2004 filing of the Provisional. Ex. 6.  But the technology was not deployed in power plants until a full decade later, Op. Br. at 35, Senior Dec. Ex. 1 ¶¶ 106-08, so a power plant engineer at the time of the invention would have no knowledge, experience, or training in the use of halogens, activated carbon, or mercury control, and would not be a POSA.  *Id.* at 40.

ME2C asserts that "Defendants do not dispute that Mr. Pavlish . . . understands his own inventions," Resp. at 36, but that is incorrect.  *See* Op. Br. at 37 (disputing same).  Inventor and ME2C officer John Pavlish conceded that ███████████████████████████████ ███████████████████████████████████████.  Indeed, his testimony was one factor compelling Dr. Niksa to elevate the proposed educational level of a POSA (while still requiring knowledge of the enumerated topics regardless of the educational degree).  For multi-inventor patents such as these, the level of skill may reflect a composite of the inventors.  *See Bial-Portela & CA. S.A. v. Alkem Lab. Ltd.*, 2022 WL 4244989 at *6–7 (D. Del. Sept. 15, 2022) (POSA would have ***both*** an M.D. with specific clinical experience ***and*** a Ph.D. in a pharmaceutical science, reflecting inventors' different backgrounds and specification's embrace of both areas).  In view of Mr. Pavlish's testimony, his co-inventors' education, and the knowledge that the patents-in-suit attribute to a POSA, a master's degree in chemistry or chemical engineering (or equivalent skill) is a conservative reflection of the three named inventors here.

The Court must determine the level of skill in the art; Defendants' evidence is unrebutted. If that level of skill requires ***any*** education, training, or experience relating to the problem addressed by the patents-in-suit and their proposed solution—reducing mercury emissions from coal-fired power plants using halogens and activated carbon—Mr. O'Keefe does not measure up.

**C.      Mr. O'Keefe's Power Plant Experience Is Outdated and Irrelevant.**

Mr. O'Keefe's power plant experience does not provide the specialized knowledge needed

to offer opinions on infringement and validity in this case.

- The equipment that Mr. O'Keefe "managed and operated" in the 1980s is irrelevant; they are not issue in this case.  Resp. at 34.

- Embellishing Mr. O'Keefe's deposition testimony, ME2C touts his "substantial experience operating and testing pollution control equipment such as electrostatic precipitators and baghouses."  *Id.*  But Mr. O'Keefe said only that he checked the "wrappers and vibrators" that shake fly ash off the ESPs.  Ex. 24 at 14:19-23.

- ME2C asserts that Mr. O'Keefe trained power plant engineers on "numerous coal-fired power plant systems," Resp. at 34, but he taught no courses on emissions control or measuring the concentration or level of pollutants.  Ex. 49 at 23:15-18.

- Likewise, his training in "power plant chemistry" was limited to water purification, Ex. 24 at 11:21-12:17, and his post-ComEd courses were aimed at sales and marketing personnel of equipment vendors, Ex. 49 at 49:5-50:3, 50:22-51:5.

ME2C cannot explain why knowledge of power plant systems not at issue here, water purification

chemistry, or training sales personnel qualifies Mr. O'Keefe as a POSA.

ME2C twice asserts—with no citation—that Defendants do not dispute that Mr. O'Keefe

qualifies under Dr. Niksa's POSA standard from the IPR.  Resp. 35, 37.  This is wrong.  Mr.

O'Keefe has no knowledge of, or experience with, halogens, ACI, or mercury control, or

implementing any pollution control systems in power plants.  Op. Br. at 34-36.  Indeed, Mr.

O'Keefe knew nothing about this area or technology before beginning work on this case a year

ago.  Ex. 24 at 42:12-25, 47:23-24.  ME2C has not proved that Mr. O'Keefe qualifies as a POSA.

**D.      Plaintiffs Do Not Meet Their Burden of Establishing That Mr. O'Keefe Should Be Permitted to Testify in Six Areas Where He Has No Experience.**

Defendants identified six technical areas in which Mr. O'Keefe seeks to offer opinions but

admits he has no training or practical experience and that academic gap is not filled by "specialized

knowledge" purportedly acquired through "extensive experience with power plant operations."

22

Resp. at 37.[16]  His unspecified power plant experience did not include the devices (*e.g.*, ACI systems, Refined Coal plants, wet or dry scrubbers, or selective catalytic reactors (SCRs)) on which he would offer expert testimony.  His training in "power plant chemistry" was limited to water purification, and thus irrelevant here.  Plaintiffs' claim that he was "tasked with EPA compliance during his time at ComEd" is an attorney's assertion unsupported by Mr. O'Keefe's CV, deposition testimony, or anything else in the record.  Resp. at 38.  Prompted, Mr. O'Keefe provided no evidence that he had EPA or other compliance experience for power plants—just jobs where he sampled emissions from lawn equipment engines, or worked on regulatory compliance for medical devices.  Ex. 49 at 34:1-25, 36:1-8.  His experience does not fill the gap in his training.

