Originally Filed:  April 18, 2023
Redacted Version Filed:  April 25, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS CORP. )
and MES INC., )
)
Plaintiffs, )
) C.A. No. 19-1334 (CJB)
v. )
) REDACTED - PUBLIC  VERSION
ARTHUR J. GALLAGHER & CO., et al., )
)
Defendants. )

**OMNIBUS SUPPLEMENTAL DECLARATION OF BRIAN P. EGAN IN
SUPPORT OF DEFENDANTS' REPLY IN FURTHER SUPPORT OF
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
AND *DAUBERT* MOTIONS**

I, Brian P. Egan, declare as follows:

1.      I am admitted to practice in Delaware and before this Court.  I am an attorney of

the law firm Morris, Nichols, Arsht & Tunnell LLP, counsel of record for Defendants in this action.

I make this supplemental declaration in support of Defendants' Reply in Further Support of

Defendants' Motion For Summary Judgment and *Daubert* Motions, filed concurrently herewith.

I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could

and would testify competently to such facts under oath.

**Patents and Patent Documents**

2.      Attached hereto as **Exhibit 41** is a true and correct copy of Paper 17 filed in *NRG*

*Energy, Inc. and Talen Energy Corporation v. Midwest Energy Emissions Corp*., IPR2020-00832

(P.T.A.B. Oct. 26, 2020).

3.      Attached hereto as **Exhibit 42** is a true and correct copy of Paper 17 filed in *NRG*

*Energy, Inc. and Talen Energy Corporation v. Midwest Energy Emissions Corp.*, IPR2020-00928,

(P.T.A.B. Dec. 2, 2020).

4.      Attached hereto as **Exhibit 43** is a true and correct copy of excerpts from the deposition transcript of Sally Batanian in this case, dated September 1, 2022.

5.      Attached hereto as **Exhibit 44** is a true and correct copy of excerpts from the deposition transcript of Thomas Erickson in this case, dated September 21, 2022.

6.      Attached hereto as **Exhibit 45** is a true and correct copy of excerpts from the deposition transcript of Philip Green in this case, dated March 7, 2023.

7.      Attached hereto as **Exhibit 46** is a true and correct copy of excerpts from the deposition transcript of Jay R. Gunderson in this case, dated September 21, 2022.

8.      Attached hereto as **Exhibit 47** is a true and correct copy of excerpts from the deposition transcript of Vincent Inendino in this case, dated July 15, 2022.

9.      Attached hereto as **Exhibit 48** is a true and correct copy of excerpts from the deposition transcript of Dr. Stephen Niksa in this case, dated February 24, 2023.

10.      Attached hereto as **Exhibit 49** is a true and correct copy of excerpts from the deposition transcript of Philip J. O'Keefe in this case, dated March 2, 203.

11.      Attached hereto as **Exhibit 50** is a true and correct copy of excerpts from the deposition transcript of Philip J. O'Keefe in this case, dated March 3, 2023.

12.      Attached hereto as **Exhibit 52** is a true and correct copy of excerpts from the deposition transcript of Vincent Verschueren in this case, dated July 19, 2022.

13.      Attached hereto as **Exhibit 53** is a true and correct copy of excerpts from the Declaration of Dr. Stephen Niksa, filed in *NRG Energy, Inc. and Talen Energy Corporation v. Midwest Energy Emissions Corp.*, IPR2020-00928 (P.T.A.B. Dec. 2, 2020), and dated September 1, 2022.

14.      Attached hereto as **Exhibit 54** is the Curriculum Vitae of Dr. Stephen Niksa.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 18th day of April, 2023, Wilmington, Delaware.

*/s/ Brian P. Egan*

_____

Brian P. Egan

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 18, 2023, upon the following in the manner indicated:

James M. Lennon, Esquire                              *VIA ELECTRONIC MAIL*
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE  19806
*Attorneys for Plaintiffs*


Bradley W. Caldwell, Esquire                           *VIA ELECTRONIC MAIL*
Jason D. Cassady, Esquire
John Austin Curry, Esquire
Justin T. Nemunaitis, Esquire
Adrienne R. Dellinger, Esquire
Daniel R. Pearson, Esquire
CALDWELL CASSADY CURRY PC
2121 North Pearl Street, Suite 1200
Dallas, TX  75201
*Attorneys for Plaintiffs*


                                    */s/ Brian P. Egan*
                                    _____
                                    Brian P. Egan (#6227)

# EXHIBIT 41

Trials@uspto.gov                                              Paper 17
571-272-7822                                    Date: October 26, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

NRG ENERGY, INC. and
TALEN ENERGY CORPORATION,
Petitioner,

v.

MIDWEST ENERGY EMISSIONS CORP.,
Patent Owner.

_____

IPR2020-00832
Patent 10,343,114 B2

_____

Before KRISTINA M. KALAN, CHRISTOPHER M. KAISER, and
AVELYN M. ROSS, *Administrative Patent Judges.*

KALAN, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

IPR2020-00832
Patent 10,343,114 B2

# I.   INTRODUCTION

NRG Energy, Inc., Talen Energy Corporation, and Vistra Corp. (formerly known as Vistra Energy Corp.) filed a Petition (Paper 3, "Pet.") requesting an *inter partes* review of claims 1–9 and 12–30 of U.S. Patent No. 10,343,114 B2 (Ex. 1001, "the '114 patent").  Subsequently, Vistra Corp. and Midwest Energy Emissions Corp. ("Patent Owner") filed a Joint Motion to Terminate Vistra Corp. as a petitioner pursuant to a settlement. Paper 10.  That motion was granted.  Paper 13.  Therefore, NRG Energy, Inc. and Talen Energy Corporation (collectively, "Petitioner") remain as petitioners.  *Id.* at 4.  Patent Owner filed a Preliminary Response to the Petition (Paper 9, "Prelim. Resp.").  Pursuant to our authorization, Petitioner filed a Reply (Paper 15, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 16, "Sur-reply").

To institute an *inter partes* review, we must determine that the information presented in the Petition shows "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  35 U.S.C. § 314(a).  For the reasons discussed below, after considering the parties' submissions and the evidence of record, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to at least one claim of the '114 patent.  Thus, we institute an *inter partes* review.

## A.   Related Proceedings

The parties identify *Midwest Energy Emissions Corp. v. Vistra Energy Corp.*, No. 1:19-cv-01334-RGA (D. Del.) as a related matter.  Pet. 6–7; Paper 6, 2.  Petitioner also identifies IPR2020-00834 as a second petition against the '114 patent.  Pet. 8.

IPR2020-00832
Patent 10,343,114 B2

B. *The '114 Patent*

The '114 patent, titled "Sorbents for the Oxidation and Removal of Mercury," "relates to methods and materials for the removal of pollutants from flue gas or product gas from a gasification system," and "[i]n particular, mercury is removed from gas streams generated during the burning or gasification of fossil fuels by highly reactive regenerable sorbents." Ex. 1001, code (54), 1:27–31. The'114 patent discloses that the "combustion and gasification of fossil fuel such as coal generates flue gas that contains mercury and other trace elements that originate from the fuel" and "[s]everal types of mercury control methods for flue gas have been investigated, including injection of fine sorbent particles into a flue gas duct and passing the flue gas through a sorbent bed." *Id.* at 1:33–35, 1:56–59. However, the '114 patent explains that a "major problem with existing carbon injection systems is that the sorbent is relatively unreactive toward mercury" and therefore "these sorbents must be used in large amounts." *Id.* at 2:10–12. The '114 patent further describes other mercury sorbent approaches and their problems. *Id.* at 2:20–3:15.

The '114 patent describes a halogen/halide-promoted sorbent "that is highly effective for the removal of mercury from flue gas streams" and that the "sorbent comprises any activated carbon and/or non-carbon compound." *Id.* at 3:36–39. Further, "[o]ptional secondary components and alkali may be added to further increase reactivity and mercury capacity." *Id.* at 3:43–44. The '114 patent states that "the optional secondary component is selected from the group consisting of Group V halides, Group VI halides, HI, HBr, HCl, and combinations thereof." *Id.* at 4:52–55.

The '114 patent discloses in "an embodiment, the promoted sorbent is introduced by direct injection into the flue gas stream" and in "another

3

IPR2020-00832
Patent 10,343,114 B2

embodiment, the base sorbent is promoted within the flue gas stream." *Id.*
at 5:41–43. The '114 patent describes that in "some embodiments, the
carbon base sorbent and the promoter are introduced into the mercury-
containing gas at the same location or at separate locations." *Id.* at 7:5–8.
For instance, the '114 patent explains for one example that "the sorbent is
injected into the flue gas after the boiler" and the "additive can be injected
where desired (e.g., before, after, or within the boiler)." *Id.* at 30:1–4.

The '114 patent explains that when "a promoted or a non-promoted
base sorbent reacts with elemental or oxidized mercury, a mercury/sorbent
chemical composition is formed and, in the case of elemental mercury
reacting with the promoted base sorbent, the mercury is oxidized." *Id.*
at 3:53–57. The '114 patent further describes separating the promoted
sorbent from the gas stream and adjusting "the rate at which the carbon base
sorbent is introduced or the rate at which the promoter is introduced or
combination thereof" according to a monitored mercury content of the
cleaned gas "so that the mercury content of the cleaned gas is maintained at
substantially the desired level with minimal operating cost." *Id.* at 7:10–16.

C.  *Illustrative Claim*

1. A method of separating mercury from a mercury
containing gas, the method comprising:
combusting coal in a combustion chamber, to provide the
mercury-containing gas, wherein the mercury-containing
gas comprises a halogen or halide promoter comprising
HBr, Br-, or a combination thereof, wherein
the coal comprises added $Br_2$, HBr, Br-, or a combination
thereof, added to the coal upstream of the combustion
chamber, or
the combustion chamber comprises added $Br_2$, HBr, Br-,
or a combination thereof, or
a combination thereof;

4

IPR2020-00832
Patent 10,343,114 B2

> injecting a sorbent material comprising activated carbon into
>> the mercury-containing gas downstream of the
>> combustion chamber;
> contacting mercury in the mercury-containing gas with the
>> sorbent, to form a mercury/sorbent composition;
> separating the mercury/sorbent composition from the
>> mercury-containing gas, to form a cleaned gas;
> monitoring the mercury content of the cleaned gas; and
> controlling, in response to the monitored mercury content of
>> the cleaned gas, an injection rate of injecting the sorbent
>> into the mercury-containing gas, the sorbent composition,
>> or a combination thereof, so that the mercury content of
>> the cleaned gas is maintained at or below a desired level.

Ex. 1001, 33:49–34:7.

### D. The Asserted Grounds of Unpatentability

Petitioner contends claims 1–9 and 12–30 of the '114 patent are unpatentable on the following grounds. Pet. 10.

| Reference(s) | Basis | Claim(s) Challenged |
|---|---|---|
| Sjostrom,[1] Eckberg[2] | § 103 | 1, 2, 4–9, 12–28, 30 |
| Sjostrom, Olson-646[3] | § 103 | 1–9, 12–30[4] |

[1] Sharon Sjostrom, "Full Scale Evaluations of Mercury Control Technologies with PRB Coals," Track A, Session A3 (Mercury – Control), Presentation A3b, EUEC: 8TH ELECTRIC UTILITIES ENVIRONMENTAL CONFERENCE (Tucson, Arizona: January 25, 2005) (Ex. 1010).
[2] Craig Eckberg *et al.*, "Mercury Control Evaluation of Halogen Injection into a Texas Lignite-Fired Boiler," Track A, Session A3 (Mercury – Control), Presentation A3c, EUEC: 8TH ELECTRIC UTILITIES ENVIRONMENTAL CONFERENCE (Tucson, Arizona: January 25, 2005) (Ex. 1011).
[3] US 2006/0048646 A1, published Mar. 9, 2006 (Ex. 1014).
[4] The Petition states that claims 1–9 and 12–30 are being challenged under this ground, but Petitioner's actual arguments for this ground appear to address only claims 1–4, 6–9, 14, 19–22, and 24–30. *Compare* Pet. 10, 69 (indicating that Ground 2 challenges claims 1–9 and 12–30) *with* Pet. 69–97

IPR2020-00832
Patent 10,343,114 B2

In support of its unpatentability arguments, Petitioner relies on the declaration of Dr. Stephen Niksa.  Ex. 1002 ("Niksa Declaration").

## II.  ANALYSIS

### A.  Claim Construction

We apply the claim construction standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005); 37 C.F.R. § 42.100(b) (2019); *see also Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board*, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (applicable to *inter partes* reviews filed on or after November 13, 2018).  Under *Phillips*, claim terms are afforded "their ordinary and customary meaning."  *Phillips*, 415 F.3d at 1312.  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1313.  Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Neither party asserts a claim construction for the challenged claims. *See* Pet. 10; *see generally* Prelim. Resp.  On this record, we determine that no claim terms require express construction.

### B.  Principles of Law

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363

---

(addressing only claims 1–4, 6–9, 14, 19–22, and 24–30).  Clarification is requested.

IPR2020-00832
Patent 10,343,114 B2

(Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).  This burden of persuasion never shifts to Patent Owner.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness (i.e., secondary considerations).  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  "To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements.  The petitioner must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness."  *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

We analyze the asserted grounds of unpatentability in accordance with these principles to determine whether Petitioner has met their burden to establish a reasonable likelihood of success at trial.

C.  *Level of Ordinary Skill in the Art*

Petitioner argues:

7

IPR2020-00832
Patent 10,343,114 B2

> A person of ordinary skill in the art ("POSITA") would have at least a bachelor's degree in chemical engineering, mechanical engineering, or a related field of study with at least two years of experience with implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration.

Pet. 12 (citing Ex. 1002 ¶ 64). Patent Owner does not appear to dispute this proposed definition. *See generally* Prelim. Resp. Neither party argues that the outcome of this case would differ based on our adoption of any particular definition of one of ordinary skill in the art.

In light of the record before us, we adopt Petitioner's proposal regarding the level of one of ordinary skill in the art. The level of ordinary skill in the art is also reflected by the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### D. Real Parties-In-Interest

Petitioner identifies a number of real parties-in-interest and potential real parties-in-interest. Pet. 1–6.

Patent Owner argues that "35 U.S.C. § 312(a)(2) provides that a petition may only be considered if 'the petition identifies all real parties in interest.'" Prelim. Resp. 8. Patent Owner contends that Petitioner lists "dozens of 'potential real parties in interest,' without explanation as to their relationship to petitioners," that this "is not an identification of *all real parties in interest*," and that, if instituted, this proceeding would be under a cloud of uncertainty because the ambiguity in Petitioner's list "will likely lead to confusion and disputes as to which parties are real parties in interest and which are bound by the estoppel provisions of 35 U.S.C. § 315." *Id.* For instance, Patent Owner asserts that Petitioner identifies various vendors and suppliers as "potential real parties in interest" but states that "[n]one of

IPR2020-00832
Patent 10,343,114 B2

these companies or any unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding" and this implies that these entities are not actually real parties in interest. *Id.* In addition, Patent Owner argues that some entities are identified both as "potential real parties in interest" and "real parties in interest," which creates ambiguity and conflict in the listing of entities. *Id.* For these reasons, Patent Owner contends that Petitioner has "not met their burden of identifying all real parties in interest" and "the Board should deny institution for failure to comply with § 312(a)(2)." *Id.* at 8–9.

We are not made aware of any rule, statute, or case law that prohibits Petitioner from identifying multiple real parties-in-interest or multiple potential real parties-in-interest. Petitioner's identification of about a dozen real parties-in-interest does not appear problematic or overly burdensome. Pet. 1–2. Petitioner's identification of numerous potential real parties-in-interest, while unusual, also does not appear problematic. *Id.* at 2–6. To the extent Petitioner has identified an entity as both a real party-in-interest and a potential real party-in-interest, we interpret that to mean that party is identified as a real party-in-interest. Petitioner's reasons for identifying numerous potential real parties-in-interest appear plausible: Petitioner identifies these parties "out of an abundance of caution" because "they are vendors and suppliers" in the related litigation but have not "agreed to be listed as a real party-in-interest" in this Petition. Pet. 1–6. This provides the Board and Patent Owner notice that other potential entities may be indirectly involved, but also provides reasons for not committing those parties to the real party-in-interest category. Ordinarily, problems regarding identification of real parties-in-interest arise when a petitioner fails to identify a real party-in-interest. *See, e.g., Ventex Co., Ltd. v. Columbia Sportswear N. Am., Inc.*,

IPR2020-00832
Patent 10,343,114 B2

IPR2017-00651, Paper 152 (PTAB Jan. 24, 2019) (precedential)
(terminating proceeding where Petition failed to name time-barred RPI and privy). Here, the alleged problem is over-identification of potential real parties-in-interest. Without express violation of a known rule, statute, or case law, however, this does not appear to be a problem warranting non-institution of *inter partes* review.

### E.  Discretion under 35 U.S.C. § 325(d)

Patent Owner argues that the Board should exercise its discretion to deny institution under 35 U.S.C. § 325(d). Prelim. Resp. 1–2. Patent Owner asserts:

> Petitioners contend that the challenged claims cannot claim priority to earlier applications because those applications fail to provide written description support for two limitations: (1) using HBr, $Br_2$, or $Br^-$/bromide as an additive (Pet. at VI.C.2); and (2) adding the additive to coal (Pet. at VI.C.3). They contend that this dispute is appropriate for *Inter Partes* Review because: "Examiners do not make findings of priority as a matter of course during prosecution." Pet. at 11-12. This assertion is misguided. Petitioners fail to mention that the examiner found written description support for the challenged claims based on material contained in, or equivalent to, the parent applications. Because Petitioners identify no material error in the examiner's conduct, the Board should deny institution under § 325(d).

*Id.* at 2.

> To evaluate whether to exercise discretion under 35 U.S.C. §325(d),
>
> the Board uses the following two-part framework: (1) whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office; and (2) if either condition of first part of the framework is satisfied, whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims

IPR2020-00832
Patent 10,343,114 B2

*Advanced Bionics LLC v. MED-EL Elektromedizinische Geräte GmbH*,
IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (precedential).  The
factors set forth in *Becton, Dickinson & Co. v. B. Braun Melsungen AG*,
IPR2017-01586, Paper 8 (PTAB Dec. 15, 2017) (precedential as to § III.C.5,
first paragraph) provide insight into how to apply the framework, because
*Becton, Dickinson* factors (a), (b), and (d) relate to part (1) of the framework
and factors (c), (e), and (f) relate to part (2).

    *1.   Advanced Bionics Framework Part (1)*

    For part (1) of the *Advanced Bionics* framework (and factors (a), (b),
and (d) of *Becton, Dickinson*), Patent Owner contends that, shortly after
filing the '760 application, a new independent claim was added which
recited, among other things, "combusting coal in a combustion chamber, to
provide the mercury-containing gas, wherein the mercury-containing gas
comprises a halogen or halide promoter comprising $Br_2$, HBr, $Br^-$, or a
combination thereof" and "injecting a sorbent material comprising activated
carbon into the mercury-containing gas downstream of the combustion
chamber."  *Id.* at 4–5 (citing Ex. 1026, 75–76).  According to Patent Owner,
"this claim encompasses all of the features that Petitioner alleges are absent
from the various parent applications, i.e., the use of HBr, Br2, or Br-, and the
addition of a bromine material to the coal."  *Id.* at 5.

    Patent Owner, however, acknowledges that the new claim "does not
expressly recite providing bromine to the coal" but argues "its scope covers
that embodiment because it covers combusting coal to obtain a mercury-
containing gas that also contains those bromine species."  *Id.*  Patent Owner
cites a subsequent interview with the Examiner to discuss support for the
amended claims and argues that the Examiner found support for the claim

IPR2020-00832
Patent 10,343,114 B2

scope in Figure 6 of the '114 patent, which is reproduced below. *Id.* (citing Ex. 1026, 1535).



FIG. 6

Figure 6 of the '114 patent is "a block diagram illustrating the use of the invention in a coal fueled facility." Ex. 1001, 9:33–34. Patent Owner asserts that Figure 6 "is taken directly from the provisional application" and "the same written description issues that form the basis of the Petition were already considered by the examiner during prosecution." Prelim. Resp. 6.

Petitioner replies that the Examiner "at most considered whether the '114 Patent, *as filed*, included support for all claim limitations in the '114 Patent specification," but did not "address entitlement to benefit through each of the parent applications." Reply 4.

The independent claims of the '114 patent require that coal comprise added $Br_2$, HBr, Br- or a bromide compound, or a combination thereof, *or* the combustion chamber comprises added $Br_2$, HBr, Br- or a bromide compound, or a combination thereof. Ex. 1001, 33:55–60, 35:9–14, 35:29–34, 36:10–15. The scope of the claim added during prosecution of the '760 application may be viewed as encompassing various methods of adding the bromine species so coal is combusted and a mercury-containing gas is

IPR2020-00832
Patent 10,343,114 B2

provided that includes the bromine species.  However, as acknowledged by Patent Owner, the claim added during prosecution of the '760 application "does not expressly recite providing bromine to the coal."  Prelim. Resp. 5. Nor does the claim expressly recite that the bromine species are added to the combustion chamber.

Therefore, the Examiner did not necessarily consider whether the '760 application and its priority applications provided support for the two specific embodiments of adding the bromine species to coal and adding the bromine species to the combustion chamber.  Analysis of the claim added during prosecution of the '760 application did not require analysis of whether there was written description support for these two specific embodiments, but rather, whether there was sufficient written description support for the claimed genus of adding the bromine species, which encompassed numerous ways of adding the bromine species.  In other words, the analysis of support for the genus did not necessarily require analysis of support for the species. As a result, we do not agree with Patent Owner that the same or substantially the same arguments regarding the priority of the '114 patent previously were presented to the Office.  Having reached this conclusion, we need not necessarily analyze the second part of the *Advanced Bionics* framework. Nevertheless, because Patent Owner argues that the Examiner implicitly considered priority issues during examination (Prelim. Resp. 6–8), we address this argument below.

2.   *Advanced Bionics Framework Part (2)*

For part (2) of the *Advanced Bionics* framework (and factors (c), (e), (f) of *Becton, Dickinson*), Patent Owner contends that Petitioner "could have attempted to argue that the examiner's § 112/priority date analysis contained some material error, but they failed to do so," and, thus, factors (c), (e),

13

IPR2020-00832
Patent 10,343,114 B2

and (f) of *Becton, Dickinson* weigh against institution.  Prelim. Resp. 6.  In response to Petitioner's statement that "Examiners do not make findings of priority as a matter of course during prosecution, instead accepting applicant's asserted priority date" (Pet. 11–12), Patent Owner argues that although "examiners are not required to provide a priority date analysis for every application, such an analysis is required when considering references that post-date the earliest claimed filing date."  Prelim. Resp. 6–7 (citing MPEP § 201.08).  Patent Owner asserts that during prosecution, "the examiner considered several references with prior art dates in between the provisional filing date and the '114 filing date" but, nonetheless, "the fact that the examiner did not reject the claims based on this reference indicates that she did not accept Petitioners' assertion of a lapse in priority."  *Id.* at 7.  In view of this, Patent Owner argues that the Board should deny the petition.  *Id.* at 8.

Petitioner argues "the Patent Office made no finding regarding priority of the '114 Patent to earlier filed applications."  Pet. 21.  Petitioner also asserts that although "the Patent Office did not make a determination regarding priority to earlier applications, applicants cited to the as-filed '760 Application for written-description support" when amending the pending claims of the '760 application to recite the addition of bromine-containing species ($Br_2$, HBr, $Br^-$, bromine compound) to coal upstream of a combustion chamber.  *Id.* at 20–21, 23–24.  However, Petitioner contends that some portions of the '760 application cited for written description support were not present in the '594 application, and earlier applications do not provide written description support for the independent claims of the '114 patent.  *Id.* at 24–26.  Petitioner further asserts that "the Examiner at most considered whether the '114 Patent, *as filed*, included support for all

14

IPR2020-00832
Patent 10,343,114 B2

claim limitations in the '114 Patent specification," the "Examiner did not address entitlement to benefit through each of the parent applications," and "[b]reaks in the priority chain occurred."  Pet. Reply 4 (citing Ex. 1026, 1535; Pet. 26–33).

We find that Petitioner has demonstrated that the Office erred in a manner material to the patentability of the challenged claims.  As discussed below with regard to the priority of the '114 patent, Petitioner demonstrates, on this record, a break in the priority chain of the '114 patent, and that the independent claims of the '114 patent lack written description support in each application of the priority chain.  This is further illustrated by Patent Owner's arguments, which show that the Examiner cited Figure 6 of the '760 application for written description support when considering the claim amendments cited by Patent Owner.  Prelim. Resp. 5–6 (citing Ex. 1026, 1535).  Although Figure 2 of the provisional application corresponds to Figure 6 of the '760 application, Petitioner is correct that this drawing was removed from intervening applications, including the '163 and '595 applications, and was added to the specification when the '760 application was filed.  Pet. Reply 5; *see* Ex. 1020, 16; Ex. 1021, 41–47; Ex. 1022, 40–46; Ex. 1026, 62.

For these reasons, we decline to exercise our discretion under § 325(d) to deny institution.

