IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE


MIDWEST ENERGY EMISSIONS CORP.,)
et al.,                        )
                               )
-------------------Plaintiff,  )
                               )Case No.
        vs.                    )19-CV-1334-CJB
                               )
ARTHUR J. GALLAGHER & CO., et  )
al.,                           )
                               )
-------------------Defendant.  )


TRANSCRIPT OF PRETRIAL CONFERENCE


PRETRIAL CONFERENCE had before the

Honorable Christopher J. Burke, U.S.M.J., in

Courtroom 2A on the 1st of November, 2023.


APPEARANCES

DEVLIN LAW FIRM
     BY:  PETER MAZUR, ESQ.

              -and-

CALDWELL CASSADY & CURRY
     BY:  BRAD CALDWELL, ESQ.
          JUSTIN NEMUNAITIS, ESQ.
          ADRIENNE DELLINGER, ESQ.
          AYESHA HALEY, ESQ.

                    Counsel for Plaintiff

(Appearances continued.)


          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
               BY:  BRIAN EGAN, ESQ.
                    ANTHONY RAUCCI, ESQ.


                         -and-

          GIBSON DUNN & CRUTCHER
               BY:  PAUL KREMER, ESQ.
                    RICHARD MARK, ESQ.
                    JOSEPH EVALL, ESQ.


                         -and-

          WINSTON & STRAWN LLP
               BY:  GEORGE LOMBARDI, ESQ.


                              Counsel for AJG and
                              DTE Defendants


          MORRIS JAMES LLP
               BY:  KENNETH DORSNEY, ESQ.


                         -and-

          BRADLY ARANT BOULT CUMMINGS LLP
               BY:  PAUL SYKES, ESQ.


                              Counsel for CERT
                              Defendants


          SKADDEN ARPS SLATE MEAGHER & FLOM LLP
               BY:  NICOLE DISALVO, ESQ.
                    DOUGLAS NEMEC, ESQ.


                              Counsel for Alistar

THE COURT:  All right.  Let's go on the record, and let me just say a few things for the record here this morning.

And the first is that we're here today in the matter of *Midwest Energy Emissions Corp., et al., versus Arthur J. Gallagher, et al.* It's Civil Action Number 19-1334-CJB here in our court, and we're here this morning for the pretrial conference in the case.  Before we go further, let's have counsel for each side identify themselves for the record.  We'll start first with counsel for the plaintiffs' side, and we'll begin there with Delaware counsel

MR. MAZUR:  Good morning, Your Honor.  Peter Mazur from the Devlin law firm for Midwest Energy Emission.  I have with me today four attorneys from Caldwell, Cassady, and Curry, Justin Nemunaitis, Adrienne Dellinger, Brad Caldwell, and Ayesha Haley.  And also with us in the gallery is the CEO of Midwest Energy, Rick MacPherson.

THE COURT:  Thank you, and welcome.

Let's do the same for Defendants' side, and we'll begin with the CERT defendants, and

there we'll given with Delaware counsel.

MR. DORSNEY:  Good morning, Your Honor.  On behalf of the CERT defendants, Ken Dorsney from Morris James, and with me I have Paul Sykes from Bradly, Arant, Boult, and Cummings.

THE COURT:  Welcome.  Thank you.

Let's have counsel for the AJGRC and DTERC defendants, beginning with Delaware counsel.

MR. EGAN:  Good morning, Your Honor. Brian Egan from Morris Nichols on behalf of the AJCRC defendants as well as the DTERC defendants.  Joining me at counsel table are Paul Kremer and Richard Mark from Gibson Dunn. We also have Goerge Lombardi from Winston and Strawn and Joe Evall from Gibson and Dunn, and my colleague Anthony Raucci is in the gallery.

THE COURT:  Thank you.  And we will do the same for the Alistar defendant, beginning there with Delaware counsel.

MS. DISALVO:  Good morning, Your Honor.  I'm Nicole DiSalvo from Skadden Arps, and with me is Doug Nemec, also from Skadden Arps, and we are representing Alistar.

THE COURT:  Thank you.  Good morning.

All right, counsel.  So I appreciate the parties' pretrial order.  I spent some time going through it.  Here's what I thought we would try to do, just kind of conceptually today, and try to get accomplished.  I thought I could talk, first, about just some basic kind of logistical issues that I think would be helpful to go over in terms of the mechanics of getting from here to trial.  And if there's any thoughts or questions from the parties about them, we can talk about them.

And then I thought we would just kind of go through the areas where there remain disputes that were raised in the pretrial order and get counsels' thoughts on the reasons behind those disputes to indicate decisions I need to make.

And then maybe lastly to put off until the end the motions in limine, and I'll hear brief argument from the parties on those motions in limine, kind of targeted, focused argument on them.

Does that make sense?  Okay.  Good.

So just a couple of introductory issues,

nuts-and-bolts logistics about the trial. Trial is going to be here in Courtroom 2A.  I'm planning to -- being it's November 13th, I'm planning to -- the first day of trial, beginning with jury selection, we'll begin at 9:30 as we typically do, and each subsequent day we'll begin at 9:00.

Now, I think in an effort to try to get as much as we can into the trial days, although in the past and I know some judges normally stop at 4:30, my plan will be to have trial from 9:00 to 5:00 on those days to allow us to get in an extra half hour at least of trial time per day.  The first day starts at 9:30. We'll go to 5:00, and each subsequent day, the plan will be to have trial from 9:00 to 5:00.

We'll take a half-hour lunch break, and the jurors will have lunch provided.  I'm going to ask the parties to provide lunch, pay for lunch for the jurors.  And our chambers may -- we'll be asking you to deal with some of the logistics regarding that, so we'll reach out to you about that.  That will allow us, again, to be kind of focused and keep things moving.

I'll also plan to take, as is typical, a

short break in the morning and short break in the afternoon, roughly about 15 minutes or so per break.

And so I think this could allow for up to a maximum of seven hours of trial time per full day, but, of course, that will depend on other logistical issues, et cetera.

Okay. I saw the parties provided me with proposed voir dire and preliminary instructions. There were some disputes in there, I noted. From what I saw, that's something it looks like I'll be able to review and produce kind of a final presumptive voir dire and preliminary jury instructions document, and I'll intend to docket that at some point before trial. I don't need any further argument on that.

Let me just talk about -- a little bit about -- this will apply to day one. We're going to have jury selection, and I will go about the voir dire process. I think this will be -- for those of you who had trials here in the court recently, I don't think this will be too unfamiliar. What will happen, basically, is that when the jury arrives on that Monday,

they will -- before they come to the courtroom they will be randomized and each be given a randomized number, one through whatever.  And there will be a form, a sheet, that will be printed out that will be given to the parties.  I think I might -- I don't know if you can see this, but it will be a sheet, basically, that goes from one to whatever with the juror's name and information that will be provided to the parties.

When we come in, the jurors will be lined up in the back of the courtroom in that numerical order, so that will be 1, 2, 3, 4, et cetera.  And then I'll read the voir dire, including the questions that I've determined that should be asked of the parties.  You all provided proposed questions.  And then the -- we'll actually provide -- and again, we'll be asking for your help logistically on this.  My chambers will reach out to you.  We'll provide the copies of the voir dire questions to the jurors so they'll have them and pens so they'll have them.  And then we'll be asking them as they go along to circle the number of a question if they have a yes answer to keep

track of what it is.

Then once the voir dire is asked and the jurors indicated where they have yes answers, basically, what we'll do from there is say, for example, Juror 1 has no yes answers to the questions. There's not going to be further voir dire of the juror. They'll stay seated there.

Let's say Juror Number 2 does have answers to the questions. We'll have the juror come back to my jury room and representatives from the sides back there as well, and we'll go through the standard, traditional voir dire process from there, leading up to a request from the parties to let me know if somebody is going to be striking the juror for cause. I'll make a determination about whether the person is struck for cause or not. If they're not, that juror is still in our presumptive first 14 spots.

And essentially, we'll go through that process until we -- starting with Juror Number 1 and going down the line until we have 14 jurors who are -- either there were no yes answers or they weren't struck for cause. When

we have that, those folks will be brought forward, and they'll be seated in the jury box area, and then the parties will be able to use their peremptory strikes, three per side, and we'll go back and forth, one for Plaintiff, one for Defendants' side, until those are finished.

And assuming that all six are used, then our courtroom deputy will let those jurors know that were amongst the six.  They can go back to the book.  We'll have our eight jurors.  We'll swear them in.  We'll excuse the remainder, take a break, and then we go forward with the beginning of trial after that with preliminary jury instructions and statements and so on.

That's the voir dire process.

Okay.  Let's see.  I saw the parties also provided me with proposed final instructions and verdict form.  What I plan to do is to address those with you during trial at prayer conference, figure out what day makes sense for that in terms of the trial days, and I will likely ask you to submit a new version of those injury instructions and verdict forms either just before the trial or right near the end just in case there's changes between now and

then, to the extent there are.

A couple of logistical things in terms of document preferences.  It's helpful for me if on direct if there's a binder of exhibits that you plan to use with the witness that you provide two copies, one for me and the clerk. If you have a binder for cross and you can hand it up, that's great.  Bottom line is it's easier for me if I have a copy of the exhibits that may get used with the particular witness, and so I ask you to do that, certainly for direct.

To the extent we're having testimony from experts, it's helpful if you can provide me with a binder that has expert reports in them, at least.  If you think there's also likely to be relevant deposition testimony, you can include that, but certainly expert reports will be helpful for that.

Okay.  Let me also say a couple things about just kind of the way I typically do exhibits and what I plan to do here or handle the introduction of exhibits.  The parties, per the pretrial order, are going to provide me with the final proposed exhibit lists with the

AO form 187 prior to trial.  I ask that you do that by no later than November 9th, so that's the Thursday before trial, so we know what the lists of exhibits are at that time.

And then during trial, what I would do is I want you to formally move in any exhibit that you want to be in evidence, and I want you to -- and any such exhibit that is going to be used with a live witness, I want you to at least show the exhibit to the witness.  There may be no objections to the document coming in, ultimately, but I want the jury to be able to see that this is an exhibit that's been shown to a witness.  It's an exhibit, and it's been moved into evidence, and that's helpful for my staff as well so we have a record on the record that the exhibit has moved.  And ask if there's objection.  If there's not, it will be admitted.

I know we may -- we'll talk about this. You may be having testimony by deposition. What I would ask there -- and I know the parties agreed, which is fine, to the extent there are exhibits that are used in the deposition video, if there are, they can show

them.  That's fine with me.  Again, what I would ask, though, is that either before the deposition is played or after it's finished that someone say, "Your Honor, I want to move into evidence Exhibits blank, blank, and blank that were discussed during the deposition testimony."

And then no exhibit should get -- no exhibit used on direct should get shown to the jury until it's admitted.  So I just want to say those things about exhibits.

One other thing about exhibits generally and about the trial, the parties should assume, and I think it should be the working assumption, that any information that is discussed or utilized or is a part of this trial is going to be public.  It's going to be publicly shared.  To the extent it's relevant and pertinent to the ultimate determination here, there's a presumption of public access for trials such as these, so the parties should go in thinking everything used here is going to be publicly available.

There are some judges in our court who say there's no -- there's zero chance,

zero percent chance, that any portion of the trial, the courtroom will be sealed.  I won't go that far, but I'll say that my walking-in presumption is nothing is going to be sealed. To the extent that one side or the other want to use some targeted, focused, or limited portion of the evidence that must be kept confidential, the courtroom must be sealed, I will just say a couple things about that.

One is you should make every effort not to do that.  First of all, there may be ways in which -- say there's a document that may have some information that could fit that bill, but it's already in evidence, and it's showing to the jury maybe -- there may be ways in which -- and I'm not sure, to be honest with you, if the jury themselves are going to have -- I don't know that they will have individual monitors. I'll have to check that out.  I'm not positive. We don't typically have them in this courtroom. That is all up on the big screen.  My point is there may be ways in which to make reference to material like that that doesn't involve speaking about it publicly, so I'd ask you to make that effort.

If that doesn't work and there's still -- again, this is not the presumption.  I'm assuming it's not going to happen, but if there's still some targeted piece of information that the parties think has to be kept confidential, I'd say we need advance notice of that, in part because if the courtroom is going to be sealed, we need a CSO in the courtroom.  There isn't always for civil actions.

And it goes without saying, every effort should be made to ensure that whatever portion is requested to be sealed should be as cabined and together as possible.  Put differently, it doesn't make sense to be saying we'll seal the courtroom for this time where we only talk about a confidential piece of information for one minute and then open it again and then seal it again seven minutes later, et cetera.

Again, my hope is this is all academic because this is not going to come to pass, but to the extent one side or the other thinks it fits this bill, we need to follow the rules.

Those are a bunch of logistical issues or preferences.  Any questions about any of those

on the plaintiffs' side?

Yes.

MR. CALDWELL:  Your Honor, Brad Caldwell.  Couple of quick --

THE COURT:  And I should say unless we're hearing argument about motions or disputed issues, it's fine to stand at counsel table as Mr. Caldwell is doing.

Okay, Mr. Caldwell.

MR. CALDWELL:  Couple of quick questions.  I'll probably put on the first witness.  I didn't want to mess it up or embarrass myself if at all possible.  Are you thinking we maybe present the exhibit to a witness, they have it in a binder, look at it, and then at the time we want to publish it, we move for its admission at that time, or are you envisioning -- sometimes what happens is the next morning, people put on the record here's what was used the day before.  I want to make sure we do it the way you envision as ideal.

THE COURT:  I'm contemplating that you move it into evidence before it's published.

MR. CALDWELL:  Sounds good.

The other question I have is -- because I think you said, obviously, I'm paraphrasing, we shouldn't show it until something is admitted. What about at opening?  Is that something where we need to, basically, at least, resolve conceptual objections beforehand with you?

THE COURT:  I think the parties worked that out in the pretrial order.  I think they agreed that -- there's a process, I know, by which, to the extent there are objections about what is in the demonstratives that the folks want to use in opening, that gets spun up, and to the extent that gets resolved, I could resolve it.  We know at the opening what the sides are going to use, so the parties will leave it there.  That's fine.

MR. CALDWELL:  That's what I'm trying to make sure.  It wouldn't be formally admitted at the time.  I wanted to make sure I wasn't going the get in trouble for that.

THE COURT:  No worries.

Mr. Kremer, any questions?

MR. KREMER:  That's all fine.

MR. EGAN:  Brian Egan.

First, with respect to the first day of

trial, I think we would think there might be objections with regard to slides and whatnot. Would it make sense to actually start at 9:00 with the parties and then jury selection start at 9:30.

THE COURT:  Yes.  So the jury selection process will start at 9:30.

I forgot to say.  Let me say a little more about what I was planning in terms of the typical days because this gets to objections. Myself and my law clerk, we'll plan to be here and be available to the parties by 8:15 every day, including the first day of trial.

Now, look, I'm saying this.  I'd love it if we're not needed at 8:15 either, 8:30, whatever.  But the parties in the pretrial order have various processes that come from my pretrial orders that are meant to kind of like identify in advance whether there are any disputed issues about exhibits or designations or demonstratives or whatever.  And they'll know that sufficiently before the day in which we're talking about for trial.

So the way I would -- the way we would do this is -- you'll have to ask my law clerk --

if the parties would let us know the night before if there a need for us to be there to resolve disputes prior to that day, and if so, when?  How much time do the parties think they'll need?  Do we need to start at 8:15 or is it a discrete dispute that will take 15 minutes?  Whatever it is, we'll prepare to be there in advance, including prior to the first day of trial if needed.

The other thing I would say is although I think almost all of our judges -- and we'll talk about charging for time when we go through the pretrial order where there's areas that the parties asked to talk about.  But almost all of our judges would charge the parties for that time used to discuss issues or objections related to exhibits or documents.  I won't do that with regard to the disputes that are raised in the morning.

Now, I'm saying that.  I'm asking you -- don't -- I'm asking you not to use that as an invitation, we've got just free time.  I think for lots of reasons it would be very good if the sides could be focused on the issues in which they really need to object.  Is this

document, does it really require us to have argument about its admission, et cetera?

But in any event, to the extent there are issues and to the extent I need to resolve them, we'll resolve as many as we can in that time period, 8:15 or a few minutes before 9:00. For the first day, we'll go a little later. And I won't charge the parties for that time. Essentially, it should give the parties, if much of that time is used, some of it is used, an additional hour or two of trial time back that they otherwise would get charged by all the judges here. I do that in part because I want to conserve as much of the time as I allowed for the parties to make their arguments at trial.

So that's the way we would handle disputes. And that said, if we can't resolve all the disputes by a few minutes before 9:00, I'm not going to keep the jury waiting until 9:30 or 10:15. We're going to proceed forward, and any disputes that might be relevant will have to be raised during trial, and if they are if there are objections, the losing side will be charged for time. Or to the extent it's not

clear who is the winner or loser or somebody lost half, one half, I'll make a decision about how the time should charged.

Mr. Egan, is that helpful?

MR. EGAN:  That was.

With respect to voir dire, we're dealing with a lot of parties here.  How many representatives can the parties send back to your chambers when you're following up with questions with the jurors?

THE COURT:  We've got limited -- we've got the jury room, but it's pretty limited in terms of space.  So just as a practical matter, we have the plaintiffs here, and we have, essentially -- the way counsel is structured, it's essentially three sets of attorneys, so I think we could fit, like, two people per set of parties.  So unless there's any issue with that, why don't we plan that that's what we'll do, and that will give us a full table with the court reporter back there and my staff as well.

Does that make sense?

MR. EGAN:  Yes.

MR. DORSNEY:  Briefly, and I could

join the questions.  Do you have a process in mind for how you'd like to deal with impeachment and scope of expert testimony and how you'll divide the time to deal with those issues?

THE COURT:  Sure.  One would hope you'd not have too many of those disputes, but I know you will.  For disputes about beyond the scope, what we'll do is if there are such disputes and they arise during trial, my plan would be to go to sidebar with counsel, and the court reporter will come over.  I'll hear the argument.  To the extent I need to take a look at the relevant portion of the expert's report, I will.  I'll make a decision, and then I'll charge the time to the losing side or, again, in the rare instance maybe where it's not clear that there is only one loser, I'll make a determination of how to charge that time.

Again, just for trial flow, it would be better if there weren't a hundred of these.  I don't think a side is incentivized to have them.  I know it's a problem.  That's what I plan to do there.

For impeachment, there's never a great

way to do it.  For that, I say right now I don't have anything specific in mind.  Let me think about it, and to the extent I have anything to share, I will do so before trial.

Yes, Mr. Nemunaitis.

MR. NEMUNAITIS:  Justin Nemunaitis.

I believe there's a standing order or some portion of the form order about the Court receiving copies of all exhibits that are currently on the exhibit list.  I'm wondering if Your Honor wants those copies or if you want us to bring in the exhibits in the direct binders and cross binders on the day of.

THE COURT:  Just sitting here right now, the way I do it is I don't think there's a need right now for you to provide all X number of exhibits to me in person.  For now, I'm presuming that the materials I'll be given are the ones that relate to those binders that I mentioned earlier, that otherwise we'll be keeping track of the exhibits that get admitted, and that at some later point, when we have kind of our list of admitted exhibits, the parties will be required to provide kind of that full list to the Court.  Does that make

sense?

MR. NEMUNAITIS:  Yes, absolutely. Thank you.

MR. DORSNEY:  Just to follow that up, when we hand in the AO form on November 7th, would you like a flash drive of the exhibits? We've done that in the past.

THE COURT:  That would work.  That would be great.  That way we can do both of the things.

MR. DORSNEY:  We can give you the hard ones that are admitted.

THE COURT:  Okay.  One other thing I wanted to ask you about, if you have thoughts about this, for logistics.  So trial starting November 13th.  Each side has 15 hours.  We talked about how the trial days would be structured.  It's theoretically possible that 30 hours of trial time could be used by end of Friday.  Maybe unlikely, but possible.  Or likely if not then, by Monday.

And so it's likely, very likely, I think, the jury will be deliberating on Monday and Tuesday.  And Wednesday, November 22nd, is the day before Thanksgiving.  And I guess my

question to the parties is, have you thought about that?  And does anybody have a view about whether that, too, will be a presumptive trial day if needed, presumably if deliberations were to go very very long?  Anybody have any thoughts about that?

MR. KREMER:  Your Honor, Paul Kremer for the defendants.  We don't see any reason why we should foreclose the possibility.  I think everyone here is in agreement that we'll do all that can be done and get all the evidence in as quickly as possible with the Court's rules, but at this point, it's certainly a distinct possibility that the jury is deliberating and we're wrapping things up on that day.

THE COURT:  Mr. Caldwell.

MR. CALDWELL:  Thank you, Your Honor. I think on behalf of the plaintiffs, we agree.  If the parties are streamlined in their objections and we're not delaying trial days as a result and we're moving efficiently, it probably won't be an issue.  But if it comes down to there's some bit of deliberations left, I think our position is like Mr. Kremer.  We'd

like to get it wrapped up.

THE COURT:  I'll take that into advisement.  I want the jury to know, the presumptive jury, when they come into voir dire what they're expecting.

MR. KREMER:  Just as a housekeeping matter, Your Honor, there are preliminary instructions on file that originally contemplated a smaller amount of trial time, prior to our motion in October, so we would recommend that obviously be revised to reflect whatever Your Honor decides to do in terms of telling the jury what they should expect.

THE COURT:  You mean the ones that are part of the pretrial order?

MR. KREMER:  I believe that they weren't updated to reflect that issue because I think probably because it was not quite resolved what we were going to tell the jury, but we would recommend that the Court advise the jury that Wednesday is likely a day for trial.

THE COURT:  I'll have to see exactly what language I used, but at a minimum, I wanted to know the answer to that so I can tell

Just stuff I have that don't involve stuff that was disputed as part of the pretrial order.  I looked it over this morning and read some of those disputes, but I did at least want to talk about the disputes that remain in there and give the parties, if there's more to be said about them, to get their thoughts.  And then, as I said, at the end, I can hear brief argument on the motions in limine as well, if that makes sense.

So just looking at the pretrial order, I think the next live disputes start at paragraphs 18 and 19, and this relates to the parties' witness lists, and there are a couple disputes.  Maybe understanding what the disputes are would be helpful here.  The thing I wasn't sure -- my proposed pretrial order asked the parties to provide me here are the witnesses we're expecting to be called live and here are the witnesses we're expecting will be called by deposition.  It seemed like the parties didn't do that.  They just listed a

bunch of witnesses under the "will call" or "may call" rubric, so I was confused.  Are there witnesses that each side is planning, as of right now, to call by deposition versus live, or what's going on with these?

I did see, by the way, Defendants provided a revised proposed witness list, which I have.

So again, I think maybe for these, you can stay at counsel table.  When we do argument on -- and you can be seated.  Although I'm -- I can see you.  It's okay.

So can you help me about about what is going on here with these exhibit lists?

MS. DELLINGER:  Certainly, Your Honor.  Adrienne Dellinger on behalf of the plaintiffs.

We understand the Court's model orders in the local rules require an identification of witnesses and whether those witnesses will be live at trial or will be presented by deposition.  The way that the plaintiffs did that was identifying which witnesses it will call live as a "will call" witness and then listed the witnesses that it may call by

deposition as a "may call."  That was explained in our correspondence, and that was how that would be handled on the plaintiffs' side to comply with those requirements.

THE COURT:  Just to understand, I can understand "will call" to be expected to be called live, "may call" to be expected to be -- if needed, expected to be called by deposition.

MS. DELLINGER:  From the plaintiffs' perspective, yes, Your Honor, but I do believe we have a disagreement about that with Defendants.

THE COURT:  Mr. Kremer.

MR. KREMER:  Yes, Your Honor.

So our understanding of local rules and the Court's model orders that we need to disclose witnesses we will call live and witnesses that we may call live, so we separately exchanged deposition designations. From our perspective as the defendants, we don't have any confusion over what ME2C intends to do with deposition designations.  It's not clear to me that they're confused about what we intend to do.  Each side has exchanged deposition designations from several witnesses,

and our understanding is that some subset of these designations can be played at trial, subject to the two-day or one-day notice provision in the agreed order.  In terms of deposition designation, I don't think there is any confusion.

Turning to live witnesses, the parties did have --

THE COURT:  I guess on that, do you know right now there are certain witnesses we will call or may call that if we call them, it's going to be depositions, those folks are not going to be here live, or no?

MR. KREMER:  We have 16 "may call" witnesses.  Each of the individuals listed as a "may call" witness we do not currently intend to bring that person live, but we have reserved our right to do that.  We believe we have complied with local rules in reserving our right to do that.

However, of the 16 "may call" witnesses, we designated testimony from several of them. We indicated that we may play their deposition testimony at trial.  We believe that we've currently reserved our right to do that, and

the single most likely outcome is that we will put those witnesses on by video designation.

THE COURT:  And you may not put all of them on.  You may make choices, et cetera.

I guess there could be a dispute here about to the extent you want to put on a witness by deposition, there could be -- seemed like there might be a dispute here about whether is that witness unavailable under the rules?  Did the parties otherwise agree that's not an issue?  Is that what's happening?

MR. KREMER:  Your Honor if there is a dispute over that, this would be the first we heard of that.  We are not aware of any concern on Plaintiffs' side about these witnesses not qualifying for testimony from deposition designation.  We think that's allowed.  Based on the -- for certain witnesses they want to put on, we haven't objected on that basis for them.

I do have to defer to Ms. Dellinger.  If there's a dispute over designations, we'd like an opportunity to respond.

THE COURT:  Bottom line, from your perspective, the list you provided for your

witnesses, the way you understand it, is the "will call" witnesses are people you expect to call live.

MR. KREMER:  Currently expect to call.

THE COURT:  The "may call" witnesses are witnesses that to the extent that you decide to offer testimony from them, the current plan is to do so by way of video.

MR. KREMER:  But that we reserve our right to do so live, depending on how the evidence comes in.

THE COURT:  Thank you.

Ms. Dellinger, tell me, what are the disputes that you have?

MS. DELLINGER:  Thank you, Your Honor.

First, it was not until this moment which witnesses Defendants would call live or via deposition.  Up until now, Defendants have maintained that any individual on the "will call" list was someone they could call live or by designation.  If they the intend the call the nine witnesses that they have listed as their "will call" as will call live at trial,

that is what's required under the local rules.

And second, there is an issue with regard to deposition -- not necessarily the designations but calling witnesses via deposition and the requirement that those witnesses be unavailable.  It is in the parties' disputes in the pretrial order twice at least in Plaintiffs' arguments in that order that parties cannot call a witness by deposition unless -- their own party, rather, by deposition and their own witnesses without showing that that witness is first unavailable. So Plaintiffs do object to Defendants calling their own witnesses by deposition without first showing those witnesses to be unavailable.

THE COURT:  This is something the parties -- I find it difficult to believe this is really a dispute that I'm going to have to resolve.

MR. KREMER:  I think we can cut through it, Your Honor.  What I'm hearing Ms. Dellinger say is that we can't designate our own witnesses by designation unless we make a showing they're unavailable.  We have not designated party witnesses.

THE COURT:  All the folks on the "may call" list are not party witnesses?

MR. KREMER:  There are individuals who are under the control of Defendants on the "may call" list.  If we propose to put them on, we will make them available live.  We're not going to try to shortchange the jury the benefit of seeing a live witness when we control that witness.  The designations we made, all of the designations that we communicated to ME2C were people we don't control.  Third parties, their guys, et cetera.

THE COURT:  In other words, it seems like the distinction you're making is there are some folks on the "may call" list who are in the control of the defendants, party witnesses, essentially.  It's just that you're not sure you'll call them.  If you did call them, though, you'd call them live.  There wouldn't need to be a fight between you and the other side about whether they're available.

MR. KREMER:  Your Honor, at this moment, we can never predict the future, but my expectation is that anyone who worked for one of our clients that we wish to put on, we will

bring them here.

THE COURT:  And theoretically, the day before the person could have a heart attack or there could be a health issue, God forbid.

Ms. Dellinger, hearing that, is there a remaining dispute?

MS. DELLINGER:  No, Your Honor.  We agree with that the, and as long as the agreement is that if they're unavailable then we can play the own party witness deposition, that's exactly what we thought.

THE COURT:  I understand.  I think there aren't now any disputes that are unresolved with regard to paragraphs 18 and 19; is that right?

MS. DELLINGER:  I believe there was one additional issue that was raised, and that was with regard to to the calling of "may call" witnesses live at trial.  Plaintiffs proposed that you can only call a "may call" witness live at trial if there's a showing of good cause subject to the Federal Rules.  So Plaintiffs' position there was that there are 9 witnesses listed on the "will call" list and 16 "may call" witnesses.

Defendants -- our position is that Defendants should be required to show good cause to bring one of those "may call" witnesses live at trial.  And they list every witness that was deposed in this case cumulatively between their 9 "will calls" and 16 "may calls."

Defendants' position, on the other hand, would allow them to call any "may call" witness without prior notice and without any real reason for making that change, and that would be put Plaintiffs in a fundamentally unfair and prejudice them greatly to have to, with very little notice, maybe the night before, prepare to cross-examine or direct, if they were going to call somebody first.

THE COURT:  I think what we're disputing here, again, we talked about on the list of "may call" witnesses, there are party witnesses and nonparty witnesses.  The nonparty witnesses, I don't think there's any dispute that their depositions could be played.  We're talking about the folks on the "may call" list who are -- who the defendants are holding out the prospect that they could call them live

depending on what happens at the trial, whether they need to; is that right?

MS. DELLINGER:  Those witnesses or they could also call a third party on the list. So there are other witnesses that Defendants maintain that they could decide at the last minute to bring live to trial regardless of whether they are to be played by deposition.

THE COURT:  And your position is that they -- anybody who is -- if they want anybody to testify live who's not on the "will call" list, they have to show good cause before that happens?

MS. DELLINGER:  Yes, Your Honor.  The local rules -- and I know the Court is aware -- require the witnesses -- or the parties to make a good-faith effort to identify the witnesses they will bring live to trial.  The time for those disclosures is in August, according to the Court's ordered schedule.  If there is some unforeseen change, some good cause that requires bringing and extra witness to trial, absolutely understood.  That should be provided for.  However, the uncertainty of allowing an unlimited number of "may call" witnesses to be

able to be called live at trial with little to no notice for no reason seems unfair and prejudicial to plaintiffs.

THE COURT:  Mr. Kremer.

MR. KREMER:  Your Honor, there's been reference to the local rule on this.  We're not aware of a local rule requiring good cause on this.  The Federal Rules govern, and the better way to deal with this, in our view, is to take it as it comes.  If we call a witness and it's perceived that it's going to be entirely improper bolstering, the Federal Rules of Evidence and the Federal Rules of Civil Procedure allow the Court to cabin or prevent that testimony.  Adding a good cause standard to the threshold question of whether we can swear someone in is going to invite very uncomfortable sidebars in which me and my team and Ms. Dellinger and her team are going to fight about it, and it's a terrible situation for the Court, and it's going to waste time for everybody.

THE COURT:  I was wondering the same thing, and I guess it's been a while since I looked at the local rules on this issue, but I

don't remember a local rule that talks about good cause standards in this context.

Ms. Dellinger, what rule are you talking about?

MS. DELLINGER:  Your Honor, I was not referring to the local rule that requires good cause.  I'm so sorry if I gave the Court that impression.  I was referring to local Rule 16.3 subsection (c)(7) that related to the identification of witnesses through the pretrial order and requiring a good faith identification of the witnesses that will be called live.

Now, following up on what Mr. Kremer said, we do not believe that this will require additional intense sidebar conversations.  The issues in this case have been set.  There are expert reports that the experts must abide by.  There are issues submitted in the pretrial order.  There should not be surprises.  So the parties, in view of the issues that are before the Court in this case, were charged with identifying which witnesses it will bring live to trial, and if there are -- and the plaintiffs' position is just if there is --

that there must be a reason for amendment and for the parties to bring live a witness that, after considering all the issues and after seeing what was going to be presented at trial, that there was a need to provide an additional witness that was not already on a "will call" list.  So there must be a reason for that.

THE COURT:  Okay.  Anything further, Mr. Kremer?

MR. KREMER:  Your Honor, I would make two points of clarification.  It's actually a two-day lead time on disclosing witnesses.  In the scenario Ms. Dellinger is proposing, it's hard to say that there's surprise when they already know who the witnesses are that we may call.  They already know what they may say because they've been all been deposed, and they will have a two-day lead time at their disposal.

The other point, Your Honor, just to put fine example on this, none of the clients that are left in the case are power plant operators. There are five power plant operators who gave depositions in case.  They're going to be tried in absentia for direct infringement.  It is

very like that the way the evidence goes, they want to come and respond directly to what is an element of the claims against us.  We don't presently expect that to happen, but it's certainly possible.  And the difference between "will call" and "may call" is, in some sense, a difficult exercise.  We can't hang percentages on it.  We don't think we're required to, but what we certainly don't think can happen is we're bound to never call a "may call" witness unless it meets a good cause standard that's never been adjudicated in this context, and Your Honor shouldn't make it.  That's too dangerous.

THE COURT:  I think I get it.  So I'll --

MS. DELLINGER:  Briefly, I think Mr. Kremer's comment proves the point.  It seems like Defendants are anticipating bringing witnesses that they haven't identified as "will call," so there would only be the need for these additional side bars and argument if they hadn't been anticipating bringing those that are on the "may call" list.

THE COURT:  I'm sorry to interrupt.

I guess to Mr. Kremer's point, you have a list. You know the witnesses who have been deposed. You have a list of witnesses that are the universe of witnesses they could call live on the witness list. You get two days' of notice, as Mr. Kremer said, if they are intending to have a witness testify live who's not amongst the nine. How much surprise could there be?

MS. DELLINGER: Thank you, Your Honor. There are 25 witnesses. That's a lot of witnesses to prepare for and the 16 additional to prepare for that they could potentially call live before the trial. I also understand that these witnesses were deposed, but for fact witnesses and third-party witnesses, they're not cabined to their deposition, and their testimony certainly isn't either. We do believe there's a significant amount of potential surprise and having to prepare for the potential 16 additional witnesses.

THE COURT: Thanks. I'll take it under advisement. I want to go back and look at the local rule, but I'll make a list of the things that I need to get you decisions on, and

this will be one of them.

Okay.  Let's see.

Okay.  Next, I think we go to paragraph 23, which is the issue of should the plaintiff have to address in their case in chief issues that otherwise can be said to relate to validity, I think secondary considerations or certain evidence about written description or conception and reduction to practice.  And I think this is Defendants' request, so we'll turn to them first.

Mr. Egan, I mean, I think, look, in an ideal world, the parties would have agreed on this, which I think does happen.  To the extent it doesn't, probably the default is, you know, does this issue relate to an issue to which Plaintiffs have a burden?  If it doesn't, the default probably would be you wouldn't be required to do it in the case in chief until you put on your case for invalidity.  But I think you all think that under the circumstances here something should trump the default.  What's your argument on that?

MR. EGAN:  Thank you, Your Honor, and we certainly defer to the Court's preference or

Your Honor's preference on what are the proofs, and we understand from your standard form order that there is a default.  I think the issues here, given the complexities of the case, 15 hours per side, we have certain issues that are foreseeable from Plaintiffs' perspective, and we think that the two mains one are secondary considerations and priority date.

And to the extent that -- certainly, Plaintiffs are aware of our positions on validity.  They're aware a validity case is going to be tried.  To help streamline the case, it makes sense here to present secondary considerations with their primary expert, and we can address those as part of our case in chief on invalidity.  But the defense to doing so is that you don't have expert witnesses coming in and out of the courtroom getting put on the stand multiple times over when there's a very foreseeable situation, factual situation, that can be addressed.

THE COURT:  And streamlinewise, in terms of what talking about, you're talking about whether they're putting the evidence on in phase one or phase three; right?  And is it

the deal whether they would have to recall Mr. O'Keefe, put him on first in phase one and put him on again in phase three?  Is that the issue?  When you're talking about streamlining, what do you mean?

MR. EGAN:  It could be multiple witnesses.  Obviously, we would have experts.  You could also have fact witnesses.  A general example, oftentimes we see in patent cases the inventor or corporate representative talking about the commercial success of the invention in their case in chief.

THE COURT:  I know generally.  I meant do you have a particular view about how it's going to play out here?  Judge, the way we're talking about here is, the way it's looking, we might have X number of witnesses who might testify in Plaintiffs case in chief who we expect might well -- if they don't have to put on secondary considerations until phase three, the number of people.  That's what I'm asking.

MR. EGAN:  We would anticipate that it would be likely that they'd have to recall Pavlich and O'Keefe in terms of rebutting the

invalidity case.

THE COURT:  Okay.  Anything further on this?

MR. EGAN:  And then, obviously, our experts having to come back up after they present on --

THE COURT:  In phase four.  Okay. Let me ask Plaintiffs for their view.

MS. DELLINGER:  Thank you, Your Honor.  Yes, our view is that Plaintiff may but is not required to present evidence regarding issues that may be considered rebuttal in nature in its case in chief.

THE COURT:  But can I just ask, are you planning to?  If you're planning to, we could short-circuit this.  Are you planning to put on secondary considerations.  It might well -- it would streamline things for everybody like they're saying.  Do you know what you're planning to do?

MS. DELLINGER:  Thank you, Your Honor.  There may be overlap of issues with secondary consideration of damages, conception or reduction to practice --

THE COURT:  You were saying?

MS. DELLINGER:  No problem.  So while we do believe that some of those issues may be touched on in the case in chief, there are particular issues as it regards to written description, conception and reduction to practice, those issues, that it would be unfair to require Plaintiff to prerebut.

Defendants in this case have a position that there could be three or four different priority dates.  While we do intend to put on our inventor to tell his invention and conception story, we do not believe that we should then have to switch gears and prerebut what these other different hypothetical dates are for conception and reduction to practice or written description, things of that nature.

THE COURT:  Don't you know what the defendants are going to assert they are?

MS. DELLINGER:  They certainly put forth many theories, but we don't know what Defendants are going to say.

THE COURT:  What about secondary considerations?  That's something you do see Plaintiffs often -- a lot of time parties agree who will take on the issue.  We know it's an

issue. It's one we're going to be putting forward evidence on in response in their validity case. We'll go ahead and put that on in our case in chief.

Currently, are you planning to do that?

MS. DELLINGER: We're planning to do some of that as incidental damage, but certainly not intent on putting all of that in the case in chief with no ability to touch on it later in rebuttal.

And secondarily, the defendants put forth this would streamline the case. We have no problem recalling Mr. O'Keefe. In accordance with the time constraints provided by the Court of 15 hours, we have no problem recalling any expert or witness that we need to to rebut their invalidity defenses once those defenses have been made.

THE COURT: And your point would be, look, if you're talking about you're worried about efficiency or time, that's the time in the trial. It comes out of our time.

