## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) ) | |
| Defendants. | ) | |

James M. Lennon, DEVLIN LAW FIRM, Wilmington, DE; Bradley W. Caldwell, Jason D. Cassady, John Austin Curry, Justin T. Nemunaitis, Daniel R. Pearson, Adrienne R. Dellinger, CALDWELL CASSADY CURRY P.C., Dallas, TX; Attorneys for Plaintiffs.

Kenneth L. Dorsney and Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE; Jeff Dyess, Paul Sykes and Benn Wilson, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL; Jessica Zurlo, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., Attorneys for Defendants CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescence Energy Products, LLC, Rutledge Products, LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, CERT Operations II LLC, and Marquis Industrial Company, LLC.

Jack B. Blumenfeld, Brian P. Egan and Anthony D. Raucci, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Richard W. Mark, Joseph Evall and Paul J. Kremer, GIBSON, DUNN & CRUTCHER LLP, New York, NY; David Glandorf, GIBSON, DUNN & CRUTCHER LLP, Denver, CO; Attorneys for Defendants AJG Iowa Refined Coal LLC, Arbor Fuels Company, LLC, Belle River Fuels Company, LLC, Canadys Refined Coal, LLC, Chouteau Fuels Company, LLC, Coronado Refined Coal, LLC, DTE Energy Resources, LLC, Erie Fuels Company, LLC, George Neal North Refined Coal, LLC, George Neal Refined Coal, LLC, Hastings Refined Coal, LLC, Huron Fuels Company, LLC, Jasper Fuels Company, LLC, Jefferies Refined Coal, LLC, Joppa Refined Coal LLC, Louisa Refined Coal, LLC, Newton Refined Coal, LLC, Portage Fuels Company, LLC, Superior Fuels Company 1, LLC, Walter Scott Refined Coal LLC, and Williams Refined Coal, LLC.

Nicole A. DiSalvo, Jessica R. Kunz and Daniel S. Atlas, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, DE; Douglas R. Nemec and Leslie A. Demers, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, NY; Attorneys for Defendant Alistar Enterprises, LLC.

## MEMORANDUM OPINION

November 3, 2023
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

      This is a patent action filed by Plaintiffs Midwest Energy Emissions Corp. ("Midwest Energy") and MES Inc. ("MES" and collectively with Midwest Energy, "Plaintiffs" or "ME2C") against 34 Defendants, in which Plaintiffs assert five patents-in-suit.  The Court has set out a listing of all of the parties and asserted patents in its recent October 16, 2023 Memorandum Opinion ("October 16, 2023 MO"), (D.I. 586 at 2); it incorporates that discussion by reference here.  Presently pending before the Court is Defendants' motion for summary judgment No. 6: no contributory infringement under 35 U.S.C. § 271(c) (the "Motion").  (D.I. 568)  ME2C opposes the Motion.  For the reasons set forth below, the Motion is DENIED.[1]

## I.      BACKGROUND

      ME2C commenced this action on July 17, 2019.  (D.I. 1)  Defendants filed the instant Motion on March 23, 2023.  (D.I. 527; *see also* D.I. 568)  The Motion was fully briefed as of April 18, 2023, (D.I. 555), and the Court held oral argument on the Motion (as well as other summary judgment motions) on May 17, 2023, (D.I. 581 ("Tr.")).  A trial is set to begin on November 13, 2023.  (D.I. 507)

      The Court here writes primarily for the parties, and so any facts relevant to this Memorandum Opinion will be discussed in Section III below.

## II.      STANDARD OF REVIEW

---

[1]      The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings.  (D.I. 398)

The Court incorporates by reference the standard of review for summary judgment motions, which it set out in the October 16, 2023 MO, (D.I. 586 at 3-4), and the summary judgment-related legal standards specifically relating to claims of patent infringement, which it set out in an October 17, 2023 Memorandum Opinion, (D.I. 588 at 3).

