## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) ) ) |
| Defendants. | ) |

## MEMORANDUM ORDER

This is a patent action filed by Plaintiffs Midwest Energy Emissions Corp. ("Midwest Energy") and MES Inc. ("MES" and collectively with Midwest Energy, "Plaintiffs" or "ME2C") against 34 Defendants, in which Plaintiffs assert five patents-in-suit. The Court has set out a listing of all of the parties and asserted patents in its recent October 16, 2023 Memorandum Opinion ("October 16, 2023 MO"), (D.I. 586 at 2); it incorporates that discussion by reference here. Presently pending before the Court is Defendants' motion to exclude the opinions offered by Philip O'Keefe ("Motion"), a technical expert witness proffered by Plaintiffs, who is expected to testify regarding infringement and invalidity. (D.I. 572) ME2C opposes the Motion. For the reasons set forth below, the Motion is GRANTED-IN-PART and DENIED-IN-PART.[1]

**I.    BACKGROUND**

ME2C commenced this action on July 17, 2019. (D.I. 1) Defendants filed the instant Motion on March 23, 2023. (D.I. 527; *see also* D.I. 572) The Motion was fully briefed as of April 18, 2023. (D.I. 555) A trial is set to begin on November 13, 2023. (D.I. 507)

---

[1] The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 398)

The Court here writes primarily for the parties, and so any facts relevant to this Memorandum Opinion will be discussed in Section III below.

## II. STANDARD OF REVIEW

The Court has frequently set out the relevant standard of review for assessing a motion, like this one, filed pursuant to Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993). One such instance came in *Integra LifeScis. Corp. v. HyperBranch Med. Tech., Inc.*, Civil Action No. 15-819-LPS-CJB, 2018 WL 1785033, at *1-2 (D. Del. Apr. 4, 2018). The Court incorporates by reference those legal standards set out in *Integra*, and will follow them herein. To the extent that additional related legal principles regarding Rule 702 and *Daubert* are relevant, the Court will set those out in Section III.

## III. DISCUSSION

With their Motion, Defendants raise five issues with Mr. O'Keefe's opinions: (1) that Mr. O'Keefe lacks the necessary qualifications for his opinions; (2) that Mr. O'Keefe lacks the necessary qualifications to testify regarding certain discrete subject matters; (3) that Mr. O'Keefe offers opinions on matters that are improper for expert testimony; (4) that Mr. O'Keefe's contributory infringement opinions should be excluded because he failed to consider significant non-infringing uses; and (5) that Mr. O'Keefe's opinions regarding secondary considerations of non-obviousness are faulty. (D.I. 528 at 34-45) The Court will address these arguments in turn.

### A. Whether Mr. O'Keefe Lacks Qualification as an Expert

Defendants first argue that the opinions of Mr. O'Keefe must be excluded in their entirety because he lacks the expertise required to assist the trier of fact in this case. (*Id.* at 34-39) For the reasons explained below, the Court does not agree.

In terms of expert qualifications, The United States Court of Appeals for the Third Circuit has explained that an inquiry under Rule 702 must address whether the expert witness has "'specialized knowledge' regarding the area of testimony." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). The basis of this specialized knowledge may be "practical experience as well as academic training and credentials." *Id.* (internal quotation marks and citations omitted). At a minimum, however, "a proffered expert witness . . . must possess skill or knowledge greater than the average layman[.]" *Id.* (internal quotation marks and citations omitted). The Third Circuit has tended to apply this standard liberally. *Id.*; *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Meanwhile, the United States Court of Appeals for the Federal Circuit has explained that "[t]o offer expert testimony from the perspective of a skilled artisan in a patent case—like for . . . validity[] or infringement—a witness must at least have ordinary skill in the art." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1376-77 (Fed. Cir. 2022); *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1362 (Fed. Cir. 2008) ("Admitting testimony from a person . . . with no skill in the pertinent art[] serves only to cause mischief and confuse the factfinder.").[2]

