IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE


MIDWEST ENERGY EMISSIONS CORP., et al., )
)
)
-------------------Plaintiffs,     )
) Case No.
vs.                                ) 19-CV-1334-CJB
)
ARTHUR J. GALLAGHER & CO., et al., )
) Volume I
-------------------Defendants.     )


TRANSCRIPT OF JURY TRIAL


JURY TRIAL had before the Honorable Christopher J. Burke, U.S.M.J., and a jury of eight in Courtroom 2A on the 26th of February, 2024.


APPEARANCES

DEVLIN LAW FIRM
      BY:   JAMES LENNON, ESQ.
            PETER MAZUR, ESQ.

                        -and-

CALDWELL CASSADY & CURRY
      BY:   BRADLEY CALDWELL, ESQ.
            JASON CASSADY, ESQ.
            JOHN CURRY, ESQ.
            JUSTIN NEMUNAITIS, ESQ.
            WARREN MCCARTY, III, ESQ.
            DANIEL PEARSON, ESQ.
            ADRIENNE DELLINGER, ESQ.
            AISHA HALEY, ESQ.
            RICHARD COCHRANE, ESQ.

                        Counsel for Plaintiff

(Appearances continued.)


MORRIS JAMES LLP
      BY:  CORTLAN HITCH, ESQ.
           KENNETH DORSNEY, ESQ.

                         -and-

BRADLEY ARANT BOULT CUMMINGS LLP
      BY:  JEFF DYESS, ESQ.
           PAUL SYKES, ESQ.
           BENN WILSON, ESQ.
           ASHLEY ROBINSON, ESQ.
           JESSICA ZURLO, ESQ.

                              Counsel for CERT Defendants

THE COURT: Thanks to our court reporter for being here and also I understand Plaintiff's Delaware counsel is still downstairs, but I didn't want to wait any longer, so why don't we get started. And why don't we go on the record, and we'll hear prior to the beginning of trial in the matter of *Midwest Energy Emissions Corp. versus Arthur J. Gallagher*. It's Civil Action 19-1334-CJB here in court. Before we go further, let's have counsel for each side give appearances for the record. I usually start with Delaware counsel, but they're not quite here, so we'll start with whoever is at Plaintiffs' table.

MR. NEMUNAITIS: Good morning, Your Honor. Justin Nemunaitis for the plaintiffs. I'll be arguing some things. Aisha Haley will be arguing some things. Warren McCarty and Daniel Pearson are also here too.

THE COURT: Thank you. Counsel, we may have you fill out a form that just has everybody exactly just to help me on the bench.

We'll do the same for counsel on Defendants' side.

MR. DORSNEY: Good morning, Your Honor. On behalf of the CERT defendants, it's Cortlan Hitch from Morris James. With me today is Ken Dorsney from Morris James, Jeff Dyess, Benn Wilson, and Ashley Robinson from Bradley Caldwell.

THE COURT:  Counsel, just a couple of logistical reminders.  One is I know we have at least -- I think there's one other jury trial that's going to be happening in court this week, so there will be counsel for that trial as well.  And I know that the line downstairs can get long.  Last time I was going to take the bench as early at 8:15 each morning.  That was in part because we had 34 defendants and three sets of counsel and also because there was a lot of back and forth about whether the 15 hours per side that I allowed for trial time was sufficient, so I gave a little extra play to raise disputes beforehand.

I'll likely take the bench at 8:30 each morning to resolve disputes before we begin at 9:00.  Today our jury won't be up until 9:30, so we have time.  That said, I'd ask Counsel to be here sitting in the courtroom 15 minutes before we start, which may mean you need to get downstairs a significant amount of time earlier.  Do your best to make sure you're ready to go, and we'll go.

The other thing is if you'll send me an e-mail, as you did, the night before letting me know what disputes we might have to take up here in the morning.  Part of the point of that is to have a list, but part of the point of it is so that I can do a little prep, you know, oh, I see, issue one is going to be about blank.  Let's just take a look at blank beforehand so that I'm not coming in cold and

I can help the parties a little more efficiently.

I think what we got is just a listing. We can guess maybe at what the issue is. But it was helpful, I think, with regard to one or two of the disputes the parties attached the slides. But otherwise, we were kind of baffled. What are we going to be talking about about issue number 4? If you could just do me a favor and, like, for issue one, kind of what you did, it's blank, and here's the rules that are implicated, and here's one sentence per side about what's going on just so I can have an understanding.

With all that said, let's try to use our time well. Parties have, I think, five different issues they want to talk about. Why don't we start with Issue 1, and I think it's your side that is bringing the issue, Mr. Nemunaitis.

MR. NEMUNAITIS: Thank you, Your Honor. Do you have a copy of Defendants' opening slides, or would you like me to put it on the document camera?

THE COURT: Yes. These? Yeah, I do.

MR. NEMUNAITIS: Issue Number 1 relates to the contributory infringement ruling that Your Honor issued recently as well as one additional motion in limine we had filed.

On the contributory issue, as Your Honor knows, we were concerned they were focusing on incorrect laws

related to contributory infringement.  They were focusing on comparing the claims to refined coal in general as opposed to the specific refined coal that's accused in this case.

THE COURT:  If you could speak up a little bit, Mr. Nemunaitis.

MR. NEMUNAITIS:  Sorry about that, Your Honor. If you look at slide 19 of their opening presentation, it looks like this slide is comparing --

THE COURT:  The slides don't have numbers on them, unfortunately, so maybe if you could tell me what slide.

MR. NEMUNAITIS:  It's this one right here.

THE COURT:  Got it.  Okay.

MR. NEMUNAITIS:  So in this slide, they're comparing Section 45 refined coal in general to the asserted patents.  In the next slide, that's just the tax regulations.  But then following that, there's a timeline, which is slide 21.  And in that timeline right after they compare sort of refined coal in general to the patents, now they're comparing non-accused refined coal sold before the infringement time period and refined coal sold by non-accused entities to the patents-in-suit.  So we believe that at least it appears that they may be making the argument that we were afraid they were going to make and that you said would be the incorrect construction, and so

that is our objection to these slides.

The other issue with this slide is we had a motion in limine ruling.  It's Plaintiffs' motion in limine number 3, and this was granted.  We were concerned that they would make the argument that it's improper to or that something improper was done by filing continuation applications that could ultimately cover what's accused in this case.  And again, here it appears on their timeline.  They're comparing sort of the length of time when a continuation was filed to what's accused in this case, which could run afoul of that motion in limine.  So those are our concerns and objections to the slides.

THE COURT:  I think I understand what's going on with the first one.  I'm not really sure I understand about the second one.

On the first issue, because we had a lot of back and forth about this what coal counts, what refined coal counts, who's going to be saying what about refined coal, this is where in my mind I was after making all these decisions, so tell me if this is helpful for the parties.  After we went through all the process, when it comes to the elements of contributory infringement, in my view, and I think per my rulings, the only coal that matters for demonstrating that the elements are met is the refined coal that these particular defendants within the damages period

provided to the power plants at issue.

That said, the only way in which that I was made to believe it could be possible for Defendants to be making arguments that matter about other refined coal, refined coal that perhaps was sold by these defendants prior to the damages period, say years before to the power plants, et cetera, would be to the extent the defendants were going to make in the evidence -- make an argument about a mistake, that they didn't know or intend to induce or contribute to infringement because they had some mistaken view of what the law required and that that impacted their relevant state of mind.  And so that's -- coming into today, that's where I'm at.  I don't know what you're going to say about that.

MR. NEMUNAITIS:  Understood, Your Honor.  And that actually feeds into the second issue.  I'm familiar with that mistake of fact, mistake of law argument and that actually looks like it's coming up on the next slide where they go through the timeline of the pleadings in this case and various orders from Your Honor.  That issue didn't come up at the motion in limine stage but the first pretrial conference, and Your Honor explained that that was fair game.  But we pointed out at that point that that would only be fair game if that defense was properly disclosed.  And with regard to the remaining defenses, at certain points, that defense was not disclosed.  And we have copies of their

interrogatory responses here if I could pass them up to the Court.

THE COURT:  You can hand them up.  Sure.

MR. SYKES:  I'm sorry.  Can I grab one of those copies.

THE COURT:  Please hand a copy to the other side too.  Thank you.

MR. NEMUNAITIS:  So what I just handed up should include Defendants' response to Interrogatory 21.  And if you look at the current Defendants' response to Interrogatory Number 21, once you get past the objections, it's on page eight.  It says, "Subject to and without waiving the foregoing objections, Defendants state at this time Defendants are not asserting an opinion of counsel defense to Plaintiffs' claims of infringement in this action."  This was the interrogatory related to opinion of counsel defenses.

In contrast to that, if you look at what the Gallagher defendants provided in response to their Interrogatory Number 21, that was the listing of this defense that goes through the changes in the complaint and the argument therein.  And that was the argument about why it was disclosed.

THE COURT:  I'm not sure.  Is this the other document you gave me?  And where are you pointing me to in

that document?

MR. NEMUNAITIS:  Yes, one of those is CERT's responses to Interrogatory 21 and the other one is the Gallagher DTE.

THE COURT:  In the CERT one, you have highlighted the portion you want me to look, and I see what they're saying.  They were not making an opinion of counsel defense.  I think you were contrasting that with the comment of Defendants.

MR. NEMUNAITIS:  Correct.

THE COURT:  I don't know where you want me to look with that one.

MR. NEMUNAITIS:  With that one, not a particular sentence, just if you look through, it goes through the history of the complaint, and the nature of the statements, they are relying on this misunderstanding of the law.

THE COURT:  I guess my question is maybe they're not making an opinion of counsel defense, like my lawyers told me that blank, but I don't know maybe -- I don't know. Maybe their employees will say I just didn't think that we infringed or contributorily infringed because blank, separate and apart from something the lawyers told me.

MR. NEMUNAITIS:  That's possible, Your Honor, and I'd like to hand up one more document, if I may.

THE COURT:  Okay.

MR. NEMUNAITIS:  And so that should be the CERT defendants' responses including response to Interrogatory Number 9 which is on page 35, and there it says, "If you dispute infringement of any claim, state your basis."  And I would direct Your Honor to page 36, the next page, where at the very top it says, "Prior to this lawsuit, they had no knowledge of the particulars of the process employed by the above listed coal powered power plants, including whether any of these power plants utilized activated carbon processes to capture mercury."  But there's not a description of this current defense here.

THE COURT:  Okay.  So let's tackle this issue about which I'll summarize as what can be said about refined coal other than refined coal that was provided by these defendants in the damages period to the power plants at issue.  And I think you're asserting you acknowledge that you talked about the possibility that the defendants could assert a mistake of law defense, but you're asserting that based on statements they made in response to certain interrogatories, they would have had to have disclosed that defense and didn't sufficiently do so.  Does that summarize what you're saying?

MR. NEMUNAITIS:  Correct, Your Honor.  Yes.

THE COURT:  Let's hear from the other side.

MR. SYKES:  Thank you, Your Honor.  Paul Sykes

for CERT, Your Honor.  It's not an advice of counsel defense.  This is goes to the defendant's state of mind, which as the Court limited in one of its orders, which is front and center of the case.

THE COURT:  Mr. Sykes, so we're on the same page, it looks like from these slides you're going to be making reference, at least in regards to the timeline slide, I'm gathering, the refined coal these defendants made at a time period prior to the 2019 key date for damages.

MR. SYKES:  Yes, Your Honor.  The issue is what they knew and what they believed.  And what they -- their belief and the reasonableness of their belief, the credibility of those beliefs as to why they did not contributorily infringe.  And so it's the state of mind that they had shortly after the complaint was filed.  What had we been doing?  What was our history?  What did they learn about the complaint?  What the allegations were?

This is a case involving activated carbon injection used with coal and added bromine.  So their understanding of the case in view of their history, so why they believed and really believed there were substantial non-infringing uses and why that coal wasn't specially made and adapted and even if that view was later found to be incorrect legally, which I believe the definitive ruling in that case came in November 2023, their view and what they

believed during the period of alleged infringement, which was July 2019 to the end of 2021, is relevant to their state of mind.  And the basis for that and the reasonableness involves their history of what they've been doing.

THE COURT:  Understood.  Just so I have an understanding, though, am I right that the kind of -- the evidence you want to talk about and present that relates to refined coal other than the refined coal that I said is relevant to the elements of the contributory infringement claim, is it limited to refined coal that these defendants made prior to the damages period or is there other refined coal you're going to be talking about?

MR. SYKES:  It's refined coal that they made prior to the damages period and refined coal that our -- that the principals of these defendants were also aware of that their sister companies, who were defendants in this case from July 2019 to May 2022, were making.  So it is coal, refined coal, before the damages period and then also refined coal during the damages period that was accused of infringement for the entire time period that the alleged infringement was going on from July 2019 to December 2021, and all of that is the basis of their state of mind and what they believed and what they reasonably believed, and we think the jury needs to hear that evidence to establish the credibility.

THE COURT:  What does refined coal that other defendants were making during the damages period or as part of this case have to do with these Defendants' belief about what they were doing, what they were doing infringed?

MR. SYKES:  Well, the plaintiff has alleged, and this is in the complaint, that the CERT company, the defendants, were run by a small number of individuals, four principals, and that the knowledge of one principal is chargeable to every other company, and that's the basis for their taking their damages claims from the date on which the entity was added to the case and trying to get back to 2019.

Similarly, the knowledge of those principals, these four individuals, is their knowledge comes from what these other companies, who were defendants in the case through 2022, what those companies, those defendant companies, were doing during the lawsuit while they were being sued and while they were making refined coal.

THE COURT:  But I don't understand.  What does -- just explain to me.  The question is:  Did these defendants, your clients, did they believe that knowledge that they were contributorily infringing?  How does -- if there's evidence, well, defendant who's now dismissed over here, they made a certain kind of coal and here's the parameters of that coal, what does that coal and their knowledge of it have to do with whether they believe they

infringed?

MR. SYKES:  Okay.  They were making -- they had knowledge of refined coal made with the same formulation during the entire damages period of this lawsuit that was sold to a power plant that was not using it at any time with activated carbon.  And so their belief and their knowledge is that, well, it's the same formulation, 0.2 percent S-Sorb and 0.002 percent MerSorb applied to this coal that is being accused of infringement.  Well, currently being accused of infringement.

And also, is going to a power plant that allegedly uses activated carbon.  Refined coal with that very same formula is being sold at the same time during the lawsuit to a power plant that is not using activated carbon.  So that goes directly to their state of mind as to the "specially made and adapted" which is -- that is knowledge.

THE COURT:  Okay.  I think I understand your argument there.  Let me ask you to address the plaintiffs' argument that you in some way didn't disclose pursuant to discovery that you would be intending to make this defense, this mistake defense.

MR. SYKES:  The first thing I would say, this is not a defense.  It is part of the proof; right?  They have to prove, and Your Honor adopted our instructions.  They come straight out of the Supreme Court case, really two

Supreme Court cases, the *Global Tech* and *Collin* cases, and its their burden of proof to prove that we actually knew we were infringing.  And a good faith or reasonable belief that we weren't defeats that burden of proof that they have.

So it's not a defense.  It's not a classic affirmative defense.  So we're not advocating or pursuing an advice of counsel defense, which is an entirely different defense, but what we believed and why we believed it, how credible, and the facts, the evidence on which our clients formed those beliefs, the jury needs to hear that in order to evaluate the credibility.

THE COURT:  And in terms of whether it's a defense or not, I was handed up one interrogatory that just says if you dispute infringement of a certain claim, tell us why.  I think here you're saying this is an argument you're going to make about why you dispute infringement.  And they say that -- in response, Defendants said that prior to this lawsuit, they had no knowledge of the particulars of the processes employed by certain power plants, including whether they utilized activated carbon.

MR. SYKES:  Prior to the lawsuit, they didn't have that knowledge of the particulars.  After we were served -- and this goes to their pursuing claims for willfulness and willful blindness.  After we were served, our clients did an investigation, and I think you'll hear

testimony that -- there's two Mr. Greens.  Our client is Mr. Jeff Green.  Their expert is Mr. Philip Green -- that Mr. Jeff Green, our client, as part of the due diligence in not being willfully blind, reached out to power plants to understand what they were doing.  And so, again, state of mind and knowledge.  They didn't understand which power plants were using or had activated carbon equipment installed and which didn't.

THE COURT:  I got you.  Let me say this because I want to make sure I try to resolve as many as I can. Based on what I heard from both sides, it strikes that the arguments that Defendants say they're going to make with regard to what I'll call "other refined coal" are asserted to go to the mistake defense -- or not a defense.  This argument that they don't infringe, contributorily infringe, because they made a mistake about what the law requires but they didn't think they did.

And essentially, the arguments go to -- I said what the refined coal that counts is for purpose of the elements, but it's asserted it can't be an argument that the defendants believe other refined coal counted or -- in some way for purposes of knowing that you were doing something wrong.  I think that's an argument Defendants can make.  I haven't seen any -- I think the types of arguments that are described by Defendants' counsel here this morning by

Mr. Sykes strike me as falling in line with whatever I would have considered an appropriate argument to make, assuming the argument bears out.

There may need to be a corrective instruction at the end of the trial to make sure the jury can distinguish between what the law is what versus maybe what Defendants say their clients thought it was.  But I don't see any of the discovery responses that are put up before me as being sufficiently clear that Defendants should have and didn't say that they were going to make the particular kind of argument that they're making.  I don't have any reason -- my decision is I don't have any reason to strike or preclude any evidence with regard to this issue that I've seen so far.  Okay.

MR. CALDWELL:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Nemunaitis, you brought up another issue, I think, about the middle of three maybe that you raised that I said I wasn't totally sure I understood.  Is that the one you want to cover next?

MR. NEMUNAITIS:  We can move on to other issues, Your Honor.

THE COURT:  Fair enough.  Tell me what you think is -- what's the next one I need to take up?

MR. NEMUNAITIS:  Issue Number 3.

THE COURT:  Issue 3 says, "Argument on

noncomparable licenses, e.g., DTX 1926."

All right, Mr. Pearson.

MR. PEARSON:  Thank you, Your Honor.

We object.  This is a limited objection.  This is not a new motion in limine.  There are eight licenses that are from ME2C to power plants.  Defendants disclosed that they wanted to use those licenses during opening statements, and we object to the use of those licenses in opening statements by Defendants because they are noncomparable licenses.  Our damages expert opined that they were noncomparable.  The license agreements themselves are not going to come into evidence.  No one from Plaintiff's side is going to admit them into evidence.

Defendants used to have a damages expert that gave opinions on these licenses.  Defendants are not calling their damages expert.  Defendants do not have a witness through whom they can admit these noncomparable licenses.  I certainly understand that defendants may intend to cross-examine our witness on these licenses, and we don't object to that cross-examination, but our understanding is that opening statements should be about what the evidence will show, not a preview of whole type about you're about to see some really cool things on cross.

And because these licenses will only be, as far as we know, shown to the jury during Defendants' cross for

the first time, and I'm not exactly sure how they will or will not come in, but I don't think the documents themselves will be admitted into evidence, so we don't believe it would be proper to discuss them during opening.  If Defendants wanted to admit them, Defendants had the opportunity to call their own damages expert.

THE COURT:  Let me hear from the other side.

Mr. Sykes.

MR. SYKES:  Your Honor, this was squarely addressed by the Court previously in its oral order, MIL Number 2, Document 620, DI Number 620.  And the plaintiff sought to exclude these very license agreements from evidence.  And the statement in the Court's order is the first category relates to the discussion of the four settlement agreements by which certain former Defendants obtained dismissal from the case there.  Defendants note such agreements are relevant to damages.  Plaintiffs do not currently maintain an objection to the admission or discussion of such evidence.  The Court agreed to this.

THE COURT:  I think I understand.  That came at a point at which you had a damages expert who was going to be relying on these licenses as part of their testimony, and now the plaintiff says you don't have a damages expert, and these documents are not going to be admitted into evidence.

MR. SYKES:  So that gets to the second issue,

and that's that the plaintiffs' witness, Mr. MacPherson, the CEO, was examined as a 30(b)(6) witness on each of these agreements. He had personal knowledge. He testified he was familiar with them. And these are ME2C licenses, so he's the chief executive office, the 30(b)(6) deponent, had personal knowledge, and we think that these are actions by the party plaintiff. He actually testified under oath that his view was that these agreements, in particular the Vistra agreement, reflected the fair value of the plaintiffs' licensed technology.

THE COURT: Is what you're saying that you think you're actually going to be able to get these licenses in and admit them through the testimony of Plaintiffs' witness?

MR. SYKES: Yes, sir, absolutely. They had personal firsthand knowledge. They dealt with these. These are corporate acts of the plaintiff. There's foundation, personal knowledge, et cetera.

THE COURT: When you do that, you may ask the plaintiffs' damages expert about them and whether he considered them, et cetera?

MR. SYKES: Yes, Your Honor.

THE COURT: I'll hear what Mr. Pearson has to say about that. Thank you.

MR. PEARSON: There's no question that Mr. Sykes would be able to cross-examine our CEO about those

documents.  There's no question the documents or that evidentiary foundation would be able to be laid.

These are not photographs, Your Honor.  These are licenses that they are trying to build a damages case.  They're going to try to admit these licenses, and Mr. Sykes is going to offer the lawyer opinion that they are comparable and then use those licenses to argue about what the reasonable royalty should be in closing argument.

We think that's improper.  We don't think noncomparable licenses should be admitted into the record, and because he cannot lay a foundation of comparability, and even if were to lay some facts that he would argue went to comparability, it would still be a lawyer's argument that it's comparable.  That would make Rule 702.

THE COURT:  My question is in terms of whether the documents may be admitted into evidence.  It think Mr. Sykes says he'll be able to lay the foundation such that he can do that through your witness.  I don't hear you disputing as -- you may be able to dispute that, but for our purposes right now, you're not saying he couldn't do that?

MR. PEARSON:  I'm sorry, Your Honor.  I am trying to indicate that I dispute that as I do not believe, regardless of the foundation he may be able to lay for the document, that it would be proper under 702 to admit a noncomparable license agreement.

THE COURT:  I think you're saying your assertion is that even if foundation could be laid with regard to the document, that it wouldn't be proper to admit it under Rule 702 because you're saying you don't think it would be relevant; is that right?

MR. PEARSON:  Because I think there's an affirmative damages opinion that it is noncomparable.  I don't think the damages evidence in this case should be admitting noncomparable licenses.

THE COURT:  Is your expert going to speak to these licenses and say they're noncomparable?

MR. PEARSON:  Absolutely, Your Honor.  This is in paragraph 124 of his opening report.  That is my --

THE COURT:  Why can't Mr. Sykes cross-examine your expert with these now admitted licenses and question and test whether that opinion is accurate, whether they really are noncomparable or whether they're not?

MR. PEARSON:  He absolutely can cross-examine my witness, but my witness is not going to admit the exhibits into evidence, and, as I mentioned before, I don't think in our understanding of opening statements, we do not believe opening statements should be a preview to the jury of Mr. Sykes's cross-examination.

THE COURT:  I thought you said the problem was these documents were not going to be admitted as exhibits.

And exhibits that may be admitted, they can be talked about in openings.  But now we need to address that piece.

MR. PEARSON:  I do not believe the exhibits will be admitted as evidence.

THE COURT:  Because when offered, although foundation may be laid for what they are and what they say by a person of knowledge, they won't be appropriate to admit because they're not comparable.

MR. PEARSON:  And would lead to severe jury confusion for the jury to have to analyze licenses that are noncomparable.

THE COURT:  Then can't the defense -- they may not have a damages expert, but they can certainly -- they can question.  They can poke holes in your damages expert's testimony.  I think you're acknowledging they can do that.

MR. PEARSON:  Absolutely, Your Honor.  I believe they can do that without admission of the exhibits.

THE COURT:  They can do that with regard to issue of comparability and licenses.  That's a big issue, whether these licenses are comparable.  Your expert actually speaks to it?

MR. PEARSON:  Yes, Your Honor.  And if after poking holes in Mr. Philip Green's opinion they move to admit the exhibits at that point and I object then Your Honor finds that they did sufficiently lay a foundation of

comparability during that cross-examination, I understand the exhibits will be admitted at that point.  But that's a long way in the future, and we don't think a preview of cross-examination is appropriate during opening statements.

THE COURT:  With regard to this issue, I have not been convinced that these exhibits -- that there won't be, necessarily, a sufficient foundation for their admission or that they may -- it's clear to me that they can never be admitted as exhibits in the case.  In fact, sitting here right this moment, if we've got license agreements that the plaintiffs' damages expert talks about, speaks to with regard to the issue of comparability, if there's otherwise a foundation of personal knowledge about these exhibits such that they could be admitted, and if the defense intends to use -- to reference the exhibits to question the plaintiffs' experts view on that subject, it seems all very possible and doable.

And so in any event, I don't have a sufficient basis at this moment to strike reference to these exhibits from the defendants' opening slides, so I won't do so.

All right.  Got a few more minutes.  Maybe we'll address one other thing before we get started or we need to get back.  I think our jury is going to be up by 9:30, so I want to have a few minutes to get ready for that.

Mr. Nemunaitis, anything further on your list

you need to take care of?

MR. NEMUNAITIS:  I believe the last two issues were Defendants' issues.

THE COURT:  Mr. Sykes, is there anything you want to raise?

MR. SYKES:  There's one agreement, Your Honor, the AJG Gallagher Chem-Mod agreement, they have identified in opening, and we would like to move to exclude that under Rule 403 as unduly prejudicial.

THE COURT:  Which number is this, is this Issue Number 4 or 5?  I hadn't seen any of these exhibits and I don't know what the issue was.

MR. SYKES:  Yes, Your Honor.  It's Issue Number 4.  This relates to PTX 766, Your Honor.  And this is the settlement agreement between the prior defendants, AJG and Gallagher, but also very importantly Chem-Mod was a party to this agreement or is a party to this agreement.  If you recall, Your Honor, Chem-Mod is the CERT defendants' entities' licensor.  So Chem-Mod joined into this agreement on behalf of all of its licensees, and if you flip to the back page, Exhibit D, and they excluded the CERT defendants of course.

And we think that this agreement is a good example of one that should be excluded as unfairly prejudicial under Rule 403.  We direct Your Honor to the

*Wyser Dynamics* case that starts out with a general rule of disapproval of settlement agreements to establish a reasonable royalty. In that case, they excluded -- the Federal Circuit excluded a license that was entered into shortly before trial. We have that here. And that agreement, the lump sum license fee was six times larger than other licenses. In this case, this Chem-Mod license is eight to nine times larger than the next license that ME2C has granted and 45 times larger than the one below it.

THE COURT: Can I stop you. This is a license that the damages expert is going to rely on and you think it's not comparable?

MR. SYKES: We think it's not comparable and unduly, unfairly prejudicial.

THE COURT: I guess my question, my first thought about this is the plaintiffs' damages expert is going to be relying on a license, and you don't think they should rely on that. How come this didn't come up during the Daubert phase?

MR. SYKES: This occurred six or nine months after the Daubert phase, Your Honor. This occurred two or three days before the last trial.

THE COURT: Okay. This is one of the licenses from the defendants that settled right before the trial?

MR. SYKES: Yes, Your Honor. This is the

license of the DTE and AJG defendants, the other 25 or so defendants, and it wasn't just the defendants that entered into the agreement.  Chem-Mod, who was the licensor of the technology that our clients used to make refined coal at issue, Chem-Mod is a party to this agreement also.  So the jury will be hearing a lot about a lot of documents, exhibits about the Chem-Mod process, refined coal made with Chem-Mod, and Chem-Mod testing of the EERC, so it becomes very confusing.  We believe it will be incredibly confusing to the jury to be hearing that the defendants' licensor took a license to the plaintiffs' patents and so why are defendants -- why haven't they taken a license.

THE COURT:  I don't mean to interrupt, but I know we're tight on time.  So this is one of the sets of defendants that settled right before the last trial.  They entered into a license with the plaintiffs regarding that settlement.  Chem-Mod, who was a licensor of yours, for some reason is part of this license.  But didn't you tell me during the conference we had right before we postponed the last trial that these license agreements, the ones that these defendants that were recently in the case, they would be super relevant, really important?

MR. SYKES:  We said we needed to understand the plaintiffs' damages opinions on them and the other agreement, the Alistar agreement, was entered in.  So these

were entered into the night before that conference.  And the Alistar agreement is the one I actually referenced as being relevant.  And that one is certainly not anything we're super happy about now, having seen it and understanding what it's about.

At the time of the conference, we hadn't even seen the Alistar agreement.  This agreement didn't exist in this form at that time, Your Honor.  It was only a term sheet, and it wasn't clear to me, not seeing it until 8:00 or 9:00 the night before, but I hadn't appreciated it because it didn't have this long list of other licensees on it and dozens of refined coal companies.

This was entered into -- just to get the chronology for Your Honor, I think the term sheet was about November 9th, Thursday night November 9th.  We had the conference with Your Honor the morning of Friday November 10th, could be off by a day but I think this is correct.  And then this agreement, the full agreement we saw here, it was entered into December 28th, so six weeks later, and was produced to us within a week or so.  So we got this in January 2024.

And because of the incredible juror confusion that will result from Chem-Mod and who is Chem-Mod, why are they a party to this agreement or not, who is Chem-Mod -- they're going to hear a lot about a Chem-Mod process.  Why

are they a party to this agreement and why is CERT's licensor -- why did they take a license to ME2C's patents? And it leads naturally to this argument about whether it's spoken or unspoken if Chem-Mod took a license, these guys must infringe, and it's incredibly confusing and prejudicial, Your Honor.

THE COURT:  Thank you, Mr. Sykes.  I'll stop you there.  I'll ask Plaintiffs' counsel if they want to say anything about this issue before we wrap up.

MR. MCCARTY:  Your Honor, this is Warren McCarty for the plaintiff.

THE COURT:  During the trial, make sure you're projecting.  I'll do the same, Mr. McCarty.  Go ahead

MR. MCCARTY:  Yes, sir.  We heard about juror confusion potentially because of Chem-Mod, maybe some prejudice.  As Your Honor observed during the conference prior to the last trial that was postponed, this license is one of the reasons why the case was postponed, and Mr. Sykes on that call said on substance this agreement that has just been entered into is highly relevant to damages.  Your Honor made the same observation, given the nature of the parties.

This document is a document that is going to be used by the plaintiffs' damages expert.  It's a document that's going to be introduced through the CEO of the company who negotiated the license.  The witnesses in this case had

percipient knowledge of this license, and the parties have had a full and fair opportunity to address that license through the last several months.

THE COURT:  Thank you, Mr. McCarty.  I agree with the plaintiffs' arguments about why it is this license appears relevant.  It is entered to into by a group of, seems to me, fairly similarly situated defendants who were going to be a part of trial prior to the last postponement. I'm not saying, ultimately, the jury will be correct to believe this license is a good one to use in figuring out damages.  The defendants will have arguments otherwise.  But it certainly seems one, as was suggested during the conference right before the last postponement, could well be relevant to the issue of damages.

With regard to the issue of undue prejudice and Rule 403, it doesn't strike me necessarily that the Chem-Mod, an entity that the jurors will hear about in another context, is for some reason a part of this license is so confusing that it would be unduly prejudicial for this license to be discussed or admitted in this case.  For that reason, I'll deny Defendants' motion.

Counsel, we're about 9:20.  I hope we're on time and the jurors will be up here at 9:30.  So I need to close so we can prepare for the beginning of voir dire.  Do you have anything more?

MR. NEMUNAITIS:  One quick issue, Your Honor. Technically, the wording of one of the motions in limine deals with dropped claims and dropped parties and things like that.  It has an exception to be able to talk about settlement agreements like this one.  We wanted to mention it in opening.  I just want to make sure we were not going to violate the motion in limine by mentioning the agreement you said we could say in opening.

THE COURT:  What thing and what motion in limine?

MR. NEMUNAITIS:  Dropped claims and dropped issues in the case, essentially.

THE COURT:  With this license agreement, if your expert is going to be opining on why it's relevant to damages, yeah, it's going to be part of the case, and you can talk about it.  It doesn't obviate anything in that regard.

Mr. Sykes.

MR. SYKES:  Just briefly, Your Honor.  Can we get an instruction from the Court or direction from the Court?  The plaintiff, with that license agreement, they can't say because Chem-Mod took a license these defendants must infringe just to eliminate that argument.

THE COURT:  I don't know that the plaintiff is going to make that argument, first of all.  And I think we

talked about this in another context.  It could be the case that with regard to final jury instructions, if there is some potential for jury confusion with regard to Chem-Mod or its role in the case that you might be able to tell me, Judge, there needs to be some clarifying instruction with regard to determining the case.  I'm just not going to make a decision on it right now.

MR. DORSNEY:  Briefly, Your Honor.  Would you like up --

THE COURT:  Mr. Dorsney, you're asking about what the process will be for the seating of prospective jurors?

MR. DORSNEY:  So we don't have a problem.  Where would you like our extra folks to sit while we have the voir dire panel?

THE COURT:  Our jury administrator will be up here.  You'll have to ask her.  My understanding is she will be bringing in jurors, and they're going to be lined up and randomly assigned juror numbers as we talked about in the first pretrial conference.  In terms of how much space that's going to take up and where your folks should sit, she should be in shortly.

Thank you.  All right.  Then the Court will stand in recess.  Thanks, everybody.

(A recess was taken, after which the following

proceedings were had:)

THE COURT:  Welcome to our prospective jurors. Everyone, I'm Judge Burke, and on behalf of my colleagues here at the U.S. District Court for the District of Delaware, I just want to welcome you to our courthouse.  And we very much appreciate your participation in this voir dire process here today.

I'm now going to begin by asking you some questions which relate to your becoming jurors in this case. This part of the trial, as I mentioned, is called a voir dire examination of prospective jury members.  "Voir dire" simply means that you will truthfully answer questions which are asked of you as a prospective juror in this proceeding.

The purpose of the voir dire examination is, first, to gain knowledge about your attitudes concerning issues to be decided and questions answered in this case; second, to enable the Court to determine whether any prospective juror should be excused; and then third, to enable the counsel for the parties to exercise their individual judgment with respect to peremptory challenges, that is, challenges for which no reason need be given by counsel.

Now, my courtroom deputy is going to administer the oath because it's important that you answer the questions that I'm about to ask truthfully.  Let's have our

courtroom deputy swear in the panel.

(The venire panel was sworn.)

THE COURT:  Okay.  Ladies and gentlemen, you all have a printed copy in front of you, hopefully, that has -- that's supposed to have all of the questions that I'm going to ask you as part of this voir dire process listed on it, but I want to make sure you actually do have all the pages that you're supposed to have.

Just to let you know, you should have a document that you're holding that's an eight-page document, and in total, there's 19 questions on it.  And you'll know that because on the bottom of page 8 is the last question, it's Question 19, and you should have each page of that eight-page document.  I just want to make sure because there was a little bit of confusion that everybody has a full document of these voir dire questions in their possession with all the pages.  If anybody doesn't, if you could raise your hand and let us know.

Looks like everybody does.  Thank you.

And the reason I say that is because if you answer "yes" to any question -- you should also all have a pen.  Okay, great.  What I'm going to do is I'm going to ask that if your answer is "yes" to any of these questions, I'd like you to take your pen and just circle the number of that question.  So, again, circle any question that you have a

"yes" answer to.

After I finish reading all the questions, you may be asked whether you answered "yes" to any questions. And once I've completed all the questions, I may ask some of you who did answer "yes" to one or more questions to come back to the jury room to discuss your answers with the lawyers and me.  So let's begin.

First, I'll tell you that this is a timed trial, which means that each side has a set amount of hours in which to present their case.  The presentation of evidence in this case is expected to be completed either on this Friday, March 1st, or next Monday, March 4th.  Jury deliberations will follow, and we expect to be completed with the case by Monday, March 4th, or Tuesday, March 5th.

The schedule that I expect to keep over the days of evidence presentation will include a morning break of 15 minutes, a lunch break of at least a half hour, and an afternoon break of 15 minutes.  Trial will start each day at 9:00 a.m. and will finish no later than 5:00 p.m. each day.

So Question Number 1 is:  Does the schedule I've just mentioned present a special problem to any of you?

Next, I'm going to ask you some questions relating to the identification of the parties and their counsel.  These questions will be about the people involved in this case, so you can tell me if anyone here has any

prior dealings with anyone involved in the case.

Question Number 2 is that the plaintiffs in this case are Midwest Energy Emissions Corp. and MES, Inc. Together they will sometimes be referred to as ME2C. Question Number 2 is:  Have you or any of your close family members had any dealings with either of the plaintiffs?

Question Number 3 is that ME2C is represented by the Devlin Law Firm and the Caldwell, Cassady & Curry law firm.  The individual lawyers involved are James Lennon, Peter Mazur, Bradley Caldwell, Justin Nemunaitis, Warren McCarty, Daniel Pearson, Aisha Haley, Adrienne Dellinger, and Richard Cochrane.  Do any of you know or are you acquainted with these lawyers or any other lawyer and employees in their offices?

Question Number 4 is:  Do any of you have pending business or have you had business with those law firms or with ME2C?

Question 5:  There are 12 separate defendants and/or counterclaim plaintiffs in this case.  I'll refer to these parties as Defendants.  The defendants are represented by the same attorneys.  I'll tell you the names of these defendants and the counsel for them.  The defendants are CERT Operations II, LLC; CERT Operations IV, LLC; CERT Operations V, LLC; CERT Operations RCB, LLC; Senescence Energy Products, LLC; Bascobert (A) Holdings, LLC;

Buffington Partners, LLC; Larkwood Energy, LLC; Rutledge Products, LLC; Cottbus Associates, LLC; Spring Hill Resources, LLC and Marquis Industrial Company, LLC.

Now I'm actually going to ask you a question. There wasn't a question in Number 5, sorry about that. So if you have a "yes" answer, circle Number 6. Okay.

The question is: Have any of you had dealings with these entities?

Also, these defendants are represented by the law firms of Morris James, LLP, and Bradley Arant Boult Cummings, LLP. The individual lawyers involved are Kenneth Dorsney, Cortlan Hitch, Paul Sykes, and Jeff Dyess. Do any of you know or are you acquainted these lawyers or any other lawyer or employees in their offices? Do any of you have pending business or have you had business with those law firms? So if the answer is "yes" to any of those questions that is in Number 6, just circle Number 6.

Next, during the course of the trial, you may hear references to companies that are not parties to this case, including but not limited to Arthur J. Gallagher & Co. and Chem-Mod LLC.

Question Number 7 is: Have any of you or your close family members had any dealings with any of these companies or any people from those companies or have you or your close family members had any dealings with any company

that operates or provides services to a coal-fired power plant?  If "yes," circle Number 7.

Next question is about the witnesses.  I'm going to read a list of witnesses who may be called during this trial:  Rick MacPherson, Jim Trettel, John Pavlish, Michael Holmes, Edwin Olson, Philip Green, Philip O'Keefe, Catharine Lawton, Stephen Niksa, Connie Senior, Sally Batanian, Vince Inendino, Katherine Panczak, Christopher Berkimer, George Kotch, Vincent Verschueren, Leah Schaatt, Jeff Green, Thomas Erickson, Jay Gunderson, William Whitney, George Kotch, James Landreth, John Finlinson, Daniel Carro, and Larry Kuennen.

Question 8 is:  Do you know or are you acquainted with any of the people that I just named?

Now I'm going to ask you some questions about the nature of the case.  I'll tell you briefly about this case and the parties involved.

ME2C has sued each of the named defendants for patent infringement.  For now, I'll simply tell you that this case is an action for patent infringement under the patent laws of the United States.  ME2C owns several United States patents that relate to methods for capturing mercury from the emissions of coal-fired power plants.  ME2C has accused Defendants of indirectly infringing those patents by selling a product known as refined coal and by inducing the

power plant customers that purchase its refined coal to practice ME2C's patented methods without permission.

If the jury in this case finds the defendant to have indirectly infringed, then ME2C is seeking money damages from that defendant of $1 for each ton of refined coal that the defendants sold to an infringing power plant that used the refined coal to infringe the patents.

Each defendant denies infringement in this case and contends that ME2C is not entitled to damages.  Each defendant also contends that ME2C's patents are invalid.

During the trial, if you're selected for the jury, you'll be asked to make decisions to resolve these disputes between ME2C and the defendants.  I've briefly described the positions and contentions of the parties in the case.

So Question Number 9 is:  Do any of you know anything about this dispute other than what I've just described?

Question Number 10 is:  Have you, any members of your family, or close friends ever been involved in a patent infringement case or involved in a controversy over a patent?

Question Number 11 says that this case is specifically about patent infringement.  Does anyone have any beliefs or views about patent infringement lawsuits

generally?

Next, I have some questions about the technology that may be at issue in this case.

Question Number 12:  As I mentioned before, that the technology in this case deals with a way of capturing mercury emissions from coal-fired power plants.  Was anyone here familiar with that type of technology before today?

Question Number 13 is:  Has anyone here ever worked at a power plant?

Question Number 14:  Has anyone here ever worked with pollution control technology?

Question Number 15:  Has anyone here ever worked in the chemicals industry?

Question Number 16:  Has anyone here ever worked for an engineering firm or as a process engineer?

Question Number 17:  The technology in this case involves power plants that combust coal to generate electricity.  Does anyone here have strong feelings about coal to the point that you could not follow the law in deciding the case?

Next, a question about the burdens of proof and the law.  One of your duties as jurors is to take the law as I instruct you, apply it to the facts, and decide which party should prevail on the issues presented.  It is my responsibility to decide which rules of law apply to the

case and to instruct you on what legal principles to follow.

In addition, because this is a patent case I'll also provide you definitions of what certain terms of the patents mean. These are called the Court's claim constructions. You are bound by your oath as jurors to follow the Court's instructions and its claim constructions even if you personally disagree with them.

So Question Number 18: Would anyone be unable to follow my instructions in this case if you personally disagree with the instructions provided by the Court?

And then lastly, a concluding question which is Question Number 19: Is there anything else, including something you have remembered in connection with one of the earlier questions or that any of you think may prevent you from rendering a fair and impartial verdict based solely upon the evidence and my instructions as to the law?

Okay. All right. So I want you to circle the number of any questions for which you had a "yes" answer. What will happen now, everyone, is that I'll leave the bench. I'm going to have certain of the lawyers for each side, two per side, come back with me and my staff to my jury room, and then others of my staff members will work with you to figure out which of you we need to bring back, if any, to talk with us about any "yes" answers that you had, and we'll proceed as efficiently as we can to complete

the voir dire process.

I expect that the process will be completed by lunchtime, but it may take some time between now and then, so I just ask you to be patient with us.

All right.  Unless there's anything further, the Court will stand in recess.  Thank you.

(The following proceedings were had in chambers:)

THE CLERK:  This is Juror Number 2.

THE COURT:  Okay.  So you're Ms. Ellingsworth?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Welcome.  I'm with Plaintiffs' counsel and Defendants' counsel here.  I'm just going to ask you a few questions and they may have some follow-up questions.

So you had a "yes" answer to at least one question.  What question was that?

PROSPECTIVE JUROR:  That was the time period.  I take care of my grandchildren while my two daughters work, both in the hospital, and their days fluctuate during the week.  I'm supposed to do it tomorrow and Wednesday for one that's a nurse at Christiana.

THE COURT:  Okay.  So you're the primary caretaker for your kids' kids?

PROSPECTIVE JUROR:  Yes.

THE COURT: And you're scheduled to watch them tomorrow and Wednesday?

PROSPECTIVE JUROR: Of this week. It fluctuates during the week. They have different days. Sometimes it can be a Monday and a Thursday or a Tuesday and Friday.

THE COURT: Okay. Got it. And I guess the question would be: Would it be feasible or would you and your kids be able to make alternate plans for someone to watch the kids?

PROSPECTIVE JUROR: Pretty much everybody else works. I'm the only one that doesn't work so -- I mean, they'd have to take off from their jobs if we tried to get somebody else, is the thing.

THE COURT: Okay.

PROSPECTIVE JUROR: And one's husband is a principal at a high school and that would create a conflict there. It's just difficult, you know. I guess not impossible but difficult, especially since tomorrow is my first day because you're saying it would start now; right?

THE COURT: It will start today, yes.

PROSPECTIVE JUROR: It would be difficult to do, especially this week.

THE COURT: Okay. Let me ask if the plaintiffs' counsel has any questions.

MR. CALDWELL: I have no questions, Your Honor.

THE COURT:  Okay.  And Defendants' counsel?

MR. DORSNEY:  No questions, Your Honor.

THE COURT:  Ms. Ellingsworth, there were no other questions that you had a "yes" answer to?

PROSPECTIVE JUROR:  No, as long as I would understand what everybody was talking about.

THE COURT:  All right.  Well, thank you very much, ma'am.  I appreciate it.

PROSPECTIVE JUROR:  All right.  Thank you.

THE COURT:  Any applications Plaintiffs' side?

MR. CALDWELL:  None, Your Honor.

THE COURT:  Defendants' side?  I'm a little concerned about whether the juror could be available Tuesday and Wednesday.  She said it's not impossible but that it would be potentially pretty difficult.  Any concerns about that?

MR. CALDWELL:  I mean, I don't want to sound like I'm being insensitive about it, I just know that probably most of the folks who have come here today probably have to shuffle some things around so it wouldn't apply for a cause dismissal on that basis.

THE COURT:  On Defendants' side?

MR. DORSNEY:  I don't know if I would apply for a basis, but she's early, so if we're going to allow someone out for that reason, I'm sure they wouldn't object.

THE COURT: Okay. I'm concerned enough. It is early. We do have a lot of additional potential jurors. I'm concerned enough with her being a primary caretaker or at least appearing not to have any idea as to how they would fix that problem and they'd have to fix it by tomorrow and that concerns me. So I don't want to have a situation where we lose a juror on our second day. So I'm going to go ahead and strike Juror Number 2 for cause.

All right. We'll bring the next juror in.

THE CLERK: This is Juror Number 4.

THE COURT: Hi, sir. Come on in. Have a seat.

PROSPECTIVE JUROR: Good morning.

THE COURT: Good morning. Are you Mr. Dailey?

PROSPECTIVE JUROR: Yes, I am.

THE COURT: Okay. Welcome. These folks are with the plaintiffs' side and these folks over here are with the defendants' side. You had a yes answer to some of the questions?

PROSPECTIVE JUROR: Yes.

THE COURT: Tell me which questions.

PROSPECTIVE JUROR: 13, 14, and 15.

THE COURT: So 13 was: Have you ever worked at a power plant?

14 was: Anyone here ever worked with pollution control technology?

And 15 was:  Anybody here ever worked in the chemicals industry?

So tell me about your answers to those.

PROSPECTIVE JUROR:  Well, I'm a union plumber and pipefitter, and I worked at Delaware City Refinery for quite some time.  I'm familiar with, you know, pollution control technologies as far as scrubbers and things like that, and, you know, just dealing with being -- working around the refinery.  I'm not familiar with the chemicals per se but the piping side of it.

THE COURT:  Could you let the folks know at the refinery -- what kind of work does the refinery do?  What does it do with chemicals?

PROSPECTIVE JUROR:  Well, there's an acid plant down there.  They make propane gas, oil, you know, regular gas.

THE COURT:  Okay.  Now, in this case, I would be giving you a lot of instructions on what the rules are that you'd have to follow, things like how you should deal with evidence and how you should respond as a juror.  And the thing you'd have to be able to do is even if you had knowledge about something that might be related to the case from your work, you have to kind of make sure that whatever that knowledge is it didn't stop you from following the rules as I give you, including that the only evidence you

could consider is the evidence that we hear during the trial.  If I said that to you, would you be able to do that in this case?

PROSPECTIVE JUROR:  I believe so, yeah.

THE COURT:  Okay.  Let me see if the lawyers have any questions on plaintiffs side.

MR. CALDWELL:  At this point we're allowed to direct questions to the juror?

THE COURT:  You may, yes.

MR. CALDWELL:  Thank you, Your Honor.

Sir, is there anything in your experience at that refinery and pipefitter work that make you feel like you come in sort of already equipped with an understanding of how pollution control works at a coal --

PROSPECTIVE JUROR:  No.

MR. CALDWELL:  -- electrical plant?

PROSPECTIVE JUROR:  No.

MR. CALDWELL:  Have you ever worked with anything related to mercury capture?

PROSPECTIVE JUROR:  No, I have not.  Not that I'm aware of, but you know.

MR. CALDWELL:  Fair enough.

Would you say that your experience working at a refinery and as a pipe fitter -- I understand you said you'd follow the Court's instructions, but do you think your

experience working for a plant like that would maybe start you out leaning one way or another, like in favor of kind of the plant because the plant is sort of the type of place that would employ folks like yourself, like pipefitters and whatnot?

PROSPECTIVE JUROR:  Not necessarily, no.  No, I kind of keep an open mind to everything, you know.  I don't try and focus, you know, in on one thing, you know.

MR. CALDWELL:  I just want to make it clear.  I mean, the reason I'm asking is that I represent the plaintiff in this case.  They aren't a plant, and do you think the fact that I represent the plaintiff who is going to be looking at what they believe to be patent infringement at plants might start you out kind of leaning in favor of the other party?

PROSPECTIVE JUROR:  I don't believe so, no.

MR. CALDWELL:  You'd be able to apply the Court's rules fairly?

PROSPECTIVE JUROR:  Absolutely.

MR. CALDWELL:  Thank you.

THE COURT:  Defendants' counsel, any questions?

MR. DYESS:  I think I'd just ask a follow-on to that question.  You wouldn't be inclined to lean in favor of somebody who was more aligned with the plant in favor of the plant, would you.

PROSPECTIVE JUROR:  No.  Okay.  I was -- I didn't work directly for the refinery.  We're hired like a subcontractor, okay, through the union.  So, you know, I worked for Local 74 Plumbers and Pipefitters.  I did not work for Delaware City Refinery plant.  So as far as the plant operations and things like that, I have no clue on how it works, you know, other than them handing us blueprints and saying, you know, this pipe goes here or, you know, whatever the case may be.  But I did not work directly for the refinery itself.

MR. DYESS:  Did any of your experience as a pipe fitter, as a contract worker lead you to believe that industrial facilities like plants like refineries are bad people and other folks are good people?

PROSPECTIVE JUROR:  No.

MR. DORSNEY:  How many years did you work at the refinery?

PROSPECTIVE JUROR:  Six years full-time and then, you know, a couple years every now and then for a few months, but six years pretty much steady.

MR. DORSNEY:  And you said Local 74.  Is that a Delaware local?

PROSPECTIVE JUROR:  Yes.

MR. DORSNEY:  No further questions.

THE COURT:  All right.  Mr. Dailey, thank you.

I appreciate it.  She'll help you out.

Okay.  Any applications?

MR. CALDWELL:  No, sir.

THE COURT:  On defense side?

MR. DORSNEY:  No, Your Honor.

THE COURT:  Okay.  I agree.  The juror remains in our pool.

All right.  Let's bring in the next juror.

THE CLERK:  This is Juror Number 5.

THE COURT:  Is it Ms. Frosch?

PROSPECTIVE JUROR:  Frosch.

THE COURT:  Okay.  Please have a seat.  Thank you.  Welcome.

These are some folks here from the plaintiffs' side, lawyers, and then the lawyers for the defendants' side as well.

Ms. Frosch, you had some yes answers.  I think I heard my deputy say it was Question 1.

PROSPECTIVE JUROR:  It was Question 1.

THE COURT:  And what were the other ones just so I know?

PROSPECTIVE JUROR:  One I had a question on -- well, actually 7, 17, and 19.

THE COURT:  So 1, 7, 17, and 19?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Let's start with 1.  What was your question?

PROSPECTIVE JUROR:  Well, I didn't realize that the case could go into March thinking January, February was the date.  So as of Monday, I was planning -- we have a lake house up in northeast Pennsylvania, which is actually coal country.  That's my biggest issue here, and we had planned to go up there Monday through Friday this week.  Was not a big deal.  That was my biggest issue.

THE COURT:  Okay.  We do expect that it is possible, well, probably likely that the jury will have to sit on Monday of next week, maybe Tuesday too.  That's our best guess.  Theoretically possible that the jury could be concluded by Friday, but we have to assume Monday or Tuesday is possible.

I guess there, I notice you're retired.  If you were selected, would you be able to say, look, we had planned to go Monday, but yes, if I had to stay even if it was through Tuesday, I could do it, we could go Wednesday.  It wouldn't love, but I could do it.

PROSPECTIVE JUROR:  This might sound crazy, but I'm a very big planner.  This weekend -- my granddaughter is in high school.  She's graduating and it's her final musical, so we're going -- and that's out near Harrisburg.  We'll bring two of my other grandchildren.  We're going up

there then we have to take them home on Sunday.  One lives in Gilbertsville, one lives in Philly, and from there we were planning to drive up so we didn't have to drive back down here and go back up.

Technically, I could have my husband take the kids back and I would have to drive up separately.  I'm not a big driver.  It was bad enough driving into Wilmington today.  I was like, I don't miss working anymore, coming into the city.  That's my biggest reason.

I could make arrangements if I had to.  Would I like to?  No, but I can.

THE COURT:  Okay.  Your granddaughter's graduation, when is that happening?

PROSPECTIVE JUROR:  It's not until May, but this is her musical this weekend --

THE COURT:  Oh, it's over the weekend.

PROSPECTIVE JUROR:  -- and she's -- it's Saturday, and she's the lighting director.

THE COURT:  So you guys were bringing her upstate this weekend?

PROSPECTIVE JUROR:  My other kids -- we were bringing two of my other grandchildren to see the play --

THE COURT:  Okay.

PROSPECTIVE JUROR:  -- and then they're coming back down here and then we have to take them home Sunday.

THE COURT:  Okay.

PROSPECTIVE JUROR:  So that -- it was just logistics so I didn't have to drive three hours up to our lake on Monday, Tuesday, or Wednesday.

THE COURT:  So it would be difficult logistically, but you don't want to do it.  You could do it if you had to.

PROSPECTIVE JUROR:  I could if I had to.

THE COURT:  Okay.  Let me ask you then about Question Number 7.  This was the question about whether any of you or your family members had dealings with companies like Arthur J. Gallagher or Chem-Mod.

PROSPECTIVE JUROR:  It's none of those companies.  My thing is it's just this is coal-fired.  My grandparents worked in the coal mines years ago.  My grandfather died because of the coal mines.  We're originally from the Scranton/Carbondale area.  So that's just when I saw coal, I said I just need to let you know I have a history and a family history of coal-related issues.

THE COURT:  Okay.  And that was also related to Question 17 which was asking:  Does anyone here have strong feelings about coal?

PROSPECTIVE JUROR:  Right.  I mean, I grew up there.  I'm not a big fan of coal-fired things.  It's dirty.  I'll be honest with you, it's dirty.  You know, but that's

related to this.  I have no idea what any of this stuff is.

THE COURT:  Understood.  Now, in this case, the technology at issue and patents at issue relate to ways of trying to take pollutants out of coal, to make it in some ways less dirty.  On one side is a party that has a patent and they're going to be arguing that the other side, the defendants who worked with power plants that burned coal, infringed the patent, and the defendants are going to arguing, no, we didn't.

Would the fact that -- I will tell you that you will need to -- if you're a juror, you have to be fair to both sides, which means you'd have to follow the rules I gave you, and you couldn't come in saying, look, I don't love coal so if, like, I feel like one side or the other is too close to people who work with coal, they start out, like, kind of in a bad place with me.

Would you be able to come in and be fair, or would you hold it against one side if they had a relationship with burning coal or involved with coal?

PROSPECTIVE JUROR:  That's a hard question for me to answer only because that was a livelihood for my ancestors growing up in the coal country.  So that was very important to them.  That was their livelihood.  It's not a big part of it now, I just -- and I'm glad to see they're taking something out of the coal to make it eco friendly or

whatever.  It's tough for me to answer.  I'll be honest, it's very hard for me to answer that question.

THE COURT:  Okay.  The last question, Number 19 I think was, like, do you have any other -- any other thing. Was that kind of related to the schedule?

PROSPECTIVE JUROR:  Yeah, because I didn't know how to bring it all in to you just to let you know that that's my background.

THE COURT:  Understood.  Let me let the lawyers ask some questions now and see if I have any follow-up.

PROSPECTIVE JUROR:  Sure.

THE COURT:  Let's ask the plaintiffs' counsel first.

Mr. Caldwell.

MR. CALDWELL:  I don't have any questions.

THE COURT:  And Defendants' side?

MR. DORSNEY:  I'm sorry if this is a touchy topic, but you said you had a family member that had passed away from a coal-related disease?

PROSPECTIVE JUROR:  Yeah, it was my father's father.

MR. DORSNEY:  He worked in the coal mines for a number of years?

PROSPECTIVE JUROR:  He worked in the coal mines.

MR. DORSNEY:  Does it have anything to do with

black lung or something like that?

PROSPECTIVE JUROR:  I don't know exactly what it was.  I'm pretty sure it was, but he -- that was years ago and he -- many, many obviously.

MR. DORSNEY:  And has that influenced your view of coal in general over the years?

PROSPECTIVE JUROR:  I just look at coal as dirty, honestly, because living in the area, and what I remember as a kid, you'd go down through that area, it might be nice and pretty and snowy, not when the coal was burning. Or you'd see the hills burning with the coal coming through the hills and stuff like that.  So this was the impression that I was left with as a kid.

MR. DORSNEY:  Thank you.

THE COURT:  One last question.  Again, here in this case it's alleged that the plaintiffs' technology helps remove from coal, from burning coal, some bad chemicals, and that the defendants, it's alleged that they were doing things to help do that.

PROSPECTIVE JUROR:  Right.

THE COURT:  So in other words, based on what you've heard so far from what I told you about the case, is there anything you heard from either said where you'd say based on my experience with coal I don't think I'd like this side or that side or not necessarily?

PROSPECTIVE JUROR:  It's not necessarily.  I mean, I'm looking at it as it's progress, I guess.

THE COURT:  And as a juror, you would make every effort to follow my instructions?

PROSPECTIVE JUROR:  Yeah, I definitely would.

THE COURT:  Okay.  Ms. Frosch, anything further?

PROSPECTIVE JUROR:  Not that I can think of.

THE COURT:  The court deputy will help you step outside.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Applications from Plaintiffs' side?

MR. CALDWELL:  No, Your Honor.

THE COURT:  Any applications from Defendants' side?

MR. DORSNEY:  I think we should -- I guess we would make the application that she should not serve on the jury.  I think she had a difficult time answering your question directly as whether or not she would have some type of -- I know you did follow up with the question, but originally when she answered the question, she had a difficult time answering it one way or the other whether or not she would have some type of bias that would be brought into her decision-making.  She hasn't seen the evidence yet, so anything that is present now would be amplified in that process.  The fact that she's lost a family member due to a

coal-related disease and coal-related disease that she tied to pollution later on that she saw in the streets and the hills and during the snow, I think, makes her unqualified and unfit to serve on the jury.

THE COURT:  I guess one question I would have is -- I talked about this with the juror is, I mean, in a sense, like, on the defendants' side, you know, the allegation is they're working with power plants to really try to help the environment, in a sense, to provide coal to be burned in a more environmentally friendly way, kind of like the opposite of, maybe, someone who has said in the past one of their relatives had died of coal-related inhalation would be worried about it.  So, I guess, what's the argument there?

MR. DORSNEY:  Well, I think I was looking beyond that, Your Honor, to whether or not she's going to put an unwarranted value on the technology.  Maybe she credits both sides with the fact that we're trying to do something right but then she sees value in the technology that it does not belong, so then the damage figure does not accurately represent the benefit that the patented technology has really provided in the industry.  So I think that that would influence that.  So I was trying to go beyond that issue.

MR. DYESS:  I think I'd just supplement, Your Honor.  I think -- my opinion of how the evidence is going

to play out in this case is we're going to be more closely tied to the power plant.

MR. DORSNEY:  Because they're dirty.

MR. DYESS:  We're going to be -- I just think that's an unfair prejudice towards our side through that.  I think that natural connection is going to come out in the evidence.

THE COURT:  Okay.  All right.  Having heard everything, I am not going to strike this juror for cause at this time.  On the -- with regard to the questions about her schedule, although which no one is suggesting is a reason for cause strike, although she said it would be -- you know, take some struggling, she could serve on this jury.

And then with regard to the issue about coal, I do acknowledge that she has a relative who has had some serious experience with coal and its effects, but I think, ultimately, her answers to the questions didn't indicate to me off the top that she would necessarily have a bias with regard to either of the sides here, including Defendants' side in terms of what the nature of their work with power plants is, as I've described it.

To the extent there is some concern with the witness ascribing too much value to Plaintiffs' technology, I didn't hear anything that would suggest that coming out of her statements, and so I'm not going to strike this juror

for cause.  I'm going to leave her in the pool, subject to peremptory challenges, of course.

Okay.  All right.  Let's bring the next juror in.

THE CLERK:  This is Juror Number 8.

THE COURT:  Are you Mr. Bazemore?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Please have a seat here. How are you doing?

PROSPECTIVE JUROR:  Okay.  How are you?

THE COURT:  Good.  Thanks for being with us.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  I'm Judge Burke, as I said.  These are the lawyers on the plaintiffs' side, and they can introduce themselves, and these are the lawyers on the defendants' side.  I know you had a "yes" answer or more than one.  Which questions did you answer yes to?

PROSPECTIVE JUROR:  Just Number 1.

THE COURT:  Okay.  Tell me what your concern was there.

PROSPECTIVE JUROR:  Just because I'm still in physical therapy twice a week from a prior auto accident I had last year.

THE COURT:  Okay.

PROSPECTIVE JUROR:  So that -- just my trying to

see if -- make sure I can still make those scheduled appointments.

THE COURT:  When are your physical therapy appointments?

PROSPECTIVE JUROR:  It's usually Tuesdays and Thursdays, twice a week.

THE COURT:  And what time are they?

PROSPECTIVE JUROR:  Usually anywhere between 11:00 or 1:00, whichever one I can actually fit into.

THE COURT:  Okay.  Yeah, so we would -- if you were a member of the jury, you would have to be here between 11:00 and 1:00 this Tuesday and Thursday.  It's possible the case could even go until next Tuesday, like we said, although, that's probably the latest it would go.  So to serve, you would not be able to attend therapy this Tuesday or -- do you go both days or just one?

PROSPECTIVE JUROR:  Both days.

THE COURT:  Both days.  If you had to miss those appointments, is that doable?  I don't know in terms of maybe you can tell a little more about, you know, if you're comfortable, why you're going to therapy and would it be doable to not make them this week.

PROSPECTIVE JUROR:  Possibly, but I'm not a hundred percent sure because with my back doctor, he wanted many me to go to therapy for six weeks because I also have

an MRI scheduled at the end of this week for my neck and back.

THE COURT:  Are why are you going to therapy?

PROSPECTIVE JUROR:  From an auto accident I had. I was hit from the rear.

THE COURT:  And how long ago was that?

PROSPECTIVE JUROR:  This was August 14th of last year.

THE COURT:  Okay.  So your doctor has ordered that you go to therapy twice a week?

PROSPECTIVE JUROR:  Yeah.  I've been going to physical therapy ever since the auto accident.  So the last visit I had, I think it was, like, maybe two or three weeks with my actual back doctor, I was still having pain so -- from actually returning back to work just this December because I was out of work for about four months.  So just going back in, like, late December, I've still been having some pain.  So going back there for my follow-up visit, he recommended me getting that MRI just to check to make sure I don't have any nerve damage.

THE COURT:  When is your MRI scheduled for?

PROSPECTIVE JUROR:  I believe it's either the 28th or 29th this week.

THE COURT:  So you're supposed to get an MRI too this week?

PROSPECTIVE JUROR:  Yes.

THE COURT:  During the day obviously?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Let me see if the lawyers have questions for you.

MR. CALDWELL:  I don't, Your Honor.

THE COURT:  Okay.

MR. DORSNEY:  The MRI, I'm assuming it took a while to get that on the books?

PROSPECTIVE JUROR:  Yeah.  Well, it was pretty fast, but usually because they want that done prior to my next doctor visit that I have coming up in, I think, mid March.

THE COURT:  And you mentioned that you're still feeling some pain.  Do you feel pain when you sit for long stretches?

PROSPECTIVE JUROR:  Yeah, I do.  I mean, because a lot of my job is constantly walking, so usually once I kind of walk, the muscles kind of loosen up and once I sit, they kind of -- for a long period of time --

MR. DORSNEY:  They begin to tighten up again, right?  And you said you were involved in August?

PROSPECTIVE JUROR:  Correct.

MR. DORSNEY:  And you involved in litigation related to that --

PROSPECTIVE JUROR:  Yes.

MR. DORSNEY:  -- auto accident as well?

PROSPECTIVE JUROR:  Yes.

MR. DORSNEY:  Okay.  And you've been going consistently to therapy since then twice a week?

PROSPECTIVE JUROR:  Yes.

MR. DORSNEY:  Is that what the doctors recommended?

PROSPECTIVE JUROR:  Correct.

MR. DORSNEY:  Okay.  With that follow-up with the MRI this week; correct?

PROSPECTIVE JUROR:  Correct.

MR. DORSNEY:  Okay.  No further questions.

THE COURT:  Okay.  Thanks, Mr. Bazemore.  That's all we have.

Counsel, I'm inclined to strike the juror for cause.  Any objections there?

MR. DORSNEY:  No objection.

THE COURT:  So Juror Number 8 will be struck for cause in light of the fact that he's clearly got a serious injury that his doctor has ordered him to go to therapy for multiple times during the week he'd have to serve as well as having an MRI, and I don't want to mess with his health in that way.

Okay.  Let's bring in our next juror.

THE CLERK:  This is Juror Number 9.

THE COURT:  Good morning.  Mr. Brown, is it?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Have a seat, please.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  I'm Judge Burke again, and these are the plaintiffs' lawyers and the defendants' lawyers.  I know you had a "yes" answer to at least one of the questions.  What questions did you have a yes answer to?

PROSPECTIVE JUROR:  Number 6.

THE COURT:  Okay.  All right.  And Question Number 6 was:  Have you had any dealings with any of the lawyers for the defendants' side working at the Morris James firm or the Bradley Arant firm or including any of the lawyers working on this case?  Tell me about that.

PROSPECTIVE JUROR:  None of the lawyers working on the case, but I do know somebody that works at the firm.  Well, I'm not even sure if they're there anymore.

THE COURT:  Is this Morris James?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  Who is the person you know?

PROSPECTIVE JUROR:  Patricia Winston.

THE COURT:  Okay.  She's not there anymore.  She became a judge --

PROSPECTIVE JUROR:  Yeah, I heard that.

THE COURT:  -- at the Superior Court.  And how do you know Judge Winston?

PROSPECTIVE JUROR:  Childhood friends and, you know, we had a relationship at one point.

THE COURT:  Okay.  All right.  Now, she did used to work at Morris James.

And, Mr. Dorsney, how long did she work there?

MR. DORSNEY:  She worked there at least ten years that I was there before she took the bench.

THE COURT:  Okay.  All right.

MR. DORSNEY:  And, Your Honor, she did work in my litigation group.  Just full disclosure.

THE COURT:  Okay.  All right.  So I guess, Mr. Brown, the real question is just that I know you know Judge Winston from the past.  The question or concern would be, like, if for some reason -- coming into this case, I will tell you, look, you have to listen to my instructions, you have to follow all the rules I give you, and you couldn't come in, like, biased or in favor of one side or the other.  So is the fact that you know somebody who used to work for one of the law firms that is representing the defendants' side, would that mean that you would come in thinking the defendants were likely right or giving them some kind of edge, or would you be able to put that out of your mind and say, no, I got to judge this fairly?

PROSPECTIVE JUROR:  No, I wouldn't.  I just thought, you know, I'd be honest about it.

THE COURT:  Oh, no, that's great.  I appreciate it.  I guess on the flip side, like, we wouldn't want you coming in saying -- I don't know -- if you had not a good relationship with somebody who used to work there, you would hold it against them.  Would you do that?

PROSPECTIVE JUROR:  No.

THE COURT:  You wouldn't hold it against them; right?

PROSPECTIVE JUROR:  No, no.

THE COURT:  All right.  Let me ask if Plaintiffs' counsel has any questions.

MR. CALDWELL:  Briefly, thank you.

So obviously, my job is to fairly represent my client and make sure that they start out with everything even, and naturally our concern will be if your friend, your childhood friend you had a relationship with, apparently had a close working relationship with Mr. Dorsney and he's one of the few lawyers that will be on the other side against us, does that mean my client starts out a little bit behind? In other words, you don't know me from Adam but you feel like there's a connection with the lawyers on the other side?

PROSPECTIVE JUROR:  No.

MR. CALDWELL:  Could you be able to sort of set that aside completely and say, hey, you know, lawyers work for different people, whatever I knew about the past has absolutely no bearing on the parties in this case?

PROSPECTIVE JUROR:  Yeah.

MR. CALDWELL:  Thank you.

THE COURT:  All right.  Defendants' side?

MR. DORSNEY:  No questions, Your Honor.

THE COURT:  All right.  Mr. Brown, anything else?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, sir.  She'll show you out.

Applications for Plaintiffs?

MR. CALDWELL:  I'll make the application because I just -- I do feel like, I mean, it's not just, hey, it's somebody I knew kind of in passing socially.  It sounds like a long-term childhood friend with whom he had a relationship.  I think the fact that it was someone that worked closely with opposing counsel who was also elevated to a judgeship, it's, like, an imprimatur of legitimacy or just authority that I think we would start off with an uneven position on, and for that reason I would move to strike for cause because of that past relationship.  It sounds extensive.  I mean, it's not just kind of in passing.

THE COURT:  Okay.  Any applications on the defense side or any response?

MR. DORSNEY:  No application, but I've never had a relationship with this individual, nor did I know that Patricia had a relationship with this individual.  I don't think the fact that he knew somebody in our law firm as a child is a basis to strike this individual for cause when they have three peremptory challenges and they're welcome to use one of them.

THE COURT:  Okay.  I agree with the defense.  I am not going to strike Juror Number 9 for cause.  In part I say this, too, because just observing his demeanor when he answered the question, he was very firm, I think, in emphasizing that no, this would not be an issue, and I think that also had an impact on me as well.

All right.  So he'll remain in the pool and we'll move on to our next juror.

THE CLERK:  This is Juror Number 13, Mr. Murphy.

THE COURT:  All right.  Mr Murphy, come on in, have a seat.

PROSPECTIVE JUROR:  Good morning.  How are you?

THE COURT:  How you doing?  Good.

Mr. Murphy, I'm Judge Burke again and these are the lawyers for the plaintiffs' side and the lawyers for the defendants' side.  I know you had a "yes" answer to at least

one question.  Which questions did you have a "yes" answer to?

PROSPECTIVE JUROR:  I had a "yes" answer to a number actually.  1 --

THE COURT:  Question 1.

PROSPECTIVE JUROR:  7, 10, 11, and 19.

THE COURT:  Okay.  That's a lot.  All right.  So for Question 1, which was the one about the schedule, tell me about your answer there.

PROSPECTIVE JUROR:  The scheduling is more due because of my work.  I work for a company called Hologic, so I develop in R&D as a -- well, as part of an engineering team.  I'm a process technician, and I'll be going to Danbury, Massachusetts.  This is a delay in our research if I'm out this week.

THE COURT:  When were you scheduled to go to Danbury?

PROSPECTIVE JUROR:  I am scheduled to leave Wednesday, and it was supposed to be Wednesday, Thursday, Friday.

THE COURT:  What were you going to be doing there?

PROSPECTIVE JUROR:  So I'm going to --

THE COURT:  Just briefly.

PROSPECTIVE JUROR:  I'm not supposed to say.

Proprietary.

THE COURT:  Okay.  So I guess we could just suffice to say you're going to be doing work for Hologic there that has a client in Connecticut.

PROSPECTIVE JUROR:  I'm supposed to be going through our -- I'll say if I'm allowed to -- assembly line to develop our next phase for mammography.

THE COURT:  Okay.  Now, with regard to that, you know, no doubt a lot of prospective jurors have some stuff that they were expected to do this week for work.  One of the things we're trying to figure out is if they ended up getting selected to serve, even if it might be difficult to reschedule, have someone go in their place, et cetera, is it possible, is it doable?  You know, so if you were selected here.

PROSPECTIVE JUROR:  I'm not able to reschedule this.  Our plant up north is closing.

THE COURT:  Okay.  And so what would happen if you did have to serve and you couldn't make this trip?  What would the company do?  Do you know?

PROSPECTIVE JUROR:  I don't know.  We don't have anybody that has the 18 years of experience in mammography like I do.

THE COURT:  There's nobody else at the company that could do the work you were scheduled to do on this

trip?

PROSPECTIVE JUROR:  I don't know if anyone is going to Philly.  I don't know if they're going to be able to do it in the manner that I do it.

THE COURT:  Okay.  All right.

PROSPECTIVE JUROR:  It's concerning for our research.  You know, when you work on devices that impact lives daily, it's important to us and it's important to our research and, frankly, to our patients.

THE COURT:  Okay.  Question 7 was the one about do you have any -- you or your family members have any dealings with any people relating to some of the entities that might come up in the case.

PROSPECTIVE JUROR:  So Dave Walker.  And, again, I'm not sure of these names, but I figured it would be better to answer "yes" and ask those questions.

THE COURT:  Sure.

PROSPECTIVE JUROR:  And then I'm not sure of her last name, but my daughter's dance teacher, her name is Haley and I know that she works in -- they both work in nuclear.

THE COURT:  Oh, okay.  So Mr. Walker and then Haley, they don't necessarily work for -- the companies I mentioned by name were Arthur J. Gallagher --

PROSPECTIVE JUROR:  Coal-fired power plants,

yes.  I'm not sure if at this point they work -- I know they were power plants.  I'm not sure if it's coal fired because I know that Dave transferred.  I just -- work's been busy, I haven't talked to him.

THE COURT:  So Mr. Walker is somebody that you know who worked at a coal-fired power plant before?

PROSPECTIVE JUROR:  Nuclear.

THE COURT:  Nuclear power plant, okay.  And Haley, did she work at a power plant?

PROSPECTIVE JUROR:  Yes.

THE COURT:  What kind of power plant?

PROSPECTIVE JUROR:  I'm not sure.

THE COURT:  And how well do you know these folks, Mr. Walker, for example?

PROSPECTIVE JUROR:  Dave I grew up with.  We went to church together, and Haley is my daughter's dance teacher, so I don't know Haley all that well, but I do see her on a weekly basis.

THE COURT:  Okay.  As far as you know, either of the power plants that they might work for involve coal or burning coal?

PROSPECTIVE JUROR:  I haven't gotten into those kinds of conversations with Haley, and, you know, it's been a while since I talked with Dave just because of work.

THE COURT:  About how long would you say it's

been since you talked to Mr. Walker?

PROSPECTIVE JUROR:  Six months.

THE COURT:  Okay.  Question 10 was about whether you or any of your family or close friends have ever been involved in a patent infringement case or a controversy with a patent.  What about that?

PROSPECTIVE JUROR:  Yes.  So with Hologic, we've had one with Larry Ibbetson and another one regarding one of our -- I'm not allowed to speak on it, but one of our parts.  So yeah, I have big issues with this.

THE COURT:  Okay.  And were you personally --

PROSPECTIVE JUROR:  And that's kind of what makes --

THE COURT:  Let me just ask -- hold on.  And you say this is also related to your answer to Question 19?

PROSPECTIVE JUROR:  Yeah.  And that's where I'm like...

THE COURT:  And I guess also Question 11 was about saying, hey, the case is about patent infringement.  It sounds like your answer to this relates to all three of these?

PROSPECTIVE JUROR:  All three, yes.

THE COURT:  What is the -- let me just ask first:  Do either of these two cases that Hologic was involved in, did you have a personal role in either case?

PROSPECTIVE JUROR:  I did not, no.  It was -- it personally impacted me and friends of mine.

THE COURT:  And tell me about that.  It sounds like you have some feelings about that.

PROSPECTIVE JUROR:  Oh, I have a lot.

THE COURT:  If you could kind of summarize them, what is the nature of your feeling and why?

PROSPECTIVE JUROR:  So there was a lot of financial loss and that led to friends being let go.

THE COURT:  Do you mean that the company, Hologic, suffered financial loss?

PROSPECTIVE JUROR:  Yes, to a degree.

THE COURT:  Is it because in these cases they were found guilty of patent infringement?

PROSPECTIVE JUROR:  No, no.

THE COURT:  What was the loss due to?

PROSPECTIVE JUROR:  So -- and again, I'm not even sure if I'm allowed to speak on this, but we have a part that's actually currently being manufactured by another company because they somehow won that case, but we had the design.  And I'm not sure if it was a matter of the information was filed incorrectly, but we were the ones to come up with the design of the part.

THE COURT:  So in these cases, was it that Hologic had a patent and they were accusing somebody else of

infringing it?

PROSPECTIVE JUROR:  The vendor that we had, they now manufacture that part.

THE COURT:  But it's the idea that, like, in the cases that Hologic was the one who was losing money because somebody else was doing something against their patent?

PROSPECTIVE JUROR:  That was our design.

THE COURT:  Okay.

PROSPECTIVE JUROR:  And as a result, like, I had friends that, you know, I was really close with.  They don't work there anymore.  I'm fortunate that I was able to work there still just based on job knowledge.

THE COURT:  Now, in this case, there's going to be allegations from the plaintiff that the defendants' side infringes two of their patents.  Now, the defendants, they disagree.  They're going to say no, we don't.  And both sides are going to put on evidence about that.

I think the concern for us would be if you were to come in the case before you heard any evidence, if you were thinking that you were kind of predisposed to one side, like the plaintiffs' side --

PROSPECTIVE JUROR:  I am.

THE COURT:  You would be?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Even if I told you you had to try to

put that out of your mind?

PROSPECTIVE JUROR:  You know, and I'm -- I was nervous in the courtroom, and I'm sitting there in the back and I'm, like, well, you got to put that out of your mind, you've got to say no to that.  Like, you just got to just put that aside.  It is very difficult to put personal feelings aside and not have that.

THE COURT:  And you have these feelings in part because you saw how --

PROSPECTIVE JUROR:  Because I've seen firsthand twice with how that's turned out.

THE COURT:  Okay.  Let me let the lawyers for each side ask questions about these issues too.

Mr. Caldwell?

MR. CALDWELL:  Good morning.

PROSPECTIVE JUROR:  Good morning.

MR. CALDWELL:  So my client will be putting on, for example, the witnesses -- the inventor on the patent-in-suit.  He's going to talk about his history of working and developing his invention, filing for the patent, and getting a patent.  And it's going to be our contention and we're going to try to put evidence on that we believe shows that the defendants are using our patented technology without permission.  If that's what unfolds through the evidence of this court -- the evidence of this trial, are

you going to start out sort of leaning towards one party or the other based on kind of what you've been through in your own life?

PROSPECTIVE JUROR:  I mean, I've already kind of leaned there, and I know that's probably wrong.

MR. CALDWELL:  Well, if you don't mind me asking just to be specific, which way are you -- do you feel that you're already leaning?

PROSPECTIVE JUROR:  I am strongly opposed to anyone stealing anyone's information and research as someone who's put in 18 years of research and had that information.

MR. CALDWELL:  Thank you.

THE COURT:  All right.  Defendants' side?

PROSPECTIVE JUROR:  I'm sorry.  I just...

THE COURT:  No, we appreciate your candor.

On Defendants' side, any questions?

MR. DORSNEY:  No questions, Your Honor.

THE COURT:  All right.  Mr. Murphy, thank you. Thank you for coming in.  The clerk will show you out, okay.

PROSPECTIVE JUROR:  Do you mind if a take a minute?

THE COURT:  No, yeah.  Absolutely.  Take your time.  Take all the time you need.  Thank you, sir.

So I'm inclined to strike that juror for cause. Is there any objection?

MR. DORSNEY:  No objection.

THE COURT:  Okay.  And just for the record, I'm doing so because the juror, upon repeated questioning, could not say that he would not favor the side that owns patent rights, in fact said he would, and additionally seemed to get emotional in thinking about these issues, which I think showed the significance of that predisposition.  So Juror 13 will be struck for cause.

All right.  Let's move on to our next juror.

THE CLERK:  Juror Number 11.

THE COURT:  Okay.  So we're going out of order. Juror Number 11.

THE CLERK:  Juror Number 11, Mr. Bernardo.

THE COURT:  All right.  Hi, sir.  Come on in, have a seat.  You're Mr. Bernardo?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  All right.  I'm Judge Burke.  Good to be with you.  And these are some lawyers for the plaintiffs' side and these for the defendants' side.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Sounds like you had a "yes" answer to at least one of the questions.  What questions do you have a "yes" answer to?

PROSPECTIVE JUROR:  Number 11.

THE COURT:  Is that the only one?

PROSPECTIVE JUROR:  Yes.

THE COURT:  So 11 is, it says:  This case is about patent infringement.  Does anybody have beliefs or views about patent infringement lawsuits generally?  What are your thoughts about that?

PROSPECTIVE JUROR:  My thoughts about that is that while I'm not against all patent laws or anything like that, but I do know that sometimes patent laws are written or interpreted in such a way as to help, you know, established corporations against smaller corporations.

THE COURT:  So is what you're saying that you --

PROSPECTIVE JUROR:  Or to extend unfair -- extend advantages to powerful corporations or powerful interests beyond what the originals laws were.

THE COURT:  Got it.  So it sounds like what you're saying, tell me if I'm right, is that you understand there are patent laws and patents that are issued, which are legitimate, but you sometimes worry that sometimes people who get patents, if they're big corporations, can use them wrongly in a way to try to enhance their power.  Is that right?

PROSPECTIVE JUROR:  Yeah.  Or sometimes have the laws redeveloped or reinterpreted.  This doesn't apply to patents, but it applies to copyright, the way certain copyright laws have been created or reinterpreted so that,

for example, Disney Corporation has had patent copyright laws changed so that the Mickey Mouse character is always -- is never in public domain.  Sir Russ Condyle's estate has done similar things.

THE COURT:  Okay.

PROSPECTIVE JUROR:  That's my -- that would be a concrete example of my objection.

THE COURT:  Got it.

PROSPECTIVE JUROR:  But again, that's...

THE COURT:  Okay.  Now, in this case, you're going to hear that the plaintiffs, they have two patents --

PROSPECTIVE JUROR:  Yes.

THE COURT:  -- and they're alleging that the defendants infringed those patents, did something that essentially amounts to what the patents cover.  Defendants are arguing, no, we did not do that, and they're going to present evidence one way or the other.

I guess when you go into this case, when you go into the -- I'm going to give you rules and instructions you've got to follow, and the gist of them are going to be, look, whatever predispositions you have about patents or the people that own them, you can't put your thumb on the scale.  You can't go into the jury thinking, well, I -- separate and apart from the evidence here, I'm leaning towards one side or the other.

PROSPECTIVE JUROR:  Right.

THE COURT:  Would you be able to put any of your prior views about patents or people that follow them out of your mind and just confront the evidence fairly like I instruct you, or would that be difficult for you?

PROSPECTIVE JUROR:  I would be able to follow the evidence and interpret it according to the laws as, you know, written and the definitions that you would give me.

THE COURT:  Okay.  You wouldn't hold it against one side like the plaintiffs who have these patents?

PROSPECTIVE JUROR:  I don't know enough about this case to decide, so naturally I couldn't do that.

THE COURT:  You would have to wait hear more evidence about -- like, what kind of evidence the parties present.

PROSPECTIVE JUROR:  Look at both sides and make that decision, but the question did ask that question, and I wanted to make sure.

THE COURT:  No, no.  Yes, absolutely.  Was there another question that you had a yes answer to?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Let me let the lawyers ask questions.  Mr. Caldwell?

MR. CALDWELL:  No questions, thank you.

MR. DORSNEY:  If I understand this correctly,

you're a teacher; is that correct?

PROSPECTIVE JUROR:  Yes.

MR. DORSNEY:  Have you encountered copyright issues in your profession?

PROSPECTIVE JUROR:  Once.  Yeah, I was preparing -- I used to teach freshman composition classes a lot, and one of the ideas I had or got from another teacher was to produce a booklet, you know, with a binder of all assignments, all handouts, all policies for my classes and give to the students on the first day of class.  And I wanted to use an essay that I found online that I thought would be very helpful for my students to read, and I sent it over to the print shop for the college I was teaching in and they said, sorry, we can't do this because the essay is under copyright.  So then I had to remove that.  That's an experience that I've had.

MR. DORSNEY:  And what was the impact on your...?

PROSPECTIVE JUROR:  Oh, I just had to come down and revise my -- my thing.  I had to take that out and make other revisions.  It wasn't a major hardship case, but it was an example.  If you asked about my work -- someone invented where my work was affected by copyright laws.

MR. DORSNEY:  Okay.  Thank you.

THE COURT:  All right.  Thank you.

Mr. Bernardo, she'll show you out.

PROSPECTIVE JUROR:  Okay.  Thank you very much.

THE COURT:  Any applications?

MR. CALDWELL:  Not from the plaintiff.

THE COURT:  On defendants' side?

MR. DORSNEY:  No, Your Honor.

THE COURT:  Okay.  The juror will remain in the pool then.  We'll move to our next juror.

THE CLERK:  This is Mr. Hale, Juror Number 14.

THE COURT:  Mr. Hale, come on in, have a seat. Welcome.

PROSPECTIVE JUROR:  How are you?

THE COURT:  I'm Judge Burke again, and these are the lawyers for the plaintiffs' side and lawyers for the defendants' side.

Sounds like you had a "yes" answer to a least one of the questions.

PROSPECTIVE JUROR:  I did.

THE COURT:  Which question?

PROSPECTIVE JUROR:  The time.

THE COURT:  The first one?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Okay.  So tell me, why did you circle that?

PROSPECTIVE JUROR:  Just financially it's going

to be really tough to miss a week's worth of work and then all the projects I've got going on.  It's going to push everything back, and that's just going to push everything farther and farther back.  It's going to be hard to get stuff done.

THE COURT:  It says here you're a carpenter.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Do you have your own business or do you work for --

PROSPECTIVE JUROR:  I work for a general contractor, but I'm on my way back.  I was actually working on getting my business license myself.

THE COURT:  Okay.  And the GC you work for, as we said in the instructions, we expect the trial -- it's going to start today and it will end -- could end before this -- the latest we expect it to end is next Tuesday.  So it could be as much as seven days, could be a little less.  During that time, are you scheduled to be working?

PROSPECTIVE JUROR:  Yeah, every day.

THE COURT:  Every day.  Every workday?

PROSPECTIVE JUROR:  Yeah.  Saturdays usually.

THE COURT:  Okay.  And obviously, for all the jurors, if they got selected, many of them work.  There's only a few that are retired.

PROSPECTIVE JUROR:  Yeah, yeah.

THE COURT:  So we're trying to -- we know it's not easy and people sometimes have to shuffle things around, but I guess the question is:  If you were selected, knowing it wouldn't be easy, but could you and the GC figure something out?  Could someone either take your place or could you just not be working --

PROSPECTIVE JUROR:  It's me and him at the moment.  And then I've got dogs and chickens and a lot of stuff to take care of.  I'd have to get that sorted out.

THE COURT:  Okay.  What would happen if you had to serve?  What would the general contractor do on this job site?

PROSPECTIVE JUROR:  I don't know.  I guess he'd just have to do as much as he could by himself.

THE COURT:  When you -- you must go on vacation or be away from work sometimes.  When that happens, what happens?

PROSPECTIVE JUROR:  He's usually on vacation as well.

THE COURT:  Okay.

PROSPECTIVE JUROR:  But this is, like, our busy time.  We slow down in the summer because we work primarily on beach homes.  We're down at the beach.

THE COURT:  All right.  And where are you working this coming week?

PROSPECTIVE JUROR:  Fenwick Island.

THE COURT:  So at the beach on a house down there that's being renovated?

PROSPECTIVE JUROR:  We've got three or four projects going right now.  One in Bethany.

THE COURT:  Okay.  The GC you work for, does he also do some of this work himself?

PROSPECTIVE JUROR:  Yeah, yeah.  It's me and him.

THE COURT:  To it's like a two-person team.  If you were to serve here, it would just be a one-person team for next week?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Which would slow things down?

PROSPECTIVE JUROR:  Dramatically.

THE COURT:  Okay.  But if I ask you, lastly, is it possible?  I mean, could you do it?

PROSPECTIVE JUROR:  I mean, if I had to.  I don't want to go to jail.

THE COURT:  All right.  Let me ask either side if they have questions for you.

MR. CALDWELL:  One super quick question.  What type of work is it?  What is the trade that's your specialty?

PROSPECTIVE JUROR:  We're renovating homes.  So

it's everything from exterior carpentry to interior finish work.  Windows, doors, siding.  We don't do any roofing.  We sub out plumbing and electrical, but it's all that stuff.

MR. CALDWELL:  Okay.  Thank you.

No other questions for me, Your Honor.

MR. DORSNEY:  Is it a situation where you would have to make up the work on top of, like, next week's projects, or are you going to lose the ability to earn --

PROSPECTIVE JUROR:  I don't think we'll lose the ability, but it just pushes -- you know, we have electrical contractors waiting on us to get stuff done, plumbing contractors coming, tile guys.  You know, so it just pushes everybody back, and then that can really pile up because, you know, everybody wants their houses ready for summertime.  So that could really push us back.

MR. DORSNEY:  Yeah, I understand.  Thank you.

THE COURT:  One more question:  The place you're working on in Fenwick, after next Tuesday will you still likely be working on the same place?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  How long is that job expected to go?

PROSPECTIVE JUROR:  Well, it's a complete interior renovation, so they want to be done -- they'd like to have it ready for summer because it's a rental property.  You know, that's a source of income for them as well.

THE COURT:  Gotcha.  All right.  Thanks, Mr. Hale.  Appreciate it.  She'll show you out.

PROSPECTIVE JUROR:  All right.  Thank you.

THE COURT:  Any applications from Plaintiff?

MR. CALDWELL:  No, sir.

THE COURT:  And for Defendant?

MR. DORSNEY:  No, Your Honor.

THE COURT:  Yeah, I cannot strike the juror for cause.  He's clearly -- I think would like to be at work, but so would many of our jurors, and I think it just strikes me that the nature of his work is such that, you know, they may be delayed, but his partner, the general contractor, could handle some it and, again, just doesn't seem outsized in comparison to what we would hear from other jurors here that's an emergency.  So this juror will remain in the pool.

THE CLERK:  This is Juror Number 17, Mr. Kratz.

THE COURT:  Hi, Mr. Kratz.  Come on in, have a seat.  Welcome.  I'm Judge Burke again, and these are some lawyers for the plaintiffs' side and these are some lawyers for the defendants' side.

Sounds like you had a "yes" answer to at least one of the questions, and let me just ask:  Which questions did you have a yes answer to?

PROSPECTIVE JUROR:  13.  I worked at a power plant before.

THE COURT:  Okay.  Was 13 the only one you had a "yes" to?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  So right, it was anyone who worked at a power plant.  So what power plant did you work at?

PROSPECTIVE JUROR:  It was for a generating station in Portland, Pennsylvania for Metropolitan Edison Company.

THE COURT:  Metropolitan Edison, okay.  And what kind of a power plant was it?

PROSPECTIVE JUROR:  Coal fire and electric generation.

THE COURT:  Coal-fired power plant, so they burned coal there?

PROSPECTIVE JUROR:  Yes.  For electric.

THE COURT:  For electric.  Just for my purposes, what does it mean to be coal-fired for electric?

PROSPECTIVE JUROR:  I mean, there's two coal-fired boilers and they generated so much megawatts for electric energy --

THE COURT:  Got it.

PROSPECTIVE JUROR:  -- for that company.

THE COURT:  The power was used to generate electricity?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Got it.  All right.  Now, this case you'll hear and you have heard is going to involve coal in some way.  The patents at issue are about a way of trying to take mercury out of coal and to try to make the environment a bit cleaner.

You're also going to hear from the defendants' side.  The defendants worked with power plants who burned coal and that they sold them a certain kind of coal.  Of course, the thing we're concerned about is when we have jurors come in, I'm going to give them the rules and they have to follow them, and we also want to make sure that they don't have any biases, that they're not going to start the case, like, predisposed, no matter what they hear, to be for one side or the other.

In your view, does you experience with working at a coal-fired power plant, does it make you -- based on what you've heard so far, predisposed to think, well, the defendants must be right in this case or the plaintiffs must be right?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you have any thoughts one way or the other about, like, coal that you would say would bias you in some way or feel strongly about it?

PROSPECTIVE JUROR:  I think it's a cheap source

of fuel and I wish they would use more of it for generation.

THE COURT: And I guess any -- and then last question is: Again, if this case is about patents that are about trying to help people burn coal in a different way that's maybe -- you know, removes mercury, any thoughts about that technology one way or the other that might predispose you one way or the other?

PROSPECTIVE JUROR: No.

THE COURT: Okay. All right. Let me ask the lawyers if they have some other questions for you.

Mr. Caldwell?

MR. CALDWELL: Good morning. What's the rough time frame when you were working at a coal-fired power plant?

PROSPECTIVE JUROR: Between April of 1986 -- wait. Yeah, 1986 until probably April or something of -- or maybe it was the fall of 1988.

MR. CALDWELL: So a couple of years then, two, two and a half years.

PROSPECTIVE JUROR: Yeah, about. I think I was over there about a year and a half at that power plant.

MR. CALDWELL: Do you know where they got the coal from?

PROSPECTIVE JUROR: West Virginia.

MR. CALDWELL: Have you ever thought or given

any thought to coal emissions or whether there's sort of toxic aspects of coal emissions or anything like that?

PROSPECTIVE JUROR:  Not really.  I mean, they used low sulfur coal.  It didn't -- it didn't look like those power plants smoked a whole lot except when they started up, and that was on fuel oil.

MR. CALDWELL:  Okay.  So my client as a result of some research, we're going to contend they had inventions that, ultimately, lead to some patents, and they run a business where they will consult with power plants and try to help them with mercury emissions, and to some extent there's some similarity with the defendants in that they have worked with power plants on mercury emissions.

Does knowing that make you feel like you come into this case with sort of some preconceived notions about maybe, like, the value of emissions technology or the lack of value of emissions technology or anything like that that you walk in with because you've had this experience that maybe some of the other jurors haven't?

PROSPECTIVE JUROR:  No, not really.  I know it's all regulated and they have to make it as clean as possible.  It's probably even cleaner now than it had to be in the '80s. ]

MR. CALDWELL:  And are those regulations something that you already know anything about?

PROSPECTIVE JUROR:  Well, I was actually in the coal handling where they dump the coal, the cars, and then we had to take a sample of each car to make sure it had the right amount of -- I guess the quality of it.  I mean, I don't know.  I just took the samples, and then they shipped them to a lab and they -- I guess they wanted to make sure they were getting their money's worth and the best coal and the lowest sulfur.  I'm sure they had to operate under really strict regulations.

MR. CALDWELL:  Were you involved at all in the chemistry aspects in evaluating coal?

PROSPECTIVE JUROR:  No, just dumping it and transporting it up to the bunker in the power plant and making sure the bunkers didn't get empty.  And that's about it really.  It was entry level.

MR. CALDWELL:  I see.  Okay.  Thank you.  Thank you for answering my questions.

THE COURT:  Defendants' counsel?

MR. DORSNEY:  No questions, Your Honor.

THE COURT:  All right.  I guess one other question, Mr. Kratz, is:  You might have some -- I know it's been a long time since you worked at this power plant.  You might have some knowledge of some rules or regulations that were in place back then or the way that plant worked or whatever.  What I'd be telling you is:  Look, regardless of

any of that, what you need to consider is not that information but just the evidence you hear in this trial and the rules that I give you.  If I told you that, would you be able to focus just on that evidence, put out of your mind any evidence about some other power plant that you worked at all those years ago?

PROSPECTIVE JUROR:  Right.  Yes.

THE COURT:  All right.  Thank you, sir.  I appreciate your candor.  She'll walk you out.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Okay.  Any applications?

MR. CALDWELL:  No, Your Honor.

THE COURT:  Defendants' side?

MR. DORSNEY:  No, Your Honor.

THE COURT:  I agree.  So Juror 17 is not struck and remains in the pool.  I think if I'm right, that means that we have three jurors that were struck for cause. Numbers 2, 8, and 13, which would mean that we have 14 jurors in a row that are not struck for cause; right?

Let's just go over who we have on the list that is not struck for cause.  Hopefully it matches up with what's on there.

So these are the people that would be in the first 14:  Juror Number 1, Juror Number 3, Juror Number 4, Juror Number 5, Juror Number 6, Juror Number 7, Juror Number

9, Juror Number 10, Juror Number 11, Juror Number 12, Juror Number 14, Juror Number 15, Juror Number 16, and Juror Number 17.  That's 14.

All right.  So those 14 jurors will be our presumptive jurors in order, subject to the parties' peremptory challenges.  If the parties use all six peremptory challenges, the eight remaining will be the jurors.  If not, there's more than eight left, we'll go with the jurors that are 1 through 8 in the order that remain will be our jurors.  So that's where we stand.

Mr. Dorsney?

MR. DORSNEY:  And it will be your preference -- I think it typically is in this courthouse -- the first person in the jury box is the foreperson.  I just didn't know if you had a different way you were going to do it.

THE COURT:  It is, and I think that's said somewhere in the our -- it's in our current final jury instructions as well.  So yes, that's correct.

All right.  So again, just so we're all on the same page in order these are the jurors that are going to be subject to the peremptory challenges:  Juror 1, Juror 3, Juror 4, Juror 5, Juror 6, Juror 7, Juror 9, Juror 10, Juror 11, Juror 12, Juror 14, Juror 15, Juror 16, and Juror 17.

Okay.  All right.  And for counsel, will those 14 in order, will they simply be seated in the back in their

order or will you be putting them in the jury box?  So you'll see everyone up there in the order starting from -- and you're going to go -- just so our counsel knows, so they know who's who, Juror Number 1 will be in the first seat in the front?

THE CLERK:  There will be a little chart for you too.  I'll be placing them in that order.

MR. DORSNEY:  You'll pass it back and forth between the tables starting with Plaintiffs?

THE CLERK:  Starting with Plaintiff, correct.

MR. DORSNEY:  And we'll just put an X across is all?

THE CLERK:  Yes.  And then I'll make a note of who it goes to.

MR. DORSNEY:  Thank you very much.

THE COURT:  Okay.  Great.  So we'll take a short break to get reconstituted.  The way this is going, once we have our final jury, we will excuse the remainder of the jurors, we'll swear them in, then I'll go ahead and at least do the preliminary jury instructions now.  And then we'll see where that takes us on time.  If it takes us up to a nice point where we could have lunch, we might break for lunch and then openings afterward is my current thought.

MR. CALDWELL:  The patent video is in the preliminary instructions as well.

THE COURT:  Right.  So it's going to take some time.

MR. DORSNEY:  Your Honor, you said break.  Are we going to seat the jury before break, or are we all just gonna walk out for a break?

THE COURT:  So what we'll do is we'll finish peremptories, we'll excuse the remaining nonselected jurors, we'll swear in the current jurors.  And then my plan is to go right into preliminary jury instructions.  My guess is that will take enough time so that when we finish that, it will be the right time to break for lunch.  We'll break for lunch, come back, and do all the others afterwards.

MR. CALDWELL:  Do we have an opportunity to confer with colleagues for a few minutes before we exercise our peremptories or....

THE COURT:  You mean before we get started out there or while we're doing it out there?

MR. CALDWELL:  I guess that's what I'm asking ultimately.

THE COURT:  Both.  There will be some minutes before we set up now, and then you'll have some -- we're not going to -- you know, we'll give you, like, a reasonable period, a minute or two, to talk amongst yourselves while you have each one before you.  If it gets outsized, we'll cut it off.

All right.  So we'll go off the record then and we'll get set up for peremptories.

(The following proceedings were had in open court:)

THE CLERK:  Would the following jurors come forward:  Juror Number 17, Juror Number 16, Juror Number 15, Juror Number 14, Juror Number 12, Juror Number 11, Juror Number 10, Juror Number 9.  Also Juror Number 7, Juror Number 6, Juror Number 5, Juror Number 4, Juror Number 3, and Juror Number 1.

THE COURT:  We're now going to begin the portion of jury selection that involves the application of peremptory challenges, and my staff will work with the parties to do that efficiently.

THE CLERK:  Those of you in the juror box, if I call your number, you can return to the back of the courtroom:  Juror Number 3, Juror Number 5, Juror Number 9, Juror Number 11, Juror Number 16, Juror Number 17, and we're going to have you guys rearrange and have Juror Number 1 seated where you are.  You're going to be in the first seat in the back row.

Next to Juror Number 1 in the front row, we're going to have Juror Number 4.  Juror Number 12, you're going to take the second seat in the back row.

So the front row should have Juror Number 1, 4.

Juror Number 6, if you'll come forward to the front row and Juror Number 7 to the front row.

The back row should be 10, 12, 14, and 15.

THE COURT:  Thanks, everyone, for going through that musical chairs.

To all of our prospective jurors who are not in the jury box and instead in the back of the courtroom, you have not been selected to serve on the jury.

I just want to say to all of you on behalf of our court, we thank you and appreciate you for appearing here today and being prepared to serve as jurors.

In light of this, you are now excused, and you can gather your things, and our jury administrator will show you out of the courtroom.

You may be seated.  All right.  For our eight jurors, I'll turn to my courtroom deputy who will swear in our jurors.

(The jury panel was sworn.)

THE COURT:  Okay.  Ladies and gentlemen, just to tell you what we're going to do now:  Now that you've been sworn in, I'm going to read some preliminary jury instructions for you, and to help you follow along with what I read, we have copies printed out for you of those instructions.  I'll ask my courtroom deputy to hand those out.

Now, after I read these instructions and finish them, we'll take a break to let you settle in and have lunch before we proceed further.

All right.  Members of the jury, now that you've been sworn in, I have the following preliminary instructions for guidance on your role as jurors in this case.  These instructions will give you some general rules and guidance that might apply to any civil case.

And also because this is a patent trial, I'll also give you some additional preliminary instructions regarding patents to assist you in discharging your duties as jurors.

As I said, this is a patent case.  The plaintiffs in this case are Midwest Energy Emissions Corp. and MES Inc., which I may refer to as ME2C, or Plaintiffs.

The defendants and or counterclaim plaintiffs, who I'll refer to as Defendants for now in this case, are CERT Operations II, LLC; CERT Operations IV, LLC; CERT Operations V, LLC; CERT Operations RCB, LLC.  I may refer to these four defendants as the CERT Operations defendants.

And Senescence Energy Products, LLC; Buffington Partners, LLC; Larkwood Energy, LLC; Rutledge Products, LLC; Cottbus Associates LLC; Springhill Resources, LLC; and Marquis Industrial Company, LLC.  I may refer to these eight defendants as the CERT RC defendants.

ME2C is the owner of the two patents that are being litigated in this case.  These are United States Patent Numbers 10,343,114 and 10,596,517.  Collectively these patents may be referred to as the patents-in-suit, or the asserted patents.

Individually, patents are often referred to by their last three digits.  For example, U.S. Patent Number 10,343,114 may be referred to as the '114 patent, and U.S. Patent Number 10,596,517 may be referred to as the '517.

A copy of each of the patents has been given to you along with these preliminary instructions.

ME2C contends that each defendant infringes certain claims of each of the patents-in-suit and that defendants' infringement of the patents-in-suit has been willful.

The specific claims that ME2C contends are infringed may be referred to collectively as the asserted claims.  ME2C also seeks damages for the infringement. Defendants deny that they infringed the patents-in-suit and contend that the patents-in-suit are invalid.

Let me now turn to the general rules that will govern the discharge of your duties as jurors in this case. It will be your duty to find what the facts are from the evidence as presented at the trial.  You and you alone will be the judges of the facts.  You'll have to apply those

facts to the law as I instruct you at the close of the evidence.

You must follow that law whether you agree with it or not.  In addition to instructing you about the law, at the close of the evidence, I'll provide you with instructions as to what the claims of the patents mean.

Again, of course, you're bound by your oath as jurors to follow these and all the instructions that I give you, even if you personally disagree with them.  All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly.  Don't let any bias or sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

Also, don't let anything that I say or do during the course of trial influence you.  Nothing I say or do is intended to indicate or should be taken by you as indicating what your verdict should be.

The evidence from which you'll find the facts will consist of the testimony of witnesses and the documents and other things that are admitted into evidence.

The evidence may also include certain facts agreed to by the parties or that I may instruct you to find.

Certain things are not evidence and must not be considered by you.  I'll list them for you now.  First,

statements, arguments, and questions by the lawyers are not evidence.

Second, objections to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they believe testimony or exhibits being offered are not admissible under the rules of evidence. You shouldn't be influenced by a lawyer's objection or my ruling on the objection.

If I sustain or uphold the objection, and I find the matter is not admissible, then you should just ignore the question or document.

If I overrule an objection and allow the matter into evidence, then you should treat the testimony or the document just like any other evidence.

If I instruct you during the trial that some item of evidence is admitted for a limited purpose, then you must follow that instruction and consider that evidence for that purpose only. If this occurs during the trial, I'll try to clarify this for you at the time.

Third, testimony that the Court has excluded or told you to disregard is not evidence and must not be considered.

Fourth, you'll be shown charts and animations to help illustrate the testimony of the witnesses. These illustrated exhibits, called demonstrative exhibits, are not

admitted into evidence and should not considered evidence.

Fifth, anything you see or hear outside the courtroom is not evidence and must be disregarded.  You are to decide this case solely on the evidence presented here in the courtroom.

Now, you may have heard the terms "direct evidence" and "circumstantial evidence."

"Direct evidence" is simply evidence like the testimony of an eyewitness, which if you believe it, directly proves a fact.  So if a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining outside.

"Circumstantial evidence" is simply a chain of circumstances that indirectly proves a fact.  If someone walked into the courtroom wearing a rain coat with drops of water carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining outside.

It's your job to decide how much weight to give the direct and circumstantial evidence.  The law makes no distinction between the weight that you should give to either one, nor does it say that one is better than the other.

You should consider all the evidence, both direct and circumstantial, and give it whatever weight you

believe it deserves.

You are the sole judges of each witness' credibility.  You may believe everything a witness says or part of it or none of it.  You should consider each witness' means of knowledge, opportunity to observe, how reasonable or unreasonable testimony is, whether it's consistent or inconsistent, whether it's been contradicted, the witness' biases, prejudices, or interests, the witness' manner or demeanor on the witness stand, and all circumstances that, according to the evidence, could affect the credibility of the testimony.

Expert testimony is testimony from a person who has a special skill or knowledge in some science or profession or business.  This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

When knowledge of a technical subject matter may be helpful to the jury, an expert is permitted to state an opinion on those technical matters.

In weighing expert testimony, you can consider the expert's qualifications, the reason for the expert's opinions, and the reliability of the information supporting the expert's opinions as well as the factors I have previously mentioned for weighing testimony of any other witnesses.

Expert testimony should receive whatever weight and credit you think appropriate given all the other evidence in the case.  You're free to accept or reject the testimony of experts, just as with any other witness.

Next, in any legal action, facts must be proven by a required standard of evidence known as the "burden of proof."  In a patent case like this one, there are two different burdens of proof that are used.  The first is called "preponderance of the evidence" and the second is called "clear and convincing evidence."

As I noted earlier, ME2C contends that the defendants infringed certain claims of their two patents.  A party asserting patent infringement has the burden of proving infringement by a preponderance of the evidence.

A preponderance of the evidence is evidence that, when considered in light of all the facts, leads you to believe that what that party claims is more likely true than not.

To put it differently, if you were to put the parties' evidence on opposite sides of the scale, the evidence supporting ME2C's claims must make the scale tip somewhat toward its side.  If the scale should remain equal or tip in favor of the defendants, you must find for the defendants.

ME2C also has the burden of proving that any

infringement was willful, again, by a preponderance of the evidence.

As I noted earlier, in addition to denying they have infringed, the defendants contend that the asserted patents are invalid.  A party challenging the validity of a patent has the burden of proving by clear and convincing evidence that the patent is invalid.

Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.  Proof by clear and convincing evidence is, thus, a higher burden than proof by a preponderance of the evidence.

Now, some of you may have heard the phrase "proof beyond a reasonable doubt."  That burden of proof applies only in criminal cases and has nothing to do with a civil case like this one.  You should, therefore, not consider it in this case.

At this time, we're going to show a short video as an introduction to the patent system.  It contains some background information to help you understand what patents are, why they're needed, the role of the Patent Office, and why disputes over patents arise.

Why don't we play the video now.

(A video was played and previously transcribed as follows:)

JUDGE FOGEL:  Hello.  I'm Jeremy Fogel.  I've been a United States District Judge since 1998, and I am now the director of the Federal Judicial Center.  As you probably know by now, this is a patent case.  So you may be wondering, how can I sit in judgment on a case like this when I'm not entirely sure what a patent is?  We hope to answer that concern with this brief video, which will give you some of the background needed to do your job.

This case will involve some special issues that the judge and lawyers will explain to you, but all patent cases involve some basics that you will learn about.  This video will discuss what patents are, why we have them, how people get them, and why there are disputes that require us to call in a jury like you.  We'll also show you what patents look like.

The United States Constitution gives Congress the power to pass laws relating to patents.  Article I, Section 8, Clause 8 allows Congress to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.

A patent, then, is an official grant by the United States government that gives its owner certain rights to an invention.  Those include the right to stop others from making, using, selling, or offering for sale the

invention that is claimed in the patent.

A patent lasts for a specific period of time, usually 20 years from the date that the application is filed by the inventor.  But because it takes an average of three years for the Patent and Trademark Office to act on the application, the effective life of the patent is closer to 17 years.

A patent represents a bargain made between the government and the inventor.  In return for the right to prevent others from using the invention, the inventor must enhance the public knowledge of what we sometimes call the state of the art by adding something new and useful to it. A famous example is Thomas Edison's invention of the light bulb.  Harnessing electrical power for illumination transformed society and led to many other important breakthroughs.

During the lifetime of the patent, its disclosure may inspire new inventions, and after it expires, the invention is free for anyone to use.  It is this combination of something new and valuable to the public that justifies granting time-limited patent protection to the inventor.

A patent is in many ways like a deed to a piece of property.  It grants the owner the right to keep people off the property or to charge them a fee like rent for using

it.  And just as a deed indicates boundaries defining a landowner's property, a patent claim defines the patentee's domain.  The patent system works because the inventor is required to describe the invention in clear and specific terms so that the public knows what the boundaries of the invention are.

Once a patent is issued by the government, it becomes available for public inspection.  In that way, anyone who learns of the patent can read it and understand exactly what the inventor invented and the limits of the patent set forth in the claims.

Now that we understand what a patent is, let's take a closer look at the term "invention."  An invention is a new way of solving a problem or a useful new machine, manufacture, or composition of matter.  The patent process begins in the mind of the inventor, and in particular when the invention is formulated in the mind of the inventor.  Patent lawyers call this conception.  This is when the idea occurs to the inventor clearly enough that he or she can write it down and explain it to someone.

To qualify for a patent, the invention needs to be new and useful.  Also, it must not be obvious to one of ordinary skill in the field.  If the inventor believes these requirements are met, he or she will prepare an application for filing with the Patent and Trademark Office whose

headquarters are in Alexandria, Virginia, just outside of Washington, D.C.  The Patent and Trademark Office, often called the PTO, is the agency of the federal government whose job it is to examine patent applications to make sure they are in proper form and comply with the requirements of the law.

The inventor can prepare an application for filing with the PTO, but usually it is drafted by a patent attorney or a patent agent who specializes in what is called prosecuting patent applications.  That is the process by which they are evaluated.  The attorney or agent works with the inventor to be sure the invention is described and claimed in a way that complies with the law and the regulations of the PTO.  98 percent of patent applications are made online using the PTO's electronic filing system, although a few paper applications are still made.

When the PTO receives the inventor's application, it is first checked to see if it is complete and complies with all the PTO's application requirements. It then assigns the submission to a patent examiner, a staff person with a background in the field or art the invention falls within, to evaluate the application and decide whether a patent can be granted.

You've been given a sample patent to refer to as you watch this video, so you already have a sense of what a

patent looks like.  But now let's take a closer look at the three main parts of a patent.

To begin with, there are some basic identifying information on the first page.  This material is highlighted in your handout.  On the upper right side of the page is the number assigned to the patent by the PTO, and on the left side is a title that describes the invention and the names of the inventors and sometimes the company to whom they've assigned the patent.  Also on the left is the date when the patent application was filed and back on the right, the date when the patent was issued.

There also is more detailed information on the first page, including a list of numbers following the caption field of search.  These numbers identify previously issued patents the examiner looked at or searched to make sure the applicant's claimed invention really is something new, not obvious, and thus patentable.  Also listed on the first page are what we call references, that is, previous patents or articles that describe the technology or prior art known at the time the application was filed.

It may seem strange to you that we call this preexisting technology "prior art," even though it has nothing to do with artists.  We use the word "art" in its historical sense to include inventions and other subject matter reasonably related to the claimed invention.  We also

refer to the latest technology as state of the art, and we say of someone who can understand and apply the technology that he or she is skilled in the art.

The second major part of the patent is what we call the specification or written description.  As is the case in your sample, it is usually the longest part of the patent.  It includes an abstract, which is a brief summary of the invention, a background section that describes the nature of the problem the invention is supposed to solve, one or more drawings called figures that illustrate various aspects of the application, and a detailed description of one or more embodiments of the invention.  An embodiment is a specific device or method that uses the invention, such as a particular form of light bulb.

The third and most important part of the patent is the claims.  These are the numbered paragraphs that appear at the end.  The claims are what give the public notice of the boundaries of the invention.  They are similar to the description of property you may have seen in a deed referring to precise measurements taken on the ground.  The judge will instruct you further on how any technical or ambiguous terms in the patent claims should be understood.

Now that we've discussed the main parts of a patent, let's look at how the PTO processes patent applications, what we referred to earlier as prosecution of

the patent application.  This process begins when the inventor's application arrives at the PTO.  There, it receives a filing date.  Under the America Invents Act of 2011, filing dates will determine who is awarded the patent if there are competing valid applications.

In 2012, the PTO received nearly 600,000 patent applications and issued more than 270,000 patents.  After determining that the application is complete, the receiving branch also decides what field of technology an application relates to and assigns it to the appropriate examining group.  In order to make that decision, the patent examiner usually looks at patents that have been issued previously in the same or closely related fields of art.  The examiner has computer databases that contain information used to accomplish this task.

Another part of the job is to decide if the inventor's description of the invention is complete and clear enough to meet the requirements for a patent, including the requirement that the description enable someone of ordinary skill in the field to actually make and use it.

However, because the job of examining so many applications is challenging, the law requires the applicant to tell the examiner whatever he or she knows about the prior art that might be important to the examiner's decision

on whether to allow the patent.  We call this the applicant's duty of candor.

One way the applicant can satisfy this duty is by bringing pertinent prior art to the attention of the examiner, either in the original application or in other submissions called information disclosure statements.  In this way, the decisions of the examiner are based on both the information provided by the applicant and on the information the examiner finds during his or her prior art search.

Sometimes the examiner concludes that the application meets all the requirements we discussed and allows the patent to issue at this first stage.  But more frequently, the examiner will reject the application as deficient in some respect.  This decision will be communicated by the examiner in what is called an Office Action, which is a preliminary notice to the applicant of what the examiner finds insufficient or unpatentable.

For example, the examiner may reject certain claims as being unpatentable because a journal article written and published by another person prior to the effective filing date of the patent application disclosed what the applicant is currently claiming.  At that point, the applicant prepares a written response either agreeing or disagreeing with the examiner.

An applicant who agrees with the examiner can suggest amendments to the application designed to overcome the examiner's rejection.  Alternatively, an applicant who disagrees with the examiner's Office Action can explain the reasons for the disagreement.  This exchange of Office Actions and responses goes on until the examiner issues a Final Office Action which may reject or allow some or all of the applicant's claims.

The overall process is referred to as the prosecution history of the application.  The written incoming and outgoing correspondence between the PTO examiner and the applicant is also called the file wrapper. In the past, these file wrappers were all in paper form, as were the submitted applications.  Now they are most often electronic and may occasionally be paper as well.

Most patent applications filed on or after November 29, 2000, are published by the PTO 18 months after the inventor has filed his or her application so that the public may inspect it.

Once a final PTO Office Action has occurred and one or more claims have been allowed, the applicant is required to pay an issuance fee and the patent is printed. Then on the date shown in the upper right-hand corner of the first page of the patent, it is issued by the PTO, and the inventor receives all the rights of the patent.  That date

is highlighted on your sample.

Once a patent has issued, the inventor or the person or company the inventor has assigned a patent to can enforce the patent against anyone who uses the invention without permission.  We call such unlawful use infringement.  But the PTO and its examiners have no jurisdiction over questions relating to infringement of patents.  If there is a dispute about infringement, it is brought to the Court to decide.

Sometimes in a court case, you are also asked to decide about validity, that is, whether the patent should have been allowed at all by the PTO.  A party accused of infringement is entitled to challenge whether the asserted patent claims are sufficiently new or nonobvious in light of the prior art or whether other requirements of patentability have been met.  In other words, a defense to an infringement lawsuit is that the patent in question is invalid.

You may wonder why it is that you would be asked to consider such things when the patent has already been reviewed by a government examiner.  There are several reasons for this.  First, there may be facts or arguments that the examiner did not consider, such as prior art that was not located by the PTO or provided by the applicant.

In addition, there is, of course, the possibility that mistakes were made or important information

overlooked.  Examiners have a lot of work to do, and no process is perfect.  Also, unlike a court proceeding, prosecution of a patent application takes place without input from people who might later be accused of infringement, so it's important that we provide a chance for someone accused of infringement to challenge the patent in court.

In deciding issues of infringement and validity, it is your job to decide the facts of the case.  The judge will instruct you about the law, which may include the meaning of certain words or phrases contained in the patent.  So it is your primary duty as jurors to resolve any factual disputes and, in some cases such as infringement and validity, to apply the law to those facts.

To prove infringement, the patent holder must persuade you by what is called a preponderance of the evidence relating to the facts of the case that the patent has been infringed.  To prove invalidity, the alleged infringer must persuade you by what is called clear and convincing evidence that the patent is invalid.

The judge in your case will explain these and other terms and provide additional specific instructions at the appropriate time.  Good luck with your task, and thank you for your service.

(The video ended.)

THE COURT:  All right.  Ladies and gentlemen, just a few more preliminary instructions before we'll let you break for lunch and get situated.

Next, let me tell you that the claims of the patent, as you've heard, define the patent owner's rights under the law.  That is, the claims define what the patent owners may exclude others from doing during the term of that patent.

The claims may be divided into a number of parts or steps referred to as claim limitations.  The claims of a patent serve two purposes.  First, they set the boundaries of the patented invention, what the patent covers, and, second, they provide notice to the public of what those boundaries are.

It's the claims of the patent that are infringed when patent infringement occurs.  The claims are at issue as well when the validity of a patent is challenged.

In this case, we will be concerned with Claims 25 and 26 of the '114 patent, and Claims 1 and 2 of the '517 patent.

While the claims define the invention, sometimes the words or phrases in those claims need to be further defined or interpreted.  This has been done already in the case, and a copy of those definitions are included in your juror notebooks.

You must accept the definition of these words or phrases in the claims as correct.  For any words or phrases in the claims for which you have not been provided with a definition, you should just apply the ordinary and customary meaning.

You should not take the definition of the language in the claims as an indication that I have a view regarding how you should decide the issues that you're being asked to decide, such as infringement and invalidity.  Those issues are yours to decide.

In this case, you must decide things according to the instructions I'll give you at the end of trial. Those instructions will repeat this summary and will provide more detail.

You must decide, first, whether ME2C has proven by a preponderance of the evidence that each defendant induced infringement by a power plant of one or more of the asserted claims of the '114 and the '517 patents.

Next, whether ME2C has proven by a preponderance of the evidence that each of the CERT RC defendants contributed to the infringement by a power plant of one or more of the asserted claims for the '114 and '517 patents.

If you decide that ME2C has proven that a defendant infringed one or more of the asserted claims of the patents, whether ME2C has proven by a preponderance of

the evidence that that defendant willfully infringed that claim.

Next, whether Defendants have proven by clear and convincing evidence that one or more of the asserted claimed of the '114 and '517 patents is invalid.

Then, if you decide that ME2C has proven that a defendant infringed a claim not shown to be invalid, you must decide what monetary damages ME2C has proven by a preponderance of the evidence that it is entitled to.

Now, a few words about your conduct as jurors. First, I instruct you that during the trial, you're not to discuss the case with anyone or permit anyone to discuss it with you.  Until you retire to the jury room at the end of this case to deliberate on your verdict, you're simply not to talk about it.

If any lawyer, party, or witness does not speak to you when you pass them in the hall or ride the elevator or the like, remember, it's because they're not supposed to talk with you nor you with them.  In this way, any unwarranted and unnecessary suspicion about your fairness can be avoided.  If anyone tries to talk to you about the case, bring it to the Court's attention promptly.

Second, do not read or listen to anything touching on this case in any way.  By that I mean if there may be newspaper or internet articles relating to the case,

don't read the article or watch or listen to the report.

Third, don't try to do any research or make any investigation about the case on your own.  Let me elaborate.

During the course of the trial, you must not conduct any independent research about the case or the matters in the case or individuals or entities involved in the case.

In other words, you should not consult dictionaries or reference materials, search the internet, websites, blogs, or any other electronic means.  Again, should there happen to be a newspaper article or radio or television report relating to this case, don't watch or listen to the report.

It's important that you decide this case based solely on the evidence that's presented in this courtroom. Please do not try to find out information from any other sources.  I know that many of you use smartphones, tablets, the internet, and other tools of technology.

You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case.  This includes your family and friends.  You may not communicate with anyone about the case on your cell phone or smartphone, through e-mail, through tablet, text messaging, Twitter, Snapchat, or Whatsapp or any blog or website or any internet chatroom or by way of any other

social networking websites including Facebook, Instagram, LinkedIn.

Finally, don't form any opinion until all the evidence is in.  Keep an open mind until you start your deliberations at the end of the case.

You'll also be given a notepad and a pen.  If you wish, you may, but you're not required to, take notes during the presentation of evidence, the summation of the attorneys at the conclusion of the evidence, and during my instructions to you on the law.

Notes can be helpful to you because at the end of the trial, you must make your decision based on what you recall of the evidence, but don't let note-taking distract you to the point that you miss hearing other testimony from the witness.

Your notes are only to be used as aids to your memory, and if your memory should later be different from your notes, then you should rely on your memory and not your notes.

Also keep in mind that you will not have a transcript of the testimony to review, so above all your memory will be your greatest asset when it comes time to deliberate and render a decision in this case.

If you do take notes, you must leave them in the jury deliberation room, which is secured at the end of each

day, and remember that your notes are for your own personal review.  At the conclusion of this trial, your notes will be collected and destroyed without review.

I'll give you details on the law at the end of the case, and those instructions will control your deliberation and decisions.

As I mentioned, to assist in your deliberations, you've been provided with a notebook that contains the following:  A glossary of patent terms, a sample patent that was mentioned in the video we just saw, the Court's claim constructions, and copies of the patents-in-suit.

These materials have been jointly submitted by the parties, so please refer to them to assist you during the trial.

During the trial, it may be necessary for me to talk with the lawyers out of your hearing by having a bench conference, which is also called a sidebar.  If that happens, please be patient.

We're not trying to keep important information from you.  These conferences are necessary for me to fulfill my responsibility to be sure that evidence is presented to you correctly under the law.  If you would like to stand or stretch or walk around the jury box while we're at sidebar, you should feel free to do so.

This case will now begin after we break for

lunch and give you all time to deal with affairs.

But when you -- after you come back after lunch, first ME2C may make an opening statement outlining its case. Then Defendants may make an opening statement outlining their case.

Opening statements are not evidence. Their only purpose is to help you understand what the evidence will be.

Next, the parties will present their evidence. ME2C will first introduce its evidence that it believes supports its contention that Defendants infringed the asserted claims.

When ME2C is finished, Defendants will introduce evidence to defend against ME2C's allegation of infringement and will introduce evidence that they believe supports their contention that the asserted claims are invalid.

When Defendants are finished, ME2C will have the opportunity to introduce evidence to defend against Defendants' allegations of invalidity.

After all the evidence is in, I'll give you instructions on the law and describe for you the matters you must resolve.

The lawyers will then offer closing arguments. The closing arguments are not evidence. Their purpose is to summarize and interpret the evidence for you and to tie the evidence to the issue. You'll then retire to the jury room

and deliberate on your verdict.

Though you have heard me say during the jury selection process, I want to again outline the schedule I expect to maintain during the course of this trial.

As I mentioned previously, the presentation of evidence in this case is expected to be concluded Friday this week or Monday of next week, with jury deliberations.

We will normally begin the day at 9:00 a.m. and continue until 5:00 p.m.  There will be at least one break every morning and at least one break every afternoon.  There will also be a lunch break each day.

The only significant snafu to the schedule may occur when the case is submitted to you for your deliberations.  At that point, you'll be able to deliberate as late as you wish.

Please keep in mind this is a timed trial.  That means I have allocated each party a maximum number of hours in which to present all portions of its case.  This allows me to tell you that we expect to be completed with this case by Monday, March 4th, or Tuesday, March 5th.

Of course, you can help me keep on schedule by being here promptly each morning and being ready to proceed at the end of each break.

One final word.  I told you when I intend to take breaks and how often I aim to take breaks, but if any

of you need an additional break at any time, that's fine. You just need to get my attention or my assistant's attention. That can be done usually by waving your hand or, if need be, standing.

So, ladies and gentlemen, those are the preliminary instructions we have for you.

Now we're going to have our jury removed so they can have lunch and get situated back there, and then we'll take ours.

(The jury exited the courtroom.)

THE COURT: Please be seated, everybody.

It's 12:30 now. I'll ask counsel to be back and ready to go by 1:00. In practice, we take at least a half hour for lunch.

Also, I saw the parties submitted some -- you had some disputes about depositions. It looks like they don't need argument on that but want me to decide them for tomorrow based on the papers.

I can do that. It may not be until the end of the day that I get you decisions. If there was one of two of them, I wouldn't charge you for it. But because there's many, I will be charging you for the time it takes me to resolve the disputes.

If between now and the end of the trial day you can reduce the number of disputes, that's great, let me

know.  Otherwise, I'll expect at the end of the day I'll have to resolve all these disputes, and the time will be charged against the losing side, and we'll let you know what that time is.

Unless there's anything further, we'll take our lunch break.

(A luncheon recess was taken, after which the following proceedings were had:)

THE COURT:  We'll bring the jury in.

MR. CALDWELL:  Your Honor, in a half a second, may I tell you something I want to do to make sure it's okay quickly?

Well, I know the rule is going to be invoked, so our plan is it applies to one witness.  He won't be here for any other witness testimony per Your Honor's instructions.

My expectation is he would watch openings and then take him out of the room before any other witness testifies.  I just want to make sure that's okay with Your Honor and that comports with your understanding of how we should -- how we should use the rule per Your Honor's orders.

(Reporter clarification.)

THE COURT:  So each side will have a client representative that can be present throughout the trial without invoking the rule, but is there some other witness

that you're talking about?

MR. CALDWELL:  One other fact witness, the CEO of Midwest Energy.  We just want him in here for the opening, and then we would sequester him before he -- before the other witness testimony, which is how we thought Your Honor's order was.

We just didn't want to be surprising you if you thought he should be gone for opening as well before the evidence actually starts.

THE COURT:  Okay.  Is this objected to?  Is there any --

MR. CALDWELL:  Just -- there's not an objection.

THE COURT:  Okay.  No worries.

Send the jury in.

(The jury entered the courtroom.)

THE COURT:  We'll begin our trial, and I'll turn to Plaintiffs' side first to ask if they wish to make an opening statement.

MR. CALDWELL:  Yes, Your Honor.

THE COURT:  Please come forward.  Mr. Caldwell.

MR. CALDWELL:  Thank you, Your Honor.  May I have just a moment to set up an easel I believe I expect to use?

THE COURT:  You may.

MR. CALDWELL:  I'm guessing I'll start here.  If

the Court or the jury can't see it, I'm obviously happy to move it.

Thank you, Your Honor.  May I proceed?

THE COURT:  You may.

MR. CALDWELL:  Good afternoon.  I'm grateful to have this opportunity to introduce you guys to my client, to the team, and to the case that you're here to listen to.

As His Honor said, this isn't evidence, what I'm about to present.  This is attempting to sort of organize what we, from the plaintiffs' perspective, believe the evidence will show.

I'll try to do that as efficiently as I can. It's a fairly complicated matter, but throughout this trial, we'll try to be respectful of your time and do it as efficiently as possible.

By way of background, my name is Brad Caldwell. I have an engineering degree from -- undergrad and then I went on to law school.  Now, I'm lucky enough to try these kinds of cases with a lot of my friends, many of whom are here and present:  Mr. Nemunaitis, Mr. McCarty, Ms. Dellinger, Ms. Haley, and Mr. Pearson.

One of the neat things about this kind of case is -- if you're somebody who's curious about how things work is you get to see a lot of people's inventions, how they came up with them, what their motivations were.

And you know, to be honest with you, sometimes you'll find out that people's career choices were motivated just by money, but other times you hear where somebody was inspired by something that was really meant to change the world and make the world better for the rest of us, make us healthier, make our families healthier, and that's the kind of story that we have in this case.  It's quite amazing.

What we're going to talk about is a team of inventors who spent countless hours attempting to solve a problem like removing a genuine severe toxin from the air that we breathe, the water that we swim in and drink, and the food we eat, and that toxin is mercury.

Now, sometimes the periodic table of the elements makes sense, and the letters kind of correlate, but mercury is signified by the symbol Hg on the periodic table.

And you'll probably see this from time to time in documents where somebody writes down Hg, and that's why I'm previewing it now.  It's mercury.

If you're old enough to remember when the doctor would stick the glass thermometer under your tongue for, like, two minutes and wait patiently, that was filled with mercury, but you never really wanted to have that thing break because you sure didn't want to adjust it or have it sit on your skin for a while because mercury can be an incredibly highly toxic chemical.

It leads to like kidney, liver, nervous system problems. It's well known to lead to birth defects. And it's even sort of inspired some literary notions like the Mad Hatter from *Alice in Wonderland*, and the context of the Mad Hatter comes because there was actually a time in Victorian England when hat makers used mercury to stiffen hats, and then they would suffer neurological problems later in life, and nobody knew what was causing it, but we do now.

It turns out that the United States relies a lot on coal, and depending where the coal comes from and the ratio at which it needs to be burned to generate steam and make electricity, there are many plants for which mercury is a huge problem.

What's interesting is a lot of these plants had really good sort of pollution control type stuff that got better over the years, but there's some unique chemical properties in mercury that kind of makes it just fly right through the flue gases, through a lot of the old filters, and just right out.

Then it ends up settling into groundwater, comes out in the rain, and ends up in lakes with fish, and you may have seen things like, You should not eat these seven types of fish, right, that people say along those lines, and it's because of mercury.

And I'm not saying that all of that is because

of coal plants, but I'm saying that's the problem we're talking about.

So I'd like to introduce you to my client, Mr. John Pavlish.

Mr. Pavlish, will you stand up, please?  Thank you.

So an appreciation of some of these mercury issues really take off in the late '90s and early 2000s.

And if I can focus on Mr. Pavlish was hard at work trying to solve these problems, and what you're going to learn is they conceived of, tested, proved, and took to market a remarkable solution that has surprising results and had dramatic, dramatic effects on reduction of mercury, like 90-plus percent kind of reduction of mercury from coal-fired plant emission.

Now, while Mr. Pavlish and his colleagues were trying to build a business around their efforts, another effort was underway as well.  Specifically, Congress was convinced that it should give a financial incentive to industry to address mercury and other pollutants like nitrogen-based pollutants like NOx, or nitrogen oxides.  And the solution Congress came up with was a set of tax credits that Congress would give to companies who treated coal.

Probably heard of tax deductions.  Tax credit is a little different than a tax deduction.  It's kind of like

a coupon for whatever the value of that tax credit is.

So, for example, if you were to start a small -- a small business, and at the end of the year you made a little profit and you were going to owe, say, $10,000 in taxes for your small business, a deduction might be -- even if you spent $10,000 on marketing materials and computer papers and computers and your phone and your phone bill, the deduction for that might take your $10,000 tax bill and reduce it a little.  Like, you'd still owe some of the taxes.

But if you add $10,000 in credits, now you owe none of those taxes.  It just offsets your entire -- your entire tax bill in that case, and you'll hear that that's where the defendants in this case entered the picture.

So the defendants, which kind of globally we're going to refer to as the CERT entities, and that will become clearer as we -- as we move forward, were right on time to get involved in the tax credit program when the government put tax credits on the line.

And you'll see that we're here today because in order to keep running their tax credit business, the defendant had to induce infringement of Mr. Pavlish's patents for tens of millions of tons of coal.

So we'll get into that evidence over the coming days, but now I want to give sort of a little primer of the

technology that's at issue to put everything in context.

The first thing I want to show is a coal-fired energy plant, and these things are huge.  For visual context, I know it's hard to picture, but, you know, if we look at the visual context, we're seeing, like, garage doors that are here, right, big commercial garage doors.  These things are huge.

The boiler is -- it's like a -- twice the size of this building in terms of size and the height and that kind of thing.

And this is a W.A. Parish coal plant.  It happens to be sort of southwest of Houston.  It's right down the road from where my wife's mom and dad live, and so we're going to talk about a lot of different parts on this.

But right now I want to talk about the coal pile.  You can start to see it right here.  You know, if I go forward to give a little bit of context, this is the coal pile at that W.A. Parish coal plant southwest of Houston.

And these gentlemen are here.  I think maybe that's a Cat D9 up there.  That's a big dozer.  This is how they keep on hand the supply that will get them through maybe a month or 45 days, something like that.

So how does all that coal get there?  Have you ever been stuck behind one of these on a railroad crossing or something like that?  These coal trains tend to have 100,

115, 120 cars.  Each car can be over a hundred tons of coal.

For context, a hundred cars, a hundred tons.  That W.A. Parish plant can go through three or four trains per day of coal.  That's how much -- that's how much these -- some of these big plants are producing and how much is used to produce electricity.  The evidence will go through that as well.

But essentially, we'll hit the high points.  That coal enters on a conveyor belt.  It is pulverized into a dust.  It's like a gigantic wear-in blender for coal.  Essentially, it just turns it into talcum powder of coal.

It comes into this combustion chamber or boiler or furnace, all sorts of names, and then what ends up happening is water is sort of pumped through pipes that are in the walls and structured around that and kind of transfer heat into the water.

The water gets heated up into steam, and the steam blasts out into what looks like a jet turbine, and it's kind of the inverse of what you do with the jet, of spinning it to pull air through.  Air is spinning.

When that steam-pressurized air spins the turbine, it turns a generator of, essentially, like, metals and magnets to basically create electricity that runs out on to transmission lines.

Now, this fire reaction is kind of amazing.

It's like a ten-story tall fire tornado or fireball, very violent reaction, and the exhaust gases are also just pushed out, and eventually emitted.

And there are pollution control devices along the way, so we'll talk about that. But to the point I made earlier, a lot of mercury flies through traditional pollution control mechanisms at these plants.

So kind of go by this quickly. This is a turbine unit at -- one of the turbine units at the W.A. Parish plant. The funny thing is, you know, we hear a lot about clean energy; right? And people may wonder, Do we still care about coal plants?

Certainly places in communities where coal is mined care a lot about them, but I mean, we, even if you don't think about it, probably need to care more than we realize.

So when you have things like wind generation or solar generation, the reality is it's not as reliable as coal-fired energy plants, and they are sort of like the backbone of the electric system in the United States.

So even over the last 20 years, let's say, the drop in percentage of electricity generated by coal might have gone from like 50 percent to 20 percent. It's still the fabric that the rest of the grid is sort of stitched to.

And part of that is because of these massive

turbines.  If you've ever seen the lamps at hotels right here say 110 volts, 60 hertz, 60 Hz, and that's talking about the frequency of the alternating current that we have in the United States.

Some sophisticated plug-in devices like an Apple charger will work either place.  You plug a toaster in over there, you've got a problem.  If -- a lot of things really depend on the frequency.

These things are very precisely controlled with the steam to oscillate at 3,600 rotations per minute, 60 cycles per minute, since there are 60 seconds in a minute, and these, essentially, define the transmission frequency of the alternating current system in the United States.  Super critical.

So don't get me wrong.  I'm not trying to endorse or minimize other types of the power.  It's not about that.  It's not about what people prefer in terms of different types.  It's that we are using coal, and we will still be using coal for the foreseeable future.

So I already touched on this.  Basically, the exhaust gases from the combustion chamber come on out.  They go through pollution control mechanisms that you'll hear more about and then eventually out the stacks.

So I'd like to talk about some stuff that's going on in the mid to late 1990s.  The EPA -- so we're

going to talk about a couple of different government entities. So I mentioned tax credits, so there's IRS and Congress.

And then there's an agency whose job it is to try to help the environment and/or reduce adverse effects on the environment, and that is the EPA.

So the EPA in the late '90s did a study of hazardous air pollutants and identified that mercury from coal-fired utilities is the hazardous air pollutant of greatest concern and merits additional research and monitoring.

And like I said, they have not been able to recognize -- they have not been able to identify any demonstrated add-on control technologies that effectively remove mercury. We're going to -- we'll talk later about -- about why that is when we get into the evidence.

So what kind of a person goes to work and wrings their hands over these problems? It's somebody like Mr. Pavlish. In the late 1990s and early 2000s, Mr. Pavlish was working for a nonprofit research center at the University of North Dakota that is called the Energy and Environmental Research Center.

He will explain how he comes to the EERC for two very good reasons: One, he'd be closer to family; and, two, to try to help some of these issues with the environment.

But one thing that these guys knew having been in industry that we may not realize is that not all coal is the same.  So Mr. Pavlish will explain that different types of coal come from different parts of the country.

And the thing is that I'll admit prior to this case, when someone says something to me like a coal mine, my first thought goes to where my mom grew up.  She's from West Virginia, and I have an image in my mind of this sort of stereotypical coal mine from there.

Well, it turns out that in the last several decades, a stunning amount of the coal that leads to power in our country actually comes from a western coal that is quite different, largely in this area over here that's blue and very specifically in something called the Powder River Basin which is pretty much northeast Wyoming, catches a little bit of Eastern Montana.

So just by sense of scale, Wyoming, which is near and dear to my heart for an entirely different reason, is the least populated state in the country, so you might wonder why we care about that coal.

That coal is so prevalent, and due to its ability to be mined, it is shipped by those trains to plants all over.  That's where the coal comes from that was in that picture I showed you from a plant that's here in Houston.

So a lot of the plants that were built to use

the Powder River Basin coal actually can't really work with the coal on the eastern side of the United States because they all have different chemical makeups.

So some of the ones on the -- on the east coast, they might be good at generating heat straight, but they have really high sulfur problems.  To deal with the sulfur problem, you have to put in this $300 million thing called a scrubber.

So if somebody builds a plant for that, great, but if somebody builds one for western coal and they don't have a scrubber, you can't really burn those.  So we're going to talk all about that today, and I don't want to belabor it at this point.

But Mr. Pavlish and his team recognize that mercury was a tremendous problem from these Powder River Basin coals and also lignite coals that are shown here in orange.  There's some large sources in North Dakota, a little spottier in other parts of the country.

And they set out to try to find a way to solve that problem in coal-fired power plants.  Now, one of the things that they knew is you could use the stuff called activated carbon, sort of in the exhaust gas.  That's to catch it.

It's like a Brita filter for the exhaust gases on a coal plant.  So if you've ever gotten a Brita filter,

taken a pitcher, you fill it up the first time. That first batch, the water is kind of gray, and you pour it out once or twice, then it's, like, ready to use.

Essentially, that test is kind of like activated carbon. It's good at adsorbing onto things, meaning it might grab the bad stuff that's in your water and sort of help it be pulled out into the filter.

But one of the things they identified was activated carbon might be a good part of the solution in the exhaust gas. The problem was mercury, specifically this elemental mercury that just came out of the burner, because of its sort of chemical state, it still can just kind of fly right through a lot of these -- a lot of these filters.

And so what they set out to do was to see if they could find some different chemical to induce the mercury sort of in a courtship with that carbon to cause it to latch on to the carbon where it could just fall out into an ash they could collect instead of going up into the environment.

And once it's out in an ash, maybe you think, "Is that okay?" Actually, it's not that bad because we can use it as a road base or something else that's, like, safe. Then it doesn't go into our food source. It doesn't go into something -- something like that.

So he's going to describe his idea and the whole

mental process for him.  He's also going to describe how he was able to test it because of his work at EERC, and that's where this -- this thing comes into play, which we may call the PTC or particulate testing combustor.

It's essentially like a miniature test power plant that they could run certain tests on, and initially Mr. Pavlish is doing sort of the contracted work he was supposed to be working on, which may be sponsored by the EPA or Department of Energy, something like that.

But if he had some extra hours after hours, he might run tests and try to come up with a solution.  He's going to explain how his test led him and his co-inventors to a very surprising finding.  It's a chemical known as a halogen, specifically bromine.

So we might be a little bit more familiar with chlorine, which is kind of well known, and its use for a lot of kind of cleaning things.  It turns out chlorine may be heavy on the right track, but chlorine is like super corrosive.  It's a big problem in high volumes for these coal plants, and he's going to describe something remarkable they discovered, and they tired to test other chemicals and figure out what was causing certain things to work to grab onto mercury.

They hatched their idea in 2002, and what we'll do is because it will -- we're going to do this not

gratuitously.  We're going to do it because it matters.  I think the defendants are going to come in and say, "I'm not sure you actually had your invention" or maybe "You had your invention after somebody else did," that kind of thing.

And so because we believe Defendants will make that charge, Mr. Pavlish is going to go through and show you how his conception of his invention was documented in 2002, how they diligently tried to raise funds so they could keep using the test environment, how it's documented after additional experiments, how it's documented again and reported to the Department of Energy who was sponsoring them to do this, how it continues to be documented to the Department of Energy, and then eventually when they filed a patent application in 2004.

At the time, the patent application was owned by his employer, which was that EERC, and the lawyers and team at the EERC kind of had some input on what types of -- parts of his invention they wanted to pursue, and they did.

And he's actually had a significant number of patents that came out of this research.  It's like a dozen, but they all claim back to that original provisional application in 2004.  That was his stake in the ground to the public that says, "I've had these inventions."

And what they did is they filed a type of patent procedure called continuation where you keep it alive, and

you can issue patents on different aspects of the invention. He'll explain that to you.

What we're going to talk about in this case -- I'm just going to summarize -- is an aspect of his invention disclosed in that original application that we believe these defendants are causing to happen at several power plants.

So specifically, we'll go to the detail at other times, but we're talking about injecting an additive, for example, over here by the coal pulverizer.  It's your bromine, and then the sorbent, which is described as the activated carbon in the gases, to cause the bromine to, essentially, catalyze this reaction and help the carbon grab the mercury, and it falls out.  It comes out of the gas.

So what does that look like in one of these plants?  The bromine sprayer can be here on the coal or it could after it's already made into dust, and then in the flue gases, activated carbon is injected.

And in this very sort of turbulent section of the flue gas, the bromine helps the carbon latch onOto the mercury before it gets here to a baghouse, sort of a filtering device that can catch that ash and pull it out of the gases so that almost all of it is removed from the exhaust gases.

This was in Mr. Pavlish's original application, and that's the invention for which we're here today.

At this time, I'd like to introduce somebody else.  I'd like to introduce Mr. Rick MacPherson.  Mr. MacPherson, would you stand up?

So this is -- Rick MacPherson is the CEO of my client, ME2C.  Now, Mr. MacPherson was not an employee at the EERC center with Mr. Pavlish.  He was actually working with -- on a different -- a different business center that was -- it was working with EERC to test them.

And in the process of testing the thing he wanted to test, he learned of this two-part invention of Mr. Pavlish.  He saw the value and importance of it and wanted to get it out into the world and build a business around it and get it to coal plants because the EERC was a research center that didn't sell things.  They didn't go to the power plants and sell them the chemicals and install the hardware to do it.

So Mr. MacPherson initially negotiated permission from the EERC called a license to take these inventions and go implement them at coal plants.  That's a license that these defendants over here, they've just never gotten for this technology.

But what's more is his company is now the plaintiff in this lawsuit because in that original agreement, he talked to the EERC and said, "For now I want a license to use your stuff, but if things start to take off,

I would like to ability to come back and kind of complete a purchase transaction and actually buy the patent, so my -- my business can own them," and EERC agreed.

So as we move forward, early -- kind of in the -- let's call it 2008 to 2015, sort of across that time, you'll get more detail later, and Mr. MacPherson is going to tell you his story of basically traveling the road, trying to convince power plants to let him implement the invention and help them reduce mercury.

But there are some other timelines going on in parallel.  That's the inventors, that is Mr. MacPherson, that is ME2C, their business.

Remember the EPA, Environmental Protection Agency.  So like I said, back in 1998, they had long recognized that mercury was a hazardous air pollutant of great concern.  And then as things start to move forward in the 2000s, and things don't always move fast at the government agencies, but they started realizing we're going to have to put some rules in place that make plants comply.

A lot of places aren't going to go install something unless you make them.  They just don't want to change things; right?  They don't want to introduce new chemicals to their system.

So around 2011, the EPA announced that it was going to implement a program called MATS, and it's a mercury

toxin removal guideline, MATS.

Here's the thing though:  MATS wasn't going to be mandatory for a few years.  It started coming in more like 2014, 2015, 2016, so plants had a little time to kind of adjust and meet it, and this is the EPA.  This is not IRS.  This is not Congress.

This is the EPA saying, "When we implement MATS, we want you to be taking 90 percent of the mercury out of your emissions."  So this is a fantastic glide path for Midwest Energy, Mr. MacPherson, and Mr. Pavlish to be at that point; right?  Because they have the solution that can get them there.

And what they started seeing in their business is as they got closer to 2014/2015, in that time frame, their business is really taking off.  Their revenue is taking off, showed up in the success of their bottom line, and the dream was finally becoming real.

I failed to mention earlier, but ultimately Mr. MacPherson convinced Mr. Pavlish to leave EERC and actually join him at the company, Midwest Energy, to try and implement the invention.

So you think you're on this glide path to success, but what the evidence is going to show is that as he should be hitting that crescendo of MATS coming into effect and everybody needing the invention, some power

plants starting declining when he wanted to offer them the system, and more and more of them started declining.  And I think even some of his existing customers said, "Ahhh, we're changing."

So why was that?  It's because somebody else was giving them a better deal, but it's not just that the people were undercutting his prices.  What you'll see is that often there was somebody competing with him who was essentially paying the power plant to take the bromine chemicals to remove mercury.

So how is he going to compete with that?  And that's where we start to hear more about the defendants and their business.

What you're going to hear is that Mr. MacPherson and his team started to learn that someone would set up this LLC, and they would put structure at the coal plant.  The coal plant already owns that pile of coal.  They've already paid for it to be there.

This LLC would buy it from the coal plant, spray it with bromine, sell it back to the coal plant, and lose money in the process.

So if they're literally losing money, how is he supposed to compete with that?  And the evidence is going to show they were losing -- those LLCs were setting up a system to lose money on that transaction to incentivize the coal

plants to use their chemical solution, which was bromine with regard to mercury.

They also had an additional chemical to address another pollutant, but they were inducing them to use bromine, the invention, to catch mercury.

So that brings us sort of to the second timeline, if I -- you'll indulge me where we got to 2015 or so -- let me back up to 2010, whereas I've been focusing on the EPA wanting to put this very tight restriction in place at 90 percent.

If we get back here into kind of that 2009/'10 time frame, Congress was convinced to give staggering tax credits to companies that make a coal and claim a credit for reducing 40 percent of the mercury or 20 percent of a different -- different pollutant, and that's where the defendants come in.

So there's these 12 defendant companies, and I need to explain who they are and what they do the best I can.

So you've heard me say CERT, and then you heard some introduction of the parties like CERT Operations IV, something like that.  CERT is C-E-R-T, and that's an acronym for Combustion Emission Reduction Technologies.

So if they are Combustion Emission Reduction Technologies, you may think you'll hear that they have their

own technologies.  No.  You may hear that they have their own inventors who discovered a different chemical process.  Also no.  And maybe they make the chemicals.  No.

So what do they do?  And, Your Honor, may I just kind of move about to use my foam board?

THE COURT:  You may.

MR. CALDWELL:  Thank you.

I'm sorry, Mr. Sykes.  I don't -- I don't know where to put this where you can see it.

THE COURT:  If Defendants' counsel needs to step around, they can do that.

MR. CALDWELL:  So the second coal plant over there is that W.A. Parish plant that I showed you pictures of earlier, just for context, and the rest of these are coal plants we're going to talk about in this case.

So in terms of who the defendants are, when we look at the Big Cajun II coal plant, defendants created an LLC called Springhill Resources, and Springhill Resources doesn't have any people that go out and prepare chemicals or apply chemicals to coal or anything like that.

So they created another entity, another LLC called CERT Operations IV, LLC.  Then for that WA Parish plant that I mentioned earlier, they created an LLC that's called Senescence Energy Products, and Senescence Energy Products didn't spray coal, so they had another operations

company called CERT Operations RCB.

Then for the plant that is Coleto Creek, they created an LLC called Bascobert (A) Holdings -- and I appreciate your indulgence and the time that it takes to do this. I think we'll refer back to this board throughout the trial, so I'm hopeful that it's, ultimately, helpful -- and Coleto Creek used the same entity, the CERT Operations RCB.

For the Limestone generation, they had created an LLC called Rutledge Products, LLC, and that -- Rutledge Products also used CERT Operations RCB.

Then for the Labadie Energy Center, the last one in this group, they created an LLC called Larkwood Energy, and Larkwood Energy again used CERT Operations, LLC.

Now, what these LLCs do is they lease a little space at the plant. They buy the coal from the plant, spray it, and sell it back at a loss.

So I think what we want to do to kind of give some context of who these people are is these guys didn't have anything -- any ability to spray the coal, so we have these things here which I will call the operations LLCs.

So what is the point of an LLC that loses money? You know, what was their motive for continuing to put millions and millions of tons of brominated coal into these coal plants?

The LLCs were claiming tax credits for putting

that bromine on the coal, so hundreds of millions of dollars worth of tax credits, just even in the -- even in the final couple of years, and that was after our patents issued, after we told them what we thought was going on.

So you might wonder:  Why would these LLCs that they set up care about tax credits if they lose money; right?  If you lose money, well, what tax bill do you have anyway?

So the evidence is going to answer that question too.  These companies were set up so somebody who might otherwise have a big tax bill can invest in those LLCs and claim the tax credits for themselves.  So these entities across the top here, these LLCs, are the ones that are meant to be invested in, so we're going to call those the investment vehicle LLCs.

Why did I group those together before I went on to the others?  Because for those investment vehicle LLCs, what you'll learn is that the folks who originally set them up sold off 99 percent of them to JPMorgan Chase so that JPMorgan Chase could claim environmental tax credits from the coal program.

A similar thing continues for the remainder of these, for the Laramie River, a company set up called Cottbus Associates, LLC, and these use CERT Operations RCB for the Rush Island project.  An entity was set up called

Buffington Partners, LLC, and a new operations LLC or different operations LLC called CERT Operations V, LLC, was set up to run their sprayers.

Those investments were sold off to a different entity called -- I believe it's pronounced Kiewit. It's large construction, and they do other heavy industrial-type things.

And then here on the far right, there's two more. We have this one called Powerton, and an LLC was created called Alistar, and Alistar was working with another entity set up called CERT Operations II.

And finally, the last LLC that I'm going to have to go through at this point is one called Marquis Industrial for the Antelope Valley Plant, which also used CERT Operations II.

The elephant in the room on this is that Alistar is grayed out, and I'd like to explain the reason for that, because CERT sold them off in their entirety, and later Alistar did what we think the evidence will show is the right thing and paid ME2C for the right to use the technology. So they are not a defendant in this case. They will not be at issue in this trial.

So who set all this up? It's -- it's a group often referred to as CERT or the CERT partners. Now, as you might expect, like, if you want to know the ownership of

that, there's more LLCs involved and things like that.

But at base, when you start to trace it to humans, it's four folks. It's first a Mr. Jeff Green, who I believe is here and will testify for the defendants. It's a Ms. Leah Schaatt. She may or may not come to the trial.

It's a gentleman, T. Barr Linton, who unfortunately passed away recently, and another gentleman, Mr. Raymond Bean, who will not come to testify.

So that is the CERT partners. And I'll tell you what, I forgot something. I didn't tell you who invested in these. The party who invested in Marquis and Alistar is called Mylan. It's a pharmaceutical venture.

So why did the CERT partners, the four people I told you about, set this up for the other people? Because these people, JPMorgan, Kiewit, Mylan, paid them very large amounts of money to set this up for them and run it and let those companies claim the tax credits.

So what you're going to hear is that stretches many, many tens into the well over hundred million dollars that these companies paid to the CERT partners to set all this up.

So why continue to cause the plants to infringe even after they learned about the patents and learned about Mr. Pavlish? It's money for themselves. That's the motive, plain and simple, but it's also tax credits for their

investors, these companies that those folks convinced, "I've got a tax credit system that I can set up for you," and they sold it to them.

In maintaining that system for their investors and maintaining the cash flow for themselves, that's what motivated them to induce the power plants to infringe.

So something else that we're going to talk about in this case is, obviously, patent infringement, and sometimes in a case, there's a big fight over whether the technology meets the claims, that kind of thing.  Does the software code do exactly what the patent claim says, that kind of thing.

I believe the evidence in this case is going to show that there's not really a question as to whether they're meeting the patent claim elements; okay?  So I'm not going to belabor that now.

But I just wanted to show you that later on, for the sake of completeness of our proof, we're going to go through the requirements of the patent claims that are at issue.  It's kind of like that thing you saw on the Federal Judicial Center video.  These are the claims.  It's like a checklist of what must be done to infringe.  You'll have plenty of time to see this later.

But the thing is in this case, there's not going to be a dispute as to what's called direct infringement, and

that is:  Is there an entity who is performing this method like spraying with the bromine, injecting -- injecting the activated carbon?  Not really in dispute.

So what will be disputed is that in this case, the kind of infringement at issue -- that's at issue is called indirect infringement.  And Judge Burke is going to instruct you on this law.  That is the Court's job.  It is -- it is not mine.

But at a fundamental level, indirect infringement is kind of a notion that the law provides that in certain circumstances, one entity might be responsible for the infringing acts of another.  And you can think of this one notion of contributory infringement sort of like if I give you that missing piece and know that it's going to result in infringement and that that's all it's going to do, well, that can be contributory infringement.

Or it's like if I act, like giving you incentives and giving you chemicals and everything else you need to incentivize you to do the steps that result in infringement, I'm liable.

So we don't have to go see individual coal plants who have enlisted the help of the CERT Operations. CERT is liable if they contribute to that infringement or inducement.  Like I say, that's going to be in the law that the -- that the Court will give you.

What you're going to hear in this case instead of like, "Oh, we don't do bromine or there's no activated carbon," what you're going to hear in this case is a different set of defenses, and I'll talk about those defenses in just a second.

But I want to talk about how we're going to prove this, and I want to introduce someone else.

Mr. O'Keefe, will you please stand up?  Thank you.  I thank you very much.

This is Mr. Philip O'Keefe.  He used to work as a large power plant operator, and he's an engineering consultant, and he's going to -- he's what's called an expert witness, and he's going to testify in this case.

Something that's different about him and Mr. Pavlish, because certainly someone could say he has the the expertise Mr. Pavlish has, Mr. Pavlish, as part of the client, doesn't get to see their confidential documents, but through the Court process, Mr. O'Keefe does.

So that's why he can come back and tick certain boxes about what was going on, what they knew, and what they saw -- I mean, you know, what was in their documents or what kind of e-mails did they get and that kind of thing that Mr. Pavlish can't do.  And so he's going to do that to run the technical side.

Now, someone else that will present is Mr. Phil

Green.

Please stand up.  Thank you.

So there's going to be -- I know you're meeting a lot of people.  It's like drinking from a fire hose.  I get it.  I just introduced you to two Phils, so Mr. O'Keefe and Mr. Green, and then there's two Greens.  There's Mr. Phil Green, who I'm introducing now, and there's Mr. Jeffrey Green, who's out there somewhere, so we'll do our best to keep that not jumbled up.

But Mr. Phil Green is -- he's an expert in patent valuation, and he's going to explain to you how you look at this from the sort of money damages standpoint under the law, which, again, will be provided by Judge Burke.

So I previewed this, but what are the defendants going to say?  They're going to say things like, "We didn't know about the patent," but that -- we sued you on it and served you.

And then they'll say things like, "Yeah, but we didn't know, like maybe you sued one of our companies but we didn't know, but it's like the same guy sort of running all the different companies.  Maybe I knew it in this part of the brain, not that part of the brain," that kind of thing.

Then it will be like, "Well, we didn't encourage infringement."  They pay the plants, essentially, to take this stuff.

And then they'll say, "Well, we don't know about activated carbon, that's our problem. We didn't know they were going to put activated carbon on it later," and that's where the evidence shows up; right? Because there's e-mails and documents, and they pay for reports.

They pay someone to go out and look and say, "How does the plant work?" and write them a report, and it says they use activated carbon, but they didn't know. And that's going to be the fight that takes place on what they knew.

But even more, after we filed this lawsuit and they knew what their allegations were, they called the plants and said, "You guys using activated carbon?"

And they'd say, "Yep."

Kept on infringing, and that's why we believe the money side of this is a pretty powerful motive to keep going.

Then those don't work. They might say, "Well, the patented value -- the patent invention has no value because we were losing money when we were encouraging infringement." I mean, yeah, if we sort of ignore the rest of it. I mean, they were -- they were doing all right.

So then what we're going to do is we're going to show you what's a fair licensing rate. It's not just, "Hey, give us everything you made."

We're going to show you what a comparable license rate would look like based on other licenses paid for similar technologies in this industry, and they might argue, "Well, you know what, we can't infringe because we got a license to do this from somebody else."

Now, we'll see if they make that argument. I'm not 100 percent sure. But in any event, the law and the evidence in the case is going to show you that getting a license from somebody else is certainly no permission to use our intellectual property.

And we're going to show you that the people that they got a license from are amongst a group of other folks in the industry who have recognized -- even the people they got license from recognize they needed to come to us to get a license. We'll present that to you too.

I know that was a lot. Thank you for being super attentive. I get called for jury duty also. I understand -- I understand the feeling, the apprehension, and all that.

We appreciate your time and attention. We'll do our best to make it sort of interesting and efficient, but I can just say sincerely on behalf of my colleagues and client, thank you so much for being here in this sort of uniquely American endeavor of jury trials in civil cases.

We look forward to presenting you the evidence.

Thanks.

THE COURT: Thank you, Mr. Caldwell. We'll ask Plaintiffs' counsel if they can clear the well for Defendants' side.

MR. CALDWELL: Certainly. Your Honor, at the appropriate time, we may wish to mark some of these as demonstratives, but for now, we'll just expeditiously get them out of the way.

THE COURT: Thank you.

Let me call on Defendants' counsel and ask if they wish to make an opening statement.

Mr. Sykes.

MR. SYKES: Thank you.

Ladies and gentlemen, I'm excited to be here to tell our side of the story. First, I want to thank you. Thank you for your service and your time, and Mr. Caldwell alluded to sometimes we're not all happy to be called to jury duty, but it is important. It's a service that goes back to the actual founding, the Constitution, so thank you for being here, your attention and your time, and we do appreciate it.

Now I'm going to comment -- again, my name is Paul Sykes, counsel for the defendant. You probably can tell already I'm not from around here. Let me introduce my client, Jeff Green.

He is one of the partners in the CERT companies. Mr. Green was vice president of engineering. He's a -- he has a mechanical engineering degree from Texas A&M, and he kind of -- we'll get into this, but he designed and set up and had constructed the refined coal facilities.

Also in our team, we have our legal assistant, Melinda Washington, who we couldn't do this without; my colleague, Ashley Robinson, partner Ben Wilson, my partner Jeff Dyess, and they're with my firm from Alabama.

And then we have Ken Dorsney from Morris James here in Wilmington and Cortlan Hitch.

And I'm going to go ahead and tell you, I'm in this terrible -- I don't know if it's abolition or devolution of my eyes where I'm sort of in between reading glasses, and you'll see me take my glasses on and off throughout the presentation.

The interesting thing about these cases is that there are two sides to every story, and I'm going to ask you to keep an open mind because you've only heard their side, and what this story is really about and what the legal claims here require is proof of CERT's, the defendant company, CERT's state of mind.

That's what Jeff Green, Leah Schaatt, and their business partner, Barr Linton and Raymond Bean, what they knew and believed and what their intentions were. You

really can only get that from us.

And as with anyone in this part of life, whatever it is, if we're asked to evaluate what the person knew or believed and what that person's intentions were, I don't know if that someone was me, and if someone was asked to evaluate my state of mind, what I knew and what I believed, I'd want them to walk a mile in my shoes. Walk a mile in my shoes before coming to a decision about my state of mind.

In this case, in this opening statement, we're going to respectfully ask you, if you could, to walk a mile in CERT's shoes. I'm going to try to put you in the position of Jeff Green and his colleagues when they got sued and what they knew and what their business was doing.

And -- and so we're going to try to do that so you can help them understand sort of what we believed and what we knew to be the truth and what our intentions were.

And of course, I'm going to tell you more about CERT and a whole lot more about this case, a lot more about certain evidence, but, you know, Mr. Caldwell ended with this sort of discussion about the motivation of money.

And I believe you're going to be hearing a very large -- very, very, large, tens of millions dollar damages demand from ME2C and their lawyers in this case.

And so I'm going to do something just a little

bit unconventional.  I'm going to jump right here to the end of the story to just give you a glimpse, a peek at the other side of that story.

Right here is an exhibit, Defendants' Exhibit 23, and I failed to introduce the man in the hot seat, Mr. Brown, Jesse Brown, who will be running all the technology for us.

What Exhibit 23 is, this is an agreement by ME2C with the utility Talen, a large utility that ran a bunch of power plants, I believe seven in this case.  It's a license for these patents.

You heard this discussion about we're going to go through this whole accounting expert presentation about comparable licenses, and the neat thing about the jury system is you don't have to check your common sense at the door.

This isn't similar technology.  These are these patents in this case, but the utility was being supplied refined coal in this case.

If we can jump over to paragraph 4.3 of the agreement -- well, let's go up to paragraph 2.1 real quick so you can see.

You have a license of these patents.  ME2C grants a license to these different power plants that were at issue, receiving refined coal we talked about, and jump

down to paragraph 4.3.

You can zoom in on paragraph 4.3.  You'll see that it was a single, one-time lump payment of $200,000, so that was a paid up, all-you-can-eat license to all ME2C's patents for all the refined coal, every power plant Talen, a big utility, could use.

So just counting the three that were at issue, that's $67,000 a month, and that's this plan, ME2C, these patents in this case, and they were being supplied by Chem-Mod refined coal, which we'll talk about.

So if we look at paragraph 9.1, they -- Talen still denied infringement, so there are two sides to every story, so we would respectfully submit to you, when you hear this enormous multimillion dollar damages award, demand -- not award, demand -- that you will remember what Mr. Caldwell said about being motivated by money because we think that's what's going on here.

And this Talen agreement is not an outlier.  We will see other agreements this week with utility NRG, also a defendant in this case, about $600,000 for all of its power plants.  And another agreement with -- with a company called Vistra, a couple of million, $3 million for all of its power plants across a huge swath of the United States.

So the point there is just right off the bat to tell you there's two sides to every story, and that's just a

glimpse. And I think once you hear the evidence from our side, you'll see why CERT does not infringe the patents, and I think your verdict will be for the defendants.

Let's get going. So who are we? Who is CERT? And as Mr. Caldwell alluded to, there are four partners who founded CERT, and these individuals have worked together and known each other a long time.

The first person here on the left, Barr Linton. Mr. Linton, a few years older than me, he's 59 years old, he died suddenly and unexpectedly just in January, left three preteen teenage girls. He was a -- the title in the company was business development and a little bit of a jack of all hands.

Leah Schaatt. Leah is in accounting and finance. She's a CPA, and so she ran that aspect of the business.

And then Jeffrey, who is here today, and Jeff was involved in -- you'll hear a lot about EERC and refined coal testing. He's a mechanical engineer. He designed our refined coal plants. We did our own design for our refined coal plants, how we put them together, coal handling. Jeff did all of that, all of that work.

And then he managed the Operations companies that made and manufactured the coal for all these years, and it was touchstone. You have these power plants burning

literally trainloads of coal.  You get a little bit anesthetized in this case.  We talk about millions of tons.  That's millions of 2,000 pounds of coal.  It's a huge amount of equipment or way that he -- he designed and managed the folks that handle all the equipment to do that.  And so he is the one who really had the hands-on knowledge of all the issues in this case.

Last is Mr. Raymond Bean, and he's your true sort of serial American entrepreneur.  He's now in his mid 80s.  He's unfortunately suffering from terminal leukemia.  Obviously, he can't be here, but Mr. Bean, he'd been in the coal business and mining a long time.

A lot of people don't know that Birmingham, Alabama, where we're from, it's founded and put there because of the coal in Jefferson County, Alabama.  That's why they drew a dot on the map for Birmingham, lots and lots of coal.

In fact, where I live, I live about a hundred yards from the entrance to an old coal mine on Red Mountain in Birmingham, and so that's sort of how -- you wonder how these Alabama folks, what are they doing in the coal business?  It's a lot of coal in that part of the world.

And so Mr. Bean had been involved in that business, the coal business, a long time.  He knew the other folks, and that's how the business got together.

So what is CERT's business?  What do they do?  And what they did is they implemented a Congressional clean coal program passed into law by President Obama and the Obama Administration to treat the coal before combustion, before it's burned, to create a self-contained fuel so that when the fuel is burned at the power plant, it will result in a reduction of emissions of mercury and nitrous oxide.

So that's a second -- or a second chemical that's not desirable in the environment.  Nitrous oxide, we call that NOx, N-O-x, for short.

And so what CERT did is they set up projects, met the requirements of the law.  They met with and recruited power plants to let them build and install the facilities on their property to make refined coal.  They had to lease land on the power plants.

And maybe we can see one, a picture of a -- there's a refined coal facility.  So you can see these aren't, you know, just trivial structures.  We're going to look at a number of these very large facilities.  They had to get permission to build these enormous structures and have them reside on the land of the power plant.

And then they had to get investors on the projects after they had gotten them built and installed and had customers ready to go, which is a tremendous risk.  Investors came later to set the projects or to get the

projects running to buy the coal and get them to sell it.

And I'm going to explain to you briefly why CERT should win in this case, why your verdict should be for CERT.  It will be straightforward.  It's going to take about three minutes.

Then I'm going to go through and orient you with the timeline.  There are a lot of dates and moving parts in these cases.  There's a sort of timeline on their side and a timeline on our side.  We work on these things for years, and we get it all in our head, and realize we come in here and throw all this information at you.  So I'm going to try to get you a just a quick overview timeline.  Then I'm going to go back through and walk you through the evidence in detail and go over the history of how we got here.

So you've already heard it, but the gist of what their patent is what they call a two-step process to reduce mercury.  That's sort of shorthand, the two-step process, and as Judge Burke instructed you, in a patent case, you look at the claims.  The claims are these detailed sentences that define the invention, and that's what infringement is evaluated based on the patent, but sort of for a shorthand, we'll call it or they call it a two-part process.

And the two-part or two-step process is to treat coal with bromine, and then after it's burned, after the coal is burned downstream in the furnace, you have the coal

is burned in the furnace, the giant fireball.  Then it goes into, you know, ductwork, the flue is what it's called, like chimneys, if you will.

And then it flows through the power plant.  It goes through a number of treatment processes to treat the flue gas, so when it comes out the stacks, it's much less harmful than it otherwise would be.

So after the coal is burned, it travels down the flue, and then once it's down the flue, they add activated carbon to capture and reduce the mercury.  That's what their patents are about.  So they reduce mercury with added bromine, and they have to get a boost from activated carbon to do so.

Those are the basics that our people, Jeff Green and Leah Schaatt, Barr Linton and Mr. Bean, understood shortly after the lawsuit was filed.

So what does CERT do?  CERT makes a fuel that chemically treats the coal to make a self-contained clean burning coal that the power plant can use.  And we have to comply.  We're implementing this Congressional clean coal program in Congress.  It's in the Tax Code.  Have you ever heard Section 45?  You'll hear that more times than you'd like this week.

Section 45 of the Tax Code, that's Title 26 of the United States Code, Section 45.  26 USC 45 is what we

lawyers call it.

And so we had to certify our refined coal under the law that it met requirements of the Tax Code every six months, beginning in 2011, eight years before these patents even existed, and we had to do that for every plant we dealt with.

And the law, again, requires our coal to remove two pollutants, mercury and nitrous oxide, which we call NOx, and we have to get an 40 percent reduction of mercury and a 20 percent reduction of NOx.

And so there it is on the slide.  It's a printout of the -- the code, the laws -- the law, the United States statute, we all have to abide by it, but we especially since we're in this business, so that's what we had to do under the law.

And so from our perspective, in July 2019, we started in 2011, and we got sued in 2019.  We understood, you know, fairly early on in the case that their patents and their patented process only reduces mercury.  That's what it deals with.

Let's go to the next slide, Jesse, the one you had before.  My apologies.

So ours is that we learn -- ours is a self-contained fuel, and they're dealing with a process that happens inside the plant.  Ours is a self-contained fuel

that's made outside of the plant out by the coal pile.

It's kind of funny.  When we started working on this, it's literally a mountain of coal, and they call it the coal pile.  So that's what we're near, the coal pile, and it's -- it could be hundreds and hundreds of yards from the actual power plant.

So that's -- we're outside this coal pile. Theirs is a process that happens in the furnace and in the flue, and then ours requires 40 percent mercury reduction, and their patents talk about reducing mercury.

That is what Mr. Pavlish claims to have invented, is mercury reduction, and then we have to meet, under the law, this 20 percent NOx reduction, and their patents don't talk about a 20 percent Nox reduction.

They really don't talk about reducing NOx at all, and that's not something that we see advertised as its patented process or products.

And then last, we -- this is very important.  To qualify our coal, we have to do it without activated carbon. We have to show that we make the 40 percent and 20 percent reduction without the boost of activated carbon that the power plant may add later, and of course they -- they require activated carbon.

And so with those basic facts, this is what we came to understand about their case and their claims on

infringement.  And I'm going to explain to you how these basic facts demonstrate why my clients knew they did not and could not contribute to infringement of these patents or why they couldn't induce infringement, why it was never their intention to induce or cause a power plant to infringe.

And this is really just the tip of the iceberg of the evidence that's going to show you, you know, our perspective and why we believe you should enter a verdict for the defendants.

Let's go through it.  I'm going to try to get you oriented with the timeline I mentioned.  So what we have here is in 2009 and 2010, that's when CERT begins, and we'll talk a little bit about this process and getting customers and what the law requires.

The law required us to be in operation by December 31, 2011.  Congress put a deadline in the code, in the Tax Code, that said these facilities had to be in service by December 2011, so that's when we got started.

We got sued over here in 2019, and the program was a ten-year program, from 2011 to December 2021.  That was the statutory period that Congress was running this coal program.

And as you'll see, as the evidence will show, 72 percent of our refined coal was manufactured before these asserted patents even existed.  The one that we're sued

under, the first one, the '114, it issued in July 2019, and they filed the lawsuit about a week or ten days later, in July 2019.

So that's kind of our basic timeline, and during this time period up to the filing of the lawsuit -- or maybe this is over the whole period -- the CERT entities produced 375 million tons -- 375 million tons of refined coal, including 182 million tons.  That's almost 50 percent of the refined coal ever made was sold to plants that did not have activated carbon equipment installed at all, were not and did not use activated carbon.

So they were selling to plants that did not use activated carbon all the way through the lawsuit, and why that's important as to why we couldn't have believed we were contributing to or inducing infringement.

So in -- down here, the plaintiffs kind of -- this is sort of what they were doing, what they were up to. So the two patent applications at issue in this case, they were filed in 2018 for the two patent applications that issued in what we call -- this is another patent lawyer nerd thing.  I think Mr. Caldwell said he has an electrical engineering degree.  I think do too.

So you're dealing with probably the nerdiest class of lawyers here.  We call the patents by numbers, so the '517 patent is one of the two patents-at-issue, and the

'114 -- those are the last three digits in the patent number.

So those applications were filed in 2018.  '114 patent issues in 2019 in July and they filed the lawsuit a week or so later, and the '517 patent issued in March 2020, and as -- as Mr. Caldwell discussed, Mr. Pavlish, he will testify he invented these inventions in 2002/2003, was working at the EERC and running various tests.

And so they filed a provisional application. That's their original first filing in 2004.  It was August 2004, and in between were additional patent applications, these continuing applications that -- I think there may be a continuation in ours.

And so the sort of gist of this is that their contention is that their 2018 filing related all the way back to 2004, and that is important because in order for their 2018 filings to relate back to 2004, each of the intervening applications in this chain, we call it a priority chain -- and we'll hit on this a little bit later. Each one has to have written description -- a description of the invention that they set forth and claimed in the 2018 applications.

And as we will show you through expert testimony, and I'll introduce the experts in a bit, you know, the thing that was different in the 2018 applications

from our perspective, and our expert will testify about, is that the 2018 applications were the first applications that claimed and that they described adding bromine directly to coal.

If you go back a few applications before, there's a break in that priority chain, and so we'll touch on that later.

So the two claims at issue in this case, I was -- now, I didn't realize we would be sort of trying Congressional policy and the wisdom of Congress in Section 45 or Delaware LLC law and the Tax Code and the business organizations that it encourages.

What we're really here about is patent infringement, and the two claims are contributory infringement and actively inducing infringement.  Okay.

So again, the two-part process that ME2C calls it, adding bromine to coal and treating the flue gas with activated carbon, and it's not enough that they power -- that they show or prove direct infringement of a power plant.  It's not enough that a power plant burned coal and added bromine, treated the flue gas with activated carbon.

They have to prove that, and they have to prove that by a preponderance of the evidence to your satisfaction.  You're the jury.  That's not enough.  If you decide that they have not proven by a preponderance of the

evidence to your satisfaction that each power plant at issue -- each one of the power plants at issue infringe their patents, then we would stop right there.

And I heard that they said that's not a dispute. Well, there's not a single witness, not one witness from a single one of these power plants, who is actually going to say and describe what the power plants did.

They're going to rely solely upon inferences that their expert, Mr. O'Keefe, draws from looking at certain documents he found.  But Mr. O'Keefe, he did work in a power plant in the 1980s up to about 1995, and he left the industry 20 years before these MATS regulations were promulgated or put into effect.

He's never actually worked with mercury control, mercury emissions, activated carbon equipment, bromine, or anything, so that is a disputed fact.

So for inducement, that's the first claim against my clients.  We'll get into this in more detail, but to show liability for active inducement, the plaintiff has to show, and the Judge will give you detailed instructions, that we specifically intended -- it's a specific intent on our part that the power plant would infringe, and we're willfully blind to that.

It's not enough that we caused a power plant to engage in some conduct like burning coal that happened to

amount to direct infringement.  It's not sufficient that we were just aware of the power plant's actions that ME2C alleges to infringe.

So knowledge isn't enough, and just causing something that happens to result in infringement is not enough.  It has to be our specific intent to encourage and induce infringement.

And they have to show -- the burden is on ME2C. You didn't hear a lot about the burden I noticed in the opening statement of the plaintiff to show that CERT's actions actually caused the power plant to perform each and every step of the asserted claims.

These are the detailed statements of the patent claims.  The two-part, quote, the two-part process is shorthand.  It's the detail -- I think you've got them in your jury notebooks.  They have to show that we encouraged the power plants and caused them to perform each and every step of the asserted claim.  And so, for example, they would have to show that it was CERT that actually caused the power plants to use activated carbon.  So we believe there's no evidence of that.  Our specific intent in selling refined coal to the power plants is exactly what we certified under the law every six months since 2011 was our intent before these patents existed.

The Section 45 of the code required CERT to do a

certification that its fuel as refined coal met the requirements from the Tax Code, had to do it every six months.

And so we certified every six months what our purpose was, and that was to sell a self-contained fuel that met the mercury requirements of Section 45 without requiring a boost from activated carbon to get there.

So from our perspective, it really didn't matter if the plant used carbon or not, and we didn't cause them to use activated carbon, and we backed that up.

We sold over a hundred million tons of refined coal to plants that didn't use activated carbon at all.  So it wasn't our intention and we weren't trying to cause anybody to use activated carbon.  So that's the first claim.

The second claim, contributory infringement, the plaintiff has to prove that we actually knew.  Okay.  They have to prove that CERT, who's represented here by Mr. Green, actually knew our state of mind that the accused acts, making and selling refined coal to power plants, was infringing.  And -- and it's a high standard.  It's that we actually knew, not that we just might have known, and if we had a reasonable belief that we did not infringe, even if that belief turned out ultimately to be incorrect, then we do not have the knowledge of infringement required under the law.

So ME2C as part of that contributory infringement breaks down to a couple of pieces and, one of those pieces is called substantial non-infringing uses.  And the other piece is called specially made and adapted.

So the first part is they have to prove that we knew or were willfully blind that our refined coal was specially made and adapted, so specially formulated, designed to be used, specially made and adapted to be used, with activated carbon in the power plant, so that's how we designed it.

Secondly, they have to prove that our refined coal had no uses except for activated carbon.

Well, I think what you'll see in a few minutes is the evidence that we'll present to you is the opposite. We sold refined coal of the very same formulation, a formulation to reduce mercury and NOx without activated carbon, that was set years before these patents even existed, and, again, talking about substantial uses, substantial non-infringing uses.

We knew when this lawsuit was filed we've got an understanding what the claims were, that we had sold and were continuing to sell thousands and actually tens of millions of tons of refined coal to power plants that weren't using activated carbon at all.

So how could our product be specially made to be

used with it, and how could there be no uses except activated carbon?  It did not make any sense to us.

Okay.  I'm going to come back and go a little bit more through the history, kind of peel the layers of the onion off one at a time and try to get you oriented, and we'll walk back, and I apologize if I repeat myself.  I sometimes practice this -- these things with my wife, and she is the artistic, creative type, and she stops me and says, "What did you say?" and "Can you say that again.  That didn't make sense to me."  Sort of in the habit of repeating.

Again, I want to put you in our shoes when you go back decades before these patents existed so you can understand for that decade of what we've been doing, what was it that we knew and believed in 2019 when we finally got sued.

And when we got sued, it was out of the blue.  Lawyers send demand letters sometimes.  We didn't get a demand letter.  We had not heard or were familiar with ME2C or the patents.  It was just a lawsuit out of the blue in 2019, similar to what we had been doing for an entire decade.

So again, refined code, it's made and formulated to meet the legal requirements of Section 45 of the Tax Code.  It's not just any laws.  It's the Tax Code says what

it must do.  It has to reduce NOx by 20 percent, mercury by 40 percent when combusted.  It's a self-contained fuel outside the power plant.  That's the law.

We've got two chemical additives to help to do that.  One is called S-Sorb, S-Sorb, it reduced NOx, and the other chemical was called MerSorb, and that was to reduce mercury.

We have -- one of the witnesses who will talk about refined coal and how it's made to some extent, she also has extensive experience in the industry.

If you could put up slide 4, Mr. Brown.

Dr. Senior, Connie Senior, I believe she's probably in the courtroom.  Dr. Senior is -- she was -- she's a Ph.D. from Cal Tech Environmental Science.  She has been in this industry for 30, 35 years, and she has worked on the energy space, emissions reductions, coal combustion, including with a particular emphasis on mercury and NOx reduction.

She holds numerous patents on mercury and NOx, and, you know, she -- this has sort of been her life, and this is what she has done in this field for decades, so probably longer than she might want to admit.

And so she will talk a bit about refined coal because she actually dealt with it and studied it in the real world in the 20-teens and while this was going on, and

she will also -- she's extremely knowledgeable about power plants and their operation, and she can talk more about the emission control equipment and what goes on in the decision-making in that aspect.

And so the -- something that -- so in addition to the two requirements that activated carbon must do and those reductions, it has to -- the law, the IRS, they gave guidance.

And this is DTX 1980, Mr. Brown.

And this was -- you know, this looks like a nice IRS government publication.  This is a bulletin, a notice that they put out in 2010 right here.  This is when the program was just getting started, and they're explaining to the people who are trying to get involved in this a lot of details.

Often what you see -- and you may have heard of this.  Congress passes a law.  The law is pretty short, and then the EPA or the FDA, the different administrative agencies, they -- they issue regulations that add a lot of detail, and that's what this is.

And if we can just page down to the second page, and let's go down on to the next page, and if we look at VI down here, I believe that's where it is, it's talking about the testing and measurement of how you do this, and it says: "The emissions of mercury are measured upstream before any

SO2 scrubber or mercury" -- Hg is mercury -- "control device such as activated carbon injection."

So there's your -- there's your -- when we kept saying it had to be done without meeting activated carbon, and it had to meet the law without activated carbon, this is the notice that we complied with.  As you'll see, it's the notice that the EERC, who certified and set our formula, they -- they certified with the professional engineer that they were testing without activated carbon.

So okay.  Just remember, turn back to the patents.  Patents, on the other hand, you must use activated carbon.  So the patent requires you to use the very thing that would disqualify our refined coal from being certified under the law, so why would there be a specific intent to make a power plant use that?

And then secondly, we're not aware of any evidence that using the patent produces a self-contained fuel that would reduce NOx by 20 percent as required by the tax law, Section 45.

So from my folks' perspective, when they understood what this case was about, the patents in the refined coal missed each other coming and going, and that's still our view and our belief.

So we got going in 2009.  We ramped up in 2010 and 2011, and again, we had to be in operation by

December 31, 2011, under the law. And that was about eight to nine years years before these patents even existed.

So what we had to do is we had to go out and meet with power plants and try to convince them to use our product, and that's hard to do.

Now, they make it sound like it's just a money printing operation, you know, selling to the power plants at a loss and the power plant can buy the coal from us cheaper than it can otherwise, but why might that be; right? Why might that be?

Well, the object of the program is to try to reduce mercury emissions in the environment, which can be harmful, and there's no dispute about that. It's something everybody wants to reduce. And bromine had been proven to be a good way to capture mercury in the coal-fire process.

Well, bromine and the other halogens on the periodic table that Mr. Caldwell showed -- halogens, they can be corrosive to furnaces, and as we learned, and I don't think it's disputed, I think I heard Mr. Caldwell say it, power plants don't want to mess with their process.

They're not real fired up about putting chemicals into these massive, enormous facilities that are football fields in size. They have to run 24/7, seven days a week, all the time. So they have to generate electricity we all like; right?

So they're going to be running all the time and just like -- just like you would think twice about putting some additive in the fuel in your gas tank in your car to reduce emissions if it might corrode your engine. You'd probably think twice about that.

So power plants are cautious about putting additives into their furnaces even if it produced emissions because it was shown that bromine could be corrosive, so if you think about it, that's why Congress -- one of the reasons Congress created the Section 45 program, to put an incentive in place that combustion is a cleaner burning fuel.

And Congress, in its wisdom, made the requirement that somebody else, a third party, not the power plant, had to treat and qualify the fuel. That's the way Congress set it up. Bipartisan legislation passed it the end of 2008 or 2009.

And the way it was set up is when the tax credit would go to the third party, okay, and that third party as it comes in this case, the refined coal companies like the CERT project companies. We'll look at the organization in a minute.

And then this allowed the CERT project company to effectively pass along some portion of that tax credit, that value -- effectively pass on some of that value to the

power plant in the form of a discounted price for the cleaner burning coal.

So the way Congress set up the program, the way that the Tax Code is written and the way that partnership law exists and, you know, it incentivized the formation of these LLCs.

And then the power plant was incentivized by companies like CERT to use the program to get the power plants to buy the refined coal, reduce their emissions, at a discount.  Otherwise, they wouldn't do it.

And that was borne out and proven because when was Section 45 program ended in 2021, the power plants basically stopped burning refined coal, and there was risk in this.  There's, again, this suggestion that this was just a no-brainer freebie.  I'm not going to go through all of it here.  We don't think it's relevant to infringement, which is what you guys are here to evaluate.

But as I'll show you a minute, these power -- these coal plants are large facilities.  They handle thousands of tons of coal every day, and they had to be designed and built.  These are enormous, and we had power plants that had shut down our project after we had built these and invested money in building these plants.

Duke Energy, we had several for them early on, and they shut all things -- three down, and we had other

ones that just got -- were put on idle mode and had to be on standstill for a period of time.

So it was an investment, and it was a risk and had to move projects around, but we got it going.

Yes, go to slide 3.

So this is sort of the breakdown, and I guess it's a different version of what was drawn earlier, so you would have an operations company, and then you would have the refined coal company, and you have the power plants.

So let's start on the right. These are power plants in different parts of the United States, and typically, you know, a utility may own 3 or 5 or 20 or 25 different power plants depending on the size of the utility.

So you hear all these names, Chesterfield, NOx, Storm, W.A Parish, Laramie, Intermountain. Then the organization was that a separate entity, separate company was formed -- was paired with each power plant.

So that company was the one that bought the coal and sold the coal, and it was the third party under the Tax Code the way Congress set it up, and then as an LLC under Delaware law, they could be a limited liability company, and that would allow investors to invest, and that was sort of the policy of this.

And then back here, you had an operations company, and let me just pause. The refined coal companies,

they actually -- they -- they were the ones that signed the contracts with the power plants to buy and sell the coal.

They leased the land.  They paid the rent, leased the land on the facilities.  They paid for these enormous, multistory, very huge refined coal facilities, so -- so, you know they weren't sort of just doing nothing as was suggested earlier.

And then operations companies, they ran them. They staffed them, and operations companies had folks, you know, run the equipment doing all the coal handling, and so they were the feet on the ground, and that was the way this was set up for.

And then for various reasons, you'd have -- one operations company would have its employees staffing multiple refined coal plants.

So let's just look at some of these pictures of a couple of these plants.  Here's one in Antelope Valley in North Dakota.  Big Cajun II in Louisiana.  You can see it had -- yeah, it had CERT Operations IV.

And then it's refined coal entity.  We sometimes call these project companies.  You'll probably hear Mr. Green call them a project companies because that's what we refer to them internally as, and I think you get a sense of how big these are.  See that crane?  And these are multistory buildings.  These are very large structures that

we had to invest in to advance this product.

Let's look at another one:  Chesterfield, West Virginia, the coal pile.  You can see the outline of the coal pile and CERT operations.  They were sued early in the case, but not currently.

Let's go to another one.  Coleto Creek in Fannin, Texas.  That's an aerial shot.  That's Bascobert and CERT Operations RCB.  You can see where we are right here.  That's our refine -- there's the coal pile.  There's your mountain of coal.  You can see we are way over here, and here's the power plant.

And these things -- I guess you can get a sense that these are, what, a couple of city blocks, and so we are spaced way apart, and we're out here where we do our work.

I think as Mr. Green will testify, we didn't go in the power plant.  We worked on our lease space.  That's where we work.

Let's take a look at another one.  There's Intermountain.  That's in Utah.  CERT Operations and Deogun Manufacturing.

Go to the next one.  Labadie in Missouri, CERT Operations and Larkwood Energy.

Next one.  Lab Tree South.  That's Franklin County, Missouri.  Larkwood and CERT Ops, and Limestone Limestone County, Texas.

This gives you a sense of the scale of the construction trailer.  You can see it, and it disappears out of the sky, and these large coal conveyers that are handling, and then we talk about -- some of these, it's arithmetic, but 7,000, 8,000, 9,000 tons a day, so that's 7,000 times 14, 15 million pounds of coal a day running through these.  These are big operations.

Laramie River in Wyoming.  That's Cottbus CERT Operations RCB.  Mount Storm in West Virginia, CERT Operations.  This entity was -- we'll talk about why that's important to our clients' beliefs.

Rush Island in Jefferson County, Missouri, has got the Buffington Partners, CERT Operations V.

W.A. Parish, Fort Bend County, Texas, that was one that you saw an aerial view of Mr. Caldwell.

This is again -- this is an aerial view of Big Cajun, and you can see this is another good example.  We're way out here where the green is.  So we're spaced pretty far apart, kind of right here by the coal pile.  We're way apart from the -- these are -- these are big spaces far away from the plant, from the furnace.  The furnaces are down in here.

So next, I want to show you what we were able to do over the years.  I'm going to put on the screen DTX 1969.  This is a chart showing the tonnages of refined coal.

This chart has a lot of information, kind of peel it back a layer at a time that we sold -- these various projects we sold to the power plants.

So the ones at the top in the white are the current defendants in the case, and then the ones shaded are other CERT companies, and, of course, the same individuals were the managers and partners.

We manage these, and so sort of what we knew as to one, we knew as to the other, and so that's why these guys -- some of them were defendants, but that's why it's relevant to our state of mind.

So what you'll see here, it's going across over the tonnages from the years 2011, '12, '13, and '14.

If we could zoom in on that just a bit, Mr. Brown.

You can kind of see over here you've got some gaps, and if you kind of scroll across, there's some other gaps here and there.  That's when we had plants that would have to be shut down or they would be idle for some period of time.  There's various causes for that.

But if we kind of zoom back out, you know, you can see that we had some fits and starts, but the defendant companies produced literally hundreds of millions of tons of refined coal before these patents even existed.  So if we kind of look right here, this is the dividing line when the

lawsuit was filed.

So let's scroll over a bit, the other way, kind of get all that -- all that right-hand stuff off the screen, up to the -- let's kind of put this on the edge.  Yeah.

So this is where we were when the lawsuit -- or maybe this is when the second patent -- the first patent issued.  This is what we've been doing since 2011.

And so this is kind of the history -- this is what's in our minds.  This is our history of what we were doing when we had been sued, and so we knew, you know, pretty quickly, as I'm going to get to that, we didn't have any reason to believe that we infringed these patents.

So ME2C filed suit in July 2019.  They sued various CERT entities.  We hired counsel and get an understanding of what this lawsuit is about and understanding basically that the lawsuit, as you heard -- that at a basic level is what the plaintiff calls a two-part process to treat coal with bromine and after combustion, you add activated carbon and flue gas.

So we understand the act of adding bromine to coal.  That's something that we do.  That's just half of it.  Nothing about producing NOx.  But also that coal had the flue gas treated with activated carbon.

That's not something that we use.  That's the self-contained product that reduced mercury and NOx.

And the case seemed to be saying that we were encouraging power plants to use activated carbon and that we knew our refined coal was especially made and adapted to be used with activated carbons, and that there were no substantial uses of refined coal except with remember.

Remember, our product is certified to meet its emission reductions without the use of activated carbon, so this is puzzling to us.  We understand -- but we understand that the power plant's activated carbon usage is at issue, and that's not something that we typically track, and so we did some due diligence to find out.

Let me stop right there.  When this lawsuit was filed, we really didn't know which power plants in particular were using activated carbon and which weren't. We, of course, heard of that in the industry.  We were aware of that here obviously.

And there were a smattering of e-mails that -- claims of e-mails over the years about them installing or maintaining an activated carbon system, but it wasn't something that we had sort of tracked and focused on.

And so, you know, in this case in this courtroom, it's sort of like all ME2C is going to want to talk about is bromine and activated carbon as if those are the only two things in the world that matter to power plants.

What you have heard and what you will hear is these plants are -- they are enormous facilities, enormously complex, incredibly complicated chemistry chemical reactions that go on in then.

And they've grown and added various kinds of emission control systems over the decades.  That's why they take up blocks.  We've got selective catalytic reducers, flue gas desulfurizers, wet scrubbers, dry scrubbers, baghouses, electrostatic precipitators, and some of these things are like buildings.

They cost tens of millions or maybe hundreds of millions of dollars, these different devices.  You have engineers and technicians who do nothing but work on one particular part of these systems, do maintenance, keep them running, and so forth.

And among all these many systems in this, you know, multiblock, very large facility, there may be an activated carbon injection system.

But just because a power plant has all these emission control systems to deal with the environmental regulations it deals with, it doesn't mean that CERT, by selling them refined coal, was the one that caused them to use the systems.

And importantly, I think as we've shown and may have picked up on, all that stuff is inside the walls of the

power plant, and that's really where we didn't go. How the power plant ran its overall emissions controls for all kinds of pollutants, not just the ones at issue here, that's not something we were involved in.

And that's an area that -- Dr. Senior in particular has a great deal of expertise in overall emissions control strategies and sort of what these different devices were doing and how those power plants can go about that compliance.

So, you know, we're a fuel supplier. That's what we are. We are a fuel supplier, and just like it wasn't our place to tell a power plant it needed to use a selective catalytic reducer or wet scrubber or electrostatic precipitator, it wasn't our place to tell the power plant, these very sophisticated entities, whether or not to use activated carbon.

And Jeff Green -- Mr. Green, he will testify that he never encouraged a power plant to use activated carbon, never asked them to, never instructed them to, never leaned on them, never persuaded them to use activated carbon at all. It's just not our business.

Get this: No power plant operator -- none of our power plant operators will testify, you won't hear from a single witness, live or by deposition, at one of our power plants that CERT encouraged them to use activated carbon.

I think they may play some testimony from some power plants that aren't at issue in the case. Remember, ME2C, as the plaintiff, has the burden of proof. And again, you won't hear from a single witness from one of these power plants, either live or by deposition, that anyone from CERT encouraged them to use activated carbon or had anything to do with that decision.

And in the lawsuit, the parties have a year or more to engage in what we call discovery. That's serving interrogatories and taking depositions, and then one of the things you can do is you can serve subpoenas, and that's sort of like a court order to force someone to show up at a deposition and to show up under the authority of the Court for the deposition.

And even with the subpoena power, ME2C won't present a single power plant witness from any one of these power plants -- and they're not hard to find. They're huge facilities that take up city blocks -- that's going to testify that CERT encouraged the plant to use activated carbon, and that's their burden of proof.

And so, yeah, after the lawsuit was filed, we didn't know for sure who was using activated carbon and who wasn't, but we asked them, and that's important. Think about that. We had to ask them.

You'd think that if it had been our specific

intent to cause a power plant to infringe by using activated carbon that, we'd know about it, and we would have to ask them but we did.

And so let's go back to DTX 1969 if we can.  So the ones in white up here are the ones that confirmed to us early in the case when we asked -- we did our due diligence. We did not stick our heads in the sand like an ostrich, and we found out the power plants in white had to use activated carbon at least at some point in time.  We don't know how much, how often, but they said they had the equipment and they had used it.  And then the shaded ones below confirmed that they did not or had never used activated carbon.

So looking at that, assuming the top set of plants was using activated carbon the whole time and they weren't -- I'll get to that in a minute -- we confirmed from the get-go that the entire time of the program since 2011, every single day for eight and a half years we've been making and selling refined coal to power plants that weren't using activated carbon.

Let's just look at one of them, Intermountain, on the bottom.  And if we scroll over, with Intermountain you can see that .12, .3 million tons, 2.0 million tons, 5 million tons.  Let's jump over to 2019, 2020, and 2021. Right there.  I'm underlining over here.  That's when the lawsuit was going on, and while this lawsuit was going on in

2019, it says 1.6 million tons after July of 2019 and then there's about 1.6 million before, 2.8 million in 2020 and 2.8 million in 2021.  That's all refined coal, our refined coal, that we were selling to a power plant that's burning it without activated carbon.  7,500 tons a day.

Remember, one of the issues is did we, you know, believe there was a substantial amount non-infringing uses and did we know and believe our coal was specially made and adapted to be used with refined carbon or activated carbon. And so that's 15 million tons -- or 15 million pounds of refined coal every day this lawsuit is going on burning without activated carbon.  And the evidence will show the CERT companies that made refined coal for Chesterfield, Mount Storm, and Intermountain at the bottom of the chart down here, that ME2C sued them in 2019 and they remained defendants in this case until May 2022.

Now, remember, the refined coal program ended in December of 2021.  And so every day that refined coal is being made during this lawsuit, we knew that over 7,500 tons of refined coal was being sold and burned without activated carbon every day by a defendant company.  Every day.  It's undisputed.  So of course we knew and we reasonably believed there were tremendous substantial non-infringing uses of this refined coal that was the subject of this lawsuit.

So our state of mind is at issue, and what we

knew and believed at the time of the alleged infringement is very important, and I think, as you'll be instructed, if the defendant reasonably believed it did not infringe, even if that belief turned out to be incorrect at the end, the defendant doesn't have the level of sufficient knowledge of infringement to hold them liable for contributory infringement.

So you might be wondering, if these power plants are using activated carbon all the time as ME2C says and we say we didn't encourage them to use it, then who did? Activated carbon is a substance.  I mean, it's a black powder.  These big power plants use tons of it.  Costs lots of money, and they've got to get it from somewhere.  So why are they using it, and how did they get it?

ME2C tells us.  The federal government, the EPA, law is passed called MATS, and I think it's Mercury Air Toxic Standard.  Passed -- they issued the regulation in notice form in 2011 or 2012 or so for it to take effect in 2015, and then there were extensions granted in 2016.  And MATS required all coal-fired power plants to reduce mercury emissions by about 90 percent by 2015 or 2016, and that required many power plants, not all of them but many, to adopt activated carbon as part of their emission control strategy.

And the plaintiffs' technical expert,

Mr. O'Keefe, his testimony is that the only reason the power plants use activated carbon is to comply with MATS and that there is no other reason they use activated carbon.  Repeat that:  The plaintiffs' own expert has testified -- remember, it's your job to find who's causing the power plants to use activated carbon -- he's testified that the only reason a power plant uses activated carbon is to comply with MATS and that there's no other reason.

And so some plants needed the boost from activated carbon to get their 90 percent.  Some didn't in relation to coal grade, but the only reason they used it was to comply with MATS, and we were not involved in any of these decisions at the power plants.  So that's the why: Federal government mandated it.

What about the how?  How and where did they get it?  We don't sell activated carbon or activated carbon injection equipment.  Why would we?  It's not anything we're involved with.  It's the stuff the law says our coal has to meet its emission requirements without.  ME2C tells us that too.

Remember, ME2C sells activated carbon itself. That's its sorbents in its products, and it lists its competitors' activated carbon suppliers in its publicly filed security statements.  ME2C is a publicly traded company, buy and sell stock on the exchanges, and like all

public companies, they have to file statements with the government and Securities and Exchange Commission with certain information about their business, and they swear under oath that the information in their filings is true.

So let's take a quick look at one of them. DTX 376. This is the annual form filed the year ended 2018. It was filed -- I believe it says on here April 2019, but let's jump down to page 9. I'm just gonna move through this.

And our competition, right there at the bottom of the screen, that's their competition. That's the companies they list to the public that they compete with: Cabot, Calgon, Albemarle, Carbonxt, Nalco, Davinda, and several others. The evidence will show that these companies are activated carbon suppliers. There's no dispute about that.

And look at the next slide. These companies employ large sales staff and are well-positioned in the market. And ME2C says it thinks it's got better technology.

All right. And I'm going to skip in the interest of time, but in 2020, 10-K filed during this lawsuit says, I think, word-for-word exactly the same thing.

What do sales forces do? Sales forces sell. Sales forces encourage, persuade, lean upon. They pester their customers to buy their products. What's their product? Activated carbon? Who are their customers? Power

plants.

So I would respectfully suggest to you between the government mandating power plants to use activated carbon, as Mr. O'Keefe says, and Albemarle and Cabot and Calgon, these are large companies employing large sales forces that are well positioned in the market selling it to power plants.  That's who's inducing power plants to use activated carbon, not CERT.  It's not our business.

Thank you for sticking with me.  I know this is a lot of information, and as the defendant, we have to go second, so you hear their whole case and their evidence before you get to us, so I really want to give you an overview, get you oriented so when you're hearing their case and their witnesses, you can perhaps put it in the context what you're hearing from me now.  Thank you so much for your attention.

So as the case progressed, 2019, 2020, 2021, CERT sort of sorted things out even further.  Remember what I told you in the lawsuit about getting discovery?  And as part of the discovery process, we were able to learn the year when the accused power plants in this case installed activated carbon equipment.

Now, mind you, we don't have the hard data on how often they used it, how much they used.  Activated carbon is expensive, so they want to minimize it.  They run

on these 30-day rolling averages which don't require them to run it all the time. Dr. Senior will testify a little bit about how that's done. But anyway, it would be ME2C's burden of proof to show refined coal is burned continuously with activated carbon, and the power plants keep detailed records of that. ME2C didn't get any and aren't going to present any to you.

But at any rate, the year in which the accused power plants installed activated carbon equipment was established and stipulated by the parties. And so now, looking back at DTX 1969, what I call the coal chart, the tonnage chart, where the italics begin were given with the plant. That's the year that the plant started using or installed activated carbon equipment, okay?

And we gave ME2C the benefit of the doubt. If they installed the equipment any time of the year, we marked the whole year as an activated carbon year, and then we assumed that they were running at 100 percent of the time which, you know, we don't know. I don't think anybody will testify that's the case because, at a minimum, the systems had to be maintained.

But so if you look at the percentages now that you can see the coal burn, before we look at before and after the patents, and now we can see what we learned as the case went on of the coal burned with and without activated

carbon.

So even at the accused plants, from about 14 percent to 60 percent of refined coal was combusted without activated carbon.  That's the bare minimum, and it averages out to 35 percent.  You know, this is tens of millions of tons of refined coal at the accused plants had been burned without activated carbon.  And this is, again, assuming they did it all the time.

And now let's look at the bottom of the chart, the bottom of this column the color region.  Yeah, that right-hand side, those three years on the right.  These were some heavy hitters.

Mr. Brown, if we could catch the far right two columns as well.

You know, you've got Intermountain, one plant that burned 7 million tons over the time period -- or 70 million tons with these plants.  38 million at Intermountain, that's at the bottom, that was burned without activated carbon, 100 percent of it without, and this is important.  The CERT entity, the CERT Operations company that made that refined coal, was a defendant in this lawsuit every single day that the refined coal program was going on through 2021.

And so while the lawsuit is going on, we have a defendant company that is making, you know, things work out

to 7,500 tons a day of coal without any activated carbon at all. And that's what we believe. It's not just what we believe, but what we knew absolutely, and there's no contrary evidence. And that's why we believe there was substantial non-infringing uses of refined coal and we didn't infringe.

Okay. The formulation. Wait, there's more. I haven't told you about the formula yet, but refined coal -- remember, you add MerSorb and S-Sorb to it to get the reduction. And it's certified at this facility called the EERC, the same place Mr. Pavlish started his career or went to. I don't know if he started there. He was there for a good while.

So the EERC has this small-scale coal-burning furnace that Mr. Caldwell talked about. They could kind of switch in and out equipment at different power plants. So what they would do is they would take a sample of the feedstock coal from the power plant and they would run it through and burn it, measure the emissions without using activated carbon, and they would treat it with MerSorb and S-Sorb and then run that through and measure the emissions again. And then with the testing, they could determine how much of the MerSorb chemical and S-Sorb chemical needed to be added to get the required NOx and mercury reductions under the law and to get those reductions without the use of

activated carbon.

So importantly, the EERC, the Energy and Environmental Research Center, which is a division of the University of North Dakota, they were the ones who would do the testing. They set the formula, not us, to meet the requirements. And they did this every six months for every power plant at issue over this ten-year period. And I'm just going to show you one report quickly.

Let's look at DTX 1692.

So this is your typical report signed by a research engineer at the EERC. This one is from 2014, and it's addressed to Mr. Jeff Green. Jeff received every one of these over all these years. Jeff traveled to the EERC many, many times, supervised these tests, back and forth, coordinated all this. This was his job. That's what he did. And let's just kind of page down just kind of scroll through the report.

You have this test report. It goes through a lot of technical details.

Keep going. Keep going. Page down.

We're not going to try to read all this, but they describe the facilities.

Keep going down.

Here's a diagram of the furnace.

Page down.

Some different settings.  And if we can -- so it goes through.  And fuel preparation describes how they set it up, analysis of the fuel.  You look at the -- do learn about things.  Coal is different in different places, so they analyze the coal.

And scroll down.

These are some of the emissions measurements, and that's from the feedstock coal, refined coal showing the reductions.

And scroll down.

So this is incredibly detailed.  You can see it looking at all kinds of ash analysis and chemicals.

And scroll down a little bit more.  Keep going.  Keep going.

This is the NOx emissions part.  When you finally get towards the end of the report, they're saying that we -- this is going to the last page or the next page.

Yeah.  So you look at this bottom paragraph right here.  You talk about the feedstock coal treated with .2 percent S-Sorb, .02 percent MerSorb.  The average NOx emission of 23.25, average mercury at 43.73.  That's our 20 and 40 percent we were aiming for.

And then the next page, there's a certification, and attached to this report as Appendix A is a certification by notice 201054.

Remember, we looked at the IRS notice earlier. We look at the certification by a professional engineer -- registered professional engineer in the state of North Dakota who is signing off and certifying as to that formulation meets those reductions.  So that's kind of how it worked.

Well, let's take a look at DTX 1968.  By the time that these -- by the time the first patent issued in 2019, we were running the same formula at each of these accused power plants, and almost all of them we've been running the same formula for years.

And it's documented in big binders.  We can show you of these Section 45 test reports, or EERC certification reports.

So if we can scroll down, go to just -- let's just kind of look -- page through the different pages of it. We've got Big Cajun II, Coleto Creek, and they're all the same formulations over all the years, and this is the document of reductions, and so you've got -- PRB is Powder River Basin coal, and there's Brigham Basin coal.

So it didn't vary with the coal type, and the power plants, they're all a little bit different from each other, and the EERC can switch in and out certain equipment. And so it didn't vary from power plant to power plant.

And then very importantly, let's just look at

the last page of this.  This Intermountain Company, again, this was one that was accused of infringement from 2019 through 2022.  This is a power plant that never used activated carbon at all.

It's exactly the same formulation over all these many years, and it burns an entirely different grade of coal, bituminous and sub bituminous, Utah and Colorado based, and it's a higher grade, better quality coal.

So you have -- so what this shows is that the formula, specially made and adapted -- the formula was set before these patents -- long before these patents ever existed.  It's the same everywhere or same in all of these. How could our refined coal be especially made and adapted to infringe a patent that didn't exist when the formula was set; right?  How could it be made to designed to infringe a patent that didn't exist when we set the formula?

More importantly, how could CERT know or believe their refined coal formulation was specially made or adapted to infringe when the formula had been set before the patents existed?

And then last, how could you -- how could they believe the formula was made and adapted, designed to be used on activated carbon when you had the same formula used at a plant without activated carbon, and then, you know, some of these plants installed activated carbon at some of

these periods in between, and the formula didn't change?

So we have the same formula before and after the patent issued, the same before and after before we know about the patent, the same formula at a plant burning an entirely different grade of coal that never used activated carbon at all.

So now I want to emphasize that. That puts you in our state of mind. We knew that every single day we were making refined coal while this lawsuit was pending, we were using the same formula to make thousands of tons, millions of pounds a day, at Intermountain, which had never used activated carbon. Same formula there as all the other plants.

And remember, they were accusing CERT Operations III, who was making the refined coal with Intermountain.

So history matters. All of that matters. That's our state of mind. That's what we knew when we were sued and then as the lawsuit goes on because they're accusing us of willful infringement.

They're accusing us of being will -- willful blindness, and I think those facts show why we had a very strong reason to believe we didn't infringe, and there's no way we could be willfully blind. We checked it out, and we confirmed.

There was no specially made and adapted, and there was substantial non-infringing uses by defendants in the lawsuit the whole time the Section 45 program was going on.  And, you know, we got sued in 2019.  I'm just going to run through this quickly.

Refined coal production ended in 2021.  This goes to this willfulness allegation.  I'm not going to go into all the details, but they filed their complaint July 2019, sued various CERT entities.  One of the things you can do as the defendant is say, "Even taking what the complaint said as true, we don't think it makes out a legal claim."  You can request the Court to dismiss it, file a motion to dismiss.

We did that.  We filed a motion to dismiss, and then in May of 2020, the first judge that reviewed it agreed with it and thought the motion to dismiss should be granted, and then in July of 2020 or June of 2020, about a full year later -- no, it was July of 2020.  The second judge who looked at it agreed and ordered all the contributory infringement claims and inducement claims of the CERT entities dismissed without prejudice, gave the plaintiff opportunity to refile, which they did in July.

And so this timeline of these complaints is -- matters because they filed their original complaint, a motion to dismiss, order granting it, and then they filed a

first amended complaint, second, and a third.

And then the current, the current operative complaint, is this one here in 2022.  Refined coal program had ended.  The entire time that the refined coal is being made, every day, there is a defendant company making refined coal without any activated carbon at all.

So that was very puzzling to us.  None of that made any sense to us.  It may not make sense to you.  That's why we had very good grounds to believe and still believe and know that we did not infringe these patents.

So you heard sort of our side of it, and ME2C is asking you to rely on the opinions of Mr. O'Keefe as their technical expert for infringement.  It's up to you to assess the credibility of his testimony.

He did work at Commonwealth Edison Utility in the '80s, up to 1995, but he left industry in '95.  We're almost three decades from that now.  No aspect of his work in the '80s or '90s involved mercury emissions control.

The MATS regulations are a fundamental basis of his opinions, but he left the industry 20 years before those regulations went into effect.  None of the power plants he worked for, Comm Ed, had any kind of mercury control system or an activated carbon injection system.

And that means he -- he acquired all his knowledge about mercury control and activated carbon

injections systems between the summer of 2022 when he was hired for this case and when he gave his export report in October, 60 to 90 days.

He's didn't visit a power plant with an activated carbon injection system in place. He's never visited the power plant that used refined coal. He didn't even talk to a power plant operator that burned refined coal or a power plant that used activated carbon before he gave his deposition testimony.

At the time he gave his opinions, he'd never even seen activated carbon or refined coal in use or a refined coal facility. So the pictures you saw a little while ago, you saw more refined coal facilities than Mr. O'Keefe when he rendered his opinions in this case.

So it will be up to you to decide if you find him credible and if you are going to rely upon his opinions to find that each of the eight different power plants in this case infringed and then, further, to rely on his opinions and his inferences to find CERT liable for infringement and award money damages.

And I know this is taking a while, so I'm not going to talk anymore about the damages at this point.

They did touch on Alistar. Alistar was at one time a CERT company. They pointed out that they did settle. They were sued in this case. They were sold to a different

company, and they settled a few days before the trial was scheduled a few months ago for $107,000.

And you will hear some interesting testimony about that, I'm sure, but it was a $100,000 payment. I think you saw the other agreement from the large utility for $200,000, and we think if you find infringement, that those are what ME2C has valued its patents at -- these patents, this party, ME2C.

And I'm going to just kind of breeze through invalidity very quickly. As I touched on earlier, if we can look at the family tree slide again. The patent applications --

THE COURT: Mr. Sykes, I'm sorry to interrupt you. I do want to make sure we take our afternoon break. I wonder if you're moving to a different part of your closing.

Would this be a good time to do that?

MR. SYKES: This is fine. I've probably got five minutes left.

THE COURT: I'm sorry. I thought you had more. Let me let you continue. I wanted to ask.

MR. SYKES: Thank you all for sticking with me. I know it's tedious and lots of data and dates and tons and coal, and sometimes we feel like we wake up with coal dust on us working on this case. So thank you for hearing us because we don't get to tell our side for a few days.

The patent applications were filed in 2018, and as I alluded to earlier, didn't have all the details. There's your original filing in 2004, and then that's called a provisional, and non-provisional in 2005 and filed another one. And this one split, which is a very regular, normal thing to happen in the Patent Office.

And so you get two chains, and you have a series of applications filed up to 2018. This is the one that issues in the '114 patent, and we have a longer chain here up to the one that issues as the '517.

So they were filed in 2018. This one issued in 2020. This one issued in 2019, and very simply, you -- you heard some of this in the video.

For a patent to be valid, it has to be novel, which means it's new or now what others have done before, shouldn't be in print publications like the prior art, patents and research papers.

The patent claim must be nonobvious, which means it's not just an obvious combination of things that a person of ordinary skill would find to be a technician in the field, someone versed in the technology would understand, and it's just to put things together in an obvious way.

And so they claim priority from 2018 back to 2004, and for ME2C to receive the benefit of that 2004 provisional application, obviously, there's a lot of work in

the space going on, lots of work going on these years.

There must be a legally sufficient written description to support the claims filed in 2018 in each one of these applications leading up to the 2018 filing, so each one in the chain has to have a written description of the invention claimed in the 2018 applications.

And it's CERT's burden, the defendants' burden to prove this by clear and convincing evidence that at least one of these applications in the chain lacks the written description, and then if it does, and that breaks the priority chain, then prior art would come in, and we will show why that would invalidate the patents.

And so the issue is whether -- this may surprise you. The issue is whether there's adequate written description support in the intervening applications for adding bromine directly to coal as opposed to just adding bromine into the flue or into the furnace itself or downstream.

And we have an expert, slide 5, I believe, Dr. Stephen Niksa. Dr. Niksa, he has a Ph.D. in chemical engineering, went to Princeton. I believe he got his Ph.D. in 1982, and he has literally spent his life studying coal combustion, emissions regulation, including mercury control, NOx.

He has modelled all the reactions, I believe, I

read in his papers, 5- or 600 different chemical reactions that happen in a coal furnace, 260 published papers.  He's written books.  He has lived this.  It's been his life since the '80s studying coal combustion, coal emissions, and all the different chemistries involved.

And Dr. Niksa will explain to you and provide his opinions, and he will explain to why it's his view, his opinion that in certain of the intervening applications, there was not a description of adding bromine directly to the coal before combustion.

And because of that -- and it breaks the authority chain -- the 2018 applications would lose the 24 filing date.  And then Dr. Niksa will explain why prior art in that early 2000s time period renders these 2018 applications in years later invalid over the prior art.

So thank you for your time.  Again, you will be hearing "specially made and adapted" and "substantial non-infringing uses."  I think, as you've seen, our people reasonably believed, having sold tens of millions of tons of refined coal that was never combusted with activated carbon while the suit was going on by -- the defendant companies had reason to believe they did not infringe and no reason to believe their product was specially made and adapted, and it was never their intention to sell refined coal to cause the power plant to infringe.

The activated carbon suppliers, that was their business.  Our business was selling fuel, refined coal, that met its targets under the law without activated carbon, and we hope that you will consider the evidence and render a verdict for the defense.

Thank you.

THE COURT:  Thank you, Mr. Sykes.

Everyone, we'll take our afternoon break at this time.

(The jury exited the courtroom.)

THE COURT:  We'll take a 15-minute break.  It's about 3:42 right now.  We'll come back and ask everyone to be back by a few minutes before the hour.

The Court will stand in recess.  Thank you.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  Is everyone set for us to bring the jury in?  Okay.

(The jury entered the courtroom.)

THE COURT:  Let me turn to Plaintiffs' counsel to begin their case in chief.

Mr. Caldwell.

MR. CALDWELL:  Thank you, Your Honor.

Your Honor, the plaintiffs would like to call Mr. John Pavlish, the inventor.

While Mr. Pavlish is being sworn, can I pass out the binders?

THE COURT:  You may.  We'll have our witness sworn.

THE CLERK:  Please state and spell your name for the record.

THE WITNESS:  John Pavlish, J-O-H-N, P-A-V-L-I-S-H.

JOHN PAVLISH,

called as a witness on behalf of the

Plaintiff, was sworn, and testified

as follows:

MR. CALDWELL:  Your Honor, I have one more binder for the witness.

THE COURT:  You may approach.

MR. CALDWELL:  Thank you.

May I begin, Your Honor?

THE COURT:  You may.

MR. CALDWELL:  I haven an unusual request. There's one thing.  I would like to seal the courtroom for for one question.  I think it would be less disruptive if I do it real quick and then go off the sealed record.

THE COURT:  Is there any way around doing this?

MR. CALDWELL:  My client believes that we should seal the courtroom for -- it's just a number.  My client

believes that we should seal the courtroom.  Obviously, I'm going to do what the Court orders.

THE COURT:  Let's have a brief sidebar so I can understand.

(The following discussion was had at sidebar:)

THE COURT:  We're on the record.  And let me -- like I mentioned at the pretrial conference, we won't be sealing the courtroom really at almost any time.  We'll be looking for any alternative to having a sealed courtroom, including making reference in some way so the jury can see something.

With that as a backdrop, what is it that we're talking about?  Why do we have to do this?

MR. CALDWELL:  I would like to talk about -- I'm trying to make it as minimally disruptive as possible -- is during the opening just basically saying, "Look at how they settled the lawsuit.  It's $100,000 or thereabouts."  I think, necessarily, we need to respond to that and point out similarly situated defendants paid $267 million because that was omitted.

So I guess my client's preference, being publicly traded, is it's probably not the ideal way for it to be released.  If it's better, maybe what we could do is pull up the document and zero in on that in the document and not say it on the transcript.

THE COURT:  I have to tell you, I think this information about what was paid for the licenses, this is information that's going -- I think going to be central to the damages issues in the case.  I can't see sealing the courtroom with regard to the discussion.  The best thing to do is if there's some way you think discussing or showing will maybe minimize the need for broadcasting whatever, you're welcome to do that, but I can't see sealing the courtroom for that.

MR. CALDWELL:  Well, to be honest, if that's kind of the direction we're going to have going forward in the case, that's helpful.  This is just the first time something came up, so it just might be that we bite the bullet and do it.

THE COURT:  Okay.  All right.  Good.  Thank you.

(The discussion at sidebar ended.)

THE COURT:  Plaintiffs' counsel can begin their questioning.

DIRECT EXAMINATION

BY MR. CALDWELL:

Q.    Good afternoon.

A.    Good afternoon.

Q.    Please introduce yourself to the jury.

A.    Good afternoon.  My name is John Pavlish.

Q.    Why are you here to testify, Mr. Pavlish?

A.      I'm here as the co-inventor on the patents-in-suit and also the corporate representative for ME2C.

Q.      In terms of personality, are you more on the technical side or business side of ME2C?

A.      I'd be more on the technical side.

Q.      Are you aware of some of the big terms of license agreements that ME2C has entered into in the past?

A.      I'm aware of it.

Q.      I'm going to go through the technical information, but I want to have you respond to something that pertains to something we heard in opening.

        Do you recall the discussion in opening from defense counsel about how to settle this lawsuit, some coal plants paid a small amount or there was a reference that Alistar paid a small amount?

A.      I remember that.

Q.      Were there any other defendants in this lawsuit that are similarly situated to these CERT entities, what they call refined coal defendants?

A.      Are there any other entities?

Q.      Were there other entities in this lawsuit?

A.      Yes.

Q.      Sir, how much did the Gallagher and DTE defendants pay to settle and get out of the lawsuit and take a license?

A.      I believe it was around 28 million.

Q.    So you said you're on the technical tide.  Will there be another witness who's more focused on the business side of ME2C?

A.    Yes.

Q.    What is it you invented, Mr. Pavlish?

A.    I invented, along with my co-inventors and co-workers, invented a two-part process to reduce mercury emissions, in particular from flue gas, but more importantly from coal-fired power plants.

Q.    Around what time did you and your co-inventors come up with this invention?

A.    Around 2002, summer of 2002.

Q.    How old a man are you?

A.    Just turned 65.

Q.    Do you have a family?

A.    I do.

Q.    Married?

A.    I am.

Q.    How big is your family?

A.    I have 4 children and 11 grandchildren.

Q.    Whereabouts do you live, Mr. Pavlish?

A.    I lived most of my life in Minnesota.  As I've gotten older, my wife and I don't particularly like the cold weather in Minnesota, 30 below, so we share a time now in Florida during the wintertime and the rest of our time we

share up in Minnesota.

Q.    Where did you grow up in Minnesota?

A.    I grew up near a small town called Bejou, Minnesota.

Q.    How big is Bejou?

A.    Bejou is a very small town.  Less than a hundred people.

Q.    What did your folks do, mom and dad do, in Bejou?

A.    I grew up on a farm.  They farmed.

Q.    Do you have siblings?

A.    I do.  Myself and six others, so total seven including me.

Q.    Obviously, you're not a farmer.  Did you end up going to college?

A.    I did.

Q.    What did you study?

A.    I went to -- got a two-year degree in the applied science, Associate of Applied Science, from University of Minnesota Crookston, and I also have a four-year degree, Bachelor of Science in mechanical engineering from North Dakota State University, and I was pursuing a degree, masters degree, in mechanical engineering from Kansas University.

Q.    What made you want to study mechanical engineering after college, Mr. Pavlish?

A.    Made we want to study it?  I guess I always had a

mechanical inclination.  Growing up on the farm, we were poor, didn't have a lot of money, so when things would break, we couldn't afford to repair it.  I would repair it and fix it.

I looked, why did it break?  Was it designed correctly?  Why was it designed that way?  I grew up through high school doing that, so just seemed natural for me to pursue a mechanical engineering degree.

Q.    In addition to the engineering degree, do you have any professional certifications?

A.    I do.

Q.    Like what?

A.    I hold a Professional Engineering certificate.

Q.    How do you get that?

A.    To get that, you have to take a thumbnail engineering course.  I took that and graduated with mechanical engineering.  That's an eight-hour exam.  I passed that and worked for about four or five years in the field of engineering and then I look an eight-hour exam called a Professional Engineering Exam and passed that as well.

Q.    Now, did you go to work after you got out of school?

A.    I did.

Q.    Where did you go to work?

A.    I worked for a company called Black & Veatch.  They're a large engineering firm that is internationally

known and specializes in the design and construction and building of power plants.

Q.    And in terms of the power plants that you got to look at, did you look at coal-fired power plants?

A.    That's pretty much all I worked on, is coal-fired plants.

Q.    Given your background, I'd like to start with a brief introduction of how coal-fired power plants work to make sure that's in the evidentiary record.  Is that okay?

A.    Sure.

Q.    Just at a high level, what are the parts of what's going on?

A.    Sure.  I never went through it.  I'll refresh it, go through it again.

We see on the left-hand side of the slide, there's the huge coal pile we talked about at the beginning of the remarks.  That sits close to the power plant, and that coal is then fed by a series of conveyers to a pulverizer, and that pulverizer takes coal and grinds it up to a real fine material like powdered sugar, real fine material.  That gets blown into a combustor, and it's where it's actually burnt.

As it burns, it generates an enormous amount of heat.  That heat is transferred to water, and that water is converted to high pressure steam as well as high temperature

steam.  That steam flows into a turbine and the turbine turns a generator.  The generator sends the electricity to the power grid and your home.

The steam is condensed at the turbine and returned back to the combustion chamber/boiler, and that cycle repeats over and over again.

Q.    We went to the boiler point, and from the boiler we focused on where the steam goes, the water side of it.  What are the key parts of what we need to know about the exhaust and combustion parts?

A.    As I mentioned, the coal comes from the coal pile, goes through the pulverizer, so it's very fine.  That fine coal is combusted, burnt, and generates what we call flue gas, and that flue gas flows out of the boiler and through a series of clean-up devices.  It cleans up the bad stuff out of the flue gas.

What we're showing here is one device.  There are a number of devices, scrubbers, other devices that are also in the stream.  The purpose of the devices is to clean out impurities.  Once those impurities, you end up with a clean gas, that gas is sent out of the stack out to the atmosphere.

Q.    Where does the big stack of coal typically come from?

A.    The big stack of coal comes from the mine.

Q.    Are mines often adjacent to the plant, or sometimes

do they have to travel a long way with the coal?

A.    Sometimes it can be adjacent to the coal, but in many cases, the coal is mined some distance from the plant and transported by truck or by train.

Q.    How much of the U.S. power supply were coal-fired power plants providing around the time of the invention in the early 2000s?

A.    Around 50 to 55 percent.

Q.    How much of the United States power supply do coal-fired power plants provide today?

A.    Approximately 20 percent.

Q.    Do you have a sense why that percentage changed over time?

A.    Sure.  A lot of the energy converters changed over to solar and wind.  There's also the increase in the amount of natural gas used for power production.

Q.    Is coal obsolete or pretty close to becoming obsolete?

A.    I wouldn't say that.

Q.    Why?

A.    I think it serves a real critical purpose in maintaining the overall stability of the electrical grid.

Q.    What is it about coal that stands out in terms of stability of the electrical grid?

A.    Well, it's a large resource that can maintain,

basically, the stability, meaning it's a very reliable source. It's got fuel stored on site, so it can generate electricity 24/7. From that viewpoint, it can provide a consistent, non-varying, so to speak, electrical current off of the grid, so it's kind of critical in that regard.

Q.    How is the process that you invented used in coal-fired power plants in your experience?

A.    What we do is we add a bromine compound to the coal and then we add additives to the coal and that goes upstream to the combustion zone and we add activated carbon downstream of the boiler combustion zone.

When we do that, kind of the -- I guess the carbon and the bromine kind of exchange some electrons and make that surface stickier toward mercury and catch that more effectively.

Q.    About how long have you been either researching or testing or working in the mercury capture-related field?

A.    It would be over 30 years now.

Q.    Have you ever published any articles or reports in this field?

A.    I've been fortunate throughout my career. I published over 200 different articles and papers and publications and so forth.

Q.    Do you serve on any professional or technical committees in the space of mercury capture?

A.    I do.

Q.    Like what?

A.    I serve on Mercury Emissions From Coal.  It's an international mercury work group.  And I also serve on the United Nations Environmental Program.  It's a global mercury partnership program.

Q.    Do you believe your invention is important?

A.    I believe it's extremely important.

Q.    Why?

A.    There really -- at the time of the invention, there really was no solution to reduce or improve mercury from coal-fired power plants, and not to any significant degree, so it was critical.

Q.    Back to your time at the engineering company Black & Veatch.  I think you said you worked on plant design.  What did you work on at Black & Veatch after that?

A.    The last five years at Black & Veatch, I spent most of my time on software, a computer program that would simulate the performance and operation of a plant that could let us look at the economics should a design change be implemented or coal quality change.

Q.    What kind of changes would that mean, a design change that you might model or coal quality change that you might model?

A.    The design change includes many things.  Typically,

we look at type first and say what are the characteristics and what sort of equipment is needed, whether that be handling equipment or whether that be the type of emission control equipment.

And then you would look at the design of that and again, overall, evaluate performance and the economics of that coal type along with that particular design.

Q.   Does it matter if a coal plant burns one type of coal versus another?

A.   Yes, very much so.

Q.   I'd like to direct you to the screen.  Can you help us understand some of the different classifications of coal?

A.   Sure.  Generally, there are four different types of classification of coal.  Shown here, they are lignite, sub-bituminous, bituminous, and anthracite.  Four different types.

Q.   What types of characteristics tend to vary and make one type of coal different from another in a meaningful way?

A.   The common difference would be the carbon content of the coal and to some degree also the moisture, or call it the impurities, the amount of ash or dirt that might also be contained within that coal.

Q.   What are the hallmarks of anthracite coal?

A.   Anthracite is a very hard coal, primarily consists of carbon, has very small amounts of impurities, doesn't have a

lot of moisture in it.  It's very hard coal.

Q.    Is there a consequence of it being a hard coal?

A.    Since it's a hard coal, even though it's got a high carbon content, it's difficult to actually burn because it doesn't have a lot of volatile materials.  It's difficult to sustain.

Q.    What hallmarks the bituminous coal?

A.    Bituminous coal has a high heat content, a little bit less carbon content than, say, anthracite.  And it's got a little more impurities, but not as much as the other coal we'll talk about.  And there's vast quantities of it, so it's used quite a bit in power production.

Q.    Are there any particular impurities or issues that bituminous coal is known to have problems and issues with?

A.    One of the bad characteristics of bituminous, even though it has high carbon content, one of the bad characteristics is high sulfur content.

Q.    What is sub-bituminous coal?

A.    Sub-bituminous is the middle road, a lower rank coal. It has less carbon, a lot of moisture, a fair bit of impurities.  One of the attractive characteristics of sub-bituminous coal is that it has a very low sulfur content.

Q.    Are there significant quantities of sub-bituminous coal in the United States?

A.    Yeah, there are vast amounts of sub-bituminous.

Q.    So wrap up.  What is lignite?

A.    Lignite is one of the worst coals, and I jokingly say it's kind of like burning dirt.  There is some carbon there. It does have some, but it has a large amount of dirt and a high amount of moisture as well.

Q.    Within a given type of coal like sub-bituminous, are there other subtypes within that?

A.    Well, there's what's called a -- we call it the PRB coal.  It's primarily mined in the Powder River Basin, which is in Wyoming and Montana.  That's the primary coal that's used for power production.

Q.    Do there tend to be differences where it's located both geographically and also geologically?

A.    I would say yes, both.  Geologically, they're located in different places across the U.S., and they're mined differently as well.

Q.    Give me an example how one type of coal might be mined differently that matters.

A.    Generally, the low coal, the lignites and sub-bituminous coals, they're near the surface and easy to mine.  You remove topsoil and take out the coal.  The higher ranked coal, such as bituminous and anthracite, they're deeper, underground, not on the outside, so they're in rocks, so a little more difficult

Q.    Do people who work in this field kind of have --

(Multiple speakers.)

Q.    Let's just try to make sure that we don't talk over each other for the sake of our court reporter.

As we move left, we kind of referred to something becoming more of a low-rank coal.  Do you remember that?

A.    I do.

Q.    If there's certain things that are higher rank coals, why don't we just burn those?

A.    Well, a lot of it comes down to the impurities, how they're mined, how well they are, where they're located. There's a lot of different factors why we burn one coal versus another coal for power production.

Q.    I'd like to direct you to this geography slide we saw before on the -- what type of coal do we typically see on the eastern side of the United States?

A.    On the eastern side of the United States, we see the anthracite we talked about, but it's there in very small amounts.  We show it in the green.

And then we have vast amounts of this bituminous coal, which I also discussed.  We can see in the yellow there's a large supply of that.

Q.    What types of coal were commonly mined and used as you get sort of west of the Mississippi?

A.      West of the Mississippi, you see in the blue is the sub-bituminous coal, which I also talked about.  It's there in vast amounts as well.

Then you have the lignites, which up in North Dakota, there's a huge supply, a resource of lignite.  And there's also some lignite down in, say, Texas, Arkansas.  It's kind of scattered around throughout the two states.

Q.      The elephant in the room on this picture is this gigantic blob in yellow up here in the middle of the country.  If I were to build a coal plant in Kansas, would I use -- automatically use the bituminous coal in Kansas?

A.      It's a complex question.  Since the coal is there, one would be led to believe that you put the plant there, but as I mentioned, the bituminous coal has the high sulfur content.

In order to reduce the SOx emissions that result from that high sulfur coal, you have to put in a scrubber that's 3 or $4 million, whereas you might look at bringing in a sub-bituminous from Wyoming.  You have transportation would be much higher, but it's easily mined, so the cost of coal is quite a bit less, and it has this attractive feature, this low sulfur.  So you wouldn't need to put it there.  You kind of have to weigh out what it makes sense, to transport the coal or put in a scrubber and economically what would make more sense.

Q.      In your career history, have you modelled that type of decision-making before?

A.      Yeah, that's exactly what I did at Black & Veatch.

Q.      Can you help us understand about how much coal a coal plant might use from an average one to a large coal plant?

A.      An average coal plant will burn on the order of, say, half a million to a million pounds per hour.  So we're talking a lot of coal, obviously.  A large plant like the one I believe you mentioned, the Parish plant for example, that's a four-unit plant and fairly large.  And that plant is probably going to burn 2, 3 million pounds an hour, and it's going to burn literally trainloads.  And the trainload, a unit train is about a hundred cars, and each car holds about a hundred tons.  And that large plant, for example, is going to burn two or three of these unit trains so looking at 2, 400 cars a day.  Burn a lot of coal.

Q.      Kind of rough estimation, unless I totally mess this up.  The courtroom is on the order of magnitude of something like 50,000 cubic feet, length, width, height.  How long would it take to burn coal filling this courtroom roughly?

A.      A plant can burn the quantity in about two to four hours.

Q.      At some point, did you leave Black & Veatch and go elsewhere?

A.      I did.

Q.    Where did you go?

A.    I went to the EERC.

Q.    What is the EERC?

A.    The EERC is the Energy and Environmental Research Center.  It's located in Grand Forks, North Dakota.

Q.    Is the EERC is a for-profit company?

A.    No, it's not.  It's a nonprofit.

Q.    When did you start working at the EERC?

A.    I started working there in 1993.

Q.    Why did you leave Black & Veatch and go to work at the EERC?

A.    The primary reason to get closer to family.  I guess closer to home is the primary reason.

Q.    Why else would you want to go work at the EERC?

A.    Why else?

Q.    Why else would you like to work at the EERC?

A.    Sure.  Gave you an opportunity to do more work in the R&D area and specialize on development of technologies in the area of energy production as well as different environmental controls.

Q.    Did you work on a specific program within the EERC when you started?

A.    I did.  I worked at the EERC, but I worked in a program under the EERC called the Center for Toxic Metals.

Q.    Is mercury an air toxic metal?

A.      Yes, it is.

Q.      What were your main responsibilities working at the
Center for Air Toxic Metals?

A.      My main responsibility was to manage and oversee the
research and development work that was done over that
program.

Q.      In that mid '90s time frame, was that an important
time to be studying mercury?

A.      In the mid '90s, it was very important.  We had come
to realize under a few years of study that -- you saw the
particulates of some air toxins being controlled, and
mercury was not.  It was being released from these plants.

Q.      If other air toxins were better being controlled in
coal emissions, why was mercury so problematic?

A.      Well, mercury was in kind of the vapor phase.  Like I
said, it wasn't being removed in the plant.  It was actually
being discharged into the atmosphere.  Once it travels to
the atmosphere, it can travel to water bodies, so bad for
the environment and certainly not good for health.  It's
harmful to your health as well.

Q.      Was there ever a time when mercury kind of started to
be the focus that the Center for Air Toxic Metals zeroed in
on?

A.      In the mid '90s, we focused on mercury.

Q.      What kind of things were you researching regarding

mercury in the mid '90s?

A.    In the Center for Air Toxins, we looked at a number of different things. We looked at how the mercury was bound in the fuel. We looked at the cake formation of the mercury as it was combusted or gasified. We looked at different ways to measure mercury in the coal combustion systems. We had the technicians to do that, good technicians. We looked a lot at the control in mercury from these plants, and we also had a little bit of a people looking at the health effects of mercury.

Q.    Did you perform all of that research alone?

A.    No, I didn't.

Q.    How many people were working under you?

A.    As director of that program, I had probably 30 to 50 different people.

Q.    How many total folks at the EERC were working on mercury?

A.    It was several years where we had 150 different people working on mercury.

Q.    Mr. Pavlish, was there anything particularly difficult or complicated with regard to studying mercury?

A.    Well, yeah. It's a gaseous form. It's in elemental form. It's very difficult to, I guess, remove from a flue gas.

Q.    Were there kinds of coals you were concerned with in

particular?

A.      By that point, we had -- from field data, we had pretty well recognized that the low-rank coals, the lignites and sub-bituminous, were emitting more elemental mercury, for example, than, say, plants that were burning bituminous coal.  The lower-ranked coals were the immediate concern.

Q.      I guess that I asked you about if mercury is difficult.  Now I'm going to focus on the power plant aspect of it.  Is there anything uniquely challenging about trying to investigate mercury in the context of a gigantic furnace?

A.      In a furnace, it's very difficult.  When you burn this fuel or this coal, you're burning it under very high temperatures, in excess of 4,000 degrees F.  It's a very hot zone, complex area where things are turbulent.  Talking about thousands of different chemicals and reactions occurring at the same time.  It's a very complex process.

Q.      Is there a way for a person to physically see what it looks like inside a combustion chamber?

A.      Yes.  Most plants have a viewport that you can view into the combustion zone.

Q.      First, I'm sure this is hard to judge.  About how big is this viewport that we're going to look at?

A.      This view port is a 4- to 6-inch opening that goes through the boiler to the combustion zone, and that's probably two feet thick just to get into the combustion

zone.  When you're looking into it, so to speak, it would be across this room, 20, 30, 40 feet deep.  It's a big box, if you will, where that combustion occurs.

Q.    What will we see when we play the video clip briefly?

A.    What we're going to see here is the actual combustion of the fine coal particles that are flying around in this big box.  You can see it's a turbulent zone.  You can see the flame and particles all being combusted.  You're looking at that way across this room.  It's a big box.

Q.    How much mercury is actually in the flue gas?

A.    Well, the amount of mercury in the flue gas is very very small amounts.  We're talking about, like, generally, in the order of 1 to 2 parts per billion.

Q.    So if mercury is only present in such small, fractional amounts, is it even that big of a deal?

A.    Even though it's there in very, very small amounts, one atom of mercury versus a billion atoms of flue gas, they burn a lot of coal and generate a lot of flue gas.  The volumes of flue gas are huge.  Even though the amount of mercury is in there is a small amount, it generates a very measurable amount of mercury.

Q.    How do you go about solving the problem of removing mercury from emissions?

A.    Well, we've done a bunch of research, lab-type skill work, and we come to realize we needed to do testing, larger

testing, so we wanted to test sorbents and additives.

Q.    Are these tests you can run on the tabletop in a small lab?

A.    We had done that already, so we were wanting to move to the next stage, and we wanted to do it at a scale that we could produce a real flue gas that would be simulated by a power plant.

Q.    Did EERC have a miniature power plant you could use for testing?

A.    Yes, it did.

Q.    What is it called?

A.    It's call a particulate test combustor or PTC.

Q.    Do you have a binder in front of you?

A.    Yes, I do.

Q.    If you're able, would you please flip to the document marked PTX 58.

A.    Yes, I see that.

Q.    What is Plaintiffs' Trial Exhibit 58?

A.    The document is a description of the test facility, that PTC combustor.

Q.    Are you familiar Plaintiffs' Trial Exhibit 58?

A.    Yes, I am.

            MR. CALDWELL:  Your Honor, Plaintiffs move for the admission of Plaintiffs' Trial Exhibit 58.

            THE COURT:  Any objection?

MR. SYKES:  No, Your Honor.

THE COURT:  It will be admitted.

(Thereupon, Plaintiffs' Exhibit 58 was admitted.)

BY MR. CALDWELL:

Q.    Sir, is this the document you were just looking at?

A.    Yes, it is.

Q.    What was the purpose of the document that says Description of Test Facilities?

A.    This document was really to describe that unit.  In other words, what does it consist of, what is it capable of doing, what are the different test parameters it can test under.  Thorough description of the particulate test combustor.

Q.    What are we looking at here on the fourth page?

A.    Yes, this is, I guess, a view of that PTC or that particulate test combustor.  What you're seeing on the right-hand side is a pictorial view, if you will, of the equipment there.  It's hard to see the different components.

If you look on the left-hand side, that describes the different components there, the combustor, how the coal is fed, the different emissions controls, the clean-up devices I referred to earlier such as the scraper, scrubber device --

THE COURT:  Could you speak a little slower.  It

will help our court reporter.  Thank you.

BY MR. CALDWELL:

Q.    So you were an employee of the EERC.  Could you just run tests on this particulate test combustor whenever you wanted?

A.    No, I couldn't.

Q.    Why?

A.    Well, there was really two reasons.  The first was it's very expensive to operate and run this unit, and so we needed a lot of funding, if you will, to run it.  And second, other projects also relied on doing tests on others.  There's also scheduling.  You have to schedule it in.

Q.    What did you do to try to obtain funding for your testing related to mercury emissions?

A.    Well, we pursued trying to get funding so that we could do these tests, and so we had some meetings, internal meetings, whatever, to discuss how could we get that funding, where should we pursue that funding.

Q.    Thank you.  In your binder, would you turn to the tab that is for Plaintiffs' Trial Exhibit 59.

A.    Yes.  I see that.

Q.    Do you recognize Plaintiffs' Trial Exhibit 59?

A.    Yes, I do.

Q.    What is it?

A.    This is a document that I had prepared to kind of

describe a project to pursue that funding.  In other words, initiate that project, but we needed to get the funding first.

Q.    Do you recall when it was that you prepared this document?

A.    I believe this document was prepared -- I was probably preparing it the latter part of 2021, so say December.

Q.    You said 2021?

A.    2001.  I apologize.  2001.

MR. CALDWELL:  Your Honor, Plaintiff moves for the admission of Trial Exhibit 59.

THE COURT:  Any objection?

MR. SYKES:  No objection.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 59 was admitted.)

BY MR. CALDWELL:

Q.    I think you already previewed.  You helped create this document?

A.    I did.

Q.    It says at the top "Mercury Control Technologies for Electrical Utilities Burning Lignite Coals."

Do you see that?

A.    I do.

Q.    Why does it say you guys wanted to study lignite?

A.    Well, at the time, we had the data -- we felt that the lignite coal was kind of the worst-case scenario, so we wanted to study it in the worst conditions.  Could we develop something to remove mercury from a worst case?

Q.    Did you have any expectation if you could fix the mercury issues with lignite whether that would be helpful on even better coals like sub-bituminous?

A.    Yeah, we thought that we could come up with an approach for technology.  If it would work on plants burning lignite, it would likely work for sub-bituminous as well because that's a low-ranked coal.

Q.    Who was the audience for this presentation?

A.    We sought funding of the audience and particularly industrial sponsors, coal partners, utility folks, governmental agencies, state agencies.  So there's quite a large group.

Q.    So when you got those groups of people together to look at your presentation, what were you trying to impress upon them?

A.    We were trying to impress that we needed to do, like, research with that coal, like, immediately, now.

          MR. CALDWELL:  Mr. Diaz, could I have you go to page four.

BY MR. CALDWELL:

Q.    I want to direct you to this slide that that says "background," and could you introduce to us -- in 2001, what problems were you specifically suggesting needed to be looked at right away?

A.    Well, the problem was with lignite coal, is it had a high fraction of the elemental mercury that was being released to the atmosphere.  We turned our attention to developing -- attempting to do research and testing and developing a technology for that particular coal, and we felt that, again, that being the worst-case scenario, it's likely not going to be very reactive or reactive for other coals, different flue gases.  Again, a worst-case scenario we wanted to do research on.

Q.    What is elemental mercury?

A.    Elemental mercury is what it says.  It's the element of mercury.  It's in its basic state, neutral state.

Q.    Is it reactive in that state?

A.    No, elemental mercury is very nonreactive.

Q.    What is the significance of something like mercury being nonreactive?

A.    Well, the significance is it doesn't really want to react with anything, so it's very difficult to, say, capture it.  It doesn't want to react.

Q.    Is there a way to make something like mercury maybe more reactive where it's willing to engage in a reaction?

A.    Yes.  One way you can do it is to, I guess, kind of steal some electrons from it, if you will, and that will give it a positive charge.  And once it has the positive charge, it's in a state that's much more reactive.

Q.    What's that called?

A.    That's generally called oxidation.

Q.    Are there particular types of those four coals that are known to have this problem with elemental mercury?

A.    The two really are the lignite that are the worst case and sub-bituminous coal, and even within those, it's, like I say, for example, the lignite.  There's that Fort Union or Texas lignite, and the sub-bituminous is part of the PRB the Powder River Basin.

Q.    The next bullet down says "potentially less reactive towards catalysts and sorbents."

      What is a catalyst?

A.    A catalyst is basically a -- you can kind of think of it as any surface that would promote a reaction or speed up a reaction between two chemicals that normally wouldn't occur unless that surface is there, that catalyst is there.

Q.    What is a sorbent?

A.    A sorbent is usually a material that can absorb or adsorb probably a harmful substance from a solid or liquid. You can think of it as small particles that are very sticky. Things that will stick to it.

Q.     Were there any specific techniques you had in mind you wanted to look into?

A.     Yes.  At this point, we really had turned our focus primarily to what we call the sorbent, looking at sorbents.

Q.     What kind of sorbents?

A.     We had done a lot of work.  At this point, we were really wanting to focus on activated carbon.

MR. CALDWELL:  Thank you, Mr. Diaz.

BY MR. CALDWELL:

Q.     So I think you said the context of documents like that is you were making presentations trying to get funding to do testing.  Did you eventually get any funding that you could use toward mercury research?

A.     Yes, we did.

Q.     How did that play out?

A.     Well, we kind of defined that project after we got some sponsors on board.  Final scope of the testing is to be submitting a proposal, and that proposal was then accepted and awarded.

Q.     By what entity?

A.     It was the United States Department of Energy.

Q.     In those early days of testing, what kind of chemical were you looking at as this oxidizing agent?

A.     The earlier start of the tests were really focused on chlorine.

Q.    When did you get going on working on carbon-based sorbents but with a chlorine?

A.    We initiated that project in February of 2002 time frame.

Q.    What did that 2002, early 2002 testing show about using chlorine and then the carbon sorbent?

A.    Usually, when we combine those two, the chlorine and activated carbon, we always see improved results, improved capture.

Q.    Did you think you'd be able to get really substantial capture, 90 percent capture, in a coal plant using chlorine as a sorbent?

A.    I think going into the test, that's certainly what we hoped for.  Unfortunately, that's not quite what the test results showed.

Q.    Tell me what you mean.

A.    Getting 90 percent or higher levels of mercury with the chlorine additive, it's virtually impossible.  You can do it, but not really.  It's a very corrosive agent, very corrosive.  So we found through some of the testing that you would have to add huge quantities of this chlorine.  If you added that much chlorine, you'd probably destroy the plant. You'd corrode it up.  No operator would put that much.  Yes, in theory, maybe, but probably in practice, no.

Q.    Why did you not just immediately jump to testing

other elements or compounds?

A.    As we went into the test, we said we're studying chlorine, and chlorine was bought by many.  It's the most reactive form of halogen, so there was no reason.  It's thought to be the best oxidant, I guess.

Q.    Were there ever occasions where you were able to test additives that were not chlorine based?

A.    We tested what we call speculative approaches.  When we finished the day, meeting the obligations of DOE tests, when we officially had time left over, we tested other things.

Q.    Your after-hours tests?

A.    Yeah, these after hours.

Q.    So when did you first test what we're now kind of describing in shorthand as this two parts of adding a bromine-based additive before the combustor and then injecting activated carbon downstream of the combustor?

A.    We did those tests in the summer of 2002.

Q.    What were the results of the after-hours tests where you used a bromine-based additive with activated carbon?

A.    They were extremely encouraging.  We tested a lot of these other approaches, but quite surprising.  It worked very well in comparison to the chlorine additive.

Q.    Didn't you have the same concerns about corrosion with bromine that you just described for chlorine?

A.      Not nearly the same level of concern, much lower level.  We were using less amounts as well, so the concern with bromine was quite diminished.

Q.      Was that what you expected going in?

A.      No, we certainly did not.  It was shocking to see great results, so we did not expect it.

Q.      How does that moment -- what are your thoughts about that moment in retrospect?

A.      It's one of the moments you have in life where you say, you're working on it hard, we finally see something that jumped out, like wow.  We have something here.  This could really work.

Q.      Mr. Pavlish, I'm going to start constructing a timeline, and you just described in 2002 --

MR. CALDWELL:  Mr. Diaz, can you get that for me.  Thank you.

BY MR. CALDWELL:

Q.      I want to ask, is this what you described in summer 2002 as the first time you put together the concept of the bromine with the sorbent?

A.      Yes, it is.

Q.      All right.  Now, let's talk a little bit more about your conception of the idea.  Can you give us a sense of orders of magnitude how much more effective you were finding bromine to be versus the chlorine?

A.      Quite a bit.  On the order of ten times better.

Q.      Why hadn't bromine been your initial go-to chemical?

A.      Like I said earlier, we thought chlorine would be far more reactive than bromine.  Going in, we thought chlorine would be the best.

Q.      Did you come to have a belief in your mind as to why the bromine sort of in practicality ended up working so much better than chlorine?

A.      Yes.  In part, the chlorine being so reactive, that it would react earlier on in the process and become less available to react than the sorbent, and the mercury versus bromine is a little less reactive.  It would be less available, if you will, to interact with the sorbent later on in the process.

        I think what we also came to understand is this catalytic effect I briefly mentioned.  In other words, the interaction of the bromine and carbon and mercury is much faster with bromine than for chlorine.  It was a much faster reaction.

Q.      Why are you mentioning how fast the bromine, carbon, and mercury can react?  Why are you mentioning that as significant?

A.      In most combustion systems where you inject the activated carbon, you only have about three seconds for all this stuff to happen so you can collect it.

Q.    What kind of reaction was going on that gave the bromine and activated carbon the ability to react in the flue gas with mercury?

A.    You have the bromine and the mercury and the sorbent and they all come together.  We call this -- we call it in-flight reaction.

Q.    In-flight?

A.    In-flight.

Q.    Did you come up with multiple ways to add the bromine?

A.    Yes, we did.  We actually came up with three different ways.  You could add it directly to the coal, or you could add it directly into the combustion chamber, or you could add it downstream of the combustion chamber.

Q.    There was some suggestion in the defendants' opening that in your invention, you have to add bromine into the boiler.

      Did you hear that?

A.    I did.

Q.    Do you agree with that?

A.    No, I don't.  I just mentioned we have three different ways.  You could add it directly to the coal.

Q.    Is that disclosed in your provisional patent application?

A.    Yes, it's disclosed.  In fact, we put a figure in

there to show the three different options, three different places you could add it.

Q.    What is the earliest -- for the sake of the timeline, what is the earliest you found you could document this idea of adding bromine to the coal, for example, and the sorbent after the boiler?

A.    I went back to my documents to try to pinpoint exactly when that was, and I was able to identify and find a document where -- that I had prepared, actually, for an upcoming Research Advisory Council meeting.  That was an annual meeting we always have, and I found that was prepared, say, in the August 2002 time frame.

Q.    If you would look in your binder at the document marked Plaintiffs' Trial Exhibit 57, let me know when you have found it.

A.    Yes, I have it.

Q.    Do you recognize it?

A.    I do.

Q.    What is it?

A.    This is the document I mentioned in preparing this for the meeting.

Q.    Does this document corroborate what you consider as the conception of your idea?

A.    Yes, it does.

        MR. CALDWELL:  Your Honor, Plaintiff moves for

the admission of Plaintiffs' Trial Exhibit 67.

THE COURT:  Is there any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  It will be admitted.

(Thereupon, Plaintiffs' Exhibit 67 was admitted.)

BY MR. CALDWELL:

Q.    What's on the screen now is Plaintiffs' Trial Exhibit 67.  It indicates at the bottom -- it has several pages.

To kind of cut to the chase, where in this document does it corroborate your idea of using bromine as an additive and activated carbon in a coal system?

A.    Well, several places, but in particular, say, page 2, page 3.

Q.    Let's just go to page 2 then.  Where is it on page 2 that you're referencing?

A.    Page 2 is under Item 4 toward the top of the page.

Q.    How do we know you're looking at bromine to catalyze the oxidation of elemental mercury?

A.    It's indicated in the top sentence.  You have the Cl, which stands for chlorine, and Br, which stands for bromine, and there was some evidence that says here it oxidizes the elemental mercury.

Q.    What else do you say here, sir?

A.     Well, we also say that we want to look at the -- I guess the mechanism or the reactions that might occur with, say, bromine in a real flue gas.

Q.     And so that sentence that says an investigation of fundamental mechanism, is that what you're referring to?

A.     Yes.

Q.     Thank you.

MR. CALDWELL:  Can you get that sentence, Mr. Diaz?

BY MR. CALDWELL:

Q.     And I see reference to testing for the optimum level of chlorine or bromine radicals.

I want to ask you about what comes after that -- after that part about expediting reaction.

It says:  You also want to surmise whether SOx or NOx may have any detrimental effects on the oxidation.

What did you mean there?

A.     Well, all flue gases have SOx and NOx.  I mean, they very much can interact, and usually not in a favorable way. We were certainly expecting, I guess, the potential for some detrimental effects.  Some other -- it's not going to work in a real flue gas like in coal.

Q.     So is there any doubt in your mind you were already thinking about bromine for treatment?

A.     Not at this point.  I mean, it's -- clearly, we want

to look at this reaction, and so -- and they want to do it in the real flue gas.  We just got done testing in a real flue gas, so...

Q.    I'd like to go to the next section of the document you wanted to direct us to, and I think it's the bottom of page 3.

MR. CALDWELL:  Can you grab the -- about a half inch above that?  Thank you.

BY MR. CALDWELL:

Q.    What is it that you were explaining here that you wanted to research?

A.    Well, first of all, we wanted to test additives other than chlorine.  We really wanted to test bromine in terms of how it might enhance the reactivity of a sorbent activated carbon.

Q.    And then you referred to recent pilot and field tests.  What -- what were you talking about?

A.    Well, we essentially just completed that after-hour test that showed bromine worked really well, so that's the recent data that I'm referring to there.

Q.    If counsel for the defendants has maybe left the impression that it is only recently you have considered adding the additives directly to the fuel, the coal, what would you say in response to that?

A.    I guess I would say definitely not.  I mean, our

first test was adding bromine on the coal, and the coal was then fed into the combustor, and it's stated newly in the last paragraph, we added additives to the fuel.

We wanted to know, and we had already done adding bromine to the fuel, coal.

Q.    Thank you.  What was your level of optimism at this point where you're seeking to continue researching the issues?

A.    Well, the initial tests were astounding.  So, I mean, we were very, I guess, optimistic that this technology that we'd invented would continue to prove out.

MR. CALDWELL:  Now, Mr. Diaz, can -- strike that.

BY MR. CALDWELL:

Q.    I don't think I've directed you to something or you've directed us to something that talks about carbon or activated carbon yet, so is that covered in the document as well?

A.    Yes, it is.

MR. CALDWELL:  Mr. Diaz, can you pull up pages 4 and 5 just to kind of short circuit this and put them side by side?

So, Mr. Diaz, do you see where it says number 3 on the first page?  Would you grab that one, and then pretty much the thing that's almost in the exact same location on

the next page, grab that one.  Thank you.

BY MR. CALDWELL:

Q.    Now, Mr. Pavlish, what is it you're showing us here in your documentation from 2002?

A.    Well, under 3, it's showing that we're going to continue to do tests with sorbents, but in particular carbons, activated carbon.

And then under item 11 we were already anticipating the -- I guess that this technique, technology was going to be superior.  We hadn't proved it all out, but we were anticipating should it work, which we hoped it would, that there might be some other, say, negative effects, if you will, and we wanted to study those.

And one of those effects would be if you add the bromine and carbon together and somebody had to inject it and goes to the bag, what does that do to the bag?  I mean, is it going to corrode, potentially, or, say, plug the bag?

So we were already thinking ahead of the actual application of that -- of that process.

Q.    So at this point, are you saying that you already had the idea of using the activated carbon with the catalyzing agent, and now you just want to make sure that that itself doesn't cause additional problems?

A.    Yeah, we were already taking a step ahead of that. It was kind of in a -- we were assuming it was going to work

well.  We just wanted to know what we -- I guess what we generally called balance of plant effects, what -- what other parts of the plant it might affect.

Q.    To be perfectly clear, at the time you wrote this document in 2002, did you have in mind the two-part invention of using bromine and activated carbon?

A.    Absolutely.

MR. CALDWELL:  Now, will you flip to the tab for Plaintiffs' Trial Exhibit 68.  Thank you, Mr. Diaz.

BY MR. CALDWELL:

Q.    What is Plaintiffs' Trial Exhibit 68?

A.    Yes.

Q.    What is it?

A.    This is the -- it looks like the metadata from that -- that file we were just talking about.

Q.    And what is -- what is the purpose of the metadata in that context?

A.    Well, what this indicates is that -- I mentioned I was working on this file for this meeting, and I had probably been working on it for a couple of weeks.

What this shows is the last time I modified it was on 8/30/2002.

Q.    August 30, 2002?

A.    Yes, I'm sorry.  Yes, August 30, 2002.

Q.    I think that's what you said.  I just want to make

sure we're talking about August.

MR. CALDWELL:  Plaintiff moves for the admission of Plaintiffs' Trial Exhibit 68, Your Honor.

THE COURT:  All right.  Is there any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  The document will be admitted.

(Thereupon, Plaintiffs' Exhibit 68 was admitted.)

THE COURT:  It's now about five o'clock. That's usually the time we end.

MR. CALDWELL:  I think it is.  This is the metadata for the one I just finished, so if I could do 60 seconds so it doesn't get linked to the wrong --

THE COURT:  I'll let you go ahead.

MR. CALDWELL:  If we could -- could we present Trial Exhibit 68?  Thank you.

Thank you, Mr. Diaz.  I've heard.  You already did it.

BY MR. CALDWELL:

Q.     So is this what you were referring to, Mr. Pavlish, that says last modified on 8/30/2002?

A.     Yes.

Q.     All right.  I'm going to pick on you a little bit. It says this is eight pages, 2,725 words, and it was edited in four minutes.

Are you the world's fastest typist?

A.    Oh, no, not the least -- no, I don't type that fast, no.

Q.    What's your understanding of what that's referring to?

A.    Well, I think what that's referring to is I modified and modified it as the final version.  Like I said, I was working on it for the meeting, and this is just renamed as the final version.

Q.    I see.  Is that why it was printed maybe earlier before --

A.    Yeah.

MR. CALDWELL:  I'll tell you what, Your Honor, this is kind of what I was referring to.  I think this is a good time to stop.

THE COURT:  Okay.  We'll use that as a stopping point.

All right.  That will conclude our testimony for today.  For our jurors, I want to say we're grateful to have you with us.  We wish you all a good night and safe travels.  The courtroom deputy will show you out, and you're through for the day.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Mr. Pavlish, you may step down, and you all may be seated.

Counsel, in terms of homework for me, I know I have to review -- it looks like there are remaining disputes about the Schaatt deposition, but the disputes about the other deposition have been resolved.

We'll do that and try to get you answers quickly so that folks can work on those.

And is there anything else we need to take up before we conclude for the day?  Mr. Caldwell?

MR. CALDWELL:  Not from the plaintiff, Your Honor.

THE COURT:  Mr. Sykes?

MR. SYKES:  We'd raise that standing issue.  I don't know if the Court wants to take that up or not.

THE COURT:  Okay.  Yes.  So this is my -- this is the way I -- this is what I understand is happening and what I think makes most sense, and I'll let you tell me if you have disagreement.

I understand there to be a CERT defendant dispute about one of the two plaintiffs and whether it has constitutional standing.  There are arguments about that. Plaintiffs believe or the defendants believe that it has the right to make that argument.  Plaintiffs think maybe the way the argument is being framed is for a statutory standing argument.  Defendants say no, it's constitutional standing.

And seems to me that the decision about whether

MES has constitutional standing or not is one that I would make. I would be making it based on documents, contracts, things like that. And I don't see any reason or need to make that decision, especially with an issue that was -- not faulting anybody -- discovered three days before trial by Defendants' side. Now, during, before trial, I would be expecting, if it's necessary to do so, to make the decision after trial with the appropriate briefing.

I didn't see any reason that the trial would be affected one way or the other if we have two plaintiffs or one, so my plan was simply to defer that decision until after trial is concluded.

Any objection on Plaintiffs' side?

MR. CALDWELL: Not from Plaintiff.

THE COURT: From Defense?

MR. SYKES: No, Your Honor. We thought it was our duty to bring it to the Court's attention, and we don't know the full ramifications of it.

THE COURT: Okay. Understood, and I appreciate Defendants' side raising the issue in the first place.

Mr. Dorsney, is there anything?

MR. DORSNEY: One quick point on that procedure. Would you like us to file a motion and engage in a briefing process on that issue?

THE COURT: I think, ultimately, if I'm going to

be called on to make a determination as to whether the plaintiff has constitutional standing, I would like it to be briefed in some way.  We can talk about how that briefing will look like and incorporated with post-trial briefing after the trial.

With that said, I hope everybody gets sleep tonight, and we look forward to seeing everybody tomorrow morning.  With that said, the Court stands in recess.


**C E R T I F I C A T E**

I, Deanna L. Warner, a Certified Shorthand Reporter, do hereby certify that as such Certified Shorthand Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings.

_____
Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. District Court

## $

**$10,000** [4] - 136:4, 136:6, 136:8, 136:11
**$100,000** [2] - 218:4, 224:17
**$107,000** [1] - 218:2
**$200,000** [2] - 168:3, 218:6
**$267** [1] - 224:19
**$300** [1] - 143:7
**$600,000** [1] - 168:20
**$67,000** [1] - 168:8

## '

**'114** [9] - 103:8, 121:19, 122:18, 122:22, 123:5, 177:1, 178:1, 178:3, 219:9
**'12** [1] - 195:13
**'13** [1] - 195:13
**'14** [1] - 195:13
**'517** [8] - 103:9, 121:20, 122:18, 122:22, 123:5, 177:25, 178:5, 219:10
**'80s** [4] - 94:23, 216:16, 216:18, 221:4
**'90s** [7] - 135:8, 141:7, 216:18, 242:7, 242:9, 242:24, 243:1
**'95** [1] - 216:16

## 0

**0.002** [1] - 15:8
**0.2** [1] - 15:7
**02** [1] - 211:20

## 1

**1** [22] - 5:13, 5:20, 36:20, 40:5, 51:18, 51:19, 51:24, 52:1, 61:18, 71:4, 71:5, 71:8, 96:24, 97:9, 97:21, 98:4, 100:10, 100:19, 100:22, 100:25, 121:19, 245:13
**1.6** [2] - 202:1, 202:2
**10** [7] - 40:19, 71:6, 75:3, 97:1, 97:22,
100:8, 101:3
**10,343,114** [2] - 103:3, 103:8
**10,596,517** [2] - 103:3, 103:9
**10-K** [1] - 205:20
**100** [4] - 137:25, 163:7, 207:18, 208:19
**10th** [1] - 29:17
**11** [14] - 40:23, 71:6, 75:18, 80:10, 80:12, 80:13, 80:24, 81:2, 97:1, 97:23, 100:7, 100:18, 227:20, 264:8
**110** [1] - 140:2
**115** [1] - 138:1
**11:00** [2] - 62:9, 62:12
**12** [9] - 37:18, 41:4, 97:1, 97:23, 100:7, 100:23, 101:3, 152:17, 201:22
**120** [1] - 138:1
**124** [1] - 23:13
**12:30** [1] - 129:12
**13** [8] - 41:8, 46:21, 46:22, 70:18, 80:7, 90:24, 91:1, 96:18
**14** [15] - 41:10, 46:21, 46:24, 85:9, 96:18, 96:24, 97:2, 97:3, 97:4, 97:23, 97:25, 100:7, 101:3, 194:6, 208:3
**14th** [1] - 63:7
**15** [14] - 4:9, 4:15, 36:17, 36:18, 41:12, 46:21, 47:1, 97:2, 97:23, 100:6, 101:3, 194:6, 202:10
**15-minute** [1] - 222:11
**150** [1] - 243:18
**16** [5] - 41:14, 97:2, 97:23, 100:6, 100:18
**1692** [1] - 210:9
**17** [11] - 41:16, 51:23, 51:24, 54:21, 90:16, 96:15, 97:3, 97:23, 100:6, 100:18, 111:7
**18** [4] - 42:8, 72:22, 79:11, 118:17
**182** [1] - 177:8
**19** [9] - 6:7, 35:11, 35:13, 42:12, 51:23, 51:24, 56:3, 71:6, 75:15
**19-1334-CJB** [1] - 3:7
**19-CV-1334-CJB** [1] - 1:6

## 2

**1926** [1] - 19:1
**1968** [1] - 212:7
**1969** [3] - 194:24, 201:4, 207:11
**1980** [1] - 186:9
**1980s** [1] - 180:11
**1982** [1] - 220:22
**1986** [2] - 93:15, 93:16
**1988** [1] - 93:17
**1990s** [2] - 140:25, 141:19
**1993** [1] - 241:9
**1995** [2] - 180:11, 216:16
**1998** [2] - 110:2, 149:14
**1:00** [3] - 62:9, 62:12, 129:13
**1st** [1] - 36:12

## 2

**2** [15] - 20:11, 37:2, 37:5, 43:9, 46:8, 96:18, 121:19, 211:20, 240:11, 240:16, 245:13, 260:14, 260:16, 260:18
**2,000** [1] - 170:3
**2,725** [1] - 266:24
**2.0** [1] - 201:22
**2.1** [1] - 167:21
**2.8** [2] - 202:2, 202:3
**20** [16] - 111:3, 139:21, 139:23, 152:14, 174:10, 175:13, 175:14, 175:20, 180:12, 185:1, 187:18, 191:12, 211:21, 216:20, 232:11, 245:2
**20-teens** [1] - 185:25
**200** [1] - 233:22
**2000** [1] - 118:17
**2000s** [5] - 135:8, 141:19, 149:17, 221:14, 232:7
**2001** [3] - 249:10, 251:2
**2002** [15] - 145:24, 146:7, 227:12, 254:3, 254:5, 255:18, 256:14, 256:19, 259:12, 264:4, 265:5, 265:23, 265:24
**2002/2003** [1] - 178:7
**2004** [9] - 146:14,
146:22, 178:10, 178:11, 178:16, 178:17, 219:3, 219:24
**2005** [1] - 219:4
**2008** [2] - 149:5, 189:17
**2009** [3] - 176:12, 187:24, 189:17
**2009/'10** [1] - 152:11
**2010** [4] - 152:8, 176:12, 186:12, 187:24
**201054** [1] - 211:25
**2011** [14] - 116:4, 149:24, 174:4, 174:17, 176:16, 176:18, 176:20, 181:23, 187:25, 188:1, 195:13, 196:7, 201:16, 203:18
**2012** [2] - 116:6, 203:18
**2014** [2] - 150:4, 210:11
**2014/2015** [1] - 150:14
**2015** [5] - 149:5, 150:4, 152:7, 203:19, 203:21
**2016** [3] - 150:4, 203:19, 203:21
**2018** [17] - 177:19, 178:3, 178:15, 178:17, 178:21, 178:25, 179:2, 205:6, 219:1, 219:8, 219:11, 219:23, 220:3, 220:4, 220:6, 221:12, 221:14
**2019** [25] - 12:9, 13:2, 13:17, 13:21, 14:11, 174:16, 174:17, 176:19, 177:1, 177:3, 178:4, 184:15, 184:21, 196:13, 201:23, 202:1, 202:15, 205:7, 206:17, 212:9, 213:2, 215:4, 215:9, 219:12
**2020** [10] - 178:5, 201:23, 202:2, 205:20, 206:17, 215:15, 215:17, 215:18, 219:12
**2021** [12] - 13:2, 13:21, 176:20, 190:12, 201:23, 202:3, 202:18, 206:17,
208:23, 215:6, 249:7, 249:9
**2022** [6] - 13:17, 14:15, 202:16, 213:3, 216:3, 217:1
**2023** [1] - 12:25
**2024** [2] - 1:13, 29:21
**21** [5] - 6:18, 9:9, 9:11, 9:20, 10:3
**23** [2] - 167:5, 167:8
**23.25** [1] - 211:21
**24** [1] - 221:12
**24/7** [2] - 188:23, 233:3
**25** [3] - 28:1, 121:19, 191:12
**26** [3] - 121:19, 173:24, 173:25
**260** [1] - 221:2
**26th** [1] - 1:13
**270,000** [1] - 116:7
**28** [1] - 226:25
**28th** [2] - 29:19, 63:23
**29** [1] - 118:17
**29th** [1] - 63:23
**2A** [1] - 1:12

## 3

**3** [18] - 7:4, 18:24, 18:25, 37:7, 96:24, 97:21, 100:9, 100:17, 168:22, 191:5, 191:12, 201:22, 239:18, 240:11, 260:15, 262:6, 263:23, 264:5
**3,600** [1] - 140:10
**30** [7] - 185:15, 227:24, 233:18, 243:14, 245:2, 265:23, 265:24
**30(b)(6** [2] - 21:2, 21:5
**30-day** [1] - 207:1
**31** [2] - 176:16, 188:1
**34** [1] - 4:7
**35** [3] - 11:3, 185:15, 208:5
**36** [1] - 11:5
**375** [2] - 177:7
**376** [1] - 205:6
**38** [1] - 208:17
**3:42** [1] - 222:12

## 4

**4** [16] - 5:7, 26:11, 26:14, 37:15, 46:10,

96:24, 97:22, 100:9, 100:23, 100:25, 185:11, 227:20, 239:18, 244:23, 260:18, 263:20
**4,000** [1] - 244:13
**4.3** [3] - 167:20, 168:1, 168:2
**40** [6] - 152:14, 175:9, 175:20, 185:2, 211:22, 245:2
**400** [1] - 240:16
**403** [3] - 26:9, 26:25, 31:16
**43.73** [1] - 211:21
**45** [16] - 6:15, 27:9, 137:22, 173:22, 173:24, 173:25, 179:11, 181:25, 182:6, 184:24, 187:19, 189:10, 190:12, 212:13, 215:3
**4O** [1] - 174:9
**4th** [3] - 36:12, 36:14, 128:20

**5**

**5** [13] - 26:11, 37:18, 38:5, 51:9, 96:25, 97:22, 100:9, 100:17, 191:12, 201:22, 220:19, 221:1, 263:21
**50** [4] - 139:23, 177:8, 232:8, 243:14
**50,000** [1] - 240:19
**55** [1] - 232:8
**57** [1] - 259:14
**58** [5] - 246:16, 246:18, 246:21, 246:24, 247:3
**59** [5] - 169:9, 248:20, 248:22, 249:12, 249:16
**5:00** [2] - 36:19, 128:9
**5th** [2] - 36:14, 128:20

**6**

**6** [9] - 38:6, 38:17, 66:10, 66:12, 96:25, 97:22, 100:9, 101:1
**6-inch** [1] - 244:23
**60** [7] - 140:2, 140:11, 208:3, 217:3, 266:12
**600** [1] - 221:1
**600,000** [1] - 116:6

**620** [2] - 20:11
**65** [1] - 227:14
**67** [3] - 260:1, 260:5, 260:9
**68** [5] - 265:9, 265:11, 266:3, 266:7, 266:16

**7**

**7** [12] - 38:22, 39:2, 51:23, 51:24, 54:10, 71:6, 73:10, 96:25, 97:22, 100:8, 101:2, 208:16
**7,000** [2] - 194:5, 194:6
**7,500** [3] - 202:5, 202:19, 209:1
**70** [1] - 208:16
**702** [3] - 22:14, 22:24, 23:4
**72** [1] - 176:24
**74** [2] - 50:4, 50:21
**766** [1] - 26:14

**8**

**8** [8] - 35:12, 39:13, 61:5, 65:19, 96:18, 97:9, 110:18
**8,000** [1] - 194:5
**8/30/2002** [2] - 265:22, 266:21
**80s** [1] - 170:10
**8:00** [1] - 29:9
**8:15** [1] - 4:6
**8:30** [1] - 4:12

**9**

**9** [9] - 11:3, 40:16, 66:1, 70:11, 97:1, 97:22, 100:8, 100:17, 205:8
**9,000** [1] - 194:5
**9.1** [1] - 168:11
**90** [7] - 150:8, 152:10, 203:21, 204:10, 217:3, 254:11, 254:17
**90-plus** [1] - 135:14
**98** [1] - 113:14
**99** [1] - 155:19
**9:00** [4] - 4:13, 29:10, 36:19, 128:8
**9:20** [1] - 31:22
**9:30** [3] - 4:14, 25:23, 31:23

**9th** [2] - 29:15

**A**

**A&M** [1] - 165:3
**a.m** [2] - 36:19, 128:8
**abide** [1] - 174:13
**abiding** [1] - 109:9
**ability** [6] - 89:8, 89:10, 142:22, 149:1, 154:19, 258:2
**able** [33] - 21:12, 21:25, 22:2, 22:17, 22:19, 22:23, 32:4, 33:4, 44:8, 47:21, 48:2, 49:17, 52:17, 55:17, 62:15, 67:24, 69:1, 72:16, 73:3, 77:11, 83:2, 83:6, 96:4, 128:14, 141:12, 141:13, 145:2, 194:23, 206:20, 246:15, 254:10, 255:6, 259:8
**abolition** [1] - 165:13
**absolutely** [10] - 21:14, 23:12, 23:18, 24:16, 49:19, 69:4, 79:22, 83:19, 209:3, 265:7
**absorb** [1] - 252:22
**abstract** [1] - 115:7
**accept** [2] - 108:3, 122:1
**accepted** [1] - 253:18
**accident** [4] - 61:22, 63:4, 63:12, 65:2
**accomplish** [1] - 116:15
**according** [3] - 83:7, 107:10, 122:11
**accounting** [2] - 167:13, 169:14
**accurate** [1] - 23:16
**accurately** [1] - 59:20
**accused** [19] - 6:3, 6:20, 6:22, 7:7, 7:10, 13:19, 15:9, 39:24, 119:12, 120:4, 120:6, 182:18, 206:21, 207:8, 208:2, 208:6, 212:10, 213:2
**accusing** [4] - 76:25, 214:14, 214:20, 214:21
**acid** [1] - 47:14
**acknowledge** [2] - 11:16, 60:15

**acknowledging** [1] - 24:15
**acquainted** [3] - 37:13, 38:13, 39:14
**acquired** [2] - 107:15, 216:24
**acronym** [1] - 152:22
**act** [3] - 111:5, 159:17, 196:20
**Act** [1] - 116:3
**action** [8] - 3:7, 9:16, 39:20, 108:5, 117:17, 118:4, 118:7, 118:20
**actions** [4] - 21:6, 118:6, 181:2, 181:11
**activated** [128] - 11:9, 12:18, 15:6, 15:12, 15:14, 16:20, 17:7, 143:22, 144:4, 144:9, 147:11, 147:17, 159:3, 160:2, 162:2, 162:3, 162:8, 162:13, 173:9, 173:12, 175:19, 175:21, 175:23, 177:10, 177:11, 177:13, 179:18, 179:21, 180:15, 181:20, 182:7, 182:10, 182:12, 182:14, 183:9, 183:12, 183:16, 183:24, 184:2, 186:6, 187:2, 187:4, 187:5, 187:9, 187:11, 196:19, 196:23, 197:2, 197:4, 197:7, 197:9, 197:14, 197:19, 197:23, 198:18, 199:16, 199:18, 199:20, 199:25, 200:6, 200:19, 200:22, 201:1, 201:8, 201:12, 201:14, 201:19, 202:5, 202:9, 202:12, 202:20, 203:9, 203:11, 203:23, 204:2, 204:3, 204:6, 204:7, 204:10, 204:16, 204:21, 204:23, 205:14, 205:25, 206:3, 206:8, 206:22, 206:24, 207:5, 207:9, 207:14, 207:17, 207:25, 208:4,

208:7, 208:19, 209:1, 209:20, 210:1, 213:4, 213:23, 213:24, 213:25, 214:5, 214:12, 216:6, 216:23, 216:25, 217:5, 217:8, 217:11, 221:20, 222:1, 222:3, 233:10, 253:7, 254:8, 255:17, 255:20, 257:24, 258:2, 260:13, 262:14, 263:17, 264:7, 264:21, 265:6
**active** [1] - 180:19
**actively** [1] - 179:15
**acts** [3] - 21:16, 159:12, 182:19
**actual** [5] - 63:14, 164:19, 175:6, 245:5, 264:18
**Adam** [1] - 68:22
**adapted** [14] - 12:23, 15:16, 183:4, 183:7, 183:8, 197:3, 202:9, 213:10, 213:13, 213:18, 213:22, 215:1, 221:17, 221:23
**add** [19] - 136:11, 141:14, 173:9, 175:22, 186:19, 196:19, 209:9, 233:8, 233:9, 233:10, 254:21, 258:9, 258:12, 258:13, 258:14, 258:16, 258:22, 259:2, 264:14
**add-on** [1] - 141:14
**added** [8] - 12:19, 14:11, 173:11, 179:21, 198:5, 209:24, 254:22, 263:3
**adding** [12] - 111:12, 179:3, 179:17, 196:20, 220:16, 221:9, 255:15, 259:5, 262:23, 263:1, 263:5
**addition** [6] - 42:2, 104:4, 109:3, 119:24, 186:5, 229:9
**additional** [10] - 5:22, 46:2, 102:10, 120:22, 129:1, 141:10, 146:10,

152:3, 178:11, 264:23
**additionally** [1] - 80:5
**additive** [7] - 147:8, 189:3, 254:18, 255:16, 255:20, 255:23, 260:13
**additives** [8] - 185:4, 189:7, 233:9, 246:1, 255:7, 262:12, 262:23, 263:3
**address** [6] - 15:18, 24:2, 25:22, 31:2, 135:20, 152:3
**addressed** [2] - 20:10, 210:12
**adequate** [1] - 220:14
**adjacent** [2] - 231:25, 232:2
**adjust** [2] - 133:23, 150:5
**administer** [1] - 34:23
**administration** [1] - 171:4
**administrative** [1] - 186:18
**administrator** [2] - 33:16, 101:13
**admissible** [2] - 105:6, 105:10
**admission** [7] - 20:18, 24:17, 25:7, 246:24, 249:12, 260:1, 266:2
**admit** [12] - 19:13, 19:17, 20:5, 21:13, 22:5, 22:24, 23:3, 23:19, 24:7, 24:24, 142:5, 185:22
**admitted** [23] - 20:3, 20:24, 22:10, 22:16, 23:15, 23:25, 24:1, 24:4, 25:2, 25:9, 25:14, 31:20, 104:21, 105:16, 106:1, 247:2, 247:4, 249:15, 249:17, 260:4, 260:6, 266:6, 266:8
**admitting** [1] - 23:9
**adopt** [1] - 203:23
**adopted** [1] - 15:24
**Adrienne** [1] - 37:11
**ADRIENNE** [1] - 1:22
**adsorb** [1] - 252:23
**adsorbing** [1] - 144:5
**advance** [1] - 193:1
**advantages** [1] - 81:13
**adverse** [1] - 141:5
**advertised** [1] -

175:16
**advice** [2] - 12:1, 16:7
**advisory** [1] - 259:10
**advocating** [1] - 16:6
**aerial** [3] - 193:7, 194:15, 194:16
**affairs** [1] - 127:1
**affect** [2] - 107:10, 265:3
**affected** [2] - 84:23, 269:10
**afford** [1] - 229:3
**afoul** [1] - 7:11
**afraid** [1] - 6:24
**after-hour** [1] - 262:18
**after-hours** [2] - 255:12, 255:19
**afternoon** [8] - 36:18, 128:10, 132:5, 218:14, 222:8, 225:21, 225:22, 225:24
**afterwards** [1] - 99:12
**agencies** [4] - 149:18, 186:19, 250:16
**agency** [2] - 113:3, 141:4
**Agency** [1] - 149:14
**agent** [5] - 113:9, 113:11, 253:23, 254:19, 264:22
**ago** [6] - 54:15, 57:3, 63:6, 96:6, 217:13, 218:2
**agree** [6] - 31:4, 51:6, 70:10, 96:15, 104:3, 258:20
**agreed** [5] - 20:19, 104:23, 149:3, 215:15, 215:19
**agreeing** [1] - 117:24
**agreement** [31] - 21:9, 22:25, 26:6, 26:7, 26:15, 26:17, 26:19, 26:23, 27:6, 28:3, 28:5, 28:25, 29:2, 29:7, 29:18, 29:24, 30:1, 30:19, 32:7, 32:13, 32:21, 148:24, 167:8, 167:21, 168:18, 168:21, 218:5
**agreements** [12] - 19:11, 20:12, 20:15, 20:17, 21:3, 21:8, 25:10, 27:2, 28:20, 32:5, 168:19, 226:7
**agrees** [1] - 118:1
**ahead** [7] - 30:13, 46:7, 98:19, 165:12,

264:18, 264:24, 266:14
**Ahhh** [1] - 151:3
**aids** [1] - 125:16
**aim** [1] - 128:25
**aiming** [1] - 211:22
**air** [14] - 133:10, 138:20, 138:21, 141:8, 141:9, 149:15, 203:16, 241:25, 242:3, 242:11, 242:13, 242:22, 243:2
**AISHA** [1] - 1:23
**Aisha** [2] - 3:14, 37:11
**AJG** [3] - 26:7, 26:15, 28:1
**al** [2] - 1:4, 1:7
**Alabama** [4] - 165:9, 170:14, 170:15, 170:21
**Albemarle** [2] - 205:12, 206:4
**Alexandria** [1] - 113:1
**Alice** [1] - 134:4
**aligned** [1] - 49:24
**Alistar** [11] - 28:25, 29:2, 29:7, 156:10, 156:16, 156:19, 157:11, 217:23, 226:15
**alive** [1] - 146:25
**all-you-can-eat** [1] - 168:4
**allegation** [3] - 59:8, 127:13, 215:7
**allegations** [4] - 12:17, 77:14, 127:18, 162:12
**alleged** [7] - 13:1, 13:20, 14:5, 57:16, 57:18, 120:18, 203:1
**allegedly** [1] - 15:12
**alleges** [1] - 181:3
**alleging** [1] - 82:13
**allocated** [1] - 128:17
**allow** [5] - 45:24, 105:12, 117:1, 118:7, 191:22
**allowed** [8] - 4:10, 48:7, 72:6, 75:9, 76:18, 118:21, 119:12, 189:23
**allows** [3] - 110:18, 117:13, 128:18
**alluded** [3] - 164:17, 169:5, 219:2
**almost** [6] - 147:22, 177:8, 212:10, 216:17, 224:8,

263:25
**alone** [2] - 103:24, 243:11
**alternate** [1] - 44:8
**alternating** [2] - 140:3, 140:13
**alternative** [1] - 224:9
**Alternatively** [1] - 118:3
**amazing** [2] - 133:7, 138:25
**ambiguous** [1] - 115:22
**amended** [1] - 216:1
**amendments** [1] - 118:2
**America** [1] - 116:3
**American** [2] - 163:24, 170:9
**amount** [18] - 4:17, 36:9, 95:4, 142:11, 170:3, 181:1, 202:7, 226:14, 226:15, 230:23, 232:15, 235:21, 237:5, 237:6, 245:11, 245:19, 245:20, 245:21
**amounts** [11] - 82:15, 157:16, 235:25, 237:1, 238:20, 238:21, 239:3, 245:12, 245:15, 245:16, 256:2
**amplified** [1] - 58:24
**analysis** [2] - 211:3, 211:12
**analyze** [2] - 24:10, 211:5
**ancestors** [1] - 55:22
**AND** [1] - 1:2
**anesthetized** [1] - 170:2
**animations** [1] - 105:23
**announced** [1] - 149:24
**annual** [2] - 205:6, 259:11
**answer** [34] - 34:12, 34:24, 35:21, 35:23, 36:1, 36:5, 38:6, 38:16, 42:18, 43:16, 45:4, 46:17, 55:21, 56:1, 56:2, 61:16, 61:17, 66:8, 66:9, 70:25, 71:1, 71:3, 71:9, 73:16, 75:15, 75:20, 80:21, 80:23, 83:20, 85:16, 90:21,

90:23, 110:7, 155:9
**answered** [4] - 34:16, 36:3, 58:20, 70:13
**answering** [3] - 58:17, 58:21, 95:17
**answers** [6] - 36:6, 42:24, 47:3, 51:17, 60:17, 268:5
**Antelope** [2] - 156:14, 192:17
**anthracite** [6] - 235:15, 235:23, 235:24, 236:9, 237:23, 238:19
**anticipating** [2] - 264:9, 264:11
**anyway** [2] - 155:8, 207:3
**apart** [5] - 10:22, 82:24, 193:14, 194:19, 194:20
**apologies** [1] - 174:22
**apologize** [2] - 184:6, 249:10
**appear** [1] - 115:17
**Appearances** [1] - 2:1
**APPEARANCES** [1] - 1:15
**appearances** [1] - 3:9
**appearing** [2] - 46:4, 101:10
**appendix** [1] - 211:24
**Apple** [1] - 140:5
**applicant** [11] - 116:23, 117:3, 117:8, 117:17, 117:23, 117:24, 118:1, 118:3, 118:12, 118:21, 119:23
**applicant's** [3] - 114:16, 117:2, 118:8
**application** [35] - 58:16, 69:15, 70:3, 100:12, 111:3, 111:6, 112:24, 113:7, 113:18, 113:19, 113:22, 114:10, 114:20, 115:11, 116:1, 116:2, 116:8, 116:9, 117:5, 117:12, 117:14, 117:22, 118:2, 118:10, 118:18, 120:3, 146:14, 146:15, 146:22, 147:5, 147:24, 178:9, 219:25, 258:24, 264:19

applications [41] - 7:7, 45:10, 51:2, 58:11, 58:13, 69:14, 70:1, 85:3, 90:4, 96:11, 113:4, 113:10, 113:14, 113:16, 115:25, 116:5, 116:7, 116:23, 118:14, 118:16, 177:18, 177:19, 178:3, 178:12, 178:18, 178:22, 178:25, 179:2, 179:5, 218:12, 219:1, 219:8, 220:4, 220:6, 220:9, 220:15, 221:8, 221:12, 221:15

applied [3] - 15:8, 228:16, 228:17

applies [3] - 81:24, 109:15, 130:14

apply [12] - 41:23, 41:25, 45:20, 45:23, 49:17, 81:23, 102:8, 103:25, 115:2, 120:14, 122:4, 153:20

appointments [3] - 62:2, 62:4, 62:19

appreciate [12] - 34:6, 45:8, 51:1, 68:3, 79:15, 90:2, 96:9, 101:10, 154:4, 163:20, 164:21, 269:19

appreciated [1] - 29:10

appreciation [1] - 135:7

apprehension [1] - 163:18

approach [2] - 223:15, 250:10

approaches [2] - 255:8, 255:22

appropriate [8] - 18:2, 24:7, 25:4, 108:2, 116:10, 120:23, 164:6, 269:8

April [3] - 93:15, 93:16, 205:7

ARANT [1] - 2:6

Arant [2] - 38:10, 66:14

area [8] - 54:17, 57:8, 57:9, 142:13, 199:5, 241:18, 241:19, 244:14

argue [3] - 22:7, 22:12, 163:4

arguing [5] - 3:13, 3:14, 55:6, 55:9, 82:16

Argument [1] - 18:25

argument [26] - 6:24, 7:5, 8:8, 8:16, 9:22, 15:18, 15:19, 16:15, 17:15, 17:20, 17:23, 18:2, 18:3, 18:11, 22:8, 22:13, 30:3, 32:23, 32:25, 59:14, 129:17, 163:6, 268:22, 268:23, 268:24

arguments [11] - 8:4, 17:12, 17:18, 17:24, 31:5, 31:11, 105:1, 119:21, 127:22, 127:23, 268:20

arise [1] - 109:22

arithmetic [1] - 194:5

Arkansas [1] - 239:6

arrangements [1] - 53:10

arrives [1] - 116:2

art [17] - 111:12, 113:21, 114:20, 114:22, 114:23, 115:1, 115:3, 116:13, 116:25, 117:4, 117:9, 119:15, 119:22, 219:16, 220:11, 221:13, 221:15

ARTHUR [1] - 1:7

Arthur [4] - 3:7, 38:20, 54:12, 73:24

Article [1] - 110:17

article [3] - 117:20, 124:1, 124:11

articles [4] - 114:19, 123:25, 233:19, 233:22

artistic [1] - 184:8

artists [1] - 114:23

arts [1] - 110:19

ascribing [1] - 60:23

ash [5] - 144:18, 144:20, 147:21, 211:12, 235:21

aspect [5] - 147:4, 169:15, 186:4, 216:17, 244:8

aspects [4] - 94:2, 95:11, 115:11, 147:1

assembly [1] - 72:6

assert [1] - 11:18

asserted [16] - 6:15, 17:13, 17:20, 103:5, 103:17, 109:4, 119:13, 122:18, 122:22, 122:24, 123:4, 127:11, 127:15, 176:25, 181:12, 181:18

asserting [4] - 9:14, 11:16, 11:18, 108:13

assertion [1] - 23:1

assess [1] - 216:13

asset [1] - 125:22

assigned [4] - 33:19, 114:6, 114:9, 119:3

assignments [1] - 84:9

assigns [2] - 113:20, 116:10

assist [3] - 102:11, 126:7, 126:13

assistant [1] - 165:6

assistant's [1] - 129:2

associate [1] - 228:17

Associates [3] - 38:2, 102:23, 155:24

assume [1] - 52:14

assumed [1] - 207:18

assuming [5] - 18:2, 64:8, 201:13, 208:8, 264:25

astounding [1] - 263:9

atmosphere [4] - 231:22, 242:17, 242:18, 251:7

atom [1] - 245:17

atoms [1] - 245:17

attached [2] - 5:5, 211:24

attempting [3] - 132:9, 133:9, 251:8

attend [1] - 62:15

attention [9] - 117:4, 123:22, 129:2, 129:3, 163:20, 164:20, 206:16, 251:7, 269:17

attentive [1] - 163:17

attitudes [1] - 34:15

attorney [2] - 113:9, 113:11

attorneys [2] - 37:21, 125:9

attractive [2] - 236:21, 239:21

audience [2] - 250:13,

250:14

August [7] - 63:7, 64:22, 178:11, 259:12, 265:23, 265:24, 266:1

authority [3] - 69:22, 200:13, 221:12

authors [1] - 110:20

auto [4] - 61:22, 63:4, 63:12, 65:2

automatically [1] - 239:11

available [4] - 45:13, 112:8, 257:11, 257:13

average [6] - 107:15, 111:4, 211:20, 211:21, 240:5, 240:6

averages [2] - 207:1, 208:5

avoided [1] - 123:21

award [3] - 168:14, 168:15, 217:20

awarded [2] - 116:4, 253:19

aware [7] - 13:15, 48:21, 181:2, 187:16, 197:15, 226:6, 226:8

**B**

bachelor [1] - 228:19

backbone [1] - 139:20

backdrop [1] - 224:12

backed [1] - 182:10

background [8] - 56:8, 109:20, 110:8, 113:21, 115:8, 132:16, 230:7, 251:2

bad [10] - 50:13, 53:7, 55:16, 57:17, 144:6, 144:21, 231:15, 236:15, 236:16, 242:18

baffled [1] - 5:6

bag [3] - 264:16, 264:17

baghouse [1] - 147:20

baghouses [1] - 198:9

balance [1] - 265:2

bare [1] - 208:4

bargain [1] - 111:8

Barr [4] - 157:6, 165:24, 169:8, 173:15

Bascobert [3] - 37:25, 154:3, 193:7

base [2] - 144:22,

157:2

based [21] - 11:19, 17:11, 42:15, 57:21, 57:24, 77:12, 79:2, 92:17, 117:7, 124:14, 125:12, 129:18, 135:21, 163:2, 172:21, 213:8, 254:1, 255:7, 255:16, 255:20, 269:2

basic [6] - 114:3, 175:24, 176:2, 177:4, 196:17, 251:16

basics [2] - 110:11, 173:14

basin [2] - 142:15, 237:10

Basin [5] - 143:1, 143:16, 212:20, 252:13

basis [10] - 11:4, 13:3, 13:22, 14:9, 25:19, 45:21, 45:24, 70:7, 74:18, 216:19

bat [1] - 168:24

Batanian [1] - 39:7

batch [1] - 144:2

Bazemore [2] - 61:6, 65:14

beach [3] - 87:23, 88:2

Bean [6] - 157:8, 165:24, 170:8, 170:11, 170:23, 173:15

bearing [1] - 69:4

bears [1] - 18:3

became [1] - 66:24

become [2] - 136:16, 257:10

becomes [2] - 28:8, 112:8

becoming [4] - 34:9, 150:17, 232:17, 238:6

beforehand [2] - 4:11, 4:25

begin [13] - 4:13, 34:8, 36:7, 64:21, 100:11, 114:3, 126:25, 128:8, 131:16, 207:12, 222:21, 223:17, 225:17

beginning [4] - 3:5, 31:24, 174:4, 230:16

begins [3] - 112:16, 116:1, 176:12

behalf [6] - 3:22, 26:20, 34:3, 101:9,

163:22, 223:10
**behind** [2] - 68:21, 137:24
**Bejou** [4] - 228:3, 228:4, 228:5, 228:7
**belabor** [2] - 143:13, 158:16
**belief** [10] - 12:12, 14:3, 15:6, 16:3, 182:22, 182:23, 187:23, 203:4, 257:6
**beliefs** [5] - 12:13, 16:10, 40:25, 81:3, 194:11
**believes** [4] - 112:23, 127:9, 223:24, 224:1
**belong** [1] - 59:20
**below** [3] - 27:9, 201:11, 227:24
**belt** [1] - 138:9
**Ben** [1] - 165:8
**bench** [6] - 3:18, 4:6, 4:12, 42:20, 67:9, 126:16
**Bend** [1] - 194:14
**benefit** [3] - 59:21, 207:15, 219:24
**BENN** [1] - 2:7
**Benn** [1] - 3:24
**Berkimer** [1] - 39:8
**Bernardo** [3] - 80:13, 80:15, 85:1
**best** [9] - 4:17, 52:13, 95:7, 152:18, 161:8, 163:21, 225:5, 255:5, 257:5
**Bethany** [1] - 88:5
**better** [12] - 73:16, 106:22, 133:5, 134:16, 151:6, 205:18, 213:8, 224:23, 242:13, 250:8, 257:1, 257:8
**between** [18] - 18:6, 26:15, 40:13, 43:3, 62:8, 62:11, 93:15, 98:9, 106:21, 111:8, 118:11, 129:24, 165:14, 178:11, 206:2, 214:1, 217:1, 252:19
**beyond** [4] - 59:15, 59:23, 81:14, 109:14
**bias** [4] - 58:22, 60:18, 92:23, 104:12
**biased** [1] - 67:19
**biases** [2] - 92:13, 107:8
**Big** [4] - 153:17, 192:18, 194:17,

212:17
**big** [30] - 24:19, 52:9, 52:22, 53:7, 54:24, 55:24, 75:10, 81:19, 137:6, 137:20, 138:5, 145:19, 155:11, 158:9, 168:6, 192:24, 194:7, 194:20, 203:12, 212:12, 226:6, 227:19, 228:4, 231:23, 231:24, 244:21, 245:2, 245:7, 245:9, 245:15
**biggest** [3] - 52:7, 52:9, 53:9
**bill** [5] - 136:7, 136:8, 136:13, 155:7, 155:11
**billion** [2] - 245:13, 245:17
**binder** [5] - 84:8, 223:14, 246:13, 248:19, 259:13
**binders** [2] - 212:12, 223:2
**bipartisan** [1] - 189:16
**Birmingham** [3] - 170:13, 170:16, 170:20
**birth** [1] - 134:2
**bit** [28] - 6:4, 35:15, 68:21, 92:6, 137:17, 142:16, 145:15, 167:1, 169:12, 170:1, 176:13, 178:19, 178:24, 184:4, 185:23, 195:14, 196:2, 207:2, 211:13, 212:22, 236:8, 236:12, 236:20, 239:21, 243:9, 256:22, 257:1, 266:23
**bite** [1] - 225:13
**bituminous** [27] - 213:7, 235:15, 236:7, 236:8, 236:14, 236:15, 236:18, 236:19, 236:22, 236:24, 237:1, 237:7, 237:21, 237:23, 238:21, 239:2, 239:11, 239:14, 239:19, 244:4, 244:5, 250:8, 250:11, 252:10,

252:12
**Black** [6] - 234:14, 234:16, 234:17, 240:3, 240:23, 241:10
**black** [3] - 57:1, 203:11, 229:24
**blank** [5] - 4:24, 4:25, 5:8, 10:19, 10:21
**blasts** [1] - 138:18
**blender** [1] - 138:10
**blind** [4] - 17:4, 180:23, 183:6, 214:24
**blindness** [2] - 16:24, 214:22
**blob** [1] - 239:9
**blocks** [3] - 193:13, 198:7, 200:18
**blog** [1] - 124:24
**blogs** [1] - 124:10
**blown** [1] - 230:21
**blue** [4] - 142:13, 184:17, 184:20, 239:1
**blueprints** [1] - 50:7
**board** [3] - 153:5, 154:5, 253:17
**bodies** [1] - 242:18
**boiler** [9] - 137:8, 138:12, 231:7, 231:14, 233:11, 244:24, 258:17, 259:6
**boilers** [1] - 91:20
**booklet** [1] - 84:8
**books** [2] - 64:9, 221:3
**boost** [4] - 173:12, 175:21, 182:7, 204:9
**borne** [1] - 190:11
**bottom** [11] - 35:12, 150:16, 201:21, 202:14, 205:9, 208:9, 208:10, 208:18, 211:18, 260:9, 262:5
**bought** [2] - 191:18, 255:3
**Boult** [1] - 38:10
**BOULT** [1] - 2:6
**bound** [3] - 42:5, 104:7, 243:3
**boundaries** [5] - 112:1, 112:5, 115:18, 121:11, 121:14
**box** [8] - 97:14, 98:1, 100:15, 101:7, 126:23, 245:2,

245:7, 245:9
**boxes** [1] - 160:20
**Br** [1] - 260:22
**Brad** [1] - 132:16
**Bradley** [4] - 3:25, 37:10, 38:10, 66:14
**BRADLEY** [2] - 1:19, 2:6
**brain** [2] - 161:22
**brainer** [1] - 190:15
**branch** [1] - 116:9
**break** [26] - 36:16, 36:17, 36:18, 98:17, 98:22, 99:3, 99:4, 99:5, 99:11, 102:2, 121:3, 126:25, 128:9, 128:10, 128:11, 128:23, 129:1, 130:6, 133:23, 179:6, 218:14, 222:8, 222:11, 229:3, 229:5
**breakdown** [1] - 191:6
**breaks** [5] - 128:25, 183:2, 220:10, 221:11
**breakthroughs** [1] - 111:16
**breathe** [1] - 133:11
**breeze** [1] - 218:9
**brief** [4] - 110:7, 115:7, 224:3, 230:7
**briefed** [1] - 270:3
**briefing** [4] - 269:8, 269:23, 270:3, 270:4
**briefly** [9] - 32:19, 33:8, 39:16, 40:13, 68:14, 71:24, 172:2, 245:4, 257:16
**Brigham** [1] - 212:20
**bring** [11] - 42:23, 46:9, 51:8, 52:25, 56:7, 61:3, 65:25, 123:22, 130:9, 222:17, 269:17
**bringing** [6] - 5:14, 33:18, 53:19, 53:22, 117:4, 239:18
**brings** [1] - 152:6
**Brita** [2] - 143:24, 143:25
**broadcasting** [1] - 225:7
**brominated** [1] - 154:23
**bromine** [60] - 12:19, 145:14, 147:10, 147:11, 147:15, 147:19, 151:9, 151:20, 152:1,

152:5, 155:1, 159:2, 160:2, 172:24, 173:12, 179:3, 179:17, 179:21, 180:15, 188:14, 188:16, 189:8, 196:18, 196:20, 197:23, 220:16, 220:17, 221:9, 233:8, 233:13, 255:16, 255:20, 255:25, 256:3, 256:20, 256:25, 257:2, 257:4, 257:7, 257:12, 257:17, 257:18, 257:20, 258:2, 258:4, 258:10, 258:16, 259:5, 260:12, 260:19, 260:22, 261:3, 261:12, 261:24, 262:13, 262:19, 263:1, 263:5, 264:15, 265:6
**bromine-based** [2] - 255:16, 255:20
**brought** [3] - 18:17, 58:22, 119:8
**brown** [8] - 66:2, 67:14, 69:9, 167:6, 185:11, 186:9, 195:15, 208:13
**Brown** [1] - 167:6
**Buffington** [4] - 38:1, 102:21, 156:1, 194:13
**build** [6] - 22:4, 135:17, 148:12, 171:13, 171:20, 239:10
**building** [3] - 137:9, 190:23, 230:2
**buildings** [2] - 192:25, 198:10
**builds** [2] - 143:9, 143:10
**built** [4] - 142:25, 171:23, 190:21, 190:22
**bulb** [2] - 111:14, 115:14
**bullet** [2] - 225:14, 252:14
**bulletin** [1] - 186:11
**bunch** [2] - 167:9, 245:24
**bunker** [1] - 95:13
**bunkers** [1] - 95:14
**burden** [15] - 16:2, 16:4, 108:6, 108:13,

108:25, 109:6, 109:11, 109:14, 181:8, 181:9, 200:3, 200:20, 207:4, 220:7

**burdens** [2] - 41:21, 108:8

**Burke** [11] - 1:12, 34:3, 61:13, 66:6, 70:23, 80:17, 85:13, 90:18, 159:6, 161:13, 172:18

**burn** [16] - 93:4, 143:11, 207:23, 209:19, 236:4, 238:10, 238:13, 240:6, 240:11, 240:12, 240:15, 240:16, 240:20, 240:21, 244:11, 245:18

**burned** [19] - 55:7, 59:10, 91:15, 92:8, 134:11, 171:5, 171:6, 172:24, 172:25, 173:1, 173:8, 179:20, 202:20, 207:4, 207:25, 208:7, 208:16, 208:18, 217:7

**burner** [1] - 144:11

**burning** [20] - 55:19, 57:10, 57:11, 57:17, 74:21, 169:25, 173:19, 180:25, 189:11, 190:2, 190:13, 202:4, 202:11, 209:14, 214:4, 237:4, 244:5, 244:12, 249:23, 250:10

**burns** [3] - 213:6, 230:23, 235:8

**burnt** [2] - 230:22, 231:13

**business** [38] - 37:16, 38:15, 86:8, 86:12, 94:10, 107:14, 135:17, 136:3, 136:5, 136:21, 148:7, 148:12, 149:3, 149:12, 150:13, 150:15, 151:13, 165:24, 166:14, 169:12, 169:16, 170:12, 170:22, 170:24, 170:25, 171:1, 174:14, 179:12, 199:21, 205:3,

206:8, 222:2, 226:4, 227:2

**busy** [2] - 74:3, 87:21

**buy** [9] - 149:2, 151:19, 154:15, 172:1, 188:8, 190:9, 192:2, 204:25, 205:24

**BY** [15] - 1:16, 225:20, 247:5, 248:2, 249:18, 250:25, 253:9, 256:17, 260:7, 261:10, 262:9, 263:14, 264:2, 265:10, 266:19

# C

**Cabot** [2] - 205:12, 206:4

**Cajun** [4] - 153:17, 192:18, 194:17, 212:17

**cake** [1] - 243:4

**Cal** [1] - 185:14

**CALDWELL** [91] - 1:19, 1:19, 18:15, 44:25, 45:11, 45:17, 48:7, 48:10, 48:16, 48:18, 48:22, 49:9, 49:17, 49:20, 51:3, 56:15, 58:12, 64:6, 68:14, 69:1, 69:6, 69:15, 78:15, 78:17, 79:6, 79:12, 83:24, 85:4, 88:22, 89:4, 90:5, 93:12, 93:18, 93:22, 93:25, 94:7, 94:24, 95:10, 95:16, 96:12, 98:24, 99:13, 99:18, 130:10, 131:2, 131:12, 131:19, 131:21, 131:25, 132:5, 153:7, 153:12, 164:5, 222:23, 223:13, 223:16, 223:19, 223:24, 224:14, 225:10, 225:20, 246:23, 247:5, 248:2, 249:11, 249:18, 250:23, 250:25, 253:8, 253:9, 256:15, 256:17, 259:25, 260:7, 261:8, 261:10, 262:7, 262:9, 263:12, 263:14,

263:20, 264:2, 265:8, 265:10, 266:2, 266:11, 266:15, 266:19, 267:13, 268:9, 269:14

**Caldwell** [22] - 3:25, 37:8, 37:10, 56:14, 78:14, 83:23, 93:11, 131:20, 132:16, 164:2, 164:16, 166:20, 168:16, 169:5, 177:21, 178:6, 188:17, 188:19, 194:15, 209:15, 222:22, 268:8

**Calgon** [2] - 205:12, 206:5

**camera** [1] - 5:18

**candor** [3] - 79:15, 96:9, 117:2

**cannot** [2] - 22:11, 90:8

**capable** [1] - 247:11

**caption** [1] - 114:14

**capture** [10] - 11:10, 48:19, 173:10, 188:15, 233:17, 233:25, 251:22, 254:9, 254:11

**capture-related** [1] - 233:17

**capturing** [2] - 39:22, 41:5

**car** [4] - 95:3, 138:1, 189:3, 240:13

**carbon** [147] - 11:9, 12:18, 15:6, 15:12, 15:14, 16:20, 17:7, 143:22, 144:5, 144:9, 144:16, 144:17, 147:11, 147:12, 147:17, 147:19, 159:3, 160:3, 162:2, 162:3, 162:8, 162:13, 173:10, 173:12, 175:19, 175:21, 175:23, 177:10, 177:11, 177:13, 179:18, 179:21, 180:15, 181:20, 182:7, 182:9, 182:10, 182:12, 182:14, 183:9, 183:12, 183:17, 183:24, 184:2, 186:6, 187:2, 187:4, 187:5, 187:9,

187:12, 196:19, 196:23, 197:2, 197:7, 197:9, 197:14, 197:19, 197:23, 198:18, 199:16, 199:19, 199:20, 199:25, 200:6, 200:20, 200:22, 201:2, 201:9, 201:12, 201:14, 201:19, 202:5, 202:9, 202:12, 202:21, 203:9, 203:11, 203:23, 204:2, 204:3, 204:6, 204:7, 204:10, 204:16, 204:21, 204:23, 205:14, 205:25, 206:4, 206:8, 206:22, 206:25, 207:5, 207:9, 207:14, 207:17, 208:1, 208:4, 208:7, 208:19, 209:1, 209:20, 210:1, 213:4, 213:23, 213:24, 213:25, 214:6, 214:12, 216:6, 216:23, 216:25, 217:5, 217:8, 217:11, 221:20, 222:1, 222:3, 233:10, 233:13, 235:19, 235:25, 236:4, 236:9, 236:16, 236:20, 237:4, 253:7, 254:1, 254:6, 254:8, 255:17, 255:20, 257:17, 257:20, 257:24, 258:2, 260:13, 262:15, 263:16, 263:17, 264:7, 264:15, 264:21, 265:6

**carbon-based** [1] - 254:1

**carbons** [2] - 197:4, 264:7

**Carbonxt** [1] - 205:12

**care** [8] - 26:1, 43:19, 87:9, 139:12, 139:14, 139:15, 142:20, 155:6

**career** [4] - 133:2, 209:11, 233:21, 240:1

**caretaker** [2] - 43:24,

46:3

**carpenter** [1] - 86:6

**carpentry** [1] - 89:1

**Carro** [1] - 39:11

**carrying** [1] - 106:16

**cars** [5] - 95:2, 138:1, 138:2, 240:13, 240:16

**case** [195] - 6:3, 7:8, 7:10, 8:18, 12:4, 12:18, 12:20, 12:25, 13:17, 14:3, 14:11, 14:14, 15:25, 20:16, 22:4, 23:8, 25:9, 27:1, 27:3, 27:7, 28:21, 30:18, 30:25, 31:20, 32:12, 32:15, 33:1, 33:4, 33:6, 34:9, 34:16, 36:10, 36:11, 36:14, 36:25, 37:1, 37:3, 37:19, 38:20, 39:16, 39:17, 39:20, 40:3, 40:8, 40:15, 40:21, 40:23, 41:3, 41:5, 41:16, 41:20, 42:1, 42:2, 42:9, 47:17, 47:22, 48:3, 49:11, 50:9, 52:4, 55:2, 57:16, 57:22, 60:1, 62:13, 66:15, 66:17, 67:16, 69:4, 73:13, 75:5, 75:19, 75:25, 76:20, 77:13, 77:19, 81:2, 82:10, 82:18, 83:12, 84:21, 92:2, 92:14, 92:19, 93:3, 94:15, 102:6, 102:8, 102:13, 102:14, 102:17, 103:2, 103:22, 106:4, 108:3, 108:7, 109:16, 109:17, 110:4, 110:5, 110:9, 115:6, 119:10, 120:9, 120:17, 120:21, 121:18, 121:24, 122:11, 123:12, 123:14, 123:22, 123:24, 123:25, 124:3, 124:5, 124:6, 124:7, 124:12, 124:14, 124:19, 124:21, 124:22, 125:5, 125:23, 126:5, 126:25, 127:3, 127:5, 128:6, 128:13, 128:18, 128:19, 132:7,

132:22, 133:7, 136:13, 136:14, 142:6, 147:3, 153:15, 156:21, 158:8, 158:9, 158:13, 158:24, 159:4, 160:1, 160:3, 160:13, 163:8, 166:10, 166:19, 166:24, 167:10, 167:18, 167:19, 168:9, 168:20, 170:2, 170:7, 172:3, 172:18, 174:18, 175:25, 177:18, 179:8, 187:21, 189:20, 193:5, 195:5, 197:1, 197:21, 200:2, 201:6, 202:16, 206:11, 206:13, 206:17, 206:21, 207:20, 207:25, 217:2, 217:14, 217:18, 217:25, 218:24, 222:21, 225:4, 225:12, 250:3, 250:5, 251:10, 251:12, 252:10

**Case** [1] - 1:5
**cases** [14] - 16:1, 75:24, 76:13, 76:24, 77:5, 109:15, 110:11, 120:13, 132:19, 163:24, 165:17, 172:8, 232:3
**cash** [1] - 158:5
**Cassady** [1] - 37:8
**CASSADY** [2] - 1:19, 1:20
**Cat** [1] - 137:20
**catalyst** [3] - 252:16, 252:17, 252:20
**catalysts** [1] - 252:15
**catalytic** [3] - 198:7, 199:13, 257:16
**catalyze** [2] - 147:12, 260:19
**catalyzing** [1] - 264:21
**catch** [5] - 143:23, 147:21, 152:5, 208:13, 233:14
**catches** [1] - 142:15
**category** [1] - 20:14
**Catharine** [1] - 39:6
**caused** [5] - 180:24, 181:11, 181:17, 181:19, 198:22
**causes** [1] - 195:20

**causing** [5] - 134:8, 145:22, 147:6, 181:4, 204:5
**cautious** [1] - 189:6
**cell** [1] - 124:22
**center** [11] - 12:4, 110:3, 141:20, 148:6, 148:7, 148:14, 241:5, 241:24, 242:3, 242:22, 243:2
**Center** [4] - 141:22, 154:11, 158:21, 210:3
**central** [1] - 225:3
**CEO** [5] - 21:2, 21:25, 30:24, 131:2, 148:4
**CERT** [87] - 2:9, 3:22, 10:5, 11:1, 12:1, 14:6, 26:18, 26:21, 37:23, 37:24, 102:18, 102:19, 102:20, 102:25, 122:20, 136:16, 152:20, 152:21, 152:22, 153:22, 154:1, 154:7, 154:10, 154:13, 155:24, 156:2, 156:11, 156:15, 156:18, 156:24, 157:9, 157:13, 157:20, 159:22, 159:23, 165:1, 166:19, 169:2, 169:4, 169:6, 171:11, 172:2, 172:4, 173:17, 176:12, 177:6, 181:19, 181:25, 182:17, 189:21, 189:23, 190:8, 192:19, 193:4, 193:8, 193:19, 193:22, 193:24, 194:8, 194:10, 194:13, 195:6, 196:14, 198:21, 199:25, 200:5, 200:19, 202:13, 206:8, 206:18, 208:20, 213:17, 214:14, 215:9, 215:20, 217:19, 217:24, 226:18, 268:18
**CERT's** [8] - 10:2, 30:1, 165:21, 165:22, 166:12, 171:1, 181:10, 220:7

**certain** [27] - 8:24, 11:19, 14:23, 16:14, 16:19, 20:15, 42:3, 42:20, 81:24, 92:9, 103:13, 104:22, 104:24, 108:12, 110:23, 117:19, 120:11, 145:6, 145:22, 159:11, 160:19, 166:20, 180:10, 205:3, 212:23, 221:8, 238:9
**certainly** [12] - 19:18, 24:13, 29:3, 31:12, 139:13, 160:15, 163:9, 164:5, 242:19, 254:13, 256:5, 261:20
**certificate** [1] - 229:13
**certification** [5] - 182:1, 211:23, 211:24, 212:2, 212:13
**certifications** [1] - 229:10
**certified** [7] - 181:22, 182:4, 187:7, 187:8, 187:13, 197:6, 209:10
**Certified** [2] - 270:11, 270:12
**certify** [2] - 174:2, 270:12
**certifying** [1] - 212:4
**cetera** [4] - 8:7, 21:17, 21:20, 72:13
**chain** [9] - 106:13, 178:18, 178:19, 179:6, 219:9, 220:5, 220:9, 220:11, 221:12
**chains** [1] - 219:7
**chairs** [1] - 101:5
**challenge** [2] - 119:13, 120:6
**challenged** [1] - 121:17
**challenges** [8] - 34:20, 34:21, 61:2, 70:8, 97:6, 97:7, 97:21, 100:13
**challenging** [3] - 109:5, 116:23, 244:9
**chamber** [5] - 138:12, 140:21, 244:18, 258:13, 258:14
**chamber/boiler** [1] - 231:5
**chambers** [1] - 43:8
**chance** [1] - 120:5

**change** [8] - 133:4, 149:22, 214:1, 234:20, 234:21, 234:22, 234:23, 234:25
**changed** [3] - 82:2, 232:12, 232:14
**changes** [2] - 9:21, 234:22
**changing** [1] - 151:4
**character** [1] - 82:2
**characteristics** [5] - 235:1, 235:17, 236:15, 236:17, 236:21
**charge** [5] - 111:25, 129:21, 146:6, 252:3, 252:4
**chargeable** [1] - 14:9
**charged** [1] - 130:3
**charger** [1] - 140:6
**charging** [1] - 129:22
**chart** [7] - 98:6, 194:25, 195:1, 202:14, 207:11, 207:12, 208:9
**charts** [1] - 105:23
**Chase** [2] - 155:19, 155:20
**chase** [1] - 260:11
**chatroom** [1] - 124:25
**cheap** [1] - 92:25
**cheaper** [1] - 188:8
**check** [2] - 63:19, 167:15
**checked** [2] - 113:18, 214:24
**checklist** [1] - 158:22
**Chem** [23] - 26:7, 26:16, 26:18, 26:19, 27:7, 28:3, 28:5, 28:7, 28:8, 28:17, 29:23, 29:24, 29:25, 30:4, 30:15, 31:17, 32:22, 33:3, 38:21, 54:12, 168:10
**Chem-Mod** [23] - 26:7, 26:16, 26:18, 26:19, 27:7, 28:3, 28:5, 28:7, 28:8, 28:17, 29:23, 29:24, 29:25, 30:4, 30:15, 31:17, 32:22, 33:3, 38:21, 54:12, 168:10
**chemical** [19] - 133:25, 134:16, 143:3, 144:12, 144:15, 145:13, 152:1, 152:3, 153:2, 171:8, 185:4, 185:6,

198:3, 209:23, 220:20, 221:1, 253:22, 257:2
**chemically** [1] - 173:18
**chemicals** [17] - 41:13, 47:2, 47:9, 47:13, 57:17, 145:21, 148:15, 149:23, 151:9, 153:3, 153:19, 153:20, 159:18, 188:22, 211:12, 244:15, 252:19
**chemistries** [1] - 221:5
**chemistry** [2] - 95:11, 198:3
**Chesterfield** [3] - 191:14, 193:2, 202:13
**chickens** [1] - 87:8
**chief** [2] - 21:5, 222:21
**child** [1] - 70:7
**childhood** [3] - 67:3, 68:18, 69:18
**children** [1] - 227:20
**chimneys** [1] - 173:3
**chlorine** [25] - 145:16, 145:17, 145:18, 253:25, 254:2, 254:6, 254:7, 254:11, 254:18, 254:21, 254:22, 255:3, 255:7, 255:23, 255:25, 256:25, 257:3, 257:4, 257:8, 257:9, 257:18, 260:22, 261:12, 262:13
**choices** [1] - 133:2
**Christiana** [1] - 43:22
**Christopher** [2] - 1:11, 39:8
**chronology** [1] - 29:14
**church** [1] - 74:16
**circle** [7] - 35:24, 35:25, 38:6, 38:17, 39:2, 42:17, 85:24
**circuit** [1] - 263:21
**Circuit** [1] - 27:4
**circumstances** [3] - 106:14, 107:9, 159:11
**circumstantial** [5] - 106:7, 106:13, 106:16, 106:20, 106:25
**City** [2] - 47:5, 50:5

**city** [3] - 53:9, 193:13, 200:18
**civil** [4] - 3:7, 102:8, 109:16, 163:24
**CI** [1] - 260:21
**claim** [24] - 11:4, 13:10, 16:14, 42:4, 42:6, 112:2, 121:10, 123:2, 123:7, 126:10, 146:21, 152:13, 155:12, 155:20, 157:17, 158:11, 158:15, 180:17, 181:18, 182:14, 182:15, 215:12, 219:18, 219:23
**claimed** [8] - 111:1, 113:13, 114:16, 114:25, 123:5, 178:21, 179:3, 220:6
**claiming** [2] - 117:23, 154:25
**Claims** [1] - 121:19
**claims** [55] - 6:2, 9:15, 14:10, 16:23, 32:3, 32:11, 103:13, 103:16, 103:18, 104:6, 108:12, 108:17, 108:21, 112:11, 115:16, 115:17, 115:22, 117:20, 118:8, 118:21, 119:14, 121:4, 121:6, 121:9, 121:10, 121:15, 121:16, 121:19, 121:21, 121:22, 122:2, 122:3, 122:7, 122:18, 122:22, 122:24, 127:11, 127:15, 158:10, 158:19, 158:21, 165:21, 172:19, 175:11, 175:25, 179:8, 179:14, 181:12, 181:14, 183:21, 197:18, 215:20, 220:3
**clarification** [1] - 130:22
**clarify** [1] - 105:19
**clarifying** [1] - 33:5
**class** [2] - 84:10, 177:24
**classes** [2] - 84:6, 84:9
**classic** [1] - 16:5
**classification** [1] - 235:14

**classifications** [1] - 235:12
**Clause** [1] - 110:18
**clean** [9] - 94:21, 139:11, 171:2, 173:18, 173:20, 231:15, 231:19, 231:21, 247:23
**clean-up** [2] - 231:15, 247:23
**cleaner** [4] - 92:6, 94:22, 189:11, 190:2
**cleaning** [1] - 145:17
**cleans** [1] - 231:15
**clear** [15] - 18:9, 25:8, 29:9, 49:9, 108:10, 109:6, 109:8, 109:10, 112:4, 116:18, 120:19, 123:3, 164:3, 220:8, 265:4
**clearer** [1] - 136:17
**clearly** [4] - 65:20, 90:9, 112:19, 261:25
**clerk** [1] - 79:19
**CLERK** [16] - 43:9, 46:10, 51:9, 61:5, 66:1, 70:18, 80:10, 80:13, 85:9, 90:16, 98:6, 98:10, 98:13, 100:5, 100:15, 223:5
**client** [16] - 17:1, 17:3, 68:16, 68:21, 72:4, 78:17, 94:7, 130:23, 132:6, 135:3, 148:5, 160:17, 163:23, 164:25, 223:24, 223:25
**client's** [1] - 224:21
**clients** [8] - 14:20, 16:9, 16:25, 18:7, 28:4, 105:4, 176:2, 180:18
**clients'** [1] - 194:11
**clip** [1] - 245:4
**close** [13] - 31:23, 37:5, 38:23, 38:25, 40:20, 55:15, 68:19, 75:4, 77:10, 104:1, 104:5, 230:17, 232:17
**closely** [3] - 60:1, 69:20, 116:13
**closer** [7] - 111:6, 112:13, 114:1, 141:24, 150:14, 241:12, 241:13
**closing** [5] - 22:8, 72:17, 127:22, 127:23, 218:15

**clue** [1] - 50:6
**Co** [1] - 38:20
**co** [5] - 145:12, 226:1, 227:6, 227:7, 227:10
**CO** [1] - 1:7
**co-inventor** [1] - 226:1
**co-inventors** [3] - 145:12, 227:6, 227:10
**co-workers** [1] - 227:7
**coal** [427] - 6:2, 6:3, 6:15, 6:19, 6:20, 6:21, 7:17, 7:18, 7:23, 7:24, 8:4, 11:8, 11:14, 12:8, 12:19, 12:22, 13:8, 13:10, 13:12, 13:13, 13:14, 13:18, 13:19, 14:1, 14:17, 14:23, 14:24, 15:3, 15:8, 15:12, 17:13, 17:19, 17:21, 28:4, 28:7, 29:12, 39:1, 39:23, 39:25, 40:1, 40:6, 40:7, 41:6, 41:17, 41:19, 48:14, 52:6, 54:14, 54:15, 54:16, 54:18, 54:19, 54:22, 54:24, 55:4, 55:7, 55:14, 55:15, 55:19, 55:22, 55:25, 56:19, 56:22, 56:24, 57:6, 57:7, 57:10, 57:11, 57:17, 57:24, 59:1, 59:9, 59:12, 60:14, 60:16, 73:25, 74:2, 74:6, 74:20, 74:21, 91:12, 91:14, 91:15, 91:18, 91:20, 92:3, 92:5, 92:9, 92:17, 92:23, 93:4, 93:13, 93:23, 94:1, 94:2, 94:4, 95:2, 95:7, 95:11, 134:10, 135:1, 135:14, 135:23, 136:23, 137:2, 137:11, 137:15, 137:17, 137:18, 137:23, 137:25, 138:1, 138:4, 138:9, 138:10, 138:11, 139:12, 139:13, 139:19, 139:22, 140:18, 140:19, 141:9, 142:2, 142:4, 142:6, 142:9, 142:11, 142:12, 142:20, 142:21, 142:23, 143:1, 143:2, 143:10,

143:20, 143:25, 145:20, 147:9, 147:15, 148:13, 148:19, 151:16, 151:17, 151:19, 151:20, 151:25, 152:13, 153:12, 153:14, 153:17, 153:20, 153:25, 154:15, 154:19, 154:23, 154:24, 155:1, 155:21, 159:21, 165:5, 167:19, 167:25, 168:5, 168:10, 169:19, 169:20, 169:21, 169:24, 170:1, 170:3, 170:12, 170:15, 170:17, 170:19, 170:21, 170:22, 170:24, 171:3, 171:4, 171:14, 171:17, 172:1, 172:24, 172:25, 173:8, 173:18, 173:19, 173:20, 174:2, 174:7, 175:1, 175:3, 175:4, 175:7, 175:19, 176:21, 176:24, 177:7, 177:9, 179:4, 179:17, 179:20, 180:25, 181:22, 182:1, 182:12, 182:19, 183:6, 183:12, 183:15, 183:23, 185:9, 185:16, 185:23, 187:13, 187:22, 188:8, 188:15, 189:20, 190:2, 190:9, 190:13, 190:19, 190:20, 191:9, 191:18, 191:19, 191:25, 192:2, 192:5, 192:10, 192:15, 192:20, 193:3, 193:4, 193:9, 193:10, 194:3, 194:6, 194:19, 194:25, 195:24, 196:18, 196:21, 196:22, 197:3, 197:5, 198:22, 201:18, 202:3, 202:4, 202:8, 202:11, 202:13, 202:17, 202:18, 202:20, 202:24,

203:20, 204:11, 204:18, 207:4, 207:11, 207:23, 207:25, 208:3, 208:6, 208:21, 208:22, 209:1, 209:5, 209:8, 209:14, 209:18, 211:4, 211:5, 211:8, 211:19, 212:20, 212:21, 213:7, 213:8, 213:13, 213:18, 214:5, 214:9, 214:15, 215:6, 216:3, 216:4, 216:6, 217:6, 217:7, 217:11, 217:12, 217:13, 218:23, 220:16, 220:22, 221:2, 221:4, 221:10, 221:20, 221:24, 222:2, 226:13, 226:19, 227:9, 230:4, 230:5, 230:8, 230:16, 230:18, 230:19, 231:11, 231:13, 231:23, 231:24, 232:1, 232:2, 232:3, 232:5, 232:10, 232:17, 232:23, 233:7, 233:8, 233:9, 234:3, 234:12, 234:21, 234:23, 235:7, 235:8, 235:12, 235:14, 235:18, 235:20, 235:22, 235:23, 235:24, 236:1, 236:2, 236:3, 236:7, 236:8, 236:10, 236:14, 236:18, 236:19, 236:22, 236:25, 237:7, 237:10, 237:11, 237:18, 237:20, 237:22, 237:23, 238:6, 238:13, 238:14, 238:16, 238:22, 238:24, 239:2, 239:10, 239:11, 239:12, 239:14, 239:17, 239:21, 239:24, 240:4, 240:5, 240:6, 240:8, 240:16, 240:20, 242:14, 243:6, 244:6, 244:12, 245:6, 245:18, 247:22, 250:3, 250:12,

250:15, 250:22, 251:5, 251:9, 252:10, 254:11, 258:12, 258:22, 259:5, 260:13, 261:22, 262:23, 263:1, 263:5
**coal-burning** [1] - 209:14
**coal-fire** [1] - 188:15
**coal-fired** [26] - 39:1, 39:23, 41:6, 54:14, 54:24, 73:25, 74:6, 91:14, 91:18, 91:20, 92:17, 93:13, 135:14, 137:2, 139:19, 141:9, 143:20, 203:20, 227:9, 230:4, 230:5, 230:8, 232:5, 232:10, 233:7, 234:12
**coal-related** [5] - 54:19, 56:19, 59:1, 59:12
**coals** [12] - 143:16, 237:3, 237:21, 238:9, 243:25, 244:3, 244:6, 249:23, 250:8, 251:12, 252:7
**coast** [1] - 143:4
**coat** [1] - 106:15
**COCHRANE** [1] - 1:23
**Cochrane** [1] - 37:12
**code** [5] - 158:11, 174:12, 176:16, 181:25, 184:23
**Code** [11] - 173:21, 173:24, 173:25, 174:3, 176:17, 179:11, 182:2, 184:25, 190:4, 191:20
**cold** [2] - 4:25, 227:23
**Coleto** [4] - 154:2, 154:7, 193:6, 212:17
**colleague** [1] - 165:8
**colleagues** [5] - 34:3, 99:14, 135:16, 163:22, 166:13
**collect** [2] - 144:18, 257:25
**collected** [1] - 126:3
**collectively** [2] - 103:3, 103:17
**college** [3] - 84:13, 228:13, 228:24
**Collin** [1] - 16:1
**color** [1] - 208:10

**Colorado** [1] - 213:7
**column** [1] - 208:10
**columns** [1] - 208:14
**combination** [2] - 111:20, 219:19
**combine** [1] - 254:7
**combust** [1] - 41:17
**combusted** [6] - 185:2, 208:3, 221:20, 231:13, 243:5, 245:8
**combustion** [25] - 138:12, 140:21, 152:23, 152:24, 171:4, 185:16, 189:11, 196:18, 220:23, 221:4, 221:10, 231:5, 231:10, 233:10, 233:11, 243:6, 244:18, 244:20, 244:24, 244:25, 245:3, 245:5, 257:23, 258:13, 258:14
**combustor** [11] - 145:4, 230:21, 246:12, 246:20, 247:14, 247:17, 247:21, 248:4, 255:16, 255:17, 263:2
**comfortable** [1] - 62:21
**coming** [18] - 4:25, 8:12, 8:17, 53:8, 53:24, 57:11, 60:24, 64:12, 67:16, 68:5, 79:19, 87:25, 89:12, 136:24, 150:3, 150:24, 166:8, 187:22
**Comm** [1] - 216:22
**comment** [2] - 10:8, 164:22
**commercial** [1] - 137:6
**Commission** [1] - 205:2
**committees** [1] - 233:25
**common** [3] - 107:15, 167:15, 235:19
**commonly** [1] - 238:24
**Commonwealth** [1] - 216:15
**communicate** [2] - 124:20, 124:22
**communicated** [1] -

117:16
**communities** [1] - 139:13
**companies** [39] - 13:16, 14:14, 14:15, 14:16, 29:12, 38:19, 38:24, 54:11, 54:14, 73:23, 135:23, 152:13, 152:17, 155:10, 157:17, 157:20, 158:1, 161:19, 161:21, 165:1, 169:23, 189:20, 189:21, 190:8, 191:25, 192:8, 192:9, 192:21, 192:22, 195:6, 195:23, 202:13, 205:1, 205:11, 205:13, 205:16, 206:5, 221:21
**Company** [4] - 38:3, 91:9, 102:24, 213:1
**company** [37] - 14:6, 14:9, 30:24, 38:25, 71:11, 72:20, 72:24, 76:10, 76:20, 91:23, 114:8, 119:3, 148:22, 150:20, 154:1, 155:23, 165:22, 168:21, 169:11, 189:23, 191:8, 191:9, 191:16, 191:18, 191:22, 191:25, 192:14, 202:21, 204:25, 208:20, 208:25, 216:5, 217:24, 218:1, 229:24, 234:14, 241:6
**comparability** [5] - 22:11, 22:13, 24:19, 25:1, 25:12
**comparable** [8] - 22:7, 22:14, 24:8, 24:20, 27:12, 27:13, 163:1, 167:14
**compare** [1] - 6:19
**comparing** [5] - 6:2, 6:8, 6:15, 6:20, 7:9
**comparison** [2] - 90:14, 255:23
**compete** [3] - 151:11, 151:23, 205:11
**competing** [2] - 116:5, 151:8
**competition** [2] - 205:9, 205:10

**competitors'** [1] - 204:23
**complaint** [10] - 9:21, 10:15, 12:15, 12:17, 14:6, 215:8, 215:11, 215:24, 216:1, 216:3
**complaints** [1] - 215:23
**complete** [6] - 42:25, 89:22, 113:18, 116:8, 116:17, 149:1
**completed** [6] - 36:4, 36:11, 36:13, 43:2, 128:19, 262:18
**completely** [1] - 69:2
**completeness** [1] - 158:18
**complex** [4] - 198:3, 239:12, 244:14, 244:16
**compliance** [1] - 199:9
**complicated** [3] - 132:13, 198:3, 243:21
**complied** [1] - 187:6
**complies** [2] - 113:13, 113:19
**comply** [6] - 113:5, 149:19, 173:20, 204:2, 204:7, 204:12
**components** [2] - 247:19, 247:21
**comports** [1] - 130:19
**composition** [2] - 84:6, 112:15
**compound** [1] - 233:8
**compounds** [1] - 255:1
**computer** [3] - 116:14, 136:6, 234:18
**computers** [1] - 136:7
**conceived** [1] - 135:11
**concept** [1] - 256:19
**conception** [4] - 112:18, 146:7, 256:23, 259:23
**concern** [11] - 60:22, 61:19, 67:15, 68:17, 77:18, 110:7, 141:10, 149:16, 244:6, 256:1, 256:2
**concerned** [8] - 5:25, 7:4, 45:13, 46:1, 46:3, 92:10, 121:18, 243:25
**concerning** [2] - 34:15, 73:6
**concerns** [4] - 7:12, 45:15, 46:6, 255:24

**conclude** [3] - 106:17, 267:18, 268:8
**concluded** [3] - 52:14, 128:6, 269:12
**concludes** [1] - 117:11
**concluding** [1] - 42:11
**conclusion** [2] - 125:9, 126:2
**concrete** [1] - 82:7
**condensed** [1] - 231:4
**conditions** [1] - 250:4
**conduct** [3] - 123:10, 124:5, 180:25
**Condyle's** [1] - 82:3
**confer** [1] - 99:14
**conference** [10] - 8:21, 28:19, 29:1, 29:6, 29:16, 30:16, 31:13, 33:20, 126:17, 224:7
**conferences** [1] - 126:20
**confidential** [1] - 160:17
**confirmed** [4] - 201:5, 201:11, 201:15, 214:25
**conflict** [1] - 44:16
**confront** [1] - 83:4
**confusing** [4] - 28:9, 30:5, 31:19
**confusion** [5] - 24:10, 29:22, 30:15, 33:3, 35:15
**Congress** [19] - 110:16, 110:18, 135:18, 135:22, 135:23, 141:3, 150:6, 152:12, 173:21, 176:16, 176:21, 179:10, 186:17, 189:9, 189:10, 189:13, 189:16, 190:3, 191:20
**Congressional** [3] - 171:2, 173:20, 179:10
**Connecticut** [1] - 72:4
**connection** [3] - 42:13, 60:6, 68:23
**Connie** [2] - 39:7, 185:12
**consequence** [1] - 236:2
**consider** [12] - 48:1, 96:1, 104:10, 105:17, 106:24, 107:4, 107:20,

109:17, 119:19, 119:22, 222:4, 259:22

**considered** [7] - 18:2, 21:20, 104:25, 105:22, 106:1, 108:16, 262:22

**consist** [2] - 104:20, 247:11

**consistent** [2] - 107:6, 233:4

**consistently** [1] - 65:5

**consists** [1] - 235:24

**constantly** [1] - 64:18

**Constitution** [2] - 110:16, 164:19

**constitutional** [4] - 268:20, 268:24, 269:1, 270:2

**constructed** [1] - 165:5

**constructing** [1] - 256:13

**construction** [4] - 6:25, 156:6, 194:2, 230:1

**constructions** [3] - 42:5, 42:6, 126:11

**consult** [2] - 94:10, 124:8

**consultant** [1] - 160:12

**contain** [1] - 116:14

**contained** [10] - 120:11, 171:5, 173:18, 174:24, 174:25, 182:5, 185:2, 187:17, 196:25, 235:22

**contains** [2] - 109:19, 126:8

**contend** [3] - 94:8, 103:20, 109:4

**contends** [5] - 40:9, 40:10, 103:12, 103:16, 108:11

**content** [8] - 235:19, 236:4, 236:8, 236:9, 236:16, 236:17, 236:23, 239:15

**contention** [5] - 78:21, 109:10, 127:10, 127:15, 178:15

**contentions** [1] - 40:14

**context** [14] - 31:18, 33:1, 134:4, 137:1, 137:4, 137:5, 137:17, 138:2, 153:14, 154:18,

206:14, 244:10, 253:10, 265:17

**continuation** [4] - 7:6, 7:10, 146:25, 178:13

**continue** [6] - 128:9, 157:22, 218:20, 263:7, 263:11, 264:6

**continued** [1] - 2:1

**continues** [2] - 146:12, 155:22

**continuing** [3] - 154:22, 178:12, 183:22

**continuously** [1] - 207:4

**contract** [1] - 50:12

**contracted** [1] - 145:7

**contractor** [3] - 86:11, 87:11, 90:12

**contractors** [2] - 89:11, 89:12

**contracts** [2] - 192:2, 269:2

**contradicted** [1] - 107:7

**contrary** [1] - 209:4

**contrast** [1] - 9:18

**contrasting** [1] - 10:8

**contribute** [3] - 8:9, 159:23, 176:3

**contributed** [1] - 122:21

**contributing** [1] - 177:15

**contributorily** [4] - 10:21, 12:14, 14:21, 17:15

**contributory** [12] - 5:21, 5:24, 6:1, 7:22, 13:9, 159:13, 159:16, 179:14, 182:15, 183:1, 203:6, 215:19

**control** [24] - 41:11, 46:25, 47:7, 48:14, 126:5, 134:15, 139:4, 139:7, 140:22, 141:14, 180:14, 186:3, 187:1, 198:6, 198:20, 199:7, 203:23, 216:18, 216:22, 216:25, 220:23, 235:4, 243:8, 249:22

**controlled** [3] - 140:9, 242:11, 242:13

**controls** [3] - 199:2, 241:20, 247:22

**controversy** [2] -

40:21, 75:5

**conversations** [1] - 74:23

**converted** [1] - 230:25

**converters** [1] - 232:14

**conveyers** [2] - 194:3, 230:18

**conveyor** [1] - 138:9

**conviction** [1] - 109:9

**convince** [2] - 149:8, 188:4

**convinced** [5] - 25:6, 135:19, 150:19, 152:12, 158:1

**convincing** [7] - 108:10, 109:6, 109:8, 109:11, 120:20, 123:4, 220:8

**cool** [1] - 19:23

**coordinated** [1] - 210:15

**copies** [4] - 8:25, 9:5, 101:23, 126:11

**copy** [5] - 5:17, 9:6, 35:4, 103:10, 121:24

**copyright** [6] - 81:24, 81:25, 82:1, 84:3, 84:15, 84:23

**corner** [1] - 118:23

**CORP** [1] - 1:3

**Corp** [3] - 3:6, 37:3, 102:14

**corporate** [2] - 21:16, 226:2

**Corporation** [1] - 82:1

**corporations** [4] - 81:10, 81:13, 81:19

**Correct** [1] - 10:10

**correct** [11] - 11:23, 29:18, 31:9, 64:23, 65:9, 65:11, 65:12, 84:1, 97:18, 98:10, 122:2

**corrective** [1] - 18:4

**correctly** [3] - 83:25, 126:22, 229:6

**correlate** [1] - 133:14

**correspondence** [1] - 118:11

**corroborate** [2] - 259:22, 260:12

**corrode** [3] - 189:4, 254:23, 264:17

**corrosion** [1] - 255:24

**corrosive** [5] - 145:19, 188:18, 189:8, 254:19, 254:20

**CORTLAN** [1] - 2:3

**Cortlan** [3] - 3:22,

38:12, 165:11

**cost** [2] - 198:11, 239:20

**costs** [1] - 203:12

**Cottbus** [4] - 38:2, 102:23, 155:24, 194:8

**council** [1] - 259:10

**counsel** [46] - 1:24, 2:9, 3:3, 3:8, 3:10, 3:16, 3:19, 4:1, 4:4, 4:8, 9:14, 9:17, 10:7, 10:18, 12:1, 16:7, 17:25, 30:8, 31:22, 34:19, 34:22, 36:24, 37:22, 43:13, 44:24, 45:1, 49:21, 56:12, 65:16, 68:13, 69:20, 95:18, 97:24, 98:3, 129:12, 153:10, 164:3, 164:10, 164:23, 196:14, 222:20, 225:17, 226:13, 262:21, 268:1

**Counsel** [1] - 4:15

**counted** [1] - 17:21

**counterclaim** [2] - 37:19, 102:16

**counting** [1] - 168:7

**countless** [1] - 133:9

**country** [7] - 52:7, 55:22, 142:4, 142:12, 142:19, 143:18, 239:10

**counts** [3] - 7:17, 7:18, 17:19

**County** [5] - 170:15, 193:24, 193:25, 194:12, 194:14

**couple** [10] - 4:1, 50:19, 93:18, 141:1, 155:3, 168:22, 183:2, 192:17, 193:13, 265:20

**coupon** [1] - 136:1

**course** [16] - 26:22, 38:18, 61:2, 92:10, 104:7, 104:16, 119:24, 124:4, 128:4, 128:21, 166:18, 175:22, 195:6, 197:15, 202:22, 229:16

**court** [14] - 3:1, 3:8, 4:4, 58:8, 78:25, 100:4, 101:10, 119:10, 120:2, 120:7, 200:12, 222:14, 238:4, 248:1

**Court** [26] - 9:2, 12:3, 15:25, 16:1, 20:10, 20:19, 32:20, 32:21, 33:23, 34:4, 34:17, 42:10, 43:6, 67:1, 105:20, 119:8, 132:1, 159:25, 160:18, 200:13, 215:12, 224:2, 268:13, 270:8, 270:17, 270:17

**COURT** [320] - 1:1, 3:1, 3:16, 4:1, 5:19, 6:4, 6:9, 6:13, 7:13, 9:3, 9:6, 9:24, 10:5, 10:11, 10:17, 10:25, 11:12, 11:24, 12:5, 13:5, 14:1, 14:18, 15:17, 16:12, 17:9, 18:16, 18:22, 18:25, 20:7, 20:20, 21:11, 21:18, 21:22, 22:15, 23:1, 23:10, 23:14, 23:24, 24:5, 24:12, 24:18, 25:5, 26:4, 26:10, 27:10, 27:15, 27:23, 28:13, 30:7, 30:12, 31:4, 32:9, 32:13, 32:24, 33:10, 33:16, 34:2, 35:3, 43:10, 43:12, 43:23, 44:1, 44:6, 44:14, 44:20, 44:23, 45:1, 45:3, 45:7, 45:10, 45:12, 45:22, 46:1, 46:11, 46:13, 46:15, 46:20, 46:22, 47:11, 47:17, 48:5, 48:9, 49:21, 50:25, 51:4, 51:6, 51:10, 51:12, 51:20, 51:24, 52:1, 52:10, 53:12, 53:16, 53:19, 53:23, 54:1, 54:5, 54:9, 54:20, 55:2, 56:3, 56:9, 56:12, 56:16, 57:15, 57:21, 58:3, 58:6, 58:8, 58:11, 58:13, 59:5, 60:8, 61:6, 61:8, 61:11, 61:13, 61:19, 61:24, 62:3, 62:7, 62:10, 62:18, 63:3, 63:6, 63:9, 63:21, 63:24, 64:2, 64:4, 64:7, 64:14, 65:14, 65:19, 66:2, 66:4, 66:6, 66:11, 66:19, 66:21, 66:23, 67:1, 67:5, 67:10, 67:13, 68:3, 68:9, 68:12, 69:7, 69:9,

69:12, 70:1, 70:10, 70:19, 70:22, 71:5, 71:7, 71:16, 71:21, 71:24, 72:2, 72:8, 72:18, 72:24, 73:5, 73:10, 73:17, 73:22, 74:5, 74:8, 74:11, 74:13, 74:19, 74:25, 75:3, 75:11, 75:14, 75:18, 75:23, 76:3, 76:6, 76:10, 76:13, 76:16, 76:24, 77:4, 77:8, 77:13, 77:23, 77:25, 78:8, 78:12, 79:13, 79:15, 79:18, 79:22, 80:2, 80:11, 80:14, 80:17, 80:21, 80:25, 81:2, 81:11, 81:15, 82:5, 82:8, 82:10, 82:13, 83:2, 83:9, 83:13, 83:19, 83:22, 84:25, 85:3, 85:5, 85:7, 85:10, 85:13, 85:19, 85:21, 85:23, 86:6, 86:8, 86:13, 86:20, 86:22, 87:1, 87:10, 87:15, 87:20, 87:24, 88:2, 88:6, 88:10, 88:14, 88:16, 88:20, 89:17, 89:21, 90:1, 90:4, 90:6, 90:8, 90:17, 91:1, 91:4, 91:10, 91:14, 91:17, 91:22, 91:24, 92:2, 92:22, 93:2, 93:9, 95:18, 95:20, 96:8, 96:11, 96:13, 96:15, 97:16, 98:16, 99:1, 99:6, 99:16, 99:20, 100:11, 101:4, 101:19, 121:1, 129:11, 130:9, 130:23, 131:10, 131:13, 131:16, 131:20, 131:24, 132:4, 153:6, 153:10, 164:2, 164:9, 218:13, 218:19, 222:7, 222:11, 222:17, 222:20, 223:3, 223:15, 223:18, 223:23, 224:3, 224:6, 225:1, 225:15, 225:17, 246:25, 247:2, 247:25, 249:13, 249:15, 260:2, 260:4, 266:4, 266:6, 266:9, 266:14,

267:16, 267:24, 268:11, 268:14, 269:15, 269:19, 269:25
**Court's** [9] - 20:13, 42:4, 42:6, 48:25, 49:18, 123:22, 126:10, 159:7, 269:17
**courthouse** [2] - 34:5, 97:13
**Courtroom** [1] - 1:12
**courtroom** [30] - 4:15, 34:23, 35:1, 78:3, 100:17, 101:7, 101:14, 101:16, 101:24, 106:3, 106:5, 106:15, 124:15, 129:10, 131:15, 185:13, 197:22, 222:10, 222:19, 223:20, 223:25, 224:1, 224:8, 224:9, 225:5, 225:9, 240:18, 240:20, 267:21, 267:23
**courtship** [1] - 144:16
**cover** [3] - 7:7, 18:19, 82:15
**covered** [1] - 263:17
**covers** [1] - 121:12
**CPA** [1] - 169:15
**crane** [1] - 192:24
**crazy** [1] - 52:21
**create** [4] - 44:16, 138:23, 171:5, 249:19
**created** [9] - 81:25, 153:17, 153:21, 153:23, 154:3, 154:8, 154:12, 156:10, 189:10
**creative** [1] - 184:8
**credibility** [6] - 12:13, 13:25, 16:11, 107:3, 107:10, 216:14
**credible** [2] - 16:9, 217:16
**credit** [9] - 108:2, 135:24, 136:1, 136:18, 136:21, 152:13, 158:2, 189:18, 189:24
**credits** [13] - 59:17, 135:22, 136:11, 136:19, 141:2, 152:13, 154:25, 155:2, 155:6, 155:12, 155:20,

157:17, 157:25
**Creek** [4] - 154:2, 154:7, 193:6, 212:17
**crescendo** [1] - 150:24
**criminal** [1] - 109:15
**critical** [4] - 140:14, 232:21, 233:5, 234:13
**Crookston** [1] - 228:18
**cross** [10] - 19:19, 19:20, 19:23, 19:25, 21:25, 23:14, 23:18, 23:23, 25:1, 25:4
**cross-examination** [4] - 19:20, 23:23, 25:1, 25:4
**cross-examine** [4] - 19:19, 21:25, 23:14, 23:18
**crossing** [1] - 137:24
**CSR** [1] - 270:16
**cubic** [1] - 240:19
**CUMMINGS** [1] - 2:6
**Cummings** [1] - 38:11
**curious** [1] - 132:23
**current** [11] - 9:10, 11:11, 97:17, 98:23, 99:8, 140:3, 140:13, 195:5, 216:2, 233:4
**Curry** [1] - 37:8
**CURRY** [2] - 1:19, 1:20
**customary** [1] - 122:4
**customers** [6] - 40:1, 151:3, 171:24, 176:13, 205:24, 205:25
**cut** [2] - 99:25, 260:11
**cycle** [1] - 231:6
**cycles** [1] - 140:11

# D

**D.C** [1] - 113:2
**D9** [1] - 137:20
**dad** [2] - 137:13, 228:7
**Dailey** [2] - 46:13, 50:25
**daily** [1] - 73:8
**Dakota** [8] - 141:21, 143:17, 192:18, 210:4, 212:4, 228:20, 239:5, 241:5
**damage** [2] - 59:20, 63:20
**damages** [43] - 7:25, 8:6, 11:15, 12:9,

13:11, 13:14, 13:18, 13:19, 14:2, 14:10, 15:4, 19:10, 19:14, 19:16, 20:6, 20:17, 20:21, 20:23, 21:19, 22:4, 23:7, 23:8, 24:13, 24:14, 25:11, 27:11, 27:16, 28:24, 30:20, 30:23, 31:11, 31:14, 32:15, 40:5, 40:9, 103:18, 123:8, 161:12, 166:23, 168:14, 217:20, 217:22, 225:4
**Danbury** [2] - 71:14, 71:17
**dance** [2] - 73:19, 74:16
**Daniel** [3] - 3:15, 37:11, 39:11
**DANIEL** [1] - 1:22
**data** [5] - 206:23, 218:22, 244:2, 250:2, 262:20
**databases** [1] - 116:14
**date** [11] - 12:9, 14:10, 52:5, 111:3, 114:9, 114:10, 116:3, 117:22, 118:23, 118:25, 221:13
**dates** [3] - 116:4, 172:7, 218:22
**Daubert** [2] - 27:19, 27:21
**daughter's** [2] - 73:19, 74:16
**daughters** [1] - 43:19
**Dave** [4] - 73:14, 74:3, 74:15, 74:24
**Davinda** [1] - 205:12
**days** [17] - 27:22, 36:15, 43:20, 44:4, 62:16, 62:17, 62:18, 86:17, 136:25, 137:22, 177:2, 188:23, 217:3, 218:1, 218:25, 253:22, 269:5
**deadline** [1] - 176:16
**deal** [8] - 47:19, 52:9, 127:1, 143:6, 151:6, 198:20, 199:6, 245:15
**dealing** [3] - 47:8, 174:24, 177:23
**dealings** [8] - 37:1, 37:6, 38:7, 38:23, 38:25, 54:11, 66:12, 73:12
**deals** [4] - 32:3, 41:5,

174:20, 198:21
**dealt** [3] - 21:15, 174:6, 185:24
**Deanna** [2] - 270:11, 270:16
**dear** [1] - 142:18
**decade** [2] - 184:14, 184:22
**decades** [5] - 142:11, 184:13, 185:21, 198:6, 216:17
**December** [10] - 13:21, 29:19, 63:15, 63:17, 176:16, 176:18, 176:20, 188:1, 202:18, 249:8
**decide** [22] - 41:23, 41:25, 83:12, 106:4, 106:19, 113:22, 116:16, 119:9, 119:11, 120:9, 122:8, 122:9, 122:10, 122:11, 122:15, 122:23, 123:6, 123:8, 124:14, 129:17, 179:25, 217:15
**decided** [1] - 34:16
**decides** [1] - 116:9
**deciding** [2] - 41:20, 120:8
**decision** [18] - 18:12, 33:7, 58:23, 83:17, 104:14, 116:11, 116:25, 117:15, 125:12, 125:23, 166:8, 186:4, 200:7, 240:2, 268:25, 269:4, 269:7, 269:11
**decision-making** [3] - 58:23, 186:4, 240:2
**decisions** [6] - 7:20, 40:12, 117:7, 126:6, 129:20, 204:13
**declining** [2] - 151:1, 151:2
**deduction** [3] - 135:25, 136:5, 136:8
**deductions** [1] - 135:24
**deed** [3] - 111:23, 112:1, 115:19
**deep** [1] - 245:2
**deeper** [1] - 237:24
**defeats** [1] - 16:4
**defects** [1] - 134:2
**defend** [2] - 127:13, 127:17
**defendant** [29] - 14:15, 14:22, 40:3,

40:5, 40:8, 40:10, 90:6, 103:12, 122:16, 122:24, 123:1, 123:7, 136:22, 152:17, 156:21, 164:23, 165:21, 168:20, 195:22, 202:21, 203:3, 203:5, 206:10, 208:21, 208:25, 215:10, 216:5, 221:21, 268:18
**defendant's** [1] - 12:2
**Defendants** [2] - 1:8, 2:9
**defendants** [111] - 3:22, 4:7, 7:25, 8:3, 8:5, 8:7, 9:13, 9:14, 9:19, 10:9, 11:15, 11:17, 12:8, 13:10, 13:15, 13:16, 14:2, 14:7, 14:14, 14:20, 16:17, 17:12, 17:21, 17:23, 18:6, 18:9, 19:6, 19:9, 19:14, 19:15, 19:16, 19:18, 20:4, 20:5, 20:15, 20:16, 26:15, 26:21, 27:24, 28:1, 28:2, 28:12, 28:15, 28:21, 31:7, 31:11, 32:22, 37:18, 37:20, 37:22, 38:9, 39:18, 39:24, 40:6, 40:13, 55:7, 55:8, 57:18, 67:23, 77:15, 78:23, 82:14, 82:15, 92:8, 92:19, 94:12, 102:16, 102:17, 102:20, 102:25, 103:19, 108:12, 108:23, 108:24, 109:4, 122:20, 123:3, 127:4, 127:10, 127:12, 127:16, 136:14, 136:15, 146:2, 146:5, 147:6, 148:20, 151:12, 152:16, 153:16, 153:17, 157:4, 161:14, 169:3, 176:9, 195:5, 195:10, 202:16, 215:2, 224:19, 226:17, 226:19, 226:23, 262:21, 268:21, 268:24
**Defendants'** [1] - 167:4

**defendants'** [49] - 3:19, 5:17, 9:9, 9:10, 11:2, 14:3, 17:25, 19:25, 25:20, 26:3, 26:18, 28:10, 31:21, 43:13, 45:1, 45:12, 45:22, 46:17, 49:21, 51:15, 56:16, 58:13, 59:7, 60:19, 61:16, 66:7, 66:13, 67:22, 69:7, 70:25, 77:14, 79:13, 79:16, 80:19, 85:5, 85:15, 90:20, 92:7, 95:18, 96:13, 103:14, 127:18, 153:10, 164:4, 164:10, 220:7, 258:15, 269:6, 269:20
**defense** [29] - 8:23, 8:25, 9:15, 9:21, 10:8, 10:18, 11:11, 11:18, 11:21, 12:2, 15:20, 15:21, 15:23, 16:5, 16:6, 16:7, 16:8, 16:13, 17:14, 24:12, 25:14, 51:4, 70:2, 70:10, 119:16, 222:5, 226:13, 269:15
**defenses** [4] - 8:24, 9:17, 160:4, 160:5
**defer** [1] - 269:11
**deficient** [1] - 117:15
**define** [5] - 121:5, 121:6, 121:21, 140:12, 172:20
**defined** [2] - 121:23, 253:16
**defines** [1] - 112:2
**defining** [1] - 112:1
**definitely** [2] - 58:5, 262:25
**definition** [3] - 122:1, 122:4, 122:6
**definitions** [3] - 42:3, 83:8, 121:24
**definitive** [1] - 12:24
**degree** [12] - 76:12, 132:17, 165:3, 177:22, 228:16, 228:18, 228:20, 228:21, 229:8, 229:9, 234:12, 235:20
**degrees** [1] - 244:13
**Delaware** [8] - 3:2, 3:10, 34:5, 47:5, 50:5, 50:22, 179:11, 191:21

**DELAWARE** [1] - 1:2
**delay** [1] - 71:14
**delayed** [1] - 90:12
**deliberate** [4] - 123:14, 125:23, 128:1, 128:14
**deliberation** [2] - 125:25, 126:6
**deliberations** [5] - 36:13, 125:5, 126:7, 128:7, 128:14
**DELLINGER** [1] - 1:22
**Dellinger** [2] - 37:11, 132:21
**demand** [5] - 166:24, 168:14, 168:15, 184:18, 184:19
**demeanor** [2] - 70:12, 107:9
**demonstrate** [1] - 176:2
**demonstrated** [1] - 141:14
**demonstrating** [1] - 7:24
**demonstrative** [1] - 105:25
**demonstratives** [1] - 164:7
**denied** [1] - 168:12
**denies** [1] - 40:8
**deny** [2] - 31:21, 103:19
**denying** [1] - 109:3
**Deogun** [1] - 193:19
**Department** [4] - 145:9, 146:11, 146:13, 253:21
**deponent** [1] - 21:5
**deposition** [7] - 199:24, 200:5, 200:13, 200:14, 217:9, 268:3, 268:4
**depositions** [2] - 129:16, 200:10
**deputy** [7] - 34:23, 35:1, 51:18, 58:8, 101:16, 101:24, 267:21
**describe** [10] - 112:4, 114:19, 127:20, 144:25, 145:1, 145:20, 180:7, 210:22, 247:10, 249:1
**described** [10] - 17:25, 40:14, 40:18, 60:21, 113:12, 147:10, 179:3, 255:25, 256:14, 256:18

**describes** [4] - 114:7, 115:8, 211:2, 247:21
**describing** [1] - 255:15
**description** [16] - 11:11, 115:5, 115:11, 115:19, 116:17, 116:19, 178:20, 220:3, 220:5, 220:10, 220:15, 221:9, 246:19, 247:9, 247:13
**deserves** [1] - 107:1
**design** [11] - 76:21, 76:23, 77:7, 169:20, 230:1, 234:15, 234:20, 234:22, 234:25, 235:5, 235:7
**designed** [11] - 118:2, 165:4, 169:19, 170:4, 183:8, 183:10, 190:21, 213:15, 213:22, 229:5, 229:6
**desirable** [1] - 171:9
**destroy** [1] - 254:22
**destroyed** [1] - 126:3
**desulfurizers** [1] - 198:8
**detail** [7] - 122:14, 147:7, 149:6, 172:14, 180:18, 181:15, 186:20
**detailed** [7] - 114:12, 115:11, 172:19, 180:20, 181:13, 207:5, 211:11
**details** [5] - 126:4, 186:15, 210:19, 215:8, 219:2
**determination** [1] - 270:1
**determine** [3] - 34:17, 116:4, 209:22
**determining** [2] - 33:6, 116:8
**detrimental** [2] - 261:16, 261:21
**develop** [3] - 71:12, 72:7, 250:5
**developing** [3] - 78:20, 251:8, 251:9
**development** [3] - 169:12, 241:18, 242:5
**device** [5] - 115:13, 147:21, 187:1, 231:17, 247:24
**devices** [10] - 73:7,

139:4, 140:5, 198:12, 199:8, 231:15, 231:18, 231:19, 247:23
**DEVLIN** [1] - 1:16
**Devlin** [1] - 37:8
**devolution** [1] - 165:14
**DI** [1] - 20:11
**diagram** [1] - 210:24
**Diaz** [9] - 250:23, 253:8, 256:15, 261:9, 263:12, 263:20, 263:23, 265:9, 266:17
**dictionaries** [1] - 124:9
**died** [3] - 54:16, 59:12, 169:10
**difference** [1] - 235:19
**differences** [1] - 237:13
**different** [72] - 5:12, 16:7, 44:4, 69:3, 93:4, 97:15, 108:8, 125:17, 135:25, 137:14, 140:18, 141:1, 142:3, 142:4, 142:13, 142:18, 143:3, 144:15, 147:1, 148:7, 152:15, 153:2, 156:2, 156:4, 160:4, 160:14, 161:21, 167:24, 178:25, 186:18, 191:7, 191:11, 191:13, 198:12, 199:8, 209:16, 211:1, 211:4, 212:16, 212:22, 213:6, 214:5, 217:17, 217:25, 218:15, 221:1, 221:5, 233:22, 235:12, 235:13, 235:15, 235:18, 237:16, 238:13, 241:19, 243:3, 243:5, 243:15, 243:18, 244:15, 247:12, 247:19, 247:21, 247:22, 251:12, 258:12, 258:22, 259:1
**differently** [3] - 108:19, 237:17, 237:19
**difficult** [18] - 44:17, 44:18, 44:21, 45:15,

54:5, 58:17, 58:21, 72:12, 78:6, 83:5, 236:4, 236:5, 237:25, 243:21, 243:23, 244:8, 244:11, 251:22
**digits** [2] - 103:7, 178:1
**diligence** [3] - 17:3, 197:11, 201:6
**diligently** [1] - 146:8
**diminished** [1] - 256:3
**dire** [9] - 31:24, 33:15, 34:6, 34:11, 34:14, 35:6, 35:16, 43:1
**DIRECT** [1] - 225:19
**direct** [15] - 11:5, 26:25, 48:8, 106:6, 106:8, 106:12, 106:20, 106:25, 158:25, 179:19, 181:1, 235:11, 238:15, 251:1, 262:5
**directed** [2] - 263:15, 263:16
**direction** [2] - 32:20, 225:11
**directly** [12] - 15:15, 50:2, 50:9, 58:18, 106:10, 179:3, 220:16, 221:9, 258:12, 258:13, 258:22, 262:23
**director** [3] - 53:18, 110:3, 243:14
**dirt** [3] - 235:21, 237:4, 237:5
**dirty** [5] - 54:24, 54:25, 55:5, 57:8, 60:3
**disagree** [4] - 42:7, 42:10, 77:16, 104:9
**disagreeing** [1] - 117:25
**disagreement** [2] - 118:5, 268:17
**disagrees** [1] - 118:4
**disappears** [1] - 194:2
**disapproval** [1] - 27:2
**discharge** [1] - 103:22
**discharged** [1] - 242:17
**discharging** [1] - 102:11
**disclose** [1] - 15:19
**disclosed** [9] - 8:23, 8:25, 9:23, 11:20, 19:6, 117:22, 147:5, 258:23, 258:25
**disclosure** [3] - 67:12,

111:18, 117:6
**discount** [1] - 190:10
**discounted** [1] - 190:1
**discovered** [3] - 145:21, 153:2, 269:5
**discoveries** [1] - 110:21
**discovery** [5] - 15:20, 18:8, 200:9, 206:19, 206:20
**discuss** [6] - 20:4, 36:6, 110:12, 123:12, 248:17
**discussed** [5] - 31:20, 115:23, 117:12, 178:6, 238:22
**discussing** [1] - 225:6
**discussion** [8] - 20:14, 20:19, 166:21, 167:12, 224:5, 225:5, 225:16, 226:12
**disease** [3] - 56:19, 59:1
**dismiss** [5] - 215:12, 215:13, 215:14, 215:16, 215:25
**dismissal** [2] - 20:16, 45:21
**dismissed** [2] - 14:22, 215:21
**Disney** [1] - 82:1
**dispute** [13] - 11:4, 16:14, 16:16, 22:19, 22:22, 40:17, 119:8, 158:25, 159:3, 180:4, 188:13, 205:14, 268:19
**disputed** [3] - 159:4, 180:16, 188:19
**disputes** [14] - 4:11, 4:13, 4:20, 5:4, 40:13, 109:22, 110:13, 120:13, 129:16, 129:23, 129:25, 130:2, 268:2, 268:3
**disputing** [1] - 22:19
**disqualify** [1] - 187:13
**disregard** [1] - 105:21
**disregarded** [1] - 106:3
**disruptive** [2] - 223:21, 224:15
**distance** [1] - 232:3
**distinction** [1] - 106:21
**distinguish** [1] - 18:5
**distract** [1] - 125:13
**DISTRICT** [2] - 1:1, 1:2

**District** [3] - 34:4, 270:17
**district** [1] - 110:2
**divided** [1] - 121:9
**dividing** [1] - 195:25
**division** [1] - 210:3
**doable** [4] - 25:17, 62:19, 62:22, 72:14
**doctor** [6] - 62:24, 63:9, 63:14, 64:12, 65:21, 133:19
**doctors** [1] - 65:7
**document** [37] - 5:18, 9:25, 10:1, 10:24, 22:24, 23:3, 30:22, 30:23, 35:9, 35:10, 35:14, 35:16, 105:11, 105:14, 212:19, 224:24, 246:15, 246:19, 247:6, 247:8, 247:10, 248:25, 249:5, 249:6, 249:20, 259:4, 259:9, 259:13, 259:20, 259:22, 260:12, 262:4, 263:17, 265:5, 266:6
**Document** [1] - 20:11
**documentation** [1] - 264:4
**documented** [5] - 146:7, 146:9, 146:10, 146:12, 212:12
**documents** [16] - 20:2, 20:24, 22:1, 22:16, 23:25, 28:6, 104:20, 133:17, 160:17, 160:21, 162:5, 180:10, 253:10, 259:7, 269:2
**DOE** [1] - 255:9
**dogs** [1] - 87:8
**dollar** [2] - 166:23, 168:14
**dollars** [3] - 155:1, 157:19, 198:12
**domain** [2] - 82:3, 112:3
**done** [19] - 7:6, 64:11, 82:4, 86:5, 89:11, 89:23, 121:23, 129:3, 158:22, 185:21, 187:4, 207:3, 219:15, 242:5, 245:24, 246:4, 253:6, 262:2, 263:4
**door** [1] - 167:16

**doors** [3] - 89:2, 137:5, 137:6
**Dorsney** [8] - 3:23, 33:10, 38:12, 67:7, 68:19, 97:11, 165:10, 269:21
**DORSNEY** [49] - 2:4, 3:21, 33:8, 33:13, 45:2, 45:23, 50:16, 50:21, 50:24, 51:5, 56:17, 56:22, 56:25, 57:5, 57:14, 58:15, 59:15, 60:3, 64:8, 64:21, 64:24, 65:2, 65:4, 65:7, 65:10, 65:13, 65:18, 67:8, 67:11, 69:8, 70:3, 79:17, 80:1, 83:25, 84:3, 84:17, 84:24, 85:6, 89:6, 89:16, 90:7, 95:19, 96:14, 97:12, 98:8, 98:11, 98:15, 99:3, 269:22
**dot** [1] - 170:16
**doubt** [4] - 72:9, 109:14, 207:15, 261:23
**down** [38] - 47:15, 53:4, 53:25, 57:9, 84:19, 87:22, 87:23, 88:2, 88:14, 112:20, 133:17, 137:12, 168:1, 173:8, 173:9, 177:16, 183:2, 186:21, 186:22, 186:23, 190:22, 190:25, 194:22, 195:19, 202:15, 205:8, 210:16, 210:20, 210:23, 210:25, 211:6, 211:10, 211:13, 212:15, 238:11, 239:6, 252:14, 267:24
**downstairs** [3] - 3:3, 4:5, 4:16
**downstream** [5] - 172:25, 220:18, 233:11, 255:17, 258:14
**dozen** [1] - 146:20
**dozens** [1] - 29:12
**dozer** [1] - 137:20
**Dr** [8] - 185:12, 185:13, 199:5, 207:2, 220:20, 221:6, 221:13
**drafted** [1] - 113:8
**dramatic** [2] - 135:13

**dramatically** [1] - 88:15
**drawings** [1] - 115:10
**drawn** [1] - 191:7
**draws** [1] - 180:9
**dream** [1] - 150:17
**drew** [1] - 170:16
**drink** [1] - 133:11
**drinking** [1] - 161:4
**drive** [4] - 53:3, 53:6, 54:3
**driver** [1] - 53:7
**driving** [1] - 53:7
**drop** [1] - 139:22
**dropped** [4] - 32:3, 32:11
**drops** [1] - 106:15
**dry** [1] - 198:8
**DTE** [3] - 10:4, 28:1, 226:23
**DTX** [8] - 19:1, 186:9, 194:24, 201:4, 205:5, 207:11, 210:9, 212:7
**ductwork** [1] - 173:2
**due** [7] - 17:3, 58:25, 71:10, 76:16, 142:21, 197:11, 201:6
**Duke** [1] - 190:24
**dump** [1] - 95:2
**dumping** [1] - 95:12
**During** [1] - 111:17
**during** [45] - 13:1, 13:19, 14:2, 14:16, 15:4, 15:13, 19:7, 19:25, 20:4, 25:1, 25:4, 27:18, 28:19, 30:12, 30:16, 31:12, 38:18, 39:4, 40:11, 43:20, 44:4, 48:1, 59:3, 64:2, 65:22, 86:18, 104:15, 105:15, 105:18, 117:9, 121:7, 123:11, 124:4, 125:8, 125:9, 126:13, 126:15, 128:2, 128:4, 177:4, 202:19, 205:20, 224:16, 227:25, 269:6
**dust** [3] - 138:10, 147:16, 218:23
**duties** [4] - 41:22, 102:11, 103:22, 104:12
**duty** [7] - 103:23, 117:2, 117:3, 120:12, 163:17,

164:18, 269:17
**DYESS** [5] - 2:6, 49:22, 50:11, 59:24, 60:4
**Dyess** [3] - 3:24, 38:12, 165:9
**Dynamics** [1] - 27:1

## E

**e-mail** [2] - 4:19, 124:23
**e-mails** [4] - 160:22, 162:4, 197:17, 197:18
**e.g** [1] - 19:1
**earliest** [2] - 259:3, 259:4
**early** [14] - 4:6, 45:24, 46:2, 135:8, 141:19, 149:4, 174:18, 190:24, 193:4, 201:6, 221:14, 232:7, 253:22, 254:5
**earn** [1] - 89:8
**easel** [1] - 131:22
**easily** [1] - 239:20
**east** [1] - 143:4
**Eastern** [1] - 142:16
**eastern** [3] - 143:2, 238:17, 238:18
**easy** [3] - 87:2, 87:4, 237:21
**eat** [3] - 133:12, 134:22, 168:4
**eco** [1] - 55:25
**economically** [1] - 239:24
**economics** [2] - 234:20, 235:6
**Ed** [1] - 216:22
**edge** [2] - 67:24, 196:4
**Edison** [3] - 91:8, 91:10, 216:15
**Edison's** [1] - 111:13
**edited** [1] - 266:24
**Edwin** [1] - 39:6
**EERC** [36] - 28:8, 141:23, 145:2, 146:16, 146:17, 148:6, 148:8, 148:13, 148:18, 148:24, 149:3, 150:19, 169:18, 178:8, 187:7, 209:11, 209:14, 210:2, 210:11, 210:13, 212:13, 212:23, 241:2,

241:3, 241:4, 241:6, 241:8, 241:11, 241:14, 241:16, 241:21, 241:23, 241:24, 243:16, 246:8, 248:3
**effect** [5] - 150:25, 180:13, 203:18, 216:21, 257:16
**effective** [3] - 111:6, 117:22, 256:24
**effectively** [4] - 141:14, 189:24, 189:25, 233:15
**effects** [9] - 60:16, 135:13, 141:5, 243:10, 261:16, 261:21, 264:13, 264:14, 265:2
**efficient** [1] - 163:21
**efficiently** [5] - 5:1, 42:25, 100:14, 132:12, 132:15
**effort** [2] - 58:4, 135:18
**efforts** [1] - 135:17
**eight** [17] - 1:12, 9:12, 19:5, 27:8, 35:10, 35:14, 97:7, 97:8, 101:15, 102:24, 174:4, 188:1, 201:17, 217:17, 229:17, 229:19, 266:24
**eight-hour** [2] - 229:17, 229:19
**eight-page** [2] - 35:10, 35:14
**either** [16] - 36:11, 37:6, 57:23, 60:19, 63:22, 74:19, 75:24, 75:25, 87:5, 88:20, 106:22, 117:5, 117:24, 140:6, 200:5, 233:16
**elaborate** [1] - 124:3
**electric** [6] - 91:12, 91:16, 91:17, 91:18, 91:21, 139:20
**electrical** [9] - 48:16, 89:3, 89:10, 111:14, 177:21, 232:22, 232:24, 233:4, 249:23
**electricity** [9] - 41:18, 91:25, 134:12, 138:6, 138:23, 139:22, 188:24, 231:2, 233:3
**electronic** [3] -

113:15, 118:15, 124:10
**electronically** [1] - 124:20
**electrons** [2] - 233:13, 252:2
**electrostatic** [2] - 198:9, 199:13
**element** [1] - 251:15
**elemental** [10] - 144:11, 243:22, 244:4, 251:6, 251:14, 251:15, 251:18, 252:8, 260:20, 260:24
**elements** [7] - 7:22, 7:24, 13:9, 17:20, 133:14, 158:15, 255:1
**elephant** [2] - 156:16, 239:8
**elevated** [1] - 69:20
**elevator** [1] - 123:17
**eliminate** [1] - 32:23
**Ellingsworth** [2] - 43:10, 45:3
**elsewhere** [1] - 240:24
**embodiment** [1] - 115:12
**embodiments** [1] - 115:12
**emergency** [1] - 90:15
**emission** [11] - 135:15, 152:23, 152:24, 186:3, 197:7, 198:6, 198:20, 203:23, 204:19, 211:21, 235:3
**emissions** [34] - 39:23, 41:6, 94:1, 94:2, 94:11, 94:13, 94:16, 94:17, 150:9, 171:7, 180:15, 185:16, 186:25, 188:12, 189:4, 189:7, 190:9, 199:2, 199:7, 203:21, 209:19, 209:21, 211:7, 211:15, 216:18, 220:23, 221:4, 227:8, 234:3, 239:16, 242:14, 245:23, 247:22, 248:14
**Emissions** [3] - 3:6, 37:3, 102:14
**EMISSIONS** [1] - 1:3
**emitted** [1] - 139:3
**emitting** [1] - 244:4

**emotional** [1] - 80:6
**emphasis** [1] - 185:17
**emphasize** [1] - 214:7
**emphasizing** [1] - 70:14
**employ** [2] - 49:4, 205:17
**employed** [2] - 11:7, 16:19
**employee** [2] - 148:5, 248:3
**employees** [4] - 10:20, 37:14, 38:14, 192:14
**employer** [1] - 146:16
**employing** [1] - 206:5
**empty** [1] - 95:14
**enable** [3] - 34:17, 34:19, 116:19
**encountered** [1] - 84:3
**encourage** [4] - 161:23, 181:6, 203:10, 205:23
**encouraged** [5] - 181:16, 199:18, 199:25, 200:6, 200:19
**encourages** [1] - 179:12
**encouraging** [3] - 162:20, 197:2, 255:21
**end** [25] - 13:2, 18:5, 63:1, 86:15, 86:16, 115:17, 122:12, 123:13, 125:5, 125:11, 125:25, 126:4, 128:23, 129:19, 129:24, 130:1, 136:3, 167:1, 189:17, 203:4, 211:16, 228:12, 231:20, 266:10
**endeavor** [1] - 163:24
**ended** [10] - 72:11, 120:25, 166:20, 190:12, 202:17, 205:6, 215:6, 216:4, 225:16, 257:7
**endorse** [1] - 140:16
**ends** [3] - 134:20, 134:21, 138:13
**ENERGY** [1] - 1:3
**Energy** [23] - 3:6, 37:3, 37:25, 38:1, 102:14, 102:21, 102:22, 131:3, 141:21, 145:9, 146:11, 146:13, 150:10, 150:20,

153:24, 154:11, 154:12, 154:13, 190:24, 193:22, 210:2, 253:21
**energy** [8] - 91:21, 137:3, 139:11, 139:19, 185:16, 232:14, 241:4, 241:19
**enforce** [1] - 119:4
**engage** [4] - 180:25, 200:9, 251:25, 269:23
**engine** [1] - 189:4
**engineer** [6] - 41:15, 169:19, 187:8, 210:11, 212:2, 212:3
**engineering** [20] - 41:15, 71:12, 132:17, 160:11, 165:2, 165:3, 177:22, 220:21, 228:19, 228:21, 228:23, 229:8, 229:9, 229:13, 229:15, 229:17, 229:19, 229:20, 229:25, 234:14
**engineers** [1] - 198:13
**England** [1] - 134:6
**enhance** [3] - 81:20, 111:11, 262:14
**enlisted** [1] - 159:22
**enormous** [7] - 168:14, 171:20, 188:22, 190:21, 192:5, 198:2, 230:23
**enormously** [1] - 198:2
**enter** [1] - 176:8
**entered** [13] - 27:4, 28:2, 28:16, 28:25, 29:1, 29:13, 29:19, 30:20, 31:6, 131:15, 136:14, 222:19, 226:7
**enters** [1] - 138:9
**entire** [7] - 13:20, 15:4, 136:12, 136:13, 184:21, 201:16, 216:4
**entirely** [5] - 16:7, 110:6, 142:18, 213:6, 214:5
**entirety** [1] - 156:18
**entities** [15] - 6:22, 38:8, 73:12, 124:6, 136:16, 141:2, 155:12, 177:6, 196:14, 199:15,

215:9, 215:21, 226:18, 226:20, 226:21

**entities'** [1] - 26:19

**entitled** [3] - 40:9, 119:13, 123:9

**entity** [14] - 14:11, 31:17, 153:21, 154:7, 155:25, 156:5, 156:11, 159:1, 159:11, 191:16, 192:20, 194:10, 208:20, 253:20

**entrance** [1] - 170:19

**entrepreneur** [1] - 170:9

**entry** [1] - 95:15

**environment** [10] - 59:9, 92:5, 141:5, 141:6, 141:25, 144:19, 146:9, 171:9, 188:12, 242:19

**Environmental** [3] - 141:22, 149:13, 210:3

**environmental** [6] - 155:20, 185:14, 198:20, 234:5, 241:4, 241:20

**environmentally** [1] - 59:10

**EPA** [11] - 140:25, 141:6, 141:7, 145:8, 149:13, 149:24, 150:5, 150:7, 152:9, 186:18, 203:15

**equal** [1] - 108:22

**equipment** [19] - 17:7, 170:4, 170:5, 177:10, 180:15, 186:3, 192:10, 201:10, 204:17, 206:22, 207:9, 207:14, 207:16, 209:16, 212:23, 235:2, 235:3, 235:4, 247:19

**equipped** [1] - 48:13

**Erickson** [1] - 39:10

**especially** [6] - 44:18, 44:22, 174:14, 197:3, 213:13, 269:4

**ESQ** [18] - 1:16, 1:17, 1:19, 1:20, 1:20, 1:21, 1:21, 1:22, 1:22, 1:23, 1:23, 2:3, 2:4, 2:6, 2:7, 2:7, 2:8, 2:8

**essay** [2] - 84:11, 84:14

**essentially** [13] - 17:18, 32:12, 82:15, 138:8, 138:11, 138:22, 140:12, 144:4, 145:5, 147:12, 151:8, 161:24, 262:18

**establish** [2] - 13:24, 27:2

**established** [2] - 81:10, 207:10

**estate** [1] - 82:3

**estimation** [1] - 240:17

**et** [6] - 1:3, 1:7, 8:6, 21:17, 21:20, 72:13

**evaluate** [6] - 16:11, 113:22, 166:3, 166:6, 190:17, 235:6

**evaluated** [2] - 113:11, 172:21

**evaluating** [1] - 95:11

**event** [2] - 25:18, 163:7

**eventually** [4] - 139:3, 140:23, 146:13, 253:12

**everywhere** [1] - 213:12

**evidence** [140] - 8:8, 13:7, 13:24, 14:22, 16:9, 18:13, 19:12, 19:13, 19:21, 20:3, 20:13, 20:19, 20:24, 22:16, 23:8, 23:20, 24:4, 36:10, 36:16, 42:16, 47:20, 47:25, 48:1, 58:23, 59:25, 60:7, 77:17, 77:19, 78:22, 78:25, 82:17, 82:24, 83:4, 83:7, 83:14, 96:2, 96:4, 96:5, 103:24, 104:2, 104:5, 104:19, 104:21, 104:22, 104:24, 105:2, 105:4, 105:7, 105:13, 105:14, 105:16, 105:17, 105:21, 106:1, 106:3, 106:4, 106:7, 106:8, 106:12, 106:13, 106:17, 106:20, 106:24, 107:10, 108:3, 108:6, 108:9, 108:10, 108:14, 108:15, 108:20,

108:21, 109:2, 109:7, 109:8, 109:11, 109:12, 120:17, 120:20, 122:16, 122:20, 123:1, 123:4, 123:9, 124:15, 125:4, 125:8, 125:9, 125:13, 126:21, 127:6, 127:7, 127:8, 127:9, 127:13, 127:14, 127:17, 127:19, 127:23, 127:24, 127:25, 128:6, 131:9, 132:8, 132:11, 136:24, 138:6, 141:16, 150:23, 151:23, 155:9, 156:19, 158:13, 162:4, 163:8, 163:25, 166:20, 169:1, 172:13, 176:7, 176:23, 179:23, 180:1, 181:21, 183:14, 187:17, 202:12, 205:13, 206:11, 209:4, 220:8, 222:4, 260:23

**evidentiary** [2] - 22:2, 230:9

**exact** [1] - 263:25

**exactly** [10] - 3:17, 20:1, 57:2, 112:10, 158:11, 181:22, 205:21, 213:5, 240:3, 259:8

**exam** [3] - 229:17, 229:19, 229:20

**examination** [6] - 19:20, 23:23, 25:1, 25:4, 34:11, 34:14

**EXAMINATION** [1] - 225:19

**examine** [5] - 19:19, 21:25, 23:14, 23:18, 113:4

**examined** [1] - 21:2

**examiner** [19] - 113:20, 114:15, 116:11, 116:13, 116:24, 117:5, 117:7, 117:9, 117:11, 117:14, 117:16, 117:18, 117:19, 117:25, 118:1, 118:6, 118:12, 119:20, 119:22

**examiner's** [3] -

116:25, 118:3, 118:4

**examiners** [1] - 119:6

**Examiners** [1] - 120:1

**examining** [2] - 116:10, 116:22

**example** [19] - 26:24, 74:14, 78:18, 82:1, 82:7, 84:22, 103:7, 111:13, 117:19, 136:2, 147:9, 181:18, 194:17, 237:18, 240:9, 240:14, 244:5, 252:11, 259:5

**except** [4] - 94:5, 183:12, 184:1, 197:5

**exception** [1] - 32:4

**excess** [1] - 244:13

**Exchange** [1] - 205:2

**exchange** [2] - 118:5, 233:13

**exchanges** [1] - 204:25

**excited** [1] - 164:14

**exclude** [3] - 20:12, 26:8, 121:7

**excluded** [5] - 26:21, 26:24, 27:3, 27:4, 105:20

**exclusive** [1] - 110:20

**excuse** [2] - 98:18, 99:7

**excused** [2] - 34:18, 101:12

**executive** [1] - 21:5

**exercise** [2] - 34:19, 99:14

**exhaust** [7] - 139:2, 140:21, 143:22, 143:24, 144:10, 147:23, 231:9

**Exhibit** [19] - 167:5, 167:8, 246:18, 246:21, 246:24, 247:3, 248:20, 248:22, 249:12, 249:16, 259:14, 260:1, 260:5, 260:9, 265:9, 265:11, 266:3, 266:7, 266:16

**exhibit** [2] - 26:21, 167:4

**exhibits** [17] - 23:19, 23:25, 24:1, 24:3, 24:17, 24:24, 25:2, 25:6, 25:9, 25:13, 25:15, 25:19, 26:11, 28:7, 105:5, 105:25

**exist** [3] - 29:7, 213:14, 213:16

**existed** [9] - 174:5, 176:25, 181:24, 183:18, 184:13, 188:2, 195:24, 213:12, 213:20

**existing** [1] - 151:3

**exists** [1] - 190:5

**exited** [3] - 129:10, 222:10, 267:23

**expect** [12] - 36:13, 36:15, 43:2, 52:10, 86:14, 86:16, 128:4, 128:19, 130:1, 131:22, 156:25, 256:6

**expectation** [2] - 130:16, 250:6

**expected** [5] - 36:11, 72:10, 89:21, 128:6, 256:4

**expecting** [2] - 261:20, 269:7

**expediting** [1] - 261:14

**expeditiously** [1] - 164:7

**expensive** [2] - 206:25, 248:9

**experience** [13] - 48:11, 48:23, 49:1, 50:11, 57:24, 60:16, 72:22, 84:16, 92:16, 94:18, 107:16, 185:10, 233:7

**experiments** [1] - 146:10

**expert** [32] - 17:2, 19:10, 19:14, 19:16, 20:6, 20:21, 20:23, 21:19, 23:10, 23:15, 24:13, 24:20, 25:11, 27:11, 27:16, 30:23, 32:14, 107:12, 107:16, 107:18, 107:20, 108:1, 160:13, 161:10, 167:13, 178:23, 179:1, 180:9, 203:25, 204:4, 216:13, 220:19

**expert's** [4] - 24:14, 107:21, 107:23

**expertise** [2] - 160:16, 199:6

**experts** [3] - 25:16, 108:4, 178:24

**expires** [1] - 111:18

**explain** [17] - 14:19, 110:10, 112:20, 118:4, 120:21,

141:23, 142:3, 145:12, 147:2, 152:18, 156:17, 161:11, 172:2, 176:1, 221:6, 221:7, 221:13
**explained** [1] - 8:21
**explaining** [2] - 186:13, 262:10
**export** [1] - 217:2
**extend** [2] - 81:12, 81:13
**extensions** [1] - 203:19
**extensive** [2] - 69:25, 185:10
**extent** [4] - 8:7, 60:22, 94:11, 185:9
**exterior** [1] - 89:1
**extra** [3] - 4:11, 33:14, 145:10
**extremely** [3] - 186:1, 234:8, 255:21
**eyes** [1] - 165:14
**eyewitness** [1] - 106:9

## F

**fabric** [1] - 139:24
**Facebook** [1] - 125:1
**Facilities** [1] - 247:9
**facilities** [13] - 50:13, 165:5, 171:14, 171:19, 176:17, 188:22, 190:19, 192:4, 192:5, 198:2, 200:18, 210:22, 217:13
**facility** [5] - 171:17, 198:17, 209:10, 217:12, 246:19
**fact** [17] - 8:16, 25:9, 49:12, 55:10, 58:25, 59:18, 65:20, 67:20, 69:19, 70:6, 80:5, 106:10, 106:14, 131:2, 170:18, 180:16, 258:25
**factors** [2] - 107:23, 238:13
**facts** [17] - 16:9, 22:12, 41:23, 103:23, 103:25, 104:1, 104:19, 104:22, 108:5, 108:16, 119:21, 120:9, 120:14, 120:17, 175:24, 176:2, 214:22

**factual** [2] - 109:9, 120:12
**failed** [2] - 150:18, 167:5
**fair** [11] - 8:21, 8:23, 18:22, 21:9, 31:2, 42:15, 48:22, 55:11, 55:17, 162:24, 236:20
**fairly** [9] - 31:7, 49:18, 67:25, 68:15, 83:4, 104:12, 132:13, 174:18, 240:10
**fairness** [1] - 123:20
**faith** [1] - 16:3
**fall** [2] - 93:17, 144:17
**falling** [1] - 18:1
**falls** [2] - 113:22, 147:13
**familiar** [8] - 8:15, 21:4, 41:7, 47:6, 47:9, 145:15, 184:19, 246:21
**families** [1] - 133:6
**family** [16] - 37:5, 38:23, 38:25, 40:20, 54:11, 54:19, 56:18, 58:25, 73:11, 75:4, 124:21, 141:24, 218:11, 227:15, 227:19, 241:12
**famous** [1] - 111:13
**fan** [1] - 54:24
**Fannin** [1] - 193:7
**fantastic** [1] - 150:9
**far** [12] - 18:14, 19:24, 47:7, 50:5, 57:22, 74:19, 92:18, 156:8, 194:19, 194:21, 208:13, 257:3
**farm** [2] - 228:8, 229:1
**farmed** [1] - 228:8
**farmer** [1] - 228:12
**fast** [4] - 64:11, 149:17, 257:20, 267:2
**faster** [2] - 257:18
**fastest** [1] - 267:1
**father** [1] - 56:21
**father's** [1] - 56:20
**faulting** [1] - 269:5
**favor** [8] - 5:7, 49:2, 49:14, 49:23, 49:24, 67:19, 80:4, 108:23
**favorable** [1] - 261:19
**FDA** [1] - 186:18
**feasible** [1] - 44:7
**feature** [1] - 239:22
**February** [3] - 1:13, 52:4, 254:3

**fed** [3] - 230:18, 247:22, 263:2
**federal** [4] - 110:3, 113:3, 203:15, 204:14
**Federal** [2] - 27:4, 158:20
**fee** [3] - 27:6, 111:25, 118:22
**feeds** [1] - 8:15
**feedstock** [3] - 209:18, 211:8, 211:19
**feelings** [5] - 41:18, 54:22, 76:4, 78:7, 78:8
**feet** [4] - 192:11, 240:19, 244:25, 245:2
**felt** [2] - 250:2, 251:10
**Fenwick** [2] - 88:1, 89:18
**few** [19] - 25:21, 25:24, 43:14, 50:19, 68:20, 86:24, 99:14, 113:16, 121:2, 123:10, 150:3, 169:9, 179:5, 183:13, 218:1, 218:2, 218:25, 222:13, 242:10
**field** [13] - 112:23, 113:21, 114:14, 116:9, 116:20, 185:21, 219:21, 229:18, 233:17, 233:20, 238:1, 244:2, 262:16
**fields** [2] - 116:13, 188:23
**fifth** [1] - 106:2
**fight** [2] - 158:9, 162:9
**figure** [6] - 42:23, 59:20, 72:11, 87:4, 145:22, 258:25
**figured** [1] - 73:15
**figures** [1] - 115:10
**figuring** [1] - 31:10
**file** [7] - 118:12, 118:13, 205:1, 215:12, 265:15, 265:19, 269:23
**filed** [36] - 5:23, 7:10, 12:15, 76:22, 111:3, 114:10, 114:20, 118:16, 118:18, 146:13, 146:24, 162:11, 173:16, 177:2, 177:19, 178:3, 178:4, 178:9,

183:20, 196:1, 196:13, 197:13, 200:21, 204:24, 205:6, 205:7, 205:20, 215:8, 215:14, 215:24, 215:25, 219:1, 219:4, 219:8, 219:11, 220:3
**filing** [14] - 7:6, 78:20, 112:25, 113:8, 113:15, 116:3, 116:4, 117:22, 177:5, 178:10, 178:15, 219:3, 220:4, 221:13
**filings** [2] - 178:17, 205:4
**fill** [2] - 3:17, 144:1
**filled** [1] - 133:21
**filling** [1] - 240:20
**filter** [3] - 143:24, 143:25, 144:7
**filtering** [1] - 147:21
**filters** [2] - 134:18, 144:13
**final** [11] - 33:2, 52:23, 97:17, 98:18, 118:7, 118:20, 128:24, 155:2, 253:17, 267:7, 267:9
**finally** [6] - 125:3, 150:17, 156:12, 184:15, 211:16, 256:10
**finance** [1] - 169:15
**financial** [3] - 76:9, 76:11, 135:19
**financially** [1] - 85:25
**fine** [7] - 129:1, 218:17, 230:20, 231:12, 245:6
**finish** [6] - 36:2, 36:19, 89:1, 99:6, 99:10, 102:1
**finished** [4] - 127:12, 127:16, 255:9, 266:12
**Finlinson** [1] - 39:11
**fire** [5] - 91:12, 138:25, 139:1, 161:4, 188:15
**fireball** [2] - 139:1, 173:1
**fired** [28] - 39:1, 39:23, 41:6, 54:14, 54:24, 73:25, 74:2, 74:6, 91:14, 91:18, 91:20, 92:17, 93:13, 135:14, 137:2,

139:19, 141:9, 143:20, 188:21, 203:20, 227:9, 230:4, 230:5, 230:8, 232:5, 232:10, 233:7, 234:12
**Firm** [1] - 37:8
**FIRM** [1] - 1:16
**firm** [9] - 37:9, 41:15, 66:14, 66:17, 70:6, 70:13, 165:9, 229:25
**firms** [4] - 37:17, 38:10, 38:16, 67:21
**First** [1] - 119:21
**first** [62] - 7:14, 7:16, 8:20, 15:22, 20:1, 20:14, 27:15, 32:25, 33:20, 34:15, 36:8, 44:19, 56:13, 75:24, 84:10, 85:21, 96:24, 97:13, 98:4, 100:20, 104:25, 108:8, 113:18, 114:4, 114:13, 114:18, 117:13, 118:24, 121:11, 122:15, 123:11, 127:3, 127:9, 131:17, 137:2, 142:7, 144:1, 157:3, 164:15, 169:8, 177:1, 178:10, 179:2, 180:17, 182:14, 183:5, 196:6, 212:8, 215:15, 216:1, 225:12, 235:1, 244:21, 248:8, 249:3, 255:14, 256:19, 262:12, 263:1, 263:24, 269:20
**firsthand** [2] - 21:15, 78:10
**fish** [2] - 134:21, 134:23
**fit** [1] - 62:9
**fits** [1] - 195:22
**fitter** [2] - 48:24, 50:12
**five** [5] - 5:12, 218:18, 229:18, 234:17, 266:9
**fix** [4] - 46:5, 229:4, 250:6
**flame** [1] - 245:8
**flies** [1] - 139:6
**flight** [3] - 258:6, 258:7, 258:8
**flip** [4] - 26:20, 68:4, 246:15, 265:8
**Florida** [1] - 227:25

flow [1] - 158:5
flows [3] - 173:4, 231:1, 231:14
fluctuate [1] - 43:20
fluctuates [1] - 44:3
flue [32] - 134:18, 147:17, 147:19, 173:2, 173:6, 173:9, 175:9, 179:17, 179:21, 196:19, 196:23, 198:8, 220:17, 227:8, 231:13, 231:14, 231:16, 243:23, 245:10, 245:11, 245:17, 245:18, 245:19, 246:6, 251:12, 258:3, 261:3, 261:18, 261:22, 262:2, 262:3
fly [2] - 134:17, 144:12
flying [1] - 245:6
foam [1] - 153:5
focus [7] - 49:8, 96:4, 135:9, 242:22, 244:8, 253:3, 253:7
focused [5] - 197:20, 227:2, 231:8, 242:24, 253:24
focusing [3] - 5:25, 6:1, 152:8
FOGEL [1] - 110:1
Fogel [1] - 110:1
folks [22] - 33:14, 33:21, 45:19, 46:15, 46:16, 47:11, 49:4, 50:14, 51:14, 74:14, 155:18, 157:3, 158:1, 163:12, 170:5, 170:21, 170:25, 192:9, 228:7, 243:16, 250:15, 268:6
folks' [1] - 187:20
follow [24] - 36:13, 41:19, 42:1, 42:6, 42:9, 43:15, 47:19, 48:25, 49:22, 55:12, 56:10, 58:4, 58:19, 63:18, 65:10, 67:18, 82:20, 83:3, 83:6, 92:12, 101:22, 104:3, 104:8, 105:17
follow-on [1] - 49:22
follow-up [4] - 43:15, 56:10, 63:18, 65:10
following [12] - 6:17, 33:25, 43:7, 47:24, 100:3, 100:5, 102:5, 114:13, 126:9,

130:8, 222:15, 224:5
follows [2] - 109:25, 223:12
food [2] - 133:12, 144:23
football [1] - 188:23
FOR [1] - 1:2
for-profit [1] - 241:6
force [1] - 200:12
forces [4] - 205:22, 205:23, 206:6
foregoing [2] - 9:13, 270:14
foreperson [1] - 97:14
foreseeable [1] - 140:19
forgot [1] - 157:10
forks [1] - 241:5
form [12] - 3:17, 29:8, 113:5, 115:14, 118:13, 125:3, 190:1, 203:18, 205:6, 243:22, 243:23, 255:4
formation [2] - 190:5, 243:4
formed [2] - 16:10, 191:17
former [1] - 20:15
formula [18] - 15:13, 187:7, 209:8, 210:5, 212:9, 212:11, 213:10, 213:14, 213:16, 213:19, 213:22, 213:23, 214:1, 214:2, 214:4, 214:10, 214:12
formulated [3] - 112:17, 183:7, 184:23
formulation [8] - 15:3, 15:7, 183:15, 183:16, 209:7, 212:5, 213:5, 213:18
formulations [1] - 212:18
Fort [2] - 194:14, 252:11
forth [8] - 4:9, 7:17, 98:8, 112:11, 178:21, 198:15, 210:14, 233:23
fortunate [2] - 77:11, 233:21
forward [10] - 100:6, 101:1, 131:20, 136:17, 137:17, 149:4, 149:16, 163:25, 225:11, 270:7

foundation [10] - 21:16, 22:2, 22:11, 22:17, 22:23, 23:2, 24:6, 24:25, 25:7, 25:13
founded [2] - 169:6, 170:14
founding [1] - 164:19
four [19] - 14:7, 14:13, 20:14, 63:16, 88:4, 102:20, 138:3, 157:3, 157:13, 169:5, 228:18, 229:18, 235:13, 235:15, 240:10, 240:22, 250:24, 252:7, 266:25
four-unit [1] - 240:10
four-year [1] - 228:18
fourth [2] - 105:23, 247:15
fraction [1] - 251:6
fractional [1] - 245:15
frame [6] - 93:13, 150:14, 152:12, 242:7, 254:4, 259:12
framed [1] - 268:23
Franklin [1] - 193:23
frankly [1] - 73:9
free [3] - 108:3, 111:19, 126:24
freebie [1] - 190:15
frequency [3] - 140:3, 140:8, 140:13
frequently [1] - 117:14
freshman [1] - 84:6
Friday [7] - 29:16, 36:12, 44:5, 52:8, 52:14, 71:20, 128:6
friend [3] - 68:17, 68:18, 69:18
friendly [2] - 55:25, 59:10
friends [8] - 40:20, 67:3, 75:4, 76:2, 76:9, 77:10, 124:21, 132:19
front [8] - 12:4, 35:4, 98:5, 100:22, 100:25, 101:2, 246:13
Frosch [4] - 51:10, 51:11, 51:17, 58:6
fuel [25] - 93:1, 94:6, 171:5, 171:6, 173:17, 174:24, 174:25, 182:1, 182:5, 185:2, 187:18, 189:3, 189:12, 189:15,

199:10, 199:11, 211:2, 211:3, 222:2, 233:2, 243:4, 244:12, 262:23, 263:3, 263:5
fulfill [1] - 126:20
full [7] - 29:18, 31:2, 35:15, 50:18, 67:12, 215:17, 269:18
full-time [1] - 50:18
fundamental [3] - 159:9, 216:19, 261:5
funding [10] - 248:10, 248:13, 248:15, 248:18, 249:1, 249:2, 250:14, 253:11, 253:12
funds [1] - 146:8
funny [2] - 139:10, 175:2
furnace [11] - 138:13, 172:25, 173:1, 175:8, 194:21, 209:15, 210:24, 220:17, 221:2, 244:10, 244:11
furnaces [3] - 188:18, 189:7, 194:22
future [2] - 25:3, 140:19

## G

gain [1] - 34:15
Gallagher [9] - 3:7, 9:19, 10:4, 26:7, 26:16, 38:20, 54:12, 73:24, 226:23
GALLAGHER [1] - 1:7
game [2] - 8:22, 8:23
gaps [2] - 195:17, 195:18
garage [2] - 137:5, 137:6
gas [32] - 47:15, 47:16, 143:22, 144:10, 147:13, 147:19, 173:6, 179:17, 179:21, 189:3, 196:19, 196:23, 198:8, 227:8, 231:14, 231:16, 231:21, 232:16, 243:24, 245:10, 245:11, 245:17, 245:18, 245:19, 246:6, 258:3, 261:3, 261:22, 262:2, 262:3

gaseous [1] - 243:22
gases [10] - 134:18, 139:2, 140:21, 143:24, 147:11, 147:17, 147:22, 147:23, 251:12, 261:18
gasified [1] - 243:5
gather [1] - 101:13
gathering [1] - 12:8
GC [3] - 86:13, 87:4, 88:6
general [10] - 6:2, 6:15, 6:19, 27:1, 57:6, 86:10, 87:11, 90:12, 102:7, 103:21
generally [7] - 41:1, 81:4, 235:13, 237:20, 245:12, 252:6, 265:2
generate [6] - 41:17, 91:24, 134:11, 188:24, 233:2, 245:18
generated [2] - 91:20, 139:22
generates [3] - 230:23, 231:13, 245:20
generating [2] - 91:7, 143:5
generation [5] - 91:13, 93:1, 139:17, 139:18, 154:8
generator [3] - 138:22, 231:2
gentleman [2] - 157:6, 157:7
gentlemen [6] - 35:3, 101:19, 121:1, 129:5, 137:19, 164:14
genuine [1] - 133:10
geographically [1] - 237:14
geography [1] - 238:15
geologically [2] - 237:14, 237:15
George [2] - 39:8, 39:10
get-go [1] - 201:16
giant [1] - 173:1
gigantic [3] - 138:10, 239:9, 244:10
Gilbertsville [1] - 53:2
girls [1] - 169:11
gist [3] - 82:20, 172:15, 178:14
given [10] - 30:21,

34:21, 93:25, 103:10, 108:2, 113:24, 125:6, 207:12, 230:7, 237:7
**glad** [1] - 55:24
**glass** [1] - 133:20
**glasses** [2] - 165:15
**glide** [2] - 150:9, 150:22
**glimpse** [2] - 167:2, 169:1
**Global** [1] - 16:1
**global** [1] - 234:5
**globally** [1] - 136:15
**glossary** [1] - 126:9
**go-to** [1] - 257:2
**gonna** [2] - 99:5, 205:8
**gotcha** [1] - 90:1
**govern** [1] - 103:22
**government** [13] - 110:23, 111:9, 112:7, 113:3, 119:20, 136:18, 141:1, 149:18, 186:11, 203:15, 204:14, 205:2, 206:3
**governmental** [1] - 250:16
**grab** [7] - 9:4, 144:6, 145:22, 147:12, 262:7, 263:24, 264:1
**grade** [4] - 204:11, 213:6, 213:8, 214:5
**graduated** [1] - 229:16
**graduating** [1] - 52:23
**graduation** [1] - 53:13
**grand** [1] - 241:5
**grandchildren** [4] - 43:19, 52:25, 53:22, 227:20
**granddaughter** [1] - 52:22
**granddaughter's** [1] - 53:12
**grandfather** [1] - 54:16
**grandparents** [1] - 54:15
**grant** [1] - 110:22
**granted** [5] - 7:4, 27:9, 113:23, 203:19, 215:16
**granting** [2] - 111:21, 215:25
**grants** [2] - 111:24, 167:24
**grateful** [2] - 132:5, 267:19
**gratuitously** [1] -

146:1
**gray** [1] - 144:2
**grayed** [1] - 156:17
**great** [8] - 35:22, 68:3, 98:16, 129:25, 143:9, 149:16, 199:6, 256:6
**greatest** [2] - 125:22, 141:10
**Green** [18] - 17:2, 17:3, 39:6, 39:9, 157:3, 161:1, 161:6, 161:7, 161:8, 161:10, 164:25, 165:23, 166:13, 173:14, 199:17, 210:12
**green** [6] - 165:2, 182:18, 192:22, 193:15, 194:18, 238:20
**Green's** [1] - 24:23
**greens** [2] - 17:1, 161:6
**grew** [6] - 54:23, 74:15, 142:7, 228:3, 228:8, 229:6
**grid** [5] - 139:24, 231:3, 232:22, 232:24, 233:5
**grinds** [1] - 230:19
**ground** [3] - 115:20, 146:22, 192:11
**grounds** [1] - 216:9
**groundwater** [1] - 134:20
**group** [9] - 31:6, 67:12, 116:11, 154:12, 155:16, 156:23, 163:12, 234:4, 250:17
**groups** [1] - 250:18
**grow** [1] - 228:2
**growing** [2] - 55:22, 229:1
**grown** [1] - 198:5
**guess** [41] - 5:3, 10:17, 27:15, 44:6, 44:17, 52:13, 52:16, 58:2, 58:15, 59:5, 59:13, 67:13, 68:4, 72:2, 75:18, 82:18, 87:3, 87:13, 93:2, 95:4, 95:6, 95:20, 99:9, 99:18, 191:6, 193:12, 224:21, 228:25, 233:12, 241:12, 243:23, 244:7, 247:16, 252:1, 255:5, 261:2,

261:20, 262:25, 263:10, 264:9, 265:1
**guessing** [1] - 131:25
**guidance** [3] - 102:6, 102:7, 186:8
**guideline** [1] - 150:1
**guilty** [1] - 76:14
**Gunderson** [1] - 39:10
**guy** [1] - 161:20
**guys** [11] - 30:4, 53:19, 89:12, 100:19, 132:6, 142:1, 154:18, 162:13, 190:17, 195:10, 250:1

## H

**habit** [1] - 184:10
**Hale** [3] - 85:9, 85:10, 90:2
**Haley** [9] - 3:14, 37:11, 73:20, 73:23, 74:9, 74:16, 74:17, 74:23, 132:21
**HALEY** [1] - 1:23
**half** [9] - 36:17, 93:19, 93:21, 129:13, 130:10, 196:21, 201:17, 240:7, 262:7
**hall** [1] - 123:17
**hallmarks** [2] - 235:23, 236:7
**halogen** [2] - 145:14, 255:4
**halogens** [2] - 188:16, 188:17
**hand** [14] - 9:3, 9:6, 10:24, 35:18, 101:24, 118:23, 129:3, 137:21, 187:11, 196:3, 208:11, 230:15, 247:18, 247:20
**handed** [2] - 9:8, 16:13
**handing** [1] - 50:7
**handle** [3] - 90:13, 170:5, 190:19
**handling** [5] - 95:2, 169:21, 192:10, 194:4, 235:3
**handout** [1] - 114:5
**handouts** [1] - 84:9
**hands** [3] - 141:18, 169:13, 170:6
**hands-on** [1] - 170:6
**happy** [3] - 29:4, 132:1, 164:17

**hard** [15] - 55:20, 56:2, 86:4, 135:9, 137:4, 188:5, 200:17, 206:23, 235:24, 236:1, 236:2, 236:3, 244:21, 247:19, 256:10
**hardship** [1] - 84:21
**hardware** [1] - 148:16
**harmful** [4] - 173:7, 188:13, 242:20, 252:23
**Harnessing** [1] - 111:14
**Harrisburg** [1] - 52:24
**hat** [1] - 134:6
**hatched** [1] - 145:24
**hats** [1] - 134:7
**Hatter** [2] - 134:4, 134:5
**haven** [1] - 223:19
**hazardous** [3] - 141:8, 141:9, 149:15
**head** [1] - 172:10
**headquarters** [1] - 113:1
**heads** [1] - 201:7
**health** [4] - 65:23, 242:19, 242:20, 243:9
**healthier** [2] - 133:6
**hear** [45] - 3:5, 11:24, 13:24, 16:10, 16:25, 20:7, 21:22, 22:18, 29:25, 31:17, 38:19, 48:1, 60:24, 82:11, 83:13, 90:14, 92:3, 92:7, 92:14, 96:2, 106:2, 133:3, 136:13, 139:10, 140:22, 151:12, 151:14, 152:25, 153:1, 157:18, 160:1, 160:3, 168:13, 169:1, 169:18, 173:22, 181:9, 191:14, 192:21, 198:1, 199:23, 200:4, 206:11, 218:3, 258:18
**heard** [32] - 17:11, 30:14, 51:18, 57:22, 57:23, 60:8, 66:25, 77:19, 92:3, 92:18, 106:6, 109:13, 121:5, 128:2, 135:24, 152:20, 165:19, 167:12, 172:15, 173:22,

180:4, 184:19, 186:16, 188:19, 196:16, 197:15, 198:1, 216:11, 219:13, 226:11, 266:17
**hearing** [9] - 28:6, 28:10, 125:14, 126:16, 166:22, 206:13, 206:15, 218:24, 221:17
**heart** [1] - 142:18
**heat** [5] - 138:16, 143:5, 230:24, 236:8
**heated** [1] - 138:17
**heavy** [3] - 145:18, 156:6, 208:12
**height** [2] - 137:9, 240:19
**Hello** [1] - 110:1
**help** [25] - 3:17, 5:1, 51:1, 57:19, 58:8, 59:9, 81:9, 93:4, 94:11, 101:22, 105:24, 109:20, 127:7, 128:21, 141:5, 141:25, 144:7, 147:12, 149:9, 159:22, 166:16, 185:4, 235:11, 240:4, 248:1
**helped** [1] - 249:19
**helpful** [8] - 5:3, 7:20, 84:12, 107:18, 125:11, 154:6, 225:12, 250:7
**helps** [2] - 57:16, 147:19
**hereby** [1] - 270:12
**hertz** [1] - 140:2
**Hg** [3] - 133:15, 133:17, 187:1
**hi** [2] - 80:14, 90:17
**Hi** [1] - 46:11
**high** [19] - 44:16, 52:23, 138:8, 143:6, 145:19, 182:20, 229:7, 230:11, 230:25, 236:3, 236:8, 236:16, 236:17, 237:6, 239:14, 239:17, 244:12, 251:6
**higher** [6] - 109:11, 213:8, 237:22, 238:9, 239:20, 254:17
**highlighted** [3] - 10:6, 114:4, 119:1
**highly** [3] - 30:20,

109:10, 133:25
**Hill** [1] - 38:2
**hills** [3] - 57:11, 57:12, 59:3
**himself** [2] - 87:14, 88:7
**hired** [3] - 50:2, 196:14, 217:2
**historical** [1] - 114:24
**history** [14] - 10:15, 12:16, 12:20, 13:4, 54:19, 78:19, 118:10, 172:14, 184:4, 196:8, 196:9, 214:17, 240:1
**hit** [3] - 63:5, 138:8, 178:19
**HITCH** [1] - 2:3
**Hitch** [3] - 3:22, 38:12, 165:11
**hitters** [1] - 208:12
**hitting** [1] - 150:24
**hold** [7] - 55:18, 68:7, 68:9, 75:14, 83:9, 203:6, 229:13
**holder** [1] - 120:15
**holding** [1] - 35:10
**Holdings** [2] - 37:25, 154:3
**holds** [2] - 185:19, 240:13
**holes** [2] - 24:14, 24:23
**Holmes** [1] - 39:6
**Hologic** [7] - 71:11, 72:3, 75:7, 75:24, 76:11, 76:25, 77:5
**home** [4] - 53:1, 53:25, 231:3, 241:13
**homes** [2] - 87:23, 88:25
**homework** [1] - 268:1
**honest** [5] - 54:25, 56:1, 68:2, 133:1, 225:10
**honestly** [1] - 57:8
**Honor** [85] - 3:12, 3:21, 5:16, 5:21, 5:24, 6:6, 8:14, 8:19, 8:21, 10:23, 11:5, 11:23, 11:25, 12:1, 12:10, 15:24, 18:15, 18:21, 19:3, 20:9, 21:21, 22:3, 22:21, 23:12, 24:16, 24:22, 24:25, 26:6, 26:13, 26:14, 26:18, 26:25, 27:21, 27:25, 29:8, 29:14, 29:16, 30:6, 30:10, 30:16, 30:20,

32:1, 32:19, 33:8, 44:25, 45:2, 45:11, 48:10, 51:5, 58:12, 59:16, 59:25, 64:6, 67:11, 69:8, 79:17, 85:6, 89:5, 90:7, 95:19, 96:12, 96:14, 99:3, 130:10, 130:19, 131:19, 131:21, 132:3, 132:8, 153:4, 164:5, 222:23, 222:24, 223:13, 223:17, 246:23, 247:1, 249:11, 259:25, 260:3, 266:3, 266:5, 267:13, 268:10, 269:16
**Honor's** [3] - 130:15, 130:20, 131:6
**Honorable** [1] - 1:11
**hope** [4] - 31:22, 110:6, 222:4, 270:6
**hoped** [2] - 254:14, 264:11
**hopeful** [1] - 154:6
**hopefully** [2] - 35:4, 96:21
**hose** [1] - 161:4
**hospital** [1] - 43:20
**hot** [2] - 167:5, 244:13
**hotels** [1] - 140:1
**hour** [8] - 36:17, 129:14, 222:13, 229:17, 229:19, 240:7, 240:11, 262:18
**hours** [11] - 4:9, 36:9, 54:3, 128:17, 133:9, 145:10, 240:22, 255:12, 255:13, 255:19
**house** [2] - 52:6, 88:2
**houses** [1] - 89:14
**Houston** [3] - 137:12, 137:18, 142:24
**huge** [11] - 134:13, 137:3, 137:7, 168:23, 170:3, 192:5, 200:17, 230:16, 239:5, 245:19, 254:21
**humans** [1] - 157:3
**hundred** [10] - 62:24, 138:1, 138:2, 157:19, 170:18, 182:11, 228:5, 240:13, 240:14
**hundreds** [5] - 155:1, 175:5, 195:23,

198:11
**husband** [2] - 44:15, 53:5
**Hz** [1] - 140:2

## I

**Ibbetson** [1] - 75:8
**iceberg** [1] - 176:6
**idea** [11] - 46:4, 55:1, 77:4, 112:18, 144:25, 145:24, 256:23, 259:4, 259:23, 260:12, 264:21
**ideal** [1] - 224:22
**ideas** [1] - 84:7
**identification** [1] - 36:23
**identified** [3] - 26:7, 141:8, 144:8
**identify** [3] - 114:14, 141:13, 259:8
**identifying** [1] - 114:3
**idle** [2] - 191:1, 195:19
**ignore** [2] - 105:10, 162:21
**II** [7] - 37:23, 102:18, 153:17, 156:11, 156:15, 192:18, 212:17
**III** [2] - 1:21, 214:15
**illumination** [1] - 111:14
**illustrate** [2] - 105:24, 115:10
**illustrated** [1] - 105:25
**image** [1] - 142:8
**immediate** [1] - 244:6
**immediately** [2] - 250:22, 254:25
**impact** [3] - 70:15, 73:7, 84:17
**impacted** [2] - 8:11, 76:2
**impartial** [1] - 42:15
**implement** [5] - 148:19, 149:8, 149:25, 150:7, 150:21
**implemented** [2] - 171:2, 234:21
**implementing** [1] - 173:20
**implicated** [1] - 5:9
**importance** [1] - 148:11
**important** [25] - 28:22, 34:24, 55:23, 73:8,

104:10, 111:15, 115:15, 116:25, 119:25, 120:5, 124:14, 126:19, 164:18, 175:18, 177:14, 178:16, 194:11, 200:23, 203:2, 208:20, 234:7, 234:8, 242:7, 242:9
**importantly** [6] - 26:16, 198:24, 210:2, 212:25, 213:17, 227:8
**impossible** [3] - 44:18, 45:14, 254:18
**impress** [2] - 250:19, 250:21
**impression** [2] - 57:12, 262:22
**imprimatur** [1] - 69:21
**improper** [3] - 7:5, 7:6, 22:9
**improve** [1] - 234:11
**improved** [2] - 254:8
**impurities** [8] - 231:20, 235:21, 235:25, 236:10, 236:13, 236:21, 238:11
**IN** [2] - 1:1, 1:2
**in-flight** [3] - 258:6, 258:7, 258:8
**Inc** [2] - 37:3, 102:15
**incentive** [2] - 135:19, 189:11
**incentives** [1] - 159:18
**incentivize** [2] - 151:25, 159:19
**incentivized** [2] - 190:5, 190:7
**inch** [1] - 262:8
**inclination** [1] - 229:1
**inclined** [3] - 49:23, 65:16, 79:24
**include** [6] - 9:9, 36:16, 104:22, 110:24, 114:24, 120:10
**included** [1] - 121:24
**includes** [3] - 115:7, 124:21, 234:25
**including** [16] - 11:2, 11:8, 16:19, 38:20, 42:12, 47:25, 60:19, 66:14, 114:13, 116:19, 125:1, 177:8, 185:17, 220:23, 224:10, 228:11

**income** [1] - 89:25
**incoming** [1] - 118:11
**inconsistent** [1] - 107:7
**incorporated** [1] - 270:4
**incorrect** [5] - 5:25, 6:25, 12:24, 182:23, 203:4
**incorrectly** [1] - 76:22
**increase** [1] - 232:15
**incredible** [1] - 29:22
**incredibly** [5] - 28:9, 30:5, 133:25, 198:3, 211:11
**independent** [1] - 124:5
**indicate** [3] - 22:22, 60:17, 104:17
**indicated** [1] - 260:21
**indicates** [3] - 112:1, 260:9, 265:18
**indicating** [1] - 104:17
**indication** [1] - 122:7
**indirect** [2] - 159:6, 159:9
**indirectly** [3] - 39:24, 40:4, 106:14
**individual** [7] - 34:20, 37:9, 38:11, 70:4, 70:5, 70:7, 159:21
**individually** [1] - 103:6
**individuals** [5] - 14:7, 14:13, 124:6, 169:6, 195:6
**induce** [7] - 8:9, 136:22, 144:15, 158:6, 176:4, 176:5, 181:7
**induced** [1] - 122:17
**inducement** [4] - 159:24, 180:17, 180:19, 215:20
**inducing** [5] - 39:25, 152:4, 177:15, 179:15, 206:7
**indulge** [1] - 152:7
**indulgence** [1] - 154:4
**Industrial** [3] - 38:3, 102:24, 156:13
**industrial** [3] - 50:13, 156:6, 250:15
**industrial-type** [1] - 156:6
**industry** [13] - 41:13, 47:2, 59:22, 135:20, 142:2, 163:3, 163:13, 180:12, 185:10, 185:15,

197:15, 216:16, 216:20
**Inendino** [1] - 39:8
**inferences** [2] - 180:8, 217:19
**influence** [3] - 59:23, 104:14, 104:16
**influenced** [2] - 57:5, 105:7
**information** [23] - 76:22, 79:10, 79:11, 96:2, 107:22, 109:20, 114:4, 114:12, 116:14, 117:6, 117:8, 117:9, 119:25, 124:16, 126:19, 172:11, 195:1, 205:3, 205:4, 206:10, 225:2, 225:3, 226:9
**infringe** [26] - 12:14, 17:15, 30:5, 32:23, 40:7, 157:22, 158:6, 158:22, 163:4, 169:2, 176:5, 180:2, 180:22, 181:3, 182:22, 201:1, 203:3, 209:6, 213:14, 213:15, 213:19, 214:23, 216:10, 221:22, 221:25
**infringed** [19] - 10:21, 14:4, 15:1, 40:4, 55:8, 82:14, 103:17, 103:19, 108:12, 109:4, 120:18, 121:15, 122:24, 123:1, 123:7, 127:10, 196:12, 217:18
**infringement** [86] - 5:21, 6:1, 6:21, 7:22, 8:10, 9:15, 11:4, 13:1, 13:9, 13:20, 13:21, 15:9, 15:10, 16:14, 16:16, 39:19, 39:20, 40:8, 40:21, 40:24, 40:25, 49:13, 75:5, 75:19, 76:14, 81:3, 81:4, 103:14, 103:18, 108:13, 108:14, 109:1, 119:5, 119:7, 119:8, 119:13, 119:16, 120:5, 120:6, 120:8, 120:13, 120:15, 121:16, 122:9, 122:17, 122:21, 127:13, 136:22,

158:8, 158:25, 159:5, 159:6, 159:10, 159:13, 159:15, 159:16, 159:20, 159:23, 161:24, 162:21, 168:12, 172:20, 176:1, 176:3, 176:4, 177:15, 179:14, 179:15, 179:19, 181:1, 181:5, 181:7, 182:15, 182:24, 183:2, 190:16, 203:1, 203:6, 203:7, 213:2, 214:20, 215:20, 216:13, 217:20, 218:6
**infringer** [1] - 120:19
**infringes** [2] - 77:15, 103:12
**infringing** [16] - 12:22, 14:21, 16:3, 39:24, 40:6, 77:1, 159:12, 162:15, 182:20, 183:3, 183:19, 202:7, 202:23, 209:5, 215:2, 221:18
**inhalation** [1] - 59:13
**initial** [2] - 257:2, 263:9
**initiate** [1] - 249:2
**initiated** [1] - 254:3
**inject** [2] - 257:23, 264:15
**injected** [1] - 147:17
**injecting** [4] - 147:8, 159:2, 255:17
**injection** [6] - 12:19, 187:2, 198:18, 204:17, 216:23, 217:5
**injections** [1] - 217:1
**injury** [1] - 65:21
**input** [2] - 120:4, 146:17
**insensitive** [1] - 45:18
**inside** [3] - 174:25, 198:25, 244:18
**inspect** [1] - 118:19
**inspection** [1] - 112:8
**inspire** [1] - 111:18
**inspired** [2] - 133:4, 134:3
**Instagram** [1] - 125:1
**install** [3] - 148:15, 149:20, 171:13
**installed** [8] - 17:8, 171:23, 177:10, 206:21, 207:9, 207:14, 207:16,

213:25
**installing** [1] - 197:18
**instead** [3] - 101:7, 144:18, 160:1
**instruct** [10] - 41:23, 42:1, 83:5, 104:1, 104:23, 105:15, 115:21, 120:10, 123:11, 159:7
**instructed** [3] - 172:18, 199:19, 203:2
**instructing** [1] - 104:4
**instruction** [4] - 18:4, 32:20, 33:5, 105:17
**instructions** [36] - 15:24, 33:2, 42:6, 42:9, 42:10, 42:16, 47:18, 48:25, 58:4, 67:17, 82:19, 86:14, 97:18, 98:20, 98:25, 99:9, 101:22, 101:24, 102:1, 102:5, 102:7, 102:10, 103:11, 104:6, 104:8, 104:10, 120:22, 121:2, 122:12, 122:13, 125:10, 126:5, 127:20, 129:6, 130:15, 180:20
**insufficient** [1] - 117:18
**intellectual** [1] - 163:10
**intend** [3] - 8:9, 19:18, 128:24
**intended** [2] - 104:17, 180:21
**intending** [1] - 15:20
**intends** [1] - 25:14
**intent** [6] - 180:21, 181:6, 181:21, 181:23, 187:14, 201:1
**intention** [3] - 176:5, 182:13, 221:24
**intentions** [3] - 165:25, 166:4, 166:17
**interact** [2] - 257:13, 261:19
**interaction** [1] - 257:17
**interest** [1] - 205:20
**interesting** [4] - 134:14, 163:21, 165:17, 218:3
**interests** [2] - 81:14,

107:8
**interior** [2] - 89:1, 89:23
**Intermountain** [10] - 191:15, 193:19, 201:20, 201:21, 202:14, 208:15, 208:18, 213:1, 214:11, 214:16
**internal** [1] - 248:16
**internally** [1] - 192:23
**international** [1] - 234:4
**internationally** [1] - 229:25
**internet** [4] - 123:25, 124:9, 124:18, 124:25
**interpret** [2] - 83:7, 127:24
**interpreted** [2] - 81:9, 121:23
**interrogatories** [2] - 11:20, 200:10
**interrogatory** [8] - 9:1, 9:9, 9:11, 9:16, 9:20, 10:3, 11:2, 16:13
**interrupt** [2] - 28:13, 218:13
**intervening** [3] - 178:18, 220:15, 221:8
**introduce** [16] - 61:15, 127:9, 127:12, 127:14, 127:17, 132:6, 135:3, 148:1, 148:2, 149:22, 160:7, 164:24, 167:5, 178:24, 225:23, 251:2
**introduced** [2] - 30:24, 161:5
**introducing** [1] - 161:7
**introduction** [3] - 109:19, 152:21, 230:8
**invalid** [10] - 40:10, 103:20, 109:5, 109:7, 119:17, 120:20, 123:5, 123:7, 127:15, 221:15
**invalidate** [1] - 220:12
**invalidity** [4] - 120:18, 122:9, 127:18, 218:10
**invented** [9] - 84:23, 112:10, 175:12, 178:7, 227:5, 227:6,

227:7, 233:6, 263:11
**invention** [48] - 78:20, 110:24, 111:1, 111:10, 111:13, 111:19, 112:4, 112:6, 112:13, 112:17, 112:21, 113:12, 113:21, 114:7, 114:16, 114:25, 115:8, 115:9, 115:12, 115:13, 115:18, 116:17, 119:4, 121:12, 121:21, 146:3, 146:4, 146:7, 146:18, 147:1, 147:4, 147:25, 148:10, 149:8, 150:21, 150:25, 152:5, 162:19, 172:20, 178:21, 220:6, 227:11, 232:6, 234:7, 234:10, 258:16, 265:6
**inventions** [7] - 94:8, 111:18, 114:24, 132:24, 146:23, 148:19, 178:7
**inventor** [19] - 78:18, 111:4, 111:9, 111:10, 111:22, 112:3, 112:10, 112:16, 112:17, 112:19, 112:23, 113:7, 113:12, 118:18, 118:25, 119:2, 119:3, 222:25, 226:1
**inventor's** [3] - 113:17, 116:2, 116:17
**inventors** [8] - 110:20, 114:8, 133:9, 145:12, 149:11, 153:2, 227:6, 227:10
**Invents** [1] - 116:3
**inverse** [1] - 138:19
**invest** [3] - 155:11, 191:22, 193:1
**invested** [4] - 155:14, 157:10, 157:11, 190:23
**investigate** [1] - 244:10
**investigation** [3] - 16:25, 124:3, 261:4
**investment** [3] - 155:15, 155:17, 191:3

**investments** [1] - 156:4
**investors** [5] - 158:1, 158:4, 171:22, 171:25, 191:22
**invoked** [1] - 130:13
**invoking** [1] - 130:25
**involve** [4] - 74:20, 92:3, 110:9, 110:11
**involved** [24] - 36:24, 37:1, 37:9, 38:11, 39:17, 40:20, 40:21, 55:19, 64:22, 64:24, 75:5, 75:25, 95:10, 124:6, 136:18, 157:1, 169:18, 170:23, 186:14, 199:4, 204:12, 204:18, 216:18, 221:5
**involves** [3] - 13:4, 41:17, 100:12
**involving** [1] - 12:18
**IRS** [5] - 141:2, 150:6, 186:7, 186:11, 212:1
**Island** [3] - 88:1, 155:25, 194:12
**issuance** [1] - 118:22
**issue** [70] - 4:24, 5:3, 5:6, 5:8, 5:13, 5:14, 5:20, 5:24, 7:2, 7:16, 8:1, 8:15, 8:19, 11:12, 11:16, 12:10, 18:13, 18:17, 18:24, 18:25, 20:25, 24:19, 25:5, 25:12, 26:10, 26:12, 26:13, 28:5, 30:9, 31:14, 31:15, 32:1, 41:3, 52:7, 52:9, 55:3, 59:23, 60:14, 70:14, 92:4, 117:13, 121:16, 127:25, 137:1, 147:1, 156:22, 158:20, 159:5, 167:25, 168:7, 177:18, 177:25, 179:8, 180:2, 186:19, 197:9, 199:3, 200:2, 202:25, 210:7, 220:13, 220:14, 268:12, 269:4, 269:20, 269:24
**issued** [19] - 5:21, 81:17, 112:7, 114:11, 114:15, 116:7, 116:12, 118:24, 119:2, 155:3, 177:1,

177:20, 178:5, 196:7, 203:17, 212:8, 214:3, 219:11, 219:12
**issues** [29] - 5:12, 18:20, 26:2, 26:3, 32:12, 34:16, 41:24, 54:19, 75:10, 78:13, 80:6, 84:4, 110:9, 118:6, 120:8, 122:8, 122:10, 135:8, 141:25, 170:7, 178:4, 202:6, 219:9, 219:10, 225:4, 236:13, 236:14, 250:7, 263:8
**italics** [1] - 207:12
**item** [3] - 105:16, 260:18, 264:8
**itself** [4] - 50:10, 204:21, 220:17, 264:22
**IV** [5] - 37:23, 102:18, 152:21, 153:22, 192:19

---

## J

**jack** [1] - 169:12
**jail** [1] - 88:19
**JAMES** [2] - 1:16, 2:3
**James** [9] - 3:23, 3:24, 37:9, 38:10, 39:11, 66:13, 66:19, 67:6, 165:10
**January** [3] - 29:21, 52:4, 169:10
**JASON** [1] - 1:20
**Jay** [1] - 39:10
**Jeff** [17] - 3:24, 17:2, 17:3, 38:12, 39:9, 157:3, 164:25, 165:9, 165:23, 166:13, 169:17, 169:21, 173:14, 199:17, 210:12, 210:13
**JEFF** [1] - 2:6
**Jefferson** [2] - 170:15, 194:12
**Jeffrey** [2] - 161:7, 169:17
**Jeremy** [1] - 110:1
**Jesse** [2] - 167:6, 174:21
**JESSICA** [1] - 2:8
**jet** [2] - 138:18, 138:19
**Jim** [1] - 39:5
**job** [15] - 64:18, 68:15,

77:12, 87:11, 89:21, 106:19, 110:8, 113:4, 116:16, 116:22, 120:9, 141:4, 159:7, 204:5, 210:15
**jobs** [1] - 44:12
**JOHN** [3] - 1:20, 223:7, 223:9
**john** [2] - 222:25, 225:24
**John** [4] - 39:5, 39:11, 135:4, 223:7
**join** [1] - 150:20
**joined** [1] - 26:19
**jointly** [1] - 126:12
**jokingly** [1] - 237:3
**journal** [1] - 117:20
**JPMorgan** [3] - 155:19, 155:20, 157:15
**Judge** [14] - 33:5, 34:3, 61:13, 66:6, 67:2, 67:15, 70:23, 80:17, 85:13, 90:18, 159:6, 161:13, 172:18, 180:20
**JUDGE** [1] - 110:1
**judge** [10] - 66:24, 67:25, 110:2, 110:10, 115:21, 120:9, 120:21, 215:15, 215:18, 244:21
**judges** [2] - 103:25, 107:2
**judgeship** [1] - 69:21
**judgment** [2] - 34:20, 110:5
**Judicial** [1] - 158:21
**judicial** [1] - 110:3
**July** [13] - 13:2, 13:17, 13:21, 174:16, 177:1, 177:3, 178:4, 196:13, 202:1, 215:9, 215:17, 215:18, 215:22
**jumbled** [1] - 161:9
**jump** [6] - 167:1, 167:20, 167:25, 201:23, 205:8, 254:25
**jumped** [1] - 256:11
**June** [1] - 215:17
**jurisdiction** [1] - 119:6
**Juror** [45] - 43:9, 46:8, 46:10, 51:9, 61:5, 65:19, 66:1, 70:11, 70:18, 80:7, 80:10, 80:12, 80:13, 85:9,

90:16, 96:15, 96:24, 96:25, 97:1, 97:2, 97:21, 97:22, 97:23, 98:4, 100:6
**juror** [57] - 29:22, 30:14, 33:19, 34:13, 34:18, 45:13, 46:7, 46:9, 47:20, 48:8, 51:6, 51:8, 55:11, 58:3, 59:6, 60:9, 60:25, 61:3, 65:16, 65:25, 70:17, 79:24, 80:3, 80:9, 85:7, 85:8, 90:8, 90:15, 97:21, 100:6, 100:7, 100:8, 100:9, 100:10, 100:15, 100:17, 100:18, 100:19, 100:22, 100:23, 100:25, 101:1, 101:2, 121:25
**JUROR** [197] - 43:11, 43:18, 43:25, 44:3, 44:10, 44:15, 44:21, 45:5, 45:9, 46:12, 46:14, 46:19, 46:21, 47:4, 47:14, 48:4, 48:15, 48:17, 48:20, 49:6, 49:16, 49:19, 50:1, 50:15, 50:18, 50:23, 51:11, 51:19, 51:22, 51:25, 52:3, 52:21, 53:14, 53:17, 53:21, 53:24, 54:2, 54:8, 54:13, 54:23, 55:20, 56:6, 56:11, 56:20, 56:24, 57:2, 57:7, 57:20, 58:1, 58:5, 58:7, 58:10, 61:7, 61:10, 61:12, 61:18, 61:21, 61:25, 62:5, 62:8, 62:17, 62:23, 63:4, 63:7, 63:11, 63:22, 64:1, 64:3, 64:10, 64:17, 64:23, 65:1, 65:3, 65:6, 65:9, 65:12, 66:3, 66:5, 66:10, 66:16, 66:20, 66:22, 66:25, 67:3, 68:1, 68:8, 68:11, 68:25, 69:5, 69:11, 70:21, 71:3, 71:6, 71:10, 71:18, 71:23, 71:25, 72:5, 72:16, 72:21, 73:2, 73:6, 73:14, 73:18, 73:25, 74:7, 74:10, 74:12, 74:15, 74:22, 75:2, 75:7, 75:12, 75:16, 75:22, 76:1, 76:5, 76:8,

76:12, 76:15, 76:17, 77:2, 77:7, 77:9, 77:22, 77:24, 78:2, 78:10, 78:16, 79:4, 79:9, 79:14, 79:20, 80:16, 80:20, 80:24, 81:1, 81:6, 81:12, 81:22, 82:6, 82:9, 82:12, 83:1, 83:6, 83:11, 83:16, 83:21, 84:2, 84:5, 84:19, 85:2, 85:12, 85:18, 85:20, 85:22, 85:25, 86:7, 86:10, 86:19, 86:21, 86:25, 87:7, 87:13, 87:18, 87:21, 88:1, 88:4, 88:8, 88:13, 88:15, 88:18, 88:25, 89:9, 89:20, 89:22, 90:3, 90:24, 91:3, 91:7, 91:12, 91:16, 91:19, 91:23, 92:1, 92:21, 92:25, 93:8, 93:15, 93:20, 93:24, 94:3, 94:20, 95:1, 95:12, 96:7, 96:10
**jurors** [38] - 31:17, 31:23, 33:12, 33:18, 34:2, 34:9, 41:22, 42:5, 46:2, 72:9, 86:23, 90:10, 90:14, 92:11, 94:19, 96:17, 96:19, 97:4, 97:5, 97:8, 97:9, 97:10, 97:20, 98:19, 99:7, 99:8, 100:5, 101:6, 101:11, 101:16, 101:17, 102:6, 102:12, 103:22, 104:8, 120:12, 123:10, 267:19
**JURY** [2] - 1:9, 1:11
**jury** [70] - 1:12, 4:3, 4:13, 13:24, 16:10, 18:5, 19:25, 23:22, 24:9, 24:10, 25:23, 28:6, 28:10, 31:9, 33:2, 33:3, 33:16, 34:11, 36:6, 36:12, 40:3, 40:12, 42:22, 52:11, 52:13, 58:17, 59:4, 60:13, 62:11, 82:23, 97:14, 97:17, 98:1, 98:18, 98:20, 99:4, 99:9, 100:12, 101:7, 101:8, 101:13, 101:18, 101:21, 102:4, 107:18, 110:14, 123:13, 125:25,

126:23, 127:25, 128:2, 128:7, 129:7, 129:10, 130:9, 131:14, 131:15, 132:1, 163:17, 163:24, 164:18, 167:14, 179:24, 181:16, 222:10, 222:18, 222:19, 224:10, 225:23, 267:23

**just..** [1] - 79:14
**justifies** [1] - 111:21
**JUSTIN** [1] - 1:21
**Justin** [2] - 3:13, 37:10

## K

**Kansas** [3] - 228:21, 239:10, 239:11
**Katherine** [1] - 39:8
**keep** [22] - 36:15, 49:7, 111:24, 125:4, 125:20, 126:19, 128:16, 128:21, 136:21, 137:21, 146:8, 146:25, 161:9, 162:16, 165:19, 198:14, 207:5, 210:20, 210:23, 211:13, 211:14
**Ken** [2] - 3:23, 165:10
**KENNETH** [1] - 2:4
**Kenneth** [1] - 38:11
**kept** [2] - 162:15, 187:3
**key** [2] - 12:9, 231:9
**kid** [2] - 57:9, 57:13
**kidney** [1] - 134:1
**kids** [5] - 43:24, 44:8, 44:9, 53:6, 53:21
**kids'** [1] - 43:24
**Kiewit** [2] - 156:5, 157:15
**kind** [110] - 5:5, 5:8, 13:6, 14:23, 18:10, 47:12, 47:23, 49:2, 49:7, 49:14, 55:16, 56:5, 59:10, 64:19, 64:20, 67:24, 69:17, 69:25, 74:11, 75:12, 76:6, 77:20, 79:2, 79:4, 83:14, 91:11, 92:9, 132:22, 133:6, 133:14, 134:17, 135:14, 135:25, 136:15, 137:10,

138:15, 138:19, 138:25, 139:8, 141:17, 144:2, 144:4, 144:12, 145:16, 145:17, 146:4, 146:17, 149:1, 149:4, 150:4, 152:11, 153:5, 154:17, 158:10, 158:12, 158:20, 159:5, 159:10, 160:22, 161:22, 165:4, 175:2, 177:4, 177:16, 184:4, 194:19, 195:1, 195:16, 195:17, 195:21, 195:25, 196:2, 196:4, 196:8, 209:15, 210:16, 212:5, 212:16, 216:22, 218:9, 225:11, 233:5, 233:12, 233:13, 234:22, 237:4, 238:1, 238:5, 239:7, 239:23, 240:17, 242:15, 242:21, 242:25, 248:25, 250:3, 252:1, 252:17, 253:5, 253:16, 253:22, 255:14, 258:1, 260:11, 263:21, 264:25, 267:14
**kinds** [6] - 74:23, 132:19, 198:5, 199:2, 211:12, 243:25
**knowing** [3] - 17:22, 87:3, 94:14
**knowledge** [34] - 11:7, 14:8, 14:12, 14:13, 14:20, 14:25, 15:3, 15:6, 15:16, 16:18, 16:22, 17:6, 21:3, 21:6, 21:15, 21:17, 24:7, 25:13, 31:1, 34:15, 47:22, 47:24, 77:12, 95:23, 107:5, 107:13, 107:14, 107:17, 111:11, 170:6, 181:4, 182:24, 203:5, 216:25
**knowledgeable** [1] - 186:1
**known** [11] - 39:25, 108:6, 114:20, 134:2, 145:13, 145:16, 169:7,

182:21, 230:1, 236:14, 252:8
**knows** [4] - 5:24, 98:3, 112:5, 116:24
**Kotch** [2] - 39:9, 39:10
**Kratz** [3] - 90:16, 90:17, 95:21
**Kuennen** [1] - 39:12

## L

**lab** [3] - 95:6, 245:24, 246:3
**Lab** [1] - 193:23
**lab-type** [1] - 245:24
**Labadie** [2] - 154:11, 193:21
**lack** [1] - 94:16
**lacks** [1] - 220:9
**ladies** [5] - 35:3, 101:19, 121:1, 129:5, 164:14
**laid** [3] - 22:2, 23:2, 24:6
**lake** [2] - 52:5, 54:4
**lakes** [1] - 134:21
**lamps** [1] - 140:1
**land** [4] - 171:15, 171:21, 192:3, 192:4
**landowner's** [1] - 112:2
**Landreth** [1] - 39:11
**language** [1] - 122:7
**Laramie** [3] - 155:23, 191:15, 194:8
**large** [25] - 143:17, 156:6, 157:15, 160:11, 166:23, 167:9, 171:19, 190:19, 192:25, 194:3, 198:17, 205:17, 206:5, 218:5, 229:25, 232:25, 237:5, 238:23, 240:5, 240:8, 240:10, 240:14, 250:17
**largely** [1] - 142:13
**larger** [4] - 27:6, 27:8, 27:9, 245:25
**Larkwood** [6] - 38:1, 102:22, 154:12, 154:13, 193:22, 193:24
**Larry** [2] - 39:11, 75:8
**last** [32] - 4:6, 26:2, 27:22, 28:15, 28:20, 30:17, 31:3, 31:8, 31:13, 35:12, 56:3,

57:15, 61:23, 63:7, 63:12, 73:19, 93:2, 103:7, 139:21, 142:10, 154:11, 156:12, 170:8, 175:18, 178:1, 211:17, 213:1, 213:21, 234:17, 263:3, 265:21, 266:21
**lastly** [2] - 42:11, 88:16
**lasts** [1] - 111:2
**latch** [2] - 144:17, 147:19
**late** [6] - 63:17, 128:15, 135:8, 140:25, 141:7, 141:19
**latest** [3] - 62:14, 86:16, 115:1
**latter** [1] - 249:7
**law** [63] - 8:11, 8:16, 10:16, 11:18, 17:16, 18:6, 37:8, 37:16, 38:10, 38:15, 41:19, 41:22, 41:25, 42:16, 67:21, 70:6, 104:1, 104:3, 104:4, 106:20, 113:6, 113:13, 116:23, 120:10, 120:14, 121:6, 125:10, 126:4, 126:22, 127:20, 132:18, 159:7, 159:10, 159:24, 161:13, 163:7, 171:3, 171:12, 174:3, 174:7, 174:12, 174:15, 175:13, 176:14, 176:15, 179:11, 181:23, 182:25, 185:3, 186:7, 186:17, 187:5, 187:14, 187:19, 188:1, 190:5, 191:21, 203:16, 204:18, 209:25, 222:3
**Law** [1] - 37:8
**LAW** [1] - 1:16
**laws** [14] - 5:25, 39:21, 81:7, 81:8, 81:14, 81:17, 81:23, 81:25, 82:2, 83:7, 84:23, 110:17, 174:12, 184:25
**lawsuit** [40] - 11:6, 14:16, 15:4, 15:14,

16:18, 16:21, 119:17, 148:23, 162:11, 173:16, 177:2, 177:5, 177:13, 178:4, 183:20, 184:20, 196:1, 196:5, 196:15, 196:16, 197:12, 200:8, 200:21, 201:25, 202:11, 202:19, 202:24, 205:21, 206:19, 208:21, 208:24, 214:9, 214:19, 215:3, 224:17, 226:13, 226:17, 226:21, 226:24
**lawsuits** [2] - 40:25, 81:4
**Lawton** [1] - 39:7
**lawyer** [5] - 22:6, 37:13, 38:14, 123:16, 177:20
**lawyer's** [2] - 22:13, 105:7
**lawyers** [44] - 10:18, 10:22, 36:7, 37:9, 37:13, 38:11, 38:13, 42:20, 48:5, 51:15, 56:9, 61:14, 61:15, 64:4, 66:7, 66:13, 66:15, 66:16, 68:20, 68:23, 69:2, 70:24, 78:12, 80:18, 83:22, 85:14, 90:19, 93:10, 105:1, 105:4, 110:10, 112:18, 126:16, 127:22, 146:16, 166:24, 174:1, 177:24, 184:18
**lay** [5] - 22:11, 22:12, 22:17, 22:23, 24:25
**layer** [1] - 195:2
**layers** [1] - 184:4
**lead** [4] - 24:9, 50:12, 94:9, 134:2
**leading** [1] - 220:4
**leads** [4] - 30:3, 108:16, 134:1, 142:11
**Leah** [6] - 39:9, 157:5, 165:23, 169:14, 173:15
**lean** [2] - 49:23, 205:23
**leaned** [2] - 79:5, 199:20
**leaning** [5] - 49:2,

49:14, 79:1, 79:8, 82:24
**learn** [8] - 12:16, 110:11, 135:11, 151:15, 155:18, 174:23, 206:20, 211:3
**learned** [5] - 148:10, 157:23, 188:18, 207:24
**learns** [1] - 112:9
**lease** [3] - 154:14, 171:15, 193:16
**leased** [2] - 192:3, 192:4
**least** [20] - 4:2, 6:23, 12:7, 36:17, 43:16, 46:4, 66:8, 67:8, 70:25, 80:22, 85:16, 90:21, 98:19, 128:9, 128:10, 129:13, 142:19, 201:9, 220:8, 267:2
**leave** [7] - 42:19, 61:1, 71:18, 125:24, 150:19, 240:23, 241:10
**led** [4] - 76:9, 111:15, 145:12, 239:13
**left** [15] - 57:13, 97:8, 114:6, 114:9, 169:8, 169:10, 180:11, 216:16, 216:20, 218:18, 230:15, 238:5, 247:20, 255:10, 262:21
**left-hand** [2] - 230:15, 247:20
**legal** [6] - 42:1, 108:5, 165:6, 165:20, 184:24, 215:11
**legally** [2] - 12:24, 220:2
**legislation** [1] - 189:16
**legitimacy** [1] - 69:21
**legitimate** [1] - 81:18
**length** [2] - 7:9, 240:19
**Lennon** [1] - 37:9
**LENNON** [1] - 1:16
**less** [13] - 55:5, 86:17, 173:6, 223:21, 228:5, 236:9, 236:20, 239:21, 252:14, 256:2, 257:10, 257:12
**letter** [1] - 184:19
**letters** [2] - 133:14, 184:18

**letting** [1] - 4:20
**leukemia** [1] - 170:10
**level** [9] - 95:15, 159:9, 196:17, 203:5, 230:11, 256:1, 256:2, 261:11, 263:6
**levels** [1] - 254:17
**liability** [2] - 180:19, 191:21
**liable** [4] - 159:20, 159:23, 203:6, 217:19
**license** [45] - 19:11, 20:12, 22:25, 25:10, 27:4, 27:6, 27:7, 27:8, 27:10, 27:17, 28:1, 28:11, 28:12, 28:16, 28:18, 28:20, 30:2, 30:4, 30:17, 30:25, 31:1, 31:2, 31:5, 31:10, 31:18, 31:20, 32:13, 32:21, 32:22, 86:12, 148:18, 148:20, 148:25, 163:2, 163:5, 163:9, 163:12, 163:14, 163:15, 167:10, 167:23, 167:24, 168:4, 226:6, 226:24
**licensed** [1] - 21:10
**licensees** [2] - 26:20, 29:11
**licenses** [27] - 19:1, 19:5, 19:7, 19:8, 19:10, 19:15, 19:17, 19:19, 19:24, 20:22, 21:4, 21:12, 22:4, 22:5, 22:7, 22:10, 23:9, 23:11, 23:15, 24:10, 24:19, 24:20, 27:7, 27:23, 163:2, 167:14, 225:2
**licensing** [1] - 162:24
**licensor** [5] - 26:19, 28:3, 28:10, 28:17, 30:2
**life** [9] - 79:3, 111:6, 134:8, 166:2, 185:20, 220:22, 221:3, 227:22, 256:9
**lifetime** [1] - 111:17
**light** [6] - 65:20, 101:12, 108:16, 111:13, 115:14, 119:14
**lighting** [1] - 53:18
**lignite** [15] - 143:16, 235:14, 237:2,

237:3, 239:5, 239:6, 249:23, 250:1, 250:3, 250:7, 250:11, 251:5, 252:9, 252:11, 252:12
**lignites** [3] - 237:20, 239:4, 244:3
**like..** [1] - 75:17
**likely** [7] - 4:12, 52:11, 67:23, 89:19, 108:17, 250:11, 251:11
**limestone** [1] - 154:8
**Limestone** [2] - 193:24, 193:25
**limine** [9] - 5:22, 7:3, 7:11, 8:20, 19:5, 32:2, 32:7, 32:10
**limitations** [1] - 121:10
**limited** [8] - 12:3, 13:10, 19:4, 38:20, 105:16, 110:19, 111:21, 191:21
**limits** [1] - 112:10
**line** [6] - 4:5, 18:1, 72:6, 136:19, 150:16, 195:25
**lined** [1] - 33:18
**lines** [2] - 134:23, 138:24
**linked** [1] - 266:13
**LinkedIn** [1] - 125:2
**Linton** [5] - 157:6, 165:24, 169:8, 169:9, 173:15
**liquid** [1] - 252:23
**list** [8] - 4:22, 25:25, 29:11, 39:4, 96:20, 104:25, 114:13, 205:11
**listed** [3] - 11:8, 35:6, 114:17
**listen** [5] - 67:17, 123:23, 124:1, 124:13, 132:7
**listing** [2] - 5:2, 9:20
**lists** [1] - 204:22
**literally** [6] - 151:22, 170:1, 175:3, 195:23, 220:22, 240:12
**literary** [1] - 134:3
**litigated** [1] - 103:2
**litigation** [2] - 64:24, 67:12
**live** [6] - 137:13, 170:18, 199:24, 200:5, 227:21

**lived** [2] - 221:3, 227:22
**livelihood** [2] - 55:21, 55:23
**liver** [1] - 134:1
**lives** [3] - 53:1, 53:2, 73:8
**living** [1] - 57:8
**LLC** [45] - 37:23, 37:24, 37:25, 38:1, 38:2, 38:3, 38:21, 102:18, 102:19, 102:21, 102:22, 102:23, 102:24, 151:16, 151:19, 153:18, 153:21, 153:22, 153:23, 154:3, 154:9, 154:12, 154:13, 154:21, 155:24, 156:1, 156:2, 156:9, 156:12, 179:11, 191:20
**LLCs** [11] - 151:24, 154:14, 154:20, 154:25, 155:5, 155:11, 155:13, 155:15, 155:17, 157:1, 190:6
**LLP** [4] - 2:3, 2:6, 38:10, 38:11
**Local** [2] - 50:4, 50:21
**local** [1] - 50:22
**located** [5] - 119:23, 237:13, 237:15, 238:12, 241:5
**location** [1] - 263:25
**logistical** [1] - 4:1
**logistically** [1] - 54:6
**logistics** [1] - 54:3
**long-term** [1] - 69:18
**longest** [1] - 115:6
**look** [66] - 4:25, 6:7, 9:10, 9:18, 10:6, 10:12, 10:14, 52:17, 55:13, 57:7, 67:17, 82:21, 83:16, 94:4, 95:25, 110:15, 112:13, 114:1, 115:24, 137:5, 147:14, 153:17, 161:12, 162:6, 163:2, 163:25, 168:11, 171:19, 172:19, 186:22, 189:21, 192:16, 193:2, 193:18, 195:25, 201:20, 205:5, 205:16, 207:22, 207:23,

208:9, 210:9, 211:3, 211:18, 212:2, 212:7, 212:16, 212:25, 218:11, 224:16, 229:19, 230:3, 230:4, 234:20, 235:1, 235:5, 239:18, 244:22, 247:20, 250:19, 253:2, 259:13, 261:1, 262:1, 270:4, 270:7
**looked** [10] - 114:15, 212:1, 215:19, 229:5, 243:2, 243:3, 243:4, 243:5, 243:7, 251:4
**looking** [17] - 49:13, 58:2, 59:15, 180:9, 201:13, 207:11, 211:12, 224:9, 240:15, 243:9, 245:1, 245:8, 247:6, 247:15, 253:4, 253:23, 260:19
**looks** [12] - 6:8, 8:17, 12:6, 35:19, 114:1, 116:12, 129:16, 138:18, 186:10, 244:18, 265:14, 268:2
**loosen** [1] - 64:19
**lose** [8] - 46:7, 89:8, 89:9, 151:20, 151:25, 155:6, 155:7, 221:12
**loses** [1] - 154:21
**losing** [5] - 77:5, 130:3, 151:22, 151:24, 162:20
**loss** [5] - 76:9, 76:11, 76:16, 154:16, 188:8
**lost** [1] - 58:25
**Louisiana** [1] - 192:18
**love** [2] - 52:20, 55:14
**low** [7] - 94:4, 236:22, 237:20, 238:6, 239:22, 244:3, 250:12
**low-rank** [2] - 238:6, 244:3
**low-ranked** [1] - 250:12
**lower** [3] - 236:19, 244:6, 256:1
**lower-ranked** [1] - 244:6
**lowest** [1] - 95:8
**luck** [1] - 120:23
**lucky** [1] - 132:18

**lump** [2] - 27:6, 168:3
**lunch** [13] - 36:17, 98:22, 98:23, 99:11, 99:12, 102:2, 121:3, 127:1, 127:2, 128:11, 129:8, 129:14, 130:6
**luncheon** [1] - 130:7
**lunchtime** [1] - 43:3
**lung** [1] - 57:1

## M

**ma'am** [1] - 45:8
**machine** [1] - 112:14
**MacPherson** [12] - 21:1, 39:5, 148:2, 148:3, 148:4, 148:5, 148:17, 149:6, 149:11, 150:10, 150:19, 151:14
**Mad** [2] - 134:4, 134:5
**magnets** [1] - 138:23
**magnitude** [2] - 240:18, 256:24
**mail** [2] - 4:19, 124:23
**mails** [4] - 160:22, 162:4, 197:17, 197:18
**main** [4] - 114:2, 115:23, 242:2, 242:4
**maintain** [3] - 20:18, 128:4, 232:25
**maintained** [1] - 207:21
**maintaining** [4] - 158:4, 158:5, 197:19, 232:22
**maintenance** [1] - 198:14
**major** [2] - 84:21, 115:4
**makers** [1] - 134:6
**makeups** [1] - 143:3
**mammography** [2] - 72:7, 72:22
**man** [2] - 167:5, 227:13
**manage** [2] - 195:8, 242:4
**managed** [2] - 169:23, 170:4
**managers** [1] - 195:7
**mandated** [1] - 204:14
**mandating** [1] - 206:3
**mandatory** [1] - 150:3
**manner** [2] - 73:4, 107:8
**manufacture** [2] -

77:3, 112:15
**manufactured** [3] - 76:19, 169:24, 176:24
**Manufacturing** [1] - 193:20
**map** [1] - 170:16
**March** [9] - 36:12, 36:14, 52:4, 64:13, 128:20, 178:5
**mark** [1] - 164:6
**marked** [3] - 207:16, 246:16, 259:14
**market** [3] - 135:12, 205:18, 206:6
**marketing** [1] - 136:6
**Marquis** [4] - 38:3, 102:24, 156:13, 157:11
**married** [1] - 227:17
**Massachusetts** [1] - 71:14
**massive** [2] - 139:25, 188:22
**masters** [1] - 228:21
**matches** [1] - 96:21
**material** [4] - 114:4, 230:20, 230:21, 252:22
**materials** [4] - 124:9, 126:12, 136:6, 236:5
**MATS** [12] - 149:25, 150:1, 150:2, 150:7, 150:24, 180:12, 203:16, 203:20, 204:2, 204:7, 204:12, 216:19
**matter** [13] - 3:6, 8:4, 76:21, 92:14, 105:10, 105:12, 107:17, 112:15, 114:25, 132:13, 182:8, 197:24, 235:8
**matters** [9] - 7:23, 107:19, 124:6, 127:20, 146:1, 214:17, 215:24, 237:19
**maximum** [1] - 128:17
**Mazur** [1] - 37:10
**MAZUR** [1] - 1:17
**McCarty** [6] - 3:15, 30:10, 30:13, 31:4, 37:11, 132:20
**MCCARTY** [3] - 1:21, 30:10, 30:14
**ME2C** [62] - 19:6, 21:4, 27:8, 37:4, 37:7, 37:17, 39:18, 39:21, 39:23, 40:4, 40:9,

40:13, 102:15, 103:1, 103:12, 103:16, 103:18, 108:11, 108:25, 122:15, 122:19, 122:23, 122:25, 123:6, 123:8, 127:3, 127:9, 127:12, 127:16, 148:5, 149:12, 156:20, 166:24, 167:8, 167:23, 168:8, 179:16, 181:2, 181:8, 183:1, 184:19, 196:13, 197:22, 200:3, 200:15, 202:15, 203:9, 203:15, 204:19, 204:21, 204:24, 205:18, 207:6, 207:15, 216:11, 218:7, 218:8, 219:24, 226:2, 226:4, 226:7, 227:3
**ME2C's** [7] - 30:2, 40:2, 40:10, 108:21, 127:13, 168:4, 207:3
**mean** [40] - 4:16, 28:13, 42:4, 44:11, 45:17, 49:10, 54:23, 58:2, 59:6, 64:17, 67:22, 68:21, 69:16, 69:25, 76:10, 79:4, 88:17, 88:18, 91:18, 91:19, 94:3, 95:4, 96:18, 99:16, 104:6, 123:24, 139:14, 160:21, 162:21, 162:22, 198:21, 203:11, 234:22, 254:16, 261:17, 261:18, 261:25, 262:25, 263:9, 264:16
**meaning** [4] - 120:11, 122:5, 144:5, 233:1
**meaningful** [1] - 235:18
**means** [10] - 34:12, 36:9, 55:12, 96:16, 107:5, 124:10, 128:17, 216:24, 219:15, 219:18
**meant** [2] - 133:4, 155:13
**measurable** [1] - 245:21
**measure** [3] - 209:19, 209:21, 243:6

**measured** [1] - 186:25
**measurement** [1] - 186:24
**measurements** [2] - 115:20, 211:7
**mechanical** [8] - 165:3, 169:19, 228:19, 228:21, 228:23, 229:1, 229:8, 229:16
**mechanism** [2] - 261:2, 261:5
**mechanisms** [2] - 139:7, 140:22
**meet** [9] - 116:18, 150:5, 175:12, 184:24, 187:5, 188:4, 197:6, 204:19, 210:5
**meeting** [9] - 158:15, 161:3, 187:4, 255:9, 259:10, 259:11, 259:21, 265:19, 267:8
**meetings** [2] - 248:16, 248:17
**meets** [3] - 117:12, 158:10, 212:5
**megawatts** [1] - 91:20
**Melinda** [1] - 165:7
**member** [3] - 56:18, 58:25, 62:11
**members** [9] - 34:11, 37:6, 38:23, 38:25, 40:19, 42:22, 54:11, 73:11, 102:4
**memory** [4] - 125:17, 125:18, 125:22
**mental** [1] - 145:1
**mention** [2] - 32:5, 150:18
**mentioned** [21] - 23:20, 34:10, 36:21, 41:4, 64:14, 73:24, 107:24, 126:7, 126:10, 128:5, 141:2, 153:23, 176:11, 224:7, 231:11, 239:14, 240:9, 257:16, 258:21, 259:20, 265:18
**mentioning** [3] - 32:7, 257:20, 257:21
**mercury** [126] - 11:10, 39:22, 41:6, 48:19, 92:5, 93:5, 94:11, 94:13, 133:12, 133:15, 133:18, 133:22, 133:24,

134:6, 134:12, 134:17, 134:24, 135:7, 135:13, 135:14, 135:20, 139:6, 141:8, 141:15, 143:15, 144:10, 144:11, 144:16, 145:23, 147:13, 147:20, 149:9, 149:15, 149:25, 150:8, 151:10, 152:2, 152:5, 152:14, 171:7, 172:17, 173:10, 173:11, 174:8, 174:9, 174:19, 175:9, 175:10, 175:12, 180:14, 180:15, 182:6, 183:16, 185:1, 185:7, 185:17, 185:19, 186:25, 187:1, 188:12, 188:15, 196:25, 203:16, 203:20, 209:24, 211:21, 216:18, 216:22, 216:25, 220:23, 227:7, 233:14, 233:17, 233:25, 234:3, 234:4, 234:5, 234:11, 241:25, 242:8, 242:12, 242:14, 242:15, 242:21, 242:24, 243:1, 243:3, 243:4, 243:6, 243:8, 243:10, 243:17, 243:19, 243:21, 244:4, 244:7, 244:10, 245:10, 245:11, 245:14, 245:17, 245:20, 245:21, 245:23, 248:14, 249:22, 250:5, 250:7, 251:6, 251:14, 251:15, 251:16, 251:18, 251:19, 251:24, 252:8, 253:13, 254:17, 257:11, 257:17, 257:21, 258:3, 258:4, 260:20, 260:24
**merits** [1] - 141:10
**MerSorb** [6] - 15:8, 185:6, 209:9, 209:20, 209:23, 211:20
**MES** [3] - 37:3,

102:15, 269:1
**mess** [3] - 65:23, 188:20, 240:17
**messaging** [1] - 124:24
**met** [9] - 7:24, 112:24, 119:16, 171:12, 174:3, 182:1, 182:6, 222:3
**metadata** [3] - 265:14, 265:16, 266:12
**metal** [1] - 241:25
**metals** [4] - 138:22, 241:24, 242:3, 242:22
**method** [2] - 115:13, 159:1
**methods** [2] - 39:22, 40:2
**Metropolitan** [2] - 91:8, 91:10
**Michael** [1] - 39:5
**Mickey** [1] - 82:2
**mid** [7] - 64:12, 140:25, 170:9, 242:7, 242:9, 242:24, 243:1
**middle** [3] - 18:17, 236:19, 239:9
**MIDWEST** [1] - 1:3
**Midwest** [6] - 3:6, 37:3, 102:14, 131:3, 150:10, 150:20
**might** [48] - 4:21, 33:4, 47:22, 49:14, 52:21, 57:9, 72:12, 73:13, 74:20, 93:6, 95:21, 95:23, 98:22, 102:8, 116:25, 120:4, 136:5, 136:8, 139:22, 142:19, 143:5, 144:6, 144:9, 145:11, 145:15, 155:5, 155:10, 156:25, 159:11, 162:18, 163:3, 182:21, 185:22, 188:9, 188:10, 189:4, 203:8, 225:13, 234:23, 235:21, 237:18, 239:18, 240:5, 261:2, 262:14, 264:12, 265:3
**MIL** [1] - 20:10
**mile** [3] - 166:7, 166:8, 166:11
**million** [27] - 143:7, 157:19, 168:22, 177:7, 177:8,

182:11, 194:6, 201:22, 201:23, 202:1, 202:2, 202:3, 202:10, 208:16, 208:17, 224:19, 226:25, 239:18, 240:7, 240:11
**millions** [14] - 136:23, 154:23, 155:1, 166:23, 170:2, 170:3, 183:23, 195:23, 198:11, 198:12, 208:6, 214:10, 221:19
**mind** [36] - 7:19, 8:12, 12:2, 12:14, 13:3, 13:22, 15:15, 17:6, 49:7, 67:25, 78:1, 78:4, 79:6, 79:20, 83:4, 96:4, 112:16, 112:17, 125:4, 125:20, 128:16, 142:8, 165:19, 165:22, 166:6, 166:9, 182:18, 195:11, 202:25, 206:23, 214:8, 214:18, 253:1, 257:6, 261:23, 265:5
**minds** [1] - 196:9
**mine** [7] - 76:2, 142:6, 142:9, 159:8, 170:19, 231:24, 237:22
**mined** [9] - 139:14, 142:22, 232:3, 237:10, 237:16, 237:19, 238:12, 238:24, 239:20
**mines** [5] - 54:15, 54:16, 56:22, 56:24, 231:25
**miniature** [2] - 145:5, 246:8
**minimally** [1] - 224:15
**minimize** [3] - 140:16, 206:25, 225:7
**minimum** [2] - 207:20, 208:4
**mining** [1] - 170:12
**Minnesota** [6] - 227:22, 227:24, 228:1, 228:2, 228:3, 228:18
**minute** [8] - 79:21, 99:23, 140:10, 140:11, 140:12, 189:22, 190:18, 201:15
**minutes** [13] - 4:15,

25:21, 25:24, 36:17, 36:18, 99:14, 99:20, 133:21, 172:5, 183:13, 218:18, 222:13, 266:25
**miss** [4] - 53:8, 62:18, 86:1, 125:14
**missed** [1] - 187:22
**missing** [1] - 159:14
**Mississippi** [2] - 238:25, 239:1
**Missouri** [3] - 193:21, 193:24, 194:12
**mistake** [7] - 8:8, 8:16, 11:18, 15:21, 17:14, 17:16
**mistaken** [1] - 8:10
**mistakes** [1] - 119:25
**misunderstanding** [1] - 10:16
**Mod** [23] - 26:7, 26:16, 26:18, 26:19, 27:7, 28:3, 28:5, 28:7, 28:8, 28:17, 29:23, 29:24, 29:25, 30:4, 30:15, 31:17, 32:22, 33:3, 38:21, 54:12, 168:10
**mode** [1] - 191:1
**model** [2] - 234:23, 234:24
**modelled** [2] - 220:25, 240:1
**modified** [4] - 265:21, 266:21, 267:6, 267:7
**moisture** [4] - 235:20, 236:1, 236:20, 237:6
**mom** [3] - 137:13, 142:7, 228:7
**moment** [6] - 25:10, 25:19, 87:8, 131:22, 256:7, 256:8
**moments** [1] - 256:9
**Monday** [11] - 36:12, 36:14, 44:5, 52:5, 52:8, 52:12, 52:14, 52:18, 54:4, 128:7, 128:20
**monetary** [1] - 123:8
**money** [21] - 40:4, 77:5, 133:3, 151:21, 151:22, 151:25, 154:21, 155:6, 155:7, 157:16, 157:24, 161:12, 162:16, 162:20, 166:21, 168:16, 188:6, 190:23, 203:13, 217:20, 229:2

**money's** [1] - 95:7
**monitoring** [1] - 141:11
**Montana** [2] - 142:16, 237:11
**month** [2] - 137:22, 168:8
**months** [12] - 27:20, 31:3, 50:20, 63:16, 75:2, 118:17, 174:4, 181:23, 182:3, 182:4, 210:6, 218:2
**morning** [19] - 3:12, 3:21, 4:7, 4:12, 4:21, 17:25, 29:16, 36:16, 46:12, 46:13, 66:2, 66:5, 70:21, 78:15, 78:16, 93:12, 128:10, 128:22, 270:8
**Morris** [7] - 3:23, 38:10, 66:13, 66:19, 67:6, 165:10
**MORRIS** [1] - 2:3
**most** [9] - 45:19, 115:15, 118:14, 227:22, 234:17, 244:19, 255:3, 257:23, 268:16
**Most** [1] - 118:16
**motion** [14] - 5:22, 7:3, 7:11, 8:20, 19:5, 31:21, 32:7, 32:9, 215:13, 215:14, 215:16, 215:25, 269:23
**motions** [1] - 32:2
**motivated** [3] - 133:2, 158:6, 168:16
**motivation** [1] - 166:21
**motivations** [1] - 132:25
**motive** [3] - 154:22, 157:24, 162:16
**Mount** [2] - 194:9, 202:14
**Mountain** [1] - 170:19
**mountain** [2] - 175:3, 193:10
**Mouse** [1] - 82:2
**move** [18] - 18:20, 24:23, 26:8, 69:23, 70:17, 80:9, 85:8, 132:2, 136:17, 149:4, 149:16, 149:17, 153:5, 191:4, 205:8, 238:5, 246:4, 246:23
**moves** [3] - 249:11,

259:25, 266:2
**moving** [2] - 172:7, 218:15
**MR** [200] - 3:12, 3:21, 5:16, 5:20, 6:6, 6:12, 6:14, 8:14, 9:4, 9:8, 10:2, 10:10, 10:13, 10:23, 11:1, 11:23, 11:25, 12:10, 13:13, 14:5, 15:2, 15:22, 16:21, 18:15, 18:20, 18:24, 19:3, 20:9, 20:25, 21:14, 21:21, 21:24, 22:21, 23:6, 23:12, 23:18, 24:3, 24:9, 24:16, 24:22, 26:2, 26:6, 26:13, 27:13, 27:20, 27:25, 28:23, 30:10, 30:14, 32:1, 32:11, 32:19, 33:8, 33:13, 44:25, 45:2, 45:11, 45:17, 45:23, 48:7, 48:10, 48:16, 48:18, 48:22, 49:9, 49:17, 49:20, 49:22, 50:11, 50:16, 50:21, 50:24, 51:3, 51:5, 56:15, 56:17, 56:22, 56:25, 57:5, 57:14, 58:12, 58:15, 59:15, 59:24, 60:3, 60:4, 64:6, 64:8, 64:21, 64:24, 65:2, 65:4, 65:7, 65:10, 65:13, 65:18, 67:8, 67:11, 68:14, 69:1, 69:6, 69:8, 69:15, 70:3, 78:15, 78:17, 79:6, 79:12, 79:17, 80:1, 83:24, 83:25, 84:3, 84:17, 84:24, 85:4, 85:6, 88:22, 89:4, 89:6, 89:16, 90:5, 90:7, 93:12, 93:18, 93:22, 93:25, 94:7, 94:24, 95:10, 95:16, 95:19, 96:12, 96:14, 97:12, 98:8, 98:11, 98:15, 98:24, 99:3, 99:13, 99:18, 130:10, 131:2, 131:12, 131:19, 131:21, 131:25, 132:5, 153:7, 153:12, 164:5, 164:13, 218:17, 218:21, 222:23, 223:13, 223:16, 223:19, 223:24, 224:14, 225:10, 225:20, 246:23,

247:1, 247:5, 248:2, 249:11, 249:14, 249:18, 250:23, 250:25, 253:8, 253:9, 256:15, 256:17, 259:25, 260:3, 260:7, 261:8, 261:10, 262:7, 262:9, 263:12, 263:14, 263:20, 264:2, 265:8, 265:10, 266:2, 266:5, 266:11, 266:15, 266:19, 267:13, 268:9, 268:12, 269:14, 269:16, 269:22

**MRI** [7] - 63:1, 63:19, 63:21, 63:24, 64:8, 65:11, 65:23

**multiblock** [1] - 198:17

**multimillion** [1] - 168:14

**Multiple** [1] - 238:2

**multiple** [3] - 65:22, 192:15, 258:9

**multistory** [2] - 192:5, 192:25

**Murphy** [4] - 70:18, 70:19, 70:23, 79:18

**muscles** [1] - 64:19

**musical** [3] - 52:24, 53:15, 101:5

**must** [32] - 30:5, 32:23, 87:15, 92:19, 104:3, 104:24, 105:17, 105:21, 106:3, 108:5, 108:21, 108:23, 111:10, 112:22, 120:15, 120:19, 122:1, 122:11, 122:15, 123:8, 124:4, 124:19, 125:12, 125:24, 127:21, 158:22, 185:1, 186:6, 187:11, 219:18, 220:2

**Mylan** [2] - 157:12, 157:15

## N

**Nalco** [1] - 205:12

**name** [7] - 73:19, 73:24, 132:16, 164:22, 223:5, 225:24

**named** [2] - 39:14, 39:18

**names** [5] - 37:21, 73:15, 114:7, 138:13, 191:14

**nations** [1] - 234:5

**natural** [3] - 60:6, 229:7, 232:16

**naturally** [3] - 30:3, 68:17, 83:12

**nature** [7] - 10:15, 30:21, 39:16, 60:20, 76:7, 90:11, 115:9

**near** [5] - 52:24, 142:18, 175:4, 228:3, 237:21

**nearly** [2] - 116:6, 256:1

**neat** [2] - 132:22, 167:14

**necessarily** [8] - 25:7, 31:16, 49:6, 57:25, 58:1, 60:18, 73:23, 224:18

**necessary** [3] - 126:15, 126:20, 269:7

**neck** [1] - 63:1

**need** [27] - 4:16, 18:4, 18:23, 24:2, 25:22, 26:1, 31:23, 34:21, 42:23, 54:18, 55:11, 79:23, 96:1, 121:22, 129:1, 129:2, 129:4, 129:17, 139:15, 152:18, 159:19, 224:18, 225:7, 231:9, 239:22, 268:7, 269:3

**needed** [13] - 28:23, 109:21, 110:8, 163:14, 199:12, 204:9, 209:23, 235:2, 245:25, 248:10, 249:2, 250:21, 251:3

**needing** [1] - 150:25

**needs** [6] - 13:24, 16:10, 33:5, 112:21, 134:11, 153:10

**negative** [1] - 264:12

**negotiated** [2] - 30:25, 148:17

**Nemunaitis** [7] - 3:13, 5:15, 6:5, 18:16, 25:25, 37:10, 132:20

**NEMUNAITIS** [20] - 1:21, 3:12, 5:16, 5:20, 6:6, 6:12, 6:14, 8:14, 9:8, 10:2,

10:10, 10:13, 10:23, 11:1, 11:23, 18:20, 18:24, 26:2, 32:1, 32:11

**nerd** [1] - 177:20

**nerdiest** [1] - 177:23

**nerve** [1] - 63:20

**nervous** [2] - 78:3, 134:1

**networking** [1] - 125:1

**neurological** [1] - 134:7

**neutral** [1] - 251:16

**never** [21] - 25:8, 70:3, 82:3, 133:22, 148:20, 176:4, 180:14, 199:18, 199:19, 199:20, 201:12, 213:3, 214:5, 214:11, 217:5, 217:10, 221:20, 221:24, 230:13

**new** [12] - 19:5, 111:12, 111:18, 111:20, 112:14, 112:22, 114:17, 119:14, 149:22, 156:1, 219:15

**newly** [1] - 263:2

**newspaper** [2] - 123:25, 124:11

**next** [46] - 6:16, 8:17, 11:5, 18:19, 18:23, 27:8, 36:12, 36:22, 38:18, 39:3, 41:2, 41:21, 46:9, 51:8, 52:12, 61:3, 62:13, 64:12, 65:25, 70:17, 72:7, 80:9, 85:8, 86:16, 88:12, 89:7, 89:18, 100:22, 108:5, 121:4, 122:19, 123:3, 127:8, 128:7, 174:21, 186:22, 193:21, 193:23, 194:23, 205:16, 211:17, 211:23, 246:5, 252:14, 262:4, 264:1

**nice** [3] - 57:10, 98:22, 186:10

**night** [5] - 4:20, 29:1, 29:10, 29:15, 267:20

**Niksa** [5] - 39:7, 220:20, 221:6, 221:13

**nine** [3] - 27:8, 27:20, 188:2

**nitrogen** [2] - 135:21

**nitrogen-based** [1] - 135:21

**nitrous** [3] - 171:7, 171:9, 174:8

**no-brainer** [1] - 190:15

**nobody** [2] - 72:24, 134:8

**non** [12] - 6:20, 6:22, 12:22, 183:3, 183:19, 202:7, 202:23, 209:5, 215:2, 219:4, 221:18, 233:4

**non-accused** [2] - 6:20, 6:22

**non-infringing** [8] - 12:22, 183:3, 183:19, 202:7, 202:23, 209:5, 215:2, 221:18

**non-provisional** [1] - 219:4

**non-varying** [1] - 233:4

**noncomparable** [11] - 19:1, 19:10, 19:11, 19:17, 22:10, 22:25, 23:7, 23:9, 23:11, 23:17, 24:11

**none** [8] - 45:11, 54:13, 66:16, 107:4, 136:12, 199:22, 216:7, 216:21

**nonobvious** [2] - 119:14, 219:18

**nonprofit** [2] - 141:20, 241:7

**nonreactive** [2] - 251:18, 251:20

**nonselected** [1] - 99:7

**normal** [1] - 219:5

**normally** [2] - 128:8, 252:19

**north** [1] - 72:17

**North** [8] - 141:21, 143:17, 192:18, 210:4, 212:4, 228:19, 239:4, 241:5

**northeast** [2] - 52:6, 142:15

**note** [3] - 20:16, 98:13, 125:13

**note-taking** [1] - 125:13

**notebook** [1] - 126:8

**notebooks** [2] - 121:25, 181:16

**noted** [2] - 108:11,

109:3

**notepad** [1] - 125:6

**notes** [8] - 125:7, 125:11, 125:16, 125:18, 125:19, 125:24, 126:1, 126:2

**nothing** [6] - 104:16, 109:15, 114:23, 192:6, 196:22, 198:13

**notice** [10] - 52:16, 115:18, 117:17, 121:13, 186:11, 187:6, 187:7, 203:18, 211:25, 212:1

**noticed** [1] - 181:9

**notion** [2] - 159:10, 159:13

**notions** [2] - 94:15, 134:3

**novel** [1] - 219:14

**November** [5] - 12:25, 29:15, 29:17, 118:17

**NOX** [1] - 171:10

**Nox** [22] - 135:21, 171:10, 174:9, 174:10, 175:13, 175:14, 175:15, 183:16, 185:1, 185:5, 185:17, 185:19, 187:18, 191:14, 196:22, 196:25, 209:24, 211:15, 211:20, 220:24, 261:16, 261:18

**NRG** [1] - 168:19

**nuclear** [3] - 73:21, 74:7, 74:8

**Number** [58] - 36:20, 37:2, 37:5, 37:7, 37:15, 38:5, 38:6, 38:17, 38:22, 39:2, 40:16, 40:19, 40:23, 41:4, 41:8, 41:10, 41:12, 41:14, 41:16, 42:8, 42:12, 43:9, 46:8, 46:10, 51:9, 54:10, 56:3, 61:5, 61:18, 65:19, 66:1, 66:10, 66:12, 70:11, 70:18, 80:10, 80:12, 80:13, 85:9, 90:16, 96:24, 96:25, 97:1, 97:2, 97:3, 98:4, 103:7, 103:9

**number** [58] - 5:7, 5:20, 7:4, 9:11, 9:20, 11:3, 14:7, 18:24,

20:11, 26:10, 26:11, 26:14, 35:24, 42:18, 56:23, 71:4, 80:24, 100:6, 100:7, 100:8, 100:9, 100:10, 100:16, 100:17, 100:18, 100:19, 100:22, 100:23, 100:25, 101:1, 101:2, 114:6, 121:9, 128:17, 129:25, 146:19, 171:19, 173:5, 178:2, 223:25, 231:18, 243:2, 263:23
**numbered** [1] - 115:16
**Numbers** [1] - 103:3
**numbers** [6] - 6:9, 33:19, 96:18, 114:13, 114:14, 177:24
**numerous** [1] - 185:19
**nurse** [1] - 43:22

## O

**o'clock** [1] - 266:9
**O'Keefe** [11] - 39:6, 160:8, 160:10, 160:18, 161:5, 180:9, 180:10, 204:1, 206:4, 216:12, 217:14
**oath** [5] - 21:7, 34:24, 42:5, 104:7, 205:4
**Obama** [2] - 171:3, 171:4
**object** [6] - 19:4, 19:8, 19:20, 24:24, 45:25, 188:11
**objected** [1] - 131:10
**objection** [21] - 7:1, 19:4, 20:18, 65:18, 79:25, 80:1, 82:7, 105:5, 105:8, 105:9, 105:12, 131:12, 246:25, 249:13, 249:14, 260:2, 260:3, 266:4, 266:5, 269:13
**objections** [5] - 7:12, 9:11, 9:13, 65:17, 105:3
**obligation** [1] - 105:4
**obligations** [1] - 255:9
**observation** [1] - 30:21
**observe** [1] - 107:5
**observed** [1] - 30:16

**observing** [1] - 70:12
**obsolete** [2] - 232:17, 232:18
**obtain** [1] - 248:13
**obtained** [1] - 20:16
**obviate** [1] - 32:16
**obvious** [4] - 112:22, 114:17, 219:19, 219:22
**obviously** [12] - 57:4, 64:2, 68:15, 86:22, 132:1, 158:8, 170:11, 197:16, 219:25, 224:1, 228:12, 240:8
**occasionally** [1] - 118:15
**occasions** [1] - 255:6
**occur** [3] - 128:13, 252:20, 261:2
**occurred** [3] - 27:20, 27:21, 118:20
**occurring** [1] - 244:16
**occurs** [4] - 105:18, 112:19, 121:16, 245:3
**October** [1] - 217:3
**OF** [2] - 1:2, 1:9
**offer** [3] - 22:6, 127:22, 151:1
**offered** [2] - 24:5, 105:6
**offering** [1] - 110:25
**office** [6] - 21:5, 117:16, 118:4, 118:5, 118:7, 118:20
**Office** [5] - 109:21, 111:5, 112:25, 113:2, 219:6
**offices** [2] - 37:14, 38:14
**official** [1] - 110:22
**Official** [1] - 270:17
**officially** [1] - 255:10
**offsets** [1] - 136:12
**often** [10] - 103:6, 113:2, 118:14, 128:25, 151:7, 156:24, 186:16, 201:10, 206:24, 231:25
**oil** [2] - 47:15, 94:6
**old** [5] - 133:19, 134:18, 169:9, 170:19, 227:13
**older** [2] - 169:9, 227:23
**Olson** [1] - 39:6
**omitted** [1] - 224:20
**on0to** [1] - 147:19

**Once** [3] - 112:7, 118:20, 119:2
**once** [13] - 9:11, 36:4, 64:18, 64:19, 84:5, 98:17, 144:2, 144:20, 169:1, 173:9, 231:20, 242:17, 252:3
**One** [1] - 117:3
**one** [210] - 4:2, 4:3, 4:24, 5:4, 5:8, 5:9, 5:22, 6:12, 7:14, 7:15, 9:4, 10:2, 10:3, 10:5, 10:12, 10:13, 10:24, 12:3, 14:8, 16:13, 18:19, 18:23, 19:12, 25:22, 26:6, 26:24, 27:9, 27:23, 28:14, 29:2, 29:3, 30:18, 31:10, 31:12, 32:1, 32:2, 32:5, 36:5, 41:22, 42:13, 43:16, 43:21, 44:11, 49:2, 49:8, 51:22, 53:1, 53:2, 55:5, 55:14, 55:18, 57:15, 58:21, 59:5, 59:12, 60:11, 61:17, 62:9, 62:16, 66:8, 67:4, 67:19, 67:21, 68:19, 70:9, 71:1, 71:8, 72:10, 73:10, 75:8, 75:9, 77:5, 77:20, 79:1, 80:22, 80:25, 82:17, 82:24, 83:10, 84:7, 85:17, 85:21, 88:5, 88:11, 88:22, 89:17, 90:22, 91:1, 92:15, 92:22, 93:6, 93:7, 95:20, 99:24, 104:13, 106:22, 108:7, 109:16, 112:22, 115:10, 115:12, 118:21, 122:17, 122:21, 122:24, 123:4, 128:9, 128:10, 128:24, 129:20, 130:14, 131:2, 132:22, 137:24, 139:9, 141:24, 142:1, 143:10, 143:20, 144:8, 147:14, 154:11, 156:9, 156:13, 159:11, 159:13, 161:19, 165:1, 168:3, 170:6, 171:16, 174:21, 176:25, 177:1, 177:25, 178:20,

180:2, 180:5, 180:6, 183:2, 184:5, 185:5, 185:8, 189:9, 191:18, 192:13, 192:17, 193:2, 193:6, 193:18, 193:21, 193:23, 194:15, 195:9, 198:13, 198:22, 199:24, 200:4, 200:10, 200:16, 201:20, 202:6, 205:5, 208:15, 210:8, 210:11, 210:12, 213:2, 215:9, 216:3, 217:23, 219:5, 219:8, 219:10, 219:11, 219:12, 220:3, 220:5, 220:9, 223:13, 223:20, 223:21, 231:17, 235:8, 235:18, 236:15, 236:16, 236:21, 237:3, 237:18, 238:13, 239:13, 240:5, 240:9, 245:17, 252:1, 256:9, 263:24, 264:1, 264:14, 266:12, 268:19, 269:1, 269:10, 269:11, 269:22
**one's** [1] - 44:15
**one-person** [1] - 88:11
**one-time** [1] - 168:3
**ones** [14] - 28:20, 51:20, 76:22, 143:4, 155:13, 191:1, 192:1, 195:4, 195:5, 199:3, 201:5, 201:11, 210:4
**onion** [1] - 184:5
**online** [2] - 84:11, 113:15
**open** [4] - 49:7, 100:3, 125:4, 165:19
**opening** [28] - 5:17, 6:7, 19:7, 19:9, 19:21, 20:4, 23:13, 23:21, 23:22, 25:4, 25:20, 26:8, 32:6, 32:8, 127:3, 127:4, 127:6, 131:4, 131:8, 131:18, 164:11, 166:10, 181:10, 224:16, 226:11, 226:12, 244:23,

258:15
**openings** [3] - 24:2, 98:23, 130:16
**operate** [2] - 95:8, 248:9
**operates** [1] - 39:1
**operation** [5] - 176:15, 186:2, 187:25, 188:7, 234:19
**Operations** [29] - 37:23, 37:24, 102:18, 102:19, 102:20, 152:21, 153:22, 154:1, 154:7, 154:13, 155:24, 156:2, 156:11, 156:15, 159:22, 169:23, 192:19, 193:8, 193:19, 193:22, 194:9, 194:10, 194:13, 208:20, 214:15
**operations** [13] - 50:6, 153:25, 154:10, 154:20, 156:1, 156:2, 191:8, 191:24, 192:8, 192:9, 192:14, 193:4, 194:7
**operative** [1] - 216:2
**operator** [4] - 160:11, 199:22, 217:7, 254:23
**operators** [1] - 199:23
**opined** [1] - 19:10
**opining** [1] - 32:14
**opinion** [12] - 9:14, 9:16, 10:7, 10:18, 22:6, 23:7, 23:16, 24:23, 59:25, 107:19, 125:3, 221:8
**opinions** [11] - 19:15, 28:24, 107:22, 107:23, 216:12, 216:20, 217:10, 217:14, 217:16, 217:19, 221:7
**opportunity** [8] - 20:5, 31:2, 99:13, 107:5, 127:17, 132:6, 215:22, 241:17
**opposed** [3] - 6:2, 79:9, 220:16
**opposing** [1] - 69:20
**opposite** [3] - 59:11, 108:20, 183:14
**Ops** [1] - 193:24
**optimism** [1] - 263:6
**optimistic** [1] - 263:10

optimum [1] - 261:11
options [1] - 259:1
or... [1] - 99:15
oral [1] - 20:10
orange [1] - 143:17
order [22] - 16:10, 20:10, 20:13, 80:11, 97:5, 97:9, 97:20, 97:25, 98:1, 98:2, 98:7, 116:11, 131:6, 136:21, 178:16, 200:12, 215:25, 239:16, 240:6, 240:18, 245:13, 257:1
ordered [3] - 63:9, 65:21, 215:19
orders [5] - 8:19, 12:3, 130:21, 224:2, 256:24
ordinary [4] - 112:23, 116:20, 122:4, 219:20
organization [2] - 189:21, 191:16
organizations [1] - 179:12
organize [1] - 132:9
orient [1] - 172:6
oriented [3] - 176:11, 184:5, 206:13
original [8] - 117:5, 146:21, 147:5, 147:24, 148:23, 178:10, 215:24, 219:3
originally [3] - 54:17, 58:20, 155:18
originals [1] - 81:14
oscillate [1] - 140:10
ostrich [1] - 201:7
otherwise [8] - 5:5, 25:12, 31:11, 130:1, 155:11, 173:7, 188:9, 190:10
outgoing [1] - 118:11
outlier [1] - 168:18
outline [2] - 128:3, 193:3
outlining [2] - 127:3, 127:4
outside [10] - 58:9, 106:2, 106:11, 106:12, 106:18, 113:1, 175:1, 175:7, 185:3, 237:24
outsized [2] - 90:13, 99:24
overall [5] - 118:9, 199:2, 199:6,

232:22, 235:6
overcome [1] - 118:2
overlooked [1] - 120:1
overrule [1] - 105:12
oversee [1] - 242:4
overview [2] - 172:12, 206:13
owe [3] - 136:4, 136:9, 136:11
own [12] - 20:6, 79:3, 82:22, 86:8, 124:3, 126:1, 149:3, 153:1, 153:2, 169:20, 191:12, 204:4
owned [1] - 146:15
owner [3] - 103:1, 110:23, 111:24
owner's [1] - 121:5
owners [1] - 121:7
ownership [1] - 156:25
owns [3] - 39:21, 80:4, 151:17
oxidant [1] - 255:5
oxidation [3] - 252:6, 260:20, 261:16
oxide [3] - 171:7, 171:9, 174:8
oxides [1] - 135:21
oxidizes [1] - 260:23
oxidizing [1] - 253:23

## P

P-A-V-L-I-S-H [1] - 223:8
p.m [2] - 36:19, 128:9
page [39] - 9:12, 11:3, 11:5, 12:6, 26:21, 35:10, 35:12, 35:13, 35:14, 97:20, 114:4, 114:5, 114:13, 114:18, 118:24, 186:21, 186:22, 205:8, 210:16, 210:20, 210:25, 211:17, 211:23, 212:16, 213:1, 247:15, 250:24, 260:14, 260:15, 260:16, 260:18, 262:6, 263:24, 264:1
pages [6] - 35:7, 35:17, 212:16, 260:10, 263:20, 266:24
paid [12] - 151:18, 156:20, 157:15, 157:20, 163:2,

168:4, 192:3, 192:4, 224:19, 225:2, 226:14, 226:15
pain [4] - 63:14, 63:18, 64:15
paired [1] - 191:17
Panczak [1] - 39:8
panel [4] - 33:15, 35:1, 35:2, 101:18
paper [3] - 113:16, 118:13, 118:15
papers [6] - 129:18, 136:7, 219:17, 221:1, 221:2, 233:22
paragraph [8] - 23:13, 167:20, 167:21, 168:1, 168:2, 168:11, 211:18, 263:3
paragraphs [1] - 115:16
parallel [1] - 149:11
parameters [2] - 14:24, 247:12
Parish [8] - 137:11, 137:18, 138:3, 139:10, 153:13, 153:22, 191:15, 194:14
parish [1] - 240:9
part [53] - 4:7, 4:21, 4:22, 14:2, 15:23, 17:3, 20:22, 28:18, 31:8, 31:18, 32:15, 34:10, 35:6, 55:24, 70:11, 71:12, 76:19, 76:23, 77:3, 78:8, 107:4, 115:4, 115:6, 115:15, 116:16, 139:25, 144:9, 148:10, 160:16, 161:21, 161:22, 166:2, 170:22, 172:22, 172:23, 179:16, 180:22, 181:14, 183:1, 183:5, 196:17, 198:14, 203:23, 206:20, 211:15, 218:15, 227:7, 249:7, 252:12, 257:9, 261:14, 265:5
participation [1] - 34:6
particles [3] - 245:6, 245:8, 252:24
particular [18] - 7:25, 10:13, 18:10, 21:8, 112:16, 115:14, 185:17, 197:14,

198:14, 199:6, 227:8, 235:7, 236:13, 244:1, 251:9, 252:7, 260:14, 264:6
particularly [3] - 227:23, 243:20, 250:14
particulars [3] - 11:7, 16:18, 16:22
particulate [5] - 145:4, 246:12, 247:13, 247:17, 248:4
particulates [1] - 242:11
parties [24] - 5:1, 5:4, 5:12, 7:20, 30:21, 31:1, 32:3, 34:19, 36:23, 37:20, 38:19, 39:17, 40:14, 69:4, 83:14, 97:6, 100:14, 104:23, 126:13, 127:8, 129:15, 152:21, 200:8, 207:10
parties' [2] - 97:5, 108:20
partner [4] - 90:12, 165:8, 165:24
partners [8] - 156:24, 157:9, 157:13, 157:20, 165:1, 169:5, 195:7, 250:15
Partners [4] - 38:1, 102:22, 156:1, 194:13
partnership [2] - 190:4, 234:6
parts [16] - 75:9, 114:2, 115:23, 121:9, 137:14, 142:4, 143:18, 146:17, 172:7, 191:11, 230:11, 231:9, 231:10, 245:13, 255:15, 265:3
party [22] - 21:7, 26:17, 28:5, 29:24, 30:1, 41:24, 49:15, 55:5, 79:1, 108:13, 108:17, 109:5, 119:12, 123:16, 128:17, 157:11, 189:14, 189:19, 191:19, 218:8
pass [7] - 9:1, 98:8, 110:17, 123:17, 189:24, 189:25, 223:1

passed [8] - 56:18, 157:7, 171:3, 189:16, 203:16, 203:17, 229:17, 229:20
passes [1] - 186:17
passing [2] - 69:17, 69:25
past [7] - 9:11, 59:12, 67:15, 69:3, 69:24, 118:13, 226:7
Patent [9] - 103:3, 103:7, 103:9, 109:21, 111:5, 112:18, 112:25, 113:2, 219:6
patent [152] - 39:19, 39:20, 39:21, 40:20, 40:22, 40:24, 40:25, 42:2, 49:13, 55:5, 55:8, 75:5, 75:6, 75:19, 76:14, 76:25, 77:6, 78:19, 78:20, 78:21, 80:4, 81:3, 81:4, 81:7, 81:8, 81:17, 82:1, 98:24, 102:9, 102:13, 103:8, 108:7, 108:13, 109:6, 109:7, 109:19, 110:4, 110:6, 110:10, 110:22, 111:1, 111:2, 111:6, 111:8, 111:17, 111:21, 111:23, 112:2, 112:3, 112:7, 112:9, 112:11, 112:12, 112:15, 112:21, 113:4, 113:8, 113:9, 113:10, 113:14, 113:20, 113:23, 113:24, 114:1, 114:2, 114:6, 114:9, 114:10, 114:11, 115:4, 115:7, 115:15, 115:22, 115:24, 116:1, 116:4, 116:6, 116:11, 116:18, 117:1, 117:13, 117:22, 118:16, 118:22, 118:24, 118:25, 119:2, 119:3, 119:4, 119:11, 119:14, 119:17, 119:19, 120:3, 120:6, 120:11, 120:15, 120:17, 120:20,

121:5, 121:6, 121:8, 121:11, 121:12, 121:15, 121:16, 121:17, 121:19, 121:20, 126:9, 146:14, 146:15, 146:24, 149:2, 158:8, 158:11, 158:15, 158:19, 161:11, 161:16, 162:19, 172:16, 172:18, 172:21, 177:18, 177:19, 177:20, 177:25, 178:1, 178:4, 178:5, 178:11, 179:13, 181:13, 187:12, 187:17, 196:6, 212:8, 213:14, 213:16, 214:3, 214:4, 218:11, 219:1, 219:9, 219:14, 219:18, 258:23

**patent-in-suit** [1] - 78:19

**patentability** [1] - 119:15

**patentable** [1] - 114:17

**patented** [7] - 40:2, 59:21, 78:23, 121:12, 162:19, 174:19, 175:17

**patentee's** [1] - 112:2

**patents** [95] - 6:16, 6:19, 6:22, 28:11, 30:2, 39:22, 39:24, 40:7, 40:10, 42:4, 55:3, 77:15, 81:17, 81:19, 81:24, 82:11, 82:14, 82:15, 82:21, 83:3, 83:10, 92:4, 93:3, 94:9, 102:11, 103:1, 103:4, 103:5, 103:6, 103:10, 103:13, 103:14, 103:19, 103:20, 104:6, 108:12, 109:5, 109:20, 109:22, 110:12, 110:15, 110:17, 114:15, 114:19, 116:7, 116:12, 119:7, 122:18, 122:22, 122:25, 123:5, 126:11, 136:23, 146:20, 147:1, 155:3, 157:23, 167:11,

167:18, 167:23, 168:5, 168:9, 169:2, 173:11, 174:5, 174:18, 175:10, 175:14, 176:3, 176:25, 177:24, 177:25, 180:3, 181:24, 183:17, 184:13, 184:20, 185:19, 187:11, 187:21, 188:2, 195:24, 196:12, 207:24, 213:11, 213:19, 216:10, 218:7, 219:17, 220:12, 226:1

**patents-at-issue** [1] - 177:25

**patents-in-suit** [8] - 6:22, 103:4, 103:13, 103:14, 103:19, 103:20, 126:11, 226:1

**path** [2] - 150:9, 150:22

**patient** [2] - 43:4, 126:18

**patiently** [1] - 133:21

**patients** [1] - 73:9

**Patricia** [2] - 66:22, 70:5

**Paul** [3] - 11:25, 38:12, 164:23

**PAUL** [1] - 2:7

**pause** [1] - 191:25

**Pavlish** [36] - 39:5, 135:4, 135:5, 135:9, 135:16, 141:19, 142:3, 143:14, 145:7, 146:6, 148:6, 148:11, 150:10, 150:19, 157:24, 160:15, 160:16, 160:23, 175:11, 178:6, 209:11, 222:25, 223:1, 223:7, 225:24, 225:25, 227:5, 227:21, 228:24, 243:20, 256:13, 264:3, 266:20, 267:24

**PAVLISH** [1] - 223:9

**Pavlish's** [2] - 136:22, 147:24

**pay** [5] - 118:22, 161:24, 162:5, 162:6, 226:24

**paying** [1] - 151:9

**payment** [2] - 168:3,

218:4

**PEARSON** [11] - 1:22, 19:3, 21:24, 22:21, 23:6, 23:12, 23:18, 24:3, 24:9, 24:16, 24:22

**Pearson** [5] - 3:15, 19:2, 21:22, 37:11, 132:21

**peek** [1] - 167:2

**peel** [2] - 184:4, 195:2

**pen** [3] - 35:22, 35:24, 125:6

**pending** [3] - 37:16, 38:15, 214:9

**Pennsylvania** [2] - 52:6, 91:8

**people** [40] - 36:24, 38:24, 39:14, 50:14, 55:15, 69:3, 73:12, 81:18, 82:22, 83:3, 87:2, 93:4, 96:23, 110:13, 111:24, 120:4, 134:23, 139:11, 140:17, 151:6, 153:19, 154:18, 157:13, 157:14, 157:15, 161:4, 163:11, 163:13, 170:13, 173:14, 186:14, 221:18, 228:6, 238:1, 243:9, 243:13, 243:15, 243:19, 250:18

**people's** [2] - 132:24, 133:2

**per** [12] - 4:9, 5:9, 7:23, 42:21, 47:10, 130:15, 130:20, 138:4, 140:10, 140:11, 240:7, 245:13

**percent** [39] - 15:7, 15:8, 62:24, 113:14, 135:14, 139:23, 150:8, 152:10, 152:14, 155:19, 163:7, 174:9, 174:10, 175:9, 175:13, 175:14, 175:20, 176:24, 177:8, 185:1, 185:2, 187:18, 203:21, 204:10, 207:18, 208:3, 208:5, 208:19, 211:20, 211:22, 232:8, 232:11, 254:11, 254:17

**percentage** [2] - 139:22, 232:12

**percentages** [1] - 207:22

**percipient** [1] - 31:1

**peremptories** [3] - 99:7, 99:15, 100:2

**peremptory** [7] - 34:20, 61:2, 70:8, 97:6, 97:7, 97:21, 100:13

**perfect** [1] - 120:2

**perfectly** [1] - 265:4

**perform** [4] - 104:12, 181:11, 181:17, 243:11

**performance** [2] - 234:19, 235:6

**performing** [1] - 159:1

**perhaps** [2] - 8:5, 206:14

**period** [25] - 6:21, 7:25, 8:6, 11:15, 12:9, 13:1, 13:11, 13:14, 13:18, 13:19, 13:20, 14:2, 15:4, 43:18, 64:20, 99:23, 111:2, 176:21, 177:5, 177:6, 191:2, 195:19, 208:16, 210:7, 221:14

**periodic** [3] - 133:13, 133:15, 188:17

**periods** [1] - 214:1

**permission** [6] - 40:2, 78:24, 119:5, 148:18, 163:9, 171:20

**permit** [1] - 123:12

**permitted** [1] - 107:18

**person** [15] - 24:7, 66:21, 88:10, 88:11, 97:14, 107:12, 107:15, 113:21, 117:21, 119:3, 141:17, 166:3, 169:8, 219:19, 244:17

**person's** [1] - 166:4

**personal** [8] - 21:3, 21:6, 21:15, 21:17, 25:13, 75:25, 78:6, 126:1

**personality** [1] - 226:3

**personally** [5] - 42:7, 42:9, 75:11, 76:2, 104:9

**perspective** [6] - 132:10, 174:16, 176:8, 179:1, 182:8,

187:20

**persuade** [3] - 120:16, 120:19, 205:23

**persuaded** [1] - 199:20

**pertains** [1] - 226:10

**pertinent** [1] - 117:4

**pester** [1] - 205:23

**Peter** [1] - 37:10

**PETER** [1] - 1:17

**Ph.D** [3] - 185:14, 220:20, 220:21

**pharmaceutical** [1] - 157:12

**phase** [4] - 27:19, 27:21, 72:7, 242:15

**Phil** [3] - 160:25, 161:7, 161:10

**Philip** [5] - 17:2, 24:23, 39:6, 160:10

**Philly** [2] - 53:2, 73:3

**Phils** [1] - 161:5

**phone** [3] - 124:23, 136:7

**photographs** [1] - 22:3

**phrase** [1] - 109:13

**phrases** [4] - 120:11, 121:22, 122:2

**physical** [3] - 61:22, 62:3, 63:12

**physically** [1] - 244:17

**pick** [1] - 266:23

**picked** [1] - 198:25

**pictorial** [1] - 247:18

**picture** [5] - 136:14, 137:4, 142:24, 171:16, 239:8

**pictures** [3] - 153:13, 192:16, 217:12

**piece** [4] - 24:2, 111:23, 159:14, 183:4

**pieces** [2] - 183:2, 183:3

**pile** [14] - 89:13, 137:16, 137:18, 151:17, 175:1, 175:4, 175:7, 193:3, 193:4, 193:9, 194:19, 230:16, 231:11

**pilot** [1] - 262:16

**pinpoint** [1] - 259:7

**pipe** [3] - 48:24, 50:8, 50:11

**pipefitter** [2] - 47:5, 48:12

**pipefitters** [2] - 49:4, 50:4

**pipes** [1] - 138:14
**piping** [1] - 47:10
**pitcher** [1] - 144:1
**place** [18] - 49:3, 55:16, 72:13, 87:5, 89:17, 89:19, 95:24, 120:3, 140:6, 149:19, 152:9, 162:9, 189:11, 199:12, 199:14, 209:11, 217:5, 269:20
**places** [6] - 139:13, 149:20, 211:4, 237:16, 259:2, 260:14
**placing** [1] - 98:7
**plain** [1] - 157:25
**plaintiff** [27] - 14:5, 20:11, 20:23, 21:7, 21:16, 30:11, 32:21, 32:24, 49:11, 49:12, 77:14, 85:4, 90:4, 98:10, 148:23, 180:19, 181:10, 182:16, 196:17, 200:3, 215:21, 249:11, 259:25, 266:2, 268:9, 269:14, 270:2
**Plaintiff** [2] - 1:24, 223:11
**plaintiff's** [2] - 3:2, 19:12
**Plaintiffs** [2] - 1:5, 268:21
**plaintiffs** [21] - 3:13, 20:17, 28:16, 37:2, 37:6, 37:19, 48:6, 69:14, 82:11, 83:10, 92:19, 98:9, 102:14, 102:15, 102:16, 177:16, 222:24, 246:23, 268:19, 268:22, 269:10
**Plaintiffs'** [7] - 7:3, 247:3, 249:16, 260:5, 265:9, 265:11, 266:3
**plaintiffs'** [49] - 3:11, 9:15, 15:18, 21:1, 21:9, 21:13, 21:19, 25:11, 25:15, 27:16, 28:11, 28:24, 30:8, 30:23, 31:5, 43:13, 44:23, 45:10, 46:16, 51:14, 56:12, 57:16, 58:11, 60:23, 61:14, 66:7, 68:13, 70:24, 77:21, 80:19, 85:14,

90:19, 131:17, 132:10, 164:3, 203:25, 204:4, 222:20, 225:17, 246:18, 246:21, 246:24, 248:20, 248:22, 259:14, 260:1, 260:8, 266:7, 269:13
**plan** [4] - 99:8, 130:14, 168:8, 269:11
**planned** [2] - 52:7, 52:18
**planner** [1] - 52:22
**planning** [2] - 52:5, 53:3
**plans** [1] - 44:8
**Plant** [1] - 156:14
**plant** [145] - 15:5, 15:11, 15:14, 39:2, 40:1, 40:6, 41:9, 46:23, 47:14, 48:16, 49:1, 49:3, 49:11, 49:24, 49:25, 50:5, 50:6, 60:2, 72:17, 74:6, 74:8, 74:9, 74:11, 90:25, 91:5, 91:11, 91:14, 92:17, 93:14, 93:21, 95:13, 95:22, 95:24, 96:5, 122:17, 122:21, 135:15, 137:3, 137:11, 137:18, 138:3, 139:10, 142:24, 143:9, 143:25, 145:6, 151:9, 151:16, 151:17, 151:19, 151:20, 153:12, 153:13, 153:17, 153:23, 154:2, 154:15, 160:11, 162:7, 168:5, 171:6, 171:21, 173:4, 173:19, 174:5, 174:25, 175:1, 175:6, 175:22, 176:5, 179:20, 180:1, 180:11, 180:22, 180:24, 181:11, 182:9, 183:9, 185:3, 187:15, 188:8, 189:15, 190:1, 190:7, 191:17, 193:11, 193:16, 194:21, 198:19, 199:1, 199:2, 199:12, 199:14, 199:18, 199:22,

199:23, 200:16, 200:19, 201:1, 202:4, 204:7, 207:13, 208:15, 209:18, 210:7, 212:24, 213:3, 213:24, 214:4, 217:4, 217:6, 217:7, 217:8, 221:25, 230:17, 231:25, 232:3, 234:15, 234:19, 235:8, 239:10, 239:13, 240:5, 240:6, 240:8, 240:9, 240:10, 240:14, 240:21, 242:16, 244:8, 246:7, 246:8, 254:11, 254:22, 265:2, 265:3
**plant's** [2] - 181:2, 197:9
**plants** [143] - 8:1, 8:6, 11:8, 11:9, 11:15, 16:19, 17:4, 17:7, 19:6, 39:23, 41:6, 41:17, 49:14, 50:13, 55:7, 59:8, 60:21, 73:25, 74:2, 74:20, 92:8, 94:5, 94:10, 94:13, 134:12, 134:14, 135:1, 138:5, 139:7, 139:12, 139:19, 142:22, 142:25, 143:20, 145:20, 147:6, 147:15, 148:13, 148:15, 148:19, 149:8, 149:19, 150:4, 151:1, 152:1, 153:15, 154:24, 157:22, 158:6, 159:22, 161:24, 162:13, 167:10, 167:24, 168:21, 168:23, 169:20, 169:21, 169:25, 171:13, 171:15, 177:9, 177:12, 180:2, 180:6, 180:7, 181:17, 181:20, 181:22, 182:12, 182:19, 183:23, 186:2, 188:4, 188:7, 188:20, 189:6, 190:9, 190:12, 190:19, 190:22, 190:23, 191:9, 191:11, 191:13, 192:2, 192:15,

192:17, 195:3, 195:18, 197:2, 197:13, 197:25, 198:2, 199:8, 199:25, 200:2, 200:5, 200:17, 201:8, 201:14, 201:18, 203:8, 203:12, 203:20, 203:22, 204:2, 204:5, 204:9, 204:13, 206:1, 206:3, 206:7, 206:21, 207:5, 207:9, 208:2, 208:6, 208:17, 209:16, 212:10, 212:22, 213:25, 214:13, 216:21, 217:17, 226:14, 227:9, 230:2, 230:3, 230:4, 230:6, 230:8, 232:6, 232:10, 233:7, 234:12, 242:12, 243:8, 244:5, 244:19, 250:10
**play** [8] - 4:11, 53:22, 60:1, 109:23, 145:3, 200:1, 245:4, 253:15
**played** [1] - 109:24
**pleadings** [1] - 8:18
**plenty** [1] - 158:23
**plug** [3] - 140:5, 140:6, 264:17
**plug-in** [1] - 140:5
**plumber** [1] - 47:4
**plumbers** [1] - 50:4
**plumbing** [2] - 89:3, 89:11
**point** [33] - 4:22, 8:22, 20:21, 24:24, 25:2, 41:19, 48:7, 67:4, 74:1, 98:22, 117:23, 125:14, 128:14, 139:5, 143:13, 150:11, 154:21, 156:13, 168:24, 201:9, 217:22, 224:18, 231:7, 240:23, 244:2, 253:3, 253:6, 261:25, 263:7, 264:20, 267:17, 269:22
**pointed** [2] - 8:22, 217:24
**pointing** [1] - 9:25
**points** [2] - 8:24, 138:8
**poke** [1] - 24:14

**poking** [1] - 24:23
**policies** [1] - 84:9
**policy** [2] - 179:10, 191:23
**pollutant** [4] - 141:9, 149:15, 152:4, 152:15
**pollutants** [6] - 55:4, 135:20, 135:21, 141:8, 174:8, 199:3
**pollution** [9] - 41:11, 46:24, 47:6, 48:14, 59:2, 134:15, 139:4, 139:7, 140:22
**pool** [6] - 51:7, 61:1, 70:16, 85:8, 90:15, 96:16
**poor** [1] - 229:2
**populated** [1] - 142:19
**port** [1] - 244:23
**portion** [3] - 10:6, 100:11, 189:24
**portions** [1] - 128:18
**Portland** [1] - 91:8
**position** [2] - 69:23, 166:13
**positioned** [2] - 205:17, 206:6
**positions** [1] - 40:14
**positive** [2] - 252:3
**possession** [1] - 35:16
**possibility** [2] - 11:17, 119:25
**possible** [12] - 8:3, 10:23, 25:16, 52:11, 52:13, 52:15, 62:12, 72:14, 88:17, 94:21, 132:15, 224:15
**possibly** [1] - 62:23
**post** [1] - 270:4
**post-trial** [1] - 270:4
**postponed** [3] - 28:19, 30:17, 30:18
**postponement** [2] - 31:8, 31:13
**potential** [3] - 33:3, 46:2, 261:20
**potentially** [4] - 30:15, 45:15, 252:14, 264:17
**pounds** [6] - 170:3, 194:6, 202:10, 214:11, 240:7, 240:11
**pour** [1] - 144:2
**powder** [2] - 138:11, 203:12
**Powder** [6] - 142:14, 143:1, 143:15,

212:19, 237:10, 252:13
**powdered** [1] - 230:20
**power** [192] - 8:1, 8:6, 11:8, 11:9, 11:15, 15:5, 15:11, 15:14, 16:19, 17:4, 17:6, 19:6, 39:1, 39:23, 40:1, 40:6, 41:6, 41:9, 41:17, 46:23, 55:7, 59:8, 60:2, 60:20, 73:25, 74:2, 74:6, 74:8, 74:9, 74:11, 74:20, 81:20, 90:24, 91:5, 91:11, 91:14, 91:24, 92:8, 92:17, 93:13, 93:21, 94:5, 94:10, 94:13, 95:13, 95:22, 96:5, 110:17, 111:14, 122:17, 122:21, 140:16, 142:11, 143:20, 145:5, 147:6, 148:15, 149:8, 150:25, 151:9, 158:6, 160:11, 167:10, 167:24, 168:5, 168:20, 168:22, 169:25, 171:6, 171:13, 171:15, 171:21, 173:4, 173:19, 175:6, 175:22, 176:5, 179:18, 179:19, 179:20, 180:1, 180:2, 180:6, 180:7, 180:11, 180:22, 180:24, 181:2, 181:11, 181:17, 181:19, 181:22, 182:19, 183:9, 183:23, 185:3, 186:1, 187:15, 188:4, 188:7, 188:8, 188:20, 189:6, 189:14, 190:1, 190:7, 190:8, 190:12, 190:18, 190:21, 191:9, 191:10, 191:13, 191:17, 192:2, 193:11, 193:16, 195:3, 197:2, 197:9, 197:13, 197:24, 198:19, 199:1, 199:2, 199:8, 199:12, 199:14, 199:18, 199:22, 199:23, 199:24, 200:2, 200:4,

200:15, 200:16, 200:17, 201:1, 201:8, 201:18, 202:4, 203:8, 203:12, 203:20, 203:22, 204:1, 204:5, 204:7, 204:13, 205:25, 206:3, 206:7, 206:21, 207:5, 207:9, 209:16, 209:18, 210:7, 212:10, 212:22, 212:24, 213:3, 216:21, 217:4, 217:6, 217:7, 217:8, 217:17, 221:25, 227:9, 230:2, 230:3, 230:4, 230:8, 230:17, 231:3, 232:5, 232:6, 232:9, 232:10, 232:16, 233:7, 234:12, 236:12, 237:12, 238:14, 244:8, 246:7, 246:8
**powered** [1] - 11:8
**powerful** [3] - 81:13, 162:16
**Powerton** [1] - 156:9
**practicality** [1] - 257:7
**practice** [4] - 40:2, 129:13, 184:7, 254:24
**PRB** [3] - 212:19, 237:9, 252:13
**precipitator** [1] - 199:14
**precipitators** [1] - 198:9
**precise** [1] - 115:20
**precisely** [1] - 140:9
**preclude** [1] - 18:12
**preconceived** [1] - 94:15
**predispose** [1] - 93:7
**predisposed** [3] - 77:20, 92:14, 92:18
**predisposition** [1] - 80:7
**predispositions** [1] - 82:21
**preexisting** [1] - 114:22
**prefer** [1] - 140:17
**preference** [2] - 97:12, 224:21
**prejudice** [5] - 30:16, 31:15, 60:5, 104:13, 215:21

**prejudices** [1] - 107:8
**prejudicial** [5] - 26:9, 26:25, 27:14, 30:6, 31:19
**preliminary** [10] - 98:20, 98:25, 99:9, 101:21, 102:5, 102:10, 103:11, 117:17, 121:2, 129:6
**prep** [1] - 4:23
**preparation** [1] - 211:2
**prepare** [4] - 31:24, 112:24, 113:7, 153:19
**prepared** [6] - 101:11, 248:25, 249:4, 249:6, 259:9, 259:12
**prepares** [1] - 117:24
**preparing** [3] - 84:6, 249:7, 259:20
**preponderance** [12] - 108:9, 108:14, 108:15, 109:1, 109:12, 120:16, 122:16, 122:19, 122:25, 123:9, 179:23, 179:25
**present** [19] - 13:7, 36:10, 36:21, 58:24, 82:17, 83:15, 127:8, 128:18, 130:24, 132:9, 132:20, 160:25, 163:15, 183:14, 200:16, 207:7, 245:14, 266:15, 270:13
**presentation** [9] - 6:7, 36:10, 36:16, 125:8, 128:5, 165:16, 167:13, 250:13, 250:19
**presentations** [1] - 253:11
**presented** [5] - 41:24, 103:24, 106:4, 124:15, 126:21
**presenting** [1] - 163:25
**President** [1] - 171:3
**president** [1] - 165:2
**pressure** [1] - 230:25
**pressurized** [1] - 138:21
**presumptive** [1] - 97:5
**preteen** [1] - 169:11
**pretrial** [3] - 8:20, 33:20, 224:7
**pretty** [15] - 44:10, 45:15, 50:20, 57:3,

57:10, 64:10, 142:15, 162:16, 186:17, 194:19, 196:11, 230:5, 232:17, 244:3, 263:24
**prevail** [1] - 41:24
**prevalent** [1] - 142:21
**prevent** [2] - 42:14, 111:10
**preview** [3] - 19:22, 23:22, 25:3
**previewed** [2] - 161:14, 249:19
**previewing** [1] - 133:18
**previous** [1] - 114:18
**previously** [6] - 20:10, 107:24, 109:24, 114:14, 116:12, 128:5
**price** [1] - 190:1
**prices** [1] - 151:7
**primarily** [4] - 87:22, 235:24, 237:10, 253:4
**primary** [6] - 43:23, 46:3, 120:12, 237:11, 241:12, 241:13
**primer** [1] - 136:25
**Princeton** [1] - 220:21
**principal** [2] - 14:8, 44:16
**principals** [3] - 13:15, 14:8, 14:12
**principles** [1] - 42:1
**print** [2] - 84:13, 219:16
**printed** [4] - 35:4, 101:23, 118:22, 267:10
**printing** [1] - 188:7
**printout** [1] - 174:12
**priority** [4] - 178:19, 179:6, 219:23, 220:11
**probable** [1] - 109:10
**problem** [19] - 23:24, 33:13, 36:21, 46:5, 112:14, 115:9, 133:10, 134:13, 135:1, 140:7, 143:7, 143:15, 143:20, 144:10, 145:19, 162:2, 245:22, 251:5, 252:8
**problematic** [1] - 242:14
**problems** [8] - 134:2,

134:7, 135:10, 141:18, 143:6, 236:14, 251:3, 264:23
**procedure** [2] - 146:25, 269:22
**proceed** [4] - 42:25, 102:3, 128:22, 132:3
**proceeding** [2] - 34:13, 120:2
**proceedings** [6] - 34:1, 43:7, 100:3, 130:8, 222:16, 270:14
**process** [45] - 7:21, 11:7, 28:7, 29:25, 33:11, 34:7, 35:6, 41:15, 43:1, 43:2, 58:25, 71:13, 112:15, 113:10, 116:1, 118:9, 120:2, 128:3, 145:1, 148:9, 151:21, 153:2, 160:18, 172:16, 172:17, 172:22, 172:23, 174:19, 174:24, 175:8, 175:17, 176:13, 179:16, 181:14, 188:15, 188:20, 196:18, 206:20, 227:7, 233:6, 244:16, 257:10, 257:14, 264:19, 269:24
**processes** [4] - 11:10, 16:19, 115:24, 173:5
**produce** [3] - 84:8, 138:6, 246:6
**produced** [4] - 29:20, 177:6, 189:7, 195:23
**produces** [2] - 109:9, 187:17
**producing** [2] - 138:5, 196:22
**product** [8] - 39:25, 183:25, 188:5, 193:1, 196:25, 197:6, 205:25, 221:23
**production** [6] - 215:6, 232:16, 236:12, 237:12, 238:14, 241:19
**Products** [8] - 37:25, 38:2, 102:21, 102:22, 153:24, 153:25, 154:9, 154:10
**products** [3] - 175:17,

204:22, 205:24
**profession** [2] - 84:4, 107:14
**professional** [7] - 187:8, 212:2, 212:3, 229:10, 229:13, 229:20, 233:24
**profit** [2] - 136:4, 241:6
**program** [26] - 136:18, 149:25, 155:21, 171:3, 173:21, 176:19, 176:20, 176:22, 186:13, 188:11, 189:10, 190:3, 190:8, 190:12, 201:16, 202:17, 208:22, 215:3, 216:3, 234:5, 234:6, 234:18, 241:21, 241:24, 242:6, 243:14
**progress** [2] - 58:2, 110:18
**progressed** [1] - 206:17
**project** [10] - 155:25, 189:21, 189:23, 190:22, 192:21, 192:22, 249:1, 249:2, 253:16, 254:3
**projecting** [1] - 30:13
**projects** [10] - 86:2, 88:5, 89:8, 171:11, 171:23, 171:25, 172:1, 191:4, 195:3, 248:11
**promote** [2] - 110:18, 252:18
**promptly** [2] - 123:22, 128:22
**promulgated** [1] - 180:13
**pronounced** [1] - 156:5
**proof** [15] - 15:23, 16:2, 16:4, 41:21, 108:7, 108:8, 109:10, 109:11, 109:14, 158:18, 165:21, 200:3, 200:20, 207:4
**propane** [1] - 47:15
**proper** [4] - 20:4, 22:24, 23:3, 113:5
**properly** [1] - 8:23
**properties** [1] - 134:17
**property** [7] - 89:24, 111:24, 111:25, 112:2, 115:19,

163:10, 171:14
**proposal** [2] - 253:18
**proprietary** [1] - 72:1
**prosecuting** [1] - 113:10
**prosecution** [3] - 115:25, 118:10, 120:3
**PROSPECTIVE** [197] - 43:11, 43:18, 43:25, 44:3, 44:10, 44:15, 44:21, 45:5, 45:9, 46:12, 46:14, 46:19, 46:21, 47:4, 47:14, 48:4, 48:15, 48:17, 48:20, 49:6, 49:16, 49:19, 50:1, 50:15, 50:18, 50:23, 51:11, 51:19, 51:22, 51:25, 52:3, 52:21, 53:14, 53:17, 53:21, 53:24, 54:2, 54:8, 54:13, 54:23, 55:20, 56:6, 56:11, 56:20, 56:24, 57:2, 57:7, 57:20, 58:1, 58:5, 58:7, 58:10, 61:7, 61:10, 61:12, 61:18, 61:21, 61:25, 62:5, 62:8, 62:17, 62:23, 63:4, 63:7, 63:11, 63:22, 64:1, 64:3, 64:10, 64:17, 64:23, 65:1, 65:3, 65:6, 65:9, 65:12, 66:3, 66:5, 66:10, 66:16, 66:20, 66:22, 66:25, 67:3, 68:1, 68:8, 68:11, 68:25, 69:5, 69:11, 70:21, 71:3, 71:6, 71:10, 71:18, 71:23, 71:25, 72:5, 72:16, 72:21, 73:2, 73:6, 73:14, 73:18, 73:25, 74:7, 74:10, 74:12, 74:15, 74:22, 75:2, 75:7, 75:12, 75:16, 75:22, 76:1, 76:5, 76:8, 76:12, 76:15, 76:17, 77:2, 77:7, 77:9, 77:22, 77:24, 78:2, 78:10, 78:16, 79:4, 79:9, 79:14, 79:20, 80:16, 80:20, 80:24, 81:1, 81:6, 81:12, 81:22, 82:6, 82:9, 82:12, 83:1, 83:6, 83:11, 83:16, 83:21, 84:2, 84:5, 84:19, 85:2, 85:12,

85:18, 85:20, 85:22, 85:25, 86:7, 86:10, 86:19, 86:21, 86:25, 87:7, 87:13, 87:18, 87:21, 88:1, 88:4, 88:8, 88:13, 88:15, 88:18, 88:25, 89:9, 89:20, 89:22, 90:3, 90:24, 91:3, 91:7, 91:12, 91:16, 91:19, 91:23, 92:1, 92:21, 92:25, 93:8, 93:15, 93:20, 93:24, 94:3, 94:20, 95:1, 95:12, 96:7, 96:10
**prospective** [7] - 33:11, 34:2, 34:11, 34:13, 34:18, 72:9, 101:6
**Protection** [1] - 149:13
**protection** [1] - 111:21
**prove** [14] - 15:24, 16:2, 120:15, 120:18, 160:7, 179:19, 179:22, 182:16, 182:17, 183:5, 183:11, 220:8, 263:11
**proved** [2] - 135:11, 264:10
**proven** [11] - 108:5, 122:15, 122:19, 122:23, 122:25, 123:3, 123:6, 123:8, 179:25, 188:14, 190:11
**proves** [2] - 106:10, 106:14
**provide** [10] - 42:3, 59:9, 104:5, 120:5, 120:22, 121:13, 122:13, 221:6, 232:10, 233:3
**provided** [10] - 8:1, 9:19, 11:14, 42:10, 59:22, 117:8, 119:23, 122:3, 126:8, 161:13
**provides** [2] - 39:1, 159:10
**providing** [1] - 232:6
**proving** [3] - 108:14, 108:25, 109:6
**provisional** [6] - 146:21, 178:9, 219:4, 219:25, 258:23
**PTC** [4] - 145:4,

246:12, 246:20, 247:16
**PTO** [15] - 113:3, 113:8, 113:14, 113:17, 114:6, 115:24, 116:2, 116:6, 118:11, 118:17, 118:20, 118:24, 119:6, 119:12, 119:23
**PTO's** [2] - 113:15, 113:19
**PTX** [2] - 26:14, 246:16
**public** [11] - 82:3, 111:11, 111:20, 112:5, 112:8, 115:17, 118:19, 121:13, 146:23, 205:1, 205:11
**publication** [1] - 186:11
**publications** [2] - 219:16, 233:23
**publicly** [3] - 204:23, 204:24, 224:22
**published** [5] - 117:21, 118:17, 221:2, 233:19, 233:22
**pull** [4] - 138:20, 147:21, 224:24, 263:20
**pulled** [1] - 144:7
**pulverized** [1] - 138:9
**pulverizer** [4] - 147:9, 230:19, 231:12
**pumped** [1] - 138:14
**purchase** [2] - 40:1, 149:2
**purpose** [11] - 17:19, 34:14, 105:16, 105:18, 127:7, 127:23, 182:5, 231:19, 232:21, 247:8, 265:16
**purposes** [4] - 17:22, 22:20, 91:17, 121:11
**pursuant** [1] - 15:19
**pursue** [4] - 146:18, 229:8, 248:18, 249:1
**pursued** [1] - 248:15
**pursuing** [3] - 16:6, 16:23, 228:20
**push** [3] - 86:2, 86:3, 89:15
**pushed** [1] - 139:2
**pushes** [2] - 89:10, 89:12
**put** [48] - 5:18, 18:8,

59:16, 67:24, 77:17, 78:1, 78:4, 78:6, 78:22, 79:11, 82:22, 83:2, 96:4, 98:11, 108:19, 136:19, 137:1, 143:7, 149:19, 151:16, 152:9, 153:9, 154:22, 162:3, 166:12, 169:21, 170:14, 176:16, 180:13, 184:12, 185:11, 186:12, 189:10, 191:1, 194:24, 196:4, 206:14, 219:22, 239:13, 239:17, 239:22, 239:24, 254:23, 256:19, 258:25, 263:21
**puts** [1] - 214:7
**putting** [6] - 78:17, 98:1, 154:25, 188:21, 189:2, 189:6
**puzzling** [2] - 197:8, 216:7

## Q

**qualifications** [1] - 107:21
**qualify** [3] - 112:21, 175:19, 189:15
**quality** [4] - 95:4, 213:8, 234:21, 234:23
**quantities** [3] - 236:11, 236:24, 254:21
**quantity** [1] - 240:21
**questioning** [2] - 80:3, 225:18
**questions** [62] - 34:9, 34:12, 34:16, 34:25, 35:5, 35:11, 35:16, 35:23, 36:2, 36:3, 36:4, 36:5, 36:22, 36:24, 38:16, 39:15, 41:2, 42:14, 42:18, 43:14, 43:15, 44:24, 44:25, 45:2, 45:4, 46:18, 46:20, 48:6, 48:8, 49:21, 50:24, 56:10, 56:15, 60:10, 60:17, 61:17, 64:5, 65:13, 66:8, 66:9, 68:13, 69:8, 71:1, 73:16, 78:13, 79:16, 79:17, 80:22, 83:23, 83:24, 85:17, 88:21,

89:5, 90:22, 93:10, 95:17, 95:19, 105:1, 105:3, 119:7
**quick** [7] - 32:1, 88:22, 167:21, 172:12, 205:5, 223:22, 269:22
**quickly** [7] - 130:12, 139:8, 196:11, 210:8, 215:5, 218:10, 268:5
**quite** [11] - 3:10, 47:6, 133:7, 142:13, 236:12, 239:21, 250:16, 254:14, 255:22, 256:3, 257:1
**quote** [1] - 181:14

## R

**R&D** [2] - 71:12, 241:18
**radicals** [1] - 261:12
**radio** [1] - 124:11
**railroad** [1] - 137:24
**rain** [2] - 106:15, 134:21
**raining** [3] - 106:11, 106:12, 106:17
**raise** [5] - 4:11, 26:5, 35:17, 146:8, 268:12
**raised** [1] - 18:18
**raising** [1] - 269:20
**ramifications** [1] - 269:18
**ramped** [1] - 187:24
**ran** [4] - 167:9, 169:15, 192:8, 199:2
**randomly** [1] - 33:19
**rank** [4] - 236:19, 238:6, 238:9, 244:3
**ranked** [3] - 237:23, 244:6, 250:12
**rate** [3] - 162:24, 163:2, 207:8
**ratio** [1] - 134:11
**Raymond** [3] - 157:8, 165:24, 170:8
**RC** [2] - 102:25, 122:20
**RCB** [8] - 37:24, 102:19, 154:1, 154:7, 154:10, 155:24, 193:8, 194:9
**reached** [1] - 17:4
**react** [6] - 251:22, 251:23, 257:10, 257:11, 257:21, 258:2

**reaction** [11] - 138:25, 139:2, 147:12, 251:25, 252:18, 252:19, 257:19, 258:1, 258:6, 261:14, 262:1
**reactions** [5] - 198:3, 220:25, 221:1, 244:15, 261:2
**reactive** [10] - 251:11, 251:17, 251:25, 252:4, 252:14, 255:4, 257:4, 257:9, 257:12
**reactivity** [1] - 262:14
**read** [10] - 39:4, 84:12, 101:21, 101:23, 102:1, 112:9, 123:23, 124:1, 210:21, 221:1
**reading** [2] - 36:2, 165:14
**ready** [8] - 4:18, 25:24, 89:14, 89:24, 128:22, 129:13, 144:3, 171:24
**real** [14] - 67:14, 150:17, 167:21, 185:25, 188:21, 223:22, 230:20, 232:21, 246:6, 261:3, 261:22, 262:2
**reality** [1] - 139:18
**realize** [7] - 52:3, 139:16, 142:2, 172:10, 179:9, 242:10, 245:25
**realizing** [1] - 149:18
**really** [53] - 7:14, 12:21, 15:25, 19:23, 23:17, 28:22, 59:8, 59:22, 77:10, 86:1, 89:13, 89:15, 94:3, 94:20, 95:9, 95:15, 114:16, 133:4, 133:22, 134:15, 135:8, 140:7, 143:1, 143:6, 143:11, 150:15, 158:14, 159:3, 165:20, 166:1, 170:6, 175:15, 176:6, 179:13, 182:8, 197:13, 199:1, 206:12, 224:8, 234:10, 234:11, 247:10, 248:8, 251:21, 252:9, 253:3, 253:7, 253:24, 254:10,

254:19, 256:12, 262:13, 262:19
**rear** [1] - 63:5
**rearrange** [1] - 100:19
**reason** [30] - 18:11, 18:12, 28:18, 31:18, 31:21, 34:21, 35:20, 45:25, 49:10, 53:9, 60:11, 67:16, 69:23, 107:21, 142:18, 156:17, 196:12, 204:1, 204:3, 204:6, 204:8, 204:11, 214:23, 221:22, 241:12, 241:13, 255:4, 269:3, 269:9
**reasonable** [7] - 16:3, 22:8, 27:3, 99:22, 107:5, 109:14, 182:22
**reasonableness** [2] - 12:12, 13:3
**reasonably** [5] - 13:23, 114:25, 202:22, 203:3, 221:19
**reasons** [7] - 30:18, 118:5, 119:21, 141:24, 189:10, 192:13, 248:8
**receive** [2] - 108:1, 219:24
**received** [2] - 116:6, 210:12
**receives** [3] - 113:17, 116:3, 118:25
**receiving** [2] - 116:8, 167:25
**recent** [2] - 262:16, 262:20
**recently** [4] - 5:22, 28:21, 157:7, 262:22
**recess** [7] - 33:24, 33:25, 43:6, 130:7, 222:14, 222:15, 270:8
**recognize** [5] - 141:13, 143:14, 163:14, 248:22, 259:17
**recognized** [3] - 149:15, 163:13, 244:3
**recommended** [2] - 63:19, 65:8
**reconstituted** [1] - 98:17
**record** [9] - 3:5, 3:9, 22:10, 80:2, 100:1, 223:6, 223:22,

224:6, 230:9
**records** [1] - 207:6
**recruited** [1] - 171:13
**Red** [1] - 170:19
**redeveloped** [1] - 81:23
**reduce** [19] - 129:25, 136:9, 141:5, 149:9, 172:16, 173:10, 173:11, 183:16, 185:1, 185:6, 187:18, 188:12, 188:14, 189:4, 190:9, 203:20, 227:7, 234:11, 239:16
**reduced** [2] - 185:5, 196:25
**reducer** [1] - 199:13
**reducers** [1] - 198:7
**reduces** [1] - 174:19
**reducing** [3] - 152:14, 175:10, 175:15
**reduction** [14] - 135:13, 135:14, 152:23, 152:24, 171:7, 174:9, 174:10, 175:9, 175:12, 175:13, 175:14, 175:21, 185:18, 209:10
**reductions** [8] - 185:16, 186:7, 197:7, 209:24, 209:25, 211:9, 212:5, 212:19
**refer** [11] - 37:19, 102:15, 102:17, 102:19, 102:24, 113:24, 115:1, 126:13, 136:16, 154:5, 192:23
**reference** [7] - 12:7, 25:15, 25:19, 124:9, 224:10, 226:14, 261:11
**referenced** [1] - 29:2
**references** [2] - 38:19, 114:18
**referencing** [1] - 260:17
**referred** [13] - 37:4, 103:4, 103:6, 103:8, 103:9, 103:17, 115:25, 118:9, 121:10, 156:24, 238:5, 247:23, 262:16
**referring** [7] - 115:20, 261:5, 262:20,

266:20, 267:4, 267:6, 267:14
**refile** [1] - 215:22
**refine** [1] - 193:9
**refined** [111] - 6:2, 6:3, 6:15, 6:19, 6:20, 6:21, 7:17, 7:18, 7:24, 8:4, 11:13, 11:14, 12:8, 13:8, 13:10, 13:11, 13:13, 13:14, 13:18, 13:19, 14:1, 14:17, 15:3, 15:12, 17:13, 17:19, 17:21, 28:4, 28:7, 29:12, 39:25, 40:1, 40:5, 40:7, 165:5, 167:19, 167:25, 168:5, 168:10, 169:18, 169:20, 171:14, 171:17, 174:2, 176:24, 177:7, 177:9, 181:21, 182:1, 182:11, 182:19, 183:6, 183:11, 183:15, 183:23, 184:23, 185:9, 185:23, 187:13, 187:22, 189:20, 190:9, 190:13, 191:9, 191:25, 192:5, 192:15, 192:20, 194:25, 195:24, 197:3, 197:5, 198:22, 201:18, 202:3, 202:9, 202:11, 202:13, 202:17, 202:18, 202:20, 202:24, 207:4, 208:3, 208:6, 208:21, 208:22, 209:5, 209:8, 211:8, 213:13, 213:18, 214:9, 214:15, 215:6, 216:3, 216:4, 216:5, 217:6, 217:7, 217:11, 217:12, 217:13, 221:20, 221:24, 222:2, 226:19
**refineries** [1] - 50:13
**Refinery** [2] - 47:5, 50:5
**refinery** [8] - 47:9, 47:12, 48:12, 48:24, 50:2, 50:10, 50:17
**reflected** [1] - 21:9
**refresh** [1] - 230:13
**regard** [21] - 5:4, 8:24,

17:13, 18:13, 23:2, 24:18, 25:5, 25:12, 31:15, 32:17, 33:2, 33:3, 33:6, 60:10, 60:14, 60:19, 72:8, 152:2, 225:5, 233:5, 243:21
**regarding** [5] - 28:16, 75:8, 102:11, 122:8, 242:25
**regardless** [2] - 22:23, 95:25
**regards** [1] - 12:7
**region** [1] - 208:10
**registered** [1] - 212:3
**regular** [2] - 47:15, 219:5
**regulated** [1] - 94:21
**regulation** [2] - 203:17, 220:23
**regulations** [10] - 6:17, 94:24, 95:9, 95:23, 113:14, 180:12, 186:19, 198:21, 216:19, 216:21
**reinterpreted** [2] - 81:23, 81:25
**reject** [4] - 108:3, 117:14, 117:19, 118:7
**rejection** [1] - 118:3
**relate** [4] - 34:9, 39:22, 55:3, 178:17
**related** [19] - 6:1, 9:16, 47:22, 48:19, 54:19, 54:20, 55:1, 56:5, 56:19, 59:1, 59:12, 64:25, 75:15, 114:25, 116:13, 178:15, 233:17, 248:14
**relates** [6] - 5:20, 13:7, 20:14, 26:14, 75:20, 116:10
**relating** [7] - 36:23, 73:12, 110:17, 119:7, 120:17, 123:25, 124:12
**relation** [1] - 204:11
**relationship** [9] - 55:19, 67:4, 68:6, 68:18, 68:19, 69:19, 69:24, 70:4, 70:5
**relative** [1] - 60:15
**relatives** [1] - 59:12
**released** [3] - 224:23, 242:12, 251:7
**relevant** [13] - 8:11, 13:2, 13:9, 20:17,

23:5, 28:22, 29:3, 30:20, 31:6, 31:14, 32:14, 190:16, 195:11
**reliability** [1] - 107:22
**reliable** [2] - 139:18, 233:1
**relied** [1] - 248:11
**relies** [1] - 134:9
**rely** [7] - 27:11, 27:18, 125:18, 180:8, 216:12, 217:16, 217:18
**relying** [3] - 10:16, 20:22, 27:17
**remain** [5] - 70:16, 85:7, 90:15, 97:9, 108:22
**remainder** [2] - 98:18, 155:22
**remained** [1] - 202:15
**remaining** [4] - 8:24, 97:7, 99:7, 268:2
**remains** [2] - 51:6, 96:16
**remarkable** [2] - 135:12, 145:20
**remarks** [1] - 230:17
**Remember** [1] - 197:6
**remember** [19] - 57:9, 123:18, 126:1, 133:19, 149:13, 168:15, 187:10, 197:5, 200:2, 202:6, 202:17, 204:4, 204:21, 206:18, 209:9, 212:1, 214:14, 226:16, 238:6
**remembered** [1] - 42:13
**reminders** [1] - 4:2
**removal** [1] - 150:1
**remove** [8] - 57:17, 84:15, 141:15, 151:10, 174:7, 237:22, 243:23, 250:5
**removed** [3] - 129:7, 147:22, 242:16
**removes** [1] - 93:5
**removing** [2] - 133:10, 245:22
**renamed** [1] - 267:8
**render** [2] - 125:23, 222:4
**rendered** [1] - 217:14
**rendering** [1] - 42:15
**renders** [1] - 221:14
**renovated** [1] - 88:3

**renovating** [1] - 88:25
**renovation** [1] - 89:23
**rent** [2] - 111:25, 192:3
**rental** [1] - 89:24
**repair** [2] - 229:3
**repeat** [3] - 122:13, 184:6, 204:3
**repeated** [1] - 80:3
**repeating** [1] - 184:11
**repeats** [1] - 231:6
**report** [12] - 23:13, 124:1, 124:12, 124:13, 162:7, 210:8, 210:10, 210:17, 210:18, 211:16, 211:24, 217:2
**reported** [2] - 146:11, 270:13
**reporter** [4] - 3:1, 130:22, 238:4, 248:1
**Reporter** [3] - 270:11, 270:12, 270:17
**reports** [4] - 162:5, 212:13, 212:14, 233:19
**represent** [4] - 49:10, 49:12, 59:21, 68:15
**representative** [2] - 130:24, 226:2
**represented** [4] - 37:7, 37:20, 38:9, 182:17
**representing** [1] - 67:21
**represents** [1] - 111:8
**request** [2] - 215:12, 223:19
**require** [4] - 110:13, 165:21, 175:23, 207:1
**required** [12] - 8:11, 108:6, 112:4, 118:22, 125:7, 176:15, 181:25, 182:24, 187:18, 203:20, 203:22, 209:24
**requirement** [2] - 116:19, 189:14
**requirements** [15] - 112:24, 113:5, 113:19, 116:18, 117:12, 119:15, 158:19, 171:12, 174:3, 182:2, 182:6, 184:24, 186:6, 204:19, 210:6
**requires** [6] - 17:16, 116:23, 174:7,

175:9, 176:14, 187:12
**requiring** [1] - 182:6
**reschedule** [2] - 72:13, 72:16
**Research** [2] - 141:22, 210:3
**research** [24] - 71:14, 73:7, 73:9, 79:10, 79:11, 94:8, 124:2, 124:5, 141:10, 141:20, 146:20, 148:14, 210:11, 219:17, 241:4, 242:5, 243:11, 245:24, 250:22, 251:8, 251:13, 253:13, 259:10, 262:11
**researching** [3] - 233:16, 242:25, 263:7
**reside** [1] - 171:21
**resolve** [7] - 4:13, 17:10, 40:12, 120:12, 127:21, 129:23, 130:2
**resolved** [1] - 268:4
**resource** [2] - 232:25, 239:5
**Resources** [4] - 38:3, 102:23, 153:18
**respect** [2] - 34:20, 117:15
**respectful** [1] - 132:14
**respectfully** [3] - 166:11, 168:13, 206:2
**respective** [1] - 110:21
**respond** [3] - 47:20, 224:18, 226:10
**response** [9] - 9:9, 9:10, 9:19, 11:2, 11:19, 16:17, 70:2, 117:24, 262:24
**responses** [5] - 9:1, 10:3, 11:2, 18:8, 118:6
**responsibilities** [1] - 242:2
**responsibility** [3] - 41:25, 126:21, 242:4
**responsible** [1] - 159:11
**rest** [5] - 133:5, 139:24, 153:14, 162:21, 227:25
**restriction** [1] - 152:9
**result** [8] - 29:23,

77:9, 94:7, 159:15, 159:19, 171:6, 181:5, 239:16
**results** [5] - 135:12, 254:8, 254:15, 255:19, 256:6
**retire** [2] - 123:13, 127:25
**retired** [2] - 52:16, 86:24
**retrospect** [1] - 256:8
**return** [2] - 100:16, 111:9
**returned** [1] - 231:5
**returning** [1] - 63:15
**revenue** [1] - 150:15
**review** [4] - 125:21, 126:2, 126:3, 268:2
**reviewed** [2] - 119:20, 215:15
**revise** [1] - 84:20
**revisions** [1] - 84:21
**Richard** [1] - 37:12
**RICHARD** [1] - 1:23
**Rick** [3] - 39:5, 148:2, 148:4
**ride** [1] - 123:17
**right-hand** [4] - 118:23, 196:3, 208:11, 247:18
**rights** [4] - 80:5, 110:23, 118:25, 121:5
**risk** [3] - 171:24, 190:13, 191:3
**River** [7] - 142:14, 143:1, 143:15, 155:23, 194:8, 212:20, 252:13
**river** [1] - 237:10
**road** [4] - 137:13, 144:22, 149:7, 236:19
**Robinson** [2] - 3:24, 165:8
**ROBINSON** [1] - 2:8
**rocks** [1] - 237:25
**role** [4] - 33:4, 75:25, 102:6, 109:21
**rolling** [1] - 207:1
**roofing** [1] - 89:2
**room** [10] - 36:6, 42:22, 123:13, 125:25, 127:25, 130:17, 156:16, 239:8, 245:2, 245:9
**rotations** [1] - 140:10
**rough** [2] - 93:12, 240:17
**roughly** [1] - 240:20

**row** [8] - 96:19, 100:21, 100:22, 100:24, 100:25, 101:2, 101:3
**royalty** [2] - 22:8, 27:3
**RPR** [1] - 270:16
**rule** [4] - 27:1, 130:13, 130:20, 130:25
**Rule** [5] - 22:14, 23:3, 26:9, 26:25, 31:16
**rules** [15] - 5:9, 41:25, 47:18, 47:25, 49:18, 55:12, 67:18, 82:19, 92:11, 95:23, 96:3, 102:7, 103:21, 105:6, 149:19
**ruling** [4] - 5:21, 7:3, 12:24, 105:8
**rulings** [1] - 7:23
**run** [19] - 7:11, 14:7, 94:9, 145:6, 145:11, 156:3, 157:16, 160:23, 188:23, 192:10, 206:25, 207:2, 209:18, 209:21, 215:5, 246:2, 248:4, 248:9, 248:10
**running** [12] - 136:21, 161:20, 167:6, 172:1, 176:21, 178:8, 189:1, 194:6, 198:15, 207:18, 212:9, 212:11
**runs** [1] - 138:23
**Rush** [2] - 155:25, 194:12
**Russ** [1] - 82:3
**Rutledge** [4] - 38:1, 102:22, 154:9

## S

**S-Sorb** [7] - 15:7, 185:5, 209:9, 209:21, 209:23, 211:20
**safe** [2] - 144:22, 267:20
**sake** [3] - 158:18, 238:4, 259:3
**sale** [1] - 110:25
**sales** [5] - 205:17, 205:22, 205:23, 206:5
**Sally** [1] - 39:7
**sample** [6] - 95:3, 113:24, 115:6, 119:1, 126:9, 209:17

**samples** [1] - 95:5
**sand** [1] - 201:7
**satisfaction** [2] - 179:24, 180:1
**satisfy** [1] - 117:3
**Saturday** [1] - 53:18
**Saturdays** [1] - 86:21
**saw** [16] - 29:18, 54:18, 59:2, 78:9, 106:11, 126:10, 129:15, 148:11, 158:20, 160:21, 194:15, 217:12, 217:13, 218:5, 238:15, 242:10
**scale** [8] - 82:22, 108:20, 108:21, 108:22, 142:17, 194:1, 209:14, 246:5
**scattered** [1] - 239:7
**scenario** [3] - 250:3, 251:10, 251:12
**Schaatt** [6] - 39:9, 157:5, 165:23, 169:14, 173:15, 268:3
**schedule** [9] - 36:15, 36:20, 56:5, 60:11, 71:8, 128:3, 128:12, 128:21, 248:12
**scheduled** [9] - 44:1, 62:1, 63:1, 63:21, 71:16, 71:18, 72:25, 86:18, 218:2
**scheduling** [2] - 71:10, 248:12
**school** [5] - 44:16, 52:23, 132:18, 229:7, 229:21
**science** [6] - 107:13, 110:19, 185:14, 228:17, 228:19
**scope** [1] - 253:17
**Scranton/ Carbondale** [1] - 54:17
**scraper** [1] - 247:23
**screen** [5] - 194:24, 196:3, 205:10, 235:11, 260:8
**scroll** [8] - 195:17, 196:2, 201:21, 210:16, 211:6, 211:10, 211:13, 212:15
**scrubber** [7] - 143:8, 143:11, 187:1, 199:13, 239:17, 239:24, 247:24
**scrubbers** [4] - 47:7,

198:8, 231:18
**se** [1] - 47:10
**seal** [3] - 223:20, 223:25, 224:1
**sealed** [2] - 223:22, 224:9
**sealing** [3] - 224:8, 225:4, 225:8
**search** [3] - 114:14, 117:10, 124:9
**searched** [1] - 114:15
**seat** [13] - 46:11, 51:12, 61:8, 66:4, 70:20, 80:15, 85:10, 90:18, 98:4, 99:4, 100:20, 100:24, 167:6
**seated** [5] - 97:25, 100:20, 101:15, 129:11, 267:25
**seating** [1] - 33:11
**second** [24] - 7:15, 8:15, 20:25, 34:17, 46:7, 100:24, 105:3, 108:9, 115:4, 121:13, 123:23, 130:10, 152:6, 153:12, 160:5, 171:8, 182:15, 186:21, 196:6, 206:11, 215:18, 216:1, 248:11
**secondly** [2] - 183:11, 187:16
**seconds** [3] - 140:11, 257:24, 266:13
**section** [3] - 115:8, 147:18, 262:4
**Section** [14] - 6:15, 110:18, 173:22, 173:24, 173:25, 179:11, 181:25, 182:6, 184:24, 187:19, 189:10, 190:12, 212:13, 215:3
**secured** [1] - 125:25
**securing** [1] - 110:19
**Securities** [1] - 205:2
**security** [1] - 204:24
**see** [80] - 4:23, 10:6, 18:7, 19:23, 48:5, 53:22, 55:24, 56:10, 57:11, 62:1, 64:4, 74:17, 95:16, 98:2, 98:21, 106:2, 113:18, 132:1, 132:24, 133:16, 136:20, 137:16, 144:14, 151:7,

153:9, 158:23, 159:21, 160:17, 163:6, 165:15, 167:22, 168:2, 168:19, 169:2, 171:16, 171:17, 175:16, 176:23, 183:13, 186:16, 187:6, 192:18, 192:24, 193:3, 193:8, 193:10, 194:2, 194:17, 195:12, 195:16, 195:22, 201:22, 207:23, 207:24, 211:11, 224:10, 225:4, 225:8, 230:15, 238:16, 238:18, 238:22, 239:1, 244:17, 245:4, 245:5, 245:7, 246:17, 247:19, 248:21, 249:24, 254:8, 256:5, 256:10, 261:11, 263:23, 267:10, 269:3, 269:9
**seeing** [5] - 29:9, 137:5, 150:13, 247:17, 270:7
**seeking** [2] - 40:4, 263:7
**seeks** [1] - 103:18
**seem** [2] - 90:13, 114:21
**sees** [1] - 59:19
**selected** [7] - 40:11, 52:17, 72:12, 72:14, 86:23, 87:3, 101:8
**selection** [2] - 100:12, 128:3
**selective** [2] - 198:7, 199:13
**self** [8] - 171:5, 173:18, 174:24, 174:25, 182:5, 185:2, 187:17, 196:25
**self-contained** [8] - 171:5, 173:18, 174:24, 174:25, 182:5, 185:2, 187:17, 196:25
**sell** [12] - 148:14, 148:15, 151:20, 154:16, 172:1, 182:5, 183:22, 192:2, 204:16, 204:25, 205:22, 221:24

**selling** [11] - 39:25, 110:25, 177:12, 181:21, 182:19, 188:7, 198:22, 201:18, 202:4, 206:6, 222:2
**sells** [1] - 204:21
**send** [3] - 4:19, 131:14, 184:18
**sends** [1] - 231:2
**Senescence** [4] - 37:24, 102:21, 153:24
**senior** [1] - 207:2
**Senior** [5] - 39:7, 185:12, 185:13, 199:5
**sense** [19] - 59:7, 59:9, 113:25, 114:24, 133:14, 142:17, 167:15, 184:2, 184:10, 192:23, 193:12, 194:1, 216:8, 232:12, 239:23, 239:25, 256:23, 268:16
**sent** [2] - 84:12, 231:21
**sentence** [5] - 5:9, 10:14, 260:21, 261:4, 261:8
**sentences** [1] - 172:19
**separate** [5] - 10:22, 37:18, 82:23, 191:16
**separately** [1] - 53:6
**sequester** [1] - 131:4
**serial** [1] - 170:9
**series** [3] - 219:7, 230:18, 231:15
**serious** [2] - 60:16, 65:20
**serve** [16] - 58:16, 59:4, 60:13, 62:15, 65:22, 72:12, 72:19, 87:11, 88:11, 101:8, 101:11, 121:11, 200:11, 233:24, 234:3, 234:4
**served** [3] - 16:23, 16:24, 161:17
**serves** [1] - 232:21
**service** [4] - 120:24, 164:16, 164:18, 176:18
**services** [1] - 39:1
**serving** [1] - 200:9
**set** [43] - 36:9, 69:1, 99:21, 100:2, 112:11, 121:11,

131:22, 135:22, 143:19, 144:14, 151:15, 155:6, 155:10, 155:18, 155:23, 155:25, 156:3, 156:11, 156:23, 157:14, 157:16, 157:20, 158:2, 160:4, 165:4, 171:11, 171:25, 178:21, 183:17, 187:7, 189:16, 189:18, 190:3, 191:20, 192:12, 201:13, 210:5, 211:2, 213:10, 213:15, 213:16, 213:19, 222:17

**sets** [2] - 4:8, 28:14

**setting** [1] - 151:24

**settings** [1] - 211:1

**settle** [4] - 102:2, 217:24, 226:13, 226:24

**settled** [4] - 27:24, 28:15, 218:1, 224:17

**settlement** [5] - 20:15, 26:15, 27:2, 28:17, 32:5

**settling** [1] - 134:20

**seven** [5] - 86:17, 134:22, 167:10, 188:23, 228:10

**several** [10] - 31:3, 39:21, 119:20, 142:10, 147:6, 190:24, 205:13, 243:18, 260:9, 260:14

**severe** [2] - 24:9, 133:10

**shaded** [2] - 195:5, 201:11

**share** [2] - 227:24, 228:1

**sheet** [2] - 29:9, 29:14

**shipped** [2] - 95:5, 142:22

**shocking** [1] - 256:5

**shoes** [4] - 166:7, 166:8, 166:12, 184:12

**shop** [1] - 84:13

**short** [5] - 98:16, 109:18, 171:10, 186:17, 263:21

**shorthand** [5] - 172:17, 172:21, 181:15, 255:15, 270:13

**Shorthand** [2] - 270:11, 270:12

**shortly** [4] - 12:15, 27:5, 33:22, 173:16

**shot** [1] - 193:7

**show** [46] - 19:22, 69:13, 79:19, 85:1, 90:2, 101:13, 109:18, 110:14, 132:11, 137:2, 146:6, 150:23, 151:24, 156:19, 158:14, 158:17, 162:24, 163:1, 163:8, 163:11, 175:20, 176:7, 176:23, 178:23, 179:19, 180:19, 180:20, 181:8, 181:10, 181:16, 181:19, 190:18, 194:23, 200:12, 200:13, 202:12, 205:13, 207:4, 210:8, 212:12, 214:22, 220:12, 238:20, 254:5, 259:1, 267:21

**showed** [7] - 80:7, 142:24, 150:16, 153:13, 188:17, 254:15, 262:19

**showing** [6] - 194:25, 211:8, 225:6, 231:17, 264:3, 264:5

**shown** [8] - 19:25, 105:23, 118:23, 123:7, 143:16, 189:8, 198:24, 235:14

**shows** [4] - 78:23, 162:4, 213:9, 265:21

**shuffle** [2] - 45:20, 87:2

**shut** [3] - 190:22, 190:25, 195:19

**siblings** [1] - 228:9

**side** [101] - 3:9, 3:20, 4:9, 5:9, 5:14, 9:6, 11:24, 19:13, 20:7, 36:9, 42:21, 45:10, 45:12, 45:22, 46:16, 46:17, 47:10, 48:6, 51:4, 51:15, 55:5, 55:6, 55:14, 55:18, 56:16, 57:25, 58:11, 58:14, 59:7, 60:5, 60:20, 61:14, 61:16, 66:13, 67:19, 67:22, 68:4, 68:20, 68:24, 69:7, 70:2, 70:24, 70:25, 77:14, 77:20, 77:21, 78:13, 79:13, 79:16, 80:4, 80:19, 82:24, 83:10, 85:5, 85:14, 85:15, 88:20, 90:19, 90:20, 92:8, 92:15, 96:13, 104:13, 108:22, 114:5, 114:7, 130:3, 130:23, 131:17, 143:2, 160:24, 162:16, 164:4, 164:15, 165:19, 167:3, 169:2, 172:8, 172:9, 208:11, 216:11, 218:25, 226:4, 226:5, 227:2, 230:15, 231:8, 238:17, 238:18, 247:18, 247:20, 263:21, 263:22, 269:6, 269:13, 269:20

**sidebar** [5] - 126:17, 126:23, 224:3, 224:5, 225:16

**sides** [10] - 17:11, 55:12, 59:18, 60:19, 77:17, 83:16, 108:20, 165:18, 168:12, 168:25

**siding** [1] - 89:2

**signed** [2] - 192:1, 210:10

**significance** [3] - 80:7, 251:19, 251:21

**significant** [6] - 4:17, 128:12, 146:19, 234:12, 236:24, 257:22

**signified** [1] - 133:15

**signing** [1] - 212:4

**similar** [6] - 82:4, 115:18, 155:22, 163:3, 167:17, 184:21

**similarity** [1] - 94:12

**similarly** [4] - 14:12, 31:7, 224:19, 226:18

**simple** [1] - 157:25

**simply** [8] - 34:12, 39:19, 97:25, 106:8, 106:13, 123:14, 219:12, 269:11

**simulate** [1] - 234:19

**simulated** [1] - 246:6

**sincerely** [1] - 163:22

**single** [9] - 168:3, 180:5, 180:6, 199:24, 200:4, 200:16, 201:17, 208:22, 214:8

**sister** [1] - 13:16

**sit** [7] - 33:14, 33:21, 52:12, 64:15, 64:19, 110:5, 133:24

**site** [2] - 87:12, 233:2

**sits** [1] - 230:17

**sitting** [3] - 4:15, 25:9, 78:3

**situated** [5] - 31:7, 121:3, 129:8, 224:19, 226:18

**situation** [2] - 46:6, 89:6

**six** [14] - 27:6, 27:20, 29:19, 50:18, 50:20, 62:25, 75:2, 97:6, 174:4, 181:23, 182:3, 182:4, 210:6, 228:10

**size** [4] - 137:8, 137:9, 188:23, 191:13

**skill** [6] - 107:13, 107:14, 112:23, 116:20, 219:20, 245:24

**skilled** [1] - 115:3

**skin** [1] - 133:24

**skip** [1] - 205:19

**sky** [1] - 194:3

**sleep** [1] - 270:6

**slide** [19] - 6:7, 6:8, 6:11, 6:14, 6:16, 6:18, 7:2, 8:17, 12:7, 174:11, 174:21, 185:11, 191:5, 205:16, 218:11, 220:19, 230:15, 238:15, 251:1

**slides** [7] - 5:5, 5:17, 6:9, 7:1, 7:12, 12:6, 25:20

**slow** [2] - 87:22, 88:14

**slower** [1] - 247:25

**small** [17] - 14:7, 136:2, 136:3, 136:5, 209:14, 226:14, 226:15, 228:3, 228:5, 235:25, 238:19, 245:12, 245:14, 245:16, 245:20, 246:3, 252:24

**small-scale** [1] - 209:14

**smaller** [1] - 81:10

**smartphone** [1] - 124:23

**smartphones** [1] - 124:17

**smattering** [1] - 197:17

**smoked** [1] - 94:5

**snafu** [1] - 128:12

**Snapchat** [1] - 124:24

**snow** [1] - 59:3

**snowy** [1] - 57:10

**so..** [1] - 262:3

**SO2** [1] - 187:1

**social** [1] - 125:1

**socially** [1] - 69:17

**society** [1] - 111:15

**software** [2] - 158:11, 234:18

**solar** [2] - 139:18, 232:15

**sold** [21] - 6:20, 6:21, 8:5, 15:5, 15:13, 40:6, 92:9, 155:19, 156:4, 156:18, 158:3, 177:9, 182:11, 183:15, 183:21, 191:19, 195:2, 195:3, 202:20, 217:25, 221:19

**sole** [1] - 107:2

**solely** [4] - 42:15, 106:4, 124:15, 180:8

**solid** [1] - 252:23

**solution** [7] - 135:12, 135:22, 144:9, 145:11, 150:11, 152:1, 234:11

**solve** [4] - 115:9, 133:9, 135:10, 143:19

**solving** [2] - 112:14, 245:22

**someone** [23] - 44:8, 45:24, 59:11, 69:19, 72:13, 79:10, 84:22, 87:5, 106:14, 112:20, 115:2, 116:20, 120:6, 142:6, 151:15, 160:7, 160:15, 160:25, 162:6, 166:5, 200:12, 219:21

**Sometimes** [2] - 117:11, 119:10

**sometimes** [21] - 37:4, 44:4, 81:8, 81:18, 81:22, 87:2, 87:16, 111:11, 114:8, 121:21, 133:1, 133:13, 158:9,

164:17, 184:7, 184:18, 192:20, 218:23, 231:25, 232:2
**somewhat** [1] - 108:22
**somewhere** [3] - 97:17, 161:8, 203:13
**sophisticated** [2] - 140:5, 199:15
**Sorb** [7] - 15:7, 185:5, 209:9, 209:21, 209:23, 211:20
**sorbent** [12] - 147:10, 252:21, 252:22, 253:4, 254:6, 254:12, 256:20, 257:11, 257:13, 258:4, 259:5, 262:14
**sorbents** [7] - 204:22, 246:1, 252:15, 253:4, 253:5, 254:2, 264:6
**sorry** [11] - 6:6, 9:4, 22:21, 38:5, 56:17, 79:14, 84:14, 153:8, 218:13, 218:19, 265:24
**sort** [58] - 6:19, 7:9, 48:13, 49:3, 69:1, 79:1, 94:1, 94:15, 132:9, 134:3, 134:15, 136:25, 137:12, 138:14, 139:19, 139:24, 142:8, 143:22, 144:6, 144:12, 144:16, 145:7, 147:18, 147:20, 149:5, 152:6, 159:13, 161:12, 161:20, 162:21, 163:21, 163:23, 165:14, 166:16, 166:21, 170:9, 170:20, 172:8, 172:17, 172:21, 177:17, 178:14, 179:9, 184:10, 185:20, 191:6, 191:23, 192:6, 195:8, 197:20, 197:22, 199:7, 200:12, 206:18, 216:11, 235:2, 238:25, 257:7
**sorted** [2] - 87:9, 206:18
**sorts** [1] - 138:13
**sought** [2] - 20:12,

250:14
**sound** [3] - 45:17, 52:21, 188:6
**sounds** [8] - 69:17, 69:25, 75:20, 76:3, 80:21, 81:15, 85:16, 90:21
**source** [4] - 89:25, 92:25, 144:23, 233:2
**sources** [2] - 124:17, 143:17
**South** [1] - 193:23
**southwest** [2] - 137:12, 137:18
**SOx** [3] - 239:16, 261:15, 261:18
**space** [6] - 33:20, 154:15, 185:16, 193:16, 220:1, 233:25
**spaced** [2] - 193:14, 194:18
**spaces** [1] - 194:21
**speakers** [1] - 238:2
**speaks** [2] - 24:21, 25:11
**special** [4] - 36:21, 107:13, 107:16, 110:9
**specialize** [1] - 241:18
**specializes** [2] - 113:9, 230:1
**specially** [13] - 12:22, 15:16, 183:4, 183:7, 183:8, 183:25, 202:8, 213:10, 213:18, 215:1, 221:17, 221:23
**specialty** [1] - 88:24
**specific** [14] - 6:3, 79:7, 103:16, 111:2, 112:4, 115:13, 120:22, 180:21, 181:6, 181:21, 187:14, 200:25, 241:21, 253:1
**specifically** [8] - 40:24, 135:18, 142:14, 144:10, 145:14, 147:7, 180:21, 251:3
**specification** [1] - 115:5
**speculative** [1] - 255:8
**speed** [1] - 252:18
**spell** [1] - 223:5
**spent** [4] - 133:9, 136:6, 220:22, 234:17
**spinning** [2] - 138:20

**spins** [1] - 138:21
**split** [1] - 219:5
**spoken** [1] - 30:4
**sponsored** [1] - 145:8
**sponsoring** [1] - 146:11
**sponsors** [2] - 250:15, 253:17
**spottier** [1] - 143:18
**spray** [4] - 151:19, 153:25, 154:15, 154:19
**sprayer** [1] - 147:15
**sprayers** [1] - 156:3
**spraying** [1] - 159:2
**Spring** [1] - 38:2
**Springhill** [3] - 102:23, 153:18
**squarely** [1] - 20:9
**stability** [3] - 232:22, 232:24, 233:1
**stack** [3] - 231:21, 231:23, 231:24
**stacks** [2] - 140:23, 173:6
**staff** [5] - 42:21, 42:22, 100:13, 113:20, 205:17
**staffed** [1] - 192:9
**staffing** [1] - 192:14
**stage** [3] - 8:20, 117:13, 246:5
**staggering** [1] - 152:12
**stake** [1] - 146:22
**stand** [10] - 33:24, 43:6, 97:10, 107:9, 126:22, 135:5, 148:3, 160:8, 161:2, 222:14
**standard** [3] - 108:6, 182:20, 203:17
**standing** [7] - 129:4, 268:12, 268:20, 268:23, 268:24, 269:1, 270:2
**standpoint** [1] - 161:12
**stands** [4] - 232:23, 260:22, 270:8
**standstill** [1] - 191:2
**start** [29] - 3:9, 3:10, 4:16, 5:13, 36:18, 44:19, 44:20, 49:1, 49:14, 52:1, 55:15, 68:16, 69:22, 79:1, 86:15, 92:13, 125:4, 131:25, 136:2, 137:16, 148:25, 149:16, 151:12,

157:2, 191:10, 230:7, 241:8, 253:24, 256:13
**started** [19] - 3:4, 25:22, 94:6, 99:16, 149:18, 150:3, 150:13, 151:2, 151:15, 174:17, 175:2, 176:18, 186:13, 207:13, 209:11, 209:12, 241:9, 241:22, 242:21
**starting** [4] - 98:2, 98:9, 98:10, 151:1
**starts** [4] - 27:1, 68:21, 131:9, 195:22
**state** [30] - 8:11, 9:13, 11:4, 12:2, 12:14, 13:2, 13:22, 15:15, 17:5, 107:18, 111:12, 115:1, 142:19, 144:12, 165:22, 166:6, 166:8, 182:18, 195:11, 202:25, 212:3, 214:8, 214:18, 223:5, 228:20, 250:16, 251:16, 251:17, 252:4
**statement** [7] - 20:13, 127:3, 127:4, 131:18, 164:11, 166:10, 181:10
**statements** [15] - 10:15, 11:19, 19:8, 19:9, 19:21, 23:21, 23:22, 25:4, 60:25, 105:1, 117:6, 127:6, 181:13, 204:24, 205:1
**States** [20] - 39:21, 39:22, 103:2, 110:2, 110:16, 110:23, 134:9, 139:20, 140:4, 140:14, 143:2, 168:23, 173:25, 174:13, 191:11, 232:9, 236:25, 238:17, 238:18, 253:21
**states** [1] - 239:7
**STATES** [1] - 1:1
**station** [1] - 91:8
**statute** [1] - 174:13
**statutory** [2] - 176:21, 268:23
**stay** [1] - 52:18
**steady** [1] - 50:20

**steal** [1] - 252:2
**stealing** [1] - 79:10
**steam** [10] - 134:11, 138:17, 138:18, 138:21, 140:10, 230:25, 231:1, 231:4, 231:8
**steam-pressurized** [1] - 138:21
**Stenotype** [1] - 270:13
**step** [9] - 58:8, 153:10, 172:16, 172:17, 172:23, 181:12, 181:18, 264:24, 267:24
**Stephen** [2] - 39:7, 220:20
**steps** [2] - 121:10, 159:19
**stereotypical** [1] - 142:9
**stick** [3] - 133:20, 201:7, 252:25
**stickier** [1] - 233:14
**sticking** [2] - 206:9, 218:21
**sticky** [1] - 252:24
**stiffen** [1] - 134:6
**still** [18] - 3:3, 22:13, 61:21, 62:1, 63:14, 63:17, 64:14, 77:12, 89:18, 113:16, 136:9, 139:12, 139:23, 140:19, 144:12, 168:12, 187:23, 216:9
**stipulated** [1] - 207:10
**stitched** [1] - 139:24
**stock** [1] - 204:25
**stop** [7] - 27:10, 30:7, 47:24, 110:24, 180:3, 197:12, 267:15
**stopped** [1] - 190:13
**stopping** [1] - 267:16
**stops** [1] - 184:8
**stored** [1] - 233:2
**Storm** [3] - 191:15, 194:9, 202:14
**story** [10] - 133:7, 139:1, 149:7, 164:15, 165:18, 165:20, 167:2, 167:3, 168:13, 168:25
**straight** [2] - 15:25, 143:5
**straightforward** [1] - 172:4
**strange** [1] - 114:21

**strategies** [1] - 199:7
**strategy** [1] - 203:24
**stream** [1] - 231:19
**streets** [1] - 59:2
**stretch** [1] - 126:23
**stretches** [2] - 64:16, 157:18
**strict** [1] - 95:9
**strike** [15] - 18:1, 18:12, 25:19, 31:16, 46:8, 60:9, 60:12, 60:25, 65:16, 69:24, 70:7, 70:11, 79:24, 90:8, 263:12
**strikes** [2] - 17:11, 90:10
**strong** [3] - 41:18, 54:21, 214:23
**strongly** [2] - 79:9, 92:24
**struck** [6] - 65:19, 80:8, 96:15, 96:17, 96:19, 96:21
**structure** [1] - 151:16
**structured** [1] - 138:15
**structures** [3] - 171:18, 171:20, 192:25
**struggling** [1] - 60:13
**stuck** [1] - 137:24
**students** [2] - 84:10, 84:12
**studied** [1] - 185:24
**study** [9] - 107:16, 141:7, 228:15, 228:23, 228:25, 242:10, 250:1, 250:4, 264:13
**studying** [5] - 220:22, 221:4, 242:8, 243:21, 255:2
**stuff** [18] - 55:1, 57:12, 72:9, 86:5, 87:9, 89:3, 89:11, 134:15, 140:24, 143:21, 144:6, 148:25, 161:25, 196:3, 198:25, 204:18, 231:15, 257:25
**stunning** [1] - 142:11
**sub** [17] - 89:3, 213:7, 235:15, 236:18, 236:19, 236:22, 236:24, 237:1, 237:7, 237:21, 239:2, 239:19, 244:4, 250:8, 250:11, 252:10, 252:12

**sub-bituminous** [15] - 235:15, 236:18, 236:19, 236:22, 236:24, 237:1, 237:7, 237:21, 239:2, 239:19, 244:4, 250:8, 250:11, 252:10, 252:12
**subcontractor** [1] - 50:3
**Subject** [1] - 9:12
**subject** [7] - 25:16, 61:1, 97:5, 97:21, 107:17, 114:24, 202:24
**submission** [1] - 113:20
**submissions** [1] - 117:6
**submit** [1] - 168:13
**submitted** [4] - 118:14, 126:12, 128:13, 129:15
**submitting** [1] - 253:18
**subpoena** [1] - 200:15
**subpoenas** [1] - 200:11
**substance** [3] - 30:19, 203:11, 252:23
**substantial** [11] - 12:21, 183:3, 183:18, 183:19, 197:5, 202:7, 202:23, 209:5, 215:2, 221:17, 254:10
**subtypes** [1] - 237:8
**success** [2] - 150:16, 150:23
**suddenly** [1] - 169:10
**sued** [18] - 14:17, 39:18, 161:16, 161:19, 166:13, 174:17, 176:19, 176:25, 184:16, 184:17, 193:4, 196:10, 196:13, 202:15, 214:19, 215:4, 215:9, 217:25
**suffer** [1] - 134:7
**suffered** [1] - 76:11
**suffering** [1] - 170:10
**suffice** [1] - 72:3
**sufficient** [6] - 4:10, 25:7, 25:18, 181:1, 203:5, 220:2
**sufficiently** [4] - 11:21, 18:9, 24:25,

119:14
**sugar** [1] - 230:20
**suggest** [3] - 60:24, 118:2, 206:2
**suggested** [2] - 31:12, 192:7
**suggesting** [2] - 60:11, 251:3
**suggestion** [2] - 190:14, 258:15
**suit** [11] - 6:22, 78:19, 103:4, 103:13, 103:14, 103:19, 103:20, 126:11, 196:13, 221:21, 226:1
**sulfur** [9] - 94:4, 95:8, 143:6, 236:17, 236:22, 239:14, 239:17, 239:22
**sum** [1] - 27:6
**summarize** [5] - 11:13, 11:21, 76:6, 127:24, 147:4
**summary** [2] - 115:7, 122:13
**summation** [1] - 125:8
**summer** [6] - 87:22, 89:24, 217:1, 227:12, 255:18, 256:18
**summertime** [1] - 89:14
**Sunday** [2] - 53:1, 53:25
**super** [6] - 28:22, 29:4, 88:22, 140:14, 145:18, 163:17
**Superior** [1] - 67:1
**superior** [1] - 264:10
**supervised** [1] - 210:14
**supplement** [1] - 59:24
**supplied** [2] - 167:18, 168:9
**supplier** [2] - 199:10, 199:11
**suppliers** [3] - 204:23, 205:14, 222:1
**supply** [5] - 137:21, 232:5, 232:9, 238:23, 239:5
**support** [2] - 220:3, 220:15
**supporting** [2] - 107:22, 108:21
**supports** [2] - 127:10, 127:14
**supposed** [11] - 35:5,

35:8, 43:21, 63:24, 71:19, 71:25, 72:5, 115:9, 123:18, 145:8, 151:23
**Supreme** [2] - 15:25, 16:1
**surface** [4] - 233:14, 237:21, 252:18, 252:20
**surmise** [1] - 261:15
**surprise** [1] - 220:13
**surprising** [4] - 131:7, 135:12, 145:13, 255:22
**suspicion** [1] - 123:20
**sustain** [2] - 105:9, 236:6
**swath** [1] - 168:23
**swear** [5] - 35:1, 98:19, 99:8, 101:16, 205:3
**swim** [1] - 133:11
**switch** [2] - 209:16, 212:23
**sworn** [7] - 35:2, 101:18, 101:21, 102:5, 223:1, 223:4, 223:11
**SYKES** [29] - 2:7, 9:4, 11:25, 12:10, 13:13, 14:5, 15:2, 15:22, 16:21, 20:9, 20:25, 21:14, 21:21, 26:6, 26:13, 27:13, 27:20, 27:25, 28:23, 32:19, 164:13, 218:17, 218:21, 247:1, 249:14, 260:3, 266:5, 268:12, 269:16
**Sykes** [19] - 11:25, 12:5, 18:1, 20:8, 21:24, 22:5, 22:17, 23:14, 26:4, 30:7, 30:18, 32:18, 38:12, 153:8, 164:12, 164:23, 218:13, 222:7, 268:11
**Sykes's** [1] - 23:23
**symbol** [1] - 133:15
**sympathy** [1] - 104:13
**system** [18] - 109:19, 112:3, 113:15, 134:1, 139:20, 140:13, 149:23, 151:2, 151:24, 158:2, 158:4, 167:15, 197:19, 198:18, 216:22, 216:23, 217:5,

260:13
**systems** [9] - 198:6, 198:14, 198:16, 198:20, 198:23, 207:20, 217:1, 243:6, 257:23

## T

**tab** [2] - 248:19, 265:8
**table** [4] - 3:11, 133:13, 133:15, 188:17
**tables** [1] - 98:9
**tablet** [1] - 124:23
**tabletop** [1] - 246:2
**tablets** [1] - 124:17
**tackle** [1] - 11:12
**talcum** [1] - 138:11
**Talen** [4] - 167:9, 168:5, 168:11, 168:18
**talks** [2] - 25:11, 263:16
**tall** [1] - 139:1
**tank** [1] - 189:3
**targets** [1] - 222:3
**task** [2] - 116:15, 120:23
**Tax** [10] - 173:21, 173:24, 174:3, 176:17, 179:11, 182:2, 184:24, 184:25, 190:4, 191:20
**tax** [26] - 6:16, 135:22, 135:24, 135:25, 136:1, 136:8, 136:13, 136:18, 136:19, 136:21, 141:2, 152:12, 154:25, 155:2, 155:6, 155:7, 155:11, 155:12, 155:20, 157:17, 157:25, 158:2, 187:19, 189:18, 189:24
**taxes** [3] - 136:5, 136:10, 136:12
**teach** [1] - 84:6
**teacher** [4] - 73:19, 74:17, 84:1, 84:7
**teaching** [1] - 84:13
**team** [9] - 71:13, 88:10, 88:11, 132:7, 133:8, 143:14, 146:16, 151:15, 165:6

**Tech** [2] - 16:1, 185:14
**technical** [12] - 107:17, 107:19, 115:21, 160:24, 203:25, 210:19, 216:13, 226:4, 226:5, 226:9, 227:1, 233:24
**technically** [2] - 32:2, 53:5
**technician** [2] - 71:13, 219:20
**technicians** [3] - 198:13, 243:7
**technique** [1] - 264:9
**techniques** [1] - 253:1
**technologies** [8] - 47:7, 141:14, 152:23, 152:25, 153:1, 163:3, 241:18, 249:22
**technology** [36] - 21:10, 28:4, 41:2, 41:5, 41:7, 41:11, 41:16, 46:25, 55:3, 57:16, 59:17, 59:19, 59:21, 60:23, 78:23, 93:6, 94:16, 94:17, 114:19, 114:22, 115:1, 115:2, 116:9, 124:18, 137:1, 148:21, 156:21, 158:10, 167:7, 167:17, 205:18, 219:21, 250:10, 251:9, 263:10, 264:9
**tedious** [1] - 218:22
**teenage** [1] - 169:11
**television** [1] - 124:12
**temperature** [1] - 230:25
**temperatures** [1] - 244:13
**ten** [6] - 67:8, 139:1, 176:20, 177:2, 210:7, 257:1
**ten-story** [1] - 139:1
**ten-year** [2] - 176:20, 210:7
**tend** [3] - 137:25, 235:17, 237:13
**tens** [7] - 136:23, 157:19, 166:23, 183:22, 198:11, 208:5, 221:19
**term** [5] - 29:8, 29:14, 69:18, 112:13, 121:7
**terminal** [1] - 170:10
**terms** [20] - 16:12, 22:15, 33:20, 42:3,

60:20, 62:19, 106:6, 112:5, 115:22, 120:22, 126:9, 137:9, 140:17, 153:16, 226:3, 226:6, 230:3, 232:23, 262:13, 268:1
**terrible** [1] - 165:13
**test** [29] - 23:16, 144:4, 145:2, 145:5, 145:12, 145:21, 146:9, 148:8, 148:10, 210:18, 212:13, 246:1, 246:12, 246:19, 247:9, 247:12, 247:13, 247:17, 248:4, 254:13, 254:14, 255:2, 255:6, 255:14, 262:12, 262:13, 262:19, 263:1
**tested** [4] - 135:11, 255:8, 255:10, 255:21
**testified** [6] - 21:3, 21:7, 106:10, 204:4, 204:6, 223:11
**testifies** [1] - 130:18
**testify** [12] - 157:4, 157:8, 160:13, 178:7, 179:1, 193:15, 199:17, 199:23, 200:19, 207:2, 207:20, 225:25
**testimony** [29] - 17:1, 20:22, 21:13, 24:15, 104:20, 105:5, 105:13, 105:20, 105:24, 106:9, 107:6, 107:11, 107:12, 107:20, 107:24, 108:1, 108:4, 125:14, 125:21, 130:15, 131:5, 178:24, 200:1, 204:1, 216:14, 217:9, 218:3, 267:18
**testing** [22] - 28:8, 145:4, 148:9, 169:19, 186:24, 187:9, 209:22, 210:5, 233:17, 245:25, 246:1, 246:9, 248:14, 251:8, 253:12, 253:17, 253:22,

254:5, 254:20, 254:25, 261:11, 262:2
**tests** [16] - 145:6, 145:11, 178:8, 210:14, 246:2, 248:4, 248:11, 248:16, 253:24, 255:9, 255:12, 255:18, 255:19, 262:17, 263:9, 264:6
**Texas** [6] - 165:3, 193:7, 193:25, 194:14, 239:6, 252:12
**text** [1] - 124:23
**that's..** [1] - 82:9
**THE** [338] - 1:1, 1:2, 3:1, 3:16, 4:1, 5:19, 6:4, 6:9, 6:13, 7:13, 9:3, 9:6, 9:24, 10:5, 10:11, 10:17, 10:25, 11:12, 11:24, 12:5, 13:5, 14:1, 14:18, 15:17, 16:12, 17:9, 18:16, 18:22, 18:25, 20:7, 20:20, 21:11, 21:18, 21:22, 22:15, 23:1, 23:10, 23:14, 23:24, 24:5, 24:12, 24:18, 25:5, 26:4, 26:10, 27:10, 27:15, 27:23, 28:13, 30:7, 30:12, 31:4, 32:9, 32:13, 32:24, 33:10, 33:16, 34:2, 35:3, 43:9, 43:10, 43:12, 43:23, 44:1, 44:6, 44:14, 44:20, 44:23, 45:1, 45:3, 45:7, 45:10, 45:12, 45:22, 46:1, 46:10, 46:11, 46:13, 46:15, 46:20, 46:22, 47:11, 47:17, 48:5, 48:9, 49:21, 50:25, 51:4, 51:6, 51:9, 51:10, 51:12, 51:20, 51:24, 52:1, 52:10, 53:12, 53:16, 53:19, 53:23, 54:1, 54:5, 54:9, 54:20, 55:2, 56:3, 56:9, 56:12, 56:16, 57:15, 57:21, 58:3, 58:6, 58:8, 58:11, 58:13, 59:5, 60:8, 61:5, 61:6, 61:8, 61:11, 61:13, 61:19, 61:24, 62:3, 62:7, 62:10, 62:18, 63:3, 63:6,

63:9, 63:21, 63:24, 64:2, 64:4, 64:7, 64:14, 65:14, 65:19, 66:1, 66:2, 66:4, 66:6, 66:11, 66:19, 66:21, 66:23, 67:1, 67:5, 67:10, 67:13, 68:3, 68:9, 68:12, 69:7, 69:9, 69:12, 70:1, 70:10, 70:18, 70:19, 70:22, 71:5, 71:7, 71:16, 71:21, 71:24, 72:2, 72:8, 72:18, 72:24, 73:5, 73:10, 73:17, 73:22, 74:5, 74:8, 74:11, 74:13, 74:19, 74:25, 75:3, 75:11, 75:14, 75:18, 75:23, 76:3, 76:6, 76:10, 76:13, 76:16, 76:24, 77:4, 77:8, 77:13, 77:23, 77:25, 78:8, 78:12, 79:13, 79:15, 79:18, 79:22, 80:2, 80:10, 80:11, 80:13, 80:14, 80:17, 80:21, 80:25, 81:2, 81:11, 81:15, 82:5, 82:8, 82:10, 82:13, 83:2, 83:9, 83:13, 83:19, 83:22, 84:25, 85:3, 85:5, 85:7, 85:9, 85:10, 85:13, 85:19, 85:21, 85:23, 86:6, 86:8, 86:13, 86:20, 86:22, 87:1, 87:10, 87:15, 87:20, 87:24, 88:2, 88:6, 88:10, 88:14, 88:16, 88:20, 89:17, 89:21, 90:1, 90:4, 90:6, 90:8, 90:16, 90:17, 91:1, 91:4, 91:10, 91:14, 91:17, 91:22, 91:24, 92:2, 92:22, 93:2, 93:9, 95:18, 95:20, 96:8, 96:11, 96:13, 96:15, 97:16, 98:6, 98:10, 98:13, 98:16, 99:1, 99:6, 99:16, 99:20, 100:5, 100:11, 100:15, 101:4, 101:19, 121:1, 129:11, 130:9, 130:23, 131:10, 131:13, 131:16, 131:20, 131:24, 132:4, 153:6, 153:10, 164:2, 164:9, 218:13,

218:19, 222:7, 222:11, 222:17, 222:20, 223:3, 223:5, 223:7, 223:15, 223:18, 223:23, 224:3, 224:6, 225:1, 225:15, 225:17, 246:25, 247:2, 247:25, 249:13, 249:15, 260:2, 260:4, 266:4, 266:6, 266:9, 266:14, 267:16, 267:24, 268:11, 268:14, 269:15, 269:19, 269:25
**theirs** [1] - 175:8
**themselves** [6] - 19:11, 20:2, 61:15, 155:12, 157:24, 158:5
**theoretically** [1] - 52:13
**theory** [1] - 254:24
**therapy** [10] - 61:22, 62:3, 62:15, 62:21, 62:25, 63:3, 63:10, 63:12, 65:5, 65:21
**thereabouts** [1] - 224:17
**therefore** [1] - 109:16
**therein** [1] - 9:22
**thereupon** [1] - 266:7
**Thereupon** [3] - 247:3, 249:16, 260:5
**thermometer** [1] - 133:20
**they've** [6] - 13:4, 114:8, 148:20, 151:17, 198:5, 203:13
**thick** [1] - 244:25
**thinking** [7] - 52:4, 67:23, 77:20, 80:6, 82:23, 261:24, 264:18
**thinks** [1] - 205:18
**third** [9] - 34:18, 105:20, 115:15, 124:2, 189:14, 189:19, 191:19, 216:1
**Thomas** [2] - 39:9, 111:13
**thorough** [1] - 247:13
**thoughts** [5] - 81:5, 81:6, 92:22, 93:5, 256:7
**thousands** [4] -

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna DE 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

183:22, 190:20, 214:10, 244:15
**three** [28] - 4:8, 18:17, 27:22, 54:3, 63:13, 70:8, 75:20, 75:22, 88:4, 96:17, 103:7, 111:4, 114:2, 138:3, 168:7, 169:10, 172:5, 178:1, 190:25, 208:11, 216:17, 240:15, 257:24, 258:11, 258:21, 259:1, 269:5
**throughout** [6] - 130:24, 132:13, 154:5, 165:16, 233:21, 239:7
**throw** [1] - 172:11
**thumb** [1] - 82:22
**thumbnail** [1] - 229:15
**Thursday** [4] - 29:15, 44:5, 62:12, 71:19
**Thursdays** [1] - 62:6
**tick** [1] - 160:19
**tide** [1] - 227:1
**tie** [1] - 127:24
**tied** [2] - 59:1, 60:2
**tight** [2] - 28:14, 152:9
**tighten** [1] - 64:21
**tile** [1] - 89:12
**time-limited** [1] - 111:21
**timed** [2] - 36:8, 128:16
**timeline** [15] - 6:17, 6:18, 7:8, 8:18, 12:7, 152:7, 172:7, 172:8, 172:9, 172:12, 176:11, 177:4, 215:23, 256:14, 259:3
**timelines** [1] - 149:10
**tip** [3] - 108:21, 108:23, 176:6
**tired** [1] - 145:21
**title** [2] - 114:7, 169:11
**Title** [1] - 173:24
**toaster** [1] - 140:6
**today** [16] - 3:23, 4:13, 8:12, 34:7, 41:7, 44:20, 45:19, 53:8, 86:15, 101:11, 136:20, 143:12, 147:25, 169:17, 232:10, 267:19
**together** [12] - 37:4, 74:16, 104:11, 155:16, 169:6, 169:21, 170:25, 219:22, 250:18,

256:19, 258:5, 264:15
**tomorrow** [6] - 43:21, 44:2, 44:18, 46:5, 129:18, 270:7
**ton** [1] - 40:5
**tongue** [1] - 133:20
**tonight** [1] - 270:7
**tonnage** [1] - 207:12
**tonnages** [2] - 194:25, 195:13
**tons** [29] - 136:23, 138:1, 138:2, 154:23, 170:2, 177:7, 177:8, 182:11, 183:23, 190:20, 194:5, 195:23, 201:22, 201:23, 202:1, 202:5, 202:10, 202:19, 203:12, 208:6, 208:16, 208:17, 209:1, 214:10, 218:22, 221:19, 240:14
**took** [8] - 28:10, 30:4, 32:22, 64:8, 67:9, 95:5, 135:11, 229:16
**tools** [2] - 124:18, 124:20
**top** [9] - 11:6, 60:18, 89:7, 155:13, 195:4, 201:13, 249:22, 260:18, 260:21
**topic** [1] - 56:18
**topsoil** [1] - 237:22
**tornado** [1] - 139:1
**total** [3] - 35:11, 228:10, 243:16
**totally** [2] - 18:18, 240:17
**touch** [2] - 179:6, 217:23
**touched** [2] - 140:20, 218:10
**touching** [1] - 123:24
**touchstone** [1] - 169:25
**touchy** [1] - 56:17
**tough** [2] - 56:1, 86:1
**toward** [5] - 104:13, 108:22, 233:14, 253:13, 260:18
**towards** [5] - 60:5, 79:1, 82:24, 211:16, 252:15
**town** [2] - 228:3, 228:5
**toxic** [7] - 94:2, 133:25, 203:17, 241:24, 241:25,

242:3, 242:22
**toxin** [3] - 133:10, 133:12, 150:1
**toxins** [2] - 242:11, 242:13
**Toxins** [1] - 243:2
**trace** [1] - 157:2
**track** [2] - 145:18, 197:10
**tracked** [1] - 197:20
**trade** [1] - 88:23
**traded** [2] - 204:24, 224:22
**Trademark** [3] - 111:5, 112:25, 113:2
**traditional** [1] - 139:6
**trailer** [1] - 194:2
**train** [2] - 232:4, 240:13
**trainload** [1] - 240:12
**trainloads** [2] - 170:1, 240:12
**trains** [4] - 137:25, 138:3, 142:22, 240:15
**transaction** [2] - 149:2, 151:25
**transcribed** [1] - 109:24
**transcript** [2] - 125:21, 224:25
**TRANSCRIPT** [1] - 1:9
**transfer** [1] - 138:15
**transferred** [2] - 74:3, 230:24
**transformed** [1] - 111:15
**transmission** [2] - 138:24, 140:12
**transport** [1] - 239:24
**transportation** [1] - 239:19
**transported** [1] - 232:4
**transporting** [1] - 95:13
**travel** [2] - 232:1, 242:18
**traveled** [1] - 210:13
**traveling** [1] - 149:7
**travels** [3] - 173:8, 242:17, 267:20
**treat** [7] - 105:13, 171:4, 172:23, 173:5, 189:15, 196:18, 209:20
**treated** [4] - 135:23, 179:21, 196:23, 211:19
**treating** [1] - 179:17

**treatment** [2] - 173:5, 261:24
**treats** [1] - 173:18
**tree** [1] - 218:11
**Tree** [1] - 193:23
**tremendous** [3] - 143:15, 171:24, 202:23
**Trettel** [1] - 39:5
**trial** [61] - 3:5, 4:3, 4:4, 4:10, 18:5, 27:5, 27:22, 27:24, 28:15, 28:20, 30:12, 30:17, 31:8, 34:10, 36:8, 36:18, 38:18, 39:5, 40:11, 48:2, 78:25, 86:14, 96:2, 102:9, 103:24, 104:16, 105:15, 105:18, 122:12, 123:11, 124:4, 125:12, 126:2, 126:14, 126:15, 128:4, 128:16, 129:24, 130:24, 131:16, 132:13, 154:6, 156:22, 157:5, 218:1, 246:18, 246:21, 246:24, 248:20, 248:22, 249:12, 259:14, 260:1, 260:8, 269:5, 269:6, 269:8, 269:9, 269:12, 270:4, 270:5
**TRIAL** [2] - 1:9, 1:11
**Trial** [4] - 265:9, 265:11, 266:3, 266:16
**trials** [1] - 163:24
**tried** [2] - 44:12, 146:8
**tries** [1] - 123:21
**trip** [2] - 72:19, 73:1
**trivial** [1] - 171:18
**truck** [1] - 232:4
**true** [4] - 108:17, 170:8, 205:4, 215:11
**truth** [2] - 109:9, 166:17
**truthfully** [2] - 34:12, 34:25
**try** [33] - 5:11, 17:10, 22:5, 49:8, 59:9, 77:25, 78:22, 81:20, 92:5, 94:10, 105:19, 124:2, 124:16, 132:12, 132:14, 132:18, 141:5, 141:25, 143:19, 145:11, 150:20, 166:12, 166:15,

172:11, 176:10, 184:5, 188:4, 188:11, 210:21, 238:3, 248:13, 259:7, 268:5
**trying** [25] - 14:11, 22:4, 22:22, 55:4, 59:18, 59:23, 61:25, 72:11, 87:1, 92:4, 93:4, 126:19, 135:10, 135:17, 140:15, 149:7, 179:9, 182:13, 186:14, 224:15, 244:9, 248:15, 250:19, 250:21, 253:11
**Tuesday** [13] - 36:14, 44:5, 45:13, 52:12, 52:14, 52:19, 54:4, 62:12, 62:13, 62:15, 86:16, 89:18, 128:20
**Tuesdays** [1] - 62:5
**turbine** [7] - 138:18, 138:22, 139:9, 231:1, 231:4
**turbines** [1] - 140:1
**turbulent** [3] - 147:18, 244:14, 245:7
**turn** [6] - 101:16, 103:21, 131:16, 187:10, 222:20, 248:19
**turned** [6] - 78:11, 182:23, 203:4, 227:14, 251:7, 253:3
**turns** [6] - 134:9, 138:11, 138:22, 142:10, 145:17, 231:2
**twice** [9] - 61:22, 62:6, 63:10, 65:5, 78:11, 137:8, 144:3, 189:2, 189:5
**Twitter** [1] - 124:24
**two** [67] - 5:4, 15:25, 17:1, 26:2, 27:21, 42:21, 43:19, 52:25, 53:22, 63:13, 75:24, 77:15, 82:11, 88:10, 91:19, 93:18, 93:19, 99:23, 103:1, 108:7, 108:12, 121:11, 129:20, 133:21, 141:23, 141:24, 148:10, 156:8, 161:5, 161:6, 165:18, 168:12, 168:25, 172:16, 172:17, 172:22,

172:23, 174:8, 177:18, 177:19, 177:25, 179:8, 179:14, 179:16, 181:14, 185:4, 186:6, 196:17, 197:24, 208:13, 219:7, 227:7, 228:16, 239:7, 240:15, 240:21, 244:25, 248:8, 252:9, 252:19, 254:7, 255:15, 265:5, 268:19, 269:10

**two-part** [9] - 148:10, 172:22, 172:23, 179:16, 181:14, 196:17, 227:7, 265:5

**two-person** [1] - 88:10

**two-step** [3] - 172:16, 172:17, 172:23

**two-year** [1] - 228:16

**type** [22] - 19:22, 41:7, 49:3, 58:18, 58:22, 88:23, 134:15, 146:24, 156:6, 184:8, 212:21, 235:1, 235:3, 235:7, 235:8, 235:18, 237:7, 237:18, 238:16, 240:1, 245:24, 267:2

**types** [11] - 17:24, 134:22, 140:16, 140:18, 142:3, 146:17, 235:13, 235:16, 235:17, 238:24, 252:7

**typical** [1] - 210:10

**typically** [6] - 97:13, 191:12, 197:10, 231:23, 234:25, 238:16

**typist** [1] - 267:1

## U

**U.S** [5] - 34:4, 103:7, 103:8, 232:5, 237:16

**u.S** [1] - 270:17

**U.S.M.J** [1] - 1:12

**ultimately** [9] - 7:7, 31:9, 60:17, 94:9, 99:19, 150:18, 154:6, 182:23, 269:25

**umbrella** [1] - 106:16

**unable** [1] - 42:8

**unconventional** [1] -

167:1

**under** [35] - 21:7, 22:24, 23:3, 26:8, 26:25, 39:20, 84:15, 95:8, 105:6, 121:6, 126:22, 133:20, 161:12, 174:2, 174:15, 175:13, 177:1, 181:22, 182:24, 187:14, 188:1, 191:19, 191:21, 200:13, 205:4, 209:25, 222:3, 241:24, 242:10, 243:13, 244:12, 247:13, 260:18, 264:5, 264:8

**Under** [1] - 116:3

**undercutting** [1] - 151:7

**undergrad** [1] - 132:17

**underground** [1] - 237:24

**underlining** [1] - 201:24

**understood** [8] - 13:5, 18:19, 56:9, 115:22, 173:15, 174:17, 187:21, 269:19

**Understood** [2] - 8:14, 55:2

**underway** [1] - 135:18

**undisputed** [1] - 202:22

**undue** [1] - 31:15

**unduly** [3] - 26:9, 27:14, 31:19

**uneven** [1] - 69:23

**unexpectedly** [1] - 169:10

**unfair** [2] - 60:5, 81:12

**unfairly** [2] - 26:24, 27:14

**unfit** [1] - 59:4

**unfolds** [1] - 78:24

**unfortunately** [4] - 6:10, 157:7, 170:10, 254:14

**union** [2] - 47:4, 50:3

**Union** [1] - 252:12

**unique** [1] - 134:16

**uniquely** [2] - 163:24, 244:9

**unit** [6] - 139:9, 240:10, 240:13, 240:15, 247:10, 248:9

**UNITED** [1] - 1:1

**United** [21] - 39:21,

103:2, 110:2, 110:16, 110:23, 134:9, 139:20, 140:4, 140:14, 143:2, 168:23, 173:25, 174:13, 191:11, 232:9, 234:5, 236:25, 238:17, 238:18, 253:21

**units** [1] - 139:9

**University** [5] - 141:21, 210:4, 228:17, 228:20, 228:22

**unlawful** [1] - 119:5

**unless** [5] - 43:5, 130:5, 149:21, 240:17, 252:20

**unlike** [1] - 120:2

**unnecessary** [1] - 123:20

**unpatentable** [2] - 117:18, 117:20

**unqualified** [1] - 59:3

**unreasonable** [1] - 107:6

**unspoken** [1] - 30:4

**unusual** [1] - 223:19

**unwarranted** [2] - 59:17, 123:20

**up** [145] - 4:14, 4:21, 6:4, 8:17, 8:20, 9:1, 9:3, 9:8, 10:24, 16:13, 18:8, 18:17, 18:23, 25:23, 27:18, 30:9, 31:23, 33:9, 33:16, 33:18, 33:21, 43:15, 52:6, 52:8, 52:25, 53:3, 53:4, 53:6, 54:3, 54:23, 55:22, 56:10, 58:19, 63:18, 64:12, 64:19, 64:21, 65:10, 72:11, 72:17, 73:13, 74:15, 76:23, 89:7, 89:13, 94:6, 95:13, 96:21, 98:2, 98:21, 99:21, 100:2, 131:22, 132:25, 134:20, 134:21, 135:5, 135:22, 137:20, 138:13, 138:17, 142:7, 144:1, 144:18, 145:11, 148:3, 150:16, 151:15, 151:24, 152:8, 155:6, 155:10, 155:19, 155:23, 155:25,

156:3, 156:11, 156:23, 157:14, 157:16, 157:21, 158:2, 160:8, 161:2, 161:9, 162:4, 165:4, 167:21, 168:4, 171:11, 177:5, 177:17, 180:11, 182:10, 185:11, 187:24, 188:21, 189:16, 189:18, 190:3, 191:20, 192:12, 196:4, 198:7, 198:25, 200:12, 200:13, 200:18, 201:5, 211:3, 216:13, 216:16, 217:15, 218:23, 219:8, 219:10, 220:4, 224:24, 225:13, 227:11, 228:1, 228:2, 228:3, 228:8, 228:12, 229:1, 229:6, 230:19, 231:15, 231:20, 237:2, 239:4, 239:9, 240:18, 247:23, 250:9, 252:18, 254:23, 257:7, 258:9, 258:11, 263:20, 268:7, 268:13

**upcoming** [1] - 259:10

**uphold** [1] - 105:9

**upper** [2] - 114:5, 118:23

**upstate** [1] - 53:20

**upstream** [2] - 186:25, 233:9

**usage** [1] - 197:9

**USC** [1] - 173:25

**useful** [4] - 110:19, 111:12, 112:14, 112:22

**uses** [16] - 12:22, 15:12, 115:13, 119:4, 183:3, 183:12, 183:18, 183:19, 184:1, 197:5, 202:7, 202:23, 204:7, 209:5, 215:2, 221:18

**Utah** [2] - 193:19, 213:7

**utilities** [2] - 141:9, 249:23

**utility** [9] - 167:9, 167:18, 168:6, 168:19, 191:12,

191:13, 218:5, 250:15

**Utility** [1] - 216:15

**utilized** [2] - 11:9, 16:20

## V

**vacation** [2] - 87:15, 87:18

**valid** [2] - 116:5, 219:14

**validity** [5] - 109:5, 119:11, 120:8, 120:14, 121:17

**Valley** [2] - 156:14, 192:17

**valuable** [1] - 111:20

**valuation** [1] - 161:11

**value** [12] - 21:9, 59:17, 59:19, 60:23, 94:16, 94:17, 136:1, 148:11, 162:19, 189:25

**valued** [1] - 218:7

**vapor** [1] - 242:15

**various** [9] - 8:19, 115:10, 178:8, 192:13, 195:2, 195:20, 196:14, 198:5, 215:9

**vary** [3] - 212:21, 212:24, 235:17

**varying** [1] - 233:4

**vast** [4] - 236:11, 237:1, 238:21, 239:3

**Veatch** [7] - 229:24, 234:15, 234:16, 234:17, 240:3, 240:23, 241:10

**vehicle** [2] - 155:15, 155:17

**vendor** [1] - 77:2

**venire** [1] - 35:2

**venture** [1] - 157:12

**verdict** [8] - 42:15, 104:18, 123:14, 128:1, 169:3, 172:3, 176:8, 222:5

**Verschueren** [1] - 39:9

**versed** [1] - 219:21

**version** [3] - 191:7, 267:7, 267:9

**versus** [7] - 3:6, 18:6, 235:9, 238:14, 245:17, 256:25, 257:11

**VI** [1] - 186:22

**vice** [1] - 165:2
**Victorian** [1] - 134:6
**video** [12] - 98:24, 109:18, 109:23, 109:24, 110:7, 110:12, 113:25, 120:25, 126:10, 158:21, 219:13, 245:4
**view** [18] - 7:22, 8:10, 12:20, 12:23, 12:25, 21:8, 25:16, 57:5, 92:16, 122:7, 187:23, 194:15, 194:16, 221:7, 244:19, 244:23, 247:16, 247:18
**viewpoint** [1] - 233:3
**viewport** [2] - 244:19, 244:22
**views** [3] - 40:25, 81:4, 83:3
**Vince** [1] - 39:7
**Vincent** [1] - 39:9
**violate** [1] - 32:7
**violent** [1] - 139:2
**Virginia** [5] - 93:24, 113:1, 142:8, 193:3, 194:9
**virtually** [1] - 254:18
**visit** [4] - 63:13, 63:18, 64:12, 217:4
**visited** [1] - 217:6
**Vistra** [2] - 21:8, 168:22
**visual** [2] - 137:3, 137:5
**voir** [9] - 31:24, 33:14, 34:6, 34:10, 34:11, 34:14, 35:6, 35:16, 43:1
**volatile** [1] - 236:5
**volts** [1] - 140:2
**Volume** [1] - 1:7
**volumes** [2] - 145:19, 245:19
**vs** [1] - 1:6

**W**

**W.A** [7] - 137:11, 137:18, 138:3, 139:9, 153:13, 191:15, 194:14
**WA** [1] - 153:22
**wait** [5] - 3:3, 83:13, 93:16, 133:21, 209:7
**waiting** [1] - 89:11
**waiving** [1] - 9:13

**wake** [1] - 218:23
**walk** [10] - 64:19, 94:18, 96:9, 99:5, 126:23, 166:7, 166:11, 172:13, 184:6
**walked** [1] - 106:15
**Walker** [1] - 73:14
**walker** [4] - 73:22, 74:5, 74:14, 75:1
**walking** [1] - 64:18
**walls** [2] - 138:15, 198:25
**wants** [3] - 89:14, 188:14, 268:13
**warner** [1] - 270:11
**Warner** [1] - 270:16
**WARREN** [1] - 1:21
**Warren** [3] - 3:14, 30:10, 37:10
**Washington** [2] - 113:2, 165:7
**watch** [6] - 44:1, 44:9, 113:25, 124:1, 124:12, 130:16
**water** [11] - 106:16, 133:11, 138:14, 138:16, 138:17, 144:2, 144:6, 230:24, 231:8, 242:18
**waving** [1] - 129:3
**ways** [7] - 55:3, 55:5, 111:23, 243:6, 258:9, 258:12, 258:22
**wear** [1] - 138:10
**wear-in** [1] - 138:10
**wearing** [1] - 106:15
**weather** [1] - 227:24
**website** [1] - 124:25
**websites** [2] - 124:10, 125:1
**Wednesday** [7] - 43:21, 44:2, 45:14, 52:19, 54:4, 71:19
**week** [29] - 4:4, 29:20, 43:21, 44:3, 44:4, 44:22, 52:8, 52:12, 61:22, 62:6, 62:22, 63:1, 63:10, 63:23, 63:25, 65:5, 65:11, 65:22, 71:15, 72:10, 87:25, 88:12, 128:7, 168:19, 173:23, 177:2, 178:5, 188:24
**week's** [2] - 86:1, 89:7
**weekend** [4] - 52:22, 53:15, 53:16, 53:20
**weekly** [1] - 74:18

**weeks** [4] - 29:19, 62:25, 63:13, 265:20
**weigh** [1] - 239:23
**weighing** [2] - 107:20, 107:24
**weight** [4] - 106:19, 106:21, 106:25, 108:1
**welcome** [9] - 34:2, 34:5, 43:12, 46:15, 51:13, 70:8, 85:11, 90:18, 225:8
**well-positioned** [1] - 205:17
**west** [2] - 238:25, 239:1
**West** [4] - 93:24, 142:8, 193:3, 194:9
**western** [2] - 142:12, 143:10
**wet** [3] - 106:16, 198:8, 199:13
**whatnot** [1] - 49:5
**Whatsapp** [1] - 124:24
**whereabouts** [1] - 227:21
**whereas** [2] - 152:8, 239:18
**whichever** [1] - 62:9
**white** [3] - 195:4, 201:5, 201:8
**Whitney** [1] - 39:10
**whole** [11] - 19:22, 94:5, 104:11, 144:25, 166:19, 167:13, 177:6, 201:14, 206:11, 207:17, 215:3
**width** [1] - 240:19
**wife** [2] - 184:7, 227:23
**wife's** [1] - 137:13
**willful** [5] - 16:24, 103:15, 109:1, 214:20, 214:21
**willfully** [5] - 17:4, 123:1, 180:23, 183:6, 214:24
**willfulness** [2] - 16:24, 215:7
**William** [1] - 39:10
**willing** [1] - 251:25
**Wilmington** [2] - 53:7, 165:11
**WILSON** [1] - 2:7
**Wilson** [2] - 3:24, 165:8
**win** [1] - 172:3
**wind** [2] - 139:17, 232:15

**windows** [1] - 89:2
**Winston** [3] - 66:22, 67:2, 67:15
**wintertime** [1] - 227:25
**wisdom** [2] - 179:10, 189:13
**wish** [7] - 93:1, 125:7, 128:15, 131:17, 164:6, 164:11, 267:20
**WITNESS** [1] - 223:7
**witness** [31] - 19:16, 19:19, 21:1, 21:2, 21:13, 22:18, 23:19, 60:23, 106:10, 107:3, 107:9, 108:4, 123:16, 125:15, 130:14, 130:15, 130:17, 130:25, 131:2, 131:5, 160:13, 180:5, 199:24, 200:4, 200:16, 223:3, 223:10, 223:14, 227:2
**witness'** [4] - 107:2, 107:4, 107:7, 107:8
**witnesses** [9] - 30:25, 39:3, 39:4, 78:18, 104:20, 105:24, 107:25, 185:8, 206:14
**won** [1] - 76:20
**wonder** [6] - 119:18, 139:11, 142:20, 155:5, 170:20, 218:15
**wondering** [2] - 110:5, 203:8
**Wonderland** [1] - 134:4
**word** [4] - 114:23, 128:24, 205:21
**word-for-word** [1] - 205:21
**wording** [1] - 32:2
**words** [13] - 57:21, 68:22, 119:16, 120:11, 121:22, 122:1, 122:2, 123:10, 124:8, 247:11, 249:1, 257:16, 266:24
**work's** [1] - 74:3
**workday** [1] - 86:20
**worker** [1] - 50:12
**workers** [1] - 227:7
**works** [7] - 44:11, 48:14, 50:7, 66:17,

73:20, 112:3, 113:11
**world** [6] - 133:5, 148:12, 170:22, 185:25, 197:24
**world's** [1] - 267:1
**worried** [1] - 59:13
**worries** [1] - 131:13
**worry** [1] - 81:18
**worst** [7] - 237:3, 250:3, 250:4, 250:5, 251:10, 251:12, 252:9
**worst-case** [3] - 250:3, 251:10, 251:12
**worth** [3] - 86:1, 95:7, 155:2
**wow** [1] - 256:11
**wrap** [2] - 30:9, 237:2
**wrapper** [1] - 118:12
**wrappers** [1] - 118:13
**wrings** [1] - 141:17
**write** [2] - 112:20, 162:7
**writes** [1] - 133:17
**writings** [1] - 110:21
**written** [13] - 81:8, 83:8, 115:5, 117:21, 117:24, 118:10, 178:20, 190:4, 220:2, 220:5, 220:9, 220:14, 221:3
**wrongly** [1] - 81:20
**wrote** [1] - 265:4
**Wyoming** [5] - 142:15, 142:17, 194:8, 237:11, 239:19
**Wyser** [1] - 27:1

**Y**

**yards** [2] - 170:19, 175:5
**year** [17] - 61:23, 63:8, 93:21, 136:3, 176:20, 200:8, 205:6, 206:21, 207:8, 207:13, 207:16, 207:17, 210:7, 215:17, 228:16, 228:18
**years** [49] - 8:6, 50:16, 50:18, 50:19, 50:20, 54:15, 56:23, 57:3, 57:6, 67:9, 72:22, 79:11, 93:18, 93:19, 96:6, 111:3, 111:5, 111:7, 134:16, 139:21, 150:3,

155:3, 169:9,
169:24, 172:9,
174:4, 180:12,
183:17, 185:15,
188:2, 194:24,
195:13, 197:18,
201:17, 208:11,
210:13, 212:11,
212:18, 213:6,
216:20, 220:1,
221:15, 229:18,
233:18, 234:17,
242:10, 243:18
**yellow** [2] - 238:22,
239:9
**your..** [1] - 84:18
**yourself** [2] - 49:4,
225:23
**yourselves** [1] - 99:23

## Z

**zero** [1] - 224:24
**zeroed** [1] - 242:22
**zone** [7] - 233:10,
233:11, 244:14,
244:20, 244:24,
245:1, 245:7
**zoom** [3] - 168:2,
195:14, 195:21
**ZURLO** [1] - 2:8

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna DE 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com