IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS CORP., et al., )
)
-------------------Plaintiffs, )
) Case No.
vs. ) 19-CV-1334-CJB
)
ARTHUR J. GALLAGHER & CO., et al., )
) Volume II
-------------------Defendants. )

TRANSCRIPT OF JURY TRIAL

JURY TRIAL had before the Honorable Christopher J. Burke, U.S.M.J., and a jury of eight in Courtroom 2A on the 27th of February, 2024.

APPEARANCES

DEVLIN LAW FIRM
    BY:  JAMES LENNON, ESQ.
         PETER MAZUR, ESQ.

                    -and-

CALDWELL CASSADY & CURRY
    BY:  BRADLEY CALDWELL, ESQ.
         JASON CASSADY, ESQ.
         JOHN CURRY, ESQ.
         JUSTIN NEMUNAITIS, ESQ.
         WARREN MCCARTY, III, ESQ.
         DANIEL PEARSON, ESQ.
         ADRIENNE DELLINGER, ESQ.
         AISHA HALEY, ESQ.
         RICHARD COCHRANE, ESQ.

                    Counsel for Plaintiff

(Appearances continued.)


        MORRIS JAMES LLP
              BY:  CORTLAN HITCH, ESQ.
                   KENNETH DORSNEY, ESQ.

                          -and-

        BRADLEY ARANT BOULT CUMMINGS LLP
              BY:  JEFF DYESS, ESQ.
                   PAUL SYKES, ESQ.
                   BENN WILSON, ESQ.
                   ASHLEY ROBINSON, ESQ.
                   JESSICA ZURLO, ESQ.

                              Counsel for CERT Defendants

THE COURT:  All right, everybody.  Just a couple of housekeeping things.  One is -- and I appreciate -- I know you guys were up late.  I feel bad for Mr. Caldwell sending the e-mails at 11:48.  I know you're not getting a lot of sleep.

I will tell you, FYI, because we try to get in as early as we can to review what you send us to we see what's coming up.  The reason we're doing that is the better we have a sense of what the issues really are, we can review in advance, the quicker we can deal with them so that your time doesn't get charged.  The fewer things I can cover here, the less circumstance where you're not going to be charged time.

If you're talking about an exhibit or a paragraph of a report and you're not including it, we've got to figure out where is it, where is paragraph 101 of O'Keefe's report, et cetera, and we just lose time.  It uses time, so less we have to resolve it.  So the more you can include stuff in the e-mail, the better for us.

Lastly, this is a little strange, but apparently a man at the pretrial conference and yesterday who is not affiliated with this case has come into the courtroom both times and crossed the well of the courtroom.  Mr. Dorsney apparently, according to any courtroom deputy, he's dropped papers off in the vicinity.  Nothing to do with you or your

case, apparently doesn't have anything to do with a case I have.  This same person has twice apparently come into the courtroom and passed the well of the courtroom.

Again, it's hard to distinguish -- for court security to understand if this is a courier or whatever, but it's strange and unusual, and we alerted our marshal service to it.  It's all to say -- I didn't even notice him.  If you see this person again or if this happens again, alert us in some way and let us know, and we'll let court staff know as well.

Let's try to cover as much as we can.  Let's go to the first issue.  Mr. Nemunaitis, do you want to start us off?

MR. NEMUNAITIS:  Thank you, Your Honor.  Justin Nemunaitis for the defendants.

Last night, after we sent the e-mail to the Court with the exhibits and slide objection issues, there are two additional things that came up.  One is we filed a motion for corrective instruction.  I spoke to the other side about that.  This deals with the contributory infringement issue and things that were said during the opening.

I don't think they really had, fairly, much time to digest the motion, but I did want to bring that to the Court's attention, and we would like a ruling on it fairly

soon because we do think it's an important issue.

THE COURT:  I guess is what you're saying that we see that the Court has ruled that with regard to contributory infringement, the material issue that's going to be material to each defendant is the refined coal which the defendant sold to each power plant.  We also see that the defendants are going to use evidence and attempt to demonstrate that they're not guilty of contributory infringement, evidence of the coal provided to other CERT entities, perhaps, who are not defendants anymore or these CERT defendants prior to the damages period in an attempt to show that when it came to the question of did they know that the coal was specially made or adapted for infringement, they thought it wasn't because, look at all this other coal that's associated in some way with us, et cetera, et cetera, and that's what this is about.

MR. NEMUNAITIS:  That's the issue, Your Honor. And if Your Honor wants to take up argument, my co-counsel Mr. McCarty could handle that, but I do think there's a different issue, sort of is higher urgency.  I did want to bring it to the Court's attention, and the issue at our end is about jury confusion.  You know, we can all understand that, but we think it's more difficult for the jury, and that's what we're concerned about.

THE COURT:  You said you filed a motion on the

docket?

MR. NEMUNAITIS:  Yes.

THE COURT:  Oh, I didn't see that.  Okay.  But the gist is a motion saying, look, when you get to final jury instructions, we're going to want an instruction that makes it clear to the jury that when it comes to analyzing the elements of the claim, this is the coal that matters. You know, and presumably, like, there will be some request, or to the extent other coal is mentioned, it can only be relevant to the defense at stake, et cetera.  That's the gist -- you want to know what the instruction is going to be?

MR. NEMUNAITIS:  I think we might want the instruction before the final jury instructions, so that's part of the issue.

THE COURT:  That's what my question is.  You know, we're kind of in triage mode, so it's like, why do I need to decide what the exact wording of that instruction is going to be prior to Thursday night, is the question.  Why do we use our time, whenever we get it right now, to decide that question right now as opposed to these other issues coming up that will relate to the testimony today?

MR. NEMUNAITIS:  I think we should focus on the other issues right now.

THE COURT:  Okay.  To put it differently, I

think Thursday night, the parties will make argument about this instruction, and I'll decide.  And then going into, you know, closings, everyone will know what that instruction is. Is that okay with you?

MR. NEMUNAITIS:  I expect that this issue is going to come up before.  What we're asking for is an instruction before the final jury instructions.  I expect this is going to come to a head in front of a witness or sometime earlier than that.  I think we need to get their response to the motion, and I believe Your Honor needs time to take a look at that.

THE COURT:  I don't know how I would be prepared to decide that at this very moment.  So if you want to try to work out some process, you know, with the other side, we file a motion, they should have a chance to provide their response, Judge, we'd like you to decide it by X, and I'll try to do so.  I don't know what else we can do.

MR. NEMUNAITIS:  We talked about it this morning.  We'll continue talking and go back to it at the next opportunity.

THE COURT:  Okay.  If you can get me your positions and we can figure out the time period in which overnight or whatever that I can decide, you know, I'm happy to do it.

MR. NEMUNAITIS:  The other issue, Your Honor,

was in an e-mail to the Court after the evidentiary e-mail, and this deals with something that we think is very important to get resolved before the cross-examination of Mr. Pavlish, who will be the first witness up this morning.

The issue here is on the priority date issue. This was one of the two issues that was left to resolve in Your Honor's preliminary instructions.

We spoke to the other side this morning. They said they intend to cross Pavlish on that priority chain issue that was raised in opening. That could be a problem because we think, ultimately, their arguments are going to be legally improper under the final jury instruction. And the real issue here is on the '517 patent.

If Your Honor rules as a matter of law that the provisional application was incorporated into the '517 patent, then them going through all these intervening applications talking about changes and disclosure and all of that would be very confusing to the jury because, as a matter of law, that provisional is considered a part of the '517 patent.

THE COURT:  I have a memory that I dealt with this issue.  I know parties have cited it.  I just got this e-mail at 6:34 a.m.  I don't understand why, but I dealt with an issue about, I guess, the '114 during summary judgment.  But other than that, you're coming to me cold

with it.

So there's a provisional application.  Is that the one that's filed in, like, '04?

MR. NEMUNAITIS:  August 2004.

THE COURT:  Okay.  And then we got to the '517 patent, and that's issued in -- is that 2019?

MR. NEMUNAITIS:  It would have been filed around 2019.

THE COURT:  Okay.  And the sole question is going to be whether the '517 patent sufficiently incorporates by reference the contents of the provisional?

MR. NEMUNAITIS:  Correct.

THE COURT:  Okay.  And you're telling me that if that's a legal decision I need to make and if I make the decision that it does, that it sufficiently incorporates the provision, then this line of argument the defendant is making about breaking the priority chain is a nonstarter, it's a nonentity; is that the idea?

MR. NEMUNAITIS:  Correct.  And they could potentially still have that argument on the '114 side of the chain, but for the bulk of the chain and the thing that we think they're going to cross Mr. Pavlish on, it should be a nonissue.

THE COURT:  And the issue is whether -- you said in your e-mail that previously I determined that phraseology

like "incorporated by reference to the extent appropriate under the law" isn't the sufficient matter of incorporation to appropriately incorporate a prior provisional application.  But you're saying that the '517 patent doesn't have that language, it just flatly says something like incorporates by reference?

MR. NEMUNAITIS:  Correct, Your Honor, and I can walk through each of the statements there, but I don't dispute that every single application of the '517 chain says "hereby incorporate by reference" or "hereby incorporate by reference in its entirety."  And that language has been blessed by the Federal Circuit in the case we cited as exactly what you're supposed to do to maintain priority.

THE COURT:  Okay.  All right.  So I guess let me hear from the other side.  And, Mr. Nemunaitis, you're saying this is an issue that needs to be decided, in your mind, before cross-examination of Mr. Pavlish?

MR. NEMUNAITIS:  Absolutely, Your Honor.  We think that this is going to be a significant part of the cross-examination and deciding it now could avoid a whole range of disputes that occur or objections coming up in his testimony.

THE COURT:  Let's hear from the other side.

MR. WILSON:  Good morning, Your Honor.  Benn Wilson.

THE COURT:  Mr. Wilson, good morning.

MR. WILSON:  So there's a couple of steps going on in this.  The first step is back to your summary judgment order.  I think we have a different reading of the summary judgment order in which we laid out the argument that we think the language to incorporate was improper as to any of the patents, and the Court from our reading dealt with that collectively and said, "I agree with Defendants on this."

So I think our view is exactly flipped, that this has already been decided, that it's not incorporated into the intervening application.

Moving on from that step if we are --

THE COURT:  Just so I understand at, Step 1, you say you read my prior summary judgment order to say that I have already determined that as to the '517 patent and its language that it was not sufficient to incorporate by reference the 2004 provisional?

MR. WILSON:  Yes, sir, that was our reading of it, is that everything was dealt with collectively in the discussion of that.

THE COURT:  But Mr. Nemunaitis says that the basis of that ruling was this language like "incorporated by reference to the extent appropriate," and he says that the '517 patent and I guess all of the other applications in the relevant chain vis-a-vis it, don't use that language.  They

use language like "incorporated by reference" or something without that "to the extent of the appropriate" language. Is that wrong?

MR. WILSON:  I don't think that's wrong, Your Honor.  No, those have -- I don't have the language of incorporation of all of those memorized, but they do not use "to the extent appropriate" in connection with that.  They do use "to the extent appropriate" in connection with some priority statements right next to that, which is what we were discussing and previewing.

THE COURT:  I guess my question is, on your first argument, if the very language that I said was problematic and it was the basis of my decision at summary judgment stage as to other applications, there's other patents at least is not present in the relevant chain, how would my prior decision have decided this issue?  I don't understand.

MR. WILSON:  From our reading, Your Honor, the order basically outlined Defendants have argued that this isn't incorporated by reference to either chain because of this language, and the paragraph kind of outlined the arguments, and the following paragraph just started with, you know, "I agree with Defendants on this point."  So we read it as being treated collectively, but certainly understand Your Honor's point that --

THE COURT:  I'm just not understanding what you're saying.

MR. WILSON:  Okay.

THE COURT:  So I'm asking what I think is a pretty clear question, but I'm not getting what I understand to be a clear answer from you.

Let me ask it again.  My understanding is, at least the way Plaintiffs have said it is the case, that when I look back at that prior order, that the sole basis, the key basis in my decision about the lack of sufficient incorporation will be the presence to these words "to the extent appropriate."  Do you disagree that was the key basis for the decision?

MR. WILSON:  No, absolutely that's the basis.

THE COURT:  And so they have said with regard to this issue now, the one that's coming up right now about the '517, that in it and I guess maybe other applications that are relevant to go back to the '204, that language, the key language that was the basis of my prior decision, is not found.  Is that wrong?

MR. WILSON:  That language is not found in the sentence about incorporation.  It's found in the prior sentence about priority.

THE COURT:  Okay.  But so I guess I'm not understanding.  So if the key language is not found in the

sentence about incorporation, how would my prior decision have resolved this issue?  Seems like you think it did, but I'm not understanding how.

MR. WILSON:  Well, again, because from our understanding, we argued them together and they were dealt with collectively.  We may be misunderstanding, Your Honor.  That's entirely possible, but that was our reading of it, is that the inclusion of the "to the extent appropriate" language in the discussion of priority and incorporation was dealing with all application chains.

THE COURT:  Okay.  All right.  So what's the next step?

MR. WILSON:  So even if Defendants misunderstood that part before the '517 chain, there's still, as I think counsel has pointed out, the open issue of even if the language of incorporation is correct, there is still an issue that is open as to whether it can be incorporated by reference because it is essential material into that chain.

That's an issue that the Court touched on in summary judgment and decided there was a dispute of fact as to whether it would be essential material and left that for the jury.  Now, what we do have is that, I think, the one big open issue on jury instructions as to what will be the appropriate instruction on that point.

THE COURT:  Just let me make sure I understand

what the issue is.  Let's say the plaintiff is correct and there has not been a decision made already at summary judgment as to the '517, that it can't incorporate by reference this provisional.  Then you're saying there's that separate question about whether the material and what material is essential material?

MR. WILSON:  Correct.

THE COURT:  What material?

MR. WILSON:  So in our view, it's a figure, it's Figure Number 2 and it's a textual description of Figure Number 2 in the provisional application.

THE COURT:  So it's whether Figure Number 2 in the provisional application is essential to you?

MR. WILSON:  Correct.

THE COURT:  Okay.  And you're saying there are going to be factual disputes about that?

MR. WILSON:  Yes, and Your Honor stated that in the summary judgment order.  They identified other materials that they think disclose that as well which would impact whether it is or is not essential material.

THE COURT:  And are those facts and disputes that relate to a decision that ultimately, though, is a legal decision I make?

MR. WILSON:  So those factual disputes, the way I read Your Honor's previous order, those are factual

disputes for the jury to decide whether there is other written description of the point of adding bromine to coal prior to combustion in the chain.  If there is, then it is not essential material.  If there is not, then it is essential material.  And then I think the legal point that Your Honor would be deciding that's still kind of embedded in the jury instructions fight is what is the rule on incorporating essential material.

THE COURT:  Okay.  I guess here's the question: The parties raised this at 6:30 in the morning.  The answer to some of these questions is going to depend on review, I think, of the prior summary judgment decision.  It's going to depend on review of the provisional and patents that I don't have before me, no one presented me with.  It may well involve additional arguments.  I just want to make sure I'm understanding what the arguments are that you all want me to decide before Mr. Pavlish gets crossed and we're going to start at 9:00.

So is what you want me to do we bring him up, we do his direct, and then I take a break and we take whatever time you need for you to make arguments for me to decide this issue about the provisional, charging the time to whatever sides loses, and then we bring Mr. Pavlish out to cross?  Is that what you want to do?

MR. WILSON:  I think from our side, I don't

think that's necessary.  I do think we intend to question Mr. Pavlish on that to some degree.  I don't think there's the high degree of confusion that counsel is worried about.

I mean, ultimately if Your Honor decides a rule on incorporation which makes that testimony irrelevant, that can be very clearly instructed later on if the provisional application is or is not incorporated.  It is probably a good issue to decide before the expert testimony on this, but that's going to be tomorrow at the earliest.  I think that would be our sense on that.

THE COURT:  I think we're talking about logistics here.  Because ultimately, the only thing I can tell you for certain is that at 9:00, the clock will start ticking.  Either testimony will be taken or time will be taken up to decide legal issues.  Either way, all that time will be charged to the parties.  It's a question about how you want to deal with these issues, how we can possibly deal with them.  Sounds like you're saying that whatever these issues are, you don't think I need to decide before Mr. Pavlish's cross.

MR. WILSON:  I think the best use of time would be to move forward and to the extent something becomes irrelevant because of a later decision, I think that can be dealt with later.  Yes, Your Honor.

THE COURT:  Mr. Nemunaitis, I'll let you add

anything else you want to add, particularly about logistics.

MR. NEMUNAITIS:  I would propose this as an option, Your Honor.  It should save everyone time.  And once we see what they say, maybe we object and try to raise the issue again.  But it looks like there's no dispute that if the application has the language "I hereby incorporate by reference," that as a matter of law that incorporates the application by reference.  If we had that instruction from the Court before Mr. Pavlish's cross-examination or at the appropriate time, that may be a way to mitigate some of this and then resolve the final issue about what goes into the final jury instructions.

THE COURT:  If I'm going to satisfy myself that what you're saying is correct that, (A), the relevant language in the relevant patents is X or that the law is Y or that in my prior summary judgment I said -- what are the things I'd have to look at to be able to do that?

MR. NEMUNAITIS:  I don't think there's anything more that Your Honor needs to look at.  Looks like we agree that all the applications in the chain of the '517 has the correct language.

THE COURT:  Mr. Wilson said something like "as it relates to incorporation of reference but not priority."  I don't know what he's talking about there, but it sounds like at least with regard to the language about

incorporation by reference, he's correct.

MR. NEMUNAITIS:  And that's the only sentence that matters.

THE COURT:  The legal decision I have to make is whether a document was properly incorporated by reference into a patent at issue.

MR. NEMUNAITIS:  So if there's a different statement about what other applications are in the chain, I don't see how that could possibly matter to the incorporation by reference statement.  And that is addressed on -- I believe it's page 8 of the summary judgment order from Your Honor.

THE COURT:  Do you have a DI number on the summary judgment order?

MR. NEMUNAITIS:  I'm sorry, Your Honor.  This was sealed.  I don't have it handy.

THE COURT:  614 apparently.

Okay.  So what you're saying is, Mr. Nemunaitis, if I can't satisfy myself, that -- under the law, that -- well, if it's not disputed that the phraseology, "to the extent appropriate" is not found in these documents and instead these documents simply say, "incorporated by reference," if I could satisfy myself that that kind of statement is sufficient to incorporate the prior patent or patent application, that will provide the clarity you need

at least to know what the legal landscape will be?

MR. NEMUNAITIS:  Correct.

THE COURT:  Mr. Wilson, is that disagreed with on this issue by the defendant?

MR. WILSON:  Thank you.  If I'm understanding correct, it seems like there would still be the dispute about what the ultimate rule is going to be on incorporating essential material by reference.  So I think that would still be an open issue.  I mean, if it answers their question enough for them to move forward this morning, I certainly won't disagree with their position on that.

But ultimately, there is going to be an open question of what is the rule on incorporating essential material by reference.  I think their position is ultimately going to be there is no bar on that.  So their position is going to be if you rule that that language is correct, it is incorporated by reference for all purposes, and we don't need to worry about anything else.

Our stance is the bar on incorporation by reference of essential material will apply, and it would still be appropriate for us to ask questions about what is disclosed in that intervening chain as it relates to the provisional because it will affect whether it's essential material or not.

THE COURT:  Okay.  All right.  Well, I think --

we're about 8:55 right now.  And so I'm not certain how it is that in the time between now and when Mr. Pavlish is cross-examined I'll be able to make a final decision with regard to what I think are multiple issues that the parties are raising about this issue.

So I think, ultimately, what's going to need to happen is either after his direct, the parties will somehow need to let me know if they want to stop and have the jury go out and then to have whatever argument I need and whatever documents, as long as we need to take to make a decision now.

If one or both sides ask for that, I'll consider it and may allow it, but the side that does not prevail will lose the time.  Or if there's some alternative, proceed with testimony and somehow the parties can put before me in a clear way what are the decisions I need to make, what are the documents I need to refer to, and I can do so at some point during the trial, like in the evenings or in the morning, I'll try to do it.  That's the call you guys have to make, ideally jointly, and let me know.  Does that make sense?

MR. WILSON:  Yes, thank you, Your Honor.

THE COURT:  We're basically at our time here.  I saw there were other issues that the parties had.  If it helps, briefly, I can say it seemed like the parties were

having some issue about discussion of information about other coal other than the refined coal that would be related to the elements of contributory infringement, like the stuff that Defendants talked about in their opening.

I think what I ruled is that Defendants can make an argument about mistake of law. They cited the common case and the Connecticut case and I agreed they can make that argument based on the evidence that their client maybe misunderstood the law about what coal counted for -- whether the coal was especially made or adapted. My sense was those docs should be usable for that purpose.

And then there were disputes about Mr. O'Keefe's report. I did see a couple of disputes about can we talk about the org chart about the CERT defendants. My thought was, sure you can. Both sides talked about that in opening. The structure of these entities can be relevant in the case. What are these entities? Are they related to each other? So I give you that feedback.

We're not going to have time to discuss it. Since there are objections, we'll have to discuss them during trial at sidebar, and hopefully there won't be too many. But I give you that feedback to a couple things I saw, the best I can divine.

We have to get the jury in. So we'll conclude, unless we need to take something else up. Seeing nothing,

the Court will stand in recess.  Thank you.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  We'll bring the jury in.

(The jury entered the courtroom.)

THE COURT:  All right.  Let's continue with direct examination of Mr. Pavlish.  We'll have Mr. Pavlish come forward.

You remain sworn.

DIRECT EXAMINATION

BY MR. CALDWELL:

Q.    Good morning, Mr. Pavlish.

A.    Good morning.

Q.    Do you have your binder still just in case we need it?  Perfect, thank you.

Now, I don't want to replow old ground, but to remind everybody where we were, you had just shown us documentation in 2002 of having conceived your invention.

Do you recall that discussion?

A.    I do.

Q.    If I could, I'd like to go back to adding that flag, and what we've done is on August 30, 2002, we've cited documentation of your conception citing Plaintiffs' Trial Exhibits 67 and 68; is that fair?

A.    Yes.

Q.    So those were those after-hours tests you had talked about.

Do you remember?

A.    Yes.

Q.    After these after-hours tests, how frequently did you work on developing the invention?

A.    As much as I could.

Q.    Why couldn't you work on it every day?

A.    We were limited in funding, and those tests were very expensive.

MR. CALDWELL:  Can the Court and everybody hear him through the microphone?

THE COURT:  Can everybody hear him?

BY MR. CALDWELL:

Q.    What happened to that original Department of Energy funding we talked about?

A.    By that point, it had been exhausted.  There were no funds left.

Q.    Were you diligent in trying to obtain funding for additional testing?

A.    Yes.

Q.    Over about what time frame would you say you had to continue diligently trying to obtain funding?

A.    We pursued funding immediately.  The document we discussed yesterday was actually part of pursuing funding,

so we pursued funding from 2002 through 2003 to acquire funding.

Q.    Were you able to secure some funding that would let you do further actual tests in the boiler test environment?

A.    Yes, we were.

Q.    When did that additional testing take place?

A.    That testing took place in early September of 2003.

Q.    Can we add that testing to the timeline?

A.    Sure.

Q.    Were those September 2003 tests just sort of after-hours tests like the original ones you described?

A.    We had adequate funding at this point, so they were much more thorough, much more at length, we could study a lot more.

Q.    What I'd like to find out is do you have any documentation that you did the test in case there's any dispute that you were actually implementing this thing in 2003?

A.    Yes, we had -- it was documented in the PTC logbook.

Q.    What is a PTC logbook?

A.    The PTC logbook is a particulate test combustor that we use.  So it's a logbook, and it basically has records or entries, if you want to call them, as to actually how the tests were done, the time, what conditions, what rates we are adding.  Pretty much all the details of how the test was

actually performed.

Q.    Would the logbook track the particular chemicals that you were adding?

A.    Oh, absolutely, yeah.

Q.    What was the purpose of somebody keeping these types of records in the PTC logbook?

A.    Well, the primary purpose was to really document the actual conditions so that when you looked at the data, you can kind of understand how did this perform under these conditions and how much material we would be adding in order to achieve these reductions.

Q.    Was the PTC logbook something that your employer, the EERC, kept in the ordinary course of business?

A.    It was done for every project so yeah, in the normal course of business.

Q.    Could anybody just walk in and modify that logbook willy-nilly if they wanted to?

A.    No.

Q.    Is it something that you personally filled out?

A.    No.

Q.    So who is it that fills out the particulate test combustor logbook?

A.    The entries in the logbook would be strictly done by the people who were running the tests, so the operators, the technicians, people who were actually making observations,

turning the knob, so to speak, in terms of different rates, et cetera. So it was the actual operators and technicians.

Q. So if I understand this correctly, you would have something that you wanted to test. You would set up the test conditions, and then you would give it to the technicians who actually run the test combustor?

A. That's correct.

Q. And those are the ones who wrote down, here's what I put in, according to your instructions?

A. Right.

Q. Now, if you would in your binder, would you flip to the tab that says PTX 69.

A. Yes, I see that.

Q. What is the document that is at PTX 69?

A. That's a declaration from Tom Erickson providing a certified copy of these PTC logbooks.

Q. First of all, who is Tom Erickson?

A. Tom Erickson is the director of Energy and Environmental Research Center.

Q. And you said attached to his declaration he declares to facts was also some copies of the logbook?

A. Yes, and he basically reviewed them, stated that these were accurate and true and correct copies of those logbooks.

Q. And are those logbooks that reflect tests that were

run for you?

A.    Yes.

MR. CALDWELL:  Your Honor, Plaintiff moves for the admission of Plaintiffs' Trial Exhibit 69.

THE COURT:  Is there any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 69 was admitted.)

MR. CALDWELL:  If you would, Mr. Diaz, would you pull up Plaintiffs' Exhibit 69.  Can we split screen the first two pages of that?  Thank you.

BY MR. CALDWELL:

Q.    Mr. Pavlish, what is it that we're seeing here sort of as the first two pages?

A.    Well, it's basically the declaration stating that he is the director of the Energy and Environmental Research Center and he did review all those pages, and based on that, they are true and accurate copies of the logbooks.  And he also states that this is done in regular practice, normal course of business, and they're kept over time at the -- as part of the business.

Q.    Do you have any question whatsoever about the authenticity of these logbooks we're about to show?

A.    No, I do not.

MR. CALDWELL:  Mr. Diaz, would you flip to page -- it's Plaintiffs' Trial Exhibit 69.0315.

BY MR. CALDWELL:

Q.    At this point, we're kind of into -- well, I guess it looks like they're handwritten, so give us the context as to what we're -- what a document or page like this is reflecting.

A.    A typical logbook is -- it's kind of listed on the left-hand column, the actual time when these tests were done.  And the bottom of that page kind of states the date at which it was done, and then they're handwritten -- I guess you'd call them notes.  It's describing exactly what was done.  Was some material turned off, a piece of equipment turned on or turned off, was the rate adjusted.

And then on the far right column, it's the technicians, if you will, that actually documented that entry.

Q.    So for context, this is September 18, 2003; is that right?

A.    Correct.

Q.    And if we see a time like 1904, is that 7:04 p.m.?

A.    Yes, we do use military time.

MR. CALDWELL:  Mr. Diaz, could you grab the top third of this document.

BY MR. CALDWELL:

Q.    And what is it that this document reflects, sir, in terms of tests that were being done in September 2003?

A.    At that particular date, it states the time at which a sodium bromide feeder was turned on.  And sodium bromide is a bromine-containing compound, and it was turned on, and it was turned on at 40 grams per hour.

Q.    Now, when I ask you -- I think there was a suggestion yesterday that it was maybe recent that you had this idea to say your invention relates to putting bromine on the coal.

So in this experiment in September of 2003, where did you put the bromine solution?

A.    It's stated right there:  Sodium bromide coal to feeders.  Put right on the coal.

Q.    Thank you.

MR. CALDWELL:  Mr. Diaz, if we flip to page 317, please.  Would you mind?  Thank you.

BY MR. CALDWELL:

Q.    On this one, let's kind of grab -- well, first of all, this looks like the next day, September 19th.

A.    Yes.

MR. CALDWELL:  Can we kind of grab that middle section there, Mr. Diaz, right above where it says 217?  Thank you.

BY MR. CALDWELL:

Q.    So what's going on kind of the next morning now in

the test combustor?

A.    Here, we're starting that sodium bromide feeder again.  And it's being set at 10 grams per hour, and shortly thereafter, a half an hour later, we start up our activated carbon injection system.  And that's noted as NORIT FGD carbon.  NORIT FGD is kind of a trade name for a carbon in the industry.  It is a large company called North American Zicon, Inc.

Q.    And this looks like it's in the morning, like 9:50 in the morning the next day?

A.    Yes.

Q.    So did they just turn the machine off and go home that night?

A.    The machine has to run 24/7 to keep combustion and everything warm.  The generator feeders are turned off so the machine can minimize operator time.

Q.    Just turning to chemicals, like, I realize this says literally sodium bromide, but what is represented by Na and then Br?

A.    Na is the chemical symbol for sodium, and Br is the chemical symbol for bromine, so put the two together and you get sodium bromide.

Q.    Separate and apart from putting bromine directly on the coal, did you also test putting bromine elsewhere in the process?

A.      Yes, we did.

MR. CALDWELL:  Let's flip to the next page, Mr. Diaz.  Can you grab the bottom 40 percent or so of that page.

BY MR. CALDWELL:

Q.      What are we seeing here reflected on September 19th, sir?

A.      Here we've kind of reversed order, but we started the carbon feed system.  In this case, it's a brominated treated type carbon, so the carbon has bromine.  And then later on, a few hours later, we then started the sodium bromide feeder and feeding it 10 grams an hour.

Q.      Where?

A.      That's, again, on the coal.

Q.      You even tested mixing the bromine with the carbon?

A.      Yes.  The sodium bromide is set on the coal, and, again, this activated carbon was injected into that flue gas downstream of the combustion.

Q.      Why were you testing so many different kind of places and combinations of where you could insert the bromine?

A.      For a lot of reasons I guess, but the primary was to see does the position of where you place the bromine affect the efficacy or the efficiency, you know, of removing mercury, so we wanted to look at those different combinations.

And so that's why.  At this point, we didn't know where the best location per se was, so we were exploring.

Q.   Kind of stepping away from the book for one second, I want to ask you something about coal plants.  I would assume there are differences from one plant to another; is that fair?  Just a coal plant in general.

A.   Yeah.

Q.   Might it be the case that depending on coal or the way that a facility is structured just what makes sense for one environment?

A.   There's a lot of factors to consider.  That certainly would be one of them.

MR. CALDWELL:  Could we go to the next page, Mr. Diaz.

BY MR. CALDWELL:

Q.   And then what are we looking at the top half of this page?

A.   Here it's just demonstrating or showing that both the treated carbon and the sodium bromide systems were on, and at 10:22 when it says "stop."  They essentially shut off.

Q.   Thank you.

Is there any doubt in your mind that you not only conceived your idea but now you practiced your invention?

A.    These tests most definitely did that.

Q.    And are they documented, sir?

A.    They're very well documented.

Q.    What were the results of the September 2003 testing?

A.    Well, the 2003 testing further confirmed what we had seen, I guess, during it was after-hour testing to confirm that adding a bromine additive -- again, whether it's on the coal or downstream of the flue gas -- and then adding an activated carbon.

Q.    Thank you.

So, Mr. Pavlish, what I've got here, this PTX 69.  You'll recognize that reference as the logbook you just looked at.

A.    Yes.

Q.    I've added the date September 2003 testing, and I want to look after that.  After September 2003, did you conduct even more tests to continue to test and confirm your findings?

A.    Yes, we did.

Q.    Roughly when?

A.    I believe we did tests in December '03 and some additional testing in the spring, early spring, later spring of '04.

MR. CALDWELL:  Mr. Diaz, back in the logbook, let's jump to sort of a different time.  Let's jump to the

page 334.  Can we have about the bottom 40 percent or so? Perfect.

BY MR. CALDWELL:

Q.     Okay.  Now, for December 11th, 2003, what is reflected in the logbook?

A.     Those tests were done on that date.

Q.     And what were these tests?

A.     These tests were done.  Again, we started this sodium bromide feeder, 20 grams an hour.  Shortly later, we started the FGD carbon again -- that's an activated carbon provided by NORIT Americas -- at 10 grams an hour.

A little bit later, we actually lowered the sodium bromide feeder, the feed rate, to 10 grams per hour. So we were kind of starting to look at is there an optimum, if you will.

Q.     So in this test, you started out with 20 grams an hour roughly, if I understand correctly, and cut it in half partway through the test?

A.     Correct.

Q.     And what did those results teach you?

A.     They demonstrated that you could actually get by -- when I say "by," use less bromine -- and still get very, very good removal.

MR. CALDWELL:  Mr. Diaz, would you flip to the page that is 363.

BY MR. CALDWELL:

Q.    Moving along now to February, a couple months later, February 20, 2004.  Now I'd like to get sort of maybe the bottom half of this page.

      All right, Mr. Pavlish, what is it that's reflected in the logbook from February 20, 2004?

A.    Here, again, on that date, we started the sorbent feeder -- not the sorbent feeder -- the sodium bromide feeder adding in -- I think it says 1 gram per hour there, and we actually increased the sorbent feed, and the sorbent here is referring to activated carbon, to that rate.

Q.    Were you continuing to test ratios of bromine to activated carbon?

A.    Yeah, that was one of -- certainly, one of our goals, was to kind of determine an optimum, so to speak, amount of this bromine versus the activated carbon to see if there's an optimum ratio, if you will.

Q.    And then what did you find with respect to the amount of bromine needed to get really good mercury removal?

A.    I think all of these tests kind of continue to show that you can use very small amounts of bromine and get a significant improvement in mercury capture.

Q.    Separate and apart from the scientific data, what was your emotional reaction to these results?

A.    Well, I found them quite fascinating, if you consider

we're talking about a coal that's got impurities in it, and combustion is coal, and we're generating flue gas that has thousands and thousands of reactions.

I mean, these impurities in the coal, there's probably every element known to man in coal, so when you burn it, you end up with an awful lot of different reactions.  And it also has ash in it, small ash particles that are kind of flowing along with the gas.  So we're not really talking about gas-phase-type reactions.  We're taking about complex surface-tension-type reactions like we talked about yesterday.

If you recall, we're also talking about one part per billion.  So I think what these tests demonstrated is you can remove very small amounts of mercury.  You can remove them in a very short period of time, in a very complex flue gas, and we can use the in-flight reactions of the bromine, mercury, and carbon to remove significant amounts of mercury.  So I think the results are really amazing.

MR CALDWELL:  Mr. Diaz, could you flip back to the other graphic.

BY MR. CALDWELL:

Q.    So can we now add the continued testing in December of 2003 and February of 2004 to our timeline?

A.    Yes.

Q.      And each of those are, again, pointing to the logbook that has been authenticated by the EERC?

A.      That's correct.

Q.      So you mentioned something about, I think, the Department of Energy was funding this testing for you to continue working?

A.      Yes, the United States Department of Energy funded this work.

Q.      If they're paying for it, did you have to give them some reports on what was happening?

A.      We generated a number of reports for them.

Q.      Did those documents confirm that you had actually really run tests?

A.      Yeah, the documents contain, essentially, what we did, the tests, and the results of the tests.

Q.      Let's try to move through these quickly so we can add them to the timeline.  Would you look at your binder at Plaintiffs' Trial Exhibit 64.

A.      Yes, I see that.

Q.      What is Plaintiffs' Exhibit 64?

A.      This is a report that we prepared that documented those September tests that we just talked about and submitted on February of 2004 to the Department of Energy.

Q.      Did you help prepare it?

A.      I did.

Q.    Does it confirm in the documents that you tested your invention?

A.    Yes, it does.

MR. CALDWELL:  Your Honor, we'll move for the admission of Plaintiffs' Trial Exhibit 64.  It's a report to the Department of Energy.

THE COURT:  Is there any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 64 was admitted.)

MR. CALDWELL:  Mr. Diaz, if you pull it up, we'll get into what's at issue here.

BY MR. CALDWELL:

Q.    Are you one of the authors of this document, sir?

A.    Yes, I am.

Q.    At a high level, what did the February 2004 report generally explain to the Department of Energy?

A.    At a very high level, it would explain what tests were done, what conditions they were done under, and then what test configurations those tests were performed under and also what coal type.

Q.    Cutting to the chase, will you jump to page 17.  What are we seeing on page 17 of this report to the DOE?

A.    This is a report that on the top half shows the test

configuration where we added the bromine additive that was fed into this PTC combustor, and then downstream of that we measured the mercury.  And downstream we also added a sorbent, in this case activated carbon, as shown in the table below.

And we were testing with this ESP, and ESP is an electrostatic precipitator, and that essentially removes particulates.  And so it would remove the sorbent, and mercury would be attached to the sorbent, and so then we would measure the mercury downstream of that and determine, essentially, what we captured.

Q.    Does it tell the DOE what kind of combinations of substances you tested?

A.    Yes, that's shown in table 1.

MR. CALDWELL:  Let's blow up the table.  Thank you.

BY MR. CALDWELL:

Q.    So you've told us before about this brand name DARCO FG is your activated carbon; right?

A.    Yes.

Q.    What is the sort of trade name or brand name being used for the bromine solution?

A.    The bromine solution was referred to as SEA2.

Q.    What does SEA stand for?

A.    It's a trade name we came up with that refers to

sorbent enhancement additive.

Q.    This says it's sorbent enhancement additive 2.  So if that's bromine, what was sorbent enhancement additive 1?

A.    Sorbent enhancement additive 1 was a chlorine base instead of a bromine base.

Q.    So which tests are there that indicate you were testing bromine additives and then activated carbon?

A.    Yes.  We did tests with SEA2, that would be T15, T16, and T19.

Q.    How do we know you tested it with activated carbon?

A.    Where it's indicated by DARCO FGD, again, that's an activated carbon, and then T19, it's the ERC-treated carbon.

Q.    Did the EERC provide further reports to the Department of Energy continuing to report on tests from December '03 and February '04?

A.    Yes, we did.

Q.    Now, would you flip to the page or the tab for Plaintiffs' Trial Exhibit 65.

A.    I see that.

Q.    What is Plaintiffs' Trial Exhibit 65?

A.    This is another report that was prepared and sent in to the Department of Energy in 2005 further describing and providing tests results on the time we did testing in September that we talked about.

MR. CALDWELL:  Your Honor, Plaintiff moves for

the admission of Plaintiffs' Trial Exhibit 65, which is another Department of Energy report.

THE COURT:  Any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 65 was admitted.)

BY MR. CALDWELL:

Q.    Sir, what is this report that's Plaintiffs' Trial Exhibit 65?

A.    This is the report we prepared for DOE in February 2005 and showing that I was a co-author on that.

MR. CALDWELL:  Mr. Diaz, let's jump to page 37.

BY MR. CALDWELL:

Q.    I particularly want to focus on what is demonstrated here on page 37.  Can you tell us what it is that we see in terms of this graph?

A.    Sure.  What we're showing you on this graph is on the Y axis is mercury removal in terms of percent of how much mercury was being removed from the gas, and on the X axis is the rate at which we were applying these three different options:  The sodium chloride, the SEA2, and the SEA2 with activated carbon.

Q.    I want to break down the legend here.  The little black triangle says NaCl or a chloride-type product, and

there appears to be a trend line that relates to that.  So can you describe for us, essentially, what the impact is of the line related to your chlorine additive?

A.    Well, when we tested the chlorine additive by itself, we had to add a lot, as you can see, relative to the others. I mean, 14, 16.  The units may not make sense to you, but just kind of look at the magnitude of those numbers, and you can see we were adding a lot.

Q.    Were you getting a great effect from adding a lot?

A.    Rather disappointing.  We were only getting about 40 to 45 percent.  So nothing too impressive.

Q.    Does it seem to be peaking around 45 percent or so?

A.    I think we could have probably added a million pounds, but I think you wouldn't have gotten more than 50 percent no matter what you did.

Q.    Now, the middle trend line, it looks like it may be the square, it just says SEA2.  First of all, what is it that this middle trend line is reflecting by only saying SEA2?

A.    SEA2, that's where we tested with a bromine only.  We didn't use an activated carbon, so bromine only.  And you can see that it actually had a much better level of mercury removal, mercury capture, than, say, chlorine alone.  And it looks like we were getting somewhere in the neighborhood of 60 to 65 percent, and it was starting to plateau or level

off as well.

Q.    Now, what is the final trend line by the purple square?

A.    The final trend line is showing there is, again, where we had this bromine, but in this case, we have it with activated carbon, and here we're achieving nearly 85 percent.  Very, very low amounts of bromine.

Q.    And based on the trend line you see, did you have a sense as to whether you could accomplish extraordinarily high removal, like in the 90s?

A.    I think the trend line would say you'll get 90 plus.

Q.    Do you understand these documents have been admitted and if the jury wants to look at them later in their deliberations, these are fair game for the jury to consider?

A.    They're all publicly available.

Q.    So not only that, but these, because you sent them to the Department of Energy, they're publicly available?

A.    They've been all submitted to the Department of Energy back in the time frame, so they're all publicly available reports.

Q.    Is there a doubt in your mind that not only did you conceive of the patented invention, but you had documented the conception and implementation of your invention in 2002, '03, '04?

A.    No doubt in my mind.

Q.    Were there still other reports submitted to the Department of Energy?

A.    Yes, there were still other reports.

Q.    What's number 66, if you'll just tell us and hit it really quickly?

A.    66 was another report that was submitted on October 2005.  And this report focused on testing with the sub-bituminous coal.  The other reports were more focused on lignite coal.

Q.    Are you familiar with the document that's number 66?

A.    Yes, I am.

        MR. CALDWELL:  Your Honor, Plaintiff moves for admission of Plaintiffs' Trial Exhibit 66.

        THE COURT:  Any objection?

        MR. SYKES:  No objection.

        THE COURT:  It's admitted.

        (Thereupon, Plaintiffs' Exhibit 66 was admitted.)

BY MR. CALDWELL:

Q.    Just quickly, what is now this report that's Exhibit 66?

A.    It's a similar report.  Again, we tested sub-bituminous coal.  We tested it with a bromine additive in conjunction with activated carbon and demonstrated those results.

Q.      Does this sequence kind of correlate to what you said yesterday, that early on you wanted to start with the worst coals and see if we could solve the problem in the worst coals, it will be in good shape for the better coals?

A.      That was our general strategy, to tackle the worst case.  And as we found out, the technology worked very good with lignite and also worked very good with sub-bituminous.

Q.      Can we see the page marked 58.

        And what were you reporting in the tables on page 58 of Plaintiffs' Trial Exhibit 66?

A.      We were reporting specific tests, again, with sub-bituminous coal, but we were testing it with the SEA2 sodium as well as with activated carbon, the DARCO -- provided by DARCO.

Q.      Just quickly, so does this reflect that you guys did tests with your chlorine additive and you also did tests with your bromine additive?

A.      Correct.

Q.      And then you did some where you actually said, oh, let's test it together?

A.      That's an exploratory test to see if there's synergy with adding the two.

Q.      Thank you.

        MR. CALDWELL:  Can we go back to the PowerPoint.
Perfect.

BY MR. CALDWELL:

Q.    Mr. Pavlish, can we continue to build our timeline, this time by just sort of adding additional documents that we've seen that corroborated dates?

A.    Yes.

Q.    Thank you.

So in addition to submitting all of this to the Department of Energy, did you and your co-inventors decide to file a patent application for your invention?

A.    Yes, we did.

Q.    When was it that you guys filed your patent application?

A.    Well, that application was actually filed in August of 2004.

Q.    Did you have to just sort of go out and hire your own lawyers or was there a process in place for this?

A.    The EERC had their own IP department, so they really had patent attorneys that they would work with.

Q.    At this point, in 2004, did you have any experience in writing patents?

A.    Zero.  None.

Q.    What kind of papers are you used to writing?

A.    Generally, the reports that we went through and more technical in nature.

Q.    What did you think of the patent process?

A.    My first impression was they write them in a different language.

Q.    So at some point after you filed your provisional application, were you awarded a patent for your work?

A.    Yes, we were.

Q.    How did that feel?

A.    It felt really great.  I mean, that was my first patent.  I didn't have a patent up to that point.

Q.    Around when did your first patent issue?

A.    I believe the first patent was, like, 2008.

Q.    When it issued, who was the owner of that patent?

A.    Well, as part of employment at the EERC, all IP was automatically owned by EERC.

Q.    Was there only one inventive concept in your patent application, or were there several different ways of using your invention?

A.    Yeah, there was a number of different ways.

Q.    Who got to sort of decide in the early patent prosecution which ideas to focus on for patent claims?

A.    Since the EERC owned the IP, it was kind of more, I guess, a business decision on their part to decide, essentially, what particular aspects of the invention they would pursue.

Q.    And by the way, you said something.  I think you said that the first one issued, you think, in 2008.

A.    Yes.

Q.    Do you remember that?

But you told me you filed your application in 2004.  Does it, like, take years for the examination process to go through on each patent?

A.    Unfortunately, yeah.  Many of these earlier patents -- I think we had one that took almost seven, eight years.  It's a long process.

Q.    So approximately how many patents has the United States Patent and Trademark Office awarded you and your co-inventors, Dr. Olson and Mr. Holmes?

A.    I think at this point, it's slightly over a dozen.

Q.    Do you have a sense as to why so many have issued out of that original provisional application?

A.    We had a lot of different features, or if you want to call them inventions, within:  Adding the bromine to the coal, adding the bromine in the boiler, adding the bromine downstream of the boiler, using activated carbon.  So there's different ways, I guess, that you can apply that invention, and so we wanted to make sure we had, I guess, coverage or patent claims on them.

Q.    And was there a stake in the ground at the Patent Office for every one of those in your original application in 2004?

A.    Yes, all of them are tied back to that provisional.

Q.     Is that sort of legal process something that you're going to testify about, like the legal patent prosecution work?

A.     No, I don't know a lot about that.  I provide information to review, but I'm not a patent attorney.

Q.     Okay.  So what method of providing bromine into the system do the patents in this case relate to?

A.     The patents in this case relate to adding bromine to the coal and then adding -- again, prior to the combustion chamber -- and then adding an activated sorbent downstream of the combustion chamber.

Q.     Now, I'm going to ask you to look at the jury and tell them when was it you conceived of your idea of putting bromine on the coal before it goes into the boiler.

A.     That was in the summer of 2002.

Q.     If you could take a look at the binder in front of you and look at Plaintiffs' Trial Exhibits 1 and 3.

A.     Yes, I see.

Q.     What are those?

A.     Those are the two patents that are part of the suit.

        MR. CALDWELL:  Your Honor, Plaintiff moves for the admission of Plaintiffs' Trial Exhibits 1 and 3, the '114 patent and the '517 patent.

        THE COURT:  Is there any objection?

        MR. SYKES:  No objection.

THE COURT:  They're admitted.

(Thereupon, Plaintiffs' Exhibit 1 and 3 were admitted.)

BY MR. CALDWELL:

Q.    So there's another exhibit I'd like to direct you to while you've got the binder.  Will you flip to the one that says Plaintiffs' Trial Exhibit 17?

A.    Yes, I see that.

Q.    What is Plaintiffs' Trial Exhibit 17?

A.    That's the provisional application that we filed for this invention back in August of 2004.

Q.    Did you personally write the claims, like I showed on that foam board in opening, the sort of legal description?

A.    Like I said earlier, they write in a different language.  That's up to the patent attorneys to do.

MR. CALDWELL:  Can I get Slide 10, Mr. Diaz?  Thank you.

BY MR. CALDWELL:

Q.    What is the figure that is on the screen now, sir?  It's from the '114 patent.

A.    This is a figure that shows where you can add the additive bromine and where you would add the activated carbon.

Q.    So the additive, is that what you're referring to as bromine?

A.    Yes.

Q.    And what is the sorbent in this context?

A.    In this context, it's activated carbon.

Q.    And is this figure in the other patent, the '517, as well?

A.    Correct.

Q.    When did the '114 patent get issued?

A.    I want to say July of 2019.

Q.    Later in time, did yourself and your current employer, ME2C, kind of get to control the direction of the patent prosecution and which inventions to focus on?

A.    Yeah, they were purchased by ME2C in 2017.

Q.    We'll get to that in just a minute.

       In case there's a suggestion you sort of recently came up with this, are you aware of any documents that aren't from 2017, '18, '19, or '20 that have this figure in them?

A.    Certainly, the patents have them in them.

Q.    And when was it first in a patent application, sir?

A.    I put that diagram together before we filed the provisional back in '04.

Q.    And is the invention also described in words in terms of where you can put the additive?

A.    Yes, it's described in the figure, and it's also described in words that the additive can be put,

essentially, on the coal before, within the boiler, or it can be put after the boiler.

Q.    So if the lawyer for the defendants has suggested in opening yesterday that your invention is just about putting bromine straight in the furnace and not on the coal before, what do you have to say to that?

A.    I think that would be a false statement.  I mean, we did all our early work putting bromine on the coal, so...

Q.    I want to go back to this kind of artistic graphic that we looked at.  So based on kind of the figure drawn from your patents, kind of in the graphic of a coal plant, where would these places be that you disclosed adding bromine?

A.    Yes, this is a figure we reviewed yesterday.  And so where you'd add -- one place you'd add the bromine we'd say right downstream of the combustion chamber.  Another place would be directly into the combustion chamber, and the most common place is to add it on the coal before it goes into the combustion chamber.

Q.    And then where is it that the sorbent like the activated carbon would be injected?

A.    The sorbent would be downstream of the combustor.

Q.    Is there further disclosure of this two-part process in your '114 patent?

A.    Yes.

Q.      And describe what you mean.

A.      There's some additional figures that show, again, where these -- this bromine can be added, and you can see as noted by 401 that, again, you can add the bromine with the coal into the furnace area there or directly into the furnace.  And then the sorbent, again, as shown in green, 402, would be added downstream of the combustor/boiler.

Q.      Would you give us yet another example of disclosure where you add the promoter?

A.      Yeah, there's actually verbiage or words that state it can be introduced upstream of the boiler of the combustion chamber, as that diagram shows.

Q.      This may be obvious, but for each of the patents we're talking about, from the provisional application and all the ones that EERC pursued and the ones that ME2C pursued and the ones that are in this case, all of these sat in the hands of the Patent Office for investigation to determine if they allow your patent?

A.      Yes.

Q.      Thank you.

        So at some point, while you were working for the EERC, did you become familiar with a company that we now know as Midwest Energy Emissions Corporation or ME2C?

A.      Yes, I did.

Q.      How did you become aware of the entity that's ME2C

now?

A.    That company was actually doing work at the EERC doing different types of testing.

Q.    Was there a time when you went to work for Mr. Rick MacPherson at ME2C?

A.    Yes, I did.  I started kind of in a consulting role, and then in 2014, I actually took full-time employment with ME2C.

Q.    What sort of work did you do for them in a consulting role?

A.    In a consulting role, it was quite minimal.  It was really just answering questions about the invention, maybe how to apply it in the best mode, maybe some type of measurements, sometimes there were measurement issues. Just, I guess, technical questions as needed.

Q.    Did you ever move over to full-time at ME2C?

A.    I did.  I took full-time employment in 2014.

Q.    Why?

A.    Well, I had been doing mercury research for, I guess, going on 20 years.  We came up with this really cool invention, and I really wanted to actually see it applied, see if it could make a difference, so to speak, in the real world in terms of reducing mercury.

Q.    What really motivated you about getting your technology out into the world?

A.      Well, my main motivation was we had this great invention, probably the best technology out there to reduce mercury from low-rank coal, and I wanted to see it actually make it out of the lab and make a difference and actually be put into practice where you could actually reduce significantly mercury from those sources.

Q.      So what is your position at ME2C?

A.      I'm chief technology officer CTO and senior VP.

Q.      What do you do as senior vice president and chief technology officer or CTO of ME2C?

A.      I focus primarily on technical issues that arise, and I also work in business development.

Q.      We previewed this, but the EERC used to own the patents; correct?

A.      Yes.

Q.      Who owns them now?

A.      ME2C.

Q.      And when was it that ME2C acquired ownership of the patents?

A.      It was around -- it was in 2017.

Q.      Do you have an understanding of why that was a possible transaction, that the EERC was comfortable selling the patents to ME2C?

A.      Yeah.  I mean, part of their business model is they really only do research and development.  They don't

commercialize technology.  They're looking at an entity like ME2C to actually take the technology, move it into the marketplace, and make it commercial.

Q.    Did you receive any compensation -- let me ask a question before that.

When the patents were filed and started issuing, did the EERC give you any honorary interest in the patents or anything like that?

A.    Yeah, they had a policy where the inventors would get a small interest in them.

Q.    So then when the patents went to ME2C, did you receive any kind of compensation?

A.    Yeah, as part of that policy, I received a small payment as well as a small amount of shares.

Q.    Do you have a financial stake in the outcome of this stake?

A.    Well, as an ME2C employee, yes.  I have shares in the company, so yes.  But on a personal level, no.

Q.    Mr. Pavlish, has your financial state as an employee at ME2C impacted the truth of anything you said in your testimony?

A.    Absolutely not.

Q.    Have there been any times in the last several years when you're trying to commercialize the product as you described but you've run into commercial headaches that

relate to this case?

A.      Yes.   The major headache is when you run into some other business entity that's, essentially, using your technology, and so we have to compete with that business so we can sell our technology, which is the same technology. So yeah, it's -- I guess that's one of the major challenges.

Q.      How does that make you feel?

A.      Makes me frustrated.   It's sometimes maddening.   You have other entities out there that are taking advantage of all of the development work and effort you put into developing the technology and proving it out and, essentially, they're just using it without permission.

And beyond that, it makes it much more difficult for us, obviously, ME2C, to take on more business.

Q.      When you go to a plant or you read kind of like environmental reports about plants, have you gotten a sense as to where other companies are treating coal with bromine?

A.      Yeah, it's quite obvious they're adding it to the coal.

Q.      Are there any reports or anything public from which you can get a sense as to whether activated carbon is used at coal plants that burn that Wyoming Powder River Basin coal?

A.      There are some public reports out there that do indicate.   I know there's an EPA page that's out there that

shares some of that information.  So yeah, there's some publicly available information.

Q.    In your experience, why is activated carbon being used at those PRB coal plants?

A.    It's based on our technology.  I mean, we have the best technology, so...

If they're going to use activated carbon, they're going to need bromine on the coal as well in order to meet the Mercury and Air Toxic Standard that was mentioned yesterday.

Q.    I'm glad you mentioned that.  Mercury and Air Toxic Standard, is that sometimes called MATS, all capital letters, M-A-T-S?

A.    Yes, that's what it's referred to as.

Q.    I tend to talk with my hands a lot.  In the opening, I was talking about the EPA side of things, right, and MATS?

Do you remember that?

A.    Yes.

Q.    And then sort of the Congress and tax credit side?

A.    Yes.

Q.    What kind of mercury emissions were initially sufficient for getting tax credits sort of on the Congress and IRS side?

A.    My understanding is to get those credits, you had to remove mercury, NOx, and/or SOx.

Q.     What sort of percentage of mercury reduction?

A.     To meet the qualifications or certifications, again, this is my understanding, but you have to get 40 percent or greater.

Q.     That stuff came into effect in around 2010; correct?

A.     I think 2012 is when they actually started.  It probably was announced sooner than that.

Q.     Even if that struck an alarm with the 40 percent requirement, when did that MATS EPA requirement come into place?

A.     That was promulgated from the effective 2013 time frame where it would actually be implemented where the plant would actually have to meet regulations.  In 2015, they had this one-year exception that you could request, so a lot of plants did request that.  So really a lot of them started testing these things out in '14, started putting in systems in '15, but by '16, they all had to meet the regulations.

Q.     If you wanted to keep selling your tax credit coal once the EPA said 40 percent is not good enough, it's got to be 90 percent, did you have a sense of what needed to be done from then on with the PRB coal we talked about?

A.     Yeah.  It's the same thing we demonstrated in our test.  You need that 90 percent reduction.

Q.     Thank you.  Now, Mr. Pavlish, given your experience in mercury control and capture in coal fired power plants,

are you going to use your background and qualifications to go -- sort of go through the defendants' documents and offer opinions on the issue of infringement?

A.      That's not my role.

Q.      If you have a coal background -- if you have a coal background, why is it that you're not going to take us through their documents?

A.      Because I haven't had access to any of their information, any confidential information.  I haven't seen it, haven't touched it, haven't accessed it.  I'm not privy, I guess, to that information.

Q.      And that's because you're part of the party, the plaintiff, ME2C?

A.      Yes.

Q.      So is there somebody who has had access to that document -- those sorts of confidential documents from the defendants that can present them to the jury?

A.      Yes.  That would be Mr. O'Keefe.

Q.      And then Mr. Philip Green on the damages side?

A.      Yes.

         MR. CALDWELL:  The folks that do a better job of tracking this than I do say that, Your Honor, I did not move to admit Plaintiffs' Trial Exhibit 17, the provisional.

         THE COURT:  It's on my list.

         MR. CALDWELL:  Plaintiff moves to admit

Plaintiffs' Trial Exhibit 17.

THE COURT:  Any objection?

MR. SYKES:  No objection.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 17 was admitted.)

BY MR. CALDWELL:

Q.    Do you normally wear a coat and tie to work?

A.    No, I prefer never.  Can you tell it's a new suit for just this occasion?

Q.    What about the experience?  Not just the suit.  Is this a new experience?

A.    This is my first time.  So never before.

Q.    Butterflies a little bit?

A.    A little nervous.

Q.    Mr. Pavlish, how do you feel sitting here today with the jury in the box, the courtroom full of lawyers or interested parties, the judge sitting on the bench, everybody gathered together to hear about your invention from over 20 years ago and your patents?

A.    Well, it's a rather humbling experience to kind of look around the courtroom and see everybody that's gathered here today to kind of learn and listen about an invention, a technology, that I developed and tested over 20 years ago. I'm very thankful for the opportunity to share the story of

this invention.

Q.      Thank you, Mr. Pavlish.

MR. CALDWELL:  We'll pass the witness, Your Honor.

THE COURT:  Okay.  Before we do, let me see counsel at sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  Okay, counsel, so we're at a point now where our discussion this morning becomes relevant because we're about to do cross-examination of Mr. Pavlish. What I'm proposing is if either side asks me to do -- so what I'd be prepared to do is take an early morning break, the jury go out, and then to hear argument and to look at whatever documents I might need to with regard to this incorporation by reference/essential material issue which I understand the legal decisions I'm being asked to make are, and probably likely taking a short break, going back and talking about it and trying to make a decision on those as best I can, and, ultimately, if I could, ultimately, either decide the time it took for that would be charged to the losing side or maybe it should be split between both sides, I'm prepared to do that if either side asks me to do it.  If neither side asks me to do this, maybe we can resolve it. Maybe we can do that too.

Let me ask.  What is Plaintiffs' perspective?

MR. NEMUNAITIS:  Counsel proposed a compromise to narrow this down.  We had narrowed this down to one single legal issue that we proposed to the other side and only fight about that.  Whoever wins that wins the issue.  I don't know if you guys --

MR. DORSNEY:  What was your one legal issue?

MR. NEMUNAITIS:  The essential matter argument. I think that's what, essentially, this issue is conceded down to, is whether the essential matter causes a problem with the incorporation.

MR. DORSNEY:  And, Your Honor, you're treating this as a motion that they're making or as an evidentiary issue that they're making procedurally?

THE COURT:  Well, I'm trying to -- what I understood the distinction that you're making, Mr. Dorsney, it seems like they are seeking a ruling on a legal issue which they say is going to be relevant and necessary to know because it will feed the type of evidence that is or isn't presented or types of questions asked, I think.

MR. DORSNEY:  I think our position would be that a dispute that needs to go to the jury that cannot be decided by a motion which amounts to basically a motion for summary judgment, that there are disputed facts regarding whether or not there is a priority issue there and that the Court should allow those facts to go to the jury and make a

determination even after trial, after the evidence goes to the jury, and we find out what the jury has to say about that issue.

THE COURT:  What is the issue that you're saying is a jury issue?

MR. SYKES:  Let me address that, Your Honor. Mr. Caldwell's direct just opened it wide up.  Do you remember in PTX 17 they had that chart with the arrows?

THE COURT:  With the picture?

MR. SYKES:  With the picture.

THE COURT:  The same picture that's in Figure 6 of the patent issued in 2019?

MR. SYKES:  Yes, Your Honor.  And the patent issued in 2020, and he made a statement to the extent that this was disclosed all the way through.  That was the gist of the examination.

There is a patent in the middle, the '147 patent, that issued in 2012 in which that figure is omitted. And the plaintiffs have been pointing from the get-go of this lawsuit to that figure as the figure that clearly shows adding bromine to coal.  And it's essential.

Where there is a factual dispute over whether that figure is essential material to show adding bromine to coal, it's the thing I always point to, and it disappears in the 2012 patent, which is part of the priority chain and

then later several years later they add it back in and there's some text around that too.

So that "whether it's essential material" was an issue that the Court did not resolve in summary judgment. We disputed issues of facts over that, and I just have a few questions for Mr. Pavlish to clarify what now they've basically said.  This is here all the way through, and I need to show that.

THE COURT:  To make sure I understand what you're saying --

Mr. Dorsney, I'm speaking right now.

To make sure I understand what you're saying, is that there's going to be a dispute -- there's going to be no dispute that this picture does not appear in certain intervening applications that could be part of the chain at issue.  There's going to be a dispute, a factual dispute, you're saying, about whether their disclosure in the picture is essential material with regard to the invention.  Am I understanding that correctly?  What that means is, let's say it was essential material and I gather my essential material.  There's another disclosure in the relevant application.

MR. SYKES:  It's just that figure and the description of that figure, and they want to point to some other stuff, and our expert says that's not good enough.

That's a factual dispute, and this goes to the heart of it.

And the rule is you can't incorporate essential material by reference in the provisional.

THE COURT:  Okay.  So maybe a factual dispute about whether, in fact, this has essential material or whether, alternatively, there is some other disclosure of the same concept that's in dispute, and are you saying that the dispute about whether the figure is essential material is one for the jury?

MR. SYKES:  Yes.  It's a factual dispute about which there's competing expert --

THE COURT:  Which written description with regard to the ultimate issue of written description?

MR. SYKES:  Breaking the priority chain based on written description.

THE COURT:  So you want to ask questions of the witness about what you say relates to a factual dispute about essential material?

MR. SYKES:  Yes, Your Honor.

THE COURT:  And on the plaintiffs' side, what's wrong with that understanding?

MR. CALDWELL:  If you'll indulge us, I want to respond to what he said I just did.

What I did was very deliberate, I think, to avoid this problem.  First, it's stated at the beginning,

and second of all, he created this issue in opening. Mr. Sykes did fair -- Mr. Sykes did because he's the one who put up this long chain and said, "We're going to show the intervening apps have something."

And he also suggested it was a recent concept to have treated the coal before. What I did is I didn't actually talk about what's in the intervening ones. I didn't talk about text. I did none of that.

What I said is if he's suggesting it's a recent concept that you put in the coal earlier, when was this first offered to the Patent Office? In 2004.

I didn't do anything with the legal references or anything like that. I responded to purely what he did in the opening, and I tried to stay away from this issue that I don't think is appropriate.

What I'm afraid of, there's a trial. I lost a trial that went like this. What happened is the lawyers on the other side were, essentially, instructing the jury on improper law through the entire trial.

We got a corrective instruction. It was right before closing. There was no one else we could fix it with, and all the evidentiary record came in with a false standard under the law and the inability to meet this false standard.

That's the path we're heading down because we wanted resolution of the law on this.

I didn't mean to jump ahead of Mr. Nemunaitis. I wanted to respond to the suggestion that I've now been the one that created the problem.

THE COURT:  Regardless, what's the relevance of whether you created a problem?  Is that an issue about whether these questions are on the scope of direct?

What I'm trying to understand is:  What do I need to decide now, if anything, and what are the issues?

MR. CALDWELL:  Fair enough.  To answer your question what's, the relevance, Mr. Sykes started by saying, "It's all good now.  Mr. Caldwell just opened the door.  I get to do this."

That's what I'm responding to, your question about what's the relevance.  I was responding to him saying it's now me creating this problem, and it existed before now.  I didn't mean to interrupt Mr. Nemunaitis.

THE COURT:  Let me stop you for a second. Whatever is going on, it's clear that at a minimum, we need to understand and resolve this before we can decide what we're going to do in the courtroom.

I don't want to keep the jury sitting here for half an hour while we're talking.  What I will plan to do is tell them we're taking an early break, and I have to discuss issues with the lawyers, and I'll determine what it is I need to do and decide, if anything.

And then, hopefully, we can resolve that and figure out how to bring the jury back in and keep moving today.

MR. SYKES:  One super quick comment, Your Honor, responding to Mr. Caldwell's comments about my opening.  I referred not to the concept.  I said what they claimed.  What was claimed in the 2018 applications, that's the issue.

So whether those claims have written description, we weren't -- I didn't suggest in opening that there was an absence of a concept.  It was the priority argument in the claims.

THE COURT:  Okay.  This time will be charged equally to both sides.  Let's go back to counsel table, and I'll tell the jury what's going on.

(The discussion at sidebar ended.)

THE COURT:  Ladies and gentlemen of the jury, there's a legal issue I need to discuss with the parties, so what we'll do is we'll take an early morning break so you don't have to sit here while I discuss what could be 30 minutes.

All right.  So we're going to go ahead and do that.  And it may be a longer break than normal, depending on how long I need to talk to them about this issue and figure out and decide.

So with that said, we'll take our morning break,

and the jury can go out.

(The jury exited the courtroom.)

THE COURT:  Mr. Pavlish, you don't have to stay there for this.  I'll let you head down from the witness stand and take a seat, and everyone can be seated.

All right.  So what I was discussing with counsel at sidebar is I'm trying to understand a few things, and frankly it's -- I don't know -- I don't know that I'm being aided in doing so or maybe I am, and it's just me.

But I'm trying to understand:  (A), the parties are discussing certain, maybe, legal issues that I need to decide or maybe factual issues that the jury needs to resolve that have come up and that may relate to questions.

The reason why this is being brought up right this moment is because it's asserted it may relate to cross-examination of Mr. Pavlish.

And so we're trying to understand, What are the issues that are at play?  I'm trying to understand, Are these issues that are legal issues that the parties are requesting a legal determination from me right now?  Are they factual disputes that the parties will ultimately be arguing about to the jury in their closing arguments?

And I'm also trying to understand, Do I need to make decisions on them right now because if I don't, something bad may happen with regard to cross-examination or

things may get upset or with regard to the efficient course of the trial?

So I want to try to understand what's being asked of me, what the issues are, and what I need to do, if anything. We started that.

So let me call Plaintiffs' counsel up to try to synthesize.

MR. NEMUNAITIS: Thank you, Your Honor. Justin Nemunaitis.

I believe there's one legal issue, one legal decision that can solve all of this, and that is a determination as to whether there's a restriction on whether or not a provisional application can be incorporated into a non- provisional application for priority date.

A lot of confusing words, but this is the issue. For written description where the claims of the patent --

THE COURT: If you could speak up a little bit.

MR. NEMUNAITIS: Sure. For written description, we're comparing the claims of the patent to the specification of the same patent. There is a rule that says essential material from a provisional cannot save you on a written description claim. It's got to be in the spec -- in the spec itself because you want to have one document that, you know, gives notice to the public.

There is another rule in the MBEB, which has

been endorsed by the courts and decided and briefed awhile ago, that says that that rule about essential material for written description does not apply in priority date context.

And so if Your Honor agrees with that and rules as a matter of law that this essential material written description rule does not apply to the priority date dispute, then that will resolve all of this because this morning they conceded that -- the magic language for incorporating through the final and second change is there, and that should do it to incorporate the provisional.

THE COURT:  So, I mean, I have a sense of what's going on, but you used a lot of words and -- but you haven't provided a lot of no context.

So we've got a provisional.  We're talking about the 2004 provisional.

MR. NEMUNAITIS:  Right.

THE COURT:  And we're talking about the patents-in-suit here, the '114 and the '517.

MR. NEMUNAITIS:  Correct.

THE COURT:  So we're also talking about a disclosure in the provisional, if I understand it correctly, what I think is Figure 2 in the provisional; is that right?

MR. NEMUNAITIS:  Correct.

THE COURT:  It's a disclosure.  It's a picture.

MR. NEMUNAITIS:  Yes.

THE COURT:  And it's a picture, I think Plaintiff asserts, and Mr. Pavlish testified about this, disclosing adding bromine to the refined coal prior to combustion.

MR. NEMUNAITIS:  Right.

THE COURT:  Is that right?  Is that the key?

MR. NEMUNAITIS:  Yes.

THE COURT:  So we've got that picture in the provisional.  We know we've got -- we've got the same picture in our patents-in-suit.

MR. NEMUNAITIS:  Right.

THE COURT:  Okay.  So I'm with you now.  I'm with you so far.  And we've got -- there's some kind of dispute about essential material, whether -- is it -- it is disputable whether this picture is essential material?

MR. NEMUNAITIS:  They -- they would say that that picture is essential to ensuring that there's written descriptions in the claims.

THE COURT:  Hold on.  Let me just stop you there.

So you understand the defendants' arguments that this picture and its inclusion, not only in the provisional application but, the defendants are arguing, that it needs to be included and displayed in all of the other relevant patent applications, if I understand correctly, between that

provisional and the '517 patent that's at issue here, or in both patents?

MR. NEMUNAITIS:  Both patents.

THE COURT:  Both patents.  Is it your understanding that picture needs to show up in all the intervening patent applications?

MR. NEMUNAITIS:  I think their position is that it does need to be in there.  Our position is that there is no rule that says essential material can be incorporated by reference.  As a matter of law, if it's in the provisional and the provisional is incorporated in each of the applications, then it is, as a matter of law, as if it is literally copied into the document.

THE COURT:  So now you're introducing a different concept, which is, there's no rule about essential material being incorporated by reference.

What are we talking about there?

MR. NEMUNAITIS:  For written description, the Patent Office is very clear.  They want to have one document that has all the information you need to settle that issue.

For priority date, they just want to make sure that you actually invented the thing you claimed on the dates that you claimed.

So if you incorporate material from a provisional application, that's fine for priority date

purposes.

THE COURT:  Let me stop you.

So part of the reason we're having this dispute, you mentioned priority.  I just want to make sure it's explained in a way that's very clear for the record.  What are we talking about here?  What's the issue?  What are we arguing about today?

So that's why I'm stopping you.  I want to break it down.

So the reason -- and I gather a reason or maybe the reason we're having this dispute is that the plaintiff wants to use the provisional application and its date as a relevant priority date; is that right?

MR. NEMUNAITIS:  Yes.

THE COURT:  Okay.  And so -- and the defendant is combatting it?

MR. NEMUNAITIS:  Right.

THE COURT:  And so there's an issue then.  This issue about essential material is related to this priority date issue; is that right?

MR. NEMUNAITIS:  Right.

THE COURT:  And there's an "incorporation by reference" element of this dispute?

MR. NEMUNAITIS:  Right.

THE COURT:  What is that?

MR. NEMUNAITIS:  If that material from the provisional is incorporated by reference into all the patents leading to the '517, then we win the priority date issue.

THE COURT:  And your view is that if in all of the patents leading to the '517 the material in the provisional, including this picture, is incorporated by reference, then you get to use the provisional date as your priority date?

MR. NEMUNAITIS:  Right.

THE COURT:  And that's a legal decision you're saying the Court has to make; is that right?

MR. NEMUNAITIS:  Yes.

THE COURT:  And that just relates to the '517 patent?

MR. NEMUNAITIS:  For our purposes today, yes.

THE COURT:  All right.  So what you're saying you want me to decide is you want me to decide, as a matter of law, that the language in the relevant applications, including in the '517 patent but also the other applications in the chain, was sufficient to incorporate by reference the provisional application and this figure?

MR. NEMUNAITIS:  Correct.

THE COURT:  Do I have that language before me? I don't, do I?  Or do I?

MR. NEMUNAITIS:  We have that all here, Your Honor.

THE COURT:  Okay.  But if I understand it correctly, so that's an issue that's coming up between the parties.  Did -- the plaintiff thinks so long as it sufficiently incorporates by reference in all the intervening applications, the provisional application in this figure, that it gets to use the provisional date as a priority date.  You want me to make a legal ruling that you're correct?

MR. NEMUNAITIS:  Yes, Your Honor.

THE COURT:  And you think they may not disagree with you on that issue?

MR. NEMUNAITIS:  On that particular issue, is the magic language on the application, correct, I think there's agreement.

THE COURT:  But there's another issue, and this relates, I think, to this "essential material" list.

MR. NEMUNAITIS:  Their position is that if the material you need to rely on to prove the priority date, so Figure 2 in the provisional, if you have to rely on that to prove the priority date, that is considered essential.

THE COURT:  And when you say if you have to rely on it to prove the priority date, I think what you mean is, and tell me if I'm wrong, the argument on their side is,

(A), this disclosure in the figure -- what disclosure?  The disclosure of putting the bromine onto the coal before it gets combusted -- if that's related to the invention, what's claimed in the dispute, that it is, but it's part of the claims, so we'll talk about that.

Then go ahead from there.

MR. NEMUNAITIS:  Right.  So if that's the material that's related to the claim language, then we consider that essential.

THE COURT:  And essential meaning -- am I right that, and -- I have my prior ruling, the regulation, which is, I guess, section 1.57, defines "essential material" as "material that's necessary to provide a written description of the claimed invention as required by section 112."

MR. NEMUNAITIS:  Right.

THE COURT:  "Required" meaning, I guess, that what's depicted in this thing, this picture, it's not described anywhere else in these applications.  The provisional and the other applications leading up to the '517, that's their argument.

MR. NEMUNAITIS:  Right.

THE COURT:  And that's why they think it's essential.

MR. NEMUNAITIS:  Right.

THE COURT:  And they say this picture did not

find its way into one of the intervening applications.

MR. NEMUNAITIS:  Right.

THE COURT:  And you don't dispute that.

MR. NEMUNAITIS:  I don't dispute that it's not explicitly in there, but if it's incorporated by reference, it is in there.

THE COURT:  So again, you say that it's a legal issue about whether it's sufficient to incorporate by reference the content of the visual for purposes of the prior art.

MR. NEMUNAITIS:  Right.

THE COURT:  Regardless of whether this thing is essential material or not.

MR. NEMUNAITIS:  Right.

Let me try one more sentence to make sure we're on the same page here, which is:  If we were fighting over -- let's suppose we're looking at the '147 patent where that Figure 2 is not in the figures of the patent.  Make sense?

THE COURT:  Okay.

MR. NEMUNAITIS:  If we were fighting over whether or not that figure was incorporated into the '147 and the written description to support the '147 claims, there would be no dispute that we're not allowed to do that. You cannot incorporate essential material to rebut a written

description.

But we're not arguing that point. We're arguing about the priority date. So for priority date, that rule that says you cannot incorporate essential material by reference does not apply to priority date, and it makes sense because the PTO doesn't really care if you copy and paste every preceding application into the next one. They just want to make sure you actually invented it when you said you did.

THE COURT: So what you just said is when it comes to a determination of the appropriate priority date, whether or not this picture is essential material is irrelevant if it was otherwise incorporated by reference into all of the preceding applications; is that right?

MR. NEMUNAITIS: Yes. And, essentially, there's an MPEP rule that says that and if Your Honor agrees that that rule is the rule of law, that that resolves this issue.

THE COURT: Okay. But is the question of whether this figure -- you say the question about whether this figure is essential material is irrelevant to the priority question?

MR. NEMUNAITIS: Yes.

THE COURT: But the other side disagrees.

MR. NEMUNAITIS: I believe they might. I'm not sure about that.

THE COURT:  If they did, is the question of whether a figure is essential material, is that a question for the judge or the jury?

MR. NEMUNAITIS:  It's something that would need to be decided to prepare the jury instruction as to what has been incorporated by reference into the final application. I believe the judge would have to make that determination.

THE COURT:  Something that would have to be decided for the jury instructions for the jury?  Is it a judge question or jury question?

MR. NEMUNAITIS:  Judge question.

THE COURT:  Whether it's essential material is a judge question?

MR. NEMUNAITIS:  Correct.

THE COURT:  Okay.  And so to summarize, you think the only thing I need to do is make a legal determination about whether the phraseology used in these various applications, including the '517, that incorporated by reference the provisional is sufficient to incorporate by reference the provisional and its content?  And you think if I make that decision in your favor, there is no issue because it resolves that you're entitled to use the priority date from the provisional for the '517 patent?

MR. NEMUNAITIS:  Yes.  I have the rule here, Your Honor, if I may.

THE COURT:  Hold on.  I'm trying to understand what the issues are.

So the other side thinks that's not right.  And the other side thinks it's important that this figure is essential material.  And they think it's important, it's essential material, because they think if it is essential material, then it wouldn't be sufficient to just incorporate it by reference in all these intervening applications.  Instead, it would actually have to be in all the intervening applications.  And it's not -- so if it's not, then I guess their position is you wouldn't be able to use the 2004 provisional for priority date.

Is that their position?

MR. NEMUNAITIS:  Yes.  I believe that's correct, Your Honor.

THE COURT:  You say I don't have to decide that, whether it's essential material or not.  I think they'd say I do.  If I do need to decide it, you say that's a judge question?

MR. NEMUNAITIS:  Right.

THE COURT:  Are those all the issues that are percolating here?

MR. NEMUNAITIS:  I believe that's correct.

THE COURT:  The last question:  Why are we doing this now?  Why do I have to use this time right now, using

the time that would otherwise be used for the witnesses, including Mr. Pavlish's cross, as opposed to making it at a meet-and-confer of the parties, some letters, at some later point in the trial.  Why do I need to make it now?

MR. NEMUNAITIS:  They're about to accuse Mr. Pavlish of doing something nefarious by not including the figure in intervening applications.  But if the law is that everything he did and the prosecution he did is normal and consistent with the law, he did nothing wrong, then that sort of attack on him as a lay witness by a lawyer would be completely inappropriate to do in front of a jury.

THE COURT:  Because it would be irrelevant?

MR. NEMUNAITIS:  Because we exactly followed the law by relying on his incorporation by reference.

THE COURT:  What I'm trying to understand is, what's the objection to the question?  Is it the question would be irrelevant?  What's the objection to it?  You say it would be bad to have, but I'm trying to understand the legal basis.

MR. NEMUNAITIS:  It would be irrelevant and unduly prejudicial.

THE COURT:  Let me hear from the other side about what they think the issues are, if you want to hand up what you have.

MR. NEMUNAITIS:  I have one copy.  It's the MPEP

rule at the top there.

THE COURT:  And I guess, Mr. Nemunaitis, before you sit down, what would happen if I said no, I don't think I need to make these calls?  It's difficult, needs research, and the parties need to make this legal decision, maybe a legal decision, maybe not a legal decision, in 5 minutes or 10 minutes.  I don't want to do that.  They just presented this issue to me as one I need to resolve at 6:30 in the morning without any documents or briefing.  That seems like a bad idea.

Let's say I said no, I'm not going to do it.  Now you can lay your arguments out and I'll make them when I've had a chance to reflect on it.  And then we go ahead and we have questioning about this issue.  What's the harm?  What would happen later?

MR. NEMUNAITIS:  Well, I believe we have very inappropriate questioning of a lay witness that would be completely irrelevant based on an erroneous instruction on the law, and we would need to deal with how to correct the legally erroneous arguments made in front of the jury.

THE COURT:  And the erroneous instruction of law would be?

MR. NEMUNAITIS:  Accusing Mr. Pavlish of doing something wrong by not explicitly putting that provisional figure in the provisional.

THE COURT:  If it turns out that doing that doesn't have any meaningful effect because of a legal decision, you can just point that out.

MR. NEMUNAITIS:  If we have the correct instruction at that appropriate time, but if they're accusing him of doing something wrong, of something nefarious, I believe that could be very misleading to the jury.

THE COURT:  You keep saying something nefarious, that there's not a picture in this disclosure.  This is about a disclosure that may lead to a legal or factual issue.  I don't understand what's so nefarious about it.  What is so prejudicial that if this questioning happens -- it's only going to be a couple of questions -- that it's so damaging?  I don't understand.

MR. NEMUNAITIS:  It would seem to me a theme from their opening is that the plaintiffs in this case didn't properly disclose everything they did with the invention.  I'm afraid it would be consistent with that theme and would be misleading, and ultimately, perhaps, can ask for a corrective legal instruction to address the issue.

THE COURT:  Let me hear from the other side. Thank you, Mr. Nemunaitis.

Okay.  Mr. Wilson, and I do want to focus. Again, I'm trying to figure out, what are the issues that

you think are at play here?  Explain them.  And then what do you think I need to decide or not, et cetera, in a way that we went through it with Mr. Nemunaitis?  Can you help me with that?

MR. WILSON:  Absolutely.  I think Your Honor has accurately hit on the issues, but I'll step through them as we see them to make sure we're on the same page.

THE COURT:  Step 1.

MR. WILSON:  Step 1 is the issue that's addressed in the summary judgment order about the language of incorporation.  That's addressed there and briefed there.

THE COURT:  That's whether or not the language that's used in the '517 patent and any relevant application in the priority chain leading to the provision was sufficient under the law to incorporate by reference the content of the 2004 provisional?

MR. WILSON:  Correct.

THE COURT:  You have made an argument, at least with regard to other patents and the relevant disclosures, that the nature of the disclosure as a legal matter wasn't sufficient to incorporate by reference certain content.

MR. WILSON:  Correct.

THE COURT:  And I -- and I agreed with you, and I think the other side says, and I'm -- and I have my order. So, you know, look at it with this.  Look at it.

But I think they say the reason why I agreed with you is because there was particular phraseology in those intervening applications, including in the '114, which was something like, "Hereby incorporated herein by reference to the extent appropriate." And I focused on that phraseology, "to the extent appropriate," because it was a confusing thing. What extent was being appropriate? That was the basis of the rulings of that.

MR. WILSON: That was the language you quoted in your order. Right.

THE COURT: And I think the -- Mr. Nemunaitis says it is undisputed. It is undisputed that with regard with what we're arguing about now, the disclosure in the '517 and all the applications in between going back to the 2004 provisional, is that "to the extent appropriate" language is not included and, instead, language that's included, which I'll see if I ever need to look at the relevant documents, is something like "incorporated by reference"; is that incorrect?

MR. WILSON: With respect to the particular phrase "incorporated by reference," it is correct that, in the chain leading to the '517, "to the extent appropriate" is not in the same sentence as the "incorporated by reference" language.

The "to the extent appropriate" language does

appear in the multiple applications in that chain in the preceding sentence talking about claiming priority to the provisional, and our argument at the time was that was equally confusing as to what was to be incorporated.

THE COURT:  Okay.  So are you arguing that the legal decision I would have to make as to whether or not the content of the 2004 provisional was incorporated by reference to the chain -- are you arguing that it is not decided one way or the other with regard to this "incorporation by reference" issue as to the provisional? Are you arguing that whatever you're saying is an additional sentence about priority and the language about "extent appropriate" has some relevance to this "incorporation by reference" issue I have to decide?

MR. WILSON:  So that was our argument on Step 1 in summary judgment.

THE COURT:  Okay.  I want to know what your argument is right now.

MR. WILSON:  Sure.  And, yes, that is our argument, that that language makes it confusing as to what is incorporated by reference in that chain as well for this Step 1 issue.

THE COURT:  But if it wasn't there, like just if -- just, like, look, incorporated by reference, this provisional --

MR. WILSON:  Yes.

THE COURT:  -- would you agree that that is sufficient to incorporate by reference certain material?

MR. WILSON:  Taking that sentence in isolation, if the preceding sentence was not there, yes, we agree that was sufficient.

THE COURT:  How many different -- this is maybe for you or the other side.  How many different applications do I have to look at to see what the language is used at issue?

MR. WILSON:  I would say it's three to four.

THE COURT:  And the plaintiffs say they have it, but I don't.  So let's say I look at it, and I decide, look, looking back at my summary judgment order, parties say I've got to make this call now.  I see the language that the plaintiff is pointing to, "the extent appropriate," which doesn't say "extent appropriate."  It says "incorporated by reference."  Yeah, I think that's sufficient to incorporate by reference the provisional, its contents, and all the intervening applications.  I think you're saying I'm not done.

MR. WILSON:  Correct.  We're saying you're not done.  We're saying there is a Step 2 which is where the legal propriety of "incorporating by reference essential material" comes into effect.

THE COURT:  Okay.  And let me make sure I understand your point there.  Okay.

So I've decided that -- in this hypothetical world, that, yes, what the plaintiff was trying to do, it was trying to incorporate by reference into the '517 via statements in that patent and all the chain applications before the content of the provisional.

And that's relevant or right, you agree, that -- because what we're fighting about is its importance, potentially, that this provisional has this picture of the -- what the plaintiffs say is the disclosure of the activated carbon being added to the coal before the boiler; is that right?

MR. WILSON:  Right.

THE COURT:  So saying I make that call, yeah, they incorporated by reference that provision.  You say I'm not done because...?

MR. WILSON:  You are not done because through the combination of 35 U.S.C. 120, which discusses how you can claim priority back through a chain of applications, which is that each preceding application has to have 112 support for the claim, coupled with the 37 CFR 1.57(d), which prohibits incorporating by reference essential material -- when those are considered together, our position is when you're stepping back through the chain to see if

there's proper claim of priority, you have to apply that 1.57(d) bar.  And you cannot incorporate essential material by reference into one of those intervening applications in order to make that a proper application for priority.

THE COURT:  So if this figure, Figure 2, is essential material, if it is, then it wouldn't be proper to incorporate it by reference in the way the plaintiffs say that they have by use of this magic language in all these applications, including the '517?

MR. WILSON:  That is -- that is what we are saying.  The language may be correct, but they are still not legally permitted to do that.

THE COURT:  So the call that has to be made there in review is if you're correct under the law that Mr. Nemunaitis says, no, it -- whether it's essential material or not, it doesn't matter.  You can incorporate by reference essential material or nonessential material in a provisional and get the benefit of a priority.  I think that's what he's arguing.

MR. WILSON:  I take that to be his argument.

THE COURT:  But you disagree with that?

MR. WILSON:  I disagree.

THE COURT:  If I was going to find, like, legal argument about whether that's true or not, where would I look?

MR. WILSON:  So we argued that point on summary judgment, so there is briefing on that issue there.  That's where we cited section 120.57(d).  In our reply brief on summary judgment, this is -- it's an odd and confusing issue, and there's very limited case law.  In our reply brief on summary judgment, we cited what it was at the time and what I believe is still the only case sort of addressing this issue as well.

THE COURT:  What's that case?

MR. WILSON:  I believe it's called *Maquet*. M-A-Q-U-E-T, I think.

THE COURT:  I will remember that later.

So your view is the first issue is Step 1.

Then Step 2 is you think I need to decide whether or not this disclosure is essential material.  And that's a dispute in and of itself because the plaintiff says I don't need to decide, but you say I do because you can't incorporate by reference essential material in the provisional, and you say this *Maquet* case is relevant.

Let's say I find that you're wrong and that you -- or maybe I -- let's say I find you're correct, and you can't -- you can't incorporate essential material by reference in this way to get the benefit of a priority date, because that's what we're fighting about.

MR. WILSON:  Yes.

THE COURT:  Is there going to be a dispute, then, about whether this is actually essential material?

MR. WILSON:  So our position is that it is essential material.  Upon summary judgment, Your Honor addressed that in a paragraph or two, finding that there was a dispute of fact about whether it would, in fact, be essential material.

THE COURT:  And all these issues we've talked about so far, including this one -- is there a dispute of fact about whether it's essential material? -- are those all questions that I have to resolve as a judge?

MR. WILSON:  I think the way it's been presented at this point following summary judgment and the way expert reports are and the way I expect them to testify, there is a dispute of fact about whether it is essential material.  And I'll try to very briefly outline what it would be.  There --

THE COURT:  I don't think that's the question I asked you.

MR. WILSON:  Sure.

THE COURT:  The question I asked you is who decides it?  Do I, the judge, decide this dispute, or is the jury going to decide is this -- was this essential material?

MR. WILSON:  I mean, I think the import of Your Honor's previous order is that the jury would decide it because it ultimately boils down to a question of written

description, on which there is a dispute of fact.

THE COURT:  Okay.  All right.  Is there anything you want to say about what is the dispute about whether this figure is essential material?

MR. WILSON:  Certainly.  I can give you a sentence or two.  So the experts at this point basically have competing opinions on whether other materials that are indisputably explicitly in these intervening applications also disclose adding bromine to coal before combustion.

THE COURT:  And you say those are just fact disputes between experts about written description that a jury would use?

MR. WILSON:  Correct.

THE COURT:  All right.  So I think you're saying there's at least three issues here.  There's the threshold Step 1 issue:  Is it appropriate in the way that they did incorporate by reference certain material?

Second, even if it is, you'd say it doesn't matter because the material at issue is essential material.  Again, essential material, you can't incorporate it by reference in that way, via provisional, to get a priority date.  They disagree.  I have to decide that.  Both judge decisions so far.

MR. WILSON:  Correct.

THE COURT:  But then, thirdly, if it becomes

relevant -- so if you're -- if you're -- I guess if you're wrong on Step 2, right -- so you say -- or to get to Step 2, it has to be essential material, and there's a dispute about that.

So you're saying that the essential material dispute, which is a jury question, relates to a dispute about, well, if it's essential material, you can't -- you can't incorporate it by reference, and that's a judge decision?

MR. WILSON:  So Your Honor's decision would basically be which of our competing interpretations of whether you're allowed to incorporate essential material. That is a decision for you.  That is a legal question.

If there is no prohibition of incorporating essential material, then at that point, the jury wouldn't need to decide whether it's essential material.

THE COURT:  Okay.  So if, at Step 2, there's no provision on incorporating essential material in order to get the priority date, then not an issue the jury needs to decide.  But if there is one, then the jury would be deciding it.

MR. WILSON:  Correct.  And I should preface this by saying that our expert has never conceded that Figure 2 in itself does provide a proper written description.  For the purposes of summary judgment, we assumed that it did.

So I just want to make sure I'm not conceding that we would be admitting that it is entitled to the provisional in that -- in that realm, but we would no longer be fighting over whether it could be incorporated.

THE COURT:  Okay.  And, lastly, do I need to make this decision now, all these various decisions about legal decisions, looking at documents?  Do I have to make this right now before you cross Mr. Pavlish?

MR. WILSON:  I mean, our take is roughly what Your Honor proposed to Mr. Nemunaitis, that if the questions about Figure 2 and the provisional with respect to the '147 become irrelevant because of something Your Honor decides, then that will basically fall out in jury instructions and can be cured and instructed if necessary.

THE COURT:  You said with respect to the '147. Are you talking about the '147 or the -- is that the --

MR. WILSON:  No, I'm just saying that I think what we're talking about is asking him questions about the provisional and whether that figure appears in an intervening patent.

THE COURT:  And it turns out it doesn't matter whether it does or not.  You're saying, "So what?  Assume some questions were asked about something that the jury will, you know, eventually be, if they had to be, told, it doesn't make any difference."

MR. WILSON:  Correct.

THE COURT:  Anything further to explain the issues?

MR. WILSON:  No, sir.

THE COURT:  All right.  Thank you, Mr. Wilson.

Anything further, Mr. Nemunaitis?

MR. NEMUNAITIS:  I have copies of the language from the application if Your Honor would like to see that.

THE COURT:  Okay.  Yeah.  How many applications are there that have this "incorporated by reference" language?

MR. NEMUNAITIS:  This just has the relevant portions copied and pasted in from Mr. O'Keefe's report.  It's one document.  Oh, I'm sorry.  It's the -- yes, it's one document, and it has all 12 of the applications.  But I think the '147 patent is the one they're really focused on.

THE COURT:  It has all the relevant ones but the '147 -- I'm sorry.  I don't understand what you're saying.

MR. NEMUNAITIS:  I'm sorry.  It has the incorporation language from every application in the chain.  My understanding is that they are claiming that the '147 patent is the one in the chain that failed to properly incorporate by reference, at least as one example of that.

THE COURT:  I don't know that they are, though.  Seems like they're saying lots of them have the language

that this prior sentence, et cetera.  But you're saying, in any event, all the ones that matter are in this document?

MR. NEMUNAITIS:  Correct.

THE COURT:  And how many are there?

MR. NEMUNAITIS:  I believe there's 12.

THE COURT:  12 different applications.  So is the language the same, or is it different?

MR. NEMUNAITIS:  Varies.  Like, differences. I --

THE COURT:  I mean, I'm just trying to picture what you want me to do.  I think you want me to take a break and decide all these issues with the documents with just what I heard from the lawyers, which could take I don't know how long.  So we just let the jury sit and wait until we get that decision?  That's what your proposal is?  Is that what you're asking for?  I just want to know.

MR. NEMUNAITIS:  No, Your Honor.  I think we should proceed with the trial, but I can provide this as a resource if that would be helpful.

THE COURT:  I'll have you hand it up and give a copy to the other side.  We'll take a short break so the lawyers can get their things together and so I can chat briefly about what's been said here.  We'll come back out, and almost certainly, in light of what Plaintiffs' counsel just said, we will proceed, but presumably we'll need to

decide how we will resolve these issues and when.  Why don't we take a short break.  We'll plan to come back -- I'd ask the lawyers to be back here by 11:00.  Thank you.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  Let me say for the record what's the outcome of what we just discussed and I'll try to articulate it as clearly as I can.

Firstly and most importantly, we are not going to take a further break for me to resolve any of the disputed issues the parties just discussed.  I don't think based on what's been said, and I think it's now agreed, there's a need to do so or that any questions that might be asked of Mr. Pavlish on cross-examination are so unduly prejudicial that if they end up being irrelevant to some issues in the case or not, depending on what the Court decides on this issue, they can't be asked now, and later, if needed, the Court and the parties can explain whether they were or weren't relevant.

With regard to the disputed issues, I understand there to be three.

I understand the first disputed issue to be whether, based on the language that was utilized in certain patents and patent applications, the plaintiffs utilized sufficient language to incorporate by reference certain

material in a prior submission.  I understand there's a dispute about that, and I understand the parties think that's a legal dispute the court needs to resolve.

Secondly, I understand there to be -- even if the plaintiffs did so, that the defendants assert that to the extent that this material is essential material, then simply incorporating it by reference isn't enough under the law to get the priority date of 2004.  The plaintiffs dispute that.  I understand that issue to be a legal dispute as well that the parties believe the Court needs to resolve.

But if the defendants are correct, that would then relate to a third disputed issue, which is whether the material is essential material.  The parties have different views on that.  Apparently, the experts do.  The defendant, at least, believes that question is one that should be put to the jury.  I don't know what the plaintiff thinks about that.

Anyway, I think there's those three issues. What I'm going to ask the parties to do is come to an agreement on when a joint letter brief submission that further articulates the positions of the parties laid out today and cites any accompanying case law or attaches any relevant documents should be submitted.  I'm going to assume based on right now that I won't need to decide that finally until the prayer conference on Thursday evening.  If the

parties believe that's wrong and they want that decided earlier, they can decide on what the right schedule is and when they're going to submit a joint letter to me and let me know when the letter is going to be submitted.

If everyone is ready to proceed, we'll bring the jury in right now.

MR. DORSNEY:  Your Honor, we have to hand up material for the witness.

(The jury entered the courtroom.)

THE COURT:  We'll have the witness retake the stand.

And I'm sorry, Mr. Dorsney, did you say you handed up materials for me?

MR. DORSNEY:  That would be cross materials.

THE COURT:  I want to make sure I know what we're talking about.  Thank you.

MR. DORSNEY:  Thank you, Your Honor.

THE COURT:  All right.  We'll proceed with cross-examination.

CROSS-EXAMINATION

BY MR. SYKES:

Q.    Good morning, Mr. Pavlish.  Paul Sykes here for the defendant.  You touched on this with Mr. Caldwell in your direct examination.  You are the CTO of ME2C now?

A.    That's correct.

Q.      And as the CTO, you also hold a number of shares of the company; fair?

A.      I do.

Q.      And the 2022 annual report said that you own about 6.1 million shares of the company; is that fair?

A.      I wouldn't quite characterize it that way.  I own shares and stock options.

Q.      Do you know how many shares and stock options you own altogether?

A.      I own approximately a million shares and maybe it's probably 3 to 4 million options.

Q.      And so you would benefit financially from the share ownership in the outcome of this case potentially?

A.      Potentially.

Q.      I'm going to just ask you a few quick questions about the continuity of the patent applications from your conception and reduction to practice that you discussed in your direct exam of the '517 and '114 patents that we're here about this week.

        MR. SYKES:  Mr. Brown, if we could just to get everyone oriented, put the family tree chart on the screen.

BY MR. SYKES:

Q.      So this is one of your patent applications for the '114; correct?

A.      Correct.

Q.    We see -- I'm pointing also to the application 091 for the '517 patent and then the provisional which we looked at as PTX 17 is back here in 2004; right?

A.    Correct.

Q.    Okay.

MR. SYKES:  And so, Mr. Brown, if we could put up PTX 17, the provisional application, and let's page down to page 13.  Maybe another couple of pages.  There we go.

BY MR. SYKES:

Q.    This is the Figure 2 of the provisional that Mr. Caldwell directed you to, and you pointed to this additive injection as pointing to adding bromine to the coal before combustion; right?

A.    Right.

MR. SYKES:  And, Mr. Brown, if we could now pull up the '517 patent, PTX 3.

BY MR. SYKES:

Q.    Okay.  Here we see this is the '517 patent issued in 2020, and here's our figure, the same figure we looked at in the provisional; correct?

A.    It's the same figure, yes.

Q.    And then I think it shows up -- that's the front page.  I believe it shows up as Figure 11 further down. We'll skip that.

And step back and have another look at the

family tree.  So right here in the family tree, we see the application filed in 2009 that issued in the 8164 or 168147 patent; correct?

A.      Correct.

Q.      And so the '147, is in this line that leads up to the '517; fair?

A.      Fair.

MR. SYKES:  And, Mr. Brown, if you could pull up PTX 5.

BY MR. SYKES:

Q.      So here is PTX 5.  If we could just page through each page.  That's the second page, third page, Figure 2, Figure 3  -- these are being played on the screen -- Figure 4, Figure 5, Figure 6, Figure 7, Figure 8, Figure 9, Figure 10, and then we get to the text.  So it's fair to say that the chart we looked at in the provisional, PTX 17, and then it showed up in the '517, PTX 3, it was not displayed there in PTX 5, the '147 patent; fair?

A.      Fair.

Q.      And if we jump down to column 14 of the '147 patent, beginning on column 14 and then continuing through column 21, you're familiar with this patent, this is one of your -- you've been examined on this before; right?

A.      Yes.

Q.      And so there are 12 examples that this goes to patent

application -- or this patent goes through in columns 14 to 21, and just to save us the time, and you testified about this before, can you confirm that none of the examples from 1 to 12 disclose adding bromine directly to the coal before combustion; fair?

A.    I think I responded that it wasn't disclosed but that I was aware of some of the examples where bromine was added to the coal.

Q.    That's right.  You agree that the written document, examples 1 to 12, it wasn't there, and then you further clarified that your memory was, as you testified today, that you had added it?

A.    Correct.

Q.    Let's -- yesterday, at the beginning of your testimony, very beginning of your direct, you remember you gave testimony about the ME2C license, I believe it's PTX 766 if memory serves correctly, the DTE-AJG-Chem-Mod license?

       Do you remember that?

A.    I guess I don't recall that.

Q.    If you could, you've got a binder with your exhibits. Let's look at the very -- look in the middle you'll.  See a PTX 766 tab.

A.    You said 766?

Q.    Yes, sir.  About halfway through the notebook.

A.    Yes, I see that.

Q.    You remember testifying about that yesterday; right?

A.    I remember testifying to the amount we settled for.

Q.    Thank you.  And you were also involved in licenses ME2C granted to several power plant operators in this case; weren't you?

A.    You would have to define when you say "involved."

Q.    You were part of the team that negotiated each of the licenses with, you remember, Talen, Vistra Energy, and AEP?

A.    I was part of the team that provided information and data that went into that negotiation.

Q.    And you provided data that was part of developing the cost structure of the negotiation; right?

A.    I provided data that eventually formed that structure.

Q.    So as -- so let's take a look, since you were part of the team that negotiated them.  They're identified as exhibits DTX 19, 20, and 23 in your binder.  DTX 19 is entitled "Fleet-Wide License and Supply, an Agreement Between ME2C and Vistra."

      Do you see that?

A.    Yes.  On 19, yes, I see that.

Q.    And as we just confirmed, you were part of the negotiating team that provided data to support this agreement; correct?

A.    Again, I wouldn't characterize it as negotiations.  I didn't do the final negotiations.  I provided information.

Q.    And but you're familiar with this agreement; aren't you?

A.    Some parts of it.  Again, I didn't finalize the agreement.  I had input on another level, providing data information.  Final agreement was not by me.

Q.    I recognize that.  You didn't finalize the agreement you talked about yesterday, PTX 766 either, did you?

A.    Yes, I think.

Q.    And the next agreement, DTX 20, between ME2C and AEP, you agree you were part of the negotiating team and you're familiar with that agreement as well?

A.    Yes.

Q.    And then DTX 21, the agreement between ME2C and NRG Energy, you were part of the negotiating team, and you're familiar with that agreement as well; correct?

A.    Again, I provided information and data.

Q.    And I believe you actually -- you were actually involved in the negotiation on that one; right?

A.    That would have been our attorney that represented us that negotiated and defined the terms of that.

Q.    And you remember giving a deposition in this case; don't you?

A.    Yes.

Q.     And do you remember being asked about all these agreements?

A.     Yes.

Q.     And do you remember that you were asked:  "Next is an NRG license agreement dated January 5, 2021.  Were you involved in the negotiation of that license?"

       And do you remember your answer?

A.     I don't remember the exact wording for that, no.

Q.     You answered "yes."

       You wouldn't have any reason to dispute that?

A.     I guess maybe I misunderstood the term in the context of what you were meaning by negotiation there.

Q.     Let's just take a look at your deposition.  I think you've got your binders?

A.     I do.

Q.     That's on page 269, line 18.  And could you --

       THE COURT:  Excuse me, Mr. Sykes.  I think the defendant is going to take down -- I think I instructed the parties about this.  Take down a picture while you're asking that.  It hasn't been entered.

       MR. SYKES:  Yes, Your Honor.  I know we're -- it's our first time to do this.  I want to make sure we're following your instructions.

       THE COURT:  Absolutely.

BY MR. SYKES:

Q.    Mr. Pavlish, if you could read beginning on page 269, line 18 through line 25, please.  And you were asked --

A.    I'm sorry.  Could you repeat?  269 through?

Q.    Line 18 to 25.

A.    Okay.

      "Next is the NRG license.  Were you involved in the negotiations of that?"  And I said yes.

      And then it says:  "Did you have the same role you had at AEP and Vistra?"

Q.    Your answer was yes?

A.    Again, it goes back to what you mean by "negotiation."  I did provide data that went into that negotiation.

Q.    You were asked if you were involved in the negotiation, and you said yes?

A.    I said yes.

Q.    And the last one is the agreement between ME2C and Brandon Shores, LLC; Talen Generation; and several other entities we refer to as the Talen agreement.

      Your role is the same in that agreement; fair?

A.    Yes.

      MR. SYKES:  I move to admit DTX 19, DTX 20, DTX 21, and DTX 23.

      THE COURT:  Any objection?

      MR. CALDWELL:  No, sir.

THE COURT:  They are admitted.

(Thereupon, Defendants' Exhibit Numbers 19, 20, 21 and 23 were admitted.)

BY MR. SYKES:

Q.    And I think as you touched on a moment ago, your role was providing data as part of developing a cost structure?

A.    Yes.

Q.    And let's take a look just at one of these agreements.

MR. SYKES:  Mr. Brown, if you could put up, say, DTX 19.

BY MR. SYKES:

Q.    DTX 19 is a -- it's a fleet-wide license.  That's what it's described as; fair?

A.    Yes.

Q.    And let's look at the first page of DTX 20.  And it's also a fleet-wide license and supply agreement; correct?

A.    Correct.

Q.    And you have the binders in front of you, but DTX 21 and 23 likewise are fleet-wide license agreements?

A.    Correct.

Q.    And "fleet-wide" means all the power plants in that utility's fleet; correct?

A.    Yes.  I mean, there are probably specific terms in there that may limit it, but in general, yes.

Q.     Some of these utilities, like Vistra and NRG, they may span multiple states, don't they?

A.     They could potentially.

Q.     How many plants does Vistra have in its fleet?  Do you know?

A.     As of today today, plants or units?

Q.     Just power plants.

A.     I'd say -- you're talking about Vistra?  They have a number in the Midwest, and they have a number in Texas, so 8, 10.

Q.     How many plants does AEP have?  Do you know?

A.     Not right off.

Q.     What about NRG?  About 20?  Does that sound right?

A.     That sounds too many for coal plants.

Q.     How many coal plants do you think it has?

A.     Plants, maybe 8 or 10.

Q.     And what about Talen?  Do you have a sense of how many coal plants?

A.     I don't recall.

Q.     Six or eight sound about right?

A.     I don't recall.

Q.     Let's just jump back to DTX 19.  And let's look at section 2.

       And you understand, Mr. Pavlish, as chief technical officer of ME2C, you deal with IP issues that --

this is ME2C granting to Vistra in this case a -- it says a nonexclusive, nontransferable, non-sublicensable section 3.5 worldwide, fully paid up, royalty free, irrevocable, and perpetual license under all the licensed patents.

Did I read that correctly?

A.    You read it correctly.

Q.    And the licensed patents are referring to ME2C's mercury control patents; is that fair?

A.    I guess I'm looking to where it actually says that.

Q.    That would be -- let's look up at section 1.5.

A.    Do I turn to that?

Q.    And you see that says "licensed patents include" legal language.  The asserted patents, the ones asserted in the lawsuit against Vistra, which was this lawsuit, and then all patents and patent applications listed on Exhibit A; right?

A.    Again, I didn't write this term, but that appears what it says.

Q.    That's what it says?

A.    Yeah.

Q.    And let's jump down to Exhibit A, which is on page 16 of the document, and then Exhibit A is a listing of various ME2C patents and patent applications.  Fair enough?

A.    Yeah, fair enough.

Q.    And you're familiar with these.  This is what you --

A.    Yeah, fair enough.

Q.    Got you.  And among these, you wouldn't dispute that we have the '114 and the '517 patents that are at issue in this case?

A.    Right.

Q.    And those are the asserted patents in this agreement?

A.    Correct.

Q.    I know this is a little tedious, but try to walk through and cover these things.

Jumping back to section 2 of DTX 19, and then we see in section 2.1, the license is to:  (A), to make, dispose of licensed products or combination products; and then (B), to have licensed products made or otherwise provided by one or more third parties for use, sell, et cetera, by Vistra and its affiliates.

Do you see that?

A.    Yes, sir.

Q.    And "licensed products," that would be what's described up in paragraph 1.6, and reading that it says: "Shall mean any and all products and services of or provided by or to, directly or indirectly" -- so products provided by or to Vistra or its affiliates -- "including any portions of those alone or in combination with other products and services such that such licensed products constitute in respect of a patent claim direct infringement of a claim,

contributory infringement of such claim, and part 3, induced infringement of a claim."

Did I read that correctly?

A.     Yes.  You read it correctly.

Q.     Okay.  So just to clarify, I touched on this, but each of these utilities, Vistra, AEP, NRG, and Talen represented by the Exhibits DTX 19, 20, 21, 22, and 23.

Now, they were the defendants in this very lawsuit; right?

A.     Yes.

Q.     And ME2C sued them for violating the same patents that we're talking about this week?

A.     Yes.

Q.     Right?

A.     Yes.

Q.     And then also included the -- infringing the '147 patent that we looked at a minute ago, PTX 5 that issued in 2012; is that right?

A.     Are you saying it was included?

Q.     Yeah.  It was included in the case.

A.     Yes.

Q.     And so ME2C, it was your understanding, was seeking damages back six years in July 2019 the -- let me start over.  That was not very well said.

In the lawsuit against these four utilities,

ME2C was seeking past damages going back six years from the filing of the complaint in July 2019 based on their past usage or alleged usage of your two-part process; is that fair?

A.    I think we were seeking past damages.  I'm not specific on the years or dates.

Q.    And let's just take a look at section 3.1 of Exhibit 19, DTX 19.

So ME2C not only granted the license we just looked at but also granted these -- Vistra and its affiliates and a long list of synonyms and others that some fine lawyers drafted, a release from these past damages and claims as well; fair?

A.    Again, I didn't write these terms.  If that's what it says, I guess that's what it says.

Q.    Well, who else was involved in negotiating these licenses?

A.    Primarily that would have been our representative, our representing attorney.

Q.    And who was that for these?

A.    That was Caldwell.

Q.    Counsel here?

A.    Yes, counsel here.

Q.    Mr. MacPherson, he's CEO.  I'm sure he had some role?

A.    I'm sure he had some input, yes.

Q.    Well, you were involved.  I mean, you and Rick --

A.    Yeah, he was involved.

Q.    I should say Mr. MacPherson.  Okay.  And we touched on a few moments ago, you said you provided data to support the cost structure.

Do you recall that?

A.    Yeah, provided data and information.

Q.    What data?  Where did you get it?

A.    We were looking at, like, generation from a plant trying to anticipate projection, coal data, coal consumption data.

Q.    Where do you get coal consumption data?

A.    That's publicly available.

Q.    Is there something called -- I've seen in this case -- the EIA database?

A.    Yes.

Q.    And what is the EIA database?

A.    Energy Information Agency database.  It's part of the Department of Energy.

Q.    And I don't pretend to know much about it, but is it fair to say that power plants and I think energy producers of all kind have to report lots of data to the federal government about their operations and their consumption, et cetera?

A.    Yeah, it's a fair amount of data.  I don't want to go

through the whole list of it, but, yes, there's a lot of data they provide in the EIA reports.

Q.    You're familiar with the EIA database?

A.    I am.

Q.    How long do you think you've been working with it in one way or another?

A.    I guess you'd have to define "working."  Looking at or actually pulling information off of it?

Q.    Well, looking at it.

A.    Well, I've been looking at that information for probably a decade.  In terms of looking at a more detailed analysis, that would be more recent.

Q.    The EIA database has coal consumption uses for basically every power plant in the United States, doesn't it?

A.    Correct.

Q.    And that's broken down by month and year, I think?

A.    Yes, month and year.

Q.    And it also has the amount of power generated by these power plants as well.  I think it may be megawatt hours?

A.    Yes.

Q.    And so let's just -- I think all of us are old enough to remember the hundred watt or 70-watt light bulb, so a megawatt is a million watts; right?

A.    Yes.

Q.    And just -- you know this, I don't know this, but what's just a midsized power plant?

A.    500 megawatts.  Nowadays about that.  It's a little higher.

Q.    Yeah.  5- or 600 million watts?

A.    Yeah.

Q.    Okay.  That's why we burn so much coal.

A.    We burn a lot of coal.

Q.    And the EIA database goes back a good decade or more?

A.    Or more, yeah.

Q.    And so you can use the EIA database to add up the coal tonnages for any power plant or set of power plants in the country; correct?

A.    You can add up the total amount of refined coal as well as the total amount of coal.

Q.    And it's got the megawatt hours that generate for that coal too?

A.    Yes.

Q.    So then you can figure out -- if you have the megawatt hours, you can figure out how much coal they burn to generate that average estimate?

A.    Yes.

Q.    Those are things you do know how to do?

A.    Essentially, yes.

Q.      And just to be clear, this EIA database, you can query it, you can download the data and put it in Excel spreadsheets, things like that?

A.      You can get it in that form.

Q.      Did you pull any EIA data for Mr. Philip Green, the plaintiffs' damages expert in this case?

A.      No.

Q.      The coal tonnage and the number of tons of coal, you could look that up in the EIA database for the power plants owned by a particular utility like Vistra, NRG, or Talen or AEP, the utilities that were parties to these agreements?

A.      It's there.

Q.      It's there.  You can look it up?

A.      Yes.

Q.      And you can look at the historical consumption data and make an estimate of future consumption; is that fair?

A.      Yeah, trajectory.

Q.      And that's sort of what you did in providing information to support these license agreements we looked at?

A.      Yes.

Q.      So turning back to DTX 19, that would be the Vistra agreement, do you know how many tons of coal are covered by that agreement?

A.      I can't recall that today.  I don't remember.  It's a

fair bit, but I don't remember exact numbers.

Q.    Several hundred billion tons?

A.    Over what duration?

Q.    Well, over six years looking back and then a forward perpetual license for the life of the patent that may be ten years?

A.    Ten years' worth, probably in that range.

Q.    Yeah.  4- or 500 million tons for a big utility like Vistra?

A.    Yeah.

Q.    And AEP probably similar, couple hundred million tons?

A.    Yeah, I think it would be similar.

Q.    And NRG, they're bigger than AEP, so they're maybe more like 400 million, 500 million tons over the relevant time frame?

A.    Again, I don't remember the numbers.

Q.    Do you remember you were asked some of these kinds of questions at your deposition before?

A.    I believe so.

Q.    And you testified that, if you recall, that you did know how many tons of the coal an NRG license covers.

        Do you remember that?

A.    Yeah, I think I said I knew; however, I didn't have them at the time.  I couldn't recall them on the spot.

Q.    What's your best judgment just as we sit here today?

A.    I really couldn't make a judgment today.

Q.    3- or 400, 500 million tons for a big utility like NRG over 6 to 10 years?

A.    I don't recall.

Q.    But that information is in a government database --

A.    Yes, yes.  I just don't recall those numbers.

Q.    It can be looked up?

A.    Yes.

Q.    And last, Talen.  Do you have a sense of how many million or hundred million tons the Talen agreement might cover?

A.    I did at the final agreement, but I don't recall.

Q.    A couple hundred million tons for a utility like Talen for 8 to 10 years?

A.    Probably that.  I don't recall.  I apologize, those are big numbers.  I've done a lot of number crunching on different plants, and it's been a few years ago, and I've done a lot of number crunching since then, so it's hard to pull the numbers out.

Q.    The brain works a little bit different in your 50s or early 60s than it does when you're 25?

A.    Absolutely.

Q.    I know that for sure.  Thank you for your answers and helping us walk through that.

And last, let's take one more thing we need to cover on those, just briefly.  Let's look at DTX 19.  That's the Vistra agreement, and that's the one that's a particularly big utility.  You said it could be 4- or 500 million tons, maybe 10ish coal fired plants.  Let's page down and have a look at what's going to be in section 4.3.

So this one, you were probably involved in this.  Remember it had a sliding scale on the payment for the license versus supply?

A.     Yes.

Q.     And the more product that Vistra bought from you guys, ME2C, the lower the royalty fee it paid.  So it kind of got a rebate or discount on the royalty for buying the product?

A.     Yes, it was an incentive to do business, continue to do business.

Q.     You wanted to have a relationship with them.  So they have this payment matrix under the payment section.  So if we page down to the next page, we can see if we go all the way down, if Vistra buys zero from you guys in the first year, it would owe ME2C $675,000; right?

A.     Yeah, based on certain quantity.

Q.     But if they bought zero, they would still owe 675?

A.     Yes.

Q.     And then they had another payment obligation for

years two to four in a similar sliding scale where you're trying to encourage them to buy product, but then at the bottom, if they buy zero, they've got to pay $900,000 a year for those three years?

A.    Yes.

Q.    So my math would say 3 times 900,000 is 2.7 million plus 675.  3.375 million is what they paid for the license and the release of maybe 4- or 500 million tons of coal?

A.    This was really based on -- the units that we were doing business with in terms of the license covered broader than that, but this is based not on the tonnage you're referring to.

Q.    It was a fleet-wide license to the whole fleet. Every power plant in the fleet had the right to use the patent to the two-part process; right?

A.    Yes.

Q.    Let's look at -- try to move through these more quickly.  The other ones, fortunately, I think are simpler. AEP, DTX 20, let's take a look at 4.3 of that agreement.  So here we see --

MR. SYKES:  Let's highlight and zoom in if we could, Mr. Brown, on 4.3.

BY MR. SYKES:

Q.    It says that AEP for the license will make a one-time lump-sum payment to ME2C in the amount of $400,000.

Do you see that?

A.    Yes.

Q.    And then it says AEP will allow ME2C to bid for supply at its Pirkey plant if they bought a sufficient amount of product they get their $400,000 back; right?

A.    Yes.

Q.    But they weren't obligated to buy anything from ME2C?

A.    They were only obligated to allow us to make a bid.

Q.    Make a pitch?

A.    Beyond their --

Q.    What?

A.    Beyond their request for proposal and supply.

Q.    Let's look at NRG, DTX 21, and look at paragraph 4.3. So at this time, NRG was paying for its license and release from the lawsuit one-time lump-sum payment to ME2C in the amount of $600,000.

Do you see that?

A.    I do.

Q.    And that was that really big utility with 4- or 500 million tons covered by this agreement?

A.    I don't know how much coal.  I can't recall that number.

Q.    Last, let's take a look at Talen, DTX 23.  So Talen is paying for its license and release, a one-time lump-sum payment to ME2C in the amount of $200,000.

A.    I see that.

Q.    And it's a little smaller than the other ones, it's more like 6 or 7 plants, something like that?

A.    Yeah.

Q.    Now, let's take a look, if we can -- and I know this isn't too exciting going through these agreements, but let's go forward while we're here.  Let's take a look, if we could, at PTX 766.

And that's the agreement with AJG, Arthur Gallagher, DTE, and Chem-Mod, and those were former defendants in this case; right?

A.    Yes.

Q.    And you understand that this license extends to several groups of entities; doesn't it?

A.    Yeah, within that group.

Q.    And let's just look to try to cut to the chase. Let's go to paragraph 3D because it was nice what they did. There are pages of what some people will call "legalese" that some of us have to live with for a living, but in paragraph 3D, it says, "For the sake of clarity," which is nice they did that, "the license entities are AJG, ETE parties, Chem-Mod, Chem-Mod licensees, sublicensees on Exhibits A, B, and D."  And then it says, "Exhibit D also lists the customers containing license extends."  Did I read that correctly?

A.    You read it correctly.

Q.    Let's jump over to Exhibit D if we can.  Exhibit D lists, it's entitled --

MR. SYKES:  Mr. Brown, there we go.

BY MR. SYKES:

Q.    "Additional License Entities," it was the exhibit just referenced in the paragraph for additional license entities.  And you see it's a full page of refined coal companies; right?

A.    Yes.

Q.    And then let's go to the next page of Exhibit D. That's another full page of refined coal companies?

A.    Yes.

Q.    And then interestingly, about two-thirds of the way down the page, some of these entities they're saying it says, like an Allen GS or Belle River GS, we go from LLC to GS.  Do you have an understanding what "GS" refers to?

A.    I do not.

Q.    Might that be the additional customers that were referenced in the paragraph we just read?

A.    Possibly.

Q.    Let's zoom back out, and we have a whole 'nother page of entities.  Have you ever tried to count how many entities ME2C licensed under this agreement?

A.    No, I haven't.

Q.     These are numerous refined coal companies and other customers is what it says, and there's pages and pages?

A.     I see it, yeah.

THE COURT:  Let me ask if counsel and the witness are still talking over each so our court reporter is not getting a good record.

Please continue.

MR. SYKES:  Thank you, Your Honor.  I was just realizing I was doing that.

BY MR. SYKES:

Q.     It probably wouldn't surprise you that I counted them.

A.     That wouldn't surprise me at all.

MR. SYKES:  Mr. Brown, can we have a version of this where we count them?

BY MR. SYKES:

Q.     So that's first two pages, and let's go to the next page.

Looks like 134; does that sound fair?

A.     Sure.

Q.     And so this was the one you said the payment was about $28 million?

A.     Yes.

Q.     Okay.  And it's really -- the payment is really 27.5 million?

A.      Like I said, approximately 28 million.

Q.      Yeah.  I'm just trying to be precise.

A.      Yes.

Q.      And so what does that work out to, 28 million or 27.5 divided by 134?

A.      I have no idea.

Q.      About 200,000 apiece, something like that?

A.      I guess.  I don't know why I would try to equate it to that, but...

Q.      Well, I'm just trying to do some simple math.  If my phone calculator says $205,223.88, does that sound -- that math is probably right?

A.      If you want to look at it that way, yes.

Q.      Thank you, Mr. Pavlish.

        Okay.  Let's talk about -- a little bit about inventions and things like that.  ME2C, it sells products that it -- that it -- that are covered by its patents; right?

A.      Correct.

Q.      You have a number of products.  Give them different numbers.  SF10, SB50, and -- probably mess them up.  Things like that?

A.      Yes.

Q.      And those are products with the chemical additives to help capture mercury in the way that you described in your

previous testimony?

A.    Correct.

Q.    They -- as we patent lawyers say, they embody your invention?

A.    Yes.

Q.    And you advertise those products as patented when you sell them?

A.    Yes.

Q.    And as part of the product offering, you let your customers know that, "If you buy our patented products from us, you have a license to practice our patents along with your purchase"?

A.    Yeah, for that particular plant.  Not a company-wide. But, yes, if the plant buys products from us, that license is folded into that.

Q.    Yeah.  It's rolled in just like whatever licenses or patents are in the iPhone when we buy it.

       And it's true, isn't it, that the ME2C process does not reduce NOx to any appreciable amount, does it?

A.    I really can't make a statement to that.  That's something we haven't really looked at.  Our focus is on mercury control.  We have other products that might.  We just haven't targeted that, I guess.  I couldn't quantify that.

Q.    And, again, you were asked about this in your

previous sworn testimony that you gave on behalf of ME2C --

A.    Yes.

Q.    -- right?

And do you remember what you answered when you were asked, "Does the ME2C process reduce NOx?"

A.    Yeah.  I believe I said something "not appreciable amount."

Q.    That's right.  And --

A.    I don't know if I qualified what "appreciable" meant, but it's not overly significant.

Q.    It might be measurable, but it's going to be very little?

A.    Yeah.

Q.    Less than 10 percent?

A.    Again, that was a statement that I -- like I said, we hadn't quantified.  So it's -- that's my thinking, that, yeah, it probably would be the 10 percent.

Q.    It's a statement, but a statement given under oath?

A.    Yeah.  It's a statement.  That was my thinking.  I don't think it would be less than 10 percent.

Q.    And ME2C has purchased activated carbon for sorbent from companies like Albemarle and Cabot, didn't it?

A.    Yes.

Q.    And Albemarle and Cabot are also ME2C's competitors?

A.    Talking in the past or currently?

Q.    Well, I'm just going by what ME2C's 10-K statements to the public say.

A.    Well, Albemarle has kind of changed their business. At one point, yes.  I don't know if they're still a competitor, per se.  In general, yes.

Q.    Yeah.  In general, you guys sell activated carbon products.  And Cabot and Albemarle and companies like that, they sell activated carbon products to the market?

A.    Yes.

Q.    Isn't it true, Mr. Pavlish, that using a halide additive like bromine in coal with no addition of a sorbent like activated carbon is not part of your invention, just doing that step?

A.    It's not part of our claimed invention.

Q.    And it's also true, isn't it, that you did not invent the way of capturing Section 45 tax credits, did you?

A.    No, we didn't do that.

Q.    And the Chem-Mod process that CERT uses is a way of capturing Section 45 tax credits; fair?

A.    It's a way of doing it, yes.

Q.    You talked a bit in your job history with the EERC from -- was it '92 to 2014, something like that?

A.    '93.

Q.    '93.  So from 2010 to 2014, you were doing the consulting with ME2C while you were still officially fully

employed -- I'm not trying to say there's anything wrong, but you -- your main job was at EERC, and you spent a few hours a week helping ME2C?

A.    Yeah, that's correct.  I don't know if it was 2010 or '11.  It was two or three years or so before I took full employment.

Q.    But while you were at the EERC -- and just to try to remind everybody, EERC is the Energy and Environmental Research Center at the University of North Dakota as part of the university?

A.    Yes.

Q.    And that's where this combustion test facility -- I may get the terminology wrong.  There's the combustion -- you tell me.  There's two of them?

A.    Yes.

Q.    The combustion test facility, and then across the hall is the pilot test facility?

A.    You have a particular test combustor, and it's like 10 feet between the two and the CTF.

Q.    CTF and PTC?

A.    Yes.

Q.    And so when you looked, you saw an opening with one of the EERC test reports.  And those gentlemen who were doing the EERC testing for the Section 45 licenses like CERT, they were at the EERC also with you?

A.      Well, yes.

Q.      I mean, you knew all of them?

A.      Well, I know them, yes.

Q.      But you personally didn't oversee the EERC's testing for the Section 45?

A.      No.

Q.      And you actually, I believe, hadn't seen any of the EERC certification reports for refined coal while you were at the EERC; is that fair?

A.      That's fair.

Q.      Do you think maybe yesterday at opening is the first time you'd really seen one?

A.      Yeah.

Q.      And so it's fair to say you've not ever been in possession of an EERC Section 45 certification before?

A.      That would be fair to say.

Q.      And it's true at the time that ME2C filed this case you would assume that the EERC's client like CERT -- that they were the ones that had actually certified and signed the reports based on the EERC data.

        Is that kind of what you thought?

A.      Well, the question that was asked is if the EERC had signed it, and I think my response was that I doubted that because I thought it had to be signed by a corporate representative.  So, yes, I made a statement to that effect.

Q.    You made an assumption that the client like CERT would sign it, and then you --

A.    Yes.

Q.    And that might be a reasonable assumption, but you've since learned that -- maybe yesterday, through the course of the case, that the EERC -- that Mr. Gunderson signs it, issues it, and then there was another gentleman who's a professional engineer who signs it as a PE, professional engineer, certified in the technology?

A.    Yes.  That's the first time I noticed that.

Q.    You know those guys?

A.    I do.

Q.    Worked with them 10, 15, 20 years?

A.    Yeah, probably.

MR. SYKES:  Your Honor, I am about to switch topics.  It's straight-up noon.  I can keep going.  Whatever the Court would like.

THE COURT:  Let's keep going.  We'll take our lunch break at about 12:30.

BY MR. SYKES:

Q.    Mr. Pavlish, by the years 2004 and 2005, you knew that Chem-Mod was adding bromine to coal; right?

A.    I suspected it in that time frame.

Q.    And let's -- you've actually lived this, and sometimes we feel like we did live this.  I'm just trying to

get the folks on the jury oriented a little bit.

So the EERC is a research facility that kind of serves the public and power plants and other folks interested in all kinds of emission control research. They can come in there and run tests; right?

A.    Correct.

Q.    And you've got these two combustion facilities like many coal-fired power plants that can be kind of leased out?

A.    Yes.

Q.    And you guys had technicians who could run the tests and folks like you who knew a lot about the field to help the utilities and so forth?

A.    Correct.  That's what I mentioned earlier. Nonprofit, you have to have funding to run the facilities.

Q.    And so the original Chem-Mod folks, I think I got it, but Hamry,, they were among the different people -- companies or people who were coming in and using the EERC's test facilities?

A.    Sure.

Q.    And you were, around that time, doing a lot of your early work that you described already?

A.    Correct.

Q.    All right.  And these -- you said these facilities are across the hall from each other?

A.    Yeah.

Q.      So folks bump into each other, and that's how you kind of --

A.      They're relatively close to each other.

Q.      So it was 2004 or 2005 that you learned about Chem-Mod or suspected that Chem-Mod might be adding bromine to coal.  But the first time you're aware that anyone with you or from ME2C actually approached a refined coal company and told them something like, "Hey, you're doing bromine on coal.  That's part of, you know, Mike Pavlish's patents or IP," that wasn't until this lawsuit was filed, right, in 2019?

A.      I can't say for certain about that.  (Indiscernible) since 2014.

Q.      And you, Mr. Pavlish --

THE COURT:  I'm going to ask the witness if you would speak up.  Re-ask the last question again and get the answer.

MR. SYKES:  Let me re-ask that question to make sure it's included.

BY MR. SYKES:

Q.      Mr. Pavlish, you first suspected Chem-Mod might be adding bromine to coal in 2004 or 2005?

A.      I think I said 2005, 2006.  In that time frame.

Q.      That time frame.  And the first time that you, Mr. Pavlish, are aware of anyone signing to a Chem-Mod

licensee or a refined coal company, "Hey, you're infringing Pavlish's mercury control patents," that was the filing of this lawsuit in July 2019; right?

A.    Yes, first time I'm aware of that.

Q.    And to be clear, you're not aware of the EERC, who is the owner of the patent from the early 2000s when they were filed through 2017 when ME2C bought them, you're not aware of them telling a refined coal company that it was infringing any EERC patents; fair?

A.    Yeah, I'm not aware of that.  I'm not sure I would be aware of that.

Q.    But after this 2004, '05, '06 time frame, you learned more about Chem-Mod over the years, didn't you?

A.    Well, yeah, once we started marketing mercury control technology being on site over -- yeah.

Q.    Let me show you an e-mail from May 2012.  I believe it's DTX 104 in your binder.

A.    Can you restate that number, please?

Q.    Yes, sorry.  It's DTX 104.  Looks like it's about a third of the way through.

You see that e-mail?  That's from you to Marc Sylvester, May 22, 2012.  This is an e-mail that you received and then replied to; isn't that right, Mr. Pavlish?

A.    Yes.

MR. SYKES:  I move to admit DTX 104.

THE COURT:  Any objection?

MR. CALDWELL:  No, sir.

THE COURT:  It is admitted.

(Thereupon, Defendants' Exhibit 104 was admitted.)

BY MR. SYKES:

Q.    If we could put that on the screen.  So this is Marc, Marc Sylvester.  He's identified as VP of sales at ME2C.

You're still consulting and working at the the EERC; right?

A.    Correct.

Q.    And he's talking about the Section 45 tax credit, that he's learned about it and asking you some questions, and your suggestion is ME2C should take a serious look at how to get into the market; right?

A.    Yes.

Q.    And then you say at the end, both them and Chem-Mod may be rely on adding bromine to coal to achieve mercury reductions; right?

A.    Correct.

Q.    You didn't tell Mr. Sylvester that they were infringing your patents, did you?

A.    I'm sorry.  Could you repeat that?

Q.    You didn't tell Mr. Sylvester that you thought Chem-Mod was infringing your patents around then?

A.      That wasn't the context, I guess, of that e-mail.

Q.      Let's take a look at the next one in your binder, DTX -- let's just stay on this just for a second.  Stay on 104.

So the date of that is May 22, 2012; right?

A.      Yes.

Q.      And in this lawsuit, you and ME2C -- as an officer of ME2C, not you, Mr. Pavlish, personally -- but as an officer of ME2C, ME2C sued Chem-Mod for infringement of the '147 patent we looked at, PTX 5 in this lawsuit; right?

A.      Originally, yes.

Q.      So in July 2019, sued Chem-Mod for infringing the '147 patent.  And do you remember when the '147 patent issued?

A.      I'm saying 2012 time frame.

Q.      Yeah.  May 1, 2012.  Does that sound right?

A.      Sure.

Q.      So you had just gotten a fresh patent three weeks ago.  I think Mr. Caldwell talked to you about how it's kind of exciting to get a patent, and back then, the PTO still mailed out the nice ribbon copies.  And now they e-mail us a PDF, which is not so great, but --

So it was just three weeks after you got your '147 patent that seven years later you sued Chem-Mod on, but here -- I think this morning you said it was maddening?

"Maddening" was the word to hear about them, but there's nothing about that here, is there?

A.    Again, the context of this e-mail wasn't related to that.  That's not what the inquiry was about.

Q.    You didn't say, "Man, these guys, I just got this patent.  These guys are infringing on it.  They're causing us -- you know, this is going to hurt us"?  You didn't say anything like that?  This is a sales guy you're talking to.

A.    I guess, again, context as I see it, no.

Q.    Let's take a look at the next one, DTX 112.  So this is an e-mail from September 2013, so we're going to jump forward a year, and this is an e-mail exchange between you and Keith McGee.

Who is Keith McGee?

A.    It's been a while.

Q.    He was with ME2C.

A.    I think he was hired to assist in business development over a decade ago.

Q.    So this is an e-mail that was sent to you by Keith and you responded to September 18, 2023?

A.    Can you refer -- give me that number?  It didn't come up on the screen, so which number e-mail are you referring to?

Q.    DTX 112.  It should be the very next one in your binder.

MR. SYKES:  I'm going to move to admit DTX 112.

THE COURT:  Any objection?

MR. CALDWELL:  No, sir.  I don't have an objection.

THE COURT:  It's admitted.

(Thereupon, Defendants' Exhibit 112 was admitted.)

BY MR. SYKES:

Q.    So this, again, is -- sometimes you use the term T45 for the Section 45 tax credit; right?

A.    Yeah, it's generally how we refer to it as.

Q.    Just to clarify that we're -- this is what this is talking about.

And you actually say in this one that -- PAC is powdered activated carbon and BAC is bromine activated carbon, right, PAC and BAC?

A.    Correct.

Q.    And that "this is basically what our patented technology is."

Do you see that statement?

A.    I'm reading through it.

Q.    It's right at the fourth line of the top paragraph: "We know that this will be very effective as that is basically what our patented technology is, the combination of a halogen halide with carbon-based sorbent."

A.    Yes.

Q.    And you go on to say, "Chem-Mod or ADA will offer this as a solution.  A number of plants are already doing this."

And then you say, "I'm not sure if teaming up with Chem-Mod makes sense, if they'd be open to the idea, but if we did team up with them, ME2C would only be providing back-end sorbent as they have the halides in place."

Do you see that?

A.    Yes.

Q.    So when you were -- you guys were talking about the potential of teaming up with Chem-Mod here in 2013, kicking it around at least?

A.    Well, again, I wasn't -- I was just a consultant, so I was either asked for an opinion or thought on it.

Q.    So, Mr. Pavlish, you're the inventor on a patent that issued in 2012 that you sued Chem-Mod on in 2019, and CERT, you sued us for that.

So here, just a year after that patent is issued, while it's really fresh -- I mean, you're talking not about it's maddening -- I mean, it's maddening what they're doing.  You're like, "Well, maybe we can figure out a way to team up with them."

A.    I was referring to "maddening" that was in reference

to more recent times.  Back in '013, that was just getting going.  There wasn't a lot of utilities using that.  It wasn't -- I think from ME2C's viewpoint, it wasn't perceived as a significant competitor, if you will, at that time.

Q.    And then it was the next year -- is that 2013?  It was the next year, 2014, November 2014 I think, you came on to ME2C as an employee and officer?

A.    Yes.

Q.    I probably talk too loud.  It may help the court reporter if you speak up a bit because I could just barely hear that.

A.    Okay.

Q.    Thank you for your answers.

      And as we established earlier, even then, when you came on as the CTO of ME2C in 2014 and 2015, 2016, and 2017, ME2C still didn't say anything to Chem-Mod or any refined coal company like CERT about infringing its patents?

A.    I didn't say anything, no.

Q.    At this point, you're the chief technology officer?

A.    Yes.

Q.    And then in April 2017, ME2C purchased the patents outright from the EERC?

A.    Correct.

Q.    And still you didn't assert infringement of those patents, now you own them, until a couple years later in

July 2019?

A.     Correct.

Q.     And let me show you a document, DTX 297.  I guess that's the next one in your binder.  And ME2C, like any company, you have meetings of your managers, employees and talk business and what's -- you know, what you're trying to do; right?

       And -- and ME2C, this document, DTX 219, is the second quarter management meeting held at the Hyatt Regency August 24, 25 of 2017; right?

A.     Which number or tab are you referring to?

Q.     DTX 297, Mr. Pavlish.  It's the next one in your book.

A.     Yes, I see that.

Q.     And the -- there's a note of "John arriving Delta flight 2385 at 4:09 p.m."  That's you, isn't it?

A.     Yes.

Q.     So you were there, and you guys have a -- I don't know what her title is but executive assistant or office manager, Stacy Hyatt.  She -- she's likely the one that prepared these --

A.     Correct.

Q.     -- meeting notes.  Is that a yes?

A.     Yes.

Q.     And Stacy -- Ms. Hyatt I should say, she's been there

a good while?

A.    Several years now.

Q.    And she generally types up the meetings -- or the minutes from meetings like this?

A.    Generally, yes.

Q.    And I'm going to move -- and you were at this meeting where these minutes -- that these minutes reflect; fair?

A.    Yeah, it's fair.

MR. SYKES:  I'm going to move to admit DTX 297.

THE COURT:  Any objection?

MR. CALDWELL:  No.

THE COURT:  It's admitted.

(Thereupon, Defendants' Exhibit 297 was admitted.)

BY MR. SYKES:

Q.    There's lots of, you know, talk about action items, what you guys are going to do.  Here's the -- so the jury can see this August meeting.  John arriving.  They have their agendas, a nice organized -- I can tell Ms. Hyatt is an organized, detailed individual.

She's got the deliverables everybody is responsible for.  Keeps them all in line, it looks like. And -- and it just goes through a lot of topics that you guys were covering.

So this was, like, an out-of-town retreat; fair?

A.      I don't know if it was a retreat.  It might have been in combination with another reason we were actually there.

Q.      Yeah, two-day meeting in Pittsburgh.  You guys were North Dakota and Ohio then?

A.      We're located throughout the U.S.  We have to fly, generally, to meet somewhere.

Q.      Okay.  Let's go on page 3.  There's a heading "IP ME2C."

        Do you see that?

        And IP for ME2C, that's kind of your department as a chief technology officer and inventor of these patents; fair?

A.      Yes.  Yes, I see that.

Q.      And I asked you that IP ME2C, as the chief technology officer and inventor, that's kind of your department?

A.      Kind of, yeah.

Q.      And the eighth bullet point down begins, "John notes," and that's you, John; right?  You're the only John at ME2C at this time?

A.      At this time, yes.

Q.      And it says, "Broadening definition, broadening the definition of 'flue gas,' making argument that anything put into the combustor is a flue gas.  Courts are not currently accepting this.  If we inject calcium bromide directly into the combustor, will instigate a challenge."

Did I read that correctly?

A.    I think you read it correctly.

Q.    And "broadening the definition of a flue gas,"
that's -- that's a reference to broadening -- broadening
something in a patent application, isn't it?

A.    I don't know if this was referred to that or not.

Q.    You don't know.  And then it was the next year, in
May and June of 2018 -- this is August of 2017.  It was the
next year, in May or June of 2018, that you filed the
applications for the patents that we're dealing with here
this week in this lawsuit?

A.    Sounds about the right time frame.

MR. SYKES:  I'm going to double check my notes.
Can I just check at counsel table?

THE COURT:  You may.

MR. SYKES:  I just want to confirm a couple of
exhibits, or -- I think they may have been admitted, but if
they're not, I'd move to admit them.

PTX 5 is the '147 patent.  I move to admit the
U.S. Patent -- remember the first three digits -- the
'147 patent from 2012, Mr. Pavlish's --

THE COURT:  Is there any objection?

MR. CALDWELL:  No, sir.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 5 was admitted.)

MR. SYKES:  Move to admit PTX 766.  That's the Chem-Mod-Gallagher-AJG agreement.

THE COURT:  Any objection?

MR. CALDWELL:  Absolutely not.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 766 was admitted.)

MR. SYKES:  Move to admit DTX 219.

THE COURT:  Any objection?  I'm sorry, did you say DTX 219?

MR. CALDWELL:  I think you mean 19.

MR. SYKES:  It must be DTX 19.  I think I admitted this.

THE COURT:  Yeah, DTX 19 was.

MR. SYKES:  That was an error on the notetaker.

THE COURT:  Blame it on them.

MR. SYKES:  With that, I pass the witness.  No further questions.

THE COURT:  Thank you.

Mr. Caldwell, how much redirect do you have?

MR. CALDWELL:  I'm guessing on the order of 15 minutes.

THE COURT:  Why don't we take our lunch break now, and I'll let you come back and do that.  We're near 12:30, and we'll use this time as a time to break for lunch.

Let's have our jury brought out for lunch.

(The jury exited the courtroom.)

THE COURT:  All right.  Counsel, it's 12:22 now. Why don't we ask counsel to be back by 12:52, and we'll bring the jury out.

Anything further, Mr. Caldwell?

MR. CALDWELL:  I'll just flag something.  I'm not aware that this requires work at this point, but I don't know if it was intentional.  I'm not casting aspersions, but I do think it's technically at least a MIL violation to talk about that they were previously sued on the '147, and that's gone now.

That is a granted MIL about dropped claims, and like I said, I'm not asking for a remedy at this point.  I'm not quite sure what an appropriate one would be that would make it not worse.

I just wanted to flag it so it didn't look like I had waived it.

MR. SYKES:  Our position would be, Your Honor, if they thought asking questions about the '147 patent, which was asserted in this case and was actually removed from the case several weeks after the Court's order on that MIL, they thought that was inappropriate, they should have objected during the questioning.

THE COURT:  Anything further about that,

Mr. Caldwell?

MR. CALDWELL:  I mean, it's an order of the Court.  Like, I can't waive orders of the Court, so it's a motion in limine, and the idea is they -- toothpaste out of the tube, not stinking the jury box kind of thing.  Like, me making a scene about it at that point, "Hey, hey, we dropped that and" -- that's not the solution.

So you -- there's an order granting a motion in limine on dropped claims and defenses, as many Courts order because they like parties to streamline and don't want to be discouraged from doing so.

So it is your order he violated.  I don't really think I have the power to waive that, and I'm not even making a big stink about it.  I'm just saying it was flagged.

I don't really think we should be going down that path.

THE COURT:  And can I say, just on the issue of timing, Mr. Sykes, what were you saying about when I entered the order versus --

MR. SYKES:  Well, the MIL was entered -- I guess it was shortly after the pretrial, and then it was maybe 10 days, two weeks later, they dropped '147.

I think more importantly for that examination, he opened the door to that line of questioning by saying

that it was maddening that they were seeing Chem-Mod and calcium bromide on the market during all of those years, and they couldn't do anything about it.  He talked about that.

I think they also discussed the '147 in the direct, and so having talked about the '147 and then, you know, having this colloquy with the witness about years of maddening conduct that finally culminated, well, no, they had a patent the entire time.

And so it would have given the jury an incorrect view of the facts to have not heard that testimony.

THE COURT:  Okay.  And let me just say to everyone standing, you may be seated.

What I will say here is I do think it's incumbent, certainly among all the parties, to follow the Court's orders.

But I also think if a question is asked that one side believes is objectionable in light of the Court's issuance of a prior order, or for some other reason, do you think it's incumbent upon them to object, and to address the issue with the Court?

There may be some reason why the other side thinks it's not objectionable, like the reason Mr. Sykes proffered here, not saying that's a good reason or not.

I think in the moment, because the objection wasn't made, the answer given, I'm not at this point going

to take remedial action.  Certainly, with regard to that MIL, if counsel believes one side is extending beyond that and they object, we can address that issue.

MR. CALDWELL:  The reason I didn't is because my understanding is that many Courts reason that it's a ruling in limine as opposed to something that you just object on the fly.  It's precisely so it's not singled out for that reason.

So as I understand rulings in limine, if he thinks the door has been opened, which is what he's now using as the excuse for having to do so, it was incumbent upon him to approach the Court and say, "Hey, I'm going to do something that is addressing a dropped claim or defense. Do I have permission?  Because the door's been open."

So I just want to explain that that's my position.  I didn't realize that we could just determine the door had been opened, go into it, and then we're back to the world where the other party has to object anyway.

THE COURT:  I certainly, though, would advise -- and regardless of that, I certainly would advise either side that believes that the other has asked a question that violates one of the motions in limine, I would encourage them to raise it in an objection.

I would certainly advise each side that if you're asking a question that could potentially violate a

motion in limine, it would certainly, at a minimum as required, be good practice to, you know, if you need to get clarity beforehand, seek that clarity.

If you think something wasn't otherwise permitted, asking a witness to seek that clarity before asking other, at this point, I'm not going to take action so we're on the same page.

Let you take your lunch break.  See you shortly.

(A luncheon recess was taken, after which the following proceedings were had:)

THE COURT:  All right.  We'll let our courtroom deputy know we can bring the jury in.

(The jury entered the courtroom.)

THE COURT:  We'll have Mr. Pavlish come forward for redirect.  Mr. Caldwell?

MR. CALDWELL:  Thank you.

May I proceed, Your Honor?

THE COURT:  You may proceed.

MR. CALDWELL:  Thank you.

REDIRECT EXAMINATION

BY MR. CALDWELL:

Q.    Now you've had another first experience, which is cross-examination, and this is the portion that's redirect.

So I'm going to -- can I look at some of the things you were asked on cross-examination?

A.    Sure.

Q.    All right.  Something I found interesting is your testimony is describing the technology, describing the invention, describing your documentation, and proving when you had the invention, when you filed the patent application.

       Do you remember all that technical information you gave us?

A.    Yes.

Q.    And the lawyer for the defendant just spent most of the cross-examination talking to you about how much someone should pay for the invention; right?

A.    Yes.

Q.    Now, I'd like to show DTX 19.  I won't traipse through all of them, but I want to pull up one of the agreements that were shown.

       So you see at the top, DTX 19 is an agreement that relates to Vistra?

A.    Yes, it is.

Q.    What is Vistra?

A.    It's a large holding company.

Q.    What does it mean for this to be a license and supply agreement?

A.    Exactly what it says.  It's a license, and they want to supply -- provide a supply of our material to them.

Q.    So why would it matter to ME2C to have a supply agreement to a large utility like Vistra?

A.    I mean, that's the business we've been trying to pursue for many years, so it would mean a lot.

Q.    And were you successful in being able to supply materials to Vistra?

A.    We already had Vistra as a customer for some plants, and we haven't been able to secure any business beyond that at this point.

Q.    Are you a supplier for NRG?

A.    Yes.

Q.    And that's your goal; is that fair?

A.    That is our goal.

Q.    Let me jump to a specific section.

MR. CALDWELL:  Mr. Diaz, if you'd go to page 3, sort of around the -- yeah.  If you don't mind, will you pull up the whole of 2.1?

BY MR. CALDWELL:

Q.    To the extent there's any confusion, I'm not sure you were directed to this portion.  I would like to point out this license.

Do you see the very last line of the grant of rights?  The very last line of section 2.1, what does it say?

A.    "Does not extend to selling or offering to sell

sorbents or additives to third parties."

MR. CALDWELL: And now can I jump to the bottom of page 4 -- really the top of page 5, which is section 3.1? Thank you.

BY MR. CALDWELL:

Q.    To short circuit this, I want to focus on kind of on the end of that.  Do you see in the very end, there's a sentence that begins, "For the avoidance of doubt"?  It's in the lower portion of the screen, right there.

A.    Oh, yes.  Yes.

Q.    And what does -- what does that agreement tell us to avoid doubt?

A.    It specifically says, "This release and discharge does not release any non-Vistra entity from a lawsuit, the entities that have provided refined coal to coal-fired power plants that are owned or operated by Vistra or its affiliates."

Q.    This release does not discharge or release entities that have provided refined coal?

A.    Correct.

Q.    Now, you understand the defendants refer to themselves as refined coal; right?

A.    Yes.

Q.    There is a license that does apply to refined coal entities that service utilities with AJ Gallagher and DTE;

correct?

A.    That's correct.

Q.    And how much did those guys pay you for their release from license?

A.    28 million.

MR. CALDWELL: Briefly, I'd like to pull up Plaintiffs' Exhibit 5.  It's the '147 patent.

BY MR. CALDWELL:

Q.    And, sir, you understand that when we show the claim boards and talk about what's proving up -- what we're proving up for infringement in this case, this isn't one of those patents that we'll be proving up for infringement; correct?

A.    Correct.

Q.    And I think you were asked some questions where you flipped through pages and said, "Aww, there's a bunch of pictures," but this one picture he was looking for wasn't in there.

A.    I recall that.

Q.    All right.  I would like to go to something -- right to where the words started and then they finished and took it down.

Do you remember that?

A.    I do.

MR. CALDWELL:  Can we go right to where the

words start, Mr. Diaz, and if you would, just -- really the very first sentence in the whole thing, will you blow that up?

BY MR. CALDWELL:

Q.    What does this document say in the very first sentence of the text?

A.    It's an application.  It's a continuation application file serial number -- filed on August 29, 2008, which is a division of the U.S. Patent application serial number --

Q.    Slow down.

      Let me just ask you this:  We'll -- I can short circuit it for the court reporter.

      What does this say about the earlier applications you filed?

A.    It says that they're all tied back to that provisional application that was filed back in August of 2004.

Q.    And does it say they are incorporated by reference?

A.    Yes, it does.

Q.    Now, was all of this, like the provisional and each application afterwards, all the way to the '114 and '517 and all of these statements about what's incorporated by reference, was any of that hidden from the Patent Office?

A.    No.

Q.    What was the purpose of even typing this text in the

first place?

A.    My understanding is that -- exactly what it says, that provisional is incorporated into this.

Q.    And was that sent to the Patent Office?

A.    Yes, it was.

Q.    All right.  Thank you.  There was a question, I think it was almost exactly, if not exactly:  You didn't invent capturing Section 45 tax credits.

      Do you remember that?

A.    I do remember that.

Q.    So are Section 45 tax credits flying through the flue gas at a coal plant, sir?

A.    No.

Q.    What sort of technologist would you need to be to be an expert in capturing Section 45 tax credits?  Do you have any idea?

A.    Maybe an accountant.

Q.    So let me ask you.  Do you think that your patent -- your patented technology is useful with the EPA's regulations in place for companies that do want to capture Section 45 tax credits?

A.    Yes.

Q.    Why?

A.    Because our technology is bromine on the coal and activated carbon in the back end, and we have to meet a

certain MATS standard.

Q.    So something I'd kind of like to clarify a little bit:  Prior to the MATS standard coming into play in sort of that 2015ish time frame, could you get away with having a coal plant that let a lot more mercury out into the atmosphere?

A.    Yes, up to that point.

Q.    So we'll set aside the issue of whether -- you know, what you've got to do to test and claim tax credits.  But after MATS came into effect, if you wanted to keep on doing the same thing that you were going to claim tax credits for, what happened to the needs in terms of capturing mercury once MATS came into effect?

A.    The need significantly went up.  I think the credit -- my understanding is 40 percent, on average, would have to be meet a 90 percent reduction.  So you have a significantly reduced capture of mercury.

Q.    So even if you could claim, with the IRS, a tax credit because you think you meet 40 percent, how many hundreds of millions of tons of coal are you going to be selling if you don't meet the 90 percent of MATS once that was a requirement?

A.    Zero.  You have to meet it.  Otherwise you shut down.

Q.    Thank you.

          There was a line of questioning about how you

didn't pitch a fit and say, "Somebody is infringing my patent in around 2012."

Do you remember that?

A.    Yes.

Q.    Were either of the patents in this case issued at that point, sir?

A.    Yes.

Q.    No, the patents that are in this case, the '114 --

A.    '114 --

Q.    -- and the '517 --

A.    -- and '517.

Q.    Just make sure we're not talking over each other. I'm sorry.  And I probably just asked an unclear question.

Was the '114 or the '517 patent issued by 2012?

A.    No.

Q.    And where were you working in 2012?

A.    At the EERC.

Q.    Do you remember, in opening, Mr. Sykes showed something -- I think he's maybe shown it since, but it was kind of this path of how you've gotten all these other paths that have issued off of your inventions, sort of splits into a couple different paths?

Remember in opening how I made some reference to -- you know, this happens; right?  You do divisionals and continuations, and it happens that you have a long path?

A.    Yes.

Q.    If you claim the bromine and activated carbon invention in the '517 and the '114 after those patents were finally in the hands of Midwest Energy and you guys could control the patent prosecution and you told the Patent Office, "Look back to my provisional," did they tell you, "No way.  You can't have a patent"?

A.    No.

Q.    What did they do?

A.    I submitted the application to the Patent Office, and they issued patents.

Q.    Thank you.

Now, is being able to control patent prosecution part of why ME2C wanted to own the patents rather than have them be at EERC?

A.    Yes.

Q.    Thank you.

MR. CALDWELL:  Could you do me a favor and pull up Defendants' Trial Exhibit 297.

BY MR. CALDWELL:

Q.    Do you recall being asked about this meeting agenda?

A.    I do.

Q.    All right.  I just want to cut right to that thing that was shown where it's like, "We're going to broaden --" something about the flue gas.

MR. CALDWELL:  Do you remember that, Mr. Diaz? I think, like, on page 3.  Yeah, it's the John notes.  Can you call up the John notes.

BY MR. CALDWELL:

Q.    You were asked about this question on cross.  Do you remember that?

A.    I was.

Q.    And I inferred the suggestion was that you tried to maybe claim something you weren't entitled to in a patent. I don't know.  But let me just ask you.

Is that what you were trying to do, or is that what this is talking about?  Did you try to claim something you weren't entitled to in a patent?

A.    I guess I don't see that in that statement.

Q.    Now, I want to direct you to something that you weren't shown.

MR. CALDWELL:  Oh, no.  Just keep it up, Mr. Diaz.  It's literally the thing right below it where it's in blue and says "Action Items."  Can we call that up?

BY MR. CALDWELL:

Q.    What does it say are your action items in terms of investigating what notes you have to confirm the timing of your invention, sir?

A.    Looks like we're digging into some prior use of calcium bromide.

Q.     And it says on the third line -- and I'll read it. See if you can find it.  It says:

        "John to find notes --"

        MR. CALDWELL:  No.  Next one up, Mr. Diaz.  Next sentence up.

        "John to find notes confirming that this was being practiced in early 2000s."

BY MR. CALDWELL:

Q.     Have you shown us those confirmatory notes in this trial of documenting your test in the early 2000s?

A.     Yeah.  We went through that quite extensively.

Q.     Is there even the slightest question in your mind whether you had invented the patented two-step process and documented it almost 22 years ago at this point?

A.     Not in my mind.  I'm positive we had.

        MR. CALDWELL:  Thank you, sir.  I'll pass the witness.

        THE COURT:  All right.  Thank you, Mr. Pavlish. You may step down, and the witness may want to take down the binders as well.

        THE WITNESS:  Take them with me?

        THE COURT:  Yes, you can take them with you.

        Plaintiff may call its next witness.

        MR. CALDWELL:  Yes, Your Honor.  I -- we're going to call a deposition, and my colleague Ms. Dellinger

is going to introduce the witness for the Court's guidance.

THE COURT:  Ms. Dellinger.

MS. DELLINGER:  Good afternoon.
Adrienne Dellinger.

Plaintiffs call Ms. Leah Schaatt by deposition. Ms. Schaatt is going to put forward the CERT's numbers, and she is a CPA and vice-president in charge of the capital aspects of the CERT business.  And she will discuss how the refined coal business works, the tax credits generated, and the entities that benefits.  The runtime is 3 minutes and 48 seconds.

(A video was played.)

BY THE ATTORNEY:

Q.    Can you please state your name for the record.

A.    Leah Schaatt.

Q.    Ms. Schaatt, what company do you work for?

A.    Combustion Emissions Reductions Technologies, LLC.

Q.    Is that oftentimes referred to as "CERT"?

A.    It is.

Q.    Can you tell me what your current position at CERT, LLC, is.

A.    Vice president.

Q.    Is there any specific division or vice president of a certain part of the company?

A.    My official title is vice president and treasurer.

Q.      Are the refined coal companies operating right now?

A.      No.

Q.      When did they cease operating?

A.      Late 2021, starting maybe as early as October and as late as -- you know, very close to the end of December.

Q.      So if the refined coal facilities were established to produce refined coal, why did they shut their doors as soon as the Section 45 tax credit expired?

A.      The product is not economical without the tax credit.

Q.      Would the refined coal companies sell refined coal back to the power plant for more money or less money than it purchased the raw coal for?

A.      Generally, less money.

Q.      Do any of the refined coal companies make a profit?

A.      Define "profit."

Q.      Do any of the refined coal companies make any money, have a positive cash flow?

A.      Refined coal companies do not have positive cash flow.

Q.      Why would JPMorgan Chase spend tens of millions of dollars to purchase an ownership interest in a company that did not make any money?

A.      They received the benefit of the tax credits that were generated by the refined coal facility that was owned by the LLC that they have a 90 percent ownership interest

in.

Q.    So a large refined coal facility that's processing around 4 million tons of coal per year would generate close to around $30 million in tax credits per year; is that fair?

A.    That math sounds right.

Q.    So they generate tax credits also because they operate at a loss, and the companies that own an ownership interest in those companies are able to write off those losses; is that fair?

A.    The partnership rules require those losses to be allocated to the members pro rata based on their ownership. I don't have any visibility in where those losses are used or if they're used in the investors' tax returns.

Q.    I'm going to read that paragraph, and you let me know if I read it correctly.  It says:

        "The site host receives all associated environmental benefits of emissions reduction at no cost while CERT pays a competitive site host lease rate of approximately $1.15 per ton of the refined coal consumed by the host utility."

        Do you see that?

A.    I do.

Q.    Was this typical of the arrangements between the refined coal companies and the host sites, that the refined coal company would pay the host site a certain fee per ton

of refined coal that the host utility used?

A.      I don't know if the dollar amount is typical, but it was typical that the utilities were provided with a financial incentive to allow us to operate a refined coal facility on their site.

(The video ended.)

THE COURT:  Okay.  There's an exhibit mentioned. Does the plaintiff want to move the exhibit in?

MS. DELLINGER:  Yes, Your Honor.

THE COURT:  All right.  Is there any objection?

MR. DORSNEY:  No objection, Your Honor.

THE COURT:  All right.  Just for the record, what was the number of the exhibit?

MS. DELLINGER:  580.

THE COURT:  Plaintiffs' 580 is admitted.

(Thereupon, Plaintiffs' Exhibit 580 was admitted.)

THE COURT:  All right.  Let me ask Plaintiffs to call their next witness.

MR. MCCARTY:  Your Honor, Plaintiff calls the CEO of the company, Mr. Rick MacPherson.

THE COURT:  We'll have Mr. MacPherson come forward and be sworn.

THE CLERK:  Please raise your right hand and state and spell your full name for the record.

THE WITNESS:  My name is Richard Allen MacPherson.

THE CLERK:  And can you spell that.

THE WITNESS:  Richard, R-I-C-H-A-R-D; Allen, A-L-L-E-N; MacPherson M-A-C-P-H-E-R-S-O-N.

RICK MACPHERSON,
called as a witness on behalf of the
Plaintiff, was sworn, and testified
as follows:

THE COURT:  Mr. McCarty, you may proceed.

MR. MCCARTY:  Thank you.

DIRECT EXAMINATION

BY MR. MCCARTY:

Q.    Good afternoon.

A.    Good afternoon, sir.

Q.    Would you please introduce yourself to the ladies and gentlemen of the jury.

A.    Sure.  My name is -- I go by Rick MacPherson, and I'm the CEO of Midwest Energy Emissions.

Q.    Tell us about the company.  What kind of company is Midwest Energy?

A.    Midwest Energy Emissions is an environmental technology company that I started back in 2008, and its main purpose was to be able to continue developing technology to remove mercury emissions from coal-fired plants, which is

what we've gone on to do.

Q.    And what responsibility do you have, sir, as the CEO of the company?

A.    As the CEO, I'm responsible for everything top to bottom.  Basically, I oversee the hiring and the new strategies that we employ and the daily operations of the company.

Q.    Who are your company's customers?

A.    Power plants.

Q.    What do we see on the screen here, sir?

A.    That's power plants representative of our customer base.

Q.    What about in the corner there?

A.    That's our logo -- our company logo.  ME2C Environmental is what our brand is.

Q.    Now, before we get into details, can we learn just a little bit more about you personally?

A.    Sure.  So I'm a Canadian citizen, actually, that started working in the U.S. a number of years ago.  I grew up in a small town in Nova Scotia on the east coast, a place called Sydney, Nova Scotia.  And I went to school there and -- well, elementary, junior high, high school.  And then I went to the main city of the province, Halifax, for university.

Q.    And are you married?  Do you have any kids?

A.      Yes, I'm married, and I have two children, adult children.  One lives in Mexico, another one in -- just outside of DC.

Q.      So tell us a bit about growing up in Sydney in Canada.

A.      Small town, blue-collar town.  It was a steel town -- steel mill town, and the secondary industry was the coal mine, coal mining area.  So I grew up in a blue-collar town.

My dad was a milkman back in the days when they delivered milk door to door to the houses and the universities and the hospitals and things of that nature.  So, you know, I worked with him on the milk truck from when I was a young kid.  Probably 8 years old or so, I started and worked with him up until I was about 14.  We would work, deliver.  I would help him deliver the milk after school and weekends.

And then when I was 14, I took a job actually at a motorcycle place.  I was a Harley Davidson/Yamaha mechanic for a few years.  Did that before I went off to university.

Q.      Where did you go to university?

A.      I went to university at the Dalhousie University in, like I say, Halifax, probably about 200 miles the other side of the province.

Q.      Did you graduate?

A.      No, I didn't, no.

Q.    Tell us about that.

A.    Well, I was there for about a year and a half, and it was just a little too much theory and not enough work, I guess, for me at the time.  So I decided to go into the work field.

Q.    After leaving university, did you immediately go start Midwest Energy?

A.    Oh, no.  That was not for many years to come, no.

Q.    And so what did you do at that time?

A.    So a friend of mine that was -- that I grew up next to in the neighborhood ran the television network in Halifax.  So I took a job with that TV network in the advertising department.

Q.    And were you in advertising for some number of years?

A.    Yeah.  I stayed in it for the better part of 20 years and, you know, moved up as sales manager and then regional manager, that sort of thing.  I was actually manager of a TV station there for a while, and that was the years where I was raising my children.

Q.    So at some point in time, did you kind of get the itch to go off and do something on your own and start something like your dad did with his milk business?

A.    Yeah.  You know, I -- so from a young kid, I always wanted to have my own business type of thing.  So I did make plans to leave the corporate business and work, go into

business on my own.

Q.    And how did you make that first breakaway?

A.    Well, first, you know, I took every bit of money I was making to raise a family.  So I had to do something extra on the side, so I basically started to renovate old houses downtown in Halifax by the university.  And I would work through the day and then take the suit off and put on the coveralls and start tearing apart these old houses at nighttime and on the weekends and convert them into the student housing.

Q.    Were you doing the drywall and the painting and carpentry?

A.    Yeah, I did it all myself.

Q.    And --

A.    I had helpers, of course.  I didn't do it all myself. I had -- you know, I hired guys to give me a hand.  You can't do all that stuff yourself.

Q.    The electrical work?

A.    Yeah, not an electrician and not a plumber, so...

Q.    Transitioning into that, did you start to think about the environment some more?

A.    Yeah.  Well, I had always been thinking about it because as a kid, when I grew up in Sydney, we had a steel mill.  And so they had coke ovens, and they would produce a lot of pollution.  And when they would dump the slag from

the blast furnace, it would leave this residue of red stuff in the air.  I don't know what it was exactly.  But every other morning, I'd have to go clean the cars off so -- or it would eat through the paint.

So I was kind of thinking about that for a long time.  And, also, our area, there was a higher-than-usual cancer rate, things like that.  So it always was in the back of my mind that if I could do something in that field, I would certainly try.

Q.     And this time period in your life, did you begin work in the environmental field?

A.     Yeah.  So at some point after that, I started to work with a local combustion company.  I worked with them for a couple of years, learning more about what they were doing and learning more about the industry as a whole.  So I left those guys after a couple of years and went pretty much on my own to see if I could develop something.

That's when I went down to the Energy Environment Research Center in North Dakota because, from what I read, they were the best at figuring out environmental stuff.  They had been in the business since the '50s and one of the oldest coal research facilities.  Actually used to be part of the DOE.  So I went there to try to test some different chemicals and compounds that I had come across that I thought might work for mercury catching.

Q.    And did your experience growing up in a coal town kind of make you realize the power and the danger of mercury?

A.    Yeah.  Well, I mean, it was all -- it was a lot written up on it.  And, you know, it's a -- it's a miserable toxin that causes all kinds of bad things to, you know, the population.  You know, toxins for the -- your nervous system and goes into the water and fish.  So I knew it was something that was important to get after.  And I knew that, because there had been a number of state regulations incorporated, that it was only a matter of time before the federal government regulated it.

Q.    Now, you mentioned, at some point in time after learning about mercury and mercury capture, you went down to North Dakota to work with the EERC.  What time period was that, sir?

A.    I started working with those guys probably 2007.  2007, 2008.

Q.    And was that a -- kind of a leap of faith for you to go down to North Dakota?

A.    Oh, yeah.  I mean, I was basically going on my own in an unknown situation.  So that's always...

Q.    And what was your impression of the EERC's expertise when you arrived?

A.    Oh, they were top-notch.  I mean, they've got, I

don't know, 2- or 300 people that have been working at that stuff for years.

Q.    Okay.

A.    Folks like John Pavlish, one of the leading people in the world, actually, is in the field.  So you know what?  As I tested with them for about six months, I realized, you know, these folks were way ahead of anything I was going to bring to the table.

So I went and sat down with the director of the operation there at the time, and I said, "Look, you know, you've got all these -- all this know-how and patents and stuff developed.  But, you know, why don't I see if I can't take those to the market?"

Q.    You mentioned meeting Mr. Pavlish in this time.  What was your impression of Mr. Pavlish?

A.    Oh, top-notch professional in the field.

Q.    And were there also some regulations that you became aware of at this time?

A.    Yeah.  So they had been trying to pass a federal law to capture mercury emissions for a number of years.  And it kept getting, you know, bantered around between the power plants and the government and the EPA.  But it looked to me that it was on the horizon of being accepted, so I figured I would see if I couldn't go down that road.

Q.    After you discovered Pavlish at the EERC and you

decided to try to build a business around the technology, did you first a have to enter into an agreement with the EERC?

A.    Yeah.  So after I talked to them, they said yes.  You know, their business was to develop and research.  They both were very good at that and that's what they knew as their business model, so they didn't really know what to do with the technologies once they had them developed, and they needed somebody like me to be able to take them into the marketplace and not only to commercialize them but to validate them commercially in the real world, and so I started in on that process.

Q.    And did you enter into an exclusive license?

A.    Yeah.  There's an exclusive worldwide license with an option to buy out the patents in total at some point if I elected to do so.

Q.    Will you turn, in your witness binder, sir, to Tab 1?

A.    All right.

Q.    And do you see a document in Tab 1, PTX 48, sir?

A.    Yes, I do.

Q.    And, tell me, what is this document?

A.    It's the original license between my company and the EERC for the technologies.

            MR. MCCARTY:  Your Honor, Plaintiffs move into evidence Plaintiffs' Trial Exhibit 48.

THE COURT:  Any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 48 was admitted.)

BY MR. SYKES:

Q.     Looking at the -- is this the original license agreement here on the screen of PTX 48?

A.     Yes, I believe it is.

Q.     Okay.  I see you called out a couple things here.  Is that your signature at the bottom?

A.     Yes, sir.

Q.     And I see the signature is underneath "RLP Energy, Inc."  What was that?

A.     That was just an original name I put on the company when I formed it so that we would have -- you know, just have a company to get things underway.  It stands for Rick, Louis, and Patrick, just a couple guys I was working with.

Q.     And under the licensing contract with the EERC, who was the licensor at the time at the top there?

A.     So that would have been the EERC.

Q.     And what were they looking to accomplish through this?

A.     Well, as you've got highlighted there, you know, I basically had to commit to really take a good crack at

making this commercial and do everything I could to take it from the bench scale to the full scale operating technology that would help the public.

Q.    And in the top box there, what does it say is the desire of the EERC?

A.    To have the intellectual property developed and commercialized, as I said, for the public.

Q.    And the bottom portion, who's the company here?

A.    That was my company, RLP at the time.

Q.    What are you agreeing to do?

A.    I'm agreeing to do everything I could to make sure I can take that technology to market and that it would actually become something that the power plants could use to reduce mercury and would be able to commercialize it in a way to continue its growth throughout the industry.

Q.    Under this agreement, sir, did your company own the patents yet?

A.    No.

Q.    As part of negotiating this agreement, did you negotiate, at some point, for the right or the option to purchase that --

A.    Yes, sir.

Q.    So you've now entered into this agreement with the EERC, and you've founded the company.  Were you then immediately able to go start selling product on the market?

A.      Oh, no, no.  No.  I mean, they had done a great job of, you know, working out how the technology was supposed to work and doing all the testing and stuff like that.  But somebody needed to take it to market and get the real-world power plants to actually start and do some testing and see that it actually would work and wouldn't hurt the boiler and that it would capture enough mercury to get them into compliance.  Because at that point, if you couldn't get into compliance, you basically have to shut down the power plant.

So what we were trying to do, then, and did for the next three years before we ever got our first business, was go plant to plant as many times as we could and test the technology at the plant with the plant guys overseeing it and the EERC people -- EERC people carrying out all the actual testing and stuff.

Q.      So what did you do to take the next step?

A.      Oh, this is me here.  What I've got behind me here is 70-pound totes of mostly bromine.

So what we would do is we'd receive -- I say we, my son and I.  There was three of us, actually, that did the day-to-day work on this thing for years.  It was my wife and my son.

So my -- my son and I would mix this material up every week before we started a plant demonstration.  We'd get about 50,000 pounds of activated carbon, which is like

black soot, and we'd get about 30-, 40,000 pounds of bromine, and then we'd get a bunch of luminance silicates too.  We just call it clay.

And then we would have to hand mix all that stuff in these 70-pound boxes or in these big thousand pound totes.  Then we'd have to take it into the plant.  I'd rent a little storage space as close to the plant as I could get.

And then we would bring all this down on trailers and forklift it in and up to usually the third or fourth floor of the power plant in order to be able to feed it.

So then we would basically feed all day and then mix most of the next day ahead of it, after we got our first load put together.  These tests would go for -- anywheres from a month to four months, and then typically it would go seven days a week.

Q.    Was it hard work?

A.    Yeah, it was hard work.

Q.    What are you showing on the screen here?

A.    Well, that's just me looking like I'm doing nothing, but I'm just probably doing -- you know, you had to do inspections and stuff every once in a while.

Q.    And about what time frame were these pictures taken?

A.    2008 to 2012, something like that.

Q.    And what are you showing on the screen here, sir?

A.    That's one of our portable feed systems that our guys built.

Q.    And is your logo there in the corner?

A.    Yes, sir.

Q.    Now, you mentioned during this time period of sort of developing the marketplace and products and visiting customer sites, you traveled a lot.

What are you showing on the screen here?

A.    So this represents some, not all, of the actual demonstrations that were carried out or tests at the different power plants across the country.

So what we would do, basically, was pack up our gear. We'd just -- you know, we'd drive a one-ton truck and a 25, 30-foot trailer, industrial trailer, so we'd haul our forklift and all of our odds and ends from plant to plant.

And then we'd have the material shipped to the storage place that we'd rent near the plant where we'd do our mixing, and then we carried out the testing. All of that, all of the analytical work, would be done by the EERC team.

So they'd just fly in. They'd set up. They'd do all the analytics on a daily basis. We'd have to feed the plant every day, and in a lot of cases, we'd have to change the mixture so that -- you know, if something wasn't working, we'd have to go back the next couple of days and

change it up so that they could try something different.

So we carried out demonstrations at all these plants pretty steady over the first three years, from 2008 until we got our first contract in 2011. We keep going. We kept doing testing after that, but the majority of that work was done until we get that first contract up in Centralia, Washington, the far left pin.

Q.    During these years of traveling around the country, did that have a strain on your family?

A.    Yeah, but, you know, we made a pact, my wife and I, that we were going to do this as a team, so she came with us most of the time.

Q.    Now, after years of traveling and customer site visits, did all that hard work eventually pay off in the form of a paying customer?

A.    Yea. So we got our first customer, I like to say Christmas, but it's signed off as January 1, 2011, and that was up -- as I say, up there in Centralia, Washington. Two big 750 megawatt coal units.

Q.    And was the power plant company Vistra an example of an early customer of ME2C in the 2015 time frame?

A.    Yes, yeah.

Q.    And tell us about that contract.

A.    So that was a really great contract. That was our biggest contract to date, 12 boilers in -- in total, and

Vistra, still a client of ours today, and what was nice about it as well is we were able to get a couple of their plants in compliance that they couldn't get in compliance.

So they had -- and they had an option of either cutting back on the output of the plant, or they were going to have to shut it down.

So our guys, John and his team, were able to figure out a way with the chemistry to get them into compliance, so that was very helpful to be able to get that contract, and they were super pleased with us being able to do that.

And as you can see, they awarded us this Nexus Award, which is an award for a company that improves their operations dramatically.  It also had to meet a bunch of community standards, which -- which we met at the time, and we still do.

So that's our history with Vistra.

Q.    Now, going back to that license with EERC and the option to purchase the patents later on, at some point, did you exercise that option to acquire the patent rights?

A.    Yes, sir, we did.

Q.    Okay.  I'd like to look at that agreement, sir, if you could turn to Tab 2 of your witness binder.

A.    I'm sorry, which page?

Q.    Tab 2.

A.    Okay.

Q.    And, sir, what is the document in Tab 2?

A.    So this is the agreement where we actually moved forward and acquired the patents.

Q.    And did you help work on this agreement, sir?

A.    Yes, I did.

         MR. MCCARTY:  Your Honor, Plaintiffs move into evidence Plaintiffs' Trial Exhibit 54.

         THE COURT:  Any objection?

         MR. SYKES:  No objection, Your Honor.

         THE COURT:  It's admitted.

         (Thereupon, Plaintiffs' Exhibit 54 was admitted.)

BY MR. MCCARTY:

Q.    Sir, why did Midwest Energy not just stick with the license but rather chose to acquire the patents outright?

A.    Well, we had grown the business well enough that we actually would be paying more in a license fee than if we bought them out.  So it just made business sense to buy them out at that point.

Q.    Did you also have more control at that point as well?

A.    Yeah.  I would say yes, given that we owned it, but the main reason is was it was going to cost us more just to keep paying the license.

Q.    As part of this agreement, did the EERC assign all

rights of the patents-in-suit eventually over to your company?

A.    Yes, sir.

Q.    Sir, could you please turn in your witness binder to Tab 3.  Sir, have you seen the patent assignment documents in Tab 3 before?

A.    Yes, I have.  Yes, there's a lot of them.

Q.    And what are these documents, sir?

A.    These would be filings made with the SEC.

Q.    Sorry.  The patent assignment documents, sir, in Tab 3?

A.    Oh, okay.  Yeah.  That is the -- that is the patent.

MR. MCCARTY:  And, Your Honor -- or excuse me.

BY MR. MCCARTY:

Q.    Sir, these are PTX 39 through 47.  Are these the copies of the assignment records showing assignment of the patents-in-suit eventually to your company, Midwest Energy?

A.    Yes, they are, sir.

Q.    Thank you.

MR. MCCARTY:  Your Honor, plaintiffs move into evidence Plaintiffs' Trial Exhibits 39 through 47.

THE COURT:  Any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  They're admitted.

(Thereupon, Plaintiffs' Exhibits 39 through 47

were admitted.)

MR. MCCARTY:  Thank you.

BY MR. MCCARTY:

Q.    Now, Mr. MacPherson, back to where we were in the 2014, 2016 time period.  Okay?

After the success of driving around the country, meeting with customers, and getting new customers, did the business grow?

A.    Oh, yes.  The business started to grow nicely in 2014, '15, '16 because the federal regulations started to come into play.

Q.    And did your company's financials begin to grow as well?

A.    Yes, sir.

Q.    Let's take a look at those financials, if you could turn in your binder to Tab 4.

Are you there?

A.    Yeah.

Q.    And, sir, what are the documents in your binder in Tab 4?

A.    These are the ones I skipped ahead to last time. These are SEC filings.

Q.    And which years are these filings for sir?

A.    This would be '14 -- 2014 through '16, I believe.

Q.    Thank you.

MR. MCCARTY:  Your Honor, Plaintiffs move into evidence Plaintiffs' Trial Exhibits 358, 359, and 360.

THE COURT:  Any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  They're admitted.

(Thereupon, Plaintiffs' Exhibits 358, 359, and 360 were admitted.)

BY MR. MCCARTY:

Q.    Sir, what are you showing on the screen here?

A.    This would be showing the years and the gross revenue of the company for those three years, '14, '15, '16.

Q.    Can you explain what the trajectory is, the growth path for the company, at this point in time?

A.    Sure.  So as we move from the state regulations to the federal regulations, our -- our technology really started to take off.

So we had a situation where, you know, our testing really ramped up in 2014, and we were starting to get paid for it at that time.  A lot of the early testing, we didn't make any money on.

So then in 2015, we got some nice contracts starting out, and then 2016, we added to -- to that with some more contracts.

So we had a gross revenue in 2016 of over $32 million.

Q.   Did the company head count -- head count grow as well?

A.   Yeah.  We -- you know, we went from half a dozen people to I think about 30 people at the time.

Q.   And did you expect at the time that growth trend to continue on forward into the years that followed?

A.   Yeah.  I mean, all indications were that we were going to continue on that path.  You know, and I talked to the investment community and tell them, you know, as far as I can see, I think we're going to keep going in that direction because we only -- probably only had -- probably only working at 20 percent of the people that in particular use those PRB coals and lignite coals.

And they really needed our technology in order to be able to get into compliance at a reasonable price, so I expected, you know, that 32 was going to grow nicely.

Q.   To what?

A.   60 wouldn't have been out of the question.

Q.   For the following years?

A.   For the next, say, two years.  I would say we'd move up closer to 60 than where we were at that point.

Q.   And, sir, did that growth actually bear out in the years that followed?

A.   Oh, not at all.

Q.   Did the revenues stay stagnant or flat?

A.    No, they fell off a bit in 2017.  Then they went downward from there.

Q.    What happened, sir?

A.    Well, in a nutshell, what happened was we ended up competing against our own technology.  This tax credit program was basically out there giving away our technology, and not only that, paying people to take it and providing materials in a lot of cases free of charge that we would typically be mixing up and selling.

So we were competing against ourselves and -- and had no way to win, and it wasn't like a regular competition.  There's not much you could do about it.

Q.    Sir, I'd like to talk about that a bit.  Was there a law in 2009 that introduced some tax credits for refined coal?

A.    Yeah.  There was this tax credit program called T45 that was introduced.

Q.    And did you expect that tax program from Congress would cause the creation of these refined coal companies as tax vehicles?

A.    Well, I knew they were doing something with it.  The refined coal program's what it turned out to be.

Q.    How did you first start to learn about these investment vehicles in the refined coal industry as you kind of went along in your -- in your tenure?

A.      So at the time, we had about five sales guys, and they were all doing good, but they -- they start running into it, and really they couldn't sell any more.

So they would, you know, come back to me.  We'd have meetings, and they'd say, "Look, we go talk to this guy about our technology" -- you have to understand most people just had an activated carbon system installed at that time.

Once the MATS came along, just about everybody installed a back-end activated carbon system.  Very few didn't, especially those that were burning PRB and lignites.

So we would focus on those folks, and, you know, starting particularly in 2014, '15, we started -- the sales guys started coming back saying, "We just can't sell against this because they don't need our stuff."  If they've got this and they don't even need to pay for it, how are we going to sell it to them?

So that's kind of what we were up against.

Q.      Did you also start to do research and investigation to kind of try to understand the scope of the -- of the industry?

A.      Yeah.  I started doing as much research as I could, and, you know, basically I discovered just a whack of companies that weren't really -- you know, they weren't operating like we were as a business.

They were just -- I don't know whether you'd

call them LLCs or paper companies, so I don't know what you want to call them, that were manned by accountants and tax people and lawyers.

And they weren't really in the business as such -- as much as controlling these things. We would -- we would talk to the guys at the plant and told people we wanted to do business with them. They would tell us to talk to head office. We'd do our best to get through to head office. Head office guys that we knew in operations would say that's all in the legal department, and lawyers wouldn't talk to us.

Q.    Did you also come across investigative reports about the refined coal industry at some point?

A.    Yeah, there was lots of that stuff, like rooter or routers, however you call them, they wrote articles up about it. There was a -- there was a lot in the news about this tax credit program as it got up and running in the mid teens.

Q.    Can you please turn to Tab 5 in your binder, please. Are you there?

A.    Yes, sir.

Q.    What is -- what is, generally, Tab 5, the document there, sir?

A.    It's just another one of these news pieces like the one I mentioned that talks about --

MR. SYKES:  Your Honor, we -- we would like to object to this before the witness gets too much into -- I don't know how you'd like us to object.

We believe this is hearsay.  He's just reading a newspaper article that he didn't write.  We object to this exhibit or the testimony regarding it.

THE COURT:  Your objection is on hearsay grounds.

Mr. McCarty, what's your response.

MR. MCCARTY:  Your Honor, our first response is that Your Honor's order requires defense counsel to lodge that objection before the witness takes the stand pursuant to Your Honor's pretrial order of February 14, 2024.

THE COURT:  What portion of the pretrial order says no objections can be made?

MR. MCCARTY:  Any objection to an exhibit of a witness needs to be made the night before, and it will be waived if not raised and dealt with Your Honor before the witness takes the stand.

THE COURT:  Are you saying his objection was not raised the night before?  I thought it was.  I thought I remembered it was raised in the parties' list of disputes that we didn't get a chance to resolve.

MR. MCCARTY:  Correct.  And under your Court's ruling, it needs to be raised and dealt with prior to the

witness taking the stand, so that's my first issue, just make sure that I raise that --

THE COURT:  Just to make sure I understand, the pretrial order requires that the objection be raised.  It was raised by the other side.  I think we agree on that; is that right?

MR. MCCARTY:  Yes, it was raised, sir.

THE COURT:  And we weren't able to resolve it prior to the beginning of trial today; correct?

MR. MCCARTY:  It was not resolved; correct.

THE COURT:  Okay.  So I'm going to -- I'm going to entertain the objection, but what's the -- what's the response with regard to hearsay?

MR. MCCARTY:  We're not introducing this document for the truth of the investigative report.  The document is being introduced for several reasons, including the notice of the refined coal industry that -- that the witness had as he went through as part of kind of responding to some of the timeline implications that have been made in opening statements.

THE COURT:  Mr. Sykes?

MR. SYKES:  Yeah.  We -- we further objected to this in our submission to the Court on 402 and 403 grounds.  We just think that this is not relevant.  It's chockful of out-of-court statements.  They're not particularly relevant

to the patent infringement case that's before Your Honor.

And this is trying to try Congressional policy, and it's really not our role here to be guessing -- second-guessing Congress.

THE COURT:  Okay.  So I'm going to sustain the objection on the grounds that newspaper articles like these are rarely admitted, absent exceptional circumstances.

Indeed, they would include hearsay and double hearsay, and I believe at a minimum even if there was some other argument for non-hearsay purpose, Rule 403 would require exclusion.

So I'll sustain the objection.

MR. MCCARTY:  Thank you, Your Honor.

BY MR. MCCARTY:

Q.    Now, as you begin to learn about the refined coal industry, was it your understanding that these companies were environmental technology companies like ME2C?

A.    No.  The more I looked into it, the more I realized they were not like us or other emission control companies. They were set up entirely differently and operated differently from us and others like us.

Q.    At this time in your company's history, were you forced to make some hard decisions about your staff?

A.    Oh, yeah.  I mean, our business basically fell right off.  We went from 32 million down to about 8 million.  I

had to lay the sales staff off, cut back on all personnel across the board, and cut all our costs out.

Myself and John and others in the company took pay decreases in order to be able to keep things alive.

So, yeah, drastic changes to the company.

Q.    Was that difficult?

A.    Yeah, it was very difficult.

Q.    Now, once you gathered more information about the refined coal and the investment LLCs doing business, did you -- did you reach out to those companies and tell them to stop doing what they were doing?

A.    Well, we tried, but you really couldn't get ahold of anybody.  They -- you know, as you might have noticed in Mr. Caldwell's display earlier in the trial, they had -- it was a hard group to try to figure out, you know.

As I mentioned, you know, we go to power plants. They wouldn't -- they'd put us on the head office.  Go to head office, they'd refer us to the lawyers to put it all together, and then it was really nowheres to go after that.

It was really very difficult to try to figure out who to talk to about it because we were used to, you know, carrying out business at the power plants, and so it wasn't like they had a big refined coal company that you could go to.  Most of these places existed just as LLCs with operating or overseeing the business of spraying something

on coal.

Q.     Were you here during opening statements?

A.     Yes, sir.

Q.     Did you hear from CERT that before filing this lawsuit, there wasn't an outreach made through letter and that this lawsuit came out of the blue?

A.     Well, if you talk to anybody that they were working with at the power plants or at the head offices, they would know that we had been trying to get in touch with them, but they're really -- I heard what they said, but I don't think that's fair.

Q.     Now, there's been some discussion about having to bring some actions against power plant customers of yours.

A.     Yes.

Q.     Did you have to enforce your rights against some of your own power plant customers?

A.     Yeah.  I mean, that was really tough, and nobody ever wants to sue the people that they're doing business with, but we couldn't find any other way to get them to take notice, so we had to -- we had to file suit against them.

Q.     Did you meet with them?

A.     Yes, as soon as I could.  You know, we made the filing, and then we immediately reached out to them and said, "Look, we'd rather find a business solution to this." Since I started the company, we've always just wanted to do

business with the power plants.

So I -- I reached out to them, and it took about six months before they sorted through the legal stuff, and then I arranged meetings, and I went and saw all of the first four that we had involved in the litigation, and we settled with every one of them.

Every one of them, they sat down with us and here's what we had to say, and they all took a license.

Q.     Now, did any of those power plants that were part of this eventually become customers again or for the first time?

A.     Yeah.  So the power plants, which is great for us -- I mean, we did a license with them, but that was only part of it, you know.  The biggest part for us in getting a license with those folks, was to be able to sell them products because that's what -- that's where we do most of our business.

So in all of the cases that we have licenses with power plants, we actually have a supply side to it, and our biggest client right now is the first ones that we had sued that did a license with us, and now they're our best clients in terms of product supply.

Q.     Is the deal like you just described with power plant customers something that you would negotiate with a refined coal company?

A.    No, totally different business model.

Q.    Have you also struck some licensing deals, however, with refined coal companies?

A.    Yes, sir.

Q.    How many patent licenses have you entered into with refined coal companies as opposed to actual power plants?

A.    Two of them so far.

Q.    And did you structure the licenses with the refined coal companies in the same way that you structured the customer power plant licenses?

A.    No, not at all.  No.

Q.    Okay.  Can you explain why not?

A.    Well, as I mentioned, you know, the CERT crowd, they were -- they're not in the same business as a power plant, and so there's -- there is not -- was no chance of supplying them.

So what we did with the power plants was did a license and then a supply addition to that license.

With the CERT folks, we did a license with them for the use of the technology while they were selling refined coal.

Q.    Let's have a look at those agreements, if you could turn, sir, in your binder to Tab Number 6.

A.    Yeah.

Q.    There's two documents in here.  The first document is

PTX 766, which has been admitted into evidence, and the second document I want you to look at, sir, is PTX 763, if you could pull that up.

A.    Okay.

Q.    And what is PTX 763, sir?

A.    763?

Q.    It should be the second document in Tab 6.

A.    That's a license between Midwest Energy and one of the CERT companies, Alistar Enterprises.

Q.    Thank you.

        MR. MCCARTY:  Your Honor, Plaintiffs move into evidence Plaintiffs' Trial Exhibit 763.

        THE COURT:  Any objection?

        MR. SYKES:  No objection, Your Honor.

        THE COURT:  All right.  It's admitted.

        (Thereupon, Plaintiffs' Exhibit 763 was admitted.)

BY MR. MCCARTY:

Q.    Are these documents on the screen, 766 and 763, sir, the contracts that you entered into with the refined coal companies?

A.    Yes, they are.

Q.    Let's look at the first document, 766.  Who are the parties to this agreement, sir?

A.    That was Midwest Emissions and our corporate company

and AJ Gallagher and Detroit Edison.

Q.      Are these companies power plants?

A.      AJ Gallagher is a CERT company -- refined coal company.  I'm sorry.  Not CERT, of course.  Refined coal company.  And DTE is a refined coal company.

Q.      How much did these refined coal entities pay ME2C under this agreement?

A.      They paid us $27.5 million.

Q.      And did you give these companies a discount?

A.      Yes, sir, indeed we did.

Q.      Why would these companies get a discount?

A.      Well, first off, they were the first ones to come to the table and recognize that we were valid and that we were owed something.  And so we gave them a discount based on being the first ones to come forward and settle with us.

        Secondly, you know, all of the power plants that are still out there that we need to try to do more business with would look at this settlement, I would think, and see the validity of what our claims are.

        And last but not least, you know, I've been at this for 15 years now.  And, initially, a lot of friends and family invested in this with me.  And I wanted to make sure that we had enough of a win under our belt that we would be able to keep growing.

Q.      Now, there's another agreement at PTX 763.  Who are

the companies to this agreement, sir?

A.    This is actually one of the CERT operators, which is why I got mixed up.  This is the Alistar Enterprise, LLC.  These are all LLCs, and these are the second guys that settled with us.

Q.    Did you give Alistar the same discount that you gave the other refined coal companies?

A.    Not on a per-ton basis, no.  We charged them a dollar a ton for every ton of refined coal that they burned but just, of course, from the time we filed the suit.  So we charged them a dollar a ton.  They agreed with that, and they paid it.

Q.    And what do you understand to be the request for damages in this case, sir?

A.    I think it would only be fair if we got a dollar a ton for each ton of refined coal that they burned from the time at least from when we filed suit.

So a dollar a ton is what I would like you folks to look at as being a fair settlement as we go forward.

Q.    Now, before we conclude, are you aware whether or not the CERT companies at issue in this case are still operating in the market at the power plants?

A.    I don't think so.  I think when the tax credit thing was finished, they just packed up and either turned over the equipment, maybe sold it, maybe just idled it in case

another one of these tax programs comes along.  I don't see CERT operating any environmental efforts in the country anymore.

Q.    Now that CERT is out of the market, from your vantage point, has business started to pick up, sir?

A.    Yes, it has started to come back.

MR. MCCARTY:  Thank you for your time.

THE WITNESS:  Thank you.

THE COURT:  Thank you.  All right. Cross-examination.

MR. HITCH:  May I approach the witness, Your Honor?

THE COURT:  You may.

MR. SYKES:  May I proceed, Your Honor?

THE COURT:  You may, Mr. Sykes.

CROSS-EXAMINATION

BY MR. SYKES:

Q.    Mr. MacPherson, Paul Sykes.  You and I have met two or three times.

A.    Yes.

Q.    And I learned something today.  I knew you were Canadian, but I didn't know you grew up in Nova Scotia.  And I have this funny dog that's a Nova Scotia toller.  Have you ever come across --

A.    Little red toller, yeah.  The red --

Q.    He's a little toller raised in Nova Scotia, so somebody finally knows what kind of dog I have.

Mr. MacPherson, we'll start kind of where you left off about the Alistar case. And as you said, you had a damages claim against Alistar for all the tonnage they had sold since the beginning, since you filed the lawsuit.

And I just wanted to show you -- if we could put it up on the screen, Mr. Brown.

Do you recognize that this is -- this was ME2C's pretrial damages claim against Alistar right here just before the last -- just a few months ago in November 2023. I believe this document ME2C filed with the Court in late October 2023, so just a few months ago.

And if you can see, the refined coal tonnage that ME2C represented its claim was for was 1.424,924 tons -- so a million and 424 tons for a damages award of -- at $1 a ton of $1,424,924. Do you see that?

A.    I see that, sir.

Q.    Yeah. And so that settlement was actually for $107,000, wasn't it?

A.    I believe it was just over 100,000, yes.

Q.    Yeah, 107,000. So $107,000 divided by 1.4 million, well, that's not dollars. That's about $0.08 a ton, isn't it?

A.    I'm not privy to the exact math on this article

you're showing me, sir.  But your math is correct.  I just don't know if it's represented correctly here.

Q.     You just don't know if this was actually what your company that you're the CEO of filed with this Court and represented to the Court was its damages award based upon its statement that this was out of the expert report of Philip Green, Docket Entry 547, and other citations?

A.     If they submitted it, then it must be accurate.

Q.     It might be accurate?

A.     Must.

Q.     Must be accurate.  Okay.  We will work on getting this document into evidence.  If we could...

So just to review, the Alistar settlement agreement you're pointing to is $107,000, which you said was a dollar a ton.  And the actual claim in the case was 1.4 million tons.  Works out, as you agree, to a lot less, about $0.08 a ton.

Okay.  And are you aware of what the damages claim was against the other defendants that you referenced that you gave a discount to?

A.     Not off the top of my head sir, no.

Q.     And I think, just to try to finish up these license agreements, you testified about them before, the NRG/Talen agreements.  And you testified, I believe, that the licensees -- they represented a -- as far as you were

concerned, a -- ME2C considered those license payments in those agreements a fair price for their use of ME2C's technology at the power plants?

A.    Those license agreements I signed thinking they were a good, fair price, given the completeness of the agreement, yes, not just the license itself.

Q.    Okay.  And the power plants actually perform the two-step process, as you guys call it; right?

A.    If they have a license from us, yes.

Q.    But I'm saying that they have the -- they're burning the coal -- combusting the coal and then, downstream, treating the flue gas with the activated carbon?

A.    Upstream, sir, they would be adding some halogen, yes.

Q.    But just the point I'm trying to make is the power plants do perform the two-step process, according to you guys?

A.    I'm sorry?

Q.    The power plants perform the two-step process from your perspective when they use your --

A.    The licensed ones do, yes.

Q.    And, Mr. MacPherson, you're CEO of the company, and I believe you testified you're the founder.  You're also the largest shareholder; correct?

A.    Correct.

Q.    And about what's -- do you know how many shares you have in the company?

A.    I have about 12 million shares and about 3 or 4 million offshoots.

Q.    And what percentage ownership do you have?

A.    Well, I started out with a hundred, but I'm down now to probably about 15.

Q.    But it's fair to say that you have a financial stake in the outcome of this?

A.    Of course.

Q.    Just to -- just to recap a couple of things, PTX 48, that was the ME2C EERC license agreement from 2009.

A.    Which one was it?

Q.    It's been admitted as PTX 48.

A.    48?

Q.    Yeah.  So it would be -- there you go.

And this was the agreement that your company at the time, RLP Energy, signed with EERC to license the EERC's mercury control portfolio.  And then some years later, after the license agreement ran, you guys exercised your option to buy those patents?

A.    That's correct.

Q.    So that exclusive license to those patents and patent applications, that's a very important asset to ME2C to what, at that time, was sort of a young, starting-up company?

A.    Yes, sir.

Q.    And you considered those to be quite valuable to your business?

A.    Well, they had great potential value, yes, sir.

Q.    And later in 2017, you purchased the EERC patents outright for $2.5 million cash and about $900,000 or so in stock for a total of about 3.4 million.  Does that sound about right?

A.    That sounds about right.

Q.    In 2017 when you made that purchase, you considered that $3.4 million price to be a fair price for the patents that you were buying from a public research institute like the EERC?

A.    At that time in our development, yes.

Q.    I'm just going to transition for a second to just your -- just a bit about your products, and then we'll get maybe a little bit -- cover some things about your business.

So I think, as we established previously, ME2C sells products it considers to be covered by one or more of its patents; right?

A.    Yes, sir.

Q.    And I think you told me that -- told us that your first contract to sell those products was in 2010.  So it's been selling mercury control products for about 14 years, something like that?

A.    Actually, it was in January 2011, but yeah.

Q.    Yeah.  Christmas 2010/January 2011?

A.    Yeah.

Q.    13 years.  So -- and when ME2C sells its patented products to power plant customers, that sale includes a license to the power plant to use those products to perform the two-part process?

A.    Yes.  So the license -- you get the license a couple of different ways.  One, either we're supplying you and you get a license as a nominal fee; or you buy a license in order to use the system of the patented process, and you may or may not buy a product from us.

Q.    So from -- you had exclusive license to the patents in 2010 to 2017, and you've owned the patents since 2017 to the present.  You've been selling your patented products the whole time period.  And during that entire time frame from 2010 to the end of 2021 and up through today, has ME2C -- it's not received a single Section 45 tax credit in connection with those sales, has it?

A.    No.  That was never our business.

Q.    So the amount of Section 45 tax credits that ME2C has gotten from the use of its products is zero?

A.    I'm sorry, sir?

Q.    The amount of Section 45 tax credits ME2C has received from the sale of its patented products or practice

of its patents is zero?

A.    From the T45 program, you mean?

Q.    Yes.

A.    Yeah, no, of course.  No, nothing.

Q.    How many -- I want to shift gears and kind of talk a bit about your business and a bit about the evolution, some of the things we talked about -- or you guys talked about on direct.

Mr. MacPherson, you have in your notebook -- flip over to -- starting at DTX 372, I've got some 10-Ks. Let's see.  The first one, 372, 373, 374 I think are in the record.  So let's flip over to 375.

A.    Sir, which of these binders am I looking at?

Q.    You should be looking at the black one.

A.    The big black one?

Q.    The big black one.  And if you flip to about the middle of it, you'll see it labeled "DTX 375."

A.    Yeah.

Q.    And that's your 10-K for the year ending 2017; correct?

A.    Yeah.

Q.    And then the next one in your binder, DTX 376, is your 10-K for the year ending 2018?

A.    Yes, sir.

Q.    And then your next one, DTX 377, is your 10-K for the

year ending 2019?

A.    Mm-hmm.

Q.    And the next one, 378, is your 10-K for the year ending 2020?

A.    Yes, sir.

Q.    And 379 is your 10-K for the year ending 2021?

A.    Yes.

Q.    And you're a CEO.  You sign off on these reports?

A.    Yes, sir.

        MR. SYKES:  I move to admit DTX 376 through 379.

        THE COURT:  Any objection?

        MR. MCCARTY:  No, sir.

        THE COURT:  They're admitted.

        (Thereupon, Defendants' Exhibits 376 through 379 was admitted.)

BY MR. SYKES:

Q.    Let's just look at 376.  It's the one for the year ending 2018.  This is the first page filed with the Securities and Exchange Commission.  And if we just jump down to the end of it -- page up one more time.

A.    Do you mean the back page, sir?

Q.    The back page -- it's actually next to the last page. It may be easier just to see it on the screen.  That's for you as the CEO.

        You signed off on the accuracy of the report?

A.    That's right, sir.

Q.    And I know you're not a lawyer and certainly not a securities lawyer, but you understand that when it's referencing Section 13 and 15 of the Securities and Exchange Act of 1934 that you're certifying the information is true, and you're not omitting information that would make this report misleading about information it's describing?

A.    Yes, sir.

Q.    So let's get back to -- let's look at about page 5, if we can.

A.    Which year, sir?

Q.    We're on -- we're on DTX 376, the same...

      And there's the heading "Regulations and Markets."  Do you see that?

A.    Yes, sir.

Q.    And then there's the sort of second large paragraph, and you're describing -- we kind of just view the company as describing these MATS regulations we talked about.  Kind of went in or promulgated, as lawyers say, in 2011.

      And this is now -- you filed this for the year in 2018, and you said at the time that MATS was promulgated in December 2011, there were approximately 1,250 coal-fired BTUs affected by the rule.  Since that time, such EGUs have been shut down as a result of this regulation.

      Did you see that?

A.    Yes, sir, I do.

Q.    And they've been shut down as a result of the MATS regulations.  And, also, they've been shut down due to the competitive disadvantage of newer gas-fired EGUs.

Do you see that?

A.    Mm-hmm.

Q.    And a newer gas-fired EGU would be a natural gas kind of equivalent to a boiler?

A.    Yes, sir.

Q.    And then you say at the end of 2018 there's 450 coal-fired EGUs remaining in the power market.  So EGU, electrical generating unit?

A.    That's correct.

Q.    Okay.  So sort of contrary from sort of being set on an expected glide path of MATS making the market buy your product, it actually -- what you saw was your customer base decrease from 1,250 to 450.  That's about a two-thirds drop in seven years as a result of MATS itself and then -- and then natural gas; right?

A.    No, that's not right.

Q.    That's not what it says?

A.    Well, that might be what it says, but that's not what happened in the real world.

Q.    All right.  Well, you swear that this is true and accurate, and this is something the investing public is

entitled to rely on; right?

A.      No, sir.  I'm just suggesting here that it's reduced and that there is a risk.  However, what actually happened was a lot of consolidation happened, and those plants that remained open burnt more coal.

Q.      We went from 1,250 to 450 from 2011 to --

A.      Yes, that's true.  That's a true statement.

Q.      And you attributed that to the MATS regulation itself and natural gas?

A.      That's why they used the number, yes, sir.

Q.      Let's look at page 9, if we can.  Let's take a look under the heading "Competition," and here you identified Cabot, Albemarle, Carbonxt, and a number of others as your competitors; right?

A.      That's right.

Q.      And what makes these companies your competitors is they sell activated carbon as a commodity?

A.      Yes, they sell activated carbon.  That's what they do, yeah.

Q.      And these are pretty sizable companies, aren't they?

A.      Yes, sir.

Q.      I mean, some of them are international, I would think?

A.      Yes, they are.

Q.      And then your next statement is, "They have employed

large sales staff and are well positioned in the market";
right?

A.      That's correct.

Q.      And then you end the statement -- the paragraph, "You
guys have better technology," which I'm sure you believe.
And then say, "With our experienced team of sales and
technical staff, we can compete effectively"; right?

A.      That's correct.

Q.      And just to make a point here, when you are required
to identify your competition or when you did identify your
competition certified as true, certified as not omitting
anything that would make this misleading, you didn't list
refined coal or Chem-Mod or the CERT companies in your
statement of competitors, did you?

A.      No, we didn't, sir.

Q.      And this was for the year ended 2018.  I believe this
to be filed in about April 2019; right?  Does that sound
about right?

A.      I don't know what the file date is, but most likely,
yes.  We didn't -- this is what we filed for that return.

Q.      Yeah.  The way it works is you have to get to the end
of the year, close your books out, work with accounts and
the lawyers, and it takes a few months to file the 10-K.

A.      Correct.

Q.      And so probably spring 2019 for the one ending

December 31st, 2018?

A.      Usually about mid April.

Q.      Okay.  Anyways, the lawsuit was filed mid July that year?

A.      Yes, sir.

Q.      So four years before the lawsuit, you didn't identify refined coal or CERT or Chem-Mod as your competitor, did you?

A.      No, sir.

Q.      Let's look at page 10, the next page.  And this Item 1(a), "Risk Factors."  That's a required disclosure. You've got to tell the investing public of various risks your business might be subject to in its market; fair?

A.      Yes.

Q.      And so there are a lot of them, and companies always list this.  It's not unusual to have a list of risk factors for any company, from you guys to some large tech company; right?

        And so we look over on page 11, and you have a -- first of all, you talk about your industry being highly competitive.  Do you see that?

A.      Yes.

Q.      And there again you list Cabot, Calgon, Albemarle, and others and then the additional statement about their large sales staff and the need to maintain your sales staff

to compete with them; right?

A.    That's correct, sir.

Q.    All right.  And then two headings down, you list as a risk factor that you depend upon third-party suppliers for materials to implement your technology?

A.    Yes, sir.

Q.    And you note that you buy your raw materials -- that would be like activated carbon -- for mercury removal technology from third-party suppliers?

A.    Yes, sir.

Q.    And those third-party suppliers, at least some of them, would be Cabot or Calgon or Albemarle or those type of companies?

A.    That's correct.

Q.    So you're buying your raw materials, your carbon, from your competitor?

A.    That's correct.

Q.    Okay.  And do you have any reason to believe that your competitors are giving you a sweetheart deal on the pricing of the carbon?

A.    No.  They treated us like a customer.  Actually, now that you mention it, Cabot is our biggest supplier and they still are today, and we do good business with them as our supplier.  NORIT is actually the company that handles it.

Q.    And the utilities, that's your customer utilities;

right?

A.     Yes, the power plants.

Q.     And I think you said they're pretty big entities also?

A.     Yes, they are, sir.

Q.     And you might have a power plant that's owned by a parent company like Vistra and NRG, and they cover one or two states?

A.     Yes, sir.

Q.     And the -- I guess you probably are familiar that sometimes the power plants -- individual power plant is a subsidiary of the parent?

A.     Yeah.  Most of them have a direct relationship with the -- with the parent.

Q.     And the parent utility like Vistra or NRG, it exercises control over its subsidiaries by negotiating bulk agreements or products and services related to mercury control; right?

A.     Not always.  Sometimes we put a deal together with the plant itself, but that could go the other way, too, where the parent company could buy.

        Let's say what happens is we add new plants to -- you know, you might have a fleet of power plants and might get one of them.  So you just deal with that plant. And then if you go to get more of them, you might have to go

back to corporate and make a presentation to get more of the plants.

Q.    But the parents -- it's fair to say the parent companies, they negotiate and influence the decisions of their -- of their subsidiary and individual power plants as to where they're going to buy things like activated carbon or emission control products; is that fair?

A.    Not necessarily.  Again, sir, to a degree, they do. But a lot of cases, they don't want to get in front of the guys operating the plant in case they, you know, don't buy the right stuff or --

It's not just a matter of negotiating for price, which is what the accountants in the head office would do. The guys at the plant know really what needs to be bought. And so in a lot of cases, we deal with the plant or alongside the head office.

Q.    Mr. MacPherson, you -- as CEO, you authorized the filing of the complaints in this lawsuit; correct?

A.    Yes, sir.

Q.    And you believe that what ME2C alleged in its complaints, you believed that those were true allegations, didn't you?

A.    Of course.

Q.    And I just want to draw your attention to the first amended complaint filed in this case.  It's Docket

Entry 130.  And if we can, let's take a look at it.

MR. MCCARTY:  Your Honor, may I approach real quick?  I'd like to lodge an objection, but I think we need to do it at sidebar.

THE COURT:  The parties can come to the sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  What's the nature of the objection?

MR. MCCARTY:  It's a concern I have about MIL Number 2 for a new drop claim, dropped parties, dropped patents, dropped issues.  It's the motion in limine that my colleague, Mr. Caldwell, mentioned before lunch.

I think it was the complaint that was put up has a bunch of parties that I'm assuming are no longer an issue, and it looked like we filed against the parties that have now been dropped.

I don't know where the line of questioning is going, but given the Court's guidance this morning, I wanted to raise it and make sure exact wording -- getting into things like you had a bunch of patents-in-suit that you dropped, had a bunch of parties and they're dropped, that's very prejudicial, and I believe it's covered by the MIL, and we shouldn't be going there.

THE COURT:  What's your response?

MR. SYKES:  We're not getting into that sort of questioning on this, Your Honor.  There is an allegation

that he just said he believes is true, that the utilities --
the parent utilities control the decision-making and
exercise veto power over the power plant's decisions to
purchase activated carbon.

And that goes directly to the causation issue in
this case, who was making the decision, who was causing the
utility power plant to buy activated carbon.

THE COURT:  I'm not sure I understand.  So we're
using the complaint that was filed to address an issue that
relates to who is causing the power plants?

MR. SYKES:  It's their allegation, and he just
said was true -- a true statement, and it just explains what
they've actually said is the decision-making chain of
command on buying -- making decisions and purchasing
activated carbon.

THE COURT:  Just to step back, I'm not sure you
answered my question, or I didn't ask it well.

The purpose for which this portion of the
complaint is going to be used is -- relates to demonstrating
why power plants or how or what causes them -- I'm not sure
I understand.  What's the purpose for which you're
attempting to use this portion of the complaint?

MR. SYKES:  The first purpose is just to plain
straight-up impeach his testimony, that he said they don't
necessarily control.  They allege the opposite.

THE COURT:  They don't control?  I'm not following.

MR. SYKES:  The utilities don't control.

THE COURT:  The power plants?

MR. SYKES:  You typically have the parent entity in the utility, and it owns the power plants, and what their allegation -- they say is true is that the utility controls the power plant's purchases of activated carbon, that they negotiate and influence those decisions and exercise veto power over those decisions.

THE COURT:  Utilities like your clients are talking about?

MR. SYKES:  Like Vistra.  The allegation in the case is that we, CERT, are causing the power plants to buy -- we're controlling and causing them to buy activated carbon and we somehow encourage them or that we're part of that decision making chain.

And this just undercuts that.

THE COURT:  Encourage them to perform the methods in the patents?  That's the allegation?

MR. SYKES:  Right.  You have to buy the activated carbon in order to perform the methods.

THE COURT:  To use it, okay.

So I understand that's the allegation in the case.  You said you're using this to impeach his testimony?

MR. SYKES:  Just because we -- yeah.  I mean, he's saying something different than ME2C has represented to this Court to be the truth.

THE COURT:  I'm not totally sure I'm following, I'm sorry.

MR. DORSNEY:  He testified that those controlling entities don't actually have control over the power plants is what he testified, and in the complaint it says the opposite of that.

THE COURT:  He testified that the controlling entities meaning the entities.

MR. DORSNEY:  The utilities do not have control over the power plants.

THE COURT:  Did he testify to that?

MR. SYKES:  Yeah, yes.

MR. DORSNEY:  I think that's the part you were missing.

THE COURT:  The plaintiff says different.

MR. MCCARTY:  I don't have realtime, so I can't confirm exactly what he testified to.  I'm pretty sure he said in some instances when he did -- the reason I came up here is I don't understand why we have to get into the first amended or second amended complaint.

That's only going to dredge up issues of why was that one dismissed or why was that one dropped, why are we

going back to an allegation from 40 years ago, which parties and experts and witnesses are talking about things going on now based on the record the --

That's a MIL concern I have.  He's entitled to impeach a witness, but I don't think he needs to get into this complaint.

THE COURT:  It seems like it may not be on the question of -- was that a first complaint.  That issue is not going to come out in a way in terms of the issues with regard to the other side's knowledge.

MR. MCCARTY:  It's unclear whether they're even making that argument.  So far they haven't put on their evidence yet.

THE COURT:  In any event, to the extent that Defendant believes that the witness said something about an overarching entity's ability to control a power plant and believes there's a statement -- particular statement in the complaint that might be impeachment material doesn't seem like that's getting into an issue.

Let's not go into dropped claims and patents and entities.

By the way, on that front, I do want to say I think one of Mr. Sykes's response to that was the MIL was entered back in November, and the '147 got dropped later.  The MIL would control, and if we agree there's not going to

be references to dropped claims, they can come afterwards and say that MIL applies.

I want to make that clear for the record.

MR. DORSNEY:  For the record, I want to say that the actual transcript will come close to something along what my colleague said.  Not in all instances, but in some instances, the power plant is not controlled by the --

THE COURT:  That's just a question about -- so I'm going to overrule the objection to the extent there is an objection because I'm not sure that the plaintiff has pushed an objection.

I understand the plaintiffs' larger concern, which is it doesn't want to get into something that would clearly violate the spirit or letter of the MIL Number 2.

Mr. Sykes, I do want to say we've got to do this because it's going to be hard for the court reporter.  It's been happening a lot.  When I'm speaking, you can't be speaking.  You can't try to interrupt me when you're speaking.  It really makes it difficult.

I'm finished speaking now.

MR. SYKES:  My apologies.

On the MIL issue, what I said before, which is inartfully stated, that was -- there was -- the MIL was to not reference dropped claims and discovery disputes and that kind of stuff.

And Defendants agreed to that and said we were -- really two points in dispute, and that's laid out in Your Honor's order.

So at the time that the defendants made an agreement to the scope of the MIL, '147 patent was in the case.

THE COURT: I'm sorry to interrupt you. I'm saying the argument is not in there. It's not in there because once we agree to the case that I ordered that we won't reference dropped claims, the claim gets drops and that applies to -- it doesn't matter that he dropped it.

Does that make sense? Unless there's a carveout here for exceptions, if it falls into it, that's fine, but this control as to dropped claims, I'm not sure anymore that we're addressing the objection, so I want to get back to our testimony.

Thank you.

(The discussion at sidebar ended.)

THE COURT: So with the objection overruled, we'll ask Plaintiffs' counsel -- or Defendants' counsel to please repeat the question and move on.

MR. SYKES: Thank you, Your Honor.

Mr. Brown, if you could pull up DI 130. Let's just jump down to paragraph 201.

THE COURT: I'm sorry, Mr. Sykes, this is not an

exhibit that's been admitted, so does the witness have a copy of it?  Take it down, Mr. Sykes.  We talked earlier about in general documents that aren't exhibits yet.

MR. SYKES:  Your Honor, may I approach?

THE COURT:  You may approach.

MR. SYKES:  May I approach the witness?

THE COURT:  You may.

BY MR. SYKES:

Q.    So if we could turn to the tab in the document that's entitled "First Amended Complaint" in the most recent binder.

A.    Sorry, sir.  What was it you want me to turn to?

Q.    It's entitled "The First Amended Complaint."

A.    Called complaint timeline?

Q.    No, it's a document --

THE COURT:  Mr. Sykes, you may approach if you'd like to show the witness where it is.

MR. SYKES:  Unfortunately, I believe my separate notebook of this is elsewhere.

BY MR. SYKES:

Q.    Paragraph 201, Mr. MacPherson.

A.    Can you maybe put it up on the screen?  I can't seem to find it.

THE COURT:  Mr. MacPherson, I told them not to.

THE WITNESS:  Oh, I see.  I'm sorry.

What page is that?

BY MR. SYKES:

Q.    The paragraphs were numbered in order, 1, 2, 3, and then if you follow the paragraphs along, you --

MR. SYKES:  May I approach the witness, Your Honor?

THE COURT:  You may.

THE WITNESS:  So number 201?

BY MR. SYKES:

Q.    Yes, sir.

A.    Okay.

Q.    And in paragraph 201, ME2C alleges that you -- that the firm -- was a truthful statement when you made it, "That Vistra is a utility company, exercises control over its subsidiaries by providing technical, administrative, logistical, and financial services to the subsidiaries and/or negotiating standard form or bulk agreement for products and services related to mercury control."

Did I read that correctly?

A.    Yes, sir.

Q.    And then you go on to say, "For example, Vistra negotiates or exercises veto power over decisions to sign supply contracts for activated carbon in bromine-containing additives."

Did I read that correctly?

A.    Yes, sir.

Q.    And then last, "In so doing, Vistra takes part in the decisions regarding supply contracts, influences the other Vistra entities to select suppliers for the plant, including those that provide bromine-containing additives and activated carbon."

A.    Correct.

Q.    And you agree those are accurate statements?

A.    Yes, sir.

Q.    Was -- this may be a bit of a tangential -- something I thought would be straightforward, but let's get back to DTX 376, your 10-K.

       And so the risk factor of trying to sell to utilities and competing against your activated carbon suppliers, that proved too difficult, ultimately, for your -- for your sales force; is that -- is that fair?

A.    Yes.  We needed -- we had to layoff sales force because of what was going on with refined coal.

Q.    Now, you gave a deposition in this case; right?

A.    Yes, sir.

Q.    And do you remember you were asked a similar question as to why the sales force was disbanded after 2018?

A.    I don't recall the question exactly, sir, but if you say it was asked, I would have given a similar answer.  We had to lay them off.

Q.     You didn't say anything in your 10-K about competition from refined coal as being even a risk factor of even a competitor, did you?

A.     No, sir.

Q.     And I think, as we established, it has a risk of utilities just shutting down the power plants or the coal-fired boilers entirely; right?

A.     Yes, sir, it exists all the time.

Q.     And -- and that was a significant factor in the drop in revenue you had 2017 to 2018?

A.     No, sir.

Q.     The shutting down of your customers was not a significant factor?

A.     No.  I -- I can't recall exactly if we lost any clients that year from shutdowns, so I can't answer that truthfully, sir.  I don't really recall.

Q.     And again, you gave a deposition in this case under oath; right?

A.     Yes.

Q.     And I believe you may have a copy of your deposition upon your table amongst the many notebooks.  It would be the spiral-bound one.

A.     Sure.  Do you want me to take that out?

Q.     Yes, please.

A.     Okay.

Q.    And turn to page 280, the bottom of 280, and we're going to carry to the top of 281.  We were discussing this very section, and the question was:

"Question:  And the section goes on to say the decrease from the prior year -- decrease in revenue is primarily due to the loss of customer EGUs.

"Do you see that?"

Your answer was "yes."

"And that's an accurate statement; correct?

"Answer:  Yes.

"And you certified that as an accurate statement; correct?

"Answer:  Yes."

That's how you testified previously; right?

A.    Yes, sir.

Q.    And it's fair to say that the drop in revenue when competing against activated carbon suppliers and having your customers actually shut down the coal-fired power plants, that was a driving reason behind disbanding the sales force?

A.    No, sir.

Q.    You don't think so?

A.    I think it was part of it.

Q.    And again, do you remember testifying --

A.    Yes, sir, I know the rest of it too, and the rest of it reads -- adds more information.

Q.      Well, I'm asking you, your counsel --

A.      That part that you read is correct, sir.

Q.      Okay.  If you could, let's take a look, since you've got it open to page 277 in your deposition.

On page 277, question beginning at line 10:

"You said ME2C disbanded its sales force in 2018; correct?"

The answer was "yes."

"And that's the same year as this big drop in revenue; correct?

"Yes.  We established drop in revenue related at least in part to customers shutting down their coal-fired power plants.

"Is it fair to say that this greater than 50 percent drop in revenue caused ME2C to disband its sales force?

"Answer:  I think the result of lack of sales overhead led to sales force decline..

"And that's reflected in the loss of this revenue?

"Answer:  Correct.

"It says a loss of revenue is at least a factor in letting the sales force?

"Yes, it was.  They were convention sales people to do --"

A.    I just -- and I may have heard you wrong, sir, but I think you interjected there something about plants shutting down.  I couldn't find that on the page.

Q.    Well, we talked about just a moment ago that --

A.    It's not on this page, sir, as you were reading it.

Q.    Okay.  But the 50 percent drop in revenue was attributable to the plant shutting down.  You just testified about that.

A.    It was part of it, yes.

Q.    And today through -- at least through 2022, ME2C still doesn't have anyone in charge of going out in the field and selling ME2C's products and services, does it?

A.    Yes, we do, sir.

Q.    As of 2022?  You did not at the time you gave your deposition.

A.    Well, we don't have a sales force per se, but our vice president of operations is constantly looking for new business.

Q.    That would be Jim Trettel?

A.    That's correct.

Q.    And again, the deposition, again paragraph -- page 36, if you could look at page 36, line 25.

A.    Line 25?

Q.    That's correct.

        "Is someone in charge of going out into the

field and selling ME2C's product and services today?"

And your answer was, "No one specifically."

A.    Yes.  As I said, our VP ops tried to do the best he can, but we don't have a salesperson specifically out there selling.

Q.    Mr. MacPherson, in your direct exam, you talked about competing against the refined coal companies and how there was -- I think you said there was no way to win and not much you could do about it.

Do you recall that testimony?

A.    Yes, sir.

Q.    And you suggested and you still seem to be suggesting that you blame the decline in your business on -- from early 20-teens to the late 20-teens on refined coal?

A.    Mostly from '15 onward.

Q.    And you were aware of Chem-Mod many years before that, weren't you?

A.    I was aware of them, yes.

Q.    And just to kind of orient us, Chem-Mod is a process by which refined coal can be made; fair?

A.    It plays a role in it, yes.

Q.    And as early as 2009, January 2009, even before your license, you were aware of Chem-Mod?

A.    I think our license was before that, but I -- like I said, I was aware of Chem-Mod, yes.

Q.    If we take a look in your exhibit notebook at DTX 48.

A.    Is that the big one?

Q.    The big one.

A.    Which number sir?

Q.    48, Mr. MacPherson.

A.    Yeah.

Q.    And there's an e-mail from you to Mr. Pavlish dated May 28, 2009; right?

A.    Yes, sir.

Q.    And you've seen this e-mail before, and you recognize it, don't you?

A.    I don't remember it, but I do see it coming from me to John.

        MR. SYKES:  I'll move to admit DTX 48.

        THE COURT:  Any objection?

        MR. MCCARTY:  No objection.

        THE COURT:  It's admitted.

        (Thereupon, Defendants' Exhibit 48 was admitted.)

BY MR. SYKES:

Q.    This is just a simple e-mail from you to John entitled "Chem-Mod:  What's the deal with these guys?" Right?

A.    Yeah.

Q.    And that probably prompted a conversation with

Mr. Pavlish about Chem-Mod?

A.    I'm not sure, sir.  I don't know if he responded or what.

Q.    Yeah.  I mean, sitting here now, you probably don't remember, but at least as early as 2009, you were hearing about Chem-Mod?

A.    Yeah.  As I mentioned, I was aware of them.

Q.    Let's -- let's take a look at the next exhibit.  It should be the very next tab over in the binder, DTX 077.  Turn one tab.

A.    Okay.

Q.    And this is a letter by ME2C October 11, 2012 to Mr. Mark Curtis, plant engineering in Joppa, Illinois, and you recognize Joppa as a power plant in Illinois; correct?

A.    Correct.

Q.    And this is an e-mail from ME2C to a potential customer; fair?

A.    Yes.  It's from my sales guy.

        MR. SYKES:  I move to admit DTX 77.

        THE COURT:  Any objection?

        MR. MCCARTY:  No objection.

        THE COURT:  All right.  It's admitted.

        (Thereupon, Defendants' Exhibit 77 was admitted.)

BY MR. SYKES:

Q.    This letter is the proposal to work with Joppa.  ME2C says it's "pleased to provide the following breakdown of pricing for its services for your current mercury capture program as well as injecting the dose rate with the Chem-Mod control program that's in the process of being installed."

Do you see that?

A.    Yes, sir.

Q.    And then you go on to say, "With the Chem-Mod program, we believe we can provide Joppa a 25 to 30 percent cost reduction over other methods for meeting the Illinois state mercury limits."

(Stenographer clarification.)

THE COURT:  The court reporter is having trouble hearing.  Maybe if you could speak up, Mr. Sykes.

BY MR. SYKES:

Q.    And in this letter, DTX 11, ME2C is proposing to work with Chem-Mod; correct?

A.    No.  We were proposing to work with the power plant.

Q.    But alongside the Chem-Mod's refined coal they're in the process of installing?

A.    What we're trying to do here is, sir, is we're trying to be the front-end supplier for the material for this plant that's going forward with this refined coal program.

Q.    You didn't tell Joppa that use of the Chem-Mod's program was infringing any ME2C patents, did you?

A.      Not in this particular e-mail, it appears, but I'm sure there was a lot more communication than this.

Q.      And there was a communication in July 2019 when you actually filed a lawsuit over the Joppa use of Chem-Mod; correct?

A.      I don't recall.  You'd have to refresh me with a document.

Q.      Let me show you an exhibit marked as DTX 56.  That would be the other direction in your binder as the tab marked 56.  I think you'll see Exhibit 56, the e-mail exchange, December 2014, Marc Sylvester and Allen Kelly, employees of ME2C, to you and Mr. Pavlish and others.

        Take a minute to review that.

        MR. SYKES:  Move to admit DTX 56.

        THE COURT:  Is there any objection?

        MR. MCCARTY:  No objection, Your Honor.

        THE COURT:  All right.  It's admitted.

        (Thereupon, Defendants' Exhibit 56 was admitted.)

BY MR. SYKES:

Q.      So this is two years later, and your sales guy, Marc Sylvester, is noting that Newton and Edwards are using CCS refined coal.

        Do you see that?

A.      Yes, sir.

Q.    Now, calcium bromide on the belt and back is brominated activated carbon; is that right?

A.    Yes, sir.

Q.    So Joppa, again, using Chem-Mod's.  So this doesn't say anything about the Chem-Mod being an infringement of patents or ME2C's intellectual property, does it?

A.    Not this particular piece of e-mail, no.

Q.    If -- and ME2C didn't write Chem-Mod or any refined coal company alleging infringement, did it?

A.    I'm not aware of any at this time.

Q.    Not until it filed the lawsuit in 2019?

A.    No, sir.

Q.    And ME2C didn't write to EERC, the North Dakota Institute, who was the owner of the patents.  You were their licensee.  You didn't write the EERC and tell them that you thought that Chem-Mod was infringing patent rights, did you?

A.    I'm not sure, sir.

Q.    If -- if you had written such an e-mail or letter, ME2C surely would have turned it over to us in this lawsuit; is that fair to say?

A.    I would think so.

Q.    And you didn't receive any kind of letters from the EERC to do so either, did you?  I mean, you didn't see a notice from the EERC that Chem-Mod was infringing its patents?

A.     No, sir.

Q.     And you generally, as a company, try to abide by your contracts; right?

A.     Of course.

Q.     And especially obligations in your license agreement, very important agreement, with the EERC to the mercury control patents and technology that you're building your business around; fair?

A.     That's fair.

Q.     Well, let's -- let's look back at the license agreement that is PTX -- with the number again.

       MR. SYKES:  Do you have it, Mr. Brown, EERC license agreement?  They admitted it.  Let's just go down to paragraph 7.1.

BY MR. SYKES:

Q.     So both ME2C and the EERC, both of you had an obligation in this agreement, very important agreement to your company, to provide written notice to the other party promptly after becoming aware of any infringement of the patent office; fair?

       That's what it says?

A.     I'm sorry.  Yes, you're correct in what it says.

Q.     And neither ME2C nor the EERC provided any such notice all of these many years that refined coal as being made?

A.      Correct.

Q.      And all it would have taken on your part is just an e-mail?

A.      Yes, sir, we could have notified with an e-mail.

Q.      And you said something in your direct about you couldn't find CERT.  You didn't know who we were.  You didn't know how to contact us.  I assume you knew how to contact us when you filed this lawsuit.  You...

A.      You know, it took us a long while to be able to track it all down.

Q.      Really?

A.      Yeah.

Q.      We happen to be organized in this great state of Delaware.  And, you know, the CERT documents have registered agents that you could have just, off the internet, gotten their address and written a letter for, I guess -- what's a stamp? -- 49 cents.  And you guys didn't do that, did you?

A.      No, sir.

Q.      And you actually listed the street address of the companies down in Birmingham, Alabama, in your complaint, didn't you?

A.      I'm not sure about the complaint exactly, sir.  I'll have to see.

Q.      You reviewed the complaints before they were filed and authorized to be filed?

A.    It was some time ago, sir.  I don't remember the address offhand.

Q.    So you would agree that if it has a street address in Birmingham, that ME2C had that?

A.    Yes, I would say we had the address of an agency representing an LLC, yes.

Q.    Well, you had the agent in Delaware, but you had a street address for the company in Birmingham, Alabama, too?

A.    Again, sir, we'd have to go back to the documents. I've never been to the street address in Alabama.

Q.    I'll tell you what.  We'll just move on.

THE COURT:  Mr. Sykes, about how much more minutes do you think you have?

MR. SYKES:  I probably have, Your Honor -- it may be a good time for a break.

THE COURT:  That's fine.  It's about the time that we take our afternoon break.  So if that's convenient for you, then -- it's 3:15.  Let's take a 15-minute break, and the jurors can be led out now.

THE CLERK:  All rise.

(The jury exited the courtroom.)

THE COURT:  All right.  Let's come back at 3:15. The Court will stand in recess.

THE CLERK:  All rise.

(A recess was taken, after which the following

proceedings were had:)

THE COURT:  We'll let the witness retake the stand.  We'll bring the jury in.

(The jury entered the courtroom.)

THE COURT:  We'll continue with the cross-examination, Mr. Sykes.

MR. SYKES:  Thank you, Your Honor.  I'd just like to move to admit DTX 375.  That's the 10-K -- ME2C's 10-K from the year ending 2017.

MR. MCCARTY:  No objection.

THE COURT:  It is admitted.

Please continue.

(Thereupon, Plaintiffs' Exhibit 375 was admitted.)

BY MR. SYKES:

Q.    Mr. MacPherson, before the break, we had a little exchange of discussion of the layoff of the sales force in 2018 -- the 2017, 2018 time frame.  And you suggested that that, in part, was due to refined coal or some alleged infringement; fair?

A.    That's fair.

Q.    But the patents you're suing under didn't issue until a couple years later in 2019 and 2020; right?

A.    I'm not certain of that, sir.

Q.    You're not certain of the years that the patents

we're dealing with this week --

A.    Yeah.

Q.    -- were issued?

A.    I believe they were issued -- sorry.

Q.    Yeah.  They were issued in 2019 and 2020?

A.    Correct.

Q.    So there was certainly no infringement of those patents back in 2017?

A.    I'm not sure, sir, whether or not they come into play prior to their actual issuance.  But I'd have to leave that to the attorneys.

Q.    And the one patent that you did have you later asserted you didn't write any letters or send any notices to a refined coal company or Chem-Mod or anybody.

A.    No, sir.

Q.    During these years, one of the things that ME2C was looking at or actually did was enter a license agreement with Cabot, one of these raw materials suppliers; right?

A.    Correct.

Q.    And you thought that Cabot might get ME2C's technology into new markets like Europe?

A.    It was specifically for the European market, yes.

Q.    But the Cabot agreement, ultimately, wasn't successful?

A.    No.  They decided it was more valuable for them to

just sell their raw product than try to change the market.

Q.    And they paid ME2C zero in royalties for that?

A.    They were not successful, no, sir.

Q.    And, you know, ME2C, like any business, you have periodic management meetings sometimes and off-site conferences for a couple of days to strategize; fair?

A.    Once in a while, yes.

Q.    Let me show -- let's look at what's marked as DTX 92 in your binder.  So that would be towards the front. They're in numerical order.  Tab DTX 92.

And this is a document on ME2C letterhead with your name, "Rick MacPherson, President, CEO, Confidential," dated November 28th, 2017.  Do you see that?

A.    Yes, sir.

MR. SYKES:  I move to admit DTX 92.

THE COURT:  Any objection?

MR. MCCARTY:  No, sir.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 92 was admitted.)

BY MR. SYKES:

Q.    And it sounds like you wrote this.

"I am confident that the following strategic development from Midwest Energy Emissions Corp. will take our growing company to the next level."

Do you see that?

A.      I'm sorry.  Which part is that?

Q.      Just the very first sentence.

A.      Yes, sir.

Q.      So this is the first person.  You wrote this?

A.      Yes.

Q.      And you recognize this document; right?

A.      I don't remember it.  It's a while back, but it looks like I wrote it.

Q.      And November 2017, that's -- you bought the patents -- or ME2C bought the patents in April 2017; fair?

A.      Correct.

Q.      And the first heading, "Corporate Rework," you note the company is transitioning into new technologies company. First line there for "Overview."

        I read that correctly?

A.      Yes, sir.

Q.      All right.  Let's look at -- let's look at the next paragraph.  I'm just going to read it:

        "The initial concept of building value in the patents and technologies was sound but did not fully consider the costs and time required to realize their inherent value.  A company needs a champion to lead the enforcement charge, whether by sheer size or direct defense. The relationship built over the past three years with Cabot

is that preferred champion.  The alternative route is that of a litigious patent troll approach, which would see us litigate the very market we're here to serve."

Did I read that correctly?

A.    Yes, sir.

Q.    And you wrote that?

A.    Yes, sir.

Q.    And the Cabot deal didn't turn out to be successful did it?

A.    No, it didn't.

Q.    And then it was -- it was after this corporate rework in late November 2017 that ME2C filed the applications we're dealing with today in the first half of 2018; is that right?

A.    I would think so, yes, sir.

Q.    And just take a look at another set of meeting notes, DTX 97.  That will be -- sorry, that is not in my binder.

Is that in your binder?

A.    No.

Q.    It was somehow left out.

Do you ever remember, Mr. MacPherson, writing a set of meeting notes, July 2019, just before this lawsuit was filed on July 2nd, about two weeks before the case was filed, announcing the consistent messaging to the industry?

A.    No, sir, I don't recall.

Q.    You don't recall saying that ME2C management -- the

message was to tell its customers "to do business with us or be heaped onto the litigation pile"?

A.    I'm sorry.  What was that?

Q.    "Do business with us or be heaped on the litigation pile"?

A.    No, sir, I don't remember saying that to anybody.

MR. SYKES:  I'll pass the witness.

THE COURT:  All right.  Mr. McCarty, redirect?

MR. MCCARTY:  Just a few questions.

THE COURT:  Okay.

MR. MCCARTY:  May I proceed, Your Honor?

THE COURT:  You may.  Thank you.

REDIRECT EXAMINATION

BY MR. MCCARTY:

Q.    Thank you, Mr. MacPherson.  Do you recall CERT's counsel asking about ME2C's competitors in the industry?

A.    Yes, sir.

Q.    And, in fact, Mr. Sykes put up your company financials that you have to sign every quarter and annually where you discuss your business; correct?

A.    Yes, sir.

Q.    Okay.  You remember that.  Who are ME2C's competitors?

A.    Well, we list them typically as being the folks that are in business that provide the same services that we do.

They sell products to capture mercury.

Q.    There seemed to be a suggestion, I think, that you and ME2C should have listed the CERT defendants as competitors.

Did you get that sense?

A.    Yes, I got that sense, yeah.

Q.    Does that notion make any sense to you?

A.    Not really, no, because we weren't in their business. We were selling products and services under our patents to power plants to remove mercury.  We weren't in that tax program business.

Q.    Do you recall some questions, sir, again, about why you didn't reach out to these tax entities before initiating litigation?

A.    Yeah.  And as I responded, you know, we made it our best effort.  I mean, we talked to the guys at the plants. We talked to management.  We talked to whoever would listen to us at the head offices, but we couldn't get anywhere because it was a very complex program through these LLC companies that were really difficult to track down.

And so we reached out to them.  And, you know, as we showed them the different documents, we tried to approach plants to see if we could even be a part of the supply side when they were on the program.  But we couldn't compete because of the incentives they were getting to take

the product from the refined coal people.

Q.    Were you here during opening statements?

A.    Yes, sir.

Q.    Do you recall Mr. Caldwell putting up a board of those various tax entities and how they're structured?

MR. SYKES:  Your Honor --

A.    Yes, sir.

MR. SYKES:  Yes, Your Honor, I object to counsel referring to the defendants as, quote, "tax entities."

THE COURT:  Okay.  That is sustained, and counsel will refer to the defendants by their names or shortened parts of the names.

MR. MCCARTY:  Yes, Your Honor.

BY MR. MCCARTY:

Q.    Do you recall seeing some of the names of the companies there in the middle, like Senescence, LLC?

A.    Yes.

Q.    And Larkwood Energy, LLC?

A.    Yes.

Q.    Are these household names in the energy industry?

A.    No.  I don't think, other than the, you know, management people at the corporate offices of the power plants or corporations would even know who they are outside of themselves.

Q.    Could you go talk to the plant operators or fellow

CEOs in the company to track down all of these LLCs and have business-to-business discussions at the time?

A.    No.  As I mentioned, sir, we tried, but they were hard to find.

Q.    In fact, to initiate litigation, did you include some "John Doe" companies as defendants because you just didn't know the names yet?

A.    Yeah.  I mean, it took months and months just even for the lawyers to figure out who they were.

Q.    Sir, you were asked some questions about the time period in 2011, 2012, and 2014 where you were sending some correspondence regarding business prospects, and there were some letters and e-mails.  Do you recall those?

A.    Yes, sir.

Q.    And you were asked by Mr. Sykes about why you and your company didn't pipe up about your patents at the time. Do you recall those questions?

A.    Yes, sir.

MR. MCCARTY:  Let's look at one of those. Mr. Diaz, can you put up DTX 77.  Can you zoom in, sir, on the date of this document.

BY MR. MCCARTY:

Q.    Sir, at the top there, what's the date of the document that Mr. Sykes showed you?

A.    October 11th, 2012.

Q.    Did Mr. Pavlish work at the company at that time?

A.    Yes.

Q.    Did you have ownership rights in the patents at the time?

A.    No.  Just let me think for a second.

Q.    Did your company acquire --

A.    We had --

Q.    -- all the patents?

A.    We had the licenses, but we didn't acquire them until later.

Q.    And as you talked about with Mr. Sykes, did the patents-in-suit issue in 2019 and 2020?

A.    Yes.

Q.    Sir, how could you write to companies in 2012 about patents that would not issue for eight years later?  Does that make any sense to you?

A.    No, it wouldn't.

Q.    You were asked very early on in the cross-examination about the Alistar agreement.  Do you recall that question?

A.    Yes, sir.

Q.    And I think there was a discussion about the total amount paid under that agreement.  Do you recall that?

A.    Yes.

Q.    Would you please remind the jury what amount per ton Alistar paid under its license to your company for the

patents in this case?

A.    Sure.  So to the best of my understanding, they paid a dollar a ton for all of the refined coal that they burned since the time we filed the suit.

Q.    Sir, what is your understanding of the Alistar's connection to the CERT entities in this case?

A.    Well, they apparently were just one of the operating entities, one of those LLCs that operated a refined coal program.

Q.    And are you asking the jury to award the same exact amount in this case than what Alistar paid under that agreement?

A.    Yes, I am.  I'm asking the jury to consider paying the same amount as the first CERT folks paid when they settled.

Q.    And that amount is how much?

A.    That amount is one dollar for each refined coal ton that they burned in their program, and that's only from the time that we filed the suit onward to the end of the program.

MR. MCCARTY:  Thank you.  No further questions.

THE COURT:  You may step down.  Thank you.

THE WITNESS:  Thank you, Your Honor.  Thank you, folks.  Do I have to take these books with me?

THE COURT:  Counsel will help you.  Thank you.

MR. CALDWELL:  Your Honor, quick question.  I'm just wondering if Mr. MacPherson can be excused from the rules so that he can stay in the courtroom and watch the rest of his company's trial.

THE COURT:  Discuss with the other side.

MR. DORSNEY:  Your Honor, on this issue, the parties have reached an agreement in the pretrial order prior to the start of trial regarding the witnesses that would be present in the courtroom throughout the trial. We'd like stick to the Court's order.

THE COURT:  Okay.  Very well, then.  The request will be denied.

Mr. Nemunaitis?

MR. NEMUNAITIS:  Just here to call the next witness.

THE COURT:  We're ready.

MR. NEMUNAITIS:  Plaintiffs call William Whitney by video deposition.

Mr. Whitney is an employee of MidAmerican, which operates a number of coal-fired -- a number of coal-fired power plants.  He will talk about burning refined coal, operating activated carbon systems, and power plant operating permits.  The time for Plaintiffs is 3 minutes and 49 seconds.  The time for Defendants is 5 minutes and 30 seconds.

(A video was played.)

BY THE ATTORNEY:

Q.    Can you please tell me your name.

A.    William Whitney.

Q.    And who do you work for, Mr. Whitney?

A.    MidAmerican Energy Company.

Q.    And what's your job title at MidAmerican Energy Company?

A.    General manager, engineering services.

Q.    Are you familiar with how MidAmerican handles coal at its coal-fired power plants?

A.    Yes, I am.

Q.    And is it part of your job to understand and manage how the MidAmerican power plant controls mercury?

A.    Yes.

Q.    The four power plants that you identified as being power plants that use activated carbon injection for MidAmerican are Louisa Generating Station, George Neal Energy Center Unit 3, George Neal Energy Center Unit 4, and Walter Scott Energy Center Unit 3 and 4; is that correct?

A.    Yes.  Five units total.

Q.    Right.  Now, is it okay for purposes of today if we refer to the George Neal Energy Center Unit 3 as "George Neal North"?

A.    Sure.

Q.     And can we refer to George Neal Energy Center Unit 4 as "George Neal South"?

A.     Yes.

Q.     Is it also fair to refer to the Walter Scott Energy Center Units 3 and 4 as "Walter Scott"?

A.     Yes, except there may be certain things that are different between the two units there.

Q.     Right.  Okay.  I'll -- thank you.  I'll keep that in mind.  Can you tell me approximately when Louisa, George Neal North, George Neal South, and Walter Scott Units 3 and 4 started using activated carbon injection?

A.     Walter Scott Unit 4 started using it in 2007, and the other four units would have been about 2014.

Q.     For the Louisa, George Neal North, George Neal South, and Walter Scott Unit 3 that use activated carbon injection, have they been using activated carbon injection continuously from 2014 until at least the end of 2021?

A.     Yes.

Q.     And for Walter Scott Unit 4, has it been using activated carbon injection continuously from 2007 until at least the end of 2021?

A.     Yes.

Q.     For these power plants that use activated carbon injection, why do you use it continuously as opposed to turning it off for some period of time?

A.      Well, we had mercury emission limits in our permits, and we wanted to make sure we're in compliance with those. So we need to inject it to make sure our mercury emissions are low enough to meet those limits.

Q.      And when you refer to "limits," are you referring to state and federal regulations?

A.      Yes.

Q.      Does MidAmerican ever adjust the amount of carbon being injected or the rate of activated carbon injection for these power plants?

A.      Yes.

Q.      And can you tell me, just at a high level, why that would be done?

A.      Well, certain facilities have emission monitors.  So if -- that are continuous.  So if they see a change in the emission rate, they may adjust it up, or they may adjust it down if they know that they're controlling beyond where they need to.  So it's basically just to make it as economical as possible while still meeting the emission criteria.

Q.      Do Louisa, George Neal North, George Neal South, and Walter Scott Units 3 and 4 all have mercury monitoring?

A.      No.  Walter Scott 3 and 4 do.  The others do not.

Q.      For Louisa, George Neal North, and George Neal South, do those power plants make adjustments for the amount of activated carbon being injected?

A.      Yes.  They use sorbent traps, so they do get information on what the mercury level is, but it's just not continuous.  You pull a trap, analyze it, see what the emission level is, and then they may make an adjustment based on that if they need to.

Q.      MidAmerican has had coal purchase agreements with refined coal suppliers for Louisa, George Neal North, George Neal South, and Walter Scott; is that right?

A.      Yes.

Q.      And did those power plants combust the refined total they received?

A.      Yes.

Q.      Is the fact that the activated carbon is listed in Title V permit mean that this power plant is required to operate the activated carbon injection equipment?

A.      Yes, and it's an acknowledgment that that is what we need to do to meet our emission requirements and that it's an improved part of our emission controls.

Q.      I just have a few questions for you about a couple of topics that we covered earlier today.  You mentioned during Mr. Nemunaitis's questioning that the supply of refined coal to the power plants that MidAmerican operates is sometimes paused or interrupted for various reasons.

        Do you recall that?

A.      Yes.

Q.    And is that true for each of the four facilities, George Neal North, George Neal South, Louisa, and Walter Scott?

A.    Yes.

Q.    What about the activated carbon systems used at those plants?  Do the activated carbon systems in use at George Neal North ever get turned off or disengaged for any reason?

A.    Yes, if they need to, like, clean the nozzles or something like that.

Q.    And is that also the case with George Neal South?

A.    To my knowledge, yes.

Q.    Is that also the case for Walter Scott?

A.    Yes.

Q.    Is that also the case for Louisa?

A.    Yes.

Q.    Do you know, for George Neal North, the amount of time in a given year that the activated carbon system disengaged or turned off for any reason?

A.    I don't know that.

Q.    Is that information that MidAmerican keeps track of?

A.    The only way I know that we could track that is there's information in our control system that says whether it's on or not.  I suppose you could go through the historian of our control system and figure that out, I believe, but I've never tried to do that.

Q.      Do you believe that the history of the control system at the other plants -- George Neal South, Walter Scott, and Louisa -- might also provide the information?

A.      I believe it would, yes.  I do not know how long that data is stored.

Q.      Are there ever times when refined coal is burned at MidAmerican plant while the activated carbon system is turned off?

A.      Yes, I believe there would be.

Q.      Mr. Whitney, about how long does it take to clean the nozzles on an activated carbon injection system?

A.      Probably an hour or two.  I don't know exactly.  That would be my guess.

Q.      So if you wanted to ballpark the amount of time in a year where MidAmerican turns off the activated carbon injection system at its plants, are we talking months of time or hours of time?

A.      Hours.

Q.      And if MidAmerican wanted to shut off the activated carbon injection systems at its plants for, you know, a more sustained period of time, for months at a time or years at a time, would they need to apply for a new permit to do that?

A.      Possibly or might have to leave the plant out of service.

                (The video ended.)

THE COURT:  All right.  Mr. Nemunaitis?

MR. NEMUNAITIS:  Plaintiffs are ready to call their next witness, Your Honor.

THE COURT:  Please do so.

MR. NEMUNAITIS:  Plaintiffs call Mr. Philip O'Keefe.

THE COURT:  Mr. O'Keefe, come forward and be sworn.

THE CLERK:  Please raise your right hand and state and spell your full name for the record.

MR. O'KEEFE:  My name is Philip O'Keefe, P-H-I-L-I-P, O-'-K-E-E-F-E.

PHILIP O'KEEFE,
called as a witness on behalf of the
Plaintiff, was sworn, and testified
as follows:

THE COURT:  Counsel, we've got some binders that say 2 of 2, some that say 1 of 3.  How many binders?

MR. NEMUNAITIS:  There are a number of large exhibits so we have multiple volumes to contain all the exhibits.  I believe there's one binder with his reports and two binders with his exhibits.

THE COURT:  I'm not going to need exercise this week.  I'm in good shape.  Okay.

DIRECT EXAMINATION

BY MR. NEMUNAITIS:

Q.    Could you please tell us your name?

A.    My name is Philip J. O'Keefe.

        (Stenographer clarification.)

BY MR. NEMUNAITIS:

Q.    You might need to speak more in the microphone.

        THE COURT:  You may approach, Mr. Nemunaitis, if you want to help.

        (Off the record.)

BY MR. NEMUNAITIS:

Q.    Are you an ME2C employee, Mr. O'Keefe?

A.    No, I'm not.

Q.    Are you what's called an expert witness?

A.    Yes, I am.

Q.    What's the role of an expert witness?

A.    To review materials in the case and render opinions based on experience and education.

Q.    As part of your work in this case, did you have access to a database of evidence from the case?

A.    Yes, I did.

Q.    And did you use that evidence to prepare a report on your investigation?

A.    Yes, I did.

Q.    Was that report provided to the defendants before

this trial started?

A.    Yes.

Q.    Are you being compensated for your role as an outside expert?

A.    Yes.

Q.    What's your compensation?

A.    $300 per hour.

Q.    Does your compensation have anything to do with who wins or loses the trial?

A.    No.

Q.    All right, Mr. O'Keefe.  Can you tell us a little bit about yourself and where you're from.

A.    I'm from Chicago.  I spent most of my life there in the Chicago area, and I moved to rural Minnesota about 20 years ago.

Q.    About how old are you?

A.    I'm 65.

Q.    Do you have any kids?

A.    Yes, I have three children.  I have a daughter -- two daughters and a son.

Q.    Did you go to college?

A.    Yes.

Q.    Where did you go?

A.    I went to the Illinois Institute of Technology.

Q.    And did you get a degree there?

A.    Yes.

Q.    What was your degree?

A.    A bachelor of science in mechanical engineering.

Q.    How did you get interested in engineering?

A.    I was always interested in technology, and it just was natural for me.

Q.    What topics did you study for mechanical engineering?

A.    Well, I studied a variety of topics which includes thermodynamics and heat transfer, which is used at power plants, and machine design, material science, a lot of different things, even aerodynamics.

Q.    Sorry about that.

       What did you do after you graduated?

A.    I went to work for an electrical utility called Commonwealth Edison.  They're an electric utility in the northern third of Illinois.

Q.    Where were you first posted at ComEd?

A.    A coal-fired power plant in Hammond, Indiana, that was known as Stateline Station.

Q.    Can you tell us about the first day at the job there.

A.    Sure.  I was interviewed in a general office.  I had never been in a power plant before, and the HR rep from the downtown general office offered me a job, which I accepted.

       And I asked him -- I said, "Well, how should I dress when I go out to a power plant?  I've never been to a

power plant before."

"Oh," he said, "why don't you wear a three-piece suit."  So I got all dressed up, you know, looking really sharp, kind of like I am today.

And everybody was wearing blue jeans and flannel shirts and work boots, and I stuck out like a sore thumb.

Q.    Was your job pretty hands-on at ComEd?

A.    It's very hands-on.  I had to crawl through boilers and do equipment inspection, and it's a great way to learn.

Q.    What was your first role for ComEd?

A.    Well, I had to be a tech staff engineer, and I primarily ran efficiency tests on boilers and turbines and all the auxiliary equipment in the power plant and determined how well they were operating, how efficiently they were operating, and recommended the kind of repairs or corrective actions to improve the efficiency.

Q.    Did you move on to another role after being a tech staff engineer?

A.    Yes, I went into the training department, and I had to put together a first-line supervisor training program.

Q.    What did that entail?

A.    It was more or less putting together a training program about how a power plant operates and all the equipment that goes into a power plant and makes it go.

Q.    Did you train new engineers coming into ComEd?

A.      No, I didn't at that point.  I -- I was primarily interested in training first-line supervisors, and that position, I went into the fossil division training department, training center for the entire coal-fired power plants and the utility.

        And there I had trained new tech staff engineers and existing tech staff engineers on power plant operations and conducting tests.

Q.      Did you have any other roles at ComEd?

A.      Yes.  I went into the engineering department, and I had to decide burn management and combustion control systems and a lot of auxiliary control systems.  Primarily industrial control system design.

Q.      When you were at ComEd, did you work with pollution control equipment?

A.      Yes, I did.

Q.      Did that include mercury capture technology at the time?

A.      No.

Q.      Why is that?

A.      Well, the plants weren't required to capture mercury at that point.

Q.      As part of your involvement in this case, have you reviewed mercury capture regulations and the technology at issue in this case?

A.    Well, only in this case.

Q.    Are you comfortable talking about the technology and the mercury control issues in this case?

A.    Sure.

Q.    How long did you work at ComEd?

A.    I was an employee at ComEd for 14 years.

Q.    Around what time did you leave?

A.    I left around 1995, and I went to go work in the food industry.

Q.    Did you continue doing engineering after you left ComEd?

A.    Oh, sure.

Q.    You said food industry.  What kind of work did you do after leaving ComEd?

A.    I was a plant engineer in a food manufacturing plant, and I did that for about 18 months, and from there I went into outdoor power equipment manufacturing.

Q.    Even when you were working at these other roles at that plant -- at that point in time, did you continue teaching about power plants after leaving ComEd?

A.    I did later on after the turn of the century.

Q.    Are you a professional engineer, Mr. O'Keefe?

A.    Yes, I am.

Q.    What does that mean?

A.    Well, that means I'm licensed to practice engineering

in the state of Minnesota.  That's where I'm from.  And in order to get my PE license, I had to take an eight-hour exam to begin with about engineering.

I had to pass that, and that gave me EIT certification, engineer in training, and after a few months I took another test, a PE test, and I had to pass that to get my PE license.

Q.    Have you had involvement with patents before working on this case?

A.    Oh, yes.

Q.    And have you previously testified as an expert in a patent proceeding?

A.    Oh, yes, I have.

MR. NEMUNAITIS:  Your Honor, Plaintiffs offer Mr. Philip O'Keefe as an expert in the filed of power plant operation including operation and regulation of coal-fired power plant equipment and related equipment for pollution control.

THE COURT:  So noted.

BY MR. NEMUNAITIS:

Q.    All right.  Mr. O'Keefe, do you have some slides to assist in your testimony today?

A.    Yes, I do.

Q.    Mr. O'Keefe, can you give us an overview of the topics that you're going to be discussing?

A.      Sure.  I want to talk about some -- various topics. First off is I want to discuss the patents-in-suit.  Then I want to talk about the tests that I applied for deciding infringement of those patents.

        And then I want to talk about Defendants' refined coal operations, and then I want to talk about power plant infringement analysis that I performed and then Defendant infringement analysis and additional information for damages.

Q.      And just to preview where we're going to end up, what was your ultimate conclusion regarding infringement in this case?

A.      Well, the defendants infringed the two patents-in-suit.

Q.      Can we begin with your first topic.  What's that one?

A.      Sure.

Q.      What topic are we going to talk about the patents?

A.      Sure.  There's two patents in this case.  As -- as mentioned before, we talk about the abbreviation which is the '517 and '114 patents.

Q.      And for the record, those are PTX 3 and PTX 1; is that right?

A.      Yes.

Q.      Now, Mr. O'Keefe, do you need to be a lawyer to understand those patents?

A.    No.

Q.    As part of your investigation in this case, did you need to determine what's called the level of skill in the art?

A.    Yes, I did.

Q.    And just generally, when we're talking about patents, what does that mean, the term "level of skill in the art"?

A.    Well, that's a person that I opine can understand the technology in the patents and make and use the invention.

Q.    And what is the level of skill that you identified for the patents at issue in this case?

A.    Okay.  I said, "A person of ordinary skill in the art of the patent-in-suit at the time of the invention would have a bachelor's degree in mechanical engineering, chemical engineering, or chemistry or related technology and at least two years of experience with power plant operation and/or pollution control equipment.

"Additional work experience in relative industries could compensate for less education or education in a different field.  Similarly, advanced education degrees compensate for less work experience."

Q.    How do you know that that's the appropriate level of skill as it applies to the patents-at-issue in this case?

A.    Well, I based my opinion on my engineering education and also my experience in coal-fired power plants.

Q.    Now, if we think back to the time before mercury regulations were in effect and before Mr. Pavlish came up with his invention, am I right that power plants weren't required to capture mercury at that point; right?

A.    That's correct.

Q.    Even though they weren't required at that point, was it known in the industry that that would eventually be important?

A.    Well, eventually it was known that, you know, they would be required to remove mercury.

Q.    Could you open your first binder to Tab 3.

A.    I'm sorry, which tab?

Q.    Tab 3.

A.    Okay.

Q.    Can you tell me what that document is.

A.    It's a study prepared by the Federal Environmental Protection Agency.

Q.    And is that something you reviewed in this case?

A.    Yes.

Q.    And did you rely on that to prepare your report?

A.    Yes.

          MR. NEMUNAITIS:  Your Honor, we move to admit PTX 57.

          THE COURT:  Any objection?

          MR. DYESS:  No objection, Your Honor.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 57 was admitted.)

BY MR. NEMUNAITIS:

Q.    In this report, Mr. O'Keefe, does the EPA explain what prompted the interest in mercury capture?

A.    Yes.  They -- they did the study, and they listed the reason for it, and I can read it if that's okay.

Q.    Yes.

A.    "They performed a study of hazards to public health reasonably anticipated to occur as a result of emissions by electric utilities' steam generating units of hazardous air pollution after the requirements of this act."

Q.    Does the report go on to talk about what the EPA concluded regarding mercury at the time it was prepared?

A.    Yes.

Q.    And what is the date on this report?

A.    The date is, let's see, February 1998.

Q.    So what -- what did the EPA conclude regarding mercury at that point in time?

A.    Well, the conclusion here is, "Based on available information and current analysis, the EPA believes that mercury from coal-fired utilities is a hazardous air pollutant of greatest potential concern and merits additional research and monitoring."

Q.      Did the report also consider available technologies at the time?

A.      It certainly did.

Q.      And what was the conclusion there?

A.      Regarding potential methods for reducing mercury emissions the EPA --

MR. DYESS:  Your Honor?

THE COURT:  I'm sorry.  If you could pause for a second.

MR. DYESS:  The witness is testifying from a slide.  We have an exhibit, and we're not being told what the reference in the exhibit is.

MR. NEMUNAITIS:  We gave them the slides last night.

THE COURT:  Is there some confusion about where to look in the document?

MR. DYESS:  Yes, Your Honor.  I mean, there are pictures on the slides that you can't make out.

THE COURT:  Why don't we ask counsel to confer with opposing counsel to let me know where in the documents these are.

Mr. Nemunaitis?

BY MR. NEMUNAITIS:

Q.      Did the EPA ultimately conclude that they had not identified any demonstrated add-on control technologies

currently in use in the U.S. that effectively removed mercury from the utility emissions?

A.    Right.

Q.    Is that the problem the inventors were trying to solve?

A.    It certainly was.

MR. NEMUNAITIS:  Mr. Diaz, can you give me PTX 3.

BY MR. NEMUNAITIS:

Q.    Now, Mr. O'Keefe, the jury saw the patent video that explained some of the parts of the patent in this case, but could you identify on here who owns the patent that's identified as the '517 patent?

A.    Well, the entity that owns the patent is Midwest Energy Emissions Corporation.  It's known as the assignee, and it's listed -- it's highlighted here on the front of the patent, the first page.

Q.    And are the inventors also identified?

A.    Yes.  Edwin S. Olson, Michael J. Holmes, and John H. Pavlish, who testified earlier.

Q.    And I think Mr. Pavlish gave some testimony about this, but did these inventors file additional applications related to the technology in this patent?

A.    Yes, they did.

Q.    And is that listed here in the patent as well?

A.      Yes, it is.

Q.      And where is that?

A.      It's related to U.S. application data.

MR. NEMUNAITIS:  And, Mr. Diaz, if you could grab the rest of that related U.S. application data from the next page.

BY MR. NEMUNAITIS:

Q.      So these portions of the patent labeled as "Related U.S. Application Data," are these the applications you were talking about?

A.      Yes.

Q.      Okay.  Mr. O'Keefe, could you take a look at Tabs 4 through 16 in your binder?

A.      Okay.

Q.      Are those the applications related to the patents-at-issue in this case?

A.      Yes, they are.

Q.      And did you review those applications as part of your work on the case?

A.      I certainly did.

Q.      And did you rely on them in forming your opinions?

A.      Yes.

MR. NEMUNAITIS:  Your Honor, we move to admit exhibits PTX 2, PTX 4, PTX 5, PTX 15, 16, 17, 19, 20, 21, 22, 24, 25, and 26.

THE COURT:  Any objection?

MR. DYESS:  Your Honor, no objection.  I would make a request, and you did it this time, just identify the tab because they don't wind up in the exhibit.

THE COURT:  Just ask the Court if you have a request.  So you're asking to say the tab they're speaking of?

MR. DYESS:  Yes.  The tabs aren't exhibit numbers.  They're just tabs.

THE COURT:  Okay.  Fair enough.  We'll ask Plaintiffs' counsel.  Thank you.  They're admitted.

(Thereupon, Plaintiffs' Exhibits 2, 4, 5, 15, 16, 17, 19, 20, 21, 22, 24, 25, and 26 were admitted.)

MR. NEMUNAITIS:  Could you zoom out, Mr. Diaz?

BY MR. NEMUNAITIS:

Q.    Now, what's listed below this related U.S. application data labeled "References Cited" there?

A.    Well, "References Cited" is just a listing of prior art references, and it's going to include other patents, documents, papers that were written, newspaper articles, all kinds of different information.

And that has to be disclosed to the application because, you know, reference to prior art for the examiner, and the examiner is also looking at their own prior art they find.

MR. NEMUNAITIS:  And if we could skip ahead to Claim 1, Mr. Diaz.

BY MR. NEMUNAITIS:

Q.    What's the purpose of the patent claim?

A.    Well, the patent claim is a legal description of the invention.  As you were instructed in the video, it's like a description -- a legal description of the invention, and it tells potential infringers, you know, this is the property -- intellectual property that's claimed, stay away or license it or whatever.

Q.    Is this what you focused on to decide infringement in this case?

A.    It sure is.

Q.    Can we move on to talking about the test for infringement.

       Can I have my slides back, slide number 9.

A.    Yes.

Q.    How do you determine direct infringement?

A.    Well, direct infringement requires that each and every element of a claim is, like, copied or used or infringed upon in order to make a competing invention, for example.

Q.    So do you have to check off all the boxes?

A.    Yes.

Q.    Is that the only way to infringe a claim?

A.    Yes.  Well, directly infringe a claim.

Q.    Are there indirect ways to infringe a claim?

A.    Yes, there are.

Q.    What is contributory infringement?

A.    Well, contributory infringement is selling a component of a patented process knowing that it will be used to infringe.

Q.    And what about induced infringement?

A.    Intentionally acting to encourage or influence someone else to infringe.

Q.    Of these three types of infringement, which ones did the defendants do in this case?

A.    Contributory and induced infringement.

Q.    All right.  Mr. O'Keefe, what was the next topic we're going to move on to?

A.    I want to talk about the defendants' refined coal operations.

Q.    Were you here for Mr. Pavlish's testimony?

A.    Yes.

Q.    Do you remember him showing this slide?

A.    Yes.

Q.    Now, I believe Mr. Pavlish testified that he thought a number of the power plants at issue in this case might be using activated carbon.  Was he right about that?

A.    Yes.

Q.    As part of your investigation, did you look into whether the power plants were also using refined coal?

A.    Yes, I did.

Q.    And did you look into where the chemicals for preparing refined coal were being applied to the coal?

A.    Yes, I did.

Q.    And where did that occur?

A.    It occurred between the coal pile and the power plant.  Mainly, it's shown here in the diagram as a pulverizer.  That's where the power plant begins.

Q.    What was the process that Defendants used to add chemicals to the coal to prepare refined coal?

A.    They sprayed the two chemicals onto the coal as it was passing through the refining plant on the way from the coal pile to the pulverizer.

Q.    And who brought the coal into the coal pile?  Was that the power plant or the refined coal defendants?

A.    The power plants did.

Q.    And then did the defendants take possession of that coal on the conveyer belt?

A.    Yes.  They bought it from the power plant for a certain dollar amount at the time.

Q.    And then what did they do after they bought it?

A.    Well, they would refine it.  They'd spray it onto the two chemicals, and then they sold it back to the power plant

for less money than they paid for it.

Q.     Why did they sell it back for less money than they paid?

MR. DYESS:  Objection, Your Honor.  Can we approach, Your Honor?

THE COURT:  You may.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  All right.

MR. DYESS:  The objection is he was asked the question why did they do something.  He isn't asked to testify what evidence did he see.  He's asking why is a state of mind -- why is an intent statement, and you ruled he cannot testify to these things.

THE COURT:  That sounds correct.

MR. NEMUNAITIS:  I'll withdraw the question.

THE COURT:  Okay.  Great.

(The discussion at sidebar ended.)

THE COURT:  Plaintiffs' counsel is withdrawing the question.

BY MR. NEMUNAITIS:

Q.     Mr. O'Keefe, did you see any evidence to explain what financial benefits the defendants received from selling refined coal at a loss?

A.     Yes, I did.

Q.     What's that?

MR. DYESS:  Your Honor, we have another objection.  Can we approach?

THE COURT:  Let's go to sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  Okay.

MR. DYESS:  I think we're going to have to deal with this a few times.  We might as well deal with it now.

There are a number of subjects that Mr. O'Keefe is not qualified to testify to in this case.  He has not testified that he has any background on reviewing the financial information, the financial operations of a power plant.

He's been qualified to talk about the operations of boilers and combustion rooms and things like that, but he's about to give testimony about the financial incentives that pass between clients.

We think this is one of those areas where he is simply casting the facts that the plaintiffs want him to testify to, and you said we would take that up at the time.

He's not qualified to give opinions on things like financial incentive, indemnities, things like that.  Here's the first one.  It's financial incentives.

THE COURT:  You mentioned that I said we would take this up at the time.  Are you referring to an order?

MR. DYESS:  The order on the Daubert motion

where you denied the motion and said, I'm paraphrasing, I'm not going to read through every opinion in his report to see whether he's qualified to give each individual one, or if it's a fact-casting exercise, but we can take it up contemporaneously.

THE COURT:  Do the parties have the prior order on them?

MR. DYESS:  I do at the table, Your Honor.  I apologize.  Apologize.  I just have one copy, Your Honor. The reference I'm specifically making is to footnote 15.

THE COURT:  I think you're saying footnote 9.

MR. DYESS:  I'm sorry, footnote 9 on page 15. I'm sorry, Your Honor.

THE COURT:  So the portion of the Daubert opinion that counsel is referring to is a portion in which I cited certain statements in Mr. O'Keefe's report that I thought was improperly making commentary on the state of mind of the defendants.

And then there's a paragraph thereafter where I said beyond statements like these in which Mr. O'Keefe proffers specific opinions with respect to intent, motive, and state of mind, his opinions regarding the underlying facts that may show state of mind may be relevant to other claims or defenses are not necessarily improper.

And the footnote 9 says the Court notes that

Defendants call out Mr. O'Keefe for including long fact-recasting narratives in portions of his reports while some Courts have noted it's improper for an expert to engage in unnecessarily long summaries of the facts in evidence that are not sufficiently connected to their opinions on issues within their technical expertise...the Court cannot now necessarily conclude Mr. O'Keefe will do this at trial.

That's the footnote you're referring to?

MR. DYESS:  If I could, Your Honor, in the same order you pointed out the appropriate expert witness standard, which is on page 3 of that order.  The 702 year -- must order whether the expert witness has specialized knowledge regarding the area of testimony.

They haven't offered him of having any specialized knowledge in these financial incentives areas. They offered him on the operation of a power plant.  He's testified about boilers, that type of thing, but not financial incentives.

THE COURT:  Mr. Nemunaitis, what's the nature of the testimony that Mr. O'Keefe is about to deliver with regard to tax credits, and what's your response to Mr. Dyess's objection?

MR. NEMUNAITIS:  It's really meant to be a segue question to explain the difference between tax credits and contributory infringement that's come up a number of times

so I didn't want to -- the ruling is he can opine on his ultimate conclusion of induced contributory as well as marshall the evidence in support to providing the financial background as to why this makes sense will seem appropriate to provide context of his opinions and why he found infringement.

THE COURT:  More specifically, so we have a witness here who's proffered as an expert witness with regard to infringement and validity.  Technical expert, obviously.  To some extent, the defendant is objecting because it sounds like your witness is going to start talking about economics and tax credits and which people use them and why they do it.  What is the connection between the infringement analysis, the technical infringement analysis that Mr. O'Keefe is going to give, and, like, an extended discussion of a Section 45 tax credit program or its import or factually to it?

MR. NEMUNAITIS:  I'm not intending any extended discussion on this.  I really meant this to be background to move into it.  But I believe the ruling at the hearing was that he can identify the elements attributable to inducement and make sure he checks everything off in order for that to make sense to say there's an e-mail where a certain person is receiving communications of JPMorgan.  It would be helpful to understand why the parties are communicating like

this.  That's part of marshalling the evidence that experts do.

THE COURT:  I'm asking about the connection between the financial -- I think I understand your point to the extent there is information he reviewed that is directly related to his infringement analysis that he's doing.  I'm asking he may be able to speak to that, but the content of what's happening here, I'm not seeing you make that connection.  I guess part of the question is, do you need to go this route here?  Are we arguing about something that maybe...

MR. NEMUNAITIS:  I would like for him to be able to say "tax credits."  That would seem to be a relevant part of this to explain one of the elements of induced infringement, is inducing them, and the financial incentive is a big part of that.  It was in his report and appropriate for him to provide that information.  Since he can't opine on state of mind, he has to opine on circumstantial evidence.

THE COURT:  I think the opinion has -- at least some reference to the Section 45 tax credit program may be necessary to reference a fact relevant to an aspects of the infringement analysis that the induced infringement analysis -- what contributory infringement, the extent it plays, why that is the motive for causing.  That, I think,

is the argument.

MR. DYESS:  And, Your Honor, that's the point we're making with this objection.  He has no expertise that allows him to do that.  And I want want to make sure the distinction is clear here.  If he's giving opinions on the direct infringement of a power plant, what do they put on the coal, how does the coal move through, how do they burn it, we're not going to cross him on those things.  We're not objecting to him giving this testimony.

But keep in mind, Your Honor, in order to prove induced infringement, if he's giving an opinion that we induced infringement, he has to testify that we intended to cause somebody to infringe.  How in the world is he going to do that?

THE COURT:  He's not going to speak directly to the issue.  He's not going to say, "I conclude that they intend to do it."  That's part of the problem.

MR. DYESS:  Counsel, he just said from that stand that we induce infringement of these patents.  How can he reach that conclusion unless he has reached the opinion we intend to cause infringement?

THE COURT:  Let me see.  I thought I made it clear by showing what I'm thinking so it is clear.  There's a distinction, I think, that the Courts make and the Federal Circuit makes that in the one area that is clear and seems

to be the third rail is an expert can't speak the words "I conclude that a defendant" -- or plaintiff in this case -- "defendant intended to do -- I conclude that they had the state of mind of X."

Can't use that phraseology.  The expert, though, can give an opinion on the overall issue of infringement, whether there's direct infringement, indirect infringement. But the thing Courts seem to point the expert to stay away from is specifically talking about the intent and what is their intent.  Here, I ruled that Mr. O'Keefe can't say those words.  He can't say, "So I believe Defendant X intended -- I believe that Defendant X had the state of mind that blank."

Otherwise he could speak to elements and provide the overall opinion that he concludes that there is infringement, and that's the line that at least I think the Courts are drawing and I was trying to draw.

MR. DYESS:  There are statements in his report, certainly, where he opines about what the intent of parties are, and I realized --

THE COURT:  Ruled he can --

MR. NEMUNAITIS:  -- not do that.

MR. DYESS:  I don't know how he gets from A to Z without crossing the bridge.

THE COURT:  Ultimately, evidence will come into

the case and the closing arguments, to the extent there's evidence that has been made or otherwise been provided, that Plaintiffs speak to the issue. They're going to argue that in closings. The expert is not going to say the words "I believe they intended." That's what they cannot do.

MR. DYESS: And, Your Honor, apologies. We may have gotten far afield from the original objection. Our objection is here is -- he doesn't have the expertise to give the testimony that he was going to elicit.

THE COURT: And Mr. Nemunaitis' response when I asked that, what's the connection of the CERT and any connection to Section 45 tax credits, Mr. Nemunaitis said it speaks to the issue of relating to the issue of causing infringement with regard to induced infringement, the motive behind it. What is your answer to that?

MR. DYESS: Again, motive behind it, Your Honor, I think is an issue that crosses the line and he doesn't have the expertise to evaluate the motive behind it.

THE COURT: Anything further, Mr. Nemunaitis?

MR. NEMUNAITIS: He's certainly not going to speak to anyone's state of mind, but he can marshall the evidence to support the elements of contributory induced infringement. He can talk to cause.

MR. DYESS: Your Honor, this is -- you're not going to hear from any of our power plants. That was not

our power plant you just heard from.  What they're trying to do is have -- they're trying to have Mr. O'Keefe substitute for the power plant as to the inducement, and we just think that's improper in this instance.  Beyond his technical expertise, it's not based on anything from the power plant.

MR. NEMUNAITIS:  The state of mind of the power plant doesn't matter.  They're the direct infringers.

THE COURT:  And that's correct.  Were you suggesting otherwise?

MR. DYESS:  I wasn't suggesting otherwise.  However, they're claiming we induced the power plants to infringe.

THE COURT:  Okay.  I think let me tell you what my ruling is here.  So I'm going to deny the objection in the following way.  I think the original statement about the basis for the objection was that it was based on my Daubert ruling because we've had a Daubert process.

So we've had an opportunity for the parties to make the best Daubert arguments and for me to grant them or deny them.  Certainly, if a party is doing something in violation of my Daubert ruling, that's something I'll enforce.  They continue do it, but I think Defendants' counsel's statement was the thing that's happening here that is potentially in violation of my ruling related to footnote 9, talking about the issue of fact, recasting narratives.

There may be a point if the testimony gets so extreme in terms of going through every fact in the record and gets far afield of the elements of infringement where I might invoke that footnote.  I don't think we reached that point at this stage.  Otherwise, I'm not going to order that in no way can Mr. O'Keefe make no reference to Section 45 tax credits.

I don't know exactly what the scope is.  I suggest to the plaintiffs' side that testimony -- the further it gets afield from things like technical aspects of infringement and elements of infringement could be too far, and for various reasons, it could be problematic in the future.  I'd limit it, but for now, I'm not going to make a blanket ruling he can't speak to it at all because I do think there's at least some relationship between that issue and elements of infringement because we talk about induced infringement here.  We're causing that.  Causing something is at issue.

I'll deny the objection for now and I caution Plaintiffs if he gets too deep with the weeds of economics and tax policy so it's clear he's speaking on something outside the limbed purpose.

MR. DORSNEY:  For purposes of record, the witness was not offered to be the expert in the field of economics and the field of any of the motive surrounding

those claims for contributory inducement; correct, Your Honor?  He's not offered as an expert in those fields.

THE COURT:  I can almost barely hear you.  I think what you're saying is you want a clarification on the record that the witness is not being offered as an expert in economics.

I think everybody knows that.  We know what the witness is being offered for.  I don't understand that comment.  I don't understand that comment because we know exactly what the expert witness has been offered for.  They have listed in the record all the things he testified to, including infringement.  There's no reason to say that because we all know the witness is not being offered.

MR. DORSNEY:  As an economic.  He's going to testify as to the financial motive.  I thought he was going to testify to the financial motive for why they would have --

THE COURT:  It has been proffered that at least some testimony with regard to these tax credits has run into the issue of induced infringement because an element of that claim is causing infringement and the plaintiffs' case is, their assertion is, that in some way these tax credits relate to this causation, that reason for the causation.

I'm saying on that basis, it has to be a small group of questions to be asked.  I'm not saying it can't be

asked.  I'm not sustaining the objection.  We all know what the the experts have been offered for.  It's listed, and we know the witness is not an expert in economics.

Thank you.

(The discussion at sidebar ended.)

THE COURT:  Mr. Nemunaitis, you want to re-ask the question?

BY MR. NEMUNAITIS:

Q.     Mr. O'Keefe, did you come across evidence that the defendants generated tax credits in connection with their sales of refined coal?

A.     Yes.

Q.     Now, the jury has heard something about these tax credits and EPA regulations.  Can you make sure everybody is clear on the differences between those things?

A.     Sure.

Q.     Can you explain what the refined coal tax credits were and what the time period was for that?

A.     Sure.  The refined coal tax credits started in January 1, 2011, and tax credits ended on December 31, 2021, so in that time period, anyone who refined coal to help reduce mercury by at least 40 percent and NOx by at least 20 percent got a 5 to $7 per ton tax credit on refined coal.

And this was enacted by Congress, and they gave power to the --

MR. DYESS:  Your Honor?

THE COURT:  Mr. O'Keefe, can you pause for a second?

Mr. Dyess?

MR. DYESS:  This is the objection we discussed, Your Honor.  This is far afield from his technical expertise.

THE COURT:  And I overruled the objection for now, and I will still overrule it.  We'll see how much information is gone into this area, and I'll allow you at some point to raise it again.

BY MR. NEMUNAITIS:

Q.    When did the EPA regulations go into effect?

A.    Well, the EPA regulations were much later.  They began in 2015 and 2016.  Some of the plants had to comply in 2015 and the rest in 2016.

So it began about five, six years after the 40 percent refined coal tax credits enacted by Congress through the IRS.

Now, EPA tightened the regulation standard to 90 percent, so it went from 40 percent to 90 percent of mercury had to be removed from the emissions before they went up to smokestack.

Q.    All right.  Can we talk about the defendants in this case and what they did?

A.    Sure.

Q.    There's a number of defendants that have been named. Did you analyze infringement for each defendant?

A.    Yes.

Q.    Do you remember in opening when Mr. Caldwell put up the board and started identifying the names of the defendants?

A.    Yes.

Q.    And do you have a slide that's similar to that to identify each of these defendants?

A.    Sure, yes.

Q.    Oh, I'm sorry, I forgot to ask a question.

What is the infringement time period for your analysis?

A.    Well, the infringement time period begins July 17, 2019, which is when the lawsuit was filed by ME2C, and the time period extends to when the tax credits ended for refined coal, which is December 31, 2021.

Q.    So when the jury is looking at the actions and the refined coal that matters, is that the time period they need to focus on?

A.    Yes.

Q.    All right.  Can we move on to talking about the different defendants in this case?

A.    Yes, we can.

Q.    Who are the CERT contracting defendants?

A.    Well, the CERT contracting defendants, as the name implies, wrote the contracts for the power plants that directly infringe, and I listed all those plants in the bottom of the slide.  I believe there were eight of them all together, and they directly infringed the patents.

Q.    Who were the CERT operating defendants?

A.    The CERT operating defendants constructed and operated the refined coal facility at the infringing power plants.

Q.    And did the CERT operating defendants operate the sprayers that provided refined coal to what's labeled here as directly infringing power plants?

A.    Yes, they did.

Q.    What are the CERT partners?

A.    The CERT partners oversaw the CERT operating entities, the CERT contracting defendants, and the CERT operating defendants.  The CERT partners were Jeff Green, Leah Schaatt, Raymond Bean, and Barr Linton.

Q.    And who are the CERT investors?

A.    They were the people who "upfronted" the money to build the refined coal facilities, or they assumed ownership, like a certain percentage, and they received the tax credits.

Q.    And can we illustrate that on the slide?

A.      Yes.

Q.      And what did the CERT partners get out of this arrangement?

A.      Well, they got paid from the investors, JPMorgan, Kiewit Mylan --

MR. DYESS:  Objection, Your Honor.

THE COURT:  I'll -- let me hear the objection.

MR. DYESS:  Your Honor, again, this is very far afield from Mr. O'Keefe's technical expertise as a plant engineer.

THE COURT:  Mr. Nemunaitis, it seems to.

MR. NEMUNAITIS:  That was my final question, and I can move on.

THE COURT:  I'm going to sustain that objection and strike the question and beginning of the answer.  Okay.  Thank you.

Please continue.

BY MR. NEMUNAITIS:

Q.      All right.  Mr. O'Keefe, can we move on to the direct infringement part of your analysis?

A.      Sure.

MR. NEMUNAITIS:  Your Honor, I have some foam boards if I could have a moment to set those up.

THE COURT:  You may.

MR. DORSNEY:  Your Honor, we reached an

agreement to move the easel out of the way.

THE COURT:  The parties can discuss it.

(Off the record.)

BY MR. NEMUNAITIS:

Q.     Can you see that, Mr. O'Keefe?

A.     Yes.

MR. DYESS:  I'm sorry, Your Honor.  I believe the agreement was to move it a little further so we could also see the exhibit.

THE COURT:  And certainly counsel -- counsel can feel free to move their chairs if they wish.

BY MR. NEMUNAITIS:

Q.     Can you still see it, Mr. O'Keefe?

A.     Yes.

Q.     What is shown on that foam board, Mr. O'Keefe?

A.     Well, Claims 1 and 2 of the '517 patent.

MR. NEMUNAITIS:  It's a bit far from the lectern, Your Honor.  May I be free to move back and forth?

THE COURT:  You may be free, but keep your voice up if you're speaking.

BY MR. NEMUNAITIS:

Q.     All right.  Mr. O'Keefe, this first section here says, "A method for reducing mercury in a mercury-containing gas."

Did you find evidence that that limitation was

met by each of the power plants at issue in this case?

A.    Yes.  Incidentally, that's known as a preamble of the claim.

Q.    And how do you know that that limitation is met by each of the power plants at issue in this case?

A.    From my analysis and research.

Q.    And any dispute that they need to comply with the MATS regulations?

A.    Yes, they do.  I mean, MATS came into effect in 2015, 2016 and required a 90 percent reduction in mercury emissions.

Q.    Can I check that one off?

A.    Yes.

Q.    All right.  Mr. O'Keefe, the next part of this limitation says "combusting coal in a combustion chamber."

      Did you find evidence that that part of the claim was met?

A.    Yes.  Each power plant combusts coal and has a combustion chamber inside the furnace.

Q.    Any dispute about that?

A.    No.

Q.    The next part says, "The coal comprising an additive comprising Br2, HBr, a bromine compound, or a combination thereof to form a mercury-containing gas."

      Did you find evidence that that limitation was

met?

A.    Yes.

Q.    Could you turn to tab 17 in your binder.  Can you tell me what that document is?

A.    It is the Material Safety Data Sheet for MerSorb, which is one of the chemicals sprayed on coal during the refining process.

Q.    And is that something you reviewed in this case to prepare your report?

A.    Yes, it was.

MR. NEMUNAITIS:  Your Honor, we'd move to admit PTX 125.

THE COURT:  Any objection?

MR. DYESS:  No, Your Honor.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 125 was admitted.)

MR. NEMUNAITIS:  Mr. Diaz, can I have slide 34? Mr. Diaz, can you please bring up PTX 125?

BY MR. NEMUNAITIS:

Q.    All right.  Mr. O'Keefe, what does PTX 125 say about what MerSorb is?

A.    Well, it lists the chemical composition of MerSorb, which is one of chemicals sprayed in the refining process.

Q.    Is MerSorb a bromide compound?

A.      Yes, it is.  It's listed in the data sheet.

Q.      And was MerSorb sprayed on all the refined coal sold to the power plants at issue in this case during the damages period?

A.      Yes, it was.

Q.      Can we check off this limitation?

A.      Yes.

Q.      Now, the next limitation requires collecting mercury in the mercury-containing gas and -- let me stop there. What equipment at the power plants at issue in this case actually collects the mercury?

A.      There's two devices.  One or both could be used. They're known as a baghouse and electrostatic precipitator, ESP.

        MR. NEMUNAITIS:  And can you give me my slide number 22, Mr. Diaz.

BY MR. NEMUNAITIS:

Q.      And is the baghouse or ESP shown on this slide?

A.      Yes, it is.

Q.      Did you confirm that all the power plants at issue in this case employ a baghouse or ESP?

A.      Or both, yes.

Q.      Can you explain how one of these devices actually collects the mercury?

A.      Sure.  We can first talk about the baghouse.  The

baghouse is, essentially, a box where the dirty flue gas or combustion gases are directed into, and this box contains a fabric filter a lot like your vacuum cleaner at home.  And the filter attracts particulate matter containing mercury and fly ash and drops it off, when it accumulates sufficiently, into the hoppers where it's removed from the bottom, and the clean gas passes out of the filter elements, and it's passed up the stack.

Q.    If we zoom in on one of the filter elements, can you explain how that collects the mercury?

A.    Sure.  Like, I think I mentioned the filter itself is made out of fabric material.  So it passes the combustion gases through, but it collects particulate matter like fly ash and particles of carbon containing mercury.  And that particulate matter is dropped off in ash hoppers that accumulates on the filter, and it's removed from the combustion gas.  So the clean gas passes out of the filter.

Q.    What is pre-coating material?

A.    Well, the particulate matter is abrasive, and the pre-coating material helps to improve the strength of the filter elements of the baghouse.  It helps reduce wear and helps the filters last longer.

Q.    Can you explain how an ESP or electrostatic precipitator collects mercury?

A.    Sure.  The electrostatic precipitator uses static

electricity to attract the particulate matter to either plates or rods that are positively and negatively charged electrically. And when the plates and rods accumulate a certain amount of ash, they're shaken, and the ash falls off. The particulate matter falls off into ash hoppers down below. So it operates a lot like a baghouse, but it uses static electric charges. So the clean flue gas is passed out of the ESP up to the stack.

Q. All right. Mr. O'Keefe, if we can look back at the claim language, it continues that "the collecting mercury and mercury-containing gases with a sorbent added to the mercury-containing gas, the sorbent comprised of activated carbon."

Did you find evidence that that element is met?

A. Yes.

Q. Did the defendants ultimately admit that all of the power plants at issue in this case use activated carbon?

A. Yes, they did.

Q. Can you turn to Tab 18 and tell us what that document is.

A. Yes.

Q. What is that document?

A. It's the defendants' objections and responses to the plaintiffs' first request for admission to Defendants.

Q. And is this something you reviewed and relied on in

preparing your report?

A.    Yes.

MR. NEMUNAITIS:  Your Honor, we move to admit PTX 598.

THE COURT:  Any objection?

MR. DYESS:  No objection.

THE COURT:  Mr. Nemunaitis, you have time for one more question left.  We're just about at 5:00.

(Thereupon, Plaintiffs' Exhibit 598 was admitted.)

BY MR. NEMUNAITIS:

Q.    What did each of the contracting defendants admit with regard to the use of activated carbon pertaining to the power plants in this case?

A.    Well, they admitted that the infringing power plants are using activated carbon.

MR. NEMUNAITIS:  Is now a good time to stop, Your Honor?

THE COURT:  I think so.  You could have maybe got one more in, but we're going to cut it off there.  So we'll conclude the testimony for today.  We want to thank our jurors as always, and we'll have our jury removed.

THE CLERK:  All rise.

(The jury exited the courtroom.)

THE COURT:  Mr. O'Keefe, you may step down.  We

can leave the exhibits over there.  They'll be used tomorrow.

All right.  Is there anything -- oh, let me say a couple things that came to mind.

On the excusing-the-witness issue, we looked up what the language was from the pretrial order, and -- I'm not finding it here, but I think the gist -- oh, yeah, it says something to the effect of fact witnesses for the jury trial, other than witnesses who have already testified and have been excused, shall be sequestered.

Now, it's always possible the witness who testifies could be recalled.  And so if there's request to excuse but the other side objects, I don't know whether a recall could happen.  And the whole point of sequestration is so the witness's testimony is not unfairly infringed by what they see in the trial.  Under that circumstance, I'm not going to allow the request for excusal, so that's further on what was going on.

And there's one other thing I wanted to say just because I know it's something I think the parties wanted to talk about possibly this morning, and I just noted it.  I think there was a part of Mr. O'Keefe's slides when we get to the elements that deal with intent, and there's, like, some boxes that say "knew that," et cetera.  And then it looks like the boxes are going to be checked off as if he's

saying "I think they knew" or "I opined they knew."

When I saw that, I was concerned that may get too close to the line that we don't want the expert witness directly and specifically opining on state of mind.  So unless there's a fight about it, I was going to suggest to the plaintiffs that they reconfigure their slides so they don't appear as if Mr. O'Keefe is opining on state of mind in that direct way.

Any issue with that Mr. Nemunaitis?

MR. NEMUNAITIS:  No.  We had proposed a new version of that that was sent over, and it just didn't get into the e-mail to Your Honor.

THE COURT:  Fair enough.  Okay.  All right. Then let me ask before we conclude, is there anything the parties think I need to address before the end of the day?

Mr. Nemunaitis, on Plaintiffs' side?

Mr. Caldwell?

MR. CALDWELL:  Is there a point at which we could maybe reconcile where the parties are on time allocations?  Because I know some things are sort of maybe up for determination about Your Honor in terms of allocation and whatnot.  I'm just wondering if, at some point, between now and before the end of the night, whatever, at some point, if we can sort of see where we are at least in terms of your chess clock?

THE COURT:  Oh, yeah.  In fact, at the end of every day, our courtroom deputy or clerk should be coming out to confirm with you what our numbers are.  I think that was done last night.

MR. DORSNEY:  It was, Your Honor, and we plan to do so again.

THE COURT:  Okay.  And we're going to do it again tonight after court just to make sure you're on the same page.

Anything from the defendants?

MR. DYESS:  No, Your Honor.

THE COURT:  So I'll wish you a good evening and look forward to seeing you tomorrow.  With that, the Court will stand in recess.

# C E R T I F I C A T E

I, Deanna L. Warner, a Certified Shorthand Reporter, do hereby certify that as such Certified Shorthand Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings.

_____
Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. District Court

## $

**$0.08** [2] - 475:23, 476:17
**$1,424,924** [1] - 475:17
**$1.15** [1] - 438:19
**$107,000** [3] - 475:20, 475:22, 476:14
**$200,000** [1] - 395:25
**$205,223.88** [1] - 399:11
**$28** [1] - 398:22
**$30** [1] - 438:4
**$300** [1] - 534:7
**$32** [1] - 459:25
**$400,000** [2] - 394:25, 395:5
**$600,000** [1] - 395:16
**$675,000** [1] - 393:21
**$900,000** [2] - 394:3, 479:6

## '

**'013** [1] - 414:1
**'03** [3] - 304:21, 311:15, 314:24
**'04** [5] - 279:3, 304:23, 311:15, 314:24, 322:21
**'05** [1] - 408:12
**'06** [1] - 408:12
**'11** [1] - 403:5
**'114** [17] - 278:24, 279:20, 320:23, 321:20, 322:7, 323:24, 343:18, 358:3, 373:18, 373:24, 384:3, 429:21, 432:8, 432:9, 432:14, 433:3, 540:20
**'14** [3] - 330:16, 458:24, 459:11
**'147** [28] - 335:17, 350:17, 350:22, 350:23, 367:11, 367:15, 367:16, 368:16, 368:18, 368:21, 375:5, 375:18, 375:20, 385:16, 410:10, 410:13, 410:24, 418:19, 418:21, 420:11, 420:20, 421:23, 422:4, 422:5, 428:7,

495:24, 497:5
**'15** [5] - 330:17, 458:10, 459:11, 462:12, 505:15
**'16** [4] - 330:17, 458:10, 458:24, 459:11
**'18** [1] - 322:16
**'19** [1] - 322:16
**'20** [1] - 322:16
**'204** [1] - 283:18
**'50s** [1] - 445:22
**'517** [44] - 278:13, 278:15, 278:20, 279:5, 279:10, 280:4, 280:9, 281:15, 281:24, 283:17, 284:14, 285:3, 288:20, 320:23, 322:4, 343:18, 345:1, 347:3, 347:6, 347:14, 347:20, 349:20, 352:18, 352:23, 357:13, 358:14, 358:22, 361:5, 362:9, 373:18, 374:2, 374:16, 374:18, 375:6, 375:17, 384:3, 429:21, 432:10, 432:11, 432:14, 433:3, 540:20, 545:13, 568:16
**'92** [1] - 402:22
**'93** [2] - 402:23, 402:24
**'flue** [1] - 417:22
**'nother** [1] - 397:22

## 0

**077** [1] - 507:9
**091** [1] - 374:1

## 1

**1** [27] - 281:13, 306:9, 310:14, 311:3, 311:4, 320:17, 320:22, 321:2, 357:8, 357:9, 359:15, 359:22, 363:13, 365:16, 376:4, 376:10, 410:16, 448:17, 448:19, 454:17, 475:17, 499:3,

532:18, 540:21, 548:2, 563:20, 568:16
**1(a** [1] - 487:11
**1,250** [3] - 483:22, 484:17, 485:6
**1.4** [2] - 475:22, 476:16
**1.424,924** [1] - 475:16
**1.5** [1] - 383:10
**1.57** [1] - 349:12
**1.57(d** [2] - 361:22, 362:2
**1.6** [1] - 384:19
**10** [19] - 301:3, 302:12, 305:11, 305:13, 321:16, 355:7, 375:15, 382:10, 382:16, 392:4, 392:15, 401:14, 401:17, 401:20, 403:19, 405:13, 421:23, 487:10, 503:5
**10-K** [11] - 402:1, 481:19, 481:23, 481:25, 482:3, 482:6, 486:23, 500:12, 501:1, 514:8, 514:9
**10-Ks** [1] - 481:10
**100,000** [1] - 475:21
**101** [1] - 273:16
**104** [5] - 408:17, 408:19, 408:25, 409:4, 410:4
**107,000** [1] - 475:22
**10:22** [1] - 303:21
**10ish** [1] - 393:5
**11** [4] - 374:23, 487:19, 507:12, 508:16
**112** [6] - 349:14, 361:21, 411:10, 411:24, 412:1, 412:6
**11:00** [1] - 370:3
**11:48** [1] - 273:4
**11th** [2] - 305:4, 522:25
**12** [8] - 368:15, 369:5, 369:6, 375:25, 376:4, 376:10, 454:25, 478:3
**120** [1] - 361:19
**120.57(d)** [1] - 363:3
**125** [4] - 570:12, 570:16, 570:19, 570:21
**12:22** [1] - 420:3
**12:30** [2] - 405:19,

419:25
**12:52** [1] - 420:4
**13** [3] - 374:8, 480:4, 483:4
**130** [2] - 491:1, 497:23
**134** [2] - 398:19, 399:5
**14** [9] - 313:6, 375:20, 375:21, 376:1, 442:14, 442:17, 464:13, 479:24, 538:6
**15** [9] - 405:13, 419:22, 472:21, 478:7, 483:4, 546:24, 547:12, 553:10, 553:12
**15-minute** [1] - 513:18
**16** [5] - 313:6, 383:21, 546:13, 546:24, 547:13
**168147** [1] - 375:2
**17** [15] - 309:23, 309:24, 321:7, 321:9, 331:23, 332:1, 332:5, 335:8, 374:3, 374:7, 375:16, 546:24, 547:13, 565:15, 570:3
**18** [7] - 299:18, 379:16, 380:2, 380:4, 411:20, 538:16, 573:19
**19** [21] - 377:18, 377:22, 380:22, 381:2, 381:11, 381:13, 382:22, 384:10, 385:7, 386:8, 390:22, 393:2, 419:11, 419:12, 419:14, 425:14, 425:17, 546:24, 547:13
**19-CV-1334-CJB** [1] - 271:6
**1904** [1] - 299:21
**1934** [1] - 483:5
**1995** [1] - 538:8
**1998** [1] - 543:18
**19th** [2] - 300:19, 302:6

## 2

**2** [31] - 285:10, 285:11, 285:12, 311:2, 343:22, 348:21, 350:18, 360:23, 362:5, 363:14,

366:2, 366:17, 366:23, 367:11, 374:10, 375:12, 382:23, 384:10, 447:1, 455:23, 455:25, 456:2, 491:9, 496:14, 499:3, 532:18, 546:24, 547:12, 568:16
**2.1** [3] - 384:11, 426:17, 426:23
**2.5** [1] - 479:6
**2.7** [1] - 394:6
**20** [22] - 305:9, 305:16, 306:3, 306:6, 325:20, 332:20, 332:24, 377:18, 378:11, 380:22, 381:2, 381:16, 382:13, 385:7, 394:19, 405:13, 443:15, 460:12, 534:15, 546:24, 547:13, 563:23
**20-teens** [2] - 505:14
**200** [1] - 442:22
**200,000** [1] - 399:7
**2000s** [3] - 408:6, 435:7, 435:10
**2002** [5] - 293:18, 293:22, 295:1, 314:23, 320:15
**2003** [13] - 295:1, 295:7, 295:10, 295:18, 299:18, 300:2, 300:10, 304:4, 304:5, 304:15, 304:16, 305:4, 307:24
**2004** [25] - 279:4, 281:17, 306:3, 306:6, 307:24, 308:23, 309:17, 317:14, 317:19, 319:4, 319:24, 321:11, 338:11, 343:15, 353:11, 357:16, 358:15, 359:7, 371:8, 374:3, 405:21, 407:4, 407:22, 408:12, 429:17
**2005** [7] - 311:22, 312:12, 315:7, 405:21, 407:4, 407:22, 407:23
**2006** [1] - 407:23
**2007** [4] - 446:17, 446:18, 527:12,

527:20
**2008** [7] - 318:10, 318:25, 429:8, 440:23, 446:18, 452:24, 454:3
**2009** [7] - 375:2, 461:14, 478:12, 505:22, 506:8, 507:5
**201** [4] - 497:24, 498:21, 499:8, 499:12
**2010** [6] - 330:5, 402:24, 403:4, 479:23, 480:14, 480:17
**2010/January** [1] - 480:2
**2011** [9] - 454:4, 454:17, 480:1, 480:2, 483:19, 483:22, 485:6, 522:11, 563:20
**2012** [19] - 330:6, 335:18, 335:25, 385:18, 408:16, 408:22, 410:5, 410:15, 410:16, 413:18, 418:21, 432:2, 432:14, 432:16, 452:24, 507:12, 522:11, 522:25, 523:14
**2013** [4] - 330:11, 411:11, 413:13, 414:5
**2014** [17] - 325:7, 325:17, 402:22, 402:24, 407:13, 414:6, 414:15, 458:5, 458:10, 458:24, 459:18, 462:12, 509:11, 522:11, 527:13, 527:17
**2015** [7] - 330:13, 414:15, 454:21, 459:21, 564:15, 564:16, 569:9
**2015ish** [1] - 431:4
**2016** [7] - 414:15, 458:5, 459:22, 459:24, 564:15, 564:16, 569:10
**2017** [22] - 322:12, 322:16, 326:20, 408:7, 414:16, 414:21, 415:10, 418:8, 461:1, 479:5, 479:10, 480:14, 481:19, 501:10,

514:9, 514:18, 515:8, 516:13, 517:10, 517:11, 518:12
**2018** [15] - 340:7, 418:8, 418:9, 481:23, 482:18, 483:21, 484:10, 486:16, 487:1, 500:22, 501:10, 503:7, 514:18, 518:13
**2019** [21] - 279:6, 279:8, 322:8, 335:12, 385:23, 386:2, 407:11, 408:3, 410:12, 413:18, 415:1, 482:1, 486:17, 486:25, 509:3, 510:11, 514:23, 515:5, 518:21, 523:12, 565:16
**2020** [6] - 335:14, 374:19, 482:4, 514:23, 515:5, 523:12
**2021** [8] - 379:5, 437:4, 480:17, 482:6, 527:17, 527:21, 563:20, 565:18
**2022** [3] - 373:4, 504:10, 504:14
**2023** [3] - 411:20, 475:11, 475:13
**2024** [2] - 271:13, 464:13
**21** [10] - 375:22, 376:2, 378:15, 380:23, 381:3, 381:19, 385:7, 395:13, 546:24, 547:13
**217** [1] - 300:22
**219** [3] - 415:8, 419:8, 419:10
**22** [7] - 385:7, 408:22, 410:5, 435:14, 546:25, 547:13, 571:16
**23** [6] - 377:18, 380:23, 381:3, 381:20, 385:7, 395:23
**2385** [1] - 415:16
**24** [3] - 415:10, 546:25, 547:13
**24/7** [1] - 301:14
**25** [10] - 380:2, 380:4, 392:22, 415:10,

453:14, 504:22, 504:23, 508:9, 546:25, 547:13
**26** [2] - 546:25, 547:13
**269** [3] - 379:16, 380:1, 380:3
**27.5** [3] - 398:25, 399:4, 472:8
**277** [2] - 503:4, 503:5
**27th** [1] - 271:13
**28** [4] - 399:1, 399:4, 428:5, 506:8
**280** [2] - 502:1
**281** [1] - 502:2
**28th** [1] - 516:13
**29** [1] - 429:8
**297** [5] - 415:3, 415:12, 416:9, 416:13, 433:19
**2A** [1] - 271:12
**2nd** [1] - 518:22

## 3

**3** [34] - 320:17, 320:22, 321:2, 373:11, 374:16, 375:13, 375:17, 385:1, 392:3, 394:6, 417:7, 426:15, 434:2, 436:10, 457:5, 457:6, 457:11, 478:3, 499:3, 525:23, 526:19, 526:20, 526:23, 527:5, 527:10, 527:15, 528:21, 528:22, 532:18, 540:21, 542:11, 542:13, 545:8, 554:11
**3.1** [2] - 386:7, 427:3
**3.375** [1] - 394:7
**3.4** [2] - 479:7, 479:11
**3.5** [1] - 383:2
**30** [6] - 293:22, 340:19, 452:1, 460:4, 508:9, 525:25
**30-foot** [1] - 453:14
**300** [1] - 447:1
**31** [2] - 563:20, 565:18
**317** [1] - 300:15
**31st** [1] - 487:1
**32** [2] - 460:16, 466:25
**334** [1] - 305:1
**34** [1] - 570:18
**35** [1] - 361:19
**358** [2] - 459:2, 459:6
**359** [2] - 459:2, 459:6

**36** [2] - 504:22
**360** [2] - 459:2, 459:7
**363** [1] - 305:25
**37** [3] - 312:13, 312:16, 361:22
**372** [2] - 481:10, 481:11
**373** [1] - 481:11
**374** [1] - 481:11
**375** [4] - 481:12, 481:17, 514:8, 514:13
**376** [6] - 481:22, 482:10, 482:14, 482:17, 483:12, 500:12
**377** [1] - 481:25
**378** [1] - 482:3
**379** [3] - 482:6, 482:10, 482:14
**39** [3] - 457:15, 457:21, 457:25
**3:15** [2] - 513:18, 513:22
**3D** [2] - 396:17, 396:20

## 4

**4** [23] - 373:11, 375:14, 391:8, 393:4, 394:8, 395:19, 427:3, 438:3, 458:16, 458:20, 478:4, 526:19, 526:20, 527:1, 527:5, 527:11, 527:12, 527:19, 528:21, 528:22, 546:12, 546:24, 547:12
**4.3** [4] - 393:6, 394:19, 394:22, 395:13
**40** [13] - 300:6, 302:3, 305:1, 313:10, 330:3, 330:8, 330:19, 431:15, 431:19, 495:1, 563:22, 564:18, 564:21
**40,000** [1] - 452:1
**400** [2] - 391:15, 392:3
**401** [1] - 324:4
**402** [2] - 324:7, 465:23
**403** [2] - 465:23, 466:10
**424** [1] - 475:16
**45** [21] - 313:11, 313:12, 402:16, 402:19, 403:24, 404:5, 404:15,

409:12, 412:10, 430:8, 430:11, 430:15, 430:21, 437:8, 480:18, 480:21, 480:24, 555:16, 556:21, 559:12, 561:6
**450** [3] - 484:10, 484:17, 485:6
**47** [3] - 457:15, 457:21, 457:25
**48** [12] - 436:11, 448:19, 448:25, 449:4, 449:8, 478:11, 478:14, 478:15, 506:1, 506:5, 506:14, 506:18
**49** [2] - 512:17, 525:24
**4:09** [1] - 415:16

## 5

**5** [20] - 355:6, 375:9, 375:11, 375:14, 375:18, 379:5, 385:17, 389:6, 410:10, 418:19, 418:25, 427:3, 428:7, 463:19, 463:22, 483:9, 525:24, 546:24, 547:12, 563:23
**50** [3] - 313:15, 503:15, 504:6
**50,000** [1] - 451:25
**500** [7] - 389:4, 391:8, 391:15, 392:3, 393:4, 394:8, 395:19
**50s** [1] - 392:21
**54** [2] - 456:8, 456:12
**547** [1] - 476:7
**56** [5] - 509:8, 509:10, 509:14, 509:18
**57** [2] - 542:23, 543:2
**58** [2] - 316:8, 316:10
**580** [3] - 439:14, 439:15, 439:16
**598** [2] - 574:4, 574:9
**5:00** [1] - 574:8

## 6

**6** [6] - 335:11, 375:14, 392:4, 396:3, 470:23, 471:7
**6.1** [1] - 373:5
**60** [3] - 313:25, 460:18, 460:21

**600** [1] - 389:6
**60s** [1] - 392:22
**614** [1] - 289:17
**64** [4] - 308:18, 308:20, 309:5, 309:10
**65** [7] - 311:18, 311:20, 312:1, 312:6, 312:10, 313:25, 534:17
**66** [7] - 315:4, 315:6, 315:10, 315:13, 315:17, 315:21, 316:10
**67** [1] - 293:24
**675** [2] - 393:23, 394:7
**68** [1] - 293:24
**69** [6] - 297:12, 297:14, 298:4, 298:8, 298:11, 304:12
**69.0315** [1] - 299:2
**6:30** [2] - 286:10, 355:8
**6:34** [1] - 278:23

## 7

**7** [3] - 375:14, 396:3, 563:23
**7.1** [1] - 511:14
**70-pound** [2] - 451:18, 452:5
**70-watt** [1] - 388:24
**702** [1] - 554:11
**750** [1] - 454:19
**763** [7] - 471:2, 471:5, 471:6, 471:12, 471:16, 471:19, 472:25
**766** [10] - 376:17, 376:23, 376:24, 378:9, 396:8, 419:1, 419:6, 471:1, 471:19, 471:23
**77** [3] - 507:19, 507:23, 522:20
**7:04** [1] - 299:21

## 8

**8** [7] - 289:11, 375:14, 382:10, 382:16, 392:15, 442:13, 466:25
**8164** [1] - 375:2
**85** [1] - 314:7
**8:55** [1] - 291:1

## 9

**9** [7] - 375:14, 485:11, 548:16, 553:11, 553:12, 553:25, 560:25
**90** [9] - 314:11, 330:20, 330:23, 431:16, 431:21, 437:25, 564:21, 569:10
**900,000** [1] - 394:6
**90s** [1] - 314:10
**92** [4] - 516:8, 516:10, 516:15, 516:19
**97** [1] - 518:16
**9:00** [2] - 286:18, 287:13
**9:50** [1] - 301:9

## A

**a.m** [1] - 278:23
**abbreviation** [1] - 540:19
**abide** [1] - 511:2
**ability** [1] - 495:16
**able** [25] - 288:17, 291:3, 295:3, 353:11, 426:5, 426:8, 433:13, 438:8, 440:24, 448:9, 450:14, 450:25, 452:10, 455:2, 455:7, 455:9, 455:10, 460:15, 465:8, 467:4, 469:15, 472:24, 512:9, 556:7, 556:12
**abrasive** [1] - 572:19
**absence** [1] - 340:10
**absent** [1] - 466:7
**absolutely** [8] - 280:18, 283:14, 296:4, 327:22, 357:5, 379:24, 392:23, 419:4
**accepted** [2] - 447:23, 535:23
**accepting** [1] - 417:24
**access** [3] - 331:8, 331:15, 533:20
**accessed** [1] - 331:10
**accompanying** [1] - 371:22
**accomplish** [2] - 314:9, 449:22
**according** [3] -

273:24, 297:9, 477:16
**accountant** [1] - 430:17
**accountants** [2] - 463:2, 490:13
**accounts** [1] - 486:22
**accumulate** [1] - 573:3
**accumulates** [2] - 572:5, 572:16
**accuracy** [1] - 482:25
**accurate** [9] - 297:23, 298:19, 476:8, 476:9, 476:11, 484:25, 500:8, 502:9, 502:11
**accurately** [1] - 357:6
**accuse** [1] - 354:5
**accusing** [2] - 355:23, 356:6
**achieve** [2] - 296:11, 409:18
**achieving** [1] - 314:6
**acknowledgment** [1] - 529:16
**acquire** [5] - 295:1, 455:20, 456:16, 523:6, 523:9
**acquired** [2] - 326:18, 456:4
**Act** [1] - 483:5
**act** [1] - 543:13
**acting** [1] - 549:9
**Action** [1] - 434:19
**action** [4] - 416:16, 423:1, 424:6, 434:21
**actions** [3] - 468:13, 536:16, 565:19
**activated** [76] - 301:4, 302:17, 304:9, 305:10, 306:11, 306:13, 306:16, 310:4, 310:19, 311:7, 311:10, 311:12, 312:23, 313:21, 314:6, 315:24, 316:13, 319:18, 320:10, 321:22, 322:3, 323:21, 328:21, 329:3, 329:7, 361:12, 401:21, 402:6, 402:8, 402:12, 412:15, 430:25, 433:2, 451:25, 462:7, 462:9, 477:12, 485:17, 485:18, 488:8, 490:6, 492:4,

492:7, 492:15, 493:8, 493:15, 493:22, 499:23, 500:6, 500:14, 502:17, 510:2, 525:22, 526:17, 527:11, 527:15, 527:16, 527:20, 527:23, 528:9, 528:25, 529:13, 529:15, 530:5, 530:6, 530:17, 531:7, 531:11, 531:15, 531:19, 549:24, 573:12, 573:17, 574:13, 574:16
**actual** [10] - 295:4, 296:8, 297:2, 299:9, 451:15, 453:9, 470:6, 476:15, 496:5, 515:10
**ADA** [1] - 413:2
**adapted** [2] - 275:13, 292:10
**add** [19] - 287:25, 288:1, 295:8, 307:23, 308:16, 313:5, 321:21, 321:22, 323:15, 323:18, 324:4, 324:9, 336:1, 389:12, 389:15, 489:22, 544:25, 550:11
**add-on** [1] - 544:25
**added** [11] - 304:15, 310:1, 310:3, 313:13, 324:3, 324:7, 361:12, 376:7, 376:12, 459:22, 573:11
**adding** [31] - 286:2, 293:21, 295:25, 296:3, 296:10, 304:7, 304:8, 306:9, 313:8, 313:9, 316:22, 317:3, 319:16, 319:17, 320:8, 320:9, 320:10, 323:12, 328:18, 335:21, 335:23, 344:3, 365:9, 374:12, 376:4, 405:22, 407:5, 407:22, 409:18, 477:13
**addition** [3] - 317:7, 402:11, 470:18
**additional** [16] -

274:18, 286:15, 294:20, 295:6, 304:22, 317:3, 324:2, 359:11, 397:6, 397:7, 397:19, 487:24, 540:8, 541:18, 543:25, 545:22
**additive** [18] - 304:7, 310:1, 311:1, 311:2, 311:3, 311:4, 313:3, 313:4, 315:23, 316:16, 316:17, 321:22, 321:24, 322:23, 322:25, 374:12, 402:11, 569:22
**additives** [5] - 311:7, 399:24, 427:1, 499:24, 500:5
**address** [13] - 335:6, 356:21, 422:19, 423:3, 492:9, 512:16, 512:19, 513:2, 513:3, 513:5, 513:8, 513:10, 576:15
**addressed** [4] - 289:10, 357:10, 357:11, 364:5
**addressing** [3] - 363:7, 423:13, 497:15
**adds** [1] - 502:25
**adequate** [1] - 295:12
**adjust** [3] - 528:8, 528:16
**adjusted** [1] - 299:14
**adjustment** [1] - 529:4
**adjustments** [1] - 528:24
**administrative** [1] - 499:15
**admission** [6] - 298:4, 309:5, 312:1, 315:13, 320:22, 573:24
**admit** [22] - 331:23, 331:25, 380:22, 408:25, 412:1, 416:9, 418:18, 418:19, 419:1, 419:8, 482:10, 506:14, 507:19, 509:14, 514:8, 516:15, 542:22, 546:23, 570:11, 573:16, 574:3, 574:12
**admitted** [64] - 298:7,

298:9, 309:9, 309:11, 312:5, 312:7, 314:12, 315:16, 315:18, 321:1, 321:3, 332:4, 332:6, 381:1, 381:3, 409:3, 409:5, 412:5, 412:7, 416:12, 416:14, 418:17, 418:24, 418:25, 419:5, 419:7, 419:13, 439:15, 439:17, 449:3, 449:5, 456:11, 456:13, 457:24, 458:1, 459:5, 459:7, 466:7, 471:1, 471:15, 471:17, 478:14, 482:13, 482:15, 498:1, 506:17, 506:19, 507:22, 507:24, 509:17, 509:19, 511:13, 514:11, 514:14, 516:18, 516:20, 543:1, 543:3, 547:11, 547:13, 570:15, 570:17, 574:10, 574:15
**admitting** [1] - 367:2
**ADRIENNE** [1] - 271:22
**Adrienne** [1] - 436:4
**adult** [1] - 442:1
**advance** [1] - 273:10
**advanced** [1] - 541:20
**advantage** [1] - 328:9
**advertise** [1] - 400:6
**advertising** [2] - 443:13, 443:14
**advise** [3] - 423:19, 423:20, 423:24
**AEP** [11] - 377:9, 378:11, 380:9, 382:11, 385:6, 390:11, 391:11, 391:14, 394:19, 394:24, 395:3
**aerodynamics** [1] - 535:11
**affect** [2] - 290:23, 302:22
**affected** [1] - 483:23
**affiliated** [1] - 273:22
**affiliates** [4] - 384:15, 384:22, 386:11, 427:17
**afield** [5] - 559:7, 561:3, 561:10,

564:6, 567:9
**afraid** [2] - 338:16, 356:19
**after-hour** [1] - 304:6
**after-hours** [3] - 294:1, 294:5, 295:11
**afternoon** [4] - 436:3, 440:14, 440:15, 513:17
**afterwards** [2] - 429:21, 496:1
**Agency** [1] - 542:17
**agency** [2] - 387:18, 513:5
**agenda** [1] - 433:21
**agendas** [1] - 416:19
**agent** [1] - 513:7
**agents** [1] - 512:15
**ago** [17] - 332:20, 332:24, 343:2, 381:5, 385:17, 387:4, 392:18, 410:19, 411:18, 435:14, 441:19, 475:11, 475:13, 495:1, 504:4, 513:1, 534:15
**agree** [14] - 281:8, 282:23, 288:19, 360:2, 360:5, 361:8, 376:9, 378:12, 465:5, 476:16, 495:25, 497:9, 500:8, 513:3
**agreed** [6] - 292:7, 357:23, 358:1, 370:12, 473:11, 497:1
**agreeing** [2] - 450:10, 450:11
**agreement** [66] - 348:16, 371:20, 377:19, 377:25, 378:3, 378:6, 378:7, 378:8, 378:11, 378:13, 378:15, 378:17, 379:5, 380:17, 380:19, 380:20, 381:17, 384:6, 390:23, 390:24, 392:11, 392:13, 393:3, 394:19, 395:20, 396:9, 397:24, 419:2, 425:17, 425:23, 426:2, 427:11, 448:2, 449:8, 450:16, 450:19, 450:23, 455:22, 456:3,

456:5, 456:25, 471:24, 472:7, 472:25, 473:1, 476:14, 477:5, 478:12, 478:17, 478:20, 497:5, 499:17, 511:5, 511:6, 511:11, 511:13, 511:17, 515:17, 515:23, 523:19, 523:22, 524:12, 525:7, 568:1, 568:8
**agreements** [14] - 379:2, 381:9, 381:20, 390:11, 390:19, 396:6, 425:16, 470:22, 476:23, 476:24, 477:2, 477:4, 489:17, 529:6
**agrees** [2] - 343:4, 351:16
**ahead** [8] - 339:1, 340:21, 349:6, 355:13, 447:7, 452:13, 458:21, 548:1
**ahold** [1] - 467:12
**aided** [1] - 341:9
**air** [5] - 329:9, 329:11, 445:2, 543:12, 543:23
**AISHA** [1] - 271:23
**AJ** [3] - 427:25, 472:1, 472:3
**AJG** [4] - 376:17, 396:9, 396:21, 419:2
**al** [2] - 271:4, 271:7
**Alabama** [3] - 512:20, 513:8, 513:10
**alarm** [1] - 330:8
**Albemarle** [7] - 401:22, 401:24, 402:3, 402:7, 485:13, 487:23, 488:12
**alert** [1] - 274:8
**alerted** [1] - 274:6
**Alistar** [10] - 471:9, 473:3, 473:6, 475:4, 475:5, 475:10, 476:13, 523:19, 523:25, 524:11
**Alistar's** [1] - 524:5
**alive** [1] - 467:4
**allegation** [7] - 491:25, 492:11, 493:7, 493:13, 493:20, 493:24,

495:1
**allegations** [1] - 490:21
**allege** [1] - 492:25
**alleged** [3] - 386:3, 490:20, 514:19
**alleges** [1] - 499:12
**alleging** [1] - 510:9
**Allen** [4] - 397:16, 440:1, 440:4, 509:11
**ALLEN** [1] - 440:5
**allocated** [1] - 438:11
**allocation** [1] - 576:21
**allocations** [1] - 576:20
**allow** [8] - 291:13, 324:18, 334:25, 395:3, 395:8, 439:4, 564:10, 575:17
**allowed** [2] - 350:24, 366:12
**allows** [1] - 557:4
**almost** [5] - 319:7, 369:24, 430:7, 435:14, 562:3
**alone** [2] - 313:23, 384:23
**alongside** [2] - 490:16, 508:19
**alternative** [2] - 291:14, 518:1
**alternatively** [1] - 337:6
**altogether** [1] - 373:9
**always..** [1] - 446:22
**amazing** [1] - 307:19
**amended** [5] - 490:25, 494:23, 498:10, 498:13
**American** [1] - 301:7
**Americas** [1] - 305:11
**amount** [29] - 306:15, 306:18, 327:14, 377:3, 387:25, 388:19, 389:15, 389:16, 394:25, 395:5, 395:16, 395:25, 400:19, 401:7, 439:2, 480:21, 480:24, 523:22, 523:24, 524:11, 524:14, 524:16, 524:17, 528:8, 528:24, 530:16, 531:14, 550:22, 573:4
**amounts** [5] - 306:21, 307:14, 307:18, 314:7, 334:22
**analysis** [12] - 388:12,

540:7, 540:8, 543:22, 555:14, 556:6, 556:23, 556:24, 565:14, 567:20, 569:6
**analytical** [1] - 453:19
**analytics** [1] - 453:22
**analyze** [2] - 529:3, 565:3
**analyzing** [1] - 276:6
**AND** [1] - 271:2
**announced** [1] - 330:7
**announcing** [1] - 518:23
**annual** [1] - 373:4
**annually** [1] - 519:19
**answer** [17] - 283:6, 286:10, 339:9, 379:7, 380:10, 407:17, 422:25, 500:24, 501:15, 502:8, 502:10, 503:8, 503:17, 503:21, 505:2, 559:15, 567:15
**Answer** [1] - 502:13
**answered** [3] - 379:9, 401:4, 492:17
**answering** [1] - 325:12
**answers** [3] - 290:9, 392:24, 414:13
**anticipate** [1] - 387:10
**anticipated** [1] - 543:11
**anyway** [2] - 371:18, 423:18
**anyways** [1] - 487:3
**anywheres** [1] - 452:14
**apart** [3] - 301:23, 306:23, 444:8
**apiece** [1] - 399:7
**apologies** [2] - 496:21, 559:6
**apologize** [3] - 392:16, 553:9
**appear** [3] - 336:14, 359:1, 576:7
**Appearances** [1] - 272:1
**APPEARANCES** [1] - 271:15
**application** [56] - 278:15, 279:2, 280:4, 280:9, 281:11, 284:10, 285:11, 285:13, 287:7, 288:6, 288:8, 289:25, 317:9,

317:12, 317:13, 318:4, 318:15, 319:3, 319:14, 319:23, 321:10, 322:19, 324:14, 336:22, 342:13, 342:14, 344:23, 345:25, 346:12, 347:22, 348:7, 348:15, 351:7, 352:6, 357:13, 361:21, 362:4, 368:8, 368:20, 374:1, 374:7, 375:2, 376:1, 418:5, 425:6, 429:7, 429:9, 429:16, 429:21, 433:10, 546:3, 546:5, 546:9, 547:17, 547:22

**applications** [48] - 278:17, 281:24, 282:14, 283:17, 288:20, 289:8, 336:15, 340:7, 344:25, 345:6, 345:12, 347:19, 347:20, 348:7, 349:18, 349:19, 350:1, 351:14, 352:18, 353:8, 353:10, 354:7, 358:3, 358:14, 359:1, 360:8, 360:20, 361:6, 361:20, 362:3, 362:9, 365:8, 368:9, 368:15, 369:6, 370:24, 373:16, 373:23, 383:15, 383:23, 418:10, 429:14, 478:24, 518:12, 545:22, 546:9, 546:15, 546:18

**applied** [3] - 325:21, 540:3, 550:5

**applies** [3] - 496:2, 497:11, 541:23

**apply** [9] - 290:20, 319:19, 325:13, 343:3, 343:6, 351:5, 362:1, 427:24, 531:22

**applying** [1] - 312:21

**appreciable** [3] - 400:19, 401:6, 401:9

**appreciate** [1] - 273:2

**approach** [13] - 423:12, 474:11,

491:2, 498:4, 498:5, 498:6, 498:16, 499:5, 518:2, 520:23, 533:8, 551:5, 552:2

**approached** [1] - 407:7

**appropriate** [29] - 280:1, 281:23, 282:2, 282:7, 282:8, 283:12, 284:8, 284:24, 288:10, 289:21, 290:21, 338:15, 351:11, 356:5, 358:5, 358:6, 358:7, 358:15, 358:22, 358:25, 359:13, 360:16, 360:17, 365:16, 420:15, 541:22, 554:10, 555:4, 556:16

**appropriately** [1] - 280:3

**apps** [1] - 338:4

**April** [4] - 414:21, 486:17, 487:2, 517:11

**ARANT** [1] - 272:6

**area** [7] - 324:5, 442:8, 445:6, 534:14, 554:13, 557:25, 564:10

**areas** [2] - 552:17, 554:15

**argue** [1] - 559:3

**argued** [3] - 282:19, 284:5, 363:1

**arguing** [11] - 341:22, 344:23, 346:7, 351:2, 358:13, 359:5, 359:8, 359:11, 362:19, 556:10

**argument** [26] - 275:18, 277:1, 279:16, 279:20, 281:5, 282:12, 291:9, 292:6, 292:8, 333:13, 334:7, 340:11, 348:25, 349:20, 357:18, 359:3, 359:15, 359:18, 359:20, 362:20, 362:24, 417:22, 466:10, 495:12, 497:8, 557:1

**arguments** [11] - 278:11, 282:22, 286:15, 286:16,

286:21, 341:22, 344:21, 355:12, 355:20, 559:1, 560:19

**arise** [1] - 326:11

**arranged** [1] - 469:4

**arrangement** [1] - 567:3

**arrangements** [1] - 438:23

**arrived** [1] - 446:24

**arriving** [2] - 415:15, 416:18

**arrows** [1] - 335:8

**art** [7] - 350:10, 541:4, 541:7, 541:12, 547:19, 547:23, 547:24

**ARTHUR** [1] - 271:7

**Arthur** [1] - 396:9

**article** [2] - 464:5, 475:25

**articles** [3] - 463:15, 466:6, 547:20

**articulate** [1] - 370:7

**articulates** [1] - 371:21

**artistic** [1] - 323:9

**ash** [8] - 307:7, 572:5, 572:14, 572:15, 573:4, 573:5

**ASHLEY** [1] - 272:8

**aside** [1] - 431:8

**aspects** [4] - 318:22, 436:8, 556:22, 561:10

**aspersions** [1] - 420:9

**assert** [2] - 371:5, 414:24

**asserted** [6] - 341:15, 383:13, 384:6, 420:21, 515:13

**assertion** [1] - 562:22

**asserts** [1] - 344:2

**asset** [1] - 478:24

**assign** [1] - 456:25

**assignee** [1] - 545:15

**assignment** [4] - 457:5, 457:10, 457:16

**assist** [2] - 411:17, 539:22

**assistant** [1] - 415:19

**associated** [2] - 275:15, 438:16

**assume** [5] - 303:5, 367:22, 371:23, 404:18, 512:7

**assumed** [2] - 366:25, 566:22

**assuming** [1] - 491:13

**assumption** [2] - 405:1, 405:4

**atmosphere** [1] - 431:6

**attached** [2] - 297:20, 310:9

**attaches** [1] - 371:22

**attack** [1] - 354:10

**attempt** [2] - 275:7, 275:11

**attempting** [1] - 492:22

**attention** [3] - 274:25, 275:21, 490:24

**attorney** [3] - 320:5, 378:21, 386:19

**ATTORNEY** [2] - 436:13, 526:2

**attorneys** [3] - 317:18, 321:15, 515:11

**attract** [1] - 573:1

**attracts** [1] - 572:4

**attributable** [2] - 504:7, 555:21

**attributed** [1] - 485:8

**August** [9] - 279:4, 293:22, 317:13, 321:11, 415:10, 416:18, 418:8, 429:8, 429:16

**authenticated** [1] - 308:2

**authenticity** [1] - 298:24

**author** [1] - 312:12

**authorized** [2] - 490:17, 512:25

**authors** [1] - 309:15

**automatically** [1] - 318:13

**auxiliary** [2] - 536:13, 537:12

**available** [7] - 314:15, 314:17, 314:20, 329:2, 387:13, 543:21, 544:1

**average** [2] - 389:22, 431:15

**avoid** [3] - 280:20, 337:25, 427:12

**avoidance** [1] - 427:8

**Award** [1] - 455:13

**award** [4] - 455:13, 475:17, 476:5, 524:10

**awarded** [3] - 318:4, 319:10, 455:12

**aware** [21] - 322:15, 324:25, 376:7,

407:6, 407:25, 408:4, 408:5, 408:7, 408:10, 408:11, 420:8, 447:18, 473:20, 476:18, 505:16, 505:18, 505:23, 505:25, 507:7, 510:10, 511:19

**awful** [1] - 307:6

**awhile** [1] - 343:1

**Aww** [1] - 428:16

**axis** [2] - 312:19, 312:20

## B

**BAC** [2] - 412:15, 412:16

**bachelor** [1] - 535:3

**bachelor's** [1] - 541:14

**back-end** [2] - 413:8, 462:9

**background** [6] - 331:1, 331:5, 331:6, 552:10, 555:4, 555:19

**bad** [5] - 273:3, 341:25, 354:18, 355:10, 446:6

**baghouse** [7] - 571:13, 571:18, 571:21, 571:25, 572:1, 572:21, 573:6

**ballpark** [1] - 531:14

**bantered** [1] - 447:21

**bar** [3] - 290:15, 290:19, 362:2

**barely** [2] - 414:10, 562:3

**Barr** [1] - 566:19

**base** [4] - 311:4, 311:5, 441:12, 484:16

**Based** [1] - 543:21

**based** [25] - 292:8, 298:18, 314:8, 323:10, 329:5, 337:14, 355:18, 370:12, 370:23, 371:24, 386:2, 393:22, 394:9, 394:11, 404:20, 412:25, 438:11, 472:14, 476:5, 495:3, 529:5, 533:18, 541:24, 560:5, 560:16

**Basin** [1] - 328:22
**basis** [13] - 281:22, 282:13, 283:9, 283:10, 283:12, 283:14, 283:19, 354:19, 358:8, 453:22, 473:8, 560:16, 562:24
**Bean** [1] - 566:19
**bear** [1] - 460:22
**became** [1] - 447:17
**because..** [1] - 361:17
**become** [5] - 324:22, 324:25, 367:12, 450:13, 469:10
**becomes** [3] - 287:22, 333:9, 365:25
**becoming** [1] - 511:19
**beforehand** [1] - 424:3
**began** [2] - 564:15, 564:17
**begin** [5] - 445:10, 458:12, 466:15, 539:3, 540:15
**beginning** [9] - 337:25, 375:21, 376:14, 376:15, 380:1, 465:9, 475:6, 503:5, 567:15
**begins** [4] - 417:17, 427:8, 550:10, 565:15
**behalf** [3] - 401:1, 440:7, 532:14
**behind** [5] - 451:17, 502:19, 559:15, 559:16, 559:18
**believes** [8] - 371:15, 422:17, 423:2, 423:21, 492:1, 495:15, 495:17, 543:22
**Belle** [1] - 397:16
**below** [4] - 310:5, 434:18, 547:16, 573:6
**belt** [3] - 472:23, 510:1, 550:20
**bench** [2] - 332:18, 450:2
**benefit** [4] - 362:18, 363:23, 373:12, 437:23
**benefits** [3] - 436:10, 438:17, 551:22
**Benn** [1] - 280:24
**BENN** [1] - 272:7
**best** [15] - 287:21, 292:23, 303:2,

325:13, 326:2, 329:6, 333:19, 392:1, 445:20, 463:8, 469:21, 505:3, 520:16, 524:2, 560:19
**better** [7] - 273:8, 273:19, 313:22, 316:4, 331:21, 443:15, 486:5
**between** [25] - 291:2, 333:21, 344:25, 348:4, 358:14, 365:11, 377:20, 378:11, 378:15, 380:17, 403:19, 411:12, 438:23, 447:21, 448:22, 471:8, 527:7, 550:8, 552:16, 554:24, 555:13, 556:4, 561:15, 563:15, 576:22
**beyond** [8] - 328:13, 395:10, 395:12, 423:2, 426:8, 528:17, 553:20, 560:4
**bid** [2] - 395:3, 395:8
**big** [17] - 284:23, 391:8, 392:3, 392:17, 393:4, 395:19, 421:14, 452:5, 454:19, 467:23, 481:15, 481:16, 489:3, 503:9, 506:2, 506:3, 556:16
**bigger** [1] - 391:14
**biggest** [4] - 454:25, 469:14, 469:20, 488:22
**billion** [2] - 307:13, 391:2
**binder** [29] - 293:14, 297:11, 308:17, 320:16, 321:6, 376:21, 377:18, 408:17, 410:2, 411:25, 415:4, 448:17, 455:23, 457:4, 458:16, 458:19, 463:19, 470:23, 481:22, 498:11, 507:9, 509:9, 516:9, 518:16, 518:17, 532:21, 542:11, 546:13, 570:3
**binders** [7] - 379:14,

381:19, 435:20, 481:13, 532:17, 532:18, 532:22
**Birmingham** [3] - 512:20, 513:4, 513:8
**bit** [22] - 305:12, 332:14, 342:17, 391:1, 392:21, 399:15, 402:21, 406:1, 414:10, 431:3, 441:17, 442:4, 444:3, 461:1, 461:13, 479:16, 479:17, 481:6, 500:10, 534:11, 568:17
**bituminous** [4] - 315:8, 315:23, 316:7, 316:12
**black** [5] - 312:25, 452:1, 481:14, 481:15, 481:16
**blame** [2] - 419:16, 505:13
**blank** [1] - 558:13
**blanket** [1] - 561:14
**blast** [1] - 445:1
**blessed** [1] - 280:12
**blow** [2] - 310:15, 429:2
**blue** [5] - 434:19, 442:6, 442:8, 468:6, 536:5
**blue-collar** [2] - 442:6, 442:8
**board** [5] - 321:13, 467:2, 521:4, 565:6, 568:15
**boards** [2] - 428:10, 567:23
**boiler** [10] - 295:4, 319:17, 319:18, 320:14, 323:1, 323:2, 324:11, 361:12, 451:6, 484:8
**boilers** [6] - 454:25, 501:7, 536:8, 536:12, 552:14, 554:17
**boils** [1] - 364:25
**book** [2] - 303:4, 415:13
**books** [2] - 486:22, 524:24
**boots** [1] - 536:6
**bottom** [12] - 299:10, 302:3, 305:1, 306:4, 394:3, 427:2, 441:5, 449:11, 450:8, 502:1, 566:5, 572:7

**bought** [10] - 393:11, 393:23, 395:4, 408:7, 456:19, 490:14, 517:10, 517:11, 550:21, 550:23
**BOULT** [1] - 272:6
**bound** [1] - 501:22
**box** [5] - 332:17, 421:5, 450:4, 572:1, 572:2
**boxes** [4] - 452:5, 548:23, 575:24, 575:25
**Br** [2] - 301:19, 301:20
**Br2** [1] - 569:23
**BRADLEY** [2] - 271:19, 272:6
**brain** [1] - 392:21
**brand** [3] - 310:18, 310:21, 441:15
**Brandon** [1] - 380:18
**break** [21] - 286:20, 312:24, 333:12, 333:17, 339:23, 340:18, 340:22, 340:25, 346:8, 369:11, 369:21, 370:2, 370:10, 405:19, 419:23, 419:25, 424:8, 513:15, 513:17, 513:18, 514:16
**breakaway** [1] - 444:2
**breakdown** [1] - 508:2
**breaking** [2] - 279:17, 337:14
**bridge** [1] - 558:24
**brief** [3] - 363:3, 363:6, 371:20
**briefed** [2] - 343:1, 357:11
**briefing** [2] - 355:9, 363:2
**briefly** [5] - 291:25, 364:16, 369:23, 393:2, 428:6
**bring** [14] - 274:24, 275:21, 286:19, 286:23, 293:4, 340:2, 372:5, 420:5, 424:12, 447:8, 452:8, 468:13, 514:3, 570:19
**broaden** [1] - 433:24
**Broadening** [1] - 417:21
**broadening** [4] - 417:21, 418:3, 418:4
**broader** [1] - 394:10

**broken** [1] - 388:17
**bromide** [17] - 300:4, 300:12, 301:2, 301:18, 301:22, 302:11, 302:16, 303:20, 305:9, 305:13, 306:8, 417:24, 422:2, 434:25, 510:1, 570:25
**brominated** [2] - 302:9, 510:2
**bromine** [68] - 286:2, 300:5, 300:9, 300:11, 301:21, 301:23, 301:24, 302:10, 302:15, 302:20, 302:22, 304:7, 305:22, 306:12, 306:16, 306:19, 306:21, 307:17, 310:1, 310:22, 310:23, 311:3, 311:5, 311:7, 313:20, 313:21, 314:5, 314:7, 315:23, 316:17, 319:16, 319:17, 320:6, 320:8, 320:14, 321:22, 321:25, 323:5, 323:8, 323:13, 323:15, 324:3, 324:4, 328:17, 329:8, 335:21, 335:23, 344:3, 349:2, 365:9, 374:12, 376:4, 376:7, 402:11, 405:22, 407:5, 407:8, 407:22, 409:18, 412:15, 430:24, 433:2, 451:18, 452:2, 499:23, 500:5, 569:23
**bromine-containing** [3] - 300:5, 499:23, 500:5
**brought** [3] - 341:14, 420:1, 550:16
**Brown** [2] - 394:22, 398:14
**brown** [9] - 373:20, 374:6, 374:15, 375:8, 381:10, 397:4, 475:8, 497:23, 511:12
**BTUs** [1] - 483:23
**build** [3] - 317:2,

448:1, 566:22
**building** [2] - 511:7, 517:20
**built** [2] - 453:2, 517:25
**bulb** [1] - 388:24
**bulk** [3] - 279:21, 489:16, 499:17
**bullet** [1] - 417:17
**bump** [1] - 407:1
**bunch** [6] - 428:16, 452:2, 455:14, 491:13, 491:19, 491:20
**Burke** [1] - 271:12
**burn** [7] - 307:6, 328:22, 389:8, 389:9, 389:21, 537:11, 557:7
**burned** [5] - 473:9, 473:16, 524:3, 524:18, 531:6
**burning** [3] - 462:10, 477:10, 525:21
**burnt** [1] - 485:5
**business** [67] - 296:13, 296:15, 298:21, 298:22, 318:21, 326:12, 326:24, 328:3, 328:4, 328:14, 393:15, 393:16, 394:10, 402:3, 411:17, 415:6, 426:3, 426:8, 436:8, 436:9, 443:22, 443:24, 443:25, 444:1, 445:21, 448:1, 448:5, 448:7, 451:11, 456:17, 456:19, 458:8, 458:9, 462:24, 463:4, 463:7, 466:24, 467:9, 467:22, 467:25, 468:18, 468:24, 469:1, 469:17, 470:1, 470:14, 472:17, 474:5, 479:3, 479:17, 480:20, 481:6, 487:13, 488:23, 504:18, 505:13, 511:8, 516:4, 519:1, 519:4, 519:20, 519:25, 520:8, 520:11, 522:2, 522:12
**business-to-business** [1] - 522:2

**but..** [1] - 399:9
**butterflies** [1] - 332:14
**buy** [19] - 394:2, 394:3, 395:7, 400:10, 400:17, 448:15, 456:19, 478:21, 480:10, 480:12, 484:15, 488:7, 489:21, 490:6, 490:10, 492:7, 493:15, 493:21
**buying** [4] - 393:13, 479:12, 488:15, 492:14
**buys** [2] - 393:20, 400:14
**BY** [94] - 271:16, 293:11, 294:14, 298:13, 299:3, 299:25, 300:17, 300:24, 302:5, 303:16, 305:3, 306:1, 307:22, 309:14, 310:17, 312:8, 312:14, 315:19, 317:1, 321:4, 321:18, 332:7, 372:21, 373:22, 374:9, 374:17, 375:10, 379:25, 381:4, 381:12, 394:23, 397:5, 398:10, 398:16, 405:20, 407:20, 409:6, 412:8, 416:15, 424:21, 426:18, 427:5, 428:8, 429:4, 433:20, 434:4, 434:20, 435:8, 436:13, 440:13, 449:6, 456:14, 457:14, 458:3, 459:8, 466:14, 471:18, 474:17, 482:16, 498:8, 498:20, 499:2, 499:9, 506:20, 507:25, 508:15, 509:20, 511:15, 514:15, 516:21, 519:14, 521:14, 522:22, 526:2, 533:2, 533:6, 533:11, 539:20, 543:4, 544:23, 545:9, 546:7, 547:15, 548:3, 551:20, 563:8,

564:12, 567:18, 568:4, 568:12, 568:21, 570:20, 571:17, 574:11

## C

**Cabot** [12] - 401:22, 401:24, 402:7, 485:13, 487:23, 488:12, 488:22, 515:18, 515:20, 515:23, 517:25, 518:8
**calcium** [4] - 417:24, 422:2, 434:25, 510:1
**calculator** [1] - 399:11
**Caldwell** [14] - 273:3, 339:11, 372:23, 374:11, 386:21, 410:19, 419:20, 420:6, 421:1, 424:15, 491:11, 521:4, 565:5, 576:17
**CALDWELL** [83] - 271:19, 271:19, 293:11, 294:11, 294:14, 298:3, 298:10, 298:13, 299:1, 299:3, 299:23, 299:25, 300:15, 300:17, 300:21, 300:24, 302:2, 302:5, 303:14, 303:16, 304:24, 305:3, 305:24, 306:1, 307:20, 307:22, 309:4, 309:12, 309:14, 310:15, 310:17, 311:25, 312:8, 312:13, 312:14, 315:12, 315:19, 316:24, 317:1, 320:21, 321:4, 321:16, 321:18, 331:21, 331:25, 332:7, 333:3, 337:22, 339:9, 380:25, 409:2, 412:3, 416:11, 418:23, 419:4, 419:11, 419:21, 420:7, 421:2, 423:4, 424:16, 424:19, 424:21, 426:15, 426:18, 427:2, 427:5, 428:6, 428:8, 428:25, 429:4,

433:18, 433:20, 434:1, 434:4, 434:17, 434:20, 435:4, 435:8, 435:16, 435:24, 525:1, 576:18
**Caldwell's** [3] - 335:7, 340:5, 467:14
**Calgon** [2] - 487:23, 488:12
**Canada** [1] - 442:5
**Canadian** [2] - 441:18, 474:22
**cancer** [1] - 445:7
**cannot** [8] - 334:21, 342:21, 350:25, 351:4, 362:2, 551:13, 554:6, 559:5
**capital** [2] - 329:12, 436:7
**capture** [16] - 306:22, 313:23, 330:25, 399:25, 430:20, 431:17, 446:14, 447:20, 451:7, 508:3, 520:1, 537:17, 537:21, 537:24, 542:4, 543:6
**captured** [1] - 310:11
**capturing** [5] - 402:16, 402:19, 430:8, 430:15, 431:12
**carbon** [90] - 301:5, 301:6, 302:9, 302:10, 302:15, 302:17, 303:20, 304:9, 305:10, 306:11, 306:13, 306:16, 307:17, 310:4, 310:19, 311:7, 311:10, 311:12, 312:23, 313:21, 314:6, 315:24, 316:13, 319:18, 321:23, 322:3, 323:21, 328:21, 329:3, 329:7, 361:12, 401:21, 402:6, 402:8, 402:12, 412:15, 412:16, 412:25, 430:25, 433:2, 451:25, 462:7, 462:9, 477:12, 485:17, 485:18, 488:8, 488:15, 488:20, 490:6, 492:4, 492:7, 492:15, 493:8, 493:16, 493:22,

499:23, 500:6, 500:14, 502:17, 510:2, 525:22, 526:17, 527:11, 527:15, 527:16, 527:20, 527:23, 528:8, 528:9, 528:25, 529:13, 529:15, 530:5, 530:6, 530:17, 531:7, 531:11, 531:15, 531:20, 549:24, 572:14, 573:13, 573:17, 574:13, 574:16
**carbon-based** [1] - 412:25
**Carbonxt** [1] - 485:13
**care** [1] - 351:6
**carpentry** [1] - 444:12
**carried** [3] - 453:10, 453:18, 454:2
**carry** [1] - 502:2
**carrying** [2] - 451:14, 467:22
**cars** [1] - 445:3
**carveout** [1] - 497:12
**case** [99] - 273:22, 274:1, 280:12, 283:8, 292:7, 292:16, 293:14, 295:16, 302:9, 303:9, 310:4, 314:5, 316:6, 320:7, 320:8, 322:14, 324:16, 328:1, 356:17, 363:5, 363:7, 363:9, 363:19, 370:16, 371:22, 373:13, 377:5, 378:23, 383:1, 384:4, 385:20, 387:15, 390:6, 396:11, 404:17, 405:6, 420:21, 420:22, 428:11, 432:5, 432:8, 466:1, 473:14, 473:21, 473:25, 475:4, 476:15, 490:10, 490:25, 492:6, 493:14, 493:25, 497:6, 497:9, 500:19, 501:17, 518:22, 524:1, 524:6, 524:11, 530:10, 530:12, 530:14, 533:17, 533:19, 533:20, 537:23, 537:25,

538:1, 538:3, 539:9, 540:12, 540:18, 541:2, 541:11, 541:23, 542:18, 545:11, 546:16, 546:19, 548:12, 549:12, 549:23, 552:9, 558:2, 559:1, 562:21, 564:25, 565:24, 569:1, 569:5, 570:8, 571:3, 571:10, 571:21, 573:17, 574:14

**Case** [1] - 271:5

**cases** [5] - 453:23, 461:8, 469:18, 490:9, 490:15

**cash** [3] - 437:17, 437:18, 479:6

**CASSADY** [2] - 271:19, 271:20

**casting** [3] - 420:9, 552:18, 553:4

**catching** [1] - 445:25

**causation** [3] - 492:5, 562:23

**caused** [1] - 503:15

**causes** [3] - 334:9, 446:6, 492:20

**causing** [10] - 411:6, 492:6, 492:10, 493:14, 493:15, 556:25, 559:13, 561:17, 562:21

**caution** [1] - 561:19

**CCS** [1] - 509:23

**cease** [1] - 437:3

**center** [2] - 445:19, 537:4

**Center** [9] - 297:19, 298:18, 403:9, 526:19, 526:20, 526:23, 527:1, 527:5

**Centralia** [2] - 454:6, 454:18

**cents** [1] - 512:17

**century** [1] - 538:21

**CEO** [11] - 386:24, 439:21, 440:19, 441:2, 441:4, 476:4, 477:22, 482:8, 482:24, 490:17, 516:12

**CEOs** [1] - 522:1

**CERT** [46] - 272:9, 275:9, 275:11, 292:14, 402:18, 403:25, 404:18, 405:1, 413:18, 414:17, 436:8,

436:18, 436:20, 438:18, 468:4, 470:13, 470:19, 471:9, 472:3, 472:4, 473:2, 473:21, 474:2, 474:4, 486:13, 487:7, 493:14, 512:6, 512:14, 520:3, 524:6, 524:14, 559:11, 566:1, 566:2, 566:7, 566:8, 566:11, 566:15, 566:16, 566:17, 566:18, 566:20, 567:2

**CERT's** [2] - 436:6, 519:15

**certain** [23] - 287:13, 291:1, 336:14, 341:11, 357:21, 360:3, 365:17, 370:23, 370:25, 393:22, 407:12, 431:1, 436:24, 438:25, 514:24, 514:25, 527:6, 528:14, 550:22, 553:16, 555:23, 566:23, 573:4

**certainly** [23] - 282:24, 290:11, 303:12, 306:14, 322:18, 365:5, 369:24, 422:14, 423:1, 423:19, 423:20, 423:24, 424:1, 445:9, 483:2, 515:7, 544:3, 545:6, 546:20, 558:19, 559:20, 560:20, 568:10

**certification** [3] - 404:8, 404:15, 539:5

**certifications** [1] - 330:2

**certified** [6] - 297:16, 404:19, 405:9, 486:11, 502:11

**Certified** [2] - 577:17, 577:18

**certify** [1] - 577:18

**certifying** [1] - 483:5

**cetera** [10] - 273:17, 275:15, 276:10, 297:2, 357:2, 369:1, 384:15, 387:24, 575:24

**CFR** [1] - 361:22

**chain** [31] - 278:9,

279:17, 279:21, 280:9, 281:25, 282:15, 282:20, 284:14, 284:18, 286:3, 288:20, 289:8, 290:22, 335:25, 336:15, 337:14, 338:3, 347:21, 357:14, 358:22, 359:1, 359:8, 359:21, 361:6, 361:20, 361:25, 368:20, 368:22, 492:13, 493:17

**chains** [1] - 284:10

**chairs** [1] - 568:11

**challenge** [1] - 417:25

**challenges** [1] - 328:6

**chamber** [8] - 320:10, 320:11, 323:16, 323:17, 323:19, 324:12, 569:15, 569:19

**champion** [2] - 517:23, 518:1

**chance** [4] - 277:15, 355:13, 464:23, 470:15

**change** [5] - 343:9, 453:24, 454:1, 516:1, 528:15

**changed** [1] - 402:3

**changes** [2] - 278:17, 467:5

**characterize** [2] - 373:6, 378:1

**charge** [5] - 436:7, 461:8, 504:11, 504:25, 517:24

**charged** [8] - 273:11, 273:13, 287:16, 333:20, 340:12, 473:8, 473:11, 573:2

**charges** [1] - 573:7

**charging** [1] - 286:22

**chart** [4] - 292:14, 335:8, 373:21, 375:16

**chase** [2] - 309:23, 396:16

**Chase** [1] - 437:20

**chat** [1] - 369:22

**check** [5] - 418:13, 418:14, 548:23, 569:12, 571:6

**checked** [1] - 575:25

**checks** [1] - 555:22

**Chem** [45] - 376:17, 396:10, 396:22,

402:18, 405:22, 406:15, 407:5, 407:21, 407:25, 408:13, 409:17, 409:25, 410:9, 410:12, 410:24, 413:2, 413:6, 413:13, 413:18, 414:16, 419:2, 422:1, 486:13, 487:7, 505:16, 505:19, 505:23, 505:25, 506:22, 507:1, 507:6, 508:4, 508:8, 508:17, 508:19, 508:24, 509:4, 510:4, 510:5, 510:8, 510:16, 510:24, 515:14

**Chem-Mod** [40] - 396:10, 396:22, 402:18, 405:22, 406:15, 407:5, 407:21, 407:25, 408:13, 409:17, 409:25, 410:9, 410:12, 410:24, 413:2, 413:6, 413:13, 413:18, 414:16, 422:1, 486:13, 487:7, 505:16, 505:19, 505:23, 505:25, 506:22, 507:1, 507:6, 508:4, 508:8, 508:17, 509:4, 510:5, 510:8, 510:16, 510:24, 515:14

**Chem-Mod's** [3] - 508:19, 508:24, 510:4

**Chem-Mod-Gallagher-AJG** [1] - 419:2

**chemical** [5] - 301:20, 301:21, 399:24, 541:14, 570:23

**chemicals** [9] - 296:2, 301:17, 445:24, 550:4, 550:12, 550:13, 550:25, 570:6, 570:24

**chemistry** [2] - 455:8, 541:15

**chess** [1] - 576:25

**Chicago** [2] - 534:13, 534:14

**chief** [6] - 326:8, 326:9, 382:24,

414:19, 417:11, 417:14

**children** [4] - 442:1, 442:2, 443:19, 534:19

**chloride** [2] - 312:22, 312:25

**chloride-type** [1] - 312:25

**chlorine** [5] - 311:4, 313:3, 313:4, 313:23, 316:16

**chockful** [1] - 465:24

**chose** [1] - 456:16

**Christmas** [2] - 454:17, 480:2

**Christopher** [1] - 271:11

**Circuit** [1] - 280:12

**circuit** [3] - 427:6, 429:12, 557:25

**circumstance** [2] - 273:12, 575:16

**circumstances** [1] - 466:7

**circumstantial** [1] - 556:18

**citations** [1] - 476:7

**cited** [9] - 278:22, 280:12, 292:6, 293:22, 363:3, 363:6, 547:17, 547:18, 553:16

**cites** [1] - 371:22

**citing** [1] - 293:23

**citizen** [1] - 441:18

**city** [1] - 441:23

**claim** [35] - 276:7, 342:22, 349:8, 361:20, 361:22, 362:1, 384:25, 385:1, 385:2, 423:13, 428:9, 431:9, 431:11, 431:18, 433:2, 434:9, 434:12, 475:5, 475:10, 475:15, 476:15, 476:19, 491:9, 497:10, 548:4, 548:5, 548:20, 548:25, 549:1, 549:2, 562:21, 569:3, 569:17, 573:10

**Claim** [1] - 548:2

**claimed** [8] - 340:6, 340:7, 345:22, 345:23, 349:4, 349:14, 402:14,

548:9
**claiming** [3] - 359:2, 368:21, 560:11
**claims** [21] - 318:19, 319:21, 321:12, 340:8, 340:11, 342:16, 342:19, 344:18, 349:5, 350:23, 386:13, 420:13, 421:9, 472:19, 495:20, 496:1, 496:24, 497:10, 497:14, 553:24, 562:1
**Claims** [1] - 568:16
**clarification** [3] - 508:12, 533:5, 562:4
**clarified** [1] - 376:11
**clarify** [4] - 336:6, 385:5, 412:12, 431:2
**clarity** [5] - 289:25, 396:20, 424:3, 424:5
**clay** [1] - 452:3
**clean** [6] - 445:3, 530:8, 531:10, 572:7, 572:17, 573:7
**cleaner** [1] - 572:3
**clear** [16] - 276:6, 283:5, 283:6, 291:16, 339:18, 345:19, 346:5, 390:1, 408:5, 496:3, 557:5, 557:23, 557:25, 561:21, 563:15
**clearly** [4] - 287:6, 335:20, 370:8, 496:14
**CLERK** [6] - 439:24, 440:3, 513:20, 513:24, 532:9, 574:23
**clerk** [1] - 577:2
**client** [5] - 292:8, 404:18, 405:1, 455:1, 469:20
**clients** [4] - 469:22, 493:11, 501:15, 552:16
**clock** [2] - 287:13, 576:25
**close** [7] - 407:3, 437:5, 438:3, 452:7, 486:22, 496:5, 576:3
**closer** [1] - 460:21
**closing** [3] - 338:21, 341:22, 559:1
**closings** [2] - 277:3, 559:4
**co** [4] - 275:18,

312:12, 317:8, 319:11
**CO** [1] - 271:7
**co-author** [1] - 312:12
**co-counsel** [1] - 275:18
**co-inventors** [2] - 317:8, 319:11
**coal** [228] - 275:5, 275:9, 275:13, 275:14, 276:7, 276:9, 286:2, 292:2, 292:9, 292:10, 300:9, 300:12, 300:13, 301:24, 302:14, 302:16, 303:5, 303:7, 303:9, 304:8, 307:1, 307:2, 307:4, 307:5, 309:22, 315:8, 315:9, 315:23, 316:12, 319:17, 320:9, 320:14, 323:1, 323:5, 323:8, 323:11, 323:18, 324:5, 326:3, 328:17, 328:19, 328:22, 328:23, 329:4, 329:8, 330:18, 330:21, 330:25, 331:5, 335:21, 335:24, 338:6, 338:10, 344:3, 349:2, 361:12, 365:9, 374:12, 376:4, 376:8, 382:14, 382:15, 382:18, 387:10, 387:12, 388:13, 389:8, 389:9, 389:13, 389:15, 389:16, 389:18, 389:21, 390:8, 390:23, 391:22, 393:5, 394:8, 395:21, 397:8, 397:12, 398:1, 402:11, 404:8, 405:22, 406:8, 407:6, 407:7, 407:9, 407:22, 408:1, 408:8, 409:18, 414:17, 427:15, 427:19, 427:22, 427:24, 430:12, 430:24, 431:5, 431:20, 436:9, 437:1, 437:6, 437:7, 437:10, 437:12, 437:14,

437:16, 437:18, 437:24, 438:2, 438:3, 438:19, 438:24, 438:25, 439:1, 439:4, 440:25, 442:7, 442:8, 445:22, 446:1, 454:19, 461:15, 461:19, 461:22, 461:24, 463:13, 465:17, 466:15, 467:9, 467:23, 468:1, 469:25, 470:3, 470:6, 470:9, 470:21, 471:20, 472:3, 472:4, 472:5, 472:6, 473:7, 473:9, 473:16, 475:14, 477:11, 483:22, 484:11, 485:5, 486:13, 487:7, 500:18, 501:2, 501:7, 502:18, 503:12, 505:7, 505:14, 505:20, 508:19, 508:23, 509:23, 510:9, 511:24, 514:19, 515:14, 521:1, 524:3, 524:8, 524:17, 525:20, 525:21, 526:10, 526:11, 529:6, 529:7, 529:21, 531:6, 535:18, 537:4, 539:16, 540:6, 541:25, 543:23, 549:16, 550:2, 550:5, 550:8, 550:12, 550:13, 550:15, 550:16, 550:17, 550:20, 551:23, 557:7, 563:11, 563:17, 563:19, 563:21, 563:23, 564:18, 565:18, 565:20, 566:9, 566:12, 566:22, 569:15, 569:18, 569:22, 570:6, 571:2
**coal-fired** [16] - 406:8, 427:15, 440:25, 483:22, 484:11, 501:7, 502:18, 503:12, 525:20, 526:11, 535:18, 537:4, 539:16, 541:25, 543:23
**coals** [5] - 316:3,

316:4, 460:13
**coast** [1] - 441:20
**coat** [1] - 332:8
**coating** [2] - 572:18, 572:20
**COCHRANE** [1] - 271:23
**coke** [1] - 444:24
**cold** [1] - 278:25
**collar** [2] - 442:6, 442:8
**colleague** [3] - 435:25, 491:11, 496:6
**collecting** [2] - 571:8, 573:10
**collectively** [4] - 281:8, 281:19, 282:24, 284:6
**collects** [5] - 571:11, 571:24, 572:10, 572:13, 572:24
**college** [1] - 534:21
**colloquy** [1] - 422:6
**column** [5] - 299:9, 299:15, 375:20, 375:21
**columns** [1] - 376:1
**combatting** [1] - 346:16
**combination** [6] - 361:19, 384:12, 384:23, 412:24, 417:2, 569:23
**combinations** [3] - 302:20, 302:25, 310:12
**combust** [1] - 529:10
**combusted** [1] - 349:3
**combusting** [2] - 477:11, 569:15
**combustion** [26] - 286:3, 301:14, 302:18, 307:2, 320:9, 320:11, 323:16, 323:17, 323:19, 324:12, 344:4, 365:9, 374:13, 376:5, 403:12, 403:13, 403:16, 406:7, 445:13, 537:11, 552:14, 569:15, 569:19, 572:2, 572:12, 572:17
**Combustion** [1] - 436:17
**combustor** [9] - 295:21, 296:22, 297:6, 301:1, 310:2,

323:22, 403:18, 417:23, 417:25
**combustor/boiler** [1] - 324:7
**combusts** [1] - 569:18
**ComEd** [11] - 535:17, 536:7, 536:10, 536:25, 537:9, 537:14, 538:5, 538:6, 538:11, 538:14, 538:20
**comfortable** [2] - 326:22, 538:2
**coming** [12] - 273:8, 276:22, 278:25, 280:21, 283:16, 348:4, 406:17, 431:3, 462:13, 506:12, 536:25, 577:2
**command** [1] - 492:14
**comment** [3] - 340:4, 562:9
**commentary** [1] - 553:17
**comments** [1] - 340:5
**commercial** [3] - 327:3, 327:25, 450:1
**commercialize** [4] - 327:1, 327:24, 448:10, 450:14
**commercialized** [1] - 450:7
**commercially** [1] - 448:11
**Commission** [1] - 482:19
**commit** [1] - 449:25
**commodity** [1] - 485:17
**common** [2] - 292:6, 323:18
**Commonwealth** [1] - 535:15
**communicating** [1] - 555:25
**communication** [2] - 509:2, 509:3
**communications** [1] - 555:24
**community** [2] - 455:15, 460:9
**companies** [46] - 328:17, 397:9, 397:12, 398:1, 401:22, 402:7, 406:17, 430:20, 437:1, 437:10, 437:14, 437:16, 437:18, 438:7,

438:8, 438:24, 461:19, 462:23, 463:1, 466:16, 466:17, 466:19, 467:10, 470:3, 470:6, 470:9, 471:9, 471:21, 472:2, 472:9, 472:11, 473:1, 473:7, 473:21, 485:16, 485:20, 486:13, 487:15, 488:13, 490:4, 505:7, 512:20, 520:20, 521:16, 522:6, 523:14

**company** [76] - 301:7, 324:22, 325:2, 327:18, 373:2, 373:5, 400:13, 407:7, 408:1, 408:8, 414:17, 415:5, 425:21, 436:16, 436:24, 437:21, 438:25, 439:21, 440:20, 440:23, 441:3, 441:7, 441:14, 445:13, 448:22, 449:15, 449:17, 450:8, 450:9, 450:16, 450:24, 454:20, 455:13, 457:2, 457:17, 459:11, 459:13, 460:1, 467:3, 467:5, 467:23, 468:25, 469:25, 471:25, 472:3, 472:4, 472:5, 476:4, 477:22, 478:2, 478:17, 478:25, 483:17, 487:17, 488:24, 489:7, 489:21, 499:14, 510:9, 511:2, 511:18, 513:8, 515:14, 516:25, 517:14, 517:23, 519:18, 522:1, 522:16, 523:1, 523:6, 523:25

**Company** [2] - 526:6, 526:8

**company's** [4] - 441:8, 458:12, 466:22, 525:4

**company-wide** [1] - 400:13

**comparing** [1] - 342:19

**compensate** [2] - 541:19, 541:21

**compensated** [1] - 534:3

**compensation** [4] - 327:4, 327:12, 534:6, 534:8

**compete** [4] - 328:4, 486:7, 488:1, 520:25

**competing** [9] - 337:11, 365:7, 366:11, 461:5, 461:10, 500:14, 502:17, 505:7, 548:21

**competition** [4] - 461:12, 486:10, 486:11, 501:2

**Competition** [1] - 485:12

**competitive** [3] - 438:18, 484:4, 487:21

**competitor** [5] - 402:5, 414:4, 487:7, 488:16, 501:3

**competitors** [8] - 401:24, 485:14, 485:16, 486:14, 488:19, 519:16, 519:23, 520:4

**complaint** [16] - 386:2, 490:25, 491:12, 492:9, 492:19, 492:22, 494:8, 494:23, 495:6, 495:8, 495:18, 498:10, 498:13, 498:14, 512:20, 512:22

**complaints** [3] - 490:18, 490:21, 512:24

**completely** [2] - 354:11, 355:18

**completeness** [1] - 477:5

**complex** [3] - 307:10, 307:16, 520:19

**compliance** [7] - 451:8, 451:9, 455:3, 455:9, 460:15, 528:2

**comply** [2] - 564:15, 569:7

**component** [1] - 549:6

**composition** [1] - 570:23

**compound** [3] - 300:5, 569:23, 570:25

**compounds** [1] -

445:24

**comprised** [1] - 573:12

**comprising** [2] - 569:22, 569:23

**compromise** [1] - 334:1

**conceded** [3] - 334:8, 343:8, 366:23

**conceding** [1] - 367:1

**conceive** [1] - 314:22

**conceived** [3] - 293:18, 303:24, 320:13

**concept** [8] - 318:14, 337:7, 338:5, 338:10, 340:6, 340:10, 345:15, 517:20

**conception** [3] - 293:23, 314:23, 373:17

**concern** [4] - 491:8, 495:4, 496:12, 543:24

**concerned** [3] - 275:24, 477:1, 576:2

**conclude** [10] - 292:24, 473:20, 543:19, 544:24, 554:7, 557:16, 558:2, 558:3, 574:21, 576:14

**concluded** [1] - 543:15

**concludes** [1] - 558:15

**conclusion** [5] - 540:11, 543:21, 544:4, 555:2, 557:20

**conditions** [5] - 295:24, 296:8, 296:10, 297:5, 309:20

**conduct** [2] - 304:17, 422:7

**conducting** [1] - 537:8

**confer** [2] - 354:3, 544:19

**conference** [2] - 273:21, 371:25

**conferences** [1] - 516:6

**confident** [1] - 516:23

**confidential** [2] - 331:9, 331:16

**Confidential** [1] - 516:12

**configuration** [1] - 310:1

**configurations** [1] - 309:21

**confirm** [10] - 304:6, 304:17, 308:12, 309:1, 376:3, 418:16, 434:22, 494:20, 571:20, 577:3

**confirmatory** [1] - 435:9

**confirmed** [2] - 304:5, 377:23

**confirming** [1] - 435:6

**confusing** [6] - 278:18, 342:15, 358:7, 359:4, 359:20, 363:4

**confusion** [4] - 275:22, 287:3, 426:19, 544:15

**Congress** [6] - 329:19, 329:22, 461:18, 466:4, 563:24, 564:18

**Congressional** [1] - 466:2

**conjunction** [1] - 315:24

**connected** [1] - 554:5

**Connecticut** [1] - 292:7

**connection** [10] - 282:7, 282:8, 480:19, 524:6, 555:13, 556:3, 556:9, 559:11, 559:12, 563:10

**consider** [8] - 291:12, 303:12, 306:25, 314:14, 349:9, 517:22, 524:13, 544:1

**considered** [6] - 278:19, 348:22, 361:24, 477:1, 479:2, 479:10

**considers** [1] - 479:19

**consistent** [3] - 354:9, 356:19, 518:23

**consolidation** [1] - 485:4

**constantly** [1] - 504:17

**constitute** [1] - 384:24

**constructed** [1] - 566:8

**consultant** [1] - 413:15

**consulting** [5] - 325:6, 325:9, 325:11,

402:25, 409:9

**consumed** [1] - 438:19

**consumption** [6] - 387:10, 387:12, 387:23, 388:13, 390:15, 390:16

**contact** [2] - 512:7, 512:8

**contain** [2] - 308:14, 532:20

**containing** [11] - 300:5, 396:24, 499:23, 500:5, 568:23, 569:24, 571:9, 572:4, 572:14, 573:11, 573:12

**contains** [1] - 572:2

**contemporaneously** [1] - 553:5

**content** [7] - 350:9, 352:20, 357:16, 357:21, 359:7, 361:7, 556:7

**contents** [2] - 279:11, 360:19

**context** [11] - 299:5, 299:18, 322:2, 322:3, 343:3, 343:13, 379:11, 410:1, 411:3, 411:9, 555:5

**continuation** [1] - 429:7

**continuations** [1] - 432:25

**continue** [19] - 277:19, 293:6, 294:23, 304:17, 306:20, 308:6, 317:2, 393:15, 398:7, 440:24, 450:15, 460:6, 460:8, 514:5, 514:12, 538:10, 538:19, 560:22, 567:17

**continued** [2] - 272:1, 307:23

**continues** [1] - 573:10

**continuing** [3] - 306:12, 311:14, 375:21

**continuity** [1] - 373:16

**continuous** [2] - 528:15, 529:3

**continuously** [3] - 527:16, 527:20, 527:24

**contract** [8] - 449:19,

454:4, 454:6, 454:23, 454:24, 454:25, 455:10, 479:23

**contracting** [4] - 566:1, 566:2, 566:17, 574:12

**contracts** [7] - 459:21, 459:23, 471:20, 499:23, 500:3, 511:3, 566:3

**contrary** [1] - 484:14

**contributory** [13] - 274:20, 275:4, 275:8, 292:3, 385:1, 549:4, 549:5, 549:13, 554:25, 555:2, 556:24, 559:22, 562:1

**control** [40] - 322:10, 330:25, 383:8, 400:22, 406:4, 408:2, 408:14, 433:5, 433:13, 456:21, 466:19, 478:19, 479:24, 489:16, 489:18, 490:7, 492:2, 492:25, 493:1, 493:3, 494:7, 494:12, 495:16, 495:25, 497:14, 499:14, 499:18, 508:5, 511:7, 530:22, 530:24, 531:1, 537:11, 537:12, 537:13, 537:15, 538:3, 539:18, 541:17, 544:25

**controlled** [1] - 496:7

**controlling** [5] - 463:5, 493:15, 494:7, 494:10, 528:17

**controls** [3] - 493:7, 526:14, 529:18

**convenient** [1] - 513:17

**convention** [1] - 503:24

**conversation** [1] - 506:25

**convert** [1] - 444:9

**conveyer** [1] - 550:20

**cool** [1] - 325:20

**copied** [3] - 345:13, 368:13, 548:20

**copies** [6] - 297:21, 297:23, 298:19,

368:7, 410:21, 457:16

**copy** [7] - 297:16, 351:6, 354:25, 369:21, 498:2, 501:20, 553:9

**corner** [2] - 441:13, 453:3

**Corp** [1] - 516:24

**CORP** [1] - 271:3

**corporate** [6] - 404:24, 443:25, 471:25, 490:1, 518:11, 521:22

**Corporate** [1] - 517:13

**Corporation** [2] - 324:23, 545:15

**corporations** [1] - 521:23

**correct** [119] - 279:12, 279:19, 280:7, 284:16, 285:1, 285:7, 285:14, 288:14, 288:21, 289:1, 290:2, 290:6, 290:16, 297:7, 297:23, 299:20, 305:19, 308:3, 316:18, 322:6, 326:14, 330:5, 343:19, 343:23, 347:23, 348:10, 348:15, 352:14, 353:14, 353:23, 355:19, 356:4, 357:17, 357:22, 358:21, 360:22, 362:11, 362:14, 363:21, 365:13, 365:24, 366:22, 368:1, 369:3, 371:11, 372:25, 373:24, 373:25, 374:4, 374:20, 375:3, 375:4, 376:13, 377:25, 378:17, 381:17, 381:18, 381:21, 381:23, 384:7, 388:16, 389:14, 399:19, 400:2, 403:4, 406:6, 406:13, 406:22, 409:11, 409:20, 412:17, 414:23, 415:2, 415:22, 427:20, 428:1, 428:2, 428:13, 428:14, 464:24, 465:9, 465:10,

476:1, 477:24, 477:25, 478:22, 481:20, 484:13, 486:3, 486:8, 486:24, 488:2, 488:14, 488:17, 490:18, 500:7, 502:9, 502:12, 503:2, 503:7, 503:10, 503:21, 504:20, 504:24, 507:14, 507:15, 508:17, 509:5, 511:22, 512:1, 515:6, 515:19, 517:12, 519:20, 526:20, 542:5, 551:14, 560:8, 562:1

**corrective** [4] - 274:19, 338:20, 356:21, 536:16

**correctly** [21] - 297:3, 305:17, 336:19, 343:21, 344:25, 348:4, 376:17, 383:5, 383:6, 385:3, 385:4, 396:25, 397:1, 418:1, 418:2, 438:15, 476:2, 499:19, 499:25, 517:16, 518:4

**correlate** [1] - 316:1

**correspondence** [1] - 522:12

**corroborated** [1] - 317:4

**CORTLAN** [1] - 272:3

**cost** [6] - 377:13, 381:6, 387:5, 438:17, 456:23, 508:10

**costs** [2] - 467:2, 517:22

**could..** [1] - 476:12

**counsel** [36] - 271:24, 272:9, 275:18, 284:15, 287:3, 333:6, 333:8, 334:1, 340:13, 341:7, 342:6, 369:24, 386:22, 386:23, 398:4, 418:14, 420:3, 420:4, 423:2, 464:11, 497:20, 503:1, 519:16, 521:8, 521:11, 524:25, 532:17, 544:19, 544:20, 547:11, 551:18, 553:15, 557:18,

568:10

**counsel's** [1] - 560:23

**count** [4] - 397:23, 398:15, 460:1

**counted** [2] - 292:9, 398:11

**country** [5] - 389:14, 453:11, 454:8, 458:6, 474:2

**couple** [24] - 273:1, 281:2, 292:13, 292:22, 306:2, 356:14, 374:8, 391:11, 392:14, 414:25, 418:16, 432:22, 445:14, 445:16, 449:10, 449:18, 453:25, 455:2, 478:11, 480:8, 514:23, 516:6, 529:19, 575:4

**coupled** [1] - 361:22

**courier** [1] - 274:5

**course** [12] - 296:13, 296:15, 298:21, 342:1, 405:5, 444:15, 472:4, 473:10, 478:10, 481:4, 490:23, 511:4

**court** [10] - 274:4, 274:9, 371:3, 398:5, 414:9, 429:12, 465:25, 496:16, 508:13, 577:8

**COURT** [343] - 271:1, 273:1, 275:2, 275:25, 276:3, 276:16, 276:25, 277:12, 277:21, 278:21, 279:5, 279:9, 279:13, 279:24, 280:14, 280:23, 281:1, 281:13, 281:21, 282:11, 283:1, 283:4, 283:15, 283:24, 284:11, 284:25, 285:8, 285:12, 285:15, 285:21, 286:9, 287:11, 287:25, 288:13, 288:22, 289:4, 289:13, 289:17, 290:3, 290:25, 291:23, 293:4, 293:6, 294:13, 298:5, 298:7, 309:7, 309:9, 312:3, 312:5, 315:14, 315:16,

320:24, 321:1, 331:24, 332:2, 332:4, 333:5, 333:8, 334:14, 335:4, 335:9, 335:11, 336:9, 337:4, 337:12, 337:16, 337:20, 339:4, 339:17, 340:12, 340:16, 341:3, 342:17, 343:11, 343:17, 343:20, 343:24, 344:1, 344:6, 344:8, 344:12, 344:19, 345:4, 345:14, 346:2, 346:15, 346:18, 346:22, 346:25, 347:5, 347:11, 347:14, 347:17, 347:24, 348:3, 348:12, 348:17, 348:23, 349:10, 349:16, 349:22, 349:25, 350:3, 350:7, 350:12, 350:20, 351:10, 351:18, 351:23, 352:1, 352:8, 352:12, 352:15, 353:1, 353:16, 353:21, 353:24, 354:12, 354:15, 354:22, 355:2, 355:21, 356:1, 356:9, 356:22, 357:8, 357:12, 357:18, 357:23, 358:11, 359:5, 359:17, 359:23, 360:2, 360:7, 360:12, 361:1, 361:15, 362:5, 362:13, 362:21, 362:23, 363:9, 363:12, 364:1, 364:8, 364:17, 364:20, 365:2, 365:10, 365:14, 365:25, 366:17, 367:5, 367:15, 367:21, 368:2, 368:5, 368:9, 368:17, 368:24, 369:4, 369:6, 369:10, 369:20, 370:6, 372:10, 372:15, 372:18, 379:17, 379:24, 380:24, 381:1, 398:4, 405:18,

407:15, 409:1, 409:3, 412:2, 412:5, 416:10, 416:12, 418:15, 418:22, 418:24, 419:3, 419:5, 419:9, 419:14, 419:16, 419:19, 419:23, 420:3, 420:25, 421:18, 422:11, 423:19, 424:11, 424:14, 424:18, 435:18, 435:22, 436:2, 439:7, 439:10, 439:12, 439:15, 439:18, 439:22, 440:10, 449:1, 449:3, 456:9, 456:11, 457:22, 457:24, 459:3, 459:5, 464:7, 464:14, 464:20, 465:3, 465:8, 465:11, 465:21, 466:5, 471:13, 471:15, 474:9, 474:13, 474:15, 482:11, 482:13, 491:5, 491:7, 491:23, 492:8, 492:16, 493:1, 493:4, 493:11, 493:19, 493:23, 494:4, 494:10, 494:14, 494:18, 495:7, 495:14, 496:8, 497:7, 497:19, 497:25, 498:5, 498:7, 498:16, 498:24, 499:7, 506:15, 506:17, 507:20, 507:22, 508:13, 509:15, 509:17, 513:12, 513:16, 513:22, 514:2, 514:5, 514:11, 516:16, 516:18, 519:8, 519:10, 519:12, 521:10, 524:22, 524:25, 525:5, 525:11, 525:16, 532:1, 532:4, 532:7, 532:17, 532:23, 533:8, 539:19, 542:24, 543:1, 544:8, 544:15, 544:19, 547:1, 547:5, 547:10, 551:6, 551:8,

551:14, 551:16, 551:18, 552:3, 552:5, 552:23, 553:6, 553:11, 553:14, 554:19, 555:7, 556:3, 556:20, 557:15, 557:22, 558:21, 558:25, 559:10, 559:19, 560:8, 560:13, 562:3, 562:18, 563:6, 564:2, 564:8, 567:7, 567:11, 567:14, 567:24, 568:2, 568:10, 568:19, 570:13, 570:15, 574:5, 574:7, 574:19, 574:25, 576:13, 577:1, 577:7, 577:12
**Court** [31] - 274:17, 275:3, 278:1, 281:7, 284:19, 288:9, 293:1, 294:11, 334:25, 336:4, 347:12, 370:16, 370:18, 371:10, 405:17, 421:3, 422:20, 423:12, 465:23, 475:12, 476:4, 476:5, 494:3, 513:23, 547:5, 553:25, 554:6, 577:13, 577:23, 577:23
**Court's** [9] - 274:25, 275:21, 420:22, 422:15, 422:17, 436:1, 464:24, 491:17, 525:10
**Courtroom** [1] - 271:12
**courtroom** [20] - 273:22, 273:23, 273:24, 274:3, 293:5, 332:17, 332:22, 339:20, 341:2, 372:9, 420:2, 424:11, 424:13, 513:21, 514:4, 525:3, 525:9, 574:24, 577:2
**Courts** [7] - 417:23, 421:9, 423:5, 554:3, 557:24, 558:8, 558:17
**courts** [1] - 343:1
**cover** [7] - 273:11, 274:11, 384:9,

392:12, 393:2, 479:17, 489:7
**coverage** [1] - 319:21
**coveralls** [1] - 444:8
**covered** [7] - 390:23, 394:10, 395:20, 399:17, 479:19, 491:21, 529:20
**covering** [1] - 416:24
**covers** [1] - 391:22
**CPA** [1] - 436:7
**crack** [1] - 449:25
**crawl** [1] - 536:8
**created** [3] - 338:1, 339:3, 339:5
**creating** [1] - 339:15
**creation** [1] - 461:19
**credit** [16] - 329:19, 330:18, 409:12, 412:10, 431:15, 431:19, 437:8, 437:9, 461:5, 461:16, 463:17, 473:23, 480:18, 555:16, 556:21, 563:23
**credits** [33] - 329:22, 329:24, 402:16, 402:19, 430:8, 430:11, 430:15, 430:21, 431:9, 431:11, 436:9, 437:23, 438:4, 438:6, 461:14, 480:21, 480:24, 554:21, 554:24, 555:12, 556:13, 559:12, 561:7, 562:19, 562:22, 563:10, 563:14, 563:17, 563:19, 563:20, 564:18, 565:17, 566:24
**criteria** [1] - 528:19
**CROSS** [2] - 372:20, 474:16
**cross** [25] - 278:3, 278:9, 279:22, 280:17, 280:20, 286:24, 287:20, 288:9, 291:3, 333:10, 341:16, 341:25, 354:2, 367:8, 370:14, 372:14, 372:19, 424:23, 424:25, 425:11, 434:5, 474:10, 514:6, 523:18, 557:8
**CROSS-**

**EXAMINATION** [2] - 372:20, 474:16
**cross-examination** [15] - 278:3, 280:17, 280:20, 288:9, 333:10, 341:16, 341:25, 370:14, 372:19, 424:23, 424:25, 425:11, 474:10, 514:6, 523:18
**cross-examined** [1] - 291:3
**crossed** [2] - 273:23, 286:17
**crosses** [1] - 559:17
**crossing** [1] - 558:24
**crowd** [1] - 470:13
**crunching** [2] - 392:17, 392:19
**CSR** [1] - 577:22
**CTF** [2] - 403:19, 403:20
**CTO** [5] - 326:8, 326:10, 372:24, 373:1, 414:15
**culminated** [1] - 422:7
**CUMMINGS** [1] - 272:6
**cured** [1] - 367:14
**current** [4] - 322:9, 436:20, 508:3, 543:22
**CURRY** [2] - 271:19, 271:20
**Curtis** [1] - 507:13
**customer** [13] - 426:7, 441:11, 453:7, 454:13, 454:15, 454:16, 454:21, 470:10, 484:16, 488:21, 488:25, 502:6, 507:17
**customers** [16] - 396:24, 397:19, 398:2, 400:10, 441:8, 458:7, 468:13, 468:16, 469:10, 469:24, 480:5, 501:12, 502:18, 503:12, 519:1
**cut** [6] - 305:17, 396:16, 433:23, 467:1, 467:2, 574:20
**cutting** [2] - 309:23, 455:5

## D

**dad** [2] - 442:9, 443:22
**daily** [2] - 441:6, 453:22
**Dakota** [6] - 403:9, 417:4, 445:19, 446:15, 446:20, 510:13
**Dalhousie** [1] - 442:21
**damages** [15] - 275:11, 331:19, 385:23, 386:1, 386:5, 386:12, 390:6, 473:14, 475:5, 475:10, 475:16, 476:5, 476:18, 540:9, 571:3
**damaging** [1] - 356:15
**danger** [1] - 446:2
**DANIEL** [1] - 271:22
**DARCO** [4] - 310:18, 311:11, 316:13, 316:14
**Data** [1] - 570:5
**data** [29] - 296:8, 306:23, 377:11, 377:12, 377:14, 377:24, 378:6, 378:18, 380:12, 381:6, 387:4, 387:7, 387:8, 387:10, 387:11, 387:12, 387:22, 387:25, 388:2, 390:2, 390:5, 390:15, 404:20, 531:5, 546:3, 546:5, 546:9, 547:17, 571:1
**database** [11] - 387:15, 387:17, 387:18, 388:3, 388:13, 389:10, 389:12, 390:1, 390:9, 392:6, 533:20
**date** [39] - 278:5, 299:10, 300:3, 304:15, 305:6, 306:7, 342:14, 343:3, 343:6, 345:21, 345:25, 346:12, 346:13, 346:20, 347:3, 347:8, 347:9, 348:8, 348:9, 348:20, 348:22, 348:24, 351:3, 351:5, 351:11, 352:23, 353:12, 363:23, 365:22, 366:19,

371:8, 410:5, 454:25, 486:19, 522:21, 522:23, 543:17, 543:18
**dated** [3] - 379:5, 506:7, 516:13
**dates** [3] - 317:4, 345:23, 386:6
**Daubert** [6] - 552:25, 553:14, 560:16, 560:17, 560:19, 560:21
**daughter** [1] - 534:19
**daughters** [1] - 534:20
**Davidson/Yamaha** [1] - 442:18
**day-to-day** [1] - 451:21
**days** [5] - 421:23, 442:9, 452:16, 453:25, 516:6
**DC** [1] - 442:3
**deal** [15] - 273:10, 287:17, 355:19, 382:25, 469:23, 488:19, 489:19, 489:24, 490:15, 506:22, 518:8, 552:6, 552:7, 575:23
**dealing** [4] - 284:10, 418:10, 515:1, 518:13
**deals** [3] - 274:20, 278:2, 470:2
**dealt** [8] - 278:21, 278:23, 281:7, 281:19, 284:5, 287:24, 464:18, 464:25
**Deanna** [2] - 577:17, 577:22
**decade** [3] - 388:11, 389:10, 411:18
**December** [10] - 304:21, 305:4, 307:23, 311:15, 437:5, 483:22, 487:1, 509:11, 563:20, 565:18
**decide** [42] - 276:18, 276:20, 277:2, 277:13, 277:16, 277:23, 286:1, 286:17, 286:21, 287:8, 287:15, 287:19, 317:8, 318:18, 318:21, 333:20, 339:8, 339:19, 339:25, 340:24, 341:12,

347:18, 353:16, 353:18, 357:2, 359:14, 360:13, 363:14, 363:17, 364:21, 364:22, 364:24, 365:22, 366:16, 366:20, 369:12, 370:1, 371:24, 372:2, 537:11, 548:11
**decided** [14] - 280:16, 281:10, 282:16, 284:20, 334:22, 343:1, 352:5, 352:9, 359:9, 361:3, 372:1, 443:4, 448:1, 515:25
**decides** [4] - 287:4, 364:21, 367:12, 370:17
**deciding** [4] - 280:20, 286:6, 366:21, 540:3
**decision** [35] - 279:14, 279:15, 282:13, 282:16, 283:10, 283:13, 283:19, 284:1, 285:2, 285:22, 285:23, 286:12, 287:23, 289:4, 291:3, 291:11, 318:21, 333:18, 342:11, 347:11, 352:21, 355:5, 355:6, 356:3, 359:6, 366:9, 366:10, 366:13, 367:6, 369:15, 492:2, 492:6, 492:13, 493:17
**decision-making** [2] - 492:2, 492:13
**decisions** [14] - 291:16, 333:16, 341:24, 365:23, 367:6, 367:7, 466:23, 490:4, 492:3, 492:14, 493:9, 493:10, 499:22, 500:3
**declaration** [3] - 297:15, 297:20, 298:16
**declares** [1] - 297:20
**decline** [1] - 505:13
**decline.** [1] - 503:18
**decrease** [3] - 484:17, 502:5
**decreases** [1] - 467:4
**deep** [1] - 561:20
**defendant** [17] - 275:5, 275:6,

279:16, 290:4, 346:15, 371:14, 372:23, 379:18, 425:10, 495:15, 540:8, 555:10, 558:2, 558:3, 558:11, 558:12, 565:3
**defendants** [53] - 274:15, 275:7, 275:10, 275:11, 281:8, 282:19, 282:23, 284:13, 292:4, 292:5, 292:14, 323:3, 331:17, 344:23, 371:5, 371:11, 385:8, 396:11, 427:21, 476:19, 497:1, 497:4, 520:3, 521:9, 521:11, 522:6, 525:24, 533:25, 540:13, 549:12, 550:11, 550:17, 550:19, 551:22, 553:18, 554:1, 563:10, 564:24, 565:2, 565:7, 565:10, 565:24, 566:1, 566:2, 566:7, 566:8, 566:11, 566:17, 566:18, 573:16, 573:24, 574:12, 577:10
**Defendants** [2] - 271:8, 272:9
**defendants'** [8] - 331:2, 344:21, 433:19, 497:20, 540:5, 549:16, 560:22, 573:23
**Defendants'** [8] - 381:2, 409:4, 412:6, 416:13, 482:14, 506:18, 507:23, 509:18
**defense** [4] - 276:10, 423:13, 464:11, 517:24
**defenses** [2] - 421:9, 553:24
**define** [3] - 377:7, 388:7, 437:15
**defined** [1] - 378:22
**defines** [1] - 349:12
**definitely** [1] - 304:1
**definition** [3] - 417:21, 417:22, 418:3
**degree** [6] - 287:2,

287:3, 490:8, 534:25, 535:2, 541:14
**degrees** [1] - 541:20
**DELAWARE** [1] - 271:2
**Delaware** [2] - 512:14, 513:7
**deliberate** [1] - 337:24
**deliberations** [1] - 314:14
**deliver** [3] - 442:15, 554:20
**deliverables** [1] - 416:21
**delivered** [1] - 442:10
**dellinger** [1] - 435:25
**DELLINGER** [4] - 271:22, 436:3, 439:9, 439:14
**Dellinger** [2] - 436:2, 436:4
**Delta** [1] - 415:15
**demonstrate** [1] - 275:8
**demonstrated** [6] - 305:21, 307:13, 312:15, 315:24, 330:22, 544:25
**demonstrating** [2] - 303:19, 492:19
**demonstration** [1] - 451:24
**demonstrations** [2] - 453:10, 454:2
**denied** [2] - 525:12, 553:1
**deny** [3] - 560:14, 560:20, 561:19
**Department** [14] - 294:15, 308:5, 308:7, 308:23, 309:6, 309:18, 311:14, 311:22, 312:2, 314:17, 314:18, 315:2, 317:8, 387:19
**department** [8] - 317:17, 417:10, 417:15, 443:13, 463:10, 536:19, 537:4, 537:10
**depicted** [1] - 349:17
**deposition** [12] - 378:23, 379:13, 391:19, 435:25, 436:5, 500:19, 501:17, 501:20, 503:4, 504:15, 504:21, 525:18

**deputy** [3] - 273:24, 424:12, 577:2
**describe** [2] - 313:2, 324:1
**described** [11] - 295:11, 322:22, 322:24, 322:25, 327:25, 349:18, 381:14, 384:19, 399:25, 406:21, 469:23
**describing** [8] - 299:12, 311:22, 425:3, 425:4, 483:7, 483:17, 483:18
**description** [23] - 285:10, 286:2, 321:13, 336:24, 337:12, 337:13, 337:15, 340:9, 342:16, 342:18, 342:22, 343:3, 343:6, 345:18, 349:13, 350:23, 351:1, 365:1, 365:11, 366:24, 548:5, 548:7
**descriptions** [1] - 344:18
**design** [2] - 535:10, 537:13
**desire** [1] - 450:5
**detailed** [2] - 388:11, 416:20
**details** [2] - 295:25, 441:16
**determination** [7] - 335:1, 341:20, 342:12, 351:11, 352:7, 352:17, 576:21
**determine** [7] - 306:15, 310:10, 324:18, 339:24, 423:16, 541:3, 548:18
**determined** [3] - 279:25, 281:15, 536:14
**Detroit** [1] - 472:1
**develop** [2] - 445:17, 448:5
**developed** [4] - 332:24, 447:12, 448:8, 450:6
**developing** [6] - 294:6, 328:11, 377:12, 381:6, 440:24, 453:6
**development** [6] -

326:12, 326:25, 328:10, 411:18, 479:14, 516:24

**devices** [2] - 571:12, 571:23

**DEVLIN** [1] - 271:16

**DI** [2] - 289:13, 497:23

**diagram** [3] - 322:20, 324:12, 550:9

**Diaz** [26] - 298:10, 299:1, 299:23, 300:15, 300:22, 302:3, 303:15, 304:24, 305:24, 307:20, 309:12, 312:13, 321:16, 426:15, 429:1, 434:1, 434:18, 435:4, 522:20, 545:7, 546:4, 547:14, 548:2, 570:18, 570:19, 571:16

**difference** [4] - 325:22, 326:4, 367:25, 554:24

**differences** [3] - 303:6, 369:8, 563:15

**different** [40] - 275:20, 281:4, 289:7, 297:1, 302:19, 302:24, 304:25, 307:6, 312:21, 318:2, 318:15, 318:17, 319:15, 319:19, 321:14, 325:3, 345:15, 360:7, 360:8, 369:6, 369:7, 371:13, 392:18, 392:21, 399:20, 406:16, 432:22, 445:24, 453:11, 454:1, 470:1, 480:9, 494:2, 494:18, 520:22, 527:7, 535:11, 541:20, 547:21, 565:24

**differently** [3] - 276:25, 466:20, 466:21

**difficult** [9] - 275:23, 328:13, 355:4, 467:6, 467:7, 467:20, 496:19, 500:15, 520:20

**digest** [1] - 274:24

**digging** [1] - 434:24

**digits** [1] - 418:20

**diligent** [1] - 294:19

**diligently** [1] - 294:23

**DIRECT** [3] - 293:10, 440:12, 533:1

**direct** [24] - 286:20, 291:7, 293:7, 321:5, 335:7, 339:6, 372:24, 373:18, 376:15, 384:25, 422:5, 434:15, 481:8, 489:13, 505:6, 512:5, 517:24, 548:18, 548:19, 557:6, 558:7, 560:7, 567:19, 576:8

**directed** [3] - 374:11, 426:20, 572:2

**direction** [3] - 322:10, 460:11, 509:9

**directly** [14] - 301:23, 323:17, 324:5, 376:4, 384:21, 417:24, 492:5, 549:1, 556:5, 557:15, 566:4, 566:6, 566:13, 576:4

**director** [3] - 297:18, 298:17, 447:9

**dirty** [1] - 572:1

**disadvantage** [1] - 484:4

**disagree** [6] - 283:12, 290:11, 348:12, 362:21, 362:22, 365:22

**disagreed** [1] - 290:3

**disagrees** [1] - 351:23

**disappears** [1] - 335:24

**disappointing** [1] - 313:10

**disband** [1] - 503:15

**disbanded** [2] - 500:22, 503:6

**disbanding** [1] - 502:19

**discharge** [2] - 427:13, 427:18

**disclose** [4] - 285:19, 356:18, 365:9, 376:4

**disclosed** [5] - 290:22, 323:12, 335:15, 376:6, 547:22

**disclosing** [1] - 344:3

**disclosure** [18] - 278:17, 323:23, 324:8, 336:17, 336:21, 337:6, 343:21, 343:24, 349:1, 349:2,

356:10, 356:11, 357:20, 358:13, 361:11, 363:15, 487:11

**disclosures** [1] - 357:19

**discount** [6] - 393:13, 472:9, 472:11, 472:14, 473:6, 476:20

**discouraged** [1] - 421:11

**discovered** [2] - 447:25, 462:22

**discovery** [1] - 496:24

**discuss** [10] - 292:19, 292:20, 339:23, 340:17, 340:19, 436:8, 519:20, 525:5, 540:2, 568:2

**discussed** [6] - 294:25, 370:7, 370:11, 373:17, 422:4, 564:5

**discusses** [1] - 361:19

**discussing** [5] - 282:10, 341:6, 341:11, 502:2, 539:25

**discussion** [18] - 281:20, 284:9, 292:1, 293:19, 333:7, 333:9, 340:15, 468:12, 491:6, 497:18, 514:17, 523:21, 551:7, 551:17, 552:4, 555:16, 555:19, 563:5

**discussions** [1] - 522:2

**disengaged** [2] - 530:7, 530:18

**dismissed** [1] - 494:25

**display** [1] - 467:14

**displayed** [2] - 344:24, 375:17

**dispose** [1] - 384:12

**disputable** [1] - 344:15

**dispute** [46] - 280:9, 284:20, 288:5, 290:6, 295:17, 334:21, 335:22, 336:13, 336:14, 336:16, 337:1, 337:4, 337:7, 337:8, 337:10, 337:17, 343:7, 344:14,

346:3, 346:11, 346:23, 349:4, 350:3, 350:4, 350:24, 363:16, 364:1, 364:6, 364:9, 364:15, 364:21, 365:1, 365:3, 366:3, 366:6, 371:2, 371:3, 371:9, 379:10, 384:2, 497:2, 569:7, 569:20

**disputed** [7] - 289:20, 334:23, 336:5, 370:11, 370:20, 370:22, 371:12

**disputes** [11] - 280:21, 285:16, 285:21, 285:24, 286:1, 292:12, 292:13, 341:21, 365:11, 464:22, 496:24

**distinction** [3] - 334:15, 557:5, 557:24

**distinguish** [1] - 274:4

**District** [1] - 577:23

**DISTRICT** [2] - 271:1, 271:2

**divided** [2] - 399:5, 475:22

**divine** [1] - 292:23

**division** [3] - 429:9, 436:23, 537:3

**divisionals** [1] - 432:24

**Docket** [2] - 476:7, 490:25

**docket** [1] - 276:1

**docs** [1] - 292:11

**document** [45] - 289:5, 294:24, 296:7, 297:14, 299:6, 299:24, 300:1, 309:15, 315:10, 331:16, 342:23, 345:13, 345:19, 368:14, 368:15, 369:2, 376:9, 383:22, 415:3, 415:8, 429:5, 448:19, 448:21, 456:2, 463:22, 465:15, 465:16, 470:25, 471:2, 471:7, 471:23, 475:12, 476:12, 498:9, 498:15, 509:7, 516:11, 517:7, 522:21, 522:24, 542:15,

544:16, 570:4, 573:19, 573:22

**documentation** [4] - 293:18, 293:23, 295:16, 425:4

**documented** [7] - 295:19, 299:16, 304:2, 304:3, 308:21, 314:22, 435:14

**documenting** [1] - 435:10

**documents** [31] - 289:21, 289:22, 291:10, 291:17, 308:12, 308:14, 309:1, 314:12, 317:3, 322:15, 331:2, 331:7, 331:16, 333:14, 355:9, 358:18, 367:7, 369:12, 371:23, 457:5, 457:8, 457:10, 458:19, 470:25, 471:19, 498:3, 512:14, 513:9, 520:22, 544:20, 547:20

**DOE** [4] - 309:24, 310:12, 312:11, 445:23

**Doe** [1] - 522:6

**dog** [2] - 474:23, 475:2

**dollar** [9] - 439:2, 473:8, 473:11, 473:15, 473:18, 476:15, 524:3, 524:17, 550:22

**dollars** [2] - 437:21, 475:23

**done** [25] - 293:22, 295:24, 296:14, 296:23, 298:20, 299:10, 299:11, 299:13, 300:2, 305:6, 305:8, 309:20, 330:21, 360:21, 360:23, 361:17, 361:18, 392:17, 392:19, 451:1, 453:19, 454:6, 528:13, 577:4

**door** [6] - 339:11, 421:25, 423:10, 423:17, 442:10

**door's** [1] - 423:14

**doors** [1] - 437:7

**Dorsney** [4] - 273:23,

334:15, 336:11, 372:12
**DORSNEY** [17] - 272:4, 334:6, 334:11, 334:20, 372:7, 372:14, 372:17, 439:11, 494:6, 494:12, 494:16, 496:4, 525:6, 561:23, 562:14, 567:25, 577:5
**dose** [1] - 508:4
**double** [2] - 418:13, 466:8
**doubt** [5] - 303:23, 314:21, 314:25, 427:8, 427:12
**doubted** [1] - 404:23
**down** [61] - 297:8, 312:24, 334:2, 334:9, 338:24, 341:4, 346:9, 355:3, 364:25, 374:7, 374:23, 375:20, 379:18, 379:19, 383:21, 388:17, 393:6, 393:19, 393:20, 397:15, 417:17, 421:16, 428:22, 429:10, 431:23, 435:19, 445:18, 446:14, 446:20, 447:9, 447:24, 451:9, 452:8, 455:6, 466:25, 469:7, 478:6, 482:20, 483:24, 484:2, 484:3, 488:3, 497:24, 498:2, 501:6, 501:12, 502:18, 503:12, 504:3, 504:7, 511:13, 512:10, 512:20, 520:20, 522:1, 524:22, 528:17, 573:5, 574:25
**download** [1] - 390:2
**downstream** [11] - 302:18, 304:8, 310:2, 310:3, 310:10, 319:18, 320:10, 323:16, 323:22, 324:7, 477:11
**downtown** [2] - 444:6, 535:23
**downward** [1] - 461:2

**dozen** [2] - 319:12, 460:3
**Dr** [1] - 319:11
**drafted** [1] - 386:12
**dramatically** [1] - 455:14
**drastic** [1] - 467:5
**draw** [2] - 490:24, 558:17
**drawing** [1] - 558:17
**drawn** [1] - 323:10
**dredge** [1] - 494:24
**dress** [1] - 535:25
**dressed** [1] - 536:3
**drive** [1] - 453:13
**driving** [2] - 458:6, 502:19
**drop** [8] - 484:17, 491:9, 501:9, 502:16, 503:9, 503:11, 503:15, 504:6
**dropped** [21] - 273:24, 420:13, 421:6, 421:9, 421:23, 423:13, 491:9, 491:10, 491:15, 491:20, 494:25, 495:20, 495:24, 496:1, 496:24, 497:10, 497:11, 497:14, 572:15
**drops** [2] - 497:10, 572:5
**drywall** [1] - 444:11
**DTE** [4] - 376:17, 396:10, 427:25, 472:5
**DTE-AJG-Chem-Mod** [1] - 376:17
**DTX** [58] - 377:18, 378:11, 378:15, 380:22, 380:23, 381:11, 381:13, 381:16, 381:19, 382:22, 384:10, 385:7, 386:8, 390:22, 393:2, 394:19, 395:13, 395:23, 408:17, 408:19, 408:25, 410:3, 411:10, 411:24, 412:1, 415:3, 415:8, 415:12, 416:9, 419:8, 419:10, 419:12, 419:14, 425:14, 425:17, 481:10, 481:17, 481:22, 481:25,

482:10, 483:12, 500:12, 506:1, 506:14, 507:9, 507:19, 508:16, 509:8, 509:14, 514:8, 516:8, 516:10, 516:15, 518:16, 522:20
**due** [3] - 484:3, 502:6, 514:19
**dump** [1] - 444:25
**duration** [1] - 391:3
**during** [16] - 274:21, 278:24, 291:18, 292:21, 304:6, 420:24, 422:2, 453:5, 454:8, 468:2, 480:16, 515:16, 521:2, 529:20, 570:6, 571:3
**DYESS** [31] - 272:6, 542:25, 544:7, 544:10, 544:17, 547:2, 547:8, 551:4, 551:9, 552:1, 552:6, 552:25, 553:8, 553:12, 554:9, 557:2, 557:18, 558:18, 558:23, 559:6, 559:16, 559:24, 560:10, 564:1, 564:5, 567:6, 567:8, 568:7, 570:14, 574:6, 577:11
**Dyess** [1] - 564:4
**Dyess's** [1] - 554:22

## E

**e-mail** [28] - 273:19, 274:16, 278:1, 278:23, 279:25, 408:16, 408:21, 408:22, 410:1, 410:21, 411:3, 411:11, 411:12, 411:19, 411:22, 506:7, 506:10, 506:21, 507:16, 509:1, 509:10, 510:7, 510:18, 512:3, 512:4, 555:23, 576:12
**e-mails** [2] - 273:4, 522:13
**earliest** [1] - 287:9
**early** [21] - 273:7, 295:7, 304:22, 316:2, 318:18,

323:8, 333:12, 339:23, 340:18, 392:22, 406:21, 408:6, 435:7, 435:10, 437:4, 454:21, 459:19, 505:13, 505:22, 507:5, 523:18
**easel** [1] - 568:1
**easier** [1] - 482:23
**east** [1] - 441:20
**eat** [1] - 445:4
**economic** [1] - 562:14
**economical** [2] - 437:9, 528:18
**economics** [5] - 555:12, 561:20, 561:25, 562:6, 563:3
**Edison** [2] - 472:1, 535:15
**education** [5] - 533:18, 541:19, 541:20, 541:24
**Edwards** [1] - 509:22
**Edwin** [1] - 545:19
**EERC** [58] - 296:13, 308:2, 311:13, 317:17, 318:12, 318:13, 318:20, 324:15, 324:22, 325:2, 326:13, 326:22, 327:7, 402:21, 403:2, 403:7, 403:8, 403:23, 403:24, 403:25, 404:8, 404:9, 404:15, 404:20, 404:22, 405:6, 406:2, 408:5, 408:9, 409:10, 414:22, 432:17, 433:15, 446:15, 447:25, 448:3, 448:23, 449:19, 449:21, 450:5, 450:24, 451:14, 453:19, 455:18, 456:25, 478:12, 478:18, 479:5, 479:13, 510:13, 510:15, 510:23, 510:24, 511:6, 511:12, 511:16, 511:23
**EERC's** [5] - 404:4, 404:18, 406:17, 446:23, 478:18
**effect** [11] - 313:9, 330:5, 356:2, 360:25, 404:25,

431:10, 431:13, 542:2, 564:13, 569:9, 575:8
**effective** [2] - 330:11, 412:23
**effectively** [2] - 486:7, 545:1
**efficacy** [1] - 302:23
**efficiency** [3] - 302:23, 536:12, 536:16
**efficient** [1] - 342:1
**efficiently** [1] - 536:14
**effort** [2] - 328:10, 520:16
**efforts** [1] - 474:2
**EGU** [2] - 484:7, 484:11
**EGUs** [4] - 483:23, 484:4, 484:11, 502:6
**EIA** [10] - 387:15, 387:17, 388:2, 388:3, 388:13, 389:10, 389:12, 390:1, 390:5, 390:9
**eight** [6] - 271:12, 319:7, 382:20, 523:15, 539:2, 566:5
**eight-hour** [1] - 539:2
**eighth** [1] - 417:17
**EIT** [1] - 539:4
**either** [16] - 282:20, 287:14, 287:15, 291:7, 333:11, 333:19, 333:22, 378:9, 413:16, 423:20, 432:5, 455:4, 473:24, 480:9, 510:23, 573:1
**elected** [1] - 448:16
**electric** [3] - 535:15, 543:12, 573:7
**electrical** [3] - 444:18, 484:12, 535:14
**electrically** [1] - 573:3
**electrician** [1] - 444:19
**electricity** [1] - 573:1
**electrostatic** [4] - 310:7, 571:13, 572:23, 572:25
**element** [5] - 307:5, 346:23, 548:20, 562:20, 573:14
**elementary** [1] - 441:22
**elements** [13] - 276:7, 292:3, 555:21, 556:14, 558:14, 559:22, 561:3, 561:11, 561:16,

572:7, 572:9, 572:21, 575:23
**elicit** [1] - 559:9
**elsewhere** [2] - 301:24, 498:19
**embedded** [1] - 286:6
**embody** [1] - 400:3
**emission** [10] - 406:4, 466:19, 490:7, 528:1, 528:14, 528:16, 528:19, 529:4, 529:17, 529:18
**EMISSIONS** [1] - 271:3
**Emissions** [6] - 324:23, 436:17, 440:19, 440:22, 516:24, 545:15
**emissions** [11] - 329:21, 438:17, 440:25, 447:20, 471:25, 528:3, 543:11, 544:6, 545:2, 564:22, 569:11
**emotional** [1] - 306:24
**employ** [2] - 441:6, 571:21
**employed** [2] - 403:1, 485:25
**employee** [6] - 327:17, 327:19, 414:7, 525:19, 533:12, 538:6
**employees** [2] - 415:5, 509:12
**employer** [2] - 296:12, 322:10
**employment** [4] - 318:12, 325:7, 325:17, 403:6
**enacted** [2] - 563:24, 564:18
**encourage** [5] - 394:2, 423:22, 493:16, 493:19, 549:9
**end** [23] - 275:21, 307:6, 370:15, 409:17, 413:8, 427:7, 430:25, 437:5, 462:9, 480:17, 482:20, 484:10, 486:4, 486:21, 508:22, 524:19, 527:17, 527:21, 540:10, 576:15, 576:23, 577:1
**ended** [10] - 340:15,

439:6, 461:4, 486:16, 497:18, 531:25, 551:17, 563:5, 563:20, 565:17
**ending** [8] - 481:19, 481:23, 482:1, 482:4, 482:6, 482:18, 486:25, 514:9
**endorsed** [1] - 343:1
**ends** [1] - 453:15
**energy** [4] - 387:18, 387:21, 445:18, 521:20
**ENERGY** [1] - 271:3
**Energy** [41] - 294:15, 297:18, 298:17, 308:5, 308:7, 308:23, 309:6, 309:18, 311:14, 311:22, 312:2, 314:17, 314:19, 315:2, 317:8, 324:23, 377:9, 378:16, 387:19, 403:8, 433:4, 440:19, 440:21, 440:22, 443:7, 449:13, 456:15, 457:17, 471:8, 478:18, 516:24, 521:18, 526:6, 526:7, 526:19, 526:20, 526:23, 527:1, 527:4, 545:15
**enforce** [2] - 468:15, 560:22
**enforcement** [1] - 517:24
**engage** [1] - 554:3
**engineer** [8] - 405:8, 405:9, 536:11, 536:18, 538:15, 538:22, 539:5, 567:10
**engineering** [12] - 507:13, 526:9, 535:3, 535:4, 535:7, 537:10, 538:10, 538:25, 539:3, 541:14, 541:15, 541:24
**engineers** [3] - 536:25, 537:6, 537:7
**enhancement** [4] - 311:1, 311:2, 311:3, 311:4
**ensuring** [1] - 344:17
**entail** [1] - 536:21

**enter** [3] - 448:2, 448:13, 515:17
**entered** [11] - 293:5, 372:9, 379:20, 421:19, 421:21, 424:13, 450:23, 470:5, 471:20, 495:24, 514:4
**Enterprise** [1] - 473:3
**Enterprises** [1] - 471:9
**entertain** [1] - 465:12
**entire** [4] - 338:19, 422:8, 480:16, 537:4
**entirely** [3] - 284:7, 466:20, 501:7
**entirety** [1] - 280:11
**entities** [29] - 275:10, 292:16, 292:17, 328:9, 380:19, 396:14, 396:21, 397:6, 397:8, 397:15, 397:23, 427:15, 427:18, 427:25, 436:10, 472:6, 489:3, 494:7, 494:11, 495:21, 500:4, 520:13, 521:5, 521:9, 524:6, 524:8, 566:17
**entitled** [11] - 352:22, 367:2, 377:19, 397:3, 434:9, 434:13, 485:1, 495:4, 498:10, 498:13, 506:22
**entity** [6] - 324:25, 327:1, 328:3, 427:14, 493:5, 545:14
**entity's** [1] - 495:16
**entries** [2] - 295:23, 296:23
**Entry** [2] - 476:7, 491:1
**entry** [1] - 299:17
**environment** [4] - 295:4, 303:11, 444:21, 445:19
**Environmental** [5] - 297:19, 298:17, 403:8, 441:15, 542:16
**environmental** [7] - 328:16, 438:17, 440:22, 445:11, 445:21, 466:17, 474:2
**EPA** [15] - 328:25, 329:16, 330:9,

330:19, 447:22, 543:5, 543:14, 543:19, 543:22, 544:6, 544:24, 563:14, 564:13, 564:14, 564:20
**EPA's** [1] - 430:19
**equally** [2] - 340:13, 359:4
**equate** [1] - 399:8
**equipment** [12] - 299:14, 473:25, 529:15, 536:9, 536:13, 536:24, 537:15, 538:17, 539:17, 541:17, 571:10
**equivalent** [1] - 484:8
**ERC** [1] - 311:12
**ERC-treated** [1] - 311:12
**Erickson** [3] - 297:15, 297:17, 297:18
**erroneous** [3] - 355:18, 355:20, 355:21
**error** [1] - 419:15
**ESP** [7] - 310:6, 571:14, 571:18, 571:21, 572:23, 573:8
**especially** [3] - 292:10, 462:10, 511:5
**ESQ** [18] - 271:16, 271:17, 271:19, 271:20, 271:20, 271:21, 271:21, 271:22, 271:22, 271:23, 271:23, 272:3, 272:4, 272:6, 272:7, 272:7, 272:8, 272:8
**essential** [77] - 284:18, 284:21, 285:6, 285:13, 285:20, 286:4, 286:5, 286:8, 290:8, 290:13, 290:20, 290:23, 334:7, 334:9, 335:21, 335:23, 336:3, 336:18, 336:20, 337:2, 337:5, 337:8, 337:18, 342:21, 343:2, 343:5, 344:14, 344:15, 344:17, 345:9, 345:15, 346:19, 348:18, 348:22,

349:9, 349:10, 349:12, 349:23, 350:13, 350:25, 351:4, 351:12, 351:20, 352:2, 352:12, 353:5, 353:6, 353:17, 360:24, 361:23, 362:2, 362:6, 362:15, 362:17, 363:15, 363:18, 363:22, 364:2, 364:4, 364:7, 364:10, 364:15, 364:22, 365:4, 365:19, 365:20, 366:3, 366:5, 366:7, 366:12, 366:15, 366:16, 366:18, 371:6, 371:13
**essentially** [14] - 303:21, 308:14, 310:7, 310:11, 313:2, 318:22, 323:1, 328:3, 328:12, 334:8, 338:18, 351:15, 389:25, 572:1
**established** [5] - 414:14, 437:6, 479:18, 501:5, 503:11
**estimate** [2] - 389:22, 390:16
**et** [12] - 271:3, 271:7, 273:17, 275:15, 276:10, 297:2, 357:2, 369:1, 384:14, 387:24, 575:24
**ETE** [1] - 396:21
**Europe** [1] - 515:21
**European** [1] - 515:22
**evaluate** [1] - 559:18
**evening** [2] - 371:25, 577:12
**evenings** [1] - 291:18
**event** [2] - 369:2, 495:14
**eventually** [8] - 367:24, 377:14, 454:14, 457:1, 457:17, 469:10, 542:7, 542:9
**evidence** [29] - 275:7, 275:9, 292:8, 334:18, 335:1, 448:25, 456:8, 457:21, 459:2, 471:1, 471:12,

476:12, 495:13, 533:20, 533:22, 551:11, 551:21, 554:4, 555:3, 556:1, 556:19, 558:25, 559:2, 559:22, 563:9, 568:25, 569:16, 569:25, 573:14

**evidentiary** [3] - 278:1, 334:12, 338:22

**evolution** [1] - 481:6

**exact** [6] - 276:18, 379:8, 391:1, 475:25, 491:18, 524:10

**exactly** [16] - 280:13, 281:9, 299:12, 354:13, 425:24, 430:2, 430:7, 445:2, 494:20, 500:23, 501:14, 512:22, 531:12, 561:8, 562:10

**exam** [3] - 373:18, 505:6, 539:2

**examination** [20] - 278:3, 280:17, 280:20, 288:9, 293:7, 319:4, 333:10, 335:16, 341:16, 341:25, 370:14, 372:19, 372:24, 421:24, 424:23, 424:25, 425:11, 474:10, 514:6, 523:18

**EXAMINATION** [7] - 293:10, 372:20, 424:20, 440:12, 474:16, 519:13, 533:1

**examined** [2] - 291:3, 375:23

**examiner** [2] - 547:23, 547:24

**example** [5] - 324:8, 368:23, 454:20, 499:21, 548:22

**examples** [4] - 375:25, 376:3, 376:7, 376:10

**Excel** [1] - 390:2

**except** [1] - 527:6

**exception** [1] - 330:14

**exceptional** [1] - 466:7

**exceptions** [1] - 497:13

**Exchange** [2] -

482:19, 483:4

**exchange** [3] - 411:12, 509:11, 514:17

**exciting** [2] - 396:6, 410:20

**exclusion** [1] - 466:11

**exclusive** [4] - 448:13, 448:14, 478:23, 480:13

**excusal** [1] - 575:17

**excuse** [4] - 379:17, 423:11, 457:13, 575:13

**excused** [2] - 525:2, 575:10

**excusing** [1] - 575:5

**excusing-the-witness** [1] - 575:5

**executive** [1] - 415:19

**exercise** [5] - 455:20, 492:3, 493:9, 532:23, 553:4

**exercised** [1] - 478:20

**exercises** [3] - 489:16, 499:14, 499:22

**exhausted** [1] - 294:17

**Exhibit** [52] - 298:4, 298:8, 298:11, 299:2, 308:18, 308:20, 309:5, 309:10, 311:18, 311:20, 312:1, 312:6, 312:10, 315:13, 315:17, 315:21, 316:10, 321:2, 321:7, 321:9, 331:23, 332:1, 332:5, 381:2, 383:15, 383:21, 383:22, 386:8, 397:2, 409:4, 412:6, 416:13, 418:25, 419:6, 428:7, 433:19, 439:16, 448:25, 449:4, 456:8, 456:12, 471:12, 471:16, 506:18, 507:23, 509:10, 509:18, 514:13, 516:19, 543:2, 570:16, 574:9

**exhibit** [20] - 273:14, 321:5, 396:23, 397:2, 397:6, 397:11, 439:7, 439:8, 439:13, 464:6, 464:16, 498:1, 506:1, 507:8,

509:8, 544:11, 544:12, 547:4, 547:8, 568:9

**Exhibits** [10] - 293:24, 320:17, 320:22, 385:7, 457:21, 457:25, 459:2, 459:6, 482:14, 547:12

**exhibits** [11] - 274:17, 376:21, 377:18, 396:23, 418:17, 498:3, 532:20, 532:21, 532:22, 546:24, 575:1

**existed** [2] - 339:15, 467:24

**existing** [1] - 537:7

**exists** [1] - 501:8

**exited** [4] - 341:2, 420:2, 513:21, 574:24

**expect** [5] - 277:5, 277:7, 364:14, 460:5, 461:18

**expected** [2] - 460:16, 484:15

**expensive** [1] - 294:10

**experience** [13] - 317:19, 329:3, 330:24, 332:11, 332:12, 332:21, 424:22, 446:1, 533:18, 541:16, 541:18, 541:21, 541:25

**experienced** [1] - 486:6

**experiment** [1] - 300:10

**expert** [28] - 287:8, 336:25, 337:11, 364:13, 366:23, 390:6, 430:15, 476:6, 533:14, 533:16, 534:4, 539:11, 539:15, 554:3, 554:10, 554:12, 555:8, 555:9, 558:1, 558:5, 558:8, 559:4, 561:24, 562:2, 562:5, 562:10, 563:3, 576:3

**expertise** [7] - 446:23, 557:3, 559:8, 559:18, 560:5, 564:7, 567:9

**expertise...the** [1] - 554:6

**experts** [6] - 365:6, 365:11, 371:14, 495:2, 556:1, 563:2

**expired** [1] - 437:8

**explain** [16] - 309:18, 309:19, 357:1, 368:2, 370:18, 423:15, 459:12, 470:12, 543:5, 551:21, 554:24, 556:14, 563:17, 571:23, 572:10, 572:23

**explained** [2] - 346:5, 545:11

**explains** [1] - 492:12

**explicitly** [3] - 350:5, 355:24, 365:8

**exploratory** [1] - 316:21

**exploring** [1] - 303:3

**extend** [1] - 426:25

**extended** [2] - 555:15, 555:18

**extending** [1] - 423:2

**extends** [3] - 396:13, 396:24, 565:17

**extensively** [1] - 435:11

**extent** [28] - 276:9, 280:1, 281:23, 282:2, 282:7, 282:8, 283:12, 284:8, 287:22, 289:21, 335:14, 358:5, 358:6, 358:7, 358:15, 358:22, 358:25, 359:12, 360:16, 360:17, 371:6, 426:19, 495:14, 496:9, 555:10, 556:5, 556:24, 559:1

**extra** [1] - 444:5

**extraordinarily** [1] - 314:9

**extreme** [1] - 561:2

---

**F**

---

**fabric** [2] - 572:3, 572:12

**facilities** [9] - 406:7, 406:14, 406:18, 406:23, 437:6, 445:22, 528:14, 530:1, 566:22

**facility** [9] - 303:10, 403:12, 403:16,

403:17, 406:2, 437:24, 438:2, 439:5, 566:9

**fact** [18] - 284:20, 337:5, 364:6, 364:10, 364:15, 365:1, 365:10, 519:18, 522:5, 529:13, 553:4, 554:2, 556:22, 560:25, 561:2, 575:8, 577:1

**fact-casting** [1] - 553:4

**fact-recasting** [1] - 554:2

**factor** [6] - 488:4, 500:13, 501:2, 501:9, 501:13, 503:22

**factors** [2] - 303:12, 487:16

**Factors** [1] - 487:11

**facts** [9] - 285:21, 297:21, 334:23, 334:25, 336:5, 422:10, 552:18, 553:23, 554:4

**factual** [12] - 285:16, 285:24, 285:25, 335:22, 336:16, 337:1, 337:4, 337:10, 337:17, 341:12, 341:21, 356:11

**factually** [1] - 555:17

**failed** [1] - 368:22

**fair** [65] - 293:24, 303:7, 314:14, 338:2, 339:9, 373:2, 373:5, 375:6, 375:7, 375:15, 375:18, 375:19, 376:5, 380:20, 381:14, 383:8, 383:23, 383:24, 384:1, 386:4, 386:13, 387:21, 387:25, 390:16, 391:1, 398:19, 402:19, 404:9, 404:10, 404:14, 404:16, 408:9, 416:7, 416:8, 416:25, 417:12, 426:12, 438:4, 438:9, 468:11, 473:15, 473:19, 477:2, 477:5, 478:8, 479:11, 487:13, 490:3, 490:7,

500:16, 502:16, 503:14, 505:20, 507:17, 510:20, 511:8, 511:9, 511:20, 514:20, 514:21, 516:6, 517:11, 527:4, 547:10, 576:13

**fairly** [2] - 274:23, 274:25

**faith** [1] - 446:19

**fall** [1] - 367:13

**falls** [3] - 497:13, 573:4, 573:5

**false** [3] - 323:7, 338:22, 338:23

**familiar** [10] - 315:10, 324:22, 375:22, 378:3, 378:13, 378:17, 383:25, 388:3, 489:10, 526:10

**family** [6] - 373:21, 375:1, 444:4, 454:9, 472:22

**far** [15] - 299:15, 344:13, 364:9, 365:23, 454:7, 460:9, 470:7, 476:25, 495:12, 559:7, 561:3, 561:11, 564:6, 567:8, 568:17

**fascinating** [1] - 306:25

**favor** [2] - 352:21, 433:18

**features** [1] - 319:15

**February** [11] - 271:13, 306:2, 306:3, 306:6, 307:24, 308:23, 309:17, 311:15, 312:12, 464:13, 543:18

**fed** [1] - 310:2

**federal** [7] - 387:22, 446:12, 447:19, 458:10, 459:15, 528:6, 557:24

**Federal** [2] - 280:12, 542:16

**fee** [4] - 393:12, 438:25, 456:18, 480:10

**feed** [8] - 302:9, 305:13, 306:10, 334:18, 452:10, 452:12, 453:1, 453:22

**feedback** [2] - 292:18, 292:22

**feeder** [8] - 300:4, 301:2, 302:11, 305:9, 305:13, 306:8, 306:9

**feeders** [2] - 300:13, 301:15

**feeding** [1] - 302:12

**feet** [1] - 403:19

**fell** [2] - 461:1, 466:24

**fellow** [1] - 521:25

**felt** [1] - 318:7

**few** [16] - 302:11, 336:5, 341:7, 373:15, 387:4, 392:18, 403:2, 442:19, 462:9, 475:11, 475:13, 486:23, 519:9, 529:19, 539:5, 552:7

**fewer** [1] - 273:11

**FG** [1] - 310:19

**FGD** [4] - 301:5, 301:6, 305:10, 311:11

**field** [11] - 406:11, 443:5, 445:8, 445:11, 447:5, 447:16, 504:12, 505:1, 541:20, 561:24, 561:25

**fields** [1] - 562:2

**fight** [3] - 286:7, 334:4, 576:5

**fighting** [5] - 350:16, 350:21, 361:9, 363:24, 367:3

**figure** [44] - 273:16, 277:22, 285:9, 321:19, 321:21, 322:4, 322:17, 322:24, 323:10, 323:14, 335:18, 335:20, 335:23, 336:23, 336:24, 337:8, 340:2, 340:24, 347:22, 348:8, 349:1, 350:22, 351:19, 351:20, 352:2, 353:4, 354:7, 355:25, 356:25, 362:5, 365:4, 367:19, 374:19, 374:21, 389:20, 389:21, 413:23, 455:8, 467:15, 467:20, 522:9, 530:24

**Figure** [21] - 285:10, 285:12, 335:11, 343:22, 348:21, 350:18, 362:5, 366:23, 367:11, 374:10, 374:23, 375:12, 375:13, 375:14, 375:15

**figured** [1] - 447:23

**figures** [2] - 324:2, 350:18

**figuring** [1] - 445:20

**file** [7] - 277:15, 317:9, 429:8, 468:20, 486:19, 486:23, 545:22

**filed** [45] - 274:18, 275:25, 279:3, 279:7, 317:11, 317:13, 318:3, 319:3, 321:10, 322:20, 327:6, 375:2, 404:17, 407:10, 408:7, 418:9, 425:5, 429:8, 429:14, 429:16, 473:10, 473:17, 475:6, 475:12, 476:4, 482:18, 483:20, 486:17, 486:20, 487:3, 490:25, 491:14, 492:9, 509:4, 510:11, 512:8, 512:24, 512:25, 518:12, 518:22, 518:23, 524:4, 524:19, 539:15, 565:16

**filing** [5] - 386:2, 408:2, 468:4, 468:23, 490:18

**filings** [3] - 457:9, 458:22, 458:23

**filled** [1] - 296:19

**fills** [1] - 296:21

**filter** [8] - 572:3, 572:4, 572:7, 572:9, 572:11, 572:16, 572:17, 572:21

**filters** [1] - 572:22

**final** [15] - 276:4, 276:14, 277:7, 278:12, 288:11, 288:12, 291:3, 314:2, 314:4, 343:9, 352:6, 378:2, 378:7, 392:13, 567:12

**finalize** [2] - 378:5, 378:8

**finally** [4] - 371:24, 422:7, 433:4, 475:2

**financial** [18] - 327:15, 327:19, 439:4, 478:8, 499:16, 551:22, 552:11, 552:15, 552:21, 552:22, 554:15, 554:18, 555:3, 556:4, 556:15, 562:15, 562:16

**financially** [1] - 373:12

**financials** [3] - 458:12, 458:15, 519:19

**findings** [1] - 304:18

**fine** [4] - 345:25, 386:12, 497:13, 513:16

**finish** [1] - 476:22

**finished** [3] - 428:21, 473:24, 496:20

**fired** [20] - 330:25, 393:5, 406:8, 427:15, 440:25, 483:22, 484:4, 484:7, 484:11, 501:7, 502:18, 503:12, 525:20, 526:11, 535:18, 537:4, 539:16, 541:25, 543:23

**FIRM** [1] - 271:16

**firm** [1] - 499:13

**first** [84] - 274:12, 278:4, 281:3, 282:12, 297:17, 298:12, 298:15, 300:18, 313:17, 318:1, 318:7, 318:9, 318:10, 318:25, 322:19, 332:13, 337:25, 338:11, 363:13, 370:22, 379:22, 381:16, 393:20, 398:17, 404:11, 405:10, 407:6, 407:21, 407:24, 408:4, 418:20, 424:22, 429:2, 429:5, 430:1, 444:2, 444:3, 448:2, 451:11, 452:13, 454:3, 454:4, 454:6, 454:16, 461:23, 464:10, 465:1, 469:5, 469:10, 469:20, 470:25, 471:23, 472:12, 472:15, 479:23,

481:11, 482:18, 487:20, 490:24, 492:23, 494:22, 495:8, 498:10, 498:13, 517:3, 517:5, 517:13, 517:15, 518:13, 524:14, 535:17, 535:20, 536:10, 536:20, 537:2, 540:2, 540:15, 542:11, 545:17, 552:22, 568:22, 571:25, 573:24

**first-line** [2] - 536:20, 537:2

**firstly** [1] - 370:9

**fish** [1] - 446:8

**fit** [1] - 432:1

**five** [3] - 462:1, 526:21, 564:17

**fix** [1] - 338:21

**flag** [3] - 293:21, 420:7, 420:17

**flagged** [1] - 421:15

**flannel** [1] - 536:5

**flat** [1] - 460:25

**flatly** [1] - 280:5

**fleet** [11] - 377:19, 381:13, 381:17, 381:20, 381:22, 381:23, 382:4, 394:13, 394:14, 489:23

**fleet-wide** [6] - 377:19, 381:13, 381:17, 381:20, 381:22, 394:13

**flight** [2] - 307:16, 415:16

**flip** [11] - 297:11, 299:1, 300:15, 302:2, 305:24, 307:20, 311:17, 321:6, 481:10, 481:12, 481:16

**flipped** [2] - 281:9, 428:16

**floor** [1] - 452:10

**flow** [2] - 437:17, 437:19

**flowing** [1] - 307:8

**flue** [11] - 302:17, 304:8, 307:2, 307:16, 417:23, 418:3, 430:12, 433:25, 477:12, 572:1, 573:7

**fly** [5] - 417:5, 423:7, 453:21, 572:5,

572:13
**flying** [1] - 430:11
**foam** [3] - 321:13, 567:22, 568:15
**focus** [10] - 276:23, 312:15, 318:19, 322:11, 326:11, 356:24, 400:21, 427:6, 462:11, 565:21
**focused** [5] - 315:7, 315:8, 358:5, 368:16, 548:11
**folded** [1] - 400:15
**folks** [15] - 331:21, 406:1, 406:3, 406:11, 406:15, 407:1, 447:4, 447:7, 462:11, 469:15, 470:19, 473:18, 519:24, 524:14, 524:24
**follow** [2] - 422:14, 499:4
**followed** [3] - 354:13, 460:6, 460:23
**following** [13] - 282:22, 293:2, 364:13, 370:4, 379:23, 424:10, 460:19, 493:2, 494:4, 508:2, 513:25, 516:23, 560:15
**follows** [2] - 440:9, 532:16
**food** [3] - 538:8, 538:13, 538:15
**footnote** [7] - 553:10, 553:11, 553:12, 553:25, 554:8, 560:24, 561:4
**FOR** [1] - 271:2
**force** [10] - 500:16, 500:17, 500:22, 502:19, 503:6, 503:16, 503:18, 503:23, 504:16, 514:17
**forced** [1] - 466:23
**foregoing** [1] - 577:20
**forgot** [1] - 565:12
**forklift** [2] - 452:9, 453:15
**form** [4] - 390:4, 454:15, 499:17, 569:24
**formed** [2] - 377:14, 449:16
**former** [1] - 396:10

**forming** [1] - 546:21
**forth** [2] - 406:12, 568:18
**fortunately** [1] - 394:18
**forward** [16] - 287:22, 290:10, 293:8, 391:4, 396:7, 411:12, 424:14, 436:6, 439:23, 456:4, 460:6, 472:15, 473:19, 508:23, 532:7, 577:13
**fossil** [1] - 537:3
**founded** [1] - 450:24
**founder** [1] - 477:23
**four** [9] - 360:11, 385:25, 394:1, 452:15, 469:5, 487:6, 526:16, 527:13, 530:1
**fourth** [2] - 412:22, 452:10
**frame** [15] - 294:22, 314:19, 330:12, 391:16, 405:23, 407:23, 407:24, 408:12, 410:15, 418:12, 431:4, 452:23, 454:21, 480:16, 514:18
**frankly** [1] - 341:8
**free** [5] - 383:3, 461:8, 568:11, 568:18, 568:19
**frequently** [1] - 294:5
**fresh** [2] - 410:18, 413:21
**friend** [1] - 443:10
**friends** [1] - 472:21
**front** [11] - 277:8, 320:16, 354:11, 355:20, 374:22, 381:19, 490:9, 495:22, 508:22, 516:9, 545:16
**front-end** [1] - 508:22
**frustrated** [1] - 328:8
**full** [10] - 325:7, 325:16, 325:17, 332:17, 397:8, 397:12, 403:5, 439:25, 450:2, 532:10
**full-time** [3] - 325:7, 325:16, 325:17
**fully** [3] - 383:3, 402:25, 517:21
**funded** [1] - 308:7

**funding** [12] - 294:9, 294:16, 294:19, 294:23, 294:24, 294:25, 295:1, 295:2, 295:3, 295:12, 308:5, 406:14
**funds** [1] - 294:18
**funny** [1] - 474:23
**furnace** [5] - 323:5, 324:5, 324:6, 445:1, 569:19
**future** [2] - 390:16, 561:13
**FYI** [1] - 273:6

## G

**Gallagher** [5] - 396:10, 419:2, 427:25, 472:1, 472:3
**GALLAGHER** [1] - 271:7
**game** [1] - 314:14
**gas** [27] - 302:17, 304:8, 307:2, 307:8, 307:9, 307:16, 312:20, 417:22, 417:23, 418:3, 430:12, 433:25, 477:12, 484:4, 484:7, 484:19, 485:9, 568:24, 569:24, 571:9, 572:1, 572:7, 572:17, 573:7, 573:12
**gas-fired** [2] - 484:4, 484:7
**gas-phase-type** [1] - 307:9
**gases** [3] - 572:2, 572:13, 573:11
**gather** [2] - 336:20, 346:10
**gathered** [3] - 332:19, 332:22, 467:8
**gear** [1] - 453:13
**gears** [1] - 481:5
**general** [9] - 303:7, 316:5, 381:25, 402:5, 402:6, 498:3, 526:9, 535:21, 535:23
**generally** [10] - 309:18, 317:23, 412:11, 416:3, 416:5, 417:6, 437:13, 463:22,

511:2, 541:6
**generate** [4] - 389:17, 389:22, 438:3, 438:6
**generated** [5] - 308:11, 388:19, 436:9, 437:24, 563:10
**generating** [3] - 307:2, 484:12, 543:12
**Generating** [1] - 526:18
**generation** [1] - 387:9
**Generation** [1] - 380:18
**generator** [1] - 301:15
**gentleman** [1] - 405:7
**gentlemen** [3] - 340:16, 403:23, 440:17
**George** [22] - 526:18, 526:19, 526:23, 527:1, 527:2, 527:9, 527:10, 527:14, 528:20, 528:23, 529:7, 530:2, 530:6, 530:10, 530:16, 531:2
**get-go** [1] - 335:19
**gist** [4] - 276:4, 276:11, 335:15, 575:7
**given** [9] - 330:24, 401:18, 422:9, 422:25, 456:22, 477:5, 491:17, 500:24, 530:17
**glad** [1] - 329:11
**glide** [1] - 484:15
**goal** [2] - 426:12, 426:13
**goals** [1] - 306:14
**government** [4] - 387:23, 392:6, 446:12, 447:22
**grab** [5] - 299:23, 300:18, 300:21, 302:3, 546:5
**graduate** [1] - 442:24
**graduated** [1] - 535:13
**gram** [1] - 306:9
**grams** [7] - 300:6, 301:3, 302:12, 305:9, 305:11, 305:13, 305:16
**grant** [2] - 426:22, 560:19
**granted** [4] - 377:5, 386:9, 386:10, 420:13
**granting** [2] - 383:1,

421:8
**graph** [2] - 312:17, 312:18
**graphic** [3] - 307:21, 323:9, 323:11
**great** [11] - 313:9, 318:7, 326:1, 410:22, 451:1, 454:24, 469:12, 479:4, 512:13, 536:9, 551:16
**greater** [2] - 330:4, 503:14
**greatest** [1] - 543:24
**Green** [4] - 331:19, 390:5, 476:7, 566:18
**green** [1] - 324:6
**grew** [5] - 441:19, 442:8, 443:10, 444:23, 474:22
**gross** [2] - 459:10, 459:24
**ground** [2] - 293:16, 319:22
**grounds** [3] - 464:8, 465:23, 466:6
**group** [3] - 396:15, 467:15, 562:25
**groups** [1] - 396:14
**grow** [5] - 458:8, 458:9, 458:12, 460:1, 460:16
**growing** [4] - 442:4, 446:1, 472:24, 516:25
**grown** [1] - 456:17
**growth** [4] - 450:15, 459:12, 460:5, 460:22
**GS** [4] - 397:16, 397:17
**guess** [41] - 275:2, 278:24, 280:14, 281:24, 282:11, 283:17, 283:24, 286:9, 299:4, 299:12, 302:21, 304:6, 318:21, 319:19, 319:20, 325:15, 325:19, 328:6, 331:11, 349:12, 349:16, 353:10, 355:2, 366:1, 376:20, 379:11, 383:9, 386:15, 388:7, 399:8, 400:23, 410:1, 411:9, 415:3, 421:21, 434:14, 443:4, 489:10,

512:16, 531:13, 556:9
**guessing** [3] - 419:21, 466:3, 466:4
**guidance** [2] - 436:1, 491:17
**guilty** [1] - 275:8
**Gunderson** [1] - 405:6
**guy** [4] - 411:8, 462:5, 507:18, 509:21
**guys** [42] - 273:3, 291:19, 316:15, 317:11, 334:5, 393:12, 393:20, 402:6, 405:11, 406:10, 411:5, 411:6, 413:12, 415:18, 416:17, 416:24, 417:3, 428:3, 433:4, 444:16, 445:16, 446:17, 449:18, 451:13, 453:1, 455:7, 462:1, 462:13, 463:6, 463:9, 473:4, 477:8, 477:17, 478:20, 481:7, 486:5, 487:17, 490:10, 490:14, 506:22, 512:17, 520:16

## H

**HALEY** [1] - 271:23
**half** [9] - 301:4, 303:17, 305:17, 306:4, 309:25, 339:22, 443:2, 460:3, 518:13
**halfway** [1] - 376:25
**halide** [2] - 402:10, 412:25
**halides** [1] - 413:8
**Halifax** [4] - 441:23, 442:22, 443:12, 444:6
**hall** [2] - 403:17, 406:24
**halogen** [2] - 412:25, 477:13
**Hammond** [1] - 535:18
**Hamry** [1] - 406:16
**hand** [8] - 299:9, 354:23, 369:20, 372:7, 439:24, 444:16, 452:4, 532:9
**handed** [1] - 372:13

**handle** [1] - 275:19
**handles** [2] - 488:24, 526:10
**hands** [5] - 324:17, 329:15, 433:4, 536:7, 536:8
**hands-on** [2] - 536:7, 536:8
**handwritten** [2] - 299:5, 299:11
**handy** [1] - 289:16
**happy** [1] - 277:23
**hard** [9] - 274:4, 392:19, 452:17, 452:18, 454:14, 466:23, 467:15, 496:16, 522:4
**Harley** [1] - 442:18
**harm** [1] - 355:14
**haul** [1] - 453:14
**hazardous** [2] - 543:12, 543:23
**hazards** [1] - 543:10
**HBr** [1] - 569:23
**head** [14] - 277:8, 341:4, 460:1, 463:8, 463:9, 467:17, 467:18, 468:8, 476:21, 490:13, 490:16, 520:18
**headache** [1] - 328:2
**headaches** [1] - 327:25
**heading** [5] - 338:24, 417:7, 483:13, 485:12, 517:13
**headings** [1] - 488:3
**health** [1] - 543:10
**heaped** [2] - 519:2, 519:4
**hear** [14] - 280:15, 280:23, 294:11, 294:13, 332:19, 333:13, 354:22, 356:22, 411:1, 414:11, 468:4, 559:25, 562:3, 567:7
**heard** [6] - 369:13, 422:10, 468:10, 504:1, 560:1, 563:13
**hearing** [3] - 507:5, 508:14, 555:20
**hearsay** [6] - 464:4, 464:7, 465:13, 466:8, 466:9, 466:10
**heart** [1] - 337:1
**heat** [1] - 535:9
**held** [5] - 333:7, 415:9, 491:6, 551:7, 552:4
**help** [11] - 308:24,

357:3, 399:25, 406:11, 414:9, 442:15, 450:3, 456:5, 524:25, 533:9, 563:21
**helpers** [1] - 444:15
**helpful** [3] - 369:19, 455:9, 555:25
**helping** [2] - 392:25, 403:3
**helps** [4] - 291:25, 572:20, 572:21, 572:22
**Hereby** [1] - 358:4
**hereby** [4] - 280:10, 288:6, 577:18
**herein** [1] - 358:4
**hidden** [1] - 429:23
**high** [7] - 287:3, 309:17, 309:19, 314:10, 441:22, 528:12
**higher** [3] - 275:20, 389:5, 445:6
**higher-than-usual** [1] - 445:6
**highlight** [1] - 394:21
**highlighted** [2] - 449:24, 545:16
**highly** [1] - 487:20
**hire** [1] - 317:15
**hired** [2] - 411:17, 444:16
**hiring** [1] - 441:5
**historian** [1] - 530:24
**historical** [1] - 390:15
**history** [4] - 402:21, 455:17, 466:22, 531:1
**hit** [2] - 315:4, 357:6
**HITCH** [2] - 272:3, 474:11
**hmm** [2] - 482:2, 484:6
**hold** [3] - 344:19, 353:1, 373:1
**holding** [1] - 425:21
**Holmes** [2] - 319:11, 545:19
**home** [2] - 301:12, 572:3
**Honor** [130] - 274:14, 275:17, 275:18, 277:10, 277:25, 278:14, 280:7, 280:18, 280:24, 282:5, 282:18, 284:6, 285:17, 286:6, 287:4, 287:24, 288:3,

288:19, 289:12, 289:15, 291:22, 298:3, 298:6, 309:4, 309:8, 311:25, 312:4, 315:12, 320:21, 331:22, 333:4, 334:11, 335:6, 335:13, 337:19, 340:4, 342:8, 343:4, 348:2, 348:11, 351:16, 352:25, 353:15, 357:5, 364:4, 367:10, 367:12, 368:8, 369:17, 372:7, 372:17, 379:21, 398:8, 405:15, 420:19, 424:17, 435:24, 439:9, 439:11, 439:20, 448:24, 449:2, 456:7, 456:10, 457:13, 457:20, 457:23, 459:1, 459:4, 464:1, 464:10, 464:18, 466:1, 466:13, 471:11, 471:14, 474:12, 474:14, 491:2, 491:25, 497:22, 498:4, 499:6, 509:16, 513:14, 514:7, 519:11, 521:6, 521:8, 521:13, 524:23, 525:1, 525:6, 532:3, 539:14, 542:22, 542:25, 544:7, 544:17, 546:23, 547:2, 551:4, 551:5, 552:1, 553:8, 553:9, 553:13, 554:9, 557:2, 557:10, 559:6, 559:16, 559:24, 562:2, 564:1, 564:6, 567:6, 567:8, 567:22, 567:25, 568:7, 568:18, 570:11, 570:14, 574:3, 574:18, 576:12, 576:21, 577:5, 577:11
**Honor's** [8] - 278:7, 282:25, 285:25, 364:24, 366:10, 464:11, 464:13, 497:3
**Honorable** [1] - 271:11

**honorary** [1] - 327:7
**hopefully** [2] - 292:21, 340:1
**hoppers** [3] - 572:6, 572:15, 573:5
**horizon** [1] - 447:23
**hospitals** [1] - 442:11
**host** [6] - 438:16, 438:18, 438:20, 438:24, 438:25, 439:1
**hour** [14] - 300:6, 301:3, 301:4, 302:12, 304:6, 305:9, 305:11, 305:13, 305:17, 306:9, 339:22, 531:12, 534:7, 539:2
**hours** [10] - 294:1, 294:5, 295:11, 302:11, 388:21, 389:17, 389:21, 403:3, 531:17, 531:18
**household** [1] - 521:20
**housekeeping** [1] - 273:2
**houses** [3] - 442:10, 444:6, 444:8
**housing** [1] - 444:10
**HR** [1] - 535:22
**humbling** [1] - 332:21
**hundred** [6] - 388:24, 391:2, 391:11, 392:11, 392:14, 478:6
**hundreds** [1] - 431:20
**hurt** [2] - 411:7, 451:6
**Hyatt** [4] - 415:9, 415:20, 415:25, 416:19
**hypothetical** [1] - 361:3

## I

**idea** [9] - 279:18, 300:8, 303:24, 320:13, 355:10, 399:6, 413:6, 421:4, 430:16
**ideally** [1] - 291:20
**ideas** [1] - 318:19
**identified** [9] - 285:18, 377:17, 409:8, 485:12, 526:16, 541:10, 544:25, 545:13, 545:18

**identify** [7] - 486:10, 487:6, 545:12, 547:3, 555:21, 565:10
**identifying** [1] - 565:6
**idled** [1] - 473:25
**II** [1] - 271:7
**III** [1] - 271:21
**Illinois** [5] - 507:13, 507:14, 508:10, 534:24, 535:16
**illustrate** [1] - 566:25
**immediately** [4] - 294:24, 443:6, 450:25, 468:23
**impact** [2] - 285:19, 313:2
**impacted** [1] - 327:20
**impeach** [3] - 492:24, 493:25, 495:5
**impeachment** [1] - 495:18
**implement** [1] - 488:5
**implementation** [1] - 314:23
**implemented** [1] - 330:12
**implementing** [1] - 295:17
**implications** [1] - 465:19
**implies** [1] - 566:3
**import** [2] - 364:23, 555:16
**importance** [1] - 361:9
**important** [9] - 275:1, 278:3, 353:4, 353:5, 446:9, 478:24, 511:6, 511:17, 542:8
**importantly** [2] - 370:9, 421:24
**impression** [3] - 318:1, 446:23, 447:15
**impressive** [1] - 313:11
**improper** [6] - 278:12, 281:6, 338:19, 553:24, 554:3, 560:4
**improperly** [1] - 553:17
**improve** [2] - 536:16, 572:20
**improved** [1] - 529:18
**improvement** [1] - 306:22
**improves** [1] - 455:13
**impurities** [2] - 307:1, 307:4
**IN** [2] - 271:1, 271:2

**in-flight** [1] - 307:16
**inability** [1] - 338:23
**inappropriate** [3] - 354:11, 355:17, 420:23
**inartfully** [1] - 496:23
**Inc** [2] - 301:8, 449:14
**incentive** [4] - 393:15, 439:4, 552:21, 556:15
**incentives** [5] - 520:25, 552:15, 552:22, 554:15, 554:18
**incidentally** [1] - 569:2
**include** [6] - 273:19, 383:12, 466:8, 522:5, 537:17, 547:19
**included** [7] - 344:24, 358:16, 358:17, 385:16, 385:19, 385:20, 407:19
**includes** [2] - 480:5, 535:8
**including** [15] - 273:15, 347:7, 347:20, 352:18, 354:2, 354:6, 358:3, 362:9, 364:9, 384:22, 465:16, 500:4, 539:16, 554:1, 562:12
**inclusion** [2] - 284:8, 344:22
**incorporate** [33] - 280:3, 280:10, 281:6, 281:16, 285:3, 288:6, 289:24, 337:2, 343:10, 345:24, 347:21, 350:8, 350:25, 351:4, 352:19, 353:7, 357:15, 357:21, 360:3, 360:18, 361:5, 362:2, 362:7, 362:16, 363:18, 363:22, 365:17, 365:20, 366:8, 366:12, 368:23, 370:25
**incorporated** [38] - 278:15, 280:1, 281:10, 281:22, 282:1, 282:20, 284:17, 287:7, 289:5, 289:22, 290:17, 342:13,

345:9, 345:11, 345:16, 347:2, 347:7, 350:5, 350:22, 351:13, 352:6, 352:18, 358:4, 358:18, 358:21, 358:23, 359:4, 359:7, 359:21, 359:24, 360:17, 361:16, 367:4, 368:10, 429:18, 429:22, 430:3, 446:11
**incorporates** [5] - 279:11, 279:15, 280:6, 288:7, 348:6
**incorporating** [9] - 286:8, 290:7, 290:13, 343:9, 360:24, 361:23, 366:14, 366:18, 371:7
**incorporation** [20] - 280:2, 282:6, 283:11, 283:22, 284:1, 284:9, 284:16, 287:5, 288:23, 289:1, 289:10, 290:19, 333:15, 334:10, 346:22, 354:14, 357:11, 359:10, 359:13, 368:20
**incorrect** [2] - 358:19, 422:9
**increased** [1] - 306:10
**incumbent** [3] - 422:14, 422:19, 423:11
**indeed** [2] - 466:8, 472:10
**indemnities** [1] - 552:21
**Indiana** [1] - 535:18
**indicate** [2] - 311:6, 328:25
**indicated** [1] - 311:11
**indications** [1] - 460:7
**indirect** [2] - 549:2, 558:7
**indirectly** [1] - 384:21
**indiscernible** [1] - 407:12
**indisputably** [1] - 365:8
**individual** [4] - 416:20, 489:11, 490:5, 553:3
**induce** [1] - 557:19
**induced** [13] - 385:1,

549:8, 549:13, 555:2, 556:14, 556:23, 557:11, 557:12, 559:14, 559:22, 560:11, 561:16, 562:20
**inducement** [3] - 555:21, 560:3, 562:1
**inducing** [1] - 556:15
**indulge** [1] - 337:22
**industrial** [2] - 453:14, 537:13
**industries** [1] - 541:19
**industry** [16] - 301:7, 442:7, 445:15, 450:15, 461:24, 462:20, 463:13, 465:17, 466:16, 487:20, 518:23, 519:16, 521:20, 538:9, 538:13, 542:7
**inferred** [1] - 434:8
**influence** [3] - 490:4, 493:9, 549:9
**influences** [1] - 500:3
**information** [35] - 292:1, 320:5, 329:1, 329:2, 331:9, 331:11, 345:20, 377:10, 378:2, 378:7, 378:18, 387:7, 387:18, 388:8, 388:10, 390:19, 392:6, 425:7, 467:8, 483:5, 483:6, 483:7, 502:25, 529:2, 530:20, 530:22, 531:3, 540:8, 543:22, 547:21, 552:11, 556:5, 556:17, 564:10
**infringe** [8] - 548:25, 549:1, 549:2, 549:7, 549:10, 557:13, 560:12, 566:4
**infringed** [4] - 540:13, 548:21, 566:6, 575:15
**infringement** [66] - 274:21, 275:4, 275:9, 275:13, 292:3, 331:3, 384:25, 385:1, 385:2, 410:9, 414:24, 428:11, 428:12, 466:1, 510:5, 510:9, 511:19, 514:20, 515:7, 540:4, 540:7,

540:8, 540:11, 548:11, 548:15, 548:18, 548:19, 549:4, 549:5, 549:8, 549:11, 549:13, 554:25, 555:6, 555:9, 555:14, 556:6, 556:15, 556:23, 556:24, 557:6, 557:11, 557:12, 557:19, 557:21, 558:6, 558:7, 558:16, 559:14, 559:23, 561:3, 561:11, 561:16, 561:17, 562:12, 562:20, 562:21, 565:3, 565:13, 565:15, 567:20
**infringers** [2] - 548:8, 560:7
**infringing** [15] - 385:16, 408:1, 408:9, 409:22, 409:25, 410:12, 411:6, 414:17, 432:1, 508:25, 510:16, 510:24, 566:9, 566:13, 574:15
**inherent** [1] - 517:23
**initial** [1] - 517:20
**initiate** [1] - 522:5
**initiating** [1] - 520:13
**inject** [2] - 417:24, 528:3
**injected** [4] - 302:17, 323:21, 528:9, 528:25
**injecting** [1] - 508:4
**injection** [13] - 301:5, 374:12, 526:17, 527:11, 527:15, 527:16, 527:20, 527:24, 528:9, 529:15, 531:11, 531:16, 531:20
**input** [2] - 378:6, 386:25
**inquiry** [1] - 411:4
**insert** [1] - 302:20
**inside** [1] - 569:19
**inspection** [1] - 536:9
**inspections** [1] - 452:22
**installed** [3] - 462:7, 462:9, 508:5
**installing** [1] - 508:20
**instance** [1] - 560:4

**instances** [3] - 494:21, 496:6, 496:7
**instead** [4] - 289:22, 311:5, 353:9, 358:16
**instigate** [1] - 417:25
**Institute** [2] - 510:14, 534:24
**institute** [1] - 479:12
**instructed** [4] - 287:6, 367:14, 379:18, 548:6
**instructing** [1] - 338:18
**instruction** [17] - 274:19, 276:5, 276:11, 276:14, 276:18, 277:2, 277:3, 277:7, 278:12, 284:24, 288:8, 338:20, 352:5, 355:18, 355:21, 356:5, 356:21
**instructions** [11] - 276:5, 276:14, 277:7, 278:7, 284:23, 286:7, 288:12, 297:9, 352:9, 367:13, 379:23
**intellectual** [3] - 450:6, 510:6, 548:9
**intend** [4] - 278:9, 287:1, 557:17, 557:21
**intended** [4] - 557:12, 558:3, 558:12, 559:5
**intending** [1] - 555:18
**intent** [6] - 551:12, 553:21, 558:9, 558:10, 558:19, 575:23
**intentional** [1] - 420:9
**intentionally** [1] - 549:9
**interest** [6] - 327:7, 327:10, 437:21, 437:25, 438:8, 543:6
**interested** [5] - 332:18, 406:4, 535:4, 535:5, 537:2
**interesting** [1] - 425:2
**interestingly** [1] - 397:14
**interjected** [1] - 504:2
**international** [1] - 485:22
**internet** [1] - 512:15
**interpretations** [1] - 366:11

**interrupt** [3] - 339:16, 496:18, 497:7
**interrupted** [1] - 529:23
**intervening** [17] - 278:16, 281:11, 290:22, 336:15, 338:4, 338:7, 345:6, 348:7, 350:1, 353:8, 353:9, 354:7, 358:3, 360:20, 362:3, 365:8, 367:20
**interviewed** [1] - 535:21
**introduce** [2] - 436:1, 440:16
**introduced** [4] - 324:11, 461:14, 461:17, 465:16
**introducing** [2] - 345:14, 465:14
**invent** [2] - 402:15, 430:7
**invented** [3] - 345:22, 351:8, 435:13
**invention** [38] - 293:18, 294:6, 300:9, 303:25, 309:2, 314:22, 314:23, 317:9, 318:16, 318:22, 319:20, 321:11, 322:22, 323:4, 325:12, 325:21, 326:2, 332:19, 332:23, 333:1, 336:18, 349:3, 349:14, 356:19, 400:4, 402:12, 402:14, 425:4, 425:5, 425:12, 433:3, 434:23, 541:9, 541:13, 542:3, 548:6, 548:7, 548:21
**inventions** [4] - 319:16, 322:11, 399:16, 432:21
**inventive** [1] - 318:14
**inventor** [3] - 413:17, 417:11, 417:15
**inventors** [6] - 317:8, 319:11, 327:9, 545:4, 545:18, 545:22
**invested** [1] - 472:22
**investigating** [1] - 434:22
**investigation** [5] - 324:17, 462:18,

533:23, 541:2, 550:1
**investigative** [2] - 463:12, 465:15
**investing** [2] - 484:25, 487:12
**investment** [3] - 460:9, 461:24, 467:9
**investors** [2] - 566:20, 567:4
**investors'** [1] - 438:13
**invoke** [1] - 561:4
**involve** [1] - 286:15
**involved** [11] - 377:4, 377:7, 378:20, 379:6, 380:6, 380:14, 386:16, 387:1, 387:2, 393:7, 469:5
**involvement** [2] - 537:23, 539:8
**IP** [8] - 317:17, 318:12, 318:20, 382:25, 407:10, 417:8, 417:10, 417:14
**iPhone** [1] - 400:17
**irrelevant** [10] - 287:5, 287:23, 351:13, 351:20, 354:12, 354:17, 354:20, 355:18, 367:12, 370:15
**irrevocable** [1] - 383:3
**IRS** [3] - 329:23, 431:18, 564:19
**isolation** [1] - 360:4
**issuance** [2] - 422:18, 515:10
**issue** [134] - 274:12, 274:21, 275:1, 275:4, 275:17, 275:20, 275:21, 276:15, 277:5, 277:25, 278:5, 278:10, 278:13, 278:22, 278:24, 279:24, 280:16, 282:16, 283:16, 284:2, 284:15, 284:17, 284:19, 284:23, 285:1, 286:22, 287:8, 288:5, 288:11, 289:6, 290:4, 290:9, 291:5, 292:1, 309:13, 318:9, 331:3, 333:15, 334:3, 334:4, 334:6, 334:8, 334:13, 334:16, 334:24, 335:3, 335:4, 335:5,

336:4, 336:16, 337:13, 338:1, 338:14, 339:5, 340:7, 340:17, 340:23, 342:10, 342:15, 345:1, 345:20, 346:6, 346:18, 346:19, 346:20, 347:4, 348:4, 348:13, 348:14, 348:17, 350:8, 351:17, 352:21, 355:8, 355:14, 356:12, 356:21, 357:9, 359:10, 359:14, 359:22, 360:10, 363:2, 363:5, 363:8, 363:13, 365:16, 365:19, 366:19, 370:17, 370:22, 371:9, 371:12, 384:3, 421:18, 422:20, 423:3, 431:8, 465:1, 473:21, 491:13, 492:5, 492:9, 495:8, 495:19, 496:22, 514:22, 523:12, 523:15, 525:6, 537:25, 541:11, 541:23, 546:16, 549:23, 557:16, 558:6, 559:3, 559:13, 559:17, 560:25, 561:15, 561:18, 562:20, 569:1, 569:5, 571:3, 571:10, 571:20, 573:17, 575:5, 576:9
**issued** [21] - 279:6, 318:11, 318:25, 319:13, 322:7, 335:12, 335:14, 335:18, 374:18, 375:2, 385:17, 410:14, 413:18, 413:21, 432:5, 432:14, 432:21, 433:11, 515:3, 515:4, 515:5
**issues** [42] - 273:9, 274:17, 276:21, 276:24, 278:6, 287:15, 287:17, 287:19, 291:4, 291:24, 325:14, 326:11, 336:5, 339:8, 339:24, 341:11, 341:12, 341:18, 341:19,

342:4, 353:2, 353:21, 354:23, 356:25, 357:6, 364:8, 365:15, 368:3, 369:12, 370:1, 370:11, 370:16, 370:20, 371:18, 382:25, 405:7, 491:10, 494:24, 495:9, 538:3, 554:6
**issuing** [1] - 327:6
**itch** [1] - 443:21
**Item** [1] - 487:11
**items** [2] - 416:16, 434:21
**Items** [1] - 434:19
**itself** [9] - 313:4, 342:23, 363:16, 366:24, 477:6, 484:18, 485:8, 489:20, 572:11

**J**

**JAMES** [2] - 271:16, 272:3
**January** [5] - 379:5, 454:17, 480:1, 505:22, 563:20
**JASON** [1] - 271:20
**jeans** [1] - 536:5
**JEFF** [1] - 272:6
**Jeff** [1] - 566:18
**JESSICA** [1] - 272:8
**Jim** [1] - 504:19
**job** [11] - 331:21, 402:21, 403:2, 442:17, 443:12, 451:1, 526:7, 526:13, 535:20, 535:23, 536:7
**JOHN** [1] - 271:20
**John** [16] - 415:15, 416:18, 417:17, 417:18, 434:2, 434:3, 435:3, 435:6, 447:4, 455:7, 467:3, 506:13, 506:21, 522:6, 545:19
**joint** [2] - 371:20, 372:3
**jointly** [1] - 291:20
**Joppa** [7] - 507:13, 507:14, 508:1, 508:9, 508:24, 509:4, 510:4
**JPMorgan** [3] - 437:20, 555:24,

567:4

**judge** [10] - 332:18, 352:3, 352:7, 352:10, 352:13, 353:18, 364:11, 364:21, 365:22, 366:8

**Judge** [2] - 277:16, 352:11

**judgment** [25] - 278:25, 281:3, 281:5, 281:14, 282:14, 284:20, 285:3, 285:18, 286:12, 288:16, 289:11, 289:14, 334:23, 336:4, 357:10, 359:16, 360:14, 363:2, 363:4, 363:6, 364:4, 364:13, 366:25, 392:1, 392:2

**July** [11] - 322:8, 385:23, 386:2, 408:3, 410:12, 415:1, 487:3, 509:3, 518:21, 518:22, 565:15

**jump** [14] - 304:25, 309:23, 312:13, 339:1, 375:20, 382:22, 383:21, 397:2, 411:11, 426:14, 427:2, 482:19, 497:24

**jumping** [1] - 384:10

**June** [2] - 418:8, 418:9

**junior** [1] - 441:22

**jurors** [2] - 513:19, 574:22

**JURY** [2] - 271:9, 271:11

**jury** [82] - 271:12, 275:22, 275:23, 276:5, 276:6, 276:14, 277:7, 278:12, 278:18, 284:22, 284:23, 286:1, 286:7, 288:12, 291:8, 292:24, 293:4, 293:5, 314:13, 314:14, 320:12, 331:17, 332:17, 333:13, 334:21, 334:25, 335:2, 335:5, 337:9, 338:18, 339:21, 340:2, 340:14, 340:16, 341:1,

341:2, 341:12, 341:22, 352:3, 352:5, 352:9, 352:10, 354:11, 355:20, 356:8, 364:22, 364:24, 365:12, 366:6, 366:15, 366:19, 366:20, 367:13, 367:23, 369:14, 371:16, 372:6, 372:9, 406:1, 416:17, 420:1, 420:2, 420:5, 421:5, 422:9, 424:12, 424:13, 440:17, 513:21, 514:3, 514:4, 523:24, 524:10, 524:13, 545:10, 563:13, 565:19, 574:22, 574:24, 575:8

**Justin** [2] - 274:14, 342:9

**JUSTIN** [1] - 271:21

## K

**keep** [17] - 301:14, 330:18, 339:21, 340:2, 356:9, 405:16, 405:18, 431:10, 434:17, 454:4, 456:24, 460:10, 467:4, 472:24, 527:8, 557:10, 568:19

**keeping** [1] - 296:5

**keeps** [2] - 416:22, 530:20

**Keith** [3] - 411:13, 411:14, 411:19

**Kelly** [1] - 509:11

**KENNETH** [1] - 272:4

**kept** [4] - 296:13, 298:21, 447:21, 454:5

**key** [5] - 283:10, 283:12, 283:18, 283:25, 344:6

**kicking** [1] - 413:13

**kid** [3] - 442:13, 443:23, 444:23

**kids** [2] - 441:25, 534:18

**Kiewit** [1] - 567:5

**kind** [71] - 276:17, 282:21, 286:6, 289:23, 296:9, 299:4, 299:8,

299:10, 300:18, 300:21, 300:25, 301:6, 302:8, 302:19, 303:4, 305:14, 306:15, 306:20, 307:8, 310:12, 313:7, 316:1, 317:22, 318:20, 322:10, 323:9, 323:10, 323:11, 325:6, 327:12, 328:15, 329:21, 332:21, 332:23, 344:13, 387:22, 393:12, 402:3, 404:21, 406:2, 406:8, 407:2, 410:19, 417:10, 417:15, 417:16, 421:5, 427:6, 431:2, 432:20, 440:20, 443:20, 445:5, 446:2, 446:19, 461:24, 462:17, 462:19, 465:18, 475:2, 475:3, 481:5, 483:17, 483:18, 484:7, 496:25, 505:19, 510:22, 536:4, 536:15, 538:13

**kinds** [4] - 391:18, 406:4, 446:6, 547:21

**knob** [1] - 297:1

**know-how** [1] - 447:11

**knowing** [1] - 549:6

**knowledge** [4] - 495:10, 530:11, 554:13, 554:15

**known** [7] - 307:5, 535:19, 542:7, 542:9, 545:15, 569:2, 571:13

**knows** [2] - 475:2, 562:7

## L

**lab** [1] - 326:4

**labeled** [4] - 481:17, 546:8, 547:17, 566:12

**lack** [2] - 283:10, 503:17

**ladies** [2] - 340:16, 440:16

**laid** [3] - 281:5, 371:21, 497:2

**landscape** [1] - 290:1

**language** [52] - 280:5, 280:11, 281:6, 281:16, 281:22, 281:25, 282:1, 282:2, 282:5, 282:12, 282:21, 283:18, 283:19, 283:21, 283:25, 284:9, 284:16, 288:6, 288:15, 288:21, 288:25, 290:16, 318:2, 321:15, 343:8, 347:19, 347:24, 348:15, 349:8, 357:10, 357:12, 358:9, 358:16, 358:24, 358:25, 359:12, 359:20, 360:9, 360:15, 362:8, 362:11, 368:7, 368:11, 368:20, 368:25, 369:7, 370:23, 370:25, 383:13, 573:10, 575:6

**large** [9] - 301:7, 425:21, 426:2, 438:2, 483:16, 486:1, 487:17, 487:25, 532:19

**larger** [1] - 496:12

**largest** [1] - 477:24

**Larkwood** [1] - 521:18

**last** [18] - 274:16, 327:23, 353:24, 380:17, 392:10, 393:1, 395:23, 407:16, 426:22, 426:23, 458:21, 472:20, 475:11, 482:22, 500:2, 544:13, 572:22, 577:4

**lastly** [2] - 273:20, 367:5

**late** [6] - 273:3, 437:4, 437:5, 475:12, 505:14, 518:12

**law** [28] - 278:14, 278:19, 280:2, 288:7, 288:15, 289:19, 292:6, 292:9, 338:19, 338:23, 338:25, 343:5, 345:10, 345:12, 347:19, 351:17, 354:7, 354:9, 354:14, 355:19, 355:21,

357:15, 362:14, 363:5, 371:8, 371:22, 447:19, 461:14

**LAW** [1] - 271:16

**lawsuit** [24] - 335:20, 383:14, 385:9, 385:25, 395:15, 407:10, 408:3, 410:7, 410:10, 418:11, 427:14, 468:5, 468:6, 475:6, 487:3, 487:6, 490:18, 509:4, 510:11, 510:19, 512:8, 518:21, 565:16

**lawyer** [6] - 323:3, 354:10, 425:10, 483:2, 483:3, 540:24

**lawyers** [15] - 317:16, 332:17, 338:17, 339:24, 369:13, 369:22, 370:3, 386:12, 400:3, 463:3, 463:10, 467:18, 483:19, 486:23, 522:9

**lay** [5] - 354:10, 355:12, 355:17, 467:1, 500:25

**layoff** [2] - 500:17, 514:17

**lead** [2] - 356:11, 517:23

**leading** [6] - 347:3, 347:6, 349:19, 357:14, 358:22, 447:4

**leads** [1] - 375:5

**Leah** [3] - 436:5, 436:15, 566:19

**leap** [1] - 446:19

**learn** [5] - 332:23, 441:16, 461:23, 466:15, 536:9

**learned** [5] - 405:5, 407:4, 408:12, 409:13, 474:21

**learning** [3] - 445:14, 445:15, 446:14

**lease** [1] - 438:18

**leased** [1] - 406:8

**least** [27] - 282:15, 283:8, 288:25, 290:1, 357:18, 365:15, 368:23, 371:15, 413:14, 420:10, 472:20, 473:17, 488:11,

503:12, 503:22, 504:10, 507:5, 527:17, 527:21, 541:15, 556:20, 558:16, 561:15, 562:18, 563:22, 576:24

**leave** [6] - 443:25, 445:1, 515:10, 531:23, 538:7, 575:1

**leaving** [3] - 443:6, 538:14, 538:20

**lectern** [1] - 568:18

**led** [2] - 503:18, 513:19

**left** [11] - 278:6, 284:21, 294:18, 299:9, 445:15, 454:7, 475:4, 518:19, 538:8, 538:10, 574:8

**left-hand** [1] - 299:9

**legal** [44] - 279:14, 285:23, 286:5, 287:15, 289:4, 290:1, 320:1, 320:2, 321:13, 333:16, 334:3, 334:6, 334:16, 338:12, 340:17, 341:11, 341:19, 341:20, 342:10, 347:11, 348:9, 350:7, 352:16, 354:19, 355:5, 355:6, 356:2, 356:11, 356:21, 357:20, 359:6, 360:24, 362:23, 366:13, 367:7, 371:3, 371:9, 383:13, 463:10, 469:3, 548:5, 548:7

**legalese** [1] - 396:18

**legally** [3] - 278:12, 355:20, 362:12

**legend** [1] - 312:24

**length** [1] - 295:13

**LENNON** [1] - 271:16

**less** [13] - 273:12, 273:18, 305:22, 401:14, 401:20, 437:11, 437:13, 476:16, 536:22, 541:19, 541:21, 551:1, 551:2

**letter** [10] - 371:20, 372:3, 372:4, 468:5, 496:14, 507:12, 508:1, 508:16, 510:18, 512:16

**letterhead** [1] - 516:11

**letters** [5] - 329:13, 354:3, 510:22, 515:13, 522:13

**letting** [1] - 503:23

**level** [14] - 309:17, 309:19, 313:22, 313:25, 327:18, 378:6, 516:25, 528:12, 529:2, 529:4, 541:3, 541:7, 541:10, 541:22

**license** [75] - 376:16, 376:18, 377:19, 379:5, 379:6, 380:6, 381:13, 381:17, 381:20, 383:4, 384:11, 386:9, 390:19, 391:5, 391:22, 393:9, 394:7, 394:10, 394:13, 394:24, 395:14, 395:24, 396:13, 396:21, 396:24, 397:6, 397:7, 400:11, 400:14, 425:22, 425:24, 426:21, 427:24, 428:4, 448:13, 448:14, 448:22, 449:7, 455:18, 456:16, 456:18, 456:24, 469:8, 469:13, 469:15, 469:21, 470:18, 470:19, 471:8, 476:22, 477:1, 477:4, 477:6, 477:9, 478:12, 478:18, 478:20, 478:23, 480:6, 480:8, 480:10, 480:13, 505:23, 505:24, 511:5, 511:10, 511:13, 515:17, 523:25, 539:2, 539:7, 548:10

**licensed** [10] - 383:4, 383:7, 383:12, 384:12, 384:13, 384:18, 384:24, 397:24, 477:21, 538:25

**licensee** [2] - 408:1, 510:15

**licensees** [2] - 396:22, 476:25

**licenses** [10] - 377:4, 377:9, 386:17, 400:16, 403:24, 469:18, 470:5, 470:8, 470:10, 523:9

**licensing** [2] - 449:19, 470:2

**licensor** [1] - 449:20

**life** [3] - 391:5, 445:10, 534:13

**light** [3] - 369:24, 388:24, 422:17

**lignite** [3] - 315:9, 316:7, 460:13

**lignites** [1] - 462:10

**likely** [3] - 333:17, 415:20, 486:19

**likewise** [1] - 381:20

**limbed** [1] - 561:22

**limine** [7] - 421:4, 421:9, 423:6, 423:9, 423:22, 424:1, 491:10

**limit** [2] - 381:25, 561:13

**limitation** [6] - 568:25, 569:4, 569:15, 569:25, 571:6, 571:8

**limited** [2] - 294:9, 363:5

**limits** [4] - 508:11, 528:1, 528:4, 528:5

**line** [31] - 279:16, 313:1, 313:3, 313:16, 313:18, 314:2, 314:4, 314:8, 314:11, 375:5, 379:16, 380:2, 380:4, 412:22, 416:22, 421:25, 426:22, 426:23, 431:25, 435:1, 491:16, 503:5, 504:22, 504:23, 517:15, 536:20, 537:2, 558:16, 559:17, 576:3

**Linton** [1] - 566:19

**list** [11] - 331:24, 348:18, 386:11, 388:1, 464:22, 486:12, 487:16, 487:23, 488:3, 519:24

**listed** [13] - 299:8, 383:15, 512:19, 520:3, 529:13, 543:7, 545:16, 545:25, 547:16, 562:11, 563:2, 566:4, 571:1

**listen** [2] - 332:23, 520:17

**listing** [2] - 383:22, 547:18

**lists** [3] - 396:24, 397:3, 570:23

**literally** [3] - 301:18, 345:13, 434:18

**litigate** [1] - 518:3

**litigation** [5] - 469:5, 519:2, 519:4, 520:14, 522:5

**litigious** [1] - 518:2

**live** [2] - 396:19, 405:25

**lived** [1] - 405:24

**lives** [1] - 442:2

**living** [1] - 396:19

**LLC** [10] - 380:18, 397:16, 436:17, 436:21, 437:25, 473:3, 513:6, 520:19, 521:16, 521:18

**LLCs** [6] - 463:1, 467:9, 467:24, 473:4, 522:1, 524:8

**LLP** [2] - 272:3, 272:6

**load** [1] - 452:14

**local** [1] - 445:13

**located** [1] - 417:5

**location** [1] - 303:2

**lodge** [2] - 464:11, 491:3

**logbook** [17] - 295:19, 295:20, 295:21, 295:22, 296:2, 296:6, 296:12, 296:16, 296:22, 296:23, 297:21, 299:8, 304:12, 304:24, 305:5, 306:6, 308:1

**logbooks** [5] - 297:16, 297:24, 297:25, 298:19, 298:24

**logistical** [1] - 499:16

**logistics** [2] - 287:12, 288:1

**logo** [3] - 441:14, 453:3

**look** [84] - 275:14, 276:4, 277:11, 283:9, 288:17, 288:19, 302:24, 304:16, 305:14, 308:17, 313:7, 314:13, 320:12, 320:16, 320:17, 332:22, 333:13, 357:25, 358:17, 359:24, 360:9, 360:13, 362:25, 374:25, 376:22, 377:16, 379:13, 381:8, 381:16, 382:22, 383:10, 386:7, 390:9, 390:13, 390:15, 393:2, 393:6, 394:17, 394:19, 395:13, 395:23, 396:5, 396:7, 396:16, 399:13, 409:14, 410:2, 411:10, 420:17, 424:24, 455:22, 458:15, 470:22, 471:2, 471:23, 472:18, 473:19, 482:17, 483:9, 485:11, 487:10, 487:19, 491:1, 503:3, 504:22, 506:1, 507:8, 511:10, 516:8, 517:18, 518:15, 522:19, 544:16, 546:12, 550:1, 550:4, 573:9, 577:13

**Look** [4] - 433:6, 447:10, 462:5, 468:24

**looked** [17] - 296:8, 304:13, 323:10, 374:2, 374:19, 375:16, 385:17, 386:10, 390:19, 392:8, 400:21, 403:22, 410:10, 447:22, 466:18, 491:14, 575:5

**looking** [23] - 303:17, 327:1, 350:17, 360:14, 367:7, 383:9, 387:9, 388:7, 388:9, 388:10, 388:11, 391:4, 428:17, 449:7, 449:22, 452:20, 481:13, 481:14, 504:17, 515:17, 536:3, 547:24, 565:19

**looks** [13] - 288:5, 288:19, 299:5, 300:19, 301:9, 313:16, 313:24, 398:19, 408:19, 416:22, 434:24, 517:8, 575:25

**lose** [2] - 273:17,

291:14
**loses** [2] - 286:23, 534:9
**losing** [1] - 333:21
**loss** [5] - 438:7, 502:6, 503:19, 503:22, 551:23
**losses** [3] - 438:9, 438:10, 438:12
**lost** [2] - 338:16, 501:14
**loud** [1] - 414:9
**Louis** [1] - 449:18
**Louisa** [9] - 526:18, 527:9, 527:14, 528:20, 528:23, 529:7, 530:2, 530:14, 531:3
**low** [3] - 314:7, 326:3, 528:4
**low-rank** [1] - 326:3
**lower** [2] - 393:12, 427:9
**lowered** [1] - 305:12
**luminance** [1] - 452:2
**lump** [3] - 394:25, 395:15, 395:24
**lump-sum** [3] - 394:25, 395:15, 395:24
**lunch** [6] - 405:19, 419:23, 419:25, 420:1, 424:8, 491:11
**luncheon** [1] - 424:9

---

**M**

---

**M-A-C-P-H-E-R-S-O-N** [1] - 440:5
**machine** [4] - 301:12, 301:14, 301:16, 535:10
**MacPherson** [23] - 325:5, 386:24, 387:3, 439:21, 439:22, 440:2, 440:5, 440:18, 458:4, 474:18, 475:3, 477:22, 481:9, 490:17, 498:21, 498:24, 505:6, 506:5, 514:16, 516:12, 518:20, 519:15, 525:2
**MACPHERSON** [1] - 440:6
**maddening** [8] - 328:8, 410:25,

411:1, 413:22, 413:25, 422:1, 422:7
**magic** [3] - 343:8, 348:15, 362:8
**magnitude** [1] - 313:7
**mail** [28] - 273:19, 274:16, 278:1, 278:23, 279:25, 408:16, 408:21, 408:22, 410:1, 410:21, 411:3, 411:11, 411:12, 411:19, 411:22, 506:7, 506:10, 506:21, 507:16, 509:1, 509:10, 510:7, 510:18, 512:3, 512:4, 555:23, 576:12
**mailed** [1] - 410:21
**mails** [2] - 273:4, 522:13
**main** [5] - 326:1, 403:2, 440:23, 441:23, 456:23
**maintain** [2] - 280:13, 487:25
**major** [2] - 328:2, 328:6
**majority** [1] - 454:5
**man** [2] - 273:21, 307:5
**Man** [1] - 411:5
**manage** [1] - 526:13
**management** [6] - 415:9, 516:5, 518:25, 520:17, 521:22, 537:11
**manager** [5] - 415:20, 443:16, 443:17, 526:9
**managers** [1] - 415:5
**manned** [1] - 463:2
**manufacturing** [2] - 538:15, 538:17
**Maquet** [2] - 363:10, 363:19
**MAQUET** [1] - 363:11
**Marc** [5] - 408:21, 409:7, 409:8, 509:11, 509:22
**mark** [1] - 507:13
**marked** [4] - 316:8, 509:8, 509:10, 516:8
**market** [16] - 402:8, 409:15, 422:2, 447:13, 450:12, 450:25, 451:4, 473:22, 474:4, 484:11, 484:15,

486:1, 487:13, 515:22, 516:1, 518:3
**marketing** [1] - 408:14
**marketplace** [3] - 327:3, 448:10, 453:6
**markets** [1] - 515:21
**Markets** [1] - 483:14
**married** [2] - 441:25, 442:1
**marshal** [1] - 274:6
**marshall** [2] - 555:3, 559:21
**marshalling** [1] - 556:1
**Material** [1] - 570:5
**material** [99] - 275:4, 275:5, 284:18, 284:21, 285:5, 285:6, 285:8, 285:20, 286:4, 286:5, 286:8, 290:8, 290:14, 290:20, 290:24, 296:10, 299:13, 333:15, 335:23, 336:3, 336:18, 336:20, 336:21, 337:3, 337:5, 337:8, 337:18, 342:21, 343:2, 343:5, 344:14, 344:15, 345:9, 345:16, 345:24, 346:19, 347:1, 347:6, 348:18, 348:20, 349:8, 349:12, 349:13, 350:13, 350:25, 351:4, 351:12, 351:20, 352:2, 352:12, 353:5, 353:6, 353:7, 353:17, 360:3, 360:25, 361:24, 362:2, 362:6, 362:16, 362:17, 363:15, 363:18, 363:22, 364:2, 364:4, 364:7, 364:10, 364:15, 364:22, 365:4, 365:17, 365:19, 365:20, 366:3, 366:5, 366:7, 366:12, 366:15, 366:16, 366:18, 371:1, 371:6, 371:13, 372:8, 425:25, 451:23, 453:16, 495:18, 508:22, 535:10,

572:12, 572:18, 572:20
**materials** [11] - 285:18, 365:7, 372:13, 372:14, 426:6, 461:8, 488:5, 488:7, 488:15, 515:18, 533:17
**math** [6] - 394:6, 399:10, 399:12, 438:5, 475:25, 476:1
**matrix** [1] - 393:18
**MATS** [18] - 329:12, 329:13, 329:16, 330:9, 431:1, 431:3, 431:10, 431:13, 431:21, 462:8, 483:18, 483:21, 484:2, 484:15, 484:18, 485:8, 569:8, 569:9
**matter** [28] - 278:14, 278:19, 280:2, 288:7, 289:9, 313:15, 334:7, 334:9, 343:5, 345:10, 345:12, 347:18, 357:20, 362:16, 365:19, 367:21, 369:2, 426:1, 446:11, 490:12, 497:11, 560:7, 572:4, 572:13, 572:15, 572:19, 573:1, 573:5
**matters** [3] - 276:7, 289:3, 565:20
**maybe..** [1] - 556:11
**MAZUR** [1] - 271:17
**MBEB** [1] - 342:25
**McCarty** [4] - 275:19, 440:10, 464:9, 519:8
**MCCARTY** [43] - 271:21, 439:20, 440:11, 440:13, 448:24, 456:7, 456:14, 457:13, 457:14, 457:20, 458:2, 458:3, 459:1, 459:8, 464:10, 464:16, 464:24, 465:7, 465:10, 465:14, 466:13, 466:14, 471:11, 471:18, 474:7, 482:12, 491:2, 491:8, 494:19, 495:11, 506:16, 507:21, 509:16, 514:10, 516:17,

519:9, 519:11, 519:14, 521:13, 521:14, 522:19, 522:22, 524:21
**McGee** [2] - 411:13, 411:14
**ME2C** [113] - 322:10, 322:12, 324:15, 324:23, 324:25, 325:5, 325:8, 325:16, 326:7, 326:10, 326:17, 326:18, 326:23, 327:2, 327:11, 327:17, 327:20, 328:14, 331:13, 372:24, 376:16, 377:5, 377:20, 378:11, 378:15, 380:17, 382:25, 383:1, 383:23, 385:11, 385:22, 386:1, 386:9, 393:12, 393:21, 394:25, 395:3, 395:7, 395:15, 395:25, 397:24, 399:16, 400:18, 401:1, 401:5, 401:21, 402:25, 403:3, 404:17, 407:7, 408:7, 409:8, 409:14, 410:7, 410:8, 410:9, 411:16, 413:7, 414:7, 414:15, 414:16, 414:21, 415:4, 415:8, 417:8, 417:10, 417:14, 417:19, 426:1, 433:14, 441:14, 454:21, 466:17, 472:6, 475:12, 475:15, 477:1, 478:12, 478:24, 479:18, 480:4, 480:17, 480:21, 480:24, 490:20, 494:2, 499:12, 503:6, 503:15, 504:10, 507:12, 507:16, 508:1, 508:16, 508:25, 509:12, 510:8, 510:13, 510:19, 511:16, 511:23, 513:4, 515:16, 516:2, 516:4, 516:11, 517:11, 518:12, 518:25, 520:3, 533:12,

565:16
**ME2C's** [13] - 383:7, 401:24, 402:1, 414:3, 475:9, 477:2, 504:12, 505:1, 510:6, 514:8, 515:20, 519:16, 519:22
**mean** [49] - 287:4, 290:9, 307:4, 313:6, 318:7, 323:7, 324:1, 326:24, 329:5, 339:1, 339:16, 343:11, 348:24, 364:23, 367:9, 369:10, 380:11, 381:24, 384:20, 387:1, 404:2, 413:21, 413:22, 419:11, 421:2, 425:22, 426:3, 426:4, 446:4, 446:21, 446:25, 451:1, 460:7, 466:24, 468:17, 469:13, 481:2, 482:21, 485:22, 494:1, 507:4, 510:23, 520:16, 522:8, 529:14, 538:24, 541:7, 544:17, 569:9
**meaning** [4] - 349:10, 349:16, 379:12, 494:11
**meaningful** [1] - 356:2
**means** [3] - 336:19, 381:22, 538:25
**meant** [3] - 401:9, 554:23, 555:19
**measurable** [1] - 401:11
**measure** [1] - 310:10
**measured** [1] - 310:3
**measurement** [1] - 325:14
**measurements** [1] - 325:14
**mechanic** [1] - 442:18
**mechanical** [3] - 535:3, 535:7, 541:14
**meet** [16] - 329:9, 330:2, 330:13, 330:17, 338:23, 354:3, 417:6, 430:25, 431:16, 431:19, 431:21, 431:23, 455:14, 468:21, 528:4, 529:17

**meet-and-confer** [1] - 354:3
**meeting** [12] - 415:9, 415:23, 416:6, 416:18, 417:3, 433:21, 447:14, 458:7, 508:10, 518:15, 518:21, 528:19
**meetings** [6] - 415:5, 416:3, 416:4, 462:5, 469:4, 516:5
**megawatt** [5] - 388:20, 388:25, 389:17, 389:21, 454:19
**megawatts** [1] - 389:4
**members** [1] - 438:11
**memorized** [1] - 282:6
**memory** [3] - 278:21, 376:11, 376:17
**mention** [1] - 488:22
**mentioned** [20] - 276:9, 308:4, 329:10, 329:11, 346:4, 406:13, 439:7, 446:13, 447:14, 453:5, 463:25, 467:16, 470:13, 491:11, 507:7, 522:3, 529:20, 540:19, 552:23, 572:11
**mercury** [85] - 302:24, 306:19, 306:22, 307:14, 307:17, 307:18, 310:3, 310:9, 310:10, 312:19, 312:20, 313:22, 313:23, 325:19, 325:23, 326:3, 326:6, 329:9, 329:11, 329:21, 329:25, 330:1, 330:25, 383:8, 399:25, 400:22, 408:2, 408:14, 409:18, 431:5, 431:12, 431:17, 440:25, 445:25, 446:3, 446:14, 447:20, 450:14, 451:7, 478:19, 479:24, 488:8, 489:17, 499:18, 508:3, 508:11, 511:6, 520:1, 520:10, 526:14, 528:1, 528:3, 528:21, 529:2,

537:17, 537:21, 537:24, 538:3, 542:1, 542:4, 542:10, 543:6, 543:15, 543:20, 543:23, 544:5, 545:2, 563:22, 564:22, 568:23, 569:10, 569:24, 571:8, 571:9, 571:11, 571:24, 572:4, 572:10, 572:14, 572:24, 573:10, 573:11, 573:12
**mercury-containing** [5] - 568:23, 569:24, 571:9, 573:11, 573:12
**merits** [1] - 543:24
**MerSorb** [5] - 570:5, 570:22, 570:23, 570:25, 571:2
**mess** [1] - 399:21
**message** [1] - 519:1
**messaging** [1] - 518:23
**met** [7] - 455:15, 474:18, 569:1, 569:4, 569:17, 570:1, 573:14
**method** [2] - 320:6, 568:23
**methods** [4] - 493:20, 493:22, 508:10, 544:5
**Mexico** [1] - 442:2
**Michael** [1] - 545:19
**microphone** [2] - 294:12, 533:7
**mid** [3] - 463:17, 487:2, 487:3
**MidAmerican** [13] - 525:19, 526:6, 526:7, 526:10, 526:14, 526:18, 528:8, 529:6, 529:22, 530:20, 531:7, 531:15, 531:19
**middle** [7] - 300:21, 313:16, 313:18, 335:17, 376:22, 481:17, 521:16
**midsized** [1] - 389:3
**Midwest** [13] - 324:23, 382:9, 433:4, 440:19, 440:21, 440:22, 443:7, 456:15, 457:17,

471:8, 471:25, 516:24, 545:14
**MIDWEST** [1] - 271:3
**might** [30] - 276:13, 303:9, 333:14, 351:24, 370:13, 392:11, 397:19, 400:22, 401:11, 405:4, 407:5, 407:21, 417:1, 445:25, 467:13, 476:9, 484:22, 487:13, 489:6, 489:23, 489:24, 489:25, 495:18, 515:20, 531:3, 531:23, 533:7, 549:23, 552:7, 561:4
**Mike** [1] - 407:9
**MIL** [15] - 420:10, 420:13, 420:23, 421:21, 423:2, 491:8, 491:21, 495:4, 495:23, 495:25, 496:2, 496:14, 496:22, 496:23, 497:5
**miles** [1] - 442:22
**military** [1] - 299:22
**milk** [4] - 442:10, 442:12, 442:15, 443:22
**milkman** [1] - 442:9
**mill** [2] - 442:7, 444:24
**million** [38] - 313:13, 373:5, 373:10, 373:11, 388:25, 389:6, 391:8, 391:11, 391:15, 392:3, 392:11, 392:14, 393:5, 394:6, 394:7, 394:8, 395:20, 398:22, 398:25, 399:1, 399:4, 428:5, 438:3, 438:4, 459:25, 466:25, 472:8, 475:16, 475:22, 476:16, 478:3, 478:4, 479:6, 479:7, 479:11
**millions** [2] - 431:20, 437:20
**mind** [23] - 280:17, 300:16, 303:23, 314:21, 314:25, 426:16, 435:12, 435:15, 445:8, 527:9, 551:12, 553:18, 553:22,

553:23, 556:18, 557:10, 558:4, 558:12, 559:21, 560:6, 575:4, 576:4, 576:7
**mine** [2] - 442:8, 443:10
**minimal** [1] - 325:11
**minimize** [1] - 301:16
**minimum** [3] - 339:18, 424:1, 466:9
**mining** [1] - 442:8
**Minnesota** [2] - 534:14, 539:1
**minute** [3] - 322:13, 385:17, 509:13
**minutes** [11] - 340:20, 355:6, 355:7, 416:4, 416:7, 419:22, 436:10, 513:13, 525:23, 525:24
**miserable** [1] - 446:5
**misleading** [4] - 356:7, 356:20, 483:7, 486:12
**missing** [1] - 494:17
**mistake** [1] - 292:6
**misunderstanding** [1] - 284:6
**misunderstood** [3] - 284:13, 292:9, 379:11
**mitigate** [1] - 288:10
**mix** [3] - 451:23, 452:4, 452:13
**mixed** [1] - 473:3
**mixing** [3] - 302:15, 453:18, 461:9
**mixture** [1] - 453:24
**Mod** [42] - 376:17, 396:10, 396:22, 402:18, 405:22, 406:15, 407:5, 407:21, 407:25, 408:13, 409:17, 409:25, 410:9, 410:12, 410:24, 413:2, 413:6, 413:13, 413:18, 414:16, 419:2, 422:1, 486:13, 487:7, 505:16, 505:19, 505:23, 505:25, 506:22, 507:1, 507:6, 508:4, 508:8, 508:17, 509:4, 510:5, 510:8, 510:16, 510:24, 515:14
**Mod's** [3] - 508:19,

508:24, 510:4
**mode** [2] - 276:17, 325:13
**model** [3] - 326:24, 448:7, 470:1
**modify** [1] - 296:16
**moment** [6] - 277:13, 341:15, 381:5, 422:24, 504:4, 567:23
**moments** [1] - 387:4
**money** [10] - 437:11, 437:13, 437:16, 437:22, 444:3, 459:20, 551:1, 551:2, 566:21
**monitoring** [2] - 528:21, 543:25
**monitors** [1] - 528:14
**month** [3] - 388:17, 388:18, 452:15
**months** [13] - 306:2, 447:6, 452:15, 469:3, 475:11, 475:13, 486:23, 522:8, 531:16, 531:21, 538:16, 539:5
**morning** [24] - 277:19, 278:4, 278:8, 280:24, 281:1, 286:10, 290:10, 291:19, 293:12, 293:13, 300:25, 301:9, 301:10, 333:9, 333:12, 340:18, 340:25, 343:8, 355:9, 372:22, 410:25, 445:3, 491:17, 575:21
**MORRIS** [1] - 272:3
**most** [13] - 304:1, 323:17, 370:9, 425:10, 452:13, 454:12, 462:6, 467:24, 469:16, 486:19, 489:13, 498:10, 534:13
**mostly** [2] - 451:18, 505:15
**motion** [15] - 274:19, 274:24, 275:25, 276:4, 277:10, 277:15, 334:12, 334:22, 421:4, 421:8, 424:1, 491:10, 552:25, 553:1
**motions** [1] - 423:22

**motivated** [1] - 325:24
**motivation** [1] - 326:1
**motive** [8] - 553:21, 556:25, 559:14, 559:16, 559:18, 561:25, 562:15, 562:16
**motorcycle** [1] - 442:18
**move** [49] - 287:22, 290:10, 308:16, 309:4, 325:16, 327:2, 331:22, 380:22, 394:17, 408:25, 412:1, 416:6, 416:9, 418:18, 418:19, 419:1, 419:8, 439:8, 448:24, 456:7, 457:20, 459:1, 459:14, 460:20, 471:11, 482:10, 497:21, 506:14, 507:19, 509:14, 513:11, 514:8, 516:15, 536:17, 542:22, 546:23, 548:14, 549:15, 555:20, 557:7, 565:23, 567:13, 567:19, 568:1, 568:8, 568:11, 568:18, 570:11, 574:3
**moved** [3] - 443:16, 456:3, 534:14
**moves** [5] - 298:3, 311:25, 315:12, 320:21, 331:25
**moving** [3] - 281:12, 306:2, 340:2
**MPEP** [2] - 351:16, 354:25
**MR** [458] - 274:14, 275:17, 276:2, 276:13, 276:23, 277:5, 277:18, 277:25, 279:4, 279:7, 279:12, 279:19, 280:7, 280:18, 280:24, 281:2, 281:18, 282:4, 282:18, 283:3, 283:14, 283:21, 284:4, 284:13, 285:7, 285:9, 285:14, 285:17, 285:24, 286:25, 287:21, 288:2, 288:18,

289:2, 289:7, 289:15, 290:2, 290:5, 291:22, 293:11, 294:11, 294:14, 298:3, 298:6, 298:10, 298:13, 299:1, 299:3, 299:23, 299:25, 300:15, 300:17, 300:21, 300:24, 302:2, 302:5, 303:14, 303:16, 304:24, 305:3, 305:24, 306:1, 307:20, 307:22, 309:4, 309:8, 309:12, 309:14, 310:15, 310:17, 311:25, 312:4, 312:8, 312:13, 312:14, 315:12, 315:15, 315:19, 316:24, 317:1, 320:21, 320:25, 321:4, 321:16, 321:18, 331:21, 331:25, 332:3, 332:7, 333:3, 334:1, 334:6, 334:7, 334:11, 334:20, 335:6, 335:10, 335:13, 336:23, 337:10, 337:14, 337:19, 337:22, 339:9, 340:4, 342:8, 342:18, 343:16, 343:19, 343:23, 343:25, 344:5, 344:7, 344:11, 344:16, 345:3, 345:7, 345:18, 346:14, 346:17, 346:21, 346:24, 347:1, 347:10, 347:13, 347:16, 347:23, 348:1, 348:11, 348:14, 348:19, 349:7, 349:15, 349:21, 349:24, 350:2, 350:4, 350:11, 350:14, 350:21, 351:15, 351:22, 351:24, 352:4, 352:11, 352:14, 352:24, 353:14, 353:20, 353:23, 354:5, 354:13, 354:20, 354:25, 355:16, 355:23, 356:4, 356:16,

357:5, 357:9, 357:17, 357:22, 358:9, 358:20, 359:15, 359:19, 360:1, 360:4, 360:11, 360:22, 361:14, 361:18, 362:10, 362:20, 362:22, 363:1, 363:10, 363:25, 364:3, 364:12, 364:19, 364:23, 365:5, 365:13, 365:24, 366:10, 366:22, 367:9, 367:17, 368:1, 368:4, 368:7, 368:12, 368:19, 369:3, 369:5, 369:8, 369:17, 372:7, 372:14, 372:17, 372:21, 373:20, 373:22, 374:6, 374:9, 374:15, 374:17, 375:8, 375:10, 379:21, 379:25, 380:22, 380:25, 381:4, 381:10, 381:12, 394:21, 394:23, 397:4, 397:5, 398:8, 398:10, 398:14, 398:16, 405:15, 405:20, 407:18, 407:20, 408:25, 409:2, 409:6, 412:1, 412:3, 412:8, 416:9, 416:11, 416:15, 418:13, 418:16, 418:23, 419:1, 419:4, 419:8, 419:11, 419:12, 419:15, 419:17, 419:21, 420:7, 420:19, 421:2, 421:21, 423:4, 424:16, 424:19, 424:21, 426:15, 426:18, 427:2, 427:5, 428:6, 428:8, 428:25, 429:4, 433:18, 433:20, 434:1, 434:4, 434:17, 434:20, 435:4, 435:8, 435:16, 435:24, 439:11, 439:20, 440:11, 440:13, 448:24, 449:2, 449:6, 456:7, 456:10, 456:14,

457:13, 457:14, 457:20, 457:23, 458:2, 458:3, 459:1, 459:4, 459:8, 464:1, 464:10, 464:16, 464:24, 465:7, 465:10, 465:14, 465:22, 466:13, 466:14, 471:11, 471:14, 471:18, 474:7, 474:11, 474:14, 474:17, 482:10, 482:12, 482:16, 491:2, 491:8, 491:24, 492:11, 492:23, 493:3, 493:5, 493:13, 493:21, 494:1, 494:6, 494:12, 494:15, 494:16, 494:19, 495:11, 496:4, 496:21, 497:22, 498:4, 498:6, 498:8, 498:18, 498:20, 499:2, 499:5, 499:9, 506:14, 506:16, 506:20, 507:19, 507:21, 507:25, 508:15, 509:14, 509:16, 509:20, 511:12, 511:15, 513:14, 514:7, 514:10, 514:15, 516:15, 516:17, 516:21, 519:7, 519:9, 519:11, 519:14, 521:6, 521:8, 521:13, 521:14, 522:19, 522:22, 524:21, 525:1, 525:6, 525:14, 525:17, 532:2, 532:5, 532:11, 532:19, 533:2, 533:6, 533:11, 539:14, 539:20, 542:22, 542:25, 543:4, 544:7, 544:10, 544:13, 544:17, 544:23, 545:7, 545:9, 546:4, 546:7, 546:23, 547:2, 547:8, 547:14, 547:15, 548:1, 548:3, 551:4, 551:9, 551:15, 551:20, 552:1, 552:6, 552:25, 553:8, 553:12, 554:9,

554:23, 555:18, 556:12, 557:2, 557:18, 558:18, 558:22, 558:23, 559:6, 559:16, 559:20, 559:24, 560:6, 560:10, 561:23, 562:14, 563:8, 564:1, 564:5, 564:12, 567:6, 567:8, 567:12, 567:18, 567:22, 567:25, 568:4, 568:7, 568:12, 568:17, 568:21, 570:11, 570:14, 570:18, 570:20, 571:15, 571:17, 574:3, 574:6, 574:11, 574:17, 576:10, 576:18, 577:5, 577:11

**MS** [3] - 436:3, 439:9, 439:14

**multiple** [4] - 291:4, 359:1, 382:2, 532:20

**must** [5] - 419:12, 476:8, 476:10, 476:11, 554:12

**Mylan** [1] - 567:5

## N

**NaCl** [1] - 312:25

**name** [17] - 301:6, 310:18, 310:21, 310:25, 436:14, 439:25, 440:1, 440:18, 449:15, 516:12, 526:3, 532:10, 532:11, 533:3, 533:4, 566:2

**named** [1] - 565:2

**names** [6] - 521:11, 521:12, 521:15, 521:20, 522:7, 565:6

**narratives** [2] - 554:2, 560:25

**narrow** [1] - 334:2

**narrowed** [1] - 334:2

**natural** [4] - 484:7, 484:19, 485:9, 535:6

**nature** [5] - 317:24, 357:20, 442:11, 491:7, 554:19

**Neal** [22] - 526:18, 526:19, 526:23, 526:24, 527:1, 527:2, 527:10, 527:14, 528:20,

528:23, 529:7, 529:8, 530:2, 530:7, 530:10, 530:16, 531:2

**near** [2] - 419:24, 453:17

**nearly** [1] - 314:6

**necessarily** [4] - 490:8, 492:25, 553:24, 554:7

**necessary** [5] - 287:1, 334:17, 349:13, 367:14, 556:22

**need** [70] - 276:18, 277:9, 279:14, 286:21, 287:19, 289:25, 290:18, 291:6, 291:8, 291:9, 291:10, 291:16, 291:17, 292:25, 293:14, 329:8, 330:23, 333:14, 336:8, 339:8, 339:18, 339:25, 340:17, 340:23, 341:11, 341:23, 342:4, 345:8, 345:20, 348:20, 352:4, 352:16, 353:18, 354:4, 355:4, 355:5, 355:8, 355:19, 357:2, 358:17, 363:14, 363:17, 366:16, 367:5, 369:25, 370:13, 371:24, 393:1, 424:2, 430:14, 431:14, 462:14, 462:15, 472:17, 487:25, 491:3, 528:3, 528:18, 529:5, 529:17, 530:8, 531:22, 532:23, 533:7, 540:24, 541:3, 556:9, 565:20, 569:7, 576:15

**needed** [8] - 306:19, 325:15, 330:20, 370:18, 448:9, 451:4, 460:14, 500:17

**needs** [17] - 277:10, 280:16, 288:19, 334:21, 341:12, 344:23, 345:5, 355:4, 366:19, 371:3, 371:10, 431:12, 464:17,

464:25, 490:14, 495:5, 517:23

**nefarious** [4] - 354:6, 356:7, 356:9, 356:12

**negatively** [1] - 573:2

**negotiate** [4] - 450:20, 469:24, 490:4, 493:9

**negotiated** [3] - 377:8, 377:17, 378:22

**negotiates** [1] - 499:22

**negotiating** [8] - 377:24, 378:12, 378:16, 386:16, 450:19, 489:16, 490:12, 499:17

**negotiation** [8] - 377:11, 377:13, 378:20, 379:6, 379:12, 380:12, 380:13, 380:15

**negotiations** [3] - 378:1, 378:2, 380:7

**neighborhood** [2] - 313:24, 443:11

**NEMUNAITIS** [132] - 271:21, 274:14, 275:17, 276:2, 276:13, 276:23, 277:5, 277:18, 277:25, 279:4, 279:7, 279:12, 279:19, 280:7, 280:18, 288:2, 288:18, 289:2, 289:7, 289:15, 290:2, 334:1, 334:7, 342:8, 342:18, 343:16, 343:19, 343:23, 343:25, 344:5, 344:7, 344:11, 344:16, 345:3, 345:7, 345:18, 346:14, 346:17, 346:21, 346:24, 347:1, 347:10, 347:13, 347:16, 347:23, 348:1, 348:11, 348:14, 348:19, 349:7, 349:15, 349:21, 349:24, 350:2, 350:4, 350:11, 350:14, 350:21, 351:15, 351:22, 351:24, 352:4, 352:11, 352:14, 352:24, 353:14, 353:20, 353:23, 354:5,

354:13, 354:20, 354:25, 355:16, 355:23, 356:4, 356:16, 368:7, 368:12, 368:19, 369:3, 369:5, 369:8, 369:17, 525:14, 525:17, 532:2, 532:5, 532:19, 533:2, 533:6, 533:11, 539:14, 539:20, 542:22, 543:4, 544:13, 544:23, 545:7, 545:9, 546:4, 546:7, 546:23, 547:14, 547:15, 548:1, 548:3, 551:15, 551:20, 554:23, 555:18, 556:12, 558:22, 559:20, 560:6, 563:8, 564:12, 567:12, 567:18, 567:22, 568:4, 568:12, 568:17, 568:21, 570:11, 570:18, 570:20, 571:15, 571:17, 574:3, 574:11, 574:17, 576:10

**Nemunaitis** [28] - 274:12, 274:15, 280:15, 281:21, 287:25, 289:18, 339:1, 339:16, 342:9, 355:2, 356:23, 357:3, 358:11, 362:15, 367:10, 368:6, 525:13, 532:1, 533:8, 544:22, 554:19, 559:12, 559:19, 563:6, 567:11, 574:7, 576:9, 576:16

**Nemunaitis'** [1] - 559:10

**Nemunaitis's** [1] - 529:21

**nervous** [2] - 332:15, 446:7

**network** [2] - 443:11, 443:12

**never** [8] - 332:9, 332:13, 366:23, 480:20, 513:10, 530:25, 535:22, 535:25

**new** [13] - 332:9,

332:12, 441:5, 458:7, 489:22, 491:9, 504:17, 515:21, 517:14, 531:22, 536:25, 537:6, 576:10

**newer** [2] - 484:4, 484:7

**news** [2] - 463:16, 463:24

**newspaper** [3] - 464:5, 466:6, 547:20

**Newton** [1] - 509:22

**next** [51] - 277:20, 282:9, 284:12, 300:19, 300:25, 301:10, 302:2, 303:14, 351:7, 378:11, 379:4, 380:6, 393:19, 397:11, 398:17, 410:2, 411:10, 411:24, 414:5, 414:6, 415:4, 415:12, 418:7, 418:9, 435:4, 435:23, 439:19, 443:10, 451:11, 451:16, 452:13, 453:25, 460:20, 481:22, 481:25, 482:3, 482:22, 485:25, 487:10, 507:8, 507:9, 516:25, 517:18, 525:14, 532:3, 546:6, 549:14, 569:14, 569:22, 571:8

**Nexus** [1] - 455:12

**nice** [6] - 396:17, 396:21, 410:21, 416:19, 455:1, 459:21

**nicely** [2] - 458:9, 460:16

**night** [9] - 274:16, 276:19, 277:1, 301:13, 464:17, 464:21, 544:14, 576:23, 577:4

**nighttime** [1] - 444:9

**nilly** [1] - 296:17

**nobody** [1] - 468:17

**nominal** [1] - 480:10

**non** [4] - 342:14, 383:2, 427:14, 466:10

**non-hearsay** [1] - 466:10

**non-sublicensable** [1] - 383:2
**non-Vistra** [1] - 427:14
**none** [3] - 317:21, 338:8, 376:3
**nonentity** [1] - 279:18
**nonessential** [1] - 362:17
**nonexclusive** [1] - 383:2
**nonissue** [1] - 279:23
**nonprofit** [1] - 406:14
**nonstarter** [1] - 279:17
**nontransferable** [1] - 383:2
**noon** [1] - 405:16
**NORIT** [4] - 301:5, 301:6, 305:11, 488:24
**normal** [4] - 296:14, 298:20, 340:22, 354:8
**normally** [1] - 332:8
**North** [16] - 301:7, 403:9, 417:4, 445:19, 446:15, 446:20, 510:13, 526:24, 527:10, 527:14, 528:20, 528:23, 529:7, 530:2, 530:7, 530:16
**northern** [1] - 535:16
**notch** [2] - 446:25, 447:16
**note** [3] - 415:15, 488:7, 517:13
**notebook** [4] - 376:25, 481:9, 498:19, 506:1
**notebooks** [1] - 501:21
**noted** [5] - 301:5, 324:4, 539:19, 554:3, 575:21
**notes** [13] - 299:12, 415:23, 417:18, 418:13, 434:2, 434:3, 434:22, 435:3, 435:6, 435:9, 518:15, 518:21, 553:25
**notetaker** [1] - 419:15
**nothing** [7] - 273:25, 292:25, 313:11, 354:9, 411:2, 452:20, 481:4
**notice** [7] - 274:7, 342:24, 465:17, 468:20, 510:24,

511:18, 511:24
**noticed** [2] - 405:10, 467:13
**notices** [1] - 515:13
**notified** [1] - 512:4
**noting** [1] - 509:22
**notion** [1] - 520:7
**Nova** [5] - 441:20, 441:21, 474:22, 474:23, 475:1
**November** [6] - 414:6, 475:11, 495:24, 516:13, 517:10, 518:12
**nowadays** [1] - 389:4
**nowheres** [1] - 467:19
**NOx** [4] - 329:25, 400:19, 401:5, 563:22
**nozzles** [2] - 530:8, 531:11
**NRG** [15] - 378:15, 379:5, 380:6, 382:1, 382:13, 385:6, 390:10, 391:14, 391:22, 392:4, 395:13, 395:14, 426:10, 489:7, 489:15
**NRG/Talen** [1] - 476:23
**Number** [3] - 285:10, 285:11, 285:12
**number** [42] - 289:13, 308:11, 315:4, 315:10, 318:17, 373:1, 382:9, 390:8, 392:17, 392:19, 395:22, 399:20, 408:18, 411:21, 411:22, 413:3, 415:11, 429:8, 429:9, 439:13, 441:19, 443:14, 446:10, 447:20, 470:23, 485:10, 485:13, 491:9, 496:14, 499:8, 506:4, 511:11, 525:20, 532:19, 548:16, 549:23, 552:8, 554:25, 565:2, 571:16
**numbered** [1] - 499:3
**numbers** [10] - 313:7, 391:1, 391:17, 392:7, 392:17, 392:20, 399:21, 436:6, 547:9, 577:3
**Numbers** [1] - 381:2

**numerical** [1] - 516:10
**numerous** [1] - 398:1
**nutshell** [1] - 461:4

## O

**O'Keefe** [38] - 331:18, 532:6, 532:7, 532:11, 533:4, 533:12, 534:11, 538:22, 539:15, 539:21, 539:24, 540:24, 543:5, 545:10, 546:12, 549:14, 551:21, 552:8, 553:20, 554:1, 554:7, 554:20, 555:15, 558:10, 560:2, 561:6, 563:9, 564:2, 567:19, 568:5, 568:13, 568:15, 568:22, 569:14, 570:21, 573:9, 574:25, 576:7
**O'KEEFE** [2] - 532:11, 532:13
**O'Keefe's** [6] - 273:17, 292:12, 368:13, 553:16, 567:9, 575:22
**O-'-K-E-E-F-E** [1] - 532:12
**oath** [2] - 401:18, 501:18
**object** [9] - 288:4, 422:19, 423:3, 423:6, 423:18, 464:2, 464:3, 464:5, 521:8
**objected** [2] - 420:24, 465:22
**objecting** [2] - 555:10, 557:9
**objection** [84] - 274:17, 298:5, 298:6, 309:7, 309:8, 312:3, 312:4, 315:14, 315:15, 320:24, 320:25, 332:2, 332:3, 354:16, 354:17, 380:24, 409:1, 412:2, 412:4, 416:10, 418:22, 419:3, 419:9, 422:24, 423:23, 439:10, 439:11, 449:1, 449:2, 456:9, 456:10, 457:22,

457:23, 459:3, 459:4, 464:7, 464:12, 464:16, 464:20, 465:4, 465:12, 466:6, 466:12, 471:13, 471:14, 482:11, 491:3, 491:7, 496:9, 496:10, 496:11, 497:15, 497:19, 506:15, 506:16, 507:20, 507:21, 509:15, 509:16, 514:10, 516:16, 542:24, 542:25, 547:1, 547:2, 551:4, 551:9, 552:2, 554:22, 557:3, 559:7, 559:8, 560:14, 560:16, 561:19, 563:1, 564:5, 564:8, 567:6, 567:7, 567:14, 570:13, 574:5, 574:6
**objectionable** [2] - 422:17, 422:22
**objections** [4] - 280:21, 292:20, 464:15, 573:23
**objects** [1] - 575:13
**obligated** [2] - 395:7, 395:8
**obligation** [2] - 393:25, 511:17
**obligations** [1] - 511:5
**observations** [1] - 296:25
**obtain** [2] - 294:19, 294:23
**obvious** [2] - 324:13, 328:18
**obviously** [2] - 328:14, 555:10
**occasion** [1] - 332:10
**occur** [3] - 280:21, 543:11, 550:7
**occurred** [1] - 550:8
**October** [5] - 315:7, 437:4, 475:13, 507:12, 522:25
**odd** [1] - 363:4
**odds** [1] - 453:15
**OF** [2] - 271:2, 271:9
**off-site** [1] - 516:5
**offer** [3] - 331:2, 413:2, 539:14
**offered** [11] - 338:11, 535:23, 554:14, 554:16, 561:24, 562:2, 562:5, 562:8,

562:10, 562:13, 563:2
**offering** [2] - 400:9, 426:25
**offhand** [1] - 513:2
**office** [11] - 415:19, 463:8, 463:9, 467:17, 467:18, 490:13, 490:16, 511:20, 535:21, 535:23
**Office** [9] - 319:10, 319:23, 324:17, 338:11, 345:19, 429:23, 430:4, 433:6, 433:10
**officer** [9] - 326:8, 326:10, 382:25, 410:7, 410:8, 414:7, 414:19, 417:11, 417:15
**offices** [3] - 468:8, 520:18, 521:22
**official** [1] - 436:25
**Official** [1] - 577:23
**officially** [1] - 402:25
**offshoots** [1] - 478:4
**oftentimes** [1] - 436:18
**Ohio** [1] - 417:4
**old** [6] - 293:16, 388:23, 442:13, 444:5, 444:8, 534:16
**oldest** [1] - 445:22
**Olson** [2] - 319:11, 545:19
**omitted** [1] - 335:18
**omitting** [2] - 483:6, 486:11
**once** [11] - 288:3, 330:19, 408:14, 431:13, 431:21, 448:8, 452:22, 462:8, 467:8, 497:9, 516:7
**one** [143] - 273:2, 274:18, 278:6, 279:3, 283:16, 284:22, 286:14, 291:12, 300:18, 303:4, 303:6, 303:11, 303:13, 306:14, 307:12, 309:15, 318:14, 318:25, 319:7, 319:23, 321:6, 323:15, 328:6, 330:14, 334:2, 334:6, 337:9, 338:2, 338:21, 339:3,

340:4, 342:10, 342:23, 345:19, 350:1, 350:15, 351:7, 354:25, 355:8, 359:9, 362:3, 364:9, 366:20, 368:14, 368:15, 368:16, 368:22, 368:23, 371:15, 373:23, 375:22, 378:20, 380:17, 381:8, 384:14, 388:6, 393:1, 393:3, 393:7, 394:24, 395:15, 395:24, 398:21, 402:4, 403:22, 404:12, 410:2, 411:10, 411:24, 412:14, 415:4, 415:12, 415:20, 420:15, 422:16, 423:2, 423:22, 425:15, 428:11, 428:17, 435:4, 442:2, 445:22, 447:4, 453:1, 453:13, 463:24, 463:25, 469:6, 469:7, 471:8, 473:2, 474:1, 478:13, 479:19, 480:9, 481:11, 481:14, 481:15, 481:16, 481:22, 481:25, 482:3, 482:17, 482:20, 486:25, 489:7, 489:24, 494:25, 495:23, 501:22, 505:2, 506:2, 506:3, 507:10, 515:12, 515:16, 515:18, 522:19, 524:7, 524:8, 524:17, 532:21, 540:15, 552:17, 552:22, 553:3, 553:9, 556:14, 557:25, 569:12, 570:6, 570:24, 571:12, 571:23, 572:9, 574:8, 574:20, 575:19

**one-time** [3] - 394:24, 395:15, 395:24

**one-ton** [1] - 453:13

**one-year** [1] - 330:14

**ones** [18] - 295:11, 297:8, 324:15, 324:16, 338:7, 368:17, 369:2,

383:13, 394:18, 396:2, 404:19, 458:21, 469:20, 472:12, 472:15, 477:21, 549:11

**onward** [2] - 505:15, 524:19

**open** [10] - 284:15, 284:17, 284:23, 290:9, 290:12, 413:6, 423:14, 485:5, 503:4, 542:11

**opened** [5] - 335:7, 339:11, 421:25, 423:10, 423:17

**opening** [20] - 274:22, 278:10, 292:4, 292:15, 321:13, 323:4, 329:15, 338:1, 338:14, 340:5, 340:9, 356:17, 403:22, 404:11, 432:18, 432:23, 465:20, 468:2, 521:2, 565:5

**operate** [4] - 438:7, 439:4, 529:15, 566:11

**operated** [4] - 427:16, 466:20, 524:8, 566:9

**operates** [4] - 525:20, 529:22, 536:23, 573:6

**operating** [18] - 437:1, 437:3, 450:2, 462:24, 467:25, 473:21, 474:2, 490:10, 524:7, 525:22, 525:23, 536:14, 536:15, 566:7, 566:8, 566:11, 566:16, 566:18

**operation** [5] - 447:10, 539:16, 541:16, 554:16

**operations** [10] - 387:23, 441:6, 455:14, 463:9, 504:17, 537:7, 540:6, 549:17, 552:11, 552:13

**operator** [1] - 301:16

**operators** [5] - 296:24, 297:2, 377:5, 473:2, 521:25

**opine** [4] - 541:8, 555:1, 556:17, 556:18

**opined** [1] - 576:1

**opines** [1] - 558:19

**opining** [2] - 576:4, 576:7

**opinion** [9] - 413:16, 541:24, 553:2, 553:15, 556:20, 557:11, 557:20, 558:6, 558:15

**opinions** [10] - 331:3, 365:7, 533:17, 546:21, 552:20, 553:21, 553:22, 554:5, 555:5, 557:5

**opportunity** [3] - 277:20, 332:25, 560:18

**opposed** [5] - 276:21, 354:2, 423:6, 470:6, 527:24

**opposing** [1] - 544:20

**opposite** [2] - 492:25, 494:9

**ops** [1] - 505:3

**optimum** [3] - 305:14, 306:15, 306:17

**option** [7] - 288:3, 448:15, 450:20, 455:4, 455:19, 455:20, 478:20

**options** [4] - 312:22, 373:7, 373:8, 373:11

**order** [53] - 281:4, 281:5, 281:14, 282:19, 283:9, 285:18, 285:25, 289:11, 289:14, 296:10, 302:8, 329:8, 357:10, 357:24, 358:10, 360:14, 362:4, 364:24, 366:18, 419:21, 420:22, 421:2, 421:8, 421:9, 421:12, 421:20, 422:18, 452:10, 460:14, 464:11, 464:13, 464:14, 465:4, 467:4, 480:11, 493:22, 497:3, 499:3, 516:10, 525:7, 525:10, 539:2, 548:21, 552:24, 552:25, 553:6, 554:10, 554:11, 554:12, 555:22, 557:10, 561:5, 575:6

**ordered** [1] - 497:9

**orders** [2] - 421:3, 422:15

**ordinary** [2] - 296:13, 541:12

**org** [1] - 292:14

**organized** [3] - 416:19, 416:20, 512:13

**orient** [1] - 505:19

**oriented** [2] - 373:21, 406:1

**original** [10] - 294:15, 295:11, 319:14, 319:23, 406:15, 448:22, 449:7, 449:15, 559:7, 560:15

**originally** [1] - 410:11

**otherwise** [10] - 351:13, 354:1, 384:13, 424:4, 431:23, 558:14, 559:2, 560:9, 560:10, 561:5

**ourselves** [1] - 461:10

**out-of-court** [1] - 465:25

**out-of-town** [1] - 416:25

**outcome** [4] - 327:15, 370:7, 373:13, 478:9

**outdoor** [1] - 538:17

**outline** [1] - 364:16

**outlined** [2] - 282:19, 282:21

**output** [1] - 455:5

**outreach** [1] - 468:5

**outright** [3] - 414:22, 456:16, 479:6

**outside** [4] - 442:3, 521:23, 534:3, 561:22

**ovens** [1] - 444:24

**overall** [2] - 558:6, 558:15

**overarching** [1] - 495:16

**overhead** [1] - 503:18

**overly** [1] - 401:10

**overnight** [1] - 277:23

**overrule** [2] - 496:9, 564:9

**overruled** [2] - 497:19, 564:8

**oversaw** [1] - 566:16

**oversee** [2] - 404:4, 441:5

**overseeing** [2] - 451:13, 467:25

**Overview** [1] - 517:15

**overview** [1] - 539:24

**owe** [2] - 393:21,

393:23

**owed** [1] - 472:14

**own** [19] - 317:15, 317:17, 326:13, 373:4, 373:6, 373:8, 373:10, 414:25, 433:14, 438:7, 443:21, 443:24, 444:1, 445:17, 446:21, 450:16, 461:5, 468:16, 547:24

**owned** [8] - 318:13, 318:20, 390:10, 427:16, 437:24, 456:22, 480:14, 489:6

**owner** [3] - 318:11, 408:6, 510:14

**ownership** [9] - 326:18, 373:13, 437:21, 437:25, 438:7, 438:11, 478:5, 523:3, 566:23

**owns** [4] - 326:16, 493:6, 545:12, 545:14

---

**P**

**p.m** [2] - 299:21, 415:16

**PAC** [2] - 412:14, 412:16

**pack** [1] - 453:12

**packed** [1] - 473:24

**pact** [1] - 454:10

**page** [72] - 289:11, 299:2, 299:6, 299:10, 300:15, 302:2, 302:4, 303:14, 303:18, 305:1, 305:25, 306:4, 309:23, 309:24, 311:17, 312:13, 312:16, 316:8, 316:10, 328:25, 350:16, 357:7, 374:7, 374:8, 374:23, 375:11, 375:12, 379:16, 380:1, 381:16, 383:21, 393:5, 393:19, 397:8, 397:11, 397:12, 397:15, 397:22, 398:18, 417:7, 424:7, 426:15, 427:3, 434:2, 455:24, 482:18,

482:20, 482:21, 482:22, 483:9, 485:11, 487:10, 487:19, 499:1, 502:1, 503:4, 503:5, 504:3, 504:5, 504:21, 504:22, 545:17, 546:6, 553:12, 554:11, 577:9

**pages** [9] - 298:12, 298:15, 298:18, 374:8, 396:18, 398:2, 398:17, 428:16

**paid** [15] - 383:3, 393:12, 394:7, 459:19, 472:8, 473:12, 516:2, 523:22, 523:25, 524:2, 524:11, 524:14, 551:1, 551:3, 567:4

**paint** [1] - 445:4

**painting** [1] - 444:11

**paper** [1] - 463:1

**papers** [3] - 273:25, 317:22, 547:20

**paragraph** [22] - 273:15, 273:16, 282:21, 282:22, 364:5, 384:19, 395:13, 396:17, 396:20, 397:7, 397:20, 412:22, 438:14, 483:16, 486:4, 497:24, 498:21, 499:12, 504:21, 511:14, 517:19, 553:19

**paragraphs** [2] - 499:3, 499:4

**paraphrasing** [1] - 553:1

**parent** [8] - 489:7, 489:12, 489:14, 489:15, 489:21, 490:3, 492:2, 493:5

**parents** [1] - 490:3

**part** [74] - 276:15, 278:19, 280:19, 284:14, 294:25, 298:22, 307:12, 318:12, 318:21, 320:20, 323:23, 326:24, 327:13, 331:12, 335:25, 336:15, 346:3, 349:4, 377:8, 377:10, 377:12,

377:16, 377:23, 378:12, 378:16, 381:6, 385:1, 386:3, 387:18, 394:15, 400:9, 402:12, 402:14, 403:9, 407:9, 433:14, 436:24, 443:15, 445:23, 450:19, 456:25, 465:18, 469:9, 469:13, 469:14, 480:7, 493:16, 494:16, 500:2, 502:22, 503:2, 503:12, 504:9, 512:2, 514:19, 517:2, 520:23, 526:13, 529:18, 533:19, 537:23, 541:2, 546:18, 550:1, 556:1, 556:9, 556:13, 556:16, 557:17, 567:20, 569:14, 569:16, 569:22, 575:22

**particles** [2] - 307:7, 572:14

**particular** [13] - 296:2, 300:3, 318:22, 348:14, 358:2, 358:20, 390:10, 400:13, 403:18, 460:12, 495:17, 509:1, 510:7

**particularly** [5] - 288:1, 312:15, 393:4, 462:12, 465:25

**particulate** [8] - 295:21, 296:21, 572:4, 572:13, 572:15, 572:19, 573:1, 573:5

**particulates** [1] - 310:8

**parties** [49] - 277:1, 278:22, 286:10, 287:16, 291:4, 291:7, 291:15, 291:24, 291:25, 332:18, 340:17, 341:10, 341:19, 341:21, 348:5, 354:3, 355:5, 360:14, 370:11, 370:18, 371:2, 371:10, 371:13, 371:19, 371:21, 372:1, 379:19,

384:14, 390:11, 396:22, 421:10, 422:14, 427:1, 471:24, 491:5, 491:9, 491:13, 491:14, 491:20, 495:1, 525:7, 553:6, 555:25, 558:19, 560:18, 568:2, 575:20, 576:15, 576:19

**parties'** [1] - 464:22

**partners** [4] - 566:15, 566:16, 566:18, 567:2

**partnership** [1] - 438:10

**parts** [3] - 378:5, 521:12, 545:11

**partway** [1] - 305:18

**party** [7] - 331:12, 423:18, 488:4, 488:9, 488:11, 511:18, 560:20

**pass** [8] - 333:3, 419:17, 435:16, 447:19, 519:7, 539:4, 539:6, 552:16

**passed** [3] - 274:3, 572:8, 573:7

**passes** [3] - 572:7, 572:12, 572:17

**passing** [1] - 550:14

**past** [6] - 386:1, 386:2, 386:5, 386:12, 401:25, 517:25

**paste** [1] - 351:7

**pasted** [1] - 368:13

**patent** [130] - 278:13, 278:16, 278:20, 279:6, 279:10, 280:4, 281:15, 281:24, 289:6, 289:24, 289:25, 317:9, 317:11, 317:18, 317:25, 318:4, 318:8, 318:9, 318:10, 318:11, 318:14, 318:18, 318:19, 319:5, 319:21, 320:2, 320:5, 320:23, 321:15, 321:20, 322:4, 322:7, 322:11, 322:19, 323:24, 324:18, 335:12, 335:13, 335:17, 335:18, 335:25, 342:16, 342:19, 342:20,

344:25, 345:1, 345:6, 347:15, 347:20, 350:17, 350:18, 352:23, 357:13, 361:6, 367:20, 368:16, 368:22, 370:24, 373:16, 373:23, 374:2, 374:16, 374:18, 375:3, 375:18, 375:20, 375:22, 375:25, 376:1, 383:15, 383:23, 384:25, 385:17, 391:5, 394:15, 400:3, 408:6, 410:10, 410:13, 410:18, 410:20, 410:24, 411:6, 413:17, 413:20, 418:5, 418:19, 418:20, 418:21, 420:20, 422:8, 425:5, 428:7, 430:18, 432:2, 432:14, 433:5, 433:7, 433:13, 434:9, 434:13, 455:20, 457:5, 457:10, 457:12, 466:1, 470:5, 478:23, 497:5, 510:16, 511:20, 515:12, 518:2, 539:12, 541:13, 545:10, 545:11, 545:12, 545:13, 545:14, 545:17, 545:23, 545:25, 546:8, 548:4, 548:5, 568:16

**Patent** [10] - 319:10, 319:22, 324:17, 338:11, 345:19, 429:9, 429:23, 430:4, 433:5, 433:10

**patent-in-suit** [1] - 541:13

**patented** [12] - 314:22, 400:6, 400:10, 412:18, 412:24, 430:19, 435:13, 480:4, 480:11, 480:15, 480:25, 549:6

**patents** [113] - 281:7, 282:15, 286:13, 288:15, 317:20, 319:7, 319:9, 320:7, 320:8, 320:20, 322:18, 323:11,

324:13, 326:14, 326:19, 326:23, 327:6, 327:7, 327:11, 332:20, 343:18, 344:10, 345:2, 345:3, 345:4, 347:3, 347:6, 357:19, 370:24, 373:18, 383:4, 383:7, 383:8, 383:12, 383:13, 383:15, 383:23, 384:3, 384:6, 385:11, 399:17, 400:11, 400:17, 407:9, 408:2, 408:9, 409:22, 409:25, 414:17, 414:21, 414:25, 417:11, 418:10, 428:12, 432:5, 432:8, 433:3, 433:11, 433:14, 447:11, 448:15, 450:17, 455:19, 456:4, 456:16, 457:1, 457:17, 478:21, 478:23, 479:5, 479:11, 479:20, 480:13, 480:14, 481:1, 491:10, 491:19, 493:20, 495:20, 508:25, 510:6, 510:14, 510:25, 511:7, 514:22, 514:25, 515:8, 517:11, 517:21, 520:9, 522:16, 523:3, 523:8, 523:12, 523:15, 524:1, 539:8, 540:2, 540:4, 540:14, 540:17, 540:18, 540:20, 540:25, 541:6, 541:9, 541:11, 541:23, 546:16, 547:19, 557:19, 566:6

**patents-at-issue** [2] - 541:23, 546:16

**patents-in-suit** [8] - 343:18, 344:10, 457:1, 457:17, 491:19, 523:12, 540:2, 540:14

**path** [7] - 338:24, 421:17, 432:20, 432:25, 459:13, 460:8, 484:15

**paths** [2] - 432:20, 432:22

Patrick [1] - 449:18
PAUL [1] - 272:7
Paul [2] - 372:22, 474:18
pause [2] - 544:8, 564:2
paused [1] - 529:23
Pavlish [55] - 278:4, 278:9, 279:22, 280:17, 286:17, 286:23, 287:2, 291:2, 293:7, 293:12, 298:14, 304:11, 306:5, 317:2, 327:19, 330:24, 332:16, 333:2, 333:10, 336:6, 341:3, 341:16, 344:2, 354:6, 355:23, 367:8, 370:14, 372:22, 380:1, 382:24, 399:14, 402:10, 405:21, 407:14, 407:21, 407:25, 408:23, 410:8, 413:17, 415:12, 424:14, 435:18, 447:4, 447:14, 447:15, 447:25, 506:7, 507:1, 509:12, 523:1, 542:2, 545:20, 545:21, 549:22
Pavlish's [7] - 287:20, 288:9, 354:2, 407:9, 408:2, 418:21, 549:18
pay [8] - 394:3, 425:12, 428:3, 438:25, 454:14, 462:15, 467:4, 472:6
paying [8] - 308:9, 395:14, 395:24, 454:15, 456:18, 456:24, 461:7, 524:13
payment [10] - 327:14, 393:8, 393:18, 393:25, 394:25, 395:15, 395:25, 398:21, 398:24
payments [1] - 477:1
pays [1] - 438:18
PDF [1] - 410:22
PE [4] - 405:8, 539:2, 539:6, 539:7
peaking [1] - 313:12
PEARSON [1] -

271:22
people [22] - 296:24, 296:25, 396:18, 406:16, 406:17, 447:1, 447:4, 451:14, 460:4, 460:12, 461:7, 462:6, 463:3, 463:6, 468:18, 503:24, 521:1, 521:22, 555:12, 566:21
per [16] - 300:6, 301:3, 303:2, 305:13, 306:9, 307:13, 402:5, 438:3, 438:4, 438:19, 438:25, 473:8, 504:16, 523:24, 534:7, 563:23
per-ton [1] - 473:8
perceived [1] - 414:3
percent [32] - 302:3, 305:1, 312:19, 313:11, 313:12, 313:15, 313:25, 314:7, 330:3, 330:8, 330:19, 330:20, 330:23, 401:14, 401:17, 401:20, 431:15, 431:16, 431:19, 431:21, 437:25, 460:12, 503:15, 504:6, 508:9, 563:22, 563:23, 564:18, 564:21, 569:10
percentage [3] - 330:1, 478:5, 566:23
percolating [1] - 353:22
perfect [3] - 293:15, 305:2, 316:25
perform [7] - 296:9, 477:7, 477:16, 477:19, 480:6, 493:19, 493:22
performed [4] - 296:1, 309:21, 540:7, 543:10
perhaps [2] - 275:10, 356:20
period [18] - 275:11, 277:22, 307:15, 445:10, 446:15, 453:5, 458:5, 480:16, 522:11, 527:25, 531:21, 563:18, 563:21, 565:13, 565:15, 565:17, 565:20,

571:4
periodic [1] - 516:5
permission [2] - 328:12, 423:14
permit [2] - 529:14, 531:22
permits [2] - 525:23, 528:1
permitted [2] - 362:12, 424:5
perpetual [2] - 383:4, 391:5
person [6] - 274:2, 274:8, 517:5, 541:8, 541:12, 555:23
personal [1] - 327:18
personally [5] - 296:19, 321:12, 404:4, 410:8, 441:17
personnel [1] - 467:1
perspective [2] - 333:25, 477:20
pertaining [1] - 574:13
PETER [1] - 271:17
phase [1] - 307:9
Philip [7] - 331:19, 390:5, 476:7, 532:5, 532:11, 533:4, 539:15
PHILIP [2] - 532:12, 532:13
phone [1] - 399:11
phrase [1] - 358:21
phraseology [6] - 279:25, 289:20, 352:17, 358:2, 358:6, 558:5
pick [1] - 474:5
picture [22] - 335:9, 335:10, 335:11, 336:14, 336:17, 343:24, 344:1, 344:8, 344:10, 344:15, 344:17, 344:22, 345:5, 347:7, 349:17, 349:25, 351:12, 356:10, 361:10, 369:10, 379:19, 428:17
pictures [3] - 428:17, 452:23, 544:18
piece [3] - 299:13, 510:7, 536:2
pieces [1] - 463:24
pile [5] - 519:2, 519:5, 550:8, 550:15, 550:16
pilot [1] - 403:17
pin [1] - 454:7

pipe [1] - 522:16
Pirkey [1] - 395:4
pitch [2] - 395:9, 432:1
Pittsburgh [1] - 417:3
place [14] - 295:6, 295:7, 302:22, 317:16, 323:15, 323:16, 323:18, 330:10, 413:9, 430:1, 430:20, 441:20, 442:18, 453:17
places [3] - 302:19, 323:12, 467:24
plain [1] - 492:23
plaintiff [20] - 285:1, 298:3, 311:25, 315:12, 320:21, 331:13, 331:25, 344:2, 346:11, 348:5, 360:16, 361:4, 363:16, 371:16, 435:23, 439:8, 439:20, 494:18, 496:10, 558:2
Plaintiff [3] - 271:24, 440:8, 532:15
plaintiffs [25] - 283:8, 335:19, 356:17, 360:12, 361:11, 362:7, 370:24, 371:5, 371:8, 436:5, 439:18, 448:24, 456:7, 457:20, 459:1, 471:11, 525:17, 525:23, 532:2, 532:5, 539:14, 552:18, 559:3, 561:20, 576:6
Plaintiffs [1] - 271:5
Plaintiffs' [44] - 298:4, 298:8, 298:11, 299:2, 308:18, 308:20, 309:5, 309:10, 311:18, 311:20, 312:1, 312:6, 312:9, 315:13, 315:17, 316:10, 320:17, 320:22, 321:2, 321:7, 321:9, 331:23, 332:1, 332:5, 418:25, 419:6, 428:7, 439:16, 448:25, 449:4, 456:8, 456:12, 457:21, 457:25, 459:2,

459:6, 471:12, 471:16, 514:13, 516:19, 543:2, 547:12, 570:16, 574:9
plaintiffs' [15] - 293:23, 333:25, 337:20, 342:6, 369:24, 390:6, 439:15, 496:12, 497:20, 547:11, 551:18, 561:9, 562:21, 573:24, 576:16
plan [3] - 339:22, 370:2, 577:5
plans [1] - 443:25
plant [93] - 275:6, 303:6, 303:7, 323:11, 328:15, 330:12, 377:5, 387:9, 388:14, 389:3, 389:13, 394:14, 395:4, 400:13, 400:14, 430:12, 431:5, 437:11, 451:9, 451:12, 451:13, 451:24, 452:6, 452:7, 452:10, 453:15, 453:17, 453:23, 454:20, 455:5, 463:6, 468:13, 468:16, 469:23, 470:10, 470:14, 480:5, 480:6, 489:6, 489:11, 489:20, 489:24, 490:10, 490:14, 490:15, 492:7, 495:16, 496:7, 500:4, 504:7, 507:13, 507:14, 508:18, 508:22, 521:25, 525:22, 526:14, 529:14, 531:7, 531:23, 535:18, 535:22, 535:25, 536:1, 536:13, 536:23, 536:24, 537:7, 538:15, 538:19, 539:15, 539:17, 540:7, 541:16, 550:9, 550:10, 550:14, 550:17, 550:21, 550:25, 552:12, 554:16, 557:6, 560:1, 560:3, 560:5, 560:7, 567:9, 569:18

**plant's** [2] - 492:3, 493:8
**plants** [111] - 303:5, 328:16, 328:22, 329:4, 330:15, 330:25, 381:22, 382:4, 382:6, 382:7, 382:11, 382:14, 382:15, 382:16, 382:18, 387:21, 388:20, 389:13, 390:9, 392:18, 393:5, 396:3, 406:3, 406:8, 413:3, 426:7, 427:16, 440:25, 441:9, 441:11, 447:22, 450:13, 451:5, 453:11, 454:3, 455:3, 467:16, 467:22, 468:8, 469:1, 469:9, 469:12, 469:19, 470:6, 470:17, 472:2, 472:16, 473:22, 477:3, 477:7, 477:16, 477:19, 485:4, 489:2, 489:11, 489:22, 489:23, 490:2, 490:5, 492:10, 492:20, 493:4, 493:6, 493:14, 494:8, 494:13, 501:6, 502:18, 503:13, 504:2, 520:10, 520:16, 520:23, 521:23, 525:21, 526:11, 526:16, 526:17, 527:23, 528:10, 528:24, 529:10, 529:22, 530:6, 531:2, 531:16, 531:20, 535:10, 537:5, 537:21, 538:20, 541:25, 542:3, 549:23, 550:2, 550:18, 559:25, 560:11, 564:15, 566:3, 566:4, 566:10, 566:13, 569:1, 569:5, 571:3, 571:10, 571:20, 573:17, 574:14, 574:15
**plateau** [1] - 313:25
**plates** [2] - 573:2, 573:3
**play** [5] - 341:18,

357:1, 431:3, 458:11, 515:9
**played** [3] - 375:13, 436:12, 526:1
**plays** [2] - 505:21, 556:25
**pleased** [2] - 455:10, 508:2
**plumber** [1] - 444:19
**plus** [2] - 314:11, 394:7
**point** [70] - 282:23, 282:25, 284:24, 286:2, 286:5, 291:18, 294:17, 295:12, 299:4, 303:1, 317:19, 318:3, 318:8, 319:12, 324:21, 333:8, 335:24, 336:24, 351:2, 354:4, 356:3, 361:2, 363:1, 364:13, 365:6, 366:15, 402:4, 414:19, 417:17, 420:8, 420:14, 421:6, 422:25, 424:6, 426:9, 426:20, 431:7, 432:6, 435:14, 443:20, 445:12, 446:13, 448:15, 450:20, 451:8, 455:19, 456:20, 456:21, 459:13, 460:21, 463:13, 474:5, 477:15, 486:9, 537:1, 537:22, 538:19, 542:4, 542:6, 543:20, 556:4, 557:2, 558:8, 561:1, 561:5, 564:11, 575:14, 576:18, 576:22, 576:24
**pointed** [3] - 284:15, 374:11, 554:10
**pointing** [6] - 308:1, 335:19, 360:16, 374:1, 374:12, 476:14
**points** [1] - 497:2
**policy** [4] - 327:9, 327:13, 466:2, 561:21
**pollutant** [1] - 543:24
**pollution** [5] - 444:25, 537:14, 539:17, 541:17, 543:13

**population** [1] - 446:7
**portable** [1] - 453:1
**portfolio** [1] - 478:19
**portion** [9] - 424:23, 426:20, 427:9, 450:8, 464:14, 492:18, 492:22, 553:14, 553:15
**portions** [4] - 368:13, 384:22, 546:8, 554:2
**position** [17] - 290:11, 290:14, 290:15, 302:22, 326:7, 334:20, 345:7, 345:8, 348:19, 353:11, 353:13, 361:24, 364:3, 420:19, 423:16, 436:20, 537:3
**positioned** [1] - 486:1
**positions** [2] - 277:22, 371:21
**positive** [3] - 435:15, 437:17, 437:18
**positively** [1] - 573:2
**possession** [2] - 404:15, 550:19
**possible** [4] - 284:7, 326:22, 528:19, 575:11
**possibly** [5] - 287:17, 289:9, 397:21, 531:23, 575:21
**posted** [1] - 535:17
**potential** [6] - 413:13, 479:4, 507:16, 543:24, 544:5, 548:8
**potentially** [7] - 279:20, 361:10, 373:13, 373:14, 382:3, 423:25, 560:24
**pound** [1] - 452:5
**pounds** [3] - 313:14, 451:25, 452:1
**Powder** [1] - 328:22
**powdered** [1] - 412:15
**power** [141] - 275:6, 330:25, 377:5, 381:22, 382:7, 387:21, 388:14, 388:19, 388:20, 389:3, 389:13, 390:9, 394:14, 406:3, 406:8, 421:13, 427:15, 437:11, 441:9, 441:11, 446:2, 447:21, 450:13, 451:5, 451:9,

452:10, 453:11, 454:20, 467:16, 467:22, 468:8, 468:13, 468:16, 469:1, 469:9, 469:12, 469:19, 469:23, 470:6, 470:10, 470:14, 470:17, 472:2, 472:16, 473:22, 477:3, 477:7, 477:15, 477:19, 480:5, 480:6, 484:11, 489:2, 489:6, 489:11, 489:23, 490:5, 492:3, 492:7, 492:10, 492:20, 493:4, 493:6, 493:8, 493:10, 493:14, 494:8, 494:13, 495:16, 496:7, 499:22, 501:6, 502:18, 503:13, 507:14, 508:18, 520:10, 521:22, 525:21, 525:22, 526:11, 526:14, 526:16, 526:17, 527:23, 528:10, 528:24, 529:10, 529:14, 529:22, 535:9, 535:18, 535:22, 535:25, 536:1, 536:13, 536:23, 536:24, 537:4, 537:7, 538:17, 538:20, 539:15, 539:17, 540:6, 541:16, 541:25, 542:3, 549:23, 550:2, 550:8, 550:10, 550:17, 550:18, 550:21, 550:25, 552:11, 554:16, 557:6, 559:25, 560:1, 560:3, 560:5, 560:6, 560:11, 563:25, 566:3, 566:9, 566:13, 569:1, 569:5, 569:18, 571:3, 571:10, 571:20, 573:17, 574:14, 574:15
**PowerPoint** [1] - 316:24
**practice** [7] - 298:20, 326:5, 373:17, 400:11, 424:2,

480:25, 538:25
**practiced** [2] - 303:24, 435:7
**prayer** [1] - 371:25
**PRB** [4] - 329:4, 330:21, 460:13, 462:10
**pre** [2] - 572:18, 572:20
**pre-coating** [2] - 572:18, 572:20
**preamble** [1] - 569:2
**preceding** [5] - 351:7, 351:14, 359:2, 360:5, 361:21
**precipitator** [4] - 310:7, 571:13, 572:24, 572:25
**precise** [1] - 399:2
**precisely** [1] - 423:7
**preface** [1] - 366:22
**prefer** [1] - 332:9
**preferred** [1] - 518:1
**prejudicial** [4] - 354:21, 356:13, 370:15, 491:21
**preliminary** [1] - 278:7
**prepare** [6] - 308:24, 352:5, 533:22, 542:20, 550:12, 570:9
**prepared** [9] - 277:12, 308:21, 311:21, 312:11, 333:12, 333:22, 415:21, 542:16, 543:15
**preparing** [2] - 550:5, 574:1
**presence** [1] - 283:11
**present** [5] - 282:15, 331:17, 480:15, 525:9, 577:19
**presentation** [1] - 490:1
**presented** [4] - 286:14, 334:19, 355:7, 364:12
**President** [1] - 516:12
**president** [6] - 326:9, 436:7, 436:22, 436:23, 436:25, 504:17
**presumably** [2] - 276:8, 369:25
**pretend** [1] - 387:20
**pretrial** [8] - 273:21, 421:22, 464:13, 464:14, 465:4, 475:10, 525:7, 575:6
**pretty** [8] - 283:5,

295:25, 445:16, 454:3, 485:20, 489:3, 494:20, 536:7

**prevail** [1] - 291:13

**preview** [1] - 540:10

**previewed** [1] - 326:13

**previewing** [1] - 282:10

**previous** [4] - 285:25, 364:24, 400:1, 401:1

**previously** [5] - 279:25, 420:11, 479:18, 502:14, 539:11

**price** [6] - 460:15, 477:2, 477:5, 479:11, 490:12

**pricing** [2] - 488:20, 508:3

**primarily** [6] - 326:11, 386:18, 502:6, 536:12, 537:1, 537:12

**primary** [2] - 296:7, 302:21

**priority** [44] - 278:5, 278:9, 279:17, 280:13, 282:9, 283:23, 284:9, 288:23, 334:24, 335:25, 337:14, 340:10, 342:14, 343:3, 343:6, 345:21, 345:25, 346:4, 346:13, 346:19, 347:3, 347:9, 348:9, 348:20, 348:22, 348:24, 351:3, 351:5, 351:11, 351:21, 352:22, 353:12, 357:14, 359:2, 359:12, 361:20, 362:1, 362:4, 362:18, 363:23, 365:21, 366:19, 371:8

**privy** [2] - 331:10, 475:25

**pro** [1] - 438:11

**problem** [9] - 278:10, 316:3, 334:9, 337:25, 339:3, 339:5, 339:15, 545:4, 557:17

**problematic** [2] - 282:13, 561:12

**procedurally** [1] - 334:13

**proceed** [10] - 291:14,

369:18, 369:25, 372:5, 372:18, 424:17, 424:18, 440:10, 474:14, 519:11

**proceeding** [1] - 539:12

**proceedings** [5] - 293:3, 370:5, 424:10, 514:1, 577:20

**process** [28] - 277:14, 301:25, 317:16, 317:25, 319:4, 319:8, 320:1, 323:23, 386:3, 394:15, 400:18, 401:5, 402:18, 435:13, 448:12, 477:8, 477:16, 477:19, 480:7, 480:11, 505:19, 508:5, 508:20, 549:6, 550:11, 560:17, 570:7, 570:24

**processing** [1] - 438:2

**produce** [2] - 437:7, 444:24

**producers** [1] - 387:21

**product** [15] - 312:25, 327:24, 393:11, 393:14, 394:2, 395:5, 400:9, 437:9, 450:25, 469:22, 480:12, 484:16, 505:1, 516:1, 521:1

**products** [34] - 384:12, 384:13, 384:18, 384:20, 384:21, 384:23, 384:24, 399:16, 399:20, 399:24, 400:6, 400:10, 400:14, 400:22, 402:7, 402:8, 453:6, 469:16, 479:16, 479:19, 479:23, 479:24, 480:5, 480:6, 480:15, 480:22, 480:25, 489:17, 490:7, 499:18, 504:12, 520:1, 520:9

**professional** [4] - 405:8, 447:16, 538:22

**proffered** [3] - 422:23, 555:8, 562:18

**proffers** [1] - 553:21

**profit** [2] - 437:14, 437:15

**program** [20] - 461:6, 461:16, 461:18, 463:17, 481:2, 508:4, 508:5, 508:9, 508:23, 508:25, 520:11, 520:19, 520:24, 524:9, 524:18, 524:20, 536:20, 536:23, 555:16, 556:21

**program's** [1] - 461:22

**programs** [1] - 474:1

**prohibition** [1] - 366:14

**prohibits** [1] - 361:23

**project** [1] - 296:14

**projection** [1] - 387:10

**promoter** [1] - 324:9

**prompted** [2] - 506:25, 543:6

**promptly** [1] - 511:19

**promulgated** [3] - 330:11, 483:19, 483:21

**proper** [4] - 362:1, 362:4, 362:6, 366:24

**properly** [3] - 289:5, 356:18, 368:22

**property** [4] - 450:6, 510:6, 548:9

**proposal** [3] - 369:15, 395:12, 508:1

**propose** [1] - 288:2

**proposed** [4] - 334:1, 334:3, 367:10, 576:10

**proposing** [3] - 333:11, 508:16, 508:18

**propriety** [1] - 360:24

**prosecution** [6] - 318:19, 320:2, 322:11, 354:8, 433:5, 433:13

**prospects** [1] - 522:12

**Protection** [1] - 542:17

**prove** [4] - 348:20, 348:22, 348:24, 557:10

**proved** [1] - 500:15

**provide** [19] - 277:15, 289:25, 311:13, 320:4, 349:13, 366:24, 369:18, 380:12, 388:2, 425:25, 500:5, 508:2, 508:9,

511:18, 519:25, 531:3, 555:5, 556:17, 558:14

**provided** [22] - 275:9, 305:10, 316:14, 343:13, 377:10, 377:12, 377:14, 377:24, 378:2, 378:18, 384:14, 384:20, 384:21, 387:4, 387:7, 427:15, 427:19, 439:3, 511:23, 533:25, 559:2, 566:12

**providing** [10] - 297:15, 311:23, 320:6, 378:6, 381:6, 390:18, 413:8, 461:7, 499:15, 555:3

**province** [2] - 441:23, 442:23

**proving** [5] - 328:11, 425:4, 428:10, 428:11, 428:12

**provision** [4] - 279:16, 357:14, 361:16, 366:18

**provisional** [74] - 278:15, 278:19, 279:2, 279:11, 280:3, 281:17, 285:4, 285:11, 285:13, 286:13, 286:22, 287:6, 290:23, 318:3, 319:14, 319:25, 321:10, 322:21, 324:14, 331:23, 337:3, 342:13, 342:14, 342:21, 343:10, 343:14, 343:15, 343:21, 343:22, 344:9, 344:22, 345:1, 345:10, 345:11, 345:25, 346:12, 347:2, 347:7, 347:8, 347:22, 348:7, 348:8, 348:21, 349:19, 352:19, 352:20, 352:23, 353:12, 355:24, 355:25, 357:16, 358:15, 359:3, 359:7, 359:10, 359:25, 360:19, 361:7, 361:10, 362:18, 363:19, 365:21, 367:2,

367:11, 367:19, 374:2, 374:7, 374:10, 374:20, 375:16, 429:16, 429:20, 430:3, 433:6

**PTC** [8] - 295:19, 295:20, 295:21, 296:6, 296:12, 297:16, 310:2, 403:20

**PTO** [2] - 351:6, 410:20

**PTX** [42] - 297:12, 297:14, 304:11, 335:8, 374:3, 374:7, 374:16, 375:9, 375:11, 375:16, 375:17, 375:18, 376:16, 376:23, 378:9, 385:17, 396:8, 410:10, 418:19, 419:1, 448:19, 449:8, 457:15, 471:1, 471:2, 471:5, 472:25, 478:11, 478:14, 511:11, 540:21, 542:23, 545:8, 546:24, 570:12, 570:19, 570:21, 574:4

**public** [11] - 328:20, 328:24, 342:24, 402:2, 406:3, 450:3, 450:7, 479:12, 484:25, 487:12, 543:10

**publicly** [5] - 314:15, 314:17, 314:19, 329:2, 387:13

**pull** [13] - 298:11, 309:12, 374:15, 375:8, 390:5, 392:20, 425:15, 426:17, 428:6, 433:18, 471:3, 497:23, 529:3

**pulling** [1] - 388:8

**pulverizer** [2] - 550:10, 550:15

**purchase** [7] - 400:12, 437:21, 450:21, 455:19, 479:10, 492:4, 529:6

**purchased** [5] - 322:12, 401:21, 414:21, 437:12, 479:5

**purchases** [1] - 493:8

**purchasing** [1] -

492:14
**purely** [1] - 338:13
**purple** [1] - 314:2
**purpose** [11] - 292:11, 296:5, 296:7, 429:25, 440:24, 466:10, 492:18, 492:21, 492:23, 548:4, 561:22
**purposes** [7] - 290:17, 346:1, 347:16, 350:9, 366:25, 526:22, 561:23
**pursuant** [1] - 464:12
**pursue** [2] - 318:23, 426:4
**pursued** [4] - 294:24, 295:1, 324:15, 324:16
**pursuing** [1] - 294:25
**pushed** [1] - 496:11
**put** [37] - 276:25, 291:15, 297:9, 300:11, 300:13, 301:21, 322:20, 322:23, 322:25, 323:2, 326:5, 328:10, 338:3, 338:10, 371:15, 373:21, 374:6, 381:10, 390:2, 409:7, 417:22, 436:6, 444:7, 449:15, 452:14, 467:17, 467:18, 475:7, 489:19, 491:12, 495:12, 498:22, 519:18, 522:20, 536:20, 557:6, 565:5
**putting** [11] - 300:9, 301:23, 301:24, 320:13, 323:4, 323:8, 330:16, 349:2, 355:24, 521:4, 536:22

## Q

**qualifications** [2] - 330:2, 331:1
**qualified** [5] - 401:9, 552:9, 552:13, 552:20, 553:3
**quantified** [1] - 401:16
**quantify** [1] - 400:23
**quantity** [1] - 393:22
**quarter** [2] - 415:9, 519:19

**query** [1] - 390:2
**questioning** [9] - 355:14, 355:17, 356:13, 420:24, 421:25, 431:25, 491:16, 491:25, 529:21
**questions** [28] - 286:11, 290:21, 325:12, 325:15, 334:19, 336:6, 337:16, 339:6, 341:13, 356:14, 364:11, 367:10, 367:18, 367:23, 370:13, 373:15, 391:19, 409:13, 419:18, 420:20, 428:15, 519:9, 520:12, 522:10, 522:17, 524:21, 529:19, 562:25
**quick** [4] - 340:4, 373:15, 491:3, 525:1
**quicker** [1] - 273:10
**quickly** [5] - 308:16, 315:5, 315:20, 316:15, 394:18
**quite** [7] - 306:25, 325:11, 328:18, 373:6, 420:15, 435:11, 479:2
**quote** [1] - 521:9
**quoted** [1] - 358:9

## R

**rail** [1] - 558:1
**raise** [8] - 288:4, 423:23, 439:24, 444:4, 465:2, 491:18, 532:9, 564:11
**raised** [10] - 278:10, 286:10, 464:18, 464:21, 464:22, 464:25, 465:4, 465:5, 465:7, 475:1
**raising** [2] - 291:5, 443:19
**ramped** [1] - 459:18
**ran** [3] - 443:11, 478:20, 536:12
**range** [2] - 280:21, 391:7
**rank** [1] - 326:3
**rarely** [1] - 466:7
**rata** [1] - 438:11
**rate** [9] - 299:14,

305:13, 306:11, 312:21, 438:18, 445:7, 508:4, 528:9, 528:16
**rates** [2] - 295:24, 297:1
**rather** [5] - 313:10, 332:21, 433:14, 456:16, 468:24
**ratio** [1] - 306:17
**ratios** [1] - 306:12
**raw** [5] - 437:12, 488:7, 488:15, 515:18, 516:1
**Raymond** [1] - 566:19
**re** [3] - 407:16, 407:18, 563:6
**re-ask** [3] - 407:16, 407:18, 563:6
**reach** [3] - 467:10, 520:13, 557:20
**reached** [7] - 468:23, 469:2, 520:21, 525:7, 557:20, 561:4, 567:25
**reaction** [1] - 306:24
**reactions** [5] - 307:3, 307:7, 307:9, 307:10, 307:16
**read** [26] - 281:14, 282:24, 285:25, 328:15, 380:1, 383:5, 383:6, 385:3, 385:4, 396:24, 397:1, 397:20, 418:1, 418:2, 435:1, 438:14, 438:15, 445:20, 499:19, 499:25, 503:2, 517:16, 517:19, 518:4, 543:8, 553:2
**reading** [9] - 281:4, 281:7, 281:18, 282:18, 284:7, 384:19, 412:21, 464:4, 504:5
**reads** [1] - 502:25
**ready** [3] - 372:5, 525:16, 532:2
**real** [6] - 278:13, 325:22, 448:11, 451:4, 484:23, 491:2
**real-world** [1] - 451:4
**realize** [4] - 301:17, 423:16, 446:2, 517:22
**realized** [3] - 447:6, 466:18, 558:20
**realizing** [1] - 398:9
**really** [56] - 273:9,

274:23, 296:7, 306:19, 307:9, 307:18, 308:13, 315:5, 317:17, 318:7, 325:12, 325:20, 325:21, 325:24, 326:25, 330:15, 351:6, 368:16, 392:2, 394:9, 395:19, 398:24, 400:20, 400:21, 404:12, 413:21, 421:12, 421:16, 427:3, 429:1, 448:7, 449:25, 454:24, 459:15, 459:18, 460:14, 462:3, 462:23, 463:4, 466:3, 467:12, 467:19, 467:20, 468:10, 468:17, 490:14, 496:19, 497:2, 501:16, 512:11, 520:8, 520:20, 536:3, 554:23, 555:19
**realm** [1] - 367:3
**realtime** [1] - 494:19
**reason** [25] - 273:8, 341:14, 346:3, 346:10, 346:11, 358:1, 379:10, 417:2, 422:18, 422:21, 422:22, 422:23, 423:4, 423:5, 423:8, 456:23, 488:18, 494:21, 502:19, 530:7, 530:18, 543:8, 562:12, 562:23
**reasonable** [2] - 405:4, 460:15
**reasonably** [1] - 543:11
**reasons** [4] - 302:21, 465:16, 529:23, 561:12
**rebate** [1] - 393:13
**rebut** [1] - 350:25
**recalled** [1] - 575:12
**recap** [1] - 478:11
**recasting** [2] - 554:2, 560:25
**receive** [4] - 327:4, 327:12, 451:19, 510:22
**received** [8] - 327:13, 408:23, 437:23,

480:18, 480:25, 529:11, 551:22, 566:23
**receives** [1] - 438:16
**receiving** [1] - 555:24
**recent** [6] - 300:8, 338:5, 338:9, 388:12, 414:1, 498:10
**recently** [1] - 322:15
**recess** [7] - 293:1, 293:2, 370:4, 424:9, 513:23, 513:25, 577:14
**recognize** [7] - 304:12, 378:8, 472:13, 475:9, 506:10, 507:14, 517:7
**recommended** [1] - 536:15
**reconcile** [1] - 576:19
**reconfigure** [1] - 576:6
**record** [19] - 338:22, 346:5, 370:6, 398:6, 436:14, 439:12, 439:25, 481:12, 495:3, 496:3, 496:4, 532:10, 533:10, 540:21, 561:2, 561:23, 562:5, 562:11, 568:3
**records** [3] - 295:22, 296:6, 457:16
**red** [3] - 445:1, 474:25
**redirect** [4] - 419:20, 424:15, 424:23, 519:8
**REDIRECT** [2] - 424:20, 519:13
**reduce** [7] - 326:2, 326:5, 400:19, 401:5, 450:14, 563:22, 572:21
**reduced** [2] - 431:17, 485:2
**reducing** [3] - 325:23, 544:5, 568:23
**reduction** [7] - 330:1, 330:23, 373:17, 431:16, 438:17, 508:10, 569:10
**reductions** [2] - 296:11, 409:19
**Reductions** [1] - 436:17
**refer** [11] - 291:17, 380:19, 411:21, 412:11, 427:21,

467:18, 521:11, 526:23, 527:1, 527:4, 528:5

**reference** [83] - 279:11, 280:1, 280:6, 280:10, 280:11, 281:17, 281:23, 282:1, 282:20, 284:18, 285:4, 288:7, 288:8, 288:23, 289:1, 289:5, 289:10, 289:23, 290:8, 290:14, 290:17, 290:20, 304:12, 337:3, 345:10, 345:16, 346:23, 347:2, 347:8, 347:21, 348:6, 350:5, 350:9, 351:5, 351:13, 352:6, 352:19, 352:20, 353:8, 354:14, 357:15, 357:21, 358:4, 358:19, 358:21, 358:24, 359:8, 359:10, 359:14, 359:21, 359:24, 360:3, 360:18, 360:19, 360:24, 361:5, 361:16, 361:23, 362:3, 362:7, 362:17, 363:18, 363:23, 365:17, 365:21, 366:8, 368:10, 368:23, 370:25, 371:7, 413:25, 418:4, 429:18, 429:23, 432:23, 496:24, 497:10, 544:12, 547:23, 553:10, 556:21, 556:22, 561:6

**reference/essential** [1] - 333:15

**referenced** [3] - 397:7, 397:20, 476:19

**references** [5] - 338:12, 496:1, 547:17, 547:18, 547:19

**referencing** [1] - 483:4

**referred** [5] - 310:23, 329:14, 340:6, 418:6, 436:18

**referring** [12] - 306:11, 321:24, 383:7, 394:12, 411:22,

413:25, 415:11, 521:9, 528:5, 552:24, 553:15, 554:8

**refers** [2] - 310:25, 397:17

**refine** [1] - 550:24

**refined** [97] - 275:5, 292:2, 344:3, 389:15, 397:8, 397:12, 398:1, 404:8, 407:7, 408:1, 408:8, 414:17, 427:15, 427:19, 427:22, 427:24, 436:9, 437:1, 437:6, 437:7, 437:10, 437:14, 437:16, 437:18, 437:24, 438:2, 438:19, 438:24, 439:1, 439:4, 461:14, 461:19, 461:22, 461:24, 463:13, 465:17, 466:15, 467:9, 467:23, 469:24, 470:3, 470:6, 470:8, 470:21, 471:20, 472:3, 472:4, 472:5, 472:6, 473:7, 473:9, 473:16, 475:14, 486:13, 487:7, 500:18, 501:2, 505:7, 505:14, 505:20, 508:19, 508:23, 509:23, 510:8, 511:24, 514:19, 515:14, 521:1, 524:3, 524:8, 524:17, 525:21, 529:7, 529:10, 529:21, 531:6, 540:6, 549:16, 550:2, 550:5, 550:12, 550:17, 551:23, 563:11, 563:17, 563:19, 563:21, 563:23, 564:18, 565:18, 565:20, 566:9, 566:12, 566:22, 571:2

**refining** [3] - 550:14, 570:7, 570:24

**reflect** [4] - 297:25, 316:15, 355:13, 416:7

**reflected** [4] - 302:6, 305:5, 306:6, 503:19

**reflecting** [2] - 299:7, 313:18

**reflects** [1] - 300:1

**refresh** [1] - 509:6

**regard** [21] - 275:3, 283:15, 288:25, 291:4, 333:14, 336:18, 337:13, 341:25, 342:1, 357:19, 358:12, 359:9, 370:20, 423:1, 465:13, 495:10, 554:21, 555:9, 559:14, 562:19, 574:13

**regarding** [11] - 334:23, 464:6, 500:3, 522:12, 525:8, 540:11, 543:15, 543:19, 544:5, 553:22, 554:13

**regardless** [3] - 339:4, 350:12, 423:20

**Regency** [1] - 415:9

**regional** [1] - 443:16

**registered** [1] - 512:14

**regular** [2] - 298:20, 461:11

**regulated** [1] - 446:12

**regulation** [5] - 349:11, 483:24, 485:8, 539:16, 564:20

**regulations** [17] - 330:13, 330:17, 430:20, 446:10, 447:17, 458:10, 459:14, 459:15, 483:18, 484:3, 528:6, 537:24, 542:2, 563:14, 564:13, 564:14, 569:8

**Regulations** [1] - 483:13

**relate** [9] - 276:22, 285:22, 320:7, 320:8, 328:1, 341:13, 341:15, 371:12, 562:23

**related** [20] - 292:2, 292:17, 313:3, 346:19, 349:3, 349:8, 411:3, 489:17, 499:18, 503:11, 539:17, 541:15, 545:23, 546:3, 546:5, 546:8, 546:15, 547:16,

556:6, 560:24

**relates** [11] - 288:23, 290:22, 300:9, 313:1, 337:17, 347:14, 348:18, 366:6, 425:18, 492:10, 492:19

**relating** [1] - 559:13

**relationship** [4] - 393:17, 489:13, 517:25, 561:15

**relative** [2] - 313:5, 541:18

**relatively** [1] - 407:3

**release** [9] - 386:12, 394:8, 395:14, 395:24, 427:13, 427:14, 427:18, 428:3

**relevance** [4] - 339:4, 339:10, 339:14, 359:13

**relevant** [29] - 276:10, 281:25, 282:15, 283:18, 288:14, 288:15, 292:16, 333:9, 334:17, 336:21, 344:24, 346:13, 347:19, 357:13, 357:19, 358:18, 361:8, 363:19, 366:1, 368:12, 368:17, 370:19, 371:23, 391:15, 465:24, 465:25, 553:23, 556:13, 556:22

**relied** [1] - 573:25

**rely** [7] - 348:20, 348:21, 348:23, 409:18, 485:1, 542:20, 546:21

**relying** [1] - 354:14

**remain** [1] - 293:9

**remained** [1] - 485:5

**remaining** [1] - 484:11

**remedial** [1] - 423:1

**remedy** [1] - 420:14

**remember** [45] - 294:3, 319:2, 329:17, 335:8, 363:12, 376:15, 376:19, 377:2, 377:3, 377:9, 378:23, 379:1, 379:4, 379:7, 379:8, 388:24, 390:25, 391:1, 391:17, 391:18, 391:23, 393:8, 401:4,

410:13, 418:20, 425:7, 428:23, 430:9, 430:10, 432:3, 432:18, 432:23, 434:1, 434:6, 500:21, 502:23, 506:12, 507:5, 513:1, 517:8, 518:20, 519:6, 519:22, 549:20, 565:5

**remembered** [1] - 464:22

**remind** [3] - 293:17, 403:8, 523:24

**removal** [6] - 305:23, 306:19, 312:19, 313:23, 314:10, 488:8

**remove** [8] - 307:14, 307:15, 307:17, 310:8, 329:25, 440:25, 520:10, 542:10

**removed** [7] - 312:20, 420:21, 545:1, 564:22, 572:6, 572:16, 574:22

**removes** [1] - 310:7

**removing** [1] - 302:23

**render** [1] - 533:17

**renovate** [1] - 444:5

**rent** [2] - 452:6, 453:17

**rep** [1] - 535:22

**repairs** [1] - 536:15

**repeat** [3] - 380:3, 409:23, 497:21

**replied** [1] - 408:23

**replow** [1] - 293:16

**reply** [2] - 363:3, 363:5

**report** [37] - 273:15, 273:17, 292:13, 308:21, 309:5, 309:17, 309:24, 309:25, 311:14, 311:21, 312:2, 312:9, 312:11, 315:6, 315:7, 315:20, 315:22, 368:13, 373:4, 387:22, 465:15, 476:6, 482:25, 483:7, 533:22, 533:25, 542:20, 543:5, 543:14, 543:17, 544:1, 553:2, 553:16, 556:16, 558:18, 570:9, 574:1

reported [1] - 577:19
reporter [5] - 398:5, 414:10, 429:12, 496:16, 508:13
Reporter [3] - 577:17, 577:18, 577:23
reporting [2] - 316:9, 316:11
reports [20] - 308:10, 308:11, 311:13, 314:20, 315:1, 315:3, 315:8, 317:23, 328:16, 328:20, 328:24, 364:14, 388:2, 403:23, 404:8, 404:20, 463:12, 482:8, 532:21, 554:2
representative [3] - 386:18, 404:25, 441:11
represented [8] - 301:18, 378:21, 385:7, 475:15, 476:2, 476:5, 476:25, 494:2
representing [2] - 386:19, 513:6
represents [1] - 453:9
request [11] - 276:8, 330:14, 330:15, 395:12, 473:13, 525:11, 547:3, 547:6, 573:24, 575:12, 575:17
requesting [1] - 341:20
require [2] - 438:10, 466:11
required [12] - 349:14, 349:16, 424:2, 486:9, 487:11, 517:22, 529:14, 537:21, 542:4, 542:6, 542:10, 569:10
requirement [3] - 330:9, 431:22
requirements [2] - 529:17, 543:13
requires [5] - 420:8, 464:11, 465:4, 548:19, 571:8
Research [3] - 297:19, 298:17, 403:9
research [13] - 325:19, 326:25, 355:4, 406:2, 406:4, 445:19, 445:22, 448:5, 462:18,

462:21, 479:12, 543:25, 569:6
residue [1] - 445:1
resolution [1] - 338:25
resolve [17] - 273:18, 278:6, 288:11, 333:23, 336:4, 339:19, 340:1, 341:13, 343:7, 355:8, 364:11, 370:1, 370:10, 371:3, 371:10, 464:23, 465:8
resolved [3] - 278:3, 284:2, 465:10
resolves [2] - 351:17, 352:22
resource [1] - 369:19
respect [6] - 306:18, 358:20, 367:11, 367:15, 384:25, 553:21
respond [2] - 337:23, 339:2
responded [5] - 338:13, 376:6, 411:20, 507:2, 520:15
responding [4] - 339:13, 339:14, 340:5, 465:18
response [10] - 277:10, 277:16, 404:23, 464:9, 464:10, 465:13, 491:23, 495:23, 554:21, 559:10
responses [1] - 573:23
responsibility [1] - 441:2
responsible [2] - 416:22, 441:4
rest [5] - 502:24, 525:4, 546:5, 564:16
restate [1] - 408:18
restriction [1] - 342:12
result [5] - 483:24, 484:2, 484:18, 503:17, 543:11
results [7] - 304:4, 305:20, 306:24, 307:18, 308:15, 311:23, 315:25
retake [2] - 372:10, 514:2
retreat [2] - 416:25, 417:1
return [1] - 486:20
returns [1] - 438:13

revenue [11] - 459:10, 459:24, 501:10, 502:5, 502:16, 503:10, 503:11, 503:15, 503:20, 503:22, 504:6
revenues [1] - 460:25
reversed [1] - 302:8
review [11] - 273:7, 273:9, 286:11, 286:13, 298:18, 320:5, 362:14, 476:13, 509:13, 533:17, 546:18
reviewed [8] - 297:22, 323:14, 512:24, 537:24, 542:18, 556:5, 570:8, 573:25
reviewing [1] - 552:10
rework [1] - 518:11
Rework [1] - 517:13
ribbon [1] - 410:21
Richard [2] - 440:1, 440:4
RICHARD [2] - 271:23, 440:4
Rick [6] - 325:4, 387:1, 439:21, 440:18, 449:17, 516:12
RICK [1] - 440:6
rights [6] - 426:23, 455:20, 457:1, 468:15, 510:16, 523:3
rise [3] - 513:20, 513:24, 574:23
risk [6] - 485:3, 487:16, 488:4, 500:13, 501:2, 501:5
Risk [1] - 487:11
risks [1] - 487:12
River [2] - 328:22, 397:16
RLP [3] - 449:13, 450:9, 478:18
road [1] - 447:24
ROBINSON [1] - 272:8
rods [2] - 573:2, 573:3
role [14] - 325:6, 325:10, 325:11, 331:4, 380:8, 380:20, 381:5, 386:24, 466:3, 505:21, 533:16, 534:3, 536:10, 536:17
roles [2] - 537:9, 538:18
rolled [1] - 400:16

rooms [1] - 552:14
rooter [1] - 463:14
roughly [3] - 304:20, 305:17, 367:9
route [2] - 518:1, 556:10
routers [1] - 463:15
royalties [1] - 516:2
royalty [3] - 383:3, 393:12, 393:13
RPR [1] - 577:22
Rule [1] - 466:10
rule [19] - 286:7, 287:4, 290:7, 290:13, 290:16, 337:2, 342:20, 342:25, 343:2, 343:6, 345:9, 345:15, 351:3, 351:16, 351:17, 352:24, 355:1, 483:23
ruled [5] - 275:3, 292:5, 551:12, 558:10, 558:21
rules [4] - 278:14, 343:4, 438:10, 525:3
ruling [14] - 274:25, 281:22, 334:16, 348:9, 349:11, 423:5, 464:25, 555:1, 555:20, 560:14, 560:17, 560:21, 560:24, 561:14
rulings [2] - 358:8, 423:9
run [10] - 297:6, 298:1, 301:14, 308:13, 327:25, 328:2, 406:5, 406:10, 406:14, 562:19
running [3] - 296:24, 462:2, 463:17
runtime [1] - 436:10
rural [1] - 534:14

**S**

Safety [1] - 570:5
sake [1] - 396:20
sale [2] - 480:5, 480:25
sales [26] - 409:8, 411:8, 443:16, 462:1, 462:12, 467:1, 480:19, 486:1, 486:6, 487:25, 500:16,

500:17, 500:22, 502:19, 503:6, 503:15, 503:17, 503:18, 503:23, 503:24, 504:16, 507:18, 509:21, 514:17, 563:11
salesperson [1] - 505:4
same.. [1] - 483:12
sat [3] - 324:16, 447:9, 469:7
satisfy [3] - 288:13, 289:19, 289:23
save [3] - 288:3, 342:21, 376:2
saw [7] - 291:24, 292:23, 403:22, 469:4, 484:16, 545:10, 576:2
SB50 [1] - 399:21
scale [4] - 393:8, 394:1, 450:2
scene [1] - 421:6
Schaatt [5] - 436:5, 436:6, 436:15, 436:16, 566:19
schedule [1] - 372:2
school [3] - 441:21, 441:22, 442:15
science [2] - 535:3, 535:10
scientific [1] - 306:23
scope [4] - 339:6, 462:19, 497:5, 561:8
Scotia [5] - 441:20, 441:21, 474:22, 474:23, 475:1
Scott [13] - 526:20, 527:4, 527:5, 527:10, 527:12, 527:15, 527:19, 528:21, 528:22, 529:8, 530:3, 530:12, 531:2
screen [17] - 298:11, 321:19, 373:21, 375:13, 409:7, 411:22, 427:9, 441:10, 449:8, 452:19, 452:25, 453:8, 459:9, 471:19, 475:8, 482:23, 498:22
se [3] - 303:2, 402:5, 504:16
SEA [1] - 310:24
SEA2 [8] - 310:23, 311:8, 312:22, 313:17, 313:19,

313:20, 316:12
**sealed** [1] - 289:16
**seat** [1] - 341:5
**seated** [2] - 341:5, 422:12
**SEC** [2] - 457:9, 458:22
**second** [18] - 303:4, 338:1, 339:17, 343:9, 365:18, 375:12, 410:3, 415:9, 466:4, 471:2, 471:7, 473:4, 479:15, 483:16, 494:23, 523:5, 544:9, 564:3
**second-guessing** [1] - 466:4
**secondary** [1] - 442:7
**secondly** [2] - 371:4, 472:16
**seconds** [3] - 436:11, 525:24, 525:25
**Section** [20] - 402:16, 402:19, 403:24, 404:5, 404:15, 409:12, 412:10, 430:8, 430:11, 430:15, 430:21, 437:8, 480:18, 480:21, 480:24, 483:4, 555:16, 556:21, 559:12, 561:6
**section** [18] - 300:22, 349:12, 349:14, 363:3, 382:23, 383:2, 383:10, 384:10, 384:11, 386:7, 393:6, 393:18, 426:14, 426:23, 427:3, 502:3, 502:4, 568:22
**secure** [2] - 295:3, 426:8
**Securities** [2] - 482:19, 483:4
**securities** [1] - 483:3
**security** [1] - 274:5
**see** [115] - 273:7, 274:8, 275:3, 275:6, 276:3, 288:4, 289:9, 292:13, 297:13, 299:21, 302:22, 306:16, 308:19, 311:19, 312:16, 313:5, 313:8, 313:22, 314:8, 316:3, 316:8, 316:21, 320:18,

321:8, 324:3, 325:21, 325:22, 326:3, 332:22, 333:5, 357:7, 358:17, 360:9, 360:15, 361:25, 368:8, 374:1, 374:18, 375:1, 376:22, 377:1, 377:21, 377:22, 383:12, 384:11, 384:16, 393:19, 394:20, 395:1, 395:17, 396:1, 397:8, 398:3, 408:21, 411:9, 412:20, 413:10, 415:14, 416:18, 417:9, 417:13, 424:8, 425:17, 426:22, 427:7, 434:14, 435:2, 438:21, 441:10, 445:17, 447:12, 447:24, 448:19, 449:10, 449:13, 451:5, 455:12, 460:10, 472:18, 474:1, 475:14, 475:17, 475:18, 481:11, 481:17, 482:23, 483:14, 483:25, 484:5, 487:21, 498:25, 502:7, 506:12, 508:6, 509:10, 509:24, 510:23, 512:23, 516:13, 517:1, 518:2, 520:23, 528:15, 529:3, 543:18, 551:11, 551:21, 553:2, 557:22, 564:9, 568:5, 568:9, 568:13, 575:16, 576:24
**seeing** [8] - 292:25, 298:14, 302:6, 309:24, 422:1, 521:15, 556:8, 577:13
**seek** [2] - 424:3, 424:5
**seeking** [4] - 334:16, 385:22, 386:1, 386:5
**seem** [8] - 313:12, 356:16, 495:18, 498:22, 505:12, 555:4, 556:13, 558:8
**segue** [1] - 554:23
**select** [1] - 500:4

**sell** [18] - 328:5, 384:14, 400:7, 402:6, 402:8, 426:25, 437:10, 462:3, 462:13, 462:16, 469:15, 479:23, 485:17, 485:18, 500:13, 516:1, 520:1, 551:2
**selling** [15] - 326:22, 330:18, 426:25, 431:21, 450:25, 461:9, 470:20, 479:24, 480:15, 504:12, 505:1, 505:5, 520:9, 549:5, 551:22
**sells** [3] - 399:16, 479:19, 480:4
**send** [2] - 273:7, 515:13
**sending** [2] - 273:4, 522:11
**Senescence** [1] - 521:16
**senior** [2] - 326:8, 326:9
**sense** [25] - 273:9, 287:10, 291:21, 292:10, 303:10, 313:6, 314:9, 319:13, 328:16, 328:21, 330:20, 343:11, 350:19, 351:6, 382:17, 392:10, 413:6, 456:19, 497:12, 520:5, 520:6, 520:7, 523:16, 555:4, 555:23
**sent** [6] - 274:16, 311:21, 314:16, 411:19, 430:4, 576:11
**sentence** [17] - 283:22, 283:23, 284:1, 289:2, 350:15, 358:23, 359:2, 359:12, 360:4, 360:5, 365:6, 369:1, 427:8, 429:2, 429:6, 435:5, 517:3
**separate** [4] - 285:5, 301:23, 306:23, 498:18
**September** [14] - 295:7, 295:10, 299:18, 300:2, 300:10, 300:19, 302:6, 304:4,

304:15, 304:16, 308:22, 311:24, 411:11, 411:20
**sequence** [1] - 316:1
**sequestered** [1] - 575:10
**sequestration** [1] - 575:14
**serial** [2] - 429:8, 429:9
**serious** [1] - 409:14
**serve** [1] - 518:3
**serves** [2] - 376:17, 406:3
**service** [3] - 274:6, 427:25, 531:24
**services** [11] - 384:20, 384:24, 489:17, 499:16, 499:18, 504:12, 505:1, 508:3, 519:25, 520:9, 526:9
**set** [11] - 297:4, 301:3, 302:16, 389:13, 431:8, 453:21, 466:20, 484:14, 518:15, 518:21, 567:23
**settle** [2] - 345:20, 472:15
**settled** [4] - 377:3, 469:6, 473:5, 524:15
**settlement** [4] - 472:18, 473:19, 475:19, 476:13
**seven** [4] - 319:7, 410:24, 452:16, 484:18
**several** [10] - 318:15, 327:23, 336:1, 377:5, 380:18, 391:2, 396:14, 416:2, 420:22, 465:16
**SF10** [1] - 399:21
**shaken** [1] - 573:4
**shall** [2] - 384:20, 575:10
**shape** [2] - 316:4, 532:24
**share** [2] - 332:25, 373:12
**shareholder** [1] - 477:24
**shares** [10] - 327:14, 327:17, 329:1, 373:1, 373:5, 373:7, 373:8, 373:10, 478:1, 478:3
**sharp** [1] - 536:4

**sheer** [1] - 517:24
**Sheet** [1] - 570:5
**sheet** [1] - 571:1
**shift** [1] - 481:5
**shipped** [1] - 453:16
**shirts** [1] - 536:6
**Shores** [1] - 380:18
**short** [6] - 307:15, 333:17, 369:21, 370:2, 427:6, 429:11
**shortened** [1] - 521:12
**Shorthand** [2] - 577:17, 577:18
**shorthand** [1] - 577:19
**shortly** [4] - 301:3, 305:9, 421:22, 424:8
**show** [17] - 275:12, 298:24, 306:20, 324:2, 335:23, 336:8, 338:3, 345:5, 408:16, 415:3, 425:14, 428:9, 475:7, 498:17, 509:8, 516:8, 553:23
**showed** [5] - 321:12, 375:17, 432:18, 520:22, 522:24
**showing** [13] - 303:19, 312:12, 312:18, 314:4, 452:19, 452:25, 453:8, 457:16, 459:9, 459:10, 476:1, 549:20, 557:23
**shown** [12] - 293:17, 310:4, 310:14, 324:6, 425:16, 432:19, 433:24, 434:16, 435:9, 550:9, 568:15, 571:18
**shows** [6] - 309:25, 321:21, 324:12, 335:20, 374:22, 374:23
**shut** [10] - 303:21, 431:23, 437:7, 451:9, 455:6, 483:24, 484:2, 484:3, 502:18, 531:19
**shutdowns** [1] - 501:15
**shutting** [5] - 501:6, 501:12, 503:12, 504:2, 504:7
**side** [42] - 274:20, 277:14, 278:8, 279:20, 280:15,

280:23, 286:25, 291:13, 329:16, 329:19, 329:23, 331:19, 333:11, 333:21, 333:22, 333:23, 334:3, 337:20, 338:18, 348:25, 351:23, 353:3, 353:4, 354:22, 356:22, 357:24, 360:8, 369:21, 422:17, 422:21, 423:2, 423:20, 423:24, 442:22, 444:5, 465:5, 469:19, 520:24, 525:5, 561:9, 575:13, 576:16
**side's** [1] - 495:10
**sidebar** [14] - 292:21, 333:6, 333:7, 340:15, 341:7, 491:4, 491:5, 491:6, 497:18, 551:7, 551:17, 552:3, 552:4, 563:5
**sides** [5] - 286:23, 291:12, 292:15, 333:21, 340:13
**sign** [4] - 405:2, 482:8, 499:22, 519:19
**signature** [2] - 449:11, 449:13
**signed** [7] - 404:19, 404:23, 404:24, 454:17, 477:4, 478:18, 482:25
**significant** [7] - 280:19, 306:22, 307:17, 401:10, 414:4, 501:9, 501:13
**significantly** [3] - 326:6, 431:14, 431:17
**signing** [1] - 407:25
**signs** [2] - 405:6, 405:8
**silicates** [1] - 452:2
**similar** [7] - 315:22, 391:11, 391:13, 394:1, 500:21, 500:24, 565:9
**similarly** [1] - 541:20
**simple** [2] - 399:10, 506:21
**simpler** [1] - 394:18
**simply** [3] - 289:22, 371:7, 552:18
**single** [3] - 280:9,

334:3, 480:18
**singled** [1] - 423:7
**sit** [4] - 340:19, 355:3, 369:14, 392:1
**site** [7] - 408:15, 438:16, 438:18, 438:25, 439:5, 454:13, 516:5
**sites** [2] - 438:24, 453:7
**sitting** [4] - 332:16, 332:18, 339:21, 507:4
**situation** [2] - 446:22, 459:17
**six** [7] - 382:20, 385:23, 386:1, 391:4, 447:6, 469:3, 564:17
**sizable** [1] - 485:20
**size** [1] - 517:24
**skill** [5] - 541:3, 541:7, 541:10, 541:12, 541:23
**skip** [2] - 374:24, 548:1
**skipped** [1] - 458:21
**slag** [1] - 444:25
**sleep** [1] - 273:5
**slide** [10] - 274:17, 544:11, 548:16, 549:20, 565:9, 566:5, 566:25, 570:18, 571:15, 571:18
**Slide** [1] - 321:16
**slides** [6] - 539:21, 544:13, 544:18, 548:16, 575:22, 576:6
**sliding** [2] - 393:8, 394:1
**slightest** [1] - 435:12
**slightly** [1] - 319:12
**slow** [1] - 429:10
**small** [9] - 306:21, 307:7, 307:14, 327:10, 327:13, 327:14, 441:20, 442:6, 562:24
**smaller** [1] - 396:2
**smokestack** [1] - 564:23
**so..** [3] - 323:8, 329:6, 444:19
**sodium** [15] - 300:4, 300:12, 301:2, 301:18, 301:20, 301:22, 302:11, 302:16, 303:20,

305:8, 305:13, 306:8, 312:22, 316:13
**sold** [5] - 275:6, 473:25, 475:6, 550:25, 571:2
**sole** [2] - 279:9, 283:9
**solution** [6] - 300:11, 310:22, 310:23, 413:3, 421:7, 468:24
**solve** [3] - 316:3, 342:11, 545:5
**someone** [3] - 425:11, 504:25, 549:10
**sometime** [1] - 277:9
**sometimes** [9] - 325:14, 328:8, 329:12, 405:25, 412:9, 489:11, 489:19, 516:5, 529:22
**somewhere** [2] - 313:24, 417:6
**son** [4] - 451:20, 451:22, 451:23, 534:20
**soon** [3] - 275:1, 437:7, 468:22
**sooner** [1] - 330:7
**soot** [1] - 452:1
**sorbent** [23] - 306:7, 306:8, 306:10, 310:4, 310:8, 310:9, 311:1, 311:2, 311:3, 311:4, 320:10, 322:2, 323:20, 323:22, 324:6, 401:21, 402:11, 412:25, 413:8, 529:1, 573:11, 573:12
**sorbents** [1] - 427:1
**sore** [1] - 536:6
**sorry** [32] - 289:15, 368:14, 368:18, 368:19, 372:12, 380:3, 408:19, 409:23, 419:9, 432:13, 455:24, 457:10, 472:4, 477:18, 480:23, 494:5, 497:7, 497:25, 498:12, 498:25, 511:22, 515:4, 517:2, 518:16, 519:3, 535:12, 542:12, 544:8, 553:12, 553:13, 565:12, 568:7

**sort** [33] - 275:20, 295:10, 298:14, 304:25, 306:3, 310:21, 317:3, 317:15, 318:18, 320:1, 321:13, 322:14, 325:9, 329:19, 329:22, 330:1, 331:2, 354:10, 363:7, 390:18, 426:16, 430:14, 431:3, 432:21, 443:17, 453:5, 478:25, 483:16, 484:14, 491:24, 576:20, 576:24
**sorted** [1] - 469:3
**sorts** [1] - 331:16
**sound** [8] - 382:13, 382:20, 398:19, 399:11, 410:16, 479:7, 486:17, 517:21
**sounds** [9] - 287:18, 288:24, 382:14, 418:12, 438:5, 479:9, 516:22, 551:14, 555:11
**sources** [1] - 326:6
**South** [9] - 527:2, 527:10, 527:14, 528:20, 528:23, 529:8, 530:2, 530:10, 531:2
**SOx** [1] - 329:25
**space** [1] - 452:7
**span** [1] - 382:2
**speaking** [8] - 336:11, 496:17, 496:18, 496:19, 496:20, 547:6, 561:21, 568:20
**speaks** [1] - 559:13
**spec** [2] - 342:22, 342:23
**specialized** [2] - 554:12, 554:15
**specially** [1] - 275:13
**specific** [6] - 316:11, 381:24, 386:6, 426:14, 436:23, 553:21
**specifically** [8] - 427:13, 505:2, 505:4, 515:22, 553:10, 555:7, 558:9, 576:4
**specification** [1] - 342:20

**spell** [3] - 439:25, 440:3, 532:10
**spend** [1] - 437:20
**spent** [3] - 403:2, 425:10, 534:13
**spiral** [1] - 501:22
**spiral-bound** [1] - 501:22
**spirit** [1] - 496:14
**split** [2] - 298:11, 333:21
**splits** [1] - 432:21
**spot** [1] - 391:25
**spray** [1] - 550:24
**sprayed** [4] - 550:13, 570:6, 570:24, 571:2
**sprayers** [1] - 566:12
**spraying** [1] - 467:25
**spreadsheets** [1] - 390:3
**spring** [4] - 304:22, 486:25
**square** [2] - 313:17, 314:3
**stack** [2] - 572:8, 573:8
**Stacy** [2] - 415:20, 415:25
**staff** [11] - 274:9, 466:23, 467:1, 486:1, 486:7, 487:25, 536:11, 536:18, 537:6, 537:7
**stage** [2] - 282:14, 561:5
**stagnant** [1] - 460:25
**stake** [5] - 276:10, 319:22, 327:15, 327:16, 478:8
**stamp** [1] - 512:17
**stance** [1] - 290:19
**stand** [11] - 293:1, 310:24, 341:5, 372:11, 464:12, 464:19, 465:1, 513:23, 514:3, 557:19, 577:14
**standard** [9] - 329:9, 329:12, 338:22, 338:23, 431:1, 431:3, 499:17, 554:11, 564:20
**standards** [1] - 455:15
**standing** [1] - 422:12
**stands** [1] - 449:17
**start** [19] - 274:12, 286:18, 287:13, 301:4, 316:2, 385:23, 429:1, 443:7, 443:21,

444:8, 444:20, 450:25, 451:5, 461:23, 462:2, 462:18, 475:3, 525:8, 555:11
**started** [39] - 282:22, 302:8, 302:11, 305:8, 305:9, 305:16, 306:7, 325:6, 327:6, 330:6, 330:15, 330:16, 339:10, 342:5, 408:14, 428:21, 440:23, 441:19, 442:13, 444:5, 445:12, 446:17, 448:12, 451:24, 458:9, 458:10, 459:16, 462:12, 462:13, 462:21, 468:25, 474:5, 474:6, 478:6, 527:11, 527:12, 534:1, 563:19, 565:6
**starting** [9] - 301:2, 305:14, 313:25, 437:4, 459:18, 459:22, 462:12, 478:25, 481:10
**starting-up** [1] - 478:25
**state** [22] - 324:10, 327:19, 436:14, 439:25, 446:10, 459:14, 508:11, 512:13, 528:6, 532:10, 539:1, 551:12, 553:17, 553:22, 553:23, 556:18, 558:4, 558:12, 559:21, 560:6, 576:4, 576:7
**Stateline** [1] - 535:19
**statement** [28] - 289:8, 289:10, 289:24, 323:7, 335:14, 400:20, 401:15, 401:18, 401:19, 404:25, 412:20, 434:14, 476:6, 485:7, 485:25, 486:4, 486:14, 487:24, 492:12, 495:17, 499:13, 502:9, 502:12, 551:12, 560:15, 560:23
**statements** [13] - 280:8, 282:9, 361:6, 402:1, 429:22,

465:20, 465:25, 468:2, 500:8, 521:2, 553:16, 553:20, 558:18
**states** [5] - 298:20, 299:10, 300:3, 382:2, 489:8
**STATES** [1] - 271:1
**States** [3] - 308:7, 319:10, 388:14
**static** [2] - 572:25, 573:7
**stating** [1] - 298:16
**station** [1] - 443:18
**Station** [2] - 526:18, 535:19
**stay** [8] - 338:14, 341:3, 410:3, 460:25, 525:3, 548:9, 558:8
**stayed** [1] - 443:15
**steady** [1] - 454:3
**steam** [1] - 543:12
**steel** [3] - 442:6, 442:7, 444:23
**stenographer** [2] - 508:12, 533:5
**Stenotype** [1] - 577:19
**step** [15] - 281:3, 281:12, 284:12, 357:6, 374:25, 402:13, 435:13, 435:19, 451:16, 477:8, 477:16, 477:19, 492:16, 524:22, 574:25
**Step** [12] - 281:13, 357:8, 357:9, 359:15, 359:22, 360:23, 363:13, 363:14, 365:16, 366:2, 366:17
**stepping** [2] - 303:4, 361:25
**steps** [1] - 281:2
**stick** [2] - 456:15, 525:10
**still** [31] - 279:20, 284:14, 284:16, 286:6, 290:6, 290:9, 290:21, 293:14, 305:22, 315:1, 315:3, 362:11, 363:7, 393:23, 398:5, 402:4, 402:25, 409:9, 410:20, 414:16, 414:24, 455:1, 455:16, 472:17, 473:21, 488:23,

504:11, 505:12, 528:19, 564:9, 568:13
**stink** [1] - 421:14
**stinking** [1] - 421:5
**stock** [3] - 373:7, 373:8, 479:7
**stop** [8] - 291:8, 303:21, 339:17, 344:19, 346:2, 467:11, 571:9, 574:17
**stopping** [1] - 346:8
**storage** [2] - 452:7, 453:17
**stored** [1] - 531:5
**story** [1] - 332:25
**straight** [3] - 323:5, 405:16, 492:24
**straight-up** [2] - 405:16, 492:24
**straightforward** [1] - 500:11
**strain** [1] - 454:9
**strange** [2] - 273:20, 274:6
**strategic** [1] - 516:23
**strategies** [1] - 441:6
**strategize** [1] - 516:6
**strategy** [1] - 316:5
**streamline** [1] - 421:10
**street** [4] - 512:19, 513:3, 513:8, 513:10
**strength** [1] - 572:20
**strictly** [1] - 296:23
**strike** [1] - 567:15
**struck** [2] - 330:8, 470:2
**structure** [6] - 292:16, 377:13, 377:15, 381:6, 387:5, 470:8
**structured** [3] - 303:10, 470:9, 521:5
**stuck** [1] - 536:6
**student** [1] - 444:10
**studied** [1] - 535:8
**study** [5] - 295:13, 535:7, 542:16, 543:7, 543:10
**stuff** [18] - 273:19, 292:3, 330:5, 336:25, 444:17, 445:1, 445:21, 447:2, 447:12, 451:3, 451:15, 452:5, 452:22, 462:14, 463:14, 469:3, 490:11, 496:25

**sub** [4] - 315:8, 315:23, 316:7, 316:12
**sub-bituminous** [4] - 315:8, 315:23, 316:7, 316:12
**subject** [1] - 487:13
**subjects** [1] - 552:8
**sublicensable** [1] - 383:2
**sublicensees** [1] - 396:22
**submission** [3] - 371:1, 371:20, 465:23
**submit** [1] - 372:3
**submitted** [8] - 308:23, 314:18, 315:1, 315:6, 371:23, 372:4, 433:10, 476:8
**submitting** [1] - 317:7
**subsidiaries** [3] - 489:16, 499:15, 499:16
**subsidiary** [2] - 489:12, 490:5
**substances** [1] - 310:13
**substitute** [1] - 560:2
**success** [1] - 458:6
**successful** [4] - 426:5, 515:24, 516:3, 518:8
**sue** [1] - 468:18
**sued** [8] - 385:11, 410:9, 410:12, 410:24, 413:18, 413:19, 420:11, 469:21
**sufficient** [16] - 280:2, 281:16, 283:10, 289:24, 329:22, 347:21, 350:8, 352:19, 353:7, 357:15, 357:21, 360:3, 360:6, 360:18, 370:25, 395:4
**sufficiently** [5] - 279:10, 279:15, 348:6, 554:5, 572:6
**suggest** [3] - 340:9, 561:9, 576:5
**suggested** [4] - 323:3, 338:5, 505:12, 514:18
**suggesting** [5] - 338:9, 485:2, 505:12, 560:9,

560:10
**suggestion** [6] - 300:7, 322:14, 339:2, 409:14, 434:8, 520:2
**suing** [1] - 514:22
**suit** [19] - 320:20, 332:9, 332:11, 343:18, 344:10, 444:7, 457:1, 457:17, 468:20, 473:10, 473:17, 491:19, 523:12, 524:4, 524:19, 536:3, 540:2, 540:14, 541:13
**sum** [3] - 394:25, 395:15, 395:24
**summaries** [1] - 554:4
**summarize** [1] - 352:15
**summary** [23] - 278:24, 281:3, 281:4, 281:14, 282:13, 284:20, 285:2, 285:18, 286:12, 288:16, 289:11, 289:14, 334:23, 336:4, 357:10, 359:16, 360:14, 363:1, 363:4, 363:6, 364:4, 364:13, 366:25
**summer** [1] - 320:15
**super** [2] - 340:4, 455:10
**supervisor** [1] - 536:20
**supervisors** [1] - 537:2
**supplier** [4] - 426:10, 488:22, 488:24, 508:22
**suppliers** [8] - 488:4, 488:9, 488:11, 500:4, 500:15, 502:17, 515:18, 529:7
**supply** [17] - 377:19, 381:17, 393:9, 395:4, 395:12, 425:22, 425:25, 426:1, 426:5, 469:19, 469:22, 470:18, 499:23, 500:3, 520:24, 529:21
**supplying** [2] - 470:15, 480:9
**support** [7] - 350:23,

361:22, 377:24, 387:4, 390:19, 555:3, 559:22
**suppose** [2] - 350:17, 530:23
**supposed** [2] - 280:13, 451:2
**surely** [1] - 510:19
**surface** [1] - 307:10
**surface-tension-type** [1] - 307:10
**surprise** [2] - 398:11, 398:13
**surrounding** [1] - 561:25
**suspected** [3] - 405:23, 407:5, 407:21
**sustain** [3] - 466:5, 466:12, 567:14
**sustained** [2] - 521:10, 531:21
**sustaining** [1] - 563:1
**swear** [1] - 484:24
**sweetheart** [1] - 488:19
**switch** [1] - 405:15
**sworn** [6] - 293:9, 401:1, 439:23, 440:8, 532:8, 532:15
**Sydney** [3] - 441:21, 442:4, 444:23
**SYKES** [105] - 272:7, 298:6, 309:8, 312:4, 315:15, 320:25, 332:3, 335:6, 335:10, 335:13, 336:23, 337:10, 337:14, 337:19, 340:4, 372:21, 373:20, 373:22, 374:6, 374:9, 374:15, 374:17, 375:8, 375:10, 379:21, 379:25, 380:22, 381:4, 381:10, 381:12, 394:21, 394:23, 397:4, 397:5, 398:8, 398:10, 398:14, 398:16, 405:15, 405:20, 407:18, 407:20, 408:25, 409:6, 412:1, 412:8, 416:9, 416:15, 418:13, 418:16, 419:1, 419:8, 419:12, 419:15, 419:17, 420:19, 421:21, 449:2,

449:6, 456:10, 457:23, 459:4, 464:1, 465:22, 471:14, 474:14, 474:17, 482:10, 482:16, 491:24, 492:11, 492:23, 493:3, 493:5, 493:13, 493:21, 494:1, 494:15, 496:21, 497:22, 498:4, 498:6, 498:8, 498:18, 498:20, 499:2, 499:5, 499:9, 506:14, 506:20, 507:19, 507:25, 508:15, 509:14, 509:20, 511:12, 511:15, 513:14, 514:7, 514:15, 516:15, 516:21, 519:7, 521:6, 521:8
**Sykes** [22] - 338:2, 339:10, 372:22, 379:17, 421:19, 422:22, 432:18, 465:21, 474:15, 474:18, 496:15, 497:25, 498:2, 498:16, 508:14, 513:12, 514:6, 519:18, 522:15, 522:24, 523:11
**Sykes's** [1] - 495:23
**Sylvester** [6] - 408:22, 409:8, 409:21, 409:24, 509:11, 509:22
**symbol** [2] - 301:20, 301:21
**synergy** [1] - 316:21
**synonyms** [1] - 386:11
**synthesize** [1] - 342:7
**system** [15] - 301:5, 302:9, 320:7, 446:7, 462:7, 462:9, 480:11, 530:17, 530:22, 530:24, 531:1, 531:7, 531:11, 531:16, 537:13
**systems** [9] - 303:20, 330:16, 453:1, 525:22, 530:5, 530:6, 531:20, 537:11, 537:12

## T

**T15** [1] - 311:8
**T16** [1] - 311:8
**T19** [2] - 311:9, 311:12
**T45** [3] - 412:9, 461:16, 481:2
**tab** [17] - 297:12, 311:17, 376:23, 415:11, 455:23, 455:25, 470:23, 498:9, 507:9, 507:10, 509:9, 516:10, 542:12, 547:4, 547:6, 570:3, 573:19
**Tab** [13] - 448:17, 448:19, 456:2, 457:5, 457:6, 457:10, 458:16, 458:20, 463:19, 463:22, 471:7, 542:11, 542:13
**table** [9] - 310:5, 310:14, 310:15, 340:13, 418:14, 447:8, 472:13, 501:21, 553:8
**tables** [1] - 316:9
**tabs** [3] - 546:12, 547:8, 547:9
**tackle** [1] - 316:5
**Talen** [11] - 377:9, 380:18, 380:19, 382:17, 385:6, 390:10, 392:10, 392:11, 392:15, 395:23
**talks** [1] - 463:25
**tangential** [1] - 500:10
**targeted** [1] - 400:23
**tax** [57] - 329:19, 329:22, 330:18, 402:16, 402:19, 409:12, 412:10, 430:8, 430:11, 430:15, 430:21, 431:9, 431:11, 431:18, 436:9, 437:8, 437:9, 437:23, 438:4, 438:6, 438:13, 461:5, 461:14, 461:16, 461:18, 461:20, 463:2, 463:17, 473:23, 474:1, 480:18, 480:21, 480:24, 520:10, 520:13,

521:5, 521:9, 554:21, 554:24, 555:12, 555:16, 556:13, 556:21, 559:12, 561:7, 561:21, 562:19, 562:22, 563:10, 563:13, 563:17, 563:19, 563:20, 563:23, 564:18, 565:17, 566:24
**teach** [1] - 305:20
**teaching** [1] - 538:20
**team** [12] - 377:8, 377:10, 377:17, 377:24, 378:12, 378:16, 413:7, 413:24, 453:20, 454:11, 455:7, 486:6
**teaming** [2] - 413:5, 413:13
**tearing** [1] - 444:8
**tech** [5] - 487:17, 536:11, 536:17, 537:6, 537:7
**technical** [14] - 317:24, 325:15, 326:11, 382:25, 425:7, 486:7, 499:15, 554:6, 555:9, 555:14, 560:4, 561:10, 564:6, 567:9
**technically** [1] - 420:10
**technicians** [5] - 296:25, 297:2, 297:6, 299:16, 406:10
**Technologies** [1] - 436:17
**technologies** [6] - 448:8, 448:23, 517:14, 517:21, 544:1, 544:25
**technologist** [1] - 430:14
**Technology** [1] - 534:24
**technology** [51] - 316:6, 325:25, 326:2, 326:8, 326:10, 327:1, 327:2, 328:4, 328:5, 328:11, 329:5, 329:6, 332:24, 405:9, 408:15, 412:19, 412:24, 414:19, 417:11, 417:14, 425:3,

430:19, 430:24, 440:23, 440:24, 448:1, 450:2, 450:12, 451:2, 451:13, 459:15, 460:14, 461:5, 461:6, 462:6, 466:17, 470:20, 477:3, 486:5, 488:5, 488:9, 511:7, 515:21, 535:5, 537:17, 537:24, 538:2, 541:9, 541:15, 545:23
**tedious** [1] - 384:8
**teens** [1] - 463:18
**television** [1] - 443:11
**ten** [2] - 391:5, 391:7
**tend** [1] - 329:15
**tens** [1] - 437:20
**tension** [1] - 307:10
**tenure** [1] - 461:25
**term** [4] - 379:11, 383:17, 412:9, 541:7
**terminology** [1] - 403:13
**terms** [18] - 297:1, 300:2, 312:17, 312:19, 322:22, 325:23, 378:22, 381:24, 386:14, 388:11, 394:10, 431:12, 434:21, 469:22, 495:9, 561:2, 576:21, 576:24
**test** [32] - 295:4, 295:16, 295:21, 295:25, 296:21, 297:4, 297:5, 297:6, 301:1, 301:24, 304:17, 305:16, 305:18, 306:12, 309:21, 309:25, 316:20, 316:21, 330:23, 403:12, 403:16, 403:17, 403:18, 403:23, 406:18, 431:9, 435:10, 445:24, 451:12, 539:6, 548:14
**tested** [10] - 302:15, 309:1, 310:13, 311:10, 313:4, 313:20, 315:22, 315:23, 332:24, 447:6
**testified** [22] - 344:2, 376:2, 376:11,

391:21, 440:8, 476:23, 476:24, 477:23, 494:6, 494:8, 494:10, 494:20, 502:14, 504:7, 532:15, 539:11, 545:20, 549:22, 552:10, 554:17, 562:11, 575:9

**testifies** [1] - 575:12

**testify** [10] - 320:2, 364:14, 494:14, 551:11, 551:13, 552:9, 552:19, 557:12, 562:15, 562:16

**testifying** [4] - 377:2, 377:3, 502:23, 544:10

**testimony** [31] - 276:22, 280:22, 287:5, 287:8, 287:14, 291:15, 327:21, 376:15, 376:16, 400:1, 401:1, 422:10, 425:3, 464:6, 492:24, 493:25, 497:16, 505:10, 539:22, 545:21, 549:18, 552:15, 554:13, 554:20, 557:9, 559:9, 561:1, 561:9, 562:19, 574:21, 575:15

**testing** [28] - 294:20, 295:6, 295:7, 295:8, 302:19, 304:4, 304:5, 304:6, 304:15, 304:22, 307:23, 308:5, 310:6, 311:7, 311:23, 315:7, 316:12, 325:3, 330:16, 403:24, 404:4, 451:3, 451:5, 451:15, 453:18, 454:5, 459:18, 459:19

**tests** [39] - 294:1, 294:5, 294:9, 295:4, 295:10, 295:11, 295:24, 296:24, 297:25, 299:9, 300:2, 304:1, 304:17, 304:21, 305:6, 305:7, 305:8, 306:20, 307:13, 308:13, 308:15,

308:22, 309:19, 309:21, 311:6, 311:8, 311:14, 311:23, 316:11, 316:16, 406:5, 406:10, 452:14, 453:10, 536:12, 537:8, 540:3

**Texas** [1] - 382:9

**text** [5] - 336:2, 338:8, 375:15, 429:6, 429:25

**textual** [1] - 285:10

**thankful** [1] - 332:25

**THE** [359] - 271:1, 271:2, 273:1, 275:2, 275:25, 276:3, 276:16, 276:25, 277:12, 277:21, 278:21, 279:5, 279:9, 279:13, 279:24, 280:14, 280:23, 281:1, 281:13, 281:21, 282:11, 283:1, 283:4, 283:15, 283:24, 284:11, 284:25, 285:8, 285:12, 285:15, 285:21, 286:9, 287:11, 287:25, 288:13, 288:22, 289:4, 289:13, 289:17, 290:3, 290:25, 291:23, 293:4, 293:6, 294:13, 298:5, 298:7, 309:7, 309:9, 312:3, 312:5, 315:14, 315:16, 320:24, 321:1, 331:24, 332:2, 332:4, 333:5, 333:8, 334:14, 335:4, 335:9, 335:11, 336:9, 337:4, 337:12, 337:16, 337:20, 339:4, 339:17, 340:12, 340:16, 341:3, 342:17, 343:11, 343:17, 343:20, 343:24, 344:1, 344:6, 344:8, 344:12, 344:19, 345:4, 345:14, 346:2, 346:15, 346:18, 346:22, 346:25, 347:5, 347:11, 347:14,

347:17, 347:24, 348:3, 348:12, 348:17, 348:23, 349:10, 349:16, 349:22, 349:25, 350:3, 350:7, 350:12, 350:20, 351:10, 351:18, 351:23, 352:1, 352:8, 352:12, 352:15, 353:1, 353:16, 353:21, 353:24, 354:12, 354:15, 354:22, 355:2, 355:21, 356:1, 356:9, 356:22, 357:8, 357:12, 357:18, 357:23, 358:11, 359:5, 359:17, 359:23, 360:2, 360:7, 360:12, 361:1, 361:15, 362:5, 362:13, 362:21, 362:23, 363:9, 363:12, 364:1, 364:8, 364:17, 364:20, 365:2, 365:10, 365:14, 365:25, 366:17, 367:5, 367:15, 367:21, 368:2, 368:5, 368:9, 368:17, 368:24, 369:4, 369:6, 369:10, 369:20, 370:6, 372:10, 372:15, 372:18, 379:17, 379:24, 380:24, 381:1, 398:4, 405:18, 407:15, 409:1, 409:3, 412:2, 412:5, 416:10, 416:12, 418:15, 418:22, 418:24, 419:3, 419:5, 419:9, 419:14, 419:16, 419:19, 419:23, 420:3, 420:25, 421:18, 422:11, 423:19, 424:11, 424:14, 424:18, 435:18, 435:21, 435:22, 436:2, 436:13, 439:7, 439:10, 439:12, 439:15, 439:18, 439:22, 439:24, 440:1, 440:3, 440:4, 440:10, 449:1,

449:3, 456:9, 456:11, 457:22, 457:24, 459:3, 459:5, 464:7, 464:14, 464:20, 465:3, 465:8, 465:11, 465:21, 466:5, 471:13, 471:15, 474:8, 474:9, 474:13, 474:15, 482:11, 482:13, 491:5, 491:7, 491:23, 492:8, 492:16, 493:1, 493:4, 493:11, 493:19, 493:23, 494:4, 494:10, 494:14, 494:18, 495:7, 495:14, 496:8, 497:7, 497:19, 497:25, 498:5, 498:7, 498:16, 498:24, 498:25, 499:7, 499:8, 506:15, 506:17, 507:20, 507:22, 508:13, 509:15, 509:17, 513:12, 513:16, 513:20, 513:22, 513:24, 514:2, 514:5, 514:11, 516:16, 516:18, 519:8, 519:10, 519:12, 521:10, 524:22, 524:23, 524:25, 525:5, 525:11, 525:16, 526:2, 532:1, 532:4, 532:7, 532:9, 532:17, 532:23, 533:8, 539:19, 542:24, 543:1, 544:8, 544:15, 544:19, 547:1, 547:5, 547:10, 551:6, 551:8, 551:14, 551:16, 551:18, 552:3, 552:5, 552:23, 553:6, 553:11, 553:14, 554:19, 555:7, 556:3, 556:20, 557:15, 557:22, 558:21, 558:25, 559:10, 559:19, 560:8, 560:13, 562:3, 562:18, 563:6, 564:2, 564:8, 567:7, 567:11,

567:14, 567:24, 568:2, 568:10, 568:19, 570:13, 570:15, 574:5, 574:7, 574:19, 574:23, 574:25, 576:13, 577:1, 577:7, 577:12

**theme** [2] - 356:16, 356:20

**themselves** [2] - 427:22, 521:24

**theory** [1] - 443:3

**thereafter** [2] - 301:4, 553:19

**thereof** [1] - 569:24

**Thereupon** [32] - 298:8, 309:10, 312:6, 315:17, 321:2, 332:5, 333:7, 381:2, 409:4, 412:6, 416:13, 418:25, 419:6, 439:16, 449:4, 456:12, 457:25, 459:6, 471:16, 482:14, 491:6, 506:18, 507:23, 509:18, 514:13, 516:19, 543:2, 547:12, 551:7, 552:4, 570:16, 574:9

**thermodynamics** [1] - 535:9

**they've** [8] - 314:18, 336:6, 394:3, 446:25, 462:14, 484:2, 484:3, 492:13

**thinking** [6] - 401:16, 401:19, 444:22, 445:5, 477:4, 557:23

**thinks** [6] - 348:5, 353:3, 353:4, 371:16, 422:22, 423:10

**third** [13] - 299:24, 371:12, 375:12, 384:14, 408:20, 427:1, 435:1, 452:9, 488:4, 488:9, 488:11, 535:16, 558:1

**third-party** [3] - 488:4, 488:9, 488:11

**thirdly** [1] - 365:25

**thirds** [2] - 397:14, 484:17

**thorough** [1] - 295:13

**thousand** [1] - 452:5

**thousands** [2] - 307:3

**three** [19] - 312:21, 360:11, 365:15, 370:21, 371:18, 394:4, 403:5, 410:18, 410:23, 418:20, 451:11, 451:20, 454:3, 459:11, 474:19, 517:25, 534:19, 536:2, 549:11
**three-piece** [1] - 536:2
**threshold** [1] - 365:15
**throughout** [3] - 417:5, 450:15, 525:9
**thumb** [1] - 536:6
**Thursday** [3] - 276:19, 277:1, 371:25
**ticking** [1] - 287:14
**tie** [1] - 332:8
**tied** [2] - 319:25, 429:15
**tightened** [1] - 564:20
**timeline** [6] - 295:8, 307:24, 308:17, 317:2, 465:19, 498:14
**timing** [2] - 421:19, 434:22
**title** [4] - 415:19, 436:25, 526:7, 529:14
**today** [26] - 276:22, 332:16, 332:23, 340:3, 346:7, 347:16, 371:22, 376:11, 382:6, 390:25, 392:1, 392:2, 455:1, 465:9, 474:21, 480:17, 488:23, 504:10, 505:1, 518:13, 526:22, 529:20, 536:4, 539:22, 574:21
**together** [13] - 284:5, 301:21, 316:20, 322:20, 332:19, 361:24, 369:22, 452:14, 467:19, 489:19, 536:20, 536:22, 566:6
**toller** [3] - 474:23, 474:25, 475:1
**Tom** [3] - 297:15, 297:17, 297:18
**tomorrow** [3] - 287:9, 575:2, 577:13
**ton** [18] - 438:19, 438:25, 453:13, 473:8, 473:9,

473:11, 473:16, 473:18, 475:17, 475:23, 476:15, 476:17, 523:24, 524:3, 524:17, 563:23
**tonight** [1] - 577:8
**tonnage** [4] - 390:8, 394:11, 475:5, 475:14
**tonnages** [1] - 389:13
**tons** [18] - 390:8, 390:23, 391:2, 391:8, 391:12, 391:15, 391:22, 392:3, 392:11, 392:14, 393:5, 394:8, 395:20, 431:20, 438:3, 475:16, 476:16
**took** [16] - 295:7, 319:7, 325:7, 325:17, 333:20, 403:5, 428:21, 442:17, 443:12, 444:3, 467:3, 469:2, 469:8, 512:9, 522:8, 539:6
**toothpaste** [1] - 421:4
**top** [15] - 299:23, 303:17, 309:25, 355:1, 412:22, 425:17, 427:3, 441:4, 446:25, 447:16, 449:20, 450:4, 476:21, 502:2, 522:23
**top-notch** [2] - 446:25, 447:16
**topic** [3] - 540:15, 540:17, 549:14
**topics** [7] - 405:16, 416:23, 529:20, 535:7, 535:8, 539:25, 540:1
**total** [8] - 389:15, 389:16, 448:15, 454:25, 479:7, 523:21, 526:21, 529:10
**totally** [2] - 470:1, 494:4
**totes** [2] - 451:18, 452:6
**touch** [1] - 468:9
**touched** [6] - 284:19, 331:10, 372:23, 381:5, 385:5, 387:3
**tough** [1] - 468:17
**towards** [1] - 516:9

**town** [8] - 416:25, 441:20, 442:6, 442:7, 442:8, 446:1
**toxic** [2] - 329:9, 329:11
**toxin** [1] - 446:6
**toxins** [1] - 446:7
**track** [6] - 296:2, 512:9, 520:20, 522:1, 530:20, 530:21
**tracking** [1] - 331:22
**trade** [3] - 301:6, 310:21, 310:25
**Trademark** [1] - 319:10
**trailer** [2] - 453:14
**trailers** [1] - 452:9
**train** [1] - 536:25
**trained** [1] - 537:6
**training** [7] - 536:19, 536:20, 536:22, 537:2, 537:3, 537:4, 539:5
**traipse** [1] - 425:14
**trajectory** [2] - 390:17, 459:12
**transaction** [1] - 326:22
**transcript** [1] - 496:5
**TRANSCRIPT** [1] - 271:9
**transfer** [1] - 535:9
**transition** [1] - 479:15
**transitioning** [2] - 444:20, 517:14
**trap** [1] - 529:3
**traps** [1] - 529:1
**traveled** [1] - 453:7
**traveling** [2] - 454:8, 454:13
**treasurer** [1] - 436:25
**treated** [6] - 282:24, 302:9, 303:20, 311:12, 338:6, 488:21
**treating** [3] - 328:17, 334:11, 477:12
**tree** [3] - 373:21, 375:1
**trend** [8] - 313:1, 313:16, 313:18, 314:2, 314:4, 314:8, 314:11, 460:5
**Trettel** [1] - 504:19
**triage** [1] - 276:17
**TRIAL** [2] - 271:9, 271:11
**Trial** [22] - 298:4, 299:2, 308:18, 309:5, 311:18,

311:20, 312:1, 312:9, 315:13, 316:10, 320:17, 320:22, 321:7, 321:9, 331:23, 332:1, 433:19, 448:25, 456:8, 457:21, 459:2, 471:12
**trial** [21] - 291:18, 292:21, 293:23, 335:1, 338:16, 338:17, 338:19, 342:2, 354:4, 369:18, 435:10, 465:9, 467:14, 525:4, 525:8, 525:9, 534:1, 534:9, 554:7, 575:9, 575:16
**triangle** [1] - 312:25
**tried** [8] - 338:14, 397:23, 434:8, 467:12, 505:3, 520:22, 522:3, 530:25
**troll** [1] - 518:2
**trouble** [1] - 508:13
**truck** [2] - 442:12, 453:13
**true** [18] - 297:23, 298:19, 362:24, 400:18, 402:10, 402:15, 404:17, 483:5, 484:24, 485:7, 486:11, 490:21, 492:1, 492:12, 493:7, 530:1
**truth** [3] - 327:20, 465:15, 494:3
**truthful** [1] - 499:13
**truthfully** [1] - 501:16
**try** [31] - 273:6, 274:11, 277:13, 277:17, 288:4, 291:19, 308:16, 342:3, 342:6, 350:15, 364:16, 370:7, 384:8, 394:17, 396:16, 399:8, 403:7, 434:12, 445:9, 445:23, 448:1, 454:1, 462:19, 466:2, 467:15, 467:20, 472:17, 476:22, 496:18, 511:2, 516:1
**trying** [39] - 294:19, 294:23, 327:24, 333:18, 334:14,

339:7, 341:7, 341:10, 341:17, 341:18, 341:23, 353:1, 354:15, 354:18, 356:25, 361:4, 361:5, 369:10, 387:10, 394:2, 399:2, 399:10, 403:1, 405:25, 415:6, 426:3, 434:11, 447:19, 451:10, 466:2, 468:9, 477:15, 500:13, 508:21, 545:4, 558:17, 560:1, 560:2
**tube** [1] - 421:5
**turbines** [1] - 536:12
**turn** [16] - 301:12, 383:11, 448:17, 455:23, 457:4, 458:16, 463:19, 470:23, 498:9, 498:12, 502:1, 507:10, 518:8, 538:21, 570:3, 573:19
**turned** [13] - 299:13, 299:14, 300:4, 300:5, 300:6, 301:15, 461:22, 473:24, 510:19, 530:7, 530:18, 531:8
**turning** [4] - 297:1, 301:17, 390:22, 527:25
**turns** [3] - 356:1, 367:21, 531:15
**TV** [2] - 443:12, 443:17
**twice** [1] - 274:2
**two** [48] - 274:18, 278:6, 298:12, 298:15, 301:21, 316:22, 320:20, 323:23, 364:5, 365:6, 386:3, 394:1, 394:15, 397:14, 398:17, 403:5, 403:14, 403:19, 406:7, 417:3, 421:23, 435:13, 442:1, 454:18, 460:20, 470:7, 470:25, 474:18, 477:8, 477:16, 477:19, 480:7, 484:17, 488:3, 489:8, 497:2, 509:21, 518:22, 527:7, 531:12,

532:22, 534:19, 540:13, 540:18, 541:16, 550:13, 550:25, 571:12
**two-day** [1] - 417:3
**two-part** [4] - 323:23, 386:3, 394:15, 480:7
**two-step** [4] - 435:13, 477:8, 477:16, 477:19
**two-thirds** [2] - 397:14, 484:17
**type** [10] - 302:10, 307:9, 307:10, 309:22, 312:25, 325:13, 334:18, 443:24, 488:12, 554:17
**types** [5] - 296:5, 325:3, 334:19, 416:3, 549:11
**typical** [4] - 299:8, 438:23, 439:2, 439:3
**typically** [4] - 452:15, 461:9, 493:5, 519:24
**typing** [1] - 429:25

## U

**u.S** [1] - 577:23
**U.S** [9] - 417:5, 418:20, 429:9, 441:19, 545:1, 546:3, 546:5, 546:9, 547:16
**U.S.C** [1] - 361:19
**U.S.M.J** [1] - 271:12
**ultimate** [4] - 290:7, 337:13, 540:11, 555:2
**ultimately** [17] - 278:11, 285:22, 287:4, 287:12, 290:12, 290:14, 291:6, 333:19, 341:21, 356:20, 364:25, 500:15, 515:23, 544:24, 558:25, 573:16
**unclear** [2] - 432:13, 495:11
**under** [27] - 278:12, 280:2, 289:19, 296:9, 309:20, 309:21, 338:23, 357:15, 362:14, 371:7, 383:4, 393:18, 397:24, 401:18, 449:19,

450:16, 464:24, 472:7, 472:23, 485:12, 501:17, 514:22, 520:9, 523:22, 523:25, 524:11, 575:16
**undercuts** [1] - 493:18
**underlying** [1] - 553:22
**underneath** [1] - 449:13
**understood** [1] - 334:15
**underway** [1] - 449:17
**undisputed** [2] - 358:12
**unduly** [2] - 354:21, 370:14
**unfairly** [1] - 575:15
**unfortunately** [2] - 319:6, 498:18
**Unit** [8] - 526:19, 526:20, 526:23, 527:1, 527:12, 527:15, 527:19
**unit** [1] - 484:12
**UNITED** [1] - 271:1
**United** [3] - 308:7, 319:10, 388:14
**units** [8] - 313:6, 382:6, 394:9, 454:19, 526:21, 527:7, 527:13, 543:12
**Units** [3] - 527:5, 527:10, 528:21
**universities** [1] - 442:11
**University** [2] - 403:9, 442:21
**university** [7] - 403:10, 441:24, 442:19, 442:20, 442:21, 443:6, 444:6
**unknown** [1] - 446:22
**unless** [4] - 292:25, 497:12, 557:20, 576:5
**unnecessarily** [1] - 554:4
**unusual** [2] - 274:6, 487:16
**up** [142] - 273:3, 273:8, 274:18, 275:18, 276:22, 277:6, 278:4, 280:21, 283:16, 286:19, 287:15, 292:25, 297:4, 298:11, 301:4, 307:6,

309:12, 310:15, 310:25, 318:8, 321:15, 322:15, 325:20, 335:7, 338:3, 341:13, 341:14, 342:6, 342:17, 345:5, 348:4, 349:19, 354:23, 369:20, 370:15, 372:7, 372:13, 374:7, 374:16, 374:22, 374:23, 375:5, 375:8, 375:17, 381:10, 383:3, 383:10, 384:19, 389:12, 389:15, 390:9, 390:13, 392:8, 399:21, 405:16, 407:16, 411:22, 413:5, 413:7, 413:13, 413:24, 414:10, 416:3, 425:15, 426:17, 428:6, 428:10, 428:11, 428:12, 429:3, 431:7, 431:14, 433:19, 434:3, 434:17, 434:19, 435:4, 435:5, 441:20, 442:4, 442:8, 442:14, 443:10, 443:16, 444:23, 446:1, 446:5, 451:23, 452:9, 453:12, 453:21, 454:1, 454:6, 454:18, 459:18, 460:21, 461:4, 461:9, 462:17, 463:15, 463:17, 466:20, 471:3, 473:3, 473:24, 474:5, 474:22, 475:8, 476:22, 478:25, 480:17, 482:20, 491:12, 492:24, 494:21, 494:24, 497:23, 498:22, 508:14, 519:18, 521:4, 522:16, 522:20, 528:16, 536:3, 540:10, 542:2, 547:4, 552:19, 552:24, 553:4, 554:25, 564:23, 565:5, 567:23, 568:20, 570:19, 572:8,

573:8, 575:5, 576:21
**upfronted** [1] - 566:21
**upset** [1] - 342:1
**upstream** [2] - 324:11, 477:13
**urgency** [1] - 275:20
**usable** [1] - 292:11
**usage** [2] - 386:3
**useful** [1] - 430:19
**uses** [5] - 273:17, 388:13, 402:18, 572:25, 573:6
**usual** [1] - 445:6
**utilities** [18] - 382:1, 385:6, 385:25, 390:11, 406:12, 414:2, 427:25, 439:3, 488:25, 492:1, 492:2, 493:3, 493:11, 494:12, 500:14, 501:6, 543:23
**utilities'** [1] - 543:12
**utility** [18] - 390:10, 391:8, 392:3, 392:14, 393:4, 395:19, 426:2, 438:20, 439:1, 489:15, 492:7, 493:6, 493:7, 499:14, 535:14, 535:15, 537:5, 545:2
**utility's** [1] - 381:23
**utilized** [2] - 370:23, 370:24

## V

**vacuum** [1] - 572:3
**valid** [1] - 472:13
**validate** [1] - 448:11
**validity** [2] - 472:19, 555:9
**valuable** [2] - 479:2, 515:25
**value** [3] - 479:4, 517:20, 517:23
**vantage** [1] - 474:4
**varies** [1] - 369:8
**variety** [1] - 535:8
**various** [8] - 352:18, 367:6, 383:22, 487:12, 521:5, 529:23, 540:1, 561:12
**vehicles** [2] - 461:20, 461:24
**verbiage** [1] - 324:10
**version** [2] - 398:14,

576:11
**versus** [3] - 306:16, 393:9, 421:20
**veto** [3] - 492:3, 493:9, 499:22
**via** [2] - 361:5, 365:21
**vice** [6] - 326:9, 436:7, 436:22, 436:23, 436:25, 504:17
**vice-president** [1] - 436:7
**vicinity** [1] - 273:25
**video** [7] - 436:12, 439:6, 525:18, 526:1, 531:25, 545:10, 548:6
**view** [6] - 281:9, 285:9, 347:5, 363:13, 422:10, 483:17
**viewpoint** [1] - 414:3
**views** [1] - 371:14
**violate** [2] - 423:25, 496:14
**violated** [1] - 421:12
**violates** [1] - 423:22
**violating** [1] - 385:11
**violation** [3] - 420:10, 560:21, 560:24
**vis** [2] - 281:25
**vis-a-vis** [1] - 281:25
**visibility** [1] - 438:12
**visiting** [1] - 453:6
**visits** [1] - 454:14
**Vistra** [35] - 377:9, 377:20, 380:9, 382:1, 382:4, 382:8, 383:1, 383:14, 384:15, 384:22, 385:6, 386:10, 390:10, 390:22, 391:9, 393:3, 393:11, 393:20, 425:18, 425:20, 426:2, 426:6, 426:7, 427:14, 427:16, 454:20, 455:1, 455:17, 489:7, 489:15, 493:13, 499:14, 499:21, 500:2, 500:4
**visual** [1] - 350:9
**voice** [1] - 568:19
**Volume** [1] - 271:7
**volumes** [1] - 532:20
**VP** [3] - 326:8, 409:8, 505:3
**vs** [1] - 271:6

## W

**wait** [1] - 369:14
**waive** [2] - 421:3, 421:13
**waived** [2] - 420:18, 464:18
**walk** [4] - 280:8, 296:16, 384:8, 392:25
**Walter** [13] - 526:20, 527:4, 527:5, 527:10, 527:12, 527:15, 527:19, 528:21, 528:22, 529:8, 530:2, 530:12, 531:2
**wants** [4] - 275:18, 314:13, 346:12, 468:18
**warm** [1] - 301:15
**warner** [1] - 577:17
**Warner** [1] - 577:22
**WARREN** [1] - 271:21
**Washington** [2] - 454:7, 454:18
**watch** [1] - 525:3
**water** [1] - 446:8
**watt** [1] - 388:24
**watts** [2] - 388:25, 389:6
**ways** [5] - 318:15, 318:17, 319:19, 480:9, 549:2
**wear** [3] - 332:8, 536:2, 572:21
**wearing** [1] - 536:5
**weeds** [1] - 561:20
**week** [8] - 373:19, 385:12, 403:3, 418:11, 451:24, 452:16, 515:1, 532:24
**weekends** [2] - 442:16, 444:9
**weeks** [5] - 410:18, 410:23, 420:22, 421:23, 518:22
**whack** [1] - 462:22
**whatnot** [1] - 576:22
**whatsoever** [1] - 298:23
**Whitney** [5] - 525:17, 525:19, 526:4, 526:5, 531:10
**whole** [9] - 280:20, 388:1, 394:13, 397:22, 426:17, 429:2, 445:15,

480:16, 575:14
**wide** [8] - 335:7, 377:19, 381:13, 381:17, 381:20, 381:22, 394:13, 400:13
**wife** [2] - 451:21, 454:10
**William** [2] - 525:17, 526:4
**willy** [1] - 296:17
**willy-nilly** [1] - 296:17
**Wilson** [6] - 280:25, 281:1, 288:22, 290:3, 356:24, 368:5
**WILSON** [53] - 272:7, 280:24, 281:2, 281:18, 282:4, 282:18, 283:3, 283:14, 283:21, 284:4, 284:13, 285:7, 285:9, 285:14, 285:17, 285:24, 286:25, 287:21, 290:5, 291:22, 357:5, 357:9, 357:17, 357:22, 358:9, 358:20, 359:15, 359:19, 360:1, 360:4, 360:11, 360:22, 361:14, 361:18, 362:10, 362:20, 362:22, 363:1, 363:10, 363:25, 364:3, 364:12, 364:19, 364:23, 365:5, 365:13, 365:24, 366:10, 366:22, 367:9, 367:17, 368:1, 368:4
**win** [4] - 347:3, 461:11, 472:23, 505:8
**wind** [1] - 547:4
**wins** [3] - 334:4, 534:9
**wish** [2] - 568:11, 577:12
**withdraw** [1] - 551:15
**withdrawing** [1] - 551:18
**witness** [58] - 277:8, 278:4, 333:3, 337:17, 341:4, 354:10, 355:17, 372:8, 372:10, 398:5, 407:15, 419:17, 422:6, 424:5, 435:17,

435:19, 435:23, 436:1, 439:19, 440:7, 448:17, 455:23, 457:4, 464:2, 464:12, 464:17, 464:19, 465:1, 465:18, 474:11, 495:5, 495:15, 498:1, 498:6, 498:17, 499:5, 514:2, 519:7, 525:15, 532:3, 532:14, 533:14, 533:16, 544:10, 554:10, 554:12, 555:8, 555:11, 561:24, 562:5, 562:8, 562:10, 562:13, 563:3, 575:5, 575:11, 576:3
**WITNESS** [7] - 435:21, 440:1, 440:4, 474:8, 498:25, 499:8, 524:23
**witness's** [1] - 575:15
**witnesses** [5] - 354:1, 495:2, 525:8, 575:8, 575:9
**wondering** [2] - 525:2, 576:22
**word** [1] - 411:1
**wording** [3] - 276:18, 379:8, 491:18
**words** [11] - 283:11, 322:22, 322:25, 324:10, 342:15, 343:12, 428:21, 429:1, 558:1, 558:11, 559:4
**works** [4] - 392:21, 436:9, 476:16, 486:21
**world** [9] - 325:23, 325:25, 361:4, 423:18, 447:5, 448:11, 451:4, 484:23, 557:13
**worldwide** [2] - 383:3, 448:14
**worried** [1] - 287:3
**worry** [1] - 290:18
**worse** [1] - 420:16
**worst** [3] - 316:2, 316:3, 316:5
**worth** [1] - 391:7
**write** [12] - 318:1, 321:12, 321:14, 383:17, 386:14, 438:8, 464:5, 510:8, 510:13, 510:15,

515:13, 523:14
**writing** [3] - 317:20, 317:22, 518:20
**written** [24] - 286:2, 337:12, 337:13, 337:15, 340:8, 342:16, 342:18, 342:22, 343:3, 343:5, 344:17, 345:18, 349:13, 350:23, 350:25, 364:25, 365:11, 366:24, 376:9, 446:5, 510:18, 511:18, 512:16, 547:20
**wrote** [7] - 297:8, 463:15, 516:22, 517:5, 517:9, 518:6, 566:3
**Wyoming** [1] - 328:22

## Y

**year** [32] - 330:14, 388:17, 388:18, 393:21, 394:3, 411:12, 413:20, 414:5, 414:6, 418:7, 418:9, 438:3, 438:4, 443:2, 481:19, 481:23, 482:1, 482:3, 482:6, 482:17, 483:11, 483:20, 486:16, 486:22, 487:4, 501:15, 502:5, 503:9, 514:9, 530:17, 531:15, 554:11
**years** [71] - 319:4, 319:8, 325:20, 327:23, 332:20, 332:24, 336:1, 385:23, 386:1, 386:6, 391:4, 391:6, 392:4, 392:15, 392:18, 394:1, 394:4, 403:5, 405:13, 405:21, 408:13, 410:24, 414:25, 416:2, 422:2, 422:6, 426:4, 435:14, 441:19, 442:13, 442:19, 443:8, 443:14, 443:15, 443:18, 445:14, 445:16, 447:2, 447:20, 451:11, 451:21,

454:3, 454:8, 454:13, 458:23, 459:10, 459:11, 460:6, 460:19, 460:20, 460:23, 472:21, 478:19, 479:24, 480:4, 484:18, 487:6, 495:1, 505:16, 509:21, 511:24, 514:23, 514:25, 515:16, 517:25, 523:15, 531:21, 534:15, 538:6, 541:16, 564:17
**years'** [1] - 391:7
**yesterday** [13] - 273:21, 294:25, 300:8, 307:11, 316:2, 323:4, 323:14, 329:10, 376:14, 377:2, 378:9, 404:11, 405:5
**you..** [1] - 512:8
**young** [3] - 442:13, 443:23, 478:25
**yourself** [4] - 322:9, 440:16, 444:17, 534:12

## Z

**zero** [8] - 317:21, 393:20, 393:23, 394:3, 431:23, 480:22, 481:1, 516:2
**Zicon** [1] - 301:8
**zoom** [5] - 394:21, 397:22, 522:20, 547:14, 572:9
**ZURLO** [1] - 272:8