IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE


MIDWEST ENERGY EMISSIONS CORP., et al.,                )
                                                       )
-------------------Plaintiffs,      )
                                                       ) Case No.
 vs.                                ) 19-CV-1334-CJB
                                                       )
ARTHUR J. GALLAGHER & CO., et al., )
                                                       ) Volume III
-------------------Defendants.      )


TRANSCRIPT OF JURY TRIAL


JURY TRIAL had before the Honorable Christopher J. Burke, U.S.M.J., and a jury of seven in Courtroom 2A on the 28th of February, 2024.



APPEARANCES

DEVLIN LAW FIRM
     BY:  JAMES LENNON, ESQ.
          PETER MAZUR, ESQ.

                         -and-

CALDWELL CASSADY & CURRY
     BY:  BRADLEY CALDWELL, ESQ.
          JASON CASSADY, ESQ.
          JOHN CURRY, ESQ.
          JUSTIN NEMUNAITIS, ESQ.
          WARREN MCCARTY, III, ESQ.
          DANIEL PEARSON, ESQ.
          ADRIENNE DELLINGER, ESQ.
          AISHA HALEY, ESQ.
          RICHARD COCHRANE, ESQ.

                    Counsel for Plaintiff

(Appearances continued.)


          MORRIS JAMES LLP
                BY:   CORTLAN HITCH, ESQ.
                      KENNETH DORSNEY, ESQ.

                            -and-

          BRADLEY ARANT BOULT CUMMINGS LLP
                BY:   JEFF DYESS, ESQ.
                      PAUL SYKES, ESQ.
                      BENN WILSON, ESQ.
                      ASHLEY ROBINSON, ESQ.
                      JESSICA ZURLO, ESQ.

                                Counsel for CERT Defendants

THE COURT:  All right.  Welcome, everyone.  I appreciate the parties' submission last night.  It was helpful, and I appreciate the linking of all the documents.  That was helpful.  It allowed us to come in and look at what we think to be the issues and take a look at some of the docs.

Here is what I thought I would do because I think it's maybe more helpful to the parties.  I think the goal of this is to try to get my input, feedback, and decisions on as many of what we noted as disputed issues as possible before we start the trial day so that the parties don't have to use trial time to argue those issues.

What I was planning to do is go through the issues that the parties have raised in their note and, to the extent relevant, maybe some that they would raise yet today that we may not have gotten to that relate to what I think the testimony may be today, to give you my inclination based on what I think the issues are, what you have told me, and then to let you, if there's an issue where you say there's actually something here or we just disagree with you, I want to make this argument, we'll let you do it.  I think we'll cover more that way.

So it seems like the first issue the parties raised last night is the issue about the slides.  I think what it goes to is what can Mr. O'Keefe say and not say

about the state-of-mind-related issues that relates to contributory infringement. I think, as I talked about in my Daubert order at DI 13, there's a fine line, and it's a difficult situation because on the one hand under the law it's clear what an expert shouldn't do is directly and specifically opine and invade the province of the jury and say things like, "It is my opinion that Defendants intended" "It is my opinion that Defendants had the state of mind" or "Defendants had this state of mind" or "Defendants intended." Even things like "I think you, jury, can conclude that Defendants had this state of mind." It's directly speaking and directly saying the words by the expert "state of mind," "intent," et cetera. That's the things I've said that Mr. O'Keefe can't do.

On the other hand, you have these elements of infringement as it relates to contributory induced infringement which they have state-of-mind elements, and Mr. O'Keefe is the expert in speaking about infringement-related issues. So what I've said in my prior order is that Mr. O'Keefe can't specifically opine on state of mind that way. It would come too close to the line. He can speak to the evidence that at least relates to different elements, and the jury will draw their own conclusions.

And he can provide an ultimate opinion on do I believe they directly infringe or that they indirectly

infringe.  He can say that.  In my view, at least, that walks the line, as appropriately as I can see it, that we're not going too close to invading the jury's province regarding state of mind, while speaking to the issues that he's properly able to speak to.

So I think back to the slides, I see the plaintiffs have inserted, and I assume they will in questioning, make it clear that Mr. O'Keefe is speaking only to evidence that he believes relates to an element, that he will not say the words that I said he cannot say.  It may even behoove Plaintiffs to make it clear that he is not and cannot speak to the issue of intent in the questions.  As long as they do that, I don't have an objection to the slides they've given.  They sufficiently walk that line in an appropriate way.

The parties have raised -- the defense has raised an issue about certain of the slides of Mr. O'Keefe that I see relate to a time period prior to the complaint for which he believes relates to elements of contributory infringement.  They cited the *Roche* case and in my view, with regard to that objection, for now, I'm going to overrule it.  I've overruled the first objection for now, is my inclination.

The second issue is the *Roche* issue.  I overruled that concern because in my view in reading *Roche*,

what I think *Roche* really says, and I think it makes total sense, if you're arguing induced infringement as a plaintiff, the acts of inducement must occur within the damages period.  That's what *Roche* stands for.

Now, if you have a case and you're the plaintiff and you don't point to acts of inducement from 2019 on, you can't win.

What *Roche* does not say is that no evidence from the time period prior to the damages period could in any way be relevant to issues of induced infringement.  Both sides here are talking about the time period before.  Like state of mind or intent, et cetera.  Of course, the specifics may depend on what the evidence is or how it comes up, but there's no basis for me to preemptively rule that these exhibits can't be discussed at this stage.

Slide 74 of Mr. O'Keefe's slides is, I guess, an indemnification agreement.  To the extent there was an objection that the discussion of such  an agreement would be beyond the scope of the report, I looked at paragraph 101 of his report, and it does seem to be like he was talking about issues like this.  So based on what I've seen, I don't have a basis to sustain that objection at this stage.

Mr. Green, the plaintiffs' damages expert, there was objection from Defense about PTX 761, and in that regard, 761 was related to -- it's a term sheet regarding

the agreement that the settling defendants signed. I was intending to overrule that objection. I don't see any -- for the reasons stated by the plaintiffs. I don't see anything objectionable to discussing that term sheet related to the agreement the parties have been talking about and talking about throughout the case. If there is nuances between the differences between the term sheet and the agreement, I'm sure that can be brought out in cross-examination for sure.

This is the PTX 762 dispute with regard to Green. It generally seemed relevant to me, but I didn't have enough information about -- it seems like there's a statement about something Green said in his prior reply report that might contradict this. I didn't have enough information about that to draw a final conclusion. I guess it's an issue that could be dealt with in cross, but not totally sure.

And then there are a couple of issues with regard to Mr. Green, who's the defendants' Mr. Green, and Ms. Senior. With regard to the former, those seem to be about the issue of defense the defendants have stated. Again, this evidence is stuff that can be talked about as I ruled. I think the parties, in their questioning, including in Plaintiffs' questioning and Defendants' questioning of Plaintiffs' expert and also in their questioning of the

other side, the parties know what the law on contributory infringement is going to be, what coal is going to matter with regard to the elements, and what argument can be made about the issue of mistake of law regarding knowledge. Seems like they can bring that out in their questioning of folks.  And so, in any event, I didn't see an initial basis to grant the plaintiffs' objection with regard to the evidence that the defendants' Mr. Green wants to talk about.

Lastly, with regard to the issue about Ms. Senior and her slides, I think some of the issue, one I just talked about there, and some of it if there's a beyond-the-scope objection, it looked like from the paragraphs in her report that she was is speaking to these issues.  And ironically, the defendants' expert there is speaking on infringement, speaking a bit about Section 45 issues, the very thing we talked about you guys have an objection to the plaintiffs' expert doing a little of, although he hardly did any in the examination so far.  So based on what I saw, I didn't see a reason to grant Plaintiffs' objection there with Ms. Senior.

So that's a lot, but I'm trying to give you as much as I can in what -- it was only about ten minutes, so that's pretty good -- my initial view of the disputes to save your time because I know time the time will be tight.

With all that said, let me ask you, is there

anything else either side wishes to further press?

Mr. Nemunaitis.

MR. NEMUNAITIS:  I believe we understand all those rulings, Your Honor.  There was also the issue of the curative instruction.  That's been briefed.  I don't know if Your Honor wants to take up argument on that now that the briefing is done.

THE COURT:  I saw it was filed last night.  I tried to focus this morning on the disputes that I knew would be most relevant to our testimony immediately, so I haven't reviewed it.

Now, today, my hope is that during breaks, I can start to review it.  But the issue is -- is part of the issue, Mr. Nemunaitis -- I'm just getting this from the titles of what the parties said.  Is part of the issue that surely we're going to talk about, in the final jury instructions, there's going be an added instruction that makes clear, look, this is the coal that matters with regard to the elements of contributory infringement with the exception of the defendants' arguments as to no knowledge due to mistaken understanding of the law, et cetera.  And there'll be maybe additional words added to make clearer what the deal is there.  Is the big deal in this motion you want me to make that kind of instruction during the trial?

MR. NEMUNAITIS:  I think that's the issue, Your

Honor, and particularly before Mr. Jeff Green takes the stand.  I expect we'll have a break before that if you want to review the briefing and we'll be able take it up at the break before he takes the stand.

THE COURT:  What do we think today? Mr. O'Keefe, we'll get through and probably Mr. Green, your expert, we'll get through.

Do you expect that to be your last witness?

MR. NEMUNAITIS:  We'll call Mr. Jeff Green adversely in the case.

THE COURT:  There will be time between now and then.  I'll take a look, and if we have the ability to deal it with before then, we'll try.

Anything else?

MR. NEMUNAITIS:  No, Your Honor.

THE COURT:  Mr. Dyess.

MR. DYESS:  Your Honor, I have one and Mr. Dorsney has the rebuttal of one of their things.  The point on the indemnity agreement wasn't that he didn't speak to indemnity at all in his report.  The point was he changes courses on what he's relying on.  The only thing he cited in his report is the basis for his indemnity opinion.

THE COURT:  You can approach if you have a report.

MR. DYESS:  I do.  I apologize, Your Honor.  So

Your Honor, this is pages 124 and 125 from his opening report, and I assume that's what the Court looked at.

THE COURT:  Yes.

MR. DYESS:  So paragraph 101, two sentences. "Defendants provide refined coal with indemnity provisions in place.  This will allow power plants to engage in infringing conduct -- that the power plant would face a diminished risk of infringement."  And they drop the footnote at 127, and it runs over two pages.

THE COURT:  And I assume this is relevant to the plaintiffs' arguments with regard to causation?  I see Mr. Nemunaitis maybe pausing for a second.

I see you nodding.  Am I right, Mr. Nemunaitis.

MR. NEMUNAITIS:  Yes, I believe it goes to a number of factors related to the induced infringement.

THE COURT:  Okay.

MR. DYESS:  If you step through footnote 127, this was a point in time there were a lot more defendants in the case.  So the first three pieces of evidence they cite to don't deal with the CERT defendants at all.  Those deal with the Gallagher defendants, the DTE defendants.  You get to the last thing they cite too, this reference 223.  It is this Intergy presentation evaluating CERT offer to provide refined coal.  That's the only thing he cites to as the basis for this opinion, and that's the exhibit that we just

handed you.  He does not say that he's relying on the refined coal sales agreement as the basis for this part of his opinion.  So that was the basis for our objection, that it exceeds the scope of his report.

THE COURT:  But -- well, okay.  Thank you.  Let me hear from the other side.  I may ask you follow-up questions.

Mr. Nemunaitis.

MR. NEMUNAITIS:  Mr. O'Keefe cites to that contract in his report, and that's on page -- beginning on page 57 is when he starts explaining how the contracts work for each of the defendants.

THE COURT:  Does anybody have a full copy?

MR. NEMUNAITIS:  I have my copy here.

THE COURT:  Did you already hand me one in the stuff you gave me?

MR. NEMUNAITIS:  There should be one over here.  Yes, it should be in the collection of Mr. O'Keefe's materials.

THE COURT:  Whoever can get me it fastest.

MR. NEMUNAITIS:  So this is the section here Defense is talking about, refined coal LLC power plant contracts.  It says:  Each of the RC LLC defendants assigns -- sorry.

THE COURT:  I'll ask you to slow down.  Let me

read it.

"Each of the RC LLC defendants has signed a set of contracts with its associated power plant.  Under these contracts, the RC LLC defendant purchases refined coal from the power plant."

So those are relevant lines so far?

MR. NEMUNAITIS:  If we go down a few pages because there were a number of defendants mentioned, we get to the listing of all of the CERT contracts.  So we plan to admit the -- some of the CERT contracts through Mr. O'Keefe, including the one on that slide.  So there's no objection to that, so the document is coming in.

The section continues to talk about what the terms of these contracts are.  So I understand that on that particular sentence, he gave the one example of power plant presentation to back up the indemnity, but he's also citing to the contracts which have the indemnity language so --

THE COURT:  Your argument is, look, in paragraph 101, did Mr. O'Keefe make it clear that he believed that indemnity agreements in these refined coal contracts were going to be important to relevance in this issue?  He did.

Now, he had, like, 34 defendants he was talking about in his report, so he was citing some exemplary examples of this.  But I think you're saying otherwise in his report, he speaks to the contracts at issue.  The

parties have those contracts, and so the defendant should be fairly aware that if there are indemnity provisions as it relates to the CERT defendants in these contracts, Mr. O'Keefe is citing them as relevant in paragraph 101.  He may speak to them; is that right?

MR. NEMUNAITIS:  Yes, Your Honor.

THE COURT:  Mr. Dyess, that sounds reasonable to me.  Anything more you want to say?

MR. DYESS:  No, Your Honor.  I apologize.  I should have said this is far afield beyond what they qualified him in his expertise to talk about refined coal supply agreements.  They're just not in his expertise.

THE COURT:  Okay.  Well, that's not the objection you started with.  You started beyond the scope. Your objection was beyond the scope.

MR. DYESS:  It was part of the objection that was lodged, I think, brought to the Court the day before. You're correct.  It's not what we just mentioned from there. I just want to make sure we got it all in.

THE COURT:  So with regard to the objection we're dealing with today, which is whether discussion of this indemnity agreement is beyond the scope of Mr. O'Keefe's expert report, I overrule the objection.  I find for the reasons I just described, I think it is fairly within the scope of the report, and I think Defendants

should have anticipated Mr. O'Keefe would be discussing that.  I overrule the objection.

All right, Mr. Dorsney.

MR. DORSNEY:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. DORSNEY:  Thank you for your time.

Just a few things to, hopefully, make the day go a little easier.

Slides with the red checkmarks that come up with what we view as reaching the conclusion regarding what we've labeled as the intent state of mind, motive type of stuff, is it your decision today that when they get to that point, the lawyer may be able to draw that conclusion but that the expert could not testify that that's the conclusion, that the defendants knew something or didn't know something?

THE COURT:  So my ruling is that Mr. O'Keefe cannot say, you know -- say for example, if Mr. Nemunaitis or whoever is doing the direct can't say, "Mr. O'Keefe, do you have an opinion on whether the defendants knew that the coal was especially made or adapted?" or "Do you have an opinion on whether the defendants knew about the patent?" and that Mr. O'Keefe can't say, "Yes, I believe -- my opinion is, and I believe that the defendants knew, blah-blah-blah."  He cannot do that.

MR. DORSNEY:  So when they put the checkmark up,

that becomes his opinion, or so that's what it says defendants knew. I can read the exact language.

THE COURT: I think what you're saying is you think that although the slides indicate that what Mr. O'Keefe is going is to be counting on as evidence is that he thinks related to these elements, and you're arguing that by putting the checkmark on the boxes --

MR. DORSNEY: He's adopting that as an opinion.

THE COURT: -- that it seems too close to Mr. O'Keefe saying the words "I believe" or "I knew" that coal. Is that the idea?

MR. DORSNEY: Yes, Your Honor.

THE COURT: Let me hear from the other side.

MR. DORSNEY: I do have other points too.

THE COURT: Let's just deal with that issue.

Mr. Nemunaitis?

MR. NEMUNAITIS: I don't intend to ask Mr. O'Keefe what he believes about those things. All I intend to ask is "Did you see evidence related to this element? If the jury finds intent or whatever, what does that mean for induced infringement?"

And I also intend to clarify with the witness that he cannot speak to state of mind of intent. That is solely for the jury.

THE COURT: Okay. All right. Thank you.

In light of that, in light of what's expected and what I said earlier, I'm going to allow the plaintiffs to use the slides, including they can check those boxes off, I think, with the caveats that the slides themselves do make clear that we're speaking only to evidence related in some way to this element.

And because Mr. Nemunaitis, I understand, will make it clear that Mr. O'Keefe can't and isn't speaking to the ultimate opinion only what's asked of the jury, I think that sufficiently walks the line, admittedly a close line. So that's my ruling.

MR. DORSNEY:  And then I have a few more points to, hopefully, keep the day going a little smoother.

So we have, in relation to this issue and to Mr. O'Keefe, 702, 703, 402, and 403 objections.  Do we need to pop up every time to preserve that, or is this issue preserved?  We made that objection.  Do we have to preserve it during his actual testimony?

So if a checkmark goes up, do I have to stand up and say, "Objection, Your Honor.  That's an opinion to the ultimate conclusion and that's the view of the expert here" or is this already preserved?  Because otherwise, we're going to be popping up a lot in the slides.

THE COURT:  Look, I think if you're asking me, ultimately, can I tell you what a court of appeals would

decide about what is required to preserve an objection?  Of course I can't.  I can't say to you, "Mr. Dorsney, well, look, in my view, you're fine."  Ultimately, it's on each party to determine what they think is necessary and relevant to do to preserve whatever objections they have.

I will say, though, to the extent it's helpful, I think you have raised the issues of whether Mr. O'Keefe speaking about certain evidence in his slides is permissible pursuant to Rules 402 and 403 and 702 and 703.  I think I addressed it as to the slides, so at least for my purposes, I don't see a need or a reason for you to stand up and object each and every time.

And so I guess all I'm saying is unless I'm misunderstanding what the law is that the court of appeals might think is the case to be able to preserve objections, certainly, I don't believe you need to do it based on what we've covered.  But I can't speak for you-all.  You make whatever decisions you think you have to make, et cetera. Does that make sense?

MR. DORSNEY:  Well, that's helpful, Your Honor. That's for sure.

And then the next point is that Mr. O'Keefe was proffered as an expert in the field of power plant operations, including operation and regulation --

THE COURT:  May I interrupt, Mr. Dorsney?  I

think you may be reading from a part of either Mr. O'Keefe's report or --

MR. DORSNEY:  His testimony --

THE COURT:  -- pretrial order.

MR. DORSNEY:  His testifying at trial.

THE COURT:  I'm speaking, please.  We really both -- because it's frustrating, frankly, and because it's incredibly difficult for our court reporter to get this down and we're trying to pack a lot in.  When I am speaking, you can't be speaking, and you can't interrupt me.  So please don't do it.  Please don't do it.  I'm asking for all those reasons.

Is there a document that I could look at, was my question, that would help me understand what you're referring to?

MR. DORSNEY:  Yes, Your Honor.  It's Day 2 trial transcript, looks like page 533 at 25 to 534 at 4.

THE COURT:  I'm not sure where that document is. I don't have it in the front of me.  Is there anything you want me to look at?  I can look at it.  I'm happy to follow up.  I don't know what the parties have access to, but it's not like I have a trial transcript from Day 2 in front of me.  I don't know what you're referring to, but I think I might need it to get my understanding; right?

THE REPORTER:  I can e-mail you.  Do you want me

to e-mail it to you?

THE COURT:  Our court reporter can send it?

THE REPORTER:  Yes.  I can e-mail you Day 2. I'm sorry, I should have done that.

THE COURT:  While we're waiting, Mr. Dorsney, knowing that I'll get this at some point, what is it that you wanted to say with regard to this issue?

MR. DORSNEY:  Well, I'm trying to understand if your ruling today has expanded the scope for which he's being offered as an expert in the case because he was offered as an expert in the case in the field of power plant operation, including operation and regulation of coal-fired power plant equipment and related equipment for emission control.

Yet he's going to offer testimony regarding license agreements, looks like maybe Patent Office procedures, indemnity agreements, conclusions to be drawn from lay fact witness testimony, a December 2018 confidential report prepared by, looks like JPMorgan -- let's see -- some internal e-mails, all of which are not related to the technical field for which he was admitted in this case and I submit to the Court that no technical expert where testimony is required on this type of evidence nor is he qualified to offer such evidence nor would the basis of his testimony be supported by Rule 703, it's something

experts in this field reasonably rely upon.

THE COURT:  Mr. Dorsney, I don't see those objections.  There were objections previously made to certain of the slides.  I don't see the objections you're talking about now having been made previously or raised with the Court previously.

MR. DORSNEY:  They came in the day before.

THE COURT:  I went through both days' worth of objections that were raised in each of the slides specifically so that I could come out and make rulings, yesterday and today, about all the issues I need to about the slides.  I think none of the arguments you're making now about the relevance of those slides, to the extent they're beyond the scope of his report, were made in those objections.

Let me ask briefly.  Does the plaintiff have a different view on that, Mr. Nemunaitis?

MR. NEMUNAITIS:  No, Your Honor.  I can't say I fully understand the issue, but I don't have a different view.

THE COURT:  In any event, we're right at 8:59, and I don't want to keep the jury waiting.  So to the extent we haven't been able to resolve some issue that may be brought up today, we may have to resolve it.

MR. DORSNEY:  One minute, Your Honor, on that

point.

THE COURT: We can't. I don't want to keep the jury waiting.

Okay. Mr. Caldwell, for that purpose, I need to get started.

MR. CALDWELL: Can I note a response? You asked counsel for defendants about this need to object, and may I note a response? Because I think it was just sort of a -- there was colloquy for you. Our.

Position is that we need to state the objection. I mean, we're intending the following evidence for the Court, but the problem is for an appellate court looking at what the issues of Defense are and what they preserved and then sort of clarity on the record as to whether we had an opportunity to correct something that was objected to, it is proper for them to lodge the objection. This isn't a deposition where you can casually agree on a running objection. In our view, we think it makes more sense to do the objection, and nobody wants to be theatrical and instigate a problem there. That is our position.

THE COURT: I think that's helpful, to have that noted, and if they make an objection and I feel like we need to discuss it in some further fashion to understand the nature of it, I can always talk to them.

MR. CALDWELL: I'm going to discuss with the

defendants and we're going to renew our request that Mr. MacPherson be released from the rule because at this point, they gave us the witness list, and he's not on it, and he's not on ours either.

THE COURT:  That's a separate issue.  You can discuss it with them.  I want to make sure we get the jury in.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  Good morning, again.  So you may be wondering why we didn't start at 9:00.  So at 9:00, I had seven of our eight jurors were here, but not the eighth. And after ten minutes passed, the clerk reached out to the juror who is not here.  By the way, this is the juror who was originally Juror Number 4 on the side list.  He's the second juror, Juror Number 2, in the jury box.

My court deputy reached him by phone, and he said that he had recently had a spinal fusion procedure on his back, that overnight he became unable to move or hardly able to move, that he can't get out of bed, and made it clear he was not coming to court today or, my courtroom deputy believes, ever again.  And he said that he didn't have a way to reach out to us to let us know this, although we had provided the jurors with my courtroom deputy's cell phone.

So understanding that and understanding that there's no reasonable chance that juror is going to participate today or in the future, my plan would be to excuse the juror, proceed forward with seven jurors to complete the trial.  Is there any objection to that from the plaintiffs' side?

MR. CALDWELL:  No, sir.

THE COURT:  For the defense?

MR. DYESS:  No, Your Honor.

THE COURT:  So what we plan to do is when we -- I think the best thing, when we bring the jury, I'll simply say that as "You'll notice we're only seven.  The remaining juror is not with us.  He's been excused from the trial, and we'll proceed with seven jurors," and we'll go forward from there.  Okay.

All right.  With that said, we'll take a brief recess and get started.

We'll have the jury brought in.

(The jury entered the courtroom.)

THE COURT:  Ladies and gentlemen of the jury, good morning.  You'll notice there are only seven of you, not eight.  One of our jurors has been excused from service.  He will not be here and not be participating for the rest of the trial.  We'll go forward with seven jurors.

With that, I want to get started with our trial

day, so I'll turn to Plaintiffs' counsel to resume their examination. We'll bring Mr. O'Keefe forward, and the witness remains sworn.

MR. CALDWELL: Your Honor, if I may, so I don't interrupt the presentation, we have conferred with opposing counsel, and I want to renew my request that Mr. MacPherson be excused from the rule on sequestration. At this point, my understanding is there's no opposition from the defendants. I just want to be able to alert him so he can make his way over.

MR. DYESS: No objection.

THE COURT: So Mr. MacPherson may make his way back to court.

Mr. Nemunaitis.

DIRECT EXAMINATION

BY MR. NEMUNAITIS:

Q. Good morning, Mr. O'Keefe.

A. Good morning.

Q. To remind everyone where we left off, we ended up talking about the defendants' admission that you had identified as the art?

A. Yes.

Q. And did Defendants admit that at least during some of the damages period, the power plants at issue in this case were using activated carbon?

A.    Yes.

Q.    Because the defendants' admission was only as to at least some of the time period, did you review additional evidence as to activated carbon use at the power plants?

A.    Yes.

Q.    Do you have a slide to help us organize that information?

A.    Yes, I do.

Q.    Does this slide have all the power plants at issue that you analyzed for this case?

A.    Yes.

Q.    And for the record, the power plants at issue in this case are the Big Cajun II, W.A. Parish, Coleto Creek, Labadie, Limestone, Laramie, Rush Island, and Antelope Valley; is that right?

A.    Correct.

Q.    All right.  And we already walked through the request for permission.  Can we put a checkmark to indicate that was evidence of activated carbon use?

A.    Yes.

Q.    What type of coal did Mr. Pavlish identify as being particularly useful for the technology at issue in this case?

A.    He said lower quality coals like sub-bituminous and lignite.

Q.    Did that include PRB?

A.    Yes.

Q.    Did you look at what types of coals were burned at the power plants at issue in this case?

A.    Yes.

Q.    What did they burn?

A.    All of them burned Powder River Basin coal except for the last one in the slide, which burned lignite.

Q.    If we put a checkmark to indicate that that's some evidence supporting using activated carbon at these power plants?

A.    Yes.

Q.    Did you review operating permits for each of the power plants at issue in this case?

A.    Yes, I did.

Q.    And can you talk about that?  What is the purpose of an operating permit for a coal-fired power plant?

A.    Well, the operating permit, as its name implies, it's a permit to operate, and in that document, the power plant has to specify what kind of equipment they're using for pollution control, for example, and it has to be approved and the permit is issued and the plant can begin operating.

Q.    Mr. O'Keefe, can you please take a look at Tab 19 through 26 in your binder.  And that should be Volume 2.

A.    Okay.

Q.    Can you tell us what those documents are?

A.    I'm sorry.  It's 19 through what?

Q.    26.

A.    They look like operating permits.  Yes, they are operating permits.

Q.    As part of your investigation in this case, did you identify operating permit documentation for each of the power plants at issue in this case?

A.    Yes.  Yes.

Q.    Did you rely on those operating permits to form your opinions in this case?

MR. DYESS:  Your Honor, we object.  We don't believe they've laid the foundation that this witness has had any experience with working with permits for power plants.  So there's a Rule 703 objection there which leads to a Rule 403 objection.  That foundation hasn't been laid.

THE COURT:  Let's address this issue and, to some degree, related issues at sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  I should say, counsel, I think maybe to try to talk in a little substance here now, but to be able to say to the extent I disagree and overrule the objection we talk about it substantively now, and that same premise relates to further objections.  That way we don't have to call parties over and lose time.

I think, Mr. Dyess, the nature of your objection is the witness is talking about power plant -- the power plants at issue and the permits that are utilized with regard to the work, and it's beyond the scope of his expertise pursuant to Rule 702 and 703 and that the testimony should be excluded for 402 and 403.

MR. NEMUNAITIS:  The specific question is "Did you review operating permits in connection with this case?" I don't believe that's an objectionable question.  Also this part of his report was not objected to or filed a Daubert motion on.  There's no objections to these exhibits coming in, and it's within the scope of his expertise.

THE COURT:  Were these exhibits, the ones we're talking about now -- the parties have a process they agreed to in pretrial orders, and we see they -- were these exhibits part of your objections in the prior day or two?

MR. DYESS:  No, Your Honor.  But the objection is testifying to the exhibits as being beyond the scope of his expertise.

THE COURT:  You're certainly aware of the fact that the witness is going to use the exhibits.  I don't understand why the basis for the objection wouldn't have been ascertainable last night or two days ago.

MR. DYESS:  Your Honor, we didn't know what he was going to say about the exhibits.

THE COURT:  So, Mr. Nemunaitis, I guess the other question to you would be if you are articulating why it is that testimony from Mr. O'Keefe related to the documents likely is related with regard to 402 and 702 objection with regard to the matters he's going to be speaking at trial and the scope of his expert witness testimony, what is your response to that?

MR. NEMUNAITIS:  That he reviewed the operating permits in connection with this case.  They're for the operation of power plants.  He has plenty of experience dealing with that, and he can opine on them and explain what that they mean.  That would be helpful to the jury.

THE COURT:  Anything further, Mr. Dyess?

MR. DYESS:  We're going to add he worked in power plants 20 years ago, and I don't believe in the qualification testimony they had they have testimony he worked in permitting or permitting at the power plants.

THE COURT:  Let me say a few things here which I hope will be helpful and may allow me to very briefly avoid additional objections without having the parties come to sidebar.  It's not clear to me that these objections -- it seems to me that these objections as to the testimony in these slides might well have been anticipated prior to Mr. O'Keefe's testimony right now.

We have an agreed-upon process in place in which

we identify those slides in advance, and Defendants didn't do so.  Even to the extent that doesn't mean they waived the objection, I'll address it substantively.

Mr. O'Keefe has been offered as a technical expert with expertise in the field of power plant operation, including operation and regulation of coal-fired power plant equipment, and he's also going to be opining consistent with his expert reports, including on the issue of infringement.

And in his testimony today, yesterday and today, there are going to be exhibits or evidence that he reviewed and that -- as part of his work as an expert that do in some way bear on the operation of a coal-fired power plant, the way the power plant operates and how it interacts with the -- like the defendants, to the extent there is that kind of -- and I think with regard to this document, there is a solution, and Mr. O'Keefe will be able to testify about them.  They are evidence that he believes in some way relates to his conclusions about the infringement questions in the case on which he's going to opine.

Now, I will say that do I think that every single piece of evidence or every single fact that the plaintiffs might produce is in some way relevant to the issues of direct or indirect infringement can be spoken to in great length by Mr. O'Keefe?  No, I won't go that far.  In fact, for example, if Mr. O'Keefe were to start talking

about the specific financial arrangement between one of these defendants and JPMorgan Chase and about the complex financial proposal that they entered into to provide investment opportunities, that is, it could be and might be some reason why that kind of testimony could be said in closing because it some way related to Plaintiffs' case, but it is so far afield and clearly unrelated to the scope of Mr. O'Keefe's testimony that I will shut it down.

Indeed, yesterday, there was a slide from the plaintiffs I thought traipsed way too far and they started talking showing dollars flowing to JPMorgan Chase. Mr. Dyess objected, and I did sustain the objection because it's beyond the scope of Mr. O'Keefe's testimony.

There are documents today like the indemnity agreement and also I think exhibits relating to the use of activated carbon and/or bromine at some power plants at issue that are tied in some way to the defendants.  My view is that testimony is sufficiently linked within the scope of Mr. O'Keefe's testimony.

Lastly, I would say I know that the defendants did have prior objections broadly to Mr. O'Keefe's qualifications that Mr. Dyess mentioned briefly.  I resolved that objection during the Daubert motion, and my decision was made.  The position is clear.  That's my ruling on this issue.  So I'll overrule the objection.  I hope that will be

helpful to the context of further decisions I have to make.

MR. DORSNEY:  One point, Your Honor.  The issue may have to come up again because I see it as divided between technical facts, which he can testify to, and things that are not technical that may be in those documents, like inferences to be drawn about what an indemnity meant to the businesspeople or why they would enter into a license or those are not technical.  So that's the line, in my mind, we may have objections to.

THE COURT:  I'll say something you mentioned starts to sound like almost intent related or knowledge related.  What does that mean to the defendant?  Obviously, the expert can't speak to what's in the head of one of our Defendants, and if they start to do so and there's an objection, I will shut it down.  There may be nuances I can't cover here.  The parties can raise those objections. If my discussion here covers it, I can refer to the discussion.

(The discussion at sidebar ended.)

BY MR. NEMUNAITIS:

Q.     Did you review the operating permits at Tabs 19 through 26 to inform your opinions in this case, Mr. O'Keefe?

A.     Yes.

Q.     And did those operating permits tell you about

activated carbon use at the power plants at issue in this case?

A.    Yes, they did.

MR. NEMUNAITIS:  Your Honor, we move to admit Exhibits PTX 103, 525, 710, 711, 714, 715, 716, and 725.

THE COURT:  Mr. Nemunaitis, just to make sure we get it, can you say the numbers one more time?

MR. NEMUNAITIS:  Yes.  PTX 103, 525, 710, 711, 714, 715, 716, and 725.

THE COURT:  Is there any objection?

MR. DYESS:  Your Honor, we would make a foundation objection.  If he's moving on from this point, we don't think he's laid foundation of what is in the documents or what he used from the documents.

THE COURT:  Any response, Mr. Nemunaitis?

MR. NEMUNAITIS:  I believe I laid the foundation for him to admit the documents as supporting his opinions, and the next set of questions would be to have him explain those documents.

THE COURT:  I agree with Plaintiffs and will overrule the objections and those documents will be admitted.

(Thereupon, Plaintiffs' Exhibit Numbers 103, 525, 710, 711, 714, 715, 716, and 725 were admitted.)

BY MR. NEMUNAITIS:

Q.    All right.  Mr. O'Keefe, what's on the screen here?

A.    It's an example of an operating permit.

Q.    And this is PTX 716.  What power plant does this operating permit relate to?

A.    That is the Labadie Energy Center which is operated by Ameren Missouri.

Q.    And what does the Ameren Labadie operating permit tell you about activated carbon use?

A.    Well, I've highlighted in the boilers 1 through 4 they use activated carbon.

Q.    If a power plant's permit states that it uses activated carbon to meet mercury regulations, is that what it needs to do?

A.    Yes.

Q.    What would happen if a power plant decided to not follow what's required in the operating permit?

A.    Well, their permit could be revoked, and they could be shut down.

Q.    Yesterday, the jury saw some video clips of Mr. Whitney who worked at Mid-American power plant.

Do you remember that?

A.    Yes.

Q.    Was Mid-American listed as one of the power plants at issue in this case?

A.    No, it was not.

Q.    Okay.  So did he work for a power plant that had connections to a different refined coal supplier?

A.    Yeah, he did.

Q.    Did he talk about how operating permits work?

A.    Yes.

Q.    And is your understanding of how operating permits for coal-fired power plants work consistent with his testimony?

A.    I think so, yes.

Q.    Did the operating permits for all of the power plants at issue in this case indicate that they use activated carbon injection equipment?

A.    Yes.

Q.    If we look back at our table, can we add the operating permits to each of the power plants in the list?

A.    Yes, we can.

Q.    Can we put a checkmark to indicate that indicates use of activated carbon?

A.    Yes.

Q.    Based on your investigation, were each of the power plants at issue in this case using activated carbon just occasionally, or were they using it pretty much all the time during the damages period?

A.    Well, I think they were using it pretty much all the time because they had to meet the MATS emission standards of

90 percent mercury reduction in the flue gas emitted to the atmosphere.

Q.    And yesterday, we talked about some different equipment that actually collects the mercury in the flue gas.  What was that equipment?

A.    Well, it's collected by a baghouse or electrostatic precipitator.

Q.    And for each of the power plants at issue in this case, were they using their baghouse or electrostatic precipitator consistently during the damages period?

A.    Yes.

Q.    All right.  Can I check off that last element now?

A.    Yes.

Q.    All right.  Mr. O'Keefe, we checked off all the elements of Claim 1.  What does that mean?

A.    Well, that means that each and every element of Claim 1 is being used and Claim 1 is infringed in the '517 patent.

Q.    Now, even though you walked through infringement of Claim 1, do we still need to go through all of the claims to prove infringement of each claim?

A.    No.

Q.    Well, do we need to walk through the claim language of Claim 2 to prove infringement of Claim 2?

A.    Yes.

Q.    Claim 2 begins, "The method of Claim 1 further

comprising."

What does that mean?

A.    Well, Claim 2 is called a dependent claim.  It depends on Claim 1, and it talks about the method of Claim 1.

Q.    All right.  Since we walked through the steps of Claim 1, does that mean that part of the claim is met?

A.    Yes.

Q.    It goes on to say, "injecting an alkaline sorbent into mercury-containing gas stream."

Did you find that the elements of that was met?

A.    Yes, I did.

Q.    Can you look at Tab 27 of the binder?

A.    Yes.

Q.    What is that document?

A.    It's a Material Safety Data Sheet for S-Sorb, which is one of the chemicals sprayed on the coal during the refining process.

Q.    And did you rely on that document in forming your opinions in this case?

A.    Oh, yes.

MR. NEMUNAITIS:  Your Honor, Plaintiffs move to admit PTX 249.

THE COURT:  Any objection?

MR. DYESS:  No, Your Honor.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 249 was admitted.)

BY MR. NEMUNAITIS:

Q.    What does PTX 249 say about S-Sorb?

A.    Well, it says S-Sorb 3, which is S-Sorb for short, is an alkaline compound.  So it's sprayed on the coal.

Q.    Did the defendants in this case use S-Sorb for all of the refined coal that's accused in this case?

A.    Yes.

Q.    Can we check off Claim 2?

A.    Yes.

Q.    And what does that mean, that we've checked off Claim 2 now?

A.    Claim 2 is infringed of the '517 patent.

Q.    All right.  And is that all of the claims of the '517 patent?

A.    Yes, in this lawsuit.

Q.    Can we move on to the '114 patent?

A.    Yes.

Q.    Claim 25 of the '114 patent begins with "A method of separating mercury from a mercury-containing gas."

      Is that met for the same reasons as the preamble in the '517 patent?

A.    Yes, it is.

Q.    Can I check that off?

A.    You certainly can.

Q.    The next limitation is a bit long, but it says, "Combusting coal in the combustion chamber to provide mercury-containing gas."

And did you explain that that was met with regard to the '517 patent?

A.    Yes.

Q.    And so it's met for the same reasons here?

A.    Yes.

Q.    And it goes on, "wherein" --

THE COURT:    Mr. Nemunaitis, I'd just ask you to slow down.

BY MR. NEMUNAITIS:

Q.    "Wherein the coal comprises added Br2 HBr, a bromide compound or a combination thereof, added to the coal upstream of the combustion chamber or the combustion chamber comprises added Br2, HBr, a bromide compound or a combination thereof or a combination thereof."

Did you find evidence to support this limitation is met?

A.    Yes, I did.

Q.    And what is that?

A.    Well, MerSorb is a bromide compound discussed in the Material Data Safety Sheet for MerSorb.

Q.      Can I check this one off?

A.      Yes.

Q.      Next limitation is, "injecting a sorbent material comprising activated carbon into mercury-containing gas downstream of and from outside the combustion chamber."

        Is that right?

A.      Yes.

Q.      And now, there's some language here in brackets.  Can you explain what that is?

A.      Well, that's the Court's claim construction.

Q.      And so even if that language wasn't written in the patent document, because that language comes from the Court, do we need to add it into the claim to decide infringement?

A.      Yes, we do.

Q.      Is this "injecting a sorbent material" limitation met?

A.      Yes, it is.

Q.      Did you explain that?  Or why is that?

A.      The power plants inject activated carbon downstream of the combustion chamber.

Q.      Can I check this one off?

A.      Yes.

Q.      And just to confirm, is the activated carbon injected from outside the combustion chamber?

A.      Yes.

Q.    The next limitation is "contacting mercury and the mercury-containing gas with the sorbent to form a mercury-sorbent combination."

Did you find that limitation was met?

A.    Yes, I did.

Q.    Why is that?

A.    Because the mercury is bonded to the carbon particles injected into the flue gas.

Q.    Can I check this one off?

A.    Yes.

Q.    Now, the last limitation is "separating the mercury-sorbent composition from the mercury-containing gas to form a clean gas."

Did you find evidence that that limitation is met?

A.    Yes.

Q.    Why is that?

A.    Because the power plants have a baghouse and/or an electrostatic precipitator, and I explained how that works.

Q.    Can we check this one off?

A.    Yes.

Q.    What does that mean for Claim 25?

A.    Well, that means Claim 25 is infringed of the '114 patent.

Q.    Now, the final claim asserted in this case is 26, and

it says, "The method of Claim 25, wherein the coal comprises the added Br2 HBr, the bromide compound or combination thereof, added to the coal upstream of the combustion chamber."

Did you find evidence to support that this limitation is met?

A.   Yes, I did.

Q.   What is that?

A.   Well, the refined coal is injected upstream of the combustion chamber.

Q.   That means it's injected before the combustion chamber?

A.   Yes.

Q.   Can I check this one off?

A.   Yes.  And incidentally, Claim 26 is what I call a dependent claim, so it depends on Claim 1 -- or Claim 25. I'm sorry.

Q.   We checked off all the boxes of Claims 25 and 26 of the '114 patent.  What does that mean?

A.   In this case, the '114 patent is infringed.

MR. NEMUNAITIS:  Can I get slide 40, Mr. Diaz.

BY MR. NEMUNAITIS:

Q.   Mr. O'Keefe, did you prepare a chart summarizing your infringement opinions in this case?

A.   Yes.

Q.    Can you just walk us through the first row of this chart to explain what it's telling us?

A.    Well, the column of the -- well, the first column starting on the very left is CERT operating defendants, and I list all of the CERT operations companies, the LLCs, in this column.  And for example, in the first row, we have CERT Operations IV, LLC.

And then the second column I have the CERT contracting defendants listed for all the -- for this case. And in the first row, for example, I have Springhill Resources, LLC.

And then in the next column I have power plant customers listed.  These are the directly infringing power plants.  And for example, in row one, I have Big Cajun II of NRG.

And in the next column, I list the coal type burned at those the power plants, and as I stated previously, all of the plants except for one burnt Powder River Basin coal, PRB coal, and the last one burns lignite.

And in the next column I have refined coal additive, which is calcium bromide.  We discussed that they add MerSorb to the coal, which is a bromide compound.

The type of boiler is listed in the next column, boiler type.  It's pulverized coal, where the coal is ground to talcum powder consistency and it's blown into the

combustion chamber to be burned.

Downstream of the combustion chamber, in the next column, I have activated carbon injection. Yes, for all plants in this case.

And the next column, they use ESP or a baghouse to collect the mercury, and I have that listed, for example, in the first row as electrostatic precipitator, ESP.

So as discussed on the '517 patent, we have infringement of Claim 1 and Claim 2, and the '114 patent, we have infringement of Claim 25 and 26.

MR. NEMUNAITIS:  Your Honor, pursuant to Rule 1006, Plaintiffs move to admit PDX slide 40 of Mr. O'Keefe's presentation as an exhibit.

THE COURT:  Any objection?

MR. DYESS:  There is an objection.  Rule 1006 requires that a summary exhibit be provided to us on a timely basis.  This was not provided to us on a timely basis.  It was provided to us two days ago.

MR. NEMUNAITIS:  I mean, if a witness can summarize his opinions on a flip chart, it would seem appropriate if I gave them the slide two days ago, we can use it here to save everyone some time.

THE COURT:  Hold on a second.  Mr. Dyess, the rule has a line that says, "the proponent must make the originals or duplicates available for examination or

copying, or both, by other parties at a reasonable time or place."  Is that if portion of the rule you're referring to?

MR. DYESS:  I believe so, Your Honor.  And I have additional reasons on the objection.

THE COURT:  All right.  What is it?

MR. DYESS:  Your Honor, we don't object to this being used as a demonstrative in this case.  This exhibit is not on their exhibit list anywhere.

THE COURT:  Is that correct, Mr. Nemunaitis?

MR. NEMUNAITIS:  Yes, we prepared it in connection with his testimony.  I thought if a witness could summarize their opinions in court, we could use Rule 1006.

THE COURT:  With regard to the portion of the objection relating to the Rule 1006 requirement that a Rule 1006 summary has to be provided at a reasonable time, on that basis, I would overrule the objection.  I don't see a reason why two days prior would be unreasonable.

But with regard to the second part of the objection, I'll sustain the objection, which is that if the document is not on an exhibit list and it's a demonstrative exhibit and there's not agreement that it otherwise be admitted, then the objection should be sustained.

So I'll sustain the objection.

BY MR. NEMUNAITIS:

Q.    All right.  Mr. O'Keefe, can I read just a few bits

of this on the record to make sure it's clear?

A.    Sure.

Q.    Did CERT Operations RCB, LLC, operate the sprayers for Senescence Energy Products, Bascobert Holdings, Larkwood Energy, Rutledge Products, and Cottbus Associates?

A.    Yes.

Q.    Did CERT Operations V operate the --

THE COURT:  Mr. Nemunaitis, I'll ask you to speak a little more slowly.

BY MR. NEMUNAITIS:

Q.    Did CERT Operations V, LLC, operate the sprayer equipment for Buffington Partners LLC?

A.    Yes.

Q.    Did CERT Operations II operate the sprayer equipment for Marquis Industrial Company LLC?

A.    Yes.

Q.    All right.  Mr. O'Keefe, can we move on to the next topic in your presentation?

A.    Yes.  I'd like to talk about Defendant infringement analysis that I used.

Q.    Does this slide show the test that you applied in determining contributory infringement?

A.    Yes, it does.

Q.    All right.  The first element says, "A power plant has directly infringed one or more claims of an asserted

ME2C patent."

Did we just explain all that?

A.    Yes, we did.

Q.    Can we check that off?

A.    Yes.

Q.    The next element says, "The defendant sold that power plant refined coal made with calcium bromide."  Did you confirm that each of the contracting defendants sold refined coal to power plants at issue in this case?

A.    Yes, I did.

Q.    Did you identify refined coal sales contracts to the power plant?

A.    Yes.

Q.    Can you take a look at Tabs 28 through 35.

A.    Okay.

Q.    Can you tell me what those documents are.

A.    Those are refined coal sales agreements.

Q.    And did you rely on those documents to form your opinions?

A.    Yes.

MR. DYESS:  Your Honor, objection.

THE COURT:  Let's let Mr. Nemunaitis finish.

Make your motion, Mr. Nemunaitis.

MR. NEMUNAITIS:  Plaintiffs move to admit PTX 193, 196, 199, 202, 205, 208, 211, and 214.

THE COURT:  And now what's the objection?

MR. DYESS:  Your Honor, this is the Rule 702, 703, and 402, 403 objection.

THE COURT:  These are refined coal sales agreements relating to the operation of the refined coal companies at certain power plants.  I'll overrule the objection on a similar basis to what was discussed earlier.

Please proceed.

MR. NEMUNAITIS:  Are those exhibits admitted, Your Honor?

THE COURT:  Yes, they are admitted.

(Thereupon, Plaintiffs' Exhibit 193, 196, 199, 202, 205, 208, 211, and 214 were admitted.)

BY MR. NEMUNAITIS:

Q.    Mr. O'Keefe, did you identify a refined coal sales contract for each power plant at issue in this case?

A.    Yes.

Q.    All right.  Can we check off Element 2?

A.    Yes.

Q.    Element 3 requires that "the refined coal supplied to that power plant as sold and delivered during the damages period is not a staple article or commodity of commerce capable of substantial non-infringing use."

Did you find evidence this requirement is met?

A.    Yes.

Q.    Starting off, did the defendants sell refined coal during the damages period?

A.    Yes, they did.

Q.    Now, this requirement also requires that the refined coal "is not a staple article or commodity of commerce capable of substantial non-infringing use."  If we look back at your diagram for how the refined coal operations work, where in this process do we need to focus on to decide whether or not there's a substantial non-infringing use?

A.    We have to look at the conveyer belt going from the coal pile to the pulverizer and leading to the refined coal plant.

Q.    Why is that?

A.    Well, the coal, after it's refined, it has no place to go except on the conveyer belt to the power plant to be pulverized and burned in the combustion chamber.

Q.    If refined coal sold to different companies that are not at issue in this case sold refined coal to a different power plant, does that matter at all to this requirement?

A.    Yes, it would.

Q.    And I may not have asked my question correctly.  When looking at this requirement, are we looking at the refined coal sold by each defendant to the power plant, or are we looking at refined coal sold to power plants that are not accused in this case?

A.     Only the power plants in this case directly infringe.

Q.     Once the refined coal is provided to the power plant, what options does the power plant have to do with it?

A.     They have no choice but to burn it in their combustion chamber.

Q.     And after that refined coal was burned, do the power plants use activated carbon injection?

A.     Yes.

Q.     Can we check off Requirement 3?

A.     Yes, you can.

Q.     Next requirement is that the refined coal constituted a material part of the claimed invention.

Did you find evidence to support that this requirement is met?

A.     Yes, it's one of the elements of the claims.

Q.     And is burning coal with bromine an important part of the claims?

A.     Yes.

Q.     Can we check off this one?

A.     Yes.

Q.     And finally, the last element is that the defendant knew that the refined coal was specially made or adapted for use in an infringing method; is that right?

A.     Yes.

Q.     Now, Mr. O'Keefe, I know you're not a mind reader, I

can't ask you as to what any Defendant knew or what was in someone else's state of mind.  That's solely for the jury to decide; right?

A.    Yes, right.

Q.    Despite that, did you find evidence to support that the defendants received information about ME2C's patents-at-issue in this case?

A.    Yes, I did.

        MR. DYESS:  Your Honor, we object.  This is the knowledge and intent issue.

        THE COURT:  The objection is overruled pursuant to our prior discussion.

BY MR. NEMUNAITIS:

Q.    How did the defendants in this case receive information about Midwest patents?

A.    Well, one way they learned about the technology in the patents is when the lawsuit was filed in July of 2019.

Q.    And was a copy of the '517 patent also provided to Defendants in connection with the lawsuit once it was added to the case?

A.    Yes.

Q.    Turning back to the test for contributory infringement, it also requires -- I'm sorry.  Let me start over.

        Did you also find evidence that the defendants

received information that the power plants at issue were using activated carbon?

A.    Yes.

Q.    And we walked through that evidence table.

MR. NEMUNAITIS:  Can we bring that up again?

THE WITNESS:  Sure.

BY MR. NEMUNAITIS:

Q.    Now, the defendants, were they aware of their request for admissions in this case?

MR. DYESS:  Objection, Your Honor.

MR. NEMUNAITIS:  I'm sorry.  I'll rephrase.

THE COURT:  Objection is sustained.  Question will be stricken, and we'll ask Mr. Nemunaitis to ask a new question.

BY MR. NEMUNAITIS:

Q.    Did the defendants in this case provide their response to the request for admission?

A.    Yes, they did.

Q.    Did the defendants in this case receive information about the coal type at each of the power plants in this case?

A.    Yes, they did.

Q.    Are the operating permits for power plants publicly available?

A.    Yes, they are.

Q.    Were operating permits provided to Defendants in connection with their refined coal operations?

A.    Yes.

Q.    Can we add the defendant names to the slide for the contracting defendants?

A.    Sure.

Q.    Did you also review testimony from the defendants regarding activated carbon use?

A.    Yes.

Q.    Did you review this testimony from Mr. Jeff Green?

A.    Yes, I did.

Q.    And what did he say about activated carbon use at the power plants?

A.    Well, he said that I was told that they used -- all of the named defendants' power plants used activated carbon during the time period mentioned, and it's 2019 to 2021.

Q.    Now, when he said that, does he say when he was told?

A.    No.

Q.    Looking back at the table, can we add that testimony as some evidence of activated carbon use?

A.    Yes.

Q.    Did you look at additional documents to see when the defendants received information about activated carbon use?

A.    Yes.

Q.    Could you take a look at Tabs 36 through 41 in your

binder?

A.    It's in Volume 3?  Is that Volume 3?

Q.    I believe it's Volume 2 still.

A.    26 through...?

Q.    36.

A.    And that's in Volume 3.  Okay.

Q.    What do those documents indicate?

A.    Well, they're reports filed by Sargent & Lundy which is an engineering firm based out of Chicago, and the reports talk about refined fuel facilities in the -- some of the power plants in this case.

Q.    Did you rely on them to form your opinions in this case?

A.    Yes, I did.

MR. NEMUNAITIS:  Your Honor, Plaintiffs move to admit PTX 77, 102, 232, 545, 689, and 690.

THE COURT:  Is there any objection?

MR. DYESS:  There's an objection to 232.  It's not a Sargent & Lundy report.

THE COURT:  I'm sorry.  I can't quite hear you.

MR. DYESS:  The objection is to Exhibit 232. It's not a Sargent & Lundy report.

THE COURT:  That seems correct.

Mr. Nemunaitis, do you possibly have the wrong one?

MR. NEMUNAITIS:  I'm sorry, Your Honor.  Let me start over.  Plaintiffs move to admit PTX 77, 102, 545, 689, and 690.

THE COURT:  Mr. Dyess, any objection to those?

MR. DYESS:  No, Your Honor.

THE COURT:  They're admitted.

(Thereupon, Plaintiffs' Exhibit Numbers 77, 102, 545, 689, and 690 were admitted.)

BY MR. NEMUNAITIS:

Q.    Mr. O'Keefe, is this an example of one of the reports in your binder?

A.    Yes.

Q.    And this is PTX 545.  What's the date of this document?

A.    The date is December 2018.

Q.    And this table on the screen, is that taken from the report?

A.    Yes.

Q.    Does it identify the coal type for the power plant?

A.    Yes.

Q.    I see there's a column identified as relating to S-Sorb.  Was that the alkaline component you talked about earlier?

A.    Yes, it's used to reduce NOx emissions.

Q.    And I see there's a column related to MerSorb.  Is

that the bromine component?

A.    Yes.

Q.    And it looks like the emissions reduction from using MerSorb were around 45 to 50 percent most of the time; is that correct?

A.    Yes.

Q.    Is that enough for this power plant to meet the MATS requirements?

A.    No, it's not.

Q.    And what's the requirement there?

A.    40 percent on mercury emissions reduction and at least 20 percent NOx emissions reductions.

Q.    And I'm sorry.  For the EPA rule, it's performing --

A.    The EPA rule is 90 percent of mercury emissions reduced.

Q.    And does this report identify what the power plant does to hit that 90 percent rule?

A.    No.  Or yeah, I'm sorry, it does.  It talks about activated carbon injection systems.

Q.    And is this a document that was provided to the defendant in this case, Senescence Energy?

A.    Yes.

Q.    All right.  Can we add the Sargent & Lundy reports to your table?

A.    Yes.

Q.    All right.  Mr. O'Keefe, can you take a look at the document identified as PTX 232 in your binder?

A.    What tab is that?

Q.    It's in the 36 to 41 range.

A.    Okay.

Q.    Did you find it?

A.    Well, I didn't find the report you mentioned, but I'm in that range.

THE COURT:  I believe -- Mr. Nemunaitis, I believe it's Tab 38.

BY MR. NEMUNAITIS:

Q.    Could you turn to Tab 38, Mr. O'Keefe?

A.    I'll try, but I'm having a binder malfunction right now.

THE COURT:  Counsel may approach if they wish to help.

MR. NEMUNAITIS:  Thank you, Your Honor.

THE COURT:  I've had a couple of those too.

BY MR. NEMUNAITIS:

Q.    What is PTX 232?

A.    It's an e-mail from Barr Linton to Daniel Murray, and let's see who else.

Q.    Did you rely on that document in forming your opinions?

A.    Yes, I did.

MR. NEMUNAITIS:  Your Honor, Plaintiffs move to admit PTX 232.

THE COURT:  Any objection?

MR. DYESS:  No objection.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit Number 232 was admitted.)

BY MR. NEMUNAITIS:

Q.     Was PTX 232 sent to Jeff Green?

A.     Yes, it was.  He's on the cc list for the e-mail.

Q.     And what power plant operators are mentioned in this e-mail?

A.     Basin and Ameren power plants.

Q.     And what's highlighted here on the slide?

A.     Well, at the very last sentence, it says, "The reason behind these requests is that the power plant is relying on calcium bromide together with activated carbon to meet their MATS compliance standards."

Q.     What's the date on PTX 232?

A.     That's May 19th, 2015.

Q.     Could we put this document on our evidence table and check it off?

A.     Yes.

Q.     All right.  Mr. O'Keefe, did you identify documents indicating that the defendants received information about

activated carbon use at all of the power plants at issue in this case?

A.     Yes, I did.

Q.     Turning back to the elements for contributory infringement, did you find that there is evidence associated with this fifth requirement here that the jury will have to evaluate when determining Defendants' knowledge?

A.     Yes.

Q.     Can I check that one off?

A.     Yes, you can.

Q.     If the jury finds that the contracting defendants knew about ME2C's patents and about the power plants using activated carbon, what would that mean for contributory infringement?

A.     It looks like they did contributory infringement, according to this test.

Q.     All right.  Can we move on to inducement?

A.     Sure.

Q.     The first requirement is that the defendants took some affirmative action intending to cause the power plant to directly infringe more and more asserted claims of ME2C's patents.

       Did you find evidence to support that that requirement was met?

A.     Yes.

Q.     And did you identify a list of actions that Defendants took to support that?

A.     Yes.

Q.     And what's the first one here?

A.     Well, they sold the refined coal for less than they paid for it.  So that was a big incentive.

MR. DYESS:  Your Honor?

THE COURT:  I'm sorry.  There's an objection.

MR. DYESS:  Your Honor, the objection, this is the 702, 703, 402, 403.  This is presented as financial incentives to power plants, and we think that's beyond the scope.

THE COURT:  Because the testimony relates to refined coal at sale at the power plants, for the reasons stated earlier, I'll overrule the objection.

BY MR. NEMUNAITIS:

Q.     What's the next item we have listed here?

A.     The defendants optimize the Br rates in the refining process, and they optimized it with the ACI rates by the power plant, the activated carbon injection rates.

Q.     Could you take a look at Tab 42.

A.     Okay.

Q.     What is that document?

A.     It's an e-mail from Barr Linton to a group of individuals, but Jeff Green was on the cc list.

Q.    Did you rely on that to form your opinions?

A.    Yes.

MR. NEMUNAITIS:  Your Honor, Plaintiffs move to admit PTX 693.

THE COURT:  Any objection?

MR. DYESS:  No objection.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 693 was admitted.)

BY MR. NEMUNAITIS:

Q.    What does that document say, Mr. O'Keefe?

A.    It says that Basin has asked us to help with testing varying amounts of MerSorb -- that's the chemical sprayed on in the refining process -- with activated carbon in preparation for MATS regulation.

Q.    What's the last item you have listed here?

A.    Fly ash benefits/reduced activated carbon field.  The power plants typically sell the fly ash, which is the products of combustion removed from the combustion gases by the baghouse and electrostatic precipitator.  They sell that fly ash to cement manufacturers.  It's very useful in making cement and cinder blocks and that sort of thing.  And if there's carbon particles in that fly ash, it's not as attractive to the cement companies.

So one of the benefits of using refined coal is

the power plants don't have to use as much activated carbon injection, so there's not that much carbon particles injected into the flue gas, and that makes the fly ash more attractive for sale after it's removed.

MR. DYESS:  Your Honor, objection.

THE COURT:  Okay.  Mr. Dyess, the objection came after the testimony concluded.  What's the nature of it?

MR. DYESS:  Mr. O'Keefe just testified as to what other companies beyond power plants would find beneficial of the sale of these products.  That's beyond the scope of his expertise.  We move to strike the testimony.

THE COURT:  Hold on a second.  Let me review the question and answer.

Mr. Nemunaitis, your response.

MR. NEMUNAITIS:  I certainly was not intending to elicit testimony as to the state of mind.  I don't have the testimony in front of me to see that.  If he was speaking to state of mind accidentally, perhaps he used the wrong words.

THE COURT:  He was not.  I reviewed the answer. I don't think that's the objection.  There wasn't any state of mind related testimony.

Mr. Dyess, that wasn't your objection?

MR. DYESS:  That wasn't the objection.  The objection was what other companies beyond power plants, what

they would find beneficial.  That's beyond his expertise.

THE COURT:  You're saying what other companies beyond power plants would find beneficial?

MR. DYESS:  Yes.

THE COURT:  I'll overrule the objection because I believe the answer can be understood also to be speaking to what is helpful or beneficial to the power plants at issue as well.  So on that basis, I'll overrule it.

BY MR. NEMUNAITIS:

Q.    In addition to financial incentives, did the defendants provide or at least some of the defendants provide indemnity to the power plants?

MR. DYESS:  Objection.

THE COURT:  This is on the previously stated basis you discussed?

MR. DYESS:  Yes, Your Honor.

THE COURT:  For those reasons I mentioned earlier, I'll overrule the objection.

THE WITNESS:  Yes, they did.

BY MR. NEMUNAITIS:

Q.    What does that mean?

A.    That means they were holding infringers of the patents-in-suit not responsible so they didn't have to deal with lawsuits or being sued or anything like that.  So it gave them a license to infringe.

MR. NEMUNAITIS:  Can I get slide 74, Mr. Diaz.

BY MR. NEMUNAITIS:

Q.    This is a slide with PTX 202.  Is this one of the refined coal sales contracts mentioned earlier?

A.    Yes, it is.

Q.    And it says here, "SP agrees to indemnify."  Who is SP?

A.    That's Senescence Energy Products LLC.

Q.    It goes on to say -- is that one of the defendants in this case?

A.    Yes, it is.

Q.    So one of the defendants agrees to indemnify defendants and hold harmless NRG.  Who's that?

A.    That's the electric utility that operates the power plant.

Q.    So, "Defendant agrees to indemnify, defend, save, and hold harmless the power plant from -- against any adverse consequences arising out of the infringement or claim of infringement of any patent."

      Is that what that says?

A.    Yes.

Q.    Why is that something that could lead to -- I'm sorry never mind -- strike that.

      THE COURT:  Question stricken.

BY MR. NEMUNAITIS:

Q.    Moving back to Element 1, is there evidence the jury can rely on to check out Element 1?

A.    Yes.

Q.    Next element is that "the defendant knew of the asserted ME2C patent or showed willful blindness to the existence of the asserted patent."  Did you provide evidence before that the defendants received information about ME2C's patents?

A.    Yes.

Q.    And can the jury rely on that to check off this element?

A.    Absolutely.

Q.    Next element is that "the defendant knew or showed willful blindness that the actions of the power plant would infringe the asserted claim."

A.    Yes.

Q.    And did you walk through evidence that the jury can rely on for that element?

A.    Yes, I did.

Q.    And finally, Element 4 requires that "the defendants' actions actually caused the power plant to perform each and every step of the asserted claim."

       Did you walk through that in the claim charts?

A.    Yes, I did.

       MR. DYESS:  Objection, Your Honor.  There's no

foundation.

THE COURT:  I'm sorry.  The objection is a lack of foundation?

MR. DYESS:  Yes, Your Honor.  He didn't lay the foundation for the statement he just made.

THE COURT:  Mr. Nemunaitis, let's have you ask some additional questions of the witness to establish what's the foundation.

BY MR. NEMUNAITIS:

Q.      This requirement requires that "the defendants' actions actually caused the power plant to perform each and every step of the asserted claim"; is that right?

A.      Yes.

Q.      When the defendants provided their refined coal to the power plants, what options did the power plant have to do with the coal?

A.      They had no choice but to burn it.

Q.      Once they burn that refined coal, did they use activated carbon?

A.      Yes, to meet the MATS standards of 90 percent mercury removal from the emissions.

Q.      Did the -- because of that, did the defendants' actions actually cause the power plants to perform each and every step of the asserted claim?

MR. DYESS:  Same objection.

THE COURT:  I'll overrule the objection.

THE WITNESS:  They supply the refined coal to help the power plants infringe the patents.

MR. NEMUNAITIS:  Can I have slide 82, Mr. Diaz.

BY MR. NEMUNAITIS:

Q.    All right.  Mr. O'Keefe, we'll move on to the last topic for today.

A.    Sure.  I'd like to talk about additional information for damages.

Q.    Are you a damages expert?

A.    No, I'm not.

Q.    What are you going to talk about today?

A.    Just the engineering technical aspects of additional information for damages.

Q.    As to the first topic, did the defendants propose a hypothetical non-infringing alternative in this case?

A.    Yes.  They said the power plants could meet the MATS requirements for mercury removal by installing a selective catalytic reduction system -- that's SCR for short -- and that they wouldn't have to use refined coal or activated carbon injection.

Q.    And did you investigate how practical that would be?

A.    No, I did not.  But the Federal Environmental Protection Agency did an estimate of an SCR installation.

Q.    What was their conclusion?

A.      They said the installation cost would be $80 per kilowatt, which equates to about 40 million to $120 million to install.  So these are quite expensive pieces of equipment.

Q.      Can we move on to the next topic?

A.      Sure.

Q.      Were you asked to review some patents other than the ME2C patents at issue in this case?

A.      Yes.

Q.      And could you open your binder to Tabs 44 to 47.

A.      Okay.

Q.      Are those the patents that you were asked to review in connection with this case?

A.      Yes.

        MR. NEMUNAITIS:  Your Honor, Plaintiffs move to admit PTX 241, 242, 244, and 345.

        THE COURT:  Any objection?

        MR. DYESS:  No objection.

        THE COURT:  They're admitted.

        (Thereupon, Plaintiffs' Exhibit 241, 242, 244, and 345 were admitted.)

BY MR. NEMUNAITIS:

Q.      What field of technology do Exhibits 241, 242, 244, and 345 relate to?

A.      They're all related to mercury removal from power

plant emissions.

Q.    And the first one is PTX 241.  What does that patent talk about?

A.    It talks about using a bromine or iodine additive to the fuel and talks about injecting the additives to the coal and, unfortunately, has to be adjusted frequently.

Q.    What does PTX 242 talk about?

A.    Well, it talks about adding a nitrogen component to the fuel to reduce a lot of mercury, and this involves injecting the mercury compound into the flue gas downstream of the combustion chamber.

Q.    What does PTX 244 talk about?

A.    Pretty much the same thing, nitrogen compound injection.

Q.    What does PTX 345 talk about?

A.    Using calcium hypochlorite to form a lump at high-energy flue gas temperature.

Q.    Can we move on to the last topic here?

A.    Yes.

Q.    Now, today and yesterday, did you walk through your infringement analysis related to the CERT defendants?

A.    Yes, in this case.

Q.    Did you also investigate and prepare a report related to other refined coal suppliers?

A.    Yes, Alistar, Arthur J. Gallagher, and DTE.

Q.      Did all of the CERT, Alistar, Arthur J. Gallagher, and DTE refined coal suppliers provide refined PRB lignite?

A.      Yes.

Q.      Did they all spray calcium bromide on the coal?

A.      Yes.

Q.      And did they sell refined coal to power plants that use activated carbon?

A.      Yes.

Q.      And did you explain all that in your report?

A.      Yes, I did.

Q.      Is your understanding that report was provided to Alistar, Arthur J. Gallagher, and the DTE LLCs?

A.      Yes, it was.

MR. NEMUNAITIS:  Your Honor, Plaintiffs pass the witness.

THE COURT:  Okay.  Thank you, Mr. Nemunaitis.

THE WITNESS:  Your Honor, can we take a short break before that?

THE COURT:  The witness has asked for a short break before cross-examination.  It's early, but we'll take our morning break, and we will have the jury led out.

(The jury exited the courtroom.)

THE COURT:  It's 10:35 now.  Let's be in the courtroom at 10:50 to begin.  Thank you.

(A recess was taken, after which the following

proceedings were had:)

THE COURT:  We'll have the jury brought in.

(The jury entered the courtroom.)

THE COURT:  Mr. Dyess?

MR. DYESS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DYESS:

Q.    Good morning, Mr. O'Keefe.

A.    Good morning.

Q.    I was just talking to Justin, and it was almost a year ago to the date that we met you in Minnesota and took your deposition.  It's kind of funny how that works out.

I wanted to talk to you a few minutes about your credentials.  Now, for the last 20 years, you've worked as a professional expert witness; is that right?

A.    Correct.

Q.    Now, I want to talk to you about your work for Commonwealth Edison, if I could.  You worked for Commonwealth Edison Power Company, and you started in 1981, and that work ended in 1995; correct?

A.    Correct.

Q.    And you haven't worked at a power plant since you left Commonwealth Edison; correct?

A.    That's correct.

Q.    Now, Commonwealth Edison is the only power company

you worked for in your career; correct?

A.    That's not correct.

Q.    How is that not correct?

A.    I did put on a seminar for a power plant in Maryland.

Q.    Sure.  Let me clarify the question.

The only place you were employed to work for a power plant was with Commonwealth Edison; correct?

A.    Correct.

Q.    You never worked a coal-fired power plant except for your work with Commonwealth Edison from 1981 through 1995?

A.    Correct.

Q.    And the rest of your jobs, your actual full-time employment, has been outside the field of coal-fired power plants; correct?

A.    Correct.

Q.    Now, let's talk about your work at Commonwealth Edison from 1981 to 1995.

It is correct that no aspect of your work for Commonwealth Edison involved mercury emission control; correct?

A.    Correct.

Q.    And none of the power plants you worked for at Commonwealth Edison had any equipment for mercury emission control; correct?

A.    That's not correct.

Q.    How is that incorrect?

A.    Well, the plants I worked at had electrostatic precipitators, which can be used for mercury control.

Q.    Okay.  Do you remember when we took your deposition we were just talking about back in March last year?

A.    Yes.

Q.    Do you recall me asking you if any of the plants you worked at in your career with Commonwealth Edison had any mercury control systems?

A.    Yes.

Q.    And didn't you answer in that deposition that, no, they didn't have any mercury control systems?

A.    That's correct.

Q.    So your correct testimony is the one you gave back in March?

A.    Well, if we're talking about mercury control systems, no, they did not, but an electrostatic precipitator is part of a mercury control system, and they had that.

Q.    But you didn't say that back in March of last year.

A.    No.

Q.    Now, none of the power plants you worked at for Commonwealth Edison had any activated carbon injection systems, did they?

A.    That's correct.

Q.    Now, the U.S. government didn't start implementing

mercury control regulations until 2015; correct?

A.    2015/2016.

Q.    And that's the MATS rule we've been talking about?

A.    Correct.

Q.    Now, we just talked about Commonwealth Edison is the only power -- the only company you worked for where you worked at a power plant; right?

A.    Correct.

Q.    And you didn't have any management position at Commonwealth Edison, did you?

A.    Yes, I did.

Q.    What was that position?

A.    In the engineering and training department and also the engineering department.

Q.    Did any of those jobs include making financial decisions regarding the supply of coal to the power plant?

A.    Can you rephrase that again.

Q.    Sure.  Did any of those jobs you just described that you did have at Commonwealth Edison -- none of them involved you being involved in the contracts for the supply of coal at the power plant?

A.    Yes, I was involved.

Q.    How is that?

A.    I had to run tests on coal samples to make sure that they complied with what -- the contracts at the coal mines I

had with the company, with the plant.

Q.    I didn't mean to talk over you.  I apologize.

But none of that involved you negotiating the supply agreement for the coal; correct?

A.    Oh, no.  No.

Q.    Now, you never -- on behalf of Commonwealth Edison, you never negotiated any kind of indemnity agreement on behalf of Commonwealth Edison, did you?

A.    No.

Q.    Now, Mr. O'Keefe, we've talked a little bit about you giving reports in this case, and you recall doing that, don't you?

A.    Yes.

Q.    Do you recall when you gave your opening or your first report as an expert in this case?

A.    I don't remember the date.

Q.    If I told you it was October 22, 2022, would that sound right?

A.    That sounds about right.

Q.    You understood when you gave that report it had to include all of your opinions on infringement in this case, didn't it?

A.    I believe so.

Q.    And everything you relied on in coming to those conclusions or opinions had to be set out in that report.

You understood that; right?

A.    Yes.

Q.    Now, you would agree that on the date you gave that report in October of 2022, it contained all of your opinions on infringement in this case; correct?

A.    Well, I did a total of, I think, three reports.

Q.    I'm asking about your infringement.

A.    The first one?

Q.    Yes.

A.    Can you rephrase that question.

Q.    Sure.  On the date that you gave that opening report, that was your infringement report; correct?

A.    Yes.

Q.    You understood that that report had to include all of your opinions on infringement that you were going to give in this case; correct?

A.    Yes.

Q.    Now, you didn't start -- we're talking about your opening report.  That's what we're talking about, the one you signed on October 22nd.  I'm sorry.  I gave the wrong date.

      It's October 25, 2022.  Does that sound right?

A.    If you say so.

Q.    Do I need to show you the report?  You don't disagree with that?

A.    I really don't care.  I submitted a report.  That's all I remember.

Q.    Okay.

MR. DYESS:  Well, if you could, can we pull up Mr. O'Keefe's report, Plaintiffs' Exhibit 637, and go to the signature page.

BY MR. DYESS:

Q.    That's your opening report, isn't it?

A.    Yes.

Q.    And that's your signature?

A.    Sure.

MR. DYESS:  If you could expand the box a little bit.

BY MR. DYESS:

Q.    And that's October 25, 2022; correct?

A.    Correct.

Q.    So there's no question about that date?

A.    I guess not.

Q.    Okay.  You started your work on this case when you got hired by ME2C's lawyers; correct?

A.    Correct.

Q.    You wouldn't have known what to start your work on in this case before they hired you; right?

A.    No.

Q.    Okay.  And I think you testified -- well, when did --

you started your work on this case in the summer of 2022; correct?

A.    Correct.

Q.    Can you be more specific about when in the summer of 2022 you started that work?

A.    I don't remember.

Q.    Can you be more specific about when they hired you in this case?

A.    I don't remember.

Q.    Was it after the 4th of July in 2022?

A.    I honestly don't remember.

Q.    I want to make sure I understand.  You can't remember that from the summer of 2022, but you're calling on your experience from a power plant that ended in 1995?

A.    Yes.

Q.    Okay.  So you would agree with me that all of your knowledge you have about activated carbon injection systems has come after the summer of 2022; correct?

A.    Yes.

Q.    Okay.  Outside of the work you've done for this case, you don't have any -- you've never studied activated carbon injection systems at power plants; right?

A.    Right.

Q.    All of your understanding of activated carbon injection systems comes entirely from your work for the

plaintiff in this case?

A.    Correct.

Q.    And that's from the summer of 2022 up until October 25th of 2022; correct?

A.    Yes.

Q.    That's three months, four months?

A.    Okay.

Q.    You agree with that?

A.    Yes.

Q.    All of your understanding -- let me back up.

You would agree that all of your knowledge about mercury control systems at power plants has come since the summer of 2022; correct?

A.    Mercury -- I'm sorry.  Can you repeat that.

Q.    Sure.  You would agree with me that all of your knowledge about mercury control systems at power plants has come since the summer of 2022 when you got hired in this case?

A.    Yes.

Q.    Okay.  That's because all of your understanding of mercury control systems comes entirely as a result of your work with Plaintiffs in this case?

A.    Correct.

Q.    So all of that knowledge you have of mercury control systems, you learned in about four months?

A.    Yes.

Q.    All of what you learned about mercury control systems is self-taught; isn't that true?

A.    Well, I relied on the documentation in this case.

Q.    Was that documentation given to you?  Did you have to go find it?

A.    I think it was given to me, yes.

Q.    It was given to you by the plaintiffs' lawyers?

A.    Yes.

Q.    Now, you've never taught any seminars on mercury control; correct?

A.    Correct.

Q.    And you've never attended any conferences on mercury control; correct?

A.    Correct.

Q.    And you haven't visited any coal-fired -- well, again, let me back up on that question.

      You would agree you're entirely self-taught about mercury control systems?

A.    Yes, I think that's a fair assessment.  Yes.

Q.    Now, you didn't visit any coal-fired power plants in connection with your work in this case, did you?

A.    That's correct.

Q.    You never visited a coal-fired power plant with an activated carbon injection system, did you?

A.    No, I did not.

Q.    In the context of your work on this case, you never spoke with the employees of any power plants that were the subject of this lawsuit, did you?

A.    No.

Q.    You didn't visit any of the power plants that are subject to the infringement claims in this case, did you?

A.    No.

Q.    So I want to make sure I got that right.  You never talked with anyone or visited with anyone from the Rush Island power plant; correct?

A.    Correct.

Q.    You never talked with anyone or visited the Big Cajun II power plant?

A.    Correct.

Q.    You never talked with anyone or visited the Limestone power plant; correct?

A.    Correct.

Q.    You never talked with anyone or visited the W.A. Parish power plant?

A.    Correct.

Q.    You never talked with anyone or visited the Antelope Valley power plant?

A.    Correct.

Q.    You never talked with anyone or visited the Laramie

River power plant?

A.    Correct.

Q.    You never talked with anyone or visited the Labadie power plant?

A.    Correct.

Q.    And you never talked with anyone or visited the Coleto Creek power plant?

A.    That's correct.

Q.    You've never visited a refined coal facility, have you?

A.    No.

Q.    You've never visited a power plant that uses refined coal, have you?

A.    No, I have not.

Q.    And you've never observed a refined coal facility in operation providing refined coal to a power plant?

A.    No.

Q.    Now, you've given some opinions in this case about MATS compliance; isn't that right?

A.    Correct.

Q.    But you're not really an expert on MATS compliance, are you?

A.    I know as much as I need to render my opinions in this case.

Q.    Okay.  Now, power plants had to comply with MATS

starting in 2015.  That's your testimony; right?

A.    2015, 2016.

Q.    Right.  So by the time power plants had to comply with MATS, you'd been out of the power plant business for 20 years; is that correct?

A.    I think so, yes.

Q.    You don't have any professional experience working with power plants on MATS compliance, do you?

A.    No.

Q.    Outside of your work you've done in this case, you've never done any research or published anything on MATS compliance; correct?

A.    Correct.

Q.    And other than the work you've done for the plaintiffs in this case, you don't have any training or eduction on MATS compliance, do you?

A.    Correct.

Q.    Other than the work you've done on this case, you don't have any teaching experience on MATS compliance, do you?

A.    Correct.

Q.    Again, Mr. O'Keefe, you gave your opening report on October 25, 2022; correct?

A.    Correct.

Q.    And it had to contain all of your opinions on

infringement of these patents in that report; correct?

A.    Correct.

Q.    So you would agree that everything you've learned about MATS compliance, you've learned in the three to four months between the summer 2022 and October 25th, 2022?

A.    Yes.

Q.    Now, when you were talking with Mr. Nemunaitis, you gave several -- you walked through some evidence, and you gave opinions in this case.  I want to talk about a few of those with you if I could.

         MR. DYESS:  The first one I want you to go to is their slide 14.

BY MR. DYESS:

Q.    Now, I believe you testified this was an accurate representation of how the power plants work in connection with what the CERT companies did; correct?

A.    Correct.

Q.    Okay.  And what we've got here...

         Okay.  All right.  So right here, this is where the CERT companies apply the MerSorb and the S-Sorb; correct?

A.    Correct.

Q.    Over here is where you say the power plants are injecting the activated carbon; correct?

A.    Correct.

Q.    Now, over here, this is where the power plant either has a baghouse or ESP; correct?

A.    Correct.

Q.    Now, this is the flue gas; right?

A.    Right.

Q.    I mean, that's what's represented here?

A.    The products of combustion.

Q.    So in other words, this is where the coal treated with the bromine gets combusted; right?

A.    Correct.

Q.    And this is where the gas is that contains the mercury as a result of the combustion; correct?

A.    Correct.

Q.    Okay.  So in order to infringe the patent, this is where the sorbents have to be injected in order to infringe; correct?

A.    The activated carbon.

Q.    Just the activated carbon?

A.    Yes.

Q.    The S-Sorb isn't injected over here?

A.    Well, the S-Sorb is injected in the refined coal plant.

Q.    Right.  It's injected way back here?

A.    Yes.

Q.    Okay.  It's not injected here?

A.    Right.

Q.    It's not injected into this mercury-containing gas?

A.    No.

Q.    Now, this is the baghouse or ESP.  This is -- I think you testified that this is where the separation step occurs where the mercury is separated from the flue gas; correct?

A.    Correct.

Q.    Okay.  Now, the flue gas at a power plant, the ductwork for it, it can't bypass this EP -- I mean this baghouse, can it?

A.    No.

Q.    No matter what's going on, that flue gas has got to come through the baghouse?

A.    It sure does, yes.

Q.    And same thing for ESP.  If they're using ESP, that flue gas has got to come through that ESP; right?

A.    Right.

Q.    Otherwise, the power company would be dumping all kinds of stuff through this stack; right?

A.    Oh, yes.

Q.    Now, these ESPs, you worked on ESPs when you were at Com-Edison back in the '90s?

A.    Yes.

Q.    ESPs have been around a long time in power plants?

A.    Yes, since the 1920s.

Q.    All of the power plants that are accused of infringement in this case, they've had ESPs and baghouses for a while; right?

A.    Yes.

Q.    They weren't installed in connection with the use of refined coal, were they?

A.    No.

Q.    They weren't installed for the use of activated carbon, were they?

A.    No.

Q.    Okay.  There's nothing the CERT defendants did that talked power plants into using baghouses, was there?

A.    No.

Q.    There's nothing the CERT defendants did to talk power plants into using ESPs; correct?

A.    No.

Q.    The power plants had to use a baghouse or ESP regardless of whether they were burning refined coal or not; right?

A.    By "talk," what do you mean by that?

Q.    Sure.  Let me ask it this way:  Before power plants starting burning refined coal -- let's make it specific. For these eight power plants, before they were burning refined coal, they were using baghouses; right?

A.    Correct.

Q.    Before these power plants were using activated carbon, they were using ESPs; right?

A.    Yes.

Q.    So there's nothing these CERT defendants did that caused the power plants to use a baghouse?

A.    That's correct.

Q.    And there's nothing the CERT defendants did that caused the power plants to use ESP; right?

A.    Correct.

Q.    Mr. O'Keefe, I want to ask you a little bit about your testimony yesterday towards the end of the day.

        MR. DYESS:  If you go to Slide 18, Mr. Brown.

BY MR. DYESS:

Q.    When you were talking about this slide, you said: Who are the CERT investors, and I believe your -- you were asked that question, and your answer was:  They were the people who "upfronted" the money to build refined coal facilities where they assumed ownership, like a certain percentage, and they received the tax credits.

        Do you recall that testimony?

A.    Yes.

Q.    Now, you were talking about these investors up here; correct?

A.    JPMorgan, Kiewit, and Mylan.

Q.    What did you look at in this case that told you that

those investors "upfronted" the money that -- to build the refined coal facilities?

A.    I believe I was in error.  I'm not sure that they "upfronted" the money, but they certainly purchased refined coal -- CERT refined coal operations, to get the tax credits.

Q.    So when you gave that testimony, it just wasn't correct; right?

A.    Well, now that I think about it --

Q.    It wasn't correct, was it?

A.    I don't think it was.

Q.    We talked a little bit about this yesterday.  You were here for the video testimony of Mr. Whitney; correct?

A.    Yes.

Q.    Now, the power plants he was discussing, the Mid-American power plants, they're not connected with the CERT defendants at all, are they?

A.    Oh, no, they're not.

Q.    And have you seen any testimony in this case from any power plants that worked with the CERT companies?

A.    I'm sorry.  Can you say that again.

Q.    Sure.

       As a part of your work on this case, did you see any deposition testimony from any power plant operators that actually did work for the CERT companies?

A.      I can't recall.

Q.      You didn't review any testimony from the Intermountain Power Agency?

A.      I can't recall.

Q.      You didn't see any testimony from somebody from Virginia Power & Electric or the Chesterfield or Mount Storm power plants?

A.      I don't recall.

Q.      Okay.  For the other eight power plants, W.A. Parish, Limestone, those power plants, you didn't see any deposition testimony from those power plant operators, did you?

A.      I can't recall.  It was over a year since I wrote my reports.

Q.      Sitting here today, you don't recall seeing any testimony from the power plant operators that are actually involved in this case; right?

A.      I don't know.

Q.      Now, again, on Mr. Whitney's testimony, you heard that testimony; right?

A.      Yes.

Q.      Mr. Whitney said he could go to the plant historian to get information on exactly when a power plant's activated carbon systems were in use.

        You heard that; correct?

A.      Yes.

Q.    Every power plant has a plant historian; correct?

A.    It's a data logger.  It tells when one piece of equipment is energized or de-energized.

Q.    I can't hear you.

A.    It's a data logger.  It logs data of what equipment was energized or de-energized.

Q.    And that includes activated carbon injection systems; right?

A.    I would assume so, yes.

Q.    Well, that's what Mr. Whitney said; right?

A.    Yes.

Q.    And you didn't get any information on the power plants at issue in the case from the plant historians at each one of those plants, did you?

A.    No.

Q.    Did you ask for that information?

A.    I didn't need to.

Q.    Why didn't you need to?

A.    Because the information was in the operating permit, it was in an e-mail, a lot of different things it was in.

Q.    Now, Mr. Whitney testified yesterday, didn't he, that activated carbon injection systems aren't working 24/7 every day of the week, every day of the year; correct?

A.    Correct.

Q.    So it's not true that these plants operate

continuously; is it?

A.      They have to maintain and clean the activated carbon system, and he said that it can take up to a few hours.

Q.      I think he said he guessed it could take up to a few hours; right?

A.      Yeah.

Q.      He didn't actually know, did he?

A.      I don't know what he knew or didn't know.

Q.      He didn't say he actually knew.

A.      All I can go by is what he said.

Q.      But you agree that power -- that activated carbon injection systems aren't working a hundred percent of the time?

A.      Well, nothing works a hundred percent of the time. Even generating units and power plants themselves come offline.  They spring leaks, equipment fails, and they come offline.  When they're offline, they don't need any activated carbon to comply with MATS.  They don't have to comply with MATS when they're not generating electricity or emitting mercury.

Q.      But it's not in your opinion testimony in this case that when power plants are burning refined coal, the activated carbon injection systems are working all the time; correct?

A.      Most of the time to comply with MATS, and I think

that's what Mr. Whitney was trying to say.

Q.    Right, but most of the time is not all the time; right?

A.    A good percentage of time.

Q.    But most of the time is not all the time, is it, Mr. O'Keefe?

A.    As required to comply with MATS emission standards. So Mr. Whitney said that in the video.

Q.    It doesn't work all the time?

A.    It has to come down for maintenance.

Q.    The activated carbon injection system?

A.    And cleanings, yes.

Q.    But the power plants are still burning coal while that's happening with the activated coal injection system; right?

A.    That could be.

Q.    But you didn't get any records from any of these power plants, from the plant historians, about when activated carbon injection systems might not have been in use when the power plant was burning coal?

A.    I didn't have to.

Q.    But you didn't, did you?

A.    No.

Q.    You used a couple of terms here, and I just wanted to make sure I understood.  We were talking about upstream of

the combustion chamber and downstream of the combustion chamber.

"Upstream" means, when you're talking about in this case, "upstream" means before the coal goes into the combustion chamber; right?

A.    Correct.

Q.    "Downstream from the combustion chamber" means when the gas is leaving the combustion chamber headed towards the baghouse or ESP; right?

A.    Right.

Q.    Mr. O'Keefe, I wanted to ask you just a minute, if I could, about some of the plaintiffs' exhibits you looked through, and this is going to get a little complicated.  I think the ones I want to talk to you about are the refined coal sales agreements.  They're in Volume 2 of your report.

They're on the floor, and I apologize.  It's just crowded over there.  Can I help you get those?  Can you get those?

THE COURT:  Mr. Dyess, you're welcome to assist the witness.  You may approach.

BY MR. DYESS:

Q.    I believe the first one that was admitted into the record is behind Tab 28.  Can you go to Tab 28?

A.    Okay.

Q.    You said you studied each one of these refined coal

sales agreements; correct?

A.    Yes.

Q.    Now, the refined coal sales agreement between Tab 28, that's the refined coal sales agreement between Marquis Industrial and Basin Electric; correct?

A.    Yes.

Q.    Now, the date on this contract is February 13, 2013; correct?

It's on about the fifth page.  It's the first numbered page of the document.

A.    I'm sorry.  Which page?

MR. DYESS:  May I assist the witness?

THE COURT:  You may.

BY MR. DYESS:

Q.    If you could give me date of that agreement, Mr. O'Keefe.

A.    It's February 23, 2013.

Q.    All right.  So the next one behind Tab 29, that's one of the refined coal sales agreements you looked at; correct?

A.    Correct.

Q.    And this is the one for Springhill Resources and I think it's Big Cajun II; is that right?

A.    Correct.

Q.    Now, looking at the same place in that contract, can you tell me what the date of this refined coal sales

agreement is?

A.    September 21, 2011.

Q.    The next one is behind Tab 30, and that's the refined coal sales agreement between Buffington Partners for the Rush Island plant; correct?

A.    Yes.

Q.    If you could tell me what the date of this agreement is.

A.    November 4, 2011.

Q.    Okay.  So the next one is behind Tab 31.  That's for the Senescence refined coal plant that was at W.A. Parish; correct?

A.    Yes.

Q.    And what's the date on that one?

A.    December 20, 2013.

Q.    Okay.  The next one is behind Tab 32.  That's the refined coal sales agreement for Bascobert at the Coleto Creek power station; correct?

A.    Correct.

Q.    And the date on this one is May 10, 2019; correct?

A.    Correct.

Q.    And I apologize.  I know this is slow to go through, but this is important to look at.

        The next one is behind Tab 33.  And that's the refined coal agreement between Rutledge for the Limestone

power plant; correct?

A.    Correct.

Q.    And the date on that contract is September 20, 2013?

A.    Correct.

Q.    I think we've got two more of these.  If you would look behind Tab 34.

A.    Okay.

Q.    And that's the refined coal sales agreement between Larkwood Energy for the Labadie power plant; correct?

A.    Correct.

Q.    And the date on this one is March 11, 2014; correct?

A.    Correct.

Q.    And I believe this is the last one.  This is for the refined coal sales agreement, another one, for Cottbus Associates for the Laramie River station; correct?

A.    Correct.

Q.    And this one is dated December 20, 2013; correct?

A.    Correct.

Q.    Did you look at any refined coal sales agreement that was dated after July 2019 in this case?

A.    I can't remember.

Q.    Okay.  Now, Mr. O'Keefe, we can put that notebook aside.  I'm sorry.

        MR. DYESS:  May I approach, Your Honor?

        THE COURT:  You may approach.

BY MR. DYESS:

Q.    I'm handing you back Volume 3.

A.    Okay.

Q.    Now, this also has exhibits that were moved to be admitted when Plaintiff was taking you through their case; correct?

A.    Okay.  Yeah.

Q.    You agree with me?

A.    I think so, yes.

Q.    Let's look behind these tabs.  Tab 36, that's one of the Sargent & Lundy reports; correct?

A.    Correct.

Q.    Now, it's dated December 2018; is that correct?

A.    Yes.

Q.    The next one behind Tab 37 -- I'm sorry.  The one behind Tab 39, Plaintiffs' Exhibit 545.

A.    Well, I hate to say it but --

Q.    I think it's on the floor right next to you.  It looks like one was pulled out.

        THE COURT:  You may approach, Mr. Dyess.

BY MR. DYESS:

Q.    Is that Exhibit 545, Plaintiffs' Exhibit 545?

A.    Yes.

Q.    I'm sorry.  I took one of your tabs.

        That Sargent & Lundy report is dated

December 2018 as well; correct?

A.    545?

Q.    Yes, the one I just handed you.

A.    December 2018.

Q.    Right.  If you would turn to Tab 41.

A.    Okay.

Q.    That's Plaintiffs' Exhibit 69; correct?

A.    Yes.

Q.    You testified about that; correct?

A.    Yes.

Q.    And that report is also dated December 2018?

A.    Correct.

Q.    Couple more of these I want to go through with you, Mr. O'Keefe, if you could turn back to Tab 38.

A.    Which exhibit is it?

Q.    It's Plaintiffs' Exhibit 232.  It's not a Sargent & Lundy report.

A.    I don't see anything that has that.  You said 38?

Q.    It's behind Tab 38 in the notebook I was given.

A.    Some of the pages have been out of sequence.  I go to Tab 38, and I don't have anything in there.

         MR. DYESS:  Can I approach, Your Honor?

         THE COURT:  You may approach.

BY MR. DYESS:

Q.    This is that Exhibit 232; correct?

A.    Yes.

Q.    What's the date of that e-mail?

A.    May 19, 2015.

Q.    2015.  Do you have Tab 42 in that notebook in front of you?

A.    Yes.

Q.    And that's Plaintiffs' Exhibit 693; correct?

A.    Correct.

Q.    That's one of the exhibits you testified about earlier today; correct?

A.    Yes.

Q.    And the date on that exhibit is March 10, 2015; correct?

A.    Correct.

Q.    Now, if you could turn to the next tab, Tab 43.

A.    Okay.

Q.    And this is Plaintiffs' Exhibit 215?

A.    Correct.

Q.    Now, that e-mail is dated December 7, 2018; correct?

A.    Correct.

Q.    Do you know who Cris Crissy is, the person who that e-mail was addressed to?

A.    No.

Q.    Does he work at a power plant?

A.    It appears that he works for JPMorgan.

Q.    Do you have any indication in this e-mail at all that this information was sent to a power plant?

A.    I really don't know for sure.

Q.    Mr. O'Keefe, you had to familiarize yourself with the patents that the plaintiffs claim my clients infringed; correct?

A.    Correct.

Q.    The '114 patent is one of them; correct?

A.    Correct.

Q.    And that patent issued on July 9, 2019; correct?

A.    Correct.

Q.    You're being put forward by the plaintiffs as an expert on patent infringement; that's correct?

A.    Correct.

Q.    It's your understanding, isn't it, that a patent can't be infringed until it's issued; isn't that correct?

A.    That's right.

Q.    So the '114 patent couldn't have been infringed prior to July 9, 2019; isn't that correct?

A.    Correct.

Q.    Mr. O'Keefe, you talked about four patents that I believe you gave the opinion were comparable to the plaintiffs' patent in this case.

       Do you remember that testimony just now?

A.    No, they're not comparable.  They're in the same --

they achieve the same result.

Q.    It's not your opinion those are technically comparable patents?

A.    No, they're not.

Q.    They aren't in one way, that none of them talk about the removal of nitrous oxide, do they, none of the patents?

A.    I don't believe any of them do.

Q.    And none of the patents talk about the removal of sulfur dioxide, do they?

A.    No, I don't believe so.

Q.    Mr. O'Keefe, you talked with the plaintiffs' damages expert, Mr. Philip Green, in this case, didn't you?

A.    If I did, I can't recall what was said.  It was a long time ago.  It was about a year ago.

Q.    It was about a year ago?

A.    Maybe a little over a year ago.

Q.    But you do recall talking to him?

A.    Yeah, I talked to him.

Q.    Sure.  And you can't remember that conversation?

A.    No.

Q.    But your testimony is drawing on what you remember from experience at power plants 20 years ago?

A.    Yeah.

Q.    You didn't give Mr. Philip Green -- you didn't provide him any information that the ME2C patents result in

any reduction in nitrous oxide, did you?

A.      No.

Q.      You didn't give Mr. Green your opinion that the ME2C patents resulted in any reduction of sulfur dioxide, did you?

A.      I can't remember.

Q.      Sitting here today, did you give Mr. Green the opinion that the ME2C patents reduced sulfur dioxide?

A.      I can't remember what we talked about.

MR. DYESS:  If you could pull up Plaintiffs' or have Plaintiffs' Exhibit 637.

BY MR. DYESS:

Q.      And you -- when you were talking to Mr. Nemunaitis, you gave some opinions on Schwartz about contributory infringement and induced infringement; correct?

A.      You mean in this trial?  Yes.

Q.      In this trial.

A.      Yes.

Q.      I want to talk about the contributory infringement piece of this case.

A.      Okay.

Q.      Based on the reports you gave in this case, isn't it correct that the products you were accusing the defendants of selling for the purposes of contributory infringement is refined coal made with calcium bromide?

A.    Calcium bromide and alkaline compound.

MR. DYESS:  If you could, Mr. Brown, go to page 137 and pull up paragraph 110 of his report.

BY MR. DYESS:

Q.    This is the contributory infringement section of your report; correct?

A.    I believe so.

MR. DYESS:  If you could highlight, also, paragraph 111, Mr. Brown.

BY MR. DYESS:

Q.    You say right here in paragraph 11, "Each of the RC LLC defendants --" you're talking about my clients; correct?

A.    Yes.

Q.    "-- sold refined coal with added calcium bromide within the United States to the power plant."  Correct?

A.    Correct.

Q.    This coal with added bromide is a component of ME2C's patented methods; correct?

A.    Yes.

Q.    That's what you said in your report?

A.    Yes.

Q.    You looked earlier with Mr. Nemunaitis about the patent claims at issue in this case.  None of those patents included what we call a limitation as to the rank of the

coal, did it?

A.    I don't believe so.

Q.    The rank of the coal, that's the lignite,
sub-bituminous; correct?

A.    Correct.

Q.    And you'd agree the location where the supplier of
the coal transfers the coal to the power plant is not in any
of the limitations; correct?

A.    You mean after the refined coal?

Q.    No.  Let me repeat.

      You would agree that the location where the
refined coal supplier transfers the coal to the power plant,
that's not a limitation in any of the claims, is it?

A.    No, as long as the refined coal is burned in the
combustion chamber.

Q.    But the location of where that supply leaves the
refined coal facility isn't a part of any claim; correct?

A.    No.

Q.    Now, Mr. O'Keefe, as a part of your work on this
case, you studied how the refined coal companies qualify
their coal for the tax credit; correct?

A.    Correct.

Q.    That work's done at the EERC; correct?

A.    Right.

Q.    And you heard Mr. Pavlish's testimony.  He used to

work at the EERC; correct?

A.    Correct.

Q.    And this testing -- this refined coal certification testing is done on what's called a pilots -- pilot scale combustion facility at the EERC?

A.    Right.

Q.    And you've educated yourself about how each one of the CERT companies qualified the refined coal at the EERC; isn't that true?

A.    Right.  I think they had to test twice a year.

Q.    Right.  Every six months?

A.    Yes.

Q.    And every six months, what the EERC had to do was they had to -- the power -- my defendants would send them a sample of the feedstock -- feedstock coal from the power plants; right?

A.    Well, they would send us -- actually, I don't know who would send the sample, but the sample was taken on the coal pile, so it was not refined in any way.

Q.    Right.  It was just a sample of the coal from that coal yard?

A.    Right.  It was, like, 400 pounds of coal off the coal pile.

Q.    The EERC would take that 400 pounds of coal and then split it into two piles; right?

A.    I'm not really sure about that.

Q.    Well, let me ask it this way.  I'm not trying to be cute.

What the EERC did is it tested some of that refined -- some of that feedstock coal that hadn't been treated with any chemicals first; right?

A.    I can't remember.

Q.    Okay.  Let me just really cut to the chase.  You would agree with me that none of the EERC qualification testing was done using activated carbon; correct?

A.    Yes.

Q.    You agree with me?

A.    Some of it was, that I know of.

Q.    What did you look at that tells you some of the refined coal was tested at the EERC using activated carbon?

A.    I can't recall.

Q.    Is it that one of the opinions you give in this case is knowledgeable about the infringement that you accuse my clients of -- is it one of their documents that you saw that said EERC testing is done using activated carbon?

A.    I can't recall.

Q.    Was the basis of the EERC testing to qualify refined coal for Section 45 tax credits part of the opinions you gave in this case?

A.    Well, getting the Section 45 tax credits does not

require the use of activated carbon.

Q.    Right.  But did you ever see any evidence that the EERC actually used activated carbon when it was testing my clients' refined coal for qualification?

A.    I don't think they did, no.

Q.    Okay.  Now, it's your understanding, isn't it, Mr. O'Keefe, from the report and the opinions you gave in this case that when the EERC performs this qualification testing, it sends a report to each one of my clients when it certifies their coal; right?

A.    I believe so.

Q.    And it has to do that every six months; right?

A.    Right.

Q.    And in that report, it's your understanding, correct, that the EERC provides the formula for MerSorb and S-Sorb that the refined coal facility can use, and if they put that on the coal, it would qualify for the Section 45 tax credits; correct?

A.    I'm not really sure.  I know that the percentages of MerSorb and S-Sorb are considered in the testing, but I don't think they tell how much of a percentage of refined coal suppliers are spraying on the coal.

Q.    That wasn't my question.  My question was:  These reports tell the EERC what the percentages of MerSorb and S-Sorb that would apply to qualify for the tax credits;

correct?

A.      I'm not sure.  I don't recall.

MR. DYESS:  If you could put up the plaintiffs' presentation of Mr. O'Keefe and go to slide 30.

BY MR. DYESS:

Q.      Now, this is from the presentation that was given just a minute ago; correct?

A.      I believe so.

Q.      Now, it's based on the defendants' exhibit, Defendants' Exhibit 1968; correct?

A.      Looking at it, I -- I can't really remember.

Q.      Do you remember looking at this Defendants' exhibit? It's pretty distinctive.  It's got these green columns in it.

Do you remember looking at this exhibit when you were preparing the opinions you've given here today?

A.      I might have, yes.

Q.      Do you recall what you looked at from that exhibit?

A.      I don't recall specifically.

Q.      You don't recall what you looked at in this exhibit?

A.      Well, to begin with -- no, I -- honestly, I don't recall.

Q.      Okay.

A.      Can you ask a further question, please.

Q.      Sure.  Let me just kind of cut to the chase.

MR. NEMUNAITIS:  Your Honor, may we approach?

THE COURT:  Okay.  We'll have a sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  Okay.  Mr. Nemunaitis?

MR. NEMUNAITIS:  We had prepared that slide but didn't present it in his direct.  I think that's where the confusion is here.  I don't think it would be appropriate to question him on a slide we didn't show in his direct.

MR. DYESS:  I'll withdraw the question.

THE COURT:  Okay.

(The discussion at sidebar ended.)

THE COURT:  Defendant has withdrawn the question.

I'll turn it to you to ask the next question.

BY MR. DYESS:

Q.    Mr. O'Keefe, were you aware of any instance where one of the defendants in this case changed either the MerSorb additive rate or the S-Sorb additive rate because a power plant asked them to do so?

A.    I don't recall any specifics.

Q.    Do you recall looking at that -- is that evidence part of any of the opinions you've given in this case at trial today?

A.    Well, I think I discussed about some of the incentives.  You know, they worked with the power plants to

optimize MerSorb injection with respect to activated carbon injection to optimize, you know, the amount of MerSorb applied to the amount of ACI to optimize mercury capture from the emissions to meet the MATS standard.

Q.    And what was that evidence?  Was that the Sargent & Lundy report?

A.    Well, I think I had a slide.  I can't remember offhand.

MR. DYESS:  Could you put up Plaintiffs' slide?

BY MR. DYESS:

Q.    Is this the slide you're talking about?

A.    No.

MR. DYESS:  Could you put up Slide 62?

BY MR. DYESS:

Q.    Is this the slide you're talking about?

A.    No, it's not the S & L report.

Q.    And I'm asking.  Can you give me some description which slide?

A.    It was the one I was talking about contributory and induced infringement.

MR. DYESS:  Your Honor, can I approach the witness?

THE COURT:  You may approach.

BY MR. DYESS:

Q.    Can you identify which slide you're referring to?

And I'm not trying to suggest that's the one.

A.    It started here where I was talking about induced infringement.

Q.    You're going to need to speak up for the court reporter.

A.    It was PDX -- starting with PDX 4.75 where I was talking about induced infringement.

Q.    Thank you, Mr. O'Keefe.

        MR. DYESS:  If you could go to that slide, Mr. Brown.  It's number 75.

BY MR. DYESS:

Q.    Is that -- with regard to one of the e-mails depicted on Slide 75, is that what you're referring to?  I know it's really small.

        MR. DYESS:  Can you blow that up?  I don't know that it will actually show.

BY MR. DYESS:

Q.    That wasn't very helpful, was it?

A.    Well, those are way too small.  It's the second bullet point optimizing Br rates and ACI rates.

        MR. DYESS:  Could you go to Slide 79, please.

BY MR. DYESS:

Q.    Is this the one you're talking about?

A.    No, no.  Go back.

Q.    Sure.

MR. DYESS:  Go back to 75, please.

THE WITNESS:  You see the second bullet point on the left?

BY MR. DYESS:

Q.    Right.

A.    Optimizing Br rates and ACI rates.  What I said was the refined coal defendants worked with the power plants so that they could set the Br, the bromine rates, the MerSorb rates, and the ACI rates so that they still met the MATS standards of 90 percent mercury removal but they didn't have to use any more activated carbon injection than necessary.

Q.    And you referenced some documents there, and that's what I'm trying to get to.  Which of the plaintiffs' documents are you referring to?

A.    I can't recall offhand.

Q.    But you said it wasn't the Sargent & Lundy report?

A.    It wasn't, no.

Q.    And I apologize for the time it's taking to flip through these slides, Mr. O'Keefe.

MR. DYESS:  If you could go to Slide 64.

BY MR. DYESS:

Q.    Is this the one we're talking about?

A.    Yes, I believe it is.  Yes, it's an e-mail from Barr Linton.

Q.    And this is one of the e-mails we looked at a minute

ago, Exhibit 232; correct?

A.     Yes.

Q.     And this e-mail is dated May 19, 2015; correct?

A.     Yes.

Q.     And that's the only evidence you discussed today where it's your testimony that the refined coal facilities optimized refined coal percentages to work with activated carbon; correct?

A.     Correct, yes.

Q.     And you're not relying on any other document for that testimony; correct?

A.     No.

Q.     I'm going to do something that's probably a little unusual here.  I want to talk about some things I think we can actually agree on.  You agree that if a power plant is burning refined coal but is not burning activated carbon, that power plant isn't infringing any of the claims of this patent; isn't that correct?

A.     That's correct.

Q.     A power plant has to have specialized equipment installed to inject activated carbon; correct?

A.     Yes.

Q.     And if a power plant doesn't have that specialized equipment installed, it can't burn -- it can't spray activated carbon, and it can't infringe the patents;

correct?

A.    Correct.

Q.    Now, you didn't do any research in this case to determine when any of the subject power plants installed activated carbon injection systems; correct?

A.    Correct.

Q.    As a matter of fact, when we took your deposition in this case, it was your understanding as the plaintiffs' expert witness on power plant operations that activated carbon injection systems were installed at the same time that a power plant had a refined coal facility installed; correct?

A.    I'm sorry.  Can you ask that again.

Q.    Sure.

       You're the plaintiffs' expert on power plant operations; right?

A.    Right.

Q.    And it was your -- when we took your testimony in this case at your deposition, it was your understanding at that time that activated carbon injection systems were installed at the same time that a power plant had a refined coal facility system installed; isn't that right?

A.    Well, they were installed when the refined coal plant was there, yes.

Q.    That wasn't my question.

A.      They had to meet the MATS standards for 90 percent mercury removal, so they used refined coal as part of the equation.

Q.      Do you recall me asking you questions at your deposition about your understanding of when activated carbon injection systems were installed?

A.      No, I don't remember.  It was a year ago.

Q.      Do you recall that you testified that activated carbon injection systems were installed in conjunction with a refined coal facility?

A.      I don't remember.

Q.      Do you recall an answer to my question that you testified that at the same time a power plant had a refined coal facility installed, it had an activated carbon injection system installed?

A.      I'm sorry.  Can you ask it again.

Q.      Sure.

        Do you recall that you gave testimony that at the same time a power plant had a refined coal facility installed, it had an activated carbon injection system installed?  Do you recall that testimony?

A.      No.

Q.      Okay.  Mr. O'Keefe, you should have in front of you a couple of spiral binders, and two of them are your depositions in this case.

MR. DYESS:  I may have to assist the witness on this one, Your Honor.

THE COURT:  You may assist the witness.

BY MR. DYESS:

Q.    Mr. O'Keefe, I'm handing you Volume 2 of your deposition transcript.  And it's Volume 2 because that deposition was two days; right?

A.    Yeah.

Q.    I want you to turn with me, if you could, to page 349 of that deposition.

A.    Okay.

Q.    And start at line 11.  I want you to read with me if you could.

A.    Okay.

Q.    "Have you done any work in this case to determine when an activated carbon injection system was installed at any power plant that's the subject of this case?

"Answer:  When it was installed?

"Question:  Yes.

"Answer:  It was installed in conjunction with the refined coal facility."

Did I read that correctly?

A.    Yes.

Q.    Okay.  And then it goes on.

"Question: Let me unpack that statement.  Are

you saying at the same time that a power plant had a refined coal facility installed, it had an activated carbon injection system installed?

"Answer:  That's my understanding."

That was your testimony?

A.    That's what it says.

Q.    And it was your testimony in that same deposition that there were no power plants that were the subject of this case that used refined coal before the power plant installed an activated carbon injection system.

That was your testimony; correct?

A.    I'm sorry.  My blood sugar is getting a little low. It's close to lunchtime.  I must ask you to repeat the question.

MR. DYESS:  Your Honor, he's requesting a break for lunch.  I don't have a problem breaking here and coming back.

THE COURT:  The time that we normally take --

Mr. O'Keefe, can you continue for a short, additional period of time?

THE WITNESS:  If he repeats the question.

THE COURT:  Let's just try to get more testimony in.  I understand at some point, if it's difficult, we'll consider breaking.

MR. DYESS:  Sure.

BY MR. DYESS:

Q.    And it was your understanding -- you gave your opinions that were in that initial report when you gave your deposition testimony in this case that there were no power plants that are the subject of this case that had -- that used refined coal before the power plant installed an activated carbon injection system; isn't that right?

A.    I don't think so.  That wasn't my intent.

Q.    Sure.  You've still got Volume 2 of your deposition in front of you?

A.    Yes.

Q.    If you could turn to page 50 and go to line 9.  Are you there?

A.    Yes.

Q.    Okay.  So if you could read from line 9 to line 13.

A.    Do you want me to read it?

Q.    Yes.

A.    "Okay.  So it's your understanding that there are no power plants that are the subject of this case that used act -- that used refined coal before it installed an activated carbon injection system?

       "Answer:  I don't think so, no."

       Do you want me to read further?

Q.    I don't.

       If you could -- well, let me ask you this,

Mr. O'Keefe:  It's part of your opinions in this case that in order for a company to induce infringement -- induced infringement is what we're talking about here -- that the company, the infringer, has to take action during the time the patent was in force that intended to cause and led to infringing acts by someone else.

That sounds familiar to you; right?

A.    Yes.

Q.    That's your opinion; correct?

A.    Yes.

Q.    Okay.  And by "in force," that's what we talked about earlier.  That's while the patent has been issued; correct?

A.    Correct.

Q.    So it can't be an action that took place before the patent issued; right?

A.    Right.

Q.    The only actual inducing act that occurred, in your opinion, after July 9, 2019, is power plant -- is my client selling refined coal to power plants; isn't that right?

A.    For the '114 patent, yes.

Q.    And let me make sure.  I want to make sure what you said, I understand what you said.

The only inducing act that took place after the '114 patent issued on July 9, 2019, is my clients selling refined coal to the power plants?

A.    Yes.

Q.    Now, Mr. O'Keefe, my clients don't use activated carbon at the power plants; right?

A.    Currently?

Q.    Let me back up.  That's a fine point.  Thank you for that.

At no time have my clients ever used activated carbon at a power plant; correct?

A.    Correct.

Q.    The power plants do that?

A.    Right.

Q.    And the power plants do that because they have to comply with MATS; correct?

A.    Correct.

Q.    And somebody else is selling that activated carbon to the power plants; correct?

A.    I believe so, yes.

Q.    And the only reason you're aware of that power plants use activated carbon is so they have to comply with MATS; correct?

A.    Yes.

Q.    The only reason that the power plants that are accused in this case installed activated carbon injection systems is so they could comply with MATS; correct?

A.    Correct.

Q.      And the only reason they continued to use those activated carbon injection systems in 2019, 2020, and 2021 is because they still had to comply with MATS; correct?

A.      Correct.

Q.      And that's the only reason; correct?

A.      It's true, yes.

MR. DYESS:  Your Honor, I offer again it's a good break point.  I don't know if you want to stop.

THE COURT:  Give me an idea.

MR. DYESS:  Probably about 15 to 20 minutes.

THE COURT:  I was hoping to break at 12:30.  You can finish your cross and break for lunch.

BY MR. DYESS:

Q.      Now, Mr. O'Keefe, we were talking a few minutes ago about when power plants installed activated carbon systems versus when power plants were using refined coal.

Do you remember that testimony?

A.      Yes.

Q.      Okay.  It's correct, isn't it, that most of the power plants that are at issue in this case actually were using refined coal for years before they used activated carbon; correct?

A.      Yes, to get Title 45 tax credits.

Q.      And they -- that use occurred for several years at these power plants before the activated carbon injection

system was installed; correct?

A.    I think the Title 45 credits became available in 2011, and the MATS standards were implemented in 2015, 2016.

Q.    You actually agree that when power plants were burning refined coal without activated -- let me back up.

You agree that the power plants in this case, when they were burning refined coal before they used activated carbon, those were non-infringing uses of that refined coal; correct?

A.    Yes, correct.

Q.    And you actually agreed that because there were a number of plants that used activated carbon -- used refined coal before they used activated carbon, it was your opinion that that would be a substantial non-infringing use of refined coal; correct?

A.    Well, they didn't infringe the patents-in-suit.

Q.    Right.  And therefore, that use of refined coal without activated carbon was a substantial non-infringing use.  You gave that opinion?

MR. NEMUNAITIS:  Objection, Your Honor.  May we approach?

THE COURT:  I'll see counsel at sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  All right, Mr. Nemunaitis, you have an objection.

MR. NEMUNAITIS:  The objection is that he just asked him to opine that sales of the non-accused refined coal would constitute a substantial non-infringing use.  We agree that's wrong on the law and extremely prejudicial to elicit testimony mis-educating the jury.  I think it would be extremely prejudicial to have him go down this line of questioning based on an erroneous understanding of the law in front of jury.

THE COURT:  Just to be precise, Mr. Nemunaitis, you're saying he was asking Mr. O'Keefe about power plants' actions of burning refined coal without the use of activated carbon before the time period at issue relating to our patents-in-suit, and asking questions or saying about whether that kind of conduct would amount to a substantial non-infringing use, and your position is, your argument is, the elements of contributory infringement with regard to what can constitute a substantial non-infringing use are going to be solely focused on the coal produced after 2019.

Is that the gist.

MR. NEMUNAITIS:  Correct, Your Honor.

THE COURT:  So the questions you're arguing are improper because they're suggesting an inaccurate statement of the law?

MR. NEMUNAITIS:  Yes, Your Honor.  And we said they could get into this issue as their clients' objective

intent, but that absolutely cannot be the case with Mr. O'Keefe on the stand.

THE COURT:  Mr. Dyess, what's your response to that?

MR. DYESS:  Your Honor, the exact wording -- going to start where they ended.  You have said we are allowed to put on our clients' state of mind.  They have a substantive good faith belief in this error of the law.  I'm not asking Mr. O'Keefe whether that's his opinion now.  His testimony in his deposition is that is his opinion, and if their expert is giving that opinion, that validates the good faith belief of my clients.

THE COURT:  I think just to be clear, though, I think the objection is that it's asserted that your questions were along the lines of wouldn't you agree, Mr. O'Keefe, that if a power plant burned refined coal without using activated carbon before 2019 that that amounts to a substantial non-infringing use.  I guess if that's the substance of the question and the gist of it what he is saying, I clearly ruled that with regard to what is a substantial non-infringing use separate and apart from what your client may have known or thought or believed that would be irrelevant.  Are you saying you weren't asking that kind of question?

MR. DYESS:  I was asking if he gave that

opinion, and he did, and I'm merely saying if this jury has the good faith or subjective belief of my clients, they have to say is that really truthful, would anybody hold that opinion.  Their expert held that opinion.

THE COURT:  You're saying that the first that Mr. O'Keefe opined to in the case, that it was his view that prior to 2019 if a power plant burned refined coal without activated carbon that would amount to a substantial non-infringing use, and you're using Mr. O'Keefe's view to speak to the reasonableness of your client's assertedly mistaken view about that.  Is that what you're saying?

MR. DYESS:  If they're going -- and we believe they are going to question the good faith or reasonableness of that belief.  The jury needs the context of what others would have that good faith and reasonable belief, and I can show you his testimony.  I can show you the question that I'm trying to ask him about.

THE COURT:  Let me see.  I think part of the basis is it hinges on your assertion that Mr. O'Keefe testified that he believed at one point in something that's a mistaken view of the law.

MR. DYESS:  Correct.  It's this block right here, Your Honor.  That's his actual testimony.

THE COURT:  So just for the record, I'm reading -- this is page 363 of Mr. O'Keefe's deposition

testimony.  The question is:

"QUESTION:  If there are other plants that burned refined coal before they installed an activated carbon system, would you agree that those would also be non-infringing uses of refined coal?"

Mr. Dyess, that question is not about substantial non-infringing use.  It's about whether the use of refined coal with activated carbon amounts to infringement, or at least just on its face, that question appears to be.

MR. DYESS:  It's the second question that follows, Your Honor.

THE COURT:  Next question -- Mr. O'Keefe replied "yes" to that.  Next question:

"For those plants that used refined coal before they installed activated carbon, would you agree that those would be substantial non-infringing uses of coal?

"ANSWER:  Yes."

That's the question?

MR. DYESS:  Yes, Your Honor.

THE COURT:  Mr. Nemunaitis, if it's the case -- now, maybe Mr. O'Keefe misspoke or something.  We can clean up if you think it's true on redirect, but if at some point, he did believe or thought that the answer to this question was yes, why.  Wouldn't that speak to what a reasonable

person might think?

MR. NEMUNAITIS:  This line of questioning, they're doing the same thing they've done at trial, talking about hundreds of thousands of pounds of burned coal.  They burn, I believe a hundred million tons of coal.  He wasn't opining on the --

THE COURT:  Counsel, I think before when we have sidebar -- well, we'd expect -- okay.  We'll expect that to be the case.  Okay.

All right.  I'm sorry, Mr. Nemunaitis.  Do you want to finish your point on this?

MR. NEMUNAITIS:  All he was saying is there's a substantial amount of coal that was burned in a non-infringing way.  There's nothing here connecting it to the test or contributory infringement, and allowing him to get into this here is going to create this confusing issue.  This is far more likely to confuse the jury than it is to elucidate them, and at the end of the day, it's their subjective intent that matters, and this hardly goes to the issue.

THE COURT:  Okay.  I understand the issues.  I think as it relates to the question before the first question here, I do not believe, for the reasons I suggest, that this question should be utilized or has any bearing on the issue of substantial non-infringing use or the

defendants' clients' reasonable belief as to what coal counted for that purpose.

But I agree that at least facially it appears, with regard to the second question, the one that begins at line 8, Mr. Dyess asked the witness what he thought counted as a substantial non-infringing use, and it looks like the answer given was that the witness stated, at least facially, that if a coal plant used refined coal before it installed activated carbon, that would count as a substantial non-infringing use.  Facially, he said yes.

So I agree with the defendants' argument that if at one point it's really true that the witness held that belief about the law, that they could speak to the reasonableness of his clients' belief, so I'll allow him to cross-examine on the question.

Now, it could be that this is -- that's not exactly what the witness said.  Maybe the witness was confused or the witness thought the context was different. That's the kind of thing the plaintiff can clean up if they think they can in redirect.

As to the overarching issue Mr. Nemunaitis was talking about at the end about what to do about these areas in which certain coal counts and doesn't, that's a broader issue we still have to resolve with regard to any supplemental instruction now, today, or at final jury

instructions.  Okay.

So I'm going to overrule the objection and allow the question to be permitted with regard to this question being allowed in.  Thank you.

(The discussion at sidebar ended.)

THE COURT:  You may continue.

BY MR. DYESS:

Q.   Mr. O'Keefe, you agree, don't you, that for those plants that used refined coal before they installed activated carbon, you agree that those would be substantial non-infringing uses of refined coal, wouldn't you?

A.   Well, I think the thing that we have to clarify is that the patents were in force after 2019.  So my indirect infringement analysis pertains to that date when the patent was in force, the '114 patent, and a year later when the '517 patent was in force up until 2021.

Q.   But you would agree with me that it was your opinion on March 3, 2022, that for those plants that used refined coal before they installed activated carbon, that those would be substantial non-infringing uses of refined coal?

A.   Well, I might have said that, but I changed my opinion.  I would like to clarify it right now.

Q.   Well, your lawyer will have the chance to clarify with you, but you agree you gave that testimony in March of 2022; correct?

A.      Yes, I agree.

Q.      Now, Mr. O'Keefe, you're not giving any opinion in this case that my clients intended the power plants to infringe these patents, are you?

A.      I don't know what they intended.

Q.      I'm just asking you if that's your opinion or not.

A.      No, I don't know what their intent was.  I don't know what was on their mind.

Q.      You can't give that opinion because you don't know what's on their mind?

A.      No.  Right.  I don't know what they knew.

Q.      And you're not giving the opinion in this case that my clients knew that refined coal was especially made or especially adapted for use with activated carbon.

        You're not giving that opinion?

A.      I don't know what they knew.  I leave that up to the jury based on the evidence I presented.

Q.      And just based on the evidence you presented; correct?

A.      Correct, yes.

        MR. DYESS:  If I could confer just a minute.

        THE COURT:  You may.

BY MR. DYESS:

Q.      Couple more questions, Mr. O'Keefe.  All the lawyers will laugh at that joke.

The power plants that are the subject of your allegations of infringement, they're still using activated carbon today; correct?

A.    Correct.

Q.    And they're still using activated carbon today because of MATS; correct?

A.    Correct.

Q.    And those power plants, if they have a baghouse, they're still using that baghouse today; correct?

A.    Correct.

Q.    And if they have an SCR, that's the other piece of filtration equipment, they're still using that today; correct?

A.    Well, they have to meet the MATS standards of 90 percent mercury reduction of emissions.

Q.    And the refined coal program, you understand it ended in 2021; right?

A.    Correct.

Q.    But these power plants kept using ACI after the refined coal program ended?

A.    Yes.

Q.    And they kept using baghouses after the refined coal program ended?

A.    Yes.

Q.    And they kept using their SCRs after the refined coal

program ended?

A.      Yes.

Q.      Now, I believe it was your testimony some version of it -- you said the power plants in -- let me back up the question.

I think you said SCR and meant ESP, so let me ask you this question:  The power plants that use ESPs while my clients were selling the refined coal, they're still using the ESPs today; correct?

A.      Yes.  I was wondering why you were saying SCR.

Q.      You should have corrected me, Mr. O'Keefe.

A.      Well, I didn't know.  They weren't using an SCR. Your question was valid, but it was confusing.

Q.      That's probably not the only one I asked today.  Let me just make sure I understand, and all kidding aside.

The power plants that were using the ESP to perform this step of filtering out the mercury, they're still using those ESPs today after the refined coal program ended in 2021; correct?

A.      Oh, yes.

Q.      Now, you said that it was your belief that the power plants and the refined coal companies worked together to maximize the -- I don't recall what you said.

What was it you said they worked together?

A.      Optimize.

Q.   Right.  To optimize the amount of activated carbon versus refined coal; correct?

A.   Right.

Q.   Now, you didn't talk to anyone at any of these power plants ever, did you?

A.   No.

Q.   So you didn't talk to the power plants about whether they would agree with that opinion, that they worked with the refined coal companies to maximize the use of activated carbon for MATS compliance; correct?

A.   No.

MR. DYESS:  We turn the witness over, Your Honor.

THE COURT:  Okay.  With that, I think it's a good time to break for lunch.  Why don't we do that, take at least a half hour break for lunch.  And we'll have the jury led out.

(The jury exited the courtroom.)

THE COURT:  Please be seated, everybody.

Let me just -- Mr. O'Keefe, you may step down.

Let me just put on the record with regard to this morning's excusal of our juror, I just want to put on the record that the juror was you excused pursuant to Federal Rule of Civil Procedure 47(c) in that there was good cause for the excusal, as I highlighted previously, in light

of the juror's physical ailment that prevented him from continuing.

With that said, unless there's anything further. We'll break for lunch.  It's 12:21.  I'll just ask counsel to be back and ready to go by 12:51.  Okay.  The Court will stand in recess.  Thank you.

(A luncheon recess was taken, after which the following proceedings were had:)

(The jury entered the courtroom.)

THE COURT:  We'll call on Plaintiff for redirect examination.

Mr. Nemunaitis.

REDIRECT EXAMINATION

BY MR. NEMUNAITIS:

Q.    Good afternoon, Mr. O'Keefe.

A.    Good afternoon.

Q.    Did you have a chance to get some lunch?

A.    Yes.

Q.    Do you remember Mr. Dyess asking you some questions about your background and your time with power plants?

A.    Yes.

Q.    And I think he made the point that you were self-taught and relying on your experience in this case.

Do you remember that?

A.    Yes.

Q.      Is that a bad thing?

A.      Well, it doesn't give the complete picture.

Q.      Did you explain all that in your direct?

A.      I tried to.

Q.      Did Mr. Dyess identify anything you got wrong about mercury control at any of the plants we discussed?

A.      I'm sorry.  Can you speak up?

Q.      Yeah.  Sorry about that.

        In your direct, you walked through the power plant permit -- or did you show the jury a power plant permit?

A.      Yes.

Q.      And did Mr. Dyess explain anything you got wrong about how you explained the permit?

A.      No, I don't think so.

Q.      Did he identify anything you got wrong about any of the operating permits we discussed?

A.      No.

Q.      Did he identify any way in which you made a mistake and were wrong about how mercury control systems were used in power plants at issue in this case?

A.      No.

Q.      Did he show you anything that led you to believe that you were wrong about MerSorb or bromine being applied to the coal in this case?

A.    No.

Q.    Did he show you anything that indicated you were wrong about how activated carbon is used at the power plants at issue?

A.    No.

Q.    Do you agree, Mr. O'Keefe, that the defendants in this case were not the ones that caused the power plants to install ESPs or baghouses?

A.    Correct, yes.

Q.    But did you see evidence that the CERT defendants added bromine to the coal at these power plants?

A.    Sure.

Q.    And they sold that brominated coal to the power plants?

A.    Yes.

Q.    And did Defendants' actions cause the baghouse or the ESP at those power plants to capture the mercury there?

A.    Yes.

Q.    Did Defendants' actions cause the power plants to perform each and every step of each of the claims that are asserted in this case?

A.    Yes.

        MR. NEMUNAITIS:  Can I have slide 86, Mr. Diaz?

BY MR. NEMUNAITIS:

Q.    Do you remember you were asked some questions about

some other licenses that you looked at in this case?

A.    Yes.

Q.    Was it your understanding that you were asked about the licenses on the screen here?

A.    Yes.

Q.    Did you explain what the field of technology was for these licenses?

A.    Yes, it was mercury capture from the emission, and they're not licenses.  They're actually patents.

Q.    And as you explained, each of these patents, did you note some ways in which they might be not as good as ME2C's patents in this case?

A.    Yes, I did.

            MR. NEMUNAITIS:  And, Mr. Diaz, could you go to the next slide, please.

BY MR. NEMUNAITIS:

Q.    One of the patents you talked about, was it PTX 241?

A.    Yes.

Q.    And what was the issue with this one?

A.    Well, it included the addition of bromine to the fuel, the coal, but it required the flue gases after burning of the coal and combustion be constantly -- continuously monitored and the level of sorbent adjusted up and down as necessary.

Q.    And even if some of the other non-Midwest patents

that you discussed are not as good or as impressive technically as Midwest patents, are they comparable in terms of the field of technology?

A.    Well, they all claim to reduce mercury emissions in coal-fired power plants.

Q.    Is that the same field of technology as the Midwest patents?

A.    Yes.

Q.    Do you remember in opening when Mr. Sykes showed the big spreadsheet of all the hundreds of million of tons of coal they've sold over the years?

A.    Yes.

Q.    Now, if some of that coal was sold before the patents issued in this case, would it infringe?

A.    No, not really.

Q.    And if it was even a substantial amount of coal that was sold before the patents-at-issue in this case, does coal sold before the patents infringe?

A.    No, the patents haven't been issued.

MR. NEMUNAITIS:  Could you bring up slide 67, Mr. Diaz?

BY MR. NEMUNAITIS:

Q.    Do you remember Mr. Dyess asking you some questions about the phrase "substantial non-infringing use"?

A.    Yes.

Q.    Now, if we look at Element 3 of contributory infringement, it says here, "The refined coal supplied to that power plant as sold and delivered during the damages phase is not a statewide commodity, article, or commodity of commerce capable of substantial non-infringing use."

Is that the test for contributory infringement?

A.    One of the tests, yes.

Q.    One of them, yes.

What is the damages period that you focus on when evaluating that part of the test for contributory infringement?

A.    2019 to 2021.

Q.    So if the defendants in this case sold tons and tons of coal before the patents issued, does that matter at all to deciding contributory infringement in this case?

A.    No.

MR. NEMUNAITIS:  Nothing further, Your Honor.

THE COURT:  Thank you, Mr. O'Keefe.  You may step down.  Thank you, sir.

I'll ask counsel to remove the binders on the witness stand.

We'll ask Plaintiffs to call their next witness.

MR. PEARSON:  Thank you, Your Honor.  Plaintiffs call their next witness, Mr. Philip Green.

THE COURT:  Mr. Green may come forward and be

sworn.

THE CLERK:  Please state and spell your name for the record.

THE WITNESS:  My full name is James Philip Green, J-A-M-E-S, P-H-I-L-I-P, G-R-E-E-N.

JAMES PHILIP GREEN,

called as a witness on behalf of the

Plaintiff, was sworn, and testified

as follows:

DIRECT EXAMINATION

BY MR. PEARSON:

Q.     Good afternoon, Mr. Green.

A.     Good afternoon.

Q.     Could you please introduce yourself to the jury?

A.     Sure.  My name is Philip Green.  I'm here to speak about the damages that would be due to Midwest.

Q.     What do you do for a living, Mr. Green?

A.     I'm a principal in a firm called Archway Research Group, which is based in Boston, Massachusetts.  And what I do is I analyze finance, accounting, valuation, and licensing issues related to intellectual properties like patents and copyrights and trademarks.

So this means that I actually help people do license negotiations for patents and those kinds of things. I help people value them if they want to buy and sell them.

I help people when they get into situations where they want to do accounting work relating to intellectual properties of one sort or another. And I work on situations like this, where I'm asked to evaluate damages for infringement.

Q. Have you ever testified in court before?

A. Yes, I have.

Q. Have you ever been qualified as an expert in patent damages by another Court?

A. Yes, I have.

Q. What is your work experience?

A. So prior to forming my current firm, which was in 1996, I was the senior manager at Pricewaterhouse, which is now called PricewaterhouseCoopers. It's one of the largest accounting firms in the world.

Before that, I was an executive consultant at a place called Peterson Consulting, which was doing valuation work as well as investigative accounting work, and I was also doing patent damages back at Peterson.

And before that, I started off my career working at a place called Ernst & Whinney, which is now called Ernst & Young. It was also one of the biggest accounting firms in the United States, and I was, basically, going from tall building to tall building in New York doing audits and financial statements.

Q. Could you please describe your educational background

to the jury.

A.    Sure.

I have an undergraduate degree from Rutgers College and Rutgers University.  I got that in 1984, so I'm coming up on my 40th college reunion.

I also have an MBA in accounting, which I got from the Rutgers Graduate School of Management.  I'm a Certified Public Accountant.  I'm also a Certified Management Accountant, which means I've taken a bunch of courses and a bunch of tests relating to how companies report internally, so how they figure out their profits and things like that, which show up the public financial statements.

I'm also accredited in business valuation by the American Institute of Certified Public Accountants, and I'm also accredited in business valuation by the American Society of Appraisers, and both of those designations relate to business valuations, patents, and copyrights.

Q.    Have you ever worked on matters in the energy industry before?

A.    Yes, I have.  These are some of the clients I worked with over the years:  Cooper Cameron is a company that makes oil field equipment, so Christmas trees that are kind of getting put underneath the water if you have sub-sea oil drilling operations; Halliburton is an oil field services

company.  They do all kinds of things, but the cases I've been involved with had to do with drilling mud.

GTA, General Technology Applications, actually has patents on how to make oil flow through pipelines more efficiently.

So a lot of different things in the energy industry.

Q.    When you work on litigation matters, do you always only work on behalf of plaintiffs?

A.    No, I work on behalf of plaintiffs and defendants, about 50/50.

Q.    How are you being compensated for the work you've been doing on this matter?

A.    So my firm, Archway Research, is being compensated based on an hourly rate.

Q.    Do you or your firm have any financial interest in the outcome of this matter?

A.    No, we don't.

MR. PEARSON:  Your Honor, I offer Mr. Philip Green as an expert on the issue of patent damages.

THE COURT:  So noted.

BY MR. PEARSON:

Q.    What was your assignment on this matter, Mr. Green?

A.    So I was asked to analyze Midwest's damages, assuming the ladies and gentlemen find one or more of their patents

in this case is valid.

Q.     What materials did you consider in conducting your analysis?

A.     So I looked at lots of things.  I looked at the patents that are in suit here, the '114 and '517 patents.  I look at Midwest's internal documents, their employees' testimony, and the depositions, those kinds of things.

I looked at the defendants' internal documents and their employees' testimony and the depositions.  I did my own independent research.  This is not something that most people talk about every day, so I had to get an understanding independently what the technology is, what does it do, how does it fit into how businesses operate.

I had to get an understanding of the relevant case law.  So I'm sort of like a tax accountant in that the work I do is related to statutes and cases, so I needed to do that.  Then I also reviewed the reports of other expert witnesses, including Mr. O'Keefe as well as the defendants' technical experts.

Q.     Mr. Green, what are the rules that you follow surrounding how you determine patent damages?

A.     So there's two parts of it.  First off, Judge Burke is going to instruct you on the law.  Like I said, like a tax accountant, I have to follow the rules that are established by the case law.  I started with this part,

which is the patent damages statute.

THE COURT:  Can I ask Mr. Pearson and our witness, it can be little bit hard to hear for the court reporter the further away you are from the mic.  So speak up as best you can.  Thank you.

BY MR. PEARSON:

Q.     What is the first part of the statute that you focused on, Mr. Green?

A.     So the first part of the statute, as we can see, talks about damages adequate to compensate for the infringement, but in no event less than a reasonable royalty.  So the issue is what would be a reasonable royalty to pay for the use of the technology.

Q.     What is the second part of the statute that you focused on?

A.     What it really focuses on is for the use made of the invention by the infringer.  So what we're really focusing on is, well, in this case, how many tons of coal were actually infringing, how many tons of coal were used in an infringing matter.

Q.     Just so we're clear, let's back up one step.  What is a royalty?

A.     So a royalty, ladies and gentlemen, is like rent. When you rent an apartment, essentially, what we're doing is we're getting the opportunity to live in the apartment

without owning it.  Before being able to live in the apartment, we pay the rent, we get the keys, we can move into the apartment.

Q.    What's a royalty in the patent context?

A.    So a royalty winds up being a payment for the use of a patented technology.  What that means is that somebody like the defendants here wouldn't necessarily own the technology, but they'd have the right to use it, just like when you rent an apartment, you have the right to live in it.  And a royalty is the payment instead of what -- we call it a royalty instead of rent, and instead of a lease like we get when we rent an apartment, we get a license to use the technology.  It's called a license when we're talking about royalties and patents.

Q.    Now, before you can determine a fair amount for the patent royalty, do you have to understand the patents?

A.    Yes, you do.

Q.    Why is that important?

A.    Well, that's because the patents -- what we're really thinking about when we're licensing a technology is we're thinking about what the claims are.  You saw it in the movie.  The claims are really what the boundaries are of the invention, what's the patent.

So I need to understand that if we're going to do anything with an understanding of how to value them, what

the royalties might be, and so forth.

Q.     What did you learn about the patents-in-suit in this case when doing your analysis?

A.     So I did a number of things.  First off, I read the patents carefully.  I read the claims, but I'm not a technical expert, so I also spoke with Mr. O'Keefe about them.  I read his report.  I read the defendants' expert reports as well.

Q.     Now, I know we've already discussed it a lot at this trial, but so the jury can understand your understanding, can you please briefly describe the benefits of the patented technology.

A.     Sure.

Simply, what I understand the patents to be related to is a two-part process to reduce mercury emissions, and it really requires two things:  A front-end halogen to be put on to the coal and a back-end sorbent, carbon in this case, to work with -- that with the coal after it's been burned to remove mercury from the flue gases.  And, essentially, the benefit of doing it this way is you don't wind up having to install heavy-duty equipment, all these heavier strippers and things.  I think Mr. O'Keefe showed us this morning it's more efficient and it's less expensive.

Q.     Now, after you gained an understanding of patents,

what's next for figuring out a fair amount of royalty?

A.      Well, so what we have to think about when we're doing patent damages is then thinking about royalties.  So we're thinking about a thing called a hypothetical negotiation. And what we're trying to do is put ourselves back to the time when the infringement first began, which would be, in this case, 2019, and figure out what CERT on the one hand and Midwest on the other would have negotiated for a license for a royalty.

Q.      Since it's hypothetical, what are the negotiation principles governing a hypothetical negotiation?

A.      Well, the first one is the parties in this negotiation have to reach an agreement.  If we go and try to rent an apartment and we don't like the deal, we can walk away.  Can't do that here.  The parties have to reach some form of agreement.

Also, we have to assume that the patents are found to be valid and infringed.  In my experience licensing patents, this is the thing that most people fight about when they're doing a patent.  Most of the time, you're going to see that the parties in the patent license don't agree that the patents are valid or infringed, and so that tends to affect what people are willing to pay.  In this case, we have to assume that in coming up with what the royalty rate is going to be.

The parties, also, in a hypothetical negotiation know each other's relevant information.  You go and try and rent an apartment, you don't know the terms the landlord has with its mortgage company, whatever it might be.  In this instance, everybody knows everybody else's information.

Last thing.  It takes place when you think about it in terms of, like I said, in this case, 2019.

Q.    So in this specific case, when would the hypothetical negotiation have taken place?

A.    In July 2019 when the '114 patent issued is a good way of thinking about the time.

Q.    In your understanding, who were the parties at the hypothetical negotiation?

A.    Well, in this instance, it would be CERT and Midwest.

Q.    What CERT entity in particular do you have in mind when you said "CERT"?

A.    Well, CERT is actually a complicated group of entities.  And so I'm thinking that, essentially, representatives or people who are the representatives of the CERT operating companies as well as the entities who are the refined coal entities, the RCs as I might say.

Q.    In doing your analysis in this case, did you see any evidence that suggested that CERT had this business structure?

A.    Yes, I did.

Q.    Would you please turn to Tab 1 in your binder, which is Plaintiffs' Exhibit Number 762.

Have you seen this document before?

A.    Yes, I have.

Q.    And did you rely on it in forming your opinion in this case?

A.    I did.

Q.    What is this document?

A.    This document is a sequence of organization charts related to the CERT entities.

MR. PEARSON:  Your Honor, I move to admit Plaintiffs' Exhibit Number 762.

THE COURT:  Any objection?

MR. SYKES:  We object based on the points raised this morning, Your Honor.

THE COURT:  Okay.  So I'd reference back to our conversation this morning.  So it will be admitted.

(Thereupon, Plaintiffs' Exhibit 762 was admitted.)

MR. PEARSON:  Thank you, Your Honor.

Mr. Diaz, can we please see the first page of PX762?

BY MR. PEARSON:

Q.    What do we see here, Mr. Green?

A.    So what we can see is this document titled the "Four

CERT Principals' Companies," and the very top row shows the four CERT principals, individuals.  You can see it's Mr. Green on one side, Ms. Schaat, Mr. Green who's here, and then you can see that each of them held LLCs, and Mr. Green's was called Springhill Management.  That's in the middle up there.  And Ms. Schaatt's was WAS Holdings, and then you can see that those entities wind up having ownership interests in other LLCs down below that.

MR. PEARSON:  Mr. Diaz, may we please see page 12 of this exhibit?

BY MR. PEARSON:

Q.    Now, having discussed the four principals -- the four CERT principals' companies, Mr. Green, can you please describe what we see on this chart.

A.    Sure.  What we can see on this organization chart is the four CERT principals' companies all have ownership interests in certain LLCs that are CERT Operations Companies.

And so you can see CERT Operations II in the middle, CERT Operations IV.  There's a company called CERT Operations RCB down in the lower right.

These are all the companies that are operating the refined coal entities that are actually at the power plants.

Q.    Mr. Green, did you prepare a demonstrative that shows

the jury where the specific defendants in this case fall on the chart?

A.    I did.

MR. PEARSON:  Mr. Diaz, can we please have Slide 16?

BY MR. PEARSON:

Q.    What do we see here?

A.    So what you see here is -- on the bottom row are the power plants, so this is where all of the refined coal LLCs are operating, and I think we've seen this before.

And then you can see up above that on the far left it says Refined Coal Defendants.  That is the LLC that is, essentially, contracting with the power plant and doing the -- and selling the refined coal to the power plant.

And up above that, you can see which of the CERT Operations defendants are the owners of -- excuse me, the operators of these refined coal LLCs.

So CERT Operations IV is operating Springhill Resources, LLC.  That's on the far left there, and they're operating at NRG's Big Cajun II plant.

Q.    What does the color coding mean, Mr. Green?

A.    Well, the color coding was an attempt that I made to be able to relate the CERT Operations defendant with the various refined coal defendants.

You can see there's a number of them that are

being operated by RCB, LLC sitting in the middle, and those are all blue, and the others are yellow, red, and green. But it was an attempt to make it so it was easy to see.

Q.    Now that we've seen the evidence supporting your opinion that it would be a single negotiation between ME2C and CERT, what would they have talked about or information they would have considered about the hypothetical negotiation?

A.    So remember I said there was the statute and then there's some case law?  Well, this is one of the pieces of the case law, and this is a list of factors that comes from an old case involving a company called Georgia-Pacific. They make plywood and paper and stuff.

But, essentially, what -- these factors are -- essentially are the things that people would talk about at one of these hypothetical negotiations.  It's a list of facts or evidence that you might consider.

Q.    How many of these factors did you consider when you conducted your analysis in this case?

A.    Well, I considered all 15 of them.

Q.    What is the most efficient way to get through this long list of factors for today's purposes?

A.    Well, what I did is I cut them up into sort of they're -- what they really relate to.  There's really four categories of those factors.  There's licenses and royalty

rates.  There's how the patents have actually been used.

There's some competition and other business-related factors, and then there's some questions about the importance of the patented technology.

That's really how these factors break down.

Q.    Before we go through all the evidence showing why you came to the conclusion you came to, can we cut to the chase and just let you have the opportunity to tell the jury your final conclusion.

MR. PEARSON:  Mr. Diaz, can we please have Slide 50?

THE WITNESS:  So my final conclusion is that the parties would've negotiated a reasonable royalty rate of $0.65 to a dollar, and we're going to go through the documents and other things that I considered to get me to that conclusion.

MR. PEARSON:  Mr. Diaz, can we please go back to Slide 19.  Let's start with the first group of *Georgia-Pacific* factors related to licenses.

BY MR. PEARSON:

Q.    What was your methodology in trying to determine whether a license you reviewed was similar enough to be useful for the purposes of a hypothetical negotiation?

A.    So there's -- I looked at it from the point of view of whether or not the technology that was in a license was

similar, whether the parties were similar; in other words, are we looking at parties that are the same as Midwest negotiating with the defendant RC LLCs, or was it some other relationship or some other entity which wasn't the same? And that makes a big difference from an economic point of view.

And then I looked at whether the licenses have similar economic terms.  And a lot of times in licenses, what you can see is that there may be other terms, maybe supply terms.  There may be other things that go on between the parties.

So they're not really comparable to what we're trying to here, which is to figure out what a reasonable royalty would be for the use of patents in this case.

Q.     How many of these three types of similarities do you need to find in order to find a license similar to one that would come from a hypothetical negotiation?

A.     In this instance, you need to find all three.

Q.     What do we see here, Mr. Green?

A.     Well, what you can see here are nine groups of licenses that I looked at in order to be able to analyze what would be a reasonable royalty from this hypothetical negotiation in this case.

MR. PEARSON:  Mr. Diaz, could we please have Slide 30?

BY MR. PEARSON:

Q.    I believe this is a summary of your conclusions regarding all of these licenses; is that fair?

A.    Yes, it is.

Q.    Let's do our best to go through this as quickly as possible.  It's a lot of information.

Let's start with the three on the bottom.  Those look different.  What do the Xs mean?

A.    So the three on the bottom are all situations where the parties are not similar or they're not similar economic terms.

So we've heard about a couple of these licenses already, the ERC, RLP license.  Mr. MacPherson talked about that as -- so did Mr. Pavlish, and that was the agreement that was between EERC and Midwest to be able to first license and then buy the patent.

And that really has nothing to do with the circumstance we find ourselves in for the hypothetical negotiation.  EERC is a not-for-profit -- not-for-profit entity.

And that exact wording is signing a purchase transaction.  It's not a licensing agreement.

Similarly, we saw some testimony yesterday about the power plant licenses.  Midwest has some licenses with some power plants, but each one of these has a supply term

in it.

Essentially, those licenses were done, as we heard Mr. MacPherson say, in order to be able to encourage those companies to buy things from Midwest.

And so those terms are different because of that in comparison, so just taking a license for the use of patented technology and never having to buy something because, essentially, Midwest was thinking they're going to get some money back from the sales instead of only technologies.

And then the bottom one is a license that I found by doing my research, and it's for similar types of technology for sure, but the parties are related.

In other words, ADA owned the entity that it was licensing to this clinical solution business, so it didn't look to me to be arm's length.

Q.    Now, since there's some Xs on the bottom three rows, are those licenses comparable or not comparable?

A.    They're not comparable.  I excluded those from my analysis.

Q.    Since they're not comparable, do we need to delve into the royalty structure?

A.    No.

Q.    Let's go back to the first row of your analysis here, the ME2C/Alistar agreement.  It's in Tab 2 of your binder,

Mr. Green, if you don't mind flipping there.

MR. PEARSON:  And, Mr. Diaz, can we please see Plaintiffs' Exhibit Number 763.

BY MR. PEARSON:

Q.    What is this document, Mr. Green?

A.    This is a license agreement between Alistar Enterprises and Midwest Energy.

Q.    This is the same Midwest Energy that's the plaintiff in case?

A.    Yes, it is.

Q.    Who is Alistar?

A.    Alistar, we talked about this yesterday, was one of the CERT RC LLCs.  It was an entity that separately settled with Midwest related to these patents.

Q.    In your opinion, would the parties consider this agreement comparable to the license that would have resulted from the hypothetical negotiation?

A.    Yes they would.

MR. PEARSON:  Let's turn to section 4.2 of the agreement, Mr. Diaz.

BY MR. PEARSON:

Q.    What were the payment terms of the ME2C/Alistar agreement, Mr. Green?

A.    The payment terms were $1 per ton of accused coal sold through the applicable damages period for Alistar in

the lawsuit.

Q.    Now, I see it says "in the lawsuit."  How does it generally affect payment terms when patent license agreements result from litigation?

A.    So patent license terms from a litigation often have the effect of what that litigation is.  Also, you'll notice through this agreement, there's no indication that the parties concluded the patents were valid and infringed.

Q.    And you see the total amount of payment right there is $107,776.  Do you see that?

A.    I do.

Q.    And then the highlighted portion, it says $1 per ton of accused coal sold during the applicable damages period.

Do you see that?

A.    I do.

Q.    Do you know what that means?

A.    Yes.  It was a very short damages period, I believe, from September 2020 to January 2021, which was the damages period related to Alistar, which is -- which is being settled by this agreement.

Q.    Yesterday, during questioning of Mr. MacPherson, I believe counsel for CERT asked some questions about this agreement and put up a document that showed a $1.4 million statement in damages.

Do you recall that?

A.    I think it was 1.4 million tons --

Q.    Okay.

A.    -- I think in that statement.

Q.    Sure.  Was that 1.4 million tons -- was that calculated -- you've seen the sales data for Alistar in this lawsuit; right?

A.    Yes, I have.

Q.    Was the $1.4 million tons calculated in that statement we showed, was that the same for the same amount of time period as what is reflected in the applicable damage damages period in the final Alistar agreement?

A.    No.  To my understanding, no.

Q.    What was different in the final Alistar agreement?

A.    The final Alistar agreement is that just for a short four-month period of time that I understand was the basis for the 107,000 tons that became this $107,000.

Q.    And you see above the $107,000 it makes reference to an IOLTA account?

A.    I do.

Q.    What is the purpose of an IOLTA account?

A.    That is an account that lawyers keep money in when they get it on behalf of their clients.

Q.    It's held there temporarily until it can be fairly dispersed to their clients or any other interested parties; right?

A.    That's right.

Q.    Did you go back with the real --

MR. PEARSON:  You can take this down, Mr. Diaz.

BY MR. PEARSON:

Q.    Did you go back and check the actual underlying sales data to make sure the $107,000 reflected in the agreement matched the tonnage for the applicable damages period that was in the agreement?

A.    Yes, I did.

Q.    What do you think is more important for the jury's analysis?  Should they trust the words of the agreement to say $1 per ton, or should they, you know, focus on calculations done in court about what those numbers might mean?

A.    So I think it makes sense to look at what's in the agreement and what the parties said.  In other words, we can see in the agreements we're going to talk about.  There are specific amounts per ton that have been repeatedly through these licenses, and you can see exactly what the parties intended on a per-ton basis, and I would use those as a basis for thinking about what a reasonable royalty would be in this case.

Otherwise, as we can see looking over this one agreement, there's lots of different ways of calculating this, and none of them -- because the agreement doesn't say

exactly what the time period is or what exactly the tons were other than in the way that it's done here, we would be speculating.  So if we look at what's in the agreements, we'll know what the parties were thinking.

Q.    Did the ME2C/Alistar license cover other patents as well?

A.    It did.

Q.    Is it your opinion some portion of the royalty paid in the license related to those other patents?

A.    Well, no, I think that the royalty is being paid for the use of these patents-in-suit as well as other things, but it doesn't set right out what the price is for the patent for any one patent.

MR. PEARSON:  Let's turn back to Slide 30, Mr. Diaz.

BY MR. PEARSON:

Q.    So how did you fill in the row for ME2C and Alistar?

A.    You can see it's a running royalty, $1 per ton, and the per-ton rate is told us in the agreement:  A dollar.

Q.    And it was similar technology and parties and economic terms?

A.    Yes, it was.

Q.    All right.  Mr. Green, let's move on to the next row. If you could please turn to Tab 4 in your binder, which is PTX 353.

Have you seen this document before?

A.      Yes, I have.

Q.      Did you rely on it in forming your opinion in this case?

A.      Yes, I did.

         MR. PEARSON:  Your Honor, I move to admit Plaintiffs' Exhibit Number 353.

         THE COURT:  Is there any objection?

         MR. SYKES:  No objection, Your Honor.

         THE COURT:  All right.  It's admitted.

         (Thereupon, Plaintiffs' Exhibit 353 was admitted.)

BY MR. PEARSON:

Q.      What is this agreement, Mr. Green?

A.      This is a license agreement between Chem-Mod and the same Alistar Enterprises we were just talking about.

Q.      Who is Chem-Mod?

A.      Chem-Mod is an entity who was providing technology to refined coal entities like the defendants in this case, and the technology they were providing related to what was called the Chem-Mod solution, and what that was, was a way of being able to modify coal by adding various types of chemicals to it and so to be able to, essentially, have that coal burn more efficiently.

Q.      What did this patent license agreement accomplish?

A.      What this did is it licensed Alistar Enterprises to use the Chem-Mod coal modification technology.

Q.      Are the Chem-Mod patents and technologies similar to ME2C's patents in this case?

A.      The Chem-Mod patents and technology are similar in that they relate to modifying coal in order to have it burn more cleanly.

Q.      So would the parties have considered this a comparable license at the hypothetical negotiation?

A.      Yes, they would have.

        MR. PEARSON:  Mr. Diaz, may we please see Section 3.1 of this agreement?

BY MR. PEARSON:

Q.      What are the payment terms of this agreement, Mr. Green?

A.      So the payment terms of this agreement provide that during the first three years of the term of the agreement -- you might have noticed that the agreement was signed in November of 2009 -- the royalty for the use of the Chem-Mod coal modification technology was $0.45 per ton.  And then after three years, that royalty rate increased to $0.65 per ton of coal that was actually treated using the Chem-Mod coal modification technology.

Q.      So at the time of the hypothetical negotiation in 2019, how much was Alistar paying Chem-Mod?

A.    They were paying $0.65 a ton.

Q.    Did other CERT-related entities have patent license agreements with Chem-Mod?

A.    Yes, they did.  They all did.

Q.    And you heard the parties talk about an entity called DTE this week.  Does that sound familiar?

A.    Yes.

Q.    Did other DTE refining coal entities have patent license agreements with Chem-Mod?

A.    Yes, they did.

Q.    And did you the recall some discussion of a company called AJG?

A.    Yes.

Q.    Did other AJG-related refined coal entities have patent license agreements with Chem-Mod?

A.    Yes, they did.

Q.    Mr. Green, if you could please turn to Tabs 5 through 17 in your binder.

A.    Okay.

Q.    What are these documents?

A.    These are all license agreements related to the use of the Chem-Mod technology.  The first several of them are the licenses between Chem-Mod and the CERT-related refined coal entities, and then there is a license agreement after that that relates to Arbor Fuels that relates to AJG --

excuse me -- DTE, I'm sorry -- and then there's another license agreement related to DTE. And then lastly, there are two or three agreements in here that relate to AJG.

MR. PEARSON: Your Honor, I move to admit Plaintiffs' Exhibits Number 243, 343, 352, 456, 457, 458, 461, 464, 467, 469, 471, 479, and 488.

THE COURT: Is there any objection?

MR. SYKES: Your Honor, I just read out of order, and I looked. I can't keep up.

THE COURT: Can we -- Mr. Pearson, could I ask you to consult with defense counsel to make sure you're on the same page?

MR. PEARSON: I can move them back in in the order they're in the notebook. I just got them in chronological order.

MR. SYKES: Mr. Pearson, that would be helpful.

MR. PEARSON: All right. Your Honor, I move to admit into the record the same exhibits in a different order: 243; 461; 467, that's Tab 7 in the binder; 469; 471; 479, which is Tab 10; 488; 464; 343; 352; 456, which is Tab 15; 457.

MR. SYKES: Thank you, Mr. Pearson. You're going fast. Let's come back to 352.

MR. PEARSON: Okay. Tab 14 is 352, Tab 15 is 456, Tab 16 is 457, Tab 17 is 458.

THE COURT:  Essentially, you're moving to admit everything from Tab 5 through Tab 17?

MR. PEARSON:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Sykes?

MR. SYKES:  Mr. Pearson, may I just look on your copy of 352?  Mine is blank.

MR. PEARSON:  It's the same 352 we disclosed to you.

THE WITNESS:  It seems to be missing a few pages.

MR. SYKES:  Your Honor, no objection.

THE COURT:  Okay.  They're admitted.

(Thereupon, Plaintiffs' Exhibit Numbers 243, 343, 352, 456, 457, 458, 461, 464, 467, 469, 471, 479, and 488 were admitted.)

BY MR. PEARSON:

Q.     What is the importance of these other long list of Chem-Mod patent license agreements, Mr. Green?

A.     So what all that these licenses show us is that there had been agreements among entities that were essentially the refined coal LLCs to use a technology, the Chem-Mod coal modification technology.  These are patent licenses in order to make refined coal, and what we can see is that they all have running royalty terms.  In other words, they're paying on a dollars-per-ton or amount-per-ton of coal that was

processed, and they're also having a running royalty that, essentially, throughout these agreements is from $0.50 to about $0.65 throughout all of these agreements.

Q.    Do you consider these other Chem-Mod agreements to be comparable licenses?

A.    Yes, I do.

MR. PEARSON:  Can we have slide 30 again, Mr. Diaz.

BY MR. PEARSON:

Q.    Now, the long list of licenses we just walked through, that's the next three rows on your chart:  The Chem-Mod CERT entities, the Chem-Mod DTE entities, and Chem-Mod AJG; is that right?

A.    That's true, yes.

Q.    And those are the payment terms you were just describing, the $0.65 and $0.50; is that fair?

A.    That's right.

Q.    Let's move on to the -- let's skip a row, and we'll come back.

Let's talk about Nalco Chem-Mod.  Mr. Green, can you explain that license to the jury.

A.    Sure.

So Nalco Chem-Mod license is related to a company called Nalco that has some technology related to removing mercury from coal stacks, and Chem-Mod wound up

getting sued by them and they settled.

Q.    And I believe that license agreement should be Tab 21 in your binder.  Plaintiffs' Trial Exhibit Number 240.

Did you rely on this license in forming your opinion in this case?

A.    Yes, I did.

MR. PEARSON:  Your Honor, I move to admit Plaintiffs' Exhibit Number 240.

THE COURT:  Any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(Thereupon, Plaintiffs' Exhibit Number 240 was admitted.)

MR. PEARSON:  May we see the agreement, Mr. Diaz?

BY MR. PEARSON:

Q.    Was the technology covered by this license similar to the patents at issue in the hypothetical negotiation?

A.    Yes, it is.

Q.    And in this case, there was Nalco, who owned the patent; is that right?

A.    That's right.

Q.    And Chem-Mod was the one that was paying Nalco for Nalco's technologies; is that fair?

A.    That's right.  Chem-Mod and AJG are the parties you

can see in highlighting.

Q.    Are Nalco and Chem-Mod and AJG similar parties to those in the hypothetical negotiation?

A.    They are in the sense that Nalco has technology and AJG and Chem-Mod are using it, and they're using it as it relates to making refined coal and using it for refined coal LLCs that are similar to the ones that are at issue in this case.

MR. PEARSON:    May we please see section 5 of this agreement?

BY MR. PEARSON:

Q.    What were the payment terms of this agreement, Mr. Green?

A.    This payment was for a lump sum of $27,500,000.

Q.    What's a lump sum payment?

A.    So a lump sum payment is where the parties agree to a single, one-time payment for the use of a technology or to settle a dispute or something of that nature.  It's a one-time payment.

Q.    How does that differ from the running royalty payments you were discussing earlier?

A.    So the lump sum payment basically means the parties -- whoever is going to -- parties are going to continue to use the technology.  They don't have to pay any more.  So if you're licensing that technology, you're

assuming that the future is sort of included in that agreement and that it may actually include past usage as well, but again, it's not clear.

The parties agreed on a single number, and you can see throughout this license, it doesn't talk about the number of tons it covers.

Q.    Did you attempt to determine what this payment would have meant if it was converted into a per ton amount?

A.    I did.

Q.    And what did you -- what range did you find for a potential per ton amount in doing your analysis?

A.    So this could have run anywhere from, I think, a dime to $0.52 -- or $0.59 excuse me -- in terms of royalties, but the challenge, if we were to convert it to a running royalty, the challenge is, as we can see from looking at the front page, there are many parties, many different time frames.  I kind of estimated what I really do know, what we all really do know, is these parties paid 27 and a half million dollars, and when I try to do the conversion, it doesn't give me a big range, so I don't think it's particularly helpful.

MR. PEARSON:  Let's go back to slide 30, Mr. Diaz.

BY MR. PEARSON:

Q.    Since we weren't able to -- well, first of all,

there's checkmarks.  You found this was a similar technology, similar parties, and similar economic terms; is that fair?

A.    That's fair, yes.

Q.    And then the royalty structure, you put in lump sum; is that right?

A.    That's right.

Q.    But since you weren't able to figure out a precise royalty rate per ton, should we just go ahead and fill in a guess here?

A.    No.  No, I just left it blank.

Q.    Okay.  And why do you think that's appropriate?

A.    Again, there's a lot of parties, there's a lot of time frames in that settlement.  It just seems to me that if I was trying to come up with a number -- a single number or range of numbers, it was on a per ton basis.

It was kind of speculating because we didn't have all the facts.  All I really know is that the parties agreed to a $27 and a half million payment.

Q.    Thank you, Mr. Green.  Let's move on to the next row above that, which is the ME2C/AJG/DTE agreement.

If you could please turn to Tab 18 in your binder.

MR. PEARSON:  And, Mr. Diaz, if we could please see PTX 776, which has previously been admitted.

BY MR. PEARSON:

Q.    And what is this document, Mr. Green?

A.    So this is an agreement -- this is a settlement and license agreement between Midwest, AJG, and DTE.

Q.    And this is the agreement that we've discussed -- we've heard discussed a couple times earlier in this trial; is that fair?

A.    Yes.

Q.    And what did this patent license agreement accomplish?

A.    What this did is it provided DTE and AJG with licenses to the patents that are in suit in this case as well as other technology that's being held by Midwest.

Q.    Does this agreement cover the CERT defendants' actions in using ME2C's technology?

A.    No, it does not.

        MR. PEARSON:  If we could please turn to section 5 of the agreement, Mr. Diaz.

BY MR. PEARSON:

Q.    What were the payment terms of this agreement?

A.    As we heard yesterday, ME2C -- the defendants, excuse me, AJG and DTE who were defendants, agreed to pay $27,500,000 to Midwest.

Q.    And again, generally, how may it have affected these payment terms -- these patent license agreements --

agreement resulted from settled litigation?

A.    Well, so in settling litigation, no one acknowledged that their -- that the patents were valid and infringed, and, again, it's a litigation settlement, so the parties had other motivations in terms of coming up with a royalty.

THE COURT:  We'll ask the witness to repeat the answer.

THE WITNESS:  The tail end of the answer was "or what the payment would be."

BY MR. PEARSON:

Q.    If you could please turn to Tabs 19 and 20 in your binder.  These are Plaintiffs' Trial Exhibits Number 759 and 760.

Have you seen these documents before?

A.    Yes, I have.

Q.    Did you rely on them in conducting your analysis in this case?

A.    I did.

MR. PEARSON:  Your Honor, may I please publish PTX 759 and 760 to the jury?

THE COURT:  Are they admitted?

MR. PEARSON:  They're not yet admitted.  I'm not sure they need to be admitted.  They are on our exhibit lists.  I was hoping to show them to the jury.

THE COURT:  Is there any objection?

MR. SYKES:  Yes, we object, Your Honor.

THE COURT:  What's the basis of the objection?

MR. SYKES:  We believe that it's -- the exhibits are inaccurate -- incomplete.  Inaccurately applies the tonnage that's subject to the agreement.

THE COURT:  Mr. Sykes, I'll ask that if you stand when you make objections.  I had trouble hearing the objection.

MR. SYKES:  My apologies, Your Honor.  We would object under Rule 403 and 402 as irrelevant and confusing because PTX 759 and 760 don't accurately reflect the tonnage that is subject to the PTX 766 agreement.

THE COURT:  Mr. Pearson, in response?

MR. PEARSON:  I don't know what he means, Your Honor.  These exhibits are exhibits that Mr. Green calculated accurately using data provided in this lawsuit.

I'm not sure what counsel has in mind, but I believe he can follow up with cross-examination to explain himself.

THE COURT:  The documents haven't been admitted.

I'll sustain the objection as to them being published.  Plaintiffs' counsel is free to ask the witness about the documents and ask him to explain what they're being used for.

MR. PEARSON:  I appreciate your consideration.

BY MR. PEARSON:

Q.      Mr. Green, did you do calculations in this case for this license similar to Nalco to attempt to figure out how much this license would be worth if you translated the lump sum to a per ton amount?

A.      Yes, I did.

Q.      Were those calculations the calculations that are in your binder at Plaintiffs' Exhibit 749 and 760?

A.      Yes, they are.

Q.      And what was the result of the calculations when you attempted to translate the $27 and a half million into a per ton amount?

A.      So the results are a range of royalties from $0.14 a ton to $0.39 a ton, but the difference is the time periods, and the amount of tons that are related to those computations.  The $27 and a half million is the same because that's what the parties agreed to in that agreement.

        But the first calculation uses tonnage by -- from the AJG and DTE defendants for the period from 2013 to 2021, and then in the second calculation -- and that's the one that results in the $0.14 many more times.

        And then the second calculation uses a shorter period, which is from 2019 through 2021, and that results in the $0.39.

Q.      Were you able to come to a firm conclusion about the

actual per ton royalty rate from ME2C and AJG/DTE agreement?

A.    No.  As you can see, if you look at the agreement, it doesn't specify what the royalty rate per ton was, and it doesn't specify the time period over which the royalties were being paid or how much tons are included.

So when we look at the agreement, it doesn't help us very much to figure out a per ton rate, which is the type of royalty that would be appropriate coming out of the hypothetical negotiation for damages in this case.

Q.    The Alistar agreement said how the payment was calculated.  It was calculated at $1 per ton.

Do you recall that?

A.    I do.

Q.    Is there a similar sentence in the ME2C/AJG license that says how the payment was calculated?

A.    No, there's not.

Q.    Could you please turn to Tab 35 in your binder, which is Plaintiffs' Trial Exhibit Number 761.

What is this document?

A.    This is a term sheet that, ultimately, became the trial Exhibit 766, that agreement we were just looking at.

Q.    Did you rely on this document in conducting your analysis in this case and cite this document repeatedly throughout your supplemental experiment report?

A.    I did.

MR. PEARSON:  Your Honor, I move to admit Plaintiffs' Trial Exhibit Number 761.

THE COURT:  Is there any objection?

MR. SYKES:  Same as this morning, Your Honor.

THE COURT:  This morning, I discussed the issue -- I gave the inclination of my ruling.  If there's no further argument in light of that ruling, the document may be admitted.

(Thereupon, Plaintiffs' Exhibit Number 761 was admitted.)

MR. PEARSON:  Can we see 761?

BY MR. PEARSON:

Q.    What is this document, Mr. Green?

A.    This document, as I said is, a term sheet that relates to the agreement that -- the Exhibit 766 we were just talking about.  And this just describes -- shows you the parties and the entities that were being discussed at the time that they were doing the term sheet.

Q.    Is a term sheet a thing where parties often come to a binding initial agreement that contains all of the important terms and then later enter into the full, complete license agreement; is that fair?

A.    Yes.  That's what I've seen before.

Q.    And this term sheet was the initial binding agreement that preceded the full ME2C/AJG agreement; is that fair?

A.      That's fair.

Q.      And this term sheet mentions the concept that Chem-Mod customers and licensees will get to license ME2C's patents; is that fair?

A.      It does.

Q.      Where in this term sheet is there a list of the 134 Chem-Mod licensees that we saw on the screen yesterday with Mr. MacPherson when this license agreement was discussed?

A.      There isn't one.

Q.      Well, what does that mean about whether the parties at the time of the license agreement negotiated payment in terms of $200,000 per Chem-Mod customers?

A.      It doesn't appear, from looking at this, that it had anything to do with how the $27 million was decided.  They looked at the parties, and the parties negotiated for the payment that they finally came up with of $27 and a half million.

MR. PEARSON:  Can we have slide 30 again, Mr. Diaz?

BY MR. PEARSON:

Q.      In view of the uncertainty surrounding how the ME2C/AJG payment was calculated and in view of the fact that the license agreement itself does not say, how did you choose to fill in the royalty rate per ton information on your chart?

A.    I didn't.  I concluded that because we can't tell what the royalty rate per ton was, there are so many different ways of figuring out what the tonnage was that they were applying this agreement to, it wouldn't -- it wasn't giving us useful information.

And so I didn't have a per ton rate that I could rely on there.

Q.    Is it fair to say the top four rows are the licenses you found most useful in conducting your analysis in this case?

A.    Yes.

Q.    Please turn to Tab 32 in your binder.

Have you seen this document before?

A.    Yes.

Q.    And did you rely on it in forming your opinion in this case?

A.    I did.

Q.    This is Plaintiffs' Trial Exhibit 446.

MR. PEARSON:  And, Your Honor, I move to admit it into the record.

THE COURT:  Any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(Thereupon, Plaintiffs' Exhibit 446 was admitted.)

MR. PEARSON:  Mr. Diaz, may I please see slide 35.

BY MR. PEARSON:

Q.     Now, I believe *Georgia-Pacific* factor 11 is related to defendants' use; is that fair?

A.     It is.

Q.     And you analyzed that in this case, didn't you?

A.     I did.

Q.     What do we see on the screen here?

A.     What you see on the screen is a page relating to May 2020 of the amounts of refined coal that were made by the refined coal entities that are at issue in this case. There are some other ones in here you can see, but we've highlighted in this chart -- you can see that Limestone Coleto Creek, Labadie, and so forth are highlighted.

       And what we're seeing here are the amount of refined coal tons made at those by those refined coal LLCs each day in May of 2020.

Q.     Did you and your team go through the hard work of analyzing the spreadsheet and tabulating precisely the amount of tons that are associated with each defendant during the damages period in this case?

A.     Yes, I did.

Q.     Here we are back at the chart of the defendants that you showed earlier.  Could you please describe for us the

damages start date here on the row that's in yellow.

A.    Sure.

So you can see that there are, essentially, two different damages start dates.  One is July 17th, 2019.  That's the date the first -- the complaint was filed in this case.  And then there's an agreement related to Senescence and Rutledge, and so their start dates for damages purposes are September 25th, 2020.

Q.    What are we seeing on the second row here?

A.    The second row are the end dates for the damages as they relate to each of the refined coal LLCs or the CERT Operations defendants.  And you can see that there are a few different dates in here.  Some of them relate to when licenses were granted by Midwest to the power plant owners like NRG, and then there are other instances where the power plant stopped using the technology, and there's other where there's agreement.

Q.    What do we see on the third row here?

A.    What you can see here are the accused tons made by each of the refined coal defendants of refined coal during the relevant damages period for each of the refined coal defendants for the CERT Operations defendants.

Q.    There's been a lot of talk of a lot of tons of coal for different time periods in this case so far.  I think it's important to be clear.  You only believe damages should

be assessed for refined coal sold by a defendant during the damages period when used with activated carbon; is that fair?

A.    That's right.

Q.    And Defendants contended that for the overall accused coal they sold during the damages period, you needed to do a reduction because sometimes may might not have used activated carbon.  Sometimes, like Mr. Whitney said, the activated carbon nozzles might be turned off for a couple hours for cleanings.

      Do you remember that?

A.    Yes, I do.

Q.    And despite their proximity to power plants and their close relationship to the customers, Defendants were unable to find out information related to how often the power plants actually did not use activated carbon, and they didn't provide that information to you, did they?

A.    I didn't get that information from them, no.

Q.    Did you get it at all?

A.    I did not.

Q.    So how did you go about addressing Defendants' concern that sometimes activated carbon might be turned off and so a reduction in the total amount of accused tons is appropriate?

A.    So there's some discussion of that in Mr. O'Keefe's

report, and so what I did is I made some reductions based on that information to the amounts that were produced.  In other words, what we just saw in that spreadsheet that I showed you.  So these numbers that are at the bottom of this chart here reflect that deduction for time that activated carbon may not have been used in those plants.

Q.    So these numbers are post reduction.  These are the accurate accused tons that you believe is appropriate to assess a per ton amount on?

A.    That's right.

Q.    If you could please turn to Tab 33 in your binder.

Sorry, before we get into Tab 33, how much would this accused tonnage be reduced by if the jury found under the '517 patent non-infringement?

A.    It would be reduced by about a third.

Q.    All right.  Let's -- thank you, Mr. Green.

Let's turn to Tab 33, which is Plaintiffs' Trial Exhibit Number 753.  Did you create this document in conducting your analysis in this case?

A.    Yes, I did.

MR. PEARSON:  Your Honor, I move to admit Plaintiffs' Trial Exhibit Number 753.

THE COURT:  Any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(Thereupon, Plaintiffs' Exhibit 753 was admitted.)

BY MR. PEARSON:

Q.    There's a lot of numbers up there, Mr. Green.  If the jury wants to double-check their notes or any other way consult with your calculations in jury deliberations, what should they do if they want to see this information?

A.    So I would turn to this exhibit, which, essentially, summarizes that whole bottom row by plant of the amount of accused tons that were made by each of the refined coal LLCs in this matter.

So you'll have this document to be able to refer to, but these are the totals.  This gives you the total 57,082,006 tons broken down by refined coal LLC defendant, and you can see what plant it relates to.

Q.    And that was Plaintiffs' Trial Exhibit 753; is that correct?

A.    That's right.

Q.    Did you review whether there are any acceptable non-infringing alternatives in this case?

A.    I did.

Q.    And very briefly, what did you find?

A.    I found that there weren't any, either because they were very expensive, they would result in a lot of capital needing to be put in place, or they just simply didn't do

the same type of thing that the technology in this case does.

MR. PEARSON:  Mr. Diaz, may we have slide 4.

BY MR. PEARSON:

Q.    At a high level, is it fair to say that the rest of your *Georgia-Pacific* factor analysis can be summed up with how you addressed the qualitative factors of your analysis?

A.    Yes.

Q.    Could you briefly describe how you considered the qualitative factors in this case or how the jury should think about whether to end up on a lower end of the range or higher end of the range per ton.

A.    So just to sort of review, we're thinking about this negotiation, and most of us when we go into a negotiation, we're thinking about renting an apartment, we have an idea about how much we want to pay.

So the licenses that we were just talking about, the ones that go from $0.50 to about a dollar, that gives us a quantitative starting place.  This is what people actually paid for the use of comparable technology or even this technology, technology related to this case.  Then what we need to think about is while in the negotiation, would other factors make us go higher or lower off of the quantitative factors.

And so the other *Georgia-Pacific* factors that we

haven't talked about in detail give us some indication about, you know, how the parties might think about is it higher, is it lower, where should we come out.

So one of the things to think about is the timing. We saw in the earlier -- in the licenses for Chem-Mod, they had two royalty rates. One of them is an earlier royalty rate, one is later. And that's what they're telling us is later on in the process. Later in time, the technology seems to be getting -- to have an increase in value, and the parties are acknowledging that in that license.

Also, in this case, when we're thinking about this hypothetical negotiation, we're thinking about validity and infringement. That isn't something that actually is going to be decided, and that's not part of any of the licenses, no one acknowledged that, and that tends to increase the royalty rates.

Also, the parties in some respects are competing. The fact that Chem-Mod is working with the five entities is, essentially, keeping Midwest, the plaintiff here, from being able to make sales to those entities. So that tends to also make it so that Midwest wouldn't want to give them a low license.

And then lastly, there's just really not many alternatives that are as effective or cost efficient as

using the technology in this case.  So that would tend to increase the royalty rates as well.

Q.     Mr. Green, could you please remind the jury of your ultimate conclusion in this case, which is the result of your consideration of all the information including both the quantitative and qualitative factors.

A.     So as we said at the beginning and it was suggested, there should a royalty rate of 65 cents to a dollar.  That's my opinion.

Q.     Mr. Green, would you please finally turn to Tab 34 in your binder, which is Plaintiffs' Trial Exhibit 754.

Is this a document that you created?

A.     Yes, it is.

MR. PEARSON:  Your Honor, I move to admit Plaintiffs' Trial Exhibit Number 754.

THE COURT:  Any objection?

MR. SYKES:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(Thereupon, Plaintiffs' Exhibit Number 754 was admitted.)

MR. PEARSON:  Mr. Diaz, could we please see it?  Could you zoom in on the top part, please.

BY MR. PEARSON:

Q.     Mr. Green, are these your damages calculations in this case?

A.      Yes, it is.

Q.      And right here in this column, this is the tonnage that we just saw in Exhibit 753; is that right?

A.      That's right.

Q.      And then this column, the $0.65 cents is what happens if you multiply the tonnage on any row by $0.65; is that fair?

A.      That's right.

Q.      And the final column is what happens if you multiply the tonnage times your opinion of $1 rate; is that fair?

A.      That's fair.

Q.      On the left, you see the names of the eight refined coal entities; is that fair?

A.      That's right.

Q.      On the bottom down here, you have the CERT Operations entities; is that fair?

A.      Yes.

Q.      And then you see here it says, "jointly and severally liable with Marquis"; right?

A.      Right.

Q.      This is sort of like the color coding; right?  RCB, the Refined Coal LLCs that RCB operated were Senescence, Bascobert, Larkwood, Rutledge and Cottbus; is that fair?

A.      That's fair.

Q.      And so to get the tonnage on the bottom row for RCB,

you simply added up the tonnage for these five entities; is that fair?

A.    That's right.

Q.    Is that an accurate description of how the math works on Plaintiffs' Trial Exhibit Number 754?

A.    Yes, it is.

Q.    And so, again, if the jury would like to consult with your math or double-check it in any way, all they have to do during their deliberations is consult with Plaintiffs' Trial Exhibit Number 754; is that fair?

A.    That's right.

Q.    And if the numbers were considered at a high level overall in the aggregate --

MR. PEARSON:  Could we please have slide number 45, Mr. Diaz?

BY MR. PEARSON:

Q.    -- what are the results of your conclusions?

A.    So if we use the $0.65 per ton at over 57,082,006 tons, the damages would be $37,103,304, or if we use the dollar per ton the damages would be $57,082,006.

MR. PEARSON:  Thank you, Mr. Green.  I appreciate your time and attention today.

I pass the witness, Your Honor.

THE COURT:  Thank you, Mr. Pearson.  I'll call on the defendants for cross-examination.

MR. SYKES:  Thank you, Your Honor.

May we proceed, Your Honor?

THE COURT:  You may, Mr. Sykes.

CROSS-EXAMINATION

BY MR. SYKES:

Q.    Good afternoon, Mr. Green.

A.    Good afternoon.

Q.    I just want to cover just a bit about what you're here for and your area versus, like, Mr. O'Keefe's area.

You're what we call a damages expert?

A.    I am.

Q.    And I think as you testified to, your background is finance, accounting, evaluation of intellectual property. That's generally what you do?

A.    Generally, yes.

Q.    So you're not a technical expert?

A.    That's fair, but I have to get an understanding of the technology to do what I do.

Q.    You try to understand and get a handle on the technology, but you're not here to offer or pretend to offer any technical opinions, are you?

A.    Not as they relate to infringement or validity, but certainly as they relate to damages.

Q.    And I don't mean this in any way to be derogatory in any way, but you're not qualified or you're not competent to

be testifying as an expert witness giving opinions on technology issues, mercury control, and the like?

A.    I think that's fair, yes.

Q.    So in your role as a damages expert, you rely on the technical expert in the case for any technical opinions you may need to look to for comparable technology, comparability, things like that?

A.    Sure, and how the technology works, things like that.

Q.    And in this case, you relied on Mr. O'Keefe for that technical basis; fair?

A.    In general, yeah.

Q.    In particular, you relied on Mr. O'Keefe for the opinion that the patents and the technology in the Chem-Mod -- subject to the Chem-Mod license agreements we reviewed and the patents and the technology and the Nalco license that was referenced, those are technically comparable to ME2C's patents in this case; fair?

A.    Yes.

Q.    And, in fact, you didn't rely upon the opinions of anyone other than Mr. O'Keefe about the Chem-Mod and Nalco technology for the comparability aspect in your opinions?

A.    Right.  I spoke with Mr. O'Keefe about those patents and what they covered, and so sure.

Q.    And just to be clear, at the time you gave your opinions in this report, we've heard -- we've seen this

week -- you sat in this week and watched the testimony; right?

A.    I have.

Q.    And you've seen references to the EERC Section 45 certification reports that have been presented from time to time?

A.    I have.

Q.    And at the time you gave your report, you hadn't reviewed or seen any of these EERC Section 45 certifications, had you?

A.    I don't think so, no.

Q.    And regarding your conversation with Mr. O'Keefe, when was that?

A.    So I spoke with Mr. O'Keefe before issuing my first report in this matter, which was in October of 2022.

Q.    And do you remember about how long before your report you spoke to him?

A.    My recollection was there were a couple of conversations, so in the weeks leading up to the issuance of my report.

Q.    In person or over the telephone?

A.    Over the phone.

Q.    And you didn't talk to Mr. O'Keefe about the Chem-Mod patents with respect to NOx, did you, reduction of nitrous oxide emissions?

A.    I wouldn't say it that way, but, I mean -- because I understood what the Chem-Mod technology was about, but I don't think we spoke about it other than thinking that we're talking about mercury reduction in this case.

Q.    Yeah.  And just to be clear, you've given a deposition or two in this case?

A.    I have, two.

Q.    And you -- you testified, didn't you, that in your conversations with Mr. O'Keefe, we didn't talk about the Nalco patents with respect to NOx; is that fair?

A.    In general, that's true, yes.

Q.    And Mr. O'Keefe, he didn't provide you technical opinions about the reduction of nitrous oxide or NOx emissions regarding the Nalco patents, did he?

A.    We were talking about the similarity between the Chem-Mod technology and its mercury-reduction capabilities and the patents that are in this case.

Q.    And your understanding is that ME2C technology is fundamentally focused on the removal of the mercury?

A.    Yes.

Q.    And isn't it true that at the time you gave your opinions, you testified it was your understanding that NOx could be removed by running different temperatures of the boiler, and it wasn't a chemical issue, a chemical added to the coal?

A.    I don't recall saying that, but that's possible, sure.

Q.    So do you remember giving a deposition in the case, as we covered?

A.    Yeah.

Q.    Let's look at -- I think you have your binders. Let's look at page 75, beginning at line 14.

"Question:  You have no reason to think that ME2C's technology enables NOx removal; correct?

"Answer:  It's my understanding that the ME2C technology is fundamentally focused on the removal of mercury, and the removal of NOx can be done in a variety of different ways.

"Question:  And among the variety of different ways that NOx can be removed are methods that are not patented by ME2C; correct?

"Yeah.  My understanding is they could be removed by simply running different temperatures of the boiler and so forth.  It's not a chemical issue."

Did I read that accurately?

A.    You did.  You said boiler.  I just heard what you said for the first time.  You said "boiler."

Q.    Now, there's a parlance in this case of the furnace people and boiler people, and I think sometimes we talk past each other, but I think in the trade they call them boilers

rather than furnaces.

At any rate, so your understanding, I think as you testified before, is you believe that reduction of NOx is more -- was more of a question of how the power plant operator operated its plant?

A.    So again, I'm not the technical expert.  I spoke with Mr. O'Keefe about what the patents in this case do generally, and I also got an understanding of what Chem-Mod's technology did generally, and your question was how else could they do it, not chemically, I think, so I was just explaining what I understood.

Q.    Well, your understanding at the time you gave your expert report was that Chem-Mod's technology -- it was MerSorb and S-Sorb and that was -- excuse me.  The Chem-Mod technology chemicals, MerSorb and S-Sorb, were used to reduce mercury and to reduce sulfur; correct?

A.    Right.

Q.    And as you understood it, Chem-Mod's technology was used to reduce either mercury or sulfur; correct?

A.    The combined technologies would be used to reduce the both of them, but MerSorb was intended to reduce mercury.

Q.    And you believe that S-Sorb was intended to reduce sulfur; right?

A.    At the time I gave my report, I knew that S-Sorb was used to remove something other than mercury.

Q.    Let's again -- let's take a look at page 76 of your deposition beginning at line 1.  Defendants in this case...

"Question:  The defendants in this case met the NOx requirements for meeting Section 45 emission standards by using Chem-Mod's technology; correct?

"Answer:  To my knowledge, they had a license to use Chem-Mod's technology.  Chem-Mod's technology was MerSorb and S-Sorb so mercury and sulfur, and again, it's my understanding that the removal of NOx was more a question how you operated the plant."

Do you see that?

A.    I do.

Q.    And with respect to the refined coal companies, you testified that it was your opinion that it was the mercury and sulfur reduction, that that technology was what was of value to the Refined Coal LLCs like the CERT entities in this case; correct?

A.    So I mentioned that it was sulfur -- in order to be able to get the Section 45 tax credits, my understanding is that you had to reduce mercury by 40 percent but one of either NOx or sulfur to be able to get the credits.

Q.    And what you testified to was that the technology that was of value to the refined coal companies was the reduction of mercury and sulfur.  You weren't focused on NOx, were you?

I see you reading your deposition.  Just to clarify, page 54, line 15:

"Question:  Are all patents that reduce mercury emissions in coal-fired power plants of equal value at a given point of time?

"Answer:  So the intention of the patents, the '083 or Chem-Mod's technology as well as the ME2C technology, is to reduce or remove mercury or sulfur in the case of S-Sorb, and so those are of value to the technology -- the technology is of value to the licensees in this case, the Refined Coal LLCs.  I haven't seen anything that would suggest there's any reason to believe there's a big difference between ME2C's technology or that of Chem-Mod."

Did I read that correctly?

A.    You did.

Q.    And then in your direct today, the big stack of exhibits that Mr. Pearson went through and with a little fumbling by me admitted them in a block, those were Chem-Mod licenses; right?

A.    That's right.

Q.    And they were Chem-Mod licenses to a number of refined coal companies?

A.    That's right.

Q.    And with respect to those Chem-Mod license

agreements, your opinion at the time you testified and gave your report was that the royalty rates charged by Chem-Mod had nothing to do with the NOx reduction; right?

A.    My understanding is that the Chem-Mod licenses are for -- the royalties that are being charged are for the use of the technology, period, whatever the technology was doing.

Q.    Okay.  Well, let's -- again, let's revisit your deposition, and this time, let's flip over to page 82 and the beginning of a question.

"As you sit here today, you're not aware of whether the defendants' refined coal products qualify for tax credits because the coal was sufficiently treated or whether they qualified for the tax credits because the firing process for the coal at the customer plants was adjusted in some way?

"Answer:  I wouldn't say it that way.  I would say that it's my understanding that if you're burning PRB coal, you wind up having a low-sulfur-content coal.  And so what's left is the potential for NOx emissions as well as a reaction between Nox emissions and mercury.

"So what we know is that the shift in reduction of NOx is one aspect of the qualifying for the Section 45 tax credit, but the other part of it is the use of the technology that's covered by the patent here in suit in that

we can see that the royalty rates that were being charged by Chem-Mod for the use of its technology had nothing to do with -- with the NOx reduction either.  So the royalty rates make sense if we're just thinking about it in terms of mercury reduction."

That was your testimony?

A.    That's right.

Q.    And I think you've heard a lot of discussion about the Section 45 program and the use of the CERT companies with the EERC test reports and the measuring of NOx emissions and NOx reduction; right?

A.    That's right.

Q.    20 percent reduction of NOx was what the refined coal companies were focused on to get their tax credits in addition to the 40 percent reduction of mercury under the law; fair?

A.    Right, or it would be a reduction in sulfur dioxide.

Q.    The way Section 45 was set up was up was you could do -- you could do mercury or sulfur, but you also had to do NOx; right?

A.    Correct.

Q.    Okay.  So NOx was essential to getting the tax credit wasn't it?

A.    NOx was part of it, yes.

Q.    Without NOx -- without a 20 percent reduction in NOx,

you wouldn't get any tax credit, if you just reduced mercury?

A.      I think that's correct.

Q.      So we -- I'm going to shift gears.  I'm going to shift over to the Alistar agreement.  So that's PTX 763.

Mr. Green, in this case, you provided an opening and reply report in which you provided your opinions on damages for the Alistar Company in this case, and you swore those reports were true and correct in a declaration you submitted to the Court; fair?

A.      I think so, yes.

Q.      And I noted that a schedule in your binder today -- your direct examination binder, PTX 661, it didn't actually show your Alistar calculations.  I don't recall if that was put on the screen.

Let's take a look in your cross-examination binder -- we're all getting good with our binders -- at PTX 641, 642, and 646.

The binders -- the tabs match the numbers.  It looks like the PTX tab -- well, excuse me.  They're not -- I think they're numerically ranked.

Have you found PTX 641, 642, and 646?

A.      I found them, yes.

Q.      And you recognize those exhibits as your very own -- as your exhibits to your reply report on damages for the

defendants in this case, including Alistar; correct?

A.    Yes.

MR. SYKES:  Move to admit PTX 641, 642 and 646.

THE COURT:  Is there objection?

MR. PEARSON:  Yes, there is, Your Honor.  I don't think we need to admit tonnage calculations for defendants that are no longer in this case.  I prefer to have a clean verdict form.

And despite the fact that counsel insists on showing the jury consistently irrelevant amounts of tonnage, I'd prefer to keep the record clean and not admit the calculations which are not his current damages calculations which were admitted as PTX 754.

THE COURT:  Let me talk to counsel at sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  First, can you tell me, again, what exhibits we're speaking about?

MR. SYKES:  641, 642, 646.

THE COURT:  So PTX 641, 642, and 646, okay.  So these are documents that were attached to Mr. Green's reply expert report.

MR. SYKES:  Yes, Your Honor.

THE COURT:  And the documents, what do they demonstrate?

MR. SYKES:  The documents demonstrate his

calculation of tonnage for Alistar during the lawsuit, and so it's a point of contention between the parties, is the amount of tonnage of coal subject to the Alistar agreement because it's a piece of their damages case and these are --

THE COURT:  That's the part that both sides have talked about so far, the whether the Alistar license -- exactly.  I was saying that that's the point that both sides have talked about and asked witnesses about, exactly what the Alistar agreement represents in terms of tonnage, et cetera.  I see that.

MR. SYKES:  And Mr. MacPherson made a very loud proclamation yesterday twice during his direct testimony that Alistar paid $1 per ton for every ton of coal that they burned since the filing of this lawsuit.  And this agreement shows Mr. Green's own calculations of the number of tons that Alistar had burned, so it's highly relevant.

THE COURT:  Okay.  Do I have it right that we're just talking about this exhibit so far?  That's why you're using it?

MR. SYKES:  That one shows the tonnage.  The next one shows this is the damages.  It will be 1.4 million based on that.

THE COURT:  It's, again, related to the Alistar issue?

MR. SYKES:  Yes, Your Honor.

THE COURT:  And similarly for the third document?

MR. SYKES:  And so the third document shows the dates of the period.  You heard a lot of discussion about the applicable damages period in the direct testimony of Mr. Green, and he testified repeatedly that the 107,000 tons was the amount of tonnage during the applicable damages period, and this shows his own calculation of the applicable damages period for CERT -- I mean for CERT/Alistar.  And the testimony we heard on direct was that it was a quote, "very short damages period," September to January or something, and this shows that he previously calculated that exact same damages period to be much longer.

THE COURT:  I think I understand the reason why you're using the document.  What you want to question him about relates to the Alistar issue, the Alistar licenses, are we correctly calculating and thinking about how many tons of coal were used to generate the license.

Mr. Pearson, my guess is you don't have a problem with that, but maybe your objection is that there's a lot of other stuff in the documents.  Is that the reason for your objection?

MR. PEARSON:  I object to the admission only of the exhibits.  I don't object to the line of questioning which I think makes sense, and I understand, and I think

it's fair.  I just think on the exhibits themselves are a lot of other extraneous information that could be confusing under 403 to the jury, and I don't want prior damages calculations that have later been supplemented to be put into the record and the jury room and they're doing their own math.  I want a clean record based on what we're asking for and them doing their own math.  We don't know what it is.

THE COURT:  Mr. Sykes, my thought is there is something to the 403 argument because there's a lot of other stuff in these docs.  You can, if your purpose is to review the docs with the witness and talk about them and get the information you're looking for without having the evidence shown.

MR. SYKES:  These are Mr. Green's own opinions that he relied on and he gave on Alistar.  He was sitting on that stand giving a completely different opinion than what he gave.

THE COURT:  There's no question you should be able to examine him and go through all the information he said or didn't say or wrote or didn't write with regard to Alistar.  The only issue is these documents have lots of other numbers about lots of other entities that aren't related to reasons why you're asking the questions.  Could you speak to that?

MR. SYKES:  Yes, Your Honor.  All of the other numbers on these pages are directly relevant to PTX 766, which is the DTE/Gallagher agreement that he testified about on opening.  So those are the entities that he says are subject to that agreement and there's a whole -- so it's independent.  The rest of the figures are infinitely relevant to 766.

THE COURT:  I don't want to keep the jury waiting.  What I'll say is for now, I'll sustain the objection on 403 grounds because at least with regard to the questions at issue and how I understand they're going to be used, it's a very small portion of this document that is relevant.  There's a lot of other information, but to the extent that there's an argument later that other material in here may be relevant to other aspects of Mr. Green's testimony, we can address that issue at the time.

MR. DORSNEY:  Would the Court admit them conditionally given the fact that they're needed for the later exhibit that wants to be admitted and foundational material for that exhibit or can we remove it at that time?

MR. SYKES:  Could we make a redacted version for this purpose?

THE COURT:  You certainly could produce a redacted version of this solely relating to the Alistar line of defendants.  That wouldn't be objected to.  Is that

something you could do?

MR. SYKES:  We could work with our tech guy and do that.

THE COURT:  I guess we could take our afternoon break now.  Do you think you could do it in that period of time?

MR. PEARSON:  I apologize, Your Honor, just for the record.

THE COURT:  The only thing we're talking about right now is the last suggestion, they would redact the document only to include the Alistar lineup.

MR. PEARSON:  No objection to that.

THE COURT:  As to that, the objection is withdrawn for the purpose the parties are entering the exhibit.  We'll take our break now and work on getting the exhibits and move forward.

MR. DORSNEY:  Just briefly, we're not precluded from removing from what we talked about the later exhibit that deals with the numbers?

THE COURT:  For now, what we're dealing with is just the limited redacted exhibit we're talking about.

MR. SYKES:  Could we just -- in terms of the witness, he'd look at these in his binder.  He's very familiar with these.  These are his reports and then just when we move to admit them and they're admitted and

displayed on the screen to the jury, it's all redacted except for the one line.  So we don't have to generate a hard copy redacted version in the next 15 minutes, can we just redact an electronic display for the jury?

THE COURT:  Any objection?

MR. PEARSON:  No.

THE COURT:  That's fine.

(The discussion at sidebar ended.)

THE COURT:  Ladies and gentlemen, we have to deal with a legal issue and it's getting close to 2:45, so I figured why don't we go ahead and we need to do a little bit of work on something, so why don't we go ahead and take our afternoon break.  And with that, we'll have the jury led out for their break.

(The jury exited the courtroom.)

THE COURT:  It's 2:38 now.  Let's come back at 2:53.  The Court will stand in recess.

(A recess was taken, after which the following proceedings were had:)

(The jury entered the courtroom.)

THE COURT:  We'll continue with Defendants' cross-examination.

BY MR. SYKES:

Q.    Mr. Green, are you ready?

A.    Yes, sir.

MR. SYKES:  Pursuant to our discussion with the Court, Defendants move to admit a redacted version -- electronically redacted version for the publication to the jury of PTX 641, PTX 642, PTX 646 which, as we discussed before the break, are exhibits to the reply reports you previously had in the case with the preservation, if I understood Your Honor correctly, that if we were able to place our foundation and for the remainder of the document and the Court found it otherwise admissible, we could move for that at this time.

THE COURT:  So with regard to the request to admit the now redacted versions of these exhibits, I understand there will be no objections to that.  So I'll order that they be admitted.  To the extent there's further dispute about a difference with the fuller version, we can take that up.

(Thereupon, Plaintiffs' Exhibits 641, 642, and 646 were admitted.)

MR. SYKES:  Thank you, Mr. Brown.

BY MR. SYKES:

Q.    You can see the redacted version of PTX 641.  So referring to this, Mr. Green, this is an exhibit to your rely report in the case in which you presented as it's titled "Adjusted Tonnage Produced Per Plant During the Damages Time Frame."

Do you see that?

A.    Yes.

Q.    And in this particular line item is for the Alistar entity that we've been talking about; correct?

A.    Yes, it is.

Q.    And the tonnage that you computed, it looks like in the initial report, there was one number, and I think as you testified, working with all these tonnages, there's always rounding errors, and I think maybe you adjusted a few percent down.

So in your reply report, you came up with the final tonnage number of 1,424,924 tons for the Alistar tonnage during the damages time frame; right?

A.    That's right.

Q.    And let's just flip over to PTX 642.  And for -- so this is the companion schedule in which you've taken your adjusted tonnage per plant from the previous and now you -- and you have that laid out as the royalty base which for Alistar was 1.4 million tons for either 2013 and 2019 and then you have your royalties at the top, your rates of -- looking at the 2019 period, you have your $0.65 to $1.  We have our tons here, and we have our rates and then we -- easy math even a lawyer can do -- 1.424924 tons results in about $1.4 million as -- at $1 a ton; right?

A.    That's right.

Q.      And then let's take a look at PTX 646.  And here is the damages period.

MR. SYKES:  So, Mr. Brown, if we could look at just the -- I don't know.

BY MR. SYKES:

Q.      The very top of the chart is entitled "Damages Period" for the '114 patent; correct?

A.      That's right.

Q.      And the '114 patent is the same '114 patent we're here today about?  This is the very same lawsuit?

A.      That's right.

Q.      And so you have the damages period in your initial report as July 17th, 2019, to January 5th, 2021, and then there's a response and a reference to a Lawton report -- we'll get to that in a moment -- that the start date should actually be September 25th, 2020, with the same end date, and then here's your reply report column July 17, 2019, with an end date of July 5th, 2021.

Do you see that?

A.      I do.

Q.      And so you had -- so you had calculated the damages period for the '114 patent in both your initial report and your reply report to run from the filing date of the lawsuit, July 17, 2019, all the way to January 5th, 2021; correct?

A.    In both cases, yes.

Q.    And the January 5th, 2021 date, it cut off there because that was the date of the NRG license agreement, and that was the power plant that Alistar was supplying to; right?

A.    That's right.

Q.    And the NRG license agreement is DTX 21. It's at the front of your binder. We don't have to look at it with the jury right now.

A.    DTX 21 in the binder.

Q.    We've been talking about those exhibits. All right.

So in -- in your opening and your reply reports, you calculated in your report, which was submitted under oath, that all the coal burned by Alistar since ME2C filed this lawsuit was 1,424,924 tons, didn't you?

It's just what we looked at on PTX 641 and 642.

A.    Yes.

Q.    And you were in the courtroom yesterday, weren't you?

A.    I was.

Q.    And you heard Mr. MacPherson's testimony?

A.    I did.

Q.    And you heard him testify, didn't you:

"Question: Would you please remind the jury what amount per ton Alistar paid under its license agreement to your company under the patent in this case?

"Answer: Sure. To the best of my understanding, they paid a dollar a ton for all the refined coal they burned since the time we filed the lawsuit."

Do you remember that testimony?

A.    I do remember that testimony.

Q.    But Alistar only paid $107,776; right?

A.    It did, yes.

Q.    And if you had calculated not once but twice under oath 1,424,924 tons, a very precise number, it's just not true that Alistar paid a dollar per ton for 1,424,924 tons you calculated Alistar burned from the start of the lawsuit on July 2019, is it?

A.    No, it paid for the period that's in the green on the chart here, which is a shorter period.

Q.    Which was a shorter period.

And that was from the defendants in the case hired, as is customary, a damages expert who would review your report and critique and analyze it and provide a response; right?

A.    That's right.

Q.    And that was -- Ms. Lawton is her name?

A.    That's right.

Q.    So the Lawton report, that's -- she had said the middle period; right?

A.    That's right.

Q.    The short period.  And you reviewed the Lawton report, and even though she said September 25, 2020, was the proper start date, you rejected that, and you stuck to your guns to the original filing date, didn't you?

A.    I used the dates that I was aware of both from the filing of the complaint and when the NRG license occurred, sure, yes.

Q.    And I think that you've testified -- and you and I had the pleasure of taking a deposition about a month ago; right?

A.    We did.

Q.    And I believe you testified that you revised your number from the 1,400,000 number to the 107,000 number because a stipulation had come to your attention since you had done that calculation, and the stipulation shortened the damages period to September 25th?

A.    Right.

Q.    But to be clear, setting aside the stipulation, it's undisputed that the lawsuit was filed July 17, 2019?

A.    Right, and you can see --

Q.    So the tonnage --

A.    You can see from looking at the license that it talks about a particular number of 107,000 tons, and those are the tons that are in that time period that's highlighted in green.

Q.    And -- but the tonnage that you calculated since the filing of the lawsuit was 1.4 million tons?

A.    That's right.

Q.    That's right.  Let's talk a bit about that stipulation.  I think you just agreed that it came to your attention after -- after you had gotten to the $1.4 million number again.  You have your report in front of you.

Let's look at paragraph 221 of your reply report.  I'll just go ahead:  "The Lawton report sets forth the damages period at CERT Alistar Enterprises, LLC, and NRG Powerton plant starts on September 25, 2020, and ends on January 5, 2021.

"This is based on a secure look back from the stipulation dated September 25, 2020," that's 287, and you cite to a particular schedule.  "It appears that the Powerton plant was first included in the second amended complaint dated May 21, 2021.  However, based on the six-year look back from either of these dates, no adjustment was necessary to the tonnage royalty base for this plan.

"Based on the analysis of estimated annual activated carbon injection rates, the Powerton plant produced tonnage of 1,424,924 starting in 2019."

Did I read that correctly?

A.    Yes.

Q.    So Ms. Lawton brought that stipulation to your

attention about the September 25, 2020, date, and you disagreed with her, and you stuck to your 1,424,924 number, didn't you?

A.    I included that in the report as -- in the reply report consistent with --

Q.    Mr. Green -- go ahead.  I apologize.

A.    -- consistent with my understanding of what the parties were talking about at the time, sure.

Q.    You just testified two minutes ago that the stipulation came to your attention after your reply report, but you actually considered the September 25th stipulation in your reply report, and you stuck to your guns on the $1.4 million final number, didn't you?

A.    Yes, I did.

MR. SYKES:  Let's just take a look, Mr. Brown, at -- drop a footnote -- just to tie this all together, drop a footnote in that paragraph to footnote 292 down here at the bottom, reply Exhibit C1.

We just looked at reply Exhibit C1 as PTX 641 a few moments ago; right?

A.    Yes.

Q.    Just to tie it all together, you're aware, aren't you, ME2C entered your 1,424,924 tons figure to the Court for its damages demand in a pretrial filing for Alistar in late October 2023, about four months ago; right?

A.    I believe so, yes.

Q.    Yeah.  You actually cite that in your supplemental report.  Let's look at your supplemental report Exhibit K3 footnote three.

A.    I cite to the statement of damages in that footnote.  Yes, sir.

MR. SYKES:  Let's see if we can -- Mr. Brown, at the very end of Mr. Green's supplemental report, do you not have it?  I'll just read it.

BY MR. SYKES:

Q.    So you cite to Plaintiff ME2C's technical damages dated October 26, 2023?

A.    That's right.

Q.    So just a few months ago, you submitted that.

It's been suggested perhaps to use the Elmo, and I don't know if I want to attempt it.  The Elmo is kind of like a 1980 overhead projector.  I'll pass.  It's the 2020 version of a 1980 overhead projector.

So up to October 26, 2023, you were sticking to your damages number of 1.4 million tons for Alistar, the amount of coal they burned since the filing date of the lawsuit; right?

A.    That's right.

Q.    So when did you change your tonnage figure for Alistar?

A.    So the tonnage figure is described in the license that we talked about earlier in my testimony.

Q.    But you changed your tonnage figure a little bit before that license agreement, didn't you?

A.    I'm not sure what you're referring to, sir.

        MR. SYKES:  May I approach the witness, Your Honor?

        THE COURT:  You may.

BY MR. SYKES:

Q.    Mr. Green, I've just handed you a list of schedules attached to an e-mail between counsel, and you'll see an Exhibit C1 attached to the e-mail which has the number for Alistar, 106,696.

        Do you see that?

A.    I do.

Q.    And what's the -- what's the -- this is an updated damages schedule for this case, wasn't it?

A.    Yes, it was.

Q.    And these are a bunch of -- this is a bunch of your work product with damages calculations for the CERT defendants, all the ones in this case as well as Alistar?

A.    Yes, it is.

Q.    All right.  And here you've got 106,000 tons -- 696. And what was the date this was disclosed by ME2C?

A.    It was disclosed on November 9, 2023, which is the

same date as -- the effective date as the agreement between Alistar and Midwest.

Q.    It was disclosed November 9, 2023, at 6:26 p.m.; correct?

A.    Yes.

Q.    So let's take a look at that Alistar agreement. PTX 763 is in evidence.  Let's flip to the back page.  Look at the signatures.  It was -- what day was it signed?

A.    Signed on November 10th.

Q.    And ink signatures on November 10th; right?

A.    That's what it looks like, yes.

Q.    So you would agree from these handwritten ink signatures, including Rick MacPherson, CEO of ME2C, this agreement was signed on the 10th?

A.    Right, one day after the e-mail you showed me.

Q.    What's that?

A.    One day after the e-mail that you just handed me.

Q.    The very next day?

A.    That's correct.

Q.    That's right.  So you changed your damages numbers the night before this agreement was signed?

A.    Right.

Q.    After sticking to them for how many years?

A.    A year.

Q.    I think your first report was October 2022, and then

you -- we had the little -- just the adjustments, your second report, February 2023.

And remember that in between October 22nd and February 23rd, the September stipulation was brought to your attention, and you said, "No, it doesn't affect my number." You stuck with it from -- you're right.  It is a year.  I was going '22 to '24.

But you stuck it out for a year and a month -- a year and a few weeks.  You stuck with it despite the stipulation.

And then somehow, the night before the agreement was signed, you dropped your number to 106,000 tons, which just magically works out to about a dollar per ton, doesn't it?

A.    I wouldn't say it that way.  I would say that by the time we were at November 9, 2023, you can see that there are more limitations in the case, other things that happened, and so I used the 106,000 or 107,000 number in schedules that are attached to this e-mail.

Q.    Mr. Green, you testified that you changed it because you reviewed a stipulation with a September 25th date, but you'd seen the stipulation nine months before in February.

Actually, you'd seen it longer before that when Ms. Lawton pointed it out to you in her report.  You said, "Oh, the stipulation doesn't affect my opinions," and then

all of a sudden, when the Alistar agreement is getting drafted up in the middle of the night, you just change your number to 100,000, which magically works out to a nice easy litigation payment and gives ME2C a number to point to?

A.    Sir, I wasn't involved in the execution of or signing or calculation or anything having to do with Plaintiffs' 763.

You can tell -- you can tell that those numbers -- no one is saying that the 106- or 107,000 tons isn't the actual number of tons that were actually processed at Alistar from September 25, 2020, to January 5, 2021.

These are the right numbers for that time period, and they appeared, based on Exhibit 763, as the amount that was paid on by Alistar to Midwest.

Q.    So let's go look at Alistar again PTX 763.  Let's page over to page 2, section 3.  Let's zoom in on ME2C's release.  And as we've learned in this case, when people sign these agreements, they give a release, and ME2C releases and discharged Alistar and all of its affiliates, managers -- these long synonyms -- for all causes of action for patent infringement, and all causes of action and all claims and demands of whatever kind and whatever nature arising out of the claims and defenses that were or could have been asserted against Alistar with respect to the action on or before the effective date November 10th, all

claims that were or could have been asserted.

So there was a claim asserted against Alistar for 1.4 million tons, wasn't there?

A.    No.  There's a claim asserted against Alistar for patent infringement.  The number of tons during the time period was 1.4 million tons over from the time of the filing of the complaint through January 5, 2021.  The parties settled very clearly, we can see it in section 4.2, on 107,000 tons.

Q.    From your perspective, a hundred percent on the up and up?

A.    The numbers agree to the underlying tonnages.  The parties paid a dollar.  Alistar paid a dollar per ton.  It says so in the agreement.  The agreement means what it says, I would assume.

Q.    Mr. Green, I notice you're usually very precise when you look at the schedules, they're these 6 and 7 digit numbers, 2,129,349.  They're very precise, and the new Alistar number disclosed it on the night of November 9th was 106,696; right?

A.    Yes.

Q.    Yet somehow the next morning, that number had changed to our 107,000 number.

Did you just make a mistake?  How did the number go from 106,696 the night of November 9th, which you say is

the effective date of the agreement, to the next day when they signed the agreement of our 107,776?

A.    Because as I mentioned earlier, we gave the CERT plants certain reductions for not running the ACI.  The reduction on the Powerton plant that's at issue in Alistar was exactly 1 percent different between 107,776 that appears in the license agreement versus the 106,696 that appears in the schedule.  So we just carried over the 1 percent reduction for the ACI in the schedule that you just handed me.

Q.    So were you involved in the negotiation of this agreement?

A.    I was not.

Q.    So you got word, like, overnight on November 9th to round up by 1 percent?

A.    Sir, the agreement is actually the day after.  I wouldn't have known about this until the 10th or later.

Q.    These legal agreements -- these license agreements like the Alistar agreement and these other big agreements in your binder, they're somewhat involved agreements; aren't they?  A lot of these have a lot of long, complicated terms?

A.    I'm not sure what you're referring to.  They look like license agreements for the use of technology that I see in other -- in my daily practice and help people negotiate.

Q.    How long do you usually take in your experience to

negotiate a technology license agreement?

A.    Some days -- sometimes it takes us a month or two, sometimes it can take years.

Q.    Okay.  So is it your testimony that you think that this agreement just got started being negotiated between 6:26 p.m. when the 106,000-ton number appeared and the next morning when it was signed?

A.    So to my knowledge, Exhibit 763 is a license agreement that settled a litigation between Alistar and Midwest, and there was a litigation pending.  I've seen and we saw earlier, for example, a term sheet that turned into a license.  It didn't take that long to do.  The term sheet is in early November.  The license is by late December.

Similarly, the parties could have been in the same time frame here.

Q.    Well, exactly.  That's what I'm getting at.  Parties might have been working on this for a whole week or ten days before -- before the November 10th signing date; right?

A.    They could have been.

Q.    Yeah.  So it might have been negotiated, "Hey, let's come up with a dollar a ton and pick a number you guys are willing to pay.  I know you're not going to pay 1.4 million, the old tonnage number, but hey, here's a number that we can get to that's just a hundred thousand bucks, and so we're papering it up" and just disclose a new damages schedule.

Nothing like that happened, did it?

A.    I don't know what the parties were doing with respect to licensing.  What we do know is looking at this document, it tells us exactly what the royalty per ton is paid for the use of the technology, for use of Midwest technology in this case.

Q.    Let's pop up PTX 761, term sheet.  So this was the other agreement.  Let's see.  Let's flip to the back page.

This one was signed November 9, 2023, wasn't it?  So this was signed around the same time as the e-mail; correct -- or same day, excuse me, same day?

A.    It appears to have been signed on the same day as the e-mail, yes, sir.

Q.    All they were able to come up with was a term sheet.  It's not a complete agreement, is it?

A.    Right, it's a term sheet.

Q.    Yeah.  And it took them another six weeks, to December 28, 2023, to fully flesh out and sign PTX 766, the Chem-Mod/Alistar -- or Chem-Mod/DTE/AJG agreement?

A.    Possibly, yes.

Q.    What's possible is that this Alistar agreement, PTX 763, it might have been in the works for a week or more.  You don't know?

A.    I don't know.  I wasn't involved.  Again, it gives us a royalty rate based on the number of tons, and it's very

specific about what that calculation is.

Q.    Let's shift gears.  Let's talk a little about tax credits.  We've talked a lot about in this case -- about tax credits, haven't we?

A.    There has been discussion about them, sure.

Q.    Do any of ME2C's power plant customers that are licensed to use ME2C's technology and actually use ME2C's patent products, do they qualify for or receive Section 45 tax credits for removing mercury from flue gas with ME2C's technology?

MR. PEARSON:  I object to this question, Your Honor, as irrelevant under 402 and 403.  This is not part of his opinion.  His opinion doesn't have anything to do with tax credits.  Counsel knows this.  He has an opportunity to review the reports, and his report is not about this.

THE COURT:  Let's try to make the objections straightforward and not argumentative, but your objection is on relevance grounds in light of the witness's direct testimony with regard to his opinion?

MR. PEARSON:  He offered no opinion on this, Your Honor.

THE COURT:  Mr. Sykes.

MR. SYKES:  I think that his reply report says that the economic basis of his of the defendants'

infringement is Section 45 tax credits.

THE COURT:  Mr. Sykes, I believe in his direct testimony, and I listened to it, I didn't hear the witness mention Section 45 tax credits once.  I think I do believe the plaintiffs are correct, so I'll sustain the objection.

BY MR. SYKES:

Q.    You've got your opening report up there with you, don't you, Mr. Green?

A.    Yes, I do.

MR. SYKES:  Mr. Brown, if you could pull that up.  I think it's -- let's -- I believe it's page 105 of the PDF.

BY MR. SYKES:

Q.    Jump down to Exhibit J of your report.  Let's just kind of zoom in on the left-hand side of this Exhibit J.

Exhibit J --

MR. SYKES:  Mr. Brown, let's take a look at the title first.

BY MR. SYKES:

Q.    "Comparable Royalty Rate Summaries"; right?  Is that what it says?

A.    Yes.

Q.    Okay.  And -- all right.  And then let's just have a look at the left-hand column.  This lists a bunch of license agreements that you have identified as being comparable; is

that fair?

A.      Yes.

Q.      And this goes on for a page or so, your Exhibit J; right?

A.      Two and a half pages, sir.

Q.      Let's just go back.  And these agreements are -- correspond to the big stack of exhibits that Mr. Pearson admitted as a set in your direct testimony, didn't he?

A.      For the most part.

Q.      And those are the agreements that you say you're getting your comparable royalty rate from; right?

A.      They help us with understanding what comparable royalty rates would be, sure.

Q.      Okay.  And let's just look at what you say the royalty is on just the very first one.  So what you say is comparable royalty is $0.99 per dollar of tax credits.

        Do you see that?

A.      I see that, yes.

Q.      So you identified the comparable royalty in your agreement as a dollar per tax credit?

A.      I would say that that's not actually identifying it as a royalty.  It's actually identifying what the terms are of the agreement to be able to understand what it is.

        As you can see down below, I identified that there's also other royalty terms that say after

December 21st, 2012, the royalty is no less than $0.50 per ton, just as I said during my direct testimony.

MR. SYKES:  Let's just look briefly at the next one on the list, the next one down, Mr. Brown.

BY MR. SYKES:

Q.     These are also included in your summary, the tax credit per ton, don't you?

A.     Yes, again, the royalty is no less than the greater of $0.50 a ton or 7.5 percent of the tax credit.

Q.     And just one more and we'll stop.  Next one.

And you say $0.99 per dollar of tax credits?

A.     That's what it says.  Again, it's the same term that after, it has to be no less than $0.50 a ton after December.

Q.     That's not what it says.  That's what you wrote.  You looked at the big thick agreement and decided to pull that out and put it in your schedule, didn't you?

A.     Sure.  That's what is in the paragraph that identifies the royalty terms.  Yes, sir.

Q.     And it's your testimony that there's not -- in your $1 a ton rate, there's not one penny of that that reflects the value of -- value attributable to a Section 45 tax credit; is that fair?

A.     It's my understanding, looking at the Alistar agreement, the royalties were due whether any tax credits were realized.

Q.    And so the $1 reflects the value of ME2C's technology for mercury control?

A.    It reflects the value of the use of ME2C's technology by the defendant, sir.

Q.    Well, what is that use?

A.    It's typically related to mercury control, although we saw in the '517 patent that there are other chemicals in Claim 2 -- excuse me -- whatever the second thing was, Claim 2.

Q.    You're not confident as a damages expert to offer any opinion as to what those chemicals are or what they do, are you?

A.    No, sir.

Q.    And the power plants -- the power plants are the ones that ME2C is identified as the direct infringers, and the power plants are performing both steps of the two-step method?

A.    That's what I understand, yes.

Q.    They burn the coal that has bromine on it and add activated carbon to the flue gas?

A.    That's right.

Q.    And you heard Mr. MacPherson say that the power plant agreements, DTX 19, 20, 21, and 23, reflect a fair price for mercury control; right?  Did you hear him testify to that yesterday?

A.    That's not how I understood what he was saying, no, as it relates to those agreements.

Q.    Okay.  Well, the transcript will show.

We referenced a little while ago this Ms. Lawton, the damages expert hired by the defendants to critique your report, and she provided a rebuttal, and you responded, and that's how we get your second report we call a reply report; correct?

A.    My reply report relates to issues that were provided in Ms. Lawton's report, yes.

Q.    You were replying to her analysis?

A.    Among other things, yes.

Q.    And you carefully considered Ms. Lawton's report before you responded to it in your reply?

A.    Right.  All thousand pages of it, yes, sir.

Q.    It was lengthy.

And let me just show you DTX 419, Schedule 720, that you would have reviewed in those materials.  It's at the back of your binders.  You would have reviewed this in connection with your analysis of the Lawton report to prepare your response; right?

A.    Yes.

MR. SYKES:  I move to admit DTX 419.

THE COURT:  Any objection?

MR. PEARSON:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(Thereupon, Defendants' Exhibit 419 was admitted.)

BY MR. SYKES:

Q.      I'm going to ask you a few quick questions about this.  We can display it.

And so this is a summary of the ME2C litigation license agreements that were provided to you.  And these correspond to our DTX 19, DTX 20, 21, and 23; right?

A.      I don't have them memorized, but -- the trial exhibit numbers memorized, but I'll take your word for it.

Q.      Yeah, but the utility agreements?

A.      Right.

Q.      And those are the dates we looked at.  There's our January 5th date, July 30th date.  And so my question is: You didn't have any reason to dispute, did you, the number of plants that Ms. Lawton identified for each of these utilities, did you?

A.      I don't think I disputed the number of plants that she identified.  I disputed the entire concept of the licenses being meaningful in the hypothetical negotiation.

Q.      You don't think that these licenses are comparable for the hypothetical negotiation?

A.      No, they're not, sir.

Q.      And these are not hypothetical licenses, are they?

A.      No.

Q.      These are real licenses that are actually negotiated by ME2C for these patents in this case with defendants in this case for coal, including the covered refined coal because they stopped and went down the conveyer; right?

A.      No, not really, sir.

Q.      Okay.  You stop your damages for NRG on July 5th, 2021, because the NRG license covered the refined coal after January 5th, 2021, didn't you?

A.      I stopped the NRG damages as they relate to CERT on January 5th, 2021, yes, sir.

Q.      And CERT continued to sell NRG refined coal for the remainder of the year 2021?

A.      That's right.

Q.      So these agreements actually licensed CERT refined coal going down the conveyer belt under these patents in this case to utilities and power plants in this case, and you say they're not comparable, and we should consider a hypothetical alternative?

A.      We should because these are licenses with power plants.  They aren't licenses with refined coal entities.  They're different parties, and as we heard Mr. MacPherson and Mr. Pavlish both say, these are agreements intended to get ME2C to be able to supply these big power plants.

        They were done in an effort to be able to

provide chemicals and other services to those companies.

Q.    So speaking of Mr. Pavlish, you heard him say yesterday that a large utility like Vistra -- the agreement may cover 400 to 500 million tons of coal.

Did you hear that testimony?

A.    I did.

Q.    And that for AEP, a somewhat similar couple hundred million tons of coal, and for Talen you agreed a couple million tons, probably that, but his memory faded on NRG.

So if we just -- let's just round down to a hundred million tons.  If we divide, picking NRG, that's 6/1000ths of a penny per ton; right?  $600,000 divided by a hundred million tons is 6/1000ths of a penny?

A.    That's arithmetic, yes, sir.  I'm not doing arithmetic for you, but that's not -- you can just explain the problem.  It doesn't specify the rate per ton.  It doesn't help us figure out patent damages, which is what we're all here to do.

Q.    At a dollar a ton, this would be a couple million dollars for each of these in the power plants for the same patents, for the same coal, the same two-step process. They're paying thousandths of a penny, a few hundred thousand bucks.

And you're saying that ME2C discounted the value of its technology by several hundred million dollars just

for an opportunity to make a pitch?

A.    It did.  It intended to do what it wanted to do, which was to sell to these power plants, and that's what it considered to be more valuable when it negotiated the agreements.  Yes, sir.

Q.    And how much coal has ME2C sold to Talen?  Do you know?

A.    I don't think ME2C sells coal.

Q.    How much coal has ME2C sold to NRG?

A.    ME2C doesn't sell coal.

Q.    Excuse me.  Sorry.  How much of its products and sorbents, patented products and sorbents, sold?

A.    I don't know.

Q.    How much of ME2C's patented product was sold to NRG?

A.    I don't know.

Q.    What about to AEP?

A.    I don't know.

Q.    But if you could figure out how many -- the tonnage of this, I think you heard Mr. Pavlish's testimony about this EIA database.  That's a public database; correct?

A.    I did.

Q.    And you pulled a lot of coal numbers in your expert report tonnages from the EIA database?

A.    I did.

Q.    So the math and data would be available to you to

look at the tonnage sold to these, but you just don't think that applies?

A.    No.  I don't.  These are -- again, you don't have specific time frames for any of these agreements.  You know that they're for obtaining a supply agreement.  They -- they don't specify tons.  They don't specify a royalty rate per ton.  They're really not helping us with trying to figure out what a reasonable royalty would be in this case.

They're also not with the right parties.  The parties they're licensing here are refined coal entities, not the power plants themselves, who are ME2C's intended customers.

Q.    Let me -- I'm going to ask a few questions of PTX 766.  That's the AJG/DTE agreement.  Let's page down.

Your understanding is that this settled -- this is a settlement of the -- of some of the previous parties of this case and other refined coal entities as well as, I guess, some parent entities and Chem-Mod; is that fair?

A.    That's right.

Q.    Let's flip over to Exhibit A.  I think it's page 17.  That's a list of the defendants; right?  Then Exhibit B is the second set.

A.    Right.  These are these are the AJG entities in Exhibit A and the DTE entities in Exhibit B.

Q.    And the tonnages for these two lists of entities,

that's where you got the range you testified about in your opening of -- what was it? -- $0.14 to $0.39 a ton?

A.    I testified about it on my direct, that's correct.

Q.    Thank you.  Yeah.  But the 14 to $0.39 was as to the tonnage for these entities?

A.    They were based on the tonnages for these entities, that's correct.

Q.    And you actually -- the exhibits we looked at before PTX 641, 642, and 646 that we previously redacted, those list the tonnages that you actually calculated for that same set of entities, don't they?

A.    Not quite, no.

Q.    Not quite.  What's different about it?

A.    So --

Q.    Includes the CERT entities?

A.    -- exhibit -- so PTX 642, for example, has five DTE entities, and Exhibit B has nine DTE entities, so they're not quite the same in what's on exhibit -- on PTX 642.

Q.    You agree that all of the entities excluding the CERT entities for DTE and AJG are listed on Exhibits A and B of PTX 766?

A.    I would agree that these are defendants or were defendants at one point in this litigation.

Q.    And you agree that PTX 641, 642, and 646 provide some information by which we can get a better idea of the

tonnages and estimates of the value paid in PTX 766; correct?

A.    No.  I don't think so.  As I said in my direct, you can see that there's $27,500,000 that was paid.  There's a variety of different dates that are related to when the damages were run for each of the parties, as we can see from the exhibits that you were just mentioning.

So the agreement tells us some things, like charts tell us some things, but we don't know what an effective royalty rate would be coming out of this agreement for any one of the defendants that settled.

Q.    Mr. Green, you're telling me that the damages and the numbers that you calculated for all of these entities is not informative of the royalties those same entities paid in PTX 766?

A.    I'm saying PTX 766, $27 and a half million payment was a lump sum.  PTX 766 doesn't identify by plant or entity what the dollar values were that are associated with any of those entities, nor does it identify for us in the document the tonnage, nor does it tell us what the royalty per ton was that the parties were considering, and they obviously chose a lump sum.

Q.    All right.  You're making it sound so complicated.  Royalty per ton, you take the dollars, the royalty.  You can just divide by tons; right?  That's how you got your $0.14

per ton and your $0.39 cents per ton.

A.      Right, you can estimate.

Q.      Right.  I mean, it's third or fifth grade arithmetic?

A.      You can estimate a broad range of royalties based on the ton.

Q.      You can add up the tonnage, take up the dollars, and add up the tonnage and divide them to get your cents per ton?

A.      Sure.

Q.      Yeah.  PTX 641, 642, 646 provide that tonnage, don't they?  They provide at least some of the tonnage that went into PTX 766?

A.      Some of the tonnage, yes.

          MR. SYKES:  So I move to admit PTX 641, 642, and 646 in unredacted form, Your Honor.

          THE COURT:  Mr. Pearson?

          MR. PEARSON:  Same objection under 403 and juror confusion that I stated previously.

          I don't have an objection to the line of questioning.  I just have an objection to the introduction of the exhibits.

          THE COURT:  I'm going to go ahead and sustain the objection.  I think we've had -- expert reports generally are not admitted as exhibits in cases like these.

          And while occasionally the charts or exhibits

attached to them at the end could be admitted, it's almost always the case that happens when there's a stipulation.

That said, of course, defense counsel is free to cross-examine the witness with bearing on the content if he wishes.

MR. SYKES:  I'll take a moment to talk about the content.

BY MR. SYKES:

Q.    Do you recall, Mr. Green, what your -- if we look at PTX 642, your damages for these different entities, what you calculated their damages would be, you've got that one number that includes the CERT entities of 168 million, and another number of 137 million.

Do you see that?

A.    That's not quite right.

Q.    Just referring to PTX 642.

A.    I am too.  It's not quite right.

Q.    What is your view of the $1 per ton rate that you calculated?  What was the total?

A.    The total is $137,689,384.

Q.    To be clear, that was inclusive of certain entities and the 1.4 million for the Alistar; right?

A.    And assuming that damages started in 2019.

Q.    And then on the 2013, you came up with $168,265,451; correct?

A.      Applying a royalty rate of $0.65 a ton starting with tonnage back in 2013, yes, sir.

Q.      We'll peek at PTX 766 to remind the jury -- we'll jump back to Exhibit 4.

A.      What would you like me to turn to, sir?

MR. SYKES:  Mr. Brown, if we could go to Exhibit 4 of PTX 766 -- Exhibit D.  I apologize.  Exhibit D, additional license entities, a couple of pages back.  There we go.

BY MR. SYKES:

Q.      So these are all the entities we established that were licensed under additional license entities under this agreement, and you did not try to investigate the tonnages associated with any of these entities when you came up with your $0.14 and $0.39 a ton, did you?

A.      I disagree.  I think a number of the entities that are on Exhibit D actually appeared in earlier exhibits and were part of the analysis that I did, so I have actually considered this, sure.

Q.      But you didn't look it up for a whole bunch of them, did you?  Aren't there a lot of these that you did not go into the EIA database and try to determine the tonnage when you calculated your $0.14 and $0.39 cent?

A.      That's true.

Q.      Do you know how many of them you considered versus

not?

A.     No, I looked at the ones that were settling Defendants' Exhibits A and B to this agreement.

Q.     You know the tonnage of the other ones can be found in the EIA database; right?

A.     That gives us a third way of knowing what the $27 million might mean and, again, we don't know based on the defendants identified in the agreement what the royalty and tonnage is.

Q.     You didn't go down that third way path?

A.     No, sir.

Q.     Just to be clear, as we add more and more tons, the cents per ton get smaller and smaller, don't they?

A.     That would be the math.

Q.     If we came up with 500 or a billion tons adding up the tonnage for pages and pages and pages of power plants that burn trainloads of coal every day, that would come out to a tiny, tiny number, wouldn't it?

A.     I don't know.  It could, but that's why looking at the parts and rates of the agreement -- it doesn't say.

Q.     You didn't investigate that, did you?

A.     No, I investigated --

Q.     You came in here and you gave an opinion of 14 and 39 cents on a subset of about 20 of the 134 entities listed on Exhibit D, and you didn't bother to go to then EIA public

database to look up the tonnage for the rest to get the actual, whatever it may be, one penny, three-pennies-per-ton rate?

A.    We don't know if it's a penny, three pennies.  No one has done that math.  All we know is that they paid a $27 and a half million.  It's not in the agreement.

MR. SYKES:  Can I take just a moment, Your Honor, to confer with counsel?

THE COURT:  You may.

BY MR. SYKES:

Q.    Just a few more questions.  I'm going to try to wrap this up.  I know it's dragging.

Speaking of the utility agreements, DTX 19, 20, 21, and 23, as we established earlier, you don't think these are comparable?

A.    That's correct.

Q.    And if you look at your reply report, bottom of page 41 --

MR. SYKES:  Let's highlight paragraph 161. Let's get the title to that, Mr. Brown.

BY MR. SYKES:

Q.    So you entitled this "The 2019 Licensing Program," and you are referencing eight agreements.  Four of those are licenses known as the litigation licenses, and those are the ones we've been talking about; correct?

A.      Right.  I referenced them in this whole section in response to Ms. Lawton.

Q.      And you go on to discuss them.  Let's look at the top of the next page.  We see the fleet-wide licenses of Vistra. That's one of the ones we looked at; fair?

A.      Yes, sir.

Q.      And you know that the utilities are part of the 2019 licensing program; right?

A.      Yes, they are.

Q.      And these utilities, Vistra, Talen, NRG, they settled out of this very litigation; right?

A.      They did, yes.

Q.      And you talk about them as the litigation licenses. So this litigation that we're dealing with now is part of the 2019 licensing program of ME2C, as you call it; fair?

            What can I help you find?

            While he's looking, let's look at the bottom of page 41 again.

A.      I don't characterize them as part of a licensing program.  I simply, in my report, identify the licenses and their terms.  I think the licensing program is something that Ms. Lawton was using.

Q.      I mean, you have a title:  "ME2C's 2019 Licensing Program."  That's not -- you're saying that's not you?

A.      That's coming from -- as I said, this page 41 is in

response to Ms. Lawton.

Q.    But you are referring to the pending litigation; right?  Or the settlement litigation?

A.    I'm referring to the licenses that Midwest executed with the power plants, yes.

Q.    And you would want, as you're considering those and the defendants in this case -- they're a part of the same litigation, aren't we?

A.    You are part of the same litigation, yes.

Q.    And you would want to be careful and thorough in your work when you're analyzing agreements coming out of litigation and look at documents that might be somehow related to that, wouldn't you?

A.    Yes.

Q.    And this litigation, it was filed July 17, 2019?

A.    That's right.

Q.    Against CERT but also these utilities here.

      And I want to you to look at DTX 97 in your binder.  This is a document dated July 2, 2019, so about two weeks before the litigation was filed.  It's on ME2C letterhead.  And you know from having been involved in litigation there's a number on the bottom, ME2C -- we call it a Bates number.

      RC00223105 shows that ME2C provided this document in the case and that John, Jim, Rick, and Rich were

present.

Did you use all that?  Have you found the document?

MR. PEARSON:  I'm sorry, counsel.  I missed the number.

MR. SYKES:  97.  Right in the middle.

MR. PEARSON:  Sorry.

THE WITNESS:  I see the document.

BY MR. SYKES:

Q.    And you see the stuff I just described, ME2C letterhead, the ME2C Bates number that shows that ME2C provided it in this case, the date of two weeks before the litigation, and that John and Rick were present?

A.    I do see that.

Q.    And you understand John and Rick to be John Pavlish and Rick MacPherson?  You're not aware of any other John and Rick in management in ME2C?

A.    I assume that's what it's referring.

Q.    You see there's a bullet, a second bullet down, IP announcements.  And it says, "Three key areas of endeavor: The refined coal business and three major utilities we're filing against and a letter campaign."

Do you see that?

A.    Can you point me to it again, sir?  I'm sorry.

Q.    Yeah, there's a --

MR. SYKES:  May I approach the witness?

THE COURT:  You may.

BY MR. SYKES:

Q.    Do you see under the sort of heading "IP announcements" there's a subheading, three areas, three key areas of endeavor.  One refined coal business, three major utilities we are filing against, and three, a letter campaign.  Do you see that?

A.    I do.

Q.    And you understand the three major utilities would be -- it would include Vistra, Talen, and NRG who were sued maybe two weeks after this document?

A.    Yes.

Q.    So this would relate to the litigation licenses in your expert report that you considered and you considered noncomparable; is that fair?

MR. PEARSON:  Your Honor, I apologize.  I object to speculation on this.  I'm not sure this document is in his report, and he's asking fact questions about what happened at the company.

THE COURT:  Mr. Sykes.

MR. SYKES:  I'm asking him questions about whether he considered documents relating to what he entitled a 2019 licensing program, and we see in this document what is clearly a licensing program, IP announcements, a letter

campaign suing three major utilities in the refined coal business.

And I think this is directly relevant to the comparability analysis in his report because as he just agreed, we're parties to the same litigation. These are litigation licenses, and this at least tends to show that we are participants in the same licensing program from which the utility licenses arise.

THE COURT: So I'll overrule the objection to the extent the witness can be asked if he considered the document and its content with regard to his analysis and depending on the answer from there.

BY MR. SYKES:

Q.    And, Mr. Green, did you consider this document -- did ME2C provide this document to you when you did your review and consideration of the 2019 licensing program?

A.    When you were asking me questions before, the thing I was doing while I was going through this document is seeing if I could find this Bates number, and I did not.

Q.    ME2C didn't provide this to you?

A.    I haven't seen this document.

MR. SYKES: Your Honor, I think this bears upon the thoroughness with which he analyzed the issues in his report, and since it's an ME2C document on letterhead with the executive officers that they provided, we would move to

admit DTX 97.

THE COURT:  Mr. Pearson.

MR. PEARSON:  I think that counsel absolutely cross-examined Mr. MacPherson and could have entered it with him.  This witness laid no foundation for the document.

THE COURT:  I agree, so the objection is sustained.

MR. SYKES:  With that, I'll pass the witness.

THE COURT:  Mr. Pearson, redirect.

MR. PEARSON:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. PEARSON:

Q.    Mr. Green, did anything happen in the last 90, 120 minutes that would cause you to reconsider your opinion or change your opinion in this case?

A.    No.

Q.    You've been here for the whole trial; right?

A.    I have.

Q.    You are an expert not only on patent damages but patent licenses.  I think you testified in the beginning you have a lot of experience with patent licensing; is that fair?

A.    Yes, that's fair.

Q.    I'm not sure why there's been a lot of discussion in this case about letters that might or might not have been

sent.  We had a question about letter writing campaign or non-letters or something.

Do you recall?

A.    Yes.

Q.    In your experience in patent licensing, is there something like a magic letter, like, where you send a notice letter to a potential infringer, they automatically sign a license with you?

A.    That doesn't usually happen, no.

Q.    Is it that simple?

A.    No.

Q.    Sort of working in reverse order of what I wrote down in my notes happened, there was some more discussion of the ME2C/AJG agreement.

Do you remember that?

A.    Yes.

Q.    And that was the one where you testified there was a lump sum, and you put a little dash up there.

Do you remember that?

A.    Yes.

Q.    And I said why, and I recall your testimony was you just were uncertain about what the per unit royalty was.

Do you remember that?

A.    That's right.

Q.    Did I summarize that fairly?

A.     You did.

Q.     And then counsel for the defendants spent seemed like a while trying to prove up that you, in fact, were uncertain and might not have had all the data you needed.

       Do you recall that?

A.     Yes.

Q.     He was talking about the EIA database.  Do you remember that?

A.     Yes.

Q.     And that was the one he said was publicly available; is that right?

A.     That's what he said.

Q.     And that's true?  It is publicly available; is that fair?

A.     It is.

Q.     So that means I could go look it up?

A.     You can.

Q.     And you can go look it up?

A.     Yes.

Q.     Could counsel for CERT go look it up?

A.     I would expect so, yes.

Q.     There's no reason he doesn't have access to the EIA database?

A.     Not that I know of, no.

Q.     If there was something in there about tonnages that

he thinks proves his point, doesn't it seem fair that he would go to the database and retrieve the data that proved his point?

A.      I would think.

MR. PEARSON:  Mr. Diaz, could I please have Plaintiffs' Exhibit 353.

BY MR. PEARSON:

Q.      There was a confusing exchange in the middle, and I want to make sure the record is crystal clear.  There was a detour about tax credits somewhere in the middle of the cross-examination.

Do you remember that?

A.      Yes.

Q.      And I made an objection and said I don't know what this is about.

Do you remember that?

A.      I do.

Q.      Because you hadn't testified about tax credits?

A.      That's right.

MR. PEARSON:  Can we please see PTX 353?

BY MR. PEARSON:

Q.      And PTX 353 is the Chem-Mod and Alistar license; right?

A.      Yes.

Q.      And there was some question about whether your

analysis was inappropriate or somehow infected with tax credits.

Do you remember that?

A.    Yes.

Q.    And I believe you testified, "No, my opinion doesn't have anything to do with tax credits.  These licenses aren't about tax credits"; is that fair?

A.    Yes.

MR. SYKES:  Can we see section 5.3 of the Chem-Mod and Alistar agreement, which is PTX 353.

Thank you, Mr. Diaz.

BY MR. PEARSON:

Q.    Is this the language you had in mind whenever you said these agreements aren't about the value of tax credits -- the Chem-Mod agreements aren't about tax credits?

A.    Yes.

Q.    It's really long, and I don't want to beat a dead horse, but could you at least tell us what this language means?

A.    What this is simply saying, ladies and gentlemen, is that -- it's after the bold piece.  It just says that it's understood that any royalty payable to Chem-Mod with respect to the permitted use of the technology is not dependent on whether the licensee or any of its affiliates receives the benefit of any form of a tax credit claimed by the licensee

and its affiliate.

Q.    This language says, no matter what about tax credits, get them, don't get them, this license and this payment is not about tax credits; it's about the technology; is that fair?

A.    That's right.

Q.    Going back even further into your cross-examination, which was now sometime ago, there's a lot of discussion about the ME2C/Alistar agreement.

Do you recall that?

A.    I do.

Q.    And there was a lot of discussion about dates and tons and Lawton and schedules.

Do you recall all that?

A.    I do.

Q.    I did my best to follow along.

And is it fair to say that you and Ms. Lawton were having a dispute about what is the appropriate damages period for Alistar, the prior CERT defendant who has now settled and taken a license to ME2C's technology; is that fair?

A.    That's fair.

Q.    Okay.  Was it is surprising that when two parties come together to negotiate and come to an agreement where they don't take up a full week of good people's lives, they

might come to an agreement over their differences?

Does that seem fair?

A.    It does.

Q.    And sometimes you might give and take, but you can write it down in an agreement; is that right?

A.    That's right.

MR. SYKES:  Your Honor, I object to counsel leading the witness.

THE COURT:  Sustained.  The questions are a bit leading.  I ask you to refrain.

BY MR. PEARSON:

Q.    What was the damages period that was listed on the face of the ME2C/Alistar agreement?

I'll withdraw the question.

What was the tonnage listed as the payment on the ME2C/Alistar agreement?

A.    The tonnage is 107,776 tons, and we know that because the royalty is a dollar a ton as it says in the agreement, and it says it sold during the applicable damages period for Alistar and the lawsuit.

Q.    Do you recall when we discussed Plaintiffs' Trial Exhibit 446, which was the big spreadsheet with the sales data or tonnage data for CERT?

Do you recall that?

A.    Yes.

Q.    In that document, there was tonnage by date; is that fair?

A.    That's right.

Q.    Is it fair to say that you calculated for the longer damages period you initially contended; is that right?

A.    Yes, I did.

Q.    What damages period did the 107,776 tons of coal relate to?

A.    It related to September 25, 2020, through January 5, 2021.

Q.    And those are the numbers that match precisely to the ton the amount of refined coal burned at Alistar between those dates; is that fair?

A.    That's right.

Q.    Counsel for CERT didn't show you that data and say you did your math wrong, did he?

A.    No.

Q.    What he did show you was Exhibit C1, the one where he said, "Aha, I got you, 106,000."

      Do you remember that?

      MR. SYKES:  Your Honor, continuing to lead the witness.

      THE COURT:  Sustained.

      Mr. Pearson, please ask your questions in a non-leading way.

BY MR. PEARSON:

Q.      What program did you use to create Exhibit C1, which reflected 106,000 tons for Alistar?

A.      I used Excel.

Q.      When you use Excel, does it contain formulas?

A.      In calculating these things, yes.  There's a lot of numbers here.

Q.      When you put in 107,776 tons for the damages period of Alistar, what number do you get?

A.      When you run it through the analysis that we were doing because we were taking off the 1 percent, we get 106,696.

Q.      Did you have a chance to review Ms. Lawton's reports?

A.      Yes.

Q.      Where in Ms. Lawton reports did she contradict the math of your tabulations?

A.      So Ms. Lawton's reports have schedules and differences of when we start damages and when you stop damages, but once we pretty much -- once we got all the dates together, we didn't really disagree on the tonnages.

Q.      What reply did Ms. Lawton offer to your calculation of 106,696 tons, which is the real amount reduced by 1 percent?

A.      I don't believe there was any.

Q.      What was Ms. Lawton's ultimate damages opinion in

this case?

A.    I don't recall how it relates specifically to this case.  I mean, she ultimately came up with a running royalty.

Q.    And do you recall that her damages opinion was de minimis?

A.    It was very small, yes.

Q.    Was that damages opinion offered by Ms. Lawton when she was representing AJG, DTE, and CERT?

A.    She was working on behalf of all of those entities, yes.

Q.    Was that opinion offered by Ms. Lawton prior to AJG and DTE taking a license to ME2C's patents for $27 and a half million?

A.    Yes.

Q.    Do you recall when Defendants told us they had withdrawn Ms. Lawton as an expert, and she would not attend this trial?

A.    I don't know the specific date.

        MR. PEARSON:  No further questions, Your Honor. Thank you.

        THE COURT:  Thank you.  Mr. Green, you can step down.  I'll have counsel retrieve the binders.

        MR. CALDWELL:  Would it be okay to start sending around binders for the next one?

THE COURT:  You may.  Yes.

MR. PEARSON:  May I approach, Your Honor?

THE COURT:  You may.

Whenever you're ready.

MR. CALDWELL:  At this point, the plaintiff calls the corporate representative for the defendants, Mr. Jeff Green, adverse.

THE COURT:  Mr. Green can come forward.

We'll have you sworn.

THE CLERK:  Please state and spell your name for the record.

THE WITNESS:  Jeff Green, J-E-F-F, G-R-E-E-N.

                    JEFF GREEN,

          called as a witness on behalf of the

          Plaintiff, was sworn, and testified

          as follows:

                 DIRECT EXAMINATION

BY MR. CALDWELL:

Q.    Hi, Mr. Green.  Take a moment to get comfortable.

A.    I just want to be close to the microphone.

Q.    We have learned.  We have learned.

      Are you ready to proceed?

A.    I am.

Q.    Good afternoon, Mr. Green.

A.    Good afternoon.

Q.    You and I met at an earlier proceeding, and we said "hi" during the break, but other than that, we don't know each; is that correct?

A.    That is correct.

Q.    And you're a lit bit different as a witness in the sense that you're not one of the witnesses that's, like, an employee of ME2C.  You actually are associated with the defendants in this case; correct?

A.    That is correct.

Q.    And, in fact, you are the CERT corporate representative; is that correct?

A.    Yes, sir.

Q.    Which defendants are you representing as CERT's corporate representative?

A.    I'm representing the six named refined coal company defendants.  Would you like me to list those?

Q.    The eight named --

A.    I'm sorry.  The eight and the four Operations defendants.

Q.    Okay.  All 12 defendants is really -- I won't make you do the list right now.

A.    That's all right.

Q.    Now, like I say, this is a little bit unusual because I've called you in what's a process called calling a witness adverse, and that doesn't mean we have to fight.  It's just

the terminology in court; is that fair?

A.      That's fair.

Q.      But also, you watched the lawyers for CERT do cross-examination where they phrase these sort of leading questions and stuff like that.

        You understand that that's kind of the position I'm in here since you are their corporate representative; correct?

A.      Sure.

Q.      I just want to make sure you understand that if I'm asking you cross-examination-type questions, I mean no disrespect.  It's just the way the mechanics of the court process goes; fair?

A.      Fair.

Q.      You and I have something in common, as it turns out, in that we both studied engineering at Texas A&M University but at different times; is that fair?

A.      That's fair.

Q.      Would you just take -- take a second and introduce yourself to the jury?

A.      Sure.  My name is Jeff Green.  I grew up in Alvin, Texas.  It's a small town.

Q.      Home of Nolan Ryan?

A.      Yeah, he was my neighbor, and I lived there, and I moved to Birmingham, Alabama, in 2002, and I've been there a

long time. Like he said, I did graduate from Texas A&M University, and that was 1993.

So now I'm living in Birmingham, Alabama, been ever since I've been there, so that's a little bit about me.

Q.    I didn't know the part about Alvin. Did they sell Nolan Ryan beef hotdogs in Birmingham, or do you have to come to Texas for these?

A.    You have to get them in Texas.

Q.    So you do represent all 12 defendants here; correct?

A.    Correct.

Q.    And we hear the abbreviation CERT, like CERT Operations IV, something like that.

What does CERT stand for?

A.    Combustion Emission Reduction Technologies.

Q.    Has it always stood for Combustion Emission Reduction Technologies?

A.    It used to be Coal Emission Reduction Technologies several years ago.

Q.    Do you know when that changed?

A.    I don't recall it. If I were to guess, it would be 2018, maybe 2019. I don't -- I don't recall.

Q.    Thanks. That's helpful.

If we see documents that say Coal Emission Reduction Technologies, it's not that we screwed up and got the wrong family of companies. It was a change?

A.    That's correct.

Q.    What does the word "Senescence" mean?

A.    It has no meaning.

Q.    Well, it kind of means, like, senility and old age, something like that?

A.    A lot of the names we see, they're strange names. Those were developed by our business development guy, and they really had no meaning whenever we set those up back in 2009 to start getting the licenses.

Q.    There's not, like, a Mr. and Mrs. Bascobert or Buffington?

A.    No, no relationship.

Q.    Do you ever drive to Larkwood?

A.    Never had.

Q.    Who's Mr. and Mrs. Rutledge?

A.    I don't know.

Q.    What's a Cottbus?  And what resources does Springhill Resources have?

A.    Just a refined coal facility.

Q.    So who made up these names?

A.    That was Barr Linton.

Q.    And each one of them, do they have a website?

A.    No, they do not.

Q.    Do they have a phone number?

A.    Yes.

Q.    Whose phone number is that?

A.    That would be our corporate office in Birmingham.

Q.    If I want to call Springhill Resources, I call the corporate office for CERT?

A.    You would.

Q.    Are you familiar with the eight power plants that are at issue as associated with the 12 defendants?

A.    Do I know the power plants?

Q.    Yes.

A.    Yes, I'm familiar with them.

Q.    Have you been to them?

A.    I have.

Q.    And I would assume -- I mean, jeez, particularly in the last 23 years, you don't just sort of roll up and walk into a power plant.  There's probably some amount of security?

A.    There's security, yes, sir.

Q.    So how does that work for you?  Does someone have to get you on an access list to get into the power plant?

A.    Typically, you would make contact -- you'd have to have permission to get in.  Once you were at the power plant, you have to have a -- you know, there's safety protocols.  You have to watch a video, a safety video.  And then you really weren't allowed to go into the power plant without being escorted.

Q.    When you said the power plant, there's like a -- do you roll up in your car and there's probably a security gate to get you into the power plant?

A.    That's correct.

Q.    And on how many occasions have you been in the power plant of one of the eight power plants that's at issue here?

A.    Several dozen times.

Q.    For each one or several dozen times altogether?

A.    Well, just well, quite a few times in the ones that are in Texas and Louisiana.  I've probably been out to North Dakota and Wyoming and Utah half a dozen times each.  So it just depends on my location.

        MR. CALDWELL:  Your Honor, may I move around the easel?

        THE COURT:  You may.

BY MR. CALDWELL:

Q.    I made this board in opening.  I realize you didn't have a good view of it because of where the board was located, but at least in terms of red, I have what you guys would call the refined coal LLCs.

        I have those correctly listed; correct?

A.    Yes, you do.

Q.    And do you remember my explanation as to why Alistar is grayed out?

A.    Yes, I do.

Q.    Have I correctly identified the four operations companies that are defendants in this case?

A.    Yes, sir, you have.

Q.    Okay.  Perfect.

So right now, are any of these entities making refined coal?

A.    No, they are not.

Q.    All right.  So how many employees are there in what you guys call the refined coal LLCs?

A.    There's no longer employees in those facilities.

Q.    And I'm not talking about these operations companies. I mean these LLCs.  How many employees currently are there of those red refined coal LLCs?

A.    They don't have employees.

Q.    At the absolute peak of producing refined coal, how many employees did these refined coal LLCs have?

A.    There were no employees.

Q.    So with respect -- not -- absolutely nothing personal, but who is it -- and I don't mean a lawyer.  I'm not talking about who thinks Mr. Green is the best witness, but who from a business perspective decides that you will come to court and testify as the corporate representative for each of those entities?

MR. DYESS:  Your Honor, objection.  This is coming mighty close to work product.

THE COURT:  Can you restate the objection?

MR. DYESS:  This is attorney work product and attorney-client communication.  I'm not sure how he can answer that question without divulging communication.

THE COURT:  Mr. Caldwell?

MR. CALDWELL:  I literally said I'm not looking for anything with lawyers who decided who would be the best witness or anything like that.  I want to know the business authority who would identify who would be the corporate representative to speak on behalf of them.

THE COURT:  So I'll overrule the objection with the proviso that the question should be re-asked to make it clear that it is not seeking conversations with attorneys, and to the extent that an answer can be given in light of that, the witness may answer.

BY MR. CALDWELL:

Q.    With respect, I hope you understand from the beginning I indicated I'm not trying to get into privileged communications.

      Do you understand that?

A.    I do.

Q.    I want to know from a purely business perspective who is it that has the authority to designate you as the corporate representative to speak on behalf of these refined coal LLCs.

A.      As VP of operations of all of the CERT Operations entities, I'm acting on behalf of the refined coal LLCs.

Q.      I'm not trying to quibble.  I understand you have a title with the ones in purple, the operations LLCs.  I'm asking from a business perspective, who can designate that you have the authority to speak on behalf of the refined coal LLCs?

A.      I'm not certain how to answer that question.

Q.      Is there anyone else that will testify as a fact witness on behalf of any CERT entity?

A.      No.

Q.      Now, who's Corporation Service Company?

A.      I'm sorry?

Q.      Who's Corporation Service Company?

A.      Corporation Service Company?

Q.      Yes.  Does that ring a bell?

A.      No, sir.

Q.      If I refer to them as CSC, does that ring a bell?

A.      CSC?  No, are we talking --

Q.      Go ahead.

A.      No, it doesn't.

Q.      Okay.  And there's a reason I ask.  You've been here for the whole trial; correct?

A.      That's correct.

Q.      And you remember there was a time period where

Mr. MacPherson, because he's not one of the corporate representatives here, he had to be out for certain testimony and can now be back?

But you've never had an exclusion period like that. You've been here for all the testimony; right?

A.    Yes, sir.

Q.    And you remember when your lawyers made a really big deal crossing Mr. MacPherson about how he did not contact CERT before filing a lawsuit?

Do you remember that?

A.    Yes, sir.

Q.    Did that make you uncomfortable?

A.    No, it didn't make me uncomfortable. Made me -- I thought that there wasn't really an attempt to do that.

Q.    Okay. Do you remember how he said, well, you could have taken a stamp, it's $0.49 or whatever, you put it on a letter and you send it to our registered agent for service?

Do you remember that?

A.    Yes, sir.

Q.    Do you know who that is?

A.    Who is that?

Q.    Sir?

A.    Who is that?

Q.    Do you know who your registered agent for service is?

A.    It's a firm in Delaware.

Q.    It's Corporation Service Company, the one that you've never heard of; right?

A.    Right.

Q.    Okay.  Now, there is no website where I can go to find how to contact these guys; right?

A.    No, we do not have a website.

Q.    And is there a website that's going to tell me -- and I guess the answer is no.  But is there something that's going to tell me CERT Operations IV, that one's working with Springhill Resources?

A.    No, there's not a website that would show that.

Q.    I hope you understand.  This isn't a matter of disrespect, but your lawyer crossed my client suggesting he should have been able to figure that out and contact you guys.

      Do you kind of remember those questions?

A.    I do.

Q.    So anyway, let's say that we put a stamp on a letter and sent it to you guys and it goes to your registered agent, and your registered agent picks it up, scans it, whatever they do, and get it to you.  Okay?  Would you guys have stopped putting brominated coal on conveyer belts that are going into boilers of power plants?

            MR. DYESS:  Objection, Your Honor.  Calls for speculation.

THE COURT:  Mr. Caldwell?

MR. CALDWELL:  I mean, it's literally their suggestion that something would have gone down a different path if we would have contacted them before suing them. They opened the door to that.

MR. DYESS:  There's no suggestion that ever occurred, so he's asking him to speculate on something. There's no evidence that ever occurred.

MR. CALDWELL:  That's the implication of asking Mr. MacPherson the cross questions in the first place.

THE COURT:  Hold on a second.  I'll allow the questions.  Objection is overruled.

THE WITNESS:  Would you repeat your question?

BY MR. CALDWELL:

Q.    My question was, if we would have put that letter in the mail to this company you've never heard of and they sent it to you, would you guys have stopped putting brominated coal on the conveyer belts going into boilers?

A.    I'm certain we would have had to evaluate the letter and the context of what it said.  I'm not saying we wouldn't.  I can't speculate what the letter would say, who would receive it, what would be done with it.

Q.    Fair enough.  Let's assume it's very thorough and it literally spells out one of the claims of the patent exactly like all the language of the claim of the patent and then it

says we believe that your entities, your refined coal companies, and your CERT Operations companies are inducing and contributing to infringement and gave you all that detail.  Would you have stopped at that point?

A.    I think we would have handled it the same way we handled it when we were served with the lawsuit.  We would have turned it over to our attorneys so they could advise us.  We're not patent lawyers.

Q.    So the suggestion that having called you or sent you a letter would have changed anything, there's just not really a basis for that; right?

MR. DYESS:  Your Honor, I'm going to register the same objection.  He's talking about a hypothetical letter that's never been written.

THE COURT:  I'll allow the question.  The prior question, had there been an objection, I may have agreed on.  This question, I'll allow it, so overrule the objection.

THE WITNESS:  I can't speculate on what we would or wouldn't have done on a letter we did not receive.

BY MR. CALDWELL:

Q.    Thank you.

MR. CALDWELL:  Mr. Diaz, can I get slide number 1?

BY MR. CALDWELL:

Q.    Do you remember when this slide as a demonstrative

was shown by my colleague, Mr. Nemunaitis, with Mr. O'Keefe?

A.      Yes.  I remember this slide.

Q.      And, I mean, obviously you can take a second to check it.  I'm not trying to cheat you or anything, but you don't dispute that this is sort of generally the orientation of the companies, at least in terms of which operations companies are associated with which contracting defendants or power plants; right?

A.      Yes, sir, I agree with that.

Q.      And then Mr. Nemunaitis showed that in the system, tax credits flow up to these investors like JPMorgan and Mylan Pharmaceuticals; correct?

A.      Correct.

Q.      How do you pronounce that one that starts with a K?

A.      Kiewit.

Q.      Kiewit?  Okay.

        And then there was another one quick that he didn't get to show, but I think you have personal knowledge that money comes from the CERT investors down to the CERT Partners; correct?

        MR. DYESS:  Your Honor, I object.  May we approach, please?

        THE COURT:  You may.  We'll see counsel at sidebar.

        (Thereupon, a discussion was held at sidebar.)

THE COURT:  Okay.  What's your objection?

MR. DYESS:  Your Honor, my concern is where this is going.  Jeff Green is not on trial here.  He hasn't been accused of infringement in this case.  We've already let them get into the investors of the company.

Are we going to let -- I'm concerned we're going to let him try this case by putting somebody on trial that hasn't been accused of anything.  In this case, Jeff Green is not on trial here.

THE COURT:  Let me understand the basis for the objection.  Mr. Green is not on trial.  He's not a defendant.  He's an adverse witness, so the questions are leading, so there's going to be an aspect of them that he's going to be suggesting an answer or disbelieving the response, but there's nothing inappropriate about that.

So I'm not sure I understand the nature of the objection.

MR. DYESS:  I apologize for speaking over Your Honor.  I think the basis of it would be a Rule 403 objection.  We really don't see the relevance of it because Mr. Green is not on trial.  It's extraordinarily prejudicial if they're going to get into how much money the witness has --

THE COURT:  The nature of the objection is less about the nature of the questions or the tone of them and

more that you're asking some questions about monies that flowed from some of the CERT entities and the defendants to the investors and the monies that flow back to the parties and CERT entities.

And what's your response?

MR. CALDWELL:  There's two fundamental responses.  One is this is the way every trial goes in the sense there's a human being that speaks on behalf of the company.  That's not something that changes unless we have AI trials at some point in the future, which is scary.

Your Honor has squarely addressed the relevance of these funds in this situation where intent and motive and then continued motive, continued intent, from selling continues after you know about the patents-at-issue.

This has been squarely addressed in multiple rulings, I think, from Your Honor.  I'm going directly to the thing.

Now, our expert wasn't allowed to do it because of the qualifications.  This gentleman is one of the guys that gets money.  He has personal knowledge.

THE COURT:  What Mr. Caldwell says seems correct to me.

Anything more you want to add?

MR. DYESS:  The only thing I would add is to the extent this is a consideration, they have said Mr. Green

had -- and Philip Green had said this information is not relevant to his damages.  I would add that adds to the lack of relevance, I understand.

THE COURT:  Fair enough.  I'm going to overrule the objection.

And, Mr. Caldwell, the Court has addressed this issue, which is that testimony about monies that flowed to CERT entities, including those partners that ran or controlled them, that it in some way relates to the provision of the refined coal is relevant to the issues of direct infringement, including the (inaudible) that is asserted to have engaged in that, and that certainly can be the subject of questioning back from Defendants' counsel after Mr. Caldwell is done.

So I'll overrule the objection.

(The discussion at sidebar ended.)

THE COURT:  Mr. Caldwell?

MR. CALDWELL:  Thank you.

BY MR. CALDWELL:

Q.    So I don't remember what my question was, but I tend to re-ask the exact same question.

So you know, based on personal knowledge, correct, that then money flows from the CERT investors over and down to the CERT Partners of which you are one; correct?

A.    Correct.

Q.      Speaking of these refined coal or investment vehicle LLCs, the ones in red, do they share a bank account?

A.      Do they share a bank account?

Q.      Yes.

A.      No.

Q.      Is that something you would defer to Ms. Schaatt on or are you certain about that?

A.      All of these bank accounts are held separately, and they all have bank accounts for each one of these CERT Operations -- well, each of the refined coal project companies.

Q.      And you are aware, at least, that the CERT organization overall provides sort of like a treasury management function on behalf of all entities?

A.      Yes, that's correct, and that's what I think Leah Schaatt testified to in her deposition.

Q.      So Mr. Dyess, I think, it was made it clear or made the point at some point in this trial that these investors up here aren't actually the ones that fronted the cost for things like sprayers and whatnot.  Maybe they invested later, or something along those lines?

A.      All of these refined coal project companies were installed and operating before any of the investors came into the project.

Q.      I hadn't quite got to the question.  I was going to

ask, who was it that fronted the money for the sprayers and all that?

A.    The CERT Partners did.

Q.    And then off of these contracting defendants and operating defendants associated with these eight power plants, approximately how much money have the CERT Partners made?

A.    During what time period are we talking about?

Q.    Overall.

A.    I don't know.  I don't think the CERT Partners made anything directly other than salaries.

Q.    That's because it actually just goes into an LLC that you set up to hold your interest?

A.    There are LLCs that hold different members' interests, yeah.

Q.    Well, I mean, I don't want to have to do a big org chart on what's going on in the CERT Partners.

       Let me just ask you this:  From certain investors to CERT, how much money has flowed associated with these defendants?

A.    I couldn't tell you that off the top of my head.

Q.    Overall, can you give me at least an order of magnitude?

A.    I would say that the investors pay anywhere from 75 percent to 95 percent of the value of the tax credits

that was forecasted prior to them buying into the project that they would produce.  It was just based on a tonnage.

Q.    Just a wild guess, even within 30, 50 percent, rough estimate, how much money has gone from investors to CERT for these companies?

A.    I can't speculate.

Q.    Is there an LLC that's a CERT partner that you own?

A.    I'm sorry?

Q.    Is there an LLC you own that is a CERT partner?

A.    As a CERT partner, do I own an LLC?

Q.    Yes.

A.    Yes.

Q.    And is that where the entirety of your portion of the investment money goes?

A.    It is.

Q.    About how much money has your LLC made from the defendants that are in this case?

          MR. DYESS:  Your Honor, we just need to lodge the same objection.

          THE COURT:  Okay.  That objection is noted.  Overruled.

          THE WITNESS:  I would just have to look at records.  I couldn't tell you right now.

BY MR. CALDWELL:

Q.    Can you tell me within $15 million?

A.      Yeah.  I would say -- I mean, maybe say 50 million.

Q.      And that's for -- that's for -- to be clear, I was asking about for your LLC within the CERT Partners; correct?  You understood that was my question; right?

A.      Yeah -- just I have to -- I'd have to look at it and see.

Q.      I'm not trying to pin you to exactly $50 million.  I'm looking for an order of magnitude.

        And my question was:  You understood that when I asked that question, I was just referring to your LLC's portion of CERT Partners.

        Did you understand that that's what I was asking?

A.      Yeah, okay.  I mean, I would say it's in the neighborhood of $50 million.

Q.      Now, are you the majority -- is your LLC the majority partner of CERT Partners?

A.      No, sir.

Q.      What percent of CERT Partners is your LLC?

A.      Under 20 percent.

Q.      Do you have a sense as to what the value of the tax credits is that these investors, JPMorgan, Kiewit, and Mylan, have made from the defendants in this case -- the work of the defendants in this case in the damages period we're talking about from starting July of 2019?

A.    I think somebody testified yesterday or the day before that the tax credit values were between 5 and $7.

Q.    And you understand that's what at issue is 57 million tons of coal?

A.    Okay.

Q.    And so we would be looking at 5 to $7 in tax credits times 57 million tons of coal, if those numbers are correct; right?

A.    Correct.

Q.    Do you agree with that?

A.    I do.

Q.    And this isn't the first time you guys have operated a tax credit business; right?

A.    No, I've been involved in a prior one.

Q.    And am I correct that the way that your group, the CERT group, got involved in this one is that another company that had previously done a tax credit business with you guys invited you to this one or introduced you to it?

A.    We had acquaintances with another refined coal producer.

Q.    Which refined coal producer was that?

A.    That was AJ Gallagher.

Q.    And you're aware that AJ Gallagher, a refined coal producer, who was previously a defendant in this case; right?

A.    I'm aware of that.

Q.    When did you learn that AJ Gallagher and DTE paid over $27 million for a license to the patents?

A.    It was in November of '22, I guess.  I think about --

Q.    You mean November of '23, just this last November?

A.    Yeah, you're correct.

Q.    So how did you get access to that document?  How did you get access to that --

A.    I saw it on the screen.

Q.    No, no.  I'm asking:  When did you learn that AJ Gallagher had paid over 27- -- AJ Gallagher and DTE paid over 27 million to license the patents?

A.    I didn't know that AJ Gallagher had paid 27 -- or whatever that settlement was.  I didn't know that number until this week in court.

Q.    Thank you.

       So you said C-E-R-T, CERT, that stands for Combustion Emission Reduction Technologies, and so just to be clear, I kind of Googled this.  There's a lot of things that relate to energy that actually say CERT, but they're not you guys; right?

       You're not Clean Energy Resource Team.  That's not you; right?

A.    That's not us.

Q.    And you're not CERT Systems that's part of

breakthroughenergy.org?

A.    No, sir.

Q.    And you're not the Council of Energy Resource Tribes. That's a Native American group, obviously; correct?

A.    Not us.

Q.    So what combustion emission technologies did you guys come up with?

A.    We licensed technology from Chem-Mod.

Q.    You used somebody else's technology; correct?

A.    Yes, sir.

Q.    Do you practice the Chem-Mod patent?

A.    Yes, sir.

Q.    Would you also agree -- we took your deposition like everybody else had their depo taken.  Am I correct that it is your view, you, Mr. Green, who is an engineer, have no firsthand knowledge that the refined coal from CERT produces any emissions benefit at a power plant?

A.    That I don't have firsthand knowledge?

Q.    Yes.

A.    The utilities do not -- we're on -- we're there to sell them a fuel.  The utilities don't share their emissions data with a lessee on their property.

Q.    So I think we're in agreement.  I just want to make it clear.  You have no firsthand knowledge that your refined coal has made an emissions improvement at an actual coal

plant; correct?

A.    No firsthand knowledge, no, sir.

Q.    But you do understand that the point of the Section 43 tax credits is to reduce mercury emissions; right?

A.    No, I would say that the purpose of the refined coal program is to reduce mercury emissions and NOx emissions.

Q.    Did I say the section wrong?  In addition to the NOx. Did I say the section number wrong?

A.    Mercury and NOx.

Q.    There's a requirement when you are going to claim tax credits that you intend for that refined coal to be burned to generate steam; right?

A.    That's correct.

Q.    So when Springhill Resources has CERT Operations IV generating refined coal at Big Cajun II, where are they intending for that coal to be burned to generate steam?

A.    Well, in that instance it would be, we're selling that to Big Cajun II, so most likely it's going to be burned at Big Cajun II.

Q.    You have no expectation that it will be burned anywhere other than Big Cajun II; correct?

A.    That's not our expectation.  We're under contract to sell it to Big Cajun II, so that's what I assume we would be doing.

Q.    I don't want to belabor this.  The point I want to

sort of get to quickly is in every one of these instances where you're operating a refined coal facility, your expectation is it will go into the boilers at that facility; correct?

A.    I would say that's our overall expectation.

Q.    But yet you say you don't have any firsthand knowledge that you actually help emissions, and I'm wondering is that because the position in this trial of CERT is trying to distance itself from knowing about the emissions equipment at the coal plants?

A.    No, we're not involved in emissions control equipment at power plants.  We are a fuel manufacturer that qualifies for the Section 45 program.

Q.    Right.  You claimed what sounds like -- I guess it's hundreds of millions of dollars of tax credits for that refined coal, and yet you say as a company, we don't even really know if we reduced emissions?

A.    We believe we do.  You have to have firsthand knowledge of what happened at the power plant.  I have firsthand knowledge of the testing I've been involved with.

Q.    And I think -- I mean, is it fair that in this trial, it is CERT, all the CERT defendants, it's their position that they just don't know what's going on in terms of emissions control at the power plants?

A.    We are not involved with the emissions control at

power plants.  We are involved in producing a fuel.

Q.    Again, I mean no disrespect, but there's something I'm asking that's a tiny bit different.  I'm not asking if you were what you would refer to as involved.  I said are you trying to have the position in this trial that you don't know what's going on with the emissions control equipment at those power plants?

A.    Not at all.  That's not the position I'm taking.  I don't have knowledge of what's going on with the emissions control at those power plants.

Q.    Now, one thing is that in opening, your lawyer said that "we don't go inside the walls of the power plant."

And just to be clear, you do get security clearance.  You get to go to a power plant.  You just may not go inside something like the boiler.  There may be certain buildings you don't go into; right?

A.    We do not go into the generating area.

Q.    When you take refined coal and you put it on that conveyer belt expecting that it's going to be burned at Big Cajun II, what do you expect is going to happen with the exhaust gases from it being burned?

A.    What do I expect is going to...?  The last part of your question, what do I expect the exhaust gases to what?

Q.    Sir, when you take what you call refined coal and put it on the conveyer belt to go to the boiler at Big Cajun II,

what are you expecting is going to happen with the exhaust gases when that coal is burned?

A.    I'm expecting the exhaust gases to have 40 percent less mercury and 20 percent less NOx.

Q.    And at that point, right then, after the boiler with 40 percent less mercury, you expect them to just go ahead and release it into the atmosphere?

A.    Let me try to be clear again.  We are a fuel manufacturer.  We sell the self-contained fuel to a power plant.  I am not privy to what goes on at that power plant in the furnace, in the flue gas, in the ESP.  I'm not sure what you're trying to get at, but that is not part of my business, and that's not what I'm here to testify about.

THE COURT:  Mr. Caldwell, you have time for one more question.

MR. CALDWELL:  Oh, before the end of the day?

BY MR. CALDWELL:

Q.    Mr. Green, you know full well that the exhaust path after the boiler at every one of the power plants involved in this case, the exhaust path includes injection of activated carbon, don't you?

A.    I do now.  I do, yes.

Q.    And you did, at the very least, for almost two and a half years before you guys shut down the program; correct?

A.    That's correct.

MR. CALDWELL:  This is a pretty good time to stop.

THE COURT:  All right.  Thank you.

All right.  So that ends our testimony for today.  Again, we thank our jurors and look forward to seeing them tomorrow morning by 9:00 a.m.

With that, we'll have the jury led out.

(The jury exited the courtroom.)

THE COURT:  Mr. Green, you may come down.  Go back to counsel table.

Just a couple housekeeping things.  Parties may have noticed, we had a chair malfunction with one of the chairs in the jury.  The bolts are old, so our juror who was previously the second juror in the back row has now shifted up to sit in the second seat in the front row where the juror got excused.  I'm just explaining what had happened.

Let me briefly talk about the plaintiffs' motion for a curative instruction based on Defendants' improper arguments made to the jury concerning indirect infringement.

So I reviewed that motion, which is at DI 686. I also reviewed the CERT defendants' response to the motion, and, essentially, I agree with everything in the CERT defendants' response.  If I were issuing a decision on the motion, I would write it almost exactly the way the CERT defendants wrote it in their response.

And just more specifically, particularly to the core of the request, which was that the Court issue a curative instruction during the trial prior to, I guess, the initial testimony of Mr. Green and Defendants' beginning of their case in chief. I don't believe that it's appropriate to do so for the reasons, essentially, that the CERT defendants gave me in their letter.

I agree with the CERT defendants that the evidence at issue can be relevant for the particular purpose that the CERT defendants are attempting to use it for and not for any other purpose. I certainly agree with the plaintiffs that otherwise, it isn't relevant, and the jury is certainly going to be instructed that with regard to the elements of contributory infringement, that the coal that is materially at issue is only that coal dating from the beginning of the damages period and thereafter.

We'll need to craft a jury instruction that sufficiently makes that clear to the jury but that also makes clear in what way any other coal that they may have occurred could possibly be relevant to a response and to the charges by the defendants.

The plaintiffs' proposal doesn't adequately do that, and we'll need to work on that. We'll work on that at the prayer conference, but there's a lot of, I think, difficult issues in the case. The jury will have to go

through the technology and the law.  I don't know that this issue, although I admit it's a challenging one, is necessarily more challenging than other difficult issues the jury will have to address and parse through.

Of course, the way they're going to be able to do that is for able counsel here through their direct and cross-examinations and also through the closing arguments with the benefit of the final jury instructions that I provide, we will try to walk the jury through that evidence and that -- walk in a way that they believe is favorable to the client, and I agree with the CERT defendants that there's not a reason to prioritize that issue or put it front and center because I think it's not warranted and could, I think, be seen as pejorative in some way to the defendants.  I don't know that they have done anything wrong at this stage.

So for that reason, I'm going to deny the motion to the extent of the request that I issue a jury instruction prior to final jury instructions would risk further the issue of what the appropriate instruction will be on that front at the prayer conference.  So I wanted to deal with that issue.

With that said, is there anything further that either side wishes to raise procedurally before we conclude for the day, knowing that you have work ahead of you

tonight?

Mr. Caldwell?

MR. CALDWELL:  The only thing I would seek ten seconds of clarity on.  We had an understanding with opposing counsel that when someone is on cross-examination, they can't be interfered with by counsel or whatever, that they're sort of sequestered.  I'm sorry, it doesn't mean Mr. Green can't have dinner, but I just want to make sure that...

THE COURT:  The rule that they're discussing is while a witness is on cross-examination or the equivalent, the counsel can't discuss the substance of the witness's testimony with the witness.

Mr. Dorsney?

MR. DORSNEY:  We have the same question.  So we still have to prepare the witness for direct.  Does the Court have guidance on preparing the witness for direct?  Because the Court hasn't -- will be there be some allowance for, like, an hour-and-a-half break, some way to prepare our witness for direct?  Otherwise, we'll suffer a good deal of prejudice not being able to talk to our witness.

THE COURT:  Have you not prepared your witness for direct testimony to date?

MR. DORSNEY:  Well, Your Honor, of course, we prepared him up to this point, but in any trial of this

length and magnitude -- just asking for guidance on the issue. If we're not allowed to talk to the witness at all, that's guidance. That's all I was asking for.

THE COURT: Okay. Mr. Caldwell, do you see some distinction between questions or discussion of the substance of Mr. Green's testimony here as you called him as a witness vis-à-vis the intended or proposed direct that's coming perhaps tomorrow?

MR. CALDWELL: Absolutely not. The parties were disclosing multiple witnesses that were going to come after him today because I think the whole day proceeded much slower. I mean, clearly, they were prepared to go forward on direct today. We were expecting, like I say, two witnesses beyond this. And I mean, I think the exception swallows the rule if, basically, you're saying, well, let's go work on this direct, then there's no point in having the rule in the first place.

THE COURT: I agree. So overnight, until Mr. Green takes the stand again, there will be no discussion of the substance of his testimony, whether it be his anticipated response to cross-examination as adverse witness or his direct testimony.

Let me say for the record that I do agree with the plaintiffs that the parties, no doubt, have been preparing multiple witnesses over many days and weeks,

witnesses that might well have testified the day before or day after, depending exactly how the trial went.

There might be a chance tomorrow, depending on how things go with breaks and things, where we can try to give the defendants a little leeway in speaking with Mr. Green after his testimony as an adverse witness is done. We can always keep that as possible.  Otherwise, that will be the Court's ruling.

Anything further from the plaintiff?

MR. CALDWELL:  No, sir.

THE COURT:  On the defendants' side, anything to take up?

MR. DYESS:  No, sir.

THE COURT:  I wish everybody a good night.  The Court will stand adjourned for the day.


**C E R T I F I C A T E**

I, Deanna L. Warner, a Certified Shorthand Reporter, do hereby certify that as such Certified Shorthand Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings.

_____
Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. Federal Court

| # | ' | 101 [4] - 583:19, 588:4, 590:19, 591:4 | 793:19, 815:20, 824:15 | 2011 [3] - 674:2, 674:9, 701:3 |
|---|---|---|---|---|

**#**

**#1687** [1] - 872:23

**$**

**$0.14** [6] - 755:13, 755:21, 816:2, 817:25, 820:15, 820:23
**$0.39** [7] - 755:14, 755:24, 816:2, 816:4, 818:1, 820:15, 820:23
**$0.45** [1] - 743:20
**$0.49** [1] - 848:16
**$0.50** [6] - 747:2, 747:16, 765:18, 808:1, 808:9, 808:13
**$0.52** [1] - 750:13
**$0.59** [1] - 750:13
**$0.65** [10] - 733:14, 743:21, 744:1, 747:3, 747:16, 768:5, 768:6, 769:18, 789:21, 820:1
**$0.99** [2] - 807:16, 808:11
**$1** [1] - 789:21
**$107,000** [3] - 739:16, 739:17, 740:6
**$107,776** [2] - 738:10, 792:6
**$120** [1] - 646:2
**$137,689,384** [1] - 819:20
**$15** [1] - 858:25
**$168,265,451** [1] - 819:24
**$200,000** [1] - 758:12
**$27** [10] - 751:19, 755:11, 755:16, 758:14, 758:16, 817:16, 821:7, 822:5, 837:14, 861:3
**$27,500,000** [3] - 749:14, 752:23, 817:4
**$37,103,304** [1] - 769:19
**$50** [2] - 859:7, 859:15
**$57,082,006** [1] - 769:20
**$600,000** [1] - 813:12
**$7** [1] - 860:2
**$80** [1] - 646:1

**'**

**'083** [1] - 777:7
**'114** [17] - 616:19, 616:21, 619:23, 620:19, 620:20, 622:9, 679:8, 679:18, 698:20, 698:24, 708:15, 723:5, 728:10, 790:7, 790:9, 790:22
**'22** [2] - 799:7, 861:4
**'23** [1] - 861:5
**'24** [1] - 799:7
**'517** [11] - 614:17, 616:15, 616:16, 616:24, 617:7, 622:8, 629:18, 708:16, 723:5, 763:14, 809:7
**'90s** [1] - 664:22

**1**

**1** [32] - 612:9, 614:15, 614:17, 614:19, 614:25, 615:4, 615:5, 615:7, 620:16, 622:9, 643:1, 643:2, 729:1, 737:24, 738:12, 740:12, 741:18, 756:11, 768:10, 776:2, 782:13, 789:24, 802:6, 802:8, 802:15, 808:20, 809:1, 819:18, 836:11, 836:23, 851:23
**1,400,000** [1] - 793:13
**1,424,924** [7] - 789:12, 791:15, 792:9, 792:10, 794:22, 795:2, 795:23
**1.4** [15] - 738:23, 739:1, 739:4, 739:8, 782:21, 789:19, 789:24, 794:2, 794:6, 795:13, 796:20, 801:3, 801:6, 803:22, 819:22
**1.424924** [1] - 789:23
**10** [3] - 674:20, 678:12, 745:20
**100,000** [1] - 800:3
**1006** [5] - 622:12, 622:15, 623:12, 623:14, 623:15

**101** [4] - 583:19, 588:4, 590:19, 591:4
**102** [3] - 632:16, 633:2, 633:7
**103** [3] - 611:5, 611:8, 611:23
**105** [1] - 806:11
**106** [1] - 800:9
**106,000** [5] - 797:23, 799:12, 799:18, 835:19, 836:3
**106,000-ton** [1] - 803:6
**106,696** [6] - 797:13, 801:20, 801:25, 802:7, 836:12, 836:22
**107,000** [8] - 739:16, 783:6, 793:13, 793:23, 799:18, 800:9, 801:9, 801:23
**107,776** [5] - 802:2, 802:6, 834:17, 835:7, 836:8
**10:35** [1] - 648:23
**10:50** [1] - 648:24
**10th** [6] - 798:9, 798:10, 798:14, 800:25, 802:17, 803:18
**11** [4] - 675:11, 682:11, 695:12, 760:4
**110** [1] - 682:3
**111** [1] - 682:9
**12** [4] - 730:10, 839:20, 841:9, 843:7
**120** [1] - 828:14
**124** [1] - 588:1
**125** [1] - 588:1
**127** [2] - 588:9, 588:17
**12:21** [1] - 713:4
**12:30** [1] - 700:11
**12:51** [1] - 713:5
**13** [3] - 581:3, 673:7, 697:15
**134** [2] - 758:6, 821:24
**137** [2] - 682:3, 819:13
**14** [5] - 662:12, 745:24, 774:7, 816:4, 821:23
**15** [6] - 700:10, 732:20, 745:21, 745:24, 777:2, 787:3
**16** [2] - 731:5, 745:25
**161** [1] - 822:19
**168** [1] - 819:12
**17** [8] - 744:18, 745:25, 746:2, 790:17, 790:24,

**17th** [2] - 761:4, 790:13
**18** [2] - 666:12, 751:22
**19** [10] - 604:23, 605:2, 610:21, 678:3, 692:3, 733:18, 753:11, 809:23, 811:9, 822:13
**19-CV-1334-CJB** [1] - 578:6
**1920s** [1] - 664:25
**193** [2] - 625:25, 626:12
**196** [2] - 625:25, 626:12
**1968** [1] - 687:10
**1980** [2] - 796:17, 796:18
**1981** [3] - 649:19, 650:10, 650:17
**1984** [1] - 721:4
**199** [2] - 625:25, 626:12
**1993** [1] - 841:2
**1995** [4] - 649:20, 650:10, 650:17, 656:14
**1996** [1] - 720:12
**19th** [1] - 636:20

**2**

**2** [24] - 596:16, 596:22, 597:3, 600:16, 604:24, 614:23, 614:25, 615:3, 616:11, 616:14, 616:15, 622:9, 626:18, 632:3, 672:15, 695:5, 695:6, 697:9, 736:25, 800:16, 809:8, 809:9, 824:19
**2,129,349** [1] - 801:18
**20** [18] - 607:15, 634:12, 649:14, 661:4, 674:15, 675:3, 675:17, 680:22, 700:10, 753:11, 779:13, 779:25, 809:23, 811:9, 821:24, 822:13, 859:20, 866:4
**2002** [1] - 840:25
**2009** [2] - 743:19, 842:9

**2011** [3] - 674:2, 674:9, 701:3
**2012** [1] - 808:1
**2013** [9] - 673:7, 673:17, 674:15, 675:3, 675:17, 755:19, 789:19, 819:24, 820:2
**2014** [1] - 675:11
**2015** [9] - 636:20, 652:1, 661:1, 661:2, 678:3, 678:4, 678:12, 692:3, 701:3
**2015/2016** [1] - 652:2
**2016** [2] - 661:2, 701:3
**2018** [8] - 597:18, 633:15, 676:13, 677:1, 677:4, 677:11, 678:19, 841:21
**2019** [40] - 583:6, 629:17, 631:16, 674:20, 675:20, 679:10, 679:19, 698:18, 698:24, 700:2, 702:18, 703:17, 704:7, 708:13, 718:12, 727:7, 728:7, 728:10, 743:25, 755:23, 761:4, 789:19, 789:21, 790:13, 790:17, 790:24, 792:12, 793:19, 794:22, 819:23, 822:22, 823:7, 823:15, 823:23, 824:15, 824:19, 826:24, 827:16, 841:21, 859:25
**202** [3] - 625:25, 626:13, 642:3
**2020** [13] - 700:2, 738:18, 760:11, 760:18, 761:8, 790:16, 793:2, 794:11, 794:14, 795:1, 796:17, 800:11, 835:9
**2021** [22] - 631:16, 700:2, 708:16, 710:17, 711:19, 718:12, 738:18, 755:20, 755:23, 790:13, 790:18, 790:24, 791:2, 794:12, 794:17, 800:11, 801:7, 812:8, 812:9,

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna DE 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

812:11, 812:13, 835:10
**2022** [20] - 653:17, 654:4, 654:22, 655:15, 656:1, 656:5, 656:10, 656:13, 656:18, 657:3, 657:4, 657:13, 657:17, 661:23, 662:5, 708:18, 708:25, 772:15, 798:25
**2023** [9] - 795:25, 796:12, 796:19, 797:25, 798:3, 799:2, 799:16, 804:9, 804:18
**2024** [1] - 578:13
**205** [2] - 625:25, 626:13
**208** [2] - 625:25, 626:13
**21** [8] - 674:2, 748:2, 791:7, 791:10, 794:17, 809:23, 811:9, 822:14
**211** [2] - 625:25, 626:13
**214** [2] - 625:25, 626:13
**215** [1] - 678:17
**21st** [1] - 808:1
**22** [1] - 653:17
**221** [1] - 794:8
**223** [1] - 588:22
**22nd** [2] - 654:20, 799:3
**23** [5] - 673:17, 809:23, 811:9, 822:14, 843:14
**232** [12] - 632:16, 632:18, 632:21, 635:2, 635:20, 636:2, 636:6, 636:9, 636:19, 677:16, 677:25, 692:1
**23rd** [1] - 799:4
**24/7** [1] - 669:22
**240** [3] - 748:3, 748:8, 748:12
**241** [5] - 646:16, 646:20, 646:23, 647:2, 716:17
**242** [4] - 646:16, 646:20, 646:23, 647:7
**243** [3] - 745:5, 745:19, 746:13
**244** [4] - 646:16, 646:20, 646:23,

647:12
**249** [3] - 615:23, 616:2, 616:5
**25** [17] - 596:17, 616:21, 619:22, 619:23, 620:1, 620:16, 620:18, 622:10, 654:22, 655:15, 661:23, 793:2, 794:11, 794:14, 795:1, 800:11, 835:9
**25th** [7] - 657:4, 662:5, 761:8, 790:16, 793:16, 795:11, 799:21
**26** [10] - 604:24, 605:3, 610:22, 619:25, 620:15, 620:18, 622:10, 632:4, 796:12, 796:19
**27** [5] - 615:13, 750:18, 861:11, 861:12, 861:13
**28** [5] - 625:14, 672:23, 673:3, 804:18
**287** [1] - 794:14
**28th** [1] - 578:13
**29** [1] - 673:18
**292** [1] - 795:17
**2:38** [1] - 787:16
**2:45** [1] - 787:10
**2:53** [1] - 787:17
**2A** [1] - 578:12

## 3

**3** [10] - 616:6, 626:20, 628:9, 632:2, 632:6, 676:2, 708:18, 718:1, 800:16
**3.1** [1] - 743:12
**30** [8] - 674:3, 687:4, 734:25, 741:14, 747:7, 750:22, 758:18, 858:3
**30th** [1] - 811:15
**31** [1] - 674:10
**32** [2] - 674:16, 759:12
**33** [4] - 674:24, 763:11, 763:12, 763:17
**34** [3] - 590:22, 675:6, 767:10
**343** [3] - 745:5, 745:20, 746:14
**345** [4] - 646:16, 646:21, 646:24,

647:15
**349** [1] - 695:9
**35** [3] - 625:14, 756:17, 760:2
**352** [7] - 745:5, 745:20, 745:23, 745:24, 746:6, 746:7, 746:14
**353** [7] - 741:25, 742:7, 742:11, 831:6, 831:20, 831:22, 832:10
**36** [4] - 631:25, 632:5, 635:4, 676:10
**363** [1] - 704:25
**37** [1] - 676:15
**38** [6] - 635:10, 635:12, 677:14, 677:18, 677:19, 677:21
**39** [2] - 676:16, 821:23

## 4

**4** [9] - 596:17, 600:15, 612:9, 643:20, 674:9, 741:24, 765:3, 820:4, 820:7
**4.2** [2] - 737:19, 801:8
**4.75** [1] - 690:6
**40** [8] - 620:21, 622:12, 634:11, 646:2, 776:20, 779:15, 866:3, 866:6
**400** [3] - 684:22, 684:24, 813:4
**402** [8] - 594:15, 595:9, 606:6, 607:4, 626:3, 638:10, 754:10, 805:12
**403** [13] - 594:15, 595:9, 605:16, 606:6, 626:3, 638:10, 754:10, 784:3, 784:10, 785:10, 805:12, 818:17, 853:19
**40th** [1] - 721:5
**41** [6] - 631:25, 635:4, 677:5, 822:18, 823:18, 823:25
**419** [3] - 810:17, 810:23, 811:2
**42** [2] - 638:21, 678:4
**43** [2] - 678:15, 863:4
**44** [1] - 646:10
**446** [3] - 759:18, 759:24, 834:22
**45** [20] - 585:15, 634:4,

685:23, 685:25, 686:17, 700:23, 701:2, 769:15, 772:4, 772:9, 776:4, 776:19, 778:23, 779:9, 779:18, 805:8, 806:1, 806:4, 808:21, 864:13
**456** [4] - 745:5, 745:20, 745:25, 746:14
**457** [4] - 745:5, 745:21, 745:25, 746:14
**458** [3] - 745:5, 745:25, 746:14
**461** [3] - 745:6, 745:19, 746:14
**464** [3] - 745:6, 745:20, 746:14
**467** [3] - 745:6, 745:19, 746:14
**469** [3] - 745:6, 745:19, 746:14
**47** [1] - 646:10
**47(c** [1] - 712:24
**471** [3] - 745:6, 745:19, 746:14
**479** [3] - 745:6, 745:20, 746:14
**488** [3] - 745:6, 745:20, 746:15
**4th** [1] - 656:10

## 5

**5** [10] - 744:17, 746:2, 749:9, 752:18, 794:12, 800:11, 801:7, 835:9, 860:2, 860:6
**5.3** [1] - 832:9
**50** [5] - 634:4, 697:12, 733:11, 858:3, 859:1
**50/50** [1] - 722:11
**500** [2] - 813:4, 821:15
**525** [3] - 611:5, 611:8, 611:24
**533** [1] - 596:17
**534** [1] - 596:17
**54** [1] - 777:2
**545** [8] - 632:16, 633:2, 633:8, 633:13, 676:16, 676:22, 677:2
**57** [3] - 589:11, 860:3, 860:7
**57,082,006** [2] - 764:14, 769:18

**5th** [8] - 790:13, 790:18, 790:24, 791:2, 811:15, 812:7, 812:9, 812:11

## 6

**6** [1] - 801:17
**6/1000ths** [2] - 813:12, 813:13
**62** [1] - 689:13
**637** [2] - 655:5, 681:11
**64** [1] - 691:20
**641** [14] - 780:18, 780:22, 781:3, 781:18, 781:19, 788:4, 788:17, 788:21, 791:16, 795:19, 816:9, 816:24, 818:10, 818:14
**642** [17] - 780:18, 780:22, 781:3, 781:18, 781:19, 788:4, 788:17, 789:15, 791:16, 816:9, 816:16, 816:18, 816:24, 818:10, 818:14, 819:10, 819:16
**646** [12] - 780:18, 780:22, 781:3, 781:18, 781:19, 788:4, 788:18, 790:1, 816:9, 816:24, 818:10, 818:15
**65** [1] - 767:8
**661** [1] - 780:13
**67** [1] - 717:20
**686** [1] - 867:20
**689** [3] - 632:16, 633:2, 633:8
**69** [1] - 677:7
**690** [3] - 632:16, 633:3, 633:8
**693** [3] - 639:4, 639:8, 678:7
**696** [1] - 797:23
**6:26** [2] - 798:3, 803:6

## 7

**7** [4] - 678:19, 745:19, 801:17, 860:6
**7.5** [1] - 808:9
**702** [6] - 594:15, 595:9, 606:5, 607:4, 626:2, 638:10

**703** [7] - 594:15, 595:9, 597:25, 605:15, 606:5, 626:3, 638:10
**710** [3] - 611:5, 611:8, 611:24
**711** [3] - 611:5, 611:8, 611:24
**714** [3] - 611:5, 611:9, 611:24
**715** [3] - 611:5, 611:9, 611:24
**716** [4] - 611:5, 611:9, 611:24, 612:3
**720** [1] - 810:17
**725** [3] - 611:5, 611:9, 611:24
**74** [2] - 583:16, 642:1
**749** [1] - 755:8
**75** [5] - 690:10, 690:13, 691:1, 774:7, 857:25
**753** [5] - 763:18, 763:22, 764:1, 764:16, 768:3
**754** [6] - 767:11, 767:15, 767:19, 769:5, 769:10, 781:13
**759** [3] - 753:12, 753:20, 754:11
**76** [1] - 776:1
**760** [3] - 753:13, 753:20, 754:11
**761** [7] - 583:24, 583:25, 756:18, 757:2, 757:9, 757:11, 804:7
**762** [4] - 584:10, 729:2, 729:12, 729:18
**763** [8] - 737:3, 780:5, 798:7, 800:7, 800:13, 800:15, 803:8, 804:22
**766** [15] - 754:12, 756:21, 757:15, 785:2, 785:7, 804:18, 815:14, 816:21, 817:1, 817:15, 817:16, 817:17, 818:12, 820:3, 820:7
**76O** [1] - 755:8
**77** [3] - 632:16, 633:2, 633:7
**776** [1] - 751:25
**79** [1] - 690:21

## 8

**8** [1] - 707:5
**82** [2] - 645:4, 778:9
**86** [1] - 715:23
**8:59** [1] - 598:21

## 9

**9** [10] - 679:10, 679:19, 697:12, 697:15, 698:18, 698:24, 797:25, 798:3, 799:16, 804:9
**90** [8] - 614:1, 634:14, 634:17, 644:20, 691:10, 694:1, 710:15, 828:13
**95** [1] - 857:25
**97** [3] - 824:18, 825:6, 828:1
**9:00** [3] - 600:11, 867:6
**9th** [3] - 801:19, 801:25, 802:14

## A

**A&M** [2] - 840:16, 841:1
**a.m** [1] - 867:6
**abbreviation** [1] - 841:11
**ability** [1] - 587:12
**able** [33] - 582:5, 587:3, 592:13, 595:15, 598:23, 600:20, 602:9, 605:22, 608:16, 725:1, 731:23, 734:21, 735:15, 736:3, 742:22, 742:23, 750:25, 751:8, 755:25, 764:12, 766:21, 776:19, 776:21, 784:20, 788:7, 804:14, 807:23, 812:24, 812:25, 849:14, 869:5, 869:6, 870:21
**absolute** [1] - 845:15
**absolutely** [5] - 643:12, 703:1, 828:3, 845:18, 871:9
**acceptable** [1] - 764:19
**access** [5] - 596:21,

830:22, 843:19, 861:7, 861:8
**accidentally** [1] - 640:18
**accomplish** [2] - 742:25, 752:10
**according** [1] - 637:16
**account** [5] - 739:18, 739:20, 739:21, 856:2, 856:3
**accountant** [4] - 721:8, 721:9, 723:15, 723:24
**Accountants** [1] - 721:15
**accounting** [7] - 719:20, 720:2, 720:14, 720:17, 720:21, 721:6, 770:13
**accounts** [2] - 856:8, 856:9
**accredited** [2] - 721:14, 721:16
**accurate** [3] - 662:14, 763:8, 769:4
**accurately** [3] - 754:11, 754:16, 774:20
**accuse** [1] - 685:18
**accused** [15] - 616:9, 627:25, 665:1, 699:23, 702:2, 737:24, 738:13, 761:19, 762:5, 762:23, 763:8, 763:13, 764:10, 853:4, 853:8
**accusing** [1] - 681:23
**achieve** [1] - 680:1
**ACI** [8] - 638:19, 689:3, 690:20, 691:6, 691:9, 710:19, 802:4, 802:9
**acknowledged** [2] - 753:2, 766:16
**acknowledging** [1] - 766:10
**acquaintances** [1] - 860:19
**act** [3] - 697:20, 698:17, 698:23
**acting** [1] - 847:2
**action** [6] - 637:20, 698:4, 698:14, 800:20, 800:21, 800:25
**actions** [9] - 638:1, 643:14, 643:21, 644:11, 644:23,

702:11, 715:16, 715:19, 752:15
**activated** [115] - 602:25, 603:4, 603:19, 604:10, 609:16, 611:1, 612:8, 612:10, 612:12, 613:11, 613:18, 613:21, 618:4, 618:19, 618:23, 622:3, 628:7, 630:2, 631:8, 631:12, 631:15, 631:20, 631:23, 634:19, 636:17, 637:1, 637:13, 638:20, 639:14, 639:17, 640:1, 644:19, 645:20, 648:7, 651:22, 656:17, 656:21, 656:24, 658:25, 662:24, 663:17, 663:18, 665:8, 666:1, 668:22, 669:7, 669:22, 670:2, 670:11, 670:18, 670:23, 671:11, 671:14, 671:19, 685:10, 685:15, 685:20, 686:1, 686:3, 689:1, 691:11, 692:7, 692:16, 692:21, 692:25, 693:5, 693:9, 693:20, 694:5, 694:8, 694:14, 694:20, 695:16, 696:2, 696:10, 697:7, 697:21, 699:2, 699:7, 699:15, 699:19, 699:23, 700:2, 700:15, 700:21, 700:25, 701:5, 701:8, 701:12, 701:13, 701:18, 702:11, 703:17, 704:8, 705:3, 705:8, 705:16, 707:9, 708:10, 708:19, 709:14, 710:2, 710:5, 712:1, 712:9, 715:3, 762:2, 762:8, 762:9, 762:16, 762:22, 763:5, 794:21, 809:20, 866:21
**acts** [3] - 583:3, 583:6, 698:6

**actual** [9] - 594:18, 650:12, 698:17, 704:23, 740:5, 756:1, 800:10, 822:2, 862:25
**ADA** [1] - 736:14
**adapted** [3] - 592:20, 628:22, 709:14
**add** [14] - 607:14, 613:14, 618:13, 621:22, 631:4, 631:19, 634:23, 809:19, 818:6, 818:7, 821:12, 854:23, 854:24, 855:2
**added** [13] - 586:17, 586:22, 617:15, 617:16, 617:18, 620:2, 620:3, 629:19, 682:15, 682:18, 715:11, 769:1, 773:24
**adding** [3] - 647:8, 742:22, 821:15
**addition** [4] - 641:10, 716:20, 779:15, 863:7
**additional** [11] - 586:22, 603:3, 607:20, 623:4, 631:22, 644:7, 645:8, 645:13, 696:20, 820:8, 820:12
**additive** [4] - 621:21, 647:4, 688:18
**additives** [1] - 647:5
**address** [4] - 605:17, 608:3, 785:16, 869:4
**addressed** [6] - 595:10, 678:22, 765:7, 854:11, 854:15, 855:6
**addressing** [1] - 762:21
**adds** [1] - 855:2
**adequate** [1] - 724:10
**adequately** [1] - 868:22
**adjourned** [1] - 872:15
**Adjusted** [1] - 788:24
**adjusted** [5] - 647:6, 716:23, 778:16, 789:9, 789:17
**adjustment** [1] - 794:18
**adjustments** [1] - 799:1
**admissible** [1] - 788:9

admission [4] - 602:20, 603:2, 630:17, 783:23
admissions [1] - 630:9
admit [33] - 590:10, 602:23, 611:4, 611:17, 615:23, 622:12, 625:24, 632:16, 633:2, 636:2, 639:4, 646:16, 729:11, 742:6, 745:4, 745:18, 746:1, 748:7, 757:1, 759:19, 763:21, 767:14, 781:3, 781:6, 781:11, 785:17, 786:25, 788:2, 788:12, 810:23, 818:14, 828:1, 869:2
admitted [51] - 597:21, 611:22, 611:24, 616:1, 616:3, 623:22, 626:9, 626:11, 626:13, 633:6, 633:8, 636:5, 636:7, 639:7, 639:9, 646:19, 646:21, 672:22, 676:5, 729:17, 729:19, 742:10, 742:12, 746:12, 746:15, 748:11, 748:13, 751:25, 753:21, 753:22, 753:23, 754:20, 757:8, 757:10, 759:23, 759:25, 763:25, 764:2, 767:18, 767:20, 777:19, 781:13, 785:19, 786:25, 788:14, 788:18, 807:8, 811:1, 811:3, 818:24, 819:1
admittedly [1] - 594:10
adopting [1] - 593:8
ADRIENNE [1] - 578:22
advance [1] - 608:1
adverse [6] - 642:17, 838:7, 839:25, 853:12, 871:21, 872:6
adversely [1] - 587:10
advise [1] - 851:7
AEP [2] - 813:7,

814:16
affect [4] - 727:23, 738:3, 799:5, 799:25
affected [1] - 752:24
affiliate [1] - 833:1
affiliates [2] - 800:19, 832:24
afield [2] - 591:10, 609:7
afternoon [10] - 713:15, 713:16, 719:12, 719:13, 770:6, 770:7, 786:4, 787:13, 838:24, 838:25
age [1] - 842:4
Agency [1] - 668:3
agency [1] - 645:24
agent [4] - 848:17, 848:24, 849:20
aggregate [1] - 769:13
ago [22] - 606:23, 607:15, 622:18, 622:21, 649:11, 680:14, 680:15, 680:16, 680:22, 687:7, 692:1, 694:7, 700:14, 793:9, 795:9, 795:20, 795:25, 796:14, 810:4, 833:8, 841:18
agree [49] - 599:17, 611:20, 654:3, 656:16, 657:8, 657:11, 657:15, 658:18, 662:3, 670:11, 676:8, 683:6, 683:11, 685:9, 685:12, 692:15, 701:4, 701:6, 702:4, 703:15, 705:4, 705:16, 707:3, 707:11, 708:8, 708:10, 708:17, 708:24, 709:1, 712:8, 715:6, 727:21, 749:16, 798:12, 801:12, 816:19, 816:22, 816:24, 828:6, 852:9, 860:10, 862:13, 867:22, 868:8, 868:11, 869:11, 871:18, 871:23
agreed [11] - 606:14, 607:25, 701:11, 750:4, 751:19, 752:22, 755:17,

794:5, 813:8, 827:5, 851:16
agreed-upon [1] - 607:25
agreement [143] - 583:17, 583:18, 584:1, 584:5, 584:8, 587:19, 589:2, 591:22, 609:15, 623:21, 653:4, 653:7, 673:3, 673:4, 673:15, 674:1, 674:4, 674:7, 674:17, 674:25, 675:8, 675:14, 675:19, 727:13, 727:16, 735:14, 735:22, 736:25, 737:6, 737:16, 737:20, 737:23, 738:7, 738:20, 738:23, 739:11, 739:13, 739:14, 740:6, 740:8, 740:11, 740:16, 740:24, 740:25, 741:19, 742:14, 742:15, 742:25, 743:12, 743:14, 743:16, 743:17, 743:18, 744:24, 745:2, 748:2, 748:14, 749:10, 749:12, 750:2, 751:21, 752:3, 752:4, 752:5, 752:9, 752:14, 752:18, 752:20, 753:1, 754:5, 754:12, 755:17, 756:1, 756:2, 756:6, 756:10, 756:21, 757:15, 757:20, 757:22, 757:24, 757:25, 758:8, 758:11, 758:23, 759:4, 761:6, 761:17, 780:5, 782:3, 782:9, 782:14, 785:3, 785:5, 791:3, 791:7, 791:24, 797:4, 798:1, 798:6, 798:14, 798:21, 799:11, 800:1, 801:14, 802:1, 802:2, 802:7, 802:12, 802:16, 802:19, 803:1, 803:5, 803:9, 804:8, 804:15, 804:19,

804:21, 807:20, 807:23, 808:15, 808:24, 813:3, 815:5, 815:14, 817:8, 817:10, 820:13, 821:3, 821:8, 821:20, 822:6, 829:14, 832:10, 833:9, 833:24, 834:1, 834:5, 834:13, 834:16, 834:18, 862:23
agreements [47] - 590:20, 591:12, 597:16, 597:17, 625:17, 626:5, 672:15, 673:1, 673:19, 738:4, 740:17, 741:3, 744:3, 744:9, 744:15, 744:21, 745:3, 746:18, 746:20, 747:2, 747:3, 747:4, 752:25, 771:14, 778:1, 800:18, 802:18, 802:19, 802:20, 802:23, 806:25, 807:6, 807:10, 809:23, 810:2, 811:8, 811:12, 812:15, 812:23, 814:5, 815:4, 822:13, 822:23, 824:11, 832:14, 832:15
agrees [3] - 642:6, 642:12, 642:16
Aha [1] - 835:19
ahead [9] - 751:9, 787:11, 787:12, 794:9, 795:6, 818:22, 847:20, 866:6, 869:25
AI [1] - 854:10
ailment [1] - 713:1
AISHA [1] - 578:23
AJ [6] - 860:22, 860:23, 861:2, 861:11, 861:13
AJG [16] - 744:12, 744:14, 744:25, 745:3, 747:13, 748:25, 749:2, 749:5, 752:4, 752:11, 752:22, 755:19, 815:23, 816:20, 837:9, 837:12

AJG-related [1] - 744:14
AJG/DTE [2] - 756:1, 815:14
al [2] - 578:4, 578:7
Alabama [2] - 840:25, 841:3
alert [1] - 602:9
Alistar [75] - 647:25, 648:1, 648:12, 737:6, 737:11, 737:12, 737:25, 738:19, 739:5, 739:11, 739:13, 739:14, 741:17, 742:16, 743:1, 743:25, 756:10, 780:5, 780:8, 780:14, 781:1, 782:1, 782:3, 782:6, 782:9, 782:13, 782:16, 782:23, 783:16, 784:16, 784:22, 785:24, 786:11, 789:3, 789:12, 789:19, 791:4, 791:14, 791:24, 792:6, 792:10, 792:11, 794:10, 795:24, 796:20, 796:25, 797:13, 797:21, 798:2, 798:6, 800:1, 800:11, 800:14, 800:15, 800:19, 800:24, 801:2, 801:4, 801:13, 801:19, 802:5, 802:19, 803:9, 804:21, 808:23, 819:22, 831:22, 832:10, 833:19, 834:20, 835:12, 836:3, 836:9, 844:23
alkaline [4] - 615:9, 616:7, 633:22, 682:1
allegations [1] - 710:2
allow [8] - 588:6, 594:2, 607:19, 707:14, 708:2, 850:11, 851:15, 851:17
allowance [1] - 870:18
allowed [6] - 580:4, 703:7, 708:4, 843:24, 854:18, 871:2
allowing [1] - 706:15
almost [5] - 610:11, 649:10, 819:1,

866:23, 867:24
**alternative** [2] - 645:16, 812:19
**alternatives** [2] - 764:20, 766:25
**altogether** [1] - 844:8
**Alvin** [2] - 840:21, 841:5
**amended** [1] - 794:16
**Ameren** [3] - 612:6, 612:7, 636:13
**American** [6] - 612:20, 612:23, 667:16, 721:15, 721:16, 862:4
**amount** [30] - 689:2, 689:3, 702:14, 704:8, 706:13, 712:1, 717:16, 725:15, 727:1, 738:9, 739:9, 746:25, 750:8, 750:11, 755:5, 755:12, 755:15, 760:16, 760:21, 762:23, 763:9, 764:9, 782:3, 783:7, 791:24, 796:21, 800:14, 835:12, 836:22, 843:15
**amount-per-ton** [1] - 746:25
**amounts** [7] - 639:13, 703:17, 705:8, 740:18, 760:11, 763:2, 781:10
**analysis** [25] - 624:20, 647:21, 708:14, 723:3, 726:3, 728:22, 732:19, 736:20, 736:24, 740:11, 750:11, 753:16, 756:23, 759:9, 763:19, 765:6, 765:7, 794:20, 810:11, 810:20, 820:18, 827:4, 827:11, 832:1, 836:10
**analyze** [4] - 719:20, 722:24, 734:21, 792:18
**analyzed** [3] - 603:10, 760:7, 827:23
**analyzing** [2] - 760:20, 824:11
**AND** [1] - 578:2
**announcements** [3] - 825:20, 826:5, 826:25

**annual** [1] - 794:20
**ANSWER** [1] - 705:18
**Answer** [4] - 774:10, 776:6, 777:6, 792:1
**answer** [22] - 640:13, 640:20, 641:6, 651:11, 666:16, 694:12, 695:18, 695:20, 696:4, 697:22, 705:24, 707:7, 753:7, 753:8, 778:17, 827:12, 846:4, 846:14, 846:15, 847:8, 849:8, 853:14
**Antelope** [2] - 603:14, 659:22
**anticipated** [3] - 592:1, 607:23, 871:21
**anyway** [1] - 849:18
**apart** [1] - 703:21
**apartment** [9] - 724:24, 724:25, 725:2, 725:3, 725:9, 725:12, 727:14, 728:3, 765:15
**apologies** [1] - 754:9
**apologize** [11] - 587:25, 591:9, 653:2, 672:16, 674:22, 691:18, 786:7, 795:6, 820:7, 826:17, 853:18
**appeals** [2] - 594:25, 595:14
**appear** [1] - 758:13
**Appearances** [1] - 579:1
**APPEARANCES** [1] - 578:15
**appeared** [3] - 800:13, 803:6, 820:17
**appellate** [1] - 599:12
**applicable** [8] - 737:25, 738:13, 739:10, 740:7, 783:5, 783:7, 783:8, 834:19
**Applications** [1] - 722:3
**applied** [3] - 624:21, 689:3, 714:24
**applies** [2] - 754:4, 815:2
**apply** [2] - 662:20, 686:25
**applying** [2] - 759:4, 820:1
**Appraisers** [1] -

721:17
**appreciate** [4] - 580:2, 580:3, 754:25, 769:22
**approach** [16] - 587:23, 635:15, 672:20, 675:24, 675:25, 676:20, 677:22, 677:23, 688:1, 689:21, 689:23, 701:21, 797:6, 826:1, 838:2, 852:22
**appropriate** [10] - 582:15, 622:21, 688:7, 751:12, 756:8, 762:24, 763:8, 833:18, 868:5, 869:20
**appropriately** [1] - 582:2
**approved** [1] - 604:21
**ARANT** [1] - 579:6
**Arbor** [1] - 744:25
**Archway** [2] - 719:18, 722:14
**area** [3] - 770:9, 865:17
**areas** [4] - 707:22, 825:20, 826:5, 826:6
**argue** [1] - 580:12
**arguing** [3] - 583:2, 593:6, 702:21
**argument** [9] - 580:21, 585:3, 586:6, 590:18, 702:15, 707:11, 757:7, 784:10, 785:14
**argumentative** [1] - 805:18
**arguments** [5] - 586:20, 588:11, 598:12, 867:19, 869:7
**arise** [1] - 827:8
**arising** [2] - 642:18, 800:23
**arithmetic** [3] - 813:14, 813:15, 818:3
**arm's** [1] - 736:16
**arrangement** [1] - 609:1
**art** [1] - 602:21
**ARTHUR** [1] - 578:7
**Arthur** [3] - 647:25, 648:1, 648:12
**article** [3] - 626:22, 627:5, 718:4
**articulating** [1] - 607:2

**ascertainable** [1] - 606:23
**ash** [5] - 639:17, 639:18, 639:21, 639:23, 640:3
**ASHLEY** [1] - 579:8
**aside** [3] - 675:23, 711:15, 793:18
**aspect** [4] - 650:18, 771:21, 778:23, 853:13
**aspects** [2] - 645:13, 785:15
**asserted** [16] - 619:25, 624:25, 637:21, 643:5, 643:6, 643:15, 643:22, 644:12, 644:24, 703:14, 715:21, 800:24, 801:1, 801:2, 801:4, 855:12
**assertedly** [1] - 704:10
**assertion** [1] - 704:19
**assess** [1] - 763:9
**assessed** [1] - 762:1
**assessment** [1] - 658:20
**assignment** [1] - 722:23
**assigns** [1] - 589:24
**assist** [4] - 672:19, 673:12, 695:1, 695:3
**associated** [10] - 590:3, 637:5, 760:21, 817:18, 820:14, 839:7, 843:7, 852:7, 857:5, 857:19
**Associates** [2] - 624:5, 675:15
**assume** [11] - 582:7, 588:2, 588:10, 669:9, 727:17, 727:24, 801:15, 825:18, 843:13, 850:23, 863:23
**assumed** [1] - 666:18
**assuming** [3] - 722:24, 750:1, 819:23
**atmosphere** [2] - 614:2, 866:7
**attached** [5] - 781:20, 797:11, 797:12, 799:19, 819:1
**attempt** [6] - 731:22, 732:3, 750:7, 755:3, 796:16, 848:14
**attempted** [1] - 755:11

**attempting** [1] - 868:10
**attend** [1] - 837:17
**attended** [1] - 658:13
**attention** [6] - 769:22, 793:14, 794:6, 795:1, 795:10, 799:5
**attorney** [2] - 846:2, 846:3
**attorney-client** [1] - 846:3
**attorneys** [2] - 846:13, 851:7
**attractive** [2] - 639:24, 640:4
**attributable** [1] - 808:21
**audits** [1] - 720:23
**authority** [3] - 846:9, 846:23, 847:6
**automatically** [1] - 829:7
**available** [6] - 622:25, 630:24, 701:2, 814:25, 830:10, 830:13
**avoid** [1] - 607:19
**aware** [12] - 591:2, 606:20, 630:8, 688:16, 699:18, 778:11, 793:5, 795:22, 825:16, 856:12, 860:23, 861:1

## B

**back-end** [1] - 726:17
**background** [3] - 713:20, 720:25, 770:12
**bad** [1] - 714:1
**baghouse** [15] - 614:6, 614:9, 619:18, 622:5, 639:20, 663:2, 664:4, 664:10, 664:13, 665:17, 666:5, 672:9, 710:8, 710:9, 715:16
**baghouses** [5] - 665:2, 665:12, 665:24, 710:22, 715:8
**bank** [4] - 856:2, 856:3, 856:8, 856:9
**Barr** [4] - 635:21, 638:24, 691:23, 842:21

**Bascobert** [4] - 624:4, 674:17, 768:23, 842:10
**base** [2] - 789:18, 794:19
**based** [28] - 580:18, 583:21, 585:19, 595:16, 613:20, 632:9, 681:22, 687:9, 702:7, 709:17, 709:18, 719:19, 722:15, 729:14, 763:1, 782:22, 784:6, 794:13, 794:17, 794:20, 800:13, 804:25, 816:6, 818:4, 821:7, 855:22, 858:2, 867:18
**basin** [1] - 636:13
**Basin** [4] - 604:7, 621:19, 639:12, 673:5
**basis** [27] - 583:14, 583:22, 585:6, 587:22, 588:25, 589:2, 589:3, 597:24, 606:22, 622:17, 622:18, 623:16, 626:7, 641:8, 641:15, 685:22, 704:19, 739:15, 740:20, 740:21, 751:16, 754:2, 771:10, 805:25, 851:11, 853:10, 853:19
**Bates** [3] - 824:23, 825:11, 827:19
**bear** [1] - 608:12
**bearing** [2] - 706:24, 819:4
**bears** [1] - 827:22
**beat** [1] - 832:17
**became** [4] - 600:19, 701:2, 739:16, 756:20
**becomes** [1] - 593:1
**bed** [1] - 600:20
**beef** [1] - 841:6
**began** [1] - 727:6
**begin** [3] - 604:22, 648:24, 687:21
**beginning** [9] - 589:10, 767:7, 774:7, 776:2, 778:10, 828:20, 846:18, 868:4, 868:16

**begins** [3] - 614:25, 616:21, 707:4
**behalf** [15] - 653:6, 653:8, 719:7, 722:9, 722:10, 739:22, 837:10, 838:14, 846:10, 846:24, 847:2, 847:6, 847:10, 854:8, 856:14
**behind** [12] - 636:16, 672:23, 673:18, 674:3, 674:10, 674:16, 674:24, 675:6, 676:10, 676:15, 676:16, 677:19
**behoove** [1] - 582:11
**belabor** [1] - 863:25
**belief** [9] - 703:8, 703:12, 704:2, 704:14, 704:15, 707:1, 707:13, 707:14, 711:21
**believes** [5] - 582:9, 582:19, 593:18, 600:22, 608:17
**bell** [2] - 847:16, 847:18
**below** [2] - 730:8, 807:24
**belt** [5] - 627:10, 627:15, 812:16, 865:19, 865:25
**belts** [2] - 849:22, 850:18
**beneficial** [4] - 640:10, 641:1, 641:3, 641:7
**benefit** [4] - 726:20, 832:25, 862:17, 869:8
**benefits** [2] - 639:25, 726:11
**benefits/reduced** [1] - 639:17
**BENN** [1] - 579:7
**best** [7] - 601:11, 724:5, 735:5, 792:1, 833:16, 845:20, 846:7
**better** [1] - 816:25
**between** [31] - 584:7, 587:11, 609:1, 610:4, 662:5, 673:3, 673:4, 674:4, 674:25, 675:8, 732:5, 734:10, 735:15, 737:6, 742:15, 744:23,

752:4, 773:15, 777:13, 778:21, 782:2, 797:11, 798:1, 799:3, 802:6, 803:5, 803:9, 835:12, 860:2, 871:5
**beyond** [17] - 583:19, 585:12, 591:10, 591:14, 591:15, 591:22, 598:14, 606:4, 606:18, 609:13, 638:11, 640:9, 640:10, 640:25, 641:1, 641:3, 871:14
**beyond-the-scope** [1] - 585:12
**big** [14] - 586:23, 638:6, 717:10, 734:5, 750:20, 777:13, 777:17, 802:19, 807:7, 808:15, 812:24, 834:22, 848:7, 857:16
**Big** [12] - 603:13, 621:14, 659:13, 673:22, 731:20, 863:15, 863:18, 863:19, 863:21, 863:23, 865:19, 865:25
**biggest** [1] - 720:21
**billion** [1] - 821:15
**binder** [28] - 604:24, 615:13, 632:1, 633:11, 635:2, 635:13, 646:10, 729:1, 736:25, 741:24, 744:18, 745:19, 748:3, 751:23, 753:12, 755:8, 756:17, 759:12, 763:11, 767:11, 780:12, 780:13, 780:17, 786:23, 791:8, 791:10, 802:20, 824:19
**binders** [8] - 694:24, 718:20, 774:6, 780:17, 780:19, 810:19, 837:23, 837:25
**binding** [2] - 757:20, 757:24
**Birmingham** [4] - 840:25, 841:3, 841:6, 843:2
**bit** [16] - 585:15,

617:3, 653:10, 655:13, 666:10, 667:12, 724:3, 770:8, 787:11, 794:4, 797:3, 834:9, 839:5, 839:23, 841:4, 865:3
**bits** [1] - 623:25
**bituminous** [2] - 603:24, 683:4
**blah** [3] - 592:24
**blah-blah-blah** [1] - 592:24
**blank** [2] - 746:6, 751:11
**blindness** [2] - 643:5, 643:14
**block** [2] - 704:22, 777:19
**blocks** [1] - 639:22
**blood** [1] - 696:12
**blow** [1] - 690:15
**blown** [1] - 621:25
**blue** [1] - 732:2
**board** [2] - 844:17, 844:18
**boiler** [11] - 621:23, 621:24, 773:24, 774:19, 774:21, 774:22, 774:24, 865:15, 865:25, 866:5, 866:19
**boilers** [5] - 612:9, 774:25, 849:23, 850:18, 864:3
**bold** [1] - 832:21
**bolts** [1] - 867:13
**bonded** [1] - 619:7
**Boston** [1] - 719:19
**bother** [1] - 821:25
**bottom** [13] - 731:8, 735:7, 735:9, 736:11, 736:17, 763:4, 764:9, 768:15, 768:25, 795:18, 822:17, 823:17, 824:22
**BOULT** [1] - 579:6
**boundaries** [1] - 725:22
**box** [2] - 600:16, 655:12
**boxes** [3] - 593:7, 594:3, 620:18
**Br** [4] - 638:18, 690:20, 691:6, 691:8
**Br2** [3] - 617:15, 617:18, 620:2
**brackets** [1] - 618:8
**BRADLEY** [2] -

578:19, 579:6
**break** [20] - 587:2, 587:4, 648:18, 648:20, 648:21, 696:15, 700:8, 700:11, 700:12, 712:15, 712:16, 713:4, 733:5, 786:5, 786:15, 787:13, 787:14, 788:5, 839:2, 870:19
**breaking** [2] - 696:16, 696:24
**breaks** [2] - 586:12, 872:4
**breakthroughenergy .org** [1] - 862:1
**brief** [1] - 601:16
**briefed** [1] - 586:5
**briefing** [2] - 586:7, 587:3
**briefly** [9] - 598:16, 607:19, 609:22, 726:11, 764:22, 765:9, 786:17, 808:3, 867:17
**bring** [5] - 585:5, 601:11, 602:2, 630:5, 717:20
**broad** [1] - 818:4
**broader** [1] - 707:23
**broadly** [1] - 609:21
**broken** [1] - 764:14
**bromide** [13] - 617:15, 617:18, 617:24, 620:2, 621:21, 621:22, 625:7, 636:17, 648:4, 681:25, 682:1, 682:15, 682:18
**brominated** [3] - 715:13, 849:22, 850:17
**bromine** [10] - 609:16, 628:16, 634:1, 647:4, 663:9, 691:8, 714:24, 715:11, 716:20, 809:19
**brought** [7] - 584:8, 591:17, 598:24, 601:18, 649:2, 794:25, 799:4
**brown** [3] - 666:12, 682:2, 682:9
**Brown** [10] - 690:10, 788:19, 790:3, 795:15, 796:7, 806:10, 806:17, 808:4, 820:6, 822:20
**bucks** [2] - 803:24,

813:23
**buffington** [1] - 842:11
**Buffington** [2] - 624:12, 674:4
**build** [2] - 666:17, 667:1
**building** [2] - 720:23
**buildings** [1] - 865:16
**bullet** [4] - 690:20, 691:2, 825:19
**bunch** [6] - 721:9, 721:10, 797:19, 806:24, 820:20
**Burke** [2] - 578:12, 723:22
**burn** [10] - 604:6, 628:4, 644:17, 644:18, 692:24, 706:5, 742:24, 743:6, 809:19, 821:17
**burned** [28] - 604:3, 604:7, 604:8, 621:17, 622:1, 627:16, 628:6, 683:14, 703:16, 704:7, 705:3, 706:4, 706:13, 726:19, 782:14, 782:16, 791:14, 792:3, 792:11, 796:21, 835:12, 863:11, 863:16, 863:18, 863:20, 865:19, 865:21, 866:2
**burning** [14] - 628:16, 665:18, 665:22, 665:23, 670:22, 671:13, 671:20, 692:16, 701:5, 701:7, 702:11, 716:21, 778:18
**burns** [1] - 621:19
**burnt** [1] - 621:18
**business** [18] - 661:4, 721:14, 721:16, 721:18, 728:23, 733:3, 736:15, 825:21, 826:6, 827:2, 842:7, 845:21, 846:8, 846:22, 847:5, 860:13, 860:17, 866:13
**business-related** [1] - 733:3
**businesses** [1] - 723:13
**businesspeople** [1] -

610:7
**buy** [4] - 719:25, 735:16, 736:4, 736:7
**buying** [1] - 858:1
**BY** [121] - 578:16, 602:16, 610:20, 611:25, 616:4, 617:14, 620:22, 623:24, 624:10, 626:14, 629:13, 630:7, 630:15, 633:9, 635:11, 635:19, 636:8, 638:16, 639:10, 641:9, 641:20, 642:2, 642:25, 644:9, 645:5, 646:22, 649:7, 655:7, 655:14, 662:13, 666:13, 672:21, 673:14, 676:1, 676:21, 677:24, 681:12, 682:4, 682:10, 687:5, 688:15, 689:10, 689:14, 689:24, 690:11, 690:17, 690:22, 691:4, 691:21, 695:4, 697:1, 700:13, 708:7, 709:23, 713:14, 715:24, 716:16, 717:22, 719:11, 722:22, 724:6, 729:23, 730:11, 731:6, 733:20, 735:1, 737:4, 737:21, 740:4, 741:16, 742:13, 743:13, 746:16, 747:9, 748:16, 749:11, 750:24, 752:1, 752:19, 753:10, 755:1, 757:12, 758:20, 760:3, 764:3, 765:4, 767:23, 769:16, 770:5, 787:23, 788:20, 790:5, 796:10, 797:9, 806:6, 806:13, 806:19, 808:5, 811:4, 819:8, 820:10, 822:10, 822:21, 825:9, 826:3, 827:13, 828:12, 831:7, 831:21, 832:12, 834:11, 836:1, 838:18, 844:16,

846:16, 850:14, 851:20, 851:24, 855:19, 858:24, 866:17
**bypass** [1] - 664:9

**C**

**C1** [5] - 795:18, 795:19, 797:12, 835:18, 836:2
**Cajun** [12] - 603:13, 621:14, 659:13, 673:22, 731:20, 863:15, 863:18, 863:19, 863:21, 863:23, 865:20, 865:25
**calcium** [8] - 621:21, 625:7, 636:17, 647:16, 648:4, 681:25, 682:1, 682:15
**calculated** [19] - 739:5, 739:8, 754:16, 756:11, 756:15, 758:22, 783:12, 790:21, 791:13, 792:8, 792:11, 794:1, 816:10, 817:13, 819:11, 819:19, 820:23, 835:4
**calculating** [3] - 740:24, 783:17, 836:6
**calculation** [9] - 755:18, 755:20, 755:22, 782:1, 783:8, 793:15, 800:6, 805:1, 836:21
**calculations** [14] - 740:13, 755:2, 755:7, 755:10, 764:6, 767:24, 780:14, 781:6, 781:12, 782:15, 784:4, 797:20
**CALDWELL** [29] - 578:19, 578:19, 599:6, 599:25, 601:7, 602:4, 837:24, 838:5, 838:18, 844:13, 844:16, 846:6, 846:16, 850:2, 850:9, 850:14, 851:20, 851:22, 851:24, 854:6, 855:18, 855:19,

858:24, 866:16, 866:17, 867:1, 870:3, 871:9, 872:10
**Caldwell** [10] - 599:4, 846:5, 850:1, 854:21, 855:6, 855:14, 855:17, 866:14, 870:2, 871:4
**Cameron** [1] - 721:22
**campaign** [4] - 825:22, 826:8, 827:1, 829:1
**cannot** [6] - 582:10, 582:12, 592:17, 592:24, 593:23, 703:1
**capabilities** [1] - 773:16
**capable** [3] - 626:23, 627:6, 718:5
**capital** [1] - 764:24
**capture** [3] - 689:3, 715:17, 716:8
**car** [1] - 844:2
**carbon** [117] - 602:25, 603:4, 603:19, 604:10, 609:16, 611:1, 612:8, 612:10, 612:12, 613:12, 613:18, 613:21, 618:4, 618:19, 618:23, 619:7, 622:3, 628:7, 630:2, 631:8, 631:12, 631:15, 631:20, 631:23, 634:19, 636:17, 637:1, 637:13, 638:20, 639:14, 639:17, 639:23, 640:1, 640:2, 644:19, 645:21, 648:7, 651:22, 656:17, 656:21, 656:24, 658:25, 662:24, 663:17, 663:18, 665:9, 666:2, 668:23, 669:7, 669:22, 670:2, 670:11, 670:18, 670:23, 671:11, 671:19, 685:10, 685:15, 685:20, 686:1, 686:3, 689:1, 691:11, 692:8, 692:16, 692:21, 692:25, 693:5, 693:10, 693:20, 694:5, 694:9,

694:14, 694:20, 695:16, 696:2, 696:10, 697:7, 697:21, 699:3, 699:8, 699:15, 699:19, 699:23, 700:2, 700:15, 700:21, 700:25, 701:8, 701:12, 701:13, 701:18, 702:12, 703:17, 704:8, 705:4, 705:8, 705:16, 707:9, 708:10, 708:19, 709:14, 710:3, 710:5, 712:1, 712:10, 715:3, 726:18, 762:2, 762:8, 762:9, 762:16, 762:22, 763:6, 794:21, 809:20, 866:21
**care** [1] - 655:1
**career** [3] - 650:1, 651:8, 720:19
**careful** [1] - 824:10
**carefully** [2] - 726:5, 810:13
**carried** [1] - 802:8
**case** [235] - 582:20, 583:5, 584:6, 587:10, 588:19, 595:15, 597:10, 597:11, 597:22, 602:24, 603:10, 603:13, 603:23, 604:4, 604:14, 605:6, 605:8, 605:11, 606:8, 607:9, 608:19, 609:6, 610:22, 611:2, 612:24, 613:11, 613:21, 614:9, 615:20, 616:8, 616:9, 619:25, 620:20, 620:24, 621:9, 622:4, 623:7, 625:9, 626:16, 627:18, 627:25, 628:1, 629:7, 629:14, 629:20, 630:9, 630:16, 630:19, 630:21, 632:11, 632:13, 634:21, 637:2, 642:10, 645:16, 646:8, 646:13, 647:22, 653:11, 653:15, 653:21, 654:5,

654:16, 655:19, 655:23, 656:1, 656:8, 656:20, 657:1, 657:18, 657:22, 658:4, 658:22, 659:2, 659:7, 660:18, 660:24, 661:10, 661:15, 661:18, 662:9, 665:2, 666:25, 667:19, 667:23, 668:16, 669:13, 670:21, 672:4, 675:20, 676:5, 679:23, 680:12, 681:20, 681:22, 682:24, 683:20, 685:17, 685:24, 686:8, 688:17, 688:22, 693:3, 693:8, 693:19, 694:25, 695:15, 695:17, 696:9, 697:4, 697:5, 697:19, 698:1, 699:23, 700:20, 701:6, 703:1, 704:6, 705:21, 706:9, 709:3, 709:12, 713:23, 714:21, 714:25, 715:7, 715:21, 716:1, 716:12, 717:14, 717:17, 718:13, 718:15, 723:1, 723:15, 723:25, 724:18, 726:3, 726:18, 727:7, 727:23, 728:7, 728:8, 728:22, 729:6, 731:1, 732:10, 732:11, 732:12, 732:19, 734:14, 734:23, 737:9, 740:22, 742:4, 742:19, 743:4, 748:5, 748:20, 749:8, 752:12, 753:17, 755:2, 756:9, 756:23, 759:10, 759:16, 760:7, 760:12, 760:22, 761:6, 761:24, 763:19, 764:20, 765:1, 765:10, 765:21, 766:12, 767:1, 767:4, 767:25, 771:5, 771:9, 771:17, 773:4, 773:6,

773:17, 774:3, 774:23, 775:7, 776:3, 776:17, 777:9, 777:11, 780:6, 780:8, 781:1, 781:7, 782:4, 788:6, 788:23, 791:25, 792:16, 797:17, 797:21, 799:17, 800:17, 804:6, 805:3, 812:3, 812:4, 812:17, 815:8, 815:17, 819:2, 824:7, 824:25, 825:12, 828:15, 828:25, 837:1, 837:3, 839:8, 845:2, 853:4, 853:7, 853:8, 858:17, 859:23, 859:24, 860:24, 866:20, 868:5, 868:25
**Case** [1] - 578:5
**case..** [1] - 776:2
**cases** [4] - 722:1, 723:16, 791:1, 818:24
**CASSADY** [2] - 578:19, 578:20
**casually** [1] - 599:17
**catalytic** [1] - 645:19
**categories** [1] - 732:25
**causation** [1] - 588:11
**caused** [5] - 643:21, 644:11, 666:5, 666:8, 715:7
**causes** [2] - 800:20, 800:21
**caveats** [1] - 594:4
**cc** [2] - 636:10, 638:25
**cell** [1] - 600:24
**cement** [3] - 639:21, 639:22, 639:24
**cent** [1] - 820:23
**center** [1] - 869:13
**Center** [1] - 612:5
**cents** [6] - 767:8, 768:5, 818:1, 818:7, 821:13, 821:24
**CEO** [1] - 798:13
**CERT** [126] - 579:9, 588:20, 588:23, 590:9, 590:10, 591:3, 621:4, 621:5, 621:7, 621:8, 624:3, 624:7, 624:11, 624:14, 647:21, 648:1, 662:16, 662:20, 665:11,

665:14, 666:4, 666:7, 666:15, 667:5, 667:17, 667:20, 667:25, 684:8, 715:10, 727:7, 728:14, 728:15, 728:16, 728:17, 728:20, 728:23, 729:10, 730:1, 730:2, 730:13, 730:16, 730:17, 730:19, 730:20, 731:16, 731:18, 731:23, 732:6, 737:13, 738:22, 744:2, 744:23, 747:12, 752:14, 761:12, 761:22, 768:15, 776:16, 779:9, 783:9, 794:10, 797:20, 802:3, 812:10, 812:12, 812:15, 816:15, 816:19, 819:12, 824:17, 830:20, 833:19, 834:23, 835:15, 837:9, 839:10, 840:3, 841:11, 841:13, 843:4, 847:1, 847:10, 848:9, 849:9, 851:2, 852:19, 852:20, 854:2, 854:4, 855:8, 855:23, 855:24, 856:9, 856:12, 857:3, 857:6, 857:10, 857:17, 857:19, 858:4, 858:7, 858:9, 858:10, 859:3, 859:11, 859:17, 859:19, 860:16, 861:17, 861:20, 861:25, 862:16, 863:14, 864:8, 864:22, 867:21, 867:22, 867:24, 868:6, 868:8, 868:10, 869:11
**CERT's** [1] - 839:13
**CERT-related** [2] - 744:2, 744:23
**CERT/Alistar** [1] - 783:9
**certain** [15] - 582:17, 595:8, 598:4, 626:6, 666:18, 707:23, 730:17, 802:4, 819:21, 847:8,

848:2, 850:19, 856:7, 857:18, 865:16
**certainly** [10] - 595:16, 606:20, 617:2, 640:15, 667:4, 770:23, 785:23, 855:12, 868:11, 868:13
**certification** [2] - 684:3, 772:5
**certifications** [1] - 772:10
**certified** [2] - 721:8
**Certified** [3] - 721:15, 872:18, 872:19
**certifies** [1] - 686:10
**certify** [1] - 872:19
**cetera** [5] - 581:13, 583:12, 586:21, 595:18, 782:10
**chair** [1] - 867:12
**chairs** [1] - 867:13
**challenge** [2] - 750:14, 750:15
**challenging** [2] - 869:2, 869:3
**chamber** [20] - 617:4, 617:17, 618:5, 618:20, 618:24, 620:4, 620:10, 620:12, 622:1, 622:2, 627:16, 628:5, 647:11, 672:1, 672:2, 672:5, 672:7, 672:8, 683:15
**chance** [5] - 601:2, 708:23, 713:17, 836:13, 872:3
**change** [4] - 796:24, 800:2, 828:15, 841:25
**changed** [8] - 688:17, 708:21, 797:3, 798:20, 799:20, 801:22, 841:19, 851:10
**changes** [2] - 587:20, 854:9
**characterize** [1] - 823:19
**charged** [3] - 778:2, 778:5, 779:1
**charges** [1] - 868:21
**chart** [14] - 620:23, 621:2, 622:20, 730:14, 730:15, 731:2, 747:11, 758:25, 760:14, 760:24, 763:5,

790:6, 792:14, 857:17
**charts** [4] - 643:23, 729:9, 817:9, 818:25
**Chase** [2] - 609:2, 609:11
**chase** [3] - 685:8, 687:25, 733:7
**cheat** [1] - 852:4
**check** [21] - 594:3, 614:12, 616:11, 617:1, 618:1, 618:21, 619:9, 619:20, 620:14, 625:4, 626:18, 628:9, 628:19, 636:22, 637:9, 643:2, 643:10, 740:5, 764:5, 769:8, 852:3
**checked** [3] - 614:14, 616:13, 620:18
**checkmark** [6] - 592:25, 593:7, 594:19, 603:18, 604:9, 613:17
**checkmarks** [2] - 592:9, 751:1
**Chem** [63] - 742:15, 742:17, 742:18, 742:21, 743:2, 743:3, 743:5, 743:19, 743:22, 743:25, 744:3, 744:9, 744:15, 744:22, 744:23, 746:18, 746:21, 747:4, 747:12, 747:13, 747:20, 747:23, 747:25, 748:23, 748:25, 749:2, 749:5, 758:3, 758:7, 758:12, 766:6, 766:19, 771:13, 771:14, 771:20, 772:23, 773:2, 773:16, 775:9, 775:13, 775:14, 775:18, 776:5, 776:7, 777:7, 777:14, 777:19, 777:22, 777:25, 778:2, 778:4, 779:2, 804:19, 815:18, 831:22, 832:10, 832:15, 832:22, 862:8, 862:11
**Chem-Mod** [54] - 742:15, 742:17, 742:18, 742:21,

743:2, 743:3, 743:5, 743:19, 743:22, 743:25, 744:3, 744:9, 744:15, 744:22, 744:23, 746:18, 746:21, 747:4, 747:12, 747:13, 747:20, 747:23, 747:25, 748:23, 748:25, 749:2, 749:5, 758:3, 758:7, 758:12, 766:6, 766:19, 771:13, 771:14, 771:20, 772:23, 773:2, 773:16, 775:14, 777:14, 777:19, 777:22, 777:25, 778:2, 778:4, 779:2, 815:18, 831:22, 832:10, 832:15, 832:22, 862:8, 862:11

**Chem-Mod's** [7] - 775:9, 775:13, 775:18, 776:5, 776:7, 777:7

**Chem-Mod/Alistar** [1] - 804:19

**Chem-Mod/DTE/AJG** [1] - 804:19

**chemical** [4] - 639:13, 773:24, 774:19

**chemically** [1] - 775:10

**chemicals** [7] - 615:17, 685:6, 742:23, 775:15, 809:7, 809:11, 813:1

**Chesterfield** [1] - 668:6

**Chicago** [1] - 632:9

**chief** [1] - 868:5

**choice** [2] - 628:4, 644:17

**choose** [1] - 758:24

**chose** [1] - 817:22

**Christmas** [1] - 721:23

**Christopher** [1] - 578:11

**chronological** [1] - 745:15

**cinder** [1] - 639:22

**circumstance** [1] - 735:18

**cite** [7] - 588:19, 588:22, 756:23, 794:15, 796:2, 796:5, 796:11

**cited** [2] - 582:20, 587:21

**cites** [2] - 588:24, 589:9

**citing** [3] - 590:16, 590:23, 591:4

**Civil** [1] - 712:24

**Claim** [26] - 614:15, 614:16, 614:17, 614:19, 614:23, 614:25, 615:3, 615:4, 615:5, 615:7, 616:11, 616:13, 616:15, 619:22, 619:23, 620:1, 620:15, 620:16, 622:9, 622:10, 809:8

**claim** [22] - 614:20, 614:22, 615:3, 615:7, 616:21, 618:10, 618:13, 619:25, 620:16, 642:18, 643:15, 643:22, 643:23, 644:12, 644:24, 679:5, 683:17, 717:4, 801:2, 801:4, 850:25, 863:10

**claimed** [3] - 628:12, 832:25, 864:14

**claims** [18] - 614:19, 616:16, 624:25, 628:15, 628:17, 637:21, 659:7, 682:24, 683:13, 692:17, 715:20, 725:21, 725:22, 726:5, 800:22, 800:23, 801:1, 850:24

**Claims** [1] - 620:18

**clarify** [6] - 593:22, 650:5, 708:12, 708:22, 708:23, 777:2

**clarity** [2] - 599:14, 870:4

**clean** [7] - 619:13, 670:2, 705:22, 707:19, 781:8, 781:11, 784:6

**Clean** [1] - 861:22

**cleanings** [2] - 671:12, 762:10

**cleanly** [1] - 743:7

**clear** [30] - 581:5, 582:8, 582:11, 586:18, 590:19, 594:5, 594:8, 600:21, 607:21,

609:24, 624:1, 703:13, 724:21, 750:3, 761:25, 771:24, 773:5, 793:18, 819:21, 821:12, 831:9, 846:13, 856:17, 859:2, 861:19, 862:24, 865:13, 866:8, 868:18, 868:19

**clearance** [1] - 865:14

**clearer** [1] - 586:22

**clearly** [5] - 609:7, 703:20, 801:8, 826:25, 871:12

**CLERK** [2] - 719:2, 838:10

**clerk** [1] - 600:13

**client** [5] - 698:18, 703:22, 846:3, 849:13, 869:11

**client's** [1] - 704:10

**clients** [15] - 679:5, 682:12, 685:19, 686:9, 698:24, 699:2, 699:7, 703:12, 704:2, 709:3, 709:13, 711:8, 721:21, 739:22, 739:24

**clients'** [5] - 686:4, 702:25, 703:7, 707:1, 707:14

**clinical** [1] - 736:15

**clips** [1] - 612:19

**close** [9] - 581:21, 582:3, 593:9, 594:10, 696:13, 762:14, 787:10, 838:20, 845:25

**closing** [2] - 609:6, 869:7

**CO** [1] - 578:7

**coal** [343] - 585:2, 586:18, 588:5, 588:24, 589:2, 589:22, 590:4, 590:20, 591:11, 592:20, 593:11, 597:12, 603:21, 604:7, 604:17, 608:6, 608:12, 613:2, 613:7, 615:17, 616:7, 616:9, 617:4, 617:15, 617:16, 620:1, 620:3, 620:9, 621:16, 621:19, 621:20, 621:22,

621:24, 625:7, 625:9, 625:11, 625:17, 626:4, 626:5, 626:15, 626:20, 627:1, 627:5, 627:7, 627:11, 627:14, 627:17, 627:18, 627:23, 627:24, 628:2, 628:6, 628:11, 628:16, 628:22, 630:20, 631:2, 633:19, 638:5, 638:14, 639:25, 642:4, 644:14, 644:16, 644:18, 645:2, 645:20, 647:5, 647:24, 648:2, 648:4, 648:6, 650:9, 650:13, 652:16, 652:20, 652:24, 652:25, 653:4, 658:16, 658:21, 658:24, 660:9, 660:13, 660:15, 660:16, 663:8, 663:21, 665:6, 665:18, 665:22, 665:24, 666:17, 667:2, 667:5, 670:22, 671:13, 671:14, 671:20, 672:4, 672:15, 672:25, 673:3, 673:4, 673:19, 673:25, 674:4, 674:11, 674:17, 674:25, 675:8, 675:14, 675:19, 681:25, 682:15, 682:18, 683:1, 683:3, 683:7, 683:9, 683:12, 683:14, 683:17, 683:20, 683:21, 684:3, 684:8, 684:15, 684:19, 684:20, 684:21, 684:22, 684:24, 685:5, 685:15, 685:23, 686:4, 686:10, 686:16, 686:17, 686:22, 691:7, 692:6, 692:7, 692:16, 693:11, 693:22, 693:23, 694:2, 694:10, 694:14, 694:19, 695:21, 696:2, 696:9, 697:6,

697:20, 698:19, 698:25, 700:16, 700:21, 701:5, 701:7, 701:9, 701:13, 701:15, 701:17, 702:3, 702:11, 702:18, 703:16, 704:7, 705:3, 705:5, 705:8, 705:15, 705:17, 706:4, 706:5, 706:13, 707:1, 707:8, 707:23, 708:9, 708:11, 708:19, 708:20, 709:13, 710:16, 710:20, 710:22, 710:25, 711:8, 711:18, 711:22, 712:2, 712:9, 714:25, 715:11, 715:13, 716:21, 716:22, 717:5, 717:11, 717:13, 717:16, 717:17, 718:2, 718:14, 724:18, 724:19, 726:17, 726:18, 728:21, 730:23, 731:9, 731:14, 731:17, 731:24, 737:24, 738:13, 742:19, 742:22, 742:24, 743:2, 743:6, 743:20, 743:22, 743:23, 744:8, 744:14, 744:24, 746:21, 746:23, 746:25, 747:25, 749:6, 760:11, 760:12, 760:17, 761:11, 761:20, 761:21, 761:23, 762:1, 762:6, 764:10, 764:14, 768:13, 773:25, 776:13, 776:23, 777:4, 777:23, 778:12, 778:13, 778:15, 778:19, 779:13, 782:3, 782:13, 783:18, 791:14, 792:3, 796:21, 809:19, 812:4, 812:8, 812:12, 812:16, 812:21, 813:4, 813:8, 813:21, 814:6, 814:8, 814:9, 814:10, 814:22,

815:10, 815:17, 821:17, 825:21, 826:6, 827:1, 835:7, 835:12, 839:15, 841:17, 841:23, 842:19, 844:20, 845:6, 845:9, 845:13, 845:15, 845:16, 846:25, 847:2, 847:7, 849:22, 850:18, 851:1, 855:10, 856:1, 856:10, 856:22, 860:4, 860:7, 860:19, 860:21, 860:23, 862:16, 862:25, 863:5, 863:11, 863:15, 863:16, 864:2, 864:10, 864:16, 865:18, 865:24, 866:2, 868:14, 868:15, 868:19

**Coal** [4] - 731:12, 768:22, 776:16, 777:11

**coal-fired** [12] - 597:12, 604:17, 608:6, 608:12, 613:7, 650:9, 650:13, 658:16, 658:21, 658:24, 717:5, 777:4

**coals** [2] - 603:24, 604:3

**COCHRANE** [1] - 578:23

**coding** [3] - 731:21, 731:22, 768:21

**Coleto** [4] - 603:13, 660:7, 674:17, 760:15

**colleague** [1] - 852:1

**collect** [1] - 622:6

**collected** [1] - 614:6

**collection** [1] - 589:18

**collects** [1] - 614:4

**College** [1] - 721:4

**college** [1] - 721:5

**colloquy** [1] - 599:9

**color** [3] - 731:21, 731:22, 768:21

**column** [17] - 621:3, 621:6, 621:8, 621:12, 621:16, 621:20, 621:23, 622:3, 622:5, 633:21, 633:25, 768:2, 768:5, 768:9,

790:17, 806:24

**columns** [1] - 687:13

**Com** [1] - 664:22

**Com-Edison** [1] - 664:22

**combination** [5] - 617:16, 617:19, 619:3, 620:2

**combined** [1] - 775:20

**combusted** [1] - 663:9

**combusting** [1] - 617:4

**Combustion** [1] - 861:18

**combustion** [29] - 617:4, 617:17, 618:5, 618:20, 618:24, 620:3, 620:10, 620:11, 622:1, 622:2, 627:16, 628:5, 639:19, 647:11, 663:7, 663:12, 672:1, 672:5, 672:7, 672:8, 683:15, 684:5, 716:22, 841:14, 841:15, 862:6

**comfortable** [1] - 838:19

**coming** [14] - 590:12, 600:21, 606:11, 653:24, 696:16, 721:5, 727:24, 753:5, 756:8, 817:10, 823:25, 824:11, 845:25, 871:7

**commerce** [3] - 626:22, 627:5, 718:5

**commodity** [4] - 626:22, 627:5, 718:4

**common** [1] - 840:15

**Commonwealth** [16] - 649:18, 649:19, 649:23, 649:25, 650:7, 650:10, 650:16, 650:19, 650:23, 651:8, 651:22, 652:5, 652:10, 652:19, 653:6, 653:8

**communication** [2] - 846:3, 846:4

**communications** [1] - 846:19

**companies** [37] - 621:5, 626:6, 627:17, 639:24, 640:9, 640:25,

641:2, 662:16, 662:20, 667:20, 667:25, 683:20, 684:8, 711:22, 712:9, 721:10, 728:20, 730:13, 730:16, 730:22, 736:4, 776:13, 776:23, 777:23, 779:9, 779:14, 813:1, 841:25, 845:2, 845:11, 851:2, 852:6, 852:7, 856:11, 856:22, 858:5

**Companies** [2] - 730:1, 730:18

**companion** [1] - 789:16

**company** [25] - 649:25, 652:6, 653:1, 664:18, 698:2, 698:4, 721:22, 722:1, 728:4, 730:20, 732:12, 744:11, 747:24, 791:25, 826:20, 839:15, 847:12, 847:14, 847:15, 849:1, 850:16, 853:5, 854:9, 860:16, 864:16

**Company** [3] - 624:15, 649:19, 780:8

**comparability** [3] - 771:7, 771:21, 827:4

**comparable** [23] - 679:22, 679:25, 680:3, 717:2, 734:12, 736:18, 736:19, 736:21, 737:16, 743:9, 747:5, 765:20, 771:6, 771:16, 806:25, 807:11, 807:12, 807:16, 807:19, 811:22, 812:18, 822:15

**Comparable** [1] - 806:20

**comparison** [1] - 736:6

**compensate** [1] - 724:10

**compensated** [2] - 722:12, 722:14

**competent** [1] - 770:25

**competing** [1] -

766:19

**competition** [1] - 733:2

**complaint** [5] - 582:18, 761:5, 793:6, 794:17, 801:7

**complete** [4] - 601:5, 714:2, 757:21, 804:15

**completely** [1] - 784:17

**complex** [1] - 609:2

**compliance** [9] - 636:18, 660:19, 660:21, 661:8, 661:12, 661:16, 661:19, 662:4, 712:10

**complicated** [4] - 672:13, 728:17, 802:21, 817:23

**complied** [1] - 652:25

**comply** [10] - 660:25, 661:3, 670:18, 670:19, 670:25, 671:7, 699:13, 699:19, 699:24, 700:3

**component** [4] - 633:22, 634:1, 647:8, 682:18

**composition** [1] - 619:12

**compound** [9] - 616:7, 617:16, 617:18, 617:24, 620:2, 621:22, 647:10, 647:13, 682:1

**comprises** [3] - 617:15, 617:18, 620:1

**comprising** [2] - 615:1, 618:4

**computations** [1] - 755:16

**computed** [1] - 789:6

**concept** [2] - 758:2, 811:20

**concern** [3] - 582:25, 762:22, 853:2

**concerned** [1] - 853:6

**concerning** [1] - 867:19

**conclude** [2] - 581:11, 869:24

**concluded** [3] - 640:7, 738:8, 759:1

**conclusion** [12] - 584:15, 592:10, 592:13, 592:14,

594:21, 645:25, 733:7, 733:9, 733:12, 733:16, 755:25, 767:4

**conclusions** [6] - 581:23, 597:17, 608:18, 653:25, 735:2, 769:17

**conditionally** [1] - 785:18

**conduct** [2] - 588:7, 702:14

**conducted** [1] - 732:19

**conducting** [5] - 723:2, 753:16, 756:22, 759:9, 763:19

**confer** [2] - 709:21, 822:8

**conference** [2] - 868:24, 869:21

**conferences** [1] - 658:13

**conferred** [1] - 602:5

**confident** [1] - 809:10

**confidential** [1] - 597:19

**confirm** [2] - 618:23, 625:8

**confuse** [1] - 706:17

**confused** [1] - 707:18

**confusing** [5] - 706:16, 711:13, 754:10, 784:2, 831:8

**confusion** [2] - 688:7, 818:18

**conjunction** [2] - 694:9, 695:20

**connected** [1] - 667:16

**connecting** [1] - 706:14

**connection** [10] - 606:8, 607:9, 623:11, 629:19, 631:2, 646:13, 658:22, 662:15, 665:5, 810:20

**connections** [1] - 613:2

**consequences** [1] - 642:18

**consider** [8] - 696:24, 723:2, 732:17, 732:18, 737:15, 747:4, 812:18, 827:14

**consideration** [4] - 754:25, 767:5,

827:16, 854:25

**considered** [16] - 686:20, 732:7, 732:20, 733:15, 743:8, 765:9, 769:12, 795:11, 810:13, 814:4, 820:19, 820:25, 826:15, 826:23, 827:10

**considering** [2] - 817:21, 824:6

**consistency** [1] - 621:25

**consistent** [4] - 608:7, 613:7, 795:5, 795:7

**consistently** [2] - 614:10, 781:10

**constantly** [1] - 716:22

**constitute** [2] - 702:3, 702:17

**constituted** [1] - 628:11

**construction** [1] - 618:10

**consult** [4] - 745:11, 764:6, 769:7, 769:9

**consultant** [1] - 720:15

**Consulting** [1] - 720:16

**contact** [4] - 843:20, 848:8, 849:5, 849:14

**contacted** [1] - 850:4

**contacting** [1] - 619:1

**contain** [2] - 661:25, 836:5

**contained** [2] - 654:4, 866:9

**containing** [7] - 615:10, 616:22, 617:5, 618:4, 619:2, 619:12, 664:2

**contains** [2] - 663:11, 757:20

**contended** [2] - 762:5, 835:5

**content** [4] - 778:19, 819:4, 819:7, 827:11

**contention** [1] - 782:2

**context** [6] - 610:1, 659:2, 704:14, 707:18, 725:4, 850:20

**continue** [4] - 696:19, 708:6, 749:24, 787:21

**continued** [5] - 579:1, 700:1, 812:12,

854:13

**continues** [2] - 590:13, 854:14

**continuing** [2] - 713:2, 835:21

**continuously** [2] - 670:1, 716:22

**contract** [6] - 589:10, 626:16, 673:7, 673:24, 675:3, 863:22

**contracting** [7] - 621:9, 625:8, 631:5, 637:11, 731:13, 852:7, 857:4

**contracts** [16] - 589:11, 589:23, 590:3, 590:4, 590:9, 590:10, 590:14, 590:17, 590:20, 590:25, 591:1, 591:3, 625:11, 642:4, 652:20, 652:25

**contradict** [2] - 584:14, 836:15

**contributing** [1] - 851:3

**contributory** [22] - 581:2, 581:16, 582:19, 585:1, 586:19, 624:22, 629:22, 637:4, 637:13, 637:15, 681:14, 681:19, 681:24, 682:5, 689:19, 702:16, 706:15, 718:1, 718:6, 718:10, 718:15, 868:14

**control** [29] - 597:14, 604:21, 650:19, 650:24, 651:3, 651:9, 651:12, 651:16, 651:18, 652:1, 657:12, 657:16, 657:21, 657:24, 658:2, 658:11, 658:14, 658:19, 714:6, 714:20, 771:2, 809:2, 809:6, 809:24, 864:11, 864:24, 864:25, 865:6, 865:10

**controlled** [1] - 855:9

**conversation** [3] - 680:19, 729:17, 772:12

**conversations** [3] -

772:19, 773:9, 846:13

**conversion** [1] - 750:19

**convert** [1] - 750:14

**converted** [1] - 750:8

**conveyer** [8] - 627:10, 627:15, 812:5, 812:16, 849:22, 850:18, 865:19, 865:25

**cooper** [1] - 721:22

**copy** [5] - 589:13, 589:14, 629:18, 746:6, 787:3

**copying** [1] - 623:1

**copyrights** [2] - 719:22, 721:18

**core** [1] - 868:2

**CORP** [1] - 578:3

**corporate** [10] - 838:6, 839:10, 839:14, 840:7, 843:2, 843:4, 845:22, 846:9, 846:24, 848:1

**corporation** [4] - 847:12, 847:14, 847:15, 849:1

**correct** [284] - 591:18, 599:15, 603:16, 623:9, 632:23, 634:5, 649:16, 649:20, 649:21, 649:23, 649:24, 650:1, 650:2, 650:3, 650:7, 650:8, 650:11, 650:14, 650:15, 650:18, 650:20, 650:21, 650:24, 650:25, 651:13, 651:14, 651:24, 652:1, 652:4, 652:8, 653:4, 654:5, 654:12, 654:16, 655:15, 655:16, 655:20, 655:21, 656:2, 656:3, 656:18, 657:2, 657:4, 657:13, 657:23, 658:11, 658:12, 658:14, 658:15, 658:23, 659:11, 659:12, 659:15, 659:17, 659:18, 659:21, 659:24, 660:2, 660:5, 660:8, 660:20, 661:5, 661:12, 661:13, 661:17, 661:21,

661:23, 661:24, 662:1, 662:2, 662:16, 662:17, 662:21, 662:22, 662:24, 662:25, 663:2, 663:3, 663:10, 663:12, 663:13, 663:16, 664:6, 664:7, 665:15, 665:25, 666:6, 666:9, 666:23, 667:8, 667:10, 667:13, 668:24, 669:1, 669:23, 669:24, 670:24, 672:6, 673:1, 673:5, 673:8, 673:19, 673:20, 673:23, 674:5, 674:12, 674:18, 674:19, 674:20, 674:21, 675:1, 675:2, 675:4, 675:9, 675:10, 675:11, 675:12, 675:15, 675:16, 675:17, 675:18, 676:6, 676:11, 676:12, 676:13, 677:1, 677:7, 677:9, 677:12, 677:25, 678:7, 678:8, 678:10, 678:13, 678:14, 678:18, 678:19, 678:20, 679:6, 679:7, 679:8, 679:9, 679:10, 679:11, 679:13, 679:14, 679:16, 679:19, 679:20, 681:15, 681:23, 682:6, 682:13, 682:16, 682:17, 682:19, 683:4, 683:5, 683:8, 683:17, 683:21, 683:22, 683:23, 684:1, 684:2, 685:10, 686:14, 686:18, 687:1, 687:7, 687:10, 692:1, 692:3, 692:8, 692:9, 692:11, 692:18, 692:19, 692:21, 693:1, 693:2, 693:5, 693:6, 693:12, 696:11, 698:9, 698:12, 698:13, 699:8, 699:9, 699:13, 699:14, 699:16,

699:20, 699:24, 699:25, 700:3, 700:4, 700:5, 700:19, 700:22, 701:1, 701:9, 701:10, 701:15, 702:20, 704:22, 708:25, 709:19, 709:20, 710:3, 710:4, 710:6, 710:7, 710:9, 710:10, 710:13, 710:18, 711:9, 711:19, 712:2, 712:10, 715:9, 764:17, 774:9, 774:16, 775:16, 775:19, 776:5, 776:17, 779:21, 780:3, 780:9, 781:1, 789:4, 790:7, 790:25, 798:4, 798:19, 804:11, 806:5, 810:8, 814:20, 816:3, 816:7, 817:2, 819:25, 822:16, 822:25, 839:3, 839:4, 839:8, 839:9, 839:11, 840:8, 841:9, 841:10, 842:1, 844:4, 844:21, 847:23, 847:24, 852:12, 852:13, 852:20, 854:21, 855:23, 855:24, 855:25, 856:15, 859:3, 860:7, 860:9, 860:15, 861:6, 862:4, 862:9, 862:14, 863:1, 863:13, 863:21, 864:4, 866:24, 866:25

**corrected** [1] - 711:11

**correctly** [8] - 627:21, 695:22, 777:15, 783:17, 788:7, 794:23, 844:21, 845:1

**correspond** [2] - 807:7, 811:9

**CORTLAN** [1] - 579:3

**cost** [3] - 646:1, 766:25, 856:19

**Cottbus** [4] - 624:5, 675:14, 768:23, 842:17

**Council** [1] - 862:3

**counsel** [35] - 578:24,

579:9, 599:7, 602:1, 602:6, 605:20, 635:15, 701:22, 706:7, 713:4, 718:20, 738:22, 745:11, 754:17, 754:22, 781:9, 781:14, 797:11, 805:14, 819:3, 822:8, 825:4, 828:3, 830:2, 830:20, 834:7, 835:15, 837:23, 852:23, 855:13, 867:10, 869:6, 870:5, 870:6, 870:12

**count** [1] - 707:9
**counted** [2] - 707:2, 707:5
**counting** [1] - 593:5
**counts** [1] - 707:23
**couple** [15] - 584:18, 635:18, 671:24, 677:13, 694:24, 709:24, 735:12, 752:6, 762:9, 772:18, 813:7, 813:8, 813:19, 820:8, 867:11
**course** [5] - 583:12, 595:2, 819:3, 869:5, 870:24
**courses** [2] - 587:21, 721:10
**Court** [19] - 591:17, 597:22, 598:6, 618:12, 713:5, 720:8, 780:10, 785:17, 787:17, 788:2, 788:9, 795:23, 855:6, 868:2, 870:17, 870:18, 872:15, 872:24, 872:24
**COURT** [237] - 578:1, 580:1, 586:8, 587:5, 587:11, 587:16, 587:23, 588:3, 588:10, 588:16, 589:5, 589:13, 589:15, 589:20, 589:25, 590:18, 591:7, 591:13, 591:20, 592:5, 592:16, 593:3, 593:9, 593:13, 593:15, 593:25, 594:24, 595:25, 596:4, 596:6, 596:18, 597:2,

597:5, 598:2, 598:8, 598:21, 599:2, 599:21, 600:5, 600:10, 601:8, 601:10, 601:20, 602:12, 605:17, 605:20, 606:13, 606:20, 607:1, 607:13, 607:18, 610:10, 611:6, 611:10, 611:15, 611:20, 615:24, 616:1, 617:12, 622:14, 622:23, 623:5, 623:9, 623:13, 624:8, 625:22, 626:1, 626:4, 626:11, 629:11, 630:12, 632:17, 632:20, 632:23, 633:4, 633:6, 635:9, 635:15, 635:18, 636:3, 636:5, 638:8, 638:13, 639:5, 639:7, 640:6, 640:12, 640:20, 641:2, 641:5, 641:14, 641:17, 642:24, 644:2, 644:6, 645:1, 646:17, 646:19, 648:16, 648:19, 648:23, 649:2, 649:4, 672:19, 673:13, 675:25, 676:20, 677:23, 688:2, 688:4, 688:10, 688:12, 689:23, 695:3, 696:18, 696:22, 700:9, 700:11, 701:22, 701:24, 702:9, 702:21, 703:3, 703:13, 704:5, 704:18, 704:24, 705:13, 705:21, 706:7, 706:21, 708:6, 709:22, 712:14, 712:19, 713:10, 718:18, 718:25, 722:21, 724:2, 729:13, 729:16, 742:8, 742:10, 745:7, 745:10, 746:1, 746:4, 746:12, 748:9, 748:11, 753:6, 753:21, 753:25, 754:2, 754:6,

754:13, 754:20, 757:3, 757:5, 759:21, 759:23, 763:23, 763:25, 767:16, 767:18, 769:24, 770:3, 781:4, 781:14, 781:16, 781:19, 781:23, 782:5, 782:17, 782:23, 783:1, 783:14, 784:9, 784:19, 785:8, 785:23, 786:4, 786:9, 786:13, 786:20, 787:5, 787:7, 787:9, 787:16, 787:21, 788:11, 797:8, 805:17, 805:23, 806:2, 810:24, 811:1, 818:16, 818:22, 822:9, 826:2, 826:21, 827:9, 828:2, 828:6, 828:9, 834:9, 835:23, 837:22, 838:1, 838:3, 838:8, 844:15, 846:1, 846:5, 846:11, 850:1, 850:11, 851:15, 852:23, 853:1, 853:10, 853:24, 854:21, 855:4, 855:17, 858:20, 866:14, 867:3, 867:9, 870:10, 870:22, 871:4, 871:18, 872:11, 872:14
**court** [19] - 588:2, 594:25, 595:14, 596:8, 597:2, 599:12, 600:17, 600:21, 602:13, 623:12, 690:4, 720:5, 724:3, 740:13, 840:1, 840:12, 845:22, 861:15
**Court's** [2] - 618:10, 872:8
**courtroom** [12] - 600:21, 600:24, 601:19, 648:22, 648:24, 649:3, 712:18, 713:9, 787:15, 787:20, 791:18, 867:8
**Courtroom** [1] - 578:12

**cover** [6] - 580:22, 610:16, 741:5, 752:14, 770:8, 813:4
**covered** [7] - 595:17, 748:17, 771:23, 774:4, 778:25, 812:4, 812:8
**covers** [2] - 610:17, 750:6
**craft** [1] - 868:17
**create** [3] - 706:16, 763:18, 836:2
**created** [1] - 767:12
**credentials** [1] - 649:14
**credit** [12] - 683:21, 778:24, 779:22, 780:1, 807:20, 808:7, 808:9, 808:22, 832:25, 860:2, 860:13, 860:17
**credits** [38] - 666:19, 667:6, 685:23, 685:25, 686:18, 686:25, 700:23, 701:2, 776:19, 776:21, 778:13, 778:14, 779:14, 805:3, 805:4, 805:9, 805:14, 806:1, 806:4, 807:16, 808:11, 808:24, 831:10, 831:18, 832:2, 832:6, 832:7, 832:15, 833:2, 833:4, 852:11, 857:25, 859:22, 860:6, 863:4, 863:11, 864:15
**Creek** [4] - 603:13, 660:7, 674:18, 760:15
**Cris** [1] - 678:21
**Crissy** [1] - 678:21
**critique** [2] - 792:18, 810:6
**cross** [20] - 584:9, 584:16, 648:20, 700:12, 707:15, 754:18, 769:25, 780:16, 787:22, 819:4, 828:4, 831:11, 833:7, 840:4, 840:11, 850:10, 869:7, 870:5, 870:11, 871:21
**CROSS** [2] - 649:6, 770:4

**cross-examination** [12] - 584:9, 648:20, 754:18, 769:25, 780:16, 787:22, 831:11, 833:7, 840:4, 870:5, 870:11, 871:21
**CROSS-EXAMINATION** [2] - 649:6, 770:4
**cross-examination-type** [1] - 840:11
**cross-examinations** [1] - 869:7
**cross-examine** [2] - 707:15, 819:4
**cross-examined** [1] - 828:4
**crossed** [1] - 849:13
**crossing** [1] - 848:8
**crowded** [1] - 672:17
**crystal** [1] - 831:9
**CSC** [2] - 847:18, 847:19
**CSR** [1] - 872:23
**CUMMINGS** [1] - 579:6
**curative** [3] - 586:5, 867:18, 868:3
**current** [2] - 720:11, 781:12
**CURRY** [2] - 578:19, 578:20
**customary** [1] - 792:17
**customer** [1] - 778:15
**customers** [6] - 621:13, 758:3, 758:12, 762:14, 805:6, 815:12
**cut** [5] - 685:8, 687:25, 732:23, 733:7, 791:2
**cute** [1] - 685:3

**D**

**daily** [1] - 802:24
**Dakota** [1] - 844:11
**damage** [1] - 739:10
**damages** [98] - 583:4, 583:9, 583:23, 602:24, 613:23, 614:10, 626:21, 627:2, 645:9, 645:10, 645:14, 680:11, 718:3, 718:9, 719:16, 720:4, 720:8, 720:18, 722:20,

722:24, 723:21, 724:1, 724:10, 727:3, 737:25, 738:13, 738:17, 738:18, 738:24, 739:11, 740:7, 756:9, 760:22, 761:1, 761:4, 761:7, 761:10, 761:21, 761:25, 762:2, 762:6, 767:24, 769:19, 769:20, 770:10, 770:23, 771:4, 780:8, 780:25, 781:12, 782:4, 782:21, 783:5, 783:7, 783:9, 783:11, 783:13, 784:3, 789:13, 790:2, 790:12, 790:21, 792:17, 793:16, 794:10, 795:24, 796:5, 796:11, 796:20, 797:17, 797:20, 798:20, 803:25, 809:10, 810:5, 812:7, 812:10, 813:17, 817:6, 817:12, 819:10, 819:11, 819:23, 828:19, 833:18, 834:12, 834:19, 835:5, 835:7, 836:8, 836:18, 836:19, 836:25, 837:5, 837:8, 855:2, 859:24, 868:16

**Damages** [2] - 788:25, 790:6
**Daniel** [1] - 635:21
**DANIEL** [1] - 578:22
**dash** [1] - 829:18
**data** [15] - 615:16, 617:25, 669:2, 669:5, 739:5, 740:6, 754:16, 814:25, 830:4, 831:2, 834:23, 835:15, 862:22
**database** [9] - 814:20, 814:23, 820:22, 821:5, 822:1, 830:7, 830:23, 831:2
**date** [45] - 633:13, 633:15, 636:19, 649:11, 653:16, 654:3, 654:11, 654:21, 655:17, 673:7, 673:15,

673:25, 674:7, 674:14, 674:20, 675:3, 675:11, 678:2, 678:12, 708:14, 761:1, 761:5, 790:15, 790:16, 790:18, 790:23, 791:2, 791:3, 793:3, 793:4, 795:1, 796:21, 797:24, 798:1, 799:21, 800:25, 802:1, 803:18, 811:15, 825:12, 835:1, 837:19, 870:23
**dated** [11] - 675:17, 675:20, 676:13, 676:25, 677:11, 678:19, 692:3, 794:14, 794:17, 796:12, 824:19
**dates** [12] - 761:4, 761:7, 761:10, 761:13, 783:4, 793:5, 794:18, 811:14, 817:5, 833:12, 835:13, 836:20
**dating** [1] - 868:15
**Daubert** [3] - 581:3, 606:10, 609:23
**days** [8] - 606:23, 622:18, 622:21, 623:17, 695:7, 803:2, 803:17, 871:25
**days'** [1] - 598:8
**de** [3] - 669:3, 669:6, 837:6
**de-energized** [2] - 669:3, 669:6
**dead** [1] - 832:17
**deal** [12] - 586:23, 587:12, 588:20, 593:15, 641:23, 727:14, 787:10, 848:8, 869:21, 870:20
**dealing** [4] - 591:21, 607:11, 786:20, 823:14
**deals** [1] - 786:19
**dealt** [1] - 584:16
**Deanna** [2] - 872:18, 872:23
**December** [13] - 597:18, 633:15, 674:15, 675:17, 676:13, 677:1,

677:4, 677:11, 678:19, 803:13, 804:18, 808:1, 808:13
**decide** [4] - 595:1, 618:13, 627:8, 629:3
**decided** [5] - 612:15, 758:14, 766:15, 808:15, 846:7
**decides** [1] - 845:21
**deciding** [1] - 718:15
**decision** [3] - 592:12, 609:23, 867:23
**decisions** [4] - 580:10, 595:18, 610:1, 652:16
**declaration** [1] - 780:9
**deduction** [1] - 763:5
**defend** [1] - 642:16
**defendant** [23] - 590:4, 591:1, 610:12, 624:19, 625:6, 627:23, 628:21, 629:1, 631:4, 634:21, 642:16, 643:4, 643:13, 688:12, 731:23, 734:3, 760:21, 762:1, 764:14, 809:4, 833:19, 853:12, 860:24
**defendants** [138] - 581:7, 581:8, 581:9, 581:11, 584:1, 584:21, 588:5, 588:18, 588:20, 588:21, 589:12, 589:23, 590:2, 590:8, 590:22, 591:3, 591:25, 592:15, 592:19, 592:21, 592:23, 593:2, 599:7, 600:1, 602:9, 602:23, 608:1, 608:14, 609:2, 609:17, 609:20, 610:14, 616:8, 621:4, 621:9, 625:8, 627:1, 629:6, 629:14, 629:19, 629:25, 630:8, 630:16, 630:19, 631:1, 631:5, 631:7, 631:23, 636:25, 637:11, 637:19, 638:2, 638:18, 641:11, 642:9, 642:12, 642:13, 643:7, 644:14,

645:15, 647:21, 665:11, 665:14, 666:4, 666:7, 667:17, 681:23, 682:12, 684:14, 688:17, 691:7, 715:6, 715:10, 718:13, 722:10, 725:7, 731:1, 731:16, 731:24, 742:19, 752:21, 752:22, 755:19, 760:24, 761:12, 761:20, 761:22, 762:5, 762:14, 769:25, 776:2, 776:3, 781:1, 781:7, 785:25, 788:2, 792:16, 797:21, 810:5, 812:3, 815:21, 816:22, 816:23, 817:11, 821:8, 824:7, 830:2, 837:16, 838:6, 839:8, 839:13, 839:16, 839:19, 839:20, 841:9, 843:7, 845:2, 852:7, 854:2, 857:4, 857:5, 857:20, 858:17, 859:23, 859:24, 864:22, 867:25, 868:7, 868:8, 868:10, 868:21, 869:11, 869:15, 872:5
**Defendants** [3] - 578:8, 579:9, 731:12
**defendants'** [34] - 584:19, 584:24, 585:8, 585:14, 586:20, 602:20, 603:2, 631:15, 637:7, 643:20, 644:10, 644:22, 687:9, 687:12, 707:1, 707:11, 715:16, 715:19, 723:8, 723:18, 726:7, 752:14, 760:5, 762:21, 778:12, 787:21, 805:25, 821:3, 855:13, 867:18, 867:21, 867:23, 868:4, 872:11
**Defendants'** [2] - 687:10, 811:2
**defense** [8] - 582:16, 583:24, 584:21, 589:22, 599:13,

601:8, 745:11, 819:3
**defenses** [1] - 800:23
**defer** [1] - 856:6
**degree** [2] - 605:18, 721:3
**Delaware** [1] - 848:25
**DELAWARE** [1] - 578:2
**deliberations** [2] - 764:6, 769:9
**delivered** [2] - 626:21, 718:3
**DELLINGER** [1] - 578:22
**delve** [1] - 736:21
**demand** [1] - 795:24
**demands** [1] - 800:22
**demonstrate** [2] - 781:24, 781:25
**demonstrative** [4] - 623:7, 623:20, 730:25, 851:25
**deny** [1] - 869:17
**department** [2] - 652:13, 652:14
**dependent** [3] - 615:3, 620:16, 832:23
**depicted** [1] - 690:12
**depo** [1] - 862:14
**deposition** [25] - 599:17, 649:12, 651:4, 651:11, 667:24, 668:10, 693:7, 693:19, 694:5, 695:6, 695:7, 695:10, 696:7, 697:4, 697:9, 703:10, 704:25, 773:6, 774:3, 776:2, 777:1, 778:9, 793:9, 856:16, 862:13
**depositions** [3] - 694:25, 723:7, 723:9
**deputy** [2] - 600:17, 600:22
**deputy's** [1] - 600:24
**derogatory** [1] - 770:24
**describe** [5] - 720:25, 726:11, 730:14, 760:25, 765:9
**described** [4] - 591:24, 652:18, 797:1, 825:10
**describes** [1] - 757:16
**describing** [1] - 747:16
**description** [2] - 689:17, 769:4
**designate** [2] -

846:23, 847:5
**designations** [1] - 721:17
**despite** [4] - 629:5, 762:13, 781:9, 799:9
**detail** [2] - 766:1, 851:4
**determine** [8] - 595:4, 693:4, 695:15, 723:21, 725:15, 733:21, 750:7, 820:22
**determining** [2] - 624:22, 637:7
**detour** [1] - 831:10
**developed** [1] - 842:7
**development** [1] - 842:7
**DEVLIN** [1] - 578:16
**DI** [2] - 581:3, 867:20
**diagram** [1] - 627:7
**Diaz** [30] - 620:21, 642:1, 645:4, 715:23, 716:14, 717:21, 729:21, 730:9, 731:4, 733:10, 733:17, 734:24, 737:2, 737:20, 740:3, 741:15, 743:11, 747:8, 748:15, 750:23, 751:24, 752:18, 758:19, 760:1, 765:3, 767:21, 769:15, 831:5, 832:11, 851:22
**differ** [1] - 749:20
**difference** [4] - 734:5, 755:14, 777:13, 788:15
**differences** [3] - 584:7, 834:1, 836:18
**different** [35] - 581:22, 598:17, 598:19, 613:2, 614:3, 627:17, 627:18, 669:20, 707:18, 722:6, 735:8, 736:5, 739:13, 740:24, 745:18, 750:16, 759:3, 761:4, 761:13, 761:24, 773:23, 774:13, 774:14, 774:18, 784:17, 802:6, 812:22, 816:13, 817:5, 819:10, 839:5, 840:17, 850:3, 857:14, 865:3

**difficult** [5] - 581:4, 596:8, 696:23, 868:25, 869:3
**digit** [1] - 801:17
**dime** [1] - 750:12
**diminished** [1] - 588:8
**dinner** [1] - 870:8
**dioxide** [4] - 680:9, 681:4, 681:8, 779:17
**DIRECT** [3] - 602:15, 719:10, 838:17
**direct** [28] - 592:18, 608:23, 688:6, 688:8, 714:3, 714:9, 777:17, 780:13, 782:12, 783:5, 783:10, 805:19, 806:2, 807:8, 808:2, 809:15, 816:3, 817:3, 855:11, 869:6, 870:16, 870:17, 870:20, 870:23, 871:7, 871:13, 871:16, 871:22
**directly** [12] - 581:5, 581:12, 581:25, 621:13, 624:25, 628:1, 637:21, 785:2, 827:3, 854:16, 857:11
**disagree** [5] - 580:20, 605:22, 654:24, 820:16, 836:20
**disagreed** [1] - 795:2
**disbelieving** [1] - 853:14
**discharged** [1] - 800:19
**disclose** [1] - 803:25
**disclosed** [5] - 746:7, 797:24, 797:25, 798:3, 801:19
**disclosing** [1] - 871:10
**discounted** [1] - 813:24
**discuss** [5] - 599:23, 599:25, 600:6, 823:3, 870:12
**discussed** [20] - 583:15, 617:24, 621:21, 622:8, 626:7, 641:15, 688:24, 692:5, 714:6, 714:17, 717:1, 726:9, 730:12, 752:5, 752:6, 757:5, 757:17, 758:8,

788:4, 834:21
**discussing** [5] - 584:4, 592:1, 667:15, 749:21, 870:10
**discussion** [27] - 583:18, 591:21, 605:19, 610:17, 610:18, 610:19, 629:12, 688:3, 688:11, 701:23, 708:5, 744:11, 762:25, 779:8, 781:15, 783:4, 787:8, 788:1, 805:5, 828:24, 829:13, 833:8, 833:12, 852:25, 855:16, 871:5, 871:19
**dispersed** [1] - 739:24
**display** [2] - 787:4, 811:6
**displayed** [1] - 787:1
**dispute** [6] - 584:10, 749:18, 788:15, 811:16, 833:18, 852:5
**disputed** [3] - 580:10, 811:19, 811:20
**disputes** [2] - 585:23, 586:9
**disrespect** [3] - 840:12, 849:13, 865:2
**distance** [1] - 864:9
**distinction** [1] - 871:5
**distinctive** [1] - 687:13
**DISTRICT** [2] - 578:1, 578:2
**divide** [3] - 813:11, 817:25, 818:7
**divided** [2] - 610:3, 813:12
**divulging** [1] - 846:4
**docs** [3] - 580:6, 784:11, 784:12
**document** [60] - 590:12, 596:13, 596:18, 604:19, 608:15, 615:15, 615:19, 618:12, 623:20, 633:14, 634:20, 635:2, 635:23, 636:21, 638:23, 639:11, 673:10, 692:10, 729:3, 729:8, 729:9, 729:25, 737:5, 738:23, 742:1,

752:2, 756:19, 756:22, 756:23, 757:7, 757:13, 757:14, 759:13, 763:18, 764:12, 767:12, 783:2, 783:3, 783:15, 785:12, 786:11, 788:8, 804:3, 817:19, 824:19, 824:25, 825:3, 825:8, 826:12, 826:18, 826:24, 827:11, 827:14, 827:15, 827:18, 827:21, 827:24, 828:5, 835:1, 861:7
**documentation** [3] - 605:7, 658:4, 658:5
**documents** [33] - 580:3, 605:1, 607:4, 609:14, 610:5, 611:13, 611:14, 611:17, 611:19, 611:21, 625:16, 625:18, 631:22, 632:7, 636:24, 685:19, 691:12, 691:14, 723:6, 723:8, 733:15, 744:20, 753:14, 754:20, 754:23, 781:20, 781:23, 781:25, 783:21, 784:22, 824:12, 826:23, 841:23
**dollar** [17] - 733:14, 741:19, 765:18, 767:8, 769:20, 792:2, 792:10, 799:13, 801:13, 803:21, 807:16, 807:20, 808:11, 813:19, 817:18, 834:18
**dollars** [8] - 609:11, 746:25, 750:19, 813:20, 813:25, 817:24, 818:6, 864:15
**dollars-per-ton** [1] - 746:25
**done** [26] - 586:7, 597:4, 656:20, 661:10, 661:11, 661:14, 661:18, 683:23, 684:4, 685:10, 685:20, 695:15, 706:3, 736:2, 740:13,

741:2, 774:12, 793:15, 812:25, 822:5, 850:22, 851:19, 855:14, 860:17, 869:15, 872:6
**door** [1] - 850:5
**Dorsney** [7] - 587:18, 592:3, 595:2, 595:25, 597:5, 598:2, 870:14
**DORSNEY** [20] - 579:4, 592:4, 592:6, 592:25, 593:8, 593:12, 593:14, 594:12, 595:20, 596:3, 596:5, 596:16, 597:8, 598:7, 598:25, 610:2, 785:17, 786:17, 870:15, 870:24
**double** [2] - 764:5, 769:8
**double-check** [2] - 764:5, 769:8
**doubt** [1] - 871:24
**down** [37] - 589:25, 590:7, 596:8, 609:8, 610:15, 612:18, 617:13, 671:10, 702:6, 712:20, 716:23, 718:19, 730:8, 730:21, 733:5, 740:3, 764:14, 768:15, 789:10, 795:17, 806:14, 807:24, 808:4, 812:5, 812:16, 813:10, 815:14, 821:10, 825:19, 829:12, 834:5, 837:23, 850:3, 852:19, 855:24, 866:24, 867:9
**downstream** [6] - 618:5, 618:19, 622:2, 647:10, 672:1, 672:7
**dozen** [3] - 844:7, 844:8, 844:11
**drafted** [1] - 800:2
**dragging** [1] - 822:12
**draw** [3] - 581:23, 584:15, 592:13
**drawing** [1] - 680:21
**drawn** [2] - 597:17, 610:6
**drilling** [2] - 721:25,

722:2
**drive** [1] - 842:13
**drop** [3] - 588:8, 795:16
**dropped** [1] - 799:12
**DTE** [21] - 588:21, 647:25, 648:2, 648:12, 744:6, 744:8, 745:1, 745:2, 747:12, 752:4, 752:11, 752:22, 755:19, 815:24, 816:16, 816:17, 816:20, 837:9, 837:13, 861:2, 861:11
**DTE/Gallagher** [1] - 785:3
**DTX** [10] - 791:7, 791:10, 809:23, 810:17, 810:23, 811:9, 822:13, 824:18, 828:1
**ductwork** [1] - 664:9
**due** [3] - 586:21, 719:16, 808:24
**dumping** [1] - 664:18
**duplicates** [1] - 622:25
**During** [1] - 788:24
**during** [31] - 586:12, 586:24, 594:18, 602:23, 609:23, 613:23, 614:10, 615:17, 626:21, 627:2, 631:16, 698:4, 718:3, 738:13, 738:21, 743:17, 760:22, 761:20, 762:1, 762:6, 769:9, 782:1, 782:12, 783:7, 789:13, 801:5, 808:2, 834:19, 839:2, 857:8, 868:3
**duty** [1] - 726:21
**DYESS** [112] - 579:6, 587:17, 587:25, 588:4, 588:17, 591:9, 591:16, 601:9, 602:11, 605:12, 606:17, 606:24, 607:14, 611:11, 615:25, 622:15, 623:3, 623:6, 625:21, 626:2, 629:9, 630:10, 632:18, 632:21, 633:5, 636:4, 638:7, 638:9,

639:6, 640:5, 640:8, 640:24, 641:4, 641:13, 641:16, 643:25, 644:4, 644:25, 646:18, 649:5, 649:7, 655:4, 655:7, 655:12, 655:14, 662:11, 662:13, 666:12, 666:13, 672:21, 673:12, 673:14, 675:24, 676:1, 676:21, 677:22, 677:24, 681:10, 681:12, 682:2, 682:4, 682:8, 682:10, 687:3, 687:5, 688:9, 688:15, 689:9, 689:10, 689:13, 689:14, 689:21, 689:24, 690:9, 690:11, 690:15, 690:17, 690:21, 690:22, 691:1, 691:4, 691:20, 691:21, 695:1, 695:4, 696:15, 696:25, 697:1, 700:7, 700:10, 700:13, 703:5, 703:25, 704:12, 704:22, 705:11, 705:20, 708:7, 709:21, 709:23, 712:12, 845:24, 846:2, 849:24, 850:6, 851:12, 852:21, 853:2, 853:18, 854:24, 858:18, 872:13
**Dyess** [21] - 587:16, 591:7, 606:1, 607:13, 609:12, 609:22, 622:23, 633:4, 640:6, 640:23, 649:4, 672:19, 676:20, 703:3, 705:6, 707:5, 713:19, 714:5, 714:13, 717:23, 856:17

**E**

**e-mail** [21] - 596:25, 597:1, 597:3, 635:21, 636:10, 636:12, 638:24, 669:20, 678:2,

678:19, 678:22, 679:1, 691:23, 692:3, 797:11, 797:12, 798:15, 798:17, 799:19, 804:10, 804:13
**e-mails** [3] - 597:20, 690:12, 691:25
**early** [2] - 648:20, 803:13
**easel** [1] - 844:14
**easier** [1] - 592:8
**easy** [3] - 732:3, 789:23, 800:3
**economic** [6] - 734:5, 734:8, 735:10, 741:21, 751:2, 805:25
**Edison** [17] - 649:18, 649:19, 649:23, 649:25, 650:7, 650:10, 650:17, 650:19, 650:23, 651:8, 651:22, 652:5, 652:10, 652:19, 653:6, 653:8, 664:22
**educated** [1] - 684:7
**educating** [1] - 702:5
**educational** [1] - 720:25
**eduction** [1] - 661:16
**EERC** [20] - 683:23, 684:1, 684:5, 684:8, 684:13, 684:24, 685:4, 685:9, 685:15, 685:20, 685:22, 686:3, 686:8, 686:15, 686:24, 735:15, 735:19, 772:4, 772:9, 779:10
**effect** [1] - 738:6
**effective** [5] - 766:25, 798:1, 800:25, 802:1, 817:10
**efficient** [3] - 726:23, 732:21, 766:25
**efficiently** [2] - 722:5, 742:24
**effort** [1] - 812:25
**EIA** [7] - 814:20, 814:23, 820:22, 821:5, 821:25, 830:7, 830:22
**eight** [11] - 600:12, 601:22, 665:23, 668:9, 768:12, 822:23, 839:17, 839:18, 843:6,

844:6, 857:5
**eighth** [1] - 600:12
**either** [12] - 586:1, 596:1, 600:4, 663:1, 688:17, 764:23, 775:19, 776:21, 779:3, 789:19, 794:18, 869:24
**Electric** [2] - 668:6, 673:5
**electric** [1] - 642:14
**electricity** [1] - 670:19
**electronic** [1] - 787:4
**electronically** [1] - 788:3
**electrostatic** [7] - 614:6, 614:9, 619:19, 622:7, 639:20, 651:2, 651:17
**element** [12] - 582:9, 593:20, 594:6, 614:12, 614:16, 624:24, 625:6, 628:21, 643:4, 643:11, 643:13, 643:18
**Element** [6] - 626:18, 626:20, 643:1, 643:2, 643:20, 718:1
**elements** [13] - 581:15, 581:17, 581:23, 582:19, 585:3, 586:19, 593:6, 614:15, 615:11, 628:15, 637:4, 702:16, 868:14
**elicit** [2] - 640:16, 702:5
**Elmo** [2] - 796:15, 796:16
**elucidate** [1] - 706:18
**Emission** [1] - 861:18
**emission** [12] - 597:13, 613:25, 650:19, 650:23, 671:7, 716:8, 776:4, 841:14, 841:15, 841:17, 841:23, 862:6
**EMISSIONS** [1] - 578:3
**emissions** [31] - 633:24, 634:3, 634:11, 634:12, 634:14, 644:21, 647:1, 689:4, 710:15, 717:4, 726:16, 772:25,

773:14, 777:4, 778:20, 778:21, 779:11, 862:17, 862:21, 862:25, 863:4, 863:6, 864:7, 864:10, 864:11, 864:17, 864:24, 864:25, 865:6, 865:9
**emitted** [1] - 614:1
**emitting** [1] - 670:20
**employed** [1] - 650:6
**employee** [1] - 839:7
**employees** [7] - 659:3, 845:8, 845:10, 845:12, 845:14, 845:16, 845:17
**employees'** [2] - 723:6, 723:9
**employment** [1] - 650:13
**enables** [1] - 774:9
**encourage** [1] - 736:3
**end** [15] - 666:11, 706:18, 707:22, 726:16, 726:17, 753:8, 761:10, 765:11, 765:12, 790:16, 790:18, 796:8, 819:1, 866:16
**endeavor** [2] - 825:20, 826:6
**ended** [14] - 602:19, 610:19, 649:20, 656:14, 688:11, 703:6, 708:5, 710:16, 710:20, 710:23, 711:1, 711:19, 787:8, 855:16
**ends** [2] - 794:11, 867:4
**energized** [4] - 669:3, 669:6
**Energy** [10] - 612:5, 624:4, 624:5, 634:21, 642:8, 675:9, 737:7, 737:8, 861:22, 862:3
**energy** [4] - 647:17, 721:19, 722:6, 861:20
**ENERGY** [1] - 578:3
**engage** [1] - 588:6
**engaged** [1] - 855:12
**engineer** [1] - 862:15
**engineering** [5] - 632:9, 645:13, 652:13, 652:14, 840:16
**enter** [2] - 610:7,

757:21
**entered** [7] - 601:19, 609:3, 649:3, 713:9, 787:20, 795:23, 828:4
**entering** [1] - 786:14
**Enterprises** [4] - 737:7, 742:16, 743:1, 794:10
**entire** [1] - 811:20
**entirely** [3] - 656:25, 657:21, 658:18
**entirety** [1] - 858:13
**entities** [60] - 728:18, 728:20, 728:21, 729:10, 730:7, 730:23, 742:19, 744:2, 744:8, 744:14, 744:24, 746:20, 747:12, 757:17, 760:12, 766:20, 766:21, 768:13, 768:16, 769:1, 776:16, 784:23, 785:4, 812:21, 815:10, 815:17, 815:18, 815:23, 815:24, 815:25, 816:5, 816:6, 816:11, 816:15, 816:17, 816:19, 816:20, 817:13, 817:14, 817:19, 819:10, 819:12, 819:21, 820:8, 820:11, 820:12, 820:14, 820:16, 821:24, 837:10, 845:5, 845:23, 847:2, 851:1, 854:2, 854:4, 855:8, 856:14
**entitled** [3] - 790:6, 822:22, 826:23
**entity** [10] - 728:15, 734:4, 735:20, 736:14, 737:13, 742:18, 744:5, 789:4, 817:17, 847:10
**environmental** [1] - 645:23
**EP** [1] - 664:9
**EPA** [2] - 634:13, 634:14
**equal** [1] - 777:4
**equates** [1] - 646:2
**equation** [1] - 694:3
**equipment** [22] - 597:13, 604:20,

608:7, 613:12, 614:4, 614:5, 624:12, 624:14, 646:4, 650:23, 669:3, 669:5, 670:16, 692:20, 692:24, 710:12, 721:23, 726:22, 864:10, 864:11, 865:6
**equivalent** [1] - 870:11
**ERC** [1] - 735:13
**Ernst** [2] - 720:20
**erroneous** [1] - 702:7
**error** [2] - 667:3, 703:8
**errors** [1] - 789:9
**escorted** [1] - 843:25
**ESP** [14] - 622:5, 622:7, 663:2, 664:4, 664:15, 664:16, 665:17, 666:8, 672:9, 711:6, 711:16, 715:17, 866:11
**especially** [3] - 592:20, 709:13, 709:14
**ESPs** [10] - 664:21, 664:24, 665:2, 665:15, 666:2, 711:7, 711:9, 711:18, 715:8
**ESQ** [18] - 578:16, 578:17, 578:19, 578:20, 578:20, 578:21, 578:21, 578:22, 578:22, 578:23, 578:23, 579:3, 579:4, 579:6, 579:7, 579:7, 579:8, 579:8
**essential** [1] - 779:22
**essentially** [17] - 724:24, 726:20, 728:18, 731:13, 732:14, 732:15, 736:2, 736:8, 742:23, 746:1, 746:20, 747:2, 761:3, 764:8, 766:20, 867:22, 868:6
**establish** [1] - 644:7
**established** [3] - 723:25, 820:11, 822:14
**estimate** [4] - 645:24, 818:2, 818:4, 858:4
**estimated** [2] -

750:17, 794:20
**estimates** [1] - 817:1
**et** [7] - 578:3, 578:7, 581:13, 583:12, 586:21, 595:18, 782:9
**evaluate** [3] - 637:7, 720:4, 850:19
**evaluating** [2] - 588:23, 718:10
**evaluation** [1] - 770:13
**event** [3] - 585:6, 598:21, 724:11
**evidence** [52] - 581:22, 582:9, 583:8, 583:13, 584:22, 585:8, 588:19, 593:5, 593:19, 594:5, 595:8, 597:23, 597:24, 599:11, 603:4, 603:19, 604:10, 608:10, 608:17, 608:21, 617:20, 619:14, 620:5, 626:24, 628:13, 629:5, 629:25, 630:4, 631:20, 636:21, 637:5, 637:23, 643:1, 643:6, 643:17, 662:8, 686:2, 688:21, 689:5, 692:5, 709:17, 709:18, 715:10, 728:23, 732:4, 732:17, 733:6, 784:13, 798:7, 850:8, 868:9, 869:9
**exact** [5] - 593:2, 703:5, 735:21, 783:12, 855:21
**exactly** [14] - 668:22, 707:17, 740:19, 741:1, 782:7, 782:8, 802:6, 803:16, 804:4, 850:24, 859:7, 867:24, 872:2
**EXAMINATION** [7] - 602:15, 649:6, 713:13, 719:10, 770:4, 828:11, 838:17
**examination** [18] - 584:9, 585:18, 602:2, 622:25, 648:20, 713:11, 754:18, 769:25,

780:13, 780:16, 787:22, 831:11, 833:7, 840:4, 840:11, 870:5, 870:11, 871:21
**examinations** [1] - 869:7
**examine** [3] - 707:15, 784:20, 819:4
**examined** [1] - 828:4
**example** [12] - 590:15, 592:17, 604:21, 608:25, 612:2, 621:6, 621:10, 621:14, 622:6, 633:10, 803:11, 816:16
**examples** [1] - 590:24
**exceeds** [1] - 589:4
**Excel** [2] - 836:4, 836:5
**except** [5] - 604:7, 621:18, 627:15, 650:9, 787:2
**exception** [2] - 586:20, 871:14
**exchange** [1] - 831:8
**excluded** [2] - 606:6, 736:19
**excluding** [1] - 816:19
**exclusion** [1] - 848:4
**excusal** [2] - 712:22, 712:25
**excuse** [10] - 601:4, 731:16, 745:1, 750:13, 752:21, 775:14, 780:20, 804:11, 809:8, 814:11
**excused** [5] - 601:13, 601:22, 602:7, 712:23, 867:16
**executed** [1] - 824:4
**execution** [1] - 800:5
**executive** [2] - 720:15, 827:25
**exemplary** [1] - 590:23
**exhaust** [6] - 865:21, 865:23, 866:1, 866:3, 866:18, 866:20
**exhibit** [29] - 588:25, 622:13, 622:16, 623:7, 623:8, 623:20, 623:21, 677:15, 678:12, 687:9, 687:12, 687:15, 687:18, 687:20, 730:10,

753:23, 764:8, 782:18, 785:19, 785:20, 786:15, 786:18, 786:21, 788:22, 796:3, 811:10, 816:16, 816:18, 831:6
**Exhibit** [72] - 611:23, 616:2, 626:12, 632:21, 633:7, 636:6, 639:8, 646:20, 655:5, 676:16, 676:22, 677:7, 677:16, 677:25, 678:7, 678:17, 681:11, 687:10, 692:1, 729:2, 729:12, 729:18, 737:3, 742:7, 742:11, 746:13, 748:3, 748:8, 748:12, 755:8, 756:18, 756:21, 757:2, 757:9, 757:15, 759:18, 759:24, 763:18, 763:22, 764:1, 764:16, 767:11, 767:15, 767:19, 768:3, 769:5, 769:10, 795:18, 795:19, 797:12, 800:13, 803:8, 806:14, 806:15, 806:16, 807:3, 811:2, 815:20, 815:21, 815:24, 816:17, 820:4, 820:7, 820:17, 821:25, 834:22, 835:18, 836:2
**Exhibits** [6] - 611:5, 646:23, 745:5, 753:12, 788:17, 816:20
**exhibits** [35] - 583:15, 606:11, 606:13, 606:16, 606:18, 606:21, 606:25, 608:10, 609:15, 626:9, 672:12, 676:4, 678:9, 745:18, 754:3, 754:15, 777:18, 780:24, 780:25, 781:17, 783:24, 784:1, 786:16, 788:5, 788:12, 791:11, 807:7, 816:8, 817:7,

818:21, 818:24, 818:25, 820:17, 821:3
**existence** [1] - 643:6
**exited** [4] - 648:22, 712:18, 787:15, 867:8
**expand** [1] - 655:12
**expanded** [1] - 597:9
**expect** [9] - 587:2, 587:8, 706:8, 830:21, 865:20, 865:22, 865:23, 866:6
**expectation** [4] - 863:20, 863:22, 864:3, 864:5
**expected** [1] - 594:1
**expecting** [4] - 865:19, 866:1, 866:3, 871:13
**expensive** [3] - 646:3, 726:24, 764:24
**experience** [12] - 605:14, 607:10, 656:14, 661:7, 661:19, 680:22, 713:23, 720:10, 727:18, 802:25, 828:21, 829:5
**experiment** [1] - 756:24
**expert** [52] - 581:5, 581:13, 581:18, 583:23, 584:25, 585:14, 585:17, 587:7, 591:23, 592:14, 594:21, 595:23, 597:10, 597:11, 597:22, 607:6, 608:5, 608:8, 608:11, 610:13, 645:10, 649:15, 653:15, 660:21, 679:13, 680:12, 693:9, 693:15, 703:11, 704:4, 720:7, 722:20, 723:17, 726:6, 726:7, 770:10, 770:16, 771:1, 771:4, 771:5, 775:6, 775:13, 781:21, 792:17, 809:10, 810:5, 814:22, 818:23, 826:15, 828:19, 837:17, 854:18
**expertise** [8] - 591:11, 591:12, 606:5,

606:12, 606:19, 608:5, 640:11, 641:1
**experts** [2] - 598:1, 723:19
**explain** [15] - 607:11, 611:18, 617:6, 618:9, 618:18, 621:2, 625:2, 648:9, 714:3, 714:13, 716:6, 747:21, 754:18, 754:23, 813:15
**explained** [3] - 619:19, 714:14, 716:10
**explaining** [3] - 589:11, 775:11, 867:16
**explanation** [1] - 844:23
**extent** [14] - 580:15, 583:17, 595:6, 598:13, 598:22, 605:22, 608:2, 608:14, 785:14, 788:14, 827:10, 846:14, 854:25, 869:18
**extraneous** [1] - 784:2
**extraordinarily** [1] - 853:21
**extremely** [2] - 702:4, 702:6

## F

**face** [3] - 588:7, 705:9, 834:13
**facially** [3] - 707:3, 707:7, 707:10
**facilities** [5] - 632:10, 666:18, 667:2, 692:6, 845:10
**facility** [15] - 660:9, 660:15, 683:17, 684:5, 686:16, 693:11, 693:22, 694:10, 694:14, 694:19, 695:21, 696:2, 842:19, 864:2, 864:3
**fact** [14] - 597:18, 606:20, 608:21, 608:25, 693:7, 758:22, 766:19, 771:19, 781:9, 785:18, 826:19, 830:3, 839:10, 847:9
**factor** [2] - 760:4, 765:6

**factors** [15] - 588:15, 732:11, 732:14, 732:18, 732:22, 732:25, 733:3, 733:5, 733:19, 765:7, 765:10, 765:23, 765:24, 765:25, 767:6
**facts** [3] - 610:4, 732:17, 751:18
**faded** [1] - 813:9
**fails** [1] - 670:16
**fair** [63] - 658:20, 725:15, 727:1, 735:3, 747:16, 748:24, 751:3, 751:4, 752:7, 757:22, 757:25, 758:1, 758:4, 759:8, 760:5, 762:3, 765:5, 768:7, 768:10, 768:11, 768:13, 768:16, 768:23, 768:24, 769:2, 769:10, 770:17, 771:3, 771:10, 771:17, 773:10, 779:16, 780:10, 784:1, 807:1, 808:22, 809:23, 815:18, 823:5, 823:15, 826:16, 828:22, 828:23, 830:14, 831:1, 832:7, 833:5, 833:17, 833:21, 833:22, 834:2, 835:2, 835:4, 835:13, 840:1, 840:2, 840:13, 840:14, 840:17, 840:18, 850:23, 855:4, 864:21
**fairly** [4] - 591:2, 591:24, 739:23, 829:25
**faith** [5] - 703:8, 703:12, 704:2, 704:13, 704:15
**fall** [1] - 731:1
**familiar** [5] - 698:7, 744:6, 786:24, 843:6, 843:10
**familiarize** [1] - 679:4
**family** [1] - 841:25
**far** [12] - 585:18, 590:6, 591:10, 608:24, 609:7, 609:10, 706:17, 731:11, 731:19,

761:24, 782:6, 782:18
**fashion** [1] - 599:23
**fast** [1] - 745:23
**fastest** [1] - 589:20
**favorable** [1] - 869:10
**February** [6] - 578:13, 673:7, 673:17, 799:2, 799:4, 799:22
**Federal** [2] - 712:24, 872:24
**federal** [1] - 645:23
**feedback** [1] - 580:9
**feedstock** [3] - 684:15, 685:5
**few** [21] - 590:7, 592:7, 594:12, 607:18, 623:25, 649:13, 662:9, 670:3, 670:4, 700:14, 746:9, 761:13, 789:9, 795:20, 796:14, 799:9, 811:5, 813:22, 815:13, 822:11, 844:9
**field** [13] - 595:23, 597:11, 597:21, 598:1, 608:5, 639:17, 646:23, 650:13, 716:6, 717:3, 717:6, 721:23, 721:25
**fifth** [3] - 637:6, 673:9, 818:3
**fight** [2] - 727:19, 839:25
**figure** [14] - 721:11, 727:7, 734:13, 751:8, 755:3, 756:7, 795:23, 796:24, 797:1, 797:3, 813:17, 814:18, 815:7, 849:14
**figured** [1] - 787:11
**figures** [1] - 785:6
**figuring** [2] - 727:1, 759:3
**filed** [10] - 586:8, 606:10, 629:17, 632:8, 761:5, 791:14, 792:3, 793:19, 824:15, 824:20
**filing** [11] - 782:14, 790:23, 793:4, 793:6, 794:2, 795:24, 796:21, 801:6, 825:22, 826:7, 848:9
**fill** [3] - 741:17, 751:9,

758:24
**filtering** [1] - 711:17
**filtration** [1] - 710:12
**final** [14] - 584:15, 586:16, 619:25, 707:25, 733:9, 733:12, 739:11, 739:13, 739:14, 768:9, 789:12, 795:13, 869:8, 869:19
**finally** [4] - 628:21, 643:20, 758:16, 767:10
**finance** [2] - 719:20, 770:13
**financial** [8] - 609:1, 609:3, 638:10, 641:10, 652:15, 720:24, 721:12, 722:16
**fine** [4] - 581:3, 595:3, 699:5, 787:7
**finish** [3] - 625:22, 700:12, 706:11
**fired** [12] - 597:12, 604:17, 608:6, 608:12, 613:7, 650:9, 650:13, 658:16, 658:21, 658:24, 717:5, 777:4
**firing** [1] - 778:15
**FIRM** [1] - 578:16
**firm** [7] - 632:9, 719:18, 720:11, 722:14, 722:16, 755:25, 848:25
**firms** [2] - 720:14, 720:21
**first** [46] - 580:23, 582:22, 588:19, 621:1, 621:3, 621:6, 621:10, 622:7, 624:24, 637:19, 638:4, 645:15, 647:2, 653:15, 654:8, 662:11, 672:22, 673:9, 685:6, 704:5, 706:22, 723:22, 724:7, 724:9, 726:4, 727:6, 727:12, 729:21, 733:18, 735:15, 736:24, 743:17, 744:22, 750:25, 755:18, 761:5, 772:14, 774:22, 781:16, 794:16, 798:25, 806:18, 807:15,

850:10, 860:12, 871:17
**firsthand** [7] - 862:16, 862:18, 862:24, 863:2, 864:6, 864:18, 864:20
**fit** [1] - 723:13
**five** [3] - 766:19, 769:1, 816:16
**fleet** [1] - 823:4
**fleet-wide** [1] - 823:4
**flesh** [1] - 804:18
**flip** [7] - 622:20, 691:18, 778:9, 789:15, 798:7, 804:8, 815:20
**flipping** [1] - 737:1
**floor** [2] - 672:16, 676:18
**flow** [3] - 722:4, 852:11, 854:3
**flowed** [3] - 854:2, 855:7, 857:19
**flowing** [1] - 609:11
**flows** [1] - 855:23
**flue** [16] - 614:1, 614:5, 619:8, 640:3, 647:10, 647:17, 663:4, 664:6, 664:8, 664:12, 664:16, 716:21, 726:20, 805:9, 809:20, 866:11
**fly** [5] - 639:17, 639:18, 639:21, 639:23, 640:3
**focus** [4] - 586:9, 627:8, 718:9, 740:12
**focused** [7] - 702:18, 724:8, 724:15, 773:19, 774:11, 776:24, 779:14
**focuses** [1] - 724:16
**focusing** [1] - 724:17
**folks** [1] - 585:6
**follow** [7] - 589:6, 596:20, 612:16, 723:20, 723:24, 754:18, 833:16
**follow-up** [1] - 589:6
**following** [5] - 599:11, 600:8, 648:25, 713:8, 787:18
**follows** [3] - 705:12, 719:9, 838:16
**footnote** [7] - 588:9, 588:17, 795:16, 795:17, 796:4, 796:5
**FOR** [1] - 578:2
**force** [5] - 698:5,

698:11, 708:13, 708:15, 708:16
**forecasted** [1] - 858:1
**foregoing** [1] - 872:21
**form** [11] - 605:10, 619:2, 619:13, 625:18, 632:12, 639:1, 647:16, 727:16, 781:8, 818:15, 832:25
**former** [1] - 584:20
**forming** [7] - 615:19, 635:23, 720:11, 729:5, 742:3, 748:4, 759:15
**formula** [1] - 686:15
**formulas** [1] - 836:5
**forth** [4] - 726:1, 760:15, 774:19, 794:9
**forward** [10] - 601:4, 601:15, 601:24, 602:2, 679:12, 718:25, 786:16, 838:8, 867:5, 871:12
**foundation** [11] - 605:13, 605:16, 611:12, 611:13, 611:16, 644:1, 644:3, 644:5, 644:8, 788:8, 828:5
**foundational** [1] - 785:19
**Four** [1] - 729:25
**four** [15] - 657:6, 657:25, 662:4, 679:21, 730:2, 730:12, 730:16, 732:24, 739:15, 759:8, 795:25, 822:23, 839:18, 845:1
**four-month** [1] - 739:15
**Frame** [1] - 788:25
**frame** [2] - 789:13, 803:15
**frames** [3] - 750:17, 751:14, 815:4
**frankly** [1] - 596:7
**free** [2] - 754:22, 819:3
**frequently** [1] - 647:6
**front** [14] - 596:19, 596:22, 640:17, 678:4, 694:23, 697:10, 702:8, 726:16, 750:16, 791:8, 794:7, 867:15, 869:13, 869:21

**front-end** [1] - 726:16
**fronted** [2] - 856:19, 857:1
**frustrating** [1] - 596:7
**fuel** [9] - 632:10, 647:5, 647:9, 716:21, 862:21, 864:12, 865:1, 866:8, 866:9
**Fuels** [1] - 744:25
**full** [7] - 589:13, 650:12, 719:4, 757:21, 757:25, 833:25, 866:18
**full-time** [1] - 650:12
**fuller** [1] - 788:15
**fully** [2] - 598:19, 804:18
**fumbling** [1] - 777:19
**function** [1] - 856:14
**fundamental** [1] - 854:6
**fundamentally** [2] - 773:19, 774:11
**funds** [1] - 854:12
**funny** [1] - 649:12
**furnace** [2] - 774:23, 866:11
**furnaces** [1] - 775:1
**fusion** [1] - 600:18
**future** [3] - 601:3, 750:1, 854:10

## G

**G-R-E-E-N** [2] - 719:5, 838:12
**gained** [1] - 726:25
**Gallagher** [10] - 588:21, 647:25, 648:1, 648:12, 860:22, 860:23, 861:2, 861:11, 861:13
**GALLAGHER** [1] - 578:7
**gas** [24] - 614:1, 614:5, 615:10, 616:22, 617:5, 618:4, 619:2, 619:8, 619:12, 619:13, 640:3, 647:10, 647:17, 663:4, 663:11, 664:2, 664:6, 664:8, 664:12, 664:16, 672:8, 805:9, 809:20, 866:11
**gases** [7] - 639:19,

716:21, 726:20, 865:21, 865:23, 866:2, 866:3
**gate** [1] - 844:2
**gears** [2] - 780:4, 805:2
**general** [2] - 771:11, 773:11
**General** [1] - 722:3
**generally** [9] - 584:11, 738:3, 752:24, 770:14, 770:15, 775:8, 775:9, 818:24, 852:5
**generate** [4] - 783:18, 787:2, 863:12, 863:16
**generating** [4] - 670:15, 670:19, 863:15, 865:17
**gentleman** [1] - 854:19
**gentlemen** [5] - 601:20, 722:25, 724:23, 787:9, 832:20
**Georgia** [5] - 732:12, 733:19, 760:4, 765:6, 765:25
**Georgia-Pacific** [5] - 732:12, 733:19, 760:4, 765:6, 765:25
**gist** [2] - 702:19, 703:19
**given** [14] - 582:14, 658:5, 658:7, 658:8, 660:18, 677:19, 687:6, 687:16, 688:22, 707:7, 773:5, 777:5, 785:18, 846:14
**goal** [1] - 580:9
**Googled** [1] - 861:19
**governing** [1] - 727:11
**government** [1] - 651:25
**grade** [1] - 818:3
**graduate** [2] - 721:7, 841:1
**grant** [2] - 585:7, 585:19
**granted** [1] - 761:14
**grayed** [1] - 844:24
**great** [1] - 608:24
**greater** [1] - 808:8
**green** [6] - 583:23, 687:13, 729:24, 732:2, 792:13, 793:25
**GREEN** [2] - 719:6,

838:13
**Green** [87] - 584:11, 584:13, 584:19, 585:8, 587:1, 587:6, 587:9, 631:10, 636:9, 638:25, 680:12, 680:24, 681:3, 681:7, 718:24, 718:25, 719:5, 719:12, 719:15, 719:17, 722:20, 722:23, 723:20, 724:8, 730:3, 730:13, 730:25, 731:21, 734:19, 737:1, 737:5, 737:23, 741:23, 742:14, 743:15, 744:17, 746:18, 747:20, 749:13, 751:20, 752:2, 754:15, 755:2, 757:13, 763:16, 764:4, 767:3, 767:10, 767:24, 769:21, 770:6, 780:6, 783:6, 787:24, 788:22, 795:6, 797:10, 799:20, 801:16, 806:8, 817:12, 819:9, 827:14, 828:13, 837:22, 838:7, 838:8, 838:12, 838:19, 838:24, 840:21, 845:20, 853:3, 853:8, 853:11, 853:21, 854:25, 855:1, 862:15, 866:18, 867:9, 868:4, 870:8, 871:19, 872:6
**Green's** [7] - 730:5, 781:20, 782:15, 784:15, 785:15, 796:8, 871:6
**grew** [1] - 840:21
**ground** [1] - 621:24
**grounds** [2] - 785:10, 805:19
**group** [6] - 638:24, 728:17, 733:18, 860:15, 860:16, 862:4
**Group** [1] - 719:19
**groups** [1] - 734:20
**GTA** [1] - 722:3
**guess** [16] - 583:16, 584:15, 595:13,

607:1, 655:18, 703:18, 751:10, 783:19, 786:4, 815:18, 841:20, 849:8, 858:3, 861:4, 864:14, 868:3
**guessed** [1] - 670:4
**guidance** [3] - 870:17, 871:1, 871:3
**guns** [2] - 793:4, 795:12
**guy** [2] - 786:2, 842:7
**guys** [15] - 585:16, 803:21, 844:19, 845:9, 849:5, 849:15, 849:19, 849:21, 850:17, 854:19, 860:12, 860:17, 861:21, 862:6, 866:24

## H

**HALEY** [1] - 578:23
**half** [13] - 712:16, 750:18, 751:19, 755:11, 755:16, 758:16, 807:5, 817:16, 822:6, 837:14, 844:11, 866:24, 870:19
**Halliburton** [1] - 721:25
**halogen** [1] - 726:17
**hand** [6] - 581:4, 581:15, 589:15, 727:7, 806:15, 806:24
**handed** [5] - 589:1, 677:3, 797:10, 798:17, 802:9
**handing** [2] - 676:2, 695:5
**handle** [1] - 770:19
**handled** [2] - 851:5, 851:6
**handwritten** [1] - 798:12
**happy** [1] - 596:20
**hard** [3] - 724:3, 760:19, 787:3
**hardly** [3] - 585:18, 600:19, 706:19
**harmless** [2] - 642:13, 642:17
**hate** [1] - 676:17
**HBr** [3] - 617:15, 617:18, 620:2
**head** [2] - 610:13,

857:21
**headed** [1] - 672:8
**heading** [1] - 826:4
**hear** [9] - 589:6, 593:13, 632:20, 669:4, 724:3, 806:3, 809:24, 813:5, 841:11
**heard** [21] - 668:18, 668:24, 683:25, 735:12, 736:3, 744:5, 752:6, 752:21, 771:25, 774:21, 779:8, 783:4, 783:10, 791:20, 791:22, 809:22, 812:22, 813:2, 814:19, 849:2, 850:16
**hearing** [1] - 754:7
**heavier** [1] - 726:22
**heavy** [1] - 726:21
**heavy-duty** [1] - 726:21
**held** [11] - 605:19, 688:3, 701:23, 704:4, 707:12, 730:4, 739:23, 752:13, 781:15, 852:25, 856:8
**help** [15] - 596:14, 603:6, 635:16, 639:12, 645:3, 672:17, 719:23, 719:25, 720:1, 756:7, 802:24, 807:12, 813:17, 823:16, 864:7
**helpful** [14] - 580:3, 580:4, 580:8, 595:6, 595:20, 599:21, 607:12, 607:19, 610:1, 641:7, 690:18, 745:16, 750:21, 841:22
**helping** [1] - 815:7
**here..** [1] - 662:18
**hereby** [1] - 872:19
**hi** [2] - 838:19, 839:2
**high** [3] - 647:17, 765:5, 769:12
**high-energy** [1] - 647:17
**higher** [3] - 765:12, 765:23, 766:3
**highlight** [2] - 682:8, 822:19
**highlighted** [7] - 612:9, 636:14, 712:25, 738:12,

760:14, 760:15, 793:24
**highlighting** [1] - 749:1
**highly** [1] - 782:16
**himself** [1] - 754:19
**hinges** [1] - 704:19
**hired** [6] - 655:20, 655:23, 656:7, 657:17, 792:17, 810:5
**historian** [2] - 668:21, 669:1
**historians** [2] - 669:13, 671:18
**hit** [1] - 634:17
**HITCH** [1] - 579:3
**hold** [8] - 622:23, 640:12, 642:13, 642:17, 704:3, 850:11, 857:13, 857:14
**holding** [1] - 641:22
**Holdings** [2] - 624:4, 730:6
**home** [1] - 840:23
**honestly** [2] - 656:11, 687:21
**Honor** [125] - 586:4, 586:6, 587:1, 587:15, 587:17, 587:25, 588:1, 591:6, 591:9, 592:4, 593:12, 594:20, 595:20, 596:16, 598:18, 598:25, 601:9, 602:4, 605:12, 606:17, 606:24, 610:2, 611:4, 611:11, 615:22, 615:25, 622:11, 623:3, 623:6, 625:21, 626:2, 626:10, 629:9, 630:10, 632:15, 633:1, 633:5, 635:17, 636:1, 638:7, 638:9, 639:3, 640:5, 641:16, 643:25, 644:4, 646:15, 648:14, 648:17, 649:5, 675:24, 677:22, 688:1, 689:21, 695:2, 696:15, 700:7, 701:20, 702:20, 702:24, 703:5, 704:23, 705:12, 705:20, 712:13,

718:17, 718:23, 722:19, 729:11, 729:15, 729:20, 742:6, 742:9, 745:4, 745:8, 745:17, 746:3, 746:11, 748:7, 748:10, 753:19, 754:1, 754:9, 754:15, 757:1, 757:4, 759:19, 759:22, 763:21, 763:24, 767:14, 767:17, 769:23, 770:1, 770:2, 781:5, 781:22, 782:25, 785:1, 786:7, 788:7, 797:7, 805:12, 805:22, 810:25, 818:15, 822:8, 826:17, 827:22, 828:10, 834:7, 835:21, 837:20, 838:2, 844:13, 845:24, 849:24, 851:12, 852:21, 853:2, 853:19, 854:11, 854:16, 858:18, 870:24
**Honorable** [1] - 578:11
**hope** [5] - 586:12, 607:19, 609:25, 846:17, 849:12
**hopefully** [2] - 592:7, 594:13
**hoping** [2] - 700:11, 753:24
**horse** [1] - 832:18
**hotdogs** [1] - 841:6
**hour** [2] - 712:16, 870:19
**hour-and-a-half** [1] - 870:19
**hourly** [1] - 722:15
**hours** [3] - 670:3, 670:5, 762:10
**housekeeping** [1] - 867:11
**human** [1] - 854:8
**hundred** [10] - 670:12, 670:14, 706:5, 801:10, 803:24, 813:7, 813:11, 813:13, 813:22, 813:25
**hundreds** [3] - 706:4, 717:10, 864:15
**hypochlorite** [1] - 647:16

**hypothetical** [25] - 645:16, 727:4, 727:10, 727:11, 728:1, 728:8, 728:13, 732:7, 732:16, 733:23, 734:17, 734:22, 735:18, 737:17, 743:9, 743:24, 748:18, 749:3, 756:9, 766:13, 811:21, 811:23, 811:25, 812:19, 851:13

## I

**idea** [4] - 593:11, 700:9, 765:15, 816:25
**identified** [11] - 602:21, 633:21, 635:2, 806:25, 807:19, 807:24, 809:15, 811:17, 811:20, 821:8, 845:1
**identifies** [1] - 808:18
**identify** [17] - 603:21, 605:7, 608:1, 625:11, 626:15, 633:19, 634:16, 636:24, 638:1, 689:25, 714:5, 714:16, 714:19, 817:17, 817:19, 823:20, 846:9
**identifying** [2] - 807:21, 807:22
**II** [14] - 603:13, 621:14, 624:14, 659:14, 673:22, 730:19, 731:20, 863:15, 863:18, 863:19, 863:21, 863:23, 865:20, 865:25
**III** [2] - 578:7, 578:21
**immediately** [1] - 586:10
**implemented** [1] - 701:3
**implementing** [1] - 651:25
**implication** [1] - 850:9
**implies** [1] - 604:18
**importance** [2] - 733:4, 746:17
**important** [7] - 590:21, 628:16, 674:23, 725:18, 740:10, 757:20,

761:25
**impressive** [1] - 717:1
**improper** [2] - 702:22, 867:18
**improvement** [1] - 862:25
**IN** [2] - 578:1, 578:2
**inaccurate** [2] - 702:22, 754:4
**inaccurately** [1] - 754:4
**inappropriate** [2] - 832:1, 853:15
**inaudible** [1] - 855:11
**incentive** [1] - 638:6
**incentives** [3] - 638:11, 641:10, 688:25
**incidentally** [1] - 620:15
**inclination** [3] - 580:17, 582:23, 757:6
**include** [7] - 604:1, 652:15, 653:21, 654:14, 750:2, 786:11, 826:11
**included** [7] - 682:25, 716:20, 750:1, 756:5, 794:16, 795:4, 808:6
**includes** [4] - 669:7, 816:15, 819:12, 866:20
**including** [14] - 584:23, 590:11, 594:3, 595:24, 597:12, 608:6, 608:8, 723:18, 767:5, 781:1, 798:13, 812:4, 855:8, 855:11
**inclusive** [1] - 819:21
**incomplete** [1] - 754:4
**incorrect** [1] - 651:1
**increase** [3] - 766:9, 766:17, 767:2
**increased** [1] - 743:21
**incredibly** [1] - 596:8
**indeed** [1] - 609:9
**indemnification** [1] - 583:17
**indemnify** [3] - 642:6, 642:12, 642:16
**indemnity** [14] - 587:19, 587:20, 587:22, 588:5, 590:16, 590:17, 590:20, 591:2, 591:22, 597:17,

609:14, 610:6, 641:12, 653:7
**independent** [2] - 723:10, 785:6
**independently** [1] - 723:12
**indicate** [6] - 593:4, 603:18, 604:9, 613:11, 613:17, 632:7
**indicated** [2] - 715:2, 846:18
**indicates** [1] - 613:17
**indicating** [1] - 636:25
**indication** [3] - 679:1, 738:7, 766:1
**indirect** [3] - 608:23, 708:13, 867:19
**indirectly** [1] - 581:25
**individuals** [2] - 638:25, 730:2
**induce** [1] - 698:2
**induced** [10] - 581:16, 583:2, 583:10, 588:15, 593:21, 681:15, 689:20, 690:2, 690:7, 698:2
**inducement** [3] - 583:3, 583:6, 637:17
**inducing** [3] - 698:17, 698:23, 851:2
**Industrial** [2] - 624:15, 673:5
**industry** [2] - 721:20, 722:7
**infected** [1] - 832:1
**inferences** [1] - 610:6
**infinitely** [1] - 785:6
**inform** [1] - 610:22
**information** [36] - 584:12, 584:15, 603:7, 629:6, 629:15, 630:1, 630:19, 631:23, 636:25, 643:7, 645:8, 645:14, 668:22, 669:12, 669:16, 669:19, 679:2, 680:25, 728:2, 728:5, 732:6, 735:6, 758:24, 759:5, 762:15, 762:17, 762:18, 763:2, 764:7, 767:5, 784:2, 784:13, 784:20, 785:13, 816:25, 855:1
**informative** [1] - 817:14
**infringe** [14] - 581:25,

582:1, 628:1, 637:21, 641:25, 643:15, 645:3, 663:14, 663:15, 692:25, 701:16, 709:4, 717:14, 717:18
**infringed** [12] - 614:17, 616:15, 619:23, 620:20, 624:25, 679:5, 679:16, 679:18, 727:18, 727:22, 738:8, 753:3
**infringement** [75] - 581:2, 581:16, 581:17, 581:19, 582:20, 583:2, 583:10, 585:2, 585:15, 586:19, 588:8, 588:15, 593:21, 608:8, 608:18, 608:23, 614:18, 614:20, 614:23, 618:13, 620:24, 622:9, 622:10, 624:19, 624:22, 629:23, 637:5, 637:14, 637:15, 642:18, 642:19, 647:21, 653:21, 654:5, 654:7, 654:12, 654:15, 659:7, 662:1, 665:2, 679:13, 681:15, 681:19, 681:24, 682:5, 685:18, 689:20, 690:3, 690:7, 698:2, 698:3, 702:16, 705:9, 706:15, 708:14, 710:2, 718:2, 718:6, 718:11, 718:15, 720:4, 724:11, 727:6, 763:14, 766:14, 770:22, 800:21, 801:5, 806:1, 851:3, 853:4, 855:11, 867:19, 868:14
**infringement-related** [1] - 581:19
**infringer** [3] - 698:4, 724:17, 829:7
**infringers** [2] - 641:22, 809:15
**infringing** [32] - 588:7, 621:13, 626:23, 627:6, 627:9,

628:23, 645:16, 692:17, 698:6, 701:8, 701:14, 701:18, 702:3, 702:15, 702:17, 703:18, 703:21, 704:9, 705:5, 705:7, 705:17, 706:14, 706:25, 707:6, 707:10, 708:11, 708:20, 717:24, 718:5, 724:19, 724:20, 764:20
**initial** [9] - 585:6, 585:23, 697:3, 757:20, 757:24, 789:7, 790:12, 790:22, 868:4
**inject** [2] - 618:19, 692:21
**injected** [11] - 618:23, 619:8, 620:9, 620:11, 640:3, 663:15, 663:20, 663:21, 663:23, 663:25, 664:2
**injecting** [6] - 615:9, 618:3, 618:15, 647:5, 647:10, 662:24
**injection** [40] - 613:12, 622:3, 628:7, 634:19, 638:20, 640:2, 645:21, 647:14, 651:22, 656:17, 656:22, 656:25, 658:25, 669:7, 669:22, 670:12, 670:23, 671:11, 671:14, 671:19, 689:1, 689:2, 691:11, 693:5, 693:10, 693:20, 694:6, 694:9, 694:15, 694:20, 695:16, 696:3, 696:10, 697:7, 697:21, 699:23, 700:2, 700:25, 794:21, 866:20
**ink** [2] - 798:10, 798:12
**input** [1] - 580:9
**inserted** [1] - 582:7
**inside** [2] - 865:12, 865:15
**insists** [1] - 781:9
**install** [3] - 646:3, 715:8, 726:21

**installation** [2] - 645:24, 646:1
**installed** [33] - 665:5, 665:8, 692:21, 692:24, 693:4, 693:10, 693:11, 693:21, 693:22, 693:23, 694:6, 694:9, 694:14, 694:15, 694:20, 694:21, 695:16, 695:18, 695:20, 696:2, 696:3, 696:10, 697:6, 697:20, 699:23, 700:15, 701:1, 705:3, 705:16, 707:8, 708:9, 708:19, 856:23
**installing** [1] - 645:18
**instance** [5] - 688:16, 728:5, 728:14, 734:18, 863:17
**instances** [2] - 761:15, 864:1
**instead** [4] - 725:10, 725:11, 736:9
**instigate** [1] - 599:20
**Institute** [1] - 721:15
**instruct** [1] - 723:23
**instructed** [1] - 868:13
**instruction** [9] - 586:5, 586:17, 586:24, 707:25, 867:18, 868:3, 868:17, 869:18, 869:20
**instructions** [4] - 586:17, 708:1, 869:8, 869:19
**intellectual** [3] - 719:21, 720:2, 770:13
**intend** [4] - 593:17, 593:19, 593:22, 863:11
**intended** [12] - 581:7, 581:10, 698:5, 709:3, 709:5, 740:20, 775:21, 775:22, 812:23, 814:2, 815:11, 871:7
**intending** [5] - 584:2, 599:11, 637:20, 640:15, 863:16
**intent** [14] - 581:13, 582:12, 583:12, 592:11, 593:20, 593:23, 610:11, 629:10, 697:8,

703:1, 706:19, 709:7, 854:12, 854:13
**intention** [1] - 777:6
**interacts** [1] - 608:13
**interest** [2] - 722:16, 857:13
**interested** [1] - 739:24
**interests** [3] - 730:8, 730:17, 857:15
**interfered** [1] - 870:6
**Intergy** [1] - 588:23
**Intermountain** [1] - 668:3
**internal** [3] - 597:20, 723:6, 723:8
**internally** [1] - 721:11
**interrupt** [3] - 595:25, 596:10, 602:5
**introduce** [2] - 719:14, 840:19
**introduced** [1] - 860:18
**introduction** [1] - 818:20
**invade** [1] - 581:6
**invading** [1] - 582:3
**invention** [3] - 628:12, 724:17, 725:23
**invested** [1] - 856:20
**investigate** [4] - 645:22, 647:23, 820:13, 821:21
**investigated** [1] - 821:22
**investigation** [2] - 605:6, 613:20
**investigative** [1] - 720:17
**investment** [3] - 609:4, 856:1, 858:14
**investors** [14] - 666:15, 666:22, 667:1, 852:11, 852:19, 853:5, 854:3, 855:23, 856:18, 856:23, 857:19, 857:24, 858:4, 859:22
**invited** [1] - 860:18
**involved** [20] - 650:19, 652:19, 652:20, 652:22, 653:3, 668:16, 722:2, 800:5, 802:11, 802:20, 804:24, 824:21, 860:14, 860:16, 864:11, 864:20, 864:25, 865:1, 865:4, 866:19

**involves** [1] - 647:9
**involving** [1] - 732:12
**iodine** [1] - 647:4
**IOLTA** [2] - 739:18, 739:20
**IP** [3] - 825:19, 826:4, 826:25
**ironically** [1] - 585:14
**irrelevant** [4] - 703:23, 754:10, 781:10, 805:12
**Island** [3] - 603:14, 659:11, 674:5
**issuance** [1] - 772:19
**issue** [96] - 580:19, 580:23, 580:24, 582:12, 582:17, 582:24, 584:16, 584:21, 585:4, 585:9, 585:10, 586:4, 586:13, 586:14, 586:15, 586:25, 590:21, 590:25, 593:15, 594:14, 594:16, 597:7, 598:19, 598:23, 600:5, 602:24, 603:9, 603:12, 603:22, 604:4, 604:14, 605:8, 605:17, 606:3, 608:8, 609:17, 609:25, 610:2, 611:1, 612:24, 613:11, 613:21, 614:8, 625:9, 626:16, 627:18, 629:7, 629:10, 630:1, 637:1, 641:8, 646:8, 669:13, 682:24, 700:20, 702:12, 702:25, 706:16, 706:20, 706:25, 707:21, 707:24, 714:21, 715:4, 716:19, 717:17, 722:20, 724:12, 748:18, 749:7, 757:6, 760:12, 773:24, 774:19, 782:24, 783:16, 784:22, 785:11, 785:16, 787:10, 802:5, 843:7, 844:6, 854:14, 855:7, 860:3, 868:2, 868:9, 868:15, 869:2, 869:12, 869:18, 869:20, 869:22,

871:2
**issued** [10] - 604:22, 679:10, 679:16, 698:12, 698:15, 698:24, 717:14, 717:19, 718:14, 728:10
**issues** [26] - 580:5, 580:10, 580:12, 580:14, 580:18, 581:1, 581:19, 582:4, 583:10, 583:21, 584:18, 585:14, 585:16, 595:7, 598:11, 599:13, 605:18, 608:23, 706:21, 719:21, 771:2, 810:9, 827:23, 855:10, 868:25, 869:3
**issuing** [2] - 772:14, 867:23
**item** [3] - 638:17, 639:16, 789:3
**itself** [2] - 758:23, 864:9
**IV** [6] - 621:7, 730:20, 731:18, 841:12, 849:9, 863:14

## J

**James** [1] - 719:4
**JAMES** [4] - 578:16, 579:3, 719:5, 719:6
**January** [12] - 738:18, 783:11, 790:13, 790:24, 791:2, 794:12, 800:11, 801:7, 811:15, 812:9, 812:11, 835:9
**JASON** [1] - 578:20
**jeez** [1] - 843:13
**JEFF** [3] - 579:6, 838:12, 838:13
**Jeff** [10] - 587:1, 587:9, 631:10, 636:9, 638:25, 838:7, 838:12, 840:21, 853:3, 853:8
**JESSICA** [1] - 579:8
**Jim** [1] - 824:25
**jobs** [3] - 650:12, 652:15, 652:18
**John** [5] - 824:25, 825:13, 825:15, 825:16
**JOHN** [1] - 578:20

**jointly** [1] - 768:18
**joke** [1] - 709:25
**JPMorgan** [7] - 597:19, 609:2, 609:11, 666:24, 678:25, 852:11, 859:22
**Judge** [1] - 723:22
**July** [20] - 629:17, 656:10, 675:20, 679:10, 679:19, 698:18, 698:24, 728:10, 761:4, 790:13, 790:17, 790:18, 790:24, 792:12, 793:19, 811:15, 812:7, 824:15, 824:19, 859:25
**jump** [2] - 806:14, 820:4
**juror** [14] - 600:14, 600:15, 600:16, 601:2, 601:4, 601:13, 712:22, 712:23, 818:17, 867:13, 867:14, 867:16
**juror's** [1] - 713:1
**jurors** [7] - 600:12, 600:24, 601:4, 601:14, 601:22, 601:24, 867:5
**JURY** [2] - 578:9, 578:11
**jury** [80] - 578:12, 581:6, 581:10, 581:23, 586:16, 593:20, 593:24, 594:9, 598:22, 599:3, 600:6, 600:16, 601:11, 601:18, 601:19, 601:20, 607:12, 612:19, 629:2, 637:6, 637:11, 643:1, 643:10, 643:17, 648:21, 648:22, 649:2, 649:3, 702:5, 702:8, 704:1, 704:14, 706:17, 707:25, 709:17, 712:16, 712:18, 713:9, 714:10, 719:14, 721:1, 726:10, 731:1, 733:8, 747:21, 753:20, 753:24, 763:13, 764:5, 764:6,

765:10, 767:3, 769:7, 781:10, 784:3, 784:5, 785:8, 787:1, 787:4, 787:13, 787:15, 787:20, 788:4, 791:9, 791:23, 820:3, 840:20, 867:7, 867:8, 867:13, 867:19, 868:12, 868:17, 868:18, 868:25, 869:4, 869:8, 869:9, 869:18, 869:19
**jury's** [2] - 582:3, 740:10
**Justin** [1] - 649:10
**JUSTIN** [1] - 578:21

## K

**K3** [1] - 796:3
**keep** [8] - 594:13, 598:22, 599:2, 739:21, 745:9, 781:11, 785:8, 872:7
**keeping** [1] - 766:20
**KENNETH** [1] - 579:4
**kept** [3] - 710:19, 710:22, 710:25
**key** [2] - 825:20, 826:5
**keys** [1] - 725:2
**kidding** [1] - 711:15
**Kiewit** [3] - 666:24, 852:15, 859:22
**kiewit** [1] - 852:16
**kilowatt** [1] - 646:2
**kind** [20] - 586:24, 604:20, 608:14, 609:5, 649:12, 653:7, 687:25, 702:14, 703:23, 707:19, 721:23, 750:17, 751:17, 796:16, 800:22, 806:15, 840:6, 842:4, 849:16, 861:19
**kinds** [4] - 664:19, 719:24, 722:1, 723:7
**knowing** [4] - 597:6, 821:6, 864:9, 869:25
**knowledge** [22] - 585:4, 586:20, 610:11, 629:10, 637:7, 656:17, 657:11, 657:16, 657:24, 776:6, 803:8, 852:18,

854:20, 855:22, 862:16, 862:18, 862:24, 863:2, 864:7, 864:19, 864:20, 865:9
**knowledgeable** [1] - 685:18
**known** [4] - 655:22, 703:22, 802:17, 822:24
**knows** [2] - 728:5, 805:14

### L

**Labadie** [6] - 603:14, 612:5, 612:7, 660:3, 675:9, 760:15
**labeled** [1] - 592:11
**lack** [2] - 644:2, 855:2
**ladies** [5] - 601:20, 722:25, 724:23, 787:9, 832:20
**laid** [6] - 605:13, 605:16, 611:13, 611:16, 789:18, 828:5
**landlord** [1] - 728:3
**language** [10] - 590:17, 593:2, 614:22, 618:8, 618:11, 618:12, 832:13, 832:18, 833:2, 850:25
**Laramie** [3] - 603:14, 659:25, 675:15
**large** [1] - 813:3
**largest** [1] - 720:13
**Larkwood** [4] - 624:4, 675:9, 768:23, 842:13
**last** [25] - 580:2, 580:24, 586:8, 587:8, 588:22, 604:8, 606:23, 614:12, 619:11, 621:19, 628:21, 636:15, 639:16, 645:6, 647:18, 649:14, 651:5, 651:19, 675:13, 728:6, 786:10, 828:13, 843:14, 861:5, 865:22
**lastly** [4] - 585:9, 609:20, 745:2, 766:24
**late** [2] - 795:25, 803:13

**laugh** [1] - 709:25
**law** [18] - 581:4, 585:1, 585:4, 586:21, 595:14, 702:4, 702:7, 702:23, 703:8, 704:21, 707:13, 723:15, 723:23, 723:25, 732:10, 732:11, 779:16, 869:1
**LAW** [1] - 578:16
**lawsuit** [21] - 616:18, 629:17, 629:19, 659:4, 738:1, 738:2, 739:6, 754:16, 782:1, 782:14, 790:10, 790:24, 791:15, 792:3, 792:11, 793:19, 794:2, 796:22, 834:20, 848:9, 851:6
**lawsuits** [1] - 641:24
**Lawton** [20] - 790:14, 792:21, 792:23, 793:1, 794:9, 794:25, 799:24, 810:5, 810:20, 811:17, 823:2, 823:22, 824:1, 833:13, 833:17, 836:15, 836:21, 837:8, 837:12, 837:17
**Lawton's** [5] - 810:10, 810:13, 836:13, 836:17, 836:25
**lawyer** [6] - 592:13, 708:23, 789:23, 845:19, 849:13, 865:11
**lawyers** [8] - 655:20, 658:8, 709:24, 739:21, 840:3, 846:7, 848:7, 851:8
**lay** [2] - 597:18, 644:4
**lead** [2] - 642:22, 835:21
**leading** [7] - 627:11, 772:19, 834:8, 834:10, 835:25, 840:4, 853:13
**leads** [1] - 605:15
**Leah** [1] - 856:16
**leaks** [1] - 670:16
**learn** [3] - 726:2, 861:2, 861:10
**learned** [8] - 629:16, 657:25, 658:2, 662:3, 662:4, 800:17, 838:21

**lease** [1] - 725:11
**least** [20] - 581:22, 582:1, 595:10, 602:23, 603:3, 634:12, 641:11, 705:9, 707:3, 707:7, 712:16, 785:10, 818:11, 827:6, 832:18, 844:19, 852:6, 856:12, 857:22, 866:23
**leave** [1] - 709:16
**leaves** [1] - 683:16
**leaving** [1] - 672:8
**led** [6] - 648:21, 698:5, 712:17, 714:23, 787:13, 867:7
**leeway** [1] - 872:5
**left** [11] - 602:19, 621:4, 649:23, 691:3, 731:12, 731:19, 751:11, 768:12, 778:20, 806:15, 806:24
**left-hand** [2] - 806:15, 806:24
**legal** [2] - 787:10, 802:18
**length** [3] - 608:24, 736:16, 871:1
**lengthy** [1] - 810:16
**LENNON** [1] - 578:16
**less** [10] - 638:5, 724:11, 726:24, 808:1, 808:8, 808:13, 853:24, 866:4, 866:6
**lessee** [1] - 862:22
**letter** [15] - 825:22, 826:7, 826:25, 829:1, 829:6, 829:7, 848:17, 849:18, 850:15, 850:19, 850:21, 851:10, 851:14, 851:19, 868:7
**letterhead** [3] - 824:21, 825:11, 827:24
**letters** [2] - 828:25, 829:2
**level** [3] - 716:23, 765:5, 769:12
**liable** [1] - 768:19
**license** [82] - 597:16, 610:7, 641:25, 719:24, 725:12, 725:13, 727:8, 727:21, 733:22, 733:25, 734:16,

735:13, 735:16, 736:6, 736:11, 737:6, 737:16, 738:3, 738:5, 741:5, 741:9, 742:15, 742:25, 743:9, 744:2, 744:9, 744:15, 744:21, 744:24, 745:2, 746:18, 747:21, 747:23, 748:2, 748:4, 748:17, 750:5, 752:4, 752:9, 752:25, 755:3, 755:4, 756:14, 757:21, 758:3, 758:8, 758:11, 758:23, 766:11, 766:23, 771:14, 771:15, 776:6, 777:25, 782:6, 783:18, 791:3, 791:7, 791:24, 793:6, 793:22, 797:1, 797:4, 802:7, 802:18, 802:23, 803:1, 803:8, 803:12, 803:13, 806:24, 811:8, 812:8, 820:8, 820:12, 829:8, 831:22, 833:3, 833:20, 837:13, 861:3, 861:12
**licensed** [5] - 743:1, 805:7, 812:15, 820:12, 862:8
**licensee** [2] - 832:24, 832:25
**licensees** [3] - 758:3, 758:7, 777:10
**licenses** [49] - 716:1, 716:4, 716:7, 716:9, 732:25, 733:19, 734:7, 734:8, 734:21, 735:3, 735:12, 735:24, 736:2, 736:18, 740:19, 744:23, 746:19, 746:22, 747:5, 747:10, 752:12, 759:8, 761:14, 765:17, 766:5, 766:16, 777:20, 777:22, 778:4, 783:16, 811:21, 811:22, 811:25, 812:2, 812:20, 812:21, 822:24, 823:4, 823:13, 823:20,

824:4, 826:14, 827:6, 827:8, 828:20, 832:6, 842:9
**licensing** [20] - 719:21, 725:20, 727:18, 735:22, 736:15, 749:25, 804:3, 815:10, 822:22, 823:8, 823:15, 823:19, 823:21, 823:23, 826:24, 826:25, 827:7, 827:16, 828:21, 829:5
**light** [6] - 594:1, 712:25, 757:7, 805:19, 846:14
**lignite** [5] - 603:25, 604:8, 621:19, 648:2, 683:3
**likely** [3] - 607:4, 706:17, 863:18
**Limestone** [5] - 603:14, 659:16, 668:10, 674:25, 760:14
**limitation** [11] - 617:3, 617:20, 618:3, 618:15, 619:1, 619:4, 619:11, 619:14, 620:6, 682:25, 683:13
**limitations** [2] - 683:8, 799:17
**limited** [1] - 786:21
**line** [23] - 581:3, 581:21, 582:2, 582:14, 594:10, 610:8, 622:24, 695:12, 697:12, 697:15, 702:6, 706:2, 707:5, 774:7, 776:2, 777:2, 783:24, 785:24, 787:2, 789:3, 818:19
**lines** [3] - 590:6, 703:15, 856:21
**lineup** [1] - 786:11
**linked** [1] - 609:18
**linking** [1] - 580:3
**Linton** [4] - 635:21, 638:24, 691:24, 842:21
**list** [23] - 600:3, 600:15, 613:15, 621:5, 621:16, 623:8, 623:20, 636:10, 638:1, 638:25, 732:11, 732:16, 732:22,

746:17, 747:10, 758:6, 797:10, 808:4, 815:21, 816:10, 839:16, 839:21, 843:19
**listed** [12] - 612:23, 621:9, 621:13, 621:23, 622:6, 638:17, 639:16, 816:20, 821:24, 834:12, 834:15, 844:21
**listened** [1] - 806:3
**listing** [1] - 590:9
**lists** [3] - 753:24, 806:24, 815:25
**lit** [1] - 839:5
**literally** [3] - 846:6, 850:2, 850:24
**litigation** [28] - 722:8, 738:4, 738:5, 738:6, 753:1, 753:2, 753:4, 800:4, 803:9, 803:10, 811:7, 816:23, 822:24, 823:11, 823:13, 823:14, 824:2, 824:3, 824:8, 824:9, 824:12, 824:15, 824:20, 824:22, 825:13, 826:14, 827:5, 827:6
**live** [3] - 724:25, 725:1, 725:9
**lived** [1] - 840:24
**lives** [1] - 833:25
**living** [2] - 719:17, 841:3
**LLC** [25] - 589:22, 589:23, 590:2, 590:4, 621:7, 621:11, 624:3, 624:11, 624:12, 624:15, 642:8, 682:12, 731:12, 731:19, 732:1, 764:14, 794:10, 857:12, 858:7, 858:9, 858:10, 858:16, 859:3, 859:16, 859:19
**LLC's** [1] - 859:10
**LLCs** [28] - 621:5, 648:12, 730:4, 730:8, 730:17, 731:9, 731:17, 734:3, 737:13, 746:21, 749:7, 760:17, 761:11, 764:10, 768:22,

776:16, 777:11, 844:20, 845:9, 845:12, 845:13, 845:16, 846:25, 847:2, 847:4, 847:7, 856:2, 857:14
**LLP** [2] - 579:3, 579:6
**located** [1] - 844:19
**location** [4] - 683:6, 683:11, 683:16, 844:12
**lodge** [2] - 599:16, 858:18
**lodged** [1] - 591:17
**logger** [2] - 669:2, 669:5
**logs** [1] - 669:5
**look** [75] - 580:4, 580:5, 586:18, 587:12, 590:18, 594:24, 595:3, 596:13, 596:20, 604:3, 604:23, 605:4, 613:14, 615:13, 625:14, 627:6, 627:10, 631:22, 631:25, 635:1, 638:21, 666:25, 674:23, 675:6, 675:19, 676:10, 685:14, 718:1, 723:6, 735:8, 736:16, 740:15, 741:3, 746:5, 756:2, 756:6, 771:6, 774:6, 774:7, 776:1, 780:16, 786:23, 790:1, 790:3, 791:8, 794:8, 794:13, 794:18, 795:15, 796:3, 798:6, 798:7, 800:15, 801:17, 802:22, 806:17, 806:24, 807:14, 808:3, 815:1, 819:9, 820:20, 822:1, 822:17, 823:3, 823:17, 824:12, 824:18, 830:16, 830:18, 830:20, 858:22, 859:5, 867:5
**looked** [25] - 583:19, 585:12, 588:2, 672:12, 673:19, 682:23, 687:18, 687:20, 691:25, 716:1, 723:4, 723:8, 733:24, 734:7, 734:21, 745:9, 758:15, 791:16,

795:19, 808:15, 811:14, 816:8, 821:2, 823:5
**looking** [25] - 599:12, 627:22, 627:24, 631:19, 673:24, 687:11, 687:12, 687:15, 688:21, 734:2, 740:23, 750:15, 756:21, 758:13, 784:13, 789:21, 793:22, 804:3, 808:23, 821:19, 823:17, 846:6, 859:8, 860:6
**looks** [10] - 596:17, 597:16, 597:19, 634:3, 637:15, 676:19, 707:6, 780:20, 789:6, 798:11
**lose** [1] - 605:25
**loud** [1] - 782:11
**Louisiana** [1] - 844:10
**low** [3] - 696:12, 766:23, 778:19
**low-sulfur-content** [1] - 778:19
**lower** [5] - 603:24, 730:21, 765:11, 765:23, 766:3
**lump** [10] - 647:16, 749:14, 749:15, 749:16, 749:22, 751:5, 755:4, 817:17, 817:22, 829:18
**lunch** [6] - 696:16, 700:12, 712:15, 712:16, 713:4, 713:17
**luncheon** [1] - 713:7
**lunchtime** [1] - 696:13
**Lundy** [9] - 632:8, 632:19, 632:22, 634:23, 676:11, 676:25, 677:17, 689:6, 691:16

## M

**MacPherson** [16] - 600:2, 602:6, 602:12, 735:13, 736:3, 738:21, 758:8, 782:11, 798:13, 809:22, 812:22, 825:16, 828:4, 848:1, 848:8, 850:10

**MacPherson's** [1] - 791:20
**magic** [1] - 829:6
**magically** [2] - 799:13, 800:3
**magnitude** [3] - 857:23, 859:8, 871:1
**mail** [22] - 596:25, 597:1, 597:3, 635:21, 636:10, 636:12, 638:24, 669:20, 678:2, 678:19, 678:22, 679:1, 691:23, 692:3, 797:11, 797:12, 798:15, 798:17, 799:19, 804:10, 804:13, 850:16
**mails** [3] - 597:20, 690:12, 691:25
**maintain** [1] - 670:2
**maintenance** [1] - 671:10
**major** [4] - 825:21, 826:6, 826:10, 827:1
**majority** [2] - 859:16
**malfunction** [2] - 635:13, 867:12
**Management** [1] - 730:5
**management** [5] - 652:9, 721:7, 721:9, 825:17, 856:14
**manager** [1] - 720:12
**managers** [1] - 800:20
**manufacturer** [2] - 864:12, 866:9
**manufacturers** [1] - 639:21
**March** [7] - 651:5, 651:15, 651:19, 675:11, 678:12, 708:18, 708:24
**Marquis** [3] - 624:15, 673:4, 768:19
**Maryland** [1] - 650:4
**Massachusetts** [1] - 719:19
**match** [2] - 780:19, 835:11
**matched** [1] - 740:7
**material** [7] - 615:16, 617:25, 618:3, 618:15, 628:12, 785:14, 785:20
**materially** [1] - 868:15
**materials** [3] - 589:19, 723:2, 810:18
**math** [10] - 769:4,

769:8, 784:6, 784:7, 789:23, 814:25, 821:14, 822:5, 835:16, 836:16
**MATS** [31] - 613:25, 634:7, 636:18, 639:15, 644:20, 645:17, 652:3, 660:19, 660:21, 660:25, 661:4, 661:8, 661:11, 661:16, 661:19, 662:4, 670:18, 670:19, 670:25, 671:7, 689:4, 691:9, 694:1, 699:13, 699:19, 699:24, 700:3, 701:3, 710:6, 710:14, 712:10
**matter** [13] - 585:2, 627:19, 664:12, 693:7, 718:14, 722:13, 722:17, 722:23, 724:20, 764:11, 772:15, 833:2, 849:12
**matters** [5] - 586:18, 607:5, 706:19, 721:19, 722:8
**maximize** [2] - 711:23, 712:9
**MAZUR** [1] - 578:17
**MBA** [1] - 721:6
**MCCARTY** [1] - 578:21
**ME2C** [41] - 625:1, 643:5, 646:8, 680:25, 681:3, 681:8, 732:5, 741:17, 752:21, 756:1, 773:18, 774:10, 774:16, 777:7, 791:14, 795:23, 797:24, 798:13, 800:4, 800:18, 809:15, 811:7, 812:3, 812:24, 813:24, 814:6, 814:8, 814:9, 814:10, 823:15, 824:20, 824:22, 824:24, 825:10, 825:11, 825:17, 827:15, 827:20, 827:24, 839:7
**ME2C's** [26] - 629:6, 637:12, 637:21, 643:7, 655:20, 682:18, 716:11, 743:4, 752:15,

758:3, 771:17, 774:9, 777:13, 796:11, 800:16, 805:6, 805:7, 805:9, 809:1, 809:3, 814:14, 815:11, 823:23, 833:20, 837:13

**ME2C/AJG** [4] - 756:14, 757:25, 758:22, 829:14

**ME2C/AJG/DTE** [1] - 751:21

**ME2C/Alistar** [6] - 736:25, 737:22, 741:5, 833:9, 834:13, 834:16

**mean** [48] - 593:21, 599:11, 607:12, 608:2, 610:12, 614:15, 615:2, 615:7, 616:13, 619:22, 620:19, 622:19, 637:13, 641:21, 653:2, 663:6, 664:9, 665:20, 681:16, 683:9, 731:21, 735:8, 740:14, 758:10, 770:24, 773:1, 783:9, 818:3, 821:7, 823:23, 837:3, 839:25, 840:11, 842:2, 843:13, 845:12, 845:19, 850:2, 852:3, 857:16, 859:1, 859:14, 861:5, 864:21, 865:2, 870:7, 871:12, 871:14

**meaning** [2] - 842:3, 842:8

**meaningful** [1] - 811:21

**means** [17] - 614:16, 619:23, 620:11, 641:22, 672:3, 672:4, 672:7, 719:23, 721:9, 725:6, 738:16, 749:22, 754:14, 801:14, 830:16, 832:19, 842:4

**meant** [3] - 610:6, 711:6, 750:8

**measuring** [1] - 779:10

**mechanics** [1] - 840:12

**meet** [9] - 612:12, 613:25, 634:7, 636:17, 644:20, 645:17, 689:4, 694:1, 710:14

**meeting** [1] - 776:4

**members'** [1] - 857:14

**memorized** [2] - 811:10, 811:11

**memory** [1] - 813:9

**mention** [1] - 806:4

**mentioned** [11] - 590:8, 591:18, 609:22, 610:10, 631:16, 635:7, 636:11, 641:17, 642:4, 776:18, 802:3

**mentioning** [1] - 817:7

**mentions** [1] - 758:2

**mercury** [85] - 612:12, 614:1, 614:4, 615:10, 616:22, 617:5, 618:4, 619:1, 619:2, 619:3, 619:7, 619:12, 622:6, 634:11, 634:14, 644:20, 645:18, 646:25, 647:9, 647:10, 650:19, 650:23, 651:3, 651:9, 651:12, 651:16, 651:18, 652:1, 657:12, 657:14, 657:16, 657:21, 657:24, 658:2, 658:10, 658:13, 658:19, 663:12, 664:2, 664:6, 670:20, 689:3, 691:10, 694:2, 710:15, 711:17, 714:6, 714:20, 715:17, 716:8, 717:4, 726:15, 726:19, 747:25, 771:2, 773:4, 773:16, 773:19, 774:12, 775:16, 775:19, 775:21, 775:25, 776:8, 776:14, 776:20, 776:24, 777:3, 777:8, 778:21, 779:5, 779:15, 779:19, 780:2, 805:9, 809:2, 809:6, 809:24, 863:4, 863:6, 863:9, 866:4, 866:6

**mercury-containing**

[7] - 615:10, 616:22, 617:5, 618:4, 619:2, 619:12, 664:2

**mercury-reduction** [1] - 773:16

**mercury-sorbent** [2] - 619:3, 619:12

**merely** [1] - 704:1

**MerSorb** [19] - 617:24, 617:25, 621:22, 633:25, 634:4, 639:13, 662:20, 686:15, 686:20, 686:24, 688:17, 689:1, 689:2, 691:8, 714:24, 775:14, 775:15, 775:21, 776:8

**met** [17] - 615:7, 615:11, 616:23, 617:6, 617:9, 617:21, 618:16, 619:4, 619:15, 620:6, 626:24, 628:14, 637:24, 649:11, 691:9, 776:3, 839:1

**method** [6] - 614:25, 615:4, 616:21, 620:1, 628:23, 809:17

**methodology** [1] - 733:21

**methods** [2] - 682:19, 774:15

**mic** [1] - 724:4

**microphone** [1] - 838:20

**Mid** [3] - 612:20, 612:23, 667:16

**Mid-American** [3] - 612:20, 612:23, 667:16

**middle** [8] - 730:6, 730:20, 732:1, 792:24, 800:2, 825:6, 831:8, 831:10

**MIDWEST** [1] - 578:3

**Midwest** [26] - 629:15, 716:25, 717:2, 717:6, 719:16, 727:8, 728:14, 734:2, 735:15, 735:24, 736:4, 736:8, 737:7, 737:8, 737:14, 752:4, 752:13, 752:23, 761:14, 766:20, 766:22, 798:2, 800:14, 803:10,

804:5, 824:4

**Midwest's** [2] - 722:24, 723:6

**might** [33] - 584:14, 595:15, 596:24, 607:23, 608:22, 609:4, 671:19, 687:17, 706:1, 708:21, 716:11, 726:1, 728:4, 728:21, 732:17, 740:13, 743:18, 762:7, 762:9, 762:22, 766:2, 803:17, 803:20, 804:22, 821:7, 824:12, 828:25, 830:4, 834:1, 834:4, 872:1, 872:3

**mighty** [1] - 845:25

**million** [46] - 646:2, 706:5, 717:10, 738:23, 739:1, 739:4, 739:8, 750:19, 751:19, 755:11, 755:16, 758:14, 758:17, 782:21, 789:19, 789:24, 794:2, 794:6, 795:13, 796:20, 801:3, 801:6, 803:22, 813:4, 813:8, 813:9, 813:11, 813:13, 813:19, 813:25, 817:16, 819:12, 819:13, 819:22, 821:7, 822:6, 837:14, 858:25, 859:1, 859:7, 859:15, 860:3, 860:7, 861:3, 861:12

**millions** [1] - 864:15

**mind** [25] - 581:1, 581:8, 581:9, 581:11, 581:13, 581:17, 581:21, 582:4, 583:12, 592:11, 593:23, 610:8, 628:25, 629:2, 640:16, 640:18, 640:22, 642:23, 703:7, 709:8, 709:10, 728:15, 737:1, 754:17, 832:13

**mine** [1] - 746:6

**mines** [1] - 652:25

**minimis** [1] - 837:6

**Minnesota** [1] -

649:11

**minute** [5] - 598:25, 672:11, 687:7, 691:25, 709:21

**minutes** [8] - 585:22, 600:13, 649:13, 700:10, 700:14, 787:3, 795:9, 828:14

**mis** [1] - 702:5

**mis-educating** [1] - 702:5

**missed** [1] - 825:4

**missing** [1] - 746:9

**Missouri** [1] - 612:6

**misspoke** [1] - 705:22

**mistake** [3] - 585:4, 714:19, 801:24

**mistaken** [3] - 586:21, 704:11, 704:21

**misunderstanding** [1] - 595:14

**Mod** [54] - 742:15, 742:17, 742:18, 742:21, 743:2, 743:3, 743:5, 743:19, 743:22, 743:25, 744:3, 744:9, 744:15, 744:22, 744:23, 746:18, 746:21, 747:4, 747:12, 747:13, 747:20, 747:23, 747:25, 748:23, 748:25, 749:2, 749:5, 758:3, 758:7, 758:12, 766:6, 766:19, 771:13, 771:14, 771:20, 772:23, 773:2, 773:16, 775:14, 777:14, 777:19, 777:22, 777:25, 778:2, 778:4, 779:2, 815:18, 831:22, 832:10, 832:15, 832:22, 862:8, 862:11

**Mod's** [7] - 775:9, 775:13, 775:18, 776:5, 776:7, 777:7

**Mod/Alistar** [1] - 804:19

**Mod/DTE/AJG** [1] - 804:19

**modification** [4] - 743:2, 743:20, 743:23, 746:22

**modify** [1] - 742:22

**modifying** [1] - 743:6

**moment** [4] - 790:15, 819:6, 822:7, 838:19
**moments** [1] - 795:20
**money** [15] - 666:17, 667:1, 667:4, 736:9, 739:21, 852:19, 853:22, 854:20, 855:23, 857:1, 857:6, 857:19, 858:4, 858:14, 858:16
**monies** [3] - 854:1, 854:3, 855:7
**monitored** [1] - 716:23
**month** [4] - 739:15, 793:9, 799:8, 803:2
**months** [10] - 657:6, 657:25, 662:5, 684:11, 684:13, 686:12, 795:25, 796:14, 799:22
**morning** [18] - 586:9, 592:4, 592:5, 600:10, 601:21, 602:17, 602:18, 648:21, 649:8, 649:9, 726:23, 729:15, 729:17, 757:4, 757:5, 801:22, 803:7, 867:6
**morning's** [1] - 712:22
**MORRIS** [1] - 579:3
**mortgage** [1] - 728:4
**most** [14] - 586:10, 634:4, 670:25, 671:2, 671:5, 700:19, 723:11, 727:19, 727:20, 732:21, 759:9, 765:14, 807:9, 863:18
**motion** [9] - 586:23, 606:11, 609:23, 625:23, 867:17, 867:20, 867:21, 867:24, 869:17
**motivations** [1] - 753:5
**motive** [3] - 592:11, 854:12, 854:13
**Mount** [1] - 668:6
**move** [41] - 600:19, 600:20, 611:4, 615:22, 616:19, 622:12, 624:17, 625:24, 632:15, 633:2, 636:1, 637:17, 639:3, 640:11, 645:6,

646:5, 646:15, 647:18, 725:2, 729:11, 741:23, 742:6, 745:4, 745:13, 745:17, 747:18, 748:7, 751:20, 757:1, 759:19, 763:21, 767:14, 781:3, 786:16, 786:25, 788:2, 788:9, 810:23, 818:14, 827:25, 844:13
**moved** [2] - 676:4, 840:25
**movie** [1] - 725:22
**moving** [3] - 611:12, 643:1, 746:1
**MR** [403] - 586:3, 586:25, 587:9, 587:15, 587:17, 587:25, 588:4, 588:14, 588:17, 589:9, 589:14, 589:17, 589:21, 590:7, 591:6, 591:9, 591:16, 592:4, 592:6, 592:25, 593:8, 593:12, 593:14, 593:17, 594:12, 595:20, 596:3, 596:5, 596:16, 597:8, 598:7, 598:18, 598:25, 599:6, 599:25, 601:7, 601:9, 602:4, 602:11, 602:16, 605:12, 606:7, 606:17, 606:24, 607:8, 607:14, 610:2, 610:20, 611:4, 611:8, 611:11, 611:16, 611:25, 615:22, 615:25, 616:4, 617:14, 620:21, 620:22, 622:11, 622:15, 622:19, 623:3, 623:6, 623:10, 623:24, 624:10, 625:21, 625:24, 626:2, 626:9, 626:14, 629:9, 629:13, 630:5, 630:7, 630:10, 630:11, 630:15, 632:15, 632:18, 632:21, 633:1, 633:5, 633:9, 635:11, 635:17,

635:19, 636:1, 636:4, 636:8, 638:7, 638:9, 638:16, 639:3, 639:6, 639:10, 640:5, 640:8, 640:15, 640:24, 641:4, 641:9, 641:13, 641:16, 641:20, 642:1, 642:2, 642:25, 643:25, 644:4, 644:9, 644:25, 645:4, 645:5, 646:15, 646:18, 646:22, 648:14, 649:5, 649:7, 655:4, 655:7, 655:12, 655:14, 662:11, 662:13, 666:12, 666:13, 672:21, 673:12, 673:14, 675:24, 676:1, 676:21, 677:22, 677:24, 681:10, 681:12, 682:2, 682:4, 682:8, 682:10, 687:3, 687:5, 688:1, 688:5, 688:9, 688:15, 689:9, 689:10, 689:13, 689:14, 689:21, 689:24, 690:9, 690:11, 690:15, 690:17, 690:21, 690:22, 691:1, 691:4, 691:20, 691:21, 695:1, 695:4, 696:15, 696:25, 697:1, 700:7, 700:10, 700:13, 701:20, 702:1, 702:20, 702:24, 703:5, 703:25, 704:12, 704:22, 705:11, 705:20, 706:2, 706:12, 708:7, 709:21, 709:23, 712:12, 713:14, 715:23, 715:24, 716:14, 716:16, 717:20, 717:22, 718:17, 718:23, 719:11, 722:19, 722:22, 724:6, 729:11, 729:14, 729:20, 729:23, 730:9, 730:11, 731:4, 731:6, 733:10, 733:17, 733:20,

734:24, 735:1, 737:2, 737:4, 737:19, 737:21, 740:3, 740:4, 741:14, 741:16, 742:6, 742:9, 742:13, 743:11, 743:13, 745:4, 745:8, 745:13, 745:16, 745:17, 745:22, 745:24, 746:3, 746:5, 746:7, 746:11, 746:16, 747:7, 747:9, 748:7, 748:10, 748:14, 748:16, 749:9, 749:11, 750:22, 750:24, 751:24, 752:1, 752:17, 752:19, 753:10, 753:19, 753:22, 754:1, 754:3, 754:9, 754:14, 754:25, 755:1, 757:1, 757:4, 757:11, 757:12, 758:18, 758:20, 759:19, 759:22, 760:1, 760:3, 763:21, 763:24, 764:3, 765:3, 765:4, 767:14, 767:17, 767:21, 767:23, 769:14, 769:16, 769:21, 770:1, 770:5, 781:3, 781:5, 781:18, 781:22, 781:25, 782:11, 782:20, 782:25, 783:3, 783:23, 784:15, 785:1, 785:17, 785:21, 786:2, 786:7, 786:12, 786:17, 786:22, 787:6, 787:23, 788:1, 788:19, 788:20, 790:3, 790:5, 795:15, 796:7, 796:10, 797:6, 797:9, 805:11, 805:21, 805:24, 806:6, 806:10, 806:13, 806:17, 806:19, 808:3, 808:5, 810:23, 810:25, 811:4, 818:14, 818:17, 819:6, 819:8, 820:6, 820:10, 822:7, 822:10, 822:19, 822:21, 825:4,

825:6, 825:7, 825:9, 826:1, 826:3, 826:17, 826:22, 827:13, 827:22, 828:3, 828:8, 828:10, 828:12, 831:5, 831:7, 831:20, 831:21, 832:9, 832:12, 834:7, 834:11, 835:21, 836:1, 837:20, 837:24, 838:2, 838:5, 838:18, 844:13, 844:16, 845:24, 846:2, 846:6, 846:16, 849:24, 850:2, 850:6, 850:9, 850:14, 851:12, 851:20, 851:22, 851:24, 852:21, 853:2, 853:18, 854:6, 854:24, 855:18, 855:19, 858:18, 858:24, 866:16, 866:17, 867:1, 870:3, 870:15, 870:24, 871:9, 872:10, 872:13
**mud** [1] - 722:2
**multiple** [3] - 854:15, 871:10, 871:25
**multiply** [2] - 768:6, 768:9
**Murray** [1] - 635:21
**must** [3] - 583:3, 622:24, 696:13
**Mylan** [3] - 666:24, 852:12, 859:23

---

**N**

---

**Nalco** [12] - 747:20, 747:23, 747:24, 748:20, 748:23, 749:2, 749:4, 755:3, 771:15, 771:20, 773:10, 773:14
**Nalco's** [1] - 748:24
**name** [7] - 604:18, 719:2, 719:4, 719:15, 792:21, 838:10, 840:21
**named** [3] - 631:15, 839:15, 839:17
**names** [5] - 631:4, 768:12, 842:6, 842:20
**Native** [1] - 862:4

**nature** [8] - 599:24, 606:1, 640:7, 749:18, 800:22, 853:16, 853:24, 853:25
**necessarily** [2] - 725:7, 869:3
**necessary** [4] - 595:4, 691:11, 716:24, 794:19
**need** [31] - 594:15, 595:11, 595:16, 596:24, 598:11, 599:4, 599:7, 599:10, 599:22, 614:19, 614:22, 618:13, 627:8, 654:24, 660:23, 669:17, 669:18, 670:17, 690:4, 725:24, 734:16, 734:18, 736:21, 753:23, 765:22, 771:6, 781:6, 787:11, 858:18, 868:17, 868:23
**needed** [4] - 723:16, 762:6, 785:18, 830:4
**needing** [1] - 764:25
**needs** [2] - 612:13, 704:14
**negotiate** [3] - 802:24, 803:1, 833:24
**negotiated** [9] - 653:7, 727:8, 733:13, 758:11, 758:15, 803:5, 803:20, 812:2, 814:4
**negotiating** [2] - 653:3, 734:3
**negotiation** [26] - 727:4, 727:10, 727:11, 727:13, 728:1, 728:9, 728:13, 732:5, 732:8, 733:23, 734:17, 734:23, 735:19, 737:17, 743:9, 743:24, 748:18, 749:3, 756:9, 765:14, 765:22, 766:13, 802:11, 811:21, 811:23
**negotiations** [2] - 719:24, 732:16
**neighbor** [1] - 840:24
**neighborhood** [1] - 859:15
**nemunaitis** [1] - 702:9

**Nemunaitis** [35] - 586:2, 586:14, 588:12, 588:13, 589:8, 592:17, 593:16, 594:7, 598:17, 602:14, 607:1, 611:6, 611:15, 617:12, 623:9, 624:8, 625:22, 625:23, 630:13, 632:24, 635:9, 640:14, 644:6, 648:16, 662:7, 681:13, 682:23, 688:4, 701:24, 705:21, 706:10, 707:21, 713:12, 852:1, 852:10
**NEMUNAITIS** [79] - 578:21, 586:3, 586:25, 587:9, 587:15, 588:14, 589:9, 589:14, 589:17, 589:21, 590:7, 591:6, 593:17, 598:18, 602:16, 606:7, 607:8, 610:20, 611:4, 611:8, 611:16, 611:25, 615:22, 616:4, 617:14, 620:21, 620:22, 622:11, 622:19, 623:10, 623:24, 624:10, 625:24, 626:9, 626:14, 629:13, 630:5, 630:7, 630:11, 630:15, 632:15, 633:1, 633:9, 635:11, 635:17, 635:19, 636:1, 636:8, 638:16, 639:3, 639:10, 640:15, 641:9, 641:20, 642:1, 642:2, 642:25, 644:9, 645:4, 645:5, 646:15, 646:22, 648:14, 688:1, 688:5, 701:20, 702:1, 702:20, 702:24, 706:2, 706:12, 713:14, 715:23, 715:24, 716:14, 716:16, 717:20, 717:22, 718:17
**never** [27] - 642:23,

650:9, 653:6, 653:7, 656:21, 658:10, 658:13, 658:24, 659:2, 659:9, 659:13, 659:16, 659:19, 659:22, 659:25, 660:3, 660:6, 660:9, 660:12, 660:15, 661:11, 736:7, 842:14, 848:4, 849:2, 850:16, 851:14
**New** [1] - 720:23
**new** [3] - 630:13, 801:18, 803:25
**next** [47] - 595:22, 611:18, 617:3, 618:3, 619:1, 621:12, 621:16, 621:20, 621:23, 622:3, 622:5, 624:17, 625:6, 628:11, 638:17, 643:4, 643:13, 646:5, 673:18, 674:3, 674:10, 674:16, 674:24, 676:15, 676:18, 678:15, 688:14, 705:13, 705:14, 716:15, 718:22, 718:24, 727:1, 741:23, 747:11, 751:20, 782:21, 787:3, 798:18, 801:22, 802:1, 803:6, 808:3, 808:4, 808:10, 823:4, 837:25
**nice** [1] - 800:3
**night** [10] - 580:2, 580:24, 586:8, 606:23, 798:21, 799:11, 800:2, 801:19, 801:25, 872:14
**nine** [3] - 734:20, 799:22, 816:17
**nitrogen** [2] - 647:8, 647:13
**nitrous** [4] - 680:6, 681:1, 772:24, 773:13
**nobody** [1] - 599:19
**Nolan** [2] - 840:23, 841:6
**non** [30] - 626:23, 627:6, 627:9, 645:16, 701:8,

701:14, 701:18, 702:2, 702:3, 702:15, 702:17, 703:18, 703:21, 704:9, 705:5, 705:7, 705:17, 706:14, 706:25, 707:6, 707:10, 708:11, 708:20, 716:25, 717:24, 718:5, 763:14, 764:20, 829:2, 835:25
**non-accused** [1] - 702:2
**non-infringement** [1] - 763:14
**non-infringing** [25] - 626:23, 627:6, 627:9, 645:16, 701:8, 701:14, 701:18, 702:3, 702:15, 702:17, 703:18, 703:21, 704:9, 705:5, 705:7, 705:17, 706:14, 706:25, 707:6, 707:10, 708:11, 708:20, 717:24, 718:5, 764:20
**non-leading** [1] - 835:25
**non-letters** [1] - 829:2
**non-Midwest** [1] - 716:25
**noncomparable** [1] - 826:16
**none** [11] - 598:12, 650:22, 651:21, 652:19, 653:3, 680:5, 680:6, 680:8, 682:24, 685:9, 740:25
**normally** [1] - 696:18
**North** [1] - 844:10
**not-for-profit** [2] - 735:19
**note** [4] - 580:14, 599:6, 599:8, 716:11
**notebook** [4] - 675:22, 677:19, 678:4, 745:14
**noted** [5] - 580:10, 599:22, 722:21, 780:12, 858:20
**notes** [2] - 764:5, 829:13
**nothing** [13] - 665:11, 665:14, 666:4, 666:7, 670:14, 706:14, 718:17,

735:17, 778:3, 779:2, 804:1, 845:18, 853:15
**notice** [5] - 601:12, 601:21, 738:6, 801:16, 829:6
**noticed** [2] - 743:18, 867:12
**November** [17] - 674:9, 743:19, 797:25, 798:3, 798:9, 798:10, 799:16, 800:25, 801:19, 801:25, 802:14, 803:13, 803:18, 804:9, 861:4, 861:5
**Nox** [31] - 633:24, 634:12, 772:24, 773:10, 773:13, 773:22, 774:9, 774:12, 774:15, 775:3, 776:4, 776:9, 776:21, 776:25, 778:3, 778:20, 778:21, 778:23, 779:3, 779:10, 779:11, 779:13, 779:20, 779:22, 779:24, 779:25, 863:6, 863:7, 863:9, 866:4
**nozzles** [1] - 762:9
**NRG** [17] - 621:15, 642:13, 761:15, 791:3, 791:7, 793:6, 794:10, 812:7, 812:8, 812:10, 812:12, 813:9, 813:11, 814:9, 814:14, 823:10, 826:11
**NRG's** [1] - 731:20
**nuances** [2] - 584:6, 610:15
**number** [60] - 588:15, 590:8, 600:15, 600:16, 690:10, 701:12, 726:4, 731:25, 750:4, 750:6, 751:15, 769:14, 777:22, 782:15, 789:7, 789:12, 792:9, 793:13, 793:23, 794:7, 795:2, 795:13, 796:20, 797:12, 799:5, 799:12, 799:18, 800:3, 800:4,

800:10, 801:5, 801:19, 801:22, 801:23, 801:24, 803:6, 803:21, 803:23, 804:25, 811:16, 811:19, 819:12, 819:13, 820:16, 821:18, 824:22, 824:23, 825:5, 825:11, 827:19, 836:9, 842:24, 843:1, 851:23, 861:14, 863:8

**Number** [19] - 636:6, 729:2, 729:12, 737:3, 742:7, 745:5, 748:3, 748:8, 748:12, 753:12, 756:18, 757:2, 757:9, 763:18, 763:22, 767:15, 767:19, 769:5, 769:10

**numbered** [1] - 673:10

**numbers** [22] - 611:7, 740:13, 751:16, 763:4, 763:7, 764:4, 769:12, 780:19, 784:23, 785:2, 786:19, 798:20, 800:9, 800:12, 801:12, 801:18, 811:11, 814:22, 817:13, 835:11, 836:7, 860:7

**Numbers** [3] - 611:23, 633:7, 746:13

**numerically** [1] - 780:21

## O

**O'Keefe** [99] - 580:25, 581:14, 581:18, 581:20, 582:8, 582:17, 587:6, 589:9, 590:10, 590:19, 591:4, 592:1, 592:16, 592:18, 592:22, 593:5, 593:10, 593:18, 594:8, 594:15, 595:7, 595:22, 602:2, 602:17, 604:23, 607:3, 608:4, 608:16, 608:24, 608:25, 610:23, 612:1, 614:14,

620:23, 623:25, 624:17, 626:15, 628:25, 633:10, 635:1, 635:12, 636:24, 639:11, 640:8, 645:6, 649:8, 653:10, 661:22, 666:10, 671:6, 672:11, 673:16, 675:22, 677:14, 679:4, 679:21, 680:11, 683:19, 686:7, 687:4, 688:16, 690:8, 691:19, 694:23, 695:5, 696:19, 698:1, 699:2, 700:14, 702:10, 703:2, 703:9, 703:16, 704:6, 704:19, 705:13, 705:22, 708:8, 709:2, 709:24, 711:11, 712:20, 713:15, 715:6, 718:18, 723:18, 726:6, 726:23, 771:9, 771:12, 771:20, 771:22, 772:12, 772:14, 772:23, 773:9, 773:12, 775:7, 852:1

**O'Keefe's** [15] - 583:16, 589:18, 591:23, 596:1, 607:24, 609:8, 609:13, 609:19, 609:21, 622:12, 655:5, 704:9, 704:25, 762:25, 770:9

**oath** [2] - 791:14, 792:9

**object** [14] - 595:12, 599:7, 605:12, 623:6, 629:9, 729:14, 754:1, 754:10, 783:23, 783:24, 805:11, 826:17, 834:7, 852:21

**objected** [4] - 599:15, 606:10, 609:12, 785:25

**objection** [143] - 582:13, 582:21, 582:22, 583:18, 583:22, 583:24, 584:2, 585:7, 585:12, 585:17,

585:20, 589:3, 590:11, 591:14, 591:15, 591:16, 591:20, 591:23, 592:2, 594:17, 594:20, 595:1, 599:10, 599:16, 599:18, 599:19, 599:22, 601:5, 602:11, 605:15, 605:16, 605:23, 606:1, 606:17, 606:22, 607:5, 608:3, 609:12, 609:23, 609:25, 610:15, 611:10, 611:12, 615:24, 622:14, 622:15, 623:4, 623:14, 623:16, 623:19, 623:22, 623:23, 625:21, 626:1, 626:3, 626:7, 629:11, 630:10, 630:12, 632:17, 632:18, 632:21, 633:4, 636:3, 636:4, 638:8, 638:9, 638:15, 639:5, 639:6, 640:5, 640:6, 640:21, 640:23, 640:24, 640:25, 641:5, 641:18, 643:25, 644:2, 644:25, 645:1, 646:17, 646:18, 701:20, 701:25, 702:1, 703:14, 708:2, 729:13, 742:8, 742:9, 745:7, 746:11, 748:9, 748:10, 753:25, 754:2, 754:8, 754:21, 757:3, 759:21, 759:22, 763:23, 763:24, 767:16, 767:17, 781:4, 783:20, 783:22, 785:10, 786:12, 786:13, 787:5, 805:18, 806:5, 810:24, 810:25, 818:17, 818:19, 818:20, 818:23, 827:9, 828:6, 831:14, 845:24, 846:1, 846:11, 849:24, 850:12, 851:13, 851:16, 851:17, 853:1, 853:11,

853:17, 853:20, 853:24, 855:5, 855:15, 858:19, 858:20

**Objection** [1] - 641:13

**objectionable** [2] - 584:4, 606:9

**objections** [21] - 594:15, 595:5, 595:15, 598:3, 598:4, 598:9, 598:15, 605:24, 606:11, 606:16, 607:20, 607:21, 607:22, 609:21, 610:9, 610:16, 611:21, 754:7, 788:13, 805:17

**objective** [1] - 702:25

**observed** [1] - 660:15

**obtaining** [1] - 815:5

**obviously** [4] - 610:12, 817:21, 852:3, 862:4

**occasionally** [2] - 613:22, 818:25

**occasions** [1] - 844:5

**occur** [1] - 583:3

**occurred** [6] - 698:17, 700:24, 793:6, 850:7, 850:8, 868:20

**occurs** [1] - 664:5

**October** [14] - 653:17, 654:4, 654:20, 654:22, 655:15, 657:4, 661:23, 662:5, 772:15, 795:25, 796:12, 796:19, 798:25, 799:3

**OF** [2] - 578:2, 578:9

**offer** [9] - 588:23, 597:15, 597:24, 700:7, 722:19, 770:20, 809:10, 836:21

**offered** [6] - 597:10, 597:11, 608:4, 805:21, 837:8, 837:12

**offhand** [2] - 689:8, 691:15

**Office** [1] - 597:16

**office** [2] - 843:2, 843:4

**officers** [1] - 827:25

**Official** [1] - 872:24

**offline** [3] - 670:16, 670:17

**often** [3] - 738:5,

757:19, 762:15

**oil** [4] - 721:23, 721:24, 721:25, 722:4

**old** [4] - 732:12, 803:23, 842:4, 867:13

**once** [8] - 628:2, 629:19, 644:18, 792:8, 806:4, 836:19, 843:21

**one** [164] - 581:4, 585:10, 587:17, 587:18, 589:15, 589:17, 590:11, 590:15, 598:25, 601:22, 604:8, 609:1, 610:2, 610:13, 611:7, 612:23, 615:17, 618:1, 618:21, 619:9, 619:20, 620:14, 621:14, 621:18, 621:19, 624:25, 628:15, 628:19, 629:16, 632:25, 633:10, 637:9, 638:4, 639:25, 642:3, 642:9, 642:12, 647:2, 651:14, 654:8, 654:19, 662:11, 669:2, 669:14, 672:22, 672:25, 673:18, 673:21, 674:3, 674:10, 674:14, 674:16, 674:20, 674:24, 675:11, 675:13, 675:14, 675:17, 676:10, 676:15, 676:19, 676:24, 677:3, 678:9, 679:8, 680:5, 684:7, 685:17, 685:19, 686:9, 688:16, 689:19, 690:1, 690:12, 690:23, 691:22, 691:25, 695:2, 704:20, 707:4, 707:12, 711:14, 716:17, 716:19, 718:7, 718:8, 720:3, 720:13, 720:21, 722:25, 724:21, 727:7, 727:12, 730:3, 732:10, 732:16, 734:16, 735:25, 736:11, 737:12, 740:23,

741:13, 748:23, 749:17, 749:19, 753:2, 755:21, 758:9, 761:4, 766:4, 766:6, 766:7, 766:16, 776:20, 778:23, 782:20, 782:21, 787:2, 789:7, 798:15, 798:17, 800:9, 804:9, 807:15, 808:4, 808:10, 808:20, 816:23, 817:11, 819:11, 822:2, 822:4, 823:5, 826:6, 829:17, 830:10, 835:18, 837:25, 839:6, 842:22, 844:6, 844:8, 848:1, 849:1, 850:24, 852:14, 852:17, 854:7, 854:19, 855:24, 856:9, 860:14, 860:16, 860:18, 864:1, 865:11, 866:14, 866:19, 867:12, 869:2

**one's** [1] - 849:9

**one-time** [2] - 749:17, 749:19

**ones** [16] - 606:13, 672:14, 715:7, 749:7, 760:13, 765:18, 797:21, 809:14, 821:2, 821:4, 822:25, 823:5, 844:9, 847:4, 856:2, 856:19

**open** [1] - 646:10

**opened** [1] - 850:5

**opening** [14] - 588:1, 653:14, 654:11, 654:19, 655:8, 661:22, 717:9, 780:6, 785:4, 791:12, 806:7, 816:2, 844:17, 865:11

**operate** [7] - 604:19, 624:3, 624:7, 624:11, 624:14, 669:25, 723:13

**operated** [6] - 612:5, 732:1, 768:22, 775:5, 776:10, 860:12

**operates** [2] - 608:13, 642:14

**operating** [33] -

604:13, 604:17, 604:18, 604:22, 605:4, 605:5, 605:7, 605:10, 606:8, 607:8, 610:21, 610:25, 612:2, 612:4, 612:7, 612:16, 613:4, 613:6, 613:10, 613:15, 621:4, 630:23, 631:1, 669:19, 714:17, 728:20, 730:22, 731:10, 731:18, 731:20, 856:23, 857:5, 864:2

**operation** [9] - 595:24, 597:12, 607:10, 608:5, 608:6, 608:12, 626:5, 660:16

**Operations** [22] - 621:7, 624:3, 624:7, 624:11, 624:14, 730:17, 730:19, 730:20, 730:21, 731:16, 731:18, 731:23, 761:12, 761:22, 768:15, 839:18, 841:12, 847:1, 849:9, 851:2, 856:10, 863:14

**operations** [13] - 595:24, 621:5, 627:7, 631:2, 667:5, 693:9, 693:16, 721:25, 845:1, 845:11, 847:1, 847:4, 852:6

**operator** [1] - 775:5

**operators** [5] - 636:11, 667:24, 668:11, 668:15, 731:17

**opine** [5] - 581:6, 581:20, 607:11, 608:19, 702:2

**opined** [1] - 704:6

**opining** [2] - 608:7, 706:6

**opinion** [62] - 581:7, 581:8, 581:24, 587:22, 588:25, 589:3, 592:19, 592:21, 592:23, 593:1, 593:8, 594:9, 594:20, 670:21, 679:22, 680:2, 681:3, 681:8, 698:9, 698:18, 701:13, 701:19, 703:9,

703:10, 703:11, 704:1, 704:4, 708:17, 708:22, 709:2, 709:6, 709:9, 709:12, 709:15, 712:8, 729:5, 732:5, 737:15, 741:8, 742:3, 748:5, 759:15, 767:9, 768:10, 771:13, 776:14, 778:1, 784:17, 805:13, 805:20, 805:21, 809:11, 821:23, 828:14, 828:15, 832:5, 836:25, 837:5, 837:8, 837:12

**opinions** [38] - 605:11, 610:22, 611:17, 615:20, 620:24, 622:20, 623:12, 625:19, 632:12, 635:24, 639:1, 653:21, 653:25, 654:4, 654:15, 660:18, 660:23, 661:25, 662:9, 681:14, 685:17, 685:23, 686:7, 687:16, 688:22, 697:3, 698:1, 770:21, 771:1, 771:5, 771:19, 771:21, 771:25, 773:13, 773:22, 780:7, 784:15, 799:25

**opportunities** [1] - 609:4

**opportunity** [5] - 599:15, 724:25, 733:8, 805:15, 814:1

**opposing** [2] - 602:5, 870:5

**opposition** [1] - 602:8

**optimize** [6] - 638:18, 689:1, 689:2, 689:3, 711:25, 712:1

**optimized** [2] - 638:19, 692:7

**optimizing** [2] - 690:20, 691:6

**options** [2] - 628:3, 644:15

**order** [20] - 581:3, 581:20, 596:4, 663:14, 663:15, 698:2, 734:16, 734:21, 736:3, 743:6, 745:9,

745:14, 745:15, 745:19, 746:22, 776:18, 788:14, 829:12, 857:22, 859:8

**orders** [1] - 606:15

**org** [1] - 857:16

**organization** [3] - 729:9, 730:15, 856:13

**organize** [1] - 603:6

**orientation** [1] - 852:5

**original** [1] - 793:4

**originally** [1] - 600:15

**originals** [1] - 622:25

**otherwise** [9] - 590:24, 594:22, 623:21, 664:18, 740:23, 788:9, 868:12, 870:20, 872:7

**ourselves** [2] - 727:5, 735:18

**outcome** [1] - 722:17

**outside** [5] - 618:5, 618:24, 650:13, 656:20, 661:10

**overall** [6] - 762:5, 769:13, 856:13, 857:9, 857:22, 864:5

**overarching** [1] - 707:21

**overhead** [2] - 796:17, 796:18

**overnight** [3] - 600:19, 802:14, 871:18

**overrule** [20] - 582:22, 584:2, 591:23, 592:2, 605:22, 609:25, 611:21, 623:16, 626:6, 638:15, 641:5, 641:8, 641:18, 645:1, 708:2, 827:9, 846:11, 851:17, 855:4, 855:15

**overruled** [5] - 582:22, 582:25, 629:11, 850:12, 858:21

**own** [12] - 581:23, 723:10, 725:7, 780:24, 782:15, 783:8, 784:6, 784:7, 784:15, 858:7, 858:9, 858:10

**owned** [2] - 736:14, 748:20

**owners** [2] - 731:16, 761:14

**ownership** [3] -

666:18, 730:8, 730:16

**owning** [1] - 725:1

**oxide** [4] - 680:6, 681:1, 772:25, 773:13

## P

**p.m** [2] - 798:3, 803:6

**Pacific** [5] - 732:12, 733:19, 760:4, 765:6, 765:25

**pack** [1] - 596:9

**page** [32] - 589:10, 589:11, 596:17, 655:6, 673:9, 673:10, 673:11, 682:2, 695:9, 697:12, 704:25, 729:21, 730:10, 745:12, 750:16, 760:10, 774:7, 776:1, 777:2, 778:9, 798:7, 800:16, 804:8, 806:11, 807:3, 815:14, 815:20, 822:17, 823:4, 823:18, 823:25

**pages** [12] - 588:1, 588:9, 590:7, 677:20, 746:10, 785:2, 807:5, 810:15, 820:8, 821:16

**paid** [24] - 638:6, 741:8, 741:10, 750:18, 756:5, 765:20, 782:13, 791:24, 792:2, 792:6, 792:10, 792:13, 800:14, 801:13, 804:4, 817:1, 817:4, 817:14, 822:5, 861:2, 861:11, 861:13

**paper** [1] - 732:13

**papering** [1] - 803:25

**paragraph** [11] - 583:19, 588:4, 590:18, 591:4, 682:3, 682:9, 682:11, 794:8, 795:17, 808:17, 822:19

**paragraphs** [1] - 585:13

**parent** [1] - 815:18

**Parish** [4] - 603:13, 659:20, 668:9, 674:11
**parlance** [1] - 774:23
**parse** [1] - 869:4
**part** [45] - 586:13, 586:15, 589:2, 591:16, 596:1, 605:6, 606:10, 606:16, 608:11, 615:7, 623:18, 628:12, 628:16, 651:17, 667:23, 683:17, 683:19, 685:23, 688:22, 694:2, 698:1, 704:18, 718:10, 723:25, 724:7, 724:9, 724:14, 726:15, 766:15, 767:22, 778:24, 779:24, 782:5, 805:13, 807:9, 820:18, 823:7, 823:14, 823:19, 824:7, 824:9, 841:5, 861:25, 865:22, 866:12
**participants** [1] - 827:7
**participate** [1] - 601:3
**participating** [1] - 601:23
**particles** [3] - 619:7, 639:23, 640:2
**particular** [7] - 590:15, 728:15, 771:12, 789:3, 793:23, 794:15, 868:9
**particularly** [5] - 587:1, 603:22, 750:21, 843:13, 868:1
**parties** [77] - 580:8, 580:11, 580:14, 580:23, 582:16, 584:5, 584:23, 585:1, 586:15, 591:1, 596:21, 605:25, 606:14, 607:20, 610:16, 623:1, 727:12, 727:15, 727:21, 728:1, 728:12, 733:13, 734:1, 734:2, 734:11, 735:10, 736:13, 737:15, 738:8, 739:24, 740:16, 740:19, 741:4,

741:20, 743:8, 744:5, 748:25, 749:2, 749:16, 749:23, 750:4, 750:16, 750:18, 751:2, 751:13, 751:18, 753:4, 755:17, 757:17, 757:19, 758:10, 758:15, 766:2, 766:10, 766:18, 782:2, 786:14, 795:8, 801:7, 801:13, 803:14, 803:16, 804:2, 812:22, 815:9, 815:10, 815:16, 817:6, 817:21, 827:5, 833:23, 854:3, 867:11, 871:9, 871:24
**parties'** [1] - 580:2
**partner** [4] - 858:7, 858:9, 858:10, 859:17
**Partners** [12] - 624:12, 674:4, 852:20, 855:24, 857:3, 857:6, 857:10, 857:17, 859:3, 859:11, 859:17, 859:19
**partners** [1] - 855:8
**parts** [2] - 723:22, 821:20
**party** [1] - 595:4
**pass** [4] - 648:14, 769:23, 796:17, 828:8
**passed** [1] - 600:13
**past** [2] - 750:2, 774:24
**patent** [83] - 592:21, 614:17, 616:15, 616:17, 616:19, 616:21, 616:24, 617:7, 618:12, 619:24, 620:19, 620:20, 622:8, 622:9, 625:1, 629:18, 642:19, 643:5, 643:6, 647:2, 663:14, 679:8, 679:10, 679:13, 679:15, 679:18, 679:23, 682:24, 692:18, 698:5, 698:12, 698:15, 698:20, 698:24, 708:14, 708:15,

708:16, 720:7, 720:18, 722:20, 723:21, 724:1, 725:4, 725:16, 725:23, 727:3, 727:20, 727:21, 728:10, 735:16, 738:3, 738:5, 741:13, 742:25, 744:2, 744:8, 744:15, 746:18, 746:22, 748:21, 752:9, 752:25, 763:14, 778:25, 790:7, 790:9, 790:22, 791:25, 800:21, 801:5, 805:8, 809:7, 813:17, 828:19, 828:20, 828:21, 829:5, 850:24, 850:25, 851:8, 862:11
**Patent** [1] - 597:16
**patented** [8] - 682:19, 725:6, 726:11, 733:4, 736:7, 774:16, 814:12, 814:14
**patents** [87] - 629:7, 629:15, 629:17, 637:12, 637:22, 641:23, 643:8, 645:3, 646:7, 646:8, 646:12, 662:1, 679:5, 679:21, 680:3, 680:6, 680:8, 680:25, 681:4, 681:8, 682:24, 692:25, 701:16, 702:13, 708:13, 709:4, 716:9, 716:10, 716:12, 716:17, 716:25, 717:2, 717:7, 717:13, 717:17, 717:18, 717:19, 718:14, 719:22, 719:24, 721:18, 722:4, 722:25, 723:5, 725:14, 725:16, 725:19, 726:2, 726:5, 726:14, 726:25, 727:17, 727:19, 727:22, 733:1, 734:14, 737:14, 738:8, 741:5, 741:9, 741:11, 743:3, 743:4, 743:5, 748:18, 752:12,

753:3, 758:4, 771:13, 771:15, 771:17, 771:22, 772:24, 773:10, 773:14, 773:17, 775:7, 777:3, 777:6, 812:3, 812:16, 813:21, 837:13, 854:14, 861:3, 861:12
**patents-at-issue** [3] - 629:7, 717:17, 854:14
**patents-in-suit** [5] - 641:23, 701:16, 702:13, 726:2, 741:11
**path** [4] - 821:10, 850:4, 866:18, 866:20
**PAUL** [1] - 579:7
**pausing** [1] - 588:12
**Pavlish** [5] - 603:21, 735:14, 812:23, 813:2, 825:15
**Pavlish's** [2] - 683:25, 814:19
**pay** [9] - 724:13, 725:2, 727:23, 749:24, 752:22, 765:16, 803:22, 857:24
**payable** [1] - 832:22
**paying** [5] - 743:25, 744:1, 746:24, 748:23, 813:22
**payment** [30] - 725:5, 725:10, 737:22, 737:24, 738:3, 738:9, 743:14, 743:16, 747:15, 749:12, 749:14, 749:15, 749:16, 749:17, 749:19, 749:22, 750:7, 751:19, 752:20, 752:25, 753:9, 756:10, 756:15, 758:11, 758:16, 758:22, 800:4, 817:16, 833:3, 834:15
**payments** [1] - 749:21
**PDF** [1] - 806:12
**PDX** [3] - 622:12, 690:6
**peak** [1] - 845:15
**PEARSON** [98] - 578:22, 718:23, 719:11, 722:19,

722:22, 724:6, 729:11, 729:20, 729:23, 730:9, 730:11, 731:4, 731:6, 733:10, 733:17, 733:20, 734:24, 735:1, 737:2, 737:4, 737:19, 737:21, 740:3, 740:4, 741:14, 741:16, 742:6, 742:13, 743:11, 743:13, 745:4, 745:13, 745:17, 745:24, 746:3, 746:7, 746:16, 747:7, 747:9, 748:7, 748:14, 748:16, 749:9, 749:11, 750:22, 750:24, 751:24, 752:1, 752:17, 752:19, 753:10, 753:19, 753:22, 754:14, 754:25, 755:1, 757:1, 757:11, 757:12, 758:18, 758:20, 759:19, 760:1, 760:3, 763:21, 764:3, 765:3, 765:4, 767:14, 767:21, 767:23, 769:14, 769:16, 769:21, 781:5, 783:23, 786:7, 786:12, 787:6, 805:11, 805:21, 810:25, 818:17, 825:4, 825:7, 826:17, 828:3, 828:10, 828:12, 831:5, 831:7, 831:20, 831:21, 832:12, 834:11, 836:1, 837:20, 838:2
**Pearson** [14] - 724:2, 745:10, 745:16, 745:22, 746:5, 754:13, 769:24, 777:18, 783:19, 807:7, 818:16, 828:2, 828:9, 835:24
**peek** [1] - 820:3
**pejorative** [1] - 869:14
**pending** [2] - 803:10, 824:2
**pennies** [2] - 822:2, 822:4

**penny** [6] - 808:20, 813:12, 813:13, 813:22, 822:2, 822:4
**people** [14] - 666:17, 719:23, 719:25, 720:1, 723:11, 727:19, 727:23, 728:19, 732:15, 765:19, 774:24, 800:17, 802:24
**people's** [1] - 833:25
**Per** [1] - 788:24
**per** [54] - 646:1, 737:24, 738:12, 740:12, 740:18, 740:20, 741:18, 741:19, 743:20, 743:21, 746:25, 750:8, 750:11, 751:9, 751:16, 755:5, 755:11, 756:1, 756:3, 756:7, 756:11, 758:12, 758:24, 759:2, 759:6, 763:9, 765:12, 769:18, 769:20, 782:13, 789:17, 791:24, 792:10, 799:13, 801:13, 804:4, 807:16, 807:20, 808:1, 808:7, 808:11, 813:12, 813:16, 815:6, 817:20, 817:24, 818:1, 818:7, 819:18, 821:13, 822:2, 829:22
**per-ton** [2] - 740:20, 741:19
**percent** [32] - 614:1, 634:4, 634:11, 634:12, 634:14, 634:17, 644:20, 670:12, 670:14, 691:10, 694:1, 710:15, 776:20, 779:13, 779:15, 779:25, 789:10, 801:10, 802:6, 802:8, 802:15, 808:9, 836:11, 836:23, 857:25, 858:3, 859:19, 859:20, 866:3, 866:4, 866:6
**percentage** [3] - 666:19, 671:4, 686:21
**percentages** [3] -

686:19, 686:24, 692:7
**perfect** [1] - 845:4
**perform** [5] - 643:21, 644:11, 644:23, 711:17, 715:20
**performing** [2] - 634:13, 809:16
**performs** [1] - 686:8
**perhaps** [3] - 640:18, 796:15, 871:8
**period** [64] - 582:18, 583:4, 583:9, 583:11, 602:24, 603:3, 613:23, 614:10, 626:22, 627:2, 631:16, 696:20, 702:12, 718:9, 737:25, 738:13, 738:17, 738:19, 739:10, 739:11, 739:15, 740:7, 741:1, 755:19, 755:23, 756:4, 760:22, 761:21, 762:2, 762:6, 778:6, 783:4, 783:5, 783:8, 783:9, 783:11, 783:13, 786:5, 789:21, 790:2, 790:12, 790:22, 792:13, 792:14, 792:15, 792:24, 793:1, 793:16, 793:24, 794:10, 800:13, 801:6, 833:19, 834:12, 834:19, 835:5, 835:7, 836:8, 847:25, 848:4, 857:8, 859:24, 868:16
**Period** [1] - 790:7
**periods** [2] - 755:14, 761:24
**permissible** [1] - 595:8
**permission** [2] - 603:18, 843:21
**permit** [15] - 604:17, 604:18, 604:19, 604:22, 605:7, 612:2, 612:4, 612:7, 612:11, 612:16, 612:17, 669:19, 714:10, 714:11, 714:14
**permits** [17] - 604:13, 605:4, 605:5, 605:10, 605:14,

606:3, 606:8, 607:9, 610:21, 610:25, 613:4, 613:6, 613:10, 613:15, 630:23, 631:1, 714:17
**permitted** [2] - 708:3, 832:23
**permitting** [2] - 607:17
**person** [3] - 678:21, 706:1, 772:21
**personal** [4] - 845:19, 852:18, 854:20, 855:22
**perspective** [4] - 801:10, 845:21, 846:22, 847:5
**pertains** [1] - 708:14
**PETER** [1] - 578:17
**Peterson** [2] - 720:16, 720:18
**Pharmaceuticals** [1] - 852:12
**phase** [1] - 718:4
**Philip** [7] - 680:12, 680:24, 718:24, 719:4, 719:15, 722:19, 855:1
**PHILIP** [2] - 719:5, 719:6
**phone** [5] - 600:17, 600:25, 772:22, 842:24, 843:1
**phrase** [2] - 717:24, 840:4
**physical** [1] - 713:1
**pick** [1] - 803:21
**picking** [1] - 813:11
**picks** [1] - 849:20
**picture** [1] - 714:2
**piece** [6] - 608:21, 669:2, 681:20, 710:11, 782:4, 832:21
**pieces** [3] - 588:19, 646:3, 732:10
**pile** [3] - 627:11, 684:19, 684:23
**piles** [1] - 684:25
**pilot** [1] - 684:4
**pilots** [1] - 684:4
**pin** [1] - 859:7
**pipelines** [1] - 722:4
**pitch** [1] - 814:1
**place** [17] - 588:6, 607:25, 623:2, 627:14, 650:6, 673:24, 698:14, 698:23, 720:16,

720:20, 728:6, 728:9, 764:25, 765:19, 788:8, 850:10, 871:17
**Plaintiff** [3] - 578:24, 719:8, 838:15
**plaintiff** [12] - 583:3, 583:5, 598:16, 657:1, 676:5, 707:19, 713:10, 737:8, 766:20, 796:11, 838:5, 872:9
**Plaintiffs** [1] - 578:5
**plaintiffs** [27] - 582:7, 582:11, 584:3, 594:2, 608:22, 609:10, 611:20, 615:22, 622:12, 625:24, 632:15, 633:2, 636:1, 639:3, 646:15, 648:14, 657:22, 661:15, 679:5, 679:12, 718:22, 718:23, 722:9, 722:10, 806:5, 868:12, 871:24
**Plaintiffs'** [39] - 585:20, 611:23, 616:2, 626:12, 633:7, 636:6, 639:8, 646:20, 655:5, 681:11, 729:2, 729:12, 729:18, 737:3, 742:7, 742:11, 745:5, 746:13, 748:3, 748:8, 748:12, 753:12, 755:8, 756:18, 757:2, 757:9, 759:18, 759:24, 763:17, 763:22, 764:1, 764:16, 767:11, 767:15, 767:19, 769:5, 769:9, 788:17, 800:7
**plaintiffs'** [30] - 583:23, 584:24, 584:25, 585:7, 585:17, 588:11, 601:6, 602:1, 609:6, 658:8, 672:12, 676:16, 676:22, 677:7, 677:16, 678:7, 678:17, 679:23, 680:11, 681:10, 687:3, 689:9, 691:13, 693:8, 693:15,

754:22, 831:6, 834:21, 867:17, 868:22
**plan** [4] - 590:9, 601:3, 601:10, 794:19
**planning** [1] - 580:13
**plant** [146] - 588:7, 589:22, 590:3, 590:5, 590:15, 595:23, 597:11, 597:13, 604:17, 604:19, 604:22, 606:2, 608:5, 608:6, 608:12, 608:13, 612:3, 612:15, 612:20, 613:1, 621:12, 624:24, 625:7, 625:12, 626:16, 626:21, 627:12, 627:15, 627:19, 627:23, 628:2, 628:3, 633:19, 634:7, 634:16, 636:11, 636:16, 637:20, 638:20, 642:15, 642:17, 643:14, 643:21, 644:11, 644:15, 647:1, 649:22, 650:4, 650:7, 650:9, 652:7, 652:16, 652:21, 653:1, 656:14, 658:24, 659:11, 659:14, 659:17, 659:20, 659:23, 660:1, 660:4, 660:7, 660:12, 660:16, 661:4, 663:1, 663:22, 664:8, 667:24, 668:11, 668:15, 668:21, 669:1, 669:13, 671:18, 671:20, 674:5, 674:11, 675:1, 675:9, 678:24, 679:2, 682:16, 683:7, 683:12, 688:19, 692:15, 692:17, 692:20, 692:23, 693:9, 693:11, 693:15, 693:21, 693:23, 694:13, 694:19, 695:17, 696:1, 696:9, 697:6, 698:18, 699:8, 703:16, 704:7, 707:8, 714:10, 718:3, 731:13, 731:14, 731:20,

735:24, 761:14, 761:16, 764:9, 764:15, 775:4, 775:5, 776:10, 789:17, 791:4, 794:11, 794:16, 794:21, 802:5, 805:6, 809:22, 817:17, 843:15, 843:19, 843:22, 843:24, 844:1, 844:3, 844:6, 862:17, 863:1, 864:19, 865:12, 865:14, 866:10

**Plant** [1] - 788:24

**plant's** [2] - 612:11, 668:22

**plants** [177] - 588:6, 602:24, 603:4, 603:9, 603:12, 604:4, 604:11, 604:14, 605:8, 605:15, 606:3, 607:10, 607:15, 607:17, 609:16, 611:1, 612:23, 613:7, 613:10, 613:15, 613:21, 614:8, 618:19, 619:18, 621:14, 621:17, 621:18, 622:4, 625:9, 626:6, 627:24, 628:1, 628:7, 630:1, 630:20, 630:23, 631:13, 631:15, 632:11, 636:13, 637:1, 637:12, 638:11, 638:14, 639:18, 640:1, 640:9, 640:25, 641:3, 641:7, 641:12, 644:15, 644:23, 645:3, 645:17, 648:6, 650:14, 650:22, 651:2, 651:7, 651:21, 656:22, 657:12, 657:16, 658:21, 659:3, 659:6, 660:25, 661:3, 661:8, 662:15, 662:23, 664:24, 665:1, 665:12, 665:15, 665:17, 665:21, 665:23, 666:1, 666:5, 666:8, 667:15, 667:16, 667:20, 668:7,

668:9, 668:10, 669:13, 669:14, 669:25, 670:15, 670:22, 671:13, 671:18, 680:22, 684:16, 688:25, 691:7, 693:4, 696:8, 697:5, 697:19, 698:19, 698:25, 699:3, 699:10, 699:12, 699:16, 699:18, 699:22, 700:15, 700:16, 700:20, 700:25, 701:4, 701:6, 701:12, 705:2, 705:15, 708:9, 708:18, 709:3, 710:1, 710:8, 710:19, 711:4, 711:7, 711:16, 711:22, 712:5, 712:7, 713:20, 714:6, 714:21, 715:3, 715:7, 715:11, 715:14, 715:17, 715:19, 717:5, 730:24, 731:9, 735:25, 762:13, 762:16, 763:6, 777:4, 778:15, 802:4, 809:14, 809:16, 811:17, 811:19, 812:17, 812:21, 812:24, 813:20, 814:3, 815:11, 821:16, 824:5, 843:6, 843:8, 844:6, 849:23, 852:8, 857:6, 864:10, 864:12, 864:24, 865:1, 865:7, 865:10, 866:19

**plants'** [1] - 702:10

**pleasure** [1] - 793:9

**plenty** [1] - 607:10

**plywood** [1] - 732:13

**point** [42] - 583:6, 587:19, 587:20, 588:18, 592:12, 595:22, 597:6, 599:1, 600:3, 602:7, 610:2, 611:12, 690:20, 691:2, 696:23, 699:5, 700:8, 704:20, 705:23, 706:11, 707:12, 713:22, 733:24, 734:5,

777:5, 782:2, 782:7, 800:4, 816:23, 825:24, 831:1, 831:3, 838:5, 851:4, 854:10, 856:18, 863:3, 863:25, 866:5, 870:25, 871:16

**pointed** [1] - 799:24

**points** [3] - 593:14, 594:12, 729:14

**pollution** [1] - 604:21

**pop** [2] - 594:16, 804:7

**popping** [1] - 594:23

**portion** [7] - 623:2, 623:13, 738:12, 741:8, 785:12, 858:13, 859:11

**position** [11] - 599:10, 599:20, 609:24, 652:9, 652:12, 702:15, 840:6, 864:8, 864:22, 865:5, 865:8

**possible** [5] - 580:11, 735:6, 774:1, 804:21, 872:7

**possibly** [3] - 632:24, 804:20, 868:20

**post** [1] - 763:7

**potential** [3] - 750:11, 778:20, 829:7

**pounds** [3] - 684:22, 684:24, 706:4

**Powder** [2] - 604:7, 621:18

**powder** [1] - 621:25

**power** [290] - 588:6, 588:7, 589:22, 590:3, 590:5, 590:15, 595:23, 597:11, 597:13, 602:24, 603:4, 603:9, 603:12, 604:4, 604:10, 604:14, 604:17, 604:19, 605:8, 605:14, 606:2, 607:10, 607:15, 607:17, 608:5, 608:6, 608:12, 608:13, 609:16, 611:1, 612:3, 612:11, 612:15, 612:20, 612:23, 613:1, 613:7, 613:10, 613:15, 613:20, 614:8, 618:19, 619:18,

621:12, 621:13, 621:17, 624:24, 625:6, 625:9, 625:12, 626:6, 626:16, 626:21, 627:15, 627:19, 627:23, 627:24, 628:1, 628:2, 628:3, 628:6, 630:1, 630:20, 630:23, 631:13, 631:15, 632:11, 633:19, 634:7, 634:16, 636:11, 636:13, 636:16, 637:1, 637:12, 637:20, 638:11, 638:14, 638:20, 639:18, 640:1, 640:9, 640:25, 641:3, 641:7, 641:12, 642:14, 642:17, 643:14, 643:21, 644:11, 644:15, 644:23, 645:3, 645:17, 646:25, 648:6, 649:22, 649:25, 650:4, 650:7, 650:9, 650:13, 650:22, 651:21, 652:6, 652:7, 652:16, 652:21, 656:14, 656:22, 657:12, 657:16, 658:21, 658:24, 659:3, 659:6, 659:11, 659:14, 659:17, 659:20, 659:23, 660:1, 660:4, 660:7, 660:12, 660:16, 660:25, 661:3, 661:4, 661:8, 662:15, 662:23, 663:1, 664:8, 664:18, 664:24, 665:1, 665:12, 665:14, 665:17, 665:21, 665:23, 666:1, 666:5, 666:8, 667:15, 667:16, 667:20, 667:24, 668:7, 668:9, 668:10, 668:11, 668:15, 668:22, 669:1, 669:12, 670:11, 670:15, 670:22, 671:13, 671:18, 671:20, 674:18, 675:1, 675:9, 678:24,

679:2, 680:22, 682:16, 683:7, 683:12, 684:14, 684:15, 688:18, 688:25, 691:7, 692:15, 692:17, 692:20, 692:23, 693:4, 693:9, 693:11, 693:15, 693:21, 694:13, 694:19, 695:17, 696:1, 696:8, 696:9, 697:4, 697:6, 697:19, 698:18, 698:19, 698:25, 699:3, 699:8, 699:10, 699:12, 699:16, 699:18, 699:22, 700:15, 700:16, 700:19, 700:25, 701:4, 701:6, 702:10, 703:16, 704:7, 709:3, 710:1, 710:8, 710:19, 711:4, 711:7, 711:16, 711:21, 712:4, 712:7, 713:20, 714:9, 714:10, 714:21, 715:3, 715:7, 715:11, 715:13, 715:17, 715:19, 717:5, 718:3, 730:23, 731:9, 731:13, 731:14, 735:24, 735:25, 761:14, 761:15, 762:13, 762:15, 775:4, 777:4, 791:4, 805:6, 809:14, 809:16, 809:22, 812:17, 812:20, 812:24, 813:20, 814:3, 815:11, 821:16, 824:5, 843:6, 843:8, 843:15, 843:19, 843:21, 843:24, 844:1, 844:3, 844:5, 844:6, 849:23, 852:8, 857:5, 862:17, 864:12, 864:19, 864:24, 865:1, 865:7, 865:10, 865:12, 865:14, 866:9, 866:10, 866:19

**Power** [3] - 649:19, 668:3, 668:6

**Powerton** [4] - 794:11, 794:16, 794:21,

802:5
**practical** [1] - 645:22
**practice** [2] - 802:24, 862:11
**prayer** [2] - 868:24, 869:21
**PRB** [4] - 604:1, 621:19, 648:2, 778:18
**preamble** [1] - 616:23
**preceded** [1] - 757:25
**precipitator** [6] - 614:7, 614:10, 619:19, 622:7, 639:20, 651:17
**precipitators** [1] - 651:3
**precise** [5] - 702:9, 751:8, 792:9, 801:16, 801:18
**precisely** [2] - 760:20, 835:11
**precluded** [1] - 786:17
**preemptively** [1] - 583:14
**prefer** [2] - 781:7, 781:11
**prejudice** [1] - 870:21
**prejudicial** [3] - 702:4, 702:6, 853:21
**premise** [1] - 605:24
**preparation** [1] - 639:15
**prepare** [6] - 620:23, 647:23, 730:25, 810:21, 870:16, 870:19
**prepared** [6] - 597:19, 623:10, 688:5, 870:22, 870:25, 871:12
**preparing** [3] - 687:16, 870:17, 871:25
**present** [4] - 688:6, 825:1, 825:13, 872:20
**presentation** [7] - 588:23, 590:16, 602:5, 622:13, 624:18, 687:4, 687:6
**presented** [5] - 638:10, 709:17, 709:18, 772:5, 788:23
**preservation** [1] - 788:6
**preserve** [5] - 594:16, 594:17, 595:1, 595:5, 595:15

**preserved** [3] - 594:17, 594:22, 599:13
**press** [1] - 586:1
**pretend** [1] - 770:20
**pretrial** [3] - 596:4, 606:15, 795:24
**pretty** [7] - 585:23, 613:22, 613:24, 647:13, 687:13, 836:19, 867:1
**prevented** [1] - 713:1
**previous** [2] - 789:17, 815:16
**previously** [14] - 598:3, 598:5, 598:6, 621:18, 641:14, 712:25, 751:25, 783:12, 788:6, 816:9, 818:18, 860:17, 860:24, 867:14
**price** [2] - 741:12, 809:23
**Pricewaterhouse** [1] - 720:12
**PricewaterhouseCoopers** [1] - 720:13
**principal** [1] - 719:18
**principals** [2] - 730:2, 730:12
**Principals'** [1] - 730:1
**principals'** [2] - 730:13, 730:16
**principles** [1] - 727:11
**prioritize** [1] - 869:12
**privileged** [1] - 846:18
**privy** [1] - 866:10
**problem** [5] - 599:12, 599:20, 696:16, 783:20, 813:16
**procedurally** [1] - 869:24
**Procedure** [1] - 712:24
**procedure** [1] - 600:18
**procedures** [1] - 597:17
**proceed** [5] - 601:4, 601:14, 626:8, 770:2, 838:22
**proceeded** [1] - 871:11
**proceeding** [1] - 839:1
**proceedings** [5] - 600:9, 649:1, 713:8, 787:19, 872:21
**process** [12] - 606:14, 607:25, 615:18, 627:8, 638:19,

639:14, 726:15, 766:8, 778:15, 813:21, 839:24, 840:13
**processed** [2] - 747:1, 800:10
**proclamation** [1] - 782:12
**produce** [3] - 608:22, 785:23, 858:2
**produced** [3] - 702:18, 763:2, 794:22
**Produced** [1] - 788:24
**producer** [3] - 860:20, 860:21, 860:24
**produces** [1] - 862:16
**producing** [2] - 845:15, 865:1
**product** [4] - 797:20, 814:14, 845:25, 846:2
**products** [8] - 639:19, 640:10, 663:7, 681:23, 778:12, 805:8, 814:11, 814:12
**Products** [3] - 624:4, 624:5, 642:8
**professional** [2] - 649:15, 661:7
**proffered** [1] - 595:23
**profit** [2] - 735:19
**profits** [1] - 721:11
**program** [20] - 710:16, 710:20, 710:23, 711:1, 711:18, 779:9, 822:22, 823:8, 823:15, 823:20, 823:21, 823:24, 826:24, 826:25, 827:7, 827:16, 836:2, 863:6, 864:13, 866:24
**project** [4] - 856:10, 856:22, 856:24, 858:1
**projector** [2] - 796:17, 796:18
**pronounce** [1] - 852:14
**proper** [2] - 599:16, 793:3
**properly** [1] - 582:5
**properties** [2] - 719:21, 720:2
**property** [2] - 770:13, 862:22
**proponent** [1] - 622:24

**proposal** [2] - 609:3, 868:22
**propose** [1] - 645:15
**proposed** [1] - 871:7
**protection** [1] - 645:24
**protocols** [1] - 843:23
**prove** [3] - 614:20, 614:23, 830:3
**proved** [1] - 831:2
**proves** [1] - 831:1
**provide** [22] - 581:24, 588:5, 588:23, 609:3, 617:4, 630:16, 641:11, 641:12, 643:6, 648:2, 680:25, 743:16, 762:17, 773:12, 792:18, 813:1, 816:24, 818:10, 818:11, 827:15, 827:20, 869:9
**provided** [21] - 600:24, 622:16, 622:17, 622:18, 623:15, 628:2, 629:18, 631:1, 634:20, 644:14, 648:11, 752:11, 754:16, 780:6, 780:7, 810:6, 810:9, 811:8, 824:24, 825:12, 827:25
**provides** [2] - 686:15, 856:13
**providing** [3] - 660:16, 742:18, 742:20
**province** [2] - 581:6, 582:3
**provision** [1] - 855:10
**provisions** [2] - 588:5, 591:2
**proviso** [1] - 846:12
**proximity** [1] - 762:13
**PTX** [71] - 583:24, 584:10, 611:5, 611:8, 612:3, 615:23, 616:5, 625:24, 632:16, 633:2, 633:13, 635:2, 635:20, 636:2, 636:9, 636:19, 639:4, 642:3, 646:16, 647:2, 647:7, 647:12, 647:15, 716:17, 741:25, 751:25, 753:20, 754:11, 754:12,

780:5, 780:13, 780:18, 780:20, 780:22, 781:3, 781:13, 781:19, 785:2, 788:4, 788:21, 789:15, 790:1, 791:16, 795:19, 798:7, 800:15, 804:7, 804:18, 804:22, 815:14, 816:9, 816:16, 816:18, 816:21, 816:24, 817:1, 817:15, 817:16, 817:17, 818:10, 818:12, 818:14, 819:10, 819:16, 820:3, 820:7, 831:20, 831:22, 832:10
**public** [4] - 721:8, 721:12, 814:20, 821:25
**Public** [1] - 721:15
**publication** [1] - 788:3
**publicly** [3] - 630:23, 830:10, 830:13
**publish** [1] - 753:19
**published** [2] - 661:11, 754:22
**pull** [5] - 655:4, 681:10, 682:3, 806:10, 808:15
**pulled** [2] - 676:19, 814:22
**pulverized** [2] - 621:24, 627:16
**pulverizer** [1] - 627:11
**purchase** [1] - 735:21
**purchased** [1] - 667:4
**purchases** [1] - 590:4
**purely** [1] - 846:22
**purple** [1] - 847:4
**purpose** [10] - 599:4, 604:16, 707:2, 739:20, 784:11, 785:22, 786:14, 863:5, 868:9, 868:11
**purposes** [5] - 595:10, 681:24, 732:22, 733:23, 761:7
**pursuant** [6] - 595:9, 606:5, 622:11, 629:11, 712:23, 788:1
**put** [32] - 592:25, 603:18, 604:9, 613:17, 636:21, 650:4, 675:22, 679:12, 686:16,

687:3, 689:9, 689:13, 703:7, 712:21, 712:22, 721:24, 726:17, 727:5, 738:23, 751:5, 764:25, 780:15, 784:4, 808:16, 829:18, 836:8, 848:16, 849:18, 850:15, 865:18, 865:24, 869:12
**putting** [4] - 593:7, 849:22, 850:17, 853:7
**PX762** [1] - 729:22

## Q

**qualification** [4] - 607:16, 685:9, 686:4, 686:8
**qualifications** [2] - 609:22, 854:19
**qualified** [6] - 591:11, 597:24, 684:8, 720:7, 770:25, 778:14
**qualifies** [1] - 864:12
**qualify** [6] - 683:20, 685:22, 686:17, 686:25, 778:12, 805:8
**qualifying** [1] - 778:23
**qualitative** [3] - 765:7, 765:10, 767:6
**quality** [1] - 603:24
**quantitative** [3] - 765:19, 765:23, 767:6
**QUESTION** [1] - 705:2
**questioning** [12] - 582:8, 584:23, 584:24, 584:25, 585:5, 702:7, 706:2, 738:21, 783:24, 818:20, 855:13
**questions** [35] - 582:12, 589:7, 608:18, 611:18, 644:7, 694:4, 702:13, 702:21, 703:15, 709:24, 713:19, 715:25, 717:23, 733:3, 738:22, 784:24, 785:11, 811:5, 815:13, 822:11, 826:19, 826:22, 827:17, 834:9,

835:24, 837:20, 840:5, 840:11, 849:16, 850:10, 850:12, 853:12, 853:25, 854:1, 871:5
**quibble** [1] - 847:3
**quick** [2] - 811:5, 852:17
**quickly** [2] - 735:5, 864:1
**quite** [9] - 632:20, 646:3, 816:12, 816:13, 816:18, 819:15, 819:17, 844:9, 856:25
**quote** [1] - 783:10

## R

**raise** [3] - 580:15, 610:16, 869:24
**raised** [8] - 580:14, 580:24, 582:16, 582:17, 595:7, 598:5, 598:9, 729:14
**ran** [1] - 855:8
**range** [10] - 635:4, 635:8, 750:10, 750:20, 751:16, 755:13, 765:11, 765:12, 816:1, 818:4
**rank** [2] - 682:25, 683:3
**ranked** [1] - 780:21
**rate** [27] - 688:18, 722:15, 727:24, 733:13, 741:19, 743:21, 751:9, 756:1, 756:3, 756:7, 758:24, 759:2, 759:6, 766:7, 767:8, 768:10, 775:2, 804:25, 807:11, 808:20, 813:16, 815:6, 817:10, 819:18, 820:1, 822:3
**Rate** [1] - 806:20
**rates** [22] - 638:18, 638:19, 638:20, 690:20, 691:6, 691:8, 691:9, 733:1, 766:6, 766:17, 767:2, 778:2, 779:1, 779:3, 789:20, 789:22, 794:21, 807:13, 821:20
**rather** [1] - 775:1
**RC** [6] - 589:23, 590:2, 590:4, 682:12, 734:3, 737:13

**RC00223105** [1] - 824:24
**RCB** [6] - 624:3, 730:21, 732:1, 768:21, 768:22, 768:25
**RCs** [1] - 728:21
**re** [2] - 846:12, 855:21
**re-ask** [1] - 855:21
**re-asked** [1] - 846:12
**reach** [3] - 600:23, 727:13, 727:15
**reached** [2] - 600:13, 600:17
**reaching** [1] - 592:10
**reaction** [1] - 778:21
**read** [17] - 590:1, 593:2, 623:25, 695:12, 695:22, 697:15, 697:16, 697:23, 726:4, 726:5, 726:7, 745:8, 774:20, 777:15, 794:23, 796:9
**reader** [1] - 628:25
**reading** [4] - 582:25, 596:1, 704:25, 777:1
**ready** [4] - 713:5, 787:24, 838:4, 838:22
**real** [3] - 740:2, 812:2, 836:22
**realize** [1] - 844:17
**realized** [1] - 808:25
**really** [39] - 583:1, 596:6, 655:1, 660:21, 679:3, 685:1, 685:8, 686:19, 687:11, 690:14, 704:3, 707:12, 717:15, 724:16, 724:17, 725:19, 725:22, 726:16, 732:24, 733:5, 734:12, 735:17, 750:17, 750:18, 751:18, 766:24, 812:6, 815:7, 832:17, 836:20, 839:20, 842:8, 843:24, 848:7, 848:14, 851:11, 853:20, 864:17
**reason** [18] - 585:19, 595:11, 609:5, 623:17, 636:15, 699:18, 699:22, 700:1, 700:5, 774:8, 777:12, 783:14,

783:21, 811:16, 830:22, 847:22, 869:12, 869:17
**reasonable** [14] - 591:7, 601:2, 623:1, 623:15, 704:15, 705:25, 707:1, 724:11, 724:12, 733:13, 734:13, 734:22, 740:21, 815:8
**reasonableness** [3] - 704:10, 704:13, 707:14
**reasonably** [1] - 598:1
**reasons** [11] - 584:3, 591:24, 596:12, 616:23, 617:9, 623:4, 638:14, 641:17, 706:23, 784:24, 868:6
**rebuttal** [2] - 587:18, 810:6
**receive** [5] - 629:14, 630:19, 805:8, 850:22, 851:19
**received** [6] - 629:6, 630:1, 631:23, 636:25, 643:7, 666:19
**receives** [1] - 832:24
**recently** [1] - 600:18
**recess** [7] - 600:8, 601:17, 648:25, 713:6, 713:7, 787:17, 787:18
**recognize** [1] - 780:24
**recollection** [1] - 772:18
**reconsider** [1] - 828:14
**record** [17] - 599:14, 603:12, 624:1, 672:23, 704:24, 712:21, 712:23, 719:3, 745:18, 759:20, 781:11, 784:5, 784:6, 786:8, 831:9, 838:11, 871:23
**records** [2] - 671:17, 858:23
**red** [5] - 592:9, 732:2, 844:19, 845:13, 856:2
**redact** [2] - 786:10, 787:4
**redacted** [10] - 785:21, 785:24, 786:21, 787:1, 787:3, 788:2,

788:3, 788:12, 788:21, 816:9
**redirect** [4] - 705:23, 707:20, 713:10, 828:9
**REDIRECT** [2] - 713:13, 828:11
**reduce** [15] - 633:24, 647:9, 717:4, 726:15, 775:16, 775:19, 775:20, 775:21, 775:22, 776:20, 777:3, 777:8, 863:4, 863:6
**reduced** [7] - 634:15, 681:8, 763:13, 763:15, 780:1, 836:22, 864:17
**reduction** [32] - 614:1, 634:3, 634:11, 645:19, 681:1, 681:4, 710:15, 762:7, 762:23, 763:7, 772:24, 773:4, 773:13, 773:16, 775:3, 776:15, 776:24, 778:3, 778:22, 779:3, 779:5, 779:11, 779:13, 779:15, 779:17, 779:25, 802:5, 802:9, 841:14, 841:15, 841:17, 841:24
**Reduction** [1] - 861:18
**reductions** [3] - 634:12, 763:1, 802:4
**refer** [4] - 610:17, 764:12, 847:18, 865:4
**reference** [4] - 588:22, 729:16, 739:17, 790:14
**referenced** [4] - 691:12, 771:16, 810:4, 823:1
**references** [1] - 772:4
**referencing** [1] - 822:23
**referring** [14] - 596:15, 596:23, 623:2, 689:25, 690:13, 691:14, 788:22, 797:5, 802:22, 819:16, 824:2, 824:4, 825:18, 859:10
**Refined** [4] - 731:12,

768:22, 776:16, 777:11

**refined** [209] - 588:5, 588:24, 589:2, 589:22, 590:4, 590:20, 591:11, 613:2, 616:9, 620:9, 621:20, 625:7, 625:8, 625:11, 625:17, 626:4, 626:5, 626:15, 626:20, 627:1, 627:4, 627:7, 627:11, 627:14, 627:17, 627:18, 627:22, 627:24, 628:2, 628:6, 628:11, 628:22, 631:2, 632:10, 638:5, 638:14, 639:25, 642:4, 644:14, 644:18, 645:2, 645:20, 647:24, 648:2, 648:6, 660:9, 660:12, 660:15, 660:16, 663:21, 665:6, 665:18, 665:22, 665:24, 666:17, 667:2, 667:4, 667:5, 670:22, 672:14, 672:25, 673:3, 673:4, 673:19, 673:25, 674:3, 674:11, 674:17, 674:25, 675:8, 675:14, 675:19, 681:25, 682:15, 683:9, 683:12, 683:14, 683:17, 683:20, 684:3, 684:8, 684:19, 685:5, 685:15, 685:22, 686:4, 686:16, 686:21, 691:7, 692:6, 692:7, 692:16, 693:11, 693:21, 693:23, 694:2, 694:10, 694:13, 694:19, 695:21, 696:1, 696:9, 697:6, 697:20, 698:19, 698:25, 700:16, 700:21, 701:5, 701:7, 701:9, 701:12, 701:15, 701:17, 702:2, 702:11, 703:16, 704:7, 705:3, 705:5,

705:8, 705:15, 707:8, 708:9, 708:11, 708:18, 708:20, 709:13, 710:16, 710:20, 710:22, 710:25, 711:8, 711:18, 711:22, 712:2, 712:9, 718:2, 728:21, 730:23, 731:9, 731:14, 731:17, 731:24, 742:19, 744:14, 744:23, 746:21, 746:23, 749:6, 760:11, 760:12, 760:17, 761:11, 761:20, 761:21, 762:1, 764:10, 764:14, 768:12, 776:13, 776:23, 777:23, 778:12, 779:13, 792:2, 812:4, 812:8, 812:12, 812:15, 812:21, 815:10, 815:17, 825:21, 826:6, 827:1, 835:12, 839:15, 842:19, 844:20, 845:6, 845:9, 845:13, 845:15, 845:16, 846:25, 847:2, 847:7, 851:1, 855:10, 856:1, 856:10, 856:22, 860:19, 860:21, 860:23, 862:16, 862:24, 863:5, 863:11, 863:15, 864:2, 864:16, 865:18, 865:24

**refining** [4] - 615:18, 638:18, 639:14, 744:8

**reflect** [3] - 754:11, 763:5, 809:23

**reflected** [3] - 739:10, 740:6, 836:3

**reflects** [3] - 808:20, 809:1, 809:3

**refrain** [1] - 834:10

**regard** [32] - 582:21, 583:25, 584:10, 584:19, 584:20, 585:3, 585:7, 585:9, 586:18, 588:11, 591:20, 597:7, 606:4, 607:4, 607:5, 608:15, 617:7,

623:13, 623:18, 690:12, 702:16, 703:20, 707:4, 707:24, 708:3, 712:21, 784:21, 785:10, 788:11, 805:20, 827:11, 868:13

**regarding** [10] - 582:4, 583:25, 585:4, 592:10, 597:15, 631:8, 652:16, 735:3, 772:12, 773:14

**regardless** [1] - 665:18

**register** [1] - 851:12

**registered** [4] - 848:17, 848:24, 849:19, 849:20

**regulation** [4] - 595:24, 597:12, 608:6, 639:15

**regulations** [2] - 612:12, 652:1

**rejected** [1] - 793:3

**relate** [17] - 580:16, 582:18, 612:4, 646:24, 721:17, 731:23, 732:24, 743:6, 745:3, 761:11, 761:13, 770:22, 770:23, 812:10, 826:14, 835:8, 861:20

**related** [50] - 581:1, 581:19, 583:25, 584:4, 588:15, 593:6, 593:19, 594:5, 597:13, 597:21, 605:18, 607:3, 607:4, 609:6, 610:11, 610:12, 633:25, 640:22, 646:25, 647:21, 647:23, 719:21, 723:16, 726:15, 729:10, 733:3, 733:19, 736:13, 737:14, 738:19, 741:9, 742:20, 744:2, 744:14, 744:21, 744:23, 745:2, 747:23, 747:24, 755:15, 760:4, 761:6, 762:15, 765:21, 782:23, 784:24, 809:6, 817:5, 824:13, 835:9

**relates** [20] - 581:1, 581:16, 581:22, 582:9, 582:19, 591:3, 605:24, 608:18, 638:13, 706:22, 744:25, 749:6, 757:15, 764:15, 783:16, 810:2, 810:9, 837:2, 855:9

**relating** [10] - 609:15, 623:14, 626:5, 633:21, 702:12, 720:2, 721:10, 760:10, 785:24, 826:23

**relation** [1] - 594:14

**relationship** [3] - 734:4, 762:14, 842:12

**release** [3] - 800:17, 800:18, 866:7

**released** [1] - 600:2

**releases** [1] - 800:19

**relevance** [6] - 590:21, 598:13, 805:19, 853:20, 854:11, 855:3

**relevant** [23] - 580:15, 583:10, 584:11, 586:10, 588:10, 590:6, 591:4, 595:4, 608:22, 723:14, 728:2, 761:21, 782:16, 785:2, 785:7, 785:13, 785:15, 827:3, 855:2, 855:10, 868:9, 868:12, 868:20

**relied** [5] - 653:24, 658:4, 771:9, 771:12, 784:16

**rely** [20] - 598:1, 605:10, 615:19, 625:18, 632:12, 635:23, 639:1, 643:2, 643:10, 643:18, 729:5, 742:3, 748:4, 753:16, 756:22, 759:7, 759:15, 771:4, 771:19, 788:23

**relying** [5] - 587:21, 589:1, 636:16, 692:10, 713:23

**remainder** [2] - 788:8, 812:13

**remaining** [1] - 601:13

**remains** [1] - 602:3

**remember** [52] - 612:21, 651:4, 653:16, 655:2, 656:6, 656:9, 656:11, 656:12, 675:21, 679:24, 680:19, 680:21, 681:6, 681:9, 685:7, 687:11, 687:12, 687:15, 689:7, 694:7, 694:11, 700:17, 713:19, 713:24, 715:25, 717:9, 717:23, 732:9, 762:11, 772:16, 774:3, 792:4, 792:5, 799:3, 829:15, 829:19, 829:23, 830:8, 831:12, 831:16, 832:3, 835:20, 844:23, 847:25, 848:7, 848:10, 848:15, 848:18, 849:16, 851:25, 852:2, 855:20

**remind** [4] - 602:19, 767:3, 791:23, 820:3

**removal** [12] - 644:21, 645:18, 646:25, 680:6, 680:8, 691:10, 694:2, 773:19, 774:9, 774:11, 774:12, 776:9

**remove** [5] - 718:20, 726:19, 775:25, 777:8, 785:20

**removed** [5] - 639:19, 640:4, 773:23, 774:15, 774:18

**removing** [3] - 747:25, 786:18, 805:9

**render** [1] - 660:23

**renew** [2] - 600:1, 602:6

**rent** [8] - 724:23, 724:24, 725:2, 725:9, 725:11, 725:12, 727:14, 728:3

**renting** [1] - 765:15

**repeat** [5] - 657:14, 683:10, 696:13, 753:6, 850:13

**repeatedly** [3] - 740:18, 756:23, 783:6

**repeats** [1] - 696:21

**rephrase** [3] - 630:11, 652:17, 654:10
**replied** [1] - 705:13
**reply** [21] - 584:13, 780:7, 780:25, 781:20, 788:5, 789:11, 790:17, 790:23, 791:12, 794:8, 795:4, 795:10, 795:12, 795:18, 795:19, 805:24, 810:8, 810:9, 810:14, 822:17, 836:21
**replying** [1] - 810:11
**report** [112] - 583:19, 583:20, 584:14, 585:13, 587:20, 587:22, 587:24, 588:2, 589:4, 589:10, 590:23, 590:25, 591:23, 591:25, 596:2, 597:19, 598:14, 606:10, 632:19, 632:22, 633:17, 634:16, 635:7, 647:23, 648:9, 648:11, 653:15, 653:20, 653:25, 654:4, 654:11, 654:12, 654:14, 654:19, 654:24, 655:1, 655:5, 655:8, 661:22, 662:1, 672:15, 676:25, 677:11, 677:17, 682:3, 682:6, 682:21, 686:7, 686:9, 686:14, 689:6, 689:16, 691:16, 697:3, 721:11, 726:7, 756:24, 763:1, 771:25, 772:8, 772:15, 772:16, 772:20, 775:13, 775:24, 778:2, 780:7, 780:25, 781:21, 788:23, 789:7, 789:11, 790:13, 790:14, 790:17, 790:22, 790:23, 791:13, 792:18, 792:23, 793:2, 794:7, 794:9, 795:4, 795:5, 795:10, 795:12, 796:3, 796:8, 798:25, 799:2,

799:24, 805:15, 805:24, 806:7, 806:14, 810:6, 810:7, 810:8, 810:9, 810:10, 810:13, 810:20, 814:23, 822:17, 823:20, 826:15, 826:19, 827:4, 827:24
**reported** [1] - 872:20
**reporter** [4] - 596:8, 597:2, 690:5, 724:4
**Reporter** [3] - 872:18, 872:19, 872:24
**REPORTER** [2] - 596:25, 597:3
**reports** [24] - 608:8, 632:8, 632:9, 633:10, 634:23, 653:11, 654:6, 668:13, 676:11, 681:22, 686:24, 723:17, 726:8, 772:5, 779:10, 780:9, 786:24, 788:5, 791:12, 805:15, 818:23, 836:13, 836:15, 836:17
**represent** [1] - 841:9
**representation** [1] - 662:15
**representative** [7] - 838:6, 839:11, 839:14, 840:7, 845:22, 846:10, 846:24
**representatives** [3] - 728:19, 848:2
**represented** [1] - 663:6
**representing** [3] - 837:9, 839:13, 839:15
**represents** [1] - 782:9
**request** [8] - 600:1, 602:6, 603:17, 630:8, 630:17, 788:11, 868:2, 869:18
**requesting** [1] - 696:15
**requests** [1] - 636:16
**require** [1] - 686:1
**required** [5] - 595:1, 597:23, 612:16, 671:7, 716:21
**requirement** [14] - 623:14, 626:24, 627:4, 627:19,

627:22, 628:9, 628:11, 628:14, 634:10, 637:6, 637:19, 637:24, 644:10, 863:10
**requirements** [3] - 634:8, 645:18, 776:4
**requires** [7] - 622:16, 626:20, 627:4, 629:23, 643:20, 644:10, 726:16
**Research** [2] - 719:18, 722:14
**research** [4] - 661:11, 693:3, 723:10, 736:12
**resolve** [3] - 598:23, 598:24, 707:24
**resolved** [1] - 609:22
**Resource** [2] - 861:22, 862:3
**resources** [1] - 842:17
**Resources** [7] - 621:11, 673:21, 731:19, 842:18, 843:3, 849:10, 863:14
**respect** [10] - 689:1, 772:24, 773:10, 776:13, 777:25, 800:24, 804:2, 832:22, 845:18, 846:17
**respects** [1] - 766:18
**responded** [2] - 810:7, 810:14
**response** [20] - 599:6, 599:8, 607:7, 611:15, 630:17, 640:14, 703:3, 754:13, 790:14, 792:19, 810:21, 823:2, 824:1, 853:15, 854:5, 867:21, 867:23, 867:25, 868:20, 871:21
**responses** [1] - 854:7
**responsible** [1] - 641:23
**rest** [5] - 601:23, 650:12, 765:5, 785:6, 822:1
**restate** [1] - 846:1
**result** [8] - 657:21, 663:12, 680:1, 680:25, 738:4, 755:10, 764:24, 767:4
**resulted** [3] - 681:4,

737:16, 753:1
**results** [5] - 755:13, 755:21, 755:23, 769:17, 789:23
**resume** [1] - 602:1
**retrieve** [2] - 831:2, 837:23
**reunion** [1] - 721:5
**reverse** [1] - 829:12
**review** [19] - 586:13, 587:3, 603:3, 604:13, 606:8, 610:21, 631:7, 631:10, 640:12, 646:7, 646:12, 668:2, 764:19, 765:13, 784:11, 792:17, 805:15, 827:15, 836:13
**reviewed** [14] - 586:11, 607:8, 608:10, 640:20, 723:17, 733:22, 771:14, 772:9, 793:1, 799:21, 810:18, 810:19, 867:20, 867:21
**revised** [1] - 793:12
**revisit** [1] - 778:8
**revoked** [1] - 612:17
**rich** [1] - 824:25
**RICHARD** [1] - 578:23
**Rick** [6] - 798:13, 824:25, 825:13, 825:15, 825:16, 825:17
**ring** [2] - 847:16, 847:18
**risk** [2] - 588:8, 869:19
**River** [4] - 604:7, 621:19, 660:1, 675:15
**RLP** [1] - 735:13
**ROBINSON** [1] - 579:8
**Roche** [6] - 582:20, 582:24, 582:25, 583:1, 583:4, 583:8
**role** [1] - 771:4
**roll** [2] - 843:14, 844:2
**room** [1] - 784:5
**rough** [1] - 858:3
**round** [2] - 802:15, 813:10
**rounding** [1] - 789:9
**row** [21] - 621:1, 621:6, 621:10, 621:14, 622:7, 730:1, 731:8, 736:24, 741:17, 741:23, 747:18,

751:20, 761:1, 761:9, 761:10, 761:18, 764:9, 768:6, 768:25, 867:14, 867:15
**rows** [3] - 736:17, 747:11, 759:8
**royalties** [11] - 725:14, 726:1, 727:3, 750:13, 755:13, 756:4, 778:5, 789:20, 808:24, 817:14, 818:4
**Royalty** [1] - 806:20
**royalty** [69] - 724:12, 724:22, 724:23, 725:4, 725:5, 725:10, 725:11, 725:16, 727:1, 727:9, 727:24, 732:25, 733:13, 734:14, 734:22, 736:22, 740:21, 741:8, 741:10, 741:18, 743:19, 743:21, 746:24, 747:1, 749:20, 750:15, 751:5, 751:9, 753:5, 756:1, 756:3, 756:8, 758:24, 759:2, 766:6, 766:7, 766:17, 767:2, 767:8, 778:2, 779:1, 779:3, 789:18, 794:19, 804:4, 804:25, 807:11, 807:13, 807:15, 807:16, 807:19, 807:22, 807:25, 808:1, 808:8, 808:18, 815:6, 815:8, 817:10, 817:20, 817:24, 820:1, 821:8, 829:22, 832:22, 834:18, 837:4
**Rule** [13] - 597:25, 605:15, 605:16, 606:5, 622:11, 622:15, 623:12, 623:14, 626:2, 712:24, 754:10, 853:19
**rule** [12] - 583:14, 600:2, 602:7, 622:24, 623:2, 634:13, 634:14, 634:17, 652:3, 870:10, 871:15,

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna DE 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

871:17
**ruled** [2] - 584:23, 703:20
**rules** [2] - 723:20, 723:24
**Rules** [1] - 595:9
**ruling** [7] - 592:16, 594:11, 597:9, 609:24, 757:6, 757:7, 872:8
**rulings** [3] - 586:4, 598:10, 854:16
**run** [5] - 652:24, 750:12, 790:23, 817:6, 836:10
**running** [10] - 599:17, 741:18, 746:24, 747:1, 749:20, 750:14, 773:23, 774:18, 802:4, 837:3
**runs** [1] - 588:9
**Rush** [3] - 603:14, 659:10, 674:5
**Rutgers** [3] - 721:3, 721:4, 721:7
**Rutledge** [5] - 624:5, 674:25, 761:7, 768:23, 842:15
**Ryan** [2] - 840:23, 841:6

## S

**S-Sorb** [19] - 615:16, 616:5, 616:6, 616:8, 633:22, 662:20, 663:20, 663:21, 686:15, 686:20, 686:25, 688:18, 775:14, 775:15, 775:22, 775:24, 776:8, 777:9
**safety** [4] - 615:16, 617:25, 843:22, 843:23
**salaries** [1] - 857:11
**sale** [3] - 638:14, 640:4, 640:10
**sales** [23] - 589:2, 625:11, 625:17, 626:4, 626:15, 642:4, 672:15, 673:1, 673:3, 673:4, 673:19, 673:25, 674:4, 674:17, 675:8, 675:14, 675:19, 702:2, 736:9, 739:5, 740:5, 766:21, 834:22

**sample** [4] - 684:15, 684:18, 684:20
**samples** [1] - 652:24
**Sargent** [9] - 632:8, 632:19, 632:22, 634:23, 676:11, 676:25, 677:16, 689:5, 691:16
**sat** [1] - 772:1
**save** [3] - 585:24, 622:22, 642:16
**saw** [13] - 585:19, 586:8, 612:19, 685:19, 725:21, 735:23, 758:7, 763:3, 766:5, 768:3, 803:11, 809:7, 861:9
**scale** [1] - 684:4
**scans** [1] - 849:20
**scary** [1] - 854:10
**Schaat** [1] - 730:3
**Schaatt** [2] - 856:6, 856:16
**Schaatt's** [1] - 730:6
**schedule** [8] - 780:12, 789:16, 794:15, 797:17, 802:8, 802:9, 803:25, 808:16
**Schedule** [1] - 810:17
**schedules** [5] - 797:10, 799:18, 801:17, 833:13, 836:17
**school** [1] - 721:7
**Schwartz** [1] - 681:14
**scope** [18] - 583:19, 585:12, 589:4, 591:14, 591:15, 591:22, 591:25, 597:9, 598:14, 606:4, 606:12, 606:18, 607:6, 609:7, 609:13, 609:18, 638:12, 640:11
**SCR** [6] - 645:19, 645:24, 710:11, 711:6, 711:10, 711:12
**screen** [9] - 612:1, 633:16, 716:4, 758:7, 760:9, 760:10, 780:15, 787:1, 861:9
**screwed** [1] - 841:24
**SCRs** [1] - 710:25
**sea** [1] - 721:24
**seat** [1] - 867:15
**seated** [1] - 712:19

**second** [27] - 582:24, 588:12, 600:16, 621:8, 622:23, 623:18, 640:12, 690:19, 691:2, 705:11, 707:4, 724:14, 755:20, 755:22, 761:9, 761:10, 794:16, 799:2, 809:8, 810:7, 815:22, 825:19, 840:19, 850:11, 852:3, 867:14, 867:15
**seconds** [1] - 870:4
**section** [13] - 589:21, 590:13, 682:5, 737:19, 749:9, 752:18, 772:9, 800:16, 801:8, 823:1, 832:9, 863:7, 863:8
**Section** [17] - 585:15, 685:23, 685:25, 686:17, 743:12, 772:4, 776:4, 776:19, 778:23, 779:9, 779:18, 805:8, 806:1, 806:4, 808:21, 863:3, 864:13
**secure** [1] - 794:13
**security** [4] - 843:16, 843:17, 844:2, 865:13
**see** [126] - 582:2, 582:6, 582:18, 584:2, 584:3, 585:6, 585:19, 588:11, 588:13, 593:19, 595:11, 597:20, 598:2, 598:4, 606:15, 610:3, 623:16, 631:22, 633:21, 633:25, 635:22, 640:17, 667:23, 668:5, 668:10, 677:18, 686:2, 691:2, 701:22, 704:18, 715:10, 724:9, 727:21, 728:22, 729:21, 729:24, 729:25, 730:2, 730:4, 730:7, 730:9, 730:14, 730:15, 730:19, 731:7, 731:8, 731:11, 731:15, 731:25, 732:3, 734:9,

734:19, 734:20, 737:2, 738:2, 738:9, 738:10, 738:14, 739:17, 740:17, 740:19, 740:23, 741:18, 743:11, 746:23, 748:14, 749:1, 749:9, 750:5, 750:15, 751:25, 756:2, 757:11, 760:1, 760:9, 760:10, 760:13, 760:14, 761:3, 761:12, 761:18, 761:19, 764:7, 764:15, 767:21, 768:12, 768:18, 776:11, 777:1, 779:1, 782:10, 788:21, 789:1, 790:19, 793:20, 793:22, 796:7, 797:11, 797:14, 799:16, 801:8, 802:23, 804:8, 807:17, 807:18, 807:24, 817:4, 817:6, 819:14, 823:4, 825:8, 825:10, 825:14, 825:19, 825:23, 826:4, 826:8, 826:24, 831:20, 832:9, 841:23, 842:6, 852:23, 853:20, 859:6, 871:4
**seeing** [5] - 668:14, 760:16, 761:9, 827:18, 867:6
**seek** [1] - 870:3
**seeking** [1] - 846:13
**seem** [5] - 583:20, 584:20, 622:20, 831:1, 834:2
**selective** [1] - 645:18
**self** [4] - 658:3, 658:18, 713:23, 866:9
**self-contained** [1] - 866:9
**self-taught** [3] - 658:3, 658:18, 713:23
**sell** [12] - 627:1, 639:18, 639:20, 648:6, 719:25, 812:12, 814:3, 814:10, 841:5, 862:21, 863:23, 866:9
**selling** [8] - 681:24,

698:19, 698:24, 699:15, 711:8, 731:14, 854:13, 863:17
**sells** [1] - 814:8
**seminar** [1] - 650:4
**seminars** [1] - 658:10
**send** [6] - 597:2, 684:14, 684:17, 684:18, 829:6, 848:17
**sending** [1] - 837:24
**sends** [1] - 686:9
**Senescence** [7] - 624:4, 634:21, 642:8, 674:11, 761:6, 768:22, 842:2
**senility** [1] - 842:4
**Senior** [1] - 584:20
**senior** [3] - 585:10, 585:20, 720:12
**sense** [10] - 583:2, 595:19, 599:18, 740:15, 749:4, 779:4, 783:25, 839:6, 854:8, 859:21
**sent** [6] - 636:9, 679:2, 829:1, 849:19, 850:16, 851:9
**sentence** [3] - 590:15, 636:15, 756:14
**sentences** [1] - 588:4
**separate** [2] - 600:5, 703:21
**separated** [1] - 664:6
**separately** [2] - 737:13, 856:8
**separating** [2] - 616:22, 619:11
**separation** [1] - 664:5
**September** [16] - 674:2, 675:3, 738:18, 761:8, 783:11, 790:16, 793:2, 793:16, 794:11, 794:14, 795:1, 795:11, 799:4, 799:21, 800:11, 835:9
**sequence** [2] - 677:20, 729:9
**sequestered** [1] - 870:7
**sequestration** [1] - 602:7
**served** [1] - 851:6
**service** [7] - 601:22, 847:12, 847:14, 847:15, 848:17, 848:24, 849:1

**services** [2] - 721:25, 813:1

**set** [11] - 590:2, 611:18, 653:25, 691:8, 741:12, 779:18, 807:8, 815:22, 816:11, 842:8, 857:13

**sets** [1] - 794:9

**setting** [1] - 793:18

**settle** [1] - 749:18

**settled** [10] - 737:13, 738:20, 748:1, 753:1, 801:8, 803:9, 815:15, 817:11, 823:10, 833:20

**settlement** [6] - 751:14, 752:3, 753:4, 815:16, 824:3, 861:14

**settling** [3] - 584:1, 753:2, 821:2

**seven** [7] - 578:12, 600:12, 601:4, 601:12, 601:14, 601:21, 601:24

**several** [7] - 662:8, 700:24, 744:22, 813:25, 841:18, 844:7, 844:8

**severally** [1] - 768:18

**share** [3] - 856:2, 856:3, 862:21

**sheet** [17] - 583:25, 584:4, 584:7, 615:16, 617:25, 756:20, 757:14, 757:18, 757:19, 757:24, 758:2, 758:6, 803:11, 803:12, 804:7, 804:14, 804:16

**shift** [4] - 778:22, 780:4, 780:5, 805:2

**shifted** [1] - 867:14

**short** [9] - 616:6, 645:19, 648:17, 648:19, 696:19, 738:17, 739:14, 783:11, 793:1

**shortened** [1] - 793:15

**shorter** [3] - 755:22, 792:14, 792:15

**Shorthand** [2] - 872:18, 872:19

**shorthand** [1] - 872:20

**show** [20] - 624:21, 654:24, 688:8, 690:16, 704:16, 714:10, 714:23, 715:2, 721:12, 746:19, 753:24, 780:14, 810:3, 810:17, 827:6, 835:15, 835:18, 849:11, 852:18

**showed** [10] - 643:5, 643:13, 717:9, 726:23, 738:23, 739:9, 760:25, 763:4, 798:15, 852:10

**showing** [3] - 609:11, 733:6, 781:10

**shown** [2] - 784:14, 852:1

**shows** [11] - 730:1, 730:25, 757:16, 782:15, 782:20, 782:21, 783:3, 783:8, 783:12, 824:24, 825:11

**shut** [4] - 609:8, 610:15, 612:18, 866:24

**side** [10] - 585:1, 586:1, 589:6, 593:13, 600:15, 601:6, 730:3, 806:15, 869:24, 872:11

**sidebar** [17] - 605:18, 605:19, 607:21, 610:19, 688:2, 688:3, 688:11, 701:22, 701:23, 706:8, 708:5, 781:14, 781:15, 787:8, 852:24, 852:25, 855:16

**sides** [3] - 583:10, 782:5, 782:7

**sign** [3] - 800:18, 804:18, 829:7

**signature** [2] - 655:6, 655:10

**signatures** [3] - 798:8, 798:10, 798:13

**signed** [14] - 584:1, 590:2, 654:20, 743:18, 798:8, 798:9, 798:14, 798:21, 799:12, 802:2, 803:7, 804:9, 804:10, 804:12

**signing** [3] - 735:21, 800:5, 803:18

**similar** [21] - 626:7, 733:22, 734:1, 734:8, 734:16, 735:10, 736:12, 741:20, 743:3, 743:5, 748:17, 749:2, 749:7, 751:1, 751:2, 755:3, 756:14, 813:7

**similarities** [1] - 734:15

**similarity** [1] - 773:15

**similarly** [3] - 735:23, 783:1, 803:14

**simple** [1] - 829:10

**simply** [7] - 601:12, 726:14, 764:25, 769:1, 774:18, 823:20, 832:20

**single** [6] - 608:21, 732:5, 749:17, 750:4, 751:15

**sit** [2] - 778:11, 867:15

**sitting** [4] - 668:14, 681:7, 732:1, 784:16

**situation** [2] - 581:4, 854:12

**situations** [3] - 720:1, 720:3, 735:9

**six** [6] - 684:11, 684:13, 686:12, 794:18, 804:17, 839:15

**six-year** [1] - 794:18

**skip** [1] - 747:18

**slide** [39] - 583:16, 590:11, 603:6, 603:9, 604:8, 609:9, 620:21, 622:12, 622:21, 624:21, 631:4, 636:14, 642:1, 642:3, 645:4, 662:12, 666:14, 687:4, 688:5, 688:8, 689:7, 689:9, 689:11, 689:15, 689:18, 689:25, 690:9, 715:23, 716:15, 717:20, 747:7, 750:22, 758:18, 760:2, 765:3, 769:14, 851:22, 851:25, 852:2

**Slide** [10] - 666:12, 689:13, 690:13, 690:21, 691:20, 731:5, 733:11, 733:18, 734:25, 741:14

**slides** [20] - 580:24, 582:6, 582:14, 582:17, 583:16, 585:10, 592:9, 593:4, 594:3, 594:4, 594:23, 595:8, 595:10, 598:4, 598:9, 598:12, 598:13, 607:23, 608:1, 691:19

**slow** [3] - 589:25, 617:13, 674:22

**slower** [1] - 871:12

**slowly** [1] - 624:9

**small** [5] - 690:14, 690:19, 785:12, 837:7, 840:22

**smaller** [2] - 821:13

**smoother** [1] - 594:13

**Society** [1] - 721:17

**sold** [26] - 625:6, 625:8, 626:21, 627:17, 627:18, 627:23, 627:24, 638:5, 682:15, 715:13, 717:11, 717:13, 717:17, 717:18, 718:3, 718:13, 737:25, 738:13, 762:1, 762:6, 814:6, 814:9, 814:12, 814:14, 815:1, 834:19

**solely** [4] - 593:24, 629:2, 702:18, 785:24

**solution** [3] - 608:16, 736:15, 742:21

**someone** [4] - 629:2, 698:6, 843:18, 870:5

**sometime** [1] - 833:8

**sometimes** [7] - 762:7, 762:8, 762:22, 774:24, 803:2, 803:3, 834:4

**somewhat** [2] - 802:20, 813:7

**somewhere** [1] - 831:10

**Sorb** [19] - 615:16, 616:5, 616:6, 616:8, 633:22, 662:20, 663:20, 663:21, 686:15, 686:20, 686:25, 688:18, 775:14, 775:15, 775:22, 775:24, 776:8, 777:9

**sorbent** [8] - 615:9, 618:3, 618:15, 619:2, 619:3, 619:12, 716:23, 726:17

**sorbents** [3] - 663:15, 814:12

**sorry** [36] - 589:24, 597:4, 605:2, 620:17, 629:23, 630:11, 632:20, 633:1, 634:13, 634:18, 638:8, 642:22, 644:2, 654:20, 657:14, 667:21, 673:11, 675:23, 676:15, 676:24, 693:13, 694:16, 696:12, 706:10, 714:7, 714:8, 745:1, 763:12, 814:11, 825:4, 825:7, 825:24, 839:18, 847:13, 858:8, 870:7

**sort** [17] - 599:8, 599:14, 639:22, 720:3, 723:15, 732:23, 750:1, 765:13, 768:21, 826:4, 829:12, 840:4, 843:14, 852:5, 856:13, 864:1, 870:7

**sound** [5] - 610:11, 653:18, 654:22, 744:6, 817:23

**sounds** [4] - 591:7, 653:19, 698:7, 864:14

**SP** [2] - 642:6, 642:7

**speaking** [22] - 581:12, 581:18, 582:4, 582:8, 585:13, 585:15, 594:5, 594:8, 595:8, 596:6, 596:9, 596:10, 607:6, 640:18, 641:6, 781:17, 813:2, 822:13, 853:18, 856:1, 872:5

**speaks** [2] - 590:25, 854:8

**specialized** [2] - 692:20, 692:23

**specially** [1] - 628:22

**specific** [11] - 606:7, 609:1, 656:4, 656:7, 665:22, 728:8, 731:1, 740:18, 805:1, 815:4, 837:19

**specifically** [6] - 581:6, 581:20,

598:10, 687:19, 837:2, 868:1

**specifics** [2] - 583:12, 688:20

**specify** [6] - 604:20, 756:3, 756:4, 813:16, 815:6

**speculate** [4] - 850:7, 850:21, 851:18, 858:6

**speculating** [2] - 741:3, 751:17

**speculation** [2] - 826:18, 849:25

**spell** [2] - 719:2, 838:10

**spells** [1] - 850:24

**spent** [1] - 830:2

**spinal** [1] - 600:18

**spiral** [1] - 694:24

**split** [1] - 684:25

**spoken** [1] - 608:23

**spray** [2] - 648:4, 692:24

**sprayed** [3] - 615:17, 616:7, 639:13

**sprayer** [2] - 624:11, 624:14

**sprayers** [3] - 624:3, 856:20, 857:1

**spraying** [1] - 686:22

**spreadsheet** [4] - 717:10, 760:20, 763:3, 834:22

**spring** [1] - 670:16

**Springhill** [8] - 621:10, 673:21, 730:5, 731:18, 842:17, 843:3, 849:10, 863:14

**squarely** [2] - 854:11, 854:15

**stack** [3] - 664:19, 777:17, 807:7

**stacks** [1] - 747:25

**stage** [3] - 583:15, 583:22, 869:16

**stamp** [2] - 848:16, 849:18

**stand** [13] - 587:2, 587:4, 594:19, 595:11, 703:2, 713:6, 718:21, 754:7, 784:17, 787:17, 841:13, 871:19, 872:15

**standard** [1] - 689:4

**standards** [9] - 613:25, 636:18, 644:20, 671:7,

691:10, 694:1, 701:3, 710:14, 776:4

**stands** [2] - 583:4, 861:17

**staple** [2] - 626:22, 627:5

**start** [23] - 580:11, 586:13, 600:11, 608:25, 610:14, 629:23, 633:2, 651:25, 654:18, 655:22, 695:12, 703:6, 733:18, 735:7, 761:1, 761:4, 761:7, 790:15, 792:11, 793:3, 836:18, 837:24, 842:9

**started** [15] - 591:14, 599:5, 601:17, 601:25, 609:10, 649:19, 655:19, 656:1, 656:5, 690:2, 720:19, 723:25, 803:5, 819:23

**starting** [9] - 621:4, 627:1, 661:1, 665:22, 690:6, 765:19, 794:22, 820:1, 859:25

**starts** [4] - 589:11, 610:11, 794:11, 852:14

**state** [19] - 581:1, 581:8, 581:9, 581:11, 581:13, 581:17, 581:20, 582:4, 583:11, 592:11, 593:23, 599:10, 629:2, 640:16, 640:18, 640:21, 703:7, 719:2, 838:10

**state-of-mind** [1] - 581:17

**state-of-mind-related** [1] - 581:1

**statement** [8] - 584:13, 644:5, 695:25, 702:22, 738:24, 739:3, 739:9, 796:5

**statements** [2] - 720:24, 721:13

**States** [2] - 682:16, 720:22

**states** [1] - 612:11

**STATES** [1] - 578:1

**statewide** [1] - 718:4

**station** [2] - 674:18,

675:15

**statute** [5] - 724:1, 724:7, 724:9, 724:14, 732:9

**statutes** [1] - 723:16

**steam** [2] - 863:12, 863:16

**Stenotype** [1] - 872:20

**step** [13] - 588:17, 643:22, 644:12, 644:24, 664:5, 711:17, 712:20, 715:20, 718:19, 724:21, 809:16, 813:21, 837:22

**steps** [2] - 615:6, 809:16

**sticking** [2] - 796:19, 798:23

**still** [14] - 614:19, 632:3, 671:13, 691:9, 697:9, 700:3, 707:24, 710:2, 710:5, 710:9, 710:12, 711:8, 711:18, 870:16

**stipulation** [14] - 793:14, 793:15, 793:18, 794:5, 794:14, 794:25, 795:10, 795:11, 799:4, 799:10, 799:21, 799:22, 799:25, 819:2

**stood** [1] - 841:15

**stop** [5] - 700:8, 808:10, 812:7, 836:18, 867:2

**stopped** [6] - 761:16, 812:5, 812:10, 849:22, 850:17, 851:4

**Storm** [1] - 668:6

**straightforward** [1] - 805:18

**strange** [1] - 842:6

**stream** [1] - 615:10

**stricken** [2] - 630:13, 642:24

**strike** [2] - 640:11, 642:23

**strippers** [1] - 726:22

**structure** [3] - 728:24, 736:22, 751:5

**stuck** [6] - 793:3, 795:2, 795:12, 799:6, 799:8, 799:9

**studied** [4] - 656:21, 672:25, 683:20, 840:16

**stuff** [9] - 584:22, 589:16, 592:11, 664:19, 732:13, 783:21, 784:11, 825:10, 840:5

**sub** [3] - 603:24, 683:4, 721:24

**sub-bituminous** [2] - 603:24, 683:4

**sub-sea** [1] - 721:24

**subheading** [1] - 826:5

**subject** [14] - 659:4, 659:7, 693:4, 695:17, 696:8, 697:5, 697:19, 710:1, 754:5, 754:12, 771:14, 782:3, 785:5, 855:13

**subjective** [2] - 704:2, 706:19

**submission** [1] - 580:2

**submit** [1] - 597:22

**submitted** [4] - 655:1, 780:10, 791:13, 796:14

**subset** [1] - 821:24

**substance** [5] - 605:21, 703:19, 870:12, 871:5, 871:20

**substantial** [22] - 626:23, 627:6, 627:9, 701:14, 701:18, 702:3, 702:14, 702:17, 703:18, 703:21, 704:8, 705:7, 705:17, 706:13, 706:25, 707:6, 707:9, 708:10, 708:20, 717:16, 717:24, 718:5

**substantive** [1] - 703:8

**substantively** [2] - 605:23, 608:3

**sudden** [1] - 800:1

**sued** [3] - 641:24, 748:1, 826:11

**suffer** [1] - 870:20

**sufficiently** [5] - 582:14, 594:10, 609:18, 778:13, 868:18

**sugar** [1] - 696:12

**suggest** [3] - 690:1, 706:23, 777:12

**suggested** [3] -

728:23, 767:7, 796:15

**suggesting** [3] - 702:22, 849:13, 853:14

**suggestion** [4] - 786:10, 850:3, 850:6, 851:9

**suing** [2] - 827:1, 850:4

**suit** [8] - 641:23, 701:16, 702:13, 723:5, 726:2, 741:11, 752:12, 778:25

**sulfur** [15] - 680:9, 681:4, 681:8, 775:16, 775:19, 775:23, 776:8, 776:15, 776:18, 776:21, 776:24, 777:8, 778:19, 779:17, 779:19

**sum** [9] - 749:14, 749:15, 749:16, 749:22, 751:5, 755:5, 817:17, 817:22, 829:18

**Summaries** [1] - 806:20

**summarize** [3] - 622:20, 623:12, 829:25

**summarizes** [1] - 764:9

**summarizing** [1] - 620:23

**summary** [5] - 622:16, 623:15, 735:2, 808:6, 811:7

**summed** [1] - 765:6

**summer** [8] - 656:1, 656:4, 656:13, 656:18, 657:3, 657:13, 657:17, 662:5

**supplemental** [5] - 707:25, 756:24, 796:2, 796:3, 796:8

**supplemented** [1] - 784:4

**supplied** [2] - 626:20, 718:2

**supplier** [3] - 613:2, 683:6, 683:12

**suppliers** [3] - 647:24, 648:2, 686:22

**supply** [10] - 591:12, 645:2, 652:16, 652:20, 653:4,

683:16, 734:10, 735:25, 812:24, 815:5

**supplying** [1] - 791:4
**support** [6] - 617:20, 620:5, 628:13, 629:5, 637:23, 638:2
**supported** [1] - 597:25
**supporting** [3] - 604:10, 611:17, 732:4
**surely** [1] - 586:16
**surprising** [1] - 833:23
**surrounding** [2] - 723:21, 758:21
**sustain** [8] - 583:22, 609:12, 623:19, 623:23, 754:21, 785:9, 806:5, 818:22
**sustained** [5] - 623:22, 630:12, 828:7, 834:9, 835:23
**swallows** [1] - 871:15
**swore** [1] - 780:8
**sworn** [5] - 602:3, 719:1, 719:8, 838:9, 838:15
**Sykes** [8] - 717:9, 746:4, 754:6, 770:3, 784:9, 805:23, 806:2, 826:21
**SYKES** [72] - 579:7, 729:14, 742:9, 745:8, 745:16, 745:22, 746:5, 746:11, 748:10, 754:1, 754:3, 754:9, 757:4, 759:22, 763:24, 767:17, 770:1, 770:5, 781:3, 781:18, 781:22, 781:25, 782:11, 782:20, 782:25, 783:3, 784:15, 785:1, 785:21, 786:2, 786:22, 787:23, 788:1, 788:19, 788:20, 790:3, 790:5, 795:15, 796:7, 796:10, 797:6, 797:9, 805:24, 806:6, 806:10, 806:13, 806:17, 806:19, 808:3, 808:5, 810:23, 811:4, 818:14, 819:6, 819:8, 820:6,

820:10, 822:7, 822:10, 822:19, 822:21, 825:6, 825:9, 826:1, 826:3, 826:22, 827:13, 827:22, 828:8, 832:9, 834:7, 835:21

**synonyms** [1] - 800:20
**system** [17] - 645:19, 651:18, 658:25, 670:3, 671:11, 671:14, 693:22, 694:15, 694:20, 695:16, 696:3, 696:10, 697:7, 697:21, 701:1, 705:4, 852:10
**systems** [30] - 634:19, 651:9, 651:12, 651:16, 651:23, 656:17, 656:22, 656:25, 657:12, 657:16, 657:21, 657:25, 658:2, 658:19, 668:23, 669:7, 669:22, 670:12, 670:23, 671:19, 693:5, 693:10, 693:20, 694:6, 694:9, 699:24, 700:2, 700:15, 714:20, 861:25

---

**T**

---

**Tab** [41] - 604:23, 615:13, 635:10, 635:12, 638:21, 672:23, 673:3, 673:18, 674:3, 674:10, 674:16, 674:24, 675:6, 676:15, 676:16, 677:5, 677:14, 677:19, 677:21, 678:4, 678:15, 729:1, 736:25, 741:24, 745:19, 745:20, 745:24, 745:25, 746:2, 748:2, 751:22, 756:17, 759:12, 763:11, 763:12, 763:17, 767:10
**tab** [5] - 635:3, 676:10, 678:15, 745:24, 780:20
**table** [7] - 613:14,

630:4, 631:19, 633:16, 634:24, 636:21, 867:10
**tabs** [6] - 625:14, 646:10, 676:10, 676:24, 753:11, 780:19
**Tabs** [3] - 610:21, 631:25, 744:17
**tabulating** [1] - 760:20
**tabulations** [1] - 836:16
**tail** [1] - 753:8
**talcum** [1] - 621:25
**Talen** [4] - 813:8, 814:6, 823:10, 826:11
**talks** [7] - 615:4, 634:18, 647:4, 647:5, 647:8, 724:10, 793:22
**tall** [2] - 720:22, 720:23
**taught** [4] - 658:3, 658:10, 658:18, 713:23
**tax** [50] - 666:19, 667:5, 683:21, 685:23, 685:25, 686:17, 686:25, 700:23, 723:15, 723:24, 776:19, 778:13, 778:14, 778:24, 779:14, 779:22, 780:1, 805:2, 805:3, 805:9, 805:14, 806:1, 806:4, 807:16, 807:20, 808:6, 808:9, 808:11, 808:21, 808:24, 831:10, 831:18, 832:1, 832:6, 832:7, 832:14, 832:15, 832:25, 833:2, 833:4, 852:11, 857:25, 859:21, 860:2, 860:6, 860:13, 860:17, 863:4, 863:10, 864:15
**teaching** [1] - 661:19
**team** [1] - 760:19
**Team** [1] - 861:22
**tech** [1] - 786:2
**technical** [17] - 597:21, 597:22, 608:4, 610:4, 610:5, 610:8, 645:13, 723:19, 726:6,

770:16, 770:21, 771:5, 771:10, 773:12, 775:6, 796:11
**technically** [3] - 680:2, 717:2, 771:16
**Technologies** [1] - 861:18
**technologies** [9] - 736:10, 743:3, 748:24, 775:20, 841:14, 841:16, 841:17, 841:24, 862:6
**technology** [89] - 603:22, 629:16, 646:23, 716:6, 717:3, 717:6, 723:12, 724:13, 725:6, 725:8, 725:13, 725:20, 726:12, 733:4, 733:25, 736:7, 736:13, 741:20, 742:18, 742:20, 743:2, 743:5, 743:20, 743:23, 744:22, 746:21, 746:22, 747:24, 748:17, 749:4, 749:17, 749:24, 749:25, 751:2, 752:13, 752:15, 761:16, 765:1, 765:20, 765:21, 766:9, 767:1, 770:18, 770:20, 771:2, 771:6, 771:8, 771:13, 771:15, 771:21, 773:2, 773:16, 773:18, 774:9, 774:11, 775:9, 775:13, 775:15, 775:18, 776:5, 776:7, 776:15, 776:22, 777:7, 777:8, 777:10, 777:13, 778:6, 778:25, 779:2, 802:23, 803:1, 804:5, 805:7, 805:10, 809:1, 809:3, 813:25, 832:23, 833:4, 833:20, 862:8, 862:9, 869:1
**Technology** [1] - 722:3
**telephone** [1] - 772:21
**temperature** [1] -

647:17
**temperatures** [2] - 773:23, 774:18
**temporarily** [1] - 739:23
**ten** [4] - 585:22, 600:13, 803:17, 870:3
**tend** [2] - 767:1, 855:20
**tends** [4] - 727:22, 766:16, 766:22, 827:6
**term** [18] - 583:25, 584:4, 584:7, 735:25, 743:17, 756:20, 757:14, 757:18, 757:19, 757:24, 758:2, 758:6, 803:11, 803:12, 804:7, 804:14, 804:16, 808:12
**terminology** [1] - 840:1
**terms** [38] - 590:14, 671:24, 717:2, 728:3, 728:7, 734:8, 734:9, 734:10, 735:11, 736:5, 737:22, 737:24, 738:3, 738:5, 741:21, 743:14, 743:16, 746:24, 747:15, 749:12, 750:13, 751:2, 752:20, 752:25, 753:5, 757:21, 758:12, 779:4, 782:9, 786:22, 802:21, 807:22, 807:25, 808:18, 823:21, 844:19, 852:6, 864:23
**test** [8] - 624:21, 629:22, 637:16, 684:10, 706:15, 718:6, 718:10, 779:10
**tested** [2] - 685:4, 685:15
**testified** [36] - 640:8, 655:25, 662:14, 664:5, 669:21, 677:9, 678:9, 694:8, 694:13, 704:20, 719:8, 720:5, 770:12, 773:8, 773:22, 775:3, 776:14, 776:22,

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna DE 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

778:1, 783:6, 785:3, 789:8, 793:8, 793:12, 795:9, 799:20, 816:1, 816:3, 828:20, 829:17, 831:18, 832:5, 838:15, 856:16, 860:1, 872:1

**testify** [8] - 592:14, 608:16, 610:4, 791:22, 809:24, 845:22, 847:9, 866:13

**testifying** [3] - 596:5, 606:18, 771:1

**testimony** [101] - 580:17, 586:10, 594:18, 596:3, 597:15, 597:18, 597:23, 597:25, 606:6, 607:3, 607:7, 607:16, 607:22, 607:24, 608:9, 609:5, 609:8, 609:13, 609:18, 609:19, 613:8, 623:11, 631:7, 631:10, 631:19, 638:13, 640:7, 640:11, 640:16, 640:17, 640:22, 651:14, 661:1, 666:11, 666:20, 667:7, 667:13, 667:19, 667:24, 668:2, 668:5, 668:11, 668:15, 668:18, 668:19, 670:21, 679:24, 680:21, 683:25, 692:6, 692:11, 693:18, 694:18, 694:21, 696:5, 696:7, 696:11, 696:22, 697:4, 700:17, 702:5, 703:10, 704:16, 704:23, 705:1, 708:24, 711:3, 723:7, 723:9, 735:23, 772:1, 779:6, 782:12, 783:5, 783:10, 785:16, 791:20, 792:4, 792:5, 797:2, 803:4, 805:20, 806:3, 807:8, 808:2, 808:19, 813:5, 814:19, 829:21, 848:2, 848:5, 855:7, 867:4, 868:4,

870:13, 870:23, 871:6, 871:20, 871:22, 872:6

**testing** [10] - 639:12, 684:3, 684:4, 685:10, 685:20, 685:22, 686:3, 686:9, 686:20, 864:20

**tests** [3] - 652:24, 718:7, 721:10

**Texas** [6] - 840:16, 840:22, 841:1, 841:7, 841:8, 844:10

**that..** [1] - 870:9

**THE** [257] - 578:1, 578:2, 580:1, 586:8, 587:5, 587:11, 587:16, 587:23, 588:3, 588:10, 588:16, 589:5, 589:13, 589:15, 589:20, 589:25, 590:18, 591:7, 591:13, 591:20, 592:5, 592:16, 593:3, 593:9, 593:13, 593:15, 593:25, 594:24, 595:25, 596:4, 596:6, 596:18, 596:25, 597:2, 597:3, 597:5, 598:2, 598:8, 598:21, 599:2, 599:21, 600:5, 600:10, 601:8, 601:10, 601:20, 602:12, 605:17, 605:20, 606:13, 606:20, 607:1, 607:13, 607:18, 610:10, 611:6, 611:10, 611:15, 611:20, 615:24, 616:1, 617:12, 622:14, 622:23, 623:5, 623:9, 623:13, 624:8, 625:22, 626:1, 626:4, 626:11, 629:11, 630:6, 630:12, 632:17, 632:20, 632:23, 633:4, 633:6, 635:9, 635:15, 635:18, 636:3, 636:5, 638:8, 638:13, 639:5, 639:7, 640:6, 640:12, 640:20,

641:2, 641:5, 641:14, 641:17, 641:19, 642:24, 644:2, 644:6, 645:1, 645:2, 646:17, 646:19, 648:16, 648:17, 648:19, 648:23, 649:2, 649:4, 672:19, 673:13, 675:25, 676:20, 677:23, 688:2, 688:4, 688:10, 688:12, 689:23, 691:2, 695:3, 696:18, 696:21, 696:22, 700:9, 700:11, 701:22, 701:24, 702:9, 702:21, 703:3, 703:13, 704:5, 704:18, 704:24, 705:13, 705:21, 706:7, 706:21, 708:6, 709:22, 712:14, 712:19, 713:10, 718:18, 718:25, 719:2, 719:4, 722:21, 724:2, 729:13, 729:16, 733:12, 742:8, 742:10, 745:7, 745:10, 746:1, 746:4, 746:9, 746:12, 748:9, 748:11, 753:6, 753:8, 753:21, 753:25, 754:2, 754:6, 754:13, 754:20, 757:3, 757:5, 759:21, 759:23, 763:23, 763:25, 767:16, 767:18, 769:24, 770:3, 781:4, 781:14, 781:16, 781:19, 781:23, 782:5, 782:17, 782:23, 783:1, 783:14, 784:9, 784:19, 785:8, 785:23, 786:4, 786:9, 786:13, 786:20, 787:5, 787:7, 787:9, 787:16, 787:21, 788:11, 797:8, 805:17, 805:23, 806:2, 810:24, 811:1, 818:16, 818:22, 822:9,

825:8, 826:2, 826:21, 827:9, 828:2, 828:6, 828:9, 834:9, 835:23, 837:22, 838:1, 838:3, 838:8, 838:10, 838:12, 844:15, 846:1, 846:5, 846:11, 850:1, 850:11, 850:13, 851:15, 851:18, 852:23, 853:1, 853:10, 853:24, 854:21, 855:4, 855:17, 858:20, 858:22, 866:14, 867:3, 867:9, 870:10, 870:22, 871:4, 871:18, 872:11, 872:14

**theatrical** [1] - 599:19

**themselves** [4] - 594:4, 670:15, 784:1, 815:11

**there'll** [1] - 586:22

**thereafter** [1] - 868:16

**therefore** [1] - 701:17

**thereof** [4] - 617:16, 617:19, 620:3

**Thereupon** [21] - 605:19, 611:23, 616:2, 626:12, 633:7, 636:6, 639:8, 646:20, 688:3, 701:23, 729:18, 742:11, 746:13, 748:12, 757:9, 759:24, 764:1, 767:19, 781:15, 811:2, 852:25

**thereupon** [1] - 788:17

**they've** [5] - 582:14, 605:13, 665:2, 706:3, 717:11

**thick** [1] - 808:15

**thinking** [16] - 725:20, 725:21, 727:3, 727:4, 728:11, 728:18, 736:8, 740:21, 741:4, 765:13, 765:15, 766:12, 766:13, 773:3, 779:4, 783:17

**thinks** [3] - 593:6, 831:1, 845:20

**third** [7] - 761:18, 763:15, 783:1, 783:3, 818:3, 821:6,

821:10

**thorough** [2] - 824:10, 850:23

**thoroughness** [1] - 827:23

**thousand** [3] - 803:24, 810:15, 813:23

**thousands** [1] - 706:4

**thousandths** [1] - 813:22

**three** [24] - 588:19, 654:6, 657:6, 662:4, 734:15, 734:18, 735:7, 735:9, 736:17, 743:17, 743:21, 745:3, 747:11, 796:4, 822:2, 822:4, 825:20, 825:21, 826:5, 826:6, 826:7, 826:10, 827:1

**three-pennies-per-ton** [1] - 822:2

**through..** [1] - 632:4

**throughout** [5] - 584:6, 747:2, 747:3, 750:5, 756:24

**tie** [2] - 795:16, 795:22

**tied** [1] - 609:17

**tight** [1] - 585:24

**timely** [2] - 622:17

**timing** [1] - 766:5

**tiny** [3] - 821:18, 865:3

**title** [4] - 806:18, 822:20, 823:23, 847:4

**Title** [2] - 700:23, 701:2

**titled** [2] - 729:25, 788:24

**titles** [1] - 586:15

**to..** [1] - 865:22

**today** [39] - 580:16, 580:17, 586:12, 587:5, 591:21, 592:12, 597:9, 598:11, 598:24, 600:21, 601:3, 608:9, 609:14, 645:7, 645:12, 647:20, 668:14, 678:10, 681:7, 687:16, 688:23, 692:5, 707:25, 710:3, 710:5, 710:9, 710:12, 711:9, 711:14, 711:18, 769:22, 777:17, 778:11, 780:12, 790:10, 867:5,

871:11, 871:13
**today's** [1] - 732:22
**together** [7] - 636:17, 711:22, 711:24, 795:16, 795:22, 833:24, 836:20
**tomorrow** [3] - 867:6, 871:8, 872:3
**ton** [64] - 737:24, 738:12, 740:12, 740:18, 740:20, 741:18, 741:19, 743:20, 743:22, 744:1, 746:25, 750:8, 750:11, 751:9, 751:16, 755:5, 755:12, 755:14, 756:1, 756:3, 756:7, 756:11, 758:24, 759:2, 759:6, 763:9, 765:12, 769:18, 769:20, 782:13, 789:24, 791:24, 792:2, 792:10, 799:13, 801:13, 803:21, 804:4, 808:2, 808:7, 808:9, 808:13, 808:20, 813:12, 813:16, 813:19, 815:7, 816:2, 817:20, 817:24, 818:1, 818:5, 818:8, 819:18, 820:1, 820:15, 821:13, 822:2, 834:18, 835:12
**tone** [1] - 853:25
**tonight** [1] - 870:1
**tonnage** [50] - 740:7, 754:5, 754:11, 755:18, 759:3, 763:13, 768:2, 768:6, 768:10, 768:25, 769:1, 781:6, 781:10, 782:1, 782:3, 782:9, 782:20, 783:7, 789:6, 789:12, 789:13, 789:17, 793:21, 794:1, 794:19, 794:22, 796:24, 797:1, 797:3, 803:23, 814:18, 815:1, 816:5, 817:20, 818:6, 818:7, 818:10, 818:11, 818:13, 820:2,

820:22, 821:4, 821:9, 821:16, 822:1, 834:15, 834:17, 834:23, 835:1, 858:2
**Tonnage** [1] - 788:24
**tonnages** [10] - 789:8, 801:12, 814:23, 815:25, 816:6, 816:10, 817:1, 820:13, 830:25, 836:20
**tons** [64] - 706:5, 717:10, 718:13, 724:18, 724:19, 739:1, 739:4, 739:8, 739:16, 741:1, 750:6, 755:15, 756:5, 760:17, 760:21, 761:19, 761:23, 762:23, 763:8, 764:10, 764:14, 769:19, 782:15, 783:6, 783:18, 789:12, 789:19, 789:22, 789:23, 791:15, 792:9, 792:10, 793:23, 793:24, 794:2, 795:23, 796:20, 797:23, 799:12, 800:9, 800:10, 801:3, 801:5, 801:6, 801:9, 804:25, 813:4, 813:8, 813:9, 813:11, 813:13, 815:6, 817:25, 821:12, 821:15, 833:13, 834:17, 835:7, 836:3, 836:8, 836:22, 860:4, 860:7
**took** [11] - 637:19, 638:2, 649:11, 651:4, 676:24, 693:7, 693:18, 698:14, 698:23, 804:17, 862:13
**top** [7] - 730:1, 759:8, 767:22, 789:20, 790:6, 823:3, 857:21
**topic** [5] - 624:18, 645:7, 645:15, 646:5, 647:18
**total** [7] - 583:1, 654:6, 738:9, 762:23, 764:13, 819:19, 819:20
**totally** [1] - 584:17
**totals** [1] - 764:13

**towards** [2] - 666:11, 672:8
**town** [1] - 840:22
**trade** [1] - 774:25
**trademarks** [1] - 719:22
**training** [2] - 652:13, 661:15
**trainloads** [1] - 821:17
**traipsed** [1] - 609:10
**transaction** [1] - 735:22
**TRANSCRIPT** [1] - 578:9
**transcript** [4] - 596:17, 596:22, 695:6, 810:3
**transfers** [2] - 683:7, 683:12
**translate** [1] - 755:11
**translated** [1] - 755:4
**treasury** [1] - 856:13
**treated** [4] - 663:8, 685:6, 743:22, 778:13
**trees** [1] - 721:23
**trial** [36] - 580:11, 580:12, 586:24, 596:5, 596:16, 596:22, 601:5, 601:14, 601:24, 601:25, 607:6, 681:16, 681:17, 688:23, 706:3, 726:10, 752:6, 756:21, 811:10, 828:17, 834:21, 837:18, 847:23, 853:3, 853:7, 853:9, 853:11, 853:21, 854:7, 856:18, 864:8, 864:21, 865:5, 868:3, 870:25, 872:2
**TRIAL** [2] - 578:9, 578:11
**Trial** [12] - 748:3, 753:12, 756:18, 757:2, 759:18, 763:17, 763:22, 764:16, 767:11, 767:15, 769:5, 769:9
**trials** [1] - 854:10
**Tribes** [1] - 862:3
**tried** [2] - 586:9, 714:4
**trouble** [1] - 754:7
**true** [13] - 658:3, 669:25, 684:9, 700:6, 705:23, 707:12, 747:14, 773:11, 773:21,

780:9, 792:10, 820:24, 830:13
**trust** [1] - 740:11
**truthful** [1] - 704:3
**try** [17] - 580:9, 587:13, 605:21, 635:13, 696:22, 727:13, 728:2, 750:19, 770:19, 805:17, 820:13, 820:22, 822:11, 853:7, 866:8, 869:9, 872:4
**trying** [21] - 585:21, 596:9, 597:8, 671:1, 685:2, 690:1, 691:13, 704:17, 727:5, 733:21, 734:13, 751:15, 815:7, 830:3, 846:18, 847:3, 852:4, 859:7, 864:9, 865:5, 866:12
**turn** [24] - 602:1, 635:12, 677:5, 677:14, 678:15, 688:14, 695:9, 697:12, 712:12, 729:1, 737:19, 741:14, 741:24, 744:17, 751:22, 752:17, 753:11, 756:17, 759:12, 763:11, 763:17, 764:8, 767:10, 820:5
**turned** [4] - 762:9, 762:22, 803:11, 851:7
**turning** [2] - 629:22, 637:4
**turns** [1] - 840:15
**twice** [3] - 684:10, 782:12, 792:8
**two** [32] - 588:4, 588:9, 606:16, 606:23, 622:18, 622:21, 623:17, 675:5, 684:25, 694:24, 695:7, 723:22, 726:15, 726:16, 745:3, 761:3, 766:6, 773:6, 773:7, 795:9, 803:2, 807:5, 809:16, 813:21, 815:25, 824:19, 825:12, 826:12, 833:23, 854:6, 866:23, 871:13
**two-part** [1] - 726:15

**two-step** [2] - 809:16, 813:21
**type** [11] - 592:11, 597:23, 603:21, 621:16, 621:23, 621:24, 630:20, 633:19, 756:8, 765:1, 840:11
**types** [4] - 604:3, 734:15, 736:12, 742:22
**typically** [3] - 639:18, 809:6, 843:20

---

**U**

---

**U.S** [2] - 651:25, 872:24
**U.S.M.J** [1] - 578:12
**ultimate** [5] - 581:24, 594:9, 594:21, 767:4, 836:25
**ultimately** [4] - 594:25, 595:3, 756:20, 837:3
**unable** [2] - 600:19, 762:14
**uncertain** [2] - 829:22, 830:3
**uncertainty** [1] - 758:21
**uncomfortable** [2] - 848:12, 848:13
**under** [18] - 581:4, 590:3, 754:10, 763:13, 779:15, 784:3, 791:13, 791:24, 791:25, 792:8, 805:12, 812:16, 818:17, 820:12, 826:4, 859:20, 863:22
**undergraduate** [1] - 721:3
**underlying** [2] - 740:5, 801:12
**underneath** [1] - 721:24
**understood** [13] - 641:6, 653:20, 654:1, 654:14, 671:25, 773:2, 775:11, 775:18, 788:7, 810:1, 832:22, 859:4, 859:9
**undisputed** [1] - 793:19
**unfortunately** [1] - 647:6

unit [1] - 829:22
United [2] - 682:16, 720:22
UNITED [1] - 578:1
units [1] - 670:15
University [3] - 721:4, 840:16, 841:2
unless [3] - 595:13, 713:3, 854:9
unpack [1] - 695:25
unreasonable [1] - 623:17
unredacted [1] - 818:15
unrelated [1] - 609:7
unusual [2] - 692:14, 839:23
up [112] - 583:13, 586:6, 587:3, 589:6, 590:16, 592:9, 592:25, 594:16, 594:19, 594:23, 595:11, 596:21, 598:24, 602:19, 610:3, 630:5, 655:4, 657:3, 657:10, 658:17, 666:22, 670:3, 670:4, 681:10, 682:3, 687:3, 689:9, 689:13, 690:4, 690:15, 699:5, 701:5, 705:23, 707:19, 708:16, 709:16, 711:4, 714:7, 716:23, 717:20, 721:5, 721:12, 724:4, 724:21, 725:5, 726:21, 727:24, 730:6, 730:7, 731:11, 731:15, 732:23, 738:23, 745:9, 747:25, 751:15, 753:5, 754:18, 758:16, 764:4, 765:6, 765:11, 769:1, 772:19, 778:19, 779:18, 788:16, 789:11, 796:19, 800:2, 801:10, 801:11, 802:15, 803:21, 803:25, 804:7, 804:14, 806:7, 806:11, 818:6, 818:7, 819:24, 820:14, 820:20, 821:15, 822:1, 822:12,

829:18, 830:3, 830:16, 830:18, 830:20, 833:25, 837:3, 840:21, 841:24, 842:8, 842:20, 843:14, 844:2, 849:20, 852:11, 856:19, 857:13, 862:7, 867:15, 870:25, 872:12
updated [1] - 797:16
upfronted [3] - 666:17, 667:1, 667:4
upstream [6] - 617:17, 620:3, 620:9, 671:25, 672:3, 672:4
usage [1] - 750:2
useful [5] - 603:22, 639:21, 733:23, 759:5, 759:9
uses [9] - 612:11, 660:12, 701:8, 705:5, 705:17, 708:11, 708:20, 755:18, 755:22
Utah [1] - 844:11
utilities [11] - 811:18, 812:17, 823:7, 823:10, 824:17, 825:21, 826:7, 826:10, 827:1, 862:20, 862:21
utility [5] - 642:14, 811:12, 813:3, 822:13, 827:8
utilized [2] - 606:3, 706:24

## V

valid [6] - 711:13, 723:1, 727:18, 727:22, 738:8, 753:3
validates [1] - 703:11
validity [2] - 766:13, 770:22
Valley [2] - 603:15, 659:23
valuable [1] - 814:4
valuation [4] - 719:20, 720:16, 721:14, 721:16
valuations [1] - 721:18
value [17] - 719:25, 725:25, 766:10, 776:16, 776:23, 777:4, 777:9,

777:10, 808:21, 809:1, 809:3, 813:24, 817:1, 832:14, 857:25, 859:21
values [2] - 817:18, 860:2
variety [3] - 774:12, 774:14, 817:5
various [2] - 731:24, 742:22
varying [1] - 639:13
vehicle [1] - 856:1
verdict [1] - 781:8
version [9] - 711:3, 785:21, 785:24, 787:3, 788:2, 788:3, 788:15, 788:21, 796:18
versions [1] - 788:12
versus [5] - 700:16, 712:2, 770:9, 802:7, 820:25
video [5] - 612:19, 667:13, 671:8, 843:23
view [22] - 582:1, 582:20, 582:25, 585:23, 592:10, 594:21, 595:3, 598:17, 598:20, 599:18, 609:17, 704:6, 704:9, 704:11, 704:21, 733:24, 734:6, 758:21, 758:22, 819:18, 844:18, 862:15
Virginia [1] - 668:6
vis-à-vis [1] - 871:7
visit [2] - 658:21, 659:6
visited [12] - 658:16, 658:24, 659:10, 659:13, 659:16, 659:19, 659:22, 659:25, 660:3, 660:6, 660:9, 660:12
Vistra [4] - 813:3, 823:4, 823:10, 826:11
Volume [8] - 578:7, 604:24, 632:3, 672:15, 676:2, 695:5, 695:6, 697:9
volume [3] - 632:2, 632:6
VP [1] - 847:1
vs [1] - 578:6

## W

W.A [4] - 603:13, 659:19, 668:9, 674:11
waiting [4] - 597:5, 598:22, 599:3, 785:9
waived [1] - 608:2
walk [10] - 582:14, 614:22, 621:1, 643:17, 643:23, 647:20, 727:14, 843:14, 869:9, 869:10
walked [7] - 603:17, 614:18, 615:6, 630:4, 662:8, 714:9, 747:10
walks [2] - 582:2, 594:10
walls [1] - 865:12
wants [5] - 585:8, 586:6, 599:19, 764:5, 785:19
warner [1] - 872:18
Warner [1] - 872:23
warranted [1] - 869:13
WARREN [1] - 578:21
WAS [1] - 730:6
watch [1] - 843:23
watched [2] - 772:1, 840:3
water [1] - 721:24
ways [5] - 716:11, 740:24, 759:3, 774:13, 774:15
website [5] - 842:22, 849:4, 849:6, 849:7, 849:11
week [8] - 669:23, 744:6, 772:1, 803:17, 804:22, 833:25, 861:15
weeks [7] - 772:19, 799:9, 804:17, 824:20, 825:12, 826:12, 871:25
welcome [2] - 580:1, 672:19
whatnot [1] - 856:20
wherein [3] - 617:11, 617:15, 620:1
Whinney [1] - 720:20
Whitney [8] - 612:20, 667:13, 668:21, 669:10, 669:21, 671:1, 671:8, 762:8
whitney's [1] - 668:18
whole [8] - 764:9,

785:5, 803:17, 820:20, 823:1, 828:17, 847:23, 871:11
wide [1] - 823:4
wild [1] - 858:3
willful [2] - 643:5, 643:14
willing [2] - 727:23, 803:22
WILSON [1] - 579:7
win [1] - 583:7
wind [3] - 726:21, 730:7, 778:19
winds [1] - 725:5
wish [2] - 635:15, 872:14
wishes [3] - 586:1, 819:5, 869:24
withdraw [2] - 688:9, 834:14
withdrawn [3] - 688:12, 786:14, 837:17
WITNESS [15] - 630:6, 641:19, 645:2, 648:17, 691:2, 696:21, 719:4, 733:12, 746:9, 753:8, 825:8, 838:12, 850:13, 851:18, 858:22
witness [68] - 587:8, 593:22, 597:18, 600:3, 602:3, 605:13, 606:2, 606:21, 607:6, 622:19, 623:11, 644:7, 648:15, 648:19, 649:15, 672:20, 673:12, 689:22, 693:9, 695:1, 695:3, 707:5, 707:7, 707:12, 707:17, 707:18, 712:12, 718:21, 718:22, 718:24, 719:7, 724:3, 753:6, 754:22, 769:23, 771:1, 784:12, 786:23, 797:6, 806:3, 819:4, 826:1, 827:10, 828:5, 828:8, 834:8, 835:22, 838:14, 839:5, 839:24, 845:20, 846:8, 846:15, 847:10, 853:12, 853:22, 870:11, 870:13,

870:16, 870:17, 870:20, 870:21, 870:22, 871:2, 871:6, 871:21, 872:6

**witness's** [2] - 805:19, 870:12

**witnesses** [7] - 723:18, 782:8, 839:6, 871:10, 871:14, 871:25, 872:1

**wondering** [3] - 600:11, 711:10, 864:8

**word** [3] - 802:14, 811:11, 842:2

**wording** [2] - 703:5, 735:21

**words** [12] - 581:12, 582:10, 586:22, 593:10, 640:19, 663:8, 734:1, 736:14, 740:11, 740:16, 746:24, 763:3

**work's** [1] - 683:23

**works** [9] - 619:19, 649:12, 670:14, 678:25, 769:4, 771:8, 799:13, 800:3, 804:22

**world** [1] - 720:14

**worth** [2] - 598:8, 755:4

**would've** [1] - 733:13

**wound** [1] - 747:25

**wrap** [1] - 822:11

**write** [3] - 784:21, 834:5, 867:24

**writing** [1] - 829:1

**written** [2] - 618:11, 851:14

**wrote** [5] - 668:12, 784:21, 808:14, 829:12, 867:25

**Wyoming** [1] - 844:11

## X

**Xs** [2] - 735:8, 736:17

## Y

**yard** [1] - 684:21

**year** [17] - 649:11, 651:5, 651:19, 668:12, 669:23, 680:14, 680:15, 680:16, 684:10,

694:7, 708:15, 794:18, 798:24, 799:6, 799:8, 799:9, 812:13

**years** [15] - 607:15, 649:14, 661:5, 680:22, 700:21, 700:24, 717:11, 721:22, 743:17, 743:21, 798:23, 803:3, 841:18, 843:14, 866:24

**yellow** [2] - 732:2, 761:1

**yesterday** [19] - 598:11, 608:9, 609:9, 612:19, 614:3, 647:20, 666:11, 667:12, 669:21, 735:23, 737:12, 738:21, 752:21, 758:7, 782:12, 791:18, 809:25, 813:3, 860:1

**York** [1] - 720:23

**you-all** [1] - 595:17

**Young** [1] - 720:21

**yourself** [4] - 679:4, 684:7, 719:14, 840:20

## Z

**zoom** [3] - 767:22, 800:16, 806:15

**ZURLO** [1] - 579:8