IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE


MIDWEST ENERGY EMISSIONS CORP., et )
al.,                               )
                                   )
-------------------Plaintiffs,     )
                                   ) Case No.
 vs.                               ) 19-CV-1334-CJB
                                   )
ARTHUR J. GALLAGHER & CO., et al., )
                                   ) Volume IV
-------------------Defendants.     )


TRANSCRIPT OF JURY TRIAL


JURY TRIAL had before the Honorable Christopher J. Burke, U.S.M.J., and a jury of seven in Courtroom 2A on the 29th of February, 2024.



APPEARANCES

DEVLIN LAW FIRM
     BY:  JAMES LENNON, ESQ.
          PETER MAZUR, ESQ.

                      -and-

CALDWELL CASSADY & CURRY
     BY:  BRADLEY CALDWELL, ESQ.
          JASON CASSADY, ESQ.
          JOHN CURRY, ESQ.
          JUSTIN NEMUNAITIS, ESQ.
          WARREN MCCARTY, III, ESQ.
          DANIEL PEARSON, ESQ.
          ADRIENNE DELLINGER, ESQ.
          AISHA HALEY, ESQ.
          RICHARD COCHRANE, ESQ.

                      Counsel for Plaintiff

(Appearances continued.)


      MORRIS JAMES LLP
          BY:  CORTLAN HITCH, ESQ.
              KENNETH DORSNEY, ESQ.

                          -and-

      BRADLEY ARANT BOULT CUMMINGS LLP
          BY:  JEFF DYESS, ESQ.
              PAUL SYKES, ESQ.
              BENN WILSON, ESQ.
              ASHLEY ROBINSON, ESQ.
              JESSICA ZURLO, ESQ.

                          Counsel for CERT Defendants

(The jury entered the courtroom.)

THE COURT:  All right.  When we left off yesterday, we were having initial questioning by Plaintiffs' counsel of Mr. Green.  Let's have Mr. Green come forward. He remains sworn.

You can be seated.

All right, Mr. Caldwell, whenever you're ready.

MR. CALDWELL:  Thank you.

DIRECT EXAMINATION

BY MR. CALDWELL:

Q.    Situated and comfortable?  Ready to go?

A.    I'm ready to go.

Q.    Mr. Green, I want to pick up pretty close to where we were and not be too redundant, but sort of as a reminder, thinking about what's required for tax credits, you can't be sort of just making coal and putting it in a parking lot with no expectation of use; right?  You needed to be intending for that coal to be used to make steam?

A.    I would agree with that, yes.

Q.    And consistent with our discussion, when you're making what you guys call refined coal at, for example, Big Cajun II, you're wanting that to be burned at Big Cajun II, not at some other plant for some other process; correct?

A.    No, I wouldn't agree with that.

Q.    Did you ever take it to some other plant?

A.     Not to my knowledge.  We did not.

Q.     You want the coal to be burned; right?

A.     That's correct.

Q.     And that's going to happen in the coal combustion process at Big Cajun II; correct?

A.     I don't agree with your statement.

Q.     Where was the refined coal at Big Cajun II burned then, sir?

A.     It was burned at Big Cajun II.

Q.     And what is it you disagree with?

A.     That our expectation is that it would be burned there.  The power plant or NRG, who that was sold to, we weren't -- they weren't required to burn it there.  They purchased a product from us.  It was produced at Big Cajun II.

Q.     So yesterday you testified and I quote, after I asked:

"In every one of these instances where you're operating a refined coal facility, your expectation is it will go into the boilers at that facility; correct?

And your answer was:  "I would say that's our overall expectation."

Was that accurately captured by the court reporter?

A.     Yes, sir, I did say that was our overall expectation.

Q.    So are you walking that back today?

A.    No, I'm saying that Big Cajun II has no obligation to burn the fuel they purchase in their boiler.

Q.    I really just want a clear answer as to your expectation.  When you guys made refined coal at one of these plants, you wanted it to get burned so you can claim a tax credit; correct?

A.    No question about that.

Q.    And you expect that to happen at the coal plant where you created that refined coal; right?

A.    That is not an obligation of the contract of where they burn that coal.

Q.    Did I ask anything about, like, obligation of a contract?

A.    It would make the most sense that that coal is burned at Big Cajun II.

Q.    Mr. Green, when you make refined coal at your Big Cajun II refined coal sprayers, it is CERT's expectation it will get burned at Big Cajun II; correct?

A.    We do not have an expectation, and I don't know what you're referring to as "sprayers."

Q.    So yesterday, when I said your expectation, it was -- it will go into that -- I'm sorry.  Lost track.

Yesterday, when I asked you:  "Your expectation is it will go into the boilers at that facility; correct?

And you said:  "I would say that's our overall expectation."

That's what you testified here in court under oath; correct?

A.     You're reading from the testimony, yes.

Q.     And today, you're saying you did not have that expectation?

A.     I'm not trying to be argumentative.  I'm telling you that it makes the most sense that Big Cajun II would burn that coal.  If that's an expectation as where it will be burned, then I would agree with you.  I'm saying we do not have -- Big Cajun II does not have an obligation to burn that coal.  I do agree with your statement that we do expect that coal to be burned to generate heat to make steam to make electricity.  That is our expectation.

Q.     Let's approach it slightly differently.  When you make refined coal at Big Cajun II, you weren't expecting it to be burned anywhere other than at Big Cajun II; right?

A.     It made the most sense to be burned at Big Cajun II, yes, it did.

Q.     And for W.A. Parish, when CERT made refined coal at W.A. Parish, you were not expecting it to be burned anywhere else than in the coal combustion process at W.A. Parish; correct?

A.     There was no expectation it would be burned somewhere else.

Q.    And the same thing for Coleto Creek; correct?

A.    Correct.  I mean, all of those would fall under the same impression that that coal is being sold to a utility where it's located at that plant.  If there were economic incentives for them to move it somewhere else they could burn it -- but I'm not saying that we never expected that coal to not be burned for the production of electricity.

Q.    At the plant where you turned it into refined coal; correct?

A.    Our expectation is that we would be paid for the refined coal that we were producing and selling to a utility.

Q.    I'm asking you questions about location and you're telling me things about selling.  Your expectation is the coal, the refined coal you make, will be burned in the coal combustion process at the plant where you made the refined coal; correct?

A.    All of it was.

Q.    You've been here for the whole trial; right?

A.    Yes, sir.

Q.    And you remember your lawyer said in opening he's, like, well, there's some questions that get to our state of mind, so you're going to have to look at the credibility of the witnesses, and only our witnesses can tell you about our state of mind.

Do you remember stuff like that?

A.    I do.

Q.    And you also remember the judge said there's direct evidence and there's circumstantial evidence of what was going on and the facts that the jury gets to determine?

A.    Yes, sir.

Q.    Is this the reason you're refusing to answer this question about whether in each instance you expected the coal to be burned in the combustion process at the plant where you made it?

A.    I'm just -- I'm here to testify about facts. We were selling refined coal from a facility that was located at a power plant. It makes the most sense that it would be burned at that power plant. All of the coal produced at those power plants was burned at those power plants.

        I can't speak to the state of mind of what a utility is going to do that has the contractural rights to burn that coal anywhere.

        We produced coal at those facilities, yes, that is correct.

Q.    And you wanted the coal to be burned in a steam generation electrical process; right?

A.    Yes, sir, that is correct.

Q.    And had no expectation that it would in any other steam-generation process than the one at the plant where you

made that coal.  You had no other expectation; right?

A.    I am not trying to argue, sir.  I'm just saying we have an expectation that that coal is going to be used to produce power.

Q.    When I said:  What do you expect?

You say:  I'm not sure.  They can contracturally move it somewhere else.

And then when I reframed it earlier to:  Okay.  But you definitely weren't expecting it to go somewhere else.

Do you remember that?  And you were, like, yeah, I can't really identify a place where it can go somewhere else.

I'm hoping that we can at least agree on that.  You can't identify an expectation that coal is going anywhere else than the power plant where you make the refined coal; right?

A.    That is true.  I can't identify anywhere else.

Q.    I'm trying to agree with you.  I'm trying to stick with that.  You have no other expectation of it going somewhere else.  That's why I'm trying to piece this together using what you just agreed to.

You want it to be burned in a coal steam electrical generation process for the IRS credits; yes?

A.    That was our expectation, yes.

Q.    And that's what you want to happen so you can claim tax credits, the burning in a steam generation process; right?

A.    That is our full expectation that that would be done.

Q.    And you tell the IRS that's what you believe is going to happen; right?

A.    Yes, sir.

Q.    And you have no expectation, none, that it's going to happen somewhere other than where you made the refined coal; right?

MR. DYESS:  Your Honor, we have an objection. This question has been asked and answered several times.

THE COURT:  I'll overrule the objection.

THE WITNESS:  I don't know how to be more clear. It makes the most sense that it would burned at that power plant.  I'm not objecting -- I'm not -- I'm not disagreeing with every bit of coal that was produced at Big Cajun II was burned at Big Cajun II.

BY MR. CALDWELL:

Q.    All right.  At the end of your testimony yesterday, I had asked you this question about whether you know full well that the exhaust path after the boiler at every one of those power plants involved in this case, the exhaust path includes injection of the activated carbon.

Do you remember that question?

A.      Yes, sir.

Q.      And as I understand, your response was, "I do now";
right?

A.      I do, yes.

Q.      And was your point that once CERT entities received
the original complaint, they checked with plants and
confirmed which ones were using activated carbon?

A.      We did confirm at that time, yes, sir.

Q.      But you and others in the CERT partners already knew
each of the plants that are in this case were using
activated carbon; right?

A.      We did know.  We had had some e-mails.  When we were
sued in this case, we started looking at e-mails to see when
we may have been notified to have the information that they
were using activated carbon.

Q.      So yesterday, the emphasis on "now," you didn't mean
to imply that you were unaware of these plants using
activated carbon prior to the lawsuit?  You didn't mean to
give that impression, did you?

A.      No, sir.

Q.      And would it be accurate if your lawyers were to
represent that we didn't know that these plants were using
activated carbon, that's why we had to call them?

A.      That would not be correct, that we had to call them.
There were some that we had no idea about.

Q.    It's not any of these eight plants.  You knew Big Cajun II, Parish, Coleto Creek, Limestone, Labadie, Laramie, Rush Island, Powerton, and Antelope Valley were using activated carbon?

A.    I think that we knew at some point that they were using activated carbon for some amount of time, but that's really not part of our business.  So it wouldn't have stuck with you.

Q.    You knew it before the lawsuit?

A.    I can agree with that.

Q.    You should have your cross binder up there.  We'll try to do this quickly, since you're kind of agreeing with me that you knew some of this.  But will you flip to the tab that's for Plaintiffs' Exhibit 545.

A.    545.  Is that a tab number?

THE COURT:  I think it's Tab 3, Mr. Caldwell.

MR. CALDWELL:  I'll try to keep the little index handy so I get you there quicker.

THE WITNESS:  I'm here.

BY MR. CALDWELL:

Q.    Okay.  And just -- I mean, you're aware of what 545 is; right?  It's one of the Sargent & Lundy reports that were prepared?

A.    Yes, sir, I'm familiar with this.

Q.    And in this case, this Sargent & Lundy report is

related to the second one on my chart here, the W.A. Parish plant; right?

A.    That is -- that is correct.

Q.    That's the big plant I showed in the opening, just the big coal pile that's kind of outside of Houston; right?

A.    Yes, sir.  That's right.

Q.    All right.  And just for the context of this document, obviously, your company is not Sargent & Lundy, but am I correct that what happened is JPMorgan says, "Hey, before we invest or around the time we're considering investing, we'd like you to commission some sort of engineering report about the plant"?

A.    Yes, JPMorgan did engage Sargent & Lundy to prepare this report prior to investing in the project.

Q.    Well, I think technically JPMorgan required you guys, CERT, to engage -- to get a report commissioned; correct?

A.    I don't recall that we engaged.  No, we did not engage Sargent & Lundy.

Q.    Okay.  Well, then let's just do it this way:  You provided some information to support the report; correct?

A.    Absolutely.

Q.    And you received a final copy; right?

A.    Yes, sir.

Q.    All right.  And for the sake of just being expeditious, let's look at -- just flip to the one that's

for -- I was going to say PTX 77, but it kind of doesn't matter. It's already been admitted. And there's a PTX -- it's fine. I'll show them in just a second.

It's PTX 690. There's a Sargent & Lundy report for Limestone which is PTX 690, and you don't dispute that there's one for Limestone; correct?

A.    Can you tell me what tab number that is.

Q.    I don't actually -- it's in there. I'll show you in just a second.

My point is, for each one of the five JPMorgan plants, you don't dispute that there's a Sargent & Lundy report; correct?

A.    To my recollection, yes.

Q.    And I'm happy to give it to you. I'm definitely not trying to hide. My point is that --

A.    I'm familiar. Thank you.

Q.    Yes, sir. My point is that --

A.    The dates are before the lawsuit; right? All of them are dated. Are they all dated before 2019?

Q.    I'm going to -- we'll get into all this. I'm just asking you: There's no dispute there's a Sargent & Lundy report for each of the five plants that JPMorgan got involved in that are in this case, which is Big Cajun II, W.A. Parish, Coleto Creek, Limestone, and Labadie?

A.    Yes, sir.

Q.    We're on the same page.  One of the things that Sargent & Lundy looked at in there was the emissions equipment for the plants.

Are you aware of that?

A.    I recall that, yes.

Q.    And like I said, you received the final version for each one of these; correct?

A.    That is correct.

MR. CALDWELL:  Mr. Diaz, can I have slide 17?

BY MR. CALDWELL:

Q.    Now, this is from Plaintiffs' Exhibit 545.  It's already an admitted exhibit.  All I wanted to observe, just to make sure we don't have a terminology problem, is there we're describing activated carbon injection as AECI; correct?

A.    That is correct.

Q.    And each of these reports kind of acknowledges that that plant is using activated carbon for Hg or mercury control; right?

A.    That is correct.

Q.    And then this is one for Springhill -- not to belabor the same point -- activated carbon for mercury control.  And that's Springhill Resources, so that would be for the Big Cajun plant; correct?

A.    Yes, sir, that's correct.

Q.    So now for this Rutledge LLC, that's the Limestone plant and, again, it was using activated carbon for mercury control?

A.    That's correct.

Q.    Then for Labadie.  Labadie, which is associated with this Larkwood LLC entity; correct?

A.    Yes, sir, that's correct.

Q.    They used activated carbon injection for mercury control; right?

A.    At some point in time, yes, sir.

Q.    Okay.  And then for the Bascobert, that's related to Coleto Creek; correct?

A.    That is correct.

Q.    And Coleto Creek was using activated carbon injection for mercury control; correct?

A.    Correct.

Q.    So trying to do this quickly, I just want to observe that for five of the eight plants, prior to this lawsuit, you guys had -- or at least on three of them, I think, are old enough to be prior to the lawsuit.  Maybe two of them happened in 2019.

      Does that sound right?

A.    Sounds right.

Q.    And one of the things you've heard from being here in court is you heard the testimony of Mr. Pavlish; right?

A.      Yes, I did.

Q.      And you heard your lawyers and me, all of us kind of referring to this two-part process of bromine that sort of comes in with the coal and then there's combustion, and in the flue gas, there's activated carbon, and people have called it, like, a two-step process?

A.      Yes.

Q.      So the reports you guys had from Sargent & Lundy, they describe that that's really exactly what each of those plants is doing, doesn't it?

A.      I'm not sure how you make that conclusion.

Q.      Well, when they refer to MerSorb, that's the bromine compound at these facilities; correct?

A.      It's used in the production of refined coal, but yes.

Q.      I didn't ask if it was used in the production of refined coal.  I'm asking, MerSorb is the bromine?

A.      MerSorb does contain the bromine, yes.  Right.

Q.      So each one of the Sargent & Lundy reports tells us that MerSorb, the bromine, is a proprietary solution including calcium bromide.  The chemicals are added to the coal on the conveyer belt coal yard in the boiler building before the fuel enters the boiler.

        Did I read that correctly?

A.      You read that correctly.

Q.      Then it says -- do you remember when Mr. Pavlish was

describing oxidation or iodizing so that you can then capture the mercury?

A.    Yes, sir.

Q.    And that's exactly what the Sargent & Lundy reports describe, that the MerSorb and bromine additive ionizes elemental mercury in the coal so that it can form a compound with unburned carbon in the coal, fly ash, bottom ash, activated carbon and then to a lesser extent, the S-Sorb.

        Do you see that?

A.    I see that.

Q.    And you don't dispute that each of these Sargent & Lundy reports relays this information about mercury control, do you?

A.    No, I don't.  I believe that this -- the text that you just read comes from the Chem-Mod Technology's website if I'm not mistaken.

Q.    What makes you think that's true?

A.    Well, all of that information is information that we received from Chem-Mod about how their process works.

Q.    And so then did you provide it to Sargent & Lundy?

A.    You know, I don't know exactly how they came up with this text.  My role in preparing or assisting in the preparation of these reports was to get information that I could and that typically dealt with discussing our refined coal facilities.

Q.    Okay.  Fundamentally, you don't dispute that whether you know that's from Chem-Mod's website originally or whatever, that the Sargent & Lundy reports that were prepared for JPMorgan and for which you received a final copy, they describe how the bromine solution will be used on the inbound part of the coal and that there could be activated carbon?

A.    That's what it says, yes, sir.

Q.    So the thing is, I showed you this little chart sort of tracking knowledge of activated carbon use -- at least that's our view.  You may disagree -- for those five plants, but the thing is, you also knew activated carbon use was in play for mercury control at Laramie River, Rush Island, and Antelope Valley well before the filing of this case; right?

A.    I don't dispute that.

Q.    You -- I'm kind of caught in a pickle here because I don't want to waste anybody's time, but you understand your lawyers have implied to the Court and to the jury that you didn't know any of this and had to call them to learn it once the lawsuit was filed.

      You know they implied that; right?

A.    I think what our lawyers said, and I may be wrong, but when we were served with this lawsuit, we reached out to the utilities to ask were they using activated carbon.

      Prior to that time -- and this was all from

research that we did for discovery, is were we ever notified over the 11, 10 years that we had been working with the utilities did they use activated carbon?  And in some cases, we found e-mails where the utility was telling us that they were going to be using activated carbon, and in some of those cases, it was power plants that never installed activated carbon.

So the information that we received before this lawsuit was utilities telling us that they would be using activated carbon or working on a carbon system or what have you, but we didn't -- we did not know for certain until the lawsuit was filed and we reached out to our clients to ask the question so we could understand these complaints, were they using activated carbon.

Q.      So to the extent that you guys worked with Sargent & Lundy and these reports were prepared for your potential investors, you had no idea whether this information about mercury control that you were presenting to your investors was true?

A.      I'm not saying that.  That doesn't say when how, how often that activated carbon is used.  It says that they're using -- and I'm looking for the sentence.  I'm sorry. Where does it say activated carbon on that slide?

It does -- I'm not disputing that activated carbon is spelled out in these Sargent & Lundy reports, but

that is not our business.  We're not an emissions control company.  We're a fuel provider.  If the power plant tells me that they are going to use activated carbon, which they had done in the past and in several instances never did, it doesn't matter to our business.

MR. CALDWELL:  Your Honor, I don't want to be confrontational.  I'll just object to the narrative answers as nonresponsive to my questions.  I'd like to strike the extraneous answers that are beyond the scope of the question.

THE COURT:  I'll overrule that objection for now.  I'll let you continue with your examination.

MR. CALDWELL:  Thank you.

BY MR. CALDWELL:

Q.    So let's talk about what you knew before the Sargent & Lundy reports.  Would you turn in your binder to -- it's Tab 7, Plaintiffs' Trial Exhibit 232.

A.    Give me just a second.  I'm on the exhibit.  I'm just looking at it.  It's the e-mail dated...?

Q.    It's on the screen.

A.    Yes, sir.  Yes, sir.

Q.    It's previously admitted.  So some of the ones that haven't been previously admitted, I'll have to go through the process of having you look at in the binder first.  Some of them are previously admitted, and I'll just try to cut to

the chase.  Make sense?

A.     Yes, sir.

Q.     All right.  So when we see Barr Linton, that's someone who's kind of in a similar position to you in the sense that that is one of the members of CERT, LLC; right?  Or one of the officers?

A.     He's an officer, yes, or he was an officer.

Q.     Recently passed away?

A.     Yeah, I agree with that statement.  Job roles were different than mine, but, yes.  He was a member.

Q.     But still -- I mean, maybe the titles or roles were a little different, but still kind of like, you would serve a support function or an officer function or something for these various LLCs; correct?

A.     Yes, sir.

Q.     All right.  And what we see -- and this is in 2015, so what is that?  A little over four years before the lawsuit was filed?

A.     That's correct.

Q.     And Mr. Linton is writing to you, so this -- I'm sorry.  He's writing to another investor at Koch Industries.  That's Daniel Murray.

       Was that somebody that was looking at investing in some of these same plants at some point in time?

A.     I think Koch Industries owned some of these

facilities at one point in time.  They were probably the owner at that time.

Q.    Gotcha.  And some of those facilities are now owned by Kiewit or Mylan as time went on; right?

A.    That's correct.

Q.    But with regard to that facility, Mr. Linton was telling the investor -- and you were copied -- that these -- he's referring to the Basin and Ameren facilities.  The reason why these are requested is that the power plant is relying on calcium bromide together with the activated carbon to meet their MATS compliance.

Did I read that correctly?

A.    You did.

Q.    And when we refer to Basin and Ameren -- and it says "but so far not in our geo" -- we'll come back to that in a minute.  But it said "with regard to Basin and Ameren."

In the context of the plants that are at issue in this case, we're talking about the Laramie plant and the Labadie plant; correct?

A.    Yes, that is correct.

Q.    Now, did you guys ever talk to -- let's back up. Let's see what the context of this e-mail is.  It's a little bit interesting.

You know how there's been some conversation in this trial about how there's an additional chemical that you

guys spray on, that the purpose of doing that is so that you can claim tax credits by meeting, in addition to mercury, sort of the NOx reduction?

A.    I agree with it.  There is a second chemical in the process to qualify the fuel, and I don't agree with your comments about spraying it on.

Q.    Okay.  I'm sorry.  Maybe that was the wrong term, I just -- and I apologize if that was wrong.  I wasn't trying to mislead you there.

What I'm saying is you're aware that there's kind of a second chemical, and that goes by S-Sorb?

A.    That is correct.

Q.    So what's interesting about this particular e-mail is if we actually pay attention above the highlight, you had utilities actually wanting you guys to help guarantee that even if you didn't use S-Sorb, you would still put the bromine solution, MerSorb, on the coal because whether or not you're doing the two-part thing or the two chemicals for tax credits, they need the mercury part, the bromine part, so they keep meeting the MATS standard; right?

Isn't that what they're saying?

A.    I agree that they had requested us to provide pricing -- to provide pricing to apply calcium bromide on their coal when we were not producing refined coal.  That's what that letter asked.

Q.    And it says specifically the reason behind these requests is that the power plant is relying on the calcium bromide together with activated carbon to meet the MATS compliance standard.

That's what it says; right?

A.    That's what it says.

Q.    So once again, I have a bad habit of talking with my hands.

We have the tax credit guys here where you guys needed to do MerSorb and S-Sorb; right?

A.    That is correct.

Q.    But then after the tax credit thing starts, you have the EPA saying your 40 percent thing is not enough; MATS is in effect and you need to get 90 percent of mercury; right?

That came into effect later?

A.    That came into effect later, yes.

Q.    And the context of this is the plant is concerned that if you stop doing the bromine part of it, they will fall out of compliance over here on the EPA MATS requirement of meeting 90 percent capture of mercury; right?

A.    I can only assume that's what they were thinking when they asked the question to Barr, could we apply calcium bromide to their coal if we were not producing and selling them refined coal.

Q.    Did you ever have potential investors who were

concerned about making sure that enough mercury was being removed from the plants they would be invested in?

A.    I think without exception, all of the investors were concerned with meeting the technical qualifications that meets the Section 45 tax credit requirements.

As far as are we talking about in a lab that we couldn't achieve those reductions?  I'm not -- I'm not following your question completely.

Q.    Let me try and clarify.

Your point is your investors want to make sure we can do tax credits, but you're not -- think your investors actually care that much about whether we truly reduce 90 percent of mercury from the emissions?

A.    Oh, no, I disagree with that completely.

Q.    Some of your investors did care whether you actually --

A.    Oh -- I'm sorry.  I didn't mean to speak over you.

Q.    That's okay.

A.    All of our investors expected that we would see the same emission reductions in the field as were in the lab. It's very, very difficult to correlate those two together for a number of technical reasons.

Q.    Let's investigate something slightly different then.

Did your investors care whether the mercury reduction was enough to meet the MATS 90 percent threshold?

MR. DYESS:  Your Honor, I object.  He's asking for speculation about what's in the mind of the parties.

MR. CALDWELL:  He just testified what all our investors care about, so I think it's very fair.

THE COURT:  Hold on a second.  I do think the witness spoke -- attempted to speak to the investors' mindset previously, so I'll allow the question and I'll overrule the objection.

THE WITNESS:  I'm sorry.  You asked if I believe that all of our investors wanted to meet what standard?  I'm sorry.

BY MR. CALDWELL:

Q.    You've told us that the investors cared about meeting the numbers they needed to meet in order to apply for tax credits.  What I'm asking is, did they care about meeting the high level of mercury reduction that was necessary to comply with MATS?

A.    So without speaking to their mind, I would say based on their actions, they were -- they were -- all of these investors that are on the board and prior investors, their objective in investing in these projects was to meet the technical requirements of Section 45 fuel.

Those technical requirements had nothing to do with governmental requirements, the EPA guidelines at the power plant.  So I'd say they would not care about the

90 percent reduction because that wasn't even in their business model or plan.  Their business model and plan -- I'm sorry if I'm -- I don't think I'm not answering your question.  I'm trying to speak to their mindset and to their actions and the requirements they placed upon us as operators that we would produce a refined coal that qualified for Section 45 tax credits.  That has nothing to do with what power plants' EPA requirements for air quality is.

Q.    Okay.  So as far as you know, your investors, as long as they get their tax credits, doesn't really matter to them if they're reducing 90 percent of the mercury?

A.    I can't speak to what our investors' moral beliefs are.  I can tell you that I know the investors require us to produce a fuel that achieves a 40 percent reduction.  If that 40 percent reduction in mercury and 20 percent reduction in NOx is the current EPA standards -- because we're not talking apples and apples, we're talking 40 percent.  The EPA standard is a limit of mercury.

So I just can't speak to whether investors care about if their fuel they're selling the power plant meets the EPA requirements.

Q.    They had a huge -- your investors had a huge incentive to care about whether the coal being burned was done in a way that would meet MATS; right?

A.     And how is that?

Q.     How many tons of coal would you sell to a plant that gets shut down for not complying with MATS?

A.     We're a coal -- we sell a product to a power plant. Of course, they want the power plant to stay in business. But that doesn't speak -- that doesn't speak to -- the power plant's going to figure out how to maintain compliance or shut their plant down.

Q.     Right.  That is precisely my point.  If they shut their plant down, you don't get tax credits if you just keep cranking out coal and it piles up in the parking lot because there's no plant to burn it; right?

A.     I would say that's correct.

Q.     All right.  Now, would you turn to your binder to Plaintiffs' Trial Exhibit 688 at Tab 6.  I can't put this one on the screen.

A.     I'm here.  I'm just taking a look real quick.  The one dated 2016?

Q.     No problem.  I was actually just making sure the court reporter had the right numbers.

       And it is a 2016 e-mail.  It's one you wrote, assuming you were Jeff Green there; correct?

A.     It is.

Q.     And you wrote it to a Jeffrey Jones; is that right?

A.     That's correct.

Q.    Who's that fellow?

A.    He is a business guy for Ameren utilities.

MR. CALDWELL:  Plaintiff moves for admission of 688, this e-mail the witness wrote.

THE COURT:  Any objection?

MR. DYESS:  No, Your Honor.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 688 was admitted.)

BY MR. CALDWELL:

Q.    Now, I've got some access to this e-mail, and keep in mind, if you need me to pull up the whole thing, I can have Mr. Diaz can do that.  I'm not trying to cheat you in any way.

But this is what I was referring to.  It's the e-mail March 9th, 2016, written by you; correct?

A.    That is correct.

Q.    And in this instance, you were reaching out to someone at Ameren.  And which plants would that relate to of the plants that are at issue in the case?

A.    That would be Labadie and Rush Island.

Q.    Labadie and Rush Island are the Ameren plants.  And you had a potential investor who found an article, it's an older article, 2011, saying Labadie was the second worst mercury polluter in the U.S., emitting a lot of pounds of

airborne mercury.

Do you see that?

A.      I do see that.

Q.      And the investor was concerned; right?

A.      The potential investor was concerned.

Q.      Maybe about being associated with the second worst polluter -- mercury polluter in the U.S. or something like that; right?

A.      I can't speak to the reason for their concern, but I will say it was concern for some reason, yes.

Q.      In order to help address the concern from the investor, you were writing the power plant people to say, can I get your mercury numbers now from 2015.  And you said, which I will read, "As long as the comparison shows positive results, it would quickly put this issue to bed.  The results should show positive results since you guys are using refined coal and also installed powered activated carbon systems."

Right?

A.      Yes, sir.

Q.      That's what you wrote to the plant; right?

A.      Yes, yes.

Q.      Now, we also see -- it's one of those e-mail chains where I think you start at the bottom and the more recent e-mails are towards the top, if that makes context -- makes

sense in terms of the context.

And you get a response back from the power plant, don't you, the power plant company?

A.    Right.

Q.    So what the power plant tells you is what's important to note is that Labadie is complying with the emissions laws.  They must comply with MATS by April 16th, 2016.  I'm going to stop there.

This is consistent with what all these other witnesses have explained; right?  Sort of in the middle 2010s, MATS started to take effect and plants had to be in compliance?

A.    By 2016.

Q.    Yes, and I think the date may be different for CERT.

A.    Yeah, yeah.

Q.    But that comports with your understanding of about when MATS came into effect for some of these plants; right?

A.    That is correct.

Q.    And he told you Ameren's compliance plan for mercury control includes activated carbon injection at the plant, which is currently under testing construction -- sent you photos -- and mercury measuring equipment is also being installed.  They will do what is required to meet the MATS requirements.

That's what he told you; right?

A.    That is what he said.

Q.    And he also tells you Rush Island uses this Chem-Mod process with MerSorb for refined coal and has an activated carbon injection system very similar to what Labadie is then installing; right?

A.    Yes, I agree with that.

Q.    And then finally, in order to help you along with signing up an investor, the power plant even offered you a tour of the activated carbon injection system.

      Do you see that?

A.    I think they're offering the tour to the potential investor.

Q.    Did either of you take it?

A.    No, sir.

Q.    Now, I believe this didn't just go to you.  You then forwarded this information on to -- I'm sorry.  I'm going to have to admit this before I show it.  You forwarded it on to your partners at CERT; right?

      Flip to Tab 9.  Plaintiffs' Trial Exhibit?

A.    Could you redirect me?  Tab 8?

Q.    Tab 9.  Plaintiffs' Trial Exhibit 96, Tab 9.

      I'm sorry.  I said too many numbers.  That's unfair to you.

A.    I'm sorry.  No, you can't show it.

      I forwarded that e-mail to my partners, is what

you're saying?

Q.      Yes.  It should be Tab 9 in your binder, and it should have a sticker on it that says PTX 96.

A.      Okay.  What was your question because this is not...?

Q.      Okay.  All right.  Never mind.  I'll just keep going.

Would it surprise you if on Plaintiffs' Trial Exhibit 68 you get information about Labadie and Rush Island and share it with your partners?  Does that surprise you?

A.      No, that would not surprise me.

Q.      Fair enough.  Now -- and I think this is where the confusion comes from because I was actually thinking about the other one.  Now look at the one that is Tab 9, 96.

A.      Okay.  I'm looking at that one.

Q.      Sorry.  I was inadvertently tricking you into looking at the next one.  That's my fault.

What is Plaintiffs' Trial Exhibit 96, sir?

A.      It is an e-mail between Barr Linton and Allen Weiner copying me dated May 19, 2015, with a draft of a proposed Chem-Mod amendment.

Q.      So you received this as a cc; correct?

A.      Correct.

Q.      And it was written by your business partner, Barr Linton; correct?

A.      That's correct.

Q.      No question you received this e-mail; right?

A.      No, no question.

MR. CALDWELL:  I move for admission of Plaintiffs' Exhibit 96.

THE COURT:  Any objection?

MR. DYESS:  No, Your Honor.

THE COURT:  All right.  It's admitted.

MR. CALDWELL:  Thank you, Your Honor.

(Thereupon, Plaintiffs' Exhibit Number 96 was admitted.)

BY MR. CALDWELL:

Q.      Let me go ahead put 66 up.  Just direct you to the top.

Barr Linton is your partner; correct?

A.      Yes.

Q.      Who is Allen Weiner?

A.      I think he's a tax director for what used to be Mylan.

Q.      And this is another instance, right, where you guys are looking into addressing this issue where producers want to make sure that even if you're not able to do tax credit refined coal, that you will still apply the calcium bromide on the coal; correct?

A.      Yes, I'd say it's similar to the prior e-mail.  Yes, that is correct.

Q.      And that's because, again, even if tax credits can't

be generated, in order to keep rocking and rolling and generating electricity, the plants are trying to stay in compliance with the EPA MATS guidelines; correct?

A.    I can't speak to the power plant's state of mind.  I can speak to our state of mind, is that when these utilities would ask us as a vendor to accommodate them for a request, which was in this case when we can't sell them refined coal to provide calcium bromide to their coal, we would -- we were looking to attempt to accommodate them, which I don't think any of these ever went into place.  We never acted on any of these agreements.

Q.    Well, regardless of what you say now about whether you guys can talk about their state of mind, I believe you had said in an earlier e-mail here -- Barr Linton, we see him writing and copying you -- that the reason behind these requests is that the power plant is relying on calcium bromide together with activated carbon to meet their MATS compliance standard.

I read that correctly, didn't I?

A.    You did read that correctly.

Q.    And you were fully aware of that fact in 2015; correct?

A.    I was aware of that sentence in 2015.

Q.    Is this document in connection with the investment that became -- the investor that became the Mylan investor

in Antelope Valley?

A.      Yes, Mylan owned a few facilities.

Q.      Including Antelope Valley?

A.      Including Antelope Valley.

Q.      What kind of company is Mylan?

A.      They're a pharmaceutical company.

Q.      Pharmaceuticals.  Did they have anything to do with making the chemicals used in a refined coal facility or anything?

A.      No, they did not.

Q.      So if you remember, I put up the slide where I had five Sargent & Lundy reports.  I'm going to come back to those, but focusing on the plants on the right-hand side, those three, we have seen e-mails between you and investors or you and power plants or you and your partners indicating you guys were aware that activated carbon was being used at each of the other three plants that are at issue in the case, the Kiewit and Mylan plants; right?

A.      We were aware.

Q.      Now, can I have you flip to Tab 2 in the binder.

A.      I'm sorry, 2?

Q.      Yes, 2.  And it should be Plaintiffs' Trial Exhibit 235.

A.      Okay.

Q.      Just kind of tell us a little bit about who that's

from and what it is.

A.    Looks like it's from Barr Linton to Thomas Ryan and Arthur Kwauk.  Both of those gentlemen are with ING Bank, I believe.

Q.    A possible investor?

A.    They were an investor.

Q.    And then are you cc'd on it?

A.    Yes, I am.

            MR. CALDWELL:  So I move for the admission of Plaintiffs' Trial Exhibit 235.

            THE COURT:  Any objection?

            MR. DYESS:  No, Your Honor.

            THE COURT:  All right.  It's admitted.

            (Thereupon, Plaintiffs' Exhibit 235 was admitted.)

BY MR. CALDWELL:

Q.    Is this Plaintiffs' Trial Exhibit 235 you were just looking at, sir?

A.    Yes, it is.

Q.    And I'll try to do this quickly, but I want to talk about, again, the Sargent & Lundy reports.  Those aren't the only source of information that you had that the JPMorgan five plants were using activated carbon; fair?

A.    That's -- yes, that's fair.

Q.    Okay.  So like Big Cajun II, for example, you guys

were aware that they were going to be relying on activated carbon; right?

A.    Yes, that's what this e-mail says.

Q.    Now, may I -- can I get you to flip to Tab 4.

A.    Okay.

Q.    Tab 4, it's one that's been marked at least for identification so far as PTX 95.

Do you see that?

A.    I do.

Q.    What is it?

A.    It's an e-mail that, ultimately, came to me from Dennis Beck with a few subsequent e-mails dated August 20, 2018.

Q.    And they relate to the Coleto Creek plant?

A.    Yes, that's correct.

MR. CALDWELL:  All right.  So Plaintiff moves for the admission of Plaintiffs' Trial Exhibit 95.

THE COURT:  Any objection?

MR. DYESS:  No objection.

THE COURT:  It's admitted.

(Thereupon, Plaintiffs' Exhibit 95 was admitted.)

BY MR. CALDWELL:

Q.    I'm showing you this kind of an abbreviated portion of 95.

This e-mail to you is confirming with regard to Coleto Creek that they meet the emission limit by injecting activated carbon into the gas stream; right?

A.     That's what that says, yes.

Q.     And there's no question -- I mean, we trimmed this to make it readable.  But there's no question they're talking about the Coleto Creek -- same plant, Coleto Creek, that's at issue in this case; right?

A.     That -- that is correct.

Q.     What's interesting about this is I think this is an instance of, basically, you interacting with the plant to learn information about how they're going to meet compliance standards; right?

A.     Yeah.  I believe that this was some of the information required for the Sargent & Lundy report.  The reason for asking, those questions were coming from the investor, which was JPMorgan.

Q.     Okay.  But you're doing your best to answer the questions and make sure the investor has what they need.

And so as I understand, you had asked the plant does the -- does the unit meet its mercury limits, or does it have mercury control equipment?  If so, what?

And you knew the possibilities would be, like, calcium bromide injection, activated carbon, et cetera, and he's, like, yes, we inject activated carbon in the gas

stream; right?

A.     Yes.  That says that they currently are meeting the mercury limits.

Q.     By injecting activated carbon in the gas stream?

A.     Yes, that's what it says.

Q.     So then real quickly, 685, which is Tab 5.  Sorry for the sort of tedious process of putting these into the record so the jury an see them, if they're so inclined.

A.     Okay.  I see 685.

Q.     What is 685?

A.     685 is an e-mail from me to Leah Schaatt dated March of '16.

Q.     So that's one CERT business partner to another; right?

A.     That is correct.

       MR. CALDWELL:  Plaintiff moves for the admission of Plaintiffs' Trial Exhibit 685.

       THE COURT:  Any objection?

       MR. DYESS:  No objection.

       THE COURT:  It's admitted.

       (Thereupon, Plaintiffs' Exhibit 685 was admitted.)

BY MR. CALDWELL:

Q.     I read a line that said, "Basin and Ameren are asking something but NRG is not asking yet."

Do you remember that parenthetical I pointed to?

A.    Yes, I do.

Q.    All right.  But you also, ultimately, engaged in some correspondence with NRG about what they would be doing for mercury control; correct?

A.    Yes.

Q.    Now, is it true that when asked about emissions issues, NRG has indicated that the station has installed activated carbon injection equipment to increase mercury control beyond just -- it says beyond the Chem-Mod process, but, in other words, beyond just the MerSorb and S-Sorb additives?

A.    Which is the Chem-Mod process, yes.  Yes, that -- that's what this says.

Q.    So they told you they went beyond that and have added activated carbon injection equipment; right?

A.    That's what this e-mail says.

Q.    And that brings to mind a question before -- before I forget.  You'll remember this slide from opening that your lawyer put up with a list of things here, a list of things here, and a bunch of red Xs; right?

      Do you remember that?

A.    Yes.

Q.    I mean, it certainly wasn't the patent claims like Mr. Nemunaitis went through with Mr. O'Keefe that's proof of

infringement.  It wasn't patent claims, was it?

A.    I recall the slide with the Xs, but I'm not sure exactly what it was.

Q.    Well, you're not -- as a party, the CERT defendants are not trying to give the impression that if they put Xs on some demonstrative that Mr. Sykes makes, that that means there's noninfringement.  You're not trying to give that impression, are you?

A.    I'm sorry.  I'm not following the question.

Q.    Okay.  Fair enough.  Here's one thing it did say. Let me just focus in on the one thing.

It talks about how when you -- or the conversation with the slide talked about how to qualify your coal for tax credits, you guys were not looking at activated carbon during that qualification process; correct?

A.    That's a true statement.

Q.    Right.  But here's the thing.  If the coal has been qualified as Section 45 refined coal, you guys absolutely -- these entities absolutely claim tax credits, hundreds of millions of dollars of tax credits, on coal -- refined coal that was burned through plants that were using activated carbon; right?

A.    We sold -- refined coal that qualified for the tax credit was sold to power plants for the expectation of being used to generate steam.

Q.    At the plants as we discussed earlier; correct?

A.    Correct, yes, at those plants.

Q.    And my point is that the plan or the system of claiming tax credits was not negated by the fact that the plant used activated carbon; right?

A.    I believe every single power plant listed at the bottom of your chart over there with the exception of Coleto Creek did not use activated carbon for some period of time prior to us.  We were there for a number of years before they started using activated carbon.

So I'm not sure the point you're trying to make.

Q.    The point I'm trying to make is once those plants were using activated carbon, even once you knew full well they were using activated carbon, you still claimed tax credits on each ton of refined coal that you sold them; right?

A.    We did -- we did receive tax credits for coal that was sold to those power plants after they installed activated carbon.

Q.    And after you knew full well that they had installed activated carbon systems?

A.    We knew that -- yes, we knew that they were using activated carbon, and we were receiving tax credits by selling them our fuel.

Q.    Thank you.

So the fact that they were using activated carbon doesn't negate or prevent tax credits; right?

A.    Our fuel is not made to work with activated carbon. That has nothing to do with the credit.  It doesn't negate anything.

Q.    I mean, you understand I didn't ask a question about whether your fuel was made to work with activated carbon. That wasn't what I asked you; right?

A.    I thought I needed that to clarify what you were asking me.  But if you'd like to ask your question again, I'll try to answer it.

Q.    By Thanksgiving 2019 or something after this case is pending and you've seen a bunch of evidence, you guys were aware there were activated carbon injection systems.

When you sold a ton of refined coal to Coleto Creek or Limestone, you claimed your tax credits even though the system -- that power plant system was going to burn the coal, and they had their activated carbon system installed; right?

A.    Yes.  We did receive tax credits for coal sold to them in November of 2019.

Q.    So if your lawyers are giving the impression that the power plant using activated carbon in the exhaust gases somehow negates the ability to claim tax credits, you're in a bit of a pickle; right?

A.    No, I don't agree with that statement.

Q.    Well, you absolutely claimed tax credits on tons of coal that went to plants and went through activated carbon injection systems in the flue gas; right?

A.    That is correct.

Q.    Just to kind of wrap up here, at this point, we have seen a lot of documentary evidence that the CERT partners, various members of them or all of them, whatever, were aware of activated carbon use at each of the plants in this case before the filing of the lawsuit; right?

A.    Right.

Q.    And so there's more evidence than that, isn't there?

A.    That pretty much covers what I've -- what we had found in discovery.

Q.    All right.  There's a tab in your binder that -- it has a -- one of these Bates numbers or serial numbers on it. It's going to be maybe third from the end.  It's the one that says CERT-0030761.

A.    Okay.  I see it.

Q.    It's a presentation; right?

A.    Yes, I prepared that presentation.  The one dated January 2012?

Q.    Yes.

A.    Yes.

Q.    I think you said you were a presenter on it?

A.      Yes.

Q.      It's a presentation that's about key points for site hosts; correct?

I'm sorry.  Right?

A.      It's a pitch book for presentation to prospective site hosts, yes.

Q.      That would have been a much better way for me to ask. So what -- what is the purpose of a pitch book to a site host?

A.      It was typically, first -- was used in our first meeting with a potential site host to get them familiar with who we are, what our process is, potential benefits for the plant.

At this point, you know, you're trying to sell a product to a customer, so that's what it was used for.

Q.      And then I'd like to have you flip to the page that ends in 782.  Do you see that?

A.      That ends in 782?

Q.      There's a slide -- yes, the page -- the Bates number will end in 782.  Let me know once you've found it.

A.      Yes, I'm on it.

Q.      So on that page in front of you, sir, can I direct you to this bullet here that's sort of like the next to the last bullet?  And I'm going to ask you a question first.

A.      Okay.

Q.    This is a presentation you were giving to plants in 2012; right?

A.    That's correct.

Q.    And even in 2012, you were indicating that the Chem-Mod process at their plant might be used with activated carbon; right?

A.    Yeah.  This statement states that it would be a potential benefit to use less carbon.

Q.    So it wasn't that you thought, "Hey, don't use activated carbon with our bromine solution."  You were telling them that the bromine solution might make the pollutant capture so much more effective, they could even cut down on their activated carbon bill; right?

A.    Yeah.  That's pointed out as a potential benefit.

Q.    A savings on the sorbent bill.  That's the potential benefit, isn't it?

A.    That is a potential benefit.

Q.    And you also talked about other things like maybe you could get better fly ash or maybe more usable fly ash, that kind of thing; right?

A.    Really it's a shotgun effect of any potential benefits that a power plant might see by using our fuel.

Q.    And you gave that presentation to every potential host site?

A.    I would say that's correct.

Q.    As I understand your testimony from your deposition. The reason you did that is, essentially, trying to convince them to do a deal with you guys.  You wanted to tell them here are all the potential benefit of working with us; right?

A.    That's correct.

Q.    Thank you.

When was your deposition taken?

A.    It's been a year ago.  I don't recall the date.

Q.    Several years after the lawsuit was filed; right?

A.    Oh, yes, sir.

Q.    And as of the time of your deposition, you had not read the patents-in-suit; right?

A.    I hadn't read them in detail, no.

Q.    Did you ever get around to doing that?

A.    I mean, I have an understanding what the patents are.

Q.    Yes.  But my specific question was:  Did you get around to reading them?

A.    I've read the patents, yes.  I've read the patents.

Q.    Did you guys do any sort of patent search before beginning to provide refined coal?

A.    No, we did not.

Q.    Do you understand that patents are publicly available?

A.    I understand patents are publicly available.

Q.    You can check on the Patent Office website.  There's patents.google.com, things like that?

A.    We looked at the technology's patents that we were using to produce refined coal.

Q.    That's because your acquaintances at Chem-Mod said hey, look at our Chem-Mod patent.  That's what your answer just --

A.    No.  We knew that we were using a technology that was patented.  That was our belief up until this lawsuit and then we looked at these patents.

Q.    There's some disconnect going on or you're answering something that's not what I'm asking you.  With respect, I just want to make sure that you're trying to listen to my question and focus your answer.

You could have searched, like, patents.google.com or the Patent Office for patents before releasing your product, and you didn't; right?

A.    That's correct.

Q.    And you said, we just looked at the patent we thought we were using, something along those lines, and you're referring to a Chem-Mod patent; right?

A.    Yes.

Q.    And it's not a result of your searching for a Chem-Mod patent.  It's because your contacts at Chem-Mod, like Sally Batanian and all of these people, gave you that

patent and said "Hey, here's the Chem-Mod patent"; right?

A.     When we were served with the lawsuit?

Q.     Why in the world would we serve you with a lawsuit on Chem-Mod's patents, sir?

       I'm telling you, you volunteered well,, we looked at Chem-Mod's patent.  You said it; right?

A.     I did say that, and I said it in regards to we were using a technology that we had looked at the patent for prior to the issuance of this lawsuit.

Q.     That is precisely my point.  You got that Chem-Mod patent because your acquaintances over at Chem-Mod like Sally Batanian gave it to you; right?

A.     Chem-Mod did give us their patent.

Q.     It's not a result of you actually making an effort to look on these public websites and see, are we going to be infringing someone else's patent?

A.     We did make an effort --

       THE COURT:  There's an objection.

       MR. DYESS:  He's attempting to mislead the witness into thinking they could search for a patent in 2012 that didn't issue until 2019.

       THE COURT:  I'll overrule the objection.  Obviously, the defendants' side will have a chance to ask questions of the witness in the future, and they can make those calls.  But I'll overrule the objection.

BY MR. CALDWELL:

Q.    You guys did not make any effort to search for patents that might apply to what you guys were going to sell; right?

A.    To search for patents?  I have not done a patent search.

Q.    And then your counsel makes the point that these particular patents weren't issued prior to the summer of 2019, which I agree with, and you understand that; right?

A.    I do.

Q.    And that means that the patents in this lawsuit couldn't have been infringed prior to the summer of 2019; right?

A.    I agree with that.

Q.    So what relevance, then, are all these charts your lawyers keep showing us that say we sold a bunch of refined coal prior to the issuance of these patents?

        MR. DYESS:  Your Honor, objection.  He's asking him to make a legal conclusion on relevance.

        MR. CALDWELL:  He's a corporate representative for the party.  He's the only person I can ask about their position.

        THE COURT:  Overruled.

        THE WITNESS:  Can you repeat the question?

BY MR. CALDWELL:

Q.    As your lawyer says, if these patents weren't issued until the summer of 2019 --

A.    Correct.

Q.    -- what relevance is there of someone coming in and saying we sold lots and lots of coal that was refined coal prior to July 2019?  What relevance is that?

A.    I think it's a tremendous amount of relevance.

Q.    You think so?

A.    Legally, yes, I do.

Q.    So you're ready to render a legal opinion, the thing your lawyer just objected to?

A.    No.  I understand after we were served in this lawsuit of getting an understanding of these claims, and I don't believe the claims have any basis.  So if you want me to explain why, ask me the questions.  If you're asking me to opine on why there's no basis or why we didn't infringe, I think there's a number of reasons.

Q.    So we'll consider going into that.  I think you had an opportunity to disclose if you had noninfringement opinions.  So let me ask you this:  The opinion you're offering to give us, is that something you came up with on our own or worked out with your lawyers?

A.    Well, I can read complaints, and I can understand the facts of what we're being accused of, and I can form my own opinion.  I'm not saying I didn't use legal counsel to

explain the claims and explain the patent and to explain patent law because I'm not a patent lawyer.  I did have to seek advice, but I do understand the issues of this case, and I understand the claims that are being made.

Q.     You understand the patent claims?

A.     I understand the claims of what we're being accused of doing, and I generally understand the requirements to infringe a patent.  Yes, sir, I do.

Q.     But you didn't even read in detail the patent for the first three years the case was on file, sir.

A.     Like I said, you asked if I read the entire patent, and I understood the important sections of that patent.

Q.     So you didn't read it for the first three years, read it after the refined coal program had stopped because there were no more tax credits; right?

A.     That is correct.  We stopped because the program expired.

Q.     And now you're here telling me I'm ready to give my legal opinion on why when I read the complaint in 2019 I thought we were okay?

A.     I formed an opinion back in 2019.

Q.     There's a difference in an opinion and an informed opinion; right?

A.     I'm saying it was an informed opinion.  Yes, I do.

Q.     Who were you relying on to tell you what the patent

required?

A.    I can read, sir.

Q.    But you didn't.

A.    I can read the claims, the first amended complaint, second amended complaint, third amended complaint.

Q.    So from day one the claim -- the '114 patent was in the complaint; right?

A.    Yes, it was.

Q.    And one of the things that was at issue that your lawyers have made a big deal about is that in the early versions of the complaint, there were some different CERT Operations companies that we had named in the original version of the complaint; right?

A.    Yeah, probably so.

Q.    And your lawyers are saying heck, when we saw that and they were associated with other LLCs that were associated with other power plants, we thought this must be about those other power plants.

      They've kind of made that argument; right?

A.    I didn't hear that in testimony.

Q.    You didn't see them sliding around on a spreadsheet, being Intermountain, let's look at Intermountain?

      Do you remember that?

A.    I do know they showed all of the CERT entities.

Q.    And the point was they were trying to say hey, we

were confused when we got this complaint because it includes some LLCs that work with some other LLCs that work with some plants that are not in this case.  That was the nature of the argument; right?

A.    I don't recall the exact nature of that argument.

Q.    Before that first complaint was filed where were we supposed to go to figure out which one of these made-up LLCs is associated with the right plants --

MR. DYESS:  Your Honor, objection.  He's arguing with the witness and he's disparaging the court order and he can't do that.

MR. CALDWELL:  He literally said yesterday they just made up the names.

THE COURT:  I'll sustain that objection, and I'll ask counsel to re-ask the question.

BY MR. CALDWELL:

Q.    Sir, when we filed the original complaint, how were we supposed to know which of these investment vehicle LLCs, that you told us have no website and there's nothing to Google on them, are associated with which plants?

MR. DYESS:  Your Honor, objection.  He's asking him to speculate.

THE COURT:  Hold on one second.

I'll overrule the objection.

THE WITNESS:  I'm sorry.  When this happens, it

gets me where I don't remember the question.  Could you repeat it?

BY MR. CALDWELL:

Q.    I can relate.  When we filed the first complaint -- and you're darn right we named, like, some CERT Operations companies no longer in the case.  I don't disagree with you.

How were we supposed to know which investment vehicle LLCs are associated with which operations LLCs and plants?

A.    I don't know the extent of how much you guys looked into the companies before we were served.  I mean, certainly, when that original complaint was filed in 2019, there was some way to contact these companies.  If you're claiming that you couldn't reach us on the phone or on the internet, which I don't understand that complaint, why were the entities still named for over a year and a half?

Q.    Happy to answer that question.  Remember, we've had the discussion that we probably don't need to replow about who does and doesn't have websites and what information is and isn't public; right?

We've talked about that?

A.    Yes, sir.

Q.    And your lawyers showed this timeline where it's, like, original complaint, first amended complaint, second amended complaint, and then some companies get dropped;

right?

A.    Yes, sir.  I saw that timeline.

Q.    Original complaint was in summer of 2019.  Do you know when it was that in all this discovery -- your lawyer talks about interrogatories.  Remember that?  We can take interrogatories.

       Do you know when it was you guys answered an interrogatory and told us the nonpublic information about the corporate structure?

A.    No, I don't know the date.

Q.    Does late 2021 sound right?

A.    I wouldn't know.  I couldn't answer that.

Q.    You have no personal knowledge and no foundation if these lawyers want to try to use you to say that our side knew that information earlier; fair?

A.    I don't have any knowledge that my lawyers wanted what?

Q.    You have -- you're here on the stand testifying under oath you don't know when our side, the ME2C side, was provided with the confidential behind-the-scenes information on the corporate structure.  You don't know?

A.    I don't recall the date.

Q.    So you have no idea, then, whether or not the amendments properly streamlining the companies to the ones at plants with activated carbon, you have no way to testify

as to whether that was actually very timely, do you?

A.    I don't -- I don't know when those were done.  I just can't answer the question.

Q.    What other witnesses are going to be presented by your side?

A.    I don't know.  I think y'all have a list of witnesses.  I'm not sure.

Q.    Who are the witnesses you expect to come testify live?

A.    Our technical expert and myself, and that's the two.  We had a technical expert and then also -- I don't think we have an invalidity person any longer.  So I know that I'm being called.  That's what I've been prepared for.

Q.    So at this point, you think one more witness for your side?

A.    I mean, I think there's two or three.  We've got some depositions to play and other things.  I'm not sure.

Q.    And yes, I just don't want this to be confused.  You think it's two or three live witnesses after you and then some depositions; correct?

A.    Sounds right.

Q.    Is one of these other witnesses going to be the one that you think addresses this timeline of when your side gave my side the confidential corporate structure information?

A.    Do I think that a witness is going to be?  No.  I'm the witness for the CERT entities.

Q.    And you are without information to address the timing of when you finally let us see the facts of the corporate structure; right?

MR. DYESS:  Objection, Your Honor.  He's implying that information was available and complied with the discovery schedule set by the Court.

THE COURT:  Mr. Caldwell.

MR. CALDWELL:  They put up a timeline suggesting we were dilatory.  We had a request out for a year and a half.

MR. DYESS:  Your Honor, Mr. Sykes didn't put up a timeline suggesting they were dilatory.  He put up a timeline showing when complaints were filed.

THE COURT:  Give me one second.

I'll overrule the objection.  The issue of knowledge and reaching out to the corporate entities has been at issue and the question relates to that.  So I'll overrule the objection.

BY MR. CALDWELL:

Q.    Do you need to re-ask?

A.    Please.

MR. CALDWELL:  May I ask the court reporter to read that, to re-ask that?

THE REPORTER: QUESTION: "And you are without information to address the timing of when you finally let us see the facts of the corporate structure; right?"

THE WITNESS: I am not certain when the corporate structure was released to you guys. I don't know.

BY MR. CALDWELL:

Q. And very shortly after Midwest Energy, our side, got that information, we streamlined the parties to make sure that we were focused on the proper plant with activated carbon; right?

A. I don't know when -- what the timing of when the next complaint came. I don't recall the date without looking.

Q. I'm sorry if I'm taking a few seconds because I just go through it mentally and ask questions that are coming to mind, and I don't want to be duplicative. Let me see if I can streamline things for a second.

Mr. Green, looking at these parties, the red ones, these LLCs and the operations ones, if we put ourselves back when you guys were getting tax credits -- so you were selling refined coal.

Are you with me, sir?

A. Yes, sir.

Q. So let's call it summer 2019. Who is the entity for these first five that would have the power to say let's stop doing this process if it infringes the patent?

A.      Senescence Energy Products would.  I mean, I'm sorry, the project company, Senescence and Springhill and Bascobert, all five of those red boxes on those five projects, they control the operations at those facilities.

Q.      The ones with zero employees are the ones who would be in a position to make a decision whether to stop?

A.      Yes, sir.  They're the ones that own the facility.

Q.      So didn't you tell us in your deposition that really the people who make a decision to stop, obviously, the power plant, they can shut down.  But amongst the CERT-related companies or contracting companies, the entity that could make a decision would have been the majority partner of the refined coal company that could stop operations at any time?

A.      The majority partner for each one of the project companies in red.  I thought that's what I said.

Q.      I think you said the project company in red doesn't have employees, but what you're actually saying is it's the majority partner, like in this instance in these first five, is JPMorgan?

A.      The majority partners of those first five is JPMorgan.

Q.      That's the company could have decided to stop operations in 2019, 2020, 2021 for Big Cajun, W.A. Parish, Coleto Creek, Limestone, and Labadie; right?

A.      I'm sorry.  Those project companies are owned as a

partnership.  We do own a piece of those projects.  We own -- I can't -- generally, one percent of those.  There's another entity that owns the 99 percent.  Those are the two partners that would be able to make the decision to stop production.

I'm trying to answer your question.

Q.    Sir, in your deposition, you said the majority partner, which is not the one percent guy; right?  The majority is not the one percent guy?

A.    The majority partner is another name between JPMorgan and there.  I'm not sure exactly what the name is without looking at the corporate structure.

Q.    That's the company that could have made the decision to stop infringing?

A.    Yes, sir.

Q.    A company you literally can't name is the company that would have been the one that could have made a decision to stop infringing?

A.    Senescence Energy Products or Springhill Resources are the companies that I'm familiar with.

Q.    I didn't ask you what companies you're familiar with, sir.  I'm sorry for getting frustrated, but I'm trying to find out because there are issues of things like willful infringement in this case, and I'm trying to help the jury with that sort of stuff.

Q.      Who is the name of the company, the majority partner you told us in your deposition, could have made the decision to stop infringing?

A.      The majority partner of each of the project companies.

Q.      And who are they?

A.      JPMorgan, Kiewit, and Mylan is who's on your list right there.

Q.      You're making it sound like I'm being ridiculous for overlooking them.  You just told me there was another company somewhere between JPMorgan and the red boxes that you can't identify; right?

A.      I told you that I didn't know the names of the companies without looking at the org charts.  That's 16 different names up there.

Q.      So now are we on the same page, that JPMorgan could have decided in late '19 to stop doing this process at Big Cajun, W.A. Parish, Coleto Creek, Limestone, and Labadie?

A.      Yes, an affiliate of JPMorgan is.

Q.      Did you send JPMorgan the patents in this case?

A.      JPMorgan has been kept abreast of this case.

Q.      Are any of those bankers here in court today?

A.      No.

Q.      What about the guys at Kiewit?  They would have been the ones that could have made the decision to stop at

Laramie and Rush Island; is that right?

A.    That is -- that's correct.

Q.    Is there another name that you can't remember, some other company squeezed in between Kiewit on top and Buffington and Cottbus below?

A.    Each one of those companies are affiliates.  Yes, there's companies that have the membership -- the ownership interest in the membership of each one of the project companies.

Q.    So did any of the folks who could have stopped infringing at Laramie and Rush Island make it to court?

A.    No, sir.

Q.    Let's take Powerton out of consideration.  That's the Alistar one who paid; correct?

A.    That's correct.

Q.    Speaking of Antelope Valley, that's the one that goes up through Marquis Industrial, LLC, and eventually to Mylan; right?

A.    Yes, sir.

Q.    Is there some company in between Mylan and Marquis Industrial that you can't remember?

A.    I think it's Marquis (A) or (B).  I don't recall the names, just similar to all the others.  Yes, sir.

Q.    Did you ever send the patents to them?

A.    They've been kept abreast of the case as well.

Q.      Kiewit, same thing?

A.      Same story.

Q.      Did any of these pharmaceutical guys from Mylan make it here?

A.      No, sir.

Q.      If JPMorgan, Kiewit, and Mylan or these other unnamed entities right below them had made the decision to stop selling refined coal at these plants, the accused plants --

        You know what I'm talking about; right?

A.      Yes.

Q.      -- when we filed the lawsuit, they would have had to forego something on the order of 300 to $350 million in tax credits; right?

A.      I'd have to do the math.

Q.      But it's that 57 million tons we talked about earlier in the case.

A.      Okay.

Q.      And you told us yesterday it's 5 to $7 per ton; right?

A.      That's correct.

Q.      Unless I misadded to the 57 million, we assume that's right.  If JPMorgan, Kiewit, Mylan or their associated entities underneath had made the decision to shut down these refined coal processes in July 2019 when we filed the complaint, they would have foregone 300 to $350 million in

tax credits; right?

A.    That sounds correct.

Q.    300 or $350 million in tax credits is a pretty powerful motive to keep going, don't you think?

MR. DYESS:  Objection.  He's asking about the opinion of a different party.

THE COURT:  Mr. Caldwell.

MR. CALDWELL:  He's the only person who's a corporate representative.

MR. DYESS:  Those parties are not defendants in this case.

MR. CALDWELL:  I'm asking about his corporate rep position for the companies he represents.

THE COURT:  I'll sustain the objection and ask you to re-ask the question.

BY MR. CALDWELL:

Q.    You told me that the red companies, you started to answer that they could have been the ones who made a decision to stop, what I labeled as the investment vehicle LLCs.

You started to say that in an answer earlier, and I think your point was it's because they're sort of controlled by the majority partner and, I think, the CERT partners who have a one percent; right?

A.    That's correct.

Q.    And you are here speaking on behalf of all of those red companies; right?

A.    Yes, sir.  I am.

Q.    Sir, 300 to $350 million in tax credits is a powerful motive to keep selling refined coal after receiving the complaint; right?

A.    That's a significant amount of money, yes.

Q.    To the best of your recollection, what is the name of the technical expert that you guys are going to bring in the case?

A.    Dr. Connie Senior.

Q.    And then what are the other witnesses you expect to hear from?

A.    The last I knew that we would just have some depositions, but I don't know if Steve Niksa is testifying or not.

Q.    Mr. Green, thank you for your time.

        MR. CALDWELL:  I'll pass the witness.

        THE COURT:  All right.  Would this be a good time to take our morning break?

        MR. DYESS:  Your Honor, we're going to reserve our time with Mr. Green when we put on the defense case.

        THE COURT:  Okay.  All right.  So no examination now of Mr. Green?

        MR. DYESS:  Correct.

THE COURT: Okay. All right. So then Mr. Green you can step down for now and go back to counsel table.

Mr. Caldwell, would this be a good time to take our morning break?

MR. CALDWELL: It would.

THE COURT: Why don't we do that and have the jury led out for our morning break.

(The jury exited the courtroom.)

THE COURT: Yes, counsel, Mr. Dyess.

MR. DYESS: Before we go off the record, Your Honor, based on the schedule yesterday, Mr. Green is now released from cross-examination. He can confer with his lawyers; correct?

THE COURT: He may.

It's about 10:40. Why don't we come back at 10:55.

Before we do, Mr. Caldwell.

MR. CALDWELL: We will probably rest at that point. I realize you probably intuited that, but I wanted you to know in case that affects how you plan for motions.

THE COURT: In terms of what's expected, so the plaintiff will rest their case in chief with regards to infringement and damages at that point, and, Mr. Dyess, what's your expectation of what your plan is?

MR. DYESS: We do have a judgment as a matter of

law motion to bring to the Court.

THE COURT:  Okay.  So maybe what we'll do is let's take a break, and I guess -- I'm just trying to think about -- we need to come back and be on the record for the plaintiff to rest and make your motion.  I'm thinking we could take up the motion -- we're going to take up the motion outside of the presence of the jury in a focused way.  And I want to do that in a way that makes best sense, and I don't want to break things up in a way that's problematic for you all.

I know you have some desire to speak with Mr. Green.

MR. DYESS:  It's probably better for him to address that, Your Honor.  I'm not going to bring the motion.

THE COURT:  Okay.  Well, why don't you all talk amongst yourselves and come up with a proposed plan for the next 30 minutes-ish, and then we'll take a break.

I'll come back out and talk with you and we'll get it.

All right.  The Court will stand in recess.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  Just to confirm, I think our plan is we're going to bring the jury in in a second and Plaintiff

will close its case on infringement and damages.

Defendant will then make for the record -- note that they have a motion for the record.  I will say I'll hear the motion later, and then we'll go into that -- Defendants' response later.

MR. CALDWELL:  With one caveat.  We will rest, not close.  But that kind of matters, and we will -- I mean, unless you want to go straight into that.

But then the other thing is prior to resting, what I'm going to do is for the record, I'm going to identify, like, demonstrative exhibit numbers, and we might have to sticker them later.

But I just want to put on the record demonstrative exhibit numbers for, like, slide decks and for boards, and I realize demonstratives -- I'm not talking about what goes to the jury box.  That's not the issue.

At this point, I Just want to make sure they're marked as demonstratives.

THE COURT:  That's fine.  And we will work to make sure at the close of all the evidence that the parties and we are on the same page with regard to what exhibits have been admitted to.  Counsel will prepare kinds of these things to go back to the jury, et cetera.

Yes, Mr. Sykes?

MR. SYKES:  Your Honor, I just wanted to confirm

for the record the discussion with ME2C's counsel, just that we do stipulate for belt and suspenders that our raising the motion after they rest and arguing at lunchtime that there's been no procedural waiver of the JMOL motion.

MR. CALDWELL:  And we agree.  What I told Mr. Sykes was whatever motions they make at lunch will count as if they -- in our minds will count as if they made it right after we rested.

THE COURT:  Okay.  If there's nothing further, we'll have the jury brought in.

(The jury entered the courtroom.)

THE COURT:  Mr. Caldwell?

MR. CALDWELL:  Thank you.

So, Your Honor, just for the record, we will be marking or stickering demonstratives, and I just want to announce into the record demonstrative exhibit numbers.  Not PTXs, but PDXs.

THE COURT:  Okay.

MR. CALDWELL:  And the opening slide deck is PDX 1.  Mr. Pavlish's slide deck is PDX 2.  Mr. MacPherson's is PDX 3.  Mr. O'Keefe's is PDX 4.  Mr. Green's is PDX 5.

The checkmark claim board that Mr. Nemunaitis made with Mr. O'Keefe for the '517 is PDX 6.  The one for the '114 patent is PDX 7.  Slides from the adverse call of Mr. Jeff Green are PDX 8.

And the org chart board that I created in opening and have used since is PDX 9.  Sorry.  We'll provide copies according to the Court's preferences on that.

THE COURT:  Will you actually be stickering these things?

MR. CALDWELL:  It's a little odd as things that are slide decks, but, yes, we will find a way to kind of unambiguously mark them and get the copies that the Court wants, and -- if that's okay with Your Honor?

THE COURT:  It is.

MR. CALDWELL:  And those, I guess, are acknowledged as demonstratives.

THE COURT:  They are so noted.

(Thereupon, Plaintiffs' Demonstrative Exhibits 1 through 9 will be marked.)

MR. CALDWELL:  Then with that, the plaintiff rests.

THE COURT:  All right.  Thank you, Mr. Caldwell.

All right.  Let me turn to Defendants' counsel.

MR. DYESS:  Your Honor, at this time, we move under Rule 50 for judgment as a matter of law.

THE COURT:  All right.  Your motion is noted. As the parties have agreed, I'll hear that motion later today.

And so next, Mr. Dyess, I'll turn to you to call

your first witness.

MR. DYESS:  Your Honor, we call Jeff Green to the stand.

THE COURT:  Mr. Green, please come forward again.

MR. DORSNEY:  Your Honor, may we approach?

THE COURT:  You may.  Thank you.  Mr. Dyess?

MR. DYESS:  May I proceed, Your Honor?

THE COURT:  You may.

JEFF GREEN,

called as a witness on behalf of the

Defendant, was previously sworn, and

testified as follows:

DIRECT EXAMINATION

BY MR. DYESS:

Q.    Mr. Green, you've already been introduced to the jury.

I want to spend a few minutes just following up on the testimony you just gave to Mr. Caldwell.  He seemed upset that you're here as the corporate representative of the defendants.

MR. CALDWELL:  Objection, Your Honor.  That's argumentative.  I literally never indicated I was upset about him being the corporate representative.

THE COURT:  I'll overrule the objection in light

of what's been said to the Court, but I'll allow it, but let's continue.

BY MR. DYESS:

Q.    Mr. Green, speaking of the four CERT partners, I don't mean to be disrespectful, Mr. Barr Linton recently passed away; correct?

A.    Correct.

Q.    Mr. Raymond Bean, he currently is not in good health; correct?

A.    That's correct.

Q.    What is his health situation?

A.    He has terminal leukemia.

Q.    That leaves you and Ms. Schaatt?

A.    Correct.

Q.    Between you and Ms. Schaatt, who knows more about refined coal?

A.    In my opinion, that would be me.

Q.    And you understand, this -- this is a case, at least as it that relates to infringement -- is about how refined coal is made, don't you?

A.    I would agree with that, sir.

Q.    So wouldn't it make sense that you would be here as the person representing the defendants who can testify about how refined coal is made?

A.    Yes, sir, I believe that's why I'm here.

Q.    You went over with Mr. Caldwell a handful of e-mails, seven, eight, nine e-mails, something like that.

Do you remember that?

A.    Yes, I do.

Q.    The life of this refined coal program is ten years; correct?

A.    That is correct.

Q.    Over the life of the refined coal program, about how many e-mails did you receive just talking about the refined coal business?

A.    It was -- it was a lot.  I used to joke with folks that I would get a hundred e-mails a day about work that had to be responded to whenever I was asked how much time I was spending just replying to e-mails, but it was -- it was a large number, yes, sir.

Q.    Did it -- does it surprise you that when this case got filed, you couldn't remember any one particular e-mail?

A.    No, that doesn't surprise me.

Q.    Now, if you'd gotten an e-mail about activated carbon -- let me back up.  Do you recall when the CERT defendants were served with a copy of the patents?

A.    I don't remember exactly, but it was definitely in the second half of July of '19.

Q.    I think the Court's record would show that Defendants -- the CERT Operations defendants were served

with a lawsuit around July 19th of 2019.  Does that sound right?

A.    That would be right, and I would have been served July 19th.

Q.    Would it surprise you that on July 19, 2019, you didn't remember an e-mail from five years prior to that?

A.    That would not surprise me, no, sir.

Q.    All of these e-mails were talking about activated carbon.  I think Mr. Caldwell went through with you.

Do you recall that?

A.    Yeah.

Q.    Was activated carbon a part of the CERT companies' business?

A.    No, sir, it was not.  It couldn't have been by the statutes or by the -- by the Section 45 code requirements.

Q.    I think we'll -- and we'll explain that a little bit later, but none of the CERT companies ever -- they weren't the ones that were supplying activated carbon to the power plants, were they?

A.    No, we didn't supply activated carbon to power plants.

Q.    To your knowledge, did anybody affiliated with the CERT companies ever suggest to the power plants they ought to use activated carbon?

A.    No, we did not.

Q.    Would it be fair to characterize these e-mails as the power plants telling you about activated carbon?

A.    That's how I would characterize all of those e-mails.

Q.    Okay.  You've still got the the plaintiffs' notebook that they provided for you?

A.    No, they just took it.  They just took it.

MR. DYESS:  May I approach, Your Honor?

THE COURT:  You may.

BY MR. DYESS:

Q.    I had a few questions about some of the documents Mr. Caldwell discussed with you.

MR. DYESS:  Can you pull up Plaintiffs' Exhibit 688?

BY MR. DYESS:

Q.    If you would turn to Tab 6 in this notebook, Mr. Green.

A.    Okay.  I'm here.

Q.    There's a sentence that Mr. Caldwell had you focus on that starts right here with "Ameren."

Do you see that?

A.    Yes, I see that.

Q.    And this part of the e-mail, this was from Jeff Jones at Ameren to you; correct?

A.    Yes, that is correct.

Q.    And the sentence I was pointing to you that starts

with "Ameren," that's them telling you what Ameren's compliance plan was for mercury control; correct?

A.    Yes, sir, that's what it appears to say.  Yes, that's what it says.

Q.    Did you ever suggest to Jeff Jones or anybody else at Ameren what their mercury compliance program should be?

A.    No, sir.  We were never asked to opine on how they control mercury.

Q.    Were you ever asked to give any advice on what their mercury compliance program ought to be?

A.    No, never.

         MR. DYESS:  If you could, Mr. Brown, pull up Plaintiffs' Exhibit 232.

BY MR. DYESS:

Q.    Now, again, this was a 2015 e-mail; correct?

A.    Yes, sir.

Q.    And the one we looked at before, it was a 2016 e-mail; correct?

A.    That's correct.

Q.    And those are both before this lawsuit got filed?

A.    Correct.

Q.    And that's before you had notice of any of the patents in this case; correct?

A.    That is correct.

Q.    Matter of fact, that was before these patents even

issued, weren't they?

A.    That is correct.

Q.    So we're looking at 232. I think when you discussed this with Mr. Caldwell, it was in the context of the power plants were asking you to -- were asking the CERT companies if they could still spray the coal with calcium bromide even if they couldn't make refined coal; is that right?

A.    Yes, sir, that's what it says.

Q.    And then there were two or three e-mails that were of the same variety, can you spray -- the plants are asking if we can spray the coal with calcium bromide if they're not making refined coal; right?

A.    Yes, sir.

Q.    Did the CERT companies ever actually, for any of their power plants, spray the coal with calcium bromide if they weren't making refined coal?

A.    No, sir. There was no -- there was never an instance where we didn't make refined coal and did what these e-mails refer to.

        MR. DYESS: Let's go -- if you could pull up, Mr. Brown, Plaintiffs' Exhibit 96.

BY MR. DYESS:

Q.    Now, this is another one of those e-mails --

        MR. DYESS: If you can pull up this paragraph, Mr. Brown. The one that starts with "As you know, some

utilities."

BY MR. DYESS:

Q.     Now this says:  "As you know, some utilities, Basin and Dominion but so far not IPA, are asking for an agreement with the refined coal project companies."

       Right?

A.     Right.

Q.     Were any CERT companies selling refined coal to a Dominion power plant?

A.     Yes, sir.  Two of the project companies were selling refined coal to Dominion power plants.

Q.     You may need to speak up a little bit.

A.     Yes, sir.  Two of the CERT refined coal project companies were selling refined coal to Dominion power plants.

Q.     And which power plants were those?

A.     That was Mount Storm station, which was in West Virginia, and Chesterfield station, which was just south of Richmond, Virginia.

Q.     To your knowledge, did Mount Storm or Chesterfield ever use activated carbon?

A.     No, sir.  To my knowledge, they never used activated carbon.

Q.     Now, IPA, do you know what this reference is to IPA right there?

A.    That's Intermountain Power Agency out of Delta, Utah. It's a power plant.

Q.    Was that a power plant where a CERT company was supplying refined coal back in 2015?

A.    Yes, sir.  They supplied coal to that power plant, Intermountain Power, from 2011 until 2021.

Q.    Did Intermountain power plant ever use activated carbon?

A.    No, sir, not to my knowledge.  They never used activated carbon.

Q.    Okay.

        MR. DYESS:  If you would go to page 2 of that deck.

BY MR. DYESS:

Q.    Mr. Green, do you recognize what's in this picture?

A.    Yes, sir, that is the refined coal, a piece of it. It's not all in the picture, but that's a piece of the refined coal facility located as W.A. Parish station phase one.

Q.    And how long was this facility, as it appears in this picture, at that W.A. Parish facility?

A.    It was installed in December of 2011 and remained there throughout the life of the program.

Q.    2011 to 2021?

A.    Yes, sir, correct.

Q.   And it pretty much looked just like this?

A.   Exactly like that.

Q.   Okay.  So these are big tank silos that hold chemicals; right?

A.   Yes, those are the S-Sorb silos.

Q.   How tall are those things?

A.   Oh, probably 70 feet tall, 65 to 70 feet.

Q.   What's this building right here?

A.   That is our control room trailer.  That building houses our employees' room and then the control room that contains all the switch gear and PLC equipment for the manufacture of refined coal.

Q.   But no employees are there, right, because these companies don't have employees?

A.   At that facility, there's about 16 employees.  We work 12 hours -- I'm sorry -- two 12-hour shifts.  So there was a staff of about 16 to 18 people that worked at that facility.  And, like I said, that's just one of the facilities.  There's another one on the site as well.

Q.   On the same W.A. Parish site?

A.   Yes, sir.  There's two refined coal facilities there.

Q.   Do both of them have a trailer like this?

A.   Yes, sir, both have -- it's almost identical equipment.  Well, it is identical equipment.

Q.   And there would have been CERT Operations Company

personnel in these trailers 24/7; correct?

A.    CERT Operations' employees manned that facility, yes, sir.

Q.    So if somebody needed to find out who was supplying refined coal through these 70-foot towers that's connected to the power plant's conveyer belt, they could have knocked on the door of that trailer and asked, "Who are you?"

A.    Yes, sir, that's correct.

Q.    And somebody would have been there 24/7?

A.    Yes, sir.

Q.    So you heard Mr. MacPherson's testimony in this case; right?

A.    Yes, I did.

Q.    It's his allegation that they couldn't find out who was selling the refined coal to power plants; is that right?

A.    I mean, no.  I certainly agree that somebody could have gone to the operation and asked, if they were on that site.

Q.    And if Mr. MacPherson was at the W.A. Parish power plant trying to sell them the ME2C products, he certainly could have asked the power plant, "Hey, where can I go find out who's making this refined coal"; right?

A.    Right.  I mean, they would have directed him to us.

Q.    So the CERT Operations' employees that were making the refined coal, those weren't the only CERT employees,

were they?

A.      No, sir.

Q.      Does CERT -- the CERT Operations' companies are subsidiaries of another CERT company; correct?

A.      That's correct, Combustion Emission Reduction Technologies, LLC.

Q.      Do we call that CERT, LLC?

A.      Yes, sir, we do.

Q.      And CERT, LLC, it has offices; right?

A.      We have offices in Birmingham, Alabama.

Q.      And do you have people that work in that office?

A.      We did.  There was about 20 staff, accounting, tax work, and general accounting folks that were in that office.

Q.      I asked the question at the wrong time I've got to remember that.

        Back from 2011 to 2021, did CERT, LLC, have people working in that office in Birmingham?

A.      Yes, sir.  Actually, from 2009 until 2022.  Yes, sir.

Q.      Those accounting people, did they come into the office pretty much every day?  Maybe not during COVID, but pretty much every other day?

A.      That was the only caveat, but, yes, sir.  They came to the office every day.

Q.      Did you have a receptionist in that office?

A.      Yes, sir, we did.

Q.    Did you have phones installed in that office?

A.    Yes, sir.

Q.    Would she be there to answer the phone if somebody called and said, "Is this CERT?"

A.    During normal business hours, yes, sir.

Q.    Let's talk about a few things that probably the jury could use some help understanding.  We talked about refined coal facilities.

      What is a refined coal facility?

A.    Refined coal facility is a very good example that we see here.  It's a collection of mechanical and electrical equipment, monitoring equipment, weighing equipment, controlled metering equipment that's made specifically to manufacture a product, which is refined coal.

Q.    I mean, that's -- all that stuff has to be built and constructed at the power plant; correct?

A.    That is correct, yes, it has to.

Q.    And that required an investment of upfront money to build these buildings, to prepare the site to put it on site, all that kind of stuff?

A.    Yes, it took a substantial capital investment.

Q.    And power plants don't pay for this, do they?

A.    No, sir.  The development, the project company -- the project companies pay for the building or installing the assets.

Q.      And who designed these facilities?

A.      I did along with some engineering firms.

Q.      Now, the defendants in this case can be divided into two groups; correct?

A.      Yes, sir, that's correct.

Q.      We've already talked about that.  They're the project companies and the operations companies; correct?

A.      That is correct.

Q.      Just so the jury understands from you, what's the difference between project companies and operations companies?

A.      The project companies own the assets that are located at the power plants, and the operations companies are contract operators that operate the facilities on behalf of the refined coal project companies.

Q.      When you say "operate on behalf of," what do you mean?

A.      The day-to-day production.  Everything that's involved with the production of the fuel.

Q.      They have the boots on the ground that make the refined coal?

A.      Yes, sir.  That's the 16 people that I was referring to.  They're the boots on the ground that make it happen.

Q.      Who sells the refined coal to the power plant?

A.      The project company does.

Q.      They own the coal that's turned into refined coal that's sold to the power plant?

A.      Yes, sir.  The project company owns the feedstock coal, the asset, the refined coal company, and they sell the production to the power plant.

Q.      Now, I'm not sure you've been asked this question, but do you have a role with the operations companies?

A.      Yes, sir, I'm also the VP of operations of all the six CERT operation companies.

Q.      Generally speaking, what are some of your job duties as VP of operations for the operation companies?

A.      I'm over all of the operations for all of the refined coal companies that CERT Operations Companies operate.  So everything, day-to-day operations, staffing.  I have management that works under me at each one of the facilities, so I oversee the day-to-day operations.

Q.      Mr. Green, you've been here for all the testimony in this case; correct?

A.      That's correct.

Q.      Do you have -- we're talking about two patents in this case; correct?

A.      Yes, sir.

Q.      And I think that they've been referred to as the '114 patent and the '517 patent; correct?

A.      That's correct.

Q.    Do you have an understanding of when the '114 patent was issued by the Patent Office?

A.    Yes, sir.  I believe that was July 9th of 2019.

Q.    And did the '517 patent issue from the Patent Office sometime after that?

A.    That's my understanding.  Early 2020 maybe.

Q.    We talked about you getting served with the complaint in July 2019.  That complaint had a copy of the '114 patent along with the complaint; right?

A.    Yes, sir.

Q.    You didn't try to avoid finding out about that patent.  It came with the complaint?

A.    That's correct.

Q.    There were some questions that Mr. Caldwell asked you about doing patent searches before you started selling refined coal.  When did these companies start supplying refined coal to power plants?

A.    That would have been in the latter half of 2011.

Q.    Do you think you would have been able to do a patent search in the latter half of 2011 for a patent that didn't even exist until 2019?

A.    No, sir.  I don't think that's possible.

Q.    Let's talk for a minute about the defendants in this case.  CERT Operations V operates the refined coal facility at the Rush Island power station for Buffington partners; is

that correct?

A.    That is correct.

Q.    And they -- that arrangement was in place from 2011 to 2021; correct?

A.    Yes, sir, that's correct.

Q.    And Buffington Partners is the one selling the refined coal to Rush Island from 2010 to 2021?

A.    That's correct.

Q.    Just so we're understanding, 2011.  I mean, CERT Operations V and Buffington Partners, they didn't start selling refined coal in 2019 when you found out about the patent; right?

A.    No, sir.  We started in 2011.

Q.    That was almost eight years before the patent issued?

A.    Yes, sir.  That's correct.

Q.    That was eight years before you could have possibly infringed these patents; right?

A.    Yes, sir.

Q.    Eight years before you could have possibly known about these patents?

A.    Yes, sir.  That's correct.

Q.    Speaking of 2011, is having a refined coal facility in place before the end of 2011 an important fact in the refined coal business?

A.    Yes, sir.  The IRS code has what we call a

placed-in-service date, and in order to qualify under the code, the facility has to be installed and commercially operating prior to -- the date was December 31, 2011.

Q.    What would happen if you wanted to get in the refined coal business and you didn't have your refined coal facility installed and commercially operating until January 2, 2012?

A.    That facility wouldn't qualify for the credit, so you couldn't do it unless you bought a facility.

Q.    Somebody that might want to get into the refined coal business in 2014, 2015, 2016, they couldn't just jump in and start making refined coal with a new facility?

A.    No, sir.

Q.    When Rush Island -- was Rush Island, the power plant, using activated carbon when you started selling -- when you starting supplying refined coal to them in 2011?

A.    It was not using activated carbon at that time.

Q.    If you would, you've got two notebooks up there that are black.  One of them is a skinny notebook, one of them is a little bit fatter.

A.    I've actually got two skinny notebooks and one fat one.  Is it DTX 1514 or the witness binder?

Q.    The witness binder.

A.    I have that.

Q.    If you would look behind the tab for DTX 1539, it should be the first one.

A.    I'm there.

Q.    Do you recognize what that document is?

A.    Yes, I'm familiar with this document.

Q.    What is that document?

A.    This is the operations and maintenance agreement between Buffington Partners, LLC, and CERT Operations V, LLC.

Q.    And that's what we were just talking about here. That's where they were selling the refined coal to the Rush Island station; correct?

A.    That's correct.

Q.    What is the purpose of this agreement?

A.    It outlined all the operation and maintenance agreements for the CERT Operations V for Buffington Partners.

Q.    And that's kind of the operating document that they would use for that relationship for supplying refined coal to Rush Island?

A.    Yes, sir, along with several other documents.

        MR. DYESS:  I would move to admit Defendants' Exhibit 1539.

        THE COURT:  Any objection?

        MR. CALDWELL:  No objection.

        THE COURT:  It's admitted.

        (Thereupon, Defendants' Exhibit 1539 was

admitted.)

BY MR. DYESS:

Q.    Would there be similar operations and maintenance agreements in place for the other refined coal facilities?

A.    Yes, sir.  All of the refined coal facilities had similar O&M agreements.

Q.    What's the date of this document?

A.    That is December 29, 2011.

Q.    And is that reflective of the date we just talked about, the placed-in-service date?

A.    Yes, sir, it is.

Q.    Is there anything in this document that described the refined coal facility that was owned by Buffington Partners and operated by CERT Operations V?

A.    Yes, sir.  That would be Exhibit A, I believe.  Yes, sir.  It's Exhibit A.

Q.    If this jury, when they go back, wanted to look at something that they could reference that kind of described what a refined coal facility was, could they do that using that Appendix A?

A.    Yes, sir.  That gives you all the mechanical and electrical equipment that makes up that facility.

Q.    It actually runs over to the next page; is that correct?

A.    Yes, sir, it does.

Q.    Now, this description of the refined coal facility that was at W.A. Parish plant, is that pretty similar to what's going to make up the refined coal facility at all of the CERT refined coal facilities?

A.    Yes, sir.  All of our equipment was very similar, if not identical, at all locations.

        MR. DYESS:  Now, if we can go back to the demonstrative.  Go to the next slide.

BY MR. DYESS:

Q.    Now we're back to the pairings.  CERT Operations IV operated the refined coal facility for the Big Cajun II plant for Springhill Resources; correct?

A.    That's correct.

Q.    For what period of time were they operating that refined coal facility and selling refined coal?

A.    Generally, the same time, 2011 to 2021.

Q.    And who was sell selling the refined coal to the Big Cajun II station?

A.    Springhill Resources was.

Q.    Now, 2011, when CERT Operations IV is making refined coal and Springhill is selling the refined coal to Big Cajun II, was the Big Cajun II station using activated carbon at that time?

A.    No, sir, not to my knowledge.

        MR. DYESS:  Let's go to the next slide.

BY MR. DYESS:

Q.    Now, the pairing of project company and operations company for the Limestone, that was Rutledge Products and CERT Operations RCB; correct?

A.    That's correct.

Q.    And that operation was preparing and selling refined coal to the Limestone power station in 2011; correct?

A.    That's correct.

Q.    And they did that 2011 to 2021; correct?

A.    Yes, sir.

Q.    When Rutledge Products started selling refined coal to the Limestone power station in 2011, was Limestone using activated carbon?

A.    No, sir, not to my knowledge.

Q.    If we could go to the next slide.  The pairing at the W.A. Parish power station was CERT Operations RCB preparing the refined coal for Senescence Energy to sell to the W.A. Parish power station; right?

A.    Correct.

Q.    And that relationship dates back to 2011, and it ran until 2021; correct?

A.    Correct.

Q.    And when Senescence started selling that refined coal to W.A. Parish in 2011, was the W.A. Parish power station using activated carbon?

A.     No, sir, it was not.  Not to my knowledge.

Q.     Let's go to the next slide.  The pairing at Antelope Valley station, that was Marquis Industrial that owned the refined coal facility and CERT Operations II that prepared the refined coal that was sold to the Antelope Valley station; correct?

A.     That is correct.

Q.     And that relationship ran from 2013 to 2021; correct?

A.     Right.

Q.     Now, you just told us that the refined coal facility had to be in operation by the end of 2011 to get the tax credit; correct?

A.     Yes, sir.

Q.     But you just said you weren't at Antelope Valley station until 2013.

A.     Right.  That facility was originally placed in service and went into NRG's power plants at Gibson Station.

Q.     Where is Gibson station?

A.     Illinois -- I'm sorry, Indiana.

Q.     For what period of time did that -- did CERT Operations II operate that facility for Marquis, Gibson Station?

A.     Yes, it did.

Q.     For what period of time?

A.     It was the latter part of 2011 into 2012.

Q.     When CERT Operations II was operating that facility for Marquis Industrial at Gibson station in 2011, was Gibson station using activated carbon?

A.     No, sir.  Not to my knowledge.

Q.     To your knowledge, did Gibson Station ever use activated carbon?

A.     Not any time we were there.  I can't speak to after 2012.

Q.     After you relocated the facility to Antelope Valley station in 2013 -- let me re-ask the question.

        When you relocated that refined coal facility to Antelope Valley in 2013, was Antelope Valley station using activated carbon?

A.     No, sir, not to my knowledge.

        MR. DYESS:  Next slide.

BY MR. DYESS:

Q.     The pairing of the facility at Laramie River station was CERT Operations RCB preparing the refined coal that Cottbus Associates sold to Laramie River station; correct?

A.     That's correct.

Q.     What period of time did that occur?

A.     That was 2013 to 2021.

Q.     When Cottbus started selling refined coal to Laramie River station in 2013, was the Laramie River station using activated carbon?

A.    No, sir, it was not.

Q.    Had that facility been in service somewhere else prior to starting operations at Laramie River station?

A.    It was, as it's shown on the screen.  Similar story as before.  That was originally placed in service Cayuga Generating Station as a Duke Energy plant that's in Indiana. It operated --

Q.    I'm sorry.  You kind of trailed off.

A.    It operated 2011, 2012.

Q.    And when this refined coal facility was in operation at the Cayuga generating station in Indiana in 2011, was the Cayuga station using activated carbon?

A.    No, sir, they were not.

        MR. DYESS:  Go to the next slide, please.

BY MR. DYESS:

Q.    The pairing at the Labadie power station was CERT Operations RCB making the refined coal for Larkwood Energy for it to sell to the Labadie power station; right?

A.    Yes, sir, it was.

Q.    For what period of time was that relationship in effect?

A.    That was 2014 to 2021.

Q.    When CERT Operations RCB and Larkwood starting supplying refined coal to the Labadie power station in 2014, was the Labadie power station using activated carbon?

A.    No, sir, it was not.

Q.    Had that -- was that just one refined coal facility that was at Labadie?

A.    No.  There were actually two refined coal facilities that made up the Larkwood facility at Labadie power station.

Q.    And had those two refined coal facilities been somewhere else prior to the time they were at the Labadie power station?

A.    Yes, sir.  There were originally two plants owned by Marquis Industrial that were at Gibson Station and were installed in 2011.  We talked about that a couple of slides back.

That refined coal facility was sold to Larkwood Energy and relocated to Labadie station, and that was installed in what we called Labadie North and then there was a south location, which Larkwood Energy owned the Dolet Hills facility from 2011 to 2012.

And there's a mistake on the slide.  It says Dolet Hills Station, Utah.  That was actually Louisiana.  And it was relocated up to, the facility, from Louisiana to the Labadie station.

Q.    It's kind of hard to confuse Louisiana and Utah, so my apologies for that.

A.    That's okay.  I just saw the mistake.

Q.    Now, at the Dolet Hills station in Louisiana, CERT

Operations RCB was operating that facility for Larkwood Energy; correct?

A.    That's correct.

Q.    And that was in 2011, 2012?

A.    Yes, sir.

Q.    When CERT Operations RCB and Larkwood Energy had the facility in the Dolet Hills station in 2011, 2012, was that Dolet Hills station using activated carbon?

A.    No, they were not.

        MR. DYESS:  Go to the next slide, please.

BY MR. DYESS:

Q.    The pairing of operations company and project company at the Coleto Creek power station was CERT Operations RCB and Bascobert Holdings; correct?

A.    That's correct.

Q.    And CERT Operations RCB made the refined coal and Bascobert sold the coal to the power plant; is that correct?

A.    Yes, sir, that's correct.

Q.    At what period of time were CERT Operations RCB and Bascobert making and selling that refined coal at Coleto Creek?

A.    It started in 2019 through 2021.

Q.    Prior to that facility being at the Coleto Creek power station, had it been located somewhere else?

A.    Yes, it was located at Duke Energy's Marshall Station

in North Carolina.

Q.    For what period of time?

A.    From 2011 until 2015.

Q.    And did CERT Operations RCB operate the facility at the Marshall Station for Bascobert during that period of time?

A.    No, sir.  The operator for that facility was CERT Operations II.  Yeah, CERT Operations II.

Q.    So CERT Operations II operated the facility at Bascobert when it was at Marshall Station from 2011 to 2015?

A.    Yes, sir, that's correct.

Q.    And that's the same CERT Operations II that's a defendant in the case; right?

A.    Yes, sir.

Q.    So some of these operation companies operated facilities at multiple power plants?

A.    That's correct.

Q.    CERT RCB, CERT Operations II?

A.    Correct.  That is correct.

Q.    So when CERT Operations II was operating the Marshall Station for Bascobert and selling -- Bascobert was selling refined coal to the Marshall Station, was the Marshall Station using activated carbon?

A.    No, sir, not to my knowledge.

Q.    So Coleto Creek -- at Coleto Creek, CERT

Operations RCB and Bascobert starting selling that refined coal in 2019; correct?

A.    Yes, sir, that's correct.

Q.    Would there have been agreements in place between Bascobert and Coleto Creek for the supply of refined coal before Bascobert started selling refined coal to Coleto Creek?

A.    Yes, sir.  We would have had similar O&M agreements like we've looked at for another project and refined coal sales agreement.  There would have been agreements in place.

Q.    Do you know when those agreements were signed and in place for Bascobert to be able to sell that refined coal to Coleto Creek?

A.    I would say it was probably in April of May of that year.

Q.    If you could look in your notebook for Tab 1573.

A.    I'm here.

Q.    What is that document?

A.    This is the paid up surface use and access agreement between Coleto Creek Power and Bascobert (A) Holdings.

Q.    That is a very fancy name.  Is this document basically a land lease agreement?

A.    Yes, sir.  We lease -- we lease the area on the site, and that's what this covers.

Q.    And what's the date of this document?

A.      It was effective as of May 10, 2019.

MR. DYESS:  Your Honor, we move to admit Defendants' Exhibit 1573.

THE COURT:  Any objection?

MR. CALDWELL:  No.

THE COURT:  It's admitted.

(Thereupon, Defendants' Exhibit 1573 was admitted.)

BY MR. DYESS:

Q.      We talked about there would be a number of documents that would be in place before Bascobert started selling refined coal at Coleto Creek.

Do you recall that testimony?

A.      Yes, sir.

Q.      Is this one of those documents?

A.      This is one of those documents.

Q.      And would that collection of documents all be signed at the same time?

A.      Yes, sir.

Q.      So is it fair to say that the agreements in place for Bascobert that -- to sell refined coal to Coleto Creek would have been in place in May of 2019; correct?

A.      Yes, that's correct.

Q.      How long before these contracts were in place had Bascobert been in discussion with Coleto Creek about

supplying refined coal to Coleto Creek?

A.    I do -- I don't know.  I do know that my initial site visit, which I take site visits to meet with folks, occurred on Halloween of the prior year, 2018.  We had been in discussions since probably the summer months, maybe the fall, but I was on site in October of '18.

Q.    So, I mean, that's several months before initial discussions to having the agreements in place that would let you sell the refined coal to the power plant; correct?

A.    That is correct.

Q.    Is that typical?

A.    It is typical.  It's a long, drawn out process trying to sell refined coal to a power plant.  It takes awhile, yes, sir.

Q.    So I want to make sure I understand this, looking at these dates.  This -- the actual physical assets for this refined coal facility are that -- and we looked at that list in the O&M agreement before, that long list of equipment.

A.    Yes.

Q.    We looked at the picture, all that big mechanical equipment, the trailer, the sprayer for the MerSorb, the other things.

All of that's the equipment that was at Marshall Station in 2011 to 2015; right?

A.    That's correct.

Q.    And it doesn't go back into operation until 2019?

A.    That's correct.

Q.    Did it go anywhere in between to make refined coal?

A.    No, sir.  It sat idle at Duke Energy's Marshall Station until we found another home for it.

Q.    Was that just because you got tired of making refined coal at that facility?

A.    No, that happened -- in all the cases where we see a relocation and even some of the ones that we didn't see -- well, it really has nothing to do with relocation.

      But we would have investors exit projects, and there's no reason to produce refined coal if you don't have an investor in the project.

Q.    If you don't have an investor in the project and the asset is not producing anything, I mean, that's a risk you take when you set up these businesses; right?

A.    It's probably the single biggest risk.

Q.    So an investor could have started with you on January 1, 2012, and it could have pulled the plug on January 2, 2012?

A.    That's correct.

Q.    And at that point -- now we talked about four CERT Operations companies:  CERT Operations II, CERT Operations IV, CERT Operations V, and CERT Operations RCB.

      Are those all of the CERT Operations companies?

A.      No.   There -- there's a total of six CERT Operations companies.

Q.      Were you also vice president of operations for those two CERT Operations companies?

A.      Yes, sir.  That was CERT Operations, LLC, and CERT Operations III, LLC.

Q.      Do you still have the plaintiffs' blue notebook in front of you, the blue binder?

A.      Yes, sir.

Q.      If you would, turn to Tab 12 in that notebook.

A.      Okay.

Q.      This is the notebook that the plaintiffs prepared and gave to you for your testimony; correct?

A.      Yes, sir, that's right.

Q.      So what's behind Tab 12?

A.      It is the original complaint in this case.

        MR. DYESS:  And, Mr. Brown, if you could pull up the original complaint for the case.  It's DI 1.  DI 1.

BY MR. DYESS:

Q.      This is -- does this appear to be the original complaint that the CERT Operations companies were served with back in July of 2019?

A.      Yes, sir, it does.

Q.      Can you turn to the second -- can you look at the second page of that document for me?

A.      Okay.

Q.      Right here out in the middle of the page, it identifies the CERT companies that are Defendants in the case; right?

A.      Yes, sir, I see that.

Q.      And which CERT Operations companies were named as defendants in that original complaint?

A.      All six of them.  Would you like me to read them?

Q.      I would, please.

A.      CERT Operations, LLC; CERT Operations II, LLC; CERT Operations III, LLC; CERT Operations IV, LLC; CERT Operations V, LLC; and CERT Operations RCB, LLC.

Q.      Could you turn to page 7 of that original complaint.

A.      Okay.

Q.      Looking at paragraph 31 -- I mean, looking at paragraph 30, what is the name of the defendant that's identified in paragraph 30?

A.      CERT Operations, LLC.

Q.      What defendant is identified in paragraph 32 of that complaint?

A.      CERT Operations III, LLC.

Q.      If you would please turn to page 20 of that document.

A.      Okay.

Q.      Can you read paragraph 152.

A.      152:  "AJG, DTE, CERT, Chem-Mod, and the RC

defendants operate RC facilities that receive coal, add bromine and/or bromide such as CaBr2 to the coal, and then provide that refined coal to the coal-fired power plant that injects a sorbent material comprising activated carbon downstream of the combustion chamber, the accused RC facilities."

Q.    Mr. Green, would you look behind Tab 13 of the blue notebook.

A.    Okay.

        MR. DYESS:  If you could, Mr. Brown, pull up DI 130.

BY MR. DYESS:

Q.    Are you there, Mr. Green?

A.    Yes, sir, I am.

Q.    Can you look at page 2 of that document?

A.    Okay.

Q.    And, again, kind of in the middle of that page, are all six CERT Operations companies named as defendants in the case?

A.    Yes, sir, they are.

Q.    Let me ask that better.  First of all, what is this document behind Tab 13?

A.    This is the first amended complaint that was filed in this case.

Q.    And what date was it filed?

A.    July 15th of 2020.

Q.    And then on that second page, it still identifies all six of the CERT Operations companies as defendants in the case; correct?

A.    Yes, sir, it does.

Q.    And that includes CERT Operations, LLC?

A.    Yes, that's correct.

Q.    And it includes CERT Operations III, LLC; correct?

A.    Yes, sir, it does.

Q.    Can you turn to page 7 of that document.

A.    I'm there.

Q.    Who's identified in paragraph 29 as a defendant in this paragraph?

A.    CERT Operations, LLC.

Q.    And who's identified as a defendant in paragraph 31 of the first amended complaint?

A.    CERT Operations III, LLC.

Q.    Could you turn to page 6 of that document.

A.    Okay.

Q.    I'm sorry.  Turn to page 31 of that document.  My apologies.

A.    Okay.  Give me one second.

Q.    Sure.

A.    Okay.  I'm on page 31.

Q.    Can you read paragraph 206 for the jury.

A.      206:  "AJG, DTE, CERT, Chem-Mod, and the RC defendants operate RC facilities that receive coal, add bromine or bromide such as calcium bromide to the coal, and then provide that refined coal to a coal-fired power plant that injects a sorbent material comprising activated carbon downstream of the combustion chamber.  The accused RC facilities."

Q.      Can you look behind Tab 14 of the blue notebook.

A.      Okay.

Q.      What's that document behind Tab 14?

A.      This is the second amendment complaint in this case, and it's dated May 21st of 2021.

Q.      If you could turn to the second page there.

        Down in the middle, we've still got all six CERT Operations companies named in that complaint as Defendants; correct?

A.      That is correct.

Q.      If you could, turn to page 6 of that complaint, that second amended complaint.

A.      Yes, sir.

Q.      What is the name of the defendant identified in paragraph 23 of the second amended complaint?

A.      CERT Operations, LLC.

Q.      And what is the name of the defendant that's the subject of paragraph 25 of the second amended complaint?

A.      CERT Operations III, LLC.

Q.      And if you would, turn to page 31 of that document.

Could you read paragraph 211 for the jury.

A.      211:  "AJG, DTE, CERT, Chem-Mod, and the RC defendants operate RC facilities that receive coal, add bromine and/or bromide such as CaBr2 to the coal, and then provide that refined coal to a coal-fired power plant that injects a sorbent material comprising activated carbon downstream of the combustion chamber."

Q.      I know this is a tremendous amount of riveting testimony for the jury, but I need you to do it one more time.

Can you turn behind Tab 15 of the notebook.

A.      Yes, sir.

MR. DYESS:  This is DI 26.

THE WITNESS:  Yes, sir.  I'm there.

BY MR. DYESS:

Q.      This first page -- well, what is this document?

A.      This is the third amended complaint for this case, and it was filed on October 7, 2021.

Q.      And, again, on this first page, we've still got all six CERT Operations companies named as defendants in the complaint; correct?

A.      Yes, that's correct.

Q.      Now, if you would turn to page 3 of that document.

A.      I'm there.

Q.      Paragraph 11, who is the named defendant that's the subject of that paragraph?

A.      CERT Operations, LLC.

Q.      And if you could, look at paragraph 13 of that second amended complaint.  What's the name -- who is the named defendant that's the subject of that paragraph of the complaint?

A.      CERT Operations III, LLC.

Q.      Let me just go back just a minute to the first page. Right here in the section where it's identifying the CERT companies, do you see that?

A.      Yes, sir.

Q.      It starts with CERT Holdings, LLC; CERT -- CERT -- Coal Holdings, LLC; CERT Holdings, LLC; CERT Holding 2018. Then it gets into all the operation companies.

        And then this parenthetical right there, it says "individually and collectively as CERT," C-E-R-T.  Do you see that?

A.      I do see that.

Q.      That was in the first amended complaint, second amended complaint, and the original complaint you looked at?

A.      Yes.

Q.      If you would turn with me to page 31.

A.      Okay.

Q.    And read paragraph 212 to the jury.

A.    Okay.  I'm sorry.  You said turn to paragraph 31?

Q.    Page 31.  My apologies.

A.    Page 31, I'm sorry.

Q.    No, that's on me.

A.    Okay.  And you asked for 212?

Q.    Correct.

A.    "AJG, DTE, CERT, Chem-Mod, and the RC defendants operate RC facilities that receive coal, add bromine and/or bromide such as CaBr2 to the coal, and then provide that refined coal to a coal-fired power plant that injects a sorbent material comprising activated carbon downstream of the combustion chamber."

Q.    Mr. Green, I know we took a lot of time to do that. The CERT entities named as defendants in that original complaint, first amended complaint, second amended complaint, third amended complaint, they got copies of all those documents from the plaintiffs; right?

A.    That's correct.

Q.    Taken together, what did you understand this collection of allegations from the original complaint, the first amended complaint, the second amended complaint, and the third amended complaint to mean as to those named Defendants we've been talking about?

A.    They were all being accused of infringing the

patents.

Q.    How?

A.    How were they accused?

Q.    How were they being accused of infringing the patents?

A.    By providing refined coal to a power plant that was using activated carbon.

Q.    Is the date of -- all right.

So the third amended complaint, what's the date on that document?

That's Tab 15.

A.    That was dated October 7th of 2021.

Q.    Is the date of October 2021 significant to you to the infringement claims made against these CERT Operations defendants in this case?

A.    Well, it's, you know, two months before the end of the refined coal program, which was 12/31 of 2021.

Q.    Is that the last complaint that the defendants received from the plaintiffs while the refined coal operation was still going on?

A.    Yes, sir, it was.

Q.    Now, we talked about the end of the refined coal program in December of 2021; is that correct?

A.    That's correct.

Q.    Did that mean no refined -- no CERT refined coal

facility was selling refined coal to any power plant after December 2021?

A.    That is correct.

Q.    Which refined coal project companies were under contract with CERT Operations, LLC?

A.    CERT Operations, LLC, that would have been -- it's not on that page.  Yeah.  It's the refined coal companies. There were two of them, Shermont Industrial and Powder Street.

Q.    I think we talked about them just a minute ago.  Was Shermont Industrial -- I'm sorry.  CERT Operations is operating the refined -- let me back up.

CERT Operations, LLC, is operating the refined coal facilities for Shermont Industrial and Powder Street; correct?

A.    That's correct.

Q.    And for the Shermont piece of it, they're operating that facility at Chesterfield Power Station in Virginia; correct?

A.    Yes, sir, that's correct.

Q.    What period of time was CERT Operations, LLC, operating a refined coal facility in Chesterfield Station Virginia?

A.    2011 until 2021.

Q.    Did the Chesterfield Power Station ever use activated

carbon?

A.    No, sir.  Chesterfield never used activated carbon.

Q.    The Powder Street CERT Operations was also operating the refined coal facility at Powder Street for the Mount Storm Power Station in West Virginia?

A.    That's correct.

Q.    In what period of time?

A.    In the same time period, 2011 to 2021.

Q.    Did the Mount Storm Power Station ever use activated carbon?

A.    No, sir, they did not.

Q.    But we just read in the original complaint, the first amended complaint, the second amended complaint, and the third amended complaint that the plaintiffs were accusing CERT Operations, LLC, of providing refined coal, coal treated with bromine, to a power plant that used activated carbon; correct?

A.    That's what the complaint said.

Q.    So what was in the complaint wasn't factually true, was it?

A.    No, it was not.

Q.    Now, CERT Operations III, did it operate a refined coal facility?

A.    It did.

Q.    For who?

A.    Or Deogun Manufacturing.  It was located at the Intermountain Power Agency in Delta, Utah.

Q.    So we finally get to Utah.

A.    Utah, yes.  We are there now.

Q.    So what period of time was CERT Operations III operating this refined coal facility for Deogun Manufacturing?

A.    2011 until 2021.

Q.    Did the Intermountain Power facility ever use activated carbon?

A.    No, sir, they did not.

Q.    But we just read in the complaint, the first amended complaint, the second amended complaint, and the third amended complaint that Plaintiffs accuse CERT Operations III of selling or providing refined coal made with calcium bromide to a power plant that used activated carbon; correct?

A.    That's what the complaint read.

Q.    So that part of the complaint wasn't ever true?

A.    No, sir, it wasn't true.

Q.    And it wasn't true when it was repeated from the original complaint through the third amended complaint; correct?

A.    That's correct.

Q.    And that third amended complaint was the last set of

allegations the CERT companies got from the plaintiffs while they were still making refined coal; right?

A.    While they were still operating, yes, that's correct.

Q.    Are CERT Operations or CERT Operations III still defendants in the case?

A.    No, they are not.

Q.    Do you have an understanding of why?

A.    They were removed from the case in the fourth amended complaint, the next complaint.

Q.    Do you know when that got filed?

A.    I think it was in 2022.

Q.    Do you recall generally when in 2022?

A.    I don't remember.  I think it was -- I don't recall factually the month.

Q.    If I told you it was May 2022, does that sound right?

A.    Yes.

Q.    In May of 2022, when the plaintiffs filed a fourth amended complaint and they dropped the claims against CERT Operations and CERT Operations III, LLC, does anybody still -- is any CERT company still making refined coal?

A.    No, sir, they weren't.

Q.    Why is that?

A.    Well, the ten-year -- the ten-year life.  The tax credit program expired at the end of 2021.

Q.    So refined coal production had stopped in

December 2021?

A.      That is correct.

MR. DYESS:  Your Honor, I'm trying to be courteous.  I don't know when you're expecting to take a lunch break.  I'm at a transition point.

THE COURT:  Any sense of how much more think you have on direct?

MR. DYESS:  It's a good bit.

THE COURT:  Why don't we get another module in or at least part of it and go closer to 12:30.

MR. DYESS:  That's fine.

BY MR. DYESS:

Q.      And we've mentioned refined coal a few times.  What is refined coal -- I'm sorry, go to the next slide -- as it pertains to this case?

A.      Well, refined coal is a self -- you know, I'd call it a self-contained fuel that's specifically formulated with a required amount of S-Sorb and MerSorb or M-Sorb to qualify that produced fuel for the Section 45 tax credits.

Q.      What do you mean by "self-contained fuel"?

A.      Well, "self-contained fuel" inasmuch as that's what's combusted in the power plant's combustion chamber and self-contained in that it's a product that's made.  It has two chemicals added to it and blended with it, the MerSorb and the S-Sorb.

It's -- when it leaves our facility, it is a product that's fully capable of meeting the Section 45 tax credits, and it doesn't require anymore additives such as a halogen or a -- or a sorbent.

Q.     Now, you talked with Mr. Caldwell for some time about expectations of refined coal.

A.     Yes, sir.

Q.     Did the power plant ever actually have to burn the refined coal for that coal to qualify for the Section 45 tax credits?

A.     No, sir.

Q.     But you had to have an expectation that they would; correct?

A.     That's correct.  We represented that we had that expectation.  Yes, sir.

Q.     But once -- when did the coal qualify for the tax credit?  At what point in the process?

A.     It's the moment that it's sold back, and the point in the process where that's done is after it leaves our facility.

Q.     So it qualifies for the tax credit whether or not the power plant ever burns it or not; correct?

A.     Yes, that's correct.

Q.     Speaking of process for making refined coal, and I don't know.  Can you describe for the jury generally what

those steps are of how your companies made the refined coal.

A.    Sure.  At a 50,000-foot level, we own the feedstock coal that's in the coal pile.  That feedstock coal is delivered by the power plant personnel on a conveyer belt to our system, which is inserted into their fuel handling system.

The coal enters our facility and prior to entering our facility, we have a scale that's installed that weighs the feedstock coal.  The feedstock coal is weighed. It enters the facility, and we apply two chemicals to the coal.  The S-Sorb, it's a powder, and the MerSorb, it's a liquid, is applied to the coal at a given rate, and that rate is decided -- and I think we're going to talk about it later on how that rate is determined, but it's added to the coal.  It's mixed in a static mixer, and then it exits our facility and is sold to the power plant.

Is that general enough?

Q.    That works pretty good for me.  This process that you just described for making refined coal, was it the same across all of the refined coal project companies?

A.    Yes, sir.  All of our refined coal project companies made refined coal in the same way.

Q.    So CERT Operations, LLC; CERT Operations II, LLC; CERT Operations III, LLC; CERT Operations IV, LLC; CERT Operations V, LLC; CERT Operations RCB, LLC, they're all

making the refined coal using that very same process you described?

A.    The same process, yes.

Q.    Were they using that same process as you described it back in 2011?

A.    Yes, sir.  That's correct.

Q.    Did that process ever change between 2011 and 2021?

A.    No, sir, it did not.

Q.    Did it change when these refined coal facilities were moved from one plant to another?

A.    No, it did not.

        MR. DYESS:  If we could go to slide 15, Mr. Brown.  I think we've seen pictures similar to this before.

        And, Your Honor, can I approach the witness?

        THE COURT:  You may.

BY MR. DYESS:

Q.    I'm going to hand you this.  If you press this button, it's digital.

A.    Okay.

Q.    What's this picture we're looking at, Mr. Green?

A.    This is an aerial photograph of the Coleto Creek power station.

Q.    And that's the one -- where is that located, again?

A.    That's in Fannin, Texas.

Q.    If you can, using that pointer, can you show the jury where the CERT refined coal companies' involvement with coal at the power plant starts and stops?

A.    Yes.  Let's see if I can make -- that right there, and we could probably zoom in on it, but that's the equipment.

And we don't have to zoom in, but if you want to, you can see one of the silos right there.  So this must have been taken during a time that we were operating.  And you see this box behind it, that's actually a conveyer belt that comes out of this.

This is a train unloader, so it unloads railcars and dumps it on a conveyer that ultimately comes out, and our facility starts and stops -- the area I'm showing is about the least area that's spelled out in the service use agreement.

MR. DYESS:  If we can zoom back out, Mr. Brown.

BY MR. DYESS:

Q.    Do you understand where the furnaces or the combustion facilities are in this picture?

A.    This is a guess.  It's not a great picture and I'm not a power plant expert, but if I can find the button, I'm guessing it's this structure right here.

THE COURT:  Mr. Dyess, we may, just for the record, to the extent we have statements like that, we need

a way to identify where on the document he's referring to, if you can do it.

BY MR. DYESS:

Q.    If we could go back.  The area that you were referring is where your involvement with the refined coal starts and stops in this larger picture, can you describe just for the record what that -- where that area is in the picture.

A.    Right there.

Q.    Can you describe.  Nobody is going to know where "right there" is.  Can you describe where it is in the picture.

A.    I'm sorry.  It is -- it is north -- you want a physical description of that location?  I'm sorry.

Q.    Let's do it this way:  This big black area.  What is that in the picture?

A.    That would be the raw coal or refined coal storage pile out there.

Q.    Okay.  That's where you store refined coal?

A.    There was some refined coal that was stored on that pile.

Q.    And I'm talking about the really big black area.  Is that the coal pile?

A.    It is the coal pile, but some of the refined coal that's produced is put into this pile out here.

Q.    So the little area that you were referring to is where the refined coal -- your involvement with the refined coal starts and stops, that's immediately to the right of the large black coal pile area?

A.    Immediately to the right at the base of the conveyer -- immediately to the right of the coal pile at the base of the conveyer going up to the transfer house.

Q.    And the area that you identified as where you think the coal-fired furnaces and combustion chambers, can you describe -- give a description for the record where that's located at the plant.

Is it the bottom?  The lower right-hand quadrant?

A.    That is the lower right-hand quadrant of the photograph, which would be southeast of the refined coal facility.

Q.    And do you have any judgment about how far away your refined coal facility is from the combustion chamber?

A.    I can estimate based on the scale that's in the bottom right-hand corner of the diagram.  That's 700 feet. It appears to me to be a thousand feet.

Q.    So that's at least the length of three football fields, the difference from where your refined coal facility is to the furnaces; correct?

A.    That's correct.

Q.     Were the CERT employees restricted on where they could go in a power plant when they came to work in the refined coal facility?

A.     Yes, sir.  We were -- the specifics are different for each power plant, but generally, we were only allowed -- when I say -- I'll explain the differences, but in our leased area.  We had to remain in the leased area.  There are plants that we could drive into, but most of them we required an escort, a golf cart, to go in.  So our on-site management would shuttle employees at shift change back and forth to the parking lot.

Q.     The point is they couldn't just wander wherever they wanted to go in the power plant, could they?

A.     No, sir.

Q.     Why is that?

A.     Safety reasons, really.  We were -- we had some strict mandates.  Really just safety issues.  They didn't want vehicles in and out of the inside of their power plant area, which the coal yard is part of.  So safety reasons.

Q.     You talked about refined coal, and we talked about refined coal facilities.  Do any of the CERT refined coal facilities have equipment for injecting activated carbon into the flue gas of a power plant?

A.     No, sir.

Q.     Has any defendant in this case ever supplied

activated carbon to a power plant?

A.    No, sir.  We've never been in the business of selling activated carbon.

Q.    Has any defendant in this case ever been involved in injecting activated carbon in the flue gas of a power plant?

A.    No, sir, we have not.

Q.    Do you understand that there's equipment that power plants have to use to do that?

A.    That's my understanding, yes.

Q.    And do any -- and that's -- do we call that activated carbon injection equipment?

A.    That's what I've heard it referenced as, yes.

Q.    Do any of the CERT defendants in this case, have they ever owned any activated carbon injection equipment?

A.    No, sir, we have not.

        MR. DYESS:  Your Honor, that was another module. I can keep going.

        THE COURT:  A few more minutes.  Take it up to 12:30 and we'll break.

BY MR. DYESS:

Q.    Mr. Green, there are some facts that the parties have stipulated to in this case that we're allowed to read to you and the jury.  The parties have agreed that they're true facts.  You can rely on them, you can not rely on them, but the parties agreed that they're true.  I want to read one of

those to you.

This is Stipulated Fact Number 47:  "Defendants CERT Operations IV, LLC, contracted with the EERC to perform Section 45 certification testing for all refined coal sold to the Big Cajun II plant by Defendant Springhill Resources."

Did you have any problem understanding that as I read it?

A.    No, sir.  I understood that.

Q.    I need to get you to help me unpack a few things in that sentence.

Would it be true that all of the CERT Operations companies contracted with the EERC to perform Section 45 certification testing for their refined coal facilities to then sell the refined coal to the power plant?

A.    That is correct.

Q.    What is the Section 45 -- I'm sorry.

What is the Section 45 certification testing that is referenced in that stipulated fact I just read to you?

A.    The certification testing, a description of how it -- a general overview or description of how it's done?

Q.    Let's back up a little bit further than that.  What is it, and why do you have to have it?

A.    Okay.  The testing is to certify our product for the

Section 45 tax credits.  It is testing that can be done in a pilot scale lab, and it's the process we go through to get the formulation for our product to meet the Section 45 tax credit.

Q.    Thank you.  That's what I was looking for.  How often do you have to do the Section 45 certification testing?

A.    The results of the test are valid for a six-month period.  So if you're producing refined coal, it has to be qualified, a test has to be done, at least every six months.

Q.    We mentioned the EERC did the certification testing. Is that the same EERC that you've heard other witnesses already testify about in this case?

A.    Yes, sir.  That's the Engineering and Environmental Research Center at the University of North Dakota.

Q.    I think it's actually the Energy and Environmental Research Center; is that right?

A.    The Energy and Environmental Research Center, that's correct.

Q.    And that's at the University of North Dakota?

A.    That's correct.

Q.    Why did the CERT Operations company use the EERC to do the certification testing?

A.    My recollection is that Chem-Mod had been using them for a while -- that's our technology provider -- and that they were represented as being a lab that was qualified or

at least knowledgeable in the testing.

Q.    Now, the lab, you just couldn't go to some high school biology lab and do this testing; right?  Not everybody has got a pilot scale combustion test facility in their den, do they?

A.    No, this is a well-respected and renowned lab.  Yes, sir.

Q.    Do you have an understanding of how the EERC went about doing the Section 45 qualification testing so that you would have a test that showed your refined coal was qualified under Section 45?

A.    Sure.  The process of what's done?

Q.    Yes.

A.    Sure.  So CERT Operations, the CERT Operations company that operated the facility at each one of the power plants, is responsible for coordinating those tests.  So the CERT Operations company collects a feedstock sample of coal, the raw coal from the coal pile, and sends that to the EERC. It's about a ton.  I think somebody testified 400 pounds, but we'll deliver about a ton of fuel to the EERC lab.

The lab then has to -- they make sure the fuel is mixed well and it's all the same so you can split it into two halves and you're comparing apples to apples.  The first sample will be burned, and they'll measure the mercury and NOx emissions downstream of the combustion chamber that

they're burning the coal in between that -- and then that flue gas passes through a particulate collection device, and those emission numbers are measured for mercury and NOx.

Then they would take the second half of that coal, treat it with a known amount of S-Sorb and MerSorb -- those are the two components that reduce the mercury and the NOx -- and they would test that sample. And if they achieve at least a 40 percent reduction in mercury and a 20 percent reduction in NOx, that fuel is qualified.

Q.    Now, you mentioned reductions in mercury and NOx. Could refined coal qualify for the Section 45 tax credit if it only reduced mercury?

A.    No, sir, it wouldn't qualify.

Q.    Could refined coal qualify for the tax credit if it only reduced NOx?

A.    No, sir.

Q.    And we said NOx. I'm not -- I wasn't a chemistry guy. What does NOx stand for?

A.    Nitrogen oxide.

Q.    And that's a pollutant that power plants need to filter out of the air too; right?

A.    Yes, sir, that's right.

Q.    Am I clear in understanding that in order to qualify for the tax credit, the refined coal has to reduce both mercury and NOx; correct?

A.    That is correct.

Q.    And it has to -- whatever amount of MerSorb and S-Sorbs gets put on the coal, it has to show a reduction -- this testing you just described -- of at least 40 percent of mercury and 20 percent of NOx; correct?

A.    That's correct.

Q.    And when the EERC is doing this testing, it puts on a specific amount of MerSorb to get to the mercury reduction; correct?

A.    Correct.

Q.    And it puts on a specific amount of S-Sorb to get the NOx reduction; correct?

A.    That's correct.

Q.    And they measure it, and if they hit the 40 percent and 20 percent, you know you've got a formula that will qualify that coal for the next six months for the tax credit; correct?

A.    That's correct.  Yes, sir.

Q.    When does the EERC use activated carbon when they're qualifying your refined coal for the tax credit?

A.    They don't use activated carbon.

Q.    The EERC doesn't use activated carbon when it's qualifying your refined coal for the tax credit?

A.    No, it's not allowed to be used.

Q.    You're saying it's not used and it's not allowed to

be used?

A.    Yes, sir, that's correct.

Q.    Why is it not allowed to be used?

A.    Well, the IRS issues guidance on things such as being able to qualify your fuel at a pilot scale lab, and the guidance that was issued specifically spells out that activated carbon cannot be used in certification testing for mercury emission reductions.

Q.    There are a lot of government documents out there. They say a lot of stuff.  You could probably put them in a stack and go all the way to the moon.

Do you personally know if the EERC does or doesn't use activated carbon in Section 45 qualification testing?

A.    Yes, sir, I do.

Q.    How do you know that?

A.    Well, I've been to the EERC a number of times, especially in the early years when we were first started this testing to witness these tests, and I know that activated carbon was never used in the testing that I personally witnessed.

Q.    So you've witnessed these EERC qualification tests and activated carbon wasn't used; correct?

A.    That's correct.

Q.    And you understand the government regulations about

the qualification of refined coal to say activated carbon can't be used; correct?

A.    That's correct.

Q.    Are you confident that the refined coal that you had qualified at the EERC never used activated carbon as a part of that qualification process?

A.    Yes, sir, a hundred percent.

Q.    What would happen if the EERC went rogue on you and said, "We're going to use some activated carbon in this test, just for fun"?

A.    Well, that would disqualify the test as being a valid test.  It would just invalidate the test, so we'd have to redo it.

Q.    When you say "redo it," would it be a problem if you had an invalid test that used activated carbon?

A.    It would be a -- it would be a -- it would be bad because we're required to have a test done every six months, and it takes a while to get into the lab.  They're very busy, so we schedule these tests six months out for the next test.

Q.    And if you have a test that's disqualified because the EERC used activated carbon and that disqualifies the test, does that mean you're dead in the water because you don't have a Section 45 test that would actually qualify the coal?

A.    For that project company, we wouldn't be able to make fuel that qualifies until the test was done.

Q.    So it's very important to all of the CERT companies that the EERC doesn't use activated carbon in qualification testing; correct?

A.    Yes, sir, that's correct.

MR. DYESS:  If you could, Mr. Brown, if you look in --

BY MR. DYESS:

Q.    I'm getting my people confused.

If you would, look in the CERT witness notebook, the black one, for Defendants' Exhibit 1980.

THE COURT:  Mr. Dyess, perhaps after we go through this exhibit, would that be a good time to stop?

MR. DYESS:  Yes, sir.

THE WITNESS:  Did you ask me for 1980?

BY MR. DYESS:

Q.    Yes.

A.    I'm there.

Q.    Do you recollect this document?

A.    Yes, sir.  This is the one I was referring to.

Q.    The one what you were referring to?

A.    I'm sorry.  It's the IRS notice I was referring to earlier.

Q.    And what does the IRS notice do?

A.     It provides guidance for the refined coal tax credit program.

Q.     And what aspect of the refined coal tax credit program?

A.     Most of it.  I mean, it's the complete guidance for the production of tax credit for refined coal.

Q.     Does it have any section that talks about what you have to do for qualified testing of the refined coal?

A.     Yes, sir.  That should be back on -- it's, I think, section 6.03.  Yeah, 6.03.

Q.     Let me ask you a couple of questions first.  Are you familiar with this IRS notice --

A.     Yes, sir, I use it.

Q.     -- for your work?

A.     Yes, sir, I do use it for -- as being responsible for operating the facilities that generate the tax credits that falls under this procedure.

Q.     And you're familiar with its provisions about what can and can't be done as far as the qualification or the certification testing for the qualification of refined coal; correct?

A.     Intimately, yes.

       MR. DYESS:  Your Honor, we'd like to have Exhibit 1980 admitted.

       THE COURT:  Any objection?

MR. CALDWELL:  I do not have an objection.

THE COURT:  It's admitted.

(Thereupon, Defendants' Exhibit 1980 was admitted.)

BY MR. DYESS:

Q.    If you could, turn to -- I believe it's page 406.

MR. DYESS:  And, Mr. Brown, could you highlight the section 406 kind of in the middle.

BY MR. DYESS:

Q.    There are three columns on this page; right?

A.    That's correct.

Q.    And if you're looking at that middle column, does that have what you understand as the rules for qualification testing at a pilot scale facility?

A.    Yes, sir, that's -- that's what I'm familiar with.

Q.    If you could, is that what's referenced up here on the screen?

A.    Yes, it is.

Q.    If you could read through that.

A.    "Other testing methods:  Methods other than CEMS, C-E-M-S, field testing may be used to determine the emissions reduction.  If a method other than CEMS field testing is used, the service may require the taxpayer to provide additional proof that the emission reduction has been achieved.

"Permissible methods include the following:  (a) demonstration pilot scale combustion furnace.  A testing method using a demonstration pilot scale combustion furnace if it is established that the method accurately measures the emission reduction that would be achieved in a boiler described at 6.031(a)(i) of this notice and a qualified individual verifies the test results in a manner that satisfies the requirements of section 6.031(c)(ii)(v) and (vi) of this notice."

Q.    And I believe these section 6.03 (1)(c)(i)(ii)(v) and (vi) are on the previous page; is that correct?

A.    Yes, sir, they are.

MR. DYESS:  If you could pull that up, Mr. Brown.  Could you highlight that area of this page, Mr. Brown.

BY MR. DYESS:

Q.    And is this that section, little romanette (vi) you referred to?

A.    That is correct.

Q.    If you could read that for the jury?

A.    "Emissions of mercury are measured upstream of any SO2 scrubber and Hg control device such as activated carbon injection."

Q.    Now, what is -- to you, do you have an understanding what it means that the emissions have to be measured

upstream of an activated carbon injection?

A.      It means that the baseline in refined coal mercury measurement numbers that you're comparing have to be measured before activated carbon is used.

Q.      And is this the restriction you were referring to before of the regulation saying you can't use activated carbon in pilot scale testing?

A.      Yes, sir, that's it.

MR. DYESS:  Your Honor, this would be a good time for a break.

THE COURT:  Thank you, Mr. Dyess.

Ladies and gentlemen of the jury, we're going to take our lunch break.  It will be a half hour for lunch, but at the end of the half hour, I'll need to come out here and talk to the lawyers about some legal issues.  So I'll just say I think lunch today is probably going to be more like 45 minutes to an hour because I have to deal with some things with them.

With all that said, let's have the jury led out.

(The jury exited the courtroom.)

THE COURT:  Just in terms of schedule, everyone, it's 12:38 now.  So I'll give everybody a half hour for lunch.  So at 1:08, I'll be ready to come back in and talk to the lawyers.

What we'll do then is hear the defendants'

motion for judgment as a matter of law and argument, and then I'll resolve that issue, and then we'll bring the jury back in for the afternoon.

A couple of other things. I will probably send you over lunchtime a draft proposal for that addition to the contributory infringement instruction you've been talking about just as a way to try to get the parties something that they can then be looking at and reacting to. I'm trying to make sure our prayer conference flows as smoothly and efficiently as possible by trying to get it to you before we get there. And I'll make sure my staff comes out and updates you on where we stand as to timing so we're all on the same page.

Anything further before we conclude? Seeing nothing, we'll recess and come back at 1:08. Thanks, everybody.

(A recess was taken, after which the following proceedings were had:)

THE COURT: I hope everybody was able to grab lunch and we're all ready to go. I should say I appreciate counsel -- I know it's got to be a very demanding schedule for you all, particularly through this week. When I was trying cases before I became a judge here, Judge Robinson would give us a half hour for lunch. I remember eating a banana and trying to get something in in the time that we

had.  And I thought, oh, man, this is rough.  Of course, I wasn't thinking about as a judge, you think about the jury and you don't want them to be here all week.

So anyway, I just want to say I appreciate what you're going through.  I've been through it before myself in this courtroom for a number of years, and I just wanted to note that.

Okay.  So what we'll do now is we'll hear argument on Defendants' JMOL motion.  And what I'd ask -- I told the parties I'm not going to charge them the full time for arguing the JMOL motions because I'm expecting arguments will be efficient.  At some point if we go very long or outside the arguments, we'll have to change that, but that would be the expectation.

So I'll call on Defendants' counsel to make their motion and then we'll hear from the plaintiffs' side, and you will have a chance to make any rebuttal and take a short break, and I'll come back and give you my decision.

MR. DORSNEY:  Your Honor, we do have one housekeeping matter about exhibits.

THE COURT:  We could address it now, sure.

MR. DORSNEY:  So during the hearing, the Court asked us to redact PTX 641, 642, and 646.  We have the redacted copies now, so could have we have them admitted as 641A, 642A and 646A?  Would the Court like us to do that

or...

THE COURT:  I don't know.  Did I admit them before on a different numbering scale?

MR. DORSNEY:  That's a good question.  That will take care of that, Your Honor.

THE COURT:  So they've already been admitted.  Okay.

MR. DORSNEY:  And then the other issue is we have three DTX exhibits, 377, 378, 379, but before -- and none of the materials were live.  Before they go back to the jury, there are footnotes in them that have to be redacted in compliance with the Court's pretrial order 63(b).  So we have redacted copies of those to hand out.  I don't know how you'd like us to hand that out.

THE COURT:  If you're talking about the versions that go back to the jury, we don't need those right now.  We'll work with you to make sure that everybody knows what the final admission of the exhibits are, prepare a final version of the exhibits that can be taken back to the jury.  In terms of needing to hand them up now, I don't need to see them.

MR. DORSNEY:  Yes, Your Honor, but the exhibits were not redacted while they're in the slide deck.  The material that needs to be redacted was never, you know, examined.  So the actual physical document would be slightly

different than what was technically admitted, so we're just trying to be as clean as possible.

THE COURT:  Okay.  Do I need to admit them?  Are you making a motion to admit them?  What are you asking for?

MR. DORSNEY:  Well, I guess we'd like to admit the redacted copies of DX 377, 378, and 379 as 377A, 378A, and 379A.  And we have copies to hand up to the Court and counsel if necessary.

THE COURT:  Okay.  And is there any objection?

MR. PEARSON:  I would love to say no, but we haven't been provided with the redactions, so I'd like a chance to review them.

THE COURT:  Why doesn't counsel provide the copies to the other side and to us as well, and then before the jury comes back out, we can take this up and get them admitted if there's no objection.

MR. DORSNEY:  Yes, Your Honor.

THE COURT:  Thank you.

All right, Mr. Wilson.

MR. WILSON:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. WILSON:  To preview what we're going to cover here right now, Defendants are bringing a motion under Rule 50(a) for induced infringement and will intend to cover any other necessary and appropriate motions after the close

of all the evidence.

Defendants move under Federal Rule of Civil Procedure 50(a) for finding that Plaintiffs have not provided legally sufficient evidence that a reasonable juror would find by a preponderance of the evidence that Defendants induced infringement of Claims 25 and 26 of the '114 patent or Claims 1 and 2 of the '517 patent and for judgment as a matter of law that Defendants have not induced infringement of those claims.

On induced infringement, Plaintiffs must establish, among other things, that a defendant took some affirmative action intending to cause a power plant to directly infringe an asserted claim, and that the defendants' actions actually caused the power plant to perform each and every step of the asserted claim.

Plaintiffs have not presented sufficient evidence to permit a reasonable juror to find by a preponderance of the evidence that any Defendant took an affirmative action intending to cause a power plant to directly infringe an asserted claim or that any Defendants' actions actually caused a power plant to perform each and every element of an asserted claim.

Both asserted independent Claim 25 of the '114 patent and, again, independent Claim 1 of the '517 patent require the similar steps of separating the mercury sorbent

composition from the mercury-containing gas to form a cleaned gas or collecting mercury into a mercury-containing gas with a sorbent added to the mercury-containing gas, the sorbent containing activated carbon.

Plaintiffs' expert, Mr. O'Keefe, identified the performance of this step at the power plants that allegedly infringe as use of an ESP or baghouse. Mr. O'Keefe, however, identified no evidence that any Defendant intended for a power plant to use an ESP or a baghouse or that any Defendants' actions actually caused a power plant to use an ESP or baghouse. To the contrary, he conceded that every power plant at issue was using an ESP or a baghouse prior to its use of refined coal or activated carbon and that every power plant at issue in this case has continued to use an ESP or baghouse even after stopping its use of refined coal.

And that testimony can be found at the 2/28 rough transcript at 657 at lines 7 to 18; 658, lines 4 to 11; 702, lines 7 to 9; 702, lines 20 to 23; and 703, lines 14 to 18.

He admitted that Defendants did nothing to encourage or cause any power plant to use any ESP or baghouse, and that can be found in yesterday's transcript at 657, 19 to 24, and 658 at 4 to 17.

And I don't know how much Your Honor wants to hear citation of the law on this, but on this point, we

would point to the Microsoft -- for example, to the *Microsoft Corp. v. DataTern, Inc.*, case which is at 755 F.3d 899, and I believe it's been cited in several filings before.

So Federal Circuit from 2014 and on pages 905 and note three, the decision discusses how if the instruction or encouragement to perform any steps of a method comes from somebody other than the defendant, then a claim of induced infringement has not been stated.

In addition, both asserted independent Claim 25 of the '114 patent and asserted independent Claim 1 of the '517 patent include a step of injecting a sorbent material in the form of activated carbon.  Mr. O'Keefe identified no evidence that any Defendant intended for a power plant to use activated carbon injection or that any Defendants' actions actually caused a power plant to use activated carbon injection.

With respect to actions taken with intent, Mr. O'Keefe identified the sale of refined coal at a loss, rate optimization of bromine and activated carbon injection, and fly ash benefits.  The "sale at a loss" evidence is only an intent to induce a power plant to use refined coal.  The evidence of rate optimization only goes to the question of whether Defendants were aware that activated carbon may have been used at some point at a given plant.  It doesn't

evidence an intent that Plaintiff use activated carbon injection or have taken any action to encourage them to do so.

With regard to the fly ash benefit, again, the evidence only supports an intent to encourage the use of refined coal by touting its benefits for fly ash.  It does not evidence any intent to encourage the use of activated carbon injection.

Mr. O'Keefe also relied on evidence that Defendants provided or offered indemnity agreements. However, indemnity agreements generally do not evidence an intent to induce infringement, and Mr. O'Keefe provided no evidence linking any indemnity agreement to an intent to cause infringement of the asserted patents.

On that point, we would point the Court to *MEMC Electronic Materials Inc. v. Mitsubishi Materials Silicon IV*, 420 F.3d 1369 Federal Circuit 2005, and on pages 1378 to 1379.  The Court stated, speaking of another case, "As in *Hewlett Packard*, the indemnity provision in this case may have facilitated the sale of the accused wafers, but there's no evidence that the primary purpose of the agreement was to induce Samsung Japan to infringe the '302 patent."

Likewise here, any indemnity provision identified by Mr. O'Keefe predated issuance of the patents, and that can be seen in yesterday's transcript at 634, lines

13 to 25, where he's talking about PTX 202, which is dated December 2013.

As a result, the primary purpose of any indemnity agreement could not have been to induce a power plant to infringe the asserted patents, which did not exist.

With regard to causation, Mr. O'Keefe relied only on his claim that power plants had no choice but to burn the refined coal after receiving it, and that can be found in yesterday's transcript at 636, line 19 to 637, line 1.

At most, this evidences that a defendant was the cause of a power plant's use of refined coal. It is not evidence to support the inference that a defendant caused a power plant to use activated carbon or to employ a separation process like an ESP or baghouse to remove that activated carbon.

Mr. O'Keefe testified that at most of the power plants at issue, refined coal was used prior to the installation of activated carbon, and that could be found in the transcript at 692:18 to 693:2. He further testified that the power plants at issue had continued to use activated carbon even after stopping use of refined coal because activated carbon injection use was necessary to comply with MATS. And that can found in yesterday's transcript at 701:25 to 702:6.

In other words, wholly absent of any action on the part of a defendant, power plants used activated carbon injection along with their particulate removal to remove mercury from a flue gas to comply with MATS.  And ultimately, Mr. O'Keefe testified that MATS compliance was the only reason power plants installed activated carbon injection systems and that Defendants do not sell activated carbon to the power plants at issue.  And that is in yesterday's transcript at 691:6 to 692:5.

Mr. O'Keefe offered no competent evidence that any Defendant acted with an intent that a power plant use activated carbon injection or that any Defendant was the cause of that power plant's use of activated carbon injection.

To the extent Mr. O'Keefe identified any evidence indicating that a defendant may have had knowledge of activated carbon use at a particular plant, evidence of knowledge of a power plant's use of activated carbon is not evidence of causation.  Moreover, evidence of such knowledge prior to July 9, 2019, such as the Sargent & Lundy reports he reviewed, which are discussed at, for example, yesterday's transcript to 668:12 to 16 and 669 to 14, e-mails that he identified and relied on which could be found discussed at 672.2 or any other evidence prior to July 9th, 2019, such as the sales agreements that he

identified and relied on.

To the extent Mr. O'Keefe otherwise contends this is evidence of an affirmative act to encourage or induce use of activated carbon, that evidence is legally insufficient to constitute an act of inducement. Acts occurring prior to the issuance of a patent or otherwise prior to the appropriate damages period cannot constitute acts of inducement of infringement. And on that, we cite the *Roche Diagnostics* case which we discussed at different times and I think Your Honor referred to the other morning as well.

Ultimately, Mr. O'Keefe testified that the only act occurring after the issuance of the patents-in-suit that he relied on as evidence as an act of inducement was the sale of refined coal. And that's stated at 690 at 16 to 25. However, the sale of a product that may be used to infringe is not, standing alone, an act of infringement. And that can be also found in the *Microsoft* case that I cited earlier, 775 F.3d at line 5. We'd also point the Court to *Takeda Pharmaceuticals v. West-Ward Pharmaceuticals Corp.*, 785 F.3d 625 and 630, and that is a Federal Circuit case from 2015.

As just discussed, there is not sufficient evidence to support an inference that the sale of refined coal in this case encouraged or otherwise induced a power

plant to do anything other than buy refined coal or that the sale of refined coal caused anything more than the purchase of refined coal.

There is not sufficient evidence that the sale of refined coal, standing alone, encouraged or otherwise induced a power plant to use activated carbon injection or to employ an ESP or baghouse or that the sale of refined coal standing alone actually caused a power plant to do so.

Accordingly, Plaintiffs have not presented legally sufficient evidence that would permit a reasonable juror to find by a preponderance of the evidence that Defendants induced infringement of any asserted claim.

So based on the record, no reasonable juror could find by a preponderance of the evidence that Defendants induced infringement of Claims 25 and 26 of the '114 patent and Claims 1 and 2 of the '517 patent.

THE COURT:  Okay.  Thank you, Mr. Wilson.

MR. WILSON:  Thank you.

THE COURT:  Let's hear from Plaintiffs' counsel.

MS. HALEY:  Thank you, Your Honor.  This is Aisha Haley on behalf of Plaintiffs.

Much of what we heard just now is a rehash of legal arguments that have been made throughout the case in the context of motions to dismiss, in the context of motion of summary judgment, and most recently in the context of

jury instructions. And just to sort of save time, I'm going to incorporate by reference our responses along the way, including the authorities that are cited therein.

I can address the specific points in the order that they were made.

The first one seems to be that because the defendants don't encourage the installation of an ESP or a baghouse, they cannot infringe. That's not an affirmative act.

I'm not aware of any requirement that equipment must be specially purchased for infringement or that the freezing of the equipment can constitute part of the evidence for induced infringement, so I'm not sure that that's a requirement.

There's also no requirement that the equipment only be used for the period of infringement and could not be used after the infringement or the accused damages period. So the fact that baghouses existed before and after infringement doesn't seem particularly relevant here.

Next, the next point was about ACI. I guess the argument is that -- that providing the coal or that injecting ACI doesn't constitute an affirmative act. I'm not exactly sure how that grabs on to the affirmative act requirement.

In any event, the evidence has shown in this

case, and a reasonable jury could conclude, that once the coal was sold by the defendants, it was on the conveyer belt destined to fall into the boiler to combust, and then that everyone understood that the remaining steps necessarily included ACI injection.

In that context, there's no failure of causation there. There's no failure of encouragement because there's a break in the causation chain, and so Defendants' view of the fact that people do other things but a jury could obviously infer from the evidence that, that's not the case.

Also point out that Defendants are -- there is ample evidence that Defendants are motivated to encourage infringement, which is evidence that the jury can rely on for specific intent.

For example, the plants generating tax credits based on the tonnage that was sold during the damages period and the plans to continue to operate must comply with MATS, and so from that evidence, a jury could infer that the defendants were encouraging the use of ACI, if that's part of the MATS compliance scheme.

There was some discussion of an indemnity. The indemnity is related at least to willful blindness. It reflects that there was a known risk that there could be litigation, particularly patent infringement in this context, coupled with a choice to either not learn more or

to avoid learning more.

For example, there was evidence today that the defendants were offered a tour of a power plant and chose not to take that tour.  So to the extent they were unaware of ACI use, they were willfully blinding themselves to that fact.

And then there was some discussion of *Roche*, and we talked about *Roche* a fair amount in the context of this case.  It is true that acts that are outside of the damages period are not -- cannot be the acts that you point to as affirmative acts for inducement.

But evidence outside of the damages period is certainly related to state of mind, and it's not as if the defendant forgets on the first day of the damages period everything they learned prior or everything they believed prior.

To the extent there's an argument on limitation of what evidence can be considered, there's no limitation on what evidence can be considered for state of mind.

Unless the Court has questions.

THE COURT:  I must say I found your arguments hard to follow, and so maybe I can ask it this way, in a way that would be helpful.

The two arguments the other side makes is that there isn't sufficient evidence for a reasonable jury to

find that each Defendant took an action intending to cause a power plant to directly infringe and that that Defendants' actions actually caused the power plant to directly infringe.

It would be most helpful to me if you would say, Judge, look, so with regard to intent --

MS. HALEY:  Yes.

THE COURT:  -- the intent to cause one of the things at issue, or maybe it's for both.  You could say it for intent to cause and for causation.

But I think maybe it makes sense to split it out.  Look, for intent to cause, what evidence is there that the defendants intended to cause infringement?  Well, there's at least four things:  A, B, C, D.

And what evidence is there that we're pointing to that demonstrates the defendants' specific intent?  Well, there's at least five things:  A, B, C, D, and E.

These are all things that are in the record and in evidence and could be used by a reasonable juror to find for the plaintiff.

That's what I don't think I got from your response so far, but it will be helpful if --

MS. HALEY:  Yeah.  I can just go through element by element through inducement.  So the first element --

THE COURT:  Well, I don't know that you need to

go through element by element.  You can if you want, but I think there's two specific elements that are being contested here.  It's the intent element -- intent to cause element and causation.

Those are the ones that I particularly want you to go through.

MS. HALEY:  Sure.

I think intent to -- the intent element and affirmative act are a little bit unrelated.

So we know, as a component of intent, there's a requirement that there's knowledge of the patent.  We know that because the damages period is post suit.  They had knowledge of the patent because they were served with a lawsuit.

THE COURT:  Again, I don't think knowledge of the patent is contested.  Do you disagree?  Do you think it was contested?

MS. HALEY:  I just think there's two components to intent, so I was just trying to be complete.  I don't -- I don't disagree that it's not contested.

THE COURT:  I'm sorry to interrupt.

MS. HALEY:  The defendants knew their actions would cause infringement because they knew that providing refined coal directly onto a conveyer belt that was headed towards the boiler at an infringing power plant and they

knew that that power plant was using ACI.  They knew it would be burned in the process.  That leads to infringement.

They knew that by provision of the coal, which is the affirmative act for certain of the defendants, that the only destiny for that coal was infringement.  So that's part of their intent, and that they were obviously motivated to maximize the amount of that infringement because they stood to gain a pecuniary benefit in the form of tax credits that's proportional to the volume of infringement.

THE COURT:  Okay.

MS. HALEY:  As for causation specifically, the defendants effectively have set off what's a chain reaction. They provided the coal on the conveyer belt that rolls into the boiler.  There are no sort of optional steps here.

The evidence showed that the coal sort of had a predetermined path forward, and that included through all of the direct infringement steps.  It's not like a case like *HC&P* or some of these pharmaceutical cases where they're optional steps.  The instructions in those cases contemplated other potential noninfringement throughout the chain.

Here, once that coal is on the conveyer belt going towards the boiler, there's no evidence that it's removed.  And in that sense, they've intended to cause infringement because they've intended to start that chain

reaction.

THE COURT:  You were talking specifically about the causation piece of it.

MS. HALEY:  Yes.

THE COURT:  So you're saying, look, part of the causation piece is they provided the coal, and by providing the coal, they know there's a hundred percent chance it's going to lead to infringement.

MS. HALEY:  Right, and that's the actual cause.

THE COURT:  Is there -- beyond the provision of sale of the coal that they know is going to lead to infringement in your view, were there other record facts that you were also pointing to to help demonstrate causation, other acts aside from the coal, or that relate to intent?

For example, Mr. Wilson mentioned a number of other things in the record, the testimony about the fact that the coal was sold at a loss or this fly ash aspect or the rate optimization aspect.

Anything else that you're pointing to?

MS. HALEY:  Yeah.  I mean, I would incorporate by reference all the testimony that Mr. O'Keefe offered on these points, which is to go through those benefits.

And it might be the case that Defendants interpreted that testimony differently, but it is the case

that a jury could infer from those facts that they intended and also caused infringement.

It's just sort of a difference in the view of the facts on those issues.

THE COURT:  Anything further, Ms. Haley?

MS. HALEY:  Even after being notified that there was an infringement charge here, Defendants continued to sell the refined coal, and that decision to continue infringing is also indicative of their intent.

There's been no reasons offered for why Defendants chose to continue infringing other than they were completely knowledgeable at that moment, and that's -- that's deliberate and intentional to continue to infringe at that level.  That's intentional for the element of inducement.

And I'll also point out that Defendants knew how -- there was ample evidence that Defendants knew that exhaust treatment required ACI at these power plants, and that's part of their -- that completes their intent and causation as well.

THE COURT:  Okay.  Anything further?

MS. HALEY:  That's it.

THE COURT:  All right.  Thank you, counsel.

Let me take a few minutes to get my thoughts together.  I'll ask our court reporter.

(His Honor speaking to court reporter.)

THE COURT:  And then I'll try to come out and get you a decision, and hopefully we'll be able to bring the jury out and start our afternoon.

The Court will stand in recess.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  We'll go on the record.  And just for the record, I have before me the defendants' motion for judgment as a matter of law with regard to the claim of induced infringement.

And just briefly, with regard to the law at issue, as the parties know, judgment as a matter of law may be entered against the nonmoving party if the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the parties on an issue.

That's found in Federal Rule of Civil Procedure 50(a).  A judgment as a matter of law, or JMOL, is appropriate only when viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there's insufficient evidence from which a jury reasonably could find, like -- the Third Circuit's law tells us that entry of a JMOL is a remedy to be practiced sparingly.

Here, I'm going to deny the defendants' motion

for a JMOL pursuant to Rule 50, of course, without prejudice to its ability pursuant to Rule 50(b) to renew that motion in the future.

I say that for a few reasons, and first I'll say that 50 in general and in light of the evidence presented so far by the plaintiff in their case, I believe that evidence could, in fact, be sufficient for a reasonable jury to find induced infringement.  And so I rely on that evidence, and I incorporate the arguments, additionally, that Plaintiffs' counsel made in response to the motion.

I'll just speak additionally, briefly, with regard to the particular aspects of the defendants' arguments, and the defendants argued that there is insufficient evidence, for example, that the defendant took some affirmative action intending to cause a power plant to directly infringe one or more of the CERT Operations claims, and relatedly that the defendants' action -- there is insufficient evidence for a reasonable jury to conclude that defendants' actions actually caused the power plants to perform each and every step of the asserted claims.

I'll speak just particularly to the aspect of the argument that intent for causation could not be found with respect to the application of the activated carbon or sorbent limitation in the claims.

So first I'll say that there is, in my view,

ample evidence that's been presented that the defendants made and sold refined coal with bromine to the respective power plants during the damages periods.

And additionally, ample evidence presented that after they did so, each of those power plants used and essentially had to use activated carbon on the flue gas at those power plants regarding that burned coal in light of the nature of the fact that certain activated carbon equipment was installed at those plants, and that is, in fact, how those power plants processed and burned that refined coal.

And additionally, in light of the evidence, it seems to me that there was a reason why those power plants used that activated carbon step in order to help meet certain environmental regulations.

Here in this case, I think it is -- would be reasonable for a jury to conclude that the sale of the coal and provision of the coal to the power plants in the particular circumstances here, that is, by certain of these Defendants on a conveyer belt at the plants at issue under the particular circumstances at issue that can be argued to be an act that causes the infringement at issue, and that in these specific circumstances, there's evidence that could lead a reasonable jury to conclude that there was no other outcome but for that coal sale to then lead to infringement

thereafter, including via the use of the sorbent or activated carbon step.

With regard to the intent, there's also evidence that Defendants, including Mr. Green, that knew of the fact that the power plants used activated carbon in the time periods at issue -- and I'll note I've noted in my view that to the extent that some of that, such as e-mail evidence or other documentary evidence from Defendants predates the damages period.

I don't believe that the use of that evidence would violate the *Roche* case, for example, because *Roche* simply says that the acts of inducement must occur within the damages period. It doesn't say that no evidence in any way related to the induced infringement can't be relevant, including evidence related from the intent and knowledge.

There's also evidence, of course, that after the case began, that the defendants and Mr. Green knew of the fact that the power plants used activated carbon in the damages period.

The fact that activated carbon was used at these plants before and after the damages periods at issue doesn't mean, in my view, that it's impossible for -- or a reasonable jury couldn't find causation that creates a factual dispute that the parties will argue about and present to the jury.

Additionally, as has been noted, and there's been evidence presented of a potential motive for why the defendant would intend for these alleged acts of infringement to occur, and that includes obtaining -- the ability to obtain the Section 45 tax credits at issue, which would flow from the respective plants being open and able to burn coal, as a practical matter, and the facts put forward suggests that the defendants sold refined coal at a loss to the power plants in order to help incentivize the action.

So all these facts, I think, are relevant to at least further flesh out why I'm denying the motion for judgment as a matter of law, and so I'll just note that here on the record.

All right.  So now, counsel, we are later than I thought we would be, and I don't want to waste the jury's time.  I'd like to try to bring the jury out now, unless there's anything further.

MR. DORSNEY:  Your Honor, we'll do the exhibits, if you want to get that on record real quick.

THE COURT:  All right.  Sure.

MR. DORSNEY:  I'm pleased to report that Plaintiffs do not object to our redactions of admitted Exhibits DTX 377, 378, and 379.

So I would propose, so that we stay in compliance with the Court's pretrial order, that they be

admitted as redacted to comply with CFR 6 and 3(b).

THE COURT:  Any objection?

MR. CALDWELL:  No objection.

THE COURT:  So those exhibits will be admitted.

(Thereupon, Defendants' Exhibits 377, 378, and 379 were admitted.)

THE COURT:  Let me -- let my law clerk let the courtroom deputy know the jury can be brought in.

(The jury entered the courtroom.)

THE COURT:  Let's have our witness back on the stand.

Mr. Green, you remain sworn, and we'll continue with direct examination.

BY MR. DYESS:

Q.    Mr. Green, welcome back.

A.    Thank you.

Q.    We talked a little bit about MerSorb and S-Sorb that's put on the coal to make activated carbon.  Earlier, I think you talked about the CERT defendants put MerSorb on the coal to help with mercury control; is that correct?

A.    That's correct.

Q.    And they put S-Sorb in the court to help with control of nitrous oxide or NOx; correct?

A.    That's correct.

Q.    I might have misspoke when I said that.  Does the

S-Sorb also help with the mercury control?

A.      Yes, sir.  It's believed to, yes.

Q.      How does -- how do the CERT companies know how much MerSorb and S-Sorb to put on feedstock coal at these refined coal facilities so that the refined coal will qualify for the tax credit?

A.      That's done in the certification testing at the EERC. They provide that information to us.

Q.      How do they provide that information to you?

A.      It comes in a report that details the report with the results.

Q.      And what does -- and part of the information that's provided in these reports are MerSorb and S-Sorb rates?

A.      Among other things, but it does include MerSorb and S-Sorb rates, yes.

Q.      And specifically, what MerSorb and S-Sorb rates did these reports include?

A.      They include MerSorb and S-Sorb rate to -- that would qualify the fuel made at the facility for the next six months to qualify for the Section 45 tax credit.

Q.      And is that the absolutely required amount, or is it a minimum amount required to meet the rate --

A.      It's the --

Q.      -- I mean, the qualification?

A.      Sorry.  It's the minimum amount required to achieve

the qualified emission reductions.

Q.      And when you get these reports, do you take that MerSorb and S-Sorb application rate?  Is that exactly what you use to make the refined coal at these refined coal facilities?

A.      No, sir.  We would -- typically, we use that for our process for that period of time, but we'll add 3 to 5 percent to that number to make sure that we stay above the minimum amount.

Q.      And why do you need to add a little bit to make sure you stay above that amount?

A.      It's a factor of safety on the equipment.  When we're dealing with these bulk commodities and these things, we need to make sure we're staying above that rate 24/7 all during all the production that is occurring.

Q.      So that's to make sure that when the coal comes out, you've got a little bit of slack in there so that you know for sure that when it comes out, it's going to qualify for the tax credit; right?

A.      Yes, sir.

Q.      The EERC runs a qualification test, gives you a MerSorb rate that tells you how the -- what to put on it so that the coal will to qualify for the tax credit; correct?

A.      That's correct.

Q.      And that's what you used for the next six months to

prepare the refined coal?

A.      That's correct.

Q.      And how soon would you get this report from the EERC?

A.      That report is fairly substantial.  I would say month and a half, two months.  Definitely before three months.

Q.      And is that the first indication you get of what the MerSorb rate and the S-Sorb rate is that the EERC is going to recommend to you as the minimum for qualifying coal for the refined coal tax credit?

A.      No, sir.  The way that it works is I will discuss the results with the lab at the end of the day.  They will verbally give me those results, and then the same day, I will receive a letter that's been signed by a certified or a qualified individual that spells out the MerSorb rate and the S-Sorb rate, the minimum rates that are required to qualify that particular coal or that sample for the 45 credit.

Q.      So what is the role of this report that you've just described?

A.      The final report?  It is the final report that outlines everything about the test.  You know, what type of coal it was, what the additive rate requirements were, and then all of the analytical information that was used to get the results at the end, which were -- ultimately, what we're looking for is the S-Sorb and MerSorb amounts required.

Q.     Did that final report include any type of official certification that you needed for the tax credit program?

A.     It did.  As I mentioned, a qualified individual has to sign the report in order to meet the -- I think it's 2010-54 IRS guidance.

Q.     Now, was that qualified person somebody at the EERC or at the CERT companies?

A.     No, it was the EERC.  That's where they're from.

Q.     Okay.  If you would look in your notebook at Tab 19 -- I'm sorry.  1692.

A.     Okay.

Q.     What is that document?

A.     This is a final report from the EERC for a test that was completed on August 12, 2014, on a refined coal -- refined coal qualification test for Antelope Valley Station coal.

MR. DYESS:  Your Honor -- let me back up.

BY MR. DYESS:

Q.     Would you -- are you the person that received this document?

A.     Yes, sir.  I received this in my capacity as vice president of operations for CERT Operating Company.

MR. DYESS:  Your Honor, we would ask that 1692 be admitted.

THE COURT:  Any objection?

MR. CALDWELL:  No, sir.

THE COURT:  It's admitted.

(Thereupon, Defendants' Exhibit 1692 was admitted.)

BY MR. DYESS:

Q.    Now that the jury is able to see this, does this report identify for you the date that the qualification test was done?

A.    Yes, it does in a few places.  It shows it in the subject line on this page.  On this, August 12, 2014.

Q.    Does it show you anywhere else?

A.    Yes.  It would be in the conclusion section, which is towards the very end of the report.

Q.    Is this the conclusion section that you were just referring to?

A.    Yes, sir, it is.

Q.    And, again, we were talking about it shows you the date that the testing was run; correct?

A.    Yes, sir, in the first sentence.

Q.    Now, the six-month period that you can use these results to qualify refined coal, does that run from the date of the test or the date of the report?

A.    It runs from the date of the test.

Q.    So it's important for you to know what the date of the test was?

A.    Yes, sir, it is.

Q.    Does this report identify for you the rate of MerSorb and S-Sorb that the EERC recommended you use to qualify the lignite and Antelope Valley station for Section 45 tax code?

A.    Yes, sir, it does, in the second paragraph of the conclusion section.

Q.    And what was that recommended MerSorb and S-Sorb application rate?

A.    The recommended MerSorb rate was .002 weight percent MerSorb, and the S-Sorb was .020 weight percent, as I understand it.

Q.    What does "weight percent" mean?

A.    Percent by weight of the sorbent or the oxidizer to the coal.  So, for example, .2 weight percent S-Sorb is 4 pounds of S-Sorb per ton of coal.

Q.    Did you receive reports that were similar to this report for the Antelope Valley station on other occasions?

A.    Yes, sir, I did, for every test that was performed there.

Q.    And would each one of those tests from the EERC identify the date the testing was done?

A.    Yes, sir, it would.

Q.    Would each one of those reports received from the EERC identify the rate of MerSorb and S-Sorb that the EERC recommended you use to qualify the refined coal for the

Section 45 tax credit?

A.    Yes, sir, it would.

Q.    Would each one of those reports received from the EERC identify the results of mercury and NOx reduction the EERC achieved in the pilot scale testing that was the subject of the test?

A.    It would.

Q.    And would each one of those tests received from the EERC show the type of feedstock coal that was used in the qualification test performed at the EERC?

A.    It would.

Q.    And are you the person who would request the testing be done on each occasion from the EERC and the person who received the testing report from the EERC?

A.    Yes, that's correct.

Q.    I want you to look at Tab 1968 in your notebook.

A.    Okay.

Q.    Do you recognize this document?

A.    I do.

Q.    Now, what is that document?

A.    This document -- this document contains test results for nine different refined coal facilities, a summary of the results for nine different refined coal facilities for all testing that was completed at those facilities when the EERC had finally settled on an additive rate of .20 percent

S-Sorb and .002 percent MerSorb.

Q.    Now, Mr. Green, did you prepare this document?

A.    I did not.

Q.    Did you do anything to confirm that the information contained in this 1968 is an accurate summary of those test reports?

A.    Yes, sir, I did.  I reviewed each report for each line item for all nine of the facilities back to the original reports and found that those were accurate numbers.

          MR. DYESS:  Your Honor, we would move to admit Exhibit 1968.

          THE COURT:  Any objection?

          MR. CALDWELL:  No objection.

          THE COURT:  All right.  It's admitted.

          (Thereupon, Defendants' Exhibit 1968 was admitted.)

          MR. DYESS:  If we could publish that document.

BY MR. DYESS:

Q.    Mr. Green, is what's up on the screen -- tell you what.  Let's take it off the screen.  Let's focus on the board.

          Is what's up on this board, is that accurate for the first page of this document, Defendants' Exhibit 1968?

A.    Yes, it is.

Q.    All right.  Again, what information is summarized on

this first page of Defendants' Exhibit 1968?

A.    The first page represents all testing that was completed between August 12th, 2014, through November 23rd, 2021, for North Dakota lignite coal that was a feedstock coal at the Antelope Valley station.  It was owned by Marquis Industrial.

Q.    And does this -- you said this chart shows all of the testing performed after this August 12th, 2014, date?

A.    That is correct.

Q.    And does it show -- does this summary show what the recommended EERC additive rate was for each one of those reported test results?

A.    Yes, sir.  That's the second column.

Q.    And what was that for each one of those test results at Antelope Valley after August 12, 2014?

A.    .02 percent S-Sorb and .002 percent MerSorb.

Q.    And does this chart reflect that -- well, let me back up.

      Was that the rate that was used -- do I have a correct understanding that the rate that was used to make all of the refined coal at the Antelope Valley station after August 12, 2014, was based on that same recommended MerSorb and S-Sorb rate of .2 percent and .002 percent?

A.    Yes, that's the basis for our rate of making refined coal.

Q.    And all of that refined coal after this date would have been used based on that same formula; correct?

A.    That is correct.

Q.    Does this chart show the results of pilot scale testing as far as reduction in NOx and mercury?

A.    Yes, sir.  That's the next column.

Q.    And does this column, in fact, show that for each one of these tests using that recommended rate of .002 percent MerSorb and .2 percent S-Sorb, the EERC was able to achieve at least a 40 percent reduction of NOx?

A.    Yes, sir, that's what the results are.

Q.    Now, Mr. Green, we've talked about, at different times in this case, the '114 patent.

      We talked about that before, haven't we?

A.    Yes, sir.

Q.    And it's your understanding that that '114 patent issued in July of 2019; correct?

A.    Yes, sir.

Q.    And that's July 9, 2019; correct?

A.    July 9th of 2019.

Q.    I'm going to draw a line here between the test performed before and after July 9, 2019.  I'm going to write the word -- I'm going to write "'114" over here to the side.

      Using this chart, can you tell me what the recommended additive rate was from the EERC for MerSorb and

S-Sorb before and after this patent issued on July 9, 2019?

A.     It remained the same, at .02 percent S-Sorb and .002 percent MerSorb.

Q.     And as a matter of fact, that same additive rate was used by Marquis Industrial for its refined coal for five years before the patent issued; correct?

A.     That's correct.

Q.     And that formula didn't change after you found out about the patent, did it?

A.     No, it did not.

Q.     So all of the refined coal for the period reflected on this chart sold before the patent issued and after the patent issued was the same as far as the additive rate used to prepare that refined coal; correct?

A.     Yes, that's correct.

Q.     Okay.  Did the process -- not the formula.  Did the process that was used at the refined coal facility to make this coal change after you found out about the patent?

A.     No, sir.  Our process remained the same since the facility was placed in service in 2011.

Q.     Let's move on to the second page of Exhibit 1968. I'm going to draw that same line for the test before and after.

          That's a great noise.

          Have I drawn that line between the tests that

were performed before and after July 9th, 2009?

A.      Yes, you did.

Q.      Okay.  Tell me what this page of the chart represents.

A.      It's the same information contained on the prior chart except this one is all of the testing that was completed between November 12, 2015, through July 22nd, 2021, for refined coal produced and sold -- or sold by Springhill Resources to Big Cajun II.

Q.      And is it correct that all of the coal -- refined coal sold to Big Cajun II after this test performed on November 12, 2015, was made using that same formula of .2 percent S-Sorb and .002 percent MerSorb?

A.      Yes, sir, it was.

Q.      And that's the same we saw on the chart for Antelope Valley; correct?

A.      Yes, sir.

Q.      So all of the coal that was produced after Springhill Resources got this test back showing .2 percent S-Sorb and .002 MerSorb rate, all of it was prepared using that same rate?

A.      That is correct.

Q.      And that was the same before the patent issued and that was the same after the patent issued?

A.      Yes, sir, that's correct.

Q.    And the process for how the refined coal was made at Springhill Resources' facility in Big Cajun II, that didn't change during that period of time either, did it?

A.    No.  That is true.  It did not change.

Q.    Let's go to the third page of Exhibit 1968.  What does this third page show?

A.    It's the same information from the prior two charts with all tests, all certification tests, performed between February 11, 2019, through July 22nd, 2021, for refined coal that Bascobert Holdings sold to Coleto Creek.

Q.    And, again, I'm going to draw this squeaky red line -- that's a little better -- between the test performed before and after --

A.    I think you missed it by one line.

Q.    That's the risk you run when you do this in realtime.

       But this second line for the '114, all the testing that was done before and after this patent issued showed that you needed to use the same recommended rate of MerSorb, .2 percent, .002 percent, to prepare the refined coal that was going to be sold to Coleto Creek; right?

A.    That's right.

Q.    This is a shorter list than the other ones.  Why is this a shorter list?

A.    If you recall, the Bascobert facility was relocated to Coleto Creek in, I think, May or June of -- I don't

recall the exact date. I know we signed the contract in May, but it was moved in 2019 to Coleto Creek.

Q.    So this is the testing for all of the refined coal that was sold to Coleto Creek?

A.    That is every test for Coleto Creek.

Q.    But the formula didn't change before and after the patent issued; correct?

A.    That is correct.

Q.    And that process was the same the entire time you were at Coleto Creek?

A.    Again, yes, it's the same.

Q.    Let's go to the next page. I have to draw the line right this time.

So this is the fourth page, and what does this fourth page of 1968 show you?

A.    The same information for EERC certification testing completed between December 2nd, 2014 through the last test that was completed July 22nd, 2021, for all of the refined coal testing done for Larkwood Energy.

Q.    All right. I'm going to draw my line, making sure I'm in the right place this time.

Now, that line shows when the patent issued between these two tests. What does this chart show you about the recommended rate that was used to prepare the refined coal that was sold to the Labadie station?

A.    It shows that it remained the same before the patent issued as it did after the patent issued.

Q.    Does that mean that all of the refined coal that was sold at the Labadie power station during this period of time was based on this same recommended rate before and after the patent issued?

A.    Yes, sir.

Q.    And that process used to prepare the coal at Labadie, it didn't change during this period of time reflected on this chart, did it?

A.    That's correct.

Q.    And this .2 percent S-Sorb and .002 percent MerSorb, that's the same rate that was used at the three other power plants we looked at; correct?

A.    That's the same rate, yes.

Q.    Go to the next page, I believe the fifth page of Exhibit 1968.  Tell me what this chart shows.

A.    That's all testing completed for refined coal certification that Cottbus Associates sold to Laramie River station starting on September 2nd, 2014, through June 1st of 2021.

Q.    Now, I'm going to draw my line again.  That's the line on.

When the patent was issued, was the recommended rate that the EERC gave you for making refined coal that's

going to be sold to Laramie River the same before and after the patent issued?

A.      Yes, it remained the same.

Q.      So this means that all the refined coal that was sold to the Laramie River station was prepared based on that same recommended formula; correct?

A.      For the dates shown, yes.

Q.      And that's September 2014 through June 1st -- or to the end of the program; right?

A.      Yes, sir, to the end of the program.

Q.      And that rate was the same before and after the patent issued?

A.      Yes, that's correct.

Q.      And it was the same rate, .2 percent S-Sorb and .002 percent MerSorb, as these other charts we looked at?

A.      Yes, sir.

Q.      And it wasn't affected at all by when you found out about the patents; correct?

A.      That is correct.

Q.      Let's turn to the next page of 1968.  What does this sixth page of this document show?

A.      That's all of the EERC qualification test results for starting on August 13th, 2018, through July 22nd, 2021, for refined coal sold by Rutledge Products.

Q.      I'll draw my red line again for July 9, 2019.

What was the recommended rate from the EERC for S-Sorb and MerSorb for this period of time between August 13, 2018, through the end of the program?

A.    .20 percent S-Sorb and .002 percent MerSorb.

Q.    So all of the refined coal that was made by Rutledge and sold to Limestone for the period reflected on this chart was based upon the same rate, .20 S-Sorb and .002 percent MerSorb; correct?

A.    That's correct.

Q.    And that didn't change when y'all found out about the patent that issued July 2019; correct?

A.    That is correct.

Q.    And the process for making this refined coal that was being sold to Limestone, that didn't change during this period either, did it?

A.    No, it did not.

Q.    Let's go to the seventh page of this document.  This may -- yeah, it's the seventh.

What does this seventh page of the document show you?

A.    Again, it's the same information contained -- that we've looked at.  This is all testing completed between December 20th of 2016 through July 22nd of 2021 for EERC testing -- qualification testing results for refined coal Buffington Partners, which sell to Rush Island.

Q.    My red line again.  That's terrible.

Does this chart reflect that the recommended rate provided by the EERC for refined coal to be sold to Rush Island was the same after this December 20th, 2016, test?

A.    Yes, that's correct.

Q.    And that formula was .2 percent S-Sorb, .002 percent MerSorb?

A.    That's correct.

Q.    So all of the refined coal that was prepared after this December 20, 2016, test was prepared using the same formula -- based on the same formula recommended by the EERC; correct?

A.    Correct.

Q.    And that's the same recommended formula that we've seen in all these other tests, all these other charts?

A.    That is correct.

Q.    And it was the same before the patent issued and the same after the patent issued; correct?

A.    Yes, sir, correct.

Q.    And the process for making refined coal at Rush Island didn't change during this period?

A.    That is correct.

Q.    A couple more of these.  Let's go to the eighth page of 1968.

Q.    What do we see on this eight page of 1968?

A.    These are all of the test results for refined coal that would be produced based on the test results on this page, which is August 11, 2014, through July 22nd, 2021.

Q.    And I'm going to draw my line again for when the patent issued on July 9th, 2019.

Was the recommended rate that Senescence received from the EERC for this entire period of time the same, the .2 percent S-Sorb and .002 percent MerSorb?

A.    Yes, sir.

Q.    Does that mean that all the refined coal for the period reflected on this chart is based on this same formula .20 percent S-Sorb and .002 percent MerSorb?

A.    That's correct.

Q.    And that didn't change when the patent issued on July 9th, 2019?

A.    That's correct.

Q.    And the process that was used to make this refined coal didn't change during this period; correct?

A.    That's correct.

Q.    One more.  I know you're excited about that.  Last one of these charts.

What does this chart show us?

A.    That shows all of the EERC testing results from each of the tests starting on September 15th, 2014, through

June 15th of 2021 for all the -- for Deogun Manufacturing, the coal that they sold to Intermountain Power Agency.

Q.    Now, interestingly enough, one of those tests was run on July 9th, 2019, the same day the patent issued; correct?

A.    Correct.

Q.    I'm going to draw my line.  Let's put it right there.

What was the recommended rate for S-Sorb and MerSorb that the EERC provided in all of the tests reflected on this chart?

A.    .2 percent S-Sorb and .002 percent MerSorb.

Q.    And does that mean all of the refined coal that was prepared during the period reflected on this chart was based on that recommended rate of .2 percent S-Sorb and .002 percent MerSorb?

A.    That is correct.

Q.    And this Deogun Manufacturing, it used a different kind of coal than was reflected in all these other charts, didn't it?

A.    It did.  Deogun/Intermountain Power had a blend of coals.  It was a bituminous, sub-bituminous coal.

Q.    And the Antelope Valley was lignite coal; correct?

A.    That's correct.

Q.    And the other set of plants, they were burning Powder River Basin coal, PRB coal; correct?

A.    That's correct.

Q.      But the additive rate recommended by the EERC to qualify the coal for the refined coal at Intermountain Power was the same rate for this blended coal as it was for PRB coal and lignite coal; correct?

A.      That's right.

Q.      And that didn't change at Intermountain before and after the patent issued; correct?

A.      Correct.

Q.      And do you know if Intermountain Power ever used activated carbon?

A.      No, they never used activated carbon at their plant.

Q.      Now, before we leave these charts, these charts don't show all of the certification testing that the EERC did for the refined coal facilities at these plants; correct?

A.      No, it does not.  It only shows the test dates shown which are -- well, it shows everything after the top test date was completed for the facility.  There are tests before those.

Q.      So for these -- except for Coleto Creek.  That was actually all of the tests; correct?

A.      You're correct.  Coleto Creek was all the tests.

Q.      For the other eight pages -- I want to make sure nobody thinks we're trying to pull a fast one on anybody.

Like, for this one, there would have been tests prior to September 15, 2014; correct?

A.    That is correct.

Q.    But why are we summarizing just this information and the information that's in these charts?

A.    What these charts -- each one of these nine charts shows is what the additive rate -- when the additive rate that was optimized by the EERC, when it was started at .2 percent S-Sorb and .002 percent S-Sorb, when they got to that rate and what it was after that rate.

Q.    And it didn't change after it settled on this rate?

A.    That is correct.

Q.    It didn't change for any of these nine plants once the EERC settled on that additive rate to make the refined coal at each one of the plants; correct?

A.    That is correct.

Q.    Now, Mr. Green, do you still have the plaintiffs' blue binder for your testimony in front of you?

A.    Yes, sir.

Q.    If you could pull that out again.  If you could -- well, we discussed earlier the amended complaints that have been filed in this case; correct?

A.    Yes, we have.

Q.    I want to take another minute to look at a different provision of those.

       Could you look at Tab 13 in Plaintiffs' notebook they prepared for you.

A.     I'm at Tab 13.

Q.     And this is the first amended complaint, Document Entry 130; correct?

A.     Yes.

Q.     And that was filed on July 15, 2020; is that correct?

A.     That is correct.

Q.     And remind me.  Were all six of the CERT operation companies named as defendants in this case?

A.     Yes, they were.

Q.     And that included CERT Operations Company that supplied refined coal to Intermountain, Mount Storm, and Chesterfield that never used activated carbon; correct?

A.     Correct.  That's correct.

Q.     If you would turn to page 14 of this document for me.

       MR. DYESS:  And, Mr. Brown, if you could pull up -- there we go, page 14 and 15.

BY MR. DYESS:

Q.     Could you read paragraph 87 for us?

A.     Sure.

       "On information and belief, when AJG, DTE, CERT, Chem-Mod, and the RC defendants perform certification testing for a particular plant, they must be aware of the other mercury control equipment in the plant, including activated carbon injections.  Because AJG, DTE, CERT, Chem-Mod, and the RC defendants make refined coal by adding

chemicals to the coal, not by removing atoms of mercury, the mercury present in the coal will also be present in the gas emitted from the combustion chamber.

"Indeed, according to Chem-Mod, the additives applied to the coal do not destroy or remove the mercury atoms.  They merely result in the mercury being converted into a different form of mercury, e.g., molecular mercury versus oxidized mercury.  Thus, if these defendants attempted to perform a certification test by merely combusting refined coal and measuring the amount of emitted mercury leaving the combustion chamber, i.e., disregarding the plant's activated carbon injection and other mercury control equipment, they would be unable to demonstrate the required reduction in mercury."

Q.    Mr. Green, as far as the CERT Operations Company goes, what do they have wrong in this paragraph?

A.    Well, biggest problem is the last sentence.  It talks about using activated carbon injection in the certification testing, which we do not do.

Q.    Have you ever done that?

A.    No, never.

Q.    Was it a correct statement that you would have to use activated carbon during the qualification testing in order to meet the required reduction in mercury required by Section 45?

A.    No, it would not.

Q.    As a matter of fact, these charts showed that you actually did achieve that without using activated carbon in the testing; correct?

A.    That's true.

Q.    Because all you had to do was show a 40 percent reduction in mercury; correct?

A.    That's correct.

Q.    And all of those -- every line of every one of these charts showed that that was achieved with this .2 percent S-Sorb rate and .002 percent MerSorb rate; correct?

A.    That's correct.

Q.    All right.  Let's go on to the next paragraph, paragraph 88.  It's a long paragraph, and here's what I'd like you to do for the jury.  I'd like you to take it sentence by sentence, and if you see a problem with what they've alleged against the CERT companies in that sentence, I'd like you to stop and tell me about it.

A.    Okay.

      88:  "On information and belief, for coal-fired power plants that use activated carbon injection, AJG, DTE, CERT, Chem-Mod, and the RC defendants demonstrate qualified emission reductions for those plants by adding activated carbon sorbent downstream of the combustion chamber during the certification testing."

Q.      Tell me what's wrong with that sentence.

A.      The claim that we do -- the CERT defendants do their certification testing by adding activated carbon sorbent downstream of the combustion chamber.  It's just wrong.

Q.      Is that correct?

A.      No, that would actually disqualify the test.

Q.      Could you please read the next sentence.

A.      "For example, these defendants can establish a baseline mercury rate by combusting non-refined coal in a combustion chamber and then using the mercury control equipment employed at the plant under test.  For example, activated carbon injection and electrostatic precipitator."

I'm a little confused on they talk about -- I'm a little confused.  It does say we're using activated carbon again, but it states "and then using mercury control equipment employed at the plant under test."  I'm assuming they mean the test facility at the EERC, but that's -- that's just full of errors.  We -- the biggest thing is we do not use activated carbon in this testing.

Q.      And then you're talking about the certification testing?

A.      In the certification testing.

Q.      And you understand that's what this paragraph refers to as well?

A.      Yes, I understand that.  It just -- it refers to

employed at the plant under test, so it's a little unclear. Are they talking about at the test or at the power plant? I assume that it's --

Q.     Well, if you could read the next two sentences of this paragraph, maybe that clears that up.

A.     Maybe.  "This could be a test at the plant or a test at a pilot scale facility that simulates the plant's equipment."

So that -- that clears it up, that it could be a test at the actual power plant or a test at the pilot scale facility that simulates the plant's equipment, which is where we do our testing at the pilot scale.

"In either case, mercury from the coal will be emitted from the combustion chamber mixed with the activated carbon and at least some will be captured in the electrostatic precipitator."

Again, the reference to activated carbon and measuring downstream of the activated carbon is incorrect.

Q.     If you could read the next sentence.

A.     "The gas downstream of the electrostatic precipitator can then be measured for mercury content to establish a baseline for mercury emissions."

Well, that is where we measure our mercury emissions, downstream of the baghouse or ESP.

Q.     Now, what about this next sentence?

MR. CALDWELL:  Your Honor, may we approach?

THE COURT:  Okay.  I'll see counsel at sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  Okay.  Mr. Caldwell?

MR. CALDWELL:  Thank you.  My concern is that we've actually gone back into that same motion in limine that we've looked at before.

These are dropped claims and defenses.  He's in the first amended complaint.  It's an information and belief allegation.  It's not even a live complaint, and there are separate paragraphs that are for the contributory and induced infringement of the patent that are still at issue.

Those are live claims that are still through. We're making a scene of information and belief pleading. They don't understand the way pleading works and admitting and denying.

At this point, I think counsel should have approached before making a big scene out of something that is really a dropped claim and what it is at this point and just the fact that he's dragging it out.

I think if he'd have just hinted were they confused about how the test is run, that's fine.  That's consistent with his last point, but this point is making a comic scene out of something that's not a live issue in the case.

THE COURT:  Can I ask, Mr. Dyess:  I'm not sure I totally follow.  I see what you're doing.  The witness -- the pointing out allegations in the complaint that you think turned out to be mistaken and wrong.

Why are you doing that?  How is it relevant to the claim?

MR. DYESS:  Your Honor, again, we've got to demonstrate what our state of mind was for the contributory infringement claim.  These allegations and the evidence is going to reflect that they were repeated again in the second amended complaint and the third amended complaint, which is the entire period of infringement here for the entire period of infringement them alleging that we do something with activated carbon at the EERC.

And that's the basis for their tailoring argument against us, and this evidence shows our state of mind is going to be we didn't do the thing they accused us of doing during the infringement period.

THE COURT:  Right.  But I guess just to tie that though:  How are these particular mistakes, the one that you're going into -- like, right now, we've been talking about these allegations, about what happens when the certification testing is done at the EERC, and there are certain allegations about the use of activated carbon, and you say that's not true.  That's not what happens when you

do that testing.

In what ways -- I'm trying to get the link. What way is it going to be asserted, we saw that allegation and we knew it was wrong, but whether they used activated carbon at the EERC testing stage, and so?  What's the "and so"?

MR. DYESS:  Well, the "and so" is not only do we have to do -- we get to, though, what our state of mind was. It is not a dropped claim that they've accused us of.

THE COURT:  That's a separate question.  We'll talk about the dropped claim issue in a second.  We haven't gotten there.

I'm trying to understand the way you're linking -- you're going through the complaints and doing it for a reason.  I'm trying to understand why you're doing it.

MR. DYESS:  They've accused us of willful infringement and -- willful infringement and specifically as to state of mind, and this shows the errors in the complaint, whether information and belief or not, were allegations that you did the specific thing and that caused the infringement, and we in fact didn't do the thing.

THE COURT:  I'm not getting the thing.  We're talking about now whether activated carbon was used at the EERC certification test process, how that relates to knowledge about whether you infringe the elements of the

claims.

We know in the elements of claims the activated carbon is downstream of the boiler; right?  So what does it have to do with that?

MR. DYESS:  They've alleged that we used it as part of our certification testing.  Our response is we didn't use activated carbon at all and it also goes to, Your Honor --

THE COURT:  How is that responsive to my question?  I'm asking to link the questioning you're asking to knowledge about practicing the claims.

MR. DYESS:  Sure.  The other part on the contributory infringement is -- claim is that they have to show our coal was specially made and adapted for an infringing use.  That is the allegation they carried forward in the complaint to show that we used activated carbon with our testing.

And therefore, it was especially made and adapted for use with activated carbon.

THE COURT:  You used activated carbon with our testing, and therefore it was --

MR. DYESS:  Especially made and adapted for use with activated carbon in an infringement.  They have to prove it.  They have to prove that we knew that our coal was especially made and adapted for an infringing use, which

here means with activated carbon.

THE COURT:  I know the allegation is that the activated carbon was used at the plant downstream.

MR. DYESS:  I'm sorry.  You know what I'm pointing out is in this complaint, they're alleging we used it in the qualification testing at the EERC.

THE COURT:  That's not the allegation at this trial; right?

MR. DYESS:  For the infringement period when they're accusing us of knowingly --

THE COURT:  I think -- tell me if this is what you're saying:  That you, at the time, may have misunderstood what the allegations were and thought that they were accusing you of infringing because you use activated carbon at the EERC qualification test.

MR. DYESS:  Yes.  And that was during the entire period of infringement.  That's what the evidence shows when these complaints were in force, and they have to prove that we knew our coal was specially made and adapted for use with activated carbon.

And they're alleging that's true because we used it in certification testing, and our state of mind was that can't be true.

THE COURT:  We know sitting here today at this trial that is not their argument.  They are not alleging

that at this trial, but I think what you're saying is that's what you thought they were alleging or Mr. Green is saying he thought were the allegations at the time he's reviewing the complaints.

MR. DYESS:  That's what he understood the allegations to be.

THE COURT:  Am I wrong you don't believe that the allegation at this trial before the jury is that the sorbent that counts for the claims is somehow used in the testing you're talking about, what your state of mind was about, what you thought the allegations were?

MR. DYESS:  Correct, and that's all this period of time they're accusing us.  They're accusing us now of willfully infringing the patents.  When that period of infringement occurred, the allegation was you're using activated carbon in your certification testing.

THE COURT:  I think I understand that.  Speak to Mr. Caldwell's argument about how raising the issues about dropped claims, how is this issue related to the claims that still remain?

MR. DYESS:  It's relevant to the willful infringement claim during the infringement period when they're accusing us of infringement.  They're saying we willfully infringed, and they're basing -- they base that during the period of time on this allegation that we used

activated carbon in the certification testing.

Therefore, we would have known our refined coal was especially made and adapted for use with activated carbon.

THE COURT:  But dropped claims talking about claims of patents.  You're saying in the allegations these still apply to the remaining CERT Operations claims of two patents-in-suit.

MR. DYESS:  Yes, sir.

THE COURT:  I assume we're not talking about looking at parts of the complaint for other patents that are no longer at issue here.

Mr. Caldwell, anything further?

MR. CALDWELL:  This allegation is no longer in the live pleading.  That's my point, is this allegation sort of -- this theory isn't in the live pleading, and I think the other problem is this 402 and 403 problem that he's just -- he's making a big scene about information and belief, pleading what we had was the sequence of times when Your Honor was working with us when we were trying to replead because it was a black box trying to figure out who's doing what in these organizations.

This is not a live allegation, and it's not from the original complaint.  To the extent he's making the argument about mental state, he's jumping forward to

amended.

THE COURT: The period of infringement that they have to have the -- the mental state is 2019 and 2021, and these pleadings we're talking about were at issue -- I think that's the challenge for plaintiff, is that the whole case -- the whole damages period is after the first complaint was filed.

So it's necessarily -- I think the way we are in terms of allegations that still remain is necessarily going to have to provide to Defendants the discussion of what the pleadings were and what the mental state was. It could get to a place where we start getting so far into the complaints that it unfairly traipses over the MIL. We haven't gotten there yet.

For that reason, I'm going to overrule the objection, and I'll let you continue.

MR. DYESS: We're just about done with this, Your Honor.

THE COURT: Okay. Thank you.

(The discussion at sidebar ended.)

THE COURT: Mr. Dyess, you can continue when ready.

BY MR. DYESS:

Q.    Mr. Green, if you could look with me to behind Tab 14 of that same complaint.

A.      I'm there.

Q.      Now, this should be the second amended complaint; correct?

A.      That is correct.

Q.      If you would turn to pages 13 and 14, if you can look at two pages at once.

A.      Okay.

Q.      Have you read -- you've read paragraphs 85 and 86 of this second amended complaint; correct?

A.      Yes, I have.

Q.      Do you have an understanding how they compare to paragraphs 87 and 88 from the first amended complaint we just looked at?

A.      It seemed to be word for word.

Q.      So the problems that you just discussed with your understanding of the claims of paragraphs 87 and 88 of the first amended complaint would be the same here; correct?

A.      Yes, sir, that's correct.

Q.      And this second amended complaint was filed on May 21, 2021; correct?

A.      That's right.

Q.      And at this point in time, all of the CERT Operations companies who were named in the second amended complaint are still selling prepared refined coal to be sold to power plants; correct?

A.     That's correct.

Q.     If you would look behind Tab 15 with me.  Are you there?

A.     I'm there.

Q.     And this is the third amended complaint; correct?

A.     That is correct.

Q.     And in this third amended complaint, all six CERT operation companies are still named as defendants; correct?

A.     Correct.

Q.     Now, this complaint was filed on October 7th -- third amended complaint was filed on October 7, 2021; correct?

A.     That is correct.

Q.     Was the refined coal program for the CERT companies still ongoing at this point?

A.     Yes, it was.

Q.     For how much longer would it be ongoing?

A.     At the longest until December 31st of the same year, so a month and a half, a month and 20 days.

Q.     By your way of understanding, was this the last amended complaint that the CERT defendants received while they were still making refined coal?

A.     While we were still making refined coal, yes.

Q.     If you would turn to page 13 of this third amended complaint.

A.     Okay.

Q.      Have you read paragraphs 83 and 84 of this third amended complaint?

A.      I have.

Q.      And do those paragraphs appear to be similar to paragraphs 87 and 88 from the first amended complaint we just read and discussed?

A.      Yes, they do.

Q.      And how do they compare?

A.      They just seem -- it looks like a cut and paste.  It looks like identical language.

Q.      Word for word?

A.      Yes, sir.

Q.      Would the discussion and the problems you had with paragraphs 83 and 84 of this third amended complaint be the same ones that you just told us about in paragraphs 87 and 88 of the first amended complaint?

A.      Yes, they would.

Q.      Now, do these paragraphs of the first, second, and third amended complaint that we just talked about have any impact on the defendants' understanding of the infringement they were being accused of?

A.      Well, they did a great deal.  I mean, these inaccurate statements seemed very important to the plaintiffs' case against the CERT defendants that they were infringing.

We -- you know, they kept repeating these for a year and a half, really all the way up until the end of the refined coal program, and we knew that we weren't using activated carbon in our certification testing. And because we knew that, we didn't have any reason to believe that these claims had any merit.

And then because we weren't doing the main thing they were saying we were doing or claiming that we were doing, which was specially formulating our coal to be used with the power plant and using the activated carbon to do that, by the time October 7th got around and through the entire rest of the year, we didn't know that there was anything for us to change at that point.

Q.    Now, up through the time of this third amended complaint, were all six of the CERT Operations companies supplying refined coal that was made with calcium bromide to a power plant?

A.    Yes, they were.

Q.    And up through the time this third amended complaint was filed, were all six of the CERT Operations companies supplying refined coal made with calcium bromide to a power plant that used activated carbon?

A.    No, sir, they were not.

Q.    And which power plants that a CERT Operations company was supplying refined coal to during this period that

weren't using activated carbon?

A.    That would have been the Mount Storm power plant, the Chesterfield power plant, and the Intermountain power plant.

Q.    Now, up through this -- the time of this third amended complaint, did you have any understanding of what the patent you were accused of infringing required a power plant to do in addition to burning your refined coal?

A.    I'm sorry.  Could you repeat that?

Q.    I can.  I'll try to slow down.

Up through the time this third amended complaint was filed, what did you understand the patents you were accused of infringing required a power plant to do in addition to burning your refined coal?

A.    The power plant had to use activated carbon in order to infringe these patents.

Q.    But as you've just testified, up through the time of this third amended complaint, you understood that not all of the power plants these CERT Operations companies were selling refined coal to were using activated carbon; correct?

A.    That's correct.  3 of the 11 were not.

Q.    Now, Mr. Green, you've heard the phrase in this trial "substantial non-infringing use"; correct?

A.    Yes, sir.

Q.    And you've heard Mr. O'Keefe testify yesterday that

he gave testimony in this case that it was his opinion on March 23, 2022, that for those plants that didn't use refined coal before they installed activated carbon, that those would be substantial non-infringing uses of refined coal.

Do you remember that testimony?

A.    Yes, I understand -- I remember that testimony.

Q.    Now, if you could look at this first amended complaint one more time.  I've just got a couple of times I need you to do that.

If you would look page 204 -- that can't be right.  Turn to -- let's try 24.  How about 20?  Let's try 20.  Page 20.

A.    This is first amended complaint; right?

Q.    Right.

A.    Okay.  I'm on page 20.

Q.    And if you could read paragraph 107.

A.    107:  "Thus when, AJG, DTE, CERT, Chem-Mod, and/or one of the RC defendants provides refined coal on the conveyance leading to the combustion chamber of a coal-fired power plant with an activated carbon injection system, AJG, DTE, CERT, Chem-Mod, and the RC defendants know that this refined coal has been specifically tailored and certified for that plant and that the provided refined coal has no substantial non-infringing use, i.e. it cannot reasonably be

used for a purpose other than to be combusted at the plant where a sorbent comprising activated carbon would later be injected."

Q.    If you look at Tab 14, paragraph 106, for me, please.

And that's the second amended complaint; correct?

A.    Yes.  This is the second amended complaint, paragraph 106.

Q.    Do you see that?

A.    I see that.

Q.    This paragraph 106 repeats the same allegation you just read from the first amended complaint; correct?

A.    Yes.  It appears to.  Yes, it does.

Q.    If you could look at Tab 13, that's the third amended complaint.  Look at paragraph 104.

A.    I'm looking at it.

Q.    Again, the plaintiff repeats the allegation from the first amended complaint?

A.    Yes, sir, that's correct.

Q.    Mr. Green, at the time you were -- received these amended complaints, did you understand that the plaintiffs were accusing all of the refined coal that had been made and supplied by all six CERT Operations companies who were defendants in the case at that time of having no use except to be used with the plant that used activated carbon?

A.    No.  I knew that three of the refined coal plants the named defendants were accused of didn't infringe and didn't use activated carbon.

Q.    But you understood these allegations to say that all of the plants where these CERT Operations companies were selling refined coal used activated carbon; correct?

A.    Yes.  All six of our CERT Operations companies were named in the case.

Q.    Mr. Green, at the time you received these three amended complaints, you had an understanding that at least three of those -- two of those operation companies were selling refined coal to three plants that never used activated carbon; correct?

A.    That's correct.

Q.    And at that time when you received these amended complaints, was the amount of refined coal that two operations companies sold in those three power plants without activated carbon, was that a substantial amount of refined coal that the CERT Operations defendants had supplied?

A.    Yes, sir.

        MR. CALDWELL:  Objection, Your Honor.  He is leading.  He's leading the witness.  I'm trying not to interrupt.

        THE COURT:  Sustained.  The question will be

struck and may be restated.

BY MR. DYESS:

Q.    Mr. Green, at the time you received these three amended complaints, did you have any understanding about the amount of refined coal that had been supplied by the CERT Operations companies to these three power plants that didn't use activated carbon?

A.    Yes.  I mean, we had been operating there since 2011, so up until 2019, I knew that it had to be a substantial amount.

Q.    And at the time the plaintiff filed all of these three amended complaints -- let me withdraw that.  Let me rephrase it.

Did you have any understanding at the time you received these three amended complaints that there were any particular reason that the refined coal that all of the six CERT Operations companies were supplying had non-infringing uses?

A.    Well, my understanding from the patent is that a power can't -- a power plant cannot infringe if they don't use activated carbon.  And my understanding from the claims were that -- well, I'm trying to follow your question.

Q.    Sure.

A.    You had cut off and back on.  I'm trying to understand.

Q.      Right.

Did you have any understanding when you got these -- the first amended complaint, second amended complaint, and third amended complaint, that the non-infringing uses of refined coal might have been substantial?

A.      Yes, I knew that if -- our understanding is that if a power plant is not using activated carbon, that they're not infringing the patents, and we knew that with these three facilities that had been in operation since 2011 up until July 21, I think, the date we received the complaint, they had been in operation a long time.

So we definitely knew that we had a substantial amount of coal that was sold to power plants in a non-infringing -- for a non-infringing use.

Q.      And did you have any understanding when you received these first -- these first three amended complaints filed by Plaintiffs whether refined coal having a non-infringing use might impact the claims against you?

A.      Yes, I did.

Q.      What was that understanding?

A.      My understanding was that if you have a non-infringing use -- a substantial non-infringing use, that you can't be infringing the patents.

Q.      And is that what you thought when you read these

allegations that we just went through in the first amended complaint, second amended complaint, and third amended complaint?

A.    Regarding the CERT Operations companies being in -- all six CERT Operations companies being in the suit?

Q.    Yes.

A.    Yes, I mean, that's exactly what we thought.

Q.    Did you know -- were you able to quantify how much refined coal at this point in time had been sold by these two CERT Operations company defendants to power plants that didn't use activated carbon?

A.    Just the two power plants or three power plants?

Q.    The two CERT Operations companies.

A.    Oh, gotcha.  Was I able to quantify that?

Q.    Yes.

A.    Yes, sir.

Q.    Do you know how much from a quantitative standpoint -- well, do you know how much refined coal was sold to those three power plants at the time you received these first amended complaint, second amended complaint, and third amended complaint?

A.    Yeah, it was -- and I'm just trying to think what date you're asking me.  I know we sold those power plants about 70 million tons of refined coal over the life of the project.

Q.      And about what percentage of that was the total amount of refined coal CERT operation companies sold to power plants?

A.      That was around 20 percent.

Q.      In your mind, was that a substantial amount of the refined coal the CERT Operations companies sold?

A.      Certainly.  Certainly, it was a substantial amount.

Q.      In your mind, did you make any connection whether that was a substantial non-infringing use of refined coal?

A.      Absolutely.

Q.      As part of your job as the vice president of operations for the CERT Operations companies, did you have any role in tracking the volume of refined coal that the refined coal facilities produced and sold at the power plants?

A.      I did.  I would receive production reports.

Q.      Do you know how -- what were these production reports?

A.      I would receive a production report from each power plant.  One of our power plant operator -- at each one of our project, companies would send me -- the CERT Operations company that was operating there would send a production report in on a daily basis.

Q.      Do you know how the tonnage of refined coal that was produced by each operations company that was reported to you

was collected by each facility?

A.    I do.  It was -- so we have two shifts that operate at each plant.  That's two 12-hour shifts, the day shift and the night shift.  The day shift operator would record all the information from the PLC, which is the process logic controller, that controls and monitors the production.  The night shift would do the same thing.

The following day, the plant manager would come in and verify those numbers and put them into what we call a production summary that contains all the necessary and pertinent information, and that would be e-mailed to the office accounting folks and myself on a daily basis.

Q.    And for what reason are you provided that production summary information for each refined coal plant?

A.    Well, I need it for several reasons.  One, we had to replenish our coal feedstock on a daily basis.  We maintain a two-day inventory, so we had to buy feedstock on a daily basis, so I had to have that -- I directed that to be done.

Our sorbents, our MerSorb and S-Sorb, the inventories are recorded on that sheet, so I had to, you know, keep on top of that.

And lastly, we would also -- I would also use those numbers to, you know, make sure that we were going to meet our monthly forecasted projections to be able to make reports to investors.

Q.    What did you do with that information you got from each facility?

A.    Each of the -- I think it was 11 reports I would put into a spreadsheet that I called a flash report.

Q.    If you could, I want you to look at Defendants' Exhibit 1514.  I think that's actually in a separate notebook that you have up there.

A.    Okay.  I'm looking at it.

Q.    What is this Document 1514?

A.    This is a printed copy of my flash report.

        MR. DYESS:  Your Honor, we move to admit Defendants' Exhibit 1514.

        THE COURT:  Any objection?

        MR. CALDWELL:  No objection.

        THE COURT:  It's admitted.

        (Thereupon, Defendants' Exhibit 1514 was admitted.)

BY MR. DYESS:

Q.    And with regard to refined coal tonnage, what information is contained in the flash report?

A.    The flash report contains the daily total refined coal production.  It's monthly totals for each one of the facilities listed at the top.

Q.    And is it possible from this flash report that you could total up the refined coal that was produced at each

facility throughout the entire time of this program?

A.    You can use it to get that information, yes.

Q.    And it's totaled at least on a monthly basis throughout that report; correct?

A.    It is.

Q.    And the headings across each one of the boxes in that report, what does that information show?

A.    The headings across, those are the power plants that each one of the refined coal facilities are located at.

Q.    And you've given us the time frame when each refined coal facility was at each plant before?

A.    That's correct.

Q.    Now, we talked about the three plants that you knew about where refined coal was made with calcium bromide, where refined coal made with calcium bromide was sold without the power plant using activated carbon.

We covered that; correct?

A.    That's correct.

Q.    Mr. Green, at the time the CERT Operations defendants received the three amended complaints that we talked about, did you know whether up to that point in time any of the other four CERT Operations companies -- defendants had supplied refined coal to power plants when those power plants were not using activated carbon?

A.    Yes.  You know, all of the power plants that we were

operating didn't use refined coal in the early years, 2011 up until some point in time.

Q.    We talked a minute ago about substantial non-infringing use.  Did this information you had about the selling refined coal to power plants at a time when you weren't aware they were using activated carbon, did that impact your understanding of "substantial non-infringing use" as we've discussed it?

A.    Yes, sir, I mean, how?

Q.    How did it impact it?

A.    Well, we knew -- when we were served in the lawsuit, we, you know, we understood that if the lawsuit explained that MATS compliance was going to come in sometime around 2014, 2015, 2016, so we reached out and started discussing -- started trying to drill down on that information and find out when power plants actually installed activated carbon, and we were able to look at that and decipher and see how much production was sold to those power plants before they used activated carbon, and it was a substantial number.

Q.    Mr. Green, I want to read to you a couple more of the stipulations that the parties agreed to in this case that are undisputed facts, and we can give them to you and the jury.

First one of those is number 44:  "The following

power plants first used activated carbon injection in one or more of their coal-fire units in 2015:  Antelope Valley, Big Cajun II, Laramie River, Rush Island."

Number 45:  "The following power plants first used activated carbon injection in one of more of their coal-fired power units in 2016:  Coleto Creek, Labadie, Limestone and W.A. Parish."

Mr. Green, what do you understand those stipulations to mean?

A.    I understand the stipulations to mean if we know the year that a power plant started using activated carbon, all the preceding years they didn't.

Q.    Now, when you got this first amended complaint, the second amended complaint, and third amended complaint, did you have any understanding or sense of how much refined coal would have been sold to those power plants during a period when they didn't use activated carbon?

A.    Yes, I did.

Q.    In your mind, was that a substantial amount of refined coal?

A.    Well, sure, it was a substantial amount.  We had been operating for all the way up until 2014 to 2015, so four or five years of production.

Q.    Now, does this -- your understanding that that would be a substantial amount of refined coal without activated

carbon, did that affect your understanding of how these allegations of infringement have been made against you in this complaint, in these amended complaints?

A.      Well, certainly.  If these were -- if these were uses without infringing the patent because the power plants weren't using activated carbon, these were substantial non-infringing uses.

Q.      Mr. Green, I want to skip to a different subject and then I want to wrap up with you.

Have the defendants -- let me do it this way.

Have any of the defendants ever known or understood that the refined coal made with calcium bromide that was sold to a power plant was especially made or adapted for use in a method that would infringe either the '114 or '517 patent?

A.      Absolutely.  You know, that's what I really don't understand.  We don't use activated carbon in the formulation of our coal.  We don't use it in the testing. You know, we've -- we're not -- you know -- sorry.  I'm trying to gather myself.

We've always -- we don't use activated carbon in our testing.  We're not allowed to use activated carbon in our testing.  We have always relied on the formula from the EERC to set our MerSorb requirements and our S-Sorb requirements.  I just don't see how we can be accused of

formulating our coal when we can't use activated carbon in the lab testing to certify the results.

You know, and also, we've never worked with a power plant, we've never coordinated with a power plant, to even look from our side at how our fuel reacts or behaves in a system that has activated carbon in it.  It just hasn't been done.

And furthermore, if you go back and look at the results you threw up on the screen or the board over here, our additive rates have remained constant over that entire period from before when the patent was issued and after the patent was issued.

So it's hard for me to understand the logic that you can have to say that our refined coal was specially made and adapted to be used with activated carbon when that plays absolutely no role in the way we formulate our coal.

Q.    Was the refined coal that the defendants sold to power plant customers especially made for any particular thing?

A.    Yes, sir, it was.

Q.    And what was that?

A.    It was to qualify for the section -- the technical requirements of the Section 45 tax credit.  We have always -- we have always formulated our coal the same way. We have always processed the coal in the same way.  It's

always been done with activated carbon specifically for the objective of qualifying the fuel for the Section 45 tax credit.

Q.    You just said it was always done with activated carbon to qualify the fuel.  Did you misspeak?

A.    I'm sorry.  It is always -- we have never used activated carbon to qualify our fuel for the tax credit program.  And, you know, using activated carbon to formulate that coal is against the code and would disqualify our fuel.

Q.    Mr. Green, did the CERT companies do anything to cause a power plant to begin using activated carbon?

A.    No, sir, it did not.

Q.    Did the CERT companies ever do anything that you're aware of that caused a power plant to continue to use activated carbon?

A.    No, sir.

Q.    Mr. Green, did the CERT companies ever do anything that you're aware of that prevailed on a power plant to use activated carbon?

A.    No, sir.

Q.    Mr. Green, did the CERT companies do anything that you're aware of that persuaded a power plant to use activated carbon?

A.    No.

        MR. DYESS:  Your Honor, we tender the witness.

THE COURT:  Okay.  Cross-examination.

MR. CALDWELL:  Thank you, Your Honor.  If I can get my timer.

CROSS-EXAMINATION

BY MR. CALDWELL:

Q.    Good afternoon.  Mr. Green, are you comfortable, ready to go?

A.    I'm ready.

Q.    You understand that we are on sort of a chess clock in this case; right?

A.    Yes, I understand.

Q.    So can I have an agreement that you will please help me by trying to focus on what I ask so we can just move through this quickly?

A.    I'll do the best I can.

Q.    You know how we were just talking about the complaints and there was a series of amended complaints?

A.    Yes, sir.

Q.    Do you understand that none of those complaints that you've shown are the live complaint in this case?

A.    They're the only complaints that what?

Q.    You understand that none of the complaints you've shown are the live complaint in the case?

A.    Live complaint?

Q.    Yes, the active complaint.

A.    The active complaint.  I understand that.

Q.    So you know how a lot of paragraphs you showed -- and I don't want to take 45 minutes going through them, but you understand how a lot of paragraphs you showed said something was pled on information and belief.

Did you see that?

A.    I did see that.

Q.    So since you've given us kind of your thoughts on how to interpret complaints, I would like to back up and say you had legal counsel at all times in this case; right?

A.    Correct.

Q.    And do you believe you got good legal advice from your lawyers from the beginning?

A.    I believe so.

Q.    Okay.  Do you understand that allegations like on information and belief, that is what a party is supposed to do if they think there's some -- maybe some merit to something but they don't know for sure?  They can lodge an allegation so they can investigate it with discovery.

Are you kind of familiar with that?

A.    Sure.

Q.    Now, who's the party that would have the confidential information about how things work inside CERT?  Was it ME2C or was it CERT?

A.    It was CERT.

Q.    So are you trying to mislead the jury when you show them, like, for 45 minutes "information and belief" allegations?

MR. DYESS:  Your Honor, objection.  This is inflammatory argument.

THE COURT:  Sustained.  Please restate the question.

BY MR. CALDWELL:

Q.    Mr. Green, you understand there is nothing inappropriate about Midwest Energy lodging "information and belief" allegations when we can't know what's going on inside the CERT companies; right?

A.    I understand that.

Q.    Now, you kept showing complaints.  First amended or second amended, third amended complaint; right?

A.    That's correct.

Q.    Did you guys ever file something that's a responsive pleading to a complaint that was called an answer?

A.    I don't believe so.  I don't know.

Q.    Let's just jump to the third amended complaint.  And I would like to pull up as a demonstrative, as you have done, your company's answer to the third amended complaint.

A.    Okay.

Q.    Now, would it surprise you that a party is supposed to go through the numbered paragraphs and provide a response

to the allegation so the parties can make progress because either they maybe agree on the allegations in a complaint or a paragraph or they partially agree or they disagree.

Do you understand that there's an admission and denial role?

MR. DYESS:  Your Honor, objection.  He hasn't laid a foundation that this witness knows any of those things.  Certainly, doesn't know about the answer.

THE COURT:  I'll overrule the objection.  That's the premise for the question.

THE WITNESS:  I'm sorry.  Your question again was...?

BY MR. CALDWELL:

Q.    Do you have any sense that there is a document where your side goes paragraph by paragraph and says whether you admit or deny the allegations?

A.    That's what this document is.

Q.    Now, Mr. Diaz [sic], just cut right to it.  You understand you were shown a bunch of paragraphs that are about information and belief pleadings that perhaps you guys used activated carbon in testing?

You showed those; right?

A.    The document said that we did use activated carbon in testing under your belief.

Q.    And that's not even an allegation in this trial, is

it?

A.    It's one of the claims in the trial.

Q.    You think that's a claim in this trial?

A.    It is an allegation against the defendants that were listed.

Q.    Sir, that's not even in a live pleading in this case, is it?

A.    Our understanding is those are the things we were being accused of doing.

Q.    Sir, it's not even in a live pleading in this case, is it?

A.    No, it's not in this case.

MR. CALDWELL:  Now, Mr. Diaz, will you show me the allegations of paragraph 212.  I think they're on page 50 of the document.  Just the allegations.

BY MR. CALDWELL:

Q.    So let's talk about something that's in the complaint that is at issue in this case for this jury.  Okay?

A.    Sure.

Q.    Now, there's multiple parties here.  Do you understand that originally in this case, A.J. Gallagher, DTE were other refined coal-type companies that were in the case; right?

A.    I understand that.

Q.    And throughout your direct, I think it was probably

before lunch you were showing these long timelines for a very long time.  There was no carbon at this plant and things like that.

Do you remember?

A.    Yes, I saw that.  I remember.

Q.    A.J. Gallagher and DTE can make charts just like that; right?

A.    I'm sure they can.

Q.    Right.  In fact, it's A.J. Gallagher that has an interest in the Chem-Mod company that invited you guys to get involved in this tax credit program; right?

A.    I have no idea how AJG and DTE run their business.

Q.    I never mentioned DTE in the question, sir.

A.    AJG.

Q.    I said it was A.J. Gallagher and Chem-Mod that invited you guys to get involved in this business; right?

A.    That is correct.

Q.    They were doing it before you were; right?

A.    Correct.

Q.    And they can show -- they can show timelines like that, that back in the day, we were supplying refined coal either before the patents issued or to different plants or to plants that didn't use activated carbon; right?

A.    I'm sure they could.

Q.    And you also know that they have paid $27 and a half

million to ME2C for the patent license; correct?

A.      I do know that they did, yes.

Q.      All right.  Now, let's look at this paragraph and understand it because they were all in the complaint together.  There are some additional parties.

So what I want to focus on is the extent to which the allegations relate to CERT.  Are you with me so far?

A.      I am.

Q.      So I'm not trying to make you answer as to what A.J. Gallagher knew.  That's not my question.  But it says these parties, including CERT, operate refined coal facilities that receive coal, add bromine or bromide such as calcium bromide to the coal, and then provide that refined coal to a coal-fired power plant that injects a sorbent material comprising activated carbon downstream of the combustion chamber.

Do you see that?

A.      I do see that.

Q.      Those are the acts of infringement that we're talking about in this trial; correct?

A.      That's correct.

Q.      And remember, this is your answer to the third amended complaint.

So you pointed out that that was late 2021;

right?

A.    Right.

Q.    And so by late 2021, you had collected your documents, you had reviewed your old e-mails, but not only that, you had called the plants; right?

A.    Yes.

Q.    So you knew, obviously, that you guys were making refined coal with, like, a bromide; correct?

A.    Correct.

Q.    But you also knew that the seven plants -- excuse me -- the eight plants at issue in this case were injecting a sorbent material, an activated carbon sorbent material, downstream of the combustion chamber; correct?

A.    Yes, we knew that.

Q.    And so by this point in time, you guys would need to admit that you were injecting or you were using -- I'm sorry.

By this point in time, late 2021, you would need to admit that you were using a bromide solution on the coal and that there were plants you guys were working with that were using activated carbon; right?

A.    There were, yes.

Q.    Okay.

MR. CALDWELL:  Now, let's see what they said in response to this, Mr. Diaz.

BY MR. CALDWELL:

Q.    "The defendants," and this is CERT's answer, "lack information sufficient to form the belief as to the truth of the allegations that do not pertain to them."  So that's the part about Gallagher, DTE that I told you we're not talking about.  So therefore they deny those.  Understood, no problem.

MR. CALDWELL:  Let's remove that highlighting, Mr. Diaz, so there's no -- no question.  I want to start with the word "the" three lines up from the bottom or two lines up.

BY MR. CALDWELL:

Q.    It says:  "The CERT defendants admit that they operate refined coal facilities.  The defendants otherwise deny any allegations in this paragraph that pertain to them."

Do you see that?

A.    I do see that.

Q.    So after going through this tedious examination about how ME2C has had to file multiple complaints to try to figure out the nature of your business and you're saying, gosh, this is the last one we saw when we were operating refined coal business, you were still telling us your customers weren't doing activated carbon; right?

A.    That's what this document says.

Q.    Is this the first time you've ever seen this?

A.    I don't recall seeing it.

Q.    Now, there's been this repeated commentary that ME2C for a while had some CERT Operations companies in the case that were not associated with plants using activated carbon.

Are you with me?

A.    Yes.

Q.    And it's, like, Intermountain; right?  What were the other two plants?

A.    Mount Storm and Chesterfield.

Q.    Do you understand that a year and a half after we asked you on December 22nd, 2021, so nine days before the refined coal program shut down, is when you guys finally gave us discovery indicating which of the plants you were working with were using activated carbon?

A.    I didn't know that date.

Q.    So while you're sitting up here saying that they just kept on leaving in these parties that are working with plants without activated carbon, you realize, though, even if you didn't know the date, that for at this point two and a half years, we hadn't been told which one of your plants that you were working with used activated carbon?  Did you realize that?

A.    No, I did not realize that.  But yeah -- excuse me.

MR. CALDWELL:  So do you have interrogatory

answers, Mr. Diaz?  We could start with Interrogatory Number 1 or Number 2.

BY MR. CALDWELL:

Q.    So what I want to direct you to here -- and we'll just kind of do this quickly.  We sent an interrogatory asking -- asking with regard to each facility, help us identify, basically, the parties that are involved.

MR. CALDWELL:  And if we can flip to the next page, Mr. Diaz.

BY MR. CALDWELL:

Q.    At this point, in December of 2021, you guys -- this is when you guys told us the information about CERT Operations IV, V, RCB -- scroll down -- and explained to us Senescence, Rutledge, Alistar -- keep going -- and then we got a supplement that had Bascobert, Buffinton, Cottbus, Larkwood, Springhill --

MR. CALDWELL:  Keep going.  Thank you.

BY MR. CALDWELL:

Q.    And then do you understand that ME2C amended its complaint to conform it to the parties that we now knew were associated with plants using activated carbon; right?

A.    I understand what you're saying.

Q.    Then we also, at the same time, year and a half earlier, had sent you Interrogatory Number 2.  This is when we got an answer to Interrogatory Number 2 that helped us

identify which plants used activated carbon.

MR. CALDWELL:  Can we just scroll through that very quickly, Mr. Diaz.

BY MR. CALDWELL:

Q.     And we hear about Big Cajun, Rush Island, W.A. Parish, Coleto Creek, Limestone, Labadie, Laramie River, Powerton.

Do you see that?

A.     I see that.

Q.     And Midwest Energy narrowed its allegations to conform to the information we had finally learned.

Do you see that?

A.     I see that.

MR. CALDWELL:  Thank you, Mr. Diaz.

BY MR. CALDWELL:

Q.     But as we discussed earlier this morning, you had known which plants were using activated carbon going back before the complaint; right?

A.     Yes, that is correct.

Q.     So you knew which ones -- when you read a paragraph that says we're accusing infringement that involves treating with bromine and a plant using activated carbon, you had that information available to you even from the time we filed the original complaint; right?

A.     90 percent of it, yeah.

Q.    Well, you had that information available to you; right?  You had all the same e-mails talking about who had --

A.    Yes.  I -- I could say yes.

Q.    And you would understand that when we're considering what coal matters for whether it has a substantial non-infringing use, we're looking at the coal of the accused power plants in this damages period of this case; right?

A.    Yes.

Q.    So now, do we understand after seeing in the discovery that you also told us, I think it's further down, that Mount Storm, Chesterfield, and Intermountain don't use activated carbon?

      Does it now make sense why they were dismissed from the suit or no longer at issue?

A.    In 2022?

Q.    Yes.

A.    It makes sense why they have been dismissed.

Q.    It seems like hours ago at this point, but when your direct started, do you remember being asked a question, "Why didn't they just come over here and knock on the door?  Why did -- why didn't Mr. MacPherson just knock on the door and talk to you guys"?

A.    Sure, I remember that.

Q.    But you saw what was wrong with that question; right?

A.      Getting into a power plant?

Q.      Yeah.  That's kind of a big problem with that question, isn't it?

A.      Yeah.  I mean, it's -- there's security.  You have to have access to get into a power plant just like we do, so...

Q.      And not only that, once you're on the power plant, they kind of won't let you just start going to different parts of the plant; right?

A.      That's true.

Q.      So you can't be over here working on this thing and say, "I'm going to go knock on that door on that trailer that's clear over there on the other side of the plant"; right?

A.      I think that's true.

Q.      Sir, just in case there's any doubt, you guys have made the commentary that we should have reached out to you or whatever, but you understand there is literally nothing, not at all, legally improper for Midwest Energy to file a lawsuit when it believes there's been a patent infringement; correct?

A.      I don't believe there's anything wrong with that.

Q.      All right.  Sir, you understand the plants we're talking about, the ones at issue, the eight?

A.      Yes.

Q.      Those are all Powder River Basin, PRB, and in one

instance a lignite plant; correct?

A.    Correct.

Q.    And you understand that those coals have different chemistry.  They have anthracite or bituminous coals; correct?

A.    I understand.

Q.    And I would assume you're familiar with the fact that because bituminous coals have sort of a higher BTU and you maybe burn at different rates, that the mercury profiles are a little different; right?

A.    Right.

Q.    So you would agree with me that there are bituminous plants that can meet MATS standards without having to have, necessarily, the same emission equipment that you would need for sub-bituminous like PRB or lignite coals; right?

A.    I'm not an expert in that area.  I can't say I know that or not.

Q.    But you guys have worked with bituminous plants that didn't need activated carbon.  You know that; right?

A.    We do work with plants that have bituminous coals.

Q.    And you know that these plants, the ones that are at issue in this case, many of them, if not all of them, have indicated to you and Mr. Linton that they are going to need ACI activated carbon to meet MATS; right?

A.    Yes.

Q.    So if the defendants later are playing deposition videos about somebody not needing activated carbon in a bituminous plant, it's not really the same thing, is it?

A.    I can't answer that.

Q.    You also understand, don't you, that these plants do use bromine with the coal and activated carbon; right?

A.    These plants being?

Q.    The plants at issue in the case, all the same ones from the boards.  So I'm sorry.  I'm gesturing generally to the left.

But these boards all relate to the accused plants; right?

A.    All but one, yes.

Q.    Okay.  Now, you understand that all of the eight accused plants do use bromine and activated carbon; right?

A.    Yes.

Q.    So if the defendants want to play a deposition clip of a guy who says, "I don't think you'd ever use bromine on a coal and also use activated carbon," you know that doesn't apply to the power plants we're talking about in this case; right?

A.    During the time -- I don't know what they're doing at this point in time, but, yes, these power plants used -- they burned refined coal and used activated carbon.

MR. CALDWELL:  I'll tell you what, I think

that's it.  So I will pass the witness.  Thank you.

THE COURT:  Okay.

MR. DYESS:  Your Honor, I have a very brief redirect if you want to take a break.

THE COURT:  How much do you have?  How many minutes?

MR. DYESS:  Should only be two or three minutes.

THE COURT:  Why don't you do that now and take a shorter break than normal because you had a long lunch and try to get the rest of the testimony in today of Mr. Green.

REDIRECT EXAMINATION

BY MR. DYESS:

Q.    Mr. Green, Mr. Caldwell just talked about them making allegations on information and belief.

You heard that; correct?

A.    Yes, sir.

Q.    Was there ever any basis for Plaintiffs to allege that you -- any of the CERT companies used activated carbon in Section 45 qualification testing?  Any basis for that?

MR. CALDWELL:  Objection, Your Honor.

THE COURT:  What's the objection?

MR. CALDWELL:  Obviously, there's no way this witness could testify about the materials that ME2C or its counsel saw when attempting to figure out these companies.

THE COURT:  Let me sustain the objection and ask

Mr. Dyess to ask him in a way that would be more directed to Mr. Green's knowledge.

BY MR. DYESS:

Q.    Mr. Green, are you aware of any information that exists that would show someone that the CERT Operations companies ever used activated carbon in Section 45 qualification tests?

A.    There wouldn't be any.

Q.    Now, as far as which power plants use activated carbon and don't use activated carbon, there are public databases and records which show which power plants use activated carbon; right?

A.    Yes, sir, there are.

Q.    And some of those are permits that the power plants have to get that the plaintiffs have put in this case; right?

A.    That would be contained in their permit applications.

Q.    So the plaintiffs got permits for some plants, but they didn't go get permits for the plants they accused of using activated carbon -- that didn't use activated carbon; correct?

A.    It would appear so.

Q.    Are you aware of any reason they couldn't have gotten that information?  That's public information; right?

A.    It is public information.

Q.    There are public databases the Department of Energy of the United States keeps that shows records of the mercury control equipment power plants use; correct?

A.    That is correct.

Q.    And that information includes which plants use activated carbon; right?

A.    Yes, sir.

Q.    And you're not aware of any deficiencies that the plaintiffs or their lawyers might have had accessing that publicly available information that would have shown that Intermountain -- I mean, Mount Storm, Intermountain, and Chesterfield didn't use activated carbon; correct?

THE COURT:  Mr. Caldwell?

MR. CALDWELL:  Objection, Your Honor.  He really -- I'm objecting to all the leading.

THE COURT:  Sustained.  It's a leading question, so the question will be stricken.

BY MR. DYESS:

Q.    That information is publicly available; correct?

A.    Yes, sir.  It is.

MR. DYESS:  We don't have anything further for this witness.

THE COURT:  Thank you, Mr. Green.  You may step down.

Let's take just a ten-minute afternoon break,

and we'll have our jury led out.

(The jury exited the courtroom.)

THE COURT:  We'll be in recess.

(A recess was taken, after which the following proceedings were had:)

(The jury entered the courtroom.)

THE COURT:  Defense will call its next witness.

MR. DYESS:  Your Honor, and ladies and gentlemen of the jury, we're going to play a deposition for you now of Jay Gunderson.  He's the principle engineer at the EERC who conducted the refined coal testing for the CERT companies.

(A video was played.)

BY THE ATTORNEY:

Q.     Would you please state and spell your name for the record.

A.     My name is Jay Gunderson.  That's J-A-Y, G-U-N-G-D-E-R-S-O-N.

Q.     And you're currently employed; is that correct?

A.     That's correct.

Q.     Who is your employer?

A.     The University of North Dakota Energy and Environmental Research Center.

Q.     What is your position there?

A.     I'm a principal engineer.

Q.     How long have you been a principal engineer at EERC?

A.      Just a few years.  Before that, I was a senior engineer.

Q.      Is principal engineer a promoted title over senior engineer?

A.      Yeah.  I -- yes.

Q.      Okay.  Congratulations then.

How long have you been at EERC?

A.      I was doing the math.  It's got to be 33, 34 years.

Q.      And could you describe your responsibilities at EERC.

A.      Well, I run the test furnace for the most part, and so I set up the tests.  I run the tests.

Q.      Mr. Gunderson, are you familiar with the term "refined coal"?

A.      Yes, I am.

Q.      And are you familiar with the Chem-Mod process for preparing refined coal?

A.      Yes, I aim.

Q.      In the course of your work at EERC, did you supervise or conduct tests of refined coal for compliance with the requirements of Section 45 of the tax code?

A.      Yes, I did.

Q.      And did you supervise or conduct such tests on refined coal that was prepared using Chem-Mod -- I'm sorry, using MerSorb and S-Sorb pursuant to the Chem-Mod process?

A.      Yes.

Q.     You -- you performed tests on refined coal that was prepared pursuant to that Chem-Mod process for purposes of qualifying the refined coal for Section 45 tax credits based on the use of the additives MerSorb and S-Sorb; is that right?

A.     That's correct.

Q.     Did you ever use activated carbon injection in a Section 45 qualification test for refined coal prepared using MerSorb and S-Sorb according to the come med process?

A.     We did not.

          (The video ended.)

          MR. DYESS:  Your Honor, ladies and gentlemen of the jury, we're now going to play a short deposition for you of Mr. Larry Kuennen.  Mr. Kuennen was a consulting engineer with Dominion Energy where he assisted the Mount Storm and Chesterfield power plants.

          (A video was played.)

BY THE ATTORNEY:

Q.     Let me get some background information on you.  Are you presently employed, Mr. Kuennen?

A.     Yeah.

Q.     Who is your employer?

A.     Dominion Energy.

Q.     And how long have you been employed by Dominion Energy?

A.      16 years.

Q.      So roughly going back to the 2006 time frame?

A.      That is correct.

Q.      Do you have a job title presently with Dominion Energy?

A.      Yes, consulting engineer.

Q.      And how long have you been a consulting engineer with Dominion Energy?

A.      For 16 years.

Q.      Generally, at present, what are your job responsibilities as a consulting engineer for Dominion Energy?

A.      I assist the power plants, support the power plants, and specifically measure the sold fuel for the coal-fire plants, help them with the entire process of combusting coal and all the air pollution control equipment associated with the machinery.

Q.      Are you familiar with the term "activated carbon" in the context of operating coal-fired boilers for the purpose of generating electricity?

A.      Yes.

Q.      And what is "activated carbon" in that context?

A.      For a utility boilers, it's utilized to help on the mercury capture.

Q.      Talking about the Mount Storm facility, first, from

July 2011 through the end of December 2021, do you know if the use of activated carbon for mercury control was ever considered for use at the Mount Storm facility?

A.    Yeah.

Q.    And when -- let me -- let me ask it this way:  Was activated carbon ever used for mercury control at the Mount Storm facility during that period of time?

A.    Activated carbon was used on a short-term basis when we had very high mercury in the fuel.  It was used from fall of 2016 through June of 2017.  It was not an activated carbon injection system.  It was just activated carbon utilized.

Q.    Do you know if the Chesterfield facility has ever used activated carbon at the -- for pollution control?

A.    No.

Q.    Do you know if the Chesterfield facility has ever considered using activated carbon for pollution control?

A.    We considered it, again, back in 2014, 2015.  We elected not to.  We felt we could control it with the clean scrub system, and mercury in the fuel was not nearly as high as what Mount Storm was.

Q.    So at the Chesterfield facility, the evaluation was done that the pollution control facilities already in place were sufficient to control mercury emission for MATS compliance without the use of activated carbon?

A.      Correct.

Q.      What rank of fuel do you burn at Mount Storm and Chesterfield?

A.      The rank?  It's going to be eastern bituminous.

Q.      Are the Mount Storm or Chesterfield power plants permitted to burn sub-bituminous or lignite coals?

A.      I don't believe, you know, it's in our Title V permit.  We could test and ask for it, but, no.  We may be.  I'm not sure on that answer.

Q.      During the time that Mount Storm or Chesterfield were using refined coal, did you ever do any work to test or to prove up whether or not you could burn sub-bituminous or lignite coal during that time?

A.      No, because lignite coming from the southwest or out west, you're hauling a lot of ash, you know, a very low BTU product, and we have small furnaces, and so we would take a load reduction, megawatt reduction, and try to burn lignite.

        And the same with PRB.  PRB is considerably lower, and so we would have to try to limit our megawatt output to try to burn that fuel.

Q.      And when you say "PRB," is that another way of referring to sub-bituminous coal?

A.      Yeah, that's your Powder River Basin sub-bituminous.

Q.      Do you know if any testing or work was done to determine whether or not the pollution control systems at

Mount Storm and Chesterfield were available to meet their emission limits if you were burning sub-bituminous and lignite coals?

A.    Well, again, we would have to limit the loads, so it's not an option.

Q.    What do you mean, "it's not an option"?

A.    The fire in the furnace, the boiler.  You burn coal to make the steam, and there's a certain capacity for the furnace for heat absorption and the mills.

And my eastern bituminous fuel is 12,000 or 13,000 BTUs.  PRB sub-bituminous is 9,000, lignite is 7,000, so our mills are not sized anywhere close to being able to handle such a low BTU fuel.

Therefore, our -- the 580 megawatt unit would become a 450 or 350 with lignite, so it's not an option. Never considered it because of that.

Q.    Do you know if any changes would need to be made to the pollution control systems at Mount Storm and Chesterfield if you were burning sub-bituminous or lignite coals?

A.    Everything would have to be expanded on the fuel delivery, the mill, especially the burners because, again, if you have a higher volume, you're burning more dirt, you know.  That's what lignite is, high ash, 40 percent ash.

Our ESPs are undersized.  All the equipment is

undersized, so again, it would be catastrophic expenditures to try to burn that fuel.

(The video ended.)

MR. DYESS:  Next, we're going to play a deposition for you of Jon Finlinson.  He's the president and chief operations officer at Intermountain Power Service Corporation which operates the Intermountain Power plant.

(A video was played.)

UNIDENTIFIED SPEAKER:  Please state and spell your first and last name for the record.

THE WITNESS:  Jon Finlinson, J-O-N, F-I-N-L-I-N-S-O-N.

BY THE ATTORNEY:

Q.    Are you presently employed?

A.    Yes.

Q.    Who is your employer?

A.    Intermountain Power Service Corporation.

Q.    Do you have a job title with Intermountain Power Service Corporation?

A.    Yes.

Q.    What is that title?

A.    President and COO.

Q.    How long have you been employed by Intermountain Power Service Corporation?

A.    39 years.

Q.     How long have you been president and COO or Intermountain Power Service Corporation?

A.     12 years.

Q.     I mentioned it earlier, the power plant -- the Intermountain Power project.  Do you have any operational responsibilities for the operations of Intermountain Power project?

A.     Yes.  My company has a hundred percent responsibility for operating the power plant.

Q.     And in your role as president and COO of Intermountain Power Service Corporation, are you -- is it your responsibility -- is it your overall responsibility to manage the operations of Intermountain Power project?

A.     Yes.

Q.     To the extent that Intermountain Power -- Intermountain Power project did anything from the end of November -- I mean, the end of 2011 through November 2021 for mercury control for MATS compliance, it was the use of refined coal at that facility; correct?

A.     The refined coal is the only mercury control technology that we used in that time period.

Q.     Are you familiar with the term "activated carbon" in the context of the operation of coal-fired boilers?

A.     Yes.

Q.     What is your understanding of what that term means in

the context of the operation of coal-fired boilers?

A.    Activated carbon has been used at some facilities to help them control mercury.

Q.    And from your previous answer to a previous question, is it correct that at no time from November 2011 through November 2021, Intermountain Power did not use activated carbon as a mercury control -- at any time from November 2011 through the end of 2021, did Intermountain Power Project consider the use of activated carbon as an emission control technology?

A.    No.

Q.    Do you know why Intermountain Power never considered activated carbon as an emission control technology?

A.    We didn't need it was the main reason.

            (The video ended.)

            MR. DYESS:  Ladies and gentlemen of the jury, Your Honor, we're going to play you one more deposition. This is the deposition of Thomas Erickson.  He's the chief operations officer and the vice president for intellectual property at the EERC.

            (A video was played.)

BY THE ATTORNEY:

Q.    Good afternoon, Mr. Erickson.  How are you today?

A.    Doing very good.

Q.    Do you have a title at EERC?

A.    My title is -- at this moment is the chief operations officer and the vice president for intellectual property.  I denote that title just took effect 21 days ago.

Q.    That being the title vice president of intellectual property?

A.    Yeah, and chief operations officer, both.  I've held many titles at EERC over the years.

Q.    What titles did you hold immediately prior to becoming the chief operating officer and vice president for IP?

A.    I was -- immediate to it, I was the -- sorry if I don't get the names correct.  I believe it was called the director for exploratory research, intellectual property, and technology commercialization, and then prior to that, I was the CEO of the EERC.

Q.    Have you heard of an entity called the EERC Foundation?

A.    Yes.  The EERC Foundation is a 501(c)3 organized by the EERC to help with the -- originally designed to help with the commercialization of intellectual property.

It has -- within the last two years, it underwent a modification or enhancement in which we -- we changed the way it's structured.  Still a 501(c)3, but we've expanded the foundation's focus to be -- still dealing with intellectual property protection and commercialization, but

also dealing with actual contracting and research activities.

Q.    You said that the EERC Foundation was founded in connection with commercializing intellectual property; is that correct?

A.    That is correct.

Q.    What does that mean, to commercialize intellectual property?

A.    It means to advance it into the marketplace.

Q.    Could that include licensing intellectual property to entities that want to use that intellectual property in the market?

A.    Yes.

Q.    Could it also include selling patents or other intellectual property to private, for-profit enterprises?

        Tell me about your are professional background. Do you have any advanced degrees beyond high school?

A.    Yes, I have a bachelor's degree in chemical engineering from the University of North Dakota.  I have a master's degree in chemical engineering, also from the University of North Dakota, which also has a business management cognate, and then I do have -- I'm one class short of a Ph.D. in chemical engineer.

Q.    Do you consider yourself an engineer?

A.    Yes.

Q.    What kind of engineer do you consider yourself?

A.    Chemical engineer.

Q.    You're aware of a company called Midwest Energy Emissions Corporation; correct?

A.    Correct.

Q.    Is that company sometimes referred to as ME2C?

A.    Yes.

Q.    Has ME2C been a client of the EERC at any point?

A.    Yes.

Q.    What products or services has EERC provided to the ME2C?

A.    Mercury control testing and testing of other environmental technologies.

Q.    Yes.   Does EERC know which ME2C products or services EERC has tested at operating coal-fired power plants?

A.    Yes.

Q.    What are the products and services?

A.    The primary technology is the technology that was licensed to them by the EERC Foundation.

Q.    That technology is related to the reduction of mercury emissions from coal-fired power plants; correct?

A.    Correct.

Q.    Do you understand the technology that the EERC Foundation licensed and then sold to ME2C to be a portfolio of patents on mercury control?

A.      Yes.

Q.      Okay.  Other than being a client of EERC for certain testing, does ME2C have any other relationship with the EERC?

A.      No.

Q.      Prior to being called ME2C, ME2C was known by the name RLP; is that correct?

A.      Correct.

Q.      Are you familiar with what is sometimes called a Section 45 tax credit program?

A.      Yes.

Q.      What is that?

A.      It is one such incentive for the control of mercury and NOx and/or SOx emissions.

Q.      So just to summarize, is it fair to say that the U.S. government issued regulations regarding mercury control, invested in mercury control technologies, and created a tax credit to incentivize the control of mercury?

A.      Yes.

Q.      Has EERC ever told anyone that the use of bromine and activated carbon simultaneously in a coal-fired power plant constitutes an infringement of one or more EERC mercury control patents?

A.      Not that I am aware of.

Q.      At some point in time, EERC became aware that

Chem-Mod and its licensees were selling refined coal to power plants in the United States; correct?

A.    Yes, correct.

Q.    And at some point in time, EERC became aware that the refined coal made using the Chem-Mod solution often was made using calcium bromide; correct?

A.    Correct.

Q.    At some point in time, EERC came to know that Chem-Mod's licensees were selling refined coal made with calcium bromide to power plants that also use an activated carbon at their facilities; correct?

A.    No.

Q.    The EERC never became aware of that?

A.    Never have I been aware nor has anybody else been aware, to the best of my knowledge, that anything we were doing with Chem-Mod was also including activated carbon.

Q.    Would your answer to that question be the same for EERCF's knowledge?

A.    Yes.

Q.    You were aware that in the 2011 to '12 time frame that the EPA announced a set of rules that would be going into effect to require the reduction of mercury emissions at coal-fired power plants; is that right?

A.    I'm certain at the time I was, yes.

Q.    And the testing of activated carbon and controlling

mercury emissions had been conducted for many years at the EERC by that time; right?

A.    Yes.

Q.    And the EERC had conducted testing on behalf of its clients involved in the use of activated carbon to reduce mercury emissions; is that fair?

A.    Yes.

Q.    So after these EPA regulations on mercury emissions were released and, you know, the EERC being, perhaps, the premier research entity if the field in this area, the EERC was aware that coal-fired power plants would be using activated carbon as a part of their emissions strategy to reduce mercury to comply with these regulations; right?

A.    Yeah, I would think we assumed that that would be the primary method.

Q.    So wouldn't it be reasonable that at least some of the refined coal certified by the EERC and Section 45 testing would be combusted at power plants using activated carbon?

A.    No.

Q.    And why would that not be reasonable?

A.    Because Section 45 provides mercury control in the absence of activated carbon, not with activated carbon.

So you -- I don't know why anybody would assume that the intent of refined coal and Section 45 is to provide

mercury control and NOx and/or SOx with the sole reason of treating the coal.  Activated carbon injection is not treating the coal.

Q.     But if, you know, the primary means being adopted in the industry for mercury control was using activated carbon, wouldn't it be reasonable that at least some of that coal would be -- some of the refined coal would be burned at plants that also were using activated carbon?

A.     It seems contrary to my thinking.  If you were doing that, there would be no reason to modify the coal.  So no, I don't agree with that.

Q.     Okay.  So based on your answer, you must believe that there are substantial uses of refined coal that do not involve the use of activated carbon?

A.     That is my belief, and that's why we tested here without injecting activated carbon.

Q.     Do you have any reason to believe that refined coal can only be used with activated carbon?

A.     No.

             (The video ended.)

             MR. SYKES:  Your Honor, with that, Defense rests its case.

             THE COURT:  Okay.  All right.

             Mr. Caldwell, Plaintiffs' side, is there anything in rebuttal?

MR. CALDWELL:  Your Honor, may we approach.

THE COURT:  Yes.

(Thereupon, a discussion was held at sidebar.)

THE COURT:  Okay.  Mr. Caldwell.

MR. CALDWELL:  It's just our intent to move for JMOL and, of course, certainly on invalidity, which, of course, they've done nothing with.  I needed to make that motion.  I think otherwise we would close, but I want to make sure we haven't waived anything and make our motion timely.  Ms. Haley, who is far smarter than me, will do that.

THE COURT:  So I think what you're saying is you don't have any further evidence to present.  You wanted to make a motion for JMOL with regard to the invalidity issue, which I understand won't be contested.

MR. CALDWELL:  Won't be.

THE COURT:  Will not be.

MR. CALDWELL:  And there may be something else. I want to take a minute.  We think they're going to call the next witness, and she was on call at the time.  I was mostly giving myself an opportunity.

THE COURT:  So other than making that motion and then outside the presence of the jury we'll be granting it with no objection, really all that's left to do is remarks to close; is that right?

MR. CALDWELL:  Yes.  And he's already rested. What's left is for me to close.

THE COURT:  So we'll do that and you can say that I've already said -- you have the motion, so you can say that again, and then I guess what we'll do is I'll tell the jury that we'll be done today, plan tomorrow to come back and have closing arguments and then final jury instructions and things.  It will be good for them to know. I don't think they fully know right now it's going to be closed and they'll be deliberating as of tomorrow.  I'm sure they'll be happy to hear that.

(The discussion at sidebar ended.)

THE COURT:  So the defendants have closed their case.

Mr. Caldwell, let me call on you to confirm whether the plaintiffs have anymore evidence to present.

MR. CALDWELL:  Thank you, Your Honor.  To note for the record, as you said, we'll make our motion still being timely, but do it once we're able to dismiss the jury. With that, the plaintiff closes.

THE COURT:  Thank you.

So, ladies and gentlemen of the jury, here's some news for you which is, we're going to end the day a little bit early because the only thing we have left is for each side to make their closing arguments.  It's going to

make sense to do it first thing tomorrow, and we can prepare for you.  And after that, we'll have final jury instructions that I'm giving you, and then you'll be deliberating tomorrow.  So I think we expect all those things to happen in the morning and you begin deliberations.

With all that said, unless there's anything further, we can have our jury led out for the evening and go from there.

(The jury exited the courtroom.)

THE COURT:  Everyone may be seated.

Mr. Caldwell, do you want to -- you have made -- do you want to make your motion officially in regard to the invalidity issue?

MR. CALDWELL:  Yes, sir.  Ms. Haley is preparing for that.  I was handed a note which I assume I'm supposed to read for the time split for depositions that were played.

THE COURT:  You can read that out and our court clerk will take care of it.  That's correct.

MR. CALDWELL:  For the defendants, what we have is 20 minutes and 43 seconds on the defendants' side.  And for our side, on the plaintiffs', we have 3 minutes and 23 seconds.

THE COURT:  And my clerk will kind of compare that and she has to get back to -- we have to get back to you to confirm the numbers.  We will.

All right.  Ms. Haley, the motion?

MS. HALEY:  Aisha Haley on behalf of Plaintiffs.

Plaintiffs move for judgment as a matter of law on all of Defendants' invalidity defenses.  There was not enough evidence on this record for a reasonable jury to find invalidity.

THE COURT:  I believe I understand that objection.  With regard to that motion, not to be disputed; is that correct?

MR. SYKES:  Yes, Your Honor.

THE COURT:  So I'll grant Plaintiffs' motion in that regard.

All right, counsel.  So I think from there, we'll have our prayer conference, and we can perhaps get started a little earlier than we might.  We will take a few minutes and try to get together the most recent versions we sent you on our end of the proposed final jury instructions as to which I have, as the parties know, have reviewed the parties' arguments and made determinations as to how I would presumptively finalize the final jury instructions as well as determinations after the parties provided the helpful letter summarizing the differences about how I believe I was to resolve the form of the final verdict form, but I'll come out and we'll -- I'll give each side a chance to raise any issues that they have still that they maybe want to still

raise with regard to my presumptive decisions.  I may have a couple things I noticed since then, and I'll mention them to you, and then we'll try to get to a point logistically where we know we're good in terms of how we're going to get to final versions we can have for the jury.

Mr. Caldwell?

MR. CALDWELL:  May I and others be excused from this process if we want to work on closing?

THE COURT:  Sure.  Whenever I come out here, whoever the team from each side that's going to stay to deal with the prayer conference issues, that's great.  If anyone else needs to go back to prep for tomorrow, they can be excused.

MR. SYKES:  We do want to move for judgment as a matter of law at the close of evidence to get that on record.

THE COURT:  Do you want to do that now?

MR. WILSON:  Good afternoon, Your Honor.

THE COURT:  Mr. Wilson, good afternoon.

MR. WILSON:  I believe, if I remember my civil procedure correctly, that our motion on induced infringement would be preserved at this point, but to the extent it's not, we would reassert it for the grounds stated earlier.

THE COURT:  Understood.  Moving on.

MR. WILSON:  Defendants move for under Federal

Rule of Civil Procedure 50(a) for finding that Plaintiffs have not provided evidence by which a reasonable jury can find by a preponderance of the evidence that Defendants contributed to infringement of Claims 25 and 26 of the '414 patent or Claims 1 and 2 of the '517 patent and for judgment as a matter of law that Defendants have not contributed to infringement of these claims.

Plaintiffs must establish, among other things, that refined coal sold by a defendant is not a staple or commodity capable of substantial non-infringing use and that the defendant knew refined coal was specially made or adapted for use in an infringing method, and the plaintiffs cannot show the requisite knowledge of infringement.

On my first point here, Your Honor, I will concede at the beginning this doesn't square with the current jury instructions. For sake of preservation, both evidentiary and instruction side, we'll make the point I wanted to preview that the evidence shows that refined coal has substantial non-infringing uses claimed by the power plants involved in this case without ACI. The sale of refined coal to power plants that never used ACI and the use of refined coal before the asserted patents issued with and without activated carbon. This was evidenced in Mr. Green's testimony today.

Nor is there sufficient evidence that refined

coal was especially made or adapted to be used, and Plaintiffs presented no evidence that Defendants knew the refined coal they sold was especially made or adapted for use in the infringing method.  The evidence shows that if refined coal was especially made for anything, it was to qualify for Section 45 tax credits.

As Mr. Green explained today, the formulation of MerSorb and S-Sorb to be added to the refined coal was determined based on testing from the EERC to certify the refined coal to qualify for the tax credits.  The formulation was not changed in relation to the patents, and the formulation was not made or designed to work with or accommodate ACI use by the power plants.  The plant could use or not use ACI in accordance with its overall operations.  Refined coal was compatible for use with or without ACI.

The record does not support any assertion that refined coal was especially made or especially adapted for use in infringement or that any Defendant knows it to be made so.  Similarly, Plaintiffs presented no evidence that Defendants actually knew its acts were infringing.

The record evidence establishes that each defendant reasonably believed it was not engaging in infringing activity.  As discussed, it's undisputed that a substantial amount of refined coal was sold and subsequently

burned without activated carbon injection. Defendants would reasonably, even if mistakenly, believe these known uses of refined coal without adding activated carbon sorbent injections constituted substantial non-infringing use of refined coal. Plaintiffs have developed no evidence that Defendants did not believe this to be the case.

Moreover, Mr. Green testified that in complaints operative to the damages period, Plaintiffs' allegations against the defendants were based on facts that Defendants reasonably believed and in fact knew to be incorrect allegations regarding the defendants' operations. Accordingly, Plaintiffs have not presented legally sufficient evidence that would let a reasonable juror to find by a preponderance of the evidence that the defendants contributed to infringement of the asserted claim.

Based on the foregoing, no reasonable juror could find by a preponderance of the evidence that Defendants contributed to the infringement of Claims 25 and 26 of the '114 patent and Claims 1 and 2 of the '517 patent.

Moving on now to willful infringement, Defendants move under Federal Rule of Civil Procedure 50(a) for finding that Plaintiffs have not provided legally sufficient evidence that a reasonable juror could find by a preponderance of the evidence that Defendants willfully infringed Claims 25 and 26 of the '114 or Claims 1 and 2 of

the '517 and for judgment as a matter of law that Defendants have not willfully infringed these claims.

On willful infringement, Plaintiffs must establish that a defendant deliberately or intentionally infringed an asserted patent.  For the reasons stated with respect to induced and contributory infringement, there also is not sufficient evidence to establish that a defendant deliberately or intentionally infringed a certain patent in particular.

In particular, as discussed in connection with contributory infringement, the record evidence establishes that Defendants reasonably believed it was not engaging in infringing activity and, further, that in compliance operated during the damages period.  Plaintiffs' allegations against the defendants were based off acts that Defendants reasonably believed and in fact knew to be incorrect allegations.

So based on the record, no reasonable juror could find by a preponderance of the evidence that Defendants willfully infringed Claims 25 and 26 of the '114 patent and Claims 1 and 2 of the '517.

And briefly, we'd like to go on damages as well. Defendants move under Federal Rule of Civil Procedure 50(a) for a finding Plaintiffs have not presented legally sufficient evidence for a reasonable juror to find by a

preponderance of the evidence that Plaintiffs are entitled to the requested damages Plaintiffs seek.

Any damages award must reflect the incremental technical value of the patented technology and must separate out the value of unpatented features and any value that artificially accrues to the patents based on existing permitted factors.

In addition, when basing a reasonable royalty on rates and other license agreements, the proper licenses must be technologically and economically comparable. The evidence shows that Plaintiffs' expert Mr. Green's calculations do not reflect the incremental technical value of the patented technology and do not separate out and exclude the value of unpatented features or values artificially accruing to the asserted patents, including specifically the artificial value related to receipt of Section 45 tax credits.

The licenses which Mr. Green treated as comparable includes tax, and that's discussed at yesterday's transcript at 798:12 to 799:17 and they did nothing to apportion that artificial value out of the rates they derived from the license.

In addition, Mr. Green's calculations failed properly to apportion out unpatented features. Mr. Green testified that Section 45 requires refined coal to reduce

mercury and NOx.  It's in yesterday's transcript at 767:21 to 768:4 and 770:29 to 770 to 701:10.

None of Plaintiffs' witnesses offered any evidence that practicing the asserted patents reduces NOx or entitles them to tax credit.

THE COURT:  If you could slow down for our court reporter.

MR. WILSON:  Sorry.

Thus, Mr. Green also failed by treating the value of asserted patents as economically -- compatible when the two are not technologically compatible.

THE REPORTER:  Slow down a little, please.

MR. WILSON:  The evidence also shows that Mr. Green's reasonable royalty is based predominantly or solely on licenses that are not technologically comparable. With respect to Nalco, ADAES and Chem-Mod licenses, the patents included in those licenses cover mercury control, NOx control, SOx control, refined coal manufacturing, non-brominated refined coal preparation, and various business methods.

Mr. O'Keefe admitted that those patents were not technically comparable, and that's in yesterday's transcript at 671:23 to 672:12.  At most, these licenses shared the same general technological field as the asserted patents, but when relying on licenses to prove a reasonable royalty,

a comparability between different technologies and licenses does not show.

With respect to the AJG/DTE agreement, I believe that license runs afoul of the Federal Circuit's longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages, which is discussed in *Laser Dynamics*, which we briefed several times.

The AJG/DTE agreement, which was at PTX 766, has every hallmark of a license with low probative value. It was entered on the eve of trial. Its lump sum fee is disproportionally large compared to Plaintiffs' other licenses, and the agreement was entered into roughly four and a half years after the hypothetical negotiation date.

In addition, the evidence shows that Mr. Green ignored a vast quantity of coal that was licensed and released by that agreement, which, if counted for, would drastically reduce the apparent royalty rate represented by the agreement, and that was discussed yesterday at 806:12 to 809:12 and then 810:5 to 813:5.

And finally, with respect to the Alistar agreement, the evidence shows that Mr. Green's calculation of a royalty rate from that license was unsupported and not credible. The amount licensed and released of coal was an order of magnitude larger than Mr. Green accounted for in his calculation of the royalty rate, and that was discussed

at yesterday's transcript 782:14 to 792:19.

So based on the foregoing, no reasonable juror could find by a preponderance of the evidence that Plaintiffs are entitled to Mr. Green's calculation of damages as a reasonable royalty.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Wilson.

All right, Ms. Haley.

MS. HALEY:  Thank you.  I'll address the infringement piece and willfulness piece, and Mr. Pearson will address the damages piece.

As to contributory infringement, there is ample evidence from which a jury could conclude that Defendants were liable for contributory infringement.  I don't think all of the elements are disputed here.

It seems like the first one is Element 3, which is whether the coal as sold and delivered -- sorry -- whether the refined coal supplied to that power plant as sold and delivered during the damages period is not a staple article or commodity of commerce capable of substantial non-infringing use, and I understand Defendants' argument to be intention is the contributory infringement under the --

THE COURT:  I should just say for the parties, I think I made a mistake earlier, which is that it turns out the pretrial order says, I think it's paragraph 69, that

time would be charged to the parties for JMOL motions.  In light of the fact I told you earlier I would not do so, I have not done so.  I want you to know that you have been such -- my point is you have time.

MS. HALEY:  So the first issue would be substantial non-infringing use.  Plaintiffs are -- Plaintiffs agree with the Court's reading or the Court's ruling on the jury instruction for contributory infringement as to this element, and under that formulation of the rule, there is ample evidence that the coal as sold and delivered in this case is destined for infringement.  Nothing else can happen to it.  The uses that Defendants point to are not relevant to the contributory infringement question.  Defendants, for example, point to refined coal outside of the damages period and outside of accused power plants.  Those are also not relevant.

As to Element 5, which is the only element of contributory infringement with a scienter requirement, there is ample evidence that Defendants knew that the coal would be burned at the power plants, that they had the expectation that it would be burned to comply with the Section 45 tax credits requirements.  It had to be used in power plants with ACI equipment particularly based on the type of coal at issue in the accused plants.

There's also ample evidence that the defendants

knew that the sited used activated carbon.  This includes the testimony and exhibits introduced by Mr. O'Keefe.

To the extent the jury would not be able to infer from this record that Defendants had specific intent to infringe, a jury could equally find willful blindness. Willful blindness evidence includes that the defendants purposefully positioned their operations with locations designed to keep them in ignorance of the power plant's operations.  It also includes that the defendants declined to read reports or grapple with information in reports that were commissioned in the process of their soliciting of investments in their LLCs.

As to willfulness, willfulness requires only deliberate and intentional infringement.  The evidence for inducement and contributory infringement in this case far exceeds the minimum requirements for a jury to find willful infringement, particularly the Defendants were motivated by significant pecuniary benefit from their infringement in the form of tax credits, and in the alternative, the defendants were willfully blind or were acting deliberately recklessly and indifferently.

With that, I'll turn it over to Mr. Pearson unless there's questions.

THE COURT:  No, thank you.

Mr. Pearson.

MR. PEARSON:  Thank you, Your Honor.

Briefly, I believe there is sufficient evidence to support an award of damages in this case by the jury. The JMOL was largely a repetition of the Daubert motion against Mr. Green that the Court has ruled on twice, and we incorporate by reference all of the responses and all the papers filed with respect to the motions.

Specifically with respect to the trial, the jury heard sufficient evidence to support damages based on the comparable analysis of ME2C's own patents done by Mr. MacPherson himself.  Further, the jury heard a full *Georgia-Pacific* analysis from Mr. Green.  The -- I tried to take notes on the argument to the best of my abilities, and it seemed to largely focus on Mr. Green's treatment of comparable licenses.  I'll go through the arguments very briefly with respect to whether the licenses were properly apportioned, which Mr. Green's analysis showed they certainly were.

First, there was an argument that the licenses improperly reflected the artificial value of tax credits. That was not demonstrated in Mr. Green's direct testimony. It was not demonstrated to the jury.  On Mr. Green's cross-examination, counsel attempted to create a double point on cross-examination and was not allowed to.

With respect to whether the licenses capture the

value of unpatented features, I do not recall that this argument was presented to the jury.  But in any event, to the extent this is even arguably true with respect to certain technologically similar licenses, it is not true with respect to the ME2C patent licenses, which don't have unpatented features.  They're about ME2C's patents.

There's an argument that ME2C's patents don't entitle them to tax credits.  I believe that was the argument, and because of that, can't rely on licenses that might touch on tax credits.

I submit that's incorrect.  Mr. Green read into the record section 5.3 of the Alistar/Chem-Mod license.  Similar provision is in all the Chem-Mod licenses that says, regardless of whether or not you get tax credits or don't get tax credits, you have to pay these royalty amounts, which were for the technology.

And even if you don't get the tax credits, you don't get a rebate, so those licenses are not directed to tax credits.  They are directed to technology.

There's an argument the licenses that he relied on were not technologically comparable.  That's incorrect.  A jury heard from both Mr. Green and Mr. O'Keefe that they are comparable.

To the extent there was some misstatement made by Mr. O'Keefe in cross-examination, that was clarified in

redirect, and it's very clear that he testified that the technology of the Chem-Mod and Nalco patents are directed to the same field and to the same type of solutions.

With respect to whether the AJG license is relevant between ME2C and AJG for being a settlement agreement, that argument was certainly not presented to the jury, but I would note that was not one of the key licenses that Mr. Green relied on in the chart, the table that had all the royalty rates filled in.

There was a blank for AJG, and it was explained extensively as to why that was, and there was some level of uncertainty and that Mr. Green suggested to the jury that it should not be one of the ones that they more heavily favor in the analysis.

And finally, there's an argument that beggars belief that the Alistar agreement -- he was using it in an unsupported way with an incredible rate, and of course he was using the rate that was within the text of the document itself.

So for those reasons, we believe that there's sufficient evidence for the jury to award damages and certainly it's a fact question that the jury should be allowed to consider.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Pearson.  Those

responses were helpful from Plaintiffs' counsel.

And considering the standard that I raised earlier with regard to Rule 50 JMOL motions like these, which I take into account, and in light of both prior rulings that the Court has made, but particularly all of the arguments that Plaintiffs' counsel made here, I will deny the motions pursuant to Rule 50.

To the extent that the motions aren't premised on a legal theory that's incompatible with the Court's legal instructions to the jury, they present classic fact questions that no doubt the parties will argue about before the jury tomorrow in closing argument.

And certainly, a reasonable jury could find for the plaintiff on these issues, and both sides will have their evidence.

All right.  So with that said -- why don't we take a -- it is 4:58.  So why don't we take just a couple of minutes to get our bearings.

We'll get the materials we need to go over the proposed final jury instructions with you and the final verdict form, talk about a logistical plan to make all that happen as well after we hear further arguments.

I may also, just because it will be helpful for me to have it, before we go back on the record, I may have a law clerk ask come out and ask counsel, look, can you just

let me know like which, if any, of these instructions is someone going to raise a further issue.

So I can kind of tick it off the list or similarly, which, if any, aspect of the verdict form is someone going to raise an issue, and we'll try to talk about that as we go through it.

So we'll stand in a brief recess.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  All right.  So we could try this. Since both sides will be popping up, you can try to stay at counsel table.  Speak up so our court reporter can hear you, and we'll go from there.

Why don't we start with final jury instructions. I think from what my courtroom deputy told me, there's various corrections items and also removing an invalidity item.

I think you guys are going to probably tell us, "Here's all the stuff you've got to get out of here."  And so maybe I don't know if those kind of things, the corrections and what we need to remove on the front, is a good place to start or maybe you guys decide who's going to lead us in this process.

MS. HALEY:  Yeah.  I'm happy to.  I would suggest maybe we go section by section.

THE COURT:  Fair enough.  Okay.  So I think right now what we're talking about is, like, what corrections do the parties think we need to make and what portions of the final jury instructions we need to take out in light of issues that are no longer in the case.

MS. HALEY:  The first one we have is section 1.14, which is the burdens of proof.

THE COURT:  Okay.

MS. HALEY:  And there's a paragraph on the bottom of the first page about the clear and convincing evidence standard.

THE COURT:  Okay.  Section 1.4.

MS. HALEY:  1.14.

THE COURT:  Okay.  Got it.  All right.  And which paragraph is it?  Begins with what words?

MS. HALEY:  It begins "In this case, in addition to each defendant denying ME2C's infringement claims."

THE COURT:  Okay.  So we can take this whole paragraph out?

MS. HALEY:  I believe so.

MR. WILSON:  Yes, we agree with that.

THE COURT:  For these, I'll assume there's no objections unless someone pipes up.  Sound good?  That way, Mr. Wilson, you don't have to keep piping up.

Okay.  So that paragraph is out.

MS. HALEY:  The next one we have is section 2.2.

THE COURT:  The parties' contentions.

MS. HALEY:  Yes.  And the last paragraph that begins with "Each defendant," the sentence that says "Defendants also collectively contend that ME2C's patents are valid for several independent reasons."

THE COURT:  That will be excluded.

MS. HALEY:  And then on 2.3, which is the next page, bullet 4.

THE COURT:  Got it.  Okay.  So bullet 4 will come out because it's referring to the clear and convincing evidence invalidity standard.

MS. HALEY:  And bullet 5 where it mentions invalidity, I think "not shown to be invalid" should be stricken.

THE COURT:  So it will read "if you decide that ME2C has proven that a defendant infringed the claim..."

Is that right?

MS. HALEY:  Yes.

THE COURT:  We'll make that change.

MS. HALEY:  The next one we have is in section 4.3.  So in the middle of this second page of this instruction, it has an instruction for direct infringement, and that instruction is verbatim in 4.2.  I think it's just a duplicate.

THE COURT:  Okay.  So the paragraph beginning "a patent claim is directly infringed" you're saying is the same paragraph verbatim as the paragraph beginning with the same words in section 4.2?

MS. HALEY:  Yes.

THE COURT:  So the parties are just saying it's redundant and doesn't need to be included; is that right?

MS. HALEY:  That's our position.

MR. WILSON:  I think there might be one extra sentence in the one in 4.3.

THE COURT:  I think it may be the last sentence?

MR. WILSON:  It might be the last sentence. That extra sentence there, I don't think that sentence makes any material difference here, but that's the only difference I see between the two paragraphs and the two sections.

THE COURT:  Okay.  Mr. Wilson, any objection if we remove that paragraph from the section 4.3 instruction in light of it's included in the prior --

MR. WILSON:  If I could just show my co-counsel what we're talking about.

THE COURT:  Sure.

MR. WILSON:  I think that is a holdover from when I believe Defendants had proposed a separate direct infringement instruction, and Plaintiffs had had that wrapped into 4.3.

So, yes, I think it would be fine to take those redundant paragraphs out of 4.3.

THE COURT:  So I'm going to take out of section 4.3 the entire paragraph beginning with the words "a patent claim is directly infringed" and the paragraph "the power plant can directly infringe."

Is that correct?

MS. HALEY:  Yes.

THE COURT:  We'll do that then.

Okay.  Ms. Haley.

MS. HALEY:  The next thing we have is the entirety of section 5, which is invalidity.

THE COURT:  Okay.  This is where we're really going to cut down some papers, so all of section 5 is going to be excised.  Got that.

MS. HALEY:  And that's the last sort of various correction bucket that we have.

THE COURT:  Okay.  There's no other valid -- invalidity stuff in here?

MS. HALEY:  Not that I recall.

THE COURT:  Mr. Wilson, anything else you saw in the way of find of corrections?

MR. WILSON:  I'm going to flip through the rest of my pages.  I don't think so, but let me double check.

In the instructions, no.  We'll need to do some

changes on the verdict form on the same issue, but nothing else in the instructions on invalidity.

THE COURT:  Okay.

MS. HALEY:  I actually have a correction to what I said, which is section 6 on damages references invalidity --

MR. PEARSON:  6.6?

THE COURT:  So the first -- I think you're referring to the first section of section 6, damages:  "If you find that an accused product infringes any of the asserted claims," and it goes on to say, "and the infringed claim is not invalid."

So I think the proposal there is to remove the word "and" ending with "invalid."

MR. PEARSON:  And it continues on to the next sentence, "on the other hand."

THE COURT:  The next sentence reads:  "On the other hand, if you find that all of the asserted patent claims are either invalid or are not infringed, then you should not consider damages."

And I think the proposal there is to excise that "are either invalid."

So it will say "all of the asserted patent claims are not infringed."

MR. PEARSON:  Yes, Your Honor.

THE COURT:  Okay.  We'll make that change.  It will be help -- we'll do -- we'll also do, like, we'll search for "invalid."

Tomorrow if I'm reading it and we happen to miss, like, a reference to invalidity, I'll try to just correct it on the fly.  Hopefully we won't.

MS. HALEY:  We have one more correction we found.  It's in 6.2.

THE COURT:  Okay.

MS. HALEY:  This is in the middle of the first paragraph.  It says, "You should assume that both parties to the hypothetical negotiation understood that the patents were..."

(Stenographer clarification.)

THE COURT:  It's not talking about a contested issue in your case --

MS. HALEY:  Right.

THE COURT:  -- more so what the parties at the hypothetical negotiation would have on their minds.

Okay.  All right.  So those are the -- we have those corrections and instances where we have to remove language for invalidity.

Okay.  Let's see.  It looks like if I'm just going down numbers-wise, I think the next section that either side had an issue with -- here's what I've got left

on my list:  Defendants' 4.3, which is inducement; 4.4, which is contributory, and 6.3, which is apportionment.  And Plaintiffs have a lingering issue with contributory, which we will cover, and 6.5.

MR. PEARSON:  And 6.1, Your Honor.

THE COURT:  Okay.  Try to take those.  Let's go to section 4.3, which is induced infringement.  And this looks like something that Defendant wanted to raise.

MR. WILSON:  Yes, Your Honor.  So what would have been bullet 4 in our proposal -- so I guess we would propose going in after bullet 3.  The prior language we had would be 4, that the defendants encouraged the power plants to perform each and every step of the asserted claim.

So we would propose inserting that between what is now currently number 3 and number 4.

THE COURT:  Okay.  I think you had had in your proposal a separate line or element that included this language; correct, in your prior proposal?

MR. WILSON:  Correct, Your Honor.

THE COURT:  And I think -- and I'll try to cut to the chase a bit.  I think the reason why I deleted it is in the current version that I proposed, bullet 4 indicates that they have to prove that the defense's actions actually caused the power plant to perform each and every step.

I didn't see there to be a distinction between

encouragement and causation, I think, in this context as I understand it to be speaking to the same issue.  Causation is the encouragement, et cetera.

Any argument why that's wrong?  What's distinctive or separate about encouragement from the causation element that's already in there?

MR. WILSON:  I mean, I think the main thing we're trying to capture with "encouragement" in this context -- this is a slightly different case where it's not necessarily a case of a -- you know, a set of instructions that existed out there.

We've got kind of a closely contested issue on affirmative acts that are causing things since it kind of boils down to Mr. O'Keefe's analysis and the sale of refined coal itself and sort of the surrounding context in which that sale happens.

So if what we're worried about is sort of devolving into where a sale alone might be enough without some sort of element of encouragement associated with that sale, which, you know, can risk collapsing inducement into contributory infringement.

THE COURT:  I think it's probably the case that folks will argue tomorrow to what extent sales of refined coal and sales and certain other factors will be to amount to a causation requirement, and certainly make those

arguments to the jury.

I guess, Mr. Wilson, is it your understanding there's some distinction made by the Federal Circuit when it lists out elements of induced infringement that they say, "Well, you have to cause the infringement, but then you have to separately encourage the infringement"?

The plaintiff says -- and I thought they were correct. This is in the prior proposals -- the plaintiff said encouragement is not a separate additional requirement for inducement. It seems right to me.

Do you disagree?

MR. WILSON: I don't know that it's a separate requirement, Your Honor. I think it's a finer articulation on it consistent with Supreme Court cases and Federal Circuit cases as we cited in our -- I don't want to retread too much -- as we cited in our previous footnote like *Global Tech Appliances versus SEBSA* where the Supreme Court said the leading and inducing prevailing on persuading.

So we think it's important in this case. It's not necessarily a separate element, but the feeling of encouragement has a helpful gloss to it that we think the Supreme Court and Federal Circuit had applied.

THE COURT: Okay. All right. Let me hear from the plaintiff.

Ms. Haley.

MS. HALEY:  Sure.  We continue to believe that encouragement is not a separate requirement and that the factors that are already in the -- in your instruction account for the concept of encouragement.

There's not an additional step, and we would just point to the authorities we cited in our proposed instructions.

THE COURT:  Okay.  All right.  Here I'm going to continue -- I'm going to, ultimately, utilize the version that I proposed.

I don't, think based on the law I've reviewed and what I've seen from the Federal Circuit guidance, that there is some separate encouragement element to the claim. I think even Defendant acknowledges that.

I think it's certainly true that there are different words that can be used to describe the type of action that is asserted to have caused or induced infringement, but there's many words.  Encouragement is one.

But there are others, and it doesn't make sense to highlight one among many here, so I think it's appropriate to include the proposal that I previously made. So we'll do that.  Okay.

Other issues with regard to section 4.3, Mr. Wilson?

MR. WILSON:  One more, Your Honor.  This would

be in what is now bullet point 4 in Your Honor's current constructions I believe we had previously.

Within that, we had the statement "instead of other factors," so it would read that "the defendants' actions instead of other factors" actually caused the power plant to perform each and every step of the asserted claim.

And we would like to reassert and preserve that additional language in 4.4.

THE COURT:  Understood.  And I think you probably understand that I had previously made a ruling that it's my understanding and my view of the law that a defendant can cause or induce someone else to commit infringement even if it might be said that there was some additional cause for why a defendant did X.

And I read the "as opposed to other factors" inclusion as coming too close to the idea that the jury might conclude that no other factor or no other cause could be related to the act that is said to amount to infringement.

And so for that reason, I think I understand the argument here, and for that reason, I'll continue to include the language that I proposed here for this instruction. Okay.

Then let's -- it sounds like the next section is contributory infringement.  Let me raise something that I

just noted.  I think it was mentioned briefly before we left.  This is something that I'm wondering where it should be added in.

And I don't remember if it was in Defendants' prior version, but it's the issue of what of the elements require the defendants' knowledge of this thing.  And I'm just wondering -- the way it reads now is Element 5 specifically says that the defendant had to know that the refined coal was especially made or adapted for use in an infringed method.

But Element 3, the element that relates to the staple article or commodity of commerce capable of substantial non-infringing use, I'm wondering if that Element 2 should not start out by saying that the defendant knew that -- I think that's probably the way it reads in section 7.1.

And it's pretty clear the knowledge element applies to both the specially made or adapted or the staple article of commodity and commerce.

And I think Defendants believe this.

MR. WILSON:  Yes, Your Honor.

THE COURT:  Does Plaintiff disagree with that?

MR. MCCARTY:  Yes, Your Honor, we believe that the current version of the elements of contributory infringement that were 1 through 5 listed in section 4.4 are

correct.

And specifically, with respect to your question -- Your Honor's question about level of knowledge, we believe that knowledge is indeed required for Element 5 if it's constituted in the jury instructions, which is that the defendant knew that the refined coal was especially made or adapted for use in an infringing method, that that same knowledge or knowledge does not extend above to number 3.

THE COURT:  I'll just tell you, the two things we looked -- because we caught it and I asked my law clerk to pick out some assistance.  First is section 271(c) itself which reads, you know, whoever offers...  And then the key area is knowing the same to be especially made or especially adapted for use in an infringement of such patent, comma.

And that's the gist of Element 5, and then it goes on, "and not a staple article or commodity of commerce suitable for a substantial non-infringing use."

I think the question here is:  Does the word "knowing" modify both the first and the second?  It kind of reads like it does, but then additionally, like, there's some case law we found, case called *Word Tech Systems, Inc., versus Integrated Networks Solution, Inc.*, a Federal Circuit case from 2010, that has the following sentence:

"Under 35 U.S.C. Section 271(c), a party who sells a component with knowledge that the component is

especially designed for use in a patented invention and it is not a staple article of commerce suitable for substantial non-infringing use is liable as a contributory infringer."

Citing another case of the Federal Circuit's, *Ricco versus Quanta Computer, Inc.*, a 2008 Federal Circuit case.  Reading that case law, again, like the Federal Circuit articulates, the knowledge elements applying to both.

Mr. McCarty, is there anything you want to add about why that is the wrong read?

MR. MCCARTY:  I don't have any counter-cases.  I think that we would disagree with Your Honor's interpretation of that.  We think that that Element 3 as apparently constituted is really more of a question about -- really a binary question of what is and what is not.

And that importing or graphing knowledge into that as an element of proof is not something that is required, and it's sort of awkward to say that, you know, in the puzzle piece analogy we've seen in trial this week, that not only does the defendant know of the patent, when he puts that puzzle piece to make the final puzzle, know that it matches onto some patent claim that they're aware of, that would be the fifth element.

But also knows that puzzle piece or the thing it's going into is not something or is not something else

and you're creating levels or sort of peeling back the onion layers of knowledge.  That does not seem to be something that's supported in Federal Circuit case law, and it seems to be in conflict with the purpose of contributory infringement.

THE COURT:  Okay.  I understand, though, that separate and apart from -- certainly in this case, that the plaintiffs' side is going to be, you know -- there is evidence that both sides have here, and the plaintiffs have some and Defendants do, to contest the defendants' assertion with regard to both these elements, not just one of them, that, yes, Mr. Green and CERT defendants did know of not just that the refined coal is especially made or adapted for use, but also that it was a staple article of commodity or commerce capable of substantial infringing use.

That would be the plaintiffs' position;  right?

MR. MCCARTY:  If I understand your question, that -- sorry, Your Honor.  If I understand your question, it's that in -- as part of the evidence in the case, whether we would have to show that they had knowledge of number 3, which is that there was -- essentially proving that they knew or had knowledge over -- or were willfully blind to the fact that the coal in this case as sold and delivered was not a staple article of commerce capable of substantial non-infringing use.

Is that the question?

THE COURT:  I'll try to say it shorter, and I didn't say it well the first time.  If I end up deciding that I need to include the words that the defendant knew in the beginning of number 3, my take is Plaintiffs are going to be like, okay, we've got evidence, we're going to show -- we're going to show that the defendants did know that.

I guess all I'm asking -- you know, of course, the decision is going to be about what the law requires. All I'm asking is, like, I think it's the case here that the plaintiffs knew that the defendants were making this argument.

I think Mr. Sykes in his opening statement, he spoke about the knowledge and mistake issue as to both especially made and adapted and substantial non-infringing use.

I think the plaintiffs are going to combat that. Both sides are going to fight about this, is that right, if that's the requirement?

MR. MCCARTY:  Yes, Your Honor I think that with reference to Mr. Sykes's opening statement, we actually did not understand that, did not understand that that was what they were arguing.  Part of what we asked the Court for a corrective instruction for early on in the case was because we thought that they were introducing the idea of pointing

to non-substantial -- or substantial non-infringing uses that basically did not qualify under section 3 of the Court's order.

And in response to that motion, we got, well, what matters is not whether this refined coal was in or out technically and legally. What matters is did we believe it, and that gets to the nub of the question which is, is there a knowledge requirement for 40.3? And we think there is not. There is no knowledge requirement that they knew or were willfully blind to that idea that the refined coal in this case was not a staple article of commodity or had capabilities of substantial non-infringing use.

THE COURT: Okay. All right.

Mr. Wilson, anything further on this issue.

MR. WILSON: We agree with Your Honor's reading of 271(c), certainly.

THE COURT: I think, having reviewed the statute and having reviewed the case law I cited, I believe it's correct that both Element 3 and Element 5 have a "defendants knew" component to them. Based on everything I've seen, it would be wrong not to include that as instructing the jury on the law. So my intention will be to add to Element 3 after the wording that -- the words "the defendant knew that" and then the remainder of the elements.

All right. Are there other issues lingering

that anyone wants to raise with regard to section 4.4?

MR. WILSON:  We have one brief one, Your Honor. So in what is Element 3, consistent with our prior position, we would ask for the "as sold and delivered during the damages period" clause to be removed.

THE COURT:  Okay.  For the reasons I've previously expressed, I'll deny that request.

Okay.  I guess I had also sent you during the day while you guys were doing other things a proposal for what should be added to try to address the plaintiffs' concerns, and I think, look, it's a difficult issue. There's a lot of issues, as I said, in the case.  The jurors will have to parse them.  Counsel will have to ably walk through them.  You guys saved an hour or so for them.

I have a proposal how I thought this would be best addressed.  Anybody have an objection to the proposal? Mr. Wilson or Mr. McCarty?  You've got 4.4?

MR. MCCARTY:  I have the pleasure.

Your Honor, yes, we object to the second paragraph of the addition that you proposed, the second highlighted paragraph, which is the final paragraph of 4.4 at this point.

We object because of the reasons discussed earlier.  It's tieing or implicitly tieing, not explicitly tieing, the requirement of showing an absence of substantial

non-infringing uses to Defendants' knowledge in the case, which we think is improper.

The second reason is, ultimately, this, as we understand it, is, basically, an instruction on mistake of law.  We don't understand -- the defendants haven't really put forth a mistake of law case, and we're concerned about instructing the jury on a claim or a defense that's not really borne out by the facts they just heard from trial and could lead to error.

THE COURT:  Can I stop you there?  You're raising a bunch of points.  I want to make sure I don't lose them.

First point you said looks like was it's tieing or implicitly tieing the requirement and showing an absence of substantial non-infringing uses to Defendants' knowledge in the case, which we think is improper.  And you said -- I'm not sure I understand that.  And then you said the second reason is we understand this is basically an instruction on a mistake of law.

I guess as to the latter, previously in the instruction is the issue which we know has been raised and come up and the case is *Kinetic*, which is otherwise referenced in instructions, which is that if a defendant reasonably believed it did not infringe, even if that belief is incorrect, the defendant does not have knowledge of

infringement.

We talked previously about case law about things like, for example, the defendant can demonstrate it read the claims, albeit, turned out, wrongly.  It could use that as a way to demonstrate no knowledge of infringement.

I ultimately decided that I think, various times now, I think Defendants can raise that as a defense or response, so if we know that -- and I guess I don't understand clearly.  There's --

I mean, Mr. Green was just up here.  There's a direct and decent part of his direct the defendants want the jury to hear through his testimony that he didn't know with regard to contributory infringement certain things he should -- that he had different beliefs, and so I think, like, part of the reason for the last paragraph is I've got to try to explain if I'm going to do the first paragraph, which I think I need to remind the jury when it comes to the elements other than the knowledge element and the alleged mistake issue, I need to tell them what to look at and the purpose for which they might look at other things.

And is there anything about the last paragraph itself that you think is otherwise wrongful for using the wrong word, wrong phraseology?

MR. MCCARTY:  Yes, Your Honor.  I would propose removing the -- basically, the reference to the refined

coal, which is kind of in between em dashes that kind of goes through the various aspects of refined coal that would not constitute the refined coal as sold and delivered in the case.  Importantly, I think that that is kind of improper in the context of a construction -- or sorry instruction about mistake of law, where we disagree that Mr. Green's testimony was actually about a mistake of law.  It sounded to us like testimony and facts in the trial were we don't believe we infringe.  Because of various reasons but we don't believe we infringe.  That, those facts and that belief, is already in the instructions and is appropriately in the instructions and the jury should hear that.

There are defenses to infringement with respect to indirect infringement, the mens rea element, knowledge in the case of contributory.  But tieing the refined coal and the various aspects of refined coal to mistake of law, we think, is improper for that reason.  If we're going to instruct on mistake of law here, we should be removing the sort of -- that section in the middle about the different types of refined coal at issue in the case.

THE COURT:  Between the em dashes.  Okay.

Mr. Wilson, do you all have any objections to the additional language I proposed?

MR. WILSON:  No objection to either proof or the additional language.

THE COURT:  Let me ask you about the em dash. Absent that, it would say "In this regard, Defendants are arguing that a reasonable and mistaken belief about what the law requires, and the disbelief caused them not to have knowledge of possible infringement."  You are making that argument you believe in this case and will be in closing. Fair?

MR. WILSON:  Yes.

THE COURT:  Now, with regard to the material between the em dashes, there's a lot of examples.  Take the plaintiffs' point in that there's a lot of examples and this coal and that coal and maybe that strayed too much in the line of -- I'm not trying to make the defendants' arguments for them.  I'm supposed to mutually set out the law.  The defendants are making the arguments they're making.  Why shouldn't I believe that?

MR. WILSON:  The first paragraph is -- and part of the goal of the first paragraph is to really highlight and home in on the only coal that they can consider as sold and delivered during the damages period, so I think the second paragraph needs to make some corresponding reference to what's the different scope there.

I mean, if Your Honor is worried at a certain point it becomes a little too lengthy, it could be set out "in connection to the coal that was sold and delivered

during the damages period" could be referencing additional coal and other coal.

THE COURT: I understand your point about the paragraph. I basically adopted the plaintiffs' language about what kind of coal can't count for the elements otherwise. I guess I don't want to be saying here that is not an argument you're making. I want to review this. Refined coal that Defendants may have sold prior to issuance of the patents-in-suit. I did hear you talk about that at trial, and you're probably going to be raising that?

MR. WILSON: Yes.

THE COURT: Prior to this litigation, those are almost the same thing. They're basically in parallel with each other. Or outside the scope of the damages period, if we're talking another prior to 2019 or refined coal sold by entities that are not defendants in this case, and I think you are, in fact, going to be pointing to that with regard to this mistake issue; is that right?

MR. WILSON: Right. We would be pointing to that, and I do think that's a different subset than the first three, which might be fairly similar in their scope.

THE COURT: All right. Knowing Defendants don't have any objections to the additional proposals that the Court made and that the plaintiffs do to the last paragraph and maybe partially to the language between the hyphens, at

this point, I'm going to overrule the plaintiffs' objection and I'm going to include the language that is there in its entirety. I think it relates to an argument and/or defense that the defendants are clearly making in the case that relates to evidence that I saw the defendants attempt to bring out with their witnesses through Mr. Green.

I think for reasons we've discussed, it's also an issue that is a confusing issue and that we have to explain for to the jury what they can and cannot do with evidence, and I think it's necessary.

I think with regard to the material between the em dashes, I think for parity's sake it should be included. The language itself about the coal issue, I think, it's fair to be a pairing of that language in the second paragraph as well, and I think it's consistent with the arguments and defenses parties actually making.

For all those reasons, we'll make a change.

MR. DYESS: Can I have one second to look at that on the point you were making?

THE COURT: You were doing other things too.

MR. DYESS: Nothing further. Thank you.

THE COURT: I think that takes us to section 6.1. That was raised by the plaintiffs, so that is for the right date for commencement of damages.

Mr. Pearson.

MR. PEARSON:  Yes, Your Honor.  This is not an issue that was taken up during this trial.  The list of dates here are dates proposed, I believe, by Ms. Lawton, the former CERT damages expert.  The way these dates in here are calculated are the dates each entity was first added to any given complaint.  That is not Plaintiffs' damages theory.

The evidence showed Mr. Green is the vice president of all the entities, and knowledge by one of them would have been knowledge by all of them on the same date.  That was discussed.  And the damages start dates are not in dispute with how Mr. Phil Green calculated.  Plaintiffs propose this whole section is unnecessary.  There's no dispute.

In the alternative, if the Court would like an instruction here, we would propose that it just stop on the second line, where it says "after the date below."  Just delete the language "after the date below" and everything that follows.

Alternatively, if the Court wants to read a lot of extraneous language, I would propose as a further alternate the dates would be amended to follow the testimony from Mr. Phil Green.

THE COURT:  I certainly don't want to read extraneous language.  I'll ask Defense.

Is this section needed?

MR. WILSON:  So at this point, I don't know that this section is needed, Your Honor.  I mean, I think really the only evidence in about when damages start is what Mr. Green put in on his slides.  I don't think the jury really has anything to pick other dates or perform calculations based off other dates.

THE COURT:  You agree if I keep the section, I should keep the first ending with the second line, "patents-in-suit"?  Surely that's true, right, that damages commence on the date of first infringement?

MR. DYESS:  Your Honor, I apologize for the confusion.  Can I have just a second?

THE COURT:  Sure.  That is fine.

MR. WILSON:  Yes, that first sentence would be accurate.

THE COURT:  So, Mr. Pearson, you're good if we have 6.1 date of commencement of damages include the first sentence "patents-in-suit" and strike everything else?

MR. PEARSON:  Yes, thank you, Your Honor.

THE COURT:  We'll do that.

Section 6.3 is next.  Okay.  Reasonable royalty.  And this is Defendants?

MR. WILSON:  Yes, Your Honor.  So basically, in our proposed instructions -- and I hate to read the entirety of it into the record but I certainly will if need to.  We

had an additional paragraph speaking more about apportionment in the specific context of external factors and specifically in the context of the Section 45 tax credits, so we want to preserve our position on including that language that was in the proposed instructions.

THE COURT:  I think you're talking about the language in yellow in the proposed instructions that may be from pages 93 to 95; is that right?

MR. WILSON:  Correct.  So this would be a guess. I'll find it in the record later.  This is Exhibit 22 to the pretrial order, and that would be the language from the bottom of 93 starting "in particular" and carrying over onto page 95 that is currently highlighted.  Yes, sir.

THE COURT:  And just to be clear for the record, this was language that read.  I don't know if I need to read it all.  We know where it is in the pages, but one of the -- it's about the concept of you need to apportion out the value added to refined coal that flows from the tax credits versus the incremental value of the patented technology.

I have to say, Mr. Pearson was saying this earlier.  Ultimately, when Mr. Green gave his testimony, he wasn't talking about Section 45 tax credit value as a part of the calculus that he was making with regard to licensing, was he, Mr. Pearson?

MR. PEARSON:  That's right.  He didn't talk

about tax credits in the direct and redirect.  I believe he established the value of licenses he relied on were actually not driven by the tax credits, as I believe I inartfully tried to describe at the most recent pretrial conference.  But my position on this instruction is this is just not an issue that was taken up in front of the jury.  Certainly, an apportionment instruction Plaintiffs don't object to, and that's in the beginning of 6.3, first paragraph.

THE COURT:  Mr. Green did talk about at times the concept of apportionment.

MR. PEARSON:  Absolutely.  That's fine.  The part about apportioning out the value of the tax credits, that was not an issue presented to the jury.  That shouldn't be there.  It is extraneous especially, and then of course the proposed Defendants' instruction concludes with "therefore you must demonstrate the value added to the refined coal that flows from the tax credits," and the jury has no basis to do that.  If that instruction were given, I suppose the defendants would just argue there should be no damages because there's been no helpful information given to the jury.  Even on Defendants' theory, even if they believe that's a thing that should be done, they didn't suggest how or that was not a part of the cross-examination of Mr. Green.

THE COURT:  Mr. Wilson, I agree with Mr. Pearson

that I don't believe that the credit for you referencing this material has been put before the jury in the case.  So I'm inclined to not include it, and you have made your position clear.

Is there anything further you wish to add?

MR. WILSON:  No, Your Honor.  On the substance of including it, it would be the sale as before, and I certainly don't want to misrepresent what Mr. Green said and certainly don't remember all of it.  It is consistent that I remember tax credits was a very minimal at best part of it, so I would agree with that.

THE COURT:  For the record, I agree with Plaintiff and what Mr. Pearson said here but also what he said in response to the JMOL.  I don't think Mr. Green in any report discussed in any way as part of the comparability substantial non-infringing uses and damages analysis that he is taking into account the value of section 45 tax credits, certainly such that there would be a need to apportion them or discuss the apportionment as to them specifically, so I'll exclude -- I'll continue to exclude that proposal by Defendants.

Okay.  Looks like Plaintiff had something with regard to section 6.5.

MR. PEARSON:  Yes, Your Honor, briefly.  It's minor.  This, I believe, instruction is a leftover from

where there may have been more defendant groups in the case, but in terms of Mr. Green's analysis, who was the only expert, he testified this hypothetical negotiation would be a single negotiation between ME2C and CERT, generally sort of based on the common ownership structure of CERT, and this instruction in 6.5 references in the middle a hypothetical license that would be noted.  "Each defendant here" is used again a few lines down.  I think that's a little bit confusing and doesn't track how the evidence came in, so I would just propose that be substituted with "between ME2C and the defendants here."

THE COURT:  Okay.  Mr. Wilson, in light of Mr. Green's testimony, which I think is the only testimony as a damages witness here, is Mr. Pearson correct?

MR. WILSON:  I mean, there certainly is testimony that they are separate entities, but I mean, yes, they were certainly dealt with collectively by Mr. Green.

THE COURT:  Okay.  All right.  In light of the fact that I agree, my recollection of Mr. Green's testimony is that his opinion was that the hypothetical negotiation would be between Plaintiffs and Defendants, that is, representatives representing all of the defendants, the CERT entities, and in light of the fact that really our witness for the CERT entities was one person, Mr. Green, who I think repeatedly indicated he speaks for each of the CERT

defendants as a whole, I agree with the plaintiffs' proposed change.

So we'll change the words after "and that is each defendant here" to "defendants" in the fourth line and the seventh line in the instruction.

Okay. I think based on my notes, that's all we had to deal with.

Mr. Wilson, do you have -- Plaintiff first.

Mr. Pearson, do you have something else?

MR. PEARSON: I just had a discussion on the verdict form. That was it for the instructions.

THE COURT: We'll turn to that.

MR. WILSON: So this isn't actually on instructions, but going through the instructions reminded me of this, and I wanted to raise it here. We may not need to resolve it right now. We previously had an instruction on express license, and Your Honor didn't include it and I certainly understand why.

And the reason we had it is from our perspective, express license is a bit of an odd situation. We're not sure it's been perfected for appeal. We had a motion for summary judgment on express license based on licenses to the utilities. You recall you denied our summary judgment motion.

I mean, I think everybody is in agreement.

Interpretation of the contract is a matter of law, but the plaintiffs did not have a corresponding motion for summary judgment of no license.  Where it stands now, we have a motion for summary judgment denied.  I'm not sure it's necessarily wrapped up in the noninfringement judgment, maybe it is, but ultimately --

THE COURT:  Didn't you say something?  Right. What I was thinking is along what you're suggesting, which is it is true that the plaintiffs didn't separately move for summary judgment of no express license, but in resolving the defendants' motion for summary judgment of an express license, I made a legal ruling that, essentially, the defendants could not raise that defense.  That's the import of the ruling.

So of course, I couldn't permit the defendants at trial to raise the defense that I had already ruled as a legal matter could not be raised.  Technically there's been no judgment on the issue granted to date.  I don't know. You are smarter than me on this about what needs to be done about that, but I think in your letter you said something like we'll figure out what needs to be done and talk to the plaintiffs and if we think we can make some kind of stipulation or motion or something, we'll do it.  Have you had any conversations like that?

MR. WILSON:  No because, honestly, I think that

disappeared after the pretrial conference, and I did not recall it again until going through this last night. We're certainly open to having that discussion with them. As long as it's done at some point, it's fine. I don't think it needs to be resolved in the next ten minutes.

THE COURT: I'll assume for now I need not take further action by the Court unless someone tells me otherwise. I would encourage you to talk to your colleagues on the other side if you think there's a stipulation that -- to be put before the Court or some other action. I will consider it.

Let's move on to talk about the verdict form. And, obviously, we should do a corrections thing for this too because there's got to come out a couple times. Let me tell you two things for the record. I reviewed the parties' respective positions with regard to the verdict form. I made edits to one form using the look of the defendants' form but incorporating in different components of the positions. I presented it to the parties, so presumptively resolving any disputes.

Since I did that, there's two things I thought of. One is I missed this when we did it first. We should be very anodyne in describing the claims, which claims are induced infringement, contributory infringement. There's the word "actively inducing infringement" in questions 1(a)

and 1(b), and I don't think that's appropriate because we should simply be referring to the claims by the legal name without including wording or phraseology that gets to some elements of that.  My inclination now is to strike the word "actively" in questions 1(a) and (b).

Separately, the parties disputed in terms of how the defendants would be listed.  The plaintiffs thought it made more sense to list the defendants grouped with the RC defendants that related to a certain operations group together.  The defendants proposed doing it alphabetically.  Because I wasn't sure how the evidence would look, I did it alphabetically.  But now I've seen the trial, the charts that link up the RC defendants, and they're very helpful, and that linkage, it's confusing.  So many names.  And it's undisputed certain of the RC defendants are related to certain operations defendants and certain power plants.

So anyway my proposal, my new inclination, is to revert to Plaintiffs' suggestion to group the defendants by way of grouping RC defendants that are linked with certain operations defendants together and then the next group and next group and next group.

Those are the two things to what I sent you that I'm considering.  With all that said, does anybody want to walk me through on the firsthand corrections we need, Mr. Pearson?

MR. PEARSON:  Sure.  Do you mind if I approach the Elmo?

THE COURT:  The 1980/2020 technology we talked about during trial.  It has probably not improved since then.

MR. PEARSON:  As far as the corrections go, Your Honor, the first thing we found was question three.

THE COURT:  Okay.

MR. PEARSON:  Which should go in its entirety.

THE COURT:  Right.  Okay.  So question three is out.

MR. PEARSON:  Then on page eight, there's the bold language at the top, the question numbers.

THE COURT:  By the way, is this leftover?  Are we relitigating this?

MR. PEARSON:  I was going to show that for the verdict form.  I apologize.

THE COURT:  I'm sorry to interrupt you.

MR. PEARSON:  Here on question four, there's the question 4 and 5 at the top.  That should be 3 and 4.

THE COURT:  That should be 3 and 4.

MR. PEARSON:  Only if you found using questions 1 through 2 that at least one defendant has infringed at least one claim.

THE COURT:  I need only take out the word.  I'll

do it as to everything in the bolded top sentence.  The proposal -- it now reads as follows:  Answer questions 3 and 4 only if you have found using questions 1 to 2 that at least one defendant has infringed at least one claim.

And then I suppose because we need to change question 4 to question 3.

MR. PEARSON:  Yes, Your Honor.

THE COURT:  Okay.

MR. PEARSON:  And then the first sentence of question now 3, the word "valid" needs to be removed.

THE COURT:  Okay.

MR. PEARSON:  And the same in the next sentence.

THE COURT:  Right.  So in the first line after question three, we remove the word "valid" and in the next paragraph, the second line, remove the word "valid" as well.  Okay.

MR. PEARSON:  Then question five becomes question four.

THE COURT:  Right.

MR. PEARSON:  And there's the word "valid."

THE COURT:  We remove "valid" in the first line of the first paragraph.

MR. PEARSON:  And the word "valid" in the sentence of the second paragraph.

THE COURT:  Okay.

MR. PEARSON:  And then if Your Honor would permit, I'd like to discuss the damages question.

THE COURT:  Sure.  Hold on a sec.

Okay.  The damages question, which is question four.

MR. PEARSON:  Correct, Your Honor.  I only proposed this as a way to reduce future work on the Court, and I don't necessarily have a perfect solution, but I was wondering if it would be possible to include a sentence that asks the jury to find whether there's joint and several liability between the refined coal defendants on the top here and the operations defendants.  And the only reason that I ask that is that it's the plaintiffs' theory that it should be assessed on a per ton basis and the tons are the same.

So for example, for the operations entity that has just one, the Marquis Industrial, we are going to ask for $11 million or -- it's on the bottom row -- and CERT Operations II which was -- managed Marquis and only managed Marquis.  We're going to ask the same amount because it's the actual same tons.

THE COURT:  And the deal is if the jury were to agree that Marquis should be liable for 11 million and change and CERT II should be, it's not like you're going to get -- you're only going to get 11 million and change.

MR. PEARSON:  That's what we're asking for, but the concern is on the current verdict form, if they write down 11 million twice, it implied they're awarding 22.

THE COURT:  It seems like it's not disputed that essentially, you know, you can't -- I mean, it doesn't seem like it's disputed that the concept of joint and several liability is applicable here at least in the sense that there's no double collection.

Well, let me hear from Defendants on this issue.

MR. DYESS:  The problem -- a problem we see with that, Your Honor, is that the operations companies are not liable on the contributory infringement claim.

So if the jury decided there's no induced infringement, then the operations companies would not be jointly and severally liable on a joint infringement claim.

THE COURT:  That seems right.

MR. PEARSON:  That seems right to me too.

THE COURT:  I wonder though,, presumably when we get the verdict form, maybe in the closings, you're going to be putting it up there and explaining to the jury like, if they find this and if they find that, here's what you do. I wonder if that's the best we could do here.

MR. PEARSON:  Sure.  No, and I have no problem -- I don't like confidence in our ability to get the jury to fill something out.  It is more just, I don't want

there to be confusion post-trial, and perhaps we could say joint and several liability for induced infringement. That's an idea. I just want the -- I apologize, Your Honor.

THE COURT: I think there's like two questions here. One is a matter of the logistics of the jury filling out the form and doing so, like, in an -- in the correct way, the way that they need to deal with what they need to deal with, though I think the problem there is the more words you include in the form, the more confusing it can be.

And then maybe, like, there's a separate piece of what you're saying that's kind of, like, as a legal matter, I want us to agree that joint and several liability is applicable here. I don't know if that's another piece of what you're saying.

Is it really -- I wonder if the first concern is about the jury articulating its view correctly.

MR. PEARSON: I think it is more that if we had a slightly more -- if there's a joint and several liability at least as to inducement question, it would provide more information from the jury, which could be helpful to the parties and Court later.

For example, if we don't include a joint and several liability question and the jury fills out the amounts that the plaintiff asks for, I don't think that's a problem.

THE COURT:  You keep saying if we don't include a joint and several liability question.  It's almost like there's a disputed question about whether there should be joint and several liability for certain claims that the jury is supposed to figure out the answer.  It's not the way it was presented to them.

I mean, I think the concept of joint and several liability may be referenced in maybe some of the docs that Mr. Green went over, but it certainly is not a disputed issue or one that they've presented competing arguments on.

So I'm not sure what you mean by --

MR. PEARSON:  I agree with that, Your Honor, and I didn't mean to speak inaccurately.  My, I guess, most basic observation is listing all of the names of the defendants with separate lines for amounts could imply that the jury intended to award additive amounts.

THE COURT:  Let's not think of, like, something that would happen that would be confusing and bad.  I don't mean bad like moral judgment if we win or lose, more like bad like this is confusing, and I wish we could avoid this.

Like, a scenario, I guess, could be let's say the jury used the -- use the example you just gave; right, Marquis and CERT II?  They're -- they're related.  They're both charged with induced infringement.

Let's say the jury puts down an $11 million

figure for both of those.  Now, we'll know whether the jury found those defendants liable for both induced and contributory infringement.

So like, in a scenario where we do have the numbers listed for both, if they didn't check the box for contributory infringement, the verdict would still make sense because they would be jointly and severally liable for induced infringement if they did check the box for induced contributory.

I'm probably trying to make up in my mind scenarios --

MR. PEARSON:  My phone died, so my calculator is gone, but an idea that I had that might be confusing is if the jury found liability for everything and then a jury took $27 and a half million, a figure that has been referenced several times and could conceivably support a damages award, and divided it by 12, whatever that number is, wrote that same number down for each different defendant.

THE COURT:  Okay.  If they did that, what would be the problem with it?

MR. PEARSON:  If they did that, I would say the jury took $27 and a half million and divided it evenly, so the award is intended to reflect $27 and a half million total.

And they would say the jury obviously bought

into the joint and several liability theory you proposed and they only intended to award $3 million whatever one time for both Marquis and CERT II.

THE COURT:  I see.

MR. PEARSON:  So Defendants would say actually this is a cumulative award of $20 million or something like that.

THE COURT:  You'd be saying it's meant to be an accumulative award, that you'd add up all the numbers together and get to 27 million, but you're worried that they would say that, no, you don't add up both 3 point something millions.  You only get one of them.

MR. PEARSON:  Right.

THE COURT:  I wish this had come up earlier.

MR. PEARSON:  I apologize, Your Honor.

THE COURT:  That's fine.

Defendants, do you have an idea -- part of me wonders if you guys could talk and agree on what to do.  Do you think there's a chance you could agree?

MR. DYESS:  I think we could certainly try.  I fully recognize the dilemma.  My brain is not particularly working well to figure out the solution.

THE COURT:  Okay.  Well, this is what I'm going to do.  Let me think about this for a second.  I'm in Mr. Dyess' place.  It's been a long day and long week.

I think maybe the best thing to do is you all are much smarter than I am about the facts of the case and work out -- and I will say this tomorrow.

I really do appreciate -- I hope you'll convey it to other colleagues -- even in a hard-fought case, I appreciate the way in court with the jury here and not here -- the way each side has treated each other with respect in terms of their interacting with each other, so I appreciate it.

Anyway, that's all a prelude to say my hope is I can say to you, can you all talk about this tonight, see if you can come up with a jointly agreed upon solution that would make the jury's task in terms of awarding damages here, if damages are going to be awarded, as clear as possible?

And then hopefully you'll come to me with a joint solution that I hope is acceptable, and if we need to tweak the verdict form as it stands as of tonight or early tomorrow morning before we the jury goes -- or before we go to closings because you're going to want to have the verdict form with you at closings, and we can deal with it.

Or alternatively, if tonight you guys agree, you know, maybe you can take -- or we can send you the current version of it after we make these changes.  If you come up with an agreement and solution, you could send it back to

us, and we'll make sure that we have copies first thing tomorrow morning.

I guess if worst came to worst and you couldn't agree, at least you'll have a chance to talk more about it, and I think it's theoretical that if I had to take the bench early to resolve something, we could do that too and have the final version.

Does that make sense, Mr. Pearson, from your perspective?

MR. PEARSON:  Yes, Your Honor.

MR. DYESS:  Yes.

THE COURT:  All right.  Then I think that's all the issues that we need to edit or address.

Anything further, Mr. Pearson?

MR. PEARSON:  Just -- I'm sorry, Your Honor, to make things easier on the Court, if you send us the current verdict form as it is, would you like the parties to rearrange the formatting to do the groups you mentioned, or were you going to do that first?

We're happy to do it.

THE COURT:  Well, I think if you wanted to make the changes since you might well be making an additional change to the verdict form by joint agreement, if you could make the changes that we already talked about, that would help us out a lot, and we could have them printed out

tomorrow morning.

We can take the jury instructions, and we can make those changes and send it to you for you to review.

MR. LENNON:  I think we need another copy.  This is James Lennon.

THE COURT:  We only sent you a PDF.  The reason we did that is we didn't want to send the Word, not that we wrote anything bad.  We had notes.  Can you take the PDF text and turn it into something?

MR. PEARSON:  Of course we can, Your Honor.

THE COURT:  Mr. Dyess?

MR. DYESS:  On the change you discussed early on on the verdict form about taking out "actively," the statute 271(b) reads whoever actively induces infringement.

So that was why we included it in our version of the verdict form, and we think the Court will probably use because that's what the statute says.

THE COURT:  Understood, and I would just say I understand that point, but I think in light of what I said earlier, I'm going to continue to make the change that I proposed.

And again, just so it's clear, because in so many ways, even the parties in the instructions are referring to these two claims in the -- I think correct, but also kind of appropriately anodyne way the law has induced

infringement -- inducing infringement and contributory infringement.

And I think doing that is the best way to make sure one side or the other doesn't have unfair advantage in integrating additional language in the statutes that is going to be there on the side.

All right.  So we will --

MS. HALEY:  Can I put something on the record just out of an abundance of caution?

THE COURT:  Okay.

MS. HALEY:  So this issue for contributory infringement with respect to the mistake of law defense came up for the first time in the context, I think, of a motion in limine, and so I just want to be clear on the record that in the context of our jury instructions, we maintain the objection that we don't think that's a defense to contributory infringement.

THE COURT:  So noted.

All right.  So you have a PDF of the most recent proposed version of the verdict form.  You will take that, and you will make the changes we discussed.

You'll talk about the issue about how to articulate the jury's task with damages and see if we can agree on it, and I know that you will.

You'll send me -- and if you do before tomorrow

morning when we get up, we'll get a final version of the verdict form.  We will in the meantime go back and make the changes to the final jury instruction that we just discussed, and we will send you a PDF with those.

I'll ask you to take a look at them one more time and make sure there's nothing on them, and then first thing tomorrow morning, ideally, we'll be good to go with final versions.

If for some reason there's a problem with the verdict form, let us know, and we can work it out.

I also want to say I would love -- I don't think it's going to be -- I don't believe we'll get a verdict tomorrow or not by Monday, maybe more time.

I enjoy the chance to talk with you all off the record about your thoughts of ways to make the trial easier for the lawyers or little things we could do to change in that regard.

I always like to try to do that.  I'm not sure if we'll get a chance to do it.  I don't want to keep you later now because you've got a lot of work to do.  Just to know if we do get it, I don't know if there will be time tomorrow at some point a year or two from now, we could all grab a beer.

MR. MCCARTY:  One housekeeping matter. Mr. Caldwell would have my neck if I didn't ask.

For closing, is the Court's intention to issue the jury instruction first and then allow the parties to present closing arguments before sending the back for deliberations?

THE COURT:  My intention was to do closings and then instruct, knowing that you will know what the instructions will be and you can say, "Judge Burke will be telling you."

I think it's my view on the thing.  Otherwise, it's best that the last thing they hear going in is a reminder of the rules they have to follow.

But, Mr. McCarty?

MR. MCCARTY:  In your experience.  That has not been our experience.  This is your courtroom, and we will follow whatever rules you wanted to do on that one.

I just needed to clarify with Mr. Caldwell so he knew if he was referring to instructions you just heard or the instructions you will hear, and that was -- that was what I told him I would ask.

THE COURT:  In all the cases I've tried in our court, we've done jury instruction after the closings, but, Mr. Dyess, do you have anything?

MR. DYESS:  I was standing because I thought you were going to be leaving.

THE COURT:  I thought so too.

All right.  So yes, the plan will be to do closings and final jury instruction, and the jury will adjourn.

With that said the Court will stand in recess.

(Time noted 6:31 p.m.)


**C E R T I F I C A T E**

I, Deanna L. Warner, a Certified Shorthand Reporter, do hereby certify that as such Certified Shorthand Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings.

_____
Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. Federal Court

## $

**$11** [2] - 1185:18, 1188:25
**$20** [1] - 1190:6
**$27** [4] - 1098:25, 1189:15, 1189:22, 1189:23
**$350** [4] - 938:12, 938:25, 939:3, 940:4

## '

**'114** [17] - 927:6, 944:24, 960:23, 961:1, 961:8, 1016:7, 1016:23, 1018:11, 1023:16, 1047:13, 1047:16, 1047:23, 1050:16, 1090:15, 1136:19, 1136:25, 1137:20
**'12** [1] - 1126:20
**'16** [1] - 913:12
**'18** [1] - 976:6
**'19** [2] - 936:17, 948:23
**'302** [1] - 1019:22
**'414** [1] - 1134:4
**'517** [12] - 944:23, 960:24, 961:4, 1016:7, 1016:24, 1018:12, 1023:16, 1090:15, 1134:5, 1136:19, 1137:1, 1137:21

## 0

**002** [20] - 1043:9, 1045:1, 1046:16, 1046:23, 1047:8, 1048:3, 1049:13, 1049:20, 1050:19, 1052:12, 1053:15, 1054:4, 1054:7, 1055:7, 1056:9, 1056:13, 1057:10, 1057:14, 1059:7, 1062:11
**02** [2] - 1046:16, 1048:2
**020** [1] - 1043:10

## 1

**1** [18] - 944:20, 945:14,

977:19, 978:18, 1016:7, 1016:24, 1018:11, 1020:10, 1023:16, 1103:2, 1134:5, 1136:19, 1136:25, 1137:21, 1160:25, 1183:23, 1184:3
**1(a** [2] - 1181:25, 1182:5
**1(b** [1] - 1182:1
**1)(c)(i)(ii)(v** [1] - 1010:10
**1.14** [2] - 1149:7, 1149:13
**1.4** [1] - 1149:12
**10** [2] - 892:2, 975:1
**104** [1] - 1079:15
**106** [3] - 1079:4, 1079:8, 1079:11
**107** [2] - 1078:17, 1078:18
**10:40** [1] - 941:15
**10:55** [1] - 941:16
**11** [10] - 892:2, 984:2, 1017:18, 1050:9, 1056:4, 1077:21, 1086:3, 1185:23, 1185:25, 1186:3
**12** [11] - 955:16, 978:10, 978:15, 1041:14, 1042:10, 1046:15, 1046:22, 1049:7, 1049:12, 1120:3, 1189:17
**12,000** [1] - 1118:10
**12-hour** [2] - 955:16, 1085:3
**12/31** [1] - 986:17
**12:30** [2] - 991:10, 999:19
**12:38** [1] - 1011:22
**12th** [2] - 1046:3, 1046:8
**13** [10] - 980:7, 980:22, 984:5, 1020:1, 1054:3, 1059:24, 1060:1, 1073:5, 1074:23, 1079:14
**13,000** [1] - 1118:11
**130** [2] - 980:11, 1060:3
**1369** [1] - 1019:17
**1378** [1] - 1019:17
**1379** [1] - 1019:18
**13th** [1] - 1053:23
**14** [9] - 982:8, 982:10, 1017:19, 1021:22, 1060:14, 1060:16, 1072:24, 1073:5,

1079:4
**15** [7] - 983:13, 986:11, 994:12, 1058:25, 1060:5, 1060:16, 1074:2
**1514** [5] - 963:21, 1086:6, 1086:9, 1086:12, 1086:16
**152** [2] - 979:24, 979:25
**1539** [3] - 963:24, 964:21, 964:25
**1573** [3] - 974:16, 975:3, 975:7
**15th** [3] - 981:1, 1056:25, 1057:1
**16** [8] - 936:14, 955:15, 955:17, 959:22, 1021:22, 1022:15, 1115:1, 1115:9
**1692** [3] - 1041:10, 1041:23, 1042:3
**16th** [1] - 904:7
**17** [2] - 887:9, 1017:23
**18** [3] - 955:17, 1017:17, 1017:19
**19** [5] - 906:18, 949:5, 1017:23, 1020:9, 1041:10
**19-CV-1334-CJB** [1] - 873:6
**1968** [13] - 1044:16, 1045:5, 1045:11, 1045:15, 1045:23, 1046:1, 1048:21, 1050:5, 1051:15, 1052:17, 1053:20, 1055:25, 1056:1
**1980** [4] - 1007:12, 1007:16, 1008:24, 1009:3
**1980/2020** [1] - 1183:3
**19th** [2] - 949:1, 949:4
**1:08** [2] - 1011:23, 1012:15
**1st** [2] - 1052:20, 1053:8

## 2

**2** [34] - 909:20, 909:21, 909:22, 944:20, 954:12, 963:6, 977:20, 980:15, 1016:7, 1023:16, 1043:14, 1046:23, 1047:9, 1049:12, 1049:19, 1050:19,

1052:12, 1053:14, 1055:7, 1056:9, 1057:10, 1057:13, 1059:7, 1062:10, 1103:2, 1103:24, 1103:25, 1134:5, 1136:19, 1136:25, 1137:21, 1160:14, 1183:23, 1184:3
**2.2** [1] - 1150:1
**2.3** [1] - 1150:8
**2/28** [1] - 1017:16
**20** [20] - 900:16, 911:12, 957:12, 979:22, 1003:8, 1004:5, 1004:15, 1017:18, 1044:25, 1054:4, 1054:7, 1055:11, 1056:13, 1074:18, 1078:12, 1078:13, 1078:16, 1084:4, 1131:20
**2005** [1] - 1019:17
**2006** [1] - 1115:2
**2008** [1] - 1162:5
**2009** [2] - 957:18, 1049:1
**2010** [2] - 962:7, 1161:23
**2010-54** [1] - 1041:5
**2010s** [1] - 904:11
**2011** [48] - 902:24, 954:6, 954:22, 954:24, 957:16, 961:18, 961:20, 962:3, 962:9, 962:13, 962:22, 962:23, 963:3, 963:15, 965:8, 966:16, 966:20, 967:7, 967:9, 967:12, 967:20, 967:24, 968:11, 968:25, 969:2, 970:9, 970:11, 971:11, 971:17, 972:4, 972:7, 973:3, 973:10, 976:24, 987:24, 988:8, 989:8, 994:5, 994:7, 1048:20, 1081:8, 1082:10, 1088:1, 1116:1, 1120:17, 1121:5, 1121:8, 1126:20
**2012** [13] - 918:22, 920:2, 920:4, 923:20, 963:6, 968:25, 969:8, 970:9, 971:17,

972:4, 972:7, 977:19, 977:20
**2013** [7] - 968:8, 968:15, 969:10, 969:12, 969:22, 969:24, 1020:2
**2014** [19] - 963:10, 970:22, 970:24, 1018:5, 1041:14, 1042:10, 1046:3, 1046:8, 1046:15, 1046:22, 1051:17, 1052:20, 1053:8, 1056:4, 1056:25, 1058:25, 1088:14, 1089:22, 1116:18
**2015** [18] - 894:16, 903:13, 906:18, 908:21, 908:23, 951:15, 954:4, 963:10, 973:3, 973:10, 976:24, 1022:22, 1049:7, 1049:12, 1088:14, 1089:2, 1089:22, 1116:18
**2016** [13] - 901:18, 901:21, 902:16, 904:7, 904:13, 951:17, 963:10, 1054:23, 1055:4, 1055:11, 1088:14, 1089:6, 1116:10
**2017** [1] - 1116:10
**2018** [5] - 911:13, 976:4, 984:15, 1053:23, 1054:3
**2019** [45] - 886:19, 888:21, 917:12, 917:21, 923:21, 924:9, 924:12, 925:2, 925:6, 926:19, 926:21, 929:12, 930:3, 933:23, 934:23, 938:24, 949:1, 949:5, 961:3, 961:8, 961:21, 962:11, 972:22, 974:2, 975:1, 975:22, 977:1, 978:22, 1021:20, 1021:25, 1047:17, 1047:19, 1047:20, 1047:22, 1048:1, 1050:9, 1051:2, 1053:25, 1054:11, 1056:6, 1056:16, 1057:4, 1072:3, 1081:9, 1171:15

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna DE 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

**202** [1] - 1020:1
**2020** [4] - 934:23, 961:6, 981:1, 1060:5
**2021** [48] - 930:11, 934:23, 954:6, 954:24, 957:16, 962:4, 962:7, 966:16, 967:9, 967:21, 968:8, 969:22, 970:22, 972:22, 982:12, 983:20, 986:12, 986:13, 986:17, 986:23, 987:2, 987:24, 988:8, 989:8, 990:24, 991:1, 994:7, 1046:4, 1049:8, 1050:9, 1051:18, 1052:21, 1053:23, 1054:23, 1056:4, 1057:1, 1072:3, 1073:20, 1074:11, 1099:25, 1100:3, 1100:18, 1102:12, 1103:11, 1116:1, 1120:17, 1121:6, 1121:8
**2022** [7] - 957:18, 990:11, 990:12, 990:15, 990:17, 1078:2, 1105:16
**2024** [1] - 873:13
**204** [1] - 1078:11
**206** [2] - 981:25, 982:1
**20th** [2] - 1054:23, 1055:4
**21** [3] - 1073:20, 1082:11, 1122:3
**211** [2] - 983:3, 983:4
**212** [3] - 985:1, 985:6, 1097:14
**21st** [1] - 982:12
**22** [2] - 1175:10, 1186:3
**22nd** [7] - 1049:7, 1050:9, 1051:18, 1053:23, 1054:23, 1056:4, 1102:12
**23** [4] - 982:22, 1017:18, 1078:2, 1131:22
**232** [3] - 893:17, 951:13, 952:3
**235** [4] - 909:23, 910:10, 910:14, 910:17
**23rd** [1] - 1046:3
**24** [2] - 1017:23, 1078:12

**24/7** [3] - 956:1, 956:9, 1039:14
**25** [11] - 982:25, 1016:6, 1016:23, 1018:10, 1020:1, 1022:15, 1023:15, 1134:4, 1136:18, 1136:25, 1137:20
**26** [7] - 983:15, 1016:6, 1023:15, 1134:4, 1136:19, 1136:25, 1137:20
**27** [1] - 1190:10
**271(b** [1] - 1193:14
**271(c** [3] - 1161:11, 1161:24, 1165:16
**29** [2] - 965:8, 981:12
**29th** [1] - 873:13
**2A** [1] - 873:12
**2nd** [2] - 1051:17, 1052:20

---

## 3

**3** [25] - 884:16, 944:21, 983:25, 1039:7, 1077:21, 1131:21, 1141:16, 1155:11, 1155:15, 1160:11, 1161:8, 1162:13, 1163:20, 1164:5, 1165:2, 1165:19, 1165:22, 1166:3, 1183:20, 1183:21, 1184:2, 1184:6, 1184:10, 1190:2, 1190:11
**3(b)** [1] - 1037:1
**30** [3] - 942:18, 979:16, 979:17
**300** [4] - 938:12, 938:25, 939:3, 940:4
**31** [10] - 963:3, 979:15, 981:15, 981:20, 981:24, 983:2, 984:24, 985:2, 985:3, 985:4
**31st** [1] - 1074:17
**32** [1] - 979:19
**33** [1] - 1113:8
**34** [1] - 1113:8
**35** [1] - 1161:24
**350** [1] - 1118:15
**377** [4] - 1014:9, 1015:6, 1036:23, 1037:5
**377A** [1] - 1015:6
**378** [4] - 1014:9, 1015:6, 1036:23, 1037:5
**378A** [1] - 1015:6
**379** [4] - 1014:9, 1015:6, 1036:23, 1037:6
**379A** [1] - 1015:7
**39** [1] - 1119:25

---

## 4

**4** [18] - 911:4, 911:6, 944:21, 1017:17, 1017:23, 1043:14, 1150:9, 1150:10, 1155:10, 1155:12, 1155:15, 1155:22, 1159:1, 1183:20, 1183:21, 1184:3, 1184:6
**4.2** [2] - 1150:24, 1151:4
**4.3** [9] - 1150:22, 1151:10, 1151:17, 1151:25, 1152:2, 1152:4, 1155:1, 1155:7, 1158:23
**4.4** [6] - 1155:1, 1159:8, 1160:25, 1166:1, 1166:17, 1166:21
**40** [10] - 897:13, 900:15, 900:16, 900:19, 1003:8, 1004:4, 1004:14, 1047:10, 1062:6, 1118:24
**40.3** [1] - 1165:8
**400** [1] - 1002:19
**402** [1] - 1071:17
**403** [1] - 1071:17
**406** [2] - 1009:6, 1009:8
**420** [1] - 1019:17
**43** [1] - 1131:20
**44** [1] - 1088:25
**45** [48] - 898:5, 899:22, 900:7, 915:18, 949:15, 991:19, 992:2, 992:9, 1000:4, 1000:13, 1000:17, 1000:18, 1001:1, 1001:3, 1001:6, 1002:9, 1002:11, 1003:11, 1005:13, 1006:24, 1011:17, 1036:5, 1038:20, 1040:16, 1043:4, 1044:1, 1061:25, 1089:4,

1091:23, 1092:2, 1094:3, 1095:2, 1109:19, 1110:6, 1113:20, 1114:3, 1114:8, 1125:10, 1127:17, 1127:22, 1127:25, 1135:6, 1138:17, 1138:25, 1142:21, 1175:3, 1175:22, 1177:17
**450** [1] - 1118:15
**47** [1] - 1000:2
**4:58** [1] - 1147:17

---

## 5

**5** [15] - 913:6, 938:18, 944:21, 1022:19, 1039:8, 1142:17, 1150:13, 1152:12, 1152:14, 1160:7, 1160:25, 1161:4, 1161:15, 1165:19, 1183:20
**5.3** [1] - 1145:12
**50** [6] - 945:21, 1033:1, 1033:5, 1097:15, 1147:3, 1147:7
**50(a** [5] - 1015:24, 1016:3, 1134:1, 1136:21, 1137:23
**50(a)** [1] - 1032:18
**50(b** [1] - 1033:2
**50,000-foot** [1] - 993:2
**501(c)3** [2] - 1122:18, 1122:23
**545** [4] - 884:14, 884:15, 884:21, 887:11
**57** [2] - 938:15, 938:21
**580** [1] - 1118:14

---

## 6

**6** [8] - 901:15, 944:23, 950:15, 981:18, 982:18, 1037:1, 1153:5, 1153:9
**6.03** [3] - 1008:10, 1010:10
**6.031(a)(i** [1] - 1010:6
**6.031(c)(ii)(v** [1] - 1010:8
**6.1** [3] - 1155:5, 1172:23, 1174:17
**6.2** [1] - 1154:8
**6.3** [3] - 1155:2, 1174:21, 1176:8

**6.5** [3] - 1155:4, 1177:23, 1178:6
**6.6** [1] - 1153:7
**625** [1] - 1022:21
**63(b)** [1] - 1014:12
**630** [1] - 1022:21
**634** [1] - 1019:25
**636** [1] - 1020:9
**637** [1] - 1020:9
**641** [1] - 1013:23
**641A** [1] - 1013:25
**642** [1] - 1013:23
**642A** [1] - 1013:25
**646** [1] - 1013:23
**646A** [1] - 1013:25
**65** [1] - 955:7
**657** [2] - 1017:17, 1017:23
**658** [2] - 1017:17, 1017:23
**66** [1] - 907:11
**668:12** [1] - 1021:22
**669** [1] - 1021:22
**671:23** [1] - 1139:23
**672.2** [1] - 1021:24
**672:12** [1] - 1139:23
**68** [1] - 906:7
**685** [6] - 913:6, 913:9, 913:10, 913:11, 913:17, 913:21
**688** [4] - 901:15, 902:4, 902:8, 950:13
**69** [1] - 1141:25
**690** [3] - 886:4, 886:5, 1022:15
**691:6** [1] - 1021:9
**692:18** [1] - 1020:20
**692:5** [1] - 1021:9
**693:2** [1] - 1020:20
**6:31** [1] - 1197:5

---

## 7

**7** [9] - 893:17, 938:18, 944:24, 979:13, 981:10, 983:20, 1017:17, 1017:18, 1074:11
**7,000** [1] - 1118:11
**7.1** [1] - 1160:16
**70** [3] - 955:7, 1083:24
**70-foot** [1] - 956:5
**700** [1] - 997:20
**701:10** [1] - 1139:2
**701:25** [1] - 1020:25
**702** [2] - 1017:18
**702:6** [1] - 1020:25
**703** [1] - 1017:18
**755** [1] - 1018:2

**766** [1] - 1140:8
**767:21** [1] - 1139:1
**768:4** [1] - 1139:2
**77** [1] - 886:1
**770** [1] - 1139:2
**770:29** [1] - 1139:2
**775** [1] - 1022:19
**782** [3] - 919:17, 919:18, 919:20
**782:14** [1] - 1141:1
**785** [1] - 1022:21
**792:19** [1] - 1141:1
**798:12** [1] - 1138:20
**799:17** [1] - 1138:20
**7th** [3] - 986:12, 1074:10, 1076:11

## 8

**8** [2] - 905:20, 944:25
**806:12** [1] - 1140:18
**809:12** [1] - 1140:19
**810:5** [1] - 1140:19
**813:5** [1] - 1140:19
**83** [2] - 1075:1, 1075:14
**84** [2] - 1075:1, 1075:14
**85** [1] - 1073:8
**86** [1] - 1073:8
**87** [5] - 1060:18, 1073:12, 1073:16, 1075:5, 1075:15
**88** [6] - 1062:14, 1062:20, 1073:12, 1073:16, 1075:5, 1075:16
**899** [1] - 1018:3

## 9

**9** [13] - 905:19, 905:21, 906:2, 906:12, 945:2, 945:15, 1017:18, 1021:20, 1047:19, 1047:22, 1048:1, 1053:25
**9,000** [1] - 1118:11
**90** [7] - 897:14, 897:20, 898:13, 898:25, 900:1, 900:12, 1104:25
**905** [1] - 1018:5
**93** [2] - 1175:8, 1175:12
**95** [6] - 911:7, 911:17, 911:21, 911:25, 1175:8, 1175:13

**96** [7] - 905:21, 906:3, 906:12, 906:16, 907:3, 907:8, 952:21
**99** [1] - 935:3
**9th** [8] - 902:16, 961:3, 1021:25, 1047:20, 1049:1, 1056:6, 1056:16, 1057:4

## A

**A.J** [5] - 1097:21, 1098:6, 1098:9, 1098:15, 1099:10
**abbreviated** [1] - 911:24
**abilities** [1] - 1144:13
**ability** [4] - 917:24, 1033:2, 1036:5, 1186:24
**able** [18] - 907:20, 935:4, 961:19, 974:12, 1005:5, 1007:1, 1012:19, 1032:3, 1036:6, 1042:6, 1047:9, 1083:8, 1083:14, 1085:24, 1088:17, 1118:12, 1130:19, 1143:3
**ably** [1] - 1166:13
**abreast** [2] - 936:21, 937:25
**absence** [3] - 1127:23, 1166:25, 1167:14
**absent** [2] - 1021:1, 1170:2
**absolutely** [9] - 885:21, 915:18, 915:19, 918:2, 1038:21, 1084:10, 1090:16, 1091:16, 1176:11
**absorption** [1] - 1118:9
**abundance** [1] - 1194:9
**acceptable** [1] - 1191:17
**access** [3] - 902:11, 974:19, 1106:5
**accessing** [1] - 1111:9
**accommodate** [3] - 908:6, 908:9, 1135:13
**accordance** [1] - 1135:14
**according** [3] - 945:3, 1061:4, 1114:9

**accordingly** [2] - 1023:9, 1136:12
**account** [3] - 1147:4, 1158:4, 1177:17
**accounted** [1] - 1140:24
**accounting** [4] - 957:12, 957:13, 957:19, 1085:12
**accrues** [1] - 1138:6
**accruing** [1] - 1138:15
**accumulative** [1] - 1190:9
**accurate** [5] - 883:21, 1045:5, 1045:9, 1045:22, 1174:15
**accurately** [2] - 876:23, 1010:4
**accuse** [1] - 989:14
**accused** [26] - 925:24, 926:6, 938:8, 980:5, 982:6, 985:25, 986:3, 986:4, 1019:20, 1024:17, 1066:17, 1067:9, 1067:16, 1075:21, 1077:6, 1077:12, 1080:2, 1090:25, 1097:9, 1105:7, 1108:11, 1108:15, 1110:19, 1142:15, 1142:24, 1153:10
**accusing** [8] - 988:14, 1069:10, 1069:14, 1070:13, 1070:23, 1079:22, 1104:21
**achieve** [5] - 898:7, 1003:7, 1038:25, 1047:9, 1062:3
**achieved** [4] - 1009:25, 1010:5, 1044:5, 1062:10
**achieves** [1] - 900:15
**ACI** [14] - 1024:20, 1024:22, 1025:5, 1025:19, 1026:5, 1029:1, 1031:18, 1107:24, 1134:20, 1134:21, 1135:13, 1135:14, 1135:16, 1142:23
**acknowledged** [1] - 945:12
**acknowledges** [2] - 887:17, 1158:14
**acquaintances** [2] - 922:5, 923:11
**act** [12] - 1022:3, 1022:5, 1022:13, 1022:14, 1022:17,

1024:9, 1024:22, 1024:23, 1028:9, 1029:4, 1034:22, 1159:18
**acted** [2] - 908:10, 1021:11
**acting** [1] - 1143:20
**action** [11] - 1016:12, 1016:19, 1019:2, 1021:1, 1027:1, 1033:15, 1033:17, 1036:9, 1158:17, 1181:7, 1181:10
**actions** [12] - 899:19, 900:5, 1016:14, 1016:21, 1017:10, 1018:16, 1018:18, 1027:3, 1028:22, 1033:19, 1155:23, 1159:5
**activated** [302] - 882:24, 883:7, 883:11, 883:15, 883:18, 883:23, 884:4, 884:6, 887:14, 887:18, 887:22, 888:2, 888:8, 888:14, 889:5, 890:8, 891:7, 891:10, 891:12, 891:24, 892:3, 892:5, 892:7, 892:10, 892:14, 892:21, 892:23, 892:24, 893:3, 895:10, 897:3, 903:17, 904:20, 905:3, 905:9, 908:17, 909:16, 910:23, 911:1, 912:3, 912:24, 912:25, 913:4, 914:9, 914:16, 915:14, 915:21, 916:5, 916:8, 916:10, 916:13, 916:14, 916:19, 916:21, 916:23, 917:1, 917:3, 917:7, 917:14, 917:18, 917:23, 918:3, 918:9, 920:5, 920:10, 920:13, 930:25, 933:9, 948:19, 949:8, 949:12, 949:18, 949:20, 949:24, 950:2, 953:21, 953:22, 954:7, 954:10, 963:14,

963:16, 966:22, 967:13, 967:25, 969:3, 969:6, 969:13, 969:25, 970:12, 970:25, 972:8, 973:23, 980:4, 982:5, 983:8, 985:12, 986:7, 987:25, 988:2, 988:9, 988:16, 989:10, 989:16, 998:22, 999:1, 999:3, 999:5, 999:10, 999:14, 1004:19, 1004:21, 1004:22, 1005:7, 1005:13, 1005:20, 1005:23, 1006:1, 1006:5, 1006:9, 1006:15, 1006:22, 1007:4, 1010:22, 1011:1, 1011:4, 1011:6, 1017:4, 1017:13, 1018:13, 1018:15, 1018:16, 1018:20, 1018:24, 1019:1, 1019:7, 1020:14, 1020:16, 1020:19, 1020:22, 1020:23, 1021:2, 1021:6, 1021:7, 1021:12, 1021:13, 1021:17, 1021:18, 1022:4, 1023:6, 1033:23, 1034:6, 1034:8, 1034:14, 1035:2, 1035:5, 1035:18, 1035:20, 1037:18, 1058:10, 1058:11, 1060:12, 1060:24, 1061:12, 1061:18, 1061:23, 1062:3, 1062:21, 1062:23, 1063:3, 1063:12, 1063:14, 1063:19, 1064:14, 1064:17, 1064:18, 1066:14, 1066:24, 1067:4, 1067:23, 1068:2, 1068:7, 1068:16, 1068:19, 1068:20, 1068:23, 1069:1, 1069:3, 1069:15, 1069:20, 1070:16, 1071:1, 1071:3, 1076:4, 1076:10, 1076:22, 1077:1, 1077:14, 1077:19, 1078:3, 1078:21, 1079:2, 1079:25, 1080:3,

1080:6, 1080:13, 1080:18, 1081:7, 1081:21, 1082:8, 1083:11, 1087:16, 1087:24, 1088:6, 1088:17, 1088:19, 1089:1, 1089:5, 1089:11, 1089:17, 1089:25, 1090:6, 1090:17, 1090:21, 1090:22, 1091:1, 1091:6, 1091:15, 1092:1, 1092:4, 1092:7, 1092:8, 1092:11, 1092:15, 1092:19, 1092:23, 1096:21, 1096:23, 1098:23, 1099:16, 1100:12, 1100:21, 1101:24, 1102:5, 1102:15, 1102:19, 1102:22, 1103:21, 1104:1, 1104:17, 1104:22, 1105:13, 1107:19, 1107:24, 1108:2, 1108:6, 1108:15, 1108:19, 1108:24, 1109:18, 1110:6, 1110:9, 1110:10, 1110:12, 1110:20, 1111:6, 1111:12, 1114:7, 1115:18, 1115:22, 1116:2, 1116:6, 1116:8, 1116:10, 1116:11, 1116:14, 1116:17, 1116:25, 1120:22, 1121:2, 1121:6, 1121:9, 1121:13, 1125:21, 1126:10, 1126:16, 1126:25, 1127:5, 1127:12, 1127:18, 1127:23, 1128:2, 1128:5, 1128:8, 1128:14, 1128:16, 1128:18, 1134:23, 1136:1, 1136:3, 1143:1

**active** [2] - 1093:25, 1094:1

**actively** [4] - 1181:25, 1182:5, 1193:13, 1193:14

**activities** [1] - 1123:2

**activity** [2] - 1135:24, 1137:13

**acts** [12] - 1022:5, 1022:8, 1026:9, 1026:10, 1026:11,

1030:14, 1035:12, 1036:3, 1099:20, 1135:21, 1137:15, 1156:13

**actual** [6] - 976:16, 1014:25, 1030:9, 1064:10, 1123:1, 1185:21

**ADAES** [1] - 1139:16

**adapted** [18] - 1068:14, 1068:19, 1068:22, 1068:25, 1069:19, 1071:3, 1090:14, 1091:15, 1134:12, 1135:1, 1135:3, 1135:18, 1160:9, 1160:18, 1161:7, 1161:14, 1163:13, 1164:15

**add** [12] - 980:1, 982:2, 983:5, 985:9, 1039:7, 1039:10, 1099:13, 1162:9, 1165:22, 1177:5, 1190:9, 1190:11

**added** [11] - 889:20, 914:15, 991:24, 993:14, 1017:3, 1135:8, 1160:3, 1166:10, 1173:5, 1175:18, 1176:16

**adding** [4] - 1060:25, 1062:23, 1063:3, 1136:3

**addition** [10] - 896:2, 1012:5, 1018:10, 1077:7, 1077:13, 1138:8, 1138:23, 1140:14, 1149:16, 1166:20

**additional** [14] - 895:25, 1009:24, 1099:5, 1157:9, 1158:5, 1159:8, 1159:14, 1169:23, 1169:25, 1171:1, 1171:23, 1175:1, 1192:22, 1194:5

**additionally** [6] - 1033:9, 1033:11, 1034:4, 1034:12, 1036:1, 1161:20

**additive** [13] - 890:5, 1040:22, 1044:25, 1046:11, 1047:25, 1048:4, 1048:13, 1058:1, 1059:5, 1059:12, 1091:10, 1188:16

**additives** [4] - 914:12,

992:3, 1061:4, 1114:4

**address** [10] - 903:11, 932:3, 933:2, 942:14, 1013:21, 1024:4, 1141:9, 1141:11, 1166:10, 1192:13

**addressed** [1] - 1166:16

**addresses** [1] - 931:23

**addressing** [1] - 907:19

**adjourn** [1] - 1197:3

**admission** [7] - 902:3, 907:2, 910:9, 911:17, 913:16, 1014:18, 1096:4

**admit** [13] - 905:17, 964:20, 975:2, 1014:2, 1015:3, 1015:4, 1015:5, 1045:10, 1086:11, 1096:16, 1100:16, 1100:19, 1101:13

**admitted** [40] - 886:2, 887:12, 893:22, 893:23, 893:25, 902:7, 902:9, 907:6, 907:9, 910:13, 910:15, 911:20, 911:22, 913:20, 913:22, 943:22, 964:24, 965:1, 975:6, 975:8, 1008:24, 1009:2, 1009:4, 1013:24, 1014:6, 1015:1, 1015:16, 1017:20, 1036:22, 1037:1, 1037:4, 1037:6, 1041:24, 1042:2, 1042:4, 1045:14, 1045:16, 1086:15, 1086:17, 1139:21

**admitting** [1] - 1065:15

**adopted** [2] - 1128:4, 1171:4

**ADRIENNE** [1] - 873:22

**advance** [1] - 1123:9

**advanced** [1] - 1123:17

**advantage** [2] - 1032:20, 1194:4

**adverse** [1] - 944:24

**advice** [3] - 926:3, 951:9, 1094:12

**AECI** [1] - 887:14

**aerial** [1] - 994:22

**affect** [1] - 1090:1

**affected** [1] - 1053:17

**affects** [1] - 941:20

**affiliate** [1] - 936:19

**affiliated** [1] - 949:22

**affiliates** [1] - 937:6

**afoul** [1] - 1140:4

**afternoon** [9] - 1012:3, 1015:20, 1015:21, 1032:4, 1093:6, 1111:25, 1121:23, 1133:18, 1133:19

**Agency** [3] - 954:1, 989:2, 1057:2

**ago** [5] - 921:9, 987:10, 1088:3, 1105:19, 1122:3

**agree** [40] - 875:19, 875:24, 876:6, 878:10, 878:12, 881:14, 881:19, 884:10, 894:9, 896:4, 896:5, 896:22, 905:6, 918:1, 924:9, 924:14, 944:5, 947:21, 956:16, 1096:2, 1096:3, 1107:12, 1128:11, 1142:7, 1149:21, 1165:15, 1174:7, 1176:25, 1177:11, 1177:12, 1178:19, 1179:1, 1185:23, 1187:12, 1188:12, 1190:18, 1190:19, 1191:22, 1192:4, 1194:24

**agreed** [6] - 881:22, 945:23, 999:23, 999:25, 1088:22, 1191:12

**agreeing** [1] - 884:12

**agreement** [23] - 953:4, 964:5, 964:12, 974:10, 974:19, 974:22, 976:18, 995:16, 1019:13, 1019:21, 1020:4, 1093:12, 1140:3, 1140:8, 1140:12, 1140:16, 1140:18, 1140:21, 1146:6, 1146:16, 1179:25, 1191:25, 1192:23

**agreements** [15] -

908:11, 964:14, 965:4, 965:6, 974:4, 974:8, 974:10, 974:11, 975:20, 976:8, 1019:10, 1019:11, 1021:25, 1138:9, 1140:5

**ahead** [1] - 907:11

**aim** [1] - 1113:17

**air** [3] - 900:8, 1003:21, 1115:16

**airborne** [1] - 903:1

**AISHA** [1] - 873:23

**Aisha** [2] - 1023:21, 1132:2

**AJG** [14] - 979:25, 982:1, 983:4, 985:8, 1060:20, 1060:24, 1062:21, 1078:18, 1078:21, 1098:12, 1098:14, 1146:4, 1146:5, 1146:10

**AJG/DTE** [2] - 1140:3, 1140:8

**al** [2] - 873:4, 873:7

**Alabama** [1] - 957:10

**albeit** [1] - 1168:4

**Alistar** [4] - 937:14, 1103:14, 1140:20, 1146:16

**Alistar/Chem** [1] - 1145:12

**Alistar/Chem-Mod** [1] - 1145:12

**allegation** [18] - 956:14, 1065:10, 1067:3, 1068:15, 1069:2, 1069:7, 1070:8, 1070:15, 1070:25, 1071:14, 1071:15, 1071:23, 1079:11, 1079:17, 1094:19, 1096:1, 1096:25, 1097:4

**allegations** [32] - 985:21, 990:1, 1066:3, 1066:9, 1066:22, 1066:24, 1067:20, 1069:13, 1070:3, 1070:6, 1070:11, 1071:6, 1072:9, 1080:4, 1083:1, 1090:2, 1094:15, 1095:3, 1095:11, 1096:2, 1096:16, 1097:14, 1097:15, 1099:7, 1101:4, 1101:15, 1104:10, 1109:14, 1136:8, 1136:11,

1137:14, 1137:17
**allege** [1] - 1109:17
**alleged** [4] - 1036:3, 1062:17, 1068:5, 1168:18
**allegedly** [1] - 1017:6
**alleging** [5] - 1066:13, 1069:5, 1069:21, 1069:25, 1070:2
**Allen** [2] - 906:17, 907:15
**allow** [3] - 899:7, 947:1, 1196:2
**allowed** [8] - 998:5, 999:22, 1004:24, 1004:25, 1005:3, 1090:22, 1144:24, 1146:23
**almost** [4] - 955:23, 962:14, 1171:13, 1188:2
**alone** [4] - 1022:17, 1023:5, 1023:8, 1156:18
**alphabetically** [2] - 1182:10, 1182:12
**alternate** [1] - 1173:21
**alternative** [2] - 1143:19, 1173:14
**alternatively** [2] - 1173:19, 1191:22
**amended** [95] - 927:4, 927:5, 929:24, 929:25, 980:23, 981:16, 982:19, 982:22, 982:25, 983:19, 984:6, 984:21, 984:22, 985:16, 985:17, 985:22, 985:23, 986:9, 988:13, 988:14, 989:12, 989:13, 989:14, 989:22, 989:25, 990:8, 990:18, 1059:19, 1060:2, 1065:9, 1066:11, 1072:1, 1073:2, 1073:9, 1073:12, 1073:17, 1073:19, 1073:23, 1074:5, 1074:7, 1074:11, 1074:20, 1074:23, 1075:2, 1075:5, 1075:14, 1075:16, 1075:19, 1076:14, 1076:19, 1077:5, 1077:10, 1077:17, 1078:8, 1078:14, 1079:5, 1079:7,

1079:12, 1079:14, 1079:18, 1079:21, 1080:10, 1080:15, 1081:4, 1081:12, 1081:15, 1082:3, 1082:4, 1082:17, 1083:1, 1083:2, 1083:20, 1083:21, 1087:20, 1089:13, 1089:14, 1090:3, 1093:17, 1095:14, 1095:15, 1095:20, 1095:22, 1099:24, 1103:19, 1173:21
**amendment** [2] - 906:19, 982:11
**amendments** [1] - 930:24
**Ameren** [11] - 895:8, 895:14, 895:16, 902:2, 902:19, 902:22, 913:24, 950:19, 950:23, 951:1, 951:6
**Ameren's** [2] - 904:19, 951:1
**amount** [33] - 884:6, 925:7, 940:7, 983:10, 991:18, 1003:5, 1004:2, 1004:8, 1004:11, 1026:8, 1029:7, 1038:21, 1038:22, 1038:25, 1039:9, 1039:11, 1061:10, 1080:16, 1080:18, 1081:5, 1081:10, 1082:14, 1084:2, 1084:5, 1084:7, 1089:19, 1089:21, 1089:25, 1135:25, 1140:23, 1156:24, 1159:18, 1185:20
**amounts** [5] - 1040:25, 1145:15, 1187:24, 1188:15, 1188:16
**ample** [8] - 1025:12, 1031:17, 1034:1, 1034:4, 1141:12, 1142:10, 1142:19, 1142:25
**analogy** [1] - 1162:19
**analysis** [7] - 1144:10, 1144:12, 1144:17, 1146:14, 1156:14, 1177:16, 1178:2
**analytical** [1] - 1040:23
**AND** [1] - 873:2

**announce** [1] - 944:16
**announced** [1] - 1126:21
**anodyne** [2] - 1181:23, 1193:25
**answer** [28] - 876:21, 877:4, 880:7, 912:18, 917:11, 922:6, 922:14, 929:17, 930:12, 931:3, 935:6, 939:18, 939:21, 958:3, 1095:18, 1095:22, 1096:8, 1099:10, 1099:23, 1101:2, 1103:25, 1108:4, 1117:9, 1121:4, 1126:17, 1128:12, 1184:2, 1188:5
**answered** [2] - 882:12, 930:7
**answering** [2] - 900:3, 922:11
**answers** [3] - 893:7, 893:9, 1103:1
**antelope** [1] - 1089:2
**Antelope** [20] - 884:3, 891:14, 909:1, 909:3, 909:4, 937:16, 968:2, 968:5, 968:14, 969:9, 969:12, 1041:15, 1043:4, 1043:17, 1046:5, 1046:15, 1046:21, 1049:15, 1057:21
**anthracite** [1] - 1107:4
**anyway** [3] - 1013:4, 1182:17, 1191:10
**apart** [1] - 1163:7
**apologies** [3] - 971:23, 981:21, 985:3
**apologize** [5] - 896:8, 1174:11, 1183:17, 1187:3, 1190:15
**apparent** [1] - 1140:17
**appeal** [1] - 1179:21
**appear** [3] - 978:20, 1075:4, 1110:22
**APPEARANCES** [1] - 873:15
**Appearances** [1] - 874:1
**appendix** [1] - 965:20
**apples** [4] - 900:18, 1002:23
**Appliances** [1] - 1157:17

**applicable** [2] - 1186:7, 1187:13
**application** [3] - 1033:23, 1039:3, 1043:8
**applications** [1] - 1110:17
**applied** [3] - 993:12, 1061:5, 1157:22
**applies** [1] - 1160:18
**apply** [8] - 896:23, 897:22, 899:14, 907:21, 924:3, 993:10, 1071:7, 1108:20
**applying** [1] - 1162:7
**apportion** [4] - 1138:21, 1138:24, 1175:17, 1177:18
**apportioned** [1] - 1144:17
**apportioning** [1] - 1176:12
**apportionment** [5] - 1155:2, 1175:2, 1176:7, 1176:10, 1177:19
**appreciate** [5] - 1012:20, 1013:4, 1191:4, 1191:6, 1191:9
**approach** [7] - 878:15, 946:6, 950:7, 994:15, 1065:1, 1129:1, 1183:1
**approached** [1] - 1065:18
**appropriate** [5] - 1015:25, 1022:7, 1032:19, 1158:21, 1182:1
**appropriately** [2] - 1169:11, 1193:25
**April** [2] - 904:7, 974:14
**ARANT** [1] - 874:6
**area** [17] - 974:23, 995:14, 995:15, 996:4, 996:7, 996:15, 996:22, 997:1, 997:4, 997:8, 998:7, 998:19, 1010:14, 1107:16, 1127:10, 1161:13
**arguably** [1] - 1145:3
**argue** [5] - 881:2, 1035:24, 1147:11, 1156:23, 1176:19
**argued** [2] - 1033:13, 1034:21

**arguing** [5] - 928:9, 944:3, 1013:11, 1164:23, 1170:3
**argument** [29] - 927:19, 928:4, 928:5, 1012:1, 1013:9, 1024:21, 1026:17, 1033:22, 1066:16, 1069:25, 1070:18, 1071:25, 1095:5, 1141:21, 1144:13, 1144:19, 1145:2, 1145:7, 1145:9, 1145:20, 1146:6, 1146:15, 1147:12, 1156:4, 1159:21, 1164:12, 1170:6, 1171:7, 1172:3
**argumentative** [2] - 878:7, 946:23
**arguments** [19] - 1013:11, 1013:13, 1023:23, 1026:21, 1026:24, 1033:9, 1033:13, 1130:7, 1130:25, 1132:19, 1144:15, 1147:6, 1147:22, 1157:1, 1170:13, 1170:15, 1172:15, 1188:10, 1196:3
**arrangement** [1] - 962:3
**Arthur** [1] - 910:3
**ARTHUR** [1] - 873:7
**article** [10] - 902:23, 902:24, 1141:20, 1160:12, 1160:19, 1161:16, 1162:2, 1163:14, 1163:24, 1165:11
**articulate** [1] - 1194:23
**articulates** [1] - 1162:7
**articulating** [1] - 1187:16
**articulation** [1] - 1157:13
**artificial** [3] - 1138:16, 1138:21, 1144:20
**artificially** [2] - 1138:6, 1138:15
**ash** [11] - 890:7, 920:19, 1018:21, 1019:4, 1019:6, 1030:18, 1117:15, 1118:24
**ASHLEY** [1] - 874:8

aside [1] - 1030:14
aspect [5] - 1008:3, 1030:18, 1030:19, 1033:21, 1148:4
aspects [3] - 1033:12, 1169:2, 1169:16
asserted [25] - 1016:13, 1016:15, 1016:20, 1016:22, 1016:23, 1018:10, 1018:11, 1019:14, 1020:5, 1023:12, 1033:20, 1067:3, 1134:22, 1136:15, 1137:5, 1138:15, 1139:4, 1139:10, 1139:24, 1153:11, 1153:18, 1153:23, 1155:13, 1158:17, 1159:6
assertion [2] - 1135:17, 1163:10
assessed [1] - 1185:14
asset [2] - 960:4, 977:15
assets [3] - 958:25, 959:12, 976:16
assist [1] - 1115:13
assistance [1] - 1161:11
assisted [1] - 1114:15
assisting [1] - 890:22
associated [12] - 888:5, 903:6, 927:16, 927:17, 928:8, 928:20, 929:8, 938:22, 1102:5, 1103:21, 1115:16, 1156:19
Associates [2] - 969:19, 1052:19
assume [10] - 897:21, 938:21, 1064:3, 1071:10, 1107:7, 1127:24, 1131:15, 1149:22, 1154:11, 1181:6
assumed [1] - 1127:14
assuming [2] - 901:22, 1063:16
atoms [2] - 1061:1, 1061:6
attempt [2] - 908:9, 1172:5
attempted [3] - 899:6, 1061:9, 1144:23
attempting [2] - 923:19, 1109:24
attention [1] - 896:14

ATTORNEY [4] - 1112:13, 1114:18, 1119:13, 1121:22
August [10] - 911:12, 1041:14, 1042:10, 1046:3, 1046:8, 1046:15, 1046:22, 1053:23, 1054:3, 1056:4
authorities [2] - 1024:3, 1158:6
available [8] - 921:24, 921:25, 932:7, 1104:23, 1105:1, 1111:10, 1111:19, 1118:1
avoid [3] - 961:11, 1026:1, 1188:20
award [9] - 1138:3, 1144:3, 1146:21, 1188:16, 1189:16, 1189:23, 1190:2, 1190:6, 1190:9
awarded [1] - 1191:14
awarding [2] - 1186:3, 1191:13
aware [30] - 884:21, 887:4, 896:10, 908:21, 908:23, 909:16, 909:19, 911:1, 917:14, 918:8, 1018:24, 1024:10, 1060:22, 1088:6, 1092:14, 1092:18, 1092:22, 1110:4, 1110:23, 1111:8, 1124:3, 1125:24, 1125:25, 1126:4, 1126:13, 1126:14, 1126:15, 1126:20, 1127:11, 1162:22
awhile [1] - 976:13
awkward [1] - 1162:18

## B

B) [1] - 937:22
b) [1] - 1182:5
bachelor's [1] - 1123:18
background [2] - 1114:19, 1123:16
bad [6] - 897:7, 1006:16, 1188:18, 1188:19, 1188:20, 1193:8
baghouse [10] - 1017:7, 1017:9,

1017:11, 1017:12, 1017:15, 1017:22, 1020:15, 1023:7, 1024:8, 1064:24
baghouses [1] - 1024:18
banana [1] - 1012:25
Bank [1] - 910:3
bankers [1] - 936:22
Barr [8] - 894:3, 897:22, 906:17, 906:22, 907:13, 908:14, 910:2, 947:5
Bascobert [20] - 888:11, 934:3, 972:14, 972:17, 972:20, 973:5, 973:10, 973:21, 974:1, 974:5, 974:6, 974:12, 974:20, 975:11, 975:21, 975:25, 1050:10, 1050:24, 1103:15
base [3] - 997:5, 997:7, 1070:24
based [32] - 899:18, 941:11, 997:19, 1023:13, 1025:16, 1046:22, 1047:2, 1052:5, 1053:5, 1054:7, 1055:12, 1056:3, 1056:12, 1057:12, 1114:3, 1128:12, 1135:9, 1136:9, 1136:16, 1137:15, 1137:18, 1138:6, 1139:14, 1141:2, 1142:23, 1144:9, 1158:11, 1165:20, 1174:6, 1178:5, 1179:6, 1179:22
baseline [3] - 1011:2, 1063:9, 1064:22
basic [1] - 1188:14
Basin [8] - 895:8, 895:14, 895:16, 913:24, 953:3, 1057:24, 1106:25, 1117:23
basing [2] - 1070:24, 1138:8
basis [15] - 925:14, 925:16, 1032:16, 1046:24, 1066:15, 1084:23, 1085:12, 1085:16, 1085:18, 1087:3, 1109:17, 1109:19, 1116:8, 1176:18, 1185:14

Batanian [2] - 922:25, 923:12
Bates [2] - 918:16, 919:19
Bean [1] - 947:8
bearings [1] - 1147:18
became [6] - 908:25, 1012:23, 1125:25, 1126:4, 1126:13
Beck [1] - 911:12
become [1] - 1118:15
becomes [2] - 1170:24, 1184:17
becoming [1] - 1122:9
bed [1] - 903:15
beer [1] - 1195:23
began [1] - 1035:17
beggars [1] - 1146:15
begin [2] - 1092:11, 1131:5
beginning [8] - 921:21, 1094:13, 1134:15, 1151:1, 1151:3, 1152:4, 1164:5, 1176:8
begins [3] - 1149:15, 1149:16, 1150:4
behalf [7] - 940:1, 946:11, 959:14, 959:16, 1023:21, 1127:4, 1132:2
behaves [1] - 1091:5
behind [13] - 897:1, 908:15, 930:20, 963:24, 978:15, 980:7, 980:22, 982:8, 982:10, 983:13, 995:10, 1072:24, 1074:2
behind-the-scenes [1] - 930:20
belabor [1] - 887:21
belief [20] - 922:9, 1060:20, 1062:20, 1065:9, 1065:14, 1067:19, 1071:19, 1094:5, 1094:16, 1095:2, 1095:11, 1096:20, 1096:24, 1101:3, 1109:14, 1128:15, 1146:16, 1167:24, 1169:10, 1170:3
beliefs [2] - 900:13, 1168:14
believes [1] - 1106:19
below [4] - 937:5, 938:7, 1173:16, 1173:17
belt [10] - 889:21,

944:2, 956:6, 993:4, 995:10, 1025:2, 1028:24, 1029:13, 1029:22, 1034:20
bench [1] - 1192:5
benefit [8] - 920:8, 920:14, 920:16, 920:17, 921:4, 1019:4, 1029:8, 1143:18
benefits [5] - 919:12, 920:22, 1018:21, 1019:6, 1030:23
BENN [1] - 874:7
best [12] - 912:18, 940:8, 942:8, 1093:15, 1126:15, 1144:13, 1166:16, 1177:10, 1186:22, 1191:1, 1194:3, 1196:10
better [5] - 919:7, 920:19, 942:13, 980:21, 1050:12
between [38] - 906:17, 909:14, 935:10, 936:11, 937:4, 937:20, 947:15, 959:10, 964:6, 974:4, 974:20, 977:3, 994:7, 1003:1, 1046:3, 1047:21, 1048:25, 1049:7, 1050:8, 1050:12, 1051:17, 1051:23, 1054:2, 1054:22, 1140:1, 1146:5, 1151:15, 1155:14, 1155:25, 1169:1, 1169:21, 1170:10, 1171:25, 1172:11, 1178:4, 1178:10, 1178:21, 1185:11
beyond [7] - 893:9, 914:10, 914:11, 914:15, 1030:10, 1123:17
Big [33] - 875:21, 875:22, 876:5, 876:7, 876:9, 876:14, 877:2, 877:16, 877:17, 877:19, 878:8, 878:11, 878:16, 878:17, 878:18, 882:17, 882:18, 884:1, 886:23, 887:23, 910:25, 934:23, 936:17,

966:11, 966:17, 966:21, 966:22, 1000:5, 1049:9, 1049:11, 1050:2, 1089:2, 1104:5

**big** [10] - 885:4, 885:5, 927:10, 955:3, 976:20, 996:15, 996:22, 1065:18, 1071:18, 1106:2

**biggest** [3] - 977:17, 1061:17, 1063:18

**bill** [2] - 920:13, 920:15

**binary** [1] - 1162:15

**binder** [11] - 884:11, 893:16, 893:24, 901:14, 906:2, 909:20, 918:15, 963:21, 963:22, 978:8, 1059:16

**biology** [1] - 1002:3

**Birmingham** [2] - 957:10, 957:17

**bit** [17] - 882:17, 895:23, 909:25, 917:25, 949:16, 953:12, 963:19, 991:8, 1000:23, 1028:9, 1037:17, 1039:10, 1039:17, 1130:24, 1155:21, 1178:8, 1179:20

**bituminous** [18] - 1057:20, 1107:4, 1107:8, 1107:12, 1107:15, 1107:18, 1107:20, 1108:3, 1117:4, 1117:6, 1117:12, 1117:22, 1117:23, 1118:2, 1118:10, 1118:11, 1118:19

**black** [6] - 963:18, 996:15, 996:22, 997:4, 1007:12, 1071:21

**blank** [1] - 1146:10

**blend** [1] - 1057:19

**blended** [2] - 991:24, 1058:3

**blind** [3] - 1143:20, 1163:22, 1165:10

**blinding** [1] - 1026:5

**blindness** [3] - 1025:22, 1143:5, 1143:6

**blue** [5] - 978:7, 978:8, 980:7, 982:8, 1059:16

**board** [6] - 899:20, 944:22, 945:1, 1045:21, 1045:22, 1091:9

**boards** [3] - 943:15, 1108:9, 1108:11

**boiler** [11] - 877:3, 882:22, 889:21, 889:22, 1010:5, 1025:3, 1028:25, 1029:14, 1029:23, 1068:3, 1118:7

**boilers** [6] - 876:20, 877:25, 1115:19, 1115:23, 1120:23, 1121:1

**boils** [1] - 1156:14

**bold** [1] - 1183:13

**bolded** [1] - 1184:1

**book** [2] - 919:5, 919:8

**boots** [2] - 959:20, 959:23

**borne** [1] - 1167:8

**bottom** [9] - 890:7, 903:24, 916:7, 997:12, 997:20, 1101:10, 1149:10, 1175:12, 1185:18

**bought** [2] - 963:8, 1189:25

**BOULT** [1] - 874:6

**box** [5] - 943:16, 995:10, 1071:21, 1189:5, 1189:8

**boxes** [3] - 934:3, 936:11, 1087:6

**BRADLEY** [2] - 873:19, 874:6

**brain** [1] - 1190:21

**break** [15] - 940:20, 941:4, 941:7, 942:3, 942:9, 942:18, 991:5, 999:19, 1011:10, 1011:13, 1013:18, 1025:8, 1109:4, 1109:9, 1111:25

**brief** [3] - 1109:3, 1148:7, 1166:2

**briefed** [1] - 1140:7

**briefly** [7] - 1032:12, 1033:11, 1137:22, 1144:2, 1144:16, 1160:1, 1177:24

**bring** [8] - 940:9, 942:1, 942:14, 942:25, 1012:2, 1032:3, 1036:16, 1172:6

**bringing** [1] - 1015:23

**brings** [1] - 914:18

**bromide** [29] - 889:20, 895:10, 896:23, 897:3, 897:23, 907:21, 908:8, 908:17, 912:24, 952:6, 952:11, 952:15, 980:2, 982:3, 983:6, 985:10, 989:16, 1076:16, 1076:21, 1087:14, 1087:15, 1090:12, 1099:13, 1099:14, 1100:8, 1100:19, 1126:6, 1126:10

**brominated** [1] - 1139:19

**bromine** [25] - 889:3, 889:12, 889:16, 889:17, 889:19, 890:5, 891:5, 896:17, 896:19, 897:18, 920:10, 920:11, 980:2, 982:3, 983:6, 985:9, 988:16, 1018:20, 1034:2, 1099:13, 1104:22, 1108:6, 1108:15, 1108:18, 1125:20

**brought** [2] - 944:10, 1037:8

**Brown** [12] - 951:12, 952:21, 952:25, 978:17, 980:10, 994:13, 995:17, 1007:7, 1009:7, 1010:14, 1010:15, 1060:15

**BTU** [3] - 1107:8, 1117:15, 1118:13

**BTUs** [1] - 1118:11

**bucket** [1] - 1152:17

**Buffington** [8] - 937:5, 961:25, 962:6, 962:10, 964:6, 964:14, 965:13, 1054:25

**Buffinton** [1] - 1103:15

**build** [1] - 958:19

**building** [4] - 889:21, 955:8, 955:9, 958:24

**buildings** [1] - 958:19

**built** [1] - 958:15

**bulk** [1] - 1039:13

**bullet** [9] - 919:23, 919:24, 1150:9,

1150:10, 1150:13, 1155:10, 1155:11, 1155:22, 1159:1

**bunch** [5] - 914:21, 917:13, 924:16, 1096:19, 1167:11

**burdens** [1] - 1149:7

**Burke** [2] - 873:12, 1196:7

**burn** [20] - 876:13, 877:3, 877:12, 878:8, 878:11, 879:6, 880:18, 901:12, 917:18, 992:8, 1020:8, 1036:7, 1107:9, 1117:2, 1117:6, 1117:12, 1117:17, 1117:20, 1118:7, 1119:2

**burned** [34] - 875:22, 876:2, 876:7, 876:9, 876:11, 877:6, 877:15, 877:19, 878:10, 878:13, 878:17, 878:18, 878:21, 878:24, 879:7, 879:15, 880:9, 880:14, 880:15, 880:21, 881:23, 882:15, 882:18, 900:24, 915:21, 1002:24, 1029:2, 1034:7, 1034:10, 1108:24, 1128:7, 1136:1, 1142:20, 1142:21

**burners** [1] - 1118:22

**burning** [8] - 882:2, 1003:1, 1057:23, 1077:7, 1077:13, 1118:2, 1118:19, 1118:23

**burns** [1] - 992:22

**business** [22] - 884:7, 893:1, 893:5, 900:2, 901:5, 902:2, 906:22, 913:13, 948:10, 949:13, 958:5, 962:24, 963:5, 963:10, 999:2, 1098:12, 1098:16, 1101:21, 1101:23, 1123:21, 1139:20

**businesses** [1] - 977:16

**busy** [1] - 1006:19

**button** [2] - 994:19, 995:22

**buy** [2] - 1023:1, 1085:17

**BY** [73] - 873:16, 875:10, 882:19, 884:20, 887:10, 893:14, 899:12, 902:10, 907:10, 910:16, 911:23, 913:23, 924:1, 924:25, 928:16, 929:3, 932:21, 933:6, 939:16, 946:15, 947:3, 950:9, 950:14, 951:14, 952:22, 953:2, 954:14, 965:2, 966:9, 967:1, 969:16, 970:15, 972:11, 975:9, 978:19, 980:12, 983:17, 991:12, 994:17, 995:18, 996:3, 999:20, 1007:9, 1007:17, 1009:5, 1009:9, 1010:16, 1037:14, 1041:18, 1042:5, 1045:18, 1060:17, 1072:23, 1081:2, 1086:18, 1093:5, 1095:8, 1096:13, 1097:16, 1101:1, 1101:12, 1103:3, 1103:10, 1103:18, 1104:4, 1104:15, 1109:12, 1110:3, 1111:18, 1112:13, 1114:18, 1119:13, 1121:22

## C

**C-E-R-T** [1] - 984:18

**CaBr2** [3] - 980:2, 983:6, 985:10

**Cajun** [33] - 875:22, 876:5, 876:7, 876:9, 876:14, 877:2, 877:16, 877:18, 877:19, 878:8, 878:11, 878:16, 878:17, 878:18, 882:17, 882:18, 884:2, 886:23, 887:24, 910:25, 934:23, 936:18, 966:11, 966:18, 966:21, 966:22, 1000:5, 1049:9, 1049:11, 1050:2,

1089:3, 1104:5

**calcium** [22] - 889:20, 895:10, 896:23, 897:2, 897:22, 907:21, 908:8, 908:16, 912:24, 952:6, 952:11, 952:15, 982:3, 989:15, 1076:16, 1076:21, 1087:14, 1087:15, 1090:12, 1099:13, 1126:6, 1126:10

**calculated** [2] - 1173:5, 1173:11

**calculation** [3] - 1140:21, 1140:25, 1141:4

**calculations** [3] - 1138:12, 1138:23, 1174:6

**calculator** [1] - 1189:12

**calculus** [1] - 1175:23

**CALDWELL** [93] - 873:19, 873:19, 875:8, 875:10, 882:19, 884:17, 884:20, 887:9, 887:10, 893:6, 893:13, 893:14, 899:3, 899:12, 902:3, 902:10, 907:2, 907:7, 907:10, 910:9, 910:16, 911:16, 911:23, 913:16, 913:23, 924:1, 924:20, 924:25, 928:12, 928:16, 929:3, 932:10, 932:21, 932:24, 933:6, 939:8, 939:12, 939:16, 940:18, 941:5, 941:18, 943:6, 944:5, 944:13, 944:19, 945:6, 945:11, 945:16, 946:22, 964:23, 975:5, 1009:1, 1037:3, 1042:1, 1045:13, 1065:1, 1065:5, 1071:14, 1080:22, 1086:14, 1093:2, 1093:5, 1095:8, 1096:13, 1097:13, 1097:16, 1100:24, 1101:1, 1101:8, 1101:12,

1102:25, 1103:3, 1103:8, 1103:10, 1103:17, 1103:18, 1104:2, 1104:4, 1104:14, 1104:15, 1108:25, 1109:20, 1109:22, 1111:14, 1129:1, 1129:5, 1129:16, 1129:18, 1130:1, 1130:17, 1131:14, 1131:19, 1133:7

**Caldwell** [27] - 875:7, 884:16, 932:9, 939:7, 941:3, 941:17, 944:12, 945:18, 946:19, 948:1, 949:9, 950:11, 950:18, 952:4, 961:14, 992:5, 1065:4, 1071:13, 1109:13, 1111:13, 1128:24, 1129:4, 1130:15, 1131:11, 1133:6, 1195:25, 1196:16

**Caldwell's** [1] - 1070:18

**cannot** [8] - 1005:7, 1022:7, 1024:8, 1026:10, 1078:25, 1081:20, 1134:13, 1172:9

**capabilities** [1] - 1165:12

**capable** [6] - 992:2, 1134:10, 1141:20, 1160:12, 1163:15, 1163:24

**capacity** [2] - 1041:21, 1118:8

**capital** [1] - 958:21

**capture** [6] - 890:2, 897:20, 920:12, 1115:24, 1144:25, 1156:8

**captured** [2] - 876:23, 1064:15

**carbon** [306] - 882:24, 883:7, 883:11, 883:15, 883:18, 883:23, 884:4, 884:6, 887:14, 887:18, 887:22, 888:2, 888:8, 888:14, 889:5, 890:7, 890:8, 891:7, 891:10, 891:12, 891:24, 892:3, 892:5, 892:7,

892:10, 892:14, 892:21, 892:23, 892:25, 893:3, 895:11, 897:3, 903:18, 904:20, 905:4, 905:9, 908:17, 909:16, 910:23, 911:2, 912:3, 912:24, 912:25, 913:4, 914:9, 914:16, 915:15, 915:22, 916:5, 916:8, 916:10, 916:13, 916:14, 916:19, 916:21, 916:23, 917:2, 917:3, 917:7, 917:14, 917:18, 917:23, 918:3, 918:9, 920:6, 920:8, 920:10, 920:13, 930:25, 933:10, 948:20, 949:9, 949:12, 949:18, 949:20, 949:24, 950:2, 953:21, 953:23, 954:8, 954:10, 963:14, 963:16, 966:22, 967:13, 967:25, 969:3, 969:6, 969:13, 969:25, 970:12, 970:25, 972:8, 973:23, 980:4, 982:5, 983:8, 985:12, 986:7, 988:1, 988:2, 988:10, 988:17, 989:10, 989:16, 998:22, 999:1, 999:3, 999:5, 999:11, 999:14, 1004:19, 1004:21, 1004:22, 1005:7, 1005:13, 1005:20, 1005:23, 1006:1, 1006:5, 1006:9, 1006:15, 1006:22, 1007:4, 1010:22, 1011:1, 1011:4, 1011:7, 1017:4, 1017:13, 1018:13, 1018:15, 1018:17, 1018:20, 1018:24, 1019:1, 1019:8, 1020:14, 1020:16, 1020:19, 1020:22, 1020:23, 1021:2, 1021:6, 1021:8, 1021:12, 1021:13, 1021:17, 1021:18,

1022:4, 1023:6, 1033:23, 1034:6, 1034:8, 1034:14, 1035:2, 1035:5, 1035:18, 1035:20, 1037:18, 1058:10, 1058:11, 1060:12, 1060:24, 1061:12, 1061:18, 1061:23, 1062:3, 1062:21, 1062:24, 1063:3, 1063:12, 1063:14, 1063:19, 1064:15, 1064:17, 1064:18, 1066:14, 1066:24, 1067:5, 1067:23, 1068:3, 1068:7, 1068:16, 1068:19, 1068:20, 1068:23, 1069:1, 1069:3, 1069:15, 1069:20, 1070:16, 1071:1, 1071:4, 1076:4, 1076:10, 1076:22, 1077:1, 1077:14, 1077:19, 1078:3, 1078:21, 1079:2, 1079:25, 1080:3, 1080:6, 1080:13, 1080:18, 1081:7, 1081:21, 1082:8, 1083:11, 1087:16, 1087:24, 1088:6, 1088:17, 1088:19, 1089:1, 1089:5, 1089:11, 1089:17, 1090:1, 1090:6, 1090:17, 1090:21, 1090:22, 1091:1, 1091:6, 1091:15, 1092:1, 1092:5, 1092:7, 1092:8, 1092:11, 1092:15, 1092:19, 1092:23, 1096:21, 1096:23, 1098:2, 1098:23, 1099:16, 1100:12, 1100:21, 1101:24, 1102:5, 1102:15, 1102:19, 1102:22, 1103:21, 1104:1, 1104:17, 1104:22, 1105:13, 1107:19, 1107:24, 1108:2, 1108:6, 1108:15, 1108:19, 1108:24, 1109:18, 1110:6, 1110:10, 1110:12, 1110:20, 1111:6, 1111:12, 1114:7, 1115:18, 1115:22,

1116:2, 1116:6, 1116:8, 1116:11, 1116:14, 1116:17, 1116:25, 1120:22, 1121:2, 1121:7, 1121:9, 1121:13, 1125:21, 1126:11, 1126:16, 1126:25, 1127:5, 1127:12, 1127:19, 1127:23, 1128:2, 1128:5, 1128:8, 1128:14, 1128:16, 1128:18, 1134:23, 1136:1, 1136:3, 1143:1

**care** [10] - 898:12, 898:15, 898:24, 899:4, 899:15, 899:25, 900:20, 900:24, 1014:5, 1131:18

**cared** [1] - 899:13

**Carolina** [1] - 973:1

**carried** [1] - 1068:15

**carrying** [1] - 1175:12

**cart** [1] - 998:9

**Case** [1] - 873:5

**case** [146] - 882:23, 883:10, 883:13, 884:25, 886:23, 891:14, 895:18, 902:20, 908:7, 909:18, 912:8, 917:12, 918:9, 926:3, 926:10, 928:3, 929:6, 935:24, 936:20, 936:21, 937:25, 938:16, 939:11, 940:10, 940:22, 941:20, 941:22, 943:1, 947:18, 948:16, 951:23, 956:11, 959:3, 960:18, 960:21, 961:24, 973:13, 978:16, 978:18, 979:4, 980:19, 980:24, 981:4, 982:11, 983:19, 986:15, 990:5, 990:8, 991:15, 998:25, 999:4, 999:13, 999:22, 1001:12, 1017:14, 1018:2, 1019:18, 1019:19, 1022:9, 1022:18, 1022:21, 1022:25, 1023:23, 1025:1, 1025:10,

1026:9, 1029:17, 1030:24, 1030:25, 1033:6, 1034:16, 1035:11, 1035:17, 1047:13, 1059:20, 1060:8, 1064:13, 1065:25, 1072:6, 1075:24, 1078:1, 1079:24, 1080:8, 1088:22, 1093:10, 1093:20, 1093:23, 1094:10, 1097:6, 1097:10, 1097:12, 1097:18, 1097:21, 1097:23, 1100:11, 1102:4, 1105:8, 1106:15, 1107:22, 1108:8, 1108:20, 1110:15, 1128:22, 1130:14, 1134:20, 1136:6, 1142:11, 1143:15, 1144:3, 1149:5, 1149:16, 1154:16, 1156:9, 1156:10, 1156:22, 1157:19, 1161:21, 1161:23, 1162:4, 1162:6, 1163:3, 1163:7, 1163:19, 1163:23, 1164:10, 1164:24, 1165:11, 1165:18, 1166:12, 1167:1, 1167:6, 1167:16, 1167:22, 1168:2, 1169:4, 1169:15, 1169:20, 1170:6, 1171:16, 1172:4, 1177:2, 1178:1, 1191:2, 1191:5

**cases** [10] - 892:3, 892:6, 977:8, 1012:23, 1029:18, 1029:19, 1157:14, 1157:15, 1162:11, 1196:20

**CASSADY** [2] - 873:19, 873:20

**catastrophic** [1] - 1119:1

**caught** [2] - 891:16, 1161:10

**causation** [17] - 1020:6, 1021:19, 1025:6, 1025:8, 1027:10, 1028:4, 1029:11, 1030:3, 1030:6, 1030:14, 1031:20, 1033:22, 1035:23, 1156:1,

1156:2, 1156:6, 1156:25

**caused** [16] - 1016:14, 1016:21, 1017:10, 1018:16, 1020:13, 1023:2, 1023:8, 1027:3, 1031:2, 1033:19, 1067:20, 1092:14, 1155:24, 1158:17, 1159:5, 1170:4

**causes** [1] - 1034:22

**causing** [1] - 1156:13

**caution** [1] - 1194:9

**caveat** [2] - 943:6, 957:22

**Cayuga** [3] - 970:5, 970:11, 970:12

**cc** [1] - 906:20

**cc'd** [1] - 910:7

**CEMS** [3] - 1009:20, 1009:21, 1009:22

**Center** [4] - 1001:14, 1001:16, 1001:17, 1112:22

**CEO** [1] - 1122:15

**CERT** [220] - 874:9, 878:20, 883:5, 883:9, 885:16, 894:5, 904:14, 905:18, 913:13, 915:4, 918:7, 927:12, 927:24, 929:5, 932:2, 934:10, 939:23, 947:4, 948:20, 948:25, 949:12, 949:17, 949:23, 952:5, 952:14, 953:8, 953:13, 954:3, 955:25, 956:2, 956:24, 956:25, 957:3, 957:4, 957:7, 957:9, 957:16, 958:4, 960:9, 960:13, 961:24, 962:9, 964:6, 964:14, 965:14, 966:4, 966:10, 966:20, 967:4, 967:16, 968:4, 968:20, 969:1, 969:18, 970:16, 970:23, 971:25, 972:6, 972:13, 972:16, 972:19, 973:4, 973:8, 973:9, 973:12, 973:18, 973:20, 973:25,

977:23, 977:24, 977:25, 978:1, 978:4, 978:5, 978:21, 979:3, 979:6, 979:10, 979:11, 979:12, 979:18, 979:21, 979:25, 980:18, 981:3, 981:6, 981:8, 981:14, 981:17, 982:1, 982:15, 982:23, 983:1, 983:4, 983:22, 984:4, 984:9, 984:11, 984:14, 984:15, 984:18, 985:8, 985:15, 986:14, 986:25, 987:5, 987:6, 987:11, 987:13, 987:21, 988:3, 988:15, 988:22, 989:5, 989:14, 990:1, 990:4, 990:18, 990:19, 990:20, 993:23, 993:24, 993:25, 995:2, 998:1, 998:21, 999:13, 1000:3, 1000:12, 1001:21, 1002:14, 1002:17, 1007:3, 1007:11, 1033:16, 1037:19, 1038:3, 1041:7, 1041:22, 1060:7, 1060:10, 1060:20, 1060:24, 1061:15, 1062:17, 1062:22, 1063:2, 1071:7, 1073:22, 1074:7, 1074:13, 1074:20, 1075:24, 1076:15, 1076:20, 1076:24, 1077:18, 1078:18, 1078:22, 1079:23, 1080:5, 1080:7, 1080:19, 1081:5, 1081:17, 1083:4, 1083:5, 1083:10, 1083:13, 1084:2, 1084:6, 1084:12, 1084:21, 1087:19, 1087:22, 1092:10, 1092:13, 1092:17, 1092:21, 1094:23, 1094:24, 1094:25, 1095:12, 1099:7, 1099:12, 1101:13, 1102:4, 1103:12, 1109:18, 1110:5, 1112:11,

1163:12, 1173:4, 1178:4, 1178:5, 1178:22, 1178:24, 1178:25, 1185:19, 1185:24, 1188:23, 1190:3

**CERT's** [2] - 877:18, 1101:2

**CERT-0030761** [1] - 918:18

**CERT-related** [1] - 934:10

**certain** [21] - 892:11, 933:4, 1029:4, 1034:8, 1034:15, 1034:19, 1066:24, 1118:8, 1125:2, 1126:24, 1137:8, 1145:4, 1156:24, 1168:13, 1170:23, 1182:9, 1182:15, 1182:16, 1182:19, 1188:4

**certainly** [30] - 914:24, 929:12, 956:16, 956:20, 1026:13, 1084:7, 1090:4, 1096:8, 1129:6, 1144:18, 1146:6, 1146:22, 1147:13, 1156:25, 1158:15, 1163:7, 1165:16, 1173:23, 1174:25, 1176:6, 1177:8, 1177:9, 1177:18, 1178:15, 1178:17, 1179:18, 1181:3, 1188:9, 1190:20

**certification** [29] - 1000:4, 1000:14, 1000:18, 1000:21, 1001:6, 1001:10, 1001:22, 1005:7, 1008:20, 1038:7, 1041:2, 1050:8, 1051:16, 1052:19, 1058:13, 1060:21, 1061:9, 1061:18, 1062:25, 1063:3, 1063:20, 1063:22, 1066:23, 1067:24, 1068:6, 1069:22, 1070:16, 1071:1, 1076:4

**certified** [3] - 1040:13, 1078:23, 1127:17

**Certified** [2] - 1197:9, 1197:10

**certify** [4] - 1000:25, 1091:2, 1135:9,

1197:10

**cetera** [3] - 912:24, 943:23, 1156:3

**CFR** [1] - 1037:1

**chain** [4] - 1025:8, 1029:12, 1029:21, 1029:25

**chains** [1] - 903:23

**challenge** [1] - 1072:5

**chamber** [16] - 980:5, 982:6, 983:9, 985:13, 991:22, 997:18, 1002:25, 1061:3, 1061:11, 1062:24, 1063:4, 1063:10, 1064:14, 1078:20, 1099:17, 1100:13

**chambers** [1] - 997:9

**chance** [9] - 923:23, 1013:17, 1015:12, 1030:7, 1132:24, 1190:19, 1192:4, 1195:14, 1195:19

**change** [31] - 994:7, 994:9, 998:10, 1013:13, 1048:8, 1048:18, 1050:3, 1050:4, 1051:6, 1052:9, 1054:10, 1054:14, 1055:22, 1056:15, 1056:19, 1058:6, 1059:9, 1059:11, 1076:13, 1150:20, 1154:1, 1172:17, 1179:2, 1179:3, 1184:5, 1185:24, 1185:25, 1192:23, 1193:12, 1193:20, 1195:16

**changed** [2] - 1122:23, 1135:11

**changes** [8] - 1118:17, 1153:1, 1191:24, 1192:22, 1192:24, 1193:3, 1194:21, 1195:3

**characterize** [2] - 950:1, 950:3

**charge** [2] - 1013:10, 1031:7

**charged** [2] - 1142:1, 1188:24

**chart** [22] - 885:1, 891:9, 916:7, 945:1, 1046:7, 1046:17, 1047:4, 1047:24, 1048:12, 1049:3, 1049:6, 1049:15, 1051:23, 1052:10,

1052:17, 1054:6, 1055:2, 1056:12, 1056:23, 1057:9, 1057:12, 1146:8
**charts** [16] - 924:15, 936:14, 1050:7, 1053:15, 1055:16, 1056:22, 1057:17, 1058:12, 1059:3, 1059:4, 1062:2, 1062:10, 1098:6, 1182:12
**chase** [2] - 894:1, 1155:21
**cheat** [1] - 902:13
**check** [4] - 922:1, 1152:24, 1189:5, 1189:8
**checked** [1] - 883:6
**checkmark** [1] - 944:22
**Chem** [43] - 890:15, 890:19, 891:2, 905:2, 906:19, 914:10, 914:13, 920:5, 922:5, 922:6, 922:21, 922:24, 923:1, 923:4, 923:6, 923:10, 923:11, 923:13, 979:25, 982:1, 983:4, 985:8, 1001:23, 1060:21, 1060:25, 1061:4, 1062:22, 1078:18, 1078:22, 1098:10, 1098:15, 1113:15, 1113:23, 1113:24, 1114:2, 1126:1, 1126:5, 1126:9, 1126:16, 1139:16, 1145:13, 1146:2
**Chem-Mod** [39] - 890:15, 890:19, 905:2, 906:19, 914:10, 914:13, 920:5, 922:5, 922:6, 922:21, 922:24, 923:1, 923:10, 923:11, 923:13, 979:25, 982:1, 983:4, 985:8, 1001:23, 1060:21, 1060:25, 1061:4, 1062:22, 1078:18, 1078:22, 1098:10, 1098:15, 1113:15, 1113:23, 1113:24, 1114:2, 1126:1, 1126:5, 1126:16, 1139:16, 1145:13,

1146:2
**Chem-Mod's** [4] - 891:2, 923:4, 923:6, 1126:9
**chemical** [7] - 895:25, 896:4, 896:11, 1123:18, 1123:20, 1123:23, 1124:2
**chemicals** [7] - 889:20, 896:18, 909:8, 955:4, 991:24, 993:10, 1061:1
**chemistry** [2] - 1003:17, 1107:4
**chess** [1] - 1093:9
**Chesterfield** [20] - 953:18, 953:20, 987:18, 987:22, 987:25, 988:2, 1060:12, 1077:3, 1102:10, 1105:12, 1111:12, 1114:16, 1116:13, 1116:16, 1116:22, 1117:3, 1117:5, 1117:10, 1118:1, 1118:19
**chief** [6] - 941:22, 1119:6, 1121:18, 1122:1, 1122:6, 1122:9
**choice** [2] - 1020:7, 1025:25
**chose** [2] - 1026:3, 1031:11
**Christopher** [1] - 873:11
**Circuit** [11] - 1018:5, 1019:17, 1022:21, 1157:3, 1157:15, 1157:22, 1158:12, 1161:22, 1162:5, 1162:7, 1163:3
**Circuit's** [3] - 1032:23, 1140:4, 1162:4
**circumstances** [3] - 1034:19, 1034:21, 1034:23
**circumstantial** [1] - 880:4
**citation** [1] - 1017:25
**cite** [1] - 1022:8
**cited** [7] - 1018:3, 1022:18, 1024:3, 1157:15, 1157:16, 1158:6, 1165:18
**citing** [1] - 1162:4
**civil** [1] - 1133:20
**Civil** [5] - 1016:2, 1032:17, 1134:1,

1136:21, 1137:23
**Claim** [4] - 1016:23, 1016:24, 1018:10, 1018:11
**claim** [37] - 877:6, 882:1, 896:2, 915:19, 917:24, 927:6, 944:22, 1016:13, 1016:15, 1016:20, 1016:22, 1018:9, 1020:7, 1023:12, 1032:10, 1063:2, 1065:19, 1066:6, 1066:9, 1067:9, 1067:11, 1068:13, 1070:22, 1097:3, 1136:15, 1151:2, 1152:5, 1153:12, 1155:13, 1158:13, 1159:6, 1162:22, 1167:7, 1183:24, 1184:4, 1186:12, 1186:15
**claim..** [1] - 1150:17
**claimed** [4] - 916:14, 917:16, 918:2, 1134:19
**claiming** [3] - 916:4, 929:14, 1076:8
**Claims** [12] - 1016:6, 1016:7, 1023:15, 1023:16, 1134:4, 1134:5, 1136:18, 1136:19, 1136:25, 1137:20, 1137:21
**claims** [43] - 914:24, 915:1, 925:13, 925:14, 926:1, 926:4, 926:5, 926:6, 927:4, 986:14, 990:18, 1016:9, 1033:16, 1033:20, 1033:24, 1065:8, 1065:13, 1068:1, 1068:2, 1068:11, 1070:9, 1070:19, 1071:5, 1071:6, 1071:7, 1073:16, 1076:6, 1081:21, 1082:19, 1097:2, 1134:7, 1137:2, 1149:17, 1153:11, 1153:19, 1153:24, 1168:4, 1181:23, 1182:2, 1188:4, 1193:24
**clarification** [1] - 1154:14
**clarified** [1] - 1145:25
**clarify** [3] - 898:9,

917:9, 1196:16
**class** [1] - 1123:22
**classic** [1] - 1147:10
**clause** [1] - 1166:5
**clean** [2] - 1015:2, 1116:19
**cleaned** [1] - 1017:2
**clear** [13] - 877:4, 882:14, 1003:23, 1106:12, 1146:1, 1149:10, 1150:11, 1160:17, 1175:14, 1177:4, 1191:14, 1193:22, 1194:14
**clearly** [2] - 1168:9, 1172:4
**clears** [2] - 1064:5, 1064:9
**clerk** [5] - 1037:7, 1131:18, 1131:23, 1147:25, 1161:10
**client** [2] - 1124:8, 1125:2
**clients** [2] - 892:12, 1127:5
**clip** [1] - 1108:17
**clock** [1] - 1093:9
**close** [11] - 875:13, 943:1, 943:7, 943:20, 1015:25, 1118:12, 1129:8, 1129:25, 1130:2, 1133:15, 1159:16
**closed** [2] - 1130:10, 1130:13
**closely** [1] - 1156:12
**closer** [1] - 991:10
**closes** [1] - 1130:20
**closing** [7] - 1130:7, 1130:25, 1133:8, 1147:12, 1170:6, 1196:1, 1196:3
**closings** [6] - 1186:19, 1191:20, 1191:21, 1196:5, 1196:21, 1197:2
**co** [1] - 1151:19
**CO** [1] - 873:7
**co-counsel** [1] - 1151:19
**coal** [595] - 875:16, 875:18, 875:21, 876:2, 876:4, 876:7, 876:19, 877:5, 877:9, 877:10, 877:12, 877:15, 877:17, 877:18, 878:9, 878:12, 878:13, 878:16, 878:20, 878:22,

879:3, 879:7, 879:8, 879:11, 879:15, 879:17, 880:9, 880:12, 880:14, 880:18, 880:19, 880:21, 881:1, 881:3, 881:15, 881:17, 881:23, 882:9, 882:17, 885:5, 889:4, 889:14, 889:16, 889:21, 890:6, 890:7, 890:25, 891:6, 896:17, 896:24, 897:23, 897:24, 900:6, 900:24, 901:2, 901:4, 901:11, 903:17, 905:3, 907:21, 907:22, 908:7, 908:8, 909:8, 915:14, 915:17, 915:18, 915:20, 915:23, 916:15, 916:17, 917:15, 917:18, 917:20, 918:3, 921:21, 922:4, 924:17, 925:5, 926:14, 933:20, 934:13, 938:8, 938:24, 940:5, 947:16, 947:20, 947:24, 948:5, 948:8, 948:10, 952:6, 952:7, 952:11, 952:12, 952:15, 952:16, 952:18, 953:5, 953:8, 953:11, 953:13, 953:14, 954:4, 954:5, 954:16, 954:18, 955:12, 955:21, 956:5, 956:15, 956:22, 956:25, 958:8, 958:9, 958:10, 958:14, 959:15, 959:21, 959:24, 960:1, 960:4, 960:13, 961:16, 961:17, 961:24, 962:7, 962:11, 962:22, 962:24, 963:5, 963:9, 963:11, 963:15, 964:9, 964:17, 965:4, 965:5, 965:13, 965:19, 966:1, 966:3, 966:4, 966:11, 966:15,

966:17, 966:21, 967:7, 967:11, 967:17, 967:23, 968:4, 968:5, 968:10, 969:11, 969:18, 969:23, 970:10, 970:17, 970:24, 971:2, 971:4, 971:6, 971:13, 972:16, 972:17, 972:20, 973:22, 974:2, 974:5, 974:6, 974:9, 974:12, 975:12, 975:21, 976:1, 976:9, 976:13, 976:17, 977:3, 977:7, 977:12, 980:1, 980:2, 980:3, 982:2, 982:3, 982:4, 983:5, 983:6, 983:7, 985:9, 985:10, 985:11, 986:6, 986:17, 986:19, 986:22, 986:25, 987:1, 987:4, 987:7, 987:14, 987:22, 988:4, 988:15, 988:23, 989:6, 989:15, 990:2, 990:20, 990:25, 991:13, 991:14, 991:16, 992:6, 992:9, 992:16, 992:24, 993:1, 993:3, 993:7, 993:9, 993:11, 993:12, 993:15, 993:19, 993:20, 993:21, 993:22, 994:1, 994:9, 995:2, 996:5, 996:17, 996:19, 996:20, 996:23, 996:24, 997:2, 997:3, 997:4, 997:6, 997:9, 997:15, 997:18, 997:23, 998:3, 998:19, 998:20, 998:21, 1000:4, 1000:14, 1000:15, 1001:8, 1002:10, 1002:17, 1002:18, 1003:1, 1003:5, 1003:11, 1003:14, 1003:24, 1004:3, 1004:16, 1004:20, 1004:23, 1006:1, 1006:4, 1006:25, 1008:1, 1008:3, 1008:6, 1008:8, 1008:20,

1011:2, 1017:13, 1017:15, 1018:19, 1018:22, 1019:6, 1020:8, 1020:12, 1020:18, 1020:22, 1022:15, 1022:25, 1023:1, 1023:2, 1023:3, 1023:5, 1023:8, 1024:21, 1025:2, 1028:24, 1029:3, 1029:5, 1029:13, 1029:15, 1029:22, 1030:6, 1030:7, 1030:11, 1030:14, 1030:18, 1031:8, 1034:2, 1034:7, 1034:11, 1034:17, 1034:18, 1034:25, 1036:7, 1036:8, 1037:18, 1037:20, 1038:4, 1038:5, 1039:4, 1039:16, 1039:23, 1040:1, 1040:8, 1040:9, 1040:16, 1040:22, 1041:14, 1041:15, 1041:16, 1042:21, 1043:14, 1043:15, 1043:25, 1044:9, 1044:22, 1044:23, 1046:4, 1046:5, 1046:21, 1046:25, 1047:1, 1048:5, 1048:11, 1048:14, 1048:17, 1048:18, 1049:8, 1049:10, 1049:11, 1049:18, 1050:1, 1050:9, 1050:20, 1051:3, 1051:19, 1051:25, 1052:3, 1052:8, 1052:18, 1052:25, 1053:4, 1053:24, 1054:5, 1054:13, 1054:24, 1055:3, 1055:10, 1055:21, 1056:2, 1056:11, 1056:19, 1057:2, 1057:11, 1057:17, 1057:20, 1057:21, 1057:24, 1058:2, 1058:3, 1058:4, 1058:14, 1059:13, 1060:11, 1060:25, 1061:1, 1061:2, 1061:5, 1061:10, 1062:20, 1063:9, 1064:13, 1068:14, 1068:24, 1069:19, 1071:2, 1073:24, 1074:13,

1074:21, 1074:22, 1076:3, 1076:9, 1076:16, 1076:21, 1076:25, 1077:7, 1077:13, 1077:19, 1078:3, 1078:5, 1078:19, 1078:20, 1078:23, 1078:24, 1079:22, 1080:1, 1080:6, 1080:12, 1080:16, 1080:19, 1081:5, 1081:16, 1082:5, 1082:14, 1082:18, 1083:9, 1083:18, 1083:24, 1084:2, 1084:6, 1084:9, 1084:13, 1084:14, 1084:24, 1085:14, 1085:16, 1086:19, 1086:22, 1086:25, 1087:9, 1087:11, 1087:14, 1087:15, 1087:23, 1088:1, 1088:5, 1089:2, 1089:6, 1089:15, 1089:20, 1089:25, 1090:12, 1090:18, 1091:1, 1091:14, 1091:16, 1091:17, 1091:24, 1091:25, 1092:9, 1097:22, 1098:21, 1099:12, 1099:13, 1099:14, 1099:15, 1100:8, 1100:19, 1101:14, 1101:23, 1102:13, 1105:6, 1105:7, 1108:6, 1108:19, 1108:24, 1112:11, 1113:13, 1113:16, 1113:19, 1113:23, 1114:1, 1114:3, 1114:8, 1115:14, 1115:15, 1115:19, 1117:11, 1117:13, 1117:22, 1118:7, 1120:19, 1120:20, 1120:23, 1121:1, 1124:15, 1124:21, 1125:21, 1126:1, 1126:5, 1126:9, 1126:23, 1127:11, 1127:17, 1127:25, 1128:2, 1128:3, 1128:6, 1128:7, 1128:10, 1128:13, 1128:17, 1134:9, 1134:11, 1134:18, 1134:21, 1134:22, 1135:1, 1135:3, 1135:5,

1135:8, 1135:10, 1135:15, 1135:18, 1135:25, 1136:3, 1136:5, 1138:25, 1139:18, 1139:19, 1140:15, 1140:23, 1141:17, 1141:18, 1142:10, 1142:14, 1142:19, 1142:23, 1156:15, 1156:24, 1160:9, 1161:6, 1163:13, 1163:23, 1165:5, 1165:10, 1169:1, 1169:2, 1169:3, 1169:15, 1169:16, 1169:20, 1170:12, 1170:19, 1170:25, 1171:2, 1171:5, 1171:8, 1171:15, 1172:13, 1175:18, 1176:17, 1185:11

**Coal** [1] - 984:15
**coal-fire** [2] - 1089:2, 1115:14
**coal-fired** [17] - 980:3, 982:4, 983:7, 985:11, 997:9, 1062:20, 1078:20, 1089:6, 1099:15, 1115:19, 1120:23, 1121:1, 1124:15, 1124:21, 1125:21, 1126:23, 1127:11
**coal-type** [1] - 1097:22
**coals** [9] - 1057:20, 1107:3, 1107:4, 1107:8, 1107:15, 1107:20, 1117:6, 1118:3, 1118:20
**COCHRANE** [1] - 873:23
**code** [6] - 949:15, 962:25, 963:2, 1043:4, 1092:9, 1113:20
**cognate** [1] - 1123:22
**Coleto** [38] - 879:1, 884:2, 886:24, 888:12, 888:14, 911:14, 912:2, 912:7, 916:8, 917:16, 934:24, 936:18, 972:13, 972:20, 972:23, 973:25, 974:5, 974:7, 974:13, 974:20, 975:12, 975:21, 975:25,

976:1, 994:22, 1050:10, 1050:20, 1050:25, 1051:2, 1051:4, 1051:5, 1051:10, 1058:19, 1058:21, 1089:6, 1104:6
**collapsing** [1] - 1156:20
**colleagues** [2] - 1181:8, 1191:5
**collected** [2] - 1085:1, 1100:3
**collecting** [1] - 1017:2
**collection** [5] - 958:11, 975:17, 985:21, 1003:2, 1186:8
**collectively** [3] - 984:18, 1150:5, 1178:17
**collects** [1] - 1002:17
**column** [4] - 1009:12, 1046:13, 1047:6, 1047:7
**columns** [1] - 1009:10
**combat** [1] - 1164:17
**combust** [1] - 1025:3
**combusted** [3] - 991:22, 1079:1, 1127:18
**combusting** [3] - 1061:10, 1063:9, 1115:15
**Combustion** [1] - 957:5
**combustion** [26] - 876:4, 878:22, 879:16, 880:9, 889:4, 980:5, 982:6, 983:9, 985:13, 991:22, 995:20, 997:9, 997:18, 1002:4, 1002:25, 1010:2, 1010:3, 1061:3, 1061:11, 1062:24, 1063:4, 1063:10, 1064:14, 1078:20, 1099:16, 1100:13
**comfortable** [2] - 875:11, 1093:6
**comic** [1] - 1065:24
**coming** [5] - 912:16, 925:4, 933:14, 1117:14, 1159:16
**comma** [1] - 1161:14
**commence** [1] - 1174:10
**commencement** [2] -

1172:24, 1174:17
**commentary** [2] - 1102:3, 1106:16
**comments** [1] - 896:6
**commerce** [7] - 1141:20, 1160:12, 1160:19, 1161:16, 1162:2, 1163:15, 1163:24
**commercialization** [3] - 1122:14, 1122:20, 1122:25
**commercialize** [1] - 1123:7
**commercializing** [1] - 1123:4
**commercially** [2] - 963:2, 963:6
**commission** [1] - 885:11
**commissioned** [2] - 885:16, 1143:11
**commit** [1] - 1159:12
**commodities** [1] - 1039:13
**commodity** [7] - 1134:10, 1141:20, 1160:12, 1160:19, 1161:16, 1163:14, 1165:11
**common** [1] - 1178:5
**Companies** [1] - 960:13
**companies** [103] - 927:12, 929:6, 929:11, 929:13, 929:25, 930:24, 934:11, 934:15, 934:25, 935:20, 935:21, 936:5, 936:14, 937:6, 937:7, 937:9, 939:13, 939:17, 940:2, 949:17, 949:23, 952:5, 952:14, 953:5, 953:8, 953:10, 953:14, 955:14, 957:3, 958:24, 959:7, 959:10, 959:11, 959:12, 959:13, 959:15, 960:7, 960:9, 960:11, 960:13, 961:16, 973:15, 977:23, 977:25, 978:2, 978:4, 978:21, 979:3, 979:6, 980:18, 981:3, 982:15,

983:22, 984:12, 984:16, 987:4, 987:7, 990:1, 993:1, 993:20, 993:21, 1000:13, 1007:3, 1038:3, 1041:7, 1060:8, 1062:17, 1073:23, 1074:8, 1074:13, 1076:15, 1076:20, 1077:18, 1079:23, 1080:5, 1080:7, 1080:11, 1080:17, 1081:6, 1081:17, 1083:4, 1083:5, 1083:13, 1084:2, 1084:6, 1084:12, 1084:21, 1087:22, 1092:10, 1092:13, 1092:17, 1092:21, 1095:12, 1097:22, 1102:4, 1109:18, 1109:24, 1110:6, 1112:11, 1186:11, 1186:14
**companies'** [2] - 949:12, 995:2
**company** [42] - 885:8, 893:2, 904:3, 909:5, 909:6, 934:2, 934:13, 934:16, 934:22, 935:13, 935:16, 936:1, 936:11, 937:4, 937:20, 954:3, 957:4, 958:23, 959:25, 960:3, 960:4, 967:2, 967:3, 972:12, 990:20, 1001:21, 1002:15, 1002:17, 1007:1, 1041:22, 1060:10, 1061:15, 1076:24, 1083:10, 1084:22, 1084:25, 1098:10, 1120:8, 1124:3, 1124:6
**Company** [1] - 955:25
**company's** [1] - 1095:22
**comparability** [2] - 1140:1, 1177:15
**comparable** [8] - 1138:10, 1138:19, 1139:15, 1139:22, 1144:10, 1144:15, 1145:21, 1145:23
**compare** [3] - 1073:11, 1075:8, 1131:23
**compared** [1] -

1140:11
**comparing** [2] - 1002:23, 1011:3
**comparison** [1] - 903:14
**compatible** [3] - 1135:15, 1139:10, 1139:11
**competent** [1] - 1021:10
**competing** [1] - 1188:10
**complaint** [147] - 883:6, 926:19, 927:4, 927:5, 927:7, 927:11, 927:13, 928:1, 928:6, 928:17, 929:4, 929:12, 929:15, 929:24, 929:25, 930:3, 933:12, 938:25, 940:6, 961:7, 961:8, 961:9, 961:12, 978:16, 978:18, 978:21, 979:7, 979:13, 979:20, 980:23, 981:16, 982:11, 982:15, 982:18, 982:19, 982:22, 982:25, 983:19, 983:23, 984:6, 984:8, 984:21, 984:22, 985:16, 985:17, 985:21, 985:22, 985:23, 986:9, 986:18, 988:12, 988:13, 988:14, 988:18, 988:19, 989:12, 989:13, 989:14, 989:18, 989:19, 989:22, 989:25, 990:9, 990:18, 1060:2, 1065:9, 1065:10, 1066:3, 1066:11, 1067:19, 1068:16, 1069:5, 1071:11, 1071:24, 1072:7, 1072:25, 1073:2, 1073:9, 1073:12, 1073:17, 1073:19, 1073:23, 1074:5, 1074:7, 1074:10, 1074:11, 1074:20, 1074:24, 1075:2, 1075:5, 1075:14, 1075:16, 1075:19, 1076:15, 1076:19, 1077:5,

1077:10, 1077:17, 1078:9, 1078:14, 1079:5, 1079:7, 1079:12, 1079:15, 1079:18, 1082:3, 1082:4, 1082:11, 1083:2, 1083:3, 1083:20, 1083:21, 1089:13, 1089:14, 1090:3, 1093:20, 1093:23, 1093:24, 1093:25, 1094:1, 1095:15, 1095:18, 1095:20, 1095:22, 1096:2, 1097:17, 1099:4, 1099:24, 1103:20, 1104:18, 1104:24, 1173:6
**complaints** [26] - 892:13, 925:23, 932:15, 1059:19, 1067:14, 1069:18, 1070:4, 1072:12, 1079:21, 1080:10, 1080:16, 1081:4, 1081:12, 1081:15, 1082:17, 1087:20, 1090:3, 1093:17, 1093:19, 1093:21, 1093:22, 1094:9, 1095:14, 1101:20, 1136:7
**complete** [2] - 1008:5, 1028:19
**completed** [9] - 1041:14, 1044:24, 1046:3, 1049:7, 1051:17, 1051:18, 1052:18, 1054:22, 1058:17
**completely** [3] - 898:8, 898:14, 1031:12
**completes** [1] - 1031:19
**compliance** [21] - 895:11, 897:4, 897:19, 901:7, 904:12, 904:19, 908:3, 908:18, 912:12, 951:2, 951:6, 951:10, 1014:12, 1021:5, 1025:20, 1036:25, 1088:13, 1113:19, 1116:25, 1120:18, 1137:13
**complied** [1] - 932:7
**comply** [8] - 899:17, 904:7, 1020:24,

1021:4, 1025:17, 1037:1, 1127:13, 1142:21
**complying** [2] - 901:3, 904:6
**component** [4] - 1028:10, 1161:25, 1165:20
**components** [3] - 1003:6, 1028:18, 1181:18
**comports** [1] - 904:16
**composition** [1] - 1017:1
**compound** [2] - 889:13, 890:6
**comprising** [6] - 980:4, 982:5, 983:8, 985:12, 1079:2, 1099:16
**Computer** [1] - 1162:5
**concede** [1] - 1134:15
**conceded** [1] - 1017:11
**conceivably** [1] - 1189:16
**concept** [5] - 1158:4, 1175:17, 1176:10, 1186:6, 1188:7
**concern** [6] - 903:9, 903:10, 903:11, 1065:5, 1186:2, 1187:15
**concerned** [6] - 897:17, 898:1, 898:4, 903:4, 903:5, 1167:6
**concerns** [1] - 1166:11
**conclude** [7] - 1012:14, 1025:1, 1033:18, 1034:17, 1034:24, 1141:13, 1159:17
**concludes** [1] - 1176:15
**conclusion** [5] - 889:11, 924:19, 1042:12, 1042:14, 1043:6
**conduct** [2] - 1113:19, 1113:22
**conducted** [3] - 1112:11, 1127:1, 1127:4
**confer** [1] - 941:12
**conference** [5] - 1012:9, 1132:14, 1133:11, 1176:4, 1181:1

confidence [1] - 1186:24
confident [1] - 1006:4
confidential [3] - 930:20, 931:24, 1094:22
confirm [6] - 883:8, 942:24, 943:25, 1045:4, 1130:15, 1131:25
confirmed [1] - 883:7
confirming [1] - 912:1
conflict [1] - 1163:4
conform [2] - 1103:20, 1104:11
confrontational [1] - 893:7
confuse [1] - 971:22
confused [6] - 928:1, 931:18, 1007:10, 1063:13, 1063:14, 1065:22
confusing [7] - 1172:8, 1178:9, 1182:14, 1187:9, 1188:18, 1188:20, 1189:13
confusion [3] - 906:11, 1174:12, 1187:1
congratulations [1] - 1113:6
connected [1] - 956:5
connection [5] - 908:24, 1084:8, 1123:4, 1137:10, 1170:25
Connie [1] - 940:11
consider [8] - 925:18, 1121:9, 1123:24, 1124:1, 1146:23, 1153:20, 1170:19, 1181:11
considerably [1] - 1117:18
consideration [1] - 937:13
considered [7] - 1026:18, 1026:19, 1116:3, 1116:17, 1116:18, 1118:16, 1121:12
considering [4] - 885:10, 1105:5, 1147:2, 1182:23
consistent [7] - 875:20, 904:9, 1065:23, 1157:14, 1166:3, 1172:15, 1177:9

constant [1] - 1091:10
constitute [5] - 1022:5, 1022:7, 1024:12, 1024:22, 1169:3
constituted [3] - 1136:4, 1161:5, 1162:14
constitutes [1] - 1125:22
constructed [1] - 958:16
construction [2] - 904:21, 1169:5
constructions [1] - 1159:2
consulting [4] - 1114:14, 1115:6, 1115:7, 1115:11
contact [1] - 929:13
contacts [1] - 922:24
contain [1] - 889:17
contained [9] - 991:17, 991:20, 991:21, 991:23, 1045:5, 1049:5, 1054:21, 1086:20, 1110:17
containing [4] - 1017:1, 1017:2, 1017:3, 1017:4
contains [4] - 955:11, 1044:21, 1085:10, 1086:21
contemplated [1] - 1029:20
contend [1] - 1150:5
contends [1] - 1022:2
content [1] - 1064:21
contentions [1] - 1150:2
contest [1] - 1163:10
contested [7] - 1028:2, 1028:16, 1028:17, 1028:20, 1129:15, 1154:15, 1156:12
context [25] - 885:7, 895:17, 895:22, 897:17, 903:25, 904:1, 952:4, 1023:24, 1023:25, 1025:6, 1025:25, 1026:8, 1115:19, 1115:22, 1120:23, 1121:1, 1156:1, 1156:9, 1156:15, 1169:5, 1175:2, 1175:3, 1194:13, 1194:15

continue [15] - 893:12, 947:2, 1025:17, 1031:8, 1031:11, 1031:13, 1037:12, 1072:16, 1072:21, 1092:14, 1158:1, 1158:9, 1159:21, 1177:20, 1193:20
continued [4] - 874:1, 1017:14, 1020:21, 1031:7
continues [1] - 1153:15
contract [6] - 877:11, 877:14, 959:14, 987:5, 1051:1, 1180:1
contracted [2] - 1000:3, 1000:13
contracting [2] - 934:11, 1123:1
contracts [1] - 975:24
contractural [1] - 880:17
contracturally [1] - 881:6
contrary [2] - 1017:11, 1128:9
contributed [4] - 1134:4, 1134:6, 1136:15, 1136:18
contributory [30] - 1012:6, 1065:11, 1066:8, 1068:13, 1137:6, 1137:11, 1141:12, 1141:14, 1141:22, 1142:8, 1142:13, 1142:18, 1143:15, 1155:2, 1155:3, 1156:21, 1159:25, 1160:24, 1162:3, 1163:4, 1168:13, 1169:15, 1181:24, 1186:12, 1189:3, 1189:6, 1189:9, 1194:1, 1194:11, 1194:17
control [56] - 887:19, 887:22, 888:3, 888:9, 888:15, 890:12, 891:13, 892:18, 893:1, 904:20, 912:22, 914:5, 914:10, 934:4, 951:2, 951:8, 955:9, 955:10, 1010:22, 1037:20, 1037:22, 1038:1, 1060:23, 1061:13, 1063:10, 1063:15,

1111:3, 1115:16, 1116:2, 1116:6, 1116:14, 1116:17, 1116:19, 1116:23, 1116:24, 1117:25, 1118:18, 1120:18, 1120:20, 1121:3, 1121:7, 1121:10, 1121:13, 1124:12, 1124:25, 1125:13, 1125:16, 1125:17, 1125:18, 1125:23, 1127:22, 1128:1, 1128:5, 1139:17, 1139:18
controlled [2] - 939:23, 958:13
controller [1] - 1085:6
controlling [1] - 1126:25
controls [1] - 1085:6
conversation [2] - 895:24, 915:13
conversations [1] - 1180:24
converted [1] - 1061:6
convey [1] - 1191:4
conveyance [1] - 1078:20
conveyer [12] - 889:21, 956:6, 993:4, 995:10, 995:13, 997:6, 997:7, 1025:2, 1028:24, 1029:13, 1029:22, 1034:20
convince [1] - 921:2
convincing [2] - 1149:10, 1150:11
COO [3] - 1119:22, 1120:1, 1120:10
coordinated [1] - 1091:4
coordinating [1] - 1002:16
copied [1] - 895:7
copies [9] - 945:3, 945:8, 985:17, 1013:24, 1014:13, 1015:6, 1015:7, 1015:14, 1192:1
copy [6] - 885:22, 891:5, 948:21, 961:8, 1086:10, 1193:4
copying [2] - 906:18, 908:15
corner [1] - 997:20
CORP [1] - 873:3
Corp [2] - 1018:2,

1022:20
corporate [13] - 924:20, 930:9, 930:21, 931:24, 932:4, 932:18, 933:3, 933:5, 935:12, 939:9, 939:12, 946:20, 946:24
Corporation [7] - 1119:7, 1119:17, 1119:19, 1119:24, 1120:2, 1120:11, 1124:4
correct [380] - 875:23, 876:3, 876:5, 876:20, 877:7, 877:19, 877:25, 878:3, 878:23, 879:1, 879:2, 879:9, 879:17, 880:20, 880:23, 883:24, 885:3, 885:9, 885:16, 885:20, 886:6, 886:12, 887:7, 887:8, 887:15, 887:16, 887:20, 887:24, 887:25, 888:4, 888:6, 888:7, 888:12, 888:13, 888:15, 888:16, 889:13, 894:14, 894:19, 895:5, 895:19, 895:20, 896:12, 897:11, 901:13, 901:22, 901:25, 902:16, 902:17, 904:18, 906:20, 906:21, 906:23, 906:24, 907:13, 907:22, 907:24, 908:3, 908:22, 911:15, 912:9, 913:15, 914:5, 915:15, 916:1, 916:2, 918:5, 919:3, 920:3, 920:25, 921:6, 922:18, 925:3, 926:16, 931:20, 937:2, 937:14, 937:15, 938:20, 939:2, 939:25, 940:25, 941:13, 947:6, 947:7, 947:9, 947:10, 947:14, 948:6, 948:7, 950:23, 950:24, 951:2, 951:15, 951:18, 951:19,

951:21, 951:23, 951:24, 952:2, 954:25, 956:1, 956:8, 957:4, 957:5, 958:16, 958:17, 959:4, 959:5, 959:7, 959:8, 960:18, 960:19, 960:21, 960:24, 960:25, 961:13, 962:1, 962:2, 962:4, 962:5, 962:8, 962:15, 962:21, 964:10, 964:11, 965:24, 966:12, 966:13, 967:4, 967:5, 967:7, 967:8, 967:9, 967:19, 967:21, 967:22, 968:6, 968:7, 968:8, 968:12, 969:19, 969:20, 972:2, 972:3, 972:14, 972:15, 972:17, 972:18, 973:11, 973:17, 973:19, 974:2, 974:3, 975:22, 975:23, 976:9, 976:10, 976:25, 977:2, 977:21, 978:13, 981:4, 981:7, 981:8, 982:16, 982:17, 983:23, 983:24, 985:7, 985:19, 986:23, 986:24, 987:3, 987:15, 987:16, 987:19, 987:20, 988:6, 988:17, 989:17, 989:23, 989:24, 990:3, 991:2, 992:13, 992:14, 992:22, 992:23, 994:6, 997:24, 997:25, 1000:16, 1001:18, 1001:20, 1003:25, 1004:1, 1004:5, 1004:6, 1004:9, 1004:10, 1004:12, 1004:13, 1004:17, 1004:18, 1005:2, 1005:23, 1005:24, 1006:2, 1006:3, 1007:5, 1007:6, 1008:21, 1009:11, 1010:11, 1010:19, 1037:20, 1037:21, 1037:23, 1037:24, 1039:23, 1039:24, 1040:2,

1042:18, 1044:15, 1046:9, 1046:20, 1047:2, 1047:3, 1047:17, 1047:19, 1048:6, 1048:7, 1048:14, 1048:15, 1049:10, 1049:16, 1049:22, 1049:25, 1051:7, 1051:8, 1052:11, 1052:14, 1053:6, 1053:13, 1053:18, 1053:19, 1054:8, 1054:9, 1054:11, 1054:12, 1055:6, 1055:9, 1055:13, 1055:14, 1055:17, 1055:19, 1055:20, 1055:23, 1056:14, 1056:17, 1056:19, 1056:20, 1057:4, 1057:5, 1057:15, 1057:21, 1057:22, 1057:24, 1057:25, 1058:4, 1058:7, 1058:8, 1058:14, 1058:20, 1058:21, 1058:25, 1059:1, 1059:10, 1059:13, 1059:14, 1059:20, 1060:3, 1060:5, 1060:6, 1060:12, 1060:13, 1061:22, 1062:4, 1062:7, 1062:8, 1062:11, 1062:12, 1063:5, 1070:12, 1073:3, 1073:4, 1073:9, 1073:17, 1073:18, 1073:20, 1073:25, 1074:1, 1074:5, 1074:6, 1074:8, 1074:9, 1074:11, 1074:12, 1077:20, 1077:21, 1077:23, 1079:6, 1079:12, 1079:19, 1080:6, 1080:13, 1080:14, 1087:4, 1087:12, 1087:17, 1087:18, 1094:11, 1095:16, 1098:17, 1098:19, 1099:1, 1099:21, 1099:22, 1100:8, 1100:9, 1100:13, 1104:19, 1106:20, 1107:1, 1107:2, 1107:5, 1109:15, 1110:21, 1111:3, 1111:4, 1111:12, 1111:19, 1112:18, 1112:19,

1114:6, 1115:3, 1117:1, 1120:19, 1121:5, 1122:12, 1123:5, 1123:6, 1124:4, 1124:5, 1124:21, 1124:22, 1125:7, 1125:8, 1126:2, 1126:3, 1126:6, 1126:7, 1126:11, 1131:18, 1132:9, 1152:7, 1154:6, 1155:18, 1155:19, 1157:8, 1161:1, 1165:19, 1175:9, 1178:14, 1185:6, 1187:6, 1193:24

**correction** [3] - 1152:17, 1153:4, 1154:7

**corrections** [8] - 1148:16, 1148:21, 1149:3, 1152:22, 1154:21, 1181:13, 1182:24, 1183:6

**corrective** [1] - 1164:24

**correctly** [7] - 889:23, 889:24, 895:12, 908:19, 908:20, 1133:21, 1187:16

**correlate** [1] - 898:21

**correspondence** [1] - 914:4

**corresponding** [2] - 1170:21, 1180:2

**CORTLAN** [1] - 874:3

**Cottbus** [5] - 937:5, 969:19, 969:23, 1052:19, 1103:15

**counsel** [31] - 873:24, 874:9, 875:4, 924:7, 925:25, 928:15, 941:2, 941:9, 943:22, 944:1, 945:19, 1012:21, 1013:15, 1015:8, 1015:13, 1023:19, 1031:23, 1033:10, 1036:14, 1065:2, 1065:17, 1094:10, 1109:24, 1132:13, 1144:23, 1147:1, 1147:6, 1147:25, 1148:12, 1151:19, 1166:13

**count** [3] - 944:6, 944:7, 1171:5

**counted** [1] - 1140:16

**counter** [1] - 1162:11

**counter-cases** [1] - 1162:11

**counts** [1] - 1070:9

**couple** [9] - 971:11, 1008:11, 1012:4, 1055:24, 1078:9, 1088:21, 1133:2, 1147:17, 1181:14

**coupled** [1] - 1025:25

**course** [12] - 901:5, 1013:1, 1033:1, 1035:16, 1113:18, 1129:6, 1129:7, 1146:17, 1164:8, 1176:14, 1180:15, 1193:10

**Court** [33] - 891:18, 932:8, 942:1, 942:21, 945:8, 947:1, 1013:22, 1013:25, 1015:7, 1019:15, 1019:18, 1022:19, 1026:20, 1032:5, 1032:14, 1144:5, 1147:5, 1157:14, 1157:17, 1157:22, 1164:23, 1171:24, 1173:14, 1173:19, 1181:7, 1181:10, 1185:7, 1187:21, 1192:16, 1193:16, 1197:4, 1197:15, 1197:15

**COURT** [260] - 873:1, 875:2, 882:13, 884:16, 893:11, 899:5, 902:5, 902:7, 907:4, 907:6, 910:11, 910:13, 911:18, 911:20, 913:18, 913:20, 923:18, 923:22, 924:23, 928:14, 928:23, 932:9, 932:16, 939:7, 939:14, 940:19, 940:23, 941:1, 941:6, 941:9, 941:14, 941:21, 942:2, 942:16, 942:24, 943:19, 944:9, 944:12, 944:18, 945:4, 945:10, 945:13, 945:18, 945:22, 946:4, 946:7, 946:9, 946:25, 950:8, 964:22, 964:24, 975:4, 975:6, 991:6, 991:9, 994:16,

995:24, 999:18, 1007:13, 1008:25, 1009:2, 1011:11, 1011:21, 1012:19, 1013:21, 1014:2, 1014:6, 1014:15, 1015:3, 1015:9, 1015:13, 1015:18, 1015:21, 1023:17, 1023:19, 1026:21, 1027:8, 1027:25, 1028:15, 1028:21, 1029:10, 1030:2, 1030:5, 1030:10, 1031:5, 1031:21, 1031:23, 1032:2, 1032:8, 1036:20, 1037:2, 1037:4, 1037:7, 1037:10, 1041:25, 1042:2, 1045:12, 1045:14, 1065:2, 1065:4, 1066:1, 1066:19, 1067:10, 1067:22, 1068:9, 1068:20, 1069:2, 1069:7, 1069:11, 1069:24, 1070:7, 1070:17, 1071:5, 1071:10, 1072:2, 1072:19, 1072:21, 1080:25, 1086:13, 1086:15, 1093:1, 1095:6, 1096:9, 1109:2, 1109:5, 1109:8, 1109:21, 1109:25, 1111:13, 1111:16, 1111:23, 1112:3, 1112:7, 1128:23, 1129:2, 1129:4, 1129:12, 1129:17, 1129:22, 1130:3, 1130:13, 1130:21, 1131:10, 1131:17, 1131:23, 1132:7, 1132:11, 1133:9, 1133:17, 1133:19, 1133:24, 1139:6, 1141:7, 1141:23, 1143:24, 1146:25, 1148:10, 1149:1, 1149:8, 1149:12, 1149:14, 1149:18, 1149:22, 1150:2, 1150:7, 1150:10, 1150:16, 1150:20, 1151:1, 1151:6, 1151:11, 1151:16, 1151:21, 1152:3, 1152:9, 1152:13, 1152:18, 1152:21,

1153:3, 1153:8, 1153:17, 1154:1, 1154:9, 1154:15, 1154:18, 1155:6, 1155:16, 1155:20, 1156:22, 1157:23, 1158:8, 1159:9, 1160:22, 1161:9, 1163:6, 1164:2, 1165:13, 1165:17, 1166:6, 1167:10, 1169:21, 1170:1, 1170:9, 1171:3, 1171:12, 1171:22, 1172:20, 1172:22, 1173:23, 1174:7, 1174:13, 1174:16, 1174:20, 1175:6, 1175:14, 1176:9, 1176:25, 1177:12, 1178:12, 1178:18, 1179:12, 1180:7, 1181:6, 1183:3, 1183:8, 1183:10, 1183:14, 1183:18, 1183:21, 1183:25, 1184:8, 1184:11, 1184:13, 1184:19, 1184:21, 1184:25, 1185:3, 1185:22, 1186:4, 1186:16, 1186:18, 1187:4, 1188:1, 1188:17, 1189:19, 1190:4, 1190:8, 1190:14, 1190:16, 1190:23, 1192:12, 1192:21, 1193:6, 1193:11, 1193:18, 1194:10, 1194:18, 1196:5, 1196:20, 1196:25

**court** [16] - 876:23, 878:2, 888:25, 901:20, 928:10, 932:24, 936:22, 937:11, 1031:25, 1032:1, 1037:22, 1131:17, 1139:6, 1148:12, 1191:6, 1196:21

**Court's** [9] - 945:3, 948:24, 1014:12, 1036:25, 1142:7, 1147:9, 1165:3, 1196:1

**courteous** [1] - 991:4

**courtroom** [12] - 875:1, 941:8, 944:11, 1011:20, 1013:6, 1037:8, 1037:9, 1112:2,

1112:6, 1131:9, 1148:15, 1196:14

**Courtroom** [1] - 873:12

**cover** [4] - 1015:23, 1015:24, 1139:17, 1155:4

**covered** [1] - 1087:17

**covers** [2] - 918:13, 974:24

**COVID** [1] - 957:20

**cranking** [1] - 901:11

**create** [1] - 1144:23

**created** [3] - 877:10, 945:1, 1125:17

**creates** [1] - 1035:23

**creating** [1] - 1163:1

**credibility** [1] - 879:23

**credible** [1] - 1140:23

**credit** [39] - 877:7, 897:9, 897:12, 898:5, 907:20, 915:24, 917:4, 963:7, 968:12, 990:24, 992:17, 992:21, 1001:4, 1003:11, 1003:14, 1003:24, 1004:17, 1004:20, 1004:23, 1008:1, 1008:3, 1008:6, 1038:6, 1038:20, 1039:19, 1039:23, 1040:9, 1040:17, 1041:2, 1044:1, 1091:23, 1092:3, 1092:7, 1098:11, 1125:10, 1125:18, 1139:5, 1175:22, 1177:1

**credits** [58] - 875:15, 881:24, 882:2, 896:2, 896:19, 898:11, 899:15, 900:7, 900:11, 901:10, 907:25, 915:14, 915:19, 915:20, 916:4, 916:15, 916:17, 916:23, 917:2, 917:16, 917:20, 917:24, 918:2, 926:15, 933:19, 938:13, 939:1, 939:3, 940:4, 991:19, 992:3, 992:10, 1001:1, 1008:16, 1025:15, 1029:8, 1036:5, 1114:3, 1135:6, 1135:10, 1138:17,

1142:22, 1143:19, 1144:20, 1145:8, 1145:10, 1145:14, 1145:15, 1145:17, 1145:19, 1175:4, 1175:18, 1176:1, 1176:3, 1176:12, 1176:17, 1177:10, 1177:17

**Creek** [38] - 879:1, 884:2, 886:24, 888:12, 888:14, 911:14, 912:2, 912:7, 916:8, 917:16, 934:24, 936:18, 972:13, 972:21, 972:23, 973:25, 974:5, 974:7, 974:13, 974:20, 975:12, 975:21, 975:25, 976:1, 994:22, 1050:10, 1050:20, 1050:25, 1051:2, 1051:4, 1051:5, 1051:10, 1058:19, 1058:21, 1089:6, 1104:6

**cross** [7] - 884:11, 941:12, 1093:1, 1144:23, 1144:24, 1145:25, 1176:23

**CROSS** [1] - 1093:4

**cross-examination** [6] - 941:12, 1093:1, 1144:23, 1144:24, 1145:25, 1176:23

**CROSS-EXAMINATION** [1] - 1093:4

**CSR** [1] - 1197:14

**CUMMINGS** [1] - 874:6

**cumulative** [1] - 1190:6

**current** [8] - 900:17, 1134:16, 1155:22, 1159:1, 1160:24, 1186:2, 1191:23, 1192:16

**CURRY** [2] - 873:19, 873:20

**customer** [1] - 919:15

**customers** [2] - 1091:18, 1101:24

**cut** [7] - 893:25, 920:13, 1075:9, 1081:24, 1096:18, 1152:14, 1155:20

## D

**daily** [5] - 1084:23, 1085:12, 1085:16, 1085:17, 1086:21

**Dakota** [6] - 1001:14, 1001:19, 1046:4, 1112:21, 1123:19, 1123:21

**damages** [52] - 941:23, 943:1, 1022:7, 1024:17, 1025:16, 1026:9, 1026:12, 1026:14, 1028:12, 1034:3, 1035:9, 1035:13, 1035:19, 1035:21, 1072:6, 1105:8, 1136:8, 1137:14, 1137:22, 1138:2, 1138:3, 1140:6, 1141:5, 1141:11, 1141:19, 1142:15, 1144:3, 1144:9, 1146:21, 1153:5, 1153:9, 1153:20, 1166:5, 1170:20, 1171:1, 1171:14, 1172:24, 1173:4, 1173:6, 1173:10, 1174:3, 1174:9, 1174:17, 1176:20, 1177:16, 1178:14, 1185:2, 1185:4, 1189:16, 1191:13, 1191:14, 1194:23

**Daniel** [1] - 894:22

**DANIEL** [1] - 873:22

**darn** [1] - 929:5

**dash** [1] - 1170:1

**dashes** [4] - 1169:1, 1169:21, 1170:10, 1172:12

**databases** [2] - 1110:11, 1111:1

**DataTern** [1] - 1018:2

**date** [38] - 904:14, 921:9, 930:10, 930:22, 933:12, 963:1, 963:3, 965:7, 965:9, 965:10, 974:25, 980:25, 986:8, 986:9, 986:13, 1042:7, 1042:18, 1042:21, 1042:22, 1042:23, 1042:24, 1043:21, 1046:8, 1047:1, 1051:1, 1058:17,

1082:11, 1083:23, 1102:16, 1102:20, 1140:13, 1172:24, 1173:9, 1173:16, 1173:17, 1174:10, 1174:17, 1180:18

**dated** [10] - 886:19, 901:18, 906:18, 911:12, 913:11, 918:21, 982:12, 986:12, 1020:1

**dated..** [1] - 893:19

**dates** [13] - 886:18, 967:20, 976:16, 1053:7, 1058:15, 1173:3, 1173:4, 1173:5, 1173:10, 1173:21, 1174:5, 1174:6

**Daubert** [1] - 1144:4

**day-to-day** [3] - 959:18, 960:14, 960:16

**days** [3] - 1074:18, 1102:12, 1122:3

**dead** [1] - 1006:23

**deal** [10] - 921:3, 927:10, 1011:17, 1075:22, 1133:10, 1179:7, 1185:22, 1187:7, 1187:8, 1191:21

**dealing** [3] - 1039:13, 1122:24, 1123:1

**dealt** [2] - 890:24, 1178:17

**Deanna** [2] - 1197:9, 1197:14

**December** [15] - 954:22, 963:3, 965:8, 986:23, 987:2, 991:1, 1020:2, 1051:17, 1054:23, 1055:4, 1055:11, 1074:17, 1102:12, 1103:11, 1116:1

**decent** [1] - 1168:11

**decide** [2] - 1148:22, 1150:16

**decided** [5] - 934:22, 936:17, 993:13, 1168:6, 1186:13

**deciding** [1] - 1164:3

**decipher** [1] - 1088:18

**decision** [16] - 934:6, 934:9, 934:12, 935:4, 935:13, 935:17, 936:3, 936:25, 938:7,

938:23, 939:19, 1013:18, 1018:6, 1031:8, 1032:3, 1164:9

**decisions** [1] - 1133:1

**deck** [4] - 944:19, 944:20, 954:13, 1014:23

**decks** [2] - 943:14, 945:7

**declined** [1] - 1143:9

**defendant** [55] - 943:2, 973:13, 979:16, 979:19, 981:12, 981:15, 982:21, 982:24, 984:2, 984:7, 998:25, 999:4, 1000:5, 1016:11, 1016:18, 1017:8, 1018:8, 1018:14, 1020:11, 1020:13, 1021:2, 1021:11, 1021:12, 1021:16, 1026:14, 1027:1, 1033:14, 1036:3, 1134:9, 1134:11, 1135:23, 1137:4, 1137:7, 1149:17, 1150:4, 1150:17, 1155:8, 1158:14, 1159:12, 1159:14, 1160:8, 1160:14, 1161:6, 1162:20, 1164:4, 1165:23, 1167:23, 1167:25, 1168:3, 1178:1, 1178:7, 1179:4, 1183:23, 1184:4, 1189:18

**Defendant** [2] - 946:12, 1135:19

**Defendants** [6] - 873:8, 874:9, 1136:9, 1136:18, 1136:24, 1170:2

**defendants** [160] - 915:4, 939:10, 946:21, 947:23, 948:21, 948:25, 959:3, 961:23, 979:3, 979:7, 980:1, 980:18, 981:3, 982:2, 982:16, 983:5, 983:22, 985:8, 985:15, 985:24, 986:15, 986:18, 990:5, 999:13, 1000:2, 1015:23, 1016:2,

1016:6, 1016:8, 1017:20, 1018:24, 1019:10, 1021:7, 1023:12, 1023:15, 1024:7, 1025:2, 1025:11, 1025:12, 1025:19, 1026:3, 1027:13, 1028:22, 1029:4, 1029:12, 1030:24, 1031:7, 1031:11, 1031:16, 1031:17, 1033:13, 1034:1, 1034:20, 1035:4, 1035:8, 1035:17, 1036:8, 1037:19, 1060:8, 1060:21, 1060:25, 1061:8, 1062:22, 1063:2, 1063:8, 1072:10, 1074:8, 1074:20, 1075:24, 1078:19, 1078:22, 1079:24, 1080:2, 1080:19, 1083:10, 1087:19, 1087:22, 1090:10, 1090:11, 1091:17, 1097:4, 1101:2, 1101:13, 1101:14, 1108:1, 1108:17, 1130:13, 1131:19, 1133:25, 1134:3, 1134:6, 1135:2, 1135:21, 1136:1, 1136:6, 1136:9, 1136:14, 1136:21, 1137:1, 1137:12, 1137:15, 1137:20, 1137:23, 1141:13, 1142:12, 1142:14, 1142:19, 1142:25, 1143:4, 1143:6, 1143:9, 1143:17, 1143:19, 1150:5, 1151:23, 1155:12, 1160:20, 1163:10, 1163:12, 1164:7, 1164:11, 1165:19, 1167:5, 1168:7, 1168:11, 1170:15, 1171:8, 1171:16, 1171:22, 1172:4, 1172:5, 1174:22, 1176:19, 1177:21, 1178:11, 1178:21, 1178:22, 1179:1, 1179:4, 1180:13, 1180:15, 1182:7, 1182:8, 1182:9, 1182:10, 1182:13, 1182:15, 1182:16, 1182:18,

1182:19, 1182:20, 1185:11, 1185:12, 1186:9, 1188:15, 1189:2, 1190:5, 1190:17

**defendants'** [36] - 923:23, 943:5, 945:19, 964:20, 1011:25, 1013:9, 1013:15, 1016:14, 1016:20, 1017:10, 1018:15, 1025:8, 1027:2, 1027:16, 1032:9, 1032:25, 1033:12, 1033:17, 1033:19, 1075:20, 1131:20, 1132:4, 1136:11, 1141:21, 1155:1, 1159:4, 1160:4, 1160:6, 1163:10, 1167:1, 1167:15, 1170:13, 1176:15, 1176:21, 1180:11, 1181:17

**Defendants'** [13] - 964:25, 975:3, 975:7, 1007:12, 1009:3, 1037:5, 1042:3, 1045:15, 1045:23, 1046:1, 1086:5, 1086:12, 1086:16

**defense** [11] - 940:22, 1112:7, 1128:21, 1167:7, 1168:7, 1172:3, 1173:24, 1180:13, 1180:16, 1194:12, 1194:16

**defense's** [1] - 1155:23

**defenses** [4] - 1065:8, 1132:4, 1169:13, 1172:16

**deficiencies** [1] - 1111:8

**definitely** [5] - 881:9, 886:14, 948:22, 1040:5, 1082:13

**degree** [2] - 1123:18, 1123:20

**degrees** [1] - 1123:17

**DELAWARE** [1] - 873:2

**delete** [1] - 1173:17

**deleted** [1] - 1155:21

**deliberate** [2] - 1031:13, 1143:14

**deliberately** [3] - 1137:4, 1137:8, 1143:20

**deliberating** [2] - 1130:10, 1131:3

**deliberations** [2] - 1131:5, 1196:4

**deliver** [1] - 1002:20

**delivered** [9] - 993:4, 1141:17, 1141:19, 1142:10, 1163:23, 1166:4, 1169:3, 1170:20, 1170:25

**delivery** [1] - 1118:22

**DELLINGER** [1] - 873:22

**Delta** [2] - 954:1, 989:2

**demanding** [1] - 1012:21

**demonstrate** [7] - 1030:13, 1061:13, 1062:22, 1066:8, 1168:3, 1168:5, 1176:16

**demonstrated** [2] - 1144:21, 1144:22

**demonstrates** [1] - 1027:16

**demonstration** [2] - 1010:2, 1010:3

**demonstrative** [6] - 915:6, 943:11, 943:14, 944:16, 966:8, 1095:21

**Demonstrative** [1] - 945:14

**demonstratives** [4] - 943:15, 943:18, 944:15, 945:12

**den** [1] - 1002:5

**denial** [1] - 1096:5

**denied** [2] - 1179:23, 1180:4

**Dennis** [1] - 911:12

**denote** [1] - 1122:3

**deny** [6] - 1032:25, 1096:16, 1101:6, 1101:15, 1147:6, 1166:7

**denying** [3] - 1036:11, 1065:16, 1149:17

**Deogun** [4] - 989:1, 989:6, 1057:1, 1057:16

**deogun/ Intermountain** [1] - 1057:19

**Department** [1] - 1111:1

**deposition** [13] - 921:1, 921:8, 921:12, 934:8,

935:7, 936:2, 1108:1, 1108:17, 1112:9, 1114:13, 1119:5, 1121:17, 1121:18

**depositions** [4] - 931:17, 931:20, 940:15, 1131:16

**deputy** [2] - 1037:8, 1148:15

**derived** [1] - 1138:22

**describe** [11] - 889:9, 890:5, 891:5, 992:25, 996:6, 996:10, 996:11, 997:10, 1113:9, 1158:16, 1176:4

**described** [8] - 965:12, 965:18, 993:19, 994:2, 994:4, 1004:4, 1010:6, 1040:19

**describing** [3] - 887:14, 890:1, 1181:23

**description** [5] - 966:1, 996:14, 997:10, 1000:21, 1000:22

**designed** [5] - 959:1, 1122:19, 1135:12, 1143:8, 1162:1

**desire** [1] - 942:11

**destined** [2] - 1025:3, 1142:11

**destiny** [1] - 1029:5

**destroy** [1] - 1061:5

**detail** [2] - 921:14, 926:9

**details** [1] - 1038:10

**determinations** [2] - 1132:19, 1132:21

**determine** [3] - 880:5, 1009:21, 1117:25

**determined** [2] - 993:14, 1135:9

**developed** [1] - 1136:5

**development** [1] - 958:23

**device** [2] - 1003:2, 1010:22

**DEVLIN** [1] - 873:16

**devolving** [1] - 1156:18

**DI** [4] - 978:18, 980:11, 983:15

**Diagnostics** [1] - 1022:9

**diagram** [1] - 997:20

**Diaz** [10] - 887:9, 902:13, 1096:18, 1097:13, 1100:25, 1101:9, 1103:1, 1103:9, 1104:3, 1104:14
**died** [1] - 1189:12
**difference** [6] - 926:22, 959:10, 997:23, 1031:3, 1151:14
**differences** [2] - 998:6, 1132:22
**different** [32] - 894:10, 894:12, 898:23, 904:14, 927:11, 936:15, 939:6, 998:4, 1014:3, 1015:1, 1022:9, 1044:22, 1044:23, 1047:12, 1057:16, 1059:22, 1061:7, 1090:8, 1098:22, 1106:7, 1107:3, 1107:9, 1107:10, 1140:1, 1156:9, 1158:16, 1168:14, 1169:19, 1170:22, 1171:20, 1181:18, 1189:18
**differently** [2] - 878:15, 1030:25
**difficult** [2] - 898:21, 1166:11
**digital** [1] - 994:19
**dilatory** [2] - 932:11, 932:14
**dilemma** [1] - 1190:21
**DIRECT** [2] - 875:9, 946:14
**direct** [15] - 880:3, 907:11, 919:22, 991:7, 1029:17, 1037:13, 1097:25, 1103:4, 1105:20, 1144:21, 1150:23, 1151:23, 1168:11, 1176:1
**directed** [6] - 956:23, 1085:18, 1110:1, 1145:18, 1145:19, 1146:2
**directly** [9] - 1016:13, 1016:20, 1027:2, 1027:3, 1028:24, 1033:16, 1151:2, 1152:5, 1152:6
**director** [2] - 907:16, 1122:13
**dirt** [1] - 1118:23

**disagree** [11] - 876:10, 891:11, 898:14, 929:6, 1028:16, 1028:20, 1096:3, 1157:11, 1160:22, 1162:12, 1169:6
**disagreeing** [1] - 882:16
**disappeared** [1] - 1181:1
**disapproval** [1] - 1140:5
**disbelief** [1] - 1170:4
**disclose** [1] - 925:19
**disconnect** [1] - 922:11
**discovery** [7] - 892:1, 918:14, 930:4, 932:8, 1094:19, 1102:14, 1105:11
**discuss** [3] - 1040:10, 1177:19, 1185:2
**discussed** [25] - 916:1, 950:11, 952:3, 1021:21, 1021:24, 1022:9, 1022:23, 1059:19, 1073:15, 1075:6, 1088:8, 1104:16, 1135:24, 1137:10, 1138:19, 1140:6, 1140:18, 1140:25, 1166:23, 1172:7, 1173:10, 1177:15, 1193:12, 1194:21, 1195:4
**discusses** [1] - 1018:6
**discussing** [2] - 890:24, 1088:15
**discussion** [14] - 875:20, 929:18, 944:1, 975:25, 1025:21, 1026:7, 1065:3, 1072:10, 1072:20, 1075:13, 1129:3, 1130:12, 1179:10, 1181:3
**discussions** [2] - 976:5, 976:8
**dismiss** [2] - 1023:24, 1130:19
**dismissed** [2] - 1105:14, 1105:18
**disparaging** [1] - 928:10
**disproportionally** [1] - 1140:11
**dispute** [9] - 886:5, 886:11, 886:21, 890:11, 891:1,

891:15, 1035:24, 1173:11, 1173:13
**disputed** [7] - 1132:8, 1141:15, 1182:6, 1186:4, 1186:6, 1188:3, 1188:9
**disputes** [1] - 1181:20
**disputing** [1] - 892:24
**disqualified** [1] - 1006:21
**disqualifies** [1] - 1006:22
**disqualify** [3] - 1006:11, 1063:6, 1092:9
**disregarding** [1] - 1061:11
**disrespectful** [1] - 947:5
**distinction** [2] - 1155:25, 1157:3
**distinctive** [1] - 1156:5
**DISTRICT** [2] - 873:1, 873:2
**divided** [3] - 959:3, 1189:17, 1189:22
**docs** [1] - 1188:8
**document** [46] - 885:8, 908:24, 964:2, 964:3, 964:4, 964:16, 965:7, 965:12, 974:18, 974:21, 974:25, 978:25, 979:22, 980:15, 980:22, 981:10, 981:18, 981:20, 982:10, 983:2, 983:18, 983:25, 986:10, 996:1, 1007:20, 1014:25, 1041:12, 1041:20, 1044:18, 1044:20, 1044:21, 1045:2, 1045:17, 1045:23, 1053:21, 1054:17, 1054:19, 1060:2, 1060:14, 1096:14, 1096:17, 1096:23, 1097:15, 1101:25, 1146:18
**Document** [1] - 1086:9
**documentary** [2] - 918:7, 1035:8
**documents** [9] - 950:10, 964:19, 975:10, 975:15, 975:16, 975:17, 985:18, 1005:9,

1100:4
**Dolet** [5] - 971:16, 971:19, 971:25, 972:7, 972:8
**dollars** [1] - 915:20
**Dominion** [10] - 953:4, 953:9, 953:11, 953:14, 1114:15, 1114:23, 1114:24, 1115:4, 1115:8, 1115:11
**done** [38] - 882:4, 893:4, 900:25, 924:5, 931:2, 992:19, 1000:22, 1001:1, 1001:9, 1002:12, 1006:17, 1007:2, 1008:19, 1038:7, 1042:8, 1043:21, 1044:13, 1050:17, 1051:19, 1061:20, 1066:23, 1072:17, 1085:18, 1091:7, 1092:1, 1092:4, 1095:22, 1116:23, 1117:24, 1129:7, 1130:6, 1142:3, 1144:10, 1176:22, 1180:19, 1180:21, 1181:4, 1196:21
**door** [4] - 956:7, 1105:21, 1105:22, 1106:11
**DORSNEY** [11] - 874:4, 946:6, 1013:19, 1013:22, 1014:4, 1014:8, 1014:22, 1015:5, 1015:17, 1036:18, 1036:21
**double** [3] - 1144:23, 1152:24, 1186:8
**doubt** [2] - 1106:15, 1147:11
**down** [23] - 901:3, 901:8, 901:10, 920:13, 934:10, 938:23, 941:2, 982:14, 1077:9, 1088:15, 1102:13, 1103:13, 1105:11, 1111:24, 1139:6, 1139:12, 1152:14, 1154:24, 1156:14, 1178:8, 1186:3, 1188:25, 1189:18
**downstream** [14] - 980:5, 982:6, 983:9, 985:12, 1002:25,

1062:24, 1063:4, 1064:18, 1064:20, 1064:24, 1068:3, 1069:3, 1099:16, 1100:13
**Dr** [1] - 940:11
**draft** [2] - 906:18, 1012:5
**dragging** [1] - 1065:20
**drastically** [1] - 1140:17
**draw** [9] - 1047:21, 1048:22, 1050:11, 1051:12, 1051:20, 1052:22, 1053:25, 1056:5, 1057:6
**drawn** [2] - 976:12, 1048:25
**drill** [1] - 1088:15
**drive** [1] - 998:8
**driven** [1] - 1176:3
**dropped** [8] - 929:25, 990:18, 1065:8, 1065:19, 1067:9, 1067:11, 1070:19, 1071:5
**DTE** [14] - 979:25, 982:1, 983:4, 985:8, 1060:20, 1060:24, 1062:21, 1078:18, 1078:22, 1097:21, 1098:6, 1098:12, 1098:13, 1101:5
**DTX** [4] - 963:21, 963:24, 1014:9, 1036:23
**Duke** [3] - 970:6, 972:25, 977:4
**dumps** [1] - 995:13
**duplicate** [1] - 1150:25
**duplicative** [1] - 933:15
**during** [36] - 915:15, 957:20, 958:5, 973:5, 995:9, 1013:22, 1025:16, 1034:3, 1039:15, 1050:3, 1052:4, 1052:9, 1054:14, 1055:22, 1056:19, 1057:12, 1061:23, 1062:24, 1066:18, 1069:16, 1070:22, 1070:25, 1076:25, 1089:16, 1108:22, 1116:7, 1117:10, 1117:13, 1137:14, 1141:19, 1166:4, 1166:8, 1170:20,

1171:1, 1173:2, 1183:4
**duties** [1] - 960:10
**DX** [1] - 1015:6
**DYESS** [129] - 874:6, 882:11, 899:1, 902:6, 907:5, 910:12, 911:19, 913:19, 923:19, 924:18, 928:9, 928:21, 932:6, 932:13, 939:5, 939:10, 940:21, 940:25, 941:10, 941:25, 942:13, 945:20, 946:2, 946:8, 946:15, 947:3, 950:7, 950:9, 950:12, 950:14, 951:12, 951:14, 952:20, 952:22, 952:24, 953:2, 954:12, 954:14, 964:20, 965:2, 966:7, 966:9, 966:25, 967:1, 969:15, 969:16, 970:14, 970:15, 972:10, 972:11, 975:2, 975:9, 978:17, 978:19, 980:10, 980:12, 983:15, 983:17, 991:3, 991:8, 991:11, 991:12, 994:12, 994:17, 995:17, 995:18, 996:3, 999:16, 999:20, 1007:7, 1007:9, 1007:15, 1007:17, 1008:23, 1009:5, 1009:7, 1009:9, 1010:13, 1010:16, 1011:9, 1037:14, 1041:17, 1041:18, 1041:23, 1042:5, 1045:10, 1045:17, 1045:18, 1060:15, 1060:17, 1066:7, 1067:7, 1067:16, 1068:5, 1068:12, 1068:22, 1069:4, 1069:9, 1069:16, 1070:5, 1070:12, 1070:21, 1071:9, 1072:17, 1072:23, 1081:2, 1086:11, 1086:18, 1092:25, 1095:4, 1096:6, 1109:3, 1109:7, 1109:12,

1110:3, 1111:18, 1111:21, 1112:8, 1114:12, 1119:4, 1121:16, 1172:18, 1172:21, 1174:11, 1186:10, 1190:20, 1192:11, 1193:12, 1196:23
**Dyess** [12] - 941:9, 941:23, 945:25, 946:7, 995:24, 1007:13, 1011:11, 1066:1, 1072:21, 1110:1, 1193:11, 1196:22
**Dyess'** [1] - 1190:25
**Dynamics** [1] - 1140:7

## E

**e-mail** [25] - 893:19, 895:22, 896:13, 901:21, 902:4, 902:11, 902:16, 903:23, 905:25, 906:17, 906:25, 907:23, 908:14, 911:3, 911:11, 912:1, 913:11, 914:17, 948:17, 948:19, 949:6, 950:22, 951:15, 951:18, 1035:7
**e-mailed** [1] - 1085:11
**e-mails** [20] - 883:12, 883:13, 892:4, 903:25, 909:14, 911:12, 948:1, 948:2, 948:9, 948:12, 948:14, 949:8, 950:1, 950:3, 952:9, 952:18, 952:23, 1021:23, 1100:4, 1105:2
**e.g** [1] - 1061:7
**early** [9] - 927:10, 961:6, 1005:18, 1088:1, 1130:24, 1164:24, 1191:18, 1192:6, 1193:12
**easier** [2] - 1192:16, 1195:15
**eastern** [2] - 1117:4, 1118:10
**eating** [1] - 1012:24
**economic** [1] - 879:4
**economically** [2] - 1138:10, 1139:10
**edit** [1] - 1192:13
**edits** [1] - 1181:17

**EERC** [94] - 1000:3, 1000:13, 1001:10, 1001:11, 1001:21, 1002:8, 1002:18, 1002:20, 1004:7, 1004:19, 1004:22, 1005:12, 1005:17, 1005:22, 1006:5, 1006:8, 1006:22, 1007:4, 1038:7, 1039:21, 1040:3, 1040:7, 1041:6, 1041:8, 1041:13, 1043:3, 1043:20, 1043:24, 1044:4, 1044:5, 1044:9, 1044:10, 1044:13, 1044:14, 1044:24, 1046:11, 1047:9, 1047:25, 1051:16, 1052:25, 1053:22, 1054:1, 1054:23, 1055:3, 1055:13, 1056:8, 1056:24, 1057:8, 1058:1, 1058:13, 1059:6, 1059:12, 1063:17, 1066:14, 1066:23, 1067:5, 1067:24, 1069:6, 1069:15, 1090:24, 1112:10, 1112:25, 1113:7, 1113:9, 1113:18, 1121:20, 1121:25, 1122:7, 1122:15, 1122:17, 1122:18, 1122:19, 1123:3, 1124:8, 1124:10, 1124:14, 1124:15, 1124:19, 1124:24, 1125:2, 1125:4, 1125:20, 1125:22, 1125:25, 1126:4, 1126:8, 1126:13, 1127:2, 1127:4, 1127:9, 1127:10, 1127:17, 1135:9
**EERCF's** [1] - 1126:18
**effect** [9] - 897:14, 897:15, 897:16, 904:11, 904:17, 920:21, 970:21, 1122:3, 1126:22
**effective** [2] - 920:12, 975:1
**effectively** [1] - 1029:12
**efficient** [1] - 1013:12
**efficiently** [1] - 1012:10

**effort** [3] - 923:14, 923:17, 924:2
**eight** [12] - 884:1, 888:18, 948:2, 962:14, 962:16, 962:19, 1056:1, 1058:22, 1100:11, 1106:23, 1108:14, 1183:12
**eighth** [1] - 1055:24
**either** [12] - 905:13, 1025:25, 1050:3, 1054:15, 1064:13, 1090:14, 1096:2, 1098:22, 1153:19, 1153:22, 1154:25, 1169:24
**elected** [1] - 1116:19
**electrical** [4] - 880:22, 881:24, 958:11, 965:22
**electricity** [4] - 878:14, 879:7, 908:2, 1115:20
**Electronic** [1] - 1019:16
**electrostatic** [3] - 1063:12, 1064:16, 1064:20
**Element** [11] - 1141:16, 1142:17, 1160:7, 1160:11, 1160:14, 1161:4, 1161:15, 1162:13, 1165:19, 1165:22, 1166:3
**element** [24] - 1016:22, 1027:23, 1027:24, 1028:1, 1028:3, 1028:8, 1031:14, 1142:9, 1142:17, 1155:17, 1156:6, 1156:19, 1157:20, 1158:13, 1160:11, 1160:17, 1162:17, 1162:23, 1165:19, 1168:18, 1169:14
**elemental** [1] - 890:6
**elements** [13] - 1028:2, 1067:25, 1068:2, 1141:15, 1157:4, 1160:5, 1160:24, 1162:7, 1163:11, 1165:24, 1168:18, 1171:5, 1182:4
**Elmo** [1] - 1183:2
**em** [5] - 1169:1, 1169:21, 1170:1,

1170:10, 1172:12
**emission** [13] - 898:20, 912:2, 1003:3, 1005:8, 1009:24, 1010:5, 1039:1, 1062:23, 1107:14, 1116:24, 1118:2, 1121:10, 1121:13
**Emission** [1] - 957:5
**emissions** [17] - 887:2, 893:1, 898:13, 904:6, 914:7, 1002:25, 1009:22, 1010:25, 1064:22, 1064:24, 1124:21, 1125:14, 1126:22, 1127:1, 1127:6, 1127:8, 1127:12
**EMISSIONS** [1] - 873:3
**Emissions** [2] - 1010:21, 1124:4
**emitted** [3] - 1061:3, 1061:10, 1064:14
**emitting** [1] - 902:25
**emphasis** [1] - 883:16
**employ** [2] - 1020:14, 1023:7
**employed** [8] - 1063:11, 1063:16, 1064:1, 1112:18, 1114:20, 1114:24, 1119:14, 1119:23
**employees** [10] - 934:5, 934:17, 955:13, 955:14, 955:15, 956:2, 956:24, 956:25, 998:1, 998:10
**employees'** [1] - 955:10
**employer** [3] - 1112:20, 1114:22, 1119:16
**encourage** [9] - 1017:21, 1019:2, 1019:5, 1019:7, 1022:3, 1024:7, 1025:12, 1157:6, 1181:8
**encouraged** [3] - 1022:25, 1023:5, 1155:12
**encouragement** [13] - 1018:7, 1025:7, 1156:1, 1156:3, 1156:5, 1156:8, 1156:19, 1157:9,

1157:21, 1158:2, 1158:4, 1158:13, 1158:18

**encouraging** [1] - 1025:19

**end** [23] - 882:20, 918:17, 919:20, 962:23, 968:11, 986:16, 986:22, 990:24, 1011:14, 1040:11, 1040:24, 1042:13, 1053:9, 1053:10, 1054:3, 1076:2, 1116:1, 1120:16, 1120:17, 1121:8, 1130:23, 1132:17, 1164:3

**ended** [6] - 1072:20, 1114:11, 1119:3, 1121:15, 1128:20, 1130:12

**ending** [2] - 1153:14, 1174:8

**ends** [2] - 919:17, 919:18

**Energy** [25] - 933:7, 934:1, 935:19, 967:17, 970:6, 970:17, 971:14, 971:16, 972:2, 972:6, 1001:15, 1001:17, 1051:19, 1095:10, 1104:10, 1106:18, 1111:1, 1112:21, 1114:15, 1114:23, 1114:25, 1115:5, 1115:8, 1115:12, 1124:3

**ENERGY** [1] - 873:3

**Energy's** [2] - 972:25, 977:4

**engage** [3] - 885:13, 885:16, 885:18

**engaged** [2] - 885:17, 914:3

**engaging** [2] - 1135:23, 1137:12

**engineer** [14] - 1112:10, 1112:24, 1112:25, 1113:2, 1113:3, 1113:4, 1114:14, 1115:6, 1115:7, 1115:11, 1123:23, 1123:24, 1124:1, 1124:2

**engineering** [4] - 885:12, 959:2, 1123:19, 1123:20

**Engineering** [1] - 1001:13

**enhancement** [1] - 1122:22

**enjoy** [1] - 1195:14

**entered** [7] - 875:1, 944:11, 1032:14, 1037:9, 1112:6, 1140:10, 1140:12

**entering** [1] - 993:8

**enterprises** [1] - 1123:15

**enters** [3] - 889:22, 993:7, 993:10

**entire** [11] - 926:11, 1051:9, 1056:8, 1066:12, 1069:16, 1076:12, 1087:1, 1091:10, 1115:15, 1152:4

**entirety** [4] - 1152:12, 1172:3, 1174:24, 1183:9

**entities** [15] - 883:5, 915:19, 927:24, 929:16, 932:2, 932:18, 938:7, 938:23, 985:15, 1123:11, 1171:16, 1173:8, 1178:16, 1178:23, 1178:24

**entitle** [1] - 1145:8

**entitled** [2] - 1138:1, 1141:4

**entitles** [1] - 1139:5

**entity** [8] - 888:6, 933:23, 934:11, 935:3, 1122:16, 1127:10, 1173:5, 1185:16

**entry** [2] - 1032:23, 1060:3

**Environmental** [4] - 1001:13, 1001:15, 1001:17, 1112:22

**environmental** [2] - 1034:15, 1124:13

**EPA** [10] - 897:13, 897:19, 899:24, 900:8, 900:17, 900:19, 900:22, 908:3, 1126:21, 1127:8

**equally** [1] - 1143:5

**equipment** [38] - 887:3, 904:22, 912:22, 914:9, 914:16, 955:11, 955:24, 958:12, 958:13, 965:22, 966:5, 976:18, 976:21, 976:23,

995:6, 998:22, 999:7, 999:11, 999:14, 1024:10, 1024:12, 1024:15, 1034:9, 1039:12, 1060:23, 1061:13, 1063:11, 1063:16, 1064:8, 1064:11, 1107:14, 1111:3, 1115:16, 1118:25, 1142:23

**Erickson** [2] - 1121:18, 1121:23

**error** [1] - 1167:9

**errors** [2] - 1063:18, 1067:18

**escort** [1] - 998:9

**ESP** [10] - 1017:7, 1017:9, 1017:11, 1017:12, 1017:15, 1017:21, 1020:15, 1023:7, 1024:7, 1064:24

**especially** [21] - 1005:18, 1068:18, 1068:22, 1068:25, 1071:3, 1090:13, 1091:18, 1118:22, 1135:1, 1135:3, 1135:5, 1135:18, 1160:9, 1161:6, 1161:13, 1162:1, 1163:13, 1164:15, 1176:14

**ESPs** [1] - 1118:25

**ESQ** [18] - 873:16, 873:17, 873:19, 873:20, 873:20, 873:21, 873:21, 873:22, 873:22, 873:23, 873:23, 874:3, 874:4, 874:6, 874:7, 874:7, 874:8, 874:8

**essentially** [5] - 921:2, 1034:6, 1163:21, 1180:12, 1186:5

**establish** [7] - 1016:11, 1063:8, 1064:21, 1134:8, 1137:4, 1137:7, 1140:6

**established** [2] - 1010:4, 1176:2

**establishes** [2] - 1135:22, 1137:11

**estimate** [1] - 997:19

**et** [5] - 873:3, 873:7, 912:24, 943:23, 1156:3

**evaluation** [1] - 1116:22

**eve** [1] - 1140:10

**evening** [1] - 1131:7

**evenly** [1] - 1189:22

**event** [2] - 1024:25, 1145:2

**eventually** [1] - 937:17

**evidence** [126] - 880:4, 917:13, 918:7, 918:12, 943:20, 1016:1, 1016:4, 1016:5, 1016:17, 1016:18, 1017:8, 1018:14, 1018:21, 1018:23, 1019:1, 1019:5, 1019:7, 1019:9, 1019:11, 1019:13, 1019:21, 1020:13, 1021:10, 1021:16, 1021:17, 1021:19, 1021:24, 1022:3, 1022:4, 1022:14, 1022:24, 1023:4, 1023:10, 1023:11, 1023:14, 1024:13, 1024:25, 1025:10, 1025:12, 1025:13, 1025:18, 1026:2, 1026:12, 1026:18, 1026:19, 1026:25, 1027:12, 1027:15, 1027:19, 1029:15, 1029:23, 1031:17, 1032:19, 1032:22, 1033:5, 1033:6, 1033:8, 1033:14, 1033:18, 1034:1, 1034:4, 1034:12, 1034:23, 1035:3, 1035:7, 1035:8, 1035:10, 1035:13, 1035:15, 1035:16, 1036:2, 1066:9, 1066:16, 1069:17, 1129:13, 1130:16, 1132:5, 1133:15, 1134:2, 1134:3, 1134:18, 1134:25, 1135:2, 1135:4, 1135:20, 1135:22, 1136:5, 1136:13, 1136:14, 1136:17, 1136:23, 1136:24, 1137:7, 1137:11, 1137:19, 1137:25, 1138:1, 1138:11, 1139:4, 1139:13, 1140:14, 1140:21, 1141:3,

1141:13, 1142:10, 1142:19, 1142:25, 1143:6, 1143:14, 1144:2, 1144:9, 1146:21, 1147:15, 1149:11, 1150:12, 1163:9, 1163:19, 1164:6, 1172:5, 1172:10, 1173:7, 1174:3, 1178:9, 1182:11

**evidenced** [1] - 1134:23

**evidences** [1] - 1020:11

**evidentiary** [2] - 1032:16, 1134:17

**exact** [2] - 928:5, 1051:1

**exactly** [10] - 889:9, 890:4, 890:21, 915:3, 935:11, 948:22, 955:2, 1024:23, 1039:3, 1083:7

**examination** [10] - 893:12, 940:23, 941:12, 1037:13, 1093:1, 1101:19, 1144:23, 1144:24, 1145:25, 1176:23

**EXAMINATION** [4] - 875:9, 946:14, 1093:4, 1109:11

**examined** [1] - 1014:25

**example** [18] - 875:21, 910:25, 958:10, 1018:1, 1021:21, 1025:15, 1026:2, 1030:16, 1033:14, 1035:11, 1043:14, 1063:8, 1063:11, 1142:14, 1168:3, 1185:16, 1187:22, 1188:22

**examples** [2] - 1170:10, 1170:11

**exceeds** [1] - 1143:16

**except** [3] - 1049:6, 1058:19, 1079:24

**exception** [2] - 898:3, 916:7

**excise** [1] - 1153:21

**excised** [1] - 1152:15

**excited** [1] - 1056:21

**exclude** [3] - 1138:14, 1177:20

**excluded** [1] - 1150:7

**excuse** [2] - 1100:10,

1102:24
**excused** [2] - 1133:7, 1133:13
**exhaust** [4] - 882:22, 882:23, 917:23, 1031:18
**exhibit** [6] - 887:12, 893:18, 943:11, 943:14, 944:16, 1007:14
**Exhibit** [43] - 884:14, 887:11, 893:17, 901:15, 902:8, 905:19, 905:21, 906:7, 906:16, 907:3, 907:8, 909:23, 910:10, 910:14, 910:17, 911:17, 911:21, 913:17, 913:21, 950:13, 951:13, 952:21, 964:21, 964:25, 965:15, 965:16, 975:3, 975:7, 1007:12, 1008:24, 1009:3, 1042:3, 1045:11, 1045:15, 1045:23, 1046:1, 1048:21, 1050:5, 1052:17, 1086:6, 1086:12, 1086:16, 1175:10
**exhibits** [9] - 943:21, 1013:20, 1014:9, 1014:18, 1014:19, 1014:22, 1036:18, 1037:4, 1143:2
**Exhibits** [3] - 945:14, 1036:23, 1037:5
**exist** [2] - 961:21, 1020:5
**existed** [2] - 1024:18, 1156:11
**existing** [1] - 1138:6
**exists** [1] - 1110:5
**exit** [1] - 977:11
**exited** [4] - 941:8, 1011:20, 1112:2, 1131:9
**exits** [1] - 993:15
**expanded** [2] - 1118:21, 1122:24
**expect** [6] - 877:9, 878:12, 881:5, 931:8, 940:12, 1131:4
**expectation** [31] - 875:17, 876:11, 876:19, 876:22, 876:25, 877:5,

877:18, 877:20, 877:22, 877:24, 878:1, 878:6, 878:9, 878:14, 878:24, 879:10, 879:14, 880:24, 881:1, 881:3, 881:15, 881:20, 881:25, 882:4, 882:8, 915:24, 941:24, 992:12, 992:15, 1013:14, 1142:20
**expectations** [1] - 992:6
**expected** [4] - 879:6, 880:8, 898:19, 941:21
**expecting** [5] - 878:16, 878:21, 881:9, 991:4, 1013:11
**expeditious** [1] - 885:25
**expenditures** [1] - 1119:1
**experience** [2] - 1196:13, 1196:14
**expert** [9] - 931:10, 931:11, 940:9, 995:22, 1017:5, 1107:16, 1138:11, 1173:4, 1178:3
**expired** [2] - 926:17, 990:24
**explain** [8] - 925:15, 926:1, 949:16, 998:6, 1168:16, 1172:9
**explained** [5] - 904:10, 1088:12, 1103:13, 1135:7, 1146:10
**explaining** [1] - 1186:20
**explicitly** [1] - 1166:24
**exploratory** [1] - 1122:13
**express** [5] - 1179:17, 1179:20, 1179:22, 1180:10, 1180:11
**expressed** [1] - 1166:7
**extend** [1] - 1161:8
**extensively** [1] - 1146:11
**extent** [18] - 890:8, 892:15, 929:10, 995:25, 1021:15, 1022:2, 1026:4, 1026:17, 1035:7,

1071:24, 1099:6, 1120:15, 1133:22, 1143:3, 1145:3, 1145:24, 1147:8, 1156:23
**external** [1] - 1175:2
**extra** [2] - 1151:9, 1151:13
**extraneous** [4] - 893:9, 1173:20, 1173:24, 1176:14

## F

**F-I-N-L-I-N-S-O-N** [1] - 1119:12
**F.3d** [4] - 1018:2, 1019:17, 1022:19, 1022:21
**facilitated** [1] - 1019:20
**facilities** [49] - 880:19, 889:13, 890:25, 895:1, 895:3, 895:8, 909:2, 934:4, 955:19, 955:21, 958:8, 959:1, 959:14, 960:16, 965:4, 965:5, 966:4, 971:4, 971:6, 973:16, 980:1, 980:6, 982:2, 982:7, 983:5, 985:9, 987:14, 994:9, 995:20, 998:21, 998:22, 1000:14, 1008:16, 1038:5, 1039:5, 1044:22, 1044:23, 1044:24, 1045:8, 1058:14, 1082:10, 1084:14, 1086:23, 1087:9, 1099:12, 1101:14, 1116:23, 1121:2, 1126:11
**facility** [94] - 876:19, 876:20, 877:25, 880:12, 895:6, 909:8, 934:7, 954:18, 954:20, 954:21, 955:15, 955:18, 956:2, 958:9, 958:10, 961:24, 962:22, 963:2, 963:5, 963:7, 963:8, 963:11, 965:13, 965:19, 965:22, 966:1, 966:3, 966:11, 966:15, 968:4,

968:10, 968:16, 968:21, 969:1, 969:9, 969:11, 969:17, 970:2, 970:10, 971:2, 971:5, 971:13, 971:17, 971:20, 972:1, 972:7, 972:23, 973:4, 973:7, 973:9, 976:17, 977:7, 987:1, 987:18, 987:22, 988:4, 988:23, 989:6, 989:9, 992:1, 992:20, 993:7, 993:8, 993:10, 993:16, 995:14, 997:16, 997:18, 997:23, 998:3, 1002:4, 1002:15, 1009:14, 1038:19, 1048:17, 1048:20, 1050:2, 1050:24, 1058:17, 1063:17, 1064:7, 1064:11, 1085:1, 1086:2, 1087:1, 1087:11, 1103:6, 1115:25, 1116:3, 1116:7, 1116:13, 1116:16, 1116:22, 1120:19
**fact** [33] - 908:21, 916:4, 917:1, 951:25, 962:23, 1000:2, 1000:19, 1024:18, 1025:9, 1026:6, 1030:17, 1033:7, 1034:8, 1034:10, 1035:4, 1035:18, 1035:20, 1047:7, 1048:4, 1062:2, 1065:20, 1067:21, 1098:9, 1107:7, 1136:10, 1137:16, 1142:2, 1146:22, 1147:10, 1163:23, 1171:17, 1178:19, 1178:23
**factor** [2] - 1039:12, 1159:17
**factors** [7] - 1138:7, 1156:24, 1158:3, 1159:4, 1159:5, 1159:15, 1175:2
**facts** [18] - 880:5, 880:11, 925:24, 932:4, 933:3, 999:21, 999:24, 1030:12, 1031:1, 1031:4, 1036:7,

1036:10, 1088:23, 1136:9, 1167:8, 1169:8, 1169:10, 1191:2
**factual** [1] - 1035:24
**factually** [2] - 988:19, 990:14
**failed** [2] - 1138:23, 1139:9
**failure** [2] - 1025:6, 1025:7
**Fair** [1] - 906:10
**fair** [14] - 899:4, 910:23, 910:24, 915:10, 930:15, 950:1, 975:20, 1026:8, 1032:21, 1125:15, 1127:6, 1149:1, 1170:7, 1172:13
**fairly** [2] - 1040:4, 1171:21
**fall** [5] - 879:2, 897:19, 976:6, 1025:3, 1116:9
**falls** [1] - 1008:17
**familiar** [16] - 884:24, 886:16, 919:11, 935:20, 935:21, 964:3, 1008:12, 1008:18, 1009:15, 1094:20, 1107:7, 1113:12, 1113:15, 1115:18, 1120:22, 1125:9
**fancy** [1] - 974:21
**Fannin** [1] - 994:25
**far** [18] - 895:15, 898:6, 900:10, 911:7, 953:4, 997:17, 1008:19, 1027:22, 1033:6, 1047:5, 1048:13, 1061:15, 1072:12, 1099:8, 1110:9, 1129:10, 1143:15, 1183:6
**fast** [1] - 1058:23
**fat** [1] - 963:20
**fatter** [1] - 963:19
**fault** [1] - 906:15
**favor** [1] - 1146:13
**favorable** [1] - 1032:20
**features** [5] - 1138:5, 1138:14, 1138:24, 1145:1, 1145:6
**February** [2] - 873:13, 1050:9
**Federal** [19] - 1016:2,

1018:5, 1019:17, 1022:21, 1032:17, 1133:25, 1136:21, 1137:23, 1140:4, 1157:3, 1157:14, 1157:22, 1158:12, 1161:22, 1162:4, 1162:5, 1162:6, 1163:3, 1197:15

**fee** [1] - 1140:10

**feedstock** [11] - 960:3, 993:2, 993:3, 993:9, 1002:17, 1038:4, 1044:9, 1046:4, 1085:16, 1085:17

**feet** [4] - 955:7, 997:20, 997:21

**fellow** [1] - 902:1

**felt** [1] - 1116:19

**few** [15] - 909:2, 911:12, 933:13, 946:18, 950:10, 958:6, 991:13, 999:18, 1000:10, 1031:24, 1033:4, 1042:9, 1113:1, 1132:15, 1178:8

**field** [6] - 898:20, 1009:21, 1009:22, 1127:10, 1139:24, 1146:3

**fields** [1] - 997:23

**fifth** [2] - 1052:16, 1162:23

**fight** [1] - 1164:18

**figure** [10] - 901:7, 928:7, 1071:21, 1101:21, 1109:24, 1180:21, 1188:5, 1189:1, 1189:15, 1190:22

**file** [4] - 926:10, 1095:17, 1101:20, 1106:18

**filed** [30] - 891:20, 892:12, 894:18, 921:10, 928:6, 928:17, 929:4, 929:12, 932:15, 938:11, 938:24, 948:17, 951:20, 980:23, 980:25, 983:20, 990:10, 990:17, 1059:20, 1060:5, 1072:7, 1073:19, 1074:10, 1074:11, 1076:20, 1077:11, 1081:11, 1082:17, 1104:24, 1144:7

**filing** [2] - 891:14, 918:10

**filings** [1] - 1018:3

**fill** [1] - 1186:25

**filled** [1] - 1146:9

**filling** [1] - 1187:5

**fills** [1] - 1187:23

**filter** [1] - 1003:21

**final** [26] - 885:22, 887:6, 891:4, 1014:18, 1040:20, 1041:1, 1041:13, 1130:7, 1131:2, 1132:17, 1132:20, 1132:23, 1133:5, 1147:20, 1148:14, 1149:4, 1162:21, 1166:21, 1192:7, 1195:1, 1195:3, 1195:8, 1197:2

**finalize** [1] - 1132:20

**finally** [9] - 905:7, 932:4, 933:2, 989:3, 1044:25, 1102:13, 1104:11, 1140:20, 1146:15

**fine** [9] - 886:3, 943:19, 991:11, 1065:22, 1152:1, 1174:13, 1176:11, 1181:4, 1190:16

**finer** [1] - 1157:13

**Finlinson** [2] - 1119:5, 1119:11

**fire** [3] - 1089:2, 1115:14, 1118:7

**fired** [17] - 980:3, 982:4, 983:7, 985:11, 997:9, 1062:20, 1078:20, 1089:6, 1099:15, 1115:19, 1120:23, 1121:1, 1124:15, 1124:21, 1125:21, 1126:23, 1127:11

**FIRM** [1] - 873:16

**firms** [1] - 959:2

**first** [101] - 893:24, 919:10, 919:24, 926:10, 926:13, 927:4, 928:6, 929:4, 929:24, 933:24, 934:18, 934:20, 946:1, 963:25, 980:21, 980:23, 981:16, 983:18, 983:21, 984:10, 984:21, 985:16, 985:22, 988:12, 989:12, 1002:23,

1005:18, 1008:11, 1024:6, 1026:14, 1027:24, 1033:4, 1033:25, 1040:6, 1042:19, 1045:23, 1046:1, 1046:2, 1060:2, 1065:9, 1072:6, 1073:12, 1073:17, 1075:5, 1075:16, 1075:18, 1078:8, 1078:14, 1079:12, 1079:18, 1082:3, 1082:17, 1083:1, 1083:20, 1088:25, 1089:1, 1089:4, 1089:13, 1095:14, 1102:1, 1115:25, 1119:10, 1131:1, 1134:14, 1141:16, 1142:5, 1144:19, 1149:6, 1149:10, 1153:8, 1153:9, 1154:10, 1161:11, 1161:19, 1164:3, 1167:13, 1168:16, 1170:17, 1170:18, 1171:21, 1173:5, 1174:8, 1174:10, 1174:14, 1174:17, 1176:8, 1179:8, 1181:22, 1183:7, 1184:9, 1184:13, 1184:21, 1184:22, 1187:15, 1192:1, 1192:19, 1194:13, 1195:6, 1196:2

**firsthand** [1] - 1182:24

**five** [16] - 886:10, 886:22, 888:18, 891:11, 909:12, 910:23, 933:24, 934:3, 934:18, 934:20, 949:6, 1027:17, 1048:5, 1089:23, 1184:17

**flash** [5] - 1086:4, 1086:10, 1086:20, 1086:21, 1086:24

**flesh** [1] - 1036:11

**flip** [8] - 884:13, 885:25, 905:19, 909:20, 911:4, 919:16, 1103:8, 1152:23

**flow** [1] - 1036:6

**flows** [3] - 1012:9, 1175:18, 1176:17

**flue** [7] - 889:5, 918:4, 998:23, 999:5,

1003:2, 1021:4, 1034:6

**fly** [8] - 890:7, 920:19, 1018:21, 1019:4, 1019:6, 1030:18, 1154:6

**focus** [8] - 915:11, 922:14, 950:18, 1045:20, 1093:13, 1099:6, 1122:24, 1144:14

**focused** [2] - 933:9, 942:7

**focusing** [1] - 909:13

**folks** [6] - 937:10, 948:11, 957:13, 976:3, 1085:12, 1156:23

**follow** [6] - 1026:22, 1066:2, 1081:22, 1173:21, 1196:11, 1196:15

**following** [13] - 898:8, 915:9, 942:22, 946:18, 1010:1, 1012:17, 1032:6, 1085:8, 1088:25, 1089:4, 1112:4, 1148:8, 1161:23

**follows** [3] - 946:13, 1173:18, 1184:2

**football** [1] - 997:22

**footnote** [1] - 1157:16

**footnotes** [1] - 1014:11

**FOR** [1] - 873:2

**for-profit** [1] - 1123:15

**force** [1] - 1069:18

**forecasted** [1] - 1085:24

**forego** [1] - 938:12

**foregoing** [3] - 1136:16, 1141:2, 1197:12

**foregone** [1] - 938:25

**forget** [1] - 914:19

**forgets** [1] - 1026:14

**form** [32] - 890:6, 925:24, 1017:1, 1018:13, 1029:8, 1061:7, 1101:3, 1132:23, 1143:19, 1147:21, 1148:4, 1153:1, 1179:11, 1181:12, 1181:16, 1181:17, 1181:18, 1183:17, 1186:2, 1186:19, 1187:6, 1187:9, 1191:18, 1191:21, 1192:17,

1192:23, 1193:13, 1193:16, 1194:20, 1195:2, 1195:10

**formatting** [1] - 1192:18

**formed** [1] - 926:21

**former** [1] - 1173:4

**formula** [13] - 1004:15, 1047:2, 1048:8, 1048:16, 1049:12, 1051:6, 1053:6, 1055:7, 1055:12, 1055:15, 1056:12, 1090:23

**formulate** [2] - 1091:16, 1092:8

**formulated** [2] - 991:17, 1091:24

**formulating** [2] - 1076:9, 1091:1

**formulation** [6] - 1001:3, 1090:18, 1135:7, 1135:11, 1135:12, 1142:9

**forth** [2] - 998:11, 1167:6

**forward** [6] - 875:4, 946:4, 1029:16, 1036:7, 1068:15, 1071:25

**forwarded** [3] - 905:16, 905:17, 905:25

**fought** [1] - 1191:5

**Foundation** [5] - 1122:17, 1122:18, 1123:3, 1124:19, 1124:24

**foundation** [2] - 930:13, 1096:7

**foundation's** [1] - 1122:24

**founded** [1] - 1123:3

**four** [10] - 894:17, 947:4, 977:22, 1027:14, 1087:22, 1089:22, 1140:12, 1183:19, 1184:18, 1185:5

**fourth** [5] - 990:8, 990:17, 1051:14, 1051:15, 1179:4

**frame** [3] - 1087:10, 1115:2, 1126:20

**freezing** [1] - 1024:12

**front** [5] - 919:22, 978:8, 1059:16, 1148:21, 1176:6

**frustrated** [1] - 935:22

**fuel** [37] - 877:3,

889:22, 893:2, 896:5, 899:22, 900:15, 900:21, 916:24, 917:3, 917:7, 920:22, 959:19, 991:17, 991:19, 991:20, 991:21, 993:5, 1002:20, 1002:21, 1003:9, 1005:5, 1007:2, 1038:19, 1091:5, 1092:2, 1092:5, 1092:7, 1092:9, 1115:14, 1116:9, 1116:20, 1117:2, 1117:20, 1118:10, 1118:13, 1118:21, 1119:2

**full** [7] - 882:4, 882:21, 916:13, 916:20, 1013:10, 1063:18, 1144:11

**fully** [4] - 908:21, 992:2, 1130:9, 1190:21

**fun** [1] - 1006:10

**function** [2] - 894:13

**fundamentally** [1] - 891:1

**furnace** [5] - 1010:2, 1010:3, 1113:10, 1118:7, 1118:9

**furnaces** [4] - 995:19, 997:9, 997:24, 1117:16

**furthermore** [1] - 1091:8

**future** [3] - 923:24, 1033:3, 1185:7

## G

**G-U-N-G-D-E-R-S-O-N** [1] - 1112:17

**gain** [1] - 1029:8

**GALLAGHER** [1] - 873:7

**Gallagher** [6] - 1097:21, 1098:6, 1098:9, 1098:15, 1099:11, 1101:5

**gas** [16] - 889:5, 912:3, 912:25, 913:4, 918:4, 998:23, 999:5, 1003:2, 1017:1, 1017:2, 1017:3, 1021:4, 1034:6, 1061:2, 1064:20

**gases** [1] - 917:23

**gather** [1] - 1090:20

**gear** [1] - 955:11

**general** [5] - 957:13, 993:17, 1000:22, 1033:5, 1139:24

**generally** [11] - 926:7, 935:2, 960:10, 966:16, 990:12, 992:25, 998:5, 1019:11, 1108:9, 1115:10, 1178:4

**generate** [3] - 878:13, 915:25, 1008:16

**generated** [1] - 908:1

**generating** [5] - 908:2, 970:6, 970:11, 1025:15, 1115:20

**generation** [4] - 880:22, 880:25, 881:24, 882:2

**gentlemen** [6] - 910:3, 1011:12, 1112:8, 1114:12, 1121:16, 1130:22

**geo** [1] - 895:15

**Georgia** [1] - 1144:12

**Georgia-Pacific** [1] - 1144:12

**gesturing** [1] - 1108:9

**Gibson** [7] - 968:17, 968:18, 968:21, 969:2, 969:5, 971:10

**gist** [1] - 1161:15

**given** [7] - 993:12, 1018:25, 1087:10, 1094:8, 1173:6, 1176:18, 1176:20

**Global** [1] - 1157:16

**gloss** [1] - 1157:21

**goal** [1] - 1170:18

**golf** [1] - 998:9

**Google** [1] - 928:20

**gosh** [1] - 1101:22

**gotcha** [2] - 895:3, 1083:14

**government** [3] - 1005:9, 1005:25, 1125:16

**governmental** [1] - 899:24

**grab** [2] - 1012:19, 1195:23

**grabs** [1] - 1024:23

**grant** [1] - 1132:11

**granted** [1] - 1180:18

**granting** [1] - 1129:23

**graphing** [1] - 1162:16

**grapple** [1] - 1143:10

**great** [4] - 995:21, 1048:24, 1075:22,

1133:11

**Green** [80] - 875:4, 875:13, 877:17, 901:22, 933:17, 940:17, 940:22, 940:24, 941:1, 941:11, 942:12, 944:25, 946:2, 946:4, 946:16, 947:4, 950:16, 954:15, 960:17, 980:7, 980:13, 985:14, 994:21, 999:21, 1035:4, 1035:17, 1037:12, 1037:15, 1045:2, 1045:19, 1047:12, 1059:15, 1061:15, 1070:2, 1072:24, 1077:22, 1079:20, 1081:3, 1087:19, 1088:21, 1089:8, 1090:8, 1092:10, 1092:17, 1092:21, 1093:6, 1095:9, 1109:10, 1109:13, 1110:4, 1111:23, 1135:7, 1136:7, 1138:18, 1138:24, 1139:9, 1140:14, 1140:24, 1144:5, 1144:12, 1145:11, 1145:22, 1146:8, 1146:12, 1163:12, 1168:10, 1172:6, 1173:7, 1173:11, 1173:22, 1174:4, 1175:21, 1176:9, 1176:24, 1177:8, 1177:14, 1178:17, 1178:24, 1188:9

**green** [1] - 1080:9

**GREEN** [1] - 946:10

**Green's** [16] - 944:21, 1110:2, 1134:23, 1138:11, 1138:23, 1139:14, 1140:21, 1141:4, 1144:14, 1144:17, 1144:21, 1144:22, 1169:6, 1178:2, 1178:13, 1178:19

**ground** [2] - 959:20, 959:23

**grounds** [1] - 1133:23

**group** [5] - 1182:9, 1182:18, 1182:20, 1182:21

**grouped** [1] - 1182:8

**grouping** [1] -

1182:19

**groups** [3] - 959:4, 1178:1, 1192:18

**guarantee** [1] - 896:15

**guess** [18] - 942:3, 945:11, 995:21, 1015:5, 1024:20, 1066:19, 1130:5, 1155:10, 1157:2, 1164:8, 1166:8, 1167:20, 1168:8, 1171:6, 1175:9, 1188:13, 1188:21, 1192:3

**guessing** [1] - 995:23

**guidance** [6] - 1005:4, 1005:6, 1008:1, 1008:5, 1041:5, 1158:12

**guidelines** [2] - 899:24, 908:3

**Gunderson** [3] - 1112:10, 1112:16, 1113:12

**guy** [5] - 902:2, 935:8, 935:9, 1003:18, 1108:18

**guys** [49] - 875:21, 877:5, 885:15, 888:19, 889:8, 892:15, 895:21, 896:1, 896:15, 897:9, 903:16, 907:18, 908:13, 909:16, 910:25, 915:14, 915:18, 917:13, 921:3, 921:20, 924:2, 924:3, 929:10, 930:7, 933:5, 933:19, 936:24, 938:3, 940:9, 1095:17, 1096:20, 1098:10, 1098:16, 1100:7, 1100:15, 1100:20, 1102:13, 1103:11, 1103:12, 1105:23, 1106:15, 1107:18, 1148:18, 1148:22, 1166:9, 1166:14, 1190:18, 1191:22

## H

**habit** [1] - 897:7

**HALEY** [41] - 873:23, 1023:20, 1027:7, 1027:23, 1028:7, 1028:18, 1028:22,

1029:11, 1030:4, 1030:9, 1030:21, 1031:6, 1031:22, 1132:2, 1141:9, 1142:5, 1148:24, 1149:6, 1149:9, 1149:13, 1149:16, 1149:20, 1150:1, 1150:3, 1150:8, 1150:13, 1150:19, 1150:21, 1151:5, 1151:8, 1152:8, 1152:11, 1152:16, 1152:20, 1153:4, 1154:7, 1154:10, 1154:17, 1158:1, 1194:8, 1194:11

**Haley** [9] - 1023:21, 1031:5, 1129:10, 1131:14, 1132:1, 1132:2, 1141:8, 1152:10, 1157:25

**half** [21] - 929:16, 932:12, 948:23, 961:18, 961:20, 1003:4, 1011:13, 1011:14, 1011:22, 1012:24, 1040:5, 1074:18, 1076:2, 1098:25, 1102:11, 1102:21, 1103:23, 1140:13, 1189:15, 1189:22, 1189:23

**hallmark** [1] - 1140:9

**Halloween** [1] - 976:4

**halogen** [1] - 992:4

**halves** [1] - 1002:23

**hand** [11] - 909:13, 994:18, 997:12, 997:14, 997:20, 1014:13, 1014:14, 1014:20, 1015:7, 1153:16, 1153:18

**handed** [1] - 1131:15

**handful** [1] - 948:1

**handle** [1] - 1118:13

**handling** [1] - 993:5

**hands** [1] - 897:8

**handy** [1] - 884:18

**happy** [5] - 886:14, 929:17, 1130:11, 1148:24, 1192:20

**hard** [4] - 971:22, 1026:22, 1091:13, 1191:5

**hard-fought** [1] - 1191:5

**hate** [1] - 1174:24

**hauling** [1] - 1117:15

**HC&P** [1] - 1029:18

**headed** [1] - 1028:24
**headings** [2] - 1087:6, 1087:8
**health** [2] - 947:8, 947:11
**hear** [20] - 927:20, 940:13, 943:4, 945:23, 1011:25, 1013:8, 1013:16, 1017:25, 1023:19, 1104:5, 1130:11, 1147:22, 1148:12, 1157:23, 1168:12, 1169:12, 1171:9, 1186:9, 1196:10, 1196:18
**heard** [16] - 888:24, 888:25, 889:2, 956:11, 999:12, 1001:11, 1023:22, 1077:22, 1077:25, 1109:15, 1122:16, 1144:9, 1144:11, 1145:22, 1167:8, 1196:17
**hearing** [1] - 1013:22
**heat** [2] - 878:13, 1118:9
**heavily** [1] - 1146:13
**heck** [1] - 927:15
**held** [3] - 1065:3, 1122:6, 1129:3
**help** [21] - 896:15, 903:11, 905:7, 935:24, 958:7, 1000:10, 1030:13, 1034:14, 1036:9, 1037:20, 1037:22, 1038:1, 1093:12, 1103:6, 1115:15, 1115:23, 1121:3, 1122:19, 1154:2, 1192:25
**helped** [1] - 1103:25
**helpful** [10] - 1026:23, 1027:5, 1027:22, 1132:21, 1147:1, 1147:23, 1157:21, 1176:20, 1182:13, 1187:20
**hereby** [1] - 1197:10
**Hewlett** [1] - 1019:19
**Hg** [2] - 887:18, 1010:22
**hide** [1] - 886:15
**high** [6] - 899:16, 1002:2, 1116:9, 1116:20, 1118:24, 1123:17
**higher** [2] - 1107:8,

1118:23
**highlight** [5] - 896:14, 1009:7, 1010:14, 1158:20, 1170:18
**highlighted** [2] - 1166:21, 1175:13
**highlighting** [1] - 1101:8
**Hills** [5] - 971:17, 971:19, 971:25, 972:7, 972:8
**himself** [1] - 1144:11
**hinted** [1] - 1065:21
**hit** [1] - 1004:14
**HITCH** [1] - 874:3
**hold** [5] - 899:5, 928:23, 955:3, 1122:8, 1185:3
**Holding** [1] - 984:15
**Holdings** [6] - 972:14, 974:20, 984:14, 984:15, 1050:10
**holdover** [1] - 1151:22
**home** [2] - 977:5, 1170:19
**honestly** [1] - 1180:25
**Honor** [102] - 882:11, 893:6, 899:1, 902:6, 907:5, 907:7, 910:12, 924:18, 928:9, 928:21, 932:6, 932:13, 940:21, 941:11, 942:14, 943:25, 944:14, 945:9, 945:20, 946:2, 946:6, 946:8, 946:22, 950:7, 975:2, 991:3, 994:15, 999:16, 1008:23, 1011:9, 1013:19, 1014:5, 1014:22, 1015:17, 1015:20, 1017:24, 1022:10, 1023:20, 1032:1, 1036:18, 1041:17, 1041:23, 1045:10, 1065:1, 1066:7, 1068:8, 1071:20, 1072:18, 1080:22, 1086:11, 1092:25, 1093:2, 1095:4, 1096:6, 1109:3, 1109:20, 1111:14, 1112:8, 1114:12, 1121:17, 1128:21, 1129:1, 1130:17, 1132:10, 1133:18, 1134:14, 1141:6, 1144:1,

1146:24, 1153:25, 1155:5, 1155:9, 1155:19, 1157:13, 1158:25, 1160:21, 1160:23, 1163:18, 1164:20, 1166:2, 1166:19, 1168:24, 1170:23, 1173:1, 1174:2, 1174:11, 1174:19, 1174:23, 1177:6, 1177:24, 1179:17, 1183:7, 1184:7, 1185:1, 1185:6, 1186:11, 1187:3, 1188:12, 1190:15, 1192:10, 1192:15, 1193:10
**Honor's** [4] - 1159:1, 1161:3, 1162:12, 1165:15
**Honorable** [1] - 873:11
**hope** [4] - 1012:19, 1191:4, 1191:10, 1191:17
**hopefully** [3] - 1032:3, 1154:6, 1191:16
**hoping** [1] - 881:14
**host** [3] - 919:9, 919:11, 920:24
**hosts** [2] - 919:3, 919:6
**hour** [6] - 1011:13, 1011:14, 1011:17, 1011:22, 1012:24, 1166:14
**hours** [3] - 955:16, 958:5, 1105:19
**house** [1] - 997:7
**housekeeping** [2] - 1013:20, 1195:24
**houses** [1] - 955:10
**Houston** [1] - 885:5
**huge** [2] - 900:23
**hundred** [4] - 948:12, 1006:7, 1030:7, 1120:8
**hundreds** [1] - 915:19
**hyphens** [1] - 1171:25
**hypothetical** [6] - 1140:13, 1154:12, 1154:19, 1178:3, 1178:6, 1178:20

---

**I**

---

**i.e** [2] - 1061:11, 1078:25
**idea** [10] - 883:25,

892:17, 930:23, 1098:12, 1159:16, 1164:25, 1165:10, 1187:3, 1189:13, 1190:17
**ideally** [1] - 1195:7
**identical** [4] - 955:23, 955:24, 966:6, 1075:10
**identification** [1] - 911:7
**identified** [14] - 979:17, 979:19, 981:12, 981:15, 982:21, 997:8, 1017:5, 1017:8, 1018:13, 1018:19, 1019:24, 1021:15, 1021:23, 1022:1
**identifies** [2] - 979:3, 981:2
**identify** [13] - 881:12, 881:15, 881:18, 936:12, 943:11, 996:1, 1042:7, 1043:2, 1043:21, 1043:24, 1044:4, 1103:7, 1104:1
**identifying** [1] - 984:11
**idle** [1] - 977:4
**ignorance** [1] - 1143:8
**ignored** [1] - 1140:15
**II** [45] - 875:22, 876:5, 876:7, 876:9, 876:15, 877:2, 877:16, 877:18, 877:19, 878:8, 878:11, 878:16, 878:17, 878:18, 882:17, 882:18, 884:2, 886:23, 910:25, 966:11, 966:18, 966:22, 968:4, 968:21, 969:1, 973:8, 973:9, 973:12, 973:18, 973:20, 977:23, 979:10, 993:23, 1000:5, 1049:9, 1049:11, 1050:2, 1089:3, 1185:19, 1185:24, 1188:23, 1190:3
**III** [14] - 873:21, 978:6, 979:11, 979:21, 981:8, 981:17, 983:1, 984:9, 988:22, 989:5, 989:14, 990:4,

990:19, 993:24
**Illinois** [1] - 968:19
**immediate** [1] - 1122:11
**immediately** [4] - 997:3, 997:5, 997:6, 1122:8
**impact** [4] - 1075:20, 1082:19, 1088:7, 1088:10
**implicitly** [2] - 1166:24, 1167:14
**implied** [3] - 891:18, 891:21, 1186:3
**imply** [2] - 883:17, 1188:15
**implying** [1] - 932:7
**import** [1] - 1180:13
**important** [7] - 904:5, 926:12, 962:23, 1007:3, 1042:24, 1075:23, 1157:19
**importantly** [1] - 1169:4
**importing** [1] - 1162:16
**impossible** [1] - 1035:22
**impression** [5] - 879:3, 883:19, 915:5, 915:8, 917:22
**improper** [5] - 1106:18, 1167:2, 1167:16, 1169:4, 1169:17
**improperly** [1] - 1144:20
**improved** [1] - 1183:4
**IN** [2] - 873:1, 873:2
**inaccurate** [1] - 1075:23
**inaccurately** [1] - 1188:13
**inadvertently** [1] - 906:14
**inappropriate** [1] - 1095:10
**inartfully** [1] - 1176:3
**inasmuch** [1] - 991:21
**inbound** [1] - 891:6
**Inc** [5] - 1018:2, 1019:16, 1161:21, 1161:22, 1162:5
**incentive** [2] - 900:24, 1125:13
**incentives** [1] - 879:5
**incentivize** [2] - 1036:9, 1125:18
**inclination** [2] - 1182:4, 1182:17

**inclined** [2] - 913:8, 1177:3
**include** [20] - 1010:1, 1018:12, 1038:14, 1038:17, 1038:18, 1041:1, 1123:10, 1123:14, 1158:21, 1159:21, 1164:4, 1165:21, 1172:2, 1174:17, 1177:3, 1179:17, 1185:9, 1187:9, 1187:22, 1188:1
**included** [9] - 1025:5, 1029:16, 1060:10, 1139:17, 1151:7, 1151:18, 1155:17, 1172:12, 1193:15
**includes** [11] - 882:24, 904:20, 928:1, 981:6, 981:8, 1036:4, 1111:5, 1138:19, 1143:1, 1143:6, 1143:9
**including** [14] - 889:20, 909:3, 909:4, 1024:3, 1035:1, 1035:4, 1035:15, 1060:23, 1099:12, 1126:16, 1138:15, 1175:4, 1177:7, 1182:3
**inclusion** [1] - 1159:16
**incompatible** [1] - 1147:9
**incorporate** [4] - 1024:2, 1030:21, 1033:9, 1144:6
**incorporating** [1] - 1181:18
**incorrect** [6] - 1064:18, 1136:10, 1137:16, 1145:11, 1145:21, 1167:25
**increase** [1] - 914:9
**incredible** [1] - 1146:17
**incremental** [3] - 1138:3, 1138:12, 1175:19
**indeed** [2] - 1061:4, 1161:4
**indemnity** [8] - 1019:10, 1019:11, 1019:13, 1019:19, 1019:23, 1020:4, 1025:21, 1025:22
**independent** [5] - 1016:23, 1016:24,

1018:10, 1018:11, 1150:6
**index** [1] - 884:17
**Indiana** [3] - 968:19, 970:6, 970:11
**indicated** [4] - 914:8, 946:23, 1107:23, 1178:25
**indicates** [1] - 1155:22
**indicating** [4] - 909:15, 920:4, 1021:16, 1102:14
**indication** [1] - 1040:6
**indicative** [1] - 1031:9
**indifferently** [1] - 1143:21
**indirect** [1] - 1169:14
**individual** [3] - 1010:7, 1040:14, 1041:3
**individually** [1] - 984:18
**induce** [6] - 1018:22, 1019:12, 1019:22, 1020:4, 1022:4, 1159:12
**induced** [27] - 1015:24, 1016:6, 1016:8, 1016:10, 1018:9, 1022:25, 1023:6, 1023:12, 1023:15, 1024:13, 1032:11, 1033:8, 1035:14, 1065:12, 1133:21, 1137:6, 1155:7, 1157:4, 1158:17, 1181:24, 1186:13, 1187:2, 1188:24, 1189:2, 1189:8, 1193:25
**inducement** [12] - 1022:5, 1022:8, 1022:14, 1026:11, 1027:24, 1031:15, 1035:12, 1143:15, 1155:1, 1156:20, 1157:10, 1187:19
**induces** [1] - 1193:14
**inducing** [3] - 1157:18, 1181:25, 1194:1
**Industrial** [11] - 937:17, 937:21, 968:3, 969:2, 971:10, 987:8, 987:11, 987:14, 1046:6, 1048:5, 1185:17
**Industries** [2] -

894:21, 894:25
**industry** [1] - 1128:5
**infer** [4] - 1025:10, 1025:18, 1031:1, 1143:4
**inference** [3] - 1020:13, 1022:24, 1032:21
**inflammatory** [1] - 1095:5
**information** [72] - 883:14, 885:20, 890:12, 890:18, 890:23, 892:8, 892:17, 905:16, 906:7, 910:22, 912:12, 912:15, 929:19, 930:8, 930:15, 930:20, 931:25, 932:3, 932:7, 933:2, 933:8, 1038:8, 1038:9, 1038:12, 1040:23, 1045:4, 1045:25, 1049:5, 1050:7, 1051:16, 1054:21, 1059:2, 1059:3, 1060:20, 1062:20, 1065:9, 1065:14, 1067:19, 1071:18, 1085:5, 1085:11, 1085:14, 1086:1, 1086:20, 1087:2, 1087:7, 1088:4, 1088:16, 1094:5, 1094:16, 1094:23, 1095:2, 1095:10, 1096:20, 1101:3, 1103:12, 1104:11, 1104:23, 1105:1, 1109:14, 1110:4, 1110:24, 1110:25, 1111:5, 1111:10, 1111:19, 1114:19, 1143:10, 1176:20, 1187:20
**informed** [2] - 926:22, 926:24
**infringe** [23] - 925:16, 926:8, 1016:13, 1016:20, 1017:7, 1019:22, 1020:5, 1022:16, 1024:8, 1027:2, 1027:4, 1031:13, 1033:16, 1067:25, 1077:15, 1080:2, 1081:20, 1090:14, 1143:5, 1152:6, 1167:24, 1169:9, 1169:10

**infringed** [17] - 924:12, 962:17, 1070:24, 1136:25, 1137:2, 1137:5, 1137:8, 1137:20, 1150:17, 1151:2, 1152:5, 1153:11, 1153:19, 1153:24, 1160:10, 1183:23, 1184:4
**infringement** [128] - 915:1, 935:24, 941:23, 943:1, 947:19, 986:14, 1012:6, 1015:24, 1016:6, 1016:9, 1016:10, 1018:9, 1019:12, 1019:14, 1022:8, 1022:17, 1023:12, 1023:15, 1024:11, 1024:13, 1024:16, 1024:17, 1024:19, 1025:13, 1025:24, 1027:13, 1028:23, 1029:2, 1029:5, 1029:7, 1029:9, 1029:17, 1029:25, 1030:8, 1030:12, 1031:2, 1031:7, 1032:11, 1033:8, 1034:22, 1034:25, 1035:14, 1036:4, 1065:12, 1066:9, 1066:12, 1066:13, 1066:18, 1067:17, 1067:21, 1068:13, 1068:23, 1069:9, 1069:17, 1070:15, 1070:22, 1070:23, 1072:2, 1075:20, 1090:2, 1099:20, 1104:21, 1106:19, 1125:22, 1133:21, 1134:4, 1134:7, 1134:13, 1135:19, 1136:15, 1136:18, 1136:20, 1137:3, 1137:6, 1137:11, 1141:10, 1141:12, 1141:14, 1141:22, 1142:8, 1142:11, 1142:13, 1142:18, 1143:14, 1143:15, 1143:17, 1143:18, 1149:17, 1150:23, 1151:24, 1155:7, 1156:21, 1157:4, 1157:5, 1157:6, 1158:18, 1159:13, 1159:19, 1159:25, 1160:25,

1161:14, 1163:5, 1168:1, 1168:5, 1168:13, 1169:13, 1169:14, 1170:5, 1174:10, 1181:24, 1181:25, 1186:12, 1186:14, 1186:15, 1187:2, 1188:24, 1189:3, 1189:6, 1189:8, 1193:14, 1194:1, 1194:2, 1194:12, 1194:17
**infringer** [1] - 1162:3
**infringes** [2] - 933:25, 1153:10
**infringing** [57] - 923:16, 935:14, 935:18, 936:3, 937:11, 985:25, 986:4, 1028:25, 1031:9, 1031:11, 1068:15, 1068:25, 1069:14, 1070:14, 1075:25, 1077:6, 1077:12, 1077:23, 1078:4, 1078:25, 1081:17, 1082:5, 1082:9, 1082:15, 1082:18, 1082:23, 1082:24, 1084:9, 1088:4, 1088:7, 1090:5, 1090:7, 1105:7, 1134:10, 1134:12, 1134:19, 1135:4, 1135:21, 1135:24, 1136:4, 1137:13, 1141:21, 1142:6, 1160:13, 1161:7, 1161:17, 1162:3, 1163:15, 1163:25, 1164:15, 1165:1, 1165:12, 1167:1, 1167:15, 1177:16
**ING** [1] - 910:3
**initial** [3] - 875:3, 976:2, 976:7
**inject** [1] - 912:25
**injected** [1] - 1079:3
**injecting** [9] - 912:2, 913:4, 998:22, 999:5, 1018:12, 1024:22, 1100:11, 1100:16, 1128:16
**injection** [39] - 882:24, 887:14, 888:8, 888:14, 904:20, 905:4, 905:9, 912:24, 914:9, 914:16, 917:14,

918:4, 999:11, 999:14, 1010:23, 1011:1, 1018:15, 1018:17, 1018:20, 1019:2, 1019:8, 1020:23, 1021:3, 1021:7, 1021:12, 1021:14, 1023:6, 1025:5, 1061:12, 1061:18, 1062:21, 1063:12, 1078:21, 1089:1, 1089:5, 1114:7, 1116:11, 1128:2, 1136:1

**injections** [2] - 1060:24, 1136:4

**injects** [5] - 980:4, 982:5, 983:8, 985:11, 1099:15

**inserted** [1] - 993:5

**inserting** [1] - 1155:14

**inside** [3] - 998:18, 1094:23, 1095:12

**installation** [2] - 1020:19, 1024:7

**installed** [18] - 892:6, 903:17, 904:23, 914:8, 916:18, 916:20, 917:19, 954:22, 958:1, 963:2, 963:6, 971:11, 971:15, 993:8, 1021:6, 1034:9, 1078:3, 1088:17

**installing** [2] - 905:5, 958:24

**instance** [7] - 880:8, 902:18, 907:18, 912:11, 934:18, 952:17, 1107:1

**instances** [3] - 876:18, 893:4, 1154:21

**instead** [2] - 1159:3, 1159:5

**instruct** [2] - 1169:18, 1196:6

**instructing** [2] - 1165:21, 1167:7

**instruction** [29] - 1012:6, 1018:7, 1134:17, 1142:8, 1150:23, 1150:24, 1151:17, 1151:24, 1158:3, 1159:22, 1164:24, 1167:4, 1167:19, 1167:21, 1169:5, 1173:15, 1176:5, 1176:7,

1176:15, 1176:18, 1177:25, 1178:6, 1179:5, 1179:16, 1195:3, 1196:2, 1196:21, 1197:2

**instructions** [32] - 1024:1, 1029:19, 1130:8, 1131:2, 1132:17, 1132:20, 1134:16, 1147:10, 1147:20, 1148:1, 1148:14, 1149:4, 1152:25, 1153:2, 1156:10, 1158:7, 1161:5, 1167:23, 1169:11, 1174:24, 1175:5, 1175:7, 1179:11, 1179:14, 1193:2, 1193:23, 1194:15, 1196:7, 1196:17, 1196:18

**insufficient** [4] - 1022:5, 1032:21, 1033:14, 1033:18

**Integrated** [1] - 1161:22

**integrating** [1] - 1194:5

**intellectual** [11] - 1121:19, 1122:2, 1122:4, 1122:13, 1122:20, 1122:25, 1123:4, 1123:7, 1123:10, 1123:11, 1123:15

**intend** [2] - 1015:24, 1036:3

**intended** [9] - 1017:8, 1018:14, 1027:13, 1029:24, 1029:25, 1031:1, 1188:16, 1189:23, 1190:2

**intending** [5] - 875:18, 1016:12, 1016:19, 1027:1, 1033:15

**intent** [30] - 1018:18, 1018:22, 1019:1, 1019:5, 1019:7, 1019:12, 1019:13, 1021:11, 1025:14, 1027:6, 1027:8, 1027:10, 1027:12, 1027:16, 1028:3, 1028:8, 1028:10, 1028:19, 1029:6, 1030:15, 1031:9, 1031:19, 1033:22, 1035:3, 1035:15, 1127:25, 1129:5, 1143:4

**intention** [4] - 1141:22, 1165:22, 1196:1, 1196:5

**intentional** [3] - 1031:13, 1031:14, 1143:14

**intentionally** [2] - 1137:4, 1137:8

**interacting** [2] - 912:11, 1191:8

**interest** [2] - 937:8, 1098:10

**interesting** [3] - 895:23, 896:13, 912:10

**interestingly** [1] - 1057:3

**Intermountain** [32] - 927:22, 954:1, 954:6, 954:7, 989:2, 989:9, 1057:2, 1058:2, 1058:6, 1058:9, 1060:11, 1077:3, 1102:8, 1105:12, 1111:11, 1119:6, 1119:7, 1119:17, 1119:18, 1119:23, 1120:2, 1120:5, 1120:6, 1120:11, 1120:13, 1120:15, 1120:16, 1121:6, 1121:8, 1121:12

**internet** [1] - 929:15

**interpret** [1] - 1094:9

**interpretation** [2] - 1162:13, 1180:1

**interpreted** [1] - 1030:25

**interrogatories** [2] - 930:5, 930:6

**Interrogatory** [2] - 1103:24, 1103:25

**interrogatory** [4] - 930:8, 1102:25, 1103:1, 1103:5

**interrupt** [3] - 1028:21, 1080:24, 1183:18

**intimately** [1] - 1008:22

**introduced** [2] - 946:16, 1143:2

**introducing** [1] - 1164:25

**intuited** [1] - 941:19

**invalid** [7] - 1006:15, 1150:14, 1153:12, 1153:14, 1153:19, 1153:22, 1154:3

**invalidate** [1] - 1006:12

**invalidity** [15] - 931:12, 1129:6, 1129:14, 1131:13, 1132:4, 1132:6, 1148:16, 1150:12, 1150:14, 1152:12, 1152:19, 1153:2, 1153:6, 1154:5, 1154:22

**invention** [1] - 1162:1

**inventories** [1] - 1085:20

**inventory** [1] - 1085:17

**invest** [1] - 885:10

**invested** [2] - 898:2, 1125:17

**investigate** [2] - 898:23, 1094:19

**investing** [4] - 885:11, 885:14, 894:23, 899:21

**investment** [6] - 908:24, 928:18, 929:7, 939:19, 958:18, 958:21

**investments** [1] - 1143:12

**investor** [17] - 894:21, 895:7, 902:23, 903:4, 903:5, 903:12, 905:8, 905:12, 908:25, 910:5, 910:6, 912:17, 912:19, 977:13, 977:14, 977:18

**investors** [21] - 892:17, 892:18, 897:25, 898:3, 898:10, 898:12, 898:15, 898:19, 898:24, 899:4, 899:10, 899:13, 899:20, 900:10, 900:14, 900:20, 900:23, 909:14, 977:11, 1085:25

**investors'** [2] - 899:6, 900:13

**invited** [2] - 1098:10, 1098:16

**involve** [1] - 1128:14

**involved** [9] - 882:23, 886:23, 959:19, 999:4, 1098:11, 1098:16, 1103:7, 1127:5, 1134:20

**involvement** [3] - 995:2, 996:5, 997:2

**involves** [1] - 1104:21

**iodizing** [1] - 890:1

**ionizes** [1] - 890:5

**IP** [1] - 1122:10

**IPA** [3] - 953:4, 953:24

**IRS** [8] - 881:24, 882:5, 962:25, 1005:4, 1007:23, 1007:25, 1008:12, 1041:5

**ish** [1] - 942:18

**Island** [19] - 884:3, 891:13, 902:21, 902:22, 905:2, 906:7, 937:1, 937:11, 961:25, 962:7, 963:13, 964:10, 964:18, 1054:25, 1055:4, 1055:22, 1089:3, 1104:5

**issuance** [6] - 923:9, 924:17, 1019:24, 1022:6, 1022:13, 1171:8

**issue** [72] - 895:17, 902:20, 903:15, 907:19, 909:17, 912:8, 923:21, 927:9, 932:17, 932:19, 943:16, 961:4, 1012:2, 1014:8, 1017:12, 1017:14, 1020:18, 1020:21, 1021:8, 1027:9, 1032:13, 1032:16, 1034:20, 1034:21, 1034:22, 1035:6, 1035:21, 1036:5, 1065:12, 1065:24, 1067:11, 1070:19, 1071:12, 1072:4, 1097:18, 1100:11, 1105:15, 1106:23, 1107:22, 1108:8, 1129:14, 1131:13, 1142:5, 1142:24, 1148:2, 1148:5, 1153:1, 1154:16, 1154:25, 1155:3, 1156:2, 1156:12, 1160:5, 1164:14, 1165:14, 1166:11, 1167:21, 1168:19, 1169:20, 1171:18, 1172:8, 1172:13, 1173:2, 1176:6, 1176:13,

1180:18, 1186:9, 1188:10, 1194:11, 1194:22, 1196:1

**issued** [34] - 924:8, 925:1, 952:1, 961:2, 962:14, 1005:6, 1047:17, 1048:1, 1048:6, 1048:12, 1048:13, 1049:23, 1049:24, 1050:17, 1051:7, 1051:22, 1052:2, 1052:6, 1052:24, 1053:2, 1053:12, 1054:11, 1055:18, 1055:19, 1056:6, 1056:15, 1057:4, 1058:7, 1091:11, 1091:12, 1098:22, 1125:16, 1134:22

**issues** [16] - 914:8, 926:3, 935:23, 998:17, 1005:4, 1011:15, 1031:4, 1070:18, 1132:25, 1133:11, 1147:14, 1149:5, 1158:23, 1165:25, 1166:12, 1192:13

**item** [2] - 1045:8, 1148:17

**items** [1] - 1148:16

**itself** [5] - 1146:19, 1156:15, 1161:11, 1168:22, 1172:13

**IV** [9] - 873:7, 966:10, 966:20, 977:24, 979:11, 993:24, 1000:3, 1019:17, 1103:13

---

**J**

**James** [1] - 1193:5

**JAMES** [2] - 873:16, 874:3

**January** [4] - 918:22, 963:6, 977:19, 977:20

**Japan** [1] - 1019:22

**JASON** [1] - 873:20

**Jay** [2] - 1112:10, 1112:16

**JAY** [1] - 1112:16

**Jeff** [5] - 901:22, 944:25, 946:2, 950:22, 951:5

**JEFF** [2] - 874:6, 946:10

**Jeffrey** [1] - 901:24

**JESSICA** [1] - 874:8

**JMOL** [12] - 944:4, 1013:9, 1013:11, 1032:18, 1032:23, 1033:1, 1129:6, 1129:14, 1142:1, 1144:4, 1147:3, 1177:14

**job** [6] - 894:9, 960:10, 1084:11, 1115:4, 1115:10, 1119:18

**JOHN** [1] - 873:20

**joint** [13] - 1185:10, 1186:6, 1186:15, 1187:2, 1187:12, 1187:18, 1187:22, 1188:2, 1188:4, 1188:7, 1190:1, 1191:17, 1192:23

**jointly** [3] - 1186:15, 1189:7, 1191:12

**joke** [1] - 948:11

**Jon** [2] - 1119:5, 1119:11

**JON** [1] - 1119:11

**Jones** [3] - 901:24, 950:22, 951:5

**JPMorgan** [19] - 885:9, 885:13, 885:15, 886:10, 886:22, 891:4, 910:22, 912:17, 934:19, 934:21, 935:10, 936:7, 936:11, 936:16, 936:19, 936:20, 936:21, 938:6, 938:22

**Judge** [3] - 1012:23, 1027:6, 1196:7

**judge** [3] - 880:3, 1012:23, 1013:2

**judgment** [23] - 941:25, 945:21, 997:17, 1012:1, 1016:8, 1023:25, 1032:10, 1032:13, 1032:18, 1036:12, 1132:3, 1133:14, 1134:5, 1137:1, 1179:22, 1179:24, 1180:3, 1180:4, 1180:5, 1180:10, 1180:11, 1180:18, 1188:19

**July** [32] - 925:6, 938:24, 948:23, 949:1, 949:4, 949:5, 961:3, 961:8, 978:22, 981:1,

1021:20, 1021:25, 1047:17, 1047:19, 1047:20, 1047:22, 1048:1, 1049:1, 1049:7, 1050:9, 1051:18, 1053:23, 1053:25, 1054:11, 1054:23, 1056:4, 1056:6, 1056:16, 1057:4, 1060:5, 1082:11, 1116:1

**jump** [2] - 963:10, 1095:20

**jumping** [1] - 1071:25

**June** [5] - 1050:25, 1052:20, 1053:8, 1057:1, 1116:10

**juror** [11] - 1016:4, 1016:17, 1023:11, 1023:13, 1027:19, 1136:13, 1136:16, 1136:23, 1137:18, 1137:25, 1141:2

**jurors** [1] - 1166:12

**JURY** [2] - 873:9, 873:11

**jury** [143] - 873:12, 875:1, 880:5, 891:18, 913:8, 935:24, 941:7, 941:8, 942:7, 942:25, 943:16, 943:23, 944:10, 944:11, 946:17, 958:6, 959:9, 965:17, 981:25, 983:3, 983:11, 985:1, 992:25, 995:1, 999:23, 1010:20, 1011:12, 1011:19, 1011:20, 1012:2, 1013:2, 1014:11, 1014:16, 1014:19, 1015:15, 1024:1, 1025:1, 1025:9, 1025:13, 1025:18, 1026:25, 1031:1, 1032:4, 1032:15, 1032:22, 1033:7, 1033:18, 1034:17, 1034:24, 1035:23, 1035:25, 1036:16, 1037:8, 1037:9, 1042:6, 1062:15, 1070:8, 1088:24, 1095:1, 1097:18, 1112:1, 1112:2, 1112:6, 1112:9, 1114:13, 1121:16, 1129:23,

1130:6, 1130:7, 1130:19, 1130:22, 1131:2, 1131:7, 1131:9, 1132:5, 1132:17, 1132:20, 1133:5, 1134:2, 1134:16, 1141:13, 1142:8, 1143:3, 1143:5, 1143:16, 1144:3, 1144:8, 1144:11, 1144:22, 1145:2, 1145:22, 1146:7, 1146:12, 1146:21, 1146:22, 1147:10, 1147:12, 1147:13, 1147:20, 1148:14, 1149:4, 1157:1, 1159:16, 1161:5, 1165:21, 1167:7, 1168:12, 1168:17, 1169:12, 1172:9, 1174:4, 1176:6, 1176:13, 1176:17, 1176:21, 1177:2, 1185:10, 1185:22, 1186:13, 1186:20, 1186:25, 1187:5, 1187:16, 1187:20, 1187:23, 1188:4, 1188:16, 1188:22, 1188:25, 1189:1, 1189:14, 1189:22, 1189:25, 1191:6, 1191:19, 1193:2, 1194:15, 1195:3, 1196:2, 1196:21, 1197:2

**jury's** [3] - 1036:15, 1191:13, 1194:23

**JUSTIN** [1] - 873:21

---

**K**

**keep** [19] - 884:17, 896:20, 901:10, 902:11, 906:5, 908:1, 924:16, 939:4, 940:5, 999:17, 1085:21, 1103:14, 1103:17, 1143:8, 1149:24, 1174:7, 1174:8, 1188:1, 1195:19

**keeps** [1] - 1111:2

**KENNETH** [1] - 874:4

**kept** [5] - 936:21, 937:25, 1076:1, 1095:14, 1102:18

**key** [3] - 919:2, 1146:7, 1161:12

**Kiewit** [8] - 895:4, 909:18, 936:7, 936:24, 937:4, 938:1, 938:6, 938:22

**kind** [44] - 884:12, 885:5, 886:1, 887:17, 889:2, 891:16, 894:4, 894:12, 896:11, 909:5, 909:25, 911:24, 918:6, 920:20, 927:19, 943:7, 945:7, 958:20, 964:16, 965:18, 970:8, 971:22, 980:17, 1009:8, 1057:17, 1094:8, 1094:20, 1103:5, 1106:2, 1106:7, 1124:1, 1131:23, 1148:3, 1148:20, 1156:12, 1156:13, 1161:19, 1169:1, 1169:4, 1171:5, 1180:22, 1187:11, 1193:25

**kinds** [1] - 943:22

**kinetic** [1] - 1167:22

**knock** [3] - 1105:21, 1105:22, 1106:11

**knocked** [1] - 956:6

**knowing** [4] - 1161:13, 1161:19, 1171:22, 1196:6

**knowingly** [1] - 1069:10

**knowledge** [53] - 876:1, 891:10, 930:13, 930:16, 932:18, 949:22, 953:20, 953:22, 954:9, 966:24, 967:14, 968:1, 969:4, 969:5, 969:14, 973:24, 1021:16, 1021:18, 1021:19, 1028:11, 1028:13, 1028:15, 1035:15, 1067:25, 1068:11, 1110:2, 1126:15, 1126:18, 1134:13, 1160:6, 1160:17, 1161:3, 1161:4, 1161:8, 1161:25, 1162:7, 1162:16, 1163:2, 1163:20, 1163:22, 1164:14, 1165:8, 1165:9, 1167:1, 1167:15, 1167:25,

1168:5, 1168:18, 1169:14, 1170:5, 1173:8, 1173:9

**knowledgeable** [2] - 1002:1, 1031:12

**known** [8] - 962:19, 1003:5, 1025:23, 1071:2, 1090:11, 1104:17, 1125:6, 1136:2

**knows** [5] - 947:15, 1014:17, 1096:7, 1135:19, 1162:24

**Koch** [2] - 894:21, 894:25

**Kuennen** [3] - 1114:14, 1114:20

**Kwauk** [1] - 910:3

**L**

**lab** [13] - 898:6, 898:20, 1001:2, 1001:25, 1002:2, 1002:3, 1002:6, 1002:20, 1002:21, 1005:5, 1006:18, 1040:11, 1091:2

**Labadie** [28] - 884:2, 886:24, 888:5, 895:19, 902:21, 902:22, 902:24, 904:6, 905:4, 906:7, 934:24, 936:18, 970:16, 970:18, 970:24, 970:25, 971:3, 971:5, 971:7, 971:14, 971:15, 971:21, 1051:25, 1052:4, 1052:8, 1089:6, 1104:6

**labeled** [1] - 939:19

**lack** [1] - 1101:2

**ladies** [5] - 1011:12, 1112:8, 1114:12, 1121:16, 1130:22

**laid** [1] - 1096:7

**land** [1] - 974:22

**language** [22] - 1075:10, 1154:22, 1155:11, 1155:18, 1159:8, 1159:22, 1169:23, 1169:25, 1171:4, 1171:25, 1172:2, 1172:13, 1172:14, 1173:17, 1173:20, 1173:24, 1175:5, 1175:7, 1175:11, 1175:15, 1183:13, 1194:5

**Laramie** [15] - 884:2, 891:13, 895:18, 937:1, 937:11, 969:17, 969:19, 969:23, 969:24, 970:3, 1052:19, 1053:1, 1053:5, 1089:3, 1104:6

**large** [3] - 948:15, 997:4, 1140:11

**largely** [2] - 1144:4, 1144:14

**larger** [2] - 996:6, 1140:24

**Larkwood** [10] - 888:6, 970:17, 970:23, 971:5, 971:13, 971:16, 972:1, 972:6, 1051:19, 1103:16

**Larry** [1] - 1114:14

**Laser** [1] - 1140:7

**last** [21] - 919:24, 940:14, 986:18, 989:25, 1051:17, 1056:21, 1061:17, 1065:23, 1074:19, 1101:22, 1119:10, 1122:21, 1150:3, 1151:11, 1151:12, 1152:16, 1168:15, 1168:21, 1171:24, 1181:2, 1196:10

**lastly** [1] - 1085:22

**late** [5] - 930:11, 936:17, 1099:25, 1100:3, 1100:18

**latter** [4] - 961:18, 961:20, 968:25, 1167:20

**law** [40] - 926:2, 942:1, 945:21, 1012:1, 1016:8, 1017:25, 1032:10, 1032:12, 1032:13, 1032:18, 1032:23, 1036:12, 1037:7, 1132:3, 1133:15, 1134:6, 1137:1, 1147:25, 1158:11, 1159:11, 1161:10, 1161:21, 1162:6, 1163:3, 1164:9, 1165:18, 1165:22, 1167:5, 1167:6, 1167:19, 1168:2, 1169:6, 1169:7, 1169:16, 1169:18, 1170:4, 1170:14, 1180:1, 1193:25, 1194:12

**LAW** [1] - 873:16

**laws** [1] - 904:7

**lawsuit** [25] - 883:18, 884:9, 886:18, 888:18, 888:20, 891:20, 891:23, 892:9, 892:12, 894:18, 918:10, 921:10, 922:9, 923:2, 923:3, 923:9, 924:11, 925:13, 938:11, 949:1, 951:20, 1028:14, 1088:11, 1088:12, 1106:19

**Lawton** [1] - 1173:3

**lawyer** [6] - 879:21, 914:20, 925:1, 925:11, 926:2, 930:4

**lawyers** [18] - 883:21, 889:2, 891:18, 891:22, 917:22, 924:16, 925:22, 927:10, 927:15, 929:23, 930:14, 930:16, 941:13, 1011:15, 1011:24, 1094:13, 1111:9, 1195:16

**layers** [1] - 1163:2

**lead** [6] - 1030:8, 1030:11, 1034:24, 1034:25, 1148:23, 1167:9

**leading** [6] - 1078:20, 1080:23, 1111:15, 1111:16, 1157:18

**leads** [1] - 1029:2

**Leah** [1] - 913:11

**learn** [3] - 891:19, 912:12, 1025:25

**learned** [2] - 1026:15, 1104:11

**learning** [1] - 1026:1

**lease** [3] - 974:22, 974:23

**leased** [2] - 998:7

**least** [29] - 881:14, 888:19, 891:10, 911:6, 947:18, 991:10, 995:15, 997:22, 1001:9, 1002:1, 1003:8, 1004:4, 1025:22, 1027:14, 1027:17, 1036:11, 1047:10, 1064:15, 1080:10, 1087:3, 1127:16, 1128:6, 1183:23, 1183:24, 1184:4,

1186:7, 1187:19, 1192:4

**leave** [1] - 1058:12

**leaves** [3] - 947:13, 992:1, 992:19

**leaving** [3] - 1061:11, 1102:18, 1196:24

**led** [4] - 941:7, 1011:19, 1112:1, 1131:7

**left** [7] - 875:2, 1108:10, 1129:24, 1130:2, 1130:24, 1154:25, 1160:2

**leftover** [2] - 1177:25, 1183:14

**legal** [14] - 924:19, 925:10, 925:25, 926:19, 1011:15, 1023:23, 1094:10, 1094:12, 1147:9, 1180:12, 1180:17, 1182:2, 1187:11

**legally** [10] - 925:9, 1016:4, 1022:4, 1023:10, 1032:15, 1106:18, 1136:12, 1136:22, 1137:24, 1165:6

**length** [1] - 997:22

**lengthy** [1] - 1170:24

**LENNON** [2] - 873:16, 1193:4

**Lennon** [1] - 1193:5

**less** [1] - 920:8

**lesser** [1] - 890:8

**letter** [4] - 896:25, 1040:13, 1132:22, 1180:20

**leukemia** [1] - 947:12

**level** [5] - 899:16, 993:2, 1031:14, 1146:11, 1161:3

**levels** [1] - 1163:1

**liability** [11] - 1185:11, 1186:7, 1187:2, 1187:12, 1187:18, 1187:23, 1188:2, 1188:4, 1188:8, 1189:14, 1190:1

**liable** [7] - 1141:14, 1162:3, 1185:23, 1186:12, 1186:15, 1189:2, 1189:7

**license** [15] - 1099:1, 1138:9, 1138:22, 1140:4, 1140:9, 1140:22, 1145:12, 1146:4, 1178:7, 1179:17, 1179:20,

1179:22, 1180:3, 1180:10, 1180:12

**licensed** [4] - 1124:19, 1124:24, 1140:15, 1140:23

**licensees** [2] - 1126:1, 1126:9

**licenses** [22] - 1138:9, 1138:18, 1139:15, 1139:16, 1139:17, 1139:23, 1139:25, 1140:1, 1140:12, 1144:15, 1144:16, 1144:19, 1144:25, 1145:4, 1145:5, 1145:9, 1145:13, 1145:18, 1145:20, 1146:7, 1176:2, 1179:23

**licensing** [2] - 1123:10, 1175:23

**life** [5] - 948:5, 948:8, 954:23, 990:23, 1083:24

**light** [13] - 946:25, 1032:19, 1033:5, 1034:7, 1034:12, 1142:2, 1147:4, 1149:5, 1151:18, 1178:12, 1178:18, 1178:23, 1193:19

**lignite** [15] - 1043:4, 1046:4, 1057:21, 1058:4, 1107:1, 1107:15, 1117:6, 1117:13, 1117:14, 1117:17, 1118:3, 1118:11, 1118:15, 1118:19, 1118:24

**likewise** [1] - 1019:23

**Limestone** [16] - 884:2, 886:5, 886:6, 886:24, 888:1, 917:16, 934:24, 936:18, 967:3, 967:7, 967:12, 1054:6, 1054:14, 1089:7, 1104:6

**limine** [2] - 1065:6, 1194:14

**limit** [4] - 900:19, 912:2, 1117:19, 1118:4

**limitation** [3] - 1026:17, 1026:18, 1033:24

**limits** [3] - 912:21, 913:3, 1118:2

**line** [31] - 913:24, 1020:9, 1020:10,

1022:19, 1042:10, 1045:8, 1047:21, 1048:22, 1048:25, 1050:12, 1050:14, 1050:16, 1051:12, 1051:20, 1051:22, 1052:22, 1052:23, 1053:25, 1055:1, 1056:5, 1057:6, 1062:9, 1155:17, 1170:13, 1173:16, 1174:8, 1179:4, 1179:5, 1184:13, 1184:15, 1184:21

**lines** [11] - 922:20, 1017:17, 1017:18, 1019:25, 1101:10, 1101:11, 1178:8, 1188:15

**lingering** [2] - 1155:3, 1165:25

**link** [3] - 1067:2, 1068:10, 1182:13

**linkage** [1] - 1182:14

**linked** [1] - 1182:19

**linking** [2] - 1019:13, 1067:14

**Linton** [10] - 894:3, 894:20, 895:6, 906:17, 906:23, 907:13, 908:14, 910:2, 947:5, 1107:23

**liquid** [1] - 993:12

**list** [12] - 914:20, 931:6, 936:7, 976:17, 976:18, 1050:22, 1050:23, 1148:3, 1155:1, 1173:2, 1182:8

**listed** [6] - 916:6, 1086:23, 1097:5, 1160:25, 1182:7, 1189:5

**listen** [1] - 922:13

**listing** [1] - 1188:14

**lists** [1] - 1157:4

**literally** [4] - 928:12, 935:16, 946:23, 1106:17

**litigation** [2] - 1025:24, 1171:12

**live** [14] - 931:9, 931:19, 1014:10, 1065:10, 1065:13, 1065:24, 1071:15, 1071:16, 1071:23, 1093:20, 1093:23, 1093:24, 1097:6, 1097:10

**LLC** [44] - 888:1, 888:6, 894:5, 937:17, 957:6, 957:7, 957:9, 957:16, 964:6, 964:7, 978:5, 978:6, 979:10, 979:11, 979:12, 979:18, 979:21, 981:6, 981:8, 981:14, 981:17, 982:23, 983:1, 984:4, 984:9, 984:14, 984:15, 987:5, 987:6, 987:13, 987:21, 988:15, 990:19, 993:23, 993:24, 993:25, 1000:3

**LLCs** [11] - 894:14, 927:16, 928:2, 928:7, 928:18, 929:8, 933:18, 939:20, 1143:12

**LLP** [2] - 874:3, 874:6

**load** [1] - 1117:17

**loads** [1] - 1118:4

**located** [10] - 879:4, 880:12, 954:18, 959:12, 972:24, 972:25, 989:1, 994:24, 997:11, 1087:9

**location** [3] - 879:13, 971:16, 996:14

**locations** [2] - 966:6, 1143:7

**lodge** [1] - 1094:18

**lodging** [1] - 1095:10

**logic** [2] - 1085:5, 1091:13

**logistical** [1] - 1147:21

**logistically** [1] - 1133:3

**logistics** [1] - 1187:5

**longest** [1] - 1074:17

**longstanding** [1] - 1140:5

**look** [46] - 879:23, 885:25, 893:24, 901:17, 906:12, 922:6, 923:15, 927:22, 963:24, 965:17, 974:16, 978:24, 980:7, 980:15, 982:8, 984:5, 1007:8, 1007:11, 1027:6, 1027:12, 1030:5, 1041:9, 1044:16,

1059:22, 1059:24, 1072:24, 1073:5, 1074:2, 1078:8, 1078:11, 1079:4, 1079:14, 1079:15, 1086:5, 1088:17, 1091:5, 1091:8, 1099:3, 1147:25, 1166:11, 1168:19, 1168:20, 1172:18, 1181:17, 1182:11, 1195:5

**looked** [19] - 887:2, 922:3, 922:10, 922:19, 923:6, 923:8, 929:10, 951:17, 955:1, 974:9, 976:17, 976:20, 984:22, 1052:14, 1053:15, 1054:22, 1065:7, 1073:13, 1161:10

**looking** [27] - 883:13, 892:22, 893:19, 894:23, 906:13, 906:14, 907:19, 908:9, 910:18, 915:14, 933:12, 933:17, 935:12, 936:14, 952:3, 976:15, 979:15, 994:21, 1001:5, 1009:12, 1012:8, 1040:25, 1071:11, 1079:16, 1086:8, 1105:7

**looks** [7] - 910:2, 1075:9, 1075:10, 1154:23, 1155:8, 1167:13, 1177:22

**lose** [2] - 1167:11, 1188:19

**loss** [4] - 1018:19, 1018:21, 1030:18, 1036:8

**lost** [1] - 877:23

**Louisiana** [4] - 971:19, 971:20, 971:22, 971:25

**love** [2] - 1015:10, 1195:11

**low** [3] - 1117:15, 1118:13, 1140:9

**lower** [3] - 997:12, 997:14, 1117:19

**lump** [1] - 1140:10

**lunch** [10] - 944:6, 991:5, 1011:13, 1011:16, 1011:23, 1012:20, 1012:24,

1098:1, 1109:9

**lunchtime** [2] - 944:3, 1012:5

**Lundy** [22] - 884:22, 884:25, 885:8, 885:13, 885:18, 886:4, 886:11, 886:21, 887:2, 889:8, 889:18, 890:4, 890:12, 890:20, 891:3, 892:16, 892:25, 893:16, 909:12, 910:21, 912:15, 1021:20

## M

**M-Sorb** [1] - 991:18

**machinery** [1] - 1115:17

**MacPherson** [3] - 956:19, 1105:22, 1144:11

**MacPherson's** [2] - 944:20, 956:11

**made-up** [1] - 928:7

**magnitude** [1] - 1140:24

**mail** [25] - 893:19, 895:22, 896:13, 901:21, 902:4, 902:11, 902:16, 903:23, 905:25, 906:17, 906:25, 907:23, 908:14, 911:3, 911:11, 912:1, 913:11, 914:17, 948:17, 948:19, 949:6, 950:22, 951:15, 951:18, 1035:7

**mailed** [1] - 1085:11

**mails** [20] - 883:12, 883:13, 892:4, 903:25, 909:14, 911:12, 948:1, 948:2, 948:9, 948:12, 948:14, 949:8, 950:1, 950:3, 952:9, 952:18, 952:23, 1021:23, 1100:4, 1105:2

**main** [3] - 1076:7, 1121:14, 1156:7

**maintain** [3] - 901:7, 1085:16, 1194:15

**maintenance** [3] - 964:5, 964:13, 965:3

**majority** [10] - 934:12,

934:14, 934:18, 934:20, 935:7, 935:9, 935:10, 936:1, 936:4, 939:23

**man** [1] - 1013:1

**manage** [1] - 1120:13

**managed** [2] - 1185:19, 1185:20

**management** [3] - 960:15, 998:10, 1123:22

**manager** [1] - 1085:8

**mandates** [1] - 998:17

**manned** [1] - 956:2

**manner** [1] - 1010:7

**manufacture** [2] - 955:12, 958:14

**manufacturing** [1] - 1139:18

**Manufacturing** [4] - 989:1, 989:7, 1057:1, 1057:16

**March** [3] - 902:16, 913:12, 1078:2

**mark** [1] - 945:8

**marked** [3] - 911:6, 943:18, 945:15

**market** [1] - 1123:12

**marketplace** [1] - 1123:9

**marking** [1] - 944:15

**Marquis** [15] - 937:17, 937:20, 937:22, 968:3, 968:21, 969:2, 971:10, 1046:6, 1048:5, 1185:17, 1185:19, 1185:20, 1185:23, 1188:23, 1190:3

**Marshall** [8] - 972:25, 973:5, 973:10, 973:20, 973:22, 976:23, 977:4

**master's** [1] - 1123:20

**matches** [1] - 1162:22

**material** [13] - 980:4, 982:5, 983:8, 985:12, 1014:24, 1018:12, 1099:15, 1100:12, 1151:14, 1170:9, 1172:11, 1177:2

**Materials** [2] - 1019:16

**materials** [3] - 1014:10, 1109:23, 1147:19

**math** [2] - 938:14, 1113:8

**MATS** [25] - 895:11, 896:20, 897:3,

897:13, 897:19, 898:25, 899:17, 900:25, 901:3, 904:7, 904:11, 904:17, 904:23, 908:3, 908:17, 1020:24, 1021:4, 1021:5, 1025:17, 1025:20, 1088:13, 1107:13, 1107:24, 1116:24, 1120:18

**matter** [25] - 886:2, 893:5, 900:11, 941:25, 945:21, 951:25, 1012:1, 1013:20, 1016:8, 1032:10, 1032:13, 1032:18, 1036:7, 1036:12, 1048:4, 1062:2, 1132:3, 1133:15, 1134:6, 1137:1, 1180:1, 1180:17, 1187:5, 1187:12, 1195:24

**matters** [4] - 943:7, 1105:6, 1165:5, 1165:6

**maximize** [1] - 1029:7

**MAZUR** [1] - 873:17

**McCarty** [3] - 1162:9, 1166:17, 1196:12

**MCCARTY** [9] - 873:21, 1160:23, 1162:11, 1163:17, 1164:20, 1166:18, 1168:24, 1195:24, 1196:13

**ME2C** [21] - 930:19, 956:20, 1094:23, 1099:1, 1101:20, 1102:3, 1103:19, 1109:23, 1124:6, 1124:8, 1124:11, 1124:14, 1124:24, 1125:3, 1125:6, 1145:5, 1146:5, 1150:17, 1178:4, 1178:10

**ME2C's** [6] - 944:1, 1144:10, 1145:6, 1145:7, 1149:17, 1150:5

**mean** [59] - 879:2, 883:16, 883:18, 884:21, 894:11, 898:17, 912:5, 914:24, 917:6, 921:16, 929:11, 931:16, 934:1, 943:7, 947:5,

956:16, 956:23, 958:15, 959:17, 962:9, 976:7, 977:15, 979:15, 985:23, 986:25, 991:20, 1006:23, 1008:5, 1030:21, 1035:22, 1038:24, 1043:12, 1052:3, 1056:11, 1057:11, 1063:17, 1075:22, 1081:8, 1083:7, 1088:9, 1089:9, 1089:10, 1106:4, 1111:11, 1118:6, 1120:17, 1123:7, 1156:7, 1168:10, 1170:23, 1174:2, 1178:15, 1178:16, 1179:25, 1186:5, 1188:7, 1188:11, 1188:13, 1188:19

**means** [9] - 915:6, 924:11, 1010:25, 1011:2, 1053:4, 1069:1, 1120:25, 1123:9, 1128:4

**meant** [1] - 1190:8

**meantime** [1] - 1195:2

**measure** [4] - 1002:24, 1004:14, 1064:23, 1115:14

**measured** [5] - 1003:3, 1010:21, 1010:25, 1011:4, 1064:21

**measurement** [1] - 1011:3

**measures** [1] - 1010:4

**measuring** [3] - 904:22, 1061:10, 1064:18

**mechanical** [3] - 958:11, 965:21, 976:20

**med** [1] - 1114:9

**meet** [22] - 895:11, 897:3, 898:25, 899:10, 899:14, 899:21, 900:25, 904:23, 908:17, 912:2, 912:12, 912:21, 976:3, 1001:3, 1034:14, 1038:22, 1041:4, 1061:24, 1085:24, 1107:13, 1107:24, 1118:1

**meeting** [9] - 896:2, 896:20, 897:20,

898:4, 899:13, 899:15, 913:2, 919:11, 992:2

**meets** [2] - 898:5, 900:21

**megawatt** [3] - 1117:17, 1117:19, 1118:14

**member** [1] - 894:10

**members** [2] - 894:5, 918:8

**membership** [2] - 937:7, 937:8

**MEMC** [1] - 1019:15

**mens** [1] - 1169:14

**mental** [3] - 1071:25, 1072:3, 1072:11

**mentally** [1] - 933:14

**mention** [1] - 1133:2

**mentioned** [9] - 991:13, 1001:10, 1003:10, 1030:16, 1041:3, 1098:13, 1120:4, 1160:1, 1192:18

**mentions** [1] - 1150:13

**mercury** [108] - 887:18, 887:22, 888:2, 888:8, 888:15, 890:2, 890:6, 890:12, 891:13, 892:18, 896:2, 896:19, 897:14, 897:20, 898:1, 898:13, 898:24, 899:16, 900:12, 900:16, 900:19, 902:25, 903:1, 903:7, 903:13, 904:19, 904:22, 912:21, 912:22, 913:3, 914:5, 914:9, 951:2, 951:6, 951:8, 951:10, 1002:24, 1003:3, 1003:6, 1003:8, 1003:10, 1003:12, 1003:25, 1004:5, 1004:8, 1005:8, 1010:21, 1011:2, 1016:25, 1017:1, 1017:2, 1017:3, 1021:4, 1037:20, 1038:1, 1044:4, 1047:5, 1060:23, 1061:1, 1061:2, 1061:5, 1061:6, 1061:7, 1061:8, 1061:11,

1061:12, 1061:14, 1061:24, 1062:7, 1063:9, 1063:10, 1063:15, 1064:13, 1064:21, 1064:22, 1064:23, 1107:9, 1111:2, 1115:24, 1116:2, 1116:6, 1116:9, 1116:20, 1116:24, 1120:18, 1120:20, 1121:3, 1121:7, 1124:12, 1124:21, 1124:25, 1125:13, 1125:16, 1125:17, 1125:18, 1125:22, 1126:22, 1127:1, 1127:6, 1127:8, 1127:13, 1127:22, 1128:1, 1128:5, 1139:1, 1139:17

**mercury-containing** [3] - 1017:1, 1017:2, 1017:3

**merely** [2] - 1061:6, 1061:9

**merit** [2] - 1076:6, 1094:17

**MerSorb** [60] - 889:12, 889:16, 889:17, 889:19, 890:5, 896:17, 897:10, 905:3, 914:11, 976:21, 991:18, 991:24, 993:11, 1003:5, 1004:2, 1004:8, 1037:17, 1037:19, 1038:4, 1038:13, 1038:14, 1038:16, 1038:18, 1039:3, 1039:22, 1040:7, 1040:14, 1040:25, 1043:2, 1043:7, 1043:9, 1043:10, 1043:24, 1045:1, 1046:16, 1046:22, 1047:9, 1047:25, 1048:3, 1049:13, 1049:20, 1050:19, 1052:12, 1053:15, 1054:2, 1054:4, 1054:8, 1055:8, 1056:9, 1056:13, 1057:8, 1057:10, 1057:14, 1062:11, 1085:19, 1090:24, 1113:24, 1114:4, 1114:9, 1135:8

**metering** [1] - 958:13

**method** [10] - 1009:22, 1010:3, 1010:4, 1018:8, 1090:14, 1127:15, 1134:12, 1135:4, 1160:10, 1161:7

**methods** [4] - 1009:20, 1010:1, 1139:20

**Microsoft** [3] - 1018:1, 1018:2, 1022:18

**middle** [10] - 904:10, 979:2, 980:17, 982:14, 1009:8, 1009:12, 1150:22, 1154:10, 1169:19, 1178:6

**Midwest** [5] - 933:7, 1095:10, 1104:10, 1106:18, 1124:3

**MIDWEST** [1] - 873:3

**might** [22] - 920:5, 920:11, 920:22, 924:3, 943:11, 963:9, 1030:24, 1037:25, 1082:5, 1082:19, 1111:9, 1132:15, 1145:10, 1151:9, 1151:12, 1156:18, 1159:13, 1159:17, 1168:20, 1171:21, 1189:13, 1192:22

**MIL** [1] - 1072:13

**mill** [1] - 1118:22

**million** [19] - 938:12, 938:15, 938:21, 938:25, 939:3, 940:4, 1083:24, 1099:1, 1185:18, 1185:23, 1185:25, 1186:3, 1188:25, 1189:15, 1189:22, 1189:23, 1190:2, 1190:6, 1190:10

**millions** [2] - 915:20, 1190:12

**mills** [2] - 1118:9, 1118:12

**mind** [25] - 879:23, 879:25, 880:16, 899:2, 899:18, 902:12, 906:5, 908:4, 908:5, 908:13, 914:18, 933:15, 1026:13, 1026:19, 1066:8, 1066:17, 1067:8, 1067:18, 1069:22, 1070:10, 1084:5,

1084:8, 1089:19, 1183:1, 1189:10

**minds** [2] - 944:7, 1154:19

**mindset** [2] - 899:7, 900:4

**mine** [1] - 894:10

**minimal** [1] - 1177:10

**minimum** [6] - 1038:22, 1038:25, 1039:9, 1040:8, 1040:15, 1143:16

**minor** [1] - 1177:25

**minute** [8] - 895:16, 961:23, 984:10, 987:10, 1059:22, 1088:3, 1111:25, 1129:19

**minutes** [14] - 942:18, 946:18, 999:18, 1011:17, 1031:24, 1094:3, 1095:2, 1109:6, 1109:7, 1131:20, 1131:21, 1132:16, 1147:18, 1181:5

**minutes-ish** [1] - 942:18

**misadded** [1] - 938:21

**mislead** [3] - 896:9, 923:19, 1095:1

**misrepresent** [1] - 1177:8

**miss** [1] - 1154:5

**missed** [2] - 1050:14, 1181:22

**misspeak** [1] - 1092:5

**misspoke** [1] - 1037:25

**misstatement** [1] - 1145:24

**mistake** [14] - 971:18, 971:24, 1141:24, 1164:14, 1167:4, 1167:6, 1167:19, 1168:19, 1169:6, 1169:7, 1169:16, 1169:18, 1171:18, 1194:12

**mistaken** [3] - 890:16, 1066:4, 1170:3

**mistakenly** [1] - 1136:2

**mistakes** [1] - 1066:20

**misunderstood** [1] - 1069:13

**Mitsubishi** [1] - 1019:16

**mixed** [3] - 993:15, 1002:22, 1064:14

**mixer** [1] - 993:15

**Mod** [40] - 890:15, 890:19, 905:2, 906:19, 914:10, 914:13, 920:5, 922:5, 922:6, 922:21, 922:24, 923:1, 923:10, 923:11, 923:13, 979:25, 982:1, 983:4, 985:8, 1001:23, 1060:21, 1060:25, 1061:4, 1062:22, 1078:18, 1078:22, 1098:10, 1098:15, 1113:15, 1113:23, 1113:24, 1114:2, 1126:1, 1126:5, 1126:16, 1139:16, 1145:12, 1145:13, 1146:2

**Mod's** [4] - 891:2, 923:4, 923:6, 1126:9

**model** [2] - 900:2

**modification** [1] - 1122:22

**modify** [2] - 1128:10, 1161:19

**module** [2] - 991:9, 999:16

**molecular** [1] - 1061:7

**moment** [3] - 992:18, 1031:12, 1122:1

**Monday** [1] - 1195:13

**money** [2] - 940:7, 958:18

**monitoring** [1] - 958:12

**monitors** [1] - 1085:6

**month** [6] - 990:14, 1001:7, 1040:4, 1042:20, 1074:18

**monthly** [3] - 1085:24, 1086:22, 1087:3

**months** [11] - 976:5, 976:7, 986:16, 1001:9, 1004:16, 1006:17, 1006:19, 1038:20, 1039:25, 1040:5

**moon** [1] - 1005:11

**moral** [2] - 900:13, 1188:19

**moreover** [2] - 1021:19, 1136:7

**morning** [11] - 940:20, 941:4, 941:7, 1022:10, 1104:16, 1131:5, 1191:19, 1192:2, 1193:1,

1195:1, 1195:7

**MORRIS** [1] - 874:3

**most** [18] - 877:15, 878:8, 878:18, 880:13, 882:15, 998:8, 1008:5, 1020:11, 1020:17, 1023:25, 1027:5, 1032:19, 1113:10, 1132:16, 1139:23, 1176:4, 1188:13, 1194:19

**mostly** [1] - 1129:20

**motion** [43] - 942:1, 942:5, 942:6, 942:7, 942:15, 943:3, 943:4, 944:3, 944:4, 945:22, 945:23, 1012:1, 1013:9, 1013:16, 1015:4, 1015:23, 1023:24, 1032:9, 1032:25, 1033:2, 1033:10, 1036:11, 1065:6, 1129:8, 1129:9, 1129:14, 1129:22, 1130:4, 1130:18, 1131:12, 1132:1, 1132:8, 1132:11, 1133:21, 1144:4, 1165:4, 1179:22, 1179:24, 1180:2, 1180:4, 1180:11, 1180:23, 1194:13

**motions** [10] - 941:20, 944:6, 1013:11, 1015:25, 1023:24, 1142:1, 1144:7, 1147:3, 1147:7, 1147:8

**motivated** [3] - 1025:12, 1029:6, 1143:17

**motive** [3] - 939:4, 940:5, 1036:2

**Mount** [19] - 953:17, 953:20, 988:5, 988:9, 1060:11, 1077:2, 1102:10, 1105:12, 1111:11, 1114:15, 1115:25, 1116:3, 1116:7, 1116:21, 1117:2, 1117:5, 1117:10, 1118:1, 1118:18

**move** [20] - 879:5, 881:7, 907:2, 910:9, 945:20, 964:20, 975:2, 1016:2, 1045:10, 1048:21,

1086:11, 1093:13, 1129:5, 1132:3, 1133:14, 1133:25, 1136:21, 1137:23, 1180:9, 1181:12

**moved** [2] - 994:10, 1051:2

**moves** [3] - 902:3, 911:16, 913:16

**Moving** [1] - 1133:24

**moving** [1] - 1136:20

**MR** [317] - 875:8, 875:10, 882:11, 882:19, 884:17, 884:20, 887:9, 887:10, 893:6, 893:13, 893:14, 899:1, 899:3, 899:12, 902:3, 902:6, 902:10, 907:2, 907:5, 907:7, 907:10, 910:9, 910:12, 910:16, 911:16, 911:19, 911:23, 913:16, 913:19, 913:23, 923:19, 924:1, 924:18, 924:20, 924:25, 928:9, 928:12, 928:16, 928:21, 929:3, 932:6, 932:10, 932:13, 932:21, 932:24, 933:6, 939:5, 939:8, 939:10, 939:12, 939:16, 940:18, 940:21, 940:25, 941:5, 941:10, 941:18, 941:25, 942:13, 943:6, 943:25, 944:5, 944:13, 944:19, 945:6, 945:11, 945:16, 945:20, 946:2, 946:6, 946:8, 946:15, 946:22, 947:3, 950:7, 950:9, 950:12, 950:14, 951:12, 951:14, 952:20, 952:22, 952:24, 953:2, 954:12, 954:14, 964:20, 964:23, 965:2, 966:7, 966:9, 966:25, 967:1, 969:15, 969:16, 970:14, 970:15, 972:10, 972:11, 975:2, 975:5, 975:9,

978:17, 978:19, 980:10, 980:12, 983:15, 983:17, 991:3, 991:8, 991:11, 991:12, 994:12, 994:17, 995:17, 995:18, 996:3, 999:16, 999:20, 1007:7, 1007:9, 1007:15, 1007:17, 1008:23, 1009:1, 1009:5, 1009:7, 1009:9, 1010:13, 1010:16, 1011:9, 1013:19, 1013:22, 1014:4, 1014:8, 1014:22, 1015:5, 1015:10, 1015:17, 1015:20, 1015:22, 1023:18, 1036:18, 1036:21, 1037:3, 1037:14, 1041:17, 1041:18, 1041:23, 1042:1, 1042:5, 1045:10, 1045:13, 1045:17, 1045:18, 1060:15, 1060:17, 1065:1, 1065:5, 1066:7, 1067:7, 1067:16, 1068:5, 1068:12, 1068:22, 1069:4, 1069:9, 1069:16, 1070:5, 1070:12, 1070:21, 1071:9, 1071:14, 1072:17, 1072:23, 1080:22, 1081:2, 1086:11, 1086:14, 1086:18, 1092:25, 1093:2, 1093:5, 1095:4, 1095:8, 1096:6, 1096:13, 1097:13, 1097:16, 1100:24, 1101:1, 1101:8, 1101:12, 1102:25, 1103:3, 1103:8, 1103:10, 1103:17, 1103:18, 1104:2, 1104:4, 1104:14, 1104:15, 1108:25, 1109:3, 1109:7, 1109:12, 1109:20, 1109:22, 1110:3, 1111:14, 1111:18, 1111:21, 1112:8, 1114:12, 1119:4, 1121:16, 1128:21, 1129:1, 1129:5, 1129:16, 1129:18, 1130:1, 1130:17,

1131:14, 1131:19, 1132:10, 1133:7, 1133:14, 1133:18, 1133:20, 1133:25, 1139:8, 1139:13, 1144:1, 1149:21, 1151:9, 1151:12, 1151:19, 1151:22, 1152:23, 1153:7, 1153:15, 1153:25, 1155:5, 1155:9, 1155:19, 1156:7, 1157:12, 1158:25, 1160:21, 1160:23, 1162:11, 1163:17, 1164:20, 1165:15, 1166:2, 1166:18, 1168:24, 1169:24, 1170:8, 1170:17, 1171:11, 1171:19, 1172:18, 1172:21, 1173:1, 1174:1, 1174:11, 1174:14, 1174:19, 1174:23, 1175:9, 1175:25, 1176:11, 1177:6, 1177:24, 1178:15, 1179:10, 1179:13, 1180:25, 1183:1, 1183:6, 1183:9, 1183:12, 1183:16, 1183:19, 1183:22, 1184:7, 1184:9, 1184:12, 1184:17, 1184:20, 1184:23, 1185:1, 1185:6, 1186:1, 1186:10, 1186:17, 1186:23, 1187:17, 1188:12, 1189:12, 1189:21, 1190:5, 1190:13, 1190:15, 1190:20, 1192:10, 1192:11, 1192:15, 1193:4, 1193:10, 1193:12, 1195:24, 1196:13, 1196:23

**MS** [40] - 1023:20, 1027:7, 1027:23, 1028:7, 1028:18, 1028:22, 1029:11, 1030:4, 1030:9, 1030:21, 1031:6, 1031:22, 1132:2, 1141:9, 1142:5, 1148:24, 1149:6, 1149:9, 1149:13, 1149:16, 1149:20, 1150:1, 1150:3, 1150:8, 1150:13, 1150:19, 1150:21,

1151:5, 1151:8, 1152:8, 1152:11, 1152:16, 1152:20, 1153:4, 1154:7, 1154:10, 1154:17, 1158:1, 1194:8, 1194:11

**multiple** [3] - 973:16, 1097:20, 1101:20

**Murray** [1] - 894:22

**must** [16] - 904:7, 927:17, 995:8, 1016:10, 1024:11, 1025:17, 1026:21, 1035:12, 1060:22, 1128:12, 1134:8, 1137:3, 1138:3, 1138:4, 1138:9, 1176:16

**mutually** [1] - 1170:14

**Mylan** [12] - 895:4, 907:17, 908:25, 909:2, 909:5, 909:18, 936:7, 937:17, 937:20, 938:3, 938:6, 938:22

## N

**Nalco** [2] - 1139:16, 1146:2

**name** [16] - 935:10, 935:11, 935:16, 936:1, 937:3, 940:8, 974:21, 979:16, 982:21, 982:24, 984:6, 1112:14, 1112:16, 1119:10, 1125:7, 1182:2

**named** [16] - 927:12, 929:5, 929:16, 979:6, 980:18, 982:15, 983:22, 984:2, 984:6, 985:15, 985:23, 1060:8, 1073:23, 1074:8, 1080:2, 1080:8

**names** [7] - 928:13, 936:13, 936:15, 937:23, 1122:12, 1182:14, 1188:14

**narrative** [1] - 893:7

**narrowed** [1] - 1104:10

**nature** [4] - 928:3, 928:5, 1034:8, 1101:21

**nearly** [1] - 1116:20

**necessarily** [8] -

1025:4, 1072:8, 1072:9, 1107:14, 1156:10, 1157:20, 1180:5, 1185:8

**necessary** [6] - 899:16, 1015:8, 1015:25, 1020:23, 1085:10, 1172:10

**neck** [1] - 1195:25

**need** [51] - 896:19, 897:14, 902:12, 912:19, 929:18, 932:22, 942:4, 953:12, 983:11, 995:25, 1000:10, 1003:20, 1011:14, 1014:16, 1014:20, 1015:3, 1027:25, 1039:10, 1039:14, 1078:10, 1085:15, 1100:15, 1100:18, 1107:14, 1107:19, 1107:23, 1118:17, 1121:14, 1147:19, 1148:21, 1149:3, 1149:4, 1151:7, 1152:25, 1164:4, 1168:17, 1168:19, 1174:25, 1175:15, 1175:17, 1177:18, 1179:15, 1181:6, 1182:24, 1183:25, 1184:5, 1187:7, 1191:17, 1192:13, 1193:4

**needed** [11] - 875:17, 897:10, 899:14, 917:9, 956:4, 1041:2, 1050:18, 1129:7, 1173:25, 1174:2, 1196:16

**needing** [2] - 1014:20, 1108:2

**needs** [7] - 1014:24, 1133:12, 1170:21, 1180:19, 1180:21, 1181:5, 1184:10

**negate** [2] - 917:2, 917:4

**negated** [1] - 916:4

**negates** [1] - 917:24

**negotiation** [6] - 1140:13, 1154:12, 1154:19, 1178:3, 1178:4, 1178:20

**NEMUNAITIS** [1] - 873:21

**Nemunaitis** [2] - 914:25, 944:22

**Networks** [1] -

1161:22

**never** [29] - 879:6, 892:6, 893:4, 906:5, 908:10, 946:23, 951:7, 951:11, 952:17, 953:22, 954:9, 988:2, 999:2, 1005:20, 1006:5, 1014:24, 1058:11, 1060:12, 1061:21, 1080:12, 1091:3, 1091:4, 1092:6, 1098:13, 1118:16, 1121:12, 1126:13, 1126:14, 1134:21

**new** [2] - 963:11, 1182:17

**news** [1] - 1130:23

**next** [49] - 906:15, 919:23, 933:11, 942:18, 945:25, 965:23, 966:8, 966:25, 967:15, 968:2, 969:15, 970:14, 972:10, 990:9, 991:14, 1004:16, 1006:19, 1024:20, 1038:19, 1039:25, 1047:6, 1051:12, 1052:16, 1053:20, 1062:13, 1063:7, 1064:4, 1064:19, 1064:25, 1103:8, 1112:7, 1119:4, 1129:20, 1150:1, 1150:8, 1150:21, 1152:11, 1153:15, 1153:17, 1154:24, 1159:24, 1174:21, 1181:5, 1182:20, 1182:21, 1184:12, 1184:14

**night** [3] - 1085:4, 1085:7, 1181:2

**Niksa** [1] - 940:15

**nine** [7] - 948:2, 1044:22, 1044:23, 1045:8, 1059:4, 1059:11, 1102:12

**nitrogen** [1] - 1003:19

**nitrous** [1] - 1037:23

**nobody** [2] - 996:10, 1058:23

**noise** [1] - 1048:24

**non** [33] - 1063:9, 1077:23, 1078:4, 1078:25, 1081:17, 1082:5, 1082:15, 1082:18, 1082:23, 1084:9, 1088:4,

1088:7, 1090:7, 1105:7, 1134:10, 1134:19, 1136:4, 1139:19, 1141:21, 1142:6, 1160:13, 1161:17, 1162:3, 1163:25, 1164:15, 1165:1, 1165:12, 1167:1, 1167:15, 1177:16

**non-brominated** [1] - 1139:19

**non-infringing** [30] - 1077:23, 1078:4, 1078:25, 1081:17, 1082:5, 1082:15, 1082:18, 1082:23, 1084:9, 1088:4, 1088:7, 1090:7, 1105:7, 1134:10, 1134:19, 1136:4, 1141:21, 1142:6, 1160:13, 1161:17, 1162:3, 1163:25, 1164:15, 1165:1, 1165:12, 1167:1, 1167:15, 1177:16

**non-refined** [1] - 1063:9

**non-substantial** [1] - 1165:1

**none** [6] - 882:8, 949:17, 1014:10, 1093:19, 1093:22, 1139:3

**noninfringement** [4] - 915:7, 925:19, 1029:20, 1180:5

**nonmovant** [1] - 1032:20

**nonmoving** [1] - 1032:14

**nonpublic** [1] - 930:8

**nonresponsive** [1] - 893:8

**normal** [2] - 958:5, 1109:9

**north** [2] - 971:15, 996:13

**North** [7] - 973:1, 1001:14, 1001:19, 1046:4, 1112:21, 1123:19, 1123:21

**not..** [1] - 906:4

**note** [9] - 904:6, 943:2, 1013:7, 1018:6, 1035:6, 1036:12, 1130:17, 1131:15, 1146:7

**notebook** [15] - 950:4,

950:15, 963:18, 974:16, 978:7, 978:10, 978:12, 980:8, 982:8, 983:13, 1007:11, 1041:9, 1044:16, 1059:24, 1086:7

**notebooks** [2] - 963:17, 963:20

**noted** [8] - 945:13, 945:22, 1035:6, 1036:1, 1160:1, 1178:7, 1194:18, 1197:5

**notes** [3] - 1144:13, 1179:6, 1193:8

**nothing** [16] - 899:23, 900:7, 917:4, 928:19, 944:9, 977:10, 1012:15, 1017:20, 1095:9, 1106:17, 1129:7, 1138:20, 1142:11, 1153:1, 1172:21, 1195:6

**notice** [6] - 951:22, 1007:23, 1007:25, 1008:12, 1010:6, 1010:9

**noticed** [1] - 1133:2

**notified** [3] - 883:14, 892:1, 1031:6

**November** [9] - 917:21, 1046:3, 1049:7, 1049:12, 1120:17, 1121:5, 1121:6, 1121:8

**NOx** [22] - 896:3, 900:17, 1002:25, 1003:3, 1003:7, 1003:9, 1003:10, 1003:15, 1003:17, 1003:18, 1003:25, 1004:5, 1004:12, 1037:23, 1044:4, 1047:5, 1047:10, 1125:14, 1128:1, 1139:1, 1139:4, 1139:18

**NRG** [4] - 876:12, 913:25, 914:4, 914:8

**NRG's** [1] - 968:17

**nub** [1] - 1165:7

**number** [24] - 884:15, 886:7, 898:22, 916:9, 919:19, 925:17, 948:15, 975:10, 1005:17, 1013:6, 1030:16, 1039:8, 1088:20,

1088:25, 1089:4, 1103:2, 1155:15, 1161:8, 1163:20, 1164:5, 1189:17, 1189:18

**Number** [4] - 907:8, 1000:2, 1103:24, 1103:25

**numbered** [1] - 1095:25

**numbering** [1] - 1014:3

**numbers** [19] - 899:14, 901:20, 903:13, 905:22, 918:16, 943:11, 943:14, 944:16, 1003:3, 1011:3, 1045:9, 1085:9, 1085:23, 1131:25, 1154:24, 1183:13, 1189:5, 1190:9

**numbers-wise** [1] - 1154:24

## O

**O&M** [3] - 965:6, 974:8, 976:18

**O'Keefe** [22] - 914:25, 944:23, 1017:5, 1017:7, 1018:13, 1018:19, 1019:9, 1019:12, 1019:24, 1020:6, 1020:17, 1021:5, 1021:10, 1021:15, 1022:2, 1022:12, 1030:22, 1077:25, 1139:21, 1143:2, 1145:22, 1145:25

**O'Keefe's** [2] - 944:21, 1156:14

**oath** [2] - 878:3, 930:19

**object** [6] - 893:7, 899:1, 1036:22, 1166:19, 1166:23, 1176:7

**objected** [1] - 925:11

**objecting** [2] - 882:16, 1111:15

**objection** [56] - 882:11, 882:13, 893:11, 899:8, 902:5, 907:4, 910:11, 911:18, 911:19, 913:18, 913:19, 923:18, 923:22, 923:25,

924:18, 928:9, 928:14, 928:21, 928:24, 932:6, 932:17, 932:20, 939:5, 939:14, 946:22, 946:25, 964:22, 964:23, 975:4, 1008:25, 1009:1, 1015:9, 1015:16, 1037:2, 1037:3, 1041:25, 1045:12, 1045:13, 1072:16, 1080:22, 1086:13, 1086:14, 1095:4, 1096:6, 1096:9, 1109:20, 1109:21, 1109:25, 1111:14, 1129:24, 1132:8, 1151:16, 1166:16, 1169:24, 1172:1, 1194:16

**objections** [3] - 1149:23, 1169:22, 1171:23

**objective** [2] - 899:21, 1092:2

**obligation** [4] - 877:2, 877:11, 877:13, 878:11

**observation** [1] - 1188:14

**observe** [2] - 887:12, 888:17

**obtain** [1] - 1036:5

**obtaining** [1] - 1036:4

**obviously** [9] - 885:8, 923:23, 934:9, 1025:10, 1029:6, 1100:7, 1109:22, 1181:13, 1189:25

**occasion** [1] - 1044:13

**occasions** [1] - 1043:17

**occur** [3] - 969:21, 1035:12, 1036:4

**occurred** [2] - 976:3, 1070:15

**occurring** [3] - 1022:6, 1022:13, 1039:15

**October** [7] - 976:6, 983:20, 986:12, 986:13, 1074:10, 1074:11, 1076:11

**odd** [2] - 945:6, 1179:20

**OF** [2] - 873:2, 873:9

**offered** [7] - 905:8, 1019:10, 1021:10,

1026:3, 1030:22, 1031:10, 1139:3

**offering** [2] - 905:11, 925:21

**offers..** [1] - 1161:12

**Office** [4] - 922:1, 922:16, 961:2, 961:4

**office** [8] - 957:11, 957:13, 957:17, 957:20, 957:23, 957:24, 958:1, 1085:12

**officer** [8] - 894:7, 894:13, 1119:6, 1121:19, 1122:2, 1122:6, 1122:9

**officers** [1] - 894:6

**offices** [2] - 957:9, 957:10

**official** [1] - 1041:1

**Official** [1] - 1197:15

**officially** [1] - 1131:12

**often** [3] - 892:21, 1001:5, 1126:5

**old** [2] - 888:20, 1100:4

**older** [1] - 902:24

**on-site** [1] - 998:9

**once** [13] - 883:5, 891:20, 897:7, 916:12, 916:13, 919:20, 992:16, 1025:1, 1029:22, 1059:11, 1073:6, 1106:6, 1130:19

**one** [155] - 876:18, 877:5, 880:25, 882:22, 884:22, 885:1, 885:25, 886:6, 886:10, 887:1, 887:7, 887:21, 888:24, 889:18, 894:5, 894:6, 895:1, 901:16, 901:18, 901:21, 903:23, 906:12, 906:13, 906:15, 911:6, 913:13, 915:10, 915:11, 918:16, 918:17, 918:21, 927:6, 927:9, 928:7, 928:23, 931:14, 931:22, 932:16, 934:14, 935:2, 935:8, 935:9, 935:17, 937:6, 937:8, 937:14, 937:16, 939:24, 943:6, 944:23,

948:17, 951:17, 952:23, 952:25, 954:19, 955:18, 955:19, 960:15, 962:6, 963:18, 963:20, 963:21, 963:25, 971:2, 975:15, 975:16, 981:22, 983:11, 994:10, 994:24, 995:8, 999:25, 1002:15, 1007:12, 1007:21, 1007:22, 1013:19, 1024:6, 1027:8, 1033:16, 1043:20, 1043:23, 1044:3, 1044:8, 1046:11, 1046:14, 1047:7, 1049:6, 1050:14, 1056:21, 1056:22, 1057:3, 1058:23, 1058:24, 1059:4, 1059:13, 1062:9, 1066:20, 1078:9, 1078:19, 1084:20, 1085:15, 1086:22, 1087:6, 1087:9, 1088:25, 1089:1, 1089:5, 1097:2, 1101:22, 1102:21, 1106:25, 1108:13, 1121:17, 1123:22, 1125:13, 1125:22, 1141:16, 1146:7, 1146:13, 1149:6, 1150:1, 1150:21, 1151:9, 1151:10, 1154:7, 1158:18, 1158:20, 1158:25, 1163:11, 1166:2, 1172:18, 1173:8, 1175:16, 1178:24, 1181:17, 1181:22, 1183:23, 1183:24, 1184:4, 1185:17, 1187:5, 1188:10, 1190:2, 1190:12, 1194:4, 1195:5, 1195:24, 1196:15

**ones** [20] - 883:7, 893:22, 930:24, 933:18, 934:5, 934:7, 936:25, 939:18, 949:18, 977:9, 1028:5, 1050:22, 1075:15, 1104:20, 1106:23, 1107:21, 1108:8, 1146:13

**ongoing** [2] - 1074:14,

1074:16
**onion** [1] - 1163:1
**open** [2] - 1036:6, 1181:3
**opening** [7] - 879:21, 885:4, 914:19, 944:19, 945:2, 1164:13, 1164:21
**operate** [14] - 959:14, 959:16, 960:13, 968:21, 973:4, 980:1, 982:2, 983:5, 985:9, 988:22, 1025:17, 1085:2, 1099:12, 1101:14
**operated** [8] - 965:14, 966:11, 970:7, 970:9, 973:9, 973:15, 1002:15, 1137:14
**operates** [2] - 961:24, 1119:7
**operating** [27] - 876:19, 963:3, 963:6, 964:16, 966:14, 969:1, 972:1, 973:20, 987:12, 987:13, 987:17, 987:22, 988:3, 989:6, 990:3, 995:9, 1008:16, 1041:22, 1081:8, 1084:22, 1088:1, 1089:22, 1101:22, 1115:19, 1120:9, 1122:9, 1124:15
**operation** [19] - 956:17, 960:9, 960:11, 964:13, 967:6, 968:11, 970:10, 973:15, 977:1, 984:16, 986:20, 1060:7, 1074:8, 1080:11, 1082:10, 1082:12, 1084:2, 1120:23, 1121:1
**operational** [1] - 1120:5
**Operations** [119] - 927:12, 929:5, 948:25, 955:25, 960:13, 961:24, 962:10, 964:6, 964:14, 965:14, 966:10, 966:20, 967:4, 967:16, 968:4, 968:21, 969:1, 969:18, 970:17, 970:23,

972:1, 972:6, 972:13, 972:16, 972:19, 973:4, 973:8, 973:9, 973:12, 973:18, 973:20, 974:1, 977:23, 977:24, 977:25, 978:1, 978:4, 978:5, 978:6, 978:21, 979:6, 979:10, 979:11, 979:12, 979:18, 979:21, 980:18, 981:3, 981:6, 981:8, 981:14, 981:17, 982:15, 982:23, 983:1, 983:22, 984:4, 984:9, 986:14, 987:5, 987:6, 987:11, 987:13, 987:21, 988:3, 988:15, 988:22, 989:5, 989:14, 990:4, 990:19, 993:23, 993:24, 993:25, 1000:3, 1000:12, 1001:21, 1002:14, 1002:17, 1033:16, 1060:10, 1061:15, 1071:7, 1073:22, 1076:15, 1076:20, 1076:24, 1077:18, 1079:23, 1080:5, 1080:7, 1080:19, 1081:6, 1081:17, 1083:4, 1083:5, 1083:10, 1083:13, 1084:6, 1084:12, 1084:21, 1087:19, 1087:22, 1102:4, 1103:13, 1110:5, 1185:19
**operations** [42] - 929:8, 933:18, 934:4, 934:13, 934:23, 959:7, 959:10, 959:13, 960:7, 960:8, 960:11, 960:12, 960:14, 960:16, 964:5, 965:3, 967:2, 970:3, 972:12, 978:3, 993:25, 1041:22, 1080:17, 1084:12, 1084:25, 1119:6, 1120:6, 1120:13, 1121:19, 1122:1, 1122:6, 1135:15, 1136:11, 1143:7, 1143:9,

1182:9, 1182:16, 1182:20, 1185:12, 1185:16, 1186:11, 1186:14
**Operations'** [3] - 956:2, 956:24, 957:3
**operative** [1] - 1136:8
**operator** [3] - 973:7, 1084:20, 1085:4
**operators** [2] - 900:6, 959:14
**opine** [2] - 925:16, 951:7
**opinion** [12] - 925:10, 925:20, 925:25, 926:19, 926:21, 926:22, 926:23, 926:24, 939:6, 947:17, 1078:1, 1178:20
**opinions** [1] - 925:20
**opportunity** [2] - 925:19, 1129:21
**opposed** [1] - 1159:15
**optimization** [3] - 1018:20, 1018:23, 1030:19
**optimized** [1] - 1059:6
**option** [3] - 1118:5, 1118:6, 1118:15
**optional** [2] - 1029:14, 1029:19
**or..** [1] - 1014:1
**order** [20] - 899:14, 903:11, 905:7, 908:1, 928:10, 938:12, 963:1, 1003:23, 1014:12, 1024:4, 1034:14, 1036:9, 1036:25, 1041:4, 1061:23, 1077:14, 1140:24, 1141:25, 1165:3, 1175:11
**org** [2] - 936:14, 945:1
**organizations** [1] - 1071:22
**organized** [1] - 1122:18
**original** [19] - 883:6, 927:12, 928:17, 929:12, 929:24, 930:3, 978:16, 978:18, 978:20, 979:7, 979:13, 984:22, 985:15, 985:21, 988:12, 989:22, 1045:9, 1071:24, 1104:24
**originally** [6] - 891:2,

968:16, 970:5, 971:9, 1097:21, 1122:19
**otherwise** [11] - 1022:2, 1022:6, 1022:25, 1023:5, 1101:14, 1129:8, 1167:22, 1168:22, 1171:6, 1181:8, 1196:9
**ought** [2] - 949:23, 951:10
**ourselves** [1] - 933:19
**outcome** [1] - 1034:25
**outlined** [1] - 964:13
**outlines** [1] - 1040:21
**output** [1] - 1117:20
**outside** [9] - 885:5, 942:7, 1013:13, 1026:9, 1026:12, 1129:23, 1142:14, 1142:15, 1171:14
**overall** [5] - 876:22, 876:25, 878:1, 1120:12, 1135:14
**overlooking** [1] - 936:10
**overrule** [12] - 882:13, 893:11, 899:8, 923:22, 923:25, 928:24, 932:17, 932:20, 946:25, 1072:15, 1096:9, 1172:1
**overruled** [1] - 924:23
**oversee** [1] - 960:16
**overview** [1] - 1000:22
**own** [9] - 925:22, 925:24, 934:7, 935:1, 935:2, 959:12, 960:1, 993:2, 1144:10
**owned** [10] - 894:25, 895:3, 909:2, 934:25, 965:13, 968:3, 971:9, 971:16, 999:14, 1046:5
**owner** [1] - 895:2
**ownership** [2] - 937:7, 1178:5
**owns** [2] - 935:3, 960:3
**oxidation** [1] - 890:1
**oxide** [2] - 1003:19, 1037:23
**oxidized** [1] - 1061:8
**oxidizer** [1] - 1043:13

---

**P**

**p.m** [1] - 1197:5
**Pacific** [1] - 1144:12
**Packard** [1] - 1019:19
**page** [68] - 887:1, 919:16, 919:19, 919:22, 936:16, 943:21, 954:12, 965:23, 978:25, 979:2, 979:13, 979:22, 980:15, 980:17, 981:2, 981:10, 981:18, 981:20, 981:24, 982:13, 982:18, 983:2, 983:18, 983:21, 983:25, 984:10, 984:24, 985:3, 985:4, 987:7, 1009:6, 1009:10, 1010:11, 1010:14, 1012:13, 1042:10, 1045:23, 1046:1, 1046:2, 1048:21, 1049:3, 1050:5, 1050:6, 1051:12, 1051:14, 1051:15, 1052:16, 1053:20, 1053:21, 1054:17, 1054:19, 1055:24, 1056:1, 1056:4, 1060:14, 1060:16, 1074:23, 1078:11, 1078:13, 1078:16, 1097:14, 1103:9, 1149:10, 1150:9, 1150:22, 1175:13, 1183:12
**pages** [8] - 1018:5, 1019:17, 1058:22, 1073:5, 1073:6, 1152:24, 1175:8, 1175:16
**paid** [4] - 879:10, 937:14, 974:19, 1098:25
**pairing** [7] - 967:2, 967:15, 968:2, 969:17, 970:16, 972:12, 1172:14
**pairings** [1] - 966:10
**papers** [2] - 1144:7, 1152:14
**paragraph** [69] - 952:24, 979:15, 979:16, 979:17, 979:19, 979:24, 981:12, 981:13, 981:15, 981:25,

982:22, 982:25, 983:3, 984:2, 984:3, 984:5, 984:7, 985:1, 985:2, 1043:5, 1060:18, 1061:16, 1062:13, 1062:14, 1063:23, 1064:5, 1078:17, 1079:4, 1079:7, 1079:11, 1079:15, 1096:3, 1096:15, 1097:14, 1099:3, 1101:15, 1104:20, 1141:25, 1149:9, 1149:15, 1149:19, 1149:25, 1150:3, 1151:1, 1151:3, 1151:17, 1152:4, 1152:5, 1154:11, 1166:20, 1166:21, 1168:15, 1168:16, 1168:21, 1170:17, 1170:18, 1170:21, 1171:4, 1171:24, 1172:14, 1175:1, 1176:8, 1184:15, 1184:22, 1184:24

**paragraphs** [16] - 1065:11, 1073:8, 1073:12, 1073:16, 1075:1, 1075:4, 1075:5, 1075:14, 1075:15, 1075:18, 1094:2, 1094:4, 1095:25, 1096:19, 1151:15, 1152:2

**parallel** [1] - 1171:13

**parenthetical** [2] - 914:1, 984:17

**Parish** [19] - 878:20, 878:21, 878:22, 884:2, 885:1, 886:24, 934:23, 936:18, 954:18, 954:21, 955:20, 956:19, 966:2, 967:16, 967:18, 967:24, 1089:7, 1104:6

**parity's** [1] - 1172:12

**parking** [3] - 875:16, 901:11, 998:11

**parse** [1] - 1166:13

**part** [38] - 884:7, 889:3, 891:6, 896:18, 896:19, 897:18, 949:12, 950:22, 968:25, 989:19, 991:10, 998:19, 1006:5,

1021:2, 1024:12, 1025:19, 1029:6, 1030:5, 1031:19, 1038:12, 1068:6, 1068:12, 1084:11, 1101:5, 1113:10, 1127:12, 1163:19, 1164:23, 1168:11, 1168:15, 1170:17, 1175:22, 1176:12, 1176:23, 1177:10, 1177:15, 1190:17

**partially** [2] - 1096:3, 1171:25

**particular** [15] - 896:13, 924:8, 948:17, 1021:17, 1033:12, 1034:19, 1034:21, 1040:16, 1060:22, 1066:20, 1081:16, 1091:18, 1137:9, 1137:10, 1175:12

**particularly** [9] - 1012:22, 1024:19, 1025:24, 1028:5, 1033:21, 1142:23, 1143:17, 1147:5, 1190:21

**particulate** [2] - 1003:2, 1021:3

**parties** [38] - 899:2, 933:8, 933:17, 939:10, 943:20, 945:23, 999:21, 999:23, 999:25, 1012:7, 1013:10, 1032:13, 1032:16, 1035:24, 1088:22, 1096:1, 1097:20, 1099:5, 1099:12, 1102:18, 1103:7, 1103:20, 1132:18, 1132:21, 1141:23, 1142:1, 1147:11, 1149:3, 1151:6, 1154:11, 1154:18, 1172:16, 1181:19, 1182:6, 1187:21, 1192:17, 1193:23, 1196:2

**parties'** [3] - 1132:19, 1150:2, 1181:15

**partner** [11] - 906:22, 907:13, 913:13, 934:12, 934:14, 934:18, 935:8, 935:10, 936:2, 936:4, 939:23

**Partners** [6] - 962:6,

962:10, 964:6, 964:15, 965:13, 1054:25

**partners** [11] - 883:9, 905:18, 905:25, 906:8, 909:15, 918:7, 934:20, 935:4, 939:24, 947:4, 961:25

**partnership** [1] - 935:1

**parts** [2] - 1071:11, 1106:8

**party** [8] - 915:4, 924:21, 939:6, 1032:14, 1094:16, 1094:22, 1095:24, 1161:24

**pass** [2] - 940:18, 1109:1

**passed** [2] - 894:8, 947:6

**passes** [1] - 1003:2

**past** [1] - 893:4

**paste** [1] - 1075:9

**Patent** [4] - 922:1, 922:16, 961:2, 961:4

**patent** [103] - 914:24, 915:1, 921:20, 922:6, 922:19, 922:21, 922:24, 923:1, 923:6, 923:8, 923:11, 923:13, 923:16, 923:20, 924:5, 926:1, 926:2, 926:5, 926:8, 926:9, 926:11, 926:12, 926:25, 927:6, 933:25, 944:24, 960:24, 961:1, 961:4, 961:8, 961:12, 961:15, 961:19, 961:20, 962:12, 962:14, 1016:7, 1016:24, 1018:11, 1018:12, 1019:22, 1022:6, 1023:16, 1025:24, 1028:11, 1028:13, 1028:16, 1047:13, 1047:16, 1048:1, 1048:6, 1048:9, 1048:12, 1048:13, 1048:18, 1049:23, 1049:24, 1050:17, 1051:7, 1051:22, 1052:1, 1052:2, 1052:6, 1052:24, 1053:2, 1053:12, 1054:11, 1055:18,

1055:19, 1056:6, 1056:15, 1057:4, 1058:7, 1065:12, 1077:6, 1081:19, 1090:5, 1090:15, 1091:11, 1091:12, 1099:1, 1106:19, 1134:5, 1136:19, 1137:5, 1137:8, 1137:21, 1145:5, 1151:2, 1152:5, 1153:18, 1153:23, 1161:14, 1162:20, 1162:22

**patented** [5] - 922:9, 1138:4, 1138:13, 1162:1, 1175:19

**patents** [61] - 921:13, 921:16, 921:19, 921:23, 921:25, 922:3, 922:10, 922:16, 923:4, 924:3, 924:5, 924:8, 924:11, 924:17, 925:1, 936:20, 937:24, 948:21, 951:23, 951:25, 960:20, 962:17, 962:20, 986:1, 986:5, 1019:14, 1019:24, 1020:5, 1022:13, 1053:18, 1070:14, 1071:6, 1071:8, 1071:11, 1077:11, 1077:15, 1082:9, 1082:24, 1098:22, 1123:14, 1124:25, 1125:23, 1134:22, 1135:11, 1138:6, 1138:15, 1139:4, 1139:10, 1139:17, 1139:21, 1139:24, 1144:10, 1145:6, 1145:7, 1146:2, 1150:5, 1154:12, 1171:9, 1174:9, 1174:18

**patents-in-suit** [6] - 921:13, 1022:13, 1071:8, 1171:9, 1174:9, 1174:18

**patents.google.com** [2] - 922:2, 922:16

**path** [3] - 882:22, 882:23, 1029:16

**PAUL** [1] - 874:7

**Pavlish** [2] - 888:25, 889:25

**Pavlish's** [1] - 944:20

**pay** [4] - 896:14,

958:22, 958:24, 1145:15

**PDF** [4] - 1193:6, 1193:8, 1194:19, 1195:4

**PDX** [9] - 944:20, 944:21, 944:23, 944:24, 944:25, 945:2

**PDXs** [1] - 944:17

**Pearson** [15] - 1141:10, 1143:22, 1143:25, 1146:25, 1172:25, 1174:16, 1175:20, 1175:24, 1176:25, 1177:13, 1178:14, 1179:9, 1182:25, 1192:8, 1192:14

**PEARSON** [41] - 873:22, 1015:10, 1144:1, 1153:7, 1153:15, 1153:25, 1155:5, 1173:1, 1174:19, 1175:25, 1176:11, 1177:24, 1179:10, 1183:1, 1183:6, 1183:9, 1183:12, 1183:16, 1183:19, 1183:22, 1184:7, 1184:9, 1184:12, 1184:17, 1184:20, 1184:23, 1185:1, 1185:6, 1186:1, 1186:17, 1186:23, 1187:17, 1188:12, 1189:12, 1189:21, 1190:5, 1190:13, 1190:15, 1192:10, 1192:15, 1193:10

**pecuniary** [2] - 1029:8, 1143:18

**peeling** [1] - 1163:1

**pending** [1] - 917:13

**people** [11] - 889:5, 903:12, 922:25, 934:9, 955:17, 957:11, 957:17, 957:19, 959:22, 1007:10, 1025:9

**per** [3] - 938:18, 1043:15, 1185:14

**percent** [72] - 897:13, 897:14, 897:20, 898:13, 898:25, 900:1, 900:12, 900:15, 900:16, 900:19, 935:2, 935:3, 935:8, 935:9,

939:24, 1003:8, 1004:4, 1004:5, 1004:14, 1004:15, 1006:7, 1030:7, 1039:8, 1043:9, 1043:10, 1043:12, 1043:13, 1043:14, 1044:25, 1045:1, 1046:16, 1046:23, 1047:8, 1047:9, 1047:10, 1048:2, 1048:3, 1049:13, 1049:19, 1050:19, 1052:12, 1053:14, 1053:15, 1054:4, 1054:7, 1055:7, 1056:9, 1056:13, 1057:10, 1057:13, 1057:14, 1059:7, 1062:6, 1062:10, 1062:11, 1084:4, 1104:25, 1118:24, 1120:8

**percentage** [1] - 1084:1

**perfect** [1] - 1185:8

**perfected** [1] - 1179:21

**perform** [12] - 1000:3, 1000:13, 1016:15, 1016:21, 1018:7, 1033:20, 1060:21, 1061:9, 1155:13, 1155:24, 1159:6, 1174:5

**performance** [1] - 1017:6

**performed** [9] - 1043:18, 1044:10, 1046:8, 1047:22, 1049:1, 1049:11, 1050:8, 1050:12, 1114:1

**perhaps** [5] - 1007:13, 1096:20, 1127:9, 1132:14, 1187:1

**period** [64] - 916:8, 966:14, 968:20, 968:24, 969:21, 970:20, 972:19, 973:2, 973:5, 987:21, 988:7, 988:8, 989:5, 1001:8, 1022:7, 1024:16, 1024:17, 1025:16, 1026:10, 1026:12, 1026:14, 1028:12, 1035:9, 1035:13, 1035:19, 1039:7, 1042:20,

1048:11, 1050:3, 1052:4, 1052:9, 1054:2, 1054:6, 1054:15, 1055:22, 1056:8, 1056:12, 1056:19, 1057:12, 1066:12, 1066:18, 1069:9, 1069:17, 1070:12, 1070:14, 1070:22, 1070:25, 1072:2, 1072:6, 1076:25, 1089:16, 1091:11, 1105:8, 1116:7, 1120:21, 1136:8, 1137:14, 1141:19, 1142:15, 1166:5, 1170:20, 1171:1, 1171:14

**periods** [3] - 1034:3, 1035:6, 1035:21

**permissible** [1] - 1010:1

**permit** [6] - 1016:17, 1023:10, 1110:17, 1117:8, 1180:15, 1185:2

**permits** [3] - 1110:14, 1110:18, 1110:19

**permitted** [2] - 1117:6, 1138:7

**person** [9] - 924:21, 931:12, 939:8, 947:23, 1041:6, 1041:19, 1044:12, 1044:13, 1178:24

**personal** [1] - 930:13

**personally** [2] - 1005:12, 1005:21

**personnel** [2] - 956:1, 993:4

**perspective** [2] - 1179:20, 1192:9

**persuaded** [1] - 1092:22

**persuading** [1] - 1157:18

**pertain** [2] - 1101:4, 1101:15

**pertains** [1] - 991:15

**pertinent** [1] - 1085:11

**PETER** [1] - 873:17

**Ph.D** [1] - 1123:23

**pharmaceutical** [3] - 909:6, 938:3, 1029:18

**Pharmaceuticals** [2] - 1022:20

**pharmaceuticals** [1] - 909:7

**phase** [1] - 954:18

**Phil** [2] - 1173:11, 1173:22

**phone** [3] - 929:14, 958:3, 1189:12

**phones** [1] - 958:1

**photograph** [2] - 994:22, 997:15

**photos** [1] - 904:22

**phrase** [1] - 1077:22

**phraseology** [2] - 1168:23, 1182:3

**physical** [3] - 976:16, 996:14, 1014:25

**pick** [3] - 875:13, 1161:11, 1174:5

**pickle** [2] - 891:16, 917:25

**picture** [11] - 954:15, 954:17, 954:21, 976:20, 994:21, 995:20, 995:21, 996:6, 996:8, 996:12, 996:16

**pictures** [1] - 994:13

**piece** [15] - 881:21, 935:1, 954:16, 954:17, 987:17, 1030:3, 1030:6, 1141:10, 1141:11, 1162:19, 1162:21, 1162:24, 1187:10, 1187:13

**pile** [10] - 885:5, 993:3, 996:18, 996:21, 996:23, 996:24, 996:25, 997:4, 997:6, 1002:18

**piles** [1] - 901:11

**pilot** [12] - 1001:2, 1002:4, 1005:5, 1009:14, 1010:2, 1010:3, 1011:7, 1044:5, 1047:4, 1064:7, 1064:10, 1064:12

**pipes** [1] - 1149:23

**piping** [1] - 1149:24

**pitch** [2] - 919:5, 919:8

**place** [18] - 881:12, 908:10, 962:3, 962:23, 965:4, 974:4, 974:10, 974:12, 975:11, 975:20, 975:22, 975:24, 976:8, 1051:21, 1072:12, 1116:23, 1148:22, 1190:25

**placed** [6] - 900:5, 963:1, 965:10, 968:16, 970:5, 1048:20

**placed-in-service** [2] - 963:1, 965:10

**places** [1] - 1042:9

**Plaintiff** [1] - 873:24

**plaintiff** [23] - 902:3, 911:16, 913:16, 941:22, 942:5, 942:25, 945:16, 1019:1, 1027:20, 1033:6, 1072:5, 1079:17, 1081:11, 1130:20, 1147:14, 1157:7, 1157:8, 1157:24, 1160:22, 1177:13, 1177:22, 1179:8, 1187:24

**plaintiffs** [52] - 978:12, 985:18, 986:19, 988:14, 989:14, 990:1, 990:17, 1016:3, 1016:10, 1016:16, 1023:9, 1023:21, 1036:22, 1079:21, 1082:18, 1109:17, 1110:15, 1110:18, 1111:9, 1130:16, 1132:2, 1132:3, 1134:1, 1134:8, 1134:12, 1135:2, 1135:20, 1136:5, 1136:12, 1136:22, 1137:3, 1137:24, 1138:1, 1138:2, 1141:4, 1142:6, 1142:7, 1151:24, 1155:3, 1163:9, 1164:5, 1164:11, 1164:17, 1171:24, 1172:23, 1173:11, 1176:7, 1178:21, 1180:2, 1180:9, 1180:22, 1182:7

**Plaintiffs** [1] - 873:5

**plaintiffs'** [30] - 875:3, 950:4, 978:7, 1013:16, 1017:5, 1023:19, 1033:9, 1059:15, 1059:24, 1075:24, 1128:24, 1131:21, 1132:11, 1136:8, 1137:14, 1138:11, 1139:3, 1140:11, 1147:1, 1147:6, 1163:8, 1163:16, 1166:10,

1170:11, 1171:4, 1172:1, 1173:6, 1179:1, 1182:18, 1185:13

**Plaintiffs'** [23] - 884:14, 887:11, 893:17, 901:15, 902:8, 905:19, 905:21, 906:6, 906:16, 907:3, 907:8, 909:22, 910:10, 910:14, 910:17, 911:17, 911:21, 913:17, 913:21, 945:14, 950:12, 951:13, 952:21

**plan** [12] - 900:2, 904:19, 916:3, 941:20, 941:24, 942:17, 942:24, 951:2, 1130:6, 1147:21, 1197:1

**plans** [1] - 1025:17

**plant** [183] - 875:23, 875:25, 876:12, 877:9, 879:4, 879:8, 879:16, 880:9, 880:13, 880:14, 880:25, 881:16, 882:16, 885:2, 885:4, 885:12, 887:18, 887:24, 888:2, 893:2, 895:9, 895:18, 895:19, 897:2, 897:17, 899:25, 900:21, 901:2, 901:4, 901:5, 901:8, 901:10, 901:12, 903:12, 903:21, 904:3, 904:5, 904:20, 905:8, 908:16, 911:14, 912:7, 912:11, 912:20, 916:5, 916:6, 917:17, 917:23, 919:13, 920:5, 920:22, 933:9, 934:10, 953:9, 954:2, 954:3, 954:5, 954:7, 956:20, 956:21, 958:16, 959:24, 960:2, 960:5, 963:13, 966:2, 966:12, 970:6, 972:17, 976:9, 976:13, 980:3, 982:4, 983:7, 985:11, 986:6, 987:1, 988:16,

989:16, 992:8, 992:22, 993:4, 993:16, 994:10, 995:3, 995:22, 997:11, 998:2, 998:5, 998:13, 998:18, 998:23, 999:1, 999:5, 1000:5, 1000:15, 1016:12, 1016:14, 1016:19, 1016:21, 1017:9, 1017:10, 1017:12, 1017:14, 1017:21, 1018:14, 1018:16, 1018:22, 1018:25, 1020:5, 1020:14, 1021:11, 1021:17, 1023:1, 1023:6, 1023:8, 1026:3, 1027:2, 1027:3, 1028:25, 1029:1, 1033:15, 1058:11, 1060:22, 1060:23, 1063:11, 1063:16, 1064:1, 1064:2, 1064:6, 1064:10, 1069:3, 1076:10, 1076:17, 1076:22, 1077:2, 1077:3, 1077:7, 1077:12, 1077:14, 1078:21, 1078:24, 1079:1, 1079:25, 1081:20, 1082:8, 1084:20, 1085:3, 1085:8, 1085:14, 1087:11, 1087:16, 1089:11, 1090:13, 1091:4, 1091:18, 1092:11, 1092:14, 1092:18, 1092:22, 1098:2, 1099:15, 1104:22, 1106:1, 1106:5, 1106:6, 1106:8, 1106:12, 1107:1, 1108:3, 1119:7, 1120:4, 1120:9, 1125:21, 1135:13, 1141:18, 1152:6, 1155:24, 1159:6

**plant's** [11] - 901:7, 908:4, 956:6, 991:22, 1020:12, 1021:13, 1021:18, 1061:12, 1064:7, 1064:11, 1143:8

**plants** [184] - 877:6, 880:15, 882:23, 883:6, 883:10, 883:17, 883:22,

884:1, 886:11, 886:22, 887:3, 888:18, 889:10, 891:11, 892:6, 894:24, 895:17, 898:2, 902:19, 902:20, 902:22, 904:11, 904:17, 908:2, 909:13, 909:15, 909:17, 909:18, 910:23, 915:21, 915:24, 916:1, 916:2, 916:12, 916:18, 918:3, 918:9, 920:1, 927:17, 927:18, 928:3, 928:8, 928:20, 929:9, 930:25, 938:8, 949:19, 949:21, 949:23, 950:2, 952:5, 952:10, 952:15, 953:11, 953:15, 953:16, 956:15, 958:22, 959:13, 961:17, 968:17, 971:9, 973:16, 998:8, 999:8, 1002:16, 1003:20, 1017:6, 1020:7, 1020:18, 1020:21, 1021:2, 1021:6, 1021:8, 1025:15, 1031:18, 1033:19, 1034:3, 1034:5, 1034:7, 1034:9, 1034:10, 1034:13, 1034:18, 1034:20, 1035:5, 1035:18, 1035:21, 1036:6, 1036:9, 1052:14, 1057:23, 1058:14, 1059:11, 1059:13, 1062:21, 1062:23, 1073:25, 1076:24, 1077:18, 1078:2, 1080:1, 1080:5, 1080:12, 1080:17, 1081:6, 1082:14, 1083:10, 1083:12, 1083:19, 1083:23, 1084:3, 1084:15, 1087:8, 1087:13, 1087:23, 1087:24, 1087:25, 1088:5, 1088:16, 1088:19, 1089:1, 1089:4, 1089:16, 1090:5, 1098:22, 1098:23, 1100:5, 1100:10, 1100:11,

1100:20, 1102:5, 1102:9, 1102:14, 1102:19, 1102:21, 1103:21, 1104:1, 1104:17, 1105:8, 1106:22, 1107:13, 1107:18, 1107:20, 1107:21, 1108:5, 1108:7, 1108:8, 1108:12, 1108:15, 1108:20, 1108:23, 1110:9, 1110:11, 1110:14, 1110:18, 1110:19, 1111:3, 1111:5, 1114:16, 1115:13, 1115:15, 1117:5, 1124:15, 1124:21, 1126:2, 1126:10, 1126:23, 1127:11, 1127:18, 1128:8, 1134:20, 1134:21, 1135:13, 1142:15, 1142:20, 1142:22, 1142:24, 1155:12, 1182:16

**plants'** [1] - 900:8
**play** [7] - 891:13, 931:17, 1108:17, 1112:9, 1114:13, 1119:4, 1121:17
**played** [5] - 1112:12, 1114:17, 1119:8, 1121:21, 1131:16
**playing** [1] - 1108:1
**plays** [1] - 1091:15
**PLC** [2] - 955:11, 1085:5
**pleading** [8] - 1065:14, 1065:15, 1071:15, 1071:16, 1071:19, 1095:18, 1097:6, 1097:10
**pleadings** [3] - 1072:4, 1072:11, 1096:20
**pleased** [1] - 1036:21
**pleasure** [1] - 1166:18
**pled** [1] - 1094:5
**plug** [1] - 977:19
**point** [83] - 883:5, 884:5, 886:10, 886:15, 886:17, 887:22, 888:10, 894:24, 895:1, 898:10, 901:9, 916:3, 916:11, 916:12, 918:6, 919:14, 923:10, 924:7, 927:25, 931:14, 939:22,

941:19, 941:23, 943:17, 977:22, 991:5, 992:17, 992:18, 998:12, 1013:12, 1017:25, 1018:1, 1018:25, 1019:15, 1022:19, 1024:20, 1025:11, 1026:10, 1031:16, 1065:17, 1065:19, 1065:23, 1071:15, 1073:22, 1074:14, 1076:13, 1083:9, 1087:21, 1088:2, 1100:15, 1100:18, 1102:20, 1103:11, 1105:19, 1108:23, 1124:8, 1125:25, 1126:4, 1126:8, 1133:3, 1133:22, 1134:14, 1134:17, 1142:4, 1142:12, 1142:14, 1144:24, 1158:6, 1159:1, 1166:22, 1167:13, 1170:11, 1170:24, 1171:3, 1172:1, 1172:19, 1174:1, 1181:4, 1190:11, 1193:19, 1195:22
**pointed** [3] - 914:1, 920:14, 1099:25
**pointer** [1] - 995:1
**pointing** [9] - 950:25, 1027:15, 1030:13, 1030:20, 1066:3, 1069:5, 1164:25, 1171:17, 1171:19
**points** [4] - 919:2, 1024:4, 1030:23, 1167:11
**pollutant** [2] - 920:12, 1003:20
**polluter** [3] - 902:25, 903:7
**pollution** [6] - 1115:16, 1116:14, 1116:17, 1116:23, 1117:25, 1118:18
**popping** [1] - 1148:11
**portfolio** [1] - 1124:25
**portion** [1] - 911:24
**portions** [1] - 1149:4
**position** [11] - 894:4, 924:22, 934:6, 939:13, 1112:23, 1151:8, 1163:16, 1166:3, 1175:4, 1176:5, 1177:4
**positioned** [1] -

1143:7
**positions** [2] - 1181:16, 1181:19
**positive** [2] - 903:14, 903:16
**possibilities** [1] - 912:23
**possible** [8] - 910:5, 961:22, 1012:10, 1015:2, 1086:24, 1170:5, 1185:9, 1191:15
**possibly** [2] - 962:16, 962:19
**post** [2] - 1028:12, 1187:1
**post-trial** [1] - 1187:1
**potential** [16] - 892:16, 897:25, 902:23, 903:5, 905:11, 919:11, 919:12, 920:8, 920:14, 920:15, 920:17, 920:21, 920:23, 921:4, 1029:20, 1036:2
**pounds** [3] - 902:25, 1002:19, 1043:15
**powder** [1] - 993:11
**Powder** [7] - 987:9, 987:14, 988:3, 988:4, 1057:23, 1106:25, 1117:23
**power** [247] - 876:12, 880:13, 880:14, 880:15, 881:4, 881:16, 882:15, 882:23, 892:6, 893:2, 895:9, 897:2, 899:25, 900:8, 900:21, 901:4, 901:5, 901:6, 903:12, 904:2, 904:3, 904:5, 905:8, 908:4, 908:16, 909:15, 915:24, 916:6, 916:18, 917:17, 917:23, 920:22, 927:17, 927:18, 933:24, 934:9, 949:18, 949:20, 949:23, 950:2, 952:4, 952:15, 953:9, 953:11, 953:14, 953:16, 954:2, 954:3, 954:5, 954:7, 956:6, 956:15, 956:19, 956:21, 958:16, 958:22,

959:13, 959:24, 960:2, 960:5, 961:17, 961:25, 963:13, 967:7, 967:12, 967:16, 967:18, 967:24, 968:17, 970:16, 970:18, 970:24, 970:25, 971:5, 971:8, 972:13, 972:17, 972:24, 973:16, 976:9, 976:13, 980:3, 982:4, 983:7, 985:11, 986:6, 987:1, 988:16, 989:16, 991:22, 992:8, 992:22, 993:4, 993:16, 994:23, 995:3, 995:22, 998:2, 998:5, 998:13, 998:18, 998:23, 999:1, 999:5, 999:7, 1000:15, 1002:15, 1003:20, 1016:12, 1016:14, 1016:19, 1016:21, 1017:6, 1017:9, 1017:10, 1017:12, 1017:14, 1017:21, 1018:14, 1018:16, 1018:22, 1020:4, 1020:7, 1020:12, 1020:14, 1020:17, 1020:21, 1021:2, 1021:6, 1021:8, 1021:11, 1021:13, 1021:18, 1022:25, 1023:6, 1023:8, 1026:3, 1027:2, 1027:3, 1028:25, 1029:1, 1031:18, 1033:15, 1033:19, 1034:3, 1034:5, 1034:7, 1034:10, 1034:13, 1034:18, 1035:5, 1035:18, 1036:9, 1052:4, 1052:13, 1062:21, 1064:2, 1064:10, 1073:24, 1076:10, 1076:17, 1076:21, 1076:24, 1077:2, 1077:3, 1077:6, 1077:12, 1077:14, 1077:18, 1078:21, 1080:17, 1081:6, 1081:20, 1082:8, 1082:14, 1083:10, 1083:12, 1083:19, 1083:23,

1084:3, 1084:14, 1084:19, 1084:20, 1087:8, 1087:16, 1087:23, 1087:25, 1088:5, 1088:16, 1088:19, 1089:1, 1089:4, 1089:6, 1089:11, 1089:16, 1090:5, 1090:13, 1091:4, 1091:18, 1092:11, 1092:14, 1092:18, 1092:22, 1099:15, 1105:8, 1106:1, 1106:5, 1106:6, 1108:20, 1108:23, 1110:9, 1110:11, 1110:14, 1111:3, 1114:16, 1115:13, 1117:5, 1120:4, 1120:9, 1124:15, 1124:21, 1125:21, 1126:2, 1126:10, 1126:23, 1127:11, 1127:18, 1134:19, 1134:21, 1135:13, 1141:18, 1142:15, 1142:20, 1142:22, 1143:8, 1152:6, 1155:12, 1155:24, 1159:5, 1182:16
**Power** [28] - 954:1, 954:6, 974:20, 987:18, 987:25, 988:5, 988:9, 989:2, 989:9, 1057:2, 1057:19, 1058:2, 1058:9, 1119:6, 1119:7, 1119:17, 1119:18, 1119:24, 1120:2, 1120:5, 1120:6, 1120:11, 1120:13, 1120:15, 1120:16, 1121:6, 1121:9, 1121:12
**powered** [1] - 903:17
**powerful** [2] - 939:4, 940:4
**Powerton** [3] - 884:3, 937:13, 1104:7
**practical** [1] - 1036:7
**practiced** [1] - 1032:24
**practicing** [2] - 1068:11, 1139:4
**prayer** [3] - 1012:9, 1132:14, 1133:11
**PRB** [8] - 1057:24, 1058:3, 1106:25, 1107:15, 1117:18,

1117:21, 1118:11
**preceding** [1] - 1089:12
**precipitator** [3] - 1063:12, 1064:16, 1064:20
**precisely** [2] - 901:9, 923:10
**predated** [1] - 1019:24
**predates** [1] - 1035:8
**predetermined** [1] - 1029:16
**predominantly** [1] - 1139:14
**preferences** [1] - 945:3
**prejudice** [1] - 1033:1
**prelude** [1] - 1191:10
**premier** [1] - 1127:10
**premise** [1] - 1096:10
**premised** [1] - 1147:8
**prep** [1] - 1133:12
**preparation** [2] - 890:23, 1139:19
**prepare** [11] - 885:13, 943:22, 958:19, 1014:18, 1040:1, 1045:2, 1048:14, 1050:19, 1051:24, 1052:8, 1131:1
**prepared** [17] - 884:23, 891:4, 892:16, 918:21, 931:13, 968:4, 978:12, 1049:20, 1053:5, 1055:10, 1055:11, 1057:12, 1059:25, 1073:24, 1113:23, 1114:2, 1114:8
**preparing** [6] - 890:22, 967:6, 967:16, 969:18, 1113:16, 1131:14
**preponderance** [11] - 1016:5, 1016:18, 1023:11, 1023:14, 1134:3, 1136:14, 1136:17, 1136:24, 1137:19, 1138:1, 1141:3
**presence** [2] - 942:7, 1129:23
**present** [9] - 1035:25, 1061:2, 1115:10, 1129:13, 1130:16, 1147:10, 1196:3, 1197:11
**presentation** [6] - 918:20, 918:21,

919:2, 919:5, 920:1, 920:23
**presented** [17] - 931:4, 1016:16, 1023:9, 1033:5, 1034:1, 1034:4, 1036:2, 1135:2, 1135:20, 1136:12, 1137:24, 1145:2, 1146:6, 1176:13, 1181:19, 1188:6, 1188:10
**presenter** [1] - 918:25
**presenting** [1] - 892:18
**presently** [3] - 1114:20, 1115:4, 1119:14
**preservation** [1] - 1134:16
**preserve** [2] - 1159:7, 1175:4
**preserved** [1] - 1133:22
**president** [12] - 978:3, 1041:22, 1084:11, 1119:5, 1119:22, 1120:1, 1120:10, 1121:19, 1122:2, 1122:4, 1122:9, 1173:8
**press** [1] - 994:18
**presumably** [1] - 1186:18
**presumptive** [1] - 1133:1
**presumptively** [2] - 1132:20, 1181:19
**pretrial** [6] - 1014:12, 1036:25, 1141:25, 1175:11, 1176:4, 1181:1
**pretty** [9] - 875:13, 918:13, 939:3, 955:1, 957:20, 957:21, 966:2, 993:18, 1160:17
**prevailed** [1] - 1092:18
**prevailing** [1] - 1157:18
**prevent** [1] - 917:2
**preview** [2] - 1015:22, 1134:18
**previous** [4] - 1010:11, 1121:4, 1157:16
**previously** [12] - 893:22, 893:23, 893:25, 899:7,

946:12, 1158:21, 1159:2, 1159:10, 1166:7, 1167:20, 1168:2, 1179:16
**pricing** [2] - 896:23
**primary** [5] - 1019:21, 1020:3, 1124:18, 1127:15, 1128:4
**principal** [3] - 1112:24, 1112:25, 1113:3
**principle** [1] - 1112:10
**printed** [2] - 1086:10, 1192:25
**private** [1] - 1123:15
**probative** [1] - 1140:9
**problem** [17] - 887:13, 901:19, 1000:7, 1006:14, 1061:17, 1062:16, 1071:17, 1101:7, 1106:2, 1186:10, 1186:24, 1187:8, 1187:25, 1189:20, 1195:9
**problematic** [1] - 942:9
**problems** [2] - 1073:15, 1075:13
**procedural** [1] - 944:4
**procedure** [2] - 1008:17, 1133:21
**Procedure** [5] - 1016:3, 1032:17, 1134:1, 1136:21, 1137:23
**proceed** [1] - 946:8
**proceedings** [6] - 942:23, 1012:18, 1032:7, 1112:5, 1148:9, 1197:12
**process** [57] - 875:23, 876:5, 878:22, 879:16, 880:9, 880:22, 880:25, 881:24, 882:2, 889:3, 889:6, 890:19, 893:24, 896:5, 905:3, 913:7, 914:10, 914:13, 915:15, 919:12, 920:5, 933:25, 936:17, 976:12, 992:17, 992:19, 992:24, 993:18, 994:1, 994:3, 994:4, 994:7, 1001:2, 1002:12, 1006:6, 1020:15, 1029:2, 1039:7, 1048:16, 1048:17, 1048:19,

1050:1, 1051:9, 1052:8, 1054:13, 1055:21, 1056:18, 1067:24, 1085:5, 1113:15, 1113:24, 1114:2, 1114:9, 1115:15, 1133:8, 1143:11, 1148:23
**processed** [2] - 1034:10, 1091:25
**processes** [1] - 938:24
**produce** [5] - 881:4, 900:6, 900:15, 922:4, 977:12
**produced** [12] - 876:14, 880:14, 880:19, 882:17, 991:19, 996:25, 1049:8, 1049:18, 1056:3, 1084:14, 1084:25, 1086:25
**producers** [1] - 907:19
**producing** [5] - 879:11, 896:24, 897:23, 977:15, 1001:8
**product** [12] - 876:14, 901:4, 919:15, 922:17, 958:14, 991:23, 992:2, 1000:25, 1001:3, 1022:16, 1117:16, 1153:10
**production** [20] - 879:7, 889:14, 889:15, 935:5, 959:18, 959:19, 960:5, 990:25, 1008:6, 1039:15, 1084:16, 1084:17, 1084:19, 1084:22, 1085:6, 1085:10, 1085:13, 1086:22, 1088:18, 1089:23
**Products** [5] - 934:1, 935:19, 967:3, 967:11, 1053:24
**products** [4] - 956:20, 1124:10, 1124:14, 1124:17
**professional** [1] - 1123:16
**profiles** [1] - 1107:9
**profit** [1] - 1123:15
**program** [23] - 926:14, 926:16, 948:5, 948:8, 951:6, 951:10, 954:23, 986:17, 986:23,

990:24, 1008:2, 1008:4, 1041:2, 1053:9, 1053:10, 1054:3, 1074:13, 1076:3, 1087:1, 1092:8, 1098:11, 1102:13, 1125:10
**progress** [1] - 1096:1
**project** [34] - 885:14, 934:2, 934:14, 934:16, 934:25, 936:4, 937:8, 953:5, 953:10, 953:13, 958:23, 958:24, 959:6, 959:10, 959:12, 959:15, 959:25, 960:3, 967:2, 972:12, 974:9, 977:13, 977:14, 987:4, 993:20, 993:21, 1007:1, 1083:25, 1084:21, 1120:5, 1120:7, 1120:13, 1120:16, 1121:9
**projections** [1] - 1085:24
**projects** [4] - 899:21, 934:4, 935:1, 977:11
**promoted** [1] - 1113:3
**proof** [5] - 914:25, 1009:24, 1149:7, 1162:17, 1169:24
**proper** [2] - 933:9, 1138:9
**properly** [3] - 930:24, 1138:24, 1144:16
**property** [11] - 1121:20, 1122:2, 1122:5, 1122:13, 1122:20, 1122:25, 1123:4, 1123:8, 1123:10, 1123:11, 1123:15
**proportional** [1] - 1029:9
**proposal** [13] - 1012:5, 1153:13, 1153:21, 1155:10, 1155:17, 1155:18, 1158:21, 1166:9, 1166:15, 1166:16, 1177:20, 1182:17, 1184:2
**proposals** [2] - 1157:8, 1171:23
**propose** [8] - 1036:24, 1155:11, 1155:14, 1168:24, 1173:12, 1173:15, 1173:20,

1178:10
**proposed** [22] - 906:18, 942:17, 1132:17, 1147:20, 1151:23, 1155:22, 1158:6, 1158:10, 1159:22, 1166:20, 1169:23, 1173:3, 1174:24, 1175:5, 1175:7, 1176:15, 1179:1, 1182:10, 1185:7, 1190:1, 1193:21, 1194:20
**proprietary** [1] - 889:19
**prospective** [1] - 919:5
**protection** [1] - 1122:25
**prove** [6] - 1068:24, 1069:18, 1117:12, 1139:25, 1155:23
**proven** [1] - 1150:17
**provide** [19] - 890:20, 896:22, 896:23, 908:8, 921:21, 945:2, 980:3, 982:4, 983:7, 985:10, 1009:24, 1015:13, 1038:8, 1038:9, 1072:10, 1095:25, 1099:14, 1127:25, 1187:19
**provided** [18] - 885:20, 930:20, 950:5, 1015:11, 1016:4, 1019:10, 1019:12, 1029:13, 1030:6, 1038:13, 1055:3, 1057:8, 1078:24, 1085:13, 1124:10, 1132:21, 1134:2, 1136:22
**provider** [2] - 893:2, 1001:24
**provides** [3] - 1008:1, 1078:19, 1127:22
**providing** [6] - 986:6, 988:15, 989:15, 1024:21, 1028:23, 1030:6
**proving** [1] - 1163:21
**provision** [7] - 1019:19, 1019:23, 1029:3, 1030:10, 1034:18, 1059:23, 1145:13
**provisions** [1] - 1008:18
**PTX** [9] - 886:1, 886:2,

886:4, 886:5, 906:3, 911:7, 1013:23, 1020:1, 1140:8
**PTXs** [1] - 944:17
**public** [6] - 923:15, 929:20, 1110:10, 1110:24, 1110:25, 1111:1
**publicly** [4] - 921:23, 921:25, 1111:10, 1111:19
**publish** [1] - 1045:17
**pull** [12] - 902:12, 950:12, 951:12, 952:20, 952:24, 978:17, 980:10, 1010:13, 1058:23, 1059:18, 1060:15, 1095:21
**pulled** [1] - 977:19
**purchase** [2] - 877:3, 1023:2
**purchased** [2] - 876:14, 1024:11
**purpose** [9] - 896:1, 919:8, 964:12, 1019:21, 1020:3, 1079:1, 1115:19, 1163:4, 1168:20
**purposefully** [1] - 1143:7
**purposes** [1] - 1114:2
**pursuant** [5] - 1033:1, 1033:2, 1113:24, 1114:2, 1147:7
**put** [32] - 896:16, 901:15, 903:15, 907:11, 909:11, 914:20, 915:5, 932:10, 932:13, 932:14, 933:18, 940:22, 943:13, 958:19, 996:25, 1004:3, 1005:10, 1036:7, 1037:18, 1037:19, 1037:22, 1038:4, 1039:22, 1057:6, 1085:9, 1086:3, 1110:15, 1167:6, 1174:4, 1177:2, 1181:10, 1194:8
**puts** [4] - 1004:7, 1004:11, 1162:20, 1188:25
**putting** [3] - 875:16, 913:7, 1186:20
**puzzle** [4] - 1162:19, 1162:21, 1162:24

**Q**

**quadrant** [2] - 997:13, 997:14
**qualification** [23] - 915:15, 1002:9, 1005:13, 1005:22, 1006:1, 1006:6, 1007:4, 1008:19, 1008:20, 1009:13, 1038:24, 1039:21, 1041:15, 1042:7, 1044:10, 1053:22, 1054:24, 1061:23, 1069:6, 1069:15, 1109:19, 1110:7, 1114:8
**qualifications** [1] - 898:4
**qualified** [15] - 900:7, 915:18, 915:23, 1001:9, 1001:25, 1002:11, 1003:9, 1006:5, 1008:8, 1010:6, 1039:1, 1040:14, 1041:3, 1041:6, 1062:22
**qualifies** [2] - 992:21, 1007:2
**qualify** [30] - 896:5, 915:13, 963:1, 963:7, 991:18, 992:9, 992:16, 1003:11, 1003:13, 1003:14, 1003:23, 1004:16, 1005:5, 1006:24, 1038:5, 1038:19, 1038:20, 1039:18, 1039:23, 1040:16, 1042:21, 1043:3, 1043:25, 1058:2, 1091:22, 1092:5, 1092:7, 1135:6, 1135:10, 1165:2
**qualifying** [5] - 1004:20, 1004:23, 1040:8, 1092:2, 1114:3
**quality** [1] - 900:8
**Quanta** [1] - 1162:5
**quantify** [2] - 1083:8, 1083:14
**quantitative** [1] - 1083:17
**quantity** [1] - 1140:15
**QUESTION** [1] - 933:1
**questioning** [2] - 875:3, 1068:10

**questions** [20] - 879:13, 879:22, 893:8, 912:16, 912:19, 923:24, 925:15, 933:14, 950:10, 961:14, 1008:11, 1026:20, 1143:23, 1147:11, 1181:25, 1182:5, 1183:22, 1184:2, 1184:3, 1187:4
**quick** [2] - 901:17, 1036:19
**quicker** [1] - 884:18
**quickly** [8] - 884:12, 888:17, 903:15, 910:20, 913:6, 1093:14, 1103:5, 1104:3
**quote** [1] - 876:16

## R

**railcars** [1] - 995:12
**raise** [11] - 1132:24, 1133:1, 1148:2, 1148:5, 1155:8, 1159:25, 1166:1, 1168:7, 1179:15, 1180:13, 1180:16
**raised** [4] - 1147:2, 1167:21, 1172:23, 1180:17
**raising** [4] - 944:2, 1070:18, 1167:11, 1171:10
**ran** [2] - 967:20, 968:8
**rank** [2] - 1117:2, 1117:4
**rate** [62] - 993:12, 993:13, 993:14, 1018:20, 1018:23, 1030:19, 1038:18, 1038:22, 1039:3, 1039:14, 1039:22, 1040:7, 1040:14, 1040:15, 1040:22, 1043:2, 1043:8, 1043:9, 1043:24, 1044:25, 1046:11, 1046:19, 1046:20, 1046:23, 1046:24, 1047:8, 1047:25, 1048:4, 1048:13, 1049:20, 1049:21, 1050:18, 1051:24, 1052:5, 1052:13, 1052:15, 1052:25, 1053:11, 1053:14, 1054:1, 1054:7,

1055:3, 1056:7, 1057:7, 1057:13, 1058:1, 1058:3, 1059:5, 1059:8, 1059:9, 1059:12, 1062:11, 1063:9, 1140:17, 1140:22, 1140:25, 1146:17, 1146:18
**rates** [9] - 1038:13, 1038:15, 1038:16, 1040:15, 1091:10, 1107:9, 1138:9, 1138:21, 1146:9
**raw** [2] - 996:17, 1002:18
**Raymond** [1] - 947:8
**RC** [19] - 979:25, 980:1, 980:5, 982:2, 982:6, 983:5, 985:8, 985:9, 1060:21, 1060:25, 1062:22, 1078:19, 1078:22, 1182:9, 1182:13, 1182:15, 1182:19
**RCB** [17] - 967:4, 967:16, 969:18, 970:17, 970:23, 972:1, 972:6, 972:13, 972:16, 972:19, 973:4, 973:18, 974:1, 977:24, 979:12, 993:25, 1103:13
**re** [5] - 928:15, 932:22, 932:25, 939:15, 969:10
**re-ask** [5] - 928:15, 932:22, 932:25, 939:15, 969:10
**rea** [1] - 1169:14
**reach** [1] - 929:14
**reached** [4] - 891:23, 892:12, 1088:14, 1106:16
**reaching** [2] - 902:18, 932:18
**reacting** [1] - 1012:8
**reaction** [2] - 1029:12, 1030:1
**reacts** [1] - 1091:5
**read** [62] - 889:23, 889:24, 890:15, 895:12, 903:14, 908:19, 908:20, 913:24, 921:13, 921:14, 921:19, 925:23, 926:9, 926:11, 926:13, 926:19, 927:2,

927:4, 932:25, 979:8, 979:24, 981:25, 983:3, 985:1, 988:12, 989:12, 989:18, 999:22, 999:25, 1000:8, 1000:19, 1009:19, 1010:20, 1060:18, 1063:7, 1064:4, 1064:19, 1073:8, 1075:1, 1075:6, 1078:17, 1079:12, 1082:25, 1088:21, 1104:20, 1131:16, 1131:17, 1143:10, 1145:11, 1150:16, 1159:4, 1159:15, 1162:10, 1168:3, 1173:19, 1173:23, 1174:24, 1175:15
**readable** [1] - 912:6
**reading** [6] - 878:4, 921:18, 1142:7, 1154:4, 1162:6, 1165:15
**reads** [7] - 1153:17, 1160:7, 1160:15, 1161:12, 1161:20, 1184:2, 1193:14
**ready** [10] - 875:7, 875:11, 875:12, 925:10, 926:18, 1011:23, 1012:20, 1072:22, 1093:7, 1093:8
**real** [3] - 901:17, 913:6, 1036:19
**realize** [5] - 941:19, 943:15, 1102:19, 1102:23, 1102:24
**really** [28] - 877:4, 881:12, 884:7, 889:9, 900:11, 920:21, 934:8, 977:10, 996:22, 998:16, 998:17, 1065:19, 1076:2, 1090:16, 1108:3, 1111:15, 1129:24, 1152:13, 1162:14, 1162:15, 1167:5, 1167:8, 1170:18, 1174:2, 1174:5, 1178:23, 1187:15, 1191:4
**realtime** [1] - 1050:15
**rearrange** [1] - 1192:18
**reason** [32] - 880:7,

895:9, 897:1, 903:9, 903:10, 908:15, 912:16, 921:2, 977:12, 1021:6, 1034:13, 1067:15, 1072:15, 1076:5, 1081:16, 1085:13, 1110:23, 1121:14, 1128:1, 1128:10, 1128:17, 1155:21, 1159:20, 1159:21, 1167:3, 1167:18, 1168:15, 1169:17, 1179:19, 1185:12, 1193:6, 1195:9
**reasonable** [33] - 1016:4, 1016:17, 1023:10, 1023:13, 1025:1, 1026:25, 1027:19, 1032:15, 1032:21, 1033:7, 1033:18, 1034:17, 1034:24, 1035:23, 1127:16, 1127:21, 1128:6, 1132:5, 1134:2, 1136:13, 1136:16, 1136:23, 1137:18, 1137:25, 1138:8, 1139:14, 1139:25, 1140:6, 1141:2, 1141:5, 1147:13, 1170:3, 1174:21
**reasonably** [8] - 1032:22, 1078:25, 1135:23, 1136:2, 1136:10, 1137:12, 1137:16, 1167:24
**reasons** [15] - 898:22, 925:17, 998:16, 998:19, 1031:10, 1033:4, 1085:15, 1137:5, 1146:20, 1150:6, 1166:6, 1166:23, 1169:9, 1172:7, 1172:17
**reassert** [2] - 1133:23, 1159:7
**rebate** [1] - 1145:18
**rebuttal** [2] - 1013:17, 1128:25
**receipt** [1] - 1138:16
**receive** [12] - 916:17, 917:20, 948:9, 980:1, 982:2, 983:5, 985:9, 1040:13, 1043:16, 1084:16, 1084:19, 1099:13
**received** [26] - 883:5, 885:22, 887:6,

890:19, 891:4, 892:8, 906:20, 906:25, 986:19, 1041:19, 1041:21, 1043:23, 1044:3, 1044:8, 1044:14, 1056:8, 1074:20, 1079:20, 1080:9, 1080:15, 1081:3, 1081:15, 1082:11, 1082:16, 1083:19, 1087:20
**receiving** [3] - 916:23, 940:5, 1020:8
**recent** [4] - 903:24, 1132:16, 1176:4, 1194:19
**recently** [3] - 894:8, 947:5, 1023:25
**receptionist** [1] - 957:24
**recess** [11] - 942:21, 942:22, 1012:15, 1012:17, 1032:5, 1032:6, 1112:3, 1112:4, 1148:7, 1148:8, 1197:4
**recklessly** [1] - 1143:20
**recognize** [4] - 954:15, 964:2, 1044:18, 1190:21
**recollect** [1] - 1007:20
**recollection** [4] - 886:13, 940:8, 1001:23, 1178:19
**recommend** [1] - 1040:8
**recommended** [21] - 1043:3, 1043:7, 1043:9, 1043:25, 1046:11, 1046:22, 1047:8, 1047:25, 1050:18, 1051:24, 1052:5, 1052:24, 1053:6, 1054:1, 1055:2, 1055:12, 1055:15, 1056:7, 1057:7, 1057:13, 1058:1
**record** [43] - 913:7, 941:10, 942:4, 943:2, 943:3, 943:10, 943:13, 944:1, 944:14, 944:16, 948:24, 995:25, 996:7, 997:10, 1023:13, 1027:18, 1030:12, 1030:17, 1032:8,

1032:9, 1036:13, 1036:19, 1085:4, 1112:15, 1119:10, 1130:18, 1132:5, 1133:16, 1135:17, 1135:22, 1137:11, 1137:18, 1143:4, 1145:12, 1147:24, 1174:25, 1175:10, 1175:14, 1177:12, 1181:15, 1194:8, 1194:14, 1195:15

**recorded** [1] - 1085:20

**records** [2] - 1110:11, 1111:2

**red** [11] - 914:21, 933:17, 934:3, 934:15, 934:16, 936:11, 939:17, 940:2, 1050:11, 1053:25, 1055:1

**redact** [1] - 1013:23

**redacted** [7] - 1013:24, 1014:11, 1014:13, 1014:23, 1014:24, 1015:6, 1037:1

**redactions** [2] - 1015:11, 1036:22

**redirect** [4] - 905:20, 1109:4, 1146:1, 1176:1

**REDIRECT** [1] - 1109:11

**redo** [2] - 1006:13, 1006:14

**reduce** [8] - 898:13, 1003:6, 1003:24, 1127:5, 1127:13, 1138:25, 1140:17, 1185:7

**reduced** [2] - 1003:12, 1003:15

**reduces** [1] - 1139:4

**reducing** [1] - 900:12

**reduction** [25] - 896:3, 898:25, 899:16, 900:1, 900:15, 900:16, 900:17, 1003:8, 1003:9, 1004:3, 1004:8, 1004:12, 1009:22, 1009:24, 1010:5, 1044:4, 1047:5, 1047:10, 1061:14, 1061:24, 1062:7, 1117:17, 1124:20, 1126:22

**Reduction** [1] - 957:5

**reductions** [6] - 898:7,

898:20, 1003:10, 1005:8, 1039:1, 1062:23

**redundant** [3] - 875:14, 1151:7, 1152:2

**refer** [3] - 889:12, 895:14, 952:19

**reference** [10] - 953:24, 965:18, 1024:2, 1030:22, 1064:17, 1144:6, 1154:5, 1164:21, 1168:25, 1170:21

**referenced** [6] - 999:12, 1000:19, 1009:16, 1167:23, 1188:8, 1189:15

**references** [2] - 1153:5, 1178:6

**referencing** [2] - 1171:1, 1177:1

**referred** [4] - 960:23, 1010:18, 1022:10, 1124:6

**referring** [20] - 877:21, 889:3, 895:8, 902:15, 922:21, 959:22, 996:1, 996:5, 997:1, 1007:21, 1007:22, 1007:23, 1011:5, 1042:15, 1117:22, 1150:11, 1153:9, 1182:2, 1193:24, 1196:17

**refers** [2] - 1063:23, 1063:25

**refined** [396] - 875:21, 876:7, 876:19, 877:5, 877:10, 877:17, 877:18, 878:16, 878:20, 879:8, 879:11, 879:15, 879:16, 880:12, 881:17, 882:9, 889:14, 889:16, 890:24, 896:24, 897:24, 900:6, 903:17, 905:3, 907:21, 908:7, 909:8, 915:18, 915:20, 915:23, 916:15, 917:15, 921:21, 922:4, 924:16, 925:5, 926:14, 933:20, 934:13, 938:8, 938:24, 940:5, 947:16,

947:19, 947:24, 948:5, 948:8, 948:9, 952:7, 952:12, 952:16, 952:18, 953:5, 953:8, 953:11, 953:13, 953:14, 954:4, 954:16, 954:18, 955:12, 955:21, 956:5, 956:15, 956:22, 956:25, 958:7, 958:9, 958:10, 958:14, 959:15, 959:21, 959:24, 960:1, 960:4, 960:12, 961:16, 961:17, 961:24, 962:7, 962:11, 962:22, 962:24, 963:4, 963:5, 963:9, 963:11, 963:15, 964:9, 964:17, 965:4, 965:5, 965:13, 965:19, 966:1, 966:3, 966:4, 966:11, 966:15, 966:17, 966:20, 966:21, 967:6, 967:11, 967:17, 967:23, 968:4, 968:5, 968:10, 969:11, 969:18, 969:23, 970:10, 970:17, 970:24, 971:2, 971:4, 971:6, 971:13, 972:16, 972:20, 973:22, 974:1, 974:5, 974:6, 974:9, 974:12, 975:12, 975:21, 976:1, 976:9, 976:13, 976:17, 977:3, 977:6, 977:12, 980:3, 982:4, 983:7, 985:11, 986:6, 986:17, 986:19, 986:22, 986:25, 987:1, 987:4, 987:7, 987:12, 987:13, 987:22, 988:4, 988:15, 988:22, 989:6, 989:15, 990:2, 990:20, 990:25, 991:13, 991:14, 991:16, 992:6, 992:9, 992:24, 993:1, 993:19, 993:20, 993:21, 993:22,

994:1, 994:9, 995:2, 996:5, 996:17, 996:19, 996:20, 996:24, 997:2, 997:15, 997:18, 997:23, 998:3, 998:20, 998:21, 1000:4, 1000:14, 1000:15, 1001:8, 1002:10, 1003:11, 1003:14, 1003:24, 1004:20, 1004:23, 1006:1, 1006:4, 1008:1, 1008:3, 1008:6, 1008:8, 1008:20, 1011:2, 1017:13, 1017:15, 1018:19, 1018:22, 1019:6, 1020:8, 1020:12, 1020:18, 1020:22, 1022:15, 1022:24, 1023:1, 1023:2, 1023:3, 1023:5, 1023:7, 1028:24, 1031:8, 1034:2, 1034:11, 1036:8, 1038:4, 1038:5, 1039:4, 1040:1, 1040:9, 1041:14, 1041:15, 1042:21, 1043:25, 1044:22, 1044:23, 1046:21, 1046:24, 1047:1, 1048:5, 1048:11, 1048:14, 1048:17, 1049:8, 1049:10, 1050:1, 1050:9, 1050:19, 1051:3, 1051:18, 1051:25, 1052:3, 1052:18, 1052:25, 1053:4, 1053:24, 1054:5, 1054:13, 1054:24, 1055:3, 1055:10, 1055:21, 1056:2, 1056:11, 1056:18, 1057:11, 1058:2, 1058:14, 1059:12, 1060:11, 1060:25, 1061:10, 1063:9, 1071:2, 1073:24, 1074:13, 1074:21, 1074:22, 1076:3, 1076:16, 1076:21, 1076:25, 1077:7, 1077:13, 1077:19, 1078:3, 1078:4, 1078:19, 1078:23, 1078:24, 1079:22, 1080:1, 1080:6, 1080:12,

1080:16, 1080:19, 1081:5, 1081:16, 1082:5, 1082:18, 1083:9, 1083:18, 1083:24, 1084:2, 1084:6, 1084:9, 1084:13, 1084:14, 1084:24, 1085:14, 1086:19, 1086:21, 1086:25, 1087:9, 1087:10, 1087:14, 1087:15, 1087:23, 1088:1, 1088:5, 1089:15, 1089:20, 1089:25, 1090:12, 1091:14, 1091:17, 1097:22, 1098:21, 1099:12, 1099:14, 1100:8, 1101:14, 1101:23, 1102:13, 1108:24, 1112:11, 1113:13, 1113:16, 1113:19, 1113:23, 1114:1, 1114:3, 1114:8, 1117:11, 1120:19, 1120:20, 1126:1, 1126:5, 1126:9, 1127:17, 1127:25, 1128:7, 1128:13, 1128:17, 1134:9, 1134:11, 1134:18, 1134:21, 1134:22, 1134:25, 1135:3, 1135:5, 1135:8, 1135:10, 1135:15, 1135:18, 1135:25, 1136:3, 1136:5, 1138:25, 1139:18, 1139:19, 1141:18, 1142:14, 1156:14, 1156:23, 1160:9, 1161:6, 1163:13, 1165:5, 1165:10, 1168:25, 1169:2, 1169:3, 1169:15, 1169:16, 1169:20, 1171:8, 1171:15, 1175:18, 1176:17, 1185:11

**reflect** [6] - 1046:17, 1055:2, 1066:10, 1138:3, 1138:12, 1189:23

**reflected** [8] - 1048:11, 1052:9, 1054:6, 1056:12, 1057:8, 1057:12, 1057:17, 1144:20

**reflective** [1] - 965:9

**reflects** [1] - 1025:23

**reframed** [1] - 881:8
**refusing** [1] - 880:7
**regard** [31] - 895:6, 895:16, 912:1, 943:21, 1019:4, 1020:6, 1027:6, 1032:10, 1032:12, 1033:12, 1035:3, 1086:19, 1103:6, 1129:14, 1131:12, 1132:8, 1132:12, 1133:1, 1147:3, 1158:23, 1163:11, 1166:1, 1168:13, 1170:2, 1170:9, 1171:17, 1172:11, 1175:23, 1177:23, 1181:16, 1195:17
**regarding** [4] - 1034:7, 1083:4, 1125:16, 1136:11
**regardless** [2] - 908:12, 1145:14
**regards** [2] - 923:7, 941:22
**regulation** [1] - 1011:6
**regulations** [5] - 1005:25, 1034:15, 1125:16, 1127:8, 1127:13
**rehash** [1] - 1023:22
**relate** [6] - 902:19, 911:14, 929:4, 1030:14, 1099:7, 1108:11
**related** [14] - 885:1, 888:11, 934:10, 1025:22, 1026:13, 1035:14, 1035:15, 1070:19, 1124:20, 1138:16, 1159:18, 1182:9, 1182:15, 1188:23
**relatedly** [1] - 1033:17
**relates** [6] - 932:19, 947:19, 1067:24, 1160:11, 1172:3, 1172:5
**relation** [1] - 1135:11
**relationship** [5] - 964:17, 967:20, 968:8, 970:20, 1125:3
**relays** [1] - 890:12
**released** [5] - 933:5, 941:12, 1127:9, 1140:16, 1140:23
**releasing** [1] - 922:17
**relevance** [5] - 924:15, 924:19, 925:4,

925:6, 925:7
**relevant** [8] - 1024:19, 1035:14, 1036:10, 1066:5, 1070:21, 1142:13, 1142:16, 1146:5
**relied** [9] - 1019:9, 1020:6, 1021:23, 1022:1, 1022:14, 1090:23, 1145:20, 1146:8, 1176:2
**relitigating** [1] - 1183:15
**relocated** [5] - 969:9, 969:11, 971:14, 971:20, 1050:24
**relocation** [2] - 977:9, 977:10
**rely** [5] - 999:24, 1025:13, 1033:8, 1145:9
**relying** [7] - 895:10, 897:2, 908:16, 911:1, 926:25, 1139:25, 1140:5
**remain** [4] - 998:7, 1037:12, 1070:20, 1072:9
**remainder** [1] - 1165:24
**remained** [6] - 954:22, 1048:2, 1048:19, 1052:1, 1053:3, 1091:10
**remaining** [2] - 1025:4, 1071:7
**remains** [1] - 875:5
**remarks** [1] - 1129:24
**remedy** [1] - 1032:24
**remember** [34] - 879:21, 880:1, 880:3, 881:11, 882:25, 889:25, 909:11, 914:1, 914:19, 914:22, 927:23, 929:1, 929:17, 930:5, 937:3, 937:21, 948:3, 948:17, 948:22, 949:6, 957:15, 990:13, 1012:24, 1078:6, 1078:7, 1098:4, 1098:5, 1099:23, 1105:20, 1105:24, 1133:20, 1160:4, 1177:9, 1177:10
**remind** [2] - 1060:7, 1168:17
**reminded** [1] -

1179:14
**reminder** [2] - 875:14, 1196:11
**removal** [1] - 1021:3
**remove** [11] - 1020:15, 1021:3, 1061:5, 1101:8, 1148:21, 1151:17, 1153:13, 1154:21, 1184:14, 1184:15, 1184:21
**removed** [5] - 898:2, 990:8, 1029:24, 1166:5, 1184:10
**removing** [4] - 1061:1, 1148:16, 1168:25, 1169:18
**render** [1] - 925:10
**renew** [1] - 1033:2
**renowned** [1] - 1002:6
**rep** [1] - 939:13
**repeat** [3] - 924:24, 929:2, 1077:8
**repeated** [3] - 989:21, 1066:10, 1102:3
**repeatedly** [1] - 1178:25
**repeating** [1] - 1076:1
**repeats** [2] - 1079:11, 1079:17
**repetition** [1] - 1144:4
**rephrase** [1] - 1081:13
**replead** [1] - 1071:21
**replenish** [1] - 1085:16
**replow** [1] - 929:18
**replying** [1] - 948:14
**report** [37] - 884:25, 885:12, 885:14, 885:16, 885:20, 886:4, 886:12, 886:22, 912:15, 1036:21, 1038:10, 1040:3, 1040:4, 1040:18, 1040:20, 1041:1, 1041:4, 1041:13, 1042:7, 1042:13, 1042:22, 1043:2, 1043:17, 1044:14, 1045:7, 1084:19, 1084:23, 1086:4, 1086:10, 1086:20, 1086:21, 1086:24, 1087:4, 1087:7, 1177:15
**reported** [3] - 1046:12, 1084:25, 1197:11
**reporter** [7] - 876:24, 901:20, 932:24, 1031:25, 1032:1, 1139:7, 1148:12

**Reporter** [3] - 1197:9, 1197:10, 1197:15
**REPORTER** [2] - 933:1, 1139:12
**reports** [28] - 884:22, 887:17, 889:8, 889:18, 890:4, 890:12, 890:23, 891:3, 892:16, 892:25, 893:16, 909:12, 910:21, 1021:20, 1038:13, 1038:17, 1039:2, 1043:16, 1043:23, 1044:3, 1045:6, 1045:9, 1084:16, 1084:18, 1085:25, 1086:3, 1143:10
**represent** [1] - 883:22
**representative** [4] - 924:20, 939:9, 946:20, 946:24
**representatives** [1] - 1178:22
**represented** [3] - 992:14, 1001:25, 1140:17
**representing** [2] - 947:23, 1178:22
**represents** [3] - 939:13, 1046:2, 1049:4
**request** [4] - 908:6, 932:11, 1044:12, 1166:7
**requested** [3] - 895:9, 896:22, 1138:2
**requests** [2] - 897:2, 908:16
**require** [6] - 900:14, 992:3, 1009:23, 1016:25, 1126:22, 1160:6
**required** [23] - 875:15, 876:13, 885:15, 904:23, 912:15, 927:1, 958:18, 991:18, 998:9, 1006:17, 1031:18, 1038:21, 1038:22, 1038:25, 1040:15, 1040:25, 1061:14, 1061:24, 1077:6, 1077:12, 1161:4, 1162:18
**requirement** [16] - 897:19, 1024:10, 1024:14, 1024:15, 1024:24, 1028:11, 1142:18, 1156:25,

1157:9, 1157:13, 1158:2, 1164:19, 1165:8, 1165:9, 1166:25, 1167:14
**requirements** [18] - 898:5, 899:22, 899:23, 899:24, 900:5, 900:8, 900:22, 904:24, 926:7, 949:15, 1010:8, 1040:22, 1090:24, 1090:25, 1091:23, 1113:20, 1142:22, 1143:16
**requires** [4] - 1138:25, 1143:13, 1164:9, 1170:4
**requisite** [1] - 1134:13
**research** [4] - 892:1, 1122:13, 1123:1, 1127:10
**Research** [4] - 1001:14, 1001:16, 1001:17, 1112:22
**reserve** [1] - 940:21
**resolve** [4] - 1012:2, 1132:23, 1179:16, 1192:6
**resolved** [1] - 1181:5
**resolving** [2] - 1180:10, 1181:20
**Resources** [7] - 887:23, 935:19, 966:12, 966:19, 1000:6, 1049:9, 1049:19
**Resources'** [1] - 1050:2
**respect** [18] - 922:12, 1018:18, 1033:23, 1137:6, 1139:16, 1140:3, 1140:20, 1144:7, 1144:8, 1144:16, 1144:25, 1145:3, 1145:5, 1146:4, 1161:2, 1169:13, 1191:8, 1194:12
**respected** [1] - 1002:6
**respective** [3] - 1034:2, 1036:6, 1181:16
**responded** [1] - 948:13
**response** [11] - 883:2, 904:2, 943:5, 1027:22, 1033:10, 1068:6, 1095:25, 1100:25, 1165:4, 1168:8, 1177:14

**responses** [3] - 1024:2, 1144:6, 1147:1
**responsibilities** [3] - 1113:9, 1115:11, 1120:6
**responsibility** [3] - 1120:8, 1120:12
**responsible** [2] - 1002:16, 1008:15
**responsive** [2] - 1068:9, 1095:17
**rest** [8] - 941:18, 941:22, 942:5, 943:6, 944:3, 1076:12, 1109:10, 1152:23
**restate** [1] - 1095:6
**restated** [1] - 1081:1
**rested** [2] - 944:8, 1130:1
**resting** [1] - 943:9
**restricted** [1] - 998:1
**restriction** [1] - 1011:5
**rests** [2] - 945:17, 1128:21
**result** [4] - 922:23, 923:14, 1020:3, 1061:6
**results** [24] - 903:15, 903:16, 1001:7, 1010:7, 1038:11, 1040:11, 1040:12, 1040:24, 1042:21, 1044:4, 1044:21, 1044:23, 1046:12, 1046:14, 1047:4, 1047:11, 1053:22, 1054:24, 1056:2, 1056:3, 1056:24, 1091:2, 1091:9
**retread** [1] - 1157:15
**revert** [1] - 1182:18
**review** [3] - 1015:12, 1171:7, 1193:3
**reviewed** [8] - 1021:21, 1045:7, 1100:4, 1132:18, 1158:11, 1165:17, 1165:18, 1181:15
**reviewing** [1] - 1070:3
**Ricco** [1] - 1162:5
**RICHARD** [1] - 873:23
**Richmond** [1] - 953:19
**ridiculous** [1] - 936:9
**right-hand** [4] - 909:13, 997:12, 997:14, 997:20
**rights** [1] - 880:17

**risk** [5] - 977:15, 977:17, 1025:23, 1050:15, 1156:20
**River** [14] - 891:13, 969:17, 969:19, 969:24, 970:3, 1052:19, 1053:1, 1053:5, 1057:24, 1089:3, 1104:6, 1106:25, 1117:23
**riveting** [1] - 983:10
**RLP** [1] - 1125:7
**ROBINSON** [1] - 874:8
**Robinson** [1] - 1012:23
**Roche** [5] - 1022:9, 1026:7, 1026:8, 1035:11
**rocking** [1] - 908:1
**rogue** [1] - 1006:8
**role** [7] - 890:22, 960:7, 1040:18, 1084:13, 1091:16, 1096:5, 1120:10
**roles** [2] - 894:9, 894:11
**rolling** [1] - 908:1
**rolls** [1] - 1029:13
**romanette** [1] - 1010:17
**room** [3] - 955:9, 955:10
**rough** [2] - 1013:1, 1017:17
**roughly** [2] - 1115:2, 1140:12
**row** [1] - 1185:18
**royalty** [11] - 1138:8, 1139:14, 1139:25, 1140:6, 1140:17, 1140:22, 1140:25, 1141:5, 1145:15, 1146:9, 1174:21
**RPR** [1] - 1197:14
**rule** [1] - 1142:9
**Rule** [11] - 945:21, 1015:24, 1016:2, 1032:17, 1033:1, 1033:2, 1134:1, 1136:21, 1137:23, 1147:3, 1147:7
**ruled** [2] - 1144:5, 1180:16
**rules** [4] - 1009:13, 1126:21, 1196:11, 1196:15
**ruling** [4] - 1142:8, 1159:10, 1180:12, 1180:14
**rulings** [1] - 1147:5

**run** [8] - 1042:18, 1042:21, 1050:15, 1057:3, 1065:22, 1098:12, 1113:10, 1113:11
**runs** [4] - 965:23, 1039:21, 1042:23, 1140:4
**Rush** [19] - 884:3, 891:13, 902:21, 902:22, 905:2, 906:7, 937:1, 937:11, 961:25, 962:7, 963:13, 964:9, 964:18, 1054:25, 1055:4, 1055:21, 1089:3, 1104:5
**Rutledge** [6] - 888:1, 967:3, 967:11, 1053:24, 1054:5, 1103:14
**Ryan** [1] - 910:2

## S

**S-Sorb** [57] - 890:8, 896:11, 896:16, 897:10, 914:11, 955:5, 991:18, 991:25, 993:11, 1003:5, 1004:11, 1037:17, 1037:22, 1038:1, 1038:4, 1038:13, 1038:15, 1038:16, 1038:18, 1039:3, 1040:7, 1040:15, 1040:25, 1043:3, 1043:7, 1043:10, 1043:14, 1043:15, 1043:24, 1045:1, 1046:16, 1046:23, 1047:9, 1048:1, 1048:2, 1049:13, 1049:19, 1052:12, 1053:14, 1054:2, 1054:4, 1054:7, 1055:7, 1056:9, 1056:13, 1057:7, 1057:10, 1057:13, 1059:7, 1062:11, 1085:19, 1090:24, 1113:24, 1114:4, 1114:9, 1135:8
**S-Sorbs** [1] - 1004:3
**safety** [4] - 998:16, 998:17, 998:19, 1039:12
**sake** [3] - 885:24,

1134:16, 1172:12
**sale** [18] - 1018:19, 1018:21, 1019:20, 1022:15, 1022:16, 1022:24, 1023:2, 1023:4, 1023:7, 1030:11, 1034:17, 1034:25, 1134:20, 1156:14, 1156:16, 1156:18, 1156:20, 1177:7
**sales** [4] - 974:10, 1021:25, 1156:23, 1156:24
**Sally** [2] - 922:25, 923:12
**sample** [4] - 1002:17, 1002:24, 1003:7, 1040:16
**Samsung** [1] - 1019:22
**Sargent** [22] - 884:22, 884:25, 885:8, 885:13, 885:18, 886:4, 886:11, 886:21, 887:2, 889:8, 889:18, 890:4, 890:11, 890:20, 891:3, 892:15, 892:25, 893:15, 909:12, 910:21, 912:15, 1021:20
**sat** [1] - 977:4
**satisfies** [1] - 1010:8
**save** [1] - 1024:1
**saved** [1] - 1166:14
**savings** [1] - 920:15
**saw** [11] - 927:15, 930:2, 971:24, 1049:15, 1067:3, 1098:5, 1101:22, 1105:25, 1109:24, 1152:21, 1172:5
**scale** [15] - 993:8, 997:19, 1001:2, 1002:4, 1005:5, 1009:14, 1010:2, 1010:3, 1011:7, 1014:3, 1044:5, 1047:4, 1064:7, 1064:10, 1064:12
**scenario** [2] - 1188:21, 1189:4
**scenarios** [1] - 1189:11
**scene** [4] - 1065:14, 1065:18, 1065:24, 1071:18
**scenes** [1] - 930:20

**Schaatt** [3] - 913:11, 947:13, 947:15
**schedule** [5] - 932:8, 941:11, 1006:19, 1011:21, 1012:21
**scheme** [1] - 1025:20
**school** [2] - 1002:3, 1123:17
**scienter** [1] - 1142:18
**scope** [4] - 893:9, 1170:22, 1171:14, 1171:21
**screen** [7] - 893:20, 901:16, 970:4, 1009:17, 1045:19, 1045:20, 1091:9
**scroll** [2] - 1103:13, 1104:2
**scrub** [1] - 1116:20
**scrubber** [1] - 1010:22
**search** [7] - 921:20, 923:20, 924:2, 924:5, 924:6, 961:20, 1154:3
**searched** [1] - 922:15
**searches** [1] - 961:15
**searching** [1] - 922:23
**seated** [2] - 875:6, 1131:10
**SEBSA** [1] - 1157:17
**sec** [1] - 1185:3
**second** [65] - 885:1, 886:3, 886:9, 893:18, 896:4, 896:11, 899:5, 902:24, 903:6, 927:5, 928:23, 929:24, 932:16, 933:16, 942:25, 948:23, 978:24, 978:25, 981:2, 981:22, 982:11, 982:13, 982:19, 982:22, 982:25, 984:5, 984:21, 985:16, 985:22, 988:13, 989:13, 1003:4, 1043:5, 1046:13, 1048:21, 1050:16, 1066:10, 1067:11, 1073:2, 1073:9, 1073:19, 1073:23, 1075:18, 1079:5, 1079:7, 1082:3, 1083:2, 1083:20, 1089:14, 1095:15, 1150:22, 1161:19, 1166:19, 1166:20, 1167:3, 1167:18, 1170:21,

1172:14, 1172:18, 1173:16, 1174:8, 1174:12, 1184:15, 1184:24, 1190:24
**seconds** [3] - 933:13, 1131:20, 1131:22
**section** [45] - 984:11, 1008:7, 1008:10, 1009:8, 1010:8, 1010:10, 1010:17, 1042:12, 1042:14, 1043:6, 1091:22, 1145:12, 1148:25, 1149:7, 1149:12, 1150:1, 1150:22, 1151:4, 1151:17, 1152:4, 1152:12, 1152:14, 1153:5, 1153:9, 1154:24, 1155:7, 1158:23, 1159:24, 1160:16, 1160:25, 1161:11, 1165:2, 1166:1, 1169:19, 1172:22, 1173:12, 1173:25, 1174:2, 1174:7, 1174:21, 1175:3, 1177:17, 1177:23
**Section** [42] - 898:5, 899:22, 900:7, 915:18, 949:15, 991:19, 992:2, 992:9, 1000:4, 1000:13, 1000:17, 1000:18, 1001:1, 1001:3, 1001:6, 1002:9, 1002:11, 1003:11, 1005:13, 1006:24, 1036:5, 1038:20, 1043:4, 1044:1, 1061:25, 1091:23, 1092:2, 1109:19, 1110:6, 1113:20, 1114:3, 1114:8, 1125:10, 1127:17, 1127:22, 1127:25, 1135:6, 1138:17, 1138:25, 1142:21, 1161:24, 1175:22
**sections** [2] - 926:12, 1151:15
**security** [1] - 1106:4
**see** [63] - 883:13, 890:9, 890:10, 894:3, 894:16, 895:22, 898:19, 903:2, 903:3, 903:23, 905:10, 908:14, 911:8,

913:8, 913:9, 918:19, 919:17, 920:22, 923:15, 927:21, 932:4, 933:3, 933:15, 950:20, 950:21, 958:11, 977:8, 977:9, 979:5, 984:12, 984:19, 984:20, 995:4, 995:8, 995:10, 1014:20, 1042:6, 1056:1, 1062:16, 1065:2, 1066:2, 1079:9, 1079:10, 1088:18, 1090:25, 1094:6, 1094:7, 1099:18, 1099:19, 1100:24, 1101:17, 1101:18, 1104:8, 1104:9, 1104:12, 1104:13, 1151:15, 1154:23, 1155:25, 1186:10, 1190:4, 1191:11, 1194:23
**seeing** [3] - 1012:14, 1102:2, 1105:10
**seek** [2] - 926:3, 1138:2
**seem** [4] - 1024:19, 1075:9, 1163:2, 1186:5
**self** [5] - 991:16, 991:17, 991:20, 991:21, 991:23
**self-contained** [4] - 991:17, 991:20, 991:21, 991:23
**sell** [18] - 901:2, 901:4, 908:7, 919:14, 924:4, 956:20, 960:4, 966:17, 967:17, 970:18, 974:12, 975:21, 976:9, 976:13, 1000:15, 1021:7, 1031:8, 1054:25
**selling** [42] - 879:11, 879:14, 880:12, 897:23, 900:21, 916:24, 933:20, 938:8, 940:5, 953:8, 953:10, 953:14, 956:15, 961:15, 962:6, 962:11, 963:14, 964:9, 966:15, 966:17, 966:21, 967:6, 967:11, 967:23, 969:23, 972:20,

973:21, 974:1, 974:6, 975:11, 987:1, 989:15, 999:2, 1073:24, 1077:19, 1080:6, 1080:12, 1088:5, 1123:14, 1126:1, 1126:9
**sells** [2] - 959:24, 1161:25
**send** [12] - 936:20, 937:24, 1012:4, 1084:21, 1084:22, 1191:23, 1191:25, 1192:16, 1193:3, 1193:7, 1194:25, 1195:4
**sending** [1] - 1196:3
**sends** [1] - 1002:18
**Senescence** [7] - 934:1, 934:2, 935:19, 967:17, 967:23, 1056:7, 1103:14
**senior** [3] - 940:11, 1113:1, 1113:3
**sense** [23] - 877:15, 878:8, 878:18, 880:13, 882:15, 894:1, 894:5, 904:1, 942:8, 947:22, 991:6, 1027:11, 1029:24, 1089:15, 1096:14, 1105:14, 1105:18, 1131:1, 1158:19, 1182:8, 1186:7, 1189:7, 1192:8
**sent** [7] - 904:21, 1103:5, 1103:24, 1132:17, 1166:8, 1182:22, 1193:6
**sentence** [30] - 892:22, 908:23, 950:18, 950:25, 1000:11, 1042:19, 1061:17, 1062:16, 1062:17, 1063:1, 1063:7, 1064:19, 1064:25, 1150:4, 1151:10, 1151:11, 1151:12, 1151:13, 1153:16, 1153:17, 1161:23, 1174:14, 1174:18, 1184:1, 1184:9, 1184:12, 1184:24, 1185:9
**sentences** [1] - 1064:4
**separate** [17] - 1065:11, 1067:10,

1086:6, 1138:4, 1138:13, 1151:23, 1155:17, 1156:5, 1157:9, 1157:12, 1157:20, 1158:2, 1158:13, 1163:7, 1178:16, 1187:10, 1188:15
**separately** [3] - 1157:6, 1180:9, 1182:6
**separating** [1] - 1016:25
**separation** [1] - 1020:15
**September** [4] - 1052:20, 1053:8, 1056:25, 1058:25
**sequence** [1] - 1071:19
**serial** [1] - 918:16
**series** [1] - 1093:17
**serve** [2] - 894:12, 923:3
**served** [11] - 891:23, 923:2, 925:12, 929:11, 948:21, 948:25, 949:3, 961:7, 978:21, 1028:13, 1088:11
**service** [8] - 963:1, 965:10, 968:17, 970:2, 970:5, 995:15, 1009:23, 1048:20
**Service** [6] - 1119:6, 1119:17, 1119:19, 1119:24, 1120:2, 1120:11
**services** [3] - 1124:10, 1124:14, 1124:17
**set** [11] - 932:8, 977:16, 989:25, 1029:12, 1057:23, 1090:24, 1113:11, 1126:21, 1156:10, 1170:14, 1170:24
**settled** [3] - 1044:25, 1059:9, 1059:12
**settlement** [2] - 1140:5, 1146:5
**seven** [3] - 873:12, 948:2, 1100:10
**seventh** [4] - 1054:17, 1054:18, 1054:19, 1179:5
**several** [20] - 882:12, 893:4, 921:10, 964:19, 976:7, 1018:3, 1085:15,

1140:7, 1150:6, 1185:10, 1186:6, 1187:2, 1187:12, 1187:18, 1187:23, 1188:2, 1188:4, 1188:7, 1189:16, 1190:1
**severally** [2] - 1186:15, 1189:7
**share** [1] - 906:8
**shared** [1] - 1139:23
**sheet** [1] - 1085:20
**Shermont** [4] - 987:8, 987:11, 987:14, 987:17
**shift** [5] - 998:10, 1085:3, 1085:4, 1085:7
**shifts** [3] - 955:16, 1085:2, 1085:3
**short** [4] - 1013:18, 1114:13, 1116:8, 1123:23
**short-term** [1] - 1116:8
**shorter** [4] - 1050:22, 1050:23, 1109:9, 1164:2
**Shorthand** [2] - 1197:9, 1197:10
**shorthand** [1] - 1197:11
**shortly** [1] - 933:7
**shotgun** [1] - 920:21
**show** [38] - 886:3, 886:8, 903:16, 905:17, 905:24, 948:24, 995:1, 1004:3, 1042:11, 1044:9, 1046:10, 1047:4, 1047:7, 1050:6, 1051:15, 1051:23, 1053:21, 1054:19, 1056:23, 1058:13, 1062:6, 1068:14, 1068:16, 1087:7, 1095:1, 1097:13, 1098:20, 1110:5, 1110:11, 1134:13, 1140:2, 1151:19, 1163:20, 1164:6, 1164:7, 1183:16
**showed** [14] - 885:4, 891:9, 927:24, 929:23, 1002:10, 1029:15, 1050:18, 1062:2, 1062:10, 1094:2, 1094:4, 1096:22, 1144:17,

1173:7
**showing** [9] - 911:24, 924:16, 932:15, 995:14, 1049:19, 1095:14, 1098:1, 1166:25, 1167:14
**shown** [9] - 970:4, 1024:25, 1053:7, 1058:15, 1093:20, 1093:23, 1096:19, 1111:10, 1150:14
**shows** [21] - 903:14, 1042:9, 1042:17, 1046:7, 1051:22, 1052:1, 1052:17, 1056:24, 1058:15, 1058:16, 1059:5, 1066:16, 1067:18, 1069:17, 1111:2, 1134:18, 1135:4, 1138:11, 1139:13, 1140:14, 1140:21
**shut** [6] - 901:3, 901:8, 901:9, 934:10, 938:23, 1102:13
**shuttle** [1] - 998:10
**sic** [1] - 1096:18
**side** [30] - 909:13, 923:23, 930:14, 930:19, 931:5, 931:15, 931:23, 931:24, 933:7, 1013:16, 1015:14, 1026:24, 1047:23, 1091:5, 1096:15, 1106:12, 1128:24, 1130:25, 1131:20, 1131:21, 1132:24, 1133:10, 1134:17, 1154:25, 1163:8, 1181:9, 1191:7, 1194:4, 1194:6
**sidebar** [5] - 1065:2, 1065:3, 1072:20, 1129:3, 1130:12
**sides** [4] - 1147:14, 1148:11, 1163:9, 1164:18
**sign** [1] - 1041:4
**signed** [4] - 974:11, 975:17, 1040:13, 1051:1
**significant** [3] - 940:7, 986:13, 1143:18
**signing** [1] - 905:8
**Silicon** [1] - 1019:16
**silos** [3] - 955:3, 955:5, 995:8
**similar** [17] - 894:4,

905:4, 907:23, 937:23, 965:3, 965:6, 966:2, 966:5, 970:4, 974:8, 994:13, 1016:25, 1043:16, 1075:4, 1145:4, 1145:13, 1171:21
**similarly** [2] - 1135:20, 1148:4
**simply** [2] - 1035:12, 1182:2
**simulates** [2] - 1064:7, 1064:11
**simultaneously** [1] - 1125:21
**single** [3] - 916:6, 977:17, 1178:4
**site** [15] - 919:2, 919:6, 919:8, 919:11, 920:24, 955:19, 955:20, 956:18, 958:19, 958:20, 974:23, 976:2, 976:3, 976:6, 998:9
**sited** [1] - 1143:1
**sitting** [2] - 1069:24, 1102:17
**situated** [1] - 875:11
**situation** [2] - 947:11, 1179:20
**six** [23] - 960:9, 978:1, 979:8, 980:18, 981:3, 982:14, 983:22, 1001:7, 1001:9, 1004:16, 1006:17, 1006:19, 1038:19, 1039:25, 1042:20, 1060:7, 1074:7, 1076:15, 1076:20, 1079:23, 1080:7, 1081:16, 1083:5
**six-month** [2] - 1001:7, 1042:20
**sixth** [1] - 1053:21
**sized** [1] - 1118:12
**skinny** [2] - 963:18, 963:20
**skip** [1] - 1090:8
**slack** [1] - 1039:17
**slide** [22] - 887:9, 892:23, 909:11, 914:19, 915:2, 915:13, 919:19, 943:14, 944:19, 944:20, 945:7, 966:8, 966:25, 967:15, 968:2,

969:15, 970:14, 971:18, 972:10, 991:14, 994:12, 1014:23
**slides** [3] - 944:24, 971:11, 1174:4
**sliding** [1] - 927:21
**slightly** [5] - 878:15, 898:23, 1014:25, 1156:9, 1187:18
**slow** [3] - 1077:9, 1139:6, 1139:12
**small** [1] - 1117:16
**smarter** [3] - 1129:10, 1180:19, 1191:2
**smoothly** [1] - 1012:9
**so..** [1] - 1106:5
**SO2** [1] - 1010:22
**sold** [69] - 876:12, 879:3, 915:23, 915:24, 916:15, 916:18, 917:15, 917:20, 924:16, 925:5, 960:2, 968:5, 969:19, 971:13, 972:17, 992:18, 993:16, 1000:4, 1025:2, 1025:16, 1030:18, 1034:2, 1036:8, 1048:12, 1049:8, 1049:11, 1050:10, 1050:20, 1051:4, 1051:25, 1052:4, 1052:19, 1053:1, 1053:4, 1053:24, 1054:6, 1054:14, 1055:3, 1057:2, 1073:24, 1080:17, 1082:14, 1083:9, 1083:19, 1083:23, 1084:2, 1084:6, 1084:14, 1087:15, 1088:18, 1089:16, 1090:13, 1091:17, 1115:14, 1124:24, 1134:9, 1135:3, 1135:25, 1141:17, 1141:19, 1142:10, 1163:23, 1166:4, 1169:3, 1170:19, 1170:25, 1171:8, 1171:15
**sole** [1] - 1128:1
**solely** [1] - 1139:15
**soliciting** [1] - 1143:11
**solution** [12] - 889:19, 891:5, 896:17, 920:10, 920:11, 1100:19, 1126:5,

1185:8, 1190:22, 1191:12, 1191:17, 1191:25
**Solution** [1] - 1161:22
**solutions** [1] - 1146:3
**someone** [10] - 894:4, 902:19, 923:16, 925:4, 1110:5, 1148:2, 1148:5, 1149:23, 1159:12, 1181:7
**sometime** [2] - 961:5, 1088:13
**sometimes** [2] - 1124:6, 1125:9
**somewhere** [11] - 878:24, 879:5, 881:7, 881:9, 881:12, 881:21, 882:9, 936:11, 970:2, 971:7, 972:24
**soon** [1] - 1040:3
**Sorb** [58] - 890:8, 896:11, 896:16, 897:10, 914:11, 955:5, 991:18, 991:25, 993:11, 1003:5, 1004:11, 1037:17, 1037:22, 1038:1, 1038:4, 1038:13, 1038:15, 1038:16, 1038:18, 1039:3, 1040:7, 1040:15, 1040:25, 1043:3, 1043:7, 1043:10, 1043:14, 1043:15, 1043:24, 1045:1, 1046:16, 1046:23, 1047:9, 1048:1, 1048:2, 1049:13, 1049:19, 1052:12, 1053:14, 1054:2, 1054:4, 1054:7, 1055:7, 1056:9, 1056:13, 1057:7, 1057:10, 1057:13, 1059:7, 1062:11, 1085:19, 1090:24, 1113:24, 1114:4, 1114:9, 1135:8
**sorbent** [21] - 920:15, 980:4, 982:5, 983:8, 985:12, 992:4, 1016:25, 1017:3, 1017:4, 1018:12, 1033:24, 1035:1, 1043:13, 1062:24, 1063:3, 1070:9, 1079:2, 1099:15,

1100:12, 1136:3
**sorbents** [1] - 1085:19
**Sorbs** [1] - 1004:3
**sorry** [52] - 877:23, 892:22, 894:21, 896:7, 898:17, 899:9, 899:11, 900:3, 905:16, 905:22, 905:24, 906:14, 909:21, 913:6, 915:9, 919:4, 928:25, 933:13, 934:1, 934:25, 935:22, 945:2, 955:16, 968:19, 970:8, 981:20, 985:2, 985:4, 987:11, 991:14, 996:13, 996:14, 1000:17, 1007:23, 1028:21, 1038:25, 1041:10, 1069:4, 1077:8, 1090:19, 1092:6, 1096:11, 1100:17, 1108:9, 1113:23, 1122:11, 1139:8, 1141:17, 1163:18, 1169:5, 1183:18, 1192:15
**sort** [27] - 875:14, 875:16, 885:11, 889:3, 891:9, 896:3, 904:10, 913:7, 919:23, 921:20, 935:25, 939:22, 1024:1, 1029:14, 1029:15, 1031:3, 1071:15, 1093:9, 1107:8, 1152:16, 1156:15, 1156:17, 1156:19, 1162:18, 1163:1, 1169:19, 1178:4
**sound** [6] - 888:22, 930:11, 936:9, 949:1, 990:15, 1149:23
**sounded** [1] - 1169:7
**sounds** [4] - 888:23, 931:21, 939:2, 1159:24
**source** [1] - 910:22
**south** [2] - 953:19, 971:16
**southeast** [1] - 997:15
**southwest** [1] - 1117:14
**SOx** [3] - 1125:14, 1128:1, 1139:18
**sparingly** [1] -

1032:24
**SPEAKER** [1] - 1119:9
**speaking** [11] - 899:18, 937:16, 940:1, 947:4, 960:10, 962:22, 992:24, 1019:18, 1032:1, 1156:2, 1175:1
**speaks** [1] - 1178:25
**specially** [7] - 1024:11, 1068:14, 1069:19, 1076:9, 1091:14, 1134:11, 1160:18
**specific** [11] - 921:17, 1004:8, 1004:11, 1024:4, 1025:14, 1027:16, 1028:2, 1034:23, 1067:20, 1143:4, 1175:2
**specifically** [17] - 897:1, 958:13, 991:17, 1005:6, 1029:11, 1030:2, 1038:16, 1067:17, 1078:23, 1092:1, 1115:14, 1138:16, 1144:8, 1160:8, 1161:2, 1175:3, 1177:19
**specifics** [1] - 998:4
**speculate** [1] - 928:22
**speculation** [1] - 899:2
**spell** [2] - 1112:14, 1119:9
**spelled** [2] - 892:25, 995:15
**spells** [2] - 1005:6, 1040:14
**spend** [1] - 946:18
**spending** [1] - 948:14
**split** [3] - 1002:22, 1027:11, 1131:16
**spray** [5] - 896:1, 952:6, 952:10, 952:11, 952:15
**sprayer** [1] - 976:21
**sprayers** [2] - 877:18, 877:21
**spraying** [1] - 896:6
**spreadsheet** [2] - 927:21, 1086:4
**Springhill** [12] - 887:21, 887:23, 934:2, 935:19, 966:12, 966:19, 966:21, 1000:5, 1049:9, 1049:18,

1050:2, 1103:16
**square** [1] - 1134:15
**squeaky** [1] - 1050:11
**squeezed** [1] - 937:4
**stack** [1] - 1005:11
**staff** [3] - 955:17, 957:12, 1012:11
**staffing** [1] - 960:14
**stage** [1] - 1067:5
**stand** [9] - 930:18, 942:21, 946:3, 1003:18, 1012:12, 1032:5, 1037:11, 1148:7, 1197:4
**standard** [8] - 896:20, 897:4, 899:10, 900:19, 908:18, 1147:2, 1149:11, 1150:12
**standards** [3] - 900:17, 912:13, 1107:13
**standing** [4] - 1022:17, 1023:5, 1023:8, 1196:23
**standpoint** [1] - 1083:18
**stands** [2] - 1180:3, 1191:18
**staple** [9] - 1134:9, 1141:19, 1160:12, 1160:18, 1161:16, 1162:2, 1163:14, 1163:24, 1165:11
**start** [15] - 903:24, 961:16, 962:10, 963:11, 1029:25, 1032:4, 1072:12, 1101:9, 1103:1, 1106:7, 1148:14, 1148:22, 1160:14, 1173:10, 1174:3
**started** [22] - 883:13, 904:11, 916:10, 939:17, 939:21, 961:15, 962:13, 963:14, 967:11, 967:23, 969:23, 972:22, 974:6, 975:11, 977:18, 1005:18, 1059:6, 1088:14, 1088:15, 1089:11, 1105:20, 1132:15
**starting** [8] - 963:15, 970:3, 970:23, 974:1, 1052:20, 1053:23, 1056:25, 1175:12
**starts** [9] - 897:12,

950:19, 950:25, 952:25, 984:14, 995:3, 995:14, 996:6, 997:3
**state** [19] - 879:22, 879:25, 880:16, 908:4, 908:5, 908:13, 1026:13, 1026:19, 1066:8, 1066:16, 1067:8, 1067:18, 1069:22, 1070:10, 1071:25, 1072:3, 1072:11, 1112:14, 1119:9
**statement** [10] - 876:6, 878:12, 894:9, 915:16, 918:1, 920:7, 1061:22, 1159:3, 1164:13, 1164:21
**statements** [2] - 995:25, 1075:23
**states** [2] - 920:7, 1063:15
**States** [2] - 1111:2, 1126:2
**STATES** [1] - 873:1
**static** [1] - 993:15
**station** [57] - 914:8, 953:17, 953:18, 954:18, 961:25, 964:10, 966:18, 966:22, 967:7, 967:12, 967:16, 967:18, 967:24, 968:3, 968:6, 968:15, 968:17, 968:18, 968:22, 969:2, 969:3, 969:5, 969:10, 969:12, 969:17, 969:19, 969:24, 970:3, 970:6, 970:11, 970:12, 970:16, 970:18, 970:24, 970:25, 971:5, 971:8, 971:10, 971:14, 971:19, 971:21, 971:25, 972:7, 972:8, 972:13, 972:24, 972:25, 994:23, 1043:4, 1043:17, 1046:5, 1046:21, 1051:25, 1052:4, 1052:20, 1053:5
**Station** [13] - 973:5, 973:10, 973:21, 973:22, 973:23, 976:24, 977:5,

987:18, 987:22, 987:25, 988:5, 988:9, 1041:15
**statute** [3] - 1165:17, 1193:13, 1193:17
**statutes** [2] - 949:15, 1194:5
**stay** [7] - 901:5, 908:2, 1036:24, 1039:8, 1039:11, 1133:10, 1148:11
**staying** [1] - 1039:14
**steam** [8] - 875:18, 878:13, 880:21, 880:25, 881:23, 882:2, 915:25, 1118:8
**steam-generation** [1] - 880:25
**stenographer** [1] - 1154:14
**Stenotype** [1] - 1197:11
**step** [13] - 889:6, 941:2, 1016:15, 1017:6, 1018:12, 1033:20, 1034:14, 1035:2, 1111:23, 1155:13, 1155:24, 1158:5, 1159:6
**steps** [7] - 993:1, 1016:25, 1018:7, 1025:4, 1029:14, 1029:17, 1029:19
**Steve** [1] - 940:15
**stick** [1] - 881:19
**sticker** [2] - 906:3, 943:12
**stickering** [2] - 944:15, 945:4
**still** [36] - 894:11, 894:12, 896:16, 907:21, 916:14, 929:16, 950:4, 952:6, 978:7, 981:2, 982:14, 983:21, 986:20, 990:2, 990:3, 990:4, 990:20, 1059:15, 1065:12, 1065:13, 1070:20, 1071:7, 1072:9, 1073:24, 1074:8, 1074:14, 1074:21, 1074:22, 1101:23, 1122:23, 1122:24, 1130:18, 1132:25, 1189:6
**stipulate** [1] - 944:2
**stipulated** [3] - 999:22, 1000:2,

1000:19
**stipulation** [2] - 1180:23, 1181:9
**stipulations** [3] - 1088:22, 1089:9, 1089:10
**stood** [1] - 1029:8
**stop** [19] - 897:18, 904:8, 933:24, 934:6, 934:9, 934:13, 934:22, 935:4, 935:14, 935:18, 936:3, 936:17, 936:25, 938:7, 939:19, 1007:14, 1062:18, 1167:10, 1173:15
**stopped** [4] - 926:14, 926:16, 937:10, 990:25
**stopping** [2] - 1017:15, 1020:22
**stops** [4] - 995:3, 995:14, 996:6, 997:3
**storage** [1] - 996:17
**store** [1] - 996:19
**stored** [1] - 996:20
**Storm** [19] - 953:17, 953:20, 988:5, 988:9, 1060:11, 1077:2, 1102:10, 1105:12, 1111:11, 1114:15, 1115:25, 1116:3, 1116:7, 1116:21, 1117:2, 1117:5, 1117:10, 1118:1, 1118:18
**story** [2] - 938:2, 970:4
**straight** [1] - 943:8
**strategy** [1] - 1127:12
**strayed** [1] - 1170:12
**stream** [3] - 912:3, 913:1, 913:4
**streamline** [1] - 933:16
**streamlined** [1] - 933:8
**streamlining** [1] - 930:24
**Street** [4] - 987:9, 987:14, 988:3, 988:4
**stricken** [2] - 1111:17, 1150:15
**strict** [1] - 998:17
**strike** [3] - 893:8, 1174:18, 1182:4
**struck** [1] - 1081:1
**structure** [9] - 930:9, 930:21, 931:24,

932:5, 933:3, 933:5, 935:12, 995:23, 1178:5

**structured** [1] - 1122:23

**stuck** [1] - 884:7

**stuff** [7] - 880:1, 935:25, 958:15, 958:20, 1005:10, 1148:19, 1152:19

**sub** [9] - 1057:20, 1107:15, 1117:6, 1117:12, 1117:22, 1117:23, 1118:2, 1118:11, 1118:19

**sub-bituminous** [9] - 1057:20, 1107:15, 1117:6, 1117:12, 1117:22, 1117:23, 1118:2, 1118:11, 1118:19

**subject** [6] - 982:25, 984:3, 984:7, 1042:10, 1044:6, 1090:8

**submit** [1] - 1145:11

**subsequent** [1] - 911:12

**subsequently** [1] - 1135:25

**subset** [1] - 1171:20

**subsidiaries** [1] - 957:4

**substance** [1] - 1177:6

**substantial** [40] - 958:21, 1040:4, 1077:23, 1078:4, 1078:25, 1080:18, 1081:9, 1082:6, 1082:13, 1082:23, 1084:5, 1084:7, 1084:9, 1088:3, 1088:7, 1088:20, 1089:19, 1089:21, 1089:25, 1090:6, 1105:6, 1128:13, 1134:10, 1134:19, 1135:25, 1136:4, 1141:20, 1142:6, 1160:13, 1161:17, 1162:2, 1163:15, 1163:24, 1164:15, 1165:1, 1165:12, 1166:25, 1167:15, 1177:16

**substituted** [1] - 1178:10

**sued** [1] - 883:13

**sufficient** [18] -

1016:4, 1016:16, 1022:23, 1023:4, 1023:10, 1026:25, 1032:15, 1033:7, 1101:3, 1116:24, 1134:25, 1136:13, 1136:23, 1137:7, 1137:25, 1144:2, 1144:9, 1146:21

**suggest** [4] - 949:23, 951:5, 1148:25, 1176:22

**suggested** [1] - 1146:12

**suggesting** [3] - 932:10, 932:14, 1180:8

**suggestion** [1] - 1182:18

**suggests** [1] - 1036:8

**suit** [9] - 921:13, 1022:13, 1028:12, 1071:8, 1083:5, 1105:15, 1171:9, 1174:9, 1174:18

**suitable** [2] - 1161:17, 1162:2

**sum** [1] - 1140:10

**summarize** [1] - 1125:15

**summarized** [1] - 1045:25

**summarizing** [2] - 1059:2, 1132:22

**summary** [12] - 1023:25, 1044:22, 1045:5, 1046:10, 1085:10, 1085:14, 1179:22, 1179:24, 1180:2, 1180:4, 1180:10, 1180:11

**summer** [6] - 924:8, 924:12, 925:2, 930:3, 933:23, 976:5

**supervise** [2] - 1113:18, 1113:22

**supplement** [1] - 1103:15

**supplied** [8] - 954:5, 998:25, 1060:11, 1079:23, 1080:20, 1081:5, 1087:23, 1141:18

**supply** [2] - 949:20, 974:5

**supplying** [13] - 949:18, 954:4, 956:4, 961:16, 963:15, 964:17, 970:24, 976:1,

1076:16, 1076:21, 1076:25, 1081:17, 1098:21

**support** [9] - 885:20, 894:13, 1020:13, 1022:24, 1115:13, 1135:17, 1144:3, 1144:9, 1189:16

**supported** [1] - 1163:3

**supports** [1] - 1019:5

**suppose** [2] - 1176:19, 1184:5

**supposed** [8] - 928:7, 928:18, 929:7, 1094:16, 1095:24, 1131:15, 1170:14, 1188:5

**Supreme** [3] - 1157:14, 1157:17, 1157:22

**surely** [1] - 1174:9

**surface** [1] - 974:19

**surprise** [8] - 906:6, 906:8, 906:9, 948:16, 948:18, 949:5, 949:7, 1095:24

**surrounding** [1] - 1156:15

**suspenders** [1] - 944:2

**sustain** [3] - 928:14, 939:14, 1109:25

**sustained** [3] - 1080:25, 1095:6, 1111:16

**switch** [1] - 955:11

**sworn** [3] - 875:5, 946:12, 1037:12

**Sykes** [5] - 915:6, 932:13, 943:24, 944:6, 1164:13

**SYKES** [5] - 874:7, 943:25, 1128:21, 1132:10, 1133:14

**Sykes's** [1] - 1164:21

**system** [13] - 892:10, 905:4, 905:9, 916:3, 917:17, 917:18, 993:5, 993:6, 1078:21, 1091:6, 1116:11, 1116:20

**Systems** [1] - 1161:21

**systems** [7] - 903:18, 916:21, 917:14, 918:4, 1021:7, 1117:25, 1118:18

**T**

**tab** [8] - 884:13, 884:15, 886:7, 905:20, 905:21, 918:15, 963:24, 1044:16

**Tab** [28] - 884:16, 893:17, 901:15, 905:19, 905:21, 906:2, 906:12, 909:20, 911:4, 911:6, 913:6, 950:15, 974:16, 978:10, 978:15, 980:7, 980:22, 982:8, 982:10, 983:13, 986:11, 1041:9, 1059:24, 1060:1, 1072:24, 1074:2, 1079:4, 1079:14

**table** [3] - 941:2, 1146:8, 1148:12

**tailored** [1] - 1078:23

**tailoring** [1] - 1066:15

**Takeda** [1] - 1022:20

**talks** [4] - 915:12, 930:5, 1008:7, 1061:17

**tall** [2] - 955:6, 955:7

**tank** [1] - 955:3

**task** [2] - 1191:13, 1194:23

**tax** [97] - 875:15, 877:7, 882:2, 896:2, 896:19, 897:9, 897:12, 898:5, 898:11, 899:14, 900:7, 900:11, 901:10, 907:16, 907:20, 907:25, 915:14, 915:19, 915:20, 915:24, 916:4, 916:14, 916:17, 916:23, 917:2, 917:16, 917:20, 917:24, 918:2, 926:15, 933:19, 938:12, 939:1, 939:3, 940:4, 957:12, 968:12, 990:24, 991:19, 992:3, 992:9, 992:17, 992:21, 1001:1, 1001:4, 1003:11, 1003:14, 1003:24, 1004:17, 1004:20, 1004:23,

1008:1, 1008:3, 1008:6, 1008:16, 1025:15, 1029:8, 1036:5, 1038:6, 1038:20, 1039:19, 1039:23, 1040:9, 1041:2, 1043:4, 1044:1, 1091:23, 1092:3, 1092:7, 1098:11, 1113:20, 1114:3, 1125:10, 1125:17, 1135:6, 1135:10, 1138:17, 1138:19, 1139:5, 1142:21, 1143:19, 1144:20, 1145:8, 1145:10, 1145:14, 1145:15, 1145:17, 1145:19, 1175:3, 1175:18, 1175:22, 1176:1, 1176:3, 1176:12, 1176:17, 1177:10, 1177:17

**taxpayer** [1] - 1009:23

**team** [1] - 1133:10

**Tech** [2] - 1157:17, 1161:21

**technical** [10] - 898:4, 898:22, 899:22, 899:23, 931:10, 931:11, 940:9, 1091:22, 1138:4, 1138:12

**technically** [5] - 885:15, 1015:1, 1139:22, 1165:6, 1180:17

**technological** [1] - 1139:24

**technologically** [5] - 1138:10, 1139:11, 1139:15, 1145:4, 1145:21

**Technologies** [1] - 957:6

**technologies** [3] - 1124:13, 1125:17, 1140:1

**technology** [18] - 922:8, 923:8, 1001:24, 1120:21, 1121:10, 1121:13, 1122:14, 1124:18, 1124:20, 1124:23, 1138:4, 1138:13, 1145:16, 1145:19, 1146:2, 1175:19, 1183:3

**Technology's** [1] - 890:15

**technology's** [1] - 922:3

**tedious** [2] - 913:7, 1101:19

**ten** [5] - 948:5, 990:23, 1111:25, 1181:5

**ten-minute** [1] - 1111:25

**ten-year** [2] - 990:23

**tender** [1] - 1092:25

**term** [6] - 896:7, 1113:12, 1115:18, 1116:8, 1120:22, 1120:25

**terminal** [1] - 947:12

**terminology** [1] - 887:13

**terms** [10] - 904:1, 941:21, 1011:21, 1014:20, 1072:9, 1133:4, 1178:2, 1182:6, 1191:8, 1191:13

**terrible** [1] - 1055:1

**test** [64] - 1001:7, 1001:9, 1002:4, 1002:10, 1003:7, 1006:10, 1006:11, 1006:12, 1006:15, 1006:17, 1006:20, 1006:21, 1006:23, 1006:24, 1007:2, 1010:7, 1039:21, 1040:21, 1041:13, 1041:15, 1042:7, 1042:22, 1042:23, 1042:25, 1043:18, 1044:6, 1044:10, 1044:21, 1045:5, 1046:12, 1046:14, 1047:21, 1048:22, 1049:11, 1049:19, 1050:12, 1051:5, 1051:17, 1053:22, 1055:5, 1055:11, 1056:2, 1056:3, 1058:15, 1058:16, 1061:9, 1063:6, 1063:11, 1063:16, 1063:17, 1064:1, 1064:2, 1064:6, 1064:10, 1065:22, 1067:24, 1069:15, 1113:10, 1114:8, 1117:8, 1117:11

**tested** [2] - 1124:15, 1128:15

**testified** [14] - 876:16, 878:2, 899:3, 946:13, 1002:19,

1020:17, 1020:20, 1021:5, 1022:12, 1077:16, 1136:7, 1138:25, 1146:1, 1178:3

**testify** [7] - 880:11, 930:25, 931:8, 947:23, 1001:12, 1077:25, 1109:23

**testifying** [2] - 930:18, 940:15

**testimony** [32] - 878:4, 882:20, 888:25, 921:1, 927:20, 946:19, 956:11, 960:17, 975:13, 978:13, 983:11, 1017:16, 1030:17, 1030:22, 1030:25, 1059:16, 1078:1, 1078:6, 1078:7, 1109:10, 1134:24, 1143:2, 1144:21, 1168:12, 1169:6, 1169:8, 1173:21, 1175:21, 1178:13, 1178:16, 1178:19

**testing** [87] - 904:21, 1000:4, 1000:14, 1000:18, 1000:21, 1000:25, 1001:1, 1001:6, 1001:10, 1001:22, 1002:1, 1002:3, 1002:9, 1004:4, 1004:7, 1005:7, 1005:14, 1005:19, 1005:20, 1007:5, 1008:8, 1008:20, 1009:14, 1009:20, 1009:21, 1009:23, 1010:2, 1011:7, 1038:7, 1042:18, 1043:21, 1044:5, 1044:12, 1044:14, 1044:24, 1046:2, 1046:8, 1047:5, 1049:6, 1050:17, 1051:3, 1051:16, 1051:19, 1052:18, 1054:22, 1054:24, 1056:24, 1058:13, 1060:22, 1061:19, 1061:23, 1062:4, 1062:25, 1063:3, 1063:19, 1063:21, 1063:22, 1064:12, 1066:23, 1067:1, 1067:5, 1068:6, 1068:17, 1068:21, 1069:6, 1069:22, 1070:10,

1070:16, 1071:1, 1076:4, 1090:18, 1090:22, 1090:23, 1091:2, 1096:21, 1096:24, 1109:19, 1112:11, 1117:24, 1124:12, 1125:3, 1126:25, 1127:4, 1127:18, 1135:9

**tests** [25] - 1002:16, 1005:19, 1005:22, 1006:19, 1043:20, 1044:8, 1047:8, 1048:25, 1050:8, 1051:23, 1055:16, 1056:25, 1057:3, 1057:8, 1058:17, 1058:20, 1058:21, 1058:24, 1110:7, 1113:11, 1113:19, 1113:22, 1114:1

**Texas** [1] - 994:25

**text** [4] - 890:14, 890:22, 1146:18, 1193:9

**Thanksgiving** [1] - 917:12

**THE** [277] - 873:1, 873:2, 875:2, 882:13, 882:14, 884:16, 884:19, 893:11, 899:5, 899:9, 902:5, 902:7, 907:4, 907:6, 910:11, 910:13, 911:18, 911:20, 913:18, 913:20, 923:18, 923:22, 924:23, 924:24, 928:14, 928:23, 928:25, 932:9, 932:16, 933:1, 933:4, 939:7, 939:14, 940:19, 940:23, 941:1, 941:6, 941:9, 941:14, 941:21, 942:2, 942:16, 942:24, 943:19, 944:9, 944:12, 944:18, 945:4, 945:10, 945:13, 945:18, 945:22, 946:4, 946:7, 946:9, 946:25, 950:8, 964:22, 964:24, 975:4, 975:6, 983:16, 991:6, 991:9, 994:16, 995:24, 999:18,

1007:13, 1007:16, 1008:25, 1009:2, 1011:11, 1011:21, 1012:19, 1013:21, 1014:2, 1014:6, 1014:15, 1015:3, 1015:9, 1015:13, 1015:18, 1015:21, 1023:17, 1023:19, 1026:21, 1027:8, 1027:25, 1028:15, 1028:21, 1029:10, 1030:2, 1030:5, 1030:10, 1031:5, 1031:21, 1031:23, 1032:2, 1032:8, 1036:20, 1037:2, 1037:4, 1037:7, 1037:10, 1041:25, 1042:2, 1045:12, 1045:14, 1065:2, 1065:4, 1066:1, 1066:19, 1067:10, 1067:22, 1068:9, 1068:20, 1069:2, 1069:7, 1069:11, 1069:24, 1070:7, 1070:17, 1071:5, 1071:10, 1072:2, 1072:19, 1072:21, 1080:25, 1086:13, 1086:15, 1093:1, 1095:6, 1096:9, 1096:11, 1109:2, 1109:5, 1109:8, 1109:21, 1109:25, 1111:13, 1111:16, 1111:23, 1112:3, 1112:7, 1112:13, 1114:18, 1119:11, 1119:13, 1121:22, 1128:23, 1129:2, 1129:4, 1129:12, 1129:17, 1129:22, 1130:3, 1130:13, 1130:21, 1131:10, 1131:17, 1131:23, 1132:7, 1132:11, 1133:9, 1133:17, 1133:19, 1133:24, 1139:6, 1139:12, 1141:7, 1141:23, 1143:24, 1146:25, 1148:10, 1149:1, 1149:8, 1149:12, 1149:14, 1149:18, 1149:22, 1150:2, 1150:7, 1150:10, 1150:16, 1150:20, 1151:1, 1151:6, 1151:11, 1151:16,

1151:21, 1152:3, 1152:9, 1152:13, 1152:18, 1152:21, 1153:3, 1153:8, 1153:17, 1154:1, 1154:9, 1154:15, 1154:18, 1155:6, 1155:16, 1155:20, 1156:22, 1157:23, 1158:8, 1159:9, 1160:22, 1161:9, 1163:6, 1164:2, 1165:13, 1165:17, 1166:6, 1167:10, 1169:21, 1170:1, 1170:9, 1171:3, 1171:12, 1171:22, 1172:20, 1172:22, 1173:23, 1174:7, 1174:13, 1174:16, 1174:20, 1175:6, 1175:14, 1176:9, 1176:25, 1177:12, 1178:12, 1178:18, 1179:12, 1180:7, 1181:6, 1183:3, 1183:8, 1183:10, 1183:14, 1183:18, 1183:21, 1183:25, 1184:8, 1184:11, 1184:13, 1184:19, 1184:21, 1184:25, 1185:3, 1185:22, 1186:4, 1186:16, 1186:18, 1187:4, 1188:1, 1188:17, 1189:19, 1190:4, 1190:8, 1190:14, 1190:16, 1190:23, 1192:12, 1192:21, 1193:6, 1193:11, 1193:18, 1194:10, 1194:18, 1196:5, 1196:20, 1196:25

**themselves** [1] - 1026:5

**theoretical** [1] - 1192:5

**theory** [6] - 1071:16, 1147:9, 1173:6, 1176:21, 1185:13, 1190:1

**thereafter** [1] - 1035:1

**therefore** [6] - 1068:18, 1068:21, 1071:2, 1101:6, 1118:14, 1176:16

**therein** [1] - 1024:3

**Thereupon** [15] - 902:8, 907:8,

910:14, 911:21, 913:21, 945:14, 964:25, 975:7, 1009:3, 1037:5, 1042:3, 1045:15, 1065:3, 1086:16, 1129:3

**they've** [12] - 927:19, 937:25, 960:23, 1014:6, 1029:24, 1029:25, 1062:17, 1067:9, 1067:16, 1068:5, 1129:7, 1188:10

**thinking** [8] - 875:15, 897:21, 906:11, 923:20, 942:5, 1013:2, 1128:9, 1180:8

**thinks** [1] - 1058:23

**third** [34] - 918:17, 927:5, 983:19, 985:17, 985:23, 986:9, 988:14, 989:13, 989:22, 989:25, 1050:5, 1050:6, 1066:11, 1074:5, 1074:7, 1074:10, 1074:23, 1075:1, 1075:14, 1075:19, 1076:14, 1076:19, 1077:4, 1077:10, 1077:17, 1079:14, 1082:4, 1083:2, 1083:21, 1089:14, 1095:15, 1095:20, 1095:22, 1099:23

**Third** [1] - 1032:23

**Thomas** [2] - 910:2, 1121:18

**thoughts** [3] - 1031:24, 1094:8, 1195:15

**thousand** [1] - 997:21

**three** [35] - 888:19, 909:14, 909:17, 926:10, 926:13, 931:16, 931:19, 952:9, 997:22, 1009:10, 1014:9, 1018:6, 1040:5, 1052:13, 1080:1, 1080:9, 1080:11, 1080:12, 1080:17, 1081:3, 1081:6, 1081:12, 1081:15, 1082:9, 1082:17, 1083:12, 1083:19, 1087:13, 1087:20,

1101:10, 1109:7, 1171:21, 1183:7, 1183:10, 1184:14

**threshold** [1] - 898:25

**threw** [1] - 1091:9

**throughout** [6] - 954:23, 1023:23, 1029:20, 1087:1, 1087:4, 1097:25

**tick** [1] - 1148:3

**tie** [1] - 1066:19

**tieing** [6] - 1166:24, 1166:25, 1167:13, 1167:14, 1169:15

**timeline** [6] - 929:23, 930:2, 931:23, 932:10, 932:14, 932:15

**timelines** [2] - 1098:1, 1098:20

**timely** [3] - 931:1, 1129:10, 1130:19

**timer** [1] - 1093:3

**timing** [4] - 932:3, 933:2, 933:11, 1012:12

**tired** [1] - 977:6

**title** [8] - 1113:3, 1115:4, 1119:18, 1119:21, 1121:25, 1122:1, 1122:3, 1122:4

**Title** [1] - 1117:7

**titles** [3] - 894:11, 1122:7, 1122:8

**today** [12] - 877:1, 878:5, 936:22, 945:24, 1011:16, 1026:2, 1069:24, 1109:10, 1121:23, 1130:6, 1134:24, 1135:7

**together** [12] - 881:22, 895:10, 897:3, 898:21, 908:17, 985:20, 1031:25, 1099:5, 1132:16, 1182:10, 1182:20, 1190:10

**tomorrow** [16] - 1130:6, 1130:10, 1131:1, 1131:4, 1133:12, 1147:12, 1154:4, 1156:23, 1191:3, 1191:19, 1192:2, 1193:1, 1194:25, 1195:7, 1195:13, 1195:22

**ton** [7] - 916:15, 917:15, 938:18,

1002:19, 1002:20, 1043:15, 1185:14

**tonight** [3] - 1191:11, 1191:18, 1191:22

**tonnage** [3] - 1025:16, 1084:24, 1086:19

**tons** [6] - 901:2, 918:2, 938:15, 1083:24, 1185:14, 1185:21

**took** [11] - 950:6, 958:21, 985:14, 1016:11, 1016:18, 1027:1, 1033:14, 1122:3, 1189:14, 1189:22

**top** [10] - 903:25, 907:12, 937:4, 1058:16, 1085:21, 1086:23, 1183:13, 1183:20, 1184:1, 1185:11

**total** [5] - 978:1, 1084:1, 1086:21, 1086:25, 1189:24

**totaled** [1] - 1087:3

**totally** [1] - 1066:2

**totals** [1] - 1086:22

**touch** [1] - 1145:10

**tour** [4] - 905:9, 905:11, 1026:3, 1026:4

**touting** [1] - 1019:6

**towards** [4] - 903:25, 1028:25, 1029:23, 1042:13

**towers** [1] - 956:5

**track** [2] - 877:23, 1178:9

**tracking** [2] - 891:10, 1084:13

**trailed** [1] - 970:8

**trailer** [5] - 955:9, 955:22, 956:7, 976:21, 1106:11

**trailers** [1] - 956:1

**train** [1] - 995:12

**traipses** [1] - 1072:13

**transcript** [12] - 1017:17, 1017:22, 1019:25, 1020:9, 1020:20, 1020:25, 1021:9, 1021:22, 1138:20, 1139:1, 1139:22, 1141:1

**TRANSCRIPT** [1] - 873:9

**transfer** [1] - 997:7

**transition** [1] - 991:5

**treat** [1] - 1003:5

**treated** [3] - 988:16, 1138:18, 1191:7

**treating** [4] - 1104:21, 1128:2, 1128:3, 1139:9

**treatment** [2] - 1031:18, 1144:14

**tremendous** [2] - 925:7, 983:10

**trial** [24] - 879:19, 895:25, 913:17, 1069:8, 1069:25, 1070:1, 1070:8, 1077:22, 1096:25, 1097:2, 1097:3, 1099:21, 1140:10, 1144:8, 1162:19, 1167:8, 1169:8, 1171:10, 1173:2, 1180:16, 1182:12, 1183:4, 1187:1, 1195:15

**TRIAL** [2] - 873:9, 873:11

**Trial** [10] - 893:17, 901:15, 905:19, 905:21, 906:6, 906:16, 909:22, 910:10, 910:17, 911:17

**tricking** [1] - 906:14

**tried** [3] - 1144:12, 1176:4, 1196:20

**trimmed** [1] - 912:5

**true** [25] - 881:18, 890:17, 892:19, 914:7, 915:16, 988:19, 989:19, 989:20, 989:21, 999:23, 999:25, 1000:12, 1026:9, 1050:4, 1062:5, 1066:25, 1069:21, 1069:23, 1106:9, 1106:14, 1145:3, 1145:4, 1158:15, 1174:9, 1180:9

**truly** [1] - 898:12

**truth** [1] - 1101:3

**try** [33] - 884:12, 884:17, 893:25, 898:9, 910:20, 917:11, 930:14, 961:11, 1012:7, 1032:2, 1036:16, 1077:9, 1078:12, 1101:20, 1109:10, 1117:17, 1117:19, 1117:20, 1119:2, 1132:16, 1133:3,

1148:5, 1148:10, 1148:11, 1154:5, 1155:6, 1155:20, 1164:2, 1166:10, 1168:16, 1190:20, 1195:18

**trying** [50] - 878:7, 881:2, 881:19, 881:21, 886:15, 888:17, 896:8, 900:4, 902:13, 908:2, 915:5, 915:7, 916:11, 916:12, 919:14, 921:2, 922:13, 927:25, 935:6, 935:22, 935:24, 942:3, 956:20, 976:12, 991:3, 1012:8, 1012:10, 1012:23, 1012:25, 1015:2, 1028:19, 1058:23, 1067:2, 1067:13, 1067:15, 1071:20, 1071:21, 1080:23, 1081:22, 1081:24, 1083:22, 1088:15, 1090:20, 1093:13, 1095:1, 1099:10, 1156:8, 1170:13, 1189:10

**turn** [28] - 893:16, 901:14, 945:19, 945:25, 950:15, 978:10, 978:24, 979:13, 979:22, 981:10, 981:18, 981:20, 982:13, 982:18, 983:2, 983:13, 983:25, 984:24, 985:2, 1009:6, 1053:20, 1060:14, 1073:5, 1074:23, 1078:12, 1143:22, 1179:12, 1193:9

**turned** [4] - 879:8, 960:1, 1066:4, 1168:4

**turns** [1] - 1141:24

**tweak** [1] - 1191:18

**twice** [2] - 1144:5, 1186:3

**two** [61] - 888:20, 889:3, 889:6, 896:18, 898:21, 931:10, 931:16, 931:19, 935:3, 952:9, 953:10, 953:13, 955:16,

955:21, 959:4, 960:20, 963:17, 963:20, 971:4, 971:6, 971:9, 978:4, 986:16, 987:8, 991:24, 993:10, 1002:23, 1003:6, 1026:24, 1028:2, 1028:18, 1040:5, 1050:7, 1051:23, 1064:4, 1071:7, 1073:6, 1080:11, 1080:16, 1083:10, 1083:12, 1083:13, 1085:2, 1085:3, 1085:17, 1101:10, 1102:9, 1102:20, 1109:7, 1122:21, 1139:11, 1151:15, 1161:9, 1181:15, 1181:21, 1182:22, 1187:4, 1193:24, 1195:22

**two-day** [1] - 1085:17
**two-part** [2] - 889:3, 896:18
**two-step** [1] - 889:6
**type** [7] - 1040:21, 1041:1, 1044:9, 1097:22, 1142:23, 1146:3, 1158:16
**types** [1] - 1169:20
**typical** [2] - 976:11, 976:12
**typically** [3] - 890:24, 919:10, 1039:6

## U

**U.S** [4] - 902:25, 903:7, 1125:15, 1197:15
**U.S.C** [1] - 1161:24
**U.S.M.J** [1] - 873:12
**ultimately** [11] - 911:11, 914:3, 995:13, 1021:5, 1022:12, 1040:24, 1158:9, 1167:3, 1168:6, 1175:21, 1180:6
**unable** [1] - 1061:13
**unambiguously** [1] - 945:8
**unaware** [2] - 883:17, 1026:4
**unburned** [1] - 890:7
**uncertainty** [1] - 1146:12

**unclear** [1] - 1064:1
**under** [24] - 878:2, 879:2, 904:21, 930:18, 945:21, 960:15, 963:1, 987:4, 1002:11, 1008:17, 1015:23, 1016:2, 1034:20, 1063:11, 1063:16, 1064:1, 1096:24, 1133:25, 1136:21, 1137:23, 1141:22, 1142:9, 1161:24, 1165:2
**underneath** [1] - 938:23
**undersized** [2] - 1118:25, 1119:1
**understood** [13] - 926:12, 1000:9, 1025:4, 1070:5, 1077:17, 1080:4, 1088:12, 1090:12, 1101:6, 1133:24, 1154:12, 1159:9, 1193:18
**underwent** [1] - 1122:22
**undisputed** [3] - 1088:23, 1135:24, 1182:15
**unfair** [2] - 905:23, 1194:4
**unfairly** [1] - 1072:13
**UNIDENTIFIED** [1] - 1119:9
**unit** [2] - 912:21, 1118:14
**UNITED** [1] - 873:1
**United** [2] - 1111:2, 1126:2
**units** [2] - 1089:2, 1089:6
**University** [5] - 1001:14, 1001:19, 1112:21, 1123:19, 1123:21
**unless** [9] - 938:21, 943:8, 963:8, 1026:20, 1036:16, 1131:6, 1143:23, 1149:23, 1181:7
**unloader** [1] - 995:12
**unloads** [1] - 995:12
**unnamed** [1] - 938:6
**unnecessary** [1] - 1173:12
**unpack** [1] - 1000:10
**unpatented** [5] - 1138:5, 1138:14,

1138:24, 1145:1, 1145:6
**unrelated** [1] - 1028:9
**unsupported** [2] - 1140:22, 1146:17
**up** [98] - 875:13, 884:11, 890:21, 895:21, 901:11, 902:12, 905:8, 907:11, 909:11, 914:20, 918:6, 922:9, 925:21, 928:7, 928:13, 932:10, 932:13, 932:14, 936:15, 937:17, 942:6, 942:9, 942:17, 946:18, 948:20, 950:12, 951:12, 952:20, 952:24, 953:12, 963:17, 965:22, 966:3, 971:5, 971:20, 974:19, 977:16, 978:17, 980:10, 987:12, 997:7, 999:18, 1000:23, 1009:16, 1010:13, 1014:20, 1015:7, 1015:15, 1041:17, 1045:19, 1045:22, 1046:18, 1060:16, 1064:5, 1064:9, 1076:2, 1076:14, 1076:19, 1077:4, 1077:10, 1077:16, 1081:9, 1082:10, 1086:7, 1086:25, 1087:21, 1088:2, 1089:22, 1090:9, 1091:9, 1094:9, 1095:21, 1101:10, 1101:11, 1102:17, 1113:11, 1117:12, 1148:11, 1148:12, 1149:23, 1149:24, 1164:3, 1167:22, 1168:10, 1173:2, 1176:6, 1180:5, 1182:13, 1186:20, 1189:10, 1190:9, 1190:11, 1190:14, 1191:12, 1191:24, 1194:13, 1195:1
**updates** [1] - 1012:12
**upfront** [1] - 958:18
**upset** [2] - 946:20, 946:23
**upstream** [2] - 1010:21, 1011:1

**usable** [1] - 920:19
**uses** [14] - 905:2, 1078:4, 1081:18, 1082:5, 1090:4, 1090:7, 1128:13, 1134:19, 1136:2, 1142:12, 1165:1, 1167:1, 1167:15, 1177:16
**Utah** [6] - 954:1, 971:19, 971:22, 989:2, 989:3, 989:4
**utilities** [9] - 891:24, 892:3, 892:9, 896:15, 902:2, 908:5, 953:1, 953:3, 1179:23
**utility** [5] - 879:3, 879:12, 880:17, 892:4, 1115:23
**utilize** [1] - 1158:9
**utilized** [2] - 1115:23, 1116:12

## V

**valid** [10] - 1001:7, 1006:11, 1150:6, 1152:18, 1184:10, 1184:14, 1184:15, 1184:20, 1184:21, 1184:23
**Valley** [21] - 884:3, 891:14, 909:1, 909:3, 909:4, 937:16, 968:3, 968:5, 968:14, 969:9, 969:12, 1041:15, 1043:4, 1043:17, 1046:5, 1046:15, 1046:21, 1049:16, 1057:21, 1089:2
**value** [18] - 1138:4, 1138:5, 1138:12, 1138:14, 1138:16, 1138:21, 1139:10, 1140:9, 1144:20, 1145:1, 1175:18, 1175:19, 1175:22, 1176:2, 1176:12, 1176:16, 1177:17
**values** [1] - 1138:14
**variety** [1] - 952:10
**various** [9] - 894:14, 918:8, 1139:19, 1148:16, 1152:16, 1168:6, 1169:2, 1169:9, 1169:16
**vast** [1] - 1140:15

**vehicle** [3] - 928:18, 929:8, 939:19
**vehicles** [1] - 998:18
**vendor** [1] - 908:6
**verbally** [1] - 1040:12
**verbatim** [2] - 1150:24, 1151:3
**verdict** [21] - 1132:23, 1147:21, 1148:4, 1153:1, 1179:11, 1181:12, 1181:16, 1183:17, 1186:2, 1186:19, 1189:6, 1191:18, 1191:20, 1192:17, 1192:23, 1193:13, 1193:16, 1194:20, 1195:2, 1195:10, 1195:12
**verifies** [1] - 1010:7
**verify** [1] - 1085:9
**version** [12] - 887:6, 927:13, 1014:19, 1155:22, 1158:9, 1160:5, 1160:24, 1191:24, 1192:7, 1193:15, 1194:20, 1195:1
**versions** [5] - 927:11, 1014:15, 1132:16, 1133:5, 1195:8
**versus** [5] - 1061:8, 1157:17, 1161:22, 1162:5, 1175:19
**vi** [3] - 1010:9, 1010:11, 1010:17
**via** [1] - 1035:1
**vice** [8] - 978:3, 1041:21, 1084:11, 1121:19, 1122:2, 1122:4, 1122:9, 1173:7
**video** [8] - 1112:12, 1114:11, 1114:17, 1119:3, 1119:8, 1121:15, 1121:21, 1128:20
**videos** [1] - 1108:2
**view** [10] - 891:11, 1025:8, 1030:12, 1031:3, 1033:25, 1035:6, 1035:22, 1159:11, 1187:16, 1196:9
**viewing** [1] - 1032:19
**violate** [1] - 1035:11
**Virginia** [5] - 953:18, 953:19, 987:18, 987:23, 988:5
**visit** [1] - 976:3
**visits** [1] - 976:3

**volume** [3] - 1029:9, 1084:13, 1118:23
**Volume** [1] - 873:7
**volunteered** [1] - 923:5
**VP** [2] - 960:8, 960:11
**vs** [1] - 873:6

## W

**W.A** [18] - 878:20, 878:21, 878:22, 885:1, 886:24, 934:23, 936:18, 954:18, 954:21, 955:20, 956:19, 966:2, 967:16, 967:17, 967:24, 1089:7, 1104:5
**wafers** [1] - 1019:20
**waived** [1] - 1129:9
**waiver** [1] - 944:4
**walk** [2] - 1166:13, 1182:24
**walking** [1] - 877:1
**wander** [1] - 998:12
**wants** [4] - 945:9, 1017:24, 1166:1, 1173:19
**Ward** [1] - 1022:20
**warner** [1] - 1197:9
**Warner** [1] - 1197:14
**WARREN** [1] - 873:21
**was..** [1] - 1096:12
**waste** [2] - 891:17, 1036:15
**water** [1] - 1006:23
**ways** [3] - 1067:2, 1193:23, 1195:15
**website** [4] - 890:15, 891:2, 922:1, 928:19
**websites** [2] - 923:15, 929:19
**week** [4] - 1012:22, 1013:3, 1162:19, 1190:25
**weighed** [1] - 993:9
**weighing** [1] - 958:12
**weighs** [1] - 993:9
**weight** [5] - 1043:9, 1043:10, 1043:12, 1043:13, 1043:14
**Weiner** [2] - 906:17, 907:15
**welcome** [1] - 1037:15
**well-respected** [1] - 1002:6
**were..** [1] - 1154:13
**west** [1] - 1117:15

**West** [3] - 953:18, 988:5, 1022:20
**West-Ward** [1] - 1022:20
**whole** [7] - 879:19, 902:12, 1072:5, 1072:6, 1149:18, 1173:12, 1179:1
**wholly** [1] - 1021:1
**willful** [10] - 935:23, 1025:22, 1067:16, 1067:17, 1070:21, 1136:20, 1137:3, 1143:5, 1143:6, 1143:16
**willfully** [9] - 1026:5, 1070:14, 1070:24, 1136:24, 1137:2, 1137:20, 1143:20, 1163:22, 1165:10
**willfulness** [3] - 1141:10, 1143:13
**Wilson** [16] - 1015:19, 1023:17, 1030:16, 1133:19, 1141:7, 1149:24, 1151:16, 1152:21, 1157:2, 1158:24, 1165:14, 1166:17, 1169:22, 1176:25, 1178:12, 1179:8
**WILSON** [36] - 874:7, 1015:20, 1015:22, 1023:18, 1133:18, 1133:20, 1133:25, 1139:8, 1139:13, 1149:21, 1151:9, 1151:12, 1151:19, 1151:22, 1152:23, 1155:9, 1155:19, 1156:7, 1157:12, 1158:25, 1160:21, 1165:15, 1166:2, 1169:24, 1170:8, 1170:17, 1171:11, 1171:19, 1174:1, 1174:14, 1174:23, 1175:9, 1177:6, 1178:15, 1179:13, 1180:25
**win** [1] - 1188:19
**wise** [1] - 1154:24
**wish** [3] - 1177:5, 1188:20, 1190:14
**withdraw** [1] - 1081:12
**witness** [28] - 899:6, 902:4, 923:20, 923:24, 928:10, 931:14, 932:1,

932:2, 940:18, 946:1, 946:11, 963:21, 963:22, 994:15, 1005:19, 1007:11, 1037:10, 1066:2, 1080:23, 1092:25, 1096:7, 1109:1, 1109:23, 1111:22, 1112:7, 1129:20, 1178:14, 1178:23
**WITNESS** [10] - 882:14, 884:19, 899:9, 924:24, 928:25, 933:4, 983:16, 1007:16, 1096:11, 1119:11
**witnessed** [2] - 1005:21, 1005:22
**witnesses** [12] - 879:24, 904:10, 931:4, 931:7, 931:8, 931:19, 931:22, 940:12, 1001:11, 1139:3, 1172:6
**wonder** [3] - 1186:18, 1186:22, 1187:15
**wondering** [4] - 1160:2, 1160:7, 1160:13, 1185:9
**wonders** [1] - 1190:18
**Word** [2] - 1161:21, 1193:7
**word** [17] - 1047:23, 1073:14, 1075:11, 1101:10, 1153:14, 1161:18, 1168:23, 1181:25, 1182:4, 1183:25, 1184:10, 1184:14, 1184:15, 1184:20, 1184:23
**wording** [2] - 1165:23, 1182:3
**words** [11] - 914:11, 1021:1, 1149:15, 1151:4, 1152:4, 1158:16, 1158:18, 1164:4, 1165:23, 1179:3, 1187:9
**works** [5] - 890:19, 960:15, 993:18, 1040:10, 1065:15
**world** [1] - 923:3
**worried** [3] - 1156:17, 1170:23, 1190:10
**worst** [4] - 902:24, 903:6, 1192:3
**wrap** [2] - 918:6, 1090:9
**wrapped** [2] -

1151:25, 1180:5
**write** [3] - 1047:22, 1047:23, 1186:2
**writing** [4] - 894:20, 894:21, 903:12, 908:15
**written** [2] - 902:16, 906:22
**wrongful** [1] - 1168:22
**wrongly** [1] - 1168:4
**wrote** [6] - 901:21, 901:24, 902:4, 903:21, 1189:17, 1193:8

## X

**Xs** [3] - 914:21, 915:2, 915:5

## Y

**y'all** [2] - 931:6, 1054:10
**yard** [2] - 889:21, 998:19
**year** [14] - 921:9, 929:16, 932:11, 974:15, 976:4, 990:23, 1074:17, 1076:2, 1076:12, 1089:11, 1102:11, 1103:23, 1195:22
**years** [28] - 892:2, 894:17, 916:9, 921:10, 926:10, 926:13, 948:5, 949:6, 962:14, 962:16, 962:19, 1005:18, 1013:6, 1048:6, 1088:1, 1089:12, 1089:23, 1102:21, 1113:1, 1113:8, 1115:1, 1115:9, 1119:25, 1120:3, 1122:7, 1122:21, 1127:1, 1140:13
**yellow** [1] - 1175:7
**yesterday** [11] - 875:3, 876:16, 877:22, 877:24, 882:20, 883:16, 928:12, 938:18, 941:11, 1077:25, 1140:18
**yesterday's** [10] - 1017:22, 1019:25, 1020:9, 1020:24, 1021:9, 1021:22,

1138:19, 1139:1, 1139:22, 1141:1
**yourself** [2] - 1123:24, 1124:1
**yourselves** [1] - 942:17

## Z

**zero** [1] - 934:5
**zoom** [3] - 995:5, 995:7, 995:17
**ZURLO** [1] - 874:8