IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS CORP., et )
al.,                                )
                                    )
-------------------Plaintiffs,      )
                                    ) Case No.
 vs.                                ) 19-CV-1334-CJB
                                    )
ARTHUR J. GALLAGHER & CO., et al., )
                                    ) Volume V
-------------------Defendants.      )

TRANSCRIPT OF JURY TRIAL

JURY TRIAL had before the Honorable Christopher J. Burke, U.S.M.J., and a jury of seven in Courtroom 2A on the 1st of March, 2024.


APPEARANCES

DEVLIN LAW FIRM
     BY:  JAMES LENNON, ESQ.
          PETER MAZUR, ESQ.

                    -and-

CALDWELL CASSADY & CURRY
     BY:  BRADLEY CALDWELL, ESQ.
          JASON CASSADY, ESQ.
          JOHN CURRY, ESQ.
          JUSTIN NEMUNAITIS, ESQ.
          WARREN MCCARTY, III, ESQ.
          DANIEL PEARSON, ESQ.
          ADRIENNE DELLINGER, ESQ.
          AISHA HALEY, ESQ.
          RICHARD COCHRANE, ESQ.

                    Counsel for Plaintiff

(Appearances continued.)


          MORRIS JAMES LLP
                BY:  CORTLAN HITCH, ESQ.
                     KENNETH DORSNEY, ESQ.

                              -and-

          BRADLEY ARANT BOULT CUMMINGS LLP
                BY:  JEFF DYESS, ESQ.
                     PAUL SYKES, ESQ.
                     BENN WILSON, ESQ.
                     ASHLEY ROBINSON, ESQ.
                     JESSICA ZURLO, ESQ.

                                   Counsel for CERT Defendants

THE COURT:  Welcome everyone.  We're on the record here.  I understand the parties made the changes we discussed last night or that the Court made the changes that we discussed last night with regard to the final jury instructions, and we sent those to the parties.

We also made an additional change.  There was a section that still referred to the concept of clear and convincing evidence relating to validity, which is no longer in the case.  We communicated that to the parties, that we were removing those references.  So that change, in addition to the other substantive changes yesterday, finalized the final jury instructions, and we have copies for the parties and for the jury, so we're ready to go there.

With respect to the verdict form, we discussed the changes the Court was going to make, which the parties did incorporate into what they sent this morning.  We had discussed a potential issue with regard to final question, the question on damages.  I understand the parties have discussed whether and to what extent they might wish to propose changes to what the -- the current version of the form looked like.  They were ultimately able to agree and seems like ultimately the proposal is that we retain what is currently in the version that the parties accepted, but I understand the parties want to put on the record some objections or maybe make some comments with regard to the

verdict form.

So let me turn to Plaintiffs' side and they can tell me anything think they should tell me.

MR. NEMUNAITIS:  We don't have any objections. I believe the defendants have an objection.

THE COURT:  Mr. Dyess.

MR. DYESS:  Yes, Your Honor.  I think at this point, we have to renew the objection we had yesterday about taking about taking "actively" out of the inducement question, question 1.  That's just renewing and preserving that objection.

THE COURT:  Okay.

MR. DYESS:  I think really the only other part of the discussion was first reordering the list of defendants.  I think we're okay with the order.  The list has to kind of make some sense, so we're fine with that.

We also have this problem with question 4 that's this intractable -- I shouldn't use that word -- difficult problem about we're grouping defendants together when one group of these defendants, not all of the infringement claims are in against these defendants, and that's the operating companies.  There's no contributory infringement claims against them.  So we made that objection yesterday, and I think the Court recognized the validity of the complication that adds to the case -- or to the form, so we

need to preserve that objection that, in our mind, it puts those defendants back in on contributory infringement when the judge has dismissed those claims against them.

THE COURT:  I guess in what sense?  Because the question is one about what damages, if any, would be appropriate.  Obviously, those defendants are asserted to be liable for certain claims, the claims of the induced infringement.  So of course there has to be the ability for the jury to award damages as to them as to those claims.  I guess I'm not sure how -- I think what you said or suggested is that the fact that those defendants are listed, a question that relates to damages somehow unduly suggests that those defendants could be found liable for contributory infringement, even though the form otherwise makes it very clear they're not charged with that.

MR. DYESS:  Your Honor, that appropriately addresses the concern.  If we just -- it's difficult to fully verbalize that objection, but the objection is it separates them out and then funnels them right back in.

THE COURT:  Understood.  That objection is noted for the record.  Anything further?

MR. DYESS:  No, Your Honor.

THE COURT:  All right.  So with those objections noted, then what we will do is just take the final version of the verdict form that the parties sent to me this

morning, we'll track changes, and have our final version and get you a copy of that as well.

I will just say for the record that in any patent case, and this one is certainly one that qualifies, as I noted earlier, there are complicated and difficult issues for the jury.  I think the current verdict form, it's the best we can attempt to explain how the parties should assess their verdict in as concise and accurate a way as possible.  Obviously, it's also on the lawyers as they make their closing arguments to explain to the jury, if they wish to, how they should look at and assess the verdict form with the regard to the law and the facts that they heard at the trial.  And that ability, the one of the lawyers to do that, is something that will also aid the jury so they can appropriately view and fill out the verdict form when it comes time to.

I think with all those factors in place, I'm comfortable and it's an appropriate verdict form.  So we'll adopt it.  We'll get it ready for you.  What else, if anything, do we need to take up?

MR. NEMUNAITIS:  Your Honor, I was replaying my statement in my head.  I just want to state on the record when we said we don't have objections that's just with reference to the verdict form and instructions.  Just wanted to clarify that.

THE COURT:  Understood.  I understand that I think the plaintiffs' side has an hour and 13 minutes remaining, the defendants' side has 56 minutes for closing. I'm assuming the plaintiffs will want to save some time fo rebuttal close.  I'll put that on you to know how much time you're using.

Would you like us to tell you when you have, like, five minutes left in your time, or is the only thing you want to hear from us is if you hit the final buzzer?  I don't want to interrupt your flow.  I'll do whatever you want.

MR. PEARSON:  If the Court would permit, I would love if it you would allow Mr. Caldwell to make the request.

THE COURT:  Okay, Sure.

Mr. Dyess?

MR. DYESS:  We would love the five-minute warning.

THE COURT:  I'll say, Mr. Sykes, Mr. Dyess, just to let you know, you have five minutes left.

Okay.  Mr. Dorsney.

MR. DORSNEY:  Good morning, Your Honor.  Can your staff send e-mails, the copies of the verdict form to so we have a PDF if we need to reference it?

THE COURT:  We'll send you a PDF version of the verdict form by e-mail.

MR. DORSNEY:  Thank you, Your Honor.

THE COURT:  Okay.  Great.  So then unless there's anything further, we'll adjourn for now and plan to come out at 9:00 for closings, and I'll give final jury instructions.

(A recess was taken, after which the following proceedings were had:)

THE COURT:  Mr. Caldwell, did you want a five minute warning?

MR. CALDWELL:  A five-minute warning on a certain time in terms of how much time I intend to reserve?

THE COURT:  I had said -- I asked the parties do you want me to let you know when you have five minutes left or do you want to keep time yourself and I only pipe up when you have no time.

MR. CALDWELL:  When I'm doing rebuttal, I'll want the warning.

THE COURT:  And you're going to save time for rebuttal?

MR. CALDWELL:  Yes.

THE COURT:  Okay.  Great.  We'll have the jury brought in.

(The jury entered the courtroom.)

THE COURT:  All right.  We're now going to proceed with closing arguments.  We'll hear first from the

plaintiffs' side and then the defendants' side and the plaintiffs may have rebuttal.

So I'll turn it to plaintiffs' counsel, Mr. Caldwell.

MR. CALDWELL:  May I have just a moment?

THE COURT:  You may.

MR. CALDWELL:  Thank you, Your Honor.

May I proceed?

THE COURT:  You may proceed.

MR. CALDWELL:  Thank you.

Ladies and gentlemen of the jury, thank you for four days of paying attention and watching some things over and over and over again.  I've tried to -- sort of the natural order of these things is we go back and here's the stuff we told you at the beginning, but I kind of think at this point, you guys have a pretty good handle on a patent about a two-step process.  Naturally, since this is a summation and argument, we're going to show you things we've shown you before, but I'm trying to be respectful of your time and not show you the same things we've gone over and over and over again.

Most importantly, so I don't forget to say it later, on behalf of Mr. Pavlish, Mr. MacPherson, and kind of the ME2C family, I want to thank you for your time and attention, and I'm desperately afraid I'll forget to do that

later.

But as you've seen, it's an odd case we've been talking about with the filing of complaints and things like that. This case alone has taken us four and a half years to get to this point. And that's on a case that was filed 15 years after Mr. Pavlish put his stake in the ground at the Patent Office and a couple more years since he had his invention documented. So if you think about the lives, the literal lives, of the children who are adults since this thing started, it's hard to express how important this is to my client. So thank you guys for being here because I know each of you had somewhere else you probably would rather have been when you showed up here on Monday.

You know that Mr. Pavlish was working at the EERC and had something that turn out to be a breakthrough, and it's basically for a certain type of coal that over the years has become the leading source of coal in the United States. It has been absolutely critical. On the dollars and business side, it's critical to those plants and the people who stay employed at those plants. And on the environmental side, it's critical for all of us.

Mr. Pavlish showed you why the mercury is such an important thing. We brought you evidence that the EPA identified it in all the different things, the SOx and NOx and these other things. Mercury was the most important

hazardous air pollutant related to coal plants.  Mr. Pavlish walked you through all of his tests in 2002 and we went through and showed you all the documentation of it, all the reports to the EPA that were public at the Department of Energy, and then his provisional application.

It's sort of in retrospect, now that the evidence is closed, you may wonder why we showed you all this.  And I referenced it with Mr. Pavlish at the time, but as I said, you guys were drinking from a fire hose that first day.

As we explained, one of the reasons we went through is because as we entered this process, the defendants were telling us they disputed that he'd had and documented this invention of putting bromine on the coal before it's burned back in 2002 and that it had been included in the provisional.  They were telling us they disputed it.

You were read the preliminary instruction from the Court that said the defendants were going to challenge the validity of these patents.  Then in their opening, the defendants said they're going to bring you an expert to show there's something wrong with how the patent chain was filed and that his patents are invalid, they were going to try to take them away.  That's why in this trial when we were on a very tight chess clock, Mr. Pavlish and I went very

carefully through the history.

You didn't hear word one about it from the defense.  Not one.  You didn't hear his expert, this Dr. Niksa.  Not a word.  But we used our time on cutting into our time on other things.  That's fine because I think any question about Mr. Pavlish's legitimacy and the legitimacy of his invention were pretty well answered by what's there in writing.

We went through and showed you the provisional patent.  There's this chain of patents, because for a while they were owned by EERC.  Then when they got brought on by ME2C, they helped shape the focus of the claims, the stuff that was originally in the application, and this is from Defendants' opening statements acknowledging that that kind of a prosecution history where you claim different aspects of an invention is perfectly normal.  There's nothing weird about it.  That's exactly what happened here.

At the risk of getting myself off the path, I think now we know exactly why this makes sense.  Mr. Pavlish did work at the EERC, and they're a fantastic research organization.  But do you remember him also telling you, "I wanted to get out of the world of theory and get out and work on what's actually happening in the plants"?  That's what he did by going to ME2C.

Yesterday, the defendants played you a video of

Mr. Tom Erickson, the guy with a heck of a beard, I've got to be honest.  And he was a student at the EERC.  He's the guy doing the testing.  He's like the head of the theory department.  And he testified.  They played you a deposition of a guy saying no, nobody would actually run a coal plant where you put bromine on the coal and then later you use activated carbon.

So think about that for a minute.  What is the point of the defendants playing you a video of a guy from a theory organization that's telling you nobody is doing that, when it is literally undisputed over the last four days that all the plants we're talking about in this case do exactly that to meet the MATS regulations?  There's no dispute they all use bromine and they all use activated carbon.  The defendants played you that video to be like yeah, nobody is doing this.

That's precisely why ME2C knew there were commercial environmental gems in this patent application and they had limited time left to file those patents and get those things issued and into the world.  This goes back to that video you watched on the first day of sort of a clock starts when you put your stake in the ground, and you only have a certain amount of time.  Even though those patents issue later, very limited window of time, and they were able to get them issued and awarded, and after all this bluster

about we're going to come in and show you this patent should be taken away, none of it happened.

You heard about how Mr. Pavlish went on to work at ME2C and heard the story of Mr. MacPherson first meeting Mr. Pavlish and the story of getting the business going, but I think each of us can relate a little bit to one of those moments you've had in life where you're starting a new venture and it's pure excitement. And it's not hard to picture Mr. MacPherson and his wife and their dog in a truck going around living at whatever hotel is closest to a plant in the middle of the country carrying around 70-pound totes of bromine that they would mix to try to convince plants to do this. They were trying to make a business. They would like to make a profit off of a business. But they're trying to bring a helpful solution to the industry.

This is where this patent case gets a little unusual. Normally, at this time, we'd be putting up patent claim boards and we'd be arguing over a word, what is this sorbent material, is it actually a bromide compound. We'd be fighting over whether those checkmarks should be there. But in this case, there's not even a dispute over whether the checkmarks should be on the patent infringement claim boards. Extraordinarily unusual. There's not even an argument that from the moment they saw the claims, these defendants knew that there should be checkmarks by every

element of the patent.  It's not even in dispute.

This is, I would venture to say, probably your only patent trial you're going to sit on in your life, but that's -- I can't imagine.  You would normally be fighting about, are they doing the steps.  There's no question.  Nobody in this courtroom is even questioning that the plants go through the steps and infringe the claims.

So what this has become is a trial about what the defendants, or a big corporate org chart that's running these things, has going on in their minds, what's motivating them, what does the evidence tell you is their thought process.

I think at the end of the day, things you guys saw on cross-examination is just the best source to provide you with the background.  No question Mr. Green, the person that is here to certainly speak for the four operations companies and the person that somebody nobody can identify is here to speak on behalf of the eight investment vehicle LLCs, acknowledges we knew they were making refined coal with the bromide, and he also knew the the eight plants at issue were injecting a sorbent material, an activated carbon sorbent material, downstream of the combustion chamber.  He knew that.

This is a case about induced infringement and contributory infringement.  I'll refer you back to a slide

that I showed you in opening.  And as I said then and I'll say you now, the judge -- it's the judge's role, in addition to sort of ruling-on-evidence issues in the trial, to instruct you on the law, and that's sort of a long process that the Court goes through with the lawyers, has all the cases and all that kind of stuff.

And you're going to get at the end of the closings instructions from the Court on how to evaluate induced infringement and contributory infringement.  What we did is we proved that the defendants in this case are responsible for contributory infringement and induced infringement.  It's a little weird because there's some different elements of the tests that make it a little different depending on which party it is.

It's not terribly complicated, but I want to make sure I spell this out very clearly because it's important that the verdict form be filled out correctly so the parties aren't later saying, got a new trial, something is confusing here.  That's why I'm going to do something that's a little bit tedious, I want to be respectful of your time, but I want you to understand why it's very important that the verdict form needs to be filled out correctly.

So we looked at the parties involved in this case.  This is a slide -- this is a slide that you guys saw a couple of times.  I think initially there was some debate

about whether the CERT partners made a lot of money off this.  That debate was pretty conclusively resolved, and we can see -- we can -- nobody seems to remember exactly what the numbers are, and I'd probably remember if I got 50 or $60 million off of something.

But we know that the numbers are staggering because what we heard was these contracting defendants ended up getting 5 to $7 a ton in tax credits.  There's 57 million tons at issue in this case.  So we're looking at 280 to 350, more than $350 million in tax credits, and then there was evidence that the payment from these companies to the CERT partners was on the order of 75 percent of that.  So you know everybody here is highly motivated to keep the machine churning.  And that's true once they knew about the patents.  It's true when they knew about exactly what the plants did.  Highly motivated to keep things churning.

So we showed you, because it became this issue, an activated carbon plant.  Why did that become an issue?  It became an issue because we have these induced and contributory infringement claims.  And there's this issue what did you know, what did you intend, what were you wanting to happen when you did things.  And certainly the CERT defendants can't say well, didn't intend to use bromine.  No question about that side of things.  The one thing they can latch onto, the only step that they can point

to, is that "I didn't mean for that to be burned in a process with activated carbon.  I didn't know that was happening.  I didn't want that to happen."  That's what this case kind of became about.

We showed you the extensive evidence that the plants were using activated carbon.  What's kind of odd about that is the defendants told us in their opening that they didn't know, they didn't know, they had to make a phone call.  You heard in opening, we heard that was out in the industry.  What?  They knew from the beginning of this case as soon as it was filed, before it was filed, all their plants were using activated carbon.  Why did it take days for all this to have to come out?

There's discovery responses where they admitted, the witness ultimately admits it on cross-examination, and then we look at the five engineering reports they paid for, the e-mails.  But that's really where the fight started off to be, what can I identify, something I didn't know was happening.  I didn't know activated carbon.  But you have to produce the documents, so we got a peek behind the curtain, and that was nonsense.

We also talked about how the defendants even went to the plants and said, "Don't worry about it.  Don't worry about it if there's a patent that comes up.  We'll indemnify you, power plants.  We'll indemnify you for patent

infringement.  Don't worry about it.  You just keep going." This is in multiple agreements with power companies.

And so that's another thing.  If somebody suggests, "Why are we here in a lawsuit against the CERT folks?  Why didn't we go sue each and every one of those power plants that's at issue?"  Well, first of all, you don't have to.  That's not the way the law is set up.  The law provides for induced contributory infringement like what's at issue in this case.  That's a cause of action to be confirmed.  But, also, I think the evidence shows the defendants know we zeroed in on the exact right parties to bring this lawsuit against.

So His Honor will give you instructions on induced infringement, okay?  And there's got to be evidence. And, remember, this is one of those things where we have the burden of proof.  So you'll hear instructions, but you'll remember, maybe, burden of proof is like on the scales -- if it's more likely than not that the elements we're responsible for proving -- if that -- if you think that's more likely than not -- doesn't mean, you know, something that's beyond a reasonable doubt or clear and convincing.

If you think it's more likely than not that we've shown the elements, that is -- that means, under the law, you need to make a finding of infringement of ME2C's patents.  And we brought you evidence -- let me back up.

They want to put their state of mind at issue -- or their state of mind is the issue, and they want to emphasize that, as they said in the opening, because he wants to say, "Disregard all the evidence that ME2C is going to show you in this case. Don't pay attention to it. The only evidence you should listen to is us because we're the people, and we're going to tell you what's in our mind. Nobody else will provide that evidence." And I ask that you listen very carefully to the Court's instructions.

The Court already told you and will tell you again, that's why there are things like direct evidence, which is -- I believe the example was, "I see it's raining," and there's circumstantial evidence which is, "You walked in with a wet umbrella, and your coat is pretty wet." The coat and the umbrella are soaking wet in this case.

Of course, the person that "the someone we can't identify" is going to come to court and be like, "Man, I didn't know." But it's the same team of people who would come in and tell you they didn't know there's activated carbon. It's the same people who filed an answer in this case two and a half years into the case, two and a half years after knowing there's activated carbon, saying, "We deny that there's activated carbon at these plants."

Those are the people who are going to tell you to believe only their direct evidence, and you don't have to

because you are the judges of the credibility of the witnesses and the evidence.  That's why I'm saying the umbrella is soaking wet.  The circumstantial evidence in this case is overwhelming.  It's exactly the type of evidence you would dream of to have a case where you show someone else's intent.  Because there is no way to literally extract what's going on in the neurons of somebody else's mind; right?  You have to look at the circumstantial evidence.

And in this case, we showed you the defendants meet the first element.  They knew they were putting bromine on coal and sending it right into the power plant that they knew was using activated carbon.  They paid the power plants take the refined coal even after they knew about our patent, knew bromine was being put on the coal, and knew there was activated carbon.  They paid the plants to do it.

Now, to be fair, there's an element of contributory infringement that says, "You sold it."  That's not negated by the fact that they paid the other side to take the coal because they actually sold the coal for, like, $0.50 more than they acquired it for, but then they turned around and paid the plant some money to let me put my equipment there on site.  So they lose money in the process selling this coal at an overall net loss to the plants.  Very powerful evidence of inducement.

They continued to do so while knowing the -- just glaring elephant in the room, knowing the completely undisputed fact that everybody knows that checks go on the patent breakdown. Nobody is disputing a single element of it and hasn't. At no point have they indicated there's an element on those check boards they dispute.

So the defendants have certainly induced infringement by taking an affirmative act that caused power plants to engage in conduct the defendants knew or believed with high probability -- sounds like I'm just rattling off big words, "knew or believed with high probability." I'm not much of a big-words guy, but that's what's going to be in the instructions that the Court reads to you. The test -- it's like the way judges have written in this country for several hundred years, and then it accumulates in the case law and ends up in the kind of jury instructions that you guys get.

Remember, when you're reading all that, you don't check your common sense at the door. Did they induce these plants to keep on going after they knew full well it resulted in infringement? Absolutely. Not a question.

And in inducement, is there any more powerful evidence than the corporate representative of a defendant that is admitting they had a tremendous motive to keep on going after they knew all about the patent and activated

carbon?

So I'll give you a preview of what I believe the verdict form will show.  I suppose it is theoretically possible something could change on the verdict form.  I think this is the final verdict form that you guys will see.  And as I expressed earlier, there's great appreciation from everybody in here about your attention to detail and care because it's super important that the verdict form be filled out correctly.

So what I'm going to show -- I feel like I'm in sort of an awkward position of, like, "Hey, do this on the verdict form."  That's not, like, trying to impose on you in that way.  What I'm saying is if you agree with ME2C that there's been infringement, the first question -- it says:

"Question 1(a):  Have plaintiffs proven by a preponderance of the evidence that any defendant listed below is liable for inducing infringement of any asserted claim of the '114 by a power plant?"

You would say "yes," and it tells you in the gray box "yes" is a finding for ME2C, and "no" is a finding for that particular defendant.  So in Question 1(a), our belief is that you should answer "yes" to all and note that that is all of the entities that were both the operations entities and the investment vehicle or refined coal LLCs.  So just -- Question 1(a), pretty easy, "yes" on everything.

Now, the next -- the next page is just really no different. I will point out that the next page is about the '517 patent up. So kind of up here at the top, the '517 patent, again, "yes" to everything.

So the first one I did -- I guess on my chart, I had the puzzle piece on the left and the dominos on the right. I just talked to you about the dominos, about my side having them in that order. His Honor's verdict form has sort of the dominos -- the, "You induced somebody to go down this path." That was listed as the first question on the verdict form, so that's why I started there.

The next question is going to be sort of the puzzle piece. And you're going to get the law on it, but essentially the contributory infringement -- you can imagine if you know that somebody kind of has a patent on a widget with five parts and everybody already had the other four parts, what you do is just give them the fifth part and say, "Hey, go put this with the other one." You're sort of saying, "Here's the missing piece to result in infringement."

That's kind of the idea of contributory infringement. You can't say, "Oh, no. I just sold this one little piece." It's about, "Did you complete the infringement," is essentially the nature, and the Court will instruct you on the precise contours of the law.

And we've proven that, too.  This is going to be a little bit different.  On contributory infringement, it's not all 12 defendants.  And it's not that, like, somebody proved a defense to contributory infringement or something like that.  It's that the law on contributory infringement includes that somebody made a sale, and so technically the way that, like, money flows -- the four guys I had in purple, those guys weren't the ones making a sale.  They were the ones that are, like, turning knobs and stuff like that at the -- at the place.  It's really the way the money flows.  It's the other guys, the eight guys, the investment vehicles, that technically made a sale.

So for contributory, it's got to be -- it's going to be slightly different.  I don't -- I don't think it will be confusing when I show you the verdict form, but I just wanted to explain to you why there may be, like, a difference in the parties listed for one and the other.

But we proved to you that the defendants contributorily infringed the patents in this case by selling what they call refined coal -- so it's coal with the bromide solution on it -- knowing that that refined coal supplied to that power plant as sold and delivered during the damages period -- we'll come back to that -- had no other substantial non-infringing use other than to keep going through the combustion and exhaustive process at those

plants where they knew it would be treated with activated carbon.

No question that the refined coal constitutes a material part of the invention -- it's one of the elements -- and that the defendants knew the refined coal produced at each facility was especially made and adapted for infringement since it was made for each specific plant where they expected it to be burnt.  And they knew it would be put in that coal combustion process at that plant.

Now, I don't know if you caught this, but you remember that I called their witness Mr. Jeff Green as an adverse witness the first time he testified.  So we started off sort of on cross-examination, and we got to the end of the day, and Judge Burke said, "You've got one or two more questions."  Oh, man, the very last thing I asked him was confirming that they knew, at every one of these plants, for the two-and-a-half-year damages period, there was going to be use of activated carbon.  It's not disputed.

He also confirmed that when they made it, they wanted it burned; right?  They needed it burned because it's a requirement of the tax program.  You can't just sort of, like, be spraying this on coal and cashing tax credits.  You can't just be spraying it and putting it in a parking lot somewhere.  You have to be desiring to have it burned and expecting that's what's going on happen.  So that's why it's

very important to them that it be burned.  That's their --

that's their plan and their desire.  Otherwise they can't go

certify that they've earned these tax credits.

So you've seen all the evidence for contributory

infringement.  We talked a lot about a lot of the reasons

why the defendants would do this.  And, you know, it goes

back to this idea of these tax credits that were set up a

long time ago.  And what's interesting is, you know -- I

keep talking with my hands.  There's this issue of IRS and

Congress being like, "You know, we'll give somebody tax

credits for cutting out 40 percent."

I mean, think what you will about the

government, whether the, you know, left hand needs to talk

to the right hand, but the guys that run sort of the

environmental rules come in later and, like, "Guys, that's

not enough.  Like, we need to be capturing 90 percent."

So what's funny is in this case, the defendants

are like, "Oh, man, all we care about is getting the

40 percent.  That's all we care about.  We -- I don't have

to use activated carbon.  I just have to test that the coal

alone -- the coal alone gets me 40 percent"; right?  You got

your tax credits for a really long time where that was

sufficient.  It's a lot of money.  It's a lot of money we're

not talking about in this case because it's not something

we're seeking damages on.

But then the EPA said, "Now you've got a choice. If you want to keep that plant running, you've got to get 90 percent," and that's where it got real.  Because now I don't care if you just sort of sprayed it in the lab and told me it's 40 percent.  "If you want to still get those tax credits, you've got to have a coal plant burning it." Remember, that's a requirement for the IRS.  "And I sure want to be able to keep burning it because I sure want to keep cashing in on tax credits."

From that point on, it's like, "How are you guys going to meet MATS?"  They say they're talking to power plants, talking to investors.  They're going to be -- they're not getting shut down.  They're going to meet MATS, activated carbon.  They're going to do it.  Why do you think they're talking to investors about how the plants will meet MATS?  It's because the investor doesn't want to say, "Well, I'll tell you what.  You think I'm going to make 500 million in tax credits.  Let me just go ahead and give you 75 percent of that to run this program for me.  Let me give you 375 million, CERT partners.  I'll do that."  And then, like, a week later, that plant gets shut down for not complying with MATS.  That's why they're going around saying, "Hey, if I'm going to invest in this, how is that plant going to meet MATS?"

Everybody knows this is happening, that in order

to keep burning, you're going to have to take out the 90 percent. So they do, but the plants start using the activated carbon so they can continue to burn this coal from the Powder River Basin that's just -- it's so voluminous. It's right under the surface of the earth. And compared to old-school, like, burrowing into the side of a mountain to get small quantities of coal, it's just in massive volumes. They're throwing it on trains by the hundred tons per car and shipping it all over, and these guys get the tax credits based on that as long as, whatever it takes, the plant keeps burning.

So that's what happens once MATS comes into effect, and they get more time where we're not asking for money. Because, as the lawyers for CERT observed with their client, you can't infringe a patent until it issues. So they get even more time where they are doing the two-step process knowing full well that they are doing both steps, and there's no damages in this case for that either. It's not until the patent issued. And even then, we're not up here saying, "Wow, the minute it issued, that's when it starts." It was close, but it's really -- our damages period starts when we served the complaint on them and put them on notice.

And I have proven this to you guys over the last couple of days. It's in the very original complaint that

it's this two-step process.  Their witness has acknowledged he understood that that's what the patent claims were about. There's not a single checkmark they dispute, and he's telling you he knew about that from the beginning and knew for the full two and a half years that activated carbon was being used.

There is zero question why the defendants, with eyes wide open to the patents and what's happening at the plants, just kept on going.  350 million in tax credits is a powerful, powerful motive.

So once we prove to you the evidence, you're going to get to Question 2 on the verdict form, and you guys know what's going on by now.  It's got less parties listed here.  These are sort of the investment-vehicle defendants, and those are the ones who made the sale, which is one of the elements of the contributory infringement.  So for the '114 patent, on Question 2, it's all "yes," and then there's a 2(b) which is for the '517 patent.

Now, once we've proved infringement, there's one other thing -- two other things, actually, that we have the burden of proof on.  And I'm going to save willfulness for a bit, but I want to talk about damages.  So once we proved the patents were infringed, we talked about the value, and Mr. Phil Green talked about that.

Mr. Green's been doing this for a long time and

said he's recognized in many courts as an expert on valuation and the law. And you're going to see --

I mean, he described things like this hypothetical negotiation. It's sounds weird; right? I mean, what -- let's sort of pretend we did something. That's literally what the case law says. This isn't something he made up. It says -- what you do is you go back and say, "They have to sit down at a table with you, and they don't get to say, 'But I don't think I infringed. I don't think I contributed. I don't think I induced. I'm no longer saying I don't think your patent is invalid. I'm not saying that.'" They sit down and say, "Yeah, it's infringed. Yeah, it's valid. I need to work out a license with you." That is the context. It comes from the case law.

And so what Mr. Green did is he talked about that case law in this thing called the *Georgia-Pacific* factors. And, again, it's a paper company and other products like that and makes probably no sense in this context that it's called -- like, when we refer to cases -- like, I mean, there's famous cases people hear about, of *Brown v. Board of Education*, stuff like that. People cite cases. There's this one where the lead party was called Georgia-Pacific, so it's been known as the *"Georgia-Pacific factors"* for as long as I've been practicing law.

And in the *Georgia-Pacific* factors, there's all these different -- all these different factors.  Factor 15 is the one that describes the hypothetical negotiation.  But it's kind of a funny opinion because it sort of says, "You do the hypothetical negotiation, but it's come to mean you take into account all these factors when you do hypothetical negotiation."

And all the folks that do this sort of patent evaluation testimony know this.  There's no dispute that it will be in the instructions.  The defendants had one of those people, too, and you heard about her.  Her name is Ms. Kathy Lawton.  You did not hear from her.  You heard about her.  She was not presented, and I think there's a reason why, which I'll come back to -- I'll come back to in a minute.

But, anyway, in terms of us meeting our burden of proof, Mr. Green told you he considered all 15 factors as required, and he walked through all the different comparable licenses and explained his understanding of the license rates.  You heard Mr. MacPherson testify about agreements like the AJ Gallagher-DTE agreement, the $27-and-a-half-million agreement, but they weren't in a hypothetical negotiation.  They weren't having to assume that everybody got rid of their invalidity and noninfringement arguments.  And they, similarly situated to

these guys, agreed to pay $27 and a half million.

They also talked about the Alistar deal for a dollar a ton with ME2C, and you heard Mr. Phil Green look at each one of these.  And there's a super important point that I just really feel like I need to address.  Do you remember, on cross-examination of Mr. Phil Green, the lawyer for CERT was just going on and on and on and saying that Mr. Phil Green and Mr. MacPherson were lying?  He didn't use those words.  I'm not trying to say he was discourteous in that way.

But he was like, "You know what?  You all sat down together at the last minute, and you hooked up this really low number of tons and then had them pay that low number so it would be like, 'It's a dollar a ton.  That's amazing.  It used to be one and a half million tons.  Let's drop it to 100,000.  You pay that.  Wink, wink.  We'll pretend this is a dollar-a-ton deal.'"

Do you remember him making that suggestion to the witness?  Do you remember the frustration of Mr. Phil Green when this is happening?  I'm going to show you why. Did he tell you the volume of documents that he had been through, the amount of spreadsheets and reports he had studied to try to get all this information together?

I'll show you this.  I'm showing you a document that is PTX 446.  You can certainly look at it if you want,

but this is -- in fact, it may be like a native Excel spreadsheet. It's probably the kind of thing that my eyes would glaze over if I had time to go through it.

But here's the killer thing about this. See, up here at the top, I've got a -- what they call a Bates number. It's sort of the serial number of the -- of how it's produced in the case, and that's -- so, like, if I give them a million pages and they give me a million pages, we know how to refer to each one uniquely.

This is a CERT document that they produced to us. So the lawyer is up here asking him, "You made up these tons?" It's his side that produced this document that Mr. Green considered, and you know what it says if you add up the Alistar tonnage for that time? It says the 101,000 tons that Mr. Green said his opinion was based on.

Now, he had an earlier number that was higher. I'm not sure of the source of the error. But like he explained to you, they had a damages expert. We have a damages expert. They both do analyses. They exchange information back and forth, and each one of them identifies things that maybe they misunderstood about the spreadsheets and try to conform those as you're getting very close to trial. Makes sense.

What else makes sense as you get very close to trial? Gallagher and DTE say, "Here's your money." Alistar

says, "What did we come settle on for the tonnage?  Here's your payment."  So this suggestion -- it's like a, "Tell you what?  I need you to, really quick, whip me out a dishonest total of tons."  It's disproven by the document they gave us.

So Mr. Green went through the damages calculation.  There's this thing about all the accused tons. I'm going to present this to you guys in slightly different format than it is because I think it kind of matters.  But ultimately he opined that based on using the framework -- which is unrebutted.  I mean, they asked him about if he made up these tons, but they didn't produce somebody who could say his methodology is wrong.  They didn't bring somebody to say, "You looked at the licenses all wrong." It's unrebutted that the reasonable royalty would be $0.65 to a dollar per ton.  And so this is kind of the final calculation that he presented, and this is at a dollar a ton.

So I don't know how to convey this information to you any more clearly than giving you the opportunity to record kind of the information that's based on tons.  It's a complicated case because there's so many different parties. And what I would like to point out is where you have CERT Operations RCB, there are several of these LLCs that are associated with CERT Operations RCB; and then for

CERT Operations II, there's just one; for CERT Operations IV, there's just one; and for CERT Operations V, there's just one.  So this is the breakdown of how it fits with each one of the LLCs.

So what you're going to get is a verdict form where the amount should be filled in, and it matters. Because of the linkage of the LLCs that worked together, there's kind of this situation where certain ones need to add up.  So, for example, it's Cottbus, Rutledge, Larkwood, Bascobert, and Senescence.  Those numbers right here need to add up to this number here.  It's the same -- it's the same tonnage that was sold.  It's the two different entities that work together.

And then when we get down to CERT Operations II and Marquis, these two numbers need to match; then when we get down to CERTs Operations IV, these two numbers need to match; and then CERT Operations V, these two numbers need to match.

Mr. Pearson, what is -- 754, there is a Plaintiffs' exhibit, an admitted exhibit, that you can request that will tell you these numbers, and that's Plaintiffs' Trial Exhibit 754.

So what kind of stuff do we hear from the defendants?  We hear things like, "You can't compare tax credits to the asserted claims."  Guys, like, it's patent

claims.  The Court tells us we don't look at -- we don't look at getting tax credits.  We see technology doesn't meet the claims, and we've been through all that.

Then we hear, "Yeah, they know anyway."  They claimed tax credits on millions and millions and millions of tons where they knew the activated carbon was being used.  So this whole thing -- like, when we test for tax credits, we don't use activated carbon.  So what?  You test it at a lab to see where you were before activated carbon.  Then in order to keep running it with 90 percent emission, you have to use activated carbon.  It's pure distraction.  It literally has nothing to do with the test.

And the Court is going to tell you, for direct infringement, that's what the plant did.  You compare the accused conduct of the power plant with the asserted claim.  It's not about, like, "Hey, did we meet a tax credit?"  That has literally nothing to do with whether the patent claim is met.

So then what did we hear?  The CERT says, "Well, I'll tell you what."  They show you -- this is a slide in their opening.  "We're going to bring you an authority."  This is Mr. Stephen Niksa, and he's going to tell you that Mr. Pavlish's patents -- "They've got a big problem in them, and they're not valid.  You're going to take his patents away."  They told you this guy was going to come testify and

tell you that.

Have you guys seen him, other than in the back of the courtroom for the first three days?  I think it wasn't long after Mr. Pavlish finished describing his invention story that Dr. Niksa disappeared.

You hear arguments like, "Hey, man, look at this plan.  Our stuff is way over here."  But do you remember when my colleagues Mr. Nemunaitis and Mr. O'Keefe went through and checked off the patent claim elements?  Who over here is remembering any discussion of, "You've got to be less than 700 feet away from the boiler"?  What is the point of this?  Like, I'm way over here.

I'll tell you what the point is.  The point is at the time they told you that stuff in opening, they thought they were going to come in and convince you, "Well, because I'm way over here, I don't know if they've got activated carbon going on in this plant."  I don't need to go through all that again, but obviously that's nonsense.

I've already showed you -- I mean, you guys know Mr. Green admitted that they knew full well activated carbon was being used.  Knew full well for years.  So when you think back to their lawyer saying in opening, "We heard of it.  We heard of activated carbon.  We heard of that in the industry, sure," you were telling your investors that's what was going to be used at this plant.  "Give me your money.

It's going to meet MATS and keep going because we're using activated carbon.  We heard of it in industry."

So we've shown you just a ton of evidence that they knew all about the infringement.  It's a Sargent and Lundy in-depth report.  And not only is it an in-depth report that they organized for the investors, by the way, it literally says it's going to work like the patents, the first one, bromine.  It ionizes elemental mercury in the coal so it can form a compound with the carbon, coal, fly ash, potash, activated carbon, and then maybe the S-sorb as well.  They knew exactly the chemistry that's going to check the boxes on the claim.

And then we went through all these e-mails where Mr. Green is saying, "Hey, power plant guy."  This is -- this one, I bring up for a very specific reason.  When you hear, "Oh, we didn't know it had activated carbon," Jeff Green, the gentleman who testified, is telling the plant, "I know you use activated carbon.  Like, can I get your mercury numbers?  The results should show positive results since you guys are using refined coal and also installed powdered activated carbon systems."  He's telling the plant, "I already know you're using this.  Give me your numbers so I can get this investor to invest."

And it's not just Mr. Green.  I told you there's four CERT partners.  They're writing amongst themselves.

Like, Barr Linton is writing to Jeff Green and other folks saying, "We know they're using it, and the reason why is because MATS is kicking into effect. Like, they need it for MATS compliance."

And here's the funny part. You'll hear them talking about, oh, some NOx or SOx or whatever. Who cares? That's not what this case is about. The patent claims are about reducing mercury, and the power plants feel the same way. It's like, "Yeah, you can do your S-sorb thing and claim a tax credit. I don't care. But even if that's broken, you've got to keep putting bromine on the coal because I need it for MATS." Like, they're literally talking about this with the power plants. We've heard about it in the industry.

So we saw just mountains of evidence. And as I observed, this isn't even all of it. Even going back to 2012, Mr. Green testified -- he admitted it when I showed him a presentation he had made. Even as far back as 2012, they were telling power plants, "Hey, use us with your activated carbon" to please you. "Guess what? We can make your activated carbon bill go down. You won't have to use quite as much because our stuff will make it more effective." They're not saying, "Whoa, keep these two things apart. What in the world is activated carbon?" These things go together perfectly.

You heard from a power plant, and they're kind of talking out of both sides of their mouth saying, "Oh, you didn't get evidence from these power plants," the ones where they had relationships.  And they called them when the lawsuit was filed, and they're like, "Hey, ME2C, you didn't bring us evidence of how often it's running."  Kind of weird, don't you think?

When they called the power plant customers and talked about this lawsuit and activated carbon, don't you think if those guys said, "Man, we hardly keep that thing on," don't you think he would be up here testifying about that?  But we found out from experts in the industry if you're permitted for it, you have to keep it running.

And that's what Mr. O'Keefe and Mr. Nemunaitis showed you.  They showed you the permitting for the plants.  You've got to keep it running.  They're saying it's off for a substantial amount of time.  Really?  This guy is telling us it may be off hours per year, hours, so he can clean the nozzles.  So it's off, so I can make sure it keeps running.  Let's say it's 24 hours, like 1/365th.  It's a third of one percent of the time it's off.  Oh, yeah, we hardly use them.

But then they tell you you're going to get an expert who's going to tell you all about this and when they don't use it.  They told you they're bringing Dr. Connie Senior to come tell you this.  Did you ever see her testify?

Did you ever see her other than sitting in about that fourth row back there until last night or the night before?  You know what, we budgeted time.  We cut some of our stuff shorter saving time for that.  Kind of got to wonder what's going on.  Make us save time, make the Court give the instructions on it.  We save time and then, well, we're not bringing her after all.

What you're going to hear about contributory infringement is a staple article or commodity of commerce is capable of substantial non-infringing use.  That would be if it's something that has uses other than as a part or component of the associated claim and those other uses are not occasional, farfetched, impractical, experimental or hypothetical.  Yes, occasionally something that proves we're right, occasionally they clean the nozzles.  It is -- they use activated carbon.

Then what you get, you get like scrolling spreadsheets.  You get squeaky markers on the same boards over and over again.  Guess what guys?  They had that formula and they used that formula before and after the date.  I don't think we needed an hour of that.  That's not been in dispute.  Our point is once you knew about the patent and it was resulting in infringement, you kept paying the plant to do it.  It's not about whether you changed that number.  You kept paying the plant to do the two-step

process once you knew it infringed.

And the Court is going to tell you that for contributory infringement, you focus on not just coal they sold years ago, not coal that they sold to a different kind of plant that didn't need it, you focus on the coal as sold and used in the accused time period at the accused plants.

We've been through the organization of these companies and I don't think we need to replow old ground, but, guys, there's sort of this last ditch effort that even if the law is what it is and we all knew about activated carbon, they're going to come and maybe argue we should get off scot-free because we were mistaken about the law.  And that's perplexing.  I mean, the law hasn't changed since 2019.  We know CERT is really good at tax law.  Also, we've talked to the witness and he says, "Whether you send us a letter or you send us a complaint, the result is the same.  We're handing it straight to our patent lawyers."  So they had the patent lawyers on.

And I asked him, "Were you getting good advice?"

"Yeah."

There's no evidence that I was confused about the law, none.  Think about it, not one bit of evidence I was confused about the law.  Nobody said that.  No lawyer said "I gave them bad advice."  No witness said "they gave me bad advice."  There's no evidence that someone was

mistaken about the law, and that's a defense.

I already told you they filed answers and just kind of denied things we all knew were true. I already told you they would just turn it over to the lawyers as soon as they receive it. So much of this trial about defenses and arguments of defendants basically were a waste of time meant to be misleading you, and you can ignore all that if you find inducement for all defendants and you find contributory for all defendants that are listed on the contributory.

I want you to step back. Remember, you don't check your common sense at the door. Step back and take a look at who's more credible. We were working for the public benefit trying to run a business to bring this to market.

I'm sorry. I didn't hit the checks, I'll come back to that.

The other side is saying -- they flatly say it's not about the public benefit. "We shut down the instant we couldn't get tax credits." They put their accountant, that accountant that's like, "do you make profit" and she says, "What's profit?" That accountant, the CFO, says, "What's profit?"

And she's like, "There would be no reason for us to keep doing this after we don't get tax credits."

Compare. Compare these two companies. ME2C rolled up its sleeves, put in the hard work, built a long

term-business traveling all over the country.  What do we know about CERT?  Only care if it's economical based on the tax credit.

We brought you four live witnesses, two fact witnesses.  We brought you an expert in the technology and brought you an expert in the damages side of it.  It's our burden of proof.  How many witnesses did they bring you?  I mean, their fact witness says, yeah, you're going to hear two or three more.  They didn't give you evidence to support their side.

So ladies and gentlemen, there is one more question that's on the verdict form.  It's very simple.  It's "Did you find that their infringement was willful?"  And I think, essentially, by the time you look at all the knowledge and -- of the elements of the other ones, the answer on those will all be yes.

I'll have a few minutes later to come back and talk to you in rebuttal, but thank you very much for your attention.

THE COURT:  Thank you, Mr. Caldwell.  Thank you.

And now we'll turn to Defendants' counsel Mr. Sykes to make Defendants' closing argument.

MR. SYKES:  Can I have a moment to get set up here, Your Honor?

THE COURT:  You may.

MR. SYKES:  May I proceed, Your Honor?

THE COURT:  You may, Mr. Sykes.

MR. SYKES:  Well, it's a pleasure to speak with you, speak directly to you.  I told you in the opening of this case that it turned on CERT's state of mind and the evidence supporting that state of mind, which you will be instructed in very carefully and thoroughly by the Court, that evidence of the tens of millions of tons of refined coal that was made and sold and combusted without activated carbon for nearly a decade before this suit was filed and every single day that the refined coal program was running during the lawsuit from 2019 to the end of 2021.  That evidence came in, it's overwhelming, and it's undisputed.

And the reasonableness and good faith of my clients' belief that its actions that refined coal and activated carbon don't go together like peanut butter and jelly, that they aren't always married together, that was corroborated by none other than the former CEO, the long-time owner, of these very patents, Mr. Erickson, the CEO of that fantastic research organization where the original research work was done.

And that's why Mr. Caldwell right out of the box took a punch at Mr. Erickson.  You had a chemical engineer, the vice president of operations and intellectual property for the EERC who owned these patents from 2004 to 2017, just

tell you "No, I wouldn't think that these would be used together because they're just totally different things." That's the way the industry looks at it, and we'll get into that.

First, I want to say you've seen Mr. Jeff Green here all week, and you've heard him testify. And this is not an easy thing to sit here as a defendant, and I want to let you know that he thanks you for your time and attention and appreciates your careful evaluation of the evidence and of the facts, and so we really do appreciate that.

I'm going to address Mr. Caldwell's points along the way. I'm going -- what I'm going to do -- I felt like what we heard was a lot of jumping around, a lot of pure speculation and attorney argument, and I'm going to try to walk us through some pretty strong statements about all this money and the incentives. I'm going to walk us through the evidence, what the legal claims are. I'm going to touch on the instructions, and the judge will carefully -- it's his role. He will instruct you on the law. But he's been very generous to us in providing advance copies of that, and if you listen to him -- and I believe His Honor will be handing them out for you to read with us. So we're going to walk through them in an orderly way.

We've talked a lot about this Section 45 tax credit and we talked about it. Why is it relevant? Its

technical requirements establish the basic facts, the simplest, most fundamental things that we understood not long after being sued.  Those simple facts --

If we could flip over to slide five, please.

Those simple facts bear directly on what our intentions were, to our knowledge and state of mind in proving that we did not and cannot have had the required state of mind that they have to prove to prove infringement of the patents from the get go.  Ours is a fuel, theirs is a process.  They both deal with mercury reduction, fair enough.  Ours reduces NOx, theirs does not.  And importantly, this is very critical, our coal is qualified under the law to meet its reductions without activated carbon.  Theirs requires activated carbon.

They miss each other coming and going.  None of that was disputed, and, in fact, you heard Mr. Pavlish himself, the inventor, testify that he didn't invent the method of capturing Section 45 tax credits.  They tried to belittle that as though it was a thing in the air in the flue, but he knew exactly what that question meant.  He was familiar with it.  And he testified that used alone, it's not part of his invention.  And he also admitted that ME2C's patents and technology don't reduce NOx to any appreciable amount.  All these basic facts our folks understood from the get-go are understood and established in this case.

So direct infringement.  Let's look back at slide -- I think it's slide two.  It's direct infringement against eight power plants.  They have to prove all these elements of these patent claims, which are tedious, long elements, for every one of these power plants that we've talked about.  And it's every word of every claim has to be proven to your satisfaction by a preponderance of the evidence.

They keep saying this is undisputed, this is undisputed.  There's a lot more than a two-step process with activated carbon and bromine laid out in all this.  So yeah, we've admitted that we knew that activated carbon was used at these plants at some time for some period of time.  What we didn't know -- it wasn't our role at the plant -- how much, how continuously, that volume.  That is information they could have gone out and gotten.  It's their burden of proof.

Remember, we did investigate in the sense that we knew well -- remember they sued plants that never used activated carbon and those plants stayed in the case through 2022?  So who did they rely on?  They relied on their professional expert witness, Mr. O'Keefe, who'd never dealt with activated carbon or bromine when he last worked at a power plant three decades ago.  He gave an opinion on MATS which went into effect 20 years after he left the industry.

He never set foot or talked to any of the power plants.  And everything he learned for his expertise he learned it in the 60 to 90 days between the time he was hired by ME2C and when he gave his testimony.

If you're not comforted relying on Mr. O'Keefe's testimony for all these claims -- the first step in the process is a finding of direct infringement for each one of these power plants.  If you're not comfortable relying on them, you can write "no" on questions 1(a) and (b), 2 (a) and (b) on the verdict form.

But I want to talk about contributory infringement first.  ME2C has to prove there was no substantial non-infringing uses.  So what is the evidence that we didn't believe that we knew there was no substantial non-infringing use?  And the jury instructions are going to explain this very carefully.

You heard this mistaken belief about the law. The jury instructions will set that out.  And they're going to say if the defendant reasonably believed it did not infringe, even if that belief is incorrect, the defendant doesn't have knowledge of the infringement.  So that's why we've been emphasizing state of mind.

And you heard and then the Court will instruct you very carefully that a reasonable belief negates the level of knowledge needed for them to carry their burden of

proof on contributory infringement.  And you heard Jeff Green testify about this evidence.  It's undisputed.  We showed you a summary chart in opening where we put in all the data, a hundred percent of the underlying data on that chart, that Excel spreadsheet, DTX 1514, went into evidence. It's an electronic spreadsheet.  It's what kept every day for a decade.

And Mr. Dyess read the stipulated facts about when each of these plants installed activated carbon equipment and then from there, it's fifth grade arithmetic that shows that tens of millions of tons of refined coal was sold to plants that combusted it without activated carbon. There was no challenge to that data.  There was no cross-examination on that data.  That evidence is really that powerful to show why our client reasonably believed that if the basis of the suit is refined coal, you have to know and intend it to be used with activated carbon, why he didn't believe and had a reasonable belief it wasn't always so.  Every single day it was being combusted without activated carbon.  I'm not going to rehash it all since you heard it just yesterday.

But just focusing on the three power plants, Intermountain, Mount Storm, and Chesterfield, who were accused of infringement the day this suit was filed in May 2022, that alone was 20 percent, 20 percent of the

refined coal ever that the CERT companies ever produced and sold every single day while the refined coal program was running during this lawsuit.

And then there's the formulation issue, especially made and adapted, and you heard that. Undisputed evidence again that without question, our refined coal was not specially made and adapted to be used with activated carbon, and we didn't know it was especially made and adapted to be used with activated carbon.

And the EERC set that formula, the 0.002 percent MerSorb and the 0.20 percent S-sorb, so how could our refined coal be specially made and adapted to infringe a patent that didn't exist when the formula was set by the EERC?

And on the accused power plants, the same power before and after the patent issued, same formula before and after we knew about the patent, the same formula as a formula burning at an entirely different grade of coal that had never used activated carbon at all, Intermountain. It's really impossible with those undisputed facts for us to believe that refined coal is specially made to adapt and infringe.

Let's look at slide eight.

Mr. Erickson. So one of the things, one of the key issues that you'll be looking at is was that belief

reasonable. Absolutely. The final witness, Mr. Erickson, the CEO -- former CEO of the EERC, its current chief operations officer -- chief operations officer, not some intellectual theorist, I don't know where that came in, that wasn't in evidence -- vice president for intellectual property. This is where these inventions were made, at these labs.

And this is the fellow, his organization owned them from 2014 to '17. Third party premier research center with no dog in this fight, and he testified it would not be reasonable to expect refined coal and activated carbon to be used together. There are substantial uses of refined coal without activated carbon. And Mr. Erickson himself, who's been in this field for his whole career, said he's been there a long time in lots of positions, had no reason to believe that refined coal could only be used with activated carbon.

So that is exactly what Jeff Green testified to, that they don't go together like peanut butter and jelly. They're not always together. If you notice, that was me taking the deposition, and I was trying to lead him down the plaintiffs' theory, "well, isn't it reasonable to think." No, he wouldn't agree to it.

The final nail in the coffin -- slide nine, please -- of the contributory infringement claim is that

even ME2C's infringement expert Mr. O'Keefe testified in this case, he confirmed it right this week on the stand, that for those patents that use refined coal before activated carbon, those would be a substantial non-infringing uses of refined coal.  He agreed with us.

So with this evidence about substantially made and adapted, the same formula, this evidence of this extensive long-term use including during the lawsuit by power plants accused of infringement in the lawsuit for years burning refined coal every day without activated carbon, then clearly we had a reasonable belief that it could be used without activated carbon obviously.  So questions 2(a) and 2(b) on your verdict form you should mark "no" for contributory infringement.

And it's true we were going to put our own expert, Dr. Senior, on to corroborate the reasonableness of Mr. Green's belief that there was substantial non-infringing uses for refined coal.  But with that testimony from Mr. O'Keefe agreeing with us, we no longer needed to do that.  Their expert witness actually testified for us.

And then you add the slam-dunk testimony of a knowledgeable independent witness, somebody with no dog in the fight -- you didn't hear that from them.  I'll touch on Mr. Whitney in just a second -- Mr. Erickson.  We didn't need to put on an expert after that.  That's why they went

after Mr. Erikson so hard in the first 90 seconds, 60 seconds of their opening.

We also put on Mr. Kuennen from Chesterfield and Mount Storm, Mr. Finlinson from Intermountain, and they corroborated exactly what Jeff Green said. Yeah, Mr. Green got confused about how many witnesses you're going to put on, live witnesses, and it's tricky being a regular person keeping up with all this lawyer stuff, but indeed we did put on Kuennen, Finlinson, and Mr. Harris, three. Mr. Caldwell made fun of the number of witnesses we had.

But did you hear from a single witness testify for them who either didn't own millions of shares of ME2C stock, Mr. Pavlish and Mr. MacPherson, or isn't being paid by ME2C to testify, Mr. Green and Mr. O'Keefe? The best they did was put on testimony of power plant operators of the defendants that settled. That's the Mr. Whitney they pointed to. He wasn't with any of our power plants. He's with a different power plant. They still didn't go out and get any deposition testimony, any witness testimony from any of our power plants. They're pointing to one that's not in the case. They settled -- the other defendants settled and we're fighting it because we have confidence that you will consider the evidence.

And inducement. Okay. This is the first question. This is intent. In selling refined coal to power

plants, was it our intent to cause the power plants to infringe? Simply put, it was not our intent.

Let's take a look at slide ten.

Were we trying to cause them to use activated carbon with the intention that they would infringe the patents? Of course not. Our specific intent in selling refined coal to the power power plants was to sell a self-contained fuel certified under the law in Section 45's emission reduction requirements for mercury and NOx. Those were certified without the use of activated carbon, so it makes no sense to say we were selling refined coal with the intention to use with activated carbon when the material we were prohibited by law from certifying with when -- I can't even say it because it's so nonsensical -- we were selling it with the intent that we use it with activated carbon which was the very material we were prohibited by law from using and testing. It just doesn't line up. You heard Mr. Erickson, the chemist, CEO of EERC, testify that he was puzzled, to that's contrary to my thinking. He couldn't put it together either.

Let's look at slide 11.

This is so important to really pay attention to the Court's jury instructions because of the state of mind and intent between contributory and inducement and what that proves. So it's not sufficient that the power plant

customer directly infringe, and it's not sufficient that the defendant was aware of it.  Okay.  Almost all of Mr. Caldwell's examination of Mr. Green was going through e-mails four, five, eight years ago to show he had awareness or knowledge.  That's not even relevant to inducement.  Not even relevant.  They have to show an intent.  And today in the opening argument -- or closing argument, they focused on knowledge, awareness, these e-mails.  They referred to a Barr Linton e-mail, I think it was from 2015, intent during the statutory period.

Causation is where their claim really falls apart.  Their own expert, again, testified against them. The Court is going to instruct you that the defendants' actions had to actually cause the power plant to perform each and every step of the asserted claim.  And each and every step, we actually cause the power plant to perform each and every step.

They've been showing you their dominos, that we perform the first one and, therefore, the dominos fall and we're responsible for everything else.  You're also going to be instructed that it's not enough for the defendant to cause a power plant to engage in conduct that happens to amount to direct infringement.  That's exactly our position, is just exactly what the dominos are about.  Where will it stop?

A fuel vendor in the coal yard responsible for the entire operations of a gigantic power plant that takes up city blocks, catalytic reducers and scrubbers and so on? Once we put the coal on the conveyer, everything that happens after that we cause it? Of course not. We're not the actual cause of the power plant making electricity. You really have look at who caused what.

So what are the jury instructions going to say on that? Look at each step, pay attention, who caused each step.

And remember the two-part process they told you about, slide 13. It turns out it's a three-part process. Mr. O'Keefe testified about this, combusting coal, injecting the sorbent material activated carbon, and separating the mercury sorbent from the gas. In the '517 patent, it's arranged a little differently, but you still have -- you're combusting coal with bromine added with the sorbent, the activated carbon, and then the third step collecting the mercury in the flue gas. They glossed over that third step all week.

Let's revisit activated carbon first. Mr. O'Keefe himself, you remember, we have to cause every step. He testified the only reason our power plants use activated carbon is that the government compels them to do so in the MATS regulations.

If that's not enough, the plaintiffs' own sworn securities filings, their 10-Ks, -- this is what I talked about -- says were sworn under oath to be true and be complete.  They identified activated carbon sellers as competitors with large, well connected sales forces selling activated carbon at the power plants.  We have no role in it.  The government mandates that they use activated carbon, and the activated carbon sellers, they're competitors, are encouraging them and selling it to them and causing them or allowing them to buy it.  We're just not -- we're out of that loop.  And the law that you'll be instructed on is we have to cause each step, but we have nothing to do with that.

And then the third step, the separated step, Mr. O'Keefe identified the power plants' ESPs and baghouses as performing that step.  So are we causing them to use a baghouse?  He flat-out testified that we didn't cause the power plants to use them.  He said all power plants in the country, all power plants must use ESPs and baghouses.  They've had them for decades.  They continue to use them before and after, after refined coal, before refined coal, CERT has nothing to do with causing power plants to use baghouses and ESPs.  Mr. O'Keefe told you that.

And then try to compare that -- fit into the concept of the jury instructions that we caused the power

plant to use a baghouse with the intention that the plant infringe the patent.  That doesn't make any sense.  So there's just to evidence of inducement either.  Answer "no" on your verdict form for questions 1(a) and (b) for every defendant for inducement.

And so you may wonder -- and I'm sure you are wondering -- why did we have to go through all those complaints?  And that was very tedious and difficult to listen to.  It's for their willfulness claim, and that's the third question on your verdict form: willfulness.  And the complaint -- it's important to look at those allegations because that's what they -- that's what the plaintiff says it was accusing of infringement.  It's what they say they're accusing of infringement.  Did we willfully infringe what they were suing on?

And let's look at Slide 19.

And, you know, we went through this.  Here are the operative allegations.  They were alleging that if the defendants performed a certification test by merely combusting refined coal and measuring mercury, they wouldn't be able to do it without activated carbon.  They wouldn't be able to demonstrate the required reduction.  And then they alleged that the coal-fired power plants that use activated carbon that we demonstrate the qualified emission reduction, the Section 45 requirements, about adding activated carbon

downstream of the combustion chamber during the testing.

And those allegations were in the complaint the whole time that we were making refined coal from July 19th to December 2021, and they didn't pull them out until May 2022. They kept saying, "Well, what's the live complaint?" Well, what did -- what were we willfully doing? What was the complaint while we were making refined coal? It was asserting we were using activated carbon in testing, and we knew that wasn't true.

And you heard, again, for us, independent third-party witnesses from the EERC. Mr. Gunderson and Mr. Erickson both testified, exactly like Jeff Green. Activated carbon was used in testing. And surely Mr. Pavlish knew that, too. He worked there right alongside those gentleman in the same facility. These combustion things were right across the hall. They're in and out every day for, you know, 15-plus years.

So Mr. Caldwell tried to cross Jeff Green and trick him up on more of the legal stuff, but he left out the facts. You remember all the talk about websites, you know, the websites of our companies. Turns out they're not so good at using them either.

As Mr. Pavlish testified, the refined coal data for power plants is in a searchable, downloadable, public EIA database with a website going back for years for refined

coal data.

And slide 20 are the operating permits. These are on the internet, too. This is public data on the internet. So every single thing they're pointing to right now to prove infringement, it was publicly known and available to them the whole time. What they said infringement was, three CERT defendants making refined coal for power plants and never used activated carbon and using it in the certification testing itself.

And those allegations are directly contrary to the law they didn't even bother to look up on the IRS website, Section 45 on the IRS. And the bulletins are right there on the IRS website. It would take about ten minutes to find.

So that's why we had to go through that. The allegations that they maintained every single day while we were making refined coal from July 2020 to December 2021 or July '19, they're ridiculous, and that's what their willfulness claim has to be judged against.

Okay. And then in May 2022, they finally settled on a theory, the domino theory that you saw in the opening we just talked about. And that fails on causation, and it's contrary to the instructions the Court is going to give you on causation -- on intent and cause and taking actions to cause the power plant to perform each and every

step.

The plaintiffs can't carry their burden of proof on any claim.  There just isn't evidence and certainly nowhere near a preponderance of the evidence to find infringement.  So we're going to ask you to render a verdict for the CERT defendants.

And something that I learned after I started practicing law is that the word "verdict" is Latin for "to speak the truth."  So for you to do your job, it's very important for you to have the facts so you can speak the truth.

And during the opening and the testimony of the plaintiffs' witnesses, it became apparent that the story that you were being told in this trial is not really what happened, and that's why we tried to pry the facts out on cross, and it took a lot longer than expected.  And because of that, we had to make a difficult choice between getting the true history out, the actual facts, the truth, and putting on our invalidity case of Dr. Niksa.  And we chose the former.  It was more important to us to get you the truth through those long difficult crosses and going through some of these documents than to prove invalidity.  So we had to -- we had to make a choice, a difficult choice at the time.

And I'm going to show why that was so important.

Because one of your biggest roles, one of your most important jobs, is evaluating credibility. You've heard the expression, "I hear what you're saying now. What did you say back then?" And I think that's a good way to judge credibility. Is somebody being consistent? That's what we used all those depositions for.

Well, you heard the sworn testimony this week. But we've also got the sworn statements of ME2C's CEO, of ME2C itself and its CEO, verified under oath in their securities filings, their stock market filings. That's why we looked at those 10-Ks, and that's what they swore to, and you remember some of the stories you heard this week.

Just a few of them to review. One of them, we heard ME2C was doing great with the announcement of MATS in 2012. They were on a glide path to success because the industry needed their products. And with new MATS regulations, they had their best year ever in 2017. And they couldn't -- but then what happened was they couldn't compete against the refined coal companies, and that's why their sales went down.

What did they swear under oath to the government and the public back then before this litigation? Let's look at DTX 376, page 5 with the heading "Regulation and Markets." What we learned was that -- was that because of the MATS regulations -- this is what they told the

government.  Because of the MATS regulation, the coal-fired power plants went from 1,250 to 450 in five or six years, a two-thirds drop.  The customers are dropping like flies because of the regulation you think is going to save the business.  It actually doomed them.

And then what did we learn?  We learned that they're actually competing against their suppliers of activated carbon.  That's who their competitors are.  And, you know, we looked at that.  And those are the ones with the large, well-connected sales forces encouraging and persuading and pestering the power plants to use activated carbon.  There is not a thing in their sworn statement on competitors about refined coal being a competitor or risk, and they're required to list their risk factors, and there are pages of them.  You can see these.  This is DTX 376, and it's in the first few pages.  So the story at trial that they're telling you that it was our fault doesn't match what they swore to to the government just a few years ago.

Another story you heard, that they couldn't do anything about refined coal.  The infringers -- you got that long timeline this morning, even, that put up, you know, the patents way over here and all this money trail back here.  That was years, you know, years before these patents existed.

Well, the whole time they had another patent,

the '147 patent issued in 2012, that they said in this very litigation was being infringed by the refined coal companies made by the Chem-Mod process, and you remember we went through some of those e-mails.  And back then, they had a contractural obligation to the EERC back and forth to notify one another of any infringement, and they said nothing.  They didn't even send an e-mail, even though they were under a contractural obligation to notify of infringement.  The EERC didn't do so either.

And then we went through a couple of e-mails from the 2012 to 2014 time frame where instead of saying Chem-Mod was an infringer, they proposed working with them at Joppa and teaming up with them; right?  That's DTX 77.  That would be in your binders.  That's October 11, 2012.  You know, that's where -- "We want to work with Chem-Mod at Joppa.  We're pleased to provide this."  It doesn't say "you're infringing" or "you shouldn't use it" or "we invented that."

And then we looked at DTX 112.  That's at September 18, 2013.  That's where they highlighted teaming up -- or considered teaming up with Chem-Mod.  They didn't say, "Hey, they're stealing my stuff."  They said, "Hey, let's team up and work with them."

Then we looked at DTX 56.  That was a December 4, 2014, e-mail.  "Great call.  Great call.

They're using refined coal, and this is what they're doing, and they've got a new plant manager" and all this stuff. Nothing like, "Hey, they're ripping us off. What are we going to do about it?" They're talking about how to work with them.

So, you know, it's completely contrary to the story you heard at this trial. It wasn't that there was nothing they could do about it. They want -- and now this was -- and, remember, they didn't list these guys as a competitor on their 10-Ks.

All right. And then the third story we've heard, it was refined coal and the alleged infringement back in 2018 on patents that didn't exist yet that caused them to lay off their sales force. That was a big deal, laying off their sales force. That's a big deal to any company.

Well, the sworn 10-Ks, sworn not to leave out any information, tells us a different story. Let's pull up DTX 376 and look at page 19. They -- this is their 2018 10-K for the year ending 2018. So it was filed in March or April 2019, just a few months before this lawsuit. And this is going to be in your binders, DTX 376. It's on page 19.

They saw a decrease in sales in 2018 as compared to 2017. They tried to blame that on us in Mr. MacPherson's testimony. What did he say? "Primarily due to the loss of customer EGUs, shutdown a competitive disadvantage of other

EGUs."  And then revenues, the money, the decrease from the primary year, is due to the loss of customer EGUs.  That goes back to the power plants shutting down from 1,200 to 400 of these things in five years.  And they're trying to blame it on us.

The regulation they're talking about -- MATS, MATS, MATS -- is causing the power plants to go out of business, and they're trying to put that on us.  And then, you know, is there a word about refined coal on here?  And these are thick documents.  Nobody can read them all. There's not a word about refined coal in these things, and they couldn't omit information that would make them misleading.  Mr. MacPherson testified to that.

All right.  And then let's jump to page 11. This says, "Our industry could be highly competitive."  And you remember we looked at this, the companies with the large sales staff.  And they say:

"Our ability to compete successfully depends, in part, on our ability to offer superior technology, including our superior team of sales and technical staff."

So this was filed in April 2019.  They had -- they had disbanded their sales staff.  Mr. MacPherson said they let them go.  They were blaming that on us.

All right.  Not only are we not the cause, but they're telling the public we -- "To be successful, we

needed to have a sale -- a superior sales staff," and they don't even have one.  How misleading is that?  So, you know, this is a risk factor.  It's something they swore to the public to tell the truth about.  And, you know, wow, they're not even telling the truth back then about the fact that they don't have a sales staff.

So let me shift gears for just a minute. Mr. Caldwell spent a huge amount of time in this trial and in his closing -- opening with the boards with stickers, talking about CERT's corporate structure, which is driven by Delaware Corporate Law, and the federal tax code as if it's a crime to comply with the law of this great state and the federal tax code to implement a program passed into law by President Obama and bipartisan in Congress to encourage cleaner burning coal.

You remember all that.  You remember the sticky boards and the LLCs and all this mystery.  Well, when you get your jury instructions -- and you may have picked this up.  You may have picked this up in the opening, but have to be careful.

On the cover sheet and in Section 2.1 on page 17, there's a plaintiff in this case named MES, MES Inc.  Did you hear any evidence about MES Inc.?  Where is it?  Who is it?  What does it do?  I searched the transcripts electronically.  There was not a single word of

testimony about MES.  Not one word about it and why it's a plaintiff in this case.  Did it put on a witness?  Did you see a picture or hear of an MES office or a single product it sells, single employee?  What does it do?  No testimony. Why is this mysterious corporation in our courtroom and on your jury instructions?  There's no evidence in the record about this entity.

And then there's ME2C.  We saw some great pictures of the early days.  We saw a little bit more of a tanned and more handsome version of Mr. MacPherson, 70-pound totes, and all that stuff.  What did you hear about more recently?  Did you hear about its customers very much?  Did you catch that Mr. Green, after touting the NRG, Talen, and AEP supply agreements, those licenses, the litigation settlement licenses, I asked him, "Well, how much have they sold?"  Mr. Green, the details man, had no answer.  "I don't know.  I don't know."  He's telling you their supply agreements, and that's what important, and he couldn't tell -- he couldn't acknowledge or tell us the volume of products sold.  No evidence they sold a penny or a nickel under those agreements.

The picture is starting to get a little bit clearer.  Let's look back at DTX 92, the corporate rework and strategic initiatives, official company document written by Mr. MacPherson himself in late November 2017, six to

nine months after they bought the patents.  And you'll remember this is written by the CEO himself.  It came in without objection, and it's corporate strategies, strategic initiatives, for a corporate strategic initiative.  Right down here.  Let me get my pointer.

In this second paragraph -- pull that up if you can, Mr. Brown.

ME2C tell us in its own words that it has either the Cabot license deal or, quote, "The alternative grounds that a litigious troll --" let me read it:

"That of a litigious patent troll route which would see us litigate to the very market we are here to serve, the utilities."

And as he testified, the Cabot license failed. Zero royalties in less than two years after he wrote this document.  18 months later, they sued the very market they were here to serve -- Vistra, NRG, Talen, AEP -- and they brought us along for the ride.

In their own words, they became a litigious patent troll.  And guess what?  Our old friends, the sworn 10-Ks, complete the picture.  Remember, these are sworn to be truthful and complete under oath.  They're given to the federal government and to the public so you can rely on them.

Let's look at 379, the 2021 10-K.  And let's

look at -- Part 1, Item 1.  This is Part 1, Item 1.  This is the very beginning of it under the business.  This is what the business is, on the very top.  The business.  We have the overview, background, industry background.  And then let's -- and then if we jump to page 7, our growth strategy for mercury emissions.  And just scroll down a little bit, patent enforcement.  Patent enforcement is a growth strategy.

"We believe a significant..."

This is in their public filings:

"... a significant percentage of coal-fired power plants in the US has adopted infringement on our patents.  Since 2018 we have engaged a Dallas-based intellectual property and business litigation firm to oversee and spearhead our efforts to protect our intellectual property."

And then they go on to describe it.  And then when you get down to the bottom:

"We have entered into agreements with four of the major defendants."

That's our old friends DTX 19, 20, 21, and 23: Vistra, Talen, AEP and NRG.  Those settlement agreements that they say are not comparable to this litigation are referenced in their 10-Ks.  They're bragging about it, and they don't want you to look at them in this case.  They've

come up with some crazy hypothetical number.

And then they tell us to look down to Part 1, Item 3 in the legal proceedings. And here they describe -- this is where it gets good -- as a risk factor to the business, to investors. Do you remember all this talk about investors and Wall Street and JPMorgan?

Getting fired up now, y'all.

They describe litigation as a growth strategy. And look at this:

"Investors should note that patent litigation, like most patents and commercial litigation, can be time-consuming and expensive. And although we have already entered into agreements with each of the four major utility defendants in this litigation, such action will continue with respect to the other defendants involved. In fact, we recently received approval from the district judge of the United States District Court of Delaware..."

That's where we are. That's this courthouse.

"... for the adoption of the recommendation and report of the magistrate judge to allow us to proceed with litigation claims against certain refined coal entities, CERT."

These are their sworn statements, y'all. You don't have to believe a word I say. This is in the 10-K as part of the business strategy of this plaintiff. "Investors

should note --" investors, investment vehicles.  You heard all that stuff in not just any litigation, this litigation; this lawsuit.  This is a Wall Street securities filing for investors who want to buy ME2C stock and get a piece of the action in this courtroom.  It says it right there.

You think mom and pops -- you heard that "mom and pop" stuff from Mr. MacPherson.  You think they're investing in patent litigation?  Have any of you all heard of investing in patent litigation?  ME2C is literally keeping Wall Street investors apprised of the blow-by-blow action in this courthouse, this actual lawsuit.

So, ladies and gentlemen, the truth comes out.  Our plaintiff ME2C and the mystery corporation MES -- ME2C is a publicly traded self-described litigious patent troll whose business growth strategy is patent litigation.

Look who's representing Wall Street now.  Here in the first state, Delaware, the first state, ME2C has turned an institution that dates back to the Constitution, the right to trial by jury, into a business for Wall Street investors.  Are you going to be part of that?  That's the question for you.

A verdict for ME2C in this case is endorsing litigation as a business, as a growth strategy.  It is right there in their 10-Ks.  That's what their business is. That's why you didn't hear or see any recent pictures.

Are you as disgusted as I am?  Speak the truth.  Speak the truth.  Give them a defense verdict, a defense verdict to report on their next 10-K.  And as we saw, they even reference their Dallas-based firm.

So now you know who ME2C's team of sales staff is.  They're right here.  They've got an army.  We've got our little team under there.  Have you noticed the gorgeous graphics, the beautiful animations?  Where's that coming from?  Lawyers -- we lawyers make slides like the ones you've been seeing us do.  I mean, they're not that great, but they're okay.  These things are gorgeous.  Yeah, you've got some Wall Street money with these, you know, beautiful graphics.  They are beautiful.

And the best part of all this is you don't have to take my word for any of it.  It's right here in ME2C's own filings, the public documents.

Now, let's talking about the most outrageous story of all, these crazy damages numbers.  Mr. MacPherson, on the stand, proclaims he didn't rehearse, like somebody from Wall Street is getting a live feed of the trial transcripts realtime, which can happen.  A dollar a ton burned since the day the lawsuit was filed.  He got his line out.  Mr. Green came right back out and then, all of a sudden, changed his tune.

From the day the lawsuit was filed to the

applicable damages period, Mr. Green had calculated 1.4 million tons for Alistar since the day the case was filed. I showed you all PTX 641, PTX 642. They were submitted to the Court. They were sworn under oath to be true. They had 1.4 million tons, and I went through all that crazy stuff with the timelines as to how these numbers changed, and then they come up with 107,000.

And so it's a $100,000 agreement. It's 100,000 bucks, and you've got some real funny business going on as to how you get from 1.4 million to 100,000 tons. And the AJG-Chem-Mod agreement settled every -- you remember those 134 entities? Every ton of refined coal ever made was settled by that agreement. See if you can draw that inference. I sure do.

In short, as they pointed out, trainloads of coal every day going to a hundred power plants. Trainloads every day for a decade or 8 or 10 years going to power plants. How much tonnage is that? We get a sense from that from DTX 419. You remember this little agreement?

Put up DTX 419.

The licenses with the big utilities -- this is a nice little summary chart of the licenses. Vistra Corp. Do you remember Mr. Pavlish? He's the EIA data expert. Hundreds of millions of tons. I think Vistra was 4- or 500 million tons over an eight-year period for a -- what,

this one was 3.3 million for half a billion tons. Do that arithmetic.

And then AEP, 400 grand. NRG is the one I'm interested in because it's $600,000, and that's a big utility. Mr. Pavlish testified ten power plants. It's 20 power plants. Mr. Green said he had no dispute with 20 power plants. These are big companies. This stuff is not hard to look up. 20 power plants. We've got eight, eight. 20 power plants for 600 grand, 30 grand apiece.

But they like this per ton number, per ton. And $600,000, remember, divided by a hundred million tons -- that's, like, running way down for Vistra, a big utility with 20 power plants. 6/1000ths of a penny. 6/1000th of a penny. And these are the agreements they bragged about on their 10-Ks to Wall Street, and that's why they're coming in here trying to come up with these totally outrageous fictitious numbers based on hypothetical negotiation.

And why didn't we bring a damages expert? Because we trust your common sense. You didn't check it at the door. You did not check your common sense at the door. And so this stuff is -- we didn't think we needed to put on an academic. And as Mr. Green said, he did do a thousand-page report. It was kind of mind-blowing to me. I was like, "No, we don't need to put something on like that." This is straightforward. The jury can figure it out. We

don't need to put somebody talking about a 12-point *Georgia-Pacific* multifactor hypothetical negotiation.

Did he ever give you an explanation of how coal -- do you remember how the licenses cut off on -- his damages just cut off on January 5?  You can look at that number that they told you to look at.  That's because, after January 5, that coal on that conveyer belt is licensed by NRG for 600 grand.

THE COURT:  Mr. Sykes, you're just under five minutes.

MR. SYKES:  Thank you.  Thank you, Your Honor.

And so somehow, in this hypothetical world that's detached from the real agreements they bragged about in their sworn security filings, the coal on the same conveyer belt -- think about it.  These power plants are running 24/7 making our electricity.  That coal -- at 11:55, 11:58, 11:59 p.m. on January 5th -- according to Mr. Green, is worth a dollar a ton.

And then somehow, as it's moving into that power plant to perform the two-step process, it magically, somehow, drops to hundreds of millions of tons for 600,000 -- you know, six one-thousandths of a penny for the same coal, magically?

That is the -- that's the mumbo jumbo that's been thrown to you guys.  Look at the agreements.  Don't get

sucked into this.  Look at the real agreements that they swore about in their -- in their 10-Ks.

So third grade math.  Take a couple hundred million tons.  If you were to find the verdict for them, if you want to endorse patent litigation as a business strategy and you want to put your stamp on that, that you think it is appropriate and proper to use the United States District Court for the District of Delaware as a business strategy, as a growth initiative -- don't believe me.  It's in their 10-Ks.  It's right there, sworn to be true.

If you want to put your stamp on that and you want to award some damages -- a thousandth of a penny; you know?  A ton or 10 grand or 20 grand a power plant.  What's NRG?  30 grand a power plant?  That's the thing.  You guys are the jury.  You can do anything you want.  You can award a dollar, a hundred dollars, $100,000.  You can do anything you want.

We say, our view, we're confident.  That's why we're here.  That's why we're fighting.  We didn't settle.  We didn't settle like AJG and DTE and Gallagher and Chem-Mod and all those guys, and we sure didn't do the funny business that Alistar did.  That's fishy as all get-out.  The number changing overnight, the number of 1.4 million all of a sudden magically changes in the wee hours before the agreement gets signed?  Fishy.  Very fishy.  You saw the

facts. That's why I dropped my invalidity expert. It was so important to get you guys the truth because I was appalled at what was going on here. And it's in their security filings, this litigation, in this court.

So going back to the evidence on infringement. I know I wore you all out in the opening, and I apologize for that. It took longer than I thought. And I know some of you seem more worn out than others, but I think I wore you all out.

Especially made and adapted, same formulas, before and after activated carbon, with and without, before and after the patents. There's no way we could know that was a especially made and adapted. So did we have a reasonable belief as to substantial non-infringing use based upon the millions and millions of tons burned without activated carbon? Heck, yeah, we did. It was reasonable.

Mr. Erickson, the CEO of the EERC, told you his view, a guy with no dog in the fight. The only disinterested witnesses in this case testified for us. Induced infringement -- did we have a specific intent to make the power plant infringe? Heck, no. No. We didn't intend to cause a power plant to use activated carbon.

Read your jury instructions carefully. Listen to them very, very carefully when His Honor gives them to you. They're detailed. They're important. They're really

important.  And the stuff on state of mind and the knowledge required and the law protecting someone with a reasonable belief that they have substantial non-infringing uses and a reasonable belief of especially made and adapted, that negates the state of mind that they have to prove for infringement.

So, with that, I'm going to ask you to take these facts and to speak the truth speak the truth.  Speak the truth.  Answer "no" on every one of those boxes on contributory and inducement and be done with it and enter a judgment for defendants.  Thank you.

THE COURT:  Thank you, Mr. Sykes.

Mr. Caldwell, lastly, I'll call on you for your rebuttal closing.  You have 13 minutes and 6 seconds.  As I did with Mr. Sykes, I'll let you know when you get to five minutes.

MR. CALDWELL:  Thank you, Your Honor.  May I proceed?

THE COURT:  You may.

MR. CALDWELL:  Ladies and gentlemen of the jury, wow, so we just tried a case for four days.  And here on Day 5, what you hear is this impassioned argument that this is some Wall Street company that's doing patent litigation as a business.

What evidence of that is there in the record?

There's none.  What he showed you was a 10-K where Mr. MacPherson said, "That's a path we can go down."  What did he show you before that?  Where ME2C had tried to go to the plants in 2012.  He showed you we tried to go to the plants in 2012.  We want to get involved in this.  We tried to go to the plants in 2014.  We want to get involved in this.  We tried repeatedly to sell.  We had a sales staff. We had to let them go because we couldn't afford it, and then he makes fun of the fact that it says we would need a sales staff to be more successful at selling.

And then it says we have an option to be a litigious patent troll.  Remember what the agreement with NRG distinctly just flashed up there.  They are supply agreements because they are trying -- they don't want to be in a litigious business.  They got shut out of the industry because people never cared about them, never cared about their invention, and were infringing.  And they tried to do it commercially and then had to bring a lawsuit once the patents issued to get other people to respect their intellectual property, and that's why the courts exist.

And here is what I would suggest to you:  Think about what he just argued to you, and look for it on the verdict form or in the Court's jury instructions. Literally, this lawyer said, "I tell you what.  You want to send a signal that these people can come use the Courts to

do this?"  He's yelling at you, "I'm getting impassioned." Look for that anywhere in the jury instructions, anywhere on the verdict form.  That was ridiculous and offensive to Mr. Pavlish and Mr. MacPherson, who have been trying hard to make this business work for decades now.  Unbelievable.

Now, we started through a whole lot of different things.  I'm not sure where to go to, but I believe one argument that he started off with is he's talking about this Tom Erickson.  He's like, "Look, we've got a neutral guy that says you would not use bromine and activated carbon," and that's supposed to be their defense.

This is why I started with it.  Like, literally they are down to an argument that a guy who works at the EERC says you would not use the two things together when we have just done a trial on four days of them using the two things together.

Now, can I see slide, I think, 340.  There's a few things that I want to show you.  This is from the Court's instructions.  Do you remember how you kept getting this argument?  "We didn't cause them to buy their baghouse."  Do you remember that?  This is the Court's description of what it means to infringe.

And the Court's instructions are actually going to tell you, for a claim that covers a process of making a round cake, it would recite, "Making cake batter, pouring

the batter into a round cake pan, and baking it in an oven."

What does that not require?  It doesn't require that you make them go shop for ovens, and that's why -- that's why this argument is absolutely ridiculous.  It is not that they -- there's no requirement that we prove that a coal plant go and install new equipment after our patents issue or that it be specialized equipment, and that's not in the instructions anywhere.  It is pure lawyer argument. What matters is did they go through the process steps once they had knowledge of the patents.  This argument is preposterous.

Then you heard, "Well, they keep talking about knowledge, not intent.  Knowledge.  Knowledge is no part of the inducement, no part in the inducement instruction." That's what he told you.  And, look, guess what?  They took an affirmative action.  Yes, they paid people to take the coal.  They knew of the asserted patent or showed willful blindness to it.  They knew or showed willful blindness that the actions of the power plant would infringe, and then the actions actually caused the power plant to perform the steps.

So you want to talk about who's on the up-and-up or who's trying to mislead you?  They showed you knowledge. Knowledge has no part of intent.  That's just what you heard.  Got to read the jury instructions.  And in these

jury instructions, when you get to the section that says induced infringement, it's a page and a half. What he is doing is he's picking out one little element from the bottom of that instruction and saying this alone is not sufficient, like the fact that the power plants happen to do the steps is not sufficient.

That's right. It's not a matter of they automatically have to pay just because some random power plant happened to do the steps. We had to prove, and did, that they caused that. That's what's on the court's instructions for inducement. So when he's showing you just some excerpted portion that says, it's not enough that they have to prove the steps, the reason he's showing you that is he's pretending it's a defense. He doesn't want to know that what converts it to an infringement verdict against them is the actual legal test that the Court is going to give you. So don't fall for this nonsense where you get one little snippet out of the instructions. That's why it's very important to rely on the Court and why I kept pointing to the Court on that.

You know, I don't mean to lead back to this, but it's, like, deeply offensive that he's talking about, oh, there's this litigation deal. Do you remember right before that he told you we wanted to try to work with Chem-Mod and they shut us out?

Do you think the tax program is open to all of us?  No.  You know what happens?  Chem-Mod who worked with these guys before on other tax programs, comes and invites just them, and the law ends up with this special requirement that you had to have your thing in place by late 2011.  So it's just those guys, just the inside circle of people who did it right then at the end of 2011 and built their equipment, and they can't invite anybody else to the party. They're the only ones who don't have to pay the taxes and the rest of us do.

Now, you want to judge credibility on who's being consistent?  That's what you just heard.  Think about the arguments when I'm talking about who's being consistent. What did you just hear?  How is that consistent with anything that has come up with the case?  These little snippets, did they ask Mr. MacPherson, are you a patent troll?  No.  They admitted a document so he could come back later and not give any explanation or evidence on it. Wonder why that is.  There's crystal clear evidence that the things that are actually on the verdict form for you guys that we have proven liability.

Can I see slide 46, please, Mr. Diaz.  I'm going to tell you it's probably in the other deck and the number may have changed.  So tell you what, can I see slide 335.

Remember, they keep saying, we sold all this

other coal to Intermountain.  He cites the other depositions.  It's Finlinson and Kuennen and we cited all those.  Guys, those are other plants that used bituminous coal, didn't use activated carbon.  So he's like, we brought you this evidence of the witnesses, their these third parties, really rely on it.  But the Court's instruction and the instruction that their corporate rep knows is right is that when you evaluate what coal matters for whether there's a substantial non-infringing use, you're looking at the coal that is used in the accused process after the infringement period starts.  That's it.  You don't look at what they did before, and that makes sense; right?

So let's say the court reporter comes up with an amazing invention that relates to sitting in a chair and it's super comfortable for your spine all day.

THE COURT:  Four and a half minutes.

MR. CALDWELL:  They file the application, and when they file the application it takes quite a while for it to be issued, but someone else had heard about or saw the published application and starting cranking it out in the meantime.  Are they scot-free now that your patent comes out because they say, oh, no, I'm going to keep using your design that I started before the Patent Office issued your patent?  It doesn't even make sense.

Yes, there's not a property right that you can

stop someone or get a license fee until it issues, that's true, but you don't check your common sense at the door. Once they give you the property right, from then on it's not a defense to just simply say, "Well, yes, of course I knew about your patent and I knew I was meeting the claim, but I'm scot-free because I don't respect your patent" and keep plowing forward doing the exact same thing over and over and over.

He makes this comment about we're not good at websites because we couldn't find something that says what a plant does. Here's the problem -- and this is why we have to look at all the entities -- the problem is, who are we supposed to accuse? He keeps making fun of the series of complaints. Who are we supposed to accuse? There's no place we can go and find out that what their witness called a made-up word, Senescence, is the company that's servicing the W.A. Parish plant. There is no website we can find that. So all this complaint nonsense is ridiculous.

Was it 341 or 341 we had? Can I see 341, Mr. Diaz.

From the very first complaint -- so this is the one that I showed you the other day in cross that we had alleged that they knew what was going on and then it goes on to say induced and contributory. From the very first complaint, this was in the very first complaint. So all

this stuff about we're confused as to this other stuff, it's because he keeps not showing you we made the exact same allegation from the very first complaint.  And all that happened later is they finally had to tell us the information that only they knew about their corporate organization, and that's why there are amendments.

I've already showed you the induced infringement.

So this is where in the original complaint, Docket Number 1, we had gone through the entities in sections 271(b) and 271(c) are the legal authority for induced and contributory infringement, detailed infringement from Day 1.  So that was a complete distraction and total nonsense.

Then you heard about who's this MES, we've never heard of this MES.  The exact page he was showing you tells you why.  From the Court's original instructions in this case, the Court said we'll be referring to Midwest Energy Emissions Corp. and MES as ME2C for the plaintiff as we have from the beginning.  So he's acting like, aha, guess what, there's some nefarious actor in their corporate structure.  Don't you think if there was something untoward about that they might have asked somebody a question about it?  If somebody comes back and is ambushing you with an out-of-context page for something that nobody thought was

worth ten seconds of questioning, what does that say to you about the credibility of the parties?  The Court told you how we would be referring to them from the very beginning. He's looking at that document when he makes the argument to you we've hidden this crazy company.

And Mr. MacPherson told you he had investors and that's why he has to stand up for their intellectual property because if you're the little guy and these guys and their tax buddies run one of these organizations and they only invite each other and it shuts you out of the business, what are you supposed to do?  Think about it.  He wants people to walk a mile in their shoes.  Walk a mile in ours. Walk 20 years worth of miles in Mr. Pavlish's shoes.  What is he supposed to do if they shut us out of their business and go to the plant and say, "Do not look their way.  I will pay you to burn my coal"?  So yeah, I'll tell you what, we agree about one thing, and that is you do not check your common sense when you go back to the jury room.

THE COURT:  Mr. Caldwell, you're at your time.

MR. CALDWELL:  Ladies and gentlemen of the jury, thank you very much.  We look forward to your verdict.

THE COURT:  All right.  Thank you, counsel for both sides.  All right.  Ladies and gentlemen, what we're going to do is take a ten-minute break so you guys with use the restroom and stretch your legs and folks here can too,

our staff will have to talk to lawyers about the exhibits, and we'll bring you back in and give you final jury instructions and you can deliberate.

Let's have the jury brought out for a ten-minute break.

(The jury exited the courtroom.)

THE COURT:  We'll get started no later than 11:25.  The Court stands in recess.  Thank you.

(A recess was taken, after which the following proceedings were had:)

(The jury entered the courtroom.)

THE COURT:  Members of the jury, now it's time for me to instruct you about the law that you must follow in deciding this case.  Each of you have been provided with a copy of these instructions.  You can read along as I deliver them if you prefer.

I'll start by explaining your duties and the general rules that apply in every civil case.  Then I'll explain some rules you must use in evaluating particular testimony and evidence.

Then I will explain the positions of the parties and the law you will apply in this case.  And last, I'll explain the rules you must follow during your deliberations in the jury room and the possible verdicts you may return.

Please listen very carefully to everything I

say.

You'll have a written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form which will list the questions you must answer to decide the case.

You have two main duties as jurors.  The first is decide what the the facts are from the evidence that you saw and heard in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.  You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and then decide under the appropriate burden of proof which party should prevail on any given issue.  It's my job to instruct about the law, and you're bound by the oath you took at the beginning of the trial to follow the instructions I give you even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial and these instructions.  All of these instructions are important, and you should consider them together as a whole.

Perform these duties fairly.  Do not guess or speculate, and don't let any bias or sympathy or prejudice you may feel toward one side or the other influence your decision in in way.

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, including deposition transcript testimony that has been played by video, the exhibits that I allowed into evidence, and the stipulations to which the parties agreed.

Certain charts and graphics have been used to illustrate testimony from witnesses.  Unless I have specifically admitted them into evidence, these charts and graphics are not themselves evidence, even if they refer to or identify or summarize evidence, and so you will not have these demonstratives in the jury room.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts.  Their questions and objections are not evidence.  My legal rulings are not evidence.  You should not be influenced by a lawyer's objection or by my ruling on the objection.  Any of my comments and questions are not evidence.

During the trial, I may not have let you hear

the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I may have ordered you to disregard things you saw or heard or that I struck from the record. You must completely ignore all these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way. Make your decision based only on the evidence as I have defined it here and nothing else.

You may have heard the terms "direct evidence" and "circumstantial evidence."

"Direct evidence" is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believe him, that would be direct evidence that it was raining.

"Circumstantial evidence" is simply a chain of circumstances that indirectly proves a fact. If somebody walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It's your job to decide how much weight to give

the direct and circumstantial evidence.  The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other.  You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

You should use your common sense in weighing the evidence.  Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, then you're free to reach that conclusion.

A further word about statements of counsel and arguments of counsel.  The attorneys' statements and arguments are not evidence.  Instead, their statements and arguments are intended to help you review the evidence presented.

If you remember evidence differently from the way it was described by the attorneys, you should rely on your own recollection.

You are the sole judges of each witness's credibility.  You may believe everything a witness says or part of it or none of it.  You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the

testimony is; whether it's consistent or inconsistent; whether it's been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

In determining the weight to give the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact or whether there was evidence that at some other time the witness said or did something or failed to say or do something that was different from the testimony he gave at trial.  You have the right to distrust such a witness's testimony in other particulars, and you may reject all of some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember some things inaccurately.  If a witness has made a misstatement, you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend on whether with it concerns an important fact or an unimportant detail.

One more point about the witnesses.  Sometimes

jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified.  What's more important is how believable the witnesses are and how much weight you think their testimony deserves.  Concentrate on that, not the numbers.

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business.  This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.  You're free to accept or reject the testimony of experts, just as with any other witness.

Deposition testimony is out-of-court testimony that's given under oath and is entitled to the same consideration you would give it had the witness personally appeared in court.

During the trial, certain testimony was presented to you by the reading of a deposition transcript or the playing of video excerpts from a deposition.  If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony.  You should not attribute any significance to the fact that the deposition videos may appear to have been edited.

You may have heard answers that the parties gave in response to written questions submitted by the other side.  These written questions are called "interrogatories."  The written answers were given in writing and under oath before the trial.

You must consider the parties' answers to interrogatories in the same manner as if the answers were made from the witness stand.

The parties have stipulated that certain facts are not disputed or have agreed to or stipulated that they are true, and some of those stipulations have been read to you during this trial, sometimes referred to as "uncontested facts" or "requests for admission."  You should treat these facts as having been proved for the purposes of this case.

During the course of the trial, you've seen many exhibits.  Many of these exhibits were admitted as evidence.  You will have these admitted exhibits in the jury room to consider as evidence for your deliberations.

The remainder of the exhibits, including charts, PowerPoint presentations and animations, were offered to help illustrate the testimony of the various witnesses. These illustrative exhibits, called "demonstrative exhibits," will not be in the jury room, and they have not been admitted. They are not, and they should not be considered as, evidence. Rather, it's the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

In some instances, certain charts and summaries may have been received into evidence to illustrate information brought out in the trial. You may use these charts and summaries as evidence, even though the underlying documents and records may not be there. You should give them only such weight as you think they deserve.

Now, in any legal action, facts must be proven by a required standard of evidence, which is known as the "burden of proof." In a case such as this, the burden of proof is called "preponderance of the evidence."

ME2C is accusing each Defendant of patent infringement. ME2C has the burden of proving for each Defendant its claims and the amount of its money damages, if any, by a preponderance of the evidence. That means that ME2C has to produce evidence which, when considered in light of all the facts, leads you to believe that what ME2C claims

is more likely true than not.  To put it differently, if you were to put the evidence of ME2C and a defendant concerning infringement on opposite sides of a scale, the evidence supporting ME2C's claims would have to make the scales tip somewhat on its side in each instance.  If the scale should remain equal or tip in favor of that defendant, you must find for that defendant.

If you find that a defendant infringed one or more of ME2C's patents then as a separate question, ME2C has also asserted that had the infringement of the patents was willful.  ME2C has the burden of proving for each Defendant this additional contention by a preponderance of the evidence.

Some of you may have heard the phrase "proof beyond a reasonable doubt."  That burden of proof applies only in criminal cases, and it has nothing to do with a civil case like this one.  You should, therefore, not consider it in this case.

You may use notes taken during trial to assist your memory.  However, as I instructed you at the beginning of this case, you should use caution in consulting your notes.  There's generally a tendency, I think, to attach undue importance to a matter which one has written down.  Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater

importance later in the trial in light of all the evidence presented.  Therefore, your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of trial.

Above all, your memory should be your greatest asset when it comes time to deliberate and to render a decision in this case.

I'll now review for you the parties in this action and the positions of the parties that you'll have to consider in reaching your verdict.

The plaintiffs in case are Midwest Energy Emissions, Corp., and MES Inc., which I may refer to as "ME2C" or "Plaintiff."

The defendants in this case are CERT Operations RCB, LLC; CERT Operations II, LLC; CERT Operations IV, LLC; CERT Operations V, LLC; Senescence Energy Products, LLC; Bascobert (A) Holdings, LLC; Buffington Partners, LLC; Larkwood Energy, LLC; Rutledge Products; Cottbus Associates, LLC; Springhill Resources, LLC; and Marquis Industrial Company, LLC.  I may refer to this group of entities as "the defendants."

There are two patents at issue in this case: United States Patent Numbers 10,343,114 and 10,596,517.  You heard the lawyers and witnesses in this case refer to ME2C's patents as the '114 and '517 patents and/or the "ME2C patents."  Copies of ME2C's patents have been given to you.

ME2C contends that each Defendant induced and contributed to the infringement of the ME2C patents, that that infringement was willful, and that ME2C is entitled to damages.

Each Defendant denies that it infringed the ME2C patents, or that it did so willfully.  Each Defendant also denies that ME2C is entitled to recover any damages relating to the patents.

I'll now summarize the patent issues that you must decide and for which I'll provide instructions to guide your deliberations.  The specific questions you must answer are listed on the verdict sheet that you will be given. Here are the issues you must decide:

First, whether ME2C has proven by a preponderance of the evidence that each defendant induced infringement by a power plant of one or more of the asserted claims of the '114 and '517 patents.

Second, whether ME2C has proven by a preponderance of the evidence that each of the CERT RC defendants contributed to the infringement by a power plant

of one or more of the asserted claims of the '114 and '517 patents.

Third, that if you decide that ME2C has proven that a defendant infringed one or more of the asserted claims of the patents, whether ME2C has proven by a preponderance of the evidence that defendant willfully infringed that claim.

And last, if you decide that ME2C has proven that a defendant infringed a claim, what monetary damages ME2C has proven by a preponderance of the evidence that it is entitled to.

I'll provide more detailed instructions on each of the issues you must decide elsewhere in these jury instructions.

At the beginning of trial, I gave you some general information about patents and the patent system and a brief overview of the patent laws relevant to this case. I'll now give you a more detailed instruction about the patent laws that specifically relate to this case.

Before you can decide many of the issues in the case, you'll need to understand the role of patent claims.

The patent claims are the numbered paragraphs at the end of each patent. The claims are important because it's the words of the claims that define what a patent covers. Only the claims of a patent can be infringed.

The claims are intended to define, in words, the bounds of an invention.  The figures and the text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage.  Each of the asserted claims must be considered individually.

In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations."  For example, a claim that covered a process for making a round cake may recite the steps of:  First making cake batter; second, pouring the batter into a round cake pan; and third, baking it in an oven.

Each of the three steps is a separate limitation of the claim.  When a process meets each and every limitation of a claim, that claim is said to cover that process, and that process is said to fall within the scope of the claim.

Each claim may cover more or less than another claim.  Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You'll first need to understand what each claim covers in order to decide whether there's infringement of the claim.

It's the Court's duty under the law to define

what the patent claims mean.  As I instructed you at the beginning of the case, I've made my determinations, and I'll now instruct you on the meaning or construction of the claim terms.

You must apply the meaning that I give in each patent claim to decide if the claim is infringed.  You must accept my definitions of these words in the claims as being correct.  You must ignore any different definitions used by the witnesses or the attorneys.

You're advised that the following definition for the following term must be applied:

For Claim 25 in the '114, the claim term "injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of the combustion chamber."

The construction for that claim term is "injecting a sorbent material comprising activated carbon into the mercury-containing gas downstream of, and from outside, the combustion chamber."

For any words in the claim for which I have not provided you a definition, you should apply the plain and ordinary meaning to a person of ordinary skill in the art.

Now, this case involves two types of patent claims:  Independent claims and dependent claims.

An independent claim does not refer to any other

claim in the patent and sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it's not necessary to look at any other claim to determine what an independent claim covers.

In this case, Claim 25 of the '114 patent and Claim 1 of the '517 patent are each independent claims. An independent claim must be read separately from the other claims to determine the scope of the claim.

Now, the remaining two asserted claims are dependent claims. A dependent claim does not itself recite all of the requirements of the claim but refers to another claim or claims for some of its requirements. In this way, the claim depends on another claim or claims.

A dependent claim incorporates all of the requirements of the claims to which it refers, and then the dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it's necessary to look at both the dependent claim and any other independent claims to which it refers.

The beginning portion, or preamble, of the asserted claims has the word "comprising." The word "comprising" means "including the following but not excluding others." A claim that uses the word "comprising" or "including" is not limited to methods having only the elements that are recited in the claim, but also covers

methods that have additional elements.

If you find, for example, that the accused conduct includes all of the elements of a particular claim, then the fact that the accused conduct might include additional steps would not avoid infringement of the claim.

I'll now instruct you how to decide whether ME2C has proven by preponderance of the evidence, that is, that it is more likely than not, that Defendants infringed the asserted claims of the patents-in-suit.

As I stated earlier, ME2C has alleged infringement of the '114 and '517 patents in this case.

A claim of a patent may be infringed directly or indirectly.  As explained further in the following instructions, direct infringement results if the accused process is covered by at least one claim of the patent. Indirect infringement results if a defendant induces another to infringe a claim of a patent or contributes to the infringement of a claim of a patent by another.

ME2C does not allege that Defendants directly infringed any asserted claim.  Instead, ME2C alleges that each Defendant induced one or more power plants to infringe one or more of the asserted claims, and that the CERT RC defendants contributed to infringement of those claims by power plants.

A finding of induced infringement or

contributory infringement requires a showing that someone has directly infringed.  ME2C alleges power plants that are Defendants' customers have directly infringed one or more asserted claims.

Now, to find that a power plant has directly infringed an asserted claim, you must compare the accused conduct of that power plant with the asserted claim using my construction of the claims -- instruction concerning the meaning of the terms that patent claims use.

A patent claim is directly infringed only if the power plant's conduct includes each and every step recited in the patent claim.  If a power plant does not perform one or more steps recited in the claim, then the power plant does not directly infringe that claim.

You must determine direct infringement with respect to each patent claim individually.  The accused conduct should be compared to the invention described in each claim it is alleged to infringe.

A power plant can directly infringe a patent without knowing of the patent or without knowing that what the power plant is doing is patent infringement.  Thus, while ME2C must prove that a defendant knew of or was willfully blind to a patent to prove induced or contributory infringement, ME2C is not required to prove that any power plant was aware of any of the asserted ME2C patents or that

the power plant knew that its conduct directly infringed.

ME2C alleges that defendants are liable for infringement by actively inducing power plants to engage in acts that directly infringe one or more claims of the asserted ME2C patents.  You must determine whether there has been active inducement on a defendant-by-defendant and claim-by-claim basis.

This may be shown by direct or circumstantial evidence.  A given defendant is liable for active inducement of a claim only if ME2C proves by a preponderance of the evidence each of the following:

First, that the defendant took some affirmative action intending to cause a power plant to directly infringe one or more asserted claims of the asserted ME2C patents;

Second, that the defendant knew of the asserted ME2C patent or showed willful blindness to the existence of the asserted ME2C patent at that time;

Third, that the defendant knew, or showed willful blindness, that the actions of the power plant would infringe the asserted claim;

And four, that the defendants' actions actually caused the power plant to perform each and every step of the asserted claim.

To find willful blindness of infringement, the defendant must have believed that there was a high

probability that the actions of its power plant customer infringed an asserted ME2C patent and taken deliberate steps to avoid learning of that customer's infringement.  A belief that a patent is invalid is not a defense to induced infringement.

The mere fact, if true, that a defendant knew or should have known there was a substantial risk that a power plant would infringe a claim would not be sufficient for active inducement of infringement.

Inducing infringement cannot occur unintentionally.  It's not enough for a defendant to cause a power plant to engage in conduct that happens to amount to direct infringement.

Rather, to have induced infringement, the defendant must have taken an affirmative act that caused a power plant to engage in conduct that the defendant knew -- or believed with a high probability but deliberately avoided confirming -- was direct infringement.

To find that a power plant has directly infringed, you must compare the accused conduct with each patent claim ME2C asserts is infringed using my instruction as to the meaning of the terms the patent claims use.

In order to establish inducement of infringement, it is not sufficient that the defendants' power plant customer directly infringed the claim, nor is it

sufficient that the defendant was aware of the actions of the power plant that allegedly constitute the direct infringement.

Rather, you must find that the defendant specifically intended that the power plant would infringe the patent claim at issue, or that the defendant believed there was a high probability that the power plant would infringe ME2C's patents but remained willfully blind to the infringing nature of the power plant's acts in order to find inducement of infringement.

ME2C also asserts that each CERT RC defendant has contributed to infringement by the power plants. As with induced infringement, you must determine whether there has been contributory infringement by each of the CERT RC defendants on a defendant-by-defendant and claim-by-claim basis.

The CERT RC defendants are Senescence Energy Products, LLC; Bascobert (A) Holdings, LLC; Buffington Partners, LLC; Larkwood Energy, LLC; Rutledge Products, LLC; Cottbus Associates, LLC; Springhill Resources, LLC; and Marquis Industrial Company, LLC.

There is not a contributory infringement claim against the CERT Operations defendants.

A given CERT RC defendant is liable for contributory infringement of a given claim only if ME2C

proves by a preponderance of the evidence each of the following:

First, that a power plant has directly infringed one or more claims of an asserted ME2C patent;

Second, that the defendants sold that power plant refined coal made with calcium bromide;

Third, that the defendant knew that the refined coal supplied to that power plant, as sold and delivered during the damages period, is not a staple article or commodity of commerce capable of substantial non-infringing use;

Fourth, that the refined coal constituted a material part of the claimed invention;

And fifth, that the defendant knew that the refined coal was especially made or adapted for use in an infringing method.

A "staple article or commodity of commerce capable of substantial non-infringing use" is something that has uses other than as a part of component of the asserted claim and those other uses are not occasional, farfetched, or impractical or experimental or hypothetical.

The defendants' knowledge that the component was especially made or adapted for use in an infringing method may be shown with evidence of willful blindness, as I previously explained when discussing induced infringement.

To find willful blindness, the defendant must have believed there was a high probability that the patent existed covering the accused method and must have taken deliberate actions to avoid learning of the patent.

Contributory infringement requires only proof of a defendant's knowledge, not intent, that the activity causes infringement.

Proof that the defendant knew that its activity might contributorily infringe is not sufficient to show contributory infringement.  Similarly, if a defendant reasonably believed it did not infringe, even if that belief was not correct, then a defendant does not have knowledge of infringement.

Instead, contributory infringement requires proof that the defendant actually knew the acts were infringing.  However, a belief that a patent is invalid is not a defense to contributory infringement.

Let me say a few final words about the refined coal that may be considered when you assess these contributory infringement issues.

When you're assessing the five elements of contributory infringement that I have just described -- including the questions of whether a defendant sold a power plant refined coal made with calcium bromide or whether that refined coal was a staple article or commodity of commerce

capable of substantial non-infringing use or whether that refined coal constituted a material part of the claimed invention or whether that refined coal was especially made or adapted for use in an infringing method -- the only refined coal you may consider is the refined coal that each defendant supplied during the damages periods to a power plant that is alleged to have directly infringed the patents-in-suit in this case.

In other words, in assessing those questions, you may not consider refined coal that the defendants may have sold prior to the issuance of the patents-in-suit, prior to this litigation, or outside the scope of the -- of the damages period, nor may you consider refined coal sold by entities that are not defendants in this case.

However, one of the defendants' arguments as to why they are not liable for contributory infringement is that, during the relevant damages period, they did not have the requisite knowledge that they were committing contributory infringement.  In this regard, Defendants are arguing that they had a reasonable though mistaken belief about what the law on contributory infringement requires. That is, that they had a reasonable though mistaken belief that the refined coal at issue in the contributory infringement analysis could include refined coal that Defendants may have sold prior to the issuance of the

patents-in-suit, prior to this litigation, or outside the scope of the damages period, or refined coal sold by entities that are not defendants in this case -- and that this belief caused them not to have knowledge of any possible infringement.

You may consider these additional types of refined coal solely for purposes of assessing this question regarding defendants' knowledge of infringement.

If you have decided that a defendant has induced and/or contributed to infringement, then you must go on to address the additional issue of whether or not this defendant's infringement was willful.  To prove willful infringement, ME2C must prove by a preponderance of the evidence that the defendants deliberately or intentionally infringed an asserted patent.  To determine whether the defendant acted willfully, consider all the facts.

If you determine that any infringement was willful, you may not allow that decision to affect the amount of any damages award you give for the infringement.

If you find that an accused product infringes any of the asserted claims, you must determine the amount of damages to be awarded to ME2C for the infringement.  On the other hand, if you find that all of the asserted patent claims are not infringed, then you should not consider damages in your deliberations.

ME2C must prove each element of its damages -- including the amount of damages -- by a preponderance of the evidence, which, again, means more likely than not.  If you find that a defendant has infringed any of the asserted claims in the patents-in-suit, patent law provides that the amount of damages that the defendant should pay ME2C for infringing ME2C's patent must be enough to compensate for the infringement, and it may not be less than a reasonable royalty for the use of the patented invention.

The purpose of a damages award is to put ME2C in about the same financial position it would have been in if the infringement had not happened.  You may not add anything to the amount of damages to punish defendants or to set an example.  You also may not add anything to the amount of damages for interest.  ME2C must prove the amount of damages with reasonable certainty.  While ME2C need not prove the amount of damages with mathematical precision, you may not award damages that are speculative, damages that are only possible, or damages based on guesswork.

The fact that I'm instructing you on damages does not mean the Court believes that one party or the other should win in this case.  My instructions about damages are for your guidance only in the event you find in favor of ME2C.

I'll now give you more detailed instruction

regarding damages.

For each defendant that you find liable for infringement, damages commence on the date that defendant first induced or contributed to infringement of a patent-in-suit.

A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between ME2C and a defendant that took place at a time prior to when Defendants' infringement first began.

Of course, we know that the parties in this case did not agree to a license and royalty payment. But in order to decide on the amount of reasonable royalty damages, you should assume that each infringing defendant did negotiate a license just before the infringement began. This is why it's called a "hypothetical" license negotiation.

You should assume that both parties to the hypothetical negotiation understood that the patents were valid and infringed and that both sides were willing to enter a license. You should also presume that the parties had full knowledge of the facts and circumstances surrounding the infringement at the time of the hypothetical negotiation.

But evidence of things that happened after the infringement first began can be considered only to the

extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

Although evidence of the actual profits each defendant made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits each defendant made.  You role is to determine what the license would have looked like had the parties agreed to a license prior to infringement.

In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors that the experts may have referenced as *Georgia-Pacific* factors, in addition to any other evidence presented by the parties on the economic value of the patents:

First, any royalties received by the licensor for the licensing of patent-in-suit proving or tending to prove an established royalty;

Second, the rates paid by each defendant to license other patents comparable to the asserted patents;

Third, the nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of its territory or with respect to whom the manufactured product may be sold;

Fourth, the licensor's established policy and

marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention or by granting licenses under special conditions designed to preserve the exclusivity;

Fifth, the commercial relationship between the licensor and the licensee, such as whether they're competitors in the same territory, in the same line of business;

Sixth, the effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its nonpatented items and the extent of such collateral sales;

7, the duration of the asserted patents and the term of the license;

8, the established profitability of the product made under the asserted patents, its commercial success, and its current popularity;

9, the utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results;

10, the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

11, the extent to which a defendant has made use of the invention and any evidence that shows the value of that use;

12, the portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions;

13, the portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer;

14, the opinion testimony of qualified experts;

15, the amount that a licensor and a licensee such as a defendant would have agreed upon at the time the infringement began if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license;

And 16, any other economic factor that a

normally prudent businessperson would, under similar circumstances, take into consideration in negotiating the hypothetical license.

The amount you find as damages must be based on the value attributable to the patent's technology as distinct from other unpatented features of the accused product or other factors, either marketing or advertising, or Defendant's size or marketing position.

In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base must reflect the valuable attributable to the patented technology.  In other words, the royalty base must be closely tied to the invention.  It's not sufficient to use a royalty base that's too high and then adjust the damages downward by applying a lower royalty rate.

Similarly, it's not appropriate to select a royalty rate that's too low and then adjust it upward by applying a higher royalty rate.  Rather, you must determine an appropriate royalty rate and an appropriate royalty base that reflects the value attributable to the patented invention alone.

Damages are not based on a hindsight evaluation of what happened but on what the parties to the hypothetical license negotiations would have agreed upon.  Nevertheless,

evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiations.  You may also consider information that the parties would have foreseen or estimated during the hypothetical negotiation which may, under certain circumstances, include evidence of usage after infringement started; license agreements entered into by the parties shortly after the date of the hypothetical negotiation; profits earned by the the infringer; and non-infringing alternatives.

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patents in play or for rights to similar technologies.  A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between ME2C and Defendants here in order for you to consider it.

However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between ME2C and the defendants here in terms of the technologies, the parties to the license, and economic circumstances of the contracting parties when you make your reasonable royalty determination.

In determining a reasonable royalty, you may

also consider evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention.  An acceptable non-infringing substitute must be a product that does not infringe the patent.  It must also have been, at the time of the hypothetical negotiation, both available and acceptable.

To be an available substitute, it must have been available during the damages period.  A substitute is available if, during the damages period, the defendant had all the necessary equipment, materials know-how, legal right, and experience to design and manufacture the non-infringing substitute.  The substitute need not actually have been sold at the time.

To be an acceptable substitute, the product or process must have had one or more of the advantages of the patent invention that were important to the actual buyers of the infringing products, not the public in general.  The acceptable substitute to their use must also -- also must not infringe the patent.  An acceptable non-infringing substitute may be one that modify the product or method to avoid infringement.

In order to recover damages for induced infringement, ME2C must either prove that the defendants' products necessarily infringed the patents-in-suit or prove acts of direct infringement by others that were induced by

the defendants.  Because the amount of damages for induced infringement is limited by the number of instances of direct infringement, ME2C must further prove the number of direct acts of infringement of the patents-in-suit, for example, by showing individual acts of direct infringement or by showing that a particular class of uses directly infringes.

In order to recover damages for contributory infringement, ME2C must either prove that the defendants' products necessarily infringe the patents-in-suit or prove acts of direct infringement by others to which Defendants made a substantial contribution.  Because the amount of damages for contributory infringement is limited by the number of instances of direct infringement, ME2C must further prove the number of direct acts of infringement of the patents-in-suit, for example, either by showing individual acts of direct infringement or by showing that a particular class of uses directly infringes.

I've now concluded the part of my instructions explaining the rulings for considering some of the testimony and evidence.  Now let me finish up by explaining some things about your deliberations in the jury room and your possible verdicts.

Once you start deliberating, do not talk to the jury officer or to me or to anyone else, except each other, about the case.  If you have any questions or messages, you

must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will then give them to me, and I'll respond to you as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.

Any questions or messages normally should be sent to me through your foreperson who, by custom of this court, is Juror Number 1.  So Juror Number 1 will be our foreperson.

One more thing about messages:  Do not ever write down or tell anyone how you stand on your votes.  For example, don't write down or tell anyone that you're split four to four or six to two or, in this case, because there are seven of you, four to three or six to one, or whatever your vote happens to be.  That should stay secret until the verdict.

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it's necessary that each juror agree to the verdict, so your verdict must be unanimous.  It's your duty as jurors to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment.

Each of you must decide the case for yourself, but do so only after an impartial consideration of the

evidence with your fellow jurors.  In the course of your deliberations, don't hesitate to re-examine your own views and change your opinion if you're convinced it's erroneous. But don't surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the purpose of returning a verdict. Remember at all times that you are not partisans.  You're judges, judges of facts.  Your sole interest is to seek the truth from the evidence in this case.

A form of verdict has been prepared for you. I'll review it with you in a moment.  You'll take this form to the jury room.  And when you've reached a unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form.  You'll then return to the courtroom and my deputy will read aloud your verdict.  Place the completed verdict sheet in the envelope we will give you.  Do not show the completed verdict form to anyone or share it with anyone until you are in the courtroom.

It's proper to add the caution that nothing said in these instructions and nothing in the verdict form is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find.  What the verdict shall be is your sole and exclusive duty and responsibility.

Now that all the evidence is in and all the

arguments are complete, you're free to talk about the case in the jury room.  In fact, it's your duty to talk with each other about the evidence and to make every reasonable effort you can to reach a unanimous agreement.  Talk with each other.  Listen carefully and respectfully to each others' views, and keep an open mind as you listen to what your fellow jurors have to say.

Try your best to work out your differences.  Do not hesitate to change your mind if you're convinced that other jurors are right and that your original position is wrong, but don't ever change your mind just because other jurors see things differently or just to get the case over with.

In the end, your vote must be exactly that: your own vote.  It's important for you to reach unanimous agreement but only if you can do so honestly and in good conscience.  No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say, so you should all feel free to speak your minds.  Listen carefully to what the other jurors have to say and then decide for yourself.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as a telephone, cell phone,

smartphone, iPhone, tablet, or computer, the internet, any internet service, any text or instant messaging service, any Internet chat room, blog, or website such as Facebook, TikTok, LinkedIn, YouTube, Instagram, Snapchat, or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you can't talk to anybody on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

Let me finish by repeating something I said earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.

Okay. It's a lot of talking, ladies and gentlemen. So I mentioned the verdict form. You're going to have a copy of the verdict form which will look like this. There will be copies in the jury room for you, including the final version of the verdict form that the foreperson must fill out and sign and bring back. You'll also have copies of the exhibits back there as well, as well as some other materials.

All right. With all that said, let's allow our

jury to begin deliberations.

Before we do, though, I'm reminded that I needed to do one more thing, which is I need to direct our CSO, who is our court security officer, forward to be sworn in. I can't forget that.

(The security officer was sworn.)

(The jury exited the courtroom.)

THE COURT: All right. Ladies and gentlemen, we will get your information and e-mails so my staff will be able to get ahold of you. We'll have lunch and be in touch. The Court will stand in recess. Thank you.

(A recess was taken, after which the following proceedings were had:)

THE COURT: All right. As I think you know, we got a note that the jury has a verdict. Is there anything to take care of before I bring the jury in?

Seeing nothing, all right, then I'll ask my law clerk to let the courtroom deputy know they can bring the jurors in.

(The jury entered the courtroom.)

THE COURT: All right. Ladies and gentlemen of the jury, thank you.

And, Mr. Foreperson, I understand the jury has reached a unanimous verdict; is that correct?

THE FOREPERSON: Yes, we have.

THE COURT:  All right.  I'm going to ask my courtroom deputy to go down and obtain the verdict from you. She'll bring it back to me to inspect.

All right.  You may hand the verdict form to my courtroom deputy, and I'll ask my courtroom deputy to publish the verdict, that is, to read it aloud here in open court.

THE CLERK:  Question 1(a):  Have Plaintiffs proven by a preponderance of the evidence that any Defendant listed below is liable for inducing infringement of any asserted claims of the '114 by a power plant?

Defendant CERT Operations RCB, LLC; Claim 23: Yes.  Claim 26:  Yes.

Defendant Senescence Energy Products, LLC; Claim 25:  Yes.  Claim 26:  Yes.

Defendant Bascobert Holdings, LLC -- sorry, Bascobert (A) Holdings, LLC; Claim 25:  Yes.  Claim 26: Yes.

Defendant Larkwood Energy, LLC; Claim 25:  Yes. Claim 26:  Yes.

Rutledge Products, LLC; Claim 25:  Yes. Claim 26:  Yes.

Cottbus Associates, LLC; Claim 25:  Yes. Claim 26:  Yes.

CERT Operations II, LLC; Claim 25:  Yes.

Claim 26:  Yes.

Marquis Industrial Company, LLC; Claim 25:  Yes.
Claim 26:  Yes.

CERT Operations IV, LLC; Claim 25:  Yes.
Claim 26:  Yes.

Springhill Resources, LLC; Claim 25:  Yes.
Claim 26:  Yes.

CERT Operations V, LLC; Claim 25:  Yes.
Claim 26:  Yes.

Buffington Partners, LLC; Claim 25:  Yes.
Claim 26:  Yes.

Question 1(b):  Have Plaintiffs proven by a preponderance of the evidence that any Defendant listed below is liable for inducing infringement of any asserted claims of the '517 patent by a power plant?

Defendants CERT Operations RCB, LLC; Claim 1: Yes.  Claim 2:  Yes.

Senescence Energy Productions, LLC; Claim 1: Yes.  Claim 2:  Yes.

Bascobert (A) Holdings, LLC; Claim 1:  Yes. Claim 2:  Yes.

Larkwood Energy, LLC; Claim 1:  Yes.  Claim 2: Yes.

Rutledge Products, LLC; Claim 1:  Yes.  Claim 2: Yes.

Cottbus Associates, LLC; Claim 1:  Yes.

Claim 2:  Yes.

CERT Operations II, LLC; Claim 1:  Yes.

Claim 2:  Yes.

Marquis Industrial Company, LLC; Claim 1:  Yes.

Claim 2:  Yes.

CERT Operations IV, LLC; Claim 1:  Yes.

Claim 2:  Yes.

Springhill Resources, LLC; Claim 1:  Yes.

Claim 2:  Yes.

CERT Operations V, LLC; Claim 1:  Yes.  Claim 2:

Yes;.

Buffington Partners, LLC; Claim 1:  Yes.

Claim 2:  Yes.

Question 2(a):  Have Plaintiffs proven by a preponderance of the evidence that any Defendant listed below is liable for contributory infringement of any asserted claim of the '114 patent by a power plant?

Defendant Senescence Energy Products, LLC;

Claim 25:  Yes.  Claim 26:  Yes.

Bascobert (A) Holdings, LLC; Claim 25:  Yes.

Claim 26:  Yes.

Larkwood Energy, LLC; Claim 25:  Yes.  Claim 26:

Yes.

Rutledge Products, LLC; Claim 25:  Yes.

Claim 26:  Yes.

Cottbus Associates, LLC; Claim 25:  Yes. Claim 26:  Yes.

Marquis Industrial Company, LLC; Claim 25:  Yes. Claim 26:  Yes.

Springhill Resources, LLC; Claim 25:  Yes. Claim 26:  Yes.

Buffington Partners, LLC; Claim 25:  Yes. Claim 26:  Yes.

Question 2(b):  Have Plaintiffs proven by a preponderance of the evidence that any Defendant listed below is liable for contributory infringement of any asserted claims of the '517 patent by a power plant?

Defendant Senescence Energy Products, LLC; Claim 25:  Yes.  Claim 26: Yes.

Bascobert (A) Holdings, LLC; Claim 25:  Yes. Claim 26:  Yes.

Larkwood Energy, LLC; Claim 25:  Yes.  Claim 26: Yes.

Rutledge Products, LLC; Claim 25:  Yes. Claim 26:  Yes.

Cottbus Associates, LLC; Claim 25:  Yes. Claim 26:  Yes.

Marquis Industrial Company, LLC; Claim 25:  Yes. Claim 26:  Yes.

Springhill Resources, LLC; Claim 25:  Yes.

Claim 26:  Yes.

Buffington Partners, LLC; Claim 25:  Yes.

Claim 26:  Yes.

Question 3:  For each Defendant, you have found to infringe at least one claim, have Plaintiffs proven by a preponderance of the evidence that such Defendants' infringement was willful?

Defendant CERT Operations RCB, LLC:  Yes.

Senescence Energy Products, LLC:  Yes.

Bascobert (A) Holdings, LLC:  Yes.

Larkwood Energy, LLC:  Yes.

Rutledge Products, LLC:  Yes.

Cottbus Associates, LLC:  Yes.

CERT Operations II, LLC:  Yes.

Marquis Industrial Company, LLC:  Yes.

CERT Operations IV, LLC:  Yes.

And Springhill Resources, LLC:  Yes.

I'm sorry.  CERT Operations V, LLC:  Yes.

Buffington Partners, LLC:  Yes.

Question 4:  For each Defendant you have found to infringe at least one claim, what is the amount of money that Plaintiffs have proven by preponderance of the evidence that would compensate for such Defendants' infringement?

Defendant CERT Operations, LLC:  $35,341,918.

Senescence Energy Products, LLC:  Amount, 2,129,349.

Bascobert (A) Holdings, LLC:  Amount, 1,296,829.

Larkwood Energy, LLC:  Amount, 20 -- I'm sorry 20,017,888.

Rutledge Products, LLC:  615,338.

Cottbus Associates, LLC:  11,282,514.

CERT Operations II, LLC:  11,119,113.

Marquis Industrial Company, LLC:  11,119,113.

CERT Operations IV, LLC:  $447,025.

Springhill Resources, LLC:  447,025.

CERT Operations V, LLC:  10,173,949.

Buffington Partners, LLC:  10,173,949.

Signed by the foreperson on March 1, 2024.

THE COURT:  Thank you very much.

Do Plaintiffs wish for the jury to be polled?

MR. CALDWELL:  No, Your Honor.

THE COURT:  Do Defendants wish for the jury to be polled?

MR. SYKES:  No, Your Honor.

THE COURT:  All right, then, ladies and gentlemen of the jury, I want to thank you very, very much for your time and your efforts in this case.  If you're willing, when you go back to the jury room to collect your things, I'd ask if you wait a few minutes because I'd love

to come back and talk to you and say a few words.  You're not obligated to wait.  It's only a few minutes with the lawyers here, and I'll come back and get you on the way today.

I guess the bottom line is we couldn't have the federal system here in our court without the service of jurors like you.  It's essential.  You worked long and hard this week, and on behalf of everybody, we sincerely appreciate your efforts.  We'll lead you book to the jury room and get your things, and I'll speak to you in a minute.  I'll ask the courtroom deputy to lead you out.

(The jury exited the courtroom.)

THE COURT:  All right.  You may be seated.  Let me just say a few brief words.

First, I want to thank you, counsel, for a well-tried case, and I want do reiterate what I said last night at the prayer conference.  I appreciate how counsel on both sides treated each other in the courtroom when the jury was here and otherwise with respect, and it made for a much easier trial week as a result of that, so I thank you very much in all those regards.

I'd ask that the parties submit -- I believe it would be a joint submission but could be separate if it needs to be -- they submit a proposed form of judgment by no later than close of business on Tuesday next week.

And with regard to post-trial motions, I would ask the parties to follow Rule 50 and local rules with regard to briefing and filing.

With all that said, is there anything else we need to take up at this time before we conclude on Plaintiffs' side, Mr. Caldwell?

MR. CALDWELL:  Not for Plaintiff.  Thank you.

THE COURT:  And on Defendants' side, Mr. Sykes?

MR. SYKES:  Not at this time, Your Honor.

THE COURT:  Thank you.  I wish everyone safe travels for our out-of-town folks and I wish everyone a very good weekend, and thank you again for all your work.  The Court will stand in recess.

(The proceedings were adjourned at 3:04 p.m.)

## C E R T I F I C A T E

I, Deanna L. Warner, a Certified Shorthand Reporter, do hereby certify that as such Certified Shorthand Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings.

_____
Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. Federal Court

## $

**$0.50** [1] - 1204:21
**$0.65** [1] - 1218:15
**$100,000** [2] - 1259:8, 1262:16
**$27** [1] - 1216:1
**$35,341,918** [1] - 1317:25
**$350** [1] - 1200:10
**$447,025** [1] - 1318:10
**$60** [1] - 1200:5
**$600,000** [2] - 1260:4, 1260:11

## '

**'114** [10] - 1206:18, 1213:17, 1285:4, 1285:22, 1286:1, 1288:12, 1289:5, 1290:11, 1313:11, 1315:18
**'147** [1] - 1249:1
**'17** [1] - 1236:9
**'19** [1] - 1245:18
**'517** [11] - 1207:3, 1213:18, 1241:15, 1285:4, 1285:22, 1286:1, 1289:6, 1290:11, 1314:15, 1316:13
**'But** [1] - 1214:9

## 0

**0.002** [1] - 1235:10
**0.20** [1] - 1235:11

## 1

**1** [24] - 1187:10, 1255:1, 1256:2, 1272:10, 1272:13, 1289:6, 1308:8, 1314:16, 1314:18, 1314:20, 1314:22, 1314:24, 1315:1, 1315:3, 1315:5, 1315:7, 1315:9, 1315:11, 1315:13, 1318:14
**1(a** [6] - 1206:15, 1206:21, 1206:25, 1233:9, 1243:4, 1313:8
**1(b** [1] - 1314:12

**1,200** [1] - 1251:3
**1,250** [1] - 1248:2
**1,296,829** [1] - 1318:3
**1.4** [4] - 1259:2, 1259:5, 1259:10, 1262:23
**1/365th** [1] - 1224:20
**10** [3] - 1259:17, 1262:13, 1302:22
**10,173,949** [2] - 1318:12, 1318:13
**10,343,114** [1] - 1285:2
**10,596,517** [1] - 1285:2
**10-K** [5] - 1250:19, 1254:25, 1256:24, 1258:3, 1265:1
**10-Ks** [10] - 1242:2, 1247:11, 1250:10, 1250:16, 1254:21, 1255:24, 1257:24, 1260:15, 1262:2, 1262:10
**100,000** [3] - 1216:16, 1259:8, 1259:10
**101,000** [1] - 1217:15
**107,000** [1] - 1259:7
**11** [4] - 1239:21, 1249:14, 1251:14, 1303:1
**11,119,113** [2] - 1318:8, 1318:9
**11,282,514** [1] - 1318:7
**112** [1] - 1249:19
**11:25** [1] - 1274:8
**11:55** [1] - 1261:16
**11:58** [1] - 1261:17
**11:59** [1] - 1261:17
**12** [2] - 1208:3, 1303:4
**12-point** [1] - 1261:1
**13** [4] - 1190:2, 1241:12, 1264:14, 1303:8
**134** [1] - 1259:12
**14** [1] - 1303:13
**15** [4] - 1193:6, 1215:2, 1215:17, 1303:14
**15-plus** [1] - 1244:17
**1514** [1] - 1234:5
**16** [1] - 1303:25
**17** [1] - 1252:22
**18** [2] - 1249:20, 1254:16
**19** [4] - 1243:16, 1250:18, 1250:21, 1255:21
**19-CV-1334-CJB** [1] -

1184:6
**19th** [1] - 1244:3
**1st** [1] - 1184:13

## 2

**2** [15] - 1213:12, 1213:17, 1233:9, 1314:17, 1314:19, 1314:21, 1314:22, 1314:24, 1315:2, 1315:4, 1315:6, 1315:8, 1315:10, 1315:11, 1315:14
**2(a** [2] - 1237:13, 1315:15
**2(b** [3] - 1213:18, 1237:13, 1316:10
**2,129,349** [1] - 1318:2
**2.1** [1] - 1252:21
**20** [13] - 1232:25, 1234:25, 1245:2, 1255:21, 1260:5, 1260:6, 1260:8, 1260:9, 1260:13, 1262:13, 1273:13, 1318:4
**20,017,888** [1] - 1318:5
**2002** [2] - 1194:2, 1194:15
**2004** [1] - 1229:25
**2011** [2] - 1269:5, 1269:7
**2012** [8] - 1223:17, 1223:18, 1247:15, 1249:1, 1249:11, 1249:14, 1265:4, 1265:5
**2013** [1] - 1249:20
**2014** [4] - 1236:9, 1249:11, 1249:25, 1265:6
**2015** [1] - 1240:9
**2017** [4] - 1229:25, 1247:17, 1250:23, 1253:25
**2018** [5] - 1250:13, 1250:18, 1250:19, 1250:22, 1255:13
**2019** [4] - 1226:14, 1229:12, 1250:20, 1251:21
**2020** [1] - 1245:17
**2021** [4] - 1229:12, 1244:4, 1245:17, 1254:25
**2022** [4] - 1232:21, 1234:25, 1244:5,

1245:20
**2024** [2] - 1184:13, 1318:14
**21** [1] - 1255:21
**23** [2] - 1255:21, 1313:12
**24** [1] - 1224:20
**24/7** [1] - 1261:16
**25** [29] - 1288:12, 1289:5, 1313:15, 1313:17, 1313:19, 1313:21, 1313:23, 1313:25, 1314:2, 1314:4, 1314:6, 1314:8, 1314:10, 1315:20, 1315:21, 1315:23, 1315:25, 1316:2, 1316:4, 1316:6, 1316:8, 1316:15, 1316:16, 1316:18, 1316:20, 1316:22, 1316:24, 1317:1, 1317:3
**26** [28] - 1313:13, 1313:15, 1313:17, 1313:20, 1313:22, 1313:24, 1314:1, 1314:3, 1314:5, 1314:7, 1314:9, 1314:11, 1315:20, 1315:22, 1315:23, 1316:1, 1316:3, 1316:5, 1316:7, 1316:9, 1316:15, 1316:17, 1316:18, 1316:21, 1316:23, 1316:25, 1317:2, 1317:4
**27-and-a-half-million** [1] - 1215:22
**271(b** [1] - 1272:11
**271(c** [1] - 1272:11
**280** [1] - 1200:9
**2A** [1] - 1184:12

## 3

**3** [2] - 1256:3, 1317:5
**3.3** [1] - 1260:1
**30** [2] - 1260:9, 1262:14
**335** [1] - 1269:24
**340** [1] - 1266:17
**341** [3] - 1271:19
**350** [2] - 1200:9, 1213:9
**375** [1] - 1211:20
**376** [4] - 1247:23, 1248:15, 1250:18,

1250:21
**379** [1] - 1254:25
**3:04** [1] - 1320:14

## 4

**4** [4] - 1187:17, 1249:25, 1259:24, 1317:21
**40** [4] - 1210:11, 1210:19, 1210:21, 1211:5
**400** [2] - 1251:4, 1260:3
**419** [2] - 1259:19, 1259:20
**446** [1] - 1216:25
**447,025** [1] - 1318:11
**45** [4] - 1230:24, 1231:18, 1243:25, 1245:12
**45's** [1] - 1239:8
**450** [1] - 1248:2
**46** [1] - 1269:22

## 5

**5** [5] - 1200:8, 1247:23, 1261:5, 1261:7, 1264:22
**50** [2] - 1200:4, 1320:2
**500** [2] - 1211:17, 1259:25
**56** [2] - 1190:3, 1249:24
**57** [1] - 1200:8
**5th** [1] - 1261:17

## 6

**6** [1] - 1264:14
**6/1000th** [1] - 1260:13
**6/1000ths** [1] - 1260:13
**60** [2] - 1233:3, 1238:1
**600** [2] - 1260:9, 1261:8
**600,000** [1] - 1261:22
**615,338** [1] - 1318:6
**641** [1] - 1259:3
**642** [1] - 1259:3

## 7

**7** [3] - 1200:8, 1255:5, 1302:14
**70-pound** [2] -

1197:11, 1253:10
**700** [1] - 1221:11
**75** [2] - 1200:12, 1211:19
**754** [2] - 1219:19, 1219:22
**77** [1] - 1249:13

## 8

**8** [2] - 1259:17, 1302:16

## 9

**9** [1] - 1302:19
**90** [6] - 1210:16, 1211:3, 1212:2, 1220:10, 1233:3, 1238:1
**92** [1] - 1253:23
**9:00** [1] - 1191:4

## A

**ability** [4] - 1188:8, 1189:13, 1251:18, 1251:19
**able** [7] - 1186:21, 1196:24, 1211:8, 1243:21, 1243:22, 1303:22, 1312:10
**absolutely** [4] - 1193:18, 1205:21, 1236:1, 1267:4
**academic** [1] - 1260:22
**accept** [3] - 1280:20, 1288:7, 1311:6
**acceptable** [7] - 1303:23, 1306:2, 1306:3, 1306:6, 1306:14, 1306:18, 1306:19
**accepted** [1] - 1186:23
**according** [2] - 1261:17, 1279:4
**account** [2] - 1215:6, 1305:19
**accountant** [3] - 1227:18, 1227:19, 1227:20
**accumulates** [1] - 1205:15
**accurate** [1] - 1189:8
**accuse** [2] - 1271:13, 1271:14
**accused** [18] - 1218:7,

1220:15, 1226:6, 1234:24, 1235:15, 1237:9, 1270:10, 1290:2, 1290:4, 1290:14, 1291:6, 1291:16, 1293:20, 1296:3, 1298:20, 1303:12, 1304:6
**accusing** [3] - 1243:13, 1243:14, 1282:20
**achieving** [1] - 1302:21
**acknowledge** [1] - 1253:19
**acknowledged** [1] - 1213:1
**acknowledges** [1] - 1198:19
**acknowledging** [1] - 1195:14
**acquired** [2] - 1204:21, 1280:11
**act** [2] - 1205:8, 1293:15
**acted** [1] - 1298:16
**acting** [1] - 1272:20
**action** [8] - 1202:9, 1256:14, 1257:5, 1257:11, 1267:16, 1282:16, 1284:13, 1292:13
**actions** [10] - 1229:15, 1240:14, 1245:25, 1267:19, 1267:20, 1292:19, 1292:21, 1293:1, 1294:1, 1296:4
**activated** [86] - 1196:7, 1196:14, 1198:21, 1200:18, 1201:2, 1201:6, 1201:12, 1201:19, 1203:19, 1203:22, 1203:23, 1204:13, 1204:16, 1205:25, 1209:1, 1209:18, 1210:20, 1211:14, 1212:3, 1213:5, 1220:6, 1220:8, 1220:9, 1220:11, 1221:17, 1221:20, 1221:23, 1222:2, 1222:10, 1222:16, 1222:18, 1222:21, 1223:20, 1223:21, 1223:24, 1224:9, 1225:16, 1226:10, 1229:9, 1229:16, 1231:13, 1231:14,

1232:11, 1232:12, 1232:20, 1232:23, 1234:9, 1234:12, 1234:17, 1234:20, 1235:7, 1235:9, 1235:19, 1236:11, 1236:13, 1236:16, 1237:4, 1237:10, 1237:12, 1239:4, 1239:10, 1239:12, 1239:15, 1241:14, 1241:18, 1241:21, 1241:24, 1242:4, 1242:6, 1242:7, 1242:8, 1243:21, 1243:23, 1243:25, 1244:8, 1244:13, 1245:8, 1248:8, 1248:11, 1263:11, 1263:16, 1263:22, 1266:10, 1270:4, 1288:13, 1288:17
**active** [3] - 1292:6, 1292:9, 1293:9
**actively** [2] - 1187:9, 1292:3
**activity** [2] - 1296:6, 1296:8
**actor** [1] - 1272:21
**acts** [9] - 1292:4, 1294:9, 1296:15, 1306:25, 1307:4, 1307:5, 1307:10, 1307:14, 1307:16
**actual** [7] - 1241:6, 1246:18, 1257:11, 1268:16, 1301:3, 1301:6, 1306:16
**adapt** [1] - 1235:21
**adapted** [12] - 1209:6, 1235:5, 1235:7, 1235:9, 1235:12, 1237:7, 1263:10, 1263:13, 1264:4, 1295:15, 1295:23, 1297:4
**add** [7] - 1217:13, 1219:9, 1219:11, 1237:21, 1299:12, 1299:14, 1309:19
**added** [2] - 1241:17, 1303:12
**adding** [1] - 1243:25
**addition** [3] - 1186:10, 1199:2, 1301:13
**additional** [7] - 1186:6, 1283:12, 1289:16, 1290:1, 1290:5, 1298:6, 1298:11

**address** [3] - 1216:5, 1230:11, 1298:11
**addresses** [1] - 1188:17
**adds** [2] - 1187:25, 1289:16
**adjourn** [1] - 1191:3
**adjourned** [1] - 1320:14
**adjust** [2] - 1304:15, 1304:18
**admission** [1] - 1281:20
**admits** [1] - 1201:15
**admitted** [11] - 1201:14, 1219:20, 1221:20, 1223:17, 1231:22, 1232:12, 1269:17, 1276:13, 1281:23, 1281:24, 1282:6
**admitting** [1] - 1205:24
**adopt** [1] - 1189:19
**adopted** [1] - 1255:12
**adoption** [1] - 1256:19
**ADRIENNE** [1] - 1184:22
**adults** [1] - 1193:9
**advance** [1] - 1230:20
**advantages** [2] - 1302:19, 1306:15
**adverse** [1] - 1209:12
**advertising** [1] - 1304:7
**advice** [3] - 1226:19, 1226:24, 1226:25
**advised** [1] - 1288:10
**AEP** [4] - 1253:14, 1254:17, 1255:22, 1260:3
**affect** [2] - 1279:5, 1298:18
**afford** [1] - 1265:8
**afraid** [1] - 1192:25
**ago** [5] - 1210:8, 1226:4, 1232:24, 1240:4, 1248:18
**agree** [6] - 1186:21, 1206:13, 1236:23, 1273:17, 1300:11, 1308:19
**agreed** [7] - 1216:1, 1237:5, 1276:10, 1281:17, 1301:8, 1303:15, 1304:25
**agreeing** [1] - 1237:19
**agreement** [14] - 1215:21, 1215:22, 1259:8, 1259:11,

1259:13, 1259:19, 1262:25, 1265:12, 1303:17, 1305:14, 1308:22, 1309:13, 1310:4, 1310:16
**agreements** [15] - 1202:2, 1215:20, 1253:14, 1253:18, 1253:21, 1255:19, 1255:22, 1256:13, 1260:14, 1261:13, 1261:25, 1262:1, 1265:14, 1305:7, 1305:19
**aha** [1] - 1272:20
**ahead** [1] - 1211:18
**ahold** [1] - 1312:10
**aid** [3] - 1189:14, 1276:19, 1284:2
**aids** [1] - 1301:1
**air** [2] - 1194:1, 1231:19
**AISHA** [1] - 1184:23
**AJ** [1] - 1215:21
**AJG** [2] - 1259:11, 1262:20
**AJG-Chem-Mod** [1] - 1259:11
**al** [2] - 1184:4, 1184:7
**Alistar** [5] - 1216:2, 1217:14, 1217:25, 1259:2, 1262:22
**allegation** [1] - 1272:3
**allegations** [5] - 1243:11, 1243:18, 1244:2, 1245:10, 1245:16
**allege** [1] - 1290:19
**alleged** [6] - 1243:23, 1250:12, 1271:23, 1290:10, 1291:18, 1297:7
**allegedly** [1] - 1294:2
**alleges** [3] - 1290:20, 1291:2, 1292:2
**alleging** [1] - 1243:18
**allow** [5] - 1190:13, 1256:20, 1298:18, 1303:6, 1311:25
**allowed** [2] - 1276:9, 1310:17
**allowing** [1] - 1242:10
**almost** [1] - 1240:2
**alone** [7] - 1193:4, 1210:21, 1231:21, 1234:25, 1268:4, 1304:22
**alongside** [1] - 1244:14
**aloud** [2] - 1309:15,

1313:6

**alternative** [1] - 1254:9

**alternatives** [1] - 1305:10

**amazing** [2] - 1216:15, 1270:14

**ambushing** [1] - 1272:24

**amendments** [1] - 1272:6

**amount** [29] - 1196:23, 1216:22, 1219:6, 1224:17, 1231:24, 1240:23, 1252:8, 1282:22, 1293:12, 1298:19, 1298:21, 1299:2, 1299:6, 1299:13, 1299:14, 1299:15, 1299:17, 1300:12, 1301:10, 1303:14, 1303:18, 1303:22, 1304:4, 1307:1, 1307:11, 1317:22, 1318:1, 1318:3, 1318:4

**amounts** [1] - 1305:12

**analogous** [1] - 1303:7

**analyses** [1] - 1217:19

**analysis** [1] - 1297:24

**AND** [1] - 1184:2

**animations** [2] - 1258:8, 1282:2

**announcement** [1] - 1247:14

**answer** [8] - 1203:20, 1206:22, 1228:16, 1243:3, 1253:16, 1264:9, 1275:5, 1285:16

**answered** [1] - 1195:7

**answers** [6] - 1227:2, 1277:1, 1281:8, 1281:11, 1281:13, 1281:14

**anticipated** [1] - 1301:4

**anyway** [2] - 1215:16, 1220:4

**apart** [2] - 1223:24, 1240:12

**apiece** [1] - 1260:9

**apologize** [1] - 1263:6

**appalled** [1] - 1263:3

**apparent** [1] - 1246:13

**appear** [1] - 1281:7

**Appearances** [1] - 1185:1

**APPEARANCES** [1] -

1184:15

**appeared** [1] - 1280:25

**applicable** [1] - 1259:1

**application** [6] - 1194:5, 1195:13, 1196:18, 1270:17, 1270:18, 1270:20

**applied** [1] - 1288:11

**applies** [1] - 1283:15

**apply** [5] - 1274:18, 1274:22, 1275:13, 1288:5, 1288:21

**applying** [2] - 1304:15, 1304:19

**appreciable** [1] - 1231:23

**appreciate** [3] - 1230:10, 1319:9, 1319:17

**appreciates** [1] - 1230:9

**appreciation** [1] - 1206:6

**apprised** [1] - 1257:10

**appropriate** [10] - 1188:6, 1189:18, 1262:7, 1275:14, 1280:19, 1304:9, 1304:10, 1304:17, 1304:20

**appropriately** [2] - 1188:16, 1189:15

**approval** [1] - 1256:16

**April** [2] - 1250:20, 1251:21

**ARANT** [1] - 1185:6

**argue** [1] - 1226:11

**argued** [1] - 1265:22

**arguing** [2] - 1197:18, 1297:20

**argument** [14] - 1192:18, 1197:24, 1228:22, 1230:14, 1240:7, 1264:22, 1266:8, 1266:13, 1266:20, 1267:4, 1267:8, 1267:10, 1273:4

**arguments** [13] - 1189:10, 1191:25, 1215:25, 1221:6, 1227:6, 1269:13, 1276:18, 1278:14, 1278:15, 1278:16, 1297:15, 1310:1

**arises** [1] - 1303:8

**arising** [1] - 1303:9

**arithmetic** [2] -

1234:10, 1260:2

**army** [1] - 1258:6

**arranged** [1] - 1241:16

**art** [1] - 1288:22

**ARTHUR** [1] - 1184:7

**article** [5] - 1225:9, 1295:9, 1295:17, 1296:25, 1303:20

**ash** [1] - 1222:10

**ASHLEY** [1] - 1185:8

**aspects** [1] - 1195:15

**asserted** [41] - 1188:6, 1206:17, 1219:25, 1220:15, 1240:15, 1267:17, 1283:10, 1285:21, 1286:1, 1286:4, 1287:6, 1289:9, 1289:21, 1290:9, 1290:20, 1290:22, 1291:4, 1291:6, 1291:7, 1291:25, 1292:5, 1292:14, 1292:15, 1292:17, 1292:20, 1292:23, 1293:2, 1295:4, 1295:19, 1298:15, 1298:21, 1298:23, 1299:4, 1301:20, 1302:14, 1302:17, 1313:11, 1314:14, 1315:18, 1316:13

**asserting** [1] - 1244:8

**asserts** [2] - 1293:21, 1294:11

**assess** [3] - 1189:8, 1189:11, 1296:19

**assessing** [4] - 1296:21, 1297:9, 1298:7, 1301:1

**asset** [1] - 1284:10

**assist** [1] - 1283:19

**associated** [2] - 1218:25, 1225:12

**Associates** [8] - 1284:23, 1294:20, 1313:23, 1315:1, 1316:2, 1316:22, 1317:14, 1318:7

**assume** [3] - 1215:23, 1300:13, 1300:17

**assuming** [1] - 1190:4

**attach** [1] - 1283:22

**attempt** [1] - 1189:7

**attention** [8] - 1192:12, 1192:25, 1203:5, 1206:7, 1228:19, 1230:8, 1239:22, 1241:9

**attorney** [1] - 1230:14

**attorneys** [2] - 1278:19, 1288:9

**attorneys'** [1] - 1278:14

**attributable** [3] - 1304:5, 1304:12, 1304:21

**attribute** [1] - 1281:6

**authority** [2] - 1220:21, 1272:11

**automatically** [1] - 1268:8

**availability** [1] - 1306:1

**available** [5] - 1245:6, 1306:6, 1306:7, 1306:8, 1306:9

**average** [1] - 1280:11

**avoid** [4] - 1290:5, 1293:3, 1296:4, 1306:21

**avoided** [1] - 1293:17

**award** [6] - 1188:9, 1262:12, 1262:15, 1298:19, 1299:10, 1299:18

**awarded** [2] - 1196:25, 1298:22

**aware** [3] - 1240:2, 1291:25, 1294:1

**awareness** [2] - 1240:4, 1240:8

**awkward** [1] - 1206:11

## B

**background** [3] - 1198:15, 1255:4

**bad** [2] - 1226:24, 1226:25

**baghouse** [3] - 1242:17, 1243:1, 1266:21

**baghouses** [3] - 1242:15, 1242:19, 1242:23

**baking** [2] - 1267:1, 1287:13

**Barr** [2] - 1223:1, 1240:9

**Bascobert** [10] - 1219:10, 1284:21, 1294:18, 1313:16, 1313:17, 1314:20, 1315:21, 1316:16, 1317:11, 1318:3

**base** [5] - 1304:9, 1304:11, 1304:13, 1304:14, 1304:20

**based** [17] - 1212:10, 1217:15, 1218:10, 1218:21, 1228:2, 1255:13, 1258:4, 1260:17, 1263:14, 1276:1, 1277:10, 1280:3, 1299:19, 1301:6, 1304:4, 1304:23, 1311:16

**basic** [2] - 1231:1, 1231:24

**Basin** [1] - 1212:4

**basis** [3] - 1234:16, 1292:7, 1294:16

**Bates** [1] - 1217:5

**batter** [4] - 1266:25, 1267:1, 1287:12

**bear** [1] - 1231:5

**beard** [1] - 1196:1

**beautiful** [3] - 1258:8, 1258:12, 1258:13

**became** [5] - 1200:17, 1200:19, 1201:4, 1246:13, 1254:19

**become** [3] - 1193:17, 1198:8, 1200:18

**began** [4] - 1300:9, 1300:14, 1300:25, 1303:16

**begin** [1] - 1312:1

**beginning** [11] - 1192:15, 1201:10, 1213:4, 1255:2, 1272:20, 1273:3, 1275:16, 1283:20, 1286:15, 1288:2, 1289:20

**behalf** [3] - 1192:23, 1198:18, 1319:8

**behind** [1] - 1201:20

**belief** [18] - 1206:22, 1229:15, 1233:17, 1233:20, 1233:24, 1234:18, 1235:25, 1237:11, 1237:17, 1263:14, 1264:3, 1264:4, 1293:3, 1296:11, 1296:16, 1297:20, 1297:22, 1298:4

**believable** [1] - 1280:5

**believes** [1] - 1299:21

**belittle** [1] - 1231:19

**below** [5] - 1206:17, 1313:10, 1314:14, 1315:17, 1316:12

**belt** [2] - 1261:7, 1261:15

**benefit** [2] - 1227:13, 1227:17

**benefits** [1] - 1302:24
**BENN** [1] - 1185:7
**best** [6] - 1189:7, 1198:14, 1238:14, 1247:17, 1258:14, 1310:8
**better** [1] - 1278:3
**between** [9] - 1233:3, 1239:24, 1246:17, 1278:2, 1300:8, 1302:5, 1305:16, 1305:20, 1305:21
**beyond** [2] - 1202:21, 1283:15
**bias** [1] - 1275:23
**biases** [1] - 1279:2
**big** [10] - 1198:9, 1205:11, 1205:12, 1220:23, 1250:14, 1250:15, 1259:21, 1260:4, 1260:7, 1260:12
**big-words** [1] - 1205:12
**biggest** [1] - 1247:1
**bill** [1] - 1223:21
**billion** [1] - 1260:1
**binders** [2] - 1249:14, 1250:21
**bipartisan** [1] - 1252:14
**bit** [8] - 1197:6, 1199:20, 1208:2, 1213:22, 1226:22, 1253:9, 1253:22, 1255:6
**bituminous** [1] - 1270:3
**blame** [2] - 1250:23, 1251:5
**blaming** [1] - 1251:23
**blind** [2] - 1291:23, 1294:8
**blindness** [7] - 1267:18, 1292:16, 1292:19, 1292:24, 1295:24, 1296:1
**blocks** [1] - 1241:3
**blog** [1] - 1311:3
**blow** [2] - 1257:10
**blow-by-blow** [1] - 1257:10
**blowing** [1] - 1260:23
**bluster** [1] - 1196:25
**Board** [1] - 1214:22
**boards** [6] - 1197:18, 1197:23, 1205:6, 1225:18, 1252:9, 1252:17
**boiler** [1] - 1221:11

**book** [1] - 1319:9
**bother** [1] - 1245:11
**bottom** [3] - 1255:18, 1268:3, 1319:5
**bought** [1] - 1254:1
**BOULT** [1] - 1185:6
**bound** [2] - 1275:16, 1277:8
**bounds** [1] - 1287:2
**box** [2] - 1206:20, 1229:22
**boxes** [2] - 1222:12, 1264:9
**BRADLEY** [2] - 1184:19, 1185:6
**bragged** [2] - 1260:14, 1261:13
**bragging** [1] - 1255:24
**breadth** [1] - 1287:5
**break** [2] - 1273:24, 1274:5
**breakdown** [2] - 1205:4, 1219:3
**breakthrough** [1] - 1193:15
**brief** [2] - 1286:17, 1319:14
**briefing** [1] - 1320:3
**bring** [16] - 1194:21, 1197:15, 1202:12, 1218:13, 1220:21, 1222:15, 1224:6, 1227:13, 1228:7, 1260:18, 1265:18, 1274:2, 1311:22, 1312:16, 1312:18, 1313:3
**bringing** [2] - 1224:24, 1225:7
**broken** [1] - 1223:11
**bromide** [5] - 1197:19, 1198:20, 1208:20, 1295:6, 1296:24
**bromine** [13] - 1194:14, 1196:6, 1196:14, 1197:12, 1200:24, 1204:11, 1204:15, 1222:8, 1223:11, 1232:11, 1232:23, 1241:17, 1266:10
**brought** [11] - 1191:22, 1193:23, 1195:11, 1202:25, 1228:4, 1228:5, 1228:6, 1254:18, 1270:4, 1274:4, 1282:12
**Brown** [2] - 1214:22, 1254:7

**bucks** [1] - 1259:9
**buddies** [1] - 1273:9
**budgeted** [1] - 1225:3
**Buffington** [8] - 1284:22, 1294:18, 1314:10, 1315:13, 1316:8, 1317:3, 1317:20, 1318:13
**built** [2] - 1227:25, 1269:7
**bulletins** [1] - 1245:12
**burden** [14] - 1202:16, 1202:17, 1213:21, 1215:16, 1228:7, 1232:16, 1233:25, 1246:2, 1275:14, 1282:18, 1282:21, 1283:11, 1283:15
**Burke** [2] - 1184:12, 1209:14
**burn** [2] - 1212:3, 1273:16
**burned** [8] - 1194:15, 1201:1, 1209:20, 1209:24, 1210:1, 1258:22, 1263:15
**burning** [7] - 1211:6, 1211:8, 1212:1, 1212:11, 1235:18, 1237:10, 1252:15
**burnt** [1] - 1209:8
**burrowing** [1] - 1212:6
**business** [34] - 1193:19, 1197:5, 1197:13, 1197:14, 1227:13, 1228:1, 1248:5, 1251:8, 1255:2, 1255:3, 1255:14, 1256:5, 1256:25, 1257:15, 1257:19, 1257:23, 1257:24, 1259:9, 1262:5, 1262:8, 1262:21, 1264:24, 1265:15, 1266:5, 1273:10, 1273:14, 1280:10, 1302:8, 1303:5, 1303:6, 1303:11, 1303:19, 1319:25
**businessperson** [1] - 1304:1
**butter** [2] - 1229:16, 1236:19
**buy** [3] - 1242:10, 1257:4, 1266:20
**buyers** [1] - 1306:16
**buzzer** [1] - 1190:9
**BY** [1] - 1184:16

## C

**Cabot** [2] - 1254:9, 1254:14
**cake** [6] - 1266:25, 1267:1, 1287:11, 1287:12, 1287:13
**calcium** [2] - 1295:6, 1296:24
**calculated** [1] - 1259:1
**calculation** [2] - 1218:7, 1218:17
**Caldwell** [11] - 1190:13, 1191:8, 1192:4, 1228:20, 1229:22, 1238:9, 1244:18, 1252:8, 1264:13, 1273:19, 1320:6
**CALDWELL** [14] - 1184:19, 1184:19, 1191:10, 1191:16, 1191:20, 1192:5, 1192:7, 1192:10, 1264:17, 1264:20, 1270:17, 1273:20, 1318:17, 1320:7
**Caldwell's** [2] - 1230:11, 1240:3
**cannot** [2] - 1231:7, 1293:10
**capable** [4] - 1225:10, 1295:10, 1295:18, 1297:1
**capturing** [2] - 1210:16, 1231:18
**car** [1] - 1212:8
**carbon** [87] - 1196:7, 1196:14, 1198:21, 1200:18, 1201:2, 1201:6, 1201:12, 1201:19, 1203:20, 1203:22, 1203:23, 1204:13, 1204:16, 1206:1, 1209:2, 1209:18, 1210:20, 1211:14, 1212:3, 1213:5, 1220:6, 1220:8, 1220:9, 1220:11, 1221:17, 1221:20, 1221:23, 1222:2, 1222:9, 1222:10, 1222:16, 1222:18, 1222:21, 1223:20, 1223:21, 1223:24, 1224:9, 1225:16, 1226:11, 1229:10, 1229:16,

1231:14, 1232:11, 1232:12, 1232:20, 1232:23, 1234:9, 1234:12, 1234:17, 1234:20, 1235:8, 1235:9, 1235:19, 1236:11, 1236:13, 1236:17, 1237:4, 1237:11, 1237:12, 1239:5, 1239:10, 1239:12, 1239:15, 1241:14, 1241:18, 1241:21, 1241:24, 1242:4, 1242:6, 1242:7, 1242:8, 1243:21, 1243:24, 1243:25, 1244:8, 1244:13, 1245:8, 1248:8, 1248:12, 1263:11, 1263:16, 1263:22, 1266:10, 1270:4, 1288:13, 1288:17
**care** [7] - 1206:7, 1210:18, 1210:19, 1211:4, 1223:10, 1228:2, 1312:16
**cared** [2] - 1265:16
**career** [1] - 1236:14
**careful** [2] - 1230:9, 1252:20
**carefully** [11] - 1195:1, 1203:9, 1229:7, 1230:18, 1233:16, 1233:24, 1263:23, 1263:24, 1274:25, 1310:5, 1310:20
**cares** [1] - 1223:6
**carry** [2] - 1233:25, 1246:2
**carrying** [2] - 1197:11, 1277:22
**case** [92] - 1186:9, 1187:25, 1189:4, 1193:2, 1193:4, 1193:5, 1196:12, 1197:16, 1197:21, 1198:24, 1199:10, 1199:24, 1200:9, 1201:4, 1201:10, 1202:9, 1203:5, 1203:15, 1203:21, 1204:4, 1204:5, 1204:10, 1205:16, 1208:19, 1210:17, 1210:24, 1212:18, 1214:6, 1214:14, 1214:17, 1217:7, 1218:22, 1223:7, 1229:5, 1231:25,

1232:20, 1237:2, 1238:21, 1246:19, 1252:22, 1253:2, 1255:25, 1257:22, 1259:2, 1263:19, 1264:21, 1269:15, 1272:18, 1274:14, 1274:18, 1274:22, 1275:5, 1276:6, 1280:20, 1281:21, 1282:9, 1282:18, 1283:17, 1283:18, 1283:21, 1284:11, 1284:15, 1284:18, 1285:1, 1285:3, 1286:17, 1286:19, 1286:21, 1288:2, 1288:23, 1289:5, 1290:11, 1297:8, 1297:14, 1298:3, 1299:22, 1300:10, 1307:25, 1308:13, 1308:24, 1309:9, 1310:1, 1310:12, 1310:24, 1311:5, 1311:6, 1311:10, 1311:16, 1318:23, 1319:16

**Case** [1] - 1184:5
**cases** [5] - 1199:6, 1214:20, 1214:21, 1214:23, 1283:16
**cashing** [2] - 1209:22, 1211:9
**CASSADY** [2] - 1184:19, 1184:20
**catalytic** [1] - 1241:3
**catch** [1] - 1253:13
**caught** [1] - 1209:10
**causation** [3] - 1240:11, 1245:22, 1245:24
**caused** [10] - 1205:8, 1241:7, 1241:9, 1242:25, 1250:13, 1267:20, 1268:10, 1292:22, 1293:15, 1298:4
**causes** [1] - 1296:7
**causing** [4] - 1242:9, 1242:16, 1242:22, 1251:7
**caution** [2] - 1283:21, 1309:19
**cell** [1] - 1310:25
**center** [1] - 1236:9
**CEO** [9] - 1229:18, 1229:20, 1236:2, 1239:18, 1247:8, 1247:9, 1254:2,

1263:17
**CERT** [52] - 1185:9, 1200:1, 1200:11, 1200:23, 1202:4, 1211:20, 1212:14, 1216:6, 1217:10, 1218:23, 1218:25, 1219:1, 1219:2, 1219:14, 1219:17, 1220:19, 1222:25, 1226:14, 1228:2, 1235:1, 1242:22, 1245:7, 1246:6, 1256:22, 1284:18, 1284:19, 1284:20, 1285:24, 1290:22, 1294:11, 1294:14, 1294:17, 1294:23, 1294:24, 1313:12, 1313:25, 1314:4, 1314:8, 1314:16, 1315:3, 1315:7, 1315:11, 1317:9, 1317:15, 1317:17, 1317:19, 1317:25, 1318:8, 1318:10, 1318:12
**CERT's** [2] - 1229:5, 1252:10
**certain** [12] - 1188:7, 1191:11, 1193:16, 1196:23, 1219:8, 1256:21, 1276:11, 1278:11, 1281:1, 1281:16, 1282:10, 1305:6
**certainly** [6] - 1189:4, 1198:16, 1200:22, 1205:7, 1216:25, 1246:3
**certainty** [1] - 1299:16
**certification** [2] - 1243:19, 1245:9
**certified** [2] - 1239:8, 1239:10
**Certified** [2] - 1320:16, 1320:17
**certify** [2] - 1210:3, 1320:17
**certifying** [1] - 1239:13
**CERTs** [1] - 1219:16
**CFO** [1] - 1227:20
**chain** [3] - 1194:22, 1195:10, 1277:19
**chair** [1] - 1270:14
**challenge** [2] - 1194:19, 1234:13
**chamber** [4] - 1198:22, 1244:1,

1288:15, 1288:19
**change** [6] - 1186:6, 1186:10, 1206:4, 1309:3, 1310:9, 1310:11
**changed** [5] - 1225:24, 1226:13, 1258:24, 1259:7, 1269:24
**changes** [7] - 1186:2, 1186:3, 1186:11, 1186:15, 1186:20, 1189:1, 1262:24
**changing** [1] - 1262:23
**character** [1] - 1302:23
**charged** [1] - 1188:15
**chart** [5] - 1198:9, 1207:5, 1234:3, 1234:5, 1259:22
**charts** [5] - 1276:11, 1276:13, 1282:1, 1282:10, 1282:13
**chat** [1] - 1311:3
**check** [8] - 1205:6, 1205:19, 1222:11, 1227:11, 1260:19, 1260:20, 1271:2, 1273:17
**checked** [1] - 1221:9
**checkmark** [1] - 1213:3
**checkmarks** [3] - 1197:20, 1197:22, 1197:25
**checks** [2] - 1205:3, 1227:14
**Chem** [8] - 1249:3, 1249:12, 1249:15, 1249:21, 1259:11, 1262:20, 1268:24, 1269:2
**Chem-Mod** [7] - 1249:3, 1249:12, 1249:15, 1249:21, 1262:20, 1268:24, 1269:2
**chemical** [1] - 1229:23
**chemist** [1] - 1239:18
**chemistry** [1] - 1222:11
**chess** [1] - 1194:25
**Chesterfield** [2] - 1234:23, 1238:3
**chief** [2] - 1236:2, 1236:3
**children** [1] - 1193:9
**choice** [4] - 1211:1, 1246:17, 1246:23

**choose** [1] - 1305:18
**chose** [1] - 1246:19
**Christopher** [1] - 1184:11
**churning** [2] - 1200:14, 1200:16
**circle** [1] - 1269:6
**circumstances** [6] - 1277:20, 1279:4, 1300:21, 1304:2, 1305:6, 1305:23
**circumstantial** [9] - 1203:13, 1204:3, 1204:8, 1277:13, 1277:19, 1277:23, 1278:1, 1278:5, 1292:8
**cite** [1] - 1214:22
**cited** [1] - 1270:2
**cites** [1] - 1270:1
**city** [1] - 1241:3
**civil** [2] - 1274:18, 1283:17
**claim** [90] - 1195:15, 1197:18, 1197:22, 1206:18, 1220:15, 1220:17, 1221:9, 1222:12, 1223:10, 1225:12, 1232:6, 1236:25, 1240:11, 1240:15, 1243:9, 1245:19, 1246:3, 1266:24, 1271:5, 1286:7, 1286:9, 1287:8, 1287:9, 1287:10, 1287:15, 1287:16, 1287:18, 1287:19, 1287:20, 1287:22, 1287:24, 1288:3, 1288:6, 1288:12, 1288:16, 1288:20, 1288:25, 1289:1, 1289:2, 1289:3, 1289:4, 1289:7, 1289:8, 1289:10, 1289:11, 1289:12, 1289:13, 1289:14, 1289:16, 1289:17, 1289:18, 1289:23, 1289:25, 1290:3, 1290:5, 1290:12, 1290:15, 1290:17, 1290:18, 1290:20, 1291:6, 1291:7, 1291:10, 1291:12, 1291:13, 1291:14, 1291:16, 1291:18, 1292:7, 1292:10, 1292:20, 1292:23, 1293:8,

1293:21, 1293:25, 1294:6, 1294:15, 1294:22, 1294:25, 1295:20, 1313:13, 1315:18, 1317:6, 1317:22
**Claim** [82] - 1288:12, 1289:5, 1289:6, 1313:12, 1313:15, 1313:17, 1313:19, 1313:20, 1313:21, 1313:22, 1313:23, 1313:24, 1313:25, 1314:1, 1314:2, 1314:3, 1314:4, 1314:5, 1314:6, 1314:7, 1314:8, 1314:9, 1314:10, 1314:11, 1314:16, 1314:17, 1314:18, 1314:19, 1314:20, 1314:21, 1314:22, 1314:24, 1315:1, 1315:2, 1315:3, 1315:4, 1315:5, 1315:6, 1315:7, 1315:8, 1315:9, 1315:10, 1315:11, 1315:13, 1315:14, 1315:20, 1315:21, 1315:22, 1315:23, 1315:25, 1316:1, 1316:2, 1316:3, 1316:4, 1316:5, 1316:6, 1316:7, 1316:8, 1316:9, 1316:15, 1316:16, 1316:17, 1316:18, 1316:20, 1316:21, 1316:22, 1316:23, 1316:24, 1316:25, 1317:1, 1317:2, 1317:3, 1317:4
**claim-by-claim** [2] - 1292:7, 1294:15
**claimed** [3] - 1220:5, 1295:13, 1297:2
**claims** [65] - 1187:21, 1187:23, 1188:3, 1188:7, 1188:9, 1195:12, 1197:24, 1198:7, 1200:20, 1213:2, 1219:25, 1220:1, 1220:3, 1223:7, 1230:17, 1232:4, 1233:6, 1256:21, 1282:22, 1282:25, 1283:4, 1285:22, 1286:1, 1286:5, 1286:21, 1286:22, 1286:23,

1286:24, 1286:25, 1287:1, 1287:4, 1287:5, 1287:6, 1287:21, 1288:1, 1288:7, 1288:24, 1289:6, 1289:8, 1289:9, 1289:10, 1289:12, 1289:13, 1289:15, 1289:19, 1289:21, 1290:9, 1290:22, 1290:23, 1291:4, 1291:8, 1291:9, 1292:4, 1292:14, 1293:22, 1295:4, 1298:21, 1298:24, 1299:5, 1313:11, 1314:15, 1316:13

**clarify** [1] - 1189:25

**class** [2] - 1307:6, 1307:17

**clean** [2] - 1224:18, 1225:15

**cleaner** [1] - 1252:15

**clear** [4] - 1186:7, 1188:15, 1202:21, 1269:19

**clearer** [1] - 1253:23

**clearly** [3] - 1199:16, 1218:20, 1237:11

**clerk** [1] - 1312:18

**CLERK** [1] - 1313:8

**client** [3] - 1193:11, 1212:15, 1234:15

**clients'** [1] - 1229:15

**clock** [2] - 1194:25, 1196:21

**close** [5] - 1190:5, 1212:21, 1217:22, 1217:24, 1319:25

**closed** [1] - 1194:7

**closely** [1] - 1304:13

**closest** [1] - 1197:10

**closing** [7] - 1189:10, 1190:3, 1191:25, 1228:22, 1240:7, 1252:9, 1264:14

**closings** [2] - 1191:4, 1199:8

**CO** [1] - 1184:7

**coal** [112] - 1193:16, 1193:17, 1194:1, 1194:14, 1196:5, 1196:6, 1198:19, 1204:12, 1204:14, 1204:15, 1204:20, 1204:24, 1206:24, 1208:20, 1208:21, 1209:3, 1209:5, 1209:9, 1209:22,

1210:20, 1210:21, 1211:6, 1212:3, 1212:7, 1222:9, 1222:20, 1223:11, 1226:3, 1226:4, 1226:5, 1229:9, 1229:11, 1229:15, 1231:12, 1234:11, 1234:16, 1235:1, 1235:2, 1235:6, 1235:12, 1235:18, 1235:21, 1236:11, 1236:12, 1236:16, 1237:3, 1237:5, 1237:10, 1237:18, 1238:25, 1239:7, 1239:11, 1241:1, 1241:4, 1241:13, 1241:17, 1242:21, 1243:20, 1243:23, 1244:3, 1244:7, 1244:23, 1245:1, 1245:7, 1245:17, 1247:19, 1248:1, 1248:13, 1248:20, 1249:2, 1250:1, 1250:12, 1251:9, 1251:11, 1252:15, 1255:11, 1256:21, 1259:12, 1259:16, 1261:4, 1261:7, 1261:14, 1261:16, 1261:23, 1267:6, 1267:17, 1270:1, 1270:4, 1270:8, 1270:9, 1273:16, 1295:6, 1295:8, 1295:12, 1295:15, 1296:19, 1296:24, 1296:25, 1297:2, 1297:3, 1297:5, 1297:10, 1297:13, 1297:23, 1297:24, 1298:2, 1298:7

**coal-fired** [3] - 1243:23, 1248:1, 1255:11

**coat** [2] - 1203:14

**COCHRANE** [1] - 1184:23

**code** [2] - 1252:11, 1252:13

**coffin** [1] - 1236:24

**collateral** [1] - 1302:13

**colleagues** [1] - 1221:8

**collect** [1] - 1318:24

**collecting** [1] - 1241:18

**combination** [1] - 1304:10

**combusted** [3] - 1229:9, 1234:12, 1234:19

**combusting** [3] - 1241:13, 1241:17, 1243:20

**combustion** [7] - 1198:22, 1208:25, 1209:9, 1244:1, 1244:15, 1288:14, 1288:19

**comfortable** [3] - 1189:18, 1233:8, 1270:15

**comforted** [1] - 1233:5

**coming** [3] - 1231:15, 1258:8, 1260:15

**commence** [1] - 1300:3

**comment** [1] - 1271:9

**comments** [2] - 1186:25, 1276:23

**commerce** [4] - 1225:9, 1295:10, 1295:17, 1296:25

**commercial** [5] - 1196:18, 1256:11, 1302:5, 1302:17, 1302:23

**commercially** [1] - 1265:18

**committing** [1] - 1297:18

**commodity** [4] - 1225:9, 1295:10, 1295:17, 1296:25

**common** [8] - 1205:19, 1227:11, 1260:19, 1260:20, 1271:2, 1273:18, 1278:7, 1280:11

**communicate** [3] - 1310:23, 1311:5, 1311:9

**communicated** [1] - 1186:9

**companies** [12] - 1187:22, 1198:17, 1200:11, 1202:2, 1226:8, 1227:24, 1235:1, 1244:21, 1247:19, 1249:2, 1251:16, 1260:7

**Company** [8] - 1284:24, 1294:21, 1314:2, 1315:5, 1316:4, 1316:24, 1317:16, 1318:9

**company** [6] - 1214:18, 1250:15, 1253:24, 1264:23, 1271:16, 1273:5

**comparable** [5] - 1215:18, 1255:23, 1301:20, 1303:6, 1305:15

**compare** [8] - 1219:24, 1220:14, 1227:24, 1242:24, 1284:3, 1291:6, 1293:20

**compared** [3] - 1212:5, 1250:22, 1291:17

**compels** [1] - 1241:24

**compensate** [2] - 1299:7, 1317:24

**compete** [2] - 1247:19, 1251:18

**competing** [1] - 1248:7

**competitive** [2] - 1250:25, 1251:15

**competitor** [2] - 1248:13, 1250:10

**competitors** [5] - 1242:5, 1242:8, 1248:8, 1248:13, 1302:7

**complaint** [13] - 1212:22, 1212:25, 1226:16, 1243:11, 1244:2, 1244:6, 1244:7, 1271:18, 1271:21, 1271:25, 1272:3, 1272:9

**complaints** [3] - 1193:3, 1243:8, 1271:14

**complete** [7] - 1207:23, 1242:4, 1254:21, 1254:22, 1272:13, 1284:6, 1310:1

**completed** [2] - 1309:16, 1309:17

**completely** [3] - 1205:2, 1250:6, 1277:5

**compliance** [1] - 1223:4

**complicated** [3] - 1189:5, 1199:15, 1218:22

**complication** [1] - 1187:25

**comply** [1] - 1252:12

**complying** [1] -

1211:22

**component** [3] - 1225:12, 1295:19, 1295:22

**compound** [2] - 1197:19, 1222:9

**comprising** [5] - 1288:13, 1288:17, 1289:21, 1289:22, 1289:23

**computer** [1] - 1311:1

**concentrate** [1] - 1280:6

**concept** [2] - 1186:7, 1242:25

**concern** [1] - 1188:17

**concerning** [4] - 1283:2, 1291:8, 1305:12, 1306:1

**concerns** [1] - 1279:23

**concise** [1] - 1189:8

**conclude** [2] - 1277:23, 1320:5

**concluded** [1] - 1307:18

**conclusion** [2] - 1278:11, 1278:12

**conclusively** [1] - 1200:2

**conditions** [1] - 1302:4

**conduct** [13] - 1205:9, 1220:15, 1240:22, 1290:3, 1290:4, 1291:7, 1291:11, 1291:17, 1292:1, 1293:12, 1293:16, 1293:20, 1311:6

**conference** [1] - 1319:17

**confidence** [1] - 1238:22

**confident** [1] - 1262:18

**confirmed** [3] - 1202:10, 1209:19, 1237:2

**confirming** [2] - 1209:16, 1293:18

**conform** [1] - 1217:22

**confused** [4] - 1226:21, 1226:23, 1238:6, 1272:1

**confusing** [2] - 1199:19, 1208:15

**congress** [1] - 1252:14

**Congress** [1] - 1210:10

connected [2] - 1242:5, 1248:10
Connie [1] - 1224:24
conscience [1] - 1310:17
consider [22] - 1238:23, 1275:21, 1278:4, 1278:8, 1278:23, 1279:21, 1280:13, 1281:13, 1281:25, 1283:18, 1284:14, 1297:5, 1297:10, 1297:13, 1298:6, 1298:16, 1298:24, 1301:11, 1305:3, 1305:12, 1305:17, 1306:1
consideration [3] - 1280:24, 1304:2, 1308:25
considered [10] - 1215:17, 1217:13, 1249:21, 1282:7, 1282:24, 1283:24, 1287:6, 1296:19, 1300:25, 1308:17
considering [1] - 1307:19
consistent [5] - 1247:5, 1269:12, 1269:13, 1269:14, 1279:1
constitute [1] - 1294:2
constituted [2] - 1295:12, 1297:2
constitutes [1] - 1209:3
Constitution [1] - 1257:18
construction [3] - 1288:3, 1288:16, 1291:8
consult [1] - 1308:21
consulting [1] - 1283:21
consuming [1] - 1256:12
contained [1] - 1239:8
containing [2] - 1288:14, 1288:18
contends [1] - 1285:6
content [1] - 1284:4
contention [1] - 1283:12
context [4] - 1214:14, 1214:20, 1272:25, 1287:4
continue [3] - 1212:3, 1242:20, 1256:14
continued [2] -

1185:1, 1205:1
continuously [1] - 1232:15
contours [1] - 1207:25
contracting [2] - 1200:7, 1305:23
contractural [2] - 1249:5, 1249:8
contradicted [1] - 1279:2
contrary [4] - 1239:19, 1245:10, 1245:23, 1250:6
contributed [7] - 1214:10, 1285:7, 1285:25, 1290:23, 1294:12, 1298:10, 1300:4
contributes [1] - 1290:17
contribution [1] - 1307:11
contributorily [2] - 1208:19, 1296:9
contributory [48] - 1187:22, 1188:2, 1188:13, 1198:25, 1199:9, 1199:11, 1200:20, 1202:8, 1204:18, 1207:14, 1207:21, 1208:2, 1208:4, 1208:5, 1208:13, 1210:4, 1213:16, 1225:8, 1226:3, 1227:8, 1227:9, 1233:11, 1234:1, 1236:25, 1237:14, 1239:24, 1264:10, 1271:24, 1272:12, 1291:1, 1291:23, 1294:14, 1294:22, 1294:25, 1296:5, 1296:10, 1296:14, 1296:17, 1296:20, 1296:22, 1297:16, 1297:19, 1297:21, 1297:23, 1307:7, 1307:12, 1315:17, 1316:12
converts [1] - 1268:15
convey [2] - 1218:19, 1309:21
conveyer [3] - 1241:4, 1261:7, 1261:15
conviction [1] - 1309:4
convince [2] - 1197:12, 1221:15
convinced [2] - 1309:3, 1310:9

convincing [2] - 1186:8, 1202:21
copies [6] - 1186:12, 1190:22, 1230:20, 1285:5, 1311:20, 1311:23
copy [4] - 1189:2, 1274:15, 1275:2, 1311:19
CORP [1] - 1184:3
Corp [3] - 1259:22, 1272:19, 1284:16
Corporate [1] - 1252:11
corporate [9] - 1198:9, 1205:23, 1252:10, 1253:23, 1254:3, 1254:4, 1270:7, 1272:5, 1272:21
corporation [2] - 1253:5, 1257:13
correct [3] - 1288:8, 1296:12, 1312:24
correctly [3] - 1199:17, 1199:22, 1206:9
correspond [1] - 1311:9
corroborate [1] - 1237:16
corroborated [2] - 1229:18, 1238:5
CORTLAN [1] - 1185:3
cost [1] - 1306:1
Cottbus [9] - 1219:9, 1284:23, 1294:20, 1313:23, 1315:1, 1316:2, 1316:22, 1317:14, 1318:7
counsel [9] - 1184:24, 1185:9, 1192:3, 1228:21, 1273:22, 1278:13, 1278:14, 1319:15, 1319:17
country [4] - 1197:11, 1205:15, 1228:1, 1242:19
couple [5] - 1193:7, 1199:25, 1212:25, 1249:10, 1262:3
course [8] - 1188:8, 1203:16, 1239:6, 1241:5, 1271:4, 1281:22, 1300:10, 1309:1
court [12] - 1203:17, 1263:4, 1270:13, 1275:8, 1276:2, 1276:4, 1280:22, 1280:25, 1308:8,

1312:4, 1313:7, 1319:6
Court [32] - 1186:3, 1186:15, 1187:24, 1190:12, 1194:19, 1199:5, 1199:8, 1203:10, 1205:13, 1207:24, 1220:1, 1220:13, 1225:5, 1226:2, 1229:7, 1233:23, 1240:13, 1245:23, 1256:17, 1259:4, 1262:8, 1268:16, 1268:19, 1268:20, 1272:18, 1273:2, 1274:8, 1299:21, 1312:11, 1320:13, 1320:22, 1320:22
COURT [40] - 1184:1, 1186:1, 1187:6, 1187:12, 1188:4, 1188:20, 1188:23, 1190:1, 1190:14, 1190:18, 1190:24, 1191:2, 1191:8, 1191:12, 1191:18, 1191:21, 1191:24, 1192:6, 1192:9, 1228:20, 1228:25, 1229:2, 1261:9, 1264:12, 1264:19, 1270:16, 1273:19, 1273:22, 1274:7, 1274:12, 1312:8, 1312:14, 1312:21, 1313:1, 1318:15, 1318:18, 1318:21, 1319:13, 1320:8, 1320:10
Court's [9] - 1203:9, 1239:23, 1265:23, 1266:19, 1266:21, 1266:23, 1270:6, 1272:17, 1287:25
court's [1] - 1268:10
courthouse [2] - 1256:18, 1257:11
courtroom [19] - 1191:23, 1198:6, 1221:3, 1253:5, 1257:5, 1274:6, 1274:11, 1277:21, 1309:15, 1309:18, 1312:7, 1312:18, 1312:20, 1313:2, 1313:5, 1319:11, 1319:12, 1319:18
Courtroom [1] - 1184:12

courts [2] - 1214:1, 1265:20
Courts [1] - 1265:25
cover [3] - 1252:21, 1287:16, 1287:19
coverage [1] - 1287:6
covered [4] - 1277:21, 1287:10, 1289:2, 1290:15
covering [1] - 1296:3
covers [8] - 1266:24, 1286:25, 1287:20, 1287:21, 1287:23, 1289:4, 1289:17, 1289:25
cranking [1] - 1270:20
crazy [4] - 1256:1, 1258:18, 1259:6, 1273:5
credibility [8] - 1204:1, 1247:2, 1247:5, 1269:11, 1273:2, 1278:22, 1279:5, 1279:16
credible [1] - 1227:12
credit [5] - 1220:16, 1223:10, 1228:3, 1230:25, 1280:18
credits [19] - 1200:8, 1200:10, 1209:22, 1210:3, 1210:7, 1210:11, 1210:22, 1211:6, 1211:9, 1211:18, 1212:9, 1213:9, 1219:25, 1220:2, 1220:5, 1220:7, 1227:18, 1227:23, 1231:18
crime [1] - 1252:12
criminal [1] - 1283:16
critical [4] - 1193:18, 1193:19, 1193:21, 1231:12
cross [8] - 1198:14, 1201:15, 1209:13, 1216:6, 1234:14, 1244:18, 1246:16, 1271:22
cross-examination [5] - 1198:14, 1201:15, 1209:13, 1216:6, 1234:14
crosses [1] - 1246:21
crystal [1] - 1269:19
CSO [1] - 1312:3
CSR [1] - 1320:21
CUMMINGS [1] - 1185:6
current [4] - 1186:20, 1189:6, 1236:2,

1302:18
**CURRY** [2] - 1184:19, 1184:20
**curtain** [1] - 1201:20
**custom** [1] - 1308:7
**customary** [1] - 1303:5
**customer** [5] - 1240:1, 1250:25, 1251:2, 1293:1, 1293:25
**customer's** [1] - 1293:3
**customers** [4] - 1224:8, 1248:3, 1253:12, 1291:3
**cut** [4] - 1225:3, 1261:4, 1261:5, 1281:5
**cutting** [2] - 1195:4, 1210:11

## D

**Dallas** [2] - 1255:13, 1258:4
**Dallas-based** [2] - 1255:13, 1258:4
**damages** [56] - 1186:18, 1188:5, 1188:9, 1188:12, 1208:22, 1209:17, 1210:25, 1212:18, 1212:21, 1213:22, 1217:18, 1217:19, 1218:6, 1228:6, 1258:18, 1259:1, 1260:18, 1261:5, 1262:12, 1282:22, 1285:9, 1285:12, 1286:9, 1295:9, 1297:6, 1297:13, 1297:17, 1298:2, 1298:19, 1298:22, 1298:25, 1299:1, 1299:2, 1299:6, 1299:10, 1299:13, 1299:15, 1299:17, 1299:18, 1299:19, 1299:20, 1299:22, 1300:1, 1300:3, 1300:12, 1304:4, 1304:15, 1304:23, 1306:8, 1306:9, 1306:22, 1307:1, 1307:7, 1307:12
**DANIEL** [1] - 1184:22
**data** [8] - 1234:4, 1234:13, 1234:14, 1244:23, 1245:1, 1245:3, 1259:23

**database** [1] - 1244:25
**date** [5] - 1225:21, 1300:3, 1305:2, 1305:8, 1309:14
**dates** [1] - 1257:18
**days** [9] - 1192:12, 1196:11, 1201:12, 1212:25, 1221:3, 1233:3, 1253:9, 1264:21, 1266:15
**deal** [7] - 1216:2, 1216:17, 1231:10, 1250:14, 1250:15, 1254:9, 1268:23
**dealt** [1] - 1232:22
**Deanna** [2] - 1320:16, 1320:21
**debate** [2] - 1199:25, 1200:2
**decade** [3] - 1229:10, 1234:7, 1259:17
**decades** [3] - 1232:24, 1242:20, 1266:5
**December** [3] - 1244:4, 1245:17, 1249:25
**decide** [17] - 1275:5, 1275:7, 1275:13, 1277:25, 1285:15, 1285:18, 1286:3, 1286:8, 1286:13, 1286:20, 1287:23, 1288:6, 1290:6, 1300:12, 1308:24, 1310:21, 1311:16
**decided** [1] - 1298:9
**deciding** [2] - 1274:14, 1275:8
**decision** [9] - 1275:10, 1275:25, 1276:1, 1276:4, 1277:9, 1277:10, 1284:11, 1298:18, 1311:15
**decisions** [1] - 1280:3
**deck** [1] - 1269:23
**decrease** [2] - 1250:22, 1251:1
**deeply** [1] - 1268:22
**defendant** [75] - 1205:23, 1206:16, 1206:21, 1230:7, 1233:19, 1233:20, 1240:2, 1240:21, 1243:5, 1283:2, 1283:6, 1283:7, 1283:8, 1285:20, 1286:4, 1286:6, 1286:9, 1290:16, 1290:21, 1291:22,

1292:6, 1292:9, 1292:12, 1292:15, 1292:18, 1292:25, 1293:6, 1293:11, 1293:15, 1293:16, 1294:1, 1294:4, 1294:6, 1294:11, 1294:15, 1294:24, 1295:7, 1295:14, 1296:1, 1296:8, 1296:10, 1296:12, 1296:15, 1296:23, 1297:6, 1298:9, 1298:16, 1299:4, 1299:6, 1300:2, 1300:3, 1300:8, 1300:13, 1301:4, 1301:7, 1301:19, 1303:1, 1303:15, 1306:9, 1313:9, 1313:12, 1313:14, 1313:16, 1313:19, 1314:13, 1315:16, 1315:19, 1316:11, 1316:14, 1317:5, 1317:9, 1317:21, 1317:25
**Defendant** [6] - 1282:20, 1282:22, 1283:11, 1285:6, 1285:10, 1285:11
**defendant's** [3] - 1296:6, 1298:12, 1304:8
**defendant-by-defendant** [2] - 1292:6, 1294:15
**Defendants** [2] - 1184:8, 1185:9
**defendants** [71] - 1187:5, 1187:15, 1187:19, 1187:20, 1187:21, 1188:2, 1188:6, 1188:11, 1188:13, 1194:13, 1194:19, 1194:21, 1195:25, 1196:9, 1196:15, 1197:25, 1198:9, 1199:10, 1200:7, 1200:23, 1201:7, 1201:22, 1202:11, 1204:10, 1205:7, 1205:9, 1208:3, 1208:18, 1209:5, 1210:6, 1210:17, 1213:7, 1213:14, 1215:10, 1219:24, 1227:6, 1227:8, 1227:9, 1238:16, 1238:21,

1243:19, 1245:7, 1246:6, 1255:20, 1256:14, 1256:15, 1264:11, 1284:18, 1284:25, 1285:25, 1290:8, 1290:19, 1290:23, 1292:2, 1294:15, 1294:17, 1294:23, 1295:5, 1297:10, 1297:14, 1297:19, 1297:25, 1298:3, 1298:14, 1299:13, 1305:16, 1305:21, 1307:1, 1307:10, 1314:16, 1318:18
**defendants'** [18] - 1190:3, 1192:1, 1195:14, 1228:21, 1228:22, 1240:13, 1291:3, 1292:21, 1293:24, 1295:22, 1297:15, 1298:8, 1300:9, 1306:23, 1307:8, 1317:7, 1317:24, 1320:8
**defense** [10] - 1195:3, 1208:4, 1227:1, 1258:2, 1266:11, 1268:14, 1271:4, 1293:4, 1296:17
**defenses** [1] - 1227:5
**define** [4] - 1286:24, 1287:1, 1287:5, 1287:25
**defined** [1] - 1277:11
**definition** [2] - 1288:10, 1288:21
**definitions** [2] - 1288:7, 1288:8
**Delaware** [3] - 1252:11, 1257:17, 1262:8
**DELAWARE** [1] - 1184:2
**Delaware..** [1] - 1256:17
**deliberate** [5] - 1274:3, 1284:10, 1293:2, 1296:3, 1308:21
**deliberately** [2] - 1293:17, 1298:14
**deliberating** [1] - 1307:23
**deliberations** [10] - 1274:23, 1275:4, 1281:25, 1285:16, 1298:25, 1307:21, 1309:2, 1310:22,

1311:12, 1312:1
**deliver** [1] - 1274:15
**delivered** [2] - 1208:22, 1295:8
**DELLINGER** [1] - 1184:22
**demeanor** [1] - 1279:3
**demonstrate** [2] - 1243:22, 1243:24
**demonstrative** [2] - 1282:4, 1282:9
**demonstratives** [1] - 1276:16
**denied** [1] - 1227:3
**denies** [2] - 1285:10, 1285:12
**deny** [1] - 1203:23
**department** [1] - 1196:4
**Department** [1] - 1194:4
**dependent** [7] - 1288:24, 1289:10, 1289:14, 1289:16, 1289:17, 1289:18
**deposition** [9] - 1196:4, 1236:21, 1238:19, 1276:8, 1280:22, 1281:2, 1281:3, 1281:4, 1281:7
**depositions** [2] - 1247:6, 1270:2
**depth** [2] - 1222:5
**deputy** [6] - 1309:15, 1312:18, 1313:2, 1313:5, 1319:11
**describe** [3] - 1255:17, 1256:3, 1256:8
**described** [5] - 1214:3, 1257:14, 1278:19, 1291:17, 1296:22
**describes** [1] - 1215:3
**describing** [1] - 1221:4
**description** [2] - 1266:22, 1287:3
**deserve** [1] - 1282:15
**deserves** [4] - 1278:6, 1278:10, 1279:16, 1280:6
**design** [2] - 1270:23, 1306:11
**designed** [1] - 1302:4
**desire** [1] - 1210:2
**desired** [1] - 1303:18
**desiring** [1] - 1209:24
**desperately** [1] -

1192:25
**detached** [1] - 1261:13
**detail** [2] - 1206:7, 1279:24
**detailed** [5] - 1263:25, 1272:12, 1286:12, 1286:18, 1299:25
**details** [1] - 1253:16
**determination** [2] - 1276:20, 1305:24
**determinations** [1] - 1288:2
**determine** [12] - 1289:4, 1289:8, 1289:17, 1291:15, 1292:5, 1294:13, 1298:15, 1298:17, 1298:21, 1301:4, 1301:7, 1304:19
**determining** [6] - 1279:7, 1284:4, 1301:10, 1304:9, 1305:11, 1305:25
**device** [1] - 1310:25
**devices** [1] - 1302:20
**DEVLIN** [1] - 1184:16
**Diaz** [2] - 1269:22, 1271:20
**difference** [2] - 1208:17, 1280:2
**differences** [2] - 1305:20, 1310:8
**different** [21] - 1193:24, 1195:15, 1199:13, 1199:14, 1207:2, 1208:2, 1208:14, 1215:2, 1215:18, 1218:8, 1218:22, 1219:12, 1226:4, 1230:2, 1235:18, 1238:18, 1250:17, 1266:6, 1279:12, 1288:8
**differently** [4] - 1241:16, 1278:18, 1283:1, 1310:12
**difficult** [7] - 1187:18, 1188:17, 1189:5, 1243:8, 1246:17, 1246:21, 1246:23
**direct** [27] - 1203:11, 1203:25, 1220:13, 1232:1, 1232:2, 1233:7, 1240:23, 1277:12, 1277:14, 1277:18, 1278:1, 1278:5, 1290:14, 1291:15, 1292:8, 1293:13, 1293:18,

1294:2, 1306:25, 1307:2, 1307:3, 1307:5, 1307:10, 1307:13, 1307:14, 1307:16, 1312:3
**directly** [22] - 1229:4, 1231:5, 1240:1, 1245:10, 1277:16, 1290:12, 1290:19, 1291:2, 1291:3, 1291:5, 1291:10, 1291:14, 1291:19, 1292:1, 1292:4, 1292:13, 1293:19, 1293:25, 1295:3, 1297:7, 1307:6, 1307:17
**disadvantage** [1] - 1250:25
**disagree** [1] - 1275:18
**disappeared** [1] - 1221:5
**disbanded** [1] - 1251:22
**discourteous** [1] - 1216:9
**discovery** [1] - 1201:14
**discuss** [1] - 1311:10
**discussed** [5] - 1186:3, 1186:4, 1186:14, 1186:17, 1186:19
**discussing** [1] - 1295:25
**discussion** [2] - 1187:14, 1221:10
**discussions** [1] - 1310:17
**disgusted** [1] - 1258:1
**dishonest** [1] - 1218:3
**disinterested** [1] - 1263:19
**dismissed** [1] - 1188:3
**disproven** [1] - 1218:4
**dispute** [8] - 1196:13, 1197:21, 1198:1, 1205:6, 1213:3, 1215:9, 1225:22, 1260:6
**disputed** [5] - 1194:13, 1194:17, 1209:18, 1231:16, 1281:17
**disputing** [1] - 1205:4
**Disregard** [1] - 1203:4
**disregard** [1] - 1277:4
**distinct** [1] - 1304:6
**distinction** [1] -

1278:2
**distinctly** [1] - 1265:13
**distraction** [2] - 1220:11, 1272:13
**DISTRICT** [2] - 1184:1, 1184:2
**district** [1] - 1256:16
**District** [3] - 1256:17, 1262:7, 1262:8
**distrust** [1] - 1279:13
**ditch** [1] - 1226:9
**divided** [1] - 1260:11
**Docket** [1] - 1272:10
**document** [8] - 1216:24, 1217:10, 1217:12, 1218:4, 1253:24, 1254:16, 1269:17, 1273:4
**documentation** [1] - 1194:3
**documented** [2] - 1193:8, 1194:14
**documents** [6] - 1201:20, 1216:21, 1246:22, 1251:10, 1258:16, 1282:14
**dog** [4] - 1197:9, 1236:10, 1237:22, 1263:18
**dollar** [8] - 1216:3, 1216:14, 1216:17, 1218:16, 1218:17, 1258:21, 1261:18, 1262:16
**dollar-a-ton** [1] - 1216:17
**dollars** [2] - 1193:18, 1262:16
**domino** [1] - 1245:21
**dominos** [6] - 1207:6, 1207:7, 1207:9, 1240:18, 1240:19, 1240:24
**done** [5] - 1229:21, 1264:10, 1266:15, 1275:9, 1311:14
**doomed** [1] - 1248:5
**door** [5] - 1205:19, 1227:11, 1260:20, 1271:2
**DORSNEY** [3] - 1185:4, 1190:21, 1191:1
**Dorsney** [1] - 1190:20
**doubt** [2] - 1202:21, 1283:15
**down** [26] - 1207:10, 1211:13, 1211:21, 1214:8, 1214:12,

1216:12, 1219:14, 1219:16, 1223:21, 1227:17, 1236:21, 1247:20, 1251:3, 1254:5, 1255:6, 1255:18, 1256:2, 1260:12, 1265:2, 1266:13, 1283:23, 1283:25, 1308:1, 1308:11, 1308:12, 1313:2
**downloadable** [1] - 1244:24
**downstream** [4] - 1198:22, 1244:1, 1288:14, 1288:18
**downward** [1] - 1304:15
**Dr** [5] - 1195:4, 1221:5, 1224:24, 1237:16, 1246:19
**draw** [1] - 1259:13
**dream** [1] - 1204:5
**drinking** [1] - 1194:9
**driven** [1] - 1252:10
**drop** [2] - 1216:16, 1248:3
**dropped** [1] - 1263:1
**dropping** [1] - 1248:3
**drops** [2] - 1261:21, 1277:22
**DTE** [3] - 1215:21, 1217:25, 1262:20
**DTX** [12] - 1234:5, 1247:23, 1248:15, 1249:13, 1249:19, 1249:24, 1250:18, 1250:21, 1253:23, 1255:21, 1259:19, 1259:20
**due** [2] - 1250:24, 1251:2
**dunk** [1] - 1237:21
**duration** [1] - 1302:14
**during** [25] - 1208:22, 1229:12, 1235:3, 1237:8, 1240:9, 1244:1, 1246:12, 1274:23, 1275:3, 1275:9, 1275:19, 1276:25, 1281:1, 1281:19, 1281:22, 1283:19, 1295:9, 1297:6, 1297:17, 1305:5, 1306:8, 1306:9, 1310:22, 1311:11, 1311:14
**duties** [3] - 1274:17, 1275:6, 1275:22
**duty** [5] - 1275:12,

1287:25, 1308:21, 1309:23, 1310:2
**DYESS** [6] - 1185:6, 1187:7, 1187:13, 1188:16, 1188:22, 1190:16
**Dyess** [4] - 1187:6, 1190:15, 1190:18, 1234:8

## E

**e-mail** [4] - 1190:25, 1240:9, 1249:7, 1249:25
**e-mails** [8] - 1190:22, 1201:17, 1222:13, 1240:4, 1240:8, 1249:4, 1249:10, 1312:9
**early** [1] - 1253:9
**earned** [2] - 1210:3, 1305:9
**earth** [1] - 1212:5
**easier** [1] - 1319:20
**easy** [2] - 1206:25, 1230:7
**economic** [3] - 1301:14, 1303:25, 1305:23
**economical** [1] - 1228:2
**edited** [2] - 1281:5, 1281:7
**Education** [1] - 1214:22
**EERC** [14] - 1193:15, 1195:11, 1195:20, 1196:2, 1229:25, 1235:10, 1235:14, 1236:2, 1239:18, 1244:11, 1249:5, 1249:9, 1263:17, 1266:14
**effect** [5] - 1212:13, 1223:3, 1232:25, 1302:9, 1309:5
**effective** [1] - 1223:23
**effort** [2] - 1226:9, 1310:3
**efforts** [3] - 1255:15, 1318:23, 1319:9
**EGUs** [3] - 1250:25, 1251:1, 1251:2
**EIA** [2] - 1244:25, 1259:23
**eight** [9] - 1198:18, 1198:20, 1208:11, 1232:3, 1235:23,

1240:4, 1259:25, 1260:8
**eight-year** [1] - 1259:25
**either** [12] - 1212:18, 1238:12, 1239:20, 1243:3, 1244:22, 1249:9, 1254:8, 1278:3, 1304:7, 1306:23, 1307:8, 1307:15
**electricity** [2] - 1241:6, 1261:16
**electronic** [2] - 1234:6, 1310:24
**electronically** [2] - 1252:25, 1311:9
**element** [7] - 1198:1, 1204:11, 1204:17, 1205:4, 1205:6, 1268:3, 1299:1
**elemental** [1] - 1222:8
**elements** [14] - 1199:13, 1202:18, 1202:23, 1209:5, 1213:16, 1221:9, 1228:15, 1232:4, 1232:5, 1287:9, 1289:25, 1290:1, 1290:3, 1296:21
**elephant** [1] - 1205:2
**elsewhere** [1] - 1286:13
**embodiment** [1] - 1302:23
**embodying** [1] - 1303:20
**emission** [3] - 1220:10, 1239:9, 1243:24
**Emissions** [2] - 1272:19, 1284:16
**emissions** [1] - 1255:6
**EMISSIONS** [1] - 1184:3
**emphasize** [1] - 1203:3
**emphasizing** [1] - 1233:22
**employed** [1] - 1193:20
**employee** [1] - 1253:4
**encourage** [1] - 1252:14
**encouraging** [2] - 1242:9, 1248:10
**end** [7] - 1198:13, 1199:7, 1209:13, 1229:12, 1269:7,

1286:23, 1310:14
**ended** [1] - 1200:7
**ending** [1] - 1250:19
**endorse** [1] - 1262:5
**endorsing** [1] - 1257:22
**ends** [2] - 1205:16, 1269:4
**ENERGY** [1] - 1184:3
**Energy** [19] - 1194:5, 1272:18, 1284:15, 1284:21, 1284:22, 1294:17, 1294:19, 1313:14, 1313:19, 1314:18, 1314:22, 1315:19, 1315:23, 1316:14, 1316:18, 1317:10, 1317:12, 1318:1, 1318:4
**enforcement** [2] - 1255:7
**engage** [5] - 1205:9, 1240:22, 1292:3, 1293:12, 1293:16
**engaged** [1] - 1255:13
**engineer** [1] - 1229:23
**engineering** [1] - 1201:16
**enter** [2] - 1264:10, 1300:20
**entered** [7] - 1191:23, 1194:12, 1255:19, 1256:13, 1274:11, 1305:7, 1312:20
**entire** [1] - 1241:2
**entirely** [1] - 1235:18
**entities** [10] - 1206:23, 1206:24, 1219:12, 1256:21, 1259:12, 1271:12, 1272:10, 1284:25, 1297:14, 1298:3
**entitled** [4] - 1280:23, 1285:8, 1285:12, 1286:11
**entity** [1] - 1253:7
**envelope** [1] - 1309:16
**environmental** [3] - 1193:21, 1196:18, 1210:15
**EPA** [3] - 1193:23, 1194:4, 1211:1
**equal** [1] - 1283:6
**equipment** [6] - 1204:23, 1234:10, 1267:6, 1267:7, 1269:8, 1306:10
**Erickson** [11] - 1196:1, 1229:19, 1229:23, 1235:24,

1236:1, 1236:13, 1237:24, 1239:18, 1244:12, 1263:17, 1266:9
**Erikson** [1] - 1238:1
**erroneous** [1] - 1309:3
**error** [1] - 1217:17
**especially** [9] - 1209:6, 1235:5, 1235:8, 1263:10, 1263:13, 1264:4, 1295:15, 1295:23, 1297:3
**ESPs** [3] - 1242:15, 1242:19, 1242:23
**ESQ** [18] - 1184:16, 1184:17, 1184:19, 1184:20, 1184:20, 1184:21, 1184:21, 1184:22, 1184:22, 1184:23, 1184:23, 1185:3, 1185:4, 1185:6, 1185:7, 1185:7, 1185:8, 1185:8
**essential** [1] - 1319:7
**essentially** [3] - 1207:14, 1207:24, 1228:14
**establish** [2] - 1231:1, 1293:23
**established** [4] - 1231:25, 1301:18, 1301:25, 1302:16
**estimated** [1] - 1305:5
**et** [2] - 1184:3, 1184:7
**evaluate** [2] - 1199:8, 1270:8
**evaluating** [3] - 1247:2, 1274:19, 1284:5
**evaluation** [3] - 1215:9, 1230:9, 1304:23
**event** [1] - 1299:23
**events** [1] - 1278:9
**everyday** [1] - 1278:8
**evidence** [144] - 1186:8, 1193:23, 1194:7, 1198:11, 1199:3, 1200:11, 1201:5, 1202:10, 1202:14, 1202:25, 1203:4, 1203:6, 1203:8, 1203:11, 1203:13, 1203:25, 1204:2, 1204:3, 1204:5, 1204:9, 1204:25, 1205:23, 1206:16, 1210:4,

1213:11, 1222:3, 1223:15, 1224:3, 1224:6, 1226:21, 1226:22, 1226:25, 1228:9, 1229:6, 1229:8, 1229:13, 1230:9, 1230:17, 1232:8, 1233:13, 1234:2, 1234:5, 1234:14, 1235:6, 1236:5, 1237:6, 1237:7, 1238:23, 1243:3, 1246:3, 1246:4, 1252:23, 1253:6, 1253:20, 1263:5, 1264:25, 1269:18, 1269:19, 1270:5, 1274:20, 1275:7, 1276:2, 1276:6, 1276:9, 1276:13, 1276:14, 1276:15, 1276:17, 1276:18, 1276:21, 1276:24, 1277:8, 1277:10, 1277:12, 1277:13, 1277:14, 1277:18, 1277:19, 1277:23, 1278:1, 1278:3, 1278:4, 1278:8, 1278:11, 1278:15, 1278:16, 1278:18, 1279:5, 1279:9, 1279:10, 1280:19, 1281:23, 1281:25, 1282:7, 1282:9, 1282:11, 1282:13, 1282:17, 1282:19, 1282:23, 1282:24, 1283:2, 1283:3, 1283:13, 1284:1, 1284:5, 1284:6, 1285:20, 1285:24, 1286:6, 1286:10, 1290:7, 1292:9, 1292:11, 1295:1, 1295:24, 1298:14, 1299:3, 1300:24, 1301:1, 1301:3, 1301:11, 1301:13, 1303:2, 1305:1, 1305:6, 1305:12, 1305:18, 1306:1, 1307:20, 1309:1, 1309:5, 1309:9, 1309:25, 1310:3, 1311:16, 1313:9, 1314:13, 1315:16, 1316:11, 1317:7, 1317:23
**exact** [4] - 1202:11, 1271:7, 1272:2,

1272:16
**exactly** [14] - 1195:17, 1195:19, 1196:12, 1200:3, 1200:15, 1204:4, 1222:11, 1231:20, 1236:18, 1238:5, 1240:23, 1240:24, 1244:12, 1310:14
**examination** [6] - 1198:14, 1201:15, 1209:13, 1216:6, 1234:14, 1240:3
**examine** [1] - 1309:2
**example** [8] - 1203:12, 1219:9, 1287:10, 1290:2, 1299:14, 1307:4, 1307:15, 1308:12
**examples** [1] - 1287:3
**Excel** [2] - 1217:1, 1234:5
**except** [1] - 1307:24
**excerpted** [1] - 1268:12
**excerpts** [1] - 1281:3
**exchange** [1] - 1217:19
**excitement** [1] - 1197:8
**exclude** [2] - 1281:5, 1302:1
**excluding** [1] - 1289:23
**exclusive** [2] - 1301:22, 1309:23
**exclusivity** [1] - 1302:4
**exhaustive** [1] - 1208:25
**exhibit** [3] - 1219:20, 1277:7
**Exhibit** [1] - 1219:22
**exhibits** [11] - 1274:1, 1276:9, 1277:3, 1281:23, 1281:24, 1282:1, 1282:4, 1282:5, 1282:9, 1311:23
**exist** [3] - 1235:13, 1250:13, 1265:20
**existed** [2] - 1248:24, 1296:2
**existence** [1] - 1292:16
**existing** [1] - 1302:11
**exited** [3] - 1274:6, 1312:7, 1319:12
**expect** [1] - 1236:11
**expected** [2] - 1209:8,

## F

1246:16
**expecting** [1] - 1209:25
**expensive** [1] - 1256:12
**experience** [4] - 1278:8, 1278:10, 1280:12, 1306:11
**experimental** [2] - 1225:13, 1295:21
**expert** [21] - 1194:21, 1195:3, 1214:1, 1217:18, 1217:19, 1224:23, 1228:5, 1228:6, 1232:22, 1237:1, 1237:16, 1237:20, 1237:25, 1240:12, 1259:23, 1260:18, 1263:1, 1280:8, 1280:12, 1280:13, 1280:18
**expert's** [3] - 1280:14, 1280:16
**expertise** [1] - 1233:2
**experts** [4] - 1224:12, 1280:21, 1301:12, 1303:13
**explain** [7] - 1189:7, 1189:10, 1208:16, 1233:16, 1274:19, 1274:21, 1274:23
**explained** [5] - 1194:11, 1215:19, 1217:18, 1290:13, 1295:25
**explaining** [3] - 1274:17, 1307:19, 1307:20
**explanation** [2] - 1261:3, 1269:18
**express** [1] - 1193:10
**expressed** [1] - 1206:6
**expression** [1] - 1247:3
**extensive** [2] - 1201:5, 1237:8
**extent** [4] - 1186:19, 1301:1, 1302:13, 1303:1
**extract** [1] - 1204:7
**extraordinarily** [1] - 1197:23
**eyes** [2] - 1213:8, 1217:2
**eyewitness** [1] - 1277:15

**Facebook** [1] - 1311:3
**facility** [2] - 1209:6, 1244:15
**fact** [20] - 1188:11, 1204:19, 1205:3, 1217:1, 1228:4, 1228:8, 1231:16, 1252:5, 1256:15, 1265:9, 1268:5, 1277:16, 1277:20, 1279:10, 1279:24, 1281:6, 1290:4, 1293:6, 1299:20, 1310:2
**factor** [3] - 1252:3, 1256:4, 1303:25
**Factor** [1] - 1215:2
**factors** [12] - 1189:17, 1214:18, 1214:25, 1215:1, 1215:2, 1215:6, 1215:17, 1248:14, 1280:16, 1301:12, 1301:13, 1304:7
**facts** [29] - 1189:12, 1230:10, 1231:1, 1231:3, 1231:5, 1231:24, 1234:8, 1235:20, 1244:20, 1246:10, 1246:15, 1246:18, 1263:1, 1264:8, 1275:7, 1275:8, 1275:11, 1275:13, 1276:20, 1281:16, 1281:20, 1281:21, 1282:16, 1282:25, 1298:16, 1300:21, 1305:2, 1309:8
**failed** [2] - 1254:14, 1279:12
**fails** [1] - 1245:22
**fair** [2] - 1204:17, 1231:10
**fairly** [1] - 1275:22
**faith** [1] - 1229:14
**fall** [3] - 1240:19, 1268:17, 1287:17
**falls** [1] - 1240:11
**falsehood** [1] - 1279:22
**falsely** [1] - 1279:9
**familiar** [1] - 1231:21
**family** [1] - 1192:24
**famous** [1] - 1214:21
**fantastic** [2] - 1195:20, 1229:20

**far** [1] - 1223:18
**farfetched** [2] - 1225:13, 1295:20
**fault** [1] - 1248:17
**favor** [2] - 1283:6, 1299:23
**features** [3] - 1303:10, 1303:11, 1304:6
**federal** [4] - 1252:11, 1252:13, 1254:23, 1319:6
**Federal** [1] - 1320:22
**fee** [1] - 1271:1
**feed** [1] - 1258:20
**feet** [1] - 1221:11
**fellow** [5] - 1236:8, 1309:1, 1309:6, 1310:7, 1311:11
**felt** [1] - 1230:12
**few** [11] - 1228:17, 1247:13, 1248:16, 1248:18, 1250:20, 1266:18, 1296:18, 1318:25, 1319:1, 1319:2, 1319:14
**fictitious** [1] - 1260:17
**field** [1] - 1236:14
**fifth** [4] - 1207:17, 1234:10, 1295:14, 1302:5
**fight** [4] - 1201:17, 1236:10, 1237:23, 1263:18
**fighting** [4] - 1197:20, 1198:4, 1238:22, 1262:19
**figure** [1] - 1260:25
**figures** [1] - 1287:2
**file** [3] - 1196:19, 1270:17, 1270:18
**filed** [14] - 1193:5, 1194:22, 1201:11, 1203:20, 1224:5, 1227:2, 1229:10, 1234:24, 1250:19, 1251:21, 1258:22, 1258:25, 1259:3
**filing** [3] - 1193:3, 1257:3, 1320:3
**filings** [7] - 1242:2, 1247:10, 1255:10, 1258:16, 1261:14, 1263:4
**fill** [3] - 1189:15, 1309:14, 1311:22
**filled** [4] - 1199:17, 1199:22, 1206:8, 1219:6
**final** [14] - 1186:4, 1186:12, 1186:17,

1188:24, 1189:1, 1190:9, 1191:4, 1206:5, 1218:16, 1236:1, 1236:24, 1274:2, 1296:18, 1311:21
**finalized** [1] - 1186:11
**finally** [2] - 1245:20, 1272:4
**financial** [1] - 1299:11
**fine** [2] - 1187:16, 1195:5
**finish** [2] - 1307:20, 1311:13
**finished** [1] - 1221:4
**Finlinson** [3] - 1238:4, 1238:9, 1270:2
**fire** [1] - 1194:9
**fired** [4] - 1243:23, 1248:1, 1255:11, 1256:7
**firm** [2] - 1255:14, 1258:4
**FIRM** [1] - 1184:16
**first** [38] - 1187:14, 1191:25, 1194:10, 1196:21, 1197:4, 1202:6, 1204:11, 1206:14, 1207:5, 1207:10, 1209:12, 1221:3, 1222:8, 1230:5, 1233:6, 1233:12, 1238:1, 1238:24, 1240:19, 1241:21, 1248:16, 1257:17, 1271:21, 1271:24, 1271:25, 1272:3, 1275:6, 1285:19, 1287:11, 1287:22, 1292:12, 1295:3, 1300:4, 1300:9, 1300:25, 1301:16, 1319:15
**fishy** [3] - 1262:22, 1262:25
**fit** [1] - 1242:24
**fits** [1] - 1219:3
**five** [15] - 1190:8, 1190:16, 1190:19, 1191:8, 1191:10, 1191:13, 1201:16, 1207:16, 1231:4, 1240:4, 1248:2, 1251:4, 1261:9, 1264:15, 1296:21
**five-minute** [2] - 1190:16, 1191:10
**flashed** [1] - 1265:13
**flat** [1] - 1242:17
**flat-out** [1] - 1242:17

**flatly** [1] - 1227:16
**flies** [1] - 1248:3
**flip** [1] - 1231:4
**flow** [1] - 1190:10
**flows** [2] - 1208:7, 1208:11
**flue** [2] - 1231:20, 1241:19
**fly** [1] - 1222:9
**fo** [1] - 1190:4
**focus** [3] - 1195:12, 1226:3, 1226:5
**focused** [1] - 1240:7
**focusing** [1] - 1234:22
**folks** [6] - 1202:5, 1215:8, 1223:1, 1231:24, 1273:25, 1320:11
**follow** [4] - 1274:13, 1274:23, 1275:17, 1320:2
**following** [10] - 1191:6, 1274:9, 1288:10, 1288:11, 1289:22, 1290:13, 1292:11, 1295:2, 1301:11, 1312:12
**foot** [1] - 1233:1
**FOR** [1] - 1184:2
**force** [2] - 1250:14, 1250:15
**forces** [2] - 1242:5, 1248:10
**foregoing** [1] - 1320:19
**foreperson** [6] - 1308:7, 1308:9, 1309:13, 1311:22, 1312:23, 1318:14
**FOREPERSON** [1] - 1312:25
**foreseen** [1] - 1305:4
**forget** [4] - 1192:22, 1192:25, 1279:19, 1312:5
**form** [45] - 1186:14, 1186:21, 1187:1, 1187:25, 1188:14, 1188:25, 1189:6, 1189:11, 1189:15, 1189:18, 1189:24, 1190:22, 1190:25, 1199:17, 1199:22, 1206:3, 1206:4, 1206:5, 1206:8, 1206:12, 1207:8, 1207:11, 1208:15, 1213:12, 1219:5, 1222:9, 1228:12, 1233:10, 1237:13,

1243:4, 1243:10, 1265:23, 1266:3, 1269:20, 1275:4, 1309:10, 1309:11, 1309:14, 1309:17, 1309:20, 1311:18, 1311:19, 1311:21, 1313:4, 1319:24
**format** [1] - 1218:9
**former** [3] - 1229:18, 1236:2, 1246:20
**formula** [8] - 1225:20, 1235:10, 1235:13, 1235:16, 1235:17, 1235:18, 1237:7
**formulas** [1] - 1263:10
**formulation** [1] - 1235:4
**forth** [3] - 1217:20, 1249:5, 1289:1
**forward** [3] - 1271:7, 1273:21, 1312:4
**four** [18] - 1192:12, 1193:4, 1196:11, 1198:16, 1207:16, 1208:7, 1222:25, 1228:4, 1240:4, 1255:19, 1256:13, 1264:21, 1266:15, 1270:16, 1292:21, 1308:13, 1308:14
**fourth** [3] - 1225:1, 1295:12, 1301:25
**frame** [1] - 1249:11
**framework** [1] - 1218:10
**free** [7] - 1226:12, 1270:21, 1271:6, 1278:12, 1280:20, 1310:1, 1310:19
**friends** [2] - 1254:20, 1255:21
**frustration** [1] - 1216:19
**fuel** [3] - 1231:9, 1239:8, 1241:1
**full** [6] - 1205:20, 1212:17, 1213:5, 1221:20, 1221:21, 1300:21
**fully** [1] - 1188:18
**fun** [3] - 1238:10, 1265:9, 1271:13
**fundamental** [1] - 1231:2
**funnels** [1] - 1188:19
**funny** [5] - 1210:17, 1215:4, 1223:5, 1259:9, 1262:21

## G

**Gallagher** [3] - 1215:21, 1217:25, 1262:20
**GALLAGHER** [1] - 1184:7
**Gallagher-DTE** [1] - 1215:21
**gas** [4] - 1241:15, 1241:19, 1288:14, 1288:18
**gears** [1] - 1252:7
**gems** [1] - 1196:18
**general** [3] - 1274:18, 1286:16, 1306:17
**generally** [1] - 1283:22
**generator** [1] - 1302:12
**generous** [1] - 1230:20
**gentleman** [2] - 1222:17, 1244:15
**gentlemen** [10] - 1192:11, 1228:11, 1257:12, 1264:20, 1273:20, 1273:23, 1311:18, 1312:8, 1312:21, 1318:22
**Georgia** [6] - 1214:17, 1214:24, 1215:1, 1261:2, 1301:13
**Georgia-Pacific** [6] - 1214:17, 1214:24, 1215:1, 1261:2, 1301:13
**get-go** [1] - 1231:25
**get-out** [1] - 1262:22
**gigantic** [1] - 1241:2
**given** [10] - 1254:22, 1275:15, 1280:19, 1280:23, 1281:11, 1285:5, 1285:17, 1292:9, 1294:24, 1294:25
**glaring** [1] - 1205:2
**glaze** [1] - 1217:3
**glide** [1] - 1247:15
**glossed** [1] - 1241:19
**gorgeous** [2] - 1258:7, 1258:11
**government** [7] - 1210:13, 1241:24, 1242:7, 1247:21, 1248:1, 1248:18, 1254:23
**grade** [3] - 1234:10, 1235:18, 1262:3

**grand** [7] - 1260:3, 1260:9, 1261:8, 1262:13, 1262:14
**grant** [1] - 1303:24
**granting** [1] - 1302:3
**graphics** [4] - 1258:8, 1258:13, 1276:11, 1276:14
**gray** [1] - 1206:20
**great** [9] - 1191:2, 1191:21, 1206:6, 1247:14, 1249:25, 1252:12, 1253:8, 1258:10
**greater** [1] - 1283:25
**greatest** [1] - 1284:9
**Green** [34] - 1198:15, 1209:11, 1213:24, 1214:16, 1215:17, 1216:3, 1216:6, 1216:8, 1216:20, 1217:13, 1217:15, 1218:6, 1221:20, 1222:14, 1222:17, 1222:24, 1223:1, 1223:17, 1230:5, 1234:2, 1236:18, 1238:5, 1238:14, 1240:3, 1244:12, 1244:18, 1253:13, 1253:16, 1258:23, 1259:1, 1260:6, 1260:22, 1261:17
**Green's** [2] - 1213:25, 1237:17
**ground** [3] - 1193:6, 1196:22, 1226:8
**grounds** [1] - 1254:9
**group** [2] - 1187:20, 1284:25
**grouping** [1] - 1187:19
**growth** [6] - 1255:5, 1255:7, 1256:8, 1257:15, 1257:23, 1262:9
**guess** [10] - 1188:4, 1188:10, 1207:5, 1223:20, 1225:19, 1254:20, 1267:15, 1272:20, 1275:22, 1319:5
**guesswork** [1] - 1299:19
**guidance** [1] - 1299:23
**guide** [1] - 1285:15
**Gunderson** [1] - 1244:11
**guy** [12] - 1196:1,

1196:3, 1196:5, 1196:9, 1205:12, 1220:25, 1222:14, 1224:17, 1263:18, 1266:9, 1266:13, 1273:8
**Guys** [1] - 1210:15
**guys** [36] - 1192:16, 1193:11, 1194:9, 1198:13, 1199:24, 1205:17, 1206:5, 1208:7, 1208:8, 1208:11, 1210:14, 1211:10, 1212:9, 1212:24, 1213:12, 1216:1, 1218:8, 1219:25, 1221:2, 1221:19, 1222:20, 1224:10, 1225:19, 1226:9, 1250:9, 1261:25, 1262:14, 1262:21, 1263:2, 1269:3, 1269:6, 1269:20, 1270:3, 1273:8, 1273:24

## H

**HALEY** [1] - 1184:23
**half** [10] - 1193:4, 1203:21, 1209:17, 1213:5, 1216:1, 1216:15, 1260:1, 1268:2, 1270:16
**hall** [1] - 1244:16
**hand** [4] - 1210:13, 1210:14, 1298:23, 1313:4
**handing** [2] - 1226:17, 1230:21
**handle** [1] - 1192:16
**hands** [1] - 1210:9
**handsome** [1] - 1253:10
**hard** [7] - 1193:10, 1197:8, 1227:25, 1238:1, 1260:8, 1266:4, 1319:7
**hardly** [2] - 1224:10, 1224:21
**Harris** [1] - 1238:9
**hazardous** [1] - 1194:1
**head** [2] - 1189:22, 1196:3
**heading** [1] - 1247:23
**hear** [28] - 1190:9, 1191:25, 1195:2, 1195:3, 1202:16,

1214:21, 1215:12, 1219:23, 1219:24, 1220:4, 1220:19, 1221:6, 1222:16, 1223:5, 1225:8, 1228:8, 1237:23, 1238:11, 1247:3, 1252:23, 1253:3, 1253:11, 1253:12, 1257:25, 1264:22, 1269:14, 1276:25, 1310:17
**heard** [51] - 1189:12, 1197:3, 1197:4, 1200:7, 1201:9, 1215:11, 1215:12, 1215:20, 1216:3, 1221:22, 1221:23, 1222:2, 1223:13, 1224:1, 1230:6, 1230:13, 1231:16, 1233:17, 1233:23, 1234:1, 1234:21, 1235:5, 1239:17, 1244:10, 1247:2, 1247:7, 1247:12, 1247:14, 1248:19, 1250:7, 1250:12, 1257:1, 1257:6, 1257:8, 1267:12, 1267:25, 1269:12, 1270:19, 1272:15, 1272:16, 1275:8, 1276:2, 1276:4, 1277:4, 1277:12, 1281:8, 1282:8, 1283:14, 1285:3
**heck** [3] - 1196:1, 1263:16, 1263:21
**help** [3] - 1276:19, 1278:16, 1282:3
**helped** [1] - 1195:12
**helpful** [1] - 1197:15
**hereby** [1] - 1320:17
**hesitate** [2] - 1309:2, 1310:9
**hidden** [1] - 1273:5
**high** [7] - 1205:10, 1205:11, 1292:25, 1293:17, 1294:7, 1296:2, 1304:15
**higher** [2] - 1217:16, 1304:19
**highlighted** [1] - 1249:20
**highlights** [1] - 1284:7
**highly** [3] - 1200:13, 1200:16, 1251:15
**himself** [5] - 1231:17, 1236:13, 1241:22,

1253:25, 1254:2
**hindsight** [1] - 1304:23
**hired** [1] - 1233:3
**history** [3] - 1195:1, 1195:15, 1246:18
**hit** [2] - 1190:9, 1227:14
**HITCH** [1] - 1185:3
**Holdings** [9] - 1284:21, 1294:18, 1313:16, 1313:17, 1314:20, 1315:21, 1316:16, 1317:11, 1318:3
**honest** [2] - 1196:2, 1309:4
**honestly** [1] - 1310:16
**Honor** [17] - 1187:7, 1188:16, 1188:22, 1189:21, 1190:21, 1191:1, 1192:7, 1202:13, 1228:24, 1229:1, 1230:21, 1261:11, 1263:24, 1264:17, 1318:17, 1318:20, 1320:9
**Honor's** [1] - 1207:8
**Honorable** [1] - 1184:11
**hooked** [1] - 1216:12
**hose** [1] - 1194:9
**hotel** [1] - 1197:10
**hour** [2] - 1190:2, 1225:21
**hours** [4] - 1224:18, 1224:20, 1262:24
**huge** [1] - 1252:8
**hundred** [7] - 1205:15, 1212:8, 1234:4, 1259:16, 1260:11, 1262:3, 1262:16
**hundreds** [2] - 1259:24, 1261:21
**hypothetical** [24] - 1214:4, 1215:3, 1215:5, 1215:6, 1215:23, 1225:14, 1256:1, 1260:17, 1261:2, 1261:12, 1295:21, 1300:7, 1300:15, 1300:18, 1300:22, 1301:2, 1301:5, 1304:3, 1304:24, 1305:3, 1305:5, 1305:8, 1305:15, 1306:5
**hypothetically** [1] - 1305:20

**I**

**idea** [2] - 1207:21, 1210:7
**identified** [3] - 1193:24, 1242:4, 1242:15
**identifies** [1] - 1217:20
**identify** [4] - 1198:17, 1201:18, 1203:17, 1276:15
**ignore** [3] - 1227:7, 1277:6, 1288:8
**II** [7] - 1219:1, 1219:14, 1284:19, 1313:25, 1315:3, 1317:15, 1318:8
**III** [1] - 1184:21
**illustrate** [3] - 1276:12, 1282:3, 1282:11
**illustrative** [1] - 1282:4
**imagine** [2] - 1198:4, 1207:14
**impartial** [1] - 1308:25
**impassioned** [2] - 1264:22, 1266:1
**implement** [1] - 1252:13
**importance** [3] - 1283:23, 1284:1, 1284:5
**important** [26] - 1193:10, 1193:23, 1193:25, 1199:17, 1199:21, 1206:8, 1210:1, 1216:4, 1239:22, 1243:11, 1246:10, 1246:20, 1246:25, 1247:2, 1253:18, 1263:2, 1263:25, 1264:1, 1268:19, 1275:21, 1279:10, 1279:23, 1280:4, 1286:23, 1306:16, 1310:15
**importantly** [2] - 1192:22, 1231:12
**impose** [1] - 1206:12
**impossible** [1] - 1235:20
**impractical** [2] - 1225:13, 1295:21
**improvements** [1] - 1303:11
**IN** [2] - 1184:1, 1184:2
**in-depth** [2] - 1222:5

**inaccurately** [1] - 1279:20
**Inc** [3] - 1252:23, 1284:16
**incentives** [1] - 1230:16
**include** [3] - 1290:4, 1297:24, 1305:6
**included** [1] - 1194:16
**includes** [5] - 1208:6, 1275:18, 1276:6, 1290:3, 1291:11
**including** [9] - 1237:8, 1251:19, 1276:8, 1282:1, 1289:22, 1289:24, 1296:23, 1299:2, 1311:21
**inconsistent** [1] - 1279:1
**incorporate** [1] - 1186:16
**incorporates** [1] - 1289:14
**incorrect** [1] - 1233:20
**increased** [1] - 1301:6
**indeed** [1] - 1238:8
**indemnify** [2] - 1201:25
**independent** [8] - 1237:22, 1244:10, 1288:24, 1288:25, 1289:4, 1289:6, 1289:7, 1289:19
**indicated** [1] - 1205:5
**indirect** [1] - 1290:16
**indirectly** [2] - 1277:20, 1290:13
**individual** [4] - 1284:3, 1307:5, 1307:16, 1308:23
**individually** [2] - 1287:7, 1291:16
**induce** [1] - 1205:19
**induced** [29] - 1188:7, 1198:24, 1199:9, 1199:11, 1200:19, 1202:8, 1202:14, 1205:7, 1207:9, 1214:10, 1263:20, 1268:2, 1271:24, 1272:7, 1272:12, 1285:6, 1285:20, 1290:21, 1290:25, 1291:23, 1293:4, 1293:14, 1294:13, 1295:25, 1298:9, 1300:4, 1306:22, 1306:25, 1307:1
**inducement** [18] - 1187:9, 1204:25,

1205:22, 1227:8, 1238:24, 1239:24, 1240:5, 1243:3, 1243:5, 1264:10, 1267:14, 1268:11, 1292:6, 1292:9, 1293:9, 1293:23, 1294:10
**induces** [1] - 1290:16
**inducing** [5] - 1206:17, 1292:3, 1293:10, 1313:10, 1314:14
**Industrial** [8] - 1284:24, 1294:21, 1314:2, 1315:5, 1316:4, 1316:24, 1317:16, 1318:9
**industry** [12] - 1197:15, 1201:10, 1221:24, 1222:2, 1223:14, 1224:12, 1230:3, 1232:25, 1247:16, 1251:15, 1255:4, 1265:15
**inference** [1] - 1259:14
**influence** [5] - 1275:10, 1275:24, 1276:4, 1277:9, 1311:15
**influenced** [1] - 1276:22
**information** [15] - 1216:23, 1217:20, 1218:19, 1218:21, 1232:15, 1250:17, 1251:12, 1272:5, 1280:15, 1282:12, 1286:16, 1305:4, 1310:23, 1311:5, 1312:9
**infringe** [31] - 1198:7, 1212:15, 1233:20, 1235:12, 1235:22, 1239:2, 1239:5, 1240:1, 1243:2, 1243:14, 1263:21, 1266:22, 1267:19, 1290:17, 1290:21, 1291:14, 1291:18, 1291:19, 1292:4, 1292:13, 1292:20, 1293:8, 1294:5, 1294:8, 1296:9, 1296:11, 1306:4, 1306:19, 1307:9, 1317:6, 1317:22
**infringed** [32] - 1208:19, 1213:23,

1214:9, 1214:13, 1226:1, 1249:2, 1283:8, 1285:10, 1286:4, 1286:7, 1286:9, 1286:25, 1288:6, 1290:8, 1290:12, 1290:20, 1291:2, 1291:3, 1291:6, 1291:10, 1292:1, 1293:2, 1293:20, 1293:21, 1293:25, 1295:3, 1297:7, 1298:15, 1298:24, 1299:4, 1300:19, 1306:24
**infringement** [157] - 1187:20, 1187:22, 1188:2, 1188:8, 1188:14, 1197:22, 1198:24, 1198:25, 1199:9, 1199:11, 1199:12, 1200:20, 1202:1, 1202:8, 1202:14, 1202:24, 1204:18, 1205:8, 1205:21, 1206:14, 1206:17, 1207:14, 1207:20, 1207:22, 1207:24, 1208:2, 1208:4, 1208:5, 1209:7, 1210:5, 1213:16, 1213:19, 1220:14, 1222:4, 1225:9, 1225:23, 1226:3, 1228:13, 1231:8, 1232:1, 1232:2, 1233:7, 1233:12, 1233:21, 1234:1, 1234:24, 1236:25, 1237:1, 1237:9, 1237:14, 1240:23, 1243:13, 1243:14, 1245:5, 1245:7, 1246:5, 1249:6, 1249:8, 1250:12, 1255:12, 1263:5, 1263:20, 1264:6, 1268:2, 1268:15, 1270:10, 1272:8, 1272:12, 1282:21, 1283:3, 1283:10, 1285:7, 1285:8, 1285:21, 1285:25, 1287:23, 1290:5, 1290:11, 1290:14, 1290:16, 1290:18, 1290:23, 1290:25, 1291:1, 1291:15, 1291:21, 1291:24, 1292:3, 1292:24, 1293:3,

1293:5, 1293:9, 1293:10, 1293:13, 1293:14, 1293:18, 1293:24, 1294:3, 1294:10, 1294:12, 1294:13, 1294:14, 1294:22, 1294:25, 1295:25, 1296:5, 1296:7, 1296:10, 1296:13, 1296:14, 1296:17, 1296:20, 1296:22, 1297:16, 1297:19, 1297:21, 1297:24, 1298:5, 1298:8, 1298:10, 1298:12, 1298:13, 1298:17, 1298:19, 1298:22, 1299:8, 1299:12, 1300:3, 1300:4, 1300:9, 1300:14, 1300:22, 1300:25, 1301:9, 1303:16, 1305:7, 1306:21, 1306:23, 1306:25, 1307:2, 1307:3, 1307:4, 1307:5, 1307:8, 1307:10, 1307:12, 1307:13, 1307:14, 1307:16, 1313:10, 1314:14, 1315:17, 1316:12, 1317:8, 1317:24

**infringer** [3] - 1249:12, 1303:12, 1305:9

**infringers** [1] - 1248:20

**infringes** [3] - 1298:20, 1307:6, 1307:17

**infringing** [27] - 1208:24, 1225:10, 1233:13, 1233:15, 1237:5, 1237:17, 1249:17, 1263:14, 1264:3, 1265:17, 1270:9, 1294:9, 1295:10, 1295:16, 1295:18, 1295:23, 1296:16, 1297:1, 1297:4, 1299:7, 1300:13, 1305:10, 1306:2, 1306:3, 1306:12, 1306:17, 1306:19

**initiative** [2] - 1254:4, 1262:9

**initiatives** [2] - 1253:24, 1254:4

**injecting** [4] - 1198:21, 1241:13, 1288:13, 1288:17

**innocent** [1] - 1279:22

**inside** [1] - 1269:6

**inspect** [1] - 1313:3

**Instagram** [1] - 1311:4

**install** [1] - 1267:6

**installed** [2] - 1222:20, 1234:9

**instance** [1] - 1283:5

**instances** [3] - 1282:10, 1307:2, 1307:13

**instant** [2] - 1227:17, 1311:2

**instead** [4] - 1249:11, 1278:15, 1290:20, 1296:14

**institution** [1] - 1257:18

**instruct** [9] - 1199:4, 1207:25, 1230:19, 1233:23, 1240:13, 1274:13, 1275:15, 1288:3, 1290:6

**instructed** [5] - 1229:7, 1240:21, 1242:11, 1283:20, 1288:1

**instructing** [1] - 1299:20

**instruction** [9] - 1194:18, 1267:14, 1268:4, 1270:6, 1270:7, 1286:18, 1291:8, 1293:21, 1299:25

**instructions** [46] - 1186:5, 1186:12, 1189:24, 1191:5, 1199:8, 1202:13, 1202:16, 1203:9, 1205:13, 1205:16, 1215:10, 1225:6, 1230:18, 1233:15, 1233:18, 1239:23, 1241:8, 1242:25, 1245:23, 1252:18, 1253:6, 1263:23, 1265:23, 1266:2, 1266:19, 1266:23, 1267:8, 1267:25, 1268:1, 1268:11, 1268:18, 1272:17, 1274:3, 1274:15, 1275:2, 1275:17, 1275:19, 1275:20, 1285:15, 1286:12, 1286:14, 1290:14,

1299:22, 1307:18, 1309:20

**intellectual** [7] - 1229:24, 1236:4, 1236:5, 1255:14, 1255:16, 1265:20, 1273:7

**intend** [5] - 1191:11, 1200:21, 1200:23, 1234:17, 1263:22

**intended** [3] - 1278:16, 1287:1, 1294:5

**intending** [1] - 1292:13

**intent** [14] - 1204:6, 1238:25, 1239:1, 1239:2, 1239:6, 1239:15, 1239:24, 1240:6, 1240:9, 1245:24, 1263:20, 1267:13, 1267:24, 1296:6

**intention** [3] - 1239:5, 1239:12, 1243:1

**intentional** [1] - 1279:22

**intentionally** [1] - 1298:14

**intentions** [1] - 1231:6

**interest** [2] - 1299:15, 1309:8

**interested** [1] - 1260:4

**interesting** [1] - 1210:8

**interests** [1] - 1279:3

**Intermountain** [4] - 1234:23, 1235:19, 1238:4, 1270:1

**Internet** [1] - 1311:3

**internet** [4] - 1245:3, 1245:4, 1311:1, 1311:2

**interrogatories** [2] - 1281:10, 1281:14

**interrupt** [1] - 1190:10

**intimation** [1] - 1309:22

**intractable** [1] - 1187:18

**invalid** [4] - 1194:23, 1214:11, 1293:4, 1296:16

**invalidity** [4] - 1215:24, 1246:19, 1246:22, 1263:1

**invent** [1] - 1231:17

**invented** [1] - 1249:18

**invention** [29] - 1193:8, 1194:14,

1195:7, 1195:16, 1209:4, 1221:5, 1231:22, 1265:17, 1270:14, 1287:2, 1287:4, 1291:17, 1295:13, 1297:3, 1299:9, 1302:2, 1302:3, 1302:11, 1302:20, 1302:22, 1302:25, 1303:2, 1303:6, 1303:9, 1303:21, 1304:14, 1304:22, 1306:3, 1306:16

**inventions** [2] - 1236:6, 1303:7

**inventor** [1] - 1231:17

**invest** [2] - 1211:23, 1222:23

**investigate** [1] - 1232:18

**investing** [2] - 1257:8, 1257:9

**investment** [5] - 1198:18, 1206:24, 1208:11, 1213:14, 1257:1

**investment-vehicle** [1] - 1213:14

**investor** [2] - 1211:16, 1222:23

**investors** [13] - 1211:12, 1211:15, 1221:24, 1222:6, 1256:5, 1256:6, 1256:10, 1256:25, 1257:1, 1257:4, 1257:10, 1257:20, 1273:6

**invite** [2] - 1269:8, 1273:10

**invites** [1] - 1269:3

**involved** [4] - 1199:23, 1256:15, 1265:5, 1265:6

**involves** [1] - 1288:23

**ionizes** [1] - 1222:8

**iPhone** [1] - 1311:1

**irrelevant** [1] - 1281:5

**IRS** [5] - 1210:9, 1211:7, 1245:11, 1245:12, 1245:13

**issuance** [2] - 1297:11, 1297:25

**issue** [20] - 1186:17, 1196:24, 1198:21, 1200:9, 1200:17, 1200:18, 1200:19, 1200:20, 1202:6, 1202:9, 1203:1,

1203:2, 1210:9, 1235:4, 1267:7, 1275:15, 1285:1, 1294:6, 1297:23, 1298:11

**issued** [9] - 1196:20, 1196:25, 1212:19, 1212:20, 1235:16, 1249:1, 1265:19, 1270:19, 1270:23

**issues** [10] - 1189:6, 1199:3, 1212:15, 1235:25, 1271:1, 1285:14, 1285:18, 1286:13, 1286:20, 1296:20

**Item** [3] - 1255:1, 1256:3

**items** [1] - 1302:12

**itself** [4] - 1245:9, 1247:9, 1289:10, 1303:9

**IV** [7] - 1219:2, 1219:16, 1284:20, 1314:4, 1315:7, 1317:17, 1318:10

## J

**JAMES** [2] - 1184:16, 1185:3

**January** [3] - 1261:5, 1261:7, 1261:17

**JASON** [1] - 1184:20

**JEFF** [1] - 1185:6

**Jeff** [9] - 1209:11, 1222:16, 1223:1, 1230:5, 1234:1, 1236:18, 1238:5, 1244:12, 1244:18

**jelly** [2] - 1229:17, 1236:19

**JESSICA** [1] - 1185:8

**job** [4] - 1246:9, 1275:9, 1275:15, 1277:25

**jobs** [1] - 1247:2

**JOHN** [1] - 1184:20

**joint** [1] - 1319:23

**Joppa** [2] - 1249:13, 1249:16

**JPMorgan** [1] - 1256:6

**Judge** [1] - 1209:14

**judge** [7] - 1188:3, 1199:2, 1230:18, 1247:4, 1256:16, 1256:20, 1269:11

**judge's** [1] - 1199:2

**judged** [1] - 1245:19

judges [6] - 1204:1, 1205:14, 1275:11, 1278:21, 1309:8
judgment [4] - 1264:11, 1308:18, 1308:23, 1319:24
July [3] - 1244:3, 1245:17, 1245:18
jumbo [1] - 1261:24
jump [2] - 1251:14, 1255:5
jumping [1] - 1230:13
Juror [2] - 1308:8
juror [2] - 1308:18, 1308:19
jurors [13] - 1275:6, 1280:1, 1284:4, 1308:21, 1309:1, 1309:6, 1310:7, 1310:10, 1310:12, 1310:20, 1311:11, 1312:19, 1319:7
JURY [2] - 1184:9, 1184:11
jury [65] - 1184:12, 1186:4, 1186:12, 1186:13, 1188:9, 1189:6, 1189:10, 1189:14, 1191:4, 1191:21, 1191:23, 1192:11, 1205:16, 1233:15, 1233:18, 1239:23, 1241:8, 1242:25, 1252:18, 1253:6, 1257:19, 1260:25, 1262:15, 1263:23, 1264:20, 1265:23, 1266:2, 1267:25, 1268:1, 1273:18, 1273:20, 1274:2, 1274:4, 1274:6, 1274:11, 1274:12, 1274:24, 1275:3, 1276:16, 1281:24, 1282:5, 1286:13, 1307:21, 1307:24, 1308:2, 1308:18, 1309:12, 1310:2, 1310:18, 1311:11, 1311:20, 1312:1, 1312:7, 1312:15, 1312:16, 1312:20, 1312:22, 1312:23, 1318:16, 1318:18, 1318:22, 1318:24, 1319:9, 1319:12, 1319:18
JUSTIN [1] - 1184:21

**K**

Kathy [1] - 1215:12
keep [26] - 1191:14, 1200:13, 1200:16, 1202:1, 1205:20, 1205:24, 1208:24, 1210:9, 1211:2, 1211:8, 1211:9, 1212:1, 1220:10, 1222:1, 1223:11, 1223:23, 1224:10, 1224:13, 1224:16, 1227:23, 1232:9, 1267:12, 1269:25, 1270:22, 1271:6, 1310:6
keeping [2] - 1238:8, 1257:10
keeps [4] - 1212:10, 1224:19, 1271:13, 1272:2
KENNETH [1] - 1185:4
kept [7] - 1213:9, 1225:23, 1225:25, 1234:6, 1244:5, 1266:19, 1268:19
key [1] - 1235:25
kicking [1] - 1223:3
killer [1] - 1217:4
kind [24] - 1187:16, 1192:15, 1192:23, 1195:14, 1199:6, 1201:4, 1201:6, 1205:16, 1207:3, 1207:15, 1207:21, 1215:4, 1217:2, 1218:9, 1218:16, 1218:21, 1219:8, 1219:23, 1224:1, 1224:6, 1225:4, 1226:4, 1227:3, 1260:23
knobs [1] - 1208:9
know-how [1] - 1306:10
knowing [7] - 1203:22, 1205:1, 1205:2, 1208:21, 1212:17, 1291:20
knowledge [23] - 1228:15, 1231:6, 1233:21, 1233:25, 1240:5, 1240:8, 1264:1, 1267:10, 1267:13, 1267:23, 1267:24, 1278:24, 1280:9, 1280:10, 1295:22, 1296:6, 1296:12, 1297:18, 1298:4, 1298:8, 1300:21
knowledgeable [1] - 1237:22
known [4] - 1214:24, 1245:5, 1282:17, 1293:7
knows [3] - 1205:3, 1211:25, 1270:7
Kuennen [3] - 1238:3, 1238:9, 1270:2

**L**

lab [2] - 1211:4, 1220:9
labs [1] - 1236:7
ladies [10] - 1192:11, 1228:11, 1257:12, 1264:20, 1273:20, 1273:23, 1311:17, 1312:8, 1312:21, 1318:21
laid [1] - 1232:11
lapse [1] - 1279:22
large [3] - 1242:5, 1248:10, 1251:16
Larkwood [9] - 1219:9, 1284:22, 1294:19, 1313:19, 1314:22, 1315:23, 1316:18, 1317:12, 1318:4
last [12] - 1186:3, 1186:4, 1196:11, 1209:15, 1212:24, 1216:12, 1225:2, 1226:9, 1232:23, 1274:22, 1286:8, 1319:16
lastly [1] - 1264:13
latch [1] - 1200:25
late [2] - 1253:25, 1269:5
Latin [1] - 1246:8
LAW [1] - 1184:16
Law [1] - 1252:11
law [44] - 1189:12, 1199:4, 1202:7, 1202:8, 1202:24, 1205:16, 1207:13, 1207:25, 1208:5, 1214:2, 1214:6, 1214:15, 1214:17, 1214:25, 1226:10, 1226:12, 1226:13, 1226:14, 1226:22, 1226:23, 1227:1, 1230:19, 1231:13, 1233:17, 1239:8, 1239:13, 1239:16, 1242:11, 1245:11, 1246:8, 1252:12, 1252:13, 1264:2, 1269:4, 1274:13, 1274:22, 1275:12, 1275:15, 1278:1, 1287:8, 1287:25, 1297:21, 1299:5, 1312:17
laws [2] - 1286:17, 1286:19
lawsuit [14] - 1202:4, 1202:12, 1224:5, 1224:9, 1229:12, 1235:3, 1237:8, 1237:9, 1250:20, 1257:3, 1257:11, 1258:22, 1258:25, 1265:18
Lawton [1] - 1215:12
lawyer [7] - 1216:6, 1217:11, 1221:22, 1226:23, 1238:8, 1265:24, 1267:8
lawyer's [1] - 1276:22
lawyers [16] - 1189:9, 1189:13, 1199:5, 1212:14, 1226:17, 1226:18, 1227:4, 1258:9, 1274:1, 1276:19, 1277:1, 1277:3, 1285:3, 1308:4, 1319:3
lawyers' [1] - 1276:17
lay [1] - 1250:14
laying [1] - 1250:14
lead [5] - 1214:23, 1236:21, 1268:21, 1319:9, 1319:11
leading [1] - 1193:17
leads [2] - 1278:11, 1282:25
learn [1] - 1248:6
learned [5] - 1233:2, 1246:7, 1247:24, 1248:6
learning [2] - 1293:3, 1296:4
least [3] - 1290:15, 1317:6, 1317:22
leave [1] - 1250:16
left [8] - 1190:8, 1190:19, 1191:13, 1196:19, 1207:6, 1210:13, 1232:25, 1244:19
legal [8] - 1230:17, 1244:19, 1256:3, 1268:16, 1272:11, 1276:21, 1282:16, 1306:10
legitimacy [2] - 1195:6, 1195:7
legs [1] - 1273:25
LENNON [1] - 1184:16
less [5] - 1213:13, 1221:11, 1254:15, 1287:19, 1299:8
letter [1] - 1226:16
level [1] - 1233:25
liability [1] - 1269:21
liable [12] - 1188:7, 1188:13, 1206:17, 1292:2, 1292:9, 1294:24, 1297:16, 1300:2, 1313:10, 1314:14, 1315:17, 1316:12
license [25] - 1214:13, 1215:19, 1254:9, 1254:14, 1271:1, 1300:7, 1300:11, 1300:14, 1300:15, 1300:20, 1301:8, 1301:9, 1301:20, 1301:21, 1302:15, 1303:19, 1303:24, 1304:3, 1304:25, 1305:7, 1305:14, 1305:15, 1305:19, 1305:21, 1305:22
licensed [1] - 1261:7
licensee [4] - 1302:6, 1302:11, 1303:14, 1303:18
licenses [9] - 1215:19, 1218:14, 1253:14, 1253:15, 1259:21, 1259:22, 1261:4, 1302:3, 1305:20
licensing [2] - 1301:17, 1302:2
licensor [5] - 1301:16, 1302:6, 1302:12, 1302:24, 1303:14
licensor's [1] - 1301:25
life [2] - 1197:7, 1198:3
light [3] - 1278:8, 1282:24, 1284:1
likely [6] - 1202:18, 1202:20, 1202:22, 1283:1, 1290:8, 1299:3
limitation [2] - 1287:14, 1287:16

**limitations** [1] - 1287:10
**limited** [7] - 1196:19, 1196:24, 1289:24, 1301:6, 1305:2, 1307:2, 1307:12
**line** [4] - 1239:17, 1258:22, 1302:7, 1319:5
**linkage** [1] - 1219:7
**LinkedIn** [1] - 1311:4
**Linton** [2] - 1223:1, 1240:9
**list** [6] - 1187:14, 1187:15, 1248:14, 1250:9, 1275:5, 1284:7
**listed** [11] - 1188:11, 1206:16, 1207:10, 1208:17, 1213:13, 1227:9, 1285:17, 1313:10, 1314:13, 1315:16, 1316:11
**listen** [9] - 1203:6, 1203:9, 1230:21, 1243:9, 1263:23, 1274:25, 1310:5, 1310:6, 1310:20
**literal** [1] - 1193:9
**literally** [10] - 1196:11, 1204:6, 1214:6, 1220:12, 1220:17, 1222:7, 1223:12, 1257:9, 1265:24, 1266:12
**litigate** [1] - 1254:12
**litigation** [22] - 1247:22, 1249:2, 1253:14, 1255:14, 1255:23, 1256:8, 1256:10, 1256:11, 1256:14, 1256:21, 1257:2, 1257:8, 1257:9, 1257:15, 1257:23, 1262:5, 1263:4, 1264:23, 1268:23, 1297:12, 1298:1
**litigious** [6] - 1254:10, 1254:11, 1254:19, 1257:14, 1265:12, 1265:15
**live** [4] - 1228:4, 1238:7, 1244:5, 1258:20
**lives** [2] - 1193:8, 1193:9
**living** [1] - 1197:10
**LLC** [84] - 1284:19, 1284:20, 1284:21,

1284:22, 1284:23, 1284:24, 1294:18, 1294:19, 1294:20, 1294:21, 1313:12, 1313:14, 1313:16, 1313:17, 1313:19, 1313:21, 1313:23, 1313:25, 1314:2, 1314:4, 1314:6, 1314:8, 1314:10, 1314:16, 1314:18, 1314:20, 1314:22, 1314:24, 1315:1, 1315:3, 1315:5, 1315:7, 1315:9, 1315:11, 1315:13, 1315:19, 1315:21, 1315:23, 1315:25, 1316:2, 1316:4, 1316:6, 1316:8, 1316:14, 1316:16, 1316:18, 1316:20, 1316:22, 1316:24, 1317:1, 1317:3, 1317:9, 1317:10, 1317:11, 1317:12, 1317:13, 1317:14, 1317:15, 1317:16, 1317:17, 1317:18, 1317:19, 1317:20, 1317:25, 1318:1, 1318:3, 1318:4, 1318:6, 1318:7, 1318:8, 1318:9, 1318:10, 1318:11, 1318:12, 1318:13
**LLCs** [6] - 1198:19, 1206:24, 1218:24, 1219:4, 1219:7, 1252:17
**LLP** [2] - 1185:3, 1185:6
**local** [1] - 1320:2
**long-term** [1] - 1237:8
**long-time** [1] - 1229:19
**Look** [1] - 1266:9
**look** [43] - 1189:11, 1201:16, 1204:8, 1216:3, 1216:25, 1220:1, 1220:2, 1221:6, 1227:12, 1228:14, 1232:1, 1235:23, 1239:3, 1239:21, 1241:7, 1241:9, 1243:11, 1243:16, 1245:11, 1247:22, 1250:18, 1253:23, 1254:25, 1255:1, 1255:25,

1256:2, 1256:9, 1257:16, 1260:8, 1261:5, 1261:6, 1261:25, 1262:1, 1265:22, 1266:2, 1267:15, 1270:11, 1271:12, 1273:15, 1273:21, 1289:3, 1289:18, 1311:19
**looked** [9] - 1186:21, 1199:23, 1218:14, 1247:11, 1248:9, 1249:19, 1249:24, 1251:16, 1301:8
**looking** [4] - 1200:9, 1235:25, 1270:9, 1273:4
**looks** [1] - 1230:3
**loop** [1] - 1242:11
**lose** [1] - 1204:23
**loss** [3] - 1204:24, 1250:24, 1251:2
**love** [3] - 1190:13, 1190:16, 1318:25
**low** [3] - 1216:13, 1304:18
**lower** [1] - 1304:16
**lunch** [1] - 1312:10
**Lundy** [1] - 1222:5
**lying** [1] - 1216:8

## M

**machine** [1] - 1200:13
**MacPherson** [16] - 1192:23, 1197:4, 1197:9, 1215:20, 1216:8, 1238:13, 1251:13, 1251:22, 1253:10, 1253:25, 1257:7, 1258:18, 1265:2, 1266:4, 1269:16, 1273:6
**MacPherson's** [1] - 1250:23
**made-up** [1] - 1271:16
**magically** [3] - 1261:20, 1261:23, 1262:24
**magistrate** [1] - 1256:20
**mail** [4] - 1190:25, 1240:9, 1249:7, 1249:25
**mails** [8] - 1190:22, 1201:17, 1222:13, 1240:4, 1240:8, 1249:4, 1249:10, 1312:9

**main** [1] - 1275:6
**maintain** [1] - 1302:1
**maintained** [1] - 1245:16
**major** [2] - 1255:20, 1256:13
**Man** [1] - 1203:17
**man** [5] - 1209:15, 1210:18, 1221:6, 1224:10, 1253:16
**manager** [1] - 1250:2
**mandates** [1] - 1242:7
**manner** [3] - 1279:3, 1281:14, 1309:21
**manufacture** [2] - 1303:19, 1306:11
**manufactured** [1] - 1301:24
**manufacturing** [1] - 1303:10
**March** [3] - 1184:13, 1250:19, 1318:14
**mark** [1] - 1237:13
**markers** [1] - 1225:18
**market** [4] - 1227:13, 1247:10, 1254:12, 1254:16
**marketing** [3] - 1302:1, 1304:7, 1304:8
**Markets** [1] - 1247:24
**Marquis** [9] - 1219:15, 1284:24, 1294:21, 1314:2, 1315:5, 1316:4, 1316:24, 1317:16, 1318:9
**married** [1] - 1229:17
**massive** [1] - 1212:7
**match** [4] - 1219:15, 1219:17, 1219:18, 1248:17
**material** [11] - 1197:19, 1198:21, 1198:22, 1209:4, 1239:12, 1239:16, 1241:14, 1288:13, 1288:17, 1295:13, 1297:2
**materials** [2] - 1306:10, 1311:24
**math** [1] - 1262:3
**mathematical** [1] - 1299:17
**MATS** [20] - 1196:13, 1211:11, 1211:13, 1211:16, 1211:22, 1211:24, 1212:12, 1222:1, 1223:3, 1223:4, 1223:12, 1232:24, 1241:25,

1247:14, 1247:16, 1247:25, 1248:1, 1251:6, 1251:7
**matter** [2] - 1268:7, 1283:23
**matters** [4] - 1218:9, 1219:6, 1267:9, 1270:8
**MAZUR** [1] - 1184:17
**MCCARTY** [1] - 1184:21
**ME2C** [81] - 1192:24, 1195:12, 1195:24, 1196:17, 1197:4, 1203:4, 1206:13, 1206:20, 1216:3, 1224:5, 1227:24, 1233:3, 1233:12, 1238:12, 1238:14, 1247:9, 1247:14, 1253:8, 1254:8, 1257:4, 1257:9, 1257:13, 1257:17, 1257:22, 1265:3, 1272:19, 1282:20, 1282:21, 1282:24, 1282:25, 1283:2, 1283:9, 1283:11, 1284:17, 1285:4, 1285:6, 1285:7, 1285:8, 1285:10, 1285:12, 1285:19, 1285:23, 1286:3, 1286:5, 1286:8, 1286:10, 1290:6, 1290:10, 1290:19, 1290:20, 1291:2, 1291:22, 1291:24, 1291:25, 1292:2, 1292:5, 1292:10, 1292:14, 1292:16, 1292:17, 1293:2, 1293:21, 1294:11, 1294:25, 1295:4, 1298:13, 1298:22, 1299:1, 1299:6, 1299:10, 1299:15, 1299:16, 1299:24, 1300:8, 1305:16, 1305:21, 1306:23, 1307:3, 1307:8, 1307:13
**ME2C's** [12] - 1202:24, 1231:22, 1237:1, 1247:8, 1258:5, 1258:15, 1283:4, 1283:9, 1285:3, 1285:5, 1294:8, 1299:7
**mean** [16] - 1201:1,

1202:20, 1210:12, 1214:3, 1214:5, 1214:21, 1215:5, 1218:11, 1221:19, 1226:13, 1228:8, 1258:10, 1268:21, 1279:18, 1288:1, 1299:21

**meaning** [5] - 1288:3, 1288:5, 1288:22, 1291:9, 1293:22

**means** [8] - 1202:23, 1266:22, 1278:24, 1282:23, 1284:6, 1289:22, 1299:3, 1310:24

**meant** [5] - 1227:6, 1231:20, 1275:10, 1309:21, 1311:15

**meantime** [1] - 1270:21

**measuring** [1] - 1243:20

**media** [1] - 1310:25

**meet** [10] - 1196:13, 1204:11, 1211:11, 1211:13, 1211:15, 1211:24, 1220:2, 1220:16, 1222:1, 1231:13

**meeting** [3] - 1197:4, 1215:16, 1271:5

**meets** [1] - 1287:15

**members** [1] - 1274:12

**memory** [5] - 1278:24, 1279:22, 1283:20, 1284:3, 1284:9

**mentioned** [2] - 1280:17, 1311:18

**mercury** [13] - 1193:22, 1193:25, 1222:8, 1222:18, 1223:8, 1231:10, 1239:9, 1241:15, 1241:19, 1243:20, 1255:6, 1288:14, 1288:18

**mercury-containing** [2] - 1288:14, 1288:18

**mere** [1] - 1293:6

**merely** [1] - 1243:19

**MerSorb** [1] - 1235:11

**MES** [10] - 1252:22, 1252:23, 1253:1, 1253:3, 1257:13, 1272:15, 1272:16, 1272:19, 1284:16

**messages** [3] -

1307:25, 1308:6, 1308:10

**messaging** [1] - 1311:2

**met** [2] - 1220:18, 1289:2

**method** [6] - 1231:18, 1295:16, 1295:23, 1296:3, 1297:4, 1306:20

**methodology** [1] - 1218:13

**methods** [2] - 1289:24, 1290:1

**middle** [1] - 1197:11

**MIDWEST** [1] - 1184:3

**Midwest** [2] - 1272:18, 1284:15

**might** [6] - 1186:19, 1272:23, 1277:7, 1290:4, 1296:9

**mile** [2] - 1273:12

**miles** [1] - 1273:13

**million** [18] - 1200:5, 1200:8, 1200:10, 1211:17, 1211:20, 1213:9, 1216:1, 1216:15, 1217:8, 1259:2, 1259:5, 1259:10, 1259:25, 1260:1, 1260:11, 1262:4, 1262:23

**millions** [10] - 1220:5, 1229:8, 1234:11, 1238:12, 1259:24, 1261:21, 1263:15

**mind** [17] - 1188:1, 1203:1, 1203:2, 1203:7, 1204:8, 1229:5, 1229:6, 1231:6, 1231:8, 1233:22, 1239:23, 1260:23, 1264:1, 1264:5, 1310:6, 1310:9, 1310:11

**mind-blowing** [1] - 1260:23

**minds** [2] - 1198:10, 1310:19

**mine** [1] - 1275:9

**minute** [11] - 1190:16, 1191:9, 1191:10, 1196:8, 1212:20, 1215:15, 1216:12, 1252:7, 1273:24, 1274:4, 1319:10

**minutes** [13] - 1190:2, 1190:3, 1190:8, 1190:19, 1191:13, 1228:17, 1245:13,

1261:10, 1264:14, 1264:16, 1270:16, 1318:25, 1319:2

**mislead** [1] - 1267:23

**misleading** [3] - 1227:7, 1251:13, 1252:2

**miss** [1] - 1231:15

**missing** [1] - 1207:19

**misstatement** [1] - 1279:21

**mistake** [1] - 1279:17

**mistaken** [5] - 1226:12, 1227:1, 1233:17, 1297:20, 1297:22

**misunderstood** [1] - 1217:21

**mix** [1] - 1197:12

**Mod** [8] - 1249:3, 1249:12, 1249:15, 1249:21, 1259:11, 1262:20, 1268:24, 1269:2

**modes** [1] - 1302:20

**modify** [1] - 1306:20

**mom** [2] - 1257:6

**moment** [4] - 1192:5, 1197:24, 1228:23, 1309:11

**moments** [1] - 1197:7

**Monday** [1] - 1193:13

**monetary** [1] - 1286:9

**money** [16] - 1200:1, 1204:22, 1204:23, 1208:7, 1208:10, 1210:23, 1212:14, 1217:25, 1221:25, 1230:16, 1248:22, 1251:1, 1258:12, 1282:22, 1317:22

**months** [3] - 1250:20, 1254:1, 1254:16

**morning** [4] - 1186:16, 1189:1, 1190:21, 1248:21

**MORRIS** [1] - 1185:3

**most** [6] - 1192:22, 1193:25, 1231:2, 1247:1, 1256:11, 1258:17

**motions** [1] - 1320:1

**motivated** [2] - 1200:13, 1200:16

**motivating** [1] - 1198:10

**motive** [2] - 1205:24, 1213:10

**Mount** [2] - 1234:23, 1238:4

**mountain** [1] - 1212:6

**mountains** [1] - 1223:15

**mouth** [1] - 1224:2

**moving** [1] - 1261:19

**MR** [28] - 1187:4, 1187:7, 1187:13, 1188:16, 1188:22, 1189:21, 1190:12, 1190:16, 1190:21, 1191:1, 1191:10, 1191:16, 1191:20, 1192:5, 1192:7, 1192:10, 1228:23, 1229:1, 1229:3, 1261:11, 1264:17, 1264:20, 1270:17, 1273:20, 1318:17, 1318:20, 1320:7, 1320:9

**multifactor** [1] - 1261:2

**multiple** [1] - 1202:2

**mumbo** [1] - 1261:24

**must** [62] - 1242:19, 1274:13, 1274:19, 1274:23, 1275:5, 1276:1, 1277:5, 1279:21, 1281:13, 1282:16, 1283:6, 1285:15, 1285:16, 1285:18, 1286:13, 1287:6, 1288:5, 1288:6, 1288:8, 1288:11, 1289:2, 1289:7, 1291:6, 1291:15, 1291:22, 1292:5, 1292:25, 1293:15, 1293:20, 1294:4, 1294:13, 1296:1, 1296:3, 1298:10, 1298:13, 1298:21, 1299:1, 1299:7, 1299:15, 1304:4, 1304:11, 1304:13, 1304:19, 1305:19, 1306:3, 1306:4, 1306:7, 1306:15, 1306:18, 1306:23, 1307:3, 1307:8, 1307:13, 1308:1, 1308:17, 1308:20, 1308:24, 1310:14, 1310:22, 1311:15, 1311:22

**mysterious** [1] - 1253:5

**mystery** [2] - 1252:17, 1257:13

**N**

**nail** [1] - 1236:24

**name** [1] - 1215:11

**named** [1] - 1252:22

**native** [1] - 1217:1

**natural** [1] - 1192:14

**naturally** [1] - 1192:17

**nature** [4] - 1207:24, 1294:9, 1301:21, 1302:22

**near** [1] - 1246:4

**nearly** [1] - 1229:10

**necessarily** [4] - 1279:18, 1305:1, 1306:24, 1307:9

**necessary** [4] - 1289:3, 1289:17, 1306:10, 1308:19

**need** [29] - 1188:1, 1189:20, 1190:23, 1202:24, 1210:16, 1214:13, 1216:5, 1218:3, 1219:8, 1219:10, 1219:15, 1219:16, 1219:17, 1221:17, 1223:3, 1223:12, 1226:5, 1226:8, 1237:25, 1260:24, 1261:1, 1265:9, 1286:21, 1287:22, 1299:16, 1305:14, 1306:12, 1312:3, 1320:5

**needed** [8] - 1209:20, 1225:21, 1233:25, 1237:19, 1247:16, 1252:1, 1260:21, 1312:2

**needs** [3] - 1199:22, 1210:13, 1319:24

**nefarious** [1] - 1272:21

**negated** [1] - 1204:19

**negates** [2] - 1233:24, 1264:5

**negotiate** [1] - 1300:14

**negotiated** [2] - 1305:16, 1305:21

**negotiating** [1] - 1304:2

**negotiation** [17] - 1214:4, 1215:3, 1215:5, 1215:7, 1215:23, 1260:17, 1261:2, 1300:7, 1300:16, 1300:18, 1300:23, 1301:2,

1301:5, 1305:1, 1305:5, 1305:9, 1306:5
**negotiations** [2] - 1304:25, 1305:3
**Nemunaitis** [2] - 1221:8, 1224:14
**NEMUNAITIS** [3] - 1184:21, 1187:4, 1189:21
**net** [1] - 1204:24
**neurons** [1] - 1204:7
**neutral** [1] - 1266:9
**never** [8] - 1232:19, 1232:22, 1233:1, 1235:19, 1245:8, 1265:16, 1272:15
**nevertheless** [1] - 1304:25
**new** [5] - 1197:7, 1199:18, 1247:16, 1250:2, 1267:6
**next** [6] - 1207:1, 1207:2, 1207:12, 1258:3, 1319:25
**nice** [1] - 1259:22
**nickel** [1] - 1253:20
**night** [5] - 1186:3, 1186:4, 1225:2, 1319:17
**Niksa** [4] - 1195:4, 1220:22, 1221:5, 1246:19
**nine** [2] - 1236:24, 1254:1
**nobody** [11] - 1196:5, 1196:10, 1196:15, 1198:6, 1198:17, 1200:3, 1203:8, 1205:4, 1226:23, 1251:10, 1272:25
**non** [17] - 1208:24, 1225:10, 1233:13, 1233:15, 1237:5, 1237:17, 1263:14, 1264:3, 1270:9, 1295:10, 1295:18, 1297:1, 1305:10, 1306:2, 1306:3, 1306:12, 1306:19
**non-infringing** [17] - 1208:24, 1225:10, 1233:13, 1233:15, 1237:5, 1237:17, 1263:14, 1264:3, 1270:9, 1295:10, 1295:18, 1297:1, 1305:10, 1306:2, 1306:3, 1306:12, 1306:19

**none** [6] - 1197:2, 1226:22, 1229:18, 1231:15, 1265:1, 1278:23
**nonexclusive** [1] - 1301:22
**noninfringement** [1] - 1215:25
**nonpatented** [1] - 1302:12
**nonrestricted** [1] - 1301:22
**nonsense** [5] - 1201:21, 1221:18, 1268:17, 1271:18, 1272:14
**nonsensical** [1] - 1239:14
**normal** [1] - 1195:16
**normally** [4] - 1197:17, 1198:4, 1304:1, 1308:6
**note** [4] - 1206:22, 1256:10, 1257:1, 1312:15
**noted** [3] - 1188:20, 1188:24, 1189:5
**notes** [5] - 1283:19, 1283:22, 1284:2, 1284:3, 1284:6
**nothing** [16] - 1195:16, 1220:12, 1220:17, 1242:12, 1242:22, 1249:6, 1250:3, 1250:8, 1275:9, 1276:17, 1277:11, 1283:16, 1309:19, 1309:20, 1311:14, 1312:17
**notice** [2] - 1212:23, 1236:20
**noticed** [1] - 1258:7
**notify** [2] - 1249:5, 1249:8
**November** [1] - 1253:25
**nowhere** [1] - 1246:4
**NOx** [5] - 1193:24, 1223:6, 1231:11, 1231:23, 1239:9
**nozzles** [2] - 1224:19, 1225:15
**NRG** [7] - 1253:13, 1254:17, 1255:22, 1260:3, 1261:8, 1262:14, 1265:13
**number** [20] - 1216:13, 1216:14, 1217:6, 1217:16, 1219:11, 1225:25,

1238:10, 1256:1, 1260:10, 1261:6, 1262:22, 1262:23, 1269:23, 1280:1, 1280:4, 1307:2, 1307:3, 1307:13, 1307:14
**Number** [3] - 1272:10, 1308:8
**numbered** [1] - 1286:22
**numbers** [13] - 1200:4, 1200:6, 1219:10, 1219:15, 1219:16, 1219:17, 1219:21, 1222:19, 1222:22, 1258:18, 1259:6, 1260:17, 1280:7
**Numbers** [1] - 1285:2

## O

**O'Keefe** [10] - 1221:8, 1224:14, 1232:22, 1237:1, 1237:19, 1238:14, 1241:13, 1241:22, 1242:15, 1242:23
**O'Keefe's** [1] - 1233:5
**oath** [10] - 1242:3, 1247:9, 1247:21, 1254:22, 1259:4, 1275:16, 1276:7, 1277:9, 1280:23, 1281:11
**Obama** [1] - 1252:14
**objection** [11] - 1187:5, 1187:8, 1187:11, 1187:23, 1188:1, 1188:18, 1188:20, 1254:3, 1276:22, 1276:23
**objections** [5] - 1186:25, 1187:4, 1188:23, 1189:23, 1276:20
**obligated** [1] - 1319:2
**obligation** [2] - 1249:5, 1249:8
**observe** [1] - 1278:25
**observed** [2] - 1212:14, 1223:16
**obtain** [2] - 1303:19, 1313:2
**obviously** [4] - 1188:6, 1189:9, 1221:18, 1237:12
**occasional** [2] -

1225:13, 1295:20
**occasionally** [2] - 1225:14, 1225:15
**occur** [1] - 1293:10
**occurred** [1] - 1305:2
**October** [1] - 1249:14
**odd** [2] - 1193:2, 1201:6
**OF** [2] - 1184:2, 1184:9
**offensive** [2] - 1266:3, 1268:22
**offer** [1] - 1251:19
**offered** [2] - 1276:19, 1282:2
**Office** [2] - 1193:7, 1270:23
**office** [1] - 1253:3
**officer** [7] - 1236:3, 1307:24, 1308:2, 1312:4, 1312:6
**Official** [1] - 1320:22
**official** [1] - 1253:24
**often** [2] - 1224:6, 1287:9
**old** [5] - 1212:6, 1226:8, 1254:20, 1255:21, 1302:20
**old-school** [1] - 1212:6
**omit** [1] - 1251:12
**once** [12] - 1200:14, 1212:12, 1213:11, 1213:19, 1213:22, 1225:22, 1226:1, 1241:4, 1265:18, 1267:9, 1271:3, 1307:23
**one** [88] - 1187:19, 1188:5, 1189:4, 1189:13, 1194:11, 1195:2, 1195:3, 1197:6, 1200:24, 1202:5, 1202:15, 1207:5, 1207:18, 1207:22, 1208:17, 1209:4, 1209:14, 1209:16, 1213:15, 1213:19, 1214:23, 1215:3, 1215:10, 1216:4, 1216:15, 1217:9, 1217:20, 1219:1, 1219:2, 1219:3, 1219:4, 1222:8, 1222:15, 1224:20, 1226:22, 1228:11, 1232:5, 1233:7, 1235:24, 1238:20, 1240:19, 1247:1, 1247:13,

1249:6, 1252:2, 1253:1, 1260:1, 1260:3, 1261:22, 1264:9, 1266:7, 1268:3, 1268:17, 1271:22, 1273:9, 1273:17, 1275:24, 1278:3, 1279:25, 1283:8, 1283:17, 1283:23, 1285:21, 1286:1, 1286:4, 1290:15, 1290:21, 1290:22, 1291:3, 1291:12, 1292:4, 1292:14, 1295:4, 1297:15, 1299:21, 1306:15, 1306:20, 1308:10, 1308:14, 1308:21, 1310:17, 1312:3, 1317:6, 1317:22
**one-thousandths** [1] - 1261:22
**ones** [9] - 1208:8, 1208:9, 1213:15, 1219:8, 1224:3, 1228:15, 1248:9, 1258:9, 1269:9
**open** [4] - 1213:8, 1269:1, 1310:6, 1313:6
**opening** [18] - 1194:20, 1195:14, 1199:1, 1201:7, 1201:9, 1203:3, 1220:21, 1221:14, 1221:22, 1229:4, 1234:3, 1238:2, 1240:7, 1245:22, 1246:12, 1252:9, 1252:19, 1263:6
**operating** [2] - 1187:22, 1245:2
**Operations** [29] - 1218:24, 1218:25, 1219:1, 1219:2, 1219:14, 1219:16, 1219:17, 1284:19, 1284:20, 1294:23, 1313:12, 1313:25, 1314:4, 1314:8, 1314:16, 1315:3, 1315:7, 1315:11, 1317:9, 1317:15, 1317:17, 1317:19, 1317:25, 1318:8, 1318:10, 1318:12
**operations** [6] - 1198:16, 1206:23, 1229:24, 1236:3,

1241:2
**operative** [1] - 1243:18
**operators** [1] - 1238:15
**opined** [1] - 1218:10
**opinion** [6] - 1215:4, 1217:15, 1232:24, 1303:13, 1309:3, 1309:5
**opinions** [2] - 1280:15, 1280:16
**opportunity** [2] - 1218:20, 1278:25
**opposed** [1] - 1303:9
**opposite** [1] - 1283:3
**option** [1] - 1265:11
**order** [15] - 1187:15, 1192:14, 1200:12, 1207:8, 1211:25, 1220:10, 1287:23, 1289:2, 1293:23, 1294:9, 1300:12, 1305:16, 1306:22, 1307:7, 1308:18
**ordered** [1] - 1277:4
**orderly** [1] - 1230:23
**ordinary** [2] - 1288:22
**org** [1] - 1198:9
**organization** [6] - 1195:21, 1196:10, 1226:7, 1229:20, 1236:8, 1272:6
**organizations** [1] - 1273:9
**organized** [1] - 1222:6
**original** [5] - 1212:25, 1229:21, 1272:9, 1272:17, 1310:10
**originally** [1] - 1195:13
**others'** [1] - 1310:5
**otherwise** [3] - 1188:14, 1210:2, 1319:19
**out-of-context** [1] - 1272:25
**out-of-court** [1] - 1280:22
**out-of-town** [1] - 1320:11
**outline** [1] - 1284:7
**outrageous** [2] - 1258:17, 1260:16
**outside** [5] - 1276:4, 1277:17, 1288:19, 1297:12, 1298:1
**oven** [2] - 1267:1, 1287:13
**ovens** [1] - 1267:3

**overall** [1] - 1204:24
**overnight** [1] - 1262:23
**oversee** [1] - 1255:15
**overview** [2] - 1255:4, 1286:17
**overwhelming** [2] - 1204:4, 1229:13
**own** [12] - 1237:15, 1238:12, 1240:12, 1242:1, 1254:8, 1254:19, 1258:16, 1278:20, 1284:3, 1289:16, 1309:2, 1310:15
**owned** [4] - 1195:11, 1229:25, 1236:8, 1302:23
**owner** [1] - 1229:19

## P

**p.m** [2] - 1261:17, 1320:14
**Pacific** [6] - 1214:17, 1214:24, 1215:1, 1261:2, 1301:13
**page** [12] - 1207:1, 1207:2, 1247:23, 1250:18, 1250:21, 1251:14, 1252:22, 1255:5, 1260:23, 1268:2, 1272:16, 1272:25
**pages** [4] - 1217:8, 1248:15, 1248:16
**paid** [9] - 1201:16, 1204:13, 1204:16, 1204:19, 1204:22, 1238:13, 1267:16, 1301:19, 1305:13
**pan** [2] - 1267:1, 1287:13
**paper** [2] - 1214:18, 1308:1
**paragraph** [1] - 1254:6
**paragraphs** [1] - 1286:22
**Parish** [1] - 1271:17
**parking** [1] - 1209:23
**Part** [3] - 1255:1, 1256:2
**part** [20] - 1187:13, 1207:17, 1209:4, 1223:5, 1225:11, 1231:22, 1241:11, 1241:12, 1251:19, 1256:25, 1257:20, 1258:14, 1267:13,

1267:14, 1267:24, 1278:23, 1295:13, 1295:19, 1297:2, 1307:18
**particular** [7] - 1206:21, 1274:19, 1290:3, 1303:5, 1303:20, 1307:6, 1307:17
**particulars** [1] - 1279:14
**parties** [38] - 1186:2, 1186:5, 1186:9, 1186:12, 1186:15, 1186:18, 1186:23, 1186:24, 1188:25, 1189:7, 1191:12, 1199:18, 1199:23, 1202:11, 1208:17, 1213:13, 1218:22, 1270:6, 1273:2, 1274:21, 1276:10, 1281:8, 1281:16, 1284:12, 1284:13, 1300:10, 1300:17, 1300:20, 1301:8, 1301:14, 1304:24, 1305:4, 1305:8, 1305:12, 1305:22, 1305:23, 1319:22, 1320:2
**parties'** [1] - 1281:13
**partisans** [1] - 1309:7
**Partners** [8] - 1284:22, 1294:19, 1314:10, 1315:13, 1316:8, 1317:3, 1317:20, 1318:13
**partners** [4] - 1200:1, 1200:12, 1211:20, 1222:25
**parts** [2] - 1207:16, 1207:17
**party** [7] - 1199:14, 1214:23, 1236:9, 1244:11, 1269:8, 1275:14, 1299:21
**passed** [1] - 1252:13
**Patent** [3] - 1193:7, 1270:23, 1285:2
**patent** [113] - 1189:4, 1192:16, 1194:22, 1195:10, 1196:18, 1197:1, 1197:16, 1197:17, 1197:22, 1198:1, 1198:3, 1201:24, 1201:25, 1204:14, 1205:4, 1205:25, 1207:3, 1207:4, 1207:15,

1212:15, 1212:19, 1213:2, 1213:17, 1213:18, 1214:11, 1215:8, 1219:25, 1220:17, 1221:9, 1223:7, 1225:23, 1226:17, 1226:18, 1232:4, 1235:13, 1235:16, 1235:17, 1241:15, 1243:2, 1248:25, 1249:1, 1254:11, 1254:20, 1255:7, 1256:10, 1257:8, 1257:9, 1257:14, 1257:15, 1262:5, 1264:23, 1265:12, 1267:17, 1269:16, 1270:21, 1270:24, 1271:5, 1271:6, 1282:20, 1285:14, 1286:16, 1286:17, 1286:19, 1286:21, 1286:22, 1286:23, 1286:24, 1286:25, 1287:3, 1287:8, 1287:20, 1288:1, 1288:6, 1288:23, 1289:1, 1289:5, 1289:6, 1290:12, 1290:15, 1290:17, 1290:18, 1291:9, 1291:10, 1291:12, 1291:16, 1291:19, 1291:20, 1291:21, 1291:23, 1292:16, 1292:17, 1293:2, 1293:4, 1293:21, 1293:22, 1294:6, 1295:4, 1296:2, 1296:4, 1296:16, 1298:15, 1298:23, 1299:5, 1299:7, 1300:5, 1301:17, 1306:4, 1306:16, 1306:19, 1314:15, 1315:18, 1316:13
**patent's** [2] - 1287:5, 1304:5
**patent-in-suit** [2] - 1300:5, 1301:17
**patented** [10] - 1299:9, 1302:2, 1302:9, 1302:19, 1302:22, 1303:9, 1303:20, 1304:12, 1304:21, 1306:2
**patentee** [1] - 1303:23
**patents** [64] - 1194:20, 1194:23, 1195:10,

1196:19, 1196:23, 1200:14, 1202:25, 1208:19, 1213:8, 1213:23, 1220:23, 1220:24, 1222:7, 1229:19, 1229:25, 1231:9, 1231:23, 1237:3, 1239:6, 1248:22, 1248:23, 1250:13, 1254:1, 1255:13, 1256:11, 1263:12, 1265:19, 1267:6, 1267:10, 1283:9, 1283:10, 1285:1, 1285:4, 1285:5, 1285:7, 1285:11, 1285:13, 1285:22, 1286:2, 1286:5, 1286:16, 1290:9, 1290:11, 1291:25, 1292:5, 1292:14, 1294:8, 1297:8, 1297:11, 1298:1, 1299:5, 1300:18, 1301:15, 1301:20, 1302:14, 1302:17, 1305:13, 1306:24, 1307:4, 1307:9, 1307:15
**patents-in-suit** [9] - 1290:9, 1297:8, 1297:11, 1298:1, 1299:5, 1306:24, 1307:4, 1307:9, 1307:15
**path** [4] - 1195:18, 1207:10, 1247:15, 1265:2
**PAUL** [1] - 1185:7
**Pavlish** [18] - 1192:23, 1193:6, 1193:14, 1193:22, 1194:1, 1194:8, 1194:25, 1195:19, 1197:3, 1197:5, 1221:4, 1231:16, 1238:13, 1244:14, 1244:23, 1259:23, 1260:5, 1266:4
**Pavlish's** [3] - 1195:6, 1220:23, 1273:13
**pay** [11] - 1203:5, 1216:1, 1216:13, 1216:16, 1239:22, 1241:9, 1268:8, 1269:9, 1273:16, 1299:6, 1303:21
**paying** [3] - 1192:12, 1225:23, 1225:25
**payment** [3] -

1200:11, 1218:2, 1300:11
**PDF** [2] - 1190:23, 1190:24
**peanut** [2] - 1229:16, 1236:19
**Pearson** [1] - 1219:19
**PEARSON** [2] - 1184:22, 1190:12
**peek** [1] - 1201:20
**penny** [5] - 1253:20, 1260:13, 1260:14, 1261:22, 1262:12
**people** [16] - 1193:20, 1203:7, 1203:18, 1203:20, 1203:24, 1214:21, 1214:22, 1215:11, 1265:16, 1265:19, 1265:25, 1267:16, 1269:6, 1273:12, 1278:9, 1279:19
**per** [5] - 1212:8, 1218:16, 1224:18, 1260:10
**percent** [16] - 1200:12, 1210:11, 1210:16, 1210:19, 1210:21, 1211:3, 1211:5, 1211:19, 1212:2, 1220:10, 1224:21, 1234:4, 1234:25, 1235:10, 1235:11
**percentage** [1] - 1255:11
**perfectly** [3] - 1195:16, 1223:25, 1305:15
**perform** [9] - 1240:14, 1240:16, 1240:19, 1245:25, 1261:20, 1267:20, 1275:22, 1291:12, 1292:22
**performed** [1] - 1243:19
**performing** [1] - 1242:16
**period** [15] - 1208:23, 1209:17, 1212:22, 1226:6, 1232:13, 1240:10, 1259:1, 1259:25, 1270:11, 1295:9, 1297:13, 1297:17, 1298:2, 1306:8, 1306:9
**periods** [1] - 1297:6
**permit** [1] - 1190:12
**permits** [1] - 1245:2
**permitted** [1] - 1224:13

**permitting** [1] - 1224:15
**perplexing** [1] - 1226:13
**person** [7] - 1198:15, 1198:17, 1203:16, 1238:7, 1280:8, 1280:11, 1288:22
**personally** [2] - 1275:18, 1280:24
**persuading** [1] - 1248:11
**pestering** [1] - 1248:11
**PETER** [1] - 1184:17
**Phil** [5] - 1213:24, 1216:3, 1216:6, 1216:7, 1216:19
**phone** [3] - 1201:8, 1310:25, 1311:9
**phrase** [1] - 1283:14
**picked** [2] - 1252:18, 1252:19
**picking** [1] - 1268:3
**picture** [4] - 1197:9, 1253:3, 1253:22, 1254:21
**pictures** [2] - 1253:9, 1257:25
**piece** [6] - 1207:6, 1207:13, 1207:19, 1207:23, 1257:4, 1308:1
**pipe** [1] - 1191:14
**place** [6] - 1189:17, 1208:10, 1269:5, 1271:15, 1300:8, 1309:15
**plain** [1] - 1288:21
**plaintiff** [7] - 1243:12, 1252:22, 1253:2, 1256:25, 1257:13, 1272:19, 1320:7
**Plaintiff** [2] - 1184:24, 1284:17
**Plaintiffs** [1] - 1184:5
**plaintiffs** [12] - 1190:4, 1192:2, 1206:15, 1246:2, 1284:15, 1313:8, 1314:12, 1315:15, 1316:10, 1317:6, 1317:23, 1318:16
**plaintiffs'** [9] - 1187:2, 1190:2, 1192:1, 1192:3, 1219:20, 1236:22, 1242:1, 1246:13, 1320:6
**Plaintiffs'** [1] - 1219:22

**plan** [3] - 1191:3, 1210:2, 1221:7
**plant** [83] - 1196:5, 1197:10, 1200:18, 1204:12, 1204:22, 1206:18, 1208:22, 1209:7, 1209:9, 1211:2, 1211:6, 1211:21, 1211:24, 1212:10, 1220:14, 1220:15, 1221:17, 1221:25, 1222:14, 1222:17, 1222:21, 1224:1, 1224:8, 1225:24, 1225:25, 1226:5, 1232:14, 1232:24, 1238:15, 1238:18, 1239:25, 1240:14, 1240:16, 1240:22, 1241:2, 1241:6, 1243:1, 1245:25, 1250:2, 1261:20, 1262:13, 1262:14, 1263:21, 1263:22, 1267:6, 1267:19, 1267:20, 1268:9, 1271:11, 1271:17, 1273:15, 1285:21, 1285:25, 1291:5, 1291:7, 1291:12, 1291:13, 1291:19, 1291:21, 1291:25, 1292:1, 1292:13, 1292:19, 1292:22, 1293:1, 1293:8, 1293:12, 1293:16, 1293:19, 1293:25, 1294:2, 1294:5, 1294:7, 1295:3, 1295:6, 1295:8, 1296:24, 1297:7, 1313:11, 1314:15, 1315:18, 1316:13
**plant's** [2] - 1291:11, 1294:9
**plants** [82] - 1193:19, 1193:20, 1194:1, 1195:23, 1196:12, 1197:12, 1198:6, 1198:20, 1200:15, 1201:6, 1201:12, 1201:23, 1201:25, 1202:6, 1203:23, 1204:13, 1204:16, 1204:24, 1205:9, 1205:20, 1209:1, 1209:16, 1211:12, 1211:15, 1212:2, 1213:9, 1223:8, 1223:13, 1223:19,

1224:3, 1224:15, 1226:6, 1232:3, 1232:5, 1232:13, 1232:19, 1232:20, 1233:1, 1233:8, 1234:9, 1234:12, 1234:22, 1235:15, 1237:9, 1238:17, 1238:20, 1239:1, 1239:7, 1241:23, 1242:6, 1242:18, 1242:19, 1242:22, 1243:23, 1244:24, 1245:8, 1248:2, 1248:11, 1251:3, 1251:7, 1255:12, 1259:16, 1259:18, 1260:5, 1260:6, 1260:7, 1260:8, 1260:9, 1260:13, 1261:15, 1265:4, 1265:5, 1265:6, 1268:5, 1270:3, 1290:21, 1290:24, 1291:2, 1292:3, 1294:12
**plants'** [1] - 1242:15
**play** [1] - 1305:13
**played** [5] - 1195:25, 1196:4, 1196:15, 1276:9, 1281:4
**playing** [2] - 1196:9, 1281:3
**pleased** [1] - 1249:16
**pleasure** [1] - 1229:3
**plowing** [1] - 1271:7
**point** [15] - 1187:8, 1192:16, 1193:5, 1196:9, 1200:25, 1205:5, 1207:2, 1211:10, 1216:4, 1218:23, 1221:11, 1221:13, 1225:22, 1279:25
**pointed** [2] - 1238:17, 1259:15
**pointer** [1] - 1254:5
**pointing** [3] - 1238:20, 1245:4, 1268:19
**points** [1] - 1230:11
**policy** [1] - 1301:25
**polled** [2] - 1318:16, 1318:19
**pollutant** [1] - 1194:1
**pop** [1] - 1257:7
**pops** [1] - 1257:6
**popularity** [1] - 1302:18
**portion** [4] - 1268:12, 1289:20, 1303:4,

1303:8
**position** [5] - 1206:11, 1240:23, 1299:11, 1304:8, 1310:10
**positions** [3] - 1236:15, 1274:21, 1284:13
**positive** [1] - 1222:19
**possible** [6] - 1189:9, 1206:4, 1274:24, 1298:5, 1299:19, 1307:22
**post** [1] - 1320:1
**post-trial** [1] - 1320:1
**potash** [1] - 1222:10
**potential** [1] - 1186:17
**pouring** [2] - 1266:25, 1287:12
**Powder** [1] - 1212:4
**powdered** [1] - 1222:20
**power** [113] - 1201:25, 1202:2, 1202:6, 1204:12, 1204:13, 1205:8, 1206:18, 1208:22, 1211:11, 1220:15, 1222:14, 1223:8, 1223:13, 1223:19, 1224:1, 1224:3, 1224:8, 1232:3, 1232:5, 1232:24, 1233:1, 1233:8, 1234:22, 1235:15, 1237:9, 1238:15, 1238:17, 1238:18, 1238:20, 1238:25, 1239:1, 1239:7, 1239:25, 1240:14, 1240:16, 1240:22, 1241:2, 1241:6, 1241:23, 1242:6, 1242:15, 1242:18, 1242:19, 1242:22, 1242:25, 1243:23, 1244:24, 1245:8, 1245:25, 1248:2, 1248:11, 1251:3, 1251:7, 1255:12, 1259:16, 1259:17, 1260:5, 1260:6, 1260:7, 1260:8, 1260:9, 1260:13, 1261:15, 1261:19, 1262:13, 1262:14, 1263:21, 1263:22, 1267:19, 1267:20, 1268:5, 1268:8, 1285:21, 1285:25, 1290:21, 1290:24, 1291:2,

1291:5, 1291:7, 1291:11, 1291:12, 1291:13, 1291:19, 1291:21, 1291:24, 1292:1, 1292:3, 1292:13, 1292:19, 1292:22, 1293:1, 1293:7, 1293:12, 1293:16, 1293:19, 1293:25, 1294:2, 1294:5, 1294:7, 1294:9, 1294:12, 1295:3, 1295:5, 1295:8, 1296:23, 1297:6, 1313:11, 1314:15, 1315:18, 1316:13
**powerful** [5] - 1204:25, 1205:22, 1213:10, 1234:15
**PowerPoint** [1] - 1282:2
**practicing** [2] - 1214:25, 1246:8
**prayer** [1] - 1319:17
**preamble** [1] - 1289:20
**precise** [1] - 1207:25
**precisely** [1] - 1196:17
**precision** [1] - 1299:17
**prefer** [1] - 1274:16
**prejudice** [1] - 1275:23
**prejudices** [1] - 1279:3
**preliminary** [1] - 1194:18
**premier** [1] - 1236:9
**prepared** [1] - 1309:10
**preponderance** [21] - 1206:16, 1232:7, 1246:4, 1282:19, 1282:23, 1283:12, 1285:20, 1285:24, 1286:6, 1286:10, 1290:7, 1292:10, 1295:1, 1298:13, 1299:2, 1313:9, 1314:13, 1315:16, 1316:11, 1317:7, 1317:23
**preposterous** [1] - 1267:11
**present** [2] - 1218:8, 1320:18
**presentation** [1] - 1223:18
**presentations** [1] - 1282:2

**presented** [8] - 1215:13, 1218:17, 1278:17, 1281:2, 1283:25, 1284:2, 1301:14, 1311:16
**preserve** [2] - 1188:1, 1302:4
**preserving** [1] - 1187:10
**president** [2] - 1229:24, 1236:5
**President** [1] - 1252:14
**presume** [1] - 1300:20
**pretend** [2] - 1214:5, 1216:17
**pretending** [1] - 1268:14
**pretty** [6] - 1192:16, 1195:7, 1200:2, 1203:14, 1206:25, 1230:15
**prevail** [1] - 1275:14
**preview** [1] - 1206:2
**previously** [2] - 1280:16, 1295:25
**price** [1] - 1303:5
**primarily** [1] - 1250:24
**primary** [1] - 1251:2
**probability** [6] - 1205:10, 1205:11, 1293:1, 1293:17, 1294:7, 1296:2
**problem** [5] - 1187:17, 1187:19, 1220:23, 1271:11, 1271:12
**proceed** [6] - 1191:25, 1192:8, 1192:9, 1229:1, 1256:20, 1264:18
**proceedings** [7] - 1191:7, 1256:3, 1274:10, 1284:7, 1312:13, 1320:14, 1320:19
**process** [28] - 1192:17, 1194:12, 1198:12, 1199:4, 1201:2, 1204:23, 1208:25, 1209:9, 1212:17, 1213:1, 1226:1, 1231:10, 1232:10, 1233:7, 1241:11, 1241:12, 1249:3, 1261:20, 1266:24, 1267:9, 1270:10, 1287:10, 1287:15, 1287:17, 1290:15, 1303:10, 1306:15

**proclaims** [1] - 1258:19
**produce** [3] - 1201:20, 1218:12, 1282:24
**produced** [6] - 1209:6, 1217:7, 1217:10, 1217:12, 1235:1, 1302:24
**product** [9] - 1253:3, 1298:20, 1301:24, 1302:10, 1302:16, 1304:7, 1306:4, 1306:14, 1306:20
**Productions** [1] - 1314:18
**Products** [15] - 1284:21, 1284:23, 1294:18, 1294:19, 1313:14, 1313:21, 1314:24, 1315:19, 1315:25, 1316:14, 1316:20, 1317:10, 1317:13, 1318:1, 1318:6
**products** [7] - 1214:19, 1247:16, 1253:20, 1302:10, 1306:17, 1306:24, 1307:9
**profession** [1] - 1280:10
**professional** [1] - 1232:22
**profit** [8] - 1197:14, 1227:19, 1227:20, 1227:21, 1303:4, 1303:8, 1303:9, 1303:22
**profitability** [1] - 1302:16
**profits** [4] - 1301:3, 1301:5, 1301:7, 1305:9
**program** [7] - 1209:21, 1211:19, 1229:11, 1235:2, 1252:13, 1269:1, 1302:1
**programs** [1] - 1269:3
**prohibited** [2] - 1239:13, 1239:16
**promoting** [1] - 1302:10
**proof** [16] - 1202:16, 1202:17, 1213:21, 1215:17, 1228:7, 1232:17, 1234:1, 1246:2, 1275:14, 1282:18, 1282:19, 1283:14, 1283:15, 1296:5, 1296:8,

1296:15
**proper** [2] - 1262:7, 1309:19
**property** [8] - 1229:24, 1236:6, 1255:14, 1255:16, 1265:20, 1270:25, 1271:3, 1273:8
**proposal** [1] - 1186:22
**propose** [1] - 1186:20
**proposed** [2] - 1249:12, 1319:24
**proposition** [1] - 1303:19
**prosecution** [1] - 1195:15
**protect** [1] - 1255:15
**protecting** [1] - 1264:2
**prove** [27] - 1213:11, 1231:8, 1232:3, 1233:12, 1245:5, 1246:22, 1264:5, 1267:5, 1268:9, 1268:13, 1279:9, 1291:22, 1291:23, 1291:24, 1298:12, 1298:13, 1299:1, 1299:15, 1299:16, 1301:18, 1306:23, 1306:24, 1307:3, 1307:8, 1307:9, 1307:14
**proved** [6] - 1199:10, 1208:4, 1208:18, 1213:19, 1213:22, 1281:21
**proven** [19] - 1206:15, 1208:1, 1212:24, 1232:7, 1269:21, 1282:16, 1285:19, 1285:23, 1286:3, 1286:5, 1286:8, 1286:10, 1290:7, 1313:9, 1314:12, 1315:15, 1316:10, 1317:6, 1317:23
**proves** [6] - 1225:14, 1239:25, 1277:16, 1277:20, 1292:10, 1295:1
**provide** [8] - 1198:14, 1203:8, 1249:16, 1285:15, 1286:12, 1287:3, 1287:4, 1310:23
**provided** [2] - 1274:14, 1288:21
**provides** [2] - 1202:8, 1299:5

**providing** [1] - 1230:20
**proving** [5] - 1202:19, 1231:7, 1282:21, 1283:11, 1301:17
**provisional** [3] - 1194:5, 1194:16, 1195:9
**prudent** [2] - 1303:18, 1304:1
**pry** [1] - 1246:15
**PTX** [3] - 1216:25, 1259:3
**public** [12] - 1194:4, 1227:12, 1227:17, 1244:24, 1245:3, 1247:22, 1251:25, 1252:4, 1254:23, 1255:10, 1258:16, 1306:17
**publicly** [2] - 1245:5, 1257:14
**publish** [1] - 1313:6
**published** [1] - 1270:20
**pull** [3] - 1244:4, 1250:17, 1254:6
**punch** [1] - 1229:23
**punish** [1] - 1299:13
**pure** [4] - 1197:8, 1220:11, 1230:13, 1267:8
**purple** [1] - 1208:8
**purpose** [2] - 1299:10, 1309:6
**purposes** [2] - 1281:21, 1298:7
**put** [35] - 1186:24, 1190:5, 1193:6, 1196:6, 1196:22, 1203:1, 1204:15, 1204:22, 1207:18, 1209:9, 1212:22, 1227:18, 1227:25, 1234:3, 1237:15, 1237:25, 1238:3, 1238:6, 1238:8, 1238:15, 1239:2, 1239:19, 1241:4, 1248:21, 1251:8, 1253:2, 1259:20, 1260:21, 1260:24, 1261:1, 1262:6, 1262:11, 1283:1, 1283:2, 1299:10
**puts** [1] - 1188:1
**putting** [6] - 1194:14, 1197:17, 1204:11, 1209:23, 1223:11, 1246:19

**puzzle** [2] - 1207:6, 1207:13
**puzzled** [1] - 1239:19

## Q

**qualifications** [1] - 1280:14
**qualified** [3] - 1231:12, 1243:24, 1303:13
**qualifies** [1] - 1189:4
**quantities** [1] - 1212:7
**questioning** [2] - 1198:6, 1273:1
**questions** [15] - 1209:15, 1233:9, 1237:13, 1243:4, 1275:5, 1276:20, 1276:23, 1277:1, 1281:9, 1281:10, 1285:16, 1296:23, 1297:9, 1307:25, 1308:6
**quick** [1] - 1218:3
**quite** [2] - 1223:22, 1270:18
**quote** [1] - 1254:9

## R

**raincoat** [1] - 1277:21
**raining** [4] - 1203:12, 1277:17, 1277:18, 1277:24
**random** [1] - 1268:8
**rate** [6] - 1304:10, 1304:11, 1304:16, 1304:18, 1304:19, 1304:20
**rates** [2] - 1215:20, 1301:19
**rather** [5] - 1193:12, 1282:7, 1293:14, 1294:4, 1304:19
**rattling** [1] - 1205:10
**RC** [6] - 1285:24, 1290:22, 1294:11, 1294:14, 1294:17, 1294:24
**RCB** [6] - 1218:24, 1218:25, 1284:19, 1313:12, 1314:16, 1317:9
**re** [1] - 1309:2
**re-examine** [1] - 1309:2
**reach** [4] - 1278:12, 1303:17, 1310:4,

1310:15
**reached** [2] - 1309:12, 1312:24
**reaching** [2] - 1284:14, 1308:22
**read** [12] - 1194:18, 1230:22, 1234:8, 1251:10, 1254:10, 1263:23, 1267:25, 1274:15, 1281:18, 1289:7, 1309:15, 1313:6
**reading** [2] - 1205:18, 1281:2
**reads** [1] - 1205:13
**ready** [2] - 1186:13, 1189:19
**real** [4] - 1211:3, 1259:9, 1261:13, 1262:1
**really** [20] - 1187:13, 1201:17, 1207:1, 1208:10, 1210:22, 1212:21, 1216:5, 1216:13, 1218:3, 1224:17, 1226:14, 1230:10, 1234:14, 1235:20, 1239:22, 1240:11, 1241:7, 1246:14, 1263:25, 1270:6
**realtime** [1] - 1258:21
**reason** [7] - 1215:14, 1222:15, 1223:2, 1227:22, 1236:15, 1241:23, 1268:13
**reasonable** [26] - 1202:21, 1218:15, 1233:24, 1234:18, 1236:1, 1236:11, 1236:22, 1237:11, 1263:14, 1263:16, 1264:2, 1264:4, 1278:25, 1283:15, 1297:20, 1297:22, 1299:8, 1299:16, 1300:6, 1300:12, 1301:10, 1303:22, 1305:11, 1305:24, 1305:25, 1310:3
**reasonableness** [2] - 1229:14, 1237:16
**reasonably** [5] - 1233:19, 1234:15, 1278:11, 1296:11, 1303:16
**reasons** [3] - 1194:11, 1210:5, 1280:14
**rebuttal** [6] - 1190:5, 1191:16, 1191:19,

1192:2, 1228:18, 1264:14
**receive** [2] - 1227:5, 1280:18
**received** [3] - 1256:16, 1282:11, 1301:16
**recent** [1] - 1257:25
**recently** [2] - 1253:12, 1256:16
**recess** [6] - 1191:6, 1274:8, 1274:9, 1312:11, 1312:12, 1320:13
**recite** [3] - 1266:25, 1287:11, 1289:10
**recited** [3] - 1289:25, 1291:11, 1291:13
**recognized** [2] - 1187:24, 1214:1
**recollection** [1] - 1278:20
**recommendation** [1] - 1256:19
**record** [10] - 1186:2, 1186:24, 1188:21, 1189:3, 1189:22, 1218:21, 1253:6, 1264:25, 1277:5, 1310:18
**records** [1] - 1282:14
**recover** [3] - 1285:12, 1306:22, 1307:7
**reduce** [1] - 1231:23
**reducers** [1] - 1241:3
**reduces** [1] - 1231:11
**reducing** [1] - 1223:8
**reduction** [4] - 1231:10, 1239:9, 1243:22, 1243:24
**reductions** [1] - 1231:13
**refer** [8] - 1198:25, 1214:20, 1217:9, 1276:14, 1284:16, 1284:24, 1285:3, 1288:25
**reference** [4] - 1189:24, 1190:23, 1258:4, 1275:3
**referenced** [3] - 1194:8, 1255:24, 1301:12
**references** [1] - 1186:10
**referred** [4] - 1186:7, 1240:8, 1281:19, 1287:9
**referring** [2] - 1272:18, 1273:3
**refers** [3] - 1289:11,

1289:15, 1289:19
**refined** [64] - 1198:19, 1204:14, 1206:24, 1208:20, 1208:21, 1209:3, 1209:5, 1222:20, 1229:8, 1229:11, 1229:15, 1234:11, 1234:16, 1235:1, 1235:2, 1235:6, 1235:12, 1235:21, 1236:11, 1236:12, 1236:16, 1237:3, 1237:5, 1237:10, 1237:18, 1238:25, 1239:7, 1239:11, 1242:21, 1243:20, 1244:3, 1244:7, 1244:23, 1244:25, 1245:7, 1245:17, 1247:19, 1248:13, 1248:20, 1249:2, 1250:1, 1250:12, 1251:9, 1251:11, 1256:21, 1259:12, 1295:6, 1295:7, 1295:12, 1295:15, 1296:18, 1296:24, 1296:25, 1297:2, 1297:3, 1297:5, 1297:10, 1297:13, 1297:23, 1297:24, 1298:2, 1298:7
**reflect** [1] - 1304:11
**reflects** [1] - 1304:21
**regard** [7] - 1186:4, 1186:17, 1186:25, 1189:12, 1297:19, 1320:1, 1320:3
**regarding** [2] - 1298:8, 1300:1
**regards** [1] - 1319:21
**regular** [1] - 1238:7
**Regulation** [1] - 1247:23
**regulation** [3] - 1248:1, 1248:4, 1251:6
**regulations** [4] - 1196:13, 1241:25, 1247:17, 1247:25
**rehash** [1] - 1234:20
**rehearse** [1] - 1258:19
**reiterate** [1] - 1319:16
**reject** [2] - 1279:15, 1280:20
**relate** [2] - 1197:6, 1286:19
**related** [1] - 1194:1
**relates** [2] - 1188:12,

1270:14
**relating** [2] - 1186:8, 1285:12
**relationship** [1] - 1302:5
**relationships** [1] - 1224:4
**relevant** [6] - 1230:25, 1240:5, 1240:6, 1286:17, 1297:17, 1305:1
**reliability** [1] - 1280:15
**relied** [1] - 1232:21
**rely** [6] - 1232:21, 1254:23, 1268:19, 1270:6, 1278:19, 1305:18
**relying** [2] - 1233:5, 1233:8
**remain** [1] - 1283:6
**remainder** [1] - 1282:1
**remained** [1] - 1294:8
**remaining** [2] - 1190:3, 1289:9
**remember** [41] - 1195:21, 1200:3, 1200:4, 1202:15, 1202:17, 1205:18, 1209:11, 1211:7, 1216:5, 1216:18, 1216:19, 1221:7, 1227:10, 1232:18, 1232:19, 1241:11, 1241:22, 1244:20, 1247:12, 1249:3, 1250:9, 1251:16, 1252:16, 1254:2, 1254:21, 1256:5, 1259:11, 1259:19, 1259:23, 1260:11, 1261:4, 1265:12, 1266:19, 1266:21, 1268:23, 1269:25, 1278:18, 1279:17, 1279:20, 1309:7
**remembering** [1] - 1221:10
**reminded** [1] - 1312:2
**removing** [1] - 1186:10
**render** [2] - 1246:5, 1284:10
**renew** [1] - 1187:8
**renewing** [1] - 1187:10
**reordering** [1] - 1187:14
**rep** [1] - 1270:7
**repeatedly** [1] -

1265:7
**repeating** [1] - 1311:13
**replaying** [1] - 1189:21
**replow** [1] - 1226:8
**report** [5] - 1222:5, 1222:6, 1256:20, 1258:3, 1260:23
**reported** [1] - 1320:18
**reporter** [1] - 1270:13
**Reporter** [3] - 1320:16, 1320:17, 1320:22
**reports** [3] - 1194:4, 1201:16, 1216:22
**represent** [1] - 1308:17
**representative** [1] - 1205:23
**representing** [1] - 1257:16
**request** [2] - 1190:13, 1219:21
**requests** [1] - 1281:20
**require** [2] - 1267:2
**required** [7] - 1215:18, 1231:7, 1243:22, 1248:14, 1264:2, 1282:17, 1291:24
**requirement** [4] - 1209:21, 1211:7, 1267:5, 1269:4
**requirements** [9] - 1231:1, 1239:9, 1243:25, 1287:8, 1289:1, 1289:11, 1289:12, 1289:15, 1289:16
**requires** [5] - 1231:14, 1291:1, 1296:5, 1296:14, 1297:21
**requisite** [1] - 1297:18
**research** [5] - 1195:20, 1229:20, 1229:21, 1236:9, 1311:6
**reserve** [1] - 1191:11
**resolved** [1] - 1200:2
**Resources** [8] - 1284:23, 1294:20, 1314:6, 1315:9, 1316:6, 1317:1, 1317:18, 1318:11
**respect** [7] - 1186:14, 1256:15, 1265:19, 1271:6, 1291:16, 1301:23, 1319:19
**respectful** [2] - 1192:19, 1199:20

**respectfully** [1] - 1310:5
**respond** [1] - 1308:3
**response** [1] - 1281:9
**responses** [1] - 1201:14
**responsibility** [1] - 1309:24
**responsible** [4] - 1199:11, 1202:19, 1240:20, 1241:1
**rest** [2] - 1269:10, 1287:3
**restricted** [1] - 1301:22
**restroom** [1] - 1273:25
**result** [3] - 1207:19, 1226:16, 1319:20
**resulted** [3] - 1205:21, 1300:7, 1301:2
**resulting** [1] - 1225:23
**results** [5] - 1222:19, 1290:14, 1290:16, 1302:21
**retain** [1] - 1186:22
**retrospect** [1] - 1194:6
**return** [3] - 1274:24, 1308:19, 1309:14
**returning** [1] - 1309:6
**revenues** [1] - 1251:1
**review** [4] - 1247:13, 1278:16, 1284:12, 1309:11
**revisit** [1] - 1241:21
**rework** [1] - 1253:23
**RICHARD** [1] - 1184:23
**rid** [1] - 1215:24
**ride** [1] - 1254:18
**ridiculous** [4] - 1245:18, 1266:3, 1267:4, 1271:18
**rights** [2] - 1305:13
**ripping** [1] - 1250:3
**risk** [6] - 1195:18, 1248:13, 1248:14, 1252:3, 1256:4, 1293:7
**risks** [1] - 1303:11
**River** [1] - 1212:4
**ROBINSON** [1] - 1185:8
**role** [6] - 1199:2, 1230:19, 1232:14, 1242:6, 1286:21, 1301:7
**roles** [1] - 1247:1
**rolled** [1] - 1227:25
**room** [16] - 1205:2, 1273:18, 1274:24,

1275:3, 1276:16, 1281:24, 1282:5, 1307:21, 1309:12, 1310:2, 1310:18, 1311:3, 1311:11, 1311:20, 1318:24, 1319:10
**round** [4] - 1266:25, 1267:1, 1287:11, 1287:12
**route** [1] - 1254:11
**row** [1] - 1225:2
**royalties** [2] - 1254:15, 1301:16
**royalty** [25] - 1218:15, 1299:9, 1300:6, 1300:11, 1300:12, 1301:1, 1301:6, 1301:11, 1301:18, 1303:21, 1304:9, 1304:10, 1304:11, 1304:13, 1304:14, 1304:16, 1304:18, 1304:19, 1304:20, 1305:11, 1305:24, 1305:25
**RPR** [1] - 1320:21
**Rule** [1] - 1320:2
**ruled** [1] - 1277:2
**rules** [5] - 1210:15, 1274:18, 1274:19, 1274:23, 1320:2
**ruling** [2] - 1199:3, 1276:23
**ruling-on-evidence** [1] - 1199:3
**rulings** [2] - 1276:21, 1307:19
**rumors** [1] - 1276:3
**run** [5] - 1196:5, 1210:14, 1211:19, 1227:13, 1273:9
**running** [11] - 1198:9, 1211:2, 1220:10, 1224:6, 1224:13, 1224:16, 1224:19, 1229:11, 1235:3, 1260:12, 1261:16
**Rutledge** [9] - 1219:9, 1284:22, 1294:19, 1313:21, 1314:24, 1315:25, 1316:20, 1317:13, 1318:6

## S

**S-sorb** [3] - 1222:10, 1223:9, 1235:11
**safe** [1] - 1320:10

**sale** [5] - 1208:6, 1208:8, 1208:12, 1213:15, 1252:1
**sales** [17] - 1242:5, 1247:20, 1248:10, 1250:14, 1250:15, 1250:22, 1251:17, 1251:20, 1251:22, 1252:1, 1252:6, 1258:5, 1265:7, 1265:10, 1302:10, 1302:12, 1302:13
**Sargent** [1] - 1222:4
**sat** [1] - 1216:11
**satisfaction** [1] - 1232:7
**save** [6] - 1190:4, 1191:18, 1213:21, 1225:5, 1225:6, 1248:4
**saving** [1] - 1225:4
**saw** [16] - 1197:24, 1198:14, 1199:24, 1223:15, 1245:21, 1250:22, 1253:8, 1253:9, 1258:3, 1262:25, 1270:19, 1275:8, 1276:2, 1277:4, 1277:16, 1282:8
**scale** [2] - 1283:3, 1283:5
**scales** [2] - 1202:17, 1283:4
**school** [1] - 1212:6
**science** [1] - 1280:9
**scope** [5] - 1287:17, 1289:8, 1297:12, 1298:2, 1301:21
**scot** [3] - 1226:12, 1270:21, 1271:6
**scot-free** [3] - 1226:12, 1270:21, 1271:6
**scroll** [1] - 1255:6
**scrolling** [1] - 1225:17
**scrubbers** [1] - 1241:3
**searchable** [1] - 1244:24
**searched** [1] - 1252:24
**seated** [1] - 1319:13
**second** [8] - 1237:24, 1254:6, 1275:12, 1285:23, 1287:12, 1292:15, 1295:5, 1301:19
**seconds** [4] - 1238:1, 1238:2, 1264:14, 1273:1

**secret** [1] - 1308:15
**section** [2] - 1186:7, 1268:1
**Section** [6] - 1230:24, 1231:18, 1239:8, 1243:25, 1245:12, 1252:21
**sections** [1] - 1272:11
**securities** [3] - 1242:2, 1247:10, 1257:3
**security** [4] - 1261:14, 1263:4, 1312:4, 1312:6
**see** [21] - 1200:3, 1203:12, 1206:5, 1214:2, 1217:4, 1220:2, 1220:9, 1224:25, 1225:1, 1248:15, 1253:3, 1254:12, 1257:25, 1259:13, 1266:17, 1269:22, 1269:24, 1271:19, 1277:2, 1277:3, 1310:12
**seeing** [2] - 1258:10, 1312:17
**seek** [1] - 1309:8
**seeking** [1] - 1210:25
**seem** [1] - 1263:8
**select** [1] - 1304:17
**self** [2] - 1239:8, 1257:14
**self-contained** [1] - 1239:8
**self-described** [1] - 1257:14
**sell** [3] - 1239:7, 1265:7, 1303:20
**sellers** [2] - 1242:4, 1242:8
**selling** [11] - 1204:24, 1208:19, 1238:25, 1239:6, 1239:11, 1239:14, 1242:5, 1242:9, 1265:10, 1302:9, 1303:4
**sells** [1] - 1253:4
**send** [6] - 1190:22, 1190:24, 1226:15, 1226:16, 1249:7, 1265:25
**sending** [1] - 1204:12
**Senescence** [10] - 1219:10, 1271:16, 1284:20, 1294:17, 1313:14, 1314:18, 1315:19, 1316:14, 1317:10, 1318:1
**senior** [1] - 1237:16

Senior [1] - 1224:25
sense [19] - 1187:16, 1188:4, 1195:19, 1205:19, 1214:19, 1217:23, 1217:24, 1227:11, 1232:18, 1239:11, 1243:2, 1259:18, 1260:19, 1260:20, 1270:12, 1270:24, 1271:2, 1273:18, 1278:7
sent [4] - 1186:5, 1186:16, 1188:25, 1308:7
separate [3] - 1283:9, 1287:14, 1319:23
separated [1] - 1242:14
separately [1] - 1289:7
separates [1] - 1188:19
separating [1] - 1241:14
September [1] - 1249:20
serial [1] - 1217:6
series [1] - 1271:13
serve [2] - 1254:13, 1254:17
served [1] - 1212:22
service [3] - 1311:2, 1319:6
servicing [1] - 1271:16
set [8] - 1202:7, 1210:7, 1228:23, 1233:1, 1233:18, 1235:10, 1235:13, 1299:13
sets [1] - 1289:1
settle [3] - 1218:1, 1262:19, 1262:20
settled [6] - 1238:16, 1238:21, 1245:21, 1259:11, 1259:13
settlement [2] - 1253:15, 1255:22
seven [2] - 1184:12, 1308:14
several [2] - 1205:15, 1218:24
shall [1] - 1309:23
shape [1] - 1195:12
share [1] - 1309:18
shares [1] - 1238:12
sheet [3] - 1252:21, 1285:17, 1309:16
shift [1] - 1252:7
shipping [1] - 1212:9

shoes [2] - 1273:12, 1273:13
shop [1] - 1267:3
short [1] - 1259:15
shorter [1] - 1225:4
Shorthand [2] - 1320:16, 1320:17
shorthand [1] - 1320:18
shortly [1] - 1305:8
show [21] - 1192:18, 1192:20, 1194:21, 1197:1, 1203:5, 1204:5, 1206:3, 1206:10, 1208:15, 1216:20, 1216:24, 1220:20, 1222:19, 1234:15, 1240:4, 1240:6, 1246:25, 1265:3, 1266:18, 1296:9, 1309:17
showed [24] - 1193:13, 1193:22, 1194:3, 1194:7, 1195:9, 1199:1, 1200:17, 1201:5, 1204:10, 1221:19, 1223:17, 1224:15, 1234:3, 1259:3, 1265:1, 1265:4, 1267:17, 1267:18, 1267:23, 1271:22, 1272:7, 1292:16, 1292:18
showing [11] - 1216:24, 1240:18, 1268:11, 1268:13, 1272:2, 1272:16, 1291:1, 1307:5, 1307:15, 1307:16
shown [6] - 1192:19, 1202:23, 1222:3, 1277:7, 1292:8, 1295:24
shows [3] - 1202:10, 1234:11, 1303:2
shut [6] - 1211:13, 1211:21, 1227:17, 1265:15, 1268:25, 1273:14
shutdown [1] - 1250:25
shuts [1] - 1273:10
shutting [1] - 1251:3
side [20] - 1187:2, 1190:2, 1190:3, 1192:1, 1193:19, 1193:21, 1200:24, 1204:19, 1207:8, 1212:6, 1217:12,

1227:16, 1228:6, 1228:10, 1275:24, 1281:10, 1283:5, 1320:6, 1320:8
sides [6] - 1224:2, 1273:23, 1283:3, 1300:19, 1303:16, 1319:18
sign [3] - 1308:1, 1309:14, 1311:22
signal [1] - 1265:25
signed [2] - 1262:25, 1318:14
significance [1] - 1281:6
significant [2] - 1255:11, 1303:11
significant.. [1] - 1255:9
similar [3] - 1302:21, 1304:1, 1305:14
similarly [3] - 1215:25, 1296:10, 1304:17
simple [4] - 1228:12, 1231:3, 1231:5, 1279:17
simplest [1] - 1231:2
simply [5] - 1239:2, 1271:4, 1277:14, 1277:19, 1279:21
sincerely [1] - 1319:8
single [11] - 1205:4, 1213:3, 1229:11, 1234:19, 1235:2, 1238:11, 1245:4, 1245:16, 1252:25, 1253:3, 1253:4
sit [4] - 1198:3, 1214:8, 1214:12, 1230:7
site [1] - 1204:23
sitting [2] - 1225:1, 1270:14
situated [1] - 1215:25
situation [1] - 1219:8
six [5] - 1248:2, 1253:25, 1261:22, 1308:13, 1308:14
Sixth [1] - 1302:9
size [1] - 1304:8
skill [3] - 1280:9, 1280:10, 1288:22
slam [1] - 1237:21
slam-dunk [1] - 1237:21
sleeves [1] - 1227:25
Slide [1] - 1243:16
slide [16] - 1198:25, 1199:24, 1220:20, 1231:4, 1232:2,

1235:23, 1236:24, 1239:3, 1239:21, 1241:12, 1245:2, 1266:17, 1269:22, 1269:24
slides [1] - 1258:9
slightly [2] - 1208:14, 1218:8
small [1] - 1212:7
smartphone [1] - 1311:1
Snapchat [1] - 1311:4
snippet [1] - 1268:18
snippets [1] - 1269:16
soaking [2] - 1203:15, 1204:3
sold [24] - 1204:18, 1204:20, 1207:22, 1208:22, 1219:12, 1226:4, 1226:5, 1229:9, 1234:12, 1235:2, 1253:16, 1253:20, 1269:25, 1295:5, 1295:8, 1296:23, 1297:11, 1297:13, 1297:25, 1298:2, 1301:24, 1306:13
sole [4] - 1275:11, 1278:21, 1309:8, 1309:23
solely [3] - 1276:19, 1298:7, 1309:5
solution [2] - 1197:15, 1208:21
someone [7] - 1203:16, 1204:6, 1226:25, 1264:2, 1270:19, 1271:1, 1291:1
sometimes [3] - 1277:3, 1279:25, 1281:19
somewhat [1] - 1283:5
somewhere [2] - 1193:12, 1209:24
soon [3] - 1201:11, 1227:4, 1308:3
sorb [3] - 1222:10, 1223:9, 1235:11
sorbent [8] - 1197:19, 1198:21, 1198:22, 1241:14, 1241:15, 1241:17, 1288:13, 1288:17
sorry [4] - 1227:14, 1313:16, 1317:19, 1318:4
sort [19] - 1192:13,

1194:6, 1196:21, 1199:3, 1199:4, 1206:11, 1207:9, 1207:12, 1207:18, 1209:13, 1209:21, 1210:14, 1211:4, 1213:14, 1214:5, 1215:4, 1215:8, 1217:6, 1226:9
sounds [2] - 1205:10, 1214:4
source [3] - 1193:17, 1198:14, 1217:17
SOx [2] - 1193:24, 1223:6
spearhead [1] - 1255:15
special [4] - 1269:4, 1280:9, 1280:12, 1302:3
specialized [1] - 1267:7
specially [3] - 1235:7, 1235:12, 1235:21
specific [5] - 1209:7, 1222:15, 1239:6, 1263:20, 1285:16
specifically [3] - 1276:13, 1286:19, 1294:5
speculate [2] - 1275:23, 1277:6
speculation [1] - 1230:14
speculative [1] - 1299:18
spell [1] - 1199:16
spent [1] - 1252:8
spine [1] - 1270:15
split [1] - 1308:12
sprayed [1] - 1211:4
spraying [2] - 1209:22, 1209:23
spreadsheet [3] - 1217:2, 1234:5, 1234:6
spreadsheets [3] - 1216:22, 1217:21, 1225:18
Springhill [8] - 1284:23, 1294:20, 1314:6, 1315:9, 1316:6, 1317:1, 1317:18, 1318:11
squeaky [1] - 1225:18
staff [11] - 1190:22, 1251:17, 1251:20, 1251:22, 1252:1, 1252:6, 1258:5, 1265:7, 1265:10,

1274:1, 1312:9
**staggering** [1] - 1200:6
**stake** [2] - 1193:6, 1196:22
**stamp** [2] - 1262:6, 1262:11
**stand** [8] - 1237:2, 1258:19, 1273:7, 1279:4, 1281:15, 1308:11, 1312:11, 1320:13
**standard** [1] - 1282:17
**stands** [1] - 1274:8
**staple** [4] - 1225:9, 1295:9, 1295:17, 1296:25
**start** [3] - 1212:2, 1274:17, 1307:23
**started** [11] - 1193:10, 1201:17, 1207:11, 1209:12, 1246:7, 1266:6, 1266:8, 1266:12, 1270:23, 1274:7, 1305:7
**starting** [3] - 1197:7, 1253:22, 1270:20
**starts** [4] - 1196:22, 1212:21, 1212:22, 1270:11
**state** [14] - 1189:22, 1203:1, 1203:2, 1229:5, 1229:6, 1231:6, 1231:8, 1233:22, 1239:23, 1252:12, 1257:17, 1264:1, 1264:5
**statement** [2] - 1189:22, 1248:12
**statements** [8] - 1195:14, 1230:15, 1247:8, 1256:23, 1276:18, 1278:13, 1278:14, 1278:15
**STATES** [1] - 1184:1
**States** [4] - 1193:18, 1256:17, 1262:7, 1285:2
**statutory** [1] - 1240:10
**stay** [2] - 1193:20, 1308:15
**stayed** [1] - 1232:20
**stealing** [1] - 1249:22
**Stenotype** [1] - 1320:18
**step** [25] - 1192:17, 1200:25, 1212:16, 1213:1, 1225:25, 1227:10, 1227:11, 1232:10, 1233:6,

1240:15, 1240:16, 1240:17, 1241:9, 1241:10, 1241:18, 1241:19, 1241:23, 1242:12, 1242:14, 1242:16, 1246:1, 1261:20, 1291:11, 1292:22
**Stephen** [1] - 1220:22
**steps** [13] - 1198:5, 1198:7, 1212:17, 1267:9, 1267:21, 1268:5, 1268:9, 1268:13, 1287:11, 1287:14, 1290:5, 1291:13, 1293:2
**stickers** [1] - 1252:9
**sticky** [1] - 1252:16
**still** [4] - 1186:7, 1211:5, 1238:18, 1241:16
**stipulated** [3] - 1234:8, 1281:16, 1281:17
**stipulations** [2] - 1276:10, 1281:18
**stock** [3] - 1238:13, 1247:10, 1257:4
**stop** [2] - 1240:25, 1271:1
**stories** [1] - 1247:12
**Storm** [2] - 1234:23, 1238:4
**story** [10] - 1197:4, 1197:5, 1221:5, 1246:13, 1248:16, 1248:19, 1250:7, 1250:11, 1250:17, 1258:18
**straight** [1] - 1226:17
**straightforward** [1] - 1260:25
**strategic** [3] - 1253:24, 1254:3, 1254:4
**strategies** [1] - 1254:3
**strategy** [8] - 1255:5, 1255:8, 1256:8, 1256:25, 1257:15, 1257:23, 1262:5, 1262:8
**Street** [9] - 1256:6, 1257:3, 1257:10, 1257:16, 1257:19, 1258:12, 1258:20, 1260:15, 1264:23
**strength** [1] - 1278:24
**stretch** [1] - 1273:25
**strong** [1] - 1230:15
**struck** [1] - 1277:5

**structure** [2] - 1252:10, 1272:21
**student** [1] - 1196:2
**studied** [1] - 1216:23
**study** [1] - 1280:12
**stuff** [23] - 1192:15, 1195:12, 1199:6, 1208:9, 1214:22, 1219:23, 1221:7, 1221:14, 1223:22, 1225:3, 1238:8, 1244:19, 1249:22, 1250:2, 1253:11, 1257:2, 1257:7, 1259:6, 1260:7, 1260:21, 1264:1, 1272:1
**submission** [1] - 1319:23
**submit** [2] - 1319:22, 1319:24
**submitted** [2] - 1259:4, 1281:9
**substantial** [16] - 1208:24, 1224:17, 1225:10, 1233:13, 1233:14, 1236:12, 1237:4, 1237:17, 1263:14, 1264:3, 1270:9, 1293:7, 1295:10, 1295:18, 1297:1, 1307:11
**substantially** [1] - 1237:6
**substantive** [1] - 1186:11
**substitute** [8] - 1306:3, 1306:7, 1306:8, 1306:12, 1306:14, 1306:18, 1306:20
**substitutes** [1] - 1306:2
**success** [2] - 1247:15, 1302:17
**successful** [2] - 1251:25, 1265:10
**successfully** [1] - 1251:18
**sucked** [1] - 1262:1
**sudden** [2] - 1258:24, 1262:24
**sue** [1] - 1202:5
**sued** [3] - 1231:3, 1232:19, 1254:16
**sufficient** [10] - 1210:23, 1239:25, 1240:1, 1268:4, 1268:6, 1293:8, 1293:24, 1294:1,

1296:9, 1304:14
**suggest** [2] - 1265:21, 1309:21
**suggested** [1] - 1188:10
**suggestion** [2] - 1216:18, 1218:2
**suggests** [2] - 1188:12, 1202:4
**suing** [1] - 1243:15
**suit** [14] - 1229:10, 1234:16, 1234:24, 1290:9, 1297:8, 1297:11, 1298:1, 1299:5, 1300:5, 1301:17, 1306:24, 1307:4, 1307:9, 1307:15
**summaries** [2] - 1282:10, 1282:13
**summarize** [2] - 1276:15, 1285:14
**summary** [2] - 1234:3, 1259:22
**summation** [1] - 1192:18
**super** [3] - 1206:8, 1216:4, 1270:15
**superior** [3] - 1251:19, 1251:20, 1252:1
**supplied** [3] - 1208:21, 1295:8, 1297:6
**suppliers** [1] - 1248:7
**supply** [3] - 1253:14, 1253:17, 1265:13
**support** [1] - 1228:9
**supporting** [3] - 1229:6, 1280:15, 1283:4
**suppose** [1] - 1206:3
**supposed** [5] - 1266:11, 1271:13, 1271:14, 1273:11, 1273:14
**surely** [1] - 1244:13
**surface** [1] - 1212:5
**surrender** [1] - 1309:4
**surrounding** [1] - 1300:22
**suspicions** [1] - 1276:3
**swear** [1] - 1247:21
**swore** [4] - 1247:11, 1248:18, 1252:3, 1262:2
**sworn** [15] - 1242:1, 1242:3, 1247:7, 1247:8, 1248:12, 1250:16, 1254:20,

1254:21, 1256:23, 1259:4, 1261:14, 1262:10, 1312:4, 1312:6
**SYKES** [7] - 1185:7, 1228:23, 1229:1, 1229:3, 1261:11, 1318:20, 1320:9
**Sykes** [7] - 1190:18, 1228:22, 1229:2, 1261:9, 1264:12, 1264:15, 1320:8
**sympathy** [1] - 1275:23
**system** [2] - 1286:16, 1319:6
**systems** [1] - 1222:21

**T**

**table** [1] - 1214:8
**tablet** [1] - 1311:1
**Talen** [3] - 1253:13, 1254:17, 1255:22
**tanned** [1] - 1253:10
**tax** [30] - 1200:8, 1200:10, 1209:21, 1209:22, 1210:3, 1210:7, 1210:10, 1210:22, 1211:6, 1211:9, 1211:18, 1212:9, 1213:9, 1219:24, 1220:2, 1220:5, 1220:7, 1220:16, 1223:10, 1226:14, 1227:18, 1227:23, 1228:3, 1230:24, 1231:18, 1252:11, 1252:13, 1269:1, 1269:3, 1273:9
**taxes** [1] - 1269:9
**team** [5] - 1203:18, 1249:23, 1251:20, 1258:5, 1258:7
**teaming** [3] - 1249:13, 1249:20, 1249:21
**technical** [2] - 1231:1, 1251:20
**technically** [2] - 1208:6, 1208:12
**technologies** [2] - 1305:14, 1305:22
**technology** [6] - 1220:2, 1228:5, 1231:23, 1251:19, 1304:5, 1304:12
**tedious** [3] - 1199:20, 1232:4, 1243:8

DEANNA WARNER, CSR
202 Ashfield Court, Smyrna DE 19977
Phone: (302) 893-1158  E-mail: warnerdeanna@gmail.com

telephone [1] - 1310:25
ten [6] - 1239:3, 1245:13, 1260:5, 1273:1, 1273:24, 1274:4
ten-minute [2] - 1273:24, 1274:4
tend [1] - 1279:19
tendency [1] - 1283:22
tending [2] - 1279:9, 1301:17
tens [2] - 1229:8, 1234:11
term [6] - 1228:1, 1237:8, 1288:11, 1288:12, 1288:16, 1302:15
term-business [1] - 1228:1
terms [8] - 1191:11, 1215:16, 1277:12, 1288:4, 1291:9, 1293:22, 1301:23, 1305:22
terribly [1] - 1199:15
territory [2] - 1301:23, 1302:7
test [7] - 1205:14, 1210:20, 1220:7, 1220:8, 1220:12, 1243:19, 1268:16
testified [23] - 1196:4, 1209:12, 1222:17, 1223:17, 1231:21, 1236:10, 1236:18, 1237:1, 1237:20, 1240:12, 1241:13, 1241:23, 1242:17, 1244:12, 1244:23, 1251:13, 1254:14, 1260:5, 1263:19, 1277:16, 1279:9, 1280:1, 1280:4
testify [9] - 1215:20, 1220:25, 1224:25, 1230:6, 1231:17, 1234:2, 1238:11, 1238:14, 1239:18
testifying [2] - 1224:11, 1276:7
testimony [41] - 1215:9, 1233:4, 1233:6, 1237:18, 1237:21, 1238:15, 1238:19, 1246:12, 1247:7, 1250:24, 1253:1, 1253:4, 1274:20, 1276:8,

1276:12, 1277:15, 1279:1, 1279:6, 1279:7, 1279:13, 1279:14, 1279:15, 1280:6, 1280:8, 1280:13, 1280:17, 1280:18, 1280:20, 1280:22, 1281:1, 1281:4, 1281:5, 1282:3, 1282:8, 1283:24, 1284:5, 1303:13, 1307:19
testing [6] - 1196:3, 1239:17, 1244:1, 1244:8, 1244:13, 1245:9
tests [2] - 1194:2, 1199:13
text [2] - 1287:2, 1311:2
THE [43] - 1184:1, 1184:2, 1186:1, 1187:6, 1187:12, 1188:4, 1188:20, 1188:23, 1190:1, 1190:14, 1190:18, 1190:24, 1191:2, 1191:8, 1191:12, 1191:18, 1191:21, 1191:24, 1192:6, 1192:9, 1228:20, 1228:25, 1229:2, 1261:9, 1264:12, 1264:19, 1270:16, 1273:19, 1273:22, 1274:7, 1274:12, 1312:8, 1312:14, 1312:21, 1312:25, 1313:1, 1313:8, 1318:15, 1318:18, 1318:21, 1319:13, 1320:8, 1320:10
theirs [3] - 1231:9, 1231:11, 1231:14
themselves [2] - 1222:25, 1276:14
theoretically [1] - 1206:3
theorist [1] - 1236:4
theory [6] - 1195:22, 1196:3, 1196:10, 1236:22, 1245:21
therefore [4] - 1240:19, 1283:17, 1284:2, 1287:20
They've [1] - 1220:23
they've [7] - 1210:3, 1221:16, 1240:18, 1242:20, 1250:2, 1255:25, 1258:6

thick [1] - 1251:10
thinking [1] - 1239:19
third [15] - 1224:20, 1236:9, 1241:18, 1241:19, 1242:14, 1243:10, 1244:11, 1250:11, 1262:3, 1270:5, 1286:3, 1287:13, 1292:18, 1295:7, 1301:21
third-party [1] - 1244:11
thirds [1] - 1248:3
thoroughly [1] - 1229:7
thousand [1] - 1260:23
thousand-page [1] - 1260:23
thousandth [1] - 1262:12
thousandths [1] - 1261:22
three [9] - 1221:3, 1228:9, 1232:24, 1234:22, 1238:9, 1241:12, 1245:7, 1287:14, 1308:14
three-part [1] - 1241:12
throwing [1] - 1212:8
thrown [1] - 1261:25
tied [1] - 1304:13
tight [1] - 1194:25
TikTok [1] - 1311:4
time-consuming [1] - 1256:12
timeline [1] - 1248:21
timelines [1] - 1259:6
tip [2] - 1283:4, 1283:6
today [2] - 1240:6, 1319:4
together [16] - 1187:19, 1216:12, 1216:23, 1219:7, 1219:13, 1223:25, 1229:16, 1229:17, 1230:2, 1236:12, 1236:19, 1236:20, 1239:20, 1266:14, 1266:16, 1275:21
Tom [2] - 1196:1, 1266:9
ton [13] - 1200:8, 1216:3, 1216:14, 1216:17, 1218:16, 1218:18, 1222:3, 1258:21, 1259:12, 1260:10, 1261:18, 1262:13

tonnage [4] - 1217:14, 1218:1, 1219:12, 1259:18
tons [23] - 1200:9, 1212:8, 1216:13, 1216:15, 1217:12, 1217:15, 1218:4, 1218:7, 1218:12, 1218:21, 1220:6, 1229:8, 1234:11, 1259:2, 1259:5, 1259:10, 1259:24, 1259:25, 1260:1, 1260:11, 1261:21, 1262:4, 1263:15
took [7] - 1229:23, 1246:16, 1263:7, 1267:15, 1275:16, 1292:12, 1300:8
tool [1] - 1284:2
top [3] - 1207:3, 1217:5, 1255:3
total [2] - 1218:4, 1272:13
totally [2] - 1230:2, 1260:16
totes [2] - 1197:11, 1253:11
touch [3] - 1230:17, 1237:23, 1312:10
touting [1] - 1253:13
toward [1] - 1275:24
towards [1] - 1308:22
town [1] - 1320:11
track [1] - 1189:1
traded [1] - 1257:14
trail [1] - 1248:22
trainloads [2] - 1259:15, 1259:16
trains [1] - 1212:8
transcript [2] - 1276:8, 1281:2
TRANSCRIPT [1] - 1184:9
transcripts [2] - 1252:25, 1258:21
traveling [1] - 1228:1
travels [1] - 1320:11
treat [1] - 1281:20
treated [2] - 1209:1, 1319:18
tremendous [1] - 1205:24
Trial [1] - 1219:22
TRIAL [2] - 1184:9, 1184:11
trial [33] - 1189:13, 1194:24, 1198:3, 1198:8, 1199:3, 1199:18, 1217:23,

1217:25, 1227:5, 1246:14, 1248:16, 1250:7, 1252:8, 1257:19, 1258:20, 1266:15, 1275:10, 1275:17, 1275:19, 1276:25, 1279:13, 1281:1, 1281:12, 1281:19, 1281:22, 1282:12, 1283:19, 1284:1, 1284:8, 1286:15, 1311:14, 1319:20, 1320:1
trick [1] - 1244:19
tricky [1] - 1238:7
tried [12] - 1192:13, 1231:18, 1244:18, 1246:15, 1250:23, 1264:21, 1265:3, 1265:4, 1265:5, 1265:7, 1265:17, 1319:16
troll [6] - 1254:10, 1254:11, 1254:20, 1257:14, 1265:12, 1269:17
truck [1] - 1197:9
true [13] - 1200:14, 1200:15, 1227:3, 1237:15, 1242:3, 1244:9, 1246:18, 1259:5, 1262:10, 1271:2, 1281:18, 1283:1, 1293:6
trust [1] - 1260:19
truth [15] - 1246:9, 1246:11, 1246:18, 1246:21, 1252:4, 1252:5, 1257:12, 1258:1, 1258:2, 1263:2, 1264:8, 1264:9, 1279:19, 1309:9
truthful [1] - 1254:22
try [8] - 1194:23, 1197:12, 1216:23, 1217:22, 1230:14, 1242:24, 1268:24, 1310:8
trying [15] - 1192:19, 1197:13, 1197:14, 1206:12, 1216:9, 1227:13, 1236:21, 1239:4, 1251:4, 1251:8, 1260:16, 1265:14, 1266:4, 1267:23, 1303:17
Tuesday [1] - 1319:25
tune [1] - 1258:24
turn [6] - 1187:2,

1192:3, 1193:15, 1227:4, 1228:21, 1287:20

**turned** [3] - 1204:21, 1229:5, 1257:18

**turning** [1] - 1208:9

**turns** [2] - 1241:12, 1244:21

**Twitter** [1] - 1311:4

**two** [31] - 1192:17, 1203:21, 1209:14, 1209:17, 1212:16, 1213:1, 1213:5, 1213:20, 1219:12, 1219:15, 1219:16, 1219:17, 1223:23, 1225:25, 1227:24, 1228:4, 1228:9, 1232:2, 1232:10, 1241:11, 1248:3, 1254:15, 1261:20, 1266:14, 1266:15, 1275:6, 1285:1, 1288:23, 1289:9, 1308:13

**two-and-a-half-year** [1] - 1209:17

**two-part** [1] - 1241:11

**two-step** [6] - 1192:17, 1212:16, 1213:1, 1225:25, 1232:10, 1261:20

**two-thirds** [1] - 1248:3

**type** [2] - 1193:16, 1204:4

**types** [2] - 1288:23, 1298:6

**U**

**U.S** [1] - 1320:22

**U.S.M.J** [1] - 1184:12

**ultimate** [1] - 1304:10

**ultimately** [4] - 1186:21, 1186:22, 1201:15, 1218:10

**umbrella** [4] - 1203:14, 1203:15, 1204:3, 1277:22

**unanimous** [5] - 1308:20, 1309:12, 1310:4, 1310:15, 1312:24

**unbelievable** [1] - 1266:5

**uncontested** [1] - 1281:19

**under** [23] - 1202:23, 1212:5, 1231:13,

1239:8, 1242:3, 1247:9, 1247:21, 1249:7, 1253:21, 1254:22, 1255:2, 1258:7, 1259:4, 1261:9, 1275:13, 1276:7, 1280:23, 1281:11, 1287:25, 1302:3, 1302:17, 1304:1, 1305:6

**underlying** [3] - 1234:4, 1282:7, 1282:13

**Understood** [1] - 1190:1

**understood** [6] - 1188:20, 1213:2, 1231:2, 1231:24, 1231:25, 1300:18

**undisputed** [8] - 1196:11, 1205:3, 1229:13, 1232:9, 1232:10, 1234:2, 1235:5, 1235:20

**undue** [1] - 1283:23

**unduly** [1] - 1188:12

**unimportant** [2] - 1279:24, 1283:24

**unintentionally** [1] - 1293:11

**uniquely** [1] - 1217:9

**United** [4] - 1193:17, 1256:17, 1262:7, 1285:2

**UNITED** [1] - 1184:1

**unless** [2] - 1191:2, 1276:12

**unpatented** [2] - 1303:10, 1304:6

**unreasonable** [1] - 1278:25

**unrebutted** [2] - 1218:11, 1218:15

**untoward** [1] - 1272:22

**unusual** [2] - 1197:17, 1197:23

**up** [56] - 1189:20, 1191:14, 1193:13, 1197:17, 1200:8, 1201:24, 1202:7, 1202:25, 1205:16, 1207:3, 1210:7, 1212:19, 1214:7, 1216:12, 1217:4, 1217:11, 1217:14, 1218:12, 1219:9, 1219:11, 1222:15, 1224:11, 1227:25, 1228:23, 1238:8,

1239:17, 1241:3, 1244:19, 1245:11, 1248:21, 1249:13, 1249:21, 1249:23, 1250:17, 1252:19, 1254:6, 1256:1, 1256:7, 1259:7, 1259:20, 1260:8, 1260:16, 1265:13, 1267:22, 1269:4, 1269:15, 1270:13, 1271:16, 1273:7, 1307:20, 1320:5

**up-and-up** [1] - 1267:22

**upward** [1] - 1304:18

**US** [1] - 1255:12

**usage** [1] - 1305:6

**uses** [12] - 1225:11, 1225:12, 1233:13, 1236:12, 1237:5, 1237:18, 1264:3, 1289:23, 1295:19, 1295:20, 1307:6, 1307:17

**utilities** [2] - 1254:13, 1259:21

**utility** [4] - 1256:13, 1260:5, 1260:12, 1302:19

**V**

**valid** [3] - 1214:13, 1220:24, 1300:19

**validity** [3] - 1186:8, 1187:24, 1194:20

**valuable** [1] - 1304:12

**valuation** [1] - 1214:2

**value** [6] - 1213:23, 1301:14, 1302:11, 1303:2, 1304:5, 1304:21

**various** [1] - 1282:3

**vehicle** [3] - 1198:18, 1206:24, 1213:14

**vehicles** [2] - 1208:12, 1257:1

**vendor** [1] - 1241:1

**venture** [2] - 1197:8, 1198:2

**verbalize** [1] - 1188:18

**verdict** [65] - 1186:14, 1187:1, 1188:25, 1189:6, 1189:8, 1189:11, 1189:15, 1189:18, 1189:24, 1190:22, 1190:25, 1199:17, 1199:22,

1206:3, 1206:4, 1206:5, 1206:8, 1206:12, 1207:8, 1207:11, 1208:15, 1213:12, 1219:5, 1228:12, 1233:10, 1237:13, 1243:4, 1243:10, 1246:5, 1246:8, 1257:22, 1258:2, 1258:3, 1262:4, 1265:23, 1266:3, 1268:15, 1269:20, 1273:21, 1275:4, 1284:14, 1285:17, 1308:16, 1308:17, 1308:19, 1308:20, 1309:6, 1309:10, 1309:13, 1309:15, 1309:16, 1309:17, 1309:20, 1309:22, 1309:23, 1311:7, 1311:18, 1311:19, 1311:21, 1312:15, 1312:24, 1313:2, 1313:4, 1313:6

**verdicts** [2] - 1274:24, 1307:22

**verified** [1] - 1247:9

**version** [7] - 1186:20, 1186:23, 1188:24, 1189:1, 1190:24, 1253:10, 1311:21

**vice** [2] - 1229:24, 1236:5

**video** [7] - 1195:25, 1196:9, 1196:15, 1196:21, 1276:9, 1281:3, 1281:4

**videos** [1] - 1281:7

**view** [4] - 1189:15, 1262:18, 1263:18, 1308:22

**views** [2] - 1309:2, 1310:6

**violence** [1] - 1308:23

**Vistra** [5] - 1254:17, 1255:22, 1259:22, 1259:24, 1260:12

**volume** [3] - 1216:21, 1232:15, 1253:19

**Volume** [1] - 1184:7

**volumes** [1] - 1212:7

**voluminous** [1] - 1212:4

**voluntarily** [1] - 1303:17

**vote** [3] - 1308:15, 1310:14, 1310:15

**votes** [1] - 1308:11

**vs** [1] - 1184:6

**W**

**W.A** [1] - 1271:17

**wait** [2] - 1318:25, 1319:2

**walk** [6] - 1230:15, 1230:16, 1230:22, 1273:12, 1273:13

**walked** [4] - 1194:2, 1203:13, 1215:18, 1277:21

**Wall** [9] - 1256:6, 1257:3, 1257:10, 1257:16, 1257:19, 1258:12, 1258:20, 1260:15, 1264:23

**wants** [2] - 1203:4, 1273:11

**warner** [1] - 1320:16

**Warner** [1] - 1320:21

**warning** [4] - 1190:17, 1191:9, 1191:10, 1191:17

**WARREN** [1] - 1184:21

**waste** [1] - 1227:6

**watched** [1] - 1196:21

**watching** [1] - 1192:12

**water** [1] - 1277:22

**wearing** [1] - 1277:21

**website** [5] - 1244:25, 1245:12, 1245:13, 1271:17, 1311:3

**websites** [3] - 1244:20, 1244:21, 1271:10

**wee** [1] - 1262:24

**week** [9] - 1211:21, 1230:6, 1237:2, 1241:20, 1247:7, 1247:12, 1319:8, 1319:20, 1319:25

**weekend** [1] - 1320:12

**weighing** [3] - 1278:7, 1280:13, 1280:17

**weight** [9] - 1277:25, 1278:2, 1278:5, 1278:9, 1279:7, 1280:5, 1280:18, 1282:15, 1309:4

**weird** [4] - 1195:16, 1199:12, 1214:4, 1224:7

**welcome** [1] - 1186:1

**well-connected** [1] - 1248:10

**well-tried** [1] - 1319:16
**wet** [5] - 1203:14, 1203:15, 1204:3, 1277:22
**whip** [1] - 1218:3
**Whitney** [2] - 1237:24, 1238:16
**who'd** [1] - 1232:22
**Whoa** [1] - 1223:23
**whole** [7] - 1220:7, 1236:14, 1244:3, 1245:6, 1248:25, 1266:6, 1275:21
**wide** [1] - 1213:8
**widget** [1] - 1207:15
**wife** [1] - 1197:9
**willful** [14] - 1228:13, 1267:17, 1267:18, 1283:11, 1285:8, 1292:16, 1292:19, 1292:24, 1295:24, 1296:1, 1298:12, 1298:18, 1317:8
**willfully** [7] - 1243:14, 1244:6, 1285:11, 1286:6, 1291:23, 1294:8, 1298:16
**willfulness** [4] - 1213:21, 1243:9, 1243:10, 1245:19
**willing** [4] - 1300:19, 1303:21, 1303:23, 1318:24
**WILSON** [1] - 1185:7
**win** [1] - 1299:22
**window** [1] - 1196:24
**wink** [2] - 1216:16
**wish** [6] - 1186:19, 1189:10, 1318:16, 1318:18, 1320:10, 1320:11
**witness** [32] - 1201:15, 1209:11, 1209:12, 1213:1, 1216:19, 1226:15, 1226:24, 1228:8, 1232:22, 1236:1, 1237:20, 1237:22, 1238:11, 1238:19, 1253:2, 1271:15, 1277:7, 1277:16, 1278:22, 1279:4, 1279:8, 1279:9, 1279:11, 1279:15, 1279:18, 1279:20, 1280:17, 1280:21, 1280:24, 1281:15, 1282:8
**witness's** [5] -

1278:21, 1278:24, 1279:2, 1279:3, 1279:14
**witnesses** [20] - 1204:2, 1228:4, 1228:5, 1228:7, 1238:6, 1238:7, 1238:10, 1244:11, 1246:13, 1263:19, 1270:5, 1276:7, 1276:12, 1279:25, 1280:1, 1280:4, 1280:5, 1282:3, 1285:3, 1288:9
**wonder** [5] - 1194:7, 1225:4, 1243:6, 1269:19, 1280:1
**wondering** [1] - 1243:7
**word** [17] - 1187:18, 1195:2, 1195:4, 1197:18, 1232:6, 1246:8, 1251:9, 1251:11, 1252:25, 1253:1, 1256:24, 1258:15, 1271:16, 1278:13, 1289:21, 1289:23
**words** [15] - 1205:11, 1205:12, 1216:9, 1254:8, 1254:19, 1286:24, 1287:1, 1288:7, 1288:20, 1296:18, 1297:9, 1304:13, 1311:8, 1319:1, 1319:14
**wore** [2] - 1263:6, 1263:8
**works** [1] - 1266:13
**world** [4] - 1195:22, 1196:20, 1223:24, 1261:12
**worn** [1] - 1263:8
**worry** [3] - 1201:23, 1201:24, 1202:1
**worth** [3] - 1261:18, 1273:1, 1273:13
**wow** [2] - 1252:4, 1264:21
**Wow** [1] - 1212:20
**write** [4] - 1233:9, 1308:1, 1308:11, 1308:12
**writing** [4] - 1195:8, 1222:25, 1223:1, 1281:11
**written** [9] - 1205:14, 1253:24, 1254:2, 1275:2, 1281:9, 1281:10, 1281:11,

1283:23, 1283:25
**wrote** [1] - 1254:15

## Y

**y'all** [2] - 1256:7, 1256:23
**yard** [1] - 1241:1
**year** [6] - 1209:17, 1224:18, 1247:17, 1250:19, 1251:2, 1259:25
**years** [23] - 1193:4, 1193:6, 1193:7, 1193:17, 1203:21, 1203:22, 1205:15, 1213:5, 1221:21, 1226:4, 1232:25, 1237:10, 1240:4, 1244:17, 1244:25, 1248:2, 1248:18, 1248:23, 1251:4, 1254:15, 1259:17, 1273:13
**yelling** [1] - 1266:1
**yes;** [1] - 1315:12
**yesterday** [5] - 1186:11, 1187:8, 1187:23, 1195:25, 1234:21
**yourself** [4] - 1191:14, 1279:8, 1308:24, 1310:21
**yourselves** [1] - 1311:16
**YouTube** [1] - 1311:4

## Z

**zero** [2] - 1213:7, 1254:15
**zeroed** [1] - 1202:11
**ZURLO** [1] - 1185:8