## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) ) | |
| Defendants. | ) ) | |

---

James M. Lennon and Peter Akawie Mazur, DEVLIN LAW FIRM, Wilmington, DE; Bradley W. Caldwell, Justin T. Nemunaitis, Warren J. McCarty, III, Daniel R. Pearson, Adrienne R. Dellinger, Aisha M. Haley, Richard A. Cochrane, CALDWELL CASSADY CURRY P.C., Dallas, TX; Attorneys for Plaintiffs Midwest Energy Emissions Corp. and MES Inc.

Kenneth L. Dorsney and Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE; Jeff Dyess, Paul Sykes, Benn Wilson and Ashley M. Robinson, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL; Jessica Zurlo, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., Attorneys for Defendants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescence Energy Products, LLC, Spring Hill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC and Rutledge Products, LLC.

---

## **MEMORANDUM OPINION**

June 10, 2025
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

## INTRODUCTION

This patent infringement case relates to mercury control at coal-fired power plants ("power plants"). Plaintiffs Midwest Energy Emissions Corp. ("Midwest Energy") and MES Inc. ("MES" and collectively with Midwest Energy, "Plaintiffs" or "ME2C") allege infringement of claims 25 and 26 of United States Patent No. 10,343,114 (the "'114 patent") and claims 1 and 2 of United States Patent No. 10,596,517 (the "'517 patent" and collectively with the '114 patent, the "asserted patents")[1] against current-named Defendants Bascobert (A) Holdings, LLC; Buffington Partners, LLC; Cottbus Associates, LLC; Larkwood Energy, LLC; Marquis Industrial Company, LLC; Rutledge Products, LLC; Senescence Energy Products, LLC and Springhill Resources, LLC (the "CERT RC Defendants"); CERT Operations II LLC; CERT Operations IV LLC; CERT Operations V LLC; and CERT Operations RCB LLC (the "CERT Operations Companies Defendants" and collectively with the CERT RC Defendants, "CERT" or the "CERT Defendants"). (D.I. 659, ex. 2 at ¶¶ 1-6; *id.*, ex. 3 at ¶ 1) The asserted claims of the asserted patents recite methods for reducing mercury emissions from power plants with the use of bromine-enhanced coal (or "refined coal") and a sorbent such as activated carbon. (D.I. 775, PTX-001, PTX-003; *see also* D.I. 546, ex. A at ¶¶ 49, 70; D.I. 743 at ¶ 4)

---

[1] Plaintiffs previously also asserted United States Patent Nos. 8,168,147 (the "'147 patent"), 10,589,225 (the "'225 patent"), and 10,668,430 (the "'430 patent"), (D.I. 406 at ¶¶ 41, 42, 44), but only pursued their claims relating to the '114 patent and '517 patent at trial, (*see, e.g.*, D.I. 659, ex. 1 at ¶¶ 15-20).

2

The Court[2] held a 5-day jury trial beginning on February 26, 2024, (D.I. 781-85 (hereinafter, "JT Tr.")), regarding Plaintiffs' claims that the CERT RC Defendants contributed to infringement of the asserted claims of the asserted patents by selling refined coal to power plants, and that each of the CERT Defendants induced these power plants to add activated carbon to the refined coal in a manner that amounted to direct infringement[3] (and that this infringement was willful), (D.I. 659, ex. 2 at ¶¶ 5-6; D.I. 689 at 15; D.I. 743 at ¶ 4; JT Tr.[4] (D.I. 785) at 1206-08). At trial, the CERT Defendants denied that they indirectly infringed the asserted patents. (D.I. 669 at 2; JT Tr. (D.I. 785) at 1246)  On March 1, 2024, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs. (D.I. 692)  The Court entered non-final judgments on the verdict against the CERT Defendants. (D.I. 697-708)  Thereafter, the parties submitted post-trial motions relating to the jury trial. (D.I. 716; D.I. 718; D.I. 720; D.I. 763)

The CERT Defendants had also asserted that Plaintiffs' infringement claims are barred because the CERT Defendants are entitled to an implied license to the asserted patents. (D.I. 515 at 112, at ¶ 16; D.I. 659, ex. 3 at 48 at ¶ 3(e)-(f))  The Court ruled that it would hold a bench trial on this defense following the jury trial. (D.I. 605)  Along with its other post-trial motion briefing, CERT filed a motion to alter or amend the non-final judgments in the CERT

---

[2]    The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 398)

[3]    The CERT Operations Companies Defendants made refined coal that the CERT RC Defendants then sold to power plants. (D.I. 659, ex. 1 at ¶¶ 34-36; *see also* D.I. 532)

[4]    While the parties appear to cite to the rough versions of the jury trial transcript in their briefing, the Court herein cites to the final versions of the jury trial transcript that have been docketed.

Defendants' favor, pursuant to Federal Rule of Civil Procedure 59(e), should the Court find as a result of the bench trial that the CERT Defendants received an implied license (the "Motion"). (D.I. 717)

On May 30, 2024, the Court held the bench trial. (D.I. 779 (hereinafter, "BT Tr.")) The parties thereafter filed post-trial briefs regarding CERT's implied license defense, (D.I. 758; D.I. 760; D.I. 767), as well as proposed findings of fact and conclusions of law, (D.I. 759; D.I. 762). That briefing did not conclude until August 7, 2024. (D.I. 767)

As explained below, the Court determines that CERT has failed to prove by a preponderance of the evidence that it has an implied license to the asserted patents. Pursuant to Federal Rule of Civil Procedure 52(a), the Court hereby presents its findings of fact and conclusions of law.

## FINDINGS OF FACT

### A.    The Parties

1.    Plaintiff Midwest Energy is a Delaware corporation. (D.I. 659, ex. 1 at ¶ 1)

2.    The CEO of Midwest Energy is Rick MacPherson. (JT Tr. (D.I. 782) at 440) Mr. MacPherson founded ME2C in 2008. (*Id.*)

3.    Plaintiff MES is a North Dakota corporation. (D.I. 659, ex. 1 at ¶ 2)

4.    Defendants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescence Energy Products, LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC and Rutledge Products, LLC are Delaware limited liability companies. (*Id.* at ¶¶ 3-14)

4

5.      The past president and Vice President of Operations for the CERT Operations Companies Defendants is Jeff Green.  (BT Tr. at 50)  Mr. Green served as the corporate representative for the CERT Defendants in this case.  (JT Tr. (D.I. 783) at 839)

**B.      The Relevant Patents**

6.      The inventors of the asserted patents were researchers at the Energy & Environmental Research Center ("EERC"), a nonprofit research arm at the University of North Dakota; the inventors were studying the issue of mercury capture at the EERC.  (D.I. 546, ex. A at 19, at ¶ 48; D.I. 759 at ¶ 7; JT Tr. (D.I. 781) at 241)

7.      On May 1, 2012, the United States Patent and Trademark Office ("PTO") issued the '147 patent, entitled "Sorbents for the Oxidation and Removal of Mercury."  (D.I. 775, PTX-005.0002; *see also* D.I. 598, ex. 1 at ¶ 37)  The '147 patent claims priority to provisional application No. 60/605,640, which was filed on August 30, 2004 (as well as to a first non-provisional application that issued as United States Patent No. 7,435,286 (the "'286 patent")).  (D.I. 775, PTX-005.0002)[5]  The '147 patent names Edwin S. Olson, Michael J. Holmes and John H. Pavlish as inventors.  (*Id.*; *see also* D.I. 598, ex. 1 at ¶ 38)

8.      On July 9, 2019, the PTO issued the '114 patent, entitled "Sorbents for the Oxidation and Removal of Mercury."  (D.I. 775, PTX-001.0002; *see also* D.I. 659, ex. 1 at ¶ 15)  The '114 patent also claims priority to provisional application No. 60/605,640, (as well as a first non-provisional application that issued as the '286 patent).  (D.I. 775, PTX-001.0003; D.I. 762 at

---

[5]      The '286 patent issued on October 14, 2008 and, like the other relevant patents, is also entitled "Sorbents for the Oxidation and Removal of Mercury[.]"  (*See* D.I. 776, PTX-049.0008)  The EERC's reference number for the '286 patent was 05-001.  (*Id.*; *see also* D.I. 775, PTX-039.0006)

¶ 2)  The '114 patent names Edwin S. Olson, Michael J. Holmes and John H. Pavlish as inventors.  (D.I. 775 at PTX-001.0002; *see also* D.I. 659, ex. 1 at ¶ 16)

9.      On March 24, 2020, the PTO issued the '517 patent, entitled "Sorbents for the Oxidation and Removal of Mercury."  (D.I. 775, PTX-003.0002; *see also* D.I. 659, ex. 1 at ¶ 18) The '517 patent too claims priority to provisional application No. 60/605,640 (as well as a first non-provisional application that issued as the '286 patent).  (D.I. 775, PTX-003.0003; D.I. 762 at ¶ 3)  The '517 patent also names Edwin S. Olson, Michael J. Holmes and John H. Pavlish as inventors.  (D.I. 775, PTX-003.002; *see also* D.I. 659, ex. 1 at ¶ 19)

10.     As noted above, the asserted claims of the asserted patents (i.e., claims 25 and 26 of the '114 patent and claims 1 and 2 of the '517 patent) recite methods for reducing mercury emissions from power plants with the use of refined coal and a sorbent such as activated carbon. (D.I. 775, PTX-0001, PTX-0003; *see also* D.I. 546, ex. A at 19, at ¶ 49 & at 32, at ¶ 70)

11.     Inventor John H. Pavlish was employed at the EERC as a senior research advisor from 1993 until 2014, and he also served as the director of the EERC's Center for Air Toxic Metals from 2000 until 2014.  (BT Tr. at 170-71)  At some point while still employed at the EERC, Mr. Pavlish began consulting work for ME2C, and in 2014 he began to work full-time for ME2C as the Chief Technology Officer and Senior Vice President.  (JT Tr. (D.I. 782) at 325-26)

C.      **Regulations Regarding Mercury Reduction**

12.     In 1990, Congress required the United States Environmental Protection Agency ("EPA") to prepare regulations addressing air pollutants, including mercury.  (D.I. 659, ex. 1 at ¶¶ 21-22)

13.     Then in 2004, Congress created a new tax credit to promote the production and

sale of refined coal ("Section 45 tax credits" or the "Section 45 tax credit program"). (*Id.* at ¶¶ 25-26) Pursuant to this law, a seller of refined coal could claim a tax credit for each ton of refined coal sold to a power plant that results in a 40% reduction in mercury emissions and a 20% reduction in NOx emissions. (*Id.* at ¶ 26; JT Tr. (D.I. 782) at 330, 431; JT Tr. (D.I. 783) at 776, 779)

14.     In order to receive the Section 45 tax credits, a refined coal facility for producing refined coal had to be in operation (i.e., placed in service) at a power plant by December 31, 2011. (D.I. 659, ex. 1 at ¶ 32; BT Tr. at 55)

15.     The Section 45 tax credit program ended on December 31, 2021. (D.I. 659, ex. 1 at ¶ 32; BT Tr. at 58; JT Tr. (D.I. 783) at 710)

16.     In 2011, the EPA finalized national standards to reduce mercury (and other toxic air pollutants) from power plants, which are known as the Mercury and Air Toxics Standards ("MATS"). (D.I. 546, ex. A at 19, at ¶ 50; JT Tr. (D.I. 782) at 329) MATS required power plants to reduce mercury emissions by 90%. (JT Tr. (D.I. 782) at 431; JT Tr. (D.I. 783) at 613-14, 694, 710) Most power plants were required to comply with this rule by 2015, unless granted a one-year extension to 2016. (JT Tr. (D.I. 782) at 330; JT Tr. (D.I. 783) at 651-52, 660-61)

17.     In order to comply with MATS, a number of power plants installed and used activated carbon systems as part of their strategy to reduce mercury by 90%. (JT Tr. (D.I. 782) at 462; JT Tr. (D.I. 783) at 613-14, 644, 699; *see also* D.I. 659, ex. 1 at ¶¶ 44-46)

**D.     The Defendants' Relationships and Activities**

18.     The CERT Operations Companies Defendants operated refined coal facilities (owned by the CERT RC Defendants) located at certain power plants (including Big Cajun II, Rush Island, WA Parish, Coleto Creek, Limestone, Labadie, Laramie River, Powerton and

Antelope Valley).  (D.I. 659, ex. 1 at ¶¶ 56-64)  The CERT Operations Companies Defendants

made refined coal at these refined coal facilities.  (*Id.* at ¶ 34)  The refined coal at issue in this

case was made by applying MerSorb and S-Sorb to coal.  (*Id.* at ¶ 38)  MerSorb is a 52%

solution of calcium bromide and S-Sorb is cement kiln dust.  (BT Tr. at 136)  These chemicals

were supplied by ChemMod (the "ChemMod technology").  (JT Tr. (D.I. 783) at 742; JT Tr.

