# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MIDWEST ENERGY EMISSIONS )
CORP. and MES INC., )
)
Plaintiffs, )
)
v. ) Civil Action No. 19-1334-CJB
)
ARTHUR J. GALLAGHER & CO., et al., )
)
Defendants. )

---

James M. Lennon and Peter Akawie Mazur, DEVLIN LAW FIRM LLC, Wilmington, DE;
Bradley W. Caldwell, Justin T. Nemunaitis, Warren J. McCarty, III, Daniel R. Pearson, Adrienne
R. Dellinger, Aisha M. Haley, Richard A. Cochrane, CALDWELL CASSADY CURRY P.C.,
Dallas, TX; Attorneys for Plaintiff Midwest Energy Emissions Corp.

Kenneth L. Dorsney and Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE; Jeff Dyess,
Paul Sykes and Benn Wilson, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham,
AL; Jessica Zurlo, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C.,
Attorneys for Defendants CERT Operations II LLC, CERT Operations IV LLC, CERT
Operations V LLC, CERT Operations RCB LLC, Senescence Energy Products, LLC, Springhill
Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy
LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC and Rutledge Products, LLC.

---

## MEMORANDUM OPINION

September 25, 2025
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

The Court[1] presided over a five-day jury trial in this patent infringement case from February 26, 2024 through March 1, 2024. (D.I. 781-85 (hereinafter, "Tr.")) At trial, Plaintiff Midwest Energy Emissions Corp. ("Midwest Energy") and then-Plaintiff MES Inc. ("MES" and collectively with Midwest Energy, "Plaintiffs" or "ME2C")[2] alleged that Defendants Bascobert (A) Holdings, LLC; Buffington Partners, LLC; Cottbus Associates, LLC; Larkwood Energy, LLC; Marquis Industrial Company, LLC; Rutledge Products, LLC; Senescence Energy Products, LLC and Springhill Resources, LLC (the "CERT RC Defendants"); CERT Operations II LLC; CERT Operations IV LLC; CERT Operations V LLC; and CERT Operations RCB LLC (the "CERT Operations Companies Defendants" and collectively with the CERT RC Defendants, "CERT" or the "CERT Defendants") indirectly and willfully infringed claims 25 and 26 of United States Patent No. 10,343,114 (the "'114 patent") and claims 1 and 2 of United States Patent No. 10,596,517 (the "'517 patent" and collectively with the '114 patent, the "asserted patents"). (D.I. 659, ex. 2 at ¶¶ 1-6; *id.*, ex. 3 at ¶ 1) At the end of trial, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs. (D.I. 692) Pending before the Court is CERT's Motion for Judgment as a Matter of Law ("JMOL") of No Induced Infringement, No Contributory Infringement, and No Willful Infringement as to Plaintiffs'

---

[1]     The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 398)

[2]     As the parties are aware, subsequent to trial, the Court granted CERT's motion to dismiss Plaintiff MES pursuant to Federal Rule of Civil Procedure 12(b)(1). (D.I. 788; D.I. 789) Because MES participated in the case up through and including the filing of the briefing on the instant Motion, and simply to avoid confusion, the Court will herein refer to "Plaintiffs" or to "Plaintiffs' position" on the relevant issues, even though there is currently only one Plaintiff (i.e., Midwest Energy) in the case.

Claims for Infringement of the '114 and '517 patents (the "Motion"). (D.I. 718) For the reasons set forth below, the Court DENIES the Motion.

## I.    BACKGROUND

This patent infringement case relates to mercury control at coal-fired power plants ("power plants"). The asserted claims of the asserted patents recite methods for reducing mercury emissions from power plants with the use of bromine-enhanced coal (or "refined coal") and a sorbent such as activated carbon. (D.I. 751, PTX-001, PTX-003; *see also* D.I. 546, ex. A at ¶¶ 49, 70; D.I. 743 at ¶ 4) All four asserted claims include, *inter alia*, the following steps: (1) the use of bromine-enhanced coal; (2) injecting an activated carbon sorbent ("ACI") into the combusted coal, i.e., into the mercury-containing gas (the "ACI step"); and (3) "separating the mercury/sorbent composition from the mercury-containing gas" or "collecting mercury in the mercury-containing gas" with the sorbent (the "separating or collecting mercury step"). (D.I. 751, PTX-001.0034; *id.*, PTX-003.0040) It is not in dispute that: (1) CERT was responsible for adding bromine to the coal at issue, (*see, e.g.*, Tr. (D.I. 781) at 196);[3] (2) each of the power plants to which CERT sold refined coal in the relevant period went on to inject ACI into the combusted coal, (*see, e.g.*, Tr. (D.I. 782) at 574); and (3) those power plants then also used devices called baghouses or electrostatic precipitators ("ESPs") to perform the separating or collecting mercury step, (*see, e.g.*, *id.* at 571-73).

---

[3]      While the parties appear to cite to the rough versions of the jury trial transcript in their briefing, the Court herein cites to the final versions of the jury trial transcript that have been docketed.

Plaintiffs filed this lawsuit on July 17, 2019. (D.I. 1)[4] Plaintiffs allege that each of the CERT RC Defendants contributed to infringement of the asserted claims of the asserted patents by selling refined coal to specific power plants, and that each of the CERT Defendants[5] induced these power plants to add activated carbon to the refined coal in a manner that amounted to direct infringement[6] (and that this infringement was willful). (D.I. 659, ex. 2 at ¶¶ 1-6; D.I. 743 at ¶ 4; Tr. (D.I. 785) at 1206-08) The Court hereby incorporates by reference its findings of fact relating to this case set out in its June 10, 2025 Memorandum Opinion. (D.I. 786 at 4-21)

This case as pleaded was a sprawling one. Partly as a result of this, the case's procedural history is very lengthy. Below, the Court will summarize certain case events that are particularly relevant to the instant Motion.

CERT filed a motion to dismiss the original Complaint, which the Court recommended be granted without prejudice on June 18, 2020 (the "June 2020 R&R"). (D.I. 110 at 13-22) With respect to induced infringement, the Court concluded that the Complaint's allegations were insufficient as to the allegation that CERT had knowledge that the power plants (i.e., the alleged direct infringers) utilized activated carbon. (*Id.* at 14) Similarly, with respect to contributory

---

[4]     Plaintiffs' original complaint asserted the '114 patent, which issued on July 9, 2019, as well as United States Patent No. 8,168,147. (D.I. 1 at ¶¶ 50-51; D.I. 751, PTX-001.0002) Plaintiffs' First Amended Complaint added claims of infringement regarding the '517 patent, which issued on March 24, 2020, as well as United States Patent Nos. 10,589,225 and 10,668,430. (D.I. 130 at ¶¶ 51-53; D.I. 751, PTX-003.0002) At trial, Plaintiffs only pursued their claims relating to the '114 patent and '517 patent. (*See, e.g.*, D.I. 659, ex. 1 at ¶¶ 15-20)

[5]     When Plaintiffs filed this case, they had also named many additional Defendants. But by the time of trial, only the CERT Defendants remained in the case.

[6]     The CERT Operations Companies Defendants made refined coal that the CERT RC Defendants then sold to the respective power plants at issue. (D.I. 659, ex. 1 at ¶¶ 34-36; *see also* D.I. 532 at ¶ 3)

4

infringement, the Court found that the Complaint failed to adequately plead that CERT knew that the coal could not reasonably be used for purposes other than to be injected with activated carbon (since the Complaint did not sufficiently plead that CERT knew or intended that the coal would be injected with activated carbon). (*Id.* at 19-20)[7] United States District Judge Richard G. Andrews, who was then presiding over the case, later adopted the June 2020 R&R. (D.I. 127)

Plaintiffs then filed their First Amended Complaint ("FAC") on July 15, 2020, (D.I. 130), which CERT moved to dismiss, (D.I. 175; *see also* D.I. 272). On July 31, 2020, the Court granted CERT's motion for a stay "until the Court determines that Plaintiffs have stated a viable claim for relief" against CERT. (D.I. 166) Plaintiffs subsequently requested leave to file a second amended complaint ("SAC") to replace certain of the John Doe Defendants then named in the FAC and to add additional allegations in response to pending motions to dismiss the FAC. (D.I. 214; D.I. 218)

On May 20, 2021, the Court issued a Report and Recommendation (the "May 2021 R&R") in which it concluded that Plaintiffs had now plausibly pleaded certain induced and contributory infringement claims against CERT. More specifically, with respect to induced infringement, the proposed SAC now plausibly alleged that CERT knew and intended that the power plants utilize activated carbon, in light of its allegations that: (1) CERT engaged in Section 45 certification testing[8] that made it aware of power plants' activated carbon usage; and

---

[7]    The Court also determined that Plaintiffs' allegations failed to plausibly establish that CERT knew of the asserted patents before the suit was filed. (D.I. 110 at 16-17)

[8]    Plaintiffs alleged that "Section 45 tax credits" were tax credits related to the production of refined coal, which were established by Congress in a 2004 law. (D.I. 279 at 20-21) Pursuant to the law, a refined coal producer could receive an inflation-adjusted tax credit for each ton of refined coal it sold to a power plant that results in a significant reduction in harmful emissions when the coal was burned. (*Id.* at 21) It was also alleged that in order to demonstrate

(2) CERT intended for power plants to continue to operate their activated carbon injection systems when CERT provided them with refined coal, so that CERT could continue to receive benefits from obtaining Section 45 tax credits. (D.I. 279 at 20-26)[9]  As for contributory infringement, the Court concluded that the proper inquiry is whether the accused refined coal "as sold and delivered" to power plants lacks substantial non-infringing use; it found that the proposed SAC plausibly pleaded that when the refined coal at issue was dropped off at the power plant, it had no substantial non-infringing use. (*Id.* at 26-29)[10]  Judge Andrews subsequently adopted these portions of the May 2021 R&R. (D.I. 319 at 6-8, 11)  On the same date that it issued the May 2021 R&R, the Court also lifted the stay of the case as to CERT. (D.I. 280)

On October 7, 2021, Plaintiffs filed a Third Amended Complaint. (D.I. 326)  This pleading replaced some John Doe Defendants with newly identified entities, removed references to prior named Defendants that had been subsequently dismissed, and removed references to since-dismissed claims. (*See* D.I. 320)

