# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MIDWEST ENERGY EMISSIONS CORP. and MES INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 19-1334-CJB |
| ARTHUR J. GALLAGHER & CO., et al., | ) ) | |
| Defendants. | ) | |

---

James M. Lennon and Peter Akawie Mazur, DEVLIN LAW FIRM LLC, Wilmington, DE; Bradley W. Caldwell, Warren J. McCarty, III, Justin T. Nemunaitis, Daniel R. Pearson, Adrienne R. Dellinger, Aisha M. Haley and Richard A. Cochrane, CALDWELL CASSADY CURRY P.C., Dallas, TX; Attorneys for Plaintiff Midwest Energy Emissions Corp.

Kenneth L. Dorsney and Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE; Jeff Dyess, Paul Sykes and Benn Wilson, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL; Jessica Zurlo, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., Attorneys for Defendants CERT Operations II LLC, CERT Operations IV LLC, CERT Operations V LLC, CERT Operations RCB LLC, Senescence Energy Products, LLC, Springhill Resources LLC, Buffington Partners LLC, Bascobert (A) Holdings LLC, Larkwood Energy LLC, Cottbus Associates LLC, Marquis Industrial Company, LLC and Rutledge Products, LLC.

---

## <u>MEMORANDUM OPINION</u>

November 20, 2025
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

The Court[1] presided over a five-day jury trial in this patent infringement case from February 26, 2024 through March 1, 2024.  (D.I. 779-85 (hereinafter, "Tr."))  At trial, Plaintiff Midwest Energy Emissions Corp. ("Midwest Energy") and then-Plaintiff MES Inc. ("MES" and collectively with Midwest Energy, "Plaintiffs" or "ME2C")[2] alleged that Defendants Bascobert (A) Holdings, LLC; Buffington Partners, LLC; Cottbus Associates, LLC; Larkwood Energy, LLC; Marquis Industrial Company, LLC; Rutledge Products, LLC; Senescence Energy Products, LLC and Springhill Resources, LLC (the "CERT RC Defendants"); CERT Operations II LLC; CERT Operations IV LLC; CERT Operations V LLC; and CERT Operations RCB LLC (the "CERT Operations Companies Defendants" and collectively with the CERT RC Defendants, "CERT" or the "CERT Defendants") indirectly and willfully infringed claims 25 and 26 of United States Patent No. 10,343,114 (the "'114 patent") and claims 1 and 2 of United States Patent No. 10,596,517 (the "'517 patent" and collectively with the '114 patent, the "asserted patents").  (D.I. 659, ex. 2 at ¶¶ 1-6; *id.*, ex. 3 at ¶ 1)  At the end of trial, the jury returned a verdict on all counts and an award of damages in favor of Plaintiffs.  (D.I. 692)  Pending before the Court is CERT's Motion for a New Trial on the Issues of Induced Infringement, Contributory Infringement, Willful Infringement and Damages with Respect to Plaintiffs' Claims for

---

[1]    The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings.  (D.I. 398)

[2]    As the parties are aware, subsequent to trial, the Court granted CERT's motion to dismiss Plaintiff MES pursuant to Federal Rule of Civil Procedure 12(b)(1).  (D.I. 788; D.I. 789)  Because MES participated in the case up through and including the filing of the briefing on the instant Motion, and simply to avoid confusion, the Court will herein refer to "Plaintiffs" or to "Plaintiffs' position" on the relevant issues, even though there is currently only one Plaintiff (i.e., Midwest Energy) in the case.

Infringement of the Asserted Patents (the "Motion"). (D.I. 720) For the reasons set forth below, the Court DENIES the Motion.

## I.    BACKGROUND

### A.    Factual Background

This patent infringement case relates to mercury control at coal-fired power plants ("power plants"). The Court has set out the background of this case in its recent opinion regarding CERT's motion for judgment as a matter of law ("JMOL decision"), and it incorporates by reference the JMOL decision. (D.I. 791) The Court here writes primarily for the parties, and so any facts relevant to this Memorandum Opinion will be discussed in Section III below.

### B.    Procedural Background

Following trial, the Court entered non-final judgments on the verdict against the CERT Defendants. (D.I. 697-708) Thereafter, the parties submitted numerous lengthy post-trial motions relating to the jury trial, including the instant Motion. (D.I. 716; D.I. 717; D.I. 718; D.I. 720; D.I. 763)[3] Briefing on the instant Motion concluded on May 17, 2024. (D.I. 737)

## II.    LEGAL STANDARD

"[A]fter a jury trial," the Court may grant a new trial "to any party" on "all or some of the issues" for "any reason for which a new trial has heretofore been granted" in federal court actions at law. Fed. R. Civ. P. 59(a)(1)(A). Common reasons for granting a new trial include the

---

[3]    CERT had also asserted that Plaintiffs' infringement claims are barred because CERT is entitled to an implied license to the asserted patents. (D.I. 515 at 112, at ¶ 16; D.I. 659, ex. 3 at 48 at ¶ 3(e)-(f)) On May 30, 2024, the Court held a bench trial regarding the implied license defense. (D.I. 779) The Court subsequently concluded that CERT failed to prove by a preponderance of the evidence that it has an implied license to the asserted patents. (D.I. 786)

following circumstances:  "(1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence exists that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent."  *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775 (D. Del. 2015).

The decision of whether to grant a new trial is committed to the sound discretion of the district court.  *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, Civil Action No. 15-108-RGA, 2025 WL 959654, at *2 (D. Del. Mar. 31, 2025).  Unlike the standard for judgment as a matter of law ("JMOL"), on a motion for a new trial, "the Court need not view the evidence in the light most favorable to the verdict winner." *Ateliers*, 85 F. Supp. 3d at 776.  However, a new trial because the verdict is against the weight of evidence should only be granted where the record shows that the jury's verdict would result in a "miscarriage of justice[,]" the verdict "cries out to be overturned[,]" or where the verdict "shocks [the] conscience."  *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).[4]

## III.    DISCUSSION

With its Motion, CERT moves for a new trial on a vast number of different grounds, which can be generally grouped into six categories.  First, CERT moves for a new trial on the jury's verdict for contributory infringement and induced infringement, respectfully, on the grounds that the jury instructions included prejudicial errors and that the verdict is against the clear weight of the evidence.  (D.I. 721 at 1-8; D.I. 737 at 1-4)  Second, CERT argues that a new

---

[4]    Regional circuit law governs the standard for ordering a new trial in a patent case. *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1383 (Fed. Cir. 2013).

trial is required on willful infringement because the jury's verdict is against the clear weight of the evidence. (D.I. 721 at 8-9; D.I. 737 at 4-5) Third, CERT argues that it is entitled to a new trial because the Court failed to provide a curative instruction regarding certain "Section 45" tax credits.[5] (D.I. 721 at 9-10; D.I. 737 at 5-6) Fourth, CERT contends that the trial record is based on multiple prejudicial evidentiary errors that require a new trial. (D.I. 721 at 10-17; D.I. 737 at 6-10) Fifth, CERT argues that a new trial on damages is warranted because the jury verdict is against the clear weight of the evidence. (D.I. 721 at 17-18) Sixth and finally, CERT moves for a new trial on infringement of claim 2 of the '517 patent, asserting that the jury's verdict is against the weight of the evidence. (*Id.* at 18-20; D.I. 737 at 10) Plaintiffs oppose the Motion, asserting that there is no basis for a new trial. (D.I. 727 at 1-20)

The Court will address each of CERT's arguments in turn below.

## A.    Contributory Infringement

With respect to contributory infringement, CERT contends that a new trial is warranted for two reasons. First, CERT argues that the jury instructions regarding contributory infringement contained prejudicial errors. (D.I. 721 at 1-3) Second, CERT argues that the jury's verdict is against the clear weight of the evidence. (*Id.* at 3-4) The Court takes up these two arguments below, in order.