### E.    Mr. O'Keefe's Other Opinions Should Be Excluded.

Defendants do not "contend that experts may not address the issue of indirect infringement," Resp. at 39, only that Mr. O'Keefe cannot do so in the way Plaintiffs propose.  Op. Br. at 42-45.  Plaintiffs' cases support the exclusion of state-of-mind testimony.[17]  *See* Resp. at 40.

### X.    Mr. Green's Opinions Should Be Excluded.

Plaintiffs argue that (i) the Chem-Mod and Nalco licenses Mr. Green considered and the asserted patent claims "involve highly similar technology—mercury capture through the use of additives," and (ii) even if comparability is imperfect, the jury should evaluate the "degree" of comparability.  Resp. at 43.  They misstate the law and uncontroverted evidence that Mr. Green's

---

[16] Plaintiffs suggest that Defendants would require an expert to have personal experience operating the equipment.  Resp. at 37.  Not so.  Such personal experience is an alternative route, for a witness lacking Dr. Niksa's deep expertise—Dr. Niksa is qualified by academic training and credentials, holding a Ph.D. in chemical engineering, more than 40 years' experience on the chemistry of coal combustion and emissions control, and extensive study of mercury emissions.  Ex. 54.

[17] *See, e.g.*, *Realtime Data, LLC v. Actian Corp.*, No. 6:15-CV-463 RWS-JDL, 2017 WL 11662038, at *3 (E.D. Tex. Mar. 29, 2017) (excluding opinions on defendant's intent); *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2011 WL 13152795, at *1 (N.D. Cal. Sept. 27, 2011) (excluding opinions on intent and state of mind).

comparability opinion ignores critical distinctions between the licenses and asserted claims.

An expert witness must provide "reasonable and specific explanations" for the selection of comparable licenses, *Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.*, 396 F. Supp. 3d 368, 388 (D. Del. 2019), *aff'd in part, vacated in part,* 967 F.3d 1353 (Fed. Cir. 2020), with at least "baseline comparability" for the opinion to have an adequate foundation for admissibility. *Id.*

Mr. Green's comparison fails this test. Plaintiffs have continuously attacked Defendants for their putative "scheme" to obtain tax credits authorized under Section 45. *See* 4AC at ¶¶ 215, 216(g), (h), and (i). But the credit requires more than "mercury capture"; it requires proof that the Refined Coal provides a "qualified emission reduction," which means a reduction:

> of at least 20 percent of the emissions of nitrogen oxide and at least 40 percent of the emissions of either sulfur dioxide or mercury released when burning the refined coal . . . compared to the emissions released when burning the feedstock coal . . .

26 U.S.C. § 45(c)(7). The $NO_x$ emission reduction is required for the Section 45 tax credit, and is a technological key to unlocking access to what Plaintiffs call "highly lucrative" tax credits. 4AC at ¶ 58. $NO_x$ reduction is not claimed in any Asserted Patent Claim, or taught in any patent-in-suit. Mr. Green, citing Mr. O'Keefe, concludes that Chem-Mod technology is "comparable" because, like the Asserted Patent Claims, it involves the use of a bromine additive "for the reduction of mercury emissions." Ex. 14 at ¶ 132; Op Br. at 47. But there is no evidence that Defendants ever made a coal product that only reduced mercury emissions; nor would they, as it would not qualify for Section 45 tax credits, and Plaintiffs assert that *every* RC Defendant in this case indirectly infringed by making and selling Section 45-qualified Refined Coal. 4AC at ¶ 77.

Asked why he opined that Chem-Mod's royalty rates had nothing to do with $NO_x$ reduction, Mr. Green answered, "Because it does not appear, based on any of these licenses, that they are changing—that the royalty rates are affected by $NO_x$, *they're talking about MerSorb and S-Sorb*." Ex. 45 at 83:1-4 (emphasis added). He apparently believed that these two chemicals related only

to mercury reduction, but that is wrong:  The RC Defendants use MerSorb and S-Sorb to make Section 45-qualified Refined Coal (*see, e.g.*, Ex. 11 at ¶ 82 (p.43)), which, in the process at issue, necessarily leads to reduction in mercury ***and*** $NO_x$ emissions.  The royalty Mr. Green described necessarily reflects value attributable to achieving the $NO_x$ reduction essential to demonstrate a Section 45 "qualified emission reduction."  26 U.S.C. § 45(c)(7).

Mr. Green thus has no basis for his opinion that Section 45 licensees pay a license fee to practice a technology—use of bromine "for the reduction of mercury emissions" only—to create a product that could not qualify for Refined Coal tax credits.  Patent infringement damages "must reflect the value attributable to the infringing features of the [patent], and no more."  *Ericsson v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  Plaintiffs argue that Mr. Green need not identify the value in the comparable licenses attributable to mercury reduction because the $NO_x$ technology was needed only to earn the tax credit, and so has no value that must be apportioned out in the context of his hypothetical negotiation.  Resp. at 48–49.  But the comparable licenses for Section 45 Refined Coal never licensed mercury reduction technology alone.  Straining to make his analysis work, Mr. Green ignores the $NO_x$ reduction that is an essential feature of the Chem-Mod technology licensed for Refined Coal (and something that the Asserted Patent Claims do not cover).  He fails, however, to take account of that technological exclusion in his valuation analysis.