F.  *Discretion under 35 U.S.C. § 314(a)*

Under § 314(a), we have discretion to deny institution of an *inter partes* review.  *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016); *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018); *Harmonic Inc.*, 815 F.3d at 1367 ("[T]he PTO is permitted, but never compelled, to institute an IPR proceeding."); *see also* 37 C.F.R. § 42.4(a) ("The Board institutes the

15

IPR2020-00832
Patent 10,343,114 B2

trial on behalf of the Director.").  In deciding whether to institute an *inter partes* review, we consider the guidance in the Consolidated Trial Practice Guide, which states:

> Based on the Board's experience, one petition should be sufficient to challenge the claims of a patent in most situations. Two or more petitions filed against the same patent at or about the same time . . . may place a substantial and unnecessary burden on the Board and the patent owner and could raise fairness, timing, and efficiency concerns.

Patent Trial and Appeal Board Consolidated Trial Practice Guide ("CTPG") (Nov. 2019), https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf, 59.

Here, Petitioner filed two petitions on the same day challenging claims 1–9 and 12–30 of the '114 patent.  In IPR2020-00834, Petitioner presented two anticipation grounds, one based on Vosteen and one based on Downs-Boiler, and six obviousness grounds based on either Vosteen or Downs-Boiler and additional references.  IPR2020-00834, Paper 3, 10.  In this proceeding, Petitioner presented two obviousness challenges, the first based on Sjostrom and Eckberg and the other based on Sjostrom and Olson-646.  Pet. 10.

Petitioner filed a Petitioner's Explanation Regarding the Necessity of Multiple Petitions.  Paper 2 ("Explanation").  Arguing that "[g]iven the strength of the prior-art references on the merits, and noncumulative nature of the references, both petitions should be instituted," Petitioner nevertheless ranks the IPR2020-00834 petition above the IPR2020-00832 petition.  Explanation 2.

Citing the CTPG's statement that "more than one petition may be necessary . . . when there is a dispute about priority date requiring arguments

IPR2020-00832
Patent 10,343,114 B2

under multiple prior art references," Petitioner also contends that the two petitions assert different priority dates and assert different references. *Id.* at 3 (citing CTPG 59). Petitioner further argues that the issues presented to the Board by the two Petitions are limited, because the Petition in IPR2020-00834 uses only two primary references and two secondary references whereas the Petition in this proceeding uses only one primary reference and two secondary references. *Id.* at 3–4. Petitioner also contends that Patent Owner may attack obviousness grounds for dependent claims in IPR2020-00834 via evidence of secondary considerations. *Id.* at 4. In view of this possibility, Petitioner requests that the Board also institute in this proceeding because Olson-646 discloses numerous limitations of the same dependent claims. *Id.* Petitioner also argues that, instead of each party individually filing separate petitions, the parties joined forces for reasons of efficiency. *Id.* at 4–5.

Petitioner's arguments are persuasive. As argued by Petitioner, the CTPG recognizes that more than one petition may be necessary when there is a priority date dispute that requires arguments under multiple prior art references. CTPG 59. We also agree with Petitioner that the second petition in this proceeding does not unduly burden the Board, due to its two grounds based on three references. Because the remaining grounds in IPR2020-00834 based on Downs-Boiler appear to challenge only claims 1–7 and 12–30 of the '114 patent, the petition in this proceeding potentially challenges claims (i.e., claims 8 and 9) in addition to those challenged by the ground based on Downs-Boiler in IPR2020-00834.

Patent Owner does not contest Petitioner's arguments that the simultaneous filing of two petitions does not unduly burden the Board. *See generally* Prelim. Resp.; Sur-reply. Nor does Patent Owner argue that two

17

IPR2020-00832
Patent 10,343,114 B2

petitions prejudice Patent Owner or otherwise request us to exercise our discretion under § 314(a).  *Id.*  Given the unique circumstances in this proceeding, we find this to be a rare instance in which we should decline to exercise our discretion to deny the lower-ranked Petition.

### G.  *Priority of '114 Patent*

Petitioner asserts that the priority date of the '114 patent is no earlier than its filing date of May 14, 2018.  Pet. 20.  Petitioner asserts it has demonstrated "the invalidity of the '114 Patent claims in the grounds below" and this places the burden on Patent Owner "to come forward with evidence 'to prove entitlement to claim priority to an earlier filing date.'"  Pet. 21–22 (citing *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305–06 (Fed. Cir. 2008) (stating a patent owner has "to prove entitlement to claim priority to an earlier filing date").

Petitioner provides the following summary of the '114 patent's priority chain and family:

IPR2020-00832
Patent 10,343,114 B2



Patent Family Tree

IPR2020-00832
Patent 10,343,114 B2

Ex. 1017.  This summary depicts the earliest filed application at the top and shows the latest filed application at the bottom.  As illustrated above, the '114 patent has the following priority chain:

- Provisional Application 60/605,640, filed August 30, 2004, ("the provisional application");

- Non-provisional Application 11/209,163 ("the '163 application"), filed August 22, 2005, claiming priority to the Provisional Application;

- Non-provisional Application 12/201,595 ("the '595 application"), filed August 29, 2008, claiming priority to the '163 application as a divisional application;

- Non-provisional Application 12/429,058 ("the '058 application"), filed April 23, 2009, claiming priority to the '595 application as a continuation-in-part;

- Non-provisional Application 14/102,896 ("the '896 application"), filed December 11, 2013, claiming priority to the '058 application as a continuation;

- Non-provisional Application 15/295,594 ("the '594 application"), filed October 17, 2016, claiming priority to the '896 application as continuation; and

- Non-provisional Application 15/978,760 ("the '760 application"), filed May 14, 2018, claiming priority to the '594 application as a continuation-in-part.

*Id.*; Ex. 1001, code (21), (22), (60).  The provisional application has an earlier date than when Sjostrom and Eckberg were publicly accessible (February 2005) and when Olson-646 was published (March 2006).

IPR2020-00832
Patent 10,343,114 B2

Reply 1.  Therefore, if the '114 patent were entitled to the priority date of the provisional application, Sjostrom, Eckberg and Olson-646 would not qualify as prior art to the '114 patent.

Petitioner contends the priority date of the '114 patent is no earlier than its filing date of May 14, 2018, because:

> The earlier-filed applications in the priority chain fail to include sufficient written description of claim limitations that appear in each of the independent claims (Claims 1, 23–25), at least because there is no disclosure of adding any type of bromine-containing species ($Br_2$, HBr, $Br^-$, bromine compound) to the coal upstream of the combustion chamber, let alone the particular species recited in the claims.

Pet. 20.  Petitioner asserts that the provisional application cannot be relied upon for support because the intervening applications do not include the relied-upon disclosure of the provisional application.  *Id.* at 26 (citing *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565 (Fed. Cir. 1997)).

Petitioner argues that "in the '760 Application and earlier applications, the Provisional is only 'incorporated by reference ***to the extent appropriate***,'" indicating that applicants did not intend to incorporate the entire document, but only parts of it, again without identifying the specific material to incorporate."  *Id.* at 27 (citing Ex. 1001, 1:20–22).  Petitioner asserts that "material from a provisional application incorporated by reference cannot be considered as providing written description support in a priority analysis, because such material would be deemed 'essential material.'"  *Id.* at 27–28.  "'[E]ssential material'—which includes 'material that is necessary to:  provide a written description of the claimed invention'—'may be incorporated by reference, but ***only*** by way of incorporation by reference to a ***U.S. patent or U.S. patent application publication***.'"  *Id.* (citing 37 C.F.R. § 1.57(d) (2020); 37 C.F.R. § 1.57(c)

21

IPR2020-00832
Patent 10,343,114 B2

(2005)).  Petitioner further argues that the provisional application "fails to disclose adding to the coal or to the combustion chamber each of the particular bromine-containing species recited in the Newly Introduced Limitations, such as $Br_2$, $Br^-$ and 'bromide compounds.'"  *Id.* at 28–33 (citing Ex. 1002 ¶¶ 187, 192–196).

In addition, Petitioner contends there is a lack of support for the '114 patent claims in the intervening applications between the provisional application and the '114 patent because "[n]othing in the '595 Application filed 8/29/2008 describes adding the bromine promoter independently from the mercury sorbent, let alone to the coal or combustion chamber."  *Id.* at 34 (citing Ex. 1022, 1–34).  Petitioner also argues that the '058, '594, and '896 applications are deficient in their written description support.  *Id.* at 34–36.

Patent Owner argues that a petitioner initially has the burden of persuasion and the burden of production on all issues, and if the petitioner provides *prima facie* evidence that its burden has been met, the burden of production shifts to patentee on some issues, such as the determination of a patent's priority date.  Prelim. Resp. 13 (citing *Dynamic Drinkware*, 800 F.3d at 1379–80).  According to Patent Owner, if "the patentee meets this burden by providing evidence of an earlier priority date, the Board must evaluate the petitioner's arguments in light of all the evidence to determine if the petitioner has met its burden of persuasion."  *Id.* (citing *Dynamic Drinkware*, 800 F.3d at 1380; *Boart Longyear Ltd. v. Australian Mud Co. Pty Ltd.*, No. IPR2019-01129, 2019 WL 6442439, at *14 (PTAB Nov. 25, 2019)).  Patent Owner contends that Petitioner confuses the burden of production with the burden of persuasion.  *Id.* at 14.

In view of the above, Patent Owner asserts that Petitioner "must demonstrate that one or more of these applications lacks written description

IPR2020-00832
Patent 10,343,114 B2

support for the challenged claims of the '114 patent" but Petitioner has not met its burden. *Id.* at 14–15. Specifically, Patent Owner argues that the provisional application supports the claims of the '114 patent and the '594 application, the '896 application, and the '058 application collectively[5] support the claims of the '114 patent. *Id.* at 16–22, 24–31.

Patent Owner also addresses the '595 and '163 applications, stating that they "contain substantively identical disclosures," and therefore refers to the '595 application when arguing that those two applications support the claims of the '114 patent. *Id.* at 22. Specifically, Patent Owner asserts that the "'595 application discloses the same chemical model as the '594 application," "the use of a 'promoter' that supplies Br- such as HBr or $Br_2$," "and the practice of adding the promoter and sorbent at one or multiple locations." *Id.* (citing Ex. 1022 ¶¶ 52–53, 56, 64, Fig. 2, original claim 8).

Patent Owner acknowledges that "instead of the hypothetical example depicted in figure 5 of the ['594] patent, the ['595][6] patent describes an experimental test setup at an actual coal plant" in which "the promoter and sorbent were both injected downstream of the boiler" but argues "the inventors explained that these components could be added before, after, or within the boiler." *Id.* at 22–23 (citing Ex. 1022 ¶ 107). Patent Owner asserts that because "a halogen/halide promoted sorbent necessarily includes a halogen/halide such as $Br_2$, HBr, or Br-, a POSITA would recognize that adding this material before the boiler necessarily results in the limitations at

---

[5] Patent Owner states that the '595 application is representative of the '163 application and the '594 application is representative of the '058 and '896 applications. Prelim. Resp. 14.

[6] There appears to be a typographical error in this passage. It appears that the '594 application and the '595 application were inadvertently switched with one another.

IPR2020-00832
Patent 10,343,114 B2

issue in the '114 patent." *Id.* at 23.  In response to Petitioner's arguments regarding lack of written description support in the intervening applications (including the '595 and '163 applications), Patent Owner contends that Petitioner offers "only brief, vague assertions as to why these applications fail to provide support for the challenged claims, or they criticize portions of the applications not relied upon above." *Id.* at 31.

Petitioner responds by arguing that it has shown Sjostrom and Eckberg to be printed publications, and that Olson-646 was published in March 2006, and this has shifted the burden to Patent Owner to show an earlier filing date.  Pet. Reply 1 (citing *Mueller Sys., LLC v. Rein Tech, Inc.*, IPR2020-00100, 2020 WL 2478524, at *10 (PTAB May 12, 2020)). Petitioner asserts that "Patent Owner has not demonstrated written-description support through *each* of the parent applications" and that Patent Owner has not shown that all limitations are found in the provisional application.  *Id.* at 1–4.  Petitioner contends that Patent Owner does not dispute that a provisional application cannot be incorporated by reference for a priority analysis.  *Id.* at 4.  In addition, Petitioner disputes Patent Owner's analysis for support in the intervening applications, arguing that "[t]he '163 Application states that 'the *inventive sorbent* can be injected where desired (e.g., before, after, or within the boiler)" and "[t]he 'inventive sorbents' are those formed from '*chemically combin[ing] molecular bromine* . . . *with activated carbon*.'"  *Id.* at 4–5 (citing Ex. 1021, 18, 29; Ex. 1022, 14, 25 (emphasis added)).  Petitioner asserts that "the '114 Patent claims require *separately* injecting the promoter and sorbent (i.e., before they chemically combine)—the promoter must be added to the coal or to the boiler, and the sorbent must be injected downstream of the boiler."  *Id.* at 5 (citing Ex. 1001, claims 1, 23–25).  Petitioner further argues that Figure 2 of the

24

IPR2020-00832
Patent 10,343,114 B2

provisional application was removed from all intervening applications but added to the specification when the '114 patent was filed (i.e., as Figure 6 in the '760 application).  *Id.*

Patent Owner argues that the provisional application supports the challenged claims.  Sur-reply 1–4.  In response to Petitioner's arguments regarding the '163 application and the separate injection of promoter and sorbent, Patent Owner argues that "[n]o such language appears in the claims," "[a]t best, Petitioners are raising a new argument based on a new claim construction position, but they fail to identify the claims affected, the claim language that they seek to construe, or any intrinsic or extrinsic evidence in support of their position", and "the claims do not merit such a construction" because the claim language "does not exclude adding bromine or sorbent at both locations."  *Id.* at 4.  Patent Owner further contends that claim 14 of the '114 patent recites "wherein the sorbent material injected into the mercury-containing gas is a promoted sorbent" and "[t]hus, the claims plainly do not exclude injection of bromine with sorbent so long as some bromine is provided upstream of the combustion chamber and some activated carbon is injected downstream of the combustion chamber."  *Id.* at 5.  In addition, Patent Owner asserts "the specification describes embodiments where multiple injection points are used to inject combined promoter and sorbent."  *Id.* (citing Ex. 1001 at 14:10–16).

Having considered the parties' positions and evidence, we determine that Petitioner has demonstrated a reasonable likelihood that one or more of the applications in the priority chain for the '114 patent lacks written description support for the challenged claims.  Conversely, Patent Owner's arguments are insufficient to establish that the applications in question provide written description support.

IPR2020-00832
Patent 10,343,114 B2

According to *Lockwood v. American Airlines, Inc.*,

In order to gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, *each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112. In re Hogan*, 559 F.2d 595, 609, 194 USPQ 527, 540 (CCPA 1977).

107 F.3d at 1571 (emphasis added).  Even if the provisional application and/or the '760 application were found to provide support for the challenged claims of the '114 patent, at least the '163 application and the '595 application do not provide written description support for the challenged claims.

The independent claims of the '114 patent recite that coal comprises added $Br_2$, HBr, $Br^-$, or a combination thereof (claims 1, 23, and 24), or $Br_2$, HBr, a bromide compound or a combination thereof (collectively, the "promoter"), (claim 25), or the combustion chamber comprises the added promoter, and the sorbent material is injected into the mercury-containing gas downstream of the combustion chamber.  Ex. 1001, 33:55–63, 35:9–17, 35:30–38, 36:10–18.  Therefore, regardless of whether the independent claims of the '114 patent encompass injecting both promoter and sorbent material into the mercury-containing gas downstream of the combustion chamber and/or adding that combination to coal or the combustion chamber, the issue is whether there is written description support in each application of the '114 patent's priority chain for a method that includes both (1) adding the promoter to coal or to the combustion chamber and (2) injecting the sorbent material into the mercury-containing gas downstream of the combustion chamber, as claims 1 and 23–25 recite.

Patent Owner states that the '595 application is representative of the '163 application and "[t]he '595 and '163 applications contain

IPR2020-00832
Patent 10,343,114 B2

substantively identical disclosures." Prelim. Resp. 14, 22.  Petitioner does not dispute these assertions.  *See generally* Pet.; Pet. Reply.  For expediency, we analyze the disclosure of the '595 application.

Although Figure 6 of the '760 application corresponds to Figure 2 of the provisional application, that drawing is absent from the '595 and '163 applications.  Ex. 1026, 62; Ex. 1020, 16; Ex 1020, 41–47; Ex. 1022, 40–46.[7]  The '595 application describes methods for "the removal of mercury from the gases produced in the utilization of fossil fuels."  Ex. 1022, 2, ¶ 8. To achieve this, the '595 application describes a "halogen/halide promoted activated carbon sorbent" that "comprises a new halide-modified carbon form containing a reactive compound produced by the reaction of bromine (or halide or other halogen) with the carbon," although "[o]ptional secondary components and alkali may be added to further increase reactivity and mercury capacity."  *Id.* at 3, ¶ 9.  The promoter can be selected from a group that includes "molecular halogens" and the optional secondary component may be selected from a group that includes HBr.  *Id.* at 3–4, ¶¶ 11, 15.  In another embodiment, the promoter is selected from a group that includes $Br_2$.  *Id.* at 4, ¶ 18.  The '595 application also describes the reaction of "[m]olecular bromine or a bromine compound" with activated carbon and the role of "halide anions electrons" in the oxidation of mercury.  *Id.* at 10, ¶¶ 52–53.

---

[7] It appears that material from the provisional application was added to the '760 application.  Ex. 1026, 36.  However, it does not appear that this practice was followed for the '595 and '163 applications.  One example of this is the absence of a drawing corresponding to Figure 6 in the '760 application or Figure 2 in the provisional application.

The '595 application further describes an example that involves "Full-Scale Testing." *Id.* at 25, ¶ 107.  For this example, the '595 application discloses "the halogen/halide promoted carbon sorbent was injected into the flue gas after the boiler." *Id.*  Thus, this passage describes a combination of promoter and sorbent material being added at one single point:  "into the flue gas after the boiler."  The '595 application continues the description of this example by stating "[i]n general however, the inventive sorbent can be injected where desired (e.g., before, after, or within the boiler)." *Id.*  Although this describes other injection points ("e.g., before, after, or within the boiler"), this disclosure regards the promoted sorbent material.  As a result, it describes the addition of both the promoter and the sorbent material at a single point, not (1) the addition of the promoter with the coal or the combustion chamber and (2) the injection of the sorbent material into mercury-containing gas downstream of the combustion chamber, as claims 1 and 23–25 of the '114 patent recite.  As a result, we do not agree with Patent Owner's arguments regarding paragraph 107 of the '595 application.  *See* Prelim. Resp. 22–23; Sur-reply 4–5.

Patent Owner further argues that paragraph 56 of the '595 application describes "the practice of adding the promoter and sorbent at one or multiple locations."  Prelim. Resp. 22.  Paragraph 56 explains that "single injection points 116 or 119 are shown in Figure 3, although one skilled in the art will understand that multiple injection points are within the scope of the present invention."  Ex. 1022, 11, ¶ 56.  However, this refers to injection points in flue gas stream 15 described in paragraph 55 of the '595 application, not multiple injection points at different points in the process (e.g., in the flue gas stream, in the combustion chamber, or with coal).  *Id.* at 10–11, ¶ 55.  Further, to the extent Patent Owner argues there is written description

IPR2020-00832
Patent 10,343,114 B2

support in the '595 and '163 applications for adding the promoter to the coal
or to the combustion chamber (in addition to injecting the sorbent material
downstream of the combustion chamber) because this would have been an
obvious variation of the '595 application's disclosure, rendering an
invention obvious does not satisfy the written description requirement.
*Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010)
(en banc) (citing *Lockwood*, 107 F.3d at 1571–72).

   We further note that the '595 and '163 applications each incorporate
by reference the provisional application in its entirety.  Ex. 1021, 5, ¶ 1;
Ex. 1022, 1, ¶ 1.  Petitioner asserts that "material from a provisional
application incorporated by reference cannot be considered as providing
written support in a priority analysis, because such material would be
deemed 'essential material,'" and such essential material may only be
incorporated by reference to a U.S. patent or U.S. patent application
publication.  Pet. 27–28 (citing 37 C.F.R. § 1.57(d) (2020); 37 C.F.R.
§ 1.57(c) (2005)).  Petitioner is correct that 37 C.F.R. § 1.57(c) (2005)
permitted the incorporation by reference of essential material, which
included material necessary to provide a written description of the claimed
invention, but it is critical to note that it limited such incorporations to U.S.
patents and U.S. patent application publications.  37 C.F.R. § 1.57(c)
(2005)).  Patent Owner does not dispute this point.  *See generally* Prelim.
Resp.; Sur-reply; *cf. Ex parte Maziere,* 27 USPQ2d 1705, 1706–07 (Bd. Pat.
App. & Inter. 1993) (holding that if "essential material" is included in the
application at issue, incorporation by reference in the parent application was
sufficient to claim priority and to satisfy the written description requirement,
but not discussing provisional applications).  Therefore, to the extent the
provisional application provides support for the challenged claims, the

IPR2020-00832
Patent 10,343,114 B2

incorporation by reference of the provisional application by the '595
and '163 applications cannot cure the deficiencies discussed above.

Moreover, although we have only analyzed the '595 and '163
applications, we also look to the incorporation statements in the other
applications in the chain leading to the '760 application. Reply 4. The
incorporation statement in the '058 application provides: "The disclosures
of US Patent Applications 12/201,595; 11/209,163; and 60/604,640 are
hereby incorporated herein by reference to the extent appropriate." Ex.
1023, 7. The incorporation statement in the '896 application provides: "The
disclosures of US Patent Application Serial Nos. 12/429,058; 12/201,595;
11/209,163; and 60/605,640 are hereby incorporated herein by reference to
the extent appropriate." Ex. 1024, 8. The incorporation statement in
the '594 application provides: "The disclosures of US Patent Application
Serial Nos. 14/102,896; 12/429,058; 12/201,595; 11/209,163; and
60/605,640 are hereby incorporated herein by reference to the extent
appropriate." Ex. 1025, 10. "To incorporate material by reference, the
host document must identify with *detailed particularity* what specific
material it incorporates and *clearly indicate where* that material is found in
the various documents." *Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506
F.3d 1370, 1378, 1379 (Fed. Cir. 2007) (quoting *Cook Biotech Inc. v. Acell,
Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006)). It is unclear to us what the
term "to the extent appropriate" means in this context. The incorporation
statements in the '058 application, the '896 application, and the '594
application all fail to identify with detailed particularity the specific material
incorporated "to the extent appropriate," and fail to clearly indicate where
that material is found in the various documents. *See also* MPEP 211.02 ("In
view of this requirement for a specific reference in the later-filed

30

IPR2020-00832
Patent 10,343,114 B2

application, the right to rely on a prior application may be waived by an applicant if a proper reference to the prior application is not included in the later-filed application.").  This ambiguity creates an additional concern regarding the chain of priority of the '760 application.

In view of the present record, Petitioner has demonstrated that one or more of the applications in the priority chain for the '114 patent lacks written description support for the challenged claims.  Patent Owner, on this record, has not presented persuasive arguments or evidence that the '114 patent is entitled to a priority date earlier than the May 14, 2018 filing date of the '760 application.

### H.  Asserted Obviousness over Sjostrom and Eckberg (Ground 1)

Petitioner argues that claims 1, 2, 4–9, 12–28, and 30 are unpatentable over Sjostrom and Eckberg.  Pet. 36–69.

#### 1.  Sjostrom

Sjostrom is a presentation titled "Full Scale Evaluations of Mercury Control Technologies with PRB Coals" that was made during the 2005 Electric Utilities Environment Conference ("EUEC").  Ex. 1010, 1; Ex 1030, 3, 23.  Sjostrom includes the following drawing of a process:

IPR2020-00832
Patent 10,343,114 B2



Sjostrom's Process Diagram

Ex. 1010, 4.  Sjostrom's Process Diagram is captioned "Enhancing Mercury Removal for Western Coals."  *Id.*  The Figure includes a boiler (or combustion chamber) on the left and arrows pointing to what appears to be upstream of the boiler, into the boiler, and to a "Sorbent Injection" device, which appears to be located downstream of the boiler.  *Id.*  The arrows are labeled with chemical species, such as bromine.  *Id.*  An "ESP or FF" is located on the right side of the figure with "Ash and Sorbent" located below the "ESP or FF" device.  *Id.*

Sjostrom describes "KNX (Alstom Power)" when discussing "Coal Additives at Meramec" and describes "Activated Carbon Injection to Improve Mercury Control."  *Id.* at 10, 23.

The far right side of Sjostrom's figure also has a "Hg CEM."  *Id.* at 4. Sjostrom provides the following drawing when discussing "Flue Gas Flow – ½ of Unit 2:"

32

IPR2020-00832
Patent 10,343,114 B2



Sjostrom's Flue Gas Flow Figure

*Id.* at 19.  Sjostrom's Flue Gas Flow figure includes "Hg Analyzers."  *Id.*

Sjostrom also includes the following graphs:

IPR2020-00832
Patent 10,343,114 B2



Sjostrom's "SDA Results" Graph



Sjostrom's "Untreated PAC Injection" Graph

34

IPR2020-00832
Patent 10,343,114 B2

*Id.* at 16, 20.

    2.  *Eckberg*

    Eckberg is a presentation titled "Mercury Control Evaluation of
Halogen Injection into a Texas Lignite-Fired Boiler" that, like Sjostrom, was
made during the 2005 EUEC.  Ex. 1011, 1; Ex 1030, 3, 23–24.  Eckberg
includes the following process figure:



Eckberg's Process Figure

Ex. 1011, 5.  Eckberg's process figure includes a boiler on the left with an
arrow pointing to the boiler that is labeled "Chemical Injection."  *Id.*
Eckberg further describes $CaBr_2$ as a chemical addition for its tests and
refers to a "Salt Solution Tank" when depicting injection equipment.  *Id.*
at 3, 8–9.