MS. DELLINGER: Exactly, Your Honor.

THE COURT: Mr. Egan, anything further?

MR. EGAN:  Nothing further.

THE COURT:  On this issue, what I'll -- I think is what I would typically default to, and Ms. Dellinger convinced me I should do it here.  I would encourage the plaintiff to -- so I'll go with the plaintiffs' proposal, which is may.  But I'd encourage the plaintiff, to the extent that they know that there are certain of these issues that have been listed by the defendants that they intend to present evidence on and could do so as easily in the case in chief, for example, when their expert is testifying, that they consider doing so because it may well make things flow easier.

I do agree, though, that, ultimately, to the extent that Plaintiffs feel they need to present this evidence in phase three, from an efficiency standpoint, the trial is timed, so it's not as though doing it one way or the other will use up more or less time.  And ultimately, the burden is on Defendants to prove invalidity and Plaintiffs to rebut that.

For those reasons, I'll side with the plaintiff.

Okay.  So I think that takes us -- we'll skip motions in limine, as I said.

I think the parties in paragraph 70 just wanted to know how we are counting time.  This is what I'm planning to do.  Tell me if you have any questions or there's any other issues.  So as we talked about the process, there's a process that the parties have set up by which they're identifying lingering disputes.  Prior to that day of trial, the parties are going to e-mail my law clerk the night before to let me know if there are such disputes, and if so, whether the Court should be prepared to address those at 8:15 or whether a limited amount of time would be needed.

In that process, I'll also ask that when you notify us that there are disputes that you in some way list what the disputes are so I have a sense of what's coming and whether the disputes are being raised by one side or the other.  And what I'll try to do in those morning meetings is be equitable about it.  It's not as though we'll hear all the disputes one side raises and none of the other.  We'll go one and the other.  I'll try to resolve as

many of those disputes as I can there, and I won't charge the parties so they'll have additional time to make their case at trial.

To the extent that we can't resolve any lingering disputes prior to a few minutes before 9:00, again, I want to make sure we don't keep the jury waiting. We'll be prepared to get started at 9:00 with the jury, so if there were disputes that lingered, they would have to be raised and addressed during trial. Any such disputes about exhibits or depositions or, obviously, disputes like beyond the scope of an expert report, those will get addressed during trial and the side who loses the dispute will get charged the time. Again, if there's ambiguity about that, I'll let my law clerk know who should get charged or how the time should get charged, and the parties will be advised as well.

What I will call is those disputes, those kinds of disputes that are discussed in the pretrial order, that's how we'll handle it.

And then I think you asked about time that it takes to address and argue JMOL, and we'll talk about the process for that in a

second.  That would be charged.  That time would be charged.

I think you -- also, when we get to depositions, video depositions, that are played, what we'll do there is we will tell you how much time it took.  Sometimes the parties say this is going to be ten minutes.  We've agreed that it's five and five, and then it takes, like, 16 minutes, and that's not right, so we'll keep track of that time, tell you how much time it was, and then you tell us -- and we should be able to agree because we have presumably agreed going in what the split is -- how we charge the sides.

I won't charge for time to deal with jury selection or reading preliminary instructions or reading final instructions or the prayer conference.  So that will all take care of that.

That's how I've done it and we'll do it. Any other questions or any other issues that I didn't cover that you're wondering about that I haven't thought of?

Ms. Dellinger?

MS. DELLINGER:  Nothing from

Plaintiffs, Your Honor.

THE COURT:  Okay.

MR. KREMER:  Just a moment, Your Honor.

We're set, Your Honor.

THE COURT:  Again, the goal, in an ideal world, as much as possible, the parties could focus where the real disputes are, address them in the morning, resolve them so trial itself is smooth.  I think it's always difficult for the jury when they're constantly getting interrupted by objections to documents or -- obviously, it's going to happen.  But the goal is to try to have enough time in the morning to address all or hopefully almost all of the issues that could be going in the day.

Then in paragraph 74, I think the sides were asking about just the process for JMOL motions.  So and I think there were two questions, basically.  One was, do they get made orally only, or could they be supplemented in writing?  I think the answer there would be the going presumption would be orally only, but it's in my discretion.  If I were to hear such a motion and to say, well, I'd like some

further written supplementation on that because I may want to consider it further -- presumably -- look, it's very possible that, with regard to JMOLs that are made, my ultimate decision may be I'll take that under advisement or essentially deny without prejudice for review post trial.  It's possible that I might definitively say I'll resolve it.  But it's also possible that, after hearing the verbal argument, I may say I may want brief written supplementation.  If I do, I'll ask for it, but the default will be orally only.

Any questions about any of that?

MR. KREMER:  No questions from the defendants, Your Honor.

MS. DELLINGER:  None from the plaintiffs, Your Honor.

THE COURT:  The other issue was when do we make them?  Meaning, I think the plaintiffs were suggesting make all of them at the close of all the evidence.  Plaintiffs were suggesting at the end of phase four, everybody makes all their JMOL motions then.

Is that what you were saying?

MS. DELLINGER:  Yes, Your Honor.

THE COURT:  Whereas the defendants are saying we should be able to make them at the appropriate time.

Is that right, Mr. Kremer?  Is that your position?

MR. KREMER:  Yes.

THE COURT:  End of the plaintiffs' case in chief, if you believe there's a basis to make a JMOL motion on a particular issue or set of issues, that you should make it then.

MR. KREMER:  Absolutely.  We expect to, and lest there be no surprise, we expect to make a JMOL motion on this case as soon as they rest their case in chief.  Whether that's Monday afternoon, Tuesday morning, we're going to want to take some time and make sure the Court has a record there.

THE COURT:  On this, I'll say my understanding is I think Federal Circuit caselaw right now is that -- I don't want to speak definitively on that because I haven't looked at it recently -- but I think there's a suggestion that there may well be the case that a party wanting to make a JMOL motion may need to make it orally in some fashion, at least at

the first time the motion can be warranted.  I don't want to do anything to inhibit a party's rights to properly preserve a motion.

The way I would presume to do it here is at the point in which the party thinks the motion needs to be made, they would stand and make the motion orally, briefly.  Just indicate that they're making a motion, and then what I presume to do -- it may be, though, at that point -- say the plaintiffs' case in chief closes but we still have 15 minutes left before lunch or it may not be a convenient time to have longer argument made about it, that the motion will be made orally and briefly just to preserve that, and to the extent there was further argument to be made about the basis of the motion or response to it, that we would make the argument at whatever appropriate time that day was, whether we could do it before we came back from lunch or later at the end of trial for that day, et cetera.  That would be how I proposed to do.

It any objections on that, Mr. Kremer?

MR. KREMER:  I'm sorry, Your Honor. I'm still in conference.

THE COURT:  Any objections to that process?

MR. KREMER:  No, we don't.

MS. DELLINGER:  No objections from Plaintiffs, Your Honor.

THE COURT:  Okay.  All right.  I think those are all of the -- absent the motions in limine, those are all the disputed issues that the parties raised in the pretrial order.  Before we go to motions in limine, any questions or disputes about that?

MS. DELLINGER:  Not for the plaintiffs, Your Honor.

MR. KREMER:  Not for Defendants, Your Honor.

THE COURT:  I will ask and maybe I'll -- we should have a final pretrial order that incorporates the decisions the Court has made so that I can sign it and enter it.  Let me ask the parties to make any changes necessitated by my decisions.  I think I do have one further thing to get back to you on.  That's the issue with paragraph 18 and 19.  So as I said, I'll take that under advisement, take a look at that and make a decision on it

and I'll set a date for you to provide me with a final pretrial order.

We'll make it focused.  I'd like to try to keep to arguments cabined because they're focused issues, but I'll hear some argument on the six motions in limine here, and maybe what we'll do is -- why don't we do Plaintiffs' motions.  Let's go on a motion-by-motion basis. It will be easier that way.

So let me call up Plaintiffs' counsel with regard to motion in limine number one. Remind me, where do the motions in limine start in the pretrial order?  Is it Exhibit 12?

It's 14 that they start.

Okay.  So, Mr. Caldwell, so this is the issue -- okay.  This is the issue about -- where the plaintiff is requesting that I exclude any argument, testimony, or evidence that a defendant does or doesn't infringe. Really, I think we're probably talking about not necessarily the defendants here but the accused direct infringers, at least in part, that they don't infringe based on a comparison of the accused process to something other than the asserted claims.

I think the way this shook out -- tell me if I'm wrong -- is it did seem like there wasn't any dispute that I should -- that I shouldn't allow the defendants to argue that there isn't direct infringement by comparing the accused products to something other than the patent.  I think everybody agrees and understands if we're talking about direct infringement, does direct infringement occur, proper comparison is the accused process to the claims.

MR. CALDWELL:  I hope so.  I hope there's agreement about that.

THE COURT:  I think there is.  Don't you think there was?

MR. CALDWELL:  As to an observation you made earlier about I think we're talking about the direct infringers alone, obviously, there's secondary types of infringement that are at issue here like direct infringement, and that is still a type of infringement.  So it's unclear to me because, basically, there is a suggestion in the briefing that at least they think that they are not infringing because they have licensed something from Chem-Mod.  Yes, in

one sense, that's cabined to an intent-like element for something like induced infringement.

On the other hand, it seems to be conflated and suggesting that might be possible that there is noninfringement if they're practicing something licensed by something else.  It's unclear to me the extent to which there is agreement.

The briefing was odd in the sense that I think it sort of meandered a little bit.  A lot of what they talk about doesn't go to the issue of infringement.  There's things they're claiming we're precluding that we're not precluding in the motion in limine.  I'm making this observation simply to say it's not clear to me from the briefing where there is agreement.

THE COURT:  What I wrote down is I think the defendants' side wants to argue that the fact that the defendants believed or knew that they were practicing Chem-Mod patents is a fact relevant to their intent about whether they indirectly infringe and knew that they were infringing.  Isn't that relevant to their

state of mind?

MR. CALDWELL:  No, because it's just an improper statement of law, and it embraces this fundamental notion of confusion.  What we wrote is essentially tracking a standard motion in limine in a lot of courts that do a lot of patent cases because it seeks to sort of capitalize on this inherent confusion that maybe laypersons have.

I tried a series of cases against Apple, for example, and every single time, somebody says to me, "You're trying against Apple?  I would have thought they had the patent on the iPhone."  It's that sort of notion and coming in here to say we have a totally improper statement of the law, we think we're innocent because we licensed the patent from somebody else, that has no bearing on the issue of whether you infringe or not.  In fact, as an example, there's not even an expert on their side who says they practice a Chem-Mod patent.  It's not an issue that anyone's joined issue on in the technical sense.

THE COURT:  That seems like a failure-of-proof issue as opposed to whether

the argument can be made.

MR. CALDWELL:  It's an issue on which -- it's something that would have put us on notice if it had been an actual issue in the case.  Further to that point, there's an interrogatory answer where we ask why do you think you don't infringe, and they said nothing about that.

THE COURT:  This comes up with regard to this motion but also some of the other motions in limine which is that are some responses to the other side's argument that say, essentially, that's not in their answers to our contentions or that's not in their expert reports.  I'm not going to have the ability to decide a "beyond the scope" or "untimeliness" issue here based on this record, nor would that be proper for motions in limine.

I guess, ultimately, if the indirect infringement question is about what is in the mind of Defendants, do they believe, think, that they infringe, you're saying that it's per se out of bounds for them to argue -- to point to evidence or argue that our employees believed we weren't infringing because they

believed we had a license to patents that allowed us to do what we were doing.

MR. CALDWELL:  That's the problem, is the last portion that you said.  No license to any patent allows you to do what you're doing.  What it does is it may allow you to practice a patent that's owned by the person from whom you licensed, but it's not permission to do anything to anybody else's intellectual property right.

THE COURT:  I'm trying to parse the difference of maybe a wrong view, a view but a wrongly held one, versus an impermissible view.  Do you know what I mean?

MR. CALDWELL:  I believe I understand exactly what you're saying.  And there's --

THE COURT:  I think what -- I'm sorry to interrupt.  I think what you would argue is, again, like, it doesn't -- the question is whether, you know, did you know that the direct infringer was doing the things that are covered by the claims and intend for that to happen?  And there's also other elements of those claims.  That's the key inquiry here, is what you're saying.

MR. CALDWELL:  That is the only inquiry.  Whether the accused processes are meeting the claims and you met the requisite requirements of contributory infringement and/or induced infringement, those are the only things that matter.  The fact that you might buy components from someone else or you might think they have patents that are licensed, none of that gets to the issue for this jury, which is whether someone had an intent of meeting or claims.

At the risk of -- I'm not trying to test you on what's in interrogatory answers and what not, but I think we also observed in the briefing that they have disclaimed any opinions of counsel, any reliance on opinions of counsel, and where I think this is headed, then, is to a situation where a witness might ostensibly say, "I relied on X."  We have to get a corrective instruction or some sort of instruction, even if it's in the final instructions but maybe in court, that that is an incorrect statement of law.  It's not a defense.  Otherwise, we're reinforcing this lay confusion about how patents work and the

difference between a right to preclude somebody having the right to do something versus permission to go and do it no matter what anybody else's patents say.  We're reinforcing this traditional confusion that the lay jurors very might have on an incorrect statement of law that doesn't bring an actual defense to them.

And it's a world in which, how do we explore that they had that belief?  They have disclaimed any reliance on advice of counsel.  Do we cross and say, "You're a layperson who has a fundamentally wrong understanding of the law.  We've got the correct instruction from the judge, and you're just guessing at the law and were completely wrong"?  It doesn't make any sense to me.  What we are doing is having a debate about an incorrect understanding of the law.

THE COURT:  The other question I have is I'm not going to deal with the beyond-the-scope objections that wasn't in the interrogatory response.  At one point in the footnote, you said -- one of the things Defendants said is these issues are relevant to

damages or evidence about damages, and you said it's limited to infringement. This dispute is limited to infringement. I didn't know if that meant you were suggesting, to the extent this evidence is intended to be used for purposes of rebutting a damages case or showing what the proper amount of damages, we're not objecting.

MR. CALDWELL: I think that is exactly what the intent of the footnote was. Couple of observations. One is we're arguing about motions in limine, not definitive rulings on evidence, and there's a procedural difference. So if something comes up and there is a fair reason that something needs to come in, even if there's a motion in limine in place, that's when the parties can approach the Court and say, "I think this is on the periphery of the ruling in limine and here is a fair use." And granting a motion in limine sort of still preserves the ability to get it in as a matter of evidence by approaching. It's not definitive ruling that it could never come in.

Second, on this point of damages, there are a lot of arguments in the briefing and some

of their expert reports that this is -- I mean, this got a little bit disjointed by how the argument started, but this is what I was trying observe.  A lot of what is briefed is not even really consistent with the topic of the motion in limine.  Our concern is a suggestion that it bears on whether or not you practice the asserted patents that you had another license. It's not about -- for example they make arguments that your patents don't talk about Section 45 tax credits, and your patents don't talk about reduction of NOX and maybe we also do that.

Nobody is saying they can't make those arguments if there's value from their process that comes differently and that factors into damages.  What we're saying is you also have a NOX reduction or you think by getting NOX reduction that enables tax credits that maybe wouldn't come from ours alone, what we're saying is --

THE COURT:  I'm sorry.  Just for the record, when you say NOX, N-O-X.

MR. CALDWELL:  It makes sense for the parties to work out a glossary of terms for the

court reporter.  That is a good thing to do beforehand.

THE COURT:  You said something about inappropriate arguments about whether they were infringing.  The infringing we're talking about is, I think, direct infringement.  Basically, like, is it the case that actions were taken that meet each of the limitations of the claim such that there is direct infringement?  There will be separate issues or evidence about the extent to which a particular defendant encouraged that infringement or contributed to it or had a certain mindset.

What you're concerned mainly about is that evidence not be presented that suggests that the direct infringement question, the question about whether the accused process meets the claims that's somehow relevant to that calculus is, for example, what these Chem-Mod patents are or whether they match what the defendants were doing.  Is that the gist?

MR. CALDWELL:  It's more than that because it's, first of all, you have an organization that worked with its lawyers and accountants and everybody else and set up these

structures that are designed to basically receive tax credits. And then he's going to come in and say we structured that, so we think we can't infringe anybody else's patents because we got a license to Chem-Mod. That's an incorrect statement of the law. In addition to what you said --

THE COURT: It's definitely -- it can't be disputed, I think. It would be an incorrect statement of the law to say that direct infringement of these patents can't occur because the defendants had a license to other patents.

MR. CALDWELL: Yes, sir.

THE COURT: The question about district infringement is whether the accused process meets the claims of the asserted patents at issue. That's not disputed, but okay. Go ahead.

MR. CALDWELL: So I'm just -- my concern on this issue of the Chem-Mod license, because there's these other issues of -- that our -- they want to compare things -- like, for example, they want to compare their process to the preferred embodiments of our spec. That is

a distinct issue.  That is the issue of they want to talk about your patent doesn't say anything about Section 45 credits.  That's a distinct issue.  But on this issue of whether the Chem-Mod license would be a defense to infringement, licensing Chem-Mod is clearly not permission to practice ours.  And my recollection, I don't think this got picked up in Defendants' response, I think there actually is -- I can't remember the case.

I think it's a Federal Circuit case that actually carefully considers this and allows a defendant to talk about their state of mind in the way that they want.  But the reason this stands out, it happened in pretrial in July, and it came up for argument in that pretrial.  But what was unique about that was it was a case where the executives were acutely aware during their own prosecution there was a rejection over the plaintiff's patent, and the debate in front of the examiner as to the distinction and the methodologies and their methodology was allowed to be patented -- by the examiner, so there was, like, a factual support and an actual logical reason for why

there would be a distinction in the processes.

What's happened in this case is absolutely zero development or ability to test their theory.  It is only the incorrect statement of law that we have some license to this patent, that nobody is going to come and prove what it does or how that would possibly bear on any sort of connection to noninfringement.  It's only reliance on something that is just legally flawed and embracing the confusion in front of the jury.

THE COURT:  I'd like to try to, while I have you up here, hear your thoughts about the other two motions and hear from Defendants about their response to those.

MR. CALDWELL:  The other two motion motions in limine?

THE COURT:  Were you going to talk about those?

MR. CALDWELL:  No, I'll yield to my colleague.

THE COURT:  Let me finish out motion number one.  Thank you.  Let me hear from Defendants.

Mr. Kremer, I think it seems like when it

comes down to it, the dispute here, we're talking about evidence that's going to be put in play about the Chem-Mod patents and what the defendants thought about them.  I know there were other categories of evidence that were discussed in this motion.  It doesn't seem like there's any dispute that it would be inappropriate for someone to argue that evidence like this bears on whether or not the direct infringers infringe, whether the process they're using meets the claim limitations of the asserted claims; is that right?

MR. KREMER:  Can you hear me, Your Honor?

THE COURT:  That mic is not great.

MR. KREMER:  How about this?

THE COURT:  Perfect.

MR. KREMER:  Your Honor is right. This is a common issue in patent cases.  It is a common lay view of how patents work.  It happens to be the view that some of our defendants' representatives actually held in good faith.  It's a little bit cynical to suggest that the jury can't be cautioned about this.  We've agreed to instructions that will

come up with the final instructions that specifically guard against what Mr. Caldwell has identified and which I personally agree is a risk.  The jury should not find direct infringement or not find direct infringement based on the degree to which we practice the Chem-Mod patents.  No dispute there.

However, the question of whether reasonable, good faith, incorrect beliefs are a defense to indirect infringement is well-settled law.  I don't think this is the case that Mr. Caldwell was referring to, but the *Kinetic Concepts* case decided by the Federal Circuit in 2009 specifically deals with a defendant who erroneously believes that because they were practicing patents in the public domain that the plaintiff's patents could not pose "a barrier" to their entering the market.  They were wrong, but that's okay because this is an intent case.  If you have reasonable, good faith beliefs that you don't cause infringement, that's a defense.

THE COURT:  Even if they're erroneous and don't match what is the law?

MR. KREMER:  I can hardly think of a

more classic question for the jury to solve than the sincerity of our clients' beliefs on that.

THE COURT:  If the accused infringer were to say, "I now understand through this trial that the way direct infringement works is that you have to compare what the power plants do with what the asserted claims say, but back here at the time, we thought, maybe wrongly, maybe erroneously, we thought as long as we have a license to these patents, we couldn't infringe someone else's patents."  That's allowed?

MR. KREMER:  That's absolutely allowed, Your Honor, and the Federal Circuit for a long time has held that's fine.

Your Honor, I want to step back.  I know we're going motion by motion, but some of these relate to each other.  I want to explain what I think is going on here about the way ME2C's first and second motions are teed up.  They're trying to empty our witnesses' minds of what they actually believed in the relevant time period.  This case was filed in July 2019, and for two and a half years after that, the

parties continued selling refined coal. And they're going to argue to the jury that's willful infringement. They're going to argue to the Court there should be an enhancement for that. They're going to argue to the jury that that constitutes knowing inducement. To aid in that effort, they're trying to put strictures around what our clients can testify to about what they actually believed in that two-and-a-half-year period.

And the first motion is directed to, you can't testify to your belief about the defenses provided by Radis [phonetic] and the Chem-Mod patents because that's incorrect or it's wrong as a matter or law and you should have known that. Whether or not they should have known that is a question of reasonableness, a question of fact for the jury to resolve.

The second motion is directed to whether we can talk about what happened in this courtroom. Our clients read the complaint at the time it was filed. They formed opinions about the allegations that the plaintiffs made.

THE COURT: By the way, on that front, is it right that there isn't going to be

testimony about advice of counsel or what was said, X or Y, to the clients?

MR. KREMER:  Advice of counsel, specifically defined in the way that we typically thing of as we sought an opinion from counsel analyzing the claims to determine whether there was infringement, we're not asserting that in this case.  But our witnesses are prepared to testify that they responded responsibly to the filing of the complaint. They hired lawyers.  The lawyers filed a motion to dismiss.  Your Honor granted it.

My clients read Your Honor's order.  To pretend that they didn't read it or to suggest that as a matter of law it could never be told to the jury that we were proceeding in good faith based on what a judge said, that's what happened here.  They're emptying our clients' brains in an attempt to substitute their own expert's speculation about what those same individuals might have thought in an alternate universe, so the motion should be seen as related in that way.

The second point, Your Honor, if I may, I think that this case -- I think that the

Chem-Mod patents are relevant to damages. Mr. Caldwell has insisted that they're not, but ME2C's expert's damages theory equates the Chem-Mod patents with the ME2C patents. One way or another --

THE COURT: I think the plaintiff is saying they don't think reference to the patents with regard to to damages in the way that --

MR. KREMER: It seems to be what they're saying. They can talk about the similarities of the Chem-Mod and ME2C patents when it suits their damages case, and we can't talk about the distinctions between the patents because it suits our liability case. We should just have parity on that issue.

THE COURT: Anything further with regard to this number one?

MR. KREMER: I believe I cited, it's in our brief, the *Kinetic Concepts* case. That's 55 F.3d 1010. And I would reiterate that the final instructions, I know Your Honor deferred on that for, now we've agreed to instructions to clarify for the jury this very common issue about direct infringement. What's

really happening here is an attack on our --
some of our most important indirect defenses.

THE COURT:  And I'm just looking.
The *Kinetic Concepts*, oh, the footnote.  I
think there, Fifth Circuit said, I wrote down,
had to do with arguments about whether a
defendant could freely practice inventions in
the public domain and whether or not that could
support a finding of lack of intent to infringe
as to induced infringement.

MR. KREMER:  That's what the case is
about, yeah.

THE COURT:  Thank you, Mr. Kremer.
I'll ask if there's anything further
Mr. Caldwell wants to say, and we'll talk about
motion in limine number two.

MR. CALDWELL:  I'm mindful that from
the beginning you said you wanted to keep this
brief.  What I'd like to observe is we spent a
lot of time talking about whether the Chem-Mod
patent is a defense to infringement, and I
think you understand the parties' positions on
that, and I think you're also correct.
Although Mr. Kremer kind of, on the one hand,
said that we won't let them talk about the

Chem-Mod patents for damages, and then he said, yes, that's they're position, this motion in limine is not about suggesting infringement or noninfringement.  It's not about damages, but I don't want to lose sight of the fact that there are other aspects of this motion in limine and things that we have reason to believe will be a problem, like comparison of their process to the embodiment, the preferred embodiment, of our patent.  The determination of infringement is on the claims.  It's not about the preferred embodiments.  To the extent it's a written description question, that is a question of comparing our claims to what's disclosed in our specs.

THE COURT:  That's kind of -- sorry to interrupt.  That's kind of a problem.  You wouldn't say that discussion of these embodiments is irrelevant to any issue in the case.  It can be talked about and discussed.

MR. CALDWELL:  Absolutely.

THE COURT:  I think what you would say is no one should be wrongly suggesting that direct infringement does or doesn't occur as it relates to those embodiments.

MR. CALDWELL:  Exactly.  That is exactly the point.  So it's kind of like a lot of their themes actually write the claims out of the patents.  In other words, it's sort of focusing on let's don't pay attention to what your claims say.  We'll pay attention to the fact that we have this license.  Or let's don't pay attention to what your claims say.  We will show that something in the preferred embodiment is different than what we do.

The Federal Circuit said over and over the name of the game is the claims, and a lot of things that Defendants do is getting away from the claims.  If you want to talk about our embodiments for written description, there's a way to do that.  It's bounded by what's in your disclosures and your expert reports, but it has nothing to do with comparing your product to our preferred embodiment.

THE COURT:  Lastly, is there any -- Mr. Kremer says the *Kinetic Concepts* is an example of case that says, look, if I'm an accused infringer with regard to induced infringement or direct infringement and I have a wrong or erroneous belief or good faith

belief that I don't infringe, maybe based on a premise that is incorrect in the law, I can still talk about that intent I had or didn't have then.  It's still a viable way to show no bad intent.

Do you disagree that's what the case said?

MR. CALDWELL:  I do because I think the fact that actually -- I think you called them out on really what *Kinetic Concepts* says. That is about whether something is in the public domain.  If you believe as a matter of fact that something is the public domain it, by definition, is not covered by the intellectual property right.  It's a factually different case.  It's not something premised on incorrect statement of the law.

THE COURT:  Thank you.  Let's talk about MIL number two on the plaintiffs' side. Mr. Nemunaitis will be taking this one.

So this one is about the extent to which Defendants can present evidence, testimony, or argument regarding pretrial proceedings, including but not limited to discovery disputes, dispositive motion practice, and

dropped claims or defenses.  Here, it seemed like what was happening as the briefing went through was it seems like there was -- the defendants ultimately raised two categories and areas which they believe they can talk about certain things that fall in the category, but that otherwise it seems like people are on the same page, which is good, that you can't make arguments about discovery disputes or developed claims and defenses in the case.  But so let's talk.  Does that seem right to you?

MR. NEMUNAITIS:  Yes, Your Honor.

THE COURT:  And so then that brings us to the two categories, and the two categories were the defendants want to be able to discuss the four settlement agreements by which certain former defendants were dismissed from the case.  These are the power plants, I think.

MR. NEMUNAITIS:  Yes, Your Honor.

THE COURT:  And the second is they want to be able to discuss my prior art R&Rs or orders relating to them about the pleadings. And so the settlement agreements themselves, my sense is they're referenced by the experts, so

some discussion about them is going to happen.

MR. NEMUNAITIS:  Your Honor, to short-circuit that one, I don't think we would try to argue that today Your Honor should rule all the settlement agreements inadmissible.  I think the real concern was talking about dropping the parties or getting into a discussion of the pleadings and Your Honor's orders, so that is really where I think the fight is on this one, and I think it's a very important one.

THE COURT:  So then focusing on that issue, I think Mr. Kremer started to talk about it in his comments.  I understand there's going to be disputes about what was the intent of Defendants after a certain point, including after the initial complaint in the case was filed if there was some damages windows here for infringement that you're seeking that come into play in terms of what was in the defendants' state of mind after the original complaint and thereafter; right?

MR. NEMUNAITIS:  Right.

THE COURT:  And I guess one thing is, like, you convinced me that, you know, the

other side said, look, we should have a world in which the complaint can provide notice of the patents for purposes of indirect infringement.  Basically, we shouldn't be dealing with this post-complaint world, and I disagree.  And so now you got the right, the option, to try to make that case even if maybe it's certainly harder, sometimes, to make it than pre-complaint.

If that's true then, if you're going to rely on the complaint for notice of the patent purposes, if the other side is going to say our employees, the question is what was in their head post-2019 about whether they infringed, they believed they didn't in part because at the time, there was a judicial order indicating that at least a claim of infringement hadn't been stated.  The claims hadn't been brought and dismissed without prejudice.  How come that's not relevant here?

MR. NEMUNAITIS:  I'd like to go back and go through the back story about how I think the evidence would come in from our side about proving of notice of the patent and that kind of thing.  I do also want to point out that

there is no case cited by any party that a without prejudice dismissal of a complaint somehow absolves the mens rea for intent or contributory induced infringement.

THE COURT:  I don't think anybody is arguing de facto absolves.  It's something that a person could point to in arguing that.

MR. NEMUNAITIS:  As long as there's no ruling, as a matter of law, we cannot go back to those days.  The question is really a 403 analysis as far as should Your Honor's prior court orders come in before the jury and can the parties argue about which side won this issue or that issue.

Just to back up a little bit, we intend to present evidence that the defendants had presuit knowledge of the patent and had everything they needed to know that they were infringing and to form an intent of infringement.  That's because they knew about activated carbon use, and through the development of the case, we have e-mails and 30(b)(6) testimony about what they knew was going on at these power plants.

As a back up, we would also intend to say

that the lawsuit was filed on X date.  It attached all the then-issued patents, so that is another date where they would have received the patents themselves.  I don't think there's any need for us to submit the complaint itself into evidence.  Really, the evidence is they had all the information they need to be culpable for induced contributory based on information they already had presuit plus, worst case scenario, receiving the patents on the day the lawsuit was filed.

And on this issue of whether or not Your Honor's orders come in, I think it's worth going back to what actually happened at the motion to dismiss stage because in the first motion to dismiss, the argument was, is there enough information in the pleadings to infer that they knew about activated carbon use?  And we're talking about the activated carbon step.

And in that first ruling, Your Honor said there's not enough for me to see that I can infer that these defendants had knowledge that that activated carbon step was being performed.  We now know that at that point in time, many people of these defendants had people on site

at the power plants.  They saw the activated carbon equipment.  They have e-mails with power plants talking about the activated carbon use.  So for them to say, well, at the time we got that order, we thought we couldn't be liable because we got a without prejudice ruling --

THE COURT:  Wouldn't that just be like contrary evidence?  Like, they would point to some evidence that you'd say, I don't think that's good evidence because look at this evidence we have about how the argument you're making can't be right.  Do you know what I mean?

MR. NEMUNAITIS:  Yes, but I think you should think about how this would play out at trial which is we would present our evidence.  They would say we got this court order.  They introduce this order into evidence and start reading statements from Your Honor in front of the jury.

THE COURT:  On that point, I do wonder if there's, like, a difference between the defendants being an able to point to the fact that claims were made and then dismissed, you know, without prejudice and what impact

that had on their clients versus, like, I could see a world, and I think you're alluding to it, where pages and pages of my prior orders are being cited and Judge Burke said -- Judge Burke told, et cetera.  Like, I wonder if maybe the argument you're making is some reference to the fact that claims were dismissed might be permissible, but there could be a way in which it goes so over the top in the amount of such evidence shown that maybe wrongly suggests that I was saying is there could never be -- is there a balance there?

MR. NEMUNAITIS:  I think there's some very good caselaw on this, and I want to read you a quote from the case in a minute.  I think the moment someone says Judge Burke dismissed these claims, that has now opened the door to a very large amount of inappropriate evidence because we would then need to explain the basis for the reasoning, the fact that they had additional evidence that we did not have because discovery had not occurred, and the fact that later on Your Honor allowed the claims and probably -- there's a number of statements in these orders that would be very

useful for cross-examination to show Your Honor agreeing with the statements I made.

But I think the best way to analyze this comes from the *Pin versus Apple* case we cited. And that was a little bit different but similar issue where the plaintiff accused multiple products, and the Court granted summary judgment as to some products. This was an actual judgment on the merits, not just a without prejudice dismissal. At that point, the defendant in that case wanted to use the noninfringing products with a noninfringing alternative and then wanted to go a step further and say we want to tell the jury that the judge agreed to us that summary judgment was granted. And the Court said no, you can't talk about my prior orders.

And the reasoning was, the Court explained, that "Evidence that the Court granted summary judgment as to certain claims would introduce substantial risks of confusion and unfair prejudice. Perhaps the jury might find Defendant more credible because the Court granted Defendant's motion. Perhaps the jury might conclude that the Court has already

disposed of any non-meritorious claims and, therefore, the remaining claims must be valuable.  This unpredictability of the effect of such evidence simply underscores the importance of excluding it under 403 because such inferences, the plaintiffs argued, with the Court's pretrial ruling will put a thumb on the scale of the jury's weighing of the evidence."

And I think that's the real issue, is just acknowledging that Your Honor made a ruling is probably the paramount problem.  If they have a substantive argument as to why they do not infringe, that's one thing but to say the Court put its imprimatur on that argument is going beyond.

THE COURT:  But it's okay for you to use the fact of the filing of a complaint as of a certain date in 2019 as a jumping-off point for now the induced infringement or indirect infringement clock is ticking.  It's okay for you to do that, but it's not okay for them to talk about why it is that the filing of that complaint actually doesn't start the induced infringement clock ticking because what is

their mind about -- it's okay for you to use it in the way you want it but not them is ultimately what they're saying.

MR. NEMUNAITIS:  There's a big difference between us providing a copy of the patent in a complaint and therefore establishing as a matter of fact that the relevant people had a copy of the patent and therefore could form the intent or knowledge. It's another thing to get into the pretrial rulings and trying to talk about what the Court believes or would rule.

THE COURT:  I think I understand your position.  Thank you.  Let me hear from defendant's side.

Mr. Kremer, I think we're focused on the second of the two issues.  I don't think there's a dispute that the first one that you raised is not something I would be precluding at this stage.

MR. KREMER:  Thank you, Your Honor.

We can cut through the other issue that is still at issue.  In the *TecSec* case, T-E-C-S-E-C, versus Adobe, that's 2018 in the Westlaw 11388472.  The Eastern District of

Virginia, no stranger to patent trials, said, you know what? The case was disposed of erroneously. The defendants understood that. They relied on that erroneous disposition. It would be too prejudicial to prove it up. Here's what we're going to do: There's no liability from the point at which the cases were reinstated. I'm perfectly happy to agree right now that until a viable complaint was endorsed by Your Honor in May 2021, there was no liability.

I don't think the plaintiffs want that. What I think we should do is have a trial, and we should bring our evidence about what intent we did and did not have. They should bring their evidence, and the Court, in its discretion, can correct the jury to the extent that any of the evidence has a tendency to unduly prejudice one side. We are having an argument about the factual merits of the case right now.

THE COURT: And I think *TecSec* is Judge O'Grady's case in the Eastern District, and I think you're saying that you think that is the most on-point case in terms of

understanding that -- I think what you're saying is that's a case I could look to for the proposition that what a Court may have done or didn't do in a particular time frame can have a usable impact on the mindset of a party.

MR. KREMER:  You can, Your Honor, and in fact, it goes beyond that because in both *TecSec* and the *Toshiba* case out of the Western District of Wisconsin, which is 990 F.Supp 2d 882, in both of these cases, the Court took really significant action to protect the defendants from being hamstrung in their defense.  In *Toshiba*, the Court actually kept the evidence of the prior summary judgment order out, and then in a post-trial posture said that was an error.  Not only should I have taken an offer of proof, but I'm reversing on that basis.  That's an extraordinary remedy because the judge found as a matter of law that the intent element that was vitiated in that case, and that was based on an erroneous grant of summary judgment.  Your Honor's dismissal order in June 2020 was not erroneous.  You got it right.

THE COURT:  I guess, Mr. Kremer, what

about the middle ground here?  Let's say I ultimately kind of agree with you that, yes, the defendant should be able to point -- if it's true, if their clients in their mindset about whether infringement was occurring in some way relied on the fact that certain claims have been dismissed for a while, but I was also concerned about the jury getting -- like, being shown pages and pages of my decisions and the parties going on and on about what I said and maybe what Judge Andrews at the time before objections said about this or that or et cetera.

Is there some middle ground where there's some amount of evidence that could be induced?  Ultimately, like, the claims were dismissed without prejudice and the defendants knew that and these claims were dismissed without necessarily going into all of that additional record evidence or overdoing, essentially.  I think 403 is the basis here for the motion.  Do you think there is some middle ground?

MR. KREMER:  You said middle ground, Your Honor?

THE COURT:  Yes, that there might be

some understood amount of facts that could be described and discussed in evidence but there might be a category of going too far.

MR. KREMER:  Your Honor, we have a 15-hour clock.  I do not intend to walk my witnesses through, line by line, any of the Court's orders.  I think that the Court has inherent authority here to issue clarifications from the bench about the import of its orders. I am promising you I do not intend to over-read that dismissal.  I know that Your Honor is going to watch me like a hawk while I direct the witness on this issue.  I don't have any problem with an instruction.

The only precedent we have for solving this problem is to eliminate liability for the period before the case was reinstated.  That is the only precedent.  So we're either going to be following that precedent, which we think makes sense, narrows the trial, simplifies things, and avoids what very well may be undue weight put on your decision, or we will find some softer relief that requires the Court to provide instructions, which the Court is well able to do.

I will be happy to propose one, but the idea of the motion is that ME2C files the complaint. It goes off like a grenade, and we can't tell the jury what we thought. And that's completely, manifestly unjust.

THE COURT: Thank you.

Mr. Nemunaitis, any rebuttal?

MR. NEMUNAITIS: I believe the *TecSec* case may have been overturned on that issue and the Court said that was a 403 issue. I would like to double check that.

The main point I wanted to raise, though, is, again, the moment anyone says the Court agreed with defendants on X issue, that becomes a huge issue, especially if something like that comes up in opening. That's potentially extremely prejudicial.

THE COURT: I understand your point there as a general matter that one might like to avoid a scenario in which that happens. I guess I wonder. You made a choice that you wanted to go for post-complaint willful infringement, and I wonder if in doing so, this might be a consequence or something of what Mr. Kremer is saying, a consequence that you

have to live with.  Some judges in our court, obviously, concluded differently, would not have allowed you to proceed with a willful infringement allegation under these circumstances, so you would never be dealing with this issue.  You got a chance to argue it, but the other side is saying you've got to live with the consequences, which is we've got to be able to defend ourselves.

MR. NEMUNAITIS:  I understood them to be wanting to make this argument even as to just induced infringement at any time.  There wasn't time in my head just to the willfulness component.  It's something to think about.