## III.   DISCUSSION

This case relates to mercury control at coal-fired power plants ("power plants"). (*See* D.I. 546, ex. A at 10, at ¶ 24) In 1990, Congress required the United States Environmental Protection Agency ("EPA") to prepare regulations addressing air pollutants, including mercury. (*Id.* at 18, at ¶ 45) Then in 2004, Congress created a new tax credit to promote the production of refined coal ("Section 45 tax credits"); pursuant to this law, a refined coal producer can claim a tax credit for each ton of refined coal sold to a power plant that results in a 40% reduction in mercury emissions and a 20% reduction in NOx emissions. (*Id.* at 20-22, at ¶¶ 52-53) In 2011, the EPA finalized national standards to reduce mercury (and other toxic air pollutants) from power plants, which are known as the Mercury and Air Toxics Standards ("MATS"). (*Id.* at 19, at ¶ 50; *see also* D.I. 406 at ¶ 55) Most power plants were required to comply with this rule by 2015, unless granted a one-year extension to 2016. (D.I. 546, ex. A at 19-20, at ¶ 50)

The inventors of the asserted patents were researchers at the Energy & Environmental Research Center ("EERC") studying the issue of mercury capture. (*Id.* at 19, at ¶¶ 48-49) The asserted claims of the asserted patents[2] relate to methods for reducing mercury emissions from

---

[2]      The '147 patent issued on May 1, 2012. (D.I. 533, ex. 2 at 1) The '114 patent issued on July 9, 2019. (*Id.*, ex. 1 at 1) The '225 patent issued on March 17, 2020. (*Id.*, ex. 3 at 1) The '517 patent issued on March 24, 2020. (*Id.*, ex. 4 at 1) The '430 patent issued on June 2, 2020. (*Id.*, ex. 5 at 1)

power plants with the use of bromine-enhanced coal (or "refined coal") and a sorbent such as activated carbon. (D.I. 533, exs. 1-5; *see also* D.I. 546, ex. A at 19, at ¶ 49 & at 32, at ¶ 70)

In this case, ME2C asserts that Defendants are liable for, *inter alia*, contributory infringement of certain method claims of the asserted patents by manufacturing and then selling refined coal to non-party power plants. (D.I. 546, ex. A at 123, at ¶ 99; *see also* D.I. 406 at ¶¶ 67, 208, 217) Specifically, Defendants[3] are alleged to have: (1) purchased un-refined coal from their power plant customers; (2) added Mer-Sorb, which contains a bromide compound, to the coal;[4] (3) sold the now refined coal back to the power plant (at a cheaper price than what the power plant paid for the coal); and (4) physically transferred the coal back to the power plant on conveyer belts leading to the combustion chambers of the power plants. (D.I. 546, ex. A at 119-24, at ¶¶ 98-99) The power plants are alleged to then inject activated carbon ("ACI") to the process in which refined coal is combusted—which enables additional mercury capture so that

_____

[3]    There are 28 "RC Defendants" that owned or leased a Refined Coal Facility that manufactured and sold refined coal to a power plant during the relevant time. (D.I. 546, ex. A at 119-20, at ¶ 98; D.I. 528 at 4) Five of the remaining defendants (four CERT Operations Defendants and AJG Iowa Refined Coal LLC) are alleged to have participated in the operation, production and delivery of refined coal to the power plants, and DTE Energy Resources, LLC is alleged to have either been the alter ego of Defendants that engaged in contributory infringement or to have used such Defendants as its agent. (D.I. 528 at 4; D.I. 546, ex. A at 46-56, at ¶¶ 85-94; D.I. 545 at 10-11) The Court recently granted summary judgment in favor of Defendants as to Plaintiffs' contributory infringement claims against the CERT Operations Defendants and AJG Iowa Refined Coal LLC. (D.I. 593 at 8) So for purposes of this Motion, it appears that contributory infringement claims against 29 Defendants (the 28 RC Defendants and DTE) are still at issue.

[4]    To determine the amount of Mer-Sorb to apply, Defendants relied on reports provided by the EERC following refined coal testing; Defendants would apply an amount sufficient to achieve mercury emissions reductions that would qualify for Section 45 tax credits. (D.I. 546, ex. A at 42, at ¶ 81; *id.* at 62-63, at ¶ 99)

the power plants can meet MATS requirements—in a manner that allegedly amounts to direct infringement of the patents. (*Id.* at 62-63, at ¶ 99; *id.* at 125, at ¶ 102)

The instant Motion focuses on ME2C's contributory infringement claims. (D.I. 568 at ¶ 1) To prove contributory infringement, a patentee must demonstrate that an alleged contributory infringer has sold, offered to sell or imported into the United States a material or apparatus for use in practicing a patented process "knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use[.]" 35 U.S.C. § 271(c); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009).