The parties dispute what is required for one to have "ordinary skill in the art" in this case. (D.I. 528 at 36; D.I. 545 at 35) Defendants argue that under their view of the pertinent level of ordinary skill in the art, Mr. O'Keefe is unqualified and thus must be excluded as an expert in

---

[2] The Federal Circuit applies the law of the otherwise applicable regional circuit to issues not unique to patent law, including the admissibility of expert testimony. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015). That Court has noted that "[p]atent cases, like all other cases, are governed by Rule 702. There is, of course, no basis for carving out a special rule as to experts in patent cases." *Sundance, Inc.*, 550 F.3d at 1360.

this case. (D.I. 528 at 36-39) According to Defendants, a person of ordinary skill in the art ("POSITA") at the time of the invention[3] would have:

> [A]t least a Master's Degree in chemical engineering, chemistry, or a related field of study, as well as knowledge of mercury chemistry—including knowledge of gas phase and heterogeneous reactions of mercury and halogen species at the temperatures and under the conditions found in coal-fired power plants. A POSITA would also have at least two years' experience with research and development or implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration. Among other areas, the POSITA would have been familiar with each of the topics discussed below in the State of the Art section.

(D.I. 530, ex. A at ¶ 67) Meanwhile, according to Plaintiffs, a POSITA would have:

> [A] bachelor's degree in mechanical engineering, chemical engineering, chemistry, or a related field of technology and at least two years of experience dealing with power plant operation, and/or pollution control equipment. Additional work experience in relevant industries could compensate for less education, or education in a different field. Similarly, advanced education and degrees could compensate for less work experience.

(D.I. 546, ex. A at 9, at ¶ 22) Plaintiffs also note that a POSITA "would be aware of some facts and principles related to power plant operation and mercury control." (*Id.* at 10, at ¶ 24)

The key to this dispute is determining what is the appropriate level of ordinary skill in the art. In making that determination, relevant factors include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d

---

[3] The earliest claimed priority date for the asserted patents is August 2004. (D.I. 530, ex. A at ¶ 67)

1254, 1256 (Fed. Cir. 2007) (internal quotation marks and citations omitted).  These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art.  *Id.*

Plaintiffs intend to offer Mr. O'Keefe as their technical expert "in the field of coal-fired power plant operation as it relates to the patented technology and infringement and invalidity of the patents-in-suit."  (D.I. 545 at 33)  The patented technology relates to mercury control at coal-fired power plants ("power plants").  (D.I. 533, ex. 1 at col. 1:27-31 ('114 patent specification describing the field of the invention as "methods . . . for the removal of pollutants from flue gas . . . . In particular, mercury is removed from gas streams generated during the burning . . . of fossil fuels by highly reactive regenerable sorbents"); *see also* D.I. 528 at 37 (Defendants describing the relevant art as "the use of halogens and sorbents to reduce mercury emissions from coal-fired power plants"); D.I. 546, ex. A at 10, at ¶ 24)  The asserted claims of the asserted patents relate to methods for reducing mercury emissions from power plants with the use of bromine-enhanced coal (or "refined coal") and a sorbent such as activated carbon.  (D.I. 533, exs. 1-5; *see also* D.I. 546, ex. A at 19, at ¶ 49 & at 32, at ¶ 70)

For the following reasons, the Court agrees with Plaintiffs' articulation of the appropriate level of skill in the art:

- For much of this case, Defendants' expert, Dr. Stephen Niska, largely *agreed* with Plaintiffs' articulation of the appropriate level of skill in the art applicable here.  During *inter partes* review proceedings in 2020 relating to certain of the asserted patents involving defendants that have been subsequently dismissed from the case, Dr. Niksa opined that a POSITA "would have at least a bachelor's degree in chemical engineering, mechanical engineering, or a related field of study with at least two years of experience with implementing pollution control in power generation plants for natural gas, coal, and/or industrial waste incineration. Among other areas, the POSITA would have been familiar with each of the topics discussed below in the State of the Art section [including flue gas constituents,