(D.I. 784) at 890; BT Tr. at 67)

19.     It was understood in the mercury capture industry that the ChemMod technology

did not include activated carbon.  (BT Tr. at 106)

20.     The CERT RC Defendants sold the refined coal made by the CERT

Operations Companies Defendants to the power plants.  (D.I. 659, ex. 1 at ¶¶ 35-36, 47-55)

21.     Powerton first used activated carbon injection in one or more of its coal-fired

units in 2009 or earlier.  (*Id.* at ¶ 43)  The remaining power plants at issue first used activated

carbon injection in one or more of their coal-fired units by 2015 or 2016.  (*Id.* at ¶¶ 44-46)[6]

22.     CERT did not become aware of any of ME2C's patents until it was served with

the original Complaint in this case in July 2019.  (D.I. 279 at 16-19; D.I. 759 at ¶ 106; D.I. 762 at

¶ 22)

     **E.**     **Refined Coal Certification Testing**

23.     The Section 45 tax credit program required each facility that produced refined

coal to document and certify that the refined coal produced and burned achieved a qualified

emission reduction (for CERT, a 20% reduction in NOx and 40% reduction in mercury), as

---

[6]     CERT also supplied refined coal to some power plants that never used activated
carbon.  (JT Tr. (D.I. 784) at 953-54; BT Tr. at 208)

compared to the raw coal feedstock ("Section 45 certification testing" or "Section 45 certification test(s)").  (BT Tr. at 56)

24.     The results of a Section 45 certification test were valid for six months.  (JT Tr. (D.I. 784) at 1001)  Accordingly, companies producing refined coal were required to have certification testing done at least every six months.  (*Id.*; BT Tr. at 64)

25.     One way that the Internal Revenue Service ("IRS") allowed Section 45 certification testing to be performed was via pilot scale testing at a facility that met testing requirements set forth by the IRS.  (BT Tr. at 56-57; D.I. 775, DTX-1980 at 406)[7]

26.     The EERC had pilot scale testing facilities that met the requirements set forth by the IRS.  (BT Tr. at 57-58; JT Tr. (D.I. 784) at 1001-02)

27.     The EERC was involved in developing Section 45 certification tests protocols and reporting requirements.  (BT Tr. at 52-53)

**F.     The License Agreement Between EERC and Plaintiffs**

28.     On January 15, 2009, ME2C (through its predecessor company RLP Energy, Inc.) and the EERC entered into an agreement titled "EXCLUSIVE PATENT AND KNOW-HOW LICENSE AGREEMENT INCLUDING TRANSFER OF OWNERSHIP" (the "Agreement").  (JT Tr. (D.I. 782) at 448-49; D.I. 776, PTX-048)

29.     The Agreement is governed by North Dakota law.  (D.I. 776, PTX-048.0022 at § 15.2)

30.     The Agreement defines the intellectual property rights that the EERC licensed to ME2C.  (D.I. 759 at ¶ 16; D.I. 762 at ¶ 8)

---

[7]     The other way was full scale testing at the power plants; that type of testing is not at issue here.  (BT Tr. at 56-57)

31.    The "Recitals" section of the Agreement provides that the EERC is the owner of "certain INTELLECTUAL PROPERTY (as later defined herein) relating to [the EERC's] Intellectual Property No. 05-001, "Sorbents and Flue Gas Additives for the Oxidation and Removal and Mercury[.]"  (D.I. 776, PTX-048.0003)

32.    Section 2 of the Agreement, entitled "Grant of Rights," includes the following license grant in Section 2.1:

> 2.1 <u>License Grants</u>. Subject to the terms of this Agreement, LICENSOR [the EERC] hereby grants to COMPANY [ME2C] and its ASSOCIATE for the TERM, an exclusive license for the INTELLECTUAL PROPERTY, to develop, make, have made, use, sell, offer to sell, lease, and import INTELLECTUAL PROPERTY in the FIELD in the TERRITORY and to develop and perform the INTELLECTUAL PROPERTY in the FIELD in the TERRITORY.

(*Id*., PTX-048.0006 at § 2.1)

33.    Section 1 of the Agreement includes the following definitions of certain terms used directly or indirectly in Section 2.1:

> 1.5 "<u>FIELD</u>" shall mean any coal-fired combustion systems.
>
> 1.6 "<u>IMPROVEMENTS</u>" shall mean any patented modification of a device, method, or product described in the PATENT RIGHTS, provided such a modification, if unlicensed, would infringe one or more claims of the issued PATENT RIGHTS.  IMPROVEMENTS shall further mean any improvement to the PATENT RIGHTS or TECHNICAL INFORMATION, whether patentable or not, which are conceived and, at least in part, reduced to practice in the course of work under the EERC projects identified and entered into under the EERC SERVICE AGREEMENT.
>
> 1.7 "<u>INTELLECTUAL PROPERTY</u>" shall mean all PATENT RIGHTS (as later defined herein), all TECHNICAL INFORMATION (as later defined herein), and all IMPROVEMENTS. . . .

1.10 "<u>PATENT RIGHTS</u>" shall mean all patents and patent applications, all divisions, substitutes, continuations, continuations-in-part, reissues, reexaminations, and extensions thereof, together with any foreign counterpart thereof and patents issuing thereon derived from or claiming the priority of the U.S. or other provisional patent applications filed or to be filed in relation to the invention(s) *listed in Appendix A*.

1.11 "<u>SUBLICENSEE</u>" shall mean any non-ASSOCIATE sublicensee of the rights granted to the COMPANY under Section 2.1.

1.12 "<u>TECHNICAL INFORMATION</u>" shall mean all CONFIDENTIAL INFORMATION that is unpublished research and development information, unpatented inventions, know-how, trade secrets, technical data, software, financial data, agreements, and marketing information related to suppliers, contractors, and customers and in the possession of the LICENSOR [EERC] at the EFFECTIVE DATE of this Agreement that are reasonably necessary to produce LICENSED PRODUCTS and that the LICENSOR [EERC] has the right to provide to the COMPANY [ME2C]. . . .

1.14 "<u>TERRITORY</u>" shall mean worldwide.

(*Id.*, PTX-048.0004-0006 at §§ 1.5, 1.6, 1.7, 1.10 (emphasis added), 1.11, 1.12, 1.14)

34.    During the jury trial, ME2C offered the Agreement into evidence (and it was thus admitted) without "Appendix A."  (*Id.*, PTX-048; JT Tr. (D.I. 782) at 448-49)

35.    It is not disputed that "Appendix A" listed at least the '286 patent ("and any invention claimed therein").  (D.I. 761, ex. 1 at ¶ 3; D.I. 767 at 2; D.I. 776, PTX-049.0005, .0008)

36.    Because the asserted patents claim priority to a non-provisional application that issued as the '286 patent, the asserted patents fall under the broad definition of "PATENT RIGHTS" in the Agreement, as patents that issued derived from or claiming the priority of the

"U.S. . . . patent applications filed or to be filed in relation to [the '286 patent]."  (D.I. 776, PTX-048.0005 at § 1.10)

      37.    The Agreement includes the following provisions relating to ME2C's right to sublicense its rights under the Agreement:

> 2.4 <u>Sublicenses</u>. COMPANY [ME2C] shall have the right to grant sublicenses of its rights under Section 2.1.  COMPANY [ME2C] shall incorporate terms and conditions into its sublicense agreements sufficient to enable COMPANY [ME2C] to comply with this Agreement.  COMPANY [ME2C] shall promptly furnish LICENSOR [EERC] with a fully signed photocopy of any sublicense agreement.  Upon termination of this Agreement for any reason, any SUBLICENSEE not then in default shall have the right to seek a license from LICENSOR [EERC].  LICENSOR [EERC] agrees to negotiate such licenses in good faith under reasonable terms and conditions. . . .

> 7.5 <u>Right to Sublicense</u>. COMPANY [ME2C] shall have the sole right to sublicense any alleged infringer in the FIELD in the TERRITORY for future use of the PATENT RIGHTS in accordance with the terms and conditions of this Agreement relating to sublicenses.

(D.I. 776, PTX-048.0006, .0013 at §§ 2.4, 7.5)

      38.    The Agreement also includes the following provision within Section 2:

> 2.6 <u>Acknowledgement of Patent Ownership</u>. Neither this Agreement, nor the use by the COMPANY [ME2C] of the LICENSED PRODUCT or LICENSED PROCESS, shall in any way give or be deemed to give the COMPANY [ME2C] any interest in the LICENSED PRODUCT or LICENSED PROCESS, except for the right to use the LICENSED PRODUCT or LICENSED PROCESS in connection with the exploitation of the COMPANY'S [ME2C's] rights under this Agreement in the FIELD in the TERRITORY. . . .

(*Id*., PTX-048.0006-7 at § 2.6)

      39.    The key terms of Section 2.6 are defined as follows:

1.8 "<u>LICENSED PROCESS</u>" shall mean any process that, absent the license granted hereunder, would infringe one or more claims of the PATENT RIGHTS or which uses TECHNICAL INFORMATION, or which uses a LICENSED PRODUCT.

1.9 "<u>LICENSED PRODUCT</u>" shall mean any service, product, or part thereof that:

A)  Absent the license granted hereunder, would infringe one or more claims of the PATENT RIGHTS; or

B)  Is manufactured by using a LICENSED PROCESS or that, when used, practices a LICENSED PROCESS; or that, when used, practices a LICENSED PROCESS; or

C)  Uses TECHNICAL INFORMATION.

(*Id.*, PTX-048.0005 at §§ 1.8, 1.9)

40.    Section 7.1 of the Agreement provides that "[e]ach [p]arty agrees to provide written notice to the other [p]arty promptly after becoming aware of any infringement of the PATENT RIGHTS."  (*Id.*, PTX-048.0012 at § 7.1)

41.    Section 9.1(B) (in the "REPRESENTATIONS OR WARRANTIES" section of the Agreement) provides the EERC's representation and warranty to ME2C that as of the effective date of the Agreement:

(i)  to LICENSOR'S knowledge, it has not received any notice of a claim by a third party for infringement of such third party's intellectual property relating to the use and practice of the LICENSED PRODUCT, LICENSED PROCESS, or PATENT RIGHTS;

(ii)  it has no knowledge of any actual infringement by any third party in the TERRITORY of the PATENT RIGHTS;

(iii)  at the Effective Date, LICENSOR is the sole owner of the PATENT RIGHTS, the LICENSED PRODUCT, and the LICENSED PROCESS and has not licensed, assigned,

13

transferred, pledged, or otherwise encumbered the rights
granted to COMPANY under Section 2.1[.]