---

that the refined coal it produced met the reduced emissions requirements, CERT engaged in "Section 45 certification testing," including by performing such testing at particular power plants it worked with. (*Id*. at 23)

[9]     With regard to CERT's knowledge that the power plants at issue utilized activated carbon, the FAC and SAC also alleged that even if CERT did not learn of a power plant's use of activated carbon in connection with the Section 45 certification testing process, they would "learn of the plant's use of activated carbon by working with the plant[ when] determin[ing] logistics for installing refined coal equipment, storing and supplying chemicals, and operating and maintaining equipment[, whereby CERT] . . . . would be able to witness activated carbon injection equipment and on-site activated carbon" and would also learn of "the plant's use of sorbent containing activated carbon through routine conversation and communications with individuals at the coal-fired power plant that are necessary to ensure coordination and smooth operation of the plant[.]" (D.I. 130 at ¶¶ 90-91; D.I. 281 at ¶¶ 89-90)

[10]     The Court again determined in the May 2021 R&R that the SAC's allegations failed to plausibly establish that CERT knew of the asserted patents before the suit was filed. (D.I. 279 at 16-20)

Next, Plaintiffs filed a motion requesting leave to file a Fourth Amended Complaint ("4AC") to, *inter alia*, add certain recently-identified Defendants and remove certain allegations indicating that Defendants had learned of activated carbon use from certification testing (with Plaintiffs noting that such allegations had "merely provided one of multiple means of inferring Defendants' knowledge"). (D.I. 372; *see also* D.I. 375) While Defendants argued that Plaintiffs' proposed 4AC failed to sufficiently plead the intent element of induced infringement, (D.I. 376 at 4-5), the Court granted Plaintiffs leave to file the 4AC, concluding that the allegations plausibly alleged Defendants' intent for the power plants to directly infringe, (D.I. 404).

On May 3, 2022, Plaintiffs filed the operative 4AC. (D.I. 406) Defendants subsequently moved to dismiss the induced infringement claims in the 4AC, (D.I. 418); the Court denied Defendants' motion in a January 12, 2023 Memorandum Order ("January 2023 MO"), (D.I. 513). The case then proceeded through the remainder of fact and expert discovery.

At the summary judgment stage, CERT filed motions for summary judgment with respect to, *inter alia*, Plaintiffs' claims of induced and contributory infringement. (D.I. 568; D.I. 569) On November 3, 2023, the Court issued a Memorandum Opinion denying CERT's motion for summary judgment of no contributory infringement. (D.I. 611) On November 8, 2023, the Court issued a Memorandum Opinion denying CERT's motion for summary judgment of no induced infringement. (D.I. 631) And on February 16, 2024, the Court issued an Oral Order denying CERT's motion for reargument of the Court's denial of its motion for summary judgment of no induced infringement. (D.I. 672)

The Court then presided over the above-referenced jury trial from February 26, 2024 to March 1, 2024. (D.I. 781-85) At trial, the CERT Defendants denied that they indirectly

7

infringed the asserted patents.  (D.I. 669 at 2; Tr. (D.I. 785) at 1246)  At the conclusion of trial, as was noted above, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs.  (D.I. 692)

The Court next entered non-final judgments on the verdict against the CERT Defendants. (D.I. 697-708)  Thereafter, the parties submitted a substantial number of post-trial motions relating to the jury trial, including the instant Motion.  (D.I. 716; D.I. 718; D.I. 720; D.I. 763)[11] Briefing on the instant Motion concluded on May 17, 2024.  (D.I. 736)

## II.    LEGAL STANDARD

A court may grant JMOL before a case is submitted to a jury if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [moving] party on that issue[.]"  Fed. R. Civ. P. 50(a)(1).  If the court denies the motion, following the entry of judgment, a party may file a renewed motion for JMOL.  Fed. R. Civ. P. 50(b).

Pursuant to Federal Rule of Civil Procedure 50(b), JMOL following a jury trial should be granted only if, "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993); *see also Wirtgen Am., Inc. v. Caterpillar, Inc.*, Case No. 1:17-cv-00770-JDW, 2024

---

[11]    In addition, CERT had also asserted that Plaintiffs' infringement claims are barred because CERT is entitled to an implied license to the asserted patents.  (D.I. 515 at 112, at ¶ 16; D.I. 659, ex. 3 at 48 at ¶ 3(e)-(f))  On May 30, 2024, the Court held a bench trial regarding the implied license defense.  (D.I. 779)  The Court thereafter issued a Memorandum Opinion and Order concluding that CERT had failed to prove, by a preponderance of the evidence, that it has an implied license to the asserted patents.  (D.I. 786; D.I. 787)

WL 4216057, at *5 (D. Del. Sept. 17, 2024).[12] Motions for JMOL are to be granted only "sparingly[.]" *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (noting that such motions should be granted where "the record is critically deficient of the minimum quantum of evidence in support of the verdict") (internal quotation marks and citation omitted).

In resolving such a motion, a court "may not weigh the evidence, determine the credibility of witnesses, or substitute [its] version of the facts for the jury's version." *Mancini v. Northampton Cnty.*, 836 F.3d 308, 314 (3d Cir. 2016) (internal quotation marks and citation omitted); *see also Wirtgen Am., Inc.*, 2024 WL 4216057, at *5. "Because the jury returned a verdict in favor of the plaintiff, [the Court] must examine the record in a light most favorable to the plaintiff, giving [it] the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (internal quotation marks and citation omitted).

## III. DISCUSSION

With its Motion, CERT argues that the jury's verdict for Plaintiffs is unsupported by legally sufficient evidence, and that the Court should therefore enter JMOL that CERT is not liable for induced infringement, contributory infringement or willful infringement of any asserted claim. (D.I. 719 at 1, 20; D.I. 736 at 10) Plaintiffs oppose the Motion, asserting that the Court should uphold the jury's verdict on all issues. (D.I. 728 at 1, 20) Below, the Court will address the Motion as it relates to each type of claim, in turn.[13]

---

[12] The law of the regional circuit governs the standards for deciding motions for judgment as a matter of law. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019); *10X Genomics, Inc. v. Bruker Spatial Biology, Inc.*, Case No. 21 C 653, 2024 WL 5201115, at *7 (D. Del. Dec. 23, 2024).

## A. Induced Infringement

The Court first addresses CERT's arguments that JMOL of no induced infringement should be granted. Section 271(b) states that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Inducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent. *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009).

CERT argues that it is entitled to JMOL of no inducement of infringement because there is no evidence: (1) that it took affirmative acts to encourage infringement; (2) that it did so with the requisite intent; nor (3) that it caused any power plant to perform two steps of the asserted claims (the ACI step and the separating or collecting mercury step). (D.I. 719 at 2) Below, the Court will explain why each of CERT's arguments is not persuasive.

---

[13]     In order to prove both induced and contributory infringement, the plaintiff must demonstrate that the defendant had knowledge of the asserted patents and that the acts at issue constituted patent infringement. *See Portus Sing. Pte Ltd v. Schneider Elec. USA, Inc.*, Civil Action No. 23-977-JLH-CJB, 2025 WL 437055, at *9 (D. Del. Feb. 7, 2025). In addition to its arguments that the Court will discuss below, CERT also makes another (brief) argument that: (1) Plaintiffs point only to their original Complaint to demonstrate the basis for CERT's knowledge of the asserted patents and of patent infringement, in order to support their indirect infringement claims; (2) but several courts have ruled that a complaint cannot alone establish a defendant's knowledge, because the purpose of a complaint is to obtain relief from an existing claim, rather than to create a claim; and (3) therefore Plaintiffs have not proved the knowledge element of both indirect infringement claims, such that CERT is entitled to judgment as a matter of law. (D.I. 719 at 17 (citing *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 250 (D. Del. 2021)); *see also* D.I. 736 at 8)

The Court does not agree. It has "already decided this issue. In doing so, it has determined that a complaint can supply knowledge of a patent for certain types of post-complaint claims." (D.I. 590 at 7 (citing cases)); *see also, e.g.*, *Staton Techiya, LLC v. Harman Int'l Indus., Inc.*, 734 F. Supp. 3d 354, 368 (D. Del. 2024) (citing cases); *Tonal Sys., Inc. v. iFIT Inc.*, C.A. No. 20-1197-LPS-CJB CONSOLIDATED, 2022 WL 951549, at *2 (D. Del. Mar. 30, 2022) (citing cases). And so JMOL is not warranted with respect to this issue.

### 1.    Affirmative Act to Encourage Infringement

The United States Court of Appeals for the Federal Circuit has explained that a patentee must plead and prove that the accused inducer "took an affirmative act to encourage [direct] infringement[,]" *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014); *see also Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760 (2011) ("The addition of the adverb 'actively' suggests that the inducement must involve the taking of affirmative steps to bring about the desired result[.]"), and that the inducer's act in turn "led to direct infringement[,]" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1331 (Fed. Cir. 2016) (internal quotation marks omitted).  With regard to the affirmative act requirement, the Federal Circuit has noted that while the concept of inducement "has connotations of active steps knowingly taken . . . the term is [otherwise] as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent[.]"  *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1378-79 (Fed. Cir. 2001) (emphasis omitted).  Indeed, to "induce" can mean, *inter alia*, "[t]o lead on; to influence; to prevail on; to move by persuasion or influence."  *Glob.-Tech Appliances, Inc.*, 563 U.S. at 760 (internal quotation marks omitted).