### 1.    Jury Instructions Regarding Contributory Infringement

CERT first argues that a new trial on contributory infringement is necessary because the Court erroneously instructed the jury that the plaintiff had to prove that "the defendant knew that the refined coal supplied to that power plant, *as sold and delivered during the damages period*, is

---

[5]    The Court has previously described what Section 45 tax credits are, and how they relate to this case, in its JMOL decision, among other places. (D.I. 791 at 5 n.8)

not a staple article or commodity of commerce capable of substantial non-infringing use[.]"  (*Id.* at 2 (emphasis added) (quoting D.I. 785 at 1295);[6] *see also* D.I. 737 at 1-2)  According to CERT, the United States Court of Appeals for the Federal Circuit rejected a "narrowed" focus on accused products "as sold and delivered during the damages period" when evaluating substantial non-infringing uses—and the proper inquiry, instead, is whether the accused products can be used for purposes other than infringement.  (D.I. 721 at 2-3)  The Court's inclusion of the above-italicized language in the Court's instruction was prejudicial, according to CERT, because it caused the jury to ignore unrebutted evidence demonstrating that:  (1) power plants other than the accused power plants used refined coal without activated carbon injection ("ACI"), both before and after the asserted patents issued; and (2) the accused power plants used refined coal without ACI prior to the issuance of the patents.  (*Id.* at 3; D.I. 737 at 2)  Had the jury considered this evidence, CERT says, it would have allowed them to return a verdict of no contributory infringement.  (D.I. 721 at 3)[7]

---

[6]    While the parties appear to cite to the rough versions of the jury trial transcript at nearly all times in their briefing, the Court herein cites to the final versions of the jury trial transcript that have been docketed.

[7]    A litigant is not entitled to "a jury instruction of its choice, or precisely in the manner and words of its own preference."  *Douglas v. Owens*, 50 F.3d 1226, 1233 (3d Cir. 1995).  To obtain a new trial due to the content of jury instructions, the movant must prove that "the jury instructions read in their entirety were incorrect or incomplete as given."  *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020) (internal quotation marks and citation omitted); *see also Fahie v. Virgin Islands*, 858 F.3d 162, 169 (3d Cir. 2017) ("The issue is whether, viewed in light of the evidence, the charge as a whole fairly and adequately submits the issues in the case to the jury.") (internal quotation marks and citation omitted).  "Moreover, a jury verdict will [only] be set aside, based on erroneous jury instructions, if the movant can establish that those instructions were legally erroneous and that the errors had prejudicial effect."  *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1278 (Fed. Cir. 2011) (internal quotation marks and citation omitted); *see also HQ Specialty Pharma Corp. v. Fresenius Kabi USA, L.L.C.*, C.A. No. 21-1714 (MN), 2025 WL 1825572, at *12 (D. Del. July 2, 2025).  A party seeking to alter a judgment based on an

In its motion for JMOL, CERT argued that the Court was wrong to limit the substantial non-infringing use inquiry to whether the accused refined coal, as it was sold and delivered by Defendants to their power plant customers, could be used for purposes other than infringement. (D.I. 719 at 14-16; *see also* D.I. 721 at 2 (referring to CERT's opening brief in support of its motion for JMOL))  For the same reasons that the Court provided for not granting JMOL on that ground, the Court is not persuaded that the jury instruction at issue here was erroneous or prejudicial.  (D.I. 791 at 33-40)

### 2.    Jury's Verdict as to Contributory Infringement

CERT next contends that the jury's verdict as to contributory infringement is against the clear weight of the evidence, because the record shows that CERT believed and knew that refined coal was made and adapted *to qualify for Section 45 tax credits*—and not that it was made and adapted for an infringing use.  (D.I. 721 at 3-4)[8]  This is a rehash of CERT's argument in its motion for JMOL that the "record lacks substantial evidence that refined coal is 'especially made or especially adapted for use in an infringement' and that CERT knew that to be the case." (D.I. 719 at 12-14)  For the reasons discussed in the JMOL decision, CERT's argument here is not persuasive.   (D.I. 791 at 28-33); *see, e.g., United States v. Gilead Scis., Inc.*, 722 F. Supp. 3d 458, 480 (D. Del. 2024) ("The Court has already found that substantial evidence supports the

---

erroneous jury instruction must establish that it made a proper and timely objection to such instruction, unless it can make a showing that the instruction contains plain error that affects substantial rights.  *Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, C.A. No. 12-540-LPS, 2018 WL 1358814, at *4 (D. Del. Mar. 16, 2018); *see also* Fed. R. Civ. P. 51(d).

[8]    CERT also argues that the jury's verdict is against the clear weight of evidence because "under the proper standard, refined coal has unrebutted substantial non-infringing uses[.]"  (D.I. 721 at 3; *see also* D.I. 737 at 2)  But for the reasons set out in the JMOL decision, the Court does not agree that it applied and/or instructed the jury with the incorrect standard for contributory infringement.  (D.I. 791 at 33-40)

jury's verdict on invalidity.  For the same reasons, the Court concludes that the jury's verdict was not against the weight of the evidence, even without viewing the evidence most favorably to Defendants."); *see also Aqua Connect, Inc. v. TeamViewer US, Inc*., C.A. No. 18-1572-MN Consolidated, 2023 WL 6387791, at *14 (D. Del. Sept. 29, 2023).

### B.    Induced Infringement

With respect to induced infringement, CERT contends that a new trial is warranted because the jury instructions regarding induced infringement contained prejudicial errors.  (D.I. 721 at 4-6)  CERT then also argues that the jury's verdict as to this claim is against the clear weight of evidence.  (*Id.* at 6-8)  The Court addresses both arguments in turn below.

### 1.    Jury Instructions Regarding Induced Infringement

CERT asserts that two aspects of the jury instructions on induced infringement require a new trial:  (1) the failure to instruct the jury that CERT must actually encourage performance of each step of the asserted claims; and (2) the failure to instruct the jury that CERT's actions, as opposed to other factors, must have caused direct infringement.  (*Id.* at 4-6)  The Court does not agree.

### a.    Requested Jury Instruction Regarding Encouragement

As to the first issue, by way of background, at trial CERT had requested that for induced infringement, the jury be instructed that Plaintiffs must show that "the defendants encouraged the power plants to perform each and every step of the asserted claim."  (D.I. 784 at 1155)  But the Court's instruction already conveyed that Plaintiffs must prove that "the Defendant's actions actually caused the power plant to perform each and every step of the asserted claim"—and when discussing this issue with the Court during the trial, CERT agreed that *encouraging* the infringement is not a "separate requirement" from *causing* the infringement.  (*Id.* at 1155-57; *see*

8

*also* D.I. 689 at § 4.3)  Instead, CERT argued that its proposed addition should be included because "the feeling of encouragement has a *helpful gloss* to it[.]"  (D.I. 784 at 1157 (emphasis added))  The Court declined to include CERT's requested instruction.  (*Id.* at 1158)  Now with its Motion, CERT argues that omitting the requested instruction was erroneous and prejudicial because:  (1) the law is clear that to prove inducement, "the affirmative acts of alleged inducement must encourage the infringing acts" and (2) the instruction invited the jury to render a verdict of induced infringement "based solely on the sale of refined coal without the requisite evidence that any affirmative actions by CERT actually encouraged any power plant to perform each and every step of the asserted claims."  (D.I. 721 at 5)

A new trial on these grounds is not warranted.  The Court's instruction correctly states the law regarding induced infringement.  *See, e.g.*, *Alpek Polyester, S.A. de C.V. v. Polymetrix AG*, 2021-1706, 2021 WL 5974163, at *8 (Fed. Cir. Dec. 16, 2021) ("To prove induced infringement, Alpek was required to show not only that Polymetrix intended to cause, but also that Polymetrix *did in fact cause*, IVP to infringe the patents-in-suit."); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1331 (Fed. Cir. 2016) ("[T]o prevail under a theory of indirect infringement, [plaintiff] must first prove that the defendants' actions led to direct infringement of the [patent-in-suit].") (quoting *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004)); *see also* (D.I. 784 at 1157 (CERT acknowledging that "encouragement is not a separate additional requirement for inducement" beyond the requirement that a defendant must cause the infringement)).  Indeed, the Court's recitation of the elements of induced infringement largely tracked those in the Model Patent Jury Instructions of the American Intellectual Property Law Association ("AIPLA"), which is the authority that Defendants themselves utilized for their proposed induced infringement instruction.  *See* AIPLA,

Model Patent Jury Instructions at § 3.8 (2019), *available at* https://www.aipla.org/docs/default-source/student-and-public-resources/publications/2019-11-13---aipla-model-patent-jury-instructions.pdf (listing as an element that the defendant "aided, instructed, or otherwise acted with the intent to cause acts by [alleged direct infringer] that would constitute direct infringement of the patent" without a separate "encouragement" requirement listed); (D.I. 659, ex. 22 at 31-32 & n.38); *see also HQ Specialty Pharma Corp. v. Fresenius Kabi USA, L.L.C.*, C.A. No. 21-1714 (MN), 2025 WL 1825572, at *12 (D. Del. July 2, 2025) (noting that it is unlikely that using a model jury instruction can constitute error) (citing cases).