The cases Plaintiffs cite excuse apportionment because the licenses were "sufficiently comparable," Resp. at 49, but that is not the case here.  Mr. Green created an imaginary technology that is not the Refined Coal technology Chem-Mod licensed, and used that for his comparison.  His premise that licenses and license fees for Section 45 technology do not encompass $NO_x$ reduction, and so are comparable to the Asserted Patent Claims, is wrong; his failure to apportion the licenses to reflect value attributable to those claims renders his royalty opinions incompetent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Brian P. Egan

_____

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
araucci@morrisnichols.com

OF COUNSEL:

Richard W. Mark
Joseph Evall
Paul J. Kremer
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
(212) 351-4000

David Glandorf
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
(303) 298-5700

*Attorneys for Defendants*
*AJG Iowa Refined Coal LLC*
*Arbor Fuels Company, LLC*
*Belle River Fuels Company, LLC*
*Canadys Refined Coal, LLC*
*Chouteau Fuels Company, LLC*
*Coronado Refined Coal, LLC*
*DTE Energy Resources, LLC*
*Erie Fuels Company, LLC*
*George Neal North Refined Coal, LLC*
*George Neal Refined Coal, LLC*
*Hastings Refined Coal, LLC*
*Huron Fuels Company, LLC*
*Jasper Fuels Company, LLC*
*Jefferies Refined Coal, LLC*
*Joppa Refined Coal LLC*
*Louisa Refined Coal, LLC*
*Newton RC, LLC*
*Portage Fuels Company, LLC*
*Superior Fuels Company 1, LLC*
*Walter Scott Refined Coal LLC*
*Williams Refined Coal, LLC*

MORRIS JAMES LLP

/s/ Kenneth L. Dorsney

OF COUNSEL:

Jeff Dyess
Paul Sykes
Benn Wilson
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL  35203
 (205) 521-8000

Jessica Zurlo
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW, Suite 1350
Washington, D.C.  20036
(202) 393-7150

_____
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Bascobert (A) Holdings LLC*
*Buffington Partners LLC*
*CERT Operations II LLC*
*CERT Operations IV LLC*
*CERT Operations RCB LLC*
*CERT Operations V LLC*
*Cottbus Associates LLC*
*Larkwood Energy LLC*
*Marquis Industrial Company, LLC*
*Rutledge Products LLC*
*Senescence Energy Products LLC*
*Springhill Resources LLC*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Nicole A. DiSalvo

OF COUNSEL:

Douglas R. Nemec, Esquire
Leslie A. Demers, Esquire
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY  10001-8602
(212) 735-300

_____
Robert S. Saunders, Esquire
Nicole A. DiSalvo, Esquire
Jessica R. Kunz, Esquire
Daniel S. Atlas, Esquire
One Rodney Square
P.O. Box 636
Wilmington, DE  19899-0636

*Attorneys for Defendant Alistar Enterprises,*
*LLC*

April 18, 2023

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 18, 2023, upon the following in the manner indicated:

James M. Lennon, Esquire                          *VIA ELECTRONIC MAIL*
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE  19806
*Attorneys for Plaintiffs*

Bradley W. Caldwell, Esquire                          *VIA ELECTRONIC MAIL*
Jason D. Cassady, Esquire
John Austin Curry, Esquire
Justin T. Nemunaitis, Esquire
Adrienne R. Dellinger, Esquire
Daniel R. Pearson, Esquire
CALDWELL CASSADY CURRY PC
2121 North Pearl Street, Suite 1200
Dallas, TX  75201
*Attorneys for Plaintiffs*

/s/ *Brian P. Egan*

_____
Brian P. Egan (#6227)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 25, 2023, upon the following in the manner indicated:

| | |
|---|---|
| James M. Lennon, Esquire<br>DEVLIN LAW FIRM LLC<br>1526 Gilpin Avenue<br>Wilmington, DE  19806<br>*Attorneys for Plaintiffs* | *VIA ELECTRONIC MAIL* |
| Bradley W. Caldwell, Esquire<br>Jason D. Cassady, Esquire<br>John Austin Curry, Esquire<br>Justin T. Nemunaitis, Esquire<br>Adrienne R. Dellinger, Esquire<br>Daniel R. Pearson, Esquire<br>CALDWELL CASSADY CURRY PC<br>2121 North Pearl Street, Suite 1200<br>Dallas, TX  75201<br>*Attorneys for Plaintiffs* | *VIA ELECTRONIC MAIL* |

*/s/ Brian P. Egan*

Brian P. Egan (#6227)