IPR2020-00832
Patent 10,343,114 B2

### 3. Public Accessibility of Sjostrom and Eckberg

Petitioner asserts "Sjostrom and Eckberg are printed publications, available as prior art under 35 U.S.C. §§102(a) and (b) (pre-AIA) and §102(a)(1) (post-AIA)."  Pet. 39.  Petitioner argues that the "Sjostrom and Eckberg presentations, delivered consecutively at the Electric Utilities Environment Conference ("EUEC") in January 2005 and mailed on CD to conference participants within a few weeks" meet the standard for public accessibility set forth in *GoPro, Inc. v. Contour IP Holding LLC*, 908 F.3d 690, 693 (Fed. Cir. 2018).  *Id.*

Patent Owner does not dispute whether Sjostrom and Eckberg were publicly accessible.  *See generally* Prelim. Resp.

On this record, Petitioner has demonstrated a reasonable likelihood that Sjostrom and Eckberg were publicly available.  *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039 (PTAB Dec. 20, 2019) (Paper 29) (for purposes of institution, a petitioner must show a reasonable likelihood that an asserted reference qualifies as a printed publication).  Petitioner provides evidence that Sjostrom and Eckberg were presented on January 25, 2005 at the 2005 EUEC and that there were over eight hundred attendees. Ex. 1002 ¶¶ 239, 245–250; Ex. 1030, 2–3, 23, 106–118.  Petitioner's evidence does not indicate that attendance of the 2005 EUEC was restricted. *Id.*  Petitioner also provides evidence of the CD that was mailed to the conference attendees and copies of the Sjostrom and Eckberg presentations from the CD, without any apparent restriction or expectation of confidentiality.  Ex. 1002 ¶ 240; Ex. 1031; Ex. 1010; Ex. 1011; *GoPro*, 908 F.3d at 694–95.  Therefore, on this record, Petitioner has met its burden of showing that Sjostrom and Eckberg qualify as printed publications.

36

IPR2020-00832
Patent 10,343,114 B2

> ### 4.   *Unpatentability Analysis*

With respect to claim 1, Petitioner argues that Sjostrom and Eckberg disclose:

Preamble:  "A method of separating mercury from a mercury-containing gas" (Pet. 44 (relying on Ex. 1010, 1, 8, 15–17, 20–21; Ex. 1002 ¶ 512));

Element 1(a):  "combusting coal in a combustion chamber, to provide the mercury-containing gas," (Pet. 44–45 (relying on Ex. 1010, 3, 4, 12, 18; Ex. 1011, 5; Ex. 1002 ¶¶ 513–514));

Element 1(b):  "the mercury-containing gas comprises a halogen or halide promoter comprising HBr, Br⁻, or a combination thereof, wherein the coal comprises added $Br_2$, HBr, Br⁻, or a combination thereof, added to the coal upstream of the combustion chamber, or the combustion chamber comprises added $Br_2$, HBr, Br⁻, or a combination thereof, or a combination thereof;" (Pet. 46–48 (relying on Ex. 1010, 4, 23; Ex. 1011, 5, 8–9; Ex. 1002 ¶¶ 515–520));

Element 1(c)(a):  "injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber" (Pet. 48 (relying on Ex. 1010, 4; Ex. 1011, 10–11, 16; Ex. 1002 ¶¶ 521–522));

Element 1(c)(b):  "contacting mercury in the mercury-containing gas with the sorbent, to form a mercury/sorbent composition;" (Pet. 49 (relying on Ex. 1002 ¶¶ 523–524));

Element 1(d): "separating the mercury/sorbent composition from the mercury-containing gas, to form a cleaned gas;" (Pet. 49–50 (relying on Ex. 1010, 4; Ex. 1002 ¶ 525));

Element 1(e):  "monitoring the mercury content of the cleaned gas"

(Pet. 50–52 (relying on Ex. 1010, 4, 19, 22; Ex. 1002 ¶ 526));

Element 1(f)(1):  "controlling, in response to the monitored mercury content of the cleaned gas, an injection rate of injecting the sorbent into the mercury-containing gas, the sorbent composition, or a combination thereof," and element 1(f)(2): "so that the mercury content of the cleaned gas is maintained at or below a desired level." (Pet. 52–54 (relying on Ex. 1010, 16, 20, 22; Ex. 1002 ¶¶ 527–530)).

Relying on the Niksa Declaration, Petitioner argues that one of ordinary skill in the art would have been motivated to combine the teachings of Sjostrom and Eckberg, and would have had a reasonable expectation of success in doing so.  Pet. 42–44 (citing Ex. 1010, 4, 15–16, 20–21; Ex. 1011, 5, 9, 14; Ex. 1002 ¶¶ 503–511; Ex. 1030, 23).  For example, Petitioner argues that Sjostrom and Eckberg are both "directed to using bromine (in conjunction with activated carbon) for improving mercury removal."  *Id.* at 42.  Petitioner argues "Sjostrom states that 'Br' is used, but does not identify the specific chemical that contains that bromine or its injection rate."  *Id.* (citing Ex. 1010, 4; Ex. 1002 ¶ 503).  Petitioner asserts that "Eckberg describes a similar system, including injection of halogens into a coal-fired boiler for mercury removal" and "Eckberg informs a POSITA of the type of bromine to be used (calcium bromide), the bromine:coal ratio, the bromine feed rate, and the bromine concentration in the flue gas."  *Id.* at 42–43 (citing Ex. 1011, 5, 9, 14; Ex. 1002 ¶ 504).  Petitioner asserts that one of ordinary skill in the art would "have understood it was obvious that a calcium bromide in an aqueous solution would dissociate to form Br⁻ (bromide ions)."  *Id.* at 47.

Petitioner also argues that further "motivation to combine existed because both references were presented consecutively during the 'A3'

IPR2020-00832
Patent 10,343,114 B2

session at the 2005 EUEC" and, thus, "a POSITA attending the conference, or reading the materials after receiving the mailed CD, would have understood that the two presentations included related material and would have complemented one another." *Id.* at 43 (citing Ex. 1030, 23; Ex. 1002 ¶ 505). In addition, Petitioner asserts that a "POSITA would have been motivated to apply the teachings of Eckberg to Sjostrom because it would have provided well-known chemical substances to use as the 'Cl' or 'Br' identified in the figures of Sjostrom" and a "POSITA would have found supplementing the system of Sjostrom with the teachings of Eckberg obvious to try." *Id.* According to Petitioner, there would have been a reasonable expectation of success in combining the teachings of Sjostrom and Eckberg "because they described nearly identical processes. Both references add bromine to coal-plants to remove mercury from flue gas," both "references include similar surrounding equipment—such as boilers, air pre-heaters, and ESPs or other particulate matter control devices" and in "combining Sjostrom with Eckberg, no modifications would need to be made to the overall process equipment, operating conditions, or activated carbon sorbent used in Sjostrom." *Id.* at 43–44 (citing Ex. 1010, 4; Ex. 1011, 5, 9; Ex. 1002 ¶¶ 506–511).

Petitioner also presents arguments and evidence that Sjostrom and Eckberg suggest the limitations of challenged dependent claims 2, 4–9, and 12–22, which depend from claim 1. Pet. 54–66.

Regarding claim 23, Petitioner asserts that "[c]laim 23 copies Elements 1(Pre)-1(d)" and, thus, "claim 23 is obvious over Sjostrom in view of Eckberg for the same reasons." *Id.* at 66 (citing Ex. 1002 ¶¶ 563–568).

Regarding claim 24, Petitioner contends that "[c]laim 24 is nearly identical to claim 1" and, thus, "claim 24 is obvious over Sjostrom in view

39

IPR2020-00832
Patent 10,343,114 B2

of Eckberg for the same reasons." *Id.* at 66 (citing Ex. 1002 ¶¶ 569–578).

Petitioner further asserts that element 24(c) "adds that 'the activated carbon

reacts with the halogen or halide promoter in the mercury-containing gas to

form a promoted sorbent' and that the mercury is contacted with 'the

promoted sorbent.'" *Id.* at 67 (citing Ex. 1001, claim 24). Petitioner

contends that the "bromine added at Addition Location 1 or Addition

Location 2 of Sjostrom would contact the sorbent in the flue gas at or

downstream of the sorbent injection point" and at least "a quantity of

promoted sorbent would have formed as a reaction between the sorbent and

halogen upon contact." *Id.* (citing Ex. 1010, 4). Petitioner argues that it

"was well-known in the art that halogens (including bromine) 'promoted'

activated carbon sorbents because they improved mercury removal by

increasing the ability of the activated carbon to bind with the mercury." *Id.*

(citing Ex. 1002 ¶¶ 573–574).

> In addition, Petitioner contends
>
> Claim 24 also differs in that Element 24(f)(1) requires
> "controlling, in response to the mercury content of the cleaned
> gas, an injection rate of injecting the sorbent into the mercury-
> containing gas, a rate of addition to the coal or the combustion
> chamber of the added $Br_2$, HBr, the bromide compound, or a
> combination thereof, or a combination thereof."

*Id.* (citing Ex. 1001, claim 24). Petitioner asserts that as "discussed for

Element 1(f), Sjostrom discloses continuously controlling the rate of

injecting the sorbent based on the continuous mercury content

measurements." *Id.* (citing Ex. 1002 ¶ 577).

Regarding claim 25, Petitioner argues that "[c]laim 25 is nearly

identical to Elements 1(Pre)-1(d)" and, thus, "claim 25 is obvious over

Sjostrom in view of Eckberg for the same reasons." *Id.* at 68 (citing

IPR2020-00832
Patent 10,343,114 B2

Ex. 1002 ¶¶ 579–584).  Petitioner further asserts that claim 25 "differs from Claim 1 in that it replaces 'Br⁻' with 'a bromide compound'" but as "discussed above with respect to Claim 1, it would have been obvious that Sjostrom's 'Br' teaches a bromide compound, and Eckberg discloses using the specific bromide compound as an aqueous solution of calcium bromide." *Id.* (citing Ex. 1001, claim 25; Ex. 1002 ¶ 582).

Petitioner also presents arguments and evidence that Sjostrom and Eckberg suggest the limitations of challenged dependent claims 26–28 and 30.  Pet. 68–69.

Patent Owner does not substantively address Petitioner's Ground 1 challenges, aside from arguing the priority of the '114 patent, as discussed herein.  Based on the preliminary record before us, we find that Petitioner's arguments and evidence are sufficient to show a reasonable likelihood Petitioner would prevail in proving unpatentability of claims 1, 2, 4–9, 12–28, and 30.

I.   *Asserted Obviousness over Sjostrom and Olson-646*

Petitioner argues that claims 1–9 and 12–30 are unpatentable over Sjostrom, Eckberg, and Olson-646.  Pet. 69–97.[8]

1.   *Olson-646*

Olson-646 is a patent publication titled "Sorbents for the Oxidation and Removal of Mercury."  Ex. 1014, code (54).  Petitioner acknowledges that Olson-646 is the patent publication of the '163 application, but argues that the earliest priority date for the challenged claims of the '114 patent is May 2018, which is the filing date of the '760 application, and thus that Olson-646 is available as prior art under 35 U.S.C. §§ 102(a) and 102(b)

───────────────

[8] *See supra* n.4.

IPR2020-00832
Patent 10,343,114 B2

(pre-AIA) and §§ 102(a)(1) and 102(a)(2).  Pet. 70–72 (citing Ex. 1017; Ex. 1002 § 264).

Olson-646 "relates to methods and materials for the removal of pollutants from flue gas or product gas from a gasification system.  In particular, mercury is removed from gas streams generated during the burning or gasification of fossil fuels by highly reactive regenerable sorbents."  Ex. 1014 ¶ 4.  Olson-646 proposes a model for the oxidation of mercury in Figure 2, which is reproduced below.



**FIG. 2**

Figure 2 is a proposed mechanistic model of the chemical reactions in the oxidation and capture of mercury.  *Id.* ¶ 33.  Olson-646 explains that "as illustrated in FIG. 2, hydrogen bromide reacts with the unsaturated structure of the activated carbon" and this "may be, by way of illustration only, a carbene species on the edge of the graphene sheet structures of the carbon."  *Id.* ¶ 54.  According to Olson-646, "[m]olecular bromine or a bromine

42

IPR2020-00832
Patent 10,343,114 B2

compound reacts to form a similar structure, with a positive carbon that is active for oxidizing the mercury with subsequent capture by the sorbent." *Id.* Olson-646's Figure 3 is reproduced below.



FIG. 3

Figure 3 is schematic for the preparation of promoted carbon sorbents and processes for flue gas mercury reduction in flue gases. *Id.* ¶ 34. Figure 3 depicts a schematic of a "mercury control system 100 comprising preparation of promoted carbon sorbents" that includes a "base activated carbon reservoir 110, an optional halogen/halide promoter reservoir 120, an optional secondary component reservoir 130, and an optional a[l]kali

IPR2020-00832
Patent 10,343,114 B2

component reservoir 180, each of which with corresponding flow control device(s) 201, 202, 203, and 208/209, respectively." *Id.* ¶ 56. Olson-646 further explains that in "operation, promoted carbon sorbent and/or an optional alkali component is injected into contaminated flue gas stream 15." *Id.* ¶ 61.

### 2. *Unpatentability Analysis*

Regarding reasons to combine the references, Petitioner argues that Sjostrom does not expressly state which specific "Br" compounds to use, or their specific injection rate. Pet. 74. One of ordinary skill in the art, however, would have been motivated to "use the 'HBr or Br$_2$' of Olson-646 as the bromine-containing species ('Br') of Sjostrom" with a reasonable expectation of success, because Olson-646 "describes the chemicals and associated reactions theorized to have been used in the system of Sjostrom" and "both references teach using the same conventional halogen to achieve the same results." *Id.* at 75 (citing Ex. 1014 ¶¶ 43, 66; Ex. 1002 ¶¶ 594–596).

Regarding its claim-specific arguments, Petitioner largely relies on its arguments for Ground 1 and Sjostrom. We discuss below Petitioner's additional reliance on Olson-646 for certain challenged claims. Regarding claim 1, Petitioner adds that "Olson-646 supplements the teachings of Sjostrom, describing specific 'Br' containing compounds that react with activated-carbon and improve mercury removal." *Id.* at 76–77. Petitioner also argues that "Figure 3 of Olson-646 shows the sorbent, along with the halide promoter, injected into the mercury-containing (flue) gas (item 15) at injection point 116." *Id.* at 78 (citing Ex. 1014, Fig. 3). For the "controlling" limitations of claim 1, Petitioner argues that one of ordinary skill in the art "would not have needed to remove anything from the system

IPR2020-00832
Patent 10,343,114 B2

of Sjostrom, they merely would have had to apply the teachings of Olson-646 to fill in the missing details, such as flow controllers and valves, to implement the desired control system." *Id.* at 82.

Regarding claims 2 and 3, Petitioner argues that "Olson-646 provides a method 'for reducing mercury in flue gas'" and "collecting greater than 70 wt-% of the mercury in the flue gas." *Id.* (citing Ex. 1014 ¶ 22).

Regarding claim 4, Petitioner argues that Olson-646 discloses that "the sorbent comprises from about 1 to about 30 grams promoter per 100 grams of base activated carbon." *Id.* at 83 (citing Ex. 1014 ¶¶ 14, 18, claims 3, 17).

Regarding claim 6, Petitioner argues that Olson-646 also discloses and identifies the effectiveness of HBr or $Br_2$. *Id.* at 84–85.

Regarding claim 7, Petitioner argues that Olson-646 also teaches embodiments "wherein the halogen/halide promoter is in gaseous or vapor form" that comprises "gaseous HBr or $Br_2$." *Id.* at 86 (citing Ex. 1014 ¶ 66).

Regarding claims 8 and 9, Petitioner argues that Olson-646 refers to a "secondary component," which is another term for "secondary material," and its introduction into the system of Olson-646. *Id.* at 86–88 (citing Ex. 1014 ¶¶ 11, 14, 15, 17, 56, 63).

Regarding claim 14, Petitioner argues that Olson-646 also uses Norit Darco FGD sorbent, and motivates one of ordinary skill in the art to add bromine to the sorbent before injecting at Addition Location 3. *Id.* at 88–90 (citing Ex. 1014, Fig. 1, ¶¶ 45–48; Ex. 1002 ¶¶ 633–635).

Regarding claims 19, 21, and 22, Petitioner argues that one of ordinary skill in in the art would understand that Olson-646 refers to HBr or $Br_2$ as sorbent enhancement additives. *Id.* at 90–91 (citing Ex. 1002 ¶¶ 640–645).

45

IPR2020-00832
Patent 10,343,114 B2

Regarding claim 20, Petitioner argues that one of ordinary skill in the art would have been motivated to look to Olson-646 to select HBr or $Br_2$ as the "Br." *Id.* at 91 (citing Ex. 1002 ¶¶ 640–641).

Regarding claim 24, Petitioner argues that Olson-646 clarifies the relationship between the halogen and the activated carbon disclosed by Sjostrom. *Id.* at 92 (citing Ex. 1002 ¶ 658).

Regarding claims 26–27, Petitioner argues that Olson-646 describes the effectiveness of HBr or $Br_2$ in promoting activated carbon. *Id.* at 93 (citing Ex. 1002 ¶¶ 669–674).

Regarding claim 29, Petitioner argues that Olson-646 discloses that "the promoter is added at from about 1 to about 30 grams per 100 grams of activated carbon." *Id.* at 94 (citing Ex. 1014 ¶¶ 23, 27, claims 3, 17, 37, 47).

Regarding claim 30, Petitioner argues that Olson-646 explains the reaction and relationship already occurring between the halogen, activated carbon, and mercury disclosed by Sjostrom. *Id.* at 97 (citing Ex. 1014, Fig. 2; Ex. 1002 ¶¶ 680–681).

Patent Owner does not substantively address Petitioner's Ground 2 challenges, aside from arguing the priority of the '114 patent, as discussed herein. Based on the preliminary record before us, we find that Petitioner's arguments and evidence are sufficient to show a reasonable likelihood Petitioner would prevail in proving unpatentability of claims 1–4, 6–9, 14, 19–22, and 24–30.[9]

## III. CONCLUSION

For the reasons set forth above, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to at least

---

[9] *See supra* n.4.

IPR2020-00832
Patent 10,343,114 B2

one challenged claim of the '114 patent.  Thus, we institute an *inter partes*
review on all challenged claims and on all grounds presented.

IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that an *inter partes* review is instituted on each of the
grounds asserted in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37
C.F.R. § 42.4, notice is hereby given of the institution of a trial, which shall
commence on the entry date of this decision.

IPR2020-00832
Patent 10,343,114 B2

FOR PETITIONER:

Brian Oaks
brian.oaks@bakerbotts.com
David Tobin
david.tobin@bakerbotts.com
Thomas Carter Jr
thomas.carter@bakerbotts.com
Elizabeth Flannery
liz.flannery@bakerbotts.com


For PATENT OWNER:

Hamad Hamad
 hhamad@caldwellcc.com

# EXHIBIT 42

Trials@uspto.gov                                                    Paper 17
571-272-7822                                        Date: December 2, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

NRG ENERGY, INC. and
TALEN ENERGY CORPORATION
Petitioner,

v.

MIDWEST ENERGY EMISSIONS CORP.,
Patent Owner.

———————————

IPR2020-00928
Patent 8,168,147 B2

———————————

Before ZHENYU YANG, CHRISTOPHER M. KAISER, and
AVELYN M. ROSS, *Administrative Patent Judges.*

ROSS, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

IPR2020-00928
Patent 8,168,147 B2

## I.   INTRODUCTION

NRG Energy, Inc., Talen Energy Corporation, and Vistra Corp. (formerly known as Vistra Energy Corp.), filed a Petition (Paper 3, "Pet.") requesting *inter partes* review of claims 18 and 19 of U.S. Patent No. 8,168,147 B2 (Ex. 1001, "the '147 patent").  Pet. 1.  Subsequently, Vistra Corp and Midwest Energy Emissions Corp. ("Patent Owner") filed a Joint Motion to Terminate Vistra Corp. as a petitioner pursuant to a settlement.  Paper 8.  That motion was granted.  Paper 11.  Therefore, NRG Energy, Inc. and Talen Energy Corporation (collectively "Petitioner") remain as petitioners.  *Id.* at 4.  Patent Owner filed a Preliminary Response to the Petition (Paper 12, "Prelim. Resp.").  Pursuant to our authorization, Petitioner filed a Reply (Paper 14, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 15, "Sur-reply").

We have authority to determine whether to institute an *inter partes* review.  35 U.S.C. § 314 (2018); 37 C.F.R. § 42.4(a) (2019).  The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides that an *inter partes* review may not be instituted "unless the Director determines . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least [one] of the claims challenged in the petition."

For the reasons set forth below, upon considering the Petition, Preliminary Response, and evidence of record, we determine the information presented in the Petition establishes a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims.  Accordingly, we institute *inter partes* review.

IPR2020-00928
Patent 8,168,147 B2

### A. Real Parties-in-Interest

Petitioner identifies the real parties-in-interest as NRG Energy, Inc.
("NRG"), Talen Energy Corporation ("Talen"), and Vistra Corp.  Pet. 1.
Petitioner identifies the following real parties-in-interest who are parties to
the pending lawsuit identified below:  Brandon Shores LLC; Talen
Generation LLC; H.A. Wagner LLC; IPH, LLC; Illinois Power Resources
Generating, LLC; Dynegy Midwest Generation LLC; Dynegy Miami Fort,
LLC; NRG Texas Power LLC; Midwest Generation EME, LLC; and
Midwest Generation, LLC.  *Id.*  Petitioner also identifies numerous *potential*
real parties-in-interest—namely vendors and suppliers.  *Id.* at 2–6.

### B. Related Matters

Petitioner identifies a pending lawsuit between the parties, styled
*Midwest Energy Emissions Corp. and MES Inc. v. Vistra Energy Corp*., No.
1:19-cv-01334-RGA (D. Del.), as a related proceeding in which the Patent
Owner asserts the '147 patent.  Pet. 6–7; *see also* Paper 6, 1 (Patent Owner's
Mandatory Notices).

Petitioner filed a second petition challenging claims 1, 2, 4–6, and 9–
24 of the '147 patent, applying different prior art and a different priority
date.  IPR2020-00926, Paper 2.[1]  Additionally, Petitioner filed concurrent
petitions challenging U.S. Patent No. 10,343,114 B2 ("the '114 patent"),
which is also asserted by Patent Owner in the district court proceeding.  *See*
IPR2020-00832, Paper 3; *see also,* IPR2020-00834, Paper 3.  We instituted

---

[1] In accordance with our Trial Practice Guide, Petitioner provides an
explanation of material differences and ranking for the multiple petitions
directed to each challenged patent.  Paper 2, (Petitioner's Explanation
Regarding the Necessity of Multiple Petitions, "Explanation").

IPR2020-00928
Patent 8,168,147 B2

trial on IPR2020-00832 and IPR2020-00834 on October 26, 2020.  *See* IPR2020-00832, Paper 17; *see also* IPR2020-00834, Paper 18.

 C. *The '147 Patent*

  1. *Specification*

 The '147 patent, titled "Sorbents for the Oxidation and Removal of Mercury," issued on May 1, 2012.  Ex. 1001, codes (45), (54).  The '147 patent is directed to methods for capturing mercury using reactive bromine-promoted carbon sorbents.  *Id.* at 6:19–24.

 The '147 patent explains that combusting coal generates flue gas containing mercury and other trace elements.  *Id.* at 1:29–40.  "The release of the mercury (and other pollutants) to the environment must be controlled by use of sorbents," e.g., activated carbon particles.  *Id.* at 1:37–40, 57–62.  According to the '147 patent, "[a] major problem with existing carbon injection systems is that the sorbent is initially unreactive, and only after extended exposure to the flue gas does the sorbent become effectively seasoned and provide increased reactivity with the mercury in the gas."  *Id.* at 2:10–14.

 The '147 patent discloses that the "present invention provides a cost-effective way to capture pollutants by utilizing exceptionally reactive halogen/halide promoted carbon sorbents using a bromide (or other halogen/halide) treatment of the carbon, that capture mercury via mercury-sorbent surface reactions, at very short contact times of seconds or less."  *Id.* at 6:19–24.  To prepare bromine-carbon sorbents, the '147 patent describes methods for chemically combining molecular bromine with activated carbon.  *Id.* at 11:45–49.  Specifically, the '147 patent describes an "in-flight" method of producing a bromine-promoted carbon sorbent by

IPR2020-00928
Patent 8,168,147 B2

contacting the vapors of any combination of halogens and optionally a second component, in-flight, with very fine carbon particles. The particles may be dispersed in a stream of transport air (or other gas), which also conveys the halogen/halide promoted carbon sorbent particles to the flue gas duct, or other contaminated gas stream, from which mercury is to then be removed.

*Id.* at 12:44–53.

The '147 patent depicts a schematic flow diagram for a mercury control system including bromine-promoted carbon sorbents in Figure 3, reproduced below:



Figure 3 "schematically illustrates preparation of promoted carbon sorbents and processes for flue gas mercury reduction in flue gases and/or product gases from a gasification system . . . including in-flight preparation of

promoted carbon sorbent." *Id.* at 5:47–51.  Figure 3 depicts base activated

carbon reservoir 110, halogen/halide promoter reservoir 120, optional

secondary component reservoir 130, and corresponding flow control devices

201–203.  *Id.* at 8:21–30.  Transport line 115 carries material discharged

from reservoirs 110, 120, and 130 in a transport gas, which injects the

materials into contaminated flue gas stream 15 via injection point 116.  *Id.* at

8:33–42.  Particulate separator 140 collects and separates solid materials,

including sorbent stream 151, which may be passed to sorbent regenerator

160 to yield regenerated sorbent stream 161.  *Id.* at 8:61–9:10.