One other point I wanted to raise about, though, is even if there were some way to say the Court dismissed some claims without prejudice, that immediately raises as a key issue, well, did the witness understand what "without prejudice" means?  And as to willful blindness, they're represented by a number of lawyers in the courtroom.  Did you ask your lawyers what "without prejudice" means?

The moment this door opened, we're going to get into a very strange world and

potentially get into issues of privilege waiver. To the extent they said that they are not asserting an opinion of counsel defense, but at this point, they're trying to use it as a sword and shield where they get to argue legal opinions, erroneous legal opinions, that are good for them and prevent us from interrogating the witness about what they did to confirm any of that. Given that that's sort of the world we're in now, it doesn't make sense to allow them to get into the first step there.

THE COURT: Okay. Thank you. Let me hear brief argument on the third motion. And we'll take a short break and finish up with argument on the defendants' motions and hopefully be finished around 1:30 or so.

MS. HALEY: Ayesha Haley on behalf of ME2C for our MIL number three.

Our MIL number three is really geared towards two issues: One, that the argument that continuation is just inherently improper in some way and, two, that because we saw continuations or because our claims were designed to cover competitors' products there's

something improper about that.

THE COURT:  I think the other side said in the briefing they don't dispute that -- like, for example, they're not going to argue that you acted improperly by drafting claims in a way that might cover technologies in the market or that it was somehow wrong.  If you accept that representation, do we not have an issue with regard to this?

MS. HALEY:  If that's true, we don't have an issue with regard to to this.  It seems like the response is about written description.  We said, obviously, we don't have problem with them presenting that.  We said if the issue is we need to add a sentence or something to the motion to make clear that it doesn't affect the written description argument, we're happy to do that.  I'm not exactly sure what the remaining dispute is.

THE COURT:  Let me short-circuit this by asking -- and you can stay there.  And I don't know who's going to be speaking on Defendants' side for this issue.

Who's going to be speaking for the defendants?

MR. SYKES:  Your Honor, Paul Sykes.

THE COURT:  Mr. Sykes, I understand the plaintiff to be tell me our concern in filing this motion is we're worried the defendant is going to argue that there's something improper we did, to the extent we did, about drafting claims in applications to cover certain technology in the market or that the defendants were going to suggest that it was somehow wrong of them to file continuation applications in the first place.  I understood your letter to be saying we're not getting into those arguments.  We're not going to be suggesting that those are wrongful; is that correct?

MR. SYKES:  Your Honor, those aren't the facts of the case, Your Honor, so I think the question doesn't quite line up with what the evidence is.  In this case, the plaintiff changed the specifications, rewrote entire sections, entire paragraphs.

THE COURT:  Let me ask you to hold on.

Since the answer isn't a clear yes or no, Ms. Haley, why don't you be seated and let me

hear what the defendants' assertion is about what is in dispute here, and I can come back to you.

MR. SYKES:  I think our view, Your Honor -- Paul Sykes for the defendants -- is that the motion is based on a set of facts that really don't exist in this case.  The law they cite and the motion is premised on that ME2C merely wrote late claims, claims that cover a product in the market, that were fully supported by the spec with no issues about written description, no written description challenge, and that's just not the case.

We have -- of course, 35 U.S.C. lets you file continuations, lets you string out the 40-day for many, many years as long as you comply with applicable laws and regulations, including Section 112, and we have a substantial 112 defense.  It's at least 50 pages of one of our expert reports.  And what they want to do is sort of keep out the highly relevant, probative facts that go to that 112 defense.  And when you don't comply with Section 112, it's not merely untimely or improper, which is what they say in the motion,

it's actually unlawful.  Here, it's unlawful. To the extent you look --

THE COURT:  I'm asking you to help me.  They were suggesting this is what the motion was about:  It was about trying to prevent.  I think you think that, in some sense, on the face, what they say they're trying to prevent is something you're not going to be doing.  But I think you think there is a dispute here, and I'm trying to figure out what the dispute is.

MR. SYKES:  Well, there is a dispute here, Your Honor.  We need to be able to put in the facts, undisputed facts, as to really what happened here and let the jury try to understand why they --

THE COURT:  Maybe we're misconnecting.  What I'm wanting you to do is, Judge, here is what's going on.  I read the briefs just like you, and I can synthesize just like you, so I'm going to help you.  And the way I'm going to help you is I'm going to tell you what I think is really disputed here. Like, if I was you and I was doing that right now, I would say, look, when I read the briefs,

it seemed like, maybe especially in the plaintiffs' reply brief, it seems like there's a dispute about this thing you said in the third page of your answering brief, something about evidence implicating what the plaintiffs' own beliefs and perceptions about -- and the plaintiffs say about the scope of the claims it shouldn't matter.  So I think, Judge, that's what's happening, but what's really at issue here --

That's what I'm wanting you to do, but I'm not getting it so far.  We need to be focused.  I'm asking you to help me to understand, what are the issues in dispute here?

MR. SYKES:  That is one of the issues.  The plaintiffs did not claim anything directed to refined coal that would be based upon treating coal.  They had marketing materials where they distinguished this from the patented technology, and that is probative as to what they thought their patents covered at the time that they were licensed by the EERC.  And then later, when their business began failing, they bought the patents, and

they changed the specifications, and they changed them to cover refined coal.

THE COURT:  Can I ask, though, in what sense are what the plaintiffs -- from your briefing -- "own beliefs and perceptions" about their inventions and what their "patents cover" relevant?  How is that relevant to the issue?

MR. SYKES:  It's certainly relevant to the written description defense.  It shows they they themselves acknowledged or recognized by their actions and their words as they wrote them in the patents that their specifications as filed, the figures as filed, didn't cover the claims that they later asserted and are asserting against us.  They had to change their specs.  And you can look at their actions before and after.  It's extremely relevant.  It takes it from just this very bare, dry recitation on the redlines of the patents and shows what was going on and whey they did it.

THE COURT:  You're not suggesting that the plaintiffs' mindset has some bearing on the scope of the claims and what they actually cover?

MR. SYKES:  The scope of the claims

is -- have been construed in the words as they were issued by the Patent Office.  But as to the written description support, support of those claims in the spec and whether they relate all the way back to the intervening applications, it certainly bears on that.

THE COURT:  The plaintiffs' mindset about what they thought about that is relevant?

MR. SYKES:  Well, their actions. Their mindset is reflected in their actions. These are facts.  These are amendments to patent specifications.

THE COURT:  I guess I'm -- again, just, I've got a lot of paper in front of me. I'm trying to figure out what's disputed here.

At the end of the plaintiffs' third page of their brief, they say -- I think they say on the third page of Defendants' response the reason Defendants actually oppose this, according to Defendants, Plaintiffs' decisions about whether or not to seek protection for pretreating coal helps to explain and illuminate their own beliefs and perceptions about their putative inventions and about what their patents cover.

And then they say, "But a patentee's beliefs and perceptions about the nature of its invention or what the patents cover do not determine infringement.  Defendants' beliefs and actions do."  What do you think they're getting at there, and can you help me understand your response?

MR. SYKES:  I think they're suggesting that they want to take themselves and their actions out of this written description invalidity defense.  I think that's what they're suggesting.  And they want to reduce it to this very dry paper record that is sort of a mind-numbing procession of amendments through the Patent Office.  And when you look at what they actually said in their marketing materials, we're doing something different than refined coal.  That's how they promoted their technology, their patented technology, for several years.

And then they did an about-face, and they did an about-face, and they didn't merely lay claim to the product on the market, which would be permissible.  They changed their specification up to add disclosures relating to

adding bromine to coal that was not present in the earlier applications. So it's very closely tied together. I think it's probative and relevant to the written description defense.

THE COURT: Let me hear rebuttal. Thank you.

So, Ms. Haley, Mr. Sykes says that the evidence at issue in this MIL is not meant to get to infringement or whether they infringe or what the scope of the claims are. It's meant to get to written description of whether the patents did or did not rightly describe in a certain context.

What's your response to that?

MS. HALEY: I guess I'm a little confused because I'm not sure what part of the written description test factors in Plaintiffs' state of mind. It's a question about adequacy of disclosure. You look at the claims. You look at the specification, you look at the prosecution history to the extent that's relevant. I'm just not sure how our state of mind is actually probative of some issue related to written description.

THE COURT: Okay. Anything more you

want to say on this issue?

MS. HALEY:  I'll also say there's a little bit of this argument that that we said in marketing materials somehow relates to what the claims cover, what they mean, or what we thought we had claims over.  That's also extremely confusing.

One, we can't be construing claims in front of the jury at all.

Two, we can't be construing claims through marketing material.

The point of all this is whether the claims are infringed, whether the claims are supported for the written description defense. I'm just not sure how -- I'm worried that if we engage in all these arguments before the jury, we're encouraging claim construction.  We're encouraging claim construction based on extrinsic evidence that doesn't have anything to do with the claims, and that seems unworkable.  It seems like it will create some problems.

THE COURT:  I'm looking at your motion and the first line of it.  The evidence you wanted to strike is evidence suggesting

that the asserted patent's applications were improper or untimely.  Is that what we're talking about right now?

MS. HALEY:  I think maybe that statement is overbroad.  Really, the fundamental issue is inherently are continuations impermissible, which the law itself suggested they are.

THE COURT:  And they're not going to say it.

MS. HALEY:  Exactly.  That's not the argument they're making.  I feel like we're a little bit talking past each other with this written description argument.

THE COURT:  In other words, are we talking about an issue that you weren't meaning to raise in this?

MS. HALEY:  That's true.  I think we're beyond the scope of what we originally planned to raise, and it's because of these arguments about the marketing statements and sort of the morphing of this written description burden on us to look at our state of mind.

THE COURT:  Thank you.  I appreciate

your argument.

Here's what we'll do.  Let's take a short break, like a five-minute break, let folks use the restroom and stretch their legs.  We'll come back and have some argument on the defendants' motions.

Mr. Kremer.

MR. KREMER:  Your Honor, do you intend to hear argument on the reconsideration motion today?  We're ready to do that.

THE COURT:  No.

Okay.  So we'll take a short break, and we're back to talk about the defense motions.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  Let's have argument on the defendants' motions and we'll finish out.

I want to say, so there's no confusion, I think Mr. Dorsney was asking me earlier with regard to the exhibit lists, we talked about the date on which they would be provided, and we're going to provide the info electronically as well, of course at the end of the trial, when the jury is about to go back, it will be the parties' responsibility -- and it's my

cardinal rule to interface with you -- to have a complete final set of marked exhibits that have been admitted.  A lot of times people do this in binders that are ready to go back to the jury.

MR. DORSNEY:  That was our understanding.

THE COURT:  Good.  I just wanted to make sure.

Okay.

MR. KREMER:  Your Honor, may I hand up a one-sheet demonstrative to discuss this motion?  I think it will simplify things quite a bit.

THE COURT:  Sure, please do.

For the record, this motion is Defendants' motion number one, which is Defendants are moving to exclude certain evidence and argument about "Defendants' corporate structure, parent entities, members, affiliates, or investors."

And maybe to start, Mr. Kremer, I think -- are we in agreement that your motion is not related to DTE or evidence that might be presented regarding the alter ego issues?

MR. KREMER:  That's right, Your Honor.  The alter ego case, such as it is, remains in the case.  That means that we do not object in this motion to the introduction of evidence that elucidates the relationship between DTE Energy Resources, LLC, which is a defendant, and the so-called DTE Refined Coal defendants for which DTE Energy Resources supplied labor.  That is the only corporate hierarchical relationship that is relevant to any issue in this case.

THE COURT:  Okay.  And then let me let you start out, and I'll jump in with a question.

MR. KREMER:  There's two points --

THE COURT:  Again, it will help me if you can do what I was asking with your colleague, which is, Judge -- because I think a lot of these motions, by the time we got to the reply, things had synthesized a bit, and what we're really fighting about is X.

MR. KREMER:  That's what I understand to be the case, Your Honor.  I think the two issues are parsing out the relevance dispute. There seems to be some dispute over what

Mr. Green's current damages theory is.

The history of this is fairly elaborate. I won't go into it in detail, but Your Honor may recall we made a motion to strike earlier in this case about this issue of Mr. Green possibly conflating who was involved in the hypothetical negotiation, possibly suggesting that dismissed entities were still defendants. And Your Honor denied that motion, and we put in pin in it. And now we're back, having gone through the cycle of expert reports and having put Mr. Green under oath and having him admit three or four different times that, no, my expert damages opinion is that the only parties to the hypothetical negotiation are the named defendants and ME2C.

THE COURT: You cited a bunch of evidence in that regard that you think that is what Mr. Green said.

MR. KREMER: I felt like I got him pretty well nailed down, Your Honor, and now I'm a little bit worried that there is a new theory coming down the pike that is somehow going to somehow restore these parent entities to prominence in the hypothetical negotiation.

There's no citation to where Mr. Green does what ME2C suggests that he does, so I'm just confused, honestly.

THE COURT:  Because I think what you're saying is one of the arguments about why we might need to go into, you know, the parents and who they are is to the extent that those -- the corporate structure, the members, investors, it's to the extent that those entities would have been involved in the hypothetical negotiation.  And you're saying that that's not a theory that you believe Defendants or Plaintiffs are putting forward.

MR. KREMER:  ME2C writes in their opposition brief that "Mr. Green opines that the corporate parents, AJG, DTE, and CERT, would have been parties to the hypothetical negotiations."  And then there's a footnote to a case.  There's no citation to the record there.

THE COURT:  I wrote down "where."  Okay.  Isn't this dispute like a beyond-the-scope kind of thing?

MR. KREMER:  Your Honor, you already told me that we couldn't get this out of the

case on that basis.

THE COURT:  I guess what I'm saying is to the extent to which Mr. Green did or didn't -- I don't even know that it's going to be stated.  I guess it is going to be stated that he's putting forward his theory.  In terms of figuring out whether he fairly did or didn't, I don't have a read on that.

MR. KREMER:  It doesn't matter.  It's a fig leaf.  Here's what what's really happening, Your Honor.  ME2C is going to ring a bell that every plaintiffs' attorney and, frankly, all of us in the defense bar know is a bell.  They're going to tell the jury that JPMorgan Chase is a major investor in the defendants.  They're going to show the jury 10Ks for Arthur Gallagher and DTE Energy.  Those are three nonparties who are not accused of infringement and are not going to be held liable in there case.

They're going to tell the jury that for one reason and one reason only, which is that those are recognizable names that have a significantly larger operating income than the named defendants.  It is probably the oldest

trick in the book, and the suggestion that, well, it's relevant is a fig leaf. The arguments for why it's relevant is that it's pertinent to our expert's damages theory. I don't think that's correct, Your Honor, unless there's a new opinion coming down the pike.

It's pertinent to inducement because it shows how the businesses operate. The inducement case flows down from the defendants to the end user, the power plant. It doesn't flow up to the parents. All of the individuals whose actions and thoughts are relevant to the liability case had titles at the Defendant entities, worked on half of the Defendant entities with the alleged direct infringers downstream.

So you're right, Your Honor. Whether it's a disclosed issue, whether it's a new opinion, whatever, it's beside the point because this is a classic prejudice problem that just needs to be nipped in the bud.

THE COURT: I guess to the extent that another assertion is that at least some information about the parents of the defendants will be referenced because it's asserted that

the parents benefitted from the tax credits that are a part of this refined coal process, and to explain that, what's happening, there ought to be some reference to the fact that there's another entity who might get the benefit of that.

MR. KREMER: I think you articulated ME2C's position in its papers correctly. I have to two responses to it.

First, their damages theory is not taxing the tax credits as the royalty base. Their damages theory, they only have one, is that the amount of refined coal processed using the Chem-Mod solution is the royalty base, and the rate is more or less the rate that Chem-Mod was paid for its patents. That is the theory. So the suggestion that talking about the total amount of tax credits claimed by a given entity is relevant to that calculation, there's no connection there.

The -- ME2C cites a portion of Mr. Green's report and says this is the -- this is why the parents are relevant. If you read those two pages -- it's a quick skim -- it's entirely about the amount of refined coal

processed by the defendants and the amount of tax credits earned by those defendants. And we are not suggesting that ME2C can't talk about what the defendants earned. What we are worried about -- and I think it's not a surprise to anyone in the courtroom, so I'm not giving away the store here -- what we are talking about is the fact that Arthur J. Gallagher and Company, DTE Energy and company, JPMorgan Chase, and any number of additional investors eventually claimed tax credits that were earned by the defendants. And those numbers are bigger than the number of tax credits earned by these individual defendants who are relatively a smaller portion of the business. So it's just an agglomeration exercise just in the name of coming up with a something that starts with a B.

THE COURT: Okay. Thank you, Mr. Kremer. Let me hear from the other side.

Mr. Nemunaitis, I did write down, I said in my notes here, one reason why you say that this evidence is relevant is that you need to provide information about the corporate parents because Mr. Green said they would have been

part of the hypothetical negotiation, but I wrote that you don't cite to anything.  And the other side cites to a bunch of exhibits that appear to show Mr. Green saying the hypothetical negotiation is between the defendants and the plaintiff.  Do you want to respond to that?

MR. NEMUNAITIS:  Yes, Your Honor, as to that particular point, I believe this is paragraph 96, although I just realized it was omitted from the copy I have here on my page. There's a paragraph in his report, and it was also discussed in the deposition testimony that they attached, where he writes "For purposes of this analysis, I have assumed that each of AJG, DTE, and CERT would have negotiated patent rights on behalf of the AJG entities," and I think he's referring to the refined coal entities there.  And he goes on to explain that process.

But the idea is, consistent with the *Union Carbide* case from the Federal Circuit, if a subsidiary has a parent company that is benefiting from their operations, they're not going to agree to a patent license that

destroys their purpose of existing for that parent company, so that is something that has to be considered at the hypothetical negotiation.

Whether or not we would say that Arthur J. Gallagher is physically present at the negotiating table or the defendants are negotiating on their behalf, that's the point. The key issue is we have to be able to tell the story of the what true economics of this activity were because that's extremely relevant to damages.

It's also relevant to more than that because, for example, one of the people on the "will call" list is a man named Vincent Indino [phonetic]. He's the corporate rep for the Gallagher defendants. We said we want to call the corporate reps at first, so I expect we will call him in our case in chief at first. He is not an employee, an officer, or an owner of any Gallagher defendant in this case. So if Defendants won't let us talk about the corporate structure, I don't know how they expect to tell the jury why he's in the courtroom, but we would like to be able to ask

him who do you work for and what is your relationship to the defendants in the case so he can explain that he has authority and makes decisions and when he receives documents, he uses that to control these entities. That is extremely relevant to damages but also the infringement issues.

And similarly on DTE and JPMorgan, part of story of those parties is that while this case was pending, DTE would have communication with JPMorgan specifically mentioning this case and the use of activated carbon at these power plants, so that, again, is an additional reason why, explaining why they're not just talking to a random bank but they're talking to someone invested in this operation is relevant to infringement as well as damages.

I think the real problem we have with the motion in limine is just that as worded, we don't know what's in bounds and what's out of bounds. At some point, they say that just mentioning the name Arthur J. Gallagher is out of bounds. That's in the name of case. At other points, they seem to say it's something more narrow than that, but we don't have an

understanding of what exactly the granting of this MIL would mean.

THE COURT:  It seems like one of their concerns is that -- about going into detail about the defendants or the corporate structure, that you'll be essentially trying to suggest to the jury that, like, as if there was an alter ego case, like, against an AJG which there isn't, that essentially there is.  Look at this parent.  Look at how much money, et cetera.  Are you planning to do that?

MR. NEMUNAITIS:  We're not planning to argue alter ego as to other parties in the case.  If that's the real concern, it seems that we should be able to cross-examine their witnesses or have our witness explain the background of the case.  If it looks like we're stepping over the line, they can object at that point.  If we're going to have disagreements about what's being too pejorative with regard to one company or the other, that's not appropriate at motion in limine stage.

THE COURT:  Anything further on this, Mr. Nemunaitis?

MR. NEMUNAITIS:  No, Your Honor.

THE COURT:  Okay.  Rebuttal.

MR. KREMER:  Your Honor, Vincent Indino is a good example of why the ultimate parents are -- Mr. Indino is the president of a company called AJG Coal LLC.  AJG Coal LLC is a member of the limited liability company that is each AJG defendant in this case.  He is ex officio the managing operating member of the named defendants that are the AJG defendants.  That is why he's in the courtroom.  He is not in the courtroom because of anything have to do with Arthur J. Gallagher and Company, which is a publicly traded Fortune 500 company.  That's whose 10Ks they put on the exhibit list.

THE COURT:  I mean, the jury is going to hear the name Arthur J. Gallagher; right?  And they're going to -- because the plaintiff is going to want to show, presumably, that people who might who have authority to act for certain defendants, who knows they may work for Arthur J. Gallagher or be affiliated with them or a related entity in some way as well, you're not trying to keep that.

MR. KREMER:  I don't think we can, Your Honor, and because this is a prejudice

motion, I'm not asking the Court to draw that kind of line in the sand.  The jury needs the context of where these companies are coming from.

THE COURT:  It is kind of broad.  In the opening letter, you use the phrase "any evidence relating to Defendants' corporate structure, parent entities, members, affiliates, investors."  I don't think you're asking for that.  What are you asking for?

MR. KREMER:  We're narrowing the dispute, Your Honor.

THE COURT:  What is it?

MR. KREMER:  The financials.  Any financials of nonparty parent entities or investors.  You want to say Arthur J. Gallagher and Company claims X million dollars on its tax returns because of the Section 45 program.  That's out.  You want to say Arthur J. Gallagher is an insurance policy that set up LLCs to sell refined coal.  That's going to come in.  That's where I would propose to draw the line on parents.  The investors, you're a little more far afield.  There's a suggestion that communications with JPMorgan are relevant.

THE COURT:  How can I know that now one way or the other?

MR. KREMER:  Exactly.  So I think maybe the way to deal with the JPMorgan issue is to say you can't talk about JPMorgan's financials.  Those are not relevant.  If you have a proffer that relates to the liability case because you think that there's a communication with JPMorgan that's important, we'll take that up when you put the exhibit in the binder.  But that's the biggest bank in the world, Your Honor.  There's no question that that's not the real reason they're doing this.

THE COURT:  Okay.  All right. Mr. Kremer, are you going to address number two?

MR. KREMER:  I don't think so, Your Honor, unless you really want me to.

THE COURT:  I sure don't know.

MR. SYKES:  Paul Sykes.

THE COURT:  Mr. Sykes, you're going to take up number two.

And this one is about -- it's facially about arguments or evidence disparaging Section 45 tax credits; the Defendants' refined coal

business model, including their owners' business, practice, organization, and structure.  Again, that's pretty broad.

By the time of the reply brief, I think it seemed to be -- there seemed to be agreement that, I mean, Plaintiff is not trying -- it says is not going to suggest illegality or wrongdoing in the defendants' business model or its use of Section 45 tax credits.  I think the plaintiff said -- this is the one where the plaintiff said we told the defense.  A lot of words you're using, we're not going to use. We're not going to call the things a scheme or a scam or tax evasion or avoidance or fraud or a trick, et cetera.  So I guess knowing that, things have kind of, again, gotten synthesized a little.  Where do you think the real dispute is?

MR. SYKES:  There are really three sort of disputes that came out of their response.  We thought this was a pretty straightforward motion in limine.  It's the type often filed by the plaintiff who represents a nonpracticing entity not to get into all the multilayer LLCs and suspect

there's something wrong with that.

Where they focused was we particularly identified in our opening language of the complaint that the defendants earn "staggering profits from a highly lucrative law," and they say that that is exactly relevant to the damages case, that it's not disparaging.  And in the same paragraph they say that a method for -- that's highly relevant to the amount of value obtained at issue here is that Defendants "generated pass-through tax credits for infringement."  Generated pass-through tax credits for infringement.

And I think you just heard Mr. Kremer say that Plaintiffs' damages expert model is not based on tax credits for infringement.  There ought not be any argument that the plaintiffs' patents read on Section 45.  As a factual matter, a legal matter, they don't, yet they're indicating that they're going to argue that generating pass-through tax credits for infringement is part of their damages model and part of the value of the case.

Staggering profits from a highly lucrative tax law, that's not damages, and it's

prejudicial.  It's not relevant to infringement.  It's not relevant to invalidity.

THE COURT:  Issues like profits and amounts of money seem like a different category, though, than a lot of what the motion focused on, which is the pejorative terms, the scam, scheme, et cetera; is that right?

MR. SYKES:  I don't think those are at issue, Your Honor, and it was a little surprising how they came back and focused on these other three points.  And they generally tried to tie it to their damages model because these things are clearly not relevant to infringement or invalidity, so damages is the hook they have to try to argue relevance.

And the second piece was lobbying, which is surprising.  They would say the value of lobbying ties to damages.  They cite and attach the Green report at 3334, but there's nothing in the Green report about lobbying.  So this is another -- I guess we're anticipating beyond the scope here, but Mr. Green didn't give any opinion purporting to tie the value of the use of the invention to lobbying.

And as a matter of law, patent damages

are based on the technical value, the technical contribution of the invention, not some artificial value.  There's no probative value to lobbying.  That was one of the other points.

THE COURT:  I would say I'm not even sure to what degree lobbying is going to be referenced in the case or not or what.  I'm not sure how I would know.  Do you know?

MR. SYKES:  Well, it was surprising because this wasn't in Green's report and came up as a reason that they should be able to suggest that we're these large powerful entities and went to Congress and lobbied and got the special tax law put into place.  That's what they want to argue, and that's not relevant, and it's only prejudicial.

THE COURT:  Lastly, there are some terms in here like "shell company" or that money -- I think the word "funneling" is used, but money goes from one to another.  On the one hand, there are certain kinds of certain pieces of evidence, as to DTE and the alter ego issue, that they'll be able to get into, which a lot of those factors are about whether DTE essentially was the subsidiary, whether the

subsidiaries were not really independent actors.

I don't think -- your motion is particularly focused on -- when we get out those pejorative words like "scam" or -- I don't think your motion is focused on this kind of evidence about DTE; is that right?

MR. SYKES:  With this caveat:  There are no alter ego claims against anyone else, but there's no allegation that DTE Energy Resources was "funneling money."  They were -- they were complying with the tax law, filing proper documents, and if you want to call that funneling money through, no, it was a pass-through entity in accordance with the tax code and Delaware organizational law.  That business model was challenged by IRS, and the DC Circuit, which cited the case, said it was entirely proper and legitimate.  When they have the alter ego claim against the DTE entity, they use terms like it was set up to funnel money.  We think it's improper.

THE COURT:  Let me hear what your colleague has to say.

I think, Mr. Caldwell, to the extent you

can help me synthesize things, a lot was talked -- I think we're probably not arguing about X anymore.  I think what we're arguing now comes down to A or B or whatever it is. That would be helpful.

MR. CALDWELL:  I think the thing we're not arguing about is sort of the letter of the motion in limine, the part about irrelevant or unduly prejudicial, and it seems like, generally speaking, what it turned into was a fight over words that aren't disparaging. I mean, just, like, literally, factually describes their thing.

We have agreed -- as you observed, we don't intend to suggest illegality and fraud and whatnot.  So I think it got away from that, and we agreed that from the beginning, but what it became was we think there are a lot of words that we think are literally actually describing the actual configuration of the defendants and how their business works.

THE COURT:  Again, from my earlier conference with Mr. Sykes for the other motion, I'm asking you to help me.  And so, like, Judge, look, when I read through the briefs,

yes, there were a lot of words that were originally at issue that were raised by Defendants, and we said we're not going to use those. So when it came down to it by the reply, here's what I think we're really arguing about.

Like, for example, I think there's a category of words like "shell company" or "funneling money." We think those are appropriate to use. We do want to use them. They seem to disagree. The reason why we can use them is because, as to DTE, we think they're relevant to the alter ego analysis and otherwise. That's what I'm asking you for. Help me.

MR. CALDWELL: Yes, sir. I certainly agree with everything you just said in terms of shell companies and why words like that are relevant. I think, fundamentally, where the dispute has boiled down to is, essentially, Defendants don't want the plaintiff to be able to prove their case when part of proving their case is showing that this patented technology is valuable, and in particular consistent with *Georgia Pacific* factors, is valuable to

defendants because what's very unusual about this case is that the refined coal defendants are actually structured to lose money.  So we're in a world where we're going to present to the jury, here's this infringement, and it is valuable, and we want compensation for the value of that infringement.  And absent an actual explanation of the way the defendants are structured, they get to say, what are you talking about?  How can we pay you?  It's not valuable.  We actually lose money.

That's where this is boiling down to.  I mean, it gets coded with words like "shell company" and whatnot, but the reality is these refined coal companies buy coal and sell it back cheaper with stuff on it.  They do things to it and sell it back cheaper.  And it only works because they are trying to obtain tax credits.  They don't want earnings.  They want the tax credits.  They don't want something to offset these tax credits they're going to get.  They don't want to be profitable.  Those tax credits have value and roll up.  And that is the reason why this is tremendously valuable.

And what it seems to me -- I'm trying my

best to boil this down to where the rubber meets the road.  It seems to me the defendants -- I mean, look, if they're ashamed of their organizations or they have problems with it, whatever.  That's not what this is about.  At the end of the day, they have a structure where a lot of value is in tax credits rather than the coal company paying me X more dollars per ton.  Without the explanation of how -- those don't just die as unused tax credits at the LLC level because they decide to have a loss.  They do have value because of the way they roll up.  Without doing that, we can't even present that there's value to the defendants, which is obviously a GP factor.

THE COURT:  Got it.  Okay.

And to the extent the other side says, look, we don't seek to exclude the financial details of the transactions between the refined coal LLCs and their power plant customers, but what's prejudicial is a suggestion -- if you could hear that statement and say the financial details, like the details including the tax credit program and the explanation of maybe

what's involved and why it would be sold at a loss, they go on to say what's prejudicial is the suggestion that structuring companies to operate this way is inherently suspect, unusual, or profitable.

MR. CALDWELL:  Correct.  And I thought we tried to say in meet-and-confers and our briefing it's not our intent and we have no intent of suggesting that it is inherently improper, it is fraudulent, it is avoiding taxes.

THE COURT:  Tax credits are legal. It's pursuant to a law; right?  It's just that you want to explain that they're getting these credits and who the credits rebound to as a way of explaining why it is they're doing what they're doing and why that's value.

MR. CALDWELL:  Why there's value, substantial value.  And the tax credit is odd in the sense that it's not like "give me a dollar, here's a candy bar" kind of thing like an exchange of cash.  It's like a credit is sort of offsetting earnings and it has, I guess, no value, right, if somebody doesn't have taxable income that it could offset.  And

that's why, I mean, describing factually how the actual structure works is necessary to demonstrating the value, and we're not trying to vilify it.  And I think -- we've gone out of our way to say every which way that we're not trying to vilify it.  That's why we tried to carve out all these words.  I think you could fairly say things like tax avoidance isn't vilifying it, but we agreed not to say that either.  But still, explaining how credits roll up, it's necessary.  They're just the necessary facts.

THE COURT:  The other question I have is there was evidence with respect to lobbying efforts.  Are you going to be putting in evidence on lobbying efforts?

MR. CALDWELL:  Two points on that.

First of all, I think the way it got argued was almost like a suggestion that in the response, we were surprised they came forward saying lobbying.  Lobbying is in their original motion.  It wasn't a surprising response.  It's page three of their opening motion.  Please don't say we lobbied.

Fundamentally, what it relates to -- I

don't know if we can put a dollar amount on it. What it relates to is the value to the country, to the United States, to the citizenry of having clean coal technology like ours, were necessary in order to meet certain thresholds.

THE COURT: Is this stuff in Mr. Green's report?

MR. CALDWELL: I'm not sure it's in Mr. Green's report because I don't think it's something that's transitioned to a dollar amount. It's more like even our own fact witnesses have followed this closely as far as trying to build their business and trying to go out -- having certain requirements that would be federally required so they could go to coal companies and convince them to embrace the technologies and whatnot. Like I said, I don't think it's something we're trying to ascribe a dollar value, lobbying was $0.17 a ton of coal or something like that. It's evidence that these technologies a needed.

THE COURT: It's meant to be relevant to damages.

MR. CALDWELL: It's relevant to damages. I would have to look at some of the

timing and whatnot, but I think just generally it's relevant to the value of the technologies. It's relevant to the competitive landscape that ME2C is in.

What you also have is Defendants -- it's kind of apparent in the motions in limine, but they want to try a theme of, like, Chem-Mod is much better than you. You failed. That proves that Chem-Mod is better than you. What people were saying in lobbying and what people were pushing for as requirements for tax credits and EPA requirements, all of this goes to the competitive landscape that ME2C was trying to deal with. It relates to a lot of issues that I think are thematic, but it fundamentally goes to value, even if it's not something that an economist would translate to cents per ton.

THE COURT: Thank you.

Any rebuttal?

MR. SYKES: I'll try to keep it brief.

The rubber is meeting the road. I will agree with my colleague on that. What you just heard repeated several times is that the value is in the tax credits. That is not relevant to

damages.  Tax credits are not part of the damages model.  In fact, tax credits are error if one were to consider them part of patent damages.

I'll direct Your Honor to the *Ericsson* case, 773 F.3d 1201 at page 1233 and this, as I wrote, *Cisco* case, 809 F.3d 1295 1305.  Those cases are dealing with standard patents in which a patent has artificial value that accrues to it because it's been made part of the standard, and the Court is crystal clear can that that artificial value -- because if you have a patent essential to WiFi, gives you incredible leverage.  It's incredibly valuable. Everybody in the world needs it because this body has adopted that patent into a standard everybody has to use.  And the Federal Circuit is crystal clear that that is not value that's relevant to patent damages, and the jury must be instructed not to consider it.  They're trying to turn that on its head and inject that value everywhere they can into this case, and it is pure legal error.

THE COURT:  This sounds more like a Daubert issue.

MR. SYKES:  It is, but my colleague said this is where the rubber is meeting the road, and this is a critical point, Your Honor.

They said it's thematic.  It's what their whole case is going to be about, and it's legally and factually erroneous.  It's factually erroneous, Your Honor, because there's no dispute that ME2C's patents don't get you the tax credit.  And if you were to use ME2C's patent with activated carbon, you couldn't qualify your coal for the tax credits. It is a complete factual mismatch coming and going.  You have this factual error and you have this massive legal error, and their entire case is going to be based upon that, trying to inject that thematically, that that's where all the value comes from.

It's clear that if you look at the technical value of the invention, which if you look at these cases, that's what they have to base their damages on, it's a completely different number.  So there's this dance going on of we're not going to -- Green doesn't say the tax credit is so many dollars per ton, that should be the damages model.  And then the

plaintiff is going to argue every step of the case that's where the value of the technology is.  It's so valuable, Congress passed a law for it.  And again, their patents don't line up any which way with the law.

THE COURT:  Okay.  All right.  Thank you.  Let's address the last motion.

MR. LOMBARDI:  For the record, George Lombardi speaking on behalf of all the defendants.  This is motion number three as you were turning to, Your Honor.  I'll read the title into the record so that we have that.  It is Defendants' motion in limine number three to exclude at trial ME2C's improper speculation regarding the existence or contents of communications.

THE COURT:  Mr. Lombardi, when I read this, I thought maybe probably everyone would agree that testimony that amounts wholly to speculation is not appropriate.  But how do I know what testimony will be offered and what level of speculation, et cetera?  So I guess, again, maybe, what are the defendants asking me to do here?

MR. LOMBARDI:  In this motion, two

very specific pieces of evidence, Your Honor, and they're on the first page of text of the motion.  They relate to two particular pieces of evidence.  One is -- and it's at page one there, Your Honor, if you have it.

THE COURT:  I do.

MR. LOMBARDI:  I won't read it into the record, but it's right there.  So those two things, so they have their expert, Mr. O'Keefe, lined up to testify that certain power plants inform the defendants who -- they say that the power plants inform the defendants about the existence of plaintiffs' patents.  They say that with no proof in the record that that's the case.

Mr. O'Keefe wants to say that himself.  That is not testimony he's entitled to give.  He cannot testify as to the underlying facts, so for him to say he's -- it actually isn't, I think, Your Honor, in these cases not that difficult to make the call because there literally is no testimony, no document, no nothing that he's pointing to to support his conclusion on the facts.  So he can't do that.

THE COURT:  I think, again, this

first point is about the extent to which an expert witness will refer to evidence that information about the patents were communicated in conversations between a power plant and a defendant.  That's the way I'm -- just reading from the first bullet on the first page.

MR. LOMBARDI:  Yes.

THE COURT:  And I guess to some degree, if the argument is there's no evidence of this, that's a summary judgment motion on the evidence.  But otherwise, if the question is at trial, will there be evidence that will be in the record from which one could circumstantially infer and directly see that certain communication was made and that certain knowledge was had, wouldn't that depend on what the evidence was at trial?

MR. LOMBARDI:  I guess, Your Honor, I would say that to some extent things always depend on what the evidence is at trial.  This is from his expert report.  So we know exactly what evidence he's summing up to support the point that he says.  He's invented a communication between power plants and the defendants, and he's invented the content of

that communication.  He's not entitled to do that.  Now, Judge, it would be one thing on the inference point on the inference point that Your Honor makes.  If there are facts out there in the record, facts A, B, and C --

THE COURT:  If there's a document like an e-mail from one person to another and it says, hey, I want to tell you about this patent.  And the person on the other side represents one of the defendants, if the document is admitted into evidence or it's part of the case, people can draw conclusions from it.

MR. LOMBARDI:  Here's the point.  That document doesn't exist.  That's the problem here.  And, Your Honor, you asked to boil down the arguments for what they really are.  If you look at their brief, they don't really address the point that we're making here.  They say, well, this is a Daubert motion, which it's not.  They say, well, we can deal with this at trial, which we shouldn't because this is the kind of issue we have properly teed up for the Court and can give everybody guidance on what we should be doing

at trial.

And then say say -- they address some issues, but they're not the issues we raised. The point, Your Honor, is that they cannot point to any evidence that says what they have their expert saying as a factual matter, and he cannot substitute facts.  He can't provide facts to this factual record.  He's not a percipient witness.

THE COURT:  I don't have the O'Keefe report in front of me, but I remember looking at these paragraphs, and there are citations to documents.

MR. LOMBARDI:  There's citation to documents, but the question is what do those documents say.  And those documents -- for instance, there is no document where a power plant tells a defendant about the existence of the patents-in-suit.  There is no document that does that.  That is all Mr. O'Keefe testifying, supposedly as an expert, but he can't put facts in, Judge.  He can deal with the facts that are out there.  But he can't put facts in.