With the Motion, Defendants move for summary judgment of no contributory infringement for two reasons. First, they argue that refined coal has "[a]lways [h]ad [s]ubstantial [n]on-[i]nfringing [u]ses." (D.I. 528 at 21 (emphasis omitted)) Second, they contend that refined coal is not especially made or adapted for use with ACI. (*Id.* at 24) The Court will assess each argument in turn.

### A.      Substantial Non-infringing Use

To establish contributory infringement, ME2C must prove, *inter alia*, that there are no substantial non-infringing uses for the refined coal at issue. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012). "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Id.* (quoting *Vita–Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009)).

Defendants begin by noting that the accused product here is refined coal (i.e., coal that has been treated with added bromide); they then assert that when assessing the issue of substantial non-infringing uses, one must not look solely at the *accused uses* of refined coal

5

during the *accused time period* (i.e., as to refined coal sold by a particular Defendant to a specific power plant after MATS went into effect). (D.I. 528 at 22; D.I. 555 at 9) Instead, the proper inquiry, according to Defendants, looks at *all uses* of refined coal, even refined coal (1) produced by entities other than the Defendants and (2) produced before the damages periods here. (Tr. at 109 ("[T]he bottom line is you look at all uses of the accused product.")) And when that is done, Defendants assert that "there is no dispute that that [refined coal] was in widespread non-infringing use throughout the United States for the duration of the Section 45 program, which ran from 2009 to 2021, both before and after each patent-in-suit issued." (D.I. 528 at 22) More specifically, Defendants point to refined coal that was sold to: (1) power plants that never used ACI and that have not been sued in this case; (2) power plants before they installed ACI systems; and (3) power plants that did not use their ACI systems continuously—all of which amounts to, according to Defendants, nearly 60% of all refined coal produced in this period. (*Id.* at 22-23; D.I. 555 at 8; Defendants' Summary Judgment and *Daubert* Motions Slides at Slide 23)

Plaintiffs, for their part, contend that Defendants are wrongly focusing on refined coal in general—instead of on the refined coal that was sold and delivered by Defendants to the relevant power plants during the relevant damages period. (D.I. 545 at 15-17; Tr. at 128-29) The start date for the damages period in this case ranges from July 17, 2013 through July 17, 2019, depending on the particular Defendant at issue. (*See* D.I. 547, ex. A. at ex. C-1; *id.*, ex. B at ex. D-2, D-3)[5] It is not disputed that during the damages period, Defendants only sold coal to plants with ACI systems—it is not the case that in this period Defendants sold some refined coal to the

---

[5]     For certain Defendants, the damages period begins before the federal government enacted MATS because certain states had earlier passed their own state versions of MATS. (*See* Tr. at 125-26)

accused power plants with ACI systems, and additional coal to power plants that did not have ACI systems.  (Tr. at 110-11, 129-31)

The Court sides with Plaintiffs here.  (*See id.* at 129)  As the Court has previously held in this case, the "proper inquiry is whether the *accused* refined coal '*as sold and delivered*' lacks substantial non-infringing use."  *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, Civil Action No. 19-1334-RGA-CJB, 2021 WL 2036671, at *13 (D. Del. May 20, 2021) (emphasis added; internal quotation marks and citations omitted), *adopted in relevant part*, 2021 WL 4350591 (D. Del. Sept. 24, 2021); *see also, e.g.*, *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012) ("For purposes of contributory infringement, the inquiry focuses on whether the *accused products* can be used for purposes other than infringement.") (certain emphasis added; certain emphasis omitted); *Hodosh v. Block Drug Co., Inc.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987) (noting that the language of the contributory infringement statute "deals with the material *actually sold by the accused* and the uses made of it *by its purchasers*") (emphasis added); *Env't Mfg. Sols., LLC v. Peach State Labs, Inc.*, No. 6:09-cv-395-Orl-28DAB, 2011 WL 1262659, at *16 (M.D. Fla. Mar. 31, 2011) (explaining that "the question of whether *urea hydrochloride* itself is suitable for substantial non-infringing use is not relevant to the present contributory infringement analysis" and instead "the relevant question is whether the *Accused Products* are staple articles of commerce with substantial non-infringing use") (emphasis in original); *cf. Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1357 (Fed. Cir. 2018) (finding that the plaintiff adequately stated a claim for contributory infringement where it pleaded that "*[a]s sold and delivered* to the Refined Coal LLCs or operators of coalfired power plants using the Chem-Mod[] Solution, the proprietary additives MerSorb and S-Sorb, which are specifically formulated to be used with the Chem-