- sorbents/activated carbon, and mercury removal using activated carbon]." (D.I. 556, ex. 41 at 7-8; *id.*, ex. 53 at ¶¶ 64, 96, 116, 144; D.I. 545 at 35)

- It was not until Defendants' opening expert report was served on October 26, 2022 that Dr. Niksa newly opined that the POSITA would have an advanced degree in chemical engineering, chemistry, or a related field of study. (D.I. 530, ex. A at ¶ 67)

- During his February 2023 deposition, Dr. Niksa seemed to once again acknowledge that "it's possible for somebody with a bachelor's degree in engineering through more work experience or deeper dives into the technical literature to be a [POSITA]." (D.I. 548, ex. 8 at 64)

- One of the three inventors of the patents-in-suit, John Pavlish, would be excluded under Defendants' proposed definition because he holds a bachelor's degree in mechanical engineering,[4] but not an advanced chemistry-related degree.[5] (D.I. 533, ex. 20 at 18-19); *see Daiichi Sankyo Co.*, 501 F.3d at 1256 (the "educational level of the inventor" is a pertinent factor in determining the appropriate level of ordinary skill in the art) (internal quotation marks and citations omitted); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (noting the "the well-settled understanding that inventors are typically persons skilled in the field of the invention"); *OrthoPediatrics Corp. v. Wishbone Med., Inc.*, Case No. 3:20-CV-929 JD, 2022 WL 4978169, at *5 (N.D. Ind. Oct. 4, 2022) (rejecting a proposed POSITA definition where the inventors would not qualify under that definition).[6]

---

[4] Mr. Pavlish also has nine years of experience in designing components for power plants and a number of years of experience at the Energy Environmental Research Center as a senior research advisor focusing on air toxic metals with an emphasis on mercury research. (D.I. 533, ex. 20 at 18-19, 20-21, 22-24, 27)

[5] One of the other inventors held a Ph.D. in chemistry and physics and had experience focused on mercury control, and the other inventor held a master's degree in chemical engineering and also had experience focused on mercury capture. (D.I. 533, ex. 18 at 9-10, 27-28; *id.*, ex. 19 at 12, 16-18)

[6] Defendants point out that Mr. Pavlish testified that he "understand[s] most of the material" in the asserted patents with "[s]ome of the chemistry [being] beyond [his] educational training and expertise[.]" (D.I. 533, ex. 20 at 92) Yet with respect to Mr. O'Keefe, Defendants

6

- Dr. Niksa acknowledged that the individuals implementing the technology at power plants did not have advanced degrees nor were they engaged in years of chemistry research, noting that "you don't find Ph.Ds on the line at power plants." (D.I. 548, ex. 8 at 17; D.I. 546, ex. B at ¶ 38 (Mr. O'Keefe noting that "[b]ased on my experience working at power plants, POSITA[s] typically do not have advanced degrees in chemistry or detailed knowledge of organic chemistry theory, and it would have been common for these individuals to 'learn on the job,' given that the study of mercury capture was still fairly new in 2004")); *see Daiichi Sankyo Co.*, 501 F.3d at 1256 (stating that the educational level of active workers in the field is a pertinent factor in determining the appropriate level of ordinary skill in the art).

In light of these factors, the Court concludes that a POSITA with respect to the asserted patents would have a bachelor's degree in mechanical engineering, chemical engineering, chemistry, or a related field of technology and at least two years of experience dealing with power plant operation, and/or pollution control equipment. Additional work experience in relevant industries could compensate for less education, or education in a different field. Similarly, advanced education and degrees could compensate for less work experience. A POSITA would be aware of some facts and principles related to power plant operation and mercury control. (D.I. 546, ex. A at 9-10, at ¶¶ 22, 24)

Mr. O'Keefe qualifies as an expert under this definition. He has a bachelor's degree in mechanical engineering and worked in various engineering capacities in coal-fired power plants for 14 years (from 1981 until 1995) at Commonwealth Edison ("ComEd"), a large utility company. (*Id.* at 2, at ¶¶ 6, 8) While employed there, Mr. O'Keefe served as the technical