(*Id.*, PTX-048.0015 at § 9.1(B))

### G.    The Closing Agreement Between EERC and ME2C

42.    A Closing Agreement (the "Closing Agreement") executed between EERC and
ME2C in 2017 shows that the Agreement was amended several times.  (D.I. 776, PTX-054.0001)

43.    Pursuant to the Closing Agreement, the Agreement was terminated and one or
more Plaintiffs acquired the EERC's patents.  (*Id.*, PTX 054.0001, 054.0003)

### H.    The Relationship Between EERC and CERT

44.    ChemMod began working with the EERC in around 2004, with ChemMod testing
the ChemMod technology at the EERC facilities.  (BT Tr. at 51, 127-29, 175)

45.    Somewhere around 2007, Mr. Pavlish made the Intellectual Property Director of
the EERC aware of his belief that ChemMod's use of bromine on coal fell within the scope of
the EERC's intellectual property rights.  (*Id.* at 180-82)

46.    In 2009, ChemMod contacted CERT to see if CERT was interested in getting into
the refined coal business using ChemMod's technology.  (*Id.* at 51)  During that discussion,
ChemMod steered CERT to the EERC with regard to the Section 45 certification testing that
would be required for CERT to qualify refined coal for Section 45 tax credits.  (*Id.*)

47.    Subsequent to ChemMod's discussion with CERT regarding the refined coal
business, CERT began interacting with the EERC in late 2009, after the EERC and ME2C
had executed the Agreement.  (*Id.* at 51, 103-04)

48.    From 2011 through the end of the Section 45 tax credit program in 2021, the

14

CERT Operations Companies Defendants contracted with the EERC to perform Section 45 certification testing via pilot scale testing at the EERC facilities for all refined coal sold to the power plants by the CERT RC Defendants.  (D.I. 659, ex. 1 at ¶¶ 47-55; BT Tr. at 51, 58)

49.    For the Section 45 certification testing, the CERT Operations Companies Defendants would send the EERC a sample of feedstock coal.  The EERC would also prepare another sample of the same feedstock coal mixed with known amounts of S-Sorb and MerSorb and would test the samples in its laboratory.  If the results provided at least a 40% reduction in mercury and a 20% reduction in NOx, the coal would be certified.  (JT Tr. (D.I. 784) at 1002-03)

50.    In reporting the test results to CERT, the EERC included the following disclaimer:

> LEGAL NOTICE This research report was prepared by the Energy & Environmental Research Center (EERC), an agency of the University of North Dakota, as an account of work sponsored by [Defendant name].  Because of the research nature of the work performed, neither the EERC nor any of its employees makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed or represents that its use would not infringe privately owned rights.

(D.I. 774, DTX-1691 at CERT-0040454; BT Tr. at 115-16)

51.    CERT looked for a back-up facility to the EERC for Section 45 certification testing, but could not find another laboratory to perform the testing that had the same or similar knowledge and capabilities as did the EERC.  (BT Tr. at 57-58)

52.    The EERC performed a total of 204 Section 45 certification tests for CERT from 2011 to 2021.  (*Id*. at 75)  CERT paid EERC approximately $8.8 million for this Section 45 certification testing.  (*Id*. at 78, 94)

53.    Other licensees of the ChemMod technology also used the EERC to perform

Section 45 certification testing.  (*Id.* at 52, 58)  For all ChemMod licensees, the EERC performed approximately 700 Section 45 certification tests.  (*Id.* at 136)

54.    The EERC also helped CERT respond to power plants' technical questions regarding the additives that would end up in the plants' boilers, and provided technical support for operational problems that CERT encountered (such as corrosion in the plants' air preheater baskets).  (*Id.* at 53-54, 59-60)

55.    When the EERC certified refined coal for CERT, it knew what power plants that refined coal would ultimately be sent to.  (*Id*. at 64, 68-69; D.I. 775, DTX-1983)

56.    Mr. Green, who was the person at CERT responsible for all communications with the EERC, testified that CERT did not tell the EERC "that several CERT connected power plants were going beyond the Chem[]Mod technology and also adding activated carbon" to the coal for mercury capture.  (BT Tr. at 107; *see also id.* at 102, 123-24)

57.    During the jury trial, Mr. Green initially took the position that CERT did not learn that its refined coal was being used in a process with activated carbon at the power plants until the same day that CERT learned that it was being sued in this case.  (*Id.* at 86)  However, Mr. Green acknowledged that during the jury trial, it had come out that CERT "knew generally [that] some of the power plants were using activated carbon at some point from 2014 and on."  (*Id.* at 85)

58.    During the jury trial, the EERC's corporate representative, Tom Erickson, testified that the EERC was not aware that ChemMod's licensees were selling refined coal to power plants that also used activated carbon.  (JT Tr. (D.I. 784) at 1126)  At the time of his testimony, Mr. Erickson was the Chief Operations Officer and Vice President for Intellectual Property at EERC; prior that, he was the Director for Exploratory Research, Intellectual Property

and Technology Commercialization, and prior to that, the Chief Executive Officer of EERC.  (*Id.* at 1121-22)

59.     During this time period (i.e., from 2009 through 2021), no one from EERC told CERT that the EERC had any patents or patent applications in the field of mercury control technology.  (BT Tr. at 55, 78-79)

60.     Mr. Green testified that if the EERC had told CERT that it had patents in the mercury control field in the 2010 to 2016 time-frame, CERT could have moved the refined coal program to power plants that were not using activated carbon.  (*Id* at 79-80)  CERT had moved approximately 7 facilities over the years, and it operated at some power plants that did not use activated carbon.  (*Id.* at 80; JT Tr. (D.I. 784) at 953-54)

61.     The EERC never told CERT that CERT had its permission to sell refined coal to power plants using activated carbon.  (BT Tr. at 84, 112)

62.     After CERT learned of ME2C's patents from this lawsuit in 2019, CERT continued to engage in the same conduct accused of infringing until the Section 45 tax credit program ended in 2021, because CERT believed that it did not infringe.  (*Id.* at 121-22)

**I.      The Relationship Between ME2C and the EERC**

63.     Mr. Pavlish (while still at the EERC) handled ME2C's competitive product testing beginning in 2009, and ME2C was testing at the Joppa power plant (later accused of infringement in this case) by 2011.[8]  (*Id.* at 160-161, 204; D.I. 406 at ¶¶ 115, 119, 128-37)  Mr. Pavlish testified that "it became pretty obvious and evident" that Joppa was using activated carbon.  (BT Tr. at 184-85)

---

[8]      The Joppa power plant did not receive its refined coal from a CERT Defendant.  (D.I. 598, ex. 1 at ¶ 103)

64.     In April 2012, Mr. Pavlish e-mailed ME2C a spreadsheet regarding competing technologies that was part of the EERC's "ongoing efforts . . . to continue to track who's doing [what], what technologies are out there, what's being applied." (*Id.* at 188-89; D.I. 773, DTX-0051-0052)

65.     In a May 22, 2012 e-mail (the "Powerton e-mail"), ME2C and the EERC discussed the fact that a product was tested by ADA at the Powerton power plant, with Mr. Pavlish responding that ME2C "should take a serious look at how to get into this market" and "[b]oth them and ChemMod rely mainly on adding bromine to the coal to achieve mercury reductions." (D.I. 773, DTX-0104; *see also* JT Tr. (D.I. 782) at 408-11)

66.     In October 2012, ME2C submitted a breakdown of pricing to Joppa for replacing its current mercury capture program "as well as projecting the dose rate with the ChemMod[] Refined Coal program that is in the process of being installed." (D.I. 773, DTX-0077; JT Tr. (D.I. 782) at 507-08)

67.     In July 2013, an e-mail among ME2C employees and Mr. Pavlish discussed that a potential power plant customer was going to be running a "Refined Coal demonstration" in September and would be adding powered activated carbon to the "backend for sorbent" which would allow it to qualify for MATS. (D.I. 773, DTX-0105; *see also* JT Tr. (D.I. 782) at 412) The e-mail noted that this "is the same thing that happened at Joppa" and that "[t]he EERC (not JP's department) is complicit in this as well—they are testing for Chem[]Mod[] and others to prove 'compliance.'" (D.I. 773, DTX-0105) Mr. Pavlish responded that ME2C "might as well pack up and go home." (*Id.*, DTX-0106)

68.     On September 18, 2013, an ME2C employee stated in an e-mail to Mr. Pavlish and Mr. Erickson that "simple/cheap efforts" to thwart the Section 45 tax certification program

18

were "causing serious damage to the effort we're making to commercialize and profit from our tech." (*Id.*, DTX-0112 at 2)  Mr. Erickson replied by asking if there was any interest in teaming up with an existing company to offer a complete mercury solution and noted that if so, "ChemMod would be a good company." (*Id.*)  Mr. Pavlish responded to ME2C that many of the power plants would need "additional control to achieve the MATS limit" and would likely employ the use of activated carbon in "combination with [the Section 45 tax credit]. . . . Either ChemMod or ADA will offer this as a solution, or the [power plant] will simply buy the [activated carbon] separately.  So we have heard, there are a number of plants already doing this." (*Id.* at 1)

69.     In a December 2014 internal ME2C e-mail, ME2C described a visit to a power plant to try to convince the plant to use ME2C's products; ME2C told the plant that it "run[s] in parallel with [refined coal] at two customer sites." (*Id.*, DTX-0056 at 1)

70.     In a May 2015 e-mail exchange, an ME2C employee stated that its "program may be a great fit" for power plants that used activated carbon, (*id.*, DTX-0181 at 3), and ME2C discussed that ChemMod probably got the rate of bromine needed to be added to its coal changed because the power plant "adds [activated carbon] to hit the MATS target[,]" (*id.* at 1).  Mr. Pavlish further noted that you "probably have better sources to find out the real scoop" and that "the whole thing[ is] a bit sneaky." (*Id.*)

71.     In August 2015, ME2C's Vice President of Sales asked Mr. Pavlish how ME2C "work[s] with Refined Coal programs" and Mr. Pavlish provided a list of advantages.  (*Id.*, DTX-0088)

72.    ME2C did not provide notice to the EERC that it believed that its patent rights were being infringed until a conversation shortly before this lawsuit was filed.  (BT Tr. at 167-69; JT Tr. (D.I. 782) at 510-12)

**J.    Plaintiffs' Claims**

73.    Plaintiffs claim in this lawsuit that the CERT RC Defendants contributed to infringement of the asserted claims of the asserted patents by selling refined coal to power plants, and that each of the CERT Defendants induced these power plants to add activated carbon to the refined coal in a manner that amounted to direct infringement (and that this infringement was willful).  (D.I. 659, ex. 2 at ¶¶ 5-6; D.I. 689 at 15; D.I. 743 at ¶ 4; JT Tr. (D.I. 785) at 1206-08)

74.    The parties tried Plaintiffs' claims of indirect and willful infringement of the asserted patents against the CERT Defendants in a jury trial before this Court from February 26, 2024 through March 1, 2024.  (D.I. 759 at ¶ 12; D.I. 762 at ¶ 5)  On March 1, 2024, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs.  (D.I. 692)  The Court has entered non-final judgments on the verdict against the CERT Defendants.  (D.I. 697-708)

**K.    CERT's Implied License Defense**

75.    CERT now argues that Plaintiffs' claims are barred in their entirety, in that it is entitled to an implied license by equitable estoppel to the asserted patents due to the EERC's conduct, and due to the doctrine of equitable estoppel in light of the EERC's misleading silence.  (D.I. 758 at 14, 20; D.I. 767 at 7 n.5, 10)  CERT's theory is that the EERC conducted Section 45 certification testing for CERT for years while remaining silent about the patented technology, and that in light of this conduct and/or silence, the EERC granted CERT an implied license to the

asserted patents, or that Plaintiffs are equitably estopped from asserting these patents against CERT.  (D.I. 758 at 1; *see also* D.I. 732 at 3)

76.    ME2C never gave CERT permission to practice the asserted patents.  (BT Tr. at 122)

77.    CERT does not contend that ME2C conveyed an implied license to CERT to practice the asserted patents.  (*Id.* at 92)

78.    ME2C contends that CERT has not met its burden of proving that it received an implied license to the asserted patents (nor that it is otherwise entitled to relief under the doctrine of equitable estoppel).  (D.I. 760 at 15-16, 20)

79.    The Court held a bench trial on May 30, 2024 regarding CERT's implied license defense.  (D.I. 779)  The parties thereafter submitted post-trial briefing and proposed findings of fact and conclusions of law regarding the defense, which concluded on August 7, 2024.  (D.I. 758; D.I. 759; D.I. 760; D.I. 762; D.I. 767)

## **LEGAL STANDARD**

"A patent grants its owner the right to exclude others from making, using, or selling the patented invention."  *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995).  However, the right to exclude may be waived, totally or in part, "by granting a license, which may be express or implied."  *Id.*; *see also Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997) ("In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention.").  With respect to implied licenses, the Supreme Court of the United States has explained that:

> No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for a tort.