As to this requirement, CERT contends that there is no evidence that it took the requisite affirmative act to induce direct infringement by the power plants.  More specifically, CERT argues that it never instructed any power plant to perform the ACI step or the separating or collecting mercury step.  Instead, according to CERT, the evidence shows that:  (1) power plants performed the ACI step based on instructions from the government[14] and (2) at times during his

---

[14]    Federal regulations passed by the United States Environmental Protection Agency ("EPA") known as the Mercury and Air Toxics Standards ("MATS") required power plants to reduce mercury emissions by 90%.  (Tr. (D.I. 782) at 329, 431; Tr. (D.I. 783) at 613-14, 694, 710)  Most power plants were required to comply with this rule by 2015, unless granted a one-

testimony, Plaintiffs' infringement expert stated that CERT did nothing to encourage power plants to use ESPs or baghouses (to perform the separating or collecting mercury step). (D.I. 719 at 5-6 (citing, *e.g.*, Tr. (D.I. 783) at 613-14, 699-700 (Plaintiffs' infringement expert agreeing that the only reason he is aware of that power plants used ACI is because they had to comply with MATS); 665-66 (Plaintiffs' expert agreeing that there's nothing CERT did to talk power plants into using ESPs or baghouses));[15] *see also* D.I. 736 at 1-2) CERT's position is that it simply sold refined coal to power plants without instructing them to perform the remaining steps of the patented method—and that, as a matter of law, its mere act of selling the refined coal (even with knowledge that it will be put to an infringing use) cannot constitute an act of encouraging or inducing infringement. (D.I. 719 at 2-6, 9; *see also* D.I. 736 at 1-3) Plaintiffs, for their part, retort that substantial evidence supports the jury's conclusion that CERT committed affirmative acts that caused the power plants to directly infringe the asserted claims—including by providing refined coal to the relevant power plants. (D.I. 728 at 2-6)

This is not the first time in this case that the Court has considered an argument like this. In the January 2023 MO, the Court noted that Defendants had moved to dismiss the 4AC for failing to plausibly allege that they took active steps to encourage the power plants to directly infringe. (D.I. 513 at ¶ 3) In denying Defendants' motion to dismiss, the Court explained that

---

year extension to 2016. (Tr. (D.I. 782) at 330; Tr. (D.I. 783) at 651-52, 660-61) In order to comply with MATS, a number of power plants installed and used activated carbon systems as part of their strategy to reduce mercury emissions by 90%. (Tr. (D.I. 782) at 462; Tr. (D.I. 783) at 613-14, 644, 699) CERT's argument is that if anybody took an affirmative act that induced direct infringement here by the power plants, it was the EPA, not CERT.

[15]     The Court notes that during Plaintiffs' expert's redirect testimony, he stated that CERT's actions in providing the coal did cause the power plants to perform each and every step of the asserted claims. (Tr. (D.I. 783) at 715)

CERT's provision of coal itself is an affirmative act, and one that was not alleged to have been performed in a vacuum. (*Id.* at ¶ 7)  In other words, Plaintiffs' theory of infringement was not just that CERT sold refined coal to some power plants with knowledge that those plants might possibly infringe at some point in the future.  Instead, the 4AC alleged that:

> [W]hen Defendants provide this coal, they and the power plants all know that:  (a) the power plants have an activated carbon injection system on site for mercury control, which requires an upfront cost and ongoing costs for operation; these systems have been installed in order to allow the plants to comply with state and federal regulations regarding mercury emissions; (b) were the plants to stop operating their activated carbon injection systems, they could face fines that would destroy the economic incentives for dealing with a refined coal provider, or be shut down; (c) were the plants to unilaterally reduce their activated carbon injection rate, or were Defendants to reduce the amount of bromine added to the refined coal that they provide to the plants, this could hinder the plants' ability to comply with state and federal mercury regulations; (d) one of the benefits of using refined coal at a power plant with an activated carbon injection system is that the bromine enhances the performance of the activated carbon, which results in a reduced need for emission controls (i.e., it reduces the quantity of activated carbon that is required to be used) and preserves the plant's ability to sell fly ash; and (e) partly in light of the above, the refined coal that Defendants produce has no substantial non-infringing use at these power plants (such that it cannot reasonably be used for purposes other than to be combusted at a plant where activated carbon will later be injected). . . . In light of these facts, a Defendant's affirmative act of providing the refined coal can reasonably be seen as a way of encouraging (or causing or aiding or influencing) the power plants to use activated carbon.  It is a way of making it easier for those power plants to infringe (since the plants need the refined coal in the first place for infringement to happen).  And it is a way of communicating to those power plants, in a non-word based manner, Defendants' intent and hope that infringement will thereafter occur.

(D.I. 513 at ¶ 8 (citing D.I. 406 at ¶¶ 80, 82-83, 85, 87-88, 96))  Importantly here, the evidence at trial bore out these allegations.  (D.I. 728 at 2-4)

But before we even get to that evidence, it is important to first step back and emphasize that, as to CERT's provision of the coal itself, the facts here don't involve just a simple, typical sale of a product by a defendant to a far-flung group of third party customers—i.e., to third parties who purchase the product online or in a store, and who then might (or might not) later directly infringe when using that product.[16]  In order to understand how CERT's provision of coal works, it is helpful to understand how the relevant coal-fired power plants generally operate here.  Large piles of coal sit near the power plants, and power plant employees place coal from these piles onto conveyer belts; this coal would then pass through the respective CERT RC Defendant's refined coal facilities (more on that step below), and the refined coal that exited the refined coal facilities would continue on the conveyer belts to pulverizers that grind up the coal.  (Tr. (D.I. 781) at 138, 230-31; Tr. (D.I. 782) at 550, 566; Tr. (D.I. 784) at 993)  The ground up coal then goes into a combustor (or boiler) where it is burned; flue gas is generated from the burning process.  (Tr. (D.I. 781) at 138, 230-31)  Power plants inject activated carbon into the flue gas from outside of the boiler.  (Tr. (D.I. 783) at 618, 628)  The flue gas then flows through devices (including baghouses and/or ESPs) that remove impurities (including mercury) from the flue gas, and the gas is released into the atmosphere.  (Tr. (D.I. 781) at 231; Tr. (D.I. 782) at 571-73; Tr. (D.I. 783) at 619)  The burning process also creates steam that flows into a turbine that turns a generator to create electricity.  (Tr. (D.I. 781) at 230-31)  The generator then sends electricity to the power grid.  (*Id.*)

---

[16]    *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) ("[A] showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use[.]"); *Intel Corp. v. Future Link Sys., LLC*, Civil Action No. 14-377-LPS, 2015 WL 649294, at *8 (D. Del. Feb. 12, 2015) ("Simply selling products to customers who may be using the products in an infringing way does not, in and of itself, amount to induced infringement.").

As for CERT's role in this process, each of the CERT RC Defendants would take possession of coal while it was on the conveyer belt by purchasing it from the power plant at issue for a specific price; at that time, the CERT Operations Companies Defendants would make refined coal by "spray[ing] the [relevant] chemicals onto the coal as it was passing through [the CERT Defendants' refined coal facilities] on the way from the coal pile to the pulverizer." (Tr. (D.I. 782) at 550; *see also* Tr. (D.I. 784) at 993) The CERT RC Defendants would then sell the coal back to the power plant "*for less money than they paid for it*"—in other words, they would pay the power plants to take the refined coal, in order so that they could later obtain valuable Section 45 tax credits. (Tr. (D.I. 782) at 550-51 (emphasis added); *see also id.* at 437, 439 (CERT employee testifying that the refined coal companies would generally sell refined coal to the power plants for "less money" than they purchased the raw coal for, that the power plants "were provided with a financial incentive" to allow CERT to operate refined coal facilities there, and that this made economic sense for CERT at the time because the provision of the coal enabled them to reap the benefit of Section 45 tax credits))

Beyond that, the evidence at trial demonstrated that:

- CERT knew that these power plants had ACI systems on site in order to comply with MATS regulations regarding mercury emissions,[17] (*see, e.g.*, Tr. (D.I. 783) at 866; Tr. (D.I. 784) at 882-84, 1104), and that the plants would be shut down if they did not maintain compliance with MATS, (Tr. (D.I. 784) at 900-01);

- In 2012, CERT gave presentations to power plants conveying that the use of CERT's bromine solution would allow power plants to use less activated carbon (therefore saving money) and would allow the power plant to get more usable fly ash, which is created during the combustion process and which power

---

[17]         *See supra* n.14.

15

plants sell to cement manufacturers. (Tr. (D.I. 783) at 639-40; Tr. (D.I. 784) at 920-21);

- In 2015, power plants requested that CERT help them optimize amounts of bromine and activated carbon to comply with MATS. (D.I. 755, PTX-693; *see also* D.I. 753, PTX-232; Tr. (D.I. 783) at 639);[18] and

- CERT knew that the refined coal that it produced had no substantial non-infringing uses at the relevant power plants— after bromine was sprayed on the coal, that coal had "no place to go except on the conveyer belt to the power plant to be pulverized and burned in the combustion chamber" with activated carbon injected therein. (Tr. (D.I. 783) at 627; *see also id.* at 866 (CERT's representative agreeing that CERT has known since the filing of this case that "the exhaust path after

---

[18]     With respect to Plaintiffs' evidence regarding CERT's presentation regarding the fly ash benefits from using refined coal and CERT's help with rate optimization of bromine and ACI, CERT argues that this shows, at most, CERT's knowledge that refined coal may be used with ACI. (D.I. 719 at 7) CERT contends that such evidence cannot contribute to a finding that it induced infringement, since these acts occurred before (i.e., in or around 2012 or 2015) the point when the first of the asserted patents issued (i.e., in July 2019). (*Id.* at 7-8; D.I. 736 at 5 n.2; *see supra* n.4)

It is true that the Federal Circuit has reversed a jury's verdict of induced infringement where all of the acts of inducement occurred before the damages period began to run (and where there was no evidence of causation between the allegedly inducing acts occurring before the damages period and the direct infringement within the damages period). *See Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F. 4th 1109, 1119-21 (Fed. Cir. 2022). And so, were it standing alone, the above-referenced inducement evidence that pre-dates the issuance of the asserted patents could not itself amount to qualifying acts that induce infringement. However, in this case Plaintiffs seek damages regarding separate acts that *did* occur after the asserted patents issued and that *are* credibly said to have induced infringement (e.g., CERT's provision of coal to the directly infringing power plants at a loss). And as Plaintiffs explain, the above-referenced evidence that pre-dates the issuance of the patents is still relevant to demonstrate that "CERT and the power plants would have been aware of the benefits of using refined coal with activated carbon, and that those benefits would persist for each ton of infringing coal burned. . . . [Acts prior to the damages period] can still provide evidence of the knowledge of the inducer and direct infringer during the damages period." (D.I. 728 at 7-8); *see also, e.g.*, *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, Civil Action No. 14-878-LPS-CJB, 2016 WL 3946770, at *10-11 (D. Del. July 20, 2016) ("And surely it seems possible that what the party did and said *before* the patent issued might at least *bear on* what its mindset was in the crucial post-issuance time period (so long as that party did, in fact, perform an inducing act in that post-issuance time period)."), *report and recommendation adopted*, 2017 WL 1050574 (D. Del. Mar. 20, 2017).