In the end, then, CERT's desire for the Court to have adopted its proposed "helpful gloss" with regard to the instruction at issue is not a basis to order a new trial.

**b.    Requested Jury Instruction Regarding Causation**

CERT also requested, over Plaintiffs' objection, that the induced infringement jury instruction convey that Plaintiffs must demonstrate that "the Defendant's actions, as opposed to other factors, actually caused the power plant to perform each and every step of the asserted claim[.]"  (D.I. 659, ex. 22 at 36-37, 38-40 & n.44; D.I. 784 at 1159)  The Court adopted the instruction but without the phrase "as opposed to other factors[.]"  (D.I. 784 at 1159; D.I. 689 at § 4.3)  CERT argues that declining to include this additional language was wrong and prejudicial because it permitted the jury to render a verdict in favor of Plaintiffs for induced infringement even though the record shows that other factors were the actual cause of the accused power plants' performance of certain steps of the asserted claims.  (D.I. 721 at 6)

As the Court noted in rejecting CERT's position during trial—and as the Court further articulated in its JMOL decision—CERT has not persuaded it that there is a *sole* causation requirement for induced infringement.  (*See* D.I. 727 at 8-9 & n.4; D.I. 784 at 1159; D.I. 791 at

10

24-27)  The Court is therefore not convinced that failure to include "as opposed to other factors" in the jury instructions was error.

## 2.    Jury's Verdict of Induced Infringement

CERT next contends that the jury's verdict of induced infringement is against the clear weight of the evidence, because there is "no evidence in the record that any CERT Defendant ever instructed a power plant to use ACI, conditioned the sale of refined coal on the use of ACI, or otherwise encouraged a power plant to begin using or continue to use ACI."  (D.I. 721 at 7)  Instead, according to CERT, the only evidence in the record is that CERT sold refined coal to power plants with knowledge that the power plants would also use ACI, which is insufficient as a matter of law to establish inducement.  (*Id.*)

But as the Court explained in the JMOL decision, there *is* substantial evidence in the record supporting the jury's verdict of induced infringement.  (D.I. 791 at 11-22)  For the same reasons that the Court set out there for not granting JMOL, the Court will not grant CERT's motion for a new trial on this basis.  *Gilead Scis., Inc.*, 722 F. Supp. 3d at 480; *Aqua Connect, Inc.*, 2023 WL 6387791, at *14.

## C.    Willful Infringement

Next, CERT argues that if the Court determines that JMOL of no willful infringement is not warranted, then a new trial is required on willful infringement because the jury's verdict is against the clear weight of the evidence.  (D.I. 721 at 8-9; D.I. 737 at 4-5)  While a finding of willful infringement required the jury to find that CERT engaged in deliberate or intentional infringement, *see Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020), CERT argues that the record does not contain any evidence that it possessed the necessary "'bad state of mind'" for willfulness, (D.I. 721 at 8; *see also* D.I. 737 at 4-5)  Here

11

again, CERT reiterates the same arguments that it made in its motion for JMOL regarding willful infringement. For the same reasons as discussed in the JMOL decision, a new trial on willfulness is not warranted. (D.I. 791 at 40-44)

### D.    Request for Instruction Regarding Section 45 Tax Credits

CERT next argues that it is entitled to a new trial because the Court's failure to provide a curative instruction regarding Section 45 tax credits was error. (D.I. 721 at 9-10; D.I. 737 at 5-6) On that front, CERT notes that Jeff Green (the past President and Vice President of Operations for the CERT Operations Companies Defendants, and the corporate representative for all of the CERT Defendants) testified—over CERT's objection—regarding the amount of money that the CERT entity that he owned made from Section 45 tax credits. (D.I. 783 at 839, 852-55, 857-60) CERT argues that the jury could have wrongly perceived this testimony regarding the economic value of selling refined coal as being relevant to the technological value of the asserted patents (i.e., relating to mercury reduction). (D.I. 721 at 9)[9] On this score, during trial CERT requested that the jury be instructed that the "damages award must not include the value of the tax credits" (the "tax credit instruction"). (D.I. 659, ex. 22 at 94-95; *see also* D.I. 784 at 1174-75) The Court, however, declined to include the tax credit instruction. (D.I. 784 at 1176-77) According to CERT, this left "the jury without guidance on a difficult economic distinction that pervaded the evidence throughout the trial[,]" which was highly prejudicial to CERT in that the jury's damages award "was orders of magnitude greater" than the amount of money that Plaintiffs licensed the asserted patents for in the absence of Section 45 tax credits. (D.I. 721 at 9-

---

[9]       As the Court will explain further below, Mr. Green's testimony in this regard was relevant to issues such as his alleged bias and personal interest in the accused infringement, as well as to CERT's motivation/intent to indirectly infringe the asserted patents. (*See infra* at 30-31)

10; *see also* D.I. 737 at 5 ("CERT is entitled to a new trial because [of] the failure to instruct the jury to disregard testimony related to the value of Section 45 tax credits that was wholly irrelevant and prejudicial."))

This is not a basis to order a new trial either. As Plaintiffs point out, (D.I. 727 at 13), during the discussion of the tax credit instruction at the prayer conference (which took place after Jeff Green had testified), in ultimately declining to give the tax credit instruction, the Court noted that Plaintiffs' damages expert Mr. Philip Green[10] "wasn't talking about Section 45 tax credit value as a part of the calculus that he was making with regard to licensing[,]" (D.I. 784 at 1175). CERT's counsel there agreed that "tax credits [were] a very minimal at best part of" Philip Green's testimony. (*Id.* at 1177) Indeed, Philip Green testified that his damages opinion didn't have anything to do with Section 45 tax credits. (D.I. 783 at 831-32; *see also id.* at 805-06 (the Court sustaining Plaintiffs' objection when *CERT's counsel* was attempting to get Philip Green to discuss Section 45 tax credits)) Put another way, the Court determined that it did not make sense to specifically instruct the jury that they should apportion out the value of Section 45 tax credits from their damages analysis, when no one (including Plaintiffs' damages expert) had *even suggested* that such tax credits were relevant to the damages analysis in the first place.

In objecting to the Court's decision not to give this tax credit instruction during the prayer conference, CERT did not then (as it does now) argue that the instruction was necessary because of the testimony of *CERT representative Jeff Green*. (*See* D.I. 784 at 1175-77; D.I. 727 at 13) Federal Rule of Civil Procedure 51(c)(1) requires a party objecting to a jury instruction to

---

[10]    Plaintiffs' damages expert (Philip Green) and the CERT Defendants' representative (Jeff Green) have the same last name. To avoid confusion, going forward the Court will try to make clear which Mr. Green it is talking about by using these witnesses' first name and last name.

"stat[e] distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1); *see also Palmer v. Hoffman*, 318 U.S. 109, 119 (1943) ("In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error."); *Lesende v. Borrero*, 752 F.3d 324, 335 (3d Cir. 2014) (explaining that such an objection "must be both cogent and specific to the alleged error"). CERT should have and could have explained *this* particular ground for the requested instruction during trial, but it failed to do so. Because CERT did not identify this specific ground during trial as a basis supporting the tax credit instruction at issue, CERT has waived this argument. *Cf. Alvarado v. City of Phila.*, 786 F. Supp. 3d 881, 897 (E.D. Pa. 2025) (finding that the defendants waived their argument that the failure to provide a particular jury instruction was error where, during trial, the defendants "did not address the distinct issues they had with this instruction").