Figure 3 illustrates several preferred methods for preparing bromine-

promoted carbon sorbents.  *Id.* at 9:43–64.  For example, the '147 patent first

describes an in-flight preparation by discharging the halogen/halide "via line

121 directly into transport line 115, within which it contacts and reacts with

the base activated carbon prior to injection point 116."  *Id.* at 9:51–56.  In a

second embodiment, "the halogen/halide may be combined via line 121*b*

with base activated carbon prior to entering transport line 115."  *Id.* at 9:56–

57.  As a third alternate method, Figure 3 of the '147 patent describes

introducing halogen/halide via line 121*c* into activated carbon reservoir 110

and reacting the compounds in reservoir 110.  *Id.* at 9:58–64.

### 2.   *Illustrative Claims*

Petitioner challenges dependent claims 18 and 19, which depend from

claims 1 and 17.  Claims 1, 17, 18 and 19 are reproduced below.

1. A method for separating mercury from a mercury
containing gas comprising:

(a) promoting at least a portion of a particulate sorbent
material comprising activated carbon by chemically reacting the
sorbent material with a bromine containing promoter to form a
promoted brominated sorbent, wherein the bromine containing

6

IPR2020-00928
Patent 8,168,147 B2

promoter is in gaseous form, vapor form, or non-aqueous liquid form, and wherein the activated carbon contains graphene sheets having carbene species edge sites which react with the bromine containing promoter to form a carbocation paired with a bromide anion in the promoted brominated sorbent for oxidation of the mercury;

(b) chemically reacting elemental mercury in the mercury containing gas with the promoted brominated sorbent to form a mercury/sorbent chemical composition; and

(c) separating particulates from the mercury containing gas, the particulates including ash and the mercury/sorbent chemical composition.

Ex. 1001, 23:34–52.

17. A method according to claim 1, further comprising

injecting the particulate sorbent material at a sorbent material injection rate and

injecting separately the bromine containing promoter into a gas stream whereby in-flight reaction produces the promoted brominated sorbent,

wherein the promoter is reacted in the gas phase or as a vapor,

wherein the promoter is added at from about 1 to about 30 grams per 100 grams of the sorbent material.

*Id.* at 24:34–41.

18. A method according to claim 17, wherein the gas stream is a mercury containing gas.

*Id.* at 24:42–43.

19. A method according to claim 18, wherein the gas stream is a transport gas.

*Id.* at 24:44–45.

IPR2020-00928
Patent 8,168,147 B2

### D. Prior Art and Asserted Grounds

Petitioner asserts that claims 18 and 19 would have been unpatentable on the following grounds:

| Claim(s) Challenged | Statutory Basis | Reference(s)/Basis |
|---|---|---|
| 18, 19 | § 103 | Lissianski-Presentation,[2] Olson[3] |
| 18, 19 | § 103 | Sjostrom,[4] Olson |

Petitioner also relies on declaration testimony of Stephen Niksa, Ph.D. (Ex. 1003, "the Niksa Declaration").

## II. ANALYSIS

### A. Legal Standards

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

---

[2] V. Lissianski, *Integrated Approach to Multi-Pollutant Control*, 9th Electric Utilities Environmental Conference (January 2006) (Exhibit 1011, "Lissianski-Presentation").

[3] Olson et al., US 2006/0048646 A1, published March 9, 2006 (Exhibit 1014, "Olson").

[4] S. Sjostrom, *Full Scale Evaluations of Mercury Control Technologies with PRB Coals*, Electric Utilities Environmental Conference (January 2005) (Exhibit 1010, "Sjostrom").

IPR2020-00928
Patent 8,168,147 B2

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness.[5]  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To show obviousness, it is not enough to merely show that the prior art includes separate references covering each separate limitation in a challenged claim.  *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011).  "This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."  *KSR*, 550 U.S. at 418–419.

On the other hand, an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."  *KSR*, 550 U.S. at 418; *accord In re Translogic Tech., Inc.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007).  However, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements."  *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d

---

[5] The parties have not asserted or otherwise directed our attention to any objective evidence of non-obviousness.

IPR2020-00928
Patent 8,168,147 B2

1364, 1380 (Fed. Cir. 2016).  Instead, Petitioner must articulate a reason why a person of ordinary skill in the art would have combined or modified the prior art references.  *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016); *see also Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017) ("In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason why a person of skill in the art would have made the combination."); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("[O]bviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention.") (citing *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)).

At this preliminary stage, we determine whether the information presented shows a reasonable likelihood that Petitioner would prevail in establishing that at least one of the challenged claims would have been obvious over the proposed prior art.

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

B.  *Level of Ordinary Skill in the Art*

We review the grounds of unpatentability in view of the understanding of a person of ordinary skill in the art at the time of invention. *Graham*, 383 U.S. at 17.  Petitioner contends that

> [a] person of ordinary skill in the art ("POSITA") would have at least a bachelor's degree in chemical engineering, mechanical engineering, or a related field of study with at least two years of

10

IPR2020-00928
Patent 8,168,147 B2

> experience with implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration.

Pet. 11 (citing Ex. 1003 ¶¶ 63–66).

Patent Owner does not identify the level of skill necessary for a person having ordinary skill in the art. *See generally* Prelim. Resp. And, neither party indicates that the outcome of any arguments made in this case would change depending on the level of ordinary skill in the art. For purposes of this Decision, and based on the record currently presented, we adopt Petitioner's definition of the level of ordinary skill in the art. Further, we find that the prior art of record reflects the level of skill in the art at the time of the invention. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). We will make any final determination pertaining to the level of ordinary skill in the art, however, on the full trial record.

*C. Claim Construction*

In an *inter partes* review filed on or after November 13, 2018, we construe claims "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2019); *see Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

Petitioner does not propose any claim construction and asserts all claim terms should be accorded their plain and ordinary meaning. Pet. 19 (citing Ex. 1003 ¶ 211).

11

IPR2020-00928
Patent 8,168,147 B2

Patent Owner contends that Petitioner interprets "claim 17 in a manner that is contrary to the plain claim language.  In particular, Petitioners insert the following limitation into the claim language:  "injecting separately the bromine containing promoter**[, and no other material,]** into a gas stream."  Prelim. Resp. 3; *see also* Sur-reply (stating that Petitioner argues "the plain meaning of the claim requires that any promoter be injected entirely on its own").  Patent Owner contends that the claimed methods include the use of additional materials beyond those specifically recited. Prelim. Resp. 3–4.  Specifically, Patent Owner contends "a particulate sorbent material comprising activated carbon" may include other materials, such as pyrolysis char, and "a bromine containing promoter" may include other materials, such as an organic solvent or chloride.  *See id.* (citing Ex. 1001, 2:55–60; 7:45–50).

Petitioner replies that it "did not insert 'and no other material' into the claims" and instead applies the plain language as written.  Pet. Reply 2. Petitioner states that "'the gas stream' in claims 18–19 refers to 'a gas stream' of parent claim 17, and thus, claims 18–19 require 'injecting the particulate sorbent material . . . and *injecting separately* the bromine containing promoter *into* a *mercury containing gas stream*."  *Id.*

After reviewing the parties' arguments, we are not persuaded that Petitioner is attempting to insert additional language into the claim such that the relevant term would read "injecting separately the bromine containing promoter[, and no other material,] into a gas stream," as alleged by Patent Owner.  And, neither party proposes an express construction for our consideration.  We determine that it is not necessary, at this stage of

IPR2020-00928
Patent 8,168,147 B2

the proceeding, to provide an express construction for this term. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

We will revisit the issue based on the full record developed over the course of trial, if needed.

### D. *Priority for claims 18 and 19 of the '147 patent*

As discussed above, the '147 patent issued from U.S. Application No. 12/419,219 ("the '219 application"), filed on April 6, 2009, which claims earliest priority through a series of non-provisional applications to U.S. Provisional Application No. 60/605,640 ("the '640 provisional"), filed August 30, 2004.

Petitioner provides the following summary of the '147 patent priority chain and family:

IPR2020-00928
Patent 8,168,147 B2



Ex. 1017. This summary depicts the earliest filed application at the top and shows the latest filed application at the bottom. As illustrated above, the '147 patent has the following priority chain:

IPR2020-00928
Patent 8,168,147 B2

- Provisional Application 60/605,640, filed August 30, 2004, ("the '640 provisional application");
- Non-provisional Application 11/209,163 ("the '163 application"), filed August 22, 2005, claiming priority to the '640 provisional application;
- Non-provisional Application 12/201,595 ("the '595 application"), filed August 29, 2008, claiming priority to the '163 application as a divisional application;
- Non-provisional Application 12/419,219 ("the '219 application"), filed on April 6, 2009, claiming priority to the '595 application as a continuation application;

*Id.*; Ex. 1001, code (21), (22), (60).

However, Petitioner contends that claims 18 and 19 are not supported by the '640 provisional application or the intervening non-provisional applications. Pet. 19–20. Therefore, according to Petitioner, the correct priority date for claims 18 and 19 is April 6, 2009, the filing date of the '219 application along with the preliminary amendment introducing the claims into the application. *Id.* at 20.

Patent Owner asserts that the '640 provisional application as well as the intervening '163 and '595 applications provide the requisite written description support for claims 18 and 19.[6] *See generally* Prelim. Resp. 9–19; Sur-reply 1–4. Because the '640 provisional application was filed before Lissianski-Presentation and Sjostrom were publicly accessible (January 2006 and January 2005, respectively) and before Olson-646 was published (March

---

[6] Patent Owner explains that "[f]or purposes of this dispute, the '595 and '163 applications contain substantively identical disclosures. For ease of reading, patent owner refers to the '163 application below." Prelim. Resp. 15. In our discussion below, we similarly refer to Exhibit 2021, i.e., the '163 application, as we discern little or no difference between the '595 and '163 applications.

IPR2020-00928
Patent 8,168,147 B2

2006), if claims 18 and 19 the '147 patent are entitled to the priority date of the '640 provisional application, Lissianski-Presentation, Sjostrom, and Olson-646 would not qualify as prior art.  Reply 1.

We address the disclosure of the provisional and non-provisional applications, along with the parties' priority arguments below.

### 1.   Provisional application

Petitioner argues that Patent Owner cannot rely on the '640 provisional application because the '640 provisional application fails to provide sufficient disclosure to support claims 18 and 19 and because the intervening applications "do not include the relied-upon disclosure of the Provisional, thus breaking priority."  Pet. 22 (citing Ex. 1003 ¶¶ 185–186; *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997)). According to Petitioner, even if the disclosure in '640 provisional application were sufficient, "the intervening applications only include[] a generic statement of incorporation by reference, without identifying with particularity what specific material is being incorporated."  *Id.* at 22–23.  For example, the '147 patent includes the following cross-reference to related applications:

> This application is a continuation of U.S. patent application Ser. No. 12/201,595 filed on Aug. 29, 2008, which is a division of U.S. patent application Ser. No. 11/209,163, filed on Aug. 22, 2005 (now U.S. Pat. No. 7,435,286), which claims priority to the extent appropriate from provisional application 60/605,640, filed on Aug. 30, 2004.   Application Ser. Nos. 12/201,595; 11/209,163; and 60/605,640 are incorporated herein by reference.

Ex. 1001, 1:7–14.  Petitioner contends that claiming "priority ***to the extent appropriate from***" the '640 provisional application "indicates that applicants did not intend to claim priority to and incorporate the entire Provisional

IPR2020-00928
Patent 8,168,147 B2

Application, but only parts of it, again without identifying the specific material to incorporate." Pet. 23. Petitioner asserts that "applicants' incorporation by reference language fails as a matter of law," and therefore, "none of the disclosure in the Provisional is properly incorporated to the applications in the priority-chain and thus cannot provide written description support for the '147 Patent claims." *Id.*

Petitioner further argues that "material incorporated by reference from the Provisional, but not disclosed in the ['147 patent] specification, cannot be considered as providing written-description support in a priority analysis because such material would be deemed 'essential material.'" *Id.* at 24. Petitioner explains that "essential material"—which includes "material that is necessary to: provide a written description of the claimed invention"— "may be incorporated by reference, but ***only*** by way of incorporation by reference to a ***U.S. patent or U.S. patent application publication***." *Id.* (quoting 37 C.F.R. § 1.57(d) (2020)). And, Petitioner asserts that because a provisional application is not published, it "is neither a 'U.S. patent' nor a 'U.S. patent application publication.'" *Id.* (citing 35 U.S.C. § 122(b)(2)(A)(iii); 35 U.S.C. § 111).

As to the substantive disclosure of the '640 provisional application, Petitioner contends that the '640 provisional application "fails to disclose Claims 18–19 because it only discloses injecting a halogen and activated carbon sorbent ***together*** into a mercury-containing gas, ***not separately*** as recited in claims 18–19." *Id.* at 25 (citing Ex. 1020, 11).[7] Petitioner contends that "[t]he halogen and activated carbon sorbent are being

---

[7] Petitioner cites to the pages of the provisional application, not the pages of Exhibit 1020.

IPR2020-00928
Patent 8,168,147 B2

combined in a transport line with a *non*-mercury-containing gas, and then injected together (not separately), into a mercury-containing gas." *Id.* (citing Ex. 1003 ¶ 203).

Petitioner discusses Figure 2 of the '640 provisional, reproduced below, in detail. *Id.* at 25–26.



FIG. 2

Figure 2 is a block diagram illustrating a mercury control method in a coal fueled facility. Ex. 1020, 15.  In relevant part, Figure 2 depicts pulverized coal introduced to a boiler and fed through a baghouse or an electrostatic precipitator ("ESP") for mercury removal. *Id.*  A sorbent is injected in the transport line after the boiler and before the baghouse or ESP. *Id.*  Figure 2 also shows an additive injection that may occur with the coal, in the boiler, or at the sorbent injection site. *Id.*

Petitioner first contends that Figure 2 was not included in the '147 patent.  Pet. 26.  Second, Petitioner contends that the "additive" of the "additive injection" is limited to "compounds of Group I or II elements," and does not include Group VII elements, e.g., bromine. *Id.* (citing Ex. 1020, 4 (Example 9)).  Third, Petitioner contends that the additive injection is used to augment previously promoted activated carbon and "does not provide an

18

IPR2020-00928
Patent 8,168,147 B2

in-flight reaction promoting the sorbent with a bromine-containing promoter within the mercury containing (flue) gas stream." *Id.* at 27 (citing Ex. 1003 ¶¶ 204–205).

Patent Owner contends that the '640 provisional provides support for separately adding bromine and activated carbon sorbent to mercury-containing flue gas, thereby supporting claims 18 and 19. Prelim. Resp. 10–13. For example, with reference to the "additive" in Figure 2, Patent Owner explains the '640 provisional discloses "the sorbent is injected into the flue gas after the boiler. The additive can be injected where desired (e.g., before, after, or within the boiler)." *Id.* at 12 (citing Ex. 1020, 15–16, Fig. 2). Patent Owner contends that Figure 2 shows "the bromine-containing additive is mixed with powdered (pulverized) coal (which inherently contains mercury) and[ ]air and injected into the combustion chamber (which also contains mercury from the combusted coal). Later, activated carbon sorbent is injected into the mercury-containing flue gas to cause the promotion reaction." *Id.* As to Petitioner's arguments limiting the Figure 2 "additive injection" to Group I or II elements, Patent Owner contends that Example 9 discloses additional additives to the bromines additives of Examples 1–8. *Id.* at 14 (citing Ex. 1020, 5). Patent Owner contends that "even if the inventors had intended example 9 to redefine the word 'additive'—they did not—it would not exclude the use of bromine containing additives." *Id.* at 14–15.

Patent Owner contends that in another example, the '640 provisional application describes "combining the treatment system with the carbon injection system at the end-use site. . . . [T]he halogen is introduced to the carbon-air mixture in the transport line (or other part of the sorbent storage

19

IPR2020-00928
Patent 8,168,147 B2

and injection system).").  This gas stream is a 'transport gas' as required by claim 19."  *Id.* at 13 (citing Ex. 1020, 14).  Patent Owner further contends that the provisional application describes "recycling and reusing the sorbent."  *Id.* (citing Ex. 1020, 5–8 (Examples 6 and 10), 13, 14).  Patent Owner contends that "[b]ecause this recycled sorbent contains mercury from its use in the flue gas, this provides 'injecting separately the bromine containing promoter into a [mercury containing] gas stream whereby in-flight reaction produces the promoted brominated sorbent'" as required by claim 18.  *Id.*

Petitioner in reply stresses that "[t]he '640 Provisional 'only discloses injecting a halogen and activated carbon sorbent ***together*** into a mercury-containing gas, ***not separately*** as recited in claims 18–19.'"  Pet. Reply 2 (quoting Pet. 25).  Petitioner further contends that claims 18 and 19 additionally require that the bromine promoter be injected separately "'***into***' a ***mercury containing gas stream***."  *Id.*  Because both separate injection of the bromine promoter and activated carbon and injection of the bromine promoter into a mercury containing gas stream are missing from the '640 provisional application, Petitioner asserts there is no written description support for claims 18 and 19 of the '147 patent.  *Id.*

Petitioner contends that Patent Owner's position that Figure 2 of the '640 provisional application—which is missing from the '163 and '595 applications—suggests the separate addition of a bromine "additive" into a mercury containing gas stream is incorrect because "$CaBr_2$ and NaBr are salts that exist as a solid or in aqueous solution" and that "[t]he '640 Provisional teaches that the 'additive' is not the 'promoter,' because the 'additive' is used to 'augment the ***treated*** activated carbon' (i.e., sorbent that

20

IPR2020-00928
Patent 8,168,147 B2

had been previously promoted)—by capturing pollutants 'released to the gas phase as the sorbent becomes saturated or capacity limited.'" *Id.* at 3 (citing Ex. 1020 at 7). Petitioner also disputes Patent Owner's position that in recycling regenerated sorbent, a bromine containing promoter is injected separately into a mercury containing gas because some mercury is recycled with the sorbent. Prelim. Resp. 13. Petitioner contends that "the '640 Provisional does not disclosed recycled sorbent containing mercury" because the sorbent is regenerated "so that the sorbent 'captures mercury at the same level as before.'" Pet. Reply. 4 (citing Ex. 1020, 4). Further, according to Petitioner, even if mercury remains in in the sorbent, it would be present as a "solid-phase as part of a 'stable bond' to the sorbent, and not in a 'mercury containing gas.'" *Id.* (citing Ex. 1001, claim 18; Prelim. Resp. 11).

Having considered the parties' positions and evidence, we determine that Petitioner has demonstrated a reasonable likelihood that one or more of the applications in the priority chain for the '147 patent lacks written description from the '640 provisional application to support the challenged claims.

According to *Lockwood v. American Airlines, Inc.*

[i]n order to gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112. *In re Hogan*, 559 F.2d 595, 609, 194 USPQ 527, 540 (CCPA 1977).

107 F.3d at 1571. Here, Figure 2 of the '640 provisional application and its corresponding written description are entirely missing from the intervening applications. *Compare* Ex. 1020, 12, Fig. 2, *with* Ex. 1021 ¶¶ 52–53, Fig. 2. Therefore, even if the '640 provisional application was found to provide

21

IPR2020-00928
Patent 8,168,147 B2

support for challenged claims 18 and 19 of the '147 patent, at least the '163 application and the '595 application do not include that written description from the '640 provisional application.  Thus, there is a break in the priority chain.

And Patent Owner's remaining arguments are insufficient to establish that the '640 provisional application in question provides the requisite written description for claims 18 and 19.  With respect to Figure 2, it is unclear whether the term "additive injection" in Figure 2 includes bromine or is limited to Group I or Group II elements, as Petitioner suggests, and further, whether an in-flight reaction occurs *in* the mercury-containing gas even assuming the "additive injection" includes bromine.  For example, the '640 provisional application refers to "additives" as "Ca, Na, and others" as separate from the "additional substances," including bromine.  *See e.g.*, Ex. 1020, Abstract, 3–4.  The '640 provisional application further states that bromine may be reacted with the activated carbon in-flight and *within* "the duct through which the carbon is transported from a reservoir *to* the flue gas duct."  *Id.* at 3 (emphasis added); *see also id.* 10–11 ("the sorbent can be readily treated with any combination of bromine and the second component in-flight using vapors of the these components contacting the very fine carbon particles dispersed in air or other gas stream that *conveys the particles to the flue gas duct*." (emphasis added)).  Thus, the only teaching of an in-flight reaction between bromine and activated carbon occurs in the duct work before being introduced into the mercury containing gas.

In addition to relying on Figure 2, Patent Owner also urges us to consider the regenerated and recycled sorbent as including a "mercury-containing gas."  Prelim. Resp. 13.  However, the '640 provisional does not

IPR2020-00928
Patent 8,168,147 B2

describe any mercury recycled with the regenerated sorbent unlike the later filed '163 application. *Compare* Ex. 1020, *with* Ex. 1021, 10 ("the mercury-containing sorbent particles are regenerated to remove some or substantially all of the mercury"). Rather, the '640 provisional application states that "[t]he sorbent can be regenerated by washing off contaminating components derived from flue gas that poison the spent sorbent." Ex. 1020, Abstract; *see also id.* at 11 ("the poisoning contaminants from the flue gas are removed and an inexpensive promoting agent added to restore mercury sorption activity"). The '640 provisional application continues to explain that "[a] comparison of the sorbent after subsequent regeneration with HBr indicates that it not only captures mercury at the same level as before (100% capture) but is enhanced such that its capacity is prolonged by several minutes." *Id.* at 14. Furthermore, the '640 provisional application contrasts its inventive aspects against other prior art inventions where "Hg is only partially removed from the sorbent at temperatures up to 500°C. The sorbents do not work effectively after regeneration using this technique." *Id.* at 15.

Lastly, Petitioner is correct that 37 C.F.R. § 1.57(c) (2005) permits incorporation by reference of essential material, which includes material necessary to provide a written description of the claimed invention, but it is critical to note that it limits such incorporations to U.S. patents and U.S. patent application publications. 37 C.F.R. § 1.57(c) (2005)). Patent Owner does not dispute this point. *See generally* Prelim. Resp.; Sur-reply; *cf. Ex parte Maziere,* 27 USPQ2d 1705, 1706–07 (BPAI 1993) (holding that if "essential material" is included in the application at issue, incorporation by reference in the parent application was sufficient to claim priority and to satisfy the written description requirement, but not discussing provisional

IPR2020-00928
Patent 8,168,147 B2

applications).  Therefore, to the extent the provisional application provides support for the challenged claims, incorporation by reference of the provisional application by the '595 and '163 applications cannot cure the deficiencies discussed above.

### 2.  Non-provisional applications

Petitioner contends that the intervening non-provisional applications, the '163 and '595 applications, do not disclose "injecting the sorbent and separately injecting the promoter into a mercury containing gas."  Pet. 28 (citing Ex. 1003 ¶¶ 181–182).  Petitioner contends that the non-provisional applications "describe 'in-flight' promotion only as treating the activated carbon with a bromine promoter ***before*** introduction into the mercury-containing flue gas."  *Id.* at 28–29 (citing Ex. 1021 ¶ 75; Ex. 1022 ¶ 75).

Petitioner contends that annotated Figure 3 of the non-provisional applications illustrates that "in-flight promotion occurs before any injection into the mercury-containing gas," as reproduced below.  *Id.* at 29–30.

IPR2020-00928
Patent 8,168,147 B2



According to Petitioner, annotated Figure 3 illustrates that "activated-carbon sorbent (red) and bromine-containing promoter (blue) are introduced into a transport line (purple), and thus react **before** being injected together into the mercury-containing gas (green)." *Id.* (citing Ex. 1021, 43; Ex. 1022, 42). Petitioner asserts that "there is no disclosure that the transport line contains any mercury-containing gas, as in Claim 19." *Id.* at 30.

Petitioner further argues that annotated Figure 1 of the non-provisional applications "reinforces that in-flight promotion occurs before any injection into the mercury-containing gas," as reproduced below. *Id.* at 31–32.



FIG. 1

Petitioner contends that "[b]oth 'paths' for the base activated-carbon sorbent (red) illustrate the activated carbon reacting with the promoter (blue) to form a promoted brominated sorbent (purple) ***before*** being injected together into the mercury-containing gas (green), such that they are not injected separately." *Id.* at 31–32.  Petitioner contends that Patent Owner cannot rely on replacement Figure 1 of the '147 patent, which includes a direct arrow between base activated carbon 10 and mercury-containing (flue) gas 50, because the replacement Figure 1 was not present in '163 and '595 applications.  *Id.* at 32–34.

Patent Owner contends that the non-provisional applications supports claims 18 and 19 because:  (1) the non-provisional applications are not

IPR2020-00928
Patent 8,168,147 B2

limited to a single point of injection and (2) the non-provisional applications describe a sorbent recycling system.  Prelim. Resp. 15–19.

First, Patent Owner contends that the non-provisional applications disclose that "[f]or clarity, single injection points 116 or 119 are shown in Figure 3, although one skilled in the art will understand that multiple injection points are within the scope of the present invention." *Id.* at 15 (quoting Ex. 1021 ¶ 56).  Patent Owner contends that "[t]his multiple injection point embodiment satisfies the requirement of 'injecting separately the bromine containing promoter into a gas stream.'" *Id.* at 15–16.

Second, Patent Owner submits a second annotated Figure 3, reproduced below, illustrating a sorbent recycling system.