The other one was they want to say that the DTE defendants learned about the

patents-in-suit because AJG defendants did a patent search, and then they said they told the representative, the DTE defendants about it. It didn't happen.  There's nothing in the record that says that conversation happened. It's just Mr. O'Keefe saying I'm going to say there was a conversation that happened based solely on the fact that somebody at AJG did a patent search.  And he says, well, then, they must have told the other folks.  That's not opinion testimony.  That's not factual testimony from a percipient witness.  He can't do it.

THE COURT:  I think I certainly agree with you that an expert couldn't just say there's this fact in the record that this entity knew about the patent.  What about this one?  Well, I think they told him.  Why do you think that?  I just think it.

MR. LOMBARDI:  And that's exactly the situation here, Your Honor.  That's exactly the situation.

THE COURT:  Let me hear what the other side says.  Thank you, Mr. Lombardi.

Ms. Dellinger, I gather from the

presentation that I think what's happening, tell me if you think I'm wrong, is that in these pages of Mr. O'Keefe's report that are referenced, he is referring, I think, to certain documents and maybe drawing certain conclusions about what was said from one party to another or what it meant.  And the other side is saying there just isn't going to be any evidence that supports the statements he's making.  What's your response to that?

MS. DELLINGER:  Thank you, Your Honor.  The first problem is that the statements that the defendants say that Mr. O'Keefe makes he doesn't make.  So they make a logical leap from what is actually in his report.  And I have copies of the report, enough for opposing counsel and the Court if they'd like it.  Or I can present things on the ELMO because I think it's very important to actually see what Mr. O'Keefe is saying and the fact that each of the statements in his report is supported by evidence, by facts, documents.

THE COURT:  Evidence that's going to come in at trial.  It's going to be admitted at trial.

MS. DELLINGER:  Yes, Your Honor.

THE COURT:  So an e-mail will come in -- if he's citing to an e-mail, that e-mail will ultimately be admitted, and then he'll be asked to comment on what is stated in the e-mail.

MS. DELLINGER:  Yes, Your Honor.  For example, the defendants, they state one of the two pieces of evidence that's narrowed from their request in their motion in limine -- I now understand it is just narrowed to the two pieces of evidence in Mr. O'Keefe's report that they highlighted, pages 87 through 94, I believe -- that they say that the first part is testimony or argument that certain power plants informed Defendants who sold them refined coal about the existence of the patents in suit. Mr. O'Keefe doesn't say that.  He says ME2C -- for example, for the San Miguel plant and I'm referencing paragraph 121 of Mr. O'Keefe's report -- and if I may approach I could provide that to the Court or I'm happy to proceed.

THE COURT:  Do you have a copy for me?

MR. KREMER:  Your Honor, can we have

a copy?

THE COURT:  I think she's referencing Mr. O'Keefe's report, paragraph 121.

MS. DELLINGER:  Look at paragraph 121 starting with the second sentence.  It says, "For example, the San Miguel power plant received information about ME2C's patents in at least 2013."  That is factual.  It is supported by a footnote, 106, which is a proposal for mercury capture optimizing that was submitted to the San Miguel power plant which identifies specifically that ME2C's patented technology is covered -- the one that they were using for mercury control -- is covered by the '147 patent at issue in this case.  That is a factual statement.

The next sentence, "AJG later looked into supplying refined coal to San Miguel and was made aware of its use of ME2C's technology." That is supported by an e-mail that was sent to Sally Batanian who is the predecessor to Mr. Indino and was listed on the "will call" list and was deposed in this case where it indicates that as they were looking into the San Miguel plant, that they were made aware

that the current mass compliance strategy is ME2C's technology, and it explains what that is.  Those are the two statements and that's the factual support.

Now, if we go back to what Defendants say that those two sentences mean, they say that it's testimony or argument that certain power plants informed Defendants who sold them refined coal about the existence of the patents-in-suit, and Mr. O'Keefe simply does not say that.

THE COURT:  Where are you?  Where are you reading from?

MS. DELLINGER:  Sorry, Your Honor.  I was reading from the first page of Defendants' motion in limine, the first bullet point of evidence that they purport to try to exclude.

THE COURT:  Which portion again?

MS. DELLINGER:  The testimony and argument that certain power plants informed the defendants who sold the refined coal about the existence of the patents-in-suit.  As we see, that's just simply not what Mr. O'Keefe said.

THE COURT:  He's not going to be testifying or arguing that certain power plants

informed the defendants who sold the refined coal about the existence of the patents-in-suit.

MS. DELLINGER:  That sentence is not in Mr. O'Keefe's report, and he's cabined to the contents of the report.  He does list this evidence in addition to other evidence.  All of this evidence is evidence from which the jury could conclude that the defendants were aware of the patents-in-suit prior to this case. This is just one example.  There are many, many others, including e-mails where they actually cite ME2C's patented process and what it is prior to the filing of the suit.  So that is a first preliminary issue.

THE COURT:  Is the distinction there that -- you've just shown me some documents where you think, like, a power plant was told of the existence of the patent, and you've said Mr. O'Keefe is not going to say this this power plant or other power plants told the defendants about the existence of the patent, but you've said but we will argue that one could infer that they did.

MS. DELLINGER:  We will present

evidence from which the jury can conclude.

THE COURT:  Not just this evidence but other evidence?

MS. DELLINGER:  Yes.  Mr. O'Keefe -- what the defendants are seeking to do is bar the presentation of this circumstantial evidence of that knowledge, and that is just simply not -- improper speculation is what they cabined it as.  It's facts and data and e-mails and evidence.  That is the first part on the conversations with power plants.

The second issue is relating to the patent search, and Defendants, similarly, they try to bar the inclusion or any testimony that an agent of the AJG defendants learned about the patents-in-suit through a patent search and then told a representative of the DTE defendants about them.  This one is a little bit more complicated and deserves a little bit of a back story.

Ms. Sally Batanian, again, she testified that prior to Chem-Mod providing its technology for refined coal, it did a patent search.  Now, Defendants claim privilege over the results of patent search and whether they obtained written

communication from counsel from the result of the patent search related to infringement of other individual patents of the Chem-Mod technology.

So what Mr. O'Keefe does is he says, according to Sally Batanian, the -- Chem-Mod performed a patent search to identify any patents in the landscape prior to providing this technology. Then separately, there was a communication between Sally Batanian and DTE representatives regarding patent infringement. And he says in his report at paragraph 115, the last sentence, "In addition, Ms. Batanian apparently shared this information with DTE." Now, that is based on the fact that we know that they did a patent search prior to this time period.

And then, separately, if we see reference 188 at the bottom of page 88, this is a section of DTE internal notes from around the same time frame when that patent search was conducted to state that I read him Sally's e-mail regarding patent infringement, and they asked him for it, and this is in the context of the conversations with potential refined coal power plants that

DTE was looking into.

So there's evidence both that the patent search occurred and that Sally communicated information related to patent infringement to DTE.  So we would -- this is not speculation as to what this is.

And the defendants also separately bring up the issue of Mr. O'Keefe performing his own form of patent search and saying if I were to do a diligent patent search, which he shows in his report just is going to Google patents and looking for mercury reduction technologies using bromine, ME2C's patents pop right up.  And furthermore, he says Sally Batanian and George Cook, further witnesses in this case, testified that they knew that the EERC was a premiere facility for mercury research.

If we were to go one step further and narrow the results to EERC, you certainly would have found ME2C's patents.  This is the evidence and underlying data that supports Mr. O'Keefe's statements, and he does not say go out there and say that the AJG Defendants say that their patents are returned to the patent-in-suit, but he certainly does provide

evidence of that.

THE COURT:  He provides evidence that you will argue one could use to infer that they did.

MS. DELLINGER:  Yes, Your Honor.

THE COURT:  He's not going to say they did.

MS. DELLINGER:  No, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Lombardi.

MR. LOMBARDI:  Yes, Your Honor.  Just a small piece of background for Your Honor. There is a Daubert motion relating to this witness, and one of the things that is specifically raised in the Daubert motion is the use of this witness, which we view as improper, to go through documents and try to make, essentially, lawyer arguments to the jury about how the facts should be viewed and the inferences.  But I just flag that for Your Honor that.  That's an issue that you'll be resolving.  That's not the issue right now.

The issue right now is whether he can speculate as to facts, and he can't speculate as to facts.  Counsel just got up and read you

from paragraph 115.  Your Honor, this was about Sally Batanian.  It says Sally Batanian, who was involved with Chem-Mod and the AJG defendants, testified that Chem-Mod did a patent search before beginning its refined coal program.  In addition, Ms. Batanian apparently shared this information with DTE."  He has zero evidence that that happened.  He wants to say it happened because it helps their case.

THE COURT:  They cite a document.

MR. LOMBARDI:  They cite a document that doesn't say there was an opinion.  That doesn't say there was a patent search provided. It doesn't say anything like that.

And while we're on the subject of the patent search, Your Honor, this witness has no qualification, as we say in Daubert, to be talking about patent searches and to talk about he did a patent search a Google search today, I guess to talk about what happened in 2007, and how all their patents show up.  Well, in 2007, their patents didn't exist, Judge.  That's the level of lack of qualification we're dealing with. What they say what they want him to do is fill in factual gaps for them.

And if the there's any doubt that that's what they're doing, go to page 87 please at paragraph 112 where they say there is evidence -- this is him, Mr. O'Keefe.  This is what they said he's going to testify to, and this is what prompted our motion.  There is evidence from which the fact finder could conclude that Defendants were aware of the patents in suit.  He's telling -- he wants to tell the jury what to infer from the facts.  That's not his job.

THE COURT:  You would say he can't speak to the intent.  He can't provide conclusions about the intent or the mindset of the party.

MR. LOMBARDI:  He absolutely cannot.  That's black letter law, Your Honor.  That's what they're trying to use him for, and that's what they seem to be trying to run from right now.

I want to reemphasize, Judge, that in the Daubert motion, we have that serious problem with him doing this kind of "I'm going to put an e-mail here and put an e-mail there and I'm going to tell the jury what to conclude about

this."  We think that's improper.

THE COURT:  Okay.  I'm aware of that. Thank you.

MR. LOMBARDI:  Thank you, Your Honor.

THE COURT:  All right, counsel. Thank you for your --

Well, I guess, Ms. Dellinger, I'm going to ask you one quick question.  You can stay there at counsel table.  Do you agree that Mr. O'Keefe is not going to be saying things like "So I conclude that Defendant X had knowledge or had the state of mind"?  Is he going to be saying those things?

MS. DELLINGER:  Your Honor, Mr. O'Keefe will not be testifying to Defendants' state of mind.  He is testifying as to the elements of induced infringement, which require knowledge and evidence to support his overall infringement opinion.  But just as in paragraph 112 where it says there's evidence from which the fact finder could conclude that the defendants were aware of the patents-in-suit, he's cabined to the scope of the report, and that's what he will say.

Also, I know my opposing counsel

referenced the outstanding Daubert motion.  We cite case law in a responsive briefing that an expert witness is allowed to accumulate and marshall evidence that supports those underlying issues for indirect infringement.

MR. LOMBARDI:  Just one, and I think you know this, Your Honor.

THE COURT:  I'll give you the last word.

MR. LOMBARDI:  Thank you.

Obviously, the elements of inducement are -- I think knowledge is mentioned in all three elements.  Maybe it's two of them.  He cannot provide testimony on that.  He can provide testimony on parts of inducement, but he can't provide testimony on the state of mind of Defendants in this case.  And so that --

THE COURT:  He could -- could he not address factual matters?  I think what you're saying is what he can't do is say, "So I conclude they had this state of mind or could have had this state of mind."  But he could talk about facts that one -- that the jury might be asked later to infer about the state of mind.

MR. LOMBARDI:  Your Honor, I don't think he can do that.  I think he can certainly express opinions that are related to inducement.  So he can talk about direct infringement, for instance, things like that, but he cannot get up and tell the jury how to interpret facts.

And the reason I mentioned the elements of inducement is counsel said no, no, no, he's not going to talk about anything related to state of mind, but of course he is going to talk about his opinion that they actively induce, and he can't do that.  He just can't do that.

THE COURT:  All right.  Thank you, counsel.  Thank you.

MR. KREMER:  I sense Your Honor might be wrapping up, and I have two small housekeeping notes at your convenience.

THE COURT:  A couple of things I thought I wanted to say.  I do have a lot of knowledge about the case, obviously.  I've heard it for years.  Even then, there's so much more I don't know, so sometimes I'll be asking in the arguments -- it's helpful to provide me

background on what is going to be argued about this.  You all have a good sense of each other's positions.  Unless it's been presented to me in a motion, I wouldn't necessarily know.

Second, I'm not saying pejoratively, just as a factual matter, a couple of times today something may have been said and counsel on one side or another laughed out loud and audibly, such that I heard it.  And I would just say that we don't want to be doing that at trial around the presence of the jury.  Obviously, the parties have their views about the strength and weaknesses of the other side's position, but shouldn't be laughing or snorting about such a position.  Okay.  I know everybody knows that for trial, but here it's just me, but I want to emphasize that.  Okay.

And I also wanted to say I know I there's a few summary judgment and Daubert motions left.  We're working on them.  You'll see a number of them by the end of the week, and we'll work to get them out as soon as we can before the trial.  The parties should expect for now that they'll be trying the case as it stands.  To the extent that some of the motions

alter that, you can pivot, but you should fully expect that would be the case.

You said you had two housekeeping matters.

MR. KREMER:  Yes, thank you, Your Honor.  So just -- Mr. Sykes gave a very compelling argument, in my view, made a reference to DTE Energy Resources, which is my client.  I just want to make clear for the record I don't think that DTE Energy Resources' structural relationship to the DTE refined coal makers is actually in the record.  We represent them.  We represent the coal makers.  I don't think the record before Your Honor on the MIL -- I don't think they made a showing of who they are.

I'm happy to elaborate on that if Your Honor wants to hear briefing or see evidence about that, but they are a random company in a large ladder that is not the parent entity that has a 10K.  I can tell you that much.  It's not clear to me that's been expressed to you, so you should know that.

Also, during one of my arguments, Your Honor, there was a somewhat casual suggestion

that one of the cases I cited to Your Honor may have been overturned. I actually did not hear it, but I went out and looked at it quickly. I don't see any indication negative treatment for the *TecSec* case. I'm not aware of any negative treatment. I would like counsel to inform me if I'm mistaken, but I did want the Court to know we're not aware of any negative treatment.

THE COURT: Okay. Thank you. All right. Thank you, counsel.

So I'll take these motion in limine arguments under advisement and work on them to get you answers sufficiently prior to trial. With all that said, unless there's anything further, we'll thank counsel for their presentations. We'll end our pretrial conference and wish out-of-town folks safe travels. And as I said, I'll get back to you on these issues.

Thank you.

## C E R T I F I C A T E

STATE OF DELAWARE          )
                          ) ss:
COUNTY OF NEW CASTLE       )

I, Deanna L. Warner, a Certified Shorthand Reporter, do hereby certify that as such Certified Shorthand Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings in Case Number 19-CV-1334-CJB, *MIDWEST ENERGY EMISSIONS CORP., et al. Vs. ARTHUR J. GALLAGHER & CO., et al.*, heard on November 1, 2023.

I further certify that a transcript of my shorthand notes was typed and that the foregoing transcript, consisting of 164 typewritten pages, is a true copy of said **PRETRIAL CONFERENCE**.

**SIGNED**, **OFFICIALLY SEALED**, and **FILED** with the Clerk of the District Court, NEW CASTLE County, Delaware, this 2nd day of November, 2023.

_____
Deanna L. Warner, CSR, #1687
Speedbudget Enterprises, LLC

## #

**#1687** [1] - 164:22

## $

**$0.17** [1] - 137:17

## '

**'147** [1] - 149:12

## 1

**1** [4] - 8:12, 9:4, 9:22, 164:11
**1010** [1] - 77:19
**106** [1] - 149:7
**10:15** [1] - 20:19
**10K** [1] - 162:19
**10Ks** [2] - 115:15, 123:12
**112** [6] - 101:16, 101:17, 101:21, 101:22, 157:1, 158:18
**11388472** [1] - 91:23
**115** [2] - 153:10, 155:24
**12** [1] - 58:11
**1201** [1] - 139:4
**121** [3] - 148:18, 149:1, 149:2
**1233** [1] - 139:4
**1295** [1] - 139:5
**13,th** [1] - 6:2
**1305** [1] - 139:5
**13th** [1] - 24:14
**14** [3] - 9:18, 9:22, 58:12
**15** [6] - 7:1, 19:5, 24:14, 44:3, 48:13, 56:9
**15-hour** [1] - 95:3
**16** [7] - 30:12, 30:19, 35:22, 36:5, 42:9, 42:18, 52:7
**16.3** [1] - 39:6
**164** [1] - 164:14
**18** [3] - 27:14, 35:12, 57:21
**187** [1] - 11:25
**188** [1] - 153:17
**19** [3] - 27:14, 35:12, 57:21
**19-1334-CJB** [1] - 3:7
**19-CV-1334-CJB** [2] -

1:6, 164:9
**1:30** [1] - 98:15
**1st** [1] - 1:14

## 2

**2** [2] - 8:12, 9:8
**2007** [2] - 156:18, 156:19
**2009** [1] - 73:12
**2013** [1] - 149:6
**2018** [1] - 91:22
**2019** [2] - 74:22, 90:17
**2020** [1] - 93:21
**2021** [1] - 92:8
**2023** [3] - 1:14, 164:11, 164:20
**22nd** [1] - 24:22
**23** [1] - 43:2
**25** [1] - 42:8
**2A** [2] - 1:14, 6:1
**2d** [1] - 93:7
**2nd** [1] - 164:19

## 3

**3** [1] - 8:12
**30** [1] - 24:17
**30(b)(6** [1] - 85:21
**3334** [1] - 128:17
**35** [1] - 101:12

## 4

**4** [1] - 8:12
**40-day** [1] - 101:14
**403** [4] - 85:9, 90:3, 94:19, 96:8
**45** [6] - 67:9, 70:1, 124:16, 125:23, 126:7, 127:16
**4:30** [1] - 6:10

## 5

**50** [1] - 101:18
**500** [1] - 123:11
**55** [1] - 77:19
**5:00** [3] - 6:11, 6:14, 6:15

## 7

**70** [1] - 50:1
**74** [1] - 53:15
**773** [1] - 139:4

**7th** [1] - 24:3

## 8

**809** [1] - 139:5
**87** [2] - 148:11, 156:25
**88** [1] - 153:17
**882** [1] - 93:8
**8:15** [5] - 18:10, 18:13, 19:3, 20:4, 50:12
**8:30** [1] - 18:13

## 9

**9** [2] - 35:21, 36:4
**94** [1] - 148:11
**96** [1] - 119:8
**990** [1] - 93:7
**9:00** [8] - 6:6, 6:11, 6:15, 18:1, 20:4, 20:17, 51:4, 51:6
**9:30** [5] - 6:5, 6:13, 18:3, 18:5, 20:19
**9th** [1] - 12:1

## A

**abide** [1] - 39:16
**ability** [4] - 48:7, 62:14, 66:18, 71:1
**able** [19] - 7:11, 10:2, 12:11, 37:24, 52:10, 54:25, 82:13, 82:20, 87:21, 94:1, 95:23, 97:7, 102:11, 120:7, 120:23, 122:13, 129:9, 129:21, 132:19
**about-face** [2] - 106:19, 106:20
**absent** [2] - 57:5, 133:5
**absentia** [1] - 40:23
**absolutely** [7] - 23:25, 37:21, 55:9, 71:1, 74:12, 79:19, 157:14
**absolves** [2] - 85:1, 85:4
**academic** [1] - 15:18
**accept** [1] - 99:6
**access** [1] - 13:18
**accomplished** [1] - 5:5
**accordance** [2] - 48:11, 130:13
**according** [3] - 37:17, 105:18, 153:4
**accountants** [1] -

68:23
**accrues** [1] - 139:8
**accumulate** [1] - 159:1
**accused** [11] - 58:20, 58:22, 59:4, 59:8, 63:25, 68:15, 69:14, 74:2, 80:21, 89:4, 115:16
**acknowledged** [1] - 104:8
**acknowledging** [1] - 90:9
**act** [1] - 123:17
**acted** [1] - 99:3
**action** [2] - 3:7, 93:9
**actions** [9] - 15:8, 68:5, 104:9, 104:14, 105:7, 105:8, 106:3, 106:8, 116:10
**activated** [8] - 85:19, 86:16, 86:17, 86:21, 86:24, 87:1, 121:10, 140:8
**actively** [1] - 160:10
**activity** [1] - 120:9
**actors** [1] - 129:25
**actual** [7] - 62:2, 65:5, 70:23, 89:7, 131:18, 133:6, 135:25
**acutely** [1] - 70:16
**add** [2] - 99:13, 106:23
**adding** [2] - 38:13, 106:24
**addition** [4] - 69:4, 151:5, 153:11, 156:4
**additional** [12] - 20:9, 35:15, 39:14, 40:3, 41:20, 42:10, 42:18, 51:1, 88:19, 94:17, 118:8, 121:11
**address** [12] - 10:18, 43:3, 44:13, 50:11, 51:22, 53:7, 53:13, 125:13, 141:5, 144:17, 144:25, 159:17
**addressed** [3] - 44:19, 51:8, 51:11
**adequacy** [1] - 107:16
**adjudicated** [1] - 41:10
**admission** [2] - 16:15, 19:25
**admit** [1] - 113:10
**admitted** [11] - 12:18, 13:8, 17:1, 17:16, 23:20, 23:21, 24:10, 111:1, 144:9, 147:22, 148:2

**Adobe** [1] - 91:22
**adopted** [1] - 139:14
**ADRIENNE** [1] - 1:21
**Adrienne** [2] - 3:19, 28:14
**advance** [3] - 15:4, 18:17, 19:6
**advice** [3] - 65:9, 75:24, 76:1
**advise** [1] - 26:18
**advised** [1] - 51:17
**advisement** [5] - 26:1, 42:21, 54:3, 57:22, 163:10
**affect** [1] - 99:14
**affiliated** [1] - 123:19
**affiliates** [2] - 111:19, 124:7
**afield** [1] - 124:22
**afternoon** [2] - 7:1, 55:13
**agent** [1] - 152:13
**agglomeration** [1] - 118:14
**agree** [15] - 25:18, 31:8, 35:6, 47:22, 49:14, 52:10, 73:1, 92:6, 93:25, 119:23, 132:15, 138:21, 141:17, 146:12, 158:7
**agreed** [13] - 12:22, 17:7, 30:2, 43:11, 52:6, 52:11, 72:23, 77:21, 89:13, 96:12, 131:12, 131:15, 136:7
**agreeing** [1] - 88:25
**agreement** [7] - 25:8, 35:7, 59:11, 60:7, 60:16, 111:21, 126:3
**agreements** [3] - 82:14, 82:22, 83:3
**agrees** [1] - 59:5
**ahead** [2] - 48:1, 69:17
**aid** [1] - 75:4
**AJC** [1] - 4:12
**AJG** [16] - 2:10, 4:8, 114:14, 119:13, 119:15, 122:6, 123:3, 123:5, 123:7, 145:24, 146:6, 149:15, 152:13, 154:21, 156:1
**al** [6] - 1:4, 1:7, 3:6, 164:10, 164:11
**Alistar** [3] - 2:20, 4:19, 4:24
**allegation** [2] - 97:2, 130:8

**allegations** [1] - 75:21
**alleged** [1] - 116:13
**allow** [8] - 6:11, 6:22, 7:3, 36:7, 38:12, 59:2, 63:4, 98:9
**allowed** [9] - 20:13, 31:15, 62:25, 70:21, 74:11, 74:13, 88:21, 97:1, 159:1
**allowing** [1] - 37:22
**allows** [2] - 63:3, 70:10
**alluding** [1] - 87:25
**almost** [4] - 19:9, 19:12, 53:13, 136:17
**alone** [2] - 59:16, 67:18
**alter** [9] - 111:23, 111:25, 122:6, 122:11, 129:20, 130:7, 130:18, 132:11, 161:24
**alternate** [1] - 76:19
**alternative** [1] - 89:11
**ambiguity** [1] - 51:14
**amendment** [1] - 39:24
**amendments** [2] - 105:9, 106:12
**amount** [15] - 26:7, 42:17, 50:12, 66:5, 88:7, 88:16, 94:13, 94:24, 117:11, 117:16, 117:23, 117:24, 127:7, 136:24, 137:9
**amounts** [2] - 128:2, 141:17
**analysis** [3] - 85:9, 119:13, 132:11
**analyze** [1] - 89:1
**analyzing** [1] - 76:4
**AND** [1] - 1:2
**Andrews** [1] - 94:9
**answer** [5] - 8:24, 26:23, 53:20, 62:4, 100:22
**answering** [1] - 103:2
**answers** [7] - 9:2, 9:4, 9:9, 9:24, 62:11, 64:11, 163:11
**Anthony** [1] - 4:17
**ANTHONY** [1] - 2:3
**anticipate** [1] - 45:21
**anticipating** [3] - 41:17, 41:21, 128:19
**AO** [2] - 11:25, 24:3
**apparent** [1] - 138:4
**appear** [1] - 119:2
**APPEARANCES** [1] -

1:16
**Appearances** [1] - 2:1
**Apple** [3] - 61:8, 61:10, 89:2
**applicable** [1] - 101:15
**applications** [5] - 100:5, 100:9, 105:4, 106:25, 108:24
**apply** [1] - 7:18
**appreciate** [2] - 5:1, 109:23
**approach** [2] - 66:14, 148:19
**approaching** [1] - 66:19
**appropriate** [5] - 55:1, 56:16, 122:20, 132:8, 141:18
**Arant** [1] - 4:5
**ARANT** [1] - 2:15
**area** [1] - 10:2
**areas** [3] - 5:13, 19:11, 82:3
**argue** [23] - 51:22, 59:2, 60:18, 62:21, 62:22, 63:16, 72:6, 74:25, 75:1, 75:3, 83:2, 85:11, 97:4, 98:3, 99:2, 100:3, 122:11, 127:18, 128:13, 129:13, 140:24, 151:21, 155:1
**argued** [3] - 90:4, 136:17, 160:24
**arguing** [8] - 66:8, 85:4, 85:5, 130:25, 131:1, 131:5, 132:3, 150:23
**argument** [46] - 5:20, 5:22, 7:16, 16:4, 19:25, 22:11, 27:10, 28:8, 41:20, 43:21, 54:8, 56:11, 56:14, 56:16, 58:3, 58:16, 61:24, 62:10, 67:1, 70:14, 81:21, 86:14, 87:9, 88:4, 90:11, 90:13, 92:18, 97:9, 98:12, 98:14, 98:19, 99:15, 108:1, 109:10, 109:12, 109:24, 110:3, 110:7, 110:14, 111:17, 127:15, 143:7, 148:13, 150:5, 150:18, 162:5
**arguments** [20] - 20:13, 33:6, 58:2,

66:23, 67:8, 67:13, 68:2, 78:4, 82:7, 100:11, 108:14, 109:19, 114:3, 116:1, 125:22, 144:15, 155:16, 160:23, 162:22, 163:10
**arise** [1] - 22:8
**ARPS** [1] - 2:18
**Arps** [2] - 4:22, 4:24
**arrives** [1] - 7:24
**ARSHT** [1] - 2:2
**art** [1] - 82:20
**Arthur** [10] - 3:6, 115:15, 118:6, 120:3, 121:20, 123:10, 123:14, 123:19, 124:14, 124:17
**ARTHUR** [2] - 1:7, 164:10
**articulated** [1] - 117:5
**artificial** [3] - 129:1, 139:7, 139:10
**ascribe** [1] - 137:16
**ashamed** [1] - 134:1
**aspects** [1] - 79:4
**assert** [1] - 47:16
**asserted** [8] - 58:23, 67:6, 69:15, 72:10, 74:6, 104:12, 108:24, 116:23
**asserting** [3] - 76:6, 98:1, 104:13
**assertion** [2] - 100:24, 116:21
**assume** [1] - 13:11
**assumed** [1] - 119:13
**assuming** [2] - 10:6, 15:1
**assumption** [1] - 13:13
**attach** [1] - 128:16
**attached** [2] - 85:25, 119:12
**attack** [2] - 35:1, 77:24
**attempt** [1] - 76:17
**attention** [3] - 80:3, 80:4, 80:6
**attorney** [1] - 115:10
**attorneys** [2] - 3:18, 21:15
**audibly** [1] - 161:6
**August** [1] - 37:17
**authority** [3] - 95:6, 121:1, 123:17
**available** [4] - 13:21, 18:10, 34:4, 34:19
**avoid** [1] - 96:18

**avoidance** [2] - 126:12, 136:6
**avoiding** [1] - 135:8
**avoids** [1] - 95:19
**aware** [14] - 31:12, 37:13, 38:5, 44:8, 44:9, 70:16, 149:17, 149:23, 151:7, 157:6, 157:25, 158:20, 163:3, 163:6
**Ayesha** [2] - 3:20, 98:16
**AYESHA** [1] - 1:21

**B**

**background** [3] - 122:15, 155:10, 160:24
**bad** [1] - 81:3
**balance** [1] - 88:10
**bank** [2] - 121:13, 125:9
**bar** [4] - 115:11, 135:19, 152:3, 152:12
**bare** [1] - 104:16
**barrier** [1] - 73:16
**bars** [1] - 41:20
**base** [3] - 117:9, 117:12, 140:19
**based** [16] - 31:15, 58:21, 62:15, 73:4, 76:15, 80:24, 86:6, 93:19, 101:4, 103:16, 108:16, 127:14, 128:24, 140:13, 146:5, 153:13
**basic** [1] - 5:6
**basis** [8] - 31:17, 55:6, 56:14, 58:6, 88:17, 93:16, 94:19, 114:24
**Batanian** [9] - 149:19, 152:19, 153:4, 153:8, 153:11, 154:12, 155:25, 156:4
**bear** [1] - 71:6
**bearing** [2] - 61:16, 104:20
**bears** [3] - 67:5, 72:7, 105:4
**became** [1] - 131:16
**becomes** [1] - 96:12
**beforehand** [2] - 17:4, 67:25
**began** [1] - 103:23
**begin** [4] - 3:13, 3:25,

6:4, 6:6
**beginning** [7] - 4:9, 4:20, 6:4, 10:12, 78:16, 131:15, 156:3
**behalf** [8] - 4:3, 4:11, 25:17, 28:14, 98:16, 119:15, 120:6, 141:7
**behind** [1] - 5:16
**belief** [4] - 65:8, 75:10, 80:23, 80:24
**beliefs** [8] - 73:7, 73:19, 73:25, 103:4, 104:3, 105:21, 105:25, 106:2
**believes** [2] - 73:13, 91:10
**bell** [2] - 115:10, 115:12
**bench** [1] - 95:7
**benefit** [2] - 34:6, 117:4
**benefiting** [1] - 119:22
**benefitted** [1] - 116:24
**beside** [1] - 116:17
**best** [2] - 89:1, 133:24
**better** [4] - 22:19, 38:6, 138:6, 138:7
**between** [14] - 10:24, 34:18, 36:4, 41:3, 64:24, 77:12, 87:20, 91:3, 112:4, 119:3, 134:18, 143:2, 143:22, 153:8
**beyond** [9] - 22:6, 51:10, 62:14, 65:20, 90:14, 93:5, 109:17, 114:21, 128:19
**beyond-the-scope** [2] - 65:20, 114:21
**big** [2] - 14:19, 91:2
**bigger** [1] - 118:11
**biggest** [1] - 125:9
**bill** [2] - 14:11, 15:21
**binder** [5] - 11:3, 11:6, 11:14, 16:13, 125:9
**binders** [4] - 23:11, 23:17, 111:2
**bit** [14] - 7:17, 25:22, 60:9, 66:25, 72:21, 85:13, 89:3, 108:1, 109:11, 111:12, 112:18, 113:20, 152:17
**black** [1] - 157:15
**blank** [3] - 13:4
**blindness** [1] - 97:19
**body** [1] - 139:14
**boil** [2] - 133:24, 144:15
**boiled** [1] - 132:18

**boiling** [1] - 133:10
**bolstering** [1] - 38:10
**bolts** [1] - 5:25
**book** [2] - 10:9, 115:24
**bottom** [3] - 11:7, 31:22, 153:17
**bought** [1] - 103:23
**Boult** [1] - 4:5
**BOULT** [1] - 2:15
**bound** [1] - 41:8
**bounded** [1] - 80:14
**bounds** [4] - 62:21, 121:18, 121:19, 121:21
**box** [1] - 10:1
**Brad** [2] - 3:20, 16:1
**BRAD** [1] - 1:20
**Bradly** [1] - 4:5
**BRADLY** [1] - 2:15
**brains** [1] - 76:17
**break** [9] - 6:16, 6:25, 7:2, 10:11, 98:13, 110:1, 110:10
**BRIAN** [1] - 2:3
**Brian** [2] - 4:11, 17:22
**brief** [13] - 5:20, 27:9, 54:8, 77:18, 78:17, 98:12, 102:25, 103:2, 105:15, 114:13, 126:2, 138:19, 144:16
**briefed** [1] - 67:2
**briefing** [11] - 59:21, 60:8, 60:15, 64:13, 66:23, 81:25, 99:1, 104:3, 135:6, 158:25, 162:16
**briefly** [4] - 21:23, 41:15, 56:5, 56:12
**briefs** [3] - 102:18, 102:23, 131:23
**bring** [12] - 23:10, 30:15, 34:24, 36:1, 37:5, 37:16, 39:21, 39:25, 65:5, 92:12, 92:13, 154:5
**bringing** [3] - 37:20, 41:17, 41:21
**brings** [1] - 82:11
**broad** [2] - 124:3, 126:1
**bromine** [2] - 106:24, 154:11
**brought** [2] - 9:25, 84:16
**bud** [1] - 116:19
**build** [1] - 137:11
**bullet** [2] - 143:4, 150:14

**bunch** [4] - 15:22, 27:24, 113:15, 119:1
**burden** [3] - 43:15, 49:20, 109:21
**Burke** [4] - 1:13, 88:2, 88:14
**business** [8] - 103:22, 118:14, 125:24, 125:25, 126:6, 130:15, 131:19, 137:11
**businesses** [1] - 116:6
**buy** [2] - 64:5, 133:13
**BY** [5] - 1:17, 2:6, 2:13, 2:15, 2:19

## C

**c)(7** [1] - 39:7
**cabin** [1] - 38:12
**cabined** [7] - 15:11, 42:14, 58:2, 59:24, 151:3, 152:7, 158:21
**calculation** [1] - 117:17
**calculus** [1] - 68:17
**CALDWELL** [32] - 1:19, 1:20, 16:1, 16:8, 16:23, 17:15, 25:16, 59:10, 59:14, 60:25, 61:25, 63:1, 63:13, 63:24, 66:6, 67:22, 68:20, 69:12, 69:18, 71:14, 71:18, 78:15, 79:19, 79:24, 81:6, 131:4, 132:14, 135:4, 135:16, 136:15, 137:6, 137:22
**Caldwell** [12] - 3:18, 3:20, 16:2, 16:6, 16:7, 25:15, 58:13, 72:25, 73:10, 76:25, 78:13, 130:23
**candy** [1] - 135:19
**cannot** [8] - 33:7, 85:7, 142:16, 145:2, 145:5, 157:14, 159:12, 160:4
**capitalize** [1] - 61:6
**capture** [1] - 149:8
**carbide** [1] - 119:20
**carbon** [8] - 85:19, 86:16, 86:17, 86:21, 86:25, 87:1, 121:10, 140:8
**cardinal** [1] - 110:24
**care** [2] - 26:24, 52:16

**carefully** [1] - 70:10
**carve** [1] - 136:5
**case** [124] - 3:9, 10:24, 36:3, 39:15, 39:20, 40:20, 40:22, 43:3, 43:17, 43:18, 44:2, 44:9, 44:11, 44:13, 45:10, 45:16, 45:24, 46:11, 47:1, 47:6, 48:1, 48:2, 48:7, 48:10, 49:10, 51:1, 55:6, 55:11, 55:12, 55:21, 56:8, 62:3, 66:4, 68:5, 70:8, 70:9, 70:16, 70:25, 73:10, 73:11, 73:18, 74:22, 76:6, 76:23, 77:11, 77:13, 77:18, 78:9, 79:18, 80:20, 81:4, 81:14, 82:8, 82:16, 83:15, 84:5, 84:24, 85:20, 86:8, 88:13, 89:2, 89:9, 91:21, 91:25, 92:18, 92:21, 92:23, 92:25, 93:6, 93:19, 95:15, 96:7, 100:15, 100:17, 101:5, 101:11, 111:25, 112:1, 112:9, 112:21, 113:3, 114:17, 114:24, 115:18, 116:7, 116:11, 119:20, 120:17, 120:19, 120:25, 121:8, 121:9, 121:21, 122:6, 122:12, 122:15, 123:5, 125:6, 127:5, 127:21, 129:5, 130:16, 132:20, 132:21, 132:25, 139:4, 139:5, 139:20, 140:3, 140:13, 140:25, 142:13, 144:10, 149:13, 149:21, 151:8, 154:13, 156:7, 158:25, 159:15, 160:20, 161:22, 161:25, 163:3
**Case** [2] - 1:5, 164:8
**caselaw** [2] - 55:18, 88:12
**cases** [10] - 45:7, 61:5, 61:8, 72:17, 92:5, 93:8, 139:6, 140:18, 142:18, 162:24

**cash** [1] - 135:20
**CASSADY** [1] - 1:19
**Cassady** [1] - 3:18
**CASTLE** [2] - 164:3, 164:19
**casual** [1] - 162:23
**categories** [4] - 72:3, 82:2, 82:12, 82:13
**category** [4] - 82:4, 95:1, 128:3, 132:6
**cautioned** [1] - 72:22
**caveat** [1] - 130:6
**cents** [1] - 138:15
**CEO** [1] - 3:21
**CERT** [5] - 2:16, 3:25, 4:3, 114:14, 119:14
**certain** [29] - 30:8, 31:16, 43:6, 44:3, 49:7, 68:11, 82:4, 82:15, 83:14, 89:18, 90:17, 94:4, 100:6, 107:11, 111:16, 123:18, 129:19, 137:3, 137:12, 142:8, 143:13, 147:3, 148:13, 150:5, 150:18, 150:23
**certainly** [18] - 11:10, 11:17, 25:12, 41:3, 41:7, 42:15, 43:23, 44:7, 47:17, 48:6, 84:6, 104:6, 105:4, 132:14, 146:12, 154:17, 154:23, 159:25
**Certainly** [1] - 28:13
**Certified** [2] - 164:4, 164:6
**certify** [2] - 164:5, 164:12
**cetera** [13] - 7:6, 8:13, 15:17, 19:25, 31:2, 34:10, 56:19, 88:3, 94:11, 122:9, 126:13, 128:5, 141:20
**challenge** [1] - 101:11
**challenged** [1] - 130:15
**chambers** [3] - 6:19, 8:19, 21:7
**chance** [3] - 13:23, 13:24, 97:4
**change** [3] - 36:9, 37:19, 104:13
**changed** [4] - 100:18, 103:24, 103:25, 106:22
**changes** [2] - 10:24,