Mod[] Solution in coal-fired power plants, have no substantial noninfringing uses" and "[w]hen a coal-fired power plant or a Refined Coal LLC receives MerSorb and S-Sorb it purchased, *[the buyer] has no other use* for MerSorb and S-Sorb except to use those additives in the Chem-Mod[] Solution") (emphasis added).

      In light of this caselaw, to determine whether the "no substantial non-infringing uses" element of Plaintiffs' contributory infringement claim has been met, we must look not to whether refined coal, *as a general matter*, has any substantial non-infringing uses. Rather, we must focus on whether the accused refined coal, *as it was sold and delivered by Defendants to their power plant customers*, could practically be used for purposes other than infringement. In other words, we need to be asking whether—after the accused refined coal was sold and delivered to the power plants at issue—it is reasonable to believe that something else could have been done with it other than injecting activated carbon to the process in which it was combusted?[6]

---

[6]    Defendants argue that non-infringing use of a product before the relevant patent issues "is proof of substantial non-infringing use"; in support, they cite to one district court case from 13 years ago: *Tyco Healthcare Grp. LP v. Biolitec, Inc.*, No. C-08-3129 MMC, 2010 WL 3324893, at *2-3 (N.D. Cal. Aug. 23, 2010). (D.I. 528 at 22; Tr. at 108) In that case, the court explained that the defendant offered undisputed evidence that it sold the accused consoles before the patents were issued, "and there is no evidence, or even allegation, that the consoles [defendant] sold after the subject patents issued were in any manner adapted or changed." *Tyco Healthcare*, 2010 WL 3324893, at *3. Here, the accused refined coal is a specific refined coal that has been sprayed with a specific amount of Mer-Sorb that is then sold to a specific power plant that subsequently utilizes its ACI system to capture additional mercury. (D.I. 546, ex. A at 62-63, at ¶ 99; D.I. 545 at 17) And so in this case, unlike in *Tyco*, the refined coal that Defendants sold after the subject patents were issued was specifically adapted for use by particular power plants. Moreover, the contributory infringement statute "does not require that the [component or material at issue] have been originally designed with the goal of infringing a patent." *Cipla Ltd. v. Sunovion Pharms. Inc.*, 174 F. Supp. 3d 869, 873 (D. Del. 2016) (rejecting the defendant's argument that the fact that its new drug application was approved more than seven years before the asserted patent issued meant that continuing to make that product after the patent's issuance cannot satisfy the "made or adapted for use" element of contributory infringement).

Plaintiffs assert that the accused refined coal, as sold and delivered to Defendants' power plant customers, has no substantial non-infringing use; they argue that this is so because the plants had to combust the refined coal at issue while using in-house ACI systems in order to: (1) meet the plants' mercury emissions limits set out in MATS; and (2) remain operational. (D.I. 545 at 15; Tr. at 124, 133) And Plaintiffs muster some evidence in support of this position. (D.I. 545 at 15)[7] For example, Plaintiffs' expert, Philip J. O'Keefe, explains that power plants must comply with Title V of the Clean Air Act ("CAA") in order to operate; they are accordingly issued permits that require them to control emissions that contribute to air pollution in order to stay operational. (D.I. 546, ex. A at 15-16, at ¶¶ 40-41 & n.4) Mr. O'Keefe further explained that before providing the coal to the power plants, Defendants apply a specific amount of Mer-Sorb to the coal as indicated by the EERC test reports (which identify the amount of Mer-Sorb required for refined coal to meet the mercury capture threshold for Section 45 tax credits), and the power plants must capture additional mercury using their ACI systems in order to meet MATS requirements. (*Id.* at 62-63, at ¶ 99) The deponent for the Mid-American power plants,[8] William Whitney, testified that ACI is listed in the plants' permits, which means that the plant is required to operate with ACI in order to comply with the mercury emissions limits set out in the permits. (D.I. 548, ex. 1 at 12, 45-46; D.I. 546, ex. A at 16 n.4 & 17 n.6; Plaintiffs' Dispositive Motions Hearing Slides at Slides 25-26) A May 2015 e-mail from an individual employed by CERT LLC notes that power plants were relying on Mer-Sorb together with ACI "to meet their