---

only identify a single purported chemistry error that he committed in this case—they fault him for testifying in deposition that "the salt $CaBr_2$ 'comprises' the molecular compound $Br_2$[.]" (D.I. 528 at 39) This could merely amount to a dispute regarding wording and does not demonstrate that the chemistry relevant to this case is beyond Mr. O'Keefe's grasp. (*See* D.I. 545 at 37)

training coordinator for all of the power plants within the ComEd system, and was brought in by power plants to research problems and develop solutions. (D.I. 548, ex. 6 at 20-21, 25-29) During this time, Mr. O'Keefe received training in power plant chemistry and taught courses on that subject. (D.I. 546, ex. C at ¶ 23 n.11) Mr. O'Keefe also gained experience operating and testing pollution control equipment such as electrostatic precipitators, which remove fly ash from flue gases. (D.I. 548, ex. 6 at 14) After leaving ComEd, Mr. O'Keefe has continued to teach seminars regarding power plant operations. (D.I. 546, ex. A at ex. C, at 5) Mr. O'Keefe currently works as a professional expert witness in the engineering field. (D.I. 533, ex. 24 at 8-9)

The dispute does not end there, however, because Defendants further argue that even pursuant to this lower level of skill, Mr. O'Keefe is still unqualified because he has no education, training or prior work experience regarding reducing mercury emissions from coal-fired power plants using halogens and activated carbon. (D.I. 528 at 36, 39; D.I. 555 at 21) It is true that Mr. O'Keefe's employment at ComEd came before power plants employed mercury control technology and utilized activated carbon injection ("ACI") systems. (*See* D.I. 528 at 35) But this Court has explained that in order for an expert to have specialized knowledge that will help the trier of fact, it is not always "necessary that the expert have expertise in the precise technology that is the subject of the [asserted] patent[s]." *Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 510 (D. Del. 2017) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).

Furthermore, an expert is permitted to obtain some knowledge regarding the patented technology through his work on the case. *See, e.g.*, *Greatbatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS, 2015 WL 9171042, at *4 (D. Del. Dec. 11, 2015) (rejecting plaintiff's argument that defendant's technical expert's opinions should be excluded because he "lacks specialized

knowledge regarding the subject matter of this lawsuit[,]" where the expert had an advanced degree in electrical engineering, many years of experience in the medical device field, and engaged in substantial preparation and work in forming his opinions in the case, including, *inter alia*, reviewing technical documents, prior art references and deposition transcripts); *Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 601-02 (D. Del. 2004) (rejecting the defendant's argument that an expert with a Ph.D. in mechanical engineering and 35 years of experience as an electro-mechanical design engineer was unqualified to testify regarding electric rotary razors, even though he did not have experience regarding razor technology (though excluding his testimony on other grounds)), *aff'd*, 140 F. App'x 236 (Fed. Cir. 2005). Mr. O'Keefe learned about ACI systems and mercury control through his extensive work in this case. (D.I. 533, ex. 24 at 42)  His report cites to "dozens of technical papers, books, and reports" on this subject matter. (D.I. 545 at 37 (citing D.I. 546, exs. A-B))  Indeed, Defendants' own expert Dr. Niska appeared to testify that he learned everything he knew about the accused power plants (which utilized the accused technologies regarding mercury control) from Mr. O'Keefe's expert reports; Dr. Niksa described those reports as going into "considerable detail [regarding] the application of calcium bromide and activated carbon in those power plants" and providing "some information about which other air pollution control devices are used at those sites." (Plaintiffs' Dispositive Motion Hearing Slides at Slide 79)[7]

      Keeping in mind the Third Circuit's liberal standard for admissibility here, the Court concludes that Mr. O'Keefe's experience regarding coal-fired power plant operation is sufficiently related to the subject matter of the asserted patents to be helpful to the trier of fact.