*De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927); *see also Carborundum Co.*, 72 F.3d at 878 (noting that an implied license is an affirmative defense to patent infringement).

There are various pathways that can lead to implied licenses—they may arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais) or by legal estoppel. *Wang*, 103 F.3d at 1580; *see also Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1374 (Fed. Cir. 2001), *opinion corrected*, 275 F.3d 1344 (Fed. Cir. 2001). That said, the United States Court of Appeals for the Federal Circuit has noted that "judicially implied licenses are rare under any doctrine[.]" *Wang*, 103 F.3d at 1581.

To establish an implied license by equitable estoppel, at issue here, the defendant must put forward proof that: "(1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to [infringe] to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim." *Winbond*, 262 F.3d at 1374 (*citing Wang*, 103 F.3d at 1581; *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992)).

Whether an implied license exists is a question of law. *Wang*, 103 F.3d at 1580; *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986). The defendant bears the burden of proving its defense of implied license by a preponderance of the evidence.

*Sprint Commc'ns Co., L.P. v. Mediacom Commc'ns Corp.*, Civil Action No. 17-1736-RGA, 2021 WL 982737, at *1 (D. Del. Mar. 16, 2021).

The Federal Circuit has also explained that the doctrine of equitable estoppel serves as a guideline for the estoppel analysis in implied license cases, but that the two doctrines are not conterminous. *Wang*, 103 F.3d at 1581. The "primary difference" between the estoppel analysis in an implied license case and the analysis in an equitable estoppel case is that the former "looks for an affirmative grant of consent or permission to make, use, or sell: i.e., a license." *Id.* Meanwhile, equitable estoppel looks for "misleading conduct suggesting that the patentee will not enforce patent rights." *Id.* (internal quotation marks and citation omitted).[9]

A defendant seeking to bar a patentee's suit pursuant to the doctrine of equitable estoppel must prove, by a preponderance of the evidence, that:

> (1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016) (internal citation omitted); *see also A.C. Aukerman Co.*, 960 F.2d at 1045-46 (noting that the defense of equitable estoppel must be proven by a preponderance of the evidence, absent special circumstances), *abrogated on other grounds by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.,*

---

[9]    The Court herein includes the legal standards regarding the doctrine of equitable estoppel, in addition to those for an implied license by equitable estoppel, since CERT seems to say that it is asserting both the defense of implied license by equitable estoppel *and* the defense of equitable estoppel. (D.I. 767 at 7 n.5; *see also* D.I. 758 at 14 (asserting that the "record here supports implied license by conduct" and "by equitable estoppel from misleading silence"); D.I. 739, ex. 3 at ¶¶ 6-7; CERT's Closing Statement Slide at 3)

*LLC*, 580 U.S. 328 (2017).[10]  "The effect of equitable estoppel is a license to use the invention that extends throughout the life of the patent."  *High Point SARL*, 817 F.3d at 1331 (internal quotation marks and citation omitted).

## DISCUSSION

CERT argues that it is entitled to an implied license to the inventions at issue (or, relatedly, that Plaintiffs are equitably estopped from asserting claims against them as to the asserted patents)—and that this means that CERT was licensed or authorized to engage in the accused conduct here (thus barring ME2C's infringement claims in their entirety).  (D.I. 758 at 14, 20)  Again, CERT's theory has to do with the EERC's actions or inaction when it was engaging in Section 45 certification testing of the refined coal for CERT.  CERT's position is that EERC's participation in this certification testing, all while it stayed silent about its mercury control technology patents, granted CERT some form of an implied license to the asserted patents.  (*Id.* at 1-2; BT Tr. at 9)  Meanwhile, according to CERT, the EERC kept ME2C in the loop as to its refined coal program (including that power plants were increasingly burning refined coal with activated carbon in order to comply with MATS)—with ME2C tacitly approving of the EERC's conduct by remaining silent about its patent rights for years.  (D.I. 758 at 1-2)

For its part, ME2C responds that CERT has failed to meet its burden of proof for several reasons.  First, ME2C argues that with the Agreement, the EERC conveyed an exclusive license to the asserted patents to ME2C, which precludes the EERC from even having the ability to grant

---

[10]    There is another doctrine referenced above—the doctrine of *legal* estoppel—that encompasses a "narrower" category of conduct by which a patentee has licensed a right, received consideration, and then attempted to derogate from the right granted.  *Wang*, 103 F.3d at 1581. CERT did not press any theory regarding the doctrine of legal estoppel in its briefing, and the Court considers it to not be at issue as to the instant Motion.  (D.I. 760 at 11; BT Tr. at 49)

any implied license to CERT.  (D.I. 760 at 1-8; BT Tr. at 23-24, 26)  Second, ME2C argues that

to prove an implied license, the alleged infringer must have knowledge of the relevant patents,

and here CERT was unaware of the patented technology during the relevant time period.  (D.I.

760 at 8-11; BT Tr. at 29-36)  Third, ME2C contends that CERT's implied license defense

requires CERT to identify an affirmative grant of permission from the EERC to CERT to engage

in infringing conduct, and to show that the EERC was aware that CERT was engaging in

infringing conduct, and that CERT relied on the grant of permission—and that CERT has failed

to make out these requirements.  (D.I. 760 at 12-19; BT Tr. at 36-39)  Finally, ME2C asserts that

even if the EERC had the authority to grant an implied license to CERT to some patents, any

such license would not apply to the asserted patents, which issued well after the conduct said to

give rise to the implied license.  (D.I. 760 at 20)

Below, the Court will first explain why it agrees with ME2C's first argument—i.e., that

the Agreement did convey an exclusive license to ME2C, which in turn precluded the EERC

from granting an implied license in any form (i.e., by conduct or by misleading silence).  Then, it

will turn to the elements of CERT's defense, and will explain why even if the Agreement did

allow the EERC the ability to grant an implied license, CERT nevertheless has failed to prove

that the EERC actually engaged in the requisite conduct and/or misleading silence sufficient to

convey an implied license to CERT.

### A.    The EERC conveyed an exclusive license to ME2C that precluded the EERC from being able to grant an implied license to CERT.

The parties dispute whether the Agreement conveyed an exclusive license to ME2C for

the patented technologies at issue in this case.  (*See, e.g.*, D.I. 758 at 3; D.I. 760 at 2)  ME2C

argues that it did, which means that the EERC lacked the authority to later impliedly license

CERT. (D.I. 760 at 1-8) CERT argues that the Agreement provided only limited rights to ME2C, reserving for the EERC broader rights (including the ability to convey an implied license). (D.I. 758 at 3-6; D.I. 767 at 1-4)

Contract interpretation is a matter of law. *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1569 (Fed. Cir. 1993); *Northstar Ctr., LLC v. Lukenbill Fam. P'ship, LLLP*, 17 N.W.3d 1, 8 (N.D. 2025).[11] The plain and unambiguous meaning of a contract controls. *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed. Cir. 1991); *see also Burk v. State by & through Bd. of Univ. & Sch. Lands*, 890 N.W.2d 535, 539 (N.D. 2017) ("The parties' intention must be ascertained from the writing alone if possible.") (internal citation omitted). If a contract is unambiguous, extrinsic evidence is not admissible to contradict the contract's language. *Burk*, 890 N.W.2d at 539. But if a contract is ambiguous, the Court can consider extrinsic evidence to evaluate the intent of the parties. *Id.* A contract is ambiguous "when rational arguments can be made in support of contrary positions as to the meaning of the language in question." *Id.* (internal citation omitted).

Here, the plain language of the Agreement unambiguously supports ME2C's position. Importantly, two provisions of the Agreement make clear that the EERC granted ME2C the exclusive right to sublicense others for use of the patent rights. (*See* D.I. 760 at 2-3) Section 7.5, located in the "Infringement" section of the Agreement, says just this—that *ME2C* "shall have

---

[11]    "A license agreement is a contract governed by ordinary principles of state contract law." *Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc.*, 871 F.2d 1082, 1085 (Fed. Cir. 1989). The parties agree that North Dakota law applies to the parties' dispute regarding whether the Agreement conveyed an exclusive license to ME2C. (*See* D.I. 758 at 6; D.I. 760 at 2) The law of the Federal Circuit, meanwhile, governs issues involved in the substance of enforcement of a patent right, such as the effect of a patent license grant. *See, e.g.*, *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 856 (Fed. Cir. 1999); *Cardiovascular Sys., Inc. v. Cardio Flow, Inc.*, 498 F. Supp. 3d 1080, 1090 (D. Minn. 2020).

the *sole right* to sublicense any alleged infringer in the FIELD in the TERRITORY for future use

of the PATENT RIGHTS in accordance with the terms and conditions of th[e] Agreement

relating to sublicenses."  (D.I. 776, PTX-048.0013 at § 7.5 (emphasis added))  The "terms and

conditions" of the Agreement relating to sublicenses are then set out in Section 2.4 (in the "Grant

of Rights" section of the Agreement), which reiterates that ME2C "shall have the right to grant

sublicences of its rights under Section 2.1."  (*Id.*, PTX-048.0006 at § 2.4)  And Section 2.1 of the

Agreement, in turn, expressly grants ME2C ("[s]ubject to the terms of this Agreement") "an

exclusive license for the INTELLECTUAL PROPERTY, to develop, make, have made, use, sell,

offer to sell, lease, and import INTELLECTUAL PROPERTY in the FIELD in the TERRITORY

and to develop and perform the INTELLECTUAL PROPERTY in the FIELD in the

TERRITORY."  (*Id.* at § 2.1)[12]  So when you read these provisions, the Agreement's language is

very clear.  ME2C was granted the *exclusive* right to make, use and sell the intellectual property

at issue in the Agreement, including the *exclusive or sole* right to grant sublicenses of such patent

rights.  (D.I. 760 at 2-4); *see also, e.g.*, *Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*,

604 F.3d 1354, 1360 (Fed. Cir. 2010) (concluding that a license agreement's language providing

that "'AMF hereby grants to AB an exclusive . . . worldwide license . . . to make, use, lease,

offer to lease, sell, offer to sell and otherwise commercially exploit products and perform

services' under the patents-in-suit" clearly granted AB an exclusive license); *Morrow v.*

*Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007) ("[T]he grant of an exclusive license to

---

[12]     Section 2.7 of the Agreement also gibes with this understanding.  It lays out the EERC's "Retained Rights," and in doing so, it only provides that the EERC retained the right to practice the "INTELLECTUAL PROPERTY for research and development purposes[.]"  (D.I. 776, PTX-048.0007 at § 2.7(A))

make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention.").

So how does CERT attempt to get around this clear language?  It makes three primary arguments, which the Court will address below.  But none are availing.