the boiler at every one of the power plants involved in this case
. . . includes injection of activated carbon"); Tr. (D.I. 784) at
882-84)[19]

In other words, the evidence showed that CERT was not merely (as CERT puts it)

making a "sale of refined coal knowing it will be put [] to an infringing use[.]" (D.I. 719 at 5)

Instead, in order to later obtain significant financial benefits in the form of Section 45 tax credits,

CERT took action that resulted in the power plants *getting paid* to accept CERT's refined coal,

as the coal was traveling through those plants' facilities on a conveyer belt—all with full

---

[19]     Plaintiffs' infringement expert also relied on certain indemnity agreements—i.e.,
agreements in which CERT promised to indemnify power plants from claims of patent
infringement—as evidence of induced infringement. (Tr. (D.I. 783) at 641-42; D.I. 752, PTX-
202.0022)  CERT argues that such agreements generally do not evidence an intent to induce
infringement, and that Plaintiffs' expert failed to link any indemnity agreement (all of which
were signed prior to issuance of the asserted patents) to an intent to cause infringement of the
asserted patents. (D.I. 719 at 8)  CERT cites in support to *MEMC Elec. Materials, Inc. v.
Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005). (*Id.*)  But in that case, the
court found that the indemnity provision at issue failed to establish the defendant's intent to
induce infringement on the part of its customer where "the sale of the wafers from [the defendant
to its customer] occurred *in Japan*" and it was therefore "more reasonable to conclude that the
indemnity clause relates to claims of patent infringement under Japanese law."  420 F.3d at
1378-79.

    Here, the Court concludes that the jury had sufficient evidence to support the conclusion
that CERT took affirmative acts to encourage infringement, even without taking into account the
evidence regarding these indemnity agreements.  That said, it could have been reasonable for the
jury to consider and factor in the existence of these agreements when assessing this element.
The agreements were executed before the asserted patents issued, but they remained in place
after those patents were in effect.  And so it could have been reasonable for the jury to consider
them as some evidence supporting the conclusion that induced infringement occurred here. *See
Moskowitz Fam. LLC v. Globus Med., Inc.*, CIVIL ACTION No. 20-3271, 2022 WL 17876699,
*17-18 (E.D. Pa. Dec. 22, 2022).  That is, the "jury could reasonably infer that, because the
power plants were already being paid to burn refined coal, these indemnity provisions were
meant to 'overcome the deterrent effect that the patent laws have on would-be infringers.'"  (D.I.
728 at 8 (quoting *MEMC Elec. Materials, Inc.*, 420 F.3d at 1378)); *see also, e.g.*, *Power
Integrations, Inc.*, 843 F.3d at 1333-34 (explaining that the plaintiff introduced significant
evidence that would allow a jury to find that the defendant took affirmative acts to induce third
parties to import its products into the United States, including that defendant's "standard terms
and conditions indemnified customers against claims for infringement of United States patents").

knowledge that this coal would certainly be injected with activated carbon thereafter (and that the power plants would subsequently use a baghouse or ESP to capture mercury). (Tr. (D.I. 783) at 715, 864, 866)[20] These acts—providing refined coal to the power plants while being physically located at those very plants, and paying the power plants to take that coal—amount to substantial evidence supporting the jury's finding that CERT took *affirmative action* with the intent to cause the power plants to directly infringe the asserted claims. *Cf. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 940 n.13 (2005) ("Inducement liability goes beyond that, and the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe. In such a case, the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use.").

In support of its position that, as a matter of law, the sale of a material with knowledge that it will be put to an infringing use cannot stand as an affirmative act to encourage infringement, CERT relies on two Federal Circuit cases: *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014) and *HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680 (Fed. Cir. 2019). (D.I. 719 at 2-4; D.I. 736 at 2-3) The Court does not agree that these cases dictate JMOL in CERT's favor.

---

[20]    CERT argues that its sale of refined coal to power plants at a loss does not constitute substantial evidence of an affirmative act of encouragement to infringe because there is no evidence that this was "tied to ACI in any way"—i.e., in that power plants in general can combust refined coal with and without ACI. (D.I. 719 at 7) But as explained above, here CERT's provision of refined coal to the directly infringing power plants is tied to ACI use because the directly infringing plants at issue *had to* combust the refined coal with the use of ACI in order to remain operational. (*See* D.I. 728 at 7 (citations omitted))

As to *HZNP*, the Court has previously explained why, in its view, "the facts of [that case] are just apples to oranges with regard to the facts here[:]"

> Of course, the statement of the law in *HZNP* is correct; an induced infringer cannot be found liable simply because it knows that the direct infringer will infringe; the inducer needs to do something to encourage that infringement. But in *HZNP*, the patented method required three distinct steps involving the use of an inventive drug formulation, and the accused infringer's label for the drug, which was alleged to induce infringement, only required the first step of the method and did not require the second or third step at all. 940 F.3d at 702. Here the factual scenario at play is just different, as it is alleged that the infringing methods require use of refined coal in conjunction with the use of activated carbon, and the alleged induced infringer's act of providing the refined coal (coal that allegedly has no other significant non-infringing use) will necessarily lead to the power plant's use of activated carbon to combust the coal [as well as to the use of ESPs or baghouses] (and thus direct infringement).

(D.I. 631 at 7 n.3)[21] The *HZNP* Court also noted that defendants' product there had substantial non-infringing uses, as evidenced by the fact that the defendants' label did not require the second or third steps of the method. 940 F.3d at 702.

In *Microsoft*, the patentee ("DataTern") had previously sued, *inter alia*, customers of Microsoft, alleging infringement of two patents (the '402 and '502 patents) based on the customers' use of Microsoft's software. 755 F.3d at 902. Microsoft then filed a declaratory judgment action against DataTern; DataTern moved to dismiss the action for lack of subject matter jurisdiction, and filed counterclaims for infringement. *Id*. The district court denied the motion to dismiss, and DataTern appealed that decision (as well as the district court's grant of

---

[21]     While CERT characterizes *HZNP* as a case in which "a seller with a financial motive provides express instructions on how to infringe[,]" (D.I. 736 at 3), again, there the defendants' labels did not affirmatively require the patient to do anything but the first step of the method.

summary judgment of non-infringement).  *Id.*  On appeal, the Federal Circuit concluded that the district court had jurisdiction over Microsoft's challenge to the '502 patent, but not over its challenge to the '402 patent.  *Id.* at 903.  With respect to induced infringement by Microsoft, the Federal Circuit explained that Microsoft had established declaratory judgment jurisdiction for the '502 patent because DataTern's claim charts in its lawsuit against Microsoft's customers had cited to Microsoft-provided documentation for each limitation of the patent's claims.  *Id.* at 905.  As for the '402 patent, DataTern's claim charts relating to Microsoft's customers had cited exclusively to third-party documentation for several key claim limitations, and therefore nothing in the record suggested that Microsoft encouraged the acts accused of direct infringement.  *Id.* ("[S]imply selling a product capable of being used in an infringing manner is not sufficient to create a substantial controversy regarding inducement.").  And there was no evidence that Microsoft's product at issue was not suitable for substantial non-infringing uses.  *Id.* at 906.

The facts here are not like those in *HZNP*, as CERT does not provide a label requiring customers to perform only one of three necessary steps for infringement (as to a product that can be used by those customers in non-infringing ways).  Nor is this case like *Microsoft*, where the plaintiff accused customers of direct infringement based on its use of a product that had non-infringing uses—and where nothing in the record suggested that Microsoft encouraged the customers' use of the product in an infringing manner.  Here, in contrast, the evidence demonstrates that CERT provided refined coal to power plants and paid power plants to take that coal, which helped foster CERT's ability to earn substantial Section 45 tax credits.  And the evidence shows that CERT knew that there was no other outcome for the refined coal it was providing to these power plants—coal that, it again bears emphasizing, was traveling *on a conveyer belt to the boiler in the plants* at the time that the refined was made and sold—other

20

than to be combusted in a manner that directly infringed the asserted claims. Under these

circumstances, CERT's provision of refined coal to power plants at a loss, with the knowledge

that it was absolutely going to be used to infringe the asserted claims, was akin to a word-based

communication to the power plants—i.e., one encouraging the plants to keep that refined coal on

the conveyer belt and to use it for infringing purposes.[22] Therefore, there was substantial

evidence to support the jury's conclusion that CERT took affirmative actions to encourage power

plants to directly infringe the asserted patents. *Cf. Forest Lab'ys, Inc. v. Ivax Pharms., Inc.*, 501

F.3d 1263, 1272 (Fed. Cir. 2007) ("An inquiry into induced infringement focuses on the party

accused of inducement as the prime mover in the chain of events leading to infringement. Here,

we do not know if Cipla first approached Ivax or vice versa, but the plan to manufacture, import,

market, and sell the EO products described in the ANDA was undoubtedly a cooperative venture,

and Cipla was to manufacture and sell infringing EO products to Ivax for resale in the United

States. Under the standards for inducement which we apply to 35 U.S.C. § 271(b), Cipla has

therefore actively induced the acts of Ivax that will constitute direct infringement upon approval

of the ANDA[.]"); *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*, 467 F. Supp. 391, 428

(S.D.N.Y. 1979) ("[D]efendant sells a product that is obviously designed to function and be used

in a specific manner, knows that it is so designed and intends it to be used in an infringing

manner, and demonstrates that use to its distributors, presumably so that they may, in turn, do the

same for their customers in promoting the sale of the product. The fact that defendant does not

---

[22]     While there is no evidence here that words were spoken between CERT and the
power plants as part of CERT's provision of the refined coal at issue, as the Court has previously
explained (and as CERT has not disputed), the law "does not absolutely require that the active
step element be satisfied by a showing that an alleged inducer utilized *written or spoken words* to
encourage infringement" as there are "surely plenty of non-word-based acts by which an inducer
can encourage (or cause or aid or influence) another's patent infringement." (D.I. 513 at ¶ 5)

actually instruct the ultimate users of the product in its use does not prevent our finding active inducement of infringement, since the intended manner or use of the product is readily apparent.").