However, even were the argument not waived, it would fail on the merits. The jury instructions conveyed that any damages award "must be based on the value attributable to the patented technology, as distinct from other, unpatented features of the accused product, or other factors such as marketing or advertising, or a Defendant's size or market position" and that the appropriate royalty rate and royalty base would "reflect the value attributable to the patented invention alone." (D.I. 689 at § 5.3) With the jury therefore being appropriately instructed about its duty to apportion out value attributable to factors other than the patented invention—and with Plaintiffs' damages expert testifying that his opinion (and the licenses that it was based on) had nothing to do with the value of Section 45 tax credits—a new trial is not warranted because the Court declined to provide the tax credit instruction.

14

### E.    CERT's Arguments Regarding Evidentiary Errors

CERT next contends that the trial record included multiple prejudicial evidentiary errors that require a new trial. (D.I. 721 at 10-17; D.I. 737 at 6-10) These purported errors relate to three general areas: (1) the testimony of Plaintiffs' technical expert Mr. Philip O'Keefe; (2) the testimony of Plaintiffs' damages expert Philip Green; and (3) the testimony of CERT representative Jeff Green about the money he received over the life of the refined coal program. (D.I. 721 at 10-17; D.I. 737 at 6-10) The Court takes these up one by one.

### 1.    Testimony of Plaintiffs' Technical Expert Mr. O'Keefe

CERT argues that a new trial is required due to the fact that Mr. O'Keefe provided certain testimony, which was unrelated to his qualifications and expertise as a mechanical engineer or otherwise improper. (D.I. 721 at 10-13; D.I. 737 at 6-7) CERT's objections here can be broken down into three broad categories, which the Court will address in turn below.

First, CERT challenges Mr. O'Keefe's testimony as to certain particular subject matter areas—areas that CERT also raised (to varying degrees of specificity) in its prior *Daubert* motion. With that motion, CERT had sought to exclude certain aspects of Mr. O'Keefe's expected trial testimony on similar grounds. (D.I. 721 at 11-12; D.I. 572; D.I. 528 at 34-45) The Court denied the motion in nearly all respects; it granted the motion only to the extent that it related to certain of Mr. O'Keefe's testimony about another's intent, motive or state of mind (the "*Daubert* decision"). (D.I. 613) During trial, the Court referred back to the substance of its *Daubert* decision as to these areas, noting that it had ruled therein that Mr. O'Keefe could testify

15

regarding evidence that sufficiently bears on the "operation of a coal-fired power plant[.]"  (D.I. 783 at 608-10)[11]

CERT's third try to render Mr. O'Keefe unqualified to testify regarding these topics does not compel a different outcome.  The Court denies CERT's Motion on this ground in significant part for the same reasons as it previously discussed in its lengthy ruling in the *Daubert* decision. As the Court noted then:

> As a general matter, these topics relate to systems and equipment, chemistry, and operations at coal-fired power plants, as well as compliance with applicable regulations at these plants.  The Court agrees with Plaintiffs that Mr. O'Keefe's extensive background with power plant operations renders him qualified to apply his experience to the factual subject matters at issue, and that he is qualified to research systems that he did not personally use.

(D.I. 613 at 12); *see, e.g.*, *Ravgen, Inc. v. Lab'y Corp. of Am. Holdings*, Civil Action No. 6:20-cv-00969-ADA, 2025 WL 572753, at *2 (W.D. Tex. Feb. 12, 2025) ("A motion for a new trial should not be used as a vehicle to renew a *Daubert* challenge or relitigate matters the Court has already decided."); *Trs. of Columbia Univ. in City of N.Y. v. Gen Digit. Inc.*, Civil Action No. 3:13cv808, 2023 WL 8698906, at *2 (E.D. Va. Sept. 30, 2023) ("The bulk of Norton's Motion for a New Trial rehashes arguments previously made, often citing and incorporating its prior

---

[11]    In their briefing on the Motion, Plaintiffs asserted that the Court could deny the Motion with respect to Mr. O'Keefe's testimony regarding mercury control systems and activated carbon injection systems, and as to Plaintiffs' damages expert Philip Green's testimony, on the ground that CERT did not lodge specific objections at trial regarding this testimony.  (D.I. 727 at 15, 17-18 (citing cases))  However, even to the extent that CERT did not object at trial, CERT had filed *Daubert* motions on these grounds.  Because CERT challenged this testimony at the *Daubert* stage and the Court ruled, the Court cannot agree with Plaintiffs that CERT has forfeited these arguments (except as to where, during trial, CERT expressly gave up its prior objections relating to Mr. O'Keefe's discussion of mercury emissions control systems and activated carbon injection systems, further discussed *infra*).  (D.I. 737 at 6, 8); *see also* Fed. R. Evid. 103; *United States v. Brownlee*, 454 F.3d 131, 140 n.6 (3d Cir. 2006).

briefing on *Daubert* motions . . . . The Court has already considered and rejected those same arguments prior to and during trial, and Norton offers nothing further to suggest a different outcome post-trial.  This alone supports a denial of the Motion for a New Trial.").  That said, to the extent there is any further nuance to the issues CERT raises here and for sake of completeness, the Court will specifically address each subject matter area at issue below.  In doing so, it will explain why the testimony at issue does not provide a basis to grant the Motion.

As to the portion of CERT's challenge regarding Mr. O'Keefe's testimony about "mercury emissions control" systems and "activated carbon injection systems," (D.I. 721 at 11), this evidence certainly relates to the "operation of a coal-fired power plant[.]"  As the Court explained in the *Daubert* decision, Mr. O'Keefe:  (1) had nearly 14 years of prior experience working at a coal-fired power plant, where he dealt with issues including emissions reduction and pollution control operations; and (2) continues to teach seminars regarding power plant operation.  (D.I. 613 at 7-8 (citations omitted); D.I. 727 at 16)  This amounted to sufficiently related experience to the matters at issue here to qualify Mr. O'Keefe as an expert.  (D.I. 613 at 7-8; D.I. 727 at 16)  And although Mr. O'Keefe did not work on *mercury reduction* techniques or the use of *ACI systems* during his prior power plant employment, experts are permitted to obtain some knowledge like this regarding the patented technology during their work on a case.[12]  (D.I. 613 at 8-9 (citing cases); D.I. 727 at 16)  Indeed, by the time of trial, CERT now *agreed* that Mr.

---

[12]    On this score, as the Court noted in its *Daubert* decision, "Defendants' own expert Dr. Ni[ks]a appeared to testify that he learned everything he knew about the accused power plants (which utilized the accused technologies regarding mercury control) from Mr. O'Keefe's expert reports; Dr. Niksa described those reports as going into 'considerable detail [regarding] the application of calcium bromide and activated carbon in those power plants' and providing 'some information about which other air pollution control devices are used at those sites.'"  (D.I. 613 at 9)

O'Keefe could properly testify about this type of evidence.  There, CERT's counsel explained that if Mr. O'Keefe was "giving opinions on the direct infringement of a power plant, what do they put on the coal, how does the coal move through, how do they burn it, we're not going to cross him on those things.  We're *not objecting* to him giving this testimony."  (D.I. 782 at 557 (emphasis added); *see also id*. at 552)  Therefore, even were there any merit to CERT's challenge as to this testimony, CERT waived it during trial.  *See Pierce v. City of Phila.*, 811 F. App'x 142, 149 n.3 (3d Cir. 2020) (finding that plaintiff waived his assertion that the defendant's counsel made certain improper comments, where the defendant "withdrew these objections at trial").