Patent Owner contends that the '163 application discloses after "mercury is removed from the gas stream by the sorbent particles, the sorbent particles

27

IPR2020-00928
Patent 8,168,147 B2

are separated from the ash particles . . . and the sorbent particles are reinjected into the gas stream." *Id.* at 17 (citing Ex. 1021 ¶ 26). Patent Owner contends that

> [w]hen such a recycling system is in use, a transport gas is used to "reinject" used sorbent back into the transport line for sorbent and promoter. As a result, the transport gas is necessarily a mercury-containing gas because it contains the mercury recycled with the used sorbent. As shown in figure 3, bromine promoter is then separately injected into this mercury-containing transport gas as required by claims 18 and 19.

*Id.* at 17–18. Patent Owner also addresses Petitioner's annotated Figure 1, arguing that both paths may be used simultaneously so that "the promoter 20 in the left path is injected into the mercury-containing gas 50 separately from the activated carbon sorbent in the right path," thereby combining promoter 20 including activated carbon, with separately added activated carbon. *See id.* at 18–19.

Petitioner replies that "[w]hile multiple injection points may be used, the activated carbon and promoter are still injected together at each individual injection point, and not separately." Pet. Reply 5 (citing Ex. 1021, 43; Ex. 1022, 42; Pet. 29–31). Petitioner contends that Figure 3 of the '163 application "shows 'regenerated sorbent stream 161' combining with 'transport line 115' prior to subsequent promoter addition and combined injection into mercury-containing flue gas." *Id.* (citing Ex. 1021, 14–15, 43). And, with reference to Figure 1 of the '163 application, Petitioner asserts that "the intervening applications refer to these as two ***alternative*** embodiments, and do not refer to both paths being used in parallel or in the same embodiment." *Id.* (citing Ex. 1021, 12–13; 1022, 8–9). Further, in each alternative embodiment, "the promoter is combined with the activated

28

carbon *prior* to injection into mercury-containing gas." *Id.* (citing Prelim. Resp. 18; Pet. 30–31).

Patent Owner responds that Figure 3 of the '163 application "depicts a loop of recycled, mercury-containing gas into which activated carbon and bromine-containing promotor are both injected." Sur-reply 4.

On this record, we determine that Petitioner has demonstrated a reasonable likelihood that one or more of the non-provisional applications in the priority chain for the '147 patent lack the written description necessary to support claims 18 and 19 of the '147 patent. We are not persuaded by Patent Owner's arguments to the contrary as we discuss below. Patent Owner's first argument is that Figure 3 depicts multiple injection points 116 and 119 and that the '163 application explains that "single injection points 116 and 119 are shown in Figure 3, although one skilled in the art will understand that multiple injection points are within the scope of the present invention." Prelim. Resp. 15 (quoting Ex. 1021, ¶ 56). However, each of injection ports 116 and 119 depicts a transport gas to inject either the brominated sorbent or optional alkali components, respectively, *into the flue gas*. Ex. 1021, 14. There is no suggestion that bromine and the activated carbon are separately injected into mercury-containing flue gas line 15 through "multiple injection points." *Id.*

We are similarly unpersuaded by Patent Owner's argument regarding the recycle feed containing mercury gas because when activated carbon and regenerated sorbent are injected into transport line 115 through line 118 and the promoter is separately injected into transport line 115 through line 121 "the transport gas is necessarily a mercury-containing gas because it contains the mercury recycled with the used sorbent." Prelim. Resp. 18. At

IPR2020-00928
Patent 8,168,147 B2

this stage in the proceeding, it is unclear whether the skilled artisan at the time would have considered the small amount of mercury recycled after the sorbent is regenerated to be a "mercury-containing gas" as recited in claim 18. The '163 application makes clear that that the purpose of the '163 application is to remove mercury from the flue gas stream generated during the burning of coal and other fossil fuels. Ex. 1021, 5. The '163 application effects this purpose by using an electrostatic precipitator, a bag house, or both to remove mercury captured on the sorbent materials. *Id.* at 6, 10, 11, 15, 26, 27, 29. Though the '163 application explains that "the mercury-containing sorbent particles are regenerated to remove some or substantially all of the mercury," the mercury that may remain has formed a "stable bond" with the sorbent. Ex. 1021, 10, 13–14; *see also* Prelim. Resp. 11 ("When these components are mixed into mercury-containing gas, the mercury (Hg) is drawn toward the carbon and the bromine ion, creating a stable bond."). Furthermore, each instance of "mercury containing" gas in the '163 application refers to "mercury-containing flue gas" as opposed to a recycled sorbent containing some amount of mercury. *Id.* at 9, 12, 36. Therefore, without more, we understand the term "mercury-containing gas" to refer to the "mercury-containing flue gas" that is subject to treatment. We encourage the parties to address this issue in subsequent briefing and will revisit this issue based on the full record developed during trial.

Lastly, Patent Owner argues that Figure 1 of the '163 application depicts parallel, simultaneous feeds such that when each path combines with mercury-containing flue gas 50, a feed containing a halogen and a feed containing an activated carbon are separately injected into a mercury-containing gas. Prelim. Resp. 17–18. We are not persuaded by Patent

IPR2020-00928
Patent 8,168,147 B2

Owner's position and instead agree with Petitioner that Figure 1 depicts alternate embodiments. According to the '163 application, "Figure 1 schematically illustrates *methods* for preparation of promoted carbon sorbents in accordance with the present invention." Ex. 1021, 10 (emphasis added). The '163 application provides further details of these embodiments and explains that the left-hand path of Figure 1 describes "a preferred embodiment illustrated by path 10-20, block 10 illustrates providing a base activated carbon, and adding a halogen or halide promoter that reacts with the carbon, illustrated at block 20, to produce a product promoted carbon sorbent." *Id.* at 12. According to the '163 disclosure, the right-hand path describes

> *another* preferred embodiment of the process of the present invention is illustrated by path 10-40, comprising providing a base activated carbon as illustrated at block 10, and adding a halogen or halide promoter and a secondary component to the activated carbon together, with which they react as illustrated by block 40, producing a product promoted carbon sorbent.

*Id.* (emphasis added)

Moreover, although we have only analyzed the '595 and '163 applications, we also look to the incorporation statements in the other applications in the chain leading to the '219 application. The '219 application provides that it "is a continuation of U.S. patent application 12/201,595 . . . which is a division of U.S. patent application 11/209,163 . . . which claims priority *to the extent appropriate* from provisional application 60/604,640." Ex. 1019, 54. The '219 application then states that "Application Serial Numbers 12/201,595; 11/209,163; and 60/604,640 are incorporated herein by reference." *Id.* "To incorporate material by reference, the host document must identify with *detailed particularity* what

IPR2020-00928
Patent 8,168,147 B2

specific material it incorporates and *clearly indicate where* that material is found in the various documents." *Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378, 1379 (Fed. Cir. 2007) (quoting *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006)).  It is unclear to us what "to the extent appropriate" means in this context.  The '219 application claims priority "to the extent appropriate" and fails to identify with detailed particularity the specific material incorporated and fails to clearly indicate where that material is found in the various documents. *See also* MPEP 211.02 ("In view of this requirement for a specific reference in the later-filed application, the right to rely on a prior art application may be waived by an applicant if a proper reference to the prior application is not included in the later-filed application.").  This ambiguity creates an additional concern regarding the chain of priority for the '219 application.

In view of the present record, Petitioner has demonstrated that one or more of the applications in the priority chain for the '147 patent lack written description support for challenged claims 18 and 19.  Patent Owner, on this record, has not presented persuasive arguments or evidence that claims 18 and 19 of the '147 patent are entitled to a priority date earlier than April 6, 2009, the filing date of the '219 patent.

E. *Discretion to Deny Institution*

1. *35 U.S.C. § 325 (d)*

Patent Owner contends we should deny institution under 35 U.S.C. § 325(d) because "Petitioners fail to demonstrate any pressing need for a separate review of two claims of this patent."  Prelim. Resp. 1.  Patent Owner further asserts that "Petitioners have already demonstrated that they may raise a priority date dispute in their primary petition," therefore, "the

IPR2020-00928
Patent 8,168,147 B2

Board should deny this petition as duplicative and an unnecessary burden on the Board and the parties." *Id.* (citing IPR2020-00834, Paper 16).

Section 325(d) provides that in determining whether to institute an *inter partes* review, "the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office."  The Board uses a two-part framework in determining whether to exercise its discretion under § 325(d), specifically:

> (1) whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office; and (2) if either condition of the first part of the framework is satisfied, whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims.

*Advanced Bionics, LLC v. Med-El Elektromedizinische Geräte GmbH,* IPR2019-01469, Paper 6, 8 (PTAB Feb. 13, 2020) (precedential).

We have reviewed Patent Owner's arguments and evidence of record and determine that the *Advanced Bionics* factors weigh against exercising our discretion under § 325(d).  Patent Owner does not allege that the Examiner considered any reference offered in the instant Petition or that the same or similar arguments were before the Office during prosecution of the '147 patent.  *See generally* Prelim. Resp. 1.  And, though Patent Owner argues that this Petition is "duplicative [of Petitioner's primary petition] and an unnecessary burden," Patent Owner fails to explain how the prior art and arguments of the instant Petition—filed contemporaneously with Petitioner's primary petition—that *were not previously presented to the Office* implicates the concerns addressed by the statutory language of § 325(d).  Without

IPR2020-00928
Patent 8,168,147 B2

more, we decline to exercise our discretion to deny the Petition under 35

U.S.C. § 325(d).

> 2. *35 U.S.C. § 314(a)*

Under § 314(a), we have discretion to deny institution of an *inter*

*partes* review. *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140

(2016); *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018); *Harmonic Inc.*,

815 F.3d at 1367 ("[T]he PTO is permitted, but never compelled, to institute

an IPR proceeding."); *see also* 37 C.F.R. § 42.4(a) ("The Board institutes the

trial on behalf of the Director.").  In deciding whether to institute an *inter*

*partes* review, we consider the guidance provided in the Consolidated Trial

Practice Guide, which states that

> [b]ased on the Board's prior experience, one petition should be
> sufficient to challenge the claims of a patent in most situations.
> Two or more petitions filed against the same patent at or about
> the same time . . . may place a substantial and unnecessary burden
> on the Board and the patent owner and could raise fairness,
> timing, and efficiency concerns.

Patent Trial and Appeal Board Consolidated Trial Practice Guide

("Consolidated TPG") 64 (Nov. 2019), https://www.uspto.gov/sites/default/

files/documents/ tpgnov.pdf, 59.

Here, Petitioner filed two petitions on the same day, one challenging

claims 18 and 19 and the other challenging claims 17–20 of the '147 patent.

Pet. 1; IPR2020-00926, Paper 2, 1.[8]  In this Petition, Petitioner presents two

obviousness grounds, one based on Lissianski-Presentation as the main

reference and the other based on Sjostrom as the main reference.  Pet. 10.  In

---

[8] Patent Owner statutorily disclaimed the non-'in-flight' claims of the '147
patent, i.e., claim 1–16 and 21–25, leaving only claim 17–20 remaining.
IPR2020-00926, Paper 13.

IPR2020-00928
Patent 8,168,147 B2

IPR2020-00926, Petitioner presents four obviousness challenges, the two based on Nelson[9] and Olson-Paper[10] and the remaining two based on Downs-Halogenation,[11] Olson-Paper, and Lissianski.[12]  IPR2020-00926, Paper 2, 10.

Petitioner "request[s] that the Board institute on both petitions" but explain that two petitions are warranted because the two petitions assert different priority dates and assert different references, citing the Consolidated Trial Practice Guide's statement that "more than one petition may be necessary . . . when there is a dispute about priority date requiring arguments under multiple prior art references."  Explanation 1, 3 (quoting Consolidated TPG 59).  According to Petitioner,

> Petitioners expect Patent Owner to argue that all the claims of the '147 Patent can trace priority back to a provisional application filed August 30, 2004, while Petitioners dispute this. Petitioners assert that two of the claims—Claims 18 and 19—have no support in the Provisional or intervening applications, and thus the earliest priority date for these two claims is the filing date of what became the '147 Patent, April 9, 2009.

*Id.* at 1.  The Explanation ranks this Petition second to the Petition in IPR2020-00926.  *Id.* at 2.

---

[9] Nelson, Jr., US 6,953,494 B2, issued October 11, 2005 (Ex. 1012, "Nelson").

[10] E.S. Olson et al., *Chemical mechanisms in mercury emission control technologies*, 107 J. Phys. IV France 979–982 (2003) (Ex. 1079, "Olson-Paper").

[11] Downs et al., US 2007/0180990 A1, published August 9, 2007 (Ex. 1015, "Downs-Halogenation").

[12] Lissianski et al., US 7,514,052 B2, issued April 7, 2009 (Ex. 1036, "Lissianski").

IPR2020-00928
Patent 8,168,147 B2

Petitioner further argues that the issues presented to the Board by the two Petitions are limited, because the Petition in this proceeding uses two primary references and a single secondary reference, whereas the Petition in IPR2020-00926 uses two primary references and two secondary reference. *Id.* at 3. Petitioner also argues that they joined efforts to provide efficiency instead of each party individually filing separate petitions. *Id.* at 4–5.

We find Petitioner's arguments persuasive. The Petitions include different prior art references that address potentially different priority date arguments. Such a situation is contemplated by the Consolidated Trial Practice Guide, which states that "more than one petition may be necessary . . . when there is a dispute about priority date requiring arguments under multiple prior art references." Consolidated TPG 59. Notwithstanding Petitioner's and Patent Owner's post-Petition arguments regarding the similarity of the priority date arguments, the fact remains that the Petitions themselves present different priority date arguments and rely on different prior art references. The Petitions are the documents to which the Patent Owner will be responding in the *inter partes* review proceeding. For the reasons discussed below, *inter partes* review will be instituted in this proceeding. We also institute *inter partes* review in IPR2020-00926 for the reasons discussed in that proceeding.

### 3.   *35 U.S.C. § 312(a)(2)*

Patent Owner argues that "35 U.S.C. § 312(a)(2) provides that a petition may only be considered if 'the petition identifies all real parties in interest.'" Prelim. Resp. 1–2. Patent Owner contends that Petitioner lists "dozens of 'potential real parties in interest,' without explanation as to their relationship to petitioners," that this "is not an identification of *all real*

IPR2020-00928
Patent 8,168,147 B2

*parties in interest*," and that, if instituted, this proceeding would be under a cloud of uncertainty because the ambiguity in Petitioner's list "will likely lead to confusion and disputes as to which parties are real parties in interest and which are bound by the estoppel provisions of 35 U.S.C. § 315." *Id.* at 2. For instance, Patent Owner asserts that Petitioner identifies various vendors and suppliers as "potential real parties in interest" but states that "[n]one of these companies or any unnamed entity is funding, controlling, or directing, or otherwise has an opportunity to control or direct this Petition or proceeding" and this implies that these entities are not actually real parties in interest. *Id.* In addition, Patent Owner argues that some entities are identified both as "potential real parties in interest" and "real parties in interest," which creates ambiguity and conflict in the listing of entities. *Id.* For these reasons, Patent Owner contends that "Petitioners have not met their burden of identifying all real parties in interest" and "the Board should deny institution for failure to comply with § 312(a)(2)." *Id.* at 3, 11–12.

We are not aware of, and Patent Owner does not direct us to, any rule, statute, or case law that prohibits Petitioner from identifying multiple real parties-in-interest or multiple potential real parties-in-interest. Petitioner's identification of about a dozen real parties-in-interest does not appear problematic or overly burdensome. Pet. 1–2. Petitioner's identification of numerous potential real parties-in-interest, albeit unusual, also does not appear problematic. *Id.* at 2–6. To the extent Petitioner has identified an entity as both a real party-in-interest and as a potential real party-in-interest, we interpret that to mean that party is identified as a real party-in-interest. Petitioner's reasons for identifying numerous potential real parties-in-interest reasons appear plausible: Petitioner identifies these parties "out of

IPR2020-00928
Patent 8,168,147 B2

an abundance of caution" because they "are vendors and suppliers" in the related litigation but have not "agreed to be listed as a real party-in-interest" in this Petition.  Pet. 1–6.  This provides the Board and Patent Owner notice that other potential entities may be indirectly involved, but also provides reasons for not committing those parties to the real party-in-interest category.  Ordinarily, problems regarding identification of real parties-in-interest arise when a petitioner fails to identify a real party-in-interest.  *See, e.g., Ventex Co., Ltd. v. Columbia Sportswear N. Am., Inc.*, IPR2017-00651, Paper 152 (PTAB Jan. 24, 2019) (precedential) (terminating proceeding where Petition failed to name time-barred RPI and privy).  Here, the alleged problem is over-identification of potential real parties-in-interest.  Without express violation of a known rule, statute, or case law, this does not appear to be a problem warranting a denial on institution of *inter partes* review.

   F.  *Alleged Obviousness Based on Lissianski-Presentation and Olson*

   Petitioner contends claims 18 and 19 are rendered obvious over the combination of Lissianski-Presentation and Olson.  Pet. 34–75.  Petitioner also relies on the testimony of Dr. Niksa to support its arguments.  *Id.*

   1.  *Lissianski-Presentation (Ex. 1011)*

   Lissianski-Presentation relates to removing mercury from flue gas of coal-fired power plants using activated-carbon sorbent and halogen-promoter injection.  Ex. 1011, 9.

   Lissianski-Presentation illustrates a mercury capture process in a figure titled "Mercury control for low-rank coals," reproduced below.  Ex. 1011, 9.

IPR2020-00928
Patent 8,168,147 B2



The figure on page 9 shows coal introduced into a combustion chamber to generate a flue gas, followed by an injection of oxidizing additives including chlorine and bromine into the flue gas stream.  *Id.*  Activated carbon is then introduced into the flue gas stream before being fed through an electrostatic precipitator and baghouse filter to remove mercury.  *Id.*  Lissianski-Presentation describes the activated carbon sorbent as "Darco FGD."  *Id.* at 8.

### 2.  Olson (Ex. 1014)

Olson is the patent application publication of the '163 application, from which the '147 patent claims priority.  Ex. 1001, code (60).  Petitioner contends that because the '163 application does not support claims 18 and 19 of the '147 patent, Olson qualifies as prior art as of its publication date on

IPR2020-00928
Patent 8,168,147 B2

March 9, 2006, prior to the filing date of the '147 patent on April 6, 2009. *See* Pet. 42.

Olson describes the mechanism by which a bromine-promoted activated carbon sorbent captures mercury from flue gas, as illustrated in Figure 2, reproduced below. Ex. 1014 ¶ 54.



**FIG. 2**

Figure 2 "illustrates a proposed mechanistic model of the chemical reactions resulting in the oxidation and capture of mercury." *Id.* ¶ 33. Olson discloses that hydrogen bromide reacts with the unsaturated structure of the active carbon by way of a carbene species on the edge of the graphene sheet structures of the carbon. *Id.* ¶ 54.

3. *Public Accessibility of Lissianski-Presentation*

Petitioner contends that Lissianski-Presentation was a presentation "delivered at the Electric Utilities Environment Conference ("EUEC") in January 2006 and mailed on CD to conference participants within a few

40

IPR2020-00928
Patent 8,168,147 B2

weeks."  Pet. at 36.  Accordingly, Petitioner contends Lissianski-Presentation qualifies as prior art under:  (1) 35 U.S.C. § 102(a) "because it was made available to the relevant public and POSITAs on January 24, 2006 when it was presented" and (2) 35 U.S.C. § 102(b) because it was mailed on CD in February 2006, meeting the standard for public accessibility set forth in *GoPro, Inc. v. Contour IP Holding LLC*, 908 F.3d 690, 693 (Fed. Cir. 2018).  *Id.* at 39.

Patent Owner does not dispute whether Lissianski-Presentation was publicly accessible.  *See generally* Prelim. Resp.

On this record, Petitioner has demonstrated a reasonable likelihood that Lissianski-Presentation was publicly available.  *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039 (PTAB Dec. 20, 2019) (Paper 29) (for purposes of institution, a petitioner must show a reasonable likelihood that an asserted reference qualifies as a printed publication).  Petitioner provides evidence that Lissianski-Presentation was presented at the 2006 EUEC on January 22–25, 2006, and that there were over a thousand attendees.  *Id.* at 36–37 (citing Ex. 1003 ¶¶ 259–264; Ex. 1047, 27; Ex. 1049, 1–30; Ex. 1048).  Petitioner's evidence does not indicate that attendance of the 2006 EUEC was restricted.  *Id.*  Petitioner also provides evidence of the CD that was mailed to the conference attendees and copies of the Lissianski-Presentation presentation from the CD, without any apparent restriction or expectation of confidentiality.  *Id.* at 36–39 (citing Ex. 1003 ¶¶ 269–272; Ex. 1047, 24, 27; Ex. 1049, 1–30; Ex. 1048; *GoPro*, 908 F.3d at 694–95).  Therefore, on this record, Petitioner has met its burden of showing that Lissianski-Presentation qualify as printed publications.

IPR2020-00928
Patent 8,168,147 B2

### 4. Analysis of Claims 18 and 19

Although claim 1 is disclaimed and claim 17 is not asserted in the instant Petition, claims 18 and 19 depend from and include the limitations of claims 1 and 17. Ex. 1001, 24:34–41. Accordingly, we review Petitioner's contentions as to claim 1, followed by the additional limitations of claim 17, before we address challenged claims 18 and 19. *See generally id.*, claims.

Petitioner contends that much of claim 1 is suggested by Lissianski-Presentation. Pet. 47–67. Petitioner relies primarily on page 9 of Lissianski-Presentation, reproduced above, to illustrate its contentions. Ex. 1011, 9. With reference to claim 1, Petitioner asserts that Lissianski-Presentation teaches a method for separating mercury from a mercury-containing flue gas because Lissianski-Presentation describes separately introducing both bromine and a chemical sorbent, i.e., activated carbon into a flue gas. Pet. 47–48 (citing Ex. 1011, 1–2, 9), 49–50 (citing Ex. 1003 ¶¶ 538–540). Petitioner asserts that "[t]he system of Lissianski-Presentation would have formed a promoted brominated sorbent that would adsorb mercury to form a mercury/sorbent chemical composition" and then would have used "particulate material separators to remove the mercury-sorbent chemical composition from the flue gas, such as an ESP and a fabric filter (or baghouse)." *Id.* at 48 (citing Ex. 1011, 9); 65–68 (citing Ex. 1001, 9, 10; Ex. 1003 ¶¶ 559–561).

According to Petitioner, a person of ordinary skill in the art "would have understood that the bromine and activated carbon would have contacted and reacted in the flue gas to form promoted-brominated sorbent." *Id.* at 51 (citing Ex. 1003 ¶ 541). Relying on the testimony of Dr. Niksa, Petitioner explains that "at least some of the bromine-containing promoter

IPR2020-00928
Patent 8,168,147 B2

injected into the flue gas of Lissianski-Presentation would have contacted the sorbent in mercury-containing gas, at or downstream[,] of the sorbent injection point, because not all of the bromine would have been consumed in oxidizing mercury in the gas-phase." *Id.* at 53–54 (citing Ex. 1003 ¶ 546). Petitioner states that "even though Lissianski-Presentation identifies oxidation of the mercury with bromine, it would have been obvious to use a sufficient amount of bromine such that the sorbent also is promoted" because "[i]t was well-known . . . that halogens improve the ability of activated carbon to capture mercury." *Id.* at 54–55 (citing Ex. 1003 ¶¶ 547; Ex. 1062, 2–3, 1079, 979). And Olson similarly "teaches the advantages of promoting activated-carbon sorbent with bromine containing promoter" that comprises "gaseous HBr or $Br_2$." *Id.* at 55 (citing Ex. 1014 ¶¶ 43, 66), 56–57 (citing Ex. 1014, 12, 54; Ex. 1003 ¶¶ 549–551), 58–59 (describing gaseous bromine) (citing Ex. 1011, 9; 1014, ¶¶ 52, 66; 1003 ¶¶ 128–129, 150–163; Ex. 1041).

Both Lissianski-Presentation and Olson exemplify Darco FGD, i.e., the activated carbon sorbent, which Olson teaches includes graphene sheets having a carbene species on edge sites. *Id.* at 59–61 (Ex. 1014 ¶¶ 54, 95; Ex. 1003 ¶¶ 554–555). Petitioner argues that Olson provides details of the chemical reaction that occurs between the bromine species and the unsaturated carbon. *Id.* at 61–62 (citing Ex. Ex. 1014 ¶¶ 93, 96; Ex. 1003 ¶ 556). And, according to Petitioner, a person of ordinary skill in the art "would have understood that the promoted brominated sorbent . . . would have chemically reacted with elemental mercury in the mercury containing gas (i.e., flue gas) to form a mercury/sorbent chemical composition," as

IPR2020-00928
Patent 8,168,147 B2

described in Olson. *Id.* at 62–64 (citing Ex. 1011, 9; Ex. 1014 ¶¶ 43, 128; Ex. 1003 ¶¶ 557–558).

Petitioner contends that the skilled artisan would have had reason to combine the teachings of Lissianski-Presentation and Olson because Olson teaches that a halogen, like bromine, can be used "to increase the effectiveness of a conventional sorbent (activated carbon) to capture mercury from coal flue gas" and that Olson "provides certain implementational details . . . such as which specific 'Br-containing' chemicals to use and the ratios of bromine promoter to activated-carbon sorbent." *Id.* at 42–47 (citing Ex. 1011, 1–2, 8–9, 19; Ex. 1014 ¶¶ 54, 66, 75, 95, 111, 113; Ex. 1003 ¶¶ 529–537).