57:18
**charge** [7] - 19:13, 20:6, 22:14, 22:17, 50:25, 52:12, 52:13
**charged** [9] - 20:10, 20:23, 21:1, 39:20, 51:13, 51:15, 51:16, 51:24, 51:25
**charging** [1] - 19:10
**chase** [1] - 115:13
**Chase** [1] - 118:8
**cheaper** [2] - 133:14, 133:15
**check** [2] - 14:17, 96:9
**Chem** [25] - 59:23, 60:20, 61:19, 68:18, 69:3, 69:19, 70:3, 70:4, 72:1, 73:5, 75:11, 76:24, 77:2, 77:10, 78:18, 78:24, 117:12, 117:13, 138:5, 138:7, 152:20, 153:1, 153:4, 156:1, 156:2
**Chem-Mod** [25] - 59:23, 60:20, 61:19, 68:18, 69:3, 69:19, 70:3, 70:4, 72:1, 73:5, 75:11, 76:24, 77:2, 77:10, 78:18, 78:24, 117:12, 117:13, 138:5, 138:7, 152:20, 153:1, 153:4, 156:1, 156:2
**chief** [14] - 43:3, 43:17, 44:14, 45:10, 45:16, 46:11, 47:1, 48:2, 48:7, 49:10, 55:6, 55:12, 56:8, 120:17
**choice** [1] - 96:19
**choices** [1] - 31:2
**Christopher** [1] - 1:13
**circle** [1] - 8:23
**circuit** [5] - 46:14, 78:3, 83:1, 99:18, 130:16
**Circuit** [7] - 55:17, 70:9, 73:12, 74:13, 80:9, 119:20, 139:15
**circumstances** [2] - 43:20, 97:3
**circumstantial** [1] - 152:4
**circumstantially** [1] - 143:12
**Cisco** [1] - 139:5
**citation** [3] - 113:24, 114:17, 145:12

**citations** [1] - 145:10

**cite** [7] - 101:6, 118:25, 128:16, 151:11, 156:8, 156:9, 158:25

**cited** [7] - 77:17, 84:24, 88:2, 89:2, 113:15, 130:16, 162:24

**cites** [2] - 117:19, 119:1

**citing** [1] - 148:1

**citizenry** [1] - 137:1

**civil** [2] - 3:7, 15:7

**Civil** [1] - 38:11

**claim** [9] - 68:6, 72:9, 84:15, 103:15, 106:21, 108:15, 108:16, 130:18, 152:22

**claimed** [2] - 117:16, 118:9

**claiming** [1] - 60:12

**claims** [54] - 41:1, 58:23, 59:9, 63:20, 63:22, 64:1, 64:9, 68:16, 69:15, 72:10, 74:6, 76:4, 79:9, 79:12, 80:1, 80:4, 80:6, 80:10, 80:12, 81:24, 82:8, 84:16, 87:22, 88:5, 88:15, 88:22, 89:18, 89:24, 89:25, 94:4, 94:14, 94:16, 97:15, 98:22, 99:3, 100:5, 101:7, 103:5, 104:12, 104:21, 104:23, 105:2, 107:8, 107:17, 108:3, 108:4, 108:6, 108:8, 108:11, 108:18, 124:15, 130:7

**clarification** [1] - 40:9

**clarifications** [1] - 95:6

**clarify** [1] - 77:22

**classic** [2] - 73:24, 116:18

**clean** [1] - 137:2

**clear** [11] - 20:24, 22:15, 29:21, 60:14, 99:14, 100:22, 139:9, 139:16, 140:16, 162:7, 162:20

**clearly** [2] - 70:4, 128:11

**clerk** [5] - 11:5, 18:9, 18:23, 50:9, 51:14

**Clerk** [1] - 164:18

**client** [1] - 162:7

**clients** [8] - 34:23, 40:19, 75:6, 75:19, 75:25, 76:11, 87:24, 94:2

**clients'** [2] - 73:25, 76:16

**clock** [3] - 90:19, 90:23, 95:3

**close** [1] - 54:19

**closely** [2] - 106:25, 137:10

**closes** [1] - 56:9

**CO** [2] - 1:7, 164:10

**coal** [35] - 74:24, 103:16, 103:17, 103:25, 105:20, 106:16, 106:24, 112:5, 116:25, 117:11, 117:23, 119:16, 123:3, 124:19, 125:23, 132:25, 133:13, 134:6, 134:19, 137:2, 137:13, 137:17, 140:9, 148:14, 149:16, 150:7, 150:19, 150:25, 152:21, 153:23, 156:3, 162:9, 162:11

**code** [1] - 130:14

**coded** [1] - 133:11

**colleague** [6] - 4:17, 71:19, 112:16, 130:22, 138:21, 139:24

**coming** [9] - 12:10, 44:16, 50:17, 61:12, 113:21, 116:4, 118:15, 124:1, 140:10

**comment** [2] - 41:16, 148:3

**comments** [1] - 83:12

**commercial** [1] - 45:9

**common** [3] - 72:17, 72:18, 77:23

**communicated** [3] - 34:9, 143:1, 154:1

**communication** [7] - 121:8, 125:7, 143:13, 143:22, 143:24, 152:24, 153:8

**communications** [2] - 124:23, 141:14

**companies** [5] - 124:1, 132:16,

133:13, 135:1, 137:14

**Company** [2] - 118:7, 123:10

**company** [13] - 118:7, 119:21, 119:25, 122:19, 123:3, 123:4, 123:11, 124:15, 129:16, 132:6, 133:12, 134:6, 162:17

**compare** [3] - 69:21, 69:22, 74:5

**comparing** [3] - 59:3, 79:12, 80:16

**comparison** [3] - 58:21, 59:8, 79:6

**compelling** [1] - 162:5

**compensation** [1] - 133:4

**competitive** [2] - 138:1, 138:11

**competitors'** [1] - 98:23

**complaint** [17] - 75:19, 76:8, 83:15, 83:20, 83:25, 84:3, 84:7, 84:9, 84:25, 86:3, 90:16, 90:22, 91:4, 92:7, 96:1, 96:20, 127:2

**complete** [2] - 110:25, 140:10

**completely** [3] - 65:14, 96:3, 140:19

**complexities** [1] - 44:2

**compliance** [1] - 149:24

**complicated** [1] - 152:17

**complied** [1] - 30:17

**comply** [3] - 29:2, 101:15, 101:21

**complying** [1] - 130:10

**component** [1] - 97:12

**components** [1] - 64:5

**conception** [5] - 43:7, 46:21, 47:3, 47:10, 47:13

**concepts** [5] - 73:11, 77:18, 78:2, 80:19, 81:8

**conceptual** [1] - 17:4

**conceptually** [1] - 5:4

**concern** [6] - 31:12, 67:4, 69:19, 83:4, 100:1, 122:12

**concerned** [2] - 68:12,

94:6

**concerns** [1] - 122:2

**conclude** [8] - 89:23, 151:7, 151:24, 157:6, 157:23, 158:9, 158:19, 159:19

**concluded** [1] - 96:25

**conclusion** [1] - 142:22

**conclusions** [3] - 144:10, 147:4, 157:12

**conducted** [1] - 153:19

**CONFERENCE** [3] - 1:10, 1:12, 164:16

**conference** [6] - 3:9, 10:19, 52:16, 56:23, 131:21, 163:15

**confers** [1] - 135:5

**confidential** [3] - 14:6, 15:4, 15:15

**configuration** [1] - 131:18

**confirm** [1] - 98:7

**conflated** [1] - 60:3

**conflating** [1] - 113:4

**confused** [4] - 27:25, 29:21, 107:14, 114:1

**confusing** [1] - 108:5

**confusion** [9] - 29:19, 30:4, 61:2, 61:6, 64:23, 65:3, 71:9, 89:19, 110:16

**Congress** [2] - 129:11, 141:1

**connection** [2] - 71:6, 117:18

**consequence** [2] - 96:22, 96:23

**consequences** [1] - 97:6

**conserve** [1] - 20:12

**consider** [4] - 49:11, 53:25, 139:1, 139:18

**consideration** [1] - 46:21

**considerations** [6] - 43:5, 44:6, 44:12, 45:18, 46:15, 47:21

**considered** [2] - 46:10, 120:1

**considering** [1] - 40:1

**considers** [1] - 70:10

**consistent** [3] - 67:3, 119:19, 132:22

**consisting** [1] - 164:14

**constantly** [1] - 53:9

**constitutes** [1] - 75:4

**constraints** [1] - 48:12

**construction** [2] - 108:15, 108:16

**construed** [1] - 104:24

**construing** [2] - 108:6, 108:8

**contemplated** [1] - 26:7

**contemplating** [1] - 16:20

**content** [1] - 143:23

**contentions** [1] - 62:12

**contents** [2] - 141:13, 151:4

**context** [5] - 38:25, 41:10, 107:11, 124:1, 153:22

**continuation** [2] - 98:20, 100:8

**continuations** [3] - 98:22, 101:13, 109:5

**continued** [2] - 2:1, 74:24

**contrary** [1] - 87:6

**contributed** [1] - 68:10

**contribution** [1] - 128:25

**contributory** [3] - 64:2, 85:2, 86:6

**control** [6] - 34:2, 34:7, 34:10, 34:14, 121:3, 149:12

**convenience** [1] - 160:17

**convenient** [1] - 56:10

**conversation** [2] - 146:3, 146:5

**conversations** [4] - 39:14, 143:2, 152:9, 153:22

**convince** [1] - 137:14

**convinced** [2] - 49:2, 83:23

**cook** [1] - 154:13

**copies** [5] - 8:20, 11:5, 23:7, 23:9, 147:14

**copy** [7] - 11:8, 91:3, 91:6, 119:9, 148:21, 148:24, 164:15

**Corp** [1] - 3:5

**CORP** [2] - 1:3, 164:10

**corporate** [11] - 45:8, 111:18, 112:7, 114:6, 114:14, 118:22, 120:14, 120:16, 120:21, 122:3, 124:5

**correct** [6] - 65:12, 78:21, 92:15, 100:13, 116:3, 135:4
**corrective** [1] - 64:18
**correctly** [1] - 117:6
**correspondence** [1] - 28:25
**counsel** [34] - 1:22, 3:10, 3:12, 3:14, 4:1, 4:8, 4:9, 4:13, 4:20, 5:1, 16:5, 21:13, 22:9, 28:8, 58:8, 64:14, 64:15, 65:9, 75:24, 76:1, 76:4, 98:1, 147:15, 152:24, 155:23, 158:3, 158:7, 158:23, 160:7, 160:14, 161:5, 163:4, 163:8, 163:13
**Counsel** [3] - 2:10, 2:16, 2:20
**counsels'** [1] - 5:15
**counting** [1] - 50:2
**country** [1] - 136:25
**County** [1] - 164:19
**COUNTY** [1] - 164:3
**couple** [9] - 5:24, 11:1, 11:19, 14:7, 16:8, 27:15, 66:8, 160:18, 161:4
**Couple** [1] - 16:2
**course** [4] - 7:5, 101:12, 110:21, 160:9
**COURT** [182] - 1:1, 3:1, 3:23, 4:7, 4:18, 4:25, 16:3, 16:20, 17:5, 17:19, 18:4, 21:9, 22:4, 23:12, 24:6, 24:11, 25:15, 25:25, 26:12, 26:21, 29:3, 29:11, 30:7, 31:1, 31:22, 32:4, 32:11, 33:14, 33:24, 34:11, 34:25, 35:10, 36:15, 37:7, 38:2, 38:21, 40:6, 41:13, 41:23, 42:20, 44:20, 45:11, 45:25, 46:5, 46:12, 46:23, 47:15, 47:20, 48:17, 48:22, 48:25, 52:25, 53:4, 54:16, 54:24, 55:5, 55:16, 56:24, 57:4, 57:14, 59:12, 60:17, 61:22, 62:7, 63:9, 63:15, 65:18, 67:20, 68:1, 69:6, 69:13, 71:10, 71:16, 71:20,

72:13, 72:15, 73:21, 74:2, 75:22, 77:4, 77:15, 78:1, 78:11, 79:14, 79:20, 80:18, 81:16, 82:11, 82:19, 83:10, 83:22, 85:3, 87:5, 87:19, 90:15, 91:11, 92:20, 93:23, 94:23, 96:4, 96:16, 98:11, 98:25, 99:18, 99:25, 100:20, 102:1, 102:15, 104:1, 104:19, 105:5, 105:11, 107:3, 107:23, 108:21, 109:7, 109:13, 109:23, 110:9, 110:14, 111:6, 111:13, 112:10, 112:14, 113:15, 114:2, 114:19, 114:25, 116:20, 118:17, 122:1, 122:21, 122:24, 123:13, 124:3, 124:11, 124:24, 125:12, 125:17, 125:19, 128:1, 129:3, 129:15, 130:21, 131:20, 134:15, 135:10, 136:11, 137:4, 137:20, 138:16, 139:22, 141:4, 141:15, 142:4, 142:23, 143:6, 144:4, 145:8, 146:12, 146:21, 147:21, 147:25, 148:21, 148:25, 150:10, 150:16, 150:22, 151:14, 151:25, 154:25, 155:4, 155:7, 156:8, 157:10, 157:25, 158:3, 159:6, 159:16, 160:13, 160:18, 163:7
**Court** [36] - 23:6, 23:23, 26:18, 37:13, 38:12, 38:19, 39:5, 39:20, 48:12, 50:11, 55:15, 57:16, 66:15, 75:2, 89:5, 89:14, 89:16, 89:21, 89:23, 91:9, 92:14, 93:1, 93:8, 93:11, 95:5, 95:21, 95:22, 96:8, 96:11, 97:15, 123:24, 139:9, 144:22, 147:15,

163:5, 164:18
**court** [13] - 3:8, 7:22, 13:22, 21:19, 22:10, 64:20, 67:24, 85:10, 87:15, 89:17, 90:13, 96:24, 148:20
**court's** [1] - 90:5
**Court's** [6] - 25:11, 28:16, 29:14, 37:18, 43:23, 95:5
**courtroom** [17] - 6:1, 7:25, 8:11, 10:7, 13:25, 14:6, 14:18, 15:6, 15:7, 15:14, 44:16, 75:19, 97:20, 118:4, 120:23, 123:8, 123:9
**Courtroom** [1] - 1:14
**courts** [1] - 61:4
**cover** [12] - 52:20, 98:23, 99:4, 100:6, 101:7, 103:25, 104:4, 104:11, 104:22, 105:23, 106:1, 108:3
**covered** [5] - 63:19, 81:12, 103:20, 149:11, 149:12
**create** [1] - 108:19
**credible** [1] - 89:21
**credit** [5] - 134:23, 135:17, 135:20, 140:7, 140:22
**credits** [31] - 67:9, 67:17, 68:25, 70:1, 116:24, 117:9, 117:16, 117:25, 118:9, 118:12, 125:23, 126:7, 127:9, 127:11, 127:14, 127:19, 133:17, 133:18, 133:19, 133:21, 134:6, 134:9, 135:10, 135:13, 136:8, 138:9, 138:23, 138:24, 138:25, 140:9
**critical** [1] - 140:1
**cross** [6] - 11:6, 23:11, 36:13, 65:10, 88:24, 122:13
**cross-examination** [1] - 88:24
**cross-examine** [2] - 36:13, 122:13
**CRUTCHER** [1] - 2:5
**crystal** [2] - 139:9, 139:16
**CSO** [1] - 15:6

**CSR** [1] - 164:22
**culpable** [1] - 86:6
**CUMMINGS** [1] - 2:15
**Cummings** [1] - 4:6
**cumulatively** [1] - 36:4
**current** [3] - 32:7, 112:24, 149:24
**CURRY** [1] - 1:19
**Curry** [1] - 3:19
**customers** [1] - 134:19
**cut** [2] - 33:18, 91:20
**cycle** [1] - 113:9
**cynical** [1] - 72:21

## D

**damage** [1] - 48:5
**damages** [38] - 46:21, 65:24, 66:4, 66:5, 66:22, 67:15, 76:24, 77:1, 77:6, 77:11, 78:24, 79:2, 83:16, 112:24, 113:12, 116:2, 117:8, 117:10, 120:10, 121:4, 121:15, 127:5, 127:13, 127:20, 127:23, 128:10, 128:12, 128:16, 128:23, 137:21, 137:23, 138:24, 138:25, 139:2, 139:17, 140:19, 140:23
**dance** [1] - 140:20
**dangerous** [1] - 41:12
**data** [2] - 152:7, 154:19
**date** [6] - 44:6, 57:24, 85:24, 86:1, 90:17, 110:19
**dates** [2] - 47:8, 47:12
**Daubert** [8] - 139:23, 144:18, 155:11, 155:13, 156:15, 157:20, 158:24, 161:17
**days** [7] - 6:8, 6:11, 10:20, 18:8, 24:15, 25:19, 85:8
**days'** [1] - 42:3
**DC** [1] - 130:16
**de** [1] - 85:4
**deal** [11] - 6:20, 21:25, 22:2, 38:7, 44:24, 52:13, 65:19, 125:2, 138:12, 144:20,

145:20
**dealing** [5] - 21:4, 84:3, 97:3, 139:6, 156:21
**deals** [1] - 73:12
**Deanna** [2] - 164:4, 164:22
**debate** [2] - 65:16, 70:19
**decide** [4] - 32:6, 37:4, 62:14, 134:10
**decided** [1] - 73:11
**decides** [1] - 26:10
**decision** [5] - 20:25, 22:13, 54:3, 57:23, 95:20
**decisions** [7] - 5:16, 42:23, 57:16, 57:19, 94:7, 105:18, 121:2
**default** [6] - 43:13, 43:16, 43:21, 44:1, 49:2, 54:10
**defend** [1] - 97:7
**defendant** [18] - 4:19, 58:17, 68:9, 70:11, 73:13, 78:5, 89:9, 89:21, 94:1, 100:3, 112:5, 116:11, 116:12, 120:19, 123:5, 143:3, 145:16, 158:9
**Defendant** [1] - 1:8
**Defendant's** [1] - 89:22
**defendant's** [1] - 91:13
**defendants** [116] - 3:25, 4:3, 4:9, 4:12, 4:13, 25:6, 28:4, 29:10, 29:18, 32:18, 33:11, 34:2, 34:14, 35:24, 35:25, 36:22, 37:3, 41:17, 47:6, 47:16, 47:19, 48:9, 49:8, 49:20, 54:13, 54:24, 57:12, 58:19, 59:2, 60:19, 62:19, 68:19, 69:10, 71:12, 71:22, 72:2, 80:11, 81:20, 82:2, 82:13, 82:15, 83:14, 85:14, 86:20, 86:23, 87:21, 92:1, 93:10, 94:15, 96:12, 99:23, 100:7, 101:3, 105:17, 105:18, 111:16, 112:6, 113:6, 113:14, 114:11, 115:14, 115:23, 116:7, 116:22,

117:24, 117:25, 118:2, 118:10, 118:12, 119:4, 120:5, 120:15, 120:20, 120:25, 122:3, 123:7, 123:18, 127:2, 127:8, 131:18, 132:1, 132:19, 132:24, 132:25, 133:6, 134:1, 134:13, 138:3, 141:8, 141:21, 142:9, 142:10, 143:23, 144:8, 145:23, 145:24, 146:1, 147:11, 148:6, 150:3, 150:6, 150:19, 150:24, 151:7, 151:19, 152:3, 152:11, 152:13, 152:16, 152:22, 154:5, 156:2, 157:6, 158:20, 159:15

**Defendants** [6] - 2:11, 2:17, 32:17, 65:23, 148:14, 154:21

**Defendants'** [2] - 111:15, 111:17

**defendants'** [21] - 3:24, 10:5, 36:6, 43:8, 60:18, 70:7, 72:20, 83:19, 98:14, 99:21, 100:24, 105:16, 106:2, 110:4, 110:15, 124:5, 125:23, 126:6, 141:11, 150:13, 158:14

**defense** [18] - 44:14, 64:22, 65:5, 70:3, 73:8, 73:20, 78:19, 93:11, 98:1, 101:17, 101:21, 104:7, 106:9, 107:2, 108:12, 110:11, 115:11, 126:9

**defenses** [6] - 48:15, 75:10, 77:25, 81:24, 82:8

**defer** [2] - 31:19, 43:23

**deferred** [1] - 77:21

**defined** [1] - 76:2

**definitely** [1] - 69:6

**definition** [1] - 81:12

**definitive** [2] - 66:9, 66:20

**definitively** [2] - 54:6,

55:19

**degree** [3] - 73:4, 129:4, 143:7

**DELAWARE** [2] - 1:2, 164:2

**Delaware** [6] - 3:13, 4:1, 4:9, 4:20, 130:14, 164:19

**delaying** [1] - 25:19

**deliberating** [2] - 24:21, 25:13

**deliberations** [2] - 25:2, 25:22

**DELLINGER** [34] - 1:21, 28:13, 29:7, 32:14, 35:5, 35:14, 37:1, 37:12, 39:3, 41:15, 42:7, 46:7, 46:19, 46:24, 47:17, 48:4, 48:21, 52:23, 54:14, 54:23, 57:2, 57:10, 147:9, 147:24, 148:5, 149:2, 150:12, 150:17, 151:2, 151:23, 152:2, 155:3, 155:6, 158:12

**Dellinger** [13] - 3:19, 28:14, 31:19, 32:12, 33:20, 35:3, 38:17, 39:1, 40:11, 49:2, 52:22, 146:23, 158:5

**demonstrating** [1] - 136:1

**demonstrative** [1] - 111:10

**demonstratives** [2] - 17:9, 18:19

**denied** [1] - 113:7

**deny** [1] - 54:4

**deposed** [5] - 36:3, 40:15, 41:25, 42:12, 149:21

**deposition** [27] - 11:16, 12:20, 12:23, 13:1, 13:5, 27:22, 28:2, 28:20, 28:24, 29:6, 29:17, 29:20, 29:23, 30:3, 30:21, 31:5, 31:14, 32:18, 33:1, 33:3, 33:8, 33:9, 33:12, 35:8, 37:6, 42:15, 119:11

**depositions** [6] - 30:10, 36:20, 40:22, 51:9, 52:2

**deputy** [1] - 10:7

**describe** [1] - 107:10

**described** [1] - 94:25

**describes** [1] - 131:11

**describing** [2] - 131:17, 135:24

**description** [19] - 43:6, 47:3, 47:14, 79:11, 80:13, 99:10, 99:15, 101:10, 104:7, 105:1, 106:9, 107:2, 107:9, 107:15, 107:22, 108:12, 109:12, 109:21

**deserves** [1] - 152:17

**designate** [1] - 33:20

**designated** [2] - 30:20, 33:23

**designation** [5] - 30:3, 30:25, 31:15, 32:21, 33:21

**designations** [9] - 18:18, 29:17, 29:20, 29:23, 29:25, 31:20, 33:2, 34:7, 34:8

**designed** [2] - 68:24, 98:23

**destroys** [1] - 119:24

**detail** [2] - 113:1, 122:3

**details** [3] - 134:18, 134:22

**determination** [4] - 9:16, 13:17, 22:17, 79:8

**determine** [2] - 76:4, 106:2

**determined** [1] - 8:14

**developed** [1] - 82:7

**development** [2] - 71:1, 85:20

**DEVLIN** [1] - 1:17

**Devlin** [1] - 3:16

**die** [1] - 134:8

**difference** [6] - 41:3, 63:10, 64:24, 66:11, 87:20, 91:3

**different** [9] - 47:7, 47:12, 80:8, 81:13, 89:3, 106:15, 113:11, 128:2, 140:20

**differently** [3] - 15:12, 67:14, 96:25

**difficult** [4] - 33:15, 41:5, 53:9, 142:19

**diligent** [1] - 154:8

**dire** [12] - 7:8, 7:13, 7:20, 8:13, 8:20, 9:1, 9:6, 9:12, 10:14, 21:4, 26:2, 26:25

**direct** [28] - 11:3, 11:11, 13:7, 23:10,

36:13, 40:23, 58:20, 59:3, 59:6, 59:7, 59:16, 59:18, 63:18, 68:4, 68:7, 68:14, 69:9, 72:8, 73:2, 73:3, 74:4, 77:23, 79:22, 80:22, 95:10, 116:13, 139:3, 160:2

**directed** [3] - 75:9, 75:17, 103:16

**directly** [2] - 40:25, 143:12

**disagree** [3] - 81:4, 84:4, 132:9

**disagreement** [1] - 29:9

**disagreements** [1] - 122:17

**DiSalvo** [1] - 4:22

**DISALVO** [2] - 2:19, 4:21

**disclaimed** [2] - 64:13, 65:9

**disclose** [1] - 29:15

**disclosed** [2] - 79:12, 116:16

**disclosing** [1] - 40:10

**disclosure** [1] - 107:17

**disclosures** [3] - 37:17, 80:15, 106:23

**discovery** [3] - 81:22, 82:7, 88:20

**discrete** [1] - 19:4

**discretion** [2] - 53:22, 92:15

**discuss** [4] - 19:14, 82:14, 82:20, 111:10

**discussed** [7] - 13:4, 13:14, 51:19, 72:4, 79:18, 94:25, 119:11

**discussion** [3] - 79:16, 82:24, 83:6

**disjointed** [1] - 66:25

**dismiss** [3] - 76:10, 86:13, 86:14

**dismissal** [4] - 84:25, 89:8, 93:20, 95:9

**dismissed** [10] - 82:15, 84:17, 87:22, 88:5, 88:14, 94:5, 94:14, 94:16, 97:15, 113:6

**disparaging** [3] - 125:22, 127:5, 131:9

**disposal** [1] - 40:17

**disposed** [2] - 89:24, 91:25

**disposition** [1] - 92:2

**dispositive** [1] - 81:23

**dispute** [30] - 19:4, 31:3, 31:6, 31:11, 31:20, 33:16, 35:4, 36:19, 51:12, 59:1, 65:25, 71:24, 72:5, 73:5, 91:16, 99:1, 99:17, 100:25, 102:8, 102:9, 102:10, 103:1, 103:12, 112:22, 112:23, 114:20, 124:10, 126:15, 132:18, 140:6

**disputed** [8] - 16:5, 18:18, 27:3, 57:6, 69:7, 69:16, 102:21, 105:13

**disputes** [38] - 5:14, 5:16, 7:9, 19:1, 19:16, 20:16, 20:17, 20:20, 22:5, 22:6, 22:8, 27:5, 27:6, 27:13, 27:16, 27:17, 32:13, 33:5, 35:11, 50:7, 50:10, 50:15, 50:16, 50:18, 50:21, 50:24, 51:3, 51:7, 51:9, 51:10, 51:18, 51:19, 53:6, 57:9, 81:23, 82:7, 83:13, 126:18

**disputing** [1] - 36:16

**distinct** [3] - 25:12, 69:24, 70:2

**distinction** [4] - 34:12, 70:20, 70:24, 151:14

**distinctions** [1] - 77:12

**distinguished** [1] - 103:18

**district** [3] - 69:14, 92:21, 93:7

**District** [2] - 91:23, 164:18

**DISTRICT** [2] - 1:1, 1:2

**divide** [1] - 22:2

**docket** [1] - 7:14

**document** [13] - 7:14, 11:2, 12:10, 14:10, 19:24, 142:20, 144:4, 144:9, 144:13, 145:15, 145:17, 156:8, 156:9

**documents** [12] - 19:15, 53:10, 121:2, 130:11, 145:11, 145:13, 145:14, 147:3, 147:20, 151:15, 155:15

**dollar** [4] - 135:19,

136:24, 137:8, 137:17
**dollars** [3] - 124:15, 134:7, 140:22
**domain** [4] - 73:15, 78:6, 81:10, 81:11
**done** [4] - 24:5, 25:9, 52:18, 93:1
**door** [2] - 88:15, 97:22
**DORSNEY** [6] - 2:13, 4:2, 21:23, 24:2, 24:9, 111:4
**Dorsney** [2] - 4:4, 110:17
**double** [1] - 96:9
**doubt** [1] - 156:24
**Doug** [1] - 4:23
**DOUGLAS** [1] - 2:19
**down** [17] - 9:22, 25:22, 60:17, 71:24, 78:3, 113:19, 113:21, 114:19, 116:4, 116:7, 118:19, 131:2, 132:2, 132:18, 133:10, 133:24, 144:15
**downstream** [1] - 116:14
**drafting** [2] - 99:3, 100:5
**draw** [3] - 123:24, 124:20, 144:10
**drawing** [1] - 147:3
**drive** [1] - 24:4
**dropped** [1] - 81:24
**dropping** [1] - 83:5
**dry** [2] - 104:16, 106:11
**DTE** [31] - 2:11, 4:8, 4:12, 111:22, 112:4, 112:5, 112:6, 114:14, 115:15, 118:7, 119:14, 121:6, 121:8, 129:20, 129:22, 130:5, 130:8, 130:18, 132:10, 145:23, 146:1, 152:15, 153:8, 153:12, 153:18, 153:24, 154:3, 156:5, 162:6, 162:8, 162:9
**Dunn** [1] - 4:14
**DUNN** [1] - 2:5
**dunn** [1] - 4:16
**during** [9] - 10:18, 12:4, 13:5, 20:21, 22:8, 51:8, 51:12,

70:17, 162:22

**E**

**e-mail** [10] - 50:9, 144:5, 147:25, 148:1, 148:4, 149:18, 153:20, 157:22
**e-mails** [4] - 85:20, 86:25, 151:10, 152:7
**earn** [1] - 127:2
**earned** [4] - 117:25, 118:2, 118:10, 118:12
**earnings** [2] - 133:17, 135:21
**easier** [3] - 11:8, 49:13, 58:7
**easily** [1] - 49:10
**Eastern** [1] - 91:23
**eastern** [1] - 92:21
**economics** [1] - 120:8
**economist** [1] - 138:15
**EERC** [3] - 103:22, 154:14, 154:17
**effect** [1] - 90:1
**efficiency** [2] - 48:19, 49:17
**efficiently** [1] - 25:20
**effort** [6] - 6:7, 14:8, 14:23, 15:9, 37:15, 75:5
**efforts** [2] - 136:13, 136:14
**Egan** [5] - 4:11, 17:22, 21:2, 43:10, 48:22
**EGAN** [10] - 2:3, 4:10, 17:22, 21:3, 21:22, 43:22, 45:4, 45:21, 46:2, 48:24
**ego** [8] - 111:23, 111:25, 122:6, 122:11, 129:20, 130:7, 130:18, 132:11
**eight** [1] - 10:9
**either** [7] - 9:23, 10:22, 13:1, 18:13, 42:16, 95:16, 136:8
**elaborate** [2] - 112:25, 162:15
**electronically** [1] - 110:20
**element** [3] - 41:1, 59:25, 93:18
**elements** [5] - 63:21, 158:15, 159:9,

159:11, 160:6
**eliminate** [1] - 95:14
**ELMO** [1] - 147:17
**elucidates** [1] - 112:3
**embarrass** [1] - 16:11
**embodiment** [4] - 79:7, 80:7, 80:17
**embodiments** [5] - 69:23, 79:10, 79:17, 79:23, 80:13
**embrace** [1] - 137:14
**embraces** [1] - 61:1
**embracing** [1] - 71:9
**Emission** [1] - 3:17
**emissions** [1] - 3:5
**EMISSIONS** [2] - 1:3, 164:9
**emphasize** [1] - 161:15
**employee** [1] - 120:18
**employees** [2] - 62:22, 84:11
**empty** [1] - 74:20
**emptying** [1] - 76:16
**enables** [1] - 67:17
**encourage** [2] - 49:3, 49:5
**encouraged** [1] - 68:10
**encouraging** [2] - 108:15, 108:16
**end** [13] - 5:19, 10:23, 24:17, 27:9, 54:20, 55:5, 56:18, 105:14, 110:21, 116:8, 134:4, 161:19, 163:14
**endorsed** [1] - 92:8
**energy** [7] - 3:5, 3:21, 112:4, 112:6, 130:8, 162:6, 162:8
**Energy** [3] - 3:17, 115:15, 118:7
**ENERGY** [2] - 1:3, 164:9
**engage** [1] - 108:14
**enhancement** [1] - 75:2
**ensure** [1] - 15:10
**enter** [1] - 57:17
**entering** [1] - 73:16
**Enterprises** [1] - 164:23
**entire** [3] - 100:18, 100:19, 140:12
**entirely** [3] - 38:9, 117:23, 130:17
**entities** [12] - 111:18, 113:6, 113:22, 114:8, 116:12,

116:13, 119:15, 119:17, 121:3, 124:6, 124:13, 129:11
**entitled** [2] - 142:15, 143:24
**entity** [8] - 117:3, 117:16, 123:20, 126:22, 130:13, 130:18, 146:15, 162:18
**envision** [1] - 16:19
**envisioning** [1] - 16:16
**EPA** [1] - 138:10
**equates** [1] - 77:1
**equipment** [1] - 86:25
**equitable** [1] - 50:20
**Ericsson** [1] - 139:3
**erroneous** [8] - 73:21, 80:23, 92:2, 93:19, 93:21, 98:4, 140:4, 140:5
**erroneously** [3] - 73:13, 74:8, 92:1
**error** [5] - 93:14, 138:25, 139:21, 140:11, 140:12
**especially** [2] - 96:13, 102:24
**ESQ** [15] - 1:17, 1:20, 1:20, 1:21, 1:21, 2:3, 2:3, 2:6, 2:6, 2:7, 2:9, 2:13, 2:15, 2:19, 2:19
**essential** [1] - 139:11
**essentially** [14] - 9:20, 20:7, 21:13, 21:14, 34:15, 54:4, 61:3, 62:11, 94:18, 122:4, 122:7, 129:23, 132:18, 155:16
**establishing** [1] - 91:5
**et** [19] - 1:4, 1:7, 3:6, 7:6, 8:12, 15:17, 19:25, 31:2, 34:10, 56:19, 88:3, 94:10, 122:8, 126:13, 128:5, 141:20, 164:10
**EVALL** [1] - 2:7
**Evall** [1] - 4:16
**evasion** [1] - 126:12
**event** [1] - 20:1
**eventually** [1] - 118:9
**everywhere** [1] - 139:20
**Evidence** [2] - 38:11, 89:17
**evidence** [105] - 12:6,

12:14, 13:3, 14:5, 14:12, 16:21, 25:10, 32:10, 40:24, 43:6, 44:22, 46:9, 47:25, 49:9, 49:16, 54:19, 58:16, 62:22, 65:24, 66:3, 66:10, 66:19, 68:8, 68:13, 71:25, 72:3, 72:7, 81:20, 84:21, 85:14, 86:4, 87:6, 87:7, 87:8, 87:9, 87:14, 87:16, 88:8, 88:16, 88:19, 90:2, 90:7, 92:12, 92:14, 92:16, 93:12, 94:13, 94:18, 94:25, 100:17, 103:3, 107:6, 108:17, 108:22, 108:23, 111:17, 111:22, 112:3, 113:16, 118:21, 124:5, 125:22, 129:20, 130:5, 136:12, 136:14, 137:18, 141:24, 142:2, 142:25, 143:7, 143:9, 143:10, 143:15, 143:18, 143:20, 144:9, 145:3, 147:7, 147:20, 147:21, 148:7, 148:10, 150:15, 151:5, 151:6, 151:24, 151:25, 152:1, 152:5, 152:8, 153:25, 154:19, 154:24, 154:25, 156:6, 157:2, 157:5, 158:16, 158:18, 159:2, 162:16
**ex** [1] - 123:5
**exactly** [15] - 26:21, 35:9, 48:21, 63:14, 66:7, 79:24, 79:25, 99:16, 109:9, 121:24, 125:1, 127:4, 143:19, 146:18, 146:19
**examination** [1] - 88:24
**examine** [2] - 36:13, 122:13
**examiner** [2] - 70:19, 70:22
**example** [18] - 9:4, 40:19, 45:7, 49:10, 61:9, 61:18, 67:7, 68:17, 69:22, 80:20,

99:2, 120:12, 123:1, 132:5, 148:6, 148:17, 149:4, 151:9
**exchange** [1] - 135:20
**exchanged** [2] - 29:17, 29:22
**exclude** [5] - 58:16, 111:16, 134:17, 141:12, 150:15
**excluding** [1] - 90:3
**excuse** [1] - 10:10
**executives** [1] - 70:16
**exercise** [2] - 41:5, 118:15
**exhibit** [15] - 11:24, 12:5, 12:7, 12:9, 12:12, 12:13, 12:16, 13:6, 13:7, 16:12, 23:8, 28:12, 110:18, 123:12, 125:8
**Exhibit** [1] - 58:11
**exhibits** [20] - 11:3, 11:8, 11:21, 11:22, 12:3, 12:23, 13:3, 13:9, 13:10, 18:18, 19:15, 23:7, 23:10, 23:15, 23:19, 23:21, 24:4, 51:9, 110:25, 119:1
**exist** [3] - 101:5, 144:13, 156:20
**existence** [9] - 141:13, 142:11, 145:16, 148:15, 150:7, 150:20, 150:25, 151:17, 151:20
**existing** [1] - 119:24
**expect** [11] - 26:11, 31:25, 32:2, 41:2, 45:17, 55:9, 55:10, 120:16, 120:22, 161:21, 161:25
**expectation** [1] - 34:22
**expected** [3] - 29:4, 29:5, 29:6
**expecting** [3] - 26:3, 27:20, 27:21
**expert** [24] - 11:14, 11:17, 22:1, 39:16, 44:12, 44:15, 48:14, 49:11, 51:11, 61:18, 62:13, 66:24, 80:15, 101:18, 113:9, 113:12, 127:13, 142:7, 142:25, 143:19, 145:4, 145:19, 146:13, 159:1
**expert's** [4] - 22:12,

76:18, 77:1, 116:2
**experts** [5] - 11:13, 39:16, 45:5, 46:3, 82:23
**explain** [8] - 74:17, 88:17, 105:20, 117:1, 119:17, 121:1, 122:14, 135:12
**explained** [2] - 28:24, 89:17
**explaining** [3] - 121:12, 135:14, 136:8
**explains** [1] - 149:25
**explanation** [3] - 133:6, 134:8, 134:23
**explore** [1] - 65:8
**express** [1] - 160:1
**expressed** [1] - 162:20
**extent** [40] - 10:25, 11:12, 12:22, 13:16, 14:3, 15:20, 17:8, 17:11, 20:1, 20:2, 20:23, 22:11, 23:1, 31:4, 32:5, 43:12, 44:7, 49:6, 49:15, 51:2, 56:13, 60:6, 66:2, 68:9, 79:10, 81:19, 92:15, 97:25, 100:4, 101:25, 107:19, 114:5, 114:7, 115:1, 116:20, 130:23, 134:16, 142:24, 143:17, 161:23
**extra** [2] - 6:12, 37:20
**extraordinary** [1] - 93:16
**extremely** [5] - 96:15, 104:15, 108:5, 120:9, 121:4
**extrinsic** [1] - 108:17