---

[7]     Defendants' contention in their reply brief that Plaintiffs "offer no evidence that power plants that burned Refined Coal without ACI before MATS came into effect could not continue to do so after MATS went into effect" is therefore without merit. (D.I. 555 at 11)

[8]     Certain AJG RC Defendants contracted to sell refined coal to certain Mid-American power plants. (D.I. 546, ex. A at 58, at ¶ 96; D.I. 528 at ix)

MATS compliance standards." (D.I. 548, ex. 20; *see also* D.I. 532 at ¶ 2) A deponent who was in charge of AJG's refined coal program, Sally Batanian,[9] hypothesized that if a power plant using ACI to comply with mercury regulations turned off its ACI system, the mercury emissions would increase and the plant would be subject to penalties from the EPA. (D.I. 546, ex. A at 62-63, at ¶ 99 & n.83) The Court agrees with Plaintiffs that this evidence supports a finding that the accused refined coal has no substantial non-infringing uses.

Defendants do have a no-contributory-infringement argument that considers the proper material to look at in the "no substantial non-infringing use" analysis (i.e., that takes into account the accused refined coal, as it is sold and delivered to Defendants' power plant customers). In that regard, Defendants argue that even their power plant customers that had ACI systems in place during the relevant time periods (i.e., after MATS went into effect) did not use their ACI systems continuously during those periods. (D.I. 528 at 22-23; D.I. 555 at 12; Tr. at 115-16) To that end, Defendants' expert, Dr. Constance Senior, explains that ACI systems require regular maintenance, during which the ACI system is shut off; she asserts that the power plants at issue here likely continued to burn refined coal during these periods. (D.I. 529, ex. 1 at ¶¶ 195-96)

Plaintiffs retort that these interruptions are "minimal" and that they demonstrate "at most . . . the existence of a fact dispute as to whether such an interruption constitutes a substantial non-infringing use." (D.I. 545 at 17) In support, Plaintiffs cite to the deposition testimony of Mr. Whitney, who: (1) estimated that the Mid-American power plants turn off their ACI systems for maintenance only for a total of "hours" in a given year and (2) described the plants' use of

---

[9]      It appears that Ms. Batanian worked for "AJG Coal LLC [or] other Arthur J. Gallagher & Co. entities"—entities that allegedly ran the AJC RC LLC Defendants. (D.I. 546, ex. A at 47, at ¶ 87)

ACI systems as "continuous[]." (D.I. 548, ex. 1 at 11-12, 45-46) Mr. O'Keefe also provided a chart estimating the amount of time the relevant power plants combusted coal while the ACI system was operating; it suggests that plants were combusting coal while the ACI system was shut off approximately 1-10% of time. (D.I. 546, ex. C at ¶ 18; *see also* D.I. 556, ex. 50 at 304-07)[10] Similarly, Defendants' own expert, Dr. Senior, opined that "it is plausible that at least 5% of each plant's Refined Coal was burned without activated carbon treatment of the flue gas after MATS compliance commenced." (D.I. 529, ex. 1 at ¶ 121)

A genuine issue of material fact exists regarding whether a power plant's burning of refined coal while its ACI system is shut down for maintenance constitutes a substantial non-infringing use. *See, e.g.*, *Johns Hopkins Univ. v. Alcon Lab'ys, Inc.*, Civil Action No. 15-525-SLR-SRF, 2018 WL 11424700, at *14 (D. Del. Apr. 5, 2018) (concluding that whether the defendant's product had substantial non-infringing uses presented a question of fact for the jury, where the testimony suggested that the non-infringing use at issue occurred with regard to either 2-8%, approximately 5%, or approximately 15% of all uses in the relevant time period), *report and recommendation adopted*, 2018 WL 11424387 (D. Del. Apr. 25, 2018); *Fuji Mach. Mfg. Co. v. Hover-Davis, Inc.*, 60 F. Supp. 2d 111, 120 (W.D.N.Y. 1999) (denying a motion for summary judgment on the question of whether an allegedly infringing product was suitable for a substantial non-infringing use, where there was a dispute of fact over "how" the accused product