---

[7]    While Plaintiffs' slide appears to contain an incorrect page citation for Dr. Niksa's testimony in this regard, it includes a picture of the relevant portion of the deposition.

*See, e.g.*, *Tesco Corp. v. Weatherford Int'l Inc.*, 750 F. Supp. 2d 780, 795 (S.D. Tex. 2010) (rejecting the defendant's argument that the plaintiff's technical expert was unqualified under Rule 702, because even though he lacked "specific experience studying or working with pipe handling devices, his three degrees in engineering and his experience in oil fields sufficiently qualify Dr. Wooley as an expert on the subject matter of this case" as "Rule 702 does not require the extreme specificity of expertise that Weatherford proposes").

All that said, an expert's level of expertise may certainly impact the weight given to the expert's opinion. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 741. Defendants "are free to question [Mr. O'Keefe] about his qualifications, and may argue that they are not as good as others [i.e., Dr. Niska's], but their challenges go to the weight that might be accorded to his opinions and not to their admissibility." *Otsuka Pharm. Co. v. Zenara Pharma Private Ltd.*, C.A. No. 19-1938-LPS, 2022 WL 4365744, at *2 (D. Del. Sept. 21, 2022) (internal quotation marks and citation omitted); *Plexxikon Inc. v. Novartis Pharms. Corp.*, Case No. 17-cv-04405-HSG, 2020 WL 1455830, at *5 (N.D. Cal. Mar. 25, 2020) (rejecting the defendant's assertion that plaintiff's expert was unqualified to testify and noting that "[d]efendant will have the opportunity at trial to question the relative strength of Dr. Metzker's qualifications and to contrast them with the qualifications of Defendant's own experts"); *TQ Delta, LLC v. ADTRAN, Inc.*, Civil Action No. 14-954-RGA, Civil Action No. 15-121-RGA, 2019 WL 5677539, at *4 (D. Del. Oct. 31, 2019) ("[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.") (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).

    **B.**    **Whether Mr. O'Keefe Lacks the Necessary Qualifications to Testify Regarding Certain Discrete Subject Matters**

Defendants' second argument is that even if Mr. O'Keefe is not entirely unqualified to testify as an expert in this case, full stop, his proffered opinions regarding six discrete subject matters should be excluded because he is unqualified to testify regarding such matters. (D.I. 528 at 40-42; D.I. 555 at 22-23) These six subject matters are as follows:

- Mr. O'Keefe's "opinions that the accused power plants deploy ACI systems as a necessary means to comply with MATS regulations or the plants' emission control permits[,]" (D.I. 528 at 40);

- Mr. O'Keefe's "opinions on the mechanisms and chemistry of mercury capture at coal fired power plants[,]" (*id.* at 41);

- Mr. O'Keefe's "opinions on Defendants' processes for preparing, testing and supplying Refined Coal to the accused power plants, and on the properties and combustion of Refined Coal[,]" (*id.*);

- Mr. O'Keefe's "opinions on the operation of SCR units and wet and dry scrubbers at coal fired power plants, and strategies for reducing mercury and other emissions[,]" (*id.*);

- Mr. O'Keefe's "opinions relating to air pollution emission control permits, including what power plants need to do to comply with those permits[,]" (*id.*); and

- Mr. O'Keefe's "technical opinions regarding the development of mercury capture technology, mercury emission control regulations at the state and federal level, and statutes providing tax credits for clean coal technologies, including Refined Coal[,]" (*id.* at 41-42).

Here, Defendants cite to a Third Circuit case, *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110 (3d Cir. 1987), in which the Third Circuit concluded that a district court had abused its discretion by allowing a tractor salesperson to testify as an expert about the cause of a tractor fire. (D.I. 528 at 40) The *Aloe Coal* Court explained:

> Drewnoski [the expert witness] was not an engineer. He had no experience in designing construction machinery. He had no

> knowledge or experience in determining the cause of equipment fires. . . . He had no training as a mechanic. He had never operated construction machinery in the course of business. He was a salesman, who at times prepared damage estimates.