First, CERT makes a kind of record-based argument, which has a few steps to it.  There CERT asserts that:  (1) the "PATENT RIGHTS" licensed to ME2C pursuant to the Agreement are limited to those patents listed in Appendix A of the Agreement; but (2) ME2C didn't offer Appendix A into evidence alongside the Agreement during either trial; and since (3) the Agreement was amended many times over the years; this means (4) that ME2C has failed to demonstrate what specific inventions it was granted the exclusive rights to under the Agreement—and whether those included the asserted patents.  (D.I. 758 at 4; D.I. 767 at 1-2)[13]

In the Court's view, however, the record *does* clearly demonstrate that the Agreement covers the asserted patents.  To start, during the jury trial, Mr. MacPherson (Midwest Energy's CEO and founder) identified the Agreement as "the original license between my company and the EERC for the technologies."  (JT Tr. (D.I. 782) at 448; *see also id.* at 478 (Mr. MacPherson agreeing that pursuant to the Agreement, ME2C "license[d] the EERC's mercury control portfolio"))

Now on its own, perhaps this testimony wouldn't be enough to conclusively establish that the Agreement covered the asserted patents—but there is more.  The "Recitals" section of the Agreement provides that the EERC is the owner of "certain INTELLECTUAL PROPERTY (as later defined herein) relating to [the EERC's] Intellectual Property No. 05-001, 'Sorbents and

---

[13]    CERT did not advance this argument during the bench trial; instead, it was raised for the first time in its post-trial briefing.  (*See, e.g.*, BT Tr. at 18-19; D.I. 760 at 2 n.1)

Flue Gas Additives for the Oxidation and Removal and Mercury[.]'" (D.I. 776, PTX-048.0003) "INTELLECTUAL PROPERTY" is thereafter defined to include "PATENT RIGHTS[,]" with "PATENT RIGHTS" being broadly defined to mean "all patents and patent applications, all divisions, substitutions, continuations, continuations-in-part, reissues, reexaminations, and extensions thereof, together with any foreign counterpart thereof and patents issuing thereon derived from or claiming the priority of the U.S. or other provisional patent applications filed or to be filed *in relation to invention(s) listed in Appendix A*." (*Id.*, PTX-048.0004-5 at §§ 1.7, 1.10 (emphasis added)) It does not appear to be disputed that the original Appendix A included at least the '286 patent. (*See* D.I. 767 at 2; *see also* D.I. 761, ex. 1 at ¶ 3; D.I. 776, PTX-049.0005)[14] Indeed, the Assignment of the '114 patent from the EERC to ME2C also demonstrates that the EERC's reference number for the '286 patent is 05-001—i.e., the number referenced in the "Recitals" section of the Agreement (as just described above). (D.I. 775, PTX-039.0006; D.I. 776, PTX-048.0003; *see also* D.I. 776, PTX-049.0008) Nor does CERT dispute that the asserted patents claim priority to a first non-provisional application that issued as the '286 patent. (D.I. 775, PTX-001.0003; *id.*, PTX-005.002; *see also* D.I. 762 at ¶¶ 2-3)

---

[14]    With its post-trial answering brief regarding CERT's implied license defense, ME2C submitted a declaration from Mr. MacPherson (the "MacPherson Declaration") in which he identifies the document that purportedly was Appendix A to the Agreement. (D.I. 761, ex. 1) The MacPherson Declaration also cites to certain exhibits marked as PTX-048 to PTX-054. (*Id.*) CERT objects to the "admission" of PTX-049-PTX-053 as violating the Pretrial Order, which provides that the exhibit list shall not be supplemented without leave and unlisted exhibits will not be admitted without good cause. (D.I. 767 at 2 n.1 (citing D.I. 739 at ¶ 38)) While these documents may not be included on the trial exhibit list, (D.I. 750), they were included as exhibits in the Joint Appendix to the parties' post-trial briefs regarding CERT's implied license defense, (D.I. 776). And at least as to PTX-049, CERT itself cites to the document in its briefing. (D.I. 767 at 2) For these reasons, the Court will consider and cite to PTX-049 in making its decision here.

When you put all of this evidence together, it shows that: (1) the '286 patent was both listed in the Recitals section of the Agreement (albeit by its reference number) and in Appendix A; and (2) the asserted patents claim priority to a non-provisional application that issued as the '286 patent. Therefore, there can be no dispute that the asserted patents fall under the broad definition of "PATENT RIGHTS" in the Agreement, since they are patents that issued "derived from or claiming the priority of the U.S. . . . patent applications filed or to be filed in relation to [the '286 patent]." (D.I. 776, PTX-048.0005)

CERT attempts to argue otherwise by asserting that "PATENT RIGHTS" as defined in the Agreement are expressly limited to "the invention(s) listed in Appendix A[,]" and that "the putative Appendix A only lists 'any invention claimed' in the '286 patent[.]" (D.I. 767 at 2) CERT also points out that the Agreement defines the term "IMPROVEMENTS" to mean "'any patented modification of a device, method or product *described* in the PATENT RIGHTS, *provided* such a modification, if unlicensed, would *infringe* one or more *claims* of the *issued* PATENT RIGHTS[.]'" (*Id.* at 2-3 (citing D.I. 776, PTX-048.0004) (emphasis added by CERT)) It draws from this that the "PATENT RIGHTS" under the Agreement "were expressly limited to 'inventions claimed' in the identified '286 patent" (and not, additionally, to inventions claimed in the asserted patents). (*Id*. at 3)

The Court does not understand CERT's argument here. The problem with the argument is that it seems to ignore the fact that in the Agreement, "PATENT RIGHTS" is *not* defined just as the "invention(s) *listed in* Appendix A[.]" Instead, the term is defined much more broadly to include any patents *related to the inventions listed in* Appendix A. (D.I. 776, PTX-048.0005 at § 1.10) Moreover, Appendix A lists the '286 patent "*and* any invention claimed therein"—it doesn't simply say "any invention claimed in the '286 patent." (D.I. 776, PTX-049.0005, .0008

(emphasis added))  Thus, in the Court's view, the record does not demonstrate that the

"PATENT RIGHTS" (to which ME2C was granted the exclusive right to sublicense in the

Agreement) were expressly limited only to what is set out in the claims of the '286 patent alone.

And so the Court rejects CERT's first counter-argument.

Second, CERT argues that even if the asserted patents are covered by the "PATENT

RIGHTS" set out in the Agreement, the EERC still *retained rights* in the intellectual property at

issue from which an implied license could flow.  (D.I. 758 at 3-6; D.I. 767 at 1-4)  Its argument

here hinges on Section 2.6 of the Agreement (the "Section 2.6 argument"), which is titled

"Acknowledgement of Patent Ownership" and provides that:

> *Neither this Agreement*, nor the use by the COMPANY [ME2C] of
> the LICENSED PRODUCT or LICENSED PROCESS, *shall in
> any way give or be deemed to give* the COMPANY [ME2C] **any
> interest** in the LICENSED PRODUCT or LICENSED PROCESS,
> *except for the right to use* the LICENSED PRODUCT or
> LICENSED PROCESS in connection with the exploitation of the
> COMPANY'S [ME2C's] rights under this Agreement in the
> FIELD in the TERRITORY. . . .

(D.I. 758 at 4-5 (citing D.I. 776, PTX-048.0006-.0007) (emphasis added by CERT); BT Tr. at

18, 210-11)  CERT asserts that Section 2.6 provides that "nothing in the Agreement gave ME2C

anything more than a right to use 'Licensed Products' and 'Licensed Processes'" which

encompass products and processes relating to refined coal.  (D.I. 758 at 5; BT Tr. at 18)  In other

words, CERT is arguing that:  (1) since any exclusive license granted to ME2C in Section 2.1

was "[s]ubject to the terms of th[e] Agreement[;]"; and (2) one such term is Section 2.6, which

provides that "nothing in the Agreement gave ME2C anything more than a right to use 'Licensed

Products' and "Licensed Processes'"; that means that (3) the EERC retained substantial rights in

the "LICENSED PRODUCT'' and "LICENSED PROCESS"—including the right to grant an implied license to CERT.  (D.I. 758 at 4-5)

In further support of this argument, CERT also points to the "REPRESENTATIONS OR WARRANTIES" section of the Agreement.  (*Id.* at 5-6)  Section 9.1(B) provides the EERC's representation and warranty to ME2C that, as of the effective date of the Agreement:

> (i) to LICENSOR'S knowledge, it has not received any notice of a claim by a third party for infringement of such third party's intellectual property relating to the use and practice of the LICENSED PRODUCT, LICENSED PROCESS, or PATENT RIGHTS;
>
> (ii) it has no knowledge of any actual infringement by any third party in the TERRITORY of the PATENT RIGHTS;
>
> (iii) at the Effective Date, LICENSOR is the sole owner of the PATENT RIGHTS, the LICENSED PRODUCT, and the LICENSED PROCESS and has not licensed, assigned, transferred, pledged, or otherwise encumbered the rights granted to COMPANY under Section 2.1[.]

(D.I. 776, PTX-048.0015 at § 9.1(B))  CERT notes that Section 9.1(B) distinguishes between "PATENT RIGHTS" on the one hand and "LICENSED PRODUCT" and "LICENSED PROCESS" on the other.  (D.I. 758 at 5-6)  It argues that this section indicates that while the EERC was warranting ownership of all three, Section 9.1(B)(iii)'s language "does not represent that [the EERC] had not licensed or granted rights to other parties in the 'Licensed Product' or 'Licensed Process.'"  (*Id.*; *see also* D.I. 767 at 4)

ME2C has a couple of rejoinders to CERT's Section 2.6 argument.  To that end, ME2C argues as follows:

- First, even if CERT is correct that Section 2.6 together with Section 2.1 means that *those* portions of the Agreement only grant ME2C a right to use licensed products, "[S]ections 2.4 and 7.5 grant ME2C the exclusive right to sublicense the

patents and any other of its rights under the [A]greement, including the right to use licensed products." (D.I. 760 at 3-4)

- Alternatively, CERT is wrong about the meaning of Section 2.6, in that it does not narrow or limit the rights granted to ME2C in other sections (like Sections 2.1, 2.4 and 7.5), including ME2C's exclusive right to sublicense. (*Id.* at 4) Instead, according to ME2C, Section 2.6 "merely clarifies that, at the time of the [A]greement, the EERC remained the assignee of the underlying intellectual property and that ME2C's use of a LICENSED PRODUCT or LICENSED PROCESS—terms that are defined to cover ME2C conduct that would infringe but for this [A]greement—cannot expand the scope of ME2C's rights beyond the terms of the [A]greement." (*Id.*) In other words, ME2C posits that Section 2.6 is conveying that, for example, ME2C's sales of products within the field of use as defined in the Agreement "does not imply that products can be used *outside the field of use*." (*Id.* (emphasis added))

- With regard to CERT's assertion that in the "REPRESENTATIONS OR WARRANTIES" section of the Agreement, the EERC did not represent that it had not already licensed rights to other parties as to the "LICENSED PRODUCT" or "LICENSED PROCESS"—ME2C retorts that CERT fails to explain how the language in Section 9.1 "would allow the EERC to retain licensing rights despite the other express provisions in the [A]greement." (*Id.*) Furthermore, ME2C asserts that the Agreement's warranty in Section 9.1(B)(iii) that it had not licensed the patent rights supports the view that, pursuant to the Agreement, *ME2C* would now have the exclusive right to do so. (*Id.*); and

- As further support for the idea that the EERC intended to grant ME2C the exclusive right to sublicense the asserted patents under the Agreement, ME2C points to the fact that Section 2.7 of the Agreement lays out the EERC's "Retained Rights"—and that this short section only provides that the EERC retained the right to practice the "INTELLECTUAL PROPERTY for research and development purposes[.]" (*Id.* at 5 (citing D.I. 776, PTX-048.0007 at § 2.7(A)))

The Court agrees with ME2C that, even when one considers all of these additional

portions of the Agreement, it remains very clear that the EERC gave ME2C the exclusive right to

33

grant a sublicense to third parties for future use of the "PATENT RIGHTS." As an initial matter, it is worth stepping back and again reiterating that the Agreement repeatedly, explicitly and directly *says just that*. Again, Section 7.5 flatly states that ME2C has the "sole right to sublicense" the asserted patents and Section 2.4 provides that ME2C shall have the right to grant sublicenses of its rights under Section 2.1, which are "exclusive" rights. (D.I. 776, PTX-048.0006 at §§ 2.1, 2.4; *id.*, PTX-048.0013 at § 7.5) When it comes to analyzing contracts, words matter. Beyond this, the Agreement's definition of "SUBLICENSEE" (i.e., "any non-ASSOCIATE sublicensee of the rights granted to the COMPANY [i.e., ME2C] under Section 2.1") reiterates that *ME2C* (and nobody else) is the entity who is being granted the right to "sublicense[]" the intellectual property rights referenced in Section 2.1. (*Id.*, PTX-048.0005 at § 1.11) And the Agreement never otherwise expressly states that the EERC would—in direct contravention of these above-referenced provisions—*retain for itself* the right to grant licenses to the intellectual property at issue. Indeed, as has been repeatedly noted above, the Agreement's "Retained Rights" provision indicates the opposite—i.e., that EERC did *not* retain such a right, since that right was not there listed as one of the rights it "[r]etained[.]"[15] (*Id.*, PTX-048.0007 at § 2.9)

As for Section 2.6—the provision that CERT hangs its hat on here—in the Court's view, it simply cannot and does not nullify all of the other provisions of the Agreement that say that ME2C has the exclusive right to grant sublicenses to the intellectual property at issue. (*See* D.I. 760 at 3-4; BT Tr. at 23-25, 213-14, 216) Section 2.6 provides that ME2C's use of the licensed

---

[15] Because the Agreement is unambiguous in providing the exclusive right to sublicense to ME2C, both parties agree that CERT's extrinsic evidence regarding the issue is not admissible. (D.I. 758 at 6; D.I. 760 at 5)

product or process does not give ME2C "any interest" therein "except for the right to use the LICENSED PRODUCT or LICENSED PROCESS *in connection with the exploitation of [ME2C's] rights under this Agreement in the FIELD in the TERRITORY*[.]"  (D.I. 776, PTX-048.0006-.0007 at § 2.6 (emphasis added))  Therein, Section 2.6 seems simply to be making a particular point about the limits of ME2C's rights to use the "LICENSED PRODUCT" or "LICENSED PROCESS."  It is explaining that the Agreement only grants ME2C rights of use "in the FIELD in the TERRITORY"—and it is further noting that ME2C does *not* have such rights outside of "the FIELD in the TERRITORY."  It simply doesn't make sense that—after having explicitly stated in multiple ways and in multiple sections of the Agreement that ME2C has the exclusive right to sublicense the asserted patents (and that EERC does not have such a right)—Section 2.6 would somehow negate that grant of rights, especially because Section 2.6 never says anything specific about sublicensing at all.