JMOL is thus not warranted on this ground of CERT's Motion.

## 2. Specific Intent to Induce Infringement

The Court next addresses CERT's second argument regarding induced infringement. This is CERT's assertion that "there is no evidence of any instruction, requirement, description or other expression from CERT to any power plant from which a specific intent to induce infringement can be inferred or that CERT believed it had or intended to provide such encouragement or instruction." (D.I. 719 at 9 (citing *HZNP*, 940 F.3d at 702)) JMOL is not warranted on this basis either.

"[S]pecific intent may be inferred from circumstantial evidence where a defendant has both knowledge of the patent and specific intent to cause the acts constituting infringement." *Ricoh Co. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1342 (Fed. Cir. 2008). Previously, the Court rejected Defendants' position that Plaintiffs' then-proposed 4AC had failed to sufficiently allege the specific intent element. In doing so, the Court explained that the pleading "allege[s] that were the power plants to which Defendants supply coal to stop infringing (i.e., to stop using activated carbon), this could hinder the plants' economic viability (which in turn would harm Defendants' economic interests). . . . These allegations are sufficient to plausibly allege that Defendants specifically intended that the plants infringe (so that Defendants could continue to benefit from a financial relationship with those plants)." (D.I. 404)

Substantial evidence at trial proved that: (1) CERT Defendants earned millions of dollars in tax credits for refined coal combusted by the power plants; and (2) had power plants shut

22

down their operations when this lawsuit was filed, CERT's investors would have lost approximately $300-350 million in tax credits. (*See, e.g.*, Tr. (D.I. 784) at 938-40) As discussed above, the evidence also showed that CERT provided power plants with the refined coal at a loss, all with the knowledge that the power plants had to use activated carbon in order to remain in operation.

CERT does not dispute this evidence. Instead, CERT retorts that: (1) CERT's financial motives (e.g., its desire to earn tax credits from selling refined coal) cannot establish specific intent, because such a motive exists in every inducement case involving a sale of products; and (2) even if CERT had a financial motive to suggest that the power plants infringe, intent cannot be inferred in a situation like this one, since CERT did not provide the plants with *express instructions* regarding how to infringe. (D.I. 736 at 2-3)

These arguments are not persuasive. As for CERT's first argument, CERT cites to no caselaw in support of the position that financial motives relating to product sales cannot be a factor that helps establish specific intent. And the Court has, in the past, held to the contrary. *Cf. Galderma Lab'ys, L.P. v. Medinter US, LLC,* Civil Action No. 18-1892-CFC-CJB, 2020 WL 871507, at *5 (D. Del. Feb. 14, 2020) (concluding that a complaint sufficiently alleged that the defendant took specific acts to knowingly induce infringement, where the pleading stated facts suggesting, *inter alia*, that the defendant would substantially benefit financially from the direct infringement by another); *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, Civil Action No. 14-878-LPS-CJB, 2016 WL 3946770, at *17 (D. Del. July 20, 2016) (same), *report and recommendation adopted*, 2017 WL 1050574 (D. Del. Mar. 20, 2017). With respect to CERT's second argument, as the Court has previously explained, "the caselaw does not absolutely require that the active step element be satisfied by a showing that an alleged inducer utilized written or

23

spoken words to encourage infringement." (D.I. 513 at ¶ 5 (emphasis omitted); *see also supra* n.22)

Thus, CERT's arguments with regard to specific intent do not entitle it to JMOL.

### 3. Causation of the ACI Step and the Separating or Collecting Step

The induced infringer must "induce[]" another party to perform "every single step" in the patented method. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014). CERT's final argument regarding inducement is that there is no evidence that CERT actually *caused* any power plant to perform the asserted claims' ACI step and separating or collecting step. (D.I. 719 at 9-12; D.I. 736 at 3-5) Instead, CERT argues that the undisputed evidence shows that: (1) power plants used ACI and ESPs or baghouses "*wholly independent*" of the provision of the refined coal at issue here—i.e., they used such equipment before and after their use of refined coal, and they used ACI to comply with MATS; (2) thus, as a matter of law, CERT's action of providing refined coal to power plants is not the cause of the ACI and separating or collecting steps. (D.I. 719 at 9-11 (emphasis added); D.I. 736 at 3-5)

Again, the Court has previously addressed this issue of causation in this case, explaining that:

> [E]ven assuming "that at the time [it] first started receiving refined coal from a Defendant, each power plant at issue had made an independent decision that it was in [its] interest to use activated carbon when combusting the coal (in order to satisfy certain mercury emissions regulations, or for other reasons)[,] Defendants cite to no authority for the proposition that an entity that has decided that it may wish to take an action relevant to patent infringement cannot nevertheless be further encouraged (or influenced, or moved) to do so by another party. Even if one is predisposed to do something, one might still be further spurred on to do so by the act of another."

(D.I. 672 (quoting D.I. 631 at 5))  To that, CERT argues that there is no evidence that it caused any power plant to use ACI or an ESP or baghouse; CERT asserts that these plants would have used ACI and ESPs or baghouses even if they had not used CERT's refined coal.  (D.I. 719 at 11)  CERT also points out that patent infringement is a tort and, relying on *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), it states that it is "textbook tort law that an action is not regarded as a cause of an event if the particular event would have occurred without it."  (D.I. 719 at 10 (quoting *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 347); *see also id.* at 11 n.7)

For their part, Plaintiffs reiterate that the evidence shows (as discussed above) that:  (1) each CERT RC Defendant sold "a specific refined coal to a single power plant and that power plant had no non-infringing use for that refined coal[;]" (2) each power plant had to burn the refined coal that came in on its conveyor belt in order to have the fuel required to stay operational; and (3) in burning the coal, each power plant needed to perform the ACI and separating or collecting steps, or it would not comply with MATS and thus not be able to stay in operation (which would mean that CERT would not be able to collect tax credits).  (D.I. 728 at 11)  In other words, Plaintiffs argue that by providing refined coal to the power plants, and by paying power plants to burn that coal, CERT *caused* the plants to perform the ACI and separating or collecting steps.  (*Id.*)

The Court agrees with Plaintiffs that such facts can demonstrate the requisite causation. And it agrees that, as set out above, there was substantial evidence in the record to allow the jury to find that such facts had been established.

The Court is not persuaded otherwise by CERT's reliance on *Nassar*—i.e., by CERT's argument that it could not be a legal cause because the power plants would have carried out the ACI and separating or collecting steps even if CERT did not supply them refined coal.  (D.I. 719

25

at 10; D.I. 736 at 4)  In "*Nassar*, the Supreme Court [of the United States] held that but-for causation is the correct standard for retaliation claims under Title VII of the Civil Rights Act." *Ormsby v. Sunbelt Rentals, Inc.*, 205 F. Supp. 3d 1204, 1212 (D. Or. 2016).  But this is not a case involving a retaliation claim brought pursuant to Title VII.  And there are other less demanding causation standards that can apply in the law, including tort law—one of which is proximate causation.  *Id.* (explaining that employment discrimination law uses two standards of causation, the more stringent "but-for" standard described in *Nassar* and the less demanding "'motivating factor' standard [that] forbids 'adverse employment decisions motivated, *even in part*, by animus based on a plaintiff's disability or request for an accommodation'") (citation omitted); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004) ("Proximate cause is causation substantial enough and close enough to the harm to be recognized by law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm.").  The Supreme Court has held that proximate cause, for example, "requires only *some direct relation* between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect" and that "[i]t is common for injuries to have multiple proximate causes."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 419-20 (2011) (internal quotation marks, brackets and citation omitted, emphasis added).

Here, for the reasons explained above, the jury could reasonably have found that CERT's provision of refined coal to power plants and its payment to the power plants to keep that coal moving along on the conveyor belt to the combustion chamber—where the coal had no other use except for direct infringement—was *a cause* of the direct infringement.[23]  *See, e.g., Pantech*

---

[23]     While CERT argues that "[t]his level of causation-in-fact . . . occurs in every case where the alleged inducer sells a component, device, or material used by the direct infringer to

*Corp. v. OnePlus Tech. (Shenzhen) Co.*, CASE NO. 5:22-CV-00069-RWS, 2024 WL 5510402, at *10 (E.D. Tex. Aug. 20, 2024) (concluding that the plaintiff had presented substantial evidence that a reasonable jury could rely upon to find that the defendant's involvement in the supply chain, by which it aided the sale of the infringing devices in the United States, amounted to the defendant actively directing and encouraging infringement by the direct infringers). CERT has cited to no case in the patent context suggesting that: (1) this type of evidence does not meet the relevant causation threshold; or (2) that some higher causation standard—e.g., "but-for" causation—is required here.

For these reasons, JMOL with respect to induced infringement is not warranted.

### B.     Contributory infringement

Next, CERT asserts that it is entitled to JMOL of no contributory infringement. To prove contributory infringement, a patentee must demonstrate that an alleged contributory infringer has sold, offered to sell or imported into the United States a material or apparatus for use in practicing a patented process "knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use[.]" 35 U.S.C. § 271(c); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009). CERT argues that the record lacks substantial evidence demonstrating that: (1) refined coal was especially made or adapted for use

---

infringe, without which the infringement could not occur[,]" (D.I. 736 at 4-5), the Court has already explained why this case is different from every such case (including that here, the inducers took steps resulting in *payments* being made to direct infringers so that they would accept the material used to infringe—material that had no other non-infringing uses). In other words, here, CERT's actions were a *particularly important*, and *particularly direct* cause of the alleged infringement—far more than in a typical circumstance where an alleged inducer simply sells a component to direct infringers, and that component later happens to be used to infringe.

in an infringement; (2) that CERT knew this to be true; and (3) refined coal lacks substantial

non-infringing uses. (D.I. 719 at 12-17; D.I. 736 at 5-7) The Court considers each element in

turn below.