CERT next challenges Mr. O'Keefe's testimony regarding "Section 45 Tax Credits[.]" (D.I. 721 at 11-12)  At trial, when Plaintiffs' counsel began to ask Mr. O'Keefe about this subject matter, CERT's counsel lodged an objection.  (D.I. 782 at 552-63)  In discussing the objection with counsel, the Court noted that it would not permit Mr. O'Keefe to engage in any extended discussion about such tax credits, such as about the economics or tax-related policy behind the use of such credits—since that type of testimony would fall outside of the scope of his expertise.  (*Id.* at 555, 561)[13]  But the Court also noted that it was not in a position to rule that Mr. O'Keefe could make *no* mention of such tax credits *at all*, since CERT's receipt of such credits related to how and why it provided refined coal to the power plants at issue (and also to how and why CERT was alleged to have taken certain actions that caused the power plants to use

---

[13]    Relatedly, when Mr. O'Keefe was later asked a question about the mechanics of how CERT partners received benefits from their investors relating to the building of the refined coal facilities, and CERT's counsel objected on the ground that this subject matter was "far afield from Mr. O'Keefe's technical expertise[,]" the Court sustained that objection and struck any answer the witness had provided.  (D.I. 782 at 567)

the technology at issue in an infringing manner). (*Id*. at 561) After the Court resolved this objection, Plaintiffs' counsel (who noted that the jury had already heard about these tax credits from other witnesses), thereafter asked Mr. O'Keefe exactly two substantive questions about tax-credit-related subject matter—regarding what the tax credits were and when they went into effect. (*Id*. at 563-64, 638) Mr. O'Keefe answered those questions. (*Id*.) In light of the above, the Court cannot see how it was error to permit this (limited) testimony.[14] And even if it was, particularly in light of the fact that the jury had otherwise heard similar facts about such tax credits on many occasions without objection, (D.I. 782 at 329-30, 402, 437-39, 461, 473; D.I. 783 at 778-80), any such error would be harmless, *see Austin v. Cnty. of Northampton*, 630 F. App'x 163, 166 (3d Cir. 2015).

As for Mr. O'Keefe's testimony regarding "the requirements of MATS compliance,"[15] (D.I. 721 at 12), the testimony that CERT objects to here involved Mr. O'Keefe answering essentially two substantive questions, i.e.: (1) one answer that simply reminded the jury about what MATS standards are, (D.I. 782 at 563-64); and (2) one answer in which the witness stated that the power plants at issue burned refined coal with activated carbon to help meet these standards, (D.I. 783 at 644-45). (D.I. 721 at 12) It is true that Mr. O'Keefe did not have personal experience working with power plants regarding MATS compliance. (*Id.*) But this too

---

[14]    Indeed, it seems possible that CERT may have given up on its objection to this aspect of Mr. O'Keefe's testimony, as in the relevant portion of its reply brief relating to Mr. O'Keefe's testimony, CERT no longer makes any explicit mention of Section 45 tax credits. (D.I. 737 at 6-8)

[15]    The Court has previously described MATS and the requirements for MATS compliance, and how these concepts relate to this case, in its JMOL decision (among other places). (D.I. 791 at 11 n.14)

is subject matter that is closely related to the core of Mr. O'Keefe's testimony regarding power plants' use of refined coal (and how and why such coal is burned)—and is information that Mr. O'Keefe could understandably pick up through his work on this case. (D.I. 613 at 8-9) Moreover, the jury had previously heard similar testimony on this point from various other witnesses, without objection. (*See, e.g.*, D.I. 782 at 329-30, 462; D.I. 784 at 895, 897, 904, 908) And so again, even if the MATS-related testimony objected to here was somehow erroneously given, any error would be harmless.[16]

Lastly, CERT objects to Mr. O'Keefe's reference in his testimony to certain "coal supply agreements" between the power plants and certain Defendants (i.e. agreements wherein CERT entities, *inter alia*, agreed to provide refined coal to the power plants) and certain "indemnity agreements" (i.e., provisions in those coal supply agreements, whereby the CERT Defendants provided indemnity to power plants as to any later-arising claims of patent infringement against them). (D.I. 721 at 12) CERT's prior *Daubert* motion very briefly referenced the topic of indemnity provisions. (D.I. 528 at 43) The Court will address these two subjects now in turn.

With regard to the coal supply agreements, Mr. O'Keefe explained that he had familiarity and experience with such agreements during his prior employment at a power plant (in that he had run tests on coal samples in order to ensure that they complied with certain requirements in these types of coal supply contracts). (D.I. 783 at 652-53) Mr. O'Keefe was asked three

---

[16]        In its *Daubert* decision, the Court also noted that to the extent that Mr. O'Keefe's prior, significant experience with pollution control at coal-fired power plants did not involve the reduction of *mercury emissions* from such plants, the use of *ACI*, or the implementation of *MATS regulations*, then a critique on that front might go to the weight the jury afforded to Mr. O'Keefe's testimony; the Court explained that CERT was free to cross-examine Mr. O'Keefe on these points. (D.I. 613 at 8, 10) At trial, CERT did just that. (D.I. 783 at 649-52, 656-58, 660-62)

questions about such agreements, to which he responded that:  (1) he had reviewed the agreements as part of his work in the case; and (2) the agreements helped demonstrate that the relevant Defendants had in fact sold refined coal to certain plants (a fact that in turn, relates to an element of the contributory infringement inquiry).  (*Id*. at 625-26)  Mr. O'Keefe's background with coal-fired power plants and his familiarity with such contracts certainly rendered him qualified to provide this testimony.[17]  *See Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, CIVIL ACTION NO. 2:22-CV-00125-JRG, 2023 WL 8260251, at *1-2 (E.D. Tex. Nov. 28, 2023) (rejecting the defendant's argument that the plaintiff's technical expert lacked qualifications to opine about a contract that the defendant required its customers to sign, where the expert "[wa]s certainly qualified to read the plain language of a contract").

As for Mr. O'Keefe's testimony regarding the indemnity agreements, he was asked a handful of questions about one such representative agreement.  More specifically, Mr. O'Keefe was asked "[D]id the defendants provide or at least some of the defendants provide indemnity to the power plants[;]" after an objection from CERT's counsel that the Court overruled, Mr. O'Keefe responded "Yes, they did."  (D.I. 783 at 641)  Mr. O'Keefe was also shown an exemplary indemnity provision in a refined coal sales agreement, wherein he identified the relevant text at issue and explained who the parties to the agreement were.  (*Id.* at 642)  In addition, in discussing indemnity provisions generally, Plaintiffs' counsel asked Mr. O'Keefe "What does that mean?" to which Mr. O'Keefe responded:

> That means they were holding infringers of the patents-in-suit not responsible so they didn't have to deal with lawsuits or being sued or anything like that.  So it gave them a license to infringe.

---

[17]    Again, it may be that CERT has jettisoned its objection to this aspect of Mr. O'Keefe's testimony, since CERT makes no specific reference to "coal supply agreements" in the relevant portion of its reply brief relating to Mr. O'Keefe's testimony.  (D.I. 737 at 6-7)

(*Id*. at 641)

The Court does not necessarily see anything objectionable to the questions and answers described above in which Mr. O'Keefe is simply confirming the existence of the indemnity agreements at issue. While Mr. O'Keefe did not have prior personal experience with negotiating indemnity provisions when he worked at a power plant, (*id.* at 653), he had reviewed such provisions in this case because they related to CERT's provision of refined coal to the power plants at issue, (*id*. at 609, 641). Simply noting that such provisions existed in the coal supply agreements, in and of itself, is not problematic. *See Entropic Commc'ns, LLC*, 2023 WL 8260251, at *1-2.

In contrast, with regard to the question and answer above wherein Mr. O'Keefe is asked what such provisions "mean," that exchange appears to cross the line into impermissible testimony about *the legal effect* of an indemnity provision—testimony that Mr. O'Keefe, who is not a lawyer and is also not the factfinder, was not qualified to give. *See id*. The problem for CERT there, however, is that it did not object again after this particular question was asked, nor after this answer was given. (D.I. 783 at 641) Had it done so, the Court would have sustained the objection. Indeed, in its *Daubert* motion, CERT had argued that a host of topics discussed in Mr. O'Keefe's expert report were improper; this included a brief assertion that possible future testimony about indemnity agreements would amount to Mr. O'Keefe providing inappropriate legal conclusions. (D.I. 528 at 43) In its *Daubert* decision, the Court did not specifically address this "legal conclusion" objection as it related to testimony regarding indemnity provisions. Instead, the Court noted that the following statement in Mr. O'Keefe's expert report was improper because it appeared to comment on another's state of mind: "[Receiving refined coal] with indemnity provisions in place. . . . would allow power plants to engage in infringing

conduct *with the expectation* that the power plant would face a diminished risk of infringement." (D.I. 613 at 14 (citation omitted) (emphasis added))  Otherwise, the Court explained that it was not practicable for it to engage in a line-by-line analysis of Mr. O'Keefe's expert report to identify any instance of possibly inappropriate trial testimony; instead, the Court urged CERT to "raise a contemporaneous objection to any such testimony" at trial if warranted.  (*Id.* at 14 n.8)  Yet when it came to the offending question and answer above, CERT did not do this.  And so it has waived the ability to complain about testimony that it did not then object to.  *See, e.g.*, *Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'ns Sols., Inc.*, 684 F. Supp. 3d 316, 336 (E.D. Pa. 2023) ("Because Broadridge did not object to Mr. Miller's testimony regarding his general understanding of the contract and the meaning of 'commercially reasonable efforts,' the objection to Mr. Miller's testimony was waived."); *Express Mobile, Inc. v. GoDaddy.com, LLC*, 680 F. Supp. 3d 517, 529-30 (D. Del. 2023) (rejecting plaintiffs' argument that improper witness testimony required a new trial, where "the Court had clearly instructed Express Mobile during the pretrial conference that if it believed that Jarrett or Silva were asked . . . to render expert testimony during the trial, it would be incumbent upon Express Mobile to object at that time" but "Express Mobile still did not object to either witness's testimony as it was unfolding, as it was required to do").