Petitioner similarly alleges that the subject matter of claim 17 is suggested by the combination of Lissianski-Presentation and Olson. *Id.* at 68–73. Specifically, Petitioner contends that Lissianski-Presentation separately injects the bromine promoter and activated carbon sorbent into the flue gas stream. *Id.* at 68–70 (citing Ex. 1011, 9; 1014 ¶¶ 57, 66, Fig. 3; Ex. 1003 ¶ 562). Petitioner argues that a person of ordinary skill in the art would have understood that an in-flight reaction would occur between the bromine promoter and activated carbon. *Id.* at 70–72 (citing Ex. 1014 ¶¶ 11, 22, 24, 27, 43, 62, 66, 77–78; Ex. 1003 ¶¶ 563–566). Finally, Petitioner contends that Olson discloses a bromine promoter to sorbent ratio "from about 1 to about 30 grams per 100 grams of activated carbon." *Id.* at 72 (quoting Ex. 1014 ¶ 23, claims 3, 17, 37, 47).

Claim 18 additionally requires that the "gas stream is a mercury containing gas." Ex. 1001, 24:42–43. Petitioner contends that Lissianski-Presentation "discloses injecting the bromine-containing promoter into

mercury-containing flue gas upstream of the air preheater ("APH"), and separately injecting the activated-carbon sorbent either between the APH and [electrostatic precipitator ("ESP")], or between the ESP and fabric filter" ("FF"). Pet. 74. Petitioner contends that a person of ordinary skill in the art "would have understood that coal combustion produced a mercury containing flue gas, which would be created at or before the bromine injection points." *Id.* at 74–75 (citing Ex. 1003 ¶ 570).

Claim 19 additionally requires that the "gas stream is a transport gas." Ex. 1001, 24:44–45. Petitioner contends that Lissianski-Presentation "discloses an in-flight reaction in the flue gas between bromine and activated carbon to form an improved sorbent. A [person of ordinary skill in the art] would have understood that coal combustion produced a mercury-containing flue gas, and that the mercury-containing gas transported the bromine-containing promoter of Lissianski-Presentation to the activated-carbon sorbent." *Id.* at 75 (citing Ex. 1003 ¶ 571).

Patent Owner does not substantively address Petitioner's contentions regarding the teachings of Lissianski-Presentation and Olson, but rather rests on arguments advanced above regarding the priority date of claims 18 and 19 of the '147 patent. *See generally* Prelim. Resp.; *see also id.* at 1 n.1 ("For purposes of this preliminary response only, Patent Owner does not dispute that the asserted art renders the claims at issue unpatentable, and will only focus on the priority dispute."). Based on the preliminary record before us, we determine that Petitioner's arguments and evidence are sufficient to show each limitation of claims 18 and 19 is present in the combination of Lissianski-Presentation and Olson. Because we determined above (*supra* Section II.D.) that claims 18 and 19 of the '147 patent are not entitled to a

IPR2020-00928
Patent 8,168,147 B2

date of invention prior to the filing of date of the '147 patent, i.e., April 6, 2009, we determine that Petitioner has established a reasonable likelihood of prevailing on its challenge to claims 18 and 19 as obvious over the combination of Lissianski-Presentation and Olson.

### G. Alleged Obviousness Based on Sjostrom and Olson

Petitioner contends claims 18 and 19 are rendered obvious over the combination of Sjostrom and Olson.  Pet. 75–104.  Petitioner also relies on the testimony of Dr. Niksa to support its arguments.  *Id.*

### 1. Sjostrom (Ex. 1010)

Sjostrom relates to methods for enhancing mercury removal from coal flue gas.  Ex. 1010, 4.  Sjostrom illustrates a mercury capture process in a figure titled "Enhancing Mercury Removal for Western Coals," reproduced below.  Ex. 1010, 4.



IPR2020-00928
Patent 8,168,147 B2

The figure on page 4 illustrates a coal combustion process including combusting coal, injecting halogens, separately injecting a halogenated sorbent, and collecting particulates. *See id.* Sjostrom discloses using Powder River Basin "(PRB)" coal having a mercury content of "0.04–0.1 ppm-dry." *Id.* 12, 18. Sjostrom discloses that flue gas treated with existing equipment, i.e., without halogen-promoted activated carbon, contains 11.2 µg/dncm mercury. *Id.*, 3.

### 2. *Public Accessibility of Sjostrom*

Petitioner contends that Sjostrom was a presentation "delivered at the EUEC in January 2005 and mailed on CD to conference participants within a few weeks." Pet. at 78. Accordingly, Petitioner contends Sjostrom qualifies as prior art under: (1) 35 U.S.C. § 102(a) "because it was made available to the relevant public and POSITAs on January 25, 2005—the date it was presented" and (2) 35 U.S.C. § 102(b) because it was mailed on CD in February 2005. *Id.* at 80.

Patent Owner does not dispute whether Sjostrom was publicly accessible. *See generally* Prelim. Resp.

On this record, Petitioner has demonstrated a reasonable likelihood that Sjostrom was publicly available. *Hulu*, IPR2018-01039 (Paper 29) (for purposes of institution, a petitioner must show a reasonable likelihood that an asserted reference qualifies as a printed publication). Petitioner provides evidence that Sjostrom was presented in Tucson, Arizona on January 25, 2005, at the 2005 EUEC and that there were over eight hundred attendees. Pet. 78 (citing Ex. 1003 ¶¶ 265–268; Ex. 1030, 2–3, 23, 106–118; Ex. 1031). Petitioner's evidence does not indicate that attendance of the 2005 EUEC was restricted. *Id.* Petitioner also provides evidence of the CD that was

mailed to the conference attendees and copies of the Sjostrom presentation from the CD, without any apparent restriction or expectation of confidentiality. Ex. 1003 ¶ 267–268; Ex. 1030, 2–3; Ex. 1010; Ex. 1011; *GoPro*, 908 F.3d at 694–95. Therefore, on this record, Petitioner has met its burden of showing that Sjostrom qualifies as printed publications.

### 3. *Analysis of Claims 18 and 19*

Although claim 1 is disclaimed and claim 17 is not asserted in the instant Petition, claims 18 and 19 depend from and include the limitations of claims 1 and 17. Ex. 1001, 24:34–41. Accordingly, we review Petitioner's contentions as to claims 1 and 17, before we address the additional limitations of challenged claims 18 and 19. *See generally id.*, claims.

Petitioner contends that much of claim 1 is suggested by Sjostrom. Pet. 84–96. Petitioner relies primarily on page 4 of Sjostrom, reproduced below, to illustrate its contentions. *Id.* With reference to claim 1, Petitioner asserts that Sjostrom teaches a method for separating mercury from a mercury-containing flue gas because Sjostrom describes separately introducing both bromine and a chemical sorbent into a flue gas, from a coal-fired power plant, followed by the removal of particulate material. *Id.* at 84–85 (citing Ex. 1010, 1, 12, 18; Ex. 1003 ¶¶ 107–108, 579). Petitioner explains that "Sjostrom describes passing the flue gas through an electrostatic precipitator (ESP) or fabric filter (FF) after the bromine and sorbent injection, each of which separate mercury/sorbent particulates and fly ash." *Id.* at 95–96 (citing Ex. 1003 ¶¶ 597–599; Ex. 1010, 4).

According to Petitioner, a person of ordinary skill in the art "would have understood that the bromine and activated carbon would have contacted and reacted in the flue gas to form promoted-brominated sorbent"

48

when implementing the embodiment where bromine is added at location 2. *Id.* at 85–86 (citing Ex. 1003 ¶ 580–581; Ex. 1010, 4).  Petitioner argues that a person of ordinary skill in the art "would have understood that the bromine-containing promoter added at Location 2 of Sjostrom would have contacted the sorbent in the flue gas at or downstream of the sorbent injection point" and that introducing bromine would have "improved mercury capture both by reacting with mercury in the gas-phase to oxidize mercury, and also by reacting with the activated-carbon sorbent." *Id.* at 88 (citing Ex. 1010, 4; Ex. 1003 ¶ 583).  Petitioner asserts that like Sjostrom, Olson "proposes that reactions between $HBr(g)$ and/or $Br_2(g)$ and activated-carbon sorbent are one of promotion, as described" by the claims. *Id.* at 89 (citing Ex. 1014 ¶ 12); *see id.* at 88–90 (citing Ex. 1010, 4; Ex. 1014 ¶¶ 12, 14, 43, 54, 66; Ex. 1003 ¶¶ 583–587).

Petitioner contends that Sjostrom and Olson each describe using activated carbon sorbents, particularly Darco FGD. *Id.* at 87 (citing Ex. 1010, 4, 10–11, 16, 20), 91 (citing Ex. 1010, 16; Ex. 1014 ¶ 95).  Olson describes its sorbent as having "a carbene species on the edge of the graphene sheet structure of the activated carbon." *Id.* at 91 (citing Ex. 1014 ¶¶ 54, 95).  According to Petitioner, Olson describes "the brominated carbon contains both covalent carbon-bound (organic) bromide as well as ***anionic bromide***" and "that this reaction "provides a highly reactive bromine containing reagent that can oxidize the mercury and promote its capture on the activated carbon." *Id.* at 93 (citing Ex. 1014 ¶¶ 93, 96; Ex. 1003 ¶ 594).  Petitioner further asserts that a person of ordinary skill in the art would have understood that the brominated sorbent would have chemically reacted with the mercury in the flue gas to form a mercury/sorbent composition," as

49

IPR2020-00928
Patent 8,168,147 B2

described in Olson.  Pet. 93–94 (citing Ex. 1010, 16; Ex. 1014 ¶¶ 43, 128; Ex. 1003 ¶¶ 595–596).

Petitioner contends that the skilled artisan would have had reason to combine the teachings of Sjostrom and Olson because Olson provides "well-known details regarding the chemicals and proposed reaction mechanisms underlying the system of Sjostrom for mercury control from coal flue gas" and because Olson describes specific bromine species, i.e., HBr or Br$_2$, as useful in a bromination reaction.  *Id.* at 80–84 (citing Ex. 1011, 1–2, 4, 10–11, 15–16; Ex. 1014 ¶¶ 22, 54, 66, 95, Fig. 2; Ex. 1003 ¶¶ 572–578).

Petitioner further alleges that the subject matter of claim 17 is suggested by the combination of Sjostrom and Olson.  *Id.* at 97–102. Specifically, Petitioner contends that "Sjostrom teaches injecting bromine into the boiler, upstream of the sorbent injection point."  *Id.* at 97 (citing Ex. 1010, 4; Ex. 1003 ¶ 600–601).  Petitioner asserts that a person of ordinary skill in the art would have understood that the halogen is injected at Location 2, while an untreated carbon is separately injected into the flue gas.  *Id.* at 98–99 (citing Ex. 1010, 4, 16; Ex. 1003 ¶ 601; Ex. 1009, 4676). Alternatively, Petitioner alleges that "even if a [person of ordinary skill in the art] were to include bromine at both Location 2 and Location 3 (i.e., creating a brominated sorbent at Location 3), this brominated sorbent is still a 'sorbent material comprising activated carbon,' which means that [the] sorbent can include other components besides activated-carbon, such as halogens."  *Id.* at 99–100 (citing Ex. 1001, 7:44–46, 10:34–57; Ex. 1003 ¶ 602).  Petitioner argues that an in-flight reaction occurs between the bromine promoter and activated carbon.  *Id.* at 100–101 (citing Ex. 1014 ¶¶ 11, 22, 24, 27, 62, 66, 77–78; Ex. 1003 ¶¶ 603–605).  Lastly, Petitioner

50

IPR2020-00928
Patent 8,168,147 B2

contends that Olson discloses a bromine promoter to sorbent ratio "from about 1 to about 30 grams per 100 grams of activated carbon." *Id.* at 102 (quoting Ex. 1014 ¶ 23, claims 3, 17, 37, 47 and citing Ex. 1003 ¶¶ 606–607).

With respect to claim 18, Petitioner contends that "Sjostrom describes injecting 'Br' promoter into a coal-fired boiler (e.g., combustion chamber)." Pet. 102 (citing Ex. 1010, 4). Petitioner contends that Sjostrom discloses both the coal and the flue gas contain mercury; thus, the Sjostrom discloses injecting bromine into a mercury-containing gas. *Id.* at 103–104. Petitioner further contends that "the sorbent is also injected into a mercury-containing gas." *Id.* at 104. Sjostrom shows injection of the sorbent into the flue-gas ductwork prior to the ESP or FF. Ex. 1010, 4.

Petitioner further asserts that Sjostrom "discloses an in-flight reaction in the mercury-containing flue gas between bromine and activated carbon to form an improved sorbent. A POSITA would have understood that coal combustion produced a mercury containing flue gas, and that the mercury-containing gas transported the bromine containing promoter of Sjostrom to the activated-carbon sorbent" as required by claim 19. *Id.* at 104 (citing Ex. 1003 ¶ 611).

Patent Owner does not substantively address Petitioner's challenge of claims 18 and 19, aside from arguing the priority of the '147 patent, as discussed above. *See generally* Prelim. Resp.; *see also id.* at 1 n.1 ("For purposes of this preliminary response only, Patent Owner does not dispute that the asserted art renders the claims at issue unpatentable, and will only focus on the priority dispute."). On this record, we determine that Petitioner's arguments and evidence are sufficient to suggest each of the

51

IPR2020-00928
Patent 8,168,147 B2

limitations of claims 18 and 19 is present in the combination of Sjostrom and Olson.  Because we determined above (*supra* Section II.D.) that claims 18 and 19 of the '147 patent are not entitled to a date of invention prior to the filing of date of the '147 patent, i.e., April 6, 20009, we determine that Petitioner has established a reasonable likelihood of prevailing on its challenge to claims 18 and 19 as obvious over the combination of Sjostrom and Olson.

## III. CONCLUSION

For the reasons set forth above, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to at least one challenged claim of the '147 patent.  Thus, we institute an *inter partes* review on all challenged claims and on all grounds presented.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that an *inter partes* review is instituted on each of the grounds asserted in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial, which shall commence on the entry date of this decision.

IPR2020-00928
Patent 8,168,147 B2

FOR PETITIONER:

Brian Oaks
David Tobin
Elizabeth Flannery
Thomas Carter Jr.
BAKER BOTTS L.L.P.

brian.oaks@bakerbotts.com
david.tobin@bakerbotts.com
liz.flannery@bakerbotts.com
thomas.carter@bakerbotts.com


FOR PATENT OWNER:

Hamad Hamad
Justin T. Nemunaitis
CALDWELL, CASSADY & CURRY P.C

hhamad@caldwellcc.com
jnemunaitis@caldwellcc.com
midwest@caldwellcc.com

# EXHIBITS 43-52
# REDACTED IN THEIR ENTIRETY

# EXHIBIT 53

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

NRG Energy, Inc,
Talen Energy Corporation, and
Vistra Energy Corp.


Petitioners

v.

Midwest Energy Emissions Corp.,

Patent Owner


_____


Case No. Unassigned
Patent No. 10,343,114

_____


**DECLARATION OF DR. STEPHEN NIKSA**

the named inventors conceived of the claimed invention before the prior art and were diligent in reducing the claimed inventions to practice.

## VII.      PERSON OF ORDINARY SKILL IN THE ART

63.    As described in Section VI.A above, I have been provided the legal standards for determining the qualifications of a Person of Ordinary Skill in the Art ("POSITA").

64.    As of the Challenged Patent's earliest claimed priority date (August 2004), a POSITA would have had at least a Bachelor's Degree in chemical engineering, mechanical engineering, or a related field of study.  A POSITA would also have at least two years' experience with implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration. Among other areas, the POSITA would have been familiar with each of the topics discussed below in the State of the Art section.

65.    I understand that Petitioners and Patent Owner may have a dispute as to whether the Challenged Claims are entitled to a priority date of August 2004.  The qualifications of a POSITA, discussed above, remain unchanged.

66.    I was at least a person of ordinary skill as of August 2004, and I remain so.

## VIII.      STATE OF THE ART

67.     The '114 Patent relates to "the removal of pollutants from flue gas or product gas from a gasification system."[1]

68.     I understand that the Challenged Patent purports to trace ultimate priority to a provisional patent application that was filed on August 30, 2004.  In the subsections below, I describe some basic principles of chemistry and engineering relating to coal combustion and removing pollutants (such as mercury) from gas streams. The principles discussed in the subsections below would have been well-known to a POSITA in August 2004 and earlier.

### A.    FUNDAMENTAL PRINCIPLES OF CHEMISTRY

### 1.    Periodic Table and Chemical Notation

69.     The periodic table of elements (or "periodic table" for short) is a common way to display chemical elements in a tabular manner.  Each box in the periodic table represents a chemical element.  The periodic table typically displays the atomic number and atomic mass of a chemical element, and some periodic tables display other properties.  The atomic number refers to the number of protons in the nucleus of an atom.  The atomic mass of a chemical element is the number of protons

---

[1]  Ex. 1001 ('114 Patent) at 1:28-29.

### 4.   Flue Gas Constituents

96.     In 1972, the EPA first published AP-42, *Compilation of Air Pollutant Emissions Factors*.[37]   The Fifth Edition of AP-42 was published in January 1995 with various supplements and updates periodically provided.[38]  Chapter 1 of the AP-42 is titled "External Combustion Sources."   Chapter 1 of the AP-42 has a first section titled "Bituminous and Subbituminous Coal Combustion."[39]     The Bituminous and Subbituminous Coal Combustion section was last supplemented in

---

[37]  *See* U.S. EPA, AP-42: Compilation of Air Emissions Factors, EPA (2019), available at https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-compilation-air-emissions-factors (last visited Apr 10, 2020).

[38]  *See* U.S. EPA, AP-42: Compilation of Air Emissions Factors, EPA (2019), available at https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-compilation-air-emissions-factors (last visited Apr 10, 2020).

[39]  *See* U.S. EPA, AP-42: External Combustion Sources, Chapter 1: Fifth Edition, Volume I, available at https://www3.epa.gov/ttn/chief/ap42/ch01/index.html (last visited Apr 10, 2020).

September 1998.[40]  Thus, in 2003, the AP-42 demonstrated that much was already known in the art about flue gas constituents.

97.     The AP-42 explained that "[e]missions from coal combustion depend on the rank and composition of the fuel, the proportions of fuel and air, the type and size of the boiler, firing conditions, load, type of control technologies, and the level of equipment maintenance."[41]  It was known that potential emissions included particulate matter, sulfur oxides (SOx), nitrogen oxides (NOx), carbon monoxide (CO), organic compounds, trace metals, acid gases, and greenhouse gases.[42]

98.     Particulate matter emitted from coal combustion processes "include[d] the ash from combustion of the fuel as well as unburned carbon resulting from incomplete combustion."[43]  It was also known that in typical pulverized coal operations, complete combustion resulted in particulate matter that "is primarily

---

[40]  U.S. EPA, AP-42: External Combustion Sources, Chapter 1: Fifth Edition, Volume I, available at https://www3.epa.gov/ttn/chief/ap42/ch01/index.html (last visited Apr 10, 2020).

[41]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-3.

[42]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-3 to 1.1-6.

[43]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-3.

composed of inorganic ash residues."[44]  In particular, the ash that is entrained in the flue gas was commonly referred to as "fly ash."[45]  Unburned carbon in fly ash was estimated as the loss-on-ignition (LOI), which is the mass fraction of combustibles lost during incineration of a fly ash sample in air.  In general, LOI is greater when in-furnace technologies are implemented to reduce $NO_X$ emissions.  LOI was also greater with coals of progressively higher rank.

99.     It was known that sulfur oxides ("$SO_x$") that were emitted from coal combustion "form[ed] as the organic and pyritic sulfur in the coal [were] oxidized during the combustion process."[46]  In fact, it was well known that "about 95 percent of the sulfur present in bituminous coal [was] emitted as gaseous $SO_x$, whereas somewhat less [was] emitted when subbituminous coal is fired."[47]  The $SO_x$ emissions were known to be "primarily sulfur dioxide ($SO_2$), with a much lower quantity of sulfur trioxide ($SO_3$) and gaseous sulfates."[48]

---

[44]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-3.

[45]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-3.

[46]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-3.

[47]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-3.

[48]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-3; *see also* U.S. DOE, How $NO_X$ is Formed, DOE NETL, available at

*Declaration of Dr. Stephen Niksa*                    NRG ET AL. EXHIBIT 1002,
                                                                              Page 79

100.   It was known that nitrogen oxide ("NO$_x$") emissions "result[ed] from thermal fixation of atmospheric nitrogen in the combustion flame and from oxidation of nitrogen bound in the coal."[49]  NO$_x$ emissions were known to be "primarily nitric oxide (NO)" with trace amounts of nitrogen dioxide (NO$_2$) and nitrous oxide (N$_2$O).[50]

101.   It was known that organic compound emissions from coal combustion "include volatile, semivolatile, and condensable organic compounds either present in the coal or formed as a product of incomplete combustion" such as "alkanes, alkenes, aldehydes, alcohols, and substituted benzenes (e.g., benzene, toluene, xylene, and ethyl benzene)."[51]  It was also known that the rate at which these

---

https://web.archive.org/web/20030426074529fw_/http://www.netl.doe.gov/coalpower/environment/nox/howNOx.html.

[49] Ex. 1053 (Chapter 1 of AP-42) at 1.1-3 *see also* U.S. DOE, How NOx is Formed, DOE NETL, available at

https://web.archive.org/web/20030426074529fw_/http://www.netl.doe.gov/coalpower/environment/nox/howNOx.html.

[50] Ex. 1053 (Chapter 1 of AP-42) at 1.1-3.

[51] Ex. 1053 (Chapter 1 of AP-42) at 1.1-4.

*Declaration of Dr. Stephen Niksa*

emissions are generated also "depends on the combustion efficiency of the boiler."[52] It was also known that similar to CO emissions, "combustion modifications that change combustion residence time, temperature, or turbulence may increase or decrease concentrations of organic compounds in the flue gas."[53]

102.   It was known that the amount of trace metals (including mercury) emitted during coal combustion generally depends on "the physical and chemical properties of the metal itself; the concentration of the metal in the coal; the combustion conditions; and the type of particulate control device used, and its collection efficiency as a function of particle size."[54]   In 2003, the types of trace metals were generally categorized into three classes:[55]

> Class 1: Elements that are approximately equally concentrated in the fly ash and bottom ash, or show little or no small particle enrichment. Examples include manganese, beryllium, cobalt, and chromium.

> Class 2: Elements that are enriched in fly ash relative to bottom ash, or show increasing enrichment with decreasing particle size. Examples include arsenic, cadmium, lead, and antimony.

---

[52] Ex. 1053 (Chapter 1 of AP-42) at 1.1-4.

[53] Ex. 1053 (Chapter 1 of AP-42) at 1.1-4.

[54] Ex. 1053 (Chapter 1 of AP-42) at 1.1-4 – 1.1-5.

[55] Ex. 1053 (Chapter 1 of AP-42) at 1.1-5.

Class 3: Elements which are emitted in the gas phase (primarily mercury and, in some cases, selenium).

Class 1 emissions were known to be "directly related to control of total particulate matter emissions."[56]  Class 2 emissions  were known to "depend[] on collection of fine particulate."[57]  However, it was known that "[b]ecause of the volatility of Class 3 metals, particulate controls have only a limited impact on emissions of these metals."[58]

103.   It was known that coal combustion "also results in emissions of chlorine and fluorine."[59]  The chlorine and fluorine were known to be "primarily in the form of hydrogen chloride (HCl) and hydrogen fluoride (HF)" but may also be found in lesser quantities as chlorine gas and fluorine gas.[60]

---

[56] Ex. 1053 (Chapter 1 of AP-42) at 1.1-5.

[57] Ex. 1053 (Chapter 1 of AP-42) at 1.1-5.

[58] Ex. 1053 (Chapter 1 of AP-42) at 1.1-5.

[59] Ex. 1053 (Chapter 1 of AP-42) at 1.1-5.

[60] Ex. 1053 (Chapter 1 of AP-42) at 1.1-5.

*Declaration of Dr. Stephen Niksa*

### 5. <u>Components Downstream of the Combustion Chamber and Boiler</u>

104.    The EPA's AP-42 report also provided a brief summary of the various downstream components that were known to be used to control certain undesirable flue gas constituents.[61]

#### a.    *Particulate Matter Emissions Controls*

105.    Known particulate matter controls included "combustion modifications (applicable to small stoker-fired boilers) and post-combustion methods (applicable to most boiler types and sizes)."[62]  Methods to control particulate matter emissions from small stoker-fired and hand-feed combustion sources included "employing good combustion practices such as operating within the recommended load ranges, controlling the rate of load changes, and ensuring steady, uniform fuel feed," as well as using "[p]roper design and operation of the combustion air delivery systems."[63] It was also known that post-combustion control of particulate matter could be accomplished using one or more of the following: an electrostatic precipitator ("ESP"), a fabric filter (or baghouse), a wet scrubber, a cyclone or multiclone

---

[61]  *See* Ex. 1053 (Chapter 1 of AP-42) at 1.1-6 – 1.1-9.

[62]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-6.

[63]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-6.

collector, or a side stream separator.[64]  It was known that electrostatic precipitators could be placed ahead of an air preheater, such as in the hot-side (HESP) configuration.