## F

**F.3d** [3] - 77:19, 139:4, 139:5
**F.Supp** [1] - 93:7
**face** [3] - 102:5, 106:19, 106:20
**facially** [1] - 125:21
**facility** [1] - 154:15
**fact** [29] - 42:13, 45:6, 60:19, 60:21, 61:17, 64:4, 75:16, 79:3, 80:5, 81:7, 81:11, 87:22, 88:5, 88:18,

88:21, 90:16, 91:5, 93:5, 94:4, 117:2, 118:6, 137:9, 138:25, 146:6, 146:14, 147:19, 153:13, 157:5, 158:19
**facto** [1] - 85:4
**factor** [1] - 134:14
**factors** [4] - 67:14, 107:15, 129:22, 132:23
**facts** [25] - 94:24, 100:15, 101:4, 101:20, 102:12, 105:9, 136:10, 142:16, 142:22, 144:2, 144:3, 145:5, 145:6, 145:19, 145:20, 145:21, 147:20, 152:7, 155:17, 155:22, 155:23, 157:8, 159:21, 160:5
**factual** [15] - 44:18, 70:22, 92:18, 127:16, 140:10, 140:11, 145:4, 145:6, 146:9, 149:6, 149:14, 150:2, 156:23, 159:17, 161:4
**factually** [5] - 81:13, 131:10, 135:24, 140:4, 140:5
**failed** [1] - 138:6
**failing** [1] - 103:23
**failure** [1] - 61:23
**failure-of-proof** [1] - 61:23
**fair** [2] - 66:12, 66:17
**fairly** [3] - 112:25, 115:5, 136:6
**faith** [7] - 37:15, 39:9, 72:21, 73:7, 73:19, 76:15, 80:23
**fall** [1] - 82:4
**far** [6] - 14:1, 85:9, 95:1, 103:10, 124:22, 137:10
**fashion** [1] - 55:23
**federal** [2] - 35:20, 38:6
**Federal** [9] - 38:10, 38:11, 55:17, 70:9, 73:12, 74:13, 80:9, 119:20, 139:15
**federally** [1] - 137:13
**felt** [1] - 113:18
**few** [5] - 3:2, 20:4,

20:17, 51:3, 161:17
**fifth** [1] - 78:3
**fig** [2] - 115:8, 115:25
**fight** [4] - 34:18, 38:18, 83:8, 131:9
**fighting** [1] - 112:19
**figure** [3] - 10:19, 102:8, 105:13
**figures** [1] - 104:11
**figuring** [1] - 115:5
**file** [3] - 26:6, 100:8, 101:13
**FILED** [1] - 164:17
**filed** [9] - 74:22, 75:20, 76:9, 83:16, 85:24, 86:9, 104:11, 126:21
**files** [1] - 95:25
**filing** [6] - 76:8, 90:16, 90:21, 100:2, 130:10, 151:12
**fill** [1] - 156:23
**final** [11] - 7:12, 10:16, 11:24, 26:25, 52:15, 57:15, 57:25, 64:19, 72:24, 77:20, 110:25
**financial** [2] - 134:17, 134:21
**financials** [3] - 124:12, 124:13, 125:4
**finder** [2] - 157:5, 158:19
**fine** [7] - 12:22, 12:24, 16:5, 17:14, 17:21, 40:19, 74:14
**finish** [3] - 71:20, 98:13, 110:15
**finished** [3] - 10:5, 13:2, 98:15
**firm** [1] - 3:16
**FIRM** [1] - 1:17
**first** [44] - 3:4, 3:12, 5:6, 6:3, 6:13, 9:18, 14:9, 16:9, 17:23, 18:11, 19:7, 20:5, 31:11, 32:16, 33:10, 33:12, 36:14, 43:9, 44:25, 55:24, 68:21, 74:19, 75:9, 86:13, 86:18, 91:16, 98:9, 100:9, 108:22, 117:8, 120:16, 120:17, 136:16, 141:25, 142:24, 143:4, 147:10, 148:12, 150:13, 150:14, 151:13, 152:8
**fit** [2] - 14:11, 21:15
**fits** [1] - 15:21

**five** [4] - 40:21, 52:6, 110:1
**five-minute** [1] - 110:1
**flag** [1] - 155:18
**flash** [1] - 24:4
**flawed** [1] - 71:8
**FLOM** [1] - 2:18
**flow** [3] - 22:18, 49:12, 116:9
**flows** [1] - 116:7
**focus** [1] - 53:6
**focused** [13] - 5:21, 6:23, 14:4, 19:22, 58:1, 58:3, 91:14, 103:11, 126:25, 128:4, 128:8, 130:2, 130:4
**focusing** [2] - 80:3, 83:10
**folks** [9] - 9:25, 17:10, 30:10, 33:24, 34:13, 36:21, 110:1, 146:8, 163:15
**follow** [2] - 15:21, 24:2
**followed** [1] - 137:10
**following** [4] - 21:7, 39:12, 95:17, 110:13
**footnote** [5] - 65:22, 66:7, 78:2, 114:16, 149:7
**FOR** [1] - 1:2
**forbid** [1] - 35:2
**foreclose** [1] - 25:7
**foregoing** [2] - 164:8, 164:14
**foreseeable** [2] - 44:4, 44:18
**forgot** [1] - 18:6
**form** [9] - 8:3, 10:17, 11:25, 23:6, 24:3, 43:25, 85:17, 91:7, 154:7
**formally** [2] - 12:5, 17:16
**formed** [1] - 75:20
**former** [1] - 82:15
**forms** [1] - 10:22
**forth** [3] - 10:4, 47:18, 48:9
**Fortune** [1] - 123:11
**forward** [7] - 10:1, 10:11, 20:19, 47:25, 114:11, 115:4, 136:18
**four** [6] - 3:18, 46:5, 47:7, 54:20, 82:14, 113:11
**frame** [2] - 93:2, 153:19
**frankly** [1] - 115:11

**fraud** [2] - 126:12, 131:13
**fraudulent** [1] - 135:8
**free** [1] - 19:20
**freely** [1] - 78:5
**Friday** [1] - 24:18
**front** [7] - 70:19, 71:9, 75:23, 87:17, 105:12, 108:7, 145:9
**full** [3] - 7:4, 21:19, 23:23
**fully** [2] - 101:8, 161:24
**fundamental** [2] - 61:2, 109:4
**fundamentally** [5] - 36:10, 65:11, 132:17, 136:23, 138:13
**funnel** [1] - 130:19
**funneling** [4] - 129:17, 130:9, 130:12, 132:7
**furthermore** [1] - 154:12
**future** [1] - 34:21

## G

**GALLAGHER** [2] - 1:7, 164:10
**Gallagher** [12] - 3:6, 115:15, 118:7, 120:4, 120:15, 120:19, 121:20, 123:10, 123:14, 123:19, 124:14, 124:18
**gallery** [2] - 3:21, 4:17
**game** [1] - 80:10
**gaps** [1] - 156:23
**gather** [1] - 146:23
**geared** [1] - 98:18
**gears** [1] - 47:11
**general** [2] - 45:6, 96:17
**generally** [5] - 13:10, 45:11, 128:9, 131:8, 137:24
**generated** [2] - 127:9, 127:10
**generating** [1] - 127:19
**GEORGE** [1] - 2:9
**George** [2] - 141:6, 154:13
**Georgia** [1] - 132:23
**Gibson** [2] - 4:14, 4:16
**GIBSON** [1] - 2:5
**gist** [1] - 68:19

**given** [7] - 4:1, 8:1, 8:4, 23:16, 44:2, 98:7, 117:16
**glossary** [1] - 67:23
**goal** [2] - 53:4, 53:12
**God** [1] - 35:2
**Goerge** [1] - 4:15
**good-faith** [1] - 37:15
**Google** [2] - 154:9, 156:17
**govern** [1] - 38:6
**GP** [1] - 134:13
**grant** [1] - 93:19
**granted** [5] - 76:10, 89:5, 89:14, 89:18, 89:22
**granting** [2] - 66:17, 121:24
**great** [4] - 11:7, 22:23, 24:7, 72:13
**greatly** [1] - 36:11
**green** [6] - 113:10, 114:13, 115:1, 128:17, 128:18, 140:21
**Green** [6] - 113:3, 113:17, 113:24, 118:23, 119:2, 128:20
**Green's** [3] - 117:20, 137:5, 137:7
**green's** [2] - 112:24, 129:8
**grenade** [1] - 96:1
**ground** [4] - 93:24, 94:12, 94:20, 94:21
**guard** [1] - 72:25
**guess** [22] - 24:23, 30:7, 31:3, 38:22, 41:24, 62:17, 83:22, 93:23, 96:19, 105:11, 107:13, 114:25, 115:3, 116:20, 126:13, 128:19, 135:22, 141:20, 143:6, 143:16, 156:18, 158:5
**guessing** [1] - 65:13
**guidance** [1] - 144:23
**guys** [1] - 34:10

## H

**Haley** [4] - 3:20, 98:16, 100:23, 107:5
**HALEY** [8] - 1:21, 98:16, 99:8, 107:13, 107:25, 109:2,

109:9, 109:16
**half** [7] - 6:12, 6:16, 20:25, 74:23, 75:8, 116:12
**half-hour** [1] - 6:16
**hamstrung** [1] - 93:10
**hand** [7] - 11:6, 24:3, 36:6, 60:2, 78:22, 111:9, 129:19
**handle** [3] - 11:21, 20:15, 51:20
**handled** [1] - 29:1
**hang** [1] - 41:5
**happy** [5] - 92:6, 95:24, 99:15, 148:20, 162:15
**hard** [2] - 24:10, 40:12
**harder** [1] - 84:6
**hardly** [1] - 73:23
**hawk** [1] - 95:10
**head** [3] - 84:12, 97:11, 139:19
**headed** [1] - 64:15
**health** [1] - 35:2
**hear** [22] - 5:19, 22:10, 27:9, 50:21, 53:22, 58:3, 71:11, 71:12, 71:21, 72:11, 91:12, 98:12, 100:24, 107:3, 110:7, 118:18, 123:14, 130:21, 134:21, 146:21, 162:16, 162:25
**heard** [6] - 31:12, 127:12, 138:22, 160:21, 161:7, 164:11
**hearing** [4] - 16:4, 33:19, 35:3, 54:7
**heart** [1] - 35:1
**held** [4] - 63:11, 72:20, 74:14, 115:17
**help** [12] - 8:18, 28:11, 44:10, 102:1, 102:19, 102:20, 103:11, 106:4, 112:14, 130:24, 131:22, 132:13
**helpful** [9] - 5:8, 11:2, 11:13, 11:18, 12:14, 21:2, 27:17, 131:3, 160:23
**helps** [2] - 105:20, 156:7
**hereby** [1] - 164:5
**hierarchical** [1] - 112:8
**highlighted** [1] - 148:11

**highly** [4] - 101:20, 127:3, 127:7, 127:22
**himself** [1] - 142:14
**hired** [1] - 76:9
**history** [2] - 107:19, 112:25
**hold** [1] - 100:20
**holding** [1] - 36:22
**honest** [1] - 14:14
**honestly** [1] - 114:1
**Honor** [121] - 3:15, 4:3, 4:10, 4:22, 13:3, 16:1, 23:9, 25:5, 25:16, 26:5, 26:10, 28:14, 29:8, 29:12, 31:10, 32:15, 33:19, 34:20, 35:5, 37:12, 38:3, 39:3, 40:8, 40:18, 41:11, 42:8, 43:22, 46:8, 46:20, 48:21, 52:24, 53:2, 53:3, 54:13, 54:15, 54:23, 56:22, 57:3, 57:11, 57:13, 72:12, 72:16, 74:13, 74:15, 76:10, 76:22, 77:20, 82:10, 82:18, 82:25, 83:2, 86:18, 87:17, 88:21, 88:24, 90:9, 91:19, 92:8, 93:4, 94:22, 95:2, 95:9, 99:24, 100:14, 100:15, 101:3, 102:11, 110:6, 111:9, 111:25, 112:21, 113:1, 113:7, 113:19, 114:22, 115:9, 116:3, 116:15, 119:6, 122:23, 122:25, 123:23, 124:10, 125:10, 125:16, 128:7, 139:3, 140:1, 140:5, 141:9, 141:24, 142:3, 142:18, 143:16, 144:2, 144:14, 145:2, 146:19, 147:10, 147:24, 148:5, 148:23, 150:12, 155:3, 155:6, 155:9, 155:10, 155:19, 155:24, 156:14, 157:15, 158:2, 158:12, 159:5, 159:24, 160:15, 162:4, 162:12, 162:16, 162:23, 162:24

**Honor's** [6] - 43:24, 76:11, 83:6, 85:9, 86:11, 93:20
**Honorable** [1] - 1:13
**hook** [1] - 128:13
**hope** [4] - 15:18, 22:4, 59:10
**hopefully** [2] - 53:13, 98:15
**hour** [3] - 6:12, 6:16, 20:9
**hours** [5] - 7:4, 24:14, 24:17, 44:3, 48:13
**housekeeping** [3] - 26:4, 160:17, 162:1
**huge** [1] - 96:13
**hundred** [1] - 22:19
**hypothetical** [9] - 47:12, 113:5, 113:13, 113:23, 114:9, 114:15, 118:24, 119:3, 120:1

## I

**idea** [2] - 95:25, 119:19
**ideal** [3] - 16:19, 43:11, 53:5
**identification** [3] - 28:17, 39:8, 39:10
**identified** [3] - 41:18, 73:1, 127:1
**identifies** [1] - 149:9
**identify** [4] - 3:11, 18:17, 37:15, 153:5
**identifying** [3] - 28:21, 39:21, 50:7
**illegality** [2] - 126:5, 131:13
**illuminate** [1] - 105:21
**immediately** [1] - 97:16
**impact** [2] - 87:23, 93:3
**impeachment** [2] - 22:1, 22:23
**impermissible** [2] - 63:11, 109:5
**implicating** [1] - 103:3
**import** [1] - 95:7
**importance** [1] - 90:3
**important** [4] - 77:25, 83:9, 125:7, 147:17
**impression** [1] - 39:6
**imprimatur** [1] - 90:13
**improper** [14] - 38:10, 61:1, 61:13, 98:20, 98:24, 100:4,

101:23, 108:25, 130:20, 135:8, 141:12, 152:6, 155:15, 157:24
**improperly** [1] - 99:3
**IN** [2] - 1:1, 1:2
**inadmissible** [1] - 83:3
**inappropriate** [3] - 68:2, 72:6, 88:16
**incentivized** [1] - 22:20
**incidental** [1] - 48:5
**include** [1] - 11:17
**including** [9] - 8:14, 18:11, 19:6, 81:22, 83:14, 101:16, 125:24, 134:22, 151:10
**inclusion** [1] - 152:12
**income** [2] - 115:22, 135:23
**incorporates** [1] - 57:16
**incorrect** [10] - 64:21, 65:4, 65:16, 69:4, 69:8, 71:2, 73:7, 75:12, 80:25, 81:14
**incredible** [1] - 139:12
**incredibly** [1] - 139:12
**independent** [1] - 129:24
**indicate** [2] - 5:16, 56:5
**indicated** [2] - 9:2, 30:21
**indicates** [1] - 149:22
**indicating** [2] - 84:14, 127:18
**indication** [1] - 163:2
**Indino** [4] - 120:13, 123:1, 123:2, 149:20
**indirect** [6] - 62:17, 73:8, 77:25, 84:1, 90:18, 159:3
**indirectly** [1] - 60:22
**individual** [4] - 14:16, 32:19, 118:12, 153:1
**individuals** [4] - 30:13, 34:1, 76:19, 116:9
**induce** [1] - 160:11
**induced** [11] - 59:25, 64:3, 78:8, 80:21, 85:2, 86:6, 90:18, 90:22, 94:13, 97:10, 158:15
**inducement** [7] - 75:4, 116:5, 116:7, 159:9, 159:13, 160:2, 160:7

**infer** [7] - 86:15, 86:20, 143:12, 151:21, 155:1, 157:8, 159:22
**inference** [2] - 144:1
**inferences** [2] - 90:4, 155:18
**info** [1] - 110:20
**inform** [3] - 142:9, 142:10, 163:4
**information** [15] - 8:8, 13:13, 14:11, 15:3, 15:15, 86:5, 86:7, 86:15, 116:22, 118:22, 143:1, 149:5, 153:12, 154:2, 156:5
**informed** [4] - 148:14, 150:6, 150:18, 150:24
**infringe** [13] - 58:17, 58:21, 60:22, 61:17, 62:5, 62:20, 69:2, 72:8, 74:10, 78:7, 80:24, 90:12, 107:7
**infringed** [2] - 84:12, 108:11
**infringement** [69] - 40:23, 59:3, 59:7, 59:17, 59:18, 59:19, 60:1, 60:11, 62:18, 64:2, 64:3, 65:25, 66:1, 68:4, 68:7, 68:10, 68:14, 69:9, 69:14, 70:4, 73:3, 73:8, 73:20, 74:4, 75:1, 76:5, 77:23, 78:8, 78:19, 79:1, 79:8, 79:22, 80:22, 83:17, 84:2, 84:15, 85:2, 85:18, 90:18, 90:19, 90:23, 94:3, 96:21, 97:2, 97:10, 106:2, 107:7, 115:17, 121:5, 121:15, 127:10, 127:11, 127:14, 127:20, 127:25, 128:12, 133:3, 133:5, 152:25, 153:9, 153:21, 154:2, 158:15, 158:17, 159:3, 160:3
**infringer** [3] - 63:19, 74:2, 80:21
**infringers** [4] - 58:20, 59:16, 72:8, 116:13
**infringing** [6] - 59:22, 60:23, 62:23, 68:3, 85:17

**inherent** [2] - 61:6, 95:6
**inherently** [4] - 98:20, 109:4, 135:2, 135:7
**inhibit** [1] - 55:25
**initial** [1] - 83:15
**inject** [2] - 139:19, 140:14
**injury** [1] - 10:22
**innocent** [1] - 61:14
**inquiry** [2] - 63:22, 63:25
**insisted** [1] - 76:25
**instance** [3] - 22:15, 145:15, 160:3
**instructed** [1] - 139:18
**instruction** [4] - 64:18, 64:19, 65:12, 95:12
**instructions** [14] - 7:9, 7:13, 10:13, 10:16, 10:22, 26:6, 52:14, 52:15, 64:20, 72:23, 72:24, 77:20, 77:22, 95:22
**insurance** [1] - 124:18
**intellectual** [2] - 63:7, 81:12
**intend** [13] - 7:14, 29:22, 30:14, 32:21, 47:8, 49:8, 63:20, 85:13, 85:23, 95:3, 95:8, 110:7, 131:13
**intended** [1] - 66:3
**intending** [1] - 42:4
**intends** [1] - 29:19
**intense** [1] - 39:14
**intent** [19] - 48:6, 59:24, 60:21, 64:8, 66:7, 73:18, 78:7, 81:1, 81:3, 83:13, 85:1, 85:17, 91:7, 92:12, 93:18, 135:6, 135:7, 157:11, 157:12
**intent-like** [1] - 59:24
**interface** [1] - 110:24
**internal** [1] - 153:18
**interpret** [1] - 160:5
**interrogating** [1] - 98:6
**interrogatory** [3] - 62:4, 64:11, 65:21
**interrupt** [3] - 41:23, 63:16, 79:15
**interrupted** [1] - 53:10
**intervening** [1] - 105:3
**introduce** [2] - 87:16, 89:19
**introduction** [2] -

11:22, 112:2
**introductory** [1] - 5:24
**invalidity** [8] - 43:18, 44:14, 45:24, 48:15, 49:21, 106:9, 127:25, 128:12
**invented** [2] - 143:21, 143:23
**invention** [6] - 45:9, 47:9, 106:1, 128:22, 128:25, 140:17
**inventions** [3] - 78:5, 104:4, 105:22
**inventor** [2] - 45:8, 47:9
**invested** [1] - 121:14
**investor** [1] - 115:13
**investors** [6] - 111:19, 114:7, 118:9, 124:7, 124:14, 124:21
**invitation** [1] - 19:20
**invite** [1] - 38:15
**involve** [2] - 14:21, 27:2
**involved** [4] - 113:4, 114:8, 134:24, 156:1
**iPhone** [1] - 61:12
**irrelevant** [2] - 79:17, 131:7
**IRS** [1] - 130:15
**issue** [85] - 21:17, 25:21, 26:15, 31:9, 32:25, 35:2, 35:15, 38:23, 43:2, 43:14, 45:2, 47:23, 47:24, 48:25, 54:16, 55:7, 57:21, 58:14, 59:18, 60:10, 61:16, 61:20, 61:23, 61:25, 62:2, 62:15, 64:7, 69:16, 69:19, 69:24, 70:2, 72:17, 77:14, 77:23, 79:17, 83:11, 85:12, 86:10, 89:4, 90:8, 91:20, 91:21, 95:6, 95:11, 96:7, 96:8, 96:12, 96:13, 97:4, 97:17, 99:7, 99:9, 99:12, 99:21, 103:7, 104:5, 107:6, 107:21, 107:24, 109:4, 109:14, 112:9, 113:3, 116:16, 120:7, 125:2, 127:8, 128:7, 129:20, 131:25, 139:23, 144:21, 149:13, 151:13, 152:10, 154:6, 155:19, 155:20,

155:21
**issued** [2] - 85:25, 104:25
**issues** [47] - 5:7, 5:24, 7:6, 15:22, 16:5, 18:18, 19:14, 19:22, 20:2, 22:3, 39:15, 39:17, 39:19, 40:1, 43:3, 44:1, 44:3, 46:10, 46:20, 46:25, 47:2, 47:4, 49:7, 50:4, 52:19, 53:14, 55:8, 57:7, 58:3, 65:23, 68:8, 69:20, 91:15, 97:24, 98:19, 101:9, 103:12, 103:15, 111:23, 112:22, 121:5, 128:1, 138:12, 145:1, 159:3, 163:17
**itself** [3] - 53:8, 86:3, 109:6

**J**

**James** [1] - 4:4
**JAMES** [1] - 2:12
**JMOL** [6] - 51:22, 53:16, 54:21, 55:7, 55:11, 55:22
**JMOLs** [1] - 54:2
**job** [1] - 157:9
**Joe** [1] - 4:16
**join** [1] - 21:24
**joined** [1] - 61:20
**joining** [1] - 4:13
**JOSEPH** [1] - 2:7
**JPMorgan** [7] - 115:13, 118:8, 121:6, 121:9, 124:23, 125:2, 125:7
**JPMorgan's** [1] - 125:3
**judge** [4] - 65:13, 76:15, 89:13, 93:17
**Judge** [14] - 45:13, 88:2, 88:14, 92:21, 94:9, 102:17, 103:6, 112:16, 131:23, 143:25, 145:20, 156:20, 157:19
**judges** [6] - 6:9, 13:22, 19:9, 19:13, 20:11, 96:24
**judgment** [8] - 89:6, 89:7, 89:13, 89:18, 93:12, 93:20, 143:8, 161:17
**judicial** [1] - 84:14

**July** [2] - 70:13, 74:22
**jump** [1] - 112:11
**jumping** [1] - 90:17
**jumping-off** [1] - 90:17
**June** [1] - 93:21
**juror** [7] - 9:4, 9:6, 9:8, 9:9, 9:15, 9:18, 9:21
**juror's** [1] - 8:7
**jurors** [11] - 6:17, 6:19, 8:10, 8:21, 9:2, 9:23, 10:7, 10:9, 21:8, 27:1, 65:3
**jury** [68] - 6:4, 7:13, 7:19, 7:24, 9:10, 10:1, 10:13, 12:11, 13:8, 14:13, 14:15, 18:2, 18:4, 20:18, 21:10, 24:21, 25:12, 26:1, 26:2, 26:11, 26:17, 26:19, 26:24, 34:5, 51:5, 51:6, 52:13, 53:9, 64:7, 71:9, 72:22, 73:2, 73:24, 74:25, 75:3, 75:16, 76:14, 77:22, 85:10, 87:18, 89:12, 89:20, 89:22, 92:15, 94:6, 96:2, 102:13, 108:7, 108:14, 110:22, 111:3, 115:12, 115:14, 115:19, 120:22, 122:5, 123:13, 123:25, 133:3, 139:17, 151:6, 151:24, 155:16, 157:8, 157:23, 159:21, 160:4, 161:9
**jury's** [1] - 90:6
**JUSTIN** [1] - 1:20
**Justin** [2] - 3:19, 23:4

## K

**keep** [10] - 6:23, 8:24, 20:18, 51:5, 52:8, 58:2, 78:16, 101:19, 123:21, 138:18
**keeping** [1] - 23:19
**Ken** [1] - 4:3
**KENNETH** [1] - 2:13
**kept** [3] - 14:5, 15:4, 93:11
**key** [3] - 63:22, 97:16, 120:7
**kind** [25] - 5:4, 5:6, 5:12, 5:21, 6:23, 7:12, 11:20, 18:16,

23:21, 23:22, 78:22, 79:14, 79:15, 79:25, 84:22, 93:25, 114:21, 123:25, 124:3, 126:14, 130:4, 135:19, 138:4, 144:21, 157:21
**kinds** [2] - 51:19, 129:19
**kinetic** [5] - 73:11, 77:18, 78:2, 80:19, 81:8
**knowing** [2] - 75:4, 126:13
**knowledge** [9] - 85:15, 86:20, 91:7, 143:14, 152:5, 158:10, 158:16, 159:10, 160:20
**known** [2] - 75:13, 75:14
**knows** [2] - 123:18, 161:13
**Kremer** [24] - 4:14, 17:20, 25:5, 25:23, 29:11, 38:2, 39:12, 40:7, 42:4, 55:2, 56:21, 71:23, 78:11, 78:22, 80:19, 83:11, 91:14, 93:23, 96:23, 110:5, 111:20, 118:18, 125:13, 127:12
**KREMER** [54] - 2:6, 17:21, 25:5, 26:4, 26:14, 29:12, 30:12, 31:10, 32:2, 32:8, 33:18, 34:1, 34:20, 38:3, 40:8, 53:1, 54:12, 55:4, 55:9, 56:22, 57:1, 57:12, 72:11, 72:14, 72:16, 73:23, 74:12, 76:1, 77:8, 77:17, 78:9, 91:19, 93:4, 94:21, 95:2, 110:6, 111:9, 111:24, 112:13, 112:20, 113:18, 114:12, 114:22, 115:7, 117:5, 122:25, 123:22, 124:9, 124:12, 125:1, 125:15, 148:23, 160:15, 162:3
**Kremer's** [2] - 41:16, 41:24

## L

**labor** [1] - 112:7
**lack** [2] - 78:7, 156:21
**ladder** [1] - 162:18
**landscape** [3] - 138:1, 138:11, 153:6
**language** [2] - 26:22, 127:1
**large** [3] - 88:16, 129:10, 162:18
**larger** [1] - 115:22
**last** [5] - 37:4, 63:2, 141:5, 153:11, 159:6
**lastly** [3] - 5:18, 80:18, 129:15
**late** [1] - 101:7
**laughed** [1] - 161:6
**laughing** [1] - 161:12
**LAW** [1] - 1:17
**law** [36] - 3:16, 18:9, 18:23, 50:9, 51:14, 61:1, 61:14, 64:21, 65:5, 65:12, 65:13, 65:17, 69:4, 69:8, 71:3, 73:9, 73:22, 75:13, 76:13, 80:25, 81:15, 85:7, 93:17, 101:5, 109:5, 127:3, 127:23, 128:23, 129:12, 130:10, 130:14, 135:11, 141:1, 141:3, 157:15, 158:25
**laws** [1] - 101:15
**lawsuit** [2] - 85:24, 86:9
**lawyer** [1] - 155:16
**lawyers** [5] - 68:22, 76:9, 97:20, 97:21
**lay** [4] - 64:22, 65:3, 72:18, 106:20
**layperson** [1] - 65:10
**laypersons** [1] - 61:7
**lead** [2] - 40:10, 40:16
**leading** [1] - 9:13
**leaf** [2] - 115:8, 115:25
**leap** [1] - 147:13
**learned** [2] - 145:23, 152:13
**least** [13] - 6:12, 11:15, 12:9, 17:3, 27:5, 33:6, 55:23, 58:20, 59:21, 84:15, 101:17, 116:21, 149:6
**leave** [1] - 17:14
**left** [4] - 25:22, 40:20, 56:9, 161:18

**legal** [6] - 98:4, 127:17, 135:10, 139:21, 140:12
**legally** [2] - 71:8, 140:4
**legitimate** [1] - 130:17
**legs** [1] - 110:2
**less** [2] - 49:19, 117:13
**lest** [1] - 55:10
**letter** [4] - 100:10, 124:4, 131:5, 157:15
**level** [3] - 134:9, 141:20, 156:21
**leverage** [1] - 139:12
**liability** [7] - 77:13, 92:5, 92:9, 95:14, 116:11, 123:4, 125:5
**liable** [2] - 87:3, 115:18
**license** [11] - 62:24, 63:2, 67:6, 69:3, 69:10, 69:19, 70:3, 71:3, 74:9, 80:5, 119:23
**licensed** [6] - 59:23, 60:5, 61:15, 63:6, 64:6, 103:21
**licensing** [1] - 70:4
**likely** [8] - 10:21, 11:15, 24:19, 24:20, 26:19, 30:24, 45:22
**limine** [31] - 5:19, 5:21, 27:10, 49:25, 57:6, 57:8, 58:4, 58:9, 58:10, 60:13, 61:4, 62:9, 62:16, 66:9, 66:13, 66:16, 66:17, 67:4, 71:15, 78:14, 79:1, 79:4, 121:17, 122:20, 126:20, 131:6, 138:4, 141:11, 148:8, 150:14, 163:9
**limitations** [2] - 68:6, 72:9
**limited** [8] - 14:4, 21:9, 21:11, 50:12, 65:25, 66:1, 81:22, 123:4
**line** [11] - 9:22, 11:7, 31:22, 95:4, 100:16, 108:22, 122:16, 123:25, 124:21, 141:2
**lined** [2] - 8:10, 142:8
**lingered** [1] - 51:7
**lingering** [2] - 50:7, 51:3
**list** [26] - 23:8, 23:21,

23:23, 28:5, 31:23, 32:20, 33:25, 34:3, 34:13, 35:22, 36:2, 36:17, 36:21, 37:2, 37:10, 40:5, 41:22, 41:24, 42:1, 42:3, 42:22, 50:16, 120:13, 123:12, 149:21, 151:4
**listed** [7] - 27:23, 28:23, 30:13, 32:22, 35:22, 49:8, 149:20
**lists** [5] - 11:24, 12:3, 27:15, 28:12, 110:18
**literally** [3] - 131:10, 131:17, 142:20
**live** [36] - 12:8, 27:13, 27:20, 28:3, 28:19, 28:22, 29:5, 29:15, 29:16, 30:5, 30:11, 30:15, 32:1, 32:9, 32:17, 32:20, 32:23, 34:4, 34:6, 34:17, 35:17, 35:19, 36:2, 36:23, 37:5, 37:9, 37:16, 37:24, 39:11, 39:21, 39:25, 42:2, 42:5, 42:11, 96:24, 97:5
**LLC** [5] - 112:4, 123:3, 134:9, 164:23
**LLCs** [3] - 124:19, 126:23, 134:19
**LLP** [5] - 2:2, 2:9, 2:12, 2:15, 2:18
**lobbied** [2] - 129:11, 136:22
**lobbying** [12] - 128:14, 128:16, 128:18, 128:22, 129:2, 129:4, 136:12, 136:14, 136:19, 137:17, 138:8
**local** [12] - 28:17, 29:13, 30:17, 32:24, 37:13, 38:4, 38:5, 38:23, 38:24, 39:4, 39:6, 42:22
**logical** [2] - 70:23, 147:13
**logistical** [4] - 5:7, 7:6, 11:1, 15:22
**logistically** [1] - 8:18
**logistics** [3] - 5:25, 6:21, 24:13
**LOMBARDI** [16] - 2:9, 141:6, 141:23, 142:5, 143:5, 143:16, 144:12, 145:12, 146:18,

155:9, 156:9, 157:14, 158:2, 159:4, 159:8, 159:24
**Lombardi** [5] - 4:15, 141:7, 141:15, 146:22, 155:8
**look** [30] - 16:13, 18:12, 22:11, 42:21, 43:10, 48:18, 54:1, 57:23, 80:20, 83:24, 87:8, 92:25, 101:25, 102:23, 104:14, 106:13, 107:17, 107:18, 109:21, 122:7, 122:8, 131:23, 134:1, 134:17, 137:23, 140:16, 140:18, 144:16, 149:2
**looked** [5] - 27:4, 38:23, 55:20, 149:15, 163:1
**looking** [8] - 27:12, 45:15, 78:1, 108:21, 145:9, 149:22, 153:24, 154:10
**looks** [2] - 7:11, 122:15
**lose** [3] - 79:3, 133:1, 133:9
**loser** [2] - 20:24, 22:16
**loses** [1] - 51:12
**losing** [2] - 20:22, 22:14
**loss** [2] - 134:10, 134:25
**lost** [1] - 20:25
**loud** [1] - 161:6
**love** [1] - 18:12
**lucrative** [2] - 127:3, 127:23
**lunch** [6] - 6:16, 6:17, 6:18, 6:19, 56:10, 56:18

## M

**MacPherson** [1] - 3:22
**mail** [10] - 50:9, 144:5, 147:25, 148:1, 148:4, 149:18, 153:20, 157:22
**mails** [4] - 85:20, 86:25, 151:10, 152:7
**main** [1] - 96:10
**mains** [1] - 44:5
**maintain** [1] - 37:4
**maintained** [1] - 32:19

**major** [1] - 115:13
**makers** [2] - 162:10, 162:11
**man** [1] - 120:13
**managing** [1] - 123:6
**manifestly** [1] - 96:3
**MARK** [1] - 2:6
**Mark** [1] - 4:14
**marked** [1] - 110:25
**market** [5] - 73:17, 99:5, 100:6, 101:8, 106:21
**marketing** [5] - 103:17, 106:14, 108:2, 108:9, 109:19
**marshall** [1] - 159:2
**mass** [1] - 149:24
**massive** [1] - 140:12
**match** [2] - 68:18, 73:22
**material** [2] - 14:21, 108:9
**materials** [4] - 23:16, 103:18, 106:15, 108:2
**matter** [20] - 3:5, 21:12, 26:5, 64:4, 65:1, 66:19, 75:13, 76:13, 81:10, 85:7, 91:5, 93:17, 96:17, 103:6, 115:7, 127:17, 128:23, 145:4, 161:4
**matters** [2] - 159:17, 162:2
**maximum** [1] - 7:4
**MAZUR** [2] - 1:17, 3:15
**Mazur** [1] - 3:16
**ME2C** [16] - 29:19, 34:9, 77:2, 77:10, 95:25, 98:17, 101:6, 113:14, 113:25, 114:12, 115:9, 117:19, 118:1, 138:2, 138:11, 148:16
**ME2C's** [13] - 74:18, 77:1, 117:6, 140:6, 140:8, 141:12, 149:5, 149:10, 149:17, 149:25, 151:11, 154:11, 154:18
**MEAGHER** [1] - 2:18
**mean** [15] - 26:12, 43:10, 45:3, 63:12, 66:24, 87:11, 108:3, 121:25, 123:13, 126:4, 131:10,

133:11, 134:1, 135:24, 150:4
**meandered** [1] - 60:9
**meaning** [2] - 54:17, 109:14
**means** [3] - 97:18, 97:21, 112:1
**meant** [7] - 18:16, 45:12, 66:2, 107:6, 107:8, 137:20, 147:5
**mechanics** [1] - 5:8
**meet** [3] - 68:6, 135:5, 137:3
**meet-and-confers** [1] - 135:5
**meeting** [4] - 64:1, 64:8, 138:20, 139:25
**meetings** [1] - 50:20
**meets** [5] - 41:9, 68:16, 69:15, 72:9, 133:25
**member** [2] - 123:4, 123:6
**members** [3] - 111:18, 114:6, 124:6
**mens** [1] - 85:1
**mentioned** [3] - 23:18, 159:10, 160:6
**mentioning** [2] - 121:9, 121:20
**mercury** [4] - 149:8, 149:12, 154:10, 154:15
**merely** [3] - 101:7, 101:22, 106:20
**meritorious** [1] - 89:24
**merits** [2] - 89:7, 92:18
**mess** [1] - 16:10
**met** [1] - 64:1
**method** [1] - 127:6
**methodologies** [1] - 70:20
**methodology** [1] - 70:21
**mic** [1] - 72:13
**middle** [4] - 93:24, 94:12, 94:20, 94:21
**MIDWEST** [2] - 1:3, 164:9
**Midwest** [3] - 3:5, 3:17, 3:21
**might** [29] - 8:5, 17:24, 20:20, 31:6, 45:15, 45:16, 45:17, 46:15, 54:5, 60:3, 64:4, 64:5, 64:16, 65:4, 76:19, 88:5, 89:20, 89:23, 94:23, 95:1,

96:17, 96:22, 99:4, 111:22, 114:4, 117:3, 123:17, 159:22, 160:15
**Miguel** [5] - 148:17, 149:4, 149:9, 149:16, 149:23
**MIL** [6] - 81:17, 98:17, 98:18, 107:6, 121:25, 162:13
**million** [1] - 124:15
**mind** [18] - 21:25, 22:25, 60:24, 62:19, 70:11, 83:19, 90:24, 106:12, 107:16, 107:21, 109:22, 158:10, 158:14, 159:14, 159:19, 159:20, 159:23, 160:9
**mind-numbing** [1] - 106:12
**mindful** [1] - 78:15
**minds** [1] - 74:20
**mindset** [7] - 68:11, 93:3, 94:2, 104:20, 105:5, 105:8, 157:12
**minimum** [1] - 26:22
**minute** [4] - 15:16, 37:5, 88:13, 110:1
**minutes** [9] - 7:1, 15:17, 19:5, 20:4, 20:17, 51:3, 52:5, 52:7, 56:9
**misconnecting** [1] - 102:16
**mismatch** [1] - 140:10
**mistaken** [1] - 163:5
**Mod** [25] - 59:23, 60:20, 61:19, 68:18, 69:3, 69:19, 70:3, 70:4, 72:1, 73:5, 75:11, 76:24, 77:2, 77:10, 78:18, 78:24, 117:12, 117:13, 138:5, 138:7, 152:20, 153:1, 153:4, 156:1, 156:2
**model** [10] - 28:16, 29:14, 125:24, 126:6, 127:13, 127:20, 128:10, 130:15, 138:25, 140:23
**moment** [6] - 32:16, 34:21, 53:1, 88:14, 96:11, 97:22
**Monday** [4] - 7:24, 24:19, 24:21, 55:13
**money** [10] - 122:8,