---

[10]     There are two power plants to which certain Defendants provided refined coal in the relevant time period—the Cope and Williams plants—wherein it appears undisputed that the plants only used ACI in the combustion process on a "'temporary basis[.]'" (D.I. 528 at 23 (citation omitted)) Plaintiffs, however, confirm that they are not accusing any Defendant of contributory infringement with regard to the provision of refined coal to those plants. (D.I. 545 at 16 n.10) If the Court understands things correctly, this would seem to mean that the Motion is moot as to contributory infringement claims against Defendants Canadys Refined Coal, LLC and Williams Refined Coal, LLC. (*See* D.I. 528 at ix)

was used).  Defendants cite to a few district court cases that granted summary judgment of no

contributory infringement, where the courts concluded that there were necessarily substantial

non-infringing uses for the products at issue because about 5% or more of those uses were non-

infringing.  (D.I. 528 at 21-22 (citing cases))  But even Defendants acknowledge that there is no

hard and fast numerical threshold in the law as to the amount of use that must be non-infringing

for a use to be deemed "substantial."  (*Id*. at 21)  And in the Court's view, in light of the record

here, a reasonable jury could conclude that a power plant's periodic shutting-off of its ACI

system for maintenance (assuming that refined coal continued to be burned during that period)

amounted to only an "occasional" and not "substantial" period of non-infringing use.  *See John

Hopkins Univ.*, 2018 WL 11424700, at *14; *cf. C.R. Bard, Inc. v. Advanced Cardiovascular Sys.,

Inc.*, 911 F.2d 670, 674 (Fed. Cir. 1990) (concluding that a reasonable jury could conclude that

substantial non-infringing uses existed for the accused product, but where there was evidence

that 40-60% of such uses were non-infringing).[11]

### B.     Especially Made or Especially Adapted for Use in an Infringement of the Patent

To prove contributory infringement, Plaintiffs must also demonstrate that the refined coal

was "especially made or especially adapted for use in an infringement of [the] patent, and not a

staple article or commodity of commerce suitable for substantial noninfringing use[.]"  *Lucent*

---

[11]     Defendants also suggest that the EERC's use of refined coal without ACI for testing purposes demonstrates that the refined coal at issue has substantial non-infringing uses. (D.I. 528 at 23)  However, and even assuming that this "use" counts as a use of Defendant-produced refined coal, (*see* Tr. at 135), such use seems *de minimis* in comparison to how the power plants were using refined coal.  (D.I. 548, ex. 33 at 4 (explaining that additives were applied to the coal by hand in EERC testing); D.I. 546, ex. C at ¶ 6 (Mr. O'Keefe opining that EERC testing does not permit Defendants to obtain Section 45 tax credits and therefore would not be a commercially viable operation); *see also* Tr. at 135)

*Techs., Inc.*, 580 F.3d at 1320.  Defendants argue that the refined coal at issue cannot meet this element because it is made by mixing coal with bromine in an amount specified by the EERC test report *to qualify for Section 45 tax credits*—not to encourage ACI use by power plants.  (D.I. 528 at 24; D.I. 555 at 7-8)  Plaintiffs, for their part, retort that the accused refined coal, as delivered, has no other use other than to be combusted at a specific power plant where ACI will be used (and thus "is especially made or adapted for use as an infringement").  (D.I. 545 at 18-19; D.I. 546, ex. A at 41-46, at ¶¶ 79-84; *id.* at 60-62, at ¶¶ 97-98; *id.* at 128-30, at ¶¶ 114-18)  Plaintiffs' evidence establishes a genuine issue of material fact as to whether the Accused Products were especially made or especially adapted for use in the infringement of the asserted patents.  *See, e.g.*, *Env't Mfg. Sols., LLC*, 2011 WL 1262659, at *16.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion is DENIED.  An appropriate Order will issue.

Because this Memorandum Opinion may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Opinion.  Any such redacted version shall be submitted no later than **November 8, 2023** for review by the Court.  It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure."  *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir.

2019) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Memorandum Opinion.