816 F.2d at 114. According to Defendants, under this standard, Mr. O'Keefe is not qualified to offer opinions regarding the above six subject matters because he has no education or training regarding these subjects. (D.I. 528 at 40-41)

The Court reaches the same conclusion here as it did above, for the same reasons. As a general matter, these topics relate to systems and equipment, chemistry, and operations at coal-fired power plants, as well as compliance with applicable regulations at these plants. The Court agrees with Plaintiffs that Mr. O'Keefe's extensive background with power plant operations renders him qualified to apply his experience to the factual subject matters at issue, and that he is qualified to research systems that he did not personally use. His report contains citations to numerous supporting sources, and as noted above, even Dr. Niksa appeared to have learned about the operations of the relevant power plants (including the application of calcium bromide and activated carbon in such plants) from Mr. O'Keefe's report. (Plaintiffs' Dispositive Motions Hearing Slides at Slide 79)

  **C. Whether Mr. O'Keefe Offers Opinions on Matters That Are Improper for Expert Testimony**

Third, Defendants argue that Mr. O'Keefe offers several opinions on matters that are improper for expert testimony. (D.I. 528 at 42-43) These areas are as follows:

- Mr. O'Keefe "simply recounts facts, then impermissibly offers his opinions" in areas relating to Defendants' corporate structure, Defendants' interactions with power plants and knowledge of ACI, Defendants' information regarding Plaintiffs' patents, evidence related to Defendants' conduct leading to infringement, induced infringement and contributory infringement, (*id.* at 43);

12

- Mr. O'Keefe's induced and contributory infringement opinions are "infected by inappropriate legal conclusions," such as his opinion that "[a] fact-finder could conclude that the Defendants intended for their power plant customers to infringe[,]" (*id.* (quoting D.I. 533, ex. 11 at 126, at ¶ 104)); and

- Mr. O'Keefe opines on contract interpretation, party motivation and other conclusions about jurors—subjects that are "outside expert terrain[,]" (*id.*).

Expert witnesses are not permitted to opine on a person's intent, motive or state of mind—such conclusions are "within the province of the jury." *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, Case No. 10-cv-10578, 2016 WL 4396085, at *4 (E.D. Mich. Aug. 18, 2016); *see also GREE, Inc. v. Supercell Oy*, Case No. 2:19-cv-00070-JRG-RSP, 2020 WL 4288350, at *2 (E.D. Tex. July 27, 2020); *AstraZeneca UK Ltd. v. Watson Lab'ys, Inc. (NV)*, C.A. No. 10-915-LPS, 2012 WL 6043266, at *2 (D. Del. Nov. 14, 2012). But they *are* permitted to opine regarding the underlying facts that may show a person's state of mind or that are otherwise relevant to the elements of claims here. *GREE, Inc.*, 2020 WL 4288350, at *2 (explaining that while the expert could opine that certain ads directed users to perform a claim limitation, the expert could not opine that the defendant "actively and intentionally induced infringement" because that phraseology would amount to providing an opinion about the defendant's intent) (internal quotation marks and citation omitted); *Visteon Glob. Techs.*, 2016 WL 4396085, at *4. And the Court will otherwise permit the experts here to give their opinion that direct or indirect infringement has or has not occurred as to asserted claims (and why). *Sonos, Inc.*, 297 F. Supp. 3d at 511.