The Court's interpretation of these provisions of the Agreement, and its meaning, are fatal to CERT's theory here.  Again, that theory is that the EERC is the entity that granted an implied license to CERT, which in turn permitted CERT to practice the patented technology. But as the Court has explained above, the Agreement granted *ME2C* an exclusive license to the intellectual property—i.e., one that included the *sole* right to sublicense other potential infringers for future use of the patent rights.  *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998) ("To qualify as an exclusive license, an agreement must clearly manifest the patentee's promise to refrain from granting to anyone else a license in the area of exclusivity."); *Morrow*, 499 F.3d at 1340 ("[T]he grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention.").  Therefore, the EERC simply did not have the authority to convey *any* licenses to the patented technology to

35

third parties—including an implied license like the one at issue here.  *See Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1336 (Fed. Cir. 2006) (stating that "because the seed distributors had no authority to confer a right to use Monsanto's biotechnology, they could not confer any sort of license to use the seeds" and acknowledging the proposition that "a seller cannot confer broader rights via an implied license than it has been granted by the patent holder") (citation omitted); *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 484 (1964); *cf. Taylor Holland LLC v. MVMT Watches, Inc.*, Case No. 2:15–cv–03578–SVW–JC, 2016 WL 6892097, at *6 (C.D. Cal. Aug. 11, 2016) (noting, in a copyright infringement matter, that "no implied license may permit what a written license prohibits"); *Hargis v. Pacifica Senior Living Mgmt. LLC*, Case No. 2:22-cv-06989-MCS-PD, 2023 WL 6373869, at *9-10 (C.D. Cal. Aug. 2, 2023) (stating the same).  Rather, pursuant to the contract between the EERC and ME2C, only ME2C had that authority.  *Morrow*, 499 F.3d at 1341 ("The grant of this exclusive license and the right to sublicense [from GUCLT to Vaupel] *constituted a transfer of the exclusionary rights to the patent* to Vaupel.") (emphasis added).  So CERT's second counter-argument is also not successful.

Third, CERT argues that regardless of what the Agreement says about ME2C's exclusive rights to the patented technology, the Court could nevertheless conclude (based on principles of equity) that EERC conveyed an implied license here.  CERT's position is that:  (1) ME2C "st[ood] by silently for over six years" while the EERC worked with entities like CERT and enabled CERT's infringement of the asserted patents; and (2) this "six-year silence communicated consent and authorization to the EERC to certify refined coal for use with [activated carbon.]"  (D.I. 758 at 11-12; D.I. 767 at 4-5)  In support, CERT says that the EERC and ME2C "together held all rights as patentee, and just as the licensee's conduct in *De Forest*

36

[*Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236 (1927)] or the patentee's predecessor's conduct in *High Point* [*SARL v. Sprint Nextel Corp.*, 817 F.3d 1325 (Fed. Cir. 2016)] was imputed to the patentee plaintiff to create an implied license against its claim, equity should impute the EERC's conduct here to ME2C." (D.I. 758 at 11-12)

As explained above, however, the EERC and ME2C did not "together" hold the right to grant sublicenses to the intellectual property covered by the Agreement. Rather, ME2C alone held that right. In the cases upon which the EERC relies, a party that had the right to license the patent rights is the party that engaged in the conduct that created the implied license at issue (or that gave rise to equitable estoppel). (*See* D.I. 760 at 7)[16] In its answering brief, ME2C pointed

---

[16]    In *De Forest*, the principal of the plaintiff ("De Forest Radio Telephone & Telegraph Company" or "De Forest") assigned to De Forest certain patents covering vacuum tubes or audions used in radio communication. 273 U.S. at 237-38. De Forest then granted certain rights in the patents to the Western Electric Company, which were later conveyed to American Telephone & Telegraph Company ("AT&T"). *Id.* at 238. De Forest maintained certain expressly reserved rights, and it was undisputed that De Forest and AT&T each had the right to license to the United States the manufacture and use of the audions. *Id.* at 238, 240. The United States was at war, and it informed AT&T that it wanted large numbers of the audions made promptly for it by General Electric Company ("GE") and other companies. *Id.* at 239. AT&T replied that it would not do anything to interfere with the manufacture of the audions, but it also represented that it was not waiving patent rights and that all claims under patents rights would be reserved and later investigated, adjusted and settled. *Id.* AT&T then assisted the United States in promptly obtaining the audions for use in the war by furnishing information, drawings and blueprints to GE, and allowing GE representatives to study its manufacturing process for the audions. *Id.* After the United States made and used the audions, AT&T executed a release to the United States and the manufacturers of all claims regarding the making and use of the audions. *Id.* at 239-40. De Forest then later sued the United States for alleged unlawful use of the patented audions. *Id.* at 237. The *De Forest* Court held that the conduct of AT&T (which, again, *had the right to license* the ability to make and use the audions to the United States)—in fully consenting to the United States' making and using of the patented invention, and in aiding the United States in such making and using—had granted the United States a license, which constituted a complete defense against De Forest's infringement lawsuit. *Id.* at 240-42.

In *High Point SARL*, AT&T's Bell Labs ("AT&T") developed the patented inventions in 1993 and 1994; in 1996, AT&T assigned the asserted patents to one of its corporate affiliates,

out that "CERT cites no authority that it could receive an implied license based on actions the EERC took when it *did not* hold the patent rights." (*Id.* at 8 (emphasis in original))  In reply, CERT identifies no such authority.  (D.I. 767 at 4-5)[17]  And so CERT's third counter-argument fails as well.[18]

---

Lucent Technologies ("Lucent") who then spun off part of its business, including the asserted patents, to Avaya, Inc. ("Avaya") in 2000.  817 F.3d at 1326.  In 2008, Avaya sold the asserted patents to High Point SARL ("High Point"), who sued Sprint Nextel Corporation and its affiliates ("Sprint") for patent infringement in December of that same year.  *Id.* at 1326-28.  The Federal Circuit found that High Point's predecessors (i.e., AT&T, Lucent and Avaya) had engaged in conduct that amounted to equitable estoppel during the timeframe in which those predecessors held rights in the asserted patents.  *Id.* at 1329-31.  The Court explained that the predecessors had failed to challenge Sprint when Sprint's activities fell outside of the scope of licenses between those parties.  *Id.* at 1331.  This effectively granted Sprint a license to use the invention that extended through the life of the patent—meaning that the predecessors' conduct was imputed to its successor-in-interest (i.e., High Point).  *Id.*  But again here, it was not disputed that the entities that had engaged in the misleading behavior that resulted in equitable estoppel (AT&T, Lucent and Avaya) *had the authority to license the patents* at the time they engaged in that activity.

[17]    In reply, CERT did cite to *Anderson v. Eiler*, 50 F. 775 (3d Cir. 1892) as purportedly "binding" authority requiring that "ME2C's misleading silence estops it from denying that it consented to the use of refined coal with ACI or that the EERC was authorized to do so under the" Agreement.  (D.I. 767 at 5)  There again though, in *Anderson*, the individual who created a design for the mantels at issue—the patentee—was the one who granted the implied license in question; he did so by selling (through an agent) sample mantels to a mantel manufacturer with knowledge that the "only object in purchasing was to copy and use [the patentee's] design, and did it without objecting to the use contemplated."  50 F. at 775.

CERT also cites to N.D. Cent Code § 31-11-06, as a "*cf.*" in support of its position here.  (D.I. 767 at 5; *see also* D.I. 758 at 12)  That statute codifies the doctrine of equitable estoppel under North Dakota law.  *Hayden v. Medctr. One, Inc.*, 828 N.W.2d 775, 784 (N.D. 2013).  CERT's brief citation to this statute, without any further explanation as to how the statute is well applied to the particular facts at play here, fails to establish the doctrine of equitable estoppel should apply in this case.

[18]    To the extent that CERT is also arguing that *ME2C* (not EERC), by *its own in*action somehow itself communicated *its own assent* to what EERC was doing and thus somehow *gave its own permission* for CERT to infringe, (D.I. 758 at 12), it is not clear how that would amount to affirmative consent *to CERT* to infringe, as would be required for an implied license by equitable estoppel, (*see* D.I. 760 at 8).

38

For all of these reasons, the Court finds that pursuant to the Agreement, ME2C held the exclusive right to license others with respect to the intellectual property. Therefore, the EERC could not grant to CERT an implied license of any type in the intellectual property at issue.

**B.    CERT has not otherwise proven the elements of implied license by equitable estoppel.**

Above, the Court has explained why, pursuant to the Agreement, the EERC could not have granted an implied license in the asserted patents to CERT. But even if that conclusion were incorrect, and even assuming that (notwithstanding the Agreement), the EERC *could* have done so, ME2C argues that CERT has additionally failed to sufficiently prove that the EERC *actually did* make such a license grant.

To set up this argument, the Court begins by again restating CERT's argument for an implied license. CERT's position is that although the EERC was "aware of the potential infringement issues" before it began interacting with CERT, it then "actively engaged, participated in, supported, and profited from CERT's refined coal business for over a decade while remaining silent about its patents and patent applications." (D.I. 758 at 16; *see also* D.I. 767 at 8 (noting that "CERT quite reasonably inferred that the EERC happily consented to their business relationship" from the EERC's "essential, ongoing, and profitable role with CERT and all ChemMod licensees")) According to CERT, the EERC was also "aware that refined coal was in fact being used with [activated carbon] by 2011, and that its use would be and actually was increasing as MATS was rolling out in the following years." (D.I. 758 at 17) CERT argues that although the EERC knew what power plants CERT sold its refined coal to, the EERC never told CERT not to sell refined coal to any power plants that were using activated carbon; thus, CERT's position is that the EERC was fully consenting to CERT's infringement of the asserted

39

patents—and in fact was *aiding* CERT in doing so (thus conveying to CERT a license).  (*Id.*; *see also* D.I. 767 at 9)  For example, CERT says that the EERC "knew as early as 2011 that the Powerton plant was using refined coal with [activated carbon]—and a CERT trial defendant made Powerton's refined coal."  (D.I. 767 at 9; *see also* D.I. 758 at 8; BT Tr. at 83 (Mr. Green suggesting that the EERC conveyed that CERT had its permission to act as it did with the "certification reports [that] allowed [CERT] to produce refined coal to qualify for the tax credit"), 91))

The Court will first assess CERT's argument regarding an implied license by equitable estoppel.  Again, to prove that such a license conveyed, CERT must establish that:  "(1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to make, use or sell to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim."  *Winbond*, 262 F.3d at 1374.  In *Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363 (Fed. Cir. 2001), the Federal Circuit made clear that a finding of implied license "requires a nexus between the patentee's purported waiver and the infringing action."  *Id.* (providing that the first element—the giving of an affirmative grant of consent or permission—"requires the patentee to communicate that 'the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is *currently* engaged'") (emphasis in original) (quoting *A.C. Aukerman Co.*, 960 F.2d at 1042).