### 1. Especially Made or Especially Adapted for Use

The Court turns first to CERT's argument about the "especially made or especially

adapted for use" element. Here, CERT contends that the evidence shows that: (1) refined coal

was made and adapted only to qualify for Section 45 tax credits (and that use of activated carbon

is not necessarily required in order to obtain such tax credits); (2) accordingly, the amount of

MerSorb and S-Sorb required to be added to the refined coal[24] was determined by testing

performed by the Energy & Environmental Research Center ("EERC"), which was done without

activated carbon; and (3) the formulation of refined coal sold by CERT was established before

the asserted patents issued. (D.I. 719 at 13-14; *see also, e.g.*, Tr. (D.I. 783) at 685-86 (Plaintiffs'

infringement expert testifying that "getting the Section 45 tax credits does not require the use of

activated carbon"); Tr. (D.I. 784) at 1038-39, 1047-48 (CERT's representative testifying that the

EERC determined the minimum rates of MerSorb and S-Sorb required to be added to the coal for

it to qualify for Section 45 tax credits, and that these rates remained the same after the asserted

patents issued)) Thus, according to CERT, "there is no evidence that any of the refined coal was

made or adapted by CERT with the asserted patents in mind"—instead, the evidence proves that

refined coal was able to be used both with and without ACI. (D.I. 719 at 14)

---

[24] The refined coal at issue in this case was made by applying MerSorb and S-Sorb to coal. (D.I. 659, ex. 1 at ¶ 38) MerSorb is a 52% solution of calcium bromide and S-Sorb is cement kiln dust. (D.I. 779 at 136) These chemicals were supplied by ChemMod (the "ChemMod technology"). (*Id.* at 67; Tr. (D.I. 783) at 742; Tr. (D.I. 784) at 890)

CERT's argument is a rehash of the argument it made at the summary judgment stage of the case. (*See* D.I. 611 at 12-13) At that time, the Court noted that with Plaintiffs pointing to evidence that "the accused refined coal, as delivered, has no other use than to be combusted at a specific power plant where ACI will be used[,]" there was a genuine issue of material fact as to whether the accused products were especially made or adapted for use in the infringement of the asserted patents. (*Id.*)

At trial, as explained above, the evidence demonstrated that the refined coal at issue was made at each directly infringing power plant by the CERT Operations Companies Defendants as the coal passed through the CERT RC Defendants' refined coal facilities on a conveyor belt. (*See supra* at 14-15) While the EERC sets the minimum rate of MerSorb and S-Sorb to be applied to coal, CERT adds "3 to 5 percent" to that number to ensure that the coal qualifies for Section 45 tax credits. (Tr. (D.I. 784) at 1038-39) After CERT made the refined coal, the only place for the coal to go was the combustion chamber at that power plant, where it would be burned and injected with activated carbon. (Tr. (D.I. 783) at 627, 866; *see also* Tr. (D.I. 784) at 882-84) And CERT expected that the refined coal that it made at a particular power plant would be burned at that same power plant. (Tr. (D.I. 783) at 863-64; Tr. (D.I. 784) at 880-82) This evidence is sufficient to permit a reasonable jury to conclude that the refined coal at issue here was especially made or adapted for use to be burned at directly infringing power plants. (*See* D.I. 728 at 13-14)

CERT attempts to avoid these facts by pointing out that refined coal with the same formulation was used (at other power plants, by other entities, or in other timeframes) with and without activated carbon, and that refined coal was not uniquely suited for use with activated carbon. If that is so, CERT asks, then how is it that refined coal can be said to be especially

made or especially adapted for use in infringing the asserted patents? (D.I. 719 at 12-14; D.I. 736 at 5-6) But for reasons the Court will further address below in greater detail, (*see infra* at 33-40), the contributory infringement inquiry does not look at refined coal in a vacuum. Rather, the statute "deals with the material actually sold by the accused and the uses made of it by its purchasers[;]" it requires "examination of the patented method only in determining whether *the material the accused actually sells constitutes a material part of the invention and is known by the accused to be especially made or adapted for use* in infringing the patent." *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987) (emphasis added); *see also ESCO Grp. LLC v. Deere & Co.*, Civil Action No. 20-1679-WCB, 2023 WL 4199413, at *9 (D. Del. June 22, 2023) ("[T]he . . . 'component' referred to in section 271(c) is the component that is sold by the accused infringer.").

And so here, we have to consider the refined coal that CERT made at the directly infringing power plants and then paid those plants to accept—that is, we must assess accused refined coal that was *sold and delivered* to those power plants.[25] *See* (D.I. 611 at 6-7 (citing cases)) As just explained, there is substantial evidence that this accused refined coal was especially made or adapted for use in an infringement. Indeed, pursuant to the facts presented at trial, once CERT's refined coal was made, there is no other use that it could possibly have been put to. *See Google Inc. v. Beneficial Innovations, Inc.*, Civil Action No. 2:11-cv-00229-JRG-RSP, 2014 WL 4215402, at *6 (E.D. Tex. Aug. 22, 2014) (rejecting the defendant's argument

---

[25] To the extent that CERT argues that the coal at issue could not have been especially made or especially adapted for infringement because the EERC established the formulation of chemicals applied to the coal before the asserted patents issued, "the contributory infringement statute 'does not require that the [component or material at issue] have been originally designed with the goal of infringing a patent.'" (D.I. 611 at 8 n.6 (quoting *Cipla Ltd. v. Sunovion Pharms. Inc.*, 174 F. Supp. 3d 869, 873 (D. Del. 2016)))

that to satisfy the "especially made" requirement of contributory infringement, the plaintiff must prove that the accused product was especially made to infringe each and every limitation of the asserted patents); *see also Cipla Ltd. v. Sunovion Pharms. Inc.*, 174 F. Supp. 3d 869, 873 (D. Del. 2016) (explaining that the requirement that a product is "especially made or especially adapted for use in a way that infringes" means that "the product in question must infringe the patent at issue if the product is used as intended").

### 2.     CERT's Knowledge

CERT next argues that the record lacks substantial evidence that CERT *knew* that refined coal was especially made or adapted for an infringing use and did not have substantial non-infringing uses.  (D.I. 719 at 14)  According to CERT, the record shows that it had a reasonable belief during the damages period (i.e., July 2019 through the end of the refined coal program in 2021) that:  (1) its refined coal was not especially made or especially adapted for use to infringe the asserted patents; and (2) the coal had substantial non-infringing uses.  (*Id.* (citing *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 642 (2015)).  And indeed, CERT's representative did offer testimony during trial meant to support CERT's position in this regard.  (*See, e.g.*, Tr. (D.I. 784) at 1043-58 (CERT's representative testifying that the EERC's recommended rate of MerSorb and S-Sorb to be applied to the coal remained the same before and after the asserted patents issued); *id.* at 979, 981-84, 1077-90 (CERT's representative testifying that he believed that refined coal had substantial non-infringing uses, since two CERT Operations Companies originally sued in this case (CERT Operations, LLC and CERT Operations III) made refined coal at power plants that did not use activated carbon,[26] and because CERT sold a substantial amount

---

[26]     CERT Operations, LLC and CERT Operations III were dropped as Defendants in May 2022.  (D.I. 406 at 1; Tr. (D.I. 781) at 202)

of refined coal to plants that did not use activated carbon before the asserted patents issued); *id.* at 1090-92 (CERT's representative testifying that he did not understand CERT's refined coal to be especially made or especially adapted for use in infringing the asserted patents because CERT does not use activated carbon in the formulation of its refined coal))

But in the Court's view, the jury could reasonably have questioned the veracity of CERT's mistake of law defense. That is, the jury could have instead determined that CERT *did* know that the refined coal it sold to the directly infringing power plants was especially made or adapted for an infringing use and had no substantial non-infringing uses. (*See* D.I. 728 at 14-15)[27] CERT's representative testified that he "would understand that when we're considering what coal matters for whether it has a substantial non-infringing use, we're looking at the coal of the accused power plants in this damages period of this case[.]" (Tr. (D.I. 784) at 1105) He also testified that he has known since this lawsuit was filed that "the exhaust path after the boiler at every one of the power plants involved in this case . . . includes injection of activated carbon[.]" (Tr. (D.I. 783) at 866) And CERT did not offer any "evidence of specific legal opinions offered, the reasonableness of those opinions, or the reliance of CERT decision-makers on any such legal opinions." (D.I. 728 at 15); *cf. Papst Licensing GmbH & Co., KG v. Samsung Elecs. Co., Ltd*, 403 F. Supp. 3d 571, 590-92 (E.D. Tex. 2019) (concluding that "[t]here is sufficient evidence in the record that a reasonable jury could discount Samsung's assertions of a good-faith belief of noninfringement and conclude that Samsung had knowledge of infringement[,]" where the defendant's representative purportedly "failed to explain what analysis was done by Samsung, when Samsung adopted that analysis and who was involved in the process of reaching the

---

[27]     It is not disputed that during the damages period, the CERT RC Defendants sold coal only to power plants with ACI systems. (*See* D.I. 611 at 6-7)

noninfringing position, at the time of infringement"); *Google Inc.*, 2014 WL 4215402, at *11 & n.3 (explaining that while a good faith belief of non-infringement is relevant evidence to negate an accused inducer's intent to induce infringement, "nothing in the record suggest[ed] that Google's belief was formed in good faith" where, for example, "there is no evidence showing that Google ever obtained an opinion of counsel finding non-infringement").