Second, CERT complains that "Mr. O'Keefe was also permitted to give a narrative recasting of Plaintiffs' favored infringement evidence over CERT's objections."  (D.I. 721 at 12 (citing cases))  This argument fails because all CERT cites in support of this position is 10 lines of the trial transcript, in which the Court was addressing an objection.[18]  In the absence of CERT

---

[18]     In the Court's *Daubert* decision, after Defendants had complained that Mr. O'Keefe's expert reports included long "fact-recasting narratives[,]" the Court noted that in

pointing to specific portions of Mr. O'Keefe's testimony that are purportedly objectionable in this regard, the Court cannot evaluate CERT's argument or grant it any relief.

Third, CERT argues in its opening brief that the Court erroneously permitted Mr. O'Keefe to testify "to the ultimate issue that CERT induced infringement, even though that necessarily includes an opinion on CERT's state of mind, *i.e.*, that CERT specifically intended to cause the power plants to infringe[.]" (*Id.* at 12-13)  The objected-to testimony here involved Mr. O'Keefe's statements in which he:  (1) stated that based on his review of the evidence, he believed that the respective CERT Defendants had engaged in induced (and contributory) infringement; and (2) listed some pieces of evidence that he had reviewed and found relevant to certain elements of the induced infringement inquiry.  (D.I. 782 at 549; D.I. 783 at 637-45 (*cited in* D.I. 721 at 13))  In addressing this issue in its *Daubert* decision and during trial, the Court ruled, *inter alia*, that:  (1) Mr. O'Keefe could not opine on CERT's intent, motive or state of mind, as such conclusions are within the province of the jury; (2) Plaintiffs should make clear in its questioning of Mr. O'Keefe that he is not and cannot be speaking to this issue of intent/state of mind; and (3) Mr. O'Keefe could otherwise testify about facts that might help demonstrate a party' state of mind, and he could otherwise provide his opinion that direct or indirect infringement has occurred as to the asserted claims (and why).  (D.I. 613 at 12-14 (citing cases); D.I. 783 at 580-82 (*cited in* D.I. 721 at 13); *see also* D.I. 782 at 557-59; D.I. 783 at 592)

---

certain circumstances, it could be improper for an expert to engage in unnecessarily long summaries of the facts in evidence during trial.  (D.I. 613 at 15 n.9 (citing cases))  But the Court explained that it would be premature to make any ruling as to Mr. O'Keefe's testimony on this basis, prior to observing that testimony at trial.  (*Id.*)  In the 10 lines of trial transcript referenced above by CERT, the Court was referring back to this portion of its *Daubert* decision—and noting that it would sustain an objection on this ground in the future if Mr. O'Keefe actually engaged in narrative recasting via his testimony (though the Court noted that it did not think "we've reached that point at this stage").  (D.I. 782 at 560-61)

In the Court's view, there was nothing inappropriate in drawing these lines, and Mr. O'Keefe's testimony here did not traipse over them.  It is well-settled that expert testimony is admissible in patent cases to give an opinion on the ultimate question of infringement.  *Snellman v. Ricoh Co.*, 862 F.2d 283, 287 (Fed. Cir. 1988); *Voxer, Inc. v. Meta Platforms, Inc.*, Case No. A-20-CV-00655-LY-SH, 2022 WL 3371634, at *3 (W.D. Tex. Aug. 16, 2022); *Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, CIVIL ACTION NO. 2:16-CV-00134-JRG, 2017 WL 2844646, at *2 (E.D. Tex. May 19, 2017); *see also* Fed. R. Evid. 704(a).  As such, it is not unusual in our Court for an expert to opine that "the defendant has committed direct infringement" or "the defendant has committed induced infringement" or "the defendant has committed contributory infringement," or words to that effect.  That said, as the Court repeatedly noted in its *Daubert* decision and in responding to objections at trial, an expert may not specifically opine on a party's intent or state of mind (which is, to be sure, an element of induced and contributory infringement)—and it should be made clear to the jury that the expert has no opinion on *that* subject/element of the inquiry.  (D.I. 613 at 13 (citing cases); *cf. GREE, Inc. v. Supercell Oy*, Case No. 2:19-cv-00070-JRG-RSP, 2020 WL 4288350, at *3 (E.D. Tex. July 27, 2020) ("To the extent that Dr. Akl, Mr. Friedman, or Dr. Zagal provides opinions regarding underlying facts that may show a party's state of mind, those opinions are proper. . . .  However, it is improper for Dr. Akl to opine that 'Supercell actively and *intentionally* induced' infringement, and thereby opine as to the ultimate issue of *intent* reserved for the factfinder.") (emphasis added); *Smith & Nephew, Inc. v. Interlace Med., Inc.*, No. CIV.A. 10-10951-RWZ, 2012 WL 3560811, at *3 (D. Mass. Aug. 17, 2012) (denying a defendant's motion seeking to preclude the plaintiff's experts from offering an opinion on the ultimate issue of induced or contributory infringement, in light

of the plaintiff's assurances that the witnesses would provide only factual testimony from which the jury may or may not infer the defendant's state of mind).

Plaintiffs followed that guidance here. Mr. O'Keefe was not permitted to give testimony about CERT's intent or state of mind as it relates to the indirect infringement allegations, and he did not do so. Additionally, in his direct examination, Plaintiffs' counsel emphasized to the jury (via his questioning of Mr. O'Keefe) that he could not "ask [Mr. O'Keefe] what any Defendant knew or what was in someone else's state of mind" because that is "solely for the jury to decide"—and Mr. O'Keefe agreed that this was so. (D.I. 783 at 628-29) And the Court otherwise policed this line throughout the trial. In the few instances where Mr. O'Keefe was asked other types of questions that might have called for him to provide an answer touching on CERT's state of mind, the Court sustained CERT's objections to such questions—and the questions were either withdrawn or any answer was stricken. (D.I. 782 at 551; D.I. 783 at 630) Similarly, after Plaintiffs prepared draft slides that they were going to use with Mr. O'Keefe— slides that might have wrongly suggested that Mr. O'Keefe was going to give an opinion as to CERT's state of mind regarding the indirect infringement inquiries—the Court directed that the slides be edited to remove that content. (D.I. 782 at 575-76; D.I. 783 at 581-82, 592-94) In the end, Mr. O'Keefe did not provide testimony as to CERT's state of mind, and the Motion should not be granted on this ground.[19]

For all of the reasons discussed above, the Court concludes that Mr. O'Keefe's testimony is not a basis on which to grant CERT's Motion.

---

[19]    Once again, here it is possible that CERT has abandoned this argument, because in its reply brief, when discussing Mr. O'Keefe's testimony, CERT makes no reference to it. (D.I. 737 at 6-7)

### 2.     Testimony of Plaintiffs' Damages Expert Philip Green

CERT's next challenge is to the testimony of Plaintiffs' damages expert Philip Green.
CERT asserts that Philip Green erroneously testified by using an unreliable methodology in two
ways:  (1) he derived a reasonable royalty from license agreements (the "Chem-Mod licenses")
that were not sufficiently technologically or economically comparable, *see ResQNet.com v.
Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010); and (2) he did not properly apportion the value
of the Chem-Mod licenses to the accused technology.  (D.I. 721 at 13-15; D.I. 737 at 8)  As
CERT notes, it previously moved to exclude this testimony in a *Daubert* motion (the "Green
*Daubert* motion"), (D.I. 571; D.I. 528 at 45-50 (*cited in* D.I. 721 at 13)), which the Court denied
(the "Green *Daubert* opinion"), (D.I. 627).[20]  This portion of CERT's Motion is another rehash
of the arguments made in the Green *Daubert* motion.  And the Court is not persuaded that its
prior rulings were wrong.