106.  It was known that fabric filters contain multiple compartments that contain "several thousand long, vertically supported, small diameter fabric bags."[65] It was known that when mercury-containing flue gas with flyash pass through the bags, they deposit flyash and unburned carbon onto thin dust cakes on their outer surfaces.  The cleaned flue gas then moves into an outlet plenum that recombines the effluents from all bags to proceed further downstream.  It was known that as the dust cake accumulates, the increasing pressure drop across the filter is managed by pulsing air jets to dislodge the dust cake into collection hoppers.

### b.  SO_x Emissions Controls

107.  Multiple techniques were known for controlling $SO_x$ emissions.  For example, it was known that "[p]ost combustion flue gas desulfurization (FGD) techniques can remove $SO_2$ formed during combustion by using an alkaline reagent to absorb $SO_2$ in the flue gas."[66]  These FGD systems would treat coal flue gas "using

---

[64]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-6 to 1.1-7.

[65]  Ex. 1027 (B&W: Steam) at 33-7.

[66]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-7.

wet, dry, or semi-dry desulfurization processes of either the throwaway type (in which all waste streams are discarded) or the recovery/regenerable type (in which the $SO_2$ absorbent is regenerated and reused)."[67]  The most common type of FGD systems were wet FGDs that "generally use alkali slurries as the $SO_2$ absorbent medium and can be designed to remove greater than 90 percent of the incoming $SO_2$."[68]  It was known that commercially viable and accepted wet FGDs include lime/limestone scrubbers, sodium scrubbers, and dual alkali scrubbers.[69]

### c.    *$NO_x$ Emissions Controls*

108.   It was known that $NO_x$ emissions could be controlled using combustion control techniques and post-combustion control.[70]  Known post-combustion control techniques included "selective noncatalytic reduction (SNCR) and selective catalytic reduction (SCR)" systems.[71]

---

[67] Ex. 1053 (Chapter 1 of AP-42) at 1.1-7.

[68] Ex. 1053 (Chapter 1 of AP-42) at 1.1-7.

[69] Ex. 1053 (Chapter 1 of AP-42) at 1.1-7.

[70] Ex. 1053 (Chapter 1 of AP-42) at 1.1-7 to 1.1-8.

[71] Ex. 1053 (Chapter 1 of AP-42) at 1.1-8.

109.   SNCR systems were known to "involve[] injecting ammonia ($NH_3$) or urea into specific temperature zones in the upper furnace or convective pass."[72]  The SNCR system was known to remove $NO_x$ by reacting the ammonia or urea with $NO_x$ in the flue gas to produce nitrogen and water.[73]  Specifically, it was known that "[a] nitrogen based reducing agent (reagent), such as ammonia or urea, is injected into the post combustion flue gas."[74]  Although it was known that the nitrogen-based reducing agent would react with numerous components in the flue gas stream, "the $NO_x$ reduction reaction is favored over other chemical reaction processes for a specific temperature range and in the presence of oxygen."[75]  Typical SNCR units

---

[72]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-9.

[73]  Ex. 1053 (Chapter 1 of AP-42) at 1.1-9.

[74]  U.S. EPA, Air Pollution Control Cost Manual EPA/452/B-02-001 6th Edition, Section 4 NOx Controls, Section 4.2 NOx Post-Combustion, Chapter 1 Selective Noncatalytic Reduction (October 2000), available at https://www3.epa.gov/ttn/ecas/docs/cs4-2ch1.pdf, at 1-4.

[75]  U.S. EPA, Air Pollution Control Cost Manual EPA/452/B-02-001 6th Edition, Section 4 NOx Controls, Section 4.2 NOx Post-Combustion, Chapter 1 Selective Noncatalytic Reduction (October 2000), available at https://www3.epa.gov/ttn/ecas/docs/cs4-2ch1.pdf, at 1-4.

in the early 2000's provided "30% to 50% $NO_x$ reduction" with known potential "$NO_x$ reduction efficiencies of up to 75 percent."[76]

110.    Known SCR systems operated in a similar way that "involves injecting $NH_3$ into the flue gas in the presence of a catalyst to reduce $NO_x$ to nitrogen and then water." Similar to SNCR systems, it was known that "the SCR process is based on the chemical reduction of the $NO_x$ molecule."[77] The known SCR systems differed from known SNCR systems because they "employ[] a metal-based catalyst with activated sites to increase the rate of the reduction reaction.:[78] Similar to known

---

[76] U.S. EPA, Air Pollution Control Cost Manual EPA/452/B-02-001 6th Edition, Section 4 NOx Controls, Section 4.2 NOx Post-Combustion, Chapter 1 Selective Noncatalytic Reduction (October 2000), available at https://www3.epa.gov/ttn/ecas/docs/cs4-2ch1.pdf, at 1-3.

[77] U.S. EPA, Air Pollution Control Cost Manual EPA/452/B-02-001 6th Edition, Section 4 NOx Controls, Section 4.2 NOx Post-Combustion, Chapter 2 Selective Catalytic Reduction (October 2000), available at https://www3.epa.gov/ttn/ecas/docs/cs4-2ch2.pdf, at 2-4.

[78] U.S. EPA, Air Pollution Control Cost Manual EPA/452/B-02-001 6th Edition, Section 4 NOx Controls, Section 4.2 NOx Post-Combustion, Chapter 2 Selective

SNCR systems, "[a] nitrogen based reducing agent (reagent), such as ammonia or urea, is injected into the post combustion flue gas."[79]  The SCR reactor was known to be flexible and could "be located at various positions in the process including before an air heater and particulate control device, or downstream of the air heater, particulate control device, and flue gas desulfurization systems."[80]  It was known that SCR systems were "often designed to meet control targets of over 90%" but typically "operate at efficiencies in the range of 70% to 90%" $NO_x$ reduction.[81]

---

Catalytic Reduction (October 2000), available at

https://www3.epa.gov/ttn/ecas/docs/cs4-2ch2.pdf, at 2-4.

[79] U.S. EPA, Air Pollution Control Cost Manual EPA/452/B-02-001 6th Edition, Section 4 NOx Controls, Section 4.2 NOx Post-Combustion, Chapter 2 Selective Catalytic Reduction (October 2000), available at

https://www3.epa.gov/ttn/ecas/docs/cs4-2ch2.pdf, at 2-4.

[80] Ex. 1053 (Chapter 1 of AP-42) at 1.1-9.

[81] U.S. EPA, Air Pollution Control Cost Manual EPA/452/B-02-001 6th Edition, Section 4 NOx Controls, Section 4.2 NOx Post-Combustion, Chapter 2 Selective Catalytic Reduction (October 2000), available at

https://www3.epa.gov/ttn/ecas/docs/cs4-2ch2.pdf, at 2-3.

111.   By January 2004, it was also known that adding a halogen "also reduces $NO_x$ emissions in a selective catalytic reduction (SCR) and/or (SNCR) process, especially if the additive is injected with a nitrogen agent (N-agent) into $NO_x$ and $O_2$ containing flue gas at flue gas temperatures in a range of 1600° F. (Fahrenheit) to 2300° F."[82]  Specifically, it was known that "[t]he halogen additive can also be added with ammonia, urea or other N-agent solution . . . to increase efficiency of $NO_x$ reduction."[83]

112.   By 2002, it was known that the catalysts in SCR units could also oxidize elemental mercury ($Hg^0$) while they eliminated NOx from the flue gas. Field tests across several SCRs at commercial power plants indicated that SCR systems "may also promote $Hg^0$ oxidation to $Hg^{2+}$, and this effect appeared to be coal-specific and possibly catalyst-specific."[84]  The coal-specific aspect was attributed to a coal's native chlorine content, as researchers interpreting the full-scale SCR field test data noted that significant increases in mercury oxidation (to $Hg^{2+}$) across the SCR that "correlate[s] with the amount of chloride in the coal."[85]

---

[82]  Ex. 1036 (Lissianski) at 3:51-55.

[83]  Ex. 1036 (Lissianski) at 4:40-42.

[84]  Ex. 1037 (Power Plant Evaluation).

[85]  Ex. 1045 (Laudal).

113.   Thus, a POSITA would have readily realized that adding chlorine compounds to the coal or furnace to produce HCl in flue gas would promote oxidation of elemental mercury across an SCR.  It would have been be a very simple extension to recognize that other halogens, particularly Br, would promote mercury oxidation on SCR catalysts as well as, or better than, chlorine.

### d.        *Mercury Emissions Controls*

114.  By February 2003, numerous projects had been completed that demonstrated components for effective mercury control from coal-fired power plants.[86]  For example, in Colorado "the DOE/FETC Mega PRDA program, DOE, Public Service Company of Colorado (PSCo), and EPRI" funded an evaluation of "carbon injection as a mercury control technology. ADA Technologies performs the fabrication, pilot operation, and reporting."[87]   Further research in Colorado sponsored by TDA evaluated "a low cost route to a carbon-based, sulfur containing

---

[86]  U.S. DOE, Completed Mercury Projects, February, 2003, available at https://web.archive.org/web/20030227051517fw_/http:/www.netl.doe.gov/coalpower/environment/mercury/index.html.

[87]  U.S. DOE, Completed Mercury Projects, February, 2003, available at https://web.archive.org/web/20030227051517fw_/http:/www.netl.doe.gov/coalpower/environment/mercury/index.html.

sorbent that should have a high capacity for mercury and also for other air toxins including chlorine and hydrogen chloride."[88]   Similarly, testing in Pennsylvania evaluated "the use of a granular activated carbon (GAC) fixed bed adsorption system for mercury adsorption from flue gas."[89]

115.   By March 2003, Apogee completed its proposal to the DOE "to test novel and less mature technologies."[90]   At that time, the DOE explained that "[u]nder the laboratory sorbent development program supported by EPRI, over 1000 potential sorbents have been evaluated and many promising low cost mercury sorbents and

---

[88]  U.S. DOE, Completed Mercury Projects, February, 2003, available at

https://web.archive.org/web/20030227051517fw_/http:/www.netl.doe.gov/coalpow er/environment/mercury/index.html.

[89]  U.S. DOE, Completed Mercury Projects, February, 2003, available at

https://web.archive.org/web/20030227051517fw_/http:/www.netl.doe.gov/coalpow er/environment/mercury/index.html.

[90]  U.S. DOE, Control Technology Assessment Of Low Cost Novel Mercury

Sorbents, March, 2003, available at

https://web.archive.org/web/20030315093024fw_/http:/www.netl.doe.gov/coalpow er/environment/mercury/control-tech/hg-sorbents.html.

processes have been identified."[91]   Thus, "a portable pilot system fabricated by Apogee for EPRI" was designed to provide fixed best testing of 6 to 12 of these novel sorbents.[92]   Also by March 2003, Babcock and Wilcox completed testing to "demonstrate their wet scrubbing mercury removal technology (which uses very small amounts of a liquid reagent to achieve increased mercury removal)."[93]

---

[91]   U.S. DOE, Control Technology Assessment Of Low Cost Novel Mercury Sorbents, March, 2003, available at

https://web.archive.org/web/20030315093024fw_/http:/www.netl.doe.gov/coalpower/environment/mercury/control-tech/hg-sorbents.html.

[92]   U.S. DOE, Control Technology Assessment Of Low Cost Novel Mercury Sorbents, March, 2003, available at

https://web.archive.org/web/20030315093024fw_/http:/www.netl.doe.gov/coalpower/environment/mercury/control-tech/hg-sorbents.html.

[93]   U.S. DOE, Control Technology Full-Scale Testing of Enhanced Mercury Control in Wet FGD, March, 2003, available at

https://web.archive.org/web/20030315095234fw_/http:/www.netl.doe.gov/coalpower/environment/mercury/control-tech/test-wet-fgd.html.

*Declaration of Dr. Stephen Niksa*

C.   SORBENTS / ACTIVATED CARBON

1.   **Sorbent Overview**

116.   In the late 1990's and early 2000's, sorbent technology was already used to remove mercury, and researchers were investigating methods to reduce costs and improve the effectiveness of sorbents.  In particular, research by the EPA in the mid-1990s suggested that "activated carbon has been shown to be a promising technology."[94]  Activated carbon's general use as a sorbent dates back as far as 1500 B.C. where the ancient Egyptians used carbonized wood "as an adsorbent for medicinal purposes and also as a purifying agent."[95]  Industrial production of activated carbon "was established in 1900-1901 in order to replace bone char in the sugar refining process."[96]  It was known in the 1980s that activated carbons "are excellent adsorbents and thus are used to purify, decolorize, deodorize, dechlorinate, detoxicate, filter, or remove or modify the salts, separate, and concentrate in order to permit recovery."[97]  It was known that "adsorption" refers to a process by which

---

[94]  Ex. 1060 (EPA 1997 Mercury Study Report Vol. VIII) at 2-54.

[95]  Ex. 1070 (Bansal) at vii.

[96]  Ex. 1070 (Bansal) at vii.

[97]  Ex. 1070 (Bansal) at viii.

an adsorbate (e.g., atoms, ions, or molecules) in a fluid (typically a gas) are bound to the surface of a sorbent.

117.   By the 1930's, it was known that activated carbon could be used for mercury capture in gas streams.[98]  U.S. Patent No. 1,984,164 to Stock, issued in 1934, explained that "[i]t has already been suggested to employ active carbon as a means of protection against the effects of mercury vapors."[99]  By 1998, "[a]ctivated carbons ha[d] been the most thoroughly studied sorbent for the capture of mercury."[100]  Additionally, many research programs completed by 2003 had shown that activated carbon injection ("ACI") in coal-fired power plants had "the most promise as a near-term mercury control technology."[101]

118.   By 1998, it was known that sorbents may capture mercury from coal flue gas by "chemical adsorption, or by chemical reaction.[102]  Chemisorption was known to refer to "a surface reaction, limited to a monolayer."[103]  Chemisorption

---

[98]  Ex. 1029 (Stock).

[99]  Ex. 1029 (Stock) at 1:27-30.

[100]  Ex. 1038 (Granite) at 22.

[101]  Ex. 1039 (Feeley) at 10.

[102]  Ex. 1038 (Granite) at 4.

[103]  Ex. 1038 (Granite) at 5.

*Declaration of Dr. Stephen Niksa*

and chemical reaction processes both were known to "occur over a wide range of temperatures" and "typically have higher activation energies and heats of reaction than does physisorption."[104]

119.   By January 2004, the EPA had already proposed rules relating to mercury emissions, and had identified "types of sorbent that may be viable for use in sorbent injection [that] include two basic types of activated carbon (AC; regular and impregnated)."[105] Of these two types of promising sorbents—regular activated carbon and chemically-impregnated activated carbons—the EPA identified Sorbalit[TM] and Darco FGD as brand-name activated-carbon sorbents of interest and indicated that chemically-impregnated activated carbons being studied included those using halogens and sulfur "bound to the [activated carbon] to enhance mercury removal.[106]

### 2.   Well-Known Structure of Activated Carbon

120.   By 1988, it was well known that activated carbon would adsorb oxidized mercury ions ($Hg^{2+}$ or $Hg(II)$).[107]  The surface structure of activated carbon

---

[104]  Ex. 1038 (Granite) at 5.

[105]  Ex. (EPA-Proposal) at 4676.

[106]  Ex. (EPA-Proposal) at 4676.

[107]  Ex. 1070 (Bansal) at 391.

*Declaration of Dr. Stephen Niksa*

(also referred to as "active carbon"), and the interaction with mercury and halogens, was discussed in a textbook authored in 1988 by Roop Chand Bansal and others, entitled "Active Carbon."  Sections of this book have been included as Exhibit 1070 to my declaration, and I refer to it as "Bansal."[108]  Bansal describes "the basic steps involved in the manufacture of activated carbons, the selectivity and suitability of different raw materials, and the probable mechanism of the physical and chemical activation processes."[109]

121.   Bansal explains that "[a]ctivated carbons are unique and versatile adsorbents because of their extended surface area, microporous structure, universal adsorption effect, high adsorption capacity, and high degree of surface reactivity."[110]  Specifically, Bansal teaches that activated carbons "are extensively used to purify, decolorize, deodorize, dechlorinate, and detoxicate potable waters; for solvent recovery and air purification in inhabited spaces such as restaurants, food processing, and chemical industries; in the purification of many chemical and foodstuff products; and in a variety of gas phase applications."[111]

---

[108]  Ex. 1070 (Bansal).

[109]  Ex. 1070 (Bansal) at iv.

[110]  Ex. 1070 (Bansal) at iii.

[111]  Ex. 1070 (Bansal) at iii.

122.   Bansal explains in 1988 that the adsorbent properties of activated carbon were known to be "attributed to their large surface area, a high degree of surface reactivity, universal adsorption effect, and favorable pore size, which makes the internal surface accessible, enhances the adsorption rate, and enhances mechanical strength."[112]   By the 1980s, it was known that "commercial active carbons have a specific surface area of the order of 800-1500 $m^2/g$."[113]   It was known that the surface area of activated carbon may be "contained predominantly within micropores, which have effective diameters smaller than 2 nm."[114]   A typical activated carbon particle was known to be "made up of a complex network of pores which have been classified into micropores (diameters < 2 nm), mesopores (diameter between 2 and 50 nm), and macropores (diameters > 50 nm)."[115]   Although the "macropores do not contribute much toward surface area," it was known that they "act as conduits for the passage of the adsorbate into the interior mesopore and the micropore surface where most of the adsorption takes place."[116]

---

[112]  Ex. 1070 (Bansal) at viii.

[113]  Ex. 1070 (Bansal) at viii.

[114]  Ex. 1070 (Bansal) at viii.

[115]  Ex. 1070 (Bansal) at viii.

[116]  Ex. 1070 (Bansal) at viii.

123.   It was known that an activated-carbon sorbent generally is formed from graphene sheets (or layers).  The Bansal reference in 1988 described activated carbon as having "a st[r]ucture consisting of sheets of aromatic condensed ring systems stacked in nonpolar layers."[117]  This can be pictured as a stack of sheets of the following structure:



Each vertex in the above structure represents a carbon atom, and each hexagon in the above figure represents an aromatic ring.

124.   Each such graphene sheet was known to have "limited dimensions and therefore present edges."[118]  Further, it was known that "these sheets are associated

---

[117]  Ex. 1070 (Bansal) at 238.

[118]  Ex. 1070 (Bansal) at 238.

*Declaration of Dr. Stephen Niksa*

with defects, dislocations, and discontinuities."[119]   In particular, the location and number of these defects, dislocations, and discontinuities could depend, among other things, on the particular relationship between the graphene sheets.  It was known that once a carbon atom is partially exposed from a sheet at a discontinuity, a pair of its valence electrons are no longer able to be delocalized into (shared by) the surrounding carbon items.  This pair of electrons becomes localized to its parent carbon atom, instead of interacting with its neighbors.  Such carbons were known to "have unpaired electrons and residual valences and are richer in potential energy."[120]  Thus, research showed that "these carbon atoms are highly reactive and constitute active sites or active centers."[121]  Bansal emphasized "[t]he importance of active sites and their characterization and of active surface area and its measurement in determining the reactivity of carbons."[122]

### 3.    <u>Reaction Between Activated Carbon and Halogens</u>

125.   It was known that activated carbon "can also fix nitrogen on treatment with ammonia; sulfur on treatment with hydrogen sulfide, carbon disulfide, or sulfur;

---

[119]   Ex. 1070 (Bansal) at 238.

[120]   Ex. 1070 (Bansal) at 238.

[121]   Ex. 1070 (Bansal) at 238.

[122]   Ex. 1070 (Bansal) at iv.

chlorine on treatment with the gas; and bromine on treatment in the gaseous or solution phase" that "give rise to stable carbon-nitrogen, carbon-sulfur, carbon-chlorine, or carbon-bromine surface structures (surface compounds) respectively."[123]   Additionally, "[x]-ray diffraction studies have shown that these heteroatoms or molecular species are bonded or retained at the edges and corners of the aromatic sheets or to carbon atoms in defect positions of the aromatic sheets, or they can be incorporated within the carbon layer, forming heterocyclic ring systems."[124]   In other words, the Bansal reference explained in 1988, based on surface chemistry studies, that activated carbon has reactive carbenes (lone pairs of electrons) at the edge sites of graphene sheets, and that bromine bonds to these sites.

126.   In 1970, it was documented that almost 100 years ago, researchers had reported that substantial loadings of both chlorine (Cl) and bromine (Br) can be bound onto carbon sorbents by simply heating them under gas mixtures containing the molecular ($Cl_2$, $Br_2$) or acid halide (HCl, HBr) forms of the halogens, among other methods.[125]   For example, it was shown that a sugar charcoal bound 24 % Cl

---

[123]  Ex. 1070 (Bansal) at 259.

[124]  Ex. 1070 (Bansal) at 259.

[125]  Ex. 1042 (Puri) at 255-57.

by weight and a coconut charcoal bound 40 wt. % Cl.[126]  Similarly, it was shown that charcoal bound up to a saturation limit (adsorption equilibrium) of 38 wt. % Br, and carbon black bound up to a saturation limit (adsorption equilibrium) of around 31 wt. % Br.[127]  A person of ordinary skill in the art would expect that in an actual industrial application, the amount of Br actually bound would be less than the saturation limit.  Halogens onto activated carbon would have been bound to similar amounts as with carbon black.  Binding refers to the element to element chemical bonding of Cl or Br with activated carbon, whereas loading refers to a weight ratio. It was known that the loading of Br is greater than that for Cl at the same conditions, because Br has a greater molecular weight than Cl (79.9 vs. 35.5 g/mol).[128]  It was known that both halogens are bound in rough proportion to the hydrogen content of the carbon sorbent.[129]  Thus, it was known that even in situations where Br was bound on a lower mole-to-mole basis than Cl under the same thermal conditions, its overall loading is greater due to the disparity in molecular weights.[130]  Additionally,

---

[126]  Ex. 1042 (Puri) at 256-57.

[127]  Ex. 1042 (Puri) at 260.

[128]  Ex. 1042 (Puri) at 260.

[129]  Ex. 1042 (Puri) at 257 (chlorine) and 260 (bromine).

[130]  Ex. 1042 (Puri) at 261.

*Declaration of Dr. Stephen Niksa*

for mercury removal at electric utility boilers, research by the EPA in the mid-1990s suggested that "even greater mercury removal may be possible with impregnated activated carbons" above what was already well understood for untreated sorbent injection.[131]

### 4.    Reaction Between Activated Carbon and Mercury

127.   It was widely understood in the late 1990's that only sorbents that bound both elemental and oxidized mercury by chemical adsorption (a.k.a. chemisorption) and chemical reaction were suitable, because this form would not be leached into the groundwater from flyash holding ponds or otherwise released during flyash disposal.[132]  In 1999, researchers demonstrated that mercury formed chemical bonds with the species on activated carbons exposed to simulated coal-derived flue gas.[133]  Researchers found that with carbon sorbents promoted by iodine and sulfur, "the XAFS data confirm that it is the activating element (I or S) that forms a sorption complex with mercury."[134]  Researchers also found that with unpromoted activated carbon exposed to flue gas that contained HCl and $SO_2$, the XAFS spectra showed

---

[131]  Ex. 1060 (EPA 1997 Mercury Study Report Vol. VIII) at 2-54.

[132]  Ex. 1038 (Granite) at 40.

[133]  Ex. 1043 (XAFS) at 119.

[134]  Ex. 1043 (XAFS) at 114.

that, first, HCl was bound to the carbon and then, elemental and oxidized Hg were bound to the chlorinated surface sites on the carbon.[135]  The XAFS spectra "indicate that the LAC carbon readily sorbs a form of chlorine present in the synthetic flue gas", and that the chlorinated surface bonds to mercury "with $Hg^{2+}$-Cl, as in $HgCl_2$, and/or $Hg^{2+}$-S, as in HgS (cinnabar)."[136]

128.   By 2004, these findings had been generalized to interpret both oxidation and capture of elemental and oxidized mercury on both inherent unburned carbon and injected activated-carbon sorbents.[137]  As my team and I explained in a paper from 2004:

> Mercury transformations occur while flue gases are cooled along an exhaust system.  At the superheater section, only $Hg^0$ is present and the carbon is oxidized but otherwise clean.  The process begins when temperatures are cooled into the range where HCl chlorinates some of the carbon sites in a reversible reaction.  With further cooling, $Hg^0$ adsorbs at appreciable rates onto the chlorinated sites. Since desorption remains relatively fast, the HgCl rapidly desorbs into the gas phase, where it oxidizes into $HgCl_2$.  In this temperature range, there is little sorption but extensive oxidation.  As the particles are cooled further, the desorption rate becomes controlling, which implies that surface coverage increases, ultimately, to the equilibrium

---

[135]  Ex. 1043 (XAFS) at 117, 119.

[136]  Ex. 1043 (XAFS) at 117, 119.

[137]  Ex. 1044 (Hg Speciation)

*Declaration of Dr. Stephen Niksa*

sorption capacity . . . . And HgCl on the carbon surface constitutes sorbed or "particulate" Hg.[138]

129. By 2004, a POSITA would have known that chlorine in coal would be released into flue gas as HCl, which is spontaneously bound to inherent unburned carbon and injected carbon sorbents.[139] The POSITA would also know that the chlorinated sites on the carbon would oxidize elemental Hg at economizer temperatures, and irreversibly capture the elemental and oxidized Hg on the carbon at air preheater temperatures and cooler.[140]

## 5. Sorbent Injection Rate Affects Mercury Removal

130. It was widely understood to a person of ordinary skill in the art in the early 2000s that by adjusting the sorbent injection rate, one could control mercury emissions. In 2002, ADA-ES, a prominent company providing mercury mitigation, recognized that the "amount of carbon [sorbent] injected" was one of a number of "factors [that] may influence the mercury removal obtained with sorbent injection upstream" of a particulate collector—other generalized factors include the type of sorbent, the injection method, and flue gas conditions.[141] By December 2003, if not

---

[138] Ex. 1044 (Hg Speciation) at 4-5.