128:2, 129:17, 129:18, 130:9, 130:12, 130:20, 132:7, 133:1, 133:9
**monitors** [1] - 14:16
**morning** [15] - 3:3, 3:8, 3:15, 4:2, 4:10, 4:21, 4:25, 6:25, 16:17, 19:17, 27:4, 50:20, 53:7, 53:13, 55:13
**morphing** [1] - 109:20
**Morris** [2] - 4:4, 4:11
**MORRIS** [2] - 2:2, 2:12
**most** [3] - 30:24, 77:25, 92:23
**motion** [82] - 26:8, 53:23, 55:7, 55:11, 55:22, 55:24, 56:1, 56:4, 56:5, 56:6, 56:12, 56:15, 58:6, 58:9, 60:13, 61:3, 62:8, 66:13, 66:17, 67:3, 71:14, 71:20, 72:4, 74:16, 75:9, 75:17, 76:9, 76:20, 78:14, 78:25, 79:4, 81:23, 86:13, 86:14, 89:22, 94:19, 95:25, 98:12, 99:14, 100:2, 101:4, 101:6, 101:23, 102:3, 108:22, 110:8, 111:11, 111:14, 111:15, 111:21, 112:2, 113:2, 113:7, 121:17, 122:20, 123:24, 126:20, 128:3, 130:1, 130:4, 131:6, 131:21, 136:20, 136:21, 141:5, 141:8, 141:11, 141:23, 142:1, 143:8, 144:19, 148:8, 150:14, 155:11, 155:13, 157:4, 157:20, 158:24, 161:2, 163:9
**motion-by-motion** [1] - 58:6
**motions** [26] - 5:19, 5:21, 16:4, 27:10, 49:25, 53:17, 54:21, 57:6, 57:8, 58:4, 58:6, 58:10, 62:9, 62:16, 66:9, 71:12, 71:15, 74:19, 98:14, 110:4, 110:11, 110:15, 112:17,

138:4, 161:17, 161:23

**move** [4] - 12:5, 13:3, 16:15, 16:21

**moved** [2] - 12:14, 12:16

**moving** [3] - 6:23, 25:20, 111:16

**MR** [145] - 3:15, 4:2, 4:10, 16:1, 16:8, 16:23, 17:15, 17:21, 17:22, 21:3, 21:22, 21:23, 23:4, 23:25, 24:2, 24:9, 25:5, 25:16, 26:4, 26:14, 29:12, 30:12, 31:10, 32:2, 32:8, 33:18, 34:1, 34:20, 38:3, 40:8, 43:22, 45:4, 45:21, 46:2, 48:24, 53:1, 54:12, 55:4, 55:9, 56:22, 57:1, 57:12, 59:10, 59:14, 60:25, 61:25, 63:1, 63:13, 63:24, 66:6, 67:22, 68:20, 69:12, 69:18, 71:14, 71:18, 72:11, 72:14, 72:16, 73:23, 74:12, 76:1, 77:8, 77:17, 78:9, 78:15, 79:19, 79:24, 81:6, 82:10, 82:18, 82:25, 83:21, 84:19, 85:6, 87:12, 88:11, 91:2, 91:19, 93:4, 94:21, 95:2, 96:6, 97:8, 99:24, 100:14, 101:2, 102:10, 103:14, 104:6, 104:23, 105:7, 106:6, 110:6, 111:4, 111:9, 111:24, 112:13, 112:20, 113:18, 114:12, 114:22, 115:7, 117:5, 119:6, 122:10, 122:23, 122:25, 123:22, 124:9, 124:12, 125:1, 125:15, 125:18, 126:17, 128:6, 129:7, 130:6, 131:4, 132:14, 135:4, 135:16, 136:15, 137:6, 137:22, 138:18, 139:24, 141:6, 141:23, 142:5, 143:5, 143:16, 144:12, 145:12, 146:18, 148:23,

155:9, 156:9, 157:14, 158:2, 159:4, 159:8, 159:24, 160:15, 162:3

**MS** [41] - 4:21, 28:13, 29:7, 32:14, 35:5, 35:14, 37:1, 37:12, 39:3, 41:15, 42:7, 46:7, 46:19, 46:24, 47:17, 48:4, 48:21, 52:23, 54:14, 54:23, 57:2, 57:10, 98:16, 99:8, 107:13, 107:25, 109:2, 109:9, 109:16, 147:9, 147:24, 148:5, 149:2, 150:12, 150:17, 151:2, 151:23, 152:2, 155:3, 155:6, 158:12

**multilayer** [1] - 126:23

**multiple** [3] - 44:17, 45:4, 89:4

**must** [8] - 14:5, 14:6, 39:16, 39:24, 40:5, 89:25, 139:17, 146:8

# N

**N-O-X** [1] - 67:21

**nailed** [1] - 113:19

**name** [6] - 8:7, 80:10, 118:15, 121:20, 121:21, 123:14

**named** [4] - 113:13, 115:23, 120:13, 123:7

**names** [1] - 115:21

**narrow** [2] - 121:23, 154:17

**narrowed** [2] - 148:7, 148:9

**narrowing** [1] - 124:9

**narrows** [1] - 95:18

**nature** [3] - 46:11, 47:14, 105:25

**near** [1] - 10:23

**necessarily** [4] - 33:1, 58:19, 94:17, 161:2

**necessary** [4] - 135:25, 136:9, 137:3

**necessitated** [1] - 57:19

**need** [31] - 5:17, 7:15, 15:4, 15:6, 15:21, 17:3, 18:25, 19:3, 19:23, 20:2, 22:11,

23:14, 26:24, 29:14, 34:18, 36:25, 40:3, 41:19, 42:23, 48:14, 49:15, 55:22, 86:3, 86:5, 88:17, 99:13, 102:11, 103:10, 114:4, 118:21

**needed** [7] - 18:13, 19:7, 25:2, 29:6, 50:13, 85:16, 137:19

**needs** [5] - 56:4, 66:12, 116:19, 123:25, 139:13

**negative** [3] - 163:2, 163:3, 163:6

**negotiated** [1] - 119:14

**negotiating** [2] - 120:5, 120:6

**negotiation** [7] - 113:5, 113:13, 113:23, 114:9, 118:24, 119:3, 120:2

**negotiations** [1] - 114:16

**Nemec** [1] - 4:23

**NEMEC** [1] - 2:19

**NEMUNAITIS** [17] - 1:20, 23:4, 23:25, 82:10, 82:18, 82:25, 83:21, 84:19, 85:6, 87:12, 88:11, 91:2, 96:6, 97:8, 119:6, 122:10, 122:23

**Nemunaitis** [7] - 3:19, 23:3, 23:4, 81:18, 96:5, 118:19, 122:22

**never** [8] - 22:23, 34:21, 41:8, 41:10, 66:20, 76:13, 88:9, 97:3

**NEW** [2] - 164:3, 164:18

**new** [4] - 10:21, 113:20, 116:4, 116:16

**next** [4] - 16:17, 27:13, 43:1, 149:15

**Nichols** [1] - 4:11

**NICHOLS** [1] - 2:2

**NICOLE** [1] - 2:19

**Nicole** [1] - 4:22

**night** [3] - 18:24, 36:12, 50:9

**nine** [2] - 32:22, 42:6

**nipped** [1] - 116:19

**nobody** [2] - 67:12, 71:4

**non** [1] - 89:24

**non-meritorious** [1] -

89:24

**none** [4] - 40:19, 50:22, 54:14, 64:6

**noninfringement** [3] - 60:4, 71:7, 79:2

**noninfringing** [2] - 89:10

**nonparties** [1] - 115:16

**nonparty** [3] - 36:18, 124:13

**nonpracticing** [1] - 126:22

**normally** [1] - 6:9

**noted** [1] - 7:10

**notes** [4] - 118:20, 153:18, 160:17, 164:13

**nothing** [8] - 14:2, 48:24, 52:23, 62:5, 80:16, 128:17, 142:21, 146:2

**notice** [10] - 15:5, 30:1, 36:8, 36:12, 37:25, 42:3, 62:2, 83:25, 84:9, 84:22

**notify** [1] - 50:15

**notion** [2] - 61:2, 61:12

**November** [8] - 1:14, 6:2, 12:1, 24:3, 24:14, 24:22, 164:11, 164:20

**NOX** [4] - 67:10, 67:16, 67:21

**Number** [1] - 164:9

**number** [27] - 3:7, 8:2, 8:23, 9:8, 9:21, 23:14, 37:23, 45:15, 45:19, 58:9, 71:21, 77:16, 78:14, 81:17, 88:22, 97:19, 98:17, 98:18, 111:15, 118:8, 118:11, 125:13, 125:20, 140:20, 141:8, 141:11, 161:19

**numbers** [1] - 118:11

**numbing** [1] - 106:12

**numerical** [1] - 8:12

**nuts** [1] - 5:25

**nuts-and-bolts** [1] - 5:25

# O

**O'Grady's** [1] - 92:21

**O'Keefe** [20] - 44:25, 45:23, 48:11, 142:7,

142:14, 145:8, 145:18, 146:4, 147:12, 147:18, 148:16, 150:8, 150:21, 151:18, 152:2, 153:3, 154:6, 157:2, 158:8, 158:13

**O'Keefe's** [6] - 147:1, 148:10, 148:18, 149:1, 151:3, 154:20

**oath** [1] - 113:10

**object** [4] - 19:23, 33:11, 112:2, 122:16

**objected** [1] - 31:17

**objecting** [1] - 66:5

**objection** [1] - 12:17

**objections** [14] - 12:10, 17:4, 17:8, 17:25, 18:8, 19:14, 20:22, 25:19, 53:10, 56:21, 56:24, 57:2, 65:20, 94:10

**observation** [2] - 59:14, 60:14

**observations** [1] - 66:8

**observe** [2] - 67:2, 78:17

**observed** [2] - 64:12, 131:12

**obtain** [1] - 133:16

**obtained** [2] - 127:8, 152:23

**obviously** [13] - 16:25, 26:9, 45:5, 46:2, 51:10, 53:11, 59:16, 96:25, 99:11, 134:13, 159:9, 160:20, 161:9

**occur** [3] - 59:7, 69:10, 79:22

**occurred** [2] - 88:20, 154:1

**occurring** [1] - 94:3

**October** [1] - 26:8

**odd** [2] - 60:8, 135:17

**OF** [4] - 1:2, 1:10, 164:2, 164:3

**offer** [2] - 32:6, 93:15

**offered** [1] - 141:19

**Office** [2] - 104:25, 106:13

**officer** [1] - 120:18

**OFFICIALLY** [1] - 164:17

**officio** [1] - 123:6

**offset** [2] - 133:19, 135:23

**offsetting** [1] - 135:21

**often** [2] - 47:22,

126:21
**oftentimes** [1] - 45:7
**oldest** [1] - 115:23
**omitted** [1] - 119:9
**on-point** [1] - 92:23
**once** [2] - 9:1, 48:15
**one** [97] - 7:18, 8:2, 8:7, 10:4, 11:5, 13:10, 14:3, 14:8, 15:16, 15:20, 20:25, 22:4, 22:16, 24:11, 30:1, 34:22, 35:15, 36:1, 42:24, 44:5, 44:23, 44:25, 47:24, 49:18, 50:18, 50:22, 50:23, 53:18, 57:20, 58:9, 59:24, 63:11, 65:21, 65:22, 66:8, 71:21, 77:2, 77:16, 78:22, 79:21, 81:18, 81:19, 83:1, 83:8, 83:9, 83:22, 90:12, 91:16, 92:17, 95:24, 96:17, 97:13, 98:19, 101:18, 103:14, 108:6, 111:10, 111:15, 114:3, 115:20, 117:10, 118:20, 120:12, 122:1, 122:19, 124:25, 125:21, 126:8, 129:2, 129:18, 139:1, 142:2, 143:11, 143:25, 144:5, 144:8, 145:22, 146:16, 147:4, 148:6, 149:11, 151:9, 151:21, 152:16, 154:16, 155:1, 155:12, 158:6, 159:4, 159:21, 161:5, 162:22, 162:24
**one-day** [1] - 30:1
**one-sheet** [1] - 111:10
**ones** [3] - 23:17, 24:10, 26:12
**open** [1] - 15:16
**opened** [2] - 88:15, 97:22
**opening** [7] - 17:2, 17:10, 17:12, 96:14, 124:4, 127:1, 136:21
**operate** [2] - 116:6, 135:2
**operating** [2] - 115:22, 123:6
**operation** [1] - 121:14
**operations** [1] -

119:22
**operators** [2] - 40:20, 40:21
**opines** [1] - 114:13
**opinion** [10] - 76:3, 98:1, 113:12, 116:4, 116:17, 128:21, 146:9, 156:10, 158:17, 160:10
**opinions** [6] - 64:13, 64:14, 75:20, 98:4, 160:1
**opportunity** [1] - 31:21
**oppose** [1] - 105:17
**opposed** [1] - 61:23
**opposing** [2] - 147:15, 158:23
**opposition** [1] - 114:13
**optimizing** [1] - 149:8
**option** [1] - 84:5
**orally** [6] - 53:19, 53:21, 54:10, 55:23, 56:5, 56:12
**order** [32] - 5:2, 5:14, 8:12, 11:23, 17:6, 18:15, 19:11, 23:5, 23:6, 26:13, 27:4, 27:12, 27:18, 30:2, 33:5, 33:6, 39:9, 39:18, 43:25, 51:20, 57:8, 57:15, 57:25, 58:11, 76:11, 84:14, 87:3, 87:15, 87:16, 93:13, 93:21, 137:3
**ordered** [1] - 37:18
**orders** [12] - 18:16, 28:16, 29:14, 82:21, 83:7, 85:10, 86:11, 88:1, 88:23, 89:15, 95:5, 95:7
**organization** [2] - 68:22, 125:25
**organizational** [1] - 130:14
**organizations** [1] - 134:2
**original** [2] - 83:19, 136:19
**originally** [3] - 26:6, 109:17, 131:25
**ostensibly** [1] - 64:17
**otherwise** [8] - 20:10, 23:18, 31:8, 43:4, 64:22, 82:5, 132:12, 143:9
**ought** [2] - 117:2, 127:15
**ourselves** [1] - 97:7

**out-of-town** [1] - 163:15
**outcome** [1] - 30:24
**outstanding** [1] - 158:24
**over-read** [1] - 95:8
**overall** [1] - 158:17
**overbroad** [1] - 109:3
**overdoing** [1] - 94:18
**overlap** [1] - 46:20
**overturned** [2] - 96:7, 162:25
**own** [12] - 33:8, 33:9, 33:12, 33:21, 35:8, 70:17, 76:17, 103:4, 104:3, 105:21, 137:9, 154:6
**owned** [1] - 63:5
**owner** [1] - 120:18
**owners'** [1] - 125:24

## P

**Pacific** [1] - 132:23
**page** [13] - 82:6, 103:2, 105:14, 105:16, 119:9, 136:21, 139:4, 141:25, 142:2, 143:4, 150:13, 153:17, 156:25
**pages** [9] - 88:1, 94:7, 101:18, 117:22, 147:1, 148:11, 164:15
**paid** [1] - 117:14
**paper** [2] - 105:12, 106:11
**papers** [1] - 117:6
**paragraph** [14] - 43:1, 50:1, 53:15, 57:21, 119:8, 119:10, 127:6, 148:18, 149:1, 149:2, 153:10, 155:24, 157:1, 158:18
**paragraphs** [4] - 27:14, 35:12, 100:19, 145:10
**paramount** [1] - 90:10
**paraphrasing** [1] - 16:25
**parent** [8] - 111:18, 113:22, 119:21, 119:25, 122:8, 124:6, 124:13, 162:18
**parents** [9] - 114:4, 114:14, 116:9,

116:22, 116:24, 117:21, 118:22, 123:2, 124:21
**parity** [1] - 77:14
**parse** [1] - 63:9
**parsing** [1] - 112:22
**part** [22] - 13:14, 15:5, 20:11, 26:13, 27:3, 44:13, 58:20, 84:13, 107:14, 116:25, 118:24, 121:6, 127:20, 127:21, 131:6, 132:20, 138:24, 139:1, 139:8, 144:9, 148:12, 152:8
**particular** [9] - 11:9, 45:12, 47:2, 55:7, 68:9, 93:2, 119:7, 132:22, 142:1
**particularly** [2] - 126:25, 130:2
**parties** [67] - 5:10, 5:20, 6:18, 7:7, 8:4, 8:9, 8:15, 9:14, 10:2, 10:15, 11:22, 12:21, 13:11, 13:19, 15:3, 17:5, 17:13, 18:2, 18:10, 18:14, 18:24, 19:2, 19:12, 19:13, 20:6, 20:7, 20:13, 21:5, 21:6, 21:16, 23:22, 24:24, 25:18, 27:7, 27:19, 27:23, 30:5, 31:8, 33:7, 33:15, 34:10, 37:14, 39:19, 39:25, 43:11, 47:22, 50:1, 50:6, 50:8, 50:25, 51:16, 52:4, 53:5, 57:7, 57:18, 66:14, 67:23, 74:24, 83:5, 85:11, 94:8, 113:12, 114:15, 121:7, 122:11, 161:10, 161:21
**parties'** [5] - 5:2, 27:15, 33:5, 78:20, 110:23
**parts** [1] - 159:13
**party** [14] - 33:8, 33:23, 33:25, 34:14, 35:8, 36:17, 37:2, 42:13, 55:22, 56:3, 84:24, 93:3, 147:4, 157:13
**party's** [1] - 55:25
**pass** [5] - 15:19, 127:9, 127:10, 127:19, 130:13

**pass-through** [4] - 127:9, 127:10, 127:19, 130:13
**passed** [1] - 141:1
**past** [3] - 6:9, 24:5, 109:11
**patent** [57] - 45:7, 59:5, 61:5, 61:11, 61:15, 61:19, 63:3, 63:5, 69:25, 70:18, 71:4, 72:17, 78:19, 79:8, 84:9, 84:22, 85:15, 91:4, 91:6, 91:24, 105:10, 119:14, 119:23, 128:23, 139:1, 139:7, 139:11, 139:14, 139:17, 140:8, 144:7, 145:25, 146:7, 146:15, 149:13, 151:17, 151:20, 152:11, 152:14, 152:21, 152:23, 152:25, 153:5, 153:9, 153:14, 153:19, 153:21, 153:25, 154:2, 154:7, 154:8, 154:23, 156:3, 156:11, 156:14, 156:16, 156:17
**Patent** [2] - 104:25, 106:13
**patent's** [1] - 108:24
**patent-in-suit** [1] - 154:23
**patented** [6] - 70:21, 103:19, 106:17, 132:21, 149:10, 151:11
**patentee's** [1] - 105:24
**patents** [67] - 60:20, 62:24, 64:6, 64:23, 65:2, 67:6, 67:8, 67:9, 68:18, 69:2, 69:9, 69:11, 69:16, 72:1, 72:18, 73:5, 73:14, 73:15, 74:9, 74:10, 75:12, 76:24, 77:2, 77:6, 77:10, 77:12, 78:24, 80:2, 84:1, 85:25, 86:2, 86:8, 103:20, 103:23, 104:4, 104:10, 104:17, 105:23, 106:1, 107:10, 117:14, 127:16, 139:6,

140:6, 141:2, 142:11, 143:1, 145:17, 145:24, 148:15, 149:5, 150:8, 150:20, 151:1, 151:8, 152:14, 153:1, 153:6, 154:9, 154:11, 154:18, 154:22, 156:19, 156:20, 157:7, 158:21

**patents-in-suit** [8] - 145:17, 145:24, 150:8, 150:20, 151:1, 151:8, 152:14, 158:21

**PAUL** [2] - 2:6, 2:15

**Paul** [6] - 4:5, 4:14, 25:5, 99:24, 101:3, 125:18

**Pavlich** [1] - 45:23

**pay** [5] - 6:18, 80:3, 80:4, 80:6, 133:8

**paying** [1] - 134:6

**pejorative** [3] - 122:18, 128:4, 130:3

**pejoratively** [1] - 161:3

**pending** [1] - 121:8

**pens** [1] - 8:21

**people** [15] - 16:17, 21:16, 31:25, 34:9, 45:19, 82:5, 86:23, 91:6, 111:1, 120:12, 123:17, 138:7, 138:8, 144:10

**per** [11] - 6:13, 7:2, 7:4, 10:3, 11:22, 21:16, 44:3, 62:20, 134:7, 138:15, 140:22

**perceived** [1] - 38:9

**percent** [1] - 13:24

**percentages** [1] - 41:5

**perceptions** [4] - 103:4, 104:3, 105:21, 105:25

**percipient** [2] - 145:7, 146:10

**peremptory** [1] - 10:3

**perfect** [1] - 72:15

**perfectly** [1] - 92:6

**performed** [2] - 86:21, 153:5

**performing** [1] - 154:6

**perhaps** [2] - 89:20, 89:22

**period** [5] - 20:4, 74:22, 75:8, 95:15,

153:15

**periphery** [1] - 66:16

**permissible** [2] - 88:6, 106:22

**permission** [3] - 63:6, 65:1, 70:5

**person** [8] - 9:16, 23:15, 30:15, 35:1, 63:5, 85:5, 144:5, 144:7

**personally** [1] - 73:1

**perspective** [4] - 29:8, 29:18, 31:23, 44:4

**pertinent** [3] - 13:17, 116:2, 116:5

**PETER** [1] - 1:17

**peter** [1] - 3:16

**phase** [8] - 44:23, 44:25, 45:1, 45:18, 46:5, 49:16, 54:20

**phonetic** [1] - 75:11

**phonetic]** [1] - 120:14

**phrase** [1] - 124:4

**physically** [1] - 120:4

**picked** [1] - 70:6

**piece** [4] - 15:2, 15:15, 128:14, 155:10

**pieces** [5] - 129:19, 141:24, 142:1, 148:7, 148:10

**pike** [2] - 113:21, 116:4

**pin** [2] - 89:2, 113:8

**pivot** [1] - 161:24

**place** [3] - 66:14, 100:9, 129:12

**plaintiff** [21] - 10:4, 43:2, 46:8, 47:5, 49:4, 49:6, 49:23, 57:11, 58:15, 77:4, 89:4, 100:1, 100:17, 119:4, 123:15, 126:4, 126:8, 126:9, 126:21, 132:19, 140:24

**Plaintiff** [2] - 1:5, 1:22

**plaintiff's** [2] - 70:18, 73:15

**Plaintiffs** [2] - 43:15, 47:22

**plaintiffs** [25] - 21:12, 25:17, 28:15, 28:20, 33:11, 35:17, 36:10, 38:1, 44:8, 45:16, 46:6, 49:15, 49:21, 52:24, 54:15, 54:18, 54:19, 57:3, 75:21, 90:4, 92:10, 103:5, 103:15, 104:2, 114:11

**Plaintiffs'** [1] - 107:15

**plaintiffs'** [25] - 3:12, 15:24, 29:1, 29:7, 31:13, 33:6, 35:21, 39:23, 44:4, 49:4, 55:5, 56:8, 58:5, 58:8, 81:17, 102:25, 103:3, 104:20, 105:5, 105:14, 105:18, 115:10, 127:13, 127:15, 142:11

**plan** [11] - 6:10, 6:15, 6:24, 10:17, 11:4, 11:21, 18:9, 21:17, 22:8, 22:22, 32:7

**planned** [1] - 109:18

**planning** [13] - 6:2, 6:3, 18:7, 28:1, 46:13, 46:14, 46:18, 48:3, 48:4, 50:3, 122:9, 122:10

**plant** [12] - 40:20, 40:21, 116:8, 134:19, 143:2, 145:16, 148:17, 149:4, 149:9, 149:23, 151:16, 151:19

**plants** [16] - 74:5, 82:16, 85:22, 86:24, 87:1, 121:11, 142:8, 142:10, 143:22, 148:13, 150:6, 150:18, 150:23, 151:19, 152:9, 153:23

**play** [6] - 30:21, 35:8, 45:13, 72:1, 83:18, 87:13

**played** [5] - 13:1, 29:25, 36:20, 37:6, 52:3

**pleadings** [3] - 82:21, 83:6, 86:15

**plus** [1] - 86:7

**point** [48] - 7:15, 14:19, 23:20, 25:11, 40:18, 41:16, 41:24, 48:17, 56:3, 56:8, 62:3, 62:21, 65:21, 66:22, 76:22, 79:25, 83:14, 84:23, 85:5, 86:22, 87:6, 87:19, 87:21, 89:8, 90:17, 92:5, 92:23, 94:1, 96:10, 96:16, 97:13, 98:2, 108:10, 116:17, 119:7, 120:6, 121:19,

122:17, 140:1, 142:24, 143:21, 144:1, 144:12, 144:17, 145:2, 145:3, 150:14

**pointing** [1] - 142:21

**points** [6] - 40:9, 112:13, 121:22, 128:9, 129:2, 136:15

**policy** [1] - 124:18

**pop** [1] - 154:11

**portion** [9] - 13:24, 14:5, 15:10, 22:12, 23:6, 63:2, 117:19, 118:13, 150:16

**pose** [1] - 73:16

**position** [13] - 25:23, 35:21, 35:24, 36:6, 37:7, 39:23, 47:6, 55:3, 78:25, 91:12, 117:6, 161:11, 161:13

**positions** [3] - 44:8, 78:20, 161:1

**positive** [1] - 14:17

**possibility** [2] - 25:7, 25:12

**possible** [11] - 15:12, 16:11, 24:16, 24:18, 25:10, 41:3, 53:5, 54:1, 54:5, 54:7, 60:3

**possibly** [3] - 71:5, 113:4, 113:5

**post** [4] - 54:5, 84:3, 93:13, 96:20

**post-2019** [1] - 84:12

**post-complaint** [2] - 84:3, 96:20

**post-trial** [1] - 93:13

**posture** [1] - 93:13

**potential** [3] - 42:17, 42:18, 153:23

**potentially** [3] - 42:11, 96:14, 97:24

**power** [26] - 40:20, 40:21, 74:5, 82:16, 85:22, 86:24, 86:25, 116:8, 121:10, 134:19, 142:8, 142:10, 143:2, 143:22, 145:15, 148:13, 149:4, 149:9, 150:5, 150:18, 150:23, 151:16, 151:18, 151:19, 152:9, 153:23

**powerful** [1] - 129:10

**practical** [1] - 21:12

**practice** [12] - 43:7, 46:22, 47:4, 47:13, 61:19, 63:4, 67:5, 70:5, 73:4, 78:5, 81:23, 125:25

**practicing** [3] - 60:5, 60:20, 73:14

**prayer** [2] - 10:18, 52:15

**pre** [1] - 84:7

**pre-complaint** [1] - 84:7

**precedent** [3] - 95:13, 95:16, 95:17

**preclude** [1] - 64:24

**precluding** [3] - 60:12, 60:13, 91:17

**predecessor** [1] - 149:19

**predict** [1] - 34:21

**preference** [2] - 43:23, 43:24

**preferences** [2] - 11:2, 15:23

**preferred** [5] - 69:23, 79:7, 79:9, 80:7, 80:17

**prejudice** [15] - 36:11, 54:4, 84:17, 84:25, 87:4, 87:23, 89:8, 89:20, 92:17, 94:15, 97:16, 97:18, 97:21, 116:18, 123:23

**prejudicial** [8] - 38:1, 92:3, 96:15, 127:24, 129:14, 131:7, 134:20, 134:25

**preliminary** [6] - 7:8, 7:13, 10:12, 26:5, 52:14, 151:13

**premiere** [1] - 154:15

**premise** [1] - 80:25

**premised** [2] - 81:14, 101:6

**prepare** [5] - 19:5, 36:12, 42:9, 42:10, 42:18

**prepared** [3] - 50:11, 51:5, 76:7

**prerebut** [2] - 47:5, 47:11

**presence** [1] - 161:9

**present** [16] - 16:12, 44:11, 46:4, 46:9, 49:9, 49:16, 81:20, 85:14, 87:14, 106:24, 120:4, 133:2, 134:12, 147:16, 151:23, 164:7

**presentation** [2] - 146:24, 152:4
**presentations** [1] - 163:14
**presented** [5] - 28:19, 40:2, 68:13, 111:23, 161:1
**presenting** [1] - 99:12
**presently** [1] - 41:2
**preserve** [2] - 56:1, 56:13
**preserves** [1] - 66:18
**president** [1] - 123:2
**presuit** [2] - 85:15, 86:7
**presumably** [4] - 25:2, 52:11, 54:1, 123:16
**presume** [2] - 56:2, 56:7
**presuming** [1] - 23:16
**presumption** [4] - 13:18, 14:2, 14:25, 53:21
**presumptive** [4] - 7:12, 9:18, 25:1, 26:2
**pretend** [1] - 76:12
**pretreating** [1] - 105:20
**PRETRIAL** [3] - 1:10, 1:12, 164:16
**pretrial** [26] - 3:9, 5:2, 5:14, 11:23, 17:6, 18:14, 18:16, 19:11, 26:13, 27:3, 27:12, 27:18, 33:5, 39:9, 39:17, 51:20, 57:7, 57:15, 57:25, 58:11, 70:13, 70:14, 81:21, 90:5, 91:8, 163:14
**pretty** [4] - 21:10, 113:19, 126:1, 126:19
**prevent** [4] - 38:12, 98:5, 102:4, 102:6
**primary** [1] - 44:12
**printed** [1] - 8:4
**priority** [2] - 44:6, 47:8
**privilege** [2] - 97:24, 152:22
**probative** [5] - 101:20, 103:19, 107:1, 107:21, 129:1
**problem** [16] - 22:21, 46:24, 48:11, 48:13, 63:1, 79:6, 79:15, 90:10, 95:12, 95:14, 99:11, 116:18, 121:16, 144:14, 147:10, 157:20

**problems** [2] - 108:20, 134:2
**procedural** [1] - 66:10
**Procedure** [1] - 38:12
**proceed** [3] - 20:19, 97:1, 148:20
**proceeding** [1] - 76:14
**proceedings** [3] - 81:21, 110:13, 164:8
**process** [24] - 7:20, 9:13, 9:21, 10:14, 17:7, 18:5, 21:24, 50:5, 50:6, 50:14, 51:23, 53:16, 56:25, 58:22, 59:8, 67:13, 68:15, 69:15, 69:22, 72:8, 79:6, 116:25, 119:18, 151:11
**processed** [2] - 117:11, 117:24
**processes** [3] - 18:15, 63:25, 70:24
**procession** [1] - 106:12
**produce** [1] - 7:12
**product** [3] - 80:16, 101:8, 106:21
**products** [5] - 59:4, 89:5, 89:6, 89:10, 98:23
**proffer** [1] - 125:5
**profitable** [2] - 133:20, 135:3
**profits** [3] - 127:3, 127:22, 128:1
**program** [3] - 124:16, 134:23, 156:4
**prominence** [1] - 113:23
**promising** [1] - 95:8
**promoted** [1] - 106:16
**prompted** [1] - 157:4
**proof** [3] - 61:23, 93:15, 142:12
**proofs** [1] - 43:24
**proper** [5] - 59:8, 62:16, 66:5, 130:11, 130:17
**properly** [2] - 56:1, 144:22
**property** [2] - 63:8, 81:13
**proposal** [2] - 49:5, 149:7
**propose** [3] - 34:3, 95:24, 124:20
**proposed** [8] - 7:8, 8:16, 10:16, 11:24, 27:18, 28:5, 35:17, 56:20

**proposing** [1] - 40:11
**proposition** [1] - 93:1
**prosecution** [2] - 70:17, 107:19
**prospect** [1] - 36:23
**protect** [1] - 93:9
**protection** [1] - 105:19
**prove** [4] - 49:21, 71:5, 92:3, 132:20
**proves** [2] - 41:16, 138:6
**provide** [23] - 6:18, 8:17, 8:19, 11:5, 11:13, 11:23, 23:14, 23:22, 27:19, 40:3, 57:24, 83:25, 95:22, 110:20, 118:22, 145:5, 148:19, 154:23, 157:11, 159:12, 159:13, 159:14, 160:23
**provided** [12] - 6:17, 7:7, 8:8, 8:16, 10:16, 28:5, 31:23, 37:21, 48:12, 75:11, 110:19, 156:11
**provides** [1] - 154:25
**providing** [3] - 91:3, 152:20, 153:6
**proving** [2] - 84:22, 132:20
**provision** [1] - 30:2
**public** [6] - 13:15, 13:18, 73:15, 78:6, 81:10, 81:11
**publicly** [4] - 13:16, 13:21, 14:22, 123:11
**publish** [1] - 16:14
**published** [1] - 16:22
**pure** [1] - 139:21
**purport** [1] - 150:15
**purporting** [1] - 128:21
**purpose** [1] - 119:24
**purposes** [4] - 66:3, 84:1, 84:10, 119:12
**pursuant** [1] - 135:11
**pushing** [1] - 138:9
**put** [39] - 5:18, 15:12, 16:9, 16:17, 30:25, 31:1, 31:4, 31:17, 34:3, 34:23, 36:10, 40:18, 43:18, 44:16, 44:25, 45:1, 45:18, 46:15, 47:8, 47:17, 48:1, 48:9, 62:1, 71:25, 75:5, 90:5, 90:13, 95:20, 102:11, 113:7,

113:10, 123:12, 125:8, 129:12, 136:24, 145:19, 145:21, 157:21, 157:22
**putative** [1] - 105:22
**putting** [6] - 44:22, 47:24, 48:6, 114:11, 115:4, 136:13

## Q

**qualification** [2] - 156:15, 156:21
**qualify** [1] - 140:9
**qualifying** [1] - 31:14
**questions** [17] - 5:10, 8:14, 8:16, 8:20, 9:5, 9:9, 15:23, 16:9, 17:20, 21:8, 21:24, 50:4, 52:19, 53:18, 54:11, 54:12, 57:9
**quick** [4] - 16:2, 16:8, 117:22, 158:6
**quickly** [2] - 25:10, 163:1
**quite** [3] - 26:16, 100:16, 111:11
**quote** [1] - 88:13

## R

**R&Rs** [1] - 82:20
**Radis** [1] - 75:11
**raise** [4] - 96:10, 97:13, 109:15, 109:18
**raised** [12] - 5:14, 19:17, 20:21, 35:15, 50:18, 51:8, 57:7, 82:2, 91:17, 131:25, 145:1, 155:13
**raises** [2] - 50:22, 97:16
**random** [2] - 121:13, 162:17
**randomized** [2] - 8:1, 8:2
**rare** [1] - 22:15
**rate** [2] - 117:13
**rather** [2] - 33:8, 134:6
**Raucci** [1] - 4:17
**RAUCCI** [1] - 2:3
**RC** [4] - 4:8, 4:9, 4:12
**rea** [1] - 85:1
**reach** [2] - 6:21, 8:19
**read** [18] - 8:13, 27:4, 75:19, 76:11, 76:12, 88:12, 95:8, 102:17,

102:23, 115:6, 117:21, 127:16, 131:23, 141:9, 141:15, 142:5, 153:20, 155:23
**reading** [6] - 52:14, 52:15, 87:17, 143:3, 150:11, 150:13
**ready** [2] - 110:8, 111:2
**real** [8] - 36:8, 53:6, 83:4, 90:8, 121:16, 122:12, 125:11, 126:15
**reality** [1] - 133:12
**realized** [1] - 119:8
**really** [25] - 19:23, 19:24, 33:16, 58:18, 67:3, 77:24, 81:8, 83:7, 85:8, 86:4, 93:9, 98:18, 101:5, 102:12, 102:21, 103:7, 109:3, 112:19, 115:8, 125:16, 126:17, 129:24, 132:3, 144:15, 144:17
**reason** [19] - 25:6, 36:9, 37:25, 39:24, 40:5, 66:12, 70:12, 70:23, 79:5, 105:17, 115:20, 118:20, 121:11, 125:11, 129:9, 132:9, 133:22, 160:6
**reasonable** [2] - 73:7, 73:19
**reasonableness** [1] - 75:15
**reasoning** [2] - 88:18, 89:16
**reasons** [3] - 5:15, 19:21, 49:22
**rebound** [1] - 135:13
**rebut** [2] - 48:14, 49:21
**rebuttal** [6] - 46:10, 48:8, 96:5, 107:3, 122:24, 138:17
**rebutting** [2] - 45:23, 66:4
**recalling** [2] - 48:11, 48:13
**receive** [1] - 68:25
**received** [2] - 86:1, 149:5
**receives** [1] - 121:2
**receiving** [2] - 23:7, 86:8
**recently** [2] - 7:22,

55:20

**recess** [1] - 110:12
**recitation** [1] - 104:17
**recognizable** [1] - 115:21
**recognized** [1] - 104:8
**recollection** [1] - 70:6
**recommend** [2] - 26:9, 26:18
**reconsideration** [1] - 110:7
**record** [25] - 3:2, 3:3, 3:11, 12:15, 16:17, 55:15, 62:15, 67:21, 94:18, 106:11, 111:14, 114:17, 141:6, 141:10, 142:6, 142:12, 143:11, 144:3, 145:6, 146:3, 146:14, 162:8, 162:10, 162:12
**redlines** [1] - 104:17
**reduce** [1] - 106:11
**reduction** [8] - 43:7, 46:22, 47:3, 47:13, 67:10, 67:16, 67:17, 154:10
**reemphasize** [1] - 157:19
**refer** [1] - 142:25
**reference** [7] - 14:20, 38:4, 77:5, 88:4, 117:2, 153:16, 162:6
**referenced** [5] - 82:23, 116:23, 129:5, 147:2, 158:24
**referencing** [2] - 148:18, 148:25
**referring** [5] - 39:4, 39:6, 73:10, 119:16, 147:2
**refined** [23] - 74:24, 103:16, 103:25, 106:16, 112:5, 116:25, 117:11, 117:23, 119:16, 124:19, 125:23, 132:25, 133:13, 134:18, 148:14, 149:16, 150:7, 150:19, 150:24, 152:21, 153:23, 156:3, 162:9
**reflect** [2] - 26:9, 26:15
**reflected** [1] - 105:8
**regard** [16] - 17:25, 19:16, 32:25, 35:12, 35:16, 54:2, 58:9,