In light of these principles, statements such as the following in Mr. O'Keefe's report are improper:[8]

- "There is evidence from which the fact-finder could conclude that Defendants were aware of the patents-in-suit." (D.I. 546, ex. A at 87, at ¶ 112; *see also id.* at 88, at ¶¶ 113, 115); *see, e.g.*, *Atlas Glob. Techs. LLC v. TP-Link Techs. Co., LTD.*, CIVIL ACTION NO. 2:21-CV-00430-JRG-RSP, 2023 WL 4847343, at *5 (E.D. Tex. July 28, 2023) ("Consistent with prior precedent, the experts are precluded from testifying as to whether Defendants possessed the requisite knowledge or intent for indirect infringement. . . . Nevertheless, Dr. Shoemake may testify as to the underlying facts that in his opinion may show Defendants' state of mind"); *Realtime Data, LLC v. Actian Corp.*, CIVIL ACTION NO. 6:15-CV-463 RWS-JDL, 2017 WL 11662038, at *3 (E.D. Tex. Mar. 29, 2017) (striking an expert's opinion that "'Defendant knew of the Asserted Patents . . .'");

- "[Receiving refined coal] with indemnity provisions in place. . . . would allow power plants to engage in infringing conduct with the expectation that the power plant would face a diminished risk of infringement." (*Id.* at 124, at ¶ 101); *Shire Viropharma Inc. v. CSL Behring LLC*, Civil Action No. 17-414, 2021 WL 1227097, at *6 (D. Del. Mar. 31, 2021) ("Mr. Lassman's report involves an impermissible attempt to infer from the contents of Plaintiff's internal documents what Plaintiff must have been thinking or intending with respect to its SHP616 program. Such opinions improperly usurp the role of the jury to draw reasonable inferences from the evidence."); *see also Pelican Int'l, Inc. v. Hobie Cat Co.*, Case No.: 3:20-cv-02390-RSH-MSB, 2023 WL 2130379, at *10 (S.D. Cal. Feb. 10, 2023) (striking expert's opinions regarding the subjective intent, motive, or state of mind of the defendant and its employees); and

---

[8] As part of their Motion, Defendants collected certain specific opinions in Mr. O'Keefe's report that they assert should be excluded on this ground. (D.I. 533 at ¶¶ h, i) The Court "declines to engage in a line-by-line analysis of [Mr. O'Keefe's] report to explain which opinions are improper. Rather, to the extent [Mr. O'Keefe's] testimony at trial fails to comply with the Court's holding [here], [Defendants] may raise a contemporaneous objection to any such testimony. *See, e.g.*, *Pelican Int'l, Inc. v. Hobie Cat Co.*, Case No.: 3:20-cv-02390-RSH-MSB, 2023 WL 2130379, at *11 (S.D. Cal. Feb. 10, 2023).

14

- "A fact-finder could conclude that the Defendants intended for their power plant customers to infringe." (*Id.* at 126, at ¶ 104)

Beyond statements like these in which Mr. O'Keefe proffers specific opinions with respect to intent, motive and state of mind, as explained above, Mr. O'Keefe's opinions regarding the underlying facts that may show state of mind or be relevant to other claims and defenses are not necessarily improper.[9] In sum, the Court grants-in-part and denies-in-part this portion of Defendants' Motion. Mr. O'Keefe may testify with respect to the underlying facts from which the jury may infer intent or knowledge and he may give an opinion as to direct and indirect infringement. But Mr. O'Keefe may not offer opinions as to another's intent, motive or state of mind.

### D. Whether Mr. O'Keefe's Contributory Infringement Opinions Should Be Excluded

Defendants' fourth argument is that Mr. O'Keefe's opinions on contributory infringement should be excluded because he ignored substantial non-infringing uses—i.e., power plants without ACI systems that burn refined coal, and accused power plants' use of refined coal before the plants had installed ACI systems—and provided no basis for his exclusion of them. (D.I. 528 at 44) But as the Court has explained in its Memorandum Opinion regarding Defendants' Motion for Summary Judgment on Contributory Infringement, "to determine whether the 'no

---

[9] The Court notes that Defendants call out Mr. O'Keefe for including long "fact-recasting narratives" in portions of his reports. (D.I. 528 at 43) While some courts have noted that is improper for an expert to engage in "unnecessarily long summaries of the facts in evidence" that are not sufficiently connected to their opinions on issues within their technical expertise, *Pelican Int'l, Inc.*, 2023 WL 2130379, at *11; *see also Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, Case No. 2:15-CV-512-WCB, Case No. 2:16-CV-198-WCB, 2017 WL 1319553, at *3 (E.D. Tex. 2017), the Court cannot now necessarily conclude that Mr. O'Keefe will do this at trial.

substantial non-infringing uses' element of Plaintiffs' contributory infringement claim has been met, we must look not to whether refined coal, *as a general matter*, has any substantial non-infringing uses. Rather, we must focus on whether the accused refined coal, *as it was sold and delivered by Defendants to their power plant customers*, could practically be used for purposes other than infringement." (D.I. 611 at 8; *see also* D.I. 545 at 41 (Plaintiffs asserting that refined coal from different feedstock delivered to different power plants, or delivered before mercury regulations went into effect, does not amount to evidence of a non-infringing use for the refined coal at issue in this case)) Thus, the Court does not agree that this is a basis to exclude Mr. O'Keefe's contributory infringement opinions.

### E. Whether Mr. O'Keefe's Opinions Regarding Secondary Considerations of Non-Obviousness Should Be Excluded

Lastly, Defendants argue that Mr. O'Keefe's opinions regarding secondary considerations of non-obviousness must be excluded.

First, Defendants contend that Mr. O'Keefe's opinions on the import of Plaintiffs' revenue for their patented process and the government's economic interest in research investments (which are found in the "commercial success" and "long-felt need" portions of Mr. O'Keefe's report), (D.I. 546, ex. B at ¶¶ 204-08, 214-15), must be excluded because he is not qualified to testify regarding matters of economics or business finance, (D.I. 528 at 45). However, in the paragraphs at issue, Mr. O'Keefe's reference to financial matters is brief, and it is interwoven with discussion of technical matters relevant to his expertise. And the financial information at issue does not seem so complex that one would need a degree in economics to understand it or impart it. For this reason, the Court denies this portion of Defendants' Motion.

Second, Defendants argue that Mr. O'Keefe fails to state *any* methodology (let alone reliable methodology) for establishing a nexus between evidence of secondary considerations

and the patented invention. (D.I. 528 at 45); *see also Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) ("In order to accord substantial weight to secondary considerations in an obviousness analysis, the evidence of secondary considerations must have a nexus to the claims, *i.e.*, there must be a legally and factually sufficient connection between the evidence and the patented invention.") (internal quotation marks and citation omitted). Defendants fault Mr. O'Keefe for (1) failing to explain how he evaluated the commercial success of Plaintiffs' offerings; (2) failing to account for exogenous forces that could have created unrelated value in the patented inventions; and (3) failing to distinguish between the asserted patents and either Plaintiffs' other patents and trade secrets or the broader use of halogens in mercury capture. (D.I. 528 at 45 (citing D.I. 531, ex. 3 at ¶¶ 8-10, 22-115))

The Court also denies this portion of Defendants' Motion.[10] In response to the Motion, Plaintiffs argued why Mr. O'Keefe's opinions do provide sufficient evidence of nexus. (D.I. 545 at 42 (citing D.I. 546, ex. A at 38-40; *id.*, ex. B, Appendix A and caselaw)) Defendants did not respond to Plaintiffs' arguments in this regard. (D.I. 555 at 23) Thus, the Court is not persuaded that this portion of the Motion is meritorious.

## IV.    CONCLUSION

For the reasons set out above, the Court hereby ORDERS that Defendants' Motion is GRANTED with respect to Mr. O'Keefe's opinions regarding another's intent, motive or state of mind. It is DENIED in all other respects.

---

[10]    Defendants did not clearly identify the paragraphs at issue that relate to this particular argument. (D.I. 528 at 42; *see also* D.I. 572 at 7) It appears that they are the same paragraphs that were at issue with respect to the first argument. (D.I. 533 at ¶ 14(a))

      Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **November 8, 2023** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: November 3, 2023

                                                                         Christopher J. Burke
                                                                         UNITED STATES MAGISTRATE JUDGE