In the Court's view, CERT has failed to establish at least two of the above-referenced requirements:  (1) that the EERC, through its statements or conduct, "gave an affirmative grant of consent or permission to" infringe; and (2) that there is a "nexus" between EERC's purported

40

waiver and the infringing action.  *Winbond*, 262 F.3d at 1374.[19]   CERT was required to

demonstrate that the EERC's statements or conduct affirmatively conveyed to CERT that it was

okay for CERT to do something that amounted to *infringement of the patents.*[20]   *See Stickle v.*

*Heublein, Inc.*, 716 F.2d 1550, 1559 (Fed. Cir. 1983) ("As the Supreme Court recognized,

'[a]ny language used by the owner of the patent, or any conduct on his part exhibited to another

from which that other may properly infer that the owner consents to his use of the patent [*i.e.*,

patented invention] . . . constitutes a license . . . .'") (emphasis and citations omitted)).  And it

has not done so.

The problem with CERT's argument is that the use of the refined coal at issue—i.e., the

coal on which the EERC performed its certification testing—*did not alone* infringe the patents.

Rather, in order to infringe, *activated carbon had to be added* to that refined coal—a step that

happened *at the power plants*.  And so CERT had to prove that the EERC affirmatively granted

CERT permission (through the EERC's statements or conduct) to infringe—i.e., to sell the

refined coal that the EERC had certified *to power plants that then added activated carbon to the*

_____

[19]     While ME2C makes additional arguments about CERT's lack of knowledge of the asserted patents, detrimental reliance, and the scope of any implied license, (D.I. 760 at 8-11, 17-20), the Court need not consider those in light of its decision set out herein.

[20]     Of course, the two asserted patents here issued to ME2C (not the EERC), and did not issue until 2019 and 2020, respectively.  So at the time of most of the conduct being discussed in this subsection, the asserted patents did not even exist.  In another portion of their briefing, Plaintiffs argue that CERT "cites no case where [an implied license] defense covers patents issued after the conduct giving rise to an implied license."  (D.I. 760 at 20)

The Court need not reach that issue, however.  Herein it will assume *arguendo* that it could be possible for the EERC to have given CERT permission to infringe the asserted patents if it gave CERT permission to infringe *related patents/applications* years earlier.  (*See* D.I. 758 at 20; BT Tr. at 15, 252-53)  But again, for the reasons set out herein, CERT has *not* sufficiently proven that the EERC even gave *that* type of permission to CERT.

*coal*—at the time that CERT was engaging in the infringing conduct.  (D.I. 760 at 11-14)  Yet the evidence does not come close to establishing this, for the reasons set out below.

For one thing, the test reports that the EERC submitted to CERT following Section 45 certification testing contained an express disclaimer of any grant of patent rights:

> LEGAL NOTICE This research report was prepared by the Energy & Environmental Research Center (EERC), an agency of the University of North Dakota, as an account of work sponsored by [Defendant name].  Because of the research nature of the work performed, neither the EERC nor any of its employees makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed or represents that its use would not infringe privately owned rights.

(*See, e.g.*, D.I. 774, DTX-1691 at CERT-0040454; BT Tr. at 115-16)  CERT tries to brush away this disclaimer as failing to "negate an inference of consent[.]"  (D.I. 767 at 8 n.6)  It does so by pointing out that in *De Forest* (described above, *see supra* n.16), AT&T had represented to the United States that it would not interfere with the manufacture of the patented audions, but had also said that it was not waiving and was reserving all claims under any patents or patent rights—and yet the *De Forest* Court still found that AT&T had granted an implied license.  (*Id.* (citing *De Forest*, 273 U.S. at 239))  That is true, as far as it goes.  But what CERT overlooks is that in *De Forest*, AT&T *also* subsequently executed a release to the United States and to all manufacturers working for the United States "of all claims for compensation of the making and use of the audions," including compensation for patent infringement.  273 U.S. at 239-40.  There was no such release here.[21]  As a result, *De Forest* is not a good comparator for CERT.  And so

---

[21]    Nor does CERT point to anything else in the test reports conveying that CERT had the right to infringe.  (BT Tr. at 43; D.I. 760 at 16)

relatedly, here (as opposed to the situation in *De Forest*) it seems like the EERC's disclaimer can and should have some real force in the implied license analysis.

The Court turns next to the other evidence establishing that the EERC did not give CERT an affirmative grant of permission to infringe.

One key category of evidence relates to what EERC did *not say*. There, it is undisputed that the EERC never told CERT that CERT had its permission to sell refined coal to power plants that used activated carbon. (BT Tr. at 84, 112; *see also* D.I. 760 at 12; D.I. 767 at 8)

Another relates to what the EERC did *not know*. On that front, while the record indicates that the EERC seemed to track the mercury control technology that entities were utilizing as a general matter, and that the EERC knew what plants CERT was selling refined coal to, (BT Tr. at 64, 68-69, 186-87; D.I. 775 at DTX-1983),[22] it also demonstrates that nevertheless, the EERC was not aware that CERT was engaging in infringing conduct. More specifically, the trial record shows that CERT and the EERC never discussed any patent applications or patents relating to mercury capture, (BT Tr. at 115), nor communicated in any way regarding activated carbon, (*id.* at 84, 113). During the bench trial, Mr. Green acknowledged that CERT did not tell the EERC "that several CERT connected power plants were going beyond the Chem[]Mod technology and also adding activated carbon" to the coal for mercury capture. (*Id.* at 107; *see also id.* at 102 (Mr. Green testifying that even when MATS went into effect in 2015-2016, CERT did not tell the EERC that some of CERT's power plant customers would be implementing activated carbon injection)) And the EERC's representative at the jury trial, Tom Erickson, testified that the

---

[22]    The EERC's Section 45 certification test reports identified what power plant the refined coal being qualified would go to. (BT Tr. at 68-69)

EERC was not aware that ChemMod's licensees were selling refined coal to power plants that also used activated carbon.  (JT Tr. (D.I. 784) at 1126)[23]  Indeed, CERT's own position at the jury trial was that, in the relevant timeframe, *CERT itself* was not even aware (until it was sued in this case) that any of its power plant partners were using activated carbon in a process involving CERT's refined coal.  (BT Tr. at 85-86; *see also* JT Tr. (D.I. 783) at 865-66 (Mr. Green testifying during the jury trial that "I don't have knowledge of what's going on with the emissions control at [the] power plants"))[24]  Under these facts, the Court "simply cannot find that

---

[23]    During the bench trial, Mr. Green claimed that Mr. Erickson was "out of touch" in this regard; Mr. Green asserted that despite what Mr. Erickson had testified to, Mr. Green believed that the EERC *did* know "that some power plants or a lot of power plants were using activated carbon and some of those we were supplying refined coal to."  (BT Tr. at 109)  Yet during closing arguments at the jury trial—in defense of the contributory infringement claim against it—CERT's counsel referred to Mr. Erickson's testimony as the "slam-dunk testimony of a knowledgeable independent witness[.]"  (JT Tr. (D.I. 785) at 1236-37; BT Tr. at 243-44 (ME2C's counsel pointing out that CERT "ran a [jury] trial theme that [it] didn't know about activated carbon . . . kind of pounded the table in closing that [Mr. Erickson] is a neutral expert and he thinks it's unreasonable to combine activated carbon and bromine and now they're saying nevertheless we got a license because surely they would have known we were [selling to power plants that used] activated carbon"))  In sum, the Court ascribes no weight to Mr. Green's speculative belief that the EERC knew that CERT was working with power plants that used activated carbon—especially because:  (1) there is no record evidence to support that belief; and (2) Mr. Green's statement contradicts CERT's own position during the jury trial—where CERT urged the jury to conclude that the EERC's witness had testified credibly when he stated that he *did not know* this fact.

[24]    As Plaintiffs demonstrated during the jury trial, CERT's position in this regard turned out not to be credible.  Instead, the evidence at the jury trial demonstrated unequivocally that CERT did in fact know that at least some of the power plants it worked with were using activated carbon in a process with CERT's refined coal.  Indeed, by the time of the bench trial, Mr. Green acknowledged that this is what the jury trial record showed.  There he stated that "in the trial" it had come out that CERT "knew generally [that] some of the power plants were using activated carbon at some point from 2014 and on."  (BT Tr. at 85)

All of that said, the question relevant to the instant Motion relates to what *the EERC* knew and conveyed, not what CERT knew.  And for the reasons set out above, there is no evidence indicating that the EERC knew about the relevant power plants' use of activated carbon in the timeframe at issue.

[the EERC's] behavior amounted to an affirmative *grant of consent* [to infringe] as required for an implied license defense." *Lautzenhiser Techs., LLC v. Sunrise Med. HHG, Inc.*, 752 F. Supp. 2d 988, 1013-14 (S.D. Ind. 2010) ("[T]he Court simply cannot find that LT's behavior amounted to an affirmative *grant of consent* as required for an implied license defense[,]" where the former patentee's website had advertised its head control device's compatibility with the PG controllers accused of infringement, but "[t]rumpeting compatibility . . . does not give Defendants *carte blanche* to use patents with impunity[.]") (emphasis in original); *see also Oracle Am., Inc. v. Google Inc.*, No. C 10–03561 WHA, 2012 WL 1965778, *1 (N.D. Cal. May 31, 2012) (explaining that the patentee's CEO's blog post and similar statements by the patentee's executives, which had congratulated defendant Google on the release of Android, "do not fall under the narrow circumstances" in which an implied license may be found, as "[e]ven if Google understood Oracle and/or Sun's conduct to condone use of the Java API packages, the 'course of conduct' must be assessed for an affirmative grant of such consent" and none was present).[25]

For its part, CERT points to some additional evidence (beyond the EERC's Section 45 certification testing) that it contends shows that the EERC enabled the entire refined coal industry to develop a large market in the accused products while remaining silent about its

---

[25]    Indeed, even when CERT learned of this lawsuit, CERT continued to engage in the same conduct accused of infringing until the Section 45 tax credit program ended in 2021; CERT did so because it believed that it *did not infringe*—not because it thought that the EERC had given it an affirmative grant of consent to engage in infringement.  (BT Tr. at 121-22; D.I. 760 at 19)  This is another fact that does not gibe with CERT's current position—i.e., that it continued its conduct because the EERC had affirmatively communicated to it that it had an implied license to do so.  *Cf. Duval Sulphur & Potash Co. v. Potash Co. of Am.*, 244 F.2d 698, 701 (10th Cir. 1957) (finding no implied license where "Duval[] never considered itself to be a user of the Patent, did not want that process and never bargained for it. . . . [t]o create an implied agreement one must have a meeting of the minds as in any contract, the variance from an express agreement being only the character of the evidence used to establish it").

patents.  (D.I. 758 at 8-10, 16-19; D.I. 767 at 8-9)  In the end, this evidence, which the Court

summarizes below, does not persuade the Court that the EERC granted CERT an implied license

to infringe the patents:

- The EERC helped CERT respond to power plants' technical questions regarding the additives that would end up in the plants' boilers, and the EERC also provided technical support for operational problems that CERT encountered at power plants including WA Parish, Big Cajun II and Rush Island (such as corrosion in the plants' air preheater baskets).  (BT Tr. at 53-54, 59-60)

- CERT points out that Mr. Pavlish (while still at the EERC) handled ME2C's competitive product testing beginning in 2009, and that ME2C was testing at the Joppa power plant (later accused of infringement in this case) by 2011.  (D.I. 758 at 7-8 (citing BT Tr. at 159-61; D.I. 406 at ¶¶ 119, 128-37); BT Tr. at 204)  Mr. Pavlish testified that "it became pretty obvious and evident" that Joppa was using activated carbon as of at least the 2014/2015 timeframe and perhaps earlier.  (BT Tr. at 184-85)

- Mr. Pavlish e-mailed ME2C a spreadsheet regarding competing technologies in April 2012 that was part of the EERC's "ongoing efforts . . . to continue to track who's doing [what], what technologies are out there, what's being applied."  (*Id.* at 188-89; D.I. 773, DTX-0051-0052)

- In the Powerton e-mail, ME2C and the EERC discussed the fact that a product was tested at Powerton power plant, with Mr. Pavlish responding that ME2C "should take a serious look at how to get into this market" and "[b]oth them and ChemMod rely mainly on adding bromine to the coal to achieve mercury reductions."  (D.I. 773, DTX-0104; *see also* JT Tr. (D.I. 782) at 408-11)

- In October 2012, ME2C submitted a breakdown of pricing to Joppa for replacing its current mercury capture program "as well as projecting the dose rate with the ChemMods Refined Coal program that is in the process of being installed."  (D.I. 773, DTX-0077; JT Tr. (D.I. 782) at 507-08)

- In July 2013, an ME2C e-mail among ME2C employees and Mr. Pavlish discussed that a potential power plant customer was going to be running a "Refined Coal demonstration" in September and would be adding powered activated carbon to the "backend for sorbent" which would allow them to qualify for MATS. (D.I. 773, DTX-0105; *see also* JT Tr. (D.I. 782) at 412) The e-mail noted that this "is the same thing that happened at Joppa" and that "[t]he EERC (not JP's department) is complicit in this as well—they are doing the testing for Chem[]Mods and others to prove 'compliance.'" (D.I. 773, DTX-0105) Mr. Pavlish responded that ME2C "might as well pack up and go home." (*Id.* at DTX-0106)

- On September 18, 2013, an ME2C employee stated in an e-mail to Mr. Pavlish and Mr. Erickson that "simple/cheap efforts" to thwart the Section 45 tax certification program were "causing serious damage to the effort [they're] making to commercialize and profit from [their] tech." (*Id.* at DTX-0112 at 2) Mr. Erickson replied by asking if there was any interest in teaming up with an existing company to offer a complete mercury solution and noted that if so, "ChemMod would be a good company." (*Id.*) Mr. Pavlish responded to ME2C that many of the power plants would need "additional control to achieve the MATS limit" and would likely employ the use of activated carbon in "combination with [the Section 45 tax credit]. . . . Either ChemMod or ADA will offer this as a solution, or the [power plant] will simply buy the [activated carbon] separately. So we have heard, there are a number of plants already doing this." (*Id.* at 1)

- In a December 2014 internal ME2C e-mail, ME2C described a visit to a power plant to try to convince the plant to use ME2C's products; ME2C told the plant that it "run[s] in parallel with [refined coal] at two customer sites." (*Id.* at DTX-0056)

- In May 2015, ME2C stated that its "program may be a great fit" for power plants that used activated carbon, (*id.* at DTX-0181 at 3), and ME2C discussed that ChemMod probably got the rate of bromine needed to be added to its coal changed because the power plant "adds [activated carbon] to hit the MATS target." (*Id.* at 1) (Mr. Pavlish further noted that you "probably have better sources to find out the real scoop" and that "the whole things a bit sneaky." (*Id.*))

- In August 2015, ME2C's Vice President of Sales asked Mr. Pavlish how ME2C "work[s] with Refined Coal programs" and Mr. Pavlish provided a list of advantages. (*Id.* at DTX-0088)

- ME2C did not provide notice to the EERC that it believed that its patent rights were being infringed until a conversation shortly before this lawsuit was filed. (BT Tr. at 167-69; JT Tr. (D.I. 782) at 510-12)

The problem for CERT is that the smattering of e-mails and documents that it points to, taken together with the EERC's Section 45 certification testing, fails to show that the EERC gave CERT an affirmative grant of permission through its conduct to infringe the patents by selling the certified refined coal to power plants that used activated carbon. To be sure, the above evidence does establish that ME2C knew that *certain power plants* (such as Joppa, which is not a power plant operated by the CERT Defendants) were using activated carbon. (D.I. 659, ex. 1 at ¶¶ 56-64) It also shows that the EERC understood that *certain power plants* used activated carbon (with Mr. Pavlish speculating that some may do so in the future to obtain the additional reduction in mercury required by MATS) and that the EERC discussed this with ME2C. But what this evidence does not show is that the EERC gave CERT permission to sell refined coal to power plants using activated carbon. Indeed, it does not refute the evidence described above establishing that the EERC was not aware that that CERT was engaging in infringing conduct.

In trying to sidestep this conclusion, CERT zeros in on the Powerton e-mail, particularly because CERT made Powerton's refined coal. (D.I. 758 at 8 (citing D.I. 773, DTX-0104; D.I. 598, ex. 1 at ¶¶ 84, 101); *see also* D.I. 767 at 9)[26] But what the Powerton e-mail conveys is that

---

[26]     ME2C says that the Powerton plant was operated and supplied by Defendants that have already settled with ME2C, not by CERT. (D.I. 760 at 14 n.4) But the record seems to establish that "Defendant CERT Operations II, LLC, through its employees, operated the refined coal facility located at the Powerton plant[.]" (D.I. 598, ex. 1 at ¶ 101)

in May 2012, "ADA" "tested" a vague "product" at Powerton during the prior week, with Mr. Pavlish of the EERC responding that ADA and ChemMod "rely mainly on adding bromine to the coal to achieve mercury reductions." (D.I. 773 at DTX-0104) This evidence doesn't do the job of establishing that the EERC was aware that Powerton was using a process that included activated carbon. And it certainly does not demonstrate that the EERC communicated to CERT that it was okay for CERT to sell its refined coal to power plants using activated carbon (e.g., without worrying about patent infringement). *See, e.g.*, *Control Laser Corp. v. Smith*, 705 F. Supp. 3d 1006, 1014 (N.D. Cal. 2023) ("Defendant fails to satisfy the first element [of the defense of implied license by equitable estoppel] because it identifies no communicative conduct by Plaintiff indicating that Defendant's activities in selling and distributing the Baublys systems would not be disturbed."); *see also Lautzenhiser Techs.*, 752 F.Supp.2d at 1013-14; *Oracle Am., Inc.*, 2012 WL 1965778, at *1.[27]

---

[27]    In the cases that CERT relies upon, it was clear that the patentee was aiding the alleged infringer in what was clearly understood to be infringing activity. (D.I. 758 at 14-16) In *De Forest*, for example, the patents at issue covered audions, and the patentee (AT&T): (1) provided information, drawings and blueprints to the entity that was going to be manufacturing the audions (GE); and (2) allowed GE employees to witness AT&T's audion manufacturing process. 273 U.S. at 237, 239, 241. In *Wang*, the asserted patents covered SIMMs, and the patentee coaxed the alleged infringer into the SIMM market, repeatedly requested that the alleged infringer manufacture SIMMs, provided the alleged infringer with designs, suggestions and samples for SIMMs and eventually purchased SIMMs from the alleged infringer. 103 F.3d at 1573-75, 1582. And in *High Point SARL*, the patentee's predecessors had license agreements with the alleged infringer (Sprint) relating to its planned network based on a new technology relating to cell phones, and had actively engaged with Sprint in establishing that network. 817 F.3d at 1327, 1330-31. Those license agreements then lapsed, and it was clear that the predecessors were on notice that Sprint was subsequently engaging in unlicensed activity in expanding the Sprint network. *Id.*

Here, in contrast, the EERC conducted Section 45 certification testing on CERT's refined coal. But the asserted patents require that, for infringement to occur, activated carbon must be added to that coal—and the EERC's testing did not involve any activated carbon, and nor did the EERC ever discuss activated carbon with CERT. So unlike the circumstances in cases like *De*

### C.    CERT has not otherwise proven the elements of the defense of equitable estoppel.

The Court also notes that to the extent that CERT alternatively relies on the defense of equitable estoppel here—and in turn argues that the EERC's *misleading silence* somehow bars Plaintiffs' infringement suit—CERT's position fares no better.  (D.I. 758 at 14)  CERT's equitable estoppel argument is based on the same evidence just discussed above as to the defense of implied license by equitable estoppel.  (*Id.* at 14-19)  And the evidence fails to establish all of the elements of equitable estoppel are satisfied.

To that end, the Federal Circuit has noted that the first element of the equitable estoppel defense is that "the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer[.]"  *High Point SARL*, 817 F.3d at 1330.  The Federal Circuit has gone on to explain that "[m]isleading conduct occurs when the alleged infringer is aware of the patentee or its patents, and *knows or can reasonably infer that the patentee has known of the allegedly infringing activities for some time*."  *Id.* (emphasis added).[28]  Moreover, the Federal Circuit has noted that another element of the defense of equitable estoppel is that the alleged infringer *relies* on the patentee's misleading silence.  *Id.*; *see also Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V. v. Sirius XM Radio Inc.*, 2023-2267, 2025 WL 1617966, at *4-5 (Fed. Cir. June 9, 2025).

---

*Forest* and *Wang* and *High Point SARL*, here one cannot say that the EERC encouraged or suggested that it was okay for CERT to *infringe* the patents at issue.

[28]     This only makes sense, as it would seem impossible to argue that a patentee became estopped from asserting infringement due to its own misleading conduct or silence—if the patentee never even knew that infringing conduct was occurring in the first place when it engaged in that conduct or silence.

CERT's evidence cannot show that these elements are met.  Here, as discussed above: (1) CERT and the EERC did not discuss activated carbon; (2) CERT did not tell the EERC that it sold its refined coal to power plants that used activated carbon; (3) the EERC's test reports disclaimed any grant of patent rights, and; (4) indeed, *CERT itself* claimed that it was not even really aware of the activated carbon use at particular power plants that it supplied (until it was sued in this case).  Moreover, when CERT did learn that it was being accused of infringement, it did not then move its operations to power plants that did not use activated carbon; instead, it simply continued doing what it was doing, because it believed that it did not infringe—*not* because it thought it had an implied license.  (D.I. 760 at 19)  CERT therefore has not demonstrated that the EERC engaged in misleading conduct or silence under circumstances sufficient to implicate the defense of equitable estoppel, nor that CERT relied upon qualifying misleading conduct or silence, when it sold refined coal to plants using activated carbon.  *Cf. Fraunhofer-Gesellschaft*, 2025 WL 1617966, at *4-5 (concluding that a grant of summary judgment premised upon an equitable estoppel defense was improper, where the defendant could not sufficiently establish that it had relied upon the plaintiff's misleading conduct or silence, in that there was record evidence suggesting that the defendant pursued the accused system not due to plaintiff's silence but because the system had greater market penetration and was the easier business choice); *Kove IO, Inc. v. Amazon Web Servs., Inc.*, Case No. 18 C 8175, 2024 WL 450028, at *28 (N.D. Ill. Feb. 6, 2024) (denying the defendant's summary judgment motion on its equitable estoppel defense, because the reliance element looks to whether the alleged infringer relied upon the patentee's "conduct in deciding to develop the accused products in their current forms rather than pursue these non-infringing alternatives" and "[t]here is no evidence in the record to support the conclusion that AWS took into account Kove's silence in connection with

taking some action") (internal quotation marks and citation omitted); *J.R. Simplot Co. v. McCain Foods USA, Inc.*, 713 F. Supp. 3d 904, 951, 954 (D. Idaho 2024) (denying a defendants' motion for summary judgment on equitable estoppel, where the defendants' position was that the patentee ("McCain") was estopped because he "did not do *anything* to dissuade [defendants] from improving PEF technology, building PEF Systems, and selling PEF devices.  In fact, McCain encouraged these actions.  But McCain also did not do anything to indicate it would not enforce and defend its patent—if and when doing so became necessary.") (emphasis in original); *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 14-CV-6544(KAM)(GRB), 2018 WL 1525686, at *24–26 (E.D.N.Y. Mar. 27, 2018) (concluding that while "the record contains some circumstantial evidence that might be helpful to an equitable estoppel claim"—where, *inter alia*, the defendant contended that plaintiffs misled it by testifying in another patent case that plaintiff followed a "live and let live" policy with respect to intellectual property and testifying that one of defendant's product infringes its patents, but that it had never filed suit—no equitable estoppel could be found, as the defendant did not present evidence that, based on that testimony, it reasonably inferred that plaintiffs did not intend to enforce its patent against defendant).

## CONCLUSION

For the foregoing reasons, the Court finds that CERT's Motion should be DENIED.  An appropriate Order will issue.

Because this Memorandum Opinion may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Opinion.  Any such redacted version shall be submitted no later than **June 17, 2025** for review by the Court.  It should be accompanied by a motion for redaction that shows that the presumption of public access to

judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure."  *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Memorandum Opinion.