Additionally, during CERT's opening statement, CERT's counsel informed the jury that "[w]hen this lawsuit was filed, we really didn't know which power plants in particular were using activated carbon and which weren't." (Tr. (D.I. 781) at 197) But later, during the trial testimony of CERT's representative, it was conclusively established that CERT *did* know that the directly infringing power plants at issue in this case were using activated carbon before this lawsuit was filed. (Tr. (D.I. 784) at 882-884, 1104) In the Court's view, when the jury realized that CERT had not told the truth about that issue from the beginning, that could have reasonably caused the jury to question the veracity of CERT's arguments about other elements of the claims—including CERT's claim that it had been mistaken in thinking that it did not contributorily infringe. (*See* D.I. 728 at 19-20)

### 3. No Substantial Non-Infringing Use

CERT's final argument with respect to contributory infringement relates to the requirement that the refined coal must not be suitable for substantial non-infringing use. As was explained above in Section III.B.1, the Court had previously concluded that, with respect to this and other elements, "the proper inquiry is whether the *accused* refined coal *as sold and delivered* [by CERT to its power plant customers] lacks substantial non-infringing use." (D.I. 611 at 7 (citations omitted); *see also* Tr. (D.I. 785) at 1295; D.I. 279 at 27; D.I. 319 at 7-8) CERT argues that the Court was wrong to do so. It says that the Court's conclusion in this regard is "too

narrow"—and argues that the proper standard considers whether refined coal made with calcium bromide, *in general*, has substantial non-infringing uses. (D.I. 719 at 14-16; *see also* D.I. 736 at 6-7) CERT states that when analyzed pursuant to that (purportedly proper) standard, the unrebutted evidence goes in its favor. That is, that the trial evidence showed that refined coal made with calcium bromide, *as a general matter*, has substantial non-infringing uses: e.g., refined coal sold by non-Defendants to power plants that did not also use activated carbon, or refined coal sold by CERT to power plants prior to the issuance of the asserted patents (used with and without activated carbon). (D.I. 719 at 16; *see also* Tr. (D.I. 784) at 960-72 (CERT's representative testifying that when CERT began supplying refined coal to the directly infringing power plants in the 2011 to 2014 timeframe, certain of them were not using activated carbon); Tr. (D.I. 784) at 952-54, 978-79, 987-89, 1080-81 (CERT's representative testifying that the original Complaint named CERT Operations LLC and CERT Operations III LLC as Defendants and that these entities: (1) operated refined coal facilities at power plants, such as Chesterfield Power Station or Mount Storm Intermountain, that never used activated carbon; and (2) supplied a substantial amount of refined coal to these plants); *id.* at 1044-58 (CERT's representative testifying that the EERC's recommended rate of MerSorb and S-Sorb did not change after the asserted patents issued))[28]

The Court stands by its prior conclusion. (D.I. 611 at 6-8 (citing case law in support)) It explains why below.

To start, the Court notes that CERT prominently relies here on the Federal Circuit's decision in *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323 (Fed.

---

[28] CERT's Motion does not challenge the jury's finding with respect to no substantial non-infringing use under the "as sold and delivered" standard. (*See* D.I. 728 at 15)

34

Cir. 2012).  CERT claims that this case "rejected the Court's narrow focus[.]"  (D.I. 719 at 15)

In support of this argument, CERT notes that:  (1) in *Bill of Lading*, the plaintiff argued that it

had adequately pleaded the element in question because the complaints stated that "as

customized by the relevant Appellee for their trucking customers, the process for scanning and

wirelessly transmitting bills-of-lading from the truck cab to the back office for the preparation of

loading manifests has no other substantial non-infringing use[;]" but (2) the Federal Circuit held

that these "allegations are tailored too narrowly; they say nothing more than if you use this

device to perform the patented method, the device will infringe and has no noninfringing uses";

and so (3) instead the proper inquiry focuses on "whether the accused products can be used for

purposes *other than* infringement."  *In re Bill of Lading*, 681 F.3d at 1337-38 (internal quotation

marks and citation omitted) (*cited in* D.I. 719 at 15).

Nothing in *Bill of Lading* indicates that the Court's decision here was incorrect.  In *Bill of*

*Lading*, the various accused scanner products were sold by the accused infringers for use in the

trucking industry.  681 F.3d at 1330.  Certain materials regarding the accused products that were

attached to the complaint contained descriptions of non-infringing uses—e.g., speeding billing

and driver settlement, or scanning proof of delivery documents—to which the accused products

could be put.  *Id.* at 1338-39.  The *Bill of Lading* Court emphasized that the accused products "do

not need to be used to practice the patented method, and [the plaintiff's] own allegations make

clear that they can be used for multiple other purposes."  *Id.  Bill of Lading* thus unsurprisingly

and rightly indicates that the "substantial non-infringing use" inquiry focuses on the accused

products—that is, the things that are made and sold by the accused infringer.  (*See* D.I. 611 at 7-8

(citing cases)); *see also, e.g.*, *AquaTex Indus., Inc. v. Techniche Sols.*, 419 F.3d 1374, 1379 n.**

(Fed. Cir. 2005) ("The proper question is . . . whether the accused Techniche products are

'suitable for substantial noninfringing use[s].'"); *ESCO Grp. LLC*, 2023 WL 4199413, at *8-9 (rejecting the defendant's summary judgment argument that the locks recited in the asserted claims had substantial non-infringing uses because they could be used in non-infringing assemblies, in light of the fact that "the 'component' referred to in section 271(c) is the component that is sold by the accused infringer" and so "the key point is whether the locks sold by Deere have substantial non-infringing uses") (emphasis added); *Hoffmann-La Roche Inc. v. Promega Corp.*, No. C-93-1748-VRW, 1994 WL 761241, at *10 (N.D. Cal. June 13, 1994) (explaining that the substantial non-infringing use analysis is directed to the "thing sold" in the case) (internal quotation marks and citation omitted).

Contrary to CERT's argument, here the Court's conclusion is in line with the focus of the "substantial non-infringing use" inquiry. That inquiry is supposed to assess what the accused infringer "know[s]" as to whether the material it "actually sold" realistically has a "substantial noninfringing use[.]" 35 U.S.C. § 271(c); *Hodosh*, 833 F.2d at 1578. In other words, if the accused infringer could well have thought—in light of the particular factual circumstances of the case—that the accused product it sold might be substantially used in a non-infringing way (as opposed to an infringing way), then perhaps it can avoid Section 271(c) liability. Yet in this case, during the damages period at issue, CERT only made and sold refined coal at power plants that had ACI systems. (*See* D.I. 611 at 6-7; *see supra* n.27) It is not as if during this time, the CERT Defendants had one large factory from which they made and sold refined coal, and then they shipped that coal out to third party customers all over the country—whereafter, some customers used the coal in an infringing way (e.g., along with the use of ACI) and some didn't. So here, it matters what the accused products *actually are* and how they were *actually (made and) sold* by the *actual Defendants in this case*. As explained above, these CERT Defendants

worked on site at each particular power plant, where they bought the coal at issue, made it into refined coal by treating it, and/or sold it back to the power plants at a loss, all while the coal was "on a conveyor belt where it was destined to be burned and treated in an infringing manner." (D.I. 728 at 15; *see also* D.I. 727 at 5 ("It is simply not the case that the facts of this case establish definitively that there are many possible uses of the accused refined coal.")) Whether *other* refined coal—e.g., coal that was bought/sold/treated by other non-Defendant CERT entities or by entities in years prior to or after the damages period—had a substantial non-infringing use is simply beside the point. What is relevant is whether the *accused coal* had substantial non-infringing uses. And here, the actual accused coal *absolutely had to be used* to practice the patented method—again, there was no other realistic outcome for it.

That this is the right way to approach the "substantial non-infringing use" inquiry in this case is confirmed by the Federal Circuit's decision in *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018). In *Nalco*, the plaintiff ("Nalco") was the exclusive licensee of a patent that described a method for the removal of elemental mercury from the flue gas created by combustion in coal-fired power plants. 883 F.3d at 1342. The defendants were alleged to infringe the patent through the use and licensing of a "Chem-Mod solution[;]" that solution involved dual injection of MerSorb and S-Sorb on the coal feed belts of coal burning power generation stations, before the coal was fed into a combustion process. *Id*. at 1343-44.[29] At the pleading stage, the defendants asserted, *inter alia*, that Nalco's contributory infringement allegations were implausible, because Nalco had failed to allege that MerSorb and S-Sorb have

---

[29]        Certain of the defendants in *Nalco* were once Defendants in this case, *see* 883 F.3d at 1342; (D.I. 1 at 1), and the MerSorb and S-Sorb components at issue in *Nalco* were used by Defendants to create the refined coal at issue in this case, (*see supra* n.24).

no substantial non-infringing use.  *Id.* at 1357.  But the Federal Circuit disagreed.  In doing so, the Federal Circuit—citing to *Bill of Lading*—emphasized that "[f]or purposes of contributory infringement, the inquiry focuses on whether the accused products can be used for purposes *other than* infringement."  *Id.* (citing *Bill of Lading*, 681 F.3d at 1338).  And it then noted that Nalco had pled that:

> *As sold and delivered* to the Refined Coal LLCs or operators of coalfired power plants using the Chem-Mod[ ] Solution, the proprietary additives MerSorb and S-Sorb, which are specifically formulated to be used with the Chem-Mod[ ] Solution in coal-fired power plants, have no substantial noninfringing uses.  *When a coal-fired power plant or a Refined Coal LLC receives MerSorb and S-Sorb it purchased, [the buyer] has no other use for MerSorb and S-Sorb except to use those additives in the Chem-Mod[] Solution*[.]

*Id.* (emphasis added).  The Federal Circuit found that these allegations, along with a related allegation that the Chem-Mod Solution Mixture had no substantial non-infringing uses, were sufficient to state a claim for contributory infringement.  *Id.*  In other words, in a case involving incredibly close factual circumstances to this one, the Federal Circuit assessed the "substantial non-infringing use" question by focusing on:  (1) the relevant additives "*as sold and delivered*" to the power plants in question; and (2) what the defendants would have known about the potential non-infringing uses of those additives *at the time when the plants in question received the additives that they purchased*.  *Id.*  In assessing this issue in the instant case, the Court has consistently drawn from the Federal Circuit's guidance in *Nalco*.  And in doing so, it has focused on the actual accused products at issue—i.e., the accused coal "as sold and delivered" by CERT to the directly infringing power plants.[30]

---

[30]    In its reply brief, CERT for the first time (such that Plaintiffs did not get to respond to it) posited a hypothetical, in order to demonstrate the "error" in limiting the non-

As a result, and for the reasons set out above, the Court concludes that there is substantial

evidence that CERT's refined coal—as sold and delivered to the power plants at issue in this

---

infringing use inquiry to uses of the specific refined coal as made and sold by CERT to the specific accused power plants during the damages period. (D.I. 736 at 6-7) CERT's hypothetical involves a patented method for hardening plain brick mortar to make it more durable, in which a hardening agent is sprayed onto the exposed surface of wet mortar after it is laid; in some counties, local construction codes require this treatment. (*Id.* at 6) On jobsites utilizing the patented method, masonry contractors "sold and delivered" the mortar, and they would mix dry mortar with water and lay the mortar before it set; a painting contractor would then spray the hardening agent onto the surface of the mortar. (*Id.*) Once the mortar was mixed on a jobsite, it must be laid within an hour or it would set, so there was no other use for it. The patentee accused contractors at jobsites using the patented method of infringement, and accuses the masonry contractors of contributory infringement. In counties that do not require this treatment, the identical mortar is mixed and laid without the hardening agent—and thus does not infringe the patented method. (*Id.* at 6-7) CERT laments that under the Court's view of the substantial non-infringing use inquiry, however, only the mortar "as sold and delivered" to the *accused* jobsites can be considered, and there is no non-infringing uses for this mortar—even though it is a "ubiquitous staple article[,]" with "plain mortar [being] sold at every Home Depot in the country[.]" (*Id.* at 7)

The Court does not see why CERT's hypothetical demonstrates that "error" has occurred here. As an initial matter, the Court does not see what is the relevance to this hypothetical (and to the Court's decision) of the fact that "plain mortar [is] sold at every Home Depot in the country." If Home Depot was being accused of contributory infringement in this scenario, then such an accusation would seem not very likely to succeed—since Home Depot presumably sells plain mortar to innumerable customers (with large numbers of those customers presumably utilizing it in non-infringing ways) and presumably has very little idea of what use any particular customer is going to put the mortar to. The masonry contractors who are selling the mortar on the jobsites are the relevant comparators to the CERT entities here. As to them, it is not clear from CERT's hypothetical whether they only sold mortar to jobsites in counties with local construction codes requiring the patented treatment (i.e., directly infringing jobsites). Nor is it clear whether those contractors knew that the mixed mortar would always then have the hardening agent applied by painting contractors on the jobsites in question. If these masonry contractors only made sales to jobsites where the hardening agent was applied—and if it was clear that these contractors knew to a certainty that the hardening agent would be applied to the wet mortar at these sites after they sold the mortar and mixed it—then they might well be at risk of liability for contributory infringement. In the end, the Section 271(c) inquiry is about what the accused infringer knew when making a sale of the accused products at issue. 35 U.S.C. § 271(c). So a lot turns on what the accused products are, where and how the accused sales of those products are made, and what the accused infringer's mindset is at the time of those sales. And of course, here the Court is not dealing in hypotheticals—it is dealing with the actual evidence in this case, as set out at trial.

case—had no substantial non-infringing uses. *See Oak Indus., Inc. v. Zenith Elecs. Corp.*, 697 F. Supp. 988, 995 (N.D. Ill. 1988) (noting that "the fact variations which may invoke § 271(c) are [infinite] and that standards derived from a specific fact situation are necessarily suspect in other circumstances[,]" such that courts must therefore "ultimately, apply statutory language to a specific fact situation in light of the congressional purpose" which "accord[s] the patented owner a reasonable area of protection, and accord[s] others a reasonable latitude in pursuing the fruits of technological change").

### C.   Willful infringement

"Willful infringement is a question of fact reviewed for substantial evidence following a jury trial." *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1353 (Fed. Cir. 2018).  A determination of willful infringement requires a finding of "deliberate or intentional" infringement, and thus the plaintiff must show that "the accused infringer knew of the patent-in-suit, and knowingly or intentionally infringed the patent after acquiring that knowledge." *Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 440 (D. Del. 2023) (citations omitted); *see also Bayer HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021) ("Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness.  Rather, willfulness requires deliberate or intentional infringement.").

CERT argues that the record does not support a finding of willful infringement because: (1) CERT was represented by counsel during the entire willfulness period, which begins here on June 29, 2020;[31] (2) during this time, CERT successfully moved to dismiss various amended

---

[31]     The Court had previously dismissed Plaintiffs' claims of willful infringement pre-dating June 29, 2020 (i.e., the date when CERT received notice of the contents of Plaintiffs' FAC).  (D.I. 279 at 41; D.I. 319 at 11)

complaints, with the Court staying the case for nearly a year as to CERT until the Court

determined that Plaintiffs stated a viable claim for relief against it; (3) CERT served invalidity

and non-infringement contentions, which suggests that it had a good faith belief that its behavior

was not infringing; (4) Plaintiffs' prior complaints falsely alleged that CERT used activated

carbon during the testing of refined coal, and "CERT could not have deliberately infringed based

on conduct that CERT indisputably did not perform"; and (5) it was only in the 4AC filed in May

2022—after the conclusion of the refined coal program—that Plaintiffs adopted the infringement

theory that was tried. (D.I. 719 at 18-19; *see also* D.I. 736 at 8-10)[32]

There is sufficient evidence on the record to support the jury's verdict of willful

infringement. With respect to the fact that CERT was represented by counsel during the period

of willfulness and that it served invalidity and non-infringement contentions in the case,

"[w]hether [CERT's] conduct constituted willful infringement is an issue of fact for the jury, as

is whether [CERT] subjectively held a good-faith belief in its non-infringement and invalidity

defenses such that its conduct would not be deemed willful." *Hillman Grp., Inc. v. KeyMe, LLC*,

CIVIL ACTION NOS. 2:19-CV-00209-JRG, 2:20-cv-00070-JRG, 2021 WL 1248180, at *2

(E.D. Tex. Mar. 30, 2021). As noted above, CERT did not offer any "evidence of specific legal

opinions offered, the reasonableness of those opinions, or the reliance of CERT decision-makers

on any such legal opinions." (D.I. 728 at 15) Moreover, with regard to CERT's invalidity and

---

[32] CERT also reiterates that as for contributory infringement, it had a good faith belief that it was making and selling refined coal that was not especially made or adapted for an infringing use and that had substantial non-infringing uses. (D.I. 719 at 19) With regard to induced infringement, CERT emphasizes that Plaintiffs identified no evidence that CERT instructed or encouraged power plants to use activated carbon. (*Id.* at 20) But the Court has already assessed (and rejected) these arguments in its above discussion of induced and contributory infringement. So it will not consider these arguments further here.

non-infringement contentions, CERT provides no evidence that the jury was ever even told of their existence. (*Id*. at 19) The jury was entitled to find that CERT did not hold a good faith belief in its defenses. Indeed, the Court notes that although CERT began the jury trial by informing the jury that it would prove that the patents were invalid, it did not end up pursuing its invalidity defense at trial. (Tr. (D.I. 781) at 218-21 (CERT's counsel asserting during its opening statement that it would show why the patents were invalid during the trial); Tr. (D.I. 785) at 1246 (CERT's counsel acknowledging during its closing statement that it ended up not pursuing its invalidity defense during the trial))

As for CERT's reliance on the fact that various amended complaints were dismissed, it is also true that:

> (1) When CERT received the original Complaint in July 2019, it learned of the '114 patent, and it learned that Plaintiffs were alleging, for example, that CERT operated refined coal facilities "that receive coal, add bromine and/or bromide such as $CaBr_2$ to the coal, and then provide that 'refined' coal to a coal-fired power plant that injects a sorbent material comprising activated carbon downstream of the combustion chamber" (and that CERT's conduct in this regard was intended to induce and/or contribute to the infringement of the power plants), (D.I. 1 at ¶¶ 152, 158; Tr. (D.I. 784) at 1104-05); and

> (2) CERT knew that the directly infringing power plants at issue in this case were using activated carbon before this lawsuit was filed, (Tr. (D.I. 783) at 866; Tr. (D.I. 784) at 882-84, 1104).

The jury could therefore have reasonably found that as of the timeframe at issue, "CERT did nothing to stop infringing even though it had all the evidence it needed to determine that the power plants were infringing[,]" (D.I. 728 at 18), and that the hundreds of millions of dollars that CERT earned in tax credits was motivation to continue infringing, (Tr. (D.I. 784) at 938-40 (CERT's representative being asked if "300 to $350 million in tax credits is a powerful motive to

keep selling refined coal after receiving the complaint" and responding that "[t]hat's a significant amount of money, yes")). *See, e.g.*, *Pantech Corp.*, 2024 WL 5510402, at *11 ("[A] reasonable jury could have found post-suit[] willfulness for the '954 patent given OnePlus's continued use of the standard essential technology even after it learned it was being accused of infringement.").[33]

Finally, CERT mischaracterizes the allegations in Plaintiffs' prior complaints by suggesting that the only conduct that was alleged therein to be infringing was CERT's use of activated carbon during certification testing of refined coal (an allegation later learned to be false). (*See* D.I. 728 at 19)  But in these complaints, Plaintiffs *also* alleged that even if CERT did not learn of a power plant's use of activated carbon in connection with the testing process, it would "learn of the plant's use of activated carbon by working with the plant. . . . they would be able to witness activated carbon injection equipment and on-site activated carbon" and would also learn of "the plant's use of sorbent containing activated carbon through routine conversation and communications with individuals at the coal-fired power plant that are necessary to ensure coordination and smooth operation of the plant[.]"  (D.I. 130 at ¶¶ 90-91; *see also* D.I. 281 at ¶¶

---

[33]    The Court notes that the standard for finding willful infringement is different from that for finding enhanced damages. *Multimedia Techs. Pte. Ltd. v. LG Elecs. Inc.*, Case No. 2:22-cv-00494-JRG-RSP, 2025 WL 396766, at *2 (E.D. Tex. Jan. 27, 2025), *report and recommendation adopted*, 2025 WL 675446 (E.D. Tex. Mar. 3, 2025); *Med-El Elektromedizinische Gerate Ges.M.B.H. v. Advanced Bionics, LLC*, Case No. 1:18-cv-01530-JDW, 2024 WL 4371292, at *10 (D. Del. Oct. 2, 2024) (noting that the standard for awarding enhanced damages is "higher" than that necessary to establish willful infringement).  While the conduct warranting enhanced damages is that which is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate[,]" *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (citation omitted), willful infringement, by contrast, is a question of fact merely requiring a finding of "deliberate or intentional infringement[,]" *id.* (citations omitted).

89-90)  And, as discussed above, the evidence showed that CERT in fact did know that the directly infringing power plants used activated carbon at the time this lawsuit was filed.

For these reasons, CERT's arguments that the evidence is insufficient to support a finding of willfulness are not persuasive, and its Motion on this ground must be denied.

IV.    **CONCLUSION**

For the foregoing reasons, CERT's Motion is DENIED.  An appropriate Order will issue.