To explain why, the Court begins by addressing CERT's position that the Chem-Mod
licensed patents were not technologically comparable to the patents-in-suit.  Philip Green found
that there was technological comparability by relying on the testimony of Mr. O'Keefe,
Plaintiffs' technical expert.  (*See* D.I. 627 at 4-5)  Now it is true that, as CERT notes, at one point
on cross-examination, Mr. O'Keefe responded "[n]o, they're not" when asked if the Chem-Mod
patents were "technically comparable" to the asserted patents.  (D.I. 783 at 679-80; *see also* D.I.
721 at 14)  But in that same discussion, Mr. O'Keefe quickly added that he believed that the
Chem-Mod patents "achieve the same result" as do the patents-in-suit.  (D.I. 783 at 679-80)  And

---

[20]     CERT moved for reconsideration, (D.I. 639), and the Court denied that motion as
well, (D.I. 677).  CERT's motion for reconsideration was focused on its assertion that Philip
Green erroneously based his royalty opinions on the value of tax credits.  (D.I. 639 at 6-7)

elsewhere, Mr. O'Keefe provided some explanation about what each Chem-Mod patent covered and why all such patents relate to "mercury removal from power plant emissions"—a fairly specific field of technology, and one that Mr. O'Keefe noted was in the "same field of technology" as the asserted patents. (*Id.* at 646-47, 716-17, 743; *cf.* D.I. 627 at 3-6 (citing cases)) And so despite his brief response to that one question on cross, Mr. O'Keefe otherwise did provide a sufficient basis for Philip Green to consider the Chem-Mod licenses to be technologically comparable to the patents-in-suit. *See Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1374 (Fed. Cir. 2020); *see also Willis Elec. Co. v. Polygroup Ltd.*, Case No. 15-cv-3443 (JNE/DTS), 2024 WL 3102257, at *11 (D. Minn. June 24, 2024) (noting that the "degree of comparability between license agreements . . . is a factual issue best resolved by the jury" and concluding that where "the patentee's expert provides some explanation of why she viewed certain licenses as [technologically] comparable, and the accused infringer has an opportunity to challenge that testimony through cross-examination and contrary evidence, the jury's damages award should not be disturbed simply because it rests in part on licenses that are not perfectly analogous").

CERT next argues that Philip Green did not sufficiently explain how the Chem-Mod licenses were economically comparable to the type of patent license that would come out of the hypothetical negotiation here. (D.I. 721 at 14-15) More specifically, CERT asserts that these licenses should not have been utilized because (unlike as to a hypothetical negotiation between Plaintiffs and CERT): (1) these Chem-Mod agreements involved a closed "common structure" of companies, and were a part of a larger plan to earn and obtain Section 45 tax credits; and (2) these agreements included other distinguishing features, such as the provision of certain engineering, technical, financial and business support. (*Id.* at 14) But in the Green *Daubert*

28

opinion, the Court explained why Philip Green had taken steps in his use of the licenses to account for the concerns that CERT raises here. (D.I. 627 at 6-9) And during trial, Philip Green provided testimony explaining why the economic structure of these agreements would have been similar to that of any license arising out of the hypothetical negotiation. (D.I. 783 at 746-47) CERT's briefing as to this argument, (D.I. 721 at 14), which does not cite to any portion of the trial transcript—and instead cites only to a part of the record at the summary judgment/*Daubert* stage—gives the Court no reason to revisit its prior *Daubert* decision on this score,[21] *see, e.g.*, *Trs. of Columbia Univ. in City of N.Y.*, 2023 WL 8698906, at *3.

Lastly, CERT argues that Philip Green did not sufficiently apportion the value of the Chem-Mod licenses to the patented technology, in that: (1) he assigned the entire Chem-Mod licenses to mercury emission reduction technology alone; when (2) those licenses provided additional benefits that have nothing to do with the patented technology, such as "technology for NOx reduction and consulting and business services relating to Section 45[.]" (D.I. 721 at 15; D.I. 783 at 746-47, 777-79) As with the prior argument above, CERT's position here is unchanged from the argument it made at the *Daubert* stage (and CERT cites only to the record at that stage—not to any relevant testimony from trial). (D.I. 721 at 15) Again, the Court sees no reason to depart from its contrary view set out in the Green *Daubert* opinion. (D.I. 627 at 9-11; *see also* D.I. 727 at 18 (citing D.I. 783 at 779)); *see, e.g.*, *Trs. of Columbia Univ. in City of N.Y.*, 2023 WL 8698906, at *3.

For these reasons, CERT's Motion is denied to the extent that it is premised on these alleged damages-related errors.

---

[21] In its reply brief, CERT does not raise the economic comparability issue, (D.I. 737 at 8); so again, it is unclear as to how hard CERT is really pressing that issue here.

### 3.     Testimony of Jeff Green

Next, CERT argues that the Court erred in allowing its representative Jeff Green to testify (over CERT's objection) that the CERT entity that he owns has received approximately $50 million during the refined coal program.  (D.I. 721 at 15-17 (citing D.I. 783 at 852-55, 857-60)) According to CERT, the testimony at issue was irrelevant, and its admission was prejudicial because:  (1) it is improper to admit overall revenues associated with an infringing product without satisfying the entire market value rule (i.e., by showing that the patented features drive demand for the entire product), which Plaintiffs did not do here; and (2) it caused the jury to base its damages award on the lucrative nature of the Section 45 tax credit program.  (*Id.* at 16-17)

The Court declines to order a new trial on this ground.  While CERT speculates that the jury relied on this testimony in calculating the appropriate amount for its total damages award, CERT does not point to any portion of the record wherein Philip Green or Plaintiffs referred to this amount in relation to Plaintiffs' request for damages.  (*See* D.I. 727 at 19)  As Plaintiffs retort, the testimony at issue is not relevant to damages.  But it *is* relevant instead to Jeff Green's[22] alleged bias and personal interest in the accused infringement, as well as to CERT's asserted motivation/intent to indirectly infringe the asserted patents.  (*Id.*; D.I. 791 at 22-23 (the Court, in its JMOL decision, explaining why CERT's financial motives to infringe could be relevant to the intent to induce infringement) (citing cases); *see also* D.I. 624; D.I. 628); *cf. Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1025 (Fed. Cir. 2009)

---

[22]     The Court is puzzled by CERT's argument that "neither Mr. [Jeff] Green nor the LLC of which he is the owner is a party to this case[,]" and that this helps to demonstrate that the testimony at issue was irrelevant.  (D.I. 721 at 16)  Jeff Green was the corporate representative for each of the CERT Defendants; he spoke for them in Court, and his intent was their intent for purposes of this trial.  (D.I. 727 at 19)  In that way, Jeff Green *was* the CERT Defendants.

(agreeing that the defendant's references to plaintiff's wealth had a "proper use[]" in proving the bias of plaintiff's witnesses).

### F.    Jury's Verdict Regarding Damages

CERT also argues that a new trial on damages is warranted because the jury verdict is against the clear weight of the evidence. (D.I. 721 at 17-18) The jury's award of over $57 million dollars was based on Plaintiffs' highest requested basis for damages—i.e., a calculation that utilized a rate of $1 per ton of refined coal. (*See* D.I. 783 at 769; D.I. 785 at 1218; D.I. 692 at 8) Philip Green's damages analysis in this regard made use of the Alistar license agreement (containing a running royalty of $1 per ton of coal) as well as the Chem-Mod licenses discussed above (containing running royalties of $0.50 to $0.65 per ton of coal). (D.I. 783 at 737-48) CERT contends that the Alistar license should not be accorded any weight because it is a "litigation settlement entered into by a fellow defendant on the eve of trial years after the date of the hypothetical negotiation including patents not at issue here[.]" (D.I. 721 at 17) As for the Chem-Mod licenses, CERT reiterates its arguments discussed and rejected above. (*Id.* at 17-18) CERT then argues that the jury should have awarded a royalty rate "of at most tenths and down to hundredths or thousandths of a penny per ton of coal" in light of certain licenses of record that CERT favors: i.e., lower-value licenses that Plaintiffs entered into with several utility operators that were former Defendants in the case. (*Id.* at 18)

This argument is also unavailing. Based on evidence in the record, the jury could reasonably have credited the Alistar license and Chem-Mod licenses over the other licenses— and thus agreed with Plaintiffs that the other licenses were less useful, since, *inter alia*, they were with power plants that were also simultaneously agreeing to purchase certain products from Plaintiffs. (*See, e.g.*, D.I. 782 at 393, 425-26, 472; D.I. 783 at 737-43; *see also* D.I. 727 at 14)

There is simply no basis to disturb the jury's damages award on this ground. *See Willis Elec. Co.*, 2024 WL 3102257, at *13 (explaining that the jury's decision to credit the plaintiff's expert's damages methodology over the defendant's expert's testimony and other contrary evidence "was within its proper fact-finding role and does not warrant overturning the verdict"); *see also Mass Engineered Design, Inc. v. Planar Sys., Inc.*, Case No. 3:16-cv-1510-SI, 2017 WL 11820360, at *12 (D. Or. Aug. 31, 2017) ("If the settlement agreements involve the same technology, involve settlements relating to the value of the patented technology, were reached after a determination of liability, or have other indicia of reliability, then proper jury instructions, admissible evidence, and argument are sufficient to enable the jury to arrive at a fair damages award, should the jury find infringement."); *Intell. Ventures I LLC v. Symantec Corp.*, C.A. No. 10-1067-LPS, 2016 WL 937220, at *4 (D. Del. Mar. 10, 2016) ("Mr. Wagner and Dr. McDaniel presented substantial evidence that the settlement agreements 'relate to the actual patents-in-suit' or are 'drawn to related technology,' . . . and thus are sufficiently comparable to be used as the basis for determining an appropriate royalty rate.").

### G.    Direct Infringement of Claim 2 of the '517 Patent

Finally, CERT moves for a new trial on infringement of claim 2 of the '517 patent.  Here, CERT asserts that the jury's verdict is against the weight of the evidence.  (D.I. 721 at 18-20; D.I. 737 at 10)  Claim 2 of the '517 patent depends from claim 1, which requires, *inter alia*, "combusting coal in a combustion chamber . . . to form the mercury-containing gas[.]"  (D.I. 751, PTX-003.0040)  Claim 2 then recites "[t]he method of claim **1**, further comprising injecting an alkaline sorbent into the mercury-containing gas stream."  (*Id.*)

CERT interprets claim 2 as requiring the alkaline sorbent to be injected into the mercury-containing gas *after* the coal has been combusted in the combustion chamber.  (D.I. 721 at 19;

32

D.I. 737 at 10)  According to CERT, Mr. O'Keefe's testimony established that claim 2 was not

infringed, (D.I. 721 at 19), because:

- Mr. O'Keefe testified that S-Sorb is the "alkaline sorbent" required by claim 2.  (D.I. 783 at 615-16);

- It is undisputed that S-Sorb is a powder that CERT applied to feedstock coal during the refining process, i.e., *before* the coal is combusted in the combustion chamber.  (*Id.* at 615-16, 663-64; D.I. 784 at 992-93);

- Mr. O'Keefe testified that S-Sorb is not injected into the mercury-containing gas.  (D.I. 783 at 663-64)

Thus, CERT argues that there is no evidence that S-Sorb was injected into the mercury

containing gas after the coal has been combusted in the combustion chamber as required by

claim 2; therefore, it argues that the jury's verdict of infringement is against the clear weight of

the evidence and promotes a manifest injustice.  (D.I. 721 at 19)[23]  Additionally, CERT contends

that a new trial is required regarding damages as well.  This is purportedly because the damages

award was based on a finding of infringement of all four asserted claims, including claim 2 of the

'517 patent—and so the jury may have rested some part of its damages award on a finding of

infringement of claim 2.  (*Id.* at 19-20; D.I. 737 at 10)

　　　　Plaintiffs retort that the scope of claim 2 of the '517 patent permits adding the alkaline

sorbent (i.e., S-Sorb) to the coal *before* it is combusted.  (D.I. 727 at 20)  Plaintiffs thus argue

that Mr. O'Keefe's testimony regarding infringement was consistent with this understanding and

provided sufficient evidence to support the jury's decision as to direct infringement of the claim.

(*Id.*)

---

[23]　　　"There can be no inducement or contributory infringement without an underlying act of direct infringement."  *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004).

As an initial matter, the Court notes that after years of litigation, it believes that this is the first it is hearing about CERT's non-infringement position regarding this particular portion of claim 2 of the '517 patent.  Neither party sought to construe any of the words found in claim 2 at the *Markman* hearing, (*see* D.I. 392), nor anytime thereafter prior to the close of trial.  At trial, although it appears that CERT's counsel asked Mr. O'Keefe a few questions about this claim language during cross-examination, (D.I. 783 at 663-64), so far as the Court can tell, CERT never raised this particular non-infringement argument to the jury during its closing argument, (*see, e.g.*, D.I. 785 at 1232-33).  Thus, when it came to any words in the claims that were not construed by the Court (like the words in claim 2), the jury was simply instructed to apply the plain and ordinary meaning that such terms would have to a person of ordinary skill in the art. (D.I. 689 at § 3.3; D.I. 785 at 1288)

The problem with CERT's argument is that it rests on an asserted claim construction dispute—i.e., what is the meaning of "injecting an alkaline sorbent into the mercury-containing gas stream" in claim 2, and does it encompass a scenario wherein the sorbent is placed onto coal upstream of the combustion chamber?  (*See* D.I. 737 at 10)  But it is well-settled that "where the parties and the district court elect to provide the jury only with the claim language itself, and do not provide an interpretation of the language in the light of the specification and the prosecution history, it is too late at the [post-trial briefing] stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation."  *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1321 (Fed. Cir. 2003); *see also, e.g.*, *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302, 1311-12 (Fed. Cir. 2017) (rejecting the defendant's assertion that there was insufficient evidence for the jury to find that a particular limitation of the asserted claims was met, where the

jury was instructed to apply the plain and ordinary meaning of claim terms, because neither party asked for a construction of the term at issue and because if the defendant had desired a narrower definition, it could have and should have sought such a construction earlier in the case); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008) ("Qualcomm here has failed to offer its proposed construction of 'networks' at or prior to trial, and we reject such arguments raised for the first time after the jury verdict.").

As was noted above, CERT did not seek claim construction regarding claim 2 of the '517 patent before trial or during trial. This was so even though it was clear that Plaintiffs and Mr. O'Keefe: (1) were relying on S-Sorb being applied to coal before it enters the boiler as an act that would infringe claim 2; and (2) did not agree that in order to infringe the '517 patent, the sorbents had to be injected downstream of the boiler. (D.I. 783 at 615-16, 663-64) "When a claim phrase is not construed, we defer to the jury's view of the claim element unless that view is contrary to the only reasonable view of the claim element." *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1341 (Fed. Cir. 2023). And although there could be some merit to CERT's belated claim construction position, at this point, the Court cannot conclude that it was absolutely unreasonable for the jury to find that "[b]ecause S-Sorb is applied to the coal before it is pulverized, and because the boiler undeniably includes mercury-containing gas, each of the directly infringing power plants inject an alkaline sorbent into a mercury[-]containing gas as required by" claim 2 of the '517 patent. (D.I. 727 at 20); *see also Moskowitz Fam. LLC v. Globus Med., Inc.*, CIVIL ACTION NO. 20-3271, 2024 WL 3792390, at *3-7 (E.D. Pa. Aug. 13, 2024) (denying plaintiff's JMOL motion or alternative motion for a new trial, where the plaintiff did not raise any claim construction issues regarding the "cooperating" claim limitation prior to or during trial, such that the term at issue was given its plain and ordinary meaning to a person of

skill in the art—and doing so on the ground that there was sufficient evidence from which a jury reasonably could find infringement based on that plain and ordinary meaning); *see also Comcast IP Holdings I LLC*, 850 F.3d at 1311-12.

CERT's Motion is therefore denied on this ground.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that CERT's Motion should be DENIED. An appropriate Order will issue.