[139] Ex. 1044 (Hg Speciation) at 5.

[140] Ex. 1044 (Hg Speciation) at 5.

[141] Ex. 1059 (Field Studies of Mercury Control) at p. 2.

earlier, the EPA drafted proposed rules (discussed in more detail in the sections below) that when using sorbents such as activated carbon, the "extent of potential Hg removal is dependent on: (1) Efficient distribution of the sorbent (e.g., activated carbon) in the flue gas; (2) *the amount of sorbent needed* to achieve a specific level of Hg removal which will vary depending on the fuel being burned."[142]

131.    Injection rates are commonly represented as "injection concentration in lb/MMacf,"[143] which stands for pounds of activated carbon per 1 million actual cubic feet of flue gas.  To account for variabilities in coal, it was known to use injection rates between 0 and 30 lb/MMacf, as represented by Figures 1-6 of the 2002 ADA-ES article.[144]   However, by 2002, engineers had determined to generally use approximately 10 lb/MMacf activated carbon to remove mercury, finding that the "maximum removal [is] achievable at injection concentrations between 5 and 10 lb/MMacf" with "little improvement . . . above 10 lb/MMacf."[145]   Ultimately, it was known that the selected injection rate of the sorbent material comes down to routine

---

[142]  Ex. 1009 (EPA-Proposal) at 4676 (emphasis added).

[143]  Ex. 1059 (Field Studies of Mercury Control) at 5.

[144]  Ex. 1059 (Field Studies of Mercury Control) at Figures 1-6.

[145]  Ex. 1059 (Field Studies of Mercury Control) at 13.

design tradeoffs between the "effectiveness and costs associated"[146] with increased rates of the injected sorbent among other routine design parameters.[147]

### D.   EPA REGULATIONS TO REDUCE MERCURY EMISSIONS

132.   By the 1990's, it was known that excess mercury in the environment can pose a significant threat to the health and safety of plants, birds, and mammals.[148] In particular, it was known that mercury may cause death, reduced reproductive success, impaired growth, and developmental/behavioral abnormalities.[149] The 1990 Clean Air Act Amendments ("CAAA") – specifically, Section 112(b) – listed various hazardous air pollutants ("HAPs") and details the relevant regulatory

---

[146]   Ex. 1059 (Field Studies of Mercury Control) at 2.

[147]   Ex. 1059 (Field Studies of Mercury Control) at 4-5.

[148]   U.S. EPA, "Mercury Study Report to Congress Volume 1: Executive Summary," EPA-452/R-97-003 (Dec. 1997), available at https://www.epa.gov/sites/production/files/2015-09/documents/volume1.pdf, at 2-6.

[149]   U.S. EPA, "Mercury Study Report to Congress Volume 1: Executive Summary," EPA-452/R-97-003 (Dec. 1997), available at https://www.epa.gov/sites/production/files/2015-09/documents/volume1.pdf, at 2-6.

*Declaration of Dr. Stephen Niksa*

including ESPs, fabric filters (FF), SCRs, and FGDs.[175]  The second phase of testing characterized activated carbon injection (ACI) installations, and a third phase covered halogenated sorbents, SDAs, and halogen/lime injections.[176]  Before 2004, almost all these phases of testing had been run mostly at about 20 plants operated by regional utility companies and cooperatives.

### G.   WELL-KNOWN METHODS OF ENHANCING MERCURY REMOVAL USING ACTIVATED CARBON

144.   Typical sorbents, including activated carbon, were known to have low native capacities for adsorbing mercury.[177]   Traditional mercury sorbents were known to have capacities "on the order of 100 micrograms Hg/gram sorbent, and range from $10^{-6}$ to $10^{-2}$ gram Hg/gram sorbent."[178]  However, researchers in 1998 also suggested that an activated carbon/mercury ratio between 3000:1 to 50,000 to 1 would be required to meet mercury removal demands.[179]

145.   Before 2003, researchers had worked to develop ways to increase activated carbon's sorption efficiency.   In particular, researchers had found that

---

[175]  Ex. 1039 (Feeley) at 2.

[176]  Ex. 1039 (Feeley) at 2.

[177]  Ex. 1038 (Granite) at 5.

[178]  Ex. 1038 (Granite) at 5.

[179]  Ex. 1038 (Granite) at 5.

*Declaration of Dr. Stephen Niksa*

"[o]ther compounds act as promoters for the removal of mercury from flue gas."[180] The term "promoter" was used to describe chemicals—including halides and halogens—that "increase the capacity of activated carbon."[181]   A promoter was known to be "a chemical dispersed on or within a high surface area substrate, which aids in the removal of mercury from flue gas."[182]   Specifically, promoters were known to "increase the chemisorption and chemical reaction of mercury on the sorbents."[183]

### 1.   Alkali Promoters of Activated Carbon

146.   An example of a well-known early promoter for activated-carbon sorbents was lime, calcium carbonate $[Ca(CO_3)_2]$.[184]   Lime was known for its use "in conjunction with activated carbon in some commercial sorbent processes."[185] Researchers noted that "lime has been demonstrated to reduce mercury emissions in

---

[180]   Ex. 1038 (Granite) at 5.

[181]   Ex. 1038 (Granite) at 15.

[182]   Ex. 1038 (Granite) at 15.

[183]   Ex. 1038 (Granite) at 15.

[184]   Ex. 1038 (Granite) at 15.

[185]   Ex. 1038 (Granite) at 5.

*Declaration of Dr. Stephen Niksa*

coal flue gas, even though lime neither sorbs nor reacts directly with mercury."[186]

The researchers "speculated that lime aids in the removal of mercury by reacting with acid gases such as $SO_2$ that compete for adsorption with mercury on coal ash, unburned carbon particles, and activated-carbon sorbents."[187]

### 2.   Halogen Promoters of Activated Carbon

147.   By 1934, it was known in the art that halogens improved the ability of activated carbon to remove mercury.  The Stock patent, issued in 1934, states:

> [I]t was found that in the process of purifying air vitiated with mercury vapors, adsorption agents which are impregnated with a halogen will constitute a protective agent, which is incomparably superior to any of the above mentioned protectives.  For instance, active carbon impregnated with iodine will surpass the protective action of non-impregnated active carbon about ten times.[188]

By 1997, numerous studies had also been conducted that further described how halides interacted with mercury.  For example, it was known that "halides are the most familiar compounds of mercury(I) and all contain the $Hg_2^{2+}$ ion."[189]   In particular, it was known that mercury could form $HgF_2$, $HgCl_2$, $HgBr_2$, $HgI_2$, $Hg_2F_2$,

---

[186]  Ex. 1038 (Granite) at 5.

[187]  Ex. 1038 (Granite) at 5.

[188]  Ex. 1029 (Stock) at 1:33-41.

[189]  Ex. 1041 (Greenwood) p. 1212.

$Hg_2Cl_2$, $Hg_2Br_2$, and $Hg_2I_2$.[190]  It was also known that solubility of $HgX_2$ compounds in water "decrease[s] with increasing molecular weight."[191]  As such, it was known that $Hg_2Br_2$ was easier to precipitate out from an aqueous solution (e.g., in a scrubber), as compared to $Hg_2Cl_2$.  And that $HgCl_2$ and $HgBr_2$ readily dissolves in aqueous scrubber solutions, whereas $Hg^0$ is insoluble.

148.  It was well-known that halides, such as chlorine, "improve[d] Hg capture both by conversion of the $Hg^0$ to the more easily removed $Hg^{2+}$ forms and by enhancing the reactivity of $Hg^0$ with activated carbons."[192] As such, it was known that the introduction of halogens helped remove mercury through at least two mechanisms: (1) by oxidizing the mercury, and thus rendering the mercury more susceptible to removal; (2) and by increasing the ability of the activated carbon to bind with the mercury.  For each of these mechanisms, it was known that halogens improved mercury removal.

149.  It was known that using halogens to oxidize mercury had the beneficial effect of increasing mercury removal in wet systems, because oxidized mercury is more soluble in water as compared to elemental mercury.  For example, Vosteen

---

[190]  Ex. 1041 (Greenwood) p. 1212-13.

[191]  Ex. 1041 (Greenwood) p. 1212.

[192]  Ex. 1062 (Crocker) at 2-3.

(which discussed both wet processes and dry processes) compared "quasi-insoluble" elemental mercury to "ionic" (oxidized) mercury:

> At a high chlorine content the proportion of ionic mercury in the flue gas is high. Ionic mercury may be readily removed in scrubbers. The quasi-water-insoluble metallic mercury can be converted into ionic mercury, for example by adding oxidizing agents, such as peroxides, ozone or sodium chlorite, in the boiler exit gas upstream of the flue gas cleaning system or in the dedusted boiler gas, and then removed in the flue gas cleaning system as for example in scrubbers.[193]

Granite reported in 1998 that elemental mercury had a solubility in water of only 20 micrograms/liter at 68ºF.[194]  However, mercuric chloride ($HgCl_2$) had a solubility in water of 69 grams/liter and mercuric bromide ($HBr_2$) had a solubility in water of 6.1 grams/liter.[195]  Both of these solubilities were over 5 orders of magnitude higher than the solubility of elemental mercury.  Among these candidates, it was also known that "bromine compounds oxidize mercury more effectively under the given conditions of high-temperature processes" as compared to "chlorine compounds."[196]

150.  It was also known in the art that adding halogens increased the effectiveness of dry-cleanup systems, such as activated-carbon sorbent, in removing

---

[193]  Ex. 1008 (Vosteen) at 1:27-35.

[194]  Ex. 1038 (Granite) at 11-12.

[195]  Ex. 1038 (Granite) at 12-13.

[196]  Ex. 1008 (Vosteen) at 4:48-52.

*Declaration of Dr. Stephen Niksa*

mercury.  Granite reported in 1998 that an "example of promoters are the halides and sulfides, which are often dispersed on high surface-area carbons and aluminosilicates."[197]

151.   Some of the earlier DOE-NETL sponsored field tests on Hg emissions control monitored Hg capture efficiencies with untreated powdered-activated carbons (PAC) like Norit Darco FGD.  These trials showed that the efficiencies increased in proportion to the chlorine:coal ratio, which prompted the understanding that adding chlorine to the PAC was an effective and inexpensive way to control Hg emissions with lower PAC injection rates and, therefore, at lower cost.[198]  Moreover, it was known for nearly a century[199] that chlorine-containing gases, such as $Cl_2$ and HCl, could be bound to a wide variety of carbons simply by heating the chlorine-containing gas mixture together with the PAC to moderate temperatures. Consequently, the incentive and the basic production scheme for chlorinated PAC was easily surmised soon after the first trials on untreated PAC.

152.   The EPA recognized such benefits of promoting activated carbon with halogens, and included the technology in its proposed mercury-reduction rules

---

[197]  Ex. 1038 (Granite) at 5.

[198]  Ex. 1028 (Bustard).

[199]  Ex. 1042 (Puri) at 255.

published in January 2004.  By January 2004, the EPA had identified two "types of

sorbent that may be viable for use in sorbent injection include two basic types of

activated carbon (AC; regular and impregnated)."[200]    The EPA described

chemically-impregnated AC as follows:

> Chemically-impregnated AC [activated carbon] is AC that has
> been supplemented with chemicals to improve its Hg removal.
> The Hg in the flue gas reacts with the chemical that is bound to
> the AC, and the resulting compound is removed by the PM
> [(particulate matter)] control device. Typical impregnants for AC
> are Cl, sulfur, and iodide. Chemically-impregnated AC have
> shown enhanced Hg removal over regular AC. Chemically-
> impregnated AC require smaller rates of carbon injection than
> does regular AC for equivalent Hg removals. The required
> carbon-to-mercury mass ratio may be reduced by a factor of from
> 3 to 10 with the chemically-impregnated AC. The cost per mass
> unit of impregnated AC may, however, be significantly greater
> than that of unmodified AC.[201]

153.    As reflected in the EPA proposed rules, researchers had earlier

recognized the benefits of promoting activated carbon with halogens and sulfur in

terms of mercury removal:

> Activated carbons are the most studied mercury sorbents.
> Activated carbons have some serious drawbacks, including high
> cost, poor utilization/selectivity for mercury, and limited
> regenerability.  Activated carbons are often promoted with
> halogens or sulfur to improve their ability to sorb elemental
> mercury.  This improvement comes at a price; promoted

---

[200]  Ex. 1009 (EPA-Proposal) at 4676.

[201]  Ex. 1009 (EPA-Proposal) at 4676.

*Declaration of Dr. Stephen Niksa*                    NRG ET AL. EXHIBIT 1002,

activated carbons are three times more costly than unpromoted carbons.[202]

As such, it was known long before the earliest filing date of the Challenged Patent that promoting activated carbon with halogens, such as chlorine or iodine, were beneficial but with attendant costs. "In order for a sorbent to attain wide usage for mercury removal from flue gas, it must be highly active, selective, and cost effective."[203] Accordingly, researchers sought, and successfully demonstrated, more economic methods for promoting the activated carbon.

154.   Once the superior performance of PACs with appreciable chlorine was demonstrated, a person of skill in the art would have realized that other halogens would exhibit the same or, hopefully, an even greater advantage.  In contrast to fluorine and astatine, a person of skill in the art had good reasons to expect that Hg-control efficiencies using bromine (Br) and iodine (I) were at least as good as chlorine's in activated-carbon applications.   Indeed, as reflected by the EPA proposed rules discussed above, the EPA had recognized the benefits of both chlorine and iodine when used with activated carbon, and bromine sits between the two in the same group in the periodic table.  A person of skill in the art would have further understood the applicability of bromine, because untreated PACs are known

---

[202]  Ex. 1038 (Granite) at 32.

[203]  Ex. 1038 (Granite) at 6.

to be basic in their chemical character, whereas the halides of Cl, Br, and I were often referred to in the utility industry as "acid gases."  A person of skill in the art, and anyone with a rudimentary understanding of chemistry, would have known that acids have a strong affinity for bases, and quickly surmise that Br and I would readily bind with PAC, because Cl and PAC behave like any combination of acids and bases.

155.    Moreover, a person of skill in the art would have known that, like any carbon, PACs are not homogeneous materials whose reactivities are determined by a single configuration of atoms on the surface.  Rather, it was known that their most reactive "sites" are the atoms at the edges and in defects on large sheets of atoms that constitute the bulk of PAC structure.  The edge sites contain unpaired electrons that impart the basic character (i.e., ability to donate electrons and thus act as Lewis bases) to PAC and have the strongest affinity for protons when acid gases contact the carbon.  A person of skill in the art would have considered bond-dissociation energy as a relevant molecular characteristic when evaluating halogens for Hg control with activated-carbon injection.  It was known that the dissociation energies are 428 kJ/mol for HCl, 363 for HBr, and 294 for HI.[204]  Based on these values a POSITA would expect Br and I to have an even greater affinity for PAC than Cl, because it takes less energy to form the ions of Br and I than those of Cl.

---

[204]  Ex. 1041 (Greenwood) at 804.

156.   In addition to the reaction between acid gases and activated carbon, a person of skill in the art would have known that mercury-bromide compounds stick more effectively to activated carbon than mercury-chloride compounds, and thus are more effectively removed.  "Mercury bromide $HgBr_2$ adsorbs more strongly to dry sorbents than mercury chloride $HgCl_2$."[205]

157.   For these reasons, a person of skill in the art would have known, and would have been motivated to try, other forms of halogens for mercury removal, beyond chlorine.  Such a person would have known that binding Br and I to activated carbon has the potential to improve Hg capture efficiencies in activated-carbon injection applications, and that the same process used to make chlorinated activated carbon would have likely worked with Br and I in gas mixtures.  Several researchers prior to the earliest filing date of the Challenged Patent had tried both chlorine and bromine, and found bromine to be more effective.

158.   By 2003, Vosteen Consulting GmbH had also conducted "experiments to demonstrate the effect of bromine on mercury removal in a coal-fired power station of Bayer AG in Uerdingen."[206]  In particular, "an experiment was carried out with addition of aqueous $HgCl_2$ solution and aqueous NaBr solution into the

---

[205]  Ex. 1008 (Vosteen) at 5:36-39.

[206]  Ex. 1008 (Vosteen) at 10:64-66.

*Declaration of Dr. Stephen Niksa*                    NRG ET AL. EXHIBIT 1002,
                                                       Page 123

combustion chamber to demonstrate the effect of bromine on Hg oxidation."[207]  The results of these experiments are shown in Figures 7 and 8 of Vosteen.[208]

159.  In addition to Vosteen, other prior-art researchers had succeeded in providing methods for a more cost-effective, activated carbon for mercury removal. Other researchers filed patent applications and published articles for using bromine-containing promoters to improve the effectiveness of activated carbon in capturing both elemental and oxidized mercury.[209]  Nelson recognized in a patent dating back to at least May 2003 that chlorinated PAC improved mercury capture, as compared to untreated PAC, but that brominated PAC improved mercury capture even more.[210] Nelson provided his results in Figure 14, annotated below, showing sorbent injection with differing amounts of halogens added.

---

[207]  Ex. 1008 (Vosteen) at 10:67-11:3.

[208]  Ex. 1008 (Vosteen) at 10:64-12:14, Figure 7, Figure 8.

[209]  Ex. 1006 (Downs-Boiler); Ex. 1008 (Vosteen); Ex. 1010 (Sjostrom); Ex. 1011 (Eckberg); Ex. 1012 (Nelson); Ex. 1015 (Downs-Halogenation); Ex. 1036 (Lissianski).

[210]  Ex. 1012 (Nelson) at Figure 14 (annotated).



In the annotated figure, points with a similar halogen loading are colored the same. Nelson provided data for a sorbent injection rate of approximately 5.8 pounds per million actual cubic feet (lb/MMacf), indicated by the vertical dashed black line. Nelson indicated that at this sorbent injection rate, untreated activated carbon ("Plain Norit FGD PAC") was able to remove less than 40% mercury. In contrast, adding 13 wt% chlorine via $Cl_2$ to the activated carbon (indicated by the $\Delta$ on the graph) was able to remove close to 60% mercury. Nelson was able to achieve mercury removal greater than 70% at the same activated-carbon sorbent injection rate by applying bromine ($Br_2$) gas. Nelson achieved: 75% mercury removal by loading the

*Declaration of Dr. Stephen Niksa*

activated carbon with 1.5 wt% bromine (indicated by the ■); approximately 92% mercury removal by loading the activated carbon with 5 wt% bromine (indicated by the ♦); and near 100% mercury removal by loading the activated carbon with 15 wt % bromine (indicated by the ▲).[211]  When using hydrogen bromide (HBr) gas to load the activated carbon with 10 wt% bromine (indicated by the ●), Nelson achieved approximately 85% mercury removal with a lower sorbent injection rate of 3.7 lb/MMacf.

160.  Accordingly, Nelson and other researchers had recognized the desirability of adding bromine to activated carbon for purposes of mercury removal and various processes to accomplish the bromine promotion.  Researchers had also figured out, and filed patents on, multiple other ways to promote the activated carbon with bromine, including by:

- providing a bromine-containing promoter separately from the activated carbon directly into the mercury-containing flue gas, as in Lissianski;[212]

- injecting activated carbon directly into the flue gas, and adding a bromine-containing promoter into either the combustion chamber and/or onto the coal, as in Vosteen[213] or Downs-Boiler.[214]

---

[211]  Ex. 1012 (Nelson) at Figure 14, 8:35-53.

[212]  Ex. 1036 (Lissianski).

[213]  Ex. 1008 (Vosteen).

[214]  Ex. 1006 (Downs-Boiler).

*Declaration of Dr. Stephen Niksa*

# EXHIBIT 54

# STEPHEN NIKSA, Ph. D.

P.O. Box 60892, Palo Alto, California 94306
Phone: (650) 631-1277      Fax: (650) 654-3179
e-mail: neasteve@gmail.com
website: niksaenergy.com
_____

## EDUCATION

B. S. in Chemical Engineering, Case Western Reserve University, Summa cum Laude, 1975
Ph. D. in Chemical Engineering, Princeton University, 1982
Business Practices for Japanese Clients, SRI International, 1995

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 7/97 – Present | Niksa Energy Associates LLC, Founder and President |
| 9/92 – 7/97 | SRI International, Program Manager of the Energy Group |
| 9/85 - 9/92 | Stanford University, Assistant Professor of Mechanical Engineering |
| 1/82 - 9/85 | Sandia National Laboratories, Livermore, Member of Technical Staff in the Combustion Research Facility |
| 3/80 - 12/81 | Princeton University, Research Associate in the Department of Chemical Engineering |

## HONORS

Who's Who in the World, 21st Edition, 2003
Who's Who in America, 49th Edition, 1995
Who's Who in Science and Engineering, 2nd Edition, 1993 through 6th Edition, 2002
Sigma Xi, 1989
Carl F. Prutton Prize in Applied Chemistry (CWRU Commencement)
C. Reinberger Merit Scholarship, 1975
American Chemical Society Student Prize, 1975

## PROFESSIONAL SOCIETIES

The Combustion Institute
American Institute of Chemical Engineers
American Chemical Society
American Society of Mechanical Engineers
Air & Waste Management Association

## LEGAL ACTIVITIES

Awarded US Patent No. 7,288,233 with Breen Energy Solutions, "Dry Adsorption of Oxidized Hg in Flue Gas"; Developed two other patent applications
Expert witness in two cases of patent infringement and in one case on a product warranty; deposed.

● Page 2                                                                October 4, 2019

## RESEARCH INTERESTS

Dr. Niksa is recognized throughout the world as the author of over 245 technical papers on the mechanisms of air pollutant formation and control, including about 100 in the archival literature; monographs entitled "*Coal Combustion Modelling*" and "*Fundamentals of Coal Combustion*" published by IEA Coal Research; a book entitled, "*Process Chemistry of Coal Utilization: Impacts of Coal Quality and Operating Conditions*" published by Elsevier, and a book chapter entitled, "Predicting Hg Emissions Rates With Device-Level Models and Reaction Mechanisms." One long-standing interest has been the release of $NO_x$, particulates, and polynuclear aromatic compounds during pulverized fuel combustion. His reaction mechanisms for coal devolatilization, called FLASHCHAIN®, spawned a predictive capability for $NO_x$ and LOI emissions from full-scale, coal-fired utility boilers now available at over 80 American utility companies. Another package called PC Coal Lab® is used to assign fuel conversion kinetics by about four dozen utility OEMs in the USA, Canada, Japan, Korea, Taiwan, China, UK, Europe, South Africa, and India. Custom software applications based on PC Coal Lab® are used at utility OEMs in the USA and Japan. Dr. Niksa's second main interest has been transformations in combustors of minerals, alkali compounds, and trace metals. He formulated the most comprehensive mechanism to predict Hg and Se emissions from coal-fired gas cleaning systems, and developed into a commercial software package called MercuRator™ installed at six American and Japanese utility services companies. A second Hg emissions predictor called the iPOG™ is distributed worldwide by the United Nations Environment Programme. He has also developed packages to predict alkali vapor emissions from pressurized fluidized bed combustors, and corrosion potentials due to alkali chlorides in slags. A third interest has been catalyst deactivation during hydrothermal treatment of residual petroleum fractions, and during flue gas cleaning in utility SCRs. A fourth has been catalysis for combustion, including predictive mechanisms for multipollutant ($NO_x$, $SO_2$, $Hg^0$) conversion across SCR catalysts, the thermal and chemical behavior of catalytic converters, and thermal shock issues in catalytic combustors for natural gas.

## BUSINESS DEVELOPMENT

Dr. Niksa is President and founder of Niksa Energy Associates LLC. This $500,000 per year consulting and software business serves major technology developers in the U.S. and Japan. At SRI International, Dr. Niksa created a $500,000 per year business based on R&D testing on pyrolysis and combustion of fossil fuels, fuel-nitrogen conversion, pollutant formation, gasification mechanisms, alkali transformations, ionization intensities, and thermal shock. He also directed a $200,000 per year business based on software products for the coal-burning utilities, and negotiated royalty-bearing license agreements. He was the manager of the Energy Group in the Chemistry and Chemical Engineering Laboratory, responsible for staffing decisions and evaluations. At Stanford he oversaw a group of 15 graduate students in mechanical engr., including 5 who finished with Ph.D.'s and 2 with Engineer's Degrees.

## TEACHING AND COMMUNICATIONS

Dr. Niksa has been invited to lecture to most major American university programs in fuels, energy, and combustion, and regularly reports his research findings at major technical conferences around the world. While a member of Stanford's Mechanical Engineering Department, he taught graduate courses in Radiation Heat Transfer; Combustion and Pollution; Physical Gas Dynamics; Introduction to Heat Transfer; Advanced Combustion; Analysis and Solution of Partial Differential Equations; Spectroscopy Lab, FTIR Section.

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 25, 2023, upon the following in the manner indicated:

James M. Lennon, Esquire                                    *VIA ELECTRONIC MAIL*
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE  19806
*Attorneys for Plaintiffs*

Bradley W. Caldwell, Esquire                                *VIA ELECTRONIC MAIL*
Jason D. Cassady, Esquire
John Austin Curry, Esquire
Justin T. Nemunaitis, Esquire
Adrienne R. Dellinger, Esquire
Daniel R. Pearson, Esquire
CALDWELL CASSADY CURRY PC
2121 North Pearl Street, Suite 1200
Dallas, TX  75201
*Attorneys for Plaintiffs*


                                        */s/ Brian P. Egan*
                                        _____
                                        Brian P. Egan (#6227)