62:7, 77:6, 77:16, 80:21, 99:7, 99:9, 110:18, 113:16, 122:18
**regarding** [7] - 6:21, 46:9, 81:21, 111:23, 141:13, 153:9, 153:20
**regardless** [1] - 37:5
**regards** [1] - 47:2
**regulations** [1] - 101:15
**reinforcing** [2] - 64:22, 65:2
**reinstated** [2] - 92:6, 95:15
**reiterate** [1] - 77:19
**rejection** [1] - 70:18
**relate** [6] - 23:17, 43:4, 43:14, 74:17, 105:3, 142:1
**related** [10] - 19:15, 39:7, 76:21, 107:22, 111:22, 123:20, 152:25, 154:2, 160:1, 160:8
**relates** [7] - 27:14, 79:23, 108:2, 125:5, 136:23, 136:25, 138:12
**relating** [5] - 82:21, 106:23, 124:5, 152:10, 155:11
**relationship** [4] - 112:3, 112:8, 120:25, 162:9
**relatively** [1] - 118:13
**relevance** [2] - 112:22, 128:13
**relevant** [47] - 11:16, 13:16, 20:20, 22:12, 60:21, 60:23, 65:23, 68:16, 74:21, 76:24, 84:18, 91:6, 101:20, 104:5, 104:6, 104:15, 105:6, 107:2, 107:20, 112:8, 115:25, 116:1, 116:10, 117:17, 117:21, 118:21, 120:9, 120:11, 121:4, 121:14, 124:23, 125:4, 127:4, 127:7, 127:24, 127:25, 128:11, 129:14, 132:11, 132:17, 137:20, 137:22, 137:25, 138:1, 138:23, 139:17

**reliance** [3] - 64:14, 65:9, 71:7
**relied** [3] - 64:17, 92:2, 94:4
**relief** [1] - 95:21
**rely** [1] - 84:9
**remain** [2] - 5:13, 27:6
**remainder** [1] - 10:10
**remaining** [3] - 35:4, 89:25, 99:16
**remains** [1] - 112:1
**remedy** [1] - 93:16
**remember** [3] - 38:24, 70:8, 145:9
**remind** [1] - 58:10
**rep** [1] - 120:14
**repeated** [1] - 138:22
**reply** [4] - 102:25, 112:18, 126:2, 132:3
**report** [23] - 22:12, 51:11, 117:20, 119:10, 128:17, 128:18, 129:8, 137:5, 137:7, 143:19, 145:9, 147:1, 147:14, 147:19, 148:10, 148:19, 149:1, 151:3, 151:4, 153:10, 154:9, 158:22
**reported** [1] - 164:7
**reporter** [3] - 21:19, 22:10, 67:24
**Reporter** [2] - 164:5, 164:6
**reports** [8] - 11:14, 11:17, 39:16, 62:13, 66:24, 80:15, 101:18, 113:9
**represent** [2] - 162:10, 162:11
**representation** [1] - 99:6
**representative** [3] - 45:8, 146:1, 152:15
**representatives** [4] - 9:10, 21:6, 72:20, 153:9
**represented** [1] - 97:19
**representing** [1] - 4:24
**represents** [2] - 126:22, 144:8
**reps** [1] - 120:16
**request** [3] - 9:13, 43:8, 148:8
**requested** [1] - 15:11
**requesting** [1] - 58:15

**require** [6] - 19:24, 28:17, 37:14, 39:13, 47:5, 158:16
**required** [7] - 23:22, 32:24, 35:25, 41:6, 43:17, 46:9, 137:13
**requirement** [1] - 33:3
**requirements** [5] - 29:2, 64:2, 137:12, 138:9, 138:10
**requires** [3] - 37:20, 39:4, 95:21
**requiring** [2] - 38:5, 39:9
**requisite** [1] - 64:1
**research** [1] - 154:15
**reserve** [1] - 32:8
**reserved** [2] - 30:15, 30:23
**reserving** [1] - 30:17
**resolve** [12] - 17:3, 17:12, 19:1, 20:2, 20:3, 20:16, 33:17, 50:23, 51:2, 53:7, 54:6, 75:16
**resolved** [2] - 17:11, 26:17
**resolving** [1] - 155:20
**resources** [4] - 112:4, 112:6, 130:9, 162:6
**resources'** [1] - 162:8
**respect** [3] - 17:23, 21:4, 136:12
**respective** [1] - 27:1
**respond** [3] - 31:21, 40:25, 119:5
**responded** [1] - 76:7
**response** [13] - 47:25, 56:15, 65:21, 70:7, 71:13, 99:10, 105:16, 106:5, 107:12, 126:19, 136:18, 136:20, 147:8
**responses** [2] - 62:10, 117:7
**responsibility** [1] - 110:23
**responsibly** [1] - 76:8
**responsive** [1] - 158:25
**rest** [1] - 55:12
**restore** [1] - 113:22
**restroom** [1] - 110:2
**result** [2] - 25:20, 152:24
**results** [2] - 152:22, 154:17
**returned** [1] - 154:22
**returns** [1] - 124:16

**reversing** [1] - 93:15
**review** [2] - 7:11, 54:5
**revised** [2] - 26:9, 28:5
**rewrote** [1] - 100:18
**RICHARD** [1] - 2:6
**Richard** [1] - 4:14
**Rick** [1] - 3:22
**rightly** [1] - 107:10
**rights** [2] - 56:1, 119:15
**ring** [1] - 115:9
**risk** [2] - 64:10, 73:2
**risks** [1] - 89:19
**road** [3] - 133:25, 138:20, 140:1
**roll** [3] - 133:21, 134:11, 136:8
**room** [2] - 9:10, 21:10
**roughly** [1] - 7:1
**royalty** [2] - 117:9, 117:12
**rubber** [3] - 133:24, 138:20, 139:25
**rubric** [1] - 27:25
**rule** [9] - 38:4, 38:5, 38:24, 39:1, 39:4, 42:22, 83:2, 91:10, 110:24
**Rule** [1] - 39:6
**rules** [11] - 15:21, 25:11, 28:17, 29:13, 30:17, 31:8, 32:24, 35:20, 37:13, 38:6, 38:23
**Rules** [2] - 38:10, 38:11
**ruling** [7] - 66:16, 66:20, 85:7, 86:18, 87:4, 90:5, 90:10
**rulings** [2] - 66:9, 91:9
**run** [1] - 157:17

## S

**safe** [1] - 163:15
**sally** [3] - 149:19, 152:19, 154:1
**Sally** [5] - 153:4, 153:8, 154:12, 155:25
**sally's** [1] - 153:20
**san** [1] - 148:17
**San** [4] - 149:4, 149:9, 149:16, 149:23
**sand** [1] - 123:25
**saw** [5] - 7:7, 7:10, 10:15, 86:24, 98:21
**scale** [1] - 90:6
**scam** [3] - 126:12,

128:5, 130:3
**scenario** [3] - 40:11, 86:8, 96:18
**schedule** [1] - 37:18
**scheme** [2] - 126:11, 128:5
**scope** [13] - 22:1, 22:7, 51:10, 62:14, 65:20, 103:5, 104:21, 104:23, 107:8, 109:17, 114:21, 128:20, 158:21
**screen** [1] - 14:19
**se** [1] - 62:21
**seal** [2] - 15:13, 15:16
**sealed** [5] - 13:25, 14:2, 14:6, 15:6, 15:11
**SEALED** [1] - 164:17
**search** [18] - 145:25, 146:7, 152:11, 152:14, 152:21, 152:23, 152:25, 153:5, 153:14, 153:19, 154:1, 154:7, 154:8, 156:3, 156:11, 156:14, 156:17
**searches** [1] - 156:16
**seated** [4] - 9:6, 10:1, 28:9, 100:23
**second** [12] - 32:25, 51:24, 66:22, 74:19, 75:17, 76:22, 82:19, 91:15, 128:14, 149:3, 152:10, 161:3
**secondarily** [1] - 48:9
**secondary** [8] - 43:5, 44:6, 44:11, 45:18, 46:15, 46:21, 47:20, 59:17
**section** [9] - 67:9, 70:1, 101:16, 101:22, 124:16, 125:22, 126:7, 127:16, 153:17
**sections** [1] - 100:19
**see** [19] - 8:5, 10:15, 12:12, 25:6, 26:21, 28:4, 28:10, 42:25, 45:7, 47:21, 86:19, 87:25, 143:12, 147:18, 150:20, 153:16, 161:18, 162:16, 163:2
**seeing** [2] - 34:6, 40:2
**seek** [2] - 105:19, 134:17
**seeking** [2] - 83:17,

152:3
**seeks** [1] - 61:5
**seem** [7] - 58:25, 72:4, 82:9, 121:22, 128:2, 132:9, 157:17
**selection** [5] - 6:4, 7:19, 18:2, 18:5, 52:14
**sell** [3] - 124:19, 133:13, 133:15
**selling** [1] - 74:24
**send** [1] - 21:6
**sense** [23] - 5:23, 10:19, 15:13, 18:1, 21:21, 23:24, 27:11, 41:4, 44:11, 50:17, 59:24, 60:8, 61:21, 65:15, 67:22, 82:23, 95:18, 98:9, 102:5, 104:2, 135:18, 160:15, 160:25
**sent** [1] - 149:18
**sentence** [5] - 99:13, 149:3, 149:15, 151:2, 153:11
**sentences** [1] - 150:4
**separate** [1] - 68:8
**separately** [4] - 29:17, 153:7, 153:16, 154:5
**series** [1] - 61:8
**serious** [1] - 157:20
**set** [11] - 21:16, 39:15, 50:6, 53:3, 55:8, 57:24, 68:23, 101:4, 110:25, 124:18, 130:19
**sets** [1] - 21:14
**settled** [1] - 73:9
**settlement** [3] - 82:14, 82:22, 83:3
**seven** [2] - 7:4, 15:17
**several** [4] - 29:23, 30:20, 106:18, 138:22
**share** [1] - 23:2
**shared** [3] - 13:16, 153:12, 156:5
**sheet** [3] - 8:3, 8:6, 111:10
**shell** [4] - 129:16, 132:6, 132:16, 133:11
**shield** [1] - 98:3
**shook** [1] - 58:24
**short** [8] - 6:25, 46:14, 83:1, 98:13, 99:18, 109:25, 110:10
**short-circuit** [3] - 46:14, 83:1, 99:18
**shortchange** [1] -

34:5
**Shorthand** [2] - 164:5, 164:6
**shorthand** [2] - 164:7, 164:13
**show** [12] - 12:9, 12:24, 17:1, 35:25, 37:10, 80:7, 81:2, 88:24, 115:14, 119:2, 123:16, 156:19
**showing** [8] - 14:12, 33:10, 33:13, 33:22, 35:19, 66:4, 132:21, 162:13
**shown** [5] - 12:12, 13:7, 88:8, 94:7, 151:15
**shows** [4] - 104:7, 104:18, 116:6, 154:8
**side** [42] - 3:10, 3:13, 3:24, 10:3, 10:5, 14:3, 15:20, 15:24, 20:22, 22:14, 22:20, 24:14, 28:1, 29:1, 29:22, 31:13, 34:19, 41:20, 44:3, 49:22, 50:18, 50:22, 51:12, 60:18, 61:19, 81:17, 83:24, 84:10, 84:21, 85:11, 91:13, 92:17, 97:5, 98:25, 99:21, 118:18, 119:1, 134:16, 144:7, 146:22, 147:6, 161:6
**side's** [2] - 62:10, 161:11
**sidebar** [2] - 22:9, 39:14
**sidebars** [1] - 38:16
**sides** [5] - 9:11, 17:13, 19:22, 52:12, 53:15
**sight** [1] - 79:3
**sign** [1] - 57:17
**SIGNED** [1] - 164:17
**significant** [2] - 42:16, 93:9
**significantly** [1] - 115:22
**similar** [1] - 89:3
**similarities** [1] - 77:10
**similarly** [2] - 121:6, 152:11
**simplifies** [1] - 95:18
**simplify** [1] - 111:11
**simply** [5] - 60:14, 90:2, 150:8, 150:21, 152:6
**sincerity** [1] - 73:25
**single** [2] - 30:24, 61:9

**site** [1] - 86:23
**sitting** [1] - 23:12
**situation** [6] - 38:18, 44:18, 64:16, 146:19, 146:20
**six** [3] - 10:6, 10:8, 58:4
**Skadden** [2] - 4:22, 4:23
**SKADDEN** [1] - 2:18
**skim** [1] - 117:22
**skip** [1] - 49:25
**SLATE** [1] - 2:18
**slides** [1] - 17:25
**small** [2] - 155:10, 160:16
**smaller** [2] - 26:7, 118:13
**smooth** [1] - 53:8
**snorting** [1] - 161:12
**so-called** [1] - 112:5
**softer** [1] - 95:21
**sold** [5] - 134:24, 148:14, 150:6, 150:19, 150:24
**solely** [1] - 146:6
**solution** [1] - 117:12
**solve** [1] - 73:24
**solving** [1] - 95:13
**someone** [9] - 13:2, 32:20, 38:15, 64:5, 64:8, 72:6, 74:10, 88:14, 121:13
**sometimes** [4] - 16:16, 52:4, 84:6, 160:22
**somewhat** [1] - 162:23
**soon** [2] - 55:11, 161:20
**sorry** [7] - 39:5, 41:23, 56:22, 63:15, 67:20, 79:14, 150:12
**sort** [14] - 60:9, 61:5, 61:12, 64:18, 66:18, 71:6, 80:2, 98:7, 101:19, 106:12, 109:20, 126:18, 131:5, 135:21
**sought** [1] - 76:3
**sounds** [2] - 16:23, 139:22
**space** [1] - 21:11
**speaking** [5] - 14:22, 99:20, 99:22, 131:8, 141:7
**spec** [3] - 69:23, 101:9, 105:2
**special** [1] - 129:12
**specific** [2] - 22:25,

141:24
**specifically** [6] - 72:25, 73:12, 76:2, 121:9, 149:10, 155:13
**specification** [2] - 106:23, 107:18
**specifications** [4] - 100:18, 103:24, 104:10, 105:10
**specs** [2] - 79:13, 104:14
**speculate** [2] - 155:22
**speculation** [6] - 76:18, 141:12, 141:18, 141:20, 152:6, 154:3
**Speedbudget** [1] - 164:23
**spent** [2] - 5:2, 78:17
**split** [1] - 52:11
**spots** [1] - 9:19
**spun** [1] - 17:10
**ss** [1] - 164:2
**staff** [2] - 12:15, 21:20
**stage** [3] - 86:13, 91:18, 122:20
**staggering** [2] - 127:2, 127:22
**stand** [3] - 16:5, 44:17, 56:4
**standard** [8] - 9:12, 38:13, 41:9, 43:25, 61:3, 139:6, 139:9, 139:14
**standards** [1] - 38:25
**standing** [1] - 23:5
**standpoint** [1] - 49:17
**stands** [2] - 70:13, 161:23
**start** [12] - 3:12, 18:1, 18:2, 18:5, 19:3, 27:13, 58:10, 58:12, 87:16, 90:22, 111:20, 112:11
**started** [3] - 51:6, 67:1, 83:11
**starting** [3] - 9:21, 24:13, 149:3
**starts** [2] - 6:13, 118:16
**STATE** [1] - 164:2
**state** [15] - 60:24, 70:11, 83:19, 107:16, 107:20, 109:21, 148:6, 153:20, 158:10, 158:14, 159:14, 159:19, 159:20, 159:22, 160:9

**statement** [11] - 61:1, 61:14, 64:21, 65:4, 69:4, 69:8, 71:3, 81:15, 109:3, 134:21, 149:14
**statements** [10] - 10:13, 87:17, 88:23, 88:25, 109:19, 147:7, 147:11, 147:19, 150:1, 154:20
**States** [1] - 137:1
**STATES** [1] - 1:1
**stay** [4] - 9:6, 28:8, 99:19, 158:6
**Stenotype** [1] - 164:7
**step** [7] - 74:15, 86:17, 86:21, 89:11, 98:9, 140:24, 154:16
**stepping** [1] - 122:16
**still** [12] - 9:18, 14:24, 15:2, 56:9, 56:23, 59:19, 66:18, 81:1, 81:2, 91:21, 113:6, 136:8
**stop** [1] - 6:10
**store** [1] - 118:5
**story** [5] - 47:10, 84:20, 120:8, 121:7, 152:18
**straightforward** [1] - 126:20
**strange** [1] - 97:23
**stranger** [1] - 91:24
**strategy** [1] - 149:24
**Strawn** [1] - 4:16
**STRAWN** [1] - 2:9
**streamline** [3] - 44:10, 46:16, 48:10
**streamlined** [1] - 25:18
**streamlinewise** [1] - 44:20
**streamlining** [1] - 45:2
**strength** [1] - 161:10
**stretch** [1] - 110:2
**strictures** [1] - 75:5
**strike** [2] - 108:23, 113:2
**strikes** [1] - 10:3
**striking** [1] - 9:15
**string** [1] - 101:13
**struck** [2] - 9:17, 9:24
**structural** [1] - 162:9
**structure** [8] - 111:18, 114:6, 120:21, 122:4, 124:6, 126:1, 134:5, 135:25
**structured** [5] - 21:14, 24:16, 69:1, 133:1,

133:7
**structures** [1] - 68:24
**structuring** [1] - 135:1
**stuff** [4] - 27:2, 27:3, 133:14, 137:4
**subject** [3] - 30:1, 35:20, 156:13
**submit** [2] - 10:21, 86:3
**submitted** [2] - 39:17, 149:8
**subsection** [1] - 39:7
**subsequent** [2] - 6:5, 6:14
**subset** [1] - 29:24
**subsidiaries** [1] - 129:24
**subsidiary** [2] - 119:21, 129:23
**substantial** [3] - 89:19, 101:17, 135:17
**substantive** [1] - 90:11
**substitute** [2] - 76:17, 145:5
**success** [1] - 45:9
**sufficiently** [2] - 18:20, 163:11
**suggest** [7] - 72:22, 76:12, 100:7, 122:5, 126:5, 129:10, 131:13
**suggested** [1] - 109:6
**suggesting** [15] - 54:18, 54:20, 60:3, 66:2, 79:1, 79:21, 100:12, 102:2, 104:19, 106:7, 106:10, 108:23, 113:5, 118:1, 135:7
**suggestion** [10] - 55:21, 59:21, 67:4, 115:24, 117:15, 124:22, 134:20, 135:1, 136:17, 162:23
**suggests** [3] - 68:13, 88:8, 113:25
**suit** [12] - 145:17, 145:24, 148:15, 150:8, 150:20, 151:1, 151:8, 151:12, 152:14, 154:23, 157:7, 158:21
**suits** [2] - 77:11, 77:13
**summary** [7] - 89:5, 89:13, 89:18, 93:12, 93:20, 143:8, 161:17

**summing** [1] - 143:20
**supplementation** [2] - 53:24, 54:9
**supplemented** [1] - 53:19
**supplied** [1] - 112:7
**supplying** [1] - 149:16
**support** [8] - 70:23, 78:7, 105:1, 142:21, 143:20, 150:2, 158:16
**supported** [5] - 101:9, 108:12, 147:20, 149:6, 149:18
**supports** [3] - 147:7, 154:19, 159:2
**supposedly** [1] - 145:19
**surprise** [5] - 40:12, 42:6, 42:17, 55:10, 118:4
**surprised** [1] - 136:18
**surprises** [1] - 39:18
**surprising** [4] - 128:8, 128:15, 129:7, 136:20
**suspect** [2] - 126:23, 135:2
**swear** [2] - 10:10, 38:15
**switch** [1] - 47:11
**sword** [1] - 98:3
**SYKES** [17] - 2:15, 99:24, 100:14, 101:2, 102:10, 103:14, 104:6, 104:23, 105:7, 106:6, 125:18, 126:17, 128:6, 129:7, 130:6, 138:18, 139:24
**Sykes** [9] - 4:5, 99:24, 99:25, 101:3, 107:5, 125:18, 125:19, 131:21, 162:4
**synthesize** [2] - 102:18, 130:24
**synthesized** [2] - 112:18, 126:14

---

**T**

**table** [6] - 4:13, 16:6, 21:19, 28:8, 120:5, 158:7
**talks** [1] - 38:24
**targeted** [3] - 5:21, 14:4, 15:2
**tax** [38] - 67:9, 67:17,

68:25, 116:24, 117:9, 117:16, 117:25, 118:9, 118:11, 124:15, 125:23, 126:7, 126:12, 127:9, 127:10, 127:14, 127:19, 127:23, 129:12, 130:10, 130:13, 133:16, 133:18, 133:19, 133:20, 134:5, 134:9, 134:22, 135:10, 135:17, 136:6, 138:9, 138:23, 138:24, 138:25, 140:7, 140:9, 140:22
**taxable** [1] - 135:23
**taxes** [1] - 135:9
**taxing** [1] - 117:8
**team** [2] - 38:16, 38:17
**technical** [4] - 61:21, 128:24, 140:17
**technologies** [5] - 99:4, 137:15, 137:19, 137:25, 154:10
**technology** [13] - 100:6, 103:19, 106:17, 132:21, 137:2, 140:25, 149:10, 149:17, 149:25, 152:20, 153:2, 153:7
**TecSec** [5] - 91:21, 92:20, 93:6, 96:6, 163:3
**TECSEC** [1] - 91:22
**teed** [2] - 74:19, 144:22
**ten** [1] - 52:5
**tendency** [1] - 92:16
**terms** [17] - 5:8, 10:20, 11:1, 18:7, 21:11, 26:10, 30:2, 44:21, 45:23, 67:23, 83:18, 92:23, 115:4, 128:4, 129:16, 130:19, 132:15
**terrible** [1] - 38:18
**test** [3] - 64:10, 71:1, 107:15
**testified** [3] - 152:19, 154:14, 156:2
**testify** [9] - 37:9, 42:5, 45:16, 75:6, 75:10, 76:7, 142:8, 142:16, 157:3
**testifying** [5] - 49:11,

145:18, 150:23, 158:13, 158:14
**testimony** [29] - 11:12, 11:16, 12:20, 13:5, 22:1, 30:20, 30:22, 31:14, 32:6, 38:13, 42:15, 58:16, 75:24, 81:20, 85:21, 119:11, 141:17, 141:19, 142:15, 142:20, 146:9, 146:10, 148:13, 150:5, 150:17, 152:12, 159:12, 159:13, 159:14
**text** [1] - 141:25
**Thanksgiving** [1] - 24:23
**THE** [183] - 1:1, 1:2, 3:1, 3:23, 4:7, 4:18, 4:25, 16:3, 16:20, 17:5, 17:19, 18:4, 21:9, 22:4, 23:12, 24:6, 24:11, 25:15, 25:25, 26:12, 26:21, 29:3, 29:11, 30:7, 31:1, 31:22, 32:4, 32:11, 33:14, 33:24, 34:11, 34:25, 35:10, 36:15, 37:7, 38:2, 38:21, 40:6, 41:13, 41:23, 42:20, 44:20, 45:11, 45:25, 46:5, 46:12, 46:23, 47:15, 47:20, 48:17, 48:22, 48:25, 52:25, 53:4, 54:16, 54:24, 55:5, 55:16, 56:24, 57:4, 57:14, 59:12, 60:17, 61:22, 62:7, 63:9, 63:15, 65:18, 67:20, 68:1, 69:6, 69:13, 71:10, 71:16, 71:20, 72:13, 72:15, 73:21, 74:2, 75:22, 77:4, 77:15, 78:1, 78:11, 79:14, 79:20, 80:18, 81:16, 82:11, 82:19, 83:10, 83:22, 85:3, 87:5, 87:19, 90:15, 91:11, 92:20, 93:23, 94:23, 96:4, 96:16, 98:11, 98:25, 99:18, 99:25, 100:20, 102:1, 102:15, 104:1, 104:19, 105:5, 105:11, 107:3, 107:23, 108:21, 109:7, 109:13, 109:23, 110:9, 110:14,

111:6, 111:13, 112:10, 112:14, 113:15, 114:2, 114:19, 114:25, 116:20, 118:17, 122:1, 122:21, 122:24, 123:13, 124:3, 124:11, 124:24, 125:12, 125:17, 125:19, 128:1, 129:3, 129:15, 130:21, 131:20, 134:15, 135:10, 136:11, 137:4, 137:20, 138:16, 139:22, 141:4, 141:15, 142:4, 142:23, 143:6, 144:4, 145:8, 146:12, 146:21, 147:21, 147:25, 148:21, 148:25, 150:10, 150:16, 150:22, 151:14, 151:25, 154:25, 155:4, 155:7, 156:8, 157:10, 157:25, 158:3, 159:6, 159:16, 160:13, 160:18, 163:7

**thematic** [2] - 138:13, 140:2

**thematically** [1] - 140:14

**theme** [1] - 138:5

**themes** [1] - 80:1

**themselves** [6] - 3:11, 14:15, 82:22, 86:2, 104:8, 106:7

**then-issued** [1] - 85:25

**theoretically** [2] - 24:16, 34:25

**theories** [1] - 47:18

**theory** [10] - 71:2, 77:1, 112:24, 113:21, 114:10, 115:4, 116:2, 117:8, 117:10, 117:14

**thereafter** [1] - 83:20

**therefore** [3] - 89:25, 91:4, 91:7

**they've** [1] - 40:15

**thinking** [2] - 13:20, 16:12

**thinks** [2] - 15:20, 56:3

**third** [7] - 34:10, 37:2, 42:13, 98:12, 103:2, 105:14, 105:16

**third-party** [1] - 42:13

**thoughts** [7] - 5:10, 5:15, 24:12, 25:4, 27:8, 71:11, 116:10

**three** [17] - 10:3, 21:14, 44:23, 45:1, 45:19, 47:7, 49:16, 98:17, 98:18, 113:11, 115:16, 126:17, 128:9, 136:21, 141:8, 141:11, 159:11

**threshold** [1] - 38:14

**thresholds** [1] - 137:3

**thumb** [1] - 90:5

**Thursday** [1] - 12:2

**ticking** [2] - 90:19, 90:23

**tie** [2] - 128:10, 128:21

**tied** [1] - 107:1

**ties** [1] - 128:16

**timed** [1] - 49:17

**timing** [1] - 137:24

**title** [1] - 141:10

**titles** [1] - 116:11

**today** [7] - 3:4, 3:17, 5:5, 83:2, 110:8, 156:17, 161:4

**together** [2] - 15:12, 107:1

**ton** [4] - 134:7, 137:17, 138:15, 140:22

**took** [2] - 52:4, 93:8

**top** [1] - 88:7

**topic** [1] - 67:3

**Toshiba** [2] - 93:6, 93:11

**total** [1] - 117:15

**totally** [1] - 61:13

**touch** [1] - 48:7

**touched** [1] - 47:1

**towards** [1] - 98:19

**town** [1] - 163:15

**track** [3] - 8:25, 23:19, 52:8

**tracking** [1] - 61:3

**traded** [1] - 123:11

**traditional** [2] - 9:12, 65:3

**transactions** [1] - 134:18

**transcript** [2] - 164:12, 164:14

**TRANSCRIPT** [1] - 1:10

**transitioned** [1] - 137:8

**translate** [1] - 138:15

**travels** [1] - 163:16

**treating** [1] - 103:17

**treatment** [3] - 163:2, 163:4, 163:6

**tremendously** [1] - 133:22

**trial** [79] - 5:9, 5:25, 6:1, 6:3, 6:8, 6:10, 6:12, 6:15, 7:4, 7:15, 10:12, 10:18, 10:20, 10:23, 11:25, 12:2, 12:4, 13:11, 13:15, 13:25, 17:24, 18:11, 18:21, 19:7, 20:9, 20:14, 20:21, 22:8, 22:18, 23:2, 24:13, 24:15, 24:17, 25:1, 25:19, 26:7, 26:20, 28:19, 29:25, 30:22, 32:23, 35:17, 35:19, 36:2, 36:24, 37:5, 37:16, 37:20, 37:24, 39:22, 40:2, 42:11, 48:20, 49:17, 50:8, 51:1, 51:8, 51:12, 53:8, 54:5, 56:19, 74:4, 87:14, 92:11, 93:13, 95:18, 110:21, 141:12, 143:10, 143:15, 143:18, 144:20, 144:24, 147:22, 147:23, 161:8, 161:14, 161:21, 163:11

**trials** [3] - 7:21, 13:19, 91:24

**trick** [2] - 115:24, 126:13

**tried** [6] - 40:22, 44:10, 61:8, 128:10, 135:5, 136:4

**trouble** [1] - 17:18

**true** [6] - 84:8, 94:2, 99:8, 109:16, 120:8, 164:15

**trump** [1] - 43:20

**try** [18] - 5:4, 5:5, 6:7, 34:5, 50:19, 50:23, 53:12, 58:1, 71:10, 83:2, 84:5, 102:13, 128:13, 138:5, 138:18, 150:15, 152:12, 155:15

**trying** [29] - 17:15, 61:10, 63:9, 64:10, 67:1, 74:20, 75:5, 91:9, 98:2, 102:3, 102:6, 102:8, 105:13, 122:4, 123:21, 126:4,

133:16, 133:23, 136:1, 136:4, 137:11, 137:16, 138:11, 139:19, 140:13, 157:16, 157:17, 161:22

**Tuesday** [2] - 24:22, 55:13

**TUNNELL** [1] - 2:2

**turn** [2] - 43:9, 139:19

**turned** [1] - 131:8

**turning** [2] - 30:5, 141:9

**twice** [1] - 33:5

**two** [40] - 11:5, 20:9, 21:15, 30:1, 40:9, 40:10, 40:16, 42:3, 44:5, 53:17, 71:12, 71:14, 74:23, 75:8, 78:14, 81:17, 82:2, 82:12, 91:15, 98:19, 98:21, 108:8, 112:13, 112:21, 117:7, 117:22, 125:14, 125:20, 136:15, 141:23, 142:1, 142:6, 148:7, 148:9, 150:1, 150:4, 159:11, 160:16, 162:1

**two-and-a-half-year** [1] - 75:8

**two-day** [3] - 30:1, 40:10, 40:16

**type** [2] - 59:19, 126:21

**typed** [1] - 164:13

**types** [1] - 59:17

**typewritten** [1] - 164:15

**typical** [2] - 6:24, 18:8

**typically** [5] - 6:5, 11:20, 14:18, 49:1, 76:3

## U

**U.S.C** [1] - 101:12

**U.S.M.J** [1] - 1:13

**ultimate** [3] - 13:17, 54:2, 123:1

**ultimately** [9] - 12:11, 49:14, 49:20, 62:17, 82:2, 91:1, 93:25, 94:14, 148:2

**unavailable** [6] - 31:7, 33:4, 33:10, 33:13, 33:22, 35:7

**uncertainty** [1] - 37:22

**unclear** [2] - 59:20, 60:6

**uncomfortable** [1] - 38:16

**under** [12] - 27:24, 31:7, 32:24, 34:2, 42:21, 43:19, 54:3, 57:22, 90:3, 97:2, 113:10, 163:10

**underlying** [3] - 142:16, 154:19, 159:3

**underscores** [1] - 90:2

**understood** [5] - 37:21, 92:1, 94:24, 97:8, 100:9

**undisputed** [1] - 102:12

**undue** [1] - 95:19

**unduly** [2] - 92:17, 131:7

**unfair** [4] - 36:10, 37:25, 47:4, 89:20

**unfamiliar** [1] - 7:23

**unforeseen** [1] - 37:19

**union** [1] - 119:20

**unique** [1] - 70:15

**UNITED** [1] - 1:1

**United** [1] - 137:1

**universe** [2] - 42:2, 76:20

**unjust** [1] - 96:3

**unlawful** [2] - 101:24

**unless** [9] - 16:3, 21:16, 33:8, 33:21, 41:9, 116:3, 125:16, 161:1, 163:12

**unlikely** [1] - 24:18

**unlimited** [1] - 37:23

**unpredictability** [1] - 90:1

**unresolved** [1] - 35:12

**untimeliness** [1] - 62:15

**untimely** [2] - 101:22, 108:25

**unused** [1] - 134:9

**unusual** [2] - 132:24, 135:3

**unworkable** [1] - 108:19

**up** [53] - 7:3, 8:11, 9:13, 11:7, 14:19, 16:10, 17:11, 21:7, 24:2, 25:13, 25:24, 32:18, 39:12, 46:3, 49:19, 50:6, 58:8, 62:7, 66:11, 68:23, 70:6, 70:14, 71:11, 72:24, 74:19, 85:13,

85:23, 92:3, 96:14, 98:13, 100:16, 106:23, 111:10, 116:9, 118:15, 124:18, 125:8, 125:20, 129:9, 130:19, 133:21, 134:11, 136:9, 141:2, 142:8, 143:20, 144:22, 154:6, 154:11, 155:23, 156:19, 160:4, 160:16
**updated** [1] - 26:15
**usable** [1] - 93:3
**useful** [1] - 88:24
**user** [1] - 116:8
**uses** [1] - 121:3
**utilized** [1] - 13:14

## V

**validity** [4] - 43:5, 44:9, 48:1
**valuable** [8] - 90:1, 132:22, 132:23, 133:4, 133:9, 133:22, 139:12, 141:1
**value** [30] - 67:13, 127:8, 127:21, 128:15, 128:21, 128:24, 129:1, 133:5, 133:21, 134:5, 134:10, 134:12, 135:15, 135:16, 135:17, 135:22, 136:1, 136:25, 137:17, 137:25, 138:14, 138:22, 139:7, 139:10, 139:16, 139:20, 140:15, 140:17, 140:25
**various** [1] - 18:15
**verbal** [1] - 54:7
**verdict** [2] - 10:17, 10:22
**version** [2] - 10:21, 26:25
**versus** [7] - 3:6, 28:2, 63:11, 64:25, 87:24, 89:2, 91:22
**via** [2] - 32:17, 33:2
**viable** [2] - 81:2, 92:7
**video** [4] - 12:23, 30:25, 32:7, 52:2
**view** [14] - 24:25, 38:7, 39:19, 45:12, 46:6,

46:8, 63:10, 63:11, 72:18, 72:19, 101:2, 155:14, 162:5
**viewed** [1] - 155:17
**views** [1] - 161:10
**vilify** [2] - 136:2, 136:4
**vilifying** [1] - 136:7
**Vincent** [2] - 120:13, 122:25
**Virginia** [1] - 91:24
**vitiated** [1] - 93:18
**voir** [12] - 7:8, 7:12, 7:20, 8:13, 8:20, 9:1, 9:6, 9:12, 10:14, 21:4, 26:2, 26:25
**vs** [2] - 1:6, 164:10

## W

**waiting** [2] - 20:18, 51:5
**waiver** [1] - 97:25
**walk** [1] - 95:3
**walking** [1] - 14:1
**walking-in** [1] - 14:1
**wants** [7] - 23:9, 60:18, 78:13, 142:14, 156:6, 157:7, 162:16
**warner** [1] - 164:4
**Warner** [1] - 164:22
**warranted** [1] - 55:24
**waste** [1] - 38:19
**watch** [1] - 95:10
**ways** [3] - 14:9, 14:13, 14:20
**weaknesses** [1] - 161:11
**Wednesday** [2] - 24:22, 26:19
**week** [1] - 161:19
**weighing** [1] - 90:6
**weight** [1] - 95:20
**welcome** [2] - 3:23, 4:7
**well-settled** [1] - 73:9
**western** [1] - 93:6
**Westlaw** [1] - 91:23
**whatnot** [5] - 17:25, 131:14, 133:12, 137:15, 137:24
**whereas** [1] - 54:24
**whey** [1] - 104:18
**whole** [1] - 140:3
**wholly** [1] - 141:17
**WiFi** [1] - 139:11
**willful** [4] - 75:1, 96:20, 97:1, 97:18
**willfulness** [1] - 97:11

**windows** [1] - 83:16
**winner** [1] - 20:24
**Winston** [1] - 4:15
**WINSTON** [1] - 2:9
**Wisconsin** [1] - 93:7
**wish** [2] - 34:23, 163:15
**witness** [41] - 11:4, 11:9, 12:8, 12:9, 12:13, 16:10, 16:13, 27:15, 28:5, 28:22, 30:14, 31:5, 31:7, 33:7, 33:10, 34:6, 34:7, 35:8, 35:18, 36:3, 36:7, 37:20, 38:8, 39:25, 40:4, 41:8, 42:3, 42:5, 48:14, 64:16, 95:11, 97:17, 98:6, 122:14, 142:25, 145:7, 146:10, 155:12, 155:14, 156:14, 159:1
**witnesses** [70] - 27:20, 27:21, 27:24, 28:1, 28:18, 28:21, 28:23, 29:15, 29:16, 29:23, 30:5, 30:8, 30:13, 30:19, 30:25, 31:13, 31:16, 31:24, 31:25, 32:4, 32:5, 32:17, 32:22, 33:2, 33:4, 33:9, 33:12, 33:13, 33:21, 33:23, 33:25, 34:14, 35:17, 35:22, 35:23, 36:2, 36:17, 36:18, 36:19, 37:1, 37:3, 37:14, 37:15, 37:23, 39:8, 39:10, 39:21, 40:10, 40:13, 41:18, 41:25, 42:1, 42:2, 42:8, 42:9, 42:12, 42:13, 42:14, 42:19, 44:15, 45:5, 45:6, 45:15, 76:6, 95:4, 122:14, 137:10, 154:13
**witnesses'** [1] - 74:20
**won** [1] - 85:11
**wonder** [4] - 87:20, 88:3, 96:19, 96:21
**wondering** [3] - 23:8, 38:21, 52:20
**word** [2] - 129:17, 159:7
**worded** [1] - 121:17
**words** [14] - 34:11, 80:2, 104:9, 104:24, 109:13, 126:10, 130:3, 131:9,

131:16, 131:24, 132:6, 132:16, 133:11, 136:5
**works** [4] - 74:4, 131:19, 133:16, 135:25
**world** [11] - 43:11, 53:5, 65:7, 83:24, 84:3, 87:25, 97:23, 98:8, 125:10, 133:2, 139:13
**worried** [5] - 48:18, 100:2, 108:13, 113:20, 118:3
**worries** [1] - 17:19
**worst** [1] - 86:8
**worth** [1] - 86:11
**wrapped** [1] - 25:24
**wrapping** [2] - 25:13, 160:16
**write** [2] - 80:1, 118:19
**writes** [2] - 114:12, 119:12
**writing** [1] - 53:20
**written** [22] - 43:6, 47:2, 47:14, 53:24, 54:8, 79:10, 80:13, 99:10, 99:15, 101:10, 104:7, 105:1, 106:8, 107:2, 107:9, 107:15, 107:22, 108:12, 109:12, 109:20, 152:23
**wrongdoing** [1] - 126:6
**wrongful** [1] - 100:12
**wrongly** [4] - 63:11, 74:7, 79:21, 88:8
**wrote** [8] - 60:17, 61:3, 78:3, 101:7, 104:9, 114:19, 118:25, 139:5

## Y

**year** [1] - 75:8
**years** [4] - 74:23, 101:14, 106:18, 160:21
**yield** [1] - 71:18

## Z

**zero** [4] - 13:23, 13:24, 71